IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

ROBERT THOMAS CONRAD,   )
#226791                 )
                        )
            Petitioner, )
                        )
vs.                     )        Civil Action No. 1:08cv32-WKW
                        )
GRANT CULLIVER, WARDEN, )
*et al.,*               )
                        )
            Respondent. )

**RESPONSE TO FEDERAL HABEAS PETITION**

Come now the Respondents in the above styled cause by and through the

Attorney General of the State of Alabama and in response to this Court's order

make the following response to Conrad's federal habeas corpus petition.

1. Conrad is currently incarcerated in the state prison serving a sentence of

life without the possibility of parole (as an habitual offender) pursuant to his

September 2, 2002, conviction of capital murder (murder during robbery) in the

Circuit Court of Coffee County, Alabama (CC-01-179 and CC-01-180).

2. Respondents aver that Conrad's claim that he was denied due process and

a fundamentally fair trial when he was "tried, convicted and sentenced by a partial

trial judge" who allegedly made pretrial remarks that "all defendants who come

before him in court would receive active prison time, if they are found guilty or plead guilty to a violent crime" is procedurally defaulted.

3.  Respondents aver that Conrad's claim that he was denied a fair trial when the prosecution failed to disclose "exculpatory and impeachment evidence" that "an Internal Affairs investigation had been conducted regarding misconduct of one of its investigators into this crime" is procedurally defaulted, and further, even if not defaulted, warrants no relief because he has not shown that the state court's decision conflicted with established federal law as set forth by the United States Supreme Court.

4.  Respondents aver that Conrad's claim that he received ineffective assistance of counsel when counsel failed to object to the oath not being administered to the venire is procedurally defaulted.

5.  Respondents aver that Conrad's claim that he received ineffective assistance of counsel when counsel failed to move to dismiss the indictment when it allegedly "tracked only part of the elements of §13A-5-40(a)(2) Code of Ala. 1975 (sic), but is devoid of the material elements of the complete capital murder statute" is procedurally defaulted.

6.  Respondents aver that Conrad's claim that he was denied effective assistance of counsel when counsel failed to challenge the indictment because it "was secured through the indictment clause of the Alabama Constitution of 1901

2

which was enacted to establish white supremacy [ ] and to disfranchise (sic) African Americans" is  procedurally defaulted.

7. Respondents aver that Conrad's claim that he was denied effective assistance of counsel when counsel failed to object to the "erroneous jury instruction on uncorroborated testimony of the codefendant" contrary to Section 12-21-222 of the Code of Alabama (1975) is procedurally defaulted.

8.  Respondents aver that Conrad's claim that he was denied effective assistance of counsel when counsel failed to "request a continuance and/or mistrial based on the prosecution withholding exculpatory and impeachment evidence" is procedurally defaulted.

9.  Respondents aver that Conrad's claim that he was denied effective assistance of counsel when counsel failed "to seek recusal o f the trial judge based on bias and impartiality" is procedurally defaulted.

10.  Respondents aver that Conrad's claim that he was denied effective assistance of counsel based on counsel's alleged conflict of interest due to counsel's being a member of the victim's church and that the victim's three children were "all members of the Sunday School class in which counsel was your director and teacher" is  procedurally defaulted.

11.  Respondents aver that Conrad's claim that he was denied effective assistance of counsel when counsel "failed to advise him of his right to take the stand and testify in his own defense" is procedurally defaulted.

12.  Respondents aver that Conrad's claim that he was denied effective assistance of counsel "when counsel was forced to become a witness in the case against him" because during the trial, "counsel was forced to reveal the identity of the source that gave him information regarding the district attorney['s] withholding of exculpatory and impeachment evidence" is procedurally defaulted.

13.  Respondents aver that Conrad's claim that he was denied effective assistance of counsel when counsel failed to "move to dismiss the indictment" on the ground that the "Alabama Death Penalty Act" is unconstitutional because "it was drafted by a committee called three branches of government while elected, in violation of the principle of separation of powers expressed in Art III (sic), sections 42 and 43, Art. I, II, and III of the United States Constitution" is procedurally defaulted.

14.  Respondents aver that Conrad's claim that he was denied effective assistance of appellate counsel when counsel failed to raise on direct appeal the issue that the bullet removed from his body was the product of an illegal search and seizure because it was seized pursuant to a subpoena issued by the district attorney is  procedurally defaulted.

15.   Respondents aver that Conrad's claim that he received ineffective assistance of counsel when his counsel, Gary Bradshaw, "filed a motion to withdraw, citing grounds that he had a close relationship with the victim's family" is procedurally defaulted.

16.   Respondents aver that Conrad's claim that he was "denied his fourteenth amendment right to due process and a fair trial when he was indicted under a statute that violates the separation of powers doctrine of the federal and state constitution" is   procedurally defaulted, and further, is due no relief because he has not shown that the state court's decision conflicts with established federal law as set forth by the United States Supreme Court.

17.   Respondents aver that Conrad's claim that he was denied a fair trial when he was convicted on "false, misleading and inadmissible evidence" from the Alabama Department of Forensic Sciences, which was unaccredited at the time the evidence in his case was tested, is procedurally defaulted.

18.   Respondents deny that any of Conrad's federal constitutional rights have been violated by the State of Alabama incident to his conviction and sentence in this case.

19.  By asserting the defense of procedural default, Respondents do not waive the future assertion of other applicable defenses.

20.  Respondents aver that based on this answer and the accompanying exhibits, this petition is due to be denied with prejudice.

## CHRONOLOGY OF THE CASE

Robert Thomas Conrad was indicted by a Coffee County Grand Jury on May 31, 2001, and charged with capital murder and robbery in the first degree.  (Exhibit A, pgs. 6, 7)

In the "order on initial appearance", issued May 31, 2001, the circuit judge appointed Mr. Don Putman to represent Conrad in this case and appointed Mr. Gary Bradshaw as co-counsel.  (Exhibit A, pgs. 13, 16)  On June 1, 2001, Mr. Bradshaw filed a motion to withdraw as did Mr. Putman on June 1, 2001.  (Exhibit A, pgs. 20, 22)  The trial court issued a written order on June 6, 2001, allowing Mr. Pittman to withdraw and ordering Mr. Al Smith to represent Conrad.  (Exhibit A, pg. 24)  Mr. Bradshaw's motion to withdraw was denied in that same order. (Exhibit a, pgs. 24, 25)

Conrad's application for youthful offender status was denied. (Exhibit A, pg. 27)  Trial commenced on September 27, 2002, at which time, Conrad was represented by appointed counsel, Mr. Albert Smith and Mr. Garry D. Bradshaw. (Exhibit A, pg. 1) The jury found Conrad guilty of capital murder and robbery in the first degree.  (Exhibit A, pgs. 1338, 1539) The jury returned a sentence

recommendation of life without the possibility of parole. (Exhibit A, pg. 1615) At the request and upon the agreement of the State, the trial court imposed sentence at the conclusion of the sentencing phase of the trial instead of setting a separate sentencing date and waiting for a presentence report. (Exhibit A, pg. 1617) The trial court sentenced Conrad to life without the possibility of parole.

Conrad filed a motion for new trial, which was denied by the trial court. Mr. Bradshaw was reappointed to represent Conrad on appeal and Mr. Al Smith was allowed to withdraw as counsel on December 13, 2002. (Exhibit A, pg. 1303) On that same date, Mr. Richard Waldrop was appointed to assist Mr. Bradshaw in representing Conrad on appeal. Conrad raised the following issues on appeal:

1. "Whether the trial court's impermissibly considering matters outside of the record in conducting the trial of appellant constituted plain error.

2. "Did the trial court commit reversible error when evidence presented at trial established a missing link in the chain of custody of essential evidence and the trial judge allowed such evidence to be admitted over objection of defendant to exclude same.

3. "Whether the trial court committed reversible error by (A) denying defendant's motion to dismiss the case after the court's own ruling that the state had withheld exculpatory and impeachable evidence and (B) whether the trial court denied Robert Conrad's constitutional right to a fair and impartial trial by forcing him to proceed and allowing testimony of the co-defendant, Brian Yeoman, when his defense counsel was not given exculpatory and impeachable evidence until midway of the trial."

(Exhibit B, pg. 5)  On October 24, 2003, the Alabama Court of Criminal Appeals issued a memorandum brief affirming Conrad's conviction and sentence.  (Exhibit D)    On November 5, 2003, Conrad filed an application for rehearing  (Exhibit E), which the Court of Criminal Appeals overruled on November 14, 2003. (Exhibit F) Conrad petitioned the Alabama Supreme Court for certiorari review on November 21, 2003.  (Exhibit G)  On January 16, 2004, the Alabama Supreme Court denied the petition and issued a certificate of judgment.  (Exhibit H)

Conrad  filed a Rule 32 petition in the Coffee County Circuit Court on January 7, 2005 (Exhibit I, pg. 11; Exhibit L), challenging his convictions of capital murder and of robbery in the first degree and resulting sentences of life without parole and life, respectively.  (Exhibit I, pg. 4)  Conrad raised the following claims in his Rule 32 petition:

1.  that trial counsel failed to object to the oath not being administered before voir dire examination by the court and attorneys in violation of Rule 12.1(c), A.R.Cr.P. (Exhibit I, pgs. 13-14);

2.  that trial counsel failed to object on the basis that the sentence was illegal "due to the fact that the petitioner's sentence was illegal due to his indictment only setting forth the material elements of robbery third degree, which resulted in petitioner being convicted and sentenced beyond the maximum authorized by law" (Exhibit I, pg. 15);

3.  that counsel failed to move to dismiss the indictment "where the grand jury foreman failed to endorse upon the indictment whether a prosecutor appeared or not before the grand jury as required by §12-16-205" (Exhibit I, pg. 18);

4.  that counsel failed to object to the trial judge swearing in the petit jury instead of the circuit clerk as required by Section 12-16-170 of the Code of Alabama (1975) (Exhibit I, pgs. 20-21);

5.  that counsel failed to move to dismiss the indictment on the basis that it failed to allege an essential element to wit: the aggravating circumstance(s) (Exhibit I, pgs. 23-24);

6.  that counsel failed to move to dismiss the second count in the indictment because the elements in the second count charging first degree robbery were the same facts encompassed in the capital murder charge alleging murder plus first degree robbery (Exhibit I, pg. 30); and,

7.  that the indictment was void because it was based upon a capital murder statute that violated the Separation of Powers Doctrine because it was drafted by a commission comprised of individuals from all three branches of government (Exhibit I, pgs. 27-29);

8.  that counsel was ineffective for failing to challenge the indictment based on the fact that it was obtained pursuant to the Alabama Constitution of 1901, which he alleges, "was enacted to establish white supremacy in the State of Alabama and to disfranchise (sic) African Americans" (Exhibit I, pg. 32); and,

9.  that trial counsel was ineffective for failing "to object to the erroneous jury instruction on uncorroborated testimony of the codefendant".  (Exhibit I, pg. 34).

On April 1, 2005, the district attorney filed a response asserting that the petition was due to be dismissed on the basis that the grounds were precluded pursuant to Rule 32.2 (a)(3) and (5) as well as Rule 32.2(c) of the Alabama Rules of Criminal Procedure.  (Exhibit I, pgs. 85-92) The district attorney also alleged the petition was due to be denied for lack of merit.  (Exhibit I, pgs. 85-92) Conrad filed a

motion to amend his petition on April 9, 2005, raising the following additional

claims.

> 1.  that trial counsel was ineffective for failing to move for a
> continuance when it was discovered during the trial that "the
> prosecutor had withheld a report regarding an internal investigation by
> the Enterprise Police Department" indicating that the district
> attorney's office knew about the plan to rob the toy store before the
> incident for which Conrad was convicted occurred (Exhibit I, pg.
> 115);
>
> 2.  that trial counsel failed to move to have the trial judge recuse on
> the basis of bias toward Conrad based on a pretrial comment and
> calling defense counsel "Tom, Dick, and Harry" during the trial
> (Exhibit I, pg. 116);
>
> 3. that trial counsel, Mr. Bradshaw, had a conflict of interest because
> he allegedly went to church with the victims and the victim's children
> were allegedly in the Sunday School class taught by Mr. Bradshaw
> (Exhibit I, pg. 117);
>
> 4.  that trial counsel filed two pretrial motions to suppress the bullet
> removed from Conrad's body but failed to object when the bullet was
> admitted into evidence (Exhibit I, pg. 118);
>
> 5.  that trial counsel failed to advise Conrad that he could testify at
> trial in his own behalf (Exhibit I, pg. 119);
>
> 6.  that trial counsel was forced to testify in a hearing during the trial
> and thereby creating a conflict of interest (Exhibit I, pg. 119); and,
>
> 7.  that newly discovered evidence required a new trial to wit: that the
> Department of Forensic Sciences was not accredited.

(Exhibit I pgs. 115-122)  The State filed a response to the amended claims on June

30, 2005, alleging that those amended claims were precluded pursuant to Rules

32.2(a)(5) and 32.2(c) of the Alabama Rules of Criminal Procedure and further, were without merit. (Exhibit I, pgs. 129-133)

On June 17, 2005, Judge Kelley issued a written order setting a hearing on the petition for December 2, 2005, and appointing the Honorable Rick Hollingsworth, Sr. to represent Conrad. (Exhibit I, pg. 137) On August 15, 2005, Conrad again moved to amend his Rule 32 petition to raise the following claim:

    1. that the capital murder statute violated the Separation of Powers Doctrine (basically a reprise of the same claim made earlier).

(Exhibit I, pgs. 150-154) On August 25, 2005, the district attorney filed a response to the second amended petition alleging that his second amended petition was due to be summarily denied. (Exhibit I, pgs. 155-156)

Following a hearing on December 2, 2006, Judge Kelley issued a detailed written order on March 17, 2006, denying the petition. (Exhibit I, pgs. 182-192) Conrad appealed pro se raising the following issues on appeal.

    1. "Whether the trial court abused its discretion in denying the petition?

    2. "Whether appellant was denied effective assistance of trial counsel?

    3. "Whether appellant was denied effective assistance of counsel on direct appeal?

    4. "Whether the trial court had jurisdiction to render judgment or to impose sentence?

    5.  "Newly discovered evidence exist (sic) requiring a new trial or other relief based on the false and misleading evidence presented at appellant's trial by employees of the Alabama Department of Forensic Sciences?"

(Exhibit J, pg. 2)  On August 24, 2007, the Alabama Court of Criminal Appeals issued a written memorandum opinion affirming the trial court's denial of Conrad's Rule 32 postconviction petition.  (Exhibit L)  Conrad filed an application for rehearing on September 18, 2007 (Exhibit M), which was overruled on September 28, 2007.  (Exhibit N) Conrad petitioned the Alabama Supreme Court for certiorari review on October 9, 2007. (Exhibit O)  On November 14, 2007, the Alabama Supreme Court denied the petition and entered a certificate of judgment. (Exhibit P)

    On January, 10, 2008,   Conrad filed this present federal habeas petition raising the following grounds for relief:

    1.  that he was denied due process  and a fundamentally fair trial when he was "tried, convicted and sentenced by a partial trial judge" who allegedly made pretrial remarks that "all defendants who come before him in court would receive active prison time, if they are found guilty or plead guilty to a violent crime";

    2.  that he was denied a fair trial when the prosecution failed to disclose "exculpatory and impeachment evidence" that "an Internal Affairs investigation had been conducted regarding misconduct of one of it's investigators into this crime";

    3.  that he received ineffective assistance of counsel when counsel failed to object to the oath not being administered to the venire;

4.  that he was denied effective assistance of counsel when counsel failed to move to dismiss the indictment when it allegedly "tracked only part of the elements of §13A-5-50(a) (2) Code of Ala. 1975 (sic), but is devoid of the material elements of the complete capital murder statute";

5.  that he was denied effective assistance of counsel when counsel failed to challenge the indictment because, allegedly, his indictment "was secured through the  indictment clause of the Alabama Constitution of 1901 which was enacted to establish white supremacy in the State of Alabama and to disfranchise (sic) African Americans";

6.  that he was denied effective assistance of counsel failed to object to the "erroneous jury instruction on uncorroborated testimony of the codefendant" contrary to §12-21-222 of the Code of Alabama (1975);

7.  that he was denied effective assistance of counsel when counsel failed "to request a continuance and/or mistrial based on the prosecution withholding exculpatory and impeachment evidence";

8.  that he was denied effective assistance of counsel when counsel failed "to seek recusal of the trial judge based on bias and impartiality";

9. that he was denied effective assistance of counsel based on counsel's alleged conflict of interest due to counsel's being a member of the victim's church and that the victim's three children were "all members of the Sunday School class in which counsel was youth director and teacher";

10.  that he was denied effective assistance of  counsel when counsel "failed to advise him of his right to take the stand and testify in his own defense";

11.  that he was denied effective assistance of counsel "when counsel was forced to become a witness in the case against him" because during the trial, "counsel was forced to reveal the identity of the source that gave him information regarding the district attorney['s] withholding of exculpatory and impeachment evidence";

12.  that he was denied effective assistance of counsel when counsel failed to "move to dismiss the indictment" on the ground that the "Alabama Death Penalty Act" is unconstitutional because "it was drafted by a committee called three branches of government while elected, in violation of the principle of separation of powers expressed in Art III (sic), section 42 and 43, Art. I, II and III of the United States Constitution";

13.  that he was denied effective assistance of counsel when counsel failed to raise on direct appeal the issue that the bullet removed from his body while in the hospital was the product of an illegal search and seizure  because it was seized from his body pursuant to a subpoena issued by the district attorney;

14.  that he received ineffective assistance of counsel when his counsel, Gary Bradshaw, "filed a motion to withdraw, citing grounds that he had a close relationship with the victim's family";

15.  that he was "denied his fourteenth amendment right to due process and a fair trial when he was indicted under a statute that violates the separation of powers doctrine of the federal and state constitution"; and,

16.  that he was denied his a fair trial when he convicted on evidence that he alleges was false, misleading and inadmissible to wit:  forensic evidence coming from the Alabama Department of Forensic Sciences, which "recently openly admitted that its laboratories was (sic) deficient  at the time of [his] trial".

## STATUTE OF LIMITATION

Conrad's conviction became final in state court on January 16, 2004, with the issuance of a certificate of judgment.  Adding ninety days to that date in which Conrad could have sought certiorari review in the United States Supreme Court, the statute of limitation commenced in this case on April 16, 2004.   The statute of

limitation continued to run until it was tolled by the filing of Conrad's Rule 32

postconviction petition on January 7, 2005.  (Exhibit I, pg. 10)   (A total of 262

days passed until the one year statute of limitation was tolled by the filing of  a

Rule 32 postconviction.)   The time remained tolled until the Rule 32 proceeding

became final in state court with the issuance of a certificate of judgment on

November 9, 2007.    The statute of limitation resumed running on November 7,

2007 until the filing of the present §2254 petition on January 10, 2008.  (Sixty-four

days elapsed then).  As a total of  330 days  (266 + 64) elapsed  between the date

the conviction became final in state court and the filing of this present habeas

petition, this petition is within the one year statute of limitation.


## EXHAUSTION DOCTRINE

All of the grounds raised in this petition are exhausted.


## DISCUSSION OF GROUNDS

### GROUNDS ONE– Alleged Biased Trial Judge

Conrad alleges in his first ground that he was tried, convicted, and sentenced

by a partial trial judge.  Specifically, he alleges that "prior to his trial, the trial

judge made pre-trial remarks that all defendants who came before him in court

would receive active prison time, if they are found guilty or plead guilty to a

violent crime".   This issue is exhausted because it was raised in Conrad's direct

appeal. (Exhibit B, pg. 21; Exhibit D, pg. 3) This issue, however, is procedurally

defaulted for purposes of federal habeas review or relief.

On direct appeal, the Alabama Court of Criminal Appeals noted that Conrad

contended on appeal that the trial judge's "pre-sentence standing order that

'Criminal defendants who enter a guilty plea or who are convicted of any act of

violence, some active time in custody will be ordered served'" gave the appearance

of impartiality. (Exhibit D, pgs. 2-3) The Alabama Court of Criminal Appeals

held that :

> "However, the record does not indicate that the appellant objected to
> the trial court's actions on the ground that the trial judge was biased
> against him or that he requested that he trial judge recuse himself.
> Therefore, this issue is not properly before this Court. *See*, Ex parte
> Crawford, 686 So. 2d 196 (Ala. 1996); Acoff v. State, 435 So. 2d
> 224 (Ala. Crim. App. 1983)."

When state courts find an issue procedurally defaulted under state law, a federal

court, on habeas review, is bound to respect that default and to decline to hear the

claim unless a petitioner either shows cause for the procedural default and actual

prejudice, or a resulting fundamental miscarriage of justice. Harmon v. Barton,

894 F.2d 1268, 1270 (11th Cir. 1990) ("We have held that where the state court

correctly applies a procedural default principle of state law, Wainwright v. Sykes,

433 U.S. 72 (1977), requires the federal court to abide by the state court's

decision." Therefore, until the procedural default has been resolved adversely to

Conrad, this Court should decline any further review of this issue.  Jones v. White, 992 F. 2d 1548, 1566-67 (11th Cir. 1993).

## GROUND TWO – Failure to Disclose Exculpatory Evidence

Conrad contends that he was denied due process and a fundamentally fair trial when the prosecution failed to disclose "exculpatory and impeachment evidence favorable" to him.  He alleges that "during the course of the trial and on cross examination of a State's witness, it was learned that an Internal Affairs investigation had been conducted regarding misconduct of one of it's investigators into this crime.  He further states that the trial court reviewed the materials and found them to contain both exculpatory and impeachment evidence that should have been turned over to the defense.

This claim is exhausted because it was raised on direct appeal in the Alabama Court of Criminal Appeals and the Alabama Supreme Court.  (Exhibits B and G)    This ground, however, is not properly reviewable on federal habeas because the last state appellate court addressing the claim found it procedurally defaulted.  The Alabama Court of Criminal Appeals held that Conrad "raised this argument for the first time in his supplemental motion for a new trial.  Therefore, it is not properly before this court.  *See* Saffold v. State, 627 So. 2d 1107 (ala. Crim. App. 1993)".   (Exhibit D, pg. 8)  When state courts find an issue procedurally defaulted under state law, a federal court, on habeas review, is bound to respect

17

that default and to decline to hear the claim unless a petitioner either shows cause for the procedural default and actual prejudice, or a resulting fundamental miscarriage of justice. Harmon v. Barton, 894 F.2d 1268, 1270 (11th Cir. 1990) ("We have held that where the state court correctly applies a procedural default principle of state law, Wainwright v. Sykes, 433 U.S. 72 (1977), requires the federal court to abide by the state court's decision." Therefore, until the procedural default has been resolved adversely to Conrad, this Court should decline any further review of this issue. Jones v. White, 992 F. 2d 1548, 1566-67 (11th Cir. 1993).

Furthermore, even if this claim was not procedurally barred it would be entitled to no relief in this Court because the state court additionally found the claim to be without merit. The Court of Criminal Appeals found that "[Conrad] did not show that he was prejudiced by the State's late disclosure of the report about the internal investigation or that he did not receive a fair trial as a result of the late disclosure. Therefore, his argument is also without merit." (Exhibit D, pg. 8) Because Conrad's claim was also decided on the merits in state court, he "is not entitled to relief unless he can establish that the state court's decision was 'contrary to or involved an unreasonable application of, clearly established Federal law,' " or 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'"

Stephens v. Hall, 407 F. 3d 1195, 1201-1202 (11th Cir. 2005) *quoting*, 28 U.S.C.

§2254(d); *see also*, Robinson v. Moore, 300 F. 3d 1320, 1342 (11th Cir. 2002).

Moreover, factual findings made by a state court shall be presumed to be correct

and the petitioner shall have the burden of rebutting the presumption by clear and

convincing evidence.  Id.; 28 U.S.C. §2254(e) (1).    Conrad cites no United States

Supreme Court decision that shows that the rulings in the state courts were

contrary to, or involved an unreasonable application of, federal law as announced

by the Supreme Court.  Thus, because Conrad has failed in his initial burden to

make such a showing, no further review or relief is warranted.

## GROUNDS THREE, FOUR, FIVE, SIX, SEVEN, EIGHT, NINE, TEN, ELEVEN, AND TWELVE –Claims of Ineffective Assistance of Trial Counsel

In grounds three, four, five, six, seven, eight, nine, ten, eleven, and twelve as

set out above and in Conrad's petition, he alleges various claims of ineffective

assistance of trial counsel.  Each of those particular claims was raised in the trial

court in Conrad's Rule 32 petition and was presented to the Court of Criminal

Appeals and the Alabama Supreme Court.  Therefore, these claims are exhausted

for purposes of federal habeas corpus review.  However, as discussed below, they

are procedurally defaulted, and thus, warrant no further review or relief.

 "Federal courts do not review a procedurally defaulted state collateral claim

in a §2254 petition if the petitioner failed to substantially comply with a state

procedural rule, <u>Lee v. Kemna</u>, 534 U.S. 362, 375-76, 382 (202), the last state

court to review the claim clearly and expressly stated that its judgment rested on

the petitioner's failure to substantially comply with the state procedural rule, and

the rule was firmly established and regularly followed when applied by the state

court." <u>Jenkins v. Bullard</u>[1], 210 Fed. Appx.  895, 2006 WL 3635410  (11th Cir.

Dec. 13, 2006),  *citing* <u>Judd v. Haley</u>, 250 F. 3d 1308, 1313 (11th Cir. 2001); <u>Hill</u>

<u>v. Jones</u>, 81 F.3d 1015, 1022 (11th Cir. 1996).  In state court, Conrad presented

this claims of ineffective assistance of trial counsel in his Rule 32 postconviction

proceeding in state court.  The trial court denied the claims on the basis that he

failed to comply with Rule 32.6(b) of the Alabama Rules of Criminal Procedure.

On appeal the Court of Criminal Appeals held that:

> "In order to prevail on a claim of ineffective assistance of counsel, a
> petitioner must adequately plead facts indicating that (1) counsel's
> performance was deficient and (2) that the deficient performance
> actually prejudiced the defense." <u>Strickland v. Washington</u>, 466 U. S.
> 668 (1984).  Se e Rules 32.3 and 32.6(b), Ala. R. Crim. P.  If
> assuming that every factual allegation in Conrad's Rule 32 petition is
> true, Conrad has failed to plead facts suggesting that counsel's
> performance was deficient.  Because his ineffective assistance of
> counsel claims are nothing more than bare allegations, the circuit
> court correctly concluded that Conrad failed to sufficiently plead

---

[1] Respondents recognize that the Eleventh Circuit Court's opinion in <u>Jenkins</u> is an
unpublished opinion and therefore not controlling authority.  However, pursuant to
Eleventh Circuit Rule 36-2, this case is properly cited as persuasive authority and
is particularly important in that regard because it is on point with the present case
and indicates the mindset of  the Eleventh Circuit Court on this matter when it does
not appear to have been addressed directly in a published opinion.   A copy of  this
case is submitted as Exhibit Q to also be supplied to Conrad.

facts, as required in Rules 32.3 and 32.6(b), Ala. Code 1975, entitling
him to relief."

 (Exhibit L, pgs. 2-3)

Moreover, this state procedural rule has been "firmly established and

regularly followed by the Alabama courts" and the Court of Criminal Appeals has

consistently affirmed … lower court decisions that have summarily dismissed Rule

32 petitions that do not include specific facts which would entitle the petitioner to

collateral relief." Id. At 5, *citing* Shaw v. State, 949 So. 2d 184 - (Ala. Crim. App.

2006); Tubbs v. State, 931 So. 2d 66, 68 (Ala. Crim. App. 2005); Boyd v. State,

913 So. 2d 1113, 1126-32 (Ala. Crim. App. 2003); Chambers v. State, 884 So. 2d

15, 18-19 (Ala. Crim. App. 2003).

Accordingly, unless and until,  Conrad establishes cause for his default and

actual prejudice therefrom or a resulting fundamental miscarriage of justice he is

entitled to no further review or relief in this Court. Id.; Harmon v. Barton, 894

F.2d 1268, 1270 (11th Cir. 1990) ("We have held that where the state court

correctly applies a procedural default principle of state law, Wainwright v. Sykes,

433 U.S. 72 (1977),  requires the federal court to abide by the state court's

decision." ).  Therefore, until the procedural default has been resolved adversely to

Conrad, this Court should decline any further review of this issue. Jones v. White,

992 F. 2d 1548, 1566-67 (11th Cir. 1993).

## GROUNDS THIRTEEN AND FOURTEEN -- Ineffective Assistance
## Of Appellate Counsel

Conrad contends in grounds thirteen and fourteen that his appellate counsel was ineffective for failing raise the claims on appeal that the bullet taken from his body was inadmissible (13) and that trial counsel had a conflict of interest (14). These claims were raised in state court, albeit improperly when raised for the first time on appeal, but are exhausted for purposes of habeas corpus because there is no longer an adequate and proper legal forum in which to raise the grounds because another Rule 32 petition would be precluded as successive pursuant to Rule 32. 2(b) of the Alabama Rules of Criminal Procedure. Those grounds, however, are procedurally defaulted and warrant no further habeas review or relief.

"Federal courts do not review a procedurally defaulted state collateral claim in a §2254 petition if the petitioner failed to substantially comply with a state procedural rule, Lee v. Kemna,  534 U.S. 362, 375-76, 382 (202), the last state court to review the claim clearly and expressly stated that its judgment rested on the petitioner's failure to substantially comply with the state procedural rule, and the rule was firmly established and regularly followed when applied by the state

court." <u>Jenkins v. Bullard</u>[2], 210 Fed.Appx. 895, 2006 WL 3635410 (11th Cir.

Dec. 13, 2006), *citing* <u>Judd v. Haley</u>, 250 F. 3d 1308, 1313 (11th Cir. 2001); <u>Hill</u>

<u>v. Jones</u>, 81 F.3d 1015, 1022 (11th Cir. 1996). It does not appear that Conrad

raised claims of ineffective assistance of appellate counsel in his Rule 32 petition

at the trial court level, but rather raised them for the first time on appeal. On

appeal the Court of Criminal Appeals held that:

> "Conrad further contends that he was denied the effective assistance
> of appellate counsel. However, because this claim was not included
> in Conrad's petition, it is not properly before this Court for review.
> *See* <u>Arrington v. State</u>, 716 So. 2d 237, 239 (Ala. Crim. App. 1997)
> ('An appellant cannot raise an issue on appeal from the denial of a
> Rule 32 petition which was not raised in the Rule 32 petition.'"

 (Exhibit L, pg. 3)

Moreover, this state procedural rule has been firmly established and

regularly followed by the Alabama courts. Accordingly, unless and until, Conrad

establishes cause for his default and actual prejudice therefrom or a resulting

fundamental miscarriage of justice he is entitled to no further review or relief in

this Court. <u>Id</u>.; <u>Harmon v. Barton</u>, 894 F.2d 1268, 1270 (11th Cir. 1990) ("We

have held that where the state court correctly applies a procedural default principle

---

[2] Respondents recognize that the Eleventh Circuit Court's opinion in <u>Jenkins</u> is an unpublished opinion and therefore not controlling authority. However, pursuant to Eleventh Circuit Rule 36-2, this case is properly cited as persuasive authority and is particularly important in that regard because it is on point with the present case and indicates the mindset of the Eleventh Circuit Court on this matter when it does not appear to have been addressed directly in a published opinion. A copy of this case is submitted as Exhibit Q to also be supplied to Conrad.

of state law, <u>Wainwright v. Sykes,</u> 433 U.S. 72 (1977), requires the federal court to abide by the state court's decision." ).   Therefore, until the procedural default has been resolved adversely to Conrad, this Court should decline any further review of this issue.   <u>Jones v. White,</u> 992 F. 2d 1548, 1566-67 (11th Cir. 1993).

## GROUND FIFTEEN – Indicted Under Statute That Violates Separation of Powers

Conrad contends that his indictment is void because it violates the "Constitutional doctrine of 'Separation of Powers'".   He asserts that Section 13A-5-40 of the code of Alabama (1975) violates the separation of powers principle because, he alleges, "it was enacted by the Alabama Law Institute which was compassed (sic) if (sic) individuals from each of the three branches of government."   He argues that the justices on the Alabama Supreme Court, the attorney general, legal advisors to the governor, state representatives, state senators and "Federal Justice all joined together, not in advisory capacity, but as creators of what has become the present Death Penalty Statute."

This claim is exhausted because it was raised in state court in Conrad's Rule 32 proceeding including in the Court of Criminal Appeals and the Alabama Supreme Court.  (Exhibits  L and O).   This claim, however, is due no relief in this Court because the last state appellate court addressing the claim found it to be without merit.  The Court of Criminal Appeals held that:

> "Although the Alabama Law Institute may have derafted the state's capital murder statue, the statute was enacted by the Alabama Legislature. The fact that individual s from all three branches of government may have served on a body that drafted this legislation does not constitute a violation of the separation of powers doctrine. Likewise, such action does not render Conrad's indictment void. Thus, the circuit court correctly concluded that this claim was without merit."

(Exhibit L, pg. 4)    Because Conrad's claim was also decided on the merits in state court, he "is not entitled to relief unless he can establish that the state court's decision was 'contrary to or involved an unreasonable application of, clearly established Federal law,' " or 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" Stephens v. Hall, 407 F.3d 1195, 1201-1202 (11th Cir. 2005) *quoting*, 28 U.S.C. §2254(d); *see also*, Robinson v. Moore, 300 F. 3d 1320, 1342 (11th Cir. 2002). Moreover, factual findings made by a state court shall be presumed to be correct and the petitioner shall have the burden of rebutting the presumption by clear and convincing evidence. Id.; 28 U.S.C. §2254(e) (1). Conrad cites no United States Supreme Court decision that shows that the rulings in the state courts were contrary to, or involved an unreasonable application of, federal law as announced by the Supreme Court. Thus, because Conrad has failed in his initial burden to make such a showing, no further review or relief is warranted.

## GROUND SIXTEEN – Department Forensic Sciences Inadmissible Because Not Accredited

Conrad contends that he was denied due process and a fair trial when "he was convicted, in part, on the basis of evidence from the Alabama Department of Forensic Sciences, which he alleges, was not accredited at the time the evidence in this case was tested. This ground was exhausted in state court when it was raised in Conrad's Rule 32 proceeding. (Exhibits L and O) This ground however, was found procedurally defaulted in the state courts, and thus, is defaulted here.

Conrad's failure to comply with Rule 32.6(b) resulted in the procedural bar of his claim. "Federal courts do not review a procedurally defaulted state collateral claim in a §2254 petition if the petitioner failed to substantially comply with a state procedural rule, Lee v. Kemna, 534 U.S. 362, 375-76, 382 (202), the last state court to review the claim clearly and expressly stated that its judgment rested on the petitioner's failure to substantially comply with the state procedural rule, and the rule was firmly established and regularly followed when applied by the state court." Jenkins v. Bullard[3], 210 Fed.Appx. 895, 2006 WL 3635410 (11th Cir. Dec. 13, 2006), citing Judd v. Haley, 250 F. 3d 1308, 1313 (11th Cir. 2001); Hill

---

[3] Respondents recognize that the Eleventh Circuit Court's opinion in Jenkins is an unpublished opinion and therefore not controlling authority. However, pursuant to Eleventh Circuit Rule 36-2, this case is properly cited as persuasive authority and is particularly important in that regard because it is on point with the present case and indicates the mindset of the Eleventh Circuit Court on this matter when it does not appear to have been addressed directly in a published opinion. A copy of this case is submitted as Exhibit Q to also be supplied to Conrad.

v. Jones, 81 F.3d 1015, 1022 (11th Cir. 1996).  In state court, Conrad presented

this claim in the context of newly discovered evidence pursuant to Rule 32.2(e) of

the Alabama Rules of Criminal Procedure.  The Court of Criminal Appeals

specifically held that his claim was "nothing more than an attack on the

admissibility of forensic evidence" and "[t]herefore [did] not satisfy the

requirements of Rule 32.2(e)".  (Exhibit L, pg. 3)  The Court of Criminal Appeals

further held that, "[b]ecause Conrad offers no evidence to support his claim other

than his bare allegations, he has thus failed to meet his burden of pleading and

proof as required by Rules 32.3 and 32.6(b).   Duncan v. State, 925 So. 2d 245, 257

(Ala.  Crim.  App.  2005)."  (Exhibit L, pgs. 3-4)

Moreover, this state procedural rule has been "firmly established and

regularly followed by the Alabama courts" and the Court of Criminal Appeals has

consistently affirmed … lower court decisions that have summarily dismissed Rule

32 petitions that do not include specific facts which would entitle the petitioner to

collateral relief."  Id. At 5, citing Shaw v. State, 949 So. 2d 184 (Ala. Crim. App.

2006);  Tubbs v. State,  931 So. 2d 66, 68 (Ala. Crim. App. 2005); Boyd v. State,

913 So. 2d 1113, 1126-32 (Ala. Crim. App. 2003); Chambers v. State, 884 So. 2d

15, 18-19 (Ala. Crim. App. 2003).

Accordingly, unless and until,  Conrad establishes cause for his default and

actual prejudice therefrom or a resulting fundamental miscarriage of justice he is

entitled to no further review or relief in this Court.  Id.;   Harmon v. Barton, 894 F.2d 1268, 1270 (11th Cir. 1990) ("We have held that where the state court correctly applies a procedural default principle of state law, Wainwright v. Sykes, 433 U.S. 72 (1977),  requires the federal court to abide by the state court's decision." ).   Therefore, until the procedural default has been resolved adversely to Conrad, this Court should decline any further review of this issue.  Jones v. White, 992 F. 2d 1548, 1566-67 (11th Cir. 1993).

## EXHIBIT LIST

A.  Copy of the record on direct appeal. CC-01-179 and CC-01-180; CR-02-0333.

B.  Copy of  Conrad's brief on direct appeal. CC-01-179 and CC-01-180; CR-02-0333.

C.  Copy of the State's brief on direct appeal.  CC-01-179 and CC-01-180; CR-02-0333.

D.  Copy of the memorandum opinion issued by the Alabama Court of Criminal Appeals on  October 24, 2003, affirming Conrad's conviction and sentence.  CC-01-179 and CC-01-180; CR-02-0333.

E.  Copy of Conrad's application for rehearing. CC-01-179 and CC-01-180; CR-02-0333.

F.  Copy of order from the Court of Criminal Appeals overruling Conrad's application for rehearing.  CC-01-179 and CC-01-180; CR-02-0333.

G.  Copy of Conrad's petition for writ of certiorari and accompanying brief in support of the petition.  CC-01-179 and CC-01-180; CR-02-0333; S. No. 1030311.

H.  Copy of the notice by the Alabama Supreme Court that Conrad's petition for writ of certiorari was denied and the certificate of judgment was issued.  CC-01-179 and CC-01-180; CR-02-0333; S. No. 1030311.

I.  Copy of the record in Conrad's Rule 32 proceeding. CC-01-179.60 and CC-01-180.60; CR-05-1913.

J.  Copy of Conrad's brief on appeal in the Rule 32 proceeding. CC-01-179.60 and CC-01-180.60; CR-05-1913.

K.  Copy o f the State's brief on appeal in the Rule 32 proceeding. CC-01-179.60 and CC-01-180.60; CR-05-1913.

L.    Copy of the memorandum opinion issued by the Alabama Court of Criminal Appeals on August 24, 2007, affirming the trial court's denial of Conrad's Rule 32 petition.  CC-01-179.60 and CC-01-180.60; CR-05-1913.

M.    Copy of Conrad's application for rehearing. CC-01-179.60 and CC-01-180.60; CR-05-1913.

N.    Copy of order from the Court of Criminal Appeals overruling Conrad's application for rehearing.  CC-01-179.60 and CC-01-180.60; CR-05-1913.

O.    Copy of Conrad's petition for writ of certiorari.  CC-01-179.60 and CC-01-180.60; CR-05-1913; S. No. 1070087.

P.    Copy of the notice by the Alabama Supreme Court that Conrad's petition for writ of certiorari was denied and the certificate of judgment was issued.  CC-01-179.60 and CC-01-180.60; CR-05-1913; S. No.  1070087.

Q.    Copy of unpublished Eleventh Circuit opinion in Jenkins v. Bullard, 210 Fed.Appx. 895 (11th Cir. Dec. 13, 2006).


                    Respectfully submitted,

                    Troy King, ASB #KIN047
                    *Attorney General*
                    By-


                    s/Beth Slate Poe
                    Beth Slate Poe ID#POE005
                    *Assistant Attorney General*

## CERTIFICATE OF SERVICE

I hereby certify that on this <u>2nd</u> day of April, 2008,  I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system and I hereby

certify that I have mailed by United States Postal Service the document to the

following non-CM/ECF participants:  <u>Robert Thomas Conrad, AIS# 226791,</u>

<u>Holman 3700, Atmore, Alabama  36503-3700</u>.

Respectfully submitted,

s/Beth Slate Poe (POE005)
Beth Slate Poe (POE005)
Office of the Attorney General
Alabama State House
11 South Union
Montgomery, AL  36130-0152
Telephone:  (334)  242-7300
Fax:  (334)  242-2848
E-Mail:  bpoe@ago.state.al.us


399247/117987-001

_VOLUME  1_

COURT OF CRIMINAL APPEALS No. _CR-02-0333_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF _____ COFFEE _____ COUNTY, ALABAMA

CIRCUIT COURT NO. __CC-01-179, CC-01-180__

CIRCUIT JUDGE _____ Gary L. McAliley _____

Type of Conviction / Order Appealed From: __Conviction, Capital Murder, Robbery 1st__

Sentence Imposed: __Life Without Parole, Life__

Defendant Indigent: [X] YES  [ ] NO

Robert Thomas Conrad

_____
NAME OF APPELLANT

Gary Bradshaw

(Appellant's Attorney)          (Telephone No.)

P. O. Box 311412

(Address)

Enterprise          AL          36331

(City)          (State)          (Zip Code)

Richard Waldrop
P. O. Box 310027
Enterprise, AL  36331

**V.**

__STATE OF ALABAMA__

_____
NAME OF APPELLEE

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)



INDEX TO CLERK'S RECORD

Page No.

Complaint And Warrant ...................................................... 1 — 2

Order On Initial Appearance ................................................ 3 — 4

Order — Case Forwarded to Grand Jury Unless Demand For Preliminary ......... 5

Indictment ................................................................. 6 — 7

Warrants Of Arrest ......................................................... 8 — 9

List Of Attorney's ......................................................... 10 — 11

Order On Initial Appearance ................................................ 12 — 16

Docket Date Notice ......................................................... 17 — 19

Motion To Withdraw By Gary D. Bradshaw ..................................... 20 — 21

Motion To Withdraw By Donald S. Pittman .................................... 22 — 23

Order On Motions To Withdraw ............................................... 24 — 26

Application For Youthful Offender And Order For Investigation ............... 27

Motion To Allow The Defendant To View The Scene Of The Crime With His
Attorneys .................................................................. 28 — 30

Order On Motion To Allow Defendant To View The Scene Of The Crime .......... 31 — 32

Motion For Discovery Of Prosecution Files, Records, And Information
Necessary To A Fair Trial .................................................. 33 — 42

Discovery Order ............................................................ 43 — 45

Motion To Inspect, Examine, and Test All Physical Evidence ................. 46 — 51

Assertion Of Right To Proceed Ex Parte On Application For Funds ............ 52 — 65

Ex Parte Application For Investigative Expenses ............................ 66 — 74

Motion To Reveal The Identity Of Informants And Reveal Any Deals, Promises
Or Inducements ............................................................. 75 — 79

Motion To Suppress Evidence Seized After An Illegal Arrest And/Or Search ... 80 — 83

Proposed Order And Jury Questionnaire ...................................... 84 — 92

Motion For A Jury Questionnaire ............................................ 93 — 96

Motion To Disqualify All Potential Jurors Who Knew Or Were Acquainted With
The Victim Or His Family ................................................... 97 —103

Motion For Disqualification From The Jury Venire Of All Potential Jurors Who
Would Automatically Vote For The Death Penalty If They Found Robert Thomas
Conrad Guilty Of Capital Murder ............................................ 104—107

Motion To Dismiss The Indictment On Grounds That The Grand Jury Was
Improperly Impaneled ....................................................... 108—110

Motion For Deposition Of State Expert Witnesses And Request For Production
Of Documents ............................................................... 111—113

Motion For Order Permitting Discovery Of Transcript, Exhibits, Other
Memorialization Of The Grand Jury Proceedings, And List Of Grand Jury
Members .................................................................... 114—119

Order On Motion For Discovery ............................................120-

Order On Motion For Deposition Of State Expert Witnesses And Request For
Production Of Documents...................................................... 121-122

Order On Motion To Dismiss The Indictment On Grounds That The Grand Jury
Was Improperly Impaneled .................................................. 123

Order On Defendant's Motion For Disqualification From The Jury Venire Of All
Potential Jurors Who Would Automatically Vote For The Death Penalty if They
Found Robert Thomas Conrad Guilty Of Capital Murder ....................... 124

Order On Motion To Disqualify All Potential Jurors Who Knew Or Were
Acquainted With The Victim Or (Her) Family. ............................... 125

Order On Motion For A Jury Questionnaire .................................. 126

Order On Motion To Suppress Evidence Seized After An Illegal Arrest And/Or
Search .................................................................... 127

Order On Motion To Reveal The Identity Of Informants ...................... 128-129

Order On Application For Funds ............................................ 130

Order On Motion To Inspect, Examine,And Test All Physical Evidence ......... 131

Report Of Youthful Offender Investigation ................................. 132-144

Motion To Continue Youthful Offender Hearing, Motion To Suppress Evidence
And Motion To Suppress Evidence Not Timely Disclosed, Motion To Compel
Discovery ................................................................. 145-149

Order On Motion ........................................................... 150

Motion For Extraordinary Expenses And Order .............................. 151

Order Of Continuance ...................................................... 152

Order For Hearing ......................................................... 153

State's Discovery Response ................................................ 154-270

State's Arrangements With Defendant's Attorney To Video Crime Scene......... 271-273

State's 1st Supplemental Response To Defendant's Motion For Discovery ...... 274-287

State's Motion For Discovery And Order .................................... 288-290

State's 2nd Supplemental Response To Defendant's Motion For Discovery ...... 291

Defendant's Second Motion To Suppress Evidence Seized After An Illegal
Arrest And/Or Search ...................................................... 292-302

Order For Discovery ....................................................... 303-304

State's 3rd Supplemental Response To Defendant's Motion For Discovery ...... 305-309

Order..................................................................... 310-311

Defendant's Third Motion To Suppress Evidence Seized After An Illegal
Arrest And/Or Search And To Suppress Statements ........................... 312-314

Order Setting Motions Hearing ............................................. 315

Subpoena Request Form ..................................................... 316

Letter To Clerk ........................................................... 317

State's 4th Supplemental Response To Defendant's Motion For Discovery ...... 318-326

Defendant's Third Motion To Suppress Evidence Seized After An Illegal
Arrest And/Or Search And To Suppress Statements .......................... 327-330

State's 5th Supplemental Response To Defendant's Motion For Discovery .... 331-346

State's 6th Supplemental Response To Defendant's Motion For Discovery .... 347-356

State's 7th Supplemental Response To Defendant's Motion For Discovery .... 357-362

Order Setting Status Conference And Motions Hearing ...................... 363

State's 8th Supplemental Response To Defendant's Motion For Discovery .... 364-378

Order On Motions Hearing ................................................ 379-383

Order For Service and Return And Juror Venire .......................... 384-402

Motion To Declare The Alabama Capital Sentencing Process Unconstituional
And To Bar Imposition Of The Death Penalty............................... 403-410

Motion To Dismiss The Indictment On The Grounds That The Failure To
Specify The Aggravating Circumstances On Which A Death Sentence May Be
Imposed Violates The Fifth, Sixth, Eighth, And Fourteenth Amendments And
State Law .............................................................. 411-417

Motion To Bar Imposition Of The Death Penalty Where The Jury's Role And
Factual Determinations Are Deemed Advisory ............................. 418-425

Defendant's Fourth Motion To Suppress Or, In The Alternative, Motion In
Liminie To Prohibit The Prosecutor From Displaying To The Jury Certain
Inflammatory Evidence .................................................. 426-428

Order- Motions Hearing Remains Set For Sept. 4, 2002 ................... 429

State's 9th Supplemental Response To Defendant's Motion For Discovery .... 430-509

Motion For Funds For Court Reporter Transcripts ........................ 510-516

Confirmation Of Receipt Of Discovery Documents ........................ 517

State Of Alabama's Response To Conrad's Various Motions That Mispresent
The Holding Of Ring V. Arizona ......................................... 518-538

Subpoena Requests ...................................................... 539-545

Order On Oral Motion For Medical Records ............................... 546

Order - Motion For Funds For Court Reporter Transcripts Denied .......... 547-548

State's 10th Supplemental Response To Defendant's Motion For Discovery ... 549-606

Subpoena Request ....................................................... 607

Confirmation Of Receipt Of Discovery Documents ........................ 608

Order For Service And Return ........................................... 609

State's Exhibit List ................................................... 610-612

Defendant's Exhibit List ............................................... 613-614

Letter To Clerk From Alabama Crime Victim's Compensation Commission ...... 615-616

Notice Of Restitution .................................................. 617-618

Defendant's Supplemental Motion For New Trial .......................... 619-625

Order For Restitution .................................................. 626

Order Setting Hearing .................................................. 627

Order-Court Reporter And Clerk To Prepare Transcript And Record On Appeal ... 628

Order To Transport ..................................................... 629

Judgment ............................................................. 629A-629D

Capital Sentence Order ................................................. 630-640

Order To Appear ....................................................... 641

Conviction Report ..................................................... 642-642A

Case Action Summary ................................................... 643-652

Questionnaires Used In This Case ...................................... 653-1016

State's Exhibit 1 ..................................................... 1017-1020

State's Exhibit 2 ..................................................... 1021

State's Exhibit 4A .................................................... 1022-1046

State's Exhibit 5 ..................................................... 1047-1061

State's Exhibit 3 ..................................................... 1062

State's Exhibit 4 ..................................................... 1063-1074

State's Exhibit 6 ..................................................... 1075-1076

State's Exhibit 6A .................................................... 1077-1082

State's Exhibit 5A .................................................... 1083-1118

State's Exhibit 7 ..................................................... 1119-1122

State's Exhibit 8 ..................................................... 1123

Defendant's Exhibit A ................................................. 1124

Defendant's Exhibit B ................................................. 1125

State's Exhibit List .................................................. 1126-1128

Defendant's Exhibit List .............................................. 1129-1131

State's Exhibit 1 ..................................................... 1132

State's Exhibit 3 ..................................................... 1133

State's Exhibit 4 ..................................................... 1134

State's Exhibit 7 ..................................................... 1135

State's Exhibit 8 ..................................................... 1136

State's Exhibit 9 ..................................................... 1137

State's Exhibit 10 .................................................... 1138

State's Exhibit 11 .................................................... 1139

State's Exhibit 12 .................................................... 1140

State's Exhibit 13 .................................................... 1141

State's Exhibit 14 .................................................... 1142

State's Exhibit 15 .................................................... 1143

State's Exhibit 16 .................................................... 1144

State's Exhibit 17 .................................................... 1145

State's Exhibit 18 .................................................... 1146

State's Exhibit 19 .................................................... 1147

State's Exhibit 20 .................................................... 1148

State's Exhibit 21 .................................................... 1149

State's Exhibit 25 .................................................... 1150

State's Exhibit 26 .................................................... 1151

State's Exhibit 27A.................................................... 1152

State's Exhibit 28A ................................................... 1153

State's Exhibit 28B ................................................... 1154

State's Exhibit 31 ............................................... 1155–1169

Defendant's Exhibit AA .......................................... 1170–1183

Defendants Exhibit A ................................................. 1184

Defendant's Exhibit B ................................................ 1185

Defendant's Exhibit C ................................................ 1186

Defendant's Exhibit D ................................................ 1187

Defendant's Exhibit F ................................................ 1188

Defendant's Exhibit G ................................................ 1189

Defendant's Exhibit H ................................................ 1190

Defendant's Exhibit I ................................................ 1191

Defendant's Exhibit J ................................................ 1192

Defendant's Exhibit L ................................................ 1193

Defendant's Exhibit N ................................................ 1194

Defendant's Exhibit O ................................................ 1195

Defendant's Exhibit P ................................................ 1196

Defendant's Exhibit V .......................................... 1197–1203

Defendant's Exhibit Z .......................................... 1204–1278

Report Of Investigation ........................................ 1279–1289

Motion For Transcript .......................................... 1290–1291

Verdict Forms .................................................. 1292–1299

Notice Of Appeal By Trial Clerk..................................... 1300

Notice Of Appeal .............................................. 1301–1302

Order – Smith's Motion To Withdraw Granted-Richard Waldrop Appointed to
Assist Gary Bradshaw as Counsel ..................................... 1303

ALABAMA JUDICIAL INFORMATION SYSTEM

* * * IN THE DISTRICT COURT OF COFFEE COUNTY * * *

AGENCY NUMBER:

WARRANT NUMBER: WR 2001 000268.00
OTHER CASE NBR:

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT  COURT OF
COFFEE COUNTY, ALABAMA, PERSONALLY APPEARED    JEFF SPENCE
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT    ROBERT THOMAS CONRAD          DEFENDANT,
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINANT, DID WITHIN THE ABOVE
NAMED COUNTY AND

ON OR ABOUT MAY 23, 2001, ROBERT THOMAS CONRAD, WHOSE NAME IS OTHERWISE
UNKNOWN TO THE COMPLAINANT, DID INTENTIONALLY CAUSE THE
DEATH OF ANOTHER PERSON, TO-WIT: JELAINE BOWMAN DENNIS, BY
SHOOTING HER WITH A PISTOL, AND THE SAID, ROBERT THOMAS CONRAD
CAUSED THE DEATH DURING THE TIME THAT HE WAS IN THE COURSE OF
COMMITTING A THEFT OF PROPERTY, TO-WIT: LAWFUL UNITED STATES
CURRENCY AND/OR COINAGE AND/OR CHECKS THE EXACT DESCRIPTION AND
DENOMINATIONS AS TO THE AFFIANT ARE UNKNOWN, THE PROPERTY OF, TO-WIT:
JELAINE BOWMAN DENNIS, BY THE USE OF FORCE OR BY THREATENING THE IMMINENT
USE OF FORCE AGAINST THE PERSON OF THE SAID JELAINE BOWMAN DENNIS, OR
ANOTHER PERSON PRESENT, WITH THE INTENT TO OVERCOME HER PHYSICAL
RESISTANCE OR PHYSICAL POWER OF RESISTANCE OR TO COMPEL ACQUIESCENCE TO
THE TAKING OR ESCAPING WITH THE PROPERTY, WHILE THE SAID ROBERT THOMAS
CONRAD WAS ARMED WITH A DEADLY WEAPON OR DANGEROUS INSTRUMENT, TO-WIT:
A PISTOL,
IN VIOLATION OF 13A-005-040                    OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

COMPLAINANT'S SIGNATURE

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 24 DAY OF MAY, 2001.

JUDGE/CLERK/MAGISTRATE OF DISTRICT  COURT

CHARGES: MURDER CAPITAL        13A-005-040          F  FELONY

WITNESS FOR THE STATE

JEFF SPENCE/C/O EPD/ENTERPRISE/36330
RICK HAUSER/C/O EPD/ENTERPRISE/36330
W R AMMONS/C/O EPD/ENTERPRISE/36330
BRUCE MATTHEWS/C/O DISTRICT ATTORNEY OFF/ENTERPRISE/36330

OPERATOR: JAC    DATE: 05/24/2001



MAY 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

# A R R A N T

STATE OF ALABAMA          COFFEE COUNTY                    DISTRICT  COURT

AGENCY NUMBER:                        WARRANT NUMBER: WR 2001 000268.00
                                      OTHER CASE NBR:            .

TO ANY LAWFUL OFFICER OF THE STATE OF ALABAMA:

YOU ARE HEREBY COMMANDED TO ARREST  ROBERT THOMAS CONRAD   AND BRING
HIM/HER BEFORE THE DISTRICT  COURT OF COFFEE COUNTY TO ANSWER THE STATE
ON A CHARGE(S) OF:
              MURDER CAPITAL  CLASS: A  TYPE: F  COUNTS: 001
AND HAVE YOU THEN AND THERE THIS WRIT WITH YOUR RETURN  THEREON.

YOU WILL RECEIVE UNTO YOUR CUSTODY AND DETAIN HIM/HER UNTIL THE
_____ DAY OF _____ _____, OR UNTIL LEGALLY DISCHARGED.

DATED THIS 24 DAY OF MAY, 2001.

BOND SET AT: (1) _____   BOND TYPE:
             (2) _____
             (3) _____

JUDGE/CLERK/MAGISTRATE OF DISTRICT  COURT

---

CHARGES: MURDER CAPITAL        13A-005-040        ·  F  FELONY

---

NAME: ROBERT THOMAS CONRAD          ALIAS:
ADDRESS: GARDEN OAKS APT.35          ALIAS:
ADDRESS:
CITY: ENTERPRISE          STATE: AL     ZIP: 36330 0000
                                        PHONE: 000 000 0000 EXT: 000

EMPLOYMENT:
  B: 09/30/1980    RACE: B     SEX: M    HAIR: BLK
  E: BRO  HEIGHT: 6'00"    WEIGHT: 155
SID: 000000000  SSN: 419175095

---

# E X E C U T I O N

EXECUTED THE WITHIN WARRANT BY ARRESTING THE DEFENDANT AND

( )  PLACING DEFENDANT IN THE COFFEE COUNTY JAIL

( )  RELEASING DEFENDANT ON APPEARANCE BOND

THIS _24th_____ DAY OF __May, 2001_____

1745 HRS.

SHERIFF

BY

---

ERATOR: JAC        DATE: 05/24/2001

| State of Alabama Unified Judicial System | **ORDER ON INITIAL APPEARANCE** | Case Number |
|---|---|---|
| Form C-80    Rev. 6/93 | | |

IN THE _District_ COURT OF _Coffee_ , ALABAMA
(Circuit, District or Municipal)        (Name of County or Municipality)

☐ STATE OF ALABAMA        SS 404-17 5095

☐ MUNICIPALITY OF _____        v. _Robert Thomas Conrad_

_9-30-50_        _20901_        **Defendant**

The above-named defendant, charged with the criminal offense(s) of _Capital Murder_
was duly brought before the Court for initial appearance on _3-25-01_ , at _2:00_ o'clock
_P_.m., whereupon the Court did the following, as checked in the appropriate blocks:

*(CHECK AS APPLICABLE):*

☐ 1. Name and address of defendant.

   ☐ (a) Ascertained the true name and address of the defendant to be:

   _31 S Garden Oaks_
   _Enterprise AL_

   ☐ (b) Amended the formal charges to reflect defendant's true name.

   ☐ (c) Instructed the defendant to notify the Court promptly of any change of address.

☑ 2. Informed the defendant of the charges against him/her and ensured that the defendant was served with a copy of the charges.

☑ 3. Informed the defendant of the right to be represented by counsel, that he/she would be afforded time and opportunity to retain an attorney, and further advised the defendant that, if he/she were indigent and unable to obtain counsel, an attorney would be appointed by the Court to represent him/her.

☑ 4. Informed the defendant that he/she had the right to remain silent and that anything that he/she said could be used against him/her.

☑ 5. Bail

   ☐ (a) Determined that the defendant shall not be released from custody since charged with a non-bailable capital offense.

   ☐ (b) Determined that the defendant shall be released from custody pending further proceedings, subject to the mandatory conditions prescribed in Rule 7.3(a), A.R.Cr.P., and subject to the following additional conditions:

      ☐ 1.) Execution of an appearance bond (recognizance) in the amount of $ _____

      ☐ 2.) Execution of a secured appearance bond in the amount of $ _____

      ☐ 3.) Other conditions (specify)

      _Bail denied_

☑ 6. If charged with a felony offense, informed the defendant of right to demand a preliminary hearing under Rule 5.1, A.R.Cr.P., and of the procedure by which that right may be exercised.

☐ 7. If charged with a felony offense a preliminary hearing was demanded with 30 days of date of arrest by the above named defendant, set a preliminary hearing to be held in the District Court of _____ an _____ (date) at _____ o'clock _____ m.

   ☐ (a) Notified the District Court that such demand was made.

   ☐ (b) Defendant made no demand for a preliminary hearing at the initial appearance hearings.

☐ 8. Other: _____

_3-25-01_

**Date**        **Judge/Magistrate**

| State of Alabama<br>Unified Judicial System | ORDER<br>ON INITIAL APPEARANCE | Case Number |
|---|---|---|
| Form C-80    Rev. 6/93 | | |

IN THE ___District___ COURT OF ___Coffee___, ALABAMA
*(Circuit, District or Municipal)*    *(Name of County or Municipality)*

☐ STATE OF ALABAMA          SS 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
☐ MUNICIPALITY OF ___9-30-80___    ___2840A___    v. ___Robert Thomas Conrad___
                                                    Defendant

The above-named defendant, charged with the criminal offense(s) of ___Capital Murder___,
was duly brought before the Court for initial appearance on ___5-25-01___, at ___2:00___ o'clock
___p___.m., whereupon the Court did the following, as checked in the appropriate blocks:
*(CHECK AS APPLICABLE):*

☒ 1. Name and address of defendant.
   ___(a) Ascertained the true name and address of the defendant to be:
   ___35 B Garden Oaks___
   ___Enterprise Al___
   ___(b) Amended the formal charges to reflect defendant's true name.
   ___(c) Instructed the defendant to notify the Court promptly of any change of address.

☐ 2. Informed the defendant of the charges against him/her and ensured that the defendant was served with a copy of the charges.

☒ 3. Informed the defendant of the right to be represented by counsel, that he/she would be afforded time and opportunity to retain an attorney, and further advised the defendant that, if he/she were indigent and unable to obtain counsel, an attorney would be appointed by the Court to represent him/her.

☒ 4. Informed the defendant that he/she had the right to remain silent and that anything that he/she said could be use against him/her.

☒ 5. Bail
   ___(a) Determined that the defendant shall not be released from custody since charged with a non-bailable capital offense.
   ___(b) Determined that the defendant shall be released from custody pending further proceedings, subject to the mandatory conditions prescribed in Rule 7.3(a), A.R.Cr.P., and subject to the following additional conditions:
      ___1.) Execution of an appearance bond (recognizance) in the amount of $ _____.
      ___2.) Execution of a secured appearance bond in the amount of $ _____.
      ___3.) Other conditions (specify) ___Bail denied___

☒ 6. If charged with a felony offense, informed the defendant of right to demand a preliminary hearing under Rule 5.1, A.R.Cr.P., and of the procedure by which that right may be exercised.

☐ 7. If charged with a felony offense a preliminary hearing was demanded with 30 days of date of arrest by the above named defendant, set a preliminary hearing to be held in the District Court of _____, _____,
   an _____ (date) at _____ o'clock ____.m.
      ___(a) Notified the District Court that such demand was made.
      ___(b) Defendant made no demand for a preliminary hearing at the initial appearance hearings.

☐ 8. Other: _____

___5-25-01___                          ___[signature]___
Date                                   Judge/Magistrate

STATE OF ALABAMA,                      *       IN THE DISTRICT COURT FOR
                                       *
     Plaintiff,                       *       COFFEE COUNTY, ALABAMA
                                       *
vs.                                    *       ENTERPRISE DIVISION
                                       *
ROBERT THOMAS CONRAD,                  *
                                       *       CASE NO.  DC 2001-505
     Defendant.                       *


## ORDER


    Initial appearance hearing was this day held (see separate order).  Case is forwarded to the action of the Grand Jury unless a demand for preliminary hearing is made within 30 days from date of Defendant's arrest.  The Defendant was provided an Affidavit of Substantial Hardship.  Notice shall issue to State and Defendant.

    DONE THIS THE 25th day of May, 2001.



                        STEVEN E. BLAIR
                        DISTRICT JUDGE

MAY 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

**INDICTMENT**

# THE STATE OF ALABAMA
### COFFEE COUNTY

**IN CIRCUIT COURT**
**MAY TERM, 2001**

### ENTERPRISE JURISDICTION

The Grand Jury of said County charges that before the finding of this indictment that:

ROBERT THOMAS CONRAD whose name is to the Grand Jury otherwise unknown, did intentionally cause the death of another person, to-wit: Jelaine Bowman Dennis by shooting her with a pistol; and the said ROBERT THOMAS CONRAD, caused the death during the time that he was in the course of committing a theft of property, to-wit: United States currency and/or United States coinage and/or one D's the property of, to-wit: Jelaine Bowman Dennis by the use of force or by threatening the imminent use of force against the person of the said Jelaine Bowman Dennis or another person present, with the intent to overcome her physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property, while the said ROBERT THOMAS CONRAD, was armed with a deadly weapon or dangerous instrument to-wit: a pistol, in violation of Section 13A-5-40 of the Code of Alabama, against the Peace and Dignity of the State of Alabama; and:

#### OFFENSE 2

The Grand Jury of said county charges that before the finding of this indictment that ROBERT THOMAS CONRAD, whose name is to the Grand Jury otherwise unknown, did, in the course of committing a theft of property, to-wit: Thirty Dollars in United States currency the denominations of which were one (1) twenty dollar bill and one (1) ten dollar bill, the property of, to-wit: Robert Ray Grimes, use force or threaten the imminent use of force against the person of the said Robert Ray Grimes or another person present with the intent to overcome his physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property, while the said ROBERT THOMAS CONRAD was armed with a deadly weapon or dangerous instrument to-wit: a pistol, in violation of Section 13A-8-41 of the Code of Alabama.

Against the Peace and Dignity of the State of Alabama

Mark E. Fuller District Attorney for the
Twelfth Judicial Circuit

GRAND JURY NO. 01-137 & 142

A TRUE BILL

_(signature)_

GRAND JURY FOREPERSON

Presented in open Court by the
Foreperson of the Grand Jury in the
presence of at least twelve other
members of the Grand Jury

_(signature)_

James W. Counts, Clerk of the Circuit
Court of Coffee County, Twelfth Judicial
Circuit of Alabama.
Filed this the ___31___ day of
_____ 2001.

Bail in each offense in this indictment is
fixed at $ _____ for a total bail
for this indictment of $ _____
[ ] Committing bailiff

_(signature)_
Judge Presiding

---

THE STATE OF ALABAMA
COFFEE COUNTY
CIRCUIT COURT
MAY    TERM, 2001

THE STATE
VS.

ROBERT THOMAS CONRAD

---

OFFENSE(S)
MURDER DURING ROBBERY 1ST
DEGREE

OFFENSE 2
ROBBERY FIRST DEGREE

---

INDICTMENT

ACR375

ALABAMA JUDICIAL DATA CENTER
GRAND JURY OF COFFEE    COUNTY
WARRANT OF ARREST

GJ 2001 000137.00
TERM #:

---

TO ANY LAW ENFORCEMENT OFFICER OF THE STATE OF ALABAMA:

AN INDICTMENT HAS BEEN RETURNED BY THE  GRAND  JURY OF COFFEE    COUNTY

AGAINST        CONRAD ROBERT THOMAS
               GARDEN OAKS APT.35

               ENTERPRISE       AL 36330-0000

CHARGING THE OFFENSE OF:

       MURDER CAPITAL        13A-005-040          CNTS:    1

YOU ARE THEREFORE ORDERED TO ARREST THE PERSON NAMED ABOVE AND BRING THAT

PERSON BEFORE A JUDGE OR MAGISTRATE OF THIS COURT TO ANSWER THE CHARGES

AGAINST THAT PERSON AND HAVE WITH YOU THEN AND THERE THE WARRANT OF ARREST

WITH YOUR RETURN THEREON.  IF A JUDGE OR MAGISTRATE OF THIS COURT IS

UNAVAILABLE, OR IF THE ARREST IS MADE IN ANOTHER COUNTY, YOU SHALL TAKE

THE ACCUSED PERSON BEFORE THE NEAREST OR MOST ACCESSIBLE JUDGE OF

MAGISTRATE IN THE COUNTY OF ARREST.


  BOND SET AT:            $.00

DATE ISSUED: 05/31/2001    JAMES M. COUNTS          BY_____
                           CLERK

---

       EXECUTED THIS ____31____ DAY OF __May__ __01__, _____, BY

ARRESTING THE WITHIN NAMED DEFENDANT __Robert Thomas Conrad__

                              _____
                              LAW ENFORCEMENT OFFICER

                              BY: __Ray Killingworth__

---

DEFENDANT'S FEATURES:

HT: 6'00"  HAIR: BLK   DOB: 09/30/1980

WT: 155  SEX: M    EYE: BRO  RACE: B
SSN: 419175095

ADDTL COMMENTS: _____

_____

_____

_____

---

31/2001 DEC

^CR375

ALABAMA JUDICIAL DATA CENTER
GRAND JURY OF COFFEE COUNTY
WARRANT OF ARREST

GJ 2001 000142.00
TERM #:

TO ANY LAW ENFORCEMENT OFFICER OF THE STATE OF ALABAMA:

AN INDICTMENT HAS BEEN RETURNED BY THE GRAND JURY OF COFFEE COUNTY

AGAINST        CONRAD ROBERT THOMAS
               GARDEN OAKS APT.35

               ENTERPRISE        AL 36330-0000

CHARGING THE OFFENSE OF:

        ROBBERY 1ST           13A-008-041          CNTS:   1

YOU ARE THEREFORE ORDERED TO ARREST THE PERSON NAMED ABOVE AND BRING THAT

PERSON BEFORE A JUDGE OR MAGISTRATE OF THIS COURT TO ANSWER THE CHARGES

AGAINST THAT PERSON AND HAVE WITH YOU THEN AND THERE THE WARRANT OF ARREST

WITH YOUR RETURN THEREON.  IF A JUDGE OR MAGISTRATE OF THIS COURT IS

UNAVAILABLE, OR IF THE ARREST IS MADE IN ANOTHER COUNTY, YOU SHALL TAKE

THE ACCUSED PERSON BEFORE THE NEAREST OR MOST ACCESSIBLE JUDGE OF

MAGISTRATE IN THE COUNTY OF ARREST.

BOND SET AT:       $250,000.00

DATE ISSUED: 05/31/2001    JAMES M. COUNTS          BY
                           CLERK

---

EXECUTED THIS ___31___ DAY OF _May_ _01_, _____, BY

ARRESTING THE WITHIN NAMED DEFENDANT _____

                                     _____
                                     LAW ENFORCEMENT OFFICER

                                     BY: _____

---

DEFENDANT'S FEATURES:

HT: 6'00"  HAIR: BLK    DOB: 09/30/1980

WT: 155  SEX: M    EYE: BRO   RACE: B
SSN: 419175095

ADDTL COMMENTS: _____

_____

_____

_____

/31/2001 DEC

*(handwritten annotations in top margin)* Expired indigent defense at 5/30/2001 by 2nd Judge. The cases underlined to the right → copy is to be pulled each file. *(arrow labeled "2nd Judge")*

*(handwritten names top right)* Gary Bradshaw — Garth Lindsey — Jodee Thompson — Bryan Golen Yeoman

# LAWYERS, COFFEE COUNTY

| # | Code | Name | Address | Phone |
|---|------|------|---------|-------|
| 1 | BRA074 | BRADSHAW, GARY | P.O. BOX 311412 | 393-6439 |
| 2 | BRO152 | BROCK, MIKE | 709 GLOVER AVENUE | 393-4357 |
| 3 | BRU019 | BRUNSON, MATT | P.O. BOX 358 ELBA | 897-3507 |
| 4 | BRO | BROWN, ED | | |
| 72 | | CARR, WILL | P.O. DRAWER 389 | 897-3658 |
| 5 | CAS011 | CASSADY, JOE SR. | P.O. BOX 310910 | 347-2626 |
| 6 | CAS010 | CASSADY, JOE JR. | P.O. BOX 310910 | 347-2626 |
| 7 | CH1020 | CHIRICO, FRANK | P.O. DRAWER 508 EL | 897-6361 |
| 8 | CLA070 | CLARK, SHANNON | P.O. BOX 311013 | 393-7680 |
| 9 | COT010 | COTTER, RAINER | P.O. BOX 310910 | 347-2626 |
| 43 | | DELL, LAURA | | 308-2000 |
| 10 | DOW011 | DOWLING, JOHN | P.O. BOX 310068 | 347-9503 |
| 11 | FUL008 | FULLER, KENNETH | P.O. BOX 310910 | 347-2626 |
| 12 | HAR222 | HARTWICK, DWAIN | P.O. BOX 311526 | 347-2236 |
| 13 | HOL070 | HOLLINGSWORTH, (Rick, Sr.) | P.O. BOX 311662 | 347-3249 |
| 14 | HOL094 | HOLLINGSWORTH, (Rick, Jr.) | P.O. BOX 311662 | 347-3249 |
| 15 | JAR002 | JARED, DEBBIE | P.O. BOX 358 EL | 897-3507 |
| 16 | JAR003 | JARED, JOHN | P.O. BOX 358 EL | 897-3507 |
| 17 | JOR006 | JORDAN, MARK | 105 EAST COLLEGE | 347-2641 |
| 18 | KEL023 | KELLEY, JEFFERY | P.O. BOX 505 EL | 897-8778 |
| 19 | LIN004 | LINDSEY, G.A. | P.O. BOX 327 EL | 897-6129 |
| 20 | MAR095 | MARLER, MARTY | 348 SIMMONS STREET EL | 897-6161 |
| 21 | MAR040 | MARSH, DALE | P.O. BOX 310910 | 347-2626 |
| 44 | | MCLUNG, JOHN | P.O. BOX 327 EL | 897-6129 |
| 45 | | MORROW, GYPSY | P.O. BOX 356 EL | 897-2894 |
| 22 | MCL007 | MCLEAN, BRUCE | 111 EAST COLLEGE STREET | 347-2622 |
| 46 | | MOORE, BILL | | |
| 23 | MOR072 | MORGAN, BILL | P.O. BOX 310396 | 347-8130 |
| 24 | MYE009 | MYERS, LETITIA | 210 E. GRUBBS STREET | 393-0908 |
| 25 | PIT014 | PITTMAN, DON | P.O. DRAWER 311447 | 347-6682 |
| 26 | ROW005 | ROWE, CHARLES | P.O. BOX 311305 | 347-3401 |
| | | SANCHEZ, | P.O. BOX 389 EL | 897-3658 |

*(handwritten right margin)* Brian Jim Smith — Frank Cherico — Ed Brown

(WALQUIRIA)

| # | Code | Name | Address | Phone |
|---|------|------|---------|-------|
| 27 | SAW004 | SAWYER, J.E., | 203 SOUTH EDWARDS STREET | 347-6447 |
| 28 | | SHERLING, PAUL | | 393-3660 |
| 29 | SHI008 | SHIRLEY, MERRILL | P.O. BOX 408 EL | 897-5775 |
| 30 | SMI098 | SMITH, AL | P.O. DRAWER 389 | 897-3658 |
| 31 | STO016 | STOKES, JACKSON | P.O. BOX 356 EL | 897-2894 |
| 32 | STO053 | STOUT, GARY | 709 GLOVER AVENUE | 393-4357 |
| 33 | SUM | SUMBLIN, ANNE | | |
| 34 | TIN | TINDOL, CHAD | | 347-2626 |
| 35 | ROW011 | THOMPSON, JODEE | P.O. BOX 311305 | 347-3401 |
| 36 | VAU004 | VAUGHAN, MARK | P.O. DRAWER E EL | 897-3413 |
| 37 | WAL051 | WALDROP, RICHARD | P.O. BOX 310027 | 393-2288 |
| 38 | WAL128 | WALKER, STANLEY | 203 SOUTH EDWARDS | 347-6447 |
| 39 | WEA012 | WEATHERFORD, JAMES | P.O. BOX 311291 | 347-1314 |
| 40 | WHI031 | WHITTAKER, RICHARD | P.O. BOX 311166 | 393-5146 |
| 41 | YOU020 | YOUNG, PAUL | P.O. DRAWER 311368 | 347-0843 |

STATE OF ALABAMA,    )    IN THE CIRCUIT COURT

        )

      PLAINTIFF,    )    COFFEE COUNTY, AL

        )

vs.    )    ENTERPRISE DIVISION

        )

BRIAN JAMES SMITH,    )

        )

      DEFENDANT.    )    CASE #s:  CC-2001- 177
               And  CC-2001- 178

---

STATE OF ALABAMA,    )    IN THE CIRCUIT COURT

        )

      PLAINTIFF,    )    COFFEE COUNTY, AL

        )

vs.    )    ENTERPRISE DIVISION

        )

ROBERT THOMAS CONRAD)

      DEFENDANT.    )    CASE #s:  CC-2001- 179
               And  CC-2001- 180

---

STATE OF ALABAMA,    )    IN THE CIRCUIT COURT

      PLAINTIFF,    )    COFFEE COUNTY, AL

        )

vs.    )    ENTERPRISE DIVISION

        )

BRYAN GLENN YEOMAN,    )

      DEFENDANT    )    CASE #s:  CC-2001-
               And  CC-2001-

## *ORDER ON INITIAL APPEARANCE*

*Each of the above Defendants appeared before this Court today for the purposes of an "initial appearance" which was had, post indictment. The Defendants were advised of the charges against them and of the possible punishments. The Defendants were also advised of their right to make application for treatment as a youthful offender, as to each charge*



*against them and of the benefits and liabilities should any Defendant be granted treatment as a youthful offender. All stated that they understood the charges against them and the possible punishments. Also, all stated that they understood their right to make application for treatment as a youthful offender in each case and that they understood the benefits and liabilities of being granted treatment as a youthful offender.*

*Each of the above Defendants made application for the appointment of counsel. Said application was granted as each Defendant was declared to be indigent.*

*The attorneys appointed to represent each Defendant were drawn by lot as follows: (1) Every (non prosecuting) Coffee County, Alabama attorney was named and each attorneys' name was assigned a number. The names are as below listed in Court's Exhibit "A". The corresponding numbers were placed in a container. By lot and in open court the Clerk of Court, James (Mickey) Counts drew in the presence of the Defendants and this Judge the identity of the attorneys below appointed to represent each Defendant.*

*IT IS THEREFORE ORDERED that Don Pittman, attorney at law— having more than five years experience in the active practice of criminal law is hereby appointed to represent Robert Thomas Conrad in each case. Also, Gary Bradshaw, attorney at law is appointed co-defense counsel.*

*IT IS FURTHER ORDERED that Garth Lindsey, attorney at law— having more than five years experience in the active practice of criminal law is hereby appointed to represent Bryan Glenn Yeoman in each of the above styled criminal cases. Also, Jodee Rowe Thompson, attorney at law is appointed co-defense counsel.*

*IT IS FURTHER ORDERED that Ed Brown, attorney at law—having more than five years experience in the active practice of criminal law is hereby appointed to represent Brian James Smith in each of the above styled criminal cases. Also, Frank Chirico, attorney at law is appointed co-defense counsel.*

*The above styled cases are scheduled for arraignment on the 18th day of June, 2001 at 10:00 a.m. Unless an assigned Judge otherwise orders, each case is scheduled for a CALL OF THE CRIMINAL DOCKET on the*



31st day of July, 2001 at 9:00 a.m. **and a trial** by jury during the August 13, 2001 at 9:00 a.m. criminal jury term of court.

Note: The list of lawyers used for the assignment of an indigent defense for each defendant is marked as Court's Exhibit "A" below. Also note, the numbers randomly drawn in open court for the assignment of an indigent defense for each Defendant are attached to this order for records purposes and marked as Court's Exhibit "B". The Clerk of Court is to seal the remaining numbers in an envelope and make that sealed information a part of the court files for records purposes.

## COURT'S EXHIBIT "A"
LAWYERS, COFFEE COUNTY

| | | | |
|---|---|---|---|
| BRA074 | BRADSHAW, GARY | P.O. BOX 311412 | 393-6439 |
| BRO152 | BROCK, MIKE | 709 GLOVER AVENUE | 393-4357 |
| BRU019 | BRUNSON, MATT | P.O. BOX 358 ELBA | 897-3507 |
| BRO | BROWN, ED | | |
| | CARR, WILL | P.O. DRAWER 389 | 897-3658 |
| CAS011 | CASSADY, JOE SR. | P.O. BOX 310910 | 347-2626 |
| CAS010 | CASSADY, JOE JR. | P.O. BOX 310910 | 347-2626 |
| CH1020 | CHIRICO, FRANK | P.O. DRAWER 508 EL | 897-6361 |
| CLA070 | CLARK, SHANNON | P.O. BOX 311013 | 393-7680 |
| COT010 | COTTER, RAINER | P.O. BOX 310910 | 347-2626 |
| DEL020 | DELL, LAURA | 111 EAST COLLEGE | 308-2000 |
| DOW011 | DOWLING, JOHN | P.O. BOX 310068 | 347-9503 |
| FUL008 | FULLER, KENNETH | P.O. BOX 310910 | 347-2626 |
| HAR222 | HARTWICK, DWAIN | P.O. BOX 311526 | 347-2236 |
| HOL070 | HOLLINGSWORTH, (Rick, Sr.) | P.O. BOX 311662 | 347-3249 |
| HOL094 | HOLLINGSWORTH, (Rick, Jr.) | P.O. BOX 311662 | 347-3249 |
| JAR002 | JARED, DEBBIE | P.O. BOX 358 EL | 897-3507 |
| JAR003 | JARED, JOHN | P.O. BOX 358 EL | 897-3507 |
| JOR006 | JORDAN, MARK | 105 EAST COLLEGE | 347-2641 |
| KEL023 | KELLEY, JEFFERY | P.O. BOX 505 EL | 897-8778 |
| LIN004 | LINDSEY, G.A. | P.O. BOX 327 EL | 897-6129 |
| MAR095 | MARLER, MARTY | 348 SIMMONS STREET EL | 897-6161 |



| MAR040 | MARSH, DALE | P.O. BOX 310910 | 347-2626 |
| | MCLUNG, JOHN | P.O. BOX 327 EL | 897-6129 |
| | MORROW, GYPSY | P.O. BOX 356 EL | 897-2894 |
| MCL007 | MCLEAN, BRUCE | 111 EAST COLLEGE STREET | 347-2622 |
| | MOORE, BILL | | |
| MOR072 | MORGAN, BILL | P.O. BOX 310396 | 347-8130 |
| MYE009 | MYERS, LETITIA | 210 E. GRUBBS STREET | 393-0908 |
| PIT014 | PITTMAN, DON | P.O. DRAWER 311447 | 347-6682 |
| ROW005 | ROWE, CHARLES | P.O. BOX 311305 | 347-3401 |
| | SANCHEZ, (WALQUIRIA) | P.O. BOX 389 EL | 897-3658 |
| SAW004 | SAWYER, J.E., | 203 SOUTH EDWARDS STREET | 347-6447 |
| | SHERLING, PAUL | | 393-3660 |
| SHI008 | SHIRLEY, MERRILL | P.O. BOX 408 EL | 897-5775 |
| SMI098 | SMITH, AL | P.O. DRAWER 389 | 897-3658 |
| STO016 | STOKES, JACKSON | P.O. BOX 356 EL | 897-2894 |
| STO053 | STOUT, GARY | 709 GLOVER AVENUE | 393-4357 |
| SUM | SUMBLIN, ANNE | | |
| TIN | TINDOL, CHAD | | 347-2626 |
| ROW011 | THOMPSON, JODEE | P.O. BOX 311305 | 347-3401 |
| VAU004 | VAUGHAN, MARK | P.O. DRAWER E EL | 897-3413 |
| WAL051 | WALDROP, RICHARD | P.O. BOX 310027 | 393-2288 |
| WAL128 | WALKER, STANLEY | 203 SOUTH EDWARDS | 347-6447 |
| WEA012 | WEATHERFORD, JAMES | P.O. BOX 311291 | 347-1314 |
| WHI031 | WHITTAKER, RICHARD | P.O. BOX 311166 | 393-5146 |
| YOU020 | YOUNG, PAUL | P.O. DRAWER 311368 | 347-0843 |

*COURT'S EXHIBIT "B"*







Done this the 31st day of May, 2001.



Gary L. McAliley, Circuit Judge,
Twelfth Judicial Circuit
State of Alabama

MAY 2001
FILED
J.M. Counts
Court Clerk
Coffee Co., AL



COPY

ACR467                          ALABAMA JUDICIAL DATA CENTER
                                      COFFEE COUNTY
   JUDG: GARY L MCALILEY         DOCKET DATE NOTICE       CASE: CC 2001 000179.00

---

   DEFENDANT, ATTORNEY(S), AND ALL WITNESSES MUST APPEAR BEFORE THIS COURT
   FOR   ARRAIGNMENT        AT THE TIME AND PLACE STATED BELOW.

   DEFENDANT: CONRAD ROBERT THOMAS       DATE: 06/18/2001
   ATTORNEY:  PITTMAN DONALD SAXON        TIME: 10:00  AM
              BRADSHAW GARY DEAN          CHARGE: MURDER CAPITAL

                                         PLACE: COFFEE COUNTY COURTHOUSE
                                                COURTROOM D
         FULLER MARK EVERETT                    99 EDWARDS STREET
         203 EAST LEE ST BOX 780               ENTERPRISE, AL  36330

         ENTERPRISE    AL 36330

NOTES:

   DATE ISSUED:  06/01/2001            JAMES M COUNTS            , CLERK

OPERATOR:  DEC
PREPARED:  06/01/2001



ACR467                          ALABAMA JUDICIAL DATA CENTER
                                        COFFEE COUNTY
    JUDG: GARY L MCALILEY          DOCKET DATE NOTICE          CASE: CC 2001 000179.00

    DEFENDANT, ATTORNEY(S), AND ALL WITNESSES MUST APPEAR BEFORE THIS COURT
    FOR   ARRAIGNMENT         AT THE TIME AND PLACE STATED BELOW.

    DEFENDANT: CONRAD ROBERT THOMAS        DATE:  06/18/2001
    ATTORNEY:  PITTMAN DONALD SAXON        TIME:  10:00  AM
               BRADSHAW GARY DEAN          CHARGE: MURDER CAPITAL

                                          PLACE: COFFEE COUNTY COURTHOUSE
                                                 COURTROOM D
                                                 99 EDWARDS STREET
            CONRAD ROBERT THOMAS                 ENTERPRISE, AL  36330
            GARDEN OAKS APT.35
            ENTERPRISE     AL 36330 0000

    NOTES:

    DATE ISSUED:  06/01/2001                JAMES M COUNTS                , CLERK

    OPERATOR:  DEC
    PREPARED:  06/01/2001



ACR467                        ALABAMA JUDICIAL DATA CENTER
                                    COFFEE COUNTY
    JUDG: GARY L MCALILEY         DOCKET DATE NOTICE       CASE: CC 2001 000179.00

    ---------------------------------------------------------------------------

    DEFENDANT, ATTORNEY(S), AND ALL WITNESSES MUST APPEAR BEFORE THIS COURT
    FOR   ARRAIGNMENT          AT THE TIME AND PLACE STATED BELOW.

    DEFENDANT: CONRAD ROBERT THOMAS        DATE:  06/18/2001
    ATTORNEY:  PITTMAN DONALD SAXON        TIME:  10:00  AM
               BRADSHAW GARY DEAN          CHARGE: MURDER CAPITAL

                                          PLACE: COFFEE COUNTY COURTHOUSE
                                                 COURTROOM D
          PITTMAN DONALD SAXON                   99 EDWARDS STREET
          P.O. DRAWER 311447                     ENTERPRISE, AL  36330

          ENTERPRISE    AL 36331


    NOTES:


     DATE ISSUED:  06/01/2001              JAMES M COUNTS              , CLERK

    OPERATOR:   DEC
    PREPARED:  06/01/2001

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,                    *

    Plaintiff,                          *

VS.                                  *        CASE NO. CC 2001- 179

ROBERT THOMAS CONRAD,                *                    180

    Defendant.                          *

## MOTION TO WITHDRAW

COMES NOW Gary D. Bradshaw and moves the court to enter an ORDER allowing him to withdraw as appointed counsel for Defendant in the above case and as grounds offers the following:

1.    The victim, Jelaine Dennis, was a member of the same church as your moveant.

2.    The victim's three children, April, Monica and Damen, were all members of the Sunday School at the same church were your moveant is a youth director and teacher.

WHEREFORE, your moveant prays this court will consider this Motion to Withdraw and enter an ORDER granting the same based upon reasons offered.

                                   GARY D. BRADSHAW (BRA074)
                                   Attorney for Defendant
                                   P.O. Box 311412
                                   Enterprise, AL 36331-1412

JUN 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

(334) 393-6439

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing Motion on Mark Fuller, District Attorney, by placing a copy of the same in the District Attorney's receptacle at the Coffee County, Enterprise, Courthouse.

This the 1st day of June, 2001.

OF COUNSEL

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

State Of Alabama,          *
      Plaintiff,          *
                *
vs.          *          Case No.:_____
                *
Robert Thomas Conrad,          *
      Defendant.          *

## MOTION TO WITHDRAW

    **COMES NOW, Donald S. Pittman**, as the court appointed counsel for the Defendant in the above-styled case and moves this Honorable Court for an Order allowing said counsel to withdraw as attorney of record for the Defendant. As grounds, therefore, the undersigned avers that he has been active in the practice of law in the Enterprise Division of Coffee County, Alabama for twelve (12) years, however, at no time has the undersigned been actively engaged in the practice of criminal law. The undersigned has never accepted a retained criminal case and the few criminal cases in which the undersigned was involved were appointed indigent cases. At no time have the gross receipts from criminal cases exceeded ten percent (10%) of the undersigned's total gross receipts. Also, at no time has the undersigned's time expended on criminal cases exceeded ten percent (10%) of the undersigned's total billable hours.

    **WHEREFORE,** the premises considered, counsel for the Defendant requests to be withdrawn as attorney of record.

    **DONE** this the ___1___ day of _____June_____, _2001_.

    *Donald Pittman*
    **DONALD S. PITTMAN, P.C.**
    Attorney at Law
    P.O. Box 311447
    Enterprise, Alabama 36331-1447
    (334) 347-6682

31\01900-60101_001:1

## CERTIFICATE OF SERVICE

I hereby certify that I have this the 1st day of June, 2001 served a copy of the above and foregoing Motion on the following counsel, properly addressed to Hon. Mark E. Fuller, District Attorney, Twelfth Judicial Circuit, Coffee County Courthouse, Enterprise, Alabama.

Counsel for Defendant

31\01900-60101_001:1

24

STATE OF ALABAMA,                    )        IN THE CIRCUIT COURT OF
                                     )
            PLAINTIFF,               )        COFFEE COUNTY, AL
                                     )
VS.                                  )        ENTERPRISE DIVISION
                                     )
ROBERT THOMAS CONRAD,                )
                                     )
            DEFENDANT.               )        CASE #s: CC-2001-M-179
                                              and
                                              CC-2001-M-180


## O R D E R

*Section 13A-5-54, Code of Alabama, 1975, as amended is entitled "APPOINTMENT OF EXPERIENCED COUNSEL FOR INDIGENT DEFENDANTS" in capital cases. This section provides, "Each person indicted for an offense punishable under the provisions of this article who is not able to afford legal counsel must be provided with court appointed counsel HAVING NO LESS THAN FIVE YEARS' PRIOR EXPERIENCE IN THE ACTIVE PRACTICE OF CRIMINAL LAW."(emphasis, the Court's)*

*Attorney Don Pittman's practice is civil  and not a criminal practice. Attorney Pittman on the 1st day of June, 2001 filed with this Court a "MOTION TO WITHDRAW" wherein he states he has been a practicing attorney for twelve (12) years, "...at no time has [attorney Pittman] been actively engaged in the practice of criminal law."*

*IT IS THEREFORE ORDERED that attorney Don Pittman is relieved from any future duty to represent the Defendant further.*

*Utilizing the same lottery process (as was earlier described in a prior court order) where the Clerk of Court  draws indigent capital defense attorneys from a list of all practicing attorneys, attorney number thirty (30), i.e., Al Smith was selected.  IT IS THEREFORE ORDERED that Al Smith, having in excess of five years' prior experience in the active practice of criminal law,  is appointed to represent this Defendant.*

25

The Court has considered the reasons stated in co-counsel, Gary Bradshaw's *"MOTION TO WITHDRAW."* The undersigned Judge has this day personally discussed with Mr. Bradshaw his knowledge of the victim and the victim's children and any resulting conflict or bias he may have as a result of his membership in the same church as this Defendant's alleged now deceased victim. After doing so, **the Court finds no conflict exists.** Attorney Bradshaw is a very competent and professionally ethical attorney. He shall remain co-counsel with newly appointed attorney, Al Smith in defense of Robert Thomas Conrad. The *"MOTION TO WITHDRAW"* by **attorney Gary Bradshaw is denied.**

Note: See attorney number 30 attached to this order. Said number was drawn by the Clerk of Court this day for the purposes stated herein.

**_IT IS FURTHER ORDERED that a copy of this order be served on Robert Thomas Conrad and due return thereof make._** Also, the Clerk is to provide a copy of this order to the Defendant's attorneys of record and to the Office of the District Attorney.

Done and ordered this the 6th day of June, 2001.

**GARY L. McALILEY, CIRCUIT JUDGE**
**TWELFTH JUDICIAL CIRCUIT**
**STATE OF ALABAMA**

JUN 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

30

## CERTIFICATE OF SERVICE

I hereby certify that I have this the 1st day of June, 2001 served a copy of the above and foregoing Motion on the following counsel, properly addressed to Hon. Mark E. Fuller, District Attorney, Twelfth Judicial Circuit, Coffee County Courthouse, Enterprise, Alabama.

Donald P H...
Counsel for Defendant



JUN 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

31\01900-60101_001:1

| State of Alabama Unified Judicial System | APPLICATION FOR YOUTHFUL OFFENDER STATUS AND ORDER OF INVESTIGATION | Case Number |
| --- | --- | --- |
| Form C-54    Rev. 8/97 | | CC 2001-179,180 |

IN THE _____Circuit_____ COURT OF __Coffee (Enterprise)__ , ALABAMA
(County)

STATE OF ALABAMA v. ___Robert Thomas Conrad___ , DEFENDANT

Comes now the defendant in the above-styled cause and makes application for youthful offender treatment:

1. I am __20__ years of age. Date of Birth: __September 30, 1980__

2. I am represented by my attorney and he has discussed my case with me. I have had enough time to talk with my attorney about the facts of my case and he/she has explained my constitutional rights to me (see reverse side). I am satisfied with the services of my attorney and I have no complaints as to the way he/she has handled my case.

3. I understand that I am eligible to apply for treatment as a youthful offender. I understand that if I waive my right to trial by jury and consent to be tried by the court without a jury and treated as a youthful offender, the court will cause me to be investigated and examined by the court and the court, in its discretion, may direct that I be arraigned and tried as a youthful offender.

4. I understand that if I am adjudged by the court to be a youthful offender, the court, in its sole discretion, may do any of the following:
   a. Suspend the imposition or execution of sentence with or without probation; or
   b. Place me on probation not to exceed three (3) years, prescribing such terms of probation as the court, in its sole discretion, may deem proper; or
   c. Impose a fine as provided by law with or without probation or commitment; or
   d. Commit me to the custody of the Board of Corrections for a term of three (3) years or where a sentence or fine is not otherwise authorized by law, in lieu of or in addition to any such fine, the court may also impose a fine not to exceed $1,000.
   e. If the underlying charge is a misdemeanor, I may be given correctional treatment as provided by law for such misdemeanor.

5. I certify that I have not been threatened or abused or offered any inducement or reward to get me to make this application. I further understand that the punishment I receive is in the sole discretion of the court, although the court may in its discretion accept recommendations of punishment from the District Attorney.

6. With a full understanding of the foregoing, I hereby waive my right to a trial by jury and consent to be examined by the court, or such agency as the court may direct, and I further consent to be tried by the court, without a jury, should the court direct that I be treated as a youthful offender.

__6-6-01__                                          __Robert Conrad__
Date                                                 Defendant

Comes the attorney for the above named defendant and certifies that on this date, the above information was read by the defendant in my presence, or was read to him/her by me, that I discussed these matters with the defendant in detail, and that I concur in this petition.

__6-6-01__                                          __Gary D. Bradshaw__
Date                                                 Attorney
                                                     Attorney Code  (Bra 074)

---

**ORDER**

It is ORDERED that the Parole and Probation Office in this County make an investigation of the defendant in accordance with the *Code of Alabama 1975.*

It is further ORDERED that a hearing is set on said Petition on (date) __July 31, 2001__ at (time) __9:00 a.m.__

__June 13, 2001__                                   _____
Date                                                 Judge

28

IN THE  CIRCUIT COURT FOR COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,                    *

     Plaintiff,                           *

VS.                                  *       CASE NO. CC 2001-179 & 180

ROBERT THOMAS CONRAD,                *

     Defendant.                           *


## MOTION TO ALLOW THE DEFENDANT TO VIEW
## THE SCENE OF THE CRIME WITH HIS ATTORNEYS

The Defendant, by and through counsels, moves this Court pursuant to the Sixth,

Eighth and Fourteenth Amendments to the United States, and the state Constitution of

Alabama, for an order requiring some law enforcement official take him and his

attorneys to view the scene of the crime <u>immediately</u>, and allowing them to discuss the

facts of the case in a manner whereby the law enforcement official cannot hear the

discussion.

IN SUPPORT THEREOF, Defendant states as follows:

1.    In order to provide effective assistance of counsels as required under the

Sixth, Eighth and Fourteenth Amendments to the United States Constitution and

<u>Strickland v. Washington</u>, 466 U.S. 668 (1984), it is necessary that defense counsels view

the scene in the presence of the Defendant.

2.    The facts of this case are so contraverted that there is no way for the

Defendant to explain the situation to his attorneys properly in a manner whereby they

JUN 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

could take pictures, take measurements or otherwise properly investigate the scene of the alleged crime without his assistance.

     3.     To deny him the right to do this would amount to a denial of due process of law and effective assistance of counsels as guaranteed by the Alabama and United States Constitutions. To allow the Defendant to view the scene as requested would not prejudice the state's case in any manner and would only serve to promote a fair and impartial trial.

     WHEREFORE, the Defendant prays that this Court will enter an order allowing him to view the scene of the crime with his attorneys.

GARY D. BRADSHAW (BRA074)
Attorney for Defendant
P.O. Box 311412
Enterprise, AL 36331-1412
(334) 393-6439

ALBERT SMITH (SMI098)
Attorney for Defendant
P.O. Drawer 389
Elba, AL 36323
(334) 897-3658

### CERTIFICATE OF SERVICE

     I hereby certify that I have this date served a copy of the foregoing Motion on Mark Fuller, District Attorney, by mailing a copy of the same addressed to him at P.O. Box 311102, Enterprise, AL 36331-1102, by United States first class mail.

30

This the 18th day of June, 2001.

OF COUNSEL

OF COUNSEL

STATE OF ALABAMA,              )    IN THE CIRCUIT COURT OF
                              )
        Plaintiffs,            )    COFFEE COUNTY, AL
                              )
vs.                           )    ENTERPRISE DIVISION
                              )
ROBERT THOMAS CONRAD,         )
                              )
        Defendant.            )    Case #:  CC-2001-M-179 &
                                           CC-2001-M-180.

*[Clerk's filing stamp: JUN 2001 FILED J.M. Counts Court Clerk Coffee Co. AL]*

### O R D E R

   This matter comes before the Court upon the Defendant's *"MOTION TO ALLOW THE DEFENDANT TO VIEW THE SCENE OF THE CRIME WITH HIS ATTORNEYS."*

   For reasons of security, said *"MOTION..."* is granted in part and denied in part.

   *(Note:  The Court has been advised by the Prosecutor  that the building of the "crime scene"  is nothing but a shell at this time...and that the merchandise contained therein at the time of the criminal acts----has been obtained by the victims family from the victim's business...and may have been disposed of.  The Prosecutor has no objection to Defense counsel's viewing and videoing as below set forth.)*

   **IT IS THEREFORE ORDERED that the Prosecutor is to make TIMELY arrangements WITH THE VICTIM'S FAMILY for Defendant's counsel to VIEW AND TO VIDEO TAPE  the scene of the crime, i.e., the** outside and inside of the building where the criminal acts were committed...along with the premises on which the building is situated.

   Thereafter, **IT IS FURTHER ORDERED that the Sheriff of Coffee County make provision for the Defendant to meet with Defense counsel IN A PRIVATE SETTING AT THE COFFEE COUNTY, ALABAMA JAIL FACILITY...AND ALLOW DEFENSE COUNSEL ACCESS TO EQUIPMENT (i.e., a television and vcr) for the purpose of allowing**

*Defendant TO VIEW THE VIDEO of the crime scene AND discussing same with defense counsel.*

*IT IS FURTHER ORDERED that the portion of Defendant's "MOTION..." which seeks permission FOR DEFENDANT to go physically with Defense Counsel to the crime scene----and, which further seeks an order allowing Defendant and counsel---to be alone and **separate from law enforcement at the scene------IS DENIED----- FOR CUSTODIAL AND SECURITY REASONS.** Note: Defendant is charged with an offense for which the death sentence is a possible punishment.*

**IT IS FURTHER ORDERED that a YOUTHFUL OFFENDER HEARING, status hearing, motions hearing and scheduling conference is set for the 6th day of September, 2001 at 9:00 a.m.** *in the Coffee County courthouse building, Enterprise, Alabama (Courtroom D) at which time the Sheriff of Coffee County, Alabama is to take all actions necessary to make sure the Defendant is present before this Court for the purposes above mentioned. (Note: The youthful offender hearing set for July 31st is set aside.)*

Done this the 26th day of June, 2001.

_____
Gary L. McAliley, Circuit Judge, 12th Cir., Al



JUN 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

IN THE CIRCUIT COURT OF

COFFEE COUNTY, ALABAMA

ENTERPRISE DIVISION

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | |
| | ) | |
| v. | ) | Case No. CC-2001-M-179 & 180 |
| | ) | |
| ROBERT THOMAS CONRAD | ) | |
| | ) | |

## MOTION FOR DISCOVERY OF PROSECUTION FILES, RECORDS, AND INFORMATION NECESSARY TO A FAIR TRIAL

Pursuant to Rule 16 of the Alabama Rules of Criminal Procedure, applicable state law, the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and the corresponding provisions of the Alabama State Constitution, the accused respectfully moves this Honorable Court to order the production of the materials specified below. ROBERT THOMAS CONRAD additionally relies on Ex parte Monk, 557 So.2d 832, 836-37 (Ala. 1989), in which the Alabama Supreme Court held that "[t]he hovering death penalty is the special circumstance justifying broader discovery in capital cases."

ROBERT THOMAS CONRAD requests that this Court order the individuals named below to produce for inspection and copying the documents specified herein, wherever such documents may be located, with such production to be arranged with undersigned counsel within fourteen days from the day that discovery is ordered.

### I. DEFINITIONS

Unless the context indicates otherwise, the terms listed below are defined and used herein as follows:

1. The "state" means any and all of the following organizations: the district attorney for the Twelfth Judicial

Circuit of Alabama, the Enterprise Police Department, the Alabama Bureau of Investigation, the Alabama Department of Forensic Sciences, the Coffee County Sheriff's, and any other law enforcement agency that the District Attorney knows or with due diligence could determine had any involvement of any kind in the present investigation and case . The "state" also means: (a) all present and former agents, officers, investigators, consultants, employees, and staff members of organizations or officials named above in this paragraph; (b) any other person or entity acting on the behalf of any of these organizations or officials or on whose behalf such person or entity has acted in the past; or (c) any other person or entity otherwise subject to the control of any of these organizations or officials.

2. "Document" or "documents" means any writing, record or data in any form or medium, whether or not privileged, that is in the state's actual or constructive possession, custody or control. As used herein, a document is deemed to be within the state's control if the state has a right to obtain a copy of it. "Document" also includes the original of any document in whatever form or medium it may exist, and all copies of each such document bearing, on any sheet or side thereof, any marks (including by way of nonlimiting example: initials, stamped indicia, or any comment or notation of any character) not a part of the original text or any reproduction thereof. Examples of documents that must be produced include, but are not limited to, working papers, preliminary, intermediate or final drafts, correspondence, transcripts, analyses, studies, reports, surveys, memoranda, charts, notes, records (of any sort) of meetings, diaries, telegrams, telexes, faxes, reports of telephone or oral conversations, desk calendars, appointment books, audio or video tape recordings, photographs, films, microfilm, microfiche, computer tapes, disks or printouts, press releases, and all other writings or recordings of every kind.

3. "Relating to" means discussing, describing, referring to, reflecting, containing, analyzing, studying, reporting on, commenting on, evidencing, constituting, setting forth, considering, recommending, concerning, relevant to, bearing on, or pertaining to, in whole or in part.

4. "All" means "any and all."

5. "Any" means "any and all."

6. "Each" means "any and all."

7. "And" means "and/or."

8. "Or" means "and/or."

9. "Record" means "document" as outline in paragraph 2 above.

## II. INSTRUCTIONS

1. References to the singular shall be construed to include the plural, and references to the plural shall be construed to include the singular.

2. All verbs shall be construed to include all tenses.

3. If any document or portion of any document covered by these requests is withheld from production, please furnish a list identifying each such document or portion of document, providing the following information with respect to each such document or portion:

(a) the reason(s) for withholding;

(b) the date of the document;

(c) identification by name, job, title, and the last known business and home address of each person who wrote, drafted or assisted in the preparation of the document;

(d) identification by name, job, title, and the last known business and home address of each person who received or has had custody of the document or copies thereof;

(e) a brief description of the nature and subject matter of the document;

(f) the length of the document;

(g) a statement of the facts that constitute the basis of any claim of privilege, work product or other grounds for nondisclosure; and

(h) the paragraph(s) of these requests to which the document is responsive.

4. Pursuant to Rule 16.3 of the Alabama Rules of Criminal Procedure, each request is continuing in nature and additional responsive documents that are obtained or discovered prior to the evidentiary hearing should be produced as soon as they are obtained or discovered.

5. If any document responsive to a request was, but is no longer, in your possession, custody or control, state whether such document: (a) is missing or lost, (b) has been destroyed, (c) has been transferred to others, or (d) has otherwise been disposed of. For each instance, explain the circumstances surrounding such disposition, identify each

person who authorized such disposition, indicate the dates of such authorization and disposition, and identify the document and each person or entity that may have custody or control of such document or any copy thereof.

6. If information responsive to a request appears on one or more pages of a multipage document, produce the entire document.

7. Individual responses of more than one page should be stapled or otherwise separately bound, with each page consecutively numbered.

### III.  DOCUMENTS TO BE PRODUCED

A. Materials in the District Attorneys' Possession

The accused moves that this Court order the district attorney for the Twelfth Judicial Circuit of Alabama to disclose to undersigned counsel, and permit him to inspect, copy and photograph, the following items:

1. each document relating to any communications or statements (written or oral); memoranda, summaries or audio or video recordings of such communications or statements; as well as grand jury testimony, made to any person by any and all of the following: ROBERT THOMAS CONRAD, and any other person, including any confidential informant, who made any such communication or statement. The accused seeks all such documents falling within the parameters outlined above in this paragraph that relate to any communication or statement made during or after May 23, 2001, the date of the underlying offense (including the names and addresses of the persons to whom the communications or statements were made), including but not limited to those relevant to:

   (a) the death of JELAINE BOWMAN DENNIS and the robbery of ROBERT RAY GRIMES;

   (b) all events leading up to the death of JELAINE BOWMAN DENNIS and the robbery of ROBERT RAY GRIMES; and,

   (c) any condition of ROBERT THOMAS CONRAD, and any other person giving a statement or interview to authorities including but not limited to their mental or physical state at any time;

1. the names and addresses of all persons who have given written, recorded, video or oral statements or communications referred to in paragraph 1 (including subparagraphs (a) through (c)) above;

2. all names and addresses of any persons with knowledge of any facts or circumstances surrounding the death

Page 4 of 10

of JELAINE BOWMAN DENNIS and the robbery of ROBERT RAY GRIMES;

3. all documents to, from or between law enforcement officers regarding the death of JELAINE BOWMAN DENNIS and the robbery of ROBERT RAY GRIMES;

4. all documents to, from or between the state's investigative staff, excluding those portions, if any, which contain the opinions, theories, or conclusions of the prosecuting attorneys or members of their staff;

5. any documents in the state's possession or available to the state that are exculpatory or favorable or provides impeachment information to ROBERT THOMAS CONRAD on the issue of guilt or punishment regarding any element of the offense of capital murder related to the death of JELAINE BOWMAN DENNIS and the robbery of ROBERT RAY GRIMES, including but not limited to:

(a) favorable or exculpatory evidence provided by or relating to any of the prosecution witnesses;

(b) any and all information including letters, records of telephone calls, memoranda, and any other records or documents disclosing bias or prejudice or prejudgment by citizens of Coffee County, Alabama, against ROBERT THOMAS CONRAD, and the identity of the persons making statements indicating such views;

(c) any and all other information respecting any state witness that is favorable to ROBERT THOMAS CONRAD on the issue of guilt or punishment regarding any element of the offense of capital murder in the death of JELAINE BOWMAN DENNIS and the robbery of ROBERT RAY GRIMES;

(d) any and all information in any form whatsoever, that derives from any person, that is exculpatory with respect to ROBERT THOMAS CONRAD having committed acts that may have caused the death of JELAINE BOWMAN DENNIS and the robbery of ROBERT RAY GRIMES, including but not limited to statements made by any prosecution witness who testified;

(e) any and all information that would support a showing that this offense was committed while ROBERT THOMAS CONRAD was under the influence of mental or emotional disturbance;

(f) any and all information relevant to the capacity of ROBERT THOMAS CONRAD to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, especially any such information that would support a finding that ROBERT THOMAS CONRAD'S capacity was substantially impaired;

(g) any information supporting the existence of a nonstatutory mitigating circumstance;

(h) any information supporting the existence of a statutory mitigating circumstance; and

(i) any evidence possessed or which by due diligence could be possessed by the state at ROBERT THOMAS CONRAD in support of any alleged aggravating circumstance that was subject to partial or total negation;

6. all physical or documentary evidence, including diagrams, sketches, books, papers, documents, photographs, illustrations or tangible objects in the possession of the prosecution, law enforcement personnel, or a prosecution witness that relate to this case or ROBERT THOMAS CONRAD in any way;

7. all documents relating to the conducting or results of any medical, pathological, toxicological, chemical, biochemical, criminalistics, laboratory, forensic, or scientific examinations, investigations or analyses regarding the death of JELAINE BOWMAN DENNIS and the robbery of ROBERT RAY GRIMES, including but not limited to:

(a) each document relating to the search of the scene of the crime;

(b) each document relating to the search of the;

(c) each document relating to any postmortem scientific or physical test(s) or experiment(s) conducted in connection with the death of JELAINE BOWMAN DENNIS and the robbery of ROBERT RAY GRIMES, including but not limited to all tests conducted by the state, including, but not limited to, the District Attorney's Office of the Twelfth Judicial Circuit, the Alabama Department of Forensic Sciences, the Alabama Bureau of Investigation, the Coffee County Sheriff's Department, and the Enterprise Police Department;

8. all psychiatric documents relating to the conducting or results of any testing, examinations or interviews of ROBERT THOMAS CONRAD, including but not limited to reports by the Alabama Department of Corrections, the Alabama Department of Mental Health and Mental Retardation (Taylor Hardin), or any other agency;

9. all documents relating to ROBERT THOMAS CONRAD, including:

(a) all juvenile and adult detention, jail, prison, parole, probation and presentence investigation records;

(b) all sentencing reports;

(c) all arrest, conviction, and adult and juvenile criminal offense records;

(d) all records of any law enforcement authority, including any document relating to any plea negotiations between ROBERT THOMAS CONRAD and the state;

(e) all records of any detention or court authority;

(f) all records that the prosecution or any law enforcement official has submitted to any professional personnel for examination or analysis in connection with this case;

(g) all institutional records of any kind including but not limited to those prepared at the Coffee County Jail, any detention facility where ROBERT THOMAS CONRAD was housed or incarcerated pending his return to the State of Alabama;

(h) all psychiatric documents relating to the conducting or results of any testing, examinations or interviews of ROBERT THOMAS CONRAD, including but not limited to reports by the Coffee County Juvenile Probation services, or any other agency, and any other psychiatric, psychological or mental health records concerning ROBERT THOMAS CONRAD;

(i) all documents relating to any tests of any kind done on ROBERT THOMAS CONRAD, including but not limited to any tests done on samples of ROBERT THOMAS CONRAD'S blood, saliva or hair;

10. all documents relating to any state witness who has testified at Grand Jury or who is expected to be called as a witness at ROBERT THOMAS CONRAD'S trial, including:

(a) all juvenile and adult detention, jail, prison, parole, probation and presentence investigation records;

(b) all sentencing reports;

(c) all arrest, conviction, and adult and juvenile criminal offense records;

(d) all records of any law enforcement authority, including all documents relating to any plea negotiations between any state witness and the state;

(e) all records of any detention or court authority;

(f) all records of any prosecuting authority;

(g) all psychiatric, psychological or mental health records;

(h) all education records;

(i) all documents relating to any lie detector test taken by any state's witness; and

(j) all other records and reports;

11. all documents and any information regarding the use of confidential informants in the investigation of the murder of JELAINE BOWMAN DENNIS and the robbery of ROBERT RAY GRIMES

. 12. all documents and any information regarding the background, arrest record or criminal record of JELAINE BOWMAN DENNIS and ROBERT RAY GRIMES; and

13. the entire case files of the District Attorneys for the Twelfth Judicial Circuit of Alabama relating to the death of JELAINE BOWMAN DENNIS and the robbery of ROBERT RAY GRIMES and the related prosecution of ROBERT THOMAS CONRAD for capital murder.

B. Materials in Possession of the Coffee County District and Circuit Courts

The accused moves that this Court order the Clerk for the Coffee County Circuit Court and the Clerk for the Coffee County District Court to disclose to Mr. CONRAD's counsel, and permit them to inspect, copy and photograph, all records of any proceeding from the dockets of the respective courts (both the juvenile dockets and the regular adult dockets) involving JELAINE BOWMAN DENNIS and ROBERT RAY GRIMES, and any confidential informant, any person who has given a statement to authorities whose information has led in any manner to the charges against Mr. CONRAD, any witness who has testified at Grand Jury, or any witness who may be called to testify at trial.

C. Materials in the Possession of (1) the Sheriff's Departments of Coffee County, Alabama, (2) the Enterprise Police Department, (3) the Office of the District Attorney of the Twelfth Judicial Circuit, and, (4) any other law enforcement agency within or without the state.

The accused moves that this Court order the Sheriff's Departments of Coffee County, Alabama, and the Police Departments of Enterprise, Alabama, and the District Attorney's Office of the Twelfth Judicial Circuit, to disclose to counsel, and permit them to inspect, copy, and photograph, all materials referenced in paragraphs 1 through 14 (including all subparagraphs) of Section III, above.

D. Materials in the Possession of the Alabama Bureau of Investigation and the Alabama Department of Forensic Sciences

The accused moves that this Court order the Alabama Bureau of Investigation ("ABI") and the Alabama Department of Forensic Sciences to disclose to counsel, and permit them to inspect, copy, and photograph, all materials referenced in paragraphs 1 through 14 (including all subparagraphs) of Section III, above.

This motion is made under the authority of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); <u>Ex parte Monk</u>, 557 So.2d 832 (Ala. 1989); <u>Napue v. Illinois</u>, 360 U.S. 264 (1959); <u>Giles v. Maryland</u>, 386 U.S. 66 (1967); <u>Davis v. Alaska</u>, 415 U.S. 308 (1974); <u>United States v. Pitt</u>, 717 F.2d 1334 (11th Cir. 1983); and Rule 16 of the Alabama Rules of Criminal Procedure, as well as the constitutional and statutory provisions cited in the opening paragraph.

WHEREFORE, Mr. Conrad respectfully requests that this Court order the production of the foregoing materials and grant leave to depose the above-named individuals and for Mr. Conrad's counsel to **PERSONALLY INSPECT ALL FILES, NOTES, DOCUMENTS, AND TANGIBLE OBJECTS AND TO PERSONALLY VIEW ALL ELECTRONIC DATA.**

Respectfully submitted this the 22nd day of June, 2001.

Smith & Carr, LLC.
Sydney Albert (Al) Smith            SMI098
P. O. Drawer 389
Elba, Al 36323
Phone:        334-897-3658
Fax:          334-897-8633

Gary D. Bradshaw    BAR074
Post Office Box 311412
Enterprise, Alabama 36331
Phone:        334-393-6439

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

Al Smith                    6/25/2001
Date

43.

STATE OF ALABAMA,　　　　　　 ＊　IN THE CIRCUIT COURT FOR
　　　　　　　　　　　　　　　　 ＊
　　　PLAINTIFF,　　　　　　　　＊　_Coffee Co.-Enterprise_
　　　　　　　　　　　　　　　　 ＊
　　　　　　　　　　　　　　　　 ＊
VS.　　　　　　　　　　　　　　 ＊
_Robert Thomas Condor_ ,　　　　＊
　　　　　　　　　　　　　　　　 ＊　CASE # _CC01-179 &_
　　　DEFENDANT.　　　　　　　　＊　　　_CC01-180_

## D I S C O V E R Y   O R D E R

IT IS HEREBY ORDERED:

1.　The District Attorney or his representative shall produce or make available to the Defendant/Defendant's attorney the following:

(a).　All statements of the defendant which are reduced to writing;

(b).　All statements of the defendant which are electronically recorded or taped and any transcripts thereof;

(c).　The substance of any oral statements made by the defendant which are not included within (a) and (b) hereof or if the District Attorney knows of any statements or spontaneous remarks made while the defendant is/was in the custody of law enforcement and during the investigation;

(d).　Any and all evidence tending to exculpate the guilt of the defendant;

(e).　The results of any scientific or expert tests, experiments, or examinations to be used by the Prosecution at trial;

(f).　All physical evidence or documentary evidence which the Prosecution will offer into evidence in its case in chief, including any search warrant and search affidavits upon which the Prosecution will rely on its case in chief;

(g).　All physical evidence or documentary evidence seized from the defendant by law enforcement officers, whether or not the same will be offered into evidence at trial;

(h).　In prosecutions under the Alabama Uniform Controlled Substance Act, the defendant may procure the examination and testing of controlled substances or other prosecution evidence by his own expert, upon request to the District Attorney or his assistants. Such examination and testing shall only take place in the presence of the District Attorney or his authorized representative, and the same shall be done at the defendant's expense unless otherwise directed; and

(i).    The names and last known confidential government informants who are more than passive observers, provided, however, the defendant meets the burden that the defendant does not know the identity of the informant and that the disclosure is necessary to the defendant in formulating defenses in that the informant is a participant in or an eyewitness to the criminal act.

2.    The Defense Attorney or his representative shall produce or make available to the District Attorney the following:

(a).    The results of any scientific or expert tests, experiments, or examinations or reports of physical or mental examinations to be used by the defense at trial or which were prepared by a witness whom the defendant intends to call at trial if such relates to the witness's testimony;

(b).    All physical evidence or documentary evidence which the defense will offer into evidence at the trial;

(c).    In connection with the offense with which the defendant is charged for the defendant to appear in a line-up, speak for identification by witnesses, be fingerprinted, palmprinted, footprinted, or voice-printed, pose for photographs not involving re-enactment of an event, try on clothing, provide handwriting samples/exemplars, permit the taking of hair, blood, saliva, urine or other specified materials involving no unreasonable body intrusions, and to submit to physical or medical exams not including psychiatric or psychological examinations.

3.    In all instances where physical or documentary evidence tape recordings and the like are to be inspected, examined or copied by the prosecution or the defense counsel, the parties shall insure that such procedures are used as will safeguard and maintain the integrity of said evidence.

4.    The District Attorney and the Defense Attorney are under an obligation and are hereby ORDERED to disclose to opposing counsel any evidence subject to this Order which they subsequently discover to exist, and they are FURTHER ORDERED to do so within a reasonable time after the existence is discovered.

5.    Any disagreements of the parties concerning the scope, identity or existence of discoverable matter are to be submitted to the Court for resolution upon motion of either party a reasonable time before trial. Any party who does not so submit any unresolved discovery issue to the Court will be precluded from raising the same at trial.

45

If the Court finds that either party has failed to use good faith in complying with this Order, the Court may in the case of the State or the Defendant, bar the State or the Defendant from using at trial any non-disclosed matter and the Court may hold any objections to the use of said matter at trial, based upon prior non-disclosure, to be waived.

This Order is to be placed in any criminal file by the Clerk when Criminal Discovery is requested.

Done and Ordered this the __27__ day of __January__, 1995.

ROBERT W. BARR
Circuit Judge

GARY L. MCALILEY
Circuit Judge

THOMAS E. HEAD
Circuit Judge

JAN 1995

cc: DA,
Backman +
Smith

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA )
)
)
v. ) Case No. CC-2001-M-179 & 180
)
ROBERT THOMAS CONRAD )
)

JUN 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

---

## MOTION TO INSPECT, EXAMINE, AND TEST ALL PHYSICAL EVIDENCE

---

Pursuant to Rule 16 of the Alabama Rules of Criminal Procedure, applicable state law, the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and the corresponding provisions of the Alabama State Constitution, the accused respectfully moves this Honorable Court to issue an order compelling the State of Alabama to produce **ALL** items of physical evidence in its possession and control, or which by due diligence could be placed in its possession, collected by the state in the investigation of the murder of JELAINE BOWMAN DENNIS and the robbery of ROBERT RAY GRIMES, for viewing by defense counsel, and for inspection and testing by experts designated by defense counsel. ROBERT THOMAS CONRAD additionally relies on Ex parte Monk, 557 So.2d 832, 836-37 (Ala. 1989), in which the Alabama Supreme Court held that "[t]he hovering death penalty is the special circumstance justifying broader discovery in capital cases."

ROBERT THOMAS CONRAD requests that this Court order the state to produce the physical evidence specified herein, with such production to be arranged with undersigned counsel within fourteen days from the day that discovery is ordered, and set a reasonable time and place for the viewing by defense counsel, and inspection, testing and photographing of the evidence by experts for the defense.

I. DEFINITIONS

Page 1 of 5

Unless the context indicates otherwise, the terms listed below are defined and used herein as follows:

1. The "state" means any and all of the following organizations: the district attorney for the Twelfth Third Judi-cial Circuit of Alabama, the Enterprise Police Department, the Alabama Bureau of Investigation, the Alabama Department of Forensic Sciences, and the Coffee County Sheriff's Department. The "state" also means: (a) all present and former agents, officers, investigators, consultants, employees, and staff members of organizations or officials named above in this paragraph; (b) any other person or entity acting on the behalf of any of these organizations or officials or on whose behalf such person or entity has acted in the past; or (c) any other person or entity otherwise subject to the control of any of these organizations or officials.

2. "Relating to" means discussing, describing, referring to, reflecting, containing, analyzing, studying, reporting on, commenting on, evidencing, constituting, setting forth, considering, recommending, concerning, relevant to, bearing on, or pertaining to, in whole or in part.

3. "All" means "any and all."

4. "Any" means "any and all."

5. "Each" means "any and all."

6. "And" means "and/or."

7. "Or" means "and/or."

## II. INSTRUCTIONS

1. References to the singular shall be construed to include the plural, and references to the plural shall be construed to include the singular.

2. All verbs shall be construed to include all tenses.

3. If any piece of evidence covered by these requests is withheld from production, please furnish a list identifying each such piece of evidence.

4. Pursuant to Rule 16.3 of the Alabama Rules of Criminal Procedure, each request is continuing in nature and additional responsive evidence that is obtained or discovered prior to the evidentiary hearing should be produced as soon as it is obtained or discovered.

5. If any piece of evidence that is responsive to a request was, but is no longer, in your possession, custody or control, state whether such evidence: (a) is missing or lost, (b) has been destroyed, (c) has been transferred to others, or (d) has otherwise been disposed of. For each instance, explain the circumstances surrounding such disposition, identify each person who authorized such disposition, indicate the dates of such authorization and disposition, and identify the evidence and each person or entity that may have custody or control of such evidence.

### III. PHYSICAL EVIDENCE TO BE PRODUCED

ROBERT THOMAS CONRAD  respectfully requests that this Court order the state to produce:

1. all clothing taken as evidence in the course of investigating the murder of JELAINE BOWMAN DENNIS and the robbery of ROBERT RAY GRIMES, including, but not limited to, the clothing taken from ROBERT THOMAS CONRAD, and any other person;

2. all weapons or dangerous instruments taken from the scene of the alleged crime, from the vehicle, home or person of ROBERT THOMAS CONRAD, **AT ANY TIME** or any suspects, or related in any way to the investigation of the murder of  JELAINE BOWMAN DENNIS  and the robbery of ROBERT RAY GRIMES;

3. all fingerprints taken as part of the investigation of this case;

4. all notes, writings, memoranda and letters taken by the state as part of the evidence in this case;

5. all physical evidence taken by the state from the scene of the crime; including but not limited to hair fibers, saliva, footprints, tire tracks and dirt samples;

6. all physical evidence seized during any search incident to the investigation in this case;

7. all blood samples taken as part of the investigation of this case;

8. all other physical evidence taken by the state that relates in any way to the investigation of the murder of JELAINE BOWMAN DENNIS  and the robbery of ROBERT RAY GRIMES, including, but not limited to, all the photographs taken by the state during the investigation of the murder, all items of physical evidence collected or received, whether or not such evidence is considered relevant or contemplated to be introduced at trial or not.

This request for the inspection, examination, and testing of the specific items set out above is essential to insure the accused his right to a fair trial, to confrontation, to prepare a defense in his own behalf, to effective assistance of

counsel, and to due process of law as guaranteed by the Alabama and the United States Constitutions. See, e.g., Barnard v. Henderson, 514 F.2d 744 (5th Cir. 1975); White v. Maggio, 556 F.2d 1352 (5th Cir. 1977). This request is covered by Rule 16(c) of the Alabama Rules of Criminal Procedure and by the necessity of broader discovery justified in capital cases. See Ex parte Monk, 557 So.2d 832 (Ala. 1989).

WHEREFORE, the accused prays that this Court:

(1) order the state to **LIST** and **PRODUCE** all the items of physical collected or received or described herein;

(2) allow ROBERT THOMAS CONRAD the right to have defense counsel view all items of physical evidence, and have an expert examine, inspect, conduct scientific tests on, and photograph the items produced;

(3) set a time and place for the inspection, testing and photographing of the items at a reasonable time after the hearing on this motion;

(4) order the state to make continuing disclosure of all additional items of physical evidence obtained by the state concerning the investigation of this case;

(5) set this motion down for an evidentiary hearing; and

(6) grant any other relief that is just and proper under the circumstances.

Respectfully submitted this June 25, 2001.

Smith & Carr, LLC.
Sydney Albert (Al) Smith          SMI098
Attorneys at Law
P. O. Drawer 389
Elba, Al 36323
Phone:   334-897-3658
Fax:            334-897-8633

Gary D. Bradshaw          BRA074
Attorney at Law
P. O. Box 311412
Enterprise, AL 36331-1412
Phone:          334-393-6439

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

_____  6/25/2001
Al Smith                                            Date

Page 5 of 5

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA       )
                              )
                              )
       v.                  )    Case No. CC-2001-M-179 & 180
                              )
ROBERT THOMAS CONRAD    )
                              )

## ORDER

Upon consideration of Defendant ROBERT THOMAS CONRAD's Motion to Inspect, Examine, and Test

All Physical Evidence, it is hereby

ORDERED that Defendant's Motion to Inspect, Examine, and Test All Physical Evidence be granted; and it

is further

ORDERED that the state shall **LIST** all items of physical evidence within 5 days, and shall **PRODUCE** all

items of physical evidence and shall allow ROBERT THOMAS CONRAD to have an expert examine, inspect,

conduct scientific tests on, and photograph the items produced; and it is further;

ORDERED that the inspection, testing and photographing of the items shall take place on the _____ day of

_____, 2001, at _____ m. o'clock at a place mutually convenient to both parties, to wit,

_____; and such other times as is reasonably requested by the Defendant

through his attorneys, and it is further;

ORDERED that the state shall make continuing disclosure of all additional items of physical evidence it

obtains concerning the investigation of this case.

Done and ordered this _____ day of _____, 2001.

_____
Gary L. McAliley
CIRCUIT JUDGE

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA          )
                          )
    v.                    )          Case No. CC-2001-M-179 & 180
                          )
ROBERT THOMAS CONRAD      )
                          )



### ASSERTION OF RIGHT TO PROCEED
### EX PARTE ON APPLICATIONS FOR FUNDS

COMES NOW, ROBERT THOMAS CONRAD, by counsel, and notifies this Court pursuant to the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 1, 5, 6, 7, 8, 9, 11, 13, 15 & 16 of the Alabama Constitution of his intention to proceed <u>ex parte</u>, in the absence of the District Attorney, in his applications for funds for expert assistance.

In support of his motion, ROBERT THOMAS CONRAD states as follows:

1. Since this is to be a capital prosecution, exacting standards must be met to assure that it is fair. "The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special '"need for reliability in the determination that death is the appropriate punishment"' in any capital case." <u>Johnson v. Mississippi</u>, 486 U.S. 578, 584, (1988) (quoting <u>Gardner v. Florida</u>, 430 U.S. 349, 363-64 (1977) (quoting <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305 (1976))).

2. Alabama law clearly entitles the defendant to <u>ex parte</u> proceedings for requesting expert assistance. <u>Ex parte Moody</u>, 684 So. 2d 114 (Ala. 1996). Mr. Conrad submits this notice of intent to emphasize why such <u>ex parte</u> proceedings are essential to protecting confidential attorney-client communications and attorney work-product material which must be disclosed to make a showing of need for the requested assistance. Disclosure of this information to the prosecution would violate Mr. Conrad's rights to present a defense, to the effective assistance of counsel, to compulsory process to secure witnesses, to confront the evidence against him, to due process, to equal protection of the laws, to freedom from cruel and unusual punishment, and against compulsory self-incrimination.

### EX PARTE PROCEEDINGS ARE ESSENTIAL TO
### PROTECT THE RIGHTS OF ROBERT THOMAS CONRAD

3. It is now well established that when a state brings its judicial power to bear on an indigent defendant in a criminal case "it must take certain precautions 'to assure that the defendant has a fair opportunity to present his defense.'" <u>Ex parte Moody</u>, 684 So. 2d at 118 (quoting <u>Ake v. Oklahoma</u>, 470 U.S.

68, 77 (1985)). In <u>Ake</u>, the United States Supreme Court held that where the assistance of an expert is needed to prepare to present a defense, an indigent defendant has a constitutional right to the services of that expert at state expense.

> [When a] question . . . [is] likely to be a significant factor in his defense . . . [the defendant is] entitled to the assistance of a[n expert] on this issue and the denial of that assistance deprive[s] him of due process.

470 U.S. at 86-87. <u>Ake</u> involved the denial of an independent psychiatrist in a capital case involving issues of insanity and future dangerousness. In analyzing under what circumstances expert assistance is constitutionally required, the Court explicitly held that a showing of need was to be made <u>ex parte</u>:

> When the defendant is able to make an ex parte <u>threshold showing</u> to the trial court that his sanity is likely to be a significant factor in his defense, the need for the assistance of a psychiatrist is readily apparent. . . . [T]he State must [then], at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

<u>Id</u>. at 82-83 (emphasis added).

4. Alabama's appellate courts have expressly recognized a capital defendant's right to seek <u>Ake</u> assistance <u>ex parte</u>. Ex parte Moody, 684 So.2d 114 (Ala. 1996); <u>see also</u> <u>Ex parte Grimsley</u>, No. 91-438 (Ala.Cr.App. Jan. 21, 1992) (granting mandamus in capital case where trial court refused to allow <u>ex parte</u> applications). Every other court that has considered the issue has determined that such hearings should be held on an <u>ex parte</u> basis. See, e.g., McGregor v. State of Oklahoma, 733 P.2d 416, 416-17 (Okla.Cr.App. 1987), <u>conviction rev'd after remand</u>, 754 P.2d 1216, 1217 (Okla.Cr. 1988) (intention of <u>Ake</u> majority that hearings be held <u>ex parte</u> is "manifest"); <u>Brooks v. State</u>, 385 S.E.2d 81, 82-84 (Ga. 1989); <u>Gipson v. State</u>, No. 1095 (D. Tenn. Aug. 25, 1989) (WESTLAW, TN-CS file); <u>People v. Loyer</u>, 425 N.W.2d 714, 721-22 (Mich. App. 1988); <u>State v. Hickey</u>, 346 S.E.2d 646, 654 (N.C. 1986) (dicta); <u>State v. Poulsen</u>, 726 P.2d 1036, 1038 (Wash.Ct.App. 1986) (dicta); <u>Wall v. State</u>, 715 S.W.2d 208, 209 (Ark. 1986) (dicta); <u>People v. Thornton</u>, 265 N.W.2d 35, 38-39 (Mich.App. 1978) (dicta); <u>see also</u> <u>Lindsey v. State</u>, 330 S.E.2d 563, 566

Page 2 of 13

(Ga. 1985) (findings of <u>Ake</u> expert privileged to defendant). Other jurisdictions have preserved the constitutional rights of the accused through a statute that expressly allows <u>ex parte</u> applications to the trial judge.[1]

    (a) The Nature and Scope of <u>Ex Parte</u> Applications

    5. The Supreme Court's decision in <u>Ake</u> was based on its recognition that to deny an indigent accused basic, critical expert assistance while the state may utilize the services of virtually any expert of its choosing would render a criminal trial fundamentally unfair.[2] The truthfinding function of the adversary process would also be lost if the prosecution were allowed simply to overwhelm the impoverished defendant with the wealth of its resources:

> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. . . . [This Court] has often reaffirmed that fundamental fairness entitles indigent defendants to "an adequate opportunity to present their claims fairly within the adversary system."

---

    1. <u>See</u>, <u>e.g.</u>, <u>Minn. Stat.</u> § 611.21 (1982); <u>Nev. Rev. Stat.</u> § 7.135 (1983); <u>N.Y. County Law</u> § 722-C (McKinney Supp. 1984-85); <u>Kan. Stat. Ann.</u> § 22-4508 (Supp. 1981); <u>Tenn. Code Ann.</u> § 40-14-207 (1988); <u>Cal. Pen. Code</u> § 987.9 (1983) (allowing <u>ex parte</u> hearing before judge other than trial judge to preserve accused's right).

    2. The <u>Ake</u> decision applies to all services and expenses reasonably necessary for an effective defense. <u>Ex parte DuBose</u>, 662 So. 2d 1189 (Ala. 1995). <u>See also</u> <u>Thornton v. State</u>, 339 S.E.2d 241 (Ga. 1986) (dental expert); <u>Patterson v. State</u>, 232 S.E.2d 233 (Ga. 1977) (narcotics analyst); <u>State v. Carmouche</u>, 553 So.2d 467 (La. 1989) (eyewitness identification expert); <u>State v. Bridges</u>, 385 S.E.2d 337, 338 (N.C. 1989) (fingerprint expert); <u>United States v. Patterson</u>, 724 F.2d 1128 (5th Cir. 1984) (same); <u>United States v. Durant</u>, 545 F.2d 823 (2d Cir. 1976) (same); <u>State v. Carmouche</u>, 527 So.2d 307 (La. 1988) (neurologist); <u>Barnard v. Henderson</u>, 514 F.2d 744 (5th Cir. 1975) (firearms expert); <u>Tatum v. State</u>, 380 S.E.2d 253 (Ga. 1989) (same); <u>Williams v. Martin</u>, 618 F.2d 1021 (4th Cir. 1980) (pathologist); <u>United States v. Fogarty</u>, 558 F.Supp. 856 (E.D. Tenn. 1982) (handwriting analyst); <u>Bowen v. Eyman</u>, 324 F.Supp. 339 (D.Ariz. 1970) (serologist); <u>State v. Carmouche</u>, 527 So.2d 307 (La. 1988) (same); <u>State v. Lippincott</u>, 307 A.2d 657 (N.J. 1973) (expert on effects of alcohol).

Ake, 470 U.S. at 77 (quoting Ross v. Moffitt, 417 U.S. 600 (1974)). Due process and fundamental fairness thus forbid the state from "legitimately assert[ing] an interest in maintenance of a strategic advantage over the defense, if the result of that advantage is to cast a pall on the accuracy of the verdict obtained." Ake, 470 U.S. at 79.

6. However, Ake provides that an indigent defendant is entitled to defense services at state expense only upon a threshold showing that such assistance is required to deal with a significant factor in the defense of the case. Ake, 470 U.S. at 86-87; Ex parte DuBose, 662 So. 2d at 1192; Ex parte Moody, 684 So. 2d at 118. See also Caldwell v. Mississippi, 472 U.S. 320, 323 n.1 (1985) (defendant must support request for investigator and fingerprint and ballistics experts with something more than general statement of need).

7. Thus, an accused cannot simply ask for unlimited funds for any and all experts and expect that they will be granted. In order to demonstrate his entitlement to an expert or investigative assistance, the defendant must reveal to the court the theory of the defense, the results of any investigation or witness consultation that has already taken place, other work product, and the information that is anticipated from the services sought. Ex parte Moody, 684 So. 2d at 120-21; Moore v. Kemp, 809 F.2d 702, 710-12 (11th Cir. 1987) (en banc); Messer v. Kemp, 831 F.2d 946 (11th Cir. 1987) (en banc). Obviously, of necessity, this showing requires disclosure of information obtained in attorney-client interviews.

8. Such disclosures go well beyond the discovery permitted either for or against the accused under Alabama law. See Ala.R.Crim.P. 16. Certainly, then, the prosecution cannot assert an interest in discovering the intimate details of the defense strategy prior to the trial. Clearly, where the potential defense expert may be performing an investigation, or may merely have been consulted by counsel with a view to providing assistance in challenging the state's case, the prosecution cannot demand notice.

9. ROBERT THOMAS CONRAD's adversary, the district attorney, should have no more right to disclosure of the intimate attorney-client discussions that precede the development of the defense strategy

than ROBERT THOMAS CONRAD should have a voice in which police officers investigate his case or how the prosecution plans to develop its strategy. See <u>Wardius v. Oregon</u>, 412 U.S. 470 (1973) (due process clause prohibits enforcement of rules for one party and not the other).

10. In essence, the only assertion that the prosecution can make in this context is that it does not trust this Court to perform its function. This is not a firm foundation upon which to predicate the violation of the rights of the accused.

(b)  The Equal Protection Clause Requires <u>Ex Parte</u> Applications

11. The United States Supreme Court has long since recognized that "[t]here can be no equal justice where the kind of trial a man gets depends on the amount of money he has." <u>Griffin v. Illinois</u>, 351 U.S. 12, 19 (1956). To the contrary, "all people charged with crime must, so far as the law is concerned, 'stand on an equality before the bar of justice in every American court.'" <u>Id</u>. at 17 (quoting <u>Chambers v. Florida</u>, 309 U.S. 227, 241 (1940)).[3]

12. Were ROBERT THOMAS CONRAD financially independent he would obtain investigative and other services without informing the prosecution of whose assistance he was seeking or why. Penalizing impoverished defendants by requiring them to announce privileged information as well as their trial strategy as a prerequisite to investigating and presenting a defense would obviously constitute invidious discrimination:

> There should be equality between "indigents and those who possess the means to protect their rights." <u>United States v. Tate</u>, 419 F.2d 131, 132 (6th Cir. 1969). An indigent defendant should not have to disclose to the state information that a financially secure defendant would not have to disclose.

---

3. The <u>Ake</u> decision is only one in a long line of cases defining the equal protection and due process rights of the indigent accused. <u>See</u>, <u>e.g.</u>, <u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963) (right to trial counsel); <u>Douglas v. California</u>, 372 U.S. 353 (1963) (right to counsel on appeal); <u>Roberts v. Lavallee</u>, 389 U.S. 40 (1967) (right to transcript of preliminary hearing); <u>Argersinger v. Hamlin</u>, 407 U.S. 25 (1972) (right to counsel for misdemeanor).

United States v. Meriwether, 486 F.2d 498 (5th Cir. 1973)

Ex parte Moody, 684 So. 2d at 120.

13. In Blazo v. Superior Court, 315 N.E.2d 857 (Mass. 1974), the court held that "[t]he reason ex

parte application is allowed is that, just as a defendant able to foot the costs need not explain to anyone his

reasons for summoning a given witness, so an impecunious defendant should be able to summon his wit-

nesses without explanation that will reach the adversary." Id. at 860 n.8. To proceed otherwise, as the court

wrote in People v. Loyer, 425 N.W.2d 714 (Mich.App. 1988),

> potentially expos[es the] defendant's defense to prosecutorial review when
> a monied defendant's defense would remain inviolate. * * * When such an
> advantage is to be reaped by the prosecution only when the defendant is
> poor and therefore cannot afford to pay the . . . fees of his witnesses, it
> seems undeniable to us that such a defendant is not the recipient of equal
> justice under law.

14. As our Supreme Court has held:

> When an indigent defendant's case is subjected to pre-trial scrutiny by the
> prosecutor, while the monied defendant is able to proceed without such
> scrutiny, serious equal protection questions are raised.

Ex parte Moody, 684 So. 2d at 120 (quoting United States v. Meriwether, 486 F.2d 498 (5th Cir. 1973), cert.

denied, 417 U.S. 948 (1974)).

15. The Court of Appeals for the First Circuit similarly held:

> We are not impressed by the government's contention that it could properly
> attend the "ex parte" presentation so long as it did not take an active part.
> Rather, we would regard the purpose of the . . . rule as apparent on its face
> to be in recognition of the principle that defendants are not to be avoidably
> discriminated against because of their indigency. Discovery, though only
> partial, would clearly be a discrimination.

United States v. Holden, 393 F.2d 276 (1st Cir. 1968) (citations omitted).

16. In Marshall v. United States, 423 F.2d 1315 (10th Cir. 1970), the court overturned a conviction

when the accused was subject to an adversarial rather than ex parte hearing on his need for investigative aid,

observing that "the manifest purpose of requiring that the inquiry be <u>ex parte</u> is to insure that the defendant will not have to make a premature disclosure of his case." <u>Id</u>. at 1318; <u>see also</u> <u>Williams v. United States</u>, 310 A.2d 244 (D.C.App. 1973) (purpose of <u>ex parte</u> hearing is to ensure that defendant need not make premature disclosure of case in order to obtain access to expert services); <u>Gaither v. United States</u>, 391 A.2d 1364, 1367 n.4 (D.C.App. 1978) (eligibility and need for defense service must be determined in <u>ex parte</u> proceeding to afford accused opportunity to present request without prematurely disclosing merits of defense to prosecution); <u>United States v. Sutton</u>, 464 F.2d 552, 553 (5th Cir. 1972).

(c) Denial of <u>Ex Parte</u> Review of Requests for Funds Would Violate Due Process

17. It is one thing to require the defense to submit to limited reciprocal discovery. A rule that is truly reciprocal may be constitutional. <u>Williams v. Florida</u>, 399 U.S. 78 (1970). However, "the Due Process Clause . . . forbids enforcement of [discovery] rules unless reciprocal rights are given to criminal defendants." <u>Wardius v. Oregon</u>, 412 U.S. 470, 472 (1973).

18. What are the limits of the prosecution's discovery obligation? When the defense seeks disclosures from the state, the district attorney need not -- at least under Alabama law -- disclose witness lists, statements made by prospective witnesses, internal memoranda made during the investigation of the case, or documents that are not to be introduced at trial.

19. Therefore, the prosecution cannot require similar disclosures of the defense. Yet the disclosures would be much broader than this were the defense denied the right to proceed <u>ex parte</u> on applications for funds.

20. It is important to note that the application for funds will come in the early stages of the development of the proposed defense. The right identified in <u>Ake</u> is to funds for "the assistance of a competent [expert] in <u>preparing</u> the defense." <u>Lindsey v. State</u>, 330 S.E.2d 563, 566 (Ga. 1985) (emphasis

supplied). The expert's "services embrace pretrial and trial assistance to the defense, as well as potential testimony." United States v. Bass, 477 F.2d 723, 725-26 (9th Cir. 1973). In order to show why such assistance will be necessary, the defendant will be asked to disclose more than the results of whatever expert testing is done: The accused must show how such testing fits into the plan of defense.

21. As stated by the United States Court of Appeals for the Fifth Circuit, proceedings must be held ex parte because "[d]issemination of information critical to the defense permits the  government to enjoy unauthorized discovery which is forbidden under our concept of criminal procedure." United States v. Edwards, 488 F.2d 1154, 1162 (5th Cir. 1974); see also United States v. Greschner, 802 F.2d 373, 379-80 (10th Cir. 1986), cert. denied, 480 U.S. 908 (1987) (although waived by defense, court of appeals notes on its own motion that it was error for trial court to allow government attorneys to attend hearing on application for penologist, pathologist, blood tests and subpoenas at which defendants were required to disclose their theory of self-defense in support of their applications); United States v. Meriwether, 486 F.2d 498, 506 (5th Cir. 1973) (intent of ex parte provision is to shield theory of defense from prosecutor's scrutiny).

22. The same considerations apply with even greater force to this capital prosecution. To require ROBERT THOMAS CONRAD to disclose the nature of his defense, the names of persons with whom he seeks to consult, and the purposes for which he seeks such assistance would compromise his right to present a defense and to prepare his case in confidence with counsel.

> (d) Ex Parte Requests are Necessary to Protect ROBERT THOMAS CONRAD's  Right to Counsel

23. As the Supreme Court observed in Ake, the appointment of an expert may be necessary to help the accused gather facts, advise counsel on how to question opposing witnesses and interpret their answers, and generally "marshal" the defense. Ake, 470 U.S. at 80. Disclosure of the need for an expert and thus the trial strategy would impair the indigent defendant's right to effective assistance of counsel. Ex parte Moody,

684 So. 2d at 120.

24. To provide effective assistance an attorney must adequately investigate and prepare his or her client's case. Goodwin v. Balkcom, 684 F.2d 794, 805 (11th Cir. 1982) (at heart of effective representation is independent duty to investigate and prepare); see also McQueen v. Swenson, 498 F.2d 207, 217 (8th Cir. 1974) (attorney who does not seek out all facts relevant to client's case will not be prepared at trial). Where investigative and other services are necessary to the preparation and presentation of an adequate defense, the denial of access to those services may also deprive a defendant of the minimally effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments. Ex parte Moody, 684 So. 2d at 120; Blake v. Kemp, 758 F.2d 523, 531 (11th Cir. 1985); Pedrero v. Wainwright, 590 F.2d 1383, 1396 (5th Cir. 1979); United States v. Fessel, 531 F.2d 1275 (5th Cir. 1976). See also Mason v. Arizona, 504 F.2d 1345, 1352 (9th Cir. 1974), cert. denied, 420 U.S. 9936 (1975)(failure to provide investigative assistance when necessary to defense results in ineffective performance).

25. ROBERT THOMAS CONRAD's counsel will not be prepared to rebut the state's evidence without meaningful consultation with experts for the defense. Nor can counsel appropriately investigate aspects of the client's case without the type of assistance that any attorney would obtain for a financially able defendant.

26. Such assistance is essential to the proper functioning of the adversary system, in which it is rarely justifiable that one party have exclusive access to the means of understanding, presenting, and explaining relevant facts:

> [The defense] expert fills a different role. He supplies expert services "necessary to an adequate defense," which embraces pretrial and trial assistance to the defense as well as availability to testify. His conclusions need not be reported to either the court or the prosecution.

United States v. Theriault, 440 F.2d 713, 715 (5th Cir. 1971), cert. denied, 411 U.S. 984 (1973); United States v. Bass 477 F.2d 723, 725-26 (9th Cir. 1973) (expert may be partisan witness whose services include

pretrial and trial assistance to the defense).[4]

27. The expert appointed pursuant to Ake is expected to "assist the defense by aiding defense counsel in the cross-examination and rebuttal of the state's . . . experts," and thereby protect his Sixth Amendment right to confront the evidence against him. Lindsey v. State, 330 S.E.2d 563, 567 (Ga. 1985); see also United States v. Fessel, 781 F.2d 826, 834 (10th Cir. 1986) (services of expert appointed in ex parte proceeding include those necessary for cross-examination of government witnesses as well as presentation of defense expertise).

28. Thus, "[j]ust as an indigent defendant has a right to appointed counsel to serve him as a loyal advocate he has a similar right under properly proven circumstances to investigative aid that will serve him unfettered by an inescapable conflict of interest." United States v. Marshall, 423 F.2d 1315, 1319 (10th Cir. 1970) (error to deny ex parte hearing on need for investigative assistance; appointment of F.B.I. agent cannot suffice to satisfy request).

29. Obviously, the state has no business interfering with how the defense chooses to prepare its case. If the state were allowed to oppose certain defense services or influence which investigators or experts were retained by the defense, the independence of the defense would be compromised. See, e.g., United States v. Chavis, 476 F.2d 1137, 1141-45 (D.C. Cir.), aff'd on reh'g, 486 F.2d 1290 (D.C. Cir. 1973) (federal statute contemplates assistance of expert in presenting defense; attendance and participation of prosecutor in hearing on request constitutes error); Gaither v. United States, 391 A.2d 1364, 1367-68 (D.C.App. 1978) (presence

---

4. Presentation of different opinions on contested matters is equally indispensable to the proper functioning of the adversary process in enabling the factfinder to resolve contested issues. See, e.g., Ford v. Wainwright, 477 U.S. 399, 414 (1986) ("[T]he factfinder must resolve differences in opinion . . . 'on the basis of the evidence offered by each party' . . . . [W]ithout any adversarial assistance from the [defendant's] representative . . . the factfinder loses the substantial benefit of potentially probative information") (quoting Ake v. Oklahoma, 470 U.S. 68 (1985)); Sisson v. State, 353 S.E.2d 836, 839 (Ga. App. 1987) (where examination administered by state expert is not subject to adversarial process, then opinion of that expert who routinely conducts tests for state would be untouchable; appointment of defense polygraph expert necessary in light of Ake).

of government counsel during proceeding on request for funds error; very purpose of appointment is to provide expert services necessary to adequate defense). See also United States v. Hamlet, 456 F.2d 1285 (5th Cir. 1972) (denial of ex parte inquiry into need for defense psychiatrist error).

30. The failure to allow ex parte applications for assistance would inevitably deprive ROBERT THOMAS CONRAD of the benefit of effective counsel such as a nonindigent defendant could expect to receive. Our Supreme Court will not tolerate such invidious distinctions. Ex parte Moody, 684 So. 2d at 120.

> (e) Ex Parte Requests are Necessary to Protect ROBERT THOMAS CONRAD's Right Against Self-Incrimination

31. Ex parte proceedings on the need for defense assistance are necessary to protect ROBERT THOMAS CONRAD's right to freedom from self-incrimination. Ex parte Moody, 684 So. 2d at 120. The privilege against self-incrimination is secured only when a criminal defendant has the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." Estelle v. Smith, 451 U.S. 454, 468 (1981) (quoting Malloy v. Hogan, 378 U.S. 1, 8 (1964)). If ROBERT THOMAS CONRAD or his attorney is compelled to disclose confidential facts in order to obtain financial assistance, the defendant surely cannot be said to have exercised his own will. Nor can the failure to justify the request for aid be deemed anything but a penalty for silence.

32. This was made abundantly clear in Marshall v. United States, 423 F.2d 1315 (10th Cir. 1970). The defendant in that case was compelled to justify his need for investigative assistance before the prosecuting attorney. As a result, the state was able to locate a witness of whom it had previously been unaware who then testified against the defendant. In reversing the conviction, the court emphasized:

> Certainly the movant cannot be said to "waive" disclosure of his case and his concomitant rights against self-incrimination and to due process by

[requesting services] . . . [That request cannot] be used . . . as a means of frustrating the fifth amendment right prohibiting self-incrimination.

Id. at 1318-19.

33. ROBERT THOMAS CONRAD cannot be called upon to sacrifice one set of constitutional rights in order to receive the benefit of another. Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978); see also State v. Armstead, 262 S.E.2d 233 (Ga.App. 1979). His motions for the "raw materials integral" to his defense must be considered ex parte.

### THE TRANSCRIPTS OF ALL EX PARTE PROCEEDINGS MUST BE PLACED UNDER SEAL.

34. ROBERT THOMAS CONRAD's right to ex parte hearings would be empty indeed if the prosecution or the media were permitted to read a transcript of all that he told the Court in support of his motions. The Alabama Supreme Court has therefore ordered that all hearings on the defendant's ex parte motions be transcribed and kept under seal. Ex parte Moody, 684 So. 2d at 122. This will safeguard ROBERT THOMAS CONRAD's rights as well as allow him to appeal any adverse decision denying him funds for the expert assistance he has requested.

### CONCLUSION

For the reasons stated herein, ROBERT THOMAS CONRAD is entitled to proceed ex parte, and on a sealed record, in his applications for the funds necessary for his defense.

Respectfully submitted this June 25, 2001.

Smith & Carr, LLC.
Sydney Albert (Al) Smith      SMI098
Attorneys at Law
P. O. Drawer 389

Elba, Al 36323
Phone:        334-897-3658
Fax:          334-897-8633

Gary D. Bradshaw      BRA074
Attorney at Law
P. O. Box 311412
Enterprise, AL 36331-1412

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

Al Smith                              6/25/2007
                                      Date

Page 13 of 13

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA          )
                          )
            v.            )        Case No. CC-2001-M-179 & 180
                          )
ROBERT THOMAS CONRAD      )
                          )

EX PARTE APPLICATION NUMBER ONE



EX PARTE PLEADING -- TO BE FILED UNDER SEAL

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA )
)
)
v. ) Case No. CC-2001-M-179 & 180
)
ROBERT THOMAS CONRAD )
)

EX PARTE APPLICATION
FOR INVESTIGATIVE EXPENSES

ROBERT THOMAS CONRAD, the defendant in the above-styled case, respectfully moves this Court,

pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Sections

1, 5, 6, 7, 8, 9, 11, 13, 15 and 16 of Article I of the Alabama Constitution, and applicable state law, for an

order authorizing the expenditure of up to $10,500 for investigative services and expenses, subject to

application for additional funds if needed.

In support of his motion, ROBERT THOMAS CONRAD states as follows:

1. ROBERT THOMAS CONRAD is before the Court awaiting trial on a capital case involving a charge

of murder.

2. ROBERT THOMAS CONRAD was indicted by a specially called Grand Jury and thus thwarted any

Page 2 of 10

right or ability to hear any evidence that the State would have presented against him.

3. Since this is a capital case, exacting standards must be met to assure that it is fair. "The fundamental respect for humanity underlying the eighth amendment's prohibition against cruel and unusual punishment gives rise to a special '"need for reliability in the determination that death is the appropriate punishment"' in any capital case." <u>Johnson v. Mississippi</u>, 486 U.S. 578, 584 (1988) (quoting <u>Gardner v. Florida</u>, 430 U.S. 349 (1977) (quoting <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305 (1976) (White, J., concurring))).

4. The prosecution has had access to numerous investigators, including investigators from the district attorney's own office, officers of the Coffee County Sheriff's Department, employees of the Alabama Department of Forensic Sciences, agents of the Alabama Bureau of Investigation and the Enterprise Police Department.

5. ROBERT THOMAS CONRAD is indigent. He was declared indigent by the Circuit Court upon his first appearance. He has been incarcerated since his arrest for the instant capital murder. ROBERT THOMAS CONRAD has been and continues to be unable to earn any money or in any way contribute financially to his defense. He has been declared indigent and granted permission to proceed <u>in forma pauperis</u>. The Alabama Supreme Court in <u>Ex parte Moody</u>, 684 So. 2d 114, (Ala.1996), reaffirmed an indigent defendant's right to have funds from the State for expert assistance. The Court also expressly ruled that:

> [W]e find it necessary to hold that an indigent criminal defendant is entitled to an *ex parte* hearing on whether expert is necessary, based on the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

*Ex parte Moody*, 684 So. 2d 114, 120, (Ala. 1996).

The Alabama Supreme Court again addressed an indigent criminal defendant's right to have reasonable expenses under §15-12-21, <u>Code of Alabama</u> 1975, in <u>Dubose v. State</u>, 662 So. 2d 1189, 1190 (Ala 1995). The Court stated:

> In *Ex Parte Sanders*, 612 So. 2d 1199 (Ala.1993), the defendant was found at his arraignment to be indigent, and the court appointed counsel to represent him. Two weeks later, the defendant's family retained counsel to represent him and the appointed counsel withdrew. Before trial, Sanders asked the court to approve funds to pay for a ballistics expert. The trial court denied the motion for funds to pay the expert, stating, "[Y]ou have got retained counsel, and I am not going to provide funds to do that." *Sanders* at 1200.

The Court held that it was error for the trial court to deny Sander's request for a ballistics expert. The Court recognized that:

> We agree with the holding of the Court of Criminal Appeals in *Russaw v. State*, 572 So.2d 1288 (Ala.Cr.App. 1990), that the assets of friends and relatives, not legally responsible for the defendant, are not included within the 'assets' referred to in §15-12-5(b).

6. In order for him to receive a full and fair trial of all relevant issues in his case, ROBERT THOMAS CONRAD requires the services of an investigator, as well as expenses for such investigation as may be conducted by counsel.

7. Defense counsel has an ethical, legal and constitutional duty to conduct a thorough inquiry into all aspects of this case. In order to do this, a comprehensive investigation must be undertaken and records and other documentary evidence must be obtained. Because ROBERT THOMAS CONRAD is indigent, the investigation required by law can be undertaken and completed only upon allocation of adequate resources by this Court.

8. In order to conduct such an investigation, ROBERT THOMAS CONRAD seeks authorization to retain the services of an investigator to be paid at the rate of $35.00 per hour. Counsel estimates that approximately three hundred (300) hours of investigative time will be required.[1]

---

1. ROBERT THOMAS CONRAD, of course, reserves the right to supplement his motion should the need for additional investigation become apparent.

9. For various reasons, ROBERT THOMAS CONRAD cannot rely upon counsel to do all of the investigation. One reason is the advocate-witness rule. Should a witness state one fact to counsel during the investigation, and something else when testifying, counsel would have to become a witness in order to impeach that witness's testimony. Under such circumstances, counsel would be ethically precluded from continuing to represent ROBERT THOMAS CONRAD.

10. Additionally, the services of an investigator are the most cost effective way to conduct the investigation. The investigator can locate and interview witnesses and obtain records and documents at a lower hourly rate than would be paid to an attorney. Upon the completion of the initial stages of the investigation, counsel's time can then be utilized interviewing those witnesses whose potential testimony would be desired at trial and making a professional determination as to their usefulness.

11. There has not been adequate investigation into critical matters relevant to guilt, level of culpability, and appropriate punishment.

12. Accordingly, ROBERT THOMAS CONRAD is in need of funds to investigate, inter alia, the following areas:

The Crime

13. Preparation for the trial of this case requires investigation into not only the circumstances of the crime and the role, if any, played by the defendant, but also the facts and circumstances surrounding ROBERT THOMAS CONRAD's arrest, the various interrogations that took place over a considerable period of time, and the relationship of ROBERT THOMAS CONRAD to other persons connected with this offense, including the deceased.

Mitigating Circumstances

14. The jury and judge who might decide whether ROBERT THOMAS CONRAD will live or die will

be constitutionally required to consider "as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604 (1978) (emphasis in original); § 13A-5-52, Code of Alabama (1975). This includes any of the diverse frailties of humankind. Woodson v. North Carolina, 428 U.S. 280 (1976). See also Skipper v. South Carolina, 428 U.S. 280 (1986); Eddings v. Oklahoma, 455 U.S. 104 (1982). Such vital information was neither developed nor presented to the persons who previously sat in judgment on ROBERT THOMAS CONRAD's life.

15. In order to prepare properly for all trial phases, counsel is required to obtain information relevant to ROBERT THOMAS CONRAD's medical history, educational history, employment and training history, family and social history, his correctional history, and any religious or cultural influences. American Bar Association, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1 (A)(2)(c) (adopted by the ABA House of Delegates Feb. 7, 1989). Therefore, counsel must direct an investigator to obtain records from all doctors, hospitals, schools, employers, and correctional facilities and interview people with knowledge of these aspects of ROBERT THOMAS CONRAD's background.

16. Visits to schools, hospitals, churches, and other institutions that have come into contact with ROBERT THOMAS CONRAD are essential to obtaining documentary evidence and discovering mitigating information.[2]

## POINTS AND AUTHORITIES

17. Counsel has an ethical, legal and constitutional duty to investigate fully all aspects of ROBERT THOMAS CONRAD's case. "At the heart of effective representation is the independent duty to investigate

---

[2]ROBERT THOMAS CONRAD also requires investigative assistance in order to present that evidence necessary to vindicate the claims alleged in the previously filed motions. Such assistance will also be required to investigate prior convictions or conduct should the district attorney state his intention to use such convictions or conduct for the purpose of aggravation.

and prepare." Goodwin v. Balkcom, 684 F.2d 794, 805 (11th Cir. 1982). When the defense team does not

engage in a thorough investigation, the lawyer is left without "all facts relevant to his client's case," and is

therefore "prepared to do little more than stand still at the time of trial." McQueen v. Swenson, 498 F.2d

207, 217 (8th Cir. 1974). See also American Bar Association, Standards for Criminal Justice § 4-4.1 (1980)

("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore

all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.").

The American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death

Penalty Cases provide:

> Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. . .
>
> The investigation for preparation of the guilt/innocence phase of the trial should be conducted regardless of any admission or statement by the client concerning facts constituting guilt.
>
> The investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered. This investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.

Id. at 93. The Guidelines then specify certain steps that should be taken with regard to investigation of the

guilt and penalty phases of the trial.

    18. The duty to investigate a case extends to "all avenues leading to facts relevant to guilt and degree

of penalty." McQueen v. Swenson, 498 F.2d 207, 216 (8th Cir. 1974). Without such thorough investigation,

therefore, Mr. Conrad will be deprived of the effective assistance of counsel. See, e.g., Code v. Montgomery,

799 F.2d 1481, 1483 (11th Cir. 1986) (ineffective assistance of counsel found where defense failed to

interview all potential alibi witnesses); Wade v. Armontrout, 798 F.2d 304, 306 (8th Cir. 1986) (ineffective

assistance of counsel where the defense does "not investigate the prosecution's case, [and does] not

investigate . . . defense witnesses"); Thomas v. Kemp, 796 F.2d 1322, 1324 (11th Cir. 1986) (ineffective

assistance of counsel where "little effort [made] to investigate possible sources of mitigation evidence");

Nealy v. Cabana, 764 F.2d 1173, 1177 (5th Cir. 1985) ("[a] substantial body of . . . case law insists . . . that

'effective counsel conduct a reasonable amount of pretrial investigation'") (quoting Martin v. Maggio, 711

F.2d 1273, 1280 (5th Cir. 1980)); Douglas v. Wainwright, 714 F.2d 1532, 1556 (11th Cir. 1983)

("permissible trial strategy can never include the failure to conduct a reasonably substantial investigation");

King v. Strickland, 714 F.2d 1481, 1490 (11th Cir. 1983) ("[t]his Court has emphasized the importance of

pretrial preparation and investigation"); United States v. Auten, 632 F.2d 478, 482-83 (5th Cir. 1980) (failure

"to investigate and impeach" witnesses may result in ineffective assistance of counsel); People v. LaBree,

313 N.E.2d 730, 731-32 (N.Y.App. 1974) (failure to "conduct appropriate investigations, both factual and

legal, to determine if matters of defense can be developed, and to allow . . . time for reflection and prepara-

tion for trial" rendered "the trial a farce and mockery of justice").

19. Moreover, because this is a capital case, the Eighth Amendment requires that exacting standards

be met to assure that it is fair and that the determinations made as to guilt and sentence are reliable. "The

fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual

punishment gives rise to a special "'need for reliability in the determination that death is the appropriate

punishment'" in any capital case." Johnson v. Mississippi, 486 U.S. 578, 584 (1988) (quoting Gardner v.

Florida, 430 U.S. 349, 363-64 (1977) (quoting Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (White,

J., concurring))).

20. It is clear from the above-cited cases that counsel would be remiss and constitutionally

ineffective if he did not conduct a thorough investigation of all aspects of ROBERT THOMAS CONRAD's

case.

21. Therefore, funds for the services of an investigator are mandated. See, e.g., Marshall v. United

States, 423 F.2d 1315 (10th Cir. 1970) (plain error to fail to approve an independent investigator); Mason

v. Arizona, 504 F.2d 1345, 1351 (9th Cir. 1974) (effective assistance of counsel guarantee of the due process

clause requires, where necessary, the allowance of investigative expenses or the appointment of investigative assistance for indigent defendants in order to insure effective preparation of their defense by their attorneys).

<u>CONCLUSION</u>

22. The investigation outlined in the preceding paragraphs, although constitutionally compelled, has not previously been undertaken. A constitutionally sufficient investigation into these aspects of the life and character of ROBERT THOMAS CONRAD will require the expense of travel to various jurisdictions, retaining the services of local investigators or social workers to assist in the identification of potential witnesses, costs of copies of records from schools, hospitals, prisons, and other institutions, and other expenses.

23. In light of <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985), <u>Ex parte DuBose</u>, 662 So. 2d 1189 (Ala. 1995), and the law already set forth in this application, it is apparent that Mr. Conrad has a constitutional right to the assistance requested. The principles of <u>Ake</u> flow from the underlying tenet of the equal protection clause, expressed over thirty years ago when the Supreme Court stated in <u>Griffin v. Illinois</u>, 351 U.S. 12, 19 (1956), that "[t]here can be no equal justice when the kind of trial a man gets depends upon the amount of money he has."

24. A person with means on trial for his life would certainly undertake the investigation outlined herein in order to properly prepare and present his case.

WHEREFORE, ROBERT THOMAS CONRAD respectfully requests that this Court:

(a) schedule an <u>ex parte</u> hearing on this motion;

(b) allow ROBERT THOMAS CONRAD to present evidence and argument on this motion;

(c) enter an order granting the motion; and

(d) grant any other relief that is just and proper under the circumstances of this motion.

Respectfully submitted this June 25th, 2001..

Page 9 of 10

Smith & Carr, LLC.
Sydney Albert (Al) Smith        SMI098
Attorneys at Law
P. O. Drawer 389
Elba, Alabama  36323
Phone:        334-897-3658
Fax:          334-897-8633

Gary D. Bradshaw BAR074
Post Office Box 311412
Enterprise, Alabama 36331
Phone:        334-393-6439

**THIS __EX PARTE__ MOTION HAS NOT BEEN SERVED ON THE D.A.**

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA

ENTERPRISE DIVISION

STATE OF ALABAMA     )
               )
v.             )    Case No. CC-2001-M-179 & 180
               )
ROBERT THOMAS CONRAD     )
               )

JUN 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

## MOTION TO REVEAL THE IDENTITY OF INFORMANTS
## AND REVEAL ANY DEALS, PROMISES OR INDUCEMENTS

ROBERT THOMAS CONRAD respectfully moves this Court for an order directing the state to reveal the identity of all confidential informants, to reveal any promises or understandings (explicit or implicit) with any witness or informant, and to reveal whether any threats or inducements of any nature whatsoever have been made regarding any witness or informant. This motion is made pursuant to the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, Rule 16 of the Alabama Rules of Criminal Procedure and Article I, §§ 1, 5, 6, 7, 8, 9, 11, 13, 15 & 16 of the State Constitution of Alabama.

## I. DEFINITIONS

Unless the context indicates otherwise, the terms listed below are defined and used herein as follows:

1. The "state" means any and all of the following organizations: the district attorney for the Twelfth Judicial Circuit of Alabama, the Enterprise Police Department, the Alabama Bureau of Investigation, the Alabama Department of Forensic Sciences, the Coffee County Sheriff's Department. The "state" also means: (a) all present and former agents, officers, investigators, consultants, employees, and staff members of organizations or officials named above in this paragraph; (b) any other person or entity acting on the behalf of any of these organizations or officials or on whose behalf such person or entity has acted in the past; or (c) any other person or entity otherwise

subject to the control of any of these organizations or officials.

2. "Relating to" means discussing, describing, referring to, reflecting, containing, analyzing, studying, reporting on, commenting on, evidencing, constituting, setting forth, considering, recommending, concerning, relevant to, bearing on, or pertaining to, in whole or in part.

3. "All" means "any and all."

4. "Any" means "any and all."

5. "Each" means "any and all."

6. "And" means "and/or."

7. "Or" means "and/or."

## II. INSTRUCTIONS

1. References to the singular shall be construed to include the plural, and references to the plural shall be construed to include the singular.

2. All verbs shall be construed to include all tenses.

3. Pursuant to Rule 16.3 of the Alabama Rules of Criminal Procedure, each request is continuing in nature and additional responsive information should be revealed as soon as it occurs.

## III. INFORMATION TO BE REVEALED

Specifically, ROBERT THOMAS CONRAD moves the Court to order the state to reveal the following facts and information:

1. the full name and address of each confidential informant upon whose statements the investigation of the accused was predicated and all the information that was related to law enforcement officials, including, but not limited to, the names, addresses and substance of information of the "[c]onfidential informants [who] advised investigating officers that ROBERT THOMAS CONRAD committed this offense;

2. the full nature and extent of all immunity, express or implied, granted to each informant and to any witness (whether she or he testified at Grand Jury or is expected to testify at trial or not), including the nature and detail of all crimes for which immunity was granted;

3. the full nature of any consideration that has been given or promised to any individual by the state that relates to the investigation and prosecution of this crime, including the nature and details of any consideration given or promised;

4. whether any threats, force, promises, inducements, or any other such devices were used to make or induce any individual to relate information to the state that relates to the investigation and prosecution of this crime, including the nature and details of any such devices used; and

5. all records, notes, memoranda, and documents in the possession of the state relating to the grant of immunity, promises, consideration, threats or any other inducements to any individual to obtain information or testimony about this crime by the state and any of its law enforcement or other agencies.

Due Process requires that the aforementioned items be revealed to the defense. <u>Giglio v. United States</u>, 405 U.S. 150 (1972); <u>Napue v. Illinois</u>, 360 U.S. 264 (1959); <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); <u>United States v. Pitt</u>, 717 F.2d 1334 (11th Cir. 1983); <u>Ex parte Monk</u>, 557 So.2d 832 (1989); <u>Ex parte Geeslin</u>, 505 So.2d 1246 (Ala. 1986).

Further, it is incumbent upon the prosecutor to inquire and determine with reasonable diligence if such information exists in the files or knowledge of the law enforcement agencies involved in the case. The Defendant notes "This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. Kyles <u>v. Whitley</u>, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed. 2d 490 (1995)

WHEREFORE, the accused respectfully requests that this Court:

(1) allow ROBERT THOMAS CONRAD to present evidence in support of this motion;

(2) schedule a hearing to permit the presentation of evidence and argument in support of this motion;

(3) enter an order requiring the state to reveal the information set out in paragraphs one through five of Section III above, including the identity of all informants and the immunity, consideration and promises given or promised by the state; and,

Page 3 of 4

(4) grant such other relief as is just and proper in light of this motion.

Respectfully submitted this June 25, 2001.

Smith & Carr, LLC.
Sydney Albert (Al) Smith        SMI098
Attorneys at Law
P. O. Drawer 389
Elba, Al 36323
Phone:        334-897-3658
Fax:          334-897-8633

Gary D. Bradshaw        BRA074
Attorney at Law
P. O. Box 311412
Enterprise, AL 36331-1412

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

Al Smith                    Date

Page 4 of 4

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

|  |  |  |
|---|---|---|
| STATE OF ALABAMA | ) | |
| | ) | |
| v. | ) | Case No. CC-2001-179 & 180 |
| | ) | |
| ROBERT T. CONRAD | ) | |
| | ) | |

## ORDER

Upon consideration of Defendant Robert Conrad's Motion to Reveal the Identity of Informants and Reveal Any Deals, Promises or Inducements, it is hereby

ORDERED that Defendant's Motion to Reveal the Identity of Informants and Reveal Any Deals, Promises or Inducements be granted; and it is further

ORDERED that the state reveal to Mr. Conrad:

a.     the full name and address of each confidential informant upon whose statements the investigation of the accused was predicated and all the information that was related to law enforcement officials;

b.     the full nature and extent of all immunity, express or implied, granted to each informant and to any witness (whether she or he testified or will testify at trial or not), including the nature and detail of all crimes for which immunity was granted;

c.     the full nature of any consideration that has been given or promised to any individual by the state that relates to the investigation and prosecution of this crime, including the nature and details of any consideration given or promised;

d.     whether any threats, force, promises, inducements, or any other such devices were used to make or induce any individual to relate information to the state that relates to the investigation or prosecution of this crime, including the nature and details of any such devices used; and

e.     all records, notes, memoranda and documents in the possession of the state relating to the grant of immunity, promises, consideration, threats or any other inducements to any individual to obtain information or testimony about this crime by the state and any of its law enforcement or other agencies.

Done and ordered this _____ day of _____, 2001.

_____
CIRCUIT JUDGE

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA            )
                            )
        v.                  )        Case No. CC-2001-M-179 & 180
                            )
ROBERT THOMAS CONRAD        )
                            )

JUN 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

## MOTION TO SUPPRESS EVIDENCE
## SEIZED AFTER AN ILLEGAL ARREST AND/OR SEARCH

ROBERT THOMAS CONRAD, asserting his rights as guaranteed by the Fourth, Fifth, Sixth,

Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama State

Constitution and state law, moves to suppress any evidence and statements obtained pursuant to

an unreasonable search and seizure by government officials or their agents . In support thereof

ROBERT THOMAS CONRAD  through counsel states the following:

1. The state, through law enforcement officials and their agents, violated ROBERT

THOMAS CONRAD's  right to be free from unreasonable searches and seizures by seizing items

without a warrant and without probable cause or with a warrant not supported by probable cause.

2. These actions violated ROBERT THOMAS CONRAD's reasonable and legitimate

expectations of privacy.  ROBERT THOMAS CONRAD has the right to be free from unreasonable

searches.  ROBERT THOMAS CONRAD did not consent to the illegal search and the state's actions

violated his rights under federal and state law. See Bumper v. North Carolina, 391 U.S. 543

Page 1 of 4

(1968); <u>McLemore v. State</u>, 562 So.2d 639 (Ala.Cr.App. 1989).

3. There were no exigent circumstances justifying this search and seizure, nor did it fit into any exception to the requirement that all searches and seizures be conducted pursuant to a warrant.

4. This search and seizure was conducted without a warrant and in violation of settled state and federal law. The United States Supreme Court has held that the "most basic" rule of Fourth Amendment jurisprudence is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967). No amount of probable cause can justify a warrantless search or seizure absent exigent circumstances. <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 445, 468 (1971). <u>See also</u> <u>Thompson v. Louisiana</u>, 469 U.S. 17 (1984) (no murder scene exception to the warrant requirement); <u>Michigan v. Tyler</u>, 436 U.S. 499 (1978) (evidence suppressed where recovered during repeated warrantless searches for evidence of arson days after fire). The search and seizure here do not fit into the limited, carefully drawn exceptions to the warrant requirement. <u>United States v. Jeffers</u>, 342 U.S. 48, 51 (1951).

5. Because the search and seizure were unreasonable and violated ROBERT THOMAS CONRAD rights under state and federal law, the evidence recovered must be suppressed. <u>Mapp v. Ohio</u>, 367 U.S. 643 (1961).

6. ROBERT THOMAS CONRAD was arrested. The warrantless arrest of ROBERT THOMAS CONRAD and the warrantless seizure of the evidence violated basic principles of state and federal law. Thus, all evidence seized as a result of this illegal arrest and search must be suppressed.

For the foregoing reasons, ROBERT THOMAS CONRAD moves this Court to vindicate his federal and state rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article One, Section Five of the Alabama State Constitution and relevant Alabama state law, by suppressing the fruits of the above-described search and seizure. In the alternative ROBERT THOMAS CONRAD moves this Court to hold a full evidentiary hearing on this matter before the trial of this case, and grant this motion for the above-stated reasons and any others that may appear to the Court during this hearing.

ROBERT THOMAS CONRAD reserves the right to supplement this motion to suppress as evidence is revealed to the Defendant.

Respectfully submitted this the June 25, 2001.

Smith & Carr, LLC.
Sydney Albert (Al) Smith        SMI098
P. O. Drawer 389
Elba, Al 36323
Phone:        334-897-3658
Fax:        334-897-8633

Gary D. Bradshaw        BRA074
Attorney at Law
P. O. Box 311412
Enterprise, AL 36331-1412

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

*83*

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

Al Smith                          6/25/2001
                                  Date

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

|  |  |  |
|---|---|---|
| STATE OF ALABAMA | ) | |
| | ) | |
| v. | ) | Case No. CC-2001-M-179 & 180 |
| | ) | |
| ROBERT THOMAS CONRAD | ) | |
| | ) | |

## ORDER

Upon consideration of Defendant ROBERT THOMAS CONRAD's  Motion for a Jury

Questionnaire, it is hereby

ORDERED that Defendant's Motion for a Jury Questionnaire be granted; it is further

ORDERED that the attached, proposed juror questionnaire be sent out with summonses

to the venirepersons; it is further

ORDERED that prospective jurors be provided with postage-paid envelopes addressed to

the Clerk of this Court and be directed to complete the forms and return them to the Court within

five days; and, it is further

ORDERED that the Clerk of the Court make copies of all questionnaires and provide

them at the same time to counsel for the state and for ROBERT THOMAS CONRAD..


Done and ordered this _____ day of _____, 2001.


_____
CIRCUIT JUDGE

IN THE CIRCUIT COURT OF

COFFEE COUNTY, ALABAMA

ENTERPRISE DIVISION

<u>**IMPORTANT JUROR QUESTIONNAIRE:**</u>  **This Questionnaire <u>must</u> be completed and returned within <u>five days</u> of your receipt of this letter.**

Dear Potential Juror:

Your name has been drawn to serve as a potential juror.

In the jury selection process before a trial begins, the judge and lawyers must often ask many questions of each juror, in order that a fair jury may be selected.  This process may last a long time.  To save both you and the Court time, and still provide the information we need, I enclose a questionnaire which you should fill out at this time.

It is necessary that these questions be answered within *five days* of your receipt of this letter, in order that the jury selection process may proceed once you come to court.  The questionnaire should be signed at the end.  Please initial the top right corner of each sheet of the questionnaire, in the event that the pages become separated.  I remind you that jury service is a serious responsibility, and you must answer these questions truthfully and as fully as possible.

The questionnaire must be returned in the pre-addressed envelope attached hereto, to which postage has already been affixed.  If you need additional space to answer one or more questions, please use additional paper.

Thank you for your cooperation.

_____
JUDGE, CIRCUIT COURT

## JUROR INFORMATION QUESTIONNAIRE

1.  Your full name:_____
    Do you go by a nickname? If so, what is?_____
2.  Present address:_____

3.  How long have you lived in Coffee County, Enterprise Division?_____

    How long have you lived at your present address?_____

4.  Your place of birth: _____Age: _____ Race:_____

5.  What work do you do?_____

6.  Who is your employer?_____

    How long have you worked there?_____

7.  Marital Status:  [ ] Married  [ ] Separated  [ ] Divorced [ ] Widowed  [ ] Single

    If you are/were married:

    For how many years?_____

    Spouse's name:_____

    Spouse's employer:_____

    How long has he/she worked there?_____

    Spouse's job responsibilities:_____

    _____

8.  What is your religious affiliation?_____

9.  What church do you attend?_____

    How often do you attend church?_____

10. What is your political party preference?_____

11. Please list the organizations to which you belong or of which you have been a member (social, fraternal, service, civic, religious, political, etc.):

    _____

    _____

    _____

Page 2 of 8

12.  For all of your children, please complete the following:

Age      Sex      School or occupation                          At Home?

___      ___      _____          _____

___      ___      _____          _____

___      ___      _____          _____

___      ___      _____          _____


13.  Please provide the following for your parents:

         Name                 Birthplace            Employment

Father:

         _____   _____   _____

Mother:

         _____   _____   _____


14.  If you ever served in the military, please complete the following:

Branch: _____Rank:_____ From: _____to_____

Duties: _____
If you were involved with military law enforcement or any court martials, please describe:

_____

_____

_____


15.  Have you had any employment besides your present one in the last ten years?_____
If yes, please state where you have worked and give the approximate dates:

_____ Dates: _____

_____ Dates: _____


16.  If you have lived at any other address during the last ten years, please give the address and approximate dates
that you lived there.

_____ Dates: _____

_____ Dates: _____

_____ Dates: _____


Page 3 of 8

17.   Please list the schools you have attended and approximate dates you were at each one:

Grade School: _____    Dates: _____

Junior High: _____    Dates: _____

High School: _____    Dates: _____

College: _____    Dates: _____

Vocational or
Trade School: _____    Dates: _____

Professional
School: _____    Dates: _____

Graduate School: _____    Dates: _____

Degrees or diplomas you hold: _____
_____

18.   Have you ever served on a jury before? _____
How many times? _____

Was this:    a grand jury ____ a trial jury ____

a criminal case ____ a civil case ____

What were the cases about? _____

_____

When were they? _____

Did the jury reach a verdict? _____

19.   Have you ever sued anyone or been sued? _____
What was the case about? _____

_____

20.   Have you or anyone in your immediate family ever appeared as a witness in any court case, before a grand jury or in any other type of proceeding? _____

If so, who appeared and what relationship did they have to you?

_____

When and where was the case? _____

_____

a.    Have you, any member of your family or anyone you know ever been the victim of a crime?

If yes, who and what relationship? _____

What was the crime?_____

Was anyone arrested in connection with the crime?_____

Was anyone convicted of the crime?_____

21.  Have you, any member of your family or anyone you know ever been accused of a crime?

_____

If yes, who and what relationship?_____
When did this happen?_____

What were the charges involved?_____
Where did this happen? _____Was there an arrest?_____

What happened in court?_____

22.  Have you, anyone in your family or any personal friend ever studied or applied to become an attorney, police officer, probation officer or parole officer?_____    If yes:

Who and what relationship?_____
Position studied or applied for:_____
State whether they got the position and currently hold it:

_____

23.  If you now know, or if you have known, anyone in any District Attorney's office, probation and parole department, police department or and correctional office, please supply the person's name and the agency for which he or she works or did work.

_____

_____

_____

24.  Have you ever worked as an employee or volunteer in a law enforcement agency, prison, jail, correctional institution or mental health facility?_____

If so, state when and where:_____

_____

25.  Has a member of your family ever worked as an employee or volunteer in a law enforcement agency, prison, jail, correctional institution or mental health facility?

Who, and what relationship?_____

When and where?_____

_____

26.    Please list your hobbies and spare time activities:_____

_____

_____

a.    What newspapers do you read?  Please state how many times per week you read each one:

_____

_____

27.    Do you regularly watch the local television news?_____

What station? _____ national news?_____

In what kind of news are you most interested?_____

_____

28.    Do you regularly listen to the radio?_____

What stations?_____

In what kind of radio news are you most interested?_____

_____

31.    If you have read any books in the past year, please list them:

_____

_____

32.    Please list the magazines and periodicals you read:

_____

_____

33.    What are your favorite T.V. programs? 1._____

2._____    3._____

34.    Are most of the people you usually see in your neighborhood:

White_____    Black_____    Blacks and Whites_____

35.    Have you, your spouse, your parent, any of your children, or anyone else to whom you are close ever had a

problem with substance abuse?

_____

_____

If so, did that person participate in a substance abuse rehabilitation program?

_____

36. Do you feel that people other than police officers should be permitted to own handguns or firearms or any other type of weapon? If yes, what type of weapons?

_____

_____

37. Please indicate whether you agree or disagree with the following:

"A defendant is innocent until proven guilty beyond a reasonable doubt."

___Strongly Agree ___Somewhat Agree___Agree ___Somewhat Disagree ___Strongly Disagree

"If the prosecution goes to the trouble of bringing someone to trial, the person is probably guilty."

___Strongly Agree ___Somewhat Agree ___Agree ___Somewhat Disagree ___Strongly Disagree

"There are two kinds of people in this world: those who are basically decent and those who are not."

___Strongly Agree ___Somewhat Agree ___Agree ___Somewhat Disagree ___Strongly Disagree

"The testimony of law enforcement officers should not be taken any more seriously than any other witnesses in a criminal trial just because they are law enforcement officers."

___Strongly Agree ___Somewhat Agree ___Agree ___Somewhat Disagree ___Strongly Disagree

"Some people are just natural born criminals."

___Strongly Agree ___Somewhat Agree ___Agree ___Somewhat Disagree ___Strongly Disagree

"If a defendant in a criminal trial doesn't testify on his own behalf, he is probably guilty."

___Strongly Agree ___Somewhat Agree ___Agree ___Somewhat Disagree ___Strongly Disagree

"Regardless of what the law says, a person who is accused of a crime should be required to prove his or her innocence."

___Strongly Agree ___Somewhat Agree ___Agree ___Somewhat Disagree ___Strongly Disagree

"Welfare recipients are a real problem in Alabama."

___Strongly Agree ___Somewhat Agree ___Agree ___Somewhat Disagree ___Strongly Disagree

"People who are convicted of serious crimes should be publicly punished."

___Strongly Agree ___Somewhat Agree ___Agree ___Somewhat Disagree ___Strongly Disagree

"People who have a lot of money are treated better than other people by the legal system."

___Strongly Agree ___Somewhat Agree ___Agree ___Somewhat Disagree ___Strongly Disagree

"Some people tend to be more violent than others."

___Strongly Agree ___Somewhat Agree ___Agree ___Somewhat Disagree ___Strongly Disagree

38.   How often do people with whom you work make disparaging remarks about other racially groups?

___Very Often ___Often ___Occasionally ___Rarely ___Very Rarely ___Never ___I don't work

39.   Is there any other information that you believe might be important for the court or for the lawyers to know about you as a possible juror:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Juror (please sign full name here)

_____

(print name here)

Date signed:_____

Page 8 of 8

93

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA                )
                                )
            v.                  )        Case No. CC-2001-M-179 & 180
                                )
ROBERT THOMAS CONRAD            )
                                )

JUN 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

## MOTION FOR A JURY QUESTIONNAIRE

The accused, ROBERT THOMAS CONRAD, moves this Court pursuant to the Fourth, Fifth,

Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and Sections 1, 5,

6, 7, 8, 9, 11, 13, 15 & 16 of Article I of the Alabama Constitution, to allow him to submit the

attached, proposed jury questionnaire to prospective jurors in time to receive completed

questionnaires at least three weeks prior to trial.

1. ROBERT THOMAS CONRAD has been charged with capital murder. The state is seeking

the death penalty.

2. Since this is to be a capital prosecution, exacting standards must be met to assure that

it is fair. "The fundamental respect for humanity underlying the Eighth Amendment's prohibition

against cruel and unusual punishment gives rise to a special '"need for reliability in the

determination that death is the appropriate punishment'" in any capital case." Johnson v. Mis-

sissippi, 486 U.S. 578, 584 (1988) (quoting Gardner v. Florida, 430 U.S. 349, 363-64 (1977)

(quoting Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (White, J., concurring))).

Page 1 of 4

3. If ROBERT THOMAS CONRAD is to receive a fair trial, it is vital that the information available to the prosecution and the defense concerning potential jurors is accurate and thorough. See, e.g., Coleman v. Kemp, 778 F.2d 1487, 1542 (11th Cir. 1985), cert. denied, 476 U.S. 1164 (1986) (voir dire procedures inadequate to uncover prejudice); Jordan v. Lippman, 763 F.2d 1265 (11th Cir. 1985) (jury selection procedures must be adequate to unearth prejudice; failure to expose potential prejudice of jurors requires reversal of conviction); Wood v. Woodham, 561 So.2d 224, 228 (Ala. 1989) ("simple extraction of an affirmative response from a potential juror does not necessarily absolve that juror of probable prejudice").

4. Moreover, because of the exceptional and irrevocable nature of the death penalty, the Supreme Court held in Turner v. Murray, 476 U.S. 28 (1986) that voir dire must be especially careful, and that trial court's refusal to allow certain voir dire questions required reversal of the death sentence. Further, a questionnaire completed prior to voir dire greatly minimize the likelihood of Batson problems.

> 'I have always thought that many Batson problems could be eliminated in both criminal and civil cases by the following procedure: (1) Requiring prospective jurors, when they are summoned to appear or when they assemble, to fill out a written questionnaire that would provide substantial background information to the parties . . . Such a procedure would greatly assist the trial court.'

Ex parte Bruner, 681 So.2d 173, 190 (Ala. 1996) (Justice Maddox, concurring)(quoting Huntley v. State, 627 So.2d 1013, 1017-1018 (Ala. 1992)

5. Attached to this motion is a proposed juror questionnaire that will elicit background information that may be relevant to challenges for cause as well as the intelligent and informed exercise of peremptory challenges. The questionnaire will provide the parties and the Court with

responses that may alert them to possible relationships, associations or experiences that may be a

source of bias or prejudice and necessitate cause excusals under § 12-16-150, Code of Alabama

(1975). It will also provide information necessary to ensure that no improper bias or prejudice

undermines ROBERT THOMAS CONRAD's rights to a fair trial or otherwise results in arbitrary or

prejudicial imposition of the death penalty. § 13A-5-53, Code of Alabama (1975). The

questionnaire will also save substantial time that can be devoted in voir dire to questioning about

the extensive and highly prejudicial publicity regarding this case if it is tried in Coffee County.

    6. ROBERT THOMAS CONRAD requests that the questionnaires be served at the same time

as the summons, and that jurors be directed to complete the questionnaires within five days and

return them in postage-paid envelopes addressed to the Clerk of the Coffee County Circuit Court.

    WHEREFORE, ROBERT THOMAS CONRAD requests that this Court

(a) allow ROBERT THOMAS CONRAD to present evidence and argument on this motion;

(b) schedule a hearing on this motion;

(c) enter an order granting the motion and directing that:

    (i)    the attached, proposed juror questionnaire be sent out with summonses to the venirepersons;

    (ii)    prospective jurors be provided with postage-paid envelopes addressed to the Clerk of this Court and be directed to complete the forms and return them to the Court within five days; and

    (iii)    the Clerk make copies of all questionnaires and provide them at the same time to counsel for the state and for ROBERT THOMAS CONRAD; and

(d) grant such other relief as may be appropriate and warranted to protect the accused's

Page 3 of 4

rights

Respectfully submitted this the 25th day of June, 2001.

Smith & Carr, LLC.
Sydney Albert (Al) Smith          SMI098
Attorneys at Law
P. O. Drawer 389
Elba, Alabama 36323
Phone:          334-897-3658
Fax:             334-897-8633

Gary D. Bradshaw BAR074
Post Office Box 311412
Enterprise, Alabama 36331
Phone:          334-393-6439

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

Al Smith                          6/25/2001
                                   Date

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA  )
)
v.  )    Case No. CC-2001-M-179 & 180
)
ROBERT THOMAS CONRAD  )
)

JUN 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

## MOTION TO DISQUALIFY ALL POTENTIAL JURORS WHO KNEW OR WERE ACQUAINTED WITH THE VICTIM OR HIS FAMILY

ROBERT THOMAS CONRAD respectfully moves this Court pursuant to the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 1, 5, 6, 7, 8, 9, 11, 15 and 16 of Article I of the Alabama Constitution to enter an order disqualifying from jury service all members of ROBERT THOMAS CONRAD's venire who knew or were acquainted with the victims, or with any member of the victims' family.

1. ROBERT THOMAS CONRAD is before this Court on a charge of capital murder, and because this is a capital prosecution, exacting standards must be met to assure that it is fair. "The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special '"need for reliability in the determination that death is the appropriate punishment"' in any capital case." Johnson v. Mississippi, 486 U.S. 578, 584 (1988) (quoting Gardner v. Florida, 430 U.S. 349, 363-64 (1977) (quoting Woodson v. North

Page 1 of 7

Carolina, 428 U.S. 280, 305 (1976) (White, J., concurring))).

2. As a matter of constitutional law, it is well established that individuals who have been exposed to highly prejudicial information regarding a capital defendant must be presumed biased for purposes of sitting on his capital sentencing jury and thus should be excused from jury service.

3. As early as Blackstone's Commentaries, our forefathers had relinquished the practice of purposefully selecting jurors who knew beforehand the character and credibility of the parties and witnesses. 3 W. Blackstone, Commentaries *359. This practice was abandoned because "jurors, coming out of the immediate neighborhood, would be apt to intermix their prejudices and partialities in the trial of right." Id. at *359-360. Thus, for centuries now, juries have been selected "only . . . de corpore comitatus, from the body of the county at large, and not de vicineto, or from the particular neighborhood." Id. at *360.

4. This long tradition reflects values that are fundamental to our criminal justice system: the right to a fair trial and to impartial and uninterested jurors.

5. "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961). In the language of Lord Coke, for a juror to be impartial he must "be indifferent as he stands unsworn." Reynolds v. United States, 98 U.S. 145, 154 (1878).

6. The United States Supreme Court, in Irvin v. Dowd, implied juror bias where there was evidence of community prejudice introduced at voir dire -- even though the jurors insisted that they could render an impartial verdict. Irvin v. Dowd, 366 U.S. at 724. That decision announced a standard of heightened scrutiny for juror bias in capital cases. Id. at 727-28. In a

long line of cases, the Court subsequently presumed juror prejudice <u>without even stopping to consider any evidence of bias</u>.[1]

7. A capital sentencing jury that includes people who knew the victim or his family -- hereinafter referred to as "victim jurors" -- is precisely the kind of "tribunal organized to return a verdict of death" that is prohibited by the Constitution. <u>Witherspoon v. Illinois</u>, 391 U.S. 510, 520-21 (1968). The Supreme Court has indicated that a state would violate a capital defendant's right to an impartial jury if it <u>deliberately</u> -- i.e., without a legitimate state purpose -- stacked the <u>capital sentencing</u> jury against the defendant for the purpose of making the imposition of death more likely. <u>Lockhart v. McCree</u>, 476 U.S. 162 (1986).

8. When a trial court allows "victim jurors" to sit on the sentencing jury, there is no doubt that the court "'crosse[s] the line of neutrality' and 'produce[s] a jury uncommonly willing to condemn a man to die.'" <u>Lockhart v. McCree</u>, 476 U.S. at 179 (quoting <u>Witherspoon</u>, 391 U.S. at 520-21).

9. Moreover, when "victim jurors" sit on a capital sentencing jury, the state deprives the defendant of a sentence based on the evidence produced at the penalty phase of his capital trial. It is well settled that the Sixth Amendment guarantees a jury verdict based on the evidence produced at trial. <u>Turner v. Louisiana</u>, 379 U.S. 466, 472 (1965); <u>Irvin v. Dowd</u>, 366 U.S. at 722.

---

1. <u>See, e.g.</u>, <u>Rideau v. Louisiana</u>, 373 U.S. 723, 726 (1963) (the entire community was presumptively partial because a taped confession was televised throughout the area); <u>Turner v. Louisiana</u>, 379 U.S. 466, 471, 473 (1965) (implied bias where two state witnesses were deputy sheriffs in charge of jury during trial; even if it could be assumed that witnesses had not discussed case with jurors, "it would be blinking reality not to recognize the extreme prejudice inherent in this continual association"); <u>Estes v. Texas</u>, 381 U.S. 532, 545 (1965) (prejudice presumed from practice of televising and broadcasting trial); <u>Sheppard v. Maxwell</u>, 384 U.S. 333, 357 (1966) (prejudice presumed because of massive publicity attending prosecution); <u>see also</u> <u>Wood v. Woodham</u>, 561 So.2d 224, 228 (Ala. 1989) (an assurance from a venire member that she is unbiased "does not necessarily absolve that juror of probable prejudice").

This requirement "goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." Turner v. Louisiana, 379 U.S. at 472.

10.  "Victim jurors" possess evidence of the victim's characteristics and of the impact of the crime on the victim's family.  This evidence is not capable of being subjected to the procedures necessary for a fair trial, and the defendant is accordingly deprived of fundamental protections, including the right of confrontation, the right of cross-examination and the right to counsel. Turner v. Louisiana, 379 U.S. at 473.

11.  In addition, "victim jurors" deprive a capital defendant of his right to an "individualized determination" of whether he should live or die based on his character and the circumstances of his crime. Zant v. Stephens, 462 U.S. 862, 879 (1983).  Regardless of any statements to the contrary, "victim jurors" simply cannot guarantee a capital defendant an individualized sentence. Wood v. Woodham, 561 So.2d 224 (Ala. 1989).  "Victim jurors" have lived, played, and talked with the victim or have experienced the pain and suffering of the victim's close family.  They would therefore be unable to determine impartially whether the man on trial for his murder should live or die, and thus would deprive any sentencing verdict of the reliability required by the Eighth Amendment. See England v. State, 601 So.2d 1108 (Ala.Cr.App. 1992) (reversible error for a trial court to not excuse juror who shared some characteristics of the victim in the crime, and indicated she may have some bias because of their commonalities).

12.  For these reasons, potential jurors who are related to the victim -- whether closely or distantly -- must be removed from a capital jury if the defendant challenges them. See § 12-16-150(4), Code of Alabama (1975) (juror may be challenged for cause if "he is connected by

consanguinity within the ninth degree, or by affinity within the fifth degree, computed according to the rules of the civil law, with . . . the person alleged to be injured").[2]  Clearly, "victim jurors" must also be removed from the venire at ROBERT THOMAS CONRAD's capital trial due to implied bias.  The failure to remove any such jurors would result in reversible error since the defendant would be forced to use peremptory challenges to remove the jurors himself.  Under Alabama law, the defendant's right to exercise peremptory challenges is absolute: A trial court commits reversible error -- without a showing of prejudice -- if it errs in denying the defendant's challenge for cause and compels the defendant to remove a juror peremptorily.  See England v. State, 601 So.2d 1108 (Ala.Cr.App. 1992); Ex parte Ellington, 580 So.2d 1367 (Ala. 1991); Pace v. State, __So.2d__ CR-93-740 (Ala.Cr.App. July 3, 1996); Ex parte Beam, 512 So.2d 723 (Ala. 1987); Ex parte Rutledge, 523 So.2d 1118 (Ala. 1988); Uptain v. State, 534 So.2d 686 (Ala.Cr.App. 1988); Mason v. State, 536 So.2d 127 (Ala.Cr.App. 1988).

13.  The Alabama Court of Criminal Appeals has most eloquently summarized the law regarding peremptory challenges in Alabama:

> "The denial or impairment of the right [of peremptory challenges] is reversible error without a showing of prejudice." . . . Since the defendants were required to use peremptory challenges in order to eliminate the three venire persons who had properly been challenged for cause, their total number of peremptories was effectively reduced by three.  "No right of a felon is more basic than the right to 'strike' a petit jury from a panel of fair-minded, impartial prospective jurors."

<p style="text-align:center">*    *    *</p>

> The error was preserved on behalf of each defendant and each is entitled to a new trial.

---

2. It is well established, of course, that the mere fact that certain grounds are set forth in the Code of Alabama at § 12-16-150 for the challenge of jurors for cause does not prevent the exclusion of jurors for cause on grounds existing under the common law and under principles of constitutional law. Lewis v. State ex rel. Baxley, 70 So.2d 790 (Ala. 1954); Felton v. State, 246 So.2d 467 (Ala.Cr.App. 1971); Rideau v. Louisiana, 373 U.S. 723 (1963).

Uptain v. State, 534 So.2d at 688 (quoting Swain v. Alabama, 380 U.S. 202, 219 (1965) and Ex parte Beam, 512 So.2d 723, 724 (Ala. 1987)).

WHEREFORE, ROBERT THOMAS CONRAD respectfully requests that this Court:

(a) allow him to present evidence and argument on this motion;

(b) schedule a hearing on this motion;

(c) enter an order, similar to the attached proposed order, granting the motion and excusing from jury service any person who knew or was acquainted with the victim or the victim's family; and

(d) grant any other relief that is just and proper under the circumstances of this motion.

Respectfully submitted this June 25th, 2001.

Smith & Carr, LLC.
Sydney Albert (Al) Smith        SMI098
Attorneys at Law
P. O. Drawer 389
Elba, Al 36323
Phone:        334-897-3658
Fax:        334-897-8633

Gary D. Bradshaw        BRA074
Attorney at Law
P. O. Box 311412
Enterprise, AL 36331-1412

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

Al Smith _____ 6/25/2001
Al Smith                    Date

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA      )
                       )
        v.            )     Case No. CC-2001-M-179 & 180
                       )
ROBERT THOMAS CONRAD   )
                       )

JUN 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

## MOTION FOR DISQUALIFICATION FROM THE JURY VENIRE OF ALL POTENTIAL JURORS WHO WOULD AUTOMATICALLY VOTE FOR THE DEATH PENALTY IF THEY FOUND ROBERT THOMAS CONRAD GUILTY OF CAPITAL MURDER

ROBERT THOMAS CONRAD respectfully petitions this Court pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Sections 1, 5, 6, 7, 8, 9, 11, 13, 15 and 16 of Article I of the Alabama State Constitution, and applicable state law to disqualify from the jury venire all potential jurors who would automatically vote for a sentence of death if they found ROBERT THOMAS CONRAD guilty of the intentional murder of the victim.

1. ROBERT THOMAS CONRAD is before this Court on a capital murder indictment. He is charged with capital murder. The state has indicated its intention to seek the death penalty.

2. Because this is a capital prosecution, exacting standards must be met to assure that it is fair. "The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special "'need for reliability in the

Page 1 of 4

determination that death is the appropriate punishment'" in any capital case." Johnson v. Mississippi, 486 U.S. 578, 584 (1988) (quoting Gardner v. Florida, 430 U.S. 349, 363-64 (1977) (quoting Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (White, J., concurring))).

3. As a matter of constitutional law, it is now well established that a potential juror is not fit to sit on a capital sentencing jury if that person will automatically vote for the death penalty in the event the defendant is found guilty of capital murder. See Morgan v. Illinois, 504 U.S. 719 (1992).

4. "A venireman who believes that the death penalty should automatically and in every case flow from conviction of first degree murder must be excused." Bracewell v. State, 506 So. 2d 354, 358 (Ala.Cr.App. 1986) (quoting Alvord v. Wainwright, 564 F.Supp. 459, 487 (M.D. Fla. 1983), aff'd in part, rev'd in part on other grounds, 725 F.2d 1282 (11th Cir.), cert. den., 469 U.S. 956 (1984)).

5. Thus, those jurors whose views on capital punishment would prevent or substantially impair the performance of their duties should be excused. Adams v. Texas, 448 U.S. 38 (1980); Pace v. State, __ So.2d __ CR-93-740 (Ala.Cr.App. Sept. 27, 1996); see also Pope v. State, 345 S.E.2d 831 (Ga. 1986) (failure to exclude for cause jurors biased in favor of death penalty violates Witherspoon and is reversible error).

6. This Court should not fail to adhere strictly to the clear mandate of Bracewell v. State, supra, and Adams v. Texas, supra.

7. It is clear that jurors should be disqualified where their "views would prevent or substantially impair the performance of [their] duties in accordance with [their] instructions and oath[s]." Watkins v. State, 509 So.2d 1071, 1073-74 (Ala.Cr.App. 1986), aff'd, 509 So.2d 1074

(Ala.), cert. denied, 484 U.S. 918 (1987); see also Black v. State, 596 So.2d 40 (Ala.Cr.App. 1991) and England v. State, 601 So.2d 1108 (Ala.Cr.App. 1992) (where jurors admitted possible source of bias that may impair their duties as jurors, reversible error for the trial court to not conduct further inquiries or excuse jurors for cause). Failure to exclude such jurors will limit ROBERT THOMAS CONRAD's right to the full exercise of his peremptory challenges in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights under the U.S. Constitution and his rights under the Alabama Constitution and applicable Alabama law.

8. This cannot be allowed to happen at ROBERT THOMAS CONRAD's trial. Any potential juror who would automatically vote for the death penalty is not qualified to serve on ROBERT THOMAS CONRAD's capital sentencing jury and must be excluded for cause. Wainwright v. Witt, 469 U.S. 810 (1985); Witherspoon v. Illinois, 391 U.S. 510 (1968).

WHEREFORE, ROBERT THOMAS CONRAD respectfully requests that this Court:

(a) allow ROBERT THOMAS CONRAD to present argument on this motion;

(b) schedule a hearing on this motion;

(c) enter an order, similar to the attached proposed order, granting the motion and excusing for cause all potential jurors at ROBERT THOMAS CONRAD's trial who would automatically vote for the death penalty; and (d) grant any other relief that is just and proper under the circumstances of this motion.

Respectfully submitted this the June 25th, 2001.

Smith & Carr, LLC.
Sydney Albert (Al) Smith          SMI098
Attorneys at Law
P. O. Drawer 389

Elba, Alabama 36323
Phone:        334-897-3658
Fax:          334-897-8633

Gary D. Bradshaw    BRA074
Attorney at Law
P. O. Box 311412
Enterprise, AL 36331-1412

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

Al Smith                    6/25/2007
Al Smith                    Date

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA     )
     )
     )
v.     )    Case No. CC-2001-M-179 & 180
     )
ROBERT THOMAS CONRAD     )
     )

JUN 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

---

**MOTION TO DISMISS THE INDICTMENT ON GROUNDS THAT THE GRAND JURY WAS
IMPROPERLY IMPANELED**

---

COMES now, ROBERT THOMAS CONRAD, by and through counsel, and moves this Honorable Court to **DISMISS** the indictment on grounds that the Grand Jury was improperly impaneled and cites as grounds therefore as follows:

1. The **Special May Term, 2001,** Grand Jury of Coffee County, Enterprise Jurisdiction indicted ROBERT THOMAS CONRAD for capital murder.

2. The case against Mr. Conrad not presented to a regularly scheduled Grand Jury, rather it was presented to a **specially called Grand Jury.** On information and belief, the case was presented as a "strategic move" on the part of the District Attorney to circumvent the warrant and Preliminary Hearing process.

4. The sudden convening of a "**SPECIAL GRAND JURY**" was unnecessary and is inconsistent with the regularly published calendar of the Court. It contravenes the supervision of the Court to ensure that the members of the Grand Jury sitting on the case of the Defendant are duly qualified and free from disqualifications. Such was a violation of the Constitutional Rights of the Defendant.

5. Due to the "Grand Jury Secrecy Act" codified at §12-16-215 Code of Alabama 1975, the Defendant has been unable to obtain the names, addresses, sex, race or the Grand Jury members in general, or the members who sat and voted on the Defendant's case. Such is an unconstitutional abrogation of the rights of the Defendant. It smacks of Star Chamber and inquisition law.

1

6. The Defendant moves to DISMISS the indictment on grounds that:

a. The Grand Jurors who were selected from the venire, were not properly drawn from a fair cross section of qualified prospective jurors who resided for the requisite time in the Enterprise Division of Coffee County, Alabama;

b. The Grand Jurors who were selected, were not properly charged in the law that must be followed to result in a valid indictment;

c. The Grand Jurors who were recalled for the Special Session that resulted in an indictment on the Defendant were insufficiently instructed in the disqualifications from participating in the hearing of evidence and deliberations on the case of the Defendant;

d. The Grand Jurors were improperly recalled for the Special Session that resulted in an indictment on the Defendant, in that the procedure used was in violation of the statutory and Constitutional rights of the Defendant to have an impartial and fairly constituted body hear the legal evidence against him, the improper purpose of the calling of the Special Session Grand Jury with motive and strategy designed to deprive the Defendant of the rights afforded him to test the evidence presented against him, to confront and cross examine witnesses and evidence presented against him, and to the effective assistance of counsel;

e. There were insufficient votes which were untainted by disqualified Grand Jurors to constitute a valid indictment against the Defendant;

f. There were unauthorized persons present in the Grand Jury which impaired the fair and legal consideration of evidence presented against the Defendant.

g. There was no legal evidence presented before the Grand Jury to warrant an indictment against the Defendant.

h. The Defendant was denied an opportunity to request an appearance before the Grand Jury as provided by Rule 12.7 ARCrP as he was unaware that a Grand Jury was scheduled to hear his case due to the manner by which the Special Session Grand Jury was convened.

i. The "Grand Jury Secrecy Act", codified at §12-16-215 Code of Alabama 1975 is unconstitutional on its face and as applied to the Defendant as depriving him of his rights to investigate, confront, appear, and to have

2

the effective assistance of counsel in violation of Rule 16 of the Alabama Rules of Criminal Procedure; the Fifth, Sixth,

Eighth, and Fourteenth Amendments to the United States Constitution; and Article I, Sections 1, 5-9, 11, 13, 15 & 16

of the State Constitution of Alabama.

Respectfully submitted this June 25th, 2001.

Smith & Carr, LLC.
Sydney Albert (Al) Smith        SMI098
Attorneys at Law
P. O. Drawer 389
Elba, Alabama 36323
Phone:        334-897-3658
Fax:          334-897-8633

Gary D. Bradshaw        BAR074
Post Office Box 311412
Enterprise, Alabama 36331
Phone:        334-393-6439

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the
United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

and

Honorable Bill Pryor,
Attorney General
State of Alabama
11 South Union St.
Montgomery, AL 36130

Al Smith                    6/25/2001
                            Date

3

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| v. | )     Case No. CC-2001-M-179 & 180 |
| | ) |
| ROBERT THOMAS CONRAD | ) |
| | ) |

JUN 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

## MOTION FOR DEPOSITION OF STATE EXPERT WITNESSES AND REQUEST FOR PRODUCTION OF DOCUMENTS

ROBERT THOMAS CONRAD respectfully petitions this Court, pursuant to the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; Sections 1, 5, 6, 7, 8, 9, 11, 13, 15, and 16 of Article I of the Alabama Constitution; and Rule 16 of the Alabama Rules of Criminal Procedure, to grant him leave to depose the expert witnesses that the state intends to call to testify at his trial and to direct the state to provide him with the curriculum vitae, certificates, qualifying documents, and all other background documentation necessary to assess adequately the qualifications of the state's expert witnesses. ROBERT THOMAS CONRAD additionally relies on Ex parte Monk, 557 So.2d 832, 836-37 (Ala. 1989), in which the Alabama Supreme Court held that "[t]he hovering death penalty is the special circumstance justifying broader discovery in capital cases."

1. ROBERT THOMAS CONRAD is charged with capital murder for which he faces the death penalty.

2. Since this is a capital prosecution, exacting standards must be met to assure that it is fair. "The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special '"need for reliability in the determination that death is the appropriate punishment"' in any capital case." Johnson v. Mississippi, 486 U.S. 578, 584 (1988) (quoting Gardner v. Florida, 430 U.S. 349, 363-64 (1977) (quoting Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (White, J., concurring))).

3. At ROBERT THOMAS CONRAD's trial, the state is expected to call several expert witnesses during the

guilt phase of the trial.

4. The admissibility of expert opinions is authorized in the State of Alabama pursuant to statute. <u>See</u> § 12-21-160, <u>Code of Alabama</u> (1975).

5. It is well established that "[t]o qualify as an expert, the witness must have such knowledge, skill, experience or training as that his opinion will be considered in reason as giving the trier of fact light upon the question to be determined." C. W. Gamble, <u>McElroy's Alabama Evidence</u> § 127.01(5)(b) (4th ed. 1991). Whether an expert is qualified to testify is a decision that rests in the discretion of the trial court after a full review of the witnesses qualifications. <u>Id</u>.

6. At trial, the defendant will have to confront the state's case, including its expert testimony. The qualifications of the experts and their opinion testimony must be developed by the defense prior to trial in order for the defendant to prepare adequately his defense to the charge.

7. Of course, at trial, the defense will be entitled to cross-examine the state's expert witnesses on their qualifications and on the details upon which they have based their opinions. <u>See id</u>. § 142.01(5) ("[t]he above principle of cross-examination permits the expert to be questioned as to the details upon which he bases the opinion he has given on direct and to be questioned as to his qualifications"). Without some preliminary access to the state's expert witnesses, the defendant's right to confrontation and cross-examination become meaningless.

8. Rule 16 of the Alabama Rules of Criminal Procedure provides, in relevant part, that:

the prosecutor shall . . . permit the defendant to . . . inspect, and copy or photograph . . . papers [and] documents . . . which are within the possession, custody, or control of the state/municipality and which are material to the preparation of defendant's defense.

Ala.R.Crim.P. 16.1(c).

9. The Rules also provide that:

[u]pon written request of the defendant, the prosecutor shall . . . permit the defendant to inspect and to copy any results or reports of physical or mental examinations or scientific tests or experiments, if the examinations, tests, or experiments were made in connection with the particular case, and the results or reports are within the possession, custody, or control of the state/municipality, and their existence is known to the prosecutor.

Ala.R.Crim.P. 16.1(d).

10. Because this is a capital case and exacting standards of justice must be met, the defendant must be permitted to depose the expert witnesses that the state intends to call. In order to guarantee ROBERT THOMAS CONRAD the rights to cross-examination and confrontation protected by the Sixth, Eighth and Fourteenth Amendments to the United

States Constitution and Section 6 of Article I of the Alabama Constitution, the defendant must be permitted to obtain background information concerning the qualifications of the state's expert witnesses and the details upon which they have formed their expert opinions.

WHEREFORE, ROBERT THOMAS CONRAD respectfully requests that this Court:

(a) allow ROBERT THOMAS CONRAD to present argument in support of this motion;

(b) schedule a hearing on this motion;

(c) enter an order granting the motion; and

(d) grant any other relief that is just and proper under the circumstances.

Respectfully submitted this June 25th, 2001.

Smith & Carr, LLC.
Sydney Albert (Al) Smith        SMI098
Attorneys at Law
P. O. Drawer 389
Elba, Alabama 36323
Phone:        334-897-3658
Fax:        334-897-8633

Gary D. Bradshaw        BAR074
Post Office Box 311412
Enterprise, Alabama 36331
Phone:        334-393-6439

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

Al Smith                    6/25/2001
                            Date

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA                )
                                )
        v.                      )        Case No. CC-2001-M-179 & 180
                                )
ROBERT THOMAS CONRAD            )
                                )

JUN 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

## MOTION FOR ORDER PERMITTING DISCOVERY OF TRANSCRIPT, EXHIBITS, OTHER MEMORIALIZATION OF THE GRAND JURY PROCEEDINGS, AND LIST OF GRAND JURY MEMBERS

ROBERT THOMAS CONRAD respectfully moves this Court, pursuant to Rule 16 of the Alabama Rules of Criminal Procedure; the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; and Article I, Sections 1, 5-9, 11, 13, 15 & 16 of the State Constitution of Alabama, to permit discovery of the grand jury proceedings and to enter an order directing the Clerk of the Coffee County Circuit Court to produce the below enumerated records pertaining to the grand jury proceedings culminating in the indictment of ROBERT THOMAS CONRAD. In support of his motion, ROBERT THOMAS CONRAD submits the following:

1. The **Special May Term, 2001,** Grand Jury of Coffee County, Enterprise Jurisdiction indicted ROBERT THOMAS CONRAD for capital murder and robbery.

2. In accompanying motions, ROBERT THOMAS CONRAD has moved to dismiss the indictment on a number of grounds challenging the propriety of the grand jury proceedings. These motions to dismiss the indictment are incorporated herein by reference.

3. To prepare for and present evidence on these motions and to litigate these claims adequately, ROBERT THOMAS CONRAD must have access to and copies of: (1) the venire list showing the name, address, race, and sex from which the Grand Jury was chosen as it was first drawn; (2) the venire list showing the name, address, race, and

Page 1 of 6

sex from which the Grand Jury was chosen as it was qualified and drawn with the persons excused and absent noted; (3)

the names of the Grand Jury members with the addresses, race and sex including the designation of the Foreperson and

the Assistant Foreperson; (4)    a transcript of the charge to the Grand Jury; (5)  the names of the Grand Jury members

with the addresses, race and sex who heard testimony that led to the indictment of ROBERT THOMAS CONRAD; (6)

the witness(es) who gave testimony in the presentation of the evidence that led to the indictment of ROBERT THOMAS

CONRAD; (7) the prosecutors notes, synopsis, testimony, and exhibits from the proceedings that led to the indictment

of ROBERT THOMAS CONRAD; (8) the notes of the number from the Grand Jury Docket and otherwise, i.e.,

handwritten notes, (but not the names of members voting for or against indictment if such were kept) of the Grand Jury

votes that resulted in the indictment of ROBERT THOMAS CONRAD; (9) the names, addresses and occupation and

reason(s) for being present of all persons not grand jury members or prosecutors who were present during any portion

of the Grand Jury proceedings that resulted in the indictment of ROBERT THOMAS CONRAD; (10) the reason that

the charges against ROBERT THOMAS CONRAD did not follow the procedure of a warrant being issued thus

permitting ROBERT THOMAS CONRAD a Preliminary Hearing, or a presentation to a regularly scheduled Grand Jury

, rather than a specially called Grand Jury, and whether or not this type of presentation was a "strategic move" of the

District Attorney's Office, which deliberately deprived ROBERT THOMAS CONRAD of his ability to test the

sufficiency of the evidence at a Preliminary Hearing.

   4.  The United States Supreme Court issued a ruling regarding the way in which grand juries are permitted to

operate. In Butterworth v. Smith, 494 U.S. 624 (1990), the Supreme Court ruled that the Constitution forbids rules that

prohibit the disclosure of matters occurring before the grand jury. An analysis of the reasoning of the Supreme Court

in Butterworth is dispositive of the issue before this Court. Reviewing the history of the grand jury, the Court noted that

the most important reason for the traditional secrecy surrounding the institution in its nascent years was "to safeguard

citizens against an overreaching Crown and unfounded accusations." Butterworth v. Smith, 494 U.S. at 629.

   5.  In this country, the secrecy of the grand jury may not be used as a tool by the state to inflict an unfair

disadvantage upon the accused.  Indeed, the Supreme Court has noted "that grand juries are expected to 'operate within

the limits of the First Amendment,' as well as other provisions of the Constitution." Butterworth v. Smith, 494 U.S. 630

(quoting Branzburg v. Hayes, 408 U.S. 665, 708 (1972)); see also Wood v. Georgia, 370 U.S. 375 (1962).  In cases

"where a person 'lawfully obtains truthful information about a matter of public significance,' we have held that 'state officials may not constitutionally punish publication of the information. . . .'" Butterworth v. Smith, 494 U.S. at 632 (quoting Smith v. Daily Mail Publishing Co., 443 U.S. 97, 103 (1979)); see also Florida Star v. B.J.F., 491 U.S. 524 (1989). The availability of grand jury testimony is "entirely consonant with the growing realization that disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice." Dennis v. United States, 384 U.S. 855, 871 (1966).

6. Applying these principles to the manner in which the grand jury proceedings were conducted here, it becomes clear that the procedures in this case contravened various constitutional provisions, including the Fifth, Sixth, Eighth, and Fourteenth Amendment rights of the accused and the First Amendment rights of all citizens of this state. The limited interest in preindictment secrecy is served by an equally limited prohibition against disclosures. However, any ban ad infinitum against ever disclosing the inconsistent testimony and perjury committed by state witnesses cannot be reconciled with the constitutional rights of the accused.

7. The only effective way of assuring that witnesses in the grand jury are brought to account is to preserve a verbatim transcript of their testimony and to provide the defense with other grand jury evidence. The grand jury transcript would ensure that other fundamental rights of the accused are respected. Counsel for ROBERT THOMAS CONRAD has no reason to expect that a transcript of the Grand Jury testimony was made here as counsel is familiar with the custom of not transcribing the testimony. However, denying ROBERT THOMAS CONRAD a the information requested concerning the Grand Jury organization, calling into special session, make up, the members, notes and testimony would violate his right to cross-examine and impeach witnesses. See Pointer v. Texas, 380 U.S. 400 (1965); Bryson v. State, 84 So.2d 782 (Ala.Ct.App. 1955) ("It is elemental that a witness may be impeached by prior contradictory statements. Testimony before a grand jury furnishes no exception."). Denying ROBERT THOMAS CONRAD the grand jury information would also violate his right to an adequate appellate record. Hammond v. State, 665 So.2d 970 (Ala.Cr.App. 1995) (inadequate record prevents appellate courts from properly deciding issues raised and from properly reviewing record for plain error as required in capital cases). Alabama has a long precedent for impeaching a witness at trial by the testimony of a Grand Jury member who heard the testimony which varied at Grand Jury, or, if a transcript was made, upon proper predicate, the examination of that transcript. Millican v. State, 423 So.

2d 268, (Ala.Cr.App.1982); <u>Stroud v. State</u>, 56 Ala.App. 692, 325 So. 2d 200, *cert. quashed*, 295 Ala. 424, 325 So. 2d

204 (1975); State wx rel. Baxley V. Strawbridge, 52 Ala.App. 685, 296 So. 2d 784 (1974); <u>Adams v. State</u>, 33 Ala.App.

136, 31 So. 2d 99, *cert. denied*, 249 Ala. 294, 31 So. 2d 845 (1945). While §12-16-215 <u>Code of Alabama</u> 1975

precludes access to grand jury deliberations, and recent Alabama decisions have refused to permit Grand Jury access,

e.g., <u>State v. Matthews</u>, 724 So. 2d 1140, (Ala.Cr.App. 1998), and the recent denial of access in the memorandum

opinion concerning a Mandamus petition directed to Circuit Clerk Jim Ellis, (CV-99-33; CR-98-1438, Released August

20, 1999), such holdings cannot stand in the face of the rationale of *Butterworth, supra*, which must be seen as effectively

overruling the Alabama Grand Jury Secrecy Act as unconstitutional.

    8. It goes without saying that a capital trial must be "a reliable adversarial testing process." <u>Strickland v.</u>

<u>Washington</u>, 466 U.S. 668, 691-93 (1984); <u>see also</u> <u>Beck v. State</u>, 396 So.2d 645 (1980). In <u>Woodson v. North Carolina</u>,

428 U.S. 280 (1976), the United States Supreme Court held that a basic function of a constitutional death penalty statute

is to "make rationally reviewable the process for imposing a sentence of death." <u>Id</u>. at 303. The Court stressed the

qualitative difference between a sentence of death and any other penalty, as well as the need for effective appellate

review. <u>Id.</u>; <u>see also</u> <u>Gregg v. Georgia</u>, 428 U.S. 153, 206 (1976). This Court must preserve a transcript of the entire

record in this case so as to ensure that "this unique penalty [is not] wantonly and . . . freakishly imposed." <u>Furman v.</u>

<u>Georgia</u>, 408 U.S. 238 (1972) (Stewart, J., concurring); <u>Jurek v. Texas</u>, 428 U.S. 262, 276 (1976). The failure to provide

counsel with important transcripts and information clearly reduces the reliability of the proceedings and taints ROBERT

THOMAS CONRAD's right to effective assistance of counsel. The imbalance in this case makes the issue particularly

clear. The prosecution was present when the Grand Jury was called and organized and met, and when witnesses testified

before the grand jury, and therefore knows (or purports to know) what they said. The defense was not even notified that

grand jury proceedings would be held, or that ROBERT THOMAS CONRAD was their target. "[T]he Due Process

Clause . . . forbids enforcement of . . . rules unless reciprocal rights are given to criminal defendants." <u>Wardius v.</u>

<u>Oregon</u>, 412 U.S. 470, 472 (1973).   The Courts, both Federal and State have recognized that confidentiality statutes must

give way in the context of the Constitutional rights of an accused to a fair trail. "The Sixth Amendment right to confront

witnesses has been held to outweigh the State's interest in protecting the anonymity of juvenile offenders. See: <u>Davis</u>

<u>v. Alaska</u>, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)." <u>May v. State</u>, 710 So.2d 1362, (Ala.Cr.App. 1997),

*cert. denied,* Ala.1998), <u>Thomas v. State</u>, 445 So.2d 992, 994 (Ala.Cr.App.1984), (youthful offender); <u>Schaefer v. State</u>, 676 So.2d 947, (Ala.Cr.App. 1995), <u>United States v. Lindstrom</u>, 698 F.2d 1154 (11th Cir.1983); <u>Ex parte Lynn</u>, 477 So.2d 1385 (Ala.1985); <u>Kirby v. State</u>, 581 So.2d 1136 (Ala.Cr.App.1990); <u>Thornton v. State</u>, 527 So.2d 143 (Ala.Cr.App.1987), *cert. quashed*, 527 So.2d 146 (Ala.1988).

9. Therefore, where, as here, the Grand Jury was suddenly called into **special session** and an indictment returned in this **CAPITAL** case, without the opportunity for ROBERT THOMAS CONRAD to test the sufficiency of **any evidence** and ROBERT THOMAS CONRAD has the right to challenge the indictment, but must do so before arraignment, the Grand Jury secrecy must give way to ROBERT THOMAS CONRAD's Constitutional Rights to challenge the propriety of the indictment and the process by which it was obtained.

WHEREFORE, the accused respectfully requests that this Court:

(1) order the Clerk of the Circuit Court for Coffee County to make available to, and permit the copying of, the testimony, transcript, recordings, exhibits, and other memorializations pertaining to the grand jury proceedings in this case, as well as the list of the members of the grand jury that returned his indictment;

(2) in the event that such transcripts do not exist, order that a hearing be conducted involving the grand jury members in this case; or, in the alternative,

(3) allow the accused to present evidence on this motion and schedule this motion for an evidentiary hearing; and,

(4) order the matters prayed for, 

(5) order such other relief as is appropriate and necessary in light of the evidence presented at the hearing on this motion.

Respectfully submitted this the 25th day of June, 2001.

Smith & Carr, LLC.
Sydney Albert (Al) Smith    SMI098
Attorneys at Law
P. O. Drawer 389
Elba, Al 36323
Phone:        334-897-3658
Fax:          334-897-8633

Gary D. Bradshaw BAR074
Post Office Box 311412
Enterprise, Alabama 36331
Phone: (334) 393-6439

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

and

Honorable Bill Pryor,
Attorney General
State of Alabama
11 South Union St.
Montgomery, AL 36130

Al Smith      6/25/2001
                 Date

STATE OF ALABAMA,      )     IN THE CIRCUIT COURT OF

         )

      PLAINTIFF,    )     COFFEE COUNTY, AL

         )

VS.         )     ENTERPRISE DIVISION

         )

ROBERT THOMAS CONRAD,    )

         )

      DEFENDANT.    )     CASE #s: CC-2001-M-179
                      and
                      CC-2001-M-180

## *O  R  D  E  R*

*The Court has considered the Defendant's "MOTION FOR ORDER PERMITTING DISCOVERY OF TRANSCRIPT, EXHIBITS, OTHER MEMORIALIZATION OF THE GRAND JURY PROCEEDINGS, AND LIST OF GRAND JURY MEMBERS."*

### *IT IS ORDERED:*

*1).    The State is to timely obtain from the Clerk of Court and produce to the Defendant's attorneys the following: A list of the jurors selected/empaneled to serve on the grand jury which returned an indictment against the above defendant, the name of the , including their names and addresses and such other information as the clerk may have obtained; a copy of the VENIRE list from which the grand jury was drawn and, a copy of the "order" of this Court which required the grand juror members to assemble on the occasion when the Defendant was indicted.*

*2).    That all additional relief set forth in the remainder of the motion…not hereby granted or provided for…is denied.*

*Done and ordered this the  11ᵗʰ day of  July, 2001.*

GARY McALILEY, CIRCUIT JUDGE
TWELFTH JUDICIAL CIRCUIT

cc: DA Smith
Bradshaw

121

STATE OF ALABAMA,      )    IN THE CIRCUIT COURT OF

              )

      PLAINTIFF,    )    COFFEE COUNTY, AL

              )

VS.            )    ENTERPRISE DIVISION

              )

ROBERT THOMAS CONRAD,    )

              )

      DEFENDANT.    )    CASE #s: CC-2001-M-179
                              and
                              CC-2001-M-180

## *O  R  D  E  R*

    *The Court has considered the Defendant's "MOTION FOR DEPOSITION OF STATE EXPERT WITNESSES AND REQUEST FOR PRODUCTION OF DOCUMENTS."*

    ***IT IS ORDERED:***

    *1).   **The State is to produce to the Defendant's attorney in a TIMELY FASHION the curriculum vitae of all experts the state expects to call in the trial of this case.***

    *2).   **The Defendant's motion to DEPOSE the state's expert witnesses is denied.  Before any witness is allowed to testify as an expert in the trial of this case, the State and/or the Defense will be required to "lay an adequate predicate" that the person tendered as an expert is in fact an expert.  If an adequate predicate is established, the Court will declare the witness to be "an expert" and will allow the witness to express his/her/their opinions based upon his/her/their field(s) of expertise.  The Defendant will be provided adequate opportunity to cross examine any and all of the State's expert witnesses and will be allowed to question any tendered expert as to his/her/their qualifications and details upon which he/she/they are allowed to express an opinion based upon a field of expertise.***

    *3).   **The State shall TIMELY "...permit the defense..." with ADEQUATE opportunities in which to "...inspect, and copy or photograph...papers...documents...which are with the possession,***

*custody, or control of the state/municipality and which are material to the preparation of the defendant's defense." (See Rule 16.1(c), Alabama Rules of Criminal Procedure.)*

*4).    The State shall TIMELY "...permit the (defense) to inspect and to copy any results or reports of physical or mental examinations or scientific tests or experiments, if the examinations, tests, or experiments were made in connection with the particular case, and the results or reports are within the possession, custody, or control of the state/municipality, and their existence is known to the prosecutor." (See Rule 16.1(d), Alabama Rules of Criminal Procedure.)*

*5).    All additional request as set forth in said "motion..." not specifically provided for are hereby denied.*

*Done and ordered this the 11th day of July, 2001.*

**GARY L. McALILEY, CIRCUIT JUDGE**
**TWELFTH JUDICIAL CIRCUIT**
**STATE OF ALABAMA**

FILED
1 JUL 2001
J.M. Counts
Court Clerk
Coffee Co. AL

C: DA + Smith
Smith
Bradshaw

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PLAINTIFF, | ) | COFFEE COUNTY, AL |
| | ) | |
| VS. | ) | ENTERPRISE DIVISION |
| | ) | |
| ROBERT THOMAS CONRAD, | ) | |
| | ) | |
| DEFENDANT. | ) | CASE #s: CC-2001-M-179 |
| | | and |
| | | CC-2001-M-180 |

## O R D E R

The Court has considered the Defendant's *"MOTION TO DISMISS THE INDICTMENT ON GROUNDS THAT THE GRAND JURY WAS IMPROPERLY IMPANELED."*

**IT IS ORDERED:**

1). The Defendant's *"MOTION…"* is denied.

2). The *"Grand Jury Secrecy Act"* codified at Section 12-16-215, the <u>Code of Alabama</u>, 1975, as amended is NOT unconstitutional on its face or as applied to the Defendant.

3). All additional relief requested in said *"motion…"* not specifically provided for herein is expressly denied.

Done and ordered this the 11th day of July, 2001.

GARY L. McALILEY, CIRCUIT JUDGE
TWELFTH JUDICIAL CIRCUIT
STATE OF ALABAMA

JUL 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

C:CA. Smith + Bradshaw

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA            )
                           )
      v.                    )        Case No. CC-2001-M-179 & 180
                           )
ROBERT THOMAS CONRAD        )
                           )

**ORDER**

Upon consideration of Defendant ROBERT THOMAS CONRAD's Motion for Disqualification

from the Jury Venire of All Potential Jurors Who Would Automatically Vote for the Death Penalty

if They Found ROBERT THOMAS CONRAD Guilty Of Capital Murder, it is hereby

ORDERED that Defendant's motion be granted; and it is further



ORDERED that all potential jurors who would automatically vote for the death penalty if

they found ROBERT THOMAS CONRAD guilty of capital murder shall be excused for cause from the

jury venire at ROBERT THOMAS CONRAD's capital trial.

Done and ordered this __11th__ day of ___July___, 2001.

CIRCUIT JUDGE

CC:DA
+ Smith
Bradshaw

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PLAINTIFF, | ) | COFFEE COUNTY, AL |
| | ) | |
| VS. | ) | ENTERPRISE DIVISION |
| | ) | |
| ROBERT THOMAS CONRAD, | ) | |
| | ) | |
| DEFENDANT. | ) | CASE #s: CC-2001-M-179 |
| | | and |
| | | CC-2001-M-180 |

## *O R D E R*

*The Court has considered the Defendant's "MOTION TO DISQUALIFY ALL POTENTIAL JURORS WHO KNEW OR WERE ACQUAINTED WITH THE VICTIM OR (HER) FAMILY."*

**IT IS ORDERED:**

1). **The Defendant's "MOTION…" is denied.**
2). **All additional relief requested in said "motion…" not specifically provided for herein is expressly denied.**

*Done and ordered this the 11th day of July, 2001.*

GARY L. McALILEY, CIRCUIT JUDGE
TWELFTH JUDICIAL CIRCUIT
STATE OF ALABAMA

*[stamp:] JUL 2001 FILED I.M. Counts Court Clerk Coffee Co. AL*

cc: DA, Smith
Smith
+ Bradshaw

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PLAINTIFF, | ) | COFFEE COUNTY, AL |
| | ) | |
| VS. | ) | ENTERPRISE DIVISION |
| | ) | |
| ROBERT THOMAS CONRAD, | ) | |
| | ) | |
| DEFENDANT. | ) | CASE #s: CC-2001-M-179 |
| | | and |
| | | CC-2001-M-180 |

## O R D E R

The Court has considered the Defendant's *"MOTION FOR A JURY QUESTIONNAIRE."*

The general request that a jury questionnaire and the attached letter from the "Judge"be sent to the venire is granted.

However, the request that the venire members be sent the questionnaire attached to the motion is denied.

**Done and ordered this the 11th day of July, 2001.**

GARY L. McALILEY, CIRCUIT JUDGE
TWELFTH JUDICIAL CIRCUIT
STATE OF ALABAMA

*C. DA Smith*
*Bradshaw*
*&*
*Counts*

| | |
|---|---|
| STATE OF ALABAMA, | ) IN THE CIRCUIT COURT OF |
| | ) |
| PLAINTIFF, | ) COFFEE COUNTY, AL |
| | ) |
| VS. | ) ENTERPRISE DIVISION |
| | ) |
| ROBERT THOMAS CONRAD, | ) |
| | ) |
| DEFENDANT. | ) CASE #s: CC-2001-M-179 |
| | and |
| | CC-2001-M-180 |

## _O  R  D  E  R_

The Court has considered the Defendant's *"MOTION TO SUPPRESS EVIDENCE SEIZED AFTER AN ILLEGAL ARREST AND/OR SEARCH."*

**IT IS ORDERED** that said *"MOTION…"* is denied.  However, the **Defense will be allowed to revisit this *"MOTION…"* should the Defense desire.**

Done and ordered this the 11th day of July, 2001.

_____

GARY L. McALILEY, CIRCUIT JUDGE
**TWELFTH JUDICIAL CIRCUIT**
**STATE OF ALABAMA**

CC: DA - Smith
Bradshaw

STATE OF ALABAMA,           )        IN THE CIRCUIT COURT OF
                            )
          PLAINTIFF,        )        COFFEE COUNTY, AL
                            )
VS.                         )        ENTERPRISE DIVISION
                            )
ROBERT THOMAS CONRAD,       )
                            )
          DEFENDANT.        )        CASE #s: CC-2001-M-179
                                              and
                                              CC-2001-M-180


## O R D E R

The Court has considered the Defendant's "MOTION TO REVEAL
THE IDENTIFY OF INFORMANTS..."

**IT IS ORDERED that said "MOTION..." is generally denied.
However, the State is ORDERED to TIMELY reveal the identity of all
informants WHO WERE MORE THAN PASSIVE OBSERVERS TO
THE COMMISSION OF THE CRIMINAL ACTS ALLEGED and made
the basis of these cases.**

The Court has also considered the Defendant's "MOTION TO
REVEAL ANY DEALS, PROMISES OR INDUCEMENTS" made to any
witness or informant as defined in Defendant's motion.

**IT IS ORDERED that said "MOTION..." is granted.  The State is
ordered to TIMELY reveal to defense counsel the full name and address of
each witness or informant to whom a deal, promise or inducement has
been made along with the officer of the law or prosecutor's name who
made any promise, inducement or deal with any witness or informant.
The State is also ordered to TIMELY reveal in detail the PROMISE,
INDUCEMENT OR DETAILS OF THE DEAL made to any witness or
informant as a result of this case.**

**IT IS FURTHER ORDERED that the State shall TIMELY reveal to
the defense counsel any threats, force, promises, inducements or devices
used as to any witness or informant as a result of this case.**

*IT IS FURTHER ORDERED that the State shall TIMELY provide to defense counsel a copy of all records, notes, memoranda, and documents in the possession of the government relating to the granting of immunity, promises, consideration, threats or any other inducements made to any witness, or informant as a result of this case.*

*IT IS FURTHER ORDERED that all relief requested in this motion but not specifically provided for is hereby denied.*

*Done and ordered this the 11th day of July, 2001.*



_____

**GARY L. McALILEY, CIRCUIT JUDGE**
**TWELFTH JUDICIAL CIRCUIT**
**STATE OF ALABAMA**

JUL 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

C: DA's
Smith
&
Bradshaw

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PLAINTIFF, | ) | COFFEE COUNTY, AL |
| | ) | |
| VS. | ) | ENTERPRISE DIVISION |
| | ) | |
| ROBERT THOMAS CONRAD, | ) | |
| | ) | |
| DEFENDANT. | ) | CASE #s: CC-2001-M-179 |

CASE #s: CC-2001-M-179
                and
                CC-2001-M-180

## O R D E R

The Court has considered the Defendant's requests to proceed in an *Ex Parte fashion for the purposes of making "...APPLICATION FOR FUNDS" is granted.*

**IT IS ORDERED that the Court pre-approves an initial expenditure (as being reasonable and necessary) of ONE THOUSAND FIVE HUNDRED ($1,500.00) DOLLARS for the investigative services and investigative expenses contracted by Defense counsel for the preparation of this case for trial.**

**IT IS ORDERED that all additional ex parte applications not granted expressly herein are AT THIS TIME DENIED.**

**Done and ordered this the 11th day of July, 2001.**

GARY L. McALILEY, CIRCUIT JUDGE
TWELFTH JUDICIAL CIRCUIT
STATE OF ALABAMA

JUL 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

C: DA by
Smith
& Bradshaw

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PLAINTIFF, | ) | COFFEE COUNTY, AL |
| | ) | |
| VS. | ) | ENTERPRISE DIVISION |
| | ) | |
| ROBERT THOMAS CONRAD, | ) | |
| | ) | |
| DEFENDANT. | ) | CASE #s: CC-2001-M-179 |

CASE #s: CC-2001-M-179
and
CC-2001-M-180

## *O  R  D  E  R*

*The Court has considered the Defendant's "MOTION TO INSPECT, EXAMINE AND TEST ALL PHYSICAL EVIDENCE" is granted.*

*The State is to timely make available for inspection, photocopying, examination and testing by the Defense...of all physical evidence expected to be used in the criminal trial(s) of the above two cases.*

*The Court will later issue a "cut off date" for production and discovery; for the completion of forensic work and the providing of usable forensic reports. The Court will also later issue a "scheduling order" wherein witnesses lists will be ordered prepared and exchanged and evidence ordered pre-marked by both parties on a day and date certain; the approval of a jury questionnaire to be sent to each venire member; along with the setting of this case for trial by jury.*

**Done and ordered this the 11th day of July, 2001.**

GARY L. McALILEY, CIRCUIT JUDGE
TWELFTH JUDICIAL CIRCUIT
STATE OF ALABAMA

JUL 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

C: DA: Smith + Bradshaw

*132*

## ALABAMA BOARD OF PARDONS AND PAROLES
## REPORT OF INVESTIGATION

Type of Investigation   YOUTHFUL OFFENDER                    Date Dictated _____

Name   ROBERT THOMAS CONRAD            True name   ROBERT THOMAS CONRAD, JR.

Alias _____

RSA   BM-20 _____   DOB   9/30/80 _____   Height and Weight   6'  155 LBS. ____

Complexion _____   Color of Hair   BLACK _____   Color of Eyes   BROWN ____

Bodily Marks   TATTOO-"TRE" ON STOMACH; MULTIPLE TATTOOS ON FOREARMS

Driver's License #   NONE _____   SSN   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 _____

AIS# _____   FBI# _____   SID# ~ _____

Address   GARDEN OAKS APARTMENTS #35      Phone #   334-348-2150 _____
          GLOVER AVENUE
          ENTERPRISE, ALABAMA  36330

County   COFFEE/ENTERPRISE _____   Case #   CC 2001-179, 180 _____

Offense(s)   CAPITAL MURDER; ROBBERY I _____

Sentence(s) _____

Date of Sentence _____   Date Sentence Began _____

Date of Arrest   5/24/2001 _____   Date of Bond _____   Bond Amount $ _____

Judge   GARY MCALILEY _____   D.A.   MARK FULLER _____

Attorney   AL SMITH AND GARY BRADSHAW _____   Retained _____   Appointed   X ____

Court Ordered Restitution $ _____

Barred From Parole              Yes   X (IF CONVICTED OF      No _____
                                      CAPITAL OFFENSE)

Date Copies Sent to Central Records _____

NOTES:
5/31/2001  INDICTED.
7/31/2001  APPLICATION FOR YOUTHFUL OFFENDER STATUS.



PBF 203

## PRESENT OFFENSE(S)

County, Court, and Case Number

Coffee/Enterprise CC 2001-179

Offense:

Capital Murder

Sentence:


Date of Sentence:


Details of Offense:

Information indicates that on 5/23/01 at approximately 1:25 p.m., Enterprise police officers were dispatched to a report of a robbery and shooting at The Toy Store located at 643 County Road 711. While enroute, officers were told that the suspect was last seen running west on County Road 711 and was described as a black male wearing all black clothing. Upon arrival at The Toy Store, Officer Lennis Darby was met by Robert Grimes who stated that he had been robbed and that "she" (later identified as Jelanie Bowman Dennis) had been shot. Officer Darby entered the store and found Ms. Dennis lying behind the counter bleeding profusely from the chest. Ms. Dennis stated that she had also shot the suspect. Officer Darby then requested rapid response from rescue personnel. Officer Darby observed that the cash register drawer was slightly open, and there was no money in the drawer. The Enterprise Rescue Squad arrived and transported Ms. Dennis to the Medical Center Enterprise where she later died.

Officer Darby was told by Robert Grimes that during the robbery, two black males were present in the business when the suspect entered and forced him to the floor. After the suspect obtained Grimes' wallet containing $30.00 and money from the register, the suspect went to where the two black males were on the floor and demanded their money. Grimes then heard gun fire. Ms. Dennis then told Grimes that she shot the suspect. Grimes reported that he then went to his vehicle where he placed a 911 call. The two black males exited the business and asked what they could do. Grimes told them to go get help, and the two black males departed.

and demanded money. He stated that as Conrad was leaving, he heard gunfire but did not raise up to watch. He stated that they went outside and asked a man what they could do, and the man replied to go get help. Smith stated that they then went to the house next to The Toy Store but could not get anyone to the door. He stated that they then returned home and found that Conrad had been shot. He said they took him to Medical Center Enterprise and returned home where they went to Yeoman's apartment and later went to Dothan with Yeoman's mother.

Captain Bill Moore of the Enterprise Police Department and Officer Key interviewed Bryan Yeoman who gave a statement that was consistent with Smith's first statement. Yeoman and Smith were then brought together, and Smith stated to Yeoman "go ahead and tell the truth, they know." Yeoman then stated to Captain Moore that he overheard Smith and Conrad talking about doing a robbery. Yeoman stated that he then went with Smith to The Toy Store, however, he was unaware they were going to commit a robbery. Yeoman stated that while inside The Toy Store, he observed Conrad rob and shoot Dennis. He said they then left The Toy Store and went to the residence next door to get assistance. When no one would answer the door, he stated that they returned home and discovered that Conrad had been shot. Yeoman stated they took Conrad to the hospital and returned home. Yeoman said they then accompanied his mother to Dothan.

On 5/24/2001, Conrad was arrested. On 5/31/2001, Conrad was indicted for Capital Murder. On 7/13/2001, application was made for Youthful Offender status.

Bars to Parole:

13A-5-39 prohibits a person convicted of a capital offense from being eligible for parole.

Subject's Statement:

Since this is a Youthful Offender Investigation, a statement was not obtained.

Case Status of Co-Defendants:

Brian James Smith was indicted for Capital Murder. The case is pending in Coffee/Enterprise CC 2001-177.

Bryan Glenn Yeoman was indicted for Capital Murder. The case is pending in Coffee/Enterprise CC 2001-181.

Location of Offense:

Enterprise, Alabama.

Court Ordered Restitution:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

County, Court, and Case Number

Coffee/Enterprise CC 2001-180

Offense:

Robbery I

Sentence:

Date of Sentence:

Details of Offense:

The details for this case are the same as found in case number CC 2001-179. This particular case involves the robbery of Robert Grimes.

Bars to Parole:

None.

Subject's Statement:

Since this is a Youthful Offender Investigation, a statement was not obtained.

Case Status of Co-Defendants:

Brian James Smith was indicted for Robbery I. The case is pending in Coffee/Enterprise CC 2001-178.

Bryan Glenn Yeoman was indicted for Robbery I. The case is pending in Coffee/Enterprise CC 2001-182.

Location of Offense:

Enterprise, Alabama.

Court Ordered Restitution:

## RECORD OF ARREST(S)

| 9/4/96 | Coffee Co.<br>JU 96-146.01 | CHINS/<br>Ungovernable | Consent decree. |
| 3/8/97 | Coffee Co.<br>JU 96-146.02 | Motion to Set Aside | 12 months<br>probation. |
| 9/8/97 | Coffee Co.<br>JU 96-146.03 | Petition to Revoke | Committed to DYS. |
| 6/29/98 | Enterprise<br>Municipal Court<br>TR 1998-1821 | Driving Without<br>First Obtaining a<br>License | $152.50 fine plus<br>court costs. |
| 8/17/98 | Enterprise<br>Municipal Court<br>TR 1998-2293 | Driving Without<br>First Obtaining a<br>License | Paid $152.00 fine<br>plus court costs. |
| 12/13/99 | Enterprise<br>Municipal Court<br>TR 1999-1930 | Driving Without<br>First Obtaining a<br>License | $182.50 fine and<br>costs. |
| 1/31/2000 | Enterprise<br>Municipal Court<br>TR 2000-25 | Seatbelt Violation | $10.00 fine. |
| 1/31/2000 | Enterprise<br>Municipal Court<br>TR 2000-26 | Driving Without<br>First Obtaining a<br>License | $182.50 fine and<br>costs. |
| 2/19/2000 | Enterprise<br>Municipal Court<br>MC 2000-238 | Assault III<br>(Domestic<br>Violence) | Guilty. 10 days jail,<br>suspended. |

| 7/19/2000 | Enterprise Municipal Court MC 2000-945 | Giving False Information to Law Enforcement Officer | Guilty. Credit for 20 days served. |
| 7/19/2000 | Enterprise Municipal Court MC 2000-946 | Contempt/ Failure to Pay Fines | Guilty. Credit for time served. |
| 4/19/2001 | Coffee/Enterprise DC 2001-395 | Possession of Marijuana I | Pending grand jury. |
| 4/19/2001 | Coffee/Enterprise DC 2001-396 | Giving False Name to Law Enforcement | Pending grand jury. |

## PERSONAL / SOCIAL HISTORY

Subject:

Robert Thomas Conrad, Jr. is a black male, 20 years old, with a date of birth of 9/30/80. Conrad stated that he was born in Germany while his father was stationed there in the U.S. Army. Conrad stated that he was raised primarily by his mother. He stated that he has three brothers and one sister. Conrad stated that his parents divorced when he was approximately nine or ten years old.

Conrad stated that he lived in Germany from his birth until he was approximately two years old. He stated that he moved to Enterprise, Alabama when he was approximately two years old and remained in Enterprise, Alabama until he was approximately eleven years old. He stated that he then moved to Connecticut for approximately three months. He stated that he returned to Enterprise, Alabama and lived there from age eleven and a half until he was approximately thirteen years old. He stated that he then moved to Lansing, Michigan where he lived for approximately one year. He stated that he returned to Enterprise, Alabama when he was fourteen years old and remained there until he was approximately sixteen years old. He stated that he then moved to Boston, Massachusetts for a couple of months before returning to Enterprise, Alabama for a brief period. He stated that he then moved to Birmingham, Alabama for approximately four or five months. He stated that he then returned to Enterprise, Alabama for a couple of months and then went back to Birmingham, Alabama for approximately five months before returning to Enterprise, Alabama.

Marital Status / History:

Conrad stated that he has never been married and that he has never fathered any children.

Health:

Conrad stated that he is presently taking medication for having been exposed to TB. He stated that he was otherwise in good health and that he did not suffer from any physical or mental disabilities. He stated that he saw a female psychiatrist in Enterprise, Alabama when he was fourteen or fifteen years old. He stated that he saw the psychiatrist one time for "playing with fire". He stated that he did not know the psychiatrist's name.

Concerning substance abuse, Conrad denied having a drug or alcohol problem. He stated that he has smoked marijuana with the first time being while he was living in Birmingham in 1997. He stated that he smoked marijuana off and on since 1997 with the last time being approximately two weeks before his arrest in the instant offense. He denied use of any other drugs.

Education:

Conrad stated that he last attended school at Enterprise Junior High School in Enterprise, Alabama in the ninth grade. He stated that he did not go back to school after the ninth grade.

Enterprise Junior High School records indicate that Conrad was suspended on at least four occasions. He was suspended on September 12, 1996 for failure to follow school rules; from January 28, 1997 through January 30, 1997 for fighting; from February 4, 1997 through February 6, 1997 for belligerent behavior; and from March 17, 1997 through March 19, 1997 for disobedience.

Conrad stated that he started a GED course at Enterprise State Junior College but didn't finish the course and has never taken the GED exam. He did not report any additional education.

Financial Status:

Conrad is presently in custody at the Coffee County Jail and is not receiving any monthly income. The only asset he reported owning was a 1989 Ford Ltd. He did not report any debts.

Employment History:

Conrad is currently in custody and is unemployed. The only employment history
that he reported was that he worked for his step-father, Thomas Anthony Williams,
at Triangle Auto Sales in Enterprise, Alabama for approximately five months in
2000. He stated that he worked there detailing cars and earned $150.00 per week.
He stated that he left employment there because the business closed.

Military Record:

Conrad has never served in any branch of the U.S. Armed Forces.

Offender's Family:

Father: Robert Thomas Conrad, circa 41 years old, resides in Columbus, Ohio. The
subject stated that he has not seen his father since 1994 or 1995.

Mother: Dorothy Ann Conrad, circa 39 years old, resides at Garden Oaks
Apartments #35 in Enterprise, Alabama and is employed at Enterprise Nursing
Home.

As mentioned previously, Conrad stated that his parents divorced when he was
approximately nine or ten years old. Conrad also stated that his mother had
previously been married to Thomas Anthony Williams but that they are now
divorced.

Siblings:

Brother: James Rockshaun Conrad, 13 years old, resides with his mother at
Garden Oaks Apartments #35 in Enterprise, Alabama and is a junior high school
student.

Brother: Jermaine Shunell Conrad, 13 years old, resides with his mother at Garden
Oaks Apartments #35 in Enterprise, Alabama and is a high school student.

Brother: Michael Alexander Conrad, 19 years old, resides with a girlfriend on Pine
Street in Enterprise, Alabama and is employed at Southland Broilers in Coffee
County, Alabama.

Sister: Connie Conrad, 21 years old, resides at 712 Damascus Road in Enterprise,
Alabama and is employed at Grocery Outlet in Enterprise, Alabama.

## EVALUATION OF OFFENDER

Psychological Reports:

None known.

Reputation and Community Activities:

Conrad provided one character reference. I contacted that reference, Lois Brooks, who said that she was a friend of Conrad's family and had known Conrad since he was in elementary school. She stated that he was "real quiet", that he was a "good boy", and that he was "always respectable" to her.

Conrad reported that he attends the Pleasant Grove Baptist Church in Enterprise, Alabama. He did not report membership in any clubs or civic groups. He stated his hobbies were playing basketball and working on cars.

Probation and Parole Officer's Remarks:

None.

## PROBATION PLAN

Home:

If granted probation, Conrad stated that he would live with his mother at Garden Oaks Apartments #35 on Glover Avenue in Enterprise, Alabama.

Employment:

Would have to obtain.

Signed and dated at Enterprise, Alabama this the 30th day of August, 2001.


William D. Taylor, Jr.
Alabama Probation & Parole Officer

WDT:at

142

**GRAND JURY NO. 01-137 & 142**

**A TRUE BILL**

_____
**GRAND JURY FOREPERSON**

Presented in open Court by the
Foreperson of the Grand Jury in the
presence of at least twelve other
members of the Grand Jury

_____
**James M. Counts, Clerk of the Circuit
Court of Coffee County, Twelfth Judicial
Circuit of Alabama.**
Filed this the ____31____ day of
_____ 2001

Bail in each offense in this indictment is
fixed at $ _____ for a total bail
for this indictment of $ _____
[ ] Continuing bond

*no Bond in the capital offense, i.e., offense one
*$250,000 in offense Two, Robbery 1st Degree*

_____
**Judge Presiding**

---

**THE STATE OF ALABAMA**

**COFFEE COUNTY**

**CIRCUIT COURT**

**MAY    TERM, 2001**

**THE STATE**

**vs.**

**ROBERT THOMAS CONRAD**

---

**OFFENSE(S)**
**MURDER DURING ROBBERY 1ST
DEGREE**

**OFFENSE 2**
**ROBBERY FIRST DEGREE**

---

**INDICTMENT**

INDICTMENT

# THE STATE OF ALABAMA
## COFFEE COUNTY
## ENTERPRISE JURISDICTION

IN CIRCUIT COURT
MAY TERM, 2001

**The Grand Jury of said County charges that before the finding of this indictment that,**

ROBERT THOMAS CONRAD, whose name is to the Grand Jury otherwise unknown, did intentionally cause the death of another person, to-wit: Jelaine Bowman Dennis, by shooting her with a pistol, and the said ROBERT THOMAS CONRAD, caused the death during the time that he was in the course of committing a theft of property, to-wit: United States currency and/or United States coinage and/or checks, the property of, to-wit: Jelaine Bowman Dennis, by the use of force or by threatening the imminent use of force against the person of the said Jelaine Bowman Dennis, or another person present, with the intent to overcome her physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property, while the said ROBERT THOMAS CONRAD, was armed with a deadly weapon or dangerous instrument, to-wit: a pistol, in violation of Section 13A-5-40 of the Code of Alabama, against the Peace and Dignity of the State of Alabama; and,

### OFFENSE 2

The Grand Jury of said county charges that before the finding of this indictment that, ROBERT THOMAS CONRAD, whose name is to the Grand Jury otherwise unknown, did, in the course of committing a theft of property, to-wit: Thirty Dollars in United States currency the denominations of which were one (1) twenty dollar bill and one (1) ten dollar bill, the property of, to-wit: Robert Ray Grimes, use force or threaten the imminent use of force against the person of the said Robert Ray Grimes, or another person present, with the intent to overcome his physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property, while the said ROBERT THOMAS CONRAD was armed with a deadly weapon or dangerous instrument, to-wit: a pistol, in violation of Section 13A-8-41 of the Code of Alabama,

Against the Peace and Dignity of the State of Alabama.

Mark E. Fuller District Attorney for the
Twelfth Judicial Circuit

COURT OF CRIMINAL APPEALS
STATE OF ALABAMA
JUDICIAL BUILDING, 300 DEXTER AVENUE
P.O. BOX 301555
MONTGOMERY, AL 36130-1555

*H. W. "Bucky" McMILLAN*
Presiding Judge
*UE BELL COBB*
*PAMELA W. BASCHAB*
*GREG SHAW*
*A. KELLI WISE*
Judges

*Lane W. Mann*
Clerk
*Wanda K. Ivey*
Assistant Clerk
(334) 242-4590
FAX (334) 242-4689

February 17th, 2003

RE: CR-02-0333

Robert Thomas Conrad v. State of Alabama (Appeal from Enterprise Division, Coffee Circuit
Court: CC01-179; CC01-180).

You are hereby notified that the following action was taken in the above cause by
the Court of Criminal Appeals:

Additional time is granted to certify the completion of reporter's transcript to
and including 03/18/2003.

Lane W. Mann, Clerk
Court of Criminal Appeals

LWM/sm

cc: Honorable Gary L. McAliley, Circuit Judge
    Honorable James M. "Mickey" Counts, Circuit Clerk
    Sheila Hanson, Court Reporter
    Honorable Gary D. Bradshaw, Attorney, Appellant
    Honorable Richard (Cracker) Waldrop, Attorney, Appellant



FEB 2003
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA            )
                            )
v.                          )       Case No. CC-2001-M-179 & 180
                            )
ROBERT THOMAS CONRAD        )
                            )

---

## MOTION TO CONTINUE YOUTHFUL OFFENDER HEARING
### AND
## MOTION TO SUPPRESS EVIDENCE NOT TIMELY DISCLOSED
### AND
## MOTION TO COMPEL DISCOVERY

---

COMES NOW the Defendant by and through counsel, and moves this Honorable Court to **CONTINUE** the hearing on the Defendant's application for treatment as a Youthful Offender now set for the 6th day of September, 2001, at 9:00 a.m., to **SUPPRESS** evidence not timely disclosed, and to **COMPEL** discovery, and cites as grounds therefore as follows:

Unless the context indicates otherwise, the terms listed below are defined and used herein as follows:

1. The Defendant was arrested n May 24, 2001, at Medical Center Enterprise on a warrant issued by the Circuit Clerk of Coffee County, Alabama on the sworn complaint of Jeff Spence, Enterprise Police Department.

2. He had an initial appearance before District Judge Steven E. Blair on May 25, 2001, and, according to the initial appearance order, was provided an Affidavit of Substantial Hardship, and, "If charged with a felony offense, informed the defendant of right to demand a preliminary hearing under Rule 5.1, A.R.Cr.P., and of the procedure by which that right may be exercised."

3. The Defendant was indicted by the Enterprise Division, Coffee County Grand Jury on May 31, 2001. He was arrested on a writ of arrest resulting from that Grand Jury the same day.

4. Also, on May 31, 2001, the Defendant and his two codefendants, BRIAN JAMES SMITH and BRYAN GLENN YEOMAN, were brought before the Honorable Gary L. McAliley, Circuit Judge, for an initial appearance. The Defendant was appointed DON PITTMAN and GARY BRADSHAW, attorneys at law to represent him.

5. On June 1, 2001, DONALD S. PITTMAN filed a motion to withdraw as counsel which was granted on June 6, 2001. GARY BRADSHAW filed a motion to withdraw on June 1, 2001, which was denied on June 6, 2001. AL SMITH was appointed on June 6, 2001 as cocounsel with Bradshaw.

6. On June 25, 2001, a series of motions as filed including seeking full discovery under Rule 16.1 and "Monk" were filed. Rule 16.1 provides that discovery be had within 14 days of request.

7. On July 11, 2001, the Honorable Gary L. McAliley, issued a series of orders including discovery orders. These orders included to "**TIMELY**", (emphasis in the original) provide discovery to the Defendant.

8. To date, 8/31/2001, 3:00 p.m., the State has not even responded to the request for discovery and completely ignored and/or refused or failed to provide **ANY** discovery.

9. Presumably, the State had some evidence with which to indict the Defendant. The District Attorney requested and the Court ordered the Grand Jury into session on May 31, 2001, thus cutting off the Defendant's right under the Rules of Criminal Procedure to have a Preliminary Hearing.

10. The Defendant's case appeared on the jury trial docket for August 13, 2001, and at docket call on July 31, 2001, the Defendant announced through counsel that no discovery had been received and counsel understood that the DA did not have forensic discovery. The DA acknowledged that he did not have forensic material to disclose and the Court continued the case on its own motion.

11. While the District Attorney has not responded to the discovery request nor the Court's orders concerning discovery, others certainly seem to have information concerning the case.

In the May 30, 2001, issue of the Southeastern Sun, a weekly newspaper of general circulation in Enterprise, Alabama, "According to preliminary autopsy reports, Mrs. Dennis died from a single gunshot wound to the chest, but also suffered two gunshots in the leg." Further, the article quotes Chief Investigator and Administrative Assistant to the District Attorney, Bruce DeVane as stating, "District Attorney Mark Fuller requested the grand jury session to consider evidence for possible indictments". The article relates, "Reports indicate Smith and Yeoman brought Conrad to the

hospital, told officials he had been injured in a incident at a location in Enterprise, and left."

The "preliminary autopsy reports" and the "evidence for possible indictments" and "reports" referenced in the news article, some attributed to the Enterprise Police and some to the District Attorneys Office, have not been provided to the Defendant, indeed, not even a response has been made. Counsel finds it reprehensible that the Defendant must learn what he can, even though a response is due and ordered, from newspaper articles quoting the officials that have a duty to respond.

12. Counsel for the Defendant further understands through "courthouse talk" that a bullet taken from the Defendant was matched to the weapon of the victim and this was reported to the police and/or the District Attorney. No report or response has been made to disclose this evidence, if it exists, in clear violation of the Defendant's rights and the duties of the State.

13. Counsel for the Defendant further understands through "jailhouse talk" that the two codefendants, Smith and Yoemans, have given statements that may implicate the Defendant. Indeed, Detective Jeff Spence of the Enterprise Police Department has confirmed to council that statements exist and tapes of those statements. However, the District Attorney, the Chief Law Enforcement Official of the Circuit, has not provided, timely or otherwise, __ANY__ discovery or response to the Defendant's motion.

14. Counsel for the Defendant has just this date at approximately 4:00 p.m. received a Youthful Offender report prepared by the Probation Office. This report contains details of the offense including that statements inculpatory of the Defendant were made by codefendants. The report contains what could be alleged to be a "dying declaration". The report contains other details that, presumably, are memorialized somewhere. Nothing has been provided to the Defendant.

15. The Youthful Offender hearing is now set for September 6, 2001, along with a status conference. A criminal docket was received by the undersigned counsel at approximately 3:00 p.m. this date and the Defendant's case is listed upon it for trial on the 1st day of October, 2001. The Defendant is completely without discovery in this most serious and capital case.

16. The failure to provide the Defendant with discovery deprives the Defendant, among other things, with the effective assistance of counsel who is unable to adequately prepare for trial, or the Youthful Offender Hearing. The

District Attorney made the election to call the Grand Jury into special session and to present the Defendant's case for indictment, the to place the Defendant's case on a trial docket. (The District Attorney prepares the trial docket). The Defendant was denied a Preliminary Hearing. He has been denied discovery. He is in jail without bond, his case has one been continued and a trial docket is imminent.

PREMISE CONSIDERED this Honorable Court is requested to:

1. CONTINUE the Youthful Offender hearing now set for the 6th of September, 2001;

2. Order the District Attorney to IMMEDIATELY copy his file, as well as the file of the Enterprise Police Department and duplicate tape recordings and turn same over to the Defendant via counsel;

3. Order the District Attorney to IMMEDIATELY in writing notify each and every law enforcement agency, forensic agency, medical facility, rescue and/or fire personnel and every other agent, official or employee that had an official act concerning the crime, investigation, treatment or collection of evidence to duplicate all material and provide same to the Defendant via counsel;

4. To order the SUPPRESSION of all evidence and material not disclosed to the Defendant prior to September 6, 2001, the docket call for the October 1, 2001, jury term of Court;

5. Such other or different relief to which the Defendant would be entitled by due process of law, equal protection of law, or rule.

Respectfully submitted this August 31, 2001.

Smith & Carr, LLC.
Sydney Albert (Al) Smith          SMI098
Attorneys at Law
P. O. Drawer 389
Elba, Al 36323
Phone:  334-897-3658
Fax:            334-897-8633

Gary D. Bradshaw          BRA074
Attorney at Law
P. O. Box 311412
Enterprise, AL 36331-1412
Phone:            334-393-6439

Page 4 of 5

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

_____        9/4/2001
            Al Smith                                    Date

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION



STATE OF ALABAMA )
)
)
v. )    Case No. CC-2001-M-179 & 180
)
ROBERT THOMAS CONRAD )
)

*9/6/2001*
*ORDER*
*motion to continue is granted.*
*[signature] Judge*

---

MOTION TO CONTINUE YOUTHFUL OFFENDER HEARING
AND
MOTION TO SUPPRESS EVIDENCE NOT TIMELY DISCLOSED
AND
MOTION TO COMPEL DISCOVERY

---

COMES NOW the Defendant by and r⁻ ... ͏ ͏onorable Court to **CONTINUE** the

hearing on the Defendant's a~~ ... for the 6th day of September, 2001,

at 9:00 a.m., to **SUPPRESS** ... ͏y, and cites as grounds therefore

as follows:

Unless the context indicates oth ... n as follows:

    1. The Defendant was arr ... ͏arrant issued by the Circuit

Clerk of Coffee County, Alabama c ... Department.

    2. He had an initial appeara. ... ͏1, and, according to the

initial appearance order, was provided ... ͏ᵤₙₐ, "If charged with a felony offense,

informed the defendant of right to demai ... ͏aring under Rule 5.1, A.R.Cr.P., and of the procedure by

which that right may be exercised."

    3. The Defendant was indicted by the Enterprise Division, Coffee County Grand Jury on May 31, 2001. He

was arrested on a writ of arrest resulting from that Grand Jury the same day.

*K—*
*Please*
*file w/*
*Clerk*

Page 1 of 5

STATE OF ALABAMA,       )      IN THE CIRCUIT COURT OF

           PLAINTIFF,        )      COFFEE COUNTY, ALABAMA

VS.                     )      ENTERPRISE DIVISION

ROBERT THOMAS CONRAD,     )

           DEFENDANT.      )      CASE NO.'S CC-2001-M-179
                           )      and CC-2001-M-180.

## MOTION FOR EXTRAORDINARY EXPENSES

Comes now the Defendant and request extraordinary expenses in the amount of $500.00 for copies of tapes and documents for the Enterprise Police Department and District Attorney's Office.

Respectfully submitted this the 6th day of September, 2001.

Al Smith, Attorney for the Defendant

9/6/2001

ORDER

The above motion is granted. Extraordinary Expenses not to exceed $500 are hereby approved for the purpose of purchasing copies of tapes and copies of documents now in the actual or constructive possession of the Enterprise Police Department and/or District Attorneys office which are produceable under the ARCr.P and/or agreement of the parties in this capital case

Gary _____, Judge

152

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PLAINTIFF, | ) | COFFEE COUNTY, ALABAMA |
| | ) | |
| VS. | ) | ENTERPRISE DIVISION |
| | ) | |
| ROBERT THOMAS CONRAD, | ) | |
| | ) | |
| DEFENDANT. | ) | CASE NO.'S CC-2001-M-179 |
| | ) | and CC-2001-M-180. |

## ORDER

The 'Youthful Offender' hearing set for the 6th day of September, 2001 is continued until the 20th day of November, 2001.

The Clerk of Court is requested to forward a copy of this 'Order' to the attorneys and/or parties of record.

Done and Ordered this the 13th day of September, 2001.

SEP 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

Gary L. McAliley, Circuit Judge
Twelfth Judicial Circuit
State of Alabama

c: DA,
Smith,
Dickhaut + Parole
Bradshaw

153

STATE OF ALABAMA,     )    IN THE CIRCUIT COURT OF

        PLAINTIFF,    )    COFFEE COUNTY, AL

VS.       )    ENTERPRISE DIVISION

ROBERT THOMAS CONRAD,    )

        DEFENDANT.    )    CASE #s: CC-2001-M-179
                        and
                        CC-2001-M-180

## *O R D E R*

A *"Scheduling Conference"* and *"MOTIONS HEARING"* is set for the 5th day of November, 2001 at 8:50 a.m.

*The Sheriff of Coffee County, Alabama is to have the Defendant present for this hearing.*

Done and ordered this the 26th day of October , 2001.

GARY L. McALILEY, CIRCUIT JUDGE
TWELFTH JUDICIAL CIRCUIT
STATE OF ALABAMA

OCT 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

cc: Smith
Braddraw
Zack
Sheriff Moates

154

1              IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA

2                          ENTERPRISE DIVISION

3

4   STATE OF ALABAMA,

5              Plaintiff,

6       vs.                          Case No.: CC 01-M-179 & 180

7   ROBERT THOMAS CONRAD,

8              Defendant

9

10

11                      **STATE'S DISCOVERY RESPONSE**

12      **COMES NOW** the State of Alabama, by and through the undersigned

13  Assistant District Attorney, pursuant to Rule 16 of the *Alabama Rules of*

14  *Criminal Procedure* and·files the following discovery:

15      1.    Transcribed but NOT CORRECTED copies of taped statements as

16            follows:

17            a.   **Robert Conrad** - May 23, 2001 at 2:13 p.m. at the

18                 Medical Center Enterprise.  Present with Conrad were

19                 Sgt. Jeff Spence, Enterprise Police Department and

20                 Dwight Holley, Investigator, 12th Judicial Circuit

21                 District Attorney's Office.  (25 pp.)

22            b.   **Robert Conrad** – May 25, 2001 at 12:16 p.m. at the

23                 Medical Center Enterprise.  Present with Conrad were

24                 Bruce Matthews and Dwight Holley, Investigators with

25                 the 12th Judicial Circuit District Attorney's Office.

                 (36 pp.)

                        Discovery  - 1

1          c.    **Robert Conrad** - May 25, 2001 at 4:45 p.m. at Medical

2                Center Enterprise.   Present with Conrad were Bruce

3                Matthews  and  Dwight  Holley,  Investigators,  12th

4                Judicial Circuit District Attorney's Office.  (6 pp.)

5    2.   Transcribed hand-corrected copies of taped statements as follows:

6          a.    **Bryan James Smith** - *May 24, 2001 at 12:31 a.m. at

7                the Enterprise Police Department.   Present with Smith

8                were Sgt. Jeff Spence, Enterprise Police Department

9                and  Bruce  Mattthews,  Investigator,  12th  Judicial

10               Circuit District Attorney's Office.  (18 pp.)

11         b.    **Bryan James Smith** - May 25, 2001 at 2:10 p.m. at the

12               Coffee County Jail.   Present with Smith was Bruce

13               Matthews, Investigator, 12th Judicial Circuit District

14               Attorney's Office.  (7 pp.)

15         c.    **Bryan Glenn Yeoman** - May 23, 2001 at 11:39 p.m. at

16               the  Enterprise  Police  Department.    Present  with

17               Yeoman were Captain William Moore and Office Matt

18               Key, Enterprise Police Department.  (8 pp.)

19         d.    **Bryan Glenn Yeoman** - May 25, 2001 at 10:13 a.m.

20               Coffee County Jail.  Present with Yeoman were Captain

21               William  Moore,  Enterprise  Police  Department  and

22               Patrick Norris, Investigator, 12th Judicial Circuit

23               District Attorney's Office.  (10 pp.)

24

25
                        Dated this the 5th day of September 2001.


                        Discovery  - 2

1        *Glenda Stout*

Glenda Stout, Bar No. PAR 057
Assistant District attorney
2        Twelfth Judicial Circuit District
3        Attorney's Office
Post Office Box 311102
4        Enterprise, AL 36331-1102
(334) 347-1142

5

6

7

### CERTIFICATE OF SERVICE

8

    I hereby certify that I have served the above-styled documents on the attorney of record

9  for the defendant by hand delivery in open court on this the 6th day of September 2001.

10        *Glenda Stout*

11        Glenda Stout, Assistant DA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| Spence: | This a taped interview between Sgt. Jeff Spence, Bruce Mathews with the D.A.'s Office and Bryan James Smith. Today's date is May 24, time now is 12 uh' 12:31 a.m., location of the interview is the Criminal Investigations Division. All right Bryan, before I turn on the tape, there's some things that we got to address okay. Now, first of which, is two forms that I presented to you. One, this form right here, which was your notification of rights. Uh' you have the right the remain silent in those. You understood those right. Okay. Nodding don't pick up, you have to say yes or no. |
| Smith: | Yes. |
| Spence: | Okay. And I advised you of your waiver which is saying that are willing to talk to me and I hadn't made any threats or promises to you, is that correct? |
| Smith: | Yes. |
| Spence: | And I showed you this one as well which is your juvenile notification of rights since you told us that you were 17 years of age, is that right? |
| Smith: | Yes. |
| Spence: | However, you've been convicted of a uh' felony, and spent some time in in the county, is that true? |
| Smith: | Yes. |
| Spence: | Okay, so we went ahead and advised you of this notification of rights and that's your signature here saying that you understand em' right? |
| Smith: | Yes. |
| Spence: | And that you're willing to talk to us without an attorney present. |
| Smith: | Yes. |
| Spence: | And your rights are still in effect, and that was approximately an hour ago, well, it's been longer than that, it's been about uh' 3 hours ago that we advised of those rights but during that time, uh' we had to wait to get some clarification of some things for you, that true? |
| Smith: | Yes. |

1

Spence:     During that time we haven't threatened you, have we?

Smith:      No.

Spence:     Okay, uh' we provided you your food and and let you drink some things too. Right?

Smith:      Yes sir.

Spence:     Okay. And also that you told me that you wanted to talk with me alone because I'm straight with your straight with me, right?

Smith:      Yes.

Spence:     And, while we were talking you told me that you wanted to tell me what happened today. Is that right?

Smith:      Yes.

Spence:     You also told me that the reason that you wanted to talk to me about it, cause it it's hurtin ya, what happened. Is that true?

Smith:      Yes.

Spence:     Okay. All right, and what I am referring to is what happened at the Toy Store off the Geneva Highway or Highway 27 South uh' a robbery that took place there. Why don't you go ahead in your own words, just start from the beginning and tell me what happened. I know it's hard.

Smith:      All right. My cousin Bryan Yeoman's house. [We go to]

Spence:     Okay, let me, let me stop you there. Who's we?

Smith:      Me and Robert (unintelligible) Bryan Yeoman's house to get Bryan Yeoman. [Conrad]

Spence:     Okay.

Smith:      We leave to go to the Toy Store. Robert is on a separate car from me and Brian Yeoman and following us in the car. Me and Brian Yeoman go inside of the store, give or take (unintelligible) the black (unintelligible) started running through the store, telling everybody to get down. In the midst of going through all that, laying everybody down, some gunshots went off. After that, the victim was laying [Bryan] [suspect]

2

(unintelligible) so when we got up, the woman was bleeding very very bad. There was an elderly man outside that sorta (unintelligible) which was a white trailer (unintelligible) about 30 – 20 yards away ain't nobody come to the door, so we left.

Spence:    And went back to your apartment or to Brian's apartment?

Smith:    Yes sir.

Spence:    When you got over there, (unintelligible) back up with who?

Smith:    Well I (unintelligible) before before we got there, Robert was already there.

Spence:    Right. Okay. Is that when you found out he got shot during the robbery?

Smith:    Well, yes and no, cause it wasn't actually he said well he wasn't like actually said yes I been shot by the woman from the Toy Store or nothing like that. You know, you could just tell by his critical condition.

Spence:    Okay. When uh' you were at your apartment and Robert told you that he needed you to go for backup, was uh' Brian present when he said that? That I need ya'll to go as backup or what?

Smith:    Yes.

Spence:    What did he meant by, what did he mean by that?

Smith:    Just in case something got out of hand.

Spence:    Okay.

Smith:    (unintelligible) that it was gonna end up into a shootout.

Spence:    Okay. Did you know he was armed?

Smith:    I didn't even know that.

Spence:    Okay. Were you armed?

Smith:    No.

Spence:    Okay. What did you do when the shooting started?

3

Smith:      Covered my head even more cause I didn't know there was gun shot going on.

Spence:     Before the robbery, did ya'll plan on splitting up the money or.

Smith:      No.

Spence:     Okay. Were you planning on getting some of the money?

Smith:      No.

Spence:     Okay. Now earlier you told me that your momma was getting evicted because she was behind on her rent.

Smith:      Yes sir.

Spence:     *Speculating*
            Were you (unintelligible) on he might give you a portion of it to help her out because of her job.

Smith:      More than likely.

Spence:     Okay. On this piece of paper, basically I drew an out outline of the store and you showed me where you and Brian was at. Is that where ya'll were at toward the back of it?

Smith:      Uh' huh'.

Spence:     Okay, that's where he come in. Did he ever strike the clerk?

Smith:      I didn't see that.

Spence:     Okay, did he ever strike you?

Smith:      Yes.

Spence:     Where did he hit you at?

Smith:      On the back of the head.

Spence:     Do you know if he hit Brian?
            *Bryan.*

Smith:      No.

Spence:     Do you know why he hit you?

Smith:      No.

Spence:     Okay.  He never mentioned about hitting you before.

Smith:      No.

Spence:     Did it hurt when he hit you?

Smith:      Yes.

Spence:     Did he hit you pretty hard?

Smith:      Yes.

Spence:     Okay.  Do you remember what he was wearing?

Smith:      The victim had on all black.

Spence:     Why are you saying the victim?  You mean, Robert Conrad right?

Smith:      Nodding yes.

Spence:     Okay.  He was the one that actually robbed the store.

Smith:      Yes.

Spence:     And ya'll were there just in case something went bad.

Smith:      Yes.

Spence:     And it went bad but you didn't do anything.

Smith:      No.

Spence:     Cause you were.

Smith:      Scared (unintelligible)

Spence:     Who's car did you go up on.

Smith:      With Brian-Young. *Bryan Foreman*

Spence:     Okay and what kind of car is that.

Smith:      *I wanto Beretta* (unintelligible)

Spence:     What kind, what color?

5

| | |
|---|---|
| Smith: | Gray. |
| Spence: | Okay. Who was on your car? |
| Smith: | Mr. Conrad. |
| Spence: | Do you have anything? |
| Mathews: | About what time did ya'll leave your car? |
| Smith: | 12:30, 12:45. |
| Mathews: | Okay, and did ya'll drive straight out to the Toy Store? |
| Smith: | Yes sir, |
| Mathews: | Did you stop anywhere on the way? |
| Smith: | No sir. |
| Mathews: | When you got out there near the Toy Store, did ya'll park down the road somewhere ? |
| Smith: | No sir. |
| Mathews: | You didn't never stop on the side of the road down a little ways down and talk or anything? |
| Smith: | No sir. |
| Spence: | Are you sure? |
| Smith: | Yes. |
| Mathews: | When you got back, you said Robert was already there? |
| Smith: | Yes. |
| Mathews: | At the apartment? |
| Smith: | In the complex above the they're three different complexes. |
| Mathews: | Yes sir. |

Smith:      You got the one that Brian stays in, you got an empty complex, and (unintelligible).

Mathews:    Yes sir.  Waiting on ya'll?

Smith:      Yeah.

Mathews:    Okay, when you got there what did ya'll do?

Smith:      We rushed him to the hospital.

Mathews:    Did he not go inside first?

Smith:      No sir.

Mathews:    Did he change clothes?

Smith:      That I don't know.

Mathews:    When ya'll left to go out there, what was he wearing?

Smith:      All black.

Mathews:    Any coloring on the shirt at all or anything?

Smith:      No sir.

Mathews:    And when ya'll took him to the hospital, what was he wearing?

Smith:      I don't know if he had on pants or not but he had on a jersey.

Mathews:    Okay, what do you mean by, described the jersey for me.

Smith:      Uh'

Mathews:    It could mean a lot of things to me so I'm  thinking football jersey or something like that.

Smith:      Um'.  It was just a jersey with different colors on it, now what kind of jersey, you know, I can't tell you that (unintelligible).

Mathews:    What kind of colors?

Smith:      Um' every loud color that you could imagine, yellow, orange, green, (unintelligible) I said yellow, orange, red, black.

7

Mathews:    Okay.  And so he stopped to change clothes at some point and time.

Smith:    Yeah.

Mathews:    Did ya'll never go back up in to Brian Yeoman's apartment before he went to the hospital?

Smith:    Before Robert went to the hospital.

Mathews:    Yeah, before ya'll took him to the hospital.

Smith:    Naw.  (unintelligible).  *Ve made no access re Bryan* *(handwritten)*

Spence:    What about yours?

Smith:    What about mine?  Yes

Spence:    Ya'll sent in yours

Smith:    *Bryan (handwritten)* Brian Yeoman did.

Spence:    Before ya'll took him to the hospital.

Smith:    Yeah, me and Brian *Bryan Yeoman (handwritten)* Yeoman did.  Robert (unintelligible) outside.

Mathews:    What did ya'll do when you went inside?

Smith:    Me and Brian Yeoman went inside, (unintelligible) basically, I said we both confused and scared, started you know things I'd seen, (unintelligible) through somebody else's eyes but I thought was to take Robert to the hospital even though really and actually I was all in all when you boil down to it, he was the oldest, (unintelligible) we knew we knew that (unintelligible) gonna be you know one way or the other, but

Mathews:    And what did ya'll do when you left his apartment.

Smith:    We were *Sat (handwritten)* there for a minute, got something to drink and then we took Robert to the hospital.

Mathews:    Did ya'll change clothes?

Smith:    No sir.

Spence:    When did, when did ya'll change clothes?

Smith:      Who?  (unintelligible).

Spence:     And what about Brian.

Smith:      He had on (unintelligible)

Spence:     I know he changed his shirt, or pulled a t-shirt over the top of tank
            shirt  right.

Smith:      (unintelligible)

Spence:     He's got a white t-shirt on now.

Smith:      Uh' huh'.

Spence:     and he had on just white tank earlier, right.

Smith:      Well, no, he could have picked that up at the house after you know
            everything else.

Mathews:    Where did you pick up your (unintelligible) t-shirt.

Smith:      (Unintelligible) I had a t-shirt on.

Mathews:    All day?

Smith:      All day.

Mathews:    Even when you were in the store

Smith:      (unintelligible). Yes including (unintelligible).

Mathews:    Okay, how long have you had this t-shirt.

Smith:      I'd say about a day.

Mathews:    It just came out of the package.

Smith:      Yeah, a fresh package of shirts.

Mathews:    Is that where he got his shirts, out of the same package?

Smith:      (unintelligible)

Mathews:    What about your shoes?  Aren't they brand new?

Smith:      No.

Mathews:    That's not the same ones you had on during the robbery, is it?  Did you have any socks on?

Smith:      (unintelligible)

Spence:     Did ya'll, did you and uh' BY come up with a story just in case or what they call an alibi just in case something go bad or what?

Smith:      (unintelligible) going to the Toy Store and after the firing and shooting went occurred, knowing that, really and rationally that moment of it, it was gonna be found out, um'

Mathews:    Where did we get the "he got robbed and we picked him up on the side of the road at".

Smith:      Who said that?

Spence:     That's what Robert's story was first (unintelligible).  BW BY's first story was that he come back over there.

Mathews:    Right.  To the apartment.  That that's the first story.  And then you you had, he didn't tell you that one.

Smith:      No.

Mathews:    Okay.  So ya'll didn't discuss let's say it happened (unintelligible).

Smith:      (unintelligible) really and truly it wouldn't have mattered.

Spence:     A lot of time people do that cause they are scared you know. And if you did, no big deal, okay.  The main thing is you being honest okay.  And that's something to be commended on.

Mathews:    Did you uh' when you went to the hospital, did you run into an off duty police officer that you recognized?

Smith:      Well, to be honest, (unintelligible) the officer off duty, to be honest, really if I was tell him no I played in the road, I didn't go in the hospital, he can't do nothing but (unintelligible) the officer that was off duty when he pulled up on me, I was already on the side of the uh'

Mathews:    Drugstore?

| | |
|---|---|
| Smith: | Yeah. And his hands were behind the desk. He pointed up, he said in these same exact words "I hope ya'll ain't got nothing to do with that in there" and the first thing I said was what are you talking about and then he asked uh' (unintelligible) well, where he come from, and Yeoman said I come from (unintelligible) off duty police officer said no you no you didn't (unintelligible) inside the hospital and then Brian Yeoman said he didn't come from, oh I mean I just come from the water fountain. |
| Mathews: | Okay. Do you know who that officer was? What was his name? |
| Smith: | Matt Key. |
| Mathews: | What did the older man in the store look like, do you, you said you'd been to the store several other times. Had you seen him there before? |
| Smith: | Well, I at that night (unintelligible) |
| Spence: | And you'd seen him in there. |
| Smith: | Yeah. |
| Spence: | And you'd (unintelligible). |
| Mathews: | Did you know his name? |
| Smith: | No. |
| Mathews: | What'd he look like? |
| Smith: | He was old. |
| Mathews: | (unintelligible). I've never seen him. |
| Smith: | Okay. He's an ugly white man with gray hair, white hair, white a plaid shirt on. |
| Spence: | Is that what he wearing today was a plaid shirt. |
| Smith: | Yeah. |
| Mathews: | And what did the lady behind, well I assume she's behind the register, I don't even know, when you went in, was there a lady behind the register. |

Smith:      Yeah.

Mathews:    What did she look like?

Smith:      She had blonde hair (unintelligible).

Mathews:    Had you seen her in the store before?  Okay.  After you went to the
            hospital, what'd ya'll do?  And left, I know you left, I mean what'd
            you do then?

Smith:      When we left the hospital, the first thing we went, we left the
            hospital and went to my house

Mathews:    Okay, and then what?

Smith:      After that, we left (unintelligible) we ran to Dothan, (unintelligible)-

Mathews:    In your car?

Smith:      No.

Mathews:    Her car.

Smith:      Yeah.

Mathews:    Okay.  And what did you go to Dothan to do?

Smith:      look for houses
            (unintelligible)

Mathews:    Okay.  Did ya'll eat while you were down there?

Smith:      No..

Mathews:    Did you stop anywhere buy anything, a cold drink or anything like
            remember getting gas anything like that?

Smith:      I remember getting a drink.

Mathews:    Okay.  Where did ya'll do that at?  Down there or

Smith:      No, it was in Daleville or Ozark (unintelligible)

Mathews:    You went thru Ozark to go to Dothan?

Smith:      Yeah.

Mathews:     Does that (unintelligible)

Smith:       Yeah.

Mathews:     Okay.  About what time did ya'll come back from down around
             Dothan?

Smith:       I think it was 8.  Anywhere between 6 and 7.

Mathews:     How did you get to Wal-Mart?

Smith:       I went on my momma's truck.

Mathews:     Okay.  Was she not waiting for you or anything?

Smith:       What?

Mathews:     Was she not going to wait for ya'll to come out, she was just gonna
             drop you off.

Smith:       Yeah, she just dropped us off.

Mathews:     Ya'll gonna walk home?

Smith:       Yeah.

Mathews:     Was Robert living with you?  Or say not living with you, I, I, that
             may be wrong, but has he been staying with you some?

Smith:       He had for a couple of nights (unintelligible)

Mathews:     And I'm asking, I I;m not I'm not suggesting anything.  Was he to
             spend the night with you last night.

Smith:       Yeah.

Mathews:     Okay.  Was there at any point and time that the conversation about
             needing money or what we gonna do for some money or anything
             like that.

Smith:       Yeah, I remember with within the last past 2 weeks there's been
             plenty of conversation going on about (unintelligible).

Mathews:     Did you talk about how we were gonna get some money.

Smith:      That wasn't (unintelligible).  This right here wasn't even planned.  It was (unintelligible).

Spence:     Who decided on the place?

Smith:      Really it was like an all in all thing.

Spence:     Was Brian in on that conversation?

Smith:      What?

Spence:     You and Yeoman conversation on deciding on where, what.  You're nodding you head again (unintelligible) so I'm just gonna say he saying he was.  Okay.

Mathews:    Did you go to a loan place today?

Smith:      A loan place.

Mathews:    Yeah.  Where they give loans or anything?

Smith:      No.

Mathews:    You didn't go to any one at all today.

Smith:      Um' um'.

Mathews:    Do you know if Brian and Robert went off together today without you.

Smith:      No.

Mathews:    Were ya'll pretty much together all day?

Smith:      Yes sir.

Mathews:    You're shaking your head, is there something you want to tell us, is there something you want to say, you welcome to say anything you want to say.  I mean, you really are, that that's what this is all about, you're trying to unload son and and this is your opportunity

Spence:     And like you told us out there, you know, he told us outside before we come in and got on the tape.

Mathews:    There's a lot of pressure on you right.

14

| | |
|---|---|
| Smith: | Yeah. |
| Spence: | It wasn't suppose to go down like that? |
| Smith: | Not at all.  (unintelligible) break out be that drastic, drastic but I guess you know once the woman had shot him, he suppose to call himself retaliating. |
| Mathews: | Any idea what kind of gun it was he had. |
| Smith: | I don't even know too much about guns. |
| Mathews: | Did you ever even see it? |
| Smith: | I didn't (unintelligible) |
| Mathews: | Black or blue steel or nickel plated or anything like that? |
| Smith: | (unintelligible) maybe it was (unintelligible) and layed everybody down, and after I was struck across the head, there was no one no contact (unintelligible) |
| Mathews: | What did he hit you with? |
| Smith: | (unintelligible) with the gun. |
| Mathews: | It was hard like then it wasn't his fist. |
| Smith: | No. |
| Mathews: | Too hard to be his fist? |
| Smith: | Yeah. |
| Mathews: | Did he ask you for any money? |
| Smith: | He took my money. |
| Mathews: | Was that part of the pre-arranged deal that he was going to check your pockets. |
| Spence: | Did you say anything to him? |
| Smith: | I ain't got nothing. |
| Spence: | Is that what you said? |

15

Smith:        Yeah.

Mathews:    When you fist came in the store, what what'd he do?  If you were
              standing in the store, what'd he do?

Smith:        Well I, to be straight up, not at one time did I see his actual face,
              when he came in the store, our backs was turned looking towards
              the wall.  We heard somebody say get on the ground.  And then,
              meanwhile,

Spence:       You had

Mathews:    What was the click click?

Smith:        I guess it
              (unintelligible) had to be the gun.

Mathews:    And that's what you thought it was.

Smith:        Yes.

Mathews:    Is what I'm asking you.   You thought it was the gun?

Smith:        Yeah.

Mathews:    Okay.

Smith:        And I heard the old man, I was sitting in front of the woman
              right here at the door giggle or chuckle rather, after that, well I felt
              some vibration of the old man being slung onto the ground right to
              right beside me but really it was beside Brian Yeoman and I was on
              the other side but I felt the vibes from the (unintelligible) you could
              tell you know (unintelligible)
              feel

Mathews:    Did you hear any conversation then about

Smith:        Naw it wasn't no conversation, it was just (unintelligible)

Mathews:    Well that's what I was asking you?  Did anybody say, I didn't want
              to say what did you, you know, I wanted you to tell me what you
              heard.  Uh' did you hear a register open, did you hear anybody
              say, here's the money?  Or take it?  Leave me alone or please don't
              do this or anything along those lines?  And I'm not saying any of
              that was said, okay, cause I, I'm just asking you what you heard.

16

Smith:      The woman said, the woman said take it.  Take the money and leave this is all the money we got.  From then, a couple of shots.

Mathews:    About how long, the time from when she said that to before you started hearing it going crazy.

Smith:      No more than a minute.

Mathews:    Where did, where did Robert leave the car?

Smith:      (unintelligible)

Mathews:    And when ya'll went outside you didn't see him drive by or drive off or anything like that?

Smith:      No sir, it was give or take 10 to 12 minutes before Robert even came up.

Mathews:    And you don't remember before ya'll went to the store ya'll stopped down the road somewhere beside the road to talk a minute.

Smith:      No.

Mathews:    You don't remember that all even if somebody said they saw ya'll standing out there.

Smith:      No.

Mathews:    What happened to Robert's cell phone?

Smith:      I didn't even know he owned a cell phone.

Mathews:    Do you know if he owns a pager or not?

Smith:      (unintelligible)

Mathews:    But I think you told us you had a cell phone is that correct?

Smith:      Yes it is.

Mathews:    And Brian Yeoman has a cell phone.  No.   His momma does?  Okay.

Spence:     And what's your cell phone number?

Smith:      4900498.

Spence: Do you have everything you want?

Mathews: Is there anything else you would like to add?

Smith: There's really a misunderstanding but I guess (unintelligible) when somebody dies (unintelligible) but it really wasn't suppose to happen nothing like that but (unintelligible) the woman was just guarded trying to save the items in the store plus her money (unintelligible) witness and victims that was in the store and the old man (unintelligible).

Mathews: And when you said the victim, who were you talking about?

Smith: Me, BY and the old man.

Spence: She didn't know that you were standing there at the lookout, huh?

Smith: (unintelligible).

Mathews: I don't have anything else either.

Spence: Okay, this concludes the interview.  The time now is 101 a.m. Same parties present, still at the same location.

*Transcribed by Tonnya Walker*
*Date Transcribed:  May 24, 2001*
*Reviewed by:_____*
*Reviewed on:_____*

18

Today's date is May 25th, 19, I mean 2001, the time is 2:10 p.m.  We are in the conference room at the Coffee County Sheriff's Department in New Brockton.  This is an interview between Bruce Mathews, Investigator with the District Attorney's Office and Bryan James Smith.  Brian Smith is seventeen years old.

MATHEWS:   Brian would you state your name please.

SMITH:        Brian James Smith.

MATHEWS:   Alright Brian I have right here on the table in front of me a juvenile notification of rights form, are you familiar with that form?

SMITH:        Yes sir.

MATHEWS:   Did I read and explain each and every one of these to you?

SMITH:        Yes sir.

MATHEWS:   And did you state to me that you understood these rights?

SMITH:        Yes sir.

MATHEWS:   And that you want to make a statement now?

SMITH:        Yes sir.

MATHEWS:   Ok, you understand that this statement is being taped right?

SMITH:        Yes sir.

MATHEWS:   And you signed that form and your signature and dated is that correct?

SMITH:        Yes sir.

MATHEWS:   Ok, and you are presently a resident out here at the county jail under arrest is that correct?

SMITH:        Yes sir.

MATHEWS:   Ok, Brian I understand that you've been out here you and I talked lastnight along with Jeff Spence and ah, down at the PD and that after being out here you know all night and most of today, when you called me out here you said that there was somethings bothering you that you wanted, that you wanted to tell me, that you wanted to get off your chest.

SMITH:        Yes sir.

1

MATHEWS:   Now before we go any further and you tell me about any of it, have I made you any promises or any inferences that I can help you or that things will go better for you if you give me this statement?

SMITH:   No sir.

MATHEWS:   Are you sure?

SMITH:   Yes sir.

MATHEWS:   Ok, has anyone threatened you to get you to give me any additional information?

SMITH:   No sir.

MATHEWS:   Ok, alright having said all that, you know what, obviously you, what you told, told me just a few minutes ago before we started the tape was that there was somethings that you remembered a little differently and may have forgotten to mention lastnight when you were, you know, it was so late and you were so nervous and, and everything had happened and that you wanted and opportunity to make sure that we covered everything that we could that you could remember that happened lastnight.

SMITH:   Yes sir.

MATHEWS:   So, this is an opportunity for you to go ahead and, and tell me any additional information in things that happened that you may have, have ah, omitted or forgotten about at, at the interview lastnight.

SMITH:   Ok, alright as far as the shootin' wise that wasn't even supposed to happen like that and as far as where the money is I don't know, as far as where the gun is the only thing I know is Robert supposedly told Brian Yeoman to hold on to his gun, Brian Yeoman first told me he had threw it in the woods but later as the day prolonged Brian Yeoman told me that he had stashed the pistol in his house in a pillow case.

MATHEWS:   Ok, did, when he first told you he threw it in the woods, did he tell you where in the woods?

SMITH:   He just said he slung it out as far as possible but I guess, I guess his conscience started eattin' at him and he just broke down and said he hadn't thrown it away it was still in his house.

MATHEWS:   Ok,

SMITH:      As far as being there I feel guilty but as far as the shootin' and this and that and the other I had nothin' to do with it because for one I ain't know Robert had a gun until after the incident went down, I didn't even know those were gunshots goin' off inside the building until I got up and I seen the elderly, well not the elderly woman, but the woman bleeding from her chest down to her knees and then the elderly man had ran to his truck and was sitting on the cell phone, that's when I knew it was serious, so the elderly man asked us to go down to the trailer about give or take twenty to thirty yards and me and Mr. Yeoman we did that, we knocked on the door, didn't nobody come to the door so us being young and not knowing what was going on we left maybe that was wrong but we were frightened, it wasn't supposed to happen like that we didn't even know that, well I didn't even know there was a gun, I can't speak for Brian Yeoman.

MATHEWS:  I understand that, ah, yeah, I, I told you ah, a few minutes ago about a witness that had come to us and told us that he had driven up on ah, a car that fits your car's description that the Ford

SMITH:      Right.

MATHEWS:  And a little silver car sittin' ah, I'm guesstimating the distance about a quarter mile right around the bend down from the Toy Store.

SMITH:      Uh huh.

MATHEWS:  Ah, do you remember, did ya'll do that lastnight, did ya'll meet up down the road or anything before this, this all took place?

SMITH:      Well, only thing I remember was a white truck coming from the side of th chicken houses.

MATHEWS:  Doing, I mean, and where were you at, ya'll at, is what I'm getting at.

SMITH:      I was in the car with Mr. Yeoman.

MATHEWS:  Ok, in, in the which car?

SMITH:      I was in the gray car

MATHEWS:  Ok.

SMITH:      with Mr. Yeoman.

MATHEWS:  And where was Robert at that time?

SMITH:      Robert was in the Ford.

3

MATHEWS:  That you, your car

SMITH:  Yeah.

MATHEWS:  More or less, yours or your moma's car, ok.  Ah, were ya'll stopped?

SMITH:  No.

MATHEWS:  You were driving?  Ya'll weren't, ya'll weren't pulled over on the side of the road?

SMITH:  The Ford was, the, the gray car wasn't the silver car, the gray car it wasn't pulled over, the Ford was,

MATHEWS:  Ok,

SMITH:  The Ford was pulled over on the side of the road, the truck was coming by and yes I could tell that the dude was paying plenty of attention but he didn't stop because I guess he took it it wasn't that serious or he probably didn't see no blood or didn't see no glass broke so he kept going about his business.

MATHEWS:  I gotcha', so he, in, in your mind he must have thought ya'll had a wreck or something.

SMITH:  Right.

MATHEWS:  Well does that, wouldn't that indicate that the silver car was stopped too?

SMITH:  No, not, not, not really, no.

MATHEWS:  Could it, could it be that the blue car was on the side of the road, the silver car was in the lane right here and he drove between that?

SMITH:  Yes.

MATHEWS:  But you're stopped in the lane?

SMITH:  Well you see I, we, we did not ever make a vivid stop actual stop, slow down yes, but a vivid stop,

MATHEWS:  Ok.

SMITH:  no.

MATHEWS:  Alright, what did we slow down for?

SMITH:  We slowed down the reason being we slowing down because they seemed, well Robert seen the truck and asked where you know what I should do about the truck you know we, me and my (unintelligible) we don't know, whatever you do from here is on you not knowing there was a gun

MATHEWS:  Talking out the window

SMITH:  Right

MATHEWS:  Ok,

SMITH:  Right, not knowing there was a gun involved or anything like that because like I say you know we'd didn't know there was a gun until fireworks, well not fireworks but gunshots were fired off inside the building.

MATHEWS:  Ok, so having explained it that way it's easier to understand why the man would say

SMITH:  Go get help.

MATHEWS:  That, well, that ya'll were talking.

SMITH:  Oh ok, ok.

MATHEWS:  Because you had, you said you had your windows down and ya'll kinda hollering back and forth and he might have thought ya'll had a wreck

SMITH:  Right

MATHEWS:  and drove between ya'll

SMITH:  Right

MATHEWS:  I gotcha, ok, alright, um, have, have you still not had any conversation, did, with Bryan Yeoman over the robbery about the money?

SMITH:  No, as far as, you know really and you know now while I been not saying accused but been tried for murder such as saying well he obviously had something to do with it that's wrong because first of all I ain't haven't got no benefit out of it, that's number one, number two I don't know where it was at, if it, if I knew where the money was at since I done told you where the guns supposedly, I, you know I might as well told you where the money was at, so I just know in this situation the mo, the gun would play a more important role than the money.

5

MATHEWS:  10-4.

SMITH:  But as far as the money goes the money could be anywhere, I haven't seen no money, the clothes he changed from I ain't seen no clothes and really as far as the gun though, as far as the gun, the last thing I was told about the gun was it was in a pillow case in Brian Yeoman's house but the first scenario was the gun was thrown into the woods but come to find out Brian Yeoman said that Robert had asked him to put the gun up for him.

MATHEWS:  Which one do you believe?

SMITH:  I believe the gun, I believe it's a fifty-fifty chance, I believe the gun could be, it can't be no further than in, in Brian Yeoman's house or in the woods near Brian Yeoman's house.

MATHEWS:  And you said that, that when he first told you he threw it, he threw it as far as he could.

SMITH:  As far as he could, didn't give or take thirty or forty five minutes later

MATHEWS:  Do you think he threw it as far as he could down there near your, your building or up there by his building or, I mean

SMITH:  I know for sure he didn't throw anything behind my building, I know that for sure sowhere, wherever he threw it had to be from my complex on up.

MATHEWS:  And if he's going from your complex up to his complex on foot which way does he usually go?

SMITH:  Up the street.

MATHEWS:  Up the street, he doesn't go around dirtside?

SMITH:  I mean its, it goes both ways, you, I guess you know, all depending on how he feel when he come home, I meant when you come home, I mean really it's about the same distance you know either way you look at it.

MATHEWS:  Ok, Brian is there anything else that you can think of that you might have left out or that you might have remembered differently and, and, and wanted to get clarified or, or just anything else that you want to tell us on this, this particular taped statement?

SMITH:  As far as this turning into a murder case I feel like I was dealt wrong in the scenario or the situation rather because like I said from the beginning this wasn't even supposed to be a murder as far as I know it wasn't no gun

supposed to be even be involved that's why the first thing I heard about the gun I call, I went to Jeff the, the employee at the Coffee County Jail and told him to contact you, so that therefore that little vital information that I left out lastnight I could call you today and go on and let you know about it.

MATHEWS:    And I had told you to feel free to call me anytime you remember something didn't I?

SMITH:    Yes you did.

MATHEWS:    Ok, and that's all?

SMITH:    Yes sir.

MATHEWS:    And this is all true and correct to the best of your knowledge is that correct?

SMITH:    Yes sir.

MATHEWS:    And we will terminate the interview at 2:21.

On _____ I reviewed the tape and made the necessary corrections to the transcript. The corrected transcript is a true representation of the taped interview.

_____
Bruce Mathews

Transcribed by Crys Fuller
                May 29, 2001

Today's date is May the 25th, 2001, the time is now 10:13 a.m. located at the Coffee County Jail in New Brockton, Alabama. Persons present are myself, Patrick Norris, I am the Investigator with the District Attorney's Office, Captain Bill Moore with Enterprise Police Department and Mr. Bryan Glenn Yeoman.

NORRIS:     Mr. Yeoman, if you would state your name, date of birth for the record please.

YEOMAN:     My name is Bryan Yeoman, I was born ah, 8-5-82.

NORRIS:     Ok, what is your address, Bryan?

YEOMAN:     1691 East Park Ave, Greentree Apartment, number 117.

NORRIS:     Ok, prior to starting this tape, Bryan, ah, we brought you in and asked you ah, some questions, is that correct, regarding the robbery out at the Toy Store?

YEOMAN:     Yes sir.

NORRIS:     Ok, prior to doing so did I or did I not read you your constitutional rights according to the Miranda warning?

YEOMAN:     You did sir.

NORRIS:     And did you understand those rights?

YEOMAN:     Yes sir.

NORRIS:     Well did you sign a form saying that, that you understood those rights?

YEOMAN:     Yes sir.

NORRIS:     Is this the form here that you signed?

YEOMAN:     Yes sir.

NORRIS:     Ok, did you or did you not waive your rights and agreed to talk to us?

YEOMAN:     Yes sir.

NORRIS:     Ok, and did you un, and you not sign this waiver?

YEOMAN:     I signed it.

NORRIS:     Ok, and are you aware that the interview that you are about to give us or

1

the statement that you're about to give us is being tape recorded?

YEOMAN:    Yes sir.

NORRIS:    And is that, is that with your permission?

YEOMAN:    Yes sir.

NORRIS:    Ok, what I want you to do is start ah, go back to the time prior to the robbery, out at the Toy Store the other day an all, why don't you tell me what happened.

YEOMAN:    (unintelligible) at the start?

NORRIS:    Well prior to, prior to going to the Toy Store.

YEOMAN:    Going to the store?

NORRIS:    Um huh, prior

MOORE:    Just start right there, when you're at your apartment and Brian Smith comes over and the conversation and what ya'll did.

YEOMAN:    Well um, I was at my house, Brian Smith comes over to my house and asks me can I get my mom's car to take Robert to his sister's house to get some clothes, so my mom, she was in her room laying down, I went in my mom's room ask her mom can I use the car, she asked me where I was going, I say mom, um, I'm fixin' to take Robert to his sister's house to get some clothes and I told her that Brian Smith was riding with me, so um, when we left I seen Robert was in Brian Smith's mom's car so I asked him why you in your mom's car, he was like 'cause we gonna put the stuff in that car, I was like well he could have put his stuff in the trunk of my mom's car but he was like that's ok don't worry about it, so Brian asked me when we was like fixin' to go Robert sister's house he asked me can I take him to the adult store to get some kind of marihuana bags so um, when I took 'em to the store or whatever um, me and him was in the store and he showed me the bags that he was supposed to been getting and then um, he kept prancing around the store and stuff asking people questions about what kind of different bags was gonna be comin' in everything, so I was standing in the back of the store and um, before you know it, the guy Robert, he ran into the store when he first came into the store he pointed the pistol at me so I got down on the ground, Brian he was out, Brian Smith was already down on the ground um, Robert had put like this older guy, he liked grabbed the older guy around his neck and them um, he pointed the gun at the lady and kept saying give him the money, give him the money, but instead he stuck his hand in the cash register and put the

2

money in his right pocket and um, he liked pushed the older guy down unto the ground and he went through his pockets, I believe there was his right pocket he went into and um, he pulled out nothing but change and then um, when Robert looked back up I believe that the lady, she was going for a gun then um, him and the lady start like tussling and like she fell on the ground and I heard two shots go off.

NORRIS:    Where, you said you thought she was going for a gun, what was she doing, what lead you to believe she was going for a gun at that point?

YEOMAN:    Um, because (unintelligible) I seen Robert, when he had the old man on the ground he start like running her way.

NORRIS:    Where was she at when they started running toward her?

YEOMAN:    Excuse me?

NORRIS:    Where was she at?

YEOMAN:    She was still from behind the cash register.

NORRIS:    Ok.

YEOMAN:    So um, I guess when after she pulled out the gun he grabbed her hand and then I seen like still had my head down and when I looked back again she was like laying on the ground then um, I head like two shots go off and then after that um, I believe it was like four, three or four more shots went off and then um,

NORRIS:    Ok, but could you tell any difference in the shots that you heard and how loud that they were or

YEOMAN:    Um, the first two shots they wasn't that loud, but the other shots after the first two they was real loud.

NORRIS:    Ok when you heard those first two that you said weren't as loud as the other, where was the lady at and where was Robert?

YEOMAN:    The lady she was laying on the ground, Robert was on top of her.

NORRIS:    Ok, where at in the store?

YEOMAN:    Um, like almost in the back where I was, almost.

NORRIS:    Ok, how did they get from the cash register where initially saw them tussling to almost in the back where you were at?

3

YEOMAN: 'Cause they was tussling all, like you know, so um, when she fell Robert was on top of her and um, I believe the other loud shots those were the shots Robert shot her and then um, she start running and he ran out the door then um, the older guy he jumped up, ran outside to his truck, he was using the phone, because when Robert when he first came into the place he ripped the um, the phone out of the wall and then um, the older guy when he was outside on the phone trying to call the police he told me to go up the street to this one house so I went to the house, I was at the house for about I'd say like a minute and a half nobody didn't come to the door so from then on, I went home.

NORRIS: Ok, how long did you, you say you were at that house for about a minute and a half, describe to me where that house was in relation to the store.

YEOMAN: Um, when you come outta the store you make a left and the house is on the same side as the adult store.

NORRIS: Ok, did you hear anything or see anything while you were down at that house trying to get help?

YEOMAN: Um, it was like a T.V. was on I think, I believe so, like a T. V. was on.

NORRIS: Did you hear any sirens or anything like that?

YEOMAN: Um, I heard the ambulance siren.

NORRIS: Ok, which way did you leave when you left that house?

YEOMAN: Um, I made another left going to like the stop sign, when I got to the stop sign I made another left, that left, the other left from the stop sign took me to Boll Weevil Circle, from Boll Weevil Circle I went to my house.

NORRIS: Uh huh,

YEOMAN: When I got to my house um, Brian had told me he was like um, I need to get that outta your attic, so I was like, ok, so he grabbed the gun

NORRIS: Alright, which gun are we talking about?

YEOMAN: It was a long gun, like the AK gun and um, he had ran it down the back way down to his house then um, after that I'd say like fifteen, twenty minutes after that him and Robert pulled up and he was like um, we need to take Robert to the hospital he's been shot so I told 'em I ain't fixin' to take him nowhere and um,

4

NORRIS:     Let, let me stop you for just a moment, when you and Brian Smith got back to your apartment, after the robbery

YEOMAN:     Yes sir.

NORRIS:     How long was out there in your apartment before he left, before ah, Brian left?

YEOMAN:     I'd say about, he went in and came out.

NORRIS:     Ok, did ya'll have any kind of conversations from the time

YEOMAN:     Yeah, um,

NORRIS:     the shooting started until you got

YEOMAN:     I had told, I had told him why the hell, I say, I say how the hell did you bring me in the middle of this, he was like because um, I know that you won't really do such a thing, so that's why he just needed an extra car I believe to make it seem he didn't have anything to do with it.

NORRIS:     But you think Brian knew what Brian Smith did?

YEOMAN:     To have something to do with it, yes sir.

NORRIS:     You think Brian knew all about the robbery and for what they were going out there for?

YEOMAN:     Yes sir.

NORRIS:     Ok, after he got the AK fire rifle out of your apartment and left, start from there and tell me what you did

YEOMAN:     Um, after that um, I was sitting at my house I had liked turned, like this movie on that I was watching from the other night or whatever um, after that um, Brian and Robert they come to my house, Robert was still in the car, Brian, he came upstairs and he told me he was like, Robert had been shot, so I said, I told Brian, I don't care you take him to the hospital and he was like come on man and be a friend you can take him to the hospital so I'm like, he, he ain't my friend look what he's done and Brian was like please man, Brian Smith he was like please man, please man, just ride with me to take him to the hospital so I said ok, so once we got like half way to the hospital, Brian wanted me to drive because I had license, so um, when we got to the hospital I dropped him off then um, we had left I had went, went back to my house, the reason why I believe Brian Smith stayed around me because he knew that I was gonna tell my mom about

the situation, so um, when we got back to my house, my mom she was up walking around or whatever and she asked us would we go to Dothan with her to look at a house, I said yeah I'll go so um, on the way riding to Dothan I told my mom I needed to talk to her about something then when I told her that Brian he kept looking at me kinda crazy or whatever then there was this one house that my mom wanted to show me when we got to Dothan this one house she wanted to show me, so when we pulled up at the house me and my mom walked to the backyard then I told her about, told my mom that um, Brian and Robert just set me up and she was like how did they set you up, I say they had just robbed the adult toy store she was like did anybody get hurt I said yeah, Robert shot the lady, she was like are you for real, I'm like yes ma'm, so she was like um, are you sure you ain't in on this, I was like mom, you know I promised I wasn't in on nothin' like this, so she was like ok, I understand, so, she say as soon as we get back to Enterprise I'm gonna take you to the Enterprise Police Department for you to talk to a police officer, so I said ok, so ah, we left from the house she went by to some guy who she know at a tire place, she stopped and talked to him for about, I'd say like

NORRIS:    And that was in Dothan?

YEOMAN:    Yes sir.

NORRIS:    She stopped at a tire place in Dothan?

YEOMAN:    Yes sir.

NORRIS:    Ok.

YEOMAN:    And um, she stopped and talked to the guy up there about twenty to thirty minutes and then after that when we got back down here my mom she said she needed to go to Wal-Mart so um, we went to Wal-Mart I was walking by myself and Brian he kept trying to keep up with me the whole time so um, I went to McDonald's and got something to eat so first thing was like I stepped outside to go back to the car the police officers had (unintelligible). And then the police officers got up to the um, police station, that's it.

NORRIS:    Ok.

MOORE:    Let's go back to the store when you're at the store and Brian had told you he wanted to get some plastic bags

YEOMAN:    Yeah he wanted, he um, he said it was some kinda like marihuana bags.

MOORE:    Ok, and then when you were in the store then Robert came in you said

Robert pointed the gun at you?

YEOMAN:     Yeah, first thing when he ran in the store they, he pointed the pistol the first person he pointed the gun at was me.

MOORE:      Ok, and then did you see him take the money is that my understanding?

YEOMAN:     Yes sir, he put the money in his right pocket.

MOORE:      Ok, and you saw 'em struggling, you saw him and the lady struggling, is that what you said, wrestling around?

YEOMAN:     Yes sir, after he pushed the (unintelligible) down to the ground. It was right after when he pushed the old guy on the ground, I believe the lady tried to go for the gun then and then him and the lady was like tussling then um, she fell on the ground and he fell on top of her, I heard two shots, two like small shots then after that I heard like three or four . . . . . . .

MOORE:      Were you looking toward him when you heard the shots?

YEOMAN:     No sir.

MOORE:      Ok, did you see Robert shoot her?

YEOMAN:     Yes sir, when um, whe, when, when it was like, when I heard like the three shots go off, no, when I looked up I seen where he was gettin' off of her and he ran out the door then.

MOORE:      But did you see him shot her?

YEOMAN:     Um, when I had looked up I knew for sho' he had shot her

MOORE:      No, did you see him shot her?

YEOMAN:     Um, yes sir.

MOORE:      Whe, where was he standing at when he shot her?

YEOMAN:     He was, he was on top of her then when he shot her.

MOORE:      When he shot her. Did you see her when you, when you left where was she at?

YEOMAN:     Um, when I left she was like crawling like to the counter and she kept someone get out, she was gonna die, she was gonna die, so um, I'm like stay with me ma'm, talk to me, talk to me, and she was like I can't, I'm

7

fixin' to die, so um, that's when I went outside and the old guy told us to go up the street and get help.

MOORE:     Ok, so you saw (unintelligible) which way?

YEOMAN:     Like towards, like staggering to the back of the cash register (unintelligible).

MOORE:     Ok, and then when you got to the house, to your house, that, as quick as your got there is when Brian asked you for that rifle.

YEOMAN:     Yes sir.

MOORE:     How did he get out of the house without your mom seeing him if she was up?

YEOMAN:     Because um, she was like, she had like went into the bathroom then um, there was like, soon as she was walking outta the bathroom he was just walking outta my house then and she wondered why all, all the white stuff was on the ground and stuff and I had told her that um, it was something in the attic that um, that I needed to get out, she didn't really ask what it was.

MOORE:     And how did you (unintelligible) into the attic from the house, where's the access at?

YEOMAN:     It's in my mom's room.

MOORE:     In your mom's room?

YEOMAN:     Yes sir.

MOORE:     So ya'll were in your mom's room getting the rifle out of the attic

YEOMAN:     While she was in the bathroom.

MOORE:     while she was in the bathroom, she never asked you anything other than what's the white stuff on the ground for?

YEOMAN:     Yes sir.

MOORE:     What did you tell her?

YEOMAN:     I had told her that um, I had got something outta the attic, she didn't ask what, what did I get out the attic or anything.

MOORE:      She never said what was you getting outta the attic?

YEOMAN:     No sir.

MOORE:      Ok, that helps me track down how they got outta' the apartment without her seeing them with the rifle. Ok, is there anything else you'd like to add while we are tape recording this statement, that, that you haven't said and, and

YEOMAN:     No sir.

MOORE:      Ok, and everything that you've told us is the truth?

YEOMAN:     Yes sir.

MOORE:      Ok.

NORRIS:     I would like to, to make it very clear for the record on your statement that at this time you have no knowledge of where this silver colored handgun might be that was used in the robbery.

YEOMAN:     No sir.

NORRIS:     You have no idea you did not see it again after the shooting (unintelligible).

YEOMAN:     I did not see it again, if I knew where it was I would tell you where it was.

MOORE:      That and you never saw any of the money other then what you saw Robert put in his pocket?

YEOMAN:     That, that was, that was the last time I seen the money.

NORRIS:     Do you have anything that you want to add to your statement Brian?

YEOMAN:     No sir.

NORRIS:     Just for the record, ah, has myself or, or Captain Moore made any threats, promises or anything to you to try to get you to make this statement?

YEOMAN:     No sir.

NORRIS:     Has your statement been made totally voluntarily on your part?

YEOMAN:     Yes sir.

NORRIS:     Ok, you feel like we've treated you fairly?

YEOMAN:     Yes sir.

NORRIS:     haven't mistreated you in anyway?

YEOMAN:     No sir.

NORRIS:     Yes sir?

YEOMAN:     No sir, just my (unintelligible)

NORRIS:     Ok, the time is now 10:30 a.m. ah still located that the Coffee County
            Sheriff's Department this concludes the interview at this time with Brian
            Glenn Yeoman same persons present at the conclusion of the interview as
            were present at the beginning of the interview.

On _____ I reviewed the tape and made the necessary corrections to the
transcript. The corrected transcript is a true representation of the taped interview.


                        _____
                        Patrick Norris


Transcribed by Crys Fuller
          May 29, 2001

Testing 1-2-3. This is a taped interview between Captain William Moore and Bryan Yeoman, today's date is May 23, 2001, the time is 11:39 also present is Officer Matt Key with the Enterprise Depart, Enterprise Police Department in Captain Moore's office.

MOORE:    Ok Bryan I was talking to you earlier about a robbery that happened today and we talking about that there was a lady had been shot and that there was and that she has died and that there was ah, an individual shot and there was two other individuals involved in this robbery.  Tell me what you know about the robbery that happened today and the shooting.

YEOMAN:    Well, um, I woke up about around 2:00 today and um, I'd say about this month the 17th I overhead Brian a guy named Alex and the guy Robert talking about a robbery.  Today the 23rd the robbery, they did the robbery, and um, they came to my house except for the guy Alex, they must have dropped him off or whatever, but um, Brian had told me that um, if I, if I told the police what the consequences would be.

MOORE:    Wh, What did he tell you the consequences would be if you told the police?

YEOMAN:    That um, if he was to do to jail, if some of his people still out of jail they would do anything for him.

MOORE:    And what did you take that meant?

YEOMAN:    Excuse me?

MOORE:    What did you think that that meant to you?

YEOMAN:    I meant though as if if I lied before, if I lied, if I told the truth and he was to go to jail that I, I be threatened, me or my mom.

MOORE:    Ok, how do you know they did the robbery today?

YEOMAN:    Because um, Brian, he had told me that um, they was goin' to do something, but I didn't really know that it was going to be today, and they been talking about doing the robbery for the last couple of days.

MOORE:    When you say they, who are, who are they?

YEOMAN:    Um, the guy Alex, Robert and Brian.

MOORE:    And Robert, what's Robert's last name?

YEOMAN:    I,



NOV 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

1

MOORE:      Is Robert the one that got shot today?

YEOMAN:    Um, yes sir.

MOORE:      Ok, so why do you think they did the robbery today, I mean you said they were talking about doing a robbery, but or doing something today but why do you think they did the robbery today?

YEOMAN:    Because um they needed the money to move.

MOORE:      Who needed the money to move?

YEOMAN:    Brian and Robert.

MOORE:      Where were they moving to?

YEOMAN:    Um, in some townhouses in Enterprise.

MOORE:      They were moving in together?

YEOMAN:    No with their mom.

MOORE:      With their mom, with Brian's mom or Robert's mom?

YEOMAN:    Brian's mom.

MOORE:      Brian's mom.  So you were at your, your house today with your mother and when was the first time you saw Brian and Robert?

YEOMAN:    Um, after the robbery occurred.

MOORE:      Ok, how do you know it was after the robbery?

YEOMAN:    Because when Robert came to my house he said he was shot.

MOORE:      Did he tell you how he got shot?

YEOMAN:    He just told me um, somebody robbed him.

MOORE:      He said somebody had robbed him?

YEOMAN:    Yes sir.

MOORE:      Ok, and what, what happened, what did you do or what did he do?

YEOMAN:    Um, when he came, when he came in my house he asked me can he use

my bathroom, he went to my bathroom, so I was looking at a movie by myself when I looked around the corner Robert was coming out of my room so he comes up to me and says he got shot so um, I was like man you playing, you playing, but he was like no, for real, he pulled up his shirt and showed me that he was shot, so he had said I need ya'll to take me to the hospital so me and Brian took him to the hospital.

MOORE:     And then what happened?

YEOMAN:     Um, I went back home.

MOORE:     (unintelligible) does Brian go with you?

YEOMAN:     Um, he went to his house when we got back to Greentree Apartments.

MOORE:     Ok, who's car were ya'll when you went to the ah, hospital?

YEOMAN:     Brian's mom's car.

MOORE:     Brian's mom's car, ok, did you drive any car today?

YEOMAN:     Today?

MOORE:     Today.

YEOMAN:     Yes sir, when I took him to the hospital.

MOORE:     And you drove Brian's car to the hospital?

YEOMAN:     Yes ma'm, I mean yes sir.

MOORE:     Ok, but the first time you saw Brian and Robert when they came to your house and Robert had been shot?

YEOMAN:     Yes sir.

MOORE:     You hadn't seen or talked to 'em before that today?

YEOMAN:     No sir.

MOORE:     Ok, and Alex, do you know Alex's last name?

YEOMAN:     No sir.

MOORE:     Do you know where I can find Alex if I was looking for him?

YEOMAN:     Um, um these apartments called, called the Villas, its like right, almost, it's a, it's across the street from a store called Big and Little,

MOORE:      Ok,

YEOMAN:     I don't really know what street its on.

MOORE:      Do you know what kind of car he drives?

YEOMAN:     Um, its like a, it's a Honda, its like a ninety two, ninety one, ninety two Honda.

MOORE:      What color is it?

YEOMAN:     Accord, its like a turquoise green color.

MOORE:      Turquoise green?

YEOMAN:     Yes sir.

MOORE:      Who does he, do you know if he lives with his mother or his wife or girlfriend or

YEOMAN:     Naw, I don't know.

MOORE;      Don't know.

YEOMAN:     I don't know who he stays with.

MOORE:      Ok, do you know anything else about the robbery that happened today? Where's the gun?

YEOMAN:     Um, that's something I don't know, I believe the guy, Alex, has that.

MOORE:      Did they have a gun?

YEOMAN:     Um, when?

MOORE:      Does Byron, Brian own a handgun?

YEOMAN:     Um,

MOORE:      Or have a handgun?

YEOMAN:     I had seen him with one before but I don't really know if it's his or not.

MOORE:      What have you seen him with?

YEOMAN:     Um, I believe it was a real small one, I'm not to good with guns, probably, it be like a 2225 I believe.

MOORE:      Ok, have you ever seen Robert with a gun?

YEOMAN:     Um, yes sir.

MOORE:      What kind of gun have you seen him with?

YEOMAN:     Um, it was like kinda big or whatever um, I don't really know the names I guess it was like a 45 or whatever, I believe.

MOORE:      Like it may have been a 45?

YEOMAN:     Yes sir.

MOORE:      Could have been a

YEOMAN:     9 millimeter

MOORE:      380, 9 millimeter

YEOMAN:     Yes sir, yeah.

MOORE:      44, 40 or just anything like that, some kind of big automatic pistol?

YEOMAN:     Yes sir.

MOORE:      Ok, but you don't know what brand or anything that was?

YEOMAN:     Uh uh.

MOORE:      Ok, did any, did anybody else have any other, any weapon?

YEOMAN:     No sir. I

MOORE:      A

YEOMAN:     The guy Alex he probably did have one but he didn't let it known that he had one alright, I didn't see one.

MOORE:      Ok, and that's all you know about it, what, wh, did ah, ya'll took ah Robert to the hospital and he didn't change clothes or anything, you took him straight on to the hospital?

YEOMAN:    Yes sir.  He probably already had changing clothes in the car whenever \ they

MOORE:    Why do you say that?

YEOMAN:    Um, I guess he, he probably did.

MOORE:    Why would you guess that?

YEOMAN:    Um, you know when they came up to my house they did have a black bag

MOORE:    A black bag,

YEOMAN:    Yes sir.

MOORE:    Like a black leather bag or black plastic

YEOMAN:    Yes sir.

MOORE:    bag or

YEOMAN:    Its' like a black little leather bag and I believe he had his extra clothes in that.

MOORE:    You think he had extra clothes in there?

YEOMAN:    Yes sir.

MOORE:    What did he do with that black bag?

YEOMAN:    Um, the dude Alex, he, he took it with him.

MOORE:    N,N,N, now wait a minute, whoa, whoa, whoa, Alex was out there is was just Robert and Byron, Brian, you didn't see Alex remember they must have dropped him off before they came to your place.

YEOMAN:    He had, he, he had came back out there

MOORE:    W, well now, ok, Alex came back to your house before you went to the hospital?

YEOMAN:    Yes sir, because whenever Robert had gave him a call um from Brian's house he came back out there.

MOORE:    He came back over before you went to the hospital, what did he come

|  | back over for? |
|---|---|
| YEOMAN: | Excuse me? |
| MOORE: | Why did he come back over there? |
| YEOMAN: | I |
| MOORE: | Why, an, and you use the term back over so that means he was there before, when was the first time Alex was at your house today? |
| YEOMAN: | Um, he wasn't at my house today, he was over there like yesterday. |
| MOORE: | Ok, so he came over today after |
| YEOMAN: | After they |
| MOORE: | Brian called him, after Brian and Robert came to your house and Robert was shot? |
| YEOMAN: | Yes sir, he came and got the bag from um, Robert, I mean, Brian. |
| MOORE: | What did he do with the bag? |
| YEOMAN: | Who? |
| MOORE: | Alex. |
| YEOMAN: | I don't know, he |
| MOORE: | You didn't know what was in the bag? |
| YEOMAN: | No sir. |
| MOORE: | You said you thought there was clothes in there |
| YEOMAN: | Yeah probably the changing clothes he probably had because um, I had seen some gloves in the bag when um, when Brian had it, when he had got out the car when he first got out the car he had some gloves in it, so I knew for sure they probably had some um different clothes or shoes or whatever. |
| MOORE: | Ok, anything else happened today? |
| YEOMAN: | Um, no sir. |

MOORE:      You and Brian go to Dothan?

YEOMAN:     Yes sir, when um, me and my mom, he went with me and my mom to go look at some houses.

MOORE:      Did you and Brian have any conversations about the robbery?

YEOMAN:     No sir, because um, he was looking (unintelligible) like its nothing ever happened.

MOORE:      Did you and Brian have any conversations about Robert?

YEOMAN:     Um, I had asked him is that true how he got shot and he said yeah.

MOORE:      Did ya'll talk about Alex any?

YEOMAN:     Um, no sir.

MOORE:      Ok, is there anything else you'd like to tell me before I turn the tape recorder off?

YEOMAN:     Um, no sir.

MOORE:      Ok, this concludes the interview, it is now 11:49, same people present.

On ___09/04/01___ I reviewed the tape and made the necessary corrections to the transcript. The corrected transcript is a true representation of the taped interview.

_____

Captain William Moore

Transcribed by Crys Fuller
              May 24, 2001

This is a taped interview between Sgt. Jeff Spence, Dwight Holley of the District Attorney's Office and Robert Conrad. Today's date is May 23, 2001. The time now is 14:13 hours. Located of interview is MCE Medical Center Enterprise.

SPENCE:    Okay, Robert, I know your voice is kinda of low because everything that's happened, I'm going to lay this right here, all it is a tape recorder. Can you handle that right there.

CONRAD:    Yes, sir.

SPENCE:    Okay. That's just so we can pick you up, okay. Ah, before I turned on the tape, I advised you of your Miranda warning, which is you have the right to remain silent and those things right?

SPENCE:    Okay, there you go nodding, it don't pick up a nod. You're going to have to say yes or no, okay? Did I advise you of that?

CONRAD:    Yes.

SPENCE:    Okay. Did you understand your rights?

CONRAD:    Yes, sir.

SPENCE:    Okay, are you willing to talk to me about what happened yesterday?

CONRAD:    Yes, sir.

SPENCE:    All right in your own words, go on and tell me what happened?

CONRAD:    Okay. I was got dropped off at this girl's house on Methodist side. And I was leaving walking and on that road where that little park at, across from the cemetery and the unknown dude come running up behind me with a pistol in his hand cause when he shot me the first time in my arm and then he pushed me down and grabbed my pager, my phone and my money and then he shot me again and he got up and ran.

SPENCE:    Okay. And that's your story and your sticking to it?

CONRAD:    Sir.

SPENCE:    And that's your story.

CONRAD:    Yes sir. That's what happened.



*VOLUME 2*

COURT OF CRIMINAL APPEALS NO. __CR-02-0333__

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF ____COFFEE____ COUNTY, ALABAMA

CIRCUIT COURT NO. __CC-01-179, CC-01-180__

CIRCUIT JUDGE ____Gary L. McAliley____

Type of Conviction / Order Appealed From: __Conviction, Capital Murder, Robbery 1st__

Sentence Imposed: __Life Without Parole, Life__

Defendant Indigent: [X] YES ☐ NO

__Robert Thomas Conrad__

NAME OF APPELLANT

__Gary Bradshaw__
(Appellant's Attorney)                    (Telephone No.)
P. O. Box 311412

(Address)
__Enterprise__        __AL__        __36331__
(City)          (State)          (Zip Code)

Richard Waldrop
P. O. Box 310027
Enterprise, AL  36331

V.

## STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

(For Court of Criminal Appeals Use Only)



SPENCE:     Okay.  You know they removed one of the bullets from your arm, right?

CONRAD:     Yes sir.

SPENCE:     Do you know what we did with that bullet this morning?

CONRAD:     No sir.

SPENCE:     We took it to Alabama Department of Forensic Science in Montgomery.  You know what they did took with?

CONRAD:     No sir.

SPENCE:     They compared it with weapon found at a robbery yesterday.  That pistol matched that bullet 100%.  Now you wanta tell me what happened?

CONRAD:     Its going to take just a minute.

SPENCE:     You know what I'm talking about, also Brian Smith and  Bryan Yoemans already told us what happened.

CONRAD:     What happened about what me getting shot?

SPENCE:     Mm.

CONRAD:     But they whutn around when I got shot.

SPENCE:     Yeah they were.

CONRAD:     (unintelligible)

SPENCE:     You want me to tell what the story, or do you wanta just go on and continue lying and make it worse, it don't matter to me.  Ya'll talked about doing a robbery at the Adult Toy Store, ya'll met in the corner, a truck went between you, your car, which is Brian Smith's car and BY's car when ya'll parked in the curve.  They go on in the store to act as your back-up, because that's what they told us that you wanted them to do, just in case something happened.  Am I hitting a nerve so far.  No.  Okay, well that's all I'm going to tell you.  Um, all I got to say is the victim's gun that you shot and killed, when she shot you that bullet matched that gun.  You know what that means, right.  You're facing Capital Murder.  Do you know what Capital Murder means.

CONRAD:     No sir.

SPENCE:    Capital Murder means is punishable by death. The electric chair.

CONRAD:    But I ain't do nothing.

SPENCE:    Okay. Well, you can explain that in court. Okay, cause I'm sure Brian Smith and Bryan Yoemans going to testify differently along with that gentlemen that you put your arm around his neck, along with the witness that can identify you out at the car along with another gentlemen that seen you running up the road. You killed a woman yesterday.

CONRAD:    No sir, I didn't.

SPENCE:    Yes you did.

CONRAD:    I'm too afraid to kill anyone.

SPENCE:    Apparently not. Apparently she grabbed your gun, cause you, I don't think you intended to, I really don't, I just think something happened yesterday that shouldn't have happened and everything went awry and you wound up getting shot.

CONRAD:    I wasn't even (unintelligible)

SPENCE:    He wasn't even there.

HOLLEY:    How do you explain the bullet that was taken out of your arm matching up with the gun that was found at the scene that the lady used to shoot you with, how do you explain that?

CONRAD:    I don't know how to explain it. Person had the same kind of gun.

HOLLEY:    Must had the same kind of gun?

CONRAD:    Yes sir.

HOLLEY:    Can you tell us where you were at yesterday?

CONRAD:    What ya' mean where I was at. I mean

HOLLEY:    Can you tell us where you were at ah about say 1:00?

CONRAD:    At the girl's house.

HOLLEY:    And who was that girl?

CONRAD:    Ann (unintelligible)

HOLLEY:     Who?

CONRAD:     Tyiesha

HOLLEY:     Who?  Tyiesha who?

CONRAD:     I don't' know her last name.

HOLLEY:     Where does she live at?

CONRAD:     Methodist side.

HOLLEY:     Bennett side?

CONRAD:     Methodist side.

HOLLEY:     Methodist side.  Do you know an address?

CONRAD:     No sir.

HOLLEY:     You don't know what street it's on?

CONRAD:     Its just a street. Second block beside the one I got shot on.

HOLLEY:     But you don't know that name of the street?

CONRAD:     No, sir.

HOLLEY:     How long have you been living in Enterprise?

CONRAD:     Whole life.

HOLLEY:     All your life?

CONRAD:     Almost.

HOLLEY:     And this is a girlfriend of yours?

CONRAD:     A good type girlfriend.

HOLLEY:     Pardon?

CONRAD:     I said a good type girlfriend, friend thing.

HOLLEY:     And her name again, her first name is what?

CONRAD:    Tyiesha?

HOLLEY:    Spell that?

CONRAD:    Tiesha, I guess?

HOLLEY:    S.H.A.? Tiesha.  And she a good type girlfriend or yours?

CONRAD:    Yes sir.

HOLLEY:    But you don't know her last name.  How long has she been a girlfriend of yours?

CONRAD:    We just started talking like a week ago.

HOLLEY:    Just started talking a week ago?

CONRAD:    Yes sir.

HOLLEY:    But you don't know her name?

CONRAD:    Don't know her last name?

HOLLEY:    And you don't know where she lives?

CONRAD:    Yeah she stay on the second to the next block on the same road as the park and the cemetery.

HOLLEY:    But you don't know what the address is?

CONRAD:    No sir.

HOLLEY:    Who does she live with?

CONRAD:    She stay with her cousin.

HOLLEY:    Her cousin?  Who's her cousin?

CONRAD:    Her name is Betty.

HOLLEY:    Betty?  Do you know what Betty's last name is?

CONRAD:    No sir.

HOLLEY:    Where does Tiesha, where does she work at?

CONRAD:     Ah, she ain't got no job.

HOLLEY:     She got any kids?

CONRAD:     No sir.

HOLLEY:     And she doesn't work anywhere?

CONRAD:     No sir.

HOLLEY:     How does she live, how does she support herself?

CONRAD:     She like 18, her cousin take care of her and pay her money and stuff.

HOLLEY:     Her cousin takes care of her?

CONRAD:     Yes sir.

HOLLEY:     And her cousin is Betty?

CONRAD:     Yes.

HOLLEY:     But you don't know her last name either do you?

CONRAD:     I just might be, she might do got a job, but I ain't never seen her working nowhere.

HOLLEY:     Where does Betty work?

CONRAD:     She, I don't know.

HOLLEY:     Well, how old is Betty?

CONRAD:     She got a job though

HOLLEY:     Pardon?

CONRAD:     She got a job but I don't know where.

HOLLEY:     How old is Betty?

CONRAD:     She's in her thirties, I think 36

HOLLEY:     Does Betty have a car?

CONRAD:     Yes sir.

HOLLEY:     What kind of car is it?

CONRAD:     It's a white Grand Am

HOLLEY:     A white Grand Am

CONRAD:     Yes sir.

HOLLEY:     Have you ever rode around with Betty and Tiesha on the white Grand Am?

CONRAD:     No sir.

HOLLEY:     Have you got another girlfriend?

CONRAD:     Yes.

HOLLEY:     What's her name?

CONRAD:     Lindell Brooks.

HOLLEY:     Who?

CONRAD:     Lindell Brooks.

HOLLEY:     Lindell?

CONRAD:     Yes sir.

HOLLEY:     Brooks?  Where does Lindell live at?

CONRAD:     She just came back from the ah Navy

HOLLEY:     Came back from the Navy?

CONRAD:     Yes sir.

HOLLEY:     Is she out of the Navy now or is she still in?

CONRAD:     She out two weeks vacation.

HOLLEY:     Where does Lindell live at?

CONRAD:     With her mom on Nance Circle.

HOLLEY:    With her mom on Nance Circle?

CONRAD:    Yes sir.

HOLLEY:    What's her mom's name?

CONRAD:    Lois Brooks.

HOLLEY:    Lois Brooks?

CONRAD:    Yes sir.

HOLLEY:    Okay.  How old is Lindell?

CONRAD:    She not twenty or twenties

HOLLEY:    Twenty?

CONRAD:    Yes sir.

HOLLEY:    Okay.  And you were with Tiesha at about 1:00 o'clock yesterday?

CONRAD:    (unintelligible)

HOLLEY:    Pardon?

CONRAD:    See if I'm not wrong it was around that time?

HOLLEY:    What time did you leave Tiesha's residence?

CONRAD:    I don't even know, I didn't look at the clock

HOLLEY:    Would you say it was in the middle of the afternoon or late in the afternoon or what would be your best guess as to what time you left her house?

CONRAD:    I'd say about, I don't know.  I don't know sir.

HOLLEY:    Well, let me ask you something, how long have you been knowing Bryan Yoeman?

CONRAD:    Bryan Yoeman?

HOLLEY:    Yeah?

CONRAD:     Three or four weeks.

HOLLEY:     Three or four weeks.  Do you know where Bryan lives?

CONRAD:     Bryan Yoeman?

HOLLEY:     Yeah, Bryan Yoeman?

CONRAD:     Greentrees.

HOLLEY:     Lives where?

CONRAD:     Greentree Apartments.

HOLLEY:     Where's Greentree Apartments at?

CONRAD:     On the road going toward Daleville on the left.

HOLLEY:     How long have you been knowing Brian Smith?

CONRAD:     For a long time.

HOLLEY:     You and Brian real close?

CONRAD:     Yes sir.

HOLLEY:     You think Brian would lie about you?

CONRAD:     I don't know.

HOLLEY:     Well if Brian Smith told us that you and he along with Bryan Yoeman was at the Toy Store yesterday afternoon about 1:30  and that you shot and killed that woman, is that a lie?

CONRAD:     Yeah it would be 'cause I ain't killed nobody.

HOLLEY:     No, I asked you is that a lie?

CONRAD:     Oh, yes sir.

HOLLEY:     You think Brian Smith would lie about that?

CONRAD:     He's got to be, (unintelligible) and wasn't there, what ever they did I wasn't in it.

HOLLEY:     How about Brian Smith's car, do you use Brian's car?

CONRAD:    No sir.

HOLLEY:    You never have driven Brian's car?

CONRAD:    Way back.

HOLLEY:    Where does Brian work at?

CONRAD:    Nowhere.

HOLLEY:    He don't work?  How about Bryan Yoeman?

CONRAD:    Unless he still working at KFC.

HOLLEY:    What kind of tennis shoes did you have on yesterday?

CONRAD:    White Reeboks.

HOLLEY:    White Reeboks?

CONRAD:    Yes sir.

HOLLEY:    How long have you had those white Reeboks?

CONRAD:    What ya mean how long?  I had 'em on

HOLLEY:    Yeah, how long have you had them?

CONRAD:    Ever since I woke up and I went outside and played basketball.

HOLLEY:    Do you know where you bought those white Reeboks at?

CONRAD:    They old

HOLLEY:    There old?

CONRAD:    Yes sir.

HOLLEY:    Real old?

CONRAD:    You can say that, to me they are.

HOLLEY:    What do you have a lot shoes?

CONRAD:    No, them, some sandals and a pair of gray Reeboks and another pair of gray Reeboks.

HOLLEY:    And you had on those white Reeboks yesterday, is that correct?

CONRAD:    Yes sir.

HOLLEY:    What was you wearing, what kind of clothes were you wearing yesterday?

CONRAD:    A Fubu jersey and a Chaps shorts.

HOLLEY:    Okay, what color is your shirt?

CONRAD:    What color, black, orange and yellow.

HOLLEY:    You say the shirt was black

CONRAD:    Yeah, it had black, orange and yellow on it.

HOLLEY:    Black, orange and yellow?

CONRAD:    Yes sir.

HOLLEY:    What kind of pants did you have on?

CONRAD:    Some tan type shorts, Chaps shorts.

HOLLEY:    Had shorts on?  Tan colored?

CONRAD:    Yes.

HOLLEY:    You had those on all day?

CONRAD:    Yes sir.

HOLLEY:    What time did you get up yesterday morning?

CONRAD:    I'd say it was about between 8:30 to 9:30

HOLLEY:    8:30 to 9:30

CONRAD:    Yes sir.

HOLLEY:    What did you do when you got up?

CONRAD:    Ate, stayed in the house for awhile, then watched TV and went a played a little basketball until the time I went over to the girl's house.

HOLLEY:    Where did you play basketball at?

CONRAD:    Around the corner from my mom's.

HOLLEY:    Around the corner from your mom's?

CONRAD:    Yes sir.

HOLLEY:    They have a basketball court at Greentree?

CONRAD:    At where?

HOLLEY:    Where were you at yesterday morning?

CONRAD:    Let's see, I stayed at Brian's house yesterday morning.

HOLLEY:    You stayed at Brian's house yesterday morning?

CONRAD:    Yes sir.

HOLLEY:    I thought you just told me that you go slept until about 8:00 or 8:30, sat around the house and watched TV

CONRAD:    I sure did.

HOLLEY:    And then went and played basketball?  Was you at your mother's house at Greentree or was you at Brian's house?

CONRAD:    Up at Brian's house (unintelligible)

HOLLEY:    Where was Brian at?

CONRAD:    Brian had left me there, he left me there for awhile.

HOLLEY:    Did Brian come back?

CONRAD:    Yes he came back.

HOLLEY:    So you and Brian was together?

CONRAD:    Not until after when I he got, when I got my other friend drop me off at my girl's house.

HOLLEY:     So you and Brian didn't get together again after you got up and he left yesterday morning and you didn't see Brian again until after you left your girlfriend's house?

CONRAD:     Yes sir.

HOLLEY:     You

CONRAD:     I ain't seen him them but one of the officers said that there was a car the people picked me up in brought be to the hospital on.

HOLLEY:     People told you what?

CONRAD:     Officers said that the car, the car, officers said that the car was looked like Brian's mom's car that picked me up and they put me in the back seat and brought me to the hospital.

HOLLEY:     Well, who brought you to the hospital?

CONRAD:     Sir, I don't even know.

HOLLEY:     You don't know?

CONRAD:     No sir.  My eyes were   (unintelligible) I didn't see anything.

HOLLEY:     You said you knew Bryan Yoeman and known him for three or four months, is that correct?

CONRAD:     Weeks.

HOLLEY:     Three of four weeks?

CONRAD:     Yes sir.

HOLLEY:     What time did you see Bryan Yoeman yesterday?

CONRAD:     I really didn't see him yesterday.  Except that night before last night last time I seen him.

HOLLEY:     You didn't see him at all yesterday, which would have been Tuesday, the 23rd?

CONRAD:     No sir.

HOLLEY:     Correction, I'm sorry that would have been Tuesday the 22nd.  You didn't see Bryan Yoeman at all on Tuesday, the 22nd?

212

CONRAD:    No

HOLLEY:    When Brian Smith and Bryan Yoeman said they brought you to the hospital, would you dispute that?

CONRAD:    I don't know, I didn't know who brought me.

HOLLEY:    You didn't know?

CONRAD:    No sir.

HOLLEY:    Nobody didn't talk to you when you were coming to the hospital?

CONRAD:    No, they just said take me to the hospital and we went to the hospital.

HOLLEY:    Okay, what street was it that you got shot on?

CONRAD:    I don't know the name of it, cause it the same street the cemetery on, on Methodist side.

HOLLEY:    Same street that the cemetary's on?

CONRAD:    Yes sir.

HOLLEY:    And that's where you were at?  What was happening when you got shot, what were you doing?

CONRAD:    Really, I was running halfway when he shot me in my arm and I fell and that's when the guy must have shot me in my stomach and I got up and trying to walk to get me some help and I fell down.

HOLLEY:    Just prior to him shooting you had you seen anybody?  Well where did this individual come from that shot you?

CONRAD:    Came out the woods.

HOLLEY:    Came out of the woods?

CONRAD:    He had to

HOLLEY:    Did he say anything to you?

CONRAD:    Yeah, he just said give me all your shit you got.

HOLLEY:    Ah, have you ever seen this individual before?

CONRAD:    No sir.

HOLLEY:    Ah, give me a description of the guy that shot you?

CONRAD:    He had a black, like a black ski mask over his head.

HOLLEY:    A black ski mask

CONRAD:    A black shirt and I believe some black jeans.

HOLLEY:    Black ski mask, a black shirt and what else did he have on?

CONRAD:    Had, look like some black pants.

HOLLEY:    Black pants?

CONRAD:    Yes sir.

HOLLEY:    What size fella was he?

CONRAD:    I don't know.

HOLLEY:    Was he as tall as you are?

CONRAD:    He's just about a little smaller than me.

HOLLEY:    Just a little bit smaller than you?

CONRAD:    Yes sir.

HOLLEY:    How much did he weigh?

CONRAD:    I don't know.

HOLLEY:    Well, did he weigh as much as you, or less than you, or more than you, or

CONRAD:    He had a little weight on him.

HOLLEY:    He had a little weight on him

CONRAD:    Yes sir.

HOLLEY:    Did he have any scars or tattoos or any kind of marks that you noticed on him?

CONRAD:     No sir.

HOLLEY:     What kind of shoes did he have on?

CONRAD:     I don't know I wasn't paying no attention.

HOLLEY:     You didn't see his shoes?

CONRAD:     No sir.

HOLLEY:     And he just told you to give you all of your shit, is that what he said?

CONRAD:     Yes sir.

HOLLEY:     Did you give it to him?

CONRAD:     He snatched it really, my pager and my phone and my eighty-five dollars in my pocket.

HOLLEY:     You had eight-five dollars?

CONRAD:     Yes sir.

HOLLEY:     And you told me you didn't work?  Right?

CONRAD:     Yes sir.

HOLLEY:     Where did you get eight-five dollars?

CONRAD:     Saved up money.  My sister gave me money and (unintelligible) gave me some money

HOLLEY:     Your sister gave you money and other family members gave you money and you saved up eighty-five dollars?

CONRAD:     Yeah, I don't spend money really.

HOLLEY:     Where do you live at?

CONRAD:     My mom on Garden Oaks.

HOLLEY:     So that's out at 117 Greentree Apartments?

CONRAD:     No sir.

SPENCE:     Glover Avenue.

HOLLEY:     Tell me again now where you live?

CONRAD:     Garden Oaks on Glover Avenue.

HOLLEY:     Garden Oaks.  That's that new

CONRAD:     Apartments

HOLLEY:     Apartments over there?

CONRAD:     Yes sir.

HOLLEY:     Which one do you live in?

CONRAD:     35

HOLLEY:     When is the last time you spend the night over there?

CONRAD:     My mom's house.

HOLLEY:     Uh huh?

CONRAD:     The night

HOLLEY:     Pardon

CONRAD:     The night before last night.  Because I supposed to have gone to an interview at Conarga then and it got postponed it till tonight

HOLLEY:     Where did you got to school at?

CONRAD:     Where?

HOLLEY:     Where did you go high school at?

CONRAD:     Enterprise Junior High.

HOLLEY:     You went to Enterprise Junior High?

CONRAD:     Yes sir.

HOLLEY:     What year did you quit school?

CONRAD:     I don't know, I reckon

HOLLEY:    So you spend the night with Brian Smith the night of the 22nd, you got up between 8:00 and 8:30 yesterday morning, which would have been the 22nd

CONRAD:    Are you talking to me, yes sir.

HOLLEY:    And you were with Brian for how long?

CONRAD:    I wasn't with Brian, I was at the house by myself.

HOLLEY:    Brian wasn't there at all?

CONRAD:    No he had left

HOLLEY:    Well just a few minutes ago, you told me that you got up and you and Brian was together until he left to go somewhere?

CONRAD:    No, I didn't

HOLLEY:    Okay. So you're telling me you didn't see Brian until after you left your girlfriend's house?

CONRAD:    I didn't even see him then. I haven't seen him yet.

HOLLEY:    So you hadn't seen Brian at all yesterday then?

CONRAD:    No sir.

HOLLEY:    Is that what your telling me know?

CONRAD:    No sir, beside when he got up  said I'll be back

HOLLEY:    He did what?

CONRAD:    He said I'll be back, and that's when I went back to sleep before I got up.

HOLLEY:    Were you with your girlfriend ah the day before yesterday, was you with Tiesha on Monday?

CONRAD:    No sir.

HOLLEY:    What did you and Brian do Tuesday night?

CONRAD:    Tuesday night.

HOLLEY:    Yeah, the night you spent the night with him, what did ya'll do?

CONRAD:     We stayed at the house and had a few females over, played cards and stuff.

HOLLEY:     Who did you have over to play cards?

CONRAD:     Who?

HOLLEY:     Yeah?

CONRAD:     Ah, two like girlfriends.

HOLLEY:     Who are they?

CONRAD:     One was named Courtney and the other was named Ashley.

HOLLEY:     Courtney and Ashley?

CONRAD:     Yeah.

HOLLEY:     Do you know their last name?

CONRAD:     No sir.

HOLLEY:     You don't?    So you have a bunch of girlfriends that you don't even know their last name, is that correct?

CONRAD:     Yes sir.  Call 'em by their first name or a nickname.

HOLLEY:     So what time did you leave Brian's house going over to your girlfriend's house yesterday?

CONRAD:     It was around about 10:30 or 11:00

HOLLEY:     Between 10:30 and 11:00?

CONRAD:     Yeah, when I left her house it was around like a little bit after 12:00 I believe

HOLLEY:      So you only stayed at her house just a little after 12:00?

CONRAD:     No sir.

HOLLEY:     Well what time did you leave, you got over there between 10:30 and 11:00, what time did you leave?

CONRAD:    It was a little bit after, you know I don't quite know, it wasn't too long cause that's when

HOLLEY:    You did what?

CONRAD:    I said it wasn't too long after, because, when I left, that's when that dude came out of the woods on me, (unintelligible)

HOLLEY:    So you don't know where it was in the early afternoon or mid-afternoon?

CONRAD:    (unintelligible)        a little early

HOLLEY:    Little early?  Like early afternoon?

CONRAD:    Uh hum.

HOLLEY:    And that's when you left and you got attacked by this man that took your pager, and your telephone and your money?

CONRAD:    Uh hum.

HOLLEY:    And how much money did you say he took?

CONRAD:    Eighty-five dollars.

HOLLEY:    Eighty-five.  You don't remember anything else after he shot you?

CONRAD:    No sir.  I remember falling down and hitting the ground and that's when a car pulled up and they threw me in the backseat and took me to the hospital.

HOLLEY:    How long did you lay there before the car pulled up and brought you to the hospital?

CONRAD:    I'd say a good three of four minutes.

HOLLEY:    Do you know what time you arrived at the hospital?

CONRAD:    No sir.

HOLLEY:    But you're fairly sure that you left your girlfriend's shortly after lunch, you got shot and robbed and they brought you to the hospital almost immediately, is that correct?

CONRAD:    Yes sir.

HOLLEY:     You didn't see Bryan Yoeman at all yesterday?

CONRAD:     No sir.

HOLLEY:     When's the last time you saw Bryan Yoeman?

CONRAD:     Like that night before last night

HOLLEY:     Night before last night?  Who was with you and Bryan?

CONRAD:     When?

HOLLEY:     You said that it was the night before last night?

CONRAD:     Who was with me and Bryan Yoeman?

HOLLEY:     Yeah?

CONRAD:     (unintelligible)  B. Smith was with us for awhile, a girl came to his house, then he went down to his house.

HOLLEY:     Who was with you for awhile?

CONRAD:     Brian Smith.

HOLLEY:     So you and Brian Smith and Bryan Yoeman then went to Brian Smith's house?

CONRAD:     Uh huh.  A girl, she was at his house, reason I know, we went down to his house, me and Bryan Yoeman stayed at his house with his mom

HOLLEY:     Ya'll stayed at Bryan Yoeman's house?

CONRAD:     Yes sir, watching, me and Bryan Yoeman did

HOLLEY:     Okay, well now, did you, was you at Bryan Yoeman's house or was you at Brian Smith's house?

CONRAD:     Bryan Yoeman's house.

HOLLEY:     Okay.  Have you ever been to the Toy Store?

CONRAD:     Toy Store?

HOLLEY:     How about the Adult Toy Store?  Have you ever been to it?

CONRAD:    No sir.

HOLLEY:    You never been with Brian Smith down to the Toy Store?

CONRAD:    No sir.

HOLLEY:    So Brian told us that you and he frequent the place quite often, he's lying then?

CONRAD:    Gotta be, cause I don't even know where the Toy Store at.

HOLLEY:    You don't know where the Toy Store is at?

CONRAD:    No sir.

HOLLEY:    Have you ever heard of it?

CONRAD:    No sir

HOLLEY:    Never heard of it?

CONRAD:    I heard Adult Store?

HOLLEY:    A what?

CONRAD:    An Adult Store.

HOLLEY:    A dork store?

CONRAD:    An Adult Store

HOLLEY:    Oh, an Adult Store, you've heard about it?

CONRAD:    Yeah, I've heard of an Adult Store.

HOLLEY:    Where did you hear that it was at?

CONRAD:    I just heard on going toward Geneva

HOLLEY:    Going toward Geneva?

CONRAD:    Yes sir.

HOLLEY:    Is that the one that Brian always went to?

CONRAD:    I don't know.  I ain't never went.

HOLLEY:    How about Bryan Yoeman, did he go down that quite a bit?

CONRAD:    I don't know sir.

HOLLEY:    Who told you about the Adult Store?

CONRAD:    Oh I heard women and girls taking about the books and dildos and all that.

HOLLEY:    Heard about the dildos and the books and all that kind of stuff?

CONRAD:    Women, the girls be talking about it.

HOLLEY:    Those girls talk about it.

CONRAD:    Yes, the girls.

HOLLEY:    How long ago was it you heard about the, heard about the Adult Store?

CONRAD:    Its just been awhile back.

HOLLEY:    Did the girls ever show you any of the dildos or anything that they bought down at the Adult Store?

CONRAD:    One girl showed me some Spanish Fly and some other type of stuff.

HOLLEY:    Who was that girl?

CONRAD:    Her name Erica

HOLLEY:    Pardon?

CONRAD:    Erica

HOLLEY:    That's another one of your girlfriend's Erica?

CONRAD:    Yes sir.

HOLLEY:    How long ago was that?

CONRAD:    Its been awhile back, when she told me that

HOLLEY:    Did Erica say that she went down there to the Store to get Spanish Fly and that kind of stuff?

CONRAD:    Yeah, that's what she said.

HOLLEY:     Did Erica have a dildo?

CONRAD:     No sir.

HOLLEY:     All right, I want to go back over it one more time and I'm telling you now that Bryan Yeoman and Brian Smith have already given statements to us about the robbery and murder at the Adult Toy Store off the Geneva Highway yesterday. Do you understand that?

CONRAD:     Yes sir.

HOLLEY:     And Brian Smith and Bryan Yeoman both told us in their statement which is on tape that you were the one that went down there with them and that you shot that woman and took her money and the money of an older white male who was standing in the business also. Are they lying?

CONRAD:     They gotta be lying

HOLLEY:     They gotta be?

CONRAD:     Yes sir.

HOLLEY:     Well, why would both of them lie about you?

CONRAD:     They probably done something wrong and trying to pin it on me, just like yesterday, someone told me Bryan Yeoman said he never like me, he's not my friend anyway

HOLLEY:     Well, let me ask you something else, lets go back one more time, you understand that the doctor here at the hospital took a projectile out of your arm, you know that don't you?

CONRAD:     Yes sir.

HOLLEY:     And you know that we took that projectile and ah sent it to the Department of Forensic Science in Montgomery and they matched it with the gun that the lady used to shoot you with, do you understand that?

CONRAD:     (unintelligible)

HOLLEY:     Pardon

CONRAD:     She must have was the one that was in the woods, cause I ain't shoot nobody

223

HOLLEY:     So they is a young white woman did not shoot you then, is that what's you saying?

CONRAD:     No sir, unless that was her that was dressed in all that black that came out of the woods.

SPENCE:     That's fine, let him hang himself. That's whats gonna happen. Because now he's gotta answer all the lies, hey, that's fine, cause when we get the Forensic people up on the stand, get Brian Smith and Bryan Yeoman up on the stand, he's going to look like the idiot and they going to have to put him out, were done. I'm done with him, you know, if he ain't going to help himself.

SPENCE:     Time now is 14:43 hours. Still at the same place, same parties present.

On _____ I reviewed the tape and made the necessary corrections to the Transcript. The corrected transcript is a true representation of the taped interview.


_____
Dwight Holley


Transcribed by Valerie McGuire
May 25, 2001

Today's Date is May 25, 2001. The time is 12:16 p.m. We are in room 207 of the Medical Center Enterprise interviewing Mr. Robert Conrad. Mr. Conrad's date of birth is September 3, 1980. He is twenty years of age. Present in the interview are Bruce Mathews, Dwight Holley and Kyle Hale. Kyle Hale being of the Enterprise Police Department.

MATHEWS:    Mr. Conrad will you state your name, please?

CONRAD:    Robert Conrad.

MATHEWS:    All right, Mr. Conrad at approximately 10:20 this morning, I read to you and showed a form that I told you was your rights form, your Miranda Rights Form, do you remember that?

CONRAD:    Yes sir.

MATHEWS:    Okay, did you read that form?

CONRAD:    Yes sir.

MATHEWS:    Did you understand your rights?

CONRAD:    Yes sir.

MATHEWS:    And we've being talking to you off and on in between the nurses coming in checking on you and breaks that we've all taken for the last hour or so is that correct?

CONRAD:    Yes sir.

MATHEWS:    Did you sign this waiver form?

CONRAD:    Yes sir.

MATHEWS:    Okay, and you've been talking to us freely?

CONRAD:    Yes sir.

MATHEWS:    Has anybody threatened you?

CONRAD:    No sir.

MATHEWS:    Have we made you any promises to get you to tell us anything?

CONRAD:    No sir.

MATHEWS:  Okay. Now you understand that I'm about to tape this interview, don't you?

CONRAD:  Yes sir.

MATHEWS:  And what I want to do is I want to go back over what you've told us during our preliminary interview and let you in your own words tell us what happened at the Adult Toy Store some things prior to going there that day, some things prior to going there and that was on the 23rd, two days ago, on the 23rd. I'm going to let you tell us, you know, what you've been telling us know, is that all right?

CONRAD:  Yes sir.

MATHEWS:  All right. I'm going to lay this recorder down and you said right here is fine, is that correct. Okay. And Mr. Holley will get you started.

HOLLEY:  Go back and give your full name?

CONRAD:  Robert Thomas Conrad.

HOLLEY:  What's your date of birth Robert?

CONRAD:  9-30-80

HOLLEY:  Okay, how old are you?

CONRAD:  Twenty.

HOLLEY:  Okay, what's your social security number?

CONRAD:  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.

HOLLEY:  419-17-50 what?

CONRAD:  95

HOLLEY:  5095. Where do you presently live, Robert?

CONRAD:  35 Garden Oaks

HOLLEY:  #35 Garden Oaks?

CONRAD:  Apartment 35

HOLLEY:  Apartment 35 and that's in Enterprise, Alabama, is that correct?

2

CONRAD:     Yes sir, Glover Avenue.

HOLLEY:     On Glover Avenue.  What grade did you complete in school, Robert?

CONRAD:     The ninth.

HOLLEY:     And you an read and write and understand the English language?

CONRAD:     Yes sir.

HOLLEY:     And you understand what we are saying to you today?

CONRAD:     Yes sir.

HOLLEY:     Okay.  Let's go back to May 23rd, 2001, that would have been Tuesday

MATHEWS:    Wednesday

HOLLEY:     I'm sorry Wednesday, tell me where you were at on the morning of May the 23rd?

CONRAD:     At Brian Smith's house.

HOLLEY:     Where does Brian live at?

CONRAD:     Greentree Apartments

HOLLEY:     Is that in Enterprise, Alabama?

CONRAD:     Yes sir.

HOLLEY:     And you spent the night with Brian?

CONRAD:     Yes sir.

HOLLEY:     What time did you get up?

CONRAD:     Approximately around 8:30 to 9:00 o'clock.

HOLLEY:     Was Brian there when you got up?

CONRAD:     No sir.

HOLLEY:     Where was Brian at?

3

| CONRAD: | He had left, he had told me would be leaving but he didn't tell me where. He just said he'd be back. |
|---------|---------|
| HOLLEY: | Was anybody with Brian when he left? |
| CONRAD: | Yes sir. |
| HOLLEY: | Who was with Brian? |
| CONRAD: | I heard Bryan Yeoman was |
| HOLLEY: | You heard Bryan Yeoman's voice? You know Bryan Yeoman? |
| CONRAD: | Yes sir. |
| HOLLEY: | How do you know Bryan Yeoman? |
| CONRAD: | I met him through Brian, B. Smith. |
| HOLLEY: | How long have you known Brian Smith? |
| CONRAD: | For years, approximately about, a good 4 to 5 years. |
| HOLLEY: | Four to five years? Did Brian tell you where he was going? |
| CONRAD: | No sir. |
| HOLLEY: | Who else was at the apartment at that morning? |
| CONRAD: | Brian Smith's mother. |
| HOLLEY: | What's Brian Smith's mothers name? |
| CONRAD: | Miss Fay |
| HOLLEY: | Miss Fay Smith? |
| CONRAD: | Yes sir. |
| HOLLEY: | You got up around 8:30 or 9:00? |
| CONRAD: | Yes sir. |
| HOLLEY: | What did you do then? |

CONRAD:     I watched a little TV, ate, sat in the room until Brian Smith and them got back.

HOLLEY:     Did Brian Smith and Bryan Yeoman come back?

CONRAD:     Yes sir.

HOLLEY:     Do you know what time they came back?

CONRAD:     No sir.

HOLLEY:     What did you, did you three do when they got back?

CONRAD:     We sat down for a minute, that's when ah, that's when Brian, B. Smith said let's ride out to the Adult Store?

HOLLEY:     Brian Smith suggested ya'll go to the Toy Store?

CONRAD:     Yes sir.

HOLLEY:     Did ya'll go to the Toy Store?

CONRAD:     Yes sir.  He said he needed some, some little bags or a scale or something.

HOLLEY:     He wanted to get some little bags or scales?

CONRAD:     Yes sir.

HOLLEY:     What would he use the little bags or scales for?

CONRAD:     I don't know sir.

HOLLEY:     Did ya'll go to the Toy Store?

CONRAD:     Yes sir.

HOLLEY:     Who went to the Toy Store?

CONRAD:     All three of us.

HOLLEY:     Name the three that went?

CONRAD:     Me, B. Smith, and Bryan Yeoman

HOLLEY:     When we say B. Smith, were talking about Brian Smith is that correct?

CONRAD:    Brian Smith, yes sir.

HOLLEY:    And when we say B. Yeoman, were talking about Bryan Yeoman, is that correct?

CONRAD:    Yes sir.

HOLLEY:    How did you go to the Toy Store?

CONRAD:    On the gray Corsica.

HOLLEY:    On a gray Corsica?

CONRAD:    Yes sir.

HOLLEY:    Who's vehicle is that?

CONRAD:    Bryan Yeoman's mother.

HOLLEY:    Bryan Yeoman's mother?

CONRAD:    Yes sir.

HOLLEY:    Who drove the vehicle?

CONRAD:    Bryan Yeoman

HOLLEY:    When you arrived at the Toy Store what did you do?

CONRAD:    We all three went in.

HOLLEY:    What did you do when you got inside?

CONRAD:    We walked around and looked at bags and stuff like that, some of the toy stuff, we actually walked around looking at stuff.

HOLLEY:    How long were you in the store?

CONRAD:    I don't know about 5 or 10 minutes.

HOLLEY:    What did you buy?

CONRAD:    We didn't buy anything, Brian was checking out the scales and the bags and stuff, and the pipes.

HOLLEY:    So nobody bought anything?

CONRAD:     No sir.

HOLLEY:     And ya'll stayed in the store 5 to 10 minutes?

CONRAD:     Yes sir.

HOLLEY:     What did you do next?

CONRAD:     Left, that's when we went all back, we all went back to the Greentrees Apartment

HOLLEY:     Greentree Apartments?

CONRAD:     Yes sir.

HOLLEY:     Whose residence is that?

CONRAD:     Brian Smith.

HOLLEY:     Who drove the vehicle back to the apartment?

CONRAD:     Bryan Yeoman

HOLLEY:     Bryan Yeoman drove it back?

CONRAD:     Yes sir.

MATHEWS:    Excuse me, do you know where Bryan Yeoman lives?

CONRAD:     Sir.

MATHEWS:    Do you know where Bryan Yeoman lives?

CONRAD:     Yes sir.

MATHEWS:    Where?

CONRAD:     Greentree Apartment.

MATHEWS:    Okay.  But the apartment that ya'll went back to was Brian Smith's apartment?

CONRAD:     Yes sir.

MATHEWS:    Okay.  Just wanted to get that on the record.

HOLLEY: What did you do when you got back to Brian Smith's apartment?

CONRAD: That's when they were doing a little chatting to theirselves, that's when Brian said we fixing to go back to the Toy Store and he got in the L, and B. Y. told me to ride with him in the Corsica.

HOLLEY: Okay now, you want to clarify just what you just said? Ya'll got back to Brian Smith residence and Brian Smith said we need to go back to the Toy Store, is that correct?

CONRAD: Yes, he said he forgot something or something, or he needed to get something

HOLLEY: And at that time ya'll left going back to the Toy Store, is that correct?

CONRAD: Yes sir.

HOLLEY: Being you, Brian Yeoman and Brian Smith?

CONRAD: Yes sir.

HOLLEY: Okay. How did you get back to the Toy Store?

CONRAD: In the Corsica.

HOLLEY: Who rode in the Corsica?

CONRAD: Me and Bryan Yeoman.

HOLLEY: Who drove, how did Brian Smith get there?

CONRAD: He drove his mom's car.

HOLLEY: What kind of car is that?

CONRAD: The blue LTD, light blue LTD

HOLLEY: Brian Smith drove his mother's car and you and Bryan Yeoman rode in Bryan Yeoman's mother's car, is that correct?

CONRAD: Yes sir.

HOLLEY: Did you stop anywhere before you got to the Toy Store?

232

CONRAD:     Yes, that's when, that's when Bryan Yeoman and B. Smith sticked there head out the window whispering something to each other.

HOLLEY:     Where was this at?

CONRAD:     Down the road from the Toy Store.

HOLLEY:     Do you know how far from the Toy Store it was?

CONRAD:     Like second or third light pole down or something like that.

HOLLEY:     What did they say to each other at that time?

CONRAD:     I don't know sir.

HOLLEY:     You didn't hear anything?

CONRAD:     No sir. And I questioned him what we were about to do, he just said, just ride on with me and go in the store with me?

HOLLEY:     Who told you that?

CONRAD:     Bryan Yeoman.

HOLLEY:     Was you suspicious at that time that something might be happening?

CONRAD:     Yes sir.

HOLLEY:     What did you think?

CONRAD:     I really thought they was fixing to try to go in there and try and steal something.

HOLLEY:     You thought they were going in there and try to steal something?

CONRAD:     Yes sir.

HOLLEY:     What made you think that?

CONRAD:     They were whispering and not telling me anything.

HOLLEY:     After they got through whispering and Bryan Yeoman told you just to ride on to the Toy Store with him, what did ya'll do next?

CONRAD:     That's when we went inside the store.

9

HOLLEY:     You and Bryan Yeoman went in the store?

CONRAD:     Yes sir.

HOLLEY:     Where was Brian Smith at?

CONRAD:     I don't know sir. He just told us to go ahead and that's when Bryan Yeoman said, that's when I asked Bryan Yeoman what was going on, he just said ride with me, go in the store with me. I don't if B. Smith parked or turned around or what.

HOLLEY:     After you got into the store you and Brian Yoeman got into the store, what did ya'll do?

CONRAD:     Walked around and looked at few things, then that's when ah, a good two minutes walking around looking at stuff, that's when B. Smith came and Bryan Yeoman went out.

HOLLEY:     So ya'll been there a couple of minutes and Brian Smith came in?

CONRAD:     Yes sir, about two or three minutes.

HOLLEY:     And Bryan Yeoman then left out of the store?

CONRAD:     Yes sir.

HOLLEY:     Okay. What happened next?

CONRAD:     That's when we was all in the back looking at the tapes, me and Brian. That's when Bryan Yeoman came in and said everybody get down. So we got on the floor and that's when he went and grabbed, that's when he went towards the lady and that man, at that time, I was turning my head back the other way so I wasn't seeing nothing that was going on with, cause I wasn't trying to get involved in none of that, that they was doing.

HOLLEY:     Let's back up now. Take is a step at a time. When Bryan Yeoman walked out where did you and Brian Smith go in the store?

CONRAD:     Inside and to the back looking at the tapes.

HOLLEY:     Okay, how long was Bryan Yeoman outside?

CONRAD:     A good four, three minutes?

HOLLEY:     A good three or four minutes?

10

CONRAD:     Yes sir.

HOLLEY:     And Bryan Yeoman came back in the store, is that correct?

CONRAD:     Yes sir.

HOLLEY:     Who else was in the store at the time Bryan Yeoman came back in?

CONRAD:     The female and the ah old couple, the old man.

HOLLEY:     So there was an old man and the lady that ran the store?

CONRAD:     Yes sir.

HOLLEY:     Was the man that was in the store, was he white or black?

CONRAD:     He was white.

HOLLEY:     Where was he standing at?

CONRAD:     I seen him standing, I believe on the outside of the counter, the glass counter.

HOLLEY:     Where was the woman standing?

CONRAD:     Behind the glass counter.

HOLLEY:     And Bryan Yeoman came back in the store, what did he do, what did Bryan Yeoman do when he walked back in the store?

CONRAD:     He came running in the store telling everybody to get down on the floor.

HOLLEY:     He told everybody to get down on the floor, what did everybody get down on the floor?

CONRAD:     He had a gun in his hand.

HOLLEY:     Did you see that gun?

CONRAD:     I only seen the tip of it.

HOLLEY:     What color was the tip that you saw?

CONRAD:     It was chrome.

HOLLEY:     And he told everybody to get down on the floor?

235

CONRAD:    Yes sir. And that's when he went toward the old man and the lady.

HOLLEY:    What did you see him do to the old man?

CONRAD:    I seen him push him down about that time is when I turned my head back around, and that's when he was grabbing the woman.

HOLLEY:    Did you see him grab the woman?

CONRAD:    Yes sir.

HOLLEY:    Okay.  Go ahead

CONRAD:    Then that's when I said forget this and I got up fixing to run out the door, that's when the gun shots hurt me.

HOLLEY:    That's when you head the first gunshot?

CONRAD:    Yes sir.

HOLLEY:    What happened next?

CONRAD:    That's when I realized I was hit by a bullet, then hit twice, then hit again in the stomach.

HOLLEY:    Where were you at in the store in relationship to the front door, when you felt that you got shot?

CONRAD:    Where was I when I got shot?

HOLLEY:    Yeah?  Were you close to the front door when you got shot?

CONRAD:    Yes sir.  Forcing myself out the door.

HOLLEY:    Did what?

CONRAD:    Forcing myself out the door.

HOLLEY:    You forced yourself out the door?

CONRAD:    Yes sir.  Cause I was in pain

HOLLEY:    Why did you force yourself, why did you have to force yourself out the door?

236

CONRAD:     Cause it was hard for me to push the door and I just fell out the door.

HOLLEY:     Where was Bryan Yeoman at when you forced yourself out the front door?

CONRAD:     He was still, still in, I don't know he was still in the building, after I got shot I just went and fell out the door, forced myself out the door.

HOLLEY:     Prior to the shots being fired and you were on the floor along with Brian Smith and the old white gentlemen, what happened?

CONRAD:     Sir, what ya' mean?

HOLLEY:     Did Bryan Yeoman come over to where you were laying at on the floor?

CONRAD:     I'm not quite sure, it was the first time when he came in I turned my head towards the tape wall, the wall where the tapes was on.

MATHEWS:   Did he ever come over and frisk you?  Check you pockets or anything like that?

CONRAD:     Yes sir.

MATHEWS:   What did he do?

CONRAD:     He just grabbed my pants pockets and that's when I said, I don't even know if he went by checking anybody else, I felt him when he grabbed my pants pockets, I just kept looking the other way.

MATHEWS:   Did you say anything to him?

CONRAD:     No sir.

MATHEWS:   Did he say anything to you?

CONRAD:     No sir.

MATHEWS:   Why did he do that?

CONRAD:     I don't know sir?

MATHEWS:   What did you tell us earlier the reason he did that?

CONRAD:     That he did what?

MATHEWS:   Came over and patted your pockets?

CONRAD:      I don't

MATHEWS:   Didn't you say something about that being part of a plan, part of a cover-up, trying to make it look like ya'll were just customers?

CONRAD:      (unintelligible)

MATHEWS:   Do what?

CONRAD:      I don't remember sir.

MATHEWS:   Well whey did he come over and pat you down?

CONRAD:      I guess just to play it off

MATHEWS:   Play, Yeah, that was your words earlier wasn't it, play it off?

CONRAD:      Yes sir.

MATHEWS:   Okay. That's what I was trying to ask you about?

CONRAD:      Okay.

HOLLEY:      Okay, after he came over and patted you down, what happened then?

CONRAD:      That's when he got up, I don't know where he was at, but that's when I jumped up and that's when I seen him with the woman, they was like struggling, struggling or something, I said man I ain't fixing to get involved in this I was about to run out the door, that's when gunshots went off.

HOLLEY:      Where did you see him and the woman struggling at?

CONRAD:      In front of the door, in front of the door, before you walk in front of the door

HOLLEY:      Was it near the counter?

CONRAD:      No sir, like on the left side over by the ah, you coming in on the right hand side of the wall

HOLLEY:      Was there any t-shirts close by?

CONRAD:      Ah----I don't quite remember if he left (unintelligible) the shirts that was on that thing that spin arounds that you look at 'em or something like, it was over by that way

14

HOLLEY:     It was over next to the rack that, the round rack that had the t-shirts, is that correct?

CONRAD:     I guess so.

HOLLEY:     That's where he and

CONRAD:     I don't remember if there were t-shirts or not, but I know its like a rack thing, there was like a rack between that, little between that and the door.

HOLLEY:     And that's where he and the woman were struggling at?

CONRAD:     Yes sir, I believe so, sir

HOLLEY:     Pardon?

CONRAD:     I said, yes sir, I believe so, cause they was all running towards the door, that's when he bumped into me or something like that, that's when the gunshots went off.

HOLLEY:     How many shots did you hear?

CONRAD:     I only heard about, as he shot me in my, that's how I got hit in the stomach, I least heard about one or two more as I was going out the door.

HOLLEY:     So after you got shot in the stomach, you ran out the door?

CONRAD:     Yes sir.

MATHEWS:    How far away from you, from her were you when she shot you?

CONRAD:     Her and Bryan Yeoman was like right like on the front and on the side of me

MATHEWS:    Just right on you?

CONRAD:     Yes sir.

MATHEWS:    About as far away as I am from you?

CONRAD:     Yes sir.

MATHEWS:    About two feet, about foot and half, so I could reach out and touch you on the shoulder right now with my arm can't I?

CONRAD:      Yes sir.

MATHEWS:  Is that about how far away

CONRAD:      Yes sir.

MATHEWS:  She was when she shot you?

CONRAD:      Yeah about that close.

MATHEWS:  Did you see her stick the gun out at you?

CONRAD:      No sir.

HOLLEY:      You never did see the gun in the lady's hand?

CONRAD:      No sir.

HOLLEY:      And after you got shot and you were shot how many times?

CONRAD:      Twice.

HOLLEY:      Where were you shot at?

CONRAD:      Sir?

HOLLEY:      Where did she shoot you at?

CONRAD:      I first felt a shot into my arm, and that's when I grabbed by arm about to
             go out that door and I felt another shot hit in my stomach, so I came
             straight on down to the car and got in the back seat of the car.

HOLLEY:      Which car did you get into?

CONRAD:      The Corsica.

HOLLEY:      And you got in the back seat of the Corsica?

CONRAD:      Yes sir.

HOLLEY:      Which side of the back seat did you get in?

CONRAD:      On the passenger side.

HOLLEY:      How was the car pulled into the, to the parking lot?

CONRAD:    Like, pulled in like right on the side of it.

HOLLEY:    If your facing the store with the car, was the car parked on the right hand side or on the left hand side of the store?

CONRAD:    Facing the store, oh, on the left side, left-hand side.

HOLLEY:    So the passenger back, the back passenger door would have been next to where you ran out the door, is that correct?

CONRAD:    No sir, I had to run out the door and go around to the car like this, the Corsica was on the back from the side.

HOLLEY:    What did you do then?

CONRAD:    I laid down in the car until they came out, that's when I saw the top of B. Y, Brian Smith's head as it was running, then that's when Bryan Yeoman came jumped in the car and said he's calling the police

HOLLEY:    Who's calling the police?

CONRAD:    I don't know, that's all I heard him say he's calling the police

HOLLEY:    When you brought, you say Brian Smith run from the store?

CONRAD:    Yes sir.

HOLLEY:    Where did Brian Smith run to?

CONRAD:    I don't know sir, like he was running down toward the hill, towards that ah, chicken place, or whatever.  Um

HOLLEY:    Are there chicken houses across the road?

CONRAD:    Yes sir.  Whatever them things, them long chicken things are.  That's where I seen him, he was heading towards that way.

HOLLEY:    So you saw Brian Smith running?

CONRAD:    Yes sir.

HOLLEY:    And what did you say Bryan Yeoman did?

CONRAD:    He jumped in the car and said, he calling the police, and he pulled out.

HOLLEY:     How long from the time you ran out the door and got into the Corsica was it you saw Brian Smith run?

CONRAD:     It was a good three, three or four minutes.

HOLLEY:     Three or four minutes?

CONRAD:     Yes sir. It could have been around about, it wasn't too long, cause I remember I just laid down in the car, about the time I closed the door, that's when I saw Brian Smith running. Then Bryan Yeoman came and jumped in the car.

MATHEWS:    Did you ever see the old man come out of the store?

CONRAD:     No sir.

MATHEWS:    You didn't never see him come out and use the phone or anything?

CONRAD:     No sir, I was laying down in the back seat

MATHEWS:    But you said you saw Brian?

CONRAD:     Cause I was laying down in the back seat looking out the window, and I saw the top of Brian Smith's head running.

MATHEWS:    I got ya'. Was there any other vehicles parked there at the store when ya'll pulled up?

CONRAD:     Yes sir, I remember seeing a van and I believe a truck, or maybe two vans, yeah a van and a truck

MATHEWS:    Well if somebody came out and walked over to the van or the truck, would you not see 'em?

CONRAD:     If they would have came around the car like this, that's way

MATHEWS:    Did you hear anybody?

CONRAD:     No sir. I was just crying in the car, saying I'm hurting

MATHEWS:    Ya'll left then and headed back to the apartment, right?

CONRAD:     Yes sir.

MATHEWS:    What happened when you got back to the apartment?

18

CONRAD:     That's when Brian, B. Smith and Bryan Yeoman, they disappeared away from, from where, they had gotten me out the Corsica, and put me in the LTD and then Brian Smith disappeared, I don't know where they went. As I'm hollering for them to take me to the hospital, then they finally come back towards me and took me to the hospital.

HOLLEY:     Who took you to the hospital?

CONRAD:     Brian Smith and Bryan Yeoman.

MATHEWS:    You didn't go into either one of 'ems apartment after you got shot?

CONRAD:     No sir, I couldn't move.

MATHEWS:    All right, what did you, what else happened before they went to the hospital?

CONRAD:     I don't know, just saying they disappeared out of my sight, then they came back and that's when they took me to the hospital.

MATHEWS:    All right did you not change some clothes?

CONRAD:     No sir, except for they took my t-shirt off and gave me a jersey, helped me put my jersey on.

MATHEWS:    Where did that happen at?

CONRAD:     In the back seat of the LTD.

MATHEWS:    Where at?

CONRAD:     At Greentrees Apartment

MATHEWS:    Okay. What happened with the t-shirt?

CONRAD:     I don't know sir.

MATHEWS:    What color t-shirt was it?

CONRAD:     White

MATHEWS:    Did it have anything on it?

CONRAD:     I don't know what

MATHEWS:    Like letters or a name on it, or?

243

CONRAD:       No sir.

MATHEWS:   Was it just ah, ah like a t- undershirt t-shirt?

CONRAD:       t-shirt

MATHEWS:   Tank top of what?

CONRAD:       Plain regular t-shirt.

MATHEWS:   All right.  How old was it?

CONRAD:       How old was what?

MATHEWS:   That shirt yeah?

CONRAD:       I don't know sir

MATHEWS:   It wasn't brand new?

CONRAD:       (unintelligible)

MATHEWS:   You worn it before?

CONRAD:       Yes sir, I believe it was washed and wore before

MATHEWS:   Okay.  And that happened in the car in the parking lot, correct?

CONRAD:       Yes sir.

MATHEWS:   Did you take your shoes off?

CONRAD:       No sir.

MATHEWS:   This is the shoes you showed up in hospital are the same shoes you had on
           at the Toy Store?

CONRAD:       Yes sir.

MATHEWS:   Did you take your shorts off, your pants or whatever?

CONRAD:       No sir.

MATHEWS:   What color pants were you wearing?

CONRAD:     Some beige, tan looking Chap shorts.

MATHEWS:  All right.  Brian was wearing what at the store?

CONRAD:     Which one, sir?

MATHEWS:  Brian Smith, I am sorry?

CONRAD:     I remember he had on a red shirt, I can't remember what else.

MATHEWS:  Don't remember if he had on long pants or short pants?

CONRAD:     It could have been long pants, but I don't know.

MATHEWS:  Did he have on any kind of hat or scarf or net?

CONRAD:     No, it was sticking up, I believe he had a bandana on a wave cap.

MATHEWS:  What color?

CONRAD:     It's a red and black.

MATHEWS:  All right.

CONRAD:     I think he had it, came around, I think he had it on, I can't remember, I
            believe he did have just braids.

MATHEWS:  Braids?  Yeah

CONRAD:     Kinda (unintelligible) remember

MATHEWS:  All right.  And B. Y. Bryan Yeoman had on what, when ya'll went in the
            store?

CONRAD:     Blue jeans and ah black or blue shirt

MATHEWS:  Dark colored, either way?

CONRAD:     Yes sir.

MATHEWS:  Did it have any writing on it?

CONRAD:     No sir.  Not that I know of.

MATHEWS:  Not that you know of or remember.  Did he wear his shirttail in or out?

CONRAD:      Out.

MATHEWS:   Have anything on his head?

CONRAD:      I don't think so, sir.  Can't remember.

MATHEWS:   What about his shoes?

CONRAD:      I don't remember.

MATHEWS:   Don't remember.  When they took you, before they took you to the hospital, did they change clothes?

CONRAD:      To tell you the truth sir, I don't even know, I wasn't even paying attention to them, I was just telling them to get me to the hospital.

MATHEWS:   All right.  When you left the apartments which way did you go, going to the hospital?

CONRAD:      Up, up and out of the apartments and then went like through town I believe, no, they went in front of the courthouse.

MATHEWS:   All right, did you stop anywhere along there in front of the courthouse?

CONRAD:      I can't remember.

MATHEWS:   Do you remember if anybody got out of the car?

CONRAD:      Huh uh.

MATHEWS:   Were you hollering out the window or anything?

CONRAD:      I was just screaming, telling them to get me to the hospital, I was in pain, I remember hearing Bryan, Brian, B.Y. and Brian yelling., saying move out of the way, get out of the road and stuff like that.  That's about it.

MATHEWS:   Who was driving?

CONRAD:      B.Y.

MATHEWS:   Did Brian start off driving, Brian Smith?

CONRAD:      I don't think, I don't think so sir.

MATHEWS:   Okay.

HOLLEY:     So both of them was hollering get out of the way, get out of the way?

CONRAD:     Yes sir.

HOLLEY:     What else were they saying?

CONRAD:     I can't quite remember, I remember Brian Smith saying, we going to just drop him off and just leave man, we going to drop him off and just leave.

HOLLEY:     What size tennis shoes do you wear?

CONRAD:     Nines to tens and half.

HOLLEY:     Nines to tens and half?

CONRAD:     Yes sir.

HOLLEY:     And what kind of tennis shoes did you have on the day that the robbery went down?

CONRAD:     Reeboks.

HOLLEY:     What color were they?

CONRAD:     White.

HOLLEY:     Do you remember what happened when you got to the hospital?

CONRAD:     I remember getting put in the wheelchair and pushed down the hall.

HOLLEY:     Which one of them pushed you down the hall?

CONRAD:     If I'm not mistaken Brian Smith.   When we got back down by the emergency room, I remember I was going towards the wall and nobody behind me, like they pushed me and let me go running into, run into the emergency room.

HOLLEY:     Did they say anything to you as they were pushing you into the emergency room?

CONRAD:     No sir

HOLLEY:     I believe you told us earlier that one of them told you that you were on your own, is that what they said?

CONRAD:     Yes sir.

23

CONRAD:    They was saying that, they was saying that between the time when they said just going to push him down here and let him go or something like that?

HOLLEY:    Who was saying that?

CONRAD:    Brian Smith and B.Y. , both like, they were kinda trying to whisper it to each other, but I was hearing little by little

MATHEWS:   Now, Robert, this is not the same story you've told us on a couple of other interviews is it?

CONRAD:    Sir.

MATHEWS:   This is not the same story you've told us on a couple of other interviews is it?

CONRAD:    You talking like the first and second day, ya'll questioned me?

MATHEWS:   Yes sir.

CONRAD:    No, sir, it's not the same cause I was scared being involved in that, ah, folks saying I'm being involved in that.

MATHEWS:   I understand that and, and so, what you're telling me know is that you lied in those interviews, is that correct?

CONRAD:    Yes sir.

MATHEWS:   And none of that was true, right?

CONRAD:    No sir.

MATHEWS:   All right.  Let me ask you something, where, and think about this now, cause you been in this shop, where in that store would your fingerprints be?

CONRAD:    Mine

MATHEWS:   In other words, yeah, where would they be, what have you touched in that store that you're fingerprints would be on the place?

CONRAD:    Probably on some of the tapes I was looking at.

MATHEWS:   The ones that are for sale of rent?

CONRAD:    Yes sir.

MATHEWS:   Okay, what else?

CONRAD:    That's about it, cause also I had my hands behind my back as I was looking at stuff.

MATHEWS:   All right.  Would they be over there, have you ever bought anything in there?

CONRAD:    No sir.

MATHEWS:   Would there be any reason for your fingerprints to be on the counter?

CONRAD:    No sir.

MATHEWS:   What about the cash register?

CONRAD:    No sir.

MATHEWS:   Never touched the cash register?

CONRAD:    No sir.

HOLLEY:    Over there where they have that display stand that's got glass in it where the pipes are at, would your fingerprints be on that?

CONRAD:    No sir.

MATHEWS:   You didn't lean over on it looking in?

CONRAD:    No sir.  I just squatted down, I was looking at the bottom of the pipes that they was showing

MATHEWS:   So you're comfortable that your fingerprints won't be there?

CONRAD:    Yes sir.

MATHEWS:   And they won't be on the register on in the drawer where the money was?

CONRAD:    No sir.

MATHEWS:   You are sure about that?

25

CONRAD:        Yes sir.

MATHEWS:    All right. You told me that B.Y., Bryan Yeoman had shown you a gun and told you about some other guns?

CONRAD:        Yes sir

MATHEWS:    Tell me about that again on this tape, please sir?

CONRAD:        I first met him, he was like always talking about guns and stuff, so I was like what ya' talking about, he was like check this out, and he showed me the .357 and he said, he said he got a 9 and 25 and he got some and he didn't name the other ones. He was like I got some more too. So he only showed me the .357 though. That's the only one I held.

MATHEWS:    Okay. What is it look like?

CONRAD:        Its like black and brown a little light.

MATHEWS:    Okay. Now, describe how the gun works?

CONRAD:        Sir.

MATHEWS:    Describe how the gun works?

CONRAD:        Ah, I ain't one no, I ain't open the thing or nothing, I don't know how it works.

MATHEWS:    You say you put, I know, but you what I'm saying is say, where you bullets is that gun that you saw?

CONRAD:        In the, what's the little thing that turns?

MATHEWS:    Is it round?

CONRAD:        Yes sir.

MATHEWS:    Okay. Cylinder?

CONRAD:        Yes sir.

MATHEWS:    All right, that's what I needed you to do, is to describe the thing where you put the bullets?

CONRAD:        Okay.

MATHEWS:    So you prints could possibly be on that gun?

CONRAD:    Yes sir.

MATHEWS:    Have you held any other gun?

CONRAD:    No sir.

MATHEWS:    So your prints, there is no way your prints will be on that 9 mm he told you about?

CONRAD:    Yes sir.

MATHEWS:    How did he describe that 9 mm?

CONRAD:    He just said chrome with a black handle.

MATHEWS:    All right. You never saw it?

CONRAD:    No sir.

MATHEWS:    Did it, does that look any, does that sound anything like the gun he had in his hands in the store?

CONRAD:    It could probably be because all I remember seeing is just ah, where the bullet come out at, that little chrome part of it, I just glanced and laid my head back down, I was scared.

MATHEWS:    All right.

CONRAD:    I ain't believe they would do something

MATHEWS:    What's your parents name?

CONRAD:    Dorothy Conrad

MATHEWS:    And your dad?

CONRAD:    Robert Conrad, but he stay in Columbus, Ohio. But down here Anthony William my father, my step-father.

MATHEWS:    Okay. Where does he live at?

CONRAD:    New Brockton.

MATHEWS:    What's his address?

27

CONRAD:    Sorry to tell you the truth, I never did know did the road.

MATHEWS:    Anthony Williams?

CONRAD:    Yes sir.

MATHEWS:    Go ahead and describe where its at?

CONRAD:    Like, taking the road down where the Health Department, it's a long ride before you get already down to the light well you fixin to go to Troy or Anniston or something like that that you make a left go around the curve his house there, like seven acres of land with some cars in the yard.

MATHEWS:    Okay.  Where does he work?

CONRAD:    I believe at Wal-Mart still, sir.

MATHEWS:    Okay.  Where's your mama work?

CONRAD:    At the Nursing Home.

MATHEWS:    Enterprise Nursing Home?

CONRAD:    Yes sir.

MATHEWS:    Okay, where does she live?

CONRAD:    35 Garden Oaks.

MATHEWS:    Okay, that's where you live, right?

CONRAD:    Yes sir.

MATHEWS:    You still live with mama.  Okay.

CONRAD:    I just mainly be staying with my mom or my sister or visiting another friend or something, staying around.

MATHEWS:    Well tell me something, if we go over there and we search your house, what we going to find?

CONRAD:    What ya' mean sir?

MATHEWS:    Are we going to find any guns?

252

CONRAD:    Oh, no sir.

MATHEWS:    You're not worrying about us finding any gun?

CONRAD:    No sir.

MATHEWS:    When's the last time you ever fired a gun?

CONRAD:    The only kind of gun I ever fired was a shotgun, it was like four or five months ago.

MATHEWS:    Where at?

CONRAD:    Our in the country.

MATHEWS:    At anybody's house or anything?

CONRAD:    Yes sir.

MATHEWS:    Did you say yes sir.?

CONRAD:    Yes sir.

MATHEWS:    Well whose was it?

CONRAD:    It was a friend of mine at Geneva.

MATHEWS:    Uh huh.

CONRAD:    And he had took us to his friends house, he had some shotguns, like rifle shotguns, bb guns, stuff like that.

MATHEWS:    Uh huh.

CONRAD:    And it was like ya'll want to shoot it and we just shooting it in the air.

MATHEWS:    Okay. Didn't shoot at some targets or anything?

CONRAD:    No sir.

MATHEWS:    Did anybody have any pistols there?

CONRAD:    No sir, just shooting at like, well they was shooting at like stuff like trees and stuff.

MATHEWS:    But nobody had any pistols?

29

CONRAD:     No sir.

MATHEWS:   Have you ever shot a pistol?

CONRAD:     No sir.

MATHEWS:   Have you ever shot any kind of guns out at Mr. William's house?

CONRAD:     No sir.

MATHEWS:   Did anybody ever shoot guns out there that you know of?

CONRAD:     No sir, not that I know of.

MATHEWS:   You said he's got about seven acres doesn't he?

CONRAD:     Yes sir.

HOLLEY:     Who did you say your father was?

CONRAD:     My real father?

HOLLEY:     yes

CONRAD:     It's a, if I'm not mistaken he name is Robert Michael Conrad, from Columbus, Ohio

MATHEWS:   Columbus, Ohio

CONRAD:     Yes sir.

HOLLEY:     So his name is Robert Conrad also?

CONRAD:     Yes sir.

HOLLEY:     Are you a junior.

CONRAD:     Yes sir, junior the fourth.

HOLLEY:     So your Robert

CONRAD:     Thomas Junior Conrad the fourth.

HOLLEY:     The fourth?

HOLLEY:    Yes sir. And say that so it will catch, so it will pick it up on the tape recorder, what's your full name?

CONRAD:    Robert Thomas Junior Conrad, the fourth.

HOLLEY:    Okay.

MATHEWS:    Do you remember that man coming up when ya'll were out on the road and you said they were whispering back and forth right before you went to the Toy Store, do you remember that man coming up in that truck? Pick-up truck?

CONRAD:    A white truck?

MATHEWS:    Yeah.

CONRAD:    Yes sir.

MATHEWS:    Did he look at ya'll kinda hard?

CONRAD:    If I'm not mistaken he was.

MATHEWS:    Where were you sitting when he looked at ya'll?

CONRAD:    On the passenger side of the Corsica.

MATHEWS:    You wasn't sitting over there in the LTD?

CONRAD:    No sir

MATHEWS:    Did you have any kind of a hat on that day, or scarf or do rag or anything?

CONRAD:    No sir. Just my braids.

MATHEWS:    Any kind of jewelry?

CONRAD:    No sir.

MATHEWS:    Just your braids, same as they are now?

CONRAD:    Before I had to chain, I think the hospital took my chain off my neck.

HOLLEY:    You said Brian Smith had his hair in braids that day?

CONRAD:    Yes sir.

HOLLEY: Were they like the braids that hang down that you, or were they braids like the ones cut close to, like your's on your?

CONRAD: He's got his going to the back.

HOLLEY: Are they long, do they hang down?

CONRAD: Not that long. Got 'em going back to design or something.

MATHEWS: And that's the way he had his hair that day?

CONRAD: If I'm not mistaken, sir.

MATHEWS: Can you think of anything else that you need to tell us about what happened that day, about what somebody said about doing anything or the money or the guns, or anything that you haven't told us. This is your opportunity to tell us whatever you need to tell us about what happened?

CONRAD: I don't know. Like I said they wasn't even telling me nothing, cause, like I said a couple of weeks ago, when and I had first met B.Y. they was talking about doing something illegal, but they wouldn't never tell me. Its cause I told them I ain't trying to get in not more trouble, I just got out of jail for real, trying to get my life straight. That's why I was suppose to have went to the interview that night.

HOLLEY: Where were you that night?

CONRAD: Went to a job interview.

MATHEWS: Oh, okay.

HOLLEY: What were you in jail for?

CONRAD: They found some drugs in my brother's house and they pinned it on me?

HOLLEY: Found some what?

CONRAD: Some reefer in my brother's house. And I got pinned for it.

HOLLEY: You were charged with Possession of Marihuana?

CONRAD: Yes sir.

MATHEWS: Whose your brother?

CONRAD: Rico.

MATHEWS:   Rico Conrad?

CONRAD:    Rico, he's my step-brother, Rico Edwards.

MATHEWS:   Rico Edwards.

CONRAD:    Yes sir.

MATHEWS:   Where does he live?

CONRAD:    He's gone now, I don't think nobody knows where he at.

MATHEWS:   Where did he live then?

CONRAD:    He was staying in the villas

MATHEWS:   in 35, with you and your mama?

CONRAD:    No sir, in the Villas.

MATHEWS:   Villa Apartments?

CONRAD:    Yes sir. D-4.

MATHEWS:   D-4?

CONRAD:    Yes sir.

MATHEWS:   How did you get pinned with it, if it was in his apartment?

CONRAD:    I, my brother had to go to work, and my sister stayed down there too, so I said just take me to the Villas and I visiting both of 'em. But the whole day I had a tooth ache, and I was just laying there on the bed asleep, the next thing I know, police coming in, rushing in the house

HOLLEY:    How long did you serve in jail?

CONRAD:    I think like three or four days, or a week?

MATHEWS:   You haven't been to Court on it yet have you?

CONRAD:    No sir. I, they postponed it, I'm supposed to go on June the 1st.

HOLLEY:    So you were charged with Possession of Marihuana, 1st degree wasn't you?

CONRAD:     Yes sir. It wasn't mine, they said it was the owner of the house and just that I was just in his spot around where they found some weed at.

MATHEWS:    There wasn't any conversation on the way back to the apartments from the house, I know you're hurting but?

CONRAD:     Oh, I was questioning and asking what was they doing, why they was doing that, he's just like man, just forget it, just forget it, were going to get you to the hospital, were going to get you to the hospital. So what Brian and was saying.

HOLLEY:     You never did see the money?

CONRAD:     No sir.

HOLLEY:     You never did receive any part of the money?

CONRAD:     No sir.

HOLLEY:     And you don't know what they did with your white t-shirt when you changed shirts at Brian Smith's apartment?

CONRAD:     No, I was just laying in the back seat, it was like a shirt, fucked up or messed up or something

HOLLEY:     Did what know?

CONRAD:     He said my shirt was excuse my language, he said my shirt was messed up, tore up and I need to take it off, so he took it off of me and handed me that jersey.

HOLLEY:     Did you ever hear Bryan Yeoman say how much money he got?

CONRAD:     No sir, to tell you the truth all I heard one of 'em say it's a lot of money

HOLLEY:     Which one of them said it was a lot of money?

CONRAD:     Can't remember sir. Cause it was, it was like away from the car coming towards the car, saying it's a lot of money. That's when I was saying just take me to the hospital, take me to the hospital, then that's when he came up on a car and they were asking are you all right, I said no, just take me to the hospital man, take me to the hospital.

MATHEWS:    That's at the apartments?

CONRAD:      Yes sir.

MATHEWS:    What did they do, take the money up into Brian's apartment and count it?

CONRAD:      I don't even know sir, I was laying down in the back seat.

MATHEWS:    Was they gone long enough to do that?

CONRAD:      Yes sir, they was gone four minutes.

MATHEWS:    Were they gone long enough to change clothes?

CONRAD:      Could have been sir.

MATHEWS:    When you use the terminology minute, you don't really mean a minute do ya?

CONRAD:      Sir?

MATHEWS:    When you say they was gone for a minute, you don't' really mean a minute do you?

CONRAD:      No sir.  Its like another figure of speech, we say like 5 minutes, 10 minutes, whatever, something

MATHEWS:    Right.  So, ah, about how long would in your terminology for a minute be?

CONRAD:      I say a good like for close to almost 10 minutes?

MATHEWS:    Okay.  Well, I, that's why I wanted to explain it, I knew what you were talking about, but I needed you to clarify that for somebody that might be listening on that, that doesn't understand it.

MATHEWS:    Dwight, I don't have anything else do you, at this time?

HOLLEY:      I have nothing else.

MATHEWS:    Its 1:00 o'clock p.m. we will terminate the interview.

On _____ I reviewed the tape and made the necessary corrections to the Transcript.  The corrected transcript is a true representation of the taped interview.

_____
Bruce Mathews

Transcribed by Valerie McGuire
May 29, 2001 and May 30, 2001

260

Mathews:  Today's date is 5-25 of 2001.  The time is 4:45 p.m.  We're in room 207 of the Medical Center Enterprise.  That's the room of Robert Conrad.  Present are uh' myself, Bruce Mathews, Investigator with the D.A.'s Office, Dwight Holley, Investigator of the D.A.'s Office, Rick Hauser, Investigator with Enterprise Police Department, Michael Hines, Deputy with Coffee County Sheriff's Department. Mr. Conrad I have shown you and read to you this rights form and gone over these rights with you, is that correct?

Conrad:  Yes.

Mathews:  And your name is Robert Conrad correct?

Conrad:  Yes sir.

Mathews:  What 's your date of birth?

Conrad:  9-30-80.

Mathews:  Okay.  And you have indicated to me that you understood these rights and that you having those rights in mind that you wish to talk to us, is that correct?

Conrad:  Yes sir,

Mathews:  Okay.  Again we're gonna show you a piece of clothing and let you identify what if anything you know about that clothing.  Can I lay this right here?

Conrad:  Yeah go ahead.

Mathews:  This tape recorder.  All right.

Hauser:  Uh' Mr. Conrad I'm showing you a blue pair of Nike Air blue and black pair of Nike Air tennis shoes, and you indicated to me earlier that these in fact are your shoes, is that correct?

Conrad:  Yes sir.

Hauser:  And that you told us that you had loaned these to who?

Conrad:  Brian Yeoman.

Hauser:  Okay and when was that sir?

Conrad:  Like a week after I met him.

1

Hauser:     Okay.  Where was the last place you saw these shoes at?

Conrad:     At his house.

Hauser:     And when was that sir?

Conrad:     Like (unintelligible) 6 days ago.

Hauser:     6 days ago?  And where does he live at?

Conrad:     In Green Tree Apartments.

Hauser:     Apartment number?

Conrad:     I, I don't know.

Hauser:     Okay.  All right, anything else about the shoes?

Mathews:    Was he wearing those shoes at the robbery the other day?

Conrad:     I don't know sir.

Mathews:    You don't know.  You wouldn't recognize your own shoes?

Conrad:     I wasn't paying attention to his feet (unintelligible).

Mathews:    All right.

Hauser:     This is a black Polo shirt.  Sig Sigfield, Sig or whatever do you
            recognize this shirt sir?

Conrad:     No sir.

Hauser:     You never seen it before?

Conrad:     Um' um'.

Hauser:     You know anything about it, does it belong to you?

Conrad:     No sir.

Hauser:     Does it belong to Mr. Yeoman?

Conrad:     No sir.

262

| Hauser: | All right, you don't recognize any part of that shirt at all? |
|---|---|
| Conrad: | I don't (unintelligible) |
| Hauser: | Okay. |
| Group: | Mumbling (unintelligible) |
| Mathews: | You ever worn that shirt before? |
| Conrad: | No sir.  That's the God's truth. |
| Mathews: | Huh? |
| Conrad: | I said that's the God's truth. |
| Group: | Mumbling (unintelligible) |
| Hauser: | All right Mr. Conrad, this is a white tennis shirt, or tennis t-shirt, white t-shirt, short with the uh' sleeves removed, Ronald McKinnon foot ball camp.  Have you ever seen this shirt before? |
| Conrad: | Yes sir. |
| Hauser: | You know who's shirt this is? |
| Conrad: | That's the shirt I had on. |
| Hauser: | This is your shirt, this is the shirt you had on? |
| Conrad: | Yes sir. |
| Hauser: | Okay. When was the last time you wore this shirt? |
| Conrad: | The day that the robbery. |
| Hauser: | The day of the robbery. |
| Conrad: | Yes sir. |
| Hauser: | It's the day you were shot? |
| Conrad: | Yes sir. |
| Hauser: | Okay, this is in fact your shirt? |

Conrad:      Yes sir.

Hauser:      Okay. And you recognize it as such.

Conrad:      Yes sir.

Hauser:      When was the last time you saw that shirt?

Conrad:      The day of the robbery, I had it on.

Hauser:      You had it on?

Conrad:      Yes sir, I got shot.

Hauser:      Okay. You got any questions about it.

Mathews:     What happened with that shirt, where'd it, how did we find it? You know?

Conrad:      No that's

Mathews:     Well what'd you do with it?

Conrad:      Oh that's the shirt Brian Smith took off me.

Mathews:     Brian Smith took it off of you? Where?

Conrad:      When I was in the back of the uh' LTD.

Mathews:     Where were you parked at?

Conrad:      At his house.

Mathews:     In Green Tree. You don't know what he did with it? Did he leave the car with it?

Conrad:      Sir.

Mathews:     Did he leave the car with it?

Conrad:      Hum?

Mathews:     Did he get out of the car after he took it off of you and take it anywhere?

Conrad:      Oh, oh yes sir.

4

Mathews:    You didn't see where he went?

Conrad:     I was laying down when he took it off, put my jersey on and I just laid back down in the back seat.

Mathews:    Okay.  Was there any other clothes he took off of you?

Conrad:     No sir.

Mathews:    What size are those shoes, do you know?

Conrad:     (unintelligible).

Mathews:    Those those black ones over there.

Conrad:     11 or 10 ½.

Mathews:    Can you look Investigator Hauser and see what size it says in em'?

Hauser:     According to this they are 11 ½.

Mathews:    Okay.  11 ½.

Conrad:     (unintelligible).

Hauser:     Is that about right?  Is that your foot size?

Conrad:     Yes sir, I can I can fit 10's and 11's and 9's.  But I haven't worn them shoes yet again.

Mathews:    You haven't what?

Conrad:     I haven't worn my shoes yet again.  Those are the ones I lent to Brian Yeoman.

Mathews:    Okay.

Hauser:     What did you have on?

Conrad:     My white Reebok's and some Chaps shorts and that white t-shirt, like jersey.

Hauser:     The ones that Detective Roberts recovered from you the night you were here in the emergency room?

5

Conrad:      Yes sir.  Beside that t-shirt when Brian took it off of me.

Mathews:     You got anything else.  Is there anything else you thought of since
             we've been gone that you want to tell us.

Conrad:      No sir.

Mathews:     Anything else.

Conrad:      I'd just like to know um' how can I get my mom to sign this paper?

Mathews:     Sign what paper sir?

Conrad:      For um' for a lawyer?

Mathews:     Oh,

Conrad:      Or something like that.

Mathews:     I have no earthly idea, that's the man with the Sheriff's Department
             sitting right there, Deputy Hines.

Conrad:      Um' hum'.

Mathews:     You'll need to direct that question to him when we leave and I'm
             sure he'll check with his supervisor and find out how that works, I
             don't have a clue how it works.    Terminate the interview at 5:55.
             Correction 4:55.


**Transcribed by Tonnya Walker**
**Transcribed on May 30, 2001**
**Reviewed by:_____**
**Reviewed on:_____**

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,              *
    PLAINTIFF,                *
                 *
VS.                           *    CASE NO. CC 2001-M-179, 180
                 *
ROBERT THOMAS CONRAD,         *
    DEFENDANT.                *

## STATE'S NOTICE OF COMPLIANCE

**COMES NOW**, the State of Alabama, by and through the undersigned

Assistant District Attorney, and files this notice of compliance to this Honorable

Court's Order dated July 11, 2001 (P29), as follows:

    1.    Attached please the Curriculum Vitae for Joseph M. Saloom,
           consisting of two (2) photostatic copies.

**RESPECTFULLY SUBMITTED**, this the _17_ day of September, 2001.



                                _Glenda Stout_
                                Glenda Stout (#PAR057)
                                Assistant District Attorney
                                P.O. Box 311102
                                Enterprise, Alabama   36331
                                (334) 347-1142

_(Stamp: SEP 2001 FILED J.M. Counts Court Clerk Coffee Co. AL)_

## CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing has been served upon the
following by placing a copy of same in the United States mail, properly addressed
and postage prepaid on this the _17_ day of _Sept._, 2001:

               Al Smith, Esquire
               P.O. Drawer 389
               Elba, Alabama  36323

                                  _Glenda Stout_
                                  Glenda Stout
                                Assistant District Attorney

# JOSEPH M. SALOOM
## PERSONAL RESUME

**PERSONAL INFORMATION:**
Name: Joseph Michael Saloom
Date of Birth: January 4, 1950
Phone: (334) 279-1924 (Home); (334) 242-2938 (Office)
Address: P.O. Box 240452, Montgomery, AL 36124-0452
e-mail: JMSaloom@cs.com

**CIVIC CLUBS:**
Montgomery Rotary Club; Assistant District Governor - District 6880 (2000-02); past member Enterprise Rotary Club; Past President Enterprise Rotary Club; Past member Enterprise Jaycees, Alabama Jaycees.

**OTHER ORGANIZATIONS:**
Captain USAF Auxiliary, Civil Air Patrol, Squadron Commander, Maxwell Senior Squadron, Legal Advisor, AL Wing; North-South Skirmish Association; Central Alabama Gun Club (treasurer).

**HONORS AND AWARDS:**
Named One of the Outstanding Young Men in America, 1982; Selected as a Rotary Group Study Exchange Team Member to India, 1985; Enterprise Rotary Club Rotarian of the Year, 1991; Marquis' Who's Who in the South and Southwest, 1990,1991,1992,1993,1994; Who's Who in Science and Engineering, 1992. Who's Who in American Colleges and Universities, 1999, representing Jones School of Law.

**PROFESSIONAL ORGANIZATIONS:**
•Southern Association of Forensic Scientists
•Alabama Peace Officer's Association
•Association of Firearms and Toolmarks Examiners (International) (Assistant Legal Advisor)
•Police Marksman Association
•National Rifle Association
•Alabama State Bar Association
•American Bar Association
•Alabama Trial Lawyers Association

**HOBBIES:**
Flying (licensed private pilot with multi-engine, instrument rating), Black powder shooting, Skirmishing, Hunting, Gunsmithing.

Joseph M. Saloom - Resume - Cont.

## EDUCATION:

SCHOOLS:

Enterprise High School;  Diploma 1968
Birmingham-Southern College;  B.S. 1972 (Chemistry)
Mississippi State University;  Masters Candidate 1973-74
Southwest Alabama Police Academy; 1980
Drug Enforcement Administration Forensic Chemist's School; 1980
North American School of Firearms; 1981-82
Jones School of Law;  1997-99; J.D.

SHORT COURSES/SEMINARS:

•Personnel Management
•International Symposium on Forensic Aspects of Controlled Substances - FBI Academy
•NRA Instructors School
•Gunpowder and Primer Residues - FBI Academy
•International Association of Firearms and Toolmarks Examiners - Educational Seminar, Houston Texas, 1990; Indianapolis, Indiana 1994, San Diego, California 1995, Annapolis, Maryland, 1997, Tampa, Florida, 1998, St. Louis, Missouri, 2000, Newport Beach, CA, 2001.
•Basic Programming
•Smith & Wesson Armorer's School (2)
•Glock Armorer's School
•Sig-Sauer Armorer's School
•Remington Shotgun Workshop
•Savage Rifle Armorer's School
•Beretta Armorer's School
•Heckler & Koch Armorer's School

## WORK EXPERIENCE:

1972-1974:
Teaching Assistance ship at Mississippi State University.

1974-1978:
Research assistant in toxicology at Medical Laboratory Associates, Birmingham, AL.

1979 to Present:
Forensic Scientist with the Alabama Department of Forensic Sciences.

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,     *
   PLAINTIFF,     *
             *
VS.           * CASE NO. CC 2001-M-179 & 180
             *
ROBERT THOMAS CONRAD,  *
   DEFENDANT.    *

## STATE'S MOTION FOR COURT TO RECONSIDER ORDER

**COMES NOW**, the State of Alabama, by and through the undersigned Assistant District Attorney, and respectfully requests this Honorable Court reconsider a portion of its order dated the 11th day of July, 2001, requiring the State provide Defense counsel a list of jurors selected/empanelled to serve on the grand jury which returned an indictment against the above defendant, including their names and addresses and such other information as the clerk may have obtained.    This request to reconsider is made pursuant to *State v. Matthews, 724 So. 2d 1140 (Ala. Crim. App. 1998) Ex parte STATE of Alabama* for which a copy is hereto attached.

**WHEREFORE**, premises considered, the State of Alabama prays this Honorable Court reconsider and vacate that portion of this Court's July 11, 2001, order.



270

**RESPECTFULLY SUBMITTED**, this the 6th day of September, 2001.

Glenda Stout (#PAR057)
Assistant District Attorney
Twelfth Judicial Circuit
P.O. Box 311102
Enterprise, Alabama  36331
(334) 347-1142

## CERTIFICATE OF SERVICE

I hereby certify that I have served the above-styled documents on the attorney of record for the defendant by hand delivery in open court on this the 6th day of September, 2001.

Glenda Stout
Assistant District Attorney

1    CIRCUIT COURT OF COFFEE COUNTY, ALABAMA

2    ENTERPRISE DIVISION

3

4    STATE OF ALABAMA,

5            Plaintiff,

6    vs.                          Case No.: CC 2001-M-179 & 180

7    ROBERT THOMAS CONRAD,

8            Defendant

9    _____

10   **STATE'S ARRANGEMENTS WITH DEFENDANT'S ATTORNEY TO VIDEO CRIME SCENE**

11       COMES NOW, the State of Alabama, by and through the undersigned

12   Assistant District Attorney, and files this notice of compliance with this

13   Honorable Court's Order regarding the video taping of the crime scene and

14   states that during the trial preparation of *State vs. Marcus King,* in which

15   Mr. Smith represented Mr. King, the undersigned spoke with Mr. Smith about

16   arrangements to video tape the crime scene in the above-styled cause.   Mr.

17   Smith agreed that we would postpone the video taping until the conclusion of

18   the *King* case.   The District Attorney's Office has possession of the keys to

19   the building and stands ready to make the building available to Attorney

20   Smith as soon as it can be arranged.

21       Respectfully submitted this the 6th day of September 2001.

22

23

24                                                        

25

COMPLIANCE - 1

1

_Glenda Stout_, Bar No. PAR 057
2       Assistant District attorney
        Twelfth Judicial Circuit District
3       Attorney's Office
        Post Office Box 311102
4       Enterprise, AL 36331-1102
        (334) 347-1142

5

6

7

8                          CERTIFICATE OF SERVICE

        I hereby certify that I have served the above-styled documents on the attorney of record
9  for the defendant by hand delivery in open court on this the 6th day of September 2001.

10

11      Glenda Stout, Assistant DA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PLAINTIFF, | ) | COFFEE COUNTY, AL |
| | ) | |
| VS. | ) | ENTERPRISE DIVISION |
| | ) | |
| ROBERT THOMAS CONRAD, | ) | |
| | ) | |
| DEFENDANT. | ) | CASE #s:  CC-2001-M-179 |
| | | and |
| | | CC-2001-M-180. |

## O R D E R

**This Court has reviewed** <u>State v. Roderick Matthews,</u> *724 So. 2d 1140 (Ala. Crim. App. 1998)* **and finds that the "STATE'S MOTION ...TO RECONSIDER..." is well taken.  Therefore, as to Defendant's** *"MOTION FOR ORDER PERMITTING DISCOVERY OF TRANSCRIPT, EXHIBITS, OTHER MEMORIALIZATION OF THE GRAND JURY PROCEEDINGS, AND LIST OF GRAND JURY MEMBERS, "* **the July 11, 2001 "ORDER" of this Court is amended to read as follows:**

### IT IS THEREFORE ORDERED:

*1).      That the state is to timely disclose to the Defense demographic data concerning the members of the grand jury which returned the indictment against this defendant including race, gender, and age. However, this information shall not include any reference to the names, addresses, or occupations, of the grand jury members.*

*2).      That all additional relief set forth in the remainder of the motion....not hereby granted or provided for... is hereby denied.*

*3).      That all prior orders inconsistent herewith are set aside.*

**Done this the 31ˢᵗ day of October, 2001.**

**GARY L. McALILEY, CIRCUIT JUDGE**
**TWELFTH JUDICIAL CIRCUIT**
**STATE OF ALABAMA**

NOV 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,          *
    PLAINTIFF,          *
                *
VS.          *          CASE NO. CC 01-M-179, 18?
                *
ROBERT THOMAS CONRAD,          *
    DEFENDANT.          *

## STATE'S 1st SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR DISCOVERY

**COMES NOW** the State of Alabama, by and through the undersigned Assigned District Attorney, and pursuant to Rule 16.3 A.R. Crim. P. and files this supplemental response thereto.

(a) Attached please find State's Forensic documents with an Itemized Index consisting of four (4) photostatic copies.

(b) Attached please find State's Law Enforcement documents with an Itemized Index consisting of one hundred fifty-three (153) photostatic copies.

(c) Attached please find transcribed statements with an Itemized Index consisting of two hundred ninety-one (291) photostatic copies. (Although Index lists statements by given all three (3) defendants, same has been provided in previous discovery on September 5, 2001, to opposing counsel and is therefore not included in this response.)

(d) Attached please find a set seventy-six (76) photographs taken by the Enterprise Police Department.

1

(e) Attached please find a CD ROM of photographs taken by the Enterprise Police Department.

(f) Attached please find nineteen (19) micro-cassette tapes of statements given by witnesses and defendants.

The above referenced copies totaling four hundred forty-eight (448) photostatic copies at $.10 a copy; nineteen (19) micro-cassette tapes at $1.00 a tape; one (1) CD ROM Disk at $5.00 each; seventy-six (76) photographs at $14.82 for the set;  will be provided to opposing counsel upon receipt of $83.62.    Counsel for Defendant may review said materials by contacting the undersigned Assistant District Attorney and making arrangements to review the documents. Payment for copies should be made payable to:

<div align="center">

Mark E. Fuller, District Attorney
P.  O. Box 1102
Enterprise, Alabama  36331

</div>

**DONE** this   5th day of   Nov. _____, 2001.

Respectfully submitted,

GLENDA STOUT (#PAR057)
ASSISTANT DISTRICT ATTORNEY
Twelfth Judicial Circuit of Alabama
P. O. Box 311102
Enterprise, Alabama  36331
(334) 347-1142

<div align="center">2</div>

276

*did not summarize discovery*

## CERTIFICATE OF SERVICE

I, Glenda Stout, Assistant District Attorney, hereby certify that the foregoing has been served upon the following counsel of record via _Dawn L. DeVane_, _Dawn L. DeVane_, employee for Attorney Al Smith, at _2:44_ p.m. on the _2nd_ day of _November_, 2001:

_Glenda Stout_

GLENDA STOUT (#PAR057)
ASSISTANT DISTRICT ATTORNEY

| # | DESCRIPTION OF DOCUMENT | DATE | TIME |
|---|---|---|---|
| | **MISCELLANEOUS** | | |
| L1A | Blockbuster Video - Customer History Report for the account of Sharon D. Joseph | 06/01/01 | 0930 |
| L2A | Pawn Express Pawns and Buys Listings for 36379 to 36573 | | |
| L3A | Powertel Phone Records for Sharron Josett | 06/04/01 | |
| L4A | Press Release | 05/23/01 | |
| L5A | Press Release | 05/24/01 | |
| L6A | Press Release | 05/25/01 | |
| | **CRIME SCENE INFORMATION** | | |
| L7A | Crime Scene List | 05/23/01 | 1340 |
| L8A | Crime Scene List | 05/23/01 | 0001 |
| L9A | Draft Drawing of Crime Scene | 05/23/01 | 1450 |
| L10A | Rough Sketch - Crime Scene | | |
| | **SEARCH WARRANT CONSENT TO SEARCH** | | |
| L11A | Consent to Search, Fay Smith 1985 Ford LTD | 05/23/01 | 1600 |
| L12A | Affidavit, Search Warrant and Return for 1985 Ford LTD, Fay Smith | 05/24/01 | 1219 |
| L13A | Affidavit, Search Warrant and Return Brian Smith's Apartment | 05/24/01 | 1219 |
| L14A | Affidavit, Search Warrant and Return for 117 Green Tree Apartments | 05/24/01 | 1649 |
| L15A | Affidavit, Search Warrant and Return for 117 Green Tree Apartments | 05/24/01 | 1219 |
| L16A | Affidavit, Search Warrant and Return for Medical Center Enterprise | 05/25/01 | 1308 |

| # | DESCRIPTION OF DOCUMENT | DATE | TIME |
|---|---|---|---|
| L17A | Permission to Search Anthony Gordon Williams | 05/25/01 | 0820 |
| L18A | Consent to Search Brian Yeoman | 05/25/01 | 1630 |
| L19A | Consent to Search Brian Smith | 05/25/01 | 1650 |
| | **DEFENDANT'S STATEMENTS** | | |
| L20A | Handwritten statement of Stanley Roberts | 05/26/01 | |
| L21A | Handwritten letter of Brian Yeoman | | |
| L22A | Handwritten letter of Brian Smith | | |
| | **EPD-PROPERTY RECEIPTS** | | |
| L23A | Medical Center Enterprise - Release of Foreign Objects; Receiving Officer Buford Roberts | | |
| L24A | Property Receipt - Buford Roberts 117 Green Tree Apartments | 05/24/01 | 0237 |
| L25A | Property Receipt - Buford Roberts Dumpster located across from 228 Greentree Apartments | 05/23/01 | |
| L26A | Property Receipt Medical Center Enterprise | 05/23/01 | 1500 |
| L27A | Property Receipt - Dale Grimes Medical Center Enterprise | 05/23/01 | 1515 |
| L28A | Property Receipt - Rick Hauser Crime Scene, Photographs | 05/23/01 | 1300 |
| L29A | Property Receipt - Rick Hauser Toy Store, CR 711, Enterprise, Al. | 05/23/01 | 1300 |
| L30A | Property Receipt - Rick Hauser Toy Store, 643 Co Rd. 711 | 05/23/01 | 1422 |
| L31A | Property Receipt - W.R. Ammons Toy Store, 643 Co. Rd. 711 | 05/23/01 | 2000 |

| # | DESCRIPTION OF DOCUMENTS | DATE | TIME |
|---|---|---|---|
| L32A | Property Receipt - W.R. Ammons Toy Store, 643 Co Rd. 711 | 05/23/01 | 1330 |
| L33A | Property Receipt - Rick Hauser Toy Store, 643 Co Rd. 711 | 05/23/01 | 1300 |
| L34A | Property Receipt - Tara Purvis Toy Store, 643 Co. Rd. 711 | 05/24/01 | 1202 |
| L35A | Property Receipt - Darrell Griswold Toy Store, 643 Co. Rd. 711 | 05/24/01 | 1530 |
| L36A | Property Receipt - Darrell Griswold 117 Green Tree Apartments | 05/24/01 | 1730 |
| L37A | Property Receipt - W.R. Ammons Toy Store, 643 Co. Rd. 711 | 05/24/01 | 1034 |
| L38A | CCSO - Property Receipt - Patrick Norris Coffee County Sheriff's Department | 05/25/01 | 1100 |
| L39A | Property Receipt - Coffee County Sheriff's Department | 05/25/01 | |
| L40A | Property Receipt - 500 Boll Weevil Cir. Dwight Holley | 05/25/01 | 0910 |
| L41A | Property Receipt - Rick Hauser Medical Center Enterprise | 05/25/01 | 1330 |
| L42A | Property Receipt - Jeff Spence Coffee County Jail | 05/26/01 | 1602 |
| L43A | Property Receipt - Darrell Griswold Cannon 275, Enterprise, Al | 05/29/01 | 1000 |
| L44A | Property Receipt - Rick Hauser Toy Store, 643 Co. Rd. 711 | 05/31/01 | 1300 |
| L45A | Property Receipt - Rick Hauser Toy Store, 643 Co. Rd. 711 | 05/31/01 | 1400 |
| L46A | Property Receipt - W.R. Ammons Toy Store, 643 Co. Rd. 711 | 05/31/01 | 1500 |

| # | DESCRIPTION OF DOCUMENTS | DATE | TIME |
|---|---|---|---|
| L47A | CCSO - Property Receipt - Donnie Farris; Coffee County Sheriff's Department | 06/04/01 | 1334 |
| L48A | Property Receipt - W.R. Ammons Toy Store, 643 Co. Rd. 711 | 06/18/01 | 1200 |
| L49A | Property Receipt - Jeff Spence Various | Various | |
| | **DEPARTMENT OF PUBLIC SAFETY** | | |
| L50A | Letter from Shannon Fitzgerald to Rick Hauser re: evidence | 07/18/01 | |
| L51A | Fingerprint Examination Request Rick Hauser | 08/29/01 | 1025 |
| L52A | Fingerprint Examination Request Rick Hauser | 05/24/01 | 0830 |
| L53A | Fingerprint Examination Request Rick Hauser | 05/29/01 | 1025 |
| L54A | Fingerprint Examination Request Rick Hauser | 06/12/01 | 1025 |
| L55A | Fingerprint Examination Request Rick Hauser | 06/12/01 | 1025 |
| L56A | Fingerprint Examination Request Rick Hauser | 08/29/01 | 1025 |
| L57A | Fingerprint Examination Request Rick Hauser | 05/29/01 | 1025 |
| L58A | Fingerprint Examination Request Rick Hauser | 05/24/01 | 0830 |
| | **DFS - REPORTS** | | |
| L59A | Letter to Tim Whitehead from Emily W. Ward, Examination of Jelaine Dennis | 05/29/01 | |
| L60A | Evidence Receipt - Pair of Glasses Officer Rick Hausser | 07/13/01 | 1325 |

| # | DESCRIPTION OF DOCUMENT | DATE | TIME |
|---|---|---|---|
| L61A | Evidence Receipt - Shoes, Shirt, Etc. Officer Jeff Spence | 06/08/01 | 1320 |
| L62A | Evidence Receipt - Blood Collection Officer Rick Hauser | 05/29/01 | 1045 |
| L63A | Evidence Receipt - Revolver, Bullet Officer Rick Hauser | 05/24/01 | 0815 |
| L64A | Evidence Submission Form Officer Jeff Spence | 07/13/01 | |
| L65A | Evidence Submission Form Officer Jeff Spence | 05/23/01 | |
| L66A | Evidence Submission Form Officer Rick Hauser | 05/24/01 | |
| L67A | Evidence Submission Form Officer Rick Hauser | 05/25/01 | |
| L68A | Evidence Submission Form Officer Rick Hauser | 05/25/01 | |
| L69A | Evidence Submission Form Officer Rick Hauser | 05/25/01 | |

28

| # | DESCRIPTION OF DOCUMENT | DATE | TIME |
|---|---|---|---|
| | | | |
| L1 | Additional Arrest Narrative Continued- Officer Jeff Spence Dr. Ward - for Jelaine Dennis | 05/25/01 | |
| L2 | Greentree Apartments Application for Beatrice Smedley | | |
| L3 | Letter of Administration - Estate of Jelaine Dennis for Collins Bowman | 06/06/01 | |
| L4 | Sgt. Bullock's Investigation Report/EPD RE: Telephone call to Medical Center | 05/23/01 | |
| L5 | Interoffice Memo to Jeff Spence from Officer Mattew Key/RE: Observing Possible Robbery Suspects | 05/23/01 | |
| L6 | Alabama Uniform Arrest Report for Robert T. Conrad/ Arresting Officers - Moates & Spence | 05/24/01 | |
| L7 | Alabama Uniform Incident/Offense Report Supplement for RE: Bryant Yeoman; Reporting Officer Buddy Ammons | 05/28/01 | |
| L8 | Alabama Uniform Incident/Offense Report Supplement for Bryan Yeoman; Reporting Officer Buddy Ammons | 05/28/01 | |
| L9 | Alabama Uniform Incident/Offense Report Supplement for Robert Conrad; Reporting Officer Tara Purvis | 05/23/01 | |
| L10 | Alabama Uniform Incident/Offense Report Supplement for Brian Smith; Reporting Officer Chris Hurley | 05/29/01 | |
| L11 | Alabama Uniform Incident/Offense Report; Death of Jelaine Dennis; Reporting Officer Lennis Darby | 05/23/01 | 1700 |
| L12 | Alabama Uniform Incident/Offense Report; Reporting Officer Jeff Spence | 05/25/01 | |
| L13 | Interoffice Memorandum from Corey Mason to Sgt. Spence | 05/25/01 | |
| | | | |

| # | DESCRIPTION OF DOCUMENT | DATE | TIME |
|---|---|---|---|
| L14 | Alabama Uniform Incident/Offense Report Supplement; Reporting Officer Rick Hauser | 05/23/01 | 2400 |
| L15 | Alabama Uniform Incident/Offense Report Supplement; Reporting Officer Rick Hauser | 05/24/01 | 0900 |
| L16 | Alabama Uniform Incident/Offense Report Supplement; Reporting Officer Rick Hauser | 05/25/01 | 1000 |
| L17 | Alabama Uniform Incident/Offense Report Supplement; Reporting Officer Lennis Darby | 05/23/01 | 1700 |
| L18 | Complaint & Warrant for Bryan James Smith | 05/24/01 | |
| L19 | Arrest Narrative Continued for Bryan James Smith; Officer Spence | 05/23/01 | |
| L20 | Alabama Uniform Arrest Report for Bryan James Smith; Arresting Officer Jeff Spence | 05/24/01 | 0 |
| L21 | Complaint & Warrant for Bryan Glenn Yeoman | 05/24/01 | |
| L22 | Arrest Narrative Continued for Bryan Glenn Yeoman; Officer Spence | 05/23/01 | |
| L23 | Alabama Uniform Arrest Report for Bryan Glenn Yeoman; Arresting Officer Jeff Spence | 05/24/01 | 0 |
| L24 | Complaint & Warrant for Robert Thomas Conrad | 05/24/01 | |
| L25 | Alabama Uniform Arrest Report for Robert Thomas Conrad; Arresting Officers Moates & Spence | 05/24/01 | |
| L26 | Alabama Driver's License of Jelaine Bowman Dennis | | |
| L27 | Business Card for "The Adult Toy Store" | | |

28

| # | DESCRIPTION OF DOCUMENT | DATE | TIME |
|---|---|---|---|
| | | | |
| L28 | Alabama Uniform Incident/Offense Report; Reportin Officer Lennis Darby | 05/23/01 | 1700 |

| | DESCRIPTION OF DOCUMENT | DATE | TIME |
|---|---|---|---|
| F1 | Preliminary Death Report of E. Jelaine Dennis, Emily W. Ward, M.D. | 05/29/01 | |
| F2 | Curriculum Vitae - Joseph Saloom | 09/17/01 | |

| WITNESS GIVING STATEMENT | INDEX # |
|---|---|
| Interview of William H. Ammons | S/A1 |
| Witness Statement of Richard Bray | S/B1 |
| Statement of Edward Lee Brown | S/B2 |
| Statement of Eric Bruce | S/B3 |
| Statement of John Howard Bush | S/B4 |
| Statement of Tia Cade | S/C4 |
| Statement of Constance Conrad | S/C5 |
| Statement of Robert Conrad (5-23-01) | S/C1 |
| Statement of Robert Conrad (5-25-01) | S/C2 |
| Statement of Robert Conrad (5-25-01) | S/C3 |
| Statement of Krysta Dillard | S/D1 |
| Enterprise Dispatch 911 Calls | S/E1 |
| Statement of Gregory Preston Grant | S/G1 |
| EPD Statement of Robert R. Grimes | S/G2 |
| Statement of Robert Ray Grimes | S/G3 |
| Statement of Robert Ray Grimes | S/G4 |
| Statement of Patsy Lisa Harrison | S/H1 |
| Statement Form of Travis Hornsby | S/H2 |
| Statement Sheet of Dennis Travis Jackson | S/J1 |
| Statement of Kyla Shaye Jones | S/J2 |
| Statement of Sharon Denise Joseph | S/J3 |
| Statement of Sharon Denise Joseph | S/J4 |
| Statement of Linda Knighton | S/K1 |
| Voluntary Statement Form of Eric Kormylo | S/K2 |

| | |
|---|---|
| Statement of Eric Kormylo | S/K3 |
| Interview Sheet of Elke Lancaster | S/L1 |
| Statement of Kenneth Miller | S/M1 |
| Interview Sheet of Dennis Muelleisen | S/M2 |
| CCSO Statement Form of Nora McCray | S/MC1 |
| Statement of Samuel L. McIrvin | S/MC2 |
| Handwritten Statement of Chasitie Nelson | S/N1 |
| Interview Sheet of Ashley Diane Ramsey | S/R1 |
| Statement of Gabriel Sierra | S/S3 |
| Statement of Wayne C. Sigourney | S/S4 |
| Handwritten Statement of Aaron L. Smith | S/S5 |
| Interview Sheet of Aaron L. Smith | S/S6 |
| Voluntary Statement Form of Donald Smith | S/S7 |
| Statement of Donald Smith | S/S8 |
| Statement of Bryan Smith (5-24-01) | S/S1 |
| Statement of Bryan Smith (5-25-01) | S/S2 |
| Handwritten Statement of Michael Stanley, Jr. | S/S9 |
| Statement of Robert William Teague | S/T1 |
| Statement of Bryan Yeoman (5-23-01) | S/Y1 |
| Statement of Bryan Yeoman  (5-25-01) | S/Y2 |
| | |

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,                    *
                                     *
        PLAINTIFF,                   *
                                     *
VS.                                  *    CASE NO.  CC 2001-179, 180
                                     *
ROBERT THOMAS CONRAD,                *
                                     *
        DEFENDANT.                   *

### STATE'S MOTION FOR DISCOVERY

**COMES NOW** the State of Alabama by and through the undersigned Assistant

District Attorney and pursuant to Rule 16.2 of the Alabama Rules of Criminal Procedure,

does hereby make the following request for discovery in the matter pending in the above-

referenced cause:

1.    **The Defendant is requested to comply with all aspects of Rule 16.2 as follows:**

      **Rule 16.2.  Discovery by the State/Municipality**

      (a) Documents and tangible objects.  Upon written request of the
          state/municipality, the defendant shall, within fourteen (14) days after
          the request has been filed in court as required by Rule 16.4(c), or
          within such shorter or longer period as may be ordered by the court, on
          motion, for good cause shown, permit the state/municipality to
          analyze, inspect, and copy or photocopy books, papers, documents,
          photographs, tangible objects, buildings, places, or portions of any of
          these things, which are within the possession, custody, or control of the
          defendant and which the defendant intends to introduce in evidence at
          the trial.

      (b) Personal physical evidence.  Upon motion of the state/municipality and
          solely in connection with the particular offense with which the
          defendant is charged, the court shall order the defendant to:

          (1) Appear in a line-up
          (2) Speak for identification by witnesses;

(3) Be fingerprinted, palm-printed, foot printed, or voice-printed.
(4) Pose for photographs not involving reenactment of an event;
(5) Try on clothing;
(6) Permit the taking of samples of defendant's hair, blood, saliva, urine, or other specified materials which involve no unreasonable intrusions into the body;
(7) **Specifically provide defendant's handwriting exemplars;**
(8) Submit to a reasonable physical inspection or medical examination of defendant's body, but such inspection or examination will not include a psychiatric or psychological examination, unless such psychiatric or psychological examination is authorized under provisions of Rule 11.2(a)(1) and (2), Rule 25.4, or Rule 26.4.

The defendant shall be entitled to the presence of counsel at the taking of such evidence. This section shall supplement and not limit any other procedures established by law.

Reports of examinations and tests, upon written request of the state/municipality, the defendant shall, within fourteen (14) days after the request has been filed in court as required by Rule 16.4(c), or within such shorter or longer periods as may be ordered by the court, on motion, for good cause shown, permit the state/municipality to inspect and to copy any results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case, which are within the possession or control of the defendant and which the defendant intends to introduce in evidence at the trial or which were prepared by a witness whom the defendant intends to call at the trial, if the results or reports related to the witness' testimony.

**RESPECTFULLY SUBMITTED** this the _18_ day of _Oct_ , 2001.


GLENDA STOUT (#PAR057)
Assistant District Attorney
P.O. Box 311102
Enterprise, Alabama 36331
(334) 347-1142

## CERTIFICATE OF SERVICE

I, Glenda Stout, Assistant District Attorney, hereby certify that the foregoing has been served upon the following counsel of record by placing a copy of same in the United States Mail, first class postage prepaid, on this the _18_ day of _Oct_____, 2001.

Al Smith, Esquire  (Counsel for Defendant)
P.O. Drawer 389
Elba, Alabama  36323

Glenda Stout (#PAR057)
Assistant District Attorney

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,
Plaintiff,

vs.

ROBERT THOMAS CONRAD,
Defendant.

CASE NO. CC 01-M-179, 180

## STATE'S 2nd SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR DISCOVERY

**COMES NOW** the State of Alabama, by and through the undersigned Assigned District Attorney, and pursuant to Rule 16.3 A.R. Crim. P. and files this supplemental response thereto.

1.   Attached please find the medical records of the defendant, Robert Conrad, from Medical Center Enterprise, consisting of thirty-four (34) photostatic copies.

**DONE** this 6th day of November, 2001.

GLENDA STOUT (#PAR057)
ASSISTANT DISTRICT ATTORNEY
P. O. Box 311102
Enterprise, Alabama 36331
(334) 347-1142

### CERTIFICATE OF SERVICE

I, Glenda Stout, Assistant District Attorney, hereby certify that the foregoing has been served upon Al Smith, Esquire, P.O. Drawer 389, Elba, Alabama 36323 by placing a copy of same in the United States Mail, first class postage prepaid, on this the 6th day of November, 2001:

GLENDA STOUT (#PAR057)
ASSISTANT DISTRICT ATTORNEY

1

P41

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

NOV 2001
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

STATE OF ALABAMA ) 
)
v. ) Case No. CC-2001-M-179 & 180
)
ROBERT THOMAS CONRAD )
)

---

### DEFENDANT'S SECOND MOTION TO SUPPRESS EVIDENCE SEIZED AFTER AN ILLEGAL ARREST AND/OR SEARCH

---

ROBERT THOMAS CONRAD, asserting his rights as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama State Constitution and state law, moves to suppress any evidence and statements obtained pursuant to an unreasonable search and seizure by government officials or their agents. In support thereof ROBERT THOMAS CONRAD through counsel states the following:

1. On May 23, 2001, a District Attorney's Subpoena was issued to: "Keeper of Records; Enterprise Medical Center, Enterprise, AL; any and all medical records, lab reports, blood, hair, saliva and bodily fluids on Robert Conrad who was treated at this facility on May 23, 2001." The Document is purportedly signed, "Mark Fuller, District Attorney." It was executed by Dwight Holley on May 23, 2001. The document lists "Special Instructions In lieu of personal appearance, certified copies may be released to the serving officer."

2. Robert Conrad the person whose records were sought is the defendant in the above styled cause.

Page 1 of 4

3. The medical records, a copy of which the undersigned counsel received on November 13, 2001, indicate that the Defendant, Robert Conrad underwent surgery at Medical Center Enterprise, where, according to the records, two bullets were removed from him and at least one given to the police.

4. No search warrant is known to have been issued, indeed, no affidavit for a search warrant nor return on search warrant has been provided to counsel by the State and none is believed to exist.

5. The State apparently relied on a DA Subpoena to obtain the information and evidence sought.

6. The law of the State of Alabama is **very clear** that the District Attorney **does not** have the authority to obtain documents and tangible evidence by D. A. Subpoena. "The district attorney had no authority to issue the subpoenas in this case. It is clear from the subpoenas, which ordered the petitioners to "deliver the following records to the District Attorney's Office," that the subpoenas were issued strictly for the purposes of obtaining documents. **The law does not sanction such action**. *Brown*, 686 So. 2d 862, 863 (Ala.Cr.App. 1980). Ex parte Fitch, 715 So. 2dn 873, 875 (Ala.Cr.App. 1997). (Emphasis added and copy of opinion attached). The District Attorney of Coffee County knows this to be the law and knew it to be the law as early as January, 2001. (See attached pleading copy citing *Fitch*, filed in State v. King, January 31, 2001, and **ignored** by the District Attorney).

7. The District Attorney obtained evidence to include, but not inclusive, a bullet or bullets removed from the body of the Defendant, which, on information and belief were matched to the pistol of the victim, (Counsel states "on information and belief" as the District Attorney has not provided defense counsel even a verbal report of the ballistics report that was obtained by the District

Attorney prior to the Defendant's indictment in spite of the Court's directing such be done), blood alcohol analysis, drug analysis, statements to the Defendant to medical personnel, and other information, all obtained by the illegal use of the D. A. Subpoena.

8. The Defendant did not consent to the release of **any** information, records or objects to the District Attorney or his agents. The information, records and objects, to include the bullets and analysis are the product of an illegal seizure by the District Attorney and his agents. All information which flowed from this illegal seizure are "fruits of the poison tree, and are due to be **SUPPRESSED** and the indictment and charges which resulted from said illegal search are due to be **DISMISSED**.

For the foregoing reasons, ROBERT THOMAS CONRAD moves this Court to vindicate his federal and state rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article One, Section Five of the Alabama State Constitution and relevant Alabama state law, by suppressing the fruits of the above-described search and seizure. In the alternative ROBERT THOMAS CONRAD moves this Court to hold a full evidentiary hearing on this matter before the trial of this case, and grant this motion for the above-stated reasons and any others that may appear to the Court during this hearing.

ROBERT THOMAS CONRAD reserves the right to supplement this motion to suppress as evidence is revealed to the Defendant.

Respectfully submitted this the November 13, 2001.

Smith & Carr, LLC.
Sydney Albert (Al) Smith    SMI098

P. O. Drawer 389
Elba, Al 36323
Phone:     334-897-3658
Fax:       334-897-8633

Gary D. Bradshaw    BRA074
Attorney at Law
P. O. Box 311412
Enterprise, AL 36331-1412

### CERTIFICATE OF SERVICE

    I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

Al Smith             Date

11/13/01

Page 4 of 4

1284

STATE OF ALABAMA

OFFICE OF THE DISTRICT ATTORNEY

TWELFTH JUDICIAL CIRCUIT

COUNTY OF ___COFFEE___

DIVISION OF ___ENTERPRISE___

719-2055

# DISTRICT ATTORNEY'S SUBPOENA

TO ANY LAWFUL OFFICER OF THE STATE OF ALABAMA;

PURSUANT TO § 12-17-184 (18) AND § 12-21-245, CODE OF ALABAMA,

YOU ARE COMMANDED TO SUMMON:

KEEPER OF RECORDS; ENTERPRISE MEDICAL CENTER, ENTERPRISE, AL;   ANY AND ALL MEDICAL RECORDS,

LAB REPORTS, BLOOD, HAIR, SALIVA AND BODILY FLUIDS ON ROBERT CONRAD WHO WAS TREATED AT THIS

FACILITY ON MAY 23rd, 2001.

PERSONALLY TO BE AND APPEAR BEFORE ___District Attorney, Mark E. Fuller___

_____ AT

98 N. EDWARDS STREET, ENTERPRISE, AL _____ ON

THE_____DAY OF ___INSTANTA___ , 19____, AT_____O'CLOCK

_____. M., AND UNTIL DULY DISCHARGED BY DUE PROCESS OF LAW.

WITNESS MY HAND, THIS___23rd___DAY OF ___MAY___ , 19__BY 2001

```
┌─      Special Instructions      ┐

   IN LIEU OF PERSONAL APPEARANCE, CERTIFIED
   COPIES MAY BE RELEASED TO THE SERVING
   OFFICER.



└─                               ┘
```

MARK E. FULLER
DISTRICT ATTORNEY
TWELFTH JUDICIAL CIRCUIT

BY _____
      DISTRICT ATTORNEY

A COPY OF THIS SUBPOENA WAS SERVED TO THE PERSON NAMED ABOVE BY

_____ON_____
                                              (Date)

_____
                Signature of Server

715 So.2d 873, Ex parte Fitch, (Ala.Crim.App. 1997)                                                    Page 1

*873  715 So.2d 873

Court of Criminal Appeals of Alabama.

Ex parte Jerry T. FITCH, Sr., et al.
(In re STATE of Alabama
v.
Jerry T. FITCH, Sr.; Jerry T. Fitch, Jr.;
and Harry G. Edwards).

CR-96-2413.
Nov. 12, 1997.

District attorney's office issued subpoenas duces tecum directing defendants, who were indicted for violating competitive bid law, using their offices for personal financial gain and theft of property, to produce bank records. Defendants filed motions to quash subpoenas, which were denied by the Pickens Circuit Court, Nos. CC-97-155 to CC-97-157 and CC-97-164, James W. Moore, Jr., J. Defendants filed petition for writ of mandamus. The Court of Criminal Appeals, Long, P.J., held that: (1) mandamus was appropriate method by which to review denial of motions to quash, and (2) district attorney had no authority to issue the subpoenas.

Petition granted.

West Headnotes

[1] Mandamus ☞61

250 ----
  250II Subjects and Purposes of Relief
    250II(A) Acts and Proceedings of Courts, Judges, and Judicial Officers
    250k61 Criminal Prosecutions.

Mandamus was appropriate method by which to review circuit court judge's denial of motion to quash subpoenas duces tecum issued by district attorney's office directing defendants to produce bank records.

[2] Witnesses ☞16

410 ----
  410I In General
    410k16 Subpoena Duces Tecum.

District attorney's office had no authority to issue subpoenas duces tecum directing defendants in criminal action to produce bank records; despite state's claim that each subpoena had been issued for a codefendant's case, cases had been consolidated so that each was a party to the criminal action. Code 1975, § 12-17-184(18); Rules Crim.Proc., Rules 17.1(c)(2), 17.3.

[3] Mandamus ☞61

250 ----
  250II Subjects and Purposes of Relief
    250II(A) Acts and Proceedings of Courts, Judges, and Judicial Officers
    250k61 Criminal Prosecutions.

Defendants were not entitled, on Fifth Amendment grounds, to writ of mandamus directing judge to quash subpoenas duces tecum issued by district attorney's office seeking production of bank records, where they made no showing that documents would incriminate them. U.S.C.A. Const.Amend. 5.

[4] Mandamus ☞1

250 ----
  250I Nature and Grounds in General
    250k1 Nature and Scope of Remedy in General.

[See headnote text below]

[4] Mandamus ☞168(2)

250 ----
  250III Jurisdiction, Proceedings, and Relief
    250k168 Evidence
    250k168(2) Presumptions and Burden of Proof.

Mandamus is drastic and extraordinary remedy and burden of proof is on petitioner.

William J. Baxley and David McKnight, Birmingham; and James S. Ward, Birmingham, for petitioners.

*874  Bill Pryor, atty. gen., and Hense R. Ellis II, asst. atty. gen., for respondent.

LONG, Presiding Judge.

The petitioners, Jerry T. Fitch, Sr., Jerry T. Fitch, Jr., and Harry G. Edwards, filed this petition for a

Copyright (c) West Group 2001 No claim to original U.S. Govt. works

715 So.2d 873, Ex parte Fitch, (Ala.Crim.App. 1997)                                  Page 2

writ of mandamus directing Judge James Moore, circuit judge for the twenty-fourth judicial circuit, to quash the subpoenas duces tecum issued to them by the district attorney's office for Pickens County. (FN1)

The petitioners were indicted for violating the competitive bid law, using their offices for personal financial gain, and theft of property. Petitioner Fitch, Sr., was a county commissioner for Pickens County and petitioner Edwards was employed by the County as a road foreman. The district attorney for Pickens County issued subpoenas duces tecum for the three petitioners, directing them to deliver their personal bank records to the district attorney's office. The petitioners moved to quash the subpoenas. After a hearing, Fitch, Sr., and Edward's motions were denied and the court directed the petitioners to produce their bank records within 14 days. No ruling was made on Fitch, Jr.'s motion. The trial is scheduled to begin on November 17, 1997. This Court granted a stay on the production of the bank records until we issued a ruling on this mandamus. (FN2)

[1] Initially, we must determine whether mandamus is the appropriate method by which to review Judge Moore's denial of the motions to quash the subpoenas. As the Alabama Supreme Court stated in *Ex parte Thackston,* 275 Ala. 424, 426, 155 So.2d 526, 528 (1963):

"The first question presented for our consideration is whether or not mandamus is the appropriate remedy in the instant case. We are of the opinion that it is. It is true, as respondent insists, that if the matter complained of can ultimately be presented to the appellate court through the medium of appeal from a final decree, mandamus will not ordinarily be granted. *Ex parte Little,* 266 Ala. 161, 95 So.2d 269; *Ex parte Jones,* 246 Ala. 433, 20 So.2d 859; *Koonce v. Arnold,* 244 Ala. 513, 14 So.2d 512. *However, this court has reviewed the issuance of a* subpoena duces tecum, *both as to parties and non-parties, or witnesses, on a petition for mandamus. Ex parte Anniston Personal Loans, Inc.,* 266 Ala. 356, 96 So.2d 627; *Ex parte Hart,* 240 Ala. 642, 200 So. 783.*"

(Emphasis added.)

Judge Moore, in his order denying the motions,

stated:

"It is undisputed that the banking records exist (the district attorney has obtained copies of the records from the bank and requests the originals from defendants as a portion of the bank records are illegible) and it is further undisputed that defendants have possession of the requested documents. The Fifth Amendment grants immunity from compelled *testimonial* self-incrimination. These documents are clearly 'voluntarily prepared personal papers' and the defendants were not compelled to issue these checks but produced them upon evaluation of a personal need to engage in financial transactions. Therefore, neither the contents of the banking records nor the act of producing the checks constitute self-compelled incrimination warranting the protection of the Fifth Amendment, see *In Re: Grand Jury Subpoena Duces Tecum,* 782 F.Supp. 1518 (1992)."

(Emphasis in original.)

I.

[2] The petitioners initially contend that the trial court abused its discretion in not quashing the subpoenas because there is no statute or rule in Alabama that allows a district attorney to issue a subpoena duces tecum to a defendant in a criminal case.

"The authority of a district attorney to issue subpoenas is found in § 12-17- *875  184(18), Code of Alabama 1975, which provides:

" 'It is the duty of every district attorney and assistant district attorney, within the circuit, county or other territory for which he is elected or appointed:

" '....

" '(18) To, at any time the grand jury is not in session, issue subpoenas to persons to come before them, and they shall have power to administer oaths to said persons and examine them as to any violation of the criminal laws of the state.'

"Also, Rule 17.1(c)(2), A.R.Crim.P., provides:

Copyright (c) West Group 2001 No claim to original U.S. Govt. works

715 So.2d 873, Ex parte Fitch, (Ala.Crim.App. 1997)                    Page 3

" 'At any time the grand jury is not in session, the district attorney shall issue subpoenas for any witnesses the district attorney may require to come before the district attorney for examination under oath administered by the district attorney as to any violations of the laws of the State of Alabama; if the matter being investigated is not before the grand jury, the district attorney shall have authority to issue such subpoenas when the grand jury is in session.'

"*See also Ex parte Clark,* 630 So.2d 493, 499-500 (Ala.Crim.App.1993). It does not appear that the district attorney had the power to issue the subpoena in this case under either § 12-17-184(18) or under Rule 17.1, because neither expert who was subpoenaed was being summoned to come before the district attorney for examination. *Compare* Ala.Code, § 12-21-245 ('The district attorney also has authority to issue subpoenas for witnesses *on the part of the state,* to appear either before the grand jury or before any court in his circuit') (emphasis added)."

*Brown v. State,* 686 So.2d 385, 405-06 (Ala.Cr.App.1995), aff'd, 686 So.2d 409 (Ala.1996).

Rule 17.3, Ala.R.Crim.P., governs the issuance of subpoenas duces tecum. (FN3) It is clear from the wording of Rule 17.3 that that rule relates to the issuance of a subpoenas duces tecum to nonparties. Rule 17.3(b) states in part: "Upon their production, the court may permit the *parties* and their attorneys to inspect them, or portions thereof." (Emphasis added.) Cf. *Thackston,* 275 Ala. at 427, 155 So.2d at 529, construing Title 7, § 426, Code of Alabama 1940, which dealt with the issuance of subpoenas duces tecum for the production of documents, and holding that it applied to "persons not parties to the action."

The state contends in its answer that the subpoenas are duly authorized by Rules 17.1 and 17.3, Ala.R.Crim.P., because they do not involve "parties." They contend that each subpoena clearly shows that it was issued for a codefendant's case. However, the petitioners assert, and exhibits support their assertion, that the cases involving the three petitioners have been consolidated for purposes of trial. Clearly, each is now a party to the criminal action. The state's assertion on this ground has no merit.

The district attorney had no authority to issue the subpoenas in this case. It is clear from the subpoenas, which ordered the petitioners to "deliver the following records to the District Attorney's Office," that the subpoenas were issued strictly for purposes of obtaining the documents. The law does not sanction such action. *Brown,* 686 So.2d at 406. In fact, the trial court stated in its order denying the motion to quash that "the district attorney has obtained copies of the records from the bank and requests the originals from defendants as a portion of the bank records are illegible." As this Court stated in *Sale v. State,* 570 So.2d 862, 863 (Ala.Cr.App.1990):

"It appears to this Court that the defendant was seeking to use the subpoenas duces tecum as a method of discovery. In Alabama, a subpoena duces tecum does not 'embrace[ ] discovery as one of its purposes,' *Ex parte Anniston Personal Loans, Inc.,* 266 Ala. 356, 359, 96 So.2d 627, 630 (1957); *Williams v. State,* 383 So.2d 547, **876** 559 (Ala.Cr.App.1979), affirmed, 383 So.2d 564 (Ala.), cert. denied, 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980), and should not be employed as a 'fishing expedition,' *Ex parte Darring,* 242 Ala. 621, 624, 7 So.2d 564, 566 (1942)."

The trial court erred in not quashing the subpoenas on this ground.

II.

The petitioners further argue that even if the subpoenas were lawfully issued they should still be quashed because their Fifth Amendment rights are being violated. The Fifth Amendment to the United States Constitution states:

"No person shall be held to answer for a capital, or otherwise infamous crime unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; *nor shall be compelled in any criminal case to be a witness against himself,* nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

Copyright (c) West Group 2001 No claim to original U.S. Govt. works

300

(Emphasis added.)    This same protection is afforded by the Alabama Constitution. Art. I, § 6, Alabama Constitution of 1901.

The United States Supreme Court in 1886 first articulated the significance of compelling an accused to produce evidence that would ultimately be used against him. In *Boyd v. United States,* 116 U.S. 616, 630-32, 6 S.Ct. 524, 532-33, 29 L.Ed. 746 (1886), the United States Supreme Court stated:

"The views of the first congress on the question of compelling a man to produce evidence against himself may be inferred from a remarkable section of the judiciary act of 1789. The 15th section of that act introduced a great improvement in the law of procedure. The substance of it is found in § 724 of the Revised Statutes, and the section as originally enacted is as follows, to wit:

" 'All the said courts of the United States shall have power in the trial of actions at law, on motion and due notice thereof being given, to require the parties to produce books or writings in their possession or power, which contain evidence pertinent to the issue, *in cases and under circumstances where they might be compelled to produce the same by the ordinary rules of proceeding in chancery;* and if a plaintiff shall fail to comply with such order to produce books or writings, it shall be lawful for the courts respectively, on motion, to give the like judgment for the defendant as in cases of nonsuit; and if a defendant shall fail to comply with such order to produce books or writings, it shall be lawful for the courts respectively, on motion as aforesaid, to give judgment against him or her by default.'

"The restriction of this proceeding to 'cases and under circumstances where they [the parties] might be compelled to produce the same [books or writings] by the ordinary rules of proceeding in chancery,' shows the wisdom of the Congress of 1789. The court of chancery had for generations been weighing and balancing the rules to be observed in granting discovery on bills filed for that purpose, in the endeavor to fix upon such as would best secure the ends of justice. To go beyond the point to which that court had gone may well have been thought hazardous. Now it is elementary knowledge, that one cardinal rule of the court of chancery is never to decree a discovery which might tend to convict the party of a crime,

or to forfeit his property. *And. any compulsory discovery by extorting the party's oath, or compelling the production of his private books and papers, to convict him of crime, or to forfeit his property, is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom."*

(First emphasis supplied in *Boyd*; second emphasis added here.)

*\*877 The United States Supreme Court's ruling in *Boyd* continues to be cited today. The Court in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), citing *Boyd,* noted that the privilege does not apply solely to verbal testimony. The Court stated:

"It is clear that the protection of the privilege reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers. *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746. On the other hand, both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture."

384 U.S. at 763-64, 86 S.Ct. at 1832, 16 L.Ed.2d at 916.

The *Schmerber* Court, quoting *Miranda v. Arizona,* 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966), explained the importance of the privilege when it stated:

" '[T]he constitutional foundation underlying the privilege is the respect a government--state or federal--must accord to the dignity and integrity of its citizens. To maintain a "fair state-individual balance," to require the government "to shoulder the entire load," ... to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent

Copyright (c) West Group 2001 No claim to original U.S. Govt. works

labors, rather than by the cruel, simple expedient of compelling it from his own mouth.' "

384 U.S. at 762, 86 S.Ct. at 1831, 16 L.Ed.2d at 915.

The privilege as first discussed by the United States Supreme Court in 1886 in *Boyd* has been modified. *Johnson v. United States,* 228 U.S. 457, 458, 33 S.Ct. 572, 572, 57 L.Ed. 919 (1913) ("[a] party is privileged from producing the evidence but not from its production"); *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) (the Court held that no Fifth Amendment privilege was violated when an informant testified as to the contents of his conversation with the defendant because the statements made to the informant were voluntary and no compulsion was present); *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); and *Couch v. United States,* 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973) (the privilege is a personal right that adheres to the person--not the contents of the information--and when other parties are ordered to surrender personal papers that were prepared by the accused and delivered to his attorney or accountant there is no "personal compulsion" of the defendant; "there was no enforced communications of any kind from any accused or potential accused").

The United States Supreme Court, in *United States v. Doe,* 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), citing prior case-law, addressed the issue whether service of a subpoena duces tecum seeking business records during a grand jury investigation violated the witnesses' Fifth Amendment protection. The Court stated:

"Although the contents of a document may not be privileged, the act of producing the document may be.... A government subpoena compels the holder of the document to perform an act that may have testimonial aspects and an incriminating effect. As we noted in *Fisher [v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) ]:

" 'Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the taxpayer. It also would indicate the taxpayer's belief that the papers are those described in the subpoena. *Curcio v. United States,* 354 U.S. 118, 125 [77

S.Ct. 1145, 1150, 1 L.Ed.2d 1225] (1957). The elements of compulsion are clearly present, but the more difficult issues are whether the tacit averments of the taxpayer are both "testimonial" and "incriminating" for purposes of applying the Fifth Amendment. These questions perhaps do not lend themselves to categorical answers; their resolution \*878. may instead depend on the facts and circumstances of particular cases or classes thereof.'[425 U.S. at 410, 96 S.Ct. at 1581.]

"In *Fisher,* the Court explored the effect that the act of production would have on the taxpayer and determined that the act of production would have only minimal testimonial value and would not operate to incriminate the taxpayer. Unlike the Court in *Fisher,* we have the explicit finding of the District Court that the act of producing the documents would involve testimonial self-incrimination. The District Court's finding essentially rests on its determination of factual issues. See *United States v. Nixon,* 418 U.S. 683, 702, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974) . Therefore, we will not overturn that finding unless it has no support in the record. *Ibid."*

465 U.S. at 612-14, 104 S.Ct. at 1242-43, 79 L.Ed.2d at 560-61.

[3][4] According to *Doe,* the focus is on whether the production of the documents involves "testimonial self-incrimination." However, the petitioners have made no showing in the petition for the writ of mandamus or in the motion to quash that the documents would incriminate them. Mandamus is a drastic and extraordinary remedy and the burden of proof is on the petitioner. *State v. Wilson,* 601 So.2d 423 (Ala.1992). The petitioners have failed to meet their burden as to this contention.

For the reasons stated in Part I of this opinion, the subpoenas are due to be quashed as to petitioners Jerry T. Fitch, Sr., and Harry G. Edwards.

PETITION GRANTED AS TO PETITIONERS FITCH, SR., AND EDWARDS.

All the judges concur.

(FN1.) This mandamus was filed on behalf of all three petitioners; however, the trial court never ruled on Jerry T. Fitch, Jr.'s motion to quash the subpoena issued to him. Thus, the correctness of

Copyright (c) West Group 2001 No claim to original U.S. Govt. works

715 So.2d 873, Ex parte Fitch, (Ala.Crim.App. 1997)

the trial court's ruling on his motion is not properly before this Court at this time.

(FN2.) The petitioners have already delivered their business records to the district attorney. This mandamus concerns only their personal bank records.

(FN3.) Rule 17.3(b) states:

"The court may direct that books, papers, documents, or other objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence. Upon their production, the court may permit the parties and their attorneys to inspect them, or portions thereof."

Copyright (c) West Group 2001 No claim to original U.S. Govt. works

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA,
ENTERPRISE DIVISION

| | | |
|---|---|---|
| STATE OF ALABAMA, | * | |
| | * | |
| PLAINTIFF, | * | |
| | * | |
| VS. | * | CASE NO.  CC 2001-179, 180 |
| | * | |
| ROBERT THOMAS CONRAD, | * | |
| | * | |
| DEFENDANT. | * | |

### ORDER

The State of Alabama having filed a Motion for Discovery and the Court being of

the opinion that same is due to be granted, it is therefore **ORDERED** that the defendant:

(1)     Appear in a line-up;

(2)     Speak for identification by witnesses;

(3)     Be fingerprinted, palm-printed, foot printed, or voice printed;

(4)     Pose for photographs not involving reenactment of an event;

(5)     Try on clothing;

(6)     Permit the taking of samples of defendant's hair, blood, saliva, urine, or
other specified materials which involve no unreasonable intrusions into the body;

(7)     Specifically provide defendant's handwriting exemplars;

(8)     Submit to a reasonable physical inspection or medical examination of
defendant's body, but such inspection or examination will not include a psychiatric or
psychological examination, unless such psychiatric or psychological examination is
authorized under the provisions of Rule 11.2(a)(1) and (2), Rule 25.4, or Rule 26.4.

The defendant shall be entitled to the presence of counsel at the taking of such
evidence.

(9)    Permit the state/municipality to inspect and copy any results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case, which are within the possession or control of the defendant and which the defendant intends to introduce in evidence at the trial or which were prepared by a witness whom the defendant intends to call at the trial, if the results or reports relate to the witness's testimony.

ORDERED this the ___19ᵗʰ___ day of _November_, 2001.

_____
Circuit Judge

NOV 2001
FILED
J.M. County
Court Clerk
Coffee Co. AL

Smith+
Bradshaw

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,               *
      Plaintiff,               *
                        *

vs.                             *          CASE NO. CC 01-M-179, 180
                        *

ROBERT THOMAS CONRAD,           *
      Defendant.               *

## STATE'S 3rd SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR DISCOVERY

**COMES NOW** the State of Alabama, by and through the undersigned Assigned District Attorney, and pursuant to Rule 16.3 A.R. Crim. P. and files this supplemental response thereto.

    1.      Attached please find a letter dated July 31, 2001, from Joseph M. Saloom, Forensic Scientists, Department of Forensic Sciences, received in the District Attorney's Office via facsimile on November 16, 2001, regarding the laboratory results of the firearms evidence examination, consisting of four (4) photostatic copies. (F3)

**DONE** this 19th day of November, 2001.

                                  _____
                                  GLENDA STOUT (#PAR057)
                                  ASSISTANT DISTRICT ATTORNEY
                                  P. O. Box 311102
                                  Enterprise, Alabama 36331
                                  (334) 347-1142

## CERTIFICATE OF SERVICE

    I, Glenda Stout, Assistant District Attorney, hereby certify that the foregoing has been served upon Al Smith, Esquire, P.O. Drawer 389, Elba, Alabama 36323 by placing a copy of same in the United States Mail, first class postage prepaid, on this the 6th day of November, 2001:

                                    _____
                                  GLENDA STOUT (#PAR057)
                                  ASSISTANT DISTRICT ATTORNEY

1



### ALABAMA
# DEPARTMENT OF FORENSIC SCIENCES

| | |
|---|---|
| REGIONAL LABORATORY | MEDICAL EXAMINER |
| P.O. BOX 210516 | P.O. BOX 240591 |
| MONTGOMERY, AL 38121-0516 | MONTGOMERY, AL 36124-0591 |
| (334) 242-2938 | (334) 242-3093 |
| FACSIMILE (334) 240-3284 | FACSIMILE (334) 260-8734 |

July 31, 2001

Re:    Case 01A-01-MM-00435
       Jelaine Dennis, subject

MEMORANDUM:    To File

BY:    Joseph M. Saloom, Forensic Scientist

SUBJECT:    Firearms Evidence Examination / Laboratory Results

During the course of the investigation of the above styled case, the following items of evidence were received from Enterprise Police Department Detective Rick Hauser on Thursday, May 24, 2001, by the undersigned.

01.00   One sealed brown paper bag containing one Clerke 1st revolver, caliber .22 Long Rifle, serial number 294415. This revolver was test fired using laboratory standard ammunition.

01.01   Four (4) fired CCI brand cartridge cases, caliber .22 Long/Long Rifle, removed from the cylinder of Exhibit 01.00 by the undersigned. Laboratory examination revealed some similarities to test fired cartridge cases, however, it could not be determined whether or not these cartridge cases were fired in the chambers of the Clerke revolver described previously as Exhibit 01.00.

01.02   One unfired CCI brand cartridge, caliber .22 Long Rifle, removed from the cylinder of Exhibit 01.00 by the undersigned.

02.00   One sealed brown paper bag containing one screw-capped plastic specimen jar containing one fired, copper color coated lead bullet, identified to be from Robert Conrad. Laboratory examination of this .22 caliber bullet revealed that it has been fired through the barrel of the Clerke revolver described previously as Exhibit 01.00.

The following additional items of evidence were received from Enterprise Police Department Detective Rick Hauser on Tuesday, May 29, 2001, by the undersigned.

Page 1 of 4

Case Number 01A-01-MM-00435
Firearms Examination / Laboratory Results

03.00   One sealed brown paper bag labeled in part "removed from dumpster", containing one white, sleeveless tee shirt. Laboratory examination of this shirt revealed two holes located in the lower front. The lower hole has heavy deposits of soot around it on the outside of the shirt, while the upper hole has deposits of soot around it on the *inside* of the shirt. Also present on the front of the shirt is another pattern of soot. Present inside the front of the shirt are what appear to be dried blood stains. These patterns of holes and soot are consistent with one revolver gunshot through folded clothing at near contact range.

04.00   One sealed manila envelope containing:

04.01   One sealed plastic film canister labeled in part "34", containing cotton, and one fired, copper jacketed bullet, identified to be from the scene. Laboratory examination of this 9mm/.38 caliber bullet revealed that it has been fired through the barrel of the same firearm as the bullets described elsewhere as Exhibits 04.02, 04.03, and 04.04. This bullet could have been fired in (but not limited to) the following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

04.02   One sealed plastic film canister labeled in part "38", containing cotton, and one fired, copper jacketed bullet, identified to be from the scene. Laboratory examination of this 9mm/.38 caliber bullet revealed that it has been fired through the barrel of the same firearm as the bullets described elsewhere as Exhibits 04.01, 04.03, and 04.04. This bullet could have been fired in (but not limited to) the following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

04.03   One sealed plastic film canister labeled in part "41", containing cotton, and one fired, copper jacketed bullet, identified to be from the scene. Laboratory examination of this 9mm/.38 caliber bullet revealed that it has been fired through the barrel of the same firearm as the bullets described elsewhere as Exhibits 04.01, 04.02, and 04.04. This bullet could have been fired in (but not limited to) the following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

04.04   One sealed plastic film canister labeled in part "42", containing cotton, and one fired, copper jacketed bullet, identified to be from the scene. Laboratory examination of this 9mm/.38 caliber bullet revealed that it has been fired through the barrel of the same firearm as the bullets described elsewhere as Exhibits 04.01, 04.02, and 04.03. This bullet could have been fired in (but not limited to) the following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

Case Number 01A-01-MM-00435
Firearms Examination / Laboratory Results

04.05   One sealed plastic film canister labeled in part "32", containing cotton, and one fired, badly damaged, copper color coated lead bullet, identified to be from the scene. This .22 caliber bullet is too damaged for further identification.

04.06   One small sealed manila envelope labeled in part "21", containing one fired Winchester brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed that it has been fired in the chamber of the same firearm as the cartridge cases described elsewhere as Exhibits 04.07, 04.08, 04.09, and 04.10.

04.07   One small sealed manila envelope labeled in part "23", containing one fired Winchester brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed that it has been fired in the chamber of the same firearm as the cartridge cases described elsewhere as Exhibits 04.06, 04.08, 04.09, and 04.10 .

04.08   One small sealed manila envelope labeled in part "24", containing one fired Winchester brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed that it has been fired in the chamber of the same firearm as the cartridge cases described elsewhere as Exhibits 04.06, 04.07, 04.09, and 04.10.

04.09   One small sealed manila envelope labeled in part "25", containing one fired Winchester brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed that it has been fired in the chamber of the same firearm as the cartridge cases described elsewhere as Exhibits 04.06, 04.07, 04.08, and 04.10.

04.10   One small sealed manila envelope labeled in part "26", containing one fired Winchester brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed that it has been fired in the chamber of the same firearm as the cartridge cases described elsewhere as Exhibits 04.06, 04.07, 04.08, and 04.09.

04.11   One small sealed manila envelope labeled in part "22", containing one fired Federal brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed some similarities to the cartridge cases described elsewhere as Exhibits 04.06, 04.07, 04.08, 04.09, and 04.10, however, it could not be determined whether or not they were fired in the chamber of the same firearm.

The following additional items of evidence were received from State Medical Examiner Dr. Emily Ward on Tuesday, June 5, 2001, by the undersigned.

Page 3 of 4

Case Number 01A-01-MM-00435
Firearms Examination / Laboratory Results

05.00   One small sealed manila envelope containing one fired, copper jacketed bullet identified to
        be from the subject. Laboratory examination of this 9mm/.38 caliber bullet revealed similar
        characteristics as the bullets described elsewhere as Exhibits 04.01, 04.02, 04.03, and 04.04,
        however, it could not be determined whether or not they have all been fired through the
        barrel of the same firearm. This bullet could have been fired in (but not limited to) the
        following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

06.00   One small sealed manila envelope containing:

06.01   One white card labeled in part "Lt. lat. thigh", containing one tape lift, identified to be from
        the subject. Laboratory examination of this tape lift revealed the presence of gunpowder
        particles.

06.02   One white card labeled in part "Front Rt. hand", containing one tape lift, identified to be
        from the subject. Laboratory examination of this tape lift revealed the presence of
        gunpowder particles.

06.03   One white card labeled in part "Post chest", containing one tape lift, identified to be from
        the subject. Laboratory examination of this tape lift revealed the presence of gunpowder
        particles.

06.04   Six white cards labeled variously, each containing one tape lift, identified to be from the
        subject. Laboratory examination of these tape lifts failed to reveal the presence of
        gunpowder particles.

The following additional item of evidence was placed into a locked evidence locker on Friday, June
8, 2001, by Enterprise Police Department Captain William Moore, and retrieved on Tuesday, June
12, 2001 by the undersigned.

07.00   One sealed brown paper bag containing one navy blue, pull-over, collared shirt, identified
        to be from Robert Conrad. Laboratory examination of this shirt revealed a hole located in
        the front, just left of center. No gunpowder particles were found around this hole.

Unless otherwise indicated, all evidence in this case will be returned to the appropriate agency at the
earliest available opportunity.

Page 4 of 4

STATE OF ALABAMA,         )    IN THE CIRCUIT COURT OF
                               )
         PLAINTIFF,        )    COFFEE COUNTY, AL
                               )
VS.                      )    ENTERPRISE DIVISION
                               )
ROBERT THOMAS CONRAD,   )
                               )
         DEFENDANT.     )    CASE #s:  CC-2001-M-179
                                          and
                                          CC-2001-M-180.

## *O  R  D  E  R*

*These two cases come before the Court upon the Defendant's application for treatment as a Youthful Offender.  The Defendant was present with his attorneys, Al Smith and Gary Bradshaw.  The State was likewise represented by an Assistant District Attorney.*

*Argument and evidence was presented with respect to Defendant's application.*

*IT IS ORDERED that Defendant's application for treatment as a YOUTHFUL OFFENDER is denied.*

*On arraignment in each case, the Defendant entered two (2) pleas of "NOT GUILTY."*

*These two (2) cases are set for trial by jury during the March 18, 2002 at 9:00 a.m. criminal jury term of court with a call of the criminal docket to take place on the 5th day of February, 2002 at 9:00 a.m.*

*IT IS ALSO ORDERED that a hearing on all then pending motions and a status conference is set for the 5th day of February, 2002 at 9:00*

*a.m.*

*Done this the 20th day of November, 2001.*



GARY L. McALILEY, CIRCUIT JUDGE
TWELFTH JUDICIAL CIRCUIT
STATE OF ALABAMA

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA )
)
)
v. ) Case No. CC-2001-M-179 & 180
)
ROBERT THOMAS CONRAD )
)

## DEFENDANT'S THIRD MOTION TO SUPPRESS EVIDENCE SEIZED AFTER AN ILLEGAL ARREST AND/OR SEARCH AND TO SUPPRESS STATEMENTS

ROBERT THOMAS CONRAD, asserting his rights as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama State Constitution and state law, moves to suppress any evidence and statements obtained pursuant to an unreasonable search and seizure by government officials or their agents. In support thereof ROBERT THOMAS CONRAD through counsel states the following:

1. On May 23, 2001, at approximately 2.13 p.m., the Defendant ROBERT THOMAS CONRAD, was interrogated at the Medical Center Enterprise where he was being treated for two gun shot wounds.

2. Conrad was interrogated by Enterprise Sergeant Jeff Spence and District Attorney's Investigator Dwight Holley.

3. According to the transcript of the interview, pre recording conversations were had with Conrad.

4. The interview with the Defendant, ROBERT THOMAS CONRAD, and the law

Page 1 of 3

enforcement officers clearly show that he was the focus of accusations of Capital Murder. He was also clearly not subject to leave or depart but was, "in custody".

5.    The medical records, a copy of which the undersigned counsel received on November 13, 2001, indicate that the Defendant, Robert Conrad was treated at the Medical Center Enterprise and received strong narcotic drugs, and underwent surgery at Medical Center Enterprise.

6. The Defendant, ROBERT THOMAS CONRAD, was **again** interrogated on May 25, 2001, at 12:16 p.m. in his room at Medical Center Enterprise by DA Investigators Bruce Mathews and Dwight Holley and Enterprise Police Officer Kyle Hale.

7.    The Defendant, ROBERT THOMAS CONRAD, was again interrogated on May 25, 2001, at 4:45 p.m. by District Attorney Investigators Bruce Mathews and Dwight Holley, Investigator Rick Hauser of the Enterprise Police Department and Deputy Michael Hines of the Coffee County Sheriff Department.

8. In this interview the Defendant, ROBERT THOMAS CONRAD very clearly expresses his wish to have a lawyer.

9.    The Defendant ROBERT THOMAS CONRAD was in custody, in pain, under the influence of strong narcotic pain killers, was not able to, nor did he act with free will and voluntarily in talking with the law enforcement officers.

For the foregoing reasons, ROBERT THOMAS CONRAD moves this Court to vindicate his federal and state rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article One, Section Five of the Alabama State Constitution and relevant Alabama state law, by suppressing all statements to law enforcement officers and officials, separately and severally, and the fruits of the above-described search and seizure. In the alternative

ROBERT THOMAS CONRAD moves this Court to hold a full evidentiary hearing on this matter before the trial of this case, and grant this motion for the above-stated reasons and any others that may appear to the Court during this hearing. Ex parte Jackson, 2001 WL 527819, ___ So.2d ____, No. 1981723, Ala.2001; Duncan v. State, 278 Ala. 145, 165, 176 So.2d 840, 859 (1965); Smith v. State, 554 So.2d 451 (Ala.1989), and Felder v. State, 470 So.2d 1321, 1326 (Ala.Crim.App.1984).

ROBERT THOMAS CONRAD reserves the right to supplement this motion to suppress as evidence is revealed to the Defendant.

Respectfully submitted this the December 20, 2001.

Smith & Carr, LLC.
Sydney Albert (Al) Smith          SMI098
P. O. Drawer 389
Elba, Al 36323
Phone:          334-897-3658
Fax:            334-897-8633


Gary D. Bradshaw       BRA074
Attorney at Law
P. O. Box 311412
Enterprise, AL 36331-1412

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

Al Smith                    12/20/01
                            Date

Page 3 of 3

315

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PLAINTIFF, | ) | COFFEE COUNTY, AL |
| | ) | |
| VS. | ) | ENTERPRISE DIVISION |
| | ) | |
| ROBERT THOMAS CONRAD, | ) | |
| | ) | |
| DEFENDANT. | ) | CASE #s: CC-2001-M-179 |

CASE #s: CC-2001-M-179
and
CC-2001-M-180

## *O R D E R*

*The Court has considered the Defendant's latest "MOTIONS TO SUPPRESS...."*

### *IT IS ORDERED:*

*1).    All pending UNRULED ON MOTIONS, including but not limited to the most recently filed motions to suppress, are scheduled for hearing on the __21st__ day of __January__, 2002 at 9:00 a.m.*

*2).    The Sheriff is to make sure Defendant is available in court for the purposes of this scheduled hearing.*

*3).    These cases remain set for trial by jury during the March 18, 2002 at 9:00 a.m. criminal jury term of court with a call of the criminal docket to take place on the 5th day of February, 2002 at 9:00 a.m.*

*Done and ordered this the 28th day of December, 2001.*

_____
**GARY L. McALILEY, CIRCUIT JUDGE**
**TWELFTH JUDICIAL CIRCUIT**
**STATE OF ALABAMA**

JAN 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

State of Alabama
Unified Judicial System

Form C-1 2 Rev. 10/86

# SUBPOENA REQUEST FORM

CASE NUMBER

CC-2001-M-179 & 180

THE. CIRCUIT _____ COURT OF COFFEE - ENTERPRISE DIVISION ... COUNTY, ALABAMA

Plaintiff: _____ v. Defendant: _____

In the matter of STATE OF ALABAMA V. ROBERT THOMAS CONRAD

Court Date 1/21/02 _____ Court Time 9:00 AM ___ AM/PM Date Requested 1/11/02

## TO BE COMPLETED BY REQUESTER

The Clerk/Register is requested to issue an Order to Appear (Subpoena) for each of. the following witnesses for:

☐ Plaintiff/State    ☒ Defendant    ☐ Grand Jury    ☐ Other

| | Date Issued | Date Executed | Remarks |
|---|---|---|---|
| 1. Name JEFF SPENCE Address % ENTERPRISE POLICE DEPARTMENT ENTERPRISE, AL 36331 ___ Zip ___ | 1-15-02 | | |
| 2. Name DWIGHT HOLLEY Address % DISTRICT ATTORNEY'S OFFICE ENTERPRISE, AL 36331 ___ Zip ___ | 1-15-02 | | |
| 3. Name BRUCE MATHEWS Address % DISTRICT ATTORNEY'S OFFICE ENTERPRISE, AL 36331 ___ Zip ___ | 1-15-02 | | |
| 4. Name KYLE HALE Address % ENTERPRISE POLICE DEPARTMENT ENTERPRISE, AL 36331 ___ Zip ___ | 1-15-02 | | |
| 5. Name RICK HAUSER Address % ENTERPRISE POLICE DEPARTMENT ENTERPRISE, AL 36331 ___ Zip ___ | 1-15-02 | | |
| 6. Name MICHAEL HINES Address % COFFEE COUNTY SHERIFF'S OFFICE NEW BROCKTON, AL ___ Zip ___ | 1-15-0? | | |
| 7. Name DR. SAMUEL SAWYER Address 101 E. Brunson St. or 216 Lakewood Dr. ENTERPRISE, AL 36331 ___ Zip ___ | 1-15-02 | | |
| 8. Name DR. VINCENT E. MARTIN Address %MEDIAL CENTER ENTERPRISE ENTERPRISE, AL 36331 ___ Zip ___ | 1-15-02 | | |
| 9. Name BUFORD ROBERTS Address % ENTERPRISE POLICE DEPARTMENT ENTERPRISE, AL 36331 ___ Zip ___ | 1-15-02 | | |
| 10. Name DR. SHERRY ROACH Address 101 E. Brunson St. or 101 Pratt Dr. ENTERPRISE, AL 36331 ___ Zip ___ | 1-15-02 | | |

*[Stamp: JAN 2002 FILED J.M. Counts Court Clerk Coffee Co. AL]*

METHOD OF SERVICE REQUESTED:

☒ Personal    ☐ Other _____

Party Requesting Subpoena

Sydney Albert Smith

Signature

347-3658

Requester Phone No.

Date _____    Clerk/Register _____



**Smith & Carr, LLC.**
Attorneys at Law
122 No. Cordelia Ave. (at corner of W. Davis)
P. O. Drawer 389
Elba, Alabama 36323-0389
Voice: 334-897-3658    Fax: 334-897-8633

Sydney Albert (Al) Smith                    Lloyd W. Carr

January 11, 2002

Hon. James M. Counts
Circuit Clerk
Coffee County Courthouse
Post Office Box 311284
Enterprise, AL 36330



<u>Re: State of Alabama vs. Robert Thomas Conrad
Case No. CC 2001-M-179-180</u>

Dear Mickey:

Enclosed please find Subpoena Request Form concerning the above styled case. Also, enclosed please find our "file copy", please stamp and return in the self addressed stamped envelope.

If you have any questions please do not hesitate to contact our office.

Thanking you in advance.

Sincerely,

Dawn K. DeVane
Legal Assistant

JAN 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

| | | |
|---|---|---|
| STATE OF ALABAMA,<br>Plaintiff, | * | |
| | * | |
| | * | |
| vs. | * | CASE NO. CC 01-M-179, 180 |
| | * | |
| ROBERT THOMAS CONRAD,<br>Defendant. | * | |
| | * | |

### STATE'S 4th SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR DISCOVERY

COMES NOW the State of Alabama, by and through the undersigned Assigned District Attorney, and pursuant to Rule 16.3 A.R. Crim. P. and files this supplemental response thereto.

1.  Attached please find a copy of a transcribed statement of Ernest LaVaughn Harrison, taken on May 25, 2001, by Investigators Dwight Holley and Bruce Mathews, consisting of eight (8) photostatic copies.

DONE this 17th day of January, 2002. (S/H3)

GLENDA STOUT (#PAR057)
ASSISTANT DISTRICT ATTORNEY
P. O. Box 311102
Enterprise, Alabama 36331
(334) 347-1142

### CERTIFICATE OF SERVICE

I, Glenda Stout, Assistant District Attorney, hereby certify that the foregoing has been served upon Al Smith, Esquire, P.O. Drawer 389, Elba, Alabama 36323 by placing a copy of same in the United States Mail, first class postage prepaid, on this the 17th day of January, 2002:

GLENDA STOUT (#PAR057)
ASSISTANT DISTRICT ATTORNEY

1

Mathews:    All right.

Holley:    Today's date is May the 25th, 2001.  Present at the residence of Ernest Lavaughn Harrison, 5905 Highwy 27, Lot #9, Enterprise, Alabama, is myself, Dwight Holley, Investigator with the District Attorney's Office, Bruce Mathews with District Attorney's Office and Ernest Lavaughn Harrison.  Time is 4:00 p.m.  Mr. Harrison would you give us your full name.

Harrison:    Ernest Lavaughn Harrison.

Holley:    How old are you Mr. Harrison?

Harrison:    34.

Holley:    What's your date of birth?

Harrison:    5-30-67.

Holley:    What's your address?

Harrison:    It's uh' 5905 Highway 27, Lot #9, Enterprise, Alabama.

Holley:    Who do you work for Mr. Harrison?

Harrison:    Donald Smith.

Holley:    What do you do?

Harrison:    Uh' farm.

Holley:    Farm is there anything else you

Harrison:    (unintelligible)

Holley:    you have any other duties?

Harrison:    I just take care of everything around there.  Just anything

Mathews:    Does that include chicken houses?

Harrison:    Yes sir.

Holley:    Were you working with Mr. Harrison, I'm sorry Mr. Smith on May the 23rd of this year?

1

S/H3

| | |
|---|---|
| Harrison: | Yes sir I was. |
| Holley: | Where were you at at approximately 1:30 p.m. on May the 23rd of this year? |
| Harrison: | Down there at the bottom of number 6. |
| Mathews: | Which his where? |
| Harrison: | Donald Smith's chicken houses. |
| Holley: | Do you know how what county road that's on? |
| Harrison: | 611 I believe. |
| Mathews: | Could that be 711? |
| Harrison: | 711. I don't know exactly I mean, a road. |
| Mathews: | Is that the same road over there by the Toy Store? |
| Harrison: | Yes sir. |
| Mathews: | Okay. |
| Holley: | In relations to the chi uh' to the Toy Store, where's the chicken houses located at? |
| Harrison: | Uh' right down uh' probably about 100 yards 200 yards from the uh' Toy Store. |
| Holley: | Are they across the road? |
| Harrison: | Not directly across the road, right below the road. |
| Mathews: | Are they on the same side of the road as the sto Toy Store? |
| Harrison: | No sir, they on opposite sides. |
| Mathews: | All right. |
| Holley: | When you said you were at chicken house #6, is that right? |
| Harrison: | Um' hum'. |
| Holley: | Could you see the Toy Store from the chicken house #6 |

Harrison:     I could see, yes sir.

Holley:       Tell me what you heard and and what you did?

Harrison:     I was in #6 house and I heard something that sounded like
              firecrackers, I looked out the door and I seen a black male run
              across the road, looked like he had a gun in his hand.

Holley:       What did or what was the black male that you saw run across the
              road, what was he wearing?

Harrison:     Look like a pair of blue jeans pants, and a uh' kind of a white uh'
              brownish or black looking tank top.

Holley:       Could you tell it was a tank top?

Harrison:     No sir, not really from that distance, I couldn't really see it that
              good.

Mathews:      What makes you think it was a tank top?

Harrison:     Cause he looked the way his uh' shoulders was his arms and all
              Was showing.

Mathews:      Okay.

Holley:       So you're saying it was a type of shirt that didn't have any sleeves
              in it.

Harrison:     Yes sir.

Mathews:      Brownish looking or

Harrison:     Yes sir.

Holley:       Could it have been a light red shirt?

Harrison:     I didn't really get a good look at it. I couldn't be 100% sure.

Holley:       Did it appear he had on tennis shoes, I mean, I'm sorry, had on uh'
              blue jeans.

Harrison:     Yes sir. They looked like you know kind of faded out not real faded
              out but looked like a dark color jean.

Holley:       Where did you first see this black male at?

Harrison:     I just seem him when he come out the door, I mean after he come out the door and all, that was that was it.

Mathews:      But where, I mean

Harrison:     Uh' bout right there when he started down the ramp of the store, probably bout 5 foot out the door there.

Holley:       Was he walking or was he running?

Harrison:     Running, well he was I mean he wasn't running real fast but he was running.  You know probably like a half gallop.

Holley:       Where was he at, I mean I 'm sorry, where did you see him go to?

Harrison:     Across from #1 house right in front of it out in a little ole scope of woods.

Holley:       You saw him go into the woods?

Harrison:     No sir I saw him go across the road in towards the woods.

Mathews:      Did, go ahead.

Holley:       Did you see him after that?

Harrison:     No sir.

Mathews:      Let me step out.

Holley:       When you uh' saw him run down toward those woods, what did you do?

Harrison:     I just went back in the houses.  Cause I was down in there working on fogger pumps.

Holley:       How many shots or how many what you thought to be firecracker, what how many do you think he heard?

Harrison:     About 3 or 4,  between 3 and 4.

Holley:       And you were just inside the chicken houses in a little ole office room or a little room.

4

Harrison:    Yes sir, office room but then I had to do, they's two doors, one that goes inside the chicken houses there into a room and then you got another door you go in there and open up the door to go into the chicken houses.

Holley:    And you were inside that room?

Harrison:    Yes sir, and I had that door open it where the chickens you, exit into the chicken houses.

Holley:    Did you have chickens in?

Harrison:    Yes sir, we got chickens that's uh' 4 ½ weeks old.

Holley:    And you could hear something that sounded like a gun from inside that room?

Harrison:    Um' hum'. Cause the curtains are up on the uh' they come up on the sides right there in front.

Holley:    And you heard 4 to 5 is that what you said.

Harrison:    3 to 4.

Holley:    Or 3 to 4, okay. You walked out after you heard those what you believe to be shots, you walked out and saw this black male running from the Toy Store.

Harrison:    Yes sir.

Holley:    And tell me once again what kind of description?

Harrison:    Had on like a dark colored pair of blue jeans and to me looked like a black tank top or rather shirt. It didn't have no sleeves in it.

Holley:    How tall do you think he was?

Harrison:    About 5'9". Cause I'm about 5'8".

Holley:    Did he appear to be heavy set, slender or what?

Harrison:    About medium build.

Mathews:    Did he have anything on his head?

Harrison:    No sir.

5

Mathews:   Notice anything about his hair?

Harrison:   No sir not at all.

Mathews:   Does you stil you keep referring to them as blue jeans, were they blue or were they you know brown or black

Harrison:   Kind of like a black, black, I can blue jeans, I call em' you know,

Mathews:   I understand that what's

Harrison:   Black, black color.

Mathews:   That's why I was asking, every a lot of people call jeans blue jeans but

Harrison:   Yeah.

Mathews:   but some of em' are colored now so.

Harrison:   Well, I mean it looked it was a darker color.

Mathews:   I got ya.

Harrison:   It wasn't no you know

Mathews:   So it wasn't necessary faded blue blue jeans, it

Harrison:   Yeah.

Mathews:   you're your thinking it was what?

Harrison:   Like a black but it was been washed a couple of times and you know how they start turning?

Mathews:   Yes sir.  Could did you see any legs?

Harrison:   No sir.

Mathews:   Do you and I'm not trying to say there is or isn't but are you are you sure or could you tell from where you were at if they were long pants or some of those long shorts or would you have been able to tell?

Harrison:   I would not been able to tell.

6

325

| | |
|---|---|
| Mathews: | Okay. |
| Harrison: | Because there's a pretty good distance away from down there. |
| Mathews: | And ya'll may have cleared this up when I stepped out Dwight but for my own piece of mind let me ask, uh' you said he went across the road |
| Harrison: | Um' hum' |
| Mathews: | Literally across the road from the Toy Store? |
| Harrison: | Yes sir. |
| Mathews: | He crossed it. |
| Harrison: | Um' hum'. |
| Mathews: | You think he went into the woods? |
| Harrison: | Yes sir, I believe he did because he didn't come up (unintelligible) you know I don't I don't think he come up beside the road. |
| Mathews: | Okay and he never came out. |
| Harrison: | No sir, not to my knowledge, I don't know, I didn't |
| Holley: | When you saw him run into the ditch and across the road into the ditch next to that wooded area, did you turn around and go back into the store, I mean back into the chicken houses then? |
| Harrison: | Yes sir. Right then, I mean I just looked out there, I just opened the door and looked out and then shut it back. I mean I just seen him when I seen him come out and I I just shut the door back so. |
| Holley: | So you don't know where he might have gone after that? |
| Harrison: | No sir. I have no idea. I turned on the fogger pump. I had just turned on the breakers to get the uh' pressure up on the pumps that's what we have to run bout 250, 225 on em' and you have to watch them lines to make sure they don't blow up blow out when they come on. There so much pressure on them lines. |
| Mathews: | And you never saw him again after that? |

7

Harrison:      No sir.

Holley:        How long after you saw him run across the road was that you heard
               about what happened up at the Toy Store?

Harrison:      Uh' probably about 10, 15 minutes later.

Holley:        How'd you find out?

Harrison:      Uh' Donald was telling me.

Holley:        Where'd you see Donald at?

Harrison:      I seen him back up there at the barn.

Holley:        Did Donald tell you he saw anything?

Harrison:      Yes sir.  He was talking to me.  I mean, he didn't tell my nothing
               about get into details bout nothing.  He just said the store got
               robbed that's all.

Mathews:       Fine but what you've told us in your descriptions is what you
               remember seeing.

Harrison:      Yes sir.

Holley:        That ends the interview, the time is 4:10, same people still present.

**Transcribed by Tonnya Walker**
**Transcribed on May 30, 2001**
**Reviewed by:**_____
**Reviewed on:**_____

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

JAN 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

STATE OF ALABAMA )
)
)
v. ) Case No. CC-2001-M-179 & 180
)
ROBERT THOMAS CONRAD )
)

## DEFENDANT'S THIRD MOTION TO SUPPRESS EVIDENCE SEIZED AFTER AN ILLEGAL ARREST AND/OR SEARCH AND TO SUPPRESS STATEMENTS

ROBERT THOMAS CONRAD, asserting his rights as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama State Constitution and state law, moves to suppress any evidence and statements obtained pursuant to an unreasonable search and seizure by government officials or their agents . In support thereof ROBERT THOMAS CONRAD through counsel states the following:

1. On May 23, 2001, at approximately 2.13 p.m., the Defendant ROBERT THOMAS CONRAD, was interrogated at the Medical Center Enterprise where he was being treated for two gun shot wounds.

2. Conrad was interrogated by Enterprise Sergeant Jeff Spence and District Attorney's Investigator Dwight Holley.

3. According to the transcript of the interview, pre recording conversations were had with Conrad.

4. The interview with the Defendant, ROBERT THOMAS CONRAD, and the law

enforcement officers clearly show that he was the focus of accusations of Capital Murder.  He was also clearly not subject to leave or depart but was, "in custody".

5.   The medical records, a copy of which the undersigned counsel received on November 13, 2001, indicate that the Defendant, Robert Conrad was treated at the Medical Center Enterprise and received strong narcotic drugs, and underwent surgery at Medical Center Enterprise.

6.   The Defendant, ROBERT THOMAS CONRAD, was **again** interrogated on May 25, 2001, at 12:16 p.m. in his room at Medical Center Enterprise by DA Investigators Bruce Mathews and Dwight Holley and Enterprise Police Officer Kyle Hale.

7.   The Defendant, ROBERT THOMAS CONRAD, was again interrogated on May 25, 2001, at 4:45 p.m. by District Attorney Investigators Bruce Mathews and Dwight Holley, Investigator Rick Hauser of the Enterprise Police Department and Deputy Michael Hines of the Coffee County Sheriff Department.

8. In this interview the Defendant, ROBERT THOMAS CONRAD very clearly expresses his wish to have a lawyer.

9.   The Defendant ROBERT THOMAS CONRAD was in custody,  in pain, under the influence of strong narcotic pain killers, was not able to, nor did he act with free will and voluntarily in talking with the law enforcement officers.

For the foregoing reasons, ROBERT THOMAS CONRAD moves this Court to vindicate his federal and state rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article One, Section Five of the Alabama State Constitution and relevant Alabama state law, by suppressing all statements to law enforcement officers and officials, separately and severally, and the fruits of the above-described search and seizure.  In the alternative

Page 2 of 3

ROBERT THOMAS CONRAD moves this Court to hold a full evidentiary hearing on this matter before the trial of this case, and grant this motion for the above-stated reasons and any others that may appear to the Court during this hearing. Ex parte Jackson, 2001 WL 527819, ___ So.2d ____, No. 1981723, Ala.2001; Duncan v. State, 278 Ala. 145, 165, 176 So.2d 840, 859 (1965); Smith v. State, 554 So.2d 451 (Ala.1989), and Felder v. State, 470 So.2d 1321, 1326 (Ala.Crim.App.1984) .

ROBERT THOMAS CONRAD reserves the right to supplement this motion to suppress as evidence is revealed to the Defendant.

Respectfully submitted this the December 20, 2001.

Smith & Carr, LLC.
Sydney Albert (Al) Smith          SMI098
P. O. Drawer 389
Elba, Al 36323
Phone:          334-897-3658
Fax:            334-897-8633

Gary D. Bradshaw       BRA074
Attorney at Law
P. O. Box 311412
Enterprise, AL 36331-1412

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

Al Smith                              12/20/01
                                      Date

Page 3 of 3

| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT |
| | ) | |
| PLAINTIFF, | ) | COFFEE COUNTY, AL |
| | ) | |
| VS. | ) | (ENTERPRISE DIV.) |
| | ) | |
| ROBERT THOMAS | ) | |
| CONRAD, | ) | CC-2001-M-179 & 180. |

## O R D E R

The Court has considered "Defendant's Third Motion to Suppress Evidence Seized After an Illegal Arrest and/or Search and to Suppress Statements".

Said motion and all other pending motions are set for hearing on the date and hour earlier set, *i.e.* 1/21/2002 @ 9:00a.m.

Done this the 20th day of January, 2002.



Gary L. McAliley, Circuit Judge
Twelfth Judicial Circuit
State of Alabama

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,                    *
      Plaintiff,                     *
                            *
vs.                                  *    CASE NO. CC 01-M-179, etc.
                            *
ROBERT THOMAS CONRAD,                *
      Defendant.                     *

### STATE'S 5th SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR DISCOVERY

     **COMES NOW** the State of Alabama, by and through the undersigned Assigned District Attorney, and pursuant to Rule 16.3 A.R. Crim. P. and files this supplemental response thereto.

    1.     Attached please find the Alabama Bureau of Investigation Case File #09-1677-09-01, on Jelaine Dennis, consisting of fifteen (15) photostatic copies.

     **DONE** this _22_ of _Feb_____, 2002. (L58B)

                                        GLENDA STOUT (#PAR057)
                                        ASSISTANT DISTRICT ATTORNEY
                                        P. O. Box 311102
                                        Enterprise, Alabama  36331
                                        (334) 347-1142

### CERTIFICATE OF SERVICE

     I, Glenda Stout, Assistant District Attorney, hereby certify that the foregoing has been served upon Al Smith, Esquire, P.O. Drawer 389, Elba, Alabama  36323 by placing a copy of same in the United States Mail, first class postage prepaid, on this the _22_ day of _Feb_, 2002:

                                        GLENDA STOUT (#PAR057)
                                        ASSISTANT DISTRICT ATTORNEY

1

Alabama Departme

# Public Safety

REPLY MAY BE MADE TO:

December 19, 2001

Assistant District Attorney Glenda Stout
Twelfth Judicial Circuit State of Alabama
POB 311102
Enterprise, AL 36331-1102

Dear Assistant District Attorney Stout,

I am enclosing all the information we have on the case file #09-1677-09-01, on the Jelaine Dennis, victim of capital murder on 5/23/01 in Enterprise, Alabama.

If I can be of further assistance, please feel to contact me at my work #334-395-4320.

Sincerely,

Shannon Fitzgerald
Certified Latent Examiner
Alabama Bureau of Investigation

SF/mw



Headquarters
Post Office Box 1511
Montgomery, Alabama 36102 - 1511

Driver License
Post Office Box 1471
Montgomery, Alabama 36102 - 1471

L58B

Shannon Fitzgerald
ABI Headquarters

July 18, 2001

Detective Richard A.Hauser
Enterprise Police Department
501 South Main Street
Enterprise, AL  36330

RE:    Capital Murder
       05-23-01
       Jelaine Dennis
       LC#09-1677-09-01
       Your#2001-05-3060

Dear Detective Hauser,

The following evidence was received from your department on 05-24-01 for the purpose of fingerprint examination and comparison:

On 05-24-01 @ 8:30 am, received personally from detective Hauser:

One (1) sealed envelope containing seven (7) white cards with eight (8) latent lifts

Named:  Robert Conrad    B/M    DOB   09-30-80

        Brian Smith      B/M    DOB   06-27-83

        Bryan Yeoman     B/M    DOB   08-05-82

On 05-29-01 @ 10:25 am, received personally from detective Hauser:

One (1) sealed cardboard box containing one (1) 22 caliber Rifle serial# 20569409

One (1) sealed cardboard box containing one (1) SKS Rifle serial# 9210533

Page Two
LC#09-1677-09-01

One (1) sealed brown bag containing one (1) $5.00 Bill #BA24402322A

One (1) set of major case prints for each:

Robert Conrad    B/M    DOB    09-30-80

Bryan Yeoman    B/M    DOB    08-05-82

Brian Smith    B/M    DOB    06-27-83

On 06-12-01 @ 10:25 am received personally from detective Hauser

One (1) sealed envelope containing one (1) white card with two (2) latent lifts

One (1) sealed envelope containing one (1) package of Winston cigarettes

One (1) sealed envelope containing one (1) cordless telephone

One (1) sealed envelope containing one (1) flash supressor

One (1) sealed envelope containing one (1) ten (10) Round magazine

One (1) sealed envelope containing one (1) thirty (30) Round magazine

One (1) sealed envelope containing five (5) 7.62 Rounds

One (1) sealed envelope containing one (1) Tommy Hilfiger sock with twenty-six (26) 7.42 Rounds

Laboratory examinations and comparisons of the above listed items indicate the following:

One (1) latent fingerprint of value was found on lift labeled "Front Door" marked Lat.#1- UNIDENTIFIED

Page Three
LC#09-1677-09-01

One (1) latent fingerprint of value was found on lift labeled, "Front Door" marked Lat.#2- UNIDENTIFIED

One (1) latent fingerprint of value was found on lift labeled "Front Door" marked Lat.#3- UNIDENTIFIED

One (1) latent impression of value was developed on ".22 caliber Rifle scope" marked Lat.#4- UNIDENTIFIED

No other latents of value were found.

Lats.#1, #2, and #3 were searched through the Automated Fingerprint Identification System (AFIS) with no identifications being effected. These prints have been registered with the AFIS data base for future computer searches.

In order to adequately compare Lat.#4 a better set of major case prints, to include lower finger and thumb joints, are needed on all individuals in this case.

The submitted evidence and inked prints are enclosed.

Lifts are being retained with the latent case file for any future comparisons you may desire.

Any future correspondence concerning this case must include the Latent Case # 09-1677-09-01.

Sincerely

Shannon Fitzgerald
Certified Latent Print Examiner
Alabama Bureau of Investigation

SF/ec

Alabama Department of
# Public Safety

## BUREAU OF INVESTIGATION

FINGERPRINT EXAMINATION REQ
ABI-28 (2

RETURN TO: LATENT PRINT UNIT
P. O. BOX 1511
Montgomery, AL 36192-0
Phone: (334) 242-4244

TYPE OR PRINT CLEARLY (USE BLACK INK) AND SUBMIT IN TRIPLICATE

| | |
|---|---|
| 1. CONTRIBUTOR TITLE: Detective | 6. CONTRIBUTOR CASE NO: 2001-05-3060 |
| 2. NAME: Rich A. Hauser | 7. TYPE OF CRIME: Capital Murder |
| 3. AGENCY: Enterprise Police Dept | 8. DATE OF CRIME: 5/23/01 |
| ADDRESS P.O. BOX 501 South Main Street | 9. VICTIM OF CRIME: Jelaine Dennis |
| CITY Enterprise  STATE Ala  ZIP 36770 | 10. DPS LATENT CASE NO: 09-1677-09-01 |
| 4. PHONE NO: (334) 347-1211 | 11. NEW CASE: ✓    12. ADDITIONAL EVIDENCE OR SUSPECT |
| 5. REPORT TO: Hauser | 13. SPECIAL INSTRUCTIONS: |

| 14. SUBMITTED BY: Richard Hauser PRINT NAME | 15. SIGNATURE | 16. AGENCY EPD | 17. DATE/TIME 5-24-01 8:30 |
|---|---|---|---|

18. DETAILED LIST OF ITEMS SUBMITTED: INCLUDE NAME, RACE, SEX, DOB, OF ALL SUSPECTS. USE EXTRA SHEETS IF NECESSARY

(6) 7¾ 3X5 Card with Latent
Prints in manilla / Yellow
Envelope.

Suspect ① B/m Robert Conrad
DOB 9/30/80

② B/m Brian Smith
DOB 06/27/83

③ Brian Yeoman B/m
DOB 8/5/82

19. FOR DPS USE ONLY

| | | | |
|---|---|---|---|
| RECEIVED BY: PRINT NAME Marilyn Fitzgerald  SIGNATURE | HOW RECEIVED Personally | DATE/TIME 8:30 5-24-01 |
| EVIDENCE RETURNED TO: PRINT NAME  SIGNATURE | AGENCY EPD | DATE/TIME 7-30-01 3:00 |
| EVIDENCE RETURNED BY: PRINT NAME Marilyn Fitzgerald  SIGNATURE | HOW RETURNED MAIL | DATE/TIME 7-31-01 3:00 |

| LOG NO: 225 | AS | CAS | CLTR | LTR | NLV | TYPE | REV. | EXHIBIT NO: |
|---|---|---|---|---|---|---|---|---|

Alabama Department of
**Public Safety**

BUREAU OF INVESTIGATION

FINGERPRINT EXAMINATION REQUEST
- ABI-28 (2-95)

RETURN TO: LATENT PRINT UNIT
P. O. BOX 1511
Montgomery, AL 36192-0501
Phone: (334) 242-4244

TYPE OR PRINT CLEARLY (USE BLACK INK) AND SUBMIT IN TRIPLICATE

| | |
|---|---|
| CONTRIBUTOR TITLE: *Detective* | 6. CONTRIBUTOR CASE NO: *2001- 05- 3060* |
| 2. NAME *Rick A. Hauser* | 7. TYPE OF CRIME: *Capal Murder* |
| 3. AGENCY *Enterprise Police Dept* | 8. DATE OF CRIME: *5/23/01* |
| ADDRESS   P. O. BOX *501 South Main Street* | 9. VICTIM OF CRIME: *Jelene Dennis* |
| CITY *Enterprise*  STATE *Al*  ZIP *36330* | 10. DPS LATENT CASE NO: *09-1677-05-01* |
| 4. PHONE NO. *(334) 347-1211* | 11. NEW CASE: ✓   12. ADDITIONAL EVIDENCE OR SUSPECT |
| 5. REPORT TO: *Hauser* | 13. SPECIAL INSTRUCTIONS: |

| | | | |
|---|---|---|---|
| 14. SUBMITTED BY: *R. Hauser*   PRINT NAME | 15. SIGNATURE | 16. AGENCY *EPD* | 17. DATE/TIME *5-29-01  10:25,* |

18. DETAILED LIST OF ITEMS SUBMITTED: INCLUDE NAME, RACE, SEX, DOB, OF ALL SUSPECTS. USE EXTRA SHEETS IF NECESSARY

① 22 Caliber Rifle
    SN: 20569409

② SKS Rifle
    SN: 9210533

③ Brown Bag with $5.00 Bill

Suspects   Brian Smith   B/m
           DOB  6/27/83
           Brian Yeoman   B/m
           DOB  08/05/82
           Robert Conrad   B/m
           DOB  9/30/80

Please Process for Latents of Value check with Suspect Known Prints

| 19. FOR DPS USE ONLY | | | | | |
|---|---|---|---|---|---|
| RECEIVED BY: *Shanna Fitzgerald*   PRINT NAME   SIGNATURE | | HOW RECEIVED *personally* | DATE/TIME *10:25 Am  5-29-01* |
| NCE RETURNED TO: *Det Hauser*   PRINT NAME   SIGNATURE | | AGENCY *EPD* | DATE/TIME *7-24-01  11:30 Am* |
| EVIDENCE RETURNED BY: *V. Shanna Fitzgerald*   PRINT NAME   SIGNATURE | | HOW RETURNED *personally* | DATE/TIME *7-24-01  11:30A* |

| LOG NO: | | AS | CAS | CLTR | LTR | NLV | TYPE | REV. | EXHIBIT NO: |
|---|---|---|---|---|---|---|---|---|---|

FINGERPRINT EXAMINATION REQUE
ABI-28 (2-9

Alabama Department of
**Public Safety**

## BUREAU OF INVESTIGATION

RETURN TO: LATENT PRINT UNIT
P. O. BOX 1511
Montgomery, AL 36192-05
Phone: (334) 242-4244

E OR PRINT CLEARLY (USE BLACK INK) AND SUBMIT IN TRIPLICATE

| | |
|---|---|
| 1. CONTRIBUTOR TITLE: *Detective* | 6. CONTRIBUTOR CASE NO: 2001 - 05 - 3060 |
| 2. NAME: *Rick A Hamm* | 7. TYPE OF CRIME: *Capital Murder* |
| 3. AGENCY: *Enterprise Police Dept* | 8. DATE OF CRIME: 5/23/01 |
| ADDRESS    P.O. BOX  501 South Main Street | 9. VICTIM OF CRIME: *Jelmene Dennis* |
| CITY *Enterprise*  STATE *AL*  ZIP 36330 | 10. DPS LATENT CASE NO: 05-1677-05-01 |
| 4. PHONE NO: (334) 347-1211 Ext 207 | 11. NEW CASE:    12. ADDITIONAL EVIDENCE OR SUSPECT ✓ |
| 5. REPORT TO: *Hamm* | 13. SPECIAL INSTRUCTIONS: |

| 14. SUBMITTED BY: *R. Hamm* | PRINT NAME | 15. SIGNATURE | 16. AGENCY *EPD* | 17. DATE/TIME |
|---|---|---|---|---|

18. DETAILED LIST OF ITEMS SUBMITTED: INCLUDE NAME, RACE, SEX, DOB, OF ALL SUSPECTS. USE EXTRA SHEETS IF NECESSARY

(1) Set of Major case Prints on    Please use for Comparison on latents found at Scene & on weapon

(A) B/m Robert Connell

(B) B/m Bryan Yeoman

(C) B/m Brian Smith

19. FOR DPS USE ONLY

| RECEIVED BY: *Sharon Fitzgerald* | PRINT NAME | SIGNATURE | HOW RECEIVED *Personally* | DATE/TIME 10:25 5-25-01 |
|---|---|---|---|---|
| EVIDENCE RETURNED TO: *Net* | PRINT NAME *Hausler* | SIGNATURE | AGENCY (EPD) | DATE/TIME 7-30-01 3:04pm |
| EVIDENCE RETURNED BY: *Norman* | PRINT NAME *Kim* | SIGNATURE | HOW RETURNED *Mail* | DATE/TIME 7-30-01 3:04pm |

| LOG NO: | AS | CAS | CLTR | LTR | NLV | TYPE | REV: | EXHIBIT NO: |
|---|---|---|---|---|---|---|---|---|

FINGERPRINT EXAMINATION REQUE
ABI-28 (2-

Alabama Department of
# Public Safety

## BUREAU OF INVESTIGATION

RETURN TO: LATENT PRINT UNIT
P. O. BOX 1511
Montgomery, AL 36192-0
Phone: (334) 242-4244

E OR PRINT CLEARLY (USE BLACK INK) AND SUBMIT IN TRIPLICATE ·

| | |
|---|---|
| 1. CONTRIBUTOR TITLE: Sergeant | 6. CONTRIBUTOR CASE NO: 01053060 |
| 2. NAME Jeffery D. Spence | 7. TYPE OF CRIME: Capital Murder |
| 3. AGENCY: Enterprise Police Department | 8. DATE OF CRIME: May 23, 2001 |
| ADDRESS P.O. BOX 311000 | 9. VICTIM OF CRIME: Jelaine Dennis |
| CITY Enterprise   STATE A1   ZIP 36331 | 10. DPS LATENT CASE NO: 09-1677-09-01 |
| 4. PHONE NO: 334-347-1211 ext 218 | 11. NEW CASE: | 12. ADDITIONAL EVIDENCE OR SUSPECT XX |
| 5. REPORT TO: Sgt. Jeff Spence | 13. SPECIAL INSTRUCTIONS: request process of evidence and compare to suspects listed (major case prints sent) |
| 14. SUBMITTED BY: Hauser   PRINT NAME | 15. SIGNATURE | 16. AGENCY EPD | 17. DATE/TIME 10:2 6-12-01 |

18. DETAILED LIST OF ITEMS SUBMITTED: INCLUDE NAME, RACE, SEX, DOB, OF ALL SUSPECTS. USE EXTRA SHEETS IF NECESSARY

SUSPECTS:

SMITH, Brian B/M DOB: 06/27/1983 SSN: 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 MAJOR CASE PRINTS SENT ON 05/25/2001

ROMAN, Bryan B/M DOB: 08/05/1982 SSN: 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 MAJOR CASE PRINTS SENT ON 05/25/2001

CONRAD, Robert B/M DOB: 09/30/1980 SSN: 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 MAJOR CASE PRINTS SENT ON 05/25/2001

EVIDENCE:

A. ✗ sealed enveloped containing one index card with latent lifts from cash register

B. ✓ sealed envelope containing one soft cigarette pack

C. ✓ sealed envelope containing one cordless telephone hand receiver

D. ✓ sealed envelope containing one flash suppressor for an assault type weapon

E. ✓ sealed envelope containing one ten round magazine for an assault type weapon

F. ✓ sealed envelope containing one thirty round magazine for an assault type weapon

G. ✓ sealed envelope containing five 7.62 rounds

H. ✓ sealed envelope containing one Tommy Hilfiger sock with 26 7.62 rounds

10:25 an

19. FOR DPS USE ONLY

| | | | |
|---|---|---|---|
| RECEIVED BY: Shannon Fitzgerald   PRINT NAME | SIGNATURE | HOW RECEIVED Personally | DATE/TIME 6-12-01 |
| EVIDENCE RETURNED TO: Lt. Hauser   PRINT NAME | SIGNATURE | AGENCY EPD | DATE/TIME 7-24-01  11:30A |
| EVIDENCE RETURNED BY: Shannon   PRINT NAME | SIGNATURE | HOW RETURNED Personally | DATE/TIME 7-24-01  11:30A |
| LOG NO: | AS | CAS | CNTR | LTR | NLV | TYPE | REV. | EXHIBIT NO: |

LATENT CASE #  05-1677-05-01

Specimens Rec                    :
Rec. personally from Det Hauser
5-24-01 @ 9:30AM    1 sealed env. containing  (7) white cards w/ (8)
lat lifts

                        Named:

                        Robert Conard  B/m   9-30-80

                        Brian Smith    B/m   6-27-83

                        Bryan Yeoman   B/m   8-5-82


5-29-01 @ 10:25 AM  Rec. personally from Det. Hauser
        (1) sealed cardboard box containing  (1) 22 caliber Rifle
    serial # 205269405
        (1) sealed cardboard box containing  (1) SKS Rifle
        serial # 9210533
        (1) sealed brown bag containing  (1) $5.00 Bill # BA 244023


        (1) set of major line prints for each:

                        Robert Conard  B/m   9-30-80

                        Bryan Yeoman   B/m   8-5-82

                        Brian Smith    B/m   6-27-83


10-12-01 @ 10:25 AM  Rec. personally from Det. Hauser
        (1) sealed env. containing  (1) white card w/ (2) lat lift
        (1) sealed env. containing  (1) pk. of Winston cig.
        (1) sealed env. containing  (1) cordless telephone
        (1) sealed env. containing  (1) flash suppressor
        (1) sealed env. containing  (1) 10 Round magazine
        (1) sealed env. containing  (1) 30 Round magazine
        (1) sealed env. containing  (5) 7.62 Rounds

LATENT CASE # _____ 09-1677-09-01

Specimens Rec. Cont. _____ :

(1) sealed env. containing (1) Tommy Hilfiger sock  w/ 26  7.42 round

LATENT CASE NO. _____ D9-1677-09-01 _____

TYPE OF PROCESSING CONDUCTED:

DATE 6-25-01 POROUS ITEMS: NIN. ✓ SUPER GLUE ____ POWDER ____ LASER ____ OT

DATE 6-28-01 NON-POROUS ITEMS: SUPER GLUE ✓ POWDER ✓ LASER ____ OTHER _

DATE 6-28-01 EXPLANATION OF OTHER TYPES OF EXAMINATIONS CONDUCTED: _exam___

_____ for LOV + compare w/ sub inked prints + AFIS _____

RESULTS OF EXAMINATION:

1 lat. f.p. of value was found on lift labeled, "Front Door" Marked L#1 - unidentified

1 lat. f.p. of value was f'd on lift labeled, "Front Door" Marked L#2 - unidentified

1 lat. f.p. of value was f'd on lift labeled, "Front Door" Marked L#3 - unidentified

1 lat. impression of value was developed on ".22 caliber rifle scope" Marked L#4 - unidentified

No other LOV were f'd

L#1, 2 +3 were searched thru AFIS w/ no Ø's being effected. These prints have been registered w/ the AFIS data base for future comparison searches.

In order to adequately compare L#4 a better set of major case prints, to include lower finger + thumb joints, are needed on

LATENT CASE NUMBER: _____ 05-1677-05-01 _____

ISPOSITION OF EVIDENCE:

_____ Evd.s Inked prints retained to Det. HAuser _____

_____ Lifts retained w/ L.C. life _____

_____

DATE PHOTOGRAPHED: _____ CC TO: _____

REPORTED RESULTS TO: _____ DATE: _____ TIME ____

COURT APPEARANCE: _____ DATE: _____ DISPOSITION: _____

DISPOSITION OF COURT EVIDENCE: _____

EXAMINER: __ SF __ NOTED BY: __ __ DATE OF WORKSHEET: 2-17-01

_____

NOTES

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____







IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

| | | |
|---|---|---|
| STATE OF ALABAMA, | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CASE NO. CC 01-M-179, 180 |
| | * | |
| ROBERT THOMAS CONRAD, | * | |
| Defendant. | * | |

## STATE'S 6th SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR DISCOVERY

COMES NOW the State of Alabama, by and through the undersigned Assigned District Attorney, and pursuant to Rule 16.3 A.R. Crim. P. and files this supplemental response thereto.

1. Attached please find a scanned copy of five (5) photographs taken by Investigator Eddy Pennington with the District Attorney's Office, consisting of 2 scanned photographic pages at $2.00 per page to defense counsel. (PH 77-81)

2. Attached please find the Enterprise Police Department Waiver of Rights Form signed by Robert Conrad on 5-25-01, at 4:45, consisting of one (1) photostatic copy. (S/C3)

3. Attached please find the Enterprise Police Department Waiver of Rights Form signed by Robert Conrad on 5-25-01, at 10:20, consisting of one (1) photostatic copy. (S/C2)

4. Attached please find the Enterprise Police Department Interview Sheet dated May 24, 2001, at 1408, and the Enterprise Police Department Waiver of Rights Form dated May 24, 2001, at 1408, for Robert Conrad, consisting of two (2) photostatic copies. (S/C1)

5. Attached please find the Enterprise Police Department Interview Sheet dated may 23, 2001, at 2005, and the Enterprise Police Department Waiver of Rights Form dated May 23, 2001, at 2005, for Robert Conrad, consisting of two (2) photostatic copies. (S/C6)

1

DONE this _7th_ of March, 2002.

GLENDA STOUT (#PAR057)
ASSISTANT DISTRICT ATTORNEY
P. O. Box 311102
Enterprise, Alabama 36331
(334) 347-1142

## CERTIFICATE OF SERVICE

I, Glenda Stout, Assistant District Attorney, hereby certify that the foregoing has been served upon Al Smith, Esquire, P.O. Drawer 389, Elba, Alabama 36323 by placing a copy of same in the United States Mail, first class postage prepaid, on this the _7_ day of March, 2002:

GLENDA STOUT (#PAR057)
ASSISTANT DISTRICT ATTORNEY

2

Name of Officer _B. Mathews_    Place _MCB    207_

Title _Investigator_    Date _5-25-07_

Time _9:45_

## YOUR CONSTITUTIONAL RIGHTS ACCORDING TO THE MIRANDA WARNING

Before we ask you any questions, you must understand your rights.

✓ 1.    You have the right to remain silent.

✓ 2.    Anything you say can and will be used against you in a court of law.

✓ 3.    You have the right to talk to a lawyer and have him present with you while you are being questioned

✓ 4.    If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning you wish.

5.    You can decide at any time to exercise these rights and not answer any questions or make any statemen

1.    Do you understand each of these rights I have explained to you?    Yes ✓    No _____

2.    Having these rights in mind, do you wish to talk to us now?    Yes ✓    No _____

## WAIVER OF RIGHTS

I have read, (or had read to me), this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promise or threats have been made to me and no pressure of any kind has been used against me to get me to make a statement.

Witness: _Dwight Holley_    Signed: _Robert Conrad_

Witness: _____    Date: _5/25/01_

Time: _____

Defendant's Name: _____    Age: _____ D.O.B. _____

Address: _____

Education: Grade completed - 1    2    3    4    5    6    7    8    (9)    10    11    12

College:    Yes _____ No ✓

Can you read and comprehend the english language?    Yes ✓    No ____

S/C3

Name of Officer _Dwight Holley / Brend Matthews_    Place _MCE Room 20-_

Title _Investigator_    Date _5-25-01_

Time _10:20_

## YOUR CONSTITUTIONAL RIGHTS ACCORDING TO THE MIRANDA WARNING

Before we ask you any questions, you must understand your rights.

1. You have the right to remain silent.

2. Anything you say can and will be used against you in a court of law.

3. You have the right to talk to a lawyer and have him present with you while you are being questio

4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questionir you wish.

5. You can decide at any time to exercise these rights and not answer any questions or make any statem

1. Do you understand each of these rights I have explained to you?    Yes ✓ No _____

2. Having these rights in mind, do you wish to talk to us now?    Yes ✓ No _____

## WAIVER OF RIGHTS

I have read, (or had read to me), this statement of my rights and I understand what my rights are. I willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and kn what I am doing. No promise or threats have been made to me and no pressure of any kind has been us against me to get me to make a statement.

Witness: _Dwight Holley_    Signed: _Robert Conrad_

Witness: _Matthews_    Date: _5/25/01_

Time: _____

Defendant's Name: _Robert Conrad_    Age: _20_    D.O.B. _9-3-80_

Address: _35 Garden Oaks_

Education: Grade completed - 1    2    3    4    5    6    7    8    (9)    10    11    12

College:    Yes _____ No ✓

Can you read and comprehend the english language?    Yes ✓ No _____

ENTERPRISE POLICE DEPARTMENT
INTERVIEW SHEET

| NAME (LAST, FIRST, MIDDLE) | ALIAS | CASE: # 01 05 3060 |
|---|---|---|

NAME: Conrad   Robert   Thomas

CASE: # 01 05 3060
START DATE 05/24/01
START TIME 1408
LOCATION OF INTERVIEW MCF
STOP DATE 05/24/01
STOP TIME

SUSPECT [X]   VICTIM [ ]   WITNESS [ ]
RELATIONSHIP TO SUSPECT:

SSN 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    DL OR OTHER ID # /STATE

DOB 09 30 80    AGE 20    POB Germany

SEX m    RACE B    HGT 6'00    WGT 155    EYES Bro    HAIR Blk

SCARS [ ]   MARKS [ ]   TATOOS [ ]   AMPUTATIONS [ ]

ACJIC/NCIC CHECK
YES [ ]   NO [ ]

HOME ADDRESS Apt 35 Garden Oaks, Enterprise Al    HOME PHONE 348-2150

TAPED INTERVIEW
YES [X]   NO [ ]
VIDEO [ ]   AUDIO [X]

EMPLOYER (NAME AND ADDRESS) ConAgra    BUSINESS PHONE

RIGHTS GIVEN BY Spence

SIO #    FBI #

INTERVIEW CONDUCTED BY Spence / Holley

FINGERPRINTED - YES [ ]   NO [X]    PHOTOGRAPHED - YES [ ]   NO [X]

STATEMENT

S/C1

# ENTERPRISE POLICE DEPARTMENT

CASE NUMBER: _O1 05 3060_

LOCATION: _CID  MCF_

DATE: _05/24/01_ TIME: _1408_

**BEFORE YOU ARE ASKED ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.**

1.  You have the right to remain silent.

2.  Anything you say can be used against you in court or other proceedings.

3.  You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

4.  If you cannot afford a lawyer, one will be appointed without cost to you before any questioning, if you wish.

5.  If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time you wish.

## WAIVER OF RIGHTS

I have been advised of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

NAME: _Unable to sign_

SIGNATURE: _____

EDUCATION: _9th_

LANGUAGE: _English_

WITNESS: _____

WITNESS: _____

Enterprise P.D. Form 96-041

ENTERPRISE POLICE DEPARTMENT
INTERVIEW SHEET

| NAME (LAST, FIRST, MIDDLE) | ALIAS | CASE # 01 05 3060 |
|---|---|---|

Conrad, Robert Thomas

START DATE 05/23/01

SUSPECT [X]  VICTIM [ ]  WITNESS [ ]
RELATIONSHIP TO SUSPECT:

START TIME 2005

| SSN 419 17 5095 | DL OR OTHER ID # /STATE | LOCATION OF INTERVIEW  MCE |
|---|---|---|
| DOB 09 30 80 | AGE 20 | POB Germany | STOP DATE 05/23/01 |
| SEX M | RACE B | HGT 6'00 | WGT 155 | EYES BRO | HAIR Blk | STOP TIME 20 19 |

SCARS [ ]  MARKS [ ]  TATOOS [ ]  AMPUTATIONS [ ]

ACJIC/NCIC CHECK
YES [ ]  NO [X]

| HOME ADDRESS  Apt 35 Garden Oaks   Enterprise Al | HOME PHONE  348-2150 | TAPED INTERVIEW  YES [ ]  NO [X]  VIDEO [ ]  AUDIO [ ] |
|---|---|---|
| EMPLOYER (NAME AND ADDRESS) | BUSINESS PHONE | RIGHTS GIVEN BY  Spence |

| SID # | FBI # | INTERVIEW CONDUCTED BY  Mathews / Spence |
|---|---|---|
| FINGERPRINTED - YES [ ]  NO [ ] | PHOTOGRAPHED - YES [ ]  NO [ ] | |

INTERVIEW RECORDS

STATEMENT

NARRATIVE

NARRATIVE

NARRATIVE

S/C6

PAGE ___ OF ___

# ENTERPRISE POLICE DEPARTMENT

CASE NUMBER: _01 05 3060_

LOCATION: _MCC_

DATE: _05 230l_  TIME: _2005_

## BEFORE YOU ARE ASKED ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

1. You have the right to remain silent.

2. Anything you say can be used against you in court or other proceedings.

3. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

4. If you cannot afford a lawyer, one will be appointed without cost to you before any questioning, if you wish.

5. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time you wish.

## WAIVER OF RIGHTS

I have been advised of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

NAME: _Robert Conrad_

SIGNATURE: _Unable to sign_

EDUCATION: _9th_

LANGUAGE: _English_

WITNESS: _____

WITNESS: _____

Enterprise P.D. Form 96-041



PH77

PH78

PH79



PH80



PH81

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,          *
    Plaintiff,          *
                  *
vs.          *          CASE NO. CC 01-M-179, 180
                  *
ROBERT THOMAS CONRAD,          *
    Defendant.          *

### STATE'S 7th SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR DISCOVERY

    **COMES NOW** the State of Alabama, by and through the undersigned Assigned District Attorney, and pursuant to Rule 16.3 A.R. Crim. P. and files this supplemental response thereto.

1.    Attached please find the Enterprise Police Department Interview Sheet and Notification of Rights dated 05/23/01, for Brian James Smith, consisting of two (2) photostatic copies. (S/S1)

2.    Attached please find the Enterprise Police Department Interview Sheet and Waiver of Rights dated 05/23/01, for Bryan Yeoman, consisting of two (2) photostatic copies. (S/Y1)

**DONE** this _13_ of March, 2002.

                            GLENDA STOUT (#PAR057)
                            ASSISTANT DISTRICT ATTORNEY
                            P. O. Box 311102
                            Enterprise, Alabama 36331
                            (334) 347-1142

### CERTIFICATE OF SERVICE

    I, Glenda Stout, Assistant District Attorney, hereby certify that the foregoing has been served upon Al Smith, Esquire, P.O. Drawer 389, Elba, Alabama 36323 by placing a copy of same in the United States Mail, first class postage prepaid, on this the _12_ day of March, 2002:

                            GLENDA STOUT (#PAR057)
                            ASSISTANT DISTRICT ATTORNEY

MAR 2002
FILED
J.M. Counts
Circuit Clerk
Coffee Co. AL

1

ENTERPRISE POLICE DEPARTMENT
INTERVIEW SHEET

| NAME (LAST, FIRST, MIDDLE) Smith, Brian James | ALIAS | CASE # 0105 3060 |
|---|---|---|
| | | START DATE 05/23/01 |

SUSPECT ☒ VICTIM [ ] WITNESS [ ]
RELATIONSHIP TO SUSPECT:

START TIME 2110

SSN 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   DL OR OTHER ID # /STATE

LOCATION OF INTERVIEW CID

DOB 06 27 83   AGE 17   PCB Bronx NY

STOP DATE 05/23/01

SEX M   RACE B   HGT 6'4   WGT 200   EYES Brn   HAIR Blk

STOP TIME

SCARS [ ]   MARKS [ ]   TATOOS ☒   AMPUTATIONS [ ]

ACJIC/NCIC CHECK
YES [ ]   NO ☒

HOME ADDRESS 1591 E. Park Ave   Apt 228   HOME PHONE 393-8322

TAPED INTERVIEW
YES ☒   NO [ ]
VIDEO [ ]   AUDIO ☒

EMPLOYER (NAME AND ADDRESS)   BUSINESS PHONE

RIGHTS GIVEN BY Spence

SID #   FBI #

INTERVIEW CONDUCTED BY Spence / Moore

FINGERPRINTED - YES [ ]   NO [ ]   PHOTOGRAPHED - YES ☒   NO [ ]

STATEMENT

NARRATIVE

NARRATIVE

NARRATIVE

5/51

| State of Alabama Unified Judicial System | NOTIFICATION OF RIGHTS | Case Number |
| --- | --- | --- |
| Form JU-18    Rev. 5/94 | | |

IN THE JUVENILE COURT OF _____ Coffee _____ COUNTY, ALABAMA

In The Matter Of _____ Brian James Smith _____

### THIS IS TO INFORM YOU THAT:

1. Both the child and the parent, guardian, or custodian have the right to be represented by legal counsel.

2. If you, as a child, are unable to pay a lawyer and if your parents or guardian have not provided a lawyer, one may be appointed for you by the court.

3. If you, as a parent or guardian, wish to be represented by an attorney and think you cannot afford to provide yourself with an attorney, you may complete a sworn Affidavit of Substantial Hardship which will be reviewed by the court and, if you are determined to be indigent or partially indigent, an attorney may be appointed to represent you.

4. If an attorney is appointed to represent you, as a parent or guardian, and, after a hearing, it is determined at this time or at some point in the future you would be able to pay for the services of an attorney, you will be ordered to reimburse the State of Alabama for any attorney's fees paid in your behalf.

5. If your child is adjudicated to have committed an act of delinquency, you, as the child's parent or guardian, may be ordered to pay restitution for damage resulting from your acts, a fine of up to $250.00, a mandatory contribution to the Alabama Crime Victims' Compensation Fund, attorney's fees, if an attorney is appointed to represent you or your child, and court costs in each case.

6. You, as a parent or guardian, may be ordered to perform any reasonable act determined by the court to be in the best interest of your child.

7. If an out-of-home placement or commitment of your child is made, you, as a parent or guardian, may be ordered to pay child support for the child in an amount determined based upon your income in accordance with Rule 32, Alabama Rules of Judicial Administration. Any and all entitlements or benefits paid for the benefit of the child will be ordered redirected to the child's physical/legal parent or guardian.

8. You, as a child, are not required to say anything, and anything you say may be used against you.

9. You, as a child, have the right to communicate with counsel, parents or guardians. Reasonable means will be provided for you to do so.

10. IF YOU, AS A CHILD, ARE PLACED IN DETENTION:

   a. You will be fully informed of the reasons for your detention.
   b. You will have a detention hearing within 72 hours.
   c. Your parents or guardian will be notified of your detention.

05 / 23 / 01 _____ 2133 _____ _____
Date _____ Time _____ Read and Explained By (Signature)

WE ACKNOWLEDGE HAVING BEEN READ MY RIGHTS BY THE ABOVE-NAMED PERSON, AND WE FULLY AND CLEARLY UNDERSTAND THEM AS ALL HAVE BEEN FULLY AND CLEARLY EXPLAINED TO US.

05/23/01 _____ _____ Brian Smith _____
Date _____ Signature of Child

_____ _____
Date _____ Signature of Parent/Guardian

360

## ENTERPRISE POLICE DEPARTMENT
### INTERVIEW SHEET

| NAME (LAST, FIRST, MIDDLE) | ALIAS | CASE # |
|---|---|---|
| Yeoman, Bryan Glenn | BY | START DATE 05/23/01 |

SUSPECT [X]  VICTIM [ ]  WITNESS [ ]
RELATIONSHIP TO SUSPECT:

| | | |
|---|---|---|
| SSN 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 | DL OR OTHER ID # /STATE | START TIME 2031 |
| DOB 08-05-82 | AGE 18 | POB Tampa Fl |
| SEX m | RACE B | HGT 5'11 | WGT 167 | EYES Bro | HAIR Blk |

START DATE 05/23/01
START TIME 2031
LOCATION OF INTERVIEW CID
STOP DATE
STOP TIME

SCARS [ ]  MARKS [ ]  TATOOS [ ]  AMPUTATIONS [ ]

| HOME ADDRESS | HOME PHONE |
|---|---|
| Greentree Apts 117, Enterprise, Al | 334-333-2559 |

ACJIC/NCIC CHECK
YES [ ]  NO [ ]

TAPED INTERVIEW
YES [X]  NO [ ]
VIDEO [ ]  AUDIO [X]

| EMPLOYER (NAME AND ADDRESS) | BUSINESS PHONE |
|---|---|
| KFC | |

RIGHTS GIVEN BY
Spence

| SID # | FBI # |
|---|---|

INTERVIEW CONDUCTED BY
Spence/Moore

FINGERPRINTED - YES [ ]  NO [X]    PHOTOGRAPHED - YES [ ]  NO [X]

STATEMENT

5/41

# ENTERPRISE POLICE DEPARTMENT

CASE NUMBER: _01 05 3060_

LOCATION: _C I O_

DATE: _05/23/01_ TIME: _2031_

**BEFORE YOU ARE ASKED ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.**

1. You have the right to remain silent.

2. Anything you say can be used against you in court or other proceedings.

3. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

4. If you cannot afford a lawyer, one will be appointed without cost to you before any questioning, if you wish.

5. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time you wish.

## WAIVER OF RIGHTS

I have been advised of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

NAME: _X Bryan Yeoman_

SIGNATURE: _X Bryan Yeoman_

EDUCATION: _11 TH_

LANGUAGE: _English_

WITNESS: _X_

WITNESS: _X_

Enterprise P.D. Form 96-041

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PLAINTIFF, | ) | COFFEE COUNTY, ALABAMA |
| | ) | |
| VS. | ) | ENTERPRISE DIVISION |
| | ) | |
| ROBERT THOMAS CONRAD, | ) | |
| | ) | |
| DEFENDANT. | ) | CASE NO.  CC-2001-M-179 & 180 |
| | | CC-2001-M-364 & 365 |

## ORDER

On joint motion, the trial of these cases are Ordered continued past the May 6, 2002 criminal jury term until the September 23, 2002  at 9:00 a.m. criminal jury term of court with a call of the docket scheduled for the 15th day of August, 2002 at 9:00 a.m. in the courthouse building, Enterprise, Alabama.

The Clerk of Court is requested to forward a copy of this 'Order' to the attorneys and/or parties of record.

Done and Ordered this the 8th day of April, 2002.

Gary L. McAliley, Circuit Judge
Twelfth Judicial Circuit
State of Alabama

APR 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

C: DA,
D,
Bradshaw
Smith

| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PLAINTIFF, | ) | COFFEE COUNTY, AL |
| | ) | |
| VS. | ) | ENTERPRISE DIVISION |
| | ) | |
| ROBERT THOMAS CONRAD, | ) | |
| | ) | |
| DEFENDANT. | ) | CASE #s: CC-2001-M-179 |
| | | and |
| | | CC-2001-M-180 |

## O R D E R

*The above styled cases are presently set for trial by jury during the criminal jury term of court scheduled to begin on the 10th day of June, 2002 at 9:00 a.m.*

*Therefore a "status conference" and motions hearing is set to begin on the 30th day of May, 2002 at 9:00 a.m.*

*The Sheriff of Coffee County, Alabama is to take all actions necessary to make sure the Defendant is present before this Court for the purposes of a status conference and motions hearing. Likewise, the Defense attorneys and the state are to be present.*

*Done and ordered this the 22nd day of May, 2002.*

**GARY L. McALILEY, CIRCUIT JUDGE**
**TWELFTH JUDICIAL CIRCUIT**
**STATE OF ALABAMA**

MAY 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

c: DA,
smith
+
Braddaw

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

MAY 2002
FILED
I.M. G...
.... Co. AL

| | | |
|---|---|---|
| STATE OF ALABAMA, | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CASE NO. CC 01-M-179, 180 |
| | * | |
| ROBERT THOMAS CONRAD, | * | |
| Defendant. | * | |

### STATE'S 8th SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR DISCOVERY

**COMES NOW** the State of Alabama, by and through the undersigned Assigned District Attorney, and pursuant to Rule 16.3 A.R. Crim. P. and files this supplemental response thereto.

1.  Attached please find a letter from Emily Wofford Ward, M.D., dated April 16, 2002, with the Alabama Department of Forensic Sciences Report of Autopsy and attachments, consisting of fifteen (15) photostatic copies. (F5)

**DONE** this the 22nd day of May, 2002.

_Glenda Stout_
GLENDA STOUT (#PAR057)
ASSISTANT DISTRICT ATTORNEY
P. O. Box 311102
Enterprise, Alabama  36331
(334) 347-1142

### CERTIFICATE OF SERVICE

I, Glenda Stout, Assistant District Attorney, hereby certify that the foregoing has been served upon Al Smith, Esquire, P.O. Drawer 389, Elba, Alabama  36323 by placing a copy of same in the United States Mail, first class postage prepaid, on this the 22nd day of May, 2002:

_Glenda Stout_
GLENDA STOUT (#PAR057)
ASSISTANT DISTRICT ATTORNEY

1



ALABAMA
DEPARTMENT OF FORENSIC SCIENCES

REGIONAL LABORATORY
P.O. BOX 210516
MONTGOMERY, AL 36121-0516
(334) 242-2938
FACSIMILE (334) 240-3284

MEDICAL EXAMINER
P.O. BOX 240591
MONTGOMERY, AL 36124-0591
(334) 242-3093
FACSIMILE (334) 260-8734

## REPORT OF AUTOPSY

CASE NO.   01MM00435 (01AH30)    DATE/TIME:  May 24, 2001
                                             12:00 p.m.

COUNTY:   Coffee

**DECEDENT:**  Evelyn Jelaine Dennis

AGE:  39 Years   SEX:  Female   LENGTH:  65 Inches   WEIGHT:   160
pounds

### FINAL ANATOMIC DIAGNOSES

I.   Multiple Gunshot Wounds.

   A.   Perforating gunshot wound of the chest with perforation
        of the right lung.
   B.   Perforating gunshot wound of the left buttock and hip.
   C.   Penetrating gunshot wound of the left thigh.

II.  Additional Anatomic Diagnoses.

   A.   Postmortem Toxicology - See Attached.

   **CAUSE OF DEATH:**     Multiple Gunshot Wounds.

   **MANNER OF DEATH:**    Homicide.

page 1 of 7

page 2 of 7
Case 01MM00435
AUTOPSY PROTOCOL

## AUTHORIZATION:

At the request of Coffee County Coroner Tim Whitehead, and under the authority granted by District Attorney Mark Fuller, as defined in Section 36-18-2, Code of Alabama, 1975, a postmortem examination is performed on Evelyn Jelaine Dennis, at the Central Alabama Forensic Medicine Facility in Montgomery, Alabama, on May 24, 2001, commencing at 12:00 p.m. Authorization was obtained May 23, 2001, at 3:45 p.m., from District Attorney Mark Fuller.

## IDENTIFICATION

The body is identified by plastic white ID bracelets on the left wrist and right ankle imprinted with the name of the deceased.

## CLOTHING AND PERSONAL EFFECTS

The clothing is partly cut-off of the body and includes a pair of blue denim jeans with bloodstains on the back and on the lateral aspect to the left thigh. Holes are present in the left leg and the left rear pocket area which correspond to the gunshot entry wounds on the left thigh and left buttock, respectively. Another hole is present on the left hip area which corresponds to the exit wound on the body. A few particles of gunpowder are visible around the entrance defect on the left leg of the jeans. All of the holes are also surrounded with copious amounts of blood soaked into the material. A knit stripe short sleeve shirt is received which is soaked with blood. The shirt also exhibits two holes, one of which is on the front of the right side of the chest of the shirt, and the other of which is on the right side near the arm seam. The hole on the front of the shirt is approximately 1-1/4 inch in diameter. It is surrounded by some dried black material, and a large amount of blood. The edges of this hole in the front of the shirt have a burned appearance where some of the synthetic fibers appear to have melted together. Part of a white bra is also received with the body. The bra is soaked with blood and the right front of the bra is not identified with the other clothing articles. One white athletic sock is present on the right foot which is noticeably not bloody. The left sock is not identified. The clothing is all photographed, dried, and packaged for transfer to the laboratory. A gold colored ring with small hearts on it is present on the left fourth finger.

## EVIDENCE OF INJURY

The gunshot wounds described below are numbered arbitrarily.

page 3 of 7
Case 01MM00435
AUTOPSY PROTOCOL

GUNSHOT WOUND # 1:

A gunshot entrance wound is present on the right side of the front
of the chest. It is located 14-1/2 inches from the top of the head
and 1-1/2 inches to the right of the midline. The entrance wound
is round with a diameter of 3/8 inch, and it is surrounded by a
concentrically shaped area of abrasion and superficial burning of
the skin. The area of abrasion has a horizontal dimension of 1-1/2
inches and a vertical dimension of 1-1/4 inches. No gunpowder
particles are visible around the entrance wound. The abraded area
appears to have been discolored with black sooty material, although
the soot is not clearly distinguishable from the other skin
changes. The bullet passed through the right side of the chest
wall, through the right third rib, fracturing the rib in its
course. Then the bullet entered the right hemithorax and passed
through the right upper lobe, the right middle lobe, and passed
into the posterior chest wall through the right sixth intercostal
space. The bullet exited the right lateral aspect of the chest
lateral to the defect in the right sixth intercostal space. The
exit wound is irregular shaped with a diameter of 1/2 inch. No
soot, stippling abrasions, or gunpowder particles are visible
around the exit wound. The exit wound is located 18 inches from
the top of the head and 10 inches to the right of the midline. The
bullet passed through the body in a direction from left to right,
downward, and backward. A large right hemopneumothorax resulted.
Hemorrhage is visible in the right lung parenchyma surrounding the
wound track.

GUNSHOT WOUND # 2:

A gunshot entrance wound is present on the back of the left
buttock, 30 inches from the top of the head and 2 inches to the
left of the midline. The entrance wound is round with a diameter
of 3/8 inch, and it is surrounded by an eccentrically shaped
marginal abrasion which is widest medially. The abrasion has a
maximum dimension of 1/4 inch. No soot, stippling abrasions, or
gunpowder particles are visible around the entrance wound. The
bullet passed through the left buttock, through the fatty tissues,
and apparently struck the left pelvic bone, changing slightly in
direction, and it exited the lateral aspect of the left hip, 29
inches from the top of the head and 9 inches to the left of the
anterior midline plane. The exit wound is irregularly shaped with
a diameter of 1/2 inch. No soot, stippling abrasions, or gunpowder
particles are visible around the exit wound. The bullet passed
through the body in a direction from right to left, slightly
upward, and slightly forward. The bullet did not pass into the
peritoneal cavity or the pelvis area.

page 4 of 7
Case 01MM00435
AUTOPSY PROTOCOL

GUNSHOT WOUND # 3:

A gunshot entrance wound is present on the lateral aspect of the
left thigh.  It is located 26-1/2 inches from the bottom of the
left heel and 6-1/2 inches lateral to the anterior midline plane.
The entrance wound is round with a diameter of 3/8 inch and is
surrounded by an eccentrically shaped marginal abrasion which is
widest inferiorly.  The abrasion has a greatest dimension of 1/4
inch.  No soot or gunpowder particles are visible around the skin
of the entrance wound.  However, several tiny particles are visible
through the transparent tape which is pressed against the skin
around the wound.  The bullet passed through the left side of the
thigh, through the soft tissues of the thigh, and became lodged in
the posterior aspect of the left buttock.  A small 1/2 inch
subcutaneous contusion is visible in the skin of the left buttock
at a point 32 inches from the top of the head and 4 inches to the
left of the posterior midline plane.  The medium caliber copper-
jacketed bullet is recovered from the subcutaneous tissues of the
left buttock just beneath the area of contusion.  The bullet passed
through the body in a direction upward, backward, and slightly from
left to right.  The bullet is cleaned, photographed, and packaged
for subsequent transfer to the laboratory for further evaluation.

**EVIDENCE OF MEDICAL INTERVENTION:**

An endotracheal tube is present in the oral cavity and in the
trachea.  Several EKG pads are stuck to the anterior aspect of the
chest wall.  An orange rectangular plastic device is also adherent
to the left side of the chest wall.  A chest tube is in place in
the right side of the chest through the right eighth intercostal
space in the anterior axillary line.  An intravascular catheter is
in place in the right antecubital fossa and the right groin area.
A foley catheter is in the urethra.

**EXTERNAL EXAMINATION**

The body is that of a middle-aged white female appearing to be the
stated age of 39 years with a length of 65 inches and a weight of
160 pounds.  The body is in full rigor mortis, and the skin is cool
to touch.  Minimal lividity is developed posteriorly.  The skin is
cold to touch.

The head is normally developed.  The head hair is long, thick,
wavy, and blonde with a greatest length of more than 20 inches.
The eyes are hazel in color with a small amount of make-up visible
including eyeliner and mascara.  No petechial hemorrhages are
visible in the conjunctiva or in the skin of the face or the buccal
mucosa.  A small amount of fluid is draining from the nose.  A

page 5 of 7
Case 01MM00435
AUTOPSY PROTOCOL

small amount of dried brown material is draining from the left side of the mouth. The permanent teeth in the mouth are in adequate repair. No abrasions or contusions of the neck or face are visible. The chest is symmetrically developed. Several striae are visible in the skin of the breasts. The abdomen is not distended or tense. The extremities are symmetrically developed. The hands are covered with brown paper bags.

Prior to further examination, the bags are cut from the hands, and the hands are examined for the presence of injury or foreign material. A 1-1/4 inch by 1/4 inch linear area of black sooty material is deposited on the palm of the left hand where the fingers join the hand across the left index and middle fingers. No distinct gunpowder particles are visible in this area of discoloration, and no contusion or edema of the skin underneath the soot is seen. The fingernails are neatly manicured with dark pink polish on the nails. A 1/2 inch abrasion is present on the medial aspect of the right wrist. No other injuries or foreign material is visible on the hands.

The lower extremities are symmetrically developed. The toenails are covered with the same dark pink polish that is visible on the fingernails. No abrasions or contusions of the lower extremities are visible other than those previously described associated with the gunshot wounds. The back and buttocks are not remarkable. The genitalia are that of a female adult. Some of the pubic hair has been partly shaved. No injuries or abnormalities of the perineum or perianal tissues are visible.

### INTERNAL EXAMINATION

BODY CAVITIES: Approximately 400 cc. of bloody fluid is present in the right pleural space. No significant fluid is present in the left pleural space or the pericardial sac. Also, no fluid is visible in the peritoneal cavity.

CARDIOVASCULAR: The heart weighs 350 grams. The epicardium is smooth and glistening. The coronary arteries course in the usual anatomic fashion with thirty percent narrowing of the left anterior descending artery. No other areas of atherosclerosis are visible. No hemorrhage or fibrosis is visible in the myocardium. The endocardium is thin and smooth. The left ventricular wall is 1.1 cm. in thickness. The cardiac valves are normally formed and delicate. No significant atherosclerosis of the aorta is demonstrable.

page 6 of 7
Case 01MM00435
AUTOPSY PROTOCOL

RESPIRATORY:  The right lung weighs 520 grams.  The left lung weighs 420 grams.  The trachea and major bronchi are opened and a small amount of bloody mucoid material is visible in the right mainstem bronchus, extending peripherally into the right lung. Otherwise, no abnormalities or occlusions of the airway are visible.  The pleural surfaces of the lungs are smooth.  Moderate anthracotic pigmentation is visible in the pleural lymphatics. The cut surfaces of the lungs reveal hemorrhage in the right lung in the vicinity of the gunshot wound track.  No other areas of hemorrhage or consolidation are visible.  Mild emphysematous destruction is visible in the apices of the lungs bilaterally.

HEPATOBILIARY: The 1570 gram liver has a smooth glistening capsule and a sharp edge.  The parenchyma is dark reddish-brown without any visible fatty degeneration, fibrosis, or focal lesions.  The gallbladder contains a small amount of liquid bile with no stones.

SPLEEN:  The spleen weighs 220 grams.  The capsule is smooth and thin.  The cut surfaces are soft and dark reddish-brown.

ENDOCRINE SYSTEM:  The thyroid and adrenal glands are unremarkable. The pancreas maintains its usual lobular architecture without any visible fibrosis, hemorrhage, necrosis, or calcification.

GASTROINTESTINAL:  The stomach contents consist of about 100 cc. of thick brown mucoid material.  No ulceration or hemorrhage of the gastric mucosa is demonstrable.  The small and large intestines occupy their usual positions within the peritoneal cavity.  A few adhesions are encountered in the pelvic area and around the right inferior peritoneal area.  No other abnormalities to the gastrointestinal tract are identified.

INTERNAL GENITALIA:  Both ovaries are present in the pelvis. Adjacent to the ovaries are numerous small pieces of surgical suture material which are knotted together and covered with thick scar tissue.  The fallopian tubes and uterus are not identified. Several small simple cysts are present near the ovaries.

KIDNEYS:  The right kidney weighs 110 grams.  The left kidney weighs 110 grams.  The capsules strip easily.  The cortical surfaces are smooth.  The cut surfaces do not reveal any abnormalities in the cortex or medulla. The collecting systems and ureters are not dilated.  The bladder is not hypertrophied.  No urine is present in the bladder.

NECK ORGANS:  The strap muscles of the neck are individually dissected.  No soft tissue hemorrhages or bruises are identified. No fractures of the hyoid bone or laryngeal cartilages are present.

page 7 of 7
Case 01MM00435
AUTOPSY PROTOCOL

The vocal cords and epiglottis are not edematous or discolored. No injury of the cervical spinal column is visible.

CENTRAL NERVOUS SYSTEM:    The brain weighs 1280 grams.    Upon reflection of the scalp, no soft tissue hemorrhages are visible. The skull cap is removed, and no abnormalities of the meninges are visible. The cerebral gyral pattern appears to have been normally developed. The meninges are thin and clear. The vessels of the Circle of Willis course in the usual anatomic fashion without any significant intracranial atherosclerosis. Multiple coronal sections of the cerebral cortex do not reveal any areas of hemorrhage, fibrosis, or contusion. The ventricles are not dilated. The cerebellum and brainstem are sectioned, and no remarkable abnormalities are seen. The dura is stripped from the inner table of the skull. No skull fracture or intracranial hemorrhage is demonstrable.

Emily Wofford Ward, M.D.
Deputy Medical Examiner

EWW:bw

372



ABAMA DEPARTMENT OF
FORENSIC SCIENCES

Date 3/24/01

Case No. 01mm0035



ALABAMA
# DEPARTMENT OF FORENSIC SCIENCES

| REGIONAL LABORATORY | MEDICAL EXAMINER |
|---|---|
| P.O. BOX 210516 | P.O. BOX 240591 |
| MONTGOMERY, AL 36121-0516 | MONTGOMERY, AL 36124-0591 |
| (334) 242-2938 | (334) 242-3093 |
| FACSIMILE (334) 240-3284 | FACSIMILE (334) 260-8734 |

July 20, 2001

MEMORANDUM TO FILE:

RE:   Case No. 01MM00435
      Evelyn Jelaine Dennis, subject

BY:  Emily Wofford Ward, M.D.  *Ward*
     Deputy Medical Examiner

MICROSCOPIC EXAMINATION

Sections of the skin of the gunshot wounds, the heart, the kidney,
liver, spleen, and lungs do not reveal any significant microscopic
abnormalities.

EWW:bw



ALABAMA
## DEPARTMENT OF FORENSIC SCIENCES

| REGIONAL LABORATORY | MEDICAL EXAMINER |
|---|---|
| P.O. BOX 210516 | P.O. BOX 240591 |
| MONTGOMERY, AL 36121-0516 | MONTGOMERY, AL 36124-0591 |
| (334) 242-2938 | (334) 242-3093 |
| FACSIMILE (334) 240-3284 | FACSIMILE (334) 260-8734 |

July 31, 2001

Re:    Case 01A-01-MM-00435
Jelaine Dennis, subject

MEMORANDUM:    To File

BY:    Joseph M. Saloom, Forensic Scientist

SUBJECT:    Firearms Evidence Examination / Laboratory Results

During the course of the investigation of the above styled case, the following items of evidence were received from Enterprise Police Department Detective Rick Hauser on Thursday, May 24, 2001, by the undersigned.

01.00   One sealed brown paper bag containing one Clerke 1st revolver, caliber .22 Long Rifle, serial number 294415. This revolver was test fired using laboratory standard ammunition.

01.01   Four (4) fired CCI brand cartridge cases, caliber .22 Long/Long Rifle, removed from the cylinder of Exhibit 01.00 by the undersigned. Laboratory examination revealed some similarities to test fired cartridge cases, however, it could not be determined whether or not these cartridge cases were fired in the chambers of the Clerke revolver described previously as Exhibit 01.00.

01.02   One unfired CCI brand cartridge, caliber .22 Long Rifle, removed from the cylinder of Exhibit 01.00 by the undersigned.

02.00   One sealed brown paper bag containing one screw-capped plastic specimen jar containing one fired, copper color coated lead bullet, identified to be from Robert Conrad. Laboratory examination of this .22 caliber bullet revealed that it has been fired through the barrel of the Clerke revolver described previously as Exhibit 01.00.

The following additional items of evidence were received from Enterprise Police Department Detective Rick Hauser on Tuesday, May 29, 2001, by the undersigned.

Page 1 of 4

Case Number 01A-01-MM-00435
Firearms Examination / Laboratory Results

03.00    One sealed brown paper bag labeled in part "removed from dumpster", containing one white, sleeveless tee shirt. Laboratory examination of this shirt revealed two holes located in the lower front. The lower hole has heavy deposits of soot around it on the outside of the shirt, while the upper hole has deposits of soot around it on the *inside* of the shirt. Also present on the front of the shirt is another pattern of soot. Present inside the front of the shirt are what appear to be dried blood stains. These patterns of holes and soot are consistent with one revolver gunshot through folded clothing at near contact range.

04.00    One sealed manila envelope containing:

04.01    One sealed plastic film canister labeled in part "34", containing cotton, and one fired, copper jacketed bullet, identified to be from the scene. Laboratory examination of this 9mm/.38 caliber bullet revealed that it has been fired through the barrel of the same firearm as the bullets described elsewhere as Exhibits 04.02, 04.03, and 04.04. This bullet could have been fired in (but not limited to) the following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

04.02    One sealed plastic film canister labeled in part "38", containing cotton, and one fired, copper jacketed bullet, identified to be from the scene. Laboratory examination of this 9mm/.38 caliber bullet revealed that it has been fired through the barrel of the same firearm as the bullets described elsewhere as Exhibits 04.01, 04.03, and 04.04. This bullet could have been fired in (but not limited to) the following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

04.03    One sealed plastic film canister labeled in part "41", containing cotton, and one fired, copper jacketed bullet, identified to be from the scene. Laboratory examination of this 9mm/.38 caliber bullet revealed that it has been fired through the barrel of the same firearm as the bullets described elsewhere as Exhibits 04.01, 04.02, and 04.04. This bullet could have been fired in (but not limited to) the following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

04.04    One sealed plastic film canister labeled in part "42", containing cotton, and one fired, copper jacketed bullet, identified to be from the scene. Laboratory examination of this 9mm/.38 caliber bullet revealed that it has been fired through the barrel of the same firearm as the bullets described elsewhere as Exhibits 04.01, 04.02, and 04.03. This bullet could have been fired in (but not limited to) the following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

Case Number 01A-01-MM-00435
Firearms Examination / Laboratory Results

04.05    One sealed plastic film canister labeled in part "32", containing cotton, and one fired, badly damaged, copper color coated lead bullet, identified to be from the scene. This .22 caliber bullet is too damaged for further identification.

04.06    One small sealed manila envelope labeled in part "21", containing one fired Winchester brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed that it has been fired in the chamber of the same firearm as the cartridge cases described elsewhere as Exhibits 04.07, 04.08, 04.09, and 04.10.

04.07    One small sealed manila envelope labeled in part "23", containing one fired Winchester brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed that it has been fired in the chamber of the same firearm as the cartridge cases described elsewhere as Exhibits 04.06, 04.08, 04.09, and 04.10 .

04.08    One small sealed manila envelope labeled in part "24", containing one fired Winchester brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed that it has been fired in the chamber of the same firearm as the cartridge cases described elsewhere as Exhibits 04.06, 04.07, 04.09, and 04.10.

04.09    One small sealed manila envelope labeled in part "25", containing one fired Winchester brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed that it has been fired in the chamber of the same firearm as the cartridge cases described elsewhere as Exhibits 04.06, 04.07, 04.08, and 04.10.

04.10    One small sealed manila envelope labeled in part "26", containing one fired Winchester brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed that it has been fired in the chamber of the same firearm as the cartridge cases described elsewhere as Exhibits 04.06, 04.07, 04.08, and 04.09.

04.11    One small sealed manila envelope labeled in part "22", containing one fired Federal brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed some similarities to the cartridge cases described elsewhere as Exhibits 04.06, 04.07, 04.08, 04.09, and 04.10, however, it could not be determined whether or not they were fired in the chamber of the same firearm.

The following additional items of evidence were received from State Medical Examiner Dr. Emily Ward on Tuesday, June 5, 2001, by the undersigned.

Case Number 01A-01-MM-00435
Firearms Examination / Laboratory Results

05.00   One small sealed manila envelope containing one fired, copper jacketed bullet identified to be from the subject. Laboratory examination of this 9mm/.38 caliber bullet revealed similar characteristics as the bullets described elsewhere as Exhibits 04.01, 04.02, 04.03, and 04.04, however, it could not be determined whether or not they have all been fired through the barrel of the same firearm. This bullet could have been fired in (but not limited to) the following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

06.00   One small sealed manila envelope containing:

06.01   One white card labeled in part "Lt. lat. thigh ", containing one tape lift, identified to be from the subject. Laboratory examination of this tape lift revealed the presence of gunpowder particles.

06.02   One white card labeled in part "Front Rt. hand ", containing one tape lift, identified to be from the subject. Laboratory examination of this tape lift revealed the presence of gunpowder particles.

06.03   One white card labeled in part "Post chest ", containing one tape lift, identified to be from the subject. Laboratory examination of this tape lift revealed the presence of gunpowder particles.

06.04   Six white cards labeled variously, each containing one tape lift, identified to be from the subject. Laboratory examination of these tape lifts failed to reveal the presence of gunpowder particles.

The following additional item of evidence was placed into a locked evidence locker on Friday, June 8, 2001, by Enterprise Police Department Captain William Moore, and retrieved on Tuesday, June 12, 2001 by the undersigned.

07.00   One sealed brown paper bag containing one navy blue, pull-over, collared shirt, identified to be from Robert Conrad. Laboratory examination of this shirt revealed a hole located in the front, just left of center. No gunpowder particles were found around this hole.

Unless otherwise indicated, all evidence in this case will be returned to the appropriate agency at the earliest available opportunity.

Page 4 of 4                    - Joseph M. Saboon



ALABAMA
# DEPARTMENT OF FORENSIC SCIENCES

991 WIRE ROAD
AUBURN, ALABAMA 36830
(334) 887-7001

P.O. BOX 3510
AUBURN, ALABAMA 36831-3510
FACSIMILE (334) 887-7531

CERTIFICATE OF ANALYSIS

TOXICOLOGY

DR. EMILY WARD
MEDICAL EXAMINER'S OFFICE
8160 UNIVERSITY DRIVE
MONTGOMERY AL 36117

CASE NUMBER: 01MM00435

AGENCY NUMBER: UNKNOWN

| SUBJECT(S) | RACE | SEX | BIRTH DATE | STATUS |
|---|---|---|---|---|
| Evelyn J Dennis | W | F | 04/10/1962 | Adult |

SERVICE REQUESTED: Toxicology

CHAIN OF CUSTODY:

| RELINQUISHED BY | RECEIVED BY | DATE | TIME |
|---|---|---|---|
| Emily Ward | Terrell Abrams | 05/30/2001 | 1000 |
| Terrell Abrams | Sarawanee C Parish | 05/30/2001 | 1100 |

SCRIPTION OF EVIDENCE: Blood, vitreous humor, gastric, bile

RESULTS:                          DATES OF ANALYSIS: 05/31/2001 - 06/06/2001

| Blood | : Ethyl alcohol | Negative |
|---|---|---|
| | Lidocaine | 5.0 mg/L |
| | Citalopram | 0.48 mg/L |
| Vitreous Humor | : Ethyl alcohol | Negative |
| Gastric Contents | : Not Analyzed | |
| Bile | : Not Analyzed | |

Sworn to and subscribed before me this the _17th_ Day of _October_ 20 _01_ as true and correct.

*Sarawanee C Parish*                          *Jalatha Sims*

Sarawanee C Parish, Ph.D.                          Notary Public
Forensic Scientist III

Note: The specimen(s) listed above will be retained in the laboratory for a period of six (6) months
       from the date of this report unless a written request is received otherwise.

STATE OF ALABAMA,      )    IN THE CIRCUIT COURT OF

                   )

        PLAINTIFF,    )    COFFEE COUNTY, AL

                   )

VS.               )    ENTERPRISE DIVISION

                   )

ROBERT THOMAS CONRAD,   )

                   )

        DEFENDANT.   )    CASE #s: CC-2001-M-179
                                  and
                                  CC-2001-M-180

## *O R D E R*

*This case comes before the Court upon a motions hearing and for a status/scheduling conference.*

*The Defendant's request for continuance past the upcoming June, 2002 criminal jury term of court is granted over no objection by and with the concurrence of the District Attorney.*

*The parties requested this case be set for trial specially during the month of September, 2002 in order to allow the state more time in which to receive all of the forensic evidence results of testing.*

*IT IS THEREFORE ORDERED that this case is set specially for trial during the criminal jury term of court beginning September 23, 2002 at 9:00 a.m.*

*IT IS FURTHER ORDERED that DISCOVERY CUT OFF is August 20, 2002 at 9:00 a.m. at which time the state and Defendant are to have fully complied with the discovery orders of this court.*

*IT IS FURTHER ORDERED that PRODUCTION of discovery materials (including but not limited to production of the state's forensic evidence results of testing) shall be completed and produced to the opposing party on or before September 5, 2002 at 9:00 a.m. Evidence, to the extent not produced pursuant to the mandates of this "ORDER", will*

*not be allowed to be admitted into evidence at trial UNLESS GOOD CAUSE FOR THE NON PRODUCTION IS PROVEN TO THE SATISFACTION OF THIS COURT. (The State is to immediately contact the Alabama Department of Forensic Science and make that Department fully aware of production deadline above set.*

*The following additional scheduling orders are ordered complied with by the parties*

1). *A "MOTIONS HEARING" is scheduled for the 4th day of September, 2002 at 9:00 a.m. (The Sheriff is requested to have Defendant present in the court room for the purposes of this hearing.) The Clerk of Court is requested to provide the Sheriff of Coffee County, Alabama a copy of this "order.".*

2). *At least TEN (10) BUSINESS DAYS prior to trial, the parties shall furnish opposing counsel for copying and inspection, all exhibits or tangible evidence to be used at trial, and shall have such evidence marked for identification. Objections are to be made as each item is offered into evidence...or in a more timely fashion if a party would be severely prejudiced by the introduction.*

3). *MOTIONS IN LIMINE must be filed and exchanged no later than September 4, 2002 at 9:00 a.m.*

4). *PROPOSED JURY INSTRUCTIONS shall be provided the trial Judge no later than ONE (1) BUSINESS DAY prior to trial. As the trial progresses, the attorneys will be allowed to supplement their requested jury charges so as to conform to the proof and as long as they do so in a timely fashion. This is required in order to allow the Court to better expedite the conduct of a "jury charge conference."*

5). *As this case is set for trial by jury beginning during the September 23, 2002 at 9:00 a.m. criminal jury term, the Clerk of Court is requested to timely send out the jury questionnaire to all members of the venire with an instruction that each venire member shall mailed or returned his or her answers to the Clerk of Court on or before September 10, 2002 at 9:00 a.m. (This will allow counsel for the parties adequate time to review the responses prior to the conduct of the jury selection process.)*

6). *The Court will conduct voir dire by breaking the venire down into panels. (In order to assist counsel in the preparation of voir dire questions, the panels reviewed will be taken in alphabetical order based on the last name of each venire member.) The number of panels will be determined based on the number of venire members who appear. The Court will conduct the first part of the voir dire of each panel. Thereafter, each party will be allowed to ask each panel proper voir dire questions.*

7). *The Clerk of Court is requested to forward a copy of this order to each attorney of record; to the Sheriff of Coffee County, Alabama as above stated.*

*LASTLY, <u>it is also ordered that the Sheriff of Coffee County, Alabama serve a copy of this "order" and a copy of the September 23, 2002 at 9:00 a.m. venire on the person of Robert Thomas Conrad and due return thereof make as is by law provided.</u>*

*Done and ordered this the 30th day of May, 2002.*

GARY E. McALILEY, CIRCUIT JUDGE
**TWELFTH JUDICIAL CIRCUIT**
**STATE OF ALABAMA**



-3-

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,                    *

      PLAINTIFF,                          *

VS.                                  *        CASE NOS. CC 2001-179 and
                                         CC 2001-180

ROBERT THOMAS CONRAD,                *

      DEFENDANT.                          *


## MOTION FOR COURT-ORDERED MENTAL EXAMINATION
## OF DEFENDANT

COMES NOW the attorney for the defendant in the above-styled case and moves

the Court to order a mental examination of the defendant to be conducted at such time or

times as the Court may direct, by a qualified mental health professional to determine:

1.      The defendant's present mental condition and competency to stand trial;

and that the prosecution of this case be stayed pending the outcome of such

examinations(s).

Counsel for the defendant further requests a hearing before a jury to determine the

defendant's competency to stand trial.

As attorney for the defendant, I question the defendant's competency to stand trial

and believe that it is essential for a mental examination to be conducted in advance of

trial because:

1.      Defendant is charged with an offense for which the death penalty is a

possible punishment.

JUN 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. Al

2.    Defendant has not had sufficient memory or recall of the events alleged in this case.

June 25, 2002

_____
GARY D. BRADSHAW (BRA074)
Attorney for Defendant
P.O. Box 311412
Enterprise, AL  36331-1412
(334) 393-6439

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing Motion on the District Attorney, Mark Fuller, by placing a copy of the same in their receptacle at the Coffee County, Enterprise, Courthouse.

This the 25th day of June, 2002.

_____
OF COUNSEL

ACR467

ALABAMA JUDICIAL DATA CENTER
COFFEE COUNTY

ORDER FOR SERVICE AND RETURN

CC 2001 000179.00
GARY L MCALILEY

STATE OF ALABAMA    VS.    CONRAD ROBERT THOMAS

SERVE ON:

CONRAD ROBERT THOMAS
GARDEN OAKS APT.35
ENTERPRISE    AL 36330 0000

NOTES:

JUROR VENIRE LIST FOR SEPTEMBER 23, 2002

TO ANY SHERIFF OR A̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ TACHED DOCUMENT TO THE
    YOU ARE ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ED.
    ABOVE ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶

08/02/2002    ̶ ̶ ̶ ̶ LERK BY ̶ ̶ ̶ ̶ ̶ ̶ ̶

I HEREBY CERTIFY T̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ F THE ATTACHED
DOCUMENT IN _____ ̶ ̶ ̶ ̶ ̶ ̶ ̶ Y. ALABAMA.

_____        SIGNATURE OF SERVER
_____

NAME 7 ADDRESS ABOVE                     DATE

OPERATOR: JAC
PREPARED: 08/02/2002

ACR

COFFEE COUNTY

ORDER FOR SERVICE AND RETURN

CC 2001 000179.00
GARY L MCALILEY

STATE OF ALABAMA   VS.   CONRAD ROBERT THOMAS

SERVE ON:

    CONRAD ROBERT THOMAS
    GARDEN OAKS APT.35
    ENTERPRISE       AL 36330 0000

NOTES:

ORDER:  TRIAL SET FOR SEPTEMBER 23, 2002 AT 9:00 AM.

TO ANY SHERIFF OR ANY AUTHORIZED AGENT:

    YOU ARE HEREBY ORDERED TO DELIVER THE ATTACHED DOCUMENT TO THE
    ABOVE NAMED PERSON AT THE ADDRESS INDICATED.

07/29/2002        JAMES M COUNTS              , CLERK BY _____

I HEREBY CERTIFY THAT I PERSONALLY DELIVERED A COPY OF THE ATTACHED

DOCUMENT IN _____ COUNTY, ALABAMA.

_____          _____
                                          SIGNATURE OF SERVER

NAME / ADDRESS ABOVE                       DATE

OPERATOR: JAC
PREPARED: 07/29/2002

ACR469

ALABAMA JUDICIAL DATA CENTER
COFFEE COUNTY

ORDER FOR SERVICE AND RETURN

CC 2001 000180.00
GARY L MCALILEY

---

STATE OF ALABAMA    VS.    CONRAD ROBERT THOMAS

---

SERVE ON:

CONRAD ROBERT THOMAS
GARDEN OAKS APT.35
ENTERPRISE      AL 36330 0000

NOTES:

JUROR VENIRE LIST FOR SEPTEMBER 23, 2002.



RECEIVED
AUG - 5 2002
CCSO

---

TO ANY SHERIFF OR ANY AUTHORIZED AGENT:

YOU ARE HEREBY ORDERED TO DELIVER THE ATTACHED DOCUMENT TO THE
ABOVE NAMED PERSON AT THE ADDRESS INDICATED.

08/02/2002      JAMES M COUNTS              , CLERK BY _____

---

I HEREBY CERTIFY THAT I PERSONALLY DELIVERED A COPY OF THE ATTACHED

DOCUMENT IN _____ COUNTY, ALABAMA.

UNABLE TO LOCATE 8-21-02
THIS DATE_____.
☐ IMPROPER ADDRESS
☐ MOVED
☐ OTHER_____

COFFEE COUNTY SHERIFF'S DEPT
BY_____
DEPUTY SHERIFF

_____          SIGNATURE OF SERVER _____

_____          DATE _____
NAME / ADDRESS ABOVE

---

OPERATOR: JAC
PREPARED: 08/02/2002

TERM DATE: SEPTEMBER 23, 2002    START TIME:  9:00 AM

| S. | KE# | JUROR NAME / ADDRESS | BIRTH DATE | RACE | SEX | JUROR# |
|----|-----|----------------------|------------|------|------|--------|
| 1. | | AID TAMMI L<br>119 KINNON DRIVE<br>ENTERPRISE        AL    36330 | 03/25/1967 | W | F | 004524 |
| 2. | | ALLEN GARY G<br>RR 2 BOX 433<br>NEW BROCKTON       AL    36351 | 03/26/1955 | W | M | 019943 |
| 3. | | ALMEIDA PEDRO G<br>505 BRIARWOOD DRIVE H4<br>ENTERPRISE        AL    36330 | 07/09/1966 | B | M | 013971 |
| 4. | | ARNETT BERTIE W<br>ROUTE 1 BOX 114<br>ENTERPRISE        AL    36330 | 10/26/1915 | W | F | 006019 |
| 5. | | AUSTIN ELEANOR M<br>125 RETIREMENT LN APT 13<br>ENTERPRISE        AL    36330 | 10/18/1916 | W | F | 017519 |
| 6. | | BAILEY ELEANOR F<br>409 GRIMES STREET<br>ENTERPRISE        AL    36330 | 08/11/1943 | B | F | 005021 |
| 7. | | BALDWIN TIMOTHY E<br>P O BOX 310861<br>ENTERPRISE        AL    36330 | 05/13/1978 | B | M | 002495 |
| 8. | | BANDY SUSAN<br>ROUTE 1 BOX 221<br>ENTERPRISE        AL    36330 | 07/14/1962 | B | F | 020940 |
| 9. | | BARIL JOSEPH A<br>ROUTE 6 BOX 305 A<br>ENTERPRISE        AL    36330 | 01/14/1972 | W | M | 020508 |
| 10. | | BARLOW FREDERICK R<br>207 KINGSTON DRIVE<br>ENTERPRISE        AL    36330 | 02/04/1964 | W | M | 009472 |
| 11. | | BARNARD RUTH A<br>ROUTE 1 BOX 193 A<br>CHANCELLOR        AL    36316 | 12/19/1962 | W | F | 013473 |
| 12. | | BARNETT JENNIFER R<br>RT 1 BOX 172A<br>COFFEE SPRINGS     AL    36318 | 05/09/1965 | W | F | 018528 |
| 13. | | BASS ELVA F<br>1831 DAMASCUS ROAD<br>ENTERPRISE        AL    36330 | 04/05/1922 | W | F | 009023 |
| 14. | | BAUM MARRIANNE M<br>403 CHOCTAW STREET<br>ENTERPRISE        AL    36330 | 06/14/1974 | W | F | 011529 |
| 15. | | BIGHEM ANGELA L<br>211 HIGHLAND DRIVE<br>ENTERPRISE        AL    36330 | 03/20/1971 | B | F | 013528 |

JUR100                    ALABAMA JUDICIAL INFORMATION SYSTEM                 PAGE:     2
OPER: JAC                         COFFEE COUNTY                     RUN DATE: 08/02/2002
                                  JUROR VENIRE                      RUN TIME: 00:10:30

FROM DATE: SEPTEMBER 23, 2002  START TIME:  9:00 AM

| S | KE# | JUROR NAME / ADDRESS | BIRTH DATE | RACE | SEX | JUROR# |
|---|-----|----------------------|------------|------|-----|--------|
| 16. | | BILAND LANEY I<br>121 WEST SILVEROAK DRIVE<br>ENTERPRISE          AL    36330 | 11/17/1965 | W | F | 004526 |
| 17. | | BLAKE REBECCA H<br>ROUTE 3 BOX 90<br>ENTERPRISE          AL    36330 | 01/02/1954 | W | F | 016530 |
| 18. | | BLEVINS ANNETTE M<br>ROUTE 1 BOX 78<br>NEW BROCKTON       AL    36351 | 08/12/1967 | W | F | 001994 |
| 19. | | BLIEN DELORES A<br>401 BRIARWOOD DRIVE<br>ENTERPRISE          AL    36330 | 08/04/1930 | W | F | 013530 |
| 20. | | BOAZ KATHY R<br>208 GATEWAY DRIVE<br>ENTERPRISE          AL    36330 | 06/19/1977 | W | F | 013962 |
| 21. | | BOHLMANN ANNA V<br>1500 SHELLFIELD RD APT 628<br>ENTERPRISE          AL    36330 | 07/30/1958 | B | F | 005982 |
| 22. | | BOYKIN HAL J JR<br>505 OUIDA ST<br>ENTERPRISE          AL    36330 | 11/20/1965 | W | M | 000997 |
| 23. | | BOYKINS JAMES<br>206 BOYKINS STREET<br>ENTERPRISE          AL    36330 | 01/09/1946 | B | M | 011477 |
| 24. | | BRADLEY LYNETTE<br>106 SHERWIN STREET<br>ENTERPRISE          AL    36330 | 01/11/1962 | B | F | 018515 |
| 25. | | BRANSON KENNETH C<br>RR 1 BOX 138<br>ARITON            AL    36311 | 07/30/1977 | W | M | 002501 |
| 26. | | BROOKS CARL T<br>310 BRANNON BEND<br>ENTERPRISE          AL    36330 | 07/21/1952 | W | M | 015025 |
| 27. | | BROOKS WALTER N JR<br>402 GLENN ST<br>ENTERPRISE          AL    36330 | 04/08/1948 | W | M | 011968 |
| 28. | | BROUILLARD JOSEPH L<br>P O BOX 310394<br>ENTERPRISE          AL    36331 | 12/26/1938 | W | M | 002994 |
| | | BROWN ANITRA T<br>401 HERITAGE BLVD<br>ENTERPRISE          AL    36330 | 09/14/1975 | B | F | 017451 |
| 30. | | BROWN KIMBERLY J<br>RT 1 BOX 243<br>NEW BROCKTON       AL    36351 | 07/10/1964 | W | F | 006018 |

```
JUR100                    ALABAMA JUDICIAL INFORMATION SYSTEM           PAGE:     3
OPER: JAC                         COFFEE COUNTY                  RUN DATE: 08/02/2002
                                   JUROR VENIRE                  RUN TIME: 00:10:30

TERM DATE: SEPTEMBER 23, 2002  START TIME:  9:00 AM
```

| S...KE# | JUROR NAME / ADDRESS | BIRTH DATE | RACE | SEX | JUROR# |
|---|---|---|---|---|---|
| 31. | BROWN MILDRED H<br>ROUTE 1 BOX 178<br>ENTERPRISE          AL    36330 | 10/16/1920 | W | F | 017459 |
| 32. | BROXTON SARAH M<br>310 SOUTH TYLER STREET<br>NEW BROCKTON      AL    36351 | 05/02/1921 | W | F | 008017 |
| 33. | BRYAN PHYLLIS R<br>RT 1 BOX 243<br>NEW BROCKTON      AL    36351 | 01/11/1954 | W | F | 005024 |
| 34. | BRYANT CAROLYN S<br>106 DEERFIELD DRIVE<br>ENTERPRISE          AL    36330 | 11/06/1950 | B | F | 008518 |
| 35. | BURKETT JAMES A<br>ROUTE 1 BOX 157<br>NEW BROCKTON      AL    36351 | 02/04/1938 | W | M | 018015 |
| 36. | BUTLER RICHARD K JR<br>404 W COLLEGE ST<br>ENTERPRISE          AL    36330 | 10/28/1951 | W | M | 019522 |
| 77. | CANNON LINDA B<br>117 W SILVER OAK DRIVE<br>ENTERPRISE          AL    36330 | 12/02/1951 | W | F | 019018 |
| 38. | CARLSON KAREN F<br>103 KEY BEND ROAD<br>ENTERPRISE          AL    36330 | 07/03/1956 | W | F | 000527 |
| 39. | CARLTON JELICKA D<br>207 MCGEE STREET<br>ENTERPRISE          AL    36330 | 02/19/1970 | B | F | 010019 |
| 40. | CARROLL LENA M<br>518 SOUTH JOHN STREET<br>NEW BROCKTON      AL    36351 | 10/20/1912 | W | F | 014469 |
| 41. | CARSTARPHEN DWAN N<br>213 DOMINEY STREET<br>ENTERPRISE          AL    36330 | 01/12/1977 | B | F | 012031 |
| 42. | CARTER SARAH L<br>641 ASHLEY LANE<br>ENTERPRISE          AL    36330 | 02/19/1970 | W | F | 010529 |
| 43. | CASHWELL JANET N<br>113 NANCY DRIVE<br>ENTERPRISE          AL    36330 | 04/04/1956 | W | F | 002021 |
| | CAWLEY WILLIAM W<br>302 HEATH ST<br>ENTERPRISE          AL    36330 | 04/02/1964 | W | M | 010532 |
| 45. | CECIL JOHN S<br>87 PRATT DRIVE<br>ENTERPRISE          AL    36330 | 02/03/1965 | W | M | 017016 |

JUR100                    ALABAMA JUDICIAL INFORMATION SYSTEM            PAGE:      4
OPER: JAC                        COFFEE COUNTY                RUN DATE: 08/02/2002
                                 JUROR VENIRE                 RUN TIME: 00:10:30

TERM DATE: SEPTEMBER 23, 2002   START TIME:  9:00 AM

| S | KEY | JUROR NAME / ADDRESS | BIRTH DATE | RACE | SEX | JUROR# |
|---|-----|----------------------|------------|------|-----|--------|
| 46. | | CHAMPION RICHARD A<br>105 GUNTER LANE APT D<br>ENTERPRISE        AL    36330 | 10/27/1971 | W | M | 016019 |
| 47. | | CHRISTENSEN JULEIGH E<br>108 LONE OAK DRIVE<br>ENTERPRISE        AL    36330 | 04/19/1975 | W | F | 001997 |
| 48. | | COLE ROBERT<br>119 W SILVEROAK DRIVE<br>ENTERPRISE        AL    36330 | 10/10/1947 | W | M | 015523 |
| 49. | | CORKRAN CHARLOTTE N<br>304 MULLINS DRIVE<br>ENTERPRISE        AL    36330 | 04/08/1945 | W | F | 007519 |
| 50. | | COTTON DAVID P<br>112 A ROSEWOOD DRIVE<br>ENTERPRISE        AL    36330 | 03/18/1973 | W | M | 002991 |
| 51. | | COUCH EMMETT M<br>105 COMANCHE ST<br>ENTERPRISE        AL    36330 | 08/20/1955 | W | M | 010481 |
| 52. | | COUNCIL BETTY J<br>103 REGAN STREET<br>ENTERPRISE        AL    36330 | 05/04/1957 | B | F | 020518 |
| 53. | | COX VERNON R<br>213 HERITAGE BLVD<br>ENTERPRISE        AL    36330 | 12/27/1950 | B | M | 007980 |
| 54. | | CUNNINGHAM JOE J<br>41 NELL COURT<br>ENTERPRISE        AL    36330 | 06/29/1977 | B | M | 002493 |
| 55. | | CURRIE JOHN P<br>P O BOX 1181<br>ENTERPRISE        AL    36331 | 05/06/1937 | W | M | 004028 |
| 56. | | CURRY WILLIE J<br>P O BOX 310161 SPRINGDALE DR<br>ENTERPRISE        AL    36330 | 06/29/1948 | B | M | 015019 |
| 57. | | DAWKINS KENNETH T<br>105 WYMAN ST<br>ENTERPRISE        AL    36330 | 11/18/1957 | W | M | 007482 |
| 58. | | DAYE GREGORY H<br>PO BOX 310427<br>ENTERPRISE        AL    36330 | 04/07/1950 | W | M | 015466 |
| 59. | | DELONG CATHY L<br>203 EAST ADAMS STREET<br>ENTERPRISE        AL    36330 | 03/01/1959 | W | F | 018459 |
| 60. | | DILLONAIRE SYLVIA F<br>105 LAKEWOOD DRIVE<br>ENTERPRISE        AL    36330 | 12/01/1936 | W | F | 012526 |

```
JUR100                  ALABAMA JUDICIAL INFORMATION SYSTEM          PAGE:      5
OPER: JAC                        COFFEE COUNTY                 RUN DATE: 09/02/2002
                                 JUROR VENIRE                  RUN TIME: 00:10:30

TERM DATE: SEPTEMBER 23, 2002  START TIME:  9:00 AM

S. KE#   JUROR NAME / ADDRESS                 BIRTH DATE    RACE    SEX    JUROR#
```

| S. KE# | JUROR NAME / ADDRESS | BIRTH DATE | RACE | SEX | JUROR# |
|---|---|---|---|---|---|
| 61. | DIXON DARRELL C<br>205 CHERRY HILL ROAD<br>ENTERPRISE        AL    36330 | 01/12/1949 | W | M | 003530 |
| 62. | DONALDSON RALPH E<br>304 EAST WATTS AVENUE<br>ENTERPRISE        AL    36330 | 03/25/1924 | W | M | 020020 |
| 63. | DROWN MARY H<br>531 EAST LEE STREET<br>ENTERPRISE        AL    36330 | 07/22/1932 | W | F | 010022 |
| 64. | DUFFY MICHAEL J<br>100 WOODBRIDGE ROAD<br>ENTERPRISE        AL    36330 | 08/14/1948 | W | M | 017021 |
| 65. | DYESS BARBARA B<br>104 REDCLIFF CIRCLE<br>ENTERPRISE        AL    36330 | 11/23/1935 | W | F | 003526 |
| 66. | ELLIOTT INGRID K<br>508 CEDAR DRIVE<br>ENTERPRISE        AL    36330 | 10/10/1942 | W | F | 000998 |
| 67. | ELLIS L B<br>108 GEORGE WALLACE DRIVE<br>ENTERPRISE        AL    36330 | 09/22/1926 | W | F | 016463 |
| 68. | ESTES DIANE C<br>ROUTE 8 BOX 48A<br>ENTERPRISE        AL    36330 | 02/24/1956 | W | F | 002999 |
| 69. | EVANS WILLIAM J<br>408 E HICKORY BEND<br>ENTERPRISE        AL    36330 | 04/17/1948 | W | M | 020950 |
| 70. | FAIRFIELD MARY C<br>106 WESTVIEW DRIVE<br>ENTERPRISE        AL    36330 | 12/26/1949 | W | F | 014023 |
| 71. | FERGUSON THOMAS P<br>2802 ROCKY BRANCH<br>ENTERPRISE        AL    36330 | 03/15/1945 | W | M | 017527 |
| 72. | FLUELLEN WILOLA D<br>P O BOX 310502<br>ENTERPRISE        AL    36331 | 04/11/1957 | B | F | 006984 |
| 73. | FRANKS DON M<br>107 CAHABA DRIVE<br>ENTERPRISE        AL    36330 | 03/28/1944 | W | M | 006515 |
| 74. | FRAZIER LEON B<br>102 THOMPSON STREET<br>ENTERPRISE        AL    36330 | 03/20/1966 | B | M | 009524 |
| 75. | FULLER JOHNNY C<br>ROUTE 6 LOT 103 MARTIN TRAILOR<br>ENTERPRISE        AL    36330 | 09/29/1953 | W | M | 003992 |

```
JUR100                    ALABAMA JUDICIAL INFORMATION SYSTEM              PAGE:      6
OPER: JAC                         COFFEE COUNTY                   RUN DATE: 08/02/2002
                                  JUROR VENIRE                    RUN TIME: 00:10:30
```

TERM DATE: SEPTEMBER 23, 2002   START TIME: 9:00 AM

| S. IKE# | JUROR NAME / ADDRESS | BIRTH DATE | RACE | SEX | JUROR# |
|---|---|---|---|---|---|
| 76. | GARRETT JERRY W<br>107 SCOTT DRIVE<br>ENTERPRISE         AL    36330 | 10/11/1936 | W | M | 007517 |
| 77. | GENTNER LARRY W<br>101 CHESTNUT DRIVE<br>ENTERPRISE         AL    36330 | 01/04/1952 | W | M | 007518 |
| 78. | GILMORE MARGIE M<br>205 GRIMES STREET<br>ENTERPRISE         AL    36330 | 04/22/1948 | W | F | 018947 |
| 79. | GODWIN VAN D<br>ROUTE 4 BOX 513<br>ENTERPRISE         AL    36330 | 12/09/1950 | W | M | 004523 |
| 80. | GOOLSBY CHARLENE S<br>200 WALNUT DRIVE<br>ENTERPRISE         AL    36330 | 01/13/1949 | W | F | 011528 |
| 81. | GREGORIO FRANCISCO A<br>RR 3 BOX 150<br>ENTERPRISE         AL    36330 | 06/27/1967 | W | M | 011976 |
| 82. | GUTHRIE IDA M<br>200 HERITAGE BLVD<br>ENTERPRISE         AL    36330 | 09/26/1943 | W | F | 001496 |
| 83. | HAGLUND WILLIAM E<br>104 ORIOLE STREET<br>ENTERPRISE         AL    36330 | 03/18/1979 | W | M | 019013 |
| 84. | HAIRSTON SHAVONNE D<br>278 DIXIE DR APT B3<br>ENTERPRISE         AL    36330 | 03/06/1970 | B | F | 016523 |
| 85. | HAMILTON DOROTHY S<br>202 LAKEWVIEW DRIVE<br>ENTERPRISE         AL    36330 | 10/27/1935 | W | F | 000500 |
| 86. | HARRELSON JAMES C<br>105 LAKE OLIVER DRIVE<br>ENTERPRISE         AL    36330 | 03/31/1943 | W | M | 000502 |
| 87. | HARRISON MARGIE D<br>ROUTE 1 BOX 143<br>NEW BROCKTON      AL    36351 | 09/17/1932 | W | F | 000029 |
| 88. | HARTLEY CHRIS G<br>27 ANTHONY CIRCLE<br>ENTERPRISE         AL    36330 | 03/14/1949 | W | M | 001998 |
| | HATAWAY LINDA G<br>106 CEDAR DRIVE<br>ENTERPRISE         AL    36330 | 04/07/1952 | W | F | 020452 |
| 90. | HELMS SUSAN D<br>102 ROWE STREET<br>ENTERPRISE         AL    36330 | 08/18/1948 | W | F | 007013 |

```
JUR100                  ALABAMA JUDICIAL INFORMATION SYSTEM          PAGE:       7
OPER: JAC                         COFFEE COUNTY                  RUN DATE: 08/02/2002
                                  JUROR VENIRE                   RUN TIME: 00:10:30

FROM DATE: SEPTEMBER 23, 2002  START TIME:  9:00 AM
------------------------------------------------------------------------------------
ST RKE#  JUROR NAME / ADDRESS                 BIRTH DATE    RACE   SEX    JUROR#
------------------------------------------------------------------------------------
 91.    HENDRIX MIGNON M                      01/08/1926     W      F    004487
        ROUTE 1 BOX 502
        ENTERPRISE         AL    36330

 92.    HICKS BETTY R                         07/30/1938     W      F    010972
        512 WEST FITZSIMMONS ST
        NEW BROCKTON       AL    36351

 93.    HIERS SARA S                          04/20/1954     W      F    012029
        RT 2 BOX 387
        NEW BROCKTON       AL    36351

 94.    HILL JACK D                           03/09/1931     W      M    009024
        101 LAKEWOOD DRIVE
        ENTERPRISE         AL    36330

 95.    HINCKLE SARA N                        05/23/1947     W      F    007978
        302 RAVEN STREET
        ENTERPRISE         AL    36330

 96.    HITE HOMER L                          09/06/1925     W      M    002499
        ROUTE 6 BOX 765
        ENTERPRISE         AL    36330

 97.    HITT JESSICA R                        02/20/1979     W      F    002997
        103 PRATT DR
        ENTERPRISE         AL    36330

 98.    HOLLOWAY BILLIE J                     02/15/1963     W      F    017961
        PO BOX 362
        NEW BROCKTON       AL    36351

 99.    HORDE LISA K                          06/11/1969     W      F    013024
        118CRESENT DRIVE
        ENTERPRISE         AL    36330

100.    HORTON DEBORAH V                      09/30/1965     W      F    005484
        107 BYRD STREET
        ENTERPRISE         AL    36330

101.    HOWARD DENNIS W                       11/20/1953     W      M    007018
        104 ANTLER DR
        ENTERPRISE         AL    36330

102.    HOWELL MARY L                         09/20/1914     W      F    006016
        110 LOFTIN STREET
        ENTERPRISE         AL    36330

103.    HUGHES ANGELA G                       12/09/1950     W      F    017514
        RR 2 BOX 71
        NEW BROCKTON       AL    36351

        HUTCHINSON ELIZ E                     11/10/1953     W      F    001000
        305 E SANDCREEK ROAD
        ENTERPRISE         AL    36330

105.    HYATT LAUREN D                        05/20/1977     W      F    011026
        507 BRIARWOOD RD 5D
        ENTERPRISE         AL    36330
```

TERM DATE: SEPTEMBER 23, 2002  START TIME:  9:00 AM

| S | KE# | JUROR NAME / ADDRESS | BIRTH DATE | RACE | SEX | JUROR# |
|---|-----|----------------------|------------|------|-----|--------|
| | 106. | INSLEY HAROLD K JR<br>213 CARDINAL LANE<br>ENTERPRISE        AL    36330 | 02/27/1943 | W | M | 000504 |
| | 107. | JACKSON BOBBY<br>103 SPRINGDALE APT 3 B<br>ENTERPRISE        AL    36330 | 03/16/1957 | B | M | 012966 |
| | 108. | JACKSON EARL<br>P O BOX 507<br>ENTERPRISE        AL    36330 | 12/16/1944 | B | M | 012527 |
| | 109. | JENKINS DIANE R<br>301 FAY STREET<br>ENTERPRISE        AL    36330 | 07/16/1954 | W | F | 002993 |
| | 110. | JERNIGAN DANNY A<br>401 REDCLIFF CIRCLE<br>ENTERPRISE        AL    36330 | 10/26/1952 | W | M | 016455 |
| | 111. | JOHNSON STEVE<br>407 EAST LEE STREET<br>ENTERPRISE        AL    36330 | 02/27/1958 | B | M | 016517 |
| | 112. | JOHNSON TINA R<br>111 VILLA DRIVE APT 22<br>ENTERPRISE        AL    36330 | 02/12/1975 | B | F | 015517 |
| | 113. | JONES JOYCE M<br>110 LOYOLA CIRCLE<br>ENTERPRISE        AL    36330 | 05/11/1945 | W | F | 006518 |
| | 114. | JONES TOMMIE L<br>907 DALEVILLE AVENUE<br>ENTERPRISE        AL    36330 | 12/12/1957 | B | F | 002519 |
| | 115. | KEEL TIMMY<br>RT 2 BOX 102<br>NEW BROCKTON        AL    36351 | 08/18/1966 | W | M | 015965 |
| | 116. | KELLEY BILL S<br>RT 4 BOX 106<br>ELBA        AL    36323 | 11/04/1961 | B | M | 021448 |
| | 117. | KELLEY FRANK<br>113 FLOWERS STREET<br>ENTERPRISE        AL    36330 | 03/15/1950 | B | M | 006987 |
| | 118. | KELLEY WILLIE S<br>RT 1 BOX 526<br>ENTERPRISE        AL    36330 | 10/23/1938 | B | M | 001523 |
| | | KLEIN TERESA M<br>RT 3 BOX 67<br>ELBA        AL    36323 | 01/06/1978 | W | F | 021438 |
| | 120. | KNIGHT CHAD A<br>301 OAKWOOD DR<br>ENTERPRISE        AL    36330 | 12/16/1976 | W | M | 020442 |

TERM DATE: SEPTEMBER 23, 2002  START TIME:  9:00 AM

| S. | KE# | JUROR NAME / ADDRESS | BIRTH DATE | RACE | SEX | JUROR# |
|----|-----|----------------------|------------|------|-----|--------|
| 121. | | LAI LING L<br>2831 QUAIL COVE DRIVE<br>ENTERPRISE        AL    36330 | 05/10/1964 | O | F | 006480 |
| 122. | | LARUE ETTA S<br>305 LAKESHORE DRIVE<br>ENTERPRISE        AL    36330 | 02/26/1938 | W | F | 004490 |
| 123. | | LINDSEY STEPHEN M<br>103 PINEHURST DRIVE<br>ENTERPRISE        AL    36330 | 06/14/1971 | W | M | 012028 |
| 124. | | LISENBY JACK W<br>200 LAKEVIEW RD<br>ENTERPRISE        AL    36330 | 10/06/1930 | W | M | 009975 |
| 125. | | LOGAN ANTONIO P<br>815 EAST LEE ST APT 5D<br>ENTERPRISE        AL    36330 | 08/01/1968 | B | M | 007015 |
| 126. | | LOTT MACK F<br>ROUTE 2 BOX 143<br>NEW BROCKTON      AL    36351 | 09/20/1947 | W | M | 009522 |
| 127. | | MAITLAND JENELL M<br>43 A APACHE DRIVE<br>ENTERPRISE        AL    36330 | 08/24/1924 | W | F | 013025 |
| 128. | | MARCUM KATIE C<br>ROUTE 4 BOX 225<br>ENTERPRISE        AL    36330 | 07/27/1946 | W | F | 018019 |
| 129. | | MARTIN LETIE N<br>601 SPRINGDALE AVENUE<br>ENTERPRISE        AL    36330 | 12/13/1936 | W | F | 011470 |
| 130. | | MARTIN MICHAEL J<br>40 WOODFIELD PLACE<br>ENTERPRISE        AL    36330 | 02/25/1971 | W | M | 008976 |
| 131. | | MCDURMONT ANDREW<br>RT 1 BOX 111<br>NEW BROCKTON      AL    36351 | 05/17/1974 | W | M | 004988 |
| 132. | | MCKINNON AUDREY Y<br>ROUTE 1 BOX 278<br>ENTERPRISE        AL    36330 | 11/07/1965 | W | F | 013025 |
| 133. | | MCKINNON JOSEPH S<br>116 FIELDBROOK DR<br>ENTERPRISE        AL    36330 | 05/04/1952 | W | M | 005022 |
| | | MEADOWS JIMMIE L<br>104 RED STREET<br>ENTERPRISE        AL    36330 | 04/11/1976 | W | M | 002496 |
| 135. | | MECKLEY TERRY A<br>100 DEERFIELD<br>ENTERPRISE        AL    36330 | 09/12/1952 | W | M | 014526 |

```
JUR100                    ALABAMA JUDICIAL INFORMATION SYSTEM        PAGE:    10
OPER: JAC                         COFFEE COUNTY                 RUN DATE: 08/02/2002
                                  JUROR VENIRE                  RUN TIME: 00:10:30

TERM DATE: SEPTEMBER 23, 2002   START TIME:  9:00 AM
```

| ST | KE# | JUROR NAME / ADDRESS | BIRTH DATE | RACE | SEX | JUROR# |
|----|-----|----------------------|------------|------|-----|--------|
| 136. | | MEREDITH LOU E<br>210 CEDAR DRIVE<br>ENTERPRISE        AL    36330 | 07/05/1938 | W | F | 009521 |
| 137. | | MITCHELL ROY D<br>ROUTE 1 BOX 275<br>CHANCELLOR       AL    36316 | 01/12/1944 | W | M | 012975 |
| 138. | | MITCHELL STEPHEN T<br>113 CAMBRIDGE RD<br>ENTERPRISE        AL    36330 | 12/09/1969 | W | M | 004024 |
| 139. | | MOORE BRANDON P<br>413 GRANDPINE DRIVE<br>ENTERPRISE        AL    36330 | 06/23/1979 | W | M | 010020 |
| 140. | | MOORE DOROTHY J<br>ROUTE 1 BOX 150<br>NEW BROCKTON     AL    36351 | 09/21/1936 | W | F | 015459 |
| 141. | | MOORE EARNESTINE<br>P O BOX 310725<br>ENTERPRISE        AL    36330 | 02/21/1948 | B | F | 010474 |
| 142. | | MOORE WILLIAM G<br>504 CANDLEWOOD DRIVE<br>ENTERPRISE        AL    36330 | 05/14/1956 | W | M | 004986 |
| 143. | | MORROW MICHAEL R<br>PO BOX 25<br>ENTERPRISE        AL    36331 | 03/07/1952 | W | M | 011027 |
| 144. | | MULLINS SHARRON R<br>110 CAMELLIA DRIVE<br>ENTERPRISE        AL    36330 | 11/20/1965 | B | F | 008974 |
| 145. | | MYERS MARCUS W<br>ROUTE 1 BOX 254<br>ENTERPRISE        AL    36330 | 10/16/1964 | W | M | 019023 |
| 146. | | NEAL ESTELLA<br>210 SHERWIN STREET<br>ENTERPRISE        AL    36330 | 01/18/1959 | B | F | 013524 |
| 147. | | NEPERENY ROSE J<br>102 CHRISTOPHER DRIVE<br>ENTERPRISE        AL    36330 | 08/15/1943 | W | F | 017950 |
| 148. | | NICKOLSON RICKY W<br>609 WEST LEE STREET<br>ENTERPRISE        AL    36330 | 03/06/1964 | W | M | 003019 |
| | | NUCKOLLS HUBERT<br>801 ALBERTA STREET<br>ENTERPRISE        AL    36330 | 12/06/1931 | W | M | 005015 |
| 150. | | PACHECO EDNEE<br>302 NORTHSIDE DRIVE<br>ENTERPRISE        AL    36330 | 11/24/1952 | W | F | 018448 |

TERM DATE: SEPTEMBER 23, 2002   START TIME: 9:00 AM

| ST. | SE# | JUROR NAME / ADDRESS | BIRTH DATE | RACE | SEX | JUROR# |
|-----|-----|----------------------|------------|------|-----|--------|
| 151. | | PARKER RONALD T<br>705 SOUTH OUIDA STREET<br>ENTERPRISE          AL    36330 | 10/12/1950 | W | M | 011530 |
| 152. | | PARRISH STEVEN D<br>ROUTE 1 BOX 134<br>COFFEE SPRINGS     AL    36318 | 03/10/1959 | W | M | 020014 |
| 153. | | PATRICK SANDRA L<br>RT 6 BOX 200<br>ENTERPRISE          AL    36330 | 08/13/1958 | W | F | 020010 |
| 154. | | PEARSON INA D<br>P O BOX 311024<br>ENTERPRISE          AL    36331 | 08/22/1939 | W | F | 008515 |
| 155. | | PERRY STEPHEN R<br>ROUTE 1 BOX 552<br>ENTERPRISE          AL    36330 | 02/27/1957 | W | M | 005520 |
| 156. | | PHILLIPS DOROTHEA M<br>514 DIXIE DR<br>ENTERPRISE          AL    36330 | 12/08/1975 | W | F | 006978 |
| 157. | | PIERCE ELIZABETH A<br>531 EAST LEE ST<br>ENTERPRISE          AL    36330 | 04/20/1962 | W | F | 010979 |
| 158. | | PIERCE KATHY S<br>107 BELL STREET<br>ENTERPRISE          AL    36330 | 07/04/1959 | W | F | 016953 |
| 159. | | POPE DEBRA H<br>806 E LEE ST TOWNHOUSE 6<br>ENTERPRISE          AL    36330 | 08/16/1952 | W | F | 003517 |
| 160. | | POPE L C<br>404 DOE STREET<br>ENTERPRISE          AL    36330 | 04/29/1929 | B | M | 011031 |
| 161. | | PORTER JAY H JR<br>502 JANICE STREET<br>ENTERPRISE          AL    36330 | 09/18/1975 | W | M | 014027 |
| 162. | | PRITCHARD GEORGE A<br>936 EAST LEE STREET<br>ENTERPRISE          AL    36330 | 10/10/1955 | W | M | 018958 |
| 163. | | PUTMAN TERESA B<br>200 WENTWORTH DRIVE<br>ENTERPRISE          AL    36330 | 04/15/1959 | W | F | 001996 |
| 1    | | RACHELS MYRTICE G<br>ROUTE 2 BOX 258<br>NEW BROCKTON     AL    36351 | 07/17/1920 | W | F | 016961 |
| 165. | | RASPONI KATHERINE M<br>101 HIGHLAND DR<br>ENTERPRISE          AL    36330 | 08/19/1976 | W | F | 014968 |

```
JUR100                    ALABAMA JUDICIAL INFORMATION SYSTEM          PAGE:    12
OPER: JAC                        COFFEE COUNTY                   RUN DATE: 08/02/2002
                                 JUROR VENIRE                    RUN TIME: 00:10:30

TERM DATE: SEPTEMBER 23, 2002  START TIME:  9:00 AM
```

| S | RE# | JUROR NAME / ADDRESS | BIRTH DATE | RACE | SEX | JUROR# |
|---|-----|----------------------|------------|------|------|--------|
| | 166. | REED CARLA S<br>613 GRAND PINE AVENUE<br>ENTERPRISE         AL   36330 | 04/23/1952 | W | F | 005513 |
| | 167. | REUTTER JON L<br>138 LAUREL BREEZE DRIVE<br>ENTERPRISE         AL   36330 | 05/04/1979 | X | M | 019516 |
| | 168. | REYNOLDS JEFFERY L<br>112 HUTCHISON AVE<br>ENTERPRISE         AL   36330 | 10/10/1961 | W | M | 018517 |
| | 169. | REYNOLDS MARK R<br>ROUTE 1 BOX 286A<br>CHANCELLOR        AL   36316 | 05/06/1965 | W | M | 003494 |
| | 170. | RICHARDS CHARLES S<br>200 AIRPORT ROAD<br>ENTERPRISE         AL   36330 | 01/31/1944 | W | M | 001495 |
| | 171. | RICHARDSON CAROLYN L<br>123 WALNUT DRIVE<br>ENTERPRISE         AL   36330 | 08/13/1922 | W | F | 018524 |
| | 172. | ROBERTS DEBORAH L<br>P O BOX 34<br>NEW BROCKTON       AL   36351 | 05/21/1959 | W | F | 004514 |
| | 173. | ROBERTS JOYCE J<br>312 BELL STREET<br>ENTERPRISE         AL   36330 | 02/28/1936 | W | F | 000501 |
| | 174. | ROGERS ROY L<br>100 OAKLAND DR<br>ENTERPRISE         AL   36330 | 04/16/1949 | W | M | 001500 |
| | 175. | ROWE CHARLES W<br>PO BOX 311305<br>ENTERPRISE         AL   36331 | 12/06/1943 | W | M | 012529 |
| | 176. | ROWE SARA T<br>ROUTE 2 BOX 434<br>NEW BROCKTON       AL   36351 | 04/05/1955 | W | F | 016032 |
| | 177. | SALTER GLENNIE M<br>906 EAST PARK AVENUE<br>ENTERPRISE         AL   36330 | 09/07/1924 | W | F | 012467 |
| | 178. | SANTOS DOROTHY F<br>P O BOX 310952<br>ENTERPRISE         AL   36331 | 07/13/1943 | W | F | 003524 |
| | 179. | SCACHETTI VALERIE L<br>102 WOODLEY DRIVE<br>ENTERPRISE         AL   36330 | 05/26/1958 | W | F | 004025 |
| | 180. | SCHOFER MELODY R<br>505 BRIARWOOD A8<br>ENTERPRISE         AL   36330 | 03/18/1969 | W | F | 013027 |

TERM DATE: SEPTEMBER 23, 2002  START TIME:  9:00 AM

| S | KE# | JUROR NAME / ADDRESS | BIRTH DATE | RACE | SEX | JUROR# |
|---|-----|---------------------|------------|------|-----|--------|
| 181. | | SCOTT GLADA F<br>118 CRESTENT DR<br>ENTERPRISE        AL    36330 | 05/29/1964 | W | F | 008018 |
| 182. | | SCOTT LISA H<br>609 FORD ALLEY<br>ENTERPRISE        AL    36330 | 05/02/1966 | B | F | 001499 |
| 183. | | SHEFFIE JENNIFER A<br>RT 1 BOX 167 B<br>COFFEE SPRINGS     AL    36318 | 07/07/1973 | W | F | 014028 |
| 184. | | SHERMAN ANGELA W<br>ROUTE 6 BOX 308<br>ENTERPRISE        AL    36330 | 02/13/1972 | W | F | 009474 |
| 185. | | SIMMONS ANNE<br>RT 4 BOX 648<br>ENTERPRISE        AL    36330 | 06/22/1954 | W | F | 007480 |
| 186. | | SKINNER MELBA S<br>407 SPRINGDALE AVENUE<br>ENTERPRISE        AL    36330 | 04/14/1918 | W | F | 001025 |
| 187. | | SMITH JEFFERY E<br>ROUTE 1 BOX 183<br>NEW BROCKTON     AL    36351 | 11/01/1940 | W | M | 014521 |
| 188. | | SNECKENBERGER MARY J<br>207 TIMBERLAKE DRIVE<br>ENTERPRISE        AL    36330 | 04/26/1945 | W | F | 006517 |
| 189. | | SNECKENBERGER MICHAEL R<br>207 TIMBERLAKE<br>ENTERPRISE        AL    36330 | 06/30/1978 | W | M | 015033 |
| 190. | | SNYDER EDWARD L<br>P O BOX 267<br>NEW BROCKTON     AL    36351 | 05/04/1944 | W | M | 001001 |
| 191. | | STEVENS WILLIAM G<br>ROUTE 2 BOX 81<br>NEW BROCKTON     AL    36351 | 04/20/1922 | W | M | 008478 |
| 192. | | STUCKEY PHILLIP D<br>ROUTE 2 BOX 366<br>NEW BROCKTON     AL    36351 | 12/30/1958 | W | M | 014460 |
| 193. | | TEW JOHN M<br>23 ANTHONY CIRCLE<br>ENTERPRISE        AL    36330 | 06/05/1968 | W | M | 019954 |
| | | THOMPSON BRENDA R<br>P O BOX 30245<br>ENTERPRISE        AL    36331 | 06/13/1947 | B | F | 008516 |
| 195. | | THOMPSON MARY W<br>412 DOUGLAS BROWN CIRCLE<br>ENTERPRISE        AL    36330 | 08/21/1934 | W | F | 009025 |

400

TERM DATE: SEPTEMBER 23, 2002  START TIME: 9:00 AM

| S | KE# | JUROR NAME / ADDRESS | BIRTH DATE | RACE | SEX | JUROR# |
|---|---|---|---|---|---|---|
| | 196. | TIDWELL LARRY J<br>106 YELLOWLEAF DRIVE<br>ENTERPRISE        AL    36330 | 12/19/1958 | W | M | 015957 |
| | 197. | TILLIES WILLIE R<br>18 ENTERPRISE APTS<br>ENTERPRISE        AL    36330 | 11/10/1957 | B | M | 012476 |
| | 198. | TILLIS JAMES R<br>3602 LAKE OAK RIDGE DR<br>ENTERPRISE        AL    36330 | 06/02/1957 | W | M | 003489 |
| | 199. | TINDELL VIRGIL P<br>1761 DAMASCUS RD<br>ENTERPRISE        AL    36330 | 10/30/1941 | W | M | 008020 |
| | 200. | TINDOL LANCE H<br>RT 4 BOX 74 1<br>ELBA            AL    36323 | 07/28/1970 | W | M | 021508 |
| | 201. | TOMBERLIN JIMMY C<br>300 MEADOWLARK LANE<br>ENTERPRISE        AL    36330 | 11/30/1943 | W | M | 014525 |
| | 202. | TOMBERLIN JOHN C<br>12 INDIGO PLACE<br>ENTERPRISE        AL    36330 | 02/12/1952 | W | M | 005519 |
| | 203. | TOWNSEND SHIRLEY G<br>1403 EAST PARK AVE<br>ENTERPRISE        AL    36330 | 04/11/1955 | B | F | 009983 |
| | 204. | TRAHAN CATRINA B<br>203 WINDHAM DR<br>ENTERPRISE        AL    36330 | 06/08/1968 | B | F | 021016 |
| | 205. | TRAMMELL ELIZABETH W<br>105 S OAKRIDGE DR<br>ENTERPRISE        AL    36330 | 11/16/1950 | W | F | 020512 |
| | 206. | TRUJILLO JOSE A<br>3969 RUCKER BLVD LOT 18<br>ENTERPRISE        AL    36330 | 12/20/1970 | X | M | 005486 |
| | 207. | WALLACE ELOISE S<br>102 CHESTNUT DRIVE<br>ENTERPRISE        AL    36330 | 10/02/1911 | W | F | 019511 |
| | 208. | WALLACE ROY D<br>RT 4 BOX 74 2<br>ELBA            AL    36323 | 11/07/1967 | W | M | 021509 |
| | | WARE LAYMON<br>LOT 49 ENDALE ESTATES<br>ENTERPRISE        AL    36330 | 08/07/1951 | B | M | 004016 |
| | 210. | WASHINGTON MAGGIE M<br>304 DIXIE DRIVE<br>ENTERPRISE        AL    36330 | 02/23/1950 | B | F | 014958 |

*VOLUME 3*

COURT OF CRIMINAL APPEALS NO. CR-02-0333

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

## CIRCUIT COURT OF ____COFFEE____ COUNTY, ALABAMA

CIRCUIT COURT NO. CC-01-179, CC-01-180

CIRCUIT JUDGE Gary L. McAliley

Type of Conviction / Order Appealed From: Conviction, Capital Murder, Robbery 1st

Sentence Imposed: Life Without Parole, Life

Defendant Indigent: [X] YES   [ ] NO

Robert Thomas Conrad

Gary Bradshaw

(Appellant's Attorney)
P. O. Box 311412

(Telephone No.)

(Address)
Enterprise            AL              36331
(City)            (State)            (Zip Code)

**NAME OF APPELLANT**

Richard Waldrop
P. O. Box 310027
Enterprise, AL  36331

**V.**

## STATE OF ALABAMA

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

**NAME OF APPELLEE**

(For Court of Criminal Appeals Use Only)



COPY

TERM DATE: SEPTEMBER 23, 2002  START TIME:  9:00 AM
----------------------------------------------------------------------------------

| ST..KE# | JUROR NAME / ADDRESS | BIRTH DATE | RACE | SEX | JUROR# |
|---------|----------------------|------------|------|-----|--------|
| 211. | WASHINGTON RUSSELL J<br>304 DIXIE DR<br>ENTERPRISE        AL    36330 | 03/19/1955 | B | M | 019445 |
| 212. | WEAVER WILLIAM C<br>303 NORTHSIDE DRIVE<br>ENTERPRISE        AL    36330 | 07/19/1922 | W | M | 000498 |
| 213. | WESLEY KIRBY E SR<br>RT 1 BOX 406AA<br>CHANCELLOR        AL    36316 | 04/03/1923 | W | M | 006486 |
| 214. | WHALEY ANGELA L<br>406 HIGHLAND DR<br>ENTERPRISE        AL    36330 | 05/10/1966 | W | F | 008476 |
| 215. | WILDZUNAS ROBERT M<br>208 STATFORD LANE<br>ENTERPRISE        AL    36330 | 05/23/1964 | W | M | 016025 |
| 216. | WILLIAMS BARRY C<br>301 SUNSET DRIVE<br>ENTERPRISE        AL    36330 | 10/05/1964 | B | M | 005988 |
| 217. | WILLIAMS JERRY G<br>ROUTE 2 BOX 419<br>NEW BROCKTON        AL    36351 | 12/01/1967 | W | M | 019456 |
| 218. | WILLIAMS MAGNOLIA D<br>215 MEADOWBROOK DR<br>ENTERPRISE        AL    36330 | 04/24/1938 | B | F | 001002 |
| 219. | WILLIAMSON ALAN L<br>202 JOHN STREET<br>ENTERPRISE        AL    36330 | 03/23/1952 | B | M | 021008 |
| 220. | WILSON VIVIAN F<br>RT 5 BOX 45<br>ENTERPRISE        AL    36330 | 03/10/1962 | B | F | 015531 |
| 221. | WISE WILLIAM E<br>326 ALBERTA ST<br>ENTERPRISE        AL    36330 | 02/02/1977 | W | M | 001993 |
| 222. | WOOTEN JOANN R<br>104 MADISON LANE<br>ENTERPRISE        AL    36330 | 01/01/1945 | W | F | 001498 |
| 223. | YAGER HELEN A<br>202 B PLAZA DRIVE 20<br>ENTERPRISE        AL    36330 | 10/11/1952 | W | F | 017028 |
| 224. | YORK DEBORAH P<br>ROUTE 5 BOX 407<br>ENTERPRISE        AL    36330 | 08/04/1954 | W | F | 021010 |
| 225. | YORK JULIAN K<br>RT 1 BOX 271<br>NEW BROCKTON        AL    36351 | 03/23/1946 | W | M | 013464 |

402

ACR469

ALABAMA JUDICIAL DATA CENTER
COFFEE COUNTY

ORDER FOR SERVICE AND RETURN

CC 2001 000179.00 + 180
GARY L MCALILEY

---

STATE OF ALABAMA   VS.   CONRAD ROBERT THOMAS

---

SERVE ON:

    CONRAD ROBERT THOMAS
    GARDEN OAKS APT.35
    ENTERPRISE     AL 36330 0000


NOTES:

JURY VENIRE FOR SEPTEMBER 23, 2002

---

TO ANY SHERIFF OR ANY AUTHORIZED AGENT:

    YOU ARE HEREBY ORDERED TO DELIVER THE ATTACHED DOCUMENT TO THE
    ABOVE NAMED PERSON AT THE ADDRESS INDICATED.


09/04/2002      JAMES M COUNTS           ,    CLERK BY _____

---

I HEREBY CERTIFY THAT I PERSONALLY DELIVERED A COPY OF THE ATTACHED
DOCUMENT IN _____ COFFEE _____ COUNTY, ALABAMA.




ROBERT THOMAS CONRAD
_____        _____
                                   SIGNATURE OF SERVER

                                   4/Sep02    11:25
                                   _____
                                   DATE
NAME 7 ADDRESS ABOVE
_____

---

OPERATOR: DEC
PREPARED: 09/04/2002

ORIGINAL

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA

STATE OF ALABAMA,       )
PLAINTIFF,

                        )

VS.

                        )

ROBERT THOMAS CONRAD,   )    CASE NO. CC-2001-179 & 18
DEFENDANT.              )

                        )
                        )

**MOTION TO DECLARE THE ALABAMA CAPITAL SENTENCING PROCESS
UNCONSTITUTIONAL AND TO BAR IMPOSITION OF THE DEATH PENALTY**

ROBERT THOMAS CONRAD respectfully moves this Honorable Court, pursuant to the

Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and applicable

state law, to bar imposition of the death penalty in the defendant's case on the grounds that the

current Alabama statute which permits the judge, and not the jury, to make the factual findings

necessary to expose the defendant to death violates the Sixth, Eight and Fourteenth Amendments to

the United States Constitution.

I.    INTRODUCTION

1.    In Apprendi v. New Jersey, 530 U.S. 466 (2000), the United States Supreme

Court determined that:

> [O]ther than the fact of a prior conviction, any fact that
> increases the penalty for a crime beyond the prescribed
> statutory maximum must be submitted to a jury, and proved
> beyond a reasonable doubt.

Id. at 490. Accordingly, the Court found that New Jersey's hate crime statute, which authorized an

Page 1 of 8

increase in the maximum prison sentence based on a judge-made finding of racial bias, violated the Sixth and Fourteenth Amendments. The Apprendi Court found that this sentence violated Mr. Apprendi's right to "a jury determination that [he] is guilty of every element of the crime with which he is charged beyond a reasonable doubt." Id. at 477 (quotations omitted). This right attached despite the fact that the New Jersey legislature intended the "racial bias" finding to be a sentencing factor, and not an element of the offense. The dispositive question, the Court found, was not one of form, but of effect- "does the required finding expose the defendant to a greater punishment than that unauthorized by the jury's guilty verdict?" Id. at 494.

2.     The Court attempted to reconcile it's decision in Apprendi with its earlier holding in Walton v. Arizona, 497 U.S. 639 (1990). In Walton, the Court had found that the Sixth Amendment did not require that the specific findings authorizing the imposition of a death sentence be made by a jury, because "aggravating circumstances are not separate penalties or offenses, " and "we cannot conclude that a State is required to denominate aggravating circumstances 'elements' of the offense or permit only a jury to determine the existence of such circumstances." Walton, 497 U.S. at 648.

3.     The Apprendi Court distinguished Walton because it found that a conviction of first-degree murder in Arizona carried a maximum sentence of death: "once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide" the penalty. Apprendi, 530 U.S. at 497 (citing Almendarez-Torres v. United States, 523 U.S. 224, 257 n.2 (1998) (Scalia, J., dissenting)). This distinction proved "baffling" to many. As Justice O'Connor pointed out in her dissent, the Court's reliance on the claim that the jury makes all the findings necessary to expose a defendant to the death

sentence was "demonstrably untrue, because without the judge's "critical findings" regarding

aggravators, the "maximum sentence to which the defendant is exposed is life imprisonment, and

not the death penalty." Id. at 538 (O'Connor, J., dissenting).

4.      Earlier this term, the Court agreed to hear Ring v. Arizona to decide whether the

factual findings necessary to expose a defendant to the death penalty "may be found by the judge,

as Arizona law specifies, or whether the Sixth Amendment's jury trial guarantee, . . . , requires that

the aggravating factor determined be entrusted to the jury." Ring v. Arizona, 122 S. Ct. 2428, 2347

(2002).

5.      On June 24, 2002, the United State Supreme Court concluded that "Walton and

Apprendi are irreconcilable; our Sixth Amendment jurisprudence cannot be home to both." Id. at

2443. Thus:

> The right to trial by jury guaranteed by the Sixth Amendment would
> be senselessly diminished if it encompassed the fact finding necessary
> to increase a defendant's sentence by two years, but not the fact
> finding necessary to put him to death. We hold that the Sixth
> Amendment applies to both.

Id.

6.      In so holding, the Court reiterated the principles established in Apprendi that the

characterization of a fact or circumstances as an 'element' or a 'sentencing factor' is not

determinative of the question 'who decides,' judge or jury." Ring, 122 S. Ct. at 2441 (citing

Apprendi, 530 U.S. at 492). Rather, "when the term 'sentence enhancement' is used to describe an

increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an

element of a greater offense than the one covered by the jury's guilty verdict." Id. at 2441 (citing

Apprendi, 530 U.S. at 494, n. 19). Thus, the Court held that "capital defendants . . . are entitled to

a jury determination of any fact on which the legislature conditions an increase in their maximum punishment. " Id. at 2432.

7.        The Court's ruling invalidates critical aspects of Alabama's capital sentencing scheme. The Supreme Court has recognized that there is no meaningful distinction between Arizona and a state like Alabama for the purposes of the issues presented here.

II.        IMPOSITION OF THE DEATH PENALTY MUST BE BARRED IN THIS CASE.

8.        Pursuant to Ring v. Arizona, 122 S. Ct. 2428 (2002) and Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), it is now clear that any fact findings necessary to support a sentence of death must be made by the jury. In Alabama, a sentence of death can only be imposed where a statutory aggravating circumstances is found to exist beyond a reasonable doubt, Ala. Code § 13-A-5-45 (f) (1975), and where the aggravating circumstance (s) is found to outweigh the mitigating circumstances in the case. Ala. Code §13-A-5-46 (e) (2) (1975). Under the current statute, these two distinct factual findings will be made not by the jury in the defendant's case but by the judge. Consequently, the statute is unconstitutional and the death penalty must not be imposed upon the defendant.

9.        In Ring, the United States Supreme Court found that "[u]nder Arizona law, Ring c could not be sentenced to death . . . unless further findings were made. " Ring, 122 S. Ct. at 2434. Without such findings, "the maximum sentence to which the defendant is exposed is life imprisonment, and not the death penalty." I.d. at 2429 (quotations omitted); see also id.at 2436 ( "The Arizona high court concluded that 'the present case is precisely as described in Justice O'Connor's dissent [in Apprendi]- Defendant's death sentence required the judge's factual findings. '") (quoting State v. Ring, 200 Ariz. 267, 25 P.3d 1139,1151 (Ariz. 2001)).

10.    Similarly, under Alabama law, defendants are not exposed to a sentence of death unless there is a finding *both* that the aggravating circumstances exist beyond a reasonable doubt *and* that those aggravating circumstances outweigh the mitigating circumstances.

**Alabama law specifically provides that defendants are not eligible for the death penalty unless a finding is made that aggravating circumstances outweigh mitigating circumstances.** See Ala. Code §13-A-5-46 (e) (2) (1975) (if aggravating circumstances do not outweigh mitigating circumstances, penalty "shall" be life imprisonment without parole); Ex parte Woodard, 631 So. 2d 1065, 1071 (Ala. 1993) ("A greater punishment-death- *may* be imposed on a defendant convicted of a capital offense, but *only* if one or more of the aggravating circumstances enumerated in §13-A-5-49 is found to exist *and* that aggravating circumstance (s) outweighs any mitigating circumstance(s) that may exist." ) (emphasis in original).

11.    Like Arizona, in Alabama it is *judges* who make the two fact findings necessary to expose a defendant to the death penalty: the trial judge must find both that an aggravating circumstance exist *and* that the aggravating circumstance (s) outweighs the mitigating circumstance(s). Without these two factual findings, the maximum penalty to which a defendant may be sentenced is life without parole. See Woodard, supra. The judge makes these two factual determinations based on aggravating circumstances, mitigation evidence, and additional facts not presented to or found to exist by the jury. For example, pre-sentence reports and the facts presented therein are typically obtained *after* the jury makes its recommendation, and must be considered by the judge in sentencing the defendant. See Ala. Code §13-A-5-47- (b) (1975) ("Before making the

sentence determination, the trial court shall order and receive a written pre-sentence investigation report.").

12.    Notably, the <u>Walton</u> Court found that the capital scheme in Arizona- which provides for judicial sentencing- had the same effects as the capital sentencing scheme in Florida, which like Alabama's, is a state where the jury renders only an advisory verdict:

> The distinctions Walton attempts to draw between the Florida and Arizona statutory scheme are not persuasive. It is true that in Florida the jury recommends a sentence, but it does not make specific factual findings with regard to the existence of mitigating or aggravating circumstances and its recommendation is not binding on the trial judge. A Florida trial court no more has the assistance of a jury's findings of fact with respect to sentencing issues than does a trial judge in Arizona.

<u>Walton,</u> 497 U.S. 639, 648 (1990); <u>see also</u> <u>Bottoson v. Moore,</u> No. SC 02-1455, 2002 WL 1472231, * 5 (Fla. July 8, 2002) (Pariente, J., concurring) (noting similarities between Arizona and Florida capital sentencing schemes). Indeed, the United States Supreme Court stayed the execution of Alabama death row prisoner Gary Brown on the basis of his claim that his sentence was imposed in violation of <u>Apprendi</u> and <u>Ring</u>. Similarly, executions in Florida-Linroy Bottoson and Amos King- were stayed as well.

13.    Morever, Alabama law provides that additional factual evidence may be presented to the judge after the jury recommendation is made. <u>See</u> Ala. Code §13-A-5-47 (d) (1975) (providing for court to consider evidence not presented to jury). [1]

---

[1] Additional argument may also be presented to the judge after the jury recommendation is made. <u>See</u> Ala. Code 13-A-5-47 (c) (1975) ("Before imposing sentence the trial court shall

Page 6 of 8

14.     The determination of whether the aggravating circumstance (s) exists beyond a reasonable doubt *and* whether the aggravating circumstance(s) outweighs the mitigating circumstance(s) are findings of "fact on which the legislature conditions an increase in [the] maximum punishment," and as such must be found to exist by a unanimous jury beyond a reasonable doubt. <u>Ring</u>, 122 S. Ct. at 2432.

15.     Only the judge makes these factual findings under the current Alabama statute; therefore, the statute is unconstitutional.

WHEREFORE, the defendant respectfully petitions this Court to:

(1) enter an order granting the motion and striking down, as unconstitutional, Alabama's statute under which the judge, and not the jury, makes the fact findings necessary to expose the defendant to a death sentence;

(2) bar imposition of the death penalty in the defendant's case, or, alternatively, continue defendant's trial under the Alabama legislature enacts a statute that conforms to constitutional requirements; and

(3) grant any other relief that is just or necessary to correct the problems raised in this motion.

Respectfully submitted this the 9th day of August, 2002.

Sydney Albert (Al) Smith          SMI098
Attorney for Defendant

_____

permit the parties to present arguments concerning the existence of aggravating and mitigation circumstances.").

Page 7 of 8

Post Office Drawer 389
Elba, AL 36323
Phone: (334) 897-3658
Fax: (334) 897-8633

| | |
|---|---|
| Gary D. Bradshaw | BRA074 |

Attorney at Law
P. O. Box 311412
Enterprise, AL 36331-1412

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

and

Honorable Bill Pryor
Attorney General, State of Alabama
Montgomery, Alabama 36081

Al Smith                         8/9/02
_____                _____
Al Smith                         Date

ORIGINAL

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA

STATE OF ALABAMA,           )
PLAINTIFF,                  )
VS.                         )
ROBERT CONRAD,              )        CASE NO. CC-2001-179 & 180
DEFENDANT.                  )
                            )
                            )

AUG 2002
FILED
M. Counts
Court Clerk
Coffee Co. AL

---

**MOTION TO DISMISS THE INDICTMENT ON THE GROUNDS THAT THE FAILURE TO SPECIFY THE AGGRAVATING CIRCUMSTANCES ON WHICH A DEATH SENTENCE MAY BE IMPOSED VIOLATES THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS AND STATE LAW**

---

Robert Conrad respectfully moves this Honorable Court, pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and applicable state law, to dismiss each count of the indictment on the grounds that the indictment violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Alabama law.

I.      Introduction

1.      On June 24th, 2002, the United States Supreme Court decided in Ring v. Arizona, 122 S. Ct. 2428, 2432 (2002), that "capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." In so holding, the Court reiterated the principles established in Apprendi v. New Jersey, 530 U.S. 466 (2000), that the "characterization of a fact or circumstance as an 'element' or a 'sentencing factor' is not determinative of the question 'who decides,' judge or jury." Ring, 122 S. Ct. at 2441 (citing Apprendi, 530 U.S. at 492). Rather, "when the term 'sentence enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, it is functional equivalent of an element

Page 1 of 8

of a greater offense than the one covered by the jury's guilty verdict." <u>Ring</u>, 122 S. Ct. at 2441 (citing <u>Apprendi,</u> 530 U.S. at 494, n. 19).

2.    Under the holdings of <u>Apprendi</u> and <u>Ring</u>, as well as state and federal law, the additional factfindings necessary to expose a defendant to the penalty of death must be charged in the indictment and found to exist by a jury beyond a reasonable doubt.

3.    Robert Conrad is before the Court on an indictment dated May 31, 2001.

4.    Robert Conrad is charged with capital murder based upon his alleged involvement in the death of **Jelaine Bowman Dennis.**

5.    No aggravating circumstances as defined in Ala. Code §13-A-5-49 (1975) are plead in the indictment.

II.    <u>The Indictment Must Be Dismissed.</u>

6.    "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." <u>Jones v. United States,</u> 526 U.S. 227, 243 n.6 (1999); <u>see also</u> <u>United States v. Cotton,</u> 122 S. Ct. 1781, 1783 ( May 20, 2002). Well-settled law establishes a criminal defendant's right to an indictment that sets forth each essential element necessary to constitute the offense intended to be punished, <u>see</u> <u>Hamling v. United States,</u> 418 U.S. 87, 117-18 (1974), a right which traditionally has been linked to the complementary right to a jury trial on each element charged in the indictment.

7.    A long series of cases dating back to the 19th century has established that in order to be valid, an indictment must meet two criteria for sufficiency. First, the indictment must contain

the elements of the offense intended to be charged, in such form as to sufficiently apprize the defendant of what he must be prepared to meet, and secondly, the indictment must identify the conduct charged with sufficient accuracy to enable the defendant to assert his Double Jeopardy rights in the event of a subsequent prosecution for the same conduct. See, e.g., Russell v. United States, 369 U.S. 749, 763-64 (1962); United States v. Hess, 124 U.S. 483, 487 (1888). It is not sufficient "to set forth the offence in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." Russell, 369 U.S. at 765 (quoting United States v. Carll, 105 U.S. 611, 612 (1882)); see also Hamling v. United States, 418 U.S. 87, 117-18 (1974); United States v. Reese, 369 U.S. 749, 763-64 (1962); United States v. Hess, 124 U.S. 483-467 (1888). It is not sufficient "to set forth the offence in the words of the statute, unless those words of themselves fully, directly, expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." Russell, 369 U.S. at 765 (quoting United States v. Carll, 105 U.S. 611, 612 (1882)); see also Hambling v. United States, 418 U.S. 87, 117-18 (1974); United States v Reese, 285 U.S. 427, 232-33 (1875).

8.    In the wake of Apprendi and Ring, these principles apply with equal force to "any fact that increases the penalty for a crime beyond the prescribed statutory maximum." Apprendi 530 U.S. at 490. When a fact increases a sentence beyond the maximum authorized statutory sentence, "it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict. Indeed, it fits squarely within the usual definition of an 'element of the offense." Id. at 494, n.19 (citing Thomas, J., concurring, at 500-501) (reviewing the relevant authorities).

9.    Apprendi makes clear the facts which authorize an increased penalty are treated as elements that create separate crimes. In his Apprendi concurrence, Justice Thomas elaborated on this principle: "Sentencing enhancements may be new creatures, but the question that they create for courts is not. Courts have long had to consider which facts are elements in order to determine the sufficiency of an accusation (usually an indictment)." Justice Thomas went on to state very clearly that "[t]his authority establishes that a 'crime' includes every fact that is by law a basis for imposing or increasing punishment . . . One need only look to the kind, degree, or range of punishment to which the prosecution is by law entitled for a given set of facts. Each fact necessary for that entitlement is an element." Apprendi, 530 U.S. at 501 ( Thomas, J., concurring).

10.    Under Alabama law, in order to increase the punishment to which a convicted defendant may be subjected from life imprisonment without parole to the death penalty, two factual determinations are necessary. First, an aggravating circumstance must be found to exist beyond a reasonable doubt at the sentencing phase of the trial, see Ala. Code §13-A-5-45 (f) (1975); and second, there must be a fact finding that aggravating circumstances outweigh mitigating circumstances. See Ala. Code §13-A-5-46 (e) (2) (1975) (if aggravating circumstances do not outweigh mitigating circumstances, penalty "shall" be life imprisonment without parole).Hence, imposition of a death sentence following a capital murder conviction involves two additional factual determinations: first, a determination as to whether an aggravating circumstances exists; and second, a determination as to whether an aggravating circumstance exists; and second, a determination that the aggravating circumstance (s) which exist outweighs any mitigating circumstance(s) which is determined to exist. Without a finding that these two "elements" exist, a defendant may not be exposed to a death sentence.

11.    The constitutional right of an accused to demand the nature and cause of the accusation against him is not a technical right, but is fundamental and essential to the guaranty that no person shall be deprived of his liberty except by due process of law, nor be twice put in jeopardy for the same offense. Summers v. State, 348 So. 2d. 1126, 1132 (Ala. Crim. App. 1977), cert. denied, 348 So. 2d. 1136 (Ala. 1977), cert denied, 434 U.S. 1070 (1978); see also Young v. State, 348 So. 2d 544, 546 (Ala. Crim. App. 1977) ( "We must be ever mindful that the right of an accused to demand the nature and cause of the accusation is one of the cornerstones of our Bill of Rights; that he fully and intelligently understands the charge against him, so that he may adequately prepare his defense, is the first requirement of due process.")

12.    In Alabama, a defective indictment deprives a trial court of jurisdiction to hear the case: "When a material element is omitted from an indictment a conviction is due to be vacated and jurisdictional issues are not subject to waiver and may be raised at any time." Poole v. State, CR-99-1200, 2001 WL 996300, at * 15 (Ala. Crim. App. Aug. 31, 2001) (citing Exparte Harper, 594 So. 2d 1181 ( Ala. 1991)).[1]

13.    The Alabama Court of Criminal Appeals recently grappled in Poole v. State with the requirement of Apprendi- specifically the question of whether elements which increase the maximum authorized punishment must be alleged in the indictment. The Poole majority held, over strong disagreement by two of its five members, that Apprendi did not require that enhancements be included in the indictment and presented to a grand jury, finding that:

---

[1] In contrast, a defective federal indictment does not deprive the trial court of jurisdiction to hear a case. See United States v. Cotton, 122 S. Ct. 1781 (May 20, 2002) (while indictment's failure to include any allegation regarding quantity of drugs involved in alleged conspiracy rendered conspirator's enhanced sentences erroneous under Apprendi, error was not jurisdictional).

Page 5 of 8

> To require an indictment to include any applicable enhancements would also elevate the fact that made the enhancement applicable to the exalted status of an 'essential element' of the crime charged and would invite challenges to the validity of the underlying convictions in every court in this state.

Id. (citations omitted).

14.    Judge Shaw- joined by Judge Cobb- strongly disagreed with this analysis. In his concurrence, he instead concluded that:

> because the sentence-enhancement factors . . . are, as a matter of federal constitutional law, the functional equivalent of an element of a greater offense, an element that, by definition, is material because it must be proven to a jury beyond a reasonable doubt and because it provides the jurisdictional basis for imposing the enhanced sentence, I would hold that a grand jury must first find probable cause to believe that these sentence-enhancement factors can be proven and that the factors must be alleged in the indictment.

Id. at * 20 ( Shaw, J., concurring in the unpublished memorandum and concurring in the result in the opinion): see also Phelps v. State, CR-01-0186, 2002 WL 1397880, at * 16-17 ( Ala. Crim. App. June 28, 2002) ( Shaw, J., concurring in part and dissenting in part from the rationale, and concurring in the result) ( "However, because the enhancement provision was not charged in the indictment . . . I do not believe that the enhancement can be applied in this case."). Judge Shaw thus found that the Court should "hold that the fully panoply of the state due-process protections must be accorded to those subject to sentence enhancement within the context of Apprendi." Id.

15.    In this case, the defendant has been afforded no such protections. The elements required in order to expose him to death have not been charged in the indictment. Under the

holdings of <u>Apprendi</u> and <u>Ring</u>, as well as state and federal law, the additional fact findings necessary to expose a defendant to the penalty of death must carry with them the full protection of the procedural safeguards that have been historically available to those accused of criminal offenses. See <u>Poole</u>, 2002 WL 996300, at * 19 ( Shaw, J., concurring in the unpublished memorandum and concurring in the result in the opinion).

16.    The fact findings necessary to subject the defendant to a death sentence have not been plead in the indictment. No aggravating circumstances have been identified, nor does the indictment allege that the aggravating circumstance(s) outweighs any mitigating circumstance(s).

WHEREFORE, the defendant respectfully petitions this Court to:

(1)    enter an order dismissing the indictment against the Defendant and causing new grand jury proceedings to commence; and

(2)    grant any other relief that is just or necessary to correct the problems raised in this motion.

Respectfully submitted this 9th day of August, 2002.

Sydney Albert (Al) Smith        SMI098
P. O. Drawer 389
Elba, Al 36323
Phone:        334-897-3658
Fax:          334-897-8633


Gary D. Bradshaw      BRA074
Attorney at Law
P. O. Box 311412
Enterprise, AL 36331-1412

ORIGINAL

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA

STATE OF ALABAMA, )
PLAINTIFF, )
 )
VS. )
 )
ROBERT THOMAS CONRAD, )  CASE NO. CC-2001-179 & 188
DEFENDANT. )
 )
 )

*[Stamp: AUG 2002 FILED J.M. Counts Court Clerk Coffee Co. AL]*

---

**MOTION TO BAR IMPOSITION OF THE DEATH PENALTY WHERE THE JURY'S ROLE AND FACTUAL DETERMINATIONS ARE DEEMED ADVISORY**

---

ROBERT THOMAS CONRAD respectfully moves this Honorable Court, pursuant to the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and applicable state law, bar imposition of the death penalty where the jury's role and factual determinations are deemed advisory on the grounds that such instructions and arguments violate Caldwell v. Mississippi.

I.    Introduction

1.    In Apprendi v. New Jersey, 530 U.S. 466 (2000), the United States Supreme Court determined that:

> [O]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.

Id. at 490. Accordingly, the Court found that New Jersey's hate crime statute, which authorized an increase in the maximum prison sentence based on a judge-made finding of racial bias, violated the

Page 1 of 7

Phone: (334) 393-6439

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

and

Honorable Bill Pryor
Attorney General, State of Alabama
Montgomery, Alabama 36081

Al Smith                              8/9/02
Al Smith                              Date

Sixth and Fourteenth Amendments. The <u>Apprendi</u> Court found that this sentence violated Mr. Apprendi's right to a "jury determination that [he] is guilty of every element of the crime with which he is charged beyond a reasonable doubt." <u>Id.</u> at 477 (quotations omitted).

2.      The Court attempted to reconcile its decision in <u>Apprendi</u> with its earlier holding in <u>Walton v. Arizona</u>, 497 U.S. 639 (1990). In <u>Walton</u>, the Court had found that the Sixth Amendment did not require that the specific findings authorizing the imposition of a death sentence be made by a jury, because "aggravating circumstances are not separate penalties or offenses," and "we cannot conclude that a State is required to denominate aggravating circumstances 'elements' of the offense or permit only a jury to determine the existence of such circumstances." <u>Walton</u>, 497 U.S. at 648.

3.      The <u>Apprendi</u> Court distinguished <u>Walton</u> because it found that a conviction of first-degree murder in Arizona carried a maximum sentence of death: "once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide" the penalty. <u>Apprendi</u>, 530 U.S. at 497 (citing <u>Almendarez-Torres v. United States</u>, 523 U.S. 224, 257 n.2 (1998) (Scalia, J., dissenting)). This distinction proved "baffling" to many. As Justice O'Connor pointed out in her dissent, the Court's reliance on the claim that the jury makes all the findings necessary to expose a defendant to the death sentence was "demonstrably untrue, because without the judge's "critical findings" regarding aggravators, the "maximum sentence to which the defendant is exposed is life imprisonment, and not the death penalty." <u>Id.</u> at 538 ( O'Connor, J., dissenting).

4.      Earlier this term, in <u>Ring v. Arizona</u>, 122 S. Ct. 2428 (June 24, 2002), the United States Supreme Court concluded that "<u>Walton</u> and <u>Apprendi</u> are irreconcilable; our Sixth

Amendment jurisprudence cannot be home to both. " Ring, 122 S. Ct. at 2443. Thus:

> The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the fact finding necessary to put him to death. We hold that the Sixth Amendment applies to both.
>
> Id.

5.      In so holding, the Court reiterated the principle established in Apprendi that the "characterization of a fact or circumstance as an 'element' or a 'sentencing factor' is not determinative of the question 'who decides,' judge or jury." Ring, 122 S. Ct. at 2441 (citing Apprendi, 530 U.S. at 492). Rather, "when the term 'sentence enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict." Id. at 2441 (citing Apprendi, 530 U.S. at 494, n.19). Thus, the Court held that "capital defendants . . .are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." Id. at 2432.

6.      The Court's ruling renders Alabama's capital sentencing scheme unconstitutional because the jury is deemed not to play a determinative role. The Supreme Court has recognized that there is no meaningful distinction between Arizona and a state like Alabama for the purposes of the issues presented here.

II.      The Death penalty Must Be Barred in this Case.

7.      In Alabama, the jury's participation in the sentencing process is "advisory" and not binding. See Ala. Code 13-A-5-47 (e) (1975) ("While the jury's recommendation concerning sentence shall be given consideration, it is not binding upon the court.") Judges and prosecutors in

capital cases routinely instruct juries that their verdicts are merely "advisory" and not binding on the court. This practice has been repeatedly upheld by the Alabama courts. See Ex parte Taylor, 666 So. 2d. 73 (Ala. 1995), overruled in part by Ex parte Borden, 769 So. 2d. 950 (Ala. 2000) (no error in trial court's instructions to jury that its verdict was advisory); Ex parte Hays, 518 So. 2d 768, 777 (Ala. 1986) (trial court's instruction that jury's verdict was merely a "recommendation" was correct); Smith v. State, CR-97-1258, 2000 WL 1868419 (Ala. Crim. App. Dec. 22, 2000) (instruction that verdict is a "recommendation" or "advisory" is proper); Thomas v. State, 766 So. 2d 860 (Ala. Crim. App. 1998) (prosecutor's statements that verdict was advisory, combined with trial court's instruction that it was merely a "recommendation" not improper); Brown v. State, 686 So. 2d 385 (Ala. Crim. App. 1995) (prosecutor statements that verdict advisory not erroneous); Weaver v. State, 678 So. 2d 260, 283 (Ala. Crim. App. 1995), overruled by Exparte Weaver, 678 So. 2d 284 (Ala. 1996) (same); Hart v. State, 612 So. 2d 520 (Ala. Crim. App. 1992) (where trial court instructed jury that its verdict was merely advisory, no reversible error occurred); Hallford v. State, 629 So. 2d. (Ala. Crim. App. 1992) (prosecutorial argument that jury verdict is "recommendation" not erroneous; Johnson v. State, 620 So. 2d 709 (Ala. 1993) (trial court and prosecutor's statements that verdict was "advisory" and a "recommendation" proper); Kuenzel v. State, 577 So. 2d. 474 (Ala. Crim. App. 1990), aff'd, 577 So. 2d 1236 (Ala. 1991) (no reversible error occurs where trial court instructs the jury that its penalty phase verdict is an advisory verdict); Smith v. State, 581 So. 2d. 497 (Ala. Crim. App. 1990), overruled on other grounds, 581 So. 2d. 531 (Ala. 1991)(trial court's instruction that verdict was "recommendation" proper); Martin v. State, 548 So. 2d. 488, 494 (Ala. Crim. App. 1988), aff'd, 548 So. 2d 496 (Ala. 1988) ("comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and

that its sentence verdict was 'advisory' and a 'recommendation' and that the trial court would make the final decision as to sentence does not violate Caldwell"); Hooks v. State, 534 So. 2d 329 (Ala. Crim. App. 1987) (holding that judge's instructions that verdict was advisory, combined with prosecutor's statements that jury verdict was advisory and a recommendation did not violate Caldwell).

8.     In Caldwell v. Mississippi, 472 U.S. 320 (1985), the United States Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Caldwell, 472 U.S. at 328. The Court reversed the defendant's conviction and sentence of death where the prosecutor at trial argued and the trial court instructed the jury that its decision was not final but that it was automatically review able by the state supreme court. In coming to this conclusion, the Court reiterated its "[b]elief in the truth of the assumption that sentencers treat their power to determine the appropriateness of death as an 'awesome responsibility' [which] has allowed this Court to view sentence discretion as consistent with- and indeed as indispensable to- the Eight Amendment's need for reliability in the determination that death is the appropriate punishment." Id. at 329-30 (citations omitted).

9.     Since Caldwell, both the Eleventh Circuit and the United States Supreme Court have found that Caldwell typically plays no determinative role in places like Alabama- even where the court and the prosecutor instruct the jury that its verdict is merely 'advisory' or a "recommendation"- because such comments do not "mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." Darden v. Wainwright, 477 U.S. 168, 184, n. 15 (1986); Duren v. Hopper, 161 F.3d 655,

Page 5 of 7

664 ( 11th Cir. 1998) (attorney not ineffective for failing to object to court's instruction to jury that its verdict was "advisory", instruction not erroneous because "court did not mislead the jury, diminish its importance, or absolve it of responsibility for its decision"); Harich v. Dugger, 844 F. 2d. 1464, 1473 (11th Cir. 1988) (informing jury of its "advisory" function does not violate Caldwell); see also Romano v. Oklahoma, 512 U.S. 1, 9 (1994) ("[T]o establish a Caldwell violation, a defendant must necessarily show that the remarks to the jury improperly described the role assigned to the jury by local law.") (citing Dugger v. Adams, 489 U.S. 401, 407 (1989)).

10.    In Ring v. Arizona, 122 S. Ct. 2428 (2002), the United States Supreme Court held that "capital defendants . . .are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." After Ring-where the Court had declared that the jury *must* play a determinative role as to the finding of facts at the penalty phase of a capital trial - a scheme under which the jury's role and factual findings are "advisory" or merely "recommendations" runs afoul of Caldwell and Darden, and any instructions to the jury indicating that its role is not determative are "inaccurate and misleading in a manner that diminishe[s] the jury's sense of responsibility." Caldwell, 472 U.S. 320. 342 ( O'Connor, J., concurring in part and concurring in the judgment).

WHEREFORE, the defendant respectfully petitions this Court to:

(1) bar imposition of the death penalty in defendant's case, or, alternatively, enter an order granting the motion and precluding instructions and/or arguments to the jury that the jury's findings are advisory and not binding on this Court; and

(2) grant any other relief that is just or necessary to correct the problems raised in this motion.

Respectfully submitted this the 9th day of August, 2002.

_____

Sydney Albert (Al) Smith        SMI098
Attorney for Defendant
Post Office Drawer 389
Elba, AL 36323
Phone: (334) 897-3658
Fax: (334) 897-8633

_____

Gary D. Bradshaw        BRA074
Attorney at Law
P. O. Box 311412
Enterprise, AL 36331-1412

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

and

Honorable Bill Pryor
Attorney General, State of Alabama
Montgomery, Alabama 36081

_____      _____
Al Smith                                      Date
8/9/02

Page 7 of 7

426

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

AUG 2 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

STATE OF ALABAMA          )
                          )
v.                        )          Case No. CC-2001-M-179 & 180
                          )
ROBERT THOMAS CONRAD      )
                          )

## DEFENDANT'S FOURTH MOTION TO SUPPRESS
## OR, IN THE ALTERNATIVE,
## MOTION IN LIMINE TO PROHIBIT THE PROSECUTOR FROM DISPLAYING TO
## THE JURY CERTAIN INFLAMMATORY EVIDENCE

COMES NOW the Defendant, ROBERT THOMAS CONRAD, by and through counsel and

moves this Honorable Court to prohibit absolutely the prosecution from displaying to, playing to,

or mentioning to or in front of the jury, the following as same is unduly prejudicial and

inflammatory, is cumulative of other evidence which is adequate to properly advise the jury of

sufficient facts, and is solely offered to prejudice the jury against the defendant without consideration

of lawful and competent evidence. Said evidence was discovered for the first time by counsel for

the Defendant on Friday, August 9, 2002.

### THE "DARBY" TAPE

1. Patrol Officer Darby responded to the Toy Store. His patrol car was equipped with a

video recorder. On the way to the Toy Store the tape revealed a conversation with unknown and

unidentified persons who appear to make statements concerning a "suspect". Such is hearsay not

within any exception and is inadmissible.

2. Officer Darby removed the camera from the vehicle and entered the Toy Store. The

Page 1 of 3

images recorded by the camera depict blood and the blood soaked body of **Jelaine Bowman Dennis**. Additionally, the audio contains the unidentified voice of a person asking for help. The video and audio further record unknown voices describing various theories and/or observations. Same is not credible or admissible evidence and is due to be kept from the jury.

## PHOTOGRAPHS AND THE PHOTOGRAPHIC COLLAGE OF THE DECEASED

3. On information and belief, the Prosecution will offer or attempt to present to the jury's viewing a collage of photographs of the body of the deceased, **Jelaine Bowman Dennis**. Said photographs are of her nude and bloody body taken post mortem and after medical intervention. Said photographs are gruesome, are highly inflammatory and prejudicial. The prejudicial effect far outweighs any probative value. Further, the collage of the photographs multiplies the undue prejudice.

4. The nude and bloody body of the deceased, **Jelaine Bowman Dennis**, does not accurately depict the facts as alleged. There is no accusation of the defendant removing the clothing of the deceased. The display of photographs of her unclothed body, after medical intervention, and post mortem, would do nothing but mislead the jury and unduly inflame the jury. Diagrams depicting wounds can just as adequately present to the jury any facts the prosecution needs to reveal without unduly prejudicing the defendant.

## PHOTOGRAPHS AND THE PHOTOGRAPHIC COLLAGE OF THE DEFENDANT

5. On information and belief, the prosecution will offer or attempt to present to the jury's viewing a collage of photographs of the defendant lying in a hospital bed. Said photographs depict

the defendant's tattoos. Said photographs are highly prejudicial and have no probative value. They are offered solely for the purpose of inflaming the jury. Further, the collage of the photographs multiplies the undue prejudice.

Respectfully submitted this 12th day of August, 2002.

Sydney Albert (Al) Smith          SMI098
P. O. Drawer 389
Elba, Al 36323
Phone:          334-897-3658
Fax:          334-897-8633


Gary D. Bradshaw          BRA074
Attorney at Law
P. O. Box 311412
Enterprise, AL 36331-1412
Phone: (334) 393-6439

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

Al Smith                    8/12/0c
                            Date

Page 3 of 3

STATE OF ALABAMA,    )    IN THE CIRCUIT COURT OF

                          )

        PLAINTIFF,    )    COFFEE COUNTY, AL

                          )

VS.                )    ENTERPRISE DIVISION

                          )

ROBERT THOMAS CONRAD, )

                          )

        DEFENDANT.    )    CASE NO. CC-2001-M-179 & 180

## *O R D E R*

The Defendant's "Fourth Motion To Suppress" or "Motion In Limine" and all other motions remain set for the 4th day of September, 2002 at 9:00 a.m. in the courthouse building Enterprise, Alabama.

The Clerk of Court is requested to forward a copy of this "Order" to the attorneys and/or parties of record.

Done and ordered this the 15th day of August, 2002.



**GARY L. MCALILEY, CIRCUIT JUDGE**
**TWELFTH JUDICIAL CIRCUIT**
**STATE OF ALABAMA**

AUG 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

CC: Attys.
Smith
x
Bradshaw

430

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

AUG 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

STATE OF ALABAMA,             *
           Plaintiff,       *
                         *
vs.                          *          CASE NO. CC 01-M-179, 180
                         *
ROBERT THOMAS CONRAD,         *
           Defendant.        *

## STATE'S 9th SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR DISCOVERY

**COMES NOW** the State of Alabama, by and through the undersigned Assigned District Attorney, and pursuant to Rule 16.3 A.R. Crim. P. and files this supplemental response thereto.

1.    On Friday, August 9, 2002, Al Smith, attorney for defendant was in the Office of the District Attorney and had the opportunity to review and duplicate the entire District Attorney file and to request any additional evidence.

2.    Attached please find the Enterprise Police Department Officer Case Report – Synopsis, dated March 11, 2002, consisting of twelve (12) photostatic copies. (L29)

3.    Attached please find the Alabama Department of Forensic Sciences letter dated August 12, 2002, for Case # 01A-01MM00435, consisting of seven (7) photostatic copies. (F6)

4.    Attached please find a transcribed statement of Mark Hines taken on June 27, 2002, at 1240 p.m., consisting of twenty (20) photostatic copies. (S/H4)

5.    Attached please find a handwritten statement of Mark Hines, consisting of one (1) photostatic copy. (S/H5)

6.    Attached please find Enterprise Police Department Officer Reports from the Criminal Investigations Division and drawings of the crime scene consisting of seven (7) photostatic copies.

1

7.    Attached please find the Officer's Investigation Report, Memo from Matt Key, I & O Report/Supplement, Letters of Administration and Arrest Report, consisting of twenty (20) photostatic copies.

8.    Attached please find per Al Smith's request, the Alabama Board of Pardons and paroles Report of Investigation Youthful Offender Report, for Robert Thomas Conrad, consisting of ten (10) photostatic copies.

9.    Attached please find per Al Smith's request, a copy of the 12th Judicial Circuit, Office of the District Attorney, Death Case Report for Jelaine Bowman Dennis, consisting of one (1) photostatic copy.

10.    Attached please find the Darby Video Tape.

**DONE** this the 16th day of August, 2002.

_Glenda Stout_
GLENDA STOUT (#PAR057)
ASSISTANT DISTRICT ATTORNEY
P. O. Box 311102
Enterprise, Alabama 36331
(334) 347-1142

## CERTIFICATE OF SERVICE

I, Glenda Stout, Assistant District Attorney, hereby certify that the foregoing has been served upon Al Smith, Esquire, P.O. Drawer 389, Elba, Alabama 36323 by placing a copy of same in the United States Mail, first class postage prepaid, on this the 16th day of August, 2002:

_Glenda Stout_
GLENDA STOUT (#PAR057)
ASSISTANT DISTRICT ATTORNEY

2

# ENTERPRISE POLICE DEPARTMENT
## CRIMINAL INVESTIGATIONS DIVISION
### CASE REPORT

**DATE OF REPORT:** March 11, 2002        **CASE NUMBER:** 2001-05-3060

**TYPE OF OFFENSE**: Capital Murder

**OFFENSE DATE:** May 23rd 2001

**LOCATION OF OFFENSE:** The Toy Store, 643 CR 711 Enterprise AL 36330.

**VICTIM(S)**

Jelaine B. Dennis

Enterprise, AL 36330

(334) 393-4656

**SUBJECT(S)**

Brian **Yeoman**                         Brian **SMITH**

B/M; DOB:08/05/82               B/M; DOB:06/27/83

LKA: 1591 East Park Ave, Apt #117     LKA:1591 East Park Ave Apt 228

Enterprise, AL 36330               Enterprise, AL 36330

Robert **CONRAD**

B/M; DOB:09/27/80

LKA: #36 Nell Court

Enterprise, AL 36330

**RESTITUTION: TBD**

**INVESTIGATED BY: Jeffery SPENCE**

**DISTRIBUTION:**                        **TYPED BY : rah**

**FILE COPY**

**DA'S OFFICE**

**APPROVED BY:**_____       **DATE:**_____

433

## SYNOPSIS

At approximately 13:25 hours on the afternoon of May 23rd, 2001 Enterprise Police Department dispatchers received a 911 call from a small adult novelty shop, The Toy Store, which is located on County Road 711, just outside the Enterprise City limits. The call was in reference to a robbery and shooting at that location. Two Enterprise Police patrol units responded. While en route to the scene, Officer Lennis Darby was stopped by two (2) white males, Eric Cormylo and Richard Bray , who told him that the woman inside the store had been shot and that they had heard the gunshots from the area of the Toy Store and recognized them to be gunshots. They had also seen a black male running west on County Road 711 from the store. He continued on into a nearby field in the direction of some chicken houses.

Continuing to the scene, Darby was met by a witness, Mr. Robert Grimes, who told him that he had been in the store and had been robbed. He also told Darby that "She" had been shot. Darby entered the store and found the victim, Ms. Jelaine Dennis lying on the floor. Dennis had been shot at least twice and was in need of emergency medial attention. Dennis was lying behind the store counter and was bleeding profusely from a gunshot wound to the chest and another to her leg. At the time Dennis was still conscious and she told Darby that she had also shot the suspect who had robbed her. Enterprise Rescue was notified and quickly responded to the scene. While waiting for the Rescue Squad, Darby noted that the store cash register was slightly open and no money was in the drawer. A short time later Enterprise Rescue units arrived on the scene. Dennis was quickly loaded into and ambulance and rushed to Medical Center Enterprise. She died shortly after arriving at the Hospital. Just after the Rescue squad had departed with Dennis, Officer Darby again spoke with Mr. Grimes. Grimes was present at the time of the incident and was the Toy Store owner. During this conversation he was able to provide description of the suspects clothing. Grimes told Darby that he was unable to get a clear look at the suspect but that he had been dressed all in black. Grimes later told Darby that the suspect was also wearing a black mask that covered his face and head.

By this time Enterprise Police Department Command personnel had been notified of the incident and Cpt. Tom Braun was the second unit to arrive on the scene. Criminal Investigations personnel were also notified and began to arrive. The crime scene was relinquished to Sgt. Jeff Spence by Officer Darby. Detective W.R. Ammons, who was also in the area because of the call responded to the scene and was told by Sgt Spence that he would be assisting as Crime scene technician and to remain on the scene until the arrival of the crime scene unit, which was en route. Meanwhile, Officer Darby remained at the scene providing security. While outside, he was approached by Mr. Donald Smith Jr., who told him that he also had seen a black male, dressed all in black, enter a light colored four door Ford LTD with damage to the left front quarter panel. The vehicle was last seen by Smith as it sped away in the direction of Highway 27 South. As Darby was talking with Smith, Officer Mike Petty arrived on the scene and told Darby that he had just passed a light blue Ford LTD with a white top traveling at a high rate of speed back toward Enterprise. Petty told Darby that he was familiar with the vehicle and that it was always parked on Nance Circle. Darby recognized the vehicle as belonging to Brian **SMITH**, and Petty agreed..

434

Darby then passed the information to Sgt Earl Pennington and Cpt. Braun, who relayed it to investigators on the scene.  A short time later a "BOLO" was put out for both **SMITH** and the vehicle.

Meanwhile, Detective Richard Hauser and the police department crime scene unit arrived on the scene and began to work .  Photos were taken both inside and outside the scene and Hauser obtained the video tape made at the scene by Darby.   One of the items collected as evidence was a Clerke 22 caliber revolver, SN: 294415.  The revolver , found lying on the floor, contained four (4) spent rounds and one (1) live round.   That weapon was later determined to belong to the victim Jeliane Dennis.  Hauser and Ammons would spend the next 8 hours on the scene collecting evidence and processing the area (See case supplementals). By this time Spence was assigned as case agent and began receiving information from the various officers and investigators looking for the suspect. Detective Buford Roberts obtained information that a black male by the name of Robert **CONRAD** had arrived at MCE, having been brought in by two black males. **CONRAD** had been shot twice and had told emergency room personnel that he had been robbed over on Methodist side. Roberts was at the hospital at the time that this occurred, having been sent there by Spence in the hopes of obtaining a statement from Dennis prior to her death.  Spence also was informed that three (3) witnesses, Donald Smith Jr, Eric Kormylo, and Richard Brey were at the police department to provide taped interviews.  Spence returned to the police department to begin the interviews (See Transcript). It was in the interview with Smith that Spence learned that a second vehicle was possibly involved as well as two (2) other black males.  Smith told Spence that he had observed two (2) vehicles parked in the curve on County Road 711 just west of the Toy Store.  One of the vehicles was a silver vehicle and the other a light blue Ford.  There were three (3) black males around the vehicles . This was just prior to the robbery. It was later determined that the vehicle was a gray in color Chevrolet Corsica belonging to Brian **YEOMAN's** mother.  Eric Cormylo and Richard Bray also mentioned to Spence that when they had heard the gunshots, they had looked out of the shop where they were working and observed a black male running toward 27South.

At approximately 14:00 hours Officer Matthew Key, who was off duty, observed Enterprise Narcotic officer Steve Key and Cory Mason turn into Brunson street running code lights.  Officer Key followed as the narcotics agents turned the MCE parking lot. He was able to observe as he went by the hospital a black male run out of the hospital entrance running toward Martin Colley Drugs.  Officer Key followed and saw the subject run to and get into the driver side of a light blue Ford LTD which he knew belonged to and was driven by Brian **SMITH**. Key made contact and observed Brian **SMITH** in the passenger side of the vehicle. Key spoke to the driver( later identified as Brian **YEOMAN**) and asked what he was doing.  **SMITH** stated that they were picking up some medication.  **YEOMAN** told Key that he was getting a drink of water.  Key then asked the them if they had anything to do with what was going on at MCE.  They then asked him what was going on. Officer Key advised them he was not sure, but they had better not have anything to do with it.

As officer Key was leaving the parking lot he encountered Deputy Sheriff Mike Hines and asked him if he knew what was going on. Hines advised Key of the robbery and shooting. Key immediately went to the Enterprise Police Department Communication center and inquired if the police were looking for Brian **SMITH** and another black male.

The communications officer advised him that they were and Key notified Lt. Mike Lolley of what had just transpired at the MCE and Martin Colley parking lot. By this time Robert **CONRAD** had been admitted to MCE and was undergoing surgery, where a 22 caliber projectile was removed from his left arm. It was released to Detective Roberts who had remained at MCE. Enterprise Police continued trying to locate **SMITH** and **YEOMAN**.
Sgt. Spence meanwhile had received a telephone call from and individual by the name of Ken Miller. Miller told Spence that as he had just left the Enterprise Ledger building on Edwards Street where he had observed a blue Ford LTD occupied by three black males driving erratically, headed toward the Hospital. One of the subject had been hanging out of the vehicle window yelling for traffic to move, that a man in the vehicle had been shot.
At approximately 15:00 hours, Investigator Steve Key located a light blue Ford LTD with the described damage at 1591 East Park Avenue (Green Tree Apartments). Backup units were dispatched and Spence arrived a short time later. Spence spoke with Fay Smith (Brian **SMITH's** mother) who gave consent for investigators to search the vehicle. Ms. Smith also stated that Robert **CONRAD** had spent the previous night with her son at her residence. When she had returned home from work that afternoon, both her son and **CONRAD** were gone. She also stated that Brian **SMITH** and Brian **YEOMAN** had came to her residence at approximately 14:15 hours and had over walked to **YEOMAN's** residence That was the last time she had seen them. Sgt. Spence and Lt. Lolley, acting on the information they had received, went to **YEOMAN'S** residence in an attempt to locate them. They were not at the residence.

Approximately an hour earlier while at the crime scene, Detective Ammons was contacted by his brother William. William Ammons stated that he had observed a light blue 4 door Ford LTD with damage to the left front fender parked approximately 1/4 mile west of the Toy Store on the south side of County Road 711. This description given by Ammons matched the description of the vehicle driven by Brian **SMITH**. William Ammons was later interviewed by his brother and he was able to point out the exact location where he had observed the vehicle. ( See statement of William H. Ammons ).

During the evening hours of May 23rd 2001, Sgt. Spence and DA investigator Bruce Matthews were able to conduct an interview with Robert **CONRAD**. **CONRAD** was given his CONSTITUTIONAL RIGHTS, which he acknowledged and signed. During this interview, **CONRAD** stated that he had been dropped off at a residence on Bell Street to visit a girl where he was robbed and shot. He had been taken to the residence by Brian **SMITH**. Meanwhile, Brian **SMITH** and Brian **YEOMAN** were observed in the vicinity of the Wal-Mart Super center. This was reported to Lt. Lolley and he and all the narcotics officers arrived in the area.

Lolley observed **SMITH** and **YEOMAN** walking across the parking lot and they were immediately detained. They were then escorted to the Enterprise Police Department for questioning.

Brian **SMITH** was interviewed by Sgt. Spence and Investigator Bruce Matthews and advised of his Juvenile CONSTITUTIONAL RIGHTS. **SMITH** first stated that **CONRAD** had borrowed his car and that he was unaware of his activities. While at **YEOMAN**'s residence, playing video games, **CONRAD** came in stating he had been shot and needed transportation to the hospital. **SMITH,** when confronted with the fact that his vehicle and a vehicle matching the description of **YEOMAN**'s vehicle was observed by two witnesses approximately 1/4 mile from the Toy Store just before the robbery became silent and began to think He was then confronted with the fact that the gentleman in the store could identify the two black males who had been in the business at the time of the robbery. **SMITH** sighed. He then stated that he was present during the robbery. **SMITH** stated that when he returned home from making payment arrangements at the District Attorney's Office, **CONRAD** stated "Let's do a hit". He also said that he needed "Back-up". They then went and got **YEOMAN** and planned what they would do. **SMITH** and **YEOMAN** went into the Toy Store and approximately (3) three minutes later, **CONRAD** entered, demanding that everyone get on the floor. **CONRAD** then came over to where **SMITH** and **YEOMAN** were. **CONRAD** then struck **SMITH** in the back of the head with his weapon and demanded money from those present.

As **CONRAD** was leaving, **SMITH** heard gunfire but did not raise up to watch. When they saw that Dennis was shot, he and **YEOMAN** went outside and asked the white male Grimes) what could they do to help. He told them to "Go get help". They then went to the house next to the Toy Store but could not get anyone to the door. They then returned home and found that **CONRAD** had beat them back home and that he had been shot. They took him to MCE and then returned home where they went to **YEOMAN**'s apartment and then on to Dothan, Alabama with **YEOMAN**'s mother. (See statement of Brian **SMITH**)

While **SMITH** was being interviewed by Spence and Mathews, Brian **YEOMAN** was being interviewed by Cpt. Bill Moore and Patrolman Matthew Key. He also was advised of his CONSTITUTIONAL RIGHTS . YEOMANS statement was consistent with the first portion of **SMITH's.** After the separate interviews however, **YEOMAN** and **SMITH** were brought together and **SMITH** stated to **YEOMAN** " Go ahead, tell the truth". **YEOMAN** then stated that he had overheard **SMITH** and **CONRAD** planning to do a robbery. He then went with **SMITH** to the Toy Store, but he was unaware that they were going to commit the robbery at that time. **YEOMAN** denied all the meetings on County Road 711 just before the Toy Store. While inside the store during the robbery he observed **CONRAD** shoot Dennis and take the money from the register. The rest of his story was consistent with **SMITH**'s statement. ( See statement of Brian **YEOMAN**).

At the conclusion of the interviews and after consultation with the District Attorney's office, both **SMITH** and **YEOMAN** were placed under arrest on the charge of Capital Murder in the death of Jalaine Dennis. Meanwhile, investigators had obtained search warrants for both **YEOMAN'S** and **SMITH'S** apartments at Green Tree.

During the searches, Detective Buford Roberts located some items of clothing which was had been thrown into a dumpster located near the apartments. Also found were several weapons as well as ammunition, which was located in various locations near the suspect's two apartments. No large caliber handgun, which was believed to be the murder weapon, was located.. It was later determined that at least one of the weapons ( an SKS assault rifle) had bee stolen in a recent burglary in Enterprise.

Early on the morning of 05/24/01, Detective Richard Hauser traveled to Montgomery. In his possession was a 22 caliber projectile, which had been received from Roberts. It was the same projectile that had been recovered from **CONRAD** the previous afternoon. Also in his possession was a 22 caliber Clerke revolver, SN: 294415, which had been recovered from the crime scene. Both of the items were taken to the Department of Forensic Sciences Lab and were released to Mr. Joe Saloom, a forensic firearms specialist. Several other items of evidence were also taken and released for testing. Later that afternoon, results confirmed that the projectile removed from **CONRAD** had been fired from the weapon found at the scene belonging to Dennis. Several days later **CONRAD** was also arrested and charges with Capital Murder. After his release from MCE, he was transported to the Coffee County Jail.

As of the date of this report, both Brian **SMITH** and Robert **CONRAD** remain in custody in the Coffee County Jail. Because of security problems and continued attempts at co orboration and intimidation, Brian **YEOMAN** has been transferred to the Covington County Jail. The weapon used in this case , believed to be a 9MM handgun, has not been recovered.

All three of the subjects remain in custody on no bond. Trial dates have yet to be determined.

438

| | EVIDENCE | LOCATION | | |
|---|---|---|---|---|
| 1. | Metal Building (Toy Store) | Released to family 05/25/01 | | |
| 2. | Cash register receipt (total sales) | EPD | property receipt | Box 1 |
| 3. | Video tape from unit 41 | EPD | property receipt | Box 1 |
| 4. | Security tape from Canon Station | EPD | property receipt | Box 1 |
| 5. | Siegfried shirt blk in color size XL | EPD | property receipt | Box 1 |
| 6. | Projectile from Conrad's arm | DFS | property receipt and DFS | |
| 7. | Brian Smith's Clothing | DFS | property receipt | |
| 8. | Bryan Yeoman's Clothing | DFS | property receipt | |
| 9. | Blood drawn from Conrad on 5/23/01 | DFS | property receipt | |
| 10. | Good 2 Go security tape | EPD | property receipt | Box 1 |
| 11. | 30 rd. Magazine for assault rifle | EPD | property receipt | |
| 12. | (5) 7.62 rounds | EPD | property receipt | |
| 13. | 10 rd. Magazine for assault rifle | EPD | property receipt | |
| 14. | Flash suppressor | EPD | property receipt | |
| 15. | Memory card of photos | EPD | property receipt | |
| 16. | Note from Smith to McIrven | EPD | property receipt | Box 1 |
| 17. | Note from Smith to Yeoman | EPD | property receipt | Box 1 |
| 18. | (26) 7.62 shells | EPD | property receipt | Box 1 |
| 19. | Tommy hilfiger sock | EPD | property receipt | Box 1 |
| 20. | Six swabs of blood collected at scene | DFS | DFS receipt | |
| 21. | Tape with blood from scene | DFS | DFS receipt | |
| 22. | Carpet collected from scene | DFS | DFS receipt | |
| 23. | Large carpet collected from scene | DFS | DFS receipt | |
| 24. | Washcloth collected from scene | DFS | DFS receipt | |
| 25. | Six fired casings from scene | DFS | DFS receipt | |
| 26. | Five projectiles from scene | DFS | DFS receipt | |
| 27. | Major case prints of Smith | LPU | LPU receipt | |
| 28. | Major case prints of Yeoman | LPU | LPU receipt | |
| 29. | Major case prints of Conrad | LPU | LPU receipt | |
| 30. | .22 cal. Rifle sn: 20569409 | LPU | LPU receipt | |
| 31. | SKS Rifle SN: 9210533 | LPU | LPU receipt | |
| 32. | $5.00 bill from scene | LPU | LPU receipt | |
| 33. | Boxer Shorts (Conrad) | EPD | property receipt | Box 1 |
| 34. | Chaps shorts (Conrad) | EPD | property receipt | Box 1 |
| 35. | FUBU Jersey (Conrad) | EPD | property receipt | Box 1 |
| 36. | Pair reebok shoes Size 13 | EPD | property receipt | Box 1 |
| 37. | Pair blk glasses | EPD | property receipt | Box 1 |
| 38. | Silver chain | EPD | property receipt | Box 1 |
| 39. | Latent prints recovered from register | EPD | property receipt | |
| 40. | 35mm photographs | EPD | case file | |
| 41. | Nike Air Tennis shoes | EPD | | |
| 42. | 35mm negatives | EPD | property receipt | Box 1 |
| 43. | Cigarette pack | EPD | | |
| 44. | Telephone | EPD | | |

| 45. | Button | EPD | | |
| 46. | Chamber of Commerce plaque | EPD | | |
| 47. | Register sales tape (complete) | EPD | property receipt | Box 1 |
| 48. | Regions bank deposit slip 52301 | EPD | property receipt | Box 1 |
| 49. | Regions bank deposit slip 52201 | EPD | property receipt | Box 1 |
| 50. | Cassette w/ Donald Smith Eric Kormylo | EPD | | |
| 51. | Cassette w/ R. Grimes, Kyla Jones | EPD | | |
| 52. | Cassette w/ L. Knighton | EPD | | |
| 53. | Cassette w/ H. Ammons | EPD | | |
| 54. | Cassette w/ Moore and Yeoman | EPD | | |
| 55. | Cassette w/ Spence and Smith | EPD | | |
| 56. | Cassette w/ T. Cade | EPD | | |
| 57. | Cassette w/ 911 | EPD | | |
| 58. | Cassette w/ K Miller | EPD | | |
| 59. | Cassette w/ unknown | EPD | | |
| 60. | White shirt from dumpster | DFS | DFS receipt | |
| 61. | Clerke revolver from scene SN: 294415 | DFS | DFS receipt | |
| 62. | Four cartridge casings | DFS | DFS receipt | |
| 63. | (6) index cards containing latents | LPU | LPU receipt | |
| 64. | CD containing digital photographs | EPD | case file | |
| 65. | Photo line up | EPD | case file | |
| 66. | Photo's of Smith's car | EPD | case file | |
| 67. | Two business card | EPD | property receipt | Box 1 |

Witness List (EPD)

| | |
|---|---|
| Sgt Lennis DARBY | Initial Responding Officer |
| Cpt Thomas BRAUN | Patrol Commander |
| Cpt (Ret) William MOORE | CID Commander |
| Cpt Michael LOLLY | Narcotics Supervisor |
| Lt. Jeffery SPENCE | Case Agent |
| Detective W.R. AMMONS | Crime Scene Inv |
| Sgt Richard HAUSER | Crime Scene Inv |
| Lt. Earl PRNNINGTON | Ptl Shift Supervisor |
| Detective Buford ROBERTS | Asst Case Agent |
| Officer Michael PETTY | Assisting Officer |
| Officer Matthew KEY | Witness |
| Officer Michael HINES | Witness |
| Officer Steve Key | Witness |
| DA Investigator Bruce MATHEWS | Witness |
| DA Investigator Dwight HOLLEY | Witness |
| DA Investigator Eddie PENNINGTON | Witness |

Witness List( Continued)

Mr. Richard BRAY                                              Witness
Rt 1, Box 235
Daleville, AL 36322


Mr. Ray GRIMES                                               Witness
1208 East Park Ave
Enterprise, AL 36330
(334) 347-5621

Mr. Donald SMITH                                             Witness
555 Co Rd 715
Enterprise, AL
(334) 393-4179

Mr. Eric CORMYLO                                             Witness
662 Co Rd 711
Enterprise, AL 36330
(334) 397-7166

Ms. Constance CONRAD                                         Witness
Apt G-6, Enterprise Villa Apts
Enterprise, AL
(334) 308-2730

Ms. Linda KNIGHTON                                           Witness
4069 Co Rd 651
Chancellor, AL
(334) 347-3616

Ms Patsy HARRISON                                            Witness
2330 Geneva Highway
Enterprise, AL 36330
(334) 347-6348

Mr. William Hayes AMMONS                                     Witness
County Road 3
5897 C/O 315
Troy AL
(334) 897-3129

Mr.Robert TEAGUE                                   Witness
105 Meagan Blvd
Ozark, AL
(334) 774-4799

Mr. Gabrial SIERRA                                 Witness


Ms. Kyla S. JONES                                  Witness
County Rd 711, 767
Enterprise, AL
(334) 393-7957

Mr. Dennis T. JACKSON                              Witness
Apt #C-6, Enterprise Villa Apts
Enterprise, AL
(334) 308-2730

Mr. Kenneth MILLER                                 Witness
203 West Brunson St
Enterprise, AL 36330

Mr. Donald M. SMITH                                Witness
Co Rd 711
Enterprise, AL

Ms.  Ashley D.RAMSEY                               Witness
210 Seminole Drive
Enterprise, AL 36330
(334) 7557

Mr.Aaron SMITH                                     Witness
C/O Director, Dept of Corrections

Ms. Christa T. DILLARD                             Witness

Ms. Tia CADE                                              Witness
400 South Watson St
Enterprise, AL 36330
(334) 347-4389

Mr. Eric BRUCE                                            Witness
206 Stratford Lane
Enterprise, AL 36330
(334) 393-9872



ALABAMA
# DEPARTMENT OF FORENSIC SCIENCES

REGIONAL LABORATORY
P.O. BOX 210516
MONTGOMERY, AL 36121-0516
(334) 242-2938
FACSIMILE (334) 240-3284

MEDICAL EXAMINER
P.O. BOX 240591
MONTGOMERY, AL 36124-0591
(334) 242-3093
FACSIMILE (334) 260-8734

August 12, 2002

Re:     Case  01A-01MM00435
        Jelaine Dennis, subject
        Brian Smith, suspect
        **JUVENILE**
        Robert Conrad, suspect
        Brian Yeoman, suspect

MEMORANDUM:     To File

BY:             Phyllis T. Rollan, Forensic Scientist

SUBJECT:        Examination of Biological Evidence

On May 29, 2001, Detective Rick Hauser of the Enterprise Police Department delivered to the Montgomery Laboratory certain evidence identified as relative to the above styled case.  The following is a description of the evidence and the results of laboratory examinations and analyses:

3.    One (1) sealed plastic bag containing one (1) cardboard container containing one (1) tube of blood (EDTA) labeled in part "Conrad, Robert".

4.    One (1) sealed manila envelope containing the following evidence identified to be from the scene:

      A.    One (1) sealed manila envelope labeled in part "entrance floor, #43" containing one (1) manila envelope with two (2) cotton swabs bearing reddish-brown stains.

Page 2                                      August 12, 2002
Case 01A-01MM00435
Examination of Biological Evidence

    B.    One (1) sealed manila envelope labeled in part "counter top, #39" containing one (1) manila envelope with two (2) cotton swabs bearing reddish-brown stains.

    C.    One (1) sealed manila envelope labeled in part "bottom of counter register, #40" containing one (1) manila envelope with two (2) cotton swabs bearing reddish-brown stains.

5.    One (1) sealed manila envelope marked "#35" containing one (1) piece of gray colored duct tape bearing reddish-brown stains.

6.    One (1) sealed manila envelope marked "#36" containing one (1) piece of purple colored carpet bearing brown colored stains.

7.    One (1) sealed brown paper bag containing one (1) piece of purple colored carpet bearing reddish-brown stains.

8.    One (1) sealed brown paper bag marked "#33" containing one (1) hand towel bearing reddish-brown stains.

9.    One (1) sealed brown paper bag containing the following evidence identified to be from Brian Smith:

    A.    One (1) pair of shorts.

    B.    One (1) belt.

    C.    One (1) T-shirt.

    D.    One (1) right tennis shoe bearing stains on the sole measuring primarily 2mm-4mm at their widest point.

    E.    One (1) left tennis shoe bearing stains on the sole measuring primarily 2mm-3mm at their widest point.

44/

Page 3                                    August 12, 2002
Case 01A-01MM00435
Examination of Biological Evidence

10.    One (1) sealed brown paper bag containing the following evidence identified
       to be from Bryan Yeoman:

       A.    One (1) pair of shorts.

       B.    One (1) undershirt.

       C.    One (1) right tennis shoe.

       D.    One (1) left tennis shoe.

On March 29, 2002, Detective Rick Hauser of the Enterprise Police Department
resubmitted to the Forensic Biology Section of the Montgomery Laboratory the
following additional evidence:

11.    One (1) sealed brown paper bag labeled in part "removed from dumpster
       across from 228 Greentree Apts" containing one (1) white colored T-shirt
       bearing stains.

On June 8, 2001, Detective Rick Hauser of the Enterprise Police Department
delivered to the Montgomery Laboratory the following additional evidence:

15.    One (1) sealed brown paper bag containing the following items of evidence:

       A.    One (1) black colored right tennis shoe.

       B.    One (1) black colored left tennis shoe.

       C.    One (1) right shoe insert.

       D.    One (1) left shoe insert.

       E.    One (1) car cell phone charger.

Page 4                                                August 12, 2002
Case 01A-01MM00435
Examination of Biological Evidence


On February 5, 2002, Detective Rick Hauser of the Enterprise Police Department
resubmitted to the Forensic Biology Section of the Montgomery Laboratory the
following evidence:

16.    One (1) sealed brown paper bag containing one (1) blue colored shirt
       identified to be from Robert Conrad.

On July 13, 2001, Investigator Michael Lolley of the Enterprise Police Department
delivered to the Montgomery Laboratory the following additional evidence:

17.    One (1) sealed manila envelope containing one (1) pair of glasses.

On December 17, 2001, Forensic Investigator Scott Belton of the Montgomery
Medical Examiner's Office delivered to the Montgomery Laboratory the following
additional evidence:

18.    One (1) sealed manila envelope containing one (1) bloodstain card labeled in
       part "Evelyn J. Dennis".


**RESULTS:**


The tube of blood identified to be from Robert Conrad (Item 3) and the bloodstain
card identified to be from Evelyn J. Dennis (Item 18) were DNA profiled using the
following PCR-based genetic systems:  CSF1PO, TPOX, AME, TH01, vWA,
D16S539, D7S820, D13S317, and D5S818.

The stains from the following evidence contained human DNA and were DNA
profiled using the following PCR-based genetic systems:  CSF1PO, TPOX, AME,
TH01, vWA, D16S539, D7S820, D13S317, and D5S818:

       -swabs identified to be from the entrance floor (Item 4A)
       -swabs identified to be from the counter top (Item 4B)

Page 5                                          August 12, 2002
Case 01A-01MM00435
Examination of Biological Evidence

    -swabs identified to be from the bottom of counter register area (Item 4C)
    -tape identified to be from the scene (Item 5)
    -carpet (Item 6)
    -stain A from the carpet (Item 7)
    -stain B from the carpet (Item 7)
    -towel identified to be from the scene (Item 8)
    -right shoe identified to be from Brian Smith (Item 9D)
    -left shoe identified to be from Brian Smith (Item 9E)
    -stain b from the shirt identified to be from the dumpster (Item 11)

The stain marked "a" on the shirt identified to be from the dumpster (Item 11) exhibited a positive result when tested for the presumptive presence of blood and was analyzed for DNA; however, none was detected.

The following items exhibited a negative result when tested for the presumptive presence of blood:

    -shorts identified to be from Brian Smith (Item 9A)
    -belt identified to be from Brian Smith (Item 9B)
    -T-shirt identified to be from Brian Smith (Item 9C)
    -shorts identified to be from Brian Yeoman (Item 10A)
    -undershirt identified to be from Brian Yeoman (Item 10B)
    -right shoe identified to be from Brian Yeoman (Item 10C)
    -left shoe identified to be from Brian Yeoman (Item 10D)
    -right shoe (Item 15A)
    -left shoe (Item 15D)
    -cell phone charger (Item 15E)
    -shirt identified to be from Robert Conrad (Item 16)
    -glasses (Item 17)

Page 6                                          August 12, 2002
Case 01A-01MM00435
Examination of Biological Evidence


## REMARKS:


The DNA profiles obtained from the human DNA from the stains identified to be
from the entrance floor (Item 4A), the counter top (Item 4B), the bottom of the
counter at the register area (Item 4C), the scene (Item 5) and the human DNA from
the carpet (Item 6), stain A from the carpet (Item 7), stain B from the carpet (Item
7), the towel identified to be from the scene (Item 8), the right shoe identified to be
from Brian Smith (Item 9D), the left shoe identified to be from Brian Smith (Item
9E), and stain b from the shirt identified to be from the dumpster (Item 11) were
compared to the DNA profiles from the tube of blood identified to be from Robert
Conrad (Item 3) and the bloodstain card identified to be from Evelyn J. Dennis
(Item 18) with the following conclusions:

> -The DNA profile obtained from the human DNA from the stains identified
> to be from the entrance floor, the counter top, the bottom of the counter at
> the register area, the scene and the human DNA from the carpet, stain A
> from the carpet, stain B from the carpet, the towel identified to be from the
> scene, the right shoe identified to be from Brian Smith, and the left shoe
> identified to be from Brian Smith is consistent with the DNA profile from
> the bloodstain card identified to be from Evelyn J. Dennis.
>
> This combination of genetic traits occurs in approximately 1 of 46.1 million
> Caucasian and 1 of 34.4 million African American random unrelated
> individuals.
>
> -Robert Conrad could not be the source of the human DNA from the stains
> identified to be from the entrance floor, the counter top, the bottom of the
> counter at the register area, the scene and the human DNA from the carpet,
> stain A from the carpet, stain B from the carpet, the towel identified to be
> from the scene, the right shoe identified to be from Brian Smith, and the left
> shoe identified to be from Brian Smith

Page 7                                                August 12, 2002
Case 01A-01MM00435
Examination of Biological Evidence

-The DNA profile obtained from the human DNA from stain b on the shirt
identified to be from the dumpster is consistent with the DNA profile from
the tube of blood identified to be from Robert Conrad.

This combination of genetic traits occurs in approximately 1 of 282 billion
Caucasian and 1 of 5.52 billion African American random unrelated
individuals.

-Evelyn J. Dennis could not be the source of the human DNA from stain b
on the shirt identified to be from the dumpster.

The spattered stains on the soles of the right and left shoe identified to be from
Brian Smith (Items 9D and 9E) were of limited quantity and showed no direct
evidence as to how they were deposited.

The DNA extracts are being retained in the laboratory in the event they are needed
in future testing. All other evidence is being returned to the investigative agency.


Phyllis T. Rollan


/PTR

Today's date is June the 27th, 2002, present at the District Attorney's Office in Enterprise, Alabama, is myself Dwight Holley, Investigator with the District Attorney's Office, Myron Williams, Chief Deputy with the Coffee County Sheriff's Department, Eddy Pennington, Chief Investigator with the District Attorney's Office and Mark Anthony Hines, the time is 12:40 p.m.

HOLLEY:     Mark, is your last name Haynes or is it Hines?

HINES:      Hines

HOLLEY:     Spell it, spell your name for me.

HINES:      H-I-N-E-S.

HOLLEY:     Ok, Mark Anthony Hines, is that correct?

HINES:      Yes sir.

HOLLEY:     What's your date of birth, Mark?

HINES:      8-21st-72.

HOLLEY:     What's your social security number?

HINES:      2-3-2-08-05-81.

HOLLEY:     Ok, where are you presently living?

HINES:      Troy, Alabama, 101 Astor Avenue.

HOLLEY:     That's your present address?

HINES:      Yes sir.

HOLLEY:     Are you an inmate at the Coffee County Jail at this time?

HINES:      Yes sir.

HOLLEY:     Ok, well let's back up then, your address that you where you're originally from before you were placed in jail was what again?

HINES:      101 Astor Avenue, Troy, Alabama.

HOLLEY:     Ok, but your present located 'er living at or incarcerated at the Coffee County Jail, is that correct?

1

| | |
|---|---|
| HINES: | Yes sir. |
| HOLLEY: | Ok, how long have you been in the Coffee County Jail? |
| HINES: | Since June the 5th of this year. |
| HOLLEY: | Ju |
| HINES: | 2002. |
| HOLLEY: | Ok, and why are you in the Coffee County Jail? |
| HINES: | For false information, where I got stopped for a speeding ticket in Elba. |
| HOLLEY: | And you gave the officer false information about who you were or |
| HINES: | Yes sir. |
| HOLLEY: | Is that what it was that you told him you were somebody else? |
| HINES: | Yes sir. |
| HOLLEY: | Why did you do that? |
| HINES: | Avoid from ah getting picked on a warrant that I had in Florala. |
| HOLLEY: | So you got some outstanding warrants in Florala, Alabama? |
| HINES: | Yes sir. |
| HOLLEY: | Alright tell me about those. |
| HINES: | For old fine and ah DUI and speeding ticket from doing minor traffic stop citations. |
| HOLLEY: | So you got some traffic tickets and a DUI in Florala but you also had some unpaid fines in Florala? |
| HINES: | Yes sir. |
| HOLLEY: | And you didn't want to get picked up on those? |
| HINES: | Yes sir. |
| HOLLEY: | And that's the reason you gave the false name to law enforcement officers in where? |

HINES:    Elba, Alabama.

HOLLEY:    Do you remember what officer that was?

HINES:    Sergeant Steve Toliver.

HOLLEY:    And you told him and gave him a different name did you?

HINES:    Yes sir.

HOLLEY:    What name did you give him?

HINES:    William Hines.

HOLLEY:    William Hines?

HINES:    Yes sir.

HOLLEY:    Ok, tell me where you've been incarcerated, in what jails you've been incarcerated in since January of 2002?

HINES:    Covington County Jail in Andalusia, Alabama

HOLLEY:    What dates were you in Covington County?

HINES:    February 27th through March, through March 14th.

HOLLEY:    Ok, and you were transferred from Covington County Jail to Coffee County Jail?

HINES:    No sir, I got released from Covington County Jail then City of Troy picked me up on a domestic violence, assault the 3rd.

HOLLEY:    So you were picked up in Troy on a domestic violence assault 3rd?

HINES:    Yes sir.

HOLLEY:    That's after you were released from the Covington County Jail?

HINES:    Yes sir.

HOLLEY:    Did you serve any time in the Pike County Jail?

HINES:    No sir, Troy City Jail.

HOLLEY:      Ok, well how did you end up in Elba then?

HINES:       Um, when they ran my name they had a hold on me for Elba and Florala.

HOLLEY:      And you were transferred then from Pike, I mean from

HINES:       Troy City Jail to Coffee County Jail.

HOLLEY:      Ok, now during the time that you were incarcerated in Covington County
             ah, during the months of February and March tell me who was your
             jailmate, roommate, cellmate, whatever.

HINES:       Brian Yeoman.

HOLLEY:      Brian Yeoman?

HINES:       Yes sir.

HOLLEY:      Ok, during the time that you were incarcerated in Covington County and
             Brian Yeoman was one of your cellmates did you and Brian Yeoman have
             any conversations?

HINES:       Yes sir, we had a conversation, it was about his case that he got for capital
             murder and 1st degree armed robbery.

HOLLEY:      And what county was he charged from?

HINES:       Coffee County.

HOLLEY:      Ok, and ya'll had a conversation about that?

HINES:       Yes sir.

HOLLEY:      Do you know what date you had this conversation?

HINES:       No sir, I couldn't call, recall what date it was.

HOLLEY:      When you were having this conversation with Brian Yeoman was anybody
             else around?

HINES:       No sir, it was just me and Mr. Yeoman.

HOLLEY:      Where were ya'll at?

HINES:       In ah, cellblock A, in Covington County Jail.

HOLLEY:    Ok, and did you have this conversation more than one time?

HINES:    Yes sir, I had a conversation with, with Brian Smith at Coffee County Jail.

HOLLEY:    But did you and Brian Yeoman have more than one conversation?

HINES:    No sir, just, just one conversation and that was it.

HOLLEY:    What brought this conversation up between you and Brian Yeoman?

HINES:    Cause Mr. Yeoman wanted to know what was the penalty on a class A felony and what is the penalty for capital murder.

HOLLEY:    Well why did he ask you?

HINES:    Cause my cousin done told him that I know a little about the law and what the statutory on a conviction of a class A felony carries.

HOLLEY:    Who's your cousin?

HINES:    Ah, Jeremiah Tiggs.

HOLLEY:    Where is Jeremiah, is he a inmate at the Covington County

HINES:    In jail.

HOLLEY:    Jail?

HINES:    Yes sir, he's at doing 90 days for boot camp.

HOLLEY:    And he told you th, I'm sorry let me back up he told Brian Yeoman that you knew a little bit about the law?

HINES:    Yes sir.

HOLLEY:    So Brian Yeoman came and asked you about that?

HINES:    Yes sir.

HOLLEY:    Ok, what else did you conversation consist of with Brian Yeoman?

HINES:    It consist of him telling me how it happened and what happened (unintelligible) ah, of the incident, he told me that him, Brian Yeoman, hisself, told me that Brian Smith went to the store and that, the freak store or whatever, you know out there on some road, went out there

HOLLEY:    He called it the freak store?

HINES:    Yes sir, I couldn't think of the name, he couldn't think of the name he just said it was a freak store, you know, and they went inside to buy some marihuana bags, he said he was at the cash register and Brian Smith was at the back of the store then he said that Mr. Conrad

HOLLEY:    Who is Conrad?

HINES:    I doesn't know Conrad by his first name I just know him Conrad it was a third party that was with them.

HOLLEY:    I believe it's Robert Conrad, isn't it?

HINES:    Yes sir, Robert Conrad was with 'em and you know next thing they know they seen Mr. Conrad come inside and tell everybody to get down on the floor and everybody got down on the floor, Mr. Conrad went into the area by the pocket that's inside the store, Brian Yeoman, B Smith and some white gentleman that was in, in the store

HOLLEY:    Who is B Smith?

HINES:    B Smith, that's Brian Smith.

HOLLEY:    Ok,

HINES:    Brian Smith, and ah he said when Conrad turned back around the owner of the store or the employee of the store had had a gun drawn turned, turned fired Mr. Conrad returned fire back at the lady and I reckon' wounded the lady and you know Conrad panicked take outside the store running and Yeoman told me said that he asked the white gentleman what could be do to help he said call the police so Yeoman told me he called the police then him and Brian Smith panick and take off in Brian Smith's car, go down the road they see Conrad running and you know he trying to stop them and flag them down talk about give me a ride to my moma's house on Bell Street so they said they took him to Bell Street dropped him off and 'cuse me and that ah, Robert Conrad mother took Robert to the store I mean to the hospital and him and Smith went to ah, Dothan and then later on they returned back from Dothan the police had caught them over there on stopped them over there by SuperWal-Mart.

HOLLEY:    Ok, let's back up, and talk about what Mr. Yeoman told you again and let's clarify some things

HINES:    Ok

6

HOLLEY:     ah, he told you that they went down to the store

HINES:     Uh uh

HOLLEY:     ah did he tell you how they we, how they went?

HINES:     Went on Brian Smith's car.

HOLLEY:     Who went on Brian Smith's car?

HINES:     Brian Yeoman, Robert Conrad and Brian Smith.

HOLLEY:     Did they say where they dropped off Mr. ah Conrad before they got to the store, did they say they dropped him off?

HINES:     No, they didn't say they dropped him off no where.

HOLLEY:     So he was in the car with them when they went to the store?

HINES:     Yes sir.

HOLLEY:     And Brian Smith and Brian Yeoman went in the store first?

HINES:     Yes sir.

HOLLEY:     And they went in there under the pretense or they told you they were going in to get what?

HINES:     Some marihuana bags.

HOLLEY:     And Brian Smith was in the back of the store?

HINES:     Yes sir.

HOLLEY:     And Brian Yeoman was in the front of the store trying to purchase some marihuana bags from

HINES:     The store owner.

HOLLEY:     The store owner, right?

HINES:     Yes sir.

HOLLEY:     Ok, ah, was at that time ah, was Robert Conrad in the store?

HINES:     No sir.

HOLLEY:     Wel

HINES:      He ran into the store after Brian Smith and Brian Yeoman was already into the store.

HOLLEY:     Alright what did, what did ah, Conrad, I'm, I'm, correction what did Yeoman tell you that he saw in possession of ah, Robert Conrad?

HINES:      A three fifty seven magnum.

HOLLEY:     A three fifty seven magnum pistol?

HINES:      Yes sir.

HOLLEY:     Alright and at that time, I believe you told us that Yeoman said that Conrad made everybody in the store get down on the floor right?

HINES:      Yes sir.

HOLLEY:     Did he tell you that he made the woman get down on the floor?

HINES:      He didn't tell me he made the woman get down on the floor.

HOLLEY:     Ok, what did he tell you he did, that, that ah, Conrad did once he made everybody get on the floor?

HINES:      Once Conrad made everybody get on the floor Conrad went into their pockets you know patten 'em down going into their pockets somehow the owner of the store got up where she can get her pistol and returned firing you know

HOLLEY:     Now you're saying returned firing

HINES:      Or turned you know fire, fire a shot off at Conrad.

HOLLEY:     So the woman fired a shot at Conrad?

HINES:      Yes sir.

HOLLEY:     And then Conrad did what?

HINES:      He returned fire.

HOLLEY:     Ok, what happened then?

8

HINES:     Ok, after Conrad gets hit he take off running out the store and panicked so like I said Brian Yeoman asked the gentleman, white gentleman at the store what can he do to help him you know the gentleman said call the police so Yeoman I reckon' Yeoman called the police and then him and Smith, Brian Smith panicked and left the scene and they was going down the road they seen Conrad running, bleeding so Conrad was flagging 'em down and stopping 'em and give him a ride.

HOLLEY:    So Conrad, they gave Conrad a ride?

HINES:     A ride.

HOLLEY:    How far did they say they were away from the store when they picked Conrad up?

HINES:     No more than a half a mile.

HOLLEY:    No more than a half a mile?

HINES:     Yes sir.

HOLLEY:    Did they say they saw anybody else at that time?

HINES:     No sir.

HOLLEY:    Did they say anything about being close to some chicken houses?

HINES:     No sir.

HOLLEY:    Did they say whether or not Conrad still was in possession of the gun?

HINES:     No sir, they said they didn't see no gun.

HOLLEY:    So they said they didn't see a gun with Conrad when he got in the car?

HINES:     No sir, that's what

HOLLEY:    What did they say they think happened to the gun?

HINES:     That Conrad had throwed it somewhere out there on that road.

HOLLEY:    And it was a three fifty seven

HINES:     Magnum.

HOLLEY:    Magnum?

HINES:     Yes sir, from what they tell me.

HOLLEY:    Ok, what did they do when Conrad got into the car?

HINES:     Ok, when Conrad got into the car, Conrad said take me to my mother's house which they took him to Bell Street, ok, then they left Conrad there and they went to Dothan for some reason, I don't know, but later on after Brian Yeoman and Brian Smith returned back from Dothan over there by SuperWal-Mart I reckon' that's 84 ain't it, ok they said police pulled 'em over and arrested 'em.

HOLLEY:    So Brian Smith and Brian Yeoman went into the store first?

HINES:     Yes sir.

HOLLEY:    And Conrad followed?

HINES:     Yes sir.

HOLLEY:    Did they say how long after they went into the store that Conr, Conrad came in?

HINES:     No sir.

HOLLEY:    Did they say anything about planning the robbery?

HINES:     No sir.

HOLLEY:    What did they say about that?

HINES:     Didn't supposed to go like that,

HOLLEY:    Now, Yeoman said what?

HINES:     It didn't, it didn't supposed to go down like that.

HOLLEY:    It didn't supposed to go down like that?

HINES:     Yes sir.

HOLLEY:    Yeoman told you that?

HINES:     Yes sir.

HOLLEY:    Did he say anything about how many shots were fired in the building?

HINES:      N, no sir, he didn't tell me how many shots were fired in the building you know from from where he said the wo, the owner fired then Conrad fired, he didn't say how many shots the owner fired he didn't say how many shots Conrad fired.

HOLLEY:     Prior to them going to the Toy Store

HINES:      Yes sir

HOLLEY:     he called it the freak store

HINES:      Yes sir.

HOLLEY:     but it was the Toy Store where did he say they was, where did Yeomans say they were at?

HINES:      The Ramada Inn.

HOLLEY:     The Ramada Inn where?

HINES:      Over here in Enterprise across from I reckon' Fraley's frame.

HOLLEY:     Ok, at Ramada Inn

HINES:      Yes

HOLLEY:     in Enterprise, Alabama, did he say they were with anybody?

HINES:      They were with some girls.

HOLLEY:     Did he give you any names of any girls?

HINES:      No sir, he didn't give me no names.

HOLLEY:     Did he say what time they left to go to the freak store?

HINES:      He didn't say what time they left.

HOLLEY:     But when they left the Ramada Inn to go to the freak store or the Toy Store, Brian Yeoman, Robert Conrad and Brian Smith was in who's vehicle?

HINES:      Brian Smith's vehicle.

HOLLEY:     Did he say who was driving?

11

HINES:      No he didn't say which one was driving.

HOLLEY:     And that's the only conversation you had with Brian Yeoman about what happened at the Toy Store?

HINES:      Yes sir, the only conversation.

HOLLEY:     And you were by yourself?

HINES:      By myself.

HOLLEY:     With Con, just you and ah

HINES:      Yeoman.

HOLLEY:     Yeoman right?

HINES:      Yes sir.

HOLLEY:     Ok, ok well let's go to the conversation you had with Brian Smith.

HINES:      Ok.

HOLLEY:     Tell me about the conversation with Brian Smith and tell me where you were at when you had this conversation.

HINES:      I was in Coffee County Jail when I had this conversation with Brian Smith.

HOLLEY:     Ok, wh, what time frame, what month was that?

HINES:      Ah, this month right here, about a week ago.

HOLLEY:     So we're talking about June of 2000?

HINES:      Yes.

HOLLEY:     Today's date is ah, June the 27th and it was approximately a week ago?

HINES:      Yes sir.

HOLLEY:     Ok, so it would be somewhere around June the 20th.

HINES:      Yes sir.

HOLLEY:     You had a conversation with Brian Smith.

HINES:      Yes sir.

HOLLEY:     How did this conversation start?

HINES:      Well you know Mr. Smith knowing, you know, Mr. Smith seen who, well we seen it on the news ok, then Mr. Smith you know, later on came to me you know I was in the cell by myself and he said can I talk to you, I said yeah, he said ah, what is the penalty of capital murder, I said the death penalty you know, you know class A felony carry up not ten or ninety-nine or life you know so he start telling me about his case talking about him and Brian Yeoman and Robert Conrad went to the freak store as they call it you know to buy some marihuana bags him and Brian Yeoman went inside Yeoman was at the cash register he was at the back of the store he tell me Robert Conrad comes into the store demand everybody to get down on the floor you know so him, Brian Smith and Brian Yeoman and the white gentleman that was in the store was down on the ground of the, of the store you know the store floor, Mr. Conrad, Robert Conrad going into Yeoman and Smith pocket and the white gentleman's pocket then somehow the owner of the store gets her pistol you know gets a shot off Mr. Conrad returned fire back at the woman knowing you know then he takes off out the store and panicked running down the store down the road then Brian Smith and Brian Yeoman, Brian Yeoman asked the gentleman, the white gentleman what can he do for 'em and he said ah, call the police so Brian Yeoman says he called the police you know then him and Brian Smith takes off I reckon' and panicks you know then they say well as they going down the road they see Conrad running you know so Conrad was flagging for them to stop to give him a ride so they get Conrad you know they stop and pick him up and Conrad said take him to his mother house so they took him to his mother house which they said was on Bell Street then later on you know they said 'cause Conrad's mother took him to the hospital so Brian Yeoman and Brian Smith went to Dothan then later on returned back to Enterprise and get stopped over there by SuperWal-Mart on 84 by the police officer.

HOLLEY:     Did Brian Smith tell you that ah, Brian Yeoman is the one that made the phone call to the police?

HINES:      Yes sir.

HOLLEY:     So he confirmed what Brian Yeoman had told you that that he, he Brian Yeoman made the phone call to police to report the, the robbery and the shooting?

HINES:      Yes sir.

13

HOLLEY:    And Brian Smith told you that?

HINES:    Yes sir.

HOLLEY:    Ok, and Brian Smith also stated that they took Robert Conrad to his mother's house on Bell Street?

HINES:    Yes sir.

HOLLEY:    And Brian Smith stated that the gun that Robert Conrad had was a three fifty seven magnum?

HINES:    Three fifty seven magnum.

HOLLEY:    Did he say anything about seeing where Conrad had been shot?

HINES:    In the side.

HOLLEY:    In the side, did he say he saw that?

HINES:    No sir, he ain't say that he saw that, that's where he say he was holding at in his side.

HOLLEY:    He was saying that Conrad was holding his side

HINES:    Yes, 'cause he say it, it was burning and it was hurting.

HOLLEY:    Who said it was burning and hurting?

HINES:    Conrad was saying that.

HOLLEY:    And he says that Conrad did not have a gun when he got into the car?

HINES:    Said he didn't have a gun in the car with him.

HOLLEY:    How far did Brian Smith say they were from the store when they picked him up?

HINES:    No more than a half a mile.

HOLLEY:    And did Brian Smith say who was driving his car?

HINES:    No sir, he didn't state to that.

HOLLEY:    Did Brian Smith say that all three of the individuals, Robert Conrad, Brian

14

Yeoman and, and himself Brian Smith they all went down to the Toy Store on Brian Smith's car, is that correct?

HINES:    Yes sir.

HOLLEY:    Brian Smith told you that?

HINES:    Yes sir, he say they all three was in the car.

HOLLEY:    Did he say where they left from?

HINES:    The Ramada Inn.

HOLLEY:    So they left from the Ramada Inn going to the Toy Store?

HINES:    Yes sir.

HOLLEY:    Did he say anything about ah, where they left from before going

HINES:    Yeah

HOLLEY:    they, he said that they were at the Ramada Inn before they left going to the Toy Store,

HINES:    Yes sir.

HOLLEY:    is that correct? Did he say what kind a car he had?

HINES:    No sir, he didn't tell me what kind of car he had.

HOLLEY:    So what you're telling us is that Brian Yeoman and Brian Smith basically gave you the same accounts of what went down at the Toy Store on the date of the robbery and murder is that correct?

HINES:    Yes sir.

HOLLEY:    And one of them gave you the account of what went down sometime during the month of February and March while ya'll were in the Covington County Jail being you and Brian Yeoman is that correct?

HINES:    Yes sir.

HOLLEY:    And he gives you this account of what went on at the Toy Store?

HINES:    Yes sir, he even showed me an affidavit of this.

15

| | |
|---|---|
| HOLLEY: | What kind of affidavit did he show you? |
| HINES: | Well a statement where he had made to the police officer over there in Enterprise. |
| HOLLEY: | Of a statement he gave us? |
| HINES: | Yes sir. |
| HOLLEY: | Ok, and then somewhere around June the 20th you are now, you were incarcerated in the Coffee County Jail with Brian Smith? |
| HINES: | Yes sir. |
| HOLLEY: | And he approaches you about his case? |
| HINES: | Yes sir. |
| HOLLEY: | And he asks you what the penalty was for capital murder? |
| HINES: | Yes sir. |
| HOLLEY: | He asked you what the penalty was for robbery? |
| HINES: | Yeah, I told him ten to ninety-nine to life. |
| HOLLEY: | And that's the same questions that Brian Yeoman asked you approximately two and a half to three months prior to that, is that correct? |
| HINES: | Yes sir. |
| HOLLEY: | But ya'll were in a different facility |
| HINES: | (unintelligible) |
| HOLLEY: | ya'll were in Covington County, is that right?\ |
| HINES: | Yes sir. |
| HOLLEY: | Ok, now if I'm refer to Conrad as Robert Thomas Conrad is that, is that the, the person we're talking about ah that was involved in the Toy Store robbery and murder ah, is that who they, who Brian Smith and Brian Yeoman was referring to? |
| HINES: | Yes sir. |

HOLLEY:      Robert Thomas Conrad?

HINES:       Yes sir.

HOLLEY:      And they're saying both Smith and Yeoman are saying that Conrad is the
             person who had the gun and did the shooting, is that correct?

HINES:       Yes sir.

HOLLEY:      And they don't know where the gun is?

HINES:       Doesn't know where the weapon is at, the guns at.

WILLIAMS:    Just a couple of questions, when they left the store

HINES:       Yes sir.

WILLIAMS:    you said that they, you do not know which one of them was driving

HINES:       No sir.

WILLIAMS:    where was Conrad at?

HINES:       He was in the backseat.

WILLIAMS:    He was in the backseat, was he laying over or, I know you said he said he
             was burning

HINES:       Yes sir.

WILLIAMS:    Did they say anything else or did he say anything at all other than that?

HINES:       No sir the only thing that was said was from what Yeoman and Smith told
             me said it didn't supposed to go down like that.

WILLIAMS:    Alright did they say that they told Conrad right or did they ask him
             anything why did he do it

HINES:       No sir.

WILLIAMS:    or any like that?

HINES:       They didn't know.

WILLIAMS:    Ok, when they were in the store

HINES:          Yes sir.

WILLIAMS:   and they told or they asked the man which one asked him is there anything
                      that I can do

HINES:          Yeoman

WILLIAM:      Yeoman asked him that?

HINES:          Yes sir.

WILLIAMS:   Where was the woman at?

HINES:          I reckon' she was on the floor behind the counter or or wherever she had
                      been shot at.

WILLIAMS:   Did they say anything about where she was shot at?

HINES:          No sir.

WILLIAMS:   Did they say anything else about going over there to help her or do
                      anything for her?

HINES:          No sir they didn't say nothing about that.

WILLIAMS:   Ok, one of them made a telephone call to the police is that right?

HINES:          Yes sir.

WILLIAMS:   Which one was that?

HINES:          Yeoman.

WILLIAMS:   Yeoman right?

HINES:          Yes sir.

WILLIAMS:   Knowing the layout of the Coffee County Jail what cellblock are you in?

HINES:          Um, two block.

WILLIAMS:   Ok, and is Brian Smith in the same cellblock with you?

HINES:          Yes sir.

WILLIAMS:   Ok, what cellblock is Robert Conrad in?

18

HINES:      Four block.

WILLIAMS:   Ok, has anyone pointed him out to you?

HINES:      No sir.

WILLIAMS:   Ok, so you would not know him at all?

HINES:      No sir.

HOLLEY:     Let me back up and ask you something, talking about the reason you were in jail now, ok,

HINES:      Yes sir.

HOLLEY:     Ok, well let's back up and let me ask you ah, Mark how many prior felony convictions do you have?

HINES:      I have six.

HOLLEY:     You have six prior felony convictions, what are they?

HINES:      One for possession of cocaine and five for being in possession of forged instrument.

HOLLEY:     So you got one conviction for possession of cocaine, when was that, what year was that?

HINES:      I got convicted in March of 94, got three years out of it.

HOLLEY:     Ok and then you got five convictions of possession of forged instrument?

HINES:      Yeah.

HOLLEY:     When did that happen?

HINES:      97 when I got convicted.

HOLLEY:     What kind of sentence did you get for those possession of forged instrument?

HINES:      I got two six year sentences and three ten year sentences ran in cc together.

HOLLEY:     In other words when you say cc that means concurrent, is that right?

19

HINES:      Yes sir, so it would make me have one ten year sentence.

HOLLEY:     So you actually got six prior felony convictions?

HINES:      Yes sir.

HOLLEY:     And all those are for Covington County is that correct?

HINES:      Yes sir.

HOLLEY:     And those six prior felony convictions is not the reason that you're jail now is that correct?

HINES:      No sir.

HOLLEY:     We're talking earlier about Yeoman making a telephone call to the police

HINES:      Yes sir.

HOLLEY:     is that correct?

HINES:      Yes sir.

HOLLEY:     Do you know or did he tell you where he made that phone call from?

HINES:      No sir he did not tell me that, he just said he asked the gentleman, the white gentleman that was in the store with them what can he do to help and he said call the police.

HOLLEY:     But he didn't, he didn't say where he made that call from?

HINES:      No sir.

HOLLEY:     Ok that ends the interview the time is now 1:10 still present in the DA's Office are the same people.

On _____ I reviewed the tape and made the necessary corrections to the transcript.  The corrected transcript is a true representation of the taped interview.

_____

Dwight Holley

I Mark Hines requesting to
speak With District Attorney, Mark
Fuller Colerning A Capital Murder Trail
Could Convict all parties but this Meeting
Will have to take place at The D.A.
Office Were Nobody expect Nothing
and A.S.A.P. Today!!!

Sincerely

Mark Hines

472

# ENTERPRISE POLICE DEPARTMENT
## CRIMINAL INVESTIGATIONS DIVISION

DATE: _05-23-2001_    TIME: _0001_    CASE# _0105-_____

OFFENSE: _____ VICTIM: _____

LOCATION: _COUNTY ROAD 711 ( THE TOY STORE )_

FIRST OFFICER ON SCENE: _____ AGENCY: _____

SECOND OFFICER ON SCENE: _____ AGENCY: _____

FIRST ARRIVING INVESTIGATOR: _____

CASE AGENT: _____

List the names of all individuals that enter crime scene:

| NAME | AGENCY | TIME | |
|------|--------|------|---|
| ADAIR LEE | ENTERPRISE POLICE DEPARTMENT | ARRIVED | 0001 |
| RICK HAUSER | ENTERPRISE POLICE DEPARTMENT | ARRIVED | 0019 |
| RICK HAUSER | ENTERPRISE POLICE DEPARTMENT | LEFT | 0020 |
| ADAIR LEE | ENTERPRISE POLICE DEPARTMENT | LEFT | 0223 |
| JOHNNY CUNNINGHAM | ENTERPRISE POLICE DEPARTMENT | ARRIVED | 0223 |
| CHRIS PETERSON | ENTERPRISE POLICE DEPARTMENT | ARRIVED | 0450 |
| JOHNNY CUNNINGHAM | ENTERPRISE POLICE DEPARTMENT | LEFT | 0451 |
| CHRIS HURLEY | ENTERPRISE POLICE DEPARTMENT | ARRIVED | 0600 |
| CHRIS PETERSON | ENTERPRISE POLICE DEPARTMENT | LEFT | 0600 |
| SGT. EARL PENNINGTON | ENTERPRISE POLICE DEPARTMENT | ARRIVED | 0602 |
| DET. GRISWALD | ENTERPRISE POLICE DEPARTMENT | ARRIVED | 0858/0935 |
| DET. PURVIS | ENTERPRISE POLICE DEPARTMENT | ARRIVED | 0858/0935 |

REPORTING OFFICER: _____ BADGE#: _____
(print name)

OFFICERS' SIGNATURE: _____

ENTERPRISE P.D.  Form 96-059

| NAME | AGENCY | TIME |
|---|---|---|
| CHRIS NURLEY | ENTERPRISE POLICE DEPARTMENT | LEFT 1907 |
| 125 Bruce Devane | D.A's OFFICE * WENT INSIDE | Arrived 1006 / 1115 LEFT |
| 125 Bruce Mathews | D.A's OFFICE | Arrived 1006 / 1100 |
| 125 Mark Fuier | D.A. * WENT INSIDE | Arrived 1006 / 1115 |
| 125 Patrick Norris | D.A's OFFICE * WENT INSIDE | Arrived 1006 / 1100 |
| 125 Eddie Pennington | D.A's OFFICE * WENT INSIDE | Arrived 1006 / 1100 |
| 125 Glenda Parker | D.A's OFFICE * WENT INSIDE | Arrived 1006 / 1115 |
| 125 Carl Watson | Enterprise city shop rel. crime scene van | Arrived 1051 / 1112 LEFT |
| 125 Chris Boothe | Enterprise city shop rel. crime scene van | 1051 / 1112 out |
| 214 Kyla Jones | Employee toy box * went inside | 1435 / 1443 out |
| 214 Buddy Hammonds | ENTERPRISE Police — went inside | 1435 / 1443 out |
| 214 Larry Oehrman | C & C Tow Auto Crime scene Van | 1435 / 1443 |
| 214 Eddie Pennington | Enterprise Police / Personal items From unit 51 | 1440 / 1443 |
| 214 Bruce Devane | District Attorney went inside | 1710 / 1810 Left |
| 214 Glenn Stout | Assistant District Attorney - went inside | 1710 / 1810 Left |
| 214 Buddy Hammonds | ENTERPRISE Police Department Inside | 1710 / 1810 Left |
| 214 Capt. Rohm | ENTERPRISE Police Dept. went to front door | 1747 / 1800 Left |
| Michael Atkison | Enterprise Police Department | 0400 / 0550 |
| Nik Hale | Enterprise Police Department | 0550 / |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

REPORTING OFFICER: _____ DATE: _____

(print name)

OFFICER'S SIGNATURE: _____

474

# ENTERPRISE POLICE DEPARTMENT
## CRIMINAL INVESTIGATIONS DIVISION

DATE: _05-23-01_    TIME: _1340_    CASE# _0105-3060_

OFFENSE: _Murder_    VICTIM: _Jalaine Dennis_

LOCATION: _643 Co. Rd. 711_

FIRST OFFICER ON SCENE: _Lennis Darby_    AGENCY: _Enterprise P.D._

SECOND OFFICER ON SCENE: _Capt. Tom Braun_    AGENCY: _Enterprise P.D._

FIRST ARRIVING INVESTIGATOR: _Buddy Ammons_

CASE AGENT:

List the names of all individuals that enter crime scene:

| NAME | AGENCY | TIME |
|---|---|---|
| Lennis Darby | Enterprise Police Department | 1327 |
| Chad Trott | Enterprise Rescue Squad | 1334 |
| Chris Schwan | Enterprise Rescue Squad | 1334 |
| Capt. Tom Braun | Enterprise Police Department | 1335 |
| Capt. Bill Morse | Enterprise Police Department | 1335 |
| Buddy Ammons | Enterprise Police Department | 1335 |
| Rick Hauser | Enterprise Police Department | 1355 |
| Jeff Spence | Enterprise Police Department | 1402 |
| | | |
| | | |
| | | |
| | | |

REPORTING OFFICER: _____    BADGE#: _____
                          (print name)

OFFICERS' SIGNATURE: _____

ENTERPRISE P.D.    Form 96-059

Draft (

Capital Murder                    2001 - 05 - 3060
5/23/01
14:50
Box 634, Co Rd 711
Enterpa

Magzu Rd

Story
Room

Parking lot

21
22
29  28
23    24
Clotu Patch
Reg
25
301
walk

Dtch

Co Rd 711

N

Legend

21  Shell Casy        25 shell casy      29 Phone    30 matrap   31 Gun
22  shell Casy        26  "    "
23   "      "          27 Blood Button                Drwg not to scale

pend in scene (                    Evidence List

Patrick Norris                21 Shell casing
Jack Herbert                  22 Shell casing    23 "
Mark Anderson                 25 Shell casing    24 "
Capt Moore                    26 Shell casing
Tara Quews                    27 One white button
Rick Hauser                   28 Cigarette pack
Myron Williams                29 Hand held telephone
Lannis Darby                  36 $5.00 bill located under
Donnie Farris                      register
Roy Harrison Jr.              31 Revolver Clerke 1st
   (cut floor)                    22 cal Revol
B Harvin DPD 8:42 - 11PM          294415
Donn Kilpatrick DPD 8:42 11PM 32 (1) Projectile Recovd in
                                   Penis Statue

                              33 · Bloody Rag / cloth

                        Slug  B  9mm Bullet Slug
                              34

                              35 · Blood / Tape

                 28 '         36 · Carpet Piece (Blood)
                              37 · Large Carpet Piece

                              38 (2) Blood Swab 9mm Slug (C)
                              39 (2) Blood Swabs
                              40 (2) Blood Swabs
                              41   9mm slug
                              42   9mm slug
                              43   Blood from Floor (Swabs)
                              44 · Black Dash plastic

Rough Sketch / Genl Layout

not to Scale.

2004-05-3060
Copel Murder-



36.6    45.6    Tree

## OFFICER'S INVESTIGATION REPORT

## ENTERPRISE POLICE DEPARTMENT

TO: _Capt. Moore_

FROM: _Sgt Bullock_

SUBJECT: _Telephone Call To Medical Center_

DATE: _5/23/01_

TIME: _____

Paulene Austin was the Switch Board Opperator that took the phone call and wrote the note and was handed to Officer Mike Adkison. Adkison advised all her information would have to be obtained from her Supervisor during daytime hours. Phone #, Address etc.

**TO:**      SGT SPENCE, CPT MOORE, AND CHIEF JONES

**DATE:**    May 23, 2001

**SUBJECT:** OBSERVING POSSIBLE ROBBERY SUSPECTS

**FROM:**    OFFICER MATTHEW KEY

ON May 23, 2001 AT APPROXAMITLY 1400 HRS OFFICER KEY OBSERVED INV KEY AND INV MASON TURN DOWN E. BRUNSON ST. WITH CODE LIGHTS ON. OFFICER KEY ALSO TURNED DOWN E. BRUNSON AFTER SEEING THAT THE TWO UNITS TURN INTO THE MCE. OFFICER KEY WENT STRAIGHT AND OBSERVED A BLACK MALE RUNN OUT OF THE FRONT ENTRANCE OF THE MCE TOWARDS MARTIN COLLEY DRUG STORE. THE BLACK MALE WAS WEARING A WHITE TANK TOP UNDER SHIRT AND A PAIR OF BLACK WIND PANTS. OFFICER KEY WENT TO THE SIDE OF THE DRUG STORE WHERE THE SUBJECT WAS RUNNING TO AND OBSERVED THE SUBJECT GETTING INTO THE DRIVER SIDE OF BRIAN SMITH'S CAR LOCATED ON THE EAST SIDE OF THE DRUG STORE PARKING LOT.SMITH WAS IN THE PASSENGER SIDE WHEN OFFICER MADE CONTACT WITH THE SUBJECT. OFFICER ASKED THE SUBJECT WHERE WAS HE COMING FROM IN SUCH A HURRY.  SMITH STATED THAT THEY WERE PICKING UP SOME MEDICATION UP AT THE DRUG STORE.OFFICER ASKED THE SUBJECT THAT WAS RUNNING FROM THE MCE WHAT WAS HE DOING. HE STATED THAT HE WAS GETTING A DRINK OF WATER AND THAT WAS IT. OFFICER KEY ASKED THE TWO SUBJECT IF THEY HAD ANYTHING TO DO WITH WHAT WAS GOING ON AT THE MCE AND THE STATED WHAT WAS GOING ON. OFFICER KEY ADVISED THE TWO SUBJECTS THAT HE WAS NOT SURE AT THIS TIME BUT THEY HAD BETTER NOT HAVE ANYTHING TO DO WITH IT. AFTER OFFICER MADE CONTACT WITH THE TWO OFFICERS PULLED OUT OF THE PARKING LOT HEADING WEST ON BRUNSON AND OBSERVED DEPUTY HINES AND ASKED WHAT WAS GOING ON. AFTER DEPUTYHINES ADVISED THAT THERE HAD BEEN A ROBBERY WITH A SHOOTING OFFICER KEY WENT TO THE POLICE DEPARTMENT. OFFICER KEY ASKED THE DISPATCHERS ON DUTY IT OFFICERS WERE LOOKING FOR BRIAN SMITH AND ANOTHER BLACK MALE. DISPATCHERS ADVISED THAT THEY WERE LOOKING FOR THEM. OFFICER KEY CALLED LT LOLLEY AND ADVISED HIM OF THE ABOVE INFORMATION.

# ALABAMA UORM INCIDENT / OFFENSE REPO SUPPLEMENT

MAY NOT BE PUBLIC INFORMATION OFFICER'S WORK PRODUCT

| 1 ORI # | 0 1 9 0 2 0 0 | 2 AGENCY NAME Enterprise Police Department | 3 DATE AND TIME OF REPORT 0 5 2 5 0 1 | ☒ 1. AM 2. PT 3. MIL. | 4 CASE # 0 1 0 5 3 0 6 0 | 5 STA |

| 6 VICTIM'S NAME (ORIGINAL REPORT) Jelaine Dennis | 7 DATE OF ORIGINAL REPORT 0 5 2 3 0 1 | 8 TYPE REPORT ☐ CONTINUATION ☒ FOLLOW UP |

| 9 ORIGINAL INCIDENT/OFFENSE Capital Murder | STATE CODE/LOCAL ORDINANCE 13A-5-40 |

| 12 NEW INCIDENT/OFFENSE | STATE CODE/LOCAL ORDINANCE |

| 15 HAS AN ARREST BEEN MADE* ☐ YES ☐ NO | 16 DATE OF ARREST | 17 HAS WARRANT BEEN OBTAIN ☒ NO ☐ YES WARRANT # | DATE OF WARRANT | 19 PRIOR YEAR | PREMISE _____ WEAPON _____ |

| ☐ DEFENDANT ☒ SUSPECT NAME Smith, Brian | ☐ DEFENDANT ☒ SUSPECT NAME Yeoman, Bryan |

05-23-01    Sgt. Spence receives page at approximately 1330 hours reference to a shooting/robbery at the Toy Store on County Road 711. Spence also receives an unrelated page advising of a suspicious death on Clay Road. Spence contacted Cpt. Moore who advised he was en-route to the scene on County Road 711. Spence responded to the death on Clay Road. Once the death was determined to be a natural death by the coroner, Spence responded to County Road 711. Once at the scene, Spence was informed that a black male, dressed in all black had entered the store, robbed it and both the clerk and the suspect had been shot. While at the scene, Det. Roberts contacted Spence and advised that a black male, Robert CONRAD, was brought to MCE and dropped off by two black males. CONRAD had two gunshot wounds and stated he was robbed and shot on Methodist side. Spence was notified that three witnesses were at the police department to give taped statements. The three witnesses were Eric Kormylo, Donald Smith Jr., and Richard Brey. Brey advised he needed to tend to his business and provided a phone number to be contacted. Smith was interviewed (see transcript). During this interview, he described to vehicles that were parked in the curve approaching the Toy Store. There were three people at these vehicles, two were black males, the third he could not be sure. One of the vehicles he described as being a Ford Ltd, blue in color, with a large dent in the left front quarter panel. Eric Kormylo advised that he and Brey were working in the shop when he heard what he thought was hammering coming from the Toy Store. Shortly after, they observed a black male running along County Road 711, towards Geneva Hwy. When they reached the roadway, they did not observe the black male any longer. Upon completion of the interviews, Spence was notified a Ford LTD, matching the description, was at Green Tree Apartments parked outside complex containing apartment 228. Spence responded to the scene and spoke with the vehicle owner, Faye Smith. Smith was informed that

☐ NARRATIVE CONTINUED ON BACK

| 24 MOTOR VEHICLE | 25 CURRENCY, NOTES | 26 JEWELRY | 27 CLOTHING/FURS | 28 FIREARMS | 2. |
| S R D | S R D | S R D | S R D | S R D | S R D |
| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE GOODS | 33 LIVESTOCK | 34 MISCELLANEOUS | |
| S R D | S R D | S R D | S R D | S R D | |

| MOTOR VEH. RECOVERY ONLY | 35 MOTOR VEH. STOLEN IN YOUR JURISDICTION* ☐ N WHERE* ☐ y | 36 RECOVERED IN YOUR JURISDICTION? ☐ Y ☐ N WHERE ? |

| 37 CASE # 0 1 0 1 1 8 5 6 | 38 sFx | 39 CASE# 0 1 0 1 0 1 6 7 | 40 SEX | 41 CASE # | 42 SEX | 43 ADDITIONAL CASE CLOSED ☐ y ☐ N |

| 44 CASE STATUS ☒ 1. PENDING ☐ 2. INACTIVE ☐ 3. CLOSED | 45 CASE DISPOSITON ☐ 1. CLEARED BY ARREST (JUV) ☐ 2. CLEARED BY ARREST(ADULT) ☐ 3. UNFOUNDED | ☐ 4. EXCEPTIONAL CLEARANCE ☐ A. SUSPECT/OFFENDER DEAD ☐ B. OTHER PROSECUTION ☐ C. EXTRADITION DENIED ☐ D. LACK OF PROSECUTION ☐ E. JUVENILE, NO REFERRAL ☐ F. DEATH OF VICTIM | 46 REPORTING OFFICER Spence, Jeffery    ID# |
| | | | 47 ASSISTING OFFICER    ID# |
| | | | 48 SUPERVISOR APPROVAL    ID#    49 WATCH CMDR.    ID# |

TYPE OR PRINT IN BLACK INK ONLY    ACJIC - 33 REV. 11-86

OFFICERS WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| )ITIONAL INCIDENT/OFFENSE NARRATIVE CONTINUED | 50 DATE AND TIME OF REPORT | ☐ 1 AM<br>☐ 2 PM<br>☐ 3. MIL. | 51 CASE# | 52 SFX |
| --- | --- | --- | --- | --- |
| | 53 TYPE REPORT  ☐ 1. CONTINUATION  ☐ 2. FOLLOW-UP | | | |

54

Conrad had been shot and that her son Brian Smith dropped him off at the hospital on her vehicle. Faye Smith informed Spence that Conrad had stayed the night with her son, Brian Smith, the night before. When asked if she knew the whereabouts of her son, she stated that approximately 1415 hours, he and Bryan Yeoman came home on her vehicle and walked to Yeoman's apartment, 117 Green Tree. Spence requested consent to search her vehicle, which she granted, and the vehicle was searched and photographed. Smith was informed that vehicle may be needed for evidence, and she advised she understood. The vehicle was kept under surveillance by Ptl. Hurley and narcotic officers. Officers checked Yeoman's apartment and learned no one was home. The landlord advised that she observed the mother and a black male leave Green Tree on her vehicle, a grey Chevrolet Corsica. Spence then traveled to MCE where he learned that the bullet was removed from Conrad's arm. Also, D.A. investigators advised that the wheelchairs handled by the persons that brought into MCE were recovered and not handled. Spence processed the wheelchairs with no latents being recovered. Spence met with D.A. investigators, and crime scene personell at the District Attorney's Office to discuss the case. Upon leaving the meeting, D.A. Investigator Mathews and Spence went to MCE to interview CONRAD. Conrad who was under medication for pain was advised of his constitutional rights and waived them. CONRAD advised he was walking near the cemetary on Bell Street when a subject umped from the bushes and robbed him of his pager and cell phone, when he attempted to flee, he was shot. He could only recall being loaded into a vehicle and taken to MCE. He could not remember who took him. A guard was placed on CONRAD'S room due to threats being made towards him concerning the death of Dennis. While at MCE, Spence received word that YEOMAN and SMITH had been located and transported to the police department. Once arriving at the police department, Spence and Cpt. Moore began interviewing YEOMAN after he waived his constitutional rights. YEOMAN advised that he and SMITH were playing video games when CONRAD arrived. CONRAD stated he been shot and needed medical attention. They took him to MCE and returned home, and Smith and he went to Dothan with his mother. Yeoman was then taken to Cpt. Moore's office and Smith was brought into Spence's office. Smith was advised of his Constitutional Rights and during the completion of the interview sheet, it was learned that he was 17 years of age. Smith had been convicted for robbery and adjudicated to be an adult. Smith was not interviewed until he was advised of his juvenile rights as well. Prior to being advised of his juvenile rights, Smith began to inquire if his mother could be present during the interview. Smith was advised she could and was not asked any questions. Spence, Mathews, and Smith continued talking about unrelated issues, ie schooling, past events. Once Smith was advised of his juvenile rights, which he waived, he was asked if he would like his mother to be present with the reply of no. Smith gave a consistent story of Yeoman. During this interview, Spence advised Smith that he could tell by looking at him that he was "troubled by something". Smith requested at that point to speak with Spence alone. .ile alone, Smith confessed that he was at home that morning with Conrad. His mother came in and woke him up at approximately 9:00 A.M. and he went to the D.A.'s Office to make restitution for his previous crime. When he returned home, Conrad began talking

☐ CONTINUE ON ADDITIONAL SUPPLEMENT

# ALABAMA UNIFORM INCIDENT/OFFENSE REPORT

Spence

| TIM SSN | COMPLAINANT SSN | ☒ INCIDENT ☒ OFFENSE ☐ SUPPLEMENT | 2 CASE # 01-051-31161 | 3 SFX |

| 4 ORI # 01-90-200 | 5 DATE AND TIME OF THIS REPORT 05-23-01 17:00 AM/PM/MIL | 6 AGENCY NAME Enterprise Police Department | 7 IF SUPPLEMENT ORIGINAL OFFENSE DATE |
| 8 REPORTED BY ☐ VICTIM OR Lennis Darby | ☒ 2 B ☐ 3 S | 9 ADDRESS (STREET, CITY, STATE, ZIP) c/o 501 S. Main St Enterprise, Al 36330 | 10 PHONE (334) 347-1211 |
| 12 VICTIM (LAST, FIRST, MIDDLE NAME) Grimes, Robert R. | 13 ADDRESS (STREET, CITY, STATE, ZIP) 1208 East Park Ave. Enterprise, Al 36330 | 14 PHONE (334) 347-5621 |
| 15 EMPLOYER/SCHOOL The Toy Store | 16 OCCUPATION Owner | 17 ADDRESS (STREET, CITY, STATE, ZIP) 643 Co. Rd. 711 Enterprise, Al 36330 | 18 PHONE (334) 393-4656 |

19 ☐ RESIDENT ☐ NON-RESIDENT   20 INJURY   21 RACE ☒ W   22 SEX ☒ MALE ☐ FEMALE   23 HGT 5'9   24 WGT 160   25 DOB M D Y   26 AGE   27 WAS OFFENDER KNOWN TO VICTIM? ☐ Y ☒ N   28 VICTIM WAS (EXPLAIN RELATIONSHIP) Unk   29 CODE 310   STATE CODE/LOCAL ORDINANCE

| 30 TYPE INCIDENT OR OFFENSE ☒ FEL. ☐ MISD. Robbery | 31 DEGREE (CIRCLE) 1 2 3 | 32 UCR CODE 120 | 33 STATE CODE/LOCAL ORDINANCE 13A-8-41 |
| 34 TYPE INCIDENT OR OFFENSE ☐ FEL. ☐ MISD. | 35 DEGREE (CIRCLE) 1 2 3 | 36 UCR CODE | 37 STATE CODE/LOCAL ORDINANCE |

## EVENT

| 38 PLACE OF OCCURRENCE 643 Co. Rd. 711 Enterprise, Al 36330 | 39 SECTOR 2131 |

40 POINT OF ENTRY ☐ DOOR ☐ ROOF ☒ WINDOW ☒ OTHER   41 METHOD OF ENTRY ☒ FORCIBLE ☒ NO FORCE ☐ ATT. FORCIBLE   42 ASSAULT ☒ SIMPLE ☐ AGGR.   43 TREATMENT FOR ASSAULT INJURY ☐ Y ☒ N

| 44 OCCURRED ON OR BETWEEN 05-23-01 13:00 AM/PM/MIL   52 TIME 05-23-01 13:23 AM/PM/MIL | 45 TIME 1 2 3 X T F S 7 | 46 ☒ NATURAL ☐ MOON ☐ ART. EXT. ☐ ART. INT. ☐ UNK. (47 LIGHTING) | 48 WEATHER ☒ CLEAR ☐ CLOUDY ☐ RAIN ☐ FOG ☐ SNOW ☐ HAIL ☐ UNK. | 49 PREMISE ☐ HWY.—ST.—ALLEY ☐ RAILROAD ☒ RESIDENCE ☐ CHURCH ☐ SCHOOL ☐ CONVENIENCE ☒ INDUSTRIAL ☐ SERVICE STA. ☐ BANK ☐ DRUG STORE ☐ APT./TWN. HSE. ☐ SHOPPING CENTER ☐ PARKING LOT ☐ OTHER COMMER. ☒ OTHER Retail Store | 50 CODE |

54 VERIFY FOR ☐ Y   55 TREAT. FOR ☐ Y   58 CIRCUMSTANCES HOMICIDE & ASSAULT   57 CODE   RAPE EXAM ☒ N   RAPE INJURY ☒ N   LOCATION: RAPE   59 DESCRIPTION OF WEAPONS/FIREARMS/TOOLS USED IN OFFENSE   ☐ HANDGUN ☐ RIFLE ☐ SHOTGUN ☐ UNKNOWN

58 WEAPON USED ☒ FIREARM ☒ HANDS, FISTS, VOICE, ETC. ☐ KNIFE ☐ OTHER DANGEROUS   DESCRIBE:

## PROPERTY DESCRIPTION

| 60 QUANTITY | 61 STOLEN, RECOVERED, LOST, FOUND OR DESTROYED (INCLUDE MAKE, MODEL, SIZE, TYPE, SERIAL NUMBER, COLOR, ETC.) | 62 DOLLAR VALUE | | 63 RECOVERED | |
| | | STOLEN | DAMAGED | DATE | VALUE |
| 1 | Men's Wallet containing $30.00 in U.S. currency | 30.00 | | | |

☐ CONTINUED IN NARRATIVE

## DOLLAR VALUE

| 64 MOTOR VEHICLE | 65 CURRENCY, NOTES 30 | 66 JEWELRY | 67 CLOTHING/FURS | 68 FIREARMS | 69 OFFICE EQUIPMENT |
| S — R — D — C — | S 30 S R — D — C — | S — R — D — C — | S — R — D — C — | S — R — D — C — | S — R — D — C — |
| 70 ELECTRONICS | 71 HOUSEHOLD | 72 CONSUMABLE GOODS | 73 LIVESTOCK | 74 MISCELLANEOUS | |
| S — R — D — C — | S — R — D — C — | S — R — D — C — | S — R — D — C — | S — R — D — C — | |

## LES

75 CHECK CATEGORIES   ☐ STOLEN   ☐ RECOVERED   ☐ SUSPECTS VEH.   ☐ VICTIMS VEH.   ☐ UNAUTH. USE   ☐ ABANDONED

| 76 # STOLEN | 77 LIC. | 78 LIS. | 79 LIY. | 80 TAG COLOR | 81 VIN |
| 82 VYR | 83 VMA | 84 VMO | 85 VST | 86 VCO: TOP: BOTTOM: | 87 ADDITIONAL DESCRIPTION |
| STOLEN MTR. VEH ONLY | 88 AREA STOLEN ☐ BUS. ☐ RES. ☐ RUR. | 89 OWNERSHIP VERIFIED BY: ☐ TAG RECEIPT ☐ BILL OF SALE ☐ TITLE ☐ OTHER | | 90 WARRANT SIGNED ☒ N ☐ Y # |
| 91 AUTO INSURER NAME (COMPANY) ADDRESS (STREET, CITY, STATE, ZIP) | | | | 92 PHONE ( ) |
| MOTOR VEH. RECOVERY UNIT REQUIRED FOR 24&8 UCR CODE | 93 STOLEN IN YOUR JURISDICTION? ☒ Y ☐ WHERE? | | 94 RECOVERED IN YOUR JURISDICTION? ☐ Y ☐ WHERE? |

**TYPE OR PRINT IN BLACK INK**

ACJIC—32 REV 8-95

INCHES  1  2  3  4  5  6

484

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| INCIDENT/OFFENSE REPORT CONTINUED | 95 DATE AND TIME OF REPORT | | 96 CASE # | 97 SFX | 98 ☑ OFFENDER ☐ SUSPECT ☐ MISSING PERSON | ☐ CHECK IF MULTIPLE |
|---|---|---|---|---|---|---|
| | 05 23 07  17 00 | ☐ AM ☑ PM ☐ MIL. | 0 1 0 5 - 3 1 6 1 | | | |

| 99 NAME (LAST, FIRST, MIDDLE) | 100 NICKNAME/ALIAS | 101 RACE | 102 SEX | 103 DOB | 104 AGE |
|---|---|---|---|---|---|
| Conrad, Robert | | ☑ W ☐ A ☐ B ☐ I | ☑ M ☐ F | 04 27 80 | 20 |

| 105 ADDRESS (STREET, CITY, STATE, ZIP) | | 106 HGT | 107 WGT | 108 EYE | 109 HAIR | 110 COMPLEXION |
|---|---|---|---|---|---|---|
| #36 Nell Ct. Enterprise, Al 36330 | | 5'10 | 159 | Bro | Blk | Med |

| 111 PROBABLE DESTINATION | 112 ARMED? | 113 WEAPON |
|---|---|---|
| | ☐ Y ☑ N ☐ UNK. | |

| 114 CLOTHING | ☐ SCARS ☐ MARKS ☐ TATOOS | 115 ☐ ARRESTED ☑ WANTED |
|---|---|---|

| 116 NAME (LAST, FIRST, MIDDLE) | 117 NICKNAME/ALIAS | 118 RACE | 119 SEX | 120 DOB | 121 AGE |
|---|---|---|---|---|---|
| Smith, Brian | | ☑ W ☐ A ☐ B ☐ I | ☑ M ☐ F | 06 27 83 | 17 |

| 122 ADDRESS (STREET, CITY, STATE, ZIP) | | 123 HGT | 124 WGT | 125 EYE | 126 HAIR | 127 COMPLEXION |
|---|---|---|---|---|---|---|
| 1591 E. Park Ave. Enterprise, Al 36330 | | 6'3" | 170 | Bro | Blk | Med |

| 128 PROBABLE DESTINATION | 129 ARMED? | 130 WEAPON |
|---|---|---|
| | ☐ Y ☑ N ☐ UNK. | |

| 131 CLOTHING | ☐ SCARS ☐ MARKS ☐ TATOOS | 132 ☐ ARRESTED ☐ WANTED |
|---|---|---|

| | 133 NAME (LAST, FIRST, MIDDLE) SEX, RACE, DOB | | 134 ADDRESS (STREET, CITY, STATE, ZIP) | 135 RES. PHONE | 136 BUS. PHONE |
|---|---|---|---|---|---|
| WITNESSES | #1 | SEX ☐M ☐F  RACE ☐W ☐A ☐B ☐I  M  D  Y | | ( ) | ( ) |
| | #2 | SEX ☐M ☐F  RACE ☐W ☐A ☐B ☐I  M  D  Y | | ( ) | ( ) |
| | #3 | SEX ☐M ☐F  RACE ☐W ☐A ☐B ☐I  M  D  Y | | ( ) | ( ) |
| | #4 | SEX ☐M ☐F  RACE ☐W ☐A ☐B ☐I  M  D  Y | | ( ) | ( ) |
| | WITNESS #1 SSN  — | WITNESS #2 SSN  — | WITNESS #3 SSN  — | WITNESS #4 SSN  — |

37

NARRATIVE

Officers responded to 643 County Road 711 to a report of a robbery and shooting. While en-route officers were told that the suspect was last seen running west on Co. Rd. 711 and was described as a black male wearing all black clothing. Upon arrival at The Toy Store Officer Darby (reporting officer) was met by Robert R. Grimes, a white male, who stated that he had been robbed and that "she" had been shot. Grimes later related to officer Darby that a black male wearing all black clothing and a black mask came into The Toy Store, grabbed him by the neck, threw him to the floor and then removed his wallet from his pants. While lying on the floor Grimes heard gun shots and then heard Jalaine Dennis say "I've been shot." Grimes then looked outside and saw the suspect running Westward.

CONTINUED ON SUPPLEMENT ☑ ☒

| ASSISTING AGENCY ORI | ASSISTING AGENCY CASE # | SFX |
|---|---|---|

I hereby affirm that I have read this report and that all information given by me is correct to the best of my knowledge. I will assume full responsibility for notifying this agency if any stolen property or missing person hereby reported is returned.

SIGNATURE  R. Darby

| 138 LOCAL USE |
|---|
| 139 STATE USE |

| MULTIPLE CASES CLOSED | 140 CASE # | 141 SFX | 142 CASE # | 143 SFX | 144 CASE # | 145 SFX | 146 ADDITIONAL CASES CLOSED |
|---|---|---|---|---|---|---|---|
| | | | | | | | NARRATIVE ☐ Y ☑ N |

| ADMINISTRATION | CASE STATUS | 148 CASE DISPOSITION: | EXCEPTIONAL CLEARANCE: | 149 REPORTING OFFICER | ID # |
|---|---|---|---|---|---|
| | ☑ PENDING | ☐ 1 CLEARED BY ARREST (JUV.) | ☐ A SUSPECT/OFFENDER DEAD | Dennis Darby | 176 |
| | ☑ INACTIVE | ☑ 2 CLEARED BY ARREST (ADULT) | ☐ B OTHER PROSECUTION | 150 ASSISTING OFFICER | ID # |
| | ☐ CLOSED | ☐ 3 UNFOUNDED | ☐ C EXTRADITION DENIED | Earl Pennington | 125 |
| | ENTERED ACIC/NCIC | ☐ 4 ADM. CLEARED | ☐ D LACK OF PROSECUTION ☐ E JUVENILE, NO REFERRAL ☐ F DEATH OF VICTIM | 151 SUPERVISOR APPROVAL  ID # | 152 WATCH CMDR. |
| | DATE ☒ | | | CTA | 153 |

**ALABAMA U ORM INCIDENT/OFFENSE REPO SUPPLEMENT**

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| 1 ORI # | 2 AGENCY NAME | 3 DATE AND TIME OF REPORT | 4 CASE # | 5 SFX |
|---|---|---|---|---|
| 1 9 0 2 0 0 | Enterprise Police Department | 05 23 01 17:00 | 01 05 - 3 06 0 | |

**EVENT**

6 VICTIM'S NAME (ORIGINAL REPORT): Dennis Jalaine Bowman

7 ORIGINAL OFFENSE DATE: M D Y

8 TYPE REPORT: ☒ CONTINUATION  ☐ FOLLOW-UP

9 ORIGINAL INCIDENT/OFFENSE: Capital Murder

10 UCR CODE

11 STATE CODE/LOCAL ORDINANCE: 13A-5-40

12 NEW INCIDENT/OFFENSE

13 UCR CODE

14 STATE CODE/LOCAL ORDINANCE

| 15 HAS AN ARREST BEEN MADE? | 16 DATE OF ARREST | 17 HAS WARRANT BEEN OBTAINED? | 18 DATE OF WARRANT | 19 PRIOR |
|---|---|---|---|---|
| ☐ YES  ☒ NO | M D Y | ☐ YES  ☒ NO  WARRANT # | M D Y | YEAR  PREMISE____ WEAPON____ |

20 ☐ DEFENDANT  ☐ SUSPECT
NAME:

21 ☐ DEFENDANT  ☐ SUSPECT
NAME:

| RACE ☐W ☒A ☒B ☐I | SEX ☐M ☐F | DOB M D Y | AGE | RACE ☐W ☒A ☐B ☐I | SEX ☐M ☐F | DOB M D Y | AGE |
|---|---|---|---|---|---|---|---|

**NAR**

Upon arriving at the scene of 643 County Road 711 officer Darby observed and / or took the following actions;

Upon first arriving officer Darby was met at the door by Mr. Robert R. Grimes, an elderly white male, who opened the door to the business (The Toy Store) for Darby and who stated at that time that he had been robbed and that "she" had been shot. Upon stepping into the business Darby immediately saw several shell casings and a silver in color revolver lying near the doorway. During a quick search of the business to ensure that all suspects had left the building Darby observed more shell casings.

Officer Darby then asked Grimes where "she" was and he replied by pointing toward the counter. Darby had already seen blood in the doorway, on the carpet and on the front of the counter. When approaching the counter to ascertain the condition of the shooting victim (Dennis) Darby saw blood on the inside face of the counter, on the shelves behind the counter and on the floor between the two counters. Darby then saw Dennis lying behind the counter. Dennis was loosely holding a towel or rag against her upper right chest and was nearly covered with blood on the right side of her torso. At that time

22 LOCAL USE

23 STATE USE

**DOLLAR VALUE**

| 24 MOTOR VEHICLE | 25 CURRENCY, NOTES | 26 JEWELRY | 27 CLOTHING/FURS | 28 FIREARMS | 29 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| S R D C | S R D C | | S R D C | S R D C | S R D C |

| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE GOODS | 33 LIVESTOCK | 34 MISCELLANEOUS |
|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C |

MOTOR VEHICLE RECOVERY ONLY REQUIRED FOR 34ss UCR CODE

35 MOTOR VEH. STOLEN IN YOUR JURISDICTION? ☐  ☒ WHERE?

36 RECOVERED IN YOUR JURISDICTION? ☐  ☒ WHERE?

| MULTIPLE CASES CLOSED | 37 CASE # | 38 SFX | 39 CASE # | 40 CASE # | 41 CASE # | 42 SFX | 43 ADDITIONAL CASES CLOSED ☐ Y ☐ N |
|---|---|---|---|---|---|---|---|

**ADMINISTRA-**

1 CASE STATUS: ☐ PENDING  ☐ INACTIVE  ☐ CLOSED

ENTERED ACIC/NCIC ☒ DATE

45 CASE DISPOSITION: ☐ CLEARED BY ARREST (JUV.)  ☐ CLEARED BY ARREST (ADULT)  ☐ UNFOUNDED  ☐ ADM. CLEARED

2 EXCEPTIONAL CLEARANCE: ☐ SUSPECT/OFFENDER DEAD  ☐ OTHER PROSECUTION  ☐ EXTRADITION DENIED  ☐ LACK OF PROSECUTION  ☐ JUVENILE, NO REFERRAL  ☐ DEATH OF VICTIM

46 REPORTING OFFICER: Lennis Darby   ID # 176

47 ASSISTING OFFICER   ID #

48 SUPERVISOR APPROVAL   ID #

49 WATCH CMDR   ID # 153

**TYPE OR PRINT IN BLACK INK ONLY**

ACJIC—33 REV. 11-94

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

**ADDITIONAL INCIDENT/OFFENSE NARRATIVE CONTINUED**

| 50 DATE AND TIME OF REPORT | | 51 CASE # | 52 BFX |
|---|---|---|---|
| 05 23 07 17:00 AM ☑PM ☐MIL. | | 01 05-13060 | 1 |
| 53 TYPE REPORT: ☑1. CONTINUATION ☐2. FOLLOW-UP | | | |

NARRATIVE

Darby called for the emergency personnel en-route to respond code-three because the victim had been shot in the chest. Emergency personnel, who were already en-route, arrived shortly after and loaded Dennis hurriedly in the ambulance then to Medical Center Enterprise. Just prior to the arrival of emergency personnel Captain Tom Braun, commander of patrol division, arrived at the scene as the second responding officer.

Officer Darby then spoke to Grimes again to obtain a concise description of the suspect's clothing. Grimes told Darby that he did not get a clear look at the suspect but that he had been wearing all black. In a later interview Grimes told Darby that the reason he did not get a clear view of the suspect was because the suspect had grabbed him from around the neck and had thrown him to the floor. He also said that the suspect had been wearing a black mask that covered his face and head.

After speaking with Grimes Darby secured the crime scene by placing crime scene tape across the front entrance of the store. Darby was then directed by Sergeant Earl Pennington, who had just arrived, to enlarge the crime scene area to include the front lawn area and driveway of the business.

Immediately after this was done Officer Michael Petty approached Darby and said that he had passed a light blue LTD with a white top while he was en-route to the scene. Petty said the LTD was driving toward Enterprise from the area of the crime at a very high rate of speed. Petty also told Darby that he was familiar with the car and that it was the one "always parked at Nance circle." Darby then responded "you mean Brian Smith." Petty then replied, "Yep. That's the one." Darby then passed this information on to Pennington and Braun.

Shortly after this Darby was approached by two witnesses that had stopped him en-route to the scene. The two men had a third witness who proceeded to tell Darby that he had watched a black male run from the scene and get into a light blue LTD with damage to the front quarter panel. The gentleman then said the vehicle sped away towards Geneva highway. * Note: The first two men had stopped Darby to report that they had seen a black male run from the store in the direction of some chicken houses just west of the scene. They reported at that time that the subject had went into a field area nearby. It was at the time of this

☐ CONTINUE ON ADDITIONAL SUPPLEMENT

**TYPE OR PRINT IN BLACK INK ONLY**

**ALABAMA UNIFORM INCIDENT/OFFENSE REPORT SUPPLEMENT**

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| 1 ORI # | 1 1 9 0 2 C 0 | 2 AGENCY NAME Enterprise Police Department | 3 DATE AND TIME OF REPORT 0 5 2 3 0 1 17 00 ☒AM ☐PM | 4 CASE # 0 1 0 5 - 3 0 6 0 | 5 SFX |

**EVENT**

6 VICTIM'S NAME (ORIGINAL REPORT)
Dennis, Jalaine Bowman

7 ORIGINAL OFFENSE DATE  M  D  Y
☒ CONTINUATION   ☐ FOLLOW-UP

9 ORIGINAL INCIDENT/OFFENSE
Capital Murder

10 UCR CODE

11 STATE CODE/LOCAL ORDINANCE
13A-5-40

12 NEW INCIDENT/OFFENSE

13 UCR CODE

14 STATE CODE/LOCAL ORDINANCE

15 HAS AN ARREST BEEN MADE?  ☐ YES  ☒ NO
16 DATE OF ARREST  M  D  Y
17 HAS WARRANT BEEN OBTAINED?  ☐ YES  ☒ NO   WARRANT #
18 DATE OF WARRANT  M  D  Y
19 PRIOR YEAR   PREMISE ____ WEAPON ____

20 ☐ DEFENDANT  ☐ SUSPECT    NAME:

21 ☐ DEFENDANT  ☐ SUSPECT    NAME:

| RACE ☐W ☒A ☐B ☐I | SEX ☒M ☐F | DOB M D Y | AGE | RACE ☐W ☐A ☐B ☐I | SEX ☐M ☐F | DOB M D Y | AGE |

**NAR E**

report that Darby requested a canine unit for tracking purposes.

These same two witnesses told Darby in a later interview that they had been working near The Toy Store when they heard what they thought were gun shots. When they went to investigate they saw the subject running away from the store and then found that Dennis had been shot.

After the arrival of numerous investigators and command personnel Darby, along with several other officers, searched the road sides to attempt to obtain evidence. None was found. After the initial search of the roadside Darby contacted canine handler Officer Robbie Lowrie, the first canine handler at the scene, and together they completed a thorough search of the truck area. That search too proved fruitless.

After returning to the crime scene officer Darby was instructed to relieve investigator Buford Roberts at the Medical Center Enterprise. Upon arriving at Medical Center Enterprise Darby learned that Dennis had expired. He then met Roberts and Park Ranger Ricky Barnes on the surgical floor. Shortly after his arrival the suspect was brought out of surgery and taken to recovery. Darby stayed with the suspect from the time he came out of surgery until approximately 1830 with the suspect always in view.

**DOLLAR VALUE**

| 24 MOTOR VEHICLE | 25 CURRENCY, NOTES | 26 JEWELRY | 27 CLOTHING/FURS | 28 FIREARMS | 29 OFFICE EQUIPMENT |
| S R D C | S R D C | S R D C | S R D C | S R D C | S R D C |

| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE GOODS | 33 LIVESTOCK | 34 MISCELLANEOUS |
| S R D C | S R D C | S R D C | S R D C | S R D C |

22 LOCAL USE

23 STATE USE

MOTOR VEHICLE RECOVERY ONLY REQUIRED FOR 24xx UCR CODE
35 MOTOR VEH. STOLEN IN YOUR JURISDICTION?  ☐ WHERE?
36 RECOVERED IN YOUR JURISDICTION?  ☐ WHERE?

**MULTIPLE CASES CLOSED**

| 37 CASE # | 38 SFX | 39 CASE # | 40 SFX | 41 CASE # | 42 SFX | 43 ADDITIONAL CASES CLOSED NARRATIVE ☐ Y ☐ N |

**ADMINISTRA**

44 CASE STATUS
☐ PENDING
☒ INACTIVE
☐ CLOSED
ENTERED ACIC/NCIC DATE

45 CASE DISPOSITION:
☐ CLEARED BY ARREST (JUV.)
☐ CLEARED BY ARREST (ADULT)
☐ UNFOUNDED
☐ ADM. CLEARED

☐ EXCEPTIONAL CLEARANCE:
☐ SUSPECT/OFFENDER DEAD
☐ OTHER PROSECUTION
☐ EXTRADITION DENIED
☐ LACK OF PROSECUTION
☐ JUVENILE, NO REFERRAL
☐ DEATH OF VICTIM

46 REPORTING OFFICER
Lennis DARBY
ID # 176

47 ASSISTING OFFICER
ID #

48 SUPERVISOR APPROVAL   ID #

49 WATCH CMDR
ID # 153

**TYPE OR PRINT IN BLACK INK ONLY**

ACJIC—33 REV. 11-94

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| )DITIONAL INCIDENT/OFFENSE NARRATIVE CONTINUED | 50 DATE AND TIME OF REPORT 05 23 01 17:00 ☐ AM ☐ PM ☒ MIL. 53 TYPE REPORT: ☐ 1. CONTINUATION ☐ 2. FOLLOW-UP | 51 CASE # 01 05 - 3 0 6 0 | 52 SFX |
|---|---|---|---|

**NARRATIVE**

Note: Officer Darby removed the in-car video camera from his patrol car and filmed portions of the crime scene. This was done after obtaining the clothing description from Grimes.

**NARRATIVE**

**NARRATIVE**

☐ CONTINUE ON ADDITIONAL SUPPLEMENT

**TYPE OR PRINT IN BLACK INK ONLY**

## ALABAMA UNIFORM INCIDENT/OFFENSE REPORT SUPPLEMENT

**OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION**

| 1 ORI # | 2 AGENCY NAME | 3 DATE AND TIME OF REPORT | 4 CASE # | 5 SFX |
|---|---|---|---|---|
| 9 0 2 0 0 | ENTERPRISE POLICE DEPARTMENT | 05 29 01  07 41  AM PM MIL | 01 05 - 1 3 0 6 0 | |

| 6 VICTIM'S NAME (ORIGINAL REPORT) | 7 ORIGINAL OFFENSE DATE | 8 TYPE REPORT |
|---|---|---|
| | 05 19 01 | ☐ CONTINUATION  ☒ FOLLOW-UP |

| 9 ORIGINAL INCIDENT/OFFENSE | 10 UCR CODE | 11 STATE CODE/LOCAL ORDINANCE |
|---|---|---|
| CAPITAL MURDER | | 13A 5-40 |

| 12 NEW INCIDENT/OFFENSE | 13 UCR CODE | 14 STATE CODE/LOCAL ORDINANCE |
|---|---|---|
| | | |

| 15 HAS AN ARREST BEEN MADE? | 16 DATE OF ARREST | 17 HAS WARRANT BEEN OBTAINED? | 18 DATE OF WARRANT | 19 PRIOR | PREMISE _____ |
|---|---|---|---|---|---|
| ☐ YES  ☒ NO | M  D  Y | ☐ YES  ☒ NO  WARRANT # | M  D  Y | YEAR | WEAPON _____ |

| 20 ☐ DEFENDANT  ☒ SUSPECT | 21 ☐ DEFENDANT  ☒ SUSPECT |
|---|---|
| NAME: SMITH  BRIAN | NAME: CONRAD  ROBERT |

| RACE ☐W ☒A ☐B ☐I | SEX ☒M ☐F | DOB M D Y | AGE 18 | RACE ☐W ☒A ☐B ☐I | SEX ☒M ☐F | DOB M D Y | AGE 18 |
|---|---|---|---|---|---|---|---|

I WAS DISPATCHED OVER THE RADIO TO BACK UP INVESTIGATORS AT 1591 EAST PARK AVENUE (GREEN TREE APARTMENTS) IN ENTERPRISE, AL. INVESTIGATOR KEY FOUND ONE OF THE SUSPECTS VEHICLES A 1982 BABY BLUE FORD LTD IN THE PARKING LOT OF GREEN TREE APARTMENTS WHICH ONE OF THE SUSPECTS BRIAN SMITH WAS SEEN DRIVING. I ARRIVED AT 1591 EAST PARK AVENUE AND WAS DIRECTED BY INVESTIGATOR KEY TO COVER THE BACK OF APARTMENT COMPLEX 125-128 WHILE INVESTIGATORS SEARCHED FOR THE THREE MURDER SUSPECTS. I WAS THEN TOLD BY INVESTIGATOR KEY TO SECURE THE SUSPECTS VEHICLE WHILE INVESTIGATORS SPOKE WITH THE OWNER. SGT SPENCE SPOKE WITH MS FAYE SMITH WHO GAVE CONSENT TO SEARCH THE 1982 BABY BLUE LTD TO SGT. SPENCE. I WAS A WITNESS TO THIS. A CONSENT TO SEARCH FORM WAS COMPLETED BY SGT. SPENCE. A THIRD SUSPECT IS BRIAN YEOMAN 18 DOB         B/M.

| 22 LOCAL USE | |
|---|---|
| 23 STATE USE | |

| 24 MOTOR VEHICLE | 25 CURRENCY, NOTES | 26 JEWELRY | 27 CLOTHING/FURS | 28 FIREARMS | 29 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| N/A  S R D | S R D | S R D | S R D | S R D | S R D C |

| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE GOODS | 33 LIVESTOCK | 34 MISCELLANEOUS |
|---|---|---|---|---|
| S R C | S R D C | S R D C | S R D C | S R D C |

| MOTOR VEHICLE RECOVERY ONLY REQUIRED FOR 24xx UCR CODE | 35 MOTOR VEH. STOLEN IN YOUR JURISDICTION? ☐  WHERE? | 36 RECOVERED IN YOUR JURISDICTION? ☐  WHERE? |
|---|---|---|

| MULTIPLE CASES CLOSED | 37 CASE # | 38 SFX | 39 CASE # | 40 SFX | 41 CASE # | 42 SFX | 43 ADDITIONAL CASES CLOSED NARRATIVE ☐Y ☐N |
|---|---|---|---|---|---|---|---|

| 44 CASE STATUS | 45 CASE DISPOSITION: | 46 REPORTING OFFICER | ID # |
|---|---|---|---|
| ☐1 PENDING ☒2 INACTIVE ☐3 CLOSED | ☐ CLEARED BY ARREST (JUV.) ☐ CLEARED BY ARREST (ADULT) ☐ UNFOUNDED ☐ ADM. CLEARED | ☐ EXCEPTIONAL CLEARANCE: ☐ SUSPECT/OFFENDER DEAD ☐ OTHER PROSECUTION ☐ EXTRADITION DENIED ☐ LACK OF PROSECUTION ☐ JUVENILE, NO REFERRAL ☐ DEATH OF VICTIM | CHRIS HURLEY  201 |
| ENTERED ACIC/NCIC DATE | | 47 ASSISTING OFFICER | ID # |
| | | 48 SUPERVISOR APPROVAL  ID # | 49 WATCH CMDR.  ID # 153 |

**TYPE OR PRINT IN BLACK INK ONLY**

ACJIC—33 REV. 11-94

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| ADDITIONAL INCIDENT/OFFENSE NARRATIVE CONTINUED | 50 DATE AND TIME OF REPORT | 51 CASE # | 52 BFX |
|---|---|---|---|

50 DATE AND TIME OF REPORT: 05 29 01  07:41  ☒ MIL.

53 TYPE REPORT: ☐ 1. CONTINUATION  ☒ 2. FOLLOW-UP

51 CASE #: 01 05 - 3 06 0

**NARRATIVE**

N/A

☐ CONTINUE ON ADDITIONAL SUPPLEMENT

**TYPE OR PRINT IN BLACK INK ONLY**

49)

## ALABAMA UNIFORM INCIDENT / OFFENSE REPORT SUPPLEMENT

MAY NOT BE PUBLIC INFORMATION OFFICER'S WORK PRODUCT

| 1 ORI # | 2 AGENCY NAME | | 3 DATE AND TIME OF REPORT | | 4 CASE # | 5 STA |
|---|---|---|---|---|---|---|
| 0 1 9 0 2 0 0 | ENTERPRISE POLICE DEPART. | | 0 5 2 3 0 1 | ☐ 1 AM ☒ 2 PM ☐ 3 MIL | 0 1 0 5 - 3 0 6 0 | |

| 6 VICTIM'S NAME (ORIGINAL REPORT) | 7 DATE OF ORIGINAL REPORT | 8 TYPE REPORT |
|---|---|---|
| Dennis, Jelaine | 0 5 2 3 0 1 | ☐ CONTINUATION  ☒ FOLLOW UP |

**EVENT**

| 9 ORIGINAL INCIDENT/OFFENSE | | STATE CODE/LOCAT ORDINANCE |
|---|---|---|
| Capital Murder | | 13A-6-2 |
| 12 NEW INCIDENT/OFFENSE | | STATE CODE/LOCAT ORDINANCE |
| | | |

| 15 HAS AN ARREST BEEN MADE? | 16 DATE OF ARREST | 17 HAS WARRANT BEEN OBTAIN | DATE OF WARRANT | 19 PRIOR | PREMISE ___ |
|---|---|---|---|---|---|
| ☒ YES  ☐ NO | | ☐ NO  ☐ YES WARRANT # | | YEAR | WEAPON ___ |

| ☐ DEFENDANT ☒ SUSPECT | ☐ DEFENDANT ☒ SUSPECT |
|---|---|
| NAME  Conrad, Robert  B/M  092780 | NAME  Smith, Brian  B/M  062783 |

**FIFTY-FIVE**

052301: Inv. Purvis responded to the Toy Store. Inv. Purvis walked the side of CR 711 from the Toy Store approximatley 100

yards toward Hwy 27 S. Sgt. Spence then told Inv. Purvis to assist Inv. Hauser with the scene. Inv. Purvis then went inside the

Toy Store and assisted Inv. Hauser with crime scene measurements.

052401: Inv. Purvis and Griswold went to 117 Greentree Apts. and assisted the District Attorney's Office with a search warrant.

All evidence recovered was turned over to Sgt. Spence.

052501: Inv. Purvis and Griswold interviewed Edric Borders at the Coffee County Jail for information on the case. Borders

claimed to have no knowledge of the case. Inv. Purvis went to the Coffee County Jail on the same date and spoke with Smith and

Yoeman seperately. Both Smith and Yoeman signed consent forms to release clothing to Inv. Purvis. Property was obtained and

recipted by Inv. Purvis and turned over to Sgt. Spence

☐ NARRATIVE CONTINUED ON BACK

**VALUE**

| | | S | | | S | | | S | | | S | | | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 MOTOR VEHICLE | | S | 25 CURRENCY. NOTES | | S | 26 JEWELRY | | S | 27 CLOTHING/FURS | | S | 28 FIREARMS | | S |
| S | | R | S | | R | S | | R | S | | R | S | | R |
| | | D | | | D | | | D | | | D | | | D |
| 30 ELECTRONICS | | S | 31 HOUSEHOLD | | S | 32 CONSUMABLE GOODS | | S | 33 LIVESTOCK | | S | 34 MISCELLANEOUS | | S |
| S | | R | | | R | S | | R | | | R | | | R |
| | | D | | | D | | | D | | | D | | | D |

| MOTOR VEH. RECOVERY ONLY | 35 MOTOR VEH. STOLEN IN YOUR JURISDICTION?  ☐ y ☐ N WHERE? | 36 RECOVERED IN YOUR JURISDICTION?  ☐ Y ☐ N WHERE ? |
|---|---|---|

| 37 CASE # | 38 SFx | 39 CASE# | 40 SEX | 41 CASE # | 42 SEX | 43 ADDITIONAL CASE CLOSED ☐ Y ☐ X |
|---|---|---|---|---|---|---|

**ADMINISTRATIVE**

| 44 CASE STATUS | 45 CASE DISPOSITON | | | 46 REPORTING OFFICER | ID# |
|---|---|---|---|---|---|
| ☒ 1. PENDING | ☐ 1. CLEARED BY ARREST (JUV) | ☐ 4. | EXCEPTIONAL CLEARANCE ☐ A. SUSPECT/OFFENDER DEAD | PURVIS, TARA | 190 |
| ☐ 2. INACTIVE | ☐ 2. CLEARED BY ARREST(ADULT) | | ☐ B. OTHER PROSECUTION ☐ C. EXTRADITION DENIED | 47 ASSISTING OFFICER | ID# |
| ☐ 3. CLOSED | ☐ 3. UNFOUNDED | | ☐ D. LACK OF PROSECUTION | GRISWOLD, DARRELL | 172 |
| | | | ☐ E. JUVENILE, NO REFERRAL ☐ F. DEATH OF VICTIM | 48 SUPERVISOR APPROVAL   ID# | 49 WATCH CMDR.   ID# |

TYPE OR PRINT IN BLACK INK ONLY                    ACJIC - 33 REV. 11-86

ALABAMA ( FORM INCIDENT / OFFENSE REP( F SUPPLEMENT

MAY NOT BE PUBLIC INFORMATION OFFICER'S WORK PRODUCT

| 1 ORI # | 0 1 9 0 2 0 0 | 2 AGENCY NAME Enterprise Police Department | 3 DATE AND TIME OF REPORT 0 5 2 8 0 1 | 1 AM 2 PM X MIL | 4 CASE # 0 1 0 5 - 3 0 6 0 | 5 SIX |
|---|---|---|---|---|---|---|

| 6 VICTIM'S NAME (ORIGINAL REPORT) Jeliane Dennis | 7 DATE OF ORIGINAL REPORT 0 5 2 3 0 1 | 8 TYPE REPORT ☐ CONTINUATION  ☒ FOLLOW UP |
|---|---|---|

**EVENT**

| 9 ORIGINAL INCIDENT/OFFENSE Capital Murder | STATE CODE/LOCAT ORDINANCE 13A-6-2 |
|---|---|
| 12 NEW INCIDENT/OFFENSE | STATE CODE/LOCAT ORDINANCE |

| 15 HAS AN ARREST BEEN MADE? ☐ YES  ☒ NO | 15 DATE OF ARREST | 17 HAS WARRANT BEEN OBTAIN ☐ NO  ☐ YES WARRANT # | DATE OF WARRANT | 19 PRIOR YEAR | PREMISE ____ WEAPON ____ |
|---|---|---|---|---|---|

| ☐ DEFENDANT ☒ SUSPECT NAME Robert Conrad B/M | ☐ DEFENDANT ☒ SUSPECT NAME Bryan Smith B/M |
|---|---|

**NARRATIVE**

Bryan Yoeman B/M

On 05/23/01, Detective Ammons responded to a call for service concerning a Robbery which had occured at The Adult Toy Store, located on County Road 711, South of Enterprise, Alabama. Detective Ammons arrived in the area at approximately 1330 and went directly to a dirt road which parallels Co. Rd. 711, because it had been reported that the suspect had gone in that general direction. Minutes later it was reported that the suspect had gotten into a vehicle located on Co. Rd. 711. Detective Ammons then drove to The Adult Toy Store where he as directed to assist Detective Hauser with the crime scene. The victim had been removed by the Enterprise Rescue Squad and the crime scene was secured.

Detective Ammons assisted Detective Hauser in collecting (6) six shell casings which appeared to be from a (9) nine Millimeter firearm. The shell casings were collected from the floor inside The Adult Toy Store. Also collected were (4) four projectiles which appeared to be from a (9) nine millimeter firearm. These were collected by removing part of the floor of The Toy Store.

A 22 Caliber Clerke silver colored revolver was also collected from inside the Toy Store. The revolver contained (4) four spent cartridge casings and (1) one live round. One 22 caliber projectile was collected from a glass statue which was located on a shelf at the front of the store behind the cash regester. Blood was collected from the counter, the floor and the door. The carpet was cut in sections which contained blood and collected. The telephone was collected from the floor and an empty cigarette pack was collected from the floor of the Toy Store. Latent prints were collected from the front door of the Toy Store. A second bullet hole was found in a plack located beside the door. This bullet went through the plack and inside the wall and was not removed.

Detective Ammons spoke with Hayes Ammons who saw a vehicle parked west of the Toy Store.

☒ NARRATIVE CONTINUED ON BACK

**VALUE**

| 24 MOTOR VEHICLE | 25 CURRENCY, NOTES unknown | 26 JEWELRY | 27 CLOTHING/FURS | 28 FIREARMS | 2. |
|---|---|---|---|---|---|
| S | S | S | S | S | S |
| R | R | R | R | R | R |
| D | D | D | D | D | D |

| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE GOODS | 33 LIVESTOCK | 34 MISCELLANEOUS | |
|---|---|---|---|---|---|
| S | S | S | S | S | |
| R | R | R | R | R | |
| D | D | D | D | D | |

| MOTOR VEH. RECOVERY ONLY | 35 MOTOR VEH. STOLEN IN YOUR JURISDICTION? ☐ Y  ☐ N WHERE? | 36 RECOVERED IN YOUR JURISDICTION? ☐ Y  ☐ N WHERE ? |
|---|---|---|

| 37 CASE # | 38 SFX | 39 CASE # | 40 SEX | 41 CASE # | 42 SEX | 43 ADDITIONAL CASE CLOSED ☐ Y ☐ N |
|---|---|---|---|---|---|---|

**ADMINISTRATIVE**

| CASE STATUS | 4 5 CASE DISPOSITON | | 46 REPORTING OFFICER W.R. Ammons | ID# 163 |
|---|---|---|---|---|
| ☐ 1. PENDING ☐ 2. INACTIVE ☒ 3. CLOSED | ☐ 1. CLEARED BY ARREST (JUV) ☒ 2. CLEARED BY ARREST(ADULT) ☐ 3. UNFOUNDED | ☐ 4. EXCEPTIONAL CLEARANCE ☐ A. SUSPECT/OFFENDER DEAD ☐ B. OTHER PROSECUTION ☐ C. EXTRADITION DENIED ☐ D. LACK OF PROSECUTION ☐ E. JUVENILE, NO REFERRAL ☐ F. DEATH OF VICTIM | 47 ASSISTING OFFICER | ID# |
| | | | 48 SUPERVISOR APPROVAL  ID# | 49 WATCH CMDR.  ID# |

TYPE OR PRINT IN BLACK INK ONLY

ACJIC - 33 REV. 11-86

OFFICERS WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| ADDITIONAL INCIDENT/OFFENSE NARRATIVE CONTINUED | 50 DATE AND TIME OF REPORT 0 5 2 8 0 1 | 1. AM 2. PM 3. MIL | 51 CASE# 0 1 0 5 - 3 0 6 0 | 52 SFX |
|---|---|---|---|---|
| | 53 TYPE REPORT ☐1. CONTINUATION ☒2. FOLLOW-UP | | | |

NARRATIVE

Detective Ammons assisted in the service of (2) two search warrants on apartment numbers 117 and 228 at Greentree Apartments in an effort to locate a 9 millimeter hand gun and clothing used in this offense. Some clothing was secure from Apartment # 117 which had been occupied by Bryan Yoeman and his mother.

On 05/24/01, Detective Ammons interviewed Robert Ray Grimes who was present and was victim of robbery in this offense.

On 05/24/01, Detective Ammons interviewed Kyla Jones who is a part time employee of The Adult Toy Store and observed an older model ford vehicle parked beside the road between The Adult Toy Store and Highway 27 on 05/23/01 at 1325 hrs.

On 05/28/01, Detective Ammons secured major case inked prints from Bryan Smith, Bryan Yoeman and Robert Conrad. This was done at the Coffee County Jail and while printing Bryan Smith, he asked Detective Ammons how long did he (Ammons) think that he (Smith) would have to serve for his involvment in this case.

On 05/28/01, Detective Ammons interviewed William Hayes Ammons who observed an older model LTD Ford parked near the Adult Toy Store on the day of this incident. Ammons advised that the Ford had damage to the left front fender and quarter panel, and pointed out exactly where he saw the vehicle parked on two occasions. (SEE STATEMENT OF WILLIAM HAYES AMMONS ).

On 05/29/01, Detective Ammons and Chief Investigator Bruce DeVane interviewed Robert Ray Grimes and conducted a walk through at the crime scene. (SEE STATEMENT OF ROBERT RAY GRIMES).

On 05/30/01, Detective Ammons spoke with Don Smith who showed Detective Ammons exactly where he observed the gray vehicle and the older model , light blue Ford . Mr. Smith observed the two vehicles (3) three times on this day, and the last time that he observed the two vehicles, the Ford was parked on the north side of County Road 711 and the gray vehicle was turning into the Toy Store.

On 05/30/01, Detective Ammons interviewed Lisa Harrison who was called to the scene by Robert Ray Grimes. (SEE STATEMENT OF LISA HARRISON).

On 05/31/01, Detectives Ammons and Hauser return to the crime scene and attempt to locate the sixth projectile that was fired from the 9 MM weapon. Ammons and Hauser are confident they have discovered the bullet hole of the remaining 9MM round, however it is located in the front part of the building which has a sub floor and would be very difficult to take up. The decision will be made as to take up the floor or leave it at a meeting scheduled for 1300 hrs this date. Latent prints were lifted from the cash register and the shelves underneath the cash regester were examined revealing nothing of value to this case. All the "T" shirts containing bullet holes were collected by Detective Hauser.

On 05/31/01, Detective Ammons contacted Daleville Police Departement and received information that Bryan Yoeman had been arrested by Daleville P.D in April 2001.

☒ CONTINUE ON ADDITIONAL SUPPLEMENT

TYPE OR PRINT IN BLACK INK ONLY

## ALABAMA UNIFORM INCIDENT / OFFENSE REPORT SUPPLEMENT

MAY NOT BE PUBLIC INFORMATION OFFICER'S WORK PRODUCT

| 1 ORI # 0 1 9 0 2 0 0 | 2 AGENCY NAME Enterprise Police Department | 3 DATE AND TIME OF REPORT 0 5 2 8 0 1 | □ 1 AM □ 2 PM ☒ 3. MIL | 4 CASE # 0 1 0 5 - 3 0 6 0 | 5 STA |
|---|---|---|---|---|---|

| 6 VICTIM'S NAME (ORIGINAL REPORT) Jelaine Dennis | 7 DATE OF ORIGINAL REPORT 0 5 2 3 0 1 | 8 TYPE REPORT □ CONTINUATION  ☒ FOLLOW UP |
|---|---|---|

| 9 ORIGINAL INCIDENT/OFFENSE Capital Murder | STATE CODE/LOCAT ORDINANCE 13A-6-2 |
|---|---|
| 12 NEW INCIDENT/OFFENSE | STATE CODE/LOCAT ORDINANCE |

| 15 HAS AN ARREST BEEN MADE? ☒ YES  □ NO | 16 DATE OF ARREST 0 5 2 3 0 1 | 17 HAS WARRANT BEEN OBTAIN □ NO  □ YES WARRANT # | DATE OF WARRANT 0 5 2 3 0 1 | 19 PRIOR YEAR | PREMISE ___ WEAPON ___ |
|---|---|---|---|---|---|

| ☒ DEFENDANT □ SUSPECT NAME Bryan Smith B/M | 21 ☒ DEFENDANT □ SUSPECT NAME Robert Conrad B/M |
|---|---|

Bryant Yoeman B/M

06/01/01

Detectives Ammons and Hauser attempted to collect the remaining 9 MM projectile that they believe to be under the floor of the Toy Store. Also attempted to collect the remaining 22 cal projectile that they believe to be inside the wall of the Toy Store. The statue that the 22 cal projectile was removed from on 05/23/01 was taken as evidence.

Detective Ammons made contact with Daleville Police Department and was informed that Bryant Glenn Yoemans was arrested on 04/02/01 for Theft of Property 3rd Degree. Yoemans entered Steve's Furniture in Daleville, Alabama and removed a Sony Play Station without paying for same and was arrested. Yoemans was granted youthful offender status on 04/23/01.

On 06/05/01, Detective Ammons showed photographs of Bryan Smith's 1985 Ford LTD to William Hayes Ammons and was advised by Mr. Ammons that this was the same vehicle that he had observed parked near the Adult Toy Store on 05/23/01 some-time around 1:00 P.M.

On 06/05/01, Detective Ammons made contact with Elke Lancaster, who works for Automatic Air Conditioner Specialists, located on highway 27 south of Enterprise, Alabama. Ms. Lancaster advised that on 05/23/01, (2) two black males, one tall and the other shorter came into her place of business and asked directions to The Adult Toy Store. Ms Lancaster advised them that she had never been to the Adult Toy Store, but there had been a sign located approximately one mile north, near the Cannon Station indicating that the Adult Toy Store was located down the road across from the Cannon Station.

☒ NARRATIVE CONTINUED ON BACK

| 24 MOTOR VEHICLE | 25 CURRENCY, NOTES | 26 JEWELRY | 27 CLOTHING/FURS | 28 FIREARMS | 2. |
|---|---|---|---|---|---|
| S R D | S R D | S R D | S R D | S R D | S R D |

| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE GOODS | 33 LIVESTOCK | 34 MISCELLANEOUS |
|---|---|---|---|---|
| S R D | S R D | S R D | S R D | S R D |

| MOTOR VEH. RECOVERY ONLY | 35 MOTOR VEH. STOLEN IN YOUR JURISDICTION? □ y □ N WHERE? | 36 RECOVERED IN YOUR JURISDICTION? □ Y □ N WHERE ? |
|---|---|---|

| 37 CASE # | 38 aFx | 39 CASE# | 40 SEX | 41 CASE # | 42 SEX | 43 ADDITIONAL CASE CLOSED □ Y  □ N |
|---|---|---|---|---|---|---|

| CASE STATUS | 4 5 CASE DISPOSITON | | 46 REPORTING OFFICER W.R. Ammons | ID# 163 |
|---|---|---|---|---|
| □ 1. PENDING □ 2. INACTIVE ☒ 3. CLOSED | □ 1. CLEARED BY ARREST (JUV) ☒ 2. CLEARED BY ARREST(ADULT) □ 3. UNFOUNDED | □ 4. EXCEPTIONAL CLEARANCE □ A. SUSPECT/OFFENDER DEAD □ B. OTHER PROSECUTION □ C. EXTRADITION DENIED □ D. LACK OF PROSECUTION □ E. JUVENILE, NO REFERRAL □ F. DEATH OF VICTIM | 47 ASSISTING OFFICER | ID# |
| | | | 48 SUPERVISOR APPROVAL ID# | 49 WATCH CMDR. ID# |

PLEASE PRINT IN BLACK INK ONLY    ACJIC-33 REV. 11-86

OFFICERS WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

ADDITIONAL INCIDENT/OFFENSE
NARRATIVE CONTINUED

| 50 DATE AND TIME OF REPORT | | | | | | ☐ 1 AM<br>☒ 2. PM<br>☐ 3. MIL. | 51 CASE# | | | | | | | | | 52 SFX |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 5 | 2 | 8 | 0 | 1 | | 0 | 1 | 0 | 5 | - | 3 | 0 | 6 | 0 | |

53 TYPE REPORT   ☒ 1. CONTINUATION   ☐ 2. FOLLOW-UP

**NARRATIVE**

On 06/05/01, Detectives Ammons and Roberts interviewed Krysta Thomley Dillard . Ms Dillard is the former girlfriend of John Farris

who lives with James Morgan. Mr. Morgan is the owner of the Norinco 7.62 cal rifle that was found near and linked to Robert Conrad.

James Morgan also was the victim of a second theft of a 9 MM Taraus semi-automatic pistol, stolen from the same residence that the

Norinco rifle was taken from. Ms Dillard and Mr. Farris were both living with James Morgan at the time of the theft of the Norinco

rifle but Ms Dillard advised that she had moved from the apartment approximately 2 or 3 days when the Taraus hand gun was taken.

Ms Dillar also advised that she had never spent any time at Green Tree Apartments and did not know anyone who lived there. She did

advised that Vicki Straughan who is the girlfriend of James Morgan and the former girlfriend of Ricky Sutton advised her (Krysta) that

on one occasion that a subject whose name was Yeoman was coming to the apartment and that she (Vicki) and Yeoman were going out.

Krysta advised that Vicki Straughan would know who was at the apartment when the 9Mm hand gun was taken.

☐ CONTINUE ON ADDITIONAL SUPPLEMENT

TYPE OR PRINT IN BLACK INK ONLY

```
IN RE:  THE ESTATE OF          *    IN THE PROBATE COURT OF
                               *
JELAINE B. DENNIS,             *    COFFEE COUNTY, ALABAMA
                               *
    DECEASED,                  *
                    LETTERS OF ADMINISTRATION
```

Letters of Administration on the estate of JELAINE B.

DENNIS, deceased, are hereby granted to COLLINS LYNN BOWMAN, who

has qualified and given bond as such Administrator, and is

authorized to administer such estate.  Subject to the priorities

stated in <u>Code of Alabama</u> (1975, as amended) 43-8-76, the said

Administrator, acting prudently for the benefit of interested

persons, has all the powers, without limitation, authorized in

transactions under <u>Code of Alabama</u> (1975, as amended) 43-2-843.

WITNESS MY HAND and dated this the 6TH   day of

_____JUNE_____, 2001.


                              _____
                                  Judge of Probate

STATE OF ALABAMA
COUNTY OF COFFEE

    I, William O. Gammill, Judge of Probate of Coffee County,
Alabama, do hereby certify that the above and foregoing is a true
and correct copy of the Letters Administration issued to COLLINS
LYNN BOWMAN as Administrator of JELAINE B. DENNIS, deceased, as
the same appears of record in my office and are still in full
force and effect.

    GIVEN UNDER MY HAND AND OFFICIAL SEAL of the Court on this
the _____6TH_____ day of ____JUNE____, 2001.


                              _____
                                  Judge of Probate

# ALABAMA UNIFORM ARREST REPORT

|  | Yes | Yes |
|---|---|---|
|  | No | No |

Completed

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| 1 ORI # | 2 AGENCY NAME | 3 CASE # | 4 SFX |
|---|---|---|---|
| 0190200 | Enterprise Police Department | 0 1 0 5 3 0 6 0 | |

**IDENTIFICATION**

| 5 LAST, FIRST, MIDDLE NAME | 6 ALIAS AKA |
|---|---|
| Conrad, Robert Thomas | |

| 7 SEX ☒M ☐F | 8 RACE ☒W ☐B ☐A ☐I | 9 HGT. 6'00 | 10 WGT 155 | 11 EYE BRO | 12 HAIR BLK | 13 SKIN DRK | 14 ☐SCARS ☐MARKS ☐TATTOOS ☐AMPUTATIONS |

| 15 PLACE OF BIRTH (CITY, COUNTY, STATE) | 16 SSN | 17 DATE OF BIRTH | 18 AGE | 19 MISCELLANEOUS ID# |
|---|---|---|---|---|
| Germany | 4 1 9 - 1 7 - 5 0 9 5 | 0 9 3 0 8 0 | 20 | |

| 20 SIO # | 21 FINGERPRINT CLASS KEY | MAJOR | PRIMARY | SCDV | SUB-SECONDARY | FINAL | 22 OLJ | 23 ST |
|---|---|---|---|---|---|---|---|---|

| 23 FBI # | HENRY CLASS NCIC CLASS | 25 IDENTIFICATION COMMENTS |
|---|---|---|

| 26 ☒ RESIDENT ☐ NON-RESIDENT | 27 HOME ADDRESS (STREET, CITY, STATE, ZIP) Apt 35 Garden Oaks, Enterprise, AL 36330 | 28 RESIDENCE PHONE 334  348-2150 | 29 OCCUPATION (BE SPECIFIC) |
|---|---|---|---|

| 30 EMPLOYER (NAME OF COMPANY/SCHOOL) Conagra | 31 BUSINESS ADDRESS (STREET, CITY, STATE, ZIP) Cty Rd 636, Enterprise, AL 36330 | 32 BUSINESS PHONE ( ) |
|---|---|---|

**ARREST**

| 33 LOCATION OF ARREST (STREET, CITY, STATE, ZIP) 400 N. Edwards, Enterprise, AL 36330 | 34 SECTOR# | 35 ARRESTED FOR YOUR JURISDICTION? ☒ YES ☐ NO ☐ IN STATE ☐ OUT STATE AGENCY |
|---|---|---|

| 36 CONDITION OF ARRESTEE: | ☐ DRUNK ☐ DRINKING | ☐ SOBER ☒ DRUGS | 37 RESIST ARREST? ☐ YES ☒ NO | 38 INJURIES? ☐ OFFICER ☐ ARRESTEE | 39 ARMED? ☐ Y ☒ N | 40 DESCRIPTION OF WEAPON ☐ HANDGUN ☐ RIFLE ☐ SHOTGUN ☐ OTHER FIREARM ☐ OTHER WEAPON |

| 41 DATE OF ARREST 0 9 2 9 0 1 | 42 TIME OF ARREST ☐ 1. AM ☐ 2. PM ☐ MIL. | 43 DAY OF ARREST Thursday | 44 TYPE ARREST ☐ ON-VIEW ☐ CALL ☐ WARRANT | 45 ARRESTED BEFORE? ☒ YES ☐ NO ☐ UNKNOWN |

| 46 CHARGE-1 ☒ FEL ☐ MISD Capital Murder | 47 UCR CODE 0 9 0 5 | 48 CHARGE-2 ☐ FEL ☐ MIS | 49 UCR CODE |
|---|---|---|---|

| 50 STATE CODE /LOCAL ORDINANCE 13A-5-40 | 51 WARRANT# WR2001000268 | 52 DATE ISSUED 0 5 2 4 0 1 | 53 STATE CODE/LOCAL ORDINANCE | 54 DATE ISSUED |
|---|---|---|---|---|

| 56 CHARGE-3 ☐ FEL ☐ MISD | 57 UCR CODE | 58 CHARGE-4 ☐ FEL ☐ MIS | 59 UCR CODE |
|---|---|---|---|

| 60 STATE CODE/ORDINANCE | 61 WARRANT # | 62 DATE ISSUED | 63 STATE CODE/LOCAL ORDINANCE | 64 WARRANT # | 65 DATE ISSUED |
|---|---|---|---|---|---|

| 66 ARREST DISPOSITION ☒ HELD ☐ BAIL ☐ RELEASED ☐ TOT-LE ☐ OTHER | 67 IF OUT ON RELEASE WHAT TYPE? | 68 ARRESTED WITH (1) ACCOMPLICE (FULL NAME) Smith, Brian |
|---|---|---|
|  |  | 69 ARRESTED WITH (2) ACCOMPLICE (FULL NAME) Yeoman, Bryan |

**VEHICLE**

| 70 VYR | 71 VMA | 72 VMO | 73 VST | 74 COLOR TOP BOTTOM | 75 TAG # | 76 LIS | 77 LIY |
|---|---|---|---|---|---|---|---|

| 78 VIN | 79 IMPOUNDED? ☐YES ☐NO | 80 STORAGE LOCATION/IMPOUND # |
|---|---|---|

| 81 OTHER EVIDENCE SEIZED / PROPERTY SEIZED | ☐ CONTINUED IN NARRATIVE |
|---|---|

**JUVENILE**

| 82 JUVENILE DISPOSITION | ☐ HANDLED AND RELEASED ☐ REF TO JUVENILE COURT | ☐ FOR TO WELFARE AGENCY ☐ REF. TO OTHER POLICE AGENCY | ☐ REF. TO ADULT COURT | 83 RELEASED TO |
|---|---|---|---|---|

| 84 PARENT OR GUARDIAN (LAST, FIRST, MID GUARDIAN) | 85 ADDRESS (STREET, CITY, STATE, ZIP) | 86 PHONE ( ) |
|---|---|---|

| 87 PARENTS EMPLOYER | 88 OCCUPATION | 89 ADDRESS (STREET, CITY, STATE, ZIP) | 90 PHONE ( ) |
|---|---|---|---|

**RELEASE**

| 91 DATE AND TIME OF RELEASE ☐AM ☐PM ☐MIL. | 92 RELEASING OFFICER NAME | 93 AGENCY/DIVISION | 94 ID # |
|---|---|---|---|

| 95 RELEASED TO: | 96 AGENCY/DIVISION | 97 AGENCY ADDRESS |
|---|---|---|

| 98 PERSONAL PROPERTY RELEASED ARRESTEE ☐ YES ☐ NO ☐ PARTIAL | 99 PROPERTY NOT RELEASED HELD AT | 100 PROPERTY # |
|---|---|---|

| 101 REMARKS (NOTE ANY INJURIES AT TIME OF RELEASE) | LOCAL USE STATE USE |
|---|---|

| 102 SIGNATURE OF RECEIVING OFFICER | 103 SIGNATURE OF RELEASING OFFICER |
|---|---|

| MULTIPLE CASES CLOSED | 104 CASE # | 105 SFX | 106 CASE # | 107 SFX | 108 CASE # | 109 SFX | 110 ADDITIONAL CASES CLOSED NARRATIVE ☐ Y ☐ N |
|---|---|---|---|---|---|---|---|

| 111 ARRESTING OFFICER (LAST, FIRST, M.) Moates, Ben | 112 ID# 19A1 | 113 ARRESTING OFFICER (LAST, FIRST, M.) Spence, Jeffery D | 114 ID # | 115 SUPERVISOR ID # | 116 WATCH CMDR |
|---|---|---|---|---|---|

## TYPE OR PRINT IN BLACK INK ONLY

ACJIC-34 REV. 10-90

OFFICERS WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| ADDITIONAL ARREST NARRATIVE CONTINUED | 117 DATE AND TIME OF ARREST 0 5 2 4 0 1 | ☐ AM ☐ PM ☒ MIL | 118 CASE # 0 1 0 5 3 0 6 0 | 119 SFX |
| --- | --- | --- | --- | --- |

**120 ADDITIONAL ARREST INFORMATION**

Conrad was arrested in compliance with a warrant charging him with Capital Murder. Conrad was taking into custody and is awaiting release from Medical Center Enterprise before being transferred to the Coffee County Jail.

☐ CONTINUE ON ADDITIONAL SUPPLEMENT

TYPE OR PRINT IN BLACK INK ONLY

# ALABAMA BOARD OF PARDONS AND PAROLES
## REPORT OF INVESTIGATION

Type of Investigation   YOUTHFUL OFFENDER                    Date Dictated _____

Name   ROBERT THOMAS CONRAD _____   True name   ROBERT THOMAS CONRAD, JR.

Alias _____

RSA   BM-20 _____   DOB   9/30/80 _____   Height and Weight   6'  155 LBS.

Complexion _____   Color of Hair   BLACK _____   Color of Eyes   BROWN

Bodily Marks   TATTOO-"TRE" ON STOMACH; MULTIPLE TATTOOS ON FOREARMS

Driver's License #   NONE _____   SSN   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

AIS# _____   FBI# _____   SID# _____

Address   GARDEN OAKS APARTMENTS #35 _____   Phone #   334-348-2150
          GLOVER AVENUE
          ENTERPRISE, ALABAMA  36330

County   COFFEE/ENTERPRISE _____   Case #   CC 2001-179, 180

Offense(s)   CAPITAL MURDER; ROBBERY I

Sentence(s) _____

Date of Sentence _____   Date Sentence Began _____

Date of Arrest   5/24/2001 _____   Date of Bond _____   Bond Amount $ _____

Judge   GARY MCALILEY _____   D.A.   MARK FULLER

Attorney   AL SMITH AND GARY BRADSHAW _____   Retained _____   Appointed   X

Court Ordered Restitution $ _____

Barred From Parole          Yes   X (IF CONVICTED OF       No _____
                                  CAPITAL OFFENSE)
Date Copies Sent to Central Records _____

NOTES:
5/31/2001  INDICTED.
7/31/2001  APPLICATION FOR YOUTHFUL OFFENDER STATUS.

PBF 203

# PRESENT OFFENSE(S)

## County, Court, and Case Number

Coffee/Enterprise CC 2001-179

## Offense:

Capital Murder

## Sentence:

## Date of Sentence:

## Details of Offense:

Information indicates that on 5/23/01 at approximately 1:25 p.m., Enterprise police officers were dispatched to a report of a robbery and shooting at The Toy Store located at 643 County Road 711. While enroute, officers were told that the suspect was last seen running west on County Road 711 and was described as a black male wearing all black clothing. Upon arrival at The Toy Store, Officer Lennis Darby was met by Robert Grimes who stated that he had been robbed and that "she" (later identified as Jelanie Bowman Dennis) had been shot. Officer Darby entered the store and found Ms. Dennis lying behind the counter bleeding profusely from the chest. Ms. Dennis stated that she had also shot the suspect. Officer Darby then requested rapid response from rescue personnel. Officer Darby observed that the cash register drawer was slightly open, and there was no money in the drawer. The Enterprise Rescue Squad arrived and transported Ms. Dennis to the Medical Center Enterprise where she later died.

Officer Darby was told by Robert Grimes that during the robbery, two black males were present in the business when the suspect entered and forced him to the floor. After the suspect obtained Grimes' wallet containing $30.00 and money from the register, the suspect went to where the two black males were on the floor and demanded their money. Grimes then heard gun fire. Ms. Dennis then told Grimes that she shot the suspect. Grimes reported that he then went to his vehicle where he placed a 911 call. The two black males exited the business and asked what they could do. Grimes told them to go get help, and the two black males departed.

While Officer Michael Petty was in route to The Toy Store, he observed a light blue Ford LTD that he recognized as belonging to Brian Smith. The vehicle was traveling north on Geneva Highway at a high rate of speed, but Officer Petty did not recognize the driver of the vehicle.

At approximately 1:50 p.m., Robert Conrad was dropped off by two black males at Medical Center Enterprise for treatment of gunshot wounds. Off duty Enterprise Police Officer Matt Key was in the parking lot of the hospital and observed Brian Smith and another black male, that he later identified as Bryan Yeoman, in the parking lot in Smith's vehicle. Officer Key was unaware of the robbery and had a brief conversation with Smith and then departed.

At approximately 3:00 p.m., Brian Smith's vehicle was at his residence at Green Tree Apartments in Enterprise, Alabama. Investigator Jeff Spence spoke with Smith's mother who stated that Robert Conrad had spent the night of 5/22/01, and that when she returned home from work, he was not at home. She stated that Smith and Bryan Yeoman came in at approximately 2:15 p.m. and walked to Yeoman's residence. Investigator Spence and Lt. Mike Lolley attempted to contact Yeoman and Smith at Yeoman's apartment, but they were not there.

During the evening hours of 5/23/01, Investigator Spence and District Attorney Investigator Bruce Matthews interviewed Conrad at Medical Center Enterprise. Conrad stated that he was walking near the cemetery on Bell Street when a subject jumped from the bushes and robbed him of his pager and cell phone and that when he attempted to flee he was shot. He stated he could only recall being loaded into a vehicle and taken to Medical Center Enterprise but could not remember who took him.

Investigator Spence and Investigator Matthews then went to the Enterprise Police Department and interviewed Brian Smith. Smith first stated that Conrad had borrowed his car and that he was unaware of his activities. Smith stated that while he was at Yeoman's playing video games, Conrad came in stating that he had been shot and needed transportation to the hospital. Smith was confronted with the fact that his vehicle and a vehicle matching Bryan Yeoman's was observed by two witnesses approximately one quarter of a mile from The Toy Store just prior to the robbery, and that the witness in the store could identify the two black males who had been in the business. Smith then sighed and stated that he had been home that morning with Conrad. He stated that when he had returned home from making arrangements of restitution payments in a previous matter at the District Attorney's Office, Conrad stated let's do a "hit" and he needed "backup". Smith stated that they then got Yeoman and planned what would happen. He stated that he and Yeoman went into The Toy Store, and approximately five minutes later, Conrad entered, demanded everyone to the floor and came over to where Smith and Yeoman were located. Smith stated that Conrad struck him on the back of the head

and demanded money. He stated that as Conrad was leaving, he heard gunfire but did not raise up to watch. He stated that they went outside and asked a man what they could do, and the man replied to go get help. Smith stated that they then went to the house next to The Toy Store but could not get anyone to the door. He stated that they then returned home and found that Conrad had been shot. He said they took him to Medical Center Enterprise and returned home where they went to Yeoman's apartment and later went to Dothan with Yeoman's mother.

Captain Bill Moore of the Enterprise Police Department and Officer Key interviewed Bryan Yeoman who gave a statement that was consistent with Smith's first statement. Yeoman and Smith were then brought together, and Smith stated to Yeoman "go ahead and tell the truth, they know." Yeoman then stated to Captain Moore that he overheard Smith and Conrad talking about doing a robbery. Yeoman stated that he then went with Smith to The Toy Store, however, he was unaware they were going to commit a robbery. Yeoman stated that while inside The Toy Store, he observed Conrad rob and shoot Dennis. He said they then left The Toy Store and went to the residence next door to get assistance. When no one would answer the door, he stated that they returned home and discovered that Conrad had been shot. Yeoman stated they took Conrad to the hospital and returned home. Yeoman said they then accompanied his mother to Dothan.

On 5/24/2001, Conrad was arrested. On 5/31/2001, Conrad was indicted for Capital Murder. On 7/13/2001, application was made for Youthful Offender status.

Bars to Parole:

13A-5-39 prohibits a person convicted of a capital offense from being eligible for parole.

Subject's Statement:

Since this is a Youthful Offender Investigation, a statement was not obtained.

Case Status of Co-Defendants:

Brian James Smith was indicted for Capital Murder. The case is pending in Coffee/Enterprise CC 2001-177.

Bryan Glenn Yeoman was indicted for Capital Murder. The case is pending in Coffee/Enterprise CC 2001-181.

Location of Offense:

Enterprise, Alabama.

Court Ordered Restitution:


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
County, Court, and Case Number

Coffee/Enterprise CC 2001-180

Offense:

Robbery I

Sentence:


Date of Sentence:


Details of Offense:

The details for this case are the same as found in case number CC 2001-179. This particular case involves the robbery of Robert Grimes.

Bars to Parole:

None.

Subject's Statement:

Since this is a Youthful Offender Investigation, a statement was not obtained.

Case Status of Co-Defendants:

Brian James Smith was indicted for Robbery I. The case is pending in Coffee/Enterprise CC 2001-178.

Bryan Glenn Yeoman was indicted for Robbery I. The case is pending in Coffee/Enterprise CC 2001-182.

Location of Offense:

Enterprise, Alabama.

Court Ordered Restitution:

# RECORD OF ARREST(S)

*✗ objected "no indication as to representation" Judy sustained*

| Date | Court | Charge | Disposition |
|------|-------|--------|-------------|
| 9/4/96 | Coffee Co. JU 96-146.01 | CHINS/ Ungovernable | Consent decree. |
| 3/8/97 | Coffee Co. JU 96-146.02 | Motion to Set Aside | 12 months probation. |
| 9/8/97 | Coffee Co. JU 96-146.03 | Petition to Revoke | Committed to DYS. |
| 6/29/98 | Enterprise Municipal Court TR 1998-1821 | Driving Without First Obtaining a License | $152.50 fine plus court costs. |
| 8/17/98 | Enterprise Municipal Court TR 1998-2293 | Driving Without First Obtaining a License | Paid $152.00 fine plus court costs. |
| 12/13/99 | Enterprise Municipal Court TR 1999-1930 | Driving Without First Obtaining a License | $182.50 fine and costs. |
| 1/31/2000 | Enterprise Municipal Court TR 2000-25 | Seatbelt Violation | $10.00 fine. |
| 1/31/2000 | Enterprise Municipal Court TR 2000-26 | Driving Without First Obtaining a License | $182.50 fine and costs. |
| 2/19/2000 | Enterprise Municipal Court MC 2000-238 | Assault III (Domestic Violence) | ✓ Guilty. 10 days jail, suspended. |

| 7/19/2000 | Enterprise Municipal Court MC 2000-945 | Giving False Information to Law Enforcement Officer | Guilty. Credit for 20 days served. |
| 7/19/2000 | Enterprise Municipal Court MC 2000-946 | Contempt/ Failure to Pay Fines | Guilty. Credit for time served. |
| 4/19/2001 | Coffee/Enterprise DC 2001-395 | Possession of Marijuana I | Pending grand jury. |
| 4/19/2001 | Coffee/Enterprise DC 2001-396 | Giving False Name to Law Enforcement | Pending grand jury. |

## PERSONAL / SOCIAL HISTORY

Subject:

Robert Thomas Conrad, Jr. is a black male, 20 years old, with a date of birth of 9/30/80. Conrad stated that he was born in Germany while his father was stationed there in the U.S. Army. Conrad stated that he was raised primarily by his mother. He stated that he has three brothers and one sister. Conrad stated that his parents divorced when he was approximately nine or ten years old.

Conrad stated that he lived in Germany from his birth until he was approximately two years old. He stated that he moved to Enterprise, Alabama when he was approximately two years old and remained in Enterprise, Alabama until he was approximately eleven years old. He stated that he then moved to Connecticut for approximately three months. He stated that he returned to Enterprise, Alabama and lived there from age eleven and a half until he was approximately thirteen years old. He stated that he then moved to Lansing, Michigan where he lived for approximately one year. He stated that he returned to Enterprise, Alabama when he was fourteen years old and remained there until he was approximately sixteen years old. He stated that he then moved to Boston, Massachusetts for a couple of months before returning to Enterprise, Alabama for a brief period. He stated that he then moved to Birmingham, Alabama for approximately four or five months. He stated that he then returned to Enterprise, Alabama for a couple of months and then went back to Birmingham, Alabama for approximately five months before returning to Enterprise, Alabama.

Marital Status / History:

Conrad stated that he has never been married and that he has never fathered any children.

Health:

Conrad stated that he is presently taking medication for having been exposed to TB. He stated that he was otherwise in good health and that he did not suffer from any physical or mental disabilities. He stated that he saw a female psychiatrist in Enterprise, Alabama when he was fourteen or fifteen years old. He stated that he saw the psychiatrist one time for "playing with fire". He stated that he did not know the psychiatrist's name.

Concerning substance abuse, Conrad denied having a drug or alcohol problem. He stated that he has smoked marijuana with the first time being while he was living in Birmingham in 1997. He stated that he smoked marijuana off and on since 1997 with the last time being approximately two weeks before his arrest in the instant offense. He denied use of any other drugs.

Education:

Conrad stated that he last attended school at Enterprise Junior High School in Enterprise, Alabama in the ninth grade. He stated that he did not go back to school after the ninth grade.

Enterprise Junior High School records indicate that Conrad was suspended on at least four occasions. He was suspended on September 12, 1996 for failure to follow school rules; from January 28, 1997 through January 30, 1997 for fighting; from February 4, 1997 through February 6, 1997 for belligerent behavior; and from March 17, 1997 through March 19, 1997 for disobedience.

Conrad stated that he started a GED course at Enterprise State Junior College but didn't finish the course and has never taken the GED exam. He did not report any additional education.

Financial Status:

Conrad is presently in custody at the Coffee County Jail and is not receiving any monthly income. The only asset he reported owning was a 1989 Ford Ltd. He did not report any debts.

## Employment History:

Conrad is currently in custody and is unemployed. The only employment history that he reported was that he worked for his step-father, Thomas Anthony Williams, at Triangle Auto Sales in Enterprise, Alabama for approximately five months in 2000. He stated that he worked there detailing cars and earned $150.00 per week. He stated that he left employment there because the business closed.

## Military Record:

Conrad has never served in any branch of the U.S. Armed Forces.

## Offender's Family:

Father: Robert Thomas Conrad, circa 41 years old, resides in Columbus, Ohio. The subject stated that he has not seen his father since 1994 or 1995.

Mother: Dorothy Ann Conrad, circa 39 years old, resides at Garden Oaks Apartments #35 in Enterprise, Alabama and is employed at Enterprise Nursing Home.

As mentioned previously, Conrad stated that his parents divorced when he was approximately nine or ten years old. Conrad also stated that his mother had previously been married to Thomas Anthony Williams but that they are now divorced.

## Siblings:

Brother: James Rockshaun Conrad, 13 years old, resides with his mother at Garden Oaks Apartments #35 in Enterprise, Alabama and is a junior high school student.

Brother: Jermaine Shunell Conrad, 13 years old, resides with his mother at Garden Oaks Apartments #35 in Enterprise, Alabama and is a high school student.

Brother: Michael Alexander Conrad, 19 years old, resides with a girlfriend on Pine Street in Enterprise, Alabama and is employed at Southland Broilers in Coffee County, Alabama.

Sister: Connie Conrad, 21 years old, resides at 712 Damascus Road in Enterprise, Alabama and is employed at Grocery Outlet in Enterprise, Alabama.

## EVALUATION OF OFFENDER

<u>Psychological Reports:</u>

None known.

<u>Reputation and Community Activities:</u>

Conrad provided one character reference. I contacted that reference, Lois Brooks, who said that she was a friend of Conrad's family and had known Conrad since he was in elementary school. She stated that he was "real quiet", that he was a "good boy", and that he was "always respectable" to her.

Conrad reported that he attends the Pleasant Grove Baptist Church in Enterprise, Alabama. He did not report membership in any clubs or civic groups. He stated his hobbies were playing basketball and working on cars.

<u>Probation and Parole Officer's Remarks:</u>

None.

## PROBATION PLAN

<u>Home:</u>

If granted probation, Conrad stated that he would live with his mother at Garden Oaks Apartments #35 on Glover Avenue in Enterprise, Alabama.

<u>Employment:</u>

Would have to obtain.

Signed and dated at Enterprise, Alabama this the 30th day of August, 2001.


William D. Taylor, Jr.
Alabama Probation & Parole Officer

WDT:at

STATE OF ALABAMA
OFFICE OF THE DISTRICT ATTORNEY
TWELFTH JUDICIAL CIRCUIT

# DEATH CASE REPORT

Date : 5-23-01          County : Coffee                    Time DAI Notified : 1:25 PM

Originating Agency : Enterprise Police Department          Primary Investigator : Jeff Spence

Time CI Notified : 1:35 PM       By Whom DAI Notified : Enterprise Police Dispatch

Name of Deceased : Jelaine Bowman Dennis          DOB : 4-10-62      Race : W    Sex : F

D.L. # : 4582326          SSN # : 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      Place of Birth : Unknown

Place of Residence : 1204 Co. Road 711 Enterprise, Al.          Place of Employment : Toy Store

Name, Add. & Ph. # of Next of Kin : Randy Dennis Co Road 711 Enterprise, Al. 334-347-6368

Manner of Death : Gunshots to chest and leg          Cause of Death : Pending

Body ID'd By : Nona Adams          Autopsy Performed By : N/a

Location of Death : Medical Center Enterprise ER          Discovered By : Ray Grimes

Reported By : Ray Grimes          Relationship to Deceased : Friend

Name/Time 1st Officer on Scene : Lennis Darby 1327 Hrs.          DFS Agent on Scene : Mark Day

Coroner / Time Arrived : Nona Adams

Names of Rescue Personnel : Chad Trott, Chris Swain

Name, Add. & Ph. # of Attending Physician : Dr. John Drew Medical Ct. Enterprise ER 334-347-0584

C    of Evidence on Body : Darby, E'prise Rescue, Dr. John Drew, Nona Adams, DFS

Autopsy Authorized : Yes  By Whom Mark Fuller    Scene Preserved/Secured Yes  By Whom: Lennis Darby

Scene Photo'd Yes    By Whom : Rick Hauser          Evidence Coll. Yes  By Whom Rick Hauser

Body Photo'd : Yes  By Whom : DFS          Chain of Custody of Evidence Maintained : Yes

Primary Evidence Custodian : Rick Hauser          Sketch of Scene: Yes By Whom: Rick Hauser

Scene Video Taped : Yes          By Whom: Lennis Darby          Format : Unknown

Witnesses Formally Interviewed : Yes

Exact Name Entity : Jelaine Dennis, Sole Properity          Provided By : Randy Dennis

House to House : Yes

Synopsis / Remarks ( List Any Property & Value Taken) (Use Reverse Side if Needed):

At approximately 1:23 PM on 5-23-01, Jelaine Dennis the owner of the Toy Store located at 1204 County Road 711 was robbed at gunpoint by a black male identified as Robert Conrad. Two co-defendants, Brian Smith and Brian Yoeman were inside the store acting as customers and as backup for Conrad. During the robbery a struggle ensude between Dennis and Conrad and both Dennis and Conrad was shot. Ms. Dennis was transported to Medical Center Enterprise, ER and pronounced dead by Dr. John Drew. The defendant Conrad was transported to Medical Center Enterprise by the two co-defendants and was treated by Dr. Sam Sawyer. A customer, Ray Grimes was in the store at the time of the robbery and Conrad took by force, approximatey thirty dollars from Grimes during the robbery. All three defendants confessed to their involvment in the robbery and murder of Ms. Dennis.

510

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA      )
                               )
                               )
        v.                 )      Case No. CC-2001-M-179 & 180
                               )
ROBERT THOMAS CONRAD      )
                               )

## MOTION FOR FUNDS
## FOR COURT REPORTER TRANSCRIPTS

ROBERT THOMAS CONRAD, the defendant in the above-styled case, respectfully moves this Court,

pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Sections

1, 5, 6, 7, 8, 9, 11, 13, 15 and 16 of Article I of the Alabama Constitution, and applicable state law, for an

order authorizing the expenditure of up to $500.00 for court reporter transcripts, subject to application for

additional funds if needed.

In support of his motion, ROBERT THOMAS CONRAD states as follows:

1. ROBERT THOMAS CONRAD is before the Court awaiting trial on a capital case involving a charge

of murder.

2. ROBERT THOMAS CONRAD was indicted by a specially called Grand Jury and thus thwarted any

right or ability to hear any evidence that the State would have presented against him.

3. Since this is a capital case, exacting standards must be met to assure that it is fair. "The

fundamental respect for humanity underlying the eighth amendment's prohibition against cruel and unusual

punishment gives rise to a special "'need for reliability in the determination that death is the appropriate punishment'" in any capital case." Johnson v. Mississippi, 486 U.S. 578, 584 (1988) (quoting Gardner v. Florida, 430 U.S. 349 (1977) (quoting Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (White, J., concurring))).

4. **The prosecution has requested the transcription of all evidentiary proceedings held thus far before the Court and the Grand Jury. The prosecution obviously has funds to pay for such transcripts.**

5. ROBERT THOMAS CONRAD is indigent. He was declared indigent by the Circuit Court upon his first appearance. He has been incarcerated since his arrest for the instant capital murder. ROBERT THOMAS CONRAD has been and continues to be unable to earn any money or in any way contribute financially to his defense. He has been declared indigent and granted permission to proceed in forma pauperis. The Alabama Supreme Court in Ex parte Moody, 684 So.2d 114, (Ala.1996), reaffirmed an indigent defendant's right to have funds from the State for expert assistance. The Court also expressly ruled that:

> [W]e find it necessary to hold that an indigent criminal defendant is entitled to an *ex parte* hearing on whether expert is necessary, based on the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

Ex parte Moody, 684 So. 2d 114, 120, (Ala. 1996).

The Alabama Supreme Court again addressed an indigent criminal defendant's right to have reasonable expenses under §15-12-21, Code of Alabama 1975, in Dubose v. State, 662 So. 2d 1189, 1190 (Ala 1995). The Court stated:

> In *Ex Parte Sanders*, 612 So. 2d 1199 (Ala.1993), the defendant was fould at his arraignment to be indigent, and the court appointed counsel to represent him. Two weeks later, the defendant's family retained counsel to represent him and the appointed counsel withdrew. Before trial, Sanders asked the court to approve funds to pay for a ballistics expert. The trial court denied the

Page 2 of 7

motion for funds to pay the expert, stating, "[Y]ou have got retained counsel, and I am not going to provide funds to do that." *Sanders* at 1200.

6. In order for him to receive a full and fair trial of all relevant issues in his case, ROBERT THOMAS CONRAD requires the funds for copies of the transcripts to maintain a equal footing with the prosecution.

7. Defense counsel has an ethical, legal and constitutional duty to conduct a thorough inquiry into all aspects of this case. In order to do this, a comprehensive investigation must be undertaken and records and other documentary evidence must be obtained. Because ROBERT THOMAS CONRAD is indigent, the investigation required by law can be undertaken and completed only upon allocation of adequate resources by this Court.

8. Counsel has an ethical, legal and constitutional duty to investigate fully all aspects of ROBERT THOMAS CONRAD's case. "At the heart of effective representation is the independent duty to investigate and prepare." Goodwin v. Balkcom, 684 F.2d 794, 805 (11th Cir. 1982). When the defense team does not engage in a thorough investigation, the lawyer is left without "all facts relevant to his client's case," and is therefore "prepared to do little more than stand still at the time of trial." McQueen v. Swenson, 498 F.2d 207, 217 (8th Cir. 1974). See also American Bar Association, Standards for Criminal Justice § 4-4.1 (1980) ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction."). The American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases provide:

> Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. . .

> The investigation for preparation of the guilt/innocence phase of the trial should be conducted regardless of any admission or statement by the client concerning facts constituting guilt.

> The investigation for preparation of the sentencing phase should be con-
> ducted regardless of any initial assertion by the client that mitigation is not
> to be offered. This investigation should comprise efforts to discover all
> reasonably available mitigating evidence and evidence to rebut any aggra-
> vating evidence that may be introduced by the prosecutor.

Id. at 93. The Guidelines then specify certain steps that should be taken with regard to investigation of the guilt and penalty phases of the trial.

9. The duty to investigate a case extends to "all avenues leading to facts relevant to guilt and degree of penalty." McQueen v. Swenson, 498 F.2d 207, 216 (8th Cir. 1974). Without such thorough investigation, therefore, Mr. Conrad will be deprived of the effective assistance of counsel. See, e.g., Code v. Montgomery, 799 F.2d 1481, 1483 (11th Cir. 1986) (ineffective assistance of counsel found where defense failed to interview all potential alibi witnesses); Wade v. Armontrout, 798 F.2d 304, 306 (8th Cir. 1986) (ineffective assistance of counsel where the defense does "not investigate the prosecution's case, [and does] not investigate . . . defense witnesses"); Thomas v. Kemp, 796 F.2d 1322, 1324 (11th Cir. 1986) (ineffective assistance of counsel where "little effort [made] to investigate possible sources of mitigation evidence"); Nealy v. Cabana, 764 F.2d 1173, 1177 (5th Cir. 1985) ("[a] substantial body of . . . case law insists . . . that 'effective counsel conduct a reasonable amount of pretrial investigation'") (quoting Martin v. Maggio, 711 F.2d 1273, 1280 (5th Cir. 1980)); Douglas v. Wainwright, 714 F.2d 1532, 1556 (11th Cir. 1983) ("permissible trial strategy can never include the failure to conduct a reasonably substantial investigation"); King v. Strickland, 714 F.2d 1481, 1490 (11th Cir. 1983) ("[t]his Court has emphasized the importance of pretrial preparation and investigation"); United States v. Auten, 632 F.2d 478, 482-83 (5th Cir. 1980) (failure "to investigate and impeach" witnesses may result in ineffective assistance of counsel); People v. LaBree, 313 N.E.2d 730, 731-32 (N.Y.App. 1974) (failure to "conduct appropriate investigations, both factual and legal, to determine if matters of defense can be developed, and to allow . . . time for reflection and prepara- tion for trial" rendered "the trial a farce and mockery of justice").

10. Moreover, because this is a capital case, the Eighth Amendment requires that exacting standards

be met to assure that it is fair and that the determinations made as to guilt and sentence are reliable. "The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special "'need for reliability in the determination that death is the appropriate punishment'" in any capital case." Johnson v. Mississippi, 486 U.S. 578, 584 (1988) (quoting Gardner v. Florida, 430 U.S. 349, 363-64 (1977) (quoting Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (White, J., concurring))).

11.  It is clear from the above-cited cases that counsel would be remiss and constitutionally ineffective if he did not conduct a thorough investigation of all aspects of ROBERT THOMAS CONRAD's case.

12.  Therefore, funds for the copies of the transcripts requested by the prosecution are mandated. See, e.g., Marshall v. United States, 423 F.2d 1315 (10th Cir. 1970) (plain error to fail to approve an independent investigator); Mason v. Arizona, 504 F.2d 1345, 1351 (9th Cir. 1974) (effective assistance of counsel guarantee of the due process clause requires, where necessary, the allowance of investigative expenses or the appointment of investigative assistance for indigent defendants in order to insure effective preparation of their defense by their attorneys).

Respectfully submitted this August 20, 2002.


Smith & Carr, LLC.
Sydney Albert (Al) Smith        SMI098
Attorneys at Law
P. O. Drawer 389
Elba, Alabama  36323
Phone:        334-897-3658
Fax:          334-897-8633

Gary D. Bradshaw BAR074
Post Office Box 311412
Enterprise, Alabama 36331
Phone:         334-393-6439

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Glenda Stout
Assistant District Attorney
P. O. Box 311102
Enterprise, AL 36331

_____   8/20/02
Al Smith                           Date

IN THE CIRCUIT T COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,                        *
                                         *
        Plaintiff,                       *
                                         *
vs.                                      *        CASE NO. CC 01-M-179, 180
                                         *
ROBERT THOMAS CONRAD,                    *
                                         *
        Defendant.                       *

## CONFIRMATION OF RECEIPT OF DISCOVERY DOCUMENTS

I, Gary Bradshaw, Esquire, attorney of record for defendant, hereby affirm that I am in

receipt on this the 16th day of August, 2002, State's 9th Supplemental Discovery Response,

consisting of seventy-eight (78) photostatic copies and one video tape.

Name:

AUG 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

Date:   8-16-02

Time:   4:55 p m

518

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA

| | |
|---|---|
| STATE OF ALABAMA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CC-2001-179 |
| | ) & 180 |
| ROBERT CONRAD, | ) |
| | ) |
| Defendant. | ) |

## STATE OF ALABAMA'S RESPONSE TO CONRAD'S VARIOUS MOTIONS THAT MISREPRESENT THE HOLDING OF *RING V. ARIZONA*

### I.    SUMMARY OF ARGUMENT

In *Ring v. Arizona*, --- U.S. ---, 122 S. Ct. 2428 (June 24, 2002), the United States Supreme Court extended the rule of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), to death penalty cases. In so doing, it overruled part of *Walton v. Arizona*, 497 U.S. 639 (1990). The Court held that Arizona's death penalty statute violated the Sixth Amendment right to a jury trial "to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." *Ring*, 122 S. Ct. at 2430. In other words, the trial judge cannot make a finding of "any fact on

which the legislature conditions an increase in their maximum punishment." *Id.* at 2432. Only the jury can.

## II. If The Jury Finds Conrad Guilty of Capital Murder, It Thereby Establishes Death as the Maximum Available Penalty Under *Ring v. Arizona* and Entitles the Trial Court in Its Discretion to Sentence Conrad to Death or to Something Less.

If Conrad is convicted of a capital offense, his death sentence fully satisfies *Ring v. Arizona* and *Apprendi v. New Jersey*. "[O]nce a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed." *Ring*, 122 S. Ct. at 2440 (*quoting Apprendi*, 530 U.S. at 497 (*quoting Almendarez-Torres*, 523 U.S. 224, 257 n. 2 (1998) (Scalia, J., dissenting))); *See also Harris v. United States*, --- U.S. ---, 122 S. Ct. 2406 (released same day as *Ring*, June 24, 2002) (confirming that judges may use a variety of sentencing factors to determine the appropriate sentence within the range established by the jury verdict). In this case, unlike in *Ring*, the jury, if it convicts Conrad of a capital offense will

find him "guilty of all the elements of an offense which carries as its maximum penalty the sentence of death."

The Alabama capital sentencing statute places all the factual findings required by *Ring* in the guilt phase of trial. Unlike Arizona — in which the most serious category of homicide is "first degree," Ariz. Rev. Stat. § 13-1105[1] — Alabama has defined eighteen specific types of murder as "capital" in Alabama Code section 13A-5-40. Thus, although the Alabama Legislature has chosen to require the jury or the judge to find additional aggravating circumstances during a separate sentencing hearing, the verdict that a defendant is guilty of one of the capital offenses in Section 13A-5-40 by itself renders the defendant death-eligible under Alabama law. Because the jury in this case could find Conrad guilty of capital murder beyond a reasonable doubt, he is subject to a possible death

---

[1] The offense of first-degree murder in Arizona requires that the State prove the defendant caused death, that he or she intended to cause death, and that he or she acted with premeditation. Ariz. Rev. Stat. § 13-1105. The offense in Alabama that is comparable to Arizona's first degree murder statute is "Murder" in Ala. Code § 13A-6-2.

sentence under the Sixth Amendment, no matter whether the jury or judge made the later determination that death was the appropriate punishment.

To understand why *Ring* does not invalidate the Alabama capital sentencing regime, it is as important to understand what *Ring* does not require as to understand what it does. The *Ring* Court did not hold that a jury, as opposed to a judge, must perform the function of sentencing a defendant to death. The Supreme Court made clear that "Ring's claim [wa]s tightly delineated." *Ring*, 122 S. Ct. at 2437 n. 4. He did not "argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty." *Id. Ring*, therefore, "has nothing to do with jury sentencing." *Ring*, 122 S. Ct. at 2445 (Scalia, J., concurring, joined by Thomas, J.).

Indeed, the Supreme Court has repeatedly held that judges may perform capital sentencing.[2] The Court "has

---

[2] *Proffitt v. Florida*, 428 U.S. 242 (1976); *Dobbert v. Florida*, 432 U.S. 282 (1977); *Spaziano v. Florida*, 468 U.S. 447 (1984) (upholding judicial override provision against Sixth Amendment challenge); *Hildwin v. Florida*, 490 U.S. 638 (1989); *Clemons v. Mississippi*, 494 U.S. 738 (1990); *Harris v. Alabama*, 513 U.S. 504 (1995).

never suggested that jury sentencing is constitutionally required." *Proffitt*, 428 U.S. at 252 (plurality opinion). "[T]here certainly is nothing in the safeguards necessitated by the Court's recognition of the qualitative difference of the death penalty that requires that the sentence be imposed by a jury." *Spaziano*, 468 U.S. at 460.

*Ring* did not disturb this general proposition. *Ring* held that "defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 122 S. Ct. at 2432. Put simply, *Ring* extended the rule of *Apprendi v. New Jersey* to capital defendants: a jury must make "the determination of a fact that, if found, exposes the criminal defendant to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Apprendi*, 530 U.S. at 483; *see also Ring*, 122 S. Ct. at 2432 (articulating the holding of *Apprendi*). In capital cases, therefore, the jury must make all findings of fact that establish death as the maximum available penalty. The trial court may then

impose a sentence of death, or something less, in its discretion during sentencing.

This jury determination of death-eligibility did not occur in *Ring*. The trial court made the finding that *Ring* was death-eligible, based upon evidence that was not presented to the jury. In fact, the trial court was required to make this finding, because Arizona, unlike Alabama, does not define any offenses as "capital" in its criminal statutes. Rather, the most serious category of homicide under Arizona law is "first degree." Ariz. Rev. Stat. § 13-1105. The range of punishment for a verdict of guilty of first-degree murder is life or life without parole. *State v. Ring*, 25 P.3d 1139, 1151 (Ariz. 2001) ("In Arizona, a defendant cannot be put to death solely on the basis of a jury's verdict, regardless of the jury's factual findings"). Thus, "the jury's verdict finding *Ring* guilty of first-degree felony murder" meant that "the maximum punishment he could have received was life imprisonment." *Ring*, 122 S. Ct. at 2437 (citing and reversing *State v. Ring*, 25 P. 3d 1139, 1151 (Ariz. 2001), based on the Arizona Supreme Court's

524

interpretation of Arizona's capital sentencing scheme in *State v. Ring*).

The jury in *Ring* was instructed on the alternative charges of premeditated murder and felony murder. The jury deadlocked on the charge of premeditated murder, with six of twelve jurors voting to acquit, but convicted *Ring* of felony murder occurring during the course of a robbery. 122 S. Ct. at 2433. At the sentencing hearing, the judge, not the jury, heard testimony from a co-conspirator of *Ring*. *Id.* at 2435. The co-conspirator testified that *Ring* had participated in planning the robbery of the armored car, had taken the leadership role in the robbery, and had shot the victim. *Id.* Based upon this testimony, the trial court found three facts in its special verdict: (1) that *Ring* had killed the victim; (2) that he had been a major participant in the armed robbery; and (3) that he had exhibited a reckless disregard for life. *Id.* On the basis of these facts, the judge sentenced *Ring* to death. Id.

On appeal, the Arizona Supreme Court acknowledged that the evidence presented at trial — as opposed to

the sentencing hearing – "failed to prove, beyond a reasonable doubt, that [Ring] was a major participant in the armed robbery or that he actually murdered [the victim]." *Ring*, 25 P.3d at 1152. "For all we know from the trial evidence," said the Arizona Supreme Court, Ring "did not participate in, plan, or even expect the killing." *Id.* Because, however, Arizona law permitted the trial court to "take[] into consideration the evidence presented at the sentencing hearing" and not just at trial, the Arizona Supreme Court affirmed the death sentence. *Id.* The Arizona Supreme Court noted that the United States Supreme Court had "explicitly refrained" from overruling *Walton v. Arizona*, 497 U.S. 639 (1990), in which the Supreme Court had upheld Arizona's judicial capital sentencing scheme, and so the Arizona Supreme Court ruled that the trial court could constitutionally impose a sentence that exceeded the maximum authorized by the jury verdict. *Id.* at 1151-52.

On certiorari review, the United States Supreme Court overruled *Walton v. Arizona* "to the extent that it allows a sentencing judge, sitting without a jury,

to find an aggravating circumstance necessary for imposition of the death penalty." *Ring*, 122 S. Ct. at 2443. But it did not overrule *Walton* to the extent that it permitted the judge to make the ultimate sentencing decision.

Likewise, in *Apprendi v. New Jersey*, the Supreme Court found that the trial court had violated the Sixth Amendment by making factual findings that increased Apprendi's sentence beyond the statutory maximum for the offense with which he was charged and to which he pleaded guilty. 530 U.S. at 469-70, 474. Apprendi had been charged with second-degree possession of a firearm for an unlawful purpose, a crime that carried a prison term of five to ten years. *Id.* at 470. New Jersey's hate-crime statute, however, had a sentence-enhancing provision that enabled the trial judge to extend the defendant's incarceration period beyond the statutory maximum of the charged offense. *Id.* at 468, 474. To do so, the judge, not the jury, had to find by a preponderance of the evidence that the defendant had "acted with a purpose to intimidate an individual or group of individuals because of race, color, gender,

527

handicap, religion, sexual orientation or ethnicity."
*Id.* at 468-69 (quoting N.J. Stat. § 2C:44-3(e)).

After Apprendi pleaded guilty, the trial judge
conducted an evidentiary hearing to determine
Apprendi's purpose in firing his .22 caliber firearm
into the home of an African-American family. 530 U.S.
at 469-70. In his defense, Apprendi offered the
testimony of a psychologist and of seven character
witnesses. He also took the stand himself to testify
that the shots were "an unintended consequence of
overindulgence in alcohol" and not the result of any
racial bias. *Id.* at 470-71. A police officer,
however, testified that Apprendi had given a statement
that he did not want an African-American family living
in his neighborhood. Apprendi refuted this statement.
*Id.* at 469, 471.

The trial judge found the officer more credible
than Apprendi and the testimony of Apprendi's character
witnesses and his psychologist unpersuasive. *Id.* at
471. The judge accordingly found, by a preponderance
of the evidence, that Apprendi's purpose was to
intimidate the family because of their race. *Id.* The

judge applied the statutory enhancer and sentenced Apprendi to a twelve-year term on the charge of second-degree possession of a firearm for an unlawful purpose, two years beyond the statutory maximum for the offense. *Id.* at 474. It was the increase beyond the maximum — not the fact that the judge had imposed the sentence — that led the Supreme Court to rule that Apprendi's sentence violated the Sixth Amendment. *Id.* at 494.

In Alabama, unlike in Arizona, the judge cannot make factual findings during the sentencing phase that increase the maximum penalty to which a capital defendant is subject. In Alabama, the jury first finds the defendant guilty of one of the eighteen enumerated "capital" offenses in Alabama Code section 13A-5-40, which renders the defendant eligible for death. *Black's Law Dictionary* defines "capital" as "punishable by execution; involving the death penalty." *Black's Law Dictionary* 200 (7th ed. 1999). Read in conjunction with section 13A-5-39, the plain language of section 13A-5-40 states that the maximum punishment upon conviction of capital murder is death.

The Alabama capital sentencing statute thus satisfies the Sixth Amendment in all cases. The discussion of capital sentencing by the *Apprendi* Court confirms this conclusion. In *Apprendi*, the Court attempted to insulate its holding from the charge that it invalidated capital sentencing statutes everywhere and that it conflicted with the host of capital cases in which the Supreme Court had upheld judicial capital sentencing. "For reasons we have explained," said the Court, "the capital cases are not controlling:"

> Neither the cases cited, nor any other case, permits a judge to determine the existence of a factor which makes a crime a capital offense. What the cited cases hold is that, once a jury has found the defendant guilty of all elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether the maximum penalty, rather than a lesser one, ought to be imposed . . . . The person who is charged with actions that expose him to the death penalty has an absolute entitlement to jury trial on all the elements of the charge.

530 U.S. at 496-97 (*quoting Almendarez-Torres v. United States*, 523 U.S. 224, 257 n. 2 (1998) (Scalia, J., dissenting) (emphasis deleted).

The Court thus declared in dicta that the Arizona capital sentencing scheme was constitutionally sound,

530 U.S. at 497, because the Court erroneously believed that an Arizona trial judge could not exceed the maximum sentence reflected in the jury verdict alone. *Ring*, 122 S. Ct. at 2436 (describing the basis for its erroneous statements in *Apprendi* regarding Arizona's capital sentencing scheme). Although the regime that the Court discussed with approval in *Apprendi* did not describe accurately the Arizona capital sentencing procedure, *Ring*, 122 S. Ct. at 2440, the *Apprendi* opinion described accurately Alabama's capital sentencing procedure. The plain language of Alabama Code section 13A-5-40 defines the offenses contained therein as "Capital offenses." By definition and by statute, a conviction of a "capital" offense carries a maximum possible sentence of death.

Although section 13A-5-45(f) states that "[u]nless at least one aggravating circumstance as defined in section 13A-5-49 exists, the sentence shall be life imprisonment without parole," this section does not create another element for a death-eligible offense. If the Alabama Legislature had intended the aggravating circumstances in section 13A-5-49 to be additional

elements of a death-eligible offense, the Legislature would have included them in the statutory definition of "Capital offenses" as contained in Section 13A-5-40. (Indeed, it did include certain of them in the definition of capital offense, but not others.)

Rather, as explained by the Alabama Court of Criminal Appeals in *Ex parte Woodard*, 631 So. 2d 1065 (Ala. Crim. App. 1993), this provision narrows the class of defendants who are already "death-eligible." *Id.* at 1069-70.[3]    When the jury finds beyond a reasonable doubt that a defendant has committed one of the "capital" offenses enumerated in section 13A-5-40, it has done all that it is required to do by the Sixth Amendment.    The defendant is constitutionally eligible for the death penalty, and the judge has the discretion to sentence him to death or to something less.

---

[3] *See also McGriff v. State*, CR-97-0179, 2000 WL 1455196, at *36 (Ala. Crim. App. Sept. 29, 2000); *Farrior v. State*, 728 So. 2d 691, 702-703 (Ala. Crim. App. 1998); *Ponder v. State*, 688 So. 2d 280, 284 (Ala. Crim. App. 1996).

III. If The Jury Finds Conrad Guilty Of The Capital
Offense Of Murder During Robbery The Jury Has
Found The Corresponding Aggravating Circumstance
Found in § 13A-5-49(4), Again Rendering Conrad
Death-Eligible Under *Ring* And Entitling The Trial
Court in Its Discretion to Sentence Conrad to
Death or to Something Less.

Not only can the jury in this case find Conrad

guilty of capital murder, establishing death as the

maximum available penalty under the Sixth Amendment, it

can also found Conrad guilty of capital murder

committed during the course of a robbery in violation

of Ala. Code § 13A-5-40(2). This category of capital

murder corresponds to the aggravating circumstance in §

13A-5-49(4), that "the capital offense was committed

while the defendant was engaged … in the commission of

… robbery." When, as here, a capital offense

corresponds to an aggravating circumstance, the jury's

guilty verdict necessarily establishes the existence of

the aggravating circumstance beyond a reasonable doubt.

Ala. Code § 13A-5-45(e). This too – in addition to the

verdict of capital murder itself – makes Conrad

eligible for death under the Sixth Amendment.

Like Arizona and other States, Alabama requires

the finding of at least one aggravating circumstance in

order for a defendant to be sentenced to death. Unlike Arizona and others, Alabama requires the jury to make this finding beyond a reasonable doubt. Ala. Code § 13A-5-45(f). If the jury does not find at least one aggravating circumstance beyond a reasonable doubt, it must recommend a sentence of life without parole. Ala. Code §§ 13A-5-45(f), 13A-5-46(e)(1), 13A-5-49. Furthermore, "[a]ny aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing." Ala. Code § 13A-5-45(e); *see also* Ala. Code § 13A-5-50.

The Alabama Sentencing Manual for Circuit and District Courts accordingly advises:

> If an aggravating component of the capital felony for which the defendant stands convicted constitutes an aggravating circumstance, that aggravating circumstance is considered as proved beyond a reasonable doubt for the purposes of the sentence hearing.

*Id.,* Sentencing in Capital Cases II(c) at 92. The Sentencing Manual provides the following illustration:

> For example, if a defendant is convicted of murder during the commission of a robbery in the first degree in violation of Alabama Code § 13A-5-40(a)(2), the conviction itself establishes the existence of the aggravating circumstance that the capital offense was committed while the defendant was engaged in a robbery. That aggravating circumstance is set forth in Alabama Code § 13A-5-49 (4).

Id.

In sum, if the jury finds that Conrad committed murder during a robbery – an offense that, under Alabama law, has a corresponding aggravating circumstance, they have make the case death penalty eligible because as a matter of law they have found the corresponding aggravating circumstance. The jury's finding of this aggravating circumstance will further confirm that Conrad will be eligible for death, and it further confirms that the trial court will receive the case from the jury with the option of sentencing Conrad to life without parole or to death. Conrad's death sentence, if given, will thus satisfy *Ring* on this ground as well.

*IV. Apprendi* does not require that aggravating circumstances be charged in the indictment.

Conrad claims finally that *Apprendi* and by implication *Ring* require "that every fact increasing the penalty for a crime beyond the prescribed statutory maximum must be charged in the indictment." Neither case holds any such thing. To the contrary, both acknowledge that the Fourteenth Amendment "has not . . . been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury,'" *Ring v. Arizona*, 122 S. Ct. at 2437 n. 4 (quoting *Apprendi*, 530 U.S. at 477 n. 3). For more than a century, the United States Supreme Court has held that indictment by grand jury is not fundamental to due process in the Fourteenth Amendment. *Hurtado v. California*, 110 U.S. 516 (1884); *Beck v. Washington*, 369 U.S. 541, 545 (1962).

Furthermore, this Court explicitly refrained from addressing the indictment issue in both *Apprendi* or *Ring*. *Apprendi*, 530 U.S. at 477 n. 3 ("We thus do not address the indictment question separately today"); *Ring*, 122 S.Ct. at 2437 n. 4 ("Ring does not contend that his indictment was constitutionally defective").

Finally, "[e]ven if *Apprendi* were applicable to this
case, the alleged error in the indictment does not
amount to plain error." *United States v. Bernard*, 2002
WL 1587471, *17 (5th Cir. July 19, 2002) (no error in
failure of indictment to allege the mental state and
statutory aggravating factors required by the Federal
Death Penalty Act for imposition of the death penalty)
(citing *United States v. Cotton*, --- U.S. ---, 122 S.
Ct. 1781, 1786-87 (2002) (failure to allege drug
quantity in indictment was not plain error because
evidence of the drug quantity was "overwhelming").

In any event, it is far from clear that inclusion
of capital aggravating circumstances in the indictment
would inure to the benefit of capital defendants.  It
is unlikely, for instance, that a defendant would wish
for the jury - the jury that is determining whether he
is guilty of the most violent of crimes - to be privy
to the knowledge that he "was previously convicted of .
. . a felony involving the use or threat of violence to
the person."  Ala. Code § 13A-5-49(2).  An indictment
alleging that the murder was committed in a manner that
was "heinous, atrocious, or cruel" would also not

likely meet with favor from the accused who is about to stand trial.  Ala. Code § 13A-5-49(8).

Respectfully submitted,

GLENDA D. STOUT
ASSISTANT DISTRICT ATTORNEY

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following by placing a copy of same in the United States mail, properly addressed and postage prepaid on this the _23_ day of August, 2002:

Al Smith, Esquire
Attorney for Defendant
P.O. Drawer 389
Elba, Alabama 36323

Glenda Stout
Assistant District Attorney

537

State of Alabama
Unified Judicial System

**SUBPOENA REQUEST FORM**

Form C-12 Rev. 10/86

CASE NUMBER

CC  01-179, 180

1  THE  CIRCUIT _____ COURT OF  COFFEE (ENTERPRISE) _____ COUNTY, ALABAMA

PLAINTIFF: STATE OF ALABAMA            V. DEFENDANT: ROBERT CONRAD

In the matter of _____

Court Date  09/04/02 _____  Court Time  9:00 ____ AM  PM  Date Requested  08/22/02 _____

MOTION  HEARINGS

**TO BE COMPLETED BY REQUESTER**

The Clerk/Register is requested to issue an Order to Appear (Subpoena) for each of the following witnesses for:

☒ Plaintiff/State     ☐ Defendant     ☐ Grand Jury     ☐ Other _____

| | Date Issued | Date Executed | Remarks |
|---|---|---|---|
| 1. Name  RICK HAUSER, EPD | 8-28-02 | | |
| Address  501 S. MAIN STREET | | | |
| ENTERPRISE, AL          Zip 36330 | | | |
| 2. Name  JEFF SPENCE, EPD | 8-28-02 | | |
| Address 501 S. MAIN STREET | | | |
| ENTERPRISE, AL          Zip 36330 | | | |
| 3. Name  LENNIS DARBY, EPD | 8-28-02 | | |
| Address 501 S. MAIN STREET | | | |
| ENTERPRISE, AL          Zip 36330 | | | |
| 4. Name | | | |
| Address | | | |
| Zip | | | |
| 5. Name | | | |
| Address | | | |
| Zip | | | |
| 6. Name | | | |
| Address | | | |
| Zip | | | |
| 7. Name | | | |
| Address | | | |
| Zip | | | |
| 8. Name | | | |
| Address | | | |
| Zip | | | |

METHOD OF SERVICE REQUESTED                Party Requesting Subpoena D.A.'S OFFICE

                                                            08/22/02

☐ Personal     ☐ Other _____
Date _____  Clerk/Register _____          Signature                    Date

540

State of Alabama
Unified Judicial System

Form C- 12 Rev. 10/86

# SUBPOENA REQUEST FORM

CASE NUMBER

CC   01-179, 180

I   HE   CIRCUIT _____ COURT OF  COFFEE (ENTERPRISE)   COUNTY, ALABAMA

PLAINTIFF:  STATE OF ALABAMA

V. DEFENDANT: ROBERT CONRAD

In the matter of _____

Court Date 09/23/02 _____   Court Time 9:00 _____ AM  PM  Date Requested 08/26/02

FILED
AUG 2002
Office of the
Court Clerk
Coffee Co, AL.

## TO BE COMPLETED BY REQUESTER

The Clerk/Register is requested to issue an Order to Appear (Subpoena) for each of the following witnesses for :

☒ Plaintiff/State   ☐ Defendant   ☐ Grand Jury   ☐ Other _____

|  | Date Issued | Date Executed | Remarks |
|---|---|---|---|
| 1. Name  SGT. LENNIS DARBY, EPD | 8-28-02 | | |
| Address  501 S. MAIN STREET | | | |
| ENTERPRISE, AL          Zip 36330 | | | |
| 2. Name  CPT. THOMAS BRAUN, EPD | 8-28-02 | | |
| Address 501 S. MAIN STREET | | | |
| ENTERPRISE, AL          Zip 36330 | | | |
| 'ame  CPT. WILLIAM MOORE, EPD | 8-28-02 | | |
| Address 501 S. MAIN STREET | | | |
| ENTERPRISE, AL          Zip  36330 | | | |
| 4. Name  CPT. MICHAEL LOLLEY, EPD | 8-28-02 | | |
| Address 501 S. MAIN STREET | | | |
| ENTERPRISE, AL          Zip 36330 | | | |
| 5. Name LT. JEFFERY SPENCE, EPD | 8-28-02 | | |
| Address 501 S. MAIN STREET | | | |
| ENTERPRISE, AL          Zip 36330 | | | |
| 6. Name  DET. W.R. AMMONS, EPD | 8-28-02 | | |
| Address 501 S. MAIN STREET | | | |
| ENTERPRISE, AL          Zip 36330 | | | |
| 7. Name  SGT. RICK HAUSER, EPD | 8-28-02 | | |
| Address 501 S. MAIN STREET | | | |
| ENTERPRISE, AL          Zip 36330 | | | |
| 8. Name  LT. EARL PENNINGTON, EPD | 8-28-02 | | |
| Address 501 S. MAIN STREET | | | |
| 'TERPRISE, AL          Zip 36330 | | | |

METHOD OF SERVICE REQUESTED

Party Requesting Subpoena D. A.'S OFFICE

☐ Personal   ☐ Other _____
Date_____   Clerk/Register_____

08/22/02

Signature                    Date

Page 1 of 5

| State of Alabama<br>Unified Judicial System<br><br>Form C-12  Rev. 10/86 | SUBPOENA REQUEST FORM | CASE NUMBER<br><br>CC    01-179, 180 |

1. __HE__ __CIRCUIT_____ COURT OF _COFFEE (ENTERPRISE)_____COUNTY, ALABAMA

PLAINTIFF: STATE OF ALABAMA        V. DEFENDANT: ROBERT CONRAD

In the matter of _____

Court Date _09/23/02_____    Court Time _9:00____ AM  PM  Date Requested _08/26/02_____

---

## TO BE COMPLETED BY REQUESTER

The Clerk/Register is requested to issue an Order to Appear (Subpoena) for each of the following witnesses for :

☒ Plaintiff/State    ☐ Defendant    ☐ Grand Jury    ☐ Other _____

| | Date Issued | Date Executed | Remarks |
|---|---|---|---|
| 1. Name  LT. BUFORD ROBERTS, EPD<br>Address _501 S. MAIN STREET_<br>ENTERPRISE, AL          Zip 36330 | 8-28-02 | _____ | _____ |
| 2. Name OFFICER MICHAEL PETTY, EPD<br>Address 501 S. MAIN STREET<br>ENTERPRISE, AL          Zip 36330 | 8-28-02 | _____ | _____ |
| 3. ame OFFICER MATTHEW KEY, EPD<br>Address 501 S. MAIN STREET<br>ENTERPRISE, AL          Zip 36330 | 8-28-02 | _____ | _____ |
| 4. Name  OFFICER MICHAEL HINES, EPD<br>Address 501 S. MAIN STREET<br>ENTERPRISE, AL          Zip 36330 | 8-28-02 | _____ | _____ |
| 5. Name OFFICER STEVE KEY, EPD<br>Address 501 S. MAIN STREET<br>ENTERPRISE, AL          Zip 36330 | 8-28-02 | _____ | _____ |
| 6. Name  D.A.I BRUCE MATHEWS, EPD<br>Address 98 N. EDWARDS STREET<br>ENTERPRISE, AL          Zip 36330 | 8-28-02 | _____ | _____ |
| 7. Name  D.A.I. DWIGHT HOLLEY<br>Address 98 N. EDWARDS STREET<br>ENTERPRISE, AL          Zip 36330 | 8-28-02 | _____ | _____ |
| 8. Name  D.A.I. EDDIE PENNINGTON<br>Address 98 N. EDWARDS STREET<br>TERPRISE, AL          Zip 36330 | 8-28-02 | _____ | _____ |

METHOD OF SERVICE REQUESTED          Party Requesting Subpoena D.A.'S OFFICE_____

☐ Personal   ☐ Other_____          _____08/22/02_____
Date_____   Clerk/Register_____      Signature            Date

| State of Alabama<br>Unified Judicial System<br><br>Form C-12 Rev. 10/86 | SUBPOENA REQUEST FORM | CASE NUMBER<br>CC    01-179, 180 |

1.    IE   CIRCUIT _____ COURT OF  COFFEE (ENTERPRISE) _____ COUNTY, ALABAMA

PLAINTIFF:  STATE OF ALABAMA          V. DEFENDANT: ROBERT CONRAD

In the matter of _____

Court Date  09/23/02 _____    Court Time  9:00 _____   AM  PM  Date Requested  08/26/02 _____

## TO BE COMPLETED BY REQUESTER

The Clerk/Register is requested to issue an Order to Appear (Subpoena) for each of the following witnesses for :

☒ Plaintiff/State    ☐ Defendant    ☐ Grand Jury    ☐ Other _____

| | Date Issued | Date Executed | Remarks |
|---|---|---|---|
| 1. Name  Mr. Richard Bray<br>Address Route 1, Box 235<br>Daleville, AL                Zip 36322 | 8-28-02 | _____ | _____ |
| 2. Name Mr. Ray Grimes<br>Address 1208 East Park Avenue<br>Enterprise, Al                Zip 36330 | 8-28-02 | _____ | _____ |
| 3.  me  Mr. Donald Smith<br>Address 555 County Road 715<br>Enterprise, Al.                Zip 36330 | 8-28-02 | _____ | _____ |
| 4. Name  Mr. Rick Cormylo<br>Address 662 County Road 711<br>Enterprise, Al                Zip 36330 | 8-28-02 | _____ | _____ |
| 5. Name Ms. Constance Conrad<br>Address Apartment G-6, Enterprise Villa Apts.<br>Enterprise, Al.                Zip 36330 | 8-28-02 | _____ | _____ |
| 6. Name  Ms. Linda Knighton<br>Address 4069 County Road 651<br>Chancellor, Al.                Zip | 8-28-02 | _____ | _____ |
| 7. Name  Ms. Patsy Harrison<br>Address 2330 Geneva Highway<br>Enterprise, Al                Zip 36330 | 8-28-02 | _____ | _____ |
| 8. Name  Mr. Williams Hayes Ammons<br>Address Co Rd. 3, 5897 C/O 315<br>γ, Alabama                Zip 36079 | 8-28-02 | _____ | _____ |

METHOD OF SERVICE REQUESTED          Party Requesting Subpoena D.A.'S OFFICE

☐ Personal    ☐ Other _____          _____    08/22/02
Date _____   Clerk/Register _____          Signature          Date

Page 3 of 5

State of Alabama
Unified Judicial System

Form C-12 Rev. 10/86

**SUBPOENA REQUEST FORM**

CASE NUMBER

CC  01-179, 180

THE   CIRCUIT _____ COURT OF  COFFEE (ENTERPRISE)   COUNTY, ALABAMA

PLAINTIFF: STATE OF ALABAMA          V. DEFENDANT: ROBERT CONRAD

In the matter of _____

Court Date  09/23/02 _____   Court Time  9:00 ____  AM  PM  Date Requested  08/26/02 _____

## TO BE COMPLETED BY REQUESTER

The Clerk/Register is requested to issue an Order to Appear (Subpoena) for each of the following witnesses for :

☒ Plaintiff/State    ☐ Defendant    ☐ Grand Jury    ☐ Other _____

| | Date Issued | Date Executed | Remarks |
|---|---|---|---|
| 1. Name  Mr. Robert Teague  Address 105 Meagan Blvd.  Ozark, Al            Zip 36360 | 8-28-02 | | |
| 2. Name Ms. Kyla S. Jones  Address County Road 711, 767  Enterprise, Al        Zip 36330 | 8-28-02 | | |
| 3. Name  Mr. Dennis T. Jackson  Address Apt C-6, Enterprise Villas Apts.  Enterprise, Al.        Zip  36330 | 8-28-02 | | |
| 4. Name  Mr. Kenneth Miller  Address 203 West Brunson Street  Enterprise, Al        Zip 36330 | 8-28-02 | | |
| 5. Name Mr. Donald Smith  Address County Road 711  Enterprise, Al.        Zip  36330 | 8-28-02 | | |
| 6. Name  Ms. Ashley D. Ramsey  Address 201 Seminole Drive  Enterprise, Al        Zip 36330 | 8-28-02 | | |
| 7. Name  Mr. Aaron Smith c/o Director, Dept. of Corrections  Address P.O. Box 310501  Montgomery, Al        Zip 36116 | 8-28-02 | | |
| 8. Name  Ms. Tia Cade  Address 400 South Watson Street  Enterprise, Alabama        Zip  36330 | 8-28-02 | | |

METHOD OF SERVICE REQUESTED          Party Requesting Subpoena D.A.'S OFFICE

08/22/02

☐ Personal    ☐ Other_____
Date_____   Clerk/Register_____

Signature          Date

Page 4 of 5

State of Alabama
Unified Judicial System

Form C-12 Rev. 10/86

## SUBPOENA REQUEST FORM

CASE NUMBER 544

CC  01-179, 180

1    IE   CIRCUIT _____ COURT OF _COFFEE (ENTERPRISE) ___ COUNTY, ALABAMA

PLAINTIFF: STATE OF ALABAMA      V. DEFENDANT: ROBERT CONRAD

In the matter of _____

Court Date _09/23/02_____    Court Time _9:00_____  AM  PM  Date Requested _08/26/02_____

---

### TO BE COMPLETED BY REQUESTER

The Clerk/Register is requested to issue an Order to Appear (Subpoena) for each of the following witnesses for :

☒ Plaintiff/State      ☐ Defendant      ☐ Grand Jury      ☐ Other _____

| | Date Issued | Date Executed | Remarks |
|---|---|---|---|
| 1. Name _Ms. Christa T. Dillard_ Address _100 Whitehurst_ Enterprise, Al          Zip 36330 | 8-28-02 | | |
| 2. Name _Mr. Eric Bruce_ Address _206 Stratford Lane_ Enterprise, Al          Zip 36330 | 8-28-02 | | |
| 3. Name _Coroner Rob Ward_ Address _P.O. Box 311350_ Enterprise, Alabama      Zip 36330 | 8-28-02 | | |
| 4. Name _Sheriff Ben Moates_ Address _Coffee County Sheriff's Department_ New Brockton, Alabama    Zip 36351 | 8-28-02 | | |
| 5. Name_____ Address_____ _____Zip_____ | | | |
| 6. Name_____ Address_____ _____Zip_____ | | | |
| 7. Name_____ Address_____ _____Zip_____ | | | |
| 8. Name_____ Address_____ _____Zip_____ | | | |

METHOD OF SERVICE REQUESTED

Party Requesting Subpoena D.A.'S OFFICE

08/22/02

☐ Personal    ☐ Other
Date_____  Clerk/Register_____

Signature

Date

Page 5 of 5

| State of Alabama<br>Unified Judicial System<br><br>Form C-12 Rev. 10/86 | SUBPOENA REQUEST FORM | CASE NUMBER 545<br><br>CC  01-179, 180 |

1. ᴛHE ___CIRCUIT_____ COURT OF _COFFEE (ENTERPRISE)___ COUNTY, ALABAMA

PLAINTIFF: STATE OF ALABAMA          V. DEFENDANT: ROBERT CONRAD

In the matter of _____

Court Date _09/23/02_____  Court Time _9:00____ AM  PM  Date Requested _08/26/02____

## TO BE COMPLETED BY REQUESTER

The Clerk/Register is requested to issue an Order to Appear (Subpoena) for each of the following witnesses for :

☒ Plaintiff/State      ☐ Defendant      ☐ Grand Jury      ☐ Other _____

| | Date Issued | Date Executed | Remarks |
|---|---|---|---|
| 1. Name _MR. GABRIEL SIERRA_____<br>   Address _2070 HWY 87_____<br>   SAMSON, AL_____ Zip _36477____ | 8·28·02 | _____ | _____ |
| 2. Name _DR. JOHN DREW_____<br>   Address _MEDICAL CENTER ENTERPRISE_<br>   ENTERPRISE, AL_____ Zip _36330___ | 8·28·02 | _____ | _____ |
| 3. Name _DR. SAMUEL SAWYER_____<br>   Address _101 E. BRUNSON STREET_____<br>   ENTERPRISE, AL_____ Zip _36330___ | 8·28·02 | _____ | _____ |
| 4. Name _____<br>   Address _____<br>   _____ Zip _____ | _____ | _____ | _____ |
| 5. Name _____<br>   Address _____<br>   _____ Zip _____ | _____ | _____ | _____ |
| 6. Name _____<br>   Address _____<br>   _____ Zip _____ | _____ | _____ | _____ |
| 7. Name _____<br>   Address _____<br>   _____ Zip _____ | _____ | _____ | _____ |
| 8. Name _____<br>   Address _____<br>   _____ Zip _____ | _____ | _____ | _____ |

METHOD OF SERVICE REQUESTED                Party Requesting Subpoena _D.A.'S OFFICE___

☐ Personal   ☐ Other _____                          08/26/02
Date_____ Clerk/Register_____      _____    _____
                                              Signature            Date

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,　　　　　　　)
　　　　PLAINTIFF,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
VS.　　　　　　　　　　　　　　　)　　　CASE NO. CC 2001-M-179
　　　　　　　　　　　　　　　　　　)　　　　　　　CC 2001-M-180
ROBERT THOMAS CONRAD,　　　　　)
　　　　DEFENDANT.　　　　　　　　)

## *O R D E R*

The State of Alabama having made an oral motion for the medical records of the defendant, Robert Thomas Conrad, after serving a subpoena to produce records and/or documents  on the Keeper of the Record, Gail Snell, Medical Center Enterprise, Alabama, and being informed by Ms. Snell that said records could only be produced pursuant to court, it is hereby

**ORDERED, ADJUDGED, AND DECREED**

1.　　That Gail Snell, Keeper of the Records, Medical Center Enterprise, Alabama, shall produce a certified copy of the medical records for Robert Thomas Conrad DOB 9/27/80, patient # 01143-00094 for the dates May 23, 2001 through the present to the Office of the District Attorney within **five** (5) days of receipt of this order.

2.　　That upon receipt of these records, the District Attorney's Office shall provide defense counsel a copy of said records within **five** (5) days of receipt of said records.

**DONE** this the 5th day of September 2002.

　　　　　　　　　　　　　　　　　GARY L MCALILEY
　　　　　　　　　　　　　　　　　Circuit Judge
　　　　　　　　　　　　　　　　　Twelfth Judicial Circuit
　　　　　　　　　　　　　　　　　State of Alabama

SEP 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

CC: DA, Smith
Bradshaw
+
Keeper of the Record (by service)

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PLAINTIFF, | ) | COFFEE COUNTY, AL |
| | ) | |
| VS. | ) | ENTERPRISE DIVISION |
| | ) | |
| ROBERT THOMAS CONRAD, | ) | |
| | ) | |
| DEFENDANT. | ) | CASE #s: CC-2001-M-179 |

CASE #s: CC-2001-M-179
and
CC-2001-M-180

## *O R D E R*

*Even though past opportunities have been made available to the parties to file and argue motions, most recently and near the time the scheduled trial is to begin, various motions have been filed by the defense in the above styled cases. A motions hearing has been set for the 4th day of September, 2002 at 9:00 a.m. at which time the parties/attorneys will be allowed to present legal argument with respect to any pending motion(s).*

*However, for timeliness purposes, this Court can rule on the recently filed and now pending "MOTION FOR FUNDS FOR COURT REPORTER TRANSCRIPTS."*

*This Court has in the past approved REASONABLE defense expenditure(s) where justice dictates. See Section 15-12-21, Code of Alabama 1975. However, the request now before the court is not REASONABLE and is not necessary for the Defendant to be afforded a fair and constitutionally conducted trial. The Defendant and defendant's attorneys in the instant cases have been present at all judicial proceedings with the exception of the grand jury proceedings. Grand jury proceedings are confidential and Defendant is not entitled to a transcript of these proceedings. Defendant and Defendant's attorneys have heard everything that has been stated at all judicial proceedings with the exception of the grand jury proceedings. A denial of the Defendant's "MOTION FOR FUNDS FOR COURT REPORTER TRANSCRIPTS" will in no way deny the Defendant any constitutional right. Specifically, the Defendant has been afforded his constitutional rights to confront and to cross examine all*

548

witnesses against him. All hearings with the exception of the grand jury proceedings have been held IN PUBLIC with the Defendant being able to be present and to compel the attendance of witnesses in his behalf. No hearing has been held without the Defendant and Defendant's attorneys being present. Defendant's request to be provided at state expense a copy of the transcript of all proceedings prior to this date is merely a request Defendant be provided with a written copy of what he already knows and what the Defendant and his attorneys have already been afforded an opportunity to hear. This request of the Defendant is declared NOT to be a REASONABLE REQUEST and should be denied.

Even though this motion may again be argued and reconsidered at the scheduled motions hearing, IT IS ORDERED that the "MOTION FOR FUNDS FOR COURT REPORTER TRANSCRIPTS" is hereby denied as justice does not dictate the granting of this request for pre approval of funds.

Done and ordered this the 29th day of August, 2002.

GARY L. McALILEY, CIRCUIT JUDGE
TWELFTH JUDICIAL CIRCUIT
STATE OF ALABAMA



AUG 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL.

C.D.A. Smith
x
Bradshaw

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,          *
      Plaintiff,          *
                    *
vs.          *          CASE NO. CC 01-M-179, 180
                    *
ROBERT THOMAS CONRAD,          *
      Defendant.          *

*SEP 2002 FILED J.M. Counts Court Clerk Coffee Co. AL*

## STATE'S 10th SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR DISCOVERY

      COMES NOW the State of Alabama, by and through the undersigned Assigned District Attorney, and pursuant to Rule 16.3 A.R. Crim. P. and files this supplemental response thereto.

      1.      Attached please find the medical records for Robert Conrad from Medical Center Enterprise, consisting of ninety-seven (97) photostatic copies.

      DONE this the 12th day of September, 2002.

                            *Glenda Stout*
                            GLENDA STOUT (#PAR057)
                            ASSISTANT DISTRICT ATTORNEY
                            P. O. Box 311102
                            Enterprise, Alabama 36331
                            (334) 347-1142

## CERTIFICATE OF SERVICE

      I, Glenda Stout, Assistant District Attorney, hereby certify that the foregoing has been served upon Gary Bradshaw, Esquire, via hand delivery by Tonnya Walker, employee of the District Attorney's Office, on this the 12th day of September, 2002:

                            *Glenda Stout*
                            GLENDA STOUT (#PAR057)
                            ASSISTANT DISTRICT ATTORNEY

1

# MEDICAL CENTER
### ENTERPRISE

400 NORTH EDWARDS STREET
ENTERPRISE, ALABAMA 36330
(334) 347-0584

I, <u>Gail Snell</u>, hereby certify and affirm in writing that I am <u>Supervisor of Health Information</u> of <u>Medical Center Enterprise</u>, a hospital organized or operated pursuant to or under the laws of Alabama, located at <u>Enterprise</u>, Alabama, that I am custodian of the hospital records of said hospital and that the within copy of said hospital records are an exact, full true and correct copy of said hospital records pertaining to
_Robert Conrad_.

I further certify that these records are kept in the normal course of business at said hospital.

All of which I hereby certify and affirm on this _30th_ day of _August_, 20 _02_.

_Gail Snell_
Custodian of Records

## NOTARIZATION

This is to certify that the above person appeared before me on this the _30th_ day of _August_, 20 _02_, and affixed his/her signature to the foregoing certification.

_Nancy G. Andress_
Notary Public

My commission expires on _13th_ day of _September_, _2004_

NANCY G. ANDRESS
Notary Public, AL State at Large
My Comm. Expires Sept. 13, 2004

**Medical Center**
Enterprise

*ITEMIZED STATEMENT*
*OF ALL CHARGES*

| TYPE OF BILL | DATE OF BILL | PAGE NO. |
|---|---|---|
| D1-I/P | 06/01/01 | 1 |

400 North Edwards Street
Enterprise, Alabama 36330

| PATIENT NAME | PATIENT NUMBER | SEX | AGE | ADMISSION DATE | DISCHARGE DATE | DAYS |
|---|---|---|---|---|---|---|
| ERT CONRAD | 01143-00094 | M | 21Y | 05/23/01 | 05/28/01 | |

| INSURANCE COMPANY NAME | GROUP NUMBER | POLICY NUMBER |
|---|---|---|
| | | |

PAYMENT AMOUNT

| GUARANTOR NAME AND ADDRESS | |
|---|---|
| DOROTHY A CONRAD | |
| 507 GLOVER AVE | |
| APT 35 | |
| ENTERPRISE AL        36330 | |

☐ MASTERCARD          CARD NO. | | | | | | | | | | | | | | |
☐ VISA                EXPIRATION DATE _____
SIGNATURE _____
PLEASE DETACH AND RETURN THIS PORTION WITH YOUR REMITTANCE

| DATE | ITEM NO. | DESCRIPTION | CLM CODE | ORDER NO | QTY | UNIT PRICE | TOTAL CHARGES |
|---|---|---|---|---|---|---|---|
| 05/23/01 | 70020 | ROOM 207 S | 121 | 7 | 1 | 282.00 | 282.00 |
| 05/24/01 | 70020 | ROOM 207 S | 121 | 44 | 1 | 282.00 | 282.00 |
| 05/25/01 | 70020 | ROOM 207 S | 121 | 49 | 1 | 282.00 | 282.00 |
| 05/26/01 | 70020 | ROOM 207 S | 121 | 53 | 1 | 282.00 | 282.00 |
| 05/27/01 | 70020 | ROOM 207 S | 121 | 55 | 1 | 282.00 | 282.00 |
| | | TOTAL MED-SUR-GY/2BED | | | | | 1,410.00 |
| | | | | | | | |
| 05/23/01 | 4620 | DEMEROL INJ | 250 | | 1 | 60.00 | 60.00 |
| 05/23/01 | 46315 | ZINACEF 1.5G INJ. | 250 | 1 | 1 | 85.95 | 85.95 |
| 05/23/01 | 4939 | PHENERGAN 25MG INJ. | 250 | 3 | 3 | 26.00 | 78.00 |
| 05/23/01 | 4939 | PHENERGAN 25MG INJ. | 250 | 3 | -2 | 26.00 | -52.00 |
| 05/23/01 | 75663 | NACL 100ML BAG | 250 | 1 | 1 | 41.00 | 41.00 |
| 24/01 | 4620 | DEMEROL INJ | 250 | | 1 | 60.00 | 60.00 |
| 05/24/01 | 4620 | DEMEROL INJ | 250 | | 1 | 60.00 | 60.00 |
| 05/24/01 | 4620 | DEMEROL INJ | 250 | | 1 | 60.00 | 60.00 |
| 05/24/01 | 4620 | DEMEROL INJ | 250 | | 1 | 60.00 | 60.00 |
| 05/24/01 | 46315 | ZINACEF 1.5G INJ. | 250 | 4 | 1 | 85.95 | 85.95 |
| 05/24/01 | 46315 | ZINACEF 1.5G INJ. | 250 | 4 | 1 | 85.95 | 85.95 |
| 05/24/01 | 46315 | ZINACEF 1.5G INJ. | 250 | 4 | 1 | 85.95 | 85.95 |
| 05/24/01 | 4939 | PHENERGAN 25MG INJ. | 250 | 3 | 2 | 26.00 | 52.00 |
| 05/24/01 | 4939 | PHENERGAN 25MG INJ. | 250 | 3 | 4 | 26.00 | 104.00 |
| 05/24/01 | 4939 | PHENERGAN 25MG INJ. | 250 | 11 | 1 | 26.00 | 26.00 |
| 05/24/01 | 51897 | ANECTINE 200MG INJ. | 250 | 6 | 1 | 26.00 | 26.00 |
| 05/24/01 | 56403 | NEOSTIGMINE INJ. | 250 | 7 | 1 | 45.70 | 45.70 |
| 05/24/01 | 73633 | DIPRIVAN INJ. | 250 | 9 | 1 | 40.35 | 40.35 |
| 05/24/01 | 75663 | NACL 100ML BAG | 250 | 4 | 1 | 41.00 | 41.00 |
| 05/24/01 | 75663 | NACL 100ML BAG | 250 | 4 | 1 | 41.00 | 41.00 |
| 05/24/01 | 75663 | NACL 100ML BAG | 250 | 4 | 1 | 41.00 | 41.00 |
| 05/25/01 | 4620 | DEMEROL INJ | 250 | | 1 | 60.00 | 60.00 |
| 05/25/01 | 4620 | DEMEROL INJ | 250 | | 1 | 60.00 | 60.00 |
| 05/25/01 | 4620 | DEMEROL INJ | 250 | | 1 | 60.00 | 60.00 |
| 05/25/01 | 4620 | DEMEROL INJ | 250 | 10 | 1 | 60.00 | 60.00 |
| 05/25/01 | 46315 | ZINACEF 1.5G INJ. | 250 | 4 | 1 | 85.95 | 85.95 |
| 05/25/01 | 46315 | ZINACEF 1.5G INJ. | 250 | 4 | 1 | 85.95 | 85.95 |
| 05/25/01 | 46315 | ZINACEF 1.5G INJ. | 250 | 4 | 1 | 85.95 | 85.95 |
| 05/25/01 | 4939 | PHENERGAN 25MG INJ. | 250 | 3 | 4 | 26.00 | 104.00 |

Continued

| PATIENT NUMBER | | TOTAL AMOUNT DUE |
|---|---|---|
| 01143-00094 | PLEASE REFER TO PATIENT NUMBER ON ALL INQUIRIES AND CORRESPONDENCE | |

ADDITIONAL PATIENT BILLING MAY BE NECESSARY FOR ANY CHARGES NOT POSTED WHEN THIS BILL IS PREPARED, OR IF ANY INSURANCE CARRIERS DO NOT PAY ANY AMOUMT OF THE AMOUNTS SHOWN.
PLEASE RETAIN FOR YOUR RECORDS

# Medical Center
### Enterprise

400 North Edwards Street
Enterprise, Alabama 36330

*ITEMIZED STATEMENT*
*OF ALL CHARGES*

| TYPE OF BILL | DATE OF BILL |
|---|---|
| D1-I/P | 06/01/01 |

| PAGE NO. |
|---|
| 2 |

| PATIENT NAME | PATIENT NUMBER | SEX | AGE | ADMISSION DATE | DISCHARGE DATE | DAYS |
|---|---|---|---|---|---|---|
| ERT CONRAD | 01143-00094 | M | 21Y | 05/23/01 | 05/28/01 | |

| INSURANCE COMPANY NAME | GROUP NUMBER | POLICY NUMBER | |
|---|---|---|---|
| | | | PAYMENT AMOUNT |

| GUARANTOR NAME AND ADDRESS | DOROTHY A CONRAD 507 GLOVER AVE APT 35 ENTERPRISE AL 36330 |
|---|---|

☐ MASTERCARD   CARD NO. |_|_|_|_|_|_|_|_|_|_|_|_|_|_|
☐ VISA   EXPIRATION DATE _____

SIGNATURE _____
PLEASE DETACH AND RETURN THIS PORTION WITH YOUR REMITTANCE

| DATE | ITEM NO. | DESCRIPTION | CLM CODE | ORDER NO. | QTY | UNIT PRICE | TOTAL CHARGES |
|---|---|---|---|---|---|---|---|
| 05/25/01 | 75663 | NACL 100ML BAG | 250 | 4 | 1 | 41.00 | 41.00 |
| 05/25/01 | 75663 | NACL 100ML BAG | 250 | 4 | 1 | 41.00 | 41.00 |
| 05/25/01 | 75663 | NACL 100ML BAG | 250 | 4 | 1 | 41.00 | 41.00 |
| 05/26/01 | 4620 | DEMEROL INJ | 250 | 10 | 1 | 60.00 | 60.00 |
| 05/26/01 | 4620 | DEMEROL INJ | 250 | 10 | 1 | 60.00 | 60.00 |
| 05/26/01 | 46315 | ZINACEF 1.5G INJ. | 250 | 4 | 1 | 85.95 | 85.95 |
| 05/26/01 | 46315 | ZINACEF 1.5G INJ. | 250 | 4 | 1 | 85.95 | 85.95 |
| 05/26/01 | 46315 | ZINACEF 1.5G INJ. | 250 | 4 | 1 | 85.95 | 85.95 |
| 05/26/01 | 4939 | PHENERGAN 25MG INJ. | 250 | 3 | 1 | 26.00 | 26.00 |
| 05/26/01 | 4939 | PHENERGAN 25MG INJ. | 250 | 3 | 2 | 26.00 | 52.00 |
| 05/26/01 | 75663 | NACL 100ML BAG | 250 | 4 | 1 | 41.00 | 41.00 |
| 05/26/01 | 75663 | NACL 100ML BAG | 250 | 4 | 1 | 41.00 | 41.00 |
| 26/01 | 75663 | NACL 100ML BAG | 250 | 4 | 1 | 41.00 | 41.00 |
| 05/27/01 | 4620 | DEMEROL INJ | 250 | 10 | 1 | 60.00 | 60.00 |
| 05/27/01 | 46315 | ZINACEF 1.5G INJ. | 250 | 4 | 1 | 85.95 | 85.95 |
| 05/27/01 | 4939 | PHENERGAN 25MG INJ. | 250 | 3 | 4 | 26.00 | 104.00 |
| 05/27/01 | 75663 | NACL 100ML BAG | 250 | 4 | 1 | 41.00 | 41.00 |
| 05/28/01 | 4939 | PHENERGAN 25MG INJ. | 250 | 3 | -9 | 26.00 | -234.00 |
| | | TOTAL PHARMACY | | | | | 2,488.50 |
| | | | | | | | |
| 05/23/01 | 84822 | D5 1/2 NS 1000ML | 258 | 28 | 1 | 89.02 | 89.02 |
| 05/23/01 | 85951 | LACTATED RING 1000ML | 258 | 29 | 1 | 133.60 | 133.60 |
| 05/23/01 | 85951 | LACTATED RING 1000ML | 258 | 30 | 1 | 133.60 | 133.60 |
| 05/24/01 | 84822 | D5 1/2 NS 1000ML | 258 | 48 | 1 | 89.02 | 89.02 |
| 05/25/01 | 84822 | D5 1/2 NS 1000ML | 258 | 52 | 3 | 89.02 | 267.06 |
| 05/27/01 | 84822 | D5 1/2 NS 1000ML | 258 | 61 | 1 | 89.02 | 89.02 |
| 05/27/01 | 85951 | LACTATED RING 1000ML | 258 | 60 | 1 | 133.60 | 133.60 |
| | | TOTAL IV SOLUTIONS | | | | | 934.92 |
| | | | | | | | |
| 05/24/01 | 80440 | ROBINUL 0.4MG INJ. | 259 | 8 | 1 | 46.80 | 46.80 |
| 05/28/01 | 17934 | PERCOCET TABLET | 259 | 14 | 2 | 4.50 | 9.00 |
| 05/28/01 | 27734 | TYLENOL 325MG TABLET | 259 | 15 | 1 | 3.50 | 3.50 |
| 05/28/01 | 27734 | TYLENOL 325MG TABLET | 259 | 16 | 2 | 3.50 | 7.00 |
| | | TOTAL DRUGS/OTHER | | | | | 66.30 |
| | | | | | | | |
| 05/23/01 | 17516 | BOVIE HAND TROL DISP | 270 | 20 | 1 | 114.06 | 114.06 |

Continued

| PATIENT NUMBER | | |
|---|---|---|
| 01143-00094 | *PLEASE REFER TO PATIENT NUMBER ON ALL INQUIRIES AND CORRESPONDENCE* | *ADDITIONAL PATIENT BILLING MAY BE NECESSARY FOR ANY CHARGES NOT POSTED WHEN THIS BILL IS PREPARED, OR IF ANY INSURANCE CARRIERS DO NOT PAY ANY AMOUNT OF THE AMOUNTS SHOWN.* |

| TOTAL AMOUNT DUE |
|---|
| |

*PLEASE RETAIN FOR YOUR RECORDS*

640 1991 HLL Medical Center Enterprise

# Medical Center
### Enterprise

400 North Edwards Street
Enterprise, Alabama 36330

*ITEMIZED STATEMENT*
*OF ALL CHARGES*

| TYPE OF BILL | DATE OF BILL | PAGE NO. |
|---|---|---|
| D1-I/P | 06/01/01 | 3 |

| PATIENT NAME | PATIENT NUMBER | SEX | AGE | ADMISSION DATE | DISCHARGE DATE | DAYS |
|---|---|---|---|---|---|---|
| ERT CONRAD | 01143-00094 | M | 21Y | 05/23/01 | 05/28/01 | |

| INSURANCE COMPANY NAME | GROUP NUMBER | POLICY NUMBER |
|---|---|---|
| | | |

PAYMENT AMOUNT

| GUARANTOR NAME AND ADDRESS | DOROTHY A CONRAD<br>507 GLOVER AVE<br>APT 35<br>ENTERPRISE AL          36330 |
|---|---|

☐ MASTERCARD          CARD NO. |_|_|_|_|_|_|_|_|_|_|_|_|_|_|_|
☐ VISA                         EXPIRATION DATE _____

SIGNATURE _____
PLEASE DETACH AND RETURN THIS PORTION WITH YOUR REMITTANCE

| DATE | ITEM NO. | DESCRIPTION | CLM CODE | ORDER NO. | QTY | UNIT PRICE | TOTAL CHARGES |
|---|---|---|---|---|---|---|---|
| 05/23/01 | 18859 | TUBING INSUFFLTR FLT | 270 | 32 | 1 | 63.35 | 63.35 |
| 05/23/01 | 35308 | LINER SUCTION 1500ML | 270 | 36 | 1 | 16.49 | 16.49 |
| 05/23/01 | 57622 | KIT MONITOR CATH 7FR | 270 | 40 | 1 | 326.00 | 326.00 |
| 05/23/01 | 60129 | SET DOUBLE BASIN SURGI START | 270 | 43 | 1 | 103.85 | 103.85 |
| 05/23/01 | 64139 | TUBE SUMP SALEM 18FR | 270 | 23 | 1 | 60.80 | 60.80 |
| 05/23/01 | 71472 | LINER SUCTION 3000ML | 270 | 39 | 1 | 49.98 | 49.98 |
| 05/23/01 | 72074 | MASK MED ADULT | 270 | 25 | 2 | 49.48 | 98.96 |
| 05/23/01 | 75419 | SYRINGE CATH TIP 60CC | 270 | 42 | 1 | 2.45 | 2.45 |
| 05/23/01 | 81683 | TUBE ENDO 8.0 | 270 | 33 | 1 | 47.24 | 47.24 |
| 05/23/01 | 84786 | PAD GROUNDING DISP | 270 | 27 | 1 | 15.65 | 15.65 |
| 05/24/01 | 20035 | LAPSKY TRAY | 270 | 16 | 1 | 421.93 | 421.93 |
| 05/24/01 | 30801 | OXYGEN >30 MIN | 270 | 14 | 2 | 8.34 | 16.68 |
| 25/01 | 20001 | MAJOR INST. | 270 | 46 | 1 | 667.53 | 667.53 |
| | | TOTAL MED-SUR SUPPLIES | | | | | 2,004.97 |
| | | | | | | | |
| 05/23/01 | 18927 | STAPLER ETHICON PPW35 | 272 | 35 | 1 | 76.22 | 76.22 |
| 05/23/01 | 20479 | STYLET INTUBATING 14FR | 272 | 21 | 1 | 14.79 | 14.79 |
| 05/23/01 | 28991 | PROBE BODY & SPIKE SURGIFLEX | 272 | 22 | 1 | 145.80 | 145.80 |
| 05/23/01 | 48843 | PACK LAPAROTOMY | 272 | 37 | 1 | 386.85 | 386.85 |
| 05/23/01 | 49005 | NEEDLE ENDO VERRES 120 | 272 | 38 | 1 | 105.25 | 105.25 |
| 05/23/01 | 63296 | SPONGE 4X4 TRAYS | 272 | 41 | 2 | 3.75 | 7.50 |
| 05/23/01 | 68197 | CIRCUIT BREATHING ADULT | 272 | 24 | 1 | 94.01 | 94.01 |
| 05/23/01 | 83885 | WRAP CALF | 272 | 26 | 1 | 155.60 | 155.60 |
| 05/23/01 | 91213 | SPONGE 4X4 RAY-TEC | 272 | 31 | 1 | 9.79 | 9.79 |
| 05/24/01 | 20044 | SMALL SUTURE | 272 | 17 | 1 | 68.23 | 68.23 |
| 05/24/01 | 20045 | LARGE SUTURE | 272 | 18 | 6 | 98.81 | 592.86 |
| 05/24/01 | 20957 | TROCAR 12MM DISP | 272 | 34 | 1 | 179.25 | 179.25 |
| 05/24/01 | 32996 | SPONGE DRAIN 4X4 12 PLY 2'S | 272 | 47 | 2 | 2.55 | 5.10 |
| 05/27/01 | 63296 | SPONGE 4X4 TRAYS | 272 | 59 | 1 | 3.75 | 3.75 |
| | | TOTAL STERILE SUPPLY | | | | | 1,845.00 |
| | | | | | | | |
| 05/23/01 | 1015 | ALCOHOL QN | 301 | 1 | 1 | 210.81 | 210.81 |
| 05/23/01 | 1670 | BASIC METABOLIC PANEL | 301 | 1 | 1 | 137.24 | 137.24 |
| 05/23/01 | 1900 | PHENCYCLIDINE SCREEN | 301 | 1 | 1 | 39.59 | 39.59 |
| 05/23/01 | 1901 | BENZODIAZEPINES QL SQN | 301 | 1 | 1 | 39.59 | 39.59 |
| 05/23/01 | 1902 | COCAINE METABOLITES | 301 | 1 | 1 | 39.59 | 39.59 |

Continued

| PATIENT NUMBER | | |
|---|---|---|
| 01143-00094 | PLEASE REFER TO PATIENT NUMBER ON ALL INQUIRIES AND CORRESPONDENCE | ADDITIONAL PATIENT BILLING MAY BE NECESSARY FOR ANY CHARGES NOT POSTED WHEN THIS BILL IS PREPARED, OR IF ANY INSURANCE CARRIERS DO NOT PAY ANY AMOUNT OF THE AMOUNTS SHOWN.<br>PLEASE RETAIN FOR YOUR RECORDS |

TOTAL AMOUNT DUE

440 1999 MLL Medical Center Enterprise

**Medical Center**
Enterprise

400 North Edwards Street
Enterprise, Alabama 36330

| | TYPE OF BILL | DATE OF BILL | PAGE NO. |
|---|---|---|---|
| | D1-I/P | 06/01/01 | 4 |

| PATIENT NAME | PATIENT NUMBER | SEX | AGE | ADMISSION DATE | DISCHARGE DATE | DAYS |
|---|---|---|---|---|---|---|
| ERT CONRAD | 01143-00094 | M | 21Y | 05/23/01 | 05/28/01 | |

| INSURANCE COMPANY NAME | GROUP NUMBER | POLICY NUMBER | |
|---|---|---|---|
| | | | PAYMENT AMOUNT |

| GUARANTOR NAME AND ADDRESS | |
|---|---|
| DOROTHY A CONRAD | ☐ MASTERCARD    CARD NO. \|\|\|\|\|\|\|\|\|\|\|\|\|\| |
| 507 GLOVER AVE | ☐ VISA    EXPIRATION DATE _____ |
| APT 35 | SIGNATURE _____ |
| ENTERPRISE AL          36330 | PLEASE DETACH AND RETURN THIS PORTION WITH YOUR REMITTANCE |

| DATE | ITEM NO. | DESCRIPTION | CLM CODE | ORDER NO. | QTY | UNIT PRICE | TOTAL CHARGES |
|---|---|---|---|---|---|---|---|
| 05/23/01 | 1903 | AMPHETAMINES QL SQN | 301 | 1 | 1 | 39.59 | 39.59 |
| 05/23/01 | 1904 | THC CANNABINOIDS QL SQN | 301 | 1 | 1 | 39.59 | 39.59 |
| 05/23/01 | 1905 | OPIATES QL SQN | 301 | 1 | 1 | 39.59 | 39.59 |
| 05/23/01 | 1906 | BARBITURATES QL SQN | 301 | 1 | 1 | 39.59 | 39.59 |
| 05/24/01 | 1741 | COMP METABOLIC PANEL | 301 | 6 | 1 | 163.59 | 163.59 |
| 05/26/01 | 1741 | COMP METABOLIC PANEL | 301 | 51 | 1 | 163.59 | 163.59 |
| | | TOTAL LAB/CHEMISTRY | | | | | 952.36 |
| | | | | | | | |
| 05/23/01 | 2000 | CBC PLATELET AUTO DIFF | 305 | 1 | 1 | 106.51 | 106.51 |
| 05/24/01 | 2000 | CBC PLATELET AUTO DIFF | 305 | 6 | 1 | 106.51 | 106.51 |
| 05/26/01 | 2000 | CBC PLATELET AUTO DIFF | 305 | 50 | 1 | 106.51 | 106.51 |
| 05/28/01 | 2000 | CBC PLATELET AUTO DIFF | 305 | 56 | 1 | 106.51 | 106.51 |
| | | TOTAL LAB/HEMOTOLOGY | | | | | 426.04 |
| | | | | | | | |
| 05/23/01 | 2605 | UA W MICRO AUTO | 307 | 1 | 1 | 115.75 | 115.75 |
| | | TOTAL LAB/UROLOGY | | | | | 115.75 |
| | | | | | | | |
| 05/23/01 | 10008 | XR ABD, AP & OBLIQUE VIEWS | 320 | 5 | 1 | 171.43 | 171.43 |
| 05/23/01 | 10147 | XR HUMERUS | 320 | 5 | 1 | 208.26 | 208.26 |
| 05/25/01 | 10005 | XR ABD 1 VIEW (KUB) | 320 | 45 | 1 | 151.79 | 151.79 |
| | | TOTAL DX X-RAY | | | | | 531.48 |
| | | | | | | | |
| 05/28/01 | 10036 | XR CHEST PA & LAT. | 324 | 58 | 1 | 138.50 | 138.50 |
| | | TOTAL DX X-RAY/CHEST | | | | | 138.50 |
| | | | | | | | |
| 05/24/01 | 10200 | OR ROOM TIME 91-120 MIN. | 360 | 13 | 1 | 2798.78 | 2,798.78 |
| | | TOTAL OR SERVICES | | | | | 2,798.78 |
| | | | | | | | |
| 05/24/01 | 21200 | ANESTHESIA 91-120 MIN | 370 | 12 | 1 | 1259.20 | 1,259.20 |
| | | TOTAL ANESTHESIA | | | | | 1,259.20 |
| | | | | | | | |
| 05/23/01 | 89964 | ER LEVEL V | 450 | 8 | 1 | 170.00 | 170.00 |
| | | TOTAL EMERG ROOM | | | | | 170.00 |
| | | | | | | | |
| 05/24/01 | 27658 | SUBLIMAZE 5ML INJ. | 636 | 5 | 1 | 55.90 | 55.90 |
| | | TOTAL DRUGS/DETAIL CODE | | | | | 55.90 |

Continued

| PATIENT NUMBER | PLEASE REFER TO PATIENT NUMBER ON ALL INQUIRIES AND CORRESPONDENCE | ADDITIONAL PATIENT BILLING MAY BE NECESSARY FOR ANY CHARGES NOT POSTED WHEN THIS BILL IS PREPARED, OR IF ANY INSURANCE CARRIERS DO NOT PAY ANY AMOUNT OF THE AMOUNTS SHOWN. | TOTAL AMOUNT DUE |
|---|---|---|---|
| 01143-00094 | | | |

PLEASE RETAIN FOR YOUR RECORDS

440 1993 NLL Medical Center Enterprise

# Medical Center
### Enterprise

400 North Edwards Street
Enterprise, Alabama 36330

*ITEMIZED STATEMENT*
*OF ALL CHARGES*

| TYPE OF BILL | DATE OF BILL | PAGE NO. |
|---|---|---|
| D1-I/P | 06/01/01 | 5 |

| PATIENT NAME | PATIENT NUMBER | SEX | AGE | ADMISSION DATE | DISCHARGE DATE | DAYS |
|---|---|---|---|---|---|---|
| ERT CONRAD | 01143-00094 | M | 21Y | 05/23/01 | 05/28/01 | |

| INSURANCE COMPANY NAME | GROUP NUMBER | POLICY NUMBER | |
|---|---|---|---|
| | | | PAYMENT AMOUNT |

GUARANTOR NAME AND ADDRESS:
DOROTHY A CONRAD
507 GLOVER AVE
APT 35
ENTERPRISE AL                36330

☐ MASTERCARD    CARD NO. |_|_|_|_|_|_|_|_|_|_|_|_|_|_|_|
☐ VISA           EXPIRATION DATE _____

SIGNATURE _____
PLEASE DETACH AND RETURN THIS PORTION WITH YOUR REMITTANCE

| DATE | ITEM NO. | DESCRIPTION | CLM. CODE | ORDER NO. | QTY | UNIT PRICE | TOTAL CHARGES |
|---|---|---|---|---|---|---|---|
| 05/23/01 | 32030 | PACU 30 MIN. | 710 | 9 | 1 | 644.70 | 644.70 |
| | | TOTAL RECOVERY ROOM | | | | | 644.70 |
| | | TOTAL CHARGES | | | | | 15,842.40 |
| 11/19/01 | A5030 | 706 CHARITY WO | | | | | -15,842.40 |
| | | TOTAL PAYMENTS/ADJUSTMENTS | | | | | -15,842.40 |

| PATIENT NUMBER | | | | |
|---|---|---|---|---|
| 01143-00094 | *PLEASE REFER TO PATIENT NUMBER ON ALL INQUIRIES AND CORRESPONDENCE* | *ADDITIONAL PATIENT BILLING MAY BE NECESSARY FOR ANY CHARGES NOT POSTED WHEN THIS BILL IS PREPARED, OR IF ANY INSURANCE CARRIERS DO NOT PAY ANY AMOUMT OF THE AMOUNTS SHOWN.* *PLEASE RETAIN FOR YOUR RECORDS* | TOTAL AMOUNT DUE | 0.00 |

440 1999 MLL Medical Center Enterprise

# MEDICAL CENTER ENTERPRISE                    DRG WORKSHEET

NAME: Conrad, Robert

MR#: 41053

ADMIT DATE: 5-23-01

DISCH DATE: 5-28

AGE: 20    SEX: M

ATTENDING PHYSICIAN: S. Sawyer

INSURANCE: Caid

DISC. DISP: 05 Jail

**PRINCIPAL DIAGNOSIS**                                    **CODE**

GSW (L) LQ of abdomen c through + through        863.52
laceration of transverse colon

**OTHER DIAGNOSIS**                                    **CODES**

1. Superficial GSW (L) upper arm - Gun battle c        880.13
2. police during robbery                    E970 / E849.6
3. Post-Op Ileus                            997.4 / 560.1
4.
5.
6.
8.
9.

**PRINCIPAL PROCEDURE**                                    **CODE**

5-23-01  #2
Diagnostic laparoscopy - exploratory, laparotomy, and     46.75
repair of colon, ligation of an artery              38.86

**OTHER PROCEDURES**                                    **CODES**

1. Removal of the bullet from (R) upper arm        86.05
2.
3.
4.
5.
6.
7.
8.

THIS INFORMATION HAS BEEN DISCLOSED TO
YOU FROM RECORDS WHOSE CONFIDENTIALITY
IS PROTECTED BY STATE STATUTE. STATE
REGULATIONS LIMIT YOUR RIGHT TO MAKE ANY
FURTHER DISCLOSURES OF THIS INFORMATION
WITHOUT THE PRIOR WRITTEN CONSENT OF THE
PATIENT/CLIENT TO WHOM IT PERTAINS.

FINAL DRG 148

R.W. 3.4347

Medical Center Enterprise
400 North Edwards Street
Enterprise, Alabama 36330

**Patient Summary**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **P** | PATIENT NUMBER 01143-00094 | ROOM/TYPE 207-02 | PT TYPE I/P | SERV MED 2 | ATTENDING PHYSICIAN SAWYER,SAMUEL | FAMILY PHYSICIAN SAWYER,SAMUEL | MR NUMBER 0000041053 | |

| ADMIT DATE/TIME 05/23/01 1448 | SEX M | RACE 2 | MS S | DATE OF BIRTH /AGE 09/27/80 20Y | SOCIAL SECURITY NUMBER 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 | EMPLOYMENT STATUS |
|---|---|---|---|---|---|---|

**I E N T**

PATIENT
CONRAD, ROBERT
36 NELL COURT
ENTERPRISE      AL 36330

PHONE: (334)308-2140

EMPLOYER
MCDONALDS
625 BOLL WEEVIL CIR
ENTERPRISE      AL 36330

PHONE ·(334)347-3417

| SMK | VETERAN No | OCCUPATION | | BRANCH OF SERVICE | PAY GRADE | MILITARY STATUS |
|---|---|---|---|---|---|---|

**G U A R**

GUARANTOR
CONRAD, DOROTHY A
507 GLOVER AVENUE APT 35
ENTERPRISE      AL 36330

PHONE: (334)348-2150

GUARANTOR EMPLOYER
ENTERPRISE NURSING H
300 PLAZA DR
ENTERPRISE      AL 36330

PHONE: (334)347-9541

| RELATIONSHIP MOTHER | SOCIAL SECURITY NUMBER 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 | GUARANTOR OCCUPATION LAUNDRY/HOU | EMPLOYMENT STATUS |
|---|---|---|---|

**R E L**

RELATIVE/FRIEND (OTHER THAN GUARANTOR)
CONRAD, DOROTHY;A
36 NELL COURT
ENTERPRISE      AL 36330

PHONE: (334)347-9533

RELATIVE/FRIEND EMPLOYER
ENTERPRISE NURSING H
300 PLAZA DR
ENTERPRISE      AL 36330

PHONE:

| RELATIONSHIP MOTHER | SOCIAL SECURITY NUMBER 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 | GUARANTOR OCCUPATION LAUNDRY/HOUSEKEEPI | EMPLOYMENT STATUS |
|---|---|---|---|

**I N S 1**

| CARRIER AL MCD | | F/C D | POLICY NUMBER 000419175095 | MAIL TO: PO BOX 7601 |
|---|---|---|---|---|

INSURED NAME
CONRAD, ROBERT

SOCIAL SECURITY NUMBER

MONTGOMERY      AL      36107

| GROUP NUMBER | COMMENTS | GROUP PHONE/EXT (800)688-7989 |
|---|---|---|

**I N S 2**

| CARRIER | | F/C | POLICY NUMBER | MAIL TO: |
|---|---|---|---|---|

INSURED NAME

SOCIAL SECURITY NUMBER

| GROUP NUMBER | COMMENTS | GROUP PHONE/EXT |
|---|---|---|

**I N S 3**

| CARRIER | | F/C | POLICY NUMBER | MAIL TO: |
|---|---|---|---|---|

INSURED NAME

SOCIAL SECURITY NUMBER

| GROUP NUMBER | COMMENTS | GROUP PHONE/EXT |
|---|---|---|

**I N S 4**

| CARRIER | | F/C | POLICY NUMBER | MAIL TO: |
|---|---|---|---|---|

INSURED NAME

SOCIAL SECURITY NUMBER

| GROUP NUMBER | COMMENTS | GROUP PHONE/EXT |
|---|---|---|

**M I S C**

| DIAG CODE | DIAGNOSIS GUNSH T WOUND | ALLERGIES NKDA | PMD | ORG | PRC |
|---|---|---|---|---|---|

| ACCIDENT TYPE | ACCIDENT DATE | ACC TIME | PLACE OF ACCIDENT | PREVIOUS VISIT DATE 05/07/99 | ARRIVAL MODE PERSONAL |
|---|---|---|---|---|---|

| TRANSFERRING FACILITY | RELIGION | CHURCH | ATC | INT |
|---|---|---|---|---|

| COMMENTS | | CLK PLA |
|---|---|---|

ER

MEDICAL CENTER ENTERPRISE    400 North Edwards Street    Enterprise, Alabama 36330

CONRAD, ROBERT
01143-00094                    ED
DREW, JOHN L
                        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    05/23/01

## CONDITIONS FOR TREATMENT

1. MEDICAL AND SURGICAL TREATMENT AND BLOOD TRANSFUSION CONSENT: A patient's care is under the control of his or her attending physicians and the Hospital is not liable for any act or omission in following the instructions of that physician. The undersigned consent to any radiological examination, laboratory procedure, anesthesia, Emergency Room treatment, medical, surgical or diagnostic treatment or hospital services rendered the patient under the general and special instructions of the physician. The undersigned recognized that all physicians furnishing services to the patient, including the radiologist, anesthesiologist, emergency room physician are independent contractors and are not employees nor agents of the Hospital.

2. RELEASE OF INFORMATION: The hospital may disclose all or any part (including Social Security number) of the patient's medical record to any person or corporation which is or may be liable under a contract to the Hospital or the patient or to a family member or employer of the patient for all or part of the Hospital's charge, including, but not limited to, Hospital or hospital utilization review entities, including the Peer Review Organizations that may perform Medicare/Medicaid/Champus review or those who have an agreement with the patient's employer, insurance companies, workmen's compensation carriers, veterans administration, welfare or the patient's employer. The Hospital may disclose any information concerning my case which is necessary or appropriate concerning my case which is necessary and/or appropriate for medical research. This authorization includes, but is not limited to, the release of information relating to drug, alcohol, HIV/AIDS, and/or psychiatric treatment as specified in Volume 42 of the code of Federal Regulations part 2. I further authorize any hospital, health care institution, or physician that attended me previously to furnish medical records including radiologic films and laboratory test results which may be requested by the Hospital or my attending physician. This constitutes my specific authorization and consent, under Alabama Statute, to release my prior medical records to Medical Center Enterprise and to my physician(s).

3. RELEASE FROM LIABILITY FOR VALUABLES: I have been made aware that Medical Center Enterprise provides facilities for the safekeeping of my valuables and, therefore, I release the Hospital from any responsibility due to loss or damage of my clothing, money, jewelry, glasses, dentures or other items of value that I might keep at my bedside, or that may be brought to me by my friends or relatives unless deposited with the Hospital for safekeeping.

4. GUARANTOR/FINANCIAL AGREEMENT: The undersigned and/or patient is entitled to Hospital and/or Physician's benefits of any type whatsoever arising out of any insurance policy or any other party liable to the patient, such benefits are hereby assigned to Medical Center Enterprise, and/or Physician having performed services for this patient during his/her stay at Medical Center Enterprise, and the Radiologist, Pathologist, Anesthesiologist and/or other attending or consulting Physicians, for application to the patient's bill. It is agreed that the Hospital and/or Physician may receipt for any such payment and such payment will discharge the said insurance company of all obligations under the policy to the extent of such payment. The undersigned and/or patient agrees to be responsible for charges not paid by the assignment. Should the account be referred for collection, the undersigned shall pay reasonable attorney's fees and collection expense. All delinquent accounts may be assessed interest at the legal rate.

5. ASSIGNMENT OF INSURANCE BENEFITS: In the event the undersigned is entitled to hospital benefits of any type whatsoever arising out of any policy of insurance insuring patient of any party liable to patient, such benefits are hereby assigned to Medical Center Enterprise for application on patient's bill, and it is agreed that the Hospital may receipt any such payment and such payment shall discharge the said insurance company of any and all obligation under the policy of the extent of payment, the undersigned and/or patient being responsible for charges not covered by assignment.

PHYSICIAN INSURANCE ASSIGNMENT: I, the above name subscriber, hereby authorize payment directly to any physician examining or treating me or any group and/or individual surgical and/or medical radiologist, anesthesiologist, pathologist, emergency room physician and neonatologist benefits herein specified and otherwise payable to me for the services as described but not to exceed the reasonable and customary charge for these services.

7. NOTICE OF OCCUPATIONAL EXPOSURE: Occasionally healthcare workers may experience exposure to your blood or body fluids. If this type of exposure occurs it may be necessary to perform a blood test on you for the Hepatitis B Virus and the HIV (AIDS) Virus. The testing will be done in a manner intended to preserve your privacy and at no cost to you or your family. The test results will be treated as confidential medical information and will be placed in your hospital medical record. Test results will be reported to others only at your request and with your consent or as required by law and the policies of Medical Center Enterprise.

THE UNDERSIGNED CERTIFIES THAT HE/SHE HAS READ OR HAD THE FOREGOING INFORMATION EXPLAINED, HAS RECEIVED A COPY, AND IS THE PATIENT OR IS DULY AUTHORIZED BY THE PATIENT AS THE PATIENT'S GENERAL AGENT TO EXECUTE THE ABOVE AND ACCEPT ITS TERMS.

ASSIGNMENT OF MEDICARE BENEFITS: PATIENT CERTIFICATION,
AUTHORIZATION TO RELEASE INFORMATION AND PAYMENT REQUEST.

INITIAL BLOCK IF APPLICABLE

"I certify that the information given by me in applying for payment under XVIII of the Social Security Act is correct. I authorize any holder of medical or other information about me to release to the Social Security Administration or its' intermediates or carriers any information needed to for this or a related claim. I request that payment of authorized benefits be made on my behalf. I assign the benefits payable for physicians services or authorize such physicians or organization to submit a claim to Medicare for payment to me. I understand that I am responsible for Part A deductible for each spell of illness, the Part B deductible for each year, the remaining 20% of reasonable charges and any personal charges incurred.

ACKNOWLEDGMENT OF MEDICAID

"I certify that I am a recipient of the Medicaid program, and request that payment of authorized benefits be made on my behalf. I authorize the treating physician, hospital and hospital insurance carrier to make available to the Alabama Department of the Medical Assistance and requested information concerning medical, insurance and financial records relating to my hospitalization. I hereby certify all hospital insurance shall be assigned to the hospital and/or treating physician for services provided.

| | |
|---|---|
| Patient Signature | Date |
| Guarantor or Guardian Signature | Date  5-23-01 |
| Witness | Date |

# MEDICAL CENTER ENTERPRISE
## GRAPHIC CHART AND PATIENT CARE RECORD

SAWYER, SAMUEL
05/23/01

| DATE | 5-23-01 | | | 5/24/01 | | | 5/25/01 | | | 5/26 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HOSP. DAY | | | | | | | | | | | | |
| POST OP/PP DAY | | | | | | | | | | | | |

| HOUR | AM | | | PM | | | AM | | | PM | | | AM | | | PM | | | AM | | | PM | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12MN | 4 | 8 | 12N | 4 | 8 | 12MN | 4 | 8 | 12N | 4 | 8 | 12MN | 4 | 8 | 12N | 4 | 8 | 12MN | 4 | 8 | 12N | 8 | 4 |

TEMPERATURE

| PULSE | | | | 75 | 97 | 81 | 85 | 81 | | 68 | 68 | 64 | 70 | 87 | | 86 | | 73 | 72 | 76 | | | |
| RESP. | | | | 16 | 16 | 20 | 20 | 20 | | 16 | 18 | 16 | 18 | 20 | | 20 | | 20 | 20 | 20 | | 18 | 20 |
| WEIGHT | | | | | | | | | | 112 | | 120 | 144 | | 1124 | | | | | | | | |
| ROUTINE B.P. | | | | 155 139 | 149 127 124 | | 92 140 | 92 124 148 | | 75 | | 184 154 136 | | | | | | | | | | | |
| | | | | 80 81 | 78 85 79 | | | 88 | | | | 79 70 65 | | | | | | | | | | | |

ADDITIONAL BLOOD PRESSURES

| SHIFT | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ORAL | | | | ICE CHIPS | NPO | NPO | | | | NPO | Sips | 300 |
| IV | | | | | 800 | 800 | 800 | | | 796 | 753 | 494 | 800 |
| 8 HOUR TOTAL | | | | | 800 | | | | | | | 494 | 1100 |
| 24 HOUR TOTAL | | | | | | | | | | | | |
| BLOOD COMPONENTS | | | | | | | | | | | | |

24 HOUR INTAKE

| SHIFT | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| URINE | | | 100 | 1000 | 650 | 800 | 1050 | | | 200 | 600 | 650 |
| EMESIS | | | | | | | | | | | | |
| DRAINAGE | | | | | NG tube 200 | | | | | | | |
| OTHER | | | | | | | | | | | | |
| 8 HOUR TOTAL | | | | | 850 | | | | | | | |
| 24 HOUR TOTAL | | | | | | | | | | | | |

24 HOUR OUTPUT

N-40 (REV. 3/88)

Dec'd

OII 3-00094
SAWYER, SAMUEL
BOY  M  S        05/23/01
A13-17-9035

# MEDICAL CENTER ENTERPRISE
## GRAPHIC CHART AND PATIENT CARE RECORD

| DATE | | | | 5-27-01 | | | 5-28-01 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HOSP. DAY | | | | | | | | | | | | | | | | |
| POST OP/PP DAY | | | | | | | | | | | | | | | | |

| HOUR | | AM | | | PM | | | AM | | | PM | | | AM | | | PM | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 12 MN | 4 | 8 | 12N | 4 | 8 | 12MN | 4 | 8 | 12N | 4 | 8 | 12 MN | 4 | 8 | 12N | 4 | 8 |

TEMPERATURE chart (C/F scale 96–105°)

| PULSE | 08 | 03 | 63 | | 61 | 68 | 76 | 80 | 66 | | | | | | | |
| RESP. | 20 | 18 | 20 | | 20 | 20 | 20 | 18 | 22 | | | | | | | |
| WEIGHT | | | | | 95 | 135 | 155 | 131 | | | | | | | | |
| ROUTINE B.P. | | | | | | | | | | | | | | | | |

| SHIFT | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ORAL | 210 | | 240 | 600 | | | | | | | | |
| IV | 800 | | HL | HL | | | | | | | | |
| 8 HOUR TOTAL | 100 | | | 600 | | | | | | | | |
| 24 HOUR TOTAL | 900 | | | | | | | | | | | |
| BLOOD COMPONENTS | | | | | | | | | | | | |

| SHIFT | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| URINE | 200 | 300 | 350 | X2 | X1 | | | | | | | |
| EMESIS | | | | | | | | | | | | |
| DRAINAGE | | | | | | | | | | | | |
| OTHER | | | | | | | | | | | | |
| 8 HOUR TOTAL | 200 | | | | | | | | | | | |
| 24 HOUR TOTAL | | | | | | | | | | | | |

N-40 (REV. 3/88)

# VITAL SIGN SHEET

RAO, ROBERT
01143-00094
SAWYER, SAMUEL                    I/P

| DA. | TIME | TEMP | PULSE | RESP. | B/P | DRESSING/ LOCHIA | URINE/cc's/ FUNDUS | OS / T & C & DB | OTHER |
|-----|------|------|-------|-------|-----|------------------|--------------------|-----------------|-------|
| 23-01 | 18:15 | 96$^7$ | 75 | 16 | 155/80 | | | | |
| | 18$^{30}$ | 96$^2$ | 76 | 20 | 152/92 | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

S62

MC-263
REV. 2/00

**PHYSICIAN'S ORDERS**
MC-263 (2/00)

USE BALL POINT PEN ONLY AND PRESS FIRMLY!

ALLERGIES                                                          Weight

Another brand of generically equivalent product may be dispensed unless checked or initialed.

| | PHYSICIAN'S ORDERS | ADDRESSOGRAPH |
|---|---|---|

☐ Inpatient    ☐ Outpatient    ☐ OP surgery

5-28-01
9ª          PA/LAT CXR, U/A, CBC     Now

| 1 | Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature | ADDRESSOGRAPH |

5-28-01
9ª
① Prescrip
② Cancel U/A (Done)
② oh to shower, remove dsgs
② Leva gin 500 po now
③ EST x po now
④ Release to custody of the Police
⑤ RTC me Weds po

| 2 | Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature | ADDRESSOGRAPH |
| | | | JST 0815 5-28-01 | | |

| 3 | Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature | |

DO NOT WRITE BELOW THIS POINT

MC-263
REV. 2/00

# PHYSICIAN'S ORDERS
MC-263 (2/00)

USE BALL POINT PEN ONLY AND PRESS FIRMLY!

| | Weight |
| --- | --- |

Another brand of generically equivalent product may be dispensed unless checked or initialed.

## PHYSICIAN'S ORDERS

☐ Inpatient   ☐ Outpatient   ☐ OP surgery

ADDRESSOGRAPH

**5-26-01**

① b IM med to Demerol 50 mg
& Phenergan 25 mg IM q 3hr prn

② OOB, amb c room TID

③ CBC, cmp today

④ Sips of clear liq
from fridge — no tray

| **1** | Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature |

ADDRESSOGRAPH

**5-27-01**

① Full liq + crackers

② HC IV

③ Percocet i - ii po q 4hr prn

④ D/C Demerol / Phen.

⑤ Phenergan 25 IM q 4hr prn N/V

| **2** | Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature |

ADDRESSOGRAPH

⑥ D/C Ancef

⑦ ↓ dsg (Bacitracin)
on g SWD's (2)

Noted P. McCr... RN
5-27-01
1730

5-27
340 LPN

| **3** | Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature |

DO NOT WRITE BELOW THIS POINT

**PHYSICIAN'S ORDERS**
MC-263 (2/00)

USE BALL POINT PEN ONLY AND PRESS FIRMLY!

ALLERGIES

Weight

Another brand of generically equivalent product may be dispensed unless checked or initialed.

| CRT ORDER # | PHYSICIAN'S ORDERS | ADDRESSOGRAPH |
| --- | --- | --- |

☐ Inpatient   ☐ Outpatient   ☐ OP surgery

**1**

5/24 Only four visitors in the room
@ any one time
per Dr S Sawyer   Maddox

noted Maddox

| Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature | |
| --- | --- | --- | --- | --- |

**2**

5/24 Strictly enforce, 4 visitors @ a time
in the room all other visitors
must wait outside of hospital in
front. Visitors in room must remain
quiet + sitting in chairs

T.O. Dr S. Sawyer / Pinielom LPN

| Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature | |
| --- | --- | --- | --- | --- |

**3**

5.25.01 ① Portable KUB today [45]
② NPO

| Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature |
| --- | --- | --- | --- |
| | | JST 0914 5-25-01 | |

DO NOT WRITE BELOW THIS POINT

PHYSICIAN'S ORDERS

MC-263 (2/00)

MC-263
REV. 2/00

USE BALL POINT PEN ONLY AND PRESS FIRMLY!

ALLERGIES

Weight

Another brand of generically equivalent product may be dispensed unless checked or initialed.

| CRT ORDER? | PHYSICIAN'S ORDERS | ADDRESSOGRAPH |
|---|---|---|

☐ Inpatient   ☐ Outpatient   ☐ OP surgery

**1**

5/23
1820

Demerol 75mg + Phenergan 120mg    IM   Q3° prn pain
P.O. Dr. S. Sawyer                        Westenlumr

| Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature |
|---|---|---|---|

**2**

5/24/01    ① D/C NGT, Foley, Aldo dsg
②  △ gsw dsg8.
③  OOB.

| Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature |
|---|---|---|---|
| | | 1/5 T 0928 5·24·01 | |

**3**

5/24/01↑    Demerol to 100mg c̄ Phenergan 25 mg
1445    Im Q3° prn pain.
+ to per Dr. Sam Sawyer.
C. Leutz RN
Noted C. Leutz RN
5/24/01
1445

| Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature |
|---|---|---|---|
| | | 1445 | 5/24/01 |

DO NOT WRITE BELOW THIS POINT

**PHYSICIAN'S ORDERS**
MC-263 (2/00)

USE BALL POINT PEN ONLY AND PRESS FIRMLY!

ALLERGIES | Weight

Another brand of generically equivalent product may be dispensed unless checked or initialed.

| CAT. ORDER # | PHYSICIAN'S ORDERS | ADDRESSOGRAPH |
|---|---|---|
| | ☐ Inpatient  ☐ Outpatient  ☐ OP surgery | |

5-23-01
2:45 P

Adm to _____ floor ——
Dx: GSW _____ arm

| **1** | Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature | ADDRESSOGRAPH |

5-23-01
2:5 P

① To RR room
② VS q4h, I & O Foley
③ NG to LWS, SPO₂ x icu
④ Demerol PCA 25 load, 15 dose,
6 min interval, 100 hourly limit
⑤ Phenergan 12 IVP q4h + PRN
⑥ D5 ½ NS @ 100/hr
⑦ Zinacef 1.5 g IVPB q8h
⑧ Dsg + elevate legs x2h
⑨ CBC, CMP in AM ⑥

| **2** | Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature | ADDRESSOGRAPH |

D/C pacu

V.O. Dr. Schwock/K. Thoreson
5/23/01 @ 1710

5/23/01

| **3** | Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature | ADDRESSOGRAPH |

## NURSE'S ASSESSMENT AND CARE PLAN

P I E N T S
L A T E

CONRAD, ROBERT
01143-00094          T/P
SAWYER, SAMUEL
                    05/23/01
81-12-8095

207

**SHIFT ASSESSMENT   DATE** 5/28 **TIME:** 0800

**P #1    IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR _mucous membrane_
_Klng IAM+/ ____ hyper WWD_
INTEGRITY/PRESSURE ULCER EVALUATION
_Ml Deplis intact & Sg of perfusal_
EDEMA
ADDED OBSERVATIONS _R arm dangling quarter sign_
_swelling L V per Old dsg_

**P #2    ALTERATION IN THOUGHT PROCESS DUE TO**

LOC _A+ O X 3_

**P #3    ALTERED COPING LEVEL DUE TO**

COOPERATIVE _y__
ANXIOUS/COMBATIVE
OTHER
RIC PLAY WNL

**P #4    NEURO/MUSCULAR/SKELETAL DEFICIT DUE TO** _S+_

PUPILS
MOTOR _M 4 E_
TRACTION/ETC.
ADDED OBSERVATIONS _gait steady_

**P #5    IMPAIRED COMMUNICATION DUE TO**

CLEAR _y__
SLURRED
APHASIC
OTHER

**P #6    INEFFECTIVE BREATHING PATTERNS DUE TO** _Ex Smoker_

BREATH SOUNDS _Ø occ Rale_
_bil_
RESPIRATIONS
COUGH/SPUTUM
OXYGEN TYPE/CROUP TENT
ADDED OBSERVATIONS _TCDB done c pt_

**P #7    ALTERED PERIPHERAL TISSUE PERFUSION DUE TO**

**P #8    ALTERATION IN CARDIAC OUTPUT DUE TO**

HT   NDS
R.
PULSES (R/L)   RADIAL _____   DP ____
PT ____   NAILBEDS _pink_
CAPILLARY REFILL _3 sec_
SUPPORT STOCKINGS _ Hamans sign Bilat_
MONITOR

**P #9    ALTERATION GI FUNCTIONING DUE TO**

ABD _m ___ distended_
BOWEL SOUNDS _+4 quad_
NG DRAINAGE/POSITION VERIFIED

RESIDUAL
STOOL _this am_
EMESIS
DRSG/DRAINS

**P #10   ALTERATION IN GU FUNCTIONING DUE TO**

URINE _CC yellow 5 artery_
CATHETER
MENSES
VAGINAL PACKING

**P #11   ALTERATION IN COMFORT LEVEL DUE TO** _Lt knee pain_

_0800 FST po_

**P #12   ALTERED SKIN INTEGRITY OR FLUID OVERLOAD DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED | 5/ |
|------|--------|------|------|------------|--------------|---|
| PERIPHERAL | | | | | | |
| HEPLOCK ✓ | | | | | | |
| CENTRAL | | | DATE DSG CHANGE | | | |
| IV SITE PEDS Q1H | | | | | | |
| IV SITE WNL Q2H | 08 | 0 | | | | |
| INFUSION DEVICE | | | | | | |
| TUBING CHANGES | | | | | | |

**P #13   PATIENT/FAMILY KNOWLEDGE DEFICIT DUE TO** _FSBS FST po, J test_
_only patient_

**P #14   SELF CARE DEFICIT DUE TO**

**P #15   ACTIVITY TOLERANCE DUE TO**

| | | |
|---|---|---|
| BEDREST ✓ | TURN Q2H | _sa g_ |
| DANGLE ✓ | COMMODE | |
| CHAIR ✓ | BRP ✓ | |
| AMBULATING ✓ | EGGCRATE | |
| AIRMATTRESS | | |

**P #16   DECREASED SAFETY DUE TO**

HIGH RISK IDENTIFIED
SIDE RAILS UP 1/2 ✓
                UP FULL ✓
CALL LIGHT IN REACH ✓
BED POSITION UP
            DOWN ✓
RESTRAINT RELEASE
BED CHECK
K-PAD CHECK
CRIB

**P #17   ALTERATION IN NUTRITION DUE TO** _H2O po tolerd_

TYPE _full reg_ (B) ____ S
AMOUNT _70%_
SNACK-DIABETIC
CIRCLE   (SELF)   FEED / NG   GTUBE   PUMP
NURSE
NURSE                                    RN
CARE PLAN UPDATED                YES      NO
ACUITY SCORE

Progressive Nurses Notes

| TIME | P.I.E. | DUE TO |
|------|--------|--------|
| 0900 | M. | x Ray done i pt back to rm |
| | I #12 | HL DC'ed i DC'd intact, no activ bld dsg to site |
| | I #1 13 | M L/E abd cleaned c W.C, instructed to keep clean + Dry. soap + H₂O |
| | 1 | Wkng dsg. x₃ i water i abd L/K areal wounds cleaned c sterile N/S Abilet Bactratracin, out to site i dsg to site. pt tolerated procedure well - |
| | M, 13 | scripts for Lexapra, Soma - pt i paracort c written + verbal instruction to Police office c pt. Police officer Verbal understanding along c pt. Police |
| 0915 | M | pt D/C'ed to home per Dr. orders to coffee county jail c Police officer. No distress physically noted No stress is uppermost. pts |

# NURSE'S ASSESSMENT AND CARE PLAN

P A T I E N T S
P L A T E

CONRAD, ROBERT
01143-00034          I/P
SAWYER, SAMUEL
BOY   M   5    05/23/01
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
0103190055

**SHIFT ASSESSMENT   DATE:** _____  **TIME:** 19.30

**P #1   IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR _____

INTEGRITY/PRESSURE ULCER EVALUATION _Midline incise_

EDEMA _no_

ADDED OBSERVATIONS _____

**P #2   ALTERATION IN THOUGHT PROCESS DUE TO**

LOC _A - O X 3_

**P #3   ALTERED COPING LEVEL DUE TO**

COOPERATIVE _Yes_
ANXIOUS/COMBATIVE _____
OTHER _____
RIC PLAY WNL _WA_

**P #4   NEURO/MUSCULAR/SKELETAL DEFICIT DUE TO**

PUPILS _____
MOTOR _MAE_
TRACTION/ETC. _NO_
ADDED OBSERVATIONS _____

**P #5   IMPAIRED COMMUNICATION DUE TO**

CLEAR _Yes_
SLURRED _____
APHASIC _____
OTHER _____

**P #6   INEFFECTIVE BREATHING PATTERNS DUE TO**

BREATH SOUNDS _Clear_
RESPIRATIONS _____
COUGH/SPUTUM _no_
OXYGEN TYPE/CROUP TENT _no_
ADDED OBSERVATIONS _____

**P #7   ALTERED PERIPHERAL TISSUE PERFUSION DUE TO**

**P #8   ALTERATION IN CARDIAC OUTPUT DUE TO**

HT _____
R) _____
PULSES (R/L)  RADIAL ___  DP ___
PT _____
CAPILLARY REFILL _< 3sec_
SUPPORT STOCKINGS _no_
MONITOR _none_

**P #9   ALTERATION GI FUNCTIONING DUE TO**

ABD _____
BOWEL SOUNDS _____
NG DRAINAGE/POSITION VERIFIED _____

RESIDUAL _____
STOOL _____
EMESIS _____
DRSG/DRAINS _____

**P #10   ALTERATION IN GU FUNCTIONING DUE TO**

URINE _voided - urinal_
CATHETER _____
MENSES _____
VAGINAL PACKING _____

**P #11   ALTERATION IN COMFORT LEVEL DUE TO**

**P #12   ALTERED SKIN INTEGRITY OR FLUID OVERLOAD DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|------|--------|------|------|------------|--------------|
| PERIPHERAL | | | | | |
| HEPLOCK | | | | | 3/26 |
| CENTRAL | | | | DATE DSG CHANGE | |
| IV SITE PEDS Q1H | | | | | |
| IV SITE WNL Q2H | 1930 | 20 | 2200 | 02040 | |
| INFUSION DEVICE | | | | | |
| TUBING CHANGES | | | | | |

**P #13   PATIENT/FAMILY KNOWLEDGE DEFICIT DUE TO**

**P #14   SELF CARE DEFICIT DUE TO** _NA_

**P #15   ACTIVITY TOLERANCE DUE TO**

| | | | |
|---|---|---|---|
| BEDREST _NO_ | | TURN Q2H | |
| DANGLE | | COMMODE | |
| CHAIR _Yes_ | | BRP _Yes_ | |
| AMBULATING | | EGGCRATE | |
| AIRMATTRESS | | | |

**P #16   DECREASED SAFETY DUE TO**

HIGH RISK IDENTIFIED _no_
SIDE RAILS UP 1/2 _Yes_
            UP FULL _no_
CALL LIGHT IN REACH _Yes_
BED POSITION UP _no_
            DOWN _Yes_
RESTRAINT RELEASE _____
BED CHECK _____
X-PAD CHECK _____
CRIB _____

**P #17   ALTERATION IN NUTRITION DUE TO**

| | B | L | S |
|------|---|---|---|
| TYPE | full | | |
| AMOUNT | | | |
| SNACK-DIABETIC | | | |

CIRCLE  (SELF)  FEED  NG  G TUBE  PUMP
NURSE _____ LPN
NURSE _____ RN
CARE PLAN UPDATED          YES     NO
ACUITY SCORE _____

| TIME | P.I.E. | DUE TO | |
|------|--------|--------|--|
| 2000 | m | VS taken stable | E. Jem. LVPN |
| 2200 | m | Watch TV voice no c/o | E. Jem. LVPN |
| 0001 | m | VS taken stable - soda - gum | E. Jem. LVPN |
| 0200 | m | Watch TV - | E. Jem. LVPN |
| 0400 | m | Demo 100, 5 | E. Jem. LVPN |
| 0420 | m | ice - soda served. | E. Jem. LVPN |
| 0600 | E#17 | HL intact no redness no edema @ Site P | E. Jem. LVPN |
| | E#1 | No S/S w/ initial assessment. | E. Jem. LVPN |

# NURSE'S ASSESSMENT AND CARE PLAN

CONRAD, ROBERT
01147-0001A
SAWYER, SAMUEL
I/P  05/03/01
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

201

## SHIFT ASSESSMENT   DATE: 5/25   TIME: 0800

**P  #1   IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR _WNL Warm dry to touch_

INTEGRITY/PRESSURE ULCER EVALUATION _staples to midline incision open to air. Dsg to open abd area dry/intact_

EDEMA _Ø_

ADDED OBSERVATIONS _Ø_

**P  #2   ALTERATION IN THOUGHT PROCESS DUE TO**

LOC _alert x3_

**P  #3   ALTERED COPING LEVEL DUE TO**

COOPERATIVE _yes_
ANXIOUS/COMBATIVE
OTHER
THERAPEUTIC PLAY WNL

**P  #4   NEURO/MUSCULAR/SKELETAL DEFICIT DUE TO**

PUPILS _equal & reactive to light_
MOTOR _m A P_
TRACTION/ETC _Ø_
ADDED OBSERVATIONS _Ø_

**P  #5   IMPAIRED COMMUNICATION DUE TO**

CLEAR _yes_
SLURRED
APHASIC
OTHER

**P  #6   INEFFECTIVE BREATHING PATTERNS DUE TO**

BREATH SOUNDS
RESPIRATIONS
COUGH/SPUTUM
OXYGEN TYPE/CROUP TENT
ADDED OBSERVATIONS

**P  #7   ALTERED PERIPHERAL TISSUE PERFUSION DUE TO**

**P  #8   ALTERATION IN CARDIAC OUTPUT DUE TO**

HT/POS
RH
PULSES (R/L)    RADIAL    /    DP    /
PT    /    NAILBEDS
CAPILLARY REFILL
SUPPORT STOCKINGS
MONITOR

**P  #9   ALTERATION GI FUNCTIONING DUE TO**

ABD _Soft staples intact dsg intact_
BOWEL SOUNDS _hypoactive_
NG DRAINAGE/POSITION VERIFIED

RESIDUAL _Ø_
STOOL _Ø_
EMESIS
DRSG/DRAINS

**P  #10   ALTERATION IN GU FUNCTIONING DUE TO**

URINE
CATHETER _Ø_
MENSES _Ø_
VAGINAL PACKING

**P  #11   ALTERATION IN COMFORT LEVEL DUE TO**

**P  #12   ALTERED SKIN INTEGRITY OR FLUID OVERLOAD DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|---|---|---|---|---|---|
| PERIPHERAL | D5½@100 | | L↑ | R≠c+c | 5/26 |
| HEPLOCK | | | | | |
| CENTRAL | | | DATE DSG CHANGE | | |
| IV SITE  PEDS  Q1H | | | | | |
| IV SITE WNL Q2H | | | | | |
| INFUSION DEVICE | pump | | | | |
| TUBING CHANGES | | | | | |

**P  #13   PATIENT/FAMILY KNOWLEDGE DEFICIT DUE TO**

**P  #14   SELF CARE DEFICIT DUE TO**

**P  #15   ACTIVITY TOLERANCE DUE TO**

| | | |
|---|---|---|
| BEDREST | TURN Q2H | |
| DANGLE | COMMODE | |
| CHAIR | BRP | |
| AMBULATING | EGGCRATE | |
| AIRMATTRESS | | limited |

**P  #16   DECREASED SAFETY DUE TO**

HIGH RISK IDENTIFIED
SIDE RAILS UP 1/2 _✓_
       UP FULL
CALL LIGHT IN REACH _✓_
BED POSITION UP
       DOWN _✓_
RESTRAINT RELEASE
BED CHECK
K-PAD CHECK
CRIB

**P  #17   ALTERATION IN NUTRITION DUE TO**

| TYPE | NPO T sip cl ℓ B | | L | S |
|---|---|---|---|---|
| AMOUNT | | | | |
| SNACK-DIABETIC | | | | |
| CIRCLE | SELF   FEED   NG   G TUBE   PUMP | | | |
| NURSE | D Walsh | | | |
| NURSE | | | | RN |
| CARE PLAN UPDATED | | | YES   NO | |
| ACUITY SCORE | | | | |

**Progressive Nurses Notes**

| TIME | P.I.E. | DUE TO |
|------|--------|--------|
| 0800 | m | virtual assessment done phone see other side — Ditto |
| 1900 | m | IV S to HL c̄ problem site flushed & |
|      |   | resumed — Ditto |
| 1130 | m | dsg A to abd & L arm tolerated c̄ diff - Ditto |
| 1400 | m | watch IV & % urine & dextrus c̄cald Ditto |
| 1615 | m. | & A m̄ assist at this time — Ditto |
| 1755 |   | continue c̄ previous arrangement. % PEO pad acd maintained Present p̄ PO-PRN |
| ADS 1900 |  | Rest quietly, state ṽ — Paula Ryan |
|      |   |  |
|      |   |  |

# NURSE'S ASSESSMENT AND CARE PLAN

CONRAD, ROBERT
01143-J0294        I/P
SAWYER, JAMES C.
DY   M  S    03/23/01
ADULT/PEDS
CIVIL/DC

**SHIFT ASSESSMENT   DATE:** 5-16 **TIME:** 1920

| P | #1 | IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION, DUE TO |
|---|---|---|
APPEARANCE/COLOR/TEMPERATURE/TURGOR *oral membranes*
*Pink & moist*
INTEGRITY/PRESSURE ULCER, EVALUATION (1) DSG (1) *arm*
(1) L quad mid line incision open all
EDEMA — none
ADDED OBSERVATIONS — none

| P | #2 | ALTERATION IN THOUGHT PROCESS DUE TO |
|---|---|---|
LOC — A - O X 3

| P | #3 | ALTERED COPING LEVEL DUE TO |
|---|---|---|
COOPERATIVE — yes
ANXIOUS/COMBATIVE —
THERAPEUTIC PLAY WNL — NA

| P | #4 | NEURO/MUSCULAR/SKELETAL DEFICIT DUE TO |
|---|---|---|
PUPIL — reAn
MOTOR — MAE
TRACTION/ETC. — none
ADDED OBSERVATIONS — none

| P | #5 | IMPAIRED COMMUNICATION DUE TO |
|---|---|---|
CLEAR — yes
SLURRED —
APHASIC —
OTHER —

| P | #6 | INEFFECTIVE BREATHING PATTERNS DUE TO |
|---|---|---|
BREATH SOUNDS — clear
RESPIRATIONS — no
COUGH/SPUTUM — no
OXYGEN TYPE/CROUP TENT — no
ADDED OBSERVATIONS — HOB↑

| P | #7 | ALTERED PERIPHERAL TISSUE PERFUSION DUE TO |
|---|---|---|

| P | #8 | ALTERATION IN CARDIAC OUTPUT DUE TO |
|---|---|---|
HT   DS — lub dub
RH —
PULSES (R/L)   RADIAL — 
RT      NAILBEDS —
CAPILLARY REFILL — L 3 sec
SUPPORT STOCKINGS — no
MONITOR — none

| P | #9 | ALTERATION GI FUNCTIONING DUE TO |
|---|---|---|
ABD — soft
BOWEL SOUNDS — ⊕ x 4 quad
NG DRAINAGE/POSITION VERIFIED —
RESIDUAL —
STOOL —
EMESIS —
DRSG/DRAINS —

| P | #10 | ALTERATION IN GU FUNCTIONING DUE TO |
|---|---|---|
URINE — voided
CATHETER —
MENSES —
VAGINAL PACKING —

| P | #11 | ALTERATION IN COMFORT LEVEL DUE TO |
|---|---|---|
Denies no C/O @ present

| P | #12 | ALTERED SKIN INTEGRITY OR FLUID OVERLOAD DUE TO |
|---|---|---|

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|---|---|---|---|---|---|
| PERIPHERAL | D5 .2 NS | @ 100 c/hr | @ arm | | 5/16 |
| HEPLOCK | | | | | |
| CENTRAL | | | DATE DSG CHANGE | | |
| IV SITE  PEDS  Q1H | | | | | |
| IV SITE WNL Q2H | 1920  20  ᴅᴅ  ccc1  02 0406 | | | | |
| INFUSION DEVICE | pump | | | | |
| TUBING CHANGES | | | | | |

| P | #13 | PATIENT/FAMILY KNOWLEDGE DEFICIT DUE TO | hospital routine IV plan |
|---|---|---|---|
IV + med duck pr to day

| P | #14 | SELF CARE DEFICIT DUE TO | NA |
|---|---|---|---|

| P | #15 | ACTIVITY TOLERANCE DUE TO |
|---|---|---|
| BEDREST | yes | TURN Q2H | self |
| DANGLE | | COMMODE | urinal |
| CHAIR | | BRP | yes |
| AMBULATING | | EGGCRATE | |
| AIRMATTRESS | | | |

| P | #16 | DECREASED SAFETY DUE TO | Police Guard |
|---|---|---|---|
in room
HIGH RISK IDENTIFIED — no
SIDE RAILS UP 1/2 — yes
UP FULL — no
CALL LIGHT IN REACH — yes
BED POSITION UP —
DOWN — yes
RESTRAINT RELEASE —
BED CHECK —
K-PAD CHECK —
CRIB —

| P | #17 | ALTERATION IN NUTRITION DUE TO |
|---|---|---|
| TYPE | clr sips | B | L | S |
| AMOUNT | | | | |
| SNACK-DIABETIC | | | | |
| CIRCLE | SELF | FEED | NG | G TUBE | PUMP |
| NURSE | G. Winshill LPN | | | | |
| NURSE | | | | RN | |
| CARE PLAN UPDATED | | | YES | NO | |
| ACUITY SCORE | | | | | |

| TIME | P.I.E. | DUE TO |
|------|--------|--------|
| 1920 | P#11 | IV infiltrated — _____ L. Jennifer? LPN |
|      | I#11 | DC'ed, pressure dsg intact — #22 gelco to L arm w/sus's dift. ___ L. Jennifer? LPN |
| 2000 | E#11 | IV infusing c diff — U stable stable L. Jennifer? LPN |
| 2140 | m | call out wanting to know where his glasses was. Call ER asked any glasses left from any admitt this week — Stated "No" Informed pt possible — police has all his belongings — States "OK" sitty on side of bed — 400 cc emptied from urinal. ___ L. Jennifer? LPN |
| 0001 | E#11 | effective U stable stable — ABX PO given L. ? LPN |
| 0200 | m | Sleeping resp 20 c ease — ? LPN |
| 0400 | m | U stable stable — Demp 98 — L. ? LPN |
| 0600 | E#1 | No A in initial assessment. ___ L. ? LPN |
|      | E#12 | IV infusing c diff. ___ ? LPN |
|      | E#10 | 260 cc of amber urine emptied from urinal ? LPN |
|      | / |  |

N-84

# NURSE'S ASSESSMENT AND CARE PLAN

IDENT SE

CONRAD, ROBERT
1143-00094    I/P
CARTER, SAMUEL
M    S    05/23/01
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
00.041153

207B

**SHIFT ASSESSMENT    DATE:** 5/26 **TIME:** 0800

| P #1 | IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION DUE TO |
|---|---|

APPEARANCE/COLOR/TEMPERATURE/TURGOR _Warm Dry_

INTEGRITY/PRESSURE ULCER EVALUATION _Intact to 1cm_ _Staples ABD_

EDEMA

ADDED OBSERVATIONS

| P #2 | ALTERATION IN THOUGHT PROCESS DUE TO |
|---|---|

LOC _awake/oriented_

| P #3 | ALTERED COPING LEVEL DUE TO |
|---|---|

COOPERATIVE _yes_
ANXIOUS/COMBATIVE _No_
C___S
RIC PLAY WNL

| P #4 | NEURO/MUSCULAR/SKELETAL DEFICIT DUE TO |
|---|---|

PUPILS _reactive_
MOTOR _MAE slowly_
TRACTION/ETC.
ADDED OBSERVATIONS _Dsg to (R) arm_

| P #5 | IMPAIRED COMMUNICATION DUE TO |
|---|---|

CLEAR _yes_
SLURRED _No_
APHASIC
OTHER

| P #6 | INEFFECTIVE BREATHING PATTERNS DUE TO |
|---|---|

BREATH SOUNDS
RESPIRATIONS _unlabored_
COUGH/SPUTUM
OXYGEN TYPE/CROUP TENT _T5 @ 2° while awake_
ADDED OBSERVATIONS

| P #7 | ALTERED PERIPHERAL TISSUE PERFUSION DUE TO |
|---|---|

| P #8 | ALTERATION IN CARDIAC OUTPUT DUE TO |
|---|---|

HT    OS _NBD_
RH
PULSES (R/L)    RADIAL _/_    DP _/_
PT    NAILBEDS
CAPILLARY REFILL _Not assessed_
SUPPORT STOCKINGS
MONITOR

| P #9 | ALTERATION GI FUNCTIONING DUE TO |
|---|---|

ABD _soft_
BOWEL SOUNDS
NG DRAINAGE/POSITION VERIFIED

RESIDUAL
STOOL
EMESIS
DRSG/DRAINS _Staples CSm dog to ABD_

| P #10 | ALTERATION IN GU FUNCTIONING DUE TO |
|---|---|

URINE _Voiding_
CATHETER
MENSES _N/A_
VAGINAL PACKING

| P #11 | ALTERATION IN COMFORT LEVEL DUE TO |
|---|---|

_TTO Demerol 50mg + Phenergen 25mg IV_

| P #12 | ALTERED SKIN INTEGRITY OR FLUID OVERLOAD DUE TO |
|---|---|

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|---|---|---|---|---|---|
| PERIPHERAL | | | | WN | 5/23 |
| HEPLOCK | PS/2 NS @ 100 | | | (R) FA | |
| CENTRAL | | | DATE DSG CHANGE | | |
| IV SITE  PEDS  Q1H | | | | | |
| IV SITE WNL Q2H | | _10-12_ | | | |
| INFUSION DEVICE | _Baxter pump_ | | | | |
| TUBING CHANGES | | | | | |

| P #13 | PATIENT/FAMILY KNOWLEDGE DEFICIT DUE TO |
|---|---|

| P #14 | SELF CARE DEFICIT DUE TO |
|---|---|

| P #15 | ACTIVITY TOLERANCE DUE TO |
|---|---|

| BEDREST | | TURN Q2H |
|---|---|---|
| DANGLE | | COMMODE |
| CHAIR | | BRP |
| AMBULATING | | EGGCRATE |
| AIRMATTRESS | | |

| P #16 | DECREASED SAFETY DUE TO |
|---|---|

HIGH RISK IDENTIFIED
SIDE RAILS UP 1/2
    UP FULL
CALL LIGHT IN REACH
BED POSITION UP
    DOWN
RESTRAINT RELEASE
BED CHECK
K-PAD CHECK
CRIB _N/A_

| P #17 | ALTERATION IN NUTRITION DUE TO |
|---|---|

TYPE _Clear liq_    B    L    S
AMOUNT _Sips only push fluid_
SNACK-DIABETIC
CIRCLE    SELF    FEED    NG    G TUBE    PUMP
NURSE _Starnes RN_
NURSE                                      RN
CARE PLAN UPDATED _yes_    YES    NO
ACUITY SCORE

Progressive Nurses Notes

| TIME | P.I.E. | DUE TO |
|------|--------|--------|
| 0800 | | AM assessment completed. No complaints @ this time ——— *Harkin RN* |
| 1030 | | OOB in chair at this time. Police officer @ 135 |
| 1110 | #11 | Demerol 50 mg + Phenergan 25 mg IM given for to pain ——— *Harkin RN* |
| 1300 | | Sleeping @ intervals. Sips of clear liqs ——— |
| 1430 | | No S in AM assessment *Harkin RN* |
| 1600 | m | up to bathroom x 2 showed how to work pump and use it to steady gait amb to BR's @ min diff dsg @ bedside incision line dry + intact @ resolved at staples area dsg to @ + abd + @ arm both dry + intact @ acute distress noted ——— *O'Brien RN* |
| 1730 | m | fluids main patt @ % void ——— *O'Brien RN* |

# NURSE'S ASSESSMENT AND CARE PLAN

CONRAD, ROBERT
1143-00094                I/P
SAWYER, SAMUEL
CITY M S    05/23/01

**SHIFT ASSESSMENT   DATE:** 05/25/01 **TIME:** 2330

**P  #1    IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION**
**DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR _pink / warm / dry_

INTEGRITY/PRESSURE ULCER EVALUATION _midline incision_ c̄
_staples_

EDEMA  ∅
ADDED OBSERVATIONS

**P  #2    ALTERATION IN THOUGHT PROCESS**
**DUE TO**

LOC _alert / oriented_

**P  #3    ALTERED COPING LEVEL**
**DUE TO**

COOPERATIVE _yes_
ANXIOUS/COMBATIVE ∅
OTHER  ∅
RIC PLAY WNL  ∅

**P  #4    NEURO/MUSCULAR/SKELETAL DEFICIT**
**DUE TO**

PUPILS _Equal_
MOTOR _MAE_
TRACTION/ETC.  ∅
ADDED OBSERVATIONS ∅

**P  #5    IMPAIRED COMMUNICATION**
**DUE TO**

CLEAR _yes_
SLURRED  ∅
APHASIC  ∅
OTHER  ∅

**P  #6    INEFFECTIVE BREATHING PATTERNS**
**DUE TO**

BREATH SOUNDS _clear_
RESPIRATIONS _even + reg_
COUGH/SPUTUM  ∅
OXYGEN TYPE/CROUP TENT  ∅
ADDED OBSERVATIONS _short(low) breathing_

**P  #7    ALTERED PERIPHERAL TISSUE PERFUSION**
**DUE TO**

**P  #8    ALTERATION IN CARDIAC OUTPUT**
**DUE TO**

HT    OS _5/ 3?_
RH                _reg_
PULSES (R/L)    RADIAL    + / +    DP  + / +
PT            NAILBEDS _pink_
CAPILLARY REFILL _<2 sec_
SUPPORT STOCKINGS ∅
MONITOR  ∅

**P  #9    ALTERATION GI FUNCTIONING**
**DUE TO**

ABD _soft / nontender / not distended_
BOWEL SOUNDS _(+) all 4 quadrants_
NG DRAINAGE/POSITION VERIFIED  ∅

RESIDUAL  ∅
STOOL  ∅
EMESIS  ∅
DRSG/DRAINS  ∅

**P  #10   ALTERATION IN GU FUNCTIONING**
**DUE TO**

URINE _yellow_
CATHETER  ∅
MENSES  ∅
VAGINAL PACKING  ∅

**P  #11   ALTERATION IN COMFORT LEVEL**
**DUE TO**

**P  #12   ALTERED SKIN INTEGRITY OR FLUID OVERLOAD**
**DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|------|--------|------|------|------------|--------------|
| PERIPHERAL | D5 1/2 NS @ KU | | LFA | WNL | 5/23 |
| HEPLOCK | | | | | |
| CENTRAL | | | DATE DSG CHANGE | | |
| IV SITE  PEDS  Q1H | | | | | |
| IV SITE WNL Q2H | | | | | |
| INFUSION DEVICE | _Baxter_ | | | | |
| TUBING CHANGES | | | | | |

**P  #13   PATIENT/FAMILY KNOWLEDGE DEFICIT**
**DUE TO**

**P  #14   SELF CARE DEFICIT**
**DUE TO**

**P  #15   ACTIVITY TOLERANCE**
**DUE TO**

BEDREST                    TURN Q2H
DANGLE                     COMMODE
CHAIR                      BR Daily
AMBULATING                 EGGCRATE
AIRMATTRESS

**P  #16   DECREASED SAFETY**
**DUE TO**

HIGH RISK IDENTIFIED  ∅
SIDE RAILS UP 1/2 _yes_
            UP FULL  ∅
CALL LIGHT IN REACH _yes_
BED POSITION UP  ∅
            DOWN _yes_
RESTRAINT RELEASE  ∅
BED CHECK  ∅
K-PAD CHECK  ∅
CRIB  ∅

**P  #17   ALTERATION IN NUTRITION**
**DUE TO**

| TYPE | NPO | | B | | L | | S |
|------|-----|---|---|---|---|---|---|
| AMOUNT | | | | | | | |
| SNACK-DIABETIC | | | | | | | |

| CIRCLE | SELF | FEED | NG | G TUBE | PUMP |
|--------|------|------|-----|--------|------|
| NURSE | _Pamela M Crane, RN_ | | | | |
| NURSE | | | | | RN |
| CARE PLAN UPDATED | | | YES | NO | |
| ACUITY SCORE | | | | | |

| TIME | P.I.E. | DUE TO |
|------|--------|--------|
| 2330 | | Assessment complete, perd hurt of page, airline [illegible] [illegible] — [illegible] no abd. pain, administered Demerol 100 + Phenergan 25 g IM (L) [illegible], encouraged [illegible], pt [illegible] pain with breaths deep, instruct to do when [illegible], pt voidel, had incident [illegible] & PTO, call light in reach, police at BS ———— [signature] RN |
| 0240 | | Restg q with in bed, & % pain. ———— [signature] |
| 0400 | | VSS, no c/o pain, deep breathing [illegible] & less pain [illegible] [signature] |
| 0605 | | Resting quietly, & complaints at this time. & s this shift - [signature] |

N-#4

# NURSE'S ASSESSMENT AND CARE PLAN

CONRAD, ROBERT
01143-00794          I/P
SAWYER, SAMUEL
             M   5   05/23/01

**SHIFT ASSESSMENT   DATE:** 25   **TIME:**

**P   #1   IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION**
              DUE TO

APPEARANCE/COLOR/TEMPERATURE/TURGOR _____

INTEGRITY/PRESSURE ULCER EVALUATION _____

EDEMA _____

ADDED OBSERVATIONS _____

**P   #2   ALTERATION IN THOUGHT PROCESS**
              DUE TO

LOC _____

**P   #3   ALTERED COPING LEVEL**
              DUE TO

COOPERATIVE _____

ANXIOUS/COMBATIVE _____

RIC PLAY WNL _____

**P   #4   NEURO/MUSCULAR/SKELETAL DEFICIT**
              DUE TO

PUPILS _____

MOTOR _____

TRACTION/ETC. _____

ADDED OBSERVATIONS _____

**P   #5   IMPAIRED COMMUNICATION**
              DUE TO

CLEAR _____

SLURRED _____

APHASIC _____

OTHER _____

**P   #6   INEFFECTIVE BREATHING PATTERNS**
              DUE TO

BREATH SOUNDS _____

RESPIRATIONS _____

COUGH/SPUTUM _____

OXYGEN TYPE/CROUP TENT _____

ADDED OBSERVATIONS _____

**P   #7   ALTERED PERIPHERAL TISSUE PERFUSION**
              DUE TO

**P   #8   ALTERATION IN CARDIAC OUTPUT**
              DUE TO

H        DS _____

Rh _____

PULSES (R/L)   RADIAL _____   DP _____

PT _____   NAILBEDS _____

CAPILLARY REFILL _____

SUPPORT STOCKINGS _____

MONITOR _____

**P   #9   ALTERATION GI FUNCTIONING**
              DUE TO

ABD _____

BOWEL SOUNDS _____

NG DRAINAGE/POSITION VERIFIED _____

RESIDUAL _____

STOOL _____

EMESIS _____

DRSG/DRAINS _____

**P   #10   ALTERATION IN GU FUNCTIONING**
              DUE TO

URINE _____

CATHETER _____

MENSES _____

VAGINAL PACKING _____

**P   #11   ALTERATION IN COMFORT LEVEL**
              DUE TO

_____

_____

_____

**P   #12   ALTERED SKIN INTEGRITY OR FLUID OVERLOAD**
               DUE TO

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|------|--------|------|------|------------|--------------|
| PERIPHERAL | | | | | |
| HEPLOCK | | | | | |
| CENTRAL | | | DATE DSG CHANGE | | |
| IV SITE  PEDS  Q1H | | | | | |
| IV SITE WNL Q2H | | | | | |
| INFUSION DEVICE | | | | | |
| TUBING CHANGES | | | | | |

**P   #13   PATIENT/FAMILY KNOWLEDGE DEFICIT**
               DUE TO

**P   #14   SELF CARE DEFICIT**
               DUE TO

**P   #15   ACTIVITY TOLERANCE**
               DUE TO

| | |
|--|--|
| BEDREST | TURN Q2H |
| DANGLE | COMMODE |
| CHAIR | BRP |
| AMBULATING | EGGCRATE |
| AIRMATTRESS | |

**P   #16   DECREASED SAFETY**
               DUE TO

HIGH RISK IDENTIFIED _____

SIDE RAILS UP 1/2 _____

UP FULL

CALL LIGHT IN REACH _____

BED POSITION UP

DOWN

RESTRAINT RELEASE _____

BED CHECK _____

K-PAD CHECK _____

CRIB _____

**P   #17   ALTERATION IN NUTRITION**
               DUE TO

| TYPE | B | L | S |
|------|---|---|---|
| AMOUNT | | | |
| SNACK-DIABETIC | | | |

| CIRCLE | SELF | FEED | NG | G TUBE | PUMP |
|--------|------|------|----|--------|------|

NURSE _____

NURSE _____ RN

CARE-PLAN UPDATED _____   YES _____   NO _____

ACUITY SCORE _____

| TIME | P.I.E. | DUE TO |
|------|--------|--------|
| 1530 | G1-12 | Mcg.1)(L)'q ut - Clean fry 2 Nc Modin LUQ ABD |
| | | Clars fry - inverin uti - hdga well oppnox - |
| | | Stapler in place, t Drainage - S set of when or |
| | | infection - guard present a |
| 1830 | | Stant D for 1530 - NT resting (easily |
| | | aroused) - t Clo pain or Distress a |
| 2000 | | Stata cont t Chang, from 1530 - NT remain |
| | | t Clo or Sof of pain or Distress a |
| 2220 | | Stata remain t D for 1530 - NT cont. resting |
| | | a t Clo pain or Distress a |
| | | |
| | | |
| | | |
| | | |
| | 1 | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# NURSE'S ASSESSMENT AND CARE PLAN

CONRAD, ROBERT
01143-00094
BAXTER, CHUCK
05/23/01

---

**SHIFT ASSESSMENT   DATE:** 5/23 **TIME:** 10ʰ Am

**P #1   IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR _Warm intact_

INTEGRITY/PRESSURE ULCER EVALUATION ___

EDEMA _Ø_
ADDED OBSERVATIONS _small ace wrapper, inner warm D/T O_

**P #2   ALTERATION IN THOUGHT PROCESS DUE TO**

LOC _A + O_

**P #3   ALTERED COPING LEVEL DUE TO**

COOPERATIVE _Yes_
ANXIOUS/COMBATIVE ___
GERIATRIC PLAY WNL ___

**P #4   NEURO/MUSCULAR/SKELETAL DEFICIT DUE TO**

PUPILS _PER_
MOTOR _MAEW_
TRACTION/ETC. ___
ADDED OBSERVATIONS ___

**P #5   IMPAIRED COMMUNICATION DUE TO**

CLEAR _Yes_
SLURRED ___
APHASIC ___
OTHER ___

**P #6   INEFFECTIVE BREATHING PATTERNS DUE TO** _Yes Clear_

BREATH SOUNDS _Yes Clear_
RESPIRATIONS _Easy, unlabored_
COUGH/SPUTUM _Ø_
OXYGEN TYPE/CROUP TENT _Ø_
ADDED OBSERVATIONS _Encouraged to deep breathe, splint and cough_

**P #7   ALTERED PERIPHERAL TISSUE PERFUSION DUE TO**

**P #8   ALTERATION IN CARDIAC OUTPUT DUE TO**

HR/DS _5.52_
Rh. ___
PULSES (R/L)   RADIAL _+ / +_   DP _/_
PT _+ / +_   NAILBEDS _pink_
CAPILLARY REFILL _< 3 sec._
SUPPORT STOCKINGS ___
MONITOR ___

---

**P #9   ALTERATION GI FUNCTIONING DUE TO**

ABD _tender @ surgical site_
BOWEL SOUNDS ___
NG DRAINAGE/POSITION VERIFIED ___

RESIDUAL _Staples intact, small amt ❍_
STOOL _@ midnight_
EMESIS _Ø_
DRSG/DRAINS _Dry, intact to (L) of Suture line_

**P #10   ALTERATION IN GU FUNCTIONING DUE TO**

URINE _per BR_
CATHETER ___
MENSES ___
VAGINAL PACKING ___

**P #11   ALTERATION IN COMFORT LEVEL DUE TO** _Surgery_

_1415- Demerol 100mg / Phenergan 25mg IM_

**P #12   ALTERED SKIN INTEGRITY OR FLUID OVERLOAD DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|------|--------|------|------|------------|--------------|
| PERIPHERAL | D5/12 @ 100cc/hr | RFA | | 5/23 | |
| HEPLOCK | | | | | |
| CENTRAL | | | DATE DSG CHANGE | | |
| IV SITE  PEDS  Q1H | | | | | |
| IV SITE WNL Q2H | 0800; 1000; 1200; 1400 | | | | |
| INFUSION DEVICE | Buxtor | | | | |
| TUBING CHANGES | | | | | |

**P #13   PATIENT/FAMILY KNOWLEDGE DEFICIT DUE TO**

**P #14   SELF CARE DEFICIT DUE TO** _Surgery_

**P #15   ACTIVITY TOLERANCE DUE TO**

| | |
|---|---|
| BEDREST | TURN Q2H |
| DANGLE | COMMODE |
| CHAIR 1000 - 1130 | BRP |
| AMBULATING to BR | EGGCRATE |
| AIRMATTRESS | |

**P #16   DECREASED SAFETY DUE TO**

HIGH RISK IDENTIFIED _Yes_
SIDE RAILS UP 1/2 _yes_
           UP FULL ___
CALL LIGHT IN REACH _yes_
BED POSITION UP ___
           DOWN _Yes_
RESTRAINT RELEASE ___
BED CHECK ___
K-PAD CHECK ___
CRIB ___

**P #17   ALTERATION IN NUTRITION DUE TO**

| TYPE | B | L | S |
|------|---|---|---|
| AMOUNT NPO | | | |
| SNACK-DIABETIC | | | |
| CIRCLE   SELF   FEED   NG   GTUBE   PUMP | | | |
| NURSE | | | |
| NURSE J. Sedel, RN | | | RN |
| CARE PLAN UPDATED | YES | NO | |
| ACUITY SCORE | | | |

| TIME | P.I.E. | DUE TO |
|------|--------|--------|
| 0800 | | Pt rec'd alert, oriented c̄ C/O. Encouraged to deep breathe; splint c̄ folded blanket; and cough. Policeman in room. ———— Betty Calander RN |
| 1000 | | Up to chair c̄ minimal assist. C/O pain c̄ movement only. Told to request pain medication if needed. ———— Betty Calander RN |
| 1130 | | Assisted from chair to bed c̄ minimal assist. Encouraged to deep breathe. Police officers @ bedside. Betty Calander RN |
| 1415 | | Medicated c̄ Demerol 100mg / Phenergan 25mg IM to ® gluteal by Kim Dilley, LPN. ———— Betty Calander RN |
| 1500 | | Resting c̄ eyes closed. ———— Betty Calander RN |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# NURSE'S ASSESSMENT AND CARE PLAN

I/P

```
C? ?AG .ROBEAT
??? . .?
?.?   . .  EL
??      05/23/01
??.?-?.?.?.?5
?.?.?.?.?3
```

**SHIFT ASSESSMENT   DATE:** 5/24   **TIME:** 1900

**P   #1   IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION
                DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR ___ w & d to tot ___
pink faa ___

INTEGRITY/PRESSURE ULCER EVALUATION ___ Dry (c) ? a + abd ___
s/p GSW ___

EDEMA ___

ADDED OBSERVATIONS ___

**P   #2   ALTERATION IN THOUGHT PROCESS
                DUE TO**

LOC ___ A & O ___

**P   #3   ALTERED COPING LEVEL
                DUE TO**

COOPERATIVE ___ yes ___

ANXIOUS/COMBATIVE ___

/RIC PLAY WNL ___

**P   #4   NEURO/MUSCULAR/SKELETAL DEFICIT
                DUE TO**

PUPILS ___ PERRL ___

MOTOR ___ mnl ___

TRACTION/ETC. ___

ADDED OBSERVATIONS ___

**P   #5   IMPAIRED COMMUNICATION
                DUE TO**

CLEAR ___ yes ___

SLURRED ___

APHASIC ___

OTHER ___

**P   #6   INEFFECTIVE BREATHING PATTERNS
                DUE TO**

BREATH SOUNDS ___ on clr ___

RESPIRATIONS ___ un - lrbard ___

COUGH/SPUTUM ___

OXYGEN TYPE/CROUP TENT ___

ADDED OBSERVATIONS ___

**P   #7   ALTERED PERIPHERAL TISSUE PERFUSION
                DUE TO**

**P   #8   ALTERATION IN CARDIAC OUTPUT
                DUE TO**

| | | | | | |
|---|---|---|---|---|---|
| H | IDS | S.5z | | | |
| Rh | A | VC | | | |

PULSES (R/L) ___ RADIAL ___ 1 + ___ DP ___ 1 ___

PT ___ 1 + ___ NAILBEDS ___ pink ___

CAPILLARY REFILL ___ c.O. ___

SUPPORT STOCKINGS ___

MONITOR ___

**P   #9   ALTERATION GI FUNCTIONING
                DUE TO**

ABD ___ Soft & full ___

BOWEL SOUNDS ___ (B) L & bowel ___

NG DRAINAGE/POSITION VERIFIED ___

RESIDUAL ___

STOOL ___

EMESIS ___

DRSG/DRAINS ___

**P   #10   ALTERATION IN GU FUNCTIONING
                DUE TO**

URINE ___ yellow ___

CATHETER ___

MENSES ___

VAGINAL PACKING ___

**P   #11   ALTERATION IN COMFORT LEVEL
                DUE TO**

**P   #12   ALTERED SKIN INTEGRITY OR FLUID OVERLOAD
                DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|---|---|---|---|---|---|
| PERIPHERAL | D5 1/2 | @100 | (R) FA intact | | 5/23 |
| HEPLOCK | | | | | |
| CENTRAL | | | DATE DSG CHANGE | | |
| IV SITE  PEDS  Q1H | | | | | |
| IV SITE WNL Q2H | | | | | |
| INFUSION DEVICE | | | | | |
| TUBING CHANGES | | | | | |

**P   #13   PATIENT/FAMILY KNOWLEDGE DEFICIT
                DUE TO**

**P   #14   SELF CARE DEFICIT
                DUE TO**

**P   #15   ACTIVITY TOLERANCE
                DUE TO**

| | |
|---|---|
| BEDREST | TURN Q2H |
| DANGLE | COMMODE |
| CHAIR | BRP |
| AMBULATING | EGGCRATE |
| AIRMATTRESS | |

**P   #16   DECREASED SAFETY
                DUE TO**

HIGH RISK IDENTIFIED ___

SIDE RAILS UP 1/2 ___ ✓ ___

UP FULL ___

CALL LIGHT IN REACH ___ ✓ ___

BED POSITION UP ___

DOWN ___ ✓ ___

RESTRAINT RELEASE ___

BED CHECK ___

K-PAD CHECK ___

CRIB ___

**P   #17   ALTERATION IN NUTRITION
                DUE TO**

| TYPE | NPO | B | L | S |
|---|---|---|---|---|
| AMOUNT | | | | |
| SNACK-DIABETIC | | | | |

| CIRCLE | SELF | FEED | NG | GTUBE | PUMP |
|---|---|---|---|---|---|

NURSE ___ ?.Bartle-L ___

NURSE ___                                    RN

CARE PLAN UPDATED ___              YES ___ NO ___

ACUITY SCORE ___

| TIME | P.I.E. | DUE TO |
|------|--------|--------|
| 1900 | E. | Resting quietly in bed. c/o abd pain. Demerol 100 q + phenergan 25 z IM to (R) thigh given. Res pos - taboral. Initial assessment completed. |
| 5000 | E | c/o abd & back pain. Demerol 100 q + phenergan 25 z IM to (L) thigh given. County Sheriff Dept @ bedside. |
| 0001 | C | Resting quietly - EPD in room. No acute distress noted. |
| 0215 | E | c/o pain Demerol 100 q + phenergan 25 z IM given to RUG |
| 0415 | E | Amb to bathroom. Voided 800 cc cl yellow urine. |
| 0520 | C | Resting quietly. No acute distress noted |

# NURSE'S ASSESSMENT AND CARE PLAN

**P  #9    ALTERATION GI FUNCTIONING**
**DUE TO**

ABD _____

BOWEL SOUNDS _____

NG DRAINAGE/POSITION VERIFIED _____

RESIDUAL _____

STOOL _____

EMESIS _____

DRSG/DRAINS _____

**P  #10   ALTERATION IN GU FUNCTIONING**
**DUE TO**

URINE _____

CATHETER _____

MENSES _____

VAGINAL PACKING _____

**P  #11   ALTERATION IN COMFORT LEVEL**
**DUE TO**

**P  #12   ALTERED SKIN INTEGRITY OR FLUID OVERLOAD**
**DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|------|--------|------|------|------------|--------------|
| PERIPHERAL | | | | | |
| HEPLOCK | | | | | |
| CENTRAL | | DATE DSG CHANGE | | | |
| IV SITE  PEDS  Q1H | | | | | |
| IV SITE WNL Q2H | | | | | |
| INFUSION DEVICE | | | | | |
| TUBING CHANGES | | | | | |

**P  #13   PATIENT/FAMILY KNOWLEDGE DEFICIT**
**DUE TO**

**P  #14   SELF CARE DEFICIT**
**DUE TO**

**P  #15   ACTIVITY TOLERANCE**
**DUE TO**

| BEDREST | TURN Q2H |
|---------|----------|
| DANGLE | COMMODE |
| CHAIR | BRP |
| AMBULATING | EGGCRATE |
| AIRMATTRESS | |

**P  #16   DECREASED SAFETY**
**DUE TO**

HIGH RISK IDENTIFIED _____

SIDE RAILS UP 1/2 _____

UP FULL

CALL LIGHT IN REACH _____

BED POSITION UP _____

DOWN

RESTRAINT RELEASE _____

BED CHECK _____

K-PAD CHECK _____

CRIB _____

**P  #17   ALTERATION IN NUTRITION**
**DUE TO**

| TYPE | | B | L | S |
|------|--|---|---|---|
| AMOUNT | | | | |
| SNACK-DIABETIC | | | | |

| CIRCLE | SELF | FEED | NG | G TUBE | PUMP |
|--------|------|------|-----|--------|------|

NURSE _____

NURSE _____  RN

CARE-PLAN UPDATED _____  YES _____  NO

ACUITY-SCORE _____

---

I/P

05/23/01

## SHIFT ASSESSMENT   DATE: _____ TIME: _____

**P  #1    IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION**
**DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR _____

INTEGRITY/PRESSURE ULCER EVALUATION _____

EDEMA _____

ADDED OBSERVATIONS _____

**P  #2    ALTERATION IN THOUGHT PROCESS**
**DUE TO**

LOC _____

**P  #3    ALTERED COPING LEVEL**
**DUE TO**

COOPERATIVE

ANXIOUS/COMBATIVE _____

/RIC PLAY WNL _____

**P  #4    NEURO/MUSCULAR/SKELETAL DEFICIT**
**DUE TO**

PUPILS _____

MOTOR   M A E _____

TRACTION/ETC. _____

ADDED OBSERVATIONS _____

**P  #5    IMPAIRED COMMUNICATION**
**DUE TO**

CLEAR

SLURRED _____

APHASIC _____

OTHER _____

**P  #6    INEFFECTIVE BREATHING PATTERNS**
**DUE TO**

BREATH SOUNDS _____

RESPIRATIONS _____

COUGH/SPUTUM _____

OXYGEN TYPE/CROUP TENT _____

ADDED OBSERVATIONS _____

**P  #7    ALTERED PERIPHERAL TISSUE PERFUSION**
**DUE TO**

**P  #8    ALTERATION IN CARDIAC OUTPUT**
**DUE TO**

NOS _____

RH...M _____

PULSES (R/L)   RADIAL _____ DP _____

PT _____ NAILBEDS _____

CAPILLARY REFILL _____

SUPPORT STOCKINGS _____

MONITOR _____

| TIME | P.I.E. | DUE TO |
|------|--------|--------|
| 1530 | EI-17 | Patrolman c̄ pt — Numerous vic dm̄ h̄ t̄ recpt. |
|      |       | NSg — 1)(L)Toe — 4x4 — Cln + Ory. 2) And(L) midln # — |
|      |       | LLuq — 4x4 — Cln + Ory 3) Suture line — c̄ order implore |
|      |       | c̄ Drainage — edges well approx — S̄ redness ā s+s̄ q̄ |
|      |       | infection. ✓ |
| 1800 | | ✓ T ō S̄ D pn 1530 — pt S̄ K/O pain ā Nausea |
|      | | 17:15 pt info formally informed q̄ charge against |
|      | | him — patrolman remain c̄ pt. ✓ |

# NURSE'S ASSESSMENT AND CARE PLAN

CONRAD, ROBERT
01143-03094          I/P
SAWYER, SAMUEL
BOY  M  S  05/23/01
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

20?B

---

**SHIFT ASSESSMENT  DATE** 5/24/01 **TIME:** 0810

**P #1  IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION**
**DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR _mucus membranes_
_pink, skin turgor <2 sec, warm_
INTEGRITY/PRESSURE ULCER EVALUATION _midline incision_
_blood noted on drsg middle to lower_
EDEMA _no_                                          _dr sg._
ADDED OBSERVATIONS _drsg on (L) upper inner_
_arm, sm. amt. of blood noted._

**P #2  ALTERATION IN THOUGHT PROCESS**
**DUE TO**
LOC _oriented x3_

**P #3  ALTERED COPING LEVEL**
**DUE TO**
COOPERATIVE _yes_
ANXIOUS/COMBATIVE _✓_
PRIC PLAY WNL

**P #4  NEURO/MUSCULAR/SKELETAL DEFICIT**
**DUE TO**
PUPILS _Perrla_
MOTOR _MAE_
TRACTION/ETC.
ADDED OBSERVATIONS

**P #5  IMPAIRED COMMUNICATION**
**DUE TO**
CLEAR _yes_
SLURRED
APHASIC
OTHER

**P #6  INEFFECTIVE BREATHING PATTERNS**
**DUE TO**
BREATH SOUNDS _Clear bilat._
RESPIRATIONS _reg. unlabored_
COUGH/SPUTUM _no_
OXYGEN TYPE/CROUP TENT
ADDED OBSERVATIONS

**P #7  ALTERED PERIPHERAL TISSUE PERFUSION**
**DUE TO**

**P #8  ALTERATION IN CARDIAC OUTPUT**
**DUE TO**
H     OS  _S. S @ PMI_
RH.  M  _Reg unlabored_
PULSES (R/L1  RADIAL _+2 , +2_  DP _+2, +2_
PT       NAILBEDS _pink_
CAPILLARY REFILL _<2 sec._
SUPPORT STOCKINGS
MONITOR

---

**P #9  ALTERATION GI FUNCTIONING**
**DUE TO**
ABD _nondistended, nontender_
BOWEL SOUNDS _present +4  midline_
NG DRAINAGE/POSITION VERIFIED _quads. dr sg._
                                                    _see_
RESIDUAL _no_                                    _back_
STOOL _no_
EMESIS _no_
DRSG/DRAINS _NGT to LIS._

**P #10  ALTERATION IN GU FUNCTIONING**
**DUE TO**
URINE
CATHETER _light yellow - no sediment_
MENSES
VAGINAL PACKING

**P #11  ALTERATION IN COMFORT LEVEL** 0910 - Demerol ?
**DUE TO**                                    1210 Demerol 25
_S c/o pain, S c/o nausea_ ?
                                            _vomiting_

**P #12  ALTERED SKIN INTEGRITY OR FLUID OVERLOAD**
**DUE TO**

| | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|---|---|---|---|---|---|
| SITE | | | | | |
| PERIPHERAL | (R) forearm | ns | | | 5/23 |
| HEPLOCK | D5 1/2 NS @100 | edema at | | | |
| CENTRAL | | | DATE DSG CHANGE | | c/o pain |
| IV SITE PEDS Q1H | | | | | |
| IV SITE WNL Q2H | 0810  12  14 | | | | |
| INFUSION DEVICE | | | | | |
| TUBING CHANGES | 5/23 | | | | |

**P #13  PATIENT/FAMILY KNOWLEDGE DEFICIT**
**DUE TO**

**P #14  SELF CARE DEFICIT**
**DUE TO**

**P #15  ACTIVITY TOLERANCE**
**DUE TO**

| | |
|---|---|
| (BEDREST) | TURN Q2H |
| DANGLE | COMMODE |
| CHAIR | BRP |
| AMBULATING | EGGCRATE |
| AIRMATTRESS | |

**P #16  DECREASED SAFETY**
**DUE TO**
HIGH RISK IDENTIFIED _no_
SIDE RAILS UP 1/2 _yes_
UP FULL
CALL LIGHT IN REACH _yes_
BED POSITION UP
        DOWN _yes_
RESTRAINT RELEASE
BED CHECK _yes_
K-PAD CHECK
CRIB

**P #17  ALTERATION IN NUTRITION**
**DUE TO**
TYPE _NPO_          B _NPO_ L _NPO_ S
AMOUNT
SNACK-DIABETIC
CIRCLE  (SELF)  FEED  NG  G TUBE  PUMP
NURSE
NURSE _C. Lentz R_          RN
CARE PLAN UPDATED          YES     NO
ACUITY SCORE

Progressive Nurses Notes

| TIME | P.I.E. | DUE TO |
|------|--------|--------|
| 0800 | | V/S ved and stable. Drsg to abd. — mid line motor incision covered c̄ — gauze, sm. 2x2 drsg. (L) side of — incision when where entry of gun — shot wound. Both dregs. D/I: c̄ c/o pain when palpating around sites. 2x2 gauze applied to (L) upper, inner side of arm, D/I — bullet entry site. Abd. — nondistended, soft and BS present +4 Quads. Pulses +2 radial bilat; dorsalis pedis bilat. Breath sounds clear. bilat. Resp. reg. and unlabored. Very flat affect, c̄ little conversation. Simple yes/no responses. Family members @ bs. Denies any needs @ time. c̄ no c/o. Will cont. to assess. ————————— C. Lentz R |
| 0930 | | Dced Foley. DC NG tube. Dced — drsg. to abd. and arm. midline incision on abd. s̄ edema, redness, warmth, dehiscence or drainage. — No foul odor noted. Gunshot — entries s̄ drainage or foul odor. Reapplied sm. drsg. to bullet entry sites. Approx. 200 cc of dark — green drainage collected in NG — tube and cannister. Both foley c̄ NG tube dced s̄ difficulty or c/o pain. 300 200 cc in foley bag. Assisted — pt. to chair x1 assist. ———— C. Lentz |
| 1145 | | Pt. back to bed x1 assist. c/o — pain @ bullet entry and to the (R) of incision. see front sheet for pain med administration. Officer and family members @ bs. cont. to have flat affect. No emotion noted. Little conversation. ————— C. Lentz |

# NURSE'S ASSESSMENT AND CARE PLAN

CONRAD, ROGER
C.143-00094          I/P
SAWYER, SAMUEL
M.  S.    05/23/01
-17-3795

2078

| **SHIFT ASSESSMENT   DATE:          TIME:** |
| --- |

### P  #1    IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION DUE TO

APPEARANCE/COLOR/TEMPERATURE/TURGOR _____

INTEGRITY/PRESSURE ULCER EVALUATION _____

EDEMA _____
ADDED OBSERVATIONS _____

### P  #2    ALTERATION IN THOUGHT PROCESS DUE TO

LOC _____

### P  #3    ALTERED COPING LEVEL DUE TO

COOPERATIVE _____
ANXIOUS/COMBATIVE _____
OTHER _____
RIC PLAY WNL _____

### P  #4    NEURO/MUSCULAR/SKELETAL DEFICIT DUE TO

PUPILS _____
MOTOR _____
TRACTION/ETC. _____
ADDED OBSERVATIONS _____

### P  #5    IMPAIRED COMMUNICATION DUE TO

CLEAR _____
SLURRED _____
APHASIC _____
OTHER _____

### P  #6    INEFFECTIVE BREATHING PATTERNS DUE TO

BREATH SOUNDS _____
RESPIRATIONS _____
COUGH/SPUTUM _____
OXYGEN TYPE/CROUP TENT _____
ADDED OBSERVATIONS _____

### P  #7    ALTERED PERIPHERAL TISSUE PERFUSION DUE TO

### P  #8    ALTERATION IN CARDIAC OUTPUT DUE TO

H  NDS _____
R. _____
PULSES (R/L)    RADIAL        /        DP      /
PT              NAILBEDS _____
CAPILLARY REFILL _____
SUPPORT STOCKINGS _____
MONITOR _____

### P  #9    ALTERATION GI FUNCTIONING DUE TO

ABD _____
BOWEL SOUNDS _____
NG DRAINAGE/POSITION VERIFIED _____

RESIDUAL _____
STOOL _____
EMESIS _____
DRSG/DRAINS _____

### P  #10   ALTERATION IN GU FUNCTIONING DUE TO

URINE _____
CATHETER _____
MENSES _____
VAGINAL PACKING _____

### P  #11   ALTERATION IN COMFORT LEVEL DUE TO

### P  #12   ALTERED SKIN INTEGRITY OR FLUID OVERLOAD DUE TO

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
| --- | --- | --- | --- | --- | --- |
| PERIPHERAL | | | | | |
| HEPLOCK | | | | | |
| CENTRAL | | | DATE DSG CHANGE | | |
| IV SITE  PEDS . Q1H | | | | | |
| IV SITE WNL Q2H | | | | | |
| INFUSION DEVICE | | | | | |
| TUBING CHANGES | | | | | |

### P  #13   PATIENT/FAMILY KNOWLEDGE DEFICIT DUE TO

### P  #14   SELF CARE DEFICIT DUE TO

### P  #15   ACTIVITY TOLERANCE DUE TO

| BEDREST | | TURN Q2H | |
| --- | --- | --- | --- |
| DANGLE | | COMMODE | |
| CHAIR | | BRP | |
| AMBULATING | | EGGCRATE | |
| AIRMATTRESS | | | |

### P  #16   DECREASED SAFETY DUE TO

HIGH RISK IDENTIFIED _____
SIDE RAILS UP 1/2 _____
         UP FULL _____
CALL LIGHT IN REACH _____
BED POSITION UP _____
         DOWN _____
RESTRAINT RELEASE _____
BED CHECK _____
K-PAD CHECK _____
CRIB _____

### P  #17   ALTERATION IN NUTRITION DUE TO

| TYPE | B | L | S |
| --- | --- | --- | --- |
| AMOUNT | | | |
| SNACK-DIABETIC | | | |
| CIRCLE | SELF | FEED    NG | G TUBE    PUMP |
| NURSE | | | |
| NURSE | | | RN |
| CARE PLAN UPDATED | | YES | NO |
| ACUITY SCORE | | | |

Progressive Nurses Notes

| TIME | P.I.E. | DUE TO |
|------|--------|--------|
| 1300 | | Resting c̄ eyes shut. Resp. reg. and unlabored @ 16. Officer and family members @ bs. ——————— C. Centra |
| 1430 | | C/o pain in and around area of bullet entry and (R) of incision. BS present. Repeats no gas and has not defecated. ——————— C. Centr |
| 1445 | | Called Dr. Sam per c̄ sustained relief from pain med. He ↑ed Demerol to 100mg c̄ Phenergan 25mg IM. Also restricted guest to 4 visitors to allow pt. to rest d/t post op surgical status. —— C. Centr |
| 1500 | | Informed pt. of ↑ of pain med. Denies any needs. Family @ bs. ——————— C. Center |
| | 1 | |

N-44

# NURSE'S ASSESSMENT AND CARE PLAN

CONRAD, ROBERT
01143-00094                I/P
SAWYER, SAMUEL
                    05/23/01

**SHIFT ASSESSMENT   DATE:** 5/23  **TIME:** 1725

**P  #1    IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR _WD/B to touch_
_pink fair_
INTEGRITY/PRESSURE ULCER EVALUATION _Dry to (c) arm +_
_mid abd_
EDEMA _____
ADDED OBSERVATIONS _____

**P  #2    ALTERATION IN THOUGHT PROCESS DUE TO**

LOC _Alert_

**P  #3    ALTERED COPING LEVEL DUE TO**

COOPERATIVE _yes_
ANXIOUS/COMBATIVE _____
    R _____
ATRIC PLAY WNL _____

**P  #4    NEURO/MUSCULAR/SKELETAL DEFICIT DUE TO**

PUPILS _PERRL_
MOTOR _MAE_
TRACTION/ETC _____
ADDED OBSERVATIONS _____

**P  #5    IMPAIRED COMMUNICATION DUE TO**

CLEAR _yes_
SLURRED _____
APHASIC _____
OTHER _____

**P  #6    INEFFECTIVE BREATHING PATTERNS DUE TO**

BREATH SOUNDS _en clr_
RESPIRATIONS _even - labored_
COUGH/SPUTUM _____
OXYGEN TYPE/CROUP TENT _____
ADDED OBSERVATIONS _____

**P  #7    ALTERED PERIPHERAL TISSUE PERFUSION DUE TO**

**P  #8    ALTERATION IN CARDIAC OUTPUT DUE TO**

NDS _S:S2_
RHYTHM _reg_
PULSES (R/L)  RADIAL _+/+_  DP _____
PT _+/+_  NAILBEDS _pink_
CAPILLARY REFILL _brisk_
SUPPORT STOCKINGS _6_
MONITOR _____

**P  #9    ALTERATION GI FUNCTIONING DUE TO**

ABD _soft & tender_
BOWEL SOUNDS _CBX4 quad_
NG DRAINAGE/POSITION VERIFIED _____

RESIDUAL _____
STOOL _____
EMESIS _____
DRSG/DRAINS _____

**P  #10    ALTERATION IN GU FUNCTIONING DUE TO**

URINE _____
CATHETER _foley_
MENSES _N/A_
VAGINAL PACKING _____

**P  #11    ALTERATION IN COMFORT LEVEL DUE TO**

**P  #12    ALTERED SKIN INTEGRITY OR FLUID OVERLOAD DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|------|--------|------|------|------------|--------------|
| PERIPHERAL | D5½ @ 100 | (R) FA | intact | 5/23 |  |
| HEPLOCK |  |  |  |  |  |
| CENTRAL |  |  | DATE DSG CHANGE |  |  |
| IV SITE  PEDS  Q1H |  |  |  |  |  |
| IV SITE WNL Q2H |  |  |  |  |  |
| INFUSION DEVICE |  |  |  |  |  |
| TUBING CHANGES |  |  |  |  |  |

**P  #13    PATIENT/FAMILY KNOWLEDGE DEFICIT DUE TO**

**P  #14    SELF CARE DEFICIT DUE TO**

**P  #15    ACTIVITY TOLERANCE DUE TO**

(BEDREST)                TURN Q2H
DANGLE                   COMMODE
CHAIR                    BRP
AMBULATING               EGGCRATE
AIRMATTRESS

**P  #16    DECREASED SAFETY DUE TO**

HIGH RISK IDENTIFIED _____
SIDE RAILS UP 1/2 _____
        UP FULL _____
CALL LIGHT IN REACH _____
BED POSITION UP _____
        DOWN _____
RESTRAINT RELEASE _____
BED CHECK _____
K-PAD CHECK _____
CRIB _____

**P  #17    ALTERATION IN NUTRITION DUE TO**

TYPE _NPO_        B        L        S
AMOUNT _____
SNACK-DIABETIC _____

| CIRCLE | SELF | FEED | NG | G TUBE | PUMP |
|--------|------|------|-----|--------|------|
| NURSE _Willis_ |  |  |  |  |  |
| NURSE |  |  |  |  | RN |
| CARE PLAN UPDATED |  |  | YES | NO |  |

Progressive Nurses Notes

| TIME | P.I.E. | DUE TO |
|------|--------|--------|
| 1725 | E | Arrival from surg s/p exp lap & bullet removal/from abd & (L) arm. Neg clear & un- labored. No acute dist noted. EPD @ bedrest. Aireted amcount completed |
| 1850 | E | c/o post-op pain. Demerol 75 & phenergan 12.5 mg IM to (L) thigh given. EPD remains in room. NGT to LIS started. |
| 2000 | E | Rest c eyes closed. No acute dist noted |
| 2250 | E | Rest quietly. Neg un-labored EPD remains in room |
| 0050 | E | Rest, c eyes closed. No acute dist noted |
| 0050 | E | Cont rest quietly. c/o nausea. Phenergan 12.5 mg IVP given. |
| 0450 | C | Rest, c eyes closed. Neg un-labored. EPD remains in room. |
| 0545 | E | 1 | c/o abd pain. Demerol 75 & phenergan 12.5 mg IM given |
| | | |
| | | |

N-#4

S93

# MEDICAL CENTER ENTERPRISE
## PROBLEM RESOLUTION SUMMARY

ADDRESSOGRAPH

**LEGEND**
I = IDENTIFIED      R = RESOLVED      U = UNRESOLVED

| PRIORITIZE | I | R | U | PRIORITIZE | I | R | U |
|---|---|---|---|---|---|---|---|
| P1-Impairment of skin integrity or perfusion due to* IV.dx. | 5/24 CL | | 5/28 PS | P10-Alteration in GU functioning due to* | | | |
| P2-Alteration in thought process due to* pain dx | 5/24 CL | 5/28 PS | | P11-Alteration in comfort level due to* pain. dx. | 5/24 CL | | 5/28 PS |
| P3-Altered coping level due to* + dx. pain. post op | 5/24 CL | 5/28 PS | | P12-Alteration skin integrity/fluid overload due to* IV | | 5/28 PS | |
| P4-Neuro/muscular/skeletal deficit due to* | | | | P13-Patient/Family knowledge deficit due to* post op | | 5/28 PS | |
| P5-Impaired communication due to* | | | | P14-Self-care deficit due to* dx. | 5/24 CL | 5/28 PS | |
| P6-Ineffective breathing patterns due to* | | | | P15-Activity intolerance due to* post op surgery dx | 5/24 CL | 5/28 PS | |
| P7-Altered peripheral tissue perfusion due to* | | | | P16-Decreased safety due to* | | | |
| P8-Alteration in cardiac output due to* | | | | P17-Alteration in nutrition due to* NPO status | 5/24 CL | 5/28 PS | |
| P9-Alteration in GI functioning due to* dx. post op | 5/24 CL | 5/28 PS | | P18-* | | | |

| INIT. | SIGNATURE | INIT. | SIGNATURE |
|---|---|---|---|
| CL | C. Lentz RN | PS | Penny S Quimlor |
| | | | |
| | | | |

*Comments:

**Standard of Care:** Was the expected patient outcome identified on admission met? . . . . . . . . . . . . . ☒ Yes    ☐ No
If **No***, comment below:

Discharge Date 5/28/01     Discharge Nurse Signature Penny S Quimlor

PICS # 0917870     Form #SUMMARY-2

594

SCREENING CRITERIA TO INCLUDE ALL AGES

| Patient Name |
|---|

## SOCIAL SERVICES REFERRAL     HBO Order #   Na.

- [ ] Suspected abuse/neglect   [ ] Nursing home, domicillary or rehab hospital
- [ ] Financial assistance    [ ] Transfer to other acute facility/transportation
- [ ] Hospice    [ ] Counseling aimed at various patients or family needs
- [ ] Mental Health Referrals   [ ] Assistance with adoptions
- [ ] Crisis intervention    [ ] Young mother with little support, all mothers age 16 and under.
- [ ] Discharge planning to include home health nursing, durable medical equipment, respiratory equipment, home IV and TPN therapy.

## DIETARY REFERRALS     HBO Order #   Na.

- [ ] Diet/Nutrition orders of: Tube Feeding, TPN, Calorie Count
- [ ] NPO status or unsupplemented clear liquid greater than 72 hours.
- [ ] Regular consumption of less than 50% of meals for 2-3 days
- [ ] Albumin level of 2.5 gm/dl or less
- [ ] Admitting diagnosis of: Malnutrition, Failure to Thrive, Cancer, Pressure Ulcer, Malabsorption, Sepsis, and newly diagnosed Diabetic
- [ ] Data from Admission Record of: Difficulty chewing and/or Swallowing, Unplanned weight loss of 10 pounds or more in 2 months. Severely underweight by appearance.

## PHYSICAL THERAPY /
## OCCUPATIONAL THERAPY   (*Obtain MD order PRIOR to consult*)    HBO Order #   Na.

- [ ] Patients who need training with a specific walking device, rehabilitation equipment.
- [ ] Patients who need splinting of the upper extremity.
- [ ] Admitting diagnosis of: New CVA, orthopedic problems (fractures, major joint replacement, arthroscopy, back injuries/back pain, sprains, dislocations, amputations.)
- [ ] New diagnosis of muscular/skeletal or neurological diseases to include, but not limited to: Parkinson's, arthritis/DSD, MS, MD or exacerbation of these diseases with recent loss of function.
- [ ] Major wounds which cannot be managed with basic nursing dressing changes (i.e., diabetic ulcer, decubitus ulcers, burns, stasis ulcers, traumatic lacerations).
- [ ] Patients whose functional status has decreased significantly due to admitting dx/complications, and have potential to regain that function.

## SPEECH PATHOLOGY   (*Obtain MD order PRIOR to consult*)    HBO Order #   Na.

- [ ] Need for assistive communication devices.
- [ ] Patient with recent hearing loss
- [ ] New diagnosis of speech disorders that involve problems with articulation, voice and fluency, swallowing, cognitive communication.

## CARDIO-PULMONARY     HBO Order #   Na.

- [ ] Asthma    [ ] COPD    [ ] Pneumonia    [ ] Shortness of Breath

## PHARMACY     HBO Order #   Na.

- [ ] Patients who are started on insulin for the first time.
- [ ] Patients who are taking 11 or more routine medications, including eye medications (PRN medications not included).
- [ ] Patients taking investigational drugs

## INFECTION CONTROL     HBO Order #   Na.

- [ ] Patient placed in isolation (Contact, Droplet, Air)
- [ ] Patient admit with pressure ulcer
- [ ] Neonate admission under 28 days old with dx: FUO, sepsis, pneumonia
- [ ] Patient with admitting dx of: TB, wound infection, IV site infection, POP, MRSA
- [ ] Patient placed on ventilator
- [ ] Patient with orders of vancomycin

## PERINATAL NURSE EDUCATOR    (2EAST PRINTER)     HBO Order #   Na.

- [ ] Sick newborn that is transferred
- [ ] Infant with poor prognosis
- [ ] Breastfeeding newborn with failure to gain weight
- [ ] Breastfeeding infant with failure to thrive
- [ ] Breastfeeding mom who is admitted or re-admitted to hospital during post partum
- [ ] Breastfeeding infant that is re-admitted
- [ ] Basic Life Support Referral (Infant CPR)
- [ ] Parinatal loss (Miscarriage, ectopic, stillborn, neonatal)

(IMPRINT CARD BELOW)

_C. Leutz_ RN     5/24/0   05/23/01

Screening completed by     Date

I/P

**PATIENTS' ID PLATE**

HARP, ROBERT
143-00294         I/P
DWYER, SAMUEL
5          05/23/01

| SITE CODE | C) Rt. Gluteal | G) Rt. Ven. Th | OMITTED DOSE |
|---|---|---|---|
| A) Rt. Deltoid | D) Lt. Gluteal | H) Lt. Ven. Th | 1. Patient Refused |
| B) Lt. Deltoid | E) Rt. Lat. Thigh | I) Abdomen | 2. Absent from Department |
| | F) Lt. Lat. Thigh | J) | 3. NPO Diagnostic |

| ALLERGIES | DIAGNOSIS | |
|---|---|---|
| NKDA | Gun shot to L arm | 4. NPO Surgery |
| | | 5. Vomited |
| | s abdomen | 6. Hold Dose    7. Sleepin |

## CLINICAL RECORD THERAPEUTIC DOCUMENTATION CARE PLAN ( Medications )    Mo. May   Yr. 2001

Init. Proper Column After Each Administration
DATE DISPENSED

| ORDER DATE | EXP. DATE | TRANS-SCRIBER | ROUTINE MEDICATIONS ROUTE, DOSE, FREQUENCY | 11-7 | 7-3 | 3-11 | 5/28 | 5/29 | 5/23 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/28 | / | DV | Neurontin 300mg po TID | | 09 | | | | | | | | | | |
| | / | | | | 13 | | | | | | | | | | |
| | / | | | | | 18 | | | | | | | | | |
| 5/31 | / | DV | Prilosec 20m PO q Day | | 09 | | | | | | | | | | |

**VERIFY BY INITIALING**

| INITIAL | NURSE'S SIGNATURE | INITIAL | NURSE'S SIGNATURE | INITIAL | NURSE'S SIGNATURE |
|---|---|---|---|---|---|
| | Apopaulen m | SP | SParker (PN) | PM | Pand McKenna |
| CL | C. Lentz M | | | | D. Will |
| | | | Betty Callender | | L. Jenn, Jr. LPN |

Form N - 49 REV. 12/93

**Medical Center Enterprise**

CONRAD, ROBERT
01143-00094
SAWYER, SAMUEL          I/P
                05/23/01

| SITE CODE | | OMITTED DOSE | |
|---|---|---|---|
| | | 1. Patient Refused | |
| | | 2. Absent from Department | |
| ALLERGIES | DIAGNOSIS | 3. Allergic | |
| | | 4. | |
| | | 5. | |
| | | 6. | |

## CLINICAL RECORD THERAPEUTIC DOCUMENTATION CARE PLAN ( Medications )    Mo. May Yr. '01

| ORDER DATE | EXP. DATE | TRANS-SCRIBER | ROUTINE I.V. MEDICATIONS ROUTE, DOSE, FREQUENCY | 11-7 | 7-3 | 3-11 | 5/23 | 24 | 25 | 26 | 27 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/23 | 1 | ✓ | Zinact 1.5 Gm IV q8° | 2400 | | | | M | M | M | Ordered | | | | |
| | 1 | | | | 08° | | | M | AC | S/P | not D/Ced | | | | |
| | 1 | | | | 16° | | AM | A | A | | | | | | |
| 5/23 | 1 | Dr | Zinact 1.5 Gm IV q8° | 24 | 0 | | | | | X | | | | | |
| | 1 | | | | 08 | | | | | X | | | | | |
| | 1 | | | | 16 | | X | X | X | Dr | | | | | |
| | 1 | | | | | | | | | | | | | | |
| | 1 | | / | | | | | | | | | | | | |
| | 1 | | | | | | | | | | | | | | |
| | 1 | | | | | | | | | | | | | | |
| | 1 | | | | | | | | | | | | | | |
| | 1 | | | | | | | | | | | | | | |
| 5/23 | 1 | Dr | FLUIDS D5½ @ 100 | 07 15 | X | X | Dr | X | | | | | | | |
| 5/26 | 1 | Dr | Top Int ½ p shift | 15 23 | X | X | X | | | | | | | | |
| 5/23 | 1 | Dr | D5½ @ 100 | 23 07 | X | X | X | | | | | | | | |
| 5/23 | 1 | Dr | Hep lock flush p shift | 1-7 | X | X | X | X | | | | | | | |
| | 1 | | | 7-3 | X | X | X | X | Dr | | | | | | |
| | 1 | | | 3-11 | X | X | X | X | | | | | | | |
| | 1 | | CHANGE SITE & TUBING Q 72 HOURS | | | | | | | | | | | | |
| | 1 | | | | | | | | | | | | | | |
| | 1 | | INTAKE | 7-3 | | | | | | | | | | | |
| | 1 | | | 3-11 | | | | | | | | | | | |
| | 1 | | | 11-7 | | | | | | | | | | | |
| | 1 | | LEFT IN BAG | 7-3 | | | | | | | | | | | |
| | 1 | | | 3-11 | | | | | | | | | | | |
| | 1 | | | 11-7 | | | | | | | | | | | |

PATIE ID PLA SE

[illegible patient identification stamp]

SAWYER, SAMUEL    05/23/01

ALLERGIES _____

_____

| ORDER DATE | EXP DATE | TRANS SCRIB-ER | P.R.N. MEDICATION | DATE | ROUTE/SITE | FREQUENCY | REASON TO BE GIVEN |
|---|---|---|---|---|---|---|---|
| 5/23 | | | Demerol 75 & Phenergan 25 | | Im | Q3° | pain |
| 5/23 | | | Phenergan 12 g | | IVP | Q4° | N/V |
| 5/24 | | | Demerol 100mg + Phenergan 25mg | Im | Q3° | pain n/v |
| 5/30 | | | Demerol 50 mg & Phenergan 25 | | IM | q 3° | pn-pain |
| 5/27 | | | Proxocet + a #80 | | PO | q 4° | pain |
| 5/27 | | | Phenergan 25 mg | | IM | q 4° | N/V |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

MEDICAL CENTER ENTERPRISE

| | | | | SINGLE ORDERS + PRE-OPERATIVE | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Or. Date Initials | MEDICATION - DOSAGE | ROUTE | TO BE GIVEN DATE | TIME | Nurse Initial | Or. Date Initials | MEDICATION - DOSAGE | ROUTE | TO BE GIVEN DATE | TIME | Nurse Initial |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

MEDICAL CENTER ENTERPRISE — P.R.N. MEDICATION RECORD

PATIENT'S ID PLATE

DIPAO, ROBERT
01143-00294
SAWYER, SAMUEL
05/23/0?

ALLERGIES _____

| DATE | TIME | MEDICATION AND DOSE | REASON GIVEN | RESULTS | SIGNATURE |
|------|------|---------------------|--------------|---------|-----------|
| 5/23 | 1850 | Demerol 75 mg & Phenergan 12.5 IM | post-op abd pai | eff | Wheeler |
| 5/24 | 0545 | Demerol 75g & Phenergan 12.5g IM | post op abd pai | eff | Wheeler |
| 5/24 | 0910 | Demerol 75 mg & Phenergan 12.5 | post op abd pai | eff | C. Lentz RN |
| 5/24 | 1210 | Demerol 75 mg / Phenergan 12.5 | post op pain | eff | C. Lentz |
| 5/24 | 1900 | Demerol 100g / Phenergan 25g IM | post-op pai | eff | Wheeler |
| 5/24 | 2200 | Demerol 100g / Phenergan 25g IM | pain | eff | Wheeler |
| 5/25 | 0215 | Demerol 100g & Phenergan 25g IM | pain | eff | Wheeler |
| 5/25 | 1415 | Demerol 100mg & Phenergan 25mg IM | pain | eff | |
| 5/25 | 2237 | Demerol 100mg / Phenergan 25mg IM | pain | eff | |
| 5/26 | 1110 | Demerol 50 mg / Phenergan 25mg IM | pain | eff | |
| 5/26 | 2035 | Demerol 50 mg / Phenergan 25 IM | pain | eff | |
| 5/27 | 1745 | Percocet ii po | pain | eff | |
| 5/28 | 0800 | tylenol ES GT | Ex pain | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

SIGN BEFORE USING INITIAL ON MAR.

| INITIAL | NURSE'S SIGNATURE | INITIAL | NURSE'S SIGNATURE | INITIAL | NURSE'S SIGNATURE |
|---------|-------------------|---------|-------------------|---------|-------------------|
| | | VD | Pgar Johnson | F/L | C. Lentz RN |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

599

Addressograph

Braden Scale / Skin Assessment Tool

Date: 5/29/61

| Skin / Braden Scale | 11-7 | 7-3 | 3-11 |
|---|---|---|---|
| Intact | | M. | |
| Non-Intact | C A/ | p | |
| Site            Stage: 4isq (L) T) arm = (L) quad | 0 | | |
| Site            Stage: mid line incis staple o | | | |
| Additional observations: intait - open to air | | | |
| | | | |
| | | | |
| | | | |
| Sensory Perception: 1=Completely Limited 2=Very Limited 3=Slightly Limited  4=No Impairment | 4 | 4 | |
| Moisture: 1=Constantly Moist 2=Moist 3=Occasionally Moist  4=Rarely Moist | 4 | 4 | |
| Activity: 1=Bedfast 2= Chair fast 3=Walks occasionally 4=Walks Frequently | 3 | 3 | |
| Mobility: 1=Completely Immobile 2=Very Limited 3=Slightly Limited 4=No Limitation | 3 | 3 | |
| Nutrition: 1=Very Poor 2=Probably Inadequate 3=Adequate 4=Excellent | 2 | 3 | |
| Friction and Shear: 1=Problem 2=Potential Problem 3=No apparent Problem | 3 | 3 | |
| Braden Score | 19 | 19 | |
| For score < 14, initiate Pressure Ulcer Protocol | | | |
| - Dietary consult (Date) | | | |
| -Skin Prep used when taping required | | | |
| -Incontinence precautions | | | |
| -Turning q2 | | | |
| Pressure relief measures | | | |
| -Wedges | | | |
| -Pillows | | | |
| -Heel protectors | | | |
| -Elbow Protector | | | |
| -Air mattress | | | |
| -Egg Crate | | | |
| -Floating of Feet | | | |
| | | | |
| Pressure ulcer present on admission   (Circle one) Yes   No | | | |
| Ulcer / Wound photo (admission or hospital acquired)    Date: | | | |
| Ulcer / Wound photo at discharge   Date: | | | |
| | | | |
| Nurse signature / Initials 11-7   J. Jmc(nd LPN | C.A. | M | |
| Nurse signature / Initials 7-3   P. | 0 | | |
| Nurse signature / Initials 3-11 | | | |

Jdrive:Nursing/Nursadm/Forms/Braden Scale Assessment form

Addressogra

Braden Scale / Skin Assessment Tool

Date: 5-??-01

| Skin / Braden Scale | 11-7 | 7-3 | 3-11 |
|---|---|---|---|
| Intact | CU | UU | |
| Non-Intact: | | | |
| Site          Stage: | | | |
| Site:         Stage: | | | |
| Additional observations: | | | |
| | | | |
| | | | |
| | | | |
| Sensory Perception: 1=Completely Limited 2=Very Limited 3=Slightly Limited  4=No Impairment | 4 | 4 | |
| Moisture: 1=Constantly Moist 2=Moist 3=Occasionally Moist  4=Rarely Moist | 4 | 4 | |
| Activity: 1=Bedfast 2= Chair fast 3=Walks occasionally 4=Walks Frequently | 3 | 3 | |
| Mobility: 1=Completely Immobile 2=Very Limited 3=Slightly Limited 4=No Limitation | 4 | 3 | |
| Nutrition: 1=Very Poor 2=Probably Inadequate 3=Adequate 4=Excellent | 3 | 3 | |
| Friction and Shear: 1=Problem 2=Potential Problem 3=No apparent Problem | 3 | 3 | |
| Braden Score | 20 | 20 | |
| For score < 14, initiate Pressure Ulcer Protocol | | | |
| - Dietary consult (Date) | | | |
| -Skin Prep used when taping required | | | |
| -Incontinence precautions | | | |
| -Turning q2 | | | |
| Pressure relief measures | | | |
| -Wedges | | | |
| -Pillows | | | |
| -Heel protectors | | | |
| -Elbow Protector | | | |
| -Air mattress | | | |
| -Egg Crate | | | |
| -Floating of Feet | | | |
| | | | |
| Pressure ulcer present on admission   (Circle one) Yes    No | | | |
| Ulcer / Wound photo (admission or hospital acquired)    Date: | | | |
| Ulcer / Wound photo at discharge   Date: | | | |
| | | | |
| Nurse signature / Initials 11-7 | CU | | |
| Nurse signature / Initials 7-3 | | Qu | |
| urse signature / Initials 3-11 | | | |

Jdrive:Nursing/Nursadm/Forms/Braden Scale Assessment form

599-2

Addressogra

## Braden Scale / Skin Assessment Tool

Date: 052601

| Skin / Braden Scale | 11-7 | 7-3 | 3-11 |
|---|---|---|---|
| Intact | | | |
| Non-Intact: | pmc | SP | |
| Site          Stage: | | | |
| Site:          Stage: | | | |
| Additional observations: midline mexin | pmc | SP | |
| | | | |
| | | | |
| | | | |
| Sensory Perception: 1=Completely Limited 2=Very Limited 3=Slightly Limited  4=No Impairment | 4 | 4 | |
| Moisture: 1=Constantly Moist 2=Moist 3=Occasionally Moist  4=Rarely Moist | 4 | 4 | |
| Activity: 1=Bedfast 2= Chair fast 3=Walks occasionally 4=Walks Frequently | 3 | 3 | |
| Mobility: 1=Completely Immobile 2=Very Limited 3=Slightly Limited 4=No Limitation | 3 | 3 | |
| Nutrition: 1=Very Poor 2=Probably Inadequate 3=Adequate 4=Excellent | 3 | 3 | |
| Friction and Shear: 1=Problem 2=Potential Problem 3=No apparent Problem | 3 | 3 | |
| Braden Score | 20 | 20 | |
| For score ≤ 14, initiate Pressure Ulcer Protocol | | | |
| - Dietary consult (Date) | | | |
| -Skin Prep used when taping required | | | |
| -Incontinence precautions | | | |
| -Turning q2 | | | |
| Pressure relief measures | | | |
| -Wedges | | | |
| -Pillows | | | |
| -Heel protectors | | | |
| -Elbow Protector | | | |
| -Air mattress | | | |
| -Egg Crate | | | |
| -Floating of Feet | | | |
| | | | |
| Pressure ulcer present on admission   (Circle one) Yes    No | | | |
| Ulcer / Wound photo (admission or hospital acquired)     Date: | | | |
| Ulcer / Wound photo at discharge   Date: | | | |
| | | | |
| Nurse signature / Initials 11-7 | pmc | SP | |
| Nurse signature / Initials 7-3 | | | |
| Nurse signature / Initials 3-11 | | | |

599-3

Addressograph

## Braden Scale / Skin Assessment Tool

5/25/0

Date:

| Skin / Braden Scale | 11-7 | 7-3 | 3-11 |
|---|---|---|---|
| Intact | | | |
| Non-Intact: Dry (l) Tou of abd s/p GSW (Exp lap) | he | BC | A |
| Site          Stage: | | | |
| Site:         Stage: | | | |
| Additional observations: | | | |
| | | | |
| | | | |
| | | | |
| **Sensory Perception:** 1=Completely Limited 2=Very Limited 3=Slightly Limited  4=No Impairment | 3 | 3 | 3 |
| **Moisture:** 1=Constantly Moist 2=Moist 3=Occasionally Moist  4=Rarely Moist | 4 | 4 | 4 |
| **Activity:** 1=Bedfast 2= Chair fast 3=Walks occasionally 4=Walks Frequently | 3 | 3 | 3 |
| **Mobility:** 1=Completely Immobile 2=Very Limited 3=Slightly Limited 4=No Limitation | 3 | 3 | 3 |
| **Nutrition:** 1=Very Poor 2=Probably Inadequate 3=Adequate 4=Excellent | 3 | 3 | 3 |
| **Friction and Shear:** 1=Problem 2=Potential Problem 3=No apparent Problem | 2 | 2 | 2 |
| **Braden Score** | 18 | 18 | 17 |
| **For score ≤ 14, initiate Pressure Ulcer Protocol** | | | |
| - Dietary consult (Date) | | | |
| -Skin Prep used when taping required | | | |
| -Incontinence precautions | | | |
| -Turning q2    See | he | BC | A |
| Pressure relief measures | | | |
| -Wedges | | | |
| -Pillows | | | |
| -Heel protectors | | | |
| -Elbow Protector | | | |
| -Air mattress | | | |
| -Egg Crate | | | |
| -Floating of Feet | | | |
| | | | |
| Pressure ulcer present on admission   (Circle one) Yes / No | he | BC | A |
| Ulcer / Wound photo (admission or hospital acquired)    Date: | | | |
| Ulcer / Wound photo at discharge   Date: | | | |
| | | | |
| Nurse signature / Initials 11-7   Medalhat | A | | |
| Nurse signature / Initials 7-3   Betti Cala de RN | | BC | |
| urse signature / Initials 3-11 | | | A |

Jdrive:Nursing/Nursadm/Forms/Braden Scale Assessment form

599-4

Addressograph:

## Braden Scale / Skin Assessment Tool

Date: 5/24/01

| Skin / Braden Scale | 11-7 | 7-3 | 3-11 |
|---|---|---|---|
| Intact | | | |
| Non-Intact: _incision in lower abd. quad._ | | CL | |
| Site              Stage: _Gunshot wound on ①_ | | | |
| Site:              Stage: _side of incision on abd_ | | | |
| Additional observations: _Gunshot entry wound on_ | | | |
| _① upper arm_ | | | |
| | | | |
| | | | |
| **Sensory Perception:** 1=Completely Limited 2=Very Limited 3=Slightly Limited  4=No Impairment | | 4 | |
| **Moisture:** 1=Constantly Moist 2=Moist 3=Occasionally Moist  4=Rarely Moist | | 4 | |
| **Activity:** 1=Bedfast 2= Chair fast 3=Walks occasionally 4=Walks Frequently | | 2 | |
| **Mobility:** 1=Completely Immobile 2=Very Limited 3=Slightly Limited 4=No Limitation | | 3 | |
| **Nutrition:** 1=Very Poor 2=Probably Inadequate 3=Adequate 4=Excellent | | 1 | |
| **Friction and Shear:** 1=Problem 2=Potential Problem 3=No apparent Problem | | 3 | |
| **Braden Score** | | 17 | |
| For score < 14, initiate Pressure Ulcer Protocol | | | |
| - Dietary consult (Date) | | | |
| -Skin Prep used when taping required | | | |
| -Incontinence precautions | | | |
| -Turning q2 | | | |
| Pressure relief measures | | | |
| -Wedges | | | |
| -Pillows | | | |
| -Heel protectors | | | |
| -Elbow Protector | | | |
| -Air mattress | | | |
| -Egg Crate | | | |
| -Floating of Feet | | | |
| | | | |
| Pressure ulcer present on admission   (Circle one) Yes/ No | | | |
| Ulcer / Wound photo (admission or hospital acquired)   Date: | | | |
| Ulcer / Wound photo at discharge   Date: | | | |
| | | | |
| Nurse signature / Initials 11-7 | | | |
| Nurse signature / Initials 7-3          _C. Lentz RN_ | | CL | |
| Nurse signature / Initials 3-11 | | | |

Jdrive:Nursing/Nursadm/Forms/Braden Scale Assessment form

599-

MEDICAL CENTER ENTERPRISE LABORATORY
400 NORTH EDWARDS STREET
ENTERPRISE, ALABAMA 36330
CLIA ID#s MCE: 01D0304933, RHA:01D0932794
Discharge Cumulative Trend Report from 05/23/01 1405 to 05/28/01 0723

```
Patient Name:    CONRAD,ROBERT                    All Sections-Page 1
Med Rec #:       0000041053                       Adm: 05/23/01
Dis Date         05/28/01
Phys-Service:    SAWYER,SAMUEL - MEDICAL
Acct #: .        E0114300094
```
*******************************************************************************

## Routine Chemistry Profile

| Date:<br>Time:<br>New Work: | 05/26<br>1125 | 05/24<br>0550 | 05/23<br>1405 | | | Reference Range | |
|---|---|---|---|---|---|---|---|
| Glucose | 99.0 | 110.0 | 155.0 H | | | 70-110 | (mg/dl) |
| BUN | 7.0 L | 7.0 L | 9.0 | | | 9-20 | (mg/dl) |
| Creatinine | 1.0 | 0.9 | 1.2 | | | 0.8-1.5 | (mg/dl) |
| Sodium | 141.0 | 138.0 | 145.0 | | | 137-145 | (mmol/L) |
| Potassium | 3.8 | 3.8 | 2.9 LP | | | 3.5-5.5 | (mmol/L) |
| Chloride | 101.0 | 101.0 | 105.0 | | | 98-107 | (mmol/L) |
| CO2 | 32.0 H | 29.0 | 17.0 L | | | 22-30 | (mmol/L) |
| Calcium | 8.7 | 9.1 | 9.1 | | | 8.4-10.2 | (mg/dl) |
| Prot Total | 7.2 | 7.0 | | | | 6.3-8.2 | (gm/dl) |
| Albumin | 3.3 L | 3.5 | | | | 3.5-5.0 | (gm/dl) |
| ALT/SGPT | 31.0 | 31.0 | | | | 21-72 | (U/L) |
| Alk Phos | 54.0 | 62.0 | | | | 38-126 | (U/L) |
| AST/SGOT | 95.0 H | 35.0 | | | | 10-45 | (U/L) |
| T Bili | 0.6 | 0.6 | | | | 0.2-1.3 | (mg/dl) |
| B /Creat | 6.8 | 7.8 | 7.5 | | | | |
| Anion Gap | | | 25.0 | | | | |
| A/G Ratio | 0.9 | 1.0 | | | | | |

## Routine Chemistry Comments

| | | | | | |
|---|---|---|---|---|---|

--------------------------- General Comments- - - - - - - - - - - - -
05/23/01 1405|PANEL,BASIC METABOLIC-Comment:  ER5 *&*
------------------------------------------------------------------------

```
Ed Benak,MD, Pathologist                CONRAD,ROBERT
*   JO NOT DISCARD **                    0000041053
Discharge Cumulative Trend Report
                                         (M-09/27/80)
                                         Dr. SAWYER,SAMUEL
```

599-6

MEDICAL CENTER ENTERPRISE LABORATORY
400 NORTH EDWARDS STREET
ENTERPRISE, ALABAMA 36330
CLIA ID#s MCE: 01D0304933, RHA:01D0932794
Discharge Cumulative Trend Report from 05/23/01 1405 to 05/28/01 0723

| | | |
|---|---|---|
| Patient Name: | CONRAD,ROBERT | All Sections-Page 2 |
| Med Rec #: | 0000041053 | Adm: 05/23/01 |
| Dis Date | 05/28/01 | |
| Phys-Service: | SAWYER,SAMUEL - MEDICAL | |
| Acct #: | E0114300094 | |

```
**************************************************************
In:  05/23/01 1405    ------------------------        Spec: Blood
Out: 05/23/01 1425   | ALCOHOL, ETHYL SERUM |Techs: VER TBWW7582,JAC2919
Coll Time: 05/23/01 1405  ------------------------
Order Phys: DREW,JOHN L                          [E0114300094/456909]
```

| Result Name | Result | Reference Range |
|---|---|---|
| Alcohol, Ethyl(mg/dl): | 2.0 | 0-10 |
| Comment: | ER5 *&* | |
| Date/Time: | 05/23/01 1424 | |

```
----------------------------------------------------------------
In:  05/23/01 1421  ----------------------------------     Spec: Urine
Out: 05/23/01 1438 | TRIAGE DRUG SCREEN PANEL,QUALITAT |Techs: VER TBWW7582,JAC
Coll Time: 05/23/01 1421----------------------------------
Order Phys: DREW,JOHN L                           [E0114300094/456908]
```

| Result Name | Result | Reference Range |
|---|---|---|
| Phencyclidine: | Negative | None Detected |
| Benzodiazephine: | Negative | None Detected |
| Cocaine: | Negative | None Detected |
| Amphetamine: | Negative | None Detected |
| Cannabinoids: | Positive | None Detected |
| Opiates: | Negative | None Detected |
| Barbiturate: | Negative | None Detected |
| Comment: | ER5 | |
| Date/Time: | 05/23/01 1438 | |
| Triage Comment: | ATTENTION- The ingestion of natural herbal and plant products containing Ephedra/Ephedra metabolites can produce in urine one or more substances capable of cross reacting with amphetamine/methamphetamine immunoassays. | |

```
----------------------------------------------------------------
```

Ed Renak,MD, Pathologist
** DO NOT DISCARD **
Discharge Cumulative Trend Report

CONRAD,ROBERT
0000041053

(M-09/27/80)
Dr. SAWYER,SAMUEL

599-7

MEDICAL CENTER ENTERPRISE LABORATORY
400 NORTH EDWARDS STREET
ENTERPRISE, ALABAMA 36330
CLIA ID#s MCE: 01D0304933, RHA:01D0932794
Discharge Cumulative Trend Report from 05/23/01 1405 to 05/28/01 0723

| | |
|---|---|
| Patient Name:  CONRAD,ROBERT | All Sections-Page 3 |
| Med Rec #:  0000041053 | Adm: 05/23/01 |
| Dis Date  05/28/01 | |
| Phys-Service:  SAWYER,SAMUEL - MEDICAL | |
| Acct #:  E0114300094 | |

************************************************************************

## Hematology

| Date:<br>Time:<br>New Work: | 05/28<br>0723<br>* | 05/26<br>1125 | 05/24<br>0550 | 05/23<br>1405 | | Reference Range | |
|---|---|---|---|---|---|---|---|
| WBC | 3.5 L | 5.3 | 12.2 H | 8.8 | | 4.0-11.0 | (1000/mm |
| RBC | 3.98 L | 4.31 L | 4.45 L | 4.76 | | 4.7-6.1 | (X 10(6) |
| Hemoglobin | 11.5 L | 12.5 L | 12.9 L | 13.9 L | | 14-18 | (gm/dl) |
| Hct | 34.4 L | 37.9 L | 38.7 L | 41.7 | | 39-49 | (%) |
| MCV | 86.4 | 87.9 | 87.0 | 87.6 | | 80-94 | (fl) |
| MCH | 28.9 | 29.0 | 29.0 | 29.2 | | 26-33 | (pg) |
| MCHC | 33.4 | 33.0 | 33.3 | 33.3 | | 31-36 | (%) |
| RDW | 12.8 | 13.0 | 13.2 | 13.0 | | 10.2-15.5 | (%) |
| Platelet | 127 L | 108 L | 125 L | 209 | | 150-357 | (X(10)3) |
| MPV | 10.8 H | 11.4 H | 11.9 H | 11.8 H | | 7.4-10.4 | (fl) |
| Gran-Auto | 61.6 | 68.5 | 79.9 | 46.0 L | | 50-87 | (%) |
| Lymph-Auto | 17.6 | 16.6 | 10.2 L | 43.9 | | 16-46 | (%) |
| Mono-Auto | 17.6 H | 10.9 H | 9.5 | 7.6 | | 2.9-10.0 | (%) |
| Eos-Auto | 2.9 | 3.4 | 0.2 L | 1.9 | | 0.5-4.6 | (%) |
| Baso-Auto | 0.3 | 0.6 | 0.2 L | 0.6 | | 0.3-2.0 | (%) |
| Abs Gran | 2.14 | 3.64 | 9.75 H | 4.04 | | 1.4-6.5 | (X(10)3) |
| Abs Lymp | 0.61 L | 0.88 L | 1.25 | 3.86 H | | 1.2-3.4 | (X(10)3) |
| Abs Mono | 0.61 H | 0.58 | 1.16 H | 0.67 H | | 0.11-0.59 | (X(10)3) |
| Eos Absl | 0.10 | 0.18 | 0.03 | 0.17 | | 0.0-0.7 | (X(10)3) |
| Abs Baso | 0.01 L | 0.03 L | 0.03 L | 0.05 L | | 0.3-2.0 | (X(10)3) |
| WBC Morph | | | # | | | | |
| RBC Morph | | | # | | | | |

- - - - - - - - - - - - - - Specific Comments - - - - - - - - - - - - - -
05/24/01 0550 CBC/AUTO DIFF-WBC Morph:  1+ Toxic Granulation
05/24/01 0550 CBC/AUTO DIFF-RBC Morph:  1+ Anisocytosis, Few Polychromasia
----------------------------------------------------------------------

## Urinalysis

| Date:<br>Time:<br>New Work: | 05/23<br>1421 | | | | | Reference Range |
|---|---|---|---|---|---|---|
| Color | Yellow | | | | | |
| Clarity | Clear | | | | | |
| Spec Gravity | 1.020 | | | | | 1.001-1.035 |

Continued next page
                                   CONRAD,ROBERT
                                   0000041053

Ed Benak,MD, Pathologist
*    DO NOT DISCARD **                    (M-09/27/80)
Discharge Cumulative Trend Report        Dr. SAWYER,SAMUEL

599-8

MEDICAL CENTER ENTERPRISE LABORATORY
400 NORTH EDWARDS STREET
ENTERPRISE, ALABAMA 36330
CLIA ID#s MCE: 01D0304933, RHA:01D0932794

Discharge Cumulative Trend Report from 05/23/01 1405 to 05/28/01 0723

| | |
|---|---|
| Patient Name: | CONRAD,ROBERT |
| Med Rec #: | 0000041053 |
| Dis Date | 05/28/01 |
| Phys-Service: | SAWYER,SAMUEL - MEDICAL |
| Acct #: | E0114300094 |

All Sections-Page 4
Adm: 05/23/01

*************************************************************************

### Urinalysis                                                    (Cont)

| Date:<br>Time:<br>New Work: | 05/23<br>1421 | | | | | | Reference Range |
|---|---|---|---|---|---|---|---|
| pH | 5.0 | | | | | | 5.0-8.0 |
| Leukocyt | neg | | | | | | Negative |
| Nitrite | neg | | | | | | Negative |
| Protein | # | | | | | | Negative |
| Glucose | norm | | | | | | Negative |
| Ketone | neg | | | | | | Negative |
| Urobilinogen | norm | | | | | | < 1.0 mg/dl |
| Bili | neg | | | | | | Negative |
| Blood, Occult | 50 /ul | | | | | | Negative |
| Epitheli | 3-5 | | | | | | ( /LPF) |
| RBC | 0-2 | | | | | | ( /HPF) |
| WBC | 0-2 | | | | | | ( /HPF) |
| Bacteria | 0 | | | | | | ( /HPF) |
| C..ts | 0 | | | | | | ( /LPF) |
| ( stals | # | | | | | | ( /LPF) |

- - - - - - - - - - - - - - - - - - Specific Comments - - - - - - - - - - - -
05/23/01 1421 URINALYSIS, ROUTINE W/ MICROSCOPI-Protein: 100 mg/dl
05/23/01 1421 URINALYSIS, ROUTINE W/ MICROSCOPI-Crystals: Moderate Amorphous
                Urates
------------------------------------------------------------------------------

### Urinalysis Comments

- - - - - - - - - - - - - - - - - - General Comments- - - - - - - - - - - -
05/23/01 1421 URINALYSIS, ROUTINE W/ MICROSCOPI-Comment: ER5 *&*
------------------------------------------------------------------------------

End of Report

CONRAD,ROBERT
0000041053

Ed Benak,MD, Pathologist
*   O NOT DISCARD **
Discharge Cumulative Trend Report

(M-09/27/80)
Dr. SAWYER,SAMUEL

MEDICAL CENTER ENTERPRISE LABORATORY
400 NORTH EDWARDS STREET
ENTERPRISE, ALABAMA 36330
MCE Laboratory CLIA ID# 01D0304933

Cumulative Trend Report from 05/23/01 1405 to 05/26/01 1125

Patient Name:       CONRAD, ROBERT                    All Sections-Page 1
Location:           2NO 207 02                        Adm: 05/23/01
Acct #:             E0114300094
Med Rec #:          0000041053
Phys-Service:       SAWYER, SAMUEL - MEDICAL
************************************************************************

### Routine Chemistry Profile

| Date:<br>Time:<br>New Work: | 05/26<br>1125<br>* | 05/24<br>0550 | 05/23<br>1405 | | | Reference Range | |
|---|---|---|---|---|---|---|---|
| Glucose | 99.0 | 110.0 | 155.0 H | | | 70-110 | (mg/dl) |
| BUN | 7.0 L | 7.0 L | 9.0 | | | 9-20 | (mg/dl) |
| Creatinine | 1.0 | 0.9 | 1.2 | | | 0.8-1.5 | (mg/dl) |
| Sodium | 141.0 | 138.0 | 145.0 | | | 137-145 | (mmol/L) |
| Potassium | 3.8 | 3.8 | 2.9 LP | | | 3.5-5.5 | (mmol/L) |
| Chloride | 101.0 | 101.0 | 105.0 | | | 98-107 | (mmol/L) |
| CO2 | 32.0 H | 29.0 | 17.0 L | | | 22-30 | (mmol/L) |
| Calcium | 8.7 | 9.1 | 9.1 | | | 8.4-10.2 | (mg/dl) |
| Prot Total | 7.2 | 7.0 | | | | 6.3-8.2 | (gm/dl) |
| Albumin | 3.3 L | 3.5 | | | | 3.5-5.0 | (gm/dl) |
| ALT/SGPT | 31.0 | 31.0 | | | | 21-72 | (U/L) |
| Alk Phos | 54.0 | 62.0 | | | | 38-126 | (U/L) |
| AST/SGOT | 95.0 H | 35.0 | | | | 10-45 | (U/L) |
| T ili | 0.6 | 0.6 | | | | 0.2-1.3 | (mg/dl) |
| Creat | 6.8 | 7.8 | 7.5 | | | | |
| Anion Gap | | | 25.0 | | | | |
| A/G Ratio | 0.9 | 1.0 | | | | | |

### Routine Chemistry Comments

| | | | | | |
|---|---|---|---|---|---|

------------------------- General Comments- - - - - - - - - -
05/23/01 1405 PANEL, BASIC METABOLIC-Comment:  ER5 *&*
-----------------------------------------------------------------------

Ed Benak, MD, Pathologist

Cumulative Trend Report

CONRAD, ROBERT
0000041053
2NO 207 02
(M-09/27/80)
Dr. SAWYER, SAMUEL

MEDICAL CENTER ENTERPRISE LABORATORY
400 NORTH EDWARDS STREET
ENTERPRISE, ALABAMA 36330
MCE Laboratory CLIA ID# 01D0304933
Cumulative Trend Report from 05/23/01 1405 to 05/26/01 1125

Patient Name:      CONRAD,ROBERT                    All Sections-Page 2
Location:          2NO 207 02                       Adm: 05/23/01
Acct #:            E0114300094
Med Rec #:         0000041053
Phys-Service:      SAWYER,SAMUEL - MEDICAL
****************************************************************************

```
In:  05/23/01 1405   ----------------------              Spec: Blood
Out: 05/23/01 1425   | ALCOHOL, ETHYL SERUM |Techs: VER TBWW7582,JAC2919
Coll Time: 05/23/01 1405  ----------------------
Order Phys: DREW,JOHN L                          [E0114300094/456909]
```

Result Name              Result               Reference Range

Alcohol, Ethyl(mg/dl):   2.0                  0-10
Comment:                 ER5 *&*
Date/Time:               05/23/01 1424

--------------------------------------------------------------------------

```
In:  05/23/01 1421   -----------------------------------    Spec: Urine
Out: 05/23/01 1438   | TRIAGE DRUG SCREEN PANEL,QUALITAT |Techs: VER TBWW7582,JAC
Coll Time: 05/23/01 1421-----------------------------------
Order Phys: DREW,JOHN L                          [E0114300094/456908]
```

Result Name              Result               Reference Range

Phencyclidine:           Negative             None Detected
Benzodiazephine:         Negative             None Detected
Cocaine:                 Negative             None Detected
Amphetamine:             Negative             None Detected
Cannabinoids:            Positive             None Detected
Opiates:                 Negative             None Detected
Barbiturate:             Negative             None Detected
Comment:                 ER5
Date/Time:               05/23/01 1438
Triage Comment:          ATTENTION-  The ingestion of natural herbal
                         and plant products containing
                         Ephedra/Ephedra metabolites can produce in
                         urine one or more substances capable of
                         cross reacting with
                         amphetamine/methamphetamine immunoassays.

--------------------------------------------------------------------------
```

Ed Benak,MD, Pathologist                CONRAD,ROBERT
                                        0000041053
Cumulative Trend Report                 2NO 207 02
                                        (M-09/27/80)
                                        Dr. SAWYER,SAMUEL

599-11

MEDICAL CENTER ENTERPRISE LABORATORY
400 NORTH EDWARDS STREET
ENTERPRISE, ALABAMA 36330
MCE Laboratory CLIA ID# 01D0304933
Cumulative Trend Report from 05/23/01 1405 to 05/26/01 1125

Patient Name:      CONRAD,ROBERT                    All Sections-Page 3
Location:          2NO 207 02                        Adm: 05/23/01
Acct #:            E0114300094
Med Rec #:         0000041053
Phys-Service:      SAWYER,SAMUEL - MEDICAL
*************************************************************************

### Hematology

| Date:<br>Time:<br>New Work: | 05/26<br>1125<br>* | 05/24<br>0550 | 05/23<br>1405 | | | Reference Range | |
|---|---|---|---|---|---|---|---|
| WBC | 5.3 | 12.2 H | 8.8 | | | 4.0-11.0 | (1000/mm |
| RBC | 4.31 L | 4.45 L | 4.76 | | | 4.7-6.1 | (X 10(6) |
| Hemoglobin | 12.5 L | 12.9 L | 13.9 L | | | 14-18 | (gm/dl) |
| Hct | 37.9 L | 38.7 L | 41.7 | | | 39-49 | (%) |
| MCV | 87.9 | 87.0 | 87.6 | | | 80-94 | (fl) |
| MCH | 29.0 | 29.0 | 29.2 | | | 26-33 | (pg) |
| MCHC | 33.0 | 33.3 | 33.3 | | | 31-36 | (%) |
| RDW | 13.0 | 13.2 | 13.0 | | | 10.2-15.5 | (%) |
| Platelet | 108 L | 125 L | 209 | | | 150-357 | (X(10)3) |
| MPV | 11.4 H | 11.9 H | 11.8 H | | | 7.4-10.4 | (fl) |
| Gran-Auto | 68.5 | 79.9 | 46.0 L | | | 50-87 | (%) |
| Lymph-Auto | 16.6 | 10.2 L | 43.9 | | | 16-46 | (%) |
| Mono-Auto | 10.9 H | 9.5 | 7.6 | | | 2.9-10.0 | (%) |
| F  -Auto | 3.4 | 0.2 L | 1.9 | | | 0.5-4.6 | (%) |
| l  bs-Auto | 0.6 | 0.2 L | 0.6 | | | 0.3-2.0 | (%) |
| Abs Gran | 3.64 | 9.75 H | 4.04 | | | 1.4-6.5 | (X(10)3) |
| Abs Lymp | 0.88 L | 1.25 | 3.86 H | | | 1.2-3.4 | (X(10)3) |
| Abs Mono | 0.58 | 1.16 H | 0.67 H | | | 0.11-0.59 | (X(10)3) |
| Eos Absl | 0.18 | 0.03 | 0.17 | | | 0.0-0.7 | (X(10)3) |
| Abs Baso | 0.03 L | 0.03 L | 0.05 L | | | 0.3-2.0 | (X(10)3) |
| WBC Morph | | # | | | | | |
| RBC Morph | | # | | | | | |

- - - - - - - - - - - - - - - Specific Comments - - - - - - - - - - - - - -
05/24/01 0550 |CBC/AUTO DIFF-WBC Morph:  1+ Toxic Granulation
05/24/01 0550 |CBC/AUTO DIFF-RBC Morph:  1+ Anisocytosis, Few Polychromasia
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### Urinalysis

| Date:<br>Time:<br>New Work: | 05/23<br>1421 | | | | Reference Range |
|---|---|---|---|---|---|
| Color | Yellow | | | | |
| Clarity | Clear | | | | |
| Spec Gravity | 1.020 | | | | 1.001-1.035 |

Continued next page

CONRAD,ROBERT
0000041053
2NO 207 02
Ed Benak,MD, Pathologist                          (M-09/27/80)

Cumulative Trend Report                           Dr. SAWYER,SAMUEL

MEDICAL CENTER ENTERPRISE LABORATORY
400 NORTH EDWARDS STREET
ENTERPRISE, ALABAMA 36330
MCE Laboratory CLIA ID# 01D0304933
Cumulative Trend Report from 05/23/01 1405 to 05/26/01 1125

Patient Name:      CONRAD,ROBERT                        All Sections-Page 4
Location:          2NO 207 02                           Adm: 05/23/01
Acct #:            E0114300094
Med Rec #:         0000041053
Phys-Service:      SAWYER,SAMUEL - MEDICAL
****************************************************************************

                          Urinalysis                              (Cont)

| Date:     | 05/23 | | | | | |
|-----------|-------|---|---|---|---|---|
| Time:     | 1421  | | | | | Reference Range |
| New Work: |       | | | | | |

| pH            | 5.0    | | | | | 5.0-8.0       |
|---------------|--------|---|---|---|---|---------------|
| Leukocyt      | neg    | | | | | Negative      |
| Nitrite       | neg    | | | | | Negative      |
| Protein       | #      | | | | | Negative      |
| Glucose       | norm   | | | | | Negative      |
| Ketone        | neg    | | | | | Negative      |
| Urobilinogen  | norm   | | | | | < 1.0 mg/dl   |
| Bili          | neg    | | | | | Negative      |
| Blood, Occult | 50 /ul | | | | | Negative      |
| Epitheli      | 3-5    | | | | | ( /LPF)       |
| RBC           | 0-2    | | | | | ( /HPF)       |
| WBC           | 0-2    | | | | | ( /HPF)       |
| Bacteria      | 0.     | | | | | ( /HPF)       |
| C~~ts         | 0      | | | | | ( /LPF)       |
| ( stals       | #      | | | | | ( /LPF)       |

- - - - - - - - - - - - - - - Specific Comments - - - - - - - - - - - - - -
05/23/01 1421 URINALYSIS, ROUTINE W/ MICROSCOPI-Protein:  100 mg/dl
05/23/01 1421 URINALYSIS, ROUTINE W/ MICROSCOPI-Crystals:  Moderate Amorphous
              Urates
----------------------------------------------------------------------------

                       Urinalysis Comments

- - - - - - - - - - - - - - - General Comments- - - - - - - - - - - - - - -
05/23/01 1421 URINALYSIS, ROUTINE W/ MICROSCOPI-Comment:  ER5 *&*
----------------------------------------------------------------------------

                        End of Report


Ed Benak,MD, Pathologist                     CONRAD,ROBERT
                                             0000041053
                                             2NO 207 02
Cumulative Trend Report                      (M-09/27/80)
                                             Dr. SAWYER,SAMUEL

599-13

# MEDICAL CENTER ENTERPRISE
## ENTERPRISE, ALABAMA

### RADIOLOGIC CONSULTATION REQUEST/REPORT

PATIENT:        CONRAD, ROBERT
DATE:           05/23/01
PHYSICIAN:      SAWYER, SAMUEL F./DREW
HOSPITAL #:     0000041053
RM #:           207-02/ER
SEX:            M
EXAM DATE:      05/23/01
X-RAY #:        97323
JOB #:          30535

SPECIFIC REASON(S) FOR REQUEST:    GSW

SINGLE VIEW LEFT HUMERUS;

A metallic FB, rounded, is seen in the soft tissues of the medial distal upper arm. No associated fracture is seen.

IMPRESSION:  FB AS NOTED.

SUPINE, UPRIGHT ABDOMINAL FILMS;

There is gastric distension with fluid level present. Air is seen in the rectum but no free air is seen. There is a metallic FB compatible with bullet projecting near the acetabulum, superolateral to it, on the left side. No associated fracture is seen.

IMPRESSION:  GASTRIC DISTENSION AS NOTED.  FB AS NOTED.

DICTATED AND SIGNED BUT NOT REVIEWED IN ORDER TO EXPEDITE DISTRIBUTION.

_____
VINCENT E. MARTIN, M.D.

VEM/SP
DD: 05/23/01

599-14

VEM
5-25-01

# MEDICAL CENTER ENTERPRISE
## ENTERPRISE, ALABAMA

## RADIOLOGIC CONSULTATION REQUEST/REPORT

PATIENT:        CONRAD, ROBERT
DATE:           05/23/01
PHYSICIAN:      SAWYER, SAMUEL F.
HOSPITAL #:     0000041053
RM #:           207-02
SEX:            M
EXAM DATE:      05/25/01
X-RAY #:        97323
JOB #:          30780

SPECIFIC REASON(S) FOR REQUEST:  GUNSHOT WOUND.

ABDOMEN;

25 May 01. Surgical staples are seen along the low abdomen and pelvic region in the midline. Foreign body is seen superolateral to the left acetabulum as noted on previous films. There is slight dilation of ascending colon and parallel loops of small bowel and left upper quadrant is slightly dilated as well as a couple of parallel loops in the left lower quadrant. Air is seen all the way to the rectum, however. No mass effect is seen.

IMPRESSION: FINDINGS SUGGEST MILD POST OP ILEUS.

DICTATED AND SIGNED BUT NOT REVIEWED IN ORDER TO EXPEDITE DISTRIBUTION.

_VEM_
VINCENT E. MARTIN, M.D.

VEM/SS
DD: 05/25/01
DT: 05/25/01

# MEDICAL CENTER ENTERPRISE
## ENTERPRISE, ALABAMA

### RADIOLOGIC CONSULTATION REQUEST/REPORT

PATIENT:        CONRAD, ROBERT
DATE:           05/23/01
PHYSICIAN:      SAWYER, SAMUEL F./DREW
HOSPITAL #:     0000041053
RM #:           207-02/ER
SEX:            M
EXAM DATE:      05/23/01
X-RAY #:        97323
JOB #:          30535

SPECIFIC REASON(S) FOR REQUEST:        GSW

SINGLE VIEW LEFT HUMERUS;

A metallic FB, rounded, is seen in the soft tissues of the medial distal upper arm. No associated fracture is seen.

IMPRESSION:  FB AS NOTED.

SUPINE, UPRIGHT ABDOMINAL FILMS;

There is gastric distension with fluid level present. Air is seen in the rectum but no free air is seen. There is a metallic FB compatible with bullet projecting near the acetabulum, superolateral to it, on the left side. No associated fracture is seen.

IMPRESSION:  GASTRIC DISTENSION AS NOTED.  FB AS NOTED.

DICTATED AND SIGNED BUT NOT REVIEWED IN ORDER TO EXPEDITE DISTRIBUTION.

*VEM*

VINCENT E. MARTIN, M.D.

VEM/SP
DD: 05/23/01
DT: 05/23/01

# MEDICAL CENTER ENTERPRISE
## ENTERPRISE, ALABAMA

### RADIOLOGIC CONSULTATION REQUEST/REPORT

| | |
|---|---|
| PATIENT: | CONRAD, ROBERT |
| DATE: | 05/23/01 |
| PHYSICIAN: | SAWYER, SAMUEL F. |
| HOSPITAL #: | 0000041053 |
| RM #: | 207-02 |
| SEX: | M |
| EXAM DATE: | 05/26/01 |
| X-RAY #: | 97323 |
| JOB #: | 31017 |

SPECIFIC REASON(S) FOR REQUEST:     GSW

PA & LATERAL CHEST;

The trachea is midline.  The cardiac shadow is normal in size.  The lungs are expanded with no free air beneath the diaphragms, there is no atelectasis identified.

IMPRESSION:  NO ACUTE PULMONARY PATTERN APPRECIATED.

DICTATED AND SIGNED BUT NOT REVIEWED IN ORDER TO EXPEDITE DISTRIBUTION.

_____
PAUL J. ANDERSON, M.D.

PJA/SP
DD: 05/28/01
DT: 05/28/01

CONR... ROBERT
0114...00094
DREW,JOHN L
...
...
05/23/01
S99-17



1  1414  BED 5  II  HR 87  NBP 146/90(...)  SaO2 98

...  1430  BED 5  II  SaO2 LOW SIGNAL  HR 59  NBP 133/48(75)  SaO2 96

<8A> 23 MAY 01  1447  BED 5  II  SaO2 NON-PULSATILE  HR 63  NBP -?-  SaO2 -?-

3 MAY 01  1448  BED 5  II  SaO2 NON-PULSATILE  HR 56  NBP 154/89(109)  SaO2 -?-

MAY 01  1457  BED 5  II  HR 60  NBP 157/90(111)  SaO2 98

599-18

IY 01  1458  BED 5  II  HR 62  NBP 155/93(113)  SaO2 97

599-19

# MEDICAL CENTER ENTERPRISE
## ENTERPRISE, ALABAMA

## DISCHARGE SUMMARY

PATIENT:              CONRAD, ROBERT
ROOM #:               207
HOSPITAL #:           0000041053
ATTENDING PHYSICIAN: SAWYER, SAMUEL F.
DATE OF ADMISSION:    05/23/01
DATE OF DISCHARGE:    05/28/01

DIAGNOSIS:    GSW LLQ and the abdomen with through and through laceration of the transverse colon and superficial GSW left arm.

OPERATIVE PROCEDURE:  05/23/01 - Exploratory laparotomy with repair of the colon.  Also on that same day removal of the bullet from the left upper arm.

BRIEF HISTORY:    20 year old black male was involved in a gun battle during a robbery.  He presented to the ER.  He was hemodynamically stable but had peritoneal signs.

HOSPITAL COURSE:    He was taken to surgery and the above injury found and repaired.

POST OPERATIVE COURSE:    Uneventful.  Ileus resolved, he was fed.  Bowels were moving.  He was running some temperature of around 100.5 at the time of discharge but chest x-ray and CBC were both completely normal.  UA was not done but he did not have dysuria.

DISCHARGE PLAN:    He will be discharged to the custody of the local police.  He is given Levaquin 500mg now and will get it qd x 4 more days.  I will see him in the office at 1 week post op for removal of his staples and sutures.  No lifting or straining.  Regular diet.

_____
SAMUEL F. SAWYER, M.D.

SFS/SP/31015
DD: 05/28/01
DT: 05/28/01

599-20

# MEDICAL CENTER ENTERPRISE
## DISCHARGE INSTRUCTIONS

ADDRESSOGRAPH

DATE OF DISCHARGE: _28 May '01_  TIME _____  ACCOMPANIED BY: _Policeman_

DISCHARGED: ☐ Home   ☐ Nursing Home   ☒ Other (Specify) _Enterprise Jail_

HOW: ☐ Car   ☐ Ambulance   ☐ Other     MODE OF EXIT: ☐ Wheelchair   ☐ Ambulatory   ☐ Stretcher

DATE OF PHYSICIAN FOLLOW-UP _Wens., May 30 '01 - Call for appt Time._

DISCHARGE STATUS: ☒ Stable   ☐ Fair   ☐ Poor

DATE OF LAST BM _____  VITAL SIGNS  T _99.8_  P _66_  R _22_  BP _108/60_

INCISION/OTHER DESCRIBE _Staples intact its abdomen, small hole @ staple,_ this small hole upper arm. _NONE_

TYPE OF DRAINAGE _____ NONE __X__ TYPE OF DRESSING _____ NONE ____

| MEDICATION | DOSAGE | ROUTE | FREQUENCY | TIME(S) |
|---|---|---|---|---|
| Levaquin 500 mg | 1 tab | by mouth | every day | AM (begin 5/29) |
| Darvocet N100 | 1 or 2 tabs | by mouth | every 4 hours | as needed |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

List Food Drug Interaction Handouts Given: _____

Physician Instruction/Activity Instructions: _Remove dressings tomorrow and may shower then. Do not replace dressings_

Dietary Instruction/Physical Therapy: _____

Social Service/Respiratory Therapy: _____

Has the telemetry been removed and returned to unit? . . . . . . . . . . . . . . . . . .  ☐ Yes   ☐ No   ☒ NA

s heparin lock been removed? . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ☒ Yes   ☐ No   ☐ NA

..ave the home medications been returned to patient and/or significant other? . . . . . .  ☐ Yes   ☐ No   ☒ NA

Have valuables been returned to patient and/or significant other? . . . . . . . . . . . .  ☐ Yes   ☐ No   ☒ NA

**Patient and/or responsible party has communicated an understanding of discharge instructions and has been given a copy.**

_____          _Betty Calander RN_
Patient Signature                                      Completed By

DIS 7                                                                          Form #7

## PROGRESS NOTES

Conrad

| Date | Notes Should Be Signed by Physician |
|------|-------------------------------------|
| 5.23.01 | 20 BM shot — abd's & (L) arm in post attempt |
| | c/o abd's pain LLQ |
| | PMH — unobtain |
| | Exa — Abd's tender Low ML & LLQ. |
| | Pt to OR for lpsly, poss lple. |
| | |
| 5.23.01 | OpNote Dx: GSW (T) colon, (L) arm Proc: Laparotomy repair (T) colon Rem FB (L) arm. SFS / SLR |

S99-22

CONRAD, ROGER
01140-00094          I/P
SAWYER, SAMUEL
BOY   M  S      05/23/01
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
05/23/1953

## PROGRESS NOTES

| Date | Notes Should Be Signed by Physician |
|------|-------------------------------------|
| 5·27·01 | *[handwritten clinical notes, illegible]*<br>+ Bxns.<br><br>Abd — ⊖ distn<br>W/drsn<br><br>*[illegible]* fed<br>↑ po po meds<br>⊕ to jail = dru *[signature]* |

599-23

CONRAD, ROBERT
01143-00094                    I/P
SAWYER, SAMUEL
CTY    M   S    05/23/01

## PROGRESS NOTES

| Date | Notes Should Be Signed by Physician |
|------|-------------------------------------|
| 5.24.01 | Afeb BSS. |
|  | not good NGOP'ing |
|  | Abdo - +- BS. |
|  | PLL OOB |
|  | DC NG, Jul. |
| 5.25.01 | Afeb.- USS- |
|  | + gas, distn |
|  | wd dr. |
|  | PLL ✓ KUB. |
| 5.26.01 | Afb USS |
|  | Some nausea |
|  | less distn, +- BS. |
|  | wd dr. |
|  | KUB - dr |
|  | PLL OOB |
|  | ✓ lytes. |

Dr. _____     Signature

Form N-166                                              PROGRESS NOTES

# MEDICAL CENTER ENTERPRISE
# ENTERPRISE, ALABAMA

## OPERATIVE REPORT

PATIENT:             CONRAD, ROBERT
MR#:                 0000041053
RM#:                 207-02
DATE OF SURGERY:     05/23/01

PREOPERATIVE DIAGNOSIS:
1. Gunshot wound to the abdomen, through and through injury to the transverse colon
   and with laceration of the right gastroepiploic artery.
2. Also gunshot wound, superficial, to the left arm.

SURGEON:   SAMUEL F. SAWYER, M.D.

ASSISTANT: SHERRY L. ROACH, M.D.

PROCEDURE:  Diagnostic laparoscopy followed by exploratory laparotomy and repair
of colon, ligation of an artery. Also, removal of the bullet from the left upper arm.

PROCEDURE IN DETAIL:  General endotracheal anesthesia was established and then
his abdomen was prepped and draped sterily. He had a gunshot wound in his left lower
quadrant. The abdomen was insufflated using a Verres needle. A 10 mm trocar was then
placed in the umbilicus. Laparoscopic evaluation revealed that the bullet had entered the
abdominal cavity in a lateral inferior direction from the cutaneous entrance wound and
then exited the abdomen through the left pelvic musculature going into the muscles of the
hip. There was also a fair amount of hemoperitoneum. The laparoscope was thus
withdrawn and the abdomen was entered through a lower midline incision.
Hemoperitoneum was evacuated. Exploration was carried out and the above injuries
were found. The colon edges were good and healthy. We closed both of these wounds
with interrupted 3-0 Vicryl, single layer, full thickness - this was after irrigation and
debridement. We then wrapped the colon with omentum buttressing our colorrhaphy
(colon repair). First, of course, we ligated the ends of the gastroepiploic artery. The
small bowel was examined, and there was no injury. The left colon was also carefully
examined, and there was no injury. Hemostasis was checked and then the abdomen was
thoroughly irrigated. The abdomen was then closed using a running 0 Prolene on the
fascia and staples on the skin. Once the abdomen was dressed, the left arm was prepped
and a short incision was made over the subcuticular foreign body (the bullet). This was
removed carefully, without touching its outer surface with any metal instrument. This

599-25

PATIENT:          CONRAD, ROBERT
MR#:              0000041053
RM#:              207-02

bullet was given directly to a law officer present in the operating room who observed my removal of the bullet from the arm. The wound was then cleaned and closed with Ethilon. This was dressed appropriately. He tolerated the surgery well.


_____
                    SAMUEL F. SAWYER, M.D.

SFS/IB/30554
DD: 05/23/01
DT: 05/24/01

599-26

## PREANESTHESIA EVALUATION

Developed by the American Association of Nurse Anesthetist - 1991

| Age | 70 | M | Sex F | Height 70 in / cm | Weight 18 lb / mg |

**Procedure** Ex Lap   GSW Abd

Pre-Procedure Vital Signs  B/P 70/100  P 84  R    T

**Previous Anesthesia / Operations**
Umbilical Hernia
None ☐

**Current Medications**
None ☐

**Family History of Anesthesia Complications**
None ☐

**Allergies**
NKDA ☐
NKDA

**AIRWAY / TEETH / HEAD & NECK**
MMI   H dentition
13cm Fred

**History From:**
☐ Patient   ☐ Significant Other
☐ Parent / Guardian   ☐ Chart
☐ Communication / Language Problems
☐ Poor Historian

| SYSTEM | WNL | COMMENTS | DIAGNOSTIC STUDIES |

**RESPIRATORY**
Asthma, Bronchitis, COPD—, Dyspnea, Orthopnea, Pneumonia
Productive Cough, Recent URI, SOB, Tuberculosis

Tobacco Use: ☑ Yes   ☐ No   Packs / Day for _____ Years

EKG

Chest X-ray

**CARDIOVASCULAR**
Abnormal EKG, Angina, ASHD, CHF, Dysrhythmia, Exercise Tolerance
Hypertension, MI, Murmur, Pacemaker, Rheumatic Fever, Valvular Disease

Pulmonary Studies

**HEPATO / GASTROINTESTINAL**
Bowel Obstruction, Cirrhosis, Hepatitis / Jaundice, Hernia / Reflux, Nausea / vomiting, Ulcers

Ethanol Use: ☐ Yes   ☐ No   Frequency
"Street Drug" Use: ☐ Yes   ☐ No   Frequency

⊖ CP

Other
⊕ THC

**NEURO / MUSCULOSKELETAL**
Arthritis, Back Problems, CVA / Stroke / TIAs, DJD, Headaches / ↑ ICP, Loss of Consciousness
Muscle Weakness, Neuromuscular Dis., Paralysis, Paresthesia, Syncope, Seizures

**LABORATORY STUDIES**
Hgb / Hct / CBC   13 X 205   AT

**RENAL / ENDOCRINE**
Diabetes, Renal Failure / Dialysis, Thyroid Disease, Urinary Retention, Urinary Tract Infection, Weight Loss / Gain

Electrolytes
CVP Resp

Urinalysis

**OTHER**
Anemia, Bleeding tendencies, Cancer, Chemotherapy, Dehydration, Hemophilia
Immunosuppressed, Pregnancy, Sickle Cell Dis. / Trait, Recent Steroids, Transfusion History

CVP Min
T GCS=5=

Other

**Problem List / Diagnoses**
GSW Abd   Ph Ntn
Tobacco

**POSTANESTHESIA NOTE**
Pt Stable

**PHYSICAL STATUS**  1 2 3 4 5 E

Signed _____ Date _____ Time _____

PATIENT IDENTIFICATION
Robert Combs

**Planned Anesthesia / Special Monitors**
O GET-NG

**Pre-Anesthesia Medications Ordered**

**Evaluator Signature** _____   Date 5/28/4   Time 1400

FORM # ANE-41 / PICS # 0917610

599-27

**MEDICAL CENTER ENTERPRISE**

PATIENT IDENTIFICATION

# ANESTHESIA RECORD

GSW Abd (L) Arm

Developed by the American Association of Nurse Anesthetists - 1991

Procedure: Ex lap / Laparotomy

Date: 5/23/01 OR No. 2 Page 1 of 1 Surgeon(s): S. Samuel

Anesthesia Provider

| | START | STOP |
|---|---|---|
| Anesthesia | 1530 | 1704 |
| Procedure | 1540 | 1645 |

**PRE-PROCEDURE**
- ☑ Identified: ☑ ID Band ☑ Questioning
- ☑ Chart Reviewed ☑ Permit Signed
- ☑ NPO Since: Fs
- Pre-anesthetic State: ☐ Calm ☑ Awake ☐ Asleep ☑ Apprehensive ☐ Confused ☐ Uncooperative ☐ Unresponsive

**PATIENT SAFETY**
- ☑ Anes. Machine # 2 Checked
- ☑ Safety Belt On ☐ Axillary Roll
- ☑ Armboard Restraints ☐ Arms Tucked
- ☑ Pressure points checked and padded
- ☑ Eye Care: ☐ Ointment ☐ Saline ☐ Taped ☐ Pads ☐ Goggles

**MONITORS AND EQUIPMENT**
- ☐ Steth: ☐ Precord ☑ Esoph ☐ Other
- ☑ Non-Invasive B/P: ☐ Left ☑ Right
- ☑ Continuous EKG ☑ V Lead EKG
- ☑ Pulse Oximeter ☑ Oxygen Sensor
- ☑ End Tidal $CO_2$ ☑ Gas Analyzer
- ☑ Temp. ☐ Nerve Stimulator
- ☑ Warming Blanket ☐ EEG ☐ Doppler
- ☑ Airway Humidifier ☐ Fluid Warmer
- ☑ NG Tube ☑ Foley Catheter
- ☐ Art. Line
- ☐ CVP
- ☐ PA Line
- ☑ IV(s) (R)

**ANESTHETIC TECHNIQUE**
- General: ☐ Pre-Oxygenation ☐ L.T.A. ☑ Rapid Sequence ☑ Cricoid Pressure ☑ Intravenous ☑ Inhalation ☐ Intramuscular ☐ Rectal
- Regional: ☐ Spinal ☐ Epidural ☐ Axillary ☐ Bier Block ☐ Ankle Block ☐ Position ☐ Prep ☐ Local ☐ Needle ☐ Drug(s) ☐ Dose ☐ Attempts x ☐ Site ☐ Level ☐ Catheter ☐ See Remarks
- Other: ☐ M.A.C. ☐

**AIRWAY MANAGEMENT**
- Intubation: ☑ Oral ☑ Tube 8.0
- ☑ Stylet used ☐ Nasal ☑ Regular
- ☐ Magill's ☑ Direct ☐ RAE
- ☐ Fiber optic ☐ Blind ☐ Armored
- ☑ Blade Mac 3 ☐ Laser
- ☑ Secured at 22 cm ☐ Endobronch.
- ☑ Attempts x 1 ☑ ET $CO_2$ present
- ☑ Breath sounds =
- ☐ Uncuffed, leaks at 20 cm $H_2O$
- ☑ Cuffed ☐ Min. occ. pres. ☑ Air ☐ NS
- Airway: ☑ Oral ☐ Nasal ☐ Difficult, See Remarks
- Circuit: ☑ Circle ☐ NRB
- ☐ Mask Case ☐ Nasal Cannula
- ☐ Via Tracheostomy ☐ Simple $O_2$ mask

**RECOVERY**
- Location: Rec Rm Time 1656
- B/P 123/64 $O_2$ Sat 100
- P 73 R 15 T 95.3
- ☐ Awake ☐ Stable ☐ Nasal Oxygen
- ☑ Drowsy ☐ Unstable ☐ Mask Oxygen
- ☐ Somnolent ☐ Intubated ☐ T-piece Oxygen
- ☐ Unarousable ☐ Ventilator ☐ Oral/nasal airway
- Recovery Notes

**FLUID TOTALS**
- Crystalloid 1500 EBL Min
- Blood Ø Urine 100

**TIME** 1530 — 30 — 1600 — 30

| Agent | | | | | | |
|---|---|---|---|---|---|---|
| Oxygen (L/min) | 2 | 1 | 1 | 1 | 1 | 1 |
| ☐ $N_2O$ ☐ Air (L/min) | | | | | | |
| Halo-Eth-For 1.0% | | 1.0 | .9 | .9 | .9 | .4 |
| Sub-Alfen-Suf mcg/cc (100) | 100 | | | 50 | | |
| NaPent-Dipro-Etom | 200 | | | | | |
| dtc-succinyl | 120 | | | | | |
| Trac-Nor-Pav cis | 2 | | 2 | 4 | | |
| Versed—Valium | | | | | | |
| Demerol | | | | | | |
| Neostigmine mg | | | | | | 3 |
| Robinul mg | | | | | | 0.6 |
| Isolyte | | | 1000 | | | |
| Urine (ml) | | | | 100 | | |
| EBL (ml) | | | | | | |

**MONITORS**

| | | | | | | |
|---|---|---|---|---|---|---|
| EKG | SR | SR | SR | SR | SR | SR |
| % $O_2$ Inspired | .90 | .5 | .5 | .5 | .5 | .5 |
| $O_2$ Saturation | 100 | 100 | 100 | 100 | 100 | |
| End Tidal $CO_2$ | 37 | 30 | 31 | 31 | | |
| Temp. ☑ C ☐ F | ESS | 35.1 | | 35.2 | | |
| TOF | | | 4/4 | 4/4 | | 4/4 Sustained lifting |

**VITAL SIGNS** — Baseline Values; B/P, P, R; scale 200–20 (charted graphically)

**VENTILATION**

| | | | | | | |
|---|---|---|---|---|---|---|
| Tidal Volume | 860 | 860 | 800 | 820 | 836 | 802 |
| Resp. Rate | 8 | 8 | 8 | 8 | 8 | 8 |
| Peak Pressure | 16 | 18 | 16 | 18 | 17 | 18 |
| PEEP | | | | | | |

Symbols for Remarks

Position: Supine

**SYMBOLS**: X ANESTHESIA; ⊙ OPERATION; B/P CUFF PRESSURE; ARTERIAL LINE PRESSURE; ▲ MEAN ARTERIAL PRESSURE; • PULSE; ○ SPONT RESP; Ø ASSISTED RESP; ⊗ CONTROLLED RESP; T TOURNIQUET

**REMARKS**

Stable—

RSI @ after Pre

Stable 1532

1615 Unasyn 1.5 gm

Extubated $\bar{s}$

SX, SVC

RR>12 TV>6cc

Spont Eye op

Rolled to gurney

to RR $\bar{c}$ $O_2$ 6L

Stable (Lx) To/Arm

FORM ANE-40 / PICS# 091030

CHART

2301                    599-28

1 OF 3

Date ___5/23/01___

## Medical Center Enterprise
## PERIOPERATIVE RECORD

Emergency ☑    Scheduled ☐    Add-On ☐

ADDRESSOGRAPH

### PREOPERATIVE ASSESSMENT

☑ Consent Correct, Signed, Witnessed, Dated
☑ H & P on Chart
☑ ID Bracelet
☑ Required Lab
☐ NPO / Last Oral Intake   "12 noon lunch"
Allergies: ☑ None   ☐ Yes, List   NKA

Prosthesis: ☑ None
☐ Hearing Aid
☐ Glasses / Contacts
☐ Dentures
☐ Mobility
☐ Speech
☐ Other

| Emotional Status | | Level of Consciousness | | Skin Condition | |
|---|---|---|---|---|---|
| Calm Relaxed | ☐ | Alert | ☑ | Skin Intact, No Bruises or Lesions | ☑ |
| Depressed | ☐ | Drowsy | ☐ | Flushed | ☐ |
| Anxious | ☑ | Talkative | ☐ | Pale | ☐ |
| Confused | ☐ | Non-Responsive | ☐ | Diaphoretic | ☐ |
| | | Responsive | ☑ | Dry | ☐ |
| **Knowledge Level** | | Other | | Cool | ☐ |
| ☐ Well Informed (Verbalizes Understanding of Procedure) | | **Coping Mechanism Behavioral State**    Yes | | Warm | ☑ |
| | | Cooperative | ☑ | Other | |
| ☐ Lack of Information ( _____ Child) | | Crying | ☐ | GSW - (L) ↓ quad. | |
| ☐ Language Barrier | | Withdrawn | ☐ | (L) bicep area | |
| ☐ Religious Beliefs Pertinent to Surgery | | Resistive | ☐ | foley - cath. | |
| Comments: _____ | | Combative | ☐ | | |
| | | Other | | | |

Family in Patient's Room   Yes ☐   List _____        No ☑
Comments: _____

Signature of Admitting / Circulating Nurse   _Wayne Marlow RN_        Time _1440_

---

### NURSING CARE PLAN:    SURGICAL SERVICES NURSING PROCESS

| PATIENT CARE NEEDS / PROBLEMS | GOAL | NURSING INTERVENTION | EVALUATION | COMMENTS |
|---|---|---|---|---|
| Potential for anxiety | Decrease patient anxiety | ☑ explain all procedures to patient<br>☑ provide quiet, comfortable atmosphere<br>☑ remain at patient side until anesthetized<br>☑ allow patient to verbalize feelings<br>☑ be aware of non-verbal communication | ☑ Demonstrates decreased anxiety | |
| Potential for infection | Avoidance of patient infection | ☑ appropriate skin prep<br>☑ enforce strict aseptic technique<br>☑ monitor breaks in sterile techniques and take corrective actions | ☑ Procedure is performed with proper sterile technique | |

# POST ANESTHESIA
## CARE UNIT RECORD

Admitted to Post Anesthesia Care Unit: Date: 5-23-01  Time: 1656

Per: ☑ Cart  Procedure _Removal of bullet Closer, Ux 100 + explor. lap._
☐ Bed  _Repair of Gunshot wound to Transverse colon_

Allergies _NKDA_

Surgeon _Sam Sawyer_

Accompanied by: _G. Aughtman_

☐ RN  ☑ Anesthetist  Pre-Op Vitals: B/P _151/88_ P _90_ R___ T___

☐ Anesthesiologist  ASA Classification ___ I ___ (II) ___ III ___ IV ___ V

Anesthesia:
☑ General
☐ Spinal
☐ MAC
☐ I.V. Block
☐ Local
☐ Topical
☐ Epidural
☐ Mask

Date: 05/23/01

Temp:
Axillary  Admit: _95³_
Oral  _95⁹_
Timpanic  Disch:

### PATIENT HISTORY

Check if Applies
( ) Renal Disease
( ) Diabetes
( ) Heart Disease
( ) Respiratory Disease
( ) Neurological Disorder

Other_____
Dentures_____

IV present/patient ☐
1. Site _R FA_
   Cath Size _20 B_
   Type IVF _LR_
   Amt. _150 cc_
2. Site_____
   Cath Size_____
   Type IVF_____
   Amt._____

Oximeter...............☐

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Patent Airway | | ✓ | ✓ | | | | | | | | |
| Awake & Responsive | | ✓ | ✓ | | | | | | | | |
| Deep Breathing | | ✓ | ✓ | | | | | | | | |
| Respiratory Distress | | Ø | Ø | | | | | | | | |
| Position | | O | a | | | | | | | | |
| O₂ Therapy _10_ L/min. | | | | | | | | | | | |
| Aerosol - Mask - Cannula - E.T. | | ✓ | RA | | | | | | | | |
| Cough, swallow, | | ✓ | ✓ | | | | | | | | |
| Gag reflex, present | | ✓ | ✓ | | | | | | | | |
| Airway: Oral/Nasal d C'd at | | Ø | Ø | | | | | | | | |
| Lungs Clear  R | | ✓ | ✓ | | | | | | | | |
| L | | ✓ | ✓ | | | | | | | | |
| ECG Monitor | | SR | SR | | | | | | | | |
| Skin: Warm | | ✓ | ✓ | | | | | | | | |
| Cool | | | | | | | | | | | |
| Dry | | ✓ | ✓ | | | | | | | | |
| Diaphoretic | | | | | | | | | | | |
| Warming Light | | — | — | | | | | | | | |
| Spinal Level | | Ø | Ø | | | | | | | | |
| 's Initials | | ✓ | | | | | | | | | |

SPINAL LEVELS

KEY:
→ = No change
✓ = Yes
✗ = No
*NN = See nurses notes
V = Systolic BP
∧ = Diastolic
X = Arterial Line Pressure
● = Pulse
O = Resp.
∅ = not assessed
NA = non applicable

Dressings present: ✓  _ABD - midline_
Dressings present: ✓  _Lt Arm_

☐ Drainage Admit _dry_  Disch: _scant_
☐ Drainage Admit _dry_  Disch: _scant_

Foley ☑  Irrigation  Output  _clr yellow_

NG: _Low interm. suction_
Hemovac - J/P:

Output

ANESTHESIOLOGIST RELEASE  Emesis:

## POST ANESTHESIA CARE UNIT NURSES NOTES

EK

Name: __ Conrad, Robert __
Date:     05/23/2001     Trace:   II @ 1.00 cm/mV
Time:     17:00
ECG HR:   67  BPM       Source:    Key
Resp:      9  RPM        Speed:     25.0 mm/sec
Temp:     ———— ° F
SpO2:     [ 59] %
                    Sys    Dia   Map
          IBP1:  ——  /  ——  ( —— )    mmHg
          IBP2:  ——  /  ——  ( —— )    mmHg
          NIBP:  152 /  97  ( 133 )   mmHg
          Interval: 5 min  ET:   0 min

| TIME | FOCUS | NOTES | Key | D = Data | A = Action | R = Response |
|------|-------|-------|-----|----------|------------|--------------|
|      |       |       |     |          |            |              |
|      |       |       |     |          |            |              |
|      |       |       |     |          |            |              |
|      |       |       |     |          |            |              |
|      |       |       |     |          |            |              |
|      |       |       |     |          |            |              |
|      |       |       |     |          |            |              |
|      |       |       |     |          |            |              |
|      |       |       |     |          |            |              |
|      |       |       |     |          |            |              |
|      |       |       |     |          |            |              |
|      |       |       |     |          |            |              |
|      |       |       |     |          |            |              |

**MEDICATIONS:**

1704 — Demerol 25 mg IVP _____  K Bauer RN

**Diagnostic tests:**
   ray of _____ time _____
   _____ time _____

☐ lab drawn _____ time _____
   _____ time _____
   _____ time _____

**Safety:**
☑ SRs ↑ at all times
☐ Padded SRs on _____
   _____ off _____

**Comfort:**
☐ wet linen removed _____
☐ warm blankets applied

SIGNATURES

INITIALS

Barbara Carruthers RN
K Bauer RN

699-31

# POST ANESTHESIA
# CARE UNIT RECORD

(addressograph)

| Focus | Expected Outcomes | Actions | Focus | Expected Outcomes | Actions |
|---|---|---|---|---|---|
| ☐ Altered Respiratory status<br>☐ Artificial airway<br>☐ Difficulty breathing<br>☐ Secretions<br>☐ Surgical procedure<br>☐ Medications<br>☐ Preop-condition<br>☐ Other _____ | ☐ Patient maintains patent airway<br>☐ Oximeter reading 90% or greater c̄ /s O₂<br>☐ Patient respirations are even and effortless | ☐ Assess airway and maintain patency<br>☐ Administer oxygen as ordered upon admission<br>☐ Assess lungs upon admission and prn<br>☐ Monitor respiratory rate, rhythm, and depth q 15 min and prn<br>☐ Note symetry of chest movement<br>☐ Monitor oximeter reading q 15 min and prn<br>☐ Assess skin color, temp.<br>☐ Encourage C & DB<br>☐ Provide warmth to patient:<br>  ☐ warm blankets/thermodrape<br>  ☐ patient warming device<br>  ☐ limit exposure of skin<br>☐ Follow Policy & Procedure for maintenance and removal of airway and E.T. tube<br>☐ Elevate H.O.B. unless contraindicated<br>☐ Discharge patient from PACU c̄ O₂ at — L/N.C. or mask (circle) for 24° or until oximeter > 90%<br>☐ Oximeter readings prn | ☐ Alteration in comfort<br>☐ Physical pain from surgery<br>☐ Psychological response to surgery<br>☐ Immobility<br>☐ Position<br>☐ Nausea/ vomiting<br>☐ Other _____ | ☐ Patient verbalizes feelings of comfort or decrease in pain<br>☐ Vital signs in preop range<br>☐ Absence of restlessness<br>☐ Patient verbalizes decrease or elimination of nausea | ☐ Assess pain location, duration, intensity<br>☐ Medicate prn<br>☐ Assess effectiveness & tolerance of pain medication<br>☐ Assist patient with repositioning<br>☐ Provide comfort measures:<br>  ☐ warm blanket<br>  ☐ cool cloth<br>☐ Assess type and amount of anesthesia given<br>☐ Note emesis, color, amount<br>☐ Administer antiemetic<br>☐ Assess effectiveness of antiemetic<br>☐ Maintain NPO if applicable<br>☐ Assess abdomen for distention<br>☐ Maintain patency of NG and suction<br>☐ Provide emotional support |
| ☐ Alteration in Hemody-namics<br>☐ B.P.<br>☐ Pulse<br>☐ Arrythmia<br>☐ Urine output<br>☐ Other _____ | ☐ BP and pulse within preop range<br>☐ Skin warm & dry<br>☐ Oriented to person and place<br>☐ Urine output > 30 cc/hour | ☐ Monitor vital signs q 15 & prn<br>☐ Monitor EKG q 15 & prn<br>☐ Assess resp. status prn<br>☐ Monitor I & O<br>☐ Monitor lab values<br>☐ Administer fluids/blood as indicated<br>☐ Rewarm patient<br>☐ Administer O₂<br>☐ Use analgesic cautiously<br>☐ Position patient in Trendelenberg if symptomatic<br>☐ Maintain patency of IV(s)<br>☐ Monitor urine output prn | ☐ Altered Skin Integrity other than expected surgical incision<br>☐ Position<br>☐ Preop condition<br>☐ Other _____ | ☐ Patient maintains preop skin integrity status<br>☐ Dressing is dry and intact | ☐ Assess skin integrity - note redness, open areas<br>☐ Remove wet, wrinkled linen<br>☐ Reposition prn<br>☐ Assess dressing for drainage, note color, amount, prn<br>☐ Reinforce dressing prn<br>☐ Assess neurovascular status of_____ |
| ☑ Anxiety<br>☑ Post-op diagnosis<br>☑ Unfamiliarity with environment<br>☐ separation from family/ significant other<br>☐ Other _____ | ☐ Patient verbalizes orientation to environ-ment, Patient expresses feelings, concerns, asks questions | ☑ Assess orientation<br>☑ Orient prn<br>☑ Instruct patient on monitoring equipment, procedures and document on orientation to PACU teaching record<br>☑ Provide emotional support<br>☑ Encourage patient to express fears and to ask questions<br>☑ Provide privacy | ☐ Potential for injury<br>☐ L.O.C.<br>☐ Age<br>☐ Precondition<br>☐ Mobility<br>☐ Other _____ | ☐ Patient remains injury-free | ☐ Assess L.O.C. prn<br>☐ Orient patient prn<br>☐ Monitor effects of anesthetic and analgesic<br>☐ Side rails up at all times<br>☐ Bed/cart locked<br>☐ Pad siderails prn<br>☐ Apply restraints prn<br>  ☐ posey    ☐ leather<br>  ☐ wrist    ☐ personnel<br>  ☐ ankle<br>☐ Check neurovascular status affected |

| Focus | Expected Outcomes | Actions | Focus | Expected Outcomes | Actions |
|-------|-------------------|---------|-------|-------------------|---------|
| ☐ Ineffective Thermo regulation<br>☐ Length of Surgery<br>☐ Type of Surgery<br>☐ Other ____ | ☐ Patient temperature is 95° orally or 94° axillary<br>☐ Patient is not shivering | ☐ Monitor temperature upon admission and prn<br>☐ Cover patient with warm blankets<br>☐ Limit skin exposure<br>☐ Remove wet linen<br>☐ Apply patient warming device if temp 94° or less<br>☐ Assess for shivering<br>☐ Assess peripheral circulation<br>☐ Monitor vital signs and oximetry | ☑ Knowledge deficit<br>☐ diagnosis<br>☐ unfamiliar surroundings<br>☐ other | ☑ Patient demonstrates/ restates instruction given | ☑ Assess orientation and orient prn<br>☑ Instruct on equipment, procedures, purpose, document on orientation to PACU teaching record<br>☑ Encourages patient to ask questions<br>☑ Assess ability of patient to understand instuctions and cooperate |
| ☐ Altered circulation (neurovascular status)<br>☐ Sugical procedure<br>☐ Positioning<br>☐ Other ____ | ☐ Maintain/ improve circulation | ☐ Assess neurovascular status<br>☐ Assess peripheral pulses on adm. and prn<br>☐ Use Doppler to assess pulse if not palpable<br>☐ Reposition patient prn<br>☐ Elevate affected extremity<br>☐ Loosen drsg prn or per MD order | ☐ Other | | |

## Patient Care Outcome Status

| | Time ____ | | Time 1056 |
|---|---|---|---|
| ☐ Altered Resp. Status | | ☑ Potential for Injury | |
| ☐ Met  ☐ Not Met | | ☑ Met  ☐ Not Met | |

| | Time ____ | | Time ____ |
|---|---|---|---|
| ☐ Alteration in Hemodynamics | | ☐ Ineffective Thermoregulation | |
| ☐ Met  ☐ Not Met | | ☐ Met  ☐ Not Met | |

| | Time 1056 | | Time ____ |
|---|---|---|---|
| ☑ Anxiety | | ☐ Altered Circulation (Neurovascular) | |
| ☑ Met  ☐ Not Met | | ☐ Met  ☐ Not Met | |

| | Time ____ | | Time 1056 |
|---|---|---|---|
| ☐ Alteration in Comfort | | ☑ Knowledge Deficit | |
| ☐ Met  ☐ Not Met | | ☑ Met  ☐ Not Met | |

| | Time ____ | | Time ____ |
|---|---|---|---|
| ☐ Alteration in Hemodynamics | | ☐ Ineffective Thermoregulation | |
| ☐ Met  ☐ Not Met | | ☐ Met  ☐ Not Met | |

### SCORES / P.A.C.U. SCORE SYSTEM

| ADM | DISC | P.A.C.U. SCORE SYSTEM |
|-----|------|------------------------|
| 2 | 2 | RESPIRATION:<br>2 Able to deep breathe & cough freely Normal rate & depth<br>1 Dyspnea or limited breathing Mechanical airway<br>0 Apneic |
| 2 | 2 | CIRCULATION:<br>2 BP +/–20 of pre-anesthetic level/stable pulse<br>1 BP +/– 20-50 of pre-anesthetic level/abnormal dysrhythmia<br>0 BP +/– 50 or more of pre-anesthetic level symptomatic dysrhythmia |
| 2 | 2 | COLOR:<br>2 Pink / < 3 Seconds CRT<br>1 Pale, dusky, blotchy, jaundiced<br>0 Cyanotic |
| 1 | 2 | CONSCIOUSNESS:<br>2 Awake, alert, oriented x 3<br>1 Arousable on verbal stimuli<br>0 Not responding |
| 1 | 2 | ACTIVITY:<br>2 Able to move 4 extremities on command<br>1 Able to move 2 extremities on command<br>0 Able to move 0 extremities |
| 8 | 10 | TOTAL: FOR A SCORE OF 7 OR BELOW NOTIFY THE ANESTHESIOLOGIST PRIOR TO DISCHARGE |

TOTAL IV FLUIDS IN PACU: 50 cc

| Discharged To: | Per: | Accompanied By: |
|---|---|---|
| ☑ Floor | ☑ Cart | ☑ RN |
| ☐ ICU (life pak) | ☐ Bed | ☐ NA |
| ☐ Telemetry (life pak) | | ☐ MD |
| With: | | |
| ☐ BP monitor  ☐ O₂ | ☐ Carried | |
| ☐ Other | | |

| Time 1723 | Discharged By (signature) |
|---|---|
| Accepted Report D. Nelson LRN | Time 1743 |

PAGE 3 OF 3
DATE 3/23/01

## Medical Center Enterprise
## PERIOPERATIVE RECORD

Lot #51938

ADDRESSOGRAPH

☐ N/A  ESU/LASER:
ESU: FgK 11395-A  GROUNDING PAD #: E7501
SITE: Lt thigh  BY WHOM: J Yarbrough RN
SETTINGS CUT: 45  COAG: 45  BIPOLAR:  POST-SKIN INTEGRITY: Clean
☑ N/A  LASER UNIT: _____  LASER SETTING: _____  LASER SAFETY PRECAUTION: ☐ YES
☑ N/A  TOURNIQUET: SERIAL #: _____  ☐ LEG (RT./LT.) ☐ ARM (RT./LT.)  BY WHOM: _____
      TIME ON: _____  TIME OFF: _____  ; _____  MMHG; TIME ON: _____  TIME OFF: _____  ; _____  MMHG
☐ N/A  JOBST HOSE: ☑ YES ☐ NO (BOTH/RT./LT.)  BY WHOM: D. Smith, RN
☐ N/A  ☐ X-RAY TAKEN ☐ PORTABLE ☐ C-ARM  X-RAY TECHNICIAN: _____
☑ N/A  ☐ MICROSCOPE (OPTH./ENT) ☐ 35mm CAMERA ☐ VIDEO (TAPE DISPOSITION: ☐ SURGEON ☐ PATIENT)
☑ N/A  SPECIMENS: SPECIMEN #: _____  ☐ SEND TO LAB ☐ DISCARD PER SURGEON'S ORDER ☐ SENT WITH PATIENT
☐ TAKEN BY SURGEON ☐ TAKEN BY PATHOLOGIST ☐ FROZEN SECTION ☐ C & S (SITE: _____
☐ N/A  WOUND IRRIGATION: ☐ ANCEF ☐ GU IRRIGANT ☐ L/R 5000 HEPARIN ☐ L/R 5000 HEPARIN / ANCEF ☐ NS ☐ L/R / ANCEF
      ☐ H₂O ☐ POLYBACTRIN ☐ MEFOXIN ☐ KANTREX ☐ GENTAMYCIN ☐ OTHER: _____
MEDICATIONS DURING SURGERY OTHER THAN ANESTHESIA: See anesthesia record

Y INFORMED OF PATIENT'S STATUS @ TIMES _____

| DRAINS | SIZE | LOCATION | DESCRIPTION / DRAINAGE | DRAINS | SIZE | LOCATION | DESCRIPTION / DRAINAGE |
|---|---|---|---|---|---|---|---|
| ☐ Red Rubber | | | | ☐ Penrose | | | |
| ☐ Jackson Platt | | | | ☐ Hemovac Davol | | | |
| ☐ NG | | | | ☐ Chest Tube | | | |
| ☐ Other | | | | ☐ Other | | | |

☐ N/A COUNTS: SPONGE: ☑ CORRECT ☐ INCORRECT  ☑ FINAL COUNTS CORRECT  CLOSURE TIME
☐ N/A  NEEDLE: ☑ CORRECT ☐ INCORRECT  SCRUB NURSE: A Shackleford ST
☐ N/A  INSTRUMENT: ☑ CORRECT ☐ INCORRECT  CIRCULATING NURSE: J Chamberlain  16 43
SURGEON NOTIFIED OF COUNTS  ☐ YES: IF UNRESOLVED X-RAY TAKEN (IF NO, WHY: _____

POST-OPERATIVE DIAGNOSIS  Same
☐ N/A  DRESSINGS: ☑ 4X4's ☐ STERISTRIPS ☐ ABD ☐ BANDAID ☐ EYE PAD / SHIELD ☐ KERLIX ☐ KLING ☐ MASTISOL
☐ TELFA ☐ XEROFORM ☐ ACE BANDAGES ☐ ADAPTIC ☐ COLLODIAN ☐ VASELINE GAUZE ☐ PERI PAD ☐ VAG. PACKING
☐ NASAL STENTS ☑ COTTON ROLL ☐ ANTIBIOTIC OINTMENT ☐ OTHER: _____
☐ PACKING SITE: _____  EXIT TIME  16 56
TAPE: ☑ SILK ☐ FOAM ☐ PAPER ☐ ELASTOPLAST ☐ OTHER: _____

CAST: ☐ ARM ☐ LEG ☐ RT. ☐ LT. ☐ PLASTER ☐ FIBERGLASS ☐ LONG ☐ SHORT ☐ SPICA ☐ SPLINT ☐ SLING
WOUND CLASSIFICATION: ☐ CLEAN (I) ☑ CLEAN CONTAMINATED (II) ☐ CONTAMINATED (III) ☐ DIRTY (IV)

COMMENTS: Tolerated Procedure well —
Bullet fragment to B.Bradley Enterprise Police Dept.

OD OF TRANSFER: ☑ ROLLER ☐ SELF ☐ WITH ASSISTANCE ☐ NURSE'S ARMS ☐ ANESTHESIA ARMS
TRANSFERRED BY: ☐ STRETCHER ☐ ICU / CCU BED ☐ UNIT BED ☐ OTHER: _____  (WITH SR'S) X 2
TRANSFER TO: ☐ PACU ☐ ICU / CCU ☐ ROOM ☐ DAY SURGERY ☐ OTHER: _____
PATIENT STATUS POST SURGERY: ☐ RESPONSIVE ☐ NON RESPONSIVE ☐ ALERT ☐ SEDATED
REPORT TO: K Thomas RN  L Caminale RN  PACU NURSE: J Chamberlain
PRIMARY CIRCULATOR SIGNATURE: Judy York  RELIEF CIRCULATOR SIGNATURE: J Chamberlain

OR-50-3-(Rev. 7/98)

599-34

052301

PAGE 2 OF 3

E  5/23/01

## Medical Center Enterprise
## PERIOPERATIVE RECORD

| Potential for injury | Patient will remain free of injury | ☑ maintain proper body alignment / safety devices<br>☑ appropriate padding and support devices<br>☑ positioning done according to guidelines<br>☑ follow electrical / laser safety protocol | ☑ Total procedure performed with no apparent injury |
| Potential for foreign body in surgical wound | Patient is free of any foreign body post-op | ☑ surgical count performed according to policy<br>☑ report discrepancy immediately and initiate corrective action | ☑ Patient is free of retained foreign body post-op |
| Potential for fluid volume deficit related to blood and fluid loss | Patient's fluid and electrolyte balance is maintained | ☑ check patient's lab values for baseline<br>☑ suction canisters & lap sponges in clear view<br>☑ calculate drainage from foley, N/G's and other drains<br>☑ assist with IV fluids and blood replacements | ☑ Patient fluid volume is monitored during surgery |
| Potential for lowered body temperature related to hypothermia | Patient will maintain body temperature within normal limits | ☑ apply warm blankets throughout procedure<br>☑ hyperthermia unit used if required<br>☑ expose only as much of patient as needed for prep and surgical site<br>☑ use warm irrigating solutions | ☑ Patient's body temperature within normal limits |

ature: Cindy Yale, L RN

Date/Time: 5/23/01 - 1500

ADDRESSOGRAPH

| Intraoperative Record: | | ROOM TIME |
| Date: 5/23/01 | | 1500 |
| OR #: 2 | | |

Moved to OR Table: ☑ c̄ Extra Help   ☐ s̄ Difficulty
☐ c̄ Difficulty   ☐ p̄ Induction   ☐ Nurses Arms
☐ c̄ Roller
OR Table Used: ☑ Regular   ☐ Fracture
☐ Stretcher   ☐ Cysto   ☐ C-Arm Table
ANESTHESIA: ☐ General / Mask
☑ General / Endotracheal   ☐ Spinal   ☐ Epidural
☐ Bier Block   ☐ Axillary Block
☐ Monitored Anesthesia Care (MAC)   ☐ Local
☐ Other ___

### INTRAOPERATIVE DATA

PREOPERATIVE DIAGNOSIS: Gunshot Wound to Abdomen + Left arm

| SURGEON | J. Sawyer | , M.D. SURGEON | , M.D. |
| SURGEON | J. Rodel | , M.D. | |
| PEDIATRICIAN | | , M.D. NURSERY RN | |
| ANESTHESIOLOGIST | Schwock | , M.D. ANESTHETIST | G. Altman, CRNA |
| | | ANESTHETIST | |

| CIRCULATOR | J. Yarbrough RN | OUT @ 1425 | IN @ |
| CIRCULATOR | J. Chambers | IN @ 1600 | OUT @ |
| SCRUB | D. Smith RN | OUT @ | IN @ |
| SCRUB | A. Howe, RN | IN @ | OUT @ 1610 |
| SCRUB | J. Parker, CST | IN @ 1610 | OUT @ |

MEDICAL OBSERVERS:                 LASER TECH:
SALES REP:                         OTHERS:

PROCEDURE(S): Diagnostic Laparoscopy, Exploratory Laparotomy, Repair of Gunshot wound to Colon (Transverse) Removal of bullet from Left Arm

INCISION TIME: 1540

POSITIONS: Safety Strap ☑ Yes ☐ No ☐ N/A  Location: mid thigh
☑ Supine ☐ Prone ☐ Jack-Knife ☐ Frogleg ☐ Lateral (RT./LT.) ☐ Semifowler ☐ Other
☐ High Lithotomy (Time Up: ____ : Time Down: ____ ) ☐ Low Lithotomy (Time Up: ____ : Time Down: ____ )
ARMS: ☑ Tucked at side (RT./LT.) ☑ On Armboards (RT./LT.) ☐ On Handtable (RT./LT.) ☐ Padded Mayo (RT./LT.)
SUPPORT DEVICES: ☐ Chest Rolls ☐ Foot Board ☐ Axillary Rolls (RT./LT.) ☐ Chick Leg Holder ☐ Headrest ☐ Beanbag ☑ Pillow
☐ A Lateral Positioner ☐ Well Leg Holder ☐ Eggcrate Pads ☐ Shoulder Rolls ☐ Other

__ NA SKIN PREP: ☑ Betadine ☐ Hibiclens ☐ Alcohol ☐ Other ___ Location ___ By Whom: ___
__ NA SKIN SHAVE: ☐ Yes ☑ No ☐ Patient Unit   Location Pubic area   By Whom: ___

CATHETERS: __ NA ☐ Foley Catheter in OR;  Size: ____ CC H2O in balloon;  Color of Urine ____ ; By Whom: ___
__ NA ☑ Foley Catheter from Patient Unit;  150 CC in bag;  Color of Urine yellow   Post Op. Color ___
__ NA ☐ Straight Cath in OR:  e ____ ; B ____ hom: ____   Output: ____   D/C'd ___

BLOOD GIVEN IN OR: ☐ Yes ☐ No (If Yes, see Transfusion Sheet)   PROSTHETIC DEVICE: ☐ Yes ☐ No (If Ye __ e Implant Sheet)

MEDICAL CENTER ENTERPRISE
SURGICAL COUNT SHEET                05230

OPERATION: _Diag. Lap – Expl. Lap_

5/23/01

| | PRE-OP COUNTS | | 1ST | 2ND | 3RD | FINAL COUNT |
|---|---|---|---|---|---|---|
| 4 X 18 Lap Sponges | — | | | | | |
| 18 x 18 Lap Sponges | 10 | 5 | 15 | 15 | 15 | 15 |
| 4 x 4 Ray Tec. Sp.   Diag. Lap / Expl. Lap | 10 / 10 | — | 10 / 10 | 10 / 10 | — | 10 / 10 |
| Cottonolds | — | | | | | |
| Tonsil Sponges | | | | | | |
| Dental Rolls | — | | | | | |
| Suture Needles | — | 8+8 + 2+1 | 19 | 19 | 19 | 19 |
| Hypardermic Needles | — | | | | | |
| Bovie Tips | 1 | | 1 | 1 | 1 | 1 |
| Bovie Tip Cleaners | 1 | | 1 | 1 | 1 | 1 |
| Knife Blades | 2 | | 2 | 2 | 2 | 2 |
| Dissectors | — | | | | | |
| Braided Cord Tape (umbilical) | — | | | | | |

SCRUB NURSE _Shirley CST_

CIRCULATING NURSE _A Chambers RN_

OUTCOME OF NEEDLE, INSTRUMENT AND SPONGE COUNT REPORTED TO SURGEON.

PHYSICIAN _____ M.D.

599-36

DICAL CEN      ENTERPRISE    52301
SURGICAL COUNT SHEET

OPERATION  *Diag. Lap, Expl. Lap*

5/2 3/01

SAWYER, SAMUEL

| | PRE-OP | ADDED | POST-OP | | PRE-OP | ADDED | POST-OP |
|---|---|---|---|---|---|---|---|
| Knife Handle | 2 | | 3 | Crile (Ribbon) Ret. | | | |
| Curved Hemostats | 4 | | 4 | Suction Tip | 3 | | |
| Straight Hemostatis | | | | Rake Ret. | | | |
| Scissors | 4+1 | | 5 | Tenaculum | | | |
| Tissue Forceps | 1+4+3 | | 8 | Uterine Elevator | | | |
| Needle Holders | 2 | | 2 | Towel Clips | | | |
| | | | | Harrington Ret. | | | |
| Long Kelly Clamps | 2 | | 2 | Army/Navy's | | | |
| Short Kelly Clamps | 2 | | 2 | | | | |
| Straight Oschners | 4 | | 4 | Gelpis | | | |
| Allis Clamps | 2 | | 2 | Senn Ret. | | | |
| Babcocks | 2 | | 2 | Bladder Ret. | | | |
| Sponge Sticks | 1 | | 1 | Heaney Ret. | | | |
| Heaney Clamps | | | | Weitlander | | | |
| Ballintines | | | | Foss Ret. | | | |
| Right Angle Clamps | | | | Thompson Ret. | | | |
| Pennington | | | | Bookwalter | | | |
| Lahey Clamps | | | | Balfour/Upper Hand | | | |
| | | | | OConner/Sullivan | | | |
| Richardson's | 4 | | 4 | Gallbladder Inst. | | | |
| Deavers | | | | Intestinal Inst. | | | |

SCRUB NURSE _____

CIRCULATING NURSE _____

(surctins)

599-37

## CASE MANAGEMENT

### PROGRESS NOTES:

| DATE | |
|------|---|
| 5/31/01 | Robert C____ and 20 y/o male. Med Rec # 41053 Twenty year old black male sustained gun shot wound to left lower quadrant of abdomen (R) upper arm. Recovering from surgery. No discharge needs anticipated. — S____ RN/CM |

# MULTIDISCIPLIN
# TEACHING
# RECORD FOR
# PATIENT/CARE GIVER

CONRAD, ROBERT
05/23/01

**EDUCATIONAL ASSESSMENT** for patient to complete and give to nurse.

Please check if you need more information regarding the following:

☐ My diagnosis

☐ My medications

☐ My diet

☐ Other: _____

_____

Please state the reason for your hospital visit: _____

_____

☐ Breathing Treatments/Respiratory Equipment    ☐ Activity
☐ Plan for Discharge                             ☐ Smoking Cessation
☐ Diabetic Education                             ☐ Coumadin Education
☐ Tube Feeding                                   ☐ Skin Care
☐ IV Therapy                                     ☐ Rehabilitation
☐ Assistive Devices (such as walker, cane, etc.  ☐ Other: _____

**Completed By:** _____

☐ **Patient**        ☐ **Other:** _____
                                   (Relationship to Patient)

---

**NURSE REVIEW AND VERIFICATION:** The following goals to be completed by nurse.
1) Patient/Care Giver will be prepared for: ☐ minimal,  ☐ moderate,  ☐ high level of assistance.
2) Patient/Care Giver demonstrates knowledge base to care for patient/equipment at home.
   <u>Knowledge Level:</u>  Prior to the teaching program, patient/care giver exhibits ☐ 25% ☐ 25−50% ☐ 50−75%
                          ☐ > 75% knowledge of health problem and how to deal with it.
   <u>Motivational Level:</u>  ☐ Asks questions    ☐ Eager to learn    ☐ Seems interested
                             ☐ Uncooperative    ☐ Extremely anxious    ☐ Denies need for education
   <u>Comprehension Level:</u>  Ability to grasp concepts and respond to questions: ☐ High, ☐ Medium, ☐ Low

Staff Member Completing Form: _____
                              Signature                    Title              Date

## Educational Progress Notes

| Date Time | Method Material | Need/ Comments | Pat. Resp. | Comments |
|---|---|---|---|---|
| | ☐ Discussion<br>☐ Demonstration<br>☐ Handout<br>☐ Audio<br>☐ Video<br>☐ Computer Program | **Admission Assessment Orientation**<br>Patient and/or family member orientated to room, hospital bed, call light system, emergency bathroom call light, phones, smoking and visiting policies for MCE. Patient and/or family members discussed type of IV therapy utilized heplock and/or IVF & type of medications to be given. Discuss Intake and Output and the importance of using the hat, BSC, or urinal. Discuss VS and how ordered regarding the possibility of being awaken at night. | ☐ 1<br>☐ 2<br>☐ 3<br>☐ 4 | |
| | Signature: | | | |
| | ☐ Discussion<br>☐ Demonstration<br>☐ Handout<br>☐ Audio<br>☐ Video<br>☐ Computer Program | 5/28/01<br>TCDB IS ↑ eat amb —<br>dsg clean & dry Reep<br>wounds clean & dry<br>soips H₂o  H₂o po↑<br>Pt Glucich | ☐ 1<br>☑ 2<br>☐ 3<br>☑ 4 | |
| | Signature: | | | |
| | ☐ Discussion<br>☐ Demonstration<br>☐ Handout<br>☐ Audio<br>☐ Video<br>☐ Computer Program | | ☐ 1<br>☐ 2<br>☐ 3<br>☐ 4 | |
| | Signature: | | | |
| | ☐ Discussion<br>☐ Demonstration<br>☐ Handout<br>☐ Audio<br>☐ Video<br>☐ Computer Program | | ☐ 1<br>☐ 2<br>☐ 3<br>☐ 4 | |
| | Signature: | | | |

Pat. Resp. =    1 – Did not comprehend        2 – Verbalized comprehension
3 – Needs further instruction    4 – Demonstrated comprehension/skill appropriately

MEDICAL CENTER ENTERPRISE

INFORMED CONSENT

AUTHORIZATION FOR MEDICAL AND/OR SURGICAL TREATMENTS/PROCEDURES

I, _Robert Conred_ , hereby authorize Doctor _S. Conyz_ and his/her assistants to perform upon _my self_ the following operative/diagnostic, or invasive procedure / treatments: _Removal of Bullet from (L) Arm and Abdomen_

_____

_____

(description of operation / treatment in layman's language )

My doctor has explained the risks and benefits of the procedure/treatment, advised me of alternative treatments and has told me about the expected outcome and what could happen if my condition remains untreated. I understand that if any unforeseen condition arises in the course of the procedure/treatment calling for, in the physician's judgment, additional or different procedure/treatment from those I have consented to, I further request and authorize him/her to perform whatever procedure/treatment he/she deems necessary and advisable. Any tissue or body fluids may be disposed of by the hospital in accordance with the accustomed practice. Any photographs, video recordings deemed necessary during the procedure/treatment will be permitted.

I certify and acknowledge that I have read this form or had it read to me, that I understand the risks, alternatives and expected results of the procedure/treatment and that I had ample time to ask questions and to consider my decision.

_05/23/01_

Date and Time

_MJ Shufr_

Witness.

_Robert Conred_

Patient Signature

_____

Nearest Relative (Relation to Patient)

**MEDICAL CENTER ENTERPRISE**

**INFORMED CONSENT**

AUTHORIZATION FOR MEDICAL AND/OR SURGICAL TREATMENTS/PROCEDURES

I, _Robert Conrad_ , hereby authorize Doctor _____

and his/her assistants to perform upon _My Cell_____

the following operative, diagnostic, or invasive procedure/treatments: _Diagnostic_

_Laparoscopy possible Laparotomy_____

_____

_____

_____

(description of operation / treatment in layman's language )

My doctor has explained the risks and benefits of the procedure/treatment, advised me of alternative treatments and has told me about the expected outcome and what could happen if my condition remains untreated. I understand that if any unforeseen condition arises in the course of the procedure/treatment calling for, in the physician's judgment, additional or different procedure/treatment from those I have consented to, I further request and authorize him/her to perform whatever procedure/treatment he/she deems necessary and advisable. Any tissue or body fluids may be disposed of by the hospital in accordance with the accustomed practice. Any photographs, video recordings deemed necessary during the procedure/treatment will be permitted.

I certify and acknowledge that I have read this form or had it read to me, that I understand the risks, alternatives and expected results of the procedure/treatment and that I had ample time to ask questions and to consider my decision.

_05 | 23 | 0 | 1420_

Date and Time

_[signature]_

Witness

_[signature] Robert Conrad_

Patient Signature

_____

Nearest Relative (Relation to Patient)

COURT OF CRIMINAL APPEALS NO. CR-02-0333

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF _____ COFFEE _____ COUNTY, ALABAMA

CIRCUIT COURT NO. CC-01-179, CC-01-180

CIRCUIT JUDGE ___ Gary L. McAliley

Type of Conviction / Order Appealed From: ___ Conviction, Capital Murder, Robbery 1st

Sentence Imposed: __ Life Without Parole, Life

Defendant Indigent: [X] YES   [ ] NO

Robert Thomas Conrad

_____    NAME OF APPELLANT

Gary Bradshaw
(Appellant's Attorney)                              (Telephone No.)    Richard Waldrop
P. O. Box 311412                                                P. O. Box 310027
(Address)                                                        Enterprise, AL  36331
Enterprise          AL          36331
(City)              (State)          (Zip Code)

### V.

STATE OF ALABAMA

_____    NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____
_____

(For Court of Criminal Appeals Use Only)



## CONSENT FOR ANESTHESIA SERVICES

I, _____, acknowledge that my doctor has explained to me that I will have an operation, diagnostic or treatment procedure. My doctor has explained the risks of the procedure, advised me of alternative treatments and told me about the expected outcome and what could happen if my condition remains untreated. I also understand that anesthesia services are needed so that my doctor can perform the operation or procedure.

It has been explained to me that all forms of anesthesia involve some risks and no guarantee or promises can be made concerning the results of my procedure or treatment. Although rare, unexpected *severe complications* with anesthesia can occur and include the remote possibility of *infection, bleeding, drug reactions, blood clots, loss of sensation, loss of limb function, paralysis, stroke, brain damage, heart attack or death*. I understand that these risks apply to all forms of anesthesia and that additional or specific risks have been identified below as they may apply to a specific type of anesthesia. I understand that the type(s) of anesthesia service checked below will be used for my procedure and that the anesthetic technique to be used is determined by many factors including my physical condition, the type of procedure my doctor is to do, his or her preference, as well as my own desire. It has been explained to me that sometimes an anesthesia technique which involves the use of local anesthetics, with or without sedation, may not succeed completely and therefore another technique may have to be used including general anesthesia.

| | | |
|---|---|---|
| ☑ General Anesthesia | Expected Result | Total unconscious state, possible placement of a tube into the windpipe. |
| | Technique | Drug injected into the bloodstream, breathed into the lungs, or by other routes. |
| | Risks | Mouth or throat pain, hoarseness, injury to mouth or teeth, awareness under anesthesia, injury to blood vessels, aspiration, pneumonia, death. |
| ☐ Spinal or Epidural Analgesia/ Anesthesia ☐ With sedation ☐ Without sedation | Expected Result | Temporary decreased or loss of feeling and/or movement to lower part of the body. |
| | Technique | Drug injected through a needle/catheter placed either into the spinal canal or immediately outside the spinal canal. |
| | Risks | Headache, backache, buzzing in the ears, convulsions, infection, persistent weakness, numbness, residual pain, injury to blood vessels, "total spinal", death. |
| ☐ Major / Minor Nerve Block ☐ With sedation ☐ Without sedation | Expected Result | Temporary loss of feeling and/or movement of a specific limb or area. |
| | Technique | Drug injected near nerves providing loss of sensation to the area of the operation. |
| | Risks | Infection, convulsions, weakness, persistent numbness, residual pain, injury to blood vessels, death. |
| ☐ Intravenous Regional Anesthesia ☐ With sedation ☐ Without sedation | Expected Result | Temporary loss of feeling and/or movement of a limb. |
| | Technique | Drug injected into veins of arm or leg while using a tourniquet. |
| | Risks | Infection, convulsions, persistent numbness, residual pain, injury to blood vessels, death. |
| ☐ Monitored Anesthesia Care (with sedation) | Expected Result | Reduced anxiety and pain, partial or total amnesia. |
| | Technique | Drug injected into the bloodstream, breathed into the lungs, or by other routes producing a semi-conscious state. |
| | Risks | An unconscious state, depressed breathing, injury to blood vessels, death. |
| ☐ Monitored Anesthesia Care (without sedation) | Expected Result | Measurement of vital signs, availability of anesthesia provider for further interventions. |
| | Technique | None. |
| | Risks | Increased awareness, anxiety and/or discomfort. |

I hereby consent to the anesthesia service checked above and authorize that it be administered by _____ or his/her associates, all of whom are credentialed to provide anesthesia services at this health facility. I also consent to an alternative type of anesthesia, if necessary, as deemed appropriate by them. I expressly desire the following considerations be observed (or write "none"):

---

### BLOOD TRANSFUSIONS

The likelihood of needing a blood transfusion for this procedure is:    ☐ highly unlikely,    ☐ possible,    ☑ probable.

I understand that there are potential risks from blood transfusions, though rare, and that some of these include transfusion reaction, hepatitis, and AIDS (Acquired Immune Deficiency Syndrome). *Initial in appropriate box:*

☑ I give consent to receive blood or blood products as determined by my anesthetist and doctor to be necessary for my well-being.
☐ I give consent to receive blood or blood products only as an emergency life-saving measure.
☐ I do not want to receive blood or blood products under any circumstance.

---

I certify and acknowledge that I have read this form or had it read to me, that I understand the risks, alternatives and expected results of the anesthesia service and that I had ample time to ask questions and to consider my decision.

| | |
|---|---|
| X _____ Patient's Signature | _____ Date and Time |
| _____ Substitute's Signature | _____ Relationship to Patient |
| _____ Witness | _____ Explained By |

682

Medical Center Enterprise
400 North Edwards St.
Enterprise, Alabama 36330

**Patient Summary**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **P** | PATIENT NUMBER 01143-00094 | ROOM/TYPE ER | PT ER | SERV ER 94 | ATTENDING PHYSICIAN DREW, JOHN L | | FAMILY PHYSICIAN DREW, JOHN L | | MR NUMBER 0000041053 |

| PATIENT | | | | | | | |
|---|---|---|---|---|---|---|---|
| ADMIT DATE/TIME 05/23/01 1357 | | SEX M | RACE 2 | HS S | DATE OF BIRTH /AGE 09/27/80  20Y | SOCIAL SECURITY NUMBER 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 | EMPLOYMENT STATUS |

**I E N T**

PATIENT
CONRAD, ROBERT
36 NELL COURT
ENTERPRISE        AL 36330        PHONE: (334)308-2140

SMK        VETERAN  No        OCCUPATION

EMPLOYER
MCDONALDS
625 BOLL WEEVIL CIR
ENTERPRISE        AL  36330        PHONE: (334)347-3417

BRANCH OF SERVICE        PAY GRADE        MILITARY STATUS

**G U A R**

GUARANTOR
CONRAD, DOROTHY A
507 GLOVER AVENUE APT 35
ENTERPRISE        AL 36330        PHONE: (334)348-2150

RELATIONSHIP MOTHER        SOCIAL SECURITY NUMBER 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        GUARANTOR OCCUPATION LAUNDRY/HOU

GUARANTOR EMPLOYER
ENTERPRISE NURSING H
300 PLAZA DR
ENTERPRISE    AL 36330        PHONE: (334)347-9541

EMPLOYMENT STATUS

**R E L**

RELATIVE/FRIEND (OTHER THAN GUARANTOR)
CONRAD, DOROTHY; A
36 NELL COURT
ENTERPRISE        AL  36330        PHONE: (334)347-9533

RELATIONSHIP MOTHER        SOCIAL SECURITY NUMBER 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        GUARANTOR OCCUPATION LAUNDRY/HOUSEKEEPI

RELATIVE/FRIEND EMPLOYER
ENTERPRISE NURSING H
300 PLAZA DR
ENTERPRISE        AL  36330        PHONE:

EMPLOYMENT STATUS

**I N S 1**

CARRIER AL MCD        F/C D        POLICY NUMBER 000419175095        MAIL TO: PO BOX 7601

INSURED NAME CONRAD, ROBERT        SOCIAL SECURITY NUMBER

GROUP NUMBER        COMMENTS        MONTGOMERY    AL    36107

GROUP PHONE/EXT (800)688-7989

**I N S 2**

CARRIER        F/C        POLICY NUMBER        MAIL TO:

INSURED NAME        SOCIAL SECURITY NUMBER

GROUP NUMBER        COMMENTS

GROUP PHONE/EXT

**I N S 3**

CARRIER        F/C        POLICY NUMBER        MAIL TO:

INSURED NAME        SOCIAL SECURITY NUMBER

GROUP NUMBER        COMMENTS

GROUP PHONE/EXT

**I N S 4**

CARRIER        F/C        POLICY NUMBER        MAIL TO:

INSURED NAME        SOCIAL SECURITY NUMBER

GROUP NUMBER        COMMENTS

GROUP PHONE/EXT

**M I S C**

DIAG CODE GUNSH        DIAGNOSIS T WD        ALLERGIES NKDA        AMD        ORG        PRC

ACCIDENT TYPE        ACCIDENT DATE        ACC TIME        PLACE OF ACCIDENT        PREVIOUS VISIT DATE 05/07/99        ARRIVAL MODE PERSONAL

TRANSFERRING FACILITY        RELIGION        CHURCH        ATC        INT

COMMENTS        CLK GDC

FORMS NEED
SIGNATURE

ER

ED History Physical Worksheet

General Adult

TRAUMA

NAME Conrad Robert    0143-00094    5-23-01    Room ___

All elements not circled/struck/checked/annotated - were not pertinent

| Level 2, 3 – 2 to 4 body areas / organ systems | Level 4 – 5 to 7 body areas / organ systems | Level 5 – 8 or more body areas / organ systems |

## Physical Examination

☐ Physical Examination incomplete due to critical condition of patient.

**C O N S**
- ☐ Vital signs per nurses notes
- ☐ Well developed, well nourished
- ☐ No acute pain/distress
- ☐ Odor ETOH    more below ☐

**P S Y C**
- ☐ Alert and oriented to TPP
- ☐ No abnormalities of mood or affect
- ☐ Memory (recent and remote) intact    more below ☐

**E Y E S**
- ☐ PERRL
- ☐ Conjunctivae and lids normal
- ☐ Fundi and discs normal
- ☐ EOM normal    more below ☐

**E N T**
- ☐ Otoscopic exam of external canal and TMs normal
- ☐ Nasal mucosa, turbinates, and septum normal
- ☐ Mouth, tongue, and pharynx normal
- ☐ Pharynx without edema, exudate, or injection    more below ☐

**N E C K**
- ☐ Neck supple
- ☐ No JVD
- ☐ No thyromegaly
- ☐ No bruits    more below ☐

**C H S T**
- ☐ No masses or tenderness
- ☐ Breasts symmetric
- ☐ No discharge    more below ☐

**R E S P**
- ☐ Normal respiratory effort and excursion
- ☐ No rales, rhonchi or wheezes
- ☐ Normal to percussion
- ☐ Equal air entry    more below ☐

**C**
- ☐ Normal PMI with no thrills, RSR
- ☐ No murmurs or gallops
- ☐ Normal carotids  ☐ normal abd aorta  ☐ normal femorals  ☐ normal pedals
  No edema or varicosities
  Normal capillary refill
- ☐ Distal pulses present    more below ☐

**N E U R**
- ☐ Normal speech
- ☐ CN II-XII intact
- ☐ DTRs normal, no pathologic reflexes
- ☐ Normal motor and sensory function    more below ☐

**G I**
- ☐ No masses, tenderness, rebound or guarding
- ☐ Normal liver, spleen, kidney
- ☐ No hernia
- ☐ Rectal, not indicated  ☐ rectal normal  ☐ hemoccult negative
- ☐ Normal bowel sounds    more below ☐

**G U**
- ☐ Genitalia normal to inspection
- ☐ No masses, tenderness or adenopathy
- ☐ Genitalia normal to palpation
- ☐ Normal cervix    Normal bimanual  ☐ bladder  ☐ uterus  ☐ adnexa ☐    more below ☐

☑ Normal  ⊙ Circle positives and provide additional documentation

**L Y M**
- ☐ No adenopathy of neck
- ☐ No adenopathy of axillae
- ☐ No adenopathy of groin
- ☐ No adenopathy, other _____    more below ☐

**M U S**
- ☐ Normal gait and station
- ☐ Normal digits and nails
- ☐ No tendon injury
- ☐ Proximal and distal joint normal
- ☐ No F.B. noted
- ☐ No ligamentous injury
- ☐ Normal to palpation
- ☐ Normal strength/tone
- ☐ Neurovascular status intact    more below ☐

**S K N**
- ☐ Normal to inspection
- ☐ Normal to palpation    more below ☐

## CRITICAL CARE MUST BE TIME DOCUMENTED

**Procedures**
- ☐ Laceration    Length _____ cm.    Layered Y/N
- ☐
- ☐
- ☐
- ☐

☐ CRITICAL CARE TIME BELOW **DOES NOT INCLUDE TIME** FOR SEPERATELY BILLED PROCEDURES.

**CRITICAL CARE**    Time _____  30-74 minutes ☐    75-105 minutes ☐

PHYSICIAN'S ORDERS

## Documentation of Medical Decision Making process, including differential diagnoses, nature and severity of problem, risk of morbidity and mortality and other factors.

Initial Impression/Differential Diagnoses

Additional history, exam, reassessments

Primary Diagnosis

Secondary Diagnosis

Secondary Diagnosis

Secondary Diagnosis

## Condition | Disposition | Prescriptions

☐ Stable  ☐ Improved    ☐ Disch.  ☐ Admit  ☐ AMA  ☐ Transfer  ☐ Exp.    Location

See D/C Instructions ☐

D/C Instructions/Sheet # _____

Chart complete when checked ☐

Signature: _____

☐ NOTE DICTATED

© Copyright 2000 Team Health, Inc. All Rights Reserved. Not to be reproduced without permission    Version #99129

ED Physical Worksheet
General Adult

TRAUMA

NAME Conrad Robert 01/43 000094 5-23-01

All elements not circled/struck/checked/annotated - were not pertinent

| Level 1, 2, 3 Documentation - 1 to 3 elements | Level 4 - 4+ elements or 3 chronic or inactive conditions | Level 5 - 4+ elements or 3 chronic or inactive conditions | Room |

**Chief complaint:**

Time seen by physician

Age 70

Sex M

☐ Symptom/Location

☐ Severity/Radiation Pain Severity (1-10) ___/10

☐ Modifying Factors

☐ Context/Mechanism of injury

☐ Quality

☐ Duration

☐ Timing                    ☐ Risk

Pt. wP seen by Dr. Sansauer

☐ Associated Signs & Sx        ☐ EMS Direction

| Level 1, 2, 3 Documentation - 1 system, problem pertinent | Level 4 Documentation - 2 to 9 systems | Level 5 Documentation - 10+ systems |

☐ All systems negative except as noted
☐ Unable to fully assess due to:
( ) altered LOC  ( ) patient condition  ( ) other

All normal    strike negatives    circle positives

| ENT | sore throat | nosebleeds | rhinorrhea |
| | hoarse | throat swelling | hearing loss |

| CV | chest pain | rapid ht beat | LE edema |
| | palpitations | slow ht beat | orthopnea |

| RES | SOB | prod. cough | DOE |
| | pleuritic CP | nonprod. cough | PND |
| | hemoptysis | | |

| GI | nausea | diarrhea | pain |
| | vomiting | constipation | bloating |
| | melena | | |

| GU | dysuria | discharge | dyspareunia |
| | frequency | irreg menses | flank pain |
| | hematuria | | |

| MUS | myalgias | neck/back pain | redness |
| | arthralgias | inflammation | heat |

| SKIN | rash | bruising | contusions |
| | swelling | lacerations | abrasions |

| NEURO | headache | numbness | change funct. |
| | weakness | change LOC | paresthesias |
| | change speech | | |

| CON | fever | chills | high BP |
| | weight loss | dizzy | weak |

| EYE | redness | discharge | visual loss |
| | pain | blurred | vision change |

| PSY | change MS | agitation | suicidal |
| | confusion | depression | hostile |

| META | fatigue | polyuria | hair change |
| | weakness | polydipsia | heat tolerance |

| HEME | bleeding | nodes | |
| | bruising | petechiae | |

| | rhinorrhea | atopic dermat. | |
| | asthma | sneezing | |

| Level 1, 2, 3 Documentation - None | Level 4 Documentation - One area | Level 5 Documentation - 2 of 3 areas |

**Past Medical History**
DM    HBP    CAD    GI Bleed
CVA    CA    Recent Surgery

TETANUS

LMP    G___ P___    Contraception

**Family Hx**
DM    HBP    CA
CAD    CVA

**Social Hx**
Tobacco    Marital Status
ETOH    Sub Abuse    Lives Alone

**ALLERGIES & MEDS**
☐ See Nurses Notes.

☐ See Nurses Notes.

Information gathering & documentation. Testing. Document abnormal findings.

**Lab**
☐ CBC
☐ UA
☐ HCG
☐ Amylase/Lipase
☐ PT/PTT
☐ ESR
☐ Review old charts
Consultation    Dr.    Time Called    Time answered    Time arrived

☐ CHEM    BMP
☐ Cardiac markers
☐ ABG
☐ ETOH/ASA
☐ Culture

**X-Ray**
KUB & cross table

**EKG**
☐ 12 Lead    ☐ Rhythm Strip
Rate    Rhythm
Axis    Intervals

Interpreted by:    Time:
☐ (Initials)

☐ Pulse oximetry and interpretation
☐ Repeat pulse oximetry and interpretation

© Copyright 2000 Team Health, Inc. All Rights Reserved. Not to be reproduced without permission    Version #99129

(Page 1 of 2)

**Medical Center Enterprise**

**EMERGENCY DEPARTMENT**
**TRIAGE, ASSESSMENT AND FLOW SHEET**

Patient Name: 20 Y.O. B M    ER #

Conrad  Robert

NON-URGENT:
URGENT: X
EMERGENT:

DATE: 05/23/01
FAMILY PHYSICIAN:
TRIAGE TIME: 1355
ASSESSMENT TIME: 1355
WT:
ALLERGIES: NKA
IMMUNIZATIONS CURRENT: NO
HT:
HEAD CIRC < 3 YEAR OLD
NOT CURRENT

MODE OF ARRIVAL: ☐ WHEELCHAIR  ☐ AMBULANCE
☑ AMBULATORY  ☐ PARENT'S ARMS  ☐ OTHER ___

**NURSING HISTORY**

DATA SOURCE (INFORMANT): Pt + friends 2 black males
CHIEF COMPLAINT: "Gunshot ABD/Lower Quad"
"Happened on Methodist side" "My friend found me"
ONSET: 15 - 20 min ago   + Brought Me Here"
ACTIONS: STRAIGHT TO ROOM / SENT TO REGISTER
ICE: ___ SPIT ___ DRESSING ___ IMMOBILIZE ___
WC ___ NPO EXPLAINED ___ ISOLATION PRECAUTIONS ___
TREATMENT PRIOR
TO ARRIVAL:

MEDICAL HISTORY:
☑ NO CHRONIC ILLNESS
☐ DIABETES
☐ SEIZURES
☐ HYPERTENSION
☐ HEART
☐ OTHER
☐ SURGERY ___
☐ TRAUMA ___

HOME MEDICATIONS:
SEE ATTATCHED SHEET ___
"∅"

PAIN: ☐ NO  ☑ YES  ® Arm, Lt Quadrant
LOCATION:
DESCRIPTION: "Gunshot"
RADIATION: ∅
REPRODUCED WITH MOVEMENT: ∅
INTENSITY: MILD - 1 • 2 • 3 • 4 • 5 • 6 • 7 • 8 • 9 • 10 SEVERE

TRAUMA - LOCATION-APPEARANCE:
☑ NA
☐ ABRASION
☐ AVULSION
☐ CONTUSION
☐ DEFORMITY
☐ EDEMA
☐ LACERATION
☐ PUNCTURE WOUND
☐ BURN
FRONT    BACK
SUSPECTED ABUSE  Y ☐  N ☐

COMMENTS:
Gunshot wound
x 2

SKIN:
☑ WARM  ☐ DRY  ☐ COOL  ☐ DUSTY
☐ PALE  ☐ MOIST  ☐ CLAMMY  ☐ CYANOTIC  ☐ OTHER
☑ INTACT
TURGOR: Good   INTEGRITY ☐ DISRUPTED
BLEEDING: ☐ NO  ☐ YES
LMP ___
LOCATION
☐ NONE  ☐ MINIMAL  ☐ MODERATE  ☐ SEVERE
☐ ___  ☐ DARK  ☐ CLOTS  ☐ CONTROLLED
☐ OTHER ___

NURSES INITIALS
NURSES SIGNATURES
TRIAGE NURSE

PN-2  #724

---

**NURSING OBSERVATIONS**

NEUROLOGICAL:
LEVELS OF CONSCIOUSNESS:
☑ ALERT  ☑ ORIENTED
☐ LETHARGIC  ☐ CONFUSED
☐ UNRESPONSIVE  ☐ SEIZURES
LOSS OF CONSCIOUSNESS:
☐ NA
☑ NO  ☐ YES  DURATION ___
PUPILS:  ☐ NA
☑ EQUAL  ☑ REACTIVE
☐ UNEQUAL  ☐ NON-REACTIVE

RESPONDS TO STIMULI:
☑ YES  ☐ NO
☐ VERBAL  ☐ PAINFUL
VISUAL ACUITY:
☐ NA  ☐ ___
SPEECH:
☐ SLURRED  ☑ CLEAR
☐ OTHER  ☐ APHASIC
SIZE IN mm  SIZE R ___ L ___
1  2  3  4  5  6  7

RESPIRATORY:
☑ REGULAR  ☐ ABSENT  ☐ RAPID  ☐ OTHER ___
☐ DYSPNEIC  ☐ IRREGULAR  ☐ COUGH
☐ SHALLOW  ☐ HYPERVENTILATING  ☐ USE OF ACCESSORY MUSCLES

BREATH SOUNDS:
☐ NA  ☑ EQUAL  ☐ UNEQUAL  ☑ CLEAR
☐ RALES  ☐ DIMINISHED  ☐ WHEEZES  ☐ RHONCHI

CIRCULATION-CARDIAC-PULSES:
☑ REGULAR
☐ PALPABLE
☐ ABSENT
☐ IRREGULAR
☐ WEAK
☐ CARDIAC RHYTHM
☐ HEART TONES
☐ CAPILLARY REFILL

MOTOR FUNCTION/SENSORY:
☐ EQUAL  ☑ UNEQUAL
COMMENTS: "I can't hold
my legs up, I've
Been shot."

ABD:
☐ NA
☑ SOFT - tender to ABd.
☐ DISTENDED
☐ RIGIDITY
☐ BOWEL SOUNDS
☐ FHT

GI:
☐ NA
☐ VOMITING
☐ DIARRHEA
☑ NAUSEA

EMESIS:  ☑ NO  ☐ YES
PT. DESCRIPTIONS

STOOL:  ☑ NA
☐ NORMAL  LAST B.M. ___
☐ ABNORMAL (PT. DESCRIPTION) ___

URINATION:  ☑ NA
☐ NORMAL  ☐ FREQUENCY  ☐ DYSURIA  ☐ CATHETER
☐ HEMATURIA
☐ OTHER ___

DISCHARGE:  ☑ NO  ☐ YES
☐ VAGINAL ___
☐ URETHERAL ___
☐ OTHER ___

NURSING DIAGNOSIS/ANALYSIS:
☐ ANXIETY
☐ BREATHING PATTERN INEFFECTIVE
☑ COMFORT/PAIN ALTERATION
☐ FLUID VOLUME ALTERATION IN
☐ GAS EXCHANGE IMPAIRED
☐ HYPERTHERMIA/HYPOTHERMIA
☐ IMPAIRED MOBILITY
☐ INFECTION POTENTIAL
☐ SKIN INTEGRITY - IMPAIRMENT
☑ TISSUE PERFUSION ALTERATION
☐ VISUAL DEFICIT POTENTIAL
☐ KNOWLEDGE DEFICIT
☐ THOUGHT PROCESS ALTERATION
☐ NEURO, MUSCULAR, SKELETAL, DEFICIT
☐ CARDIAC OUTPUT ALTERATION

SAFETY MEASURES:
☐ SIDE RAILS UP
☐ ATTENDANT WITH PATIENT
☐ NURSE IN ATTENDANCE
☐ SAFETY STRAP
☐ PAPOOSE BOARD
☐ RESTRAINTS
   TYPE ___
☐ AMBULATORY
☐ NON-AMBULATORY

## INTERVENTIONS

### ADDITIONAL VS

| TIME | B/P | PULSE | RESP | TEMP | O2 SAT. |
|------|-----|-------|------|------|---------|
| 1410 | 140/90 | 87 | 22 | 92.8 | 85% R.A. |
| ″ | 140/90 | | | | |
| 1:30 | 133/48 | 59 | 22 | — | 96% R.A. |
| 1447 | | 63 | 20 | — | |
| 1448 | 154/84 | 56 | 20 | — | |
| 1457 | 157/90 | 60 | 20 | — | 98% R.A. |
| 1458 | 155/93 | 62 | 23 | — | 99% R.A. |

### ADDITIONAL NURSES NOTES

| TIME | |
|------|---|
| 1400 | Arrived @ Hallway Door in Wheelchair Friend/State "He got shot", took Pt. directly to E.R. Bed 5, no Bleeding from 2 different puncture wounds @ R Arm & Another to Low @ ABD. Quadrant. No active Bleeding Alert, clearly responds to Questions State ∅ Itchurt & Holding ABD. M∅ |
| 1410 | 146 J.V. Started @ R FA. Good Blood return ∅ 0.9 Stabilization, ® |
| 1437 | 18 Fr. Foley Cath. inserted ® Nose No difficulty, cleared total Suction in epiglottic Region, connected to Suction MS∅ |
| 1500 | Transferred to St-Maries system, police escorted Pt-stable ∅MS∅ |

| PHYSICIAN | EXAM TIME | PROCEDURE DONE |
|-----------|-----------|----------------|
| Dr. Drew | Neuro Surgery | |
| Dr. S. Sawyer | | |

### MEDICATIONS

| TIME | MEDICATION | DOSE | ROUTE/SITE | INITIALS |
|------|-----------|------|-----------|----------|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### IV FLUIDS/TIMES/RATES

| STARTED | IV FLUID | RATE | IV CATH & SITE | NURSE INITIALS | TIME D/C | AMT. INFUSED |
|---------|----------|------|----------------|----------------|----------|--------------|
| | NS | KVO | 146 ® Wrist | M∅ | | |
| | | | | | | |
| | | | | | | |

### PROCEDURE/TREATMENT

| | TIME | NURSE INITIALS |
|---|------|----------------|
| Cardiac Monitor | D.A. | M∅ |
| Cast/Splint (Type): | ) | |
| (Location: | ) | |
| Central Line (Type: | ) | |
| Chest Tube (Amt. Drained: ) (Size: | ) | |
| Dressing: Type | | |
| Foley Cath (Amt. Drained: ) (Size: | ) | |
| N/G Tube (Amt. Drained: ) (Size: | ) | |
| O2 @ per | | |
| O2/Resp. Tmt. (Type: | ) | |
| EKG | | |
| CT Scan | | |
| Patient Teaching (Type: | ) | |
| (Response: | ) | |

Psychosocial: Language Spoken _English_

Able to read  ✓ yes  ____ no

Able to write  ✓ yes  ____ no

Vision Impaired  _no_  ____ Blind

Hearing Impaired  _no_  ____ Deaf

Do you have religious or cultural beliefs that you would like considered in hospital  ____ yes  ____ no

### PATIENT OUTCOMES

DISCHARGED TO

ADMITTED TO
2 North

TRANSFERRED TO
Surgery Zone 4 Cath. Flint Rd

REPORT GIVEN TO
B. Crabbski Rn

19336

ERN-2

687

State of Alabama
Unified Judicial System

Form C-12    Rev. 8/98

## ORIGINAL
## SUBPOENA REQUEST FORM

Case Number

CC-2001-179 & 180

IN THE _____CIRCUIT_____ COURT OF ___COFFEE - ENTERPRISE___, ALABAMA
(Circuit, District or Municipal)          (Name of County or Municipality)

Civil: _____ v. _____
            Plaintiff                                    Defendant

Juvenile: In the matter of _____, a child

Criminal: ☑ State of Alabama
              ☐ Municipality of _____ v. ___ROBERT CONRAD___
                                                          Defendant

Court Date ___9/23/02___ Court Time __9:00 AM__ AM/PM Date Requested ___09/11/02___

### TO BE COMPLETED BY REQUESTER

The Clerk is requested to issue an Order to Appear (Subpoena) for each of the following witnesses for:

☐ Plaintiff/State    ☑ Defendant    ☐ Grand Jury    ☐ Other

1. Name ___JOSEPH M. SALOOM___
   Home Address ___DFS, P. O. BOX 210516___
   ___MONTGOMERY, AL___ Zip __36121__
   Telephone Number _____
   Alternate Address _____
   _____ Zip _____
   Telephone Number _____

   Date Issued
   9-12-02
   Remarks:

2. Name ___TOM MOATES___
   Home Address ___ENTERPRISE JR. HIGH SCHOOL___
   ___ENTERPRISE, AL___ Zip __36330__
   Telephone Number _____
   Alternate Address _____
   _____ Zip _____
   Telephone Number _____

   9-12-02
   Remarks:

3. Name ___TREVERE PLEASURE___
   Home Address ___ST. CLAIR CORRECTIONAL FACILITY___
   ___1000 ST. CLAIR RD., SPRINGVILLE, AL___ Zip __36146__
   Telephone Number _____
   Alternate Address _____
   _____ Zip _____
   Telephone Number _____

   9-12-02
   Remarks:

4. Name ___EMILY WOFFORD WARD, DFS___
   Home Address ___P. O. BOX 240591___
   ___MONTGOMERY, AL___ Zip __36124-0591__
   Telephone Number _____
   Alternate Address _____
   _____ Zip _____
   Telephone Number _____

   9-12-02
   Remarks:

5. Name ___PHYLLIS T. ROLLAN, DFS___
   Home Address ___P. O. BOX 210516___
   ___MONTGOMERY, AL___ Zip __36121-0516__
   Telephone Number _____
   Alternate Address _____
   _____ Zip _____
   Telephone Number _____

   9-12-02
   Remarks:

METHOD OF SERVICE REQUESTED:
☑ Personal  ☑ Other  ___U. S. MAIL FOR STATE DFS AGENTS___

_____    _____
Date                     Clerk

Party Requesting Subpoena
AL SMITH
_____
Signature
334-897-3658
Requester Phone Number

IN THE CIRCUIT T COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,                    *
                                     *
        Plaintiff,                   *
                                     *
vs.                                  *        CASE NO. CC 01-179, 180
                                     *
ROBERT THOMAS CONRAD,                *
                                     *
        Defendant.                   *

## CONFIRMATION OF RECEIPT OF DISCOVERY DOCUMENTS

I, Gary Bradshaw, Esquire, attorney of record for defendant, hereby affirm that I am in

receipt on this the 12th day of September, 2002, State's 10th Supplemental Discovery Response,

consisting of ninety-seven (97) photostatic copies of defendant's medical records from Medical

Center Enterprise.

Name: _____

Date: _9/12/02_____

Time: _3:20_____

| State of Alabama Unified Judicial System | ORDER OF SERVICE AND RETURN | Case Number CC-2001-179 +. CC-2001-180 |
|---|---|---|
| Form C-15        Rev. 10/92 | | |

IN THE _Circuit_ _____ COURT OF _Coffee- Entprise_ COUNTY, ALABAMA

_State of Alabama_ _____ v. _Robert Thomas Conrad_
Plaintiff                                        Defendant

In the Matter of: _____

TO ANY SHERIFF OF THE STATE OF ALABAMA OR ANY OTHER AUTHORIZED PERSON:

   You are hereby commanded to deliver the attached document(s) _Order_

_____

_____

_____      SEP - 6 2002

_____      CCSO

to (name) _Keeper of the Record, Gail Snell_

at (address) _Medical Center Enterprise_
_Enterprise, Alabama_

and make return to this Court.

_September 6, 2002_ _____        _James M Counts_      By: _mdc_
Date                                     Clerk/Register

RETURN ON SERVICE:

   I hereby certify that I personally delivered a copy of the attached document(s)

   in _Coffee_ _____        County, Alabama to:

Name: _Gail Snell_ _____        on (Date) _9-10-02_

Address: _Med Ctr Eprise_

_____

Address
of Server _____        _____
                                  Server Signature

                                  _____
                                  Type of Process Server

*610*

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,                    )
     Plaintiff,                              )
                                     )
VS.                                  )        CASE NO.CC 2001-M-179
                                     )               CC 2001-M-180
ROBERT THOMAS CONRAD,                )
     Defendant.                            )

FILED
SEP 2002
J.M. Counts
Court Clerk
Coffee Co. AL

### STATE'S EXHIBIT LIST

| EXHIBIT NUMBER | DESCRIPTION OF EXHIBIT | Introduced | Admitted |
|---|---|---|---|
| 1 | Darby Car Tape  VHS | ___ | ___ |
| 2 | Chart of Toy Store  (outside) | ___ | ___ |
| 3 | Chart of Toy Store  (inside) | ___ | ___ |
| 4 | Chart of Toy Store  (inside with photos) | ___ | ___ |
| 5 | Chart of Toy Store (outside with photos) | ___ | ___ |
| 6 | Chart of blue car | ___ | ___ |
| 7 | Chart  -  photos of Robert Conrad in hospital showing Bullet wound area | ___ | ___ |
| 8 | Chart – photos of  wounds to Jelaine Dennis | ___ | ___ |
| 9 | Clerke .22 cal. Pistol | ___ | ___ |
| 10 | Four-(4) cartridge cases and one (1) unfired cartridge Exhibit #10  A – E collectively | ___ | ___ |
| 11 | Five projectiles collected at scene marked State's Exhibit #11 A – E collectively.  Appear to be From a 9mm or .380 cal pistol | ___ | ___ |
| 12 | Six cartridge casings collected at the scene.  Appear to be From a 9mm or .380 cal pistol.  Exhibit #12 A – F collectively | ___ | ___ |
| 13 | Photograph ---- projectile retrieved from underneath scene | ___ | ___ |
| 14 | Photograph ---- projectile retrieved from underneath building of scene | ___ | ___ |
| 15 | Photograph  ---- projectile retrieved from wooden beam marked #4 in photo | ___ | ___ |

| 16 | Photograph ---- projectile retrieved from underneath | | |
| | carpet in building | ____ | ____ |
| 17 | Photograph ----- blue LTD car | ____ | ____ |
| 18 | Photograph ---- floor area directly behind cash register | ____ | ____ |
| 19 | Photograph --- cash register area | ____ | ____ |
| 20 | Photograph ---- def. 's left arm | ____ | ____ |
| 21 | Photograph ---- def's abdomen | ____ | ____ |
| 22 | Photograph ---- def.'s abdomen (2nd photo) | ____ | ____ |
| 23 | Victim's Shirt | ____ | ____ |
| 24 | Victim's Jeans | ____ | ____ |
| 25 | White tee shirt retrieved from dumpster with bullet holes/ | | |
| | And blood stains | ____ | ____ |
| 26 | Projectile from def.'s arm | ____ | ____ |
| 27 | Projectile from victim | ____ | ____ |
| 28 | Search warrant for def.'s blood/ Medical Center | ____ | ____ |
| 29 | Tape register and receipts | ____ | ____ |
| 30 | Report ---- Phyllis Rollan – DNA | ____ | ____ |
| 31 | Report ---- Dr. Emily Ward, Medical Examiner | ____ | ____ |
| 32 | Report ---- Joseph Saloom, Firearms, Forensic Scientist | ____ | ____ |
| 33 | Statement of Defendant May 24, 2001 at 14:13 p.m. | ____ | ____ |
| 34 | Statement of Defendant May 25, 2001 at 12:16 p.m. | ____ | ____ |

Initial contact was made by the undersigned with Mr. Smith on Friday, September 6, 2002 regarding our exhibit list. Said list was discussed. Exhibit lists were to be exchanged.

Respectfully submitted this the 19th day of September 2002.

*Glenda Stout*

Glenda Stout PAR 057
Assistant DA
12 Judicial Circuit
P.O. Box 311102
Enterprise, 36331-1102
(334)347-1142

## CERTIFICATE OF SERVICE

I, Glenda Stout, hereby do certify that I have served the following on the attorneys of record for the defendant, Robert Thomas Conrad by placing same in the United State Mail. Postage prepaid on this the 19th day of September 2002.

Also served by Fax on this day to the

Hon. Gary Bradshaw
Hon. Al Smith

_____
Glenda Stout, Assistant DA

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA               )
                               )
         v.                    )        Case No. CC-2001-M-179 & 180
                               )
ROBERT THOMAS CONRAD           )
                               )

---

### DEFENDANT'S EXHIBIT LIST

---

A.   PHOTOGRAPH OUTSIDE SCENE
B.   PHOTOGRAPH INSIDE SCENE
C.   PHOTOGRAPH GRIMES AT SCENE
D.   PHOTOGRAPH INSIDE SCENE
E.   PHOTOGRAPH COUNTER FROM VIDEO
F.   PHOTOGRAPH INSIDE SCENE
G.   PHOTOGRAPH INSIDE SCENE
H.   PHOTOGRAPH INSIDE SCENE
I.   PHOTOGRAPH INSIDE SCENE
J.   PHOTOGRAPH INSIDE SCENE
K.   PHOTOGRAPH INSIDE SCENE
L.   PHOTOGRAPH INSIDE SCENE
M.   PHOTOGRAPH INSIDE SCENE
N.   PHOTOGRAPH INSIDE SCENE
O.   PHOTOGRAPH INSIDE SCENE
P.   PHOTOGRAPH INSIDE SCENE
Q.   PHOTOGRAPH VICTIM
R.   PHOTOGRAPH VICTIM
S.   PHOTOGRAPH VICTIM
T.   SALOOM REPORT
U.   WARD REPORT
V.   ROLLAN REPORT
W.   YEOMAN STATEMENT 5/23/02
X.   YOEMAN STATEMENT 5/25/01
Y.   SMITH STATEMENTS
Z.   WITNESS STATEMENTS



Respectfully submitted this September 12, 2002.

_[signature]_
_____
Smith & Carr, LLC.
Sydney Albert (Al) Smith        SMI098
Attorneys at Law
P. O. Drawer 389
Elba, Al 36323
Phone:        334-897-3658
Fax:        334-897-8633

_____
Gary D. Bradshaw BAR074
Post Office Box 311412
Enterprise, Alabama 36331
Phone: (334) 393-6439

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in ~~the United States Mail, postage paid, and~~ addressed as follows:
FAX

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

_[signature]_    9/12/0_
_____    _____
Al Smith        Date

Page 2 of  2



# ALABAMA CRIME VICTIMS
# COMPENSATION COMMISSION

*P. O. Box 1548*

*RSA Union Building, 100 N. Union Street, Suite 736*
*Montgomery, AL 36102-1548*

*Martin A. Ramsay*
*Executive Director*

*Commissioners*
*Miriam Shehane*
*Barbara Brown*
*Capt. Benny R. Peoples*

September 16, 2002

Honorable James C Ellis
Circuit Clerk
P. O. Box 1294
104 North Edwards Street
Enterprise, AL 36330-1294

*[Circular stamp: SEP 2002 FILED J.M. Counts Court Clerk Coffee Co. AL]*

ACVCC Claim #:   2002-70214
Claimant:        Lynn Bowman
Victim:          Jelaine Dennis

Defendant:       Robert Thomas Conrad
Court Case #:    CC2001-000179

Dear Honorable Ellis:

The above referenced claim for compensation has been approved by this Commission.  The claimant has been awarded compensation in the amount of $15,000.00.

Enclosed you will find a summary of payments issued by the Commission.  Please include this as part of the defendant's file so restitution may be made to this Commission for reimbursement this amount.

**\*Please note:** The Commission is subrogated by law, to the rights of the claimant for the collection of restitution.  Therefore, if payments of restitution are made to the claimant by your office, please notify us in writing.**

Thank you for your cooperation in this matter.

Sincerely,

*Martin A. Ramsay*

Martin A. Ramsay
Executive Director

Enclosure

September 16, 2002

Defendant: Robert Thomas Conrad

Court Case #: CC2001-000179

Victim: Jelaine Dennis

ACVCC Claim #: 2002-70214

Payment(s) Issued To:

| Payee | Category | Date Paid | Amount |
|-------|----------|-----------|--------|
| Estate for Evelyn Jelaine Bowman Dennis, Deceased | Lost Wages | 09/10/2002 | $10000.00 |
| Lynn Bowman | Funeral/burial | 09/10/2002 | $5000.00 |

Total This Payment: $15,000.00
Total Paid: $15,000.00

# IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
## ENTERPRISE DIVISION

STATE OF ALABAMA,           *  
        PLAINTIFF,            *  
                               *  
VS.                          *      CASE NO.  CC 01-179, 180  
                               *  
ROBERT THOMAS CONRAD,    *  
        DEFENDANT.         *

## NOTICE OF RESTITUTION

**COMES NOW**, the State of Alabama by and through the undersigned Assistant District Attorney, and in compliance with this Court's request to provide an amount of restitution in the above styled cause, and would show the court as follows:

    1.    That $15,000.00 in restitution is due to be paid to Alabama Crime Victim's Compensation Commission, P.O. Box 1548, RSA Union Building, 100 N. Union Street, Suite 736, Montgomery, Alabama 36102-1548. (See attached affidavit)

**WHEREFORE**, the State of Alabama respectfully requests this Honorable Court order the defendant, Robert Thomas Conrad, to pay to the Clerk of Court  $15,000.00 payable to Alabama Crime Victims Compensation Commission.

**RESPECTFULLY SUBMITTED** this the 1st day of October, 2002.

                                     _Glenda Stout_  
                                     Glenda  Stout (PAR057)  
                                     Assistant District Attorney  
                                     P. O. Box 311102  
                                     Enterprise, Alabama  36331  
                                     334/347-1142

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following by placing a copy of same in the United States mail, properly addressed and postage prepaid on this the 1st day of October, 2002:

Al Smith, Esquire
Attorney for Defendant
P.O. Drawer 389
Elba, Alabama 36323

Glenda Stout
Assistant District Attorney

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

| | | |
|---|---|---|
| STATE OF ALABAMA, | * | |
| PLAINTIFF, | * | |
| V. | * | CASE NO. CC 2001-179 & 180 |
| ROBERT THOMAS CONRAD, | * | |
| DEFENDANT. | * | |

## DEFENDANT'S SUPPLEMENTAL MOTION FOR NEW TRIAL

COMES now the Defendant, Robert Thomas Conrad, and moves this Honorable

Court for a new trial and cites as grounds the following:

I.    **The State withheld exculpatory Evidence.**

During the course of the above trial, the State's witness admitted he had

knowledge of evidence which could prove to be exculpatory in nature, and

that it was not disclosed to the Defendant prior to trial. After the Court

solicited testimony from the State's chief prosecutor, Bruce Devane, an in

camera hearing was held to review two files that witnesses for the State

admitted were intentionally not disclosed to the Defense. Two minutes

into the two-hour in-camera hearing, this Court ruled that the evidence it

was reviewing was **definitely** exculpatory and impeachable and should

have been disclosed to the Defense. The Court further ordered that the

entire files be given to the Defense as soon as possible.

This exculpatory evidence, which was placed in a separate filing cabinet marked "sensitive matters", contained evidence of a witness (George Roberson) who had given information to law enforcement agencies about a co-Defendant planning the robbery and murder that occurred at the Toy Store. These statements and interviews with this undisclosed witness name the co-Defendant, Brian Yeoman, and others as perpetrators of the crime. Robert Conrad is not named in the statements. The Defense moved for a mistrial and the Court denied that Motion stating that it had found no prosecutorial misconduct on the part of the two assistant district attorneys who were trying the case. The subjective intent of the prosecutor is irrelevant, whether it was intentional or unintentional, an honest mistake or an oversight is irrelevant under the case law. *Wilson v. State,* 2002 WL 732110 (Ala.Crim.App. 2002) The principles mentioned in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.ED.2d 215 (1963) are violated when the prosecutors suppresses material evidence favorable to the Defendant. Evidence is material if there is a reasonable probability that the outcome of the trial would have been different if the evidence had been disclosed prior to trial.

The exculpatory evidence which was eventually given to the Defendant during the trial did not allow the Defendant an opportunity to pursue other witnesses and expound on his version of the facts and this deprived the jury of the opportunity to render its verdict based upon the complete evidence. This Court sought to remedy the wrong done by the State by

allowing the State to fly the witness from Colorado to Enterprise overnight and make him available for the Defendant to question on the stand on the last day of the trial. This did not come close to allowing the Defense an adequate opportunity to expound on the evidence that had been wrongly withheld. The witness, in his statements, pointed direct evidence toward the co-Defendant, Brian Yeoman, as well as other parties who were not testifying at trial. Under Alabama Rules of Criminal Procedure 16.2, the Court attempted to fashion a remedy to cure the prosecutor's failure to timely produce the evidence by allowing the Defense to place this witness on the stand. However, the State was also allowed to cross-examine this witness; thereby, nullifying any advantageous testimony derived from Mr. Roberson.

In *Wilson v. State*, the Defendant's conviction for robbery and attempted murder was overturned under a very similar set of circumstances where the Court attempted to fashion a remedy by allowing both sides to question the witness on notes that had been previously withheld. The Court of Criminal Appeals disagreed with the lower court in denying the Defendant's Motion for a mistrial and reversed the case sending it back for a new trial.

The trial Court's corrective action, though well intentioned, was inadequate in that it did not have the effect of correcting the prosecutors' failure to produce the exculpatory evidence. This nearly amounted to

blowing the whistle for a violation, but not having any yardage marked off against the party committing the penalty.  Stated another way, Robert Thomas Conrad was denied due process and his right to a fair trial.  In *Jefferson v. State*, 645 So.2d. 313 (Ala.Crim.App.1994), The Court stated that "the existence of any small piece of evidence favorable to the Defense may, in a particular case, create just the doubt that prevents the jury from returning a verdict of guilty."  Had Conrad known of the contents of the exculpatory file, he would have certainly made a greater attempt to locate all the witnesses and pursue the avenues which this evidence opened up.  Whether or not the exculpatory evidence, if timely disclosed, would have resulted in an acquittal is not for this court to decide.  The credibility of witnesses and the weight of probative force of testimony are for the jury to judge and determine *Daniel v. State*, 762 So.2d 864, 866 (Ala.Crim.App.1999)(quoting *Zumbado v. State*, 615 So.2d 1223, 1241 (Ala.Crim.App.1993)).

II.    **This Court's denial of Defendant's Motion in Limine and objection to State's impeaching the testimony of George Roberson.**

After this Court ruled that the State was guilty of failing to disclose exculpatory evidence and ordering the State to produce a witness in Court at 9:00 a.m. following an in-camera hearing the day before, the State was allowed to impeach his testimony in violation of Rule 609 (Ala. Rules of Evidence).  Over the objection of the Defendant, the State was allowed on cross-examination to solicit testimony that George Roberson had been

convicted of a crime, which more than ten years had lapsed since the date of his conviction and release. Although the Rules go on to state that this evidence is inadmissible unless, the Court determines in interest of justice that the probative value of the conviction supported by specific facts and circumstances substantially outweighs this prejudicial effect, it is beyond the imagination of Conrad to think that this evidence which was ruled exculpatory and was not disclosed by the State would warrant such a determination by the Court. Furthermore, the Rules state that the party offering such evidence must give the adverse party **sufficient** advance written notice of intent to use such evidence for impeachment in order to provide the adverse party with a fair opportunity to contest the use of such evidence. All of these factors were brought before the Defense and the Court in less than a twenty-four hour period. While evidence existed in the secretive file of the prosecution that the witness, George Roberson, had been convicted of a crime involving dishonesty, it was also evident that he had been a reliable and invaluable informant for the North Carolina authorities. For this reason and other reasons, it is unimaginable to think that this evidence had any probative value for the jury's consideration.

III.    **The verdict is contrary to the weight of the evidence.**

The evidence in this case stood on the testimony of a co-Defendant who had his capital murder charge dismissed and received a twenty year sentence for robbery. In that testimony, the co-Defendant, Brian Yeoman, stated that Mr. Ray Grimes was not robbed, but only had some change

raked out of his pocket. This contradicted the indictment and the testimony of Mr. Ray Grimes himself. Mr. Yeoman also testified he had no idea that any crime was being planned or was going to be attempted at the Adult Toy Store, yet he gave up twenty years of his life to get up on the stand and make several untruths. Mr. Yeoman also stated that he knew George Roberson and had worked with him, but after the Court took a short recess Mr. Yeoman's memory had suddenly escaped him and he could no longer remember George Roberson. Without the conflicting and untruthful testimony of co-Defendant Brian Yeoman, there was no evidence whatsoever to support that Robert Thomas Conrad was guilty of robbery or murder.

The physical evidence did show that a bullet was retrieved from Mr. Conrad's arm, which came from a .22 caliber pistol retrieved from the scene. Yet there was no evidence as to who owned the pistol, whose fingerprints were on the pistol and furthermore, who had moved the pistol in the gathering of the evidence at the scene. It is painfully evident that the verdict rendered by this jury was contrary to the great weight of the evidence. This Defendant reserves the right to amend and supplement his Motion for New Trial as time is allowed by law.

For the above stated reasons, this Defendant demands this Court grant his Motion for a New Trial and recognizes that he did not receive due process nor did he in any way benefit from a fair and impartial trial.

Respectfully submitted this 22nd day of October, 2002.

GARY D. BRADSHAW (BRA074)
Attorney for Defendant
P.O. Box 311412
Enterprise, AL 36331-1412
(334) 393-6439

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing Motion on Mark E. Fuller, District Attorney for the 12th Judicial Circuit, by placing a copy of the same in his receptacle at the Coffee County, Enterprise, Courthouse.

This the 22nd day of October, 2002.

OF COUNSEL

STATE OF ALABAMA,               )       IN THE CIRCUIT COURT OF

          PLAINTIFF,           )       COFFEE COUNTY, AL

                     )       ENTERPRISE DIVISION

VS.                             )

ROBERT THOMAS CONRAD,           )

          DEFENDANT.           )       CASE #s: CC-2001-M-179
                                  and
                                  CC-2001-M-180

## _O R D E R_

    *In the above styled CAPITAL case only and as is required by law, IT IS HEREBY ORDERED that the IN COURT ORAL "sentence order" of this Court is amended by adding thereto that the Defendant, Robert Thomas Conrad pay restitution in the amount of FIFTEEN THOUSAND ($15,000.00) DOLLARS to the Clerk of Court to be distributed by the Clerk to the Alabama Crime Victim's Compensation Commission, Post Office Box 1548, RSA Union Building, 100 North Union Street, Suite 736, Montgomery, Alabama 36102-1548.*

    *IT IS FURTHER ORDERED that all prior orders of court not modified hereby are to remain in full force and effect.*

    *Done and ordered this the 9th day of December, 2002.*

                        GARY L. McALILEY, CIRCUIT JUDGE
                          TWELFTH JUDICIAL CIRCUIT
                            STATE OF ALABAMA

DEC 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL.

C: DA Smith
+ Bradshaw

STATE OF ALABAMA,    )    IN THE CIRCUIT COURT OF

        PLAINTIFF,    )    COFFEE COUNTY, AL

VS.    )    ENTERPRISE DIVISION

ROBERT THOMAS CONRAD,    )

        DEFENDANT.    )    CASE #s: CC-2001-M-179
                and
                CC-2001-M-180

## *O R D E R*

*The Defendant's "MOTION FOR NEW TRIAL/SUPPLEMENTAL MOTION FOR NEW TRIAL" and all other pending motions are set for hearing on 18th day of December, 2002 at 10:30 a.m.*

*The Sheriff is ordered to have the Defendant present before this Court for the purposes of this hearing.*

*The Defendant's attorneys have been by this Court today notified. The Clerk is to forward a copy of this "ORDER" to the Defendant's attorneys and to the Office of the District Attorney.*

*Done and ordered this the 6th day of December, 2002.*

GARY L. McALILEY, CIRCUIT JUDGE
TWELFTH JUDICIAL CIRCUIT
STATE OF ALABAMA

DEC 2 '02
FILED
J.M. Counts
Court Clerk
Coffee Co. Al

cc: DA,
Smith,
Bradshaw,
Zook,
Sheriff Marler,
Ronnie Harris

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PLAINTIFF, | ) | COFFEE COUNTY, AL |
| | ) | |
| VS. | ) | ENTERPRISE DIVISION |
| | ) | |
| ROBERT THOMAS CONRAD, | ) | |
| | ) | |
| DEFENDANT. | ) | CASE #s: CC-2001-M-179 |

CASE #s: CC-2001-M-179
and
CC-2001-M-180

## *O R D E R*

*Defendant's post trial motions have been <u>denied</u> by operation of law and therefore, no hearing on said post trial motions is now necessary.*

*The Official Court Reporter and the Clerk of Court are to immediately begin the process of preparing and submitting to the Alabama Court of Criminal Appeals the transcripts in the above styled cases and the record on appeal.*

*The Court entered its sentence orders into the Court's record in the presence of the Defendant. The Court is now in the process of converting the "Sentence Order" to a written order. It will be prepared before the Clerk finishes the preparation of a record on appeal.*

*Any prior order setting a hearing on post trial motions is set aside. Any prior order issued which is inconsistent herewith is set aside.*

*Done and ordered this the 9th day of December, 2002.*

GARY L. McALILEY, CIRCUIT JUDGE
TWELFTH JUDICIAL CIRCUIT
STATE OF ALABAMA

*[stamp:]* DEC 2002 FILED J.M. Counts Court Clerk Coffee Co. AL

*c. Ai. flht Smith Bradshaw*

| | |
|---|---|
| STATE OF ALABAMA, | ) IN THE CIRCUIT COURT OF |
| | ) |
| PLAINTIFF, | ) COFFEE COUNTY, AL. |
| | ) |
| VS. | ) ENTERPRISE DIVISION |
| | ) |
| ROBERT THOMAS CONRAD, | ) |
| | ) |
| DEFENDANT. | ) CASE # CC-2001-M-179 & 180 |

## ORDER

The Sheriff of Coffee County, Alabama is Ordered to transport Bryan G. Yeoman from the Covington County jail to appear before this court by 9:00 a.m. on the 26th day of September, 2002.

Done and Ordered this the 25th day of September, 2002.

Gary L. McAliley, Circuit Judge
Twelfth Judicial Circuit
State of Alabama

DEC 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PLAINTIFF, | ) | COFFEE COUNTY, AL |
| | ) | |
| VS. | ) | ENTERPRISE DIVISION |
| | ) | |
| ROBERT THOMAS CONRAD, | ) | |
| | ) | |
| DEFENDANT. | ) | CASE #s: CC-2001-M-180. |

## J U D G M E N T

This case came before the Court for trial by jury with the Defendant being present and represented by Albert Smith and Gary Bradshaw, attorneys at law. The State was represented by Glenda Stout and Larry Jarrell, assistant District Attorneys, Twelfth Judicial Circuit, State of Alabama.

A properly qualified and duly struck jury was empanelled. Trial was had and the jury returned a unanimous verdict, i.e., a verdict of "Guilty" of "ROBBERY IN THE FIRST DEGREE" in violation of Section 13A-8-41, the Code of Alabama as charged in offense TWO of the indictment.

The Court finds that the verdict of the jury is supported by the legal and competent evidence presented in the trial of this case.

IT IS THEREFORE ORDERED that ROBERT THOMAS CONRAD is declared "GUILTY" of *ROBBERY IN THE FIRST DEGREE"* in violation of Section 13A-8-41 of the *Code of Alabama* and as charged in the indictment.

Defendant was:

1. Afforded an opportunity to make a statement in Defendant's own behalf before sentencing and was further asked if the Defendant had anything to say as to why the sentence of the law should not be imposed.
2. Given an opportunity to present evidence as to any matter probative to the issue of sentence and/or facts in mitigation of any penalty to be imposed.

The State was then afforded an opportunity to present evidence as to any matter

probative to the issue of sentence and/or facts in aggravation or mitigation of any penalty to be imposed.

IT IS ORDERED that for the Defendant's conviction of *ROBBERY IN THE FIRST DEGREE*, **ROBERT THOMAS CONRAD** is sentenced to **LIFE IN THE PENITENTIARY**, STATE OF ALABAMA.

No application for split sentence, probation, suspended sentence or early release was made. However, had such a motion been made, it would have been denied AND THE RECORD SHALL SO REFLECT.

As an additional part of the Defendant's sentence, the Defendant is ordered:

1.)    **To pay costs** of Court;

2.)    **To pay restitution** in an amount to be TIMELY submitted by the District Attorney. *(Note: .Defendant shall be sent a copy of the restitution demanded and shall have 30 days from the date of receipt in which to object. If an objection is made, a hearing WILL be set by the Court for the purposes of determining restitution due and owing AND for the purposes of providing "due process" of law. If no objection is filed with the Clerk of Court by the Defendant or his attorney within 30 days from the date the Defendant receives notice of restitution, a judgment will be considered issued for restitution in the sum stated to the Court by written document filed by the District Attorney/victim and without the necessity of any further orders of court.)*

3.)    **To reimburse** the State of Alabama for any **attorney fees** the state is caused to pay out due to the Defendant's representation herein; and,

4.)    **To pay $50** to the Clerk of Court for distribution **to the Alabama Crime Victims Compensation Commission.**

**The Defendant is given credit toward Defendant's sentence for the time the Defendant has already served** while awaiting trial and/or disposition in this case.

Defendant's sentence was in open court ordered EXECUTED and to be served. Defendant was remanded to the custody of the Sheriff of the County for delivery to the penitentiary, State of Alabama for the purpose of serving Defendant's executed sentence.

Defendant was in open court advised of the Defendant's **right to appeal**, as long as Defendant perfects Defendant's appeal within a specified time; of the Defendant's rights, if indigent, to a free transcript for the purposes of pursuing appeal and of the Defendant's right to Court appointed legal representation, at no

charge to the Defendant, along with the Defendant's other appeal rights incident thereto.

Done and ordered this the 27th day of September, 2,002.
(*Note: This "sentence order" was rendered orally in the presence of all attorneys and the Defendant on the date of Defendant's conviction.*)

Gary L. McAliley, Circuit Judge, 12th Cir. AL



# IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
## (ENTERPRISE DIVISION)

### *O R D E R*

It is Ordered that Ronnie Vaughan appear before the Circuit Court of Coffee County, Enterprise Division, Alabama this instanter as a witness for the Court.

This Order is to be served on the above individual and due return thereof make as is provided by law.

Done and Ordered this the 27th day of September, 2002.



GARY L. McALILEY, CIRCUIT JUDGE
TWELFTH JUDICIAL CIRCUIT
STATE OF ALABAMA

DEC 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

STATE OF ALABAMA,        )     IN THE CIRCUIT COURT OF

        )

       PLAINTIFF,    )     COFFEE COUNTY, AL

        )

VS.         )     ENTERPRISE DIVISION

        )

ROBERT THOMAS CONRAD,    )

        )

       DEFENDANT.    )     CASE #s: CC-2001-M-179.

## *CAPITAL SENTENCE ORDER*

The Defendant, Robert Thomas Conrad appeared before this Circuit Court for trial by a properly struck (selected) and duly sworn jury of twelve (12) with two (2) alternates. Robert Thomas Conrad was represented by two (2) attorneys, Gary Bradshaw and Al Smith, both having the qualifications as required by law for the representation of capital defendants.

One juror was properly excused due to illness. Trial was completed with thirteen (13) jurors who were instructed as to the applicable law by the Court. Thereafter, the alternate juror was excused. The remaining twelve (12) jurors deliberated and returned a unanimous verdict which reads as follows: "We, the jury, find the Defendant, Robert Thomas Conrad "GUILTY" of the CAPITAL OFFENSE OF INTENTIONAL MURDER by the Defendant of Jelaine Bowman Dennis during a robbery in the first degree committed by the Defendant in violation of Section 13A-5-40(a)(2), the *Code of Alabama*, *1975, as amended.*"

**The State proved the Defendant's guilt** of the capital offense of "MURDER BY THE DEFENDANT DURING A ROBBERY IN THE FIRST DEGREE....COMMITTED BY THE DEFENDANT in violation of Section 13A-5-40(a)(2), the Code of Alabama, **to be fact, beyond a reasonable doubt.**

This Court finds said verdict to be supported by the legal and competent evidence presented in the trial of this case.



## *FACTS CONCERNING THE CRIME AND THE*
## *DEFENDANT'S PARTICIPATION IN IT.*

The Court finds, <u>beyond a reasonable doubt</u> that:

1).    At about 1:25 p.m. on the 23$^{rd}$ day of May, 2001, Enterprise police officers were dispatched to a report of a robbery and shooting at a place of business in the Enterprise Division of Coffee County, Alabama called "*The Toy Store*." This place of business was more specifically located at 643 County Road 711, Enterprise, Alabama. The business was that of an "adult novelty" store. While enroute, officers were told the suspect was last seen running west on Coffee County, Alabama Road 711 and was described as being a black male wearing all black clothing. Upon arrival at "*The Toy Store*", Enterprise, Alabama Police Officer Lennis Darby was met by an older caucasian male [*later found to be Robert Grimes*] who stated to officer Darby he had been robbed and that "she" [*an individual later identified as being Jelaine Bowman Dennis*] has been shot." Officer Darby entered "*The Toy Store*" and found Jelaine Bowman Dennis to be alive but lying behind the counter bleeding profusely from her chest and other areas of her body. Jelaine Bowman Dennis told Officer Darby she had also shot the suspect. Blood could be readily seen in various locations inside "*The Toy Store*." However, it was mainly found in the area of the cash register; the counter area on which the cash register set; and the floor area around where Jelaine Bowman Dennis was found by Officer Darby. Officer Darby then requested rapid response from rescue personnel. Officer Darby observed the cash register inside "The Toy Store" to be slightly open, and that there was no money inside the drawer. Officer Darby preserved the scene. Shortly thereafter, Enterprise Rescue Squad personnel arrived. Jelaine Bowman Dennis was still alive and remained alive until she was transported out of "*The Toy Store*" to Medical Center Enterprise, a hospital in Enterprise, Alabama where she later died. A video was played for the members of the jury who could see Jelaine Bowman Dennis alive at the time she was taken from the scene by rescue personnel.

Officer Darby obtained a statement made by Robert Grimes that during the robbery and shooting, he, Jelaine Bowman Dennis and two (2) black males were present in the business when a person dressed

totally in black came into *"The Toy Store"* and forced him and the other two black males onto the floor toward the back of the very small building. He further stated the person dressed totally in black was brandishing a pistol and with it forced Robert Grimes to the floor and took Robert Grimes wallet which contained thirty ($30.00) dollars. Also, moneys and a wallet was taken from one of the black individuals [*later identified as being Bryan Glenn Yeomans, a co-defendant*]. Mr. Robert Grimes further stated that moneys were taken by the person dressed in black from *"The Toy Store"* cash register. As the person dressed in black was taking moneys from the cash register, Mr. Grimes further stated he heard gun fire and that numerous shots were fired. Thereafter, the person dressed in black quickly exited *"The Toy Store"* as Jelaine Bowman Dennis told Mr. Grimes she had been shot and that she had also shot the person who had robbed her. Robert Grimes further stated he then went to his vehicle where he placed a "911 call" on his cell phone and that the two black males had also exited the business, stopping to ask what they could do. Robert Grimes told the two black males to go get help and the two black males quickly departed.

While Enterprise Police Officer Michael Petty was enroute to *"The Toy Store"*, he observed a light blue Ford LTD automobile pass him that he recognized belonged to Brian Smith who he had had dealings with in the past. The vehicle of Brian Smith was traveling North on the Geneva Highway at a high rate of speed. (*Note: A video taken from a police officer's patrol car recorded on the way to "The Toy Store" substantiates that to get to 643 County Road 711, one must turn off of what is commonly known as "The Geneva Highway---leaving out of Enterprise, Alabama.*) Officer Petty did not recognize the driver of co-Defendant, Brian Smith's light blue Ford LTD automobile.

At approximately 1:50 p.m. on the same date, Robert Thomas Conrad was dropped off by two black males at Medical Center Enterprise, Enterprise, Alabama for treatment of gun shot wounds. As the two black males pushed Robert Thomas Conrad into the emergency room of the hospital in a wheel chair, they quickly ran from the emergency room area back to their car and sped away. Off duty Enterprise, Alabama police officer, Matt Key was in the parking lot of the hospital and observed Brian Smith and another black male Officer Key later identified as co-defendant, Bryan Yeoman, in the parking lot

in Brian Smith's vehicle. Officer Key was unaware of the robbery and Jelaine Bowman Dennis' being shot at that time.

At approximately 3:00 p.m., Brian Smith's vehicle was at his residence at Green Tree Apartments in Enterprise, Coffee County, Alabama. Investigator Jeff Spence of the Enterprise, Alabama Police Department spoke with Brian Smith's mother who stated Robert Thomas Conrad had spent the night with them on May 22, 2001 and that when she had returned home from work, Robert Thomas Conrad was not at home. She stated Brian Smith and Bryan Yeoman came in at approximately 2:15 p.m. and walked to Bryan Yeoman's residence. Investigator Spence and Lt. Mike Lolley attempted to contact Bryan Yeoman and Brian Smith at the apartment of Bryan Yeoman. However, neither of the two were found there.

During the evening hours of May 23, 2001, Investigator Spence and Twelfth Judicial Circuit District Attorney Investigator, Bruce Matthews interviewed Robert Thomas Conrad concerning his gun shot wounds at Medical Center Enterprise. Robert Thomas Conrad stated he was walking near the cemetery on Bell Street in Enterprise, Alabama when an unknown person jumped from the bushes and robbed him of his pager; and, his cell phone. Robert Thomas Conrad further stated that when he attempted to flee, the unknown person shot him. Robert Thomas Conrad further told Investigator Matthews he could only recall being loaded into a vehicle and taken to Medical Center Enterprise but could not remember who took him to the hospital emergency room.

Captain William Moore of the Enterprise, Alabama Police Department and Officer Key interviewed Bryan Yeoman. Bryan Yeoman stated to Captain William Moore that he overheard Brian Smith and Robert Thomas Conrad talking about doing a robbery. Bryan Yeoman stated he then went with Brian Smith to "The Toy Store". However, he was unaware they were going to commit a robbery. Yeoman stated while inside "The Toy Store", he observed Robert Thomas Conrad rob and shoot Jelaine Bowman Dennis. Bryan Yeoman then said he and Brian Smith then left "The Toy Store" and went to the residence next door to get assistance. When no one would answer the door, he stated they returned home and later discovered that Robert Thomas Conrad had been shot. Bryan Yeoman stated he and Brian Smith took Robert Thomas Conrad to Medical Center Enterprise

and returned home where he and Brian Smith went with his mother to Dothan, Alabama.

An autopsy conducted by the Alabama Department of Forensic Science experts substantiated that Jelaine Bowman Dennis died from receiving multiple gun shot wounds and specifically, the cause of death was a gun shot wound to her chest. It was also determined Jelaine Bowman Dennis had shot her assailant with a small caliber 22 pistol.

The murder weapon, i.e., the weapon that was used to kill Jelaine Bowman Dennis was never recovered. However, ballistics expert, Joe Saloom of the Alabama Department of Forensic Science testified one of the projectiles taken from the body of the Defendant, Robert Thomas Conrad could be in his expert opinion declared to have come from/been shot from the small caliber .22 pistol of Jelaine Bowman Dennis that had been used to shoot Jelaine Bowman Dennis' assailant.

Another witness put three black males in two separate vehicles just down the road from "*The Toy Store*" talking to each other parked in the highway parallel to each other only moments before the shooting. The witness was inconvenienced in driving to his farm work as a result of their blocking the highway. As the farmer returned back down the road to get some more tools, he found the three black males still there talking with each. One of the vehicles was a light blue Ford LTD with specifically described damages to the vehicle.

At trial, Bryan Yeoman advised the Court he was desirous of testifying against Robert Thomas Conrad. He further advised he wanted to tell the jury the truth about what happened. The Court, with Bryan Yeoman's attorney, G. A. Lindsey present advised Bryan Yeoman of his constitutional rights. The Court determined Bryan Yeoman knew/was aware of his constitutional rights. The Court further finds Bryan Yeoman made a knowledgeable, intelligent and voluntary waiver of his constitutional rights (specifically, his constitutional right to remain silent; that anything he stated could and would be used against him in a court of law) and that he elected to testify freely and voluntarily.

Bryan Yeoman took the stand as a witness and after being sworn testified he, Brian Smith and Robert Thomas Conrad planned to rob

"*The Toy Store*"; that they met in two separate vehicles just down the road from "*The Toy Store*" and made last minute plans; that Robert Thomas Conrad had a pistol and made statements about using it. Bryan Yeoman testified he and Brian Smith went into "*The Toy Store*" and shortly thereafter, Robert Thomas Conrad came into "*The Toy Store*" brandishing a pistol....made the old white man; Brian Smith and Bryan Yeoman lie down on the floor. That Robert Thomas Conrad was dressed totally in black with a black hood over his face and that Robert Thomas Conrad took the billfold from the old white man and that Robert Thomas Conrad took his [*Bryan Yeoman's billfold and a designated amount of cash, i.e., United States Currency that was the property of Bryan Yeoman and that Bryan Yeoman had in his billfold*] during the robbery. Bryan Yeoman further testified he heard multiple gunshots. He further testified he saw Robert Thomas Conrad place the pistol close to the chest of Jelaine Bowman Dennis and he saw Robert Thomas Conrad pull the trigger and shoot Jelaine Bowman Dennis in the chest area. Thereafter, Bryan Yeoman testified he saw Robert Thomas Conrad run from the building. He further testified he and Brian Smith ask the old white man what they could do. They were told by the old white man to go get help. Bryan Yeoman further testified, he went to a neighbor's house but could get no one to come to the door. He and Brian Smith left the area and later determined Robert Thomas Conrad had been shot. They took Robert Thomas Conrad to the hospital emergency room in Enterprise, Alabama; rolled Robert Thomas Conrad into the emergency room in a wheel chair and quickly left the hospital premises.

The Court does find beyond a reasonable doubt that Robert Thomas Conrad did in Coffee County, Enterprise Division, Alabama on the day and date above mentioned use a pistol and did deliberately and intentionally kill and cause the death of Jelaine Bowman Dennis by shooting her with a pistol and that Robert Thomas Conrad caused the death of Jelaine Bowman Dennis during the time that he was in the course of committing a theft of property, to-wit: United States currency and/or United States coinage and/or checks, the property of Jelaine Bowman Dennis accomplished by the use of force or by threatening the imminent use of force against the person of Jelaine Bowman Dennis or another person present, with the intent to overcome her physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property, while the said ROBERT

THOMAS CONRAD was armed with a deadly weapon or a dangerous instrument, to-wit: a pistol, in violation of Section 13A-5-40 of the Code of Alabama, against the peace and dignity of the State of Alabama.

This Court does further declare the unanimous verdict of the jury finding Robert Thomas Conrad "*guilty*" of the CAPITAL OFFENSE of INTENTIONAL MURDER by the Defendant of Jelaine Bowman Dennis during a robbery in the first degree committed by the Defendant in violation of Section 13A-5-40(a)(2), *the Code of Alabama, 1975, as amended,* is supported by the legal and competent evidence presented in the trial of this case.

Therefore, ROBERT THOMAS CONRAD is declared "GUILTY" of the CAPITAL OFFENSE of the INTENTIONAL MURDER by the Defendant of Jelaine Bowman Dennis during a robbery in the first degree committed by the Defendant in violation of Section 13A-5-40(a)(2), the *Code of Alabama*, 1975, as amended.

## *AGGRAVATING CIRCUMSTANCES*

The only aggravating circumstances which may be considered in sentencing are those set out in Section 13A-5-49, the *Code of Alabama*, 1975. Also, pursuant to Section 13A-5-45(e), the *Code of Alabama, 1975, as amended,* "...the state shall have the burden of proving **beyond a reasonable doubt** the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for the purposes of the sentence hearing. (f). Unless at least one aggravating circumstance....exists, the sentence shall be life imprisonment, without parole."

Therefore, ***this Court finds*** that the below listed Section 13A-5-49(4) *AGGRAVATING CIRCUMSTANCE has been proven to be fact "**beyond a reasonable doubt**" and will be considered by this Court in sentencing*.

> *"The capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit...robbery..."*

## *MITIGATING CIRCUMSTANCES*

**In regard to the statutory mitigating circumstances set out in Section 13A-5-51, the *Code of Alabama, 1975, as amended, based upon a* "PREPONDERANCE OF THE EVIDENCE"** the Court finds the following:

(The mitigating circumstances set forth in Section 13A-5-51 have been considered.)

(1). The Defendant does have a significant history of traffic type minor offenses. He has one Assault in the Second Degree conviction on the 19th day of February, 2000 in the Enterprise Municipal Court, Enterprise, Alabama in case number MC 2000-238 and a "Giving False Information to Law Enforcement" conviction on the 19th day of July, 2000 in the Enterprise, Alabama Municipal Court. Even though he has pending a drug matter in the Coffee County, Alabama District Court, this Court has not considered those pending charges as Defendant has not been convicted of these charges. Therefore, the Defendant does not have a significant history of prior criminal activity. Therefore, this Court *does find* the Section 13A-5-51(1) Mitigating Circumstance does exist.

(2). The evidence does not justify that Robert Thomas Conrad was under the influence of any extreme mental or emotional disturbance. To the contrary, the evidence presented at trial proved beyond a reasonable doubt that the Defendant, Robert Thomas Conrad acted with deliberation and with the intent to commit this capital offense. There was no evidence presented and this Court has no basis to find that the defendant was under the influence of extreme mental or emotional disturbance. The evidence does not establish based on a preponderance of the evidence this mitigating circumstance. Therefore, **the Court finds that this Section 13A-5-51 (2) mitigating circumstance DOES NOT exist.**

(3). The victim, Jelaine Bowman Dennis was not a participant in the Defendant's conduct. Nor, did the victim, Jelaine Bowman Dennis consent to it. Therefore, **this Section 13A-5-51(3) mitigating circumstance DOES NOT exist.**

(4). Likewise, **the Section 13A-5-54(4) mitigating circumstance DOES NOT exist** as this Defendant, not another, committed the capital offense for which this defendant was convicted. It was Robert Thomas

Conrad who was proven beyond a reasonable doubt to have intentionally caused the death of Jelaine Bowman Dennis and it was Robert Thomas Conrad who beyond a reasonable doubt committed intentionally all of the other elements of this capital offense as defined, even though he was aided by others present in the commission of the robbery of the victim, Jelaine Bowman Dennis. This capital offense, beyond a reasonable doubt, was committed by Robert Thomas Conrad. This capital offense was not committed by another person. This defendant's participation was in no way "...relatively minor."

(5).    There is no evidence that the defendant acted under extreme duress or under the substantial domination of another person. Therefore, **this Circuit Court finds that the Section 13A-5-51(5) mitigating circumstance DOES NOT exist.**

(6).    There is no evidence that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. Therefore, **this Circuit Court finds that the Section 13A-5-51(6) mitigating circumstance DOES NOT exist.**

(7)    The defendant, at the time of the commission of this capital offense was a young man of approximately twenty (20) years of age, being born on the 30th day of October, 1980. Therefore, **this Circuit Court finds the Section 13A-5-51(7) mitigating circumstance DOES EXIST.**

The **NON-STATUTORY mitigating circumstances** as required by Section 13A-5-52, the Code of Alabama, 1975 as amended, have also been considered by this Circuit Court. The Defendant comes from a well thought of family who has made considerable efforts to teach the defendant right from wrong. Members of the community and defendant's family members appeared and requested the Defendant not be sentenced to death as he was a "good boy" and that he was "always respectful."

*All of the statutory and non-statutory mitigating circumstances possibilities have been carefully considered. The Court has applied the standards of proof set out in Section 13A-5-45(g) to issues involving the factual existence of the mitigating circumstance.*

## THE JURY'S RECOMMENDATION

**THE JURY VOTED EIGHT (8) TO FOUR (4) TO RECOMMEND A SENTENCE OF *"LIFE IN THE PENITENTIARY (PRISON) WITHOUT PAROLE."* THE COURT GIVES VERY SERIOUS CONSIDERATION AND WEIGHT TO THAT RECOMMENDATION.**

### THE SENTENCE

*Having found beyond a reasonable doubt the existence of the above AGGRAVATING CIRCUMSTANCE and further, based upon a preponderance of the evidence, having determined and weighed those statutory and non-statutory mitigating circumstances, and having given careful consideration and substantial weight to the jury's advisory recommendation, the Court finds that the punishment should be "LIFE IMPRISONMENT WITHOUT PAROLE."*

*It is therefore ORDERED, ADJUDGED AND DECREED that the Defendant, Robert Thomas Conrad is guilty of the Code of Alabama, 1975, as amended, Section 13A-5-40(a)(2) capital offense as charged in Offense One of the CC-2001-M-179 indictment, which indictment is referred to and incorporated herein by reference; and,*

*Nothing being stated by the Defendant as to why the sentence of the law should not be imposed;*

*IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that for his capital conviction, ROBERT THOMAS CONRAD is sentenced to "LIFE IMPRISONMENT WITHOUT PAROLE" in the penitentiary (custody of the director of corrections), State of Alabama.*

*Defendant is given credit for any time he has already served while awaiting trial and/or disposition in this case.*

*Defendant was in open court advised of his right to appeal, as long as he perfects his appeal within a specified time; of his right, if declared indigent, to a free transcript for the purposes of pursuing any appeal and of his right to court appointed legal representation, along with the Defendant's other appeal rights incident thereto.*

*The Defendant, upon demand, is also ordered to submit to DNA testing as is required by Section 36-18-20, et seq., the Code of Alabama, 1975, as amended.*

*The Defendant, Robert Thomas Conrad is remanded to the custody of the Sheriff of Coffee County, Alabama who is ORDERED to deliver ROBERT THOMAS CONRAD to the custody of the Alabama Department of Corrections as his sentence is hereby ordered "executed" and to be served.*

*Costs of Court are remitted as the Defendant, Robert Thomas Conrad is indigent.  It is further ordered that Defendant, Robert Thomas Conrad  pay restitution in the amount of FIFTEEN THOUSAND ($15,000.00) DOLLARS to the Clerk of Court for distribution to the Alabama Crime Victim's Compensation Commission.*

*Done and ordered this the  27th day of September, 2,002.  (Note: This "sentence order" was rendered orally in the presence of all attorneys and the Defendant on the date of Defendant's conviction.)*

_____
Gary L. McAliley, Circuit Judge, 12ᵗʰ Cir. AL



DEC 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

# IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
## (ENTERPRISE DIVISION)

### *O R D E R*

It is Ordered that Ronnie Vaughan appear before the Circuit Court of Coffee County, Enterprise Division, Alabama this instanter as a witness for the Court.

This Order is to be served on the above individual and due return thereof make as is provided by law.

*Done and Ordered this the 27ᵗʰ day of September, 2002.*

GARY L. McALILEY, CIRCUIT JUDGE
TWELFTH JUDICIAL CIRCUIT
STATE OF ALABAMA



SERVED ON *Ronnie Vaughan*
THIS ___27ᵗʰ___ DAY OF ___Sept 2002___
COFFEE COUNTY SHERIFF'S DEPARTMENT
_____ ~~DEPUTY~~ SHERIFF

642

ACR359

ALABAMA JUDICIAL DATA CENTER
COFFEE COUNTY
TRANSCRIPT OF RECORD
CONVICTION REPORT



CC 2001 000179.00 01
GARY L MCALILEY

```
CIRCUIT COURT OF COFFEE COUNTY              COURT ORI: 019025 J

STATE OF ALABAMA    VS.                     DC NO: GJ 2001 000137.00
CONRAD ROBERT THOMAS        ALIAS:          G J:   01-137
GARDEN OAKS APT.35          ALIAS:          SSN:   419175095
ENTERPRISE  AL  36330                       SID:   000000000
                                            AIS:

DOB:  09/30/1980   SEX: M   HT: 6 00    WT: 155  HAIR: BLK   EYE: BRO
RACE: ( )W (X)B ( )0  COMPLEXION: _____  AGE: ____  FEATURES: _____

DATE OFFENSE: 00/00/0000  ARREST DATE: 05/31/2001  ARREST ORI: 019020 0

CHARGES @ CONV    CITES          CT CL COURT ACTION         CA DATE
MURDER CAPITAL    13A-005-040    01 A  CONVICTED            09/27/2002
                                 00                         00/00/0000
                                 00                         00/00/0000

JUDGE: GARY L MCALILEY          PROSECUTOR: FULLER MARK EVERETT

PROBATION APPLIED  GRANTED  DATE    REARRESTED DATE  REVOKED  DATE
( )Y( )N          ( )Y( )N _____  ( )Y( )N _____  ( )Y( )N _____

15-18-8, CODE OF ALA 1975   IMPOSED   SUSPENDED    TOTAL    JAIL CREDIT
( )Y (X)N  CONFINEMENT: 00 00 000  00 00 000  00 00 000  00 00 479
           PROBATION  : 00 00 000             00 00 000
DATE SENTENCED: 09/27/2002   SENTENCE BEGINS: 09/27/2002

PROVISIONS            COSTS/RESTITUTION         DUE          ORDERED

  PENITENTIARY        RESTITUTION             $0.00           $0.00
  LIFE WO PAROL       ATTORNEY FEE            $0.00           $0.00
                      CRIME VICTIMS       $15000.00       $15000.00
                      COST                    $0.00           $0.00
                      FINE                    $0.00           $0.00
                      MUNICIPAL FEES          $0.00           $0.00
                      DRUG FEES               $0.00           $0.00
                      ADDTL DEFENDANT         $0.00           $0.00
                      DA FEES                 $0.00           $0.00
                      COLLECTION ACCT         $0.00           $0.00
                      JAIL FEES               $0.00           $0.00

                      TOTAL               $15000.00       $15000.00

APPEAL DATE       SUSPENDED       AFFIRMED        REARREST

(X)Y( )N 10/07/2002 ( )Y( )N _____ ( )Y( )N _____  ( )Y( )N _____

REMARKS:                         THIS IS TO CERTIFY THAT THE
                                 ABOVE INFORMATION WAS EXTRACTED
                                 FROM OFFICIAL COURT RECORDS
                                 AND IS TRUE AND CORRECT.
COPY OF ORDER ATTACHED


                                 Original Signed
                                 JAMES D COUNTS
                                 12/30/2002
```

OPERATOR: DEC
PREPARED: 12/30/2002

ACR359

ALABAMA JUDICIAL DATA CENTER
COFFEE COUNTY
TRANSCRIPT OF RECORD
CONVICTION REPORT

CC 2001 000180.00 01
GARY L MCALILEY

```
--------------------------------------------------------------------
| CIRCUIT COURT OF COFFEE COUNTY          COURT ORI: 019025 J       |
--------------------------------------------------------------------
| STATE OF ALABAMA    VS.           DC NO: GJ 2001 000142.00        |
| CONRAD ROBERT THOMAS    ALIAS:    G J:  01-142                    |
| GARDEN OAKS APT.35      ALIAS:    SSN:  419175095                 |
| ENTERPRISE  AL  36330             SID:  000000000                 |
|                                   AIS:                            |
--------------------------------------------------------------------
| DOB: 09/30/1980   SEX: M  HT: 6 00    WT: 135  HAIR: BLK   EYE: BRO |
| RACE: ( )W (X)B ( )O   COMPLEXION: _____  AGE: ____  FEATURES: _____ |
--------------------------------------------------------------------
| DATE OFFENSE: 00/00/0000  ARREST DATE: 05/31/2001  ARREST ORI: 0190200 |
--------------------------------------------------------------------
| CHARGES @ CONV     CITES           CT CL COURT ACTION       CA DATE    |
| ROBBERY 1ST        13A-008-041     01 A  CONVICTED          09/27/2002 |
|                                    00                       00/00/0000 |
|                                    00                       00/00/0000 |
--------------------------------------------------------------------
| JUDGE: GARY L MCALILEY            PROSECUTOR: STOUT GLENDA D      |
--------------------------------------------------------------------
| PROBATION APPLIED   GRANTED  DATE    REARRESTED DATE  REVOKED  DATE |
| ( )Y( )N            ( )Y( )N _____ ( )Y( )N _____ ( )Y( )N _____ |
--------------------------------------------------------------------
| 15-18-8, CODE OF ALA 1975   IMPOSED   SUSPENDED   TOTAL    JAIL CREDIT |
| ( )Y (X)N  CONFINEMENT: 00 00 000  00 00 000  00 00 000  00 00 479 |
|            PROBATION  : 00 00 000             00 00 000            |
| DATE SENTENCED: 09/27/2002   SENTENCE BEGINS: 09/27/2002          |
--------------------------------------------------------------------
| PROVISIONS              COSTS/RESTITUTION       DUE      ORDERED   |
|                                                                   |
|  PENITENTIARY          RESTITUTION           $0.00       $0.00    |
|  LIFE                  ATTORNEY FEE          $0.00       $0.00    |
|                        CRIME VICTIMS        $50.00      $50.00    |
|                        COST               $277.00     $277.00    |
|                        FINE                  $0.00       $0.00    |
|                        MUNICIPAL FEES        $0.00       $0.00    |
|                        DRUG FEES             $0.00       $0.00    |
|                        ADDTL DEFENDANT       $0.00       $0.00    |
|                        DA FEES               $0.00       $0.00    |
|                        COLLECTION ACCT       $0.00       $0.00    |
|                        JAIL FEES             $0.00       $0.00    |
|                                                                   |
|                        TOTAL               $327.00     $327.00   |
--------------------------------------------------------------------
| APPEAL DATE      SUSPENDED      AFFIRMED         REARREST         |
|                                                                  |
| (X)Y( )N 10/07/2002 ( )Y( )N _____ ( )Y( )N _____ ( )Y( )N _____ |
--------------------------------------------------------------------
| REMARKS:                      THIS IS TO CERTIFY THAT THE        |
|                               ABOVE INFORMATION WAS EXTRACTED    |
|                               FROM OFFICIAL COURT RECORDS        |
|                               AND IS TRUE AND CORRECT.           |
| COPY OF ORDER ATTACHED                                           |
|                                                                  |
|                                                                  |
|                               Original Signed                   |
|                               --------------------------         |
|                               JAMES A COURTS                     |
|                                                                  |
|                               12/30/2002                         |
--------------------------------------------------------------------
```

OPERATOR: DEC
PREPARED: 12/30/2002

643

```
ACR0372              ALABAMA JUDICIAL INFORMATION SYSTEM    CASE: CC 2001 000179.00
OPER: DEC                   CASE ACTION SUMMARY
PAGE: 1                     CIRCUIT  CRIMINAL                 RUN DATE: 06/01/2001
=================================================================================
IN THE CIRCUIT COURT OF COFFEE                                         JUDGE: GLM

STATE  OF  ALABAMA                 VS     CONRAD ROBERT THOMAS
                                          GARDEN OAKS APT.35
CASE: CC 2001 000179.00
                                          ENTERPRISE, AL   36330 0000

DOB: 09/30/1980        SEX: M  RACE: B  HT: 6 00  WT: 155  HR: BLK EYES: BRO
SSN: 419175095  ALIAS NAMES:
=================================================================================
CHARGE01: MURDER CAPITAL      CODE01: CMUR  LIT: MURDER CAPITAL TYP: F #: 001
OFFENSE DATE:                        AGENCY/OFFICER: 0190200 MOATES

DATE WAR/CAP ISS:                    DATE ARRESTED: 05/31/2001
DATE    INDICTED: 05/31/2001         DATE    FILED: 06/01/2001
DATE    RELEASED:                    DATE  HEARING:
BOND       AMOUNT:         $.00         SURETIES:

DATE 1: 06/18/2001  DESC: ARRG        TIME: 1000 A
DATE 2:             DESC:             TIME: 0000

TRACKING NOS: GJ 2001 000137 00  /  DC 2001 000505 00  /

   DEF/ATY: Non Al Smith    Gary Bradshaw TYPE: A                      TYPE:

                         00000                          00000

PROSECUTOR: FULLER MARK EVERETT

=================================================================================
OTH CSE: GJ200100013700 CHK/TICKET NO:                GRAND JURY: 01-137
COURT REPORTER: --------------  SID NO:    000000000
DEF STATUS: JAIL               DEMAND: Y                         OPER: DEC
=================================================================================
DATE          ACTIONS,  JUDGEMENTS,  AND  NOTES
=================================================================================
```

| DATE | ACTIONS, JUDGEMENTS, AND NOTES |
|---|---|
| 5-31-01 | Warrant of Arrest & Copy of Indictment Served on Δ |
| 6-1-01 | Arolure and Implied appearance |
| 6-1-01 | Arraignment Notice Sent to DA, Δ & Atty |
|  | Copy of Indictment Sent to Atty |
| 6-1-01 | Arraigned set to June 18, 2001, @ 10:00am |
| 6-1-01 | Motion to Withdraw By Bradshaw |
| 6-1-01 | Motion to Withdraw By Pittman |
| 6-6-01 | Order-Motion to Withdraw by Pittman is granted. Motion to |
|  | Withdraw by Bradshaw is denied. Hon Al Smith to |
|  | appointed. CC:DA, Δ, & Atty |
| 6-13-01 | Order appointing new counsel to Δ out for service |
| 6-8-01 | Application for YO Status |
| 6-15-01 | Order-Application for Youthful Offender set to July 31, 2001, @ |
|  | 9:00am. CC:DA, Δ, Atty, & Pros+Parole |

| State of Alabama Unified Judicial System | **CASE ACTION SUMMARY** | Case Number |
|---|---|---|
| Form C-7    Rev 2/79 | **CONTINUATION** | CC-01-179 |

Style:

State vs. Robert Thomas Conrad          Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 6-18-01 | Motion To Allow The D To View The Scene Of The Crime With His Attorney |
| 6-27-01 | Order- Defense attorney allowed to view + video tape crime scene. Motion for D to view Crime scene is denied. Application for ? hearing rescheduled e continued until September 6, 2001, @ 9:00am. cc: DA Att'y, Sheriff Moats, Jack + Prob Parole |
| 6-25-01 | Motion To Discovery of Prosecution files, records + Information To A Fair Trial |
| 6-25-01 | Motion To Inspect, Examine + Test All Physical Evidence |
| 6-25-01 | Assertion of Right To Proceed Ex Parte on Application For Funds |
| 6-25-01 | Ex Parte Application Number One |
| 6-25-01 | Motion To Reveal The Identity of Informants + Reveal any Deals, Promises of Inducements |
| 6-25-01 | Motion To Suppress Evidence Seized After An Illegal Arrest And/Or Search |
| 6-25-01 | Motion For A Jury Questionnaire |
| 6-25-01 | Motion To Disqualify All Potential Jurors Who Knew of Were Acquainted with The Victim of His Family |
| 6-25-01 | Motion For Disqualification From The Jury Venire of All Potential Jurors Who Would Automatically Vote For The Death Penalty If They Found Robert Thomas Conrad Guilty of Capital Murder |
| 6-25-01 | Motion To Dismiss The Indictment on Grounds That The Grand Jury Was Improperly Impaneled |

| State of Alabama<br>Unified Judicial System | **CASE ACTION SUMMARY** | Case Number |
|---|---|---|
| Form C-7    Rev 2/79 | **CONTINUATION** | CC 01-179 |

Style:

_State vs Robert Thomas Conrad_        Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 10-25-01 | Motion In Deposition of State Expert Witnesses + Request for Production of Documents |
| 10-25-01 | Motion for Order Permitting Discovery of Transcript, Exhibits, Other Memorialization of the Grand Jury Proceeding, and List of Grand Jury Members |
| 7-6-01 | Discovery Order Sent to DA + Attys |
| 7-11-01 | Order-Motion to Inspect, Examine + test All Physical evidence is granted. cc: DA + Attys |
| 7-11-01 | Order-... Application for Funds is granted. All additional ex parte applications not granted expressly herein are, at this time, denied. cc: DA + Attys |
| 7-11-01 | Order-Motion to Reveal the identity of informants is generally denied. However, the DA is ordered to timely reveal the identity of all informants who were more than passive observers. Motion to reveal any deals... is granted. All relief requested in this motion but not specifically provided for is hereby denied. cc: DA + Attys |
| 7-11-01 | Order-Motion to Suppress Evidence Seized... is denied. cc: DA + Attys |
| 7-11-01 | Order-The general request that a jury questionnaire + the attached letter from the judge be sent to the venire is granted. The request that the venire members be sent the questionnaire attached to the motion is denied. cc: DA, Attys + Courts |
| 7-11-01 | Order-Motion to Disqualify all potential... is denied. All additional relief requested in said motion not specifically provided for herein is denied. cc: DA + Attys |
| | continued- |

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY CONTINUATION | Case Number |
|---|---|---|
| Form C-7    Rev 2/79 | | CC-01-179 |

Style:

_State vs. Robert Thomas Conrad_                    Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 7-11-01 | Order-Motion to Disqualification ... In all potential Jurors who would alt. vote for the death penalty .. is granted. cc-DA+Atty |
| 7-11-01 | Order-Motion to Dismiss the indictment .. is denied. All additional relief requested not provided is expressly denied. cc-DA, Smith, Atty. |
| 7-11-01 | Order-① DA to Produce the curriculum vitae of all experts the State' experts to call at the Trial ② Motion to decrease the DA's expert witnesses is denied. ③ State to provide materials for the defense's preparation. ④ State to submit the defense to inspect reports. ⑤ All additional relief not provided for is denied cc-DA+Atty |
| 7-11-01 | Order-① State to provide a list of the Grand Jury + a list of the venire. Additional relief not provided for is denied. cc-DA+Atty |
| 8-31-01 | Report of Investigation |
| 9-4-01 | Motion to Continue YO hearing + Motion to suppress Evidence Not timely Disclosed + Motion to Compel Discovery |
| 9-14-01 | Motion for Extraordinary Expenses |
| 9-14-01 | Order-Motion for Extra Expense is granted. cc-DA+Atty |
| 9-14-01 | Order-YO hearing continued until November 20, 2001. cc-DA, Smith, D. Bradshaw+Pro+Parole |
| 9-18-01 | State' Motion for Court to Reconsider Order |
| 9-18-01 | State' Notice of Compliance |
| 11-2-01 | State' Arrangements w/ DA attorney to Video crime scene |

| State of Alabama Unified Judicial System | **CASE ACTION SUMMARY** | Case Number |
|---|---|---|
| Form C-7    Rev 2/79 | CONTINUATION | CC01-179 |

Style:

State vs. Robert Thomas Conrad

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 11-2-01 | State's Discovery Response |
| 10-26-01 | Order - Motion hearing set for November 5, 2001, @ 8:30am. Sheriff to have D present. CC: DA Smith, Bradshaw, Zack + Sheriff Moates |
| 11-2-01 | Order Amended previous order. cc: DA + Atty |
| 10-18-01 | State's motion for Discovery |
| 11-5-01 | State's 1st supplemental Response to D's Motion for Discovery |
| 11-9-01 | Order - State's motion for Discovery is granted. CC: DA + Atty |
| 12-12-01 | Order - Application for YO Status is denied. Case cont. to the next criminal jury term. All pending motion set for hearing on February 5, 2002, @ 9:00am. CC: DA, Atty + Pro + Parole |
| 11-19-01 | D's Second Motion to Suppress Evidence Seized After An Illegal Arrest And/Or Search |
| 12-26-01 | D's Third Motion to Suppress Evidence Seized After An Illegal Arrest And/Or Search And to Suppress Statements |
| 11-13-01 | State's 2nd Supplemental Response to D's Motion for Discovery |
| 11-20-01 | State's 3rd Supplemental Response to D's Motion for Discovery |
| 1-3-02 | Order - All pending unruled motions set for hearing on January 21, 2002, @ 9:00am. CC: DA, Atty, Zack + Sheriff |
| 1-14-02 | Subpoena Request form |
| 1-17-02 | State's 4th Supplemental Response to D's Motion for Discovery |
| 1-22-02 | D's 3rd Motion to Suppress Evidence seized after An Illegal Arrest And/Or Search + to Suppress Statements |

| State of Alabama<br>Unified Judicial System<br><br>Form C-7    Rev 2/79 | CASE ACTION SUMMARY<br>CONTINUATION | Case Number<br><br>CC-01-179 |
| --- | --- | --- |

Style:

**State vs. Robert Thomas Conrad**        Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
| --- | --- |
| 1-22-02 | Order |
| 1-22-02 | Order |
| 1-22-02 | Order |
| 2-5-02 | This case is continued past the March 2002 term to be specially set by separate order for a special term of court to be later decided. — Gary McAliley Judge CC: DA, Smith + Bradshaw |
| 3-3-02 | State's 5th Supplemental Response to D's Motion In Discovery |
| 3-7-02 | State's 6th Supplemental Response to D's Motion In Discovery |
| 3-13-02 | State's 7th Supplemental Response to D's Motion In Discovery |
| 4/08/2002 | On joint motion of the defense and of the District Attorney, the trial of this case by jury is ordered continued past the May 6, 2002 criminal jury term until the next scheduled criminal jury term or a term specially published for the trial of this case. Gary McAliley Judge |
| 5-22-02 | Order - States Conference set for May 30, 2002 @ 9:00am. Jury trial set for June 10, 2002 @ 9:00am. @ D+Att's |
| 5-24-02 | State's 8th Supplemental Response to D's Motion In Discovery |
| 8-4-02 | Order - Case Continue for trial during the September 23, 2002, jury term. Motion docket set for September 4, 2002, @ 9:00am, etc. cc: DA Sheriff Montz, Dennie Thies, Zack, Clerk, Smith + Bradshaw |
| 6-24-02 | Motion In Court - Ordered Mental Examination of D |

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY CONTINUATION | Case Number |
|---|---|---|
| Form C-7    Rev 2/79 | | CC-01-179 |

Style:

State vs. Robert Thomas Conrad   Page Number _____ of ____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 6/28/2002 | "Motion For Court Ordered Mental Examination of Defendant" without more is denied. |
| | _Gary McAliley_ Judge |
| | cc: DA, Smith & Bradshaw |
| 8-12-02 | Motion to Dismiss the Indictment On The Grounds That The Failure to Specify The Aggravating Circumstances On Which A Death Sentence May Be Imposed Violates The Fifth, Eighth, And Fourteenth Amendments And State Law |
| 8-12-02 | Motion to Declare The Alabama Capital Sentencing Process Unconstitutional And to Bar Imposition of The Death Penalty |
| 8-12-02 | Motion to Bar Imposition of The Death Penalty Where The Jury's Role And Factual Determinations Are Deemed Advisory |
| 8-14-02 | So 4th Motion to Suppress Or, in the alternative, Motion In Limine to Prohibit The Prosecutor From Displaying to The Jury Certain Inflammatory Evidence |
| 8-19-02 | Order - Motion docket set for September 4, 2002 @ 9:00am. cc: DA, Smith & Bradshaw |
| 8-19-02 | State's 9th Supplemental Response to the Motion to Discovery |
| 8-20-02 | Motion to Funds to Court Reporter transcript |
| 8-20-02 | Confirmation of Receipt of Discovery Documents |
| 8-23-02 | State of Alabama's Response to Conrad's Various motions That Misrepresent The Holding of Ring v. Arizona |
| 8-26-02 | Subpoena Request Form X2 |

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY CONTINUATION | Case Number |
|---|---|---|
| Form C-7     Rev 2/79 | | CC 01-179 |

Style: State vs Robert Thomas Conrad          Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 8-27-02 | Subpoena Request Form |
| 8-29-02 | Order- Motion to furnish to Court Reporter Transcripts is denied. cc: DA Smith + Bradshaw |
| 9-5-02 | Order- to Medical Center to Produce Medical Records |
| 9-4-02 | Jury Venire to 9-23-02 send out D |
| 9/4/2002 | A hearing on all pending motions was this day had with the Defendant present and represented by counsel. In open court the court ruled on all pending motions and stated the reasons therefore into the record. The courts' rationale need not here be restated. It is therefore ordered: |
| | 1.) Defendants' "Motion To Dismiss The Indictment on the grounds ... the failure to specify the aggravating circumstances on which a Death Sentence may be imposed violates the 5th, 6th, 8th + 14th amendments and state law " is denied. |
| | 2). Defendants' "Motion To Declare The Alabama Capital Sentencing Process Unconstitutional And Bar Imposition of the Death Penalty " is denied. and |
| | 3). Defendants' "Motion To Bar Imposition of the Death Penalty where the Jury's Role and Factual Determinations are Deemed Advisory " is denied. and |
| | 4). Defendants' motion In Limine (motion To Exclude from evidence video + composite photos + denied |

| State of Alabama Unified Judicial System | **CASE ACTION SUMMARY** | Case Number |
|---|---|---|
| Form C-7    Rev 2/79 | CONTINUATION | CC-01-179 |

Style: State vs. Robert Thomas Conrad          Page Number ____ of ____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 9-12-02 | Subpoena Request 2am |
| 9-12-02 | State's 10th Supplemental Response to D's Motion to Discovery |
| 9-13-02 | Confirmation of Receipt of Discovery Documents |
| 9-12-02 | Subpoena Request 2am |
| 9-16-02 | D's Exhibit List |
| 9-19-02 | State's Exhibit List |
| 10-22-02 | D's Supplemental Motion for New Trial |
| 12-6-02 | Order- Motion docket set for December 18, 2002 @ 10:30am cc: DA, Smith, Bradshaw, Zach, Sheriff, Maate + Connie Janis |
| 10-2-02 | Notice of Restitution |
| 12-9-02 | Order- D's post trial motions have been denied. cc: DA + Att'y |
| 9-25-02 | Al Crime Victims Compensation Commission |
| 12-9-02 | Order- D to pay $15,085.00 to Al Crime Victims Comp. cc: DA Smith + Bradshaw |
| 9-27-02 | Capital Sentence Order cc: DA, D, Att'y, DOC, Pros + Parole + Zach |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

652

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY CONTINUATION | Case Number |
|---|---|---|
| Form C-7      Rev 2/79 | | CC-01-179 |

Style:

State vs. Robert Thomas Conrad                Page Number _____ of ___ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| Plaintiff, | ) | COFFEE  COUNTY, AL. |
| | ) | |
| VS. | ) | ENTERPRISE  DIVISION |
| | ) | |
| ROBERT THOMAS CONRAD | ) | |
| | ) | |
| Defendant. | ) | CASE NO.  CC-2001-M-179 & 180 |
| | ) | |

### QUESTIONNAIRES USED IN THE ABOVE STYLED CASE

The box, hereto attached, contains the questionnaires that were required to be filled out by Circuit Judge Gary L. McAliley's order dated May 30, 2002.  All questionnaires that were received by the Coffee County Circuit Clerk's Office, Enterprise Division, from all jurors present on September 23, 2002 are herein contained.  The questionnaires are divided into two groups; those that were returned promptly via mail and present overall, and those that were on the strike list for the above referenced case.

SAME IS HEREBY Sealed this 25th day of September, 2002.

James M. "Mickey" Counts
Circuit Clerk



APPENDIX

## RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: Joseph A Baril JR

2.  Place of birth: Lowell, Massachusetts  Age 30  Sex: (X) Male () Female

3.  Race: (X) Caucasian/White  () African–American/Black  () Hispanic  () Other _____

4.  Do you: (X) Own home  () Rent home  () Rent apartment  () Live with friend or relatives  () Other

5.  What cities/states have you lived in during the past five years? Enterprise, AL

6.  Marital status: () Single  (X) Married  () Divorced  () Separated  () Widowed. If you are married:

    Spouse's employer: Full Time Student

    Number of years your spouse has worked there: 6 yrs

    Spouse's title and job responsibilities: Special Education teacher

    Educational background of your spouse, including any degrees or certificates earned:

    Associates in Arts and Science

7.  Do you have children? (X) Yes () No. If yes, please complete the following:

| Age | Sex | School or occupation | Live with you? | Their level of education |
|-----|-----|----------------------|----------------|--------------------------|
| 4   | M   | Hill Crest           | yes            | Pre school               |
| 3   | F   | N/A                  | yes            | N/A                      |
| 1   | F   | N/A                  | yes            | N/A                      |
|     |     |                      |                |                          |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) yes    College (1–4 or 5+) 2 yrs

    (b)  If college, what college, what degrees, and what was your major? Community College
    of Air Force

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
    () Yes (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
(X) Full–time () Part–time () Retired () Unemployed () Student () Homemaker

10. Your current or most recent occupation: _Air Craft Flt Mech_

11. Name of your current or most recent employer, or, if you are a student, your school and major:
_Dyncorp_

12. How long have you been employed by your current or most recent employer? _2 yrs_

13. What are/were your specific duties and responsibilities on the job? _Aircraft Maintaince_

14. Do/Did you supervise other employees? () Yes (X) No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? () Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years:
_Utility trailers Industrial Painter, Jerry Mitchell Chevy AutoBody_
_Paint Technition, U.S. Army Heavy Equipment Operator, AL Air Natia_
_Gard F-16 Crew Cheif_

17. Have you ever served in the military? (X) Yes () No. If yes, please complete the following:

Branch: _Army_    Rank: _Sgt_    Dates: From _Oct 92_ To _Aug 96_

Duties: _1st Line Supervisor_    Type of discharge: _Honerable_

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
_International Aerospace and Machinist Union_

19. Describe any offices you have held in the organizations listed in question 18: _N/A_

20. Have you ever served on a jury before? () Yes (X) No. How many times? _____
What type of jury: () Grand jury () Civil trial jury () Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____

City and state where served: _____

What verdict was rendered? Civil case:       () For plaintiff () For defendant
                           Criminal case:    () For state or federal government () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X) No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  (X)No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)? (X) Yes ( )No.  If yes, explain: _Bankrupcy_

26. Have you ever been arrested? (X)Yes ( ) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly?  _Enterprise Ledger_

29. What TV news programs do you watch frequently?  _CNN_

30. How many hours of TV do you watch per week?  _5 hrs_

31. What radio programs do you listen to most?  _John Boy and Billy Show 102.5_

32. Which do you find more interesting? ( ) Local news (X) National news

33. To what periodicals or magazines do you subscribe?  _N/A_

_____

34. Of the books you have read, which three are your favorites?  _N/A_

_____

35. Please list your hobbies, spare-time activities, and outside interests:  _Play Banjo, watching Nascar_

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?     ( ) Yes (X)No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (X) No.  If yes, what are their names and relationship to you? _____

_____

39. Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No. If yes, explain: _____

_____

_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No. If yes, explain: _____

_____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No. If yes, explain: _____

_____

43. List any reason why you do not wish to serve or why you should not serve: _____

_____

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? (X) Yes ( ) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (X) Yes ( ) No. If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? (X) Yes ( ) No. If yes, please describe: Inlaws house was robbed

_____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No. If yes, please describe: _____

_____

48. Have you taken any courses or had any training in medicine or other health–care field? (X) Yes ( ) No. If yes, please explain: CPR Course, Basic Combat Medic

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.   Do you belong to a church or otherwise have any religious affiliation?  (X) Yes ( ) No. If yes, please
      specify: Holloway Tabinacle

50.   How often do you attend religious services? ( ) Regularly (X) Occasionally ( ) Never

51.   Do you hold a special position in your religious organization? ( ) Yes (X) No

52.   What is your political party preference? Mixed.

53.   Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No.
       Of any anti–crime group or other similar organization? ( ) Yes (X) No. Of any anti–weapons or gun-
       control group? ( ) Yes (X) No.

54.   Have you ever actively participated in a political campaign? ( ) Yes (X) No. If yes, ( ) Democrat?
      ( ) Republican? ( ) Other

<u>APPENDIX</u>

# RECOMMENDED
# UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: <u>Ruth A. Barnard</u>

2.  Place of birth: <u>Amory, MS</u> _____ Age <u>39</u> ___ Sex: ( ) Male (X) Female

3.  Race: (X) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4.  Do you: (X) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5.  What cities/states have you lived in during the past five years? <u>Chancellor, AL</u> _____

6.  Marital status: ( ) Single  (X) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

    Spouse's employer: <u>U.S. Army, Civil Service</u>

    Number of years your spouse has worked there: <u>17 yrs</u>

    Spouse's title and job responsibilities: <u>Contracting Officer's Representative. Oversees daily operations of gov't contracts.</u>
    Educational background of your spouse, including any degrees or certificates earned:
    <u>2 yr – AS & AA</u>

7.  Do you have children? (X) Yes  ( ) No. If yes, please complete the following:

| Age | Sex | School or occupation | Live with you? | Their level of education |
|-----|-----|----------------------|----------------|--------------------------|
| 14  | F   | Enterprise High School | Yes | 10th grade |
|     |     |                      |                |                          |
|     |     |                      |                |                          |
|     |     |                      |                |                          |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) _____   College (1–4 or 5+) <u>1 yr</u>

    (b)  If college, what college, what degrees, and what was your major? <u>ESJC – Business</u>

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
    ( ) Yes  (X) No.  If yes, what courses? _____

9.  Your present employment status (check all that apply):
(X) Full–time  ( ) Part–time  ( ) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10.  Your current or most recent occupation: _Aircraft    Scheduler_

11.  Name of your current or most recent employer, or, if you are a student, your school and major:

_Dyn Corp_

12.  How long have you been employed by your current or most recent employer? _19 months_

13.  What are/were your specific duties and responsibilities on the job? _Schedule   aircraft_
_to be  flown  by  flight  school  pilots._

14.  Do/Did you supervise other employees? ( ) Yes (X) No.  If yes, how many? _____

15.  Do/Did you have responsibility for hiring and firing? ( ) Yes (X) No

16.  Please list all other occupations and employers you have had for the past 10 years:
_Cellular One — Billing Specialist_
_Coffee County Home Health — Admin. Supt Asst._

17.  Have you ever served in the military? ( ) Yes (X) No.  If yes, please complete the following:

Branch: _____  Rank: _____  Dates: From _____ To _____

Duties: _____  Type of discharge: _____

18.  What social, civic, professional, trade, union, or other organizations are you affiliated with?

_Union — Local 2003_

19.  Describe any offices you have held in the organizations listed in question 18: _N/A_

20.  Have you ever served on a jury before? (X) Yes  ( ) No.  How many times? ___1___
What type of jury: ( ) Grand jury  ( ) Civil trial jury  ( ) Criminal trial jury

21.  If you have served on a trial jury, please state the following: Year served: _97 - not sure_

City and state where served: _Enterprise, AL_

What verdict was rendered?  Civil case:     (X) For plaintiff  ( ) For defendant
Criminal case:  ( ) For state or federal government ( ) For defendant

22.  Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes   (X) No.
    If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes  (X) No.  If yes, explain: _____

    _____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
    ( ) Yes  (X) No.   If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly? _Enterprise Ledger_

29. What TV news programs do you watch frequently? _WTVY-4, CNN_

30. How many hours of TV do you watch per week? _5 hrs_

31. What radio programs do you listen to most? _WOOF, WDJR, WFSY_

32. Which do you find more interesting? (X) Local news ( ) National news

33. To what periodicals or magazines do you subscribe? _None_

    _____

34. Of the books you have read, which three are your favorites? _The Reef, River's End, + Another Dawn_

35. Please list your hobbies, spare-time activities, and outside interests: _Golf, watching my daughter play softball, + reading_

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?     ( ) Yes (X) No.
    If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

    ( ) Change your mind if a number of people have a different opinion?

    (X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
    ( ) Yes (X) No.  If yes, what are their names and relationship to you? _____

    _____

39. Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No. If yes, explain: _____

_____

_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No. If yes, explain: _____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No. If yes, explain: _____

_____

43. List any reason why you do not wish to serve or why you should not serve: _None._ _____

_____

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (X) Yes ( ) No. If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No. If yes, please describe:

_____

_____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No. If yes, please describe: _____

48. Have you taken any courses or had any training in medicine or other health–care field? (X) Yes ( ) No. If yes, please explain: _I worked at the Coffee County Home Health Dept from 2-94 until 6-98._

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation?  (X) Yes ( ) No. If yes, please specify: _macedonia  Baptist  Church - member_

50.  How often do you attend religious services? (X) Regularly ( ) Occasionally ( ) Never

51.  Do you hold a special position in your religious organization? ( ) Yes (X) No

52.  What is your political party preference? _Democrat_

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No. Of any anti–crime group or other similar organization? ( ) Yes (X) No. Of any anti–weapons or gun–control group? ( ) Yes (X) No.

54.  Have you ever actively participated in a political campaign? ( ) Yes (X) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: Vivian D. Bass

2. Place of birth: Chancellor, Al    Age 45    Sex: ( ) Male (✗) Female

3. Race: ( ) Caucasian/White  (✗) African–American/Black  ( ) Hispanic  ( ) Other _____

4. Do you: ( ) Own home  (✗) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5. What cities/states have you lived in during the past five years? _Alabama, Enterprise_

6. Marital status: (✗) Single  ( ) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

   Spouse's employer: _____

   Number of years your spouse has worked there: _____

   Spouse's title and job responsibilities: _____

   Educational background of your spouse, including any degrees or certificates earned:

   _____

7. Do you have children? (✗) Yes  ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|----------------------|----------------|--------------------------|
   | 21  | E   | TSU                  | yes            | Junior                   |
   |     |     |                      |                |                          |
   |     |     |                      |                |                          |
   |     |     |                      |                |                          |

8. Your level of education: Specify the highest grade you completed:

   (a) Elementary or high school (1–12) _12_    College (1–4 or 5+) _1 year_

   (b) If college, what college, what degrees, and what was your major? _ESJC, not a degree_

   (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   ( ) Yes  (✗) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
(√) Full–time ( ) Part–time ( ) Retired ( ) Unemployed ( ) Student ( ) Homemaker

10. Your current or most recent occupation: Food service worker

11. Name of your current or most recent employer, or, if you are a student, your school and major:
Daleville City School

12. How long have you been employed by your current or most recent employer? 1 month

13. What are/were your specific duties and responsibilities on the job? Food preparation, for the lunchroom.

14. Do/Did you supervise other employees? ( ) Yes (√) No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? ( ) Yes (√) No

16. Please list all other occupations and employers you have had for the past 10 years:
Dairy Queen Enterprise for 15 years

17. Have you ever served in the military? ( ) Yes (√) No. If yes, please complete the following:

Branch: _____ Rank: _____ Dates: From _____ To _____

Duties: _____ Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
AEA (Alabama Education Association)

19. Describe any offices you have held in the organizations listed in question 18: None

20. Have you ever served on a jury before? ( ) Yes (√) No. How many times? _____
What type of jury: ( ) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: no

City and state where served: _____

What verdict was rendered? Civil case:    ( ) For plaintiff  ( ) For defendant
                           Criminal case:  ( ) For state or federal government ( ) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes (√) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes   (✓) No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes  (✓) No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes  (✓) No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  (✓) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes  (✓) No

28. What newspaper(s) do you read regularly? _Enterprise Ledger_____

29. What TV news programs do you watch frequently? _10  Life time_____

30. How many hours of TV do you watch per week? _~~6~~  30_____

31. What radio programs do you listen to most? _K m X_____

32. Which do you find more interesting? (✓) Local news  ( ) National news

33. To what periodicals or magazines do you subscribe? _Ebony_____

34. Of the books you have read, which three are your favorites? _Bible, this is your
~~God~~ Day, Benny Hinn, Tale of Two Cities___

35. Please list your hobbies, spare-time activities, and outside interests: _reading + walking_

_____

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?   ( ) Yes  (✓) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

(✓) Change your mind if a number of people have a different opinion?

( ) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes  (✓) No.  If yes, what are their names and relationship to you? _____

_____

39. Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No. If yes, explain: _____

_____

_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No. If yes, explain: _____

_____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No. If yes, explain: _____

43. List any reason why you do not wish to serve or why you should not serve: _Just started a New Job, and I need All the Tranning they offer._

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (X) Yes ( ) No. If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No. If yes, please describe: _____

_____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No. If yes, please describe: _____

_____

48. Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No. If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation?  (✓) Yes  (✗) No.  If yes, please specify: _____

50. How often do you attend religious services?  (✓) Regularly  ( ) Occasionally  ( ) Never

51. Do you hold a special position in your religious organization?  ( ) Yes  (✗) No

52. What is your political party preference?  Democratic _____

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (✗) No. Of any anti-crime group or other similar organization? ( ) Yes (✗) No. Of any anti-weapons or gun-control group? ( ) Yes (✗) No.

54. Have you ever actively participated in a political campaign?  ( ) Yes (✗) No.  If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

<u>APPENDIX</u>

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: JAMES F BEDSOLE

2. Place of birth: NEWTON, AL ___ Age 72 Sex: (X) Male ( ) Female

3. Race: (X) Caucasian/White ( ) African–American/Black ( ) Hispanic ( ) Other ___

4. Do you: (X) Own home ( ) Rent home ( ) Rent apartment ( ) Live with friend or relatives ( ) Other

5. What cities/states have you lived in during the past five years? NEW BROCKTON, AL 36351

6. Marital status: ( ) Single (X) Married ( ) Divorced ( ) Separated ( ) Widowed. If you are married:

   Spouse's employer: N/A

   Number of years your spouse has worked there: N/A

   Spouse's title and job responsibilities: N/A

   Educational background of your spouse, including any degrees or certificates earned:
   High School

7. Do you have children? (X) Yes ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|---------------------|----------------|--------------------------|
   | 33 | Female | (SALES) | Yes | 15 Yrs |
   | 48 | M | Counselor | No | 18 Yrs |
   | | | | | |
   | | | | | |
   | | | | | |

8. Your level of education: Specify the highest grade you completed:

   (a) Elementary or high school (1–12) ___✓___ College (1–4 or 5+) ___2___

   (b) If college, what college, what degrees, and what was your major? N/A

   (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   ( ) Yes (X) No. If yes, what courses? ___

9. Your present employment status (check all that apply):
() Full-time (X) Part-time  () Retired  () Unemployed () Student () Homemaker

10. Your current or most recent occupation: _Consultant_

11. Name of your current or most recent employer, or, if you are a student, your school and major:

_Williams Power_

12. How long have you been employed by your current or most recent employer? _8 Years_

13. What are/were your specific duties and responsibilities on the job? _____

_Ensure Specific Codes & Procedures Are Complied
With_

14. Do/Did you supervise other employees? () Yes (X) No.  If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? () Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years:

_Same As 13, 14 & 15_

17. Have you ever served in the military? (X) Yes () No. If yes, please complete the following:

Branch: _USNEN_ Rank: _SN_ Dates: From _01/11/49_ To _01/10/55_

Duties: _Clenk_ Type of discharge: _Honovable_

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

_NA_

19. Describe any offices you have held in the organizations listed in question 18: _NA_

20. Have you ever served on a jury before? (X) Yes () No.  How many times? _1_
What type of jury: () Grand jury (X) Civil trial jury () Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _1978_

City and state where served: _Enterprise Al_

What verdict was rendered? Civil case:    () For plaintiff (X) For defendant
Criminal case:   () For state or federal government () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X)No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  (X)No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes  (X)No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  (X)No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly?  _Dothan Eagle, LEDGER  USA Today_

29. What TV news programs do you watch frequently?  _SPorts / aNEWS_

30. How many hours of TV do you watch per week?  _____ _20_

31. What radio programs do you listen to most?  _MUSICAL_

32. Which do you find more interesting? ( ) Local news  (X) National news

33. To what periodicals or magazines do you subscribe?  _BLADE ,  NRA_

_____

34. Of the books you have read, which three are your favorites?  _____

_____

35. Please list your hobbies, spare–time activities, and outside interests:  _SPORTS_

_____

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes  (X)No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

( ) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (X)No.  If yes, what are their names and relationship to you? _____

_____

39. Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? (X) Yes ( ) No. If yes, explain: _____

ARTHRITIS : CAN NOT REMAIN SEATED FOR LONG PERIODS OF TIME

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No. If yes, explain: _____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No. If yes, explain: _____

43. List any reason why you do not wish to serve or why you should not serve: _____

WORKING

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? (X) Yes ( ) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (X) Yes ( ) No. If no, why not? _____

46. Have you or a close relative ever been the victim of a crime? (X) Yes ( ) No. If yes, please describe: _____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No. If yes, please describe: _____

48. Have you taken any courses or had any training in medicine or other health-care field? ( ) Yes (X) No. If yes, please explain: _____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation? (X) Yes ( ) No.  If yes, please
     specify: _____

50.  How often do you attend religious services? ( ) Regularly (X) Occasionally ( ) Never

51.  Do you hold a special position in your religious organization? ( ) Yes (X) No

52.  What is your political party preference? _____

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No.
     Of any anti–crime group or other similar organization? ( ) Yes (X) No.  Of any anti–weapons or gun–
     control group? ( ) Yes ( ) No.

54.  Have you ever actively participated in a political campaign?  (X) Yes ( ) No.  If yes, (X) Democrat?
     ( ) Republican? ( ) Other  _____

67¢

<u>APPENDIX</u>

## RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: _Edna D. Blair_

2.  Place of birth: _Coffee County_ Age _66_ Sex: ( ) Male (✓) Female

3.  Race: (✓) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4.  Do you: (✓) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5.  What cities/states have you lived in during the past five years? _602 E. Church St._
    _New Brockton, Al_

6.  Marital status: ( ) Single  (✓) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

    Spouse's employer: _US Post. office_

    Number of years your spouse has worked there: _35 years_

    Spouse's title and job responsibilities: _rural Mail Carrier_

    Educational background of your spouse, including any degrees or certificates earned:
    _High School 12th_

7.  Do you have children? (✓) Yes  ( ) No. If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|----------------------|----------------|--------------------------|
    | 42  | f   | ~~Auburn~~ Auburn    | No             | B.S. Chemical Engineering Computer Science |
    | 32  | M   | Auburn               | No             | Masters Heath Promotion  |
    |     |     |                      |                |                          |
    |     |     |                      |                |                          |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) _12_   College (1–4 or 5+) _____

    (b)  If college, what college, what degrees, and what was your major? _____

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
         ( ) Yes  (✓) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
( ) Full–time  (X) Part–time  ( ) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10. Your current or most recent occupation: _Avon Sales rep._

11. Name of your current or most recent employer, or, if you are a student, your school and major:

_____

12. How long have you been employed by your current or most recent employer?

13. What are/were your specific duties and responsibilities on the job? _27 yrs - Sales_

_____

14. Do/Did you supervise other employees?  ( ) Yes  (X) No.  If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing?  ( ) Yes  (X) No

16. Please list all other occupations and employers you have had for the past 10 years:

_____

_____

17. Have you ever served in the military? ( ) Yes  (X) No.  If yes, please complete the following:

Branch: _____  Rank: _____  Dates: From _____ To _____

Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

_____

_____

19. Describe any offices you have held in the organizations listed in question 18: _____

_____

20. Have you ever served on a jury before? ( ) Yes  (X) No.   How many times? _____
What type of jury: ( ) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____

City and state where served: _____

What verdict was rendered?  Civil case:      ( ) For plaintiff  ( ) For defendant
                            Criminal case:   ( ) For state or federal government ( ) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes  (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes   ( ) No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes (X)No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes (X) No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly? _Enterprise Ledger, Dothen Eagle Elba clipper_

29. What TV news programs do you watch frequently? _WSFA News, Game Shows, Trinty Broadcasting Network_

30. How many hours of TV do you watch per week? _10-12 hrs –_

31. What radio programs do you listen to most? _Gospel – News –_

32. Which do you find more interesting? ( ) Local news (X) National news

33. To what periodicals or magazines do you subscribe? _Ladies Home Journal, Readers Digest_

34. Of the books you have read, which three are your favorites? _In the Eye of the Storm – The Summons, Bible._

35. Please list your hobbies, spare-time activities, and outside interests: _Gardening, reading, spending time w/ Grandchildren,_

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?   ( ) Yes (X) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes ( ) No.  If yes, what are their names and relationship to you? _yes, Hugh Maddox Montgomery 1st Cousin, Don't see often often_

39. Based on your experience, what is your opinion of lawyers? () Good (X) Fair () Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? () Yes (X) No. If yes, explain: _____ *Asthma, Not bad* _____

_____

_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? () Yes (X) No. If yes, explain: _____

_____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? () Yes (X) No. If yes, explain: _____

_____

43. List any reason why you do not wish to serve or why you should not serve: _____

_____

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? () Yes (X) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (X) Yes () No. If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? () Yes (X) No. If yes, please describe: _____

_____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? () Yes (X) No. If yes, please describe: _____

_____

48. Have you taken any courses or had any training in medicine or other health–care field? () Yes (X) No. If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? (X) Yes ( ) No. If yes, please specify: _First Baptist    New Brockton , Al_

50. How often do you attend religious services? (X) Regularly ( ) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? ( ) Yes (X) No

52. What is your political party preference? _Republican_

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No. Of any anti–crime group or other similar organization? ( ) Yes ( ) No. Of any anti–weapons or gun–control group? ( ) Yes ( ) No

54. Have you ever actively participated in a political campaign? ( ) Yes (X) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

APPENDIX

RECOMMENDED
UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: *Annette M Blevins*

2.  Place of birth: *Milwaukee, WI*  Age *35*  Sex: ( ) Male ( ) Female

3.  Race: ( ) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4.  Do you. ( ) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5.  What cities/states have you lived in during the past five years? *New Brockton, AL* *Enterpi*

6.  Marital status: ( ) Single  ( ) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

    Spouse's employer: *Dyncorp*

    Number of years your spouse has worked there: *16*

    Spouse's title and job responsibilities: _____

    Educational background of your spouse, including any degrees or certificates earned:
    *(2) Assoc Degrees - Union President IAM*

7.  Do you have children? ( ) Yes  ( ) No. If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|---------------------|----------------|--------------------------|
    | 12  | M   | New Brockton        | Yes            | 7th                      |
    |     |     |                     |                |                          |
    |     |     |                     |                |                          |
    |     |     |                     |                |                          |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) _____  College (1–4 or 5+) *1yr*

    (b)  If college, what college, what degrees, and what was your major? *N/A*

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
    ( ) Yes  ( ) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
(X) Full-time () Part-time () Retired () Unemployed () Student () Homemaker

10. Your current or most recent occupation: _Customer Service Rep_

11. Name of your current or most recent employer, or, if you are a student, your school and major:
_Unicel_

12. How long have you been employed by your current or most recent employer? _1 1/2_

13. What are/were your specific duties and responsibilities on the job? _Customer Service,_

14. Do/Did you supervise other employees? () Yes (X) No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? () Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years:
_Region Bank - Teller, Loan Processor_
_Heilig Meyers - Finance Officer_

17. Have you ever served in the military? () Yes (X) No. If yes, please complete the following:

Branch: _____  Rank: _____  Dates: From _____ To _____

Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
_N/A_

19. Describe any offices you have held in the organizations listed in question 18: _N/A_

20. Have you ever served on a jury before? () Yes (X) No.  How many times? _____
What type of jury: () Grand jury () Civil trial jury () Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____

City and state where served: _____

What verdict was rendered?  Civil case:       () For plaintiff  () For defendant
                            Criminal case:    () For state or federal government () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes (✔) No.
If yes, were you a witness for: ( ) Plaintiff ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? (✔) Yes ( ) No. If yes, explain: _____
_____Heilig Meyers - Pending_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes (✔) No.   If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (✔) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (✔) No

28. What newspaper(s) do you read regularly? _Enterprise Ledger_

29. What TV news programs do you watch frequently? _Headline News_

30. How many hours of TV do you watch per week? _____

31. What radio programs do you listen to most? _106.7_

32. Which do you find more interesting? ( ) Local news (✔) National news

33. To what periodicals or magazines do you subscribe? _N/A_

34. Of the books you have read, which three are your favorites? _Delores Claitborne -
Stephen King - SAVE The Last Dance - Mary Higgins Clark_

35. Please list your hobbies, spare-time activities, and outside interests: _My son's
Pea Wee Football_

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives? (✔) Yes ( ) No.
If yes, what do they say? _LOCAL IAM_

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(✔) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (✔) No.   If yes, what are their names and relationship to you? _____
_____

39.  Based on your experience, what is your opinion of lawyers? ( ) Good ( ) Fair ( ) Poor

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes ( ) No.  If yes, explain:  _____

_____

_____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes ( ) No.  If yes, explain:  _____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes ( ) No. If yes, explain:  _____

_____

43.  List any reason why you do not wish to serve or why you should not serve:  _*NONE*_____

_____

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes ( ) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? ( ) Yes ( ) No.  If no, why not?  _____

_____

46.  Have you or a close relative ever been the victim of a crime? ( ) Yes ( ) No. If yes, please describe: _My mothers purse was stolen out of her car that was parked in her driveway_

47.  Have you or a close relative ever worked in a law enforcement-related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes ( ) No. If yes, please describe:  _____

_____

48.  Have you taken any courses or had any training in medicine or other health-care field? ( ) Yes ( ) No. If yes, please explain:  _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? ( ) Yes ( ) No. If yes, please specify: _____

50. How often do you attend religious services? ( ) Regularly ( ) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? ( ) Yes ( ) No

52. What is your political party preference? _Republican_ _____

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes ( ) No. Of any anti–crime group or other similar organization? ( ) Yes ( ) No. Of any anti–weapons or gun-control group? ( ) Yes ( ) No.

54. Have you ever actively participated in a political campaign? ( ) Yes ( ) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

<u>APPENDIX</u>

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: *DELORES A. BLIEN*

2.  Place of birth: *SWEA CITY, IA*     Age *72*     Sex: ( ) Male (X) Female

3.  Race: (X) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4.  Do you: (X) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5.  What cities/states have you lived in during the past five years? *ENTERPRISE, AL*

6.  Marital status: ( ) Single  ( ) Married  (X) Divorced  ( ) Separated  ( ) Widowed. If you are married:

    Spouse's employer: *N/A*

    Number of years your spouse has worked there: *N/A*

    Spouse's title and job responsibilities: *N/A*

    Educational background of your spouse, including any degrees or certificates earned:

    *N/A*

7.  Do you have children? (X) Yes  ( ) No. If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|----------------------|----------------|--------------------------|
    | 49  | M   | GEOLOGY EXXON HOUSTON, TX | NO | GRADUATE OF AUBURN |
    | 42  | F   | HOMEMAKER | NO | HIGH SCHOOL - 12 |
    | 38  | —   | PERSONNEL APPLES | NO | 12 + 2 |
    | 34  | M   | SELF-EMPLOYED | NO | 12 |

8.  Your level of education: Specify the highest grade you completed:

    (a)   Elementary or high school (1–12) *12*     College (1–4 or 5+) *1*

    (b)   If college, what college, what degrees, and what was your major? _____

    *BUSINESS COLLEGE 1948 - 1949*

    (c)   Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
          ( ) Yes (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
() Full–time () Part–time (X) Retired () Unemployed () Student () Homemaker

10. Your current or most recent occupation: _____N/A_____

11. Name of your current or most recent employer, or, if you are a student, your school and major:

_____N/A_____

12. How long have you been employed by your current or most recent employer? _N/A_

13. What are/were your specific duties and responsibilities on the job? _____N/A_____

_____

14. Do/Did you supervise other employees? () Yes () No. If yes, how many? _N/A_

15. Do/Did you have responsibility for hiring and firing? () Yes () No _N/A_

16. Please list all other occupations and employers you have had for the past 10 years:
_U.S. ARMY SAFETY CENTER, FT RUCKER - SECRETARY,_
_RESORT WORLD - SECRETARY, MERGENT HALS - SECRETARY_

17. Have you ever served in the military? () Yes (X) No. If yes, please complete the following:
_20 YEARS AS WIFE OF U.S. ARMY OFFICER_
Branch: _____  Rank: _____  Dates: From _____ To _____

Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

_N/A_

_____

19. Describe any offices you have held in the organizations listed in question 18: _N/A_

_____

20. Have you ever served on a jury before? () Yes (X) No.  How many times? _____
What type of jury: () Grand jury () Civil trial jury () Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _N/A_

City and state where served: _N/A_

What verdict was rendered? Civil case:      () For plaintiff () For defendant
Criminal case:    () For state or federal government () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X) No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  (X) No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)? ( ) Yes (X) No.   If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly? *Sun, News Herald*

29. What TV news programs do you watch frequently? *MSNBC, CNBC, Fox News, CNN*

30. How many hours of TV do you watch per week? *Changes every week.*

31. What radio programs do you listen to most? *None - if any - music.*

32. Which do you find more interesting? ( ) Local news (X) National news

33. To what periodicals or magazines do you subscribe? *None at present time.*

34. Of the books you have read, which three are your favorites? *Do not have any favorites.*

35. Please list your hobbies, spare-time activities, and outside interests: *Antiques, Decorating*

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?   ( ) Yes (X) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion? *Can change my mind if proven wrong.*

( ) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel? ( ) Yes (X) No.  If yes, what are their names and relationship to you? _____

_____

39.  Based on your experience, what is your opinion of lawyers? ( ) Good (x) Fair ( ) Poor

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (x) No.  If yes, explain: _____

_____

_____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (x) No.  If yes, explain: _____

_____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (x) No.  If yes, explain: _____

_____

43.  List any reason why you do not wish to serve or why you should not serve: _____

_____

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (x) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (x) Yes ( ) No.  If no, why not? _____

_____

46.  Have you or a close relative ever been the victim of a crime? ( ) Yes (x) No.  If yes, please describe: _____

_____

47.  Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (x) No.  If yes, please describe: _____

_____

48.  Have you taken any courses or had any training in medicine or other health-care field? ( ) Yes (x) No.  If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation? (X) Yes ( ) No. If yes, please
     specify: _CHRIST THE KING LUTHERAN CHURCH_

50.  How often do you attend religious services? ( ) Regularly (X) Occasionally ( ) Never

51.  Do you hold a special position in your religious organization? ( ) Yes (X) No

52.  What is your political party preference? _DEMOCRAT_

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No.
     Of any anti–crime group or other similar organization? ( ) Yes (X) No. Of any anti–weapons or gun-
     control group? ( ) Yes (X) No.

54.  Have you ever actively participated in a political campaign? ( ) Yes (X) No. If yes, ( ) Democrat?
     ( ) Republican? ( ) Other _____

<u>APPENDIX</u>

## RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: Jessica Lynn Bradshaw Hanson

2.  Place of birth: Enterprise, Alabama  Age 25  Sex: ( ) Male (X) Female

3.  Race: (X) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4.  Do you: (X) Own home ( ) Rent home ( ) Rent apartment ( ) Live with friend or relatives ( ) Other

5.  What cities/states have you lived in during the past five years? Enterprise, Alabama
_____

6.  Marital status: ( ) Single (X) Married ( ) Divorced ( ) Separated ( ) Widowed. If you are married:

    Spouse's employer: Conagra Inc., Enterprise, Alabama

    Number of years your spouse has worked there: 12

    Spouse's title and job responsibilities: Supervisor of Shipping

    Educational background of your spouse, including any degrees or certificates earned:
    High School Diploma, Associates of Science

7.  Do you have children? ( ) Yes (X) No. If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|----------------------|----------------|--------------------------|
    | ___ | ___ | _____ | _____ | _____ |
    | ___ | ___ | _____ | _____ | _____ |
    | ___ | ___ | _____ | _____ | _____ |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) _____  College (1–4 or 5+) 5+

    (b)  If college, what college, what degrees, and what was your major? Troy State University Dothan, BS & Master's Education  math? history

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice? ( ) Yes (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
(X) Full-time ( ) Part-time ( ) Retired ( ) Unemployed ( ) Student ( ) Homemaker

10. Your current or most recent occupation: High School Teacher

11. Name of your current or most recent employer, or, if you are a student, your school and major:
Enterprise City Schools

12. How long have you been employed by your current or most recent employer? 4 yrs.

13. What are/were your specific duties and responsibilities on the job? See attachment

14. Do/Did you supervise other employees? ( ) Yes (X) No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? ( ) Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years:
Ray Hughes Chevrolet, clerk; Enterprise State Junior College
clerk; US Army ATTC-graphics artists; Enterprise City Schools (Present)

17. Have you ever served in the military? ( ) Yes (X) No. If yes, please complete the following:

Branch: _____ Rank: _____ Dates: From _____ To _____

Duties: _____ Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
NEA/AEA; Jr. Sesame Girls Club; SGA

19. Describe any offices you have held in the organizations listed in question 18: Sponsor of
Jr. Sesame Girls Club and SGA; AEA association representati.

20. Have you ever served on a jury before? ( ) Yes (X) No. How many times? _____
What type of jury: ( ) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____

City and state where served: _____

What verdict was rendered? Civil case:  ( ) For plaintiff ( ) For defendant
Criminal case:  ( ) For state or federal government ( ) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes (X) No.
If yes, were you a witness for: ( ) Plaintiff ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes (X) No. If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)? ( ) Yes (X) No. If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly? The Dothan Eagle & Southeast Sun

29. What TV news programs do you watch frequently? Dateline, Friends, West Wing

30. How many hours of TV do you watch per week? 8-10 hours

31. What radio programs do you listen to most? none

32. Which do you find more interesting? ( ) Local news (X) National news

33. To what periodicals or magazines do you subscribe? none

_____

34. Of the books you have read, which three are your favorites? The Notebook - N. Sparks, Harry Potter - J.K. Rowling, The Divine Secrets of the Ya Ya Sisterhood Rebecca Wells

35. Please list your hobbies, spare-time activities, and outside interests: Swimming, Shopping, reading, Scrapbooking, & sleeping

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives? ( ) Yes (X) No. If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel? ( ) Yes (X) No. If yes, what are their names and relationship to you? _____

_____

39. Based on your experience, what is your opinion of lawyers? (X) Good ( ) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

_____

43. List any reason why you do not wish to serve or why you should not serve: ___none___

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No.  If yes, please describe: _____

_____

47. Have you or a close relative ever worked in a law enforcement-related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No.  If yes, please describe: _____

_____

48. Have you taken any courses or had any training in medicine or other health-care field? ( ) Yes (X) No.  If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation? ( ) Yes (X) No. If yes, please specify: _____

50.  How often do you attend religious services? ( ) Regularly (X) Occasionally ( ) Never

51.  Do you hold a special position in your religious organization? ( ) Yes (X) No

52.  What is your political party preference?  _independent_____

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No. Of any anti–crime group or other similar organization? ( ) Yes (X) No. Of any anti–weapons or gun–control group? ( ) Yes (X) No.

54.  Have you ever actively participated in a political campaign? (X) Yes ( ) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other  _not party affiliated –_____

ENTERPRISE HIGH SCHOOL
FACULTY POLICIES AND PROCEDURES
REVISED BY FACULTY COMMITTEE
UPDATE - JUNE 1998

The Teacher's Handbook is prepared to provide information and assistance to teachers concerning the operating principles of Enterprise High School. Cooperation among teachers, students, and administrators is essential to providing useful and meaningful learning experiences. These policies are to be followed, however, until such time as they are changed. Any teacher may suggest such changes at any time and such suggestions will be considered by the staff. If any policy contained herein is in conflict, or comes to be in conflict with a policy of the Enterprise City School Board the building-level policy is automatically voided.

A.   Functions and Duties of Teachers
   1.   Teachers shall be directly responsible to the principal.
   2.   They shall perform such duties as are customarily performed by instructors and as the Superintendent of schools and the principal, shall direct; and the teachers shall devote themselves faithfully and exclusively to the performance of such duties during school hours.
   3.   They shall not employ their time outside of school hours in any manner which interferes with their efficiency or effectiveness in school.
   4.   In all professional and personal relations, teachers shall be held to observance of a course of conduct consistent with the ethics of the teaching profession. The Board has approved and adopted the N.E.A. Code of Ethics as the standard in this matter. Teachers employed by the Enterprise City Board of Education shall not at any time date any student who is in attendance in any school under the supervision of the Board.
   5.   Teachers shall follow the courses of study and use the textbooks prescribed by the City and State Boards of Education. Magazines, newspapers, and pamphlets used for instructional purposes shall be selected with care and approved by the principal. Teachers shall familiarize themselves with the rules and regulations of the Board, the Superintendent of Schools, and the principal, and shall observe and enforce such rules and regulations.
   6.   Teachers shall be responsible for:
       a.   Educational advancement and growth in their classes.
       b.   Development of good character and desirable attitudes among the pupils.
       c.   Protection of the pupil's health and safety.
       d.   Proper protection and care of textbooks, equipment, supplies, and other school property.
       e.   Maintenance of discipline and good order in classes and elsewhere throughout the school buildings and grounds.
   7.   Teachers shall attend all meetings to which they are called by the Superintendent or the principal.
   8.   Punctuality and regularity are expected of teachers in attending classes, meetings, conferences, and in keeping other school appointments.

9.  Teachers shall keep such records and make such reports as the Superintendent of Schools and the principal, or either of them may require.

10. Except as may be authorized by the Superintendent of Schools, no teacher shall:
   a.  Permit any commercial advertising to be announced, distributed, or otherwise promoted in or through the schools.
   b.  Permit the solicitation or collection of subscriptions or contributions from pupils or their parents in or through the schools.
   c.  Furnish the names or addresses of teachers, pupils or parents for other than school purposes.

11. The responsibility for reporting all matters harmful to the welfare of the school rests upon the teacher.

12. Teachers have a professional obligation to work with parents in interpreting the school program. The effectiveness of the school is indicated by the nature of these conferences, which can be the strongest forces at work in building public confidence and in promoting the teaching profession.

13. Teachers are obligated to accept responsibility of assignments made by the principal which may include such things as hall duty, lunchroom duty, parking lots, etc.

14. Teachers have an obligation to study each child to determine his needs.

15. Teachers should strive to recognize the significance of the maturity level of each child with whom they deal.

16. Teachers are responsible for taking advantage of professional services available to them through supervisors, special teachers, personnel workers, curriculum consultants, and administrative officers.

17. Teachers are obligated to see the total school program and to perform those acts which make it effective.

18. Teachers are obligated to contribute to curriculum development in the school by building effective programs of learning in their classrooms and by cooperating in the plans of their school for the improvement of the instructional program.

19. The Board of Education and the Superintendent of Schools urge all teachers to affiliate with the local-state-national associations.

20. Discipline:
   a.  Corporal punishment is the responsibility of the principal, administrative staff and designated individuals.
   b.  No student is to receive corporal punishment for failing his/her work or failing a test.
   c.  Mass punishment is not permitted by the Board of Education.
   d.  No student may be suspended from school without the approval of the principal.
   e.  Expulsion from school must be approved by both the Principal and the Superintendent.
   f.  Regardless of the type of punishment administered to students, it should be done in the spirit of helping the student rather than for some other purpose.
   g.  A student's academic grade may not be lowered for disciplinary reasons except as stated in the truancy policy.

9.     Your present employment status (check all that apply):
       (x) Full–time  ( ) Part–time  ( ) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10.    Your current or most recent occupation: _Instructor Pilot_

11.    Name of your current or most recent employer; or, if you are a student, your school and major:
       _LSSI_

12.    How long have you been employed by your current or most recent employer? _5yrs.._

13.    What are/were your specific duties and responsibilities on the job? _Instructing Inial_
       _Entry Rotary Wing Student Pilots_

14.    Do/Did you supervise other employees?  ( ) Yes  (x) No.  If yes, how many? _____

15.    Do/Did you have responsibility for hiring and firing?  ( ) Yes  (x) No

16.    Please list all other occupations and employers you have had for the past 10 years:
       _Instructor Pilot    LSSI_

17.    Have you ever served in the military? (x) Yes  ( ) No.  If yes, please complete the following:
       Branch: _ARMY_    Rank: _CW3_    Dates: From _MAY 68_ To _Sep 88_
       Duties: _Instructor Pilot_    Type of discharge: _Honorable_

18.    What social, civic, professional, trade, union, or other organizations are you affiliated with?
       _PHPA_

19.    Describe any offices you have held in the organizations listed in question 18: _None_

20.    Have you ever served on a jury before?  ( ) Yes  (x) No.   How many times? _____
       What type of jury: ( ) Grand jury  ( ) Civil trial jury  ( ) Criminal trial jury

21.    If you have served on a trial jury, please state the following: Year served: _____
       City and state where served: _____
       What verdict was rendered?  Civil case:      ( ) For plaintiff  ( ) For defendant
                                   Criminal case:   ( ) For state or federal government  ( ) For defendant

22.    Have you ever served as a foreperson on a grand jury or a trial jury?  ( ) Yes  (x) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  ( ) No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  ( ) No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)? ( ) Yes  ( ) No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  ( ) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes ( ) No

28. What newspaper(s) do you read regularly? _____

29. What TV news programs do you watch frequently?_____

30. How many hours of TV do you watch per week? _____

31. What radio programs do you listen to most? _____

32. Which do you find more interesting? ( ) Local news  ( ) National news

33. To what periodicals or magazines do you subscribe? _____ N/A _____

_____

34. Of the books you have read, which three are your favorites? _____ N/A _____

_____

35. Please list your hobbies, spare–time activities, and outside interests: _ wood work _

_____

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes ( ) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

( ) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes ( ) No.  If yes, what are their names and relationship to you? _____

_____

39.     Based on your experience, what is your opinion of lawyers? ( ) Good ( ) Fair ( ) Poor

40.     Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes ( ) No.   If yes, explain:     _____

        _____

        _____

41.     Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes ( ) No.  If yes, explain: _____

        _____

42.     Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes ( ) No. If yes, explain: _____

        _____

43.     List any reason why you do not wish to serve or why you should not serve: _____

        _____

44.     Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes ( ) No

45.     In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? ( ) Yes ( ) No.  If no, why not? _____

        _____

46.     Have you or a close relative ever been the victim of a crime? ( ) Yes ( ) No.  If yes, please describe:

        _____

        _____

47.     Have you or a close relative ever worked in a law enforcement−related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes ( ) No.  If yes, please describe: _____

        _____

48.     Have you taken any courses or had any training in medicine or other health−care field? ( ) Yes ( ) No.  If yes, please explain: _____

        _____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation?  ( ) Yes  (✓) No.  If yes, please specify: _____

50. How often do you attend religious services?  ( ) Regularly  (✓) Occasionally  ( ) Never

51. Do you hold a special position in your religious organization?  ( ) Yes  (✓) No

52. What is your political party preference?  _Republican_

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (✓) No. Of any anti–crime group or other similar organization?  ( ) Yes (✓) No.  Of any anti–weapons or gun–control group?  ( ) Yes  (✓) No.

54. Have you ever actively participated in a political campaign?  ( ) Yes  (✓) No.  If yes, ( ) Democrat? ( ) Republican? ( ) Other  _____

APPENDIX

RECOMMENDED
UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: *Joseph L. Gouillard*

2. Place of birth: *Woonsocket R.I.*  Age *63*  Sex: (✓) Male ( ) Female

3. Race: (✓) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4. Do you: ( ) Own home  (✓) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5. What cities/states have you lived in during the past five years? _____
   *ENTERPRISE AL.*

6. Marital status: ( ) Single  ( ) Married  (✓) Divorced  ( ) Separated  ( ) Widowed. If you are married:

   Spouse's employer: _____

   Number of years your spouse has worked there: _____

   Spouse's title and job responsibilities: _____

   Educational background of your spouse, including any degrees or certificates earned:

   _____

7. Do you have children? (✓) Yes  ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|----------------------|----------------|--------------------------|
   | 38  | M   | MILITARY             | NO             | 12 yrs                   |
   | 36  | M   | MILITARY             | NO             | 12 yrs                   |
   | 34  | M   | LANDSCAPE            | NO             | 12 yrs                   |

8. Your level of education: Specify the highest grade you completed:

   (a)  Elementary or high school (1–12) __11__    College (1–4 or 5+) _____

   (b)  If college, what college, what degrees, and what was your major? _____

   _____

   (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
        ( ) Yes  (✓) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
   () Full–time () Part–time (X) Retired () Unemployed () Student () Homemaker

10. Your current or most recent occupation: _____

11. Name of your current or most recent employer, or, if you are a student, your school and major:
    _ConAgra PoaLTRy_

12. How long have you been employed by your current or most recent employer? _10 yrs._

13. What are/were your specific duties and responsibilities on the job? _PACKER_
    _____

14. Do/Did you supervise other employees? () Yes (X) No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? () Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years:
    _____
    _____

17. Have you ever served in the military? (X) Yes () No. If yes, please complete the following:
    Branch: _USMC_, Rank: _PFC_ Dates: From _MAY 56_ To _MAY 58_
    Duties: _FIELD ARTILLERY_ Type of discharge: _HONORABLE_

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
    _NoNE_
    _____

19. Describe any offices you have held in the organizations listed in question 18: _____
    _____

20. Have you ever served on a jury before? () Yes (X) No. How many times? _____
    What type of jury: () Grand jury () Civil trial jury () Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _No_
    City and state where served: _____
    What verdict was rendered? Civil case:      () For plaintiff () For defendant
                               Criminal case:   () For state or federal government () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (✓) No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes  (✓) No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes  (✓) No.   If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  (✓) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (✓) No

28. What newspaper(s) do you read regularly? _Dothan Eagle_

29. What TV news programs do you watch frequently? _News_

30. How many hours of TV do you watch per week? _4 hrs._

31. What radio programs do you listen to most? — _W. K M X_

32. Which do you find more interesting? ( ) Local news  (✓) National news

33. To what periodicals or magazines do you subscribe? _None_

34. Of the books you have read, which three are your favorites? _____

_____

35. Please list your hobbies, spare-time activities, and outside interests: _Fishing_

_____

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?     ( ) Yes  (✓) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

(✓) Change your mind if a number of people have a different opinion?

( ) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes  (✓) No.  If yes, what are their names and relationship to you? _____

_____

39.  Based on your experience, what is your opinion of lawyers? ( ) Good (✓) Fair ( ) Poor

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (✓) No.  If yes, explain: _____

_____

_____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (✓) No.  If yes, explain: _____

_____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (✓) No.  If yes, explain: _____

_____

43.  List any reason why you do not wish to serve or why you should not serve: ___NONE___

_____

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (✓) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (✓) Yes ( ) No.  If no, why not? _____

_____

46.  Have you or a close relative ever been the victim of a crime? ( ) Yes (✓) No. If yes, please describe:

_____

_____

47.  Have you or a close relative ever worked in a law enforcement-related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (✓) No.  If yes, please describe: _____

_____

48.  Have you taken any courses or had any training in medicine or other health-care field? ( ) Yes (✓) No.  If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? ( ) Yes (✗) No. If yes, please specify: _____

50. How often do you attend religious services? ( ) Regularly (✗) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? ( ) Yes (✗) No

52. What is your political party preference? _DEMOCRAT ?_____

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (✗) No. Of any anti–crime group or other similar organization? ( ) Yes (✗) No. Of any anti–weapons or gun-control group? ( ) Yes (✗) No.

54. Have you ever actively participated in a political campaign? ( ) Yes (✗) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____



APPENDIX

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: _CRAIG CAMERON_

2. Place of birth: _PANAMA CITY FLA_  Age _58_  Sex: (X) Male ( ) Female

3. Race: (X) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4. Do you: (X) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5. What cities/states have you lived in during the past five years? _ALABAMA_

6. Marital status: ( ) Single  (X) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

   Spouse's employer: _CIVIL SERVICE_

   Number of years your spouse has worked there: _20_

   Spouse's title and job responsibilities: _EDUCATION SPECIALIST_

   Educational background of your spouse, including any degrees or certificates earned:
   _MASTERS EDUCATION_

7. Do you have children? (X) Yes ( ) No. If yes, please complete the following:

| Age | Sex | School or occupation | Live with you? | Their level of education |
|-----|-----|----------------------|----------------|--------------------------|
| 19  | M   | JR College           | YES            | 13+                      |
| 16  | F   | High School          | YES            | 10+                      |
|     |     |                      |                |                          |
|     |     |                      |                |                          |

8. Your level of education: Specify the highest grade you completed:

   (a)  Elementary or high school (1–12) _____   College (1–4 or 5+) _____

   (b)  If college, what college, what degrees, and what was your major? _MASTERS BUSINESS_

   (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
        (X) Yes ( ) No. If yes, what courses? _BUSINESS LAW_

9. Your present employment status (check all that apply):
(X) Full–time ( ) Part–time ( ) Retired ( ) Unemployed ( ) Student ( ) Homemaker

10. Your current or most recent occupation: _FLIGHT INSTRUCTOR CIVIL SERVICE_

11. Name of your current or most recent employer, or, if you are a student, your school and major:
_US ARMY DEPT OF ARMY (CIVILIAN)_

12. How long have you been employed by your current or most recent employer? _30 years_

13. What are/were your specific duties and responsibilities on the job? _WRITE AR 95-1 and changes to aircraft operators manuals._

14. Do/Did you supervise other employees? ( ) Yes (X) No.  If yes, how many? _0_

15. Do/Did you have responsibility for hiring and firing? ( ) Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years:
_SAME JOB FOR LAST 10 years_

17. Have you ever served in the military? (X) Yes ( ) No.  If yes, please complete the following:

Branch: _ARMY_    Rank: _LTC_    Dates: From _2 JUNE 65_ To _AUG 1994_

Duties: _CDR OF F COMPANY, S4 GROUP STAFF_  Type of discharge: _HONORABLE RESERVE RETIRED_

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
_NONE_

19. Describe any offices you have held in the organizations listed in question 18: _NONE_

20. Have you ever served on a jury before? (X) Yes ( ) No.  How many times? _CALLED BUT DID NOT SERVE_
What type of jury: ( ) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _NA_

City and state where served: _NA_

What verdict was rendered?  Civil case: _N/A_ ( ) For plaintiff ( ) For defendant
Criminal case: _N/A_ ( ) For state or federal government ( ) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes (X) No

23.   Have you testified as a witness in any court proceeding? ( ) Yes  (X) No.
      If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or
      criminal case.  *N A*

24.   Have you or anyone close to you ever sued or been sued in any type of lawsuit? (X) Yes ( ) No.  If yes,
      explain:  *SUED BURGER KING FOR DAUGHTERS INJURY*
      *SUED LOFTIN RENT ALL FOR AUTO ACCIDENT BROKE WIFES NECK*

25.   Have you ever been to court for any other reason (excluding divorce or traffic cases)?
      ( ) Yes (X) No.  If yes, explain: _____

26.   Have you ever been arrested? ( ) Yes (X) No

27.   Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28.   What newspaper(s) do you read regularly?  *NO*

29.   What TV news programs do you watch frequently?  *CNN*

30.   How many hours of TV do you watch per week?  *4 hrs*

31.   What radio programs do you listen to most?  *NONE*

32.   Which do you find more interesting? ( ) Local news (X) National news

33.   To what periodicals or magazines do you subscribe?  *None*

34.   Of the books you have read, which three are your favorites?  *JAMES BOND LIVE OR DIE*

35.   Please list your hobbies, spare-time activities, and outside interests:  *ANTIQUE Military Jeeps*

36.   Are there bumper stickers on the vehicles that you drive or that your spouse drives?  ( ) Yes (X) No.
      If yes, what do they say? _____

37.   In a group situation, once you have formed an opinion, do you usually:

      ( ) Change your mind if a number of people have a different opinion?

      (X) Stand by your original opinion despite what others believe?

38.   Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
      ( ) Yes (X) No.  If yes, what are their names and relationship to you? _____

39. Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No. If yes, explain: _____

_____

43. List any reason why you do not wish to serve or why you should not serve: _NONE._ _____

_____

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No.  If yes, please describe: _____

_____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police?  ( ) Yes (X) No.  If yes, please describe: _____

48. Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No. If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 -- 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation?  ( ) Yes (X) No.  If yes, please specify: _____

50. How often do you attend religious services? ( ) Regularly (X) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? ( ) Yes (X) No

52. What is your political party preference?  _NONE_____

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No. Of any anti-crime group or other similar organization? ( ) Yes (X) No. Of any anti-weapons or gun-control group? ( ) Yes (X) No.

54. Have you ever actively participated in a political campaign?  ( ) Yes (X) No.  If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

<u>APPENDIX</u>

# RECOMMENDED
# UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: Juleigh E Christensen

2. Place of birth: Anchorage AK        Age 27     Sex: ( ) Male (X) Female

3. Race: (X) Caucasian/White   ( ) African–American/Black   ( ) Hispanic   ( ) Other _____

4. Do you: (X) Own home   ( ) Rent home   ( ) Rent apartment   ( ) Live with friend or relatives   ( ) Other

5. What cities/states have you lived in during the past five years?  Enterprise, Al

6. Marital status: ( ) Single  (X) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

   Spouse's employer: Byn corp

   Number of years your spouse has worked there:  1

   Spouse's title and job responsibilities: Crash Guard    guarding air craft

   Educational background of your spouse, including any degrees or certificates earned:

   High school   some College

7. Do you have children? ( ) Yes  (X) No.  If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|----------------------|----------------|--------------------------|
   |     |     |                      |                |                          |
   |     |     |                      |                |                          |
   |     |     |                      |                |                          |
   |     |     |                      |                |                          |

8. Your level of education: Specify the highest grade you completed:

   (a)    Elementary or high school (1–12) _____    College (1–4 or 5+)  ✓

   (b)    If college, what college, what degrees, and what was your major?  ESJC   AA
          Business

   (c)    Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
          ( ) Yes  (X) No.  If yes, what courses? _____

9.  Your present employment status (check all that apply):
    (X) Full–time () Part–time () Retired () Unemployed () Student () Homemaker

10. Your current or most recent occupation: Office Manager

11. Name of your current or most recent employer, or, if you are a student, your school and major:
    Bondys Toyota

12. How long have you been employed by your current or most recent employer? 2 1/2 yrs

13. What are/were your specific duties and responsibilities on the job? transmit financial
    Statement and other accounting functions

14. Do/Did you supervise other employees? (X) Yes () No.  If yes, how many? 2

15. Do/Did you have responsibility for hiring and firing? (X) Yes () No

16. Please list all other occupations and employers you have had for the past 10 years:
    Sav-U
    Enterprise  Toyota

17. Have you ever served in the military? () Yes (X) No.  If yes, please complete the following:

    Branch: _____  Rank: _____  Dates: From _____ To _____

    Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
    N/A

19. Describe any offices you have held in the organizations listed in question 18: N/A

20. Have you ever served on a jury before? () Yes (X) No.   How many times? _____
    What type of jury: () Grand jury () Civil trial jury () Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____

    City and state where served: _____

    What verdict was rendered? Civil case:       () For plaintiff () For defendant
                               Criminal case:    () For state or federal government () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (✗) No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes  (✗) No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes  (✗) No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  (✗) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (✗) No

28. What newspaper(s) do you read regularly?  <u>Enterprise Ledge    Dothen Eagle</u>

29. What TV news programs do you watch frequently?  <u>Sitcoms</u>

30. How many hours of TV do you watch per week?  <u>10</u>

31. What radio programs do you listen to most?  <u>Music    KMX</u>

32. Which do you find more interesting? (✗) Local news ( ) National news

33. To what periodicals or magazines do you subscribe?  <u>U. S. News,  Car Magazines,</u>
<u>Animal Magazines</u>

34. Of the books you have read, which three are your favorites?  _____

_____

35. Please list your hobbies, spare-time activities, and outside interests:  <u>Cars</u>

_____

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes (✗) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(✗) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (✗) No.  If yes, what are their names and relationship to you?  _____

_____

39.   Based on your experience, what is your opinion of lawyers? ( ) Good (✓) Fair ( ) Poor

40.   Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (✓) No.  If yes, explain: _____

_____

_____

41.   Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (✓) No.  If yes, explain: _____

_____

42.   Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (✓) No.  If yes, explain: _____

_____

43.   List any reason why you do not wish to serve or why you should not serve: ___N/A_____

_____

44.   Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (✓) No

45.   In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (✓) Yes ( ) No.  If no, why not? _____

_____

46.   Have you or a close relative ever been the victim of a crime? ( ) Yes (✓) No.  If yes, please describe:

_____

_____

47.   Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (✓) No.  If yes, please describe: _____

_____

48.   Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (✓) No.  If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? (✓) Yes ( ) No. If yes, please specify: _Green Hill Presbyterian Church_

50. How often do you attend religious services? ( ) Regularly (✓) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? ( ) Yes (✓) No

52. What is your political party preference? _N/A_

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (✓) No. Of any anti-crime group or other similar organization? ( ) Yes (✓) No. Of any anti-weapons or gun-control group? ( ) Yes (✓) No.

54. Have you ever actively participated in a political campaign? ( ) Yes (✓) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
# UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: _JAMES E. COBB_

2. Place of birth: _LAKEWOOD, FL_ Age _73_ Sex: (X) Male ( ) Female

3. Race: (X) Caucasian/White ( ) African–American/Black ( ) Hispanic ( ) Other _____

4. Do you: (X) Own home ( ) Rent home ( ) Rent apartment ( ) Live with friend or relatives ( ) Other

5. What cities/states have you lived in during the past five years? _ENTERPRISE_

6. Marital status: ( ) Single (X) Married ( ) Divorced ( ) Separated ( ) Widowed. If you are married:

   Spouse's employer: _NOT EMPLOYED_

   Number of years your spouse has worked there: _____

   Spouse's title and job responsibilities: _____

   Educational background of your spouse, including any degrees or certificates earned:
   _MS DEGREE – TSU – CRIMINAL JUSTICE_

7. Do you have children? (X) Yes ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|---------------------|----------------|--------------------------|
   | 47 | F | _____ | No | JR. COLLEGE – ENTERPRISE |
   | 43 | M | CDT | No | BS – UNIV SOUTH ALABAMA |
   | 38 | M | TEACHER | No | BS – TROY STATE UNIV |

8. Your level of education: Specify the highest grade you completed:

   (a) Elementary or high school (1–12) _____ College (1–4 or 5+) _____

   (b) If college, what college, what degrees, and what was your major? _TROY STATE BS, HISTORY & SOCIAL STUDIES_

   (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   ( ) Yes (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
() Full-time () Part-time (X) Retired () Unemployed () Student () Homemaker

10. Your current or most recent occupation: _Supv Labor Relations Spec._

11. Name of your current or most recent employer, or, if you are a student, your school and major:

_USAAVNC_

12. How long have you been employed by your current or most recent employer? _21 yrs._
_Retired in 1987_

13. What are/were your specific duties and responsibilities on the job? _Negotiating Labor_
_Agreements, Supervising Incentive Awards Admin & All Disciplinary_
_Actions._

14. Do/Did you supervise other employees? (X) Yes () No. If yes, how many? _5_

15. Do/Did you have responsibility for hiring and firing? (X) Yes () No

16. Please list all other occupations and employers you have had for the past 10 years: _None_

17. Have you ever served in the military? (X) Yes () No. If yes, please complete the following:

Branch: _US Navy_ Rank: _503_ Dates: From _1946_ To _1949_
_LT (jg)_                              _1953 to 1955_
Duties: _Anti Submarine Warfare_    Type of discharge: _Hon_

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

_American Cancer Society_

19. Describe any offices you have held in the organizations listed in question 18: _Served on_
_Relay for Life Committee_

20. Have you ever served on a jury before? (X) Yes () No. How many times? _2_
What type of jury: () Grand jury (X) Civil trial jury (X) Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _1980_

City and state where served: _Enterprise, AL_

What verdict was rendered? Civil case:    (X) For plaintiff () For defendant
                          Criminal case:  (X) For state or federal government () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X) No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes  (X) No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes  (X) No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes  (X) No

28. What newspaper(s) do you read regularly?  _DOTHAN EAGLE_

29. What TV news programs do you watch frequently?  _NBC, CNN, CBS_

30. How many hours of TV do you watch per week?  _Approximately 10_

31. What radio programs do you listen to most?  _WTVY - Country  40 MIN - MON - SAT._

32. Which do you find more interesting? ( ) Local news  (X) National news

33. To what periodicals or magazines do you subscribe?  _CONSUMER DIGEST,_
_READERS DIGEST_

34. Of the books you have read, which three are your favorites?  _THE BIBLE,_
_JOHN SALES' BOOKS, WEB GRIFFIN BOOKS_

35. Please list your hobbies, spare-time activities, and outside interests:  _READING,_
_LISTENING TO MUSIC & RECORDING MUSIC_

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?  (X) Yes ( ) No.
If yes, what do they say?  _TIN CAN SAILOR, UNITED WE STAND, TROA LIFE MEMBER_

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes  (X) No.  If yes, what are their names and relationship to you? _____

_____

39. Based on your experience, what is your opinion of lawyers? (X) Good ( ) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

43. List any reason why you do not wish to serve or why you should not serve: _I CAN ONLY SERVE UNTIL 30 SEPT - I WILL BE OUT OF STATE 10/1 to 11/1_

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? (X) Yes ( ) No.  If yes, please describe: _A RADIO WAS STOLEN FROM My VEHICLE IN EARLY 60'S_

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No.  If yes, please describe: _____

48. Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No.  If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? (X) Yes ( ) No. If yes, please specify: _FIRST BAPTIST ENTERPRISE, 19 c_

50. How often do you attend religious services? (X) Regularly ( ) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? ( ) Yes (X) No

52. What is your political party preference? _REPUBLICAN_

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No. Of any anti–crime group or other similar organization? ( ) Yes (X) No. Of any anti–weapons or gun–control group? ( ) Yes (X) No.

54. Have you ever actively participated in a political campaign? ( ) Yes (X) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

APPENDIX

## RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: *PEGGY L. Contreras*

2. Place of birth: *Enterprise*          Age *43*    Sex: ( ) Male (✓) Female

3. Race: ( ) Caucasian/White  (✓) African–American/Black  ( ) Hispanic  ( ) Other _____

4. Do you: (✓) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5. What cities/states have you lived in during the past five years? *Enterprise*

6. Marital status: ( ) Single  ( ) Married  ( ) Divorced  (✓) Separated  ( ) Widowed. If you are married:

   Spouse's employer: *Civil Service   Fire Fighter   Ft Rucker*

   Number of years your spouse has worked there: *1*

   Spouse's title and job responsibilities: *Fire fighter*

   Educational background of your spouse, including any degrees or certificates earned:
   *Some College*

7. Do you have children? (✓) Yes  ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|----------------------|----------------|--------------------------|
   | 26 | M | Air Force | NO | Master Degree |
   | 17 | F | High School | Yes | 11ᵗʰ Grade |
   | 15 | M | Jr High | Yes | 7ᵗʰ Grade |

8. Your level of education: Specify the highest grade you completed:

   (a)  Elementary or high school (1–12) _____    College (1–4 or 5+) ✓_____

   (b)  If college, what college, what degrees, and what was your major? *Criminal Justice Paralegal*

   (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
        (✓) Yes  ( ) No. If yes, what courses? *All*

9. Your present employment status (check all that apply):
(✓) Full–time ( ) Part–time ( ) Retired ( ) Unemployed ( ) Student ( ) Homemaker

10. Your current or most recent occupation: *Crime Analyst*

11. Name of your current or most recent employer, or, if you are a student, your school and major:

*Dept of Public Safety*

12. How long have you been employed by your current or most recent employer? *24 yrs*

13. What are/were your specific duties and responsibilities on the job? *Crime Analysis*


14. Do/Did you supervise other employees? (✓) Yes ( ) No.  If yes, how many? *1*

15. Do/Did you have responsibility for hiring and firing? ( ) Yes (✓) No

16. Please list all other occupations and employers you have had for the past 10 years:
*Same – other Occupations include Police Officer, DARE Officer, Investigations, Crime Analysis*

17. Have you ever served in the military? ( ) Yes (✓) No.  If yes, please complete the following:

Branch: _____    Rank: _____    Dates: From _____ To _____

Duties: _____    Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

*None*


19. Describe any offices you have held in the organizations listed in question 18: _____


20. Have you ever served on a jury before? (✓) Yes ( ) No.  How many times? *1*
What type of jury: (✓) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____

City and state where served: *Montg   Federal Cases*

What verdict was rendered?  Civil case:        ( ) For plaintiff  ( ) For defendant
                           Criminal case:     (✓) For state or federal government ( ) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes (✓) No

23. Have you testified as a <u>witness</u> in any court proceeding? (✓) Yes  ( ) No.
If yes, were you a witness for: (✓) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case. *Custody Case*

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes (✓) No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes (✓) No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (✓) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? (✓) Yes ( ) No

28. What newspaper(s) do you read regularly? *Southeast Sun*

29. What TV news programs do you watch frequently? *20/20, 60 min, 60 min II, WTVY*

30. How many hours of TV do you watch per week? *Approx 8-10*

31. What radio programs do you listen to most? *AM 1200 Gospel*

32. Which do you find more interesting? (✓) Local news ( ) National news

33. To what periodicals or magazines do you subscribe? *Inc., Business Week, Money*

_____

34. Of the books you have read, which three are your favorites? *N/A*

_____

35. Please list your hobbies, spare-time activities, and outside interests: *Computer*

_____

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes (✓) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(✓) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (✓) No.  If yes, what are their names and relationship to you? _____

_____

39.   Based on your experience, what is your opinion of lawyers? (✗) Good () Fair () Poor ↗ *Like anything else some do a good job & some meet require-ments*

40.   Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? () Yes (✗) No.  If yes, explain: _____

_____

_____

41.   Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? () Yes (✗) No.  If yes, explain: _____

_____

42.   Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? () Yes (✗) No. If yes, explain: _____

_____

43.   List any reason why you do not wish to serve or why you should not serve: ___*None*___

_____

44.   Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? () Yes (✗) No

45.   In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (✗) Yes () No.  If no, why not? _____

_____

46.   Have you or a close relative ever been the victim of a crime? (✗) Yes () No. If yes, please describe:
_*2d Cousin - Sexual Assault*_
_*2d Cousin - Robbery*_

47.   Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? (✗) Yes () No. If yes, please describe: _*Self &*_
_*Uncle works for ABI (19 yrs)*_

48.   Have you taken any courses or had any training in medicine or other health–care field? () Yes (✗) No.  If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.   Do you belong to a church or otherwise have any religious affiliation? (✗) Yes ( ) No. If yes, please
      specify: _New Glorious Church of God In Christ_

50.   How often do you attend religious services? (✗) Regularly ( ) Occasionally ( ) Never

51.   Do you hold a special position in your religious organization? (✗) Yes ( ) No _Secretary_

52.   What is your political party preference? _Democrat_

53.   Are you or is any member of your family a member of any victims rights organization? ( ) Yes (✗) No.
      Of any anti–crime group or other similar organization? ( ) Yes (✗) No. Of any anti–weapons or gun–
      control group? ( ) Yes (✗) No.

54.   Have you ever actively participated in a political campaign? ( ) Yes (✗) No. If yes, ( ) Democrat?
      ( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: _Cooley_

2.  Place of birth: _Birmingham, AL_    Age _45_    Sex: ( ) Male (✓) Female

3.  Race: (✓) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4.  Do you: ( ) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  (✓) Other _House provided by Church_

5.  What cities/states have you lived in during the past five years? _Enterprise, AL only_

6.  Marital status: ( ) Single  (✓) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

    Spouse's employer: _Mt. Pleasant Bapt Church_

    Number of years your spouse has worked there: _8_

    Spouse's title and job responsibilities: _Associate Minister; Music + Youth_

    Educational background of your spouse, including any degrees or certificates earned:

    _Bachelor of Music Education, Master of Church Music, Elementary Education Certificate_

7.  Do you have children? ( ) Yes ( ) No. If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|----------------------|----------------|--------------------------|
    | 20 | fe | Judson College student | NO | College Junior |
    | 18 | fe | Student Univ of AL Bham | NO | College freshman |
    | 16 | fe | Student Enterprise High | yes | 11th grader |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) _____    College (1–4 or 5+) _____

    (b)  If college, what college, what degrees, and what was your major? _BSN - Nursing 1979 and 1995 Bachelor of Arts in Elementary / Primary Education._

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice? ( ) Yes (✓) No. If yes, what courses? _____

9.   Your present employment status (check all that apply):
     () Full-time  (✓) Part-time  () Retired  () Unemployed  () Student  () Homemaker

10.  Your current or most recent occupation: _Medical  Center Enterprise – RN Labor + Delivery_

11.  Name of your current or most recent employer, or, if you are a student, your school and major:
     _Medical Center Enterprise – RN  Maternal Child Services_
     _Labor & Delivery_

12.  How long have you been employed by your current or most recent employer?  _8 yrs._

13.  What are/were your specific duties and responsibilities on the job? _Phone triage of Pregnant Pt_
     _Emergency Care obstetric pt 20 weeks – 40 wks gestation, Care of_
     _Laboring Women to Deliver her baby_

14.  Do/Did you supervise other employees? (✓)Yes () No.  If yes, how many? _2 people_

15.  Do/Did you have responsibility for hiring and firing? () Yes (✓)No

16.  Please list all other occupations and employers you have had for the past 10 years:
     _L+D – Medical Center Enterprise – RN_
     _West Florida Community Care RN – Psychiatric Inpatient }_
     _Substitute teacher local Schools.       Services._

17.  Have you ever served in the military? () Yes (✓)No. If yes, please complete the following:

     Branch: _____  Rank: _____  Dates: From _____ To _____

     Duties: _____  Type of discharge: _____

18.  What social, civic, professional, trade, union, or other organizations are you affiliated with?
     _Mt. Pleasant Baptist Church Active member_

19.  Describe any offices you have held in the organizations listed in question 18:  _none_

20.  Have you ever served on a jury before? () Yes (✓)No.  How many times? _____
     What type of jury: () Grand jury () Civil trial jury () Criminal trial jury

21.  If you have served on a trial jury, please state the following: Year served: _____

     City and state where served: _____

     What verdict was rendered?  Civil case:     () For plaintiff () For defendant
                                 Criminal case:  () For state or federal government () For defendant

22.  Have you ever served as a foreperson on a grand jury or a trial jury? () Yes (✓)No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes   (✓) No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes  (✓) No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes  (✓) No.   If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  (✓) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (✓) No

28. What newspaper(s) do you read regularly?  South east Sun

29. What TV news programs do you watch frequently?  20/20 - Good Morning America

30. How many hours of TV do you watch per week?  8 or fewer hrs

31. What radio programs do you listen to most?  91.7

32. Which do you find more interesting? (✓) Local news ( ) National news

33. To what periodicals or magazines do you subscribe?  none

34. Of the books you have read, which three are your favorites?  Stick a Geranium in your Hat + Be Happy (Barbara Johnson), The Blessing (Smalley + Trent), God Uses Cracked Pots (Patsy Clairmon

35. Please list your hobbies, spare-time activities, and outside interests:  Camping, yard work Spending time with my family, Church work

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?      ( ) Yes (✓) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(✓) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (✓) No.  If yes, what are their names and relationship to you? _____

_____

39.  Based on your experience, what is your opinion of lawyers? ( ) Good (✓) Fair ( ) Poor   *no opinion*

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (✓) No.  If yes, explain: _____

_____

_____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (✓) No.  If yes, explain: _____

_____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (✓) No.  If yes, explain: _____

_____

43.  List any reason why you do not wish to serve or why you should not serve: _____

_____

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (✓) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (✓) Yes ( ) No.  If no, why not? _____

_____

46.  Have you or a close relative ever been the victim of a crime? (✓) Yes ( ) No.  If yes, please describe: Purse Stolen at restaurant _____

_____

47.  Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (✓) No.  If yes, please describe: _____

_____

48.  Have you taken any courses or had any training in medicine or other health-care field? (✓) Yes ( ) No.  If yes, please explain: Degree in Nursing _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? (✓) Yes ( ) No. If yes, please specify: _Mt. Pleasant Bapt Church_

50. How often do you attend religious services? (✓) Regularly ( ) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? (✓) Yes ( ) No

52. What is your political party preference? _Independent – Crossover Voter_

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (✓) No. Of any anti–crime group or other similar organization? ( ) Yes (✓) No. Of any anti–weapons or gun–control group? ( ) Yes (✓) No.

54. Have you ever actively participated in a political campaign? ( ) Yes (✓) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

<u>APPENDIX</u>

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: *Betty J. Council*

2.  Place of birth: *Enterprise*          Age *45*    Sex: ( ) Male (✓) Female

3.  Race: ( ) Caucasian/White  (✓) African–American/Black  ( ) Hispanic  ( ) Other _____

4.  Do you: (✓) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5.  What cities/states have you lived in during the past five years? *Enterprise, Al,*
    _____

6.  Marital status: ( ) Single  (✓) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

    Spouse's employer: *Twichell*

    Number of years your spouse has worked there: *3*

    Spouse's title and job responsibilities: *Operator*

    Educational background of your spouse, including any degrees or certificates earned:
    *12 years*

7.  Do you have children? (✓) Yes  ( ) No.  If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|----------------------|----------------|--------------------------|
    | 29  | M   | no                   | no             |                          |
    | 25  | F   | no                   | no             |                          |
    | 22  | M   | no                   | yes            |                          |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) *GED*    College (1–4 or 5+) *1 year*

    (b)  If college, what college, what degrees, and what was your major? *ESJC*
    *Early Childhood Education   Certificate*

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
    ( ) Yes  (✓) No.  If yes, what courses? _____

9. Your present employment status (check all that apply):
(✓) Full–time ( ) Part–time ( ) Retired ( ) Unemployed ( ) Student ( ) Homemaker

10. Your current or most recent occupation: _Cuff Set!_

11. Name of your current or most recent employer, or, if you are a student, your school and major:
_Van Heusen_

12. How long have you been employed by your current or most recent employer? _2 years_

13. What are/were your specific duties and responsibilities on the job? _Sew the cuffs on dress shirts_

14. Do/Did you supervise other employees? ( ) Yes (✓) No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? ( ) Yes (✓) No

16. Please list all other occupations and employers you have had for the past 10 years:
_Twichell & Van Heusen_

17. Have you ever served in the military? ( ) Yes (✓) No. If yes, please complete the following:

Branch: _____  Rank: _____  Dates: From _____ To _____

Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
_N A_

19. Describe any offices you have held in the organizations listed in question 18: _____
_N H_

20. Have you ever served on a jury before? (✓) Yes ( ) No. How many times? _1_
What type of jury: (✓) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _NO_

City and state where served: _____

What verdict was rendered? Civil case:  ( ) For plaintiff ( ) For defendant
Criminal case:  ( ) For state or federal government ( ) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes (✓) No

23.    Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes    (✓) No.
       If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or
       criminal case.

24.    Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  (✓) No.  If yes,
       explain: _____

       _____

25.    Have you ever been to court for any other reason (excluding divorce or traffic cases)?
       ( ) Yes  (✓) No.   If yes, explain: _____

26.    Have you ever been arrested? ( ) Yes  (✓) No

27.    Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (✓) No

28.    What newspaper(s) do you read regularly?   _Dothan   Eagle_

29.    What TV news programs do you watch frequently? _Wheel  of  Fortune_

30.    How many hours of TV do you watch per week?   _10_

31.    What radio programs do you listen to most?   _____

32.    Which do you find more interesting? (✓) Local news ( ) National news

33.    To what periodicals or magazines do you subscribe?   _Jet_

       _____

34.    Of the books you have read, which three are your favorites?   _____

       _____

35.    Please list your hobbies, spare–time activities, and outside interests:   _____

       _____

36.    Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes (✓) No.
       If yes, what do they say? _____

37.    In a group situation, once you have formed an opinion, do you usually:

       ( ) Change your mind if a number of people have a different opinion?

       (✓) Stand by your original opinion despite what others believe?

38.    Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
       ( ) Yes (✓) No.  If yes, what are their names and relationship to you? _____

       _____

39.    Based on your experience, what is your opinion of lawyers? ( ) Good ( ) Fair ( ) Poor

40.    Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (✗) No. If yes, explain: _____

_____

_____

41.    Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (✗) No. If yes, explain: _____

42.    Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (✗) No. If yes, explain: _____

_____

43.    List any reason why you do not wish to serve or why you should not serve: _____

_____

44.    Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (✗) No

45.    In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (✗) Yes ( ) No. If no, why not? _____

_____

46.    Have you or a close relative ever been the victim of a crime? ( ) Yes ( ) No. If yes, please describe: _____

_____

47.    Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (✗) No. If yes, please describe: _____

48.    Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (✗) No. If yes, please explain: _____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.    Do you belong to a church or otherwise have any religious affiliation? (✗) Yes ( ) No. If yes, please
       specify: _____

50.    How often do you attend religious services? (✗) Regularly ( ) Occasionally ( ) Never

51.    Do you hold a special position in your religious organization? ( ) Yes (✗) No

52.    What is your political party preference? _Democrat_____

53.    Are you or is any member of your family a member of any victims rights organization? ( ) Yes (✗) No.
       Of any anti–crime group or other similar organization? ( ) Yes ( ) No. Of any anti–weapons or gun–
       control group? ( ) Yes (✗) No.

54.    Have you ever actively participated in a political campaign? ( ) Yes (✗) No. If yes, ( ) Democrat?
       ( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: _Willie J. Curry_

2.  Place of birth: _Andalusia (Covington County)_ Age _54_    Sex: (✗) Male ( ) Female

3.  Race: ( ) Caucasian/White (✗) African–American/Black ( ) Hispanic ( ) Other _____

4.  Do you: ( ) Own home (✗) Rent home ( ) Rent apartment ( ) Live with friend or relatives ( ) Other

5.  What cities/states have you lived in during the past five years? _Enterprise, Al._

6.  Marital status: ( ) Single (✗) Married ( ) Divorced ( ) Separated ( ) Widowed. If you are married:

    Spouse's employer: _Coffee County Health Department._

    Number of years your spouse has worked there: _5_

    Spouse's title and job responsibilities: _Home Maker_

    Educational background of your spouse, including any degrees or certificates earned:
    _High School Graduate_

7.  Do you have children? (✗) Yes ( ) No. If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|---------------------|----------------|--------------------------|
    | 34 | F | Computer Program | No | BS Degree |
    | 30 | F | Computer Program | No | BS Degree |
    | 26 | F | Computer Program | No | BS Degree |
    | 22 | F | Cashier | No | Highschool Graduate |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) _____    College (1–4 or 5+) _2 years College_

    (b)  If college, what college, what degrees, and what was your major? _Enterprise State_
    _( No Degree )_

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
    ( ) Yes (✗) No. If yes, what courses? _____

9.  Your present employment status (check all that apply):
    ( ) Full–time  ( ) Part–time  (✗) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10. Your current or most recent occupation: _Perdue Farms    Dothan_

11. Name of your current or most recent employer, or, if you are a student, your school and major:

    _Perdue Farms   Dothan , Al. Retired Oct. 1997_

12. How long have you been employed by your current or most recent employer?

13. What are/were your specific duties and responsibilities on the job? _Bird Room   Waiter_

    _____

14. Do/Did you supervise other employees?  ( ) Yes  (✗) No.  If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? ( ) Yes  (✗) No

16. Please list all other occupations and employers you have had for the past 10 years:

    _N/A_

    _____

17. Have you ever served in the military? ( ) Yes  (✗) No. If yes, please complete the following:

    Branch: _____  Rank: _____  Dates: From _____ To _____

    Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

    _None_

    _____

19. Describe any offices you have held in the organizations listed in question 18: _None_

    _____

20. Have you ever served on a jury before? ( ) Yes  (✗) No.  How many times? _____
    What type of jury: ( ) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____

    City and state where served: _____

    What verdict was rendered? Civil case:      ( ) For plaintiff  ( ) For defendant
                               Criminal case:   ( ) For state or federal government ( ) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes  (✗) No

23.  Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes   (  ) No.
     If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or
     criminal case.

24.  Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes   ( ) No.  If yes,
     explain: _____

     _____

25.  Have you ever been to court for any other reason (excluding divorce or  traffic cases)?
     ( ) Yes  ( ) No.   If yes, explain: _____

26.  Have you ever been arrested? ( ) Yes  ( ) No

27.  Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes ( ) No

28.  What newspaper(s) do you read regularly?  __None_____

29.  What TV news programs do you watch frequently?  _News_____

30.  How many hours of TV do you watch per week?  __20_____

31.  What radio programs do you listen to most?  _None_____

32.  Which do you find more interesting? (  ) Local news ( ) National news

33.  To what periodicals or magazines do you subscribe?  __None_____

     _____

34.  Of the books you have read, which three are your favorites?  _N/A_____

     _____

35.  Please list your hobbies, spare–time activities, and outside interests:  _Fishing_____

     _____

36.  Are there bumper stickers on the vehicles that you drive or that your spouse drives?     ( ) Yes ( ) No.
     If yes, what do they say? _____

37.  In a group situation, once you have formed an opinion, do you usually:

     ( ) Change your mind if a number of people have a different opinion?

     ( ) Stand by your original opinion despite what others believe?

38.  Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
     ( ) Yes ( ) No.  If yes, what are their names and relationship to you? _____

     _____

39.    Based on your experience, what is your opinion of lawyers? ( ) Good ( ) Fair ( ) Poor

40.    Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes ( ) No.  If yes, explain: _____

_____

_____

41.    Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes ( ) No.  If yes, explain: _____

_____

42.    Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes ( ) No.  If yes, explain: _____

_____

43.    List any reason why you do not wish to serve or why you should not serve: _N/A_____

_____

44.    Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes ( ) No

45.    In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? ( ) Yes ( ) No.  If no, why not? _____

_____

46.    Have you or a close relative ever been the victim of a crime? ( ) Yes ( ) No.  If yes, please describe:

_____

_____

47.    Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes ( ) No.  If yes, please describe: _____

_____

48.    Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes ( ) No.  If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.    Do you belong to a church or otherwise have any religious affiliation?  (-) Yes ( ) No.  If yes, please
        specify: _Baptist_

50.    How often do you attend religious services?  (-) Regularly  ( ) Occasionally  ( ) Never

51.    Do you hold a special position in your religious organization?  ( ) Yes  (-) No

52.    What is your political party preference? _Democrat_

53.    Are you or is any member of your family a member of any victims rights organization? ( ) Yes (-) No.
        Of any anti–crime group or other similar organization?  ( ) Yes (-) No.  Of any anti–weapons or gun-
        control group? ( ) Yes  (-) No.

54.    Have you ever actively participated in a political campaign?  ( ) Yes  (-) No.  If yes, ( ) Democrat?
        ( ) Republican?  ( ) Other _____

APPENDIX

## RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: Kenneth T. Dawkins

2.  Place of birth: Troy, Al  Pike Co.  Age 44  Sex: (X) Male () Female

3.  Race: (X) Caucasian/White () African–American/Black () Hispanic () Other _____

4.  Do you: (X) Own home () Rent home () Rent apartment () Live with friend or relatives () Other

5.  What cities/states have you lived in during the past five years? Enterprise, Al

6.  Marital status: () Single (X) Married () Divorced () Separated () Widowed. If you are married:
    Spouse's employer: H&R Block  Elimination of Position (Corporate down sizing) 8/29  Franchise Operations
    Number of years your spouse has worked there: 10

    Spouse's title and job responsibilities: Assistant to FDM

    Educational background of your spouse, including any degrees or certificates earned:
    Business - 79 quarter hours

7.  Do you have children? (X) Yes () No. If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|----------------------|----------------|--------------------------|
    | 19  | F   | waitress             | yes            | 12th + some college      |
    | 15  | M   |                      | yes            | 9th                      |
    |     |     |                      |                |                          |
    |     |     |                      |                |                          |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) 12  College (1–4 or 5+) _____

    (b)  If college, what college, what degrees, and what was your major? _____

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
        () Yes (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
(X) Full-time ( ) Part-time ( ) Retired ( ) Unemployed ( ) Student ( ) Homemaker

10. Your current or most recent occupation: T & S Supervisor

11. Name of your current or most recent employer, or, if you are a student, your school and major:
Norfolk Southern Corp. - Atlanta GA

12. How long have you been employed by your current or most recent employer? 25 years

13. What are/were your specific duties and responsibilities on the job? _____
Supervise 38 men

14. Do/Did you supervise other employees? (X) Yes ( ) No. If yes, how many? 38

15. Do/Did you have responsibility for hiring and firing? (X) Yes ( ) No

16. Please list all other occupations and employers you have had for the past 10 years:
N/A

17. Have you ever served in the military? ( ) Yes (X) No. If yes, please complete the following:
Branch: _____ Rank: _____ Dates: From _____ To _____
Duties: _____ Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
Ariton Masonic Lodge
Brotherhood M of W Employees

19. Describe any offices you have held in the organizations listed in question 18: None

20. Have you ever served on a jury before? (X) Yes ( ) No.  How many times? 1
What type of jury: (X) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____
City and state where served: _____
What verdict was rendered?  Civil case:      ( ) For plaintiff  ( ) For defendant
                            Criminal case:   ( ) For state or federal government ( ) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? (X) Yes ( ) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X) No.
    If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or
    criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes  (X) No.  If yes,
    explain: _____

    _____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
    ( ) Yes (X) No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly? _____ USA Today _____

29. What TV news programs do you watch frequently? _____

30. How many hours of TV do you watch per week? ____ 10 _____

31. What radio programs do you listen to most? ____ None _____

32. Which do you find more interesting? ( ) Local news (X) National news

33. To what periodicals or magazines do you subscribe? ____ None _____

34. Of the books you have read, which three are your favorites? _____

    _____

35. Please list your hobbies, spare-time activities, and outside interests: ____ Fishing _____

    _____

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes (X) No.
    If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

    ( ) Change your mind if a number of people have a different opinion?

    (X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
    ( ) Yes (X) No.  If yes, what are their names and relationship to you? _____

    _____

39.  Based on your experience, what is your opinion of lawyers? (X) Good ( ) Fair ( ) Poor

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

43.  List any reason why you do not wish to serve or why you should not serve: _____

_____

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes  ( ) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

_____

46.  Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No.  If yes, please describe: _____

_____

47.  Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No.  If yes, please describe: _____

48.  Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No.  If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.   Do you belong to a church or otherwise have any religious affiliation? (X) Yes ( ) No. If yes, please
      specify: _Elam Baptist Church - Ariton, Al_

50.   How often do you attend religious services? ( ) Regularly (X) Occasionally ( ) Never

51.   Do you hold a special position in your religious organization? (X) Yes ( ) No

52.   What is your political party preference? _____

53.   Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No.
      Of any anti-crime group or other similar organization? ( ) Yes (X) No. Of any anti-weapons or gun-
      control group? ( ) Yes (X) No.

54.   Have you ever actively participated in a political campaign? ( ) Yes (X) No. If yes, ( ) Democrat?
      ( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: DARRELL DIXON     0923

2. Place of birth: LONG BEACH CALiF     Age 53     Sex: (X) Male ( ) Female

3. Race: (X) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4. Do you: ( ) Own home  (X) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5. What cities/states have you lived in during the past five years? EntERpRiSE, AL

6. Marital status: ( ) Single  ( ) Married  (X) Divorced  ( ) Separated  ( ) Widowed. If you are married:

   Spouse's employer: _____

   Number of years your spouse has worked there: _____  N/A

   Spouse's title and job responsibilities: _____

   Educational background of your spouse, including any degrees or certificates earned:

   _____

7. Do you have children? (X) Yes ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|----------------------|----------------|--------------------------|
   | 20 | E | TRoy STAtE | NO | 2Nd yEAL COllEGE |
   | | | | | |
   | | | | | |
   | | | | | |

8. Your level of education: Specify the highest grade you completed:

   (a) Elementary or high school (1–12) GED .   College (1–4 or 5+) _____

   (b) If college, what college, what degrees, and what was your major? _____

   (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   ( ) Yes (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
(X) Full–time  ( ) Part–time  ( ) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10. Your current or most recent occupation: _TRUCK DRIVER_

11. Name of your current or most recent employer, or, if you are a student, your school and major:
_WILEY SANDERS_

12. How long have you been employed by your current or most recent employer? _6 YR._

13. What are/were your specific duties and responsibilities on the job? _TRUCK DRIVER_

14. Do/Did you supervise other employees?  ( ) Yes  (X) No.  If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing?  ( ) Yes  (X) No

16. Please list all other occupations and employers you have had for the past 10 years: _WELDER - Bethlehem STEEL ) ( TRUCK DRIVER  WILEY SANDERS )_

17. Have you ever served in the military?  (X) Yes  ( ) No.  If yes, please complete the following:
Branch: _ARMY_    Rank: _E-4_    Dates: From _3-27-67_ to _3-27-70_
Duties: _RIGGER_    Type of discharge: _HONORABLE_

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
_N/A_

19. Describe any offices you have held in the organizations listed in question 18: _N/A_

20. Have you ever served on a jury before?  ( ) Yes  (X) No.  How many times? _____
What type of jury: ( ) Grand jury  ( ) Civil trial jury  ( ) Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____
City and state where served: _____
What verdict was rendered?  Civil case:        ( ) For plaintiff  ( ) For defendant
                            Criminal case:     ( ) For state or federal government  ( ) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury?  ( ) Yes  (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes ☒ No.
If yes, were you a witness for: ( ) Plaintiff ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes ☒ No.   If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes ☒ No.   If yes, explain: _____

26. Have you ever been arrested? ( ) Yes ☒ No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes ☒ No

28. What newspaper(s) do you read regularly?   _NONE_

29. What TV news programs do you watch frequently? _20-20   NATE LINE_

30. How many hours of TV do you watch per week?   _10_

31. What radio programs do you listen to most?   _NONE_

32. Which do you find more interesting? ☒ Local news ☒ National news

33. To what periodicals or magazines do you subscribe?   _NONE_

_____

34. Of the books you have read, which three are your favorites? _____

_____

35. Please list your hobbies, spare-time activities, and outside interests: _____

_____

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?     ( ) Yes ☒ No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

☒ Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes ☒ No.   If yes, what are their names and relationship to you? _____

_____

39.  Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

_____

43.  List any reason why you do not wish to serve or why you should not serve: _____

_____

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

_____

46.  Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No.  If yes, please describe: _____

_____

47.  Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No.  If yes, please describe: _____

_____

48.  Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No.  If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation? ( ) Yes (X) No. If yes, please specify: _____

50.  How often do you attend religious services? ( ) Regularly (X) Occasionally ( ) Never

51.  Do you hold a special position in your religious organization? ( ) Yes (X) No

52.  What is your political party preference? _DEMOCRAT_

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No. Of any anti–crime group or other similar organization? ( ) Yes (X) No. Of any anti–weapons or gun–control group? ( ) Yes (X) No.

54.  Have you ever actively participated in a political campaign? ( ) Yes (X) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
# UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: _MARY H. DROWN_

2.  Place of birth: _CHELSEA, MASS._ Age _70_ Sex: ( ) Male (X) Female

3.  Race: ( ) Caucasian/White ( ) African-American/Black ( ) Hispanic ( ) Other _____

4.  Do you: (X) Own home ( ) Rent home ( ) Rent apartment ( ) Live with friend or relatives ( ) Other

5.  What cities/states have you lived in during the past five years? _ENTERPRISE AL._

6.  Marital status: ( ) Single (X) Married ( ) Divorced ( ) Separated ( ) Widowed. If you are married:

    Spouse's employer: _SELF_

    Number of years your spouse has worked there: _8 1/2 yrs_

    Spouse's title and job responsibilities: _OWNER_

    Educational background of your spouse, including any degrees or certificates earned:
    _GED, RETIRED E-9 ARMY of 28 yrs._

7.  Do you have children? (X) Yes ( ) No. If yes, please complete the following:

| Age | Sex | School or occupation | Live with you? | Their level of education |
|-----|-----|---------------------|----------------|--------------------------|
| 49 | F | Housewife | NO | 12 High School, Katherine Gibbs Sec School |
| 45 | F | Nurse & Housewife | NO | 4 yrs College |
| 42 | M | Carpenter | NO | 4 yrs College |
| 39 | F | Teacher Asst | NO | 12 High School |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) _High School 12_ College (1–4 or 5+) _____

    (b)  If college, what college, what degrees, and what was your major? _____

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
         ( ) Yes (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
() Full–time () Part–time () Retired () Unemployed () Student () Homemaker

10. Your current or most recent occupation: _____

11. Name of your current or most recent employer, or, if you are a student, your school and major:

_____

12. How long have you been employed by your current or most recent employer?

13. What are/were your specific duties and responsibilities on the job? _____

_____

14. Do/Did you supervise other employees? () Yes () No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? () Yes () No

16. Please list all other occupations and employers you have had for the past 10 years:

_____

17. Have you ever served in the military? () Yes () No. If yes, please complete the following:

Branch: _____ Rank: _____ Dates: From _____ To _____

Duties: _____ Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
*Pres, Vice Pres, NCO Wives Chairperson Red Cross Vol. Chairperson Army Community Services, Pres Thursday Morning League Bowling*

19. Describe any offices you have held in the organizations listed in question 18: _____

_____

20. Have you ever served on a jury before? () Yes () No. How many times? _____
What type of jury: () Grand jury () Civil trial jury () Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____

City and state where served: _____

What verdict was rendered? Civil case:        () For plaintiff () For defendant
                          Criminal case:      () For state or federal government () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes () No

23. Have you testified as a <u>witness</u> in any court proceeding? () Yes () No.
If yes, were you a witness for: () Plaintiff () State or federal government () Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? () Yes () No. If yes, explain: _____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
() Yes () No. If yes, explain: _____

26. Have you ever been arrested? () Yes () No

27. Have you, a close relative, or a close friend ever been convicted of a crime? () Yes () No

28. What newspaper(s) do you read regularly? _Dothan Eagle & Enterprise Ledger_

29. What TV news programs do you watch frequently? _Fox News, MSNBC, 5 oclock Local NBC_

30. How many hours of TV do you watch per week? _80 Hrs ?_

31. What radio programs do you listen to most? _____

32. Which do you find more interesting? () Local news () National news

33. To what periodicals or magazines do you subscribe? _Martha Steward, Biography The Week_

34. Of the books you have read, which three are your favorites? _Kane and Abel by Jeffery Archer, Evergreen by Belva Plain, The Good Earth_

35. Please list your hobbies, spare-time activities, and outside interests: _Knitting, Sewing Reading Wallpapering Bowling, Drive To Visit my Daughters_

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    () Yes () No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

() Change your mind if a number of people have a different opinion?

() Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
() Yes () No. If yes, what are their names and relationship to you? _____

_____

39. Based on your experience, what is your opinion of lawyers? ( ) Good ( ) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

_____

43. List any reason why you do not wish to serve or why you should not serve: _____

_____

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? (X) Yes. ( ) No.  If yes, please describe:

_BROKE INTO OUR HOUSE AND STOLE VCR & MY JEWELRY_

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police?  ( ) Yes (X) No.  If yes, please describe: _____

48. Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No.  If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? ( ) Yes ( ) No. If yes, please
specify: _____

50. How often do you attend religious services? ( ) Regularly ( ) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? ( ) Yes (x) No

52. What is your political party preference? _____

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (x) No.
Of any anti–crime group or other similar organization? ( ) Yes (x) No. Of any anti–weapons or gun-
control group? ( ) Yes (x) No.

54. Have you ever actively participated in a political campaign? ( ) Yes (x) No. If yes, ( ) Democrat?
( ) Republican? ( ) Other _____

APPENDIX

RECOMMENDED
UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: Barbara B. Dyess

2. Place of birth: Harris County, Texas Age 66    Sex: ( ) Male (X) Female

3. Race: (X) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4. Do you: (X) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5. What cities/states have you lived in during the past five years? Enterprise, AL

6. Marital status: ( ) Single  (X) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

   Spouse's employer: Retired. from Civil Service

   Number of years your spouse has worked there: _____

   Spouse's title and job responsibilities: _____

   Educational background of your spouse, including any degrees or certificates earned:

   12 yrs. plus 2 years Tech. College

7. Do you have children? (X) Yes ( ) No. If yes, please complete the following:

| Age | Sex | School or occupation | Live with you? | Their level of education |
|-----|-----|----------------------|----------------|--------------------------|
| 39 | M | Marketing | No | College Graduate |
| 36 | M | Teacher | No | Post Graduate – Masters |
| 28 | F | Pharmacist | No | Post Graduate – Pharm D |

8. Your level of education: Specify the highest grade you completed:

   (a)  Elementary or high school (1–12) _12_    College (1–4 or 5+) _____

   (b)  If college, what college, what degrees, and what was your major? _____

   (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   ( ) Yes (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
() Full–time () Part–time () Retired () Unemployed () Student (X) Homemaker

10. Your current or most recent occupation: __N/A__

11. Name of your current or most recent employer, or, if you are a student, your school and major:

__N/A__

12. How long have you been employed by your current or most recent employer? __N/A__

13. What are/were your specific duties and responsibilities on the job? __N/A__

14. Do/Did you supervise other employees? () Yes () No. If yes, how many? __N/A__

15. Do/Did you have responsibility for hiring and firing? () Yes () No

16. Please list all other occupations and employers you have had for the past 10 years: __N/A__

17. Have you ever served in the military? () Yes (X) No. If yes, please complete the following:

Branch: _____    Rank: _____    Dates: From _____ To _____

Duties: _____    Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

__N/A__

19. Describe any offices you have held in the organizations listed in question 18: __N/A__

20. Have you ever served on a jury before? (X) Yes () No. How many times? __2__
What type of jury: (X) Grand jury (X) Civil trial jury () Criminal trial jury

21. If you have served on a <u>trial jury</u>, please state the following: Year served: __2 I don't remember.__

City and state where served: __Enterprise, Al__

What verdict was rendered? Civil case:    () For plaintiff () For defendant __No verdict was rendered__
Criminal case:    () For state or federal government () For defendant __as the defendant did not show up for the__

22. Have you ever served as a <u>foreperson</u> on a grand jury or a trial jury? () Yes (X) No __trial. The jury was dismissed.__

23. Have you testified as a <u>witness</u> in any court proceeding?  (X) Yes  ( ) No.
If yes, were you a witness for: (X) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  (X) No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes  (X) No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly? *The Dothan Eagle + The Enterprise Ledger*

29. What TV news programs do you watch frequently? *CBS + NBC + CNN*

30. How many hours of TV do you watch per week? *21-25 hr. a wk.*

31. What radio programs do you listen to most? *104.5 fr Ozark*

32. Which do you find more interesting? (X) Local news ( ) National news

33. To what periodicals or magazines do you subscribe? *None*

34. Of the books you have read, which three are your favorites? *I have no favorites.*

_____

35. Please list your hobbies, spare-time activities, and outside interests: *Walking, gardening, watching football, Baseball + Basketball*

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes (X) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
(X) Yes ( ) No.  If yes, what are their names and relationship to you? *Jeff Dyess - Nephew*

_____

39.    Based on your experience, what is your o~    lawyers? () Good (X) Fair () Poor

40.    Do you have any medical probl~    ~ems with your vision or hearing) that may prevent
you from serving as a jur~    ~in:

_____    blem just the same.  I have very little
xcused, I need to be excused very
_____    ~nce warning.  I would need to be
~s needed, in order for me to feel
~s is not possible, then I should not be selected to
41.    Do you have any ethical, relig~    ~and embarrassing matter for me, but I felt it needed to
() Yes (X) No.  If yes, explain: ~ection.

42.    Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial
juror? () Yes (X) No.  If yes, explain: _____

_____

43.    List any reason why you do not wish to serve or why you should not serve: Refer to #40

_____

44.    Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to
make it easier to convict? () Yes (X) No

45.    In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you
agree with that principle? (X) Yes () No.  If no, why not? _____

_____

46.    Have you or a close relative ever been the victim of a crime? (X) Yes () No.  If yes, please describe:
My wallet was stolen out of my purse.

_____

47.    Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state
trooper, prison guard, or military police?  () Yes (X) No.  If yes, please describe: _____

48.    Have you taken any courses or had any training in medicine or other health–care field? () Yes (X) No.  If
yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? (X) Yes ( ) No. If yes, please specify: I am a member of Green Hill Presbyterian.

50. How often do you attend religious services? (X) Regularly ( ) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? (X) Yes ( ) No Secretary of Presbyterian women at Green Hill

52. What is your political party preference? Republican

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No. Of any anti–crime group or other similar organization? ( ) Yes (X) No. Of any anti–weapons or gun–control group? ( ) Yes (X) No.

54. Have you ever actively participated in a political campaign? ( ) Yes (X) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: *INGRID G. ELLIOTT*

2. Place of birth: *HAMBURG, GERMANY* Age *59* Sex: ( ) Male (✗) Female

3. Race: (✗) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4. Do you: (✗) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5. What cities/states have you lived in during the past five years? *ENTERPRISE* .

   _____

6. Marital status: ( ) Single  (✗) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

   Spouse's employer: *LSI, FT RUCKER*

   Number of years your spouse has worked there: *21*

   Spouse's title and job responsibilities: *IP*

   Educational background of your spouse, including any degrees or certificates earned:

   *COLLEGE — BA*

7. Do you have children? (✗) Yes  ( ) No. If yes, please complete the following:

| Age | Sex | School or occupation | Live with you? | Their level of education |
|-----|-----|----------------------|----------------|--------------------------|
| 34  | M   | DOCTOR               | NO             | PHD +                    |
|     |     |                      |                |                          |
|     |     |                      |                |                          |
|     |     |                      |                |                          |

8. Your level of education: Specify the highest grade you completed:

   (a)  Elementary or high school (1–12) __✓__      College (1–4 or 5+) _____

   (b)  If college, what college, what degrees, and what was your major? _____

   _____

   (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
        ( ) Yes  (✗) No. If yes, what courses? _____

9.  Your present employment status (check all that apply):
    ( ) Full-time  ( ) Part-time  ( ) Retired  ( ) Unemployed  ( ) Student  (✓) Homemaker

10. Your current or most recent occupation:  _CITIZENS BANK — BOOK KEEPER_

11. Name of your current or most recent employer, or, if you are a student, your school and major:
    _CITIZENS BANK_

12. How long have you been employed by your current or most recent employer?  _18 YRS_

13. What are/were your specific duties and responsibilities on the job?  _ADMIN_

14. Do/Did you supervise other employees?  ( ) Yes  (✓) No.  If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? ( ) Yes  (✓) No

16. Please list all other occupations and employers you have had for the past 10 years:  _none_

17. Have you ever served in the military? ( ) Yes  (✓) No. If yes, please complete the following:

    Branch: _____  Rank: _____  Dates: From _____ To _____

    Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
    _none_

19. Describe any offices you have held in the organizations listed in question 18:  _none_

20. Have you ever served on a jury before? ( ) Yes  (✓) No.  How many times? _____
    What type of jury: ( ) Grand jury  ( ) Civil trial jury  ( ) Criminal trial jury

21. If you have served on a <u>trial jury</u>, please state the following: Year served:  _no_

    City and state where served: _____

    What verdict was rendered? Civil case:       ( ) For plaintiff  ( ) For defendant
                               Criminal case:    ( ) For state or federal government  ( ) For defendant

22. Have you ever served as a <u>foreperson</u> on a grand jury or a trial jury? ( ) Yes  (✓) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes   (✓) No.
    If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes  (✓) No.  If yes, explain: _____

    _____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
    ( ) Yes  (✓) No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  (✓) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (✓) No

28. What newspaper(s) do you read regularly?  _non_

29. What TV news programs do you watch frequently?  _News program_

30. How many hours of TV do you watch per week?  _6_

31. What radio programs do you listen to most?  _non_

32. Which do you find more interesting? ( ) Local news  (✓) National news

33. To what periodicals or magazines do you subscribe?  _CRAFT MAGAZINES_

    _____

34. Of the books you have read, which three are your favorites?  _Eye of the Needle,_
    _Gone with the Wind, The Winner_

35. Please list your hobbies, spare-time activities, and outside interests:  _Crafts_

    _____

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes (✓) No.
    If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

    ( ) Change your mind if a number of people have a different opinion?

    (✓) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
    ( ) Yes (✓) No.  If yes, what are their names and relationship to you? _____

    _____

39.  Based on your experience, what is your opinion of lawyers? ( ) Good ( ) Fair ( ) Poor

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes ( ) No.  If yes, explain: _____

_____

_____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes ( ) No.  If yes, explain: _____

_____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes ( ) No.  If yes, explain: _____

_____

43.  List any reason why you do not wish to serve or why you should not serve: _____

_____

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes ( ) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? ( ) Yes ( ) No.  If no, why not? _____

_____

46.  Have you or a close relative ever been the victim of a crime? ( ) Yes ( ) No.  If yes, please describe:

_____

47.  Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes ( ) No.  If yes, please describe: _____

_HUSBAND — MILITARY POLICE_

48.  Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes ( ) No.  If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.    Do you belong to a church or otherwise have any religious affiliation?  ( ) Yes ( ) No. If yes, please
       specify: _____

50.    How often do you attend religious services? ( ) Regularly ( ) Occasionally ( ) Never

51.    Do you hold a special position in your religious organization? ( ) Yes ( ) No

52.    What is your political party preference? _____

53.    Are you or is any member of your family a member of any victims rights organization? ( ) Yes ( ) No.
       Of any anti–crime group or other similar organization? ( ) Yes ( ) No.  Of any anti–weapons or gun–
       control group? ( ) Yes ( ) No.

54.    Have you ever actively participated in a political campaign?  ( ) Yes ( ) No.  If yes, ( ) Democrat?
       ( ) Republican? ( ) Other _____

APPENDIX

## RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: *Lillie "Beth" Ellis*

2.  Place of birth: *Henry County Alabama* Age *25*  Sex: ( ) Male (✓) Female

3.  Race: (✓) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4.  Do you: (✓) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5.  What cities/states have you lived in during the past five years? _____
    *Enterprise, Alabama*

6.  Marital status: ( ) Single  (✓) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

    Spouse's employer: *Ret.*

    Number of years your spouse has worked there: _____

    Spouse's title and job responsibilities: _____

    Educational background of your spouse, including any degrees or certificates earned:
    *2 Year College*

7.  Do you have children? (✓) Yes  ( ) No.  If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|----------------------|----------------|--------------------------|
    | 55  | F   |                      | No             | 12 year                  |
    | 49  | F   |                      | no             | 12 years                 |
    | 48  | M   |                      | no             | College                  |
    | 44  | F   |                      | No             | 12 yrs                   |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) *✓*    College (1–4 or 5+) _____

    (b)  If college, what college, what degrees, and what was your major? _____

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
         ( ) Yes  (✓) No.  If yes, what courses? _____

9. Your present employment status (check all that apply):
() Full–time () Part–time (✓) Retired () Unemployed () Student () Homemaker

10. Your current or most recent occupation: _N A_

11. Name of your current or most recent employer, or, if you are a student, your school and major:

_N A_

12. How long have you been employed by your current or most recent employer?

13. What are/were your specific duties and responsibilities on the job? _N A_

14. Do/Did you supervise other employees? () Yes (✓) No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? () Yes (✓) No

16. Please list all other occupations and employers you have had for the past 10 years:

17. Have you ever served in the military? () Yes (✓) No. If yes, please complete the following:

Branch: _____ Rank: _____ Dates: From _____ To _____

Duties: _____ Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

_N A_

19. Describe any offices you have held in the organizations listed in question 18: _N A_

20. Have you ever served on a jury before? () Yes (✓) No. How many times? _____
What type of jury: () Grand jury () Civil trial jury () Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _N/A_

City and state where served: _____

What verdict was rendered? Civil case:        () For plaintiff () For defendant
                           Criminal case:   () For state or federal government () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes (✓) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X) No.
    If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  (X) No.  If yes, explain: _____

    _____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
    ( ) Yes  (X) No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  (X) No.

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes  (X) No

28. What newspaper(s) do you read regularly?  *Dothan Eagle - Enquirer Ledger*

29. What TV news programs do you watch frequently?  *News*

30. How many hours of TV do you watch per week?  *20 hrs.*

31. What radio programs do you listen to most?  *WOCK Gord*

32. Which do you find more interesting? ( ) Local news  (X) National news

33. To what periodicals or magazines do you subscribe?  *None*

34. Of the books you have read, which three are your favorites?  *Bible*

    _____

35. Please list your hobbies, spare-time activities, and outside interests:  *Walking*

    _____

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?  (X) Yes ( ) No.
    If yes, what do they say? *Support Arm Forces, Stay alive dont drink & drive*

37. In a group situation, once you have formed an opinion, do you usually:

    ( ) Change your mind if a number of people have a different opinion?

    (X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
    ( ) Yes  (X) No.  If yes, what are their names and relationship to you? _____

    _____

39. Based on your experience, what is your opinion of lawyers? (✓) Good ( ) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (✓) No. If yes, explain: _____

_____

_____

_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (✓) No. If yes, explain: _____

_____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (✓) No. if yes, explain: _____

_____

43. List any reason why you do not wish to serve or why you should not serve: _____

_____

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (✓) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (✓) Yes ( ) No. If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? ( ) Yes (✓) No. If yes, please describe:

_____

_____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (✓) No. If yes, please describe: _____

_____

48. Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (✓) No. If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? (✓) Yes ( ) No. If yes, please specify: _Members of Baptist Church_

50. How often do you attend religious services? (✓) Regularly ( ) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? (✓) Yes ( ) No

52. What is your political party preference? _____

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (✓) No. Of any anti–crime group or other similar organization? ( ) Yes (✓) No. Of any anti–weapons or gun–control group? ( ) Yes (✓) No.

54. Have you ever actively participated in a political campaign? ( ) Yes (✓) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: Don M. Franks

2. Place of birth: Oakley, ID        Age 58    Sex: (X) Male ( ) Female

3. Race: (X) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4. Do you: (X) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5. What cities/states have you lived in during the past five years? Enterprise / AL

6. Marital status: (X) Single  ( ) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

   Spouse's employer: Bryars-Warren Drug Co

   Number of years your spouse has worked there: 10

   Spouse's title and job responsibilities: Sales Clerk

   Educational background of your spouse, including any degrees or certificates earned:
   H.S. Diploma

7. Do you have children? (X) Yes ( ) No. If yes, please complete the following:

| Age | Sex | School or occupation | Live with you? | Their level of education |
|-----|-----|----------------------|----------------|--------------------------|
| 38 | F | H.S. Lunch Room | No | H.S. Diploma |
| 35 | M | Waiter | No | H.S. Diploma |
| 30 | M | Air Traffic Control | No | College Associate Degree |
| 26 | F | Housewife | No | H.S. Diploma |

8. Your level of education: Specify the highest grade you completed:

   (a)  Elementary or high school (1–12) _____    College (1–4 or 5+) 5+

   (b)  If college, what college, what degrees, and what was your major? B.Y.U. Social – Psychology

   (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
        (X) Yes ( ) No. If yes, what courses? Criminology 101

9. Your present employment status (check all that apply):
(X) Full-time () Part-time () Retired () Unemployed () Student () Homemaker

10. Your current or most recent occupation: _Academic Instructor_

11. Name of your current or most recent employer, or, if you are a student, your school and major:

_HHC, ATB, USAAVNC  FT Rucker  (Civil Service)_

12. How long have you been employed by your current or most recent employer? _32 yrs._

13. What are/were your specific duties and responsibilities on the job? _Teach Instructor_

_Pilots (Helicopter) how to be instructors_

14. Do/Did you supervise other employees? () Yes (X) No.  If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? () Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years:
_Flight Instructor (Helicopter), Department of the Army_
_Civilian, 1-212 Avn Bn FT Rucker_

17. Have you ever served in the military? (X) Yes () No.  If yes, please complete the following:

Branch: _Aviation_    Rank: _MAJ_    Dates: From _1969_ To _1985_

Duties: _Fly helicopters_    Type of discharge: _Honorable_

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

_None other than Church organizations_

_____

19. Describe any offices you have held in the organizations listed in question 18: _Sunday School_
_Teacher, 1st Counselor to Bishop_

20. Have you ever served on a jury before? () Yes (X) No.   How many times? _____
What type of jury: () Grand jury () Civil trial jury () Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____

City and state where served: _____

What verdict was rendered? Civil case:       () For plaintiff () For defendant
                           Criminal case:   () For state or federal government () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes (X) No

23.  Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X) No.
     If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or
     criminal case.

24.  Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  (X) No.  If yes,
     explain: _____

     _____

25.  Have you ever been to court for any other reason (excluding divorce or traffic cases)?
     ( ) Yes (X) No.   If yes, explain: _____

26.  Have you ever been arrested? ( ) Yes (X) No

27.  Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28.  What newspaper(s) do you read regularly?  _Southeast Sun, Army Flyer_

29.  What TV news programs do you watch frequently?  _CNN_

30.  How many hours of TV do you watch per week?  _20_

31.  What radio programs do you listen to most?  _Public Radio System (PBS)_

32.  Which do you find more interesting? ( ) Local news (X) National news

33.  To what periodicals or magazines do you subscribe?  _Alaska, outdoor_

34.  Of the books you have read, which three are your favorites?  _Lonesome Dove, Hunt for
     Red October, Prince of Tides_

35.  Please list your hobbies, spare-time activities, and outside interests:  _Reading, Bicycling,
     doing things with my family_

36.  Are there bumper stickers on the vehicles that you drive or that your spouse drives?  ( ) Yes (X) No.
     If yes, what do they say? _____

37.  In a group situation, once you have formed an opinion, do you usually:

     ( ) Change your mind if a number of people have a different opinion?

     (X) Stand by your original opinion despite what others believe?

38.  Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
     ( ) Yes (X) No.  If yes, what are their names and relationship to you? _____

39.  Based on your experience, what is your opinion of lawyers? (X) Good ( ) Fair ( ) Poor

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? (X) Yes ( ) No. If yes, explain: _I would have a hard time_

_remaining unbias Concerning Crimes against Children._

43.  List any reason why you do not wish to serve or why you should not serve: ___None___

_____

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

_____

46.  Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No. If yes, please describe:

_____

_____

47.  Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police?  ( ) Yes (X) No. If yes, please describe: _____

_____

48.  Have you taken any courses or had any training in medicine or other health–care field? (X) Yes ( ) No. If yes, please explain: _Psychology Courses dealing with Mental health_

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? (X) Yes ( ) No. If yes, please
specify: _Church of Jesus Christ of Latter-day Saints_

50. How often do you attend religious services? (X) Regularly ( ) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? ( ) Yes (X) No

52. What is your political party preference? _Republican_

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No.
Of any anti–crime group or other similar organization? ( ) Yes (X) No. Of any anti–weapons or gun–
control group? ( ) Yes (X) No.

54. Have you ever actively participated in a political campaign? ( ) Yes (X) No. If yes, ( ) Democrat?
( ) Republican? ( ) Other _____



APPENDIX

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: _LARRY W. GENTNER_

2. Place of birth: _HARBOR BEACH, MICHIGAN_  Age _50_  Sex: (✓) Male ( ) Female

3. Race: (✓) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4. Do you: (✓) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5. What cities/states have you lived in during the past five years? _ENTERPRISE_

6. Marital status: ( ) Single  (✓) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

   Spouse's employer: _SELF EMPLOYED_

   Number of years your spouse has worked there: _2_

   Spouse's title and job responsibilities: _RESTAURANT OWNER – COOK_

   Educational background of your spouse, including any degrees or certificates earned:

   _HIGH SCHOOL GRADUATE_

7. Do you have children? (✓) Yes  ( ) No.  If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|----------------------|----------------|--------------------------|
   | 12 | M | ENTERPRISE H.S. | YES | SENIOR (12TH GRADE) |
   | 15 | F | ENTERPRISE H.S. | YES | SOPHMORE (10TH GRADE) |
   | | | | | |
   | | | | | |

8. Your level of education: Specify the highest grade you completed:

   (a) Elementary or high school (1–12) _12_   College (1–4 or 5+) _3_

   (b) If college, what college, what degrees, and what was your major? _BUSINESS MANAGEMENT (ASSOCIATE)_
   _AIRCRAFT MAINTENANCE_
   _ENTERPRISE STATE JUNIOR COLLEGE, AIRFRAME & POWERPLANT LICENSE FAA_

   (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   (✓) Yes  ( ) No.  If yes, what courses? _BUSINESS LAW_

9.  Your present employment status (check all that apply):
(✓) Full–time  ( ) Part–time  ( ) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10.  Your current or most recent occupation: *AIRCRAFT MAINTENANCE FOREMAN*

11.  Name of your current or most recent employer, or, if you are a student, your school and major:

*DynCorp – Lowe Army Airfield, Ft. Rucker*

12.  How long have you been employed by your current or most recent employer?  *1½ YRS*

13.  What are/were your specific duties and responsibilities on the job?  *AIRCRAFT MAINTENANCE*
*FOREMAN*

14.  Do/Did you supervise other employees?  (✓) Yes  ( ) No.  If yes, how many?  *120*

15.  Do/Did you have responsibility for hiring and firing?  ( ) Yes  (✓) No

16.  Please list all other occupations and employers you have had for the past 10 years:
*RHETT BUTLER TRUCKING, WILEY SANDERS TRUCKING, DynCORP,*
*McDONNELL DOUGLAS, BOEING*

17.  Have you ever served in the military?  (✓) Yes  ( ) No.  If yes, please complete the following:

Branch: *US ARMY*   Rank: *E-7 SFC*   Dates: From */12/16/69* To *8/31/95*

Duties: *SUPERVISOR, 1ST SGT, LOGISTICIAN  MAINTENANCE*   Type of discharge: *HONORABLE*

18.  What social, civic, professional, trade, union, or other organizations are you affiliated with?

*VFW (VETERANS OF FOREIGN WARS), FLEET MARINE RESERVE (MILITARY PRIOR),*
*NRA (NATIONAL RIFLE ASSOCIATION)*

19.  Describe any offices you have held in the organizations listed in question 18:  *NONE*

20.  Have you ever served on a jury before?  ( ) Yes  (✓) No.  How many times?  *N/A*
What type of jury:  ( ) Grand jury  ( ) Civil trial jury  ( ) Criminal trial jury

21.  If you have served on a trial jury, please state the following: Year served:  *N/A*

City and state where served:  *N/A*

What verdict was rendered?  Civil case:     ( ) For plaintiff  ( ) For defendant
                            Criminal case:  ( ) For state or federal government  ( ) For defendant

22.  Have you ever served as a foreperson on a grand jury or a trial jury?  ( ) Yes  (✓) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  ☑ No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  ☑ No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes  ☑ No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  ☑ No.

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes  ☑ No

28. What newspaper(s) do you read regularly?  _DOTHAN EAGLE , ENTERPRISE LEDGER, SoutHeAST_

29. What TV news programs do you watch frequently?  _WDHN , WTVY, CNN_

30. How many hours of TV do you watch per week?  _15_

31. What radio programs do you listen to most?  _96.9  101.1_

32. Which do you find more interesting? ☑ Local news  ( ) National news

33. To what periodicals or magazines do you subscribe?  _NONE_

_____

34. Of the books you have read, which three are your favorites?  _DON'T READ MUCH_

_____

35. Please list your hobbies, spare–time activities, and outside interests:  _BOWLING, WORKING IN YARD,_
_INVOLVEMENT IN HIGH SCHOOL BAND ACTIVITIES , FOOTBALL GAMES_

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes  ☑ No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

☑ Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes  ☑ No.  If yes, what are their names and relationship to you? _____

_____

39. Based on your experience, what is your opinion of lawyers? ( ) Good (✓) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (✓) No. If yes, explain: _____

_____

_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (✓) No. If yes, explain: _____

_____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (✓) No. If yes, explain: _____

_____

43. List any reason why you do not wish to serve or why you should not serve: _NONE_

_____

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (✓) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (✓) Yes ( ) No. If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? ( ) Yes (✓) No. If yes, please describe:

_____

_____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? (✓) Yes ( ) No. If yes, please describe: _MY UNCLE WAS_
_IN THE MICHIGAN STATE POLICE MANY YEARS AGO_

48. Have you taken any courses or had any training in medicine or other health-care field? ( ) Yes (✓) No. If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation? (✓) Yes ( ) No. If yes, please specify: _ST. LUKE METHODIST_

50.  How often do you attend religious services? (✓) Regularly ( ) Occasionally ( ) Never

51.  Do you hold a special position in your religious organization? ( ) Yes (✓) No

52.  What is your political party preference? _REPUBLICAN_

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes (✓) No. Of any anti-crime group or other similar organization? ( ) Yes (✓) No. Of any anti-weapons or gun-control group? ( ) Yes (✓) No.

54.  Have you ever actively participated in a political campaign? ( ) Yes (✓) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

## RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

349-2866

1. Juror name/number: Charlone, S. Goolsby

2. Place of birth: Henry Co          Age 53   Sex: ( ) Male (X) Female

3. Race: (X) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4. Do you: (X) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5. What cities/states have you lived in during the past five years? Enterprise, AL

6. Marital status: ( ) Single  (X) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

   Spouse's employer: Goolsby Bros. Plbg & Elect, Inc.

   Number of years your spouse has worked there: 24 yrs.

   Spouse's title and job responsibilities: Plbg & Elect. contractor

   Educational background of your spouse, including any degrees or certificates earned:
   BS - Education

7. Do you have children? (X) Yes ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|---------------------|----------------|--------------------------|
   | 33  | m   | Elect. Goolsby Bros. | | College |
   | 31  | m   | Limestone - teacher Co. Bd of Ed. | | College |

8. Your level of education: Specify the highest grade you completed:

   (a)  Elementary or high school (1–12) _____    College (1–4) or 5+) _____

   (b)  If college, what college, what degrees, and what was your major? _____
        Troy State University - Elem Ed.

   (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
        ( ) Yes (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
   _() Full–time  (✓) Part–time  () Retired  () Unemployed  () Student  () Homemaker

10. Your current or most recent occupation: _Self employed_

11. Name of your current or most recent employer, or, if you are a student, your school and major:
    _Gooby Bros Pde_

12. How long have you been employed by your current or most recent employer? _24 years_

13. What are/were your specific duties and responsibilities on the job? _Office Manager_
    _Sales_

14. Do/Did you supervise other employees? (✓) Yes () No.  If yes, how many? ___19___

15. Do/Did you have responsibility for hiring and firing? (✓) Yes () No

16. Please list all other occupations and employers you have had for the past 10 years:
    _____
    _____

17. Have you ever served in the military? () Yes (✓) No. If yes, please complete the following:

    Branch: _____  Rank: _____  Dates: From _____ To _____

    Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
    _Business council of AL_
    _American Cancer Society_
    _Salvation Army - Enterprise Chamber of Commerce_

19. Describe any offices you have held in the organizations listed in question 18:
    _President - ACS 1st Pres. Enterprise Chamber of Commerce_

20. Have you ever served on a jury before? (✓) Yes () No.  How many times? _2_
    What type of jury: () Grand jury (✓) Civil trial jury () Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _1985 - 1992 (I think)_

    City and state where served: _Dothan, AL — Federal_
    _Enterprise, AL_
    What verdict was rendered? Civil case: (✓) For plaintiff () For defendant
    Criminal case: () For state or federal government () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes (✓) No

    _#1. One case for plaintiff (1985)_
    _one case for defendant (1992)_

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X) No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes  (X) No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
(X) Yes ( ) No.  If yes, explain: _Rumil_._

26. Have you ever been arrested? ( ) Yes  (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No   Southeast Sun

28. What newspaper(s) do you read regularly?  Nonες, Advertiser — Enterprise Ledger

29. What TV news programs do you watch frequently?  Dothan  Eagle  — Ozark — Elba

30. How many hours of TV do you watch per week? _____

31. What radio programs do you listen to most?  N/A

32. Which do you find more interesting? ( ) Local news  (X) National news

33. To what periodicals or magazines do you subscribe? Southern Living,
Southern Woman, Gardening magazines

34. Of the books you have read, which three are your favorites?
(1) It's Not About The Bike - Lance Armstrong
(2) To Kill a Mockingbird

35. Please list your hobbies, spare-time activities, and outside interests: Volunteer (ACS)
gardening

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?  ( ) Yes  (X) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (X) No.  If yes, what are their names and relationship to you? _____
Several friends (customers)

39. Based on your experience, what is your opinion of lawyers? ( ) Good ( ) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

_____

43. List any reason why you do not wish to serve or why you should not serve: _____N/A_____

_____

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? (X) Yes ( ) No.  If yes, please describe:

Theft -personal + Business property

47. Have you or a close relative ever worked in a law enforcement-related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No.  If yes, please describe: _____

_____

48. Have you taken any courses or had any training in medicine or other health-care field? ( ) Yes (X) No.  If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation? (X) Yes ( ) No.  If yes, please specify: _St. Luke, United Methodist Church_

50.  How often do you attend religious services? (X) Regularly ( ) Occasionally ( ) Never

51.  Do you hold a special position in your religious organization? (X) Yes ( ) No

52.  What is your political party preference? _Republican_

53.  Are you or is any member of your family a member of any victims–rights organization? ( ) Yes (X) No. Of any anti–crime group or other similar organization? ( ) Yes (X) No. Of any anti–weapons of gun–control group? ( ) Yes (X) No.

54.  Have you ever actively participated in a political campaign? (X) Yes ( ) No.  If yes, ( ) Democrat? (X) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
# UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: *Ida Maxwell Guthrie*

2. Place of birth: *Birmingham, Al*          Age *58*     Sex: ( ) Male (X) Female

3. Race: (X) Caucasian/White   ( ) African–American/Black   ( ) Hispanic   ( ) Other _____

4. Do you: (X) Own home   ( ) Rent home   ( ) Rent apartment   ( ) Live with friend or relatives   ( ) Other

5. What cities/states have you lived in during the past five years? *Enterprise, Al* _____

6. Marital status: ( ) Single   ( ) Married   ( ) Divorced   ( ) Separated   (X) Widowed. If you are married:

   Spouse's employer: _____

   Number of years your spouse has worked there: _____

   Spouse's title and job responsibilities: _____

   Educational background of your spouse, including any degrees or certificates earned:

   _____

7. Do you have children? (X) Yes   ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|----------------------|----------------|--------------------------|
   | 38  | F   | Nurse                | No             | High school – 3 yr Nursing |
   | 31  | F   | USNavy               | No             | High school              |
   |     |     |                      |                |                          |
   |     |     |                      |                |                          |

8. Your level of education: Specify the highest grade you completed:

   (a)   Elementary or high school (1–12) _*12*_          College (1–4 or 5+) _____

   (b)   If college, what college, what degrees, and what was your major? _____

   _____

   (c)   Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   ( ) Yes   (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
   (X) Full–time  () Part–time  () Retired  () Unemployed  () Student  () Homemaker

10. Your current or most recent occupation: *Office Associate*

11. Name of your current or most recent employer, or, if you are a student, your school and major:
    *JCPenney*

12. How long have you been employed by your current or most recent employer? *23 yrs*

13. What are/were your specific duties and responsibilities on the job? *Cash room, Sales Audit*
    *Personnel, Data Entry*

14. Do/Did you supervise other employees? (X) Yes  () No.  If yes, how many? *3*

15. Do/Did you have responsibility for hiring and firing? () Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years:

    *JCPenney*

17. Have you ever served in the military? () Yes (X) No.  If yes, please complete the following:

    Branch: _____  Rank: _____  Dates: From _____ To _____

    Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
    *None*

19. Describe any offices you have held in the organizations listed in question 18: _____

20. Have you ever served on a jury before? () Yes (X) No.  How many times? _____
    What type of jury: () Grand jury  () Civil trial jury  () Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____

    City and state where served: _____

    What verdict was rendered? Civil case:     () For plaintiff  () For defendant
                               Criminal case:  () For state or federal government  () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes (X) No

787

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  ⊠ No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  ⊠ No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes  ⊠ No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  ⊠ No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ⊠ Yes ( ) No

28. What newspaper(s) do you read regularly?  *Enterprise Ledger / Dothan Eagle*

29. What TV news programs do you watch frequently?  *None*

30. How many hours of TV do you watch per week?  *30*

31. What radio programs do you listen to most?  *Music*

32. Which do you find more interesting? ⊠ Local news ( ) National news

33. To what periodicals or magazines do you subscribe?  *Southern Living, Good Housekeeping*

_____

34. Of the books you have read, which three are your favorites?  _____

_____

35. Please list your hobbies, spare-time activities, and outside interests:  *Quilting, bowling, Travel*

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes ⊠ No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:  *Depend on Type of Opinion*

( ) Change your mind if a number of people have a different opinion?

⊠ Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes ⊠ No.  If yes, what are their names and relationship to you? _____

_____

39. Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

_____

43. List any reason why you do not wish to serve or why you should not serve: _____

_____

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No. If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No. If yes, please describe:

_____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No. If yes, please describe: _____

_____

48. Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No. If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? ( ) Yes ☒ No. If yes, please specify: _____

50. How often do you attend religious services? ( ) Regularly ( ) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? ( ) Yes ☒ No

52. What is your political party preference? *None. I vote for Person That I feel will Do Best Job*

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes ☒ No. Of any anti–crime group or other similar organization? ( ) Yes ☒ No. Of any anti–weapons or gun–control group? ( ) Yes ☒ No.

54. Have you ever actively participated in a political campaign? ( ) Yes ☒ No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: *Dorothy Hamilton*

2. Place of birth: *Anniston, Al.*     Age *66*     Sex: ( ) Male (X) Female

3. Race: (X) Caucasian/White   ( ) African–American/Black   ( ) Hispanic   ( ) Other _____

4. Do you: ( ) Own home (X) Rent home   ( ) Rent apartment   ( ) Live with friend or relatives   ( ) Other

5. What cities/states have you lived in during the past five years? _____
   *Enterprise, Al.*

6. Marital status: ( ) Single   ( ) Married   ( ) Divorced   ( ) Separated   (X) Widowed. If you are married:

   Spouse's employer: _____

   Number of years your spouse has worked there: _____

   Spouse's title and job responsibilities: _____

   Educational background of your spouse, including any degrees or certificates earned:

   _____

7. Do you have children? (X) Yes ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|---------------------|----------------|--------------------------|
   | *47* | *M* | *Miller Brewery* | *No* | *Hi School* |
   | *41* | *F* | *Paralegal* | *No* | *Hi School & Jr. College* |
   |   |   |   |   |   |
   |   |   |   |   |   |

8. Your level of education: Specify the highest grade you completed:

   (a)   Elementary or high school (1–12) *11*     College (1–4 or 5+) _____

   (b)   If college, what college, what degrees, and what was your major? _____

   (c)   Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
         ( ) Yes (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
() Full–time  () Part–time  () Retired  () Unemployed  () Student  (X) Homemaker

10. Your current or most recent occupation: _____

11. Name of your current or most recent employer, or, if you are a student, your school and major:

*Homemaker* _____

12. How long have you been employed by your current or most recent employer? _____

13. What are/were your specific duties and responsibilities on the job? _____

_____

_____

14. Do/Did you supervise other employees?  () Yes () No.  If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? () Yes () No

16. Please list all other occupations and employers you have had for the past 10 years:

*none* _____

_____

17. Have you ever served in the military? () Yes (X) No.  If yes, please complete the following:

Branch: _____  Rank: _____  Dates: From _____ To _____

Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

*Church* _____

_____

19. Describe any offices you have held in the organizations listed in question 18: _____

_____

20. Have you ever served on a jury before? (X) Yes () No.  How many times? *2*
What type of jury: () Grand jury (X) Civil trial jury (X) Criminal trial jury

21. If you have served on a <u>trial jury</u>, please state the following: Year served: *I don't recall. More*
City and state where served: *Enterprise, Al. — than 10 yrs. ago*

What verdict was rendered? Civil case:        (X) For plaintiff  () For defendant
                          Criminal case:     (X) For state or federal government  () For defendant

22. Have you ever served as a <u>foreperson</u> on a grand jury or a trial jury? () Yes (X) No

23. Have you testified as a witness in any court proceeding? ( ) Yes (X) No.
If yes, were you a witness for: ( ) Plaintiff ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes (X)No. If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)? ( ) Yes (X) No. If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly? *Southeast Sun*

29. What TV news programs do you watch frequently? *National news*

30. How many hours of TV do you watch per week? *14 Hours per week*

31. What radio programs do you listen to most? *None*

32. Which do you find more interesting? ( ) Local news (X) National news

33. To what periodicals or magazines do you subscribe? *None*

34. Of the books you have read, which three are your favorites? *Bible*

35. Please list your hobbies, spare-time activities, and outside interests: *Church activities*

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives? ( ) Yes (X) No. If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel? (X) Yes ( ) No. If yes, what are their names and relationship to you? *Micky Counts (Friend) Marty Williams (Friend) Jim Weatherford (Friend)*

39. Based on your experience, what is your opinion of lawyers? (X) Good ( ) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes ( ) No.  If yes, explain: _____

_____

_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

_____

43. List any reason why you do not wish to serve or why you should not serve: _None_____

_____

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No. If yes, please describe: _____

_____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? (X) Yes ( ) No. If yes, please describe: _a Grandson who is a Police officer in Albany Ga._

48. Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No. If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? (X) Yes ( ) No. If yes, please specify: _Member of Westview Baptist Church_

50. How often do you attend religious services? (X) Regularly ( ) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? ( ) Yes (X) No

52. What is your political party preference? _Republican_

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No. Of any anti–crime group or other similar organization? ( ) Yes (X) No. Of any anti–weapons or gun–control group? ( ) Yes (X) No.

54. Have you ever actively participated in a political campaign? ( ) Yes (X) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

APPENDIX

## RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: _Hartley, Chris G._

2. Place of birth: _New York, N.Y._ Age _53_ Sex: (X) Male ( ) Female

3. Race: (X) Caucasian/White ( ) African–American/Black ( ) Hispanic ( ) Other _____

4. Do you: (X) Own home ( ) Rent home ( ) Rent apartment ( ) Live with friend or relatives ( ) Other

5. What cities/states have you lived in during the past five years? _Enterprise, AL_

6. Marital status: ( ) Single (X) Married ( ) Divorced ( ) Separated ( ) Widowed. If you are married:

   Spouse's employer: _Pam McQueen_

   Number of years your spouse has worked there: _8 yrs_

   Spouse's title and job responsibilities: _Care Giver_

   Educational background of your spouse, including any degrees or certificates earned:

   _High School Graduate_

7. Do you have children? (X) Yes ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|----------------------|----------------|--------------------------|
   | 33 | M | Civil Service | No | Nursing School |
   | 28 | F | Legal Collector | No | Some College |
   | | | | | |
   | | | | | |

8. Your level of education: Specify the highest grade you completed:

   (a) Elementary or high school (1–12) _12_     College (1–4 or 5+) _5+_

   (b) If college, what college, what degrees, and what was your major? _Troy State @ Dothan_

   _BS Ed, MS Ed   General Science_

   (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   (X) Yes ( ) No. If yes, what courses? _Corrections Officer Certification_

9.  Your present employment status (check all that apply):
    (X) Full-time  ( ) Part-time  ( ) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10. Your current or most recent occupation:  _Educator_

11. Name of your current or most recent employer, or, if you are a student, your school and major:

    _Dothan City School_

12. How long have you been employed by your current or most recent employer?  _6 yrs_

13. What are/were your specific duties and responsibilities on the job?  _Technology Teacher_

14. Do/Did you supervise other employees? ( ) Yes (X) No.  If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? ( ) Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years:
    _Corrections - Coffee Co. Sheriffs Dept._

17. Have you ever served in the military? ( ) Yes (X) No. If yes, please complete the following:

    Branch: _____  Rank: _____  Dates: From _____ To _____

    Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

    _NEA, AEA, DEA, NSTA_

19. Describe any offices you have held in the organizations listed in question 18:  _NA_

20. Have you ever served on a jury before? ( ) Yes (X) No.  How many times?  _NA_
    What type of jury: ( ) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21. If you have served on a <u>trial jury</u>, please state the following: Year served:  _NA_

    City and state where served: _____

    What verdict was rendered? Civil case:        ( ) For plaintiff  ( ) For defendant
                               Criminal case:     ( ) For state or federal government ( ) For defendant

22. Have you ever served as a <u>foreperson</u> on a grand jury or a trial jury? ( ) Yes (X) No

23.  Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X) No.
     If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24.  Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes (X)No.  If yes, explain: _____

_____

25.  Have you ever been to court for any other reason (excluding divorce or traffic cases)?
     (X) Yes ( )No.  If yes, explain:  *Prisoner Escort & witness (Did not show)*

26.  Have you ever been arrested? ( ) Yes (X)No

27.  Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X)No

28.  What newspaper(s) do you read <u>regularly</u>?  *None*

29.  What TV news programs do you watch <u>frequently</u>?  *None*

30.  How many hours of TV do you watch per week?  *None*

31.  What radio programs do you listen to most?  *NPR news*

32.  Which do you find more interesting? ( ) Local news  (X) National news

33.  To what periodicals or magazines do you subscribe?  *RD, Geographic*

34.  Of the books you have read, which three are your favorites?  *Tom Clancy*
     *Louis L Amour*

35.  Please list your hobbies, spare–time activities, and outside interests:  *Reading history*
     *& church*

36.  Are there bumper stickers on the vehicles that you drive or that your spouse drives?  (X) Yes ( ) No.
     If yes, what do they say?  *These Colors Don't Run*

37.  In a group situation, once you have formed an opinion, do you usually:

     ( ) Change your mind if a number of people have a different opinion?

     (X) Stand by your original opinion despite what others believe?

38.  Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
     ( ) Yes (X)No.  If yes, what are their names and relationship to you? _____

     *Daughter was a Magistrate*

39. Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No. If yes, explain: _____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No. If yes, explain: _____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No. If yes, explain: _____

43. List any reason why you do not wish to serve or why you should not serve: _____

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (X) Yes ( ) No. If no, why not? _____

46. Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No. If yes, please describe: _____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? (X) Yes ( ) No. If yes, please describe: _Coffee Co. Sheriffs Dept (Co Jail)    Daughter was a magistrate_

48. Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes ( ) No. If yes, please explain: _CPR_

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? (X) Yes ( ) No. If yes, please
specify: _New Life Pentecostal Church._

50. How often do you attend religious services? (X) Regularly ( ) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? ( ) Yes ( ) No    _Minister/Teacher_

52. What is your political party preference? _Republican_

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No.
Of any anti–crime group or other similar organization? ( ) Yes (X) No. Of any anti–weapons or gun–
control group? ( ) Yes (X) No.

54. Have you ever actively participated in a political campaign? ( ) Yes (X) No. If yes, ( ) Democrat?
( ) Republican? ( ) Other _____

*Please correct my address. It is Susan Helms 544 Co. Rd. 622 Enterprise, Al 36330*

APPENDIX

RECOMMENDED
M JUROR QUESTIONNAIRE

AUG 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. Al

*he judge and lawyers in selecting a jury. It is not public information. If
r a question, attach additional sheets and number your answers to*

*en Bush Helms*

..in: *Lee Co. Al*                    Age  *54*    Sex: () Male (✓) Female

3.    Race: (✓) Caucasian/White  () African–American/Black  () Hispanic  () Other _____

4.    Do you: (✓) Own home  () Rent home  () Rent apartment  () Live with friend or relatives  () Other

5.    What cities/states have you lived in during the past five years? *Enterprise, Al.*

6.    Marital status: () Single  (✓) Married  () Divorced  () Separated  () Widowed. If you are married:

Spouse's employer: *Dyncorp*

Number of years your spouse has worked there: *2*

Spouse's title and job responsibilities: *Air Craft Mechanic/Instructor*

Educational background of your spouse, including any degrees or certificates earned:
*Masters of Education*

7.    Do you have children? (✓) Yes () No. If yes, please complete the following:

| Age | Sex | School or occupation | Live with you? | Their level of education |
|-----|-----|----------------------|----------------|--------------------------|
| 32  | M   | teacher              | No             | BS Educ.                 |
| 29  | M   | Air Force National Guard | No         | 2 yr. College            |
| 25  | M   | U.S. Helicopters mechanic | NO        | 12 grade                 |
| 22  | F   | aum                  | NO             | Sr. in College now       |

8.    Your level of education: Specify the highest grade you completed:

(a)    Elementary or high school (1–12) _*12*_    College (1–4 or 5+) *Masters Educ.*

(b)    If college, what college, what degrees, and what was your major? *Education*
*MS. Elementary Education*

(c)    Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
() Yes (✓) No. If yes, what courses? _____

*VOLUME 5*

COURT OF CRIMINAL APPEALS NO. __CR-02-0333__

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

## FROM

### CIRCUIT COURT OF _____COFFEE_____ COUNTY, ALABAMA

CIRCUIT COURT NO. __CC-01-179, CC-01-180__

CIRCUIT JUDGE __Gary L. McAliley__

Type of Conviction / Order Appealed From: __Conviction, Capital Murder, Robbery 1st__

Sentence Imposed: __Life Without Parole, Life__

Defendant Indigent: [X] YES [ ] NO

__Robert Thomas Conrad__

**NAME OF APPELLANT**

__Gary Bradshaw__
(Appellant's Attorney)                                  (Telephone No.)
P. O. Box 311412
(Address)
__Enterprise__        __AL__        __36331__
(City)              (State)          (Zip Code)

Richard Waldrop
P. O. Box 310027
Enterprise, AL  36331

**V.**

## STATE OF ALABAMA

(State represented by Attorney General)

**NAME OF APPELLEE**

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

_____

(For Court of Criminal Appeals Use Only)



9. Your present employment status (check all that apply):
(✓) Full–time () Part–time () Retired () Unemployed () Student () Homemaker

10. Your current or most recent occupation: _Classroom teacher_

11. Name of your current or most recent employer, or, if you are a student, your school and major:
_Enterprise City Schools_

12. How long have you been employed by your current or most recent employer? _28 years_

13. What are/were your specific duties and responsibilities on the job? _teach 4th grade_

14. Do/Did you supervise other employees? () Yes (✓) No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? () Yes (✓) No

16. Please list all other occupations and employers you have had for the past 10 years:
_See # 11 - 13_

17. Have you ever served in the military? () Yes (✓) No. If yes, please complete the following:

Branch: _____ Rank: _____ Dates: From _____ To _____

Duties: _____ Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
_National Educ. Assoc., Al. Educ. Assoc; Enterprise Educ. Assoc. Delta Kappa Gamma_

19. Describe any offices you have held in the organizations listed in question 18: _Local educ. President, I am V.P. Secretary. On the AEA Board of Directors_

20. Have you ever served on a jury before? () Yes (✓) No. How many times? _____
What type of jury: () Grand jury () Civil trial jury () Criminal trial jury

21. If you have served on a <u>trial jury</u>, please state the following: Year served: _____

City and state where served: _____

What verdict was rendered? Civil case:     () For plaintiff  () For defendant
                            Criminal case:   () For state or federal government () For defendant

22. Have you ever served as a <u>foreperson</u> on a grand jury or a trial jury? () Yes () No

23. Have you testified as a <u>witness</u> in any court proceeding?  ( ) Yes  (✓) No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  (✓) No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes (✓) No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (✓) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (✓) No

28. What newspaper(s) do you read regularly?  *Southeast Sun*

29. What TV news programs do you watch frequently?  *C N N*

30. How many hours of TV do you watch per week?  *8-10 - hrs.*

31. What radio programs do you listen to most?  *104.3    103.9*

32. Which do you find more interesting? ( ) Local news (✓) National news

33. To what periodicals or magazines do you subscribe?  *Country Living, Woodworkers Journal & Better Homes and Gardens*

34. Of the books you have read, which three are your favorites?  *The Firm, High 5, Chicken Soup Books*

35. Please list your hobbies, spare-time activities, and outside interests:  *Sewing, painting & reading*

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?  ( ) Yes (✓) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(✓) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (✓) No.  If yes, what are their names and relationship to you? _____

_____

39.     Based on your experience, what is your opinion of lawyers? (✓) Good ( ) Fair ( ) Poor

40.     Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (✓) No.  If yes, explain: _____

_____

_____

41.     Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (✓) No.  If yes, explain: _____

_____

42.     Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (✓) No.  If yes, explain: _____

_____

43.     List any reason why you do not wish to serve or why you should not serve: _____

_____

44.     Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes  (✓) No

45.     In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (✓) Yes ( ) No.  If no, why not? _____

_____

46.     Have you or a close relative ever been the victim of a crime? ( ) Yes (✓) No. If yes, please describe:

_____

_____

47.     Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police?  ( ) Yes  (✓) No. If yes, please describe: _____

48.     Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (✓) No. If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? (✓) Yes ( ) No. If yes, please
specify: _First United Methodist_____

50. How often do you attend religious services? ( ) Regularly (✓) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? ( ) Yes (✓) No

52. What is your political party preference? _No preference_____

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (✓) No.
Of any anti–crime group or other similar organization? ( ) Yes (✓) No. Of any anti–weapons or gun–
control group? ( ) Yes (✓) No.

54. Have you ever actively participated in a political campaign? ( ) Yes (✓) No. If yes, ( ) Democrat?
( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: Sara Stanley Hiers

2.  Place of birth: Donaldsonville, Ga.    Age 48    Sex: ( ) Male (X) Female

3.  Race: (X) Caucasian/White  ( ) African-American/Black  ( ) Hispanic  ( ) Other _____

4.  Do you: (X) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5.  What cities/states have you lived in during the past five years? New Brockton _____

6.  Marital status: ( ) Single  ( ) Married  (X) Divorced  ( ) Separated  ( ) Widowed. If you are married:

    Spouse's employer: _____

    Number of years your spouse has worked there: _____

    Spouse's title and job responsibilities: _____

    Educational background of your spouse, including any degrees or certificates earned:

    _____

7.  Do you have children? (X) Yes  ( ) No.  If yes, please complete the following:

| Age | Sex | School or occupation | Live with you? | Their level of education |
|-----|-----|----------------------|----------------|--------------------------|
| 21  | F   | Huntingdon College   | no             | Entering 4th year        |
| 24  | F   | Montevallo Univ      | no             | Ass. in Art, Bach of Science |
|     |     |                      |                | minor - Deaf Studies     |
|     |     |                      |                |                          |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) 12    College (1–4 or 5+) 2

    (b)  If college, what college, what degrees, and what was your major? Wallace Jr. College Ass. in Science

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice? (X) Yes ( ) No. If yes, what courses? Police Patrol, Criminal Evidence, Criminal Investigation, Private Retail Security

9.   Your present employment status (check all that apply):
     (X) Full–time ( ) Part–time ( ) Retired ( ) Unemployed ( ) Student ( ) Homemaker

10.  Your current or most recent occupation: _Customer Service Manager_

11.  Name of your current or most recent employer, or, if you are a student, your school and major:

     _Wal-Mart Supercenter of Enterprise_

12.  How long have you been employed by your current or most recent employer? _6 years_

13.  What are/were your specific duties and responsibilities on the job? _Supervise cashiers,_
     _Handle out lying depts, Customer Satisfaction complaints_

14.  Do/Did you supervise other employees? (X) Yes ( ) No.  If yes, how many? _75 - 100_

15.  Do/Did you have responsibility for hiring and firing? (X) Yes ( ) No

16.  Please list all other occupations and employers you have had for the past 10 years:
     _Housewife, mother, student_

17.  Have you ever served in the military? ( ) Yes (X) No.  If yes, please complete the following:

     Branch: _____   Rank: _____   Dates: From _____ To _____

     Duties: _____   Type of discharge: _____

18.  What social, civic, professional, trade, union, or other organizations are you affiliated with?

     _None_

19.  Describe any offices you have held in the organizations listed in question 18: _____

20.  Have you ever served on a jury before? (X) Yes ( ) No.   How many times? _____1_____
     What type of jury: (X) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21.  If you have served on a trial jury, please state the following:  Year served: _____

     City and state where served: _____

     What verdict was rendered? Civil case:     (X) For plaintiff ( ) For defendant
                                Criminal case:  ( ) For state or federal government ( ) For defendant

22.  Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  ⊠ No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes  ⊠ No.  If yes, explain: _____
_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes  ⊠ No.   If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  ⊠ No

27. Have you, a <u>close relative</u>, or a close friend ever been convicted of a crime? ⊠ Yes ( ) No

28. What newspaper(s) do you read regularly? _Dothan Eagle, Enterprise Ledger_

29. What TV news programs do you watch frequently? _Meet my Parents, TLC, Golf_

30. How many hours of TV do you watch per week? ___3___

31. What radio programs do you listen to most? ___WDJR___

32. Which do you find more interesting? ( ) Local news  ⊠ National news

33. To what periodicals or magazines do you subscribe? _Newsweek, Readers Digest_
_____

34. Of the books you have read, which three are your favorites? _Rainbow Six, Monstrum,_
_____

35. Please list your hobbies, spare-time activities, and outside interests: _Gardening, Sewing,_
_Reading_____

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?     ( ) Yes ⊠ No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

    ( ) Change your mind if a number of people have a different opinion?

    ⊠ Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes ⊠ No.  If yes, what are their names and relationship to you? _____
_____

39.    Based on your experience, what is your opinion of lawyers? (X) Good ( ) Fair ( ) Poor

40.    Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41.    Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

42.    Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

43.    List any reason why you do not wish to serve or why you should not serve:    N O N e
_____

44.    Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45.    In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

46.    Have you or a close relative ever been the victim of a crime? (X) Yes ( ) No.  If yes, please describe:
My mother at age 72 was kidnapped, robbed, assaulted and raped Thanksgiving morning 2000 in Blakely, Ga.

47.    Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No.  If yes, please describe: _____

48.    Have you taken any courses or had any training in medicine or other health–care field? (X) Yes ( ) No.  If yes, please explain: Anat & Physiology I & II, Microbiology, Medical Terminlogy, Mental Health Concepts, Medical Assisting, General Psychology, Psychology 200, Sociology

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation? (X) Yes ( ) No.  If yes, please specify: _____

50.  How often do you attend religious services? ( ) Regularly (X) Occasionally ( ) Never

51.  Do you hold a special position in your religious organization? ( ) Yes (X) No

52.  What is your political party preference?  _Republican_____

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No. Of any anti–crime group or other similar organization? ( ) Yes (X) No. Of any anti–weapons or gun-control group? ( ) Yes (X) No.

54.  Have you ever actively participated in a political campaign?  ( ) Yes (X) No.  If yes, ( ) Democrat? ( ) Republican? ( ) Other  _____

APPENDIX

# RECOMMENDED
# UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: _Jack D. Hill_

2.  Place of birth: _Ft Branch, Ind_ Age _71_ Sex: (✓) Male ( ) Female

3.  Race: (✓) Caucasian/White ( ) African–American/Black ( ) Hispanic ( ) Other _____

4.  Do you: (✓) Own home ( ) Rent home ( ) Rent apartment ( ) Live with friend or relatives ( ) Other

5.  What cities/states have you lived in during the past five years? _Enterprise, Alabama_

6.  Marital status: ( ) Single (✓) Married ( ) Divorced ( ) Separated ( ) Widowed. If you are married:

    Spouse's employer: _N/A_

    Number of years your spouse has worked there: _N/A_

    Spouse's title and job responsibilities: _housewife_

    Educational background of your spouse, including any degrees or certificates earned:

    _Jr. College no degree_

7.  Do you have children? ( ) Yes ( ) No. If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|----------------------|----------------|--------------------------|
    | 42  | F   | Jr college           | No             | High school + 2 yr college |
    | 40  | M   | Troy State           | No             | BS in Business |
    |     |     |                      |                |                          |
    |     |     |                      |                |                          |

8.  Your level of education: Specify the highest grade you completed:

    (a) Elementary or high school (1–12) _____ College (1–4 or 5+) _College_

    (b) If college, what college, what degrees, and what was your major? _Univ of Georgia_
        _B/S education_

    (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
        ( ) Yes (✓) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
() Full–time () Part–time (✓) Retired () Unemployed () Student () Homemaker

10. Your current or most recent occupation: Sikorsky Aircraft , Marketing

11. Name of your current or most recent employer, or, if you are a student, your school and major:

SAme as above

12. How long have you been employed by your current or most recent employer? 23 yrs

13. What are/were your specific duties and responsibilities on the job? Marketing Southeast

office, Sikorsky.

14. Do/Did you supervise other employees? (✓) Yes () No. If yes, how many? 2 to 8

15. Do/Did you have responsibility for hiring and firing? () Yes (✓) No

16. Please list all other occupations and employers you have had for the past 10 years:

Retired

17. Have you ever served in the military? (✓) Yes () No. If yes, please complete the following:

Branch: Army    Rank: LTC    Dates: From Oct 1953 To Oct 1973

Duties: Armor / Pilot    Type of discharge: Honoble

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

American Helicopter Society , Rotary Club

19. Describe any offices you have held in the organizations listed in question 18:

Sgt of Arms — Rotary Club

20. Have you ever served on a jury before? (✓) Yes () No. How many times? ONE
What type of jury: () Grand jury (✓) Civil trial jury () Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: N/A

City and state where served: Fitzpatrick, Ala

What verdict was rendered? Civil case:    () For plaintiff (✓) For defendant
                          Criminal case:  () For state or federal government () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes (✓) No

23.      Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes   (✓) No.
If yes, were you a witness for: ( ) Plaintiff ( ) State or federal government ( ) Defendant in a civil or criminal case.

24.      Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes   (✓) No.  If yes, explain: _____

_____

25.      Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes (✓) No.   If yes, explain: _____

26.      Have you ever been arrested? ( ) Yes (✓) No

27.      Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (✓) No

28.      What newspaper(s) do you read regularly?   Dothan Eagle

29.      What TV news programs do you watch frequently?   CBS - NBC - Fox

30.      How many hours of TV do you watch per week?   10 hrs week

31.      What radio programs do you listen to most?   Music

32.      Which do you find more interesting? ( ) Local news (✓) National news

33.      To what periodicals or magazines do you subscribe?   Retired Army officers
Rotary club Rotarian

34.      Of the books you have read, which three are your favorites? _____

_____

35.      Please list your hobbies, spare-time activities, and outside interests:   Yard work
Golf, Sports - Hunting, Fishing,

36.      Are there bumper stickers on the vehicles that you drive or that your spouse drives?   (✓) Yes ( ) No.
If yes, what do they say?   Univ of Georgia, support of police activity

37.      In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(✓) Stand by your original opinion despite what others believe?

38.      Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (✓) No.  If yes, what are their names and relationship to you? _____

_____

39. Based on your experience, what is your opinion of lawyers? ( ) Good (✓) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (✓) No.  If yes, explain: _____

_____

_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (✓) No.  If yes, explain: _____

_____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (✓) No. If yes, explain: _____

_____

43. List any reason why you do not wish to serve or why you should not serve: ___No___

_____

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (✓) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (✓) Yes ( ) No.  If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? ( ) Yes (✓) No.  If yes, please describe:

_____

_____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police?  ( ) Yes (✓) No. If yes, please describe: _____

_____

48. Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (✓) No.  If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation?  (✗) Yes  ( ) No.  If yes, please specify: _____Catholic_____

50.  How often do you attend religious services? ( ) Regularly  ( ) Occasionally  ( ) Never

51.  Do you hold a special position in your religious organization? ( ) Yes  (✗) No

52.  What is your political party preference? _____

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes  (✗) No.  Of any anti–crime group or other similar organization?  ( ) Yes  (✗) No.  Of any anti–weapons or gun–control group? ( ) Yes  (✗) No.

54.  Have you ever actively participated in a political campaign?  ( ) Yes  ( ) No.  If yes, ( ) Democrat?  ( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: __Angela Hughes__

2. Place of birth: __Louisville, Ky_____ Age __51__ Sex: ( ) Male (X) Female

3. Race: (X) Caucasian/White ( ) African–American/Black ( ) Hispanic ( ) Other _____

4. Do you: (X) Own home ( ) Rent home ( ) Rent apartment ( ) Live with friend or relatives ( ) Other

5. What cities/states have you lived in during the past five years? __New Brockton, Al_____

6. Marital status: ( ) Single (X) Married ( ) Divorced ( ) Separated ( ) Widowed. If you are married:

   Spouse's employer: __1st Financial Bank, Eldorado, Arkansas__

   Number of years your spouse has worked there: __1 yr__

   Spouse's title and job responsibilities: __loan officer__

   Educational background of your spouse, including any degrees or certificates earned:
   __BS degree - Auburn Univ.__

7. Do you have children? (X) Yes ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|---------------------|----------------|--------------------------|
   | 23 | M | TSU | No | senior in college |
   | 21 | M | Univ. of Mobile | No | senior in college |
   | | | | | |
   | | | | | |

8. Your level of education: Specify the highest grade you completed:

   (a) Elementary or high school (1–12) _____ College (1–4 or 5+) __✓__

   (b) If college, what college, what degrees, and what was your major? __BS - Samford Univ.__
   __Home Ec Ed__

   (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   ( ) Yes (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
(X) Full–time ( ) Part–time ( ) Retired ( ) Unemployed ( ) Student ( ) Homemaker

10. Your current or most recent occupation: County Extension Agent

11. Name of your current or most recent employer, or, if you are a student, your school and major:

Al Cooperative Extension System

12. How long have you been employed by your current or most recent employer? 29 yrs

13. What are/were your specific duties and responsibilities on the job? Education — 4-H

14. Do/Did you supervise other employees? ( ) Yes (X) No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? ( ) Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years:

None

17. Have you ever served in the military? ( ) Yes (X) No. If yes, please complete the following:

Branch: _____ Rank: _____ Dates: From _____ To _____

Duties: _____ Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

Alabama Assoc. of Extension 4-H Agents (ALAE4-HA)

19. Describe any offices you have held in the organizations listed in question 18: Dist. Director — obtaining membership

20. Have you ever served on a jury before? (X) Yes ( ) No. How many times? 1
What type of jury: ( ) Grand jury (X) Civil trial jury ( ) Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: ?
City and state where served: Enterprise, Al

What verdict was rendered? Civil case: (X) For plaintiff ( ) For defendant
Criminal case: ( ) For state or federal government ( ) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes (X) No

23. Have you testified as a underline:witness in any court proceeding? ( ) Yes  (X) No.
    If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or
    criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes  (X) No.  If yes,
    explain: _____

    _____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
    ( ) Yes  (X) No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes  (X) No

28. What newspaper(s) do you read regularly?  _None_

29. What TV news programs do you watch frequently? *occasionally* Y  WTVY – 10:00 PM  (CBS) *local*

30. How many hours of TV do you watch per week?  _maybe 2_

31. What radio programs do you listen to most?  _Christain stations  or "oldies" music_

32. Which do you find more interesting? ( ) Local news ( ) National news  _about equal_

33. To what periodicals or magazines do you subscribe?  _Readers Digest , Guideposts_

    _____

34. Of the books you have read, which three are your favorites? (1) _Bible_  (2) _romance Novels_

    _____

35. Please list your hobbies, spare–time activities, and outside interests:  _playing piano , reading ,_
    _handwork (Needlework)_

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?      ( ) Yes ( ) No.
    If yes, what do they say?  _No words — a U.S. flag_

37. In a group situation, once you have formed an opinion, do you usually:

    ( ) Change your mind if a number of people have a different opinion?

    (X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
    ( ) Yes  (X) No.  If yes, what are their names and relationship to you?  _____

    _____

39.  Based on your experience, what is your opinion of lawyers? ( ) Good ( ) Fair ( ) Poor
     I ~~haven't~~ have mixed feelings about lawyers.

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent
     you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

     _____

     _____

     _____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror?
     ( ) Yes (X) No.  If yes, explain: _____

     _____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial
     juror? ( ) Yes (X) No.  If yes, explain: _____

     _____

43.  List any reason why you do not wish to serve or why you should not serve: _____

     _____

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to
     make it easier to convict? ( ) Yes (X) No.

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you
     agree with that principle? ( ) Yes ( ) No. If no, why not?  Depends — Sometimes a little
     technicality keeps a guilty party free.

46.  Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No. If yes, please describe:

     _____

     _____

47.  Have you or a close relative ever worked in a law enforcement-related job such as police, sheriff, state
     trooper, prison guard, or military police? ( ) Yes (X) No. If yes, please describe: _____

     _____

48.  Have you taken any courses or had any training in medicine or other health-care field? ( ) Yes (X) No. If
     yes, please explain: _____

     _____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? (✗) Yes ( ) No. If yes, please specify: __Park Ave. Bapt. Church__

50. How often do you attend religious services? (✗) Regularly ( ) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? (✗) Yes ( ) No

52. What is your political party preference? __We vote person – not party__

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (✗) No. Of any anti–crime group or other similar organization? ( ) Yes (✗) No. Of any anti–weapons or gun–control group? ( ) Yes (✗) No.

54. Have you ever actively participated in a political campaign? ( ) Yes (✗) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

*CELL 30P- 3008*

*82L*

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: HAROLD K. INSLEY JR.

2. Place of birth: JUNCTION CITY, KANSAS  Age 59  Sex: (✓) Male  ( ) Female

3. Race: (✓) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4. Do you: (✓) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5. What cities/states have you lived in during the past five years? ENTERPRISE, AL

6. Marital status: ( ) Single  (✓) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

   Spouse's employer: ~~LAMME~~

   Number of years your spouse has worked there: _____

   Spouse's title and job responsibilities: _____

   Educational background of your spouse, including any degrees or certificates earned:

   10$^{TH}$ GRADE

7. Do you have children? (✓) Yes  ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|---------------------|----------------|-------------------------|
   | 37 | F | MANAGER RUBY TIES | NO | HS |
   | 36 | M | CHIEF INDIGO HEAD | NO | HS |
   | 32 | M | NONE | NO | 11$^{TH}$ GRADE |
   | 28 | M | GOV CONTRACTOR HUNTSVILLE, AL | NO | HS |

8. Your level of education: Specify the highest grade you completed:

   (a) Elementary or high school (1–12) _12_   College (1–4 or 5+) _3_

   (b) If college, what college, what degrees, and what was your major? MCTNG & ESTC BUISNESS

   (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   ( ) Yes  (✓) No. If yes, what courses? _____

9.  Your present employment status (check all that apply):
    _(x) Full–time  () Part–time  (x) Retired  () Unemployed  () Student  () Homemaker

10. Your current or most recent occupation: _BOLAND LANES EMPLOYMENT_

11. Name of your current or most recent employer, or, if you are a student, your school and major:

    _TODD BOLAND_

12. How long have you been employed by your current or most recent employer?    _6 YRS_

13. What are/were your specific duties and responsibilities on the job? _ALL AREAS OF OPERATION_

    _EXCEPT COOKING_

14. Do/Did you supervise other employees? (x) Yes  () No.  If yes, how many?    _3-6_

15. Do/Did you have responsibility for hiring and firing? () Yes  (x) No

16. Please list all other occupations and employers you have had for the past 10 years:

    _JOHN POPIWITCH - QUALITY TIRE IN DALEVILLE_

17. Have you ever served in the military? (x) Yes  () No. If yes, please complete the following:

    Branch: _U.S. ARMY_    Rank: _SFC E-7_    Dates: From _JAN 62_  To  _JUN 86_

    Duties: _A/C MAINT_                        Type of discharge: _HON_

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

    _NONE_


19. Describe any offices you have held in the organizations listed in question 18:    _NONE_


20. Have you ever served on a jury before? () Yes  (x) No.  How many times?    _____
    What type of jury: () Grand jury  () Civil trial jury  () Criminal trial jury

21. If you have served on a trial jury, please state the following:  Year served:    _____

    City and state where served:    _____

    What verdict was rendered?  Civil case:        () For plaintiff  () For defendant
                                Criminal case:     () For state or federal government  () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury?  () Yes  (x) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (✓) No.
    If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? (✓) Yes  ( ) No.  If yes, explain: _____

    _____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
    ( ) Yes  (✓) No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  (✓) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (✓) No

28. What newspaper(s) do you read regularly?  _LEDGER / DOTHAN EAGLE_

29. What TV news programs do you watch frequently?  _NEWS_

30. How many hours of TV do you watch per week?  _15._

31. What radio programs do you listen to most?  _WKMX_

32. Which do you find more interesting? ( ) Local news  (✓) National news

33. To what periodicals or magazines do you subscribe?  _____

    _____

34. Of the books you have read, which three are your favorites?  _CALL OF THE WILD_

    _MOBY DICK , TREASURE ISLAND_

35. Please list your hobbies, spare–time activities, and outside interests:  _BOWLING , RACING_

    _____

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?  ( ) Yes (✓) No.
    If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

    ( ) Change your mind if a number of people have a different opinion?  _NO_

    ( ) Stand by your original opinion despite what others believe?  _YES_

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
    ( ) Yes (✓) No.  If yes, what are their names and relationship to you?  _____

    _____

39. Based on your experience, what is your opinion of lawyers? ( ) Good (×) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (×) No. If yes, explain: _____

_____

_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (×) No. If yes, explain: _____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (×) No. If yes, explain: _____

_____

43. List any reason why you do not wish to serve or why you should not serve: _____

_____

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (×) No _____

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (×) Yes ( ) No. If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? ( ) Yes (×) No. If yes, please describe: _____

_____

_____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (×) No. If yes, please describe: _____

_____

48. Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (×) No. If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation? (✓) Yes ( ) No.  If yes, please
     specify: _CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS_

50.  How often do you attend religious services? ( ) Regularly  ( ) Occasionally  (✓) Never

51.  Do you hold a special position in your religious organization? (✓) Yes ( ) No

52.  What is your political party preference?  _REP_

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes (✓) No.
     Of any anti–crime group or other similar organization? ( ) Yes ( ) No.  Of any anti–weapons or gun–
     control group? ( ) Yes ( ) No.

54.  Have you ever actively participated in a political campaign?  ( ) Yes (✓) No.  If yes, ( ) Democrat?
     ( ) Republican? ( ) Other _____

82⁵

## APPENDIX

## RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE



*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: _Earl Jorkmen_

2.  Place of birth: _Coffee County_ Age _57_  Sex: (✓) Male ( ) Female

3.  Race: ( ) Caucasian/White (✓) African–American/Black ( ) Hispanic ( ) Other _____

4.  Do you: ( ) Own home (✓) Rent home ( ) Rent apartment ( ) Live with friend or relatives ( ) Other

5.  What cities/states have you lived in during the past five years? _Enterprise, Alabama_
    _____

6.  Marital status: ( ) Single (✓) Married ( ) Divorced ( ) Separated ( ) Widowed. If you are married:

    Spouse's employer: _none_

    Number of years your spouse has worked there: _0_

    Spouse's title and job responsibilities: _____

    Educational background of your spouse, including any degrees or certificates earned:

    _High School diploma_

7.  Do you have children? (✓) Yes ( ) No. If yes, please complete the following:

| Age | Sex | School or occupation | Live with you? | Their level of education |
|-----|-----|----------------------|----------------|--------------------------|
| 35  | F   | EHS                  | no             | 11th grade               |
| 34  | M   | EHS                  | no             | 11th grade               |
| 30  | F   | EHS                  | no             | 11th grade               |
| 29  | M   | EHS                  | yes            | 12th grade               |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) _11th_   College (1–4 or 5+) _____

    (b)  If college, what college, what degrees, and what was your major? _____

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
         ( ) Yes (✓) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
(✓) Full–time ( ) Part–time  ( ) Retired  ( ) Unemployed ( ) Student ( ) Homemaker

10. Your current or most recent occupation: _Maintence_

11. Name of your current or most recent employer, or, if you are a student, your school and major:

_Conagra_

12. How long have you been employed by your current or most recent employer? _31 Yrs._

13. What are/were your specific duties and responsibilities on the job? _repair equipment_

14. Do/Did you supervise other employees?  (✓) Yes ( ) No.  If yes, how many? _Sometimes_

15. Do/Did you have responsibility for hiring and firing? ( ) Yes (✓) No

16. Please list all other occupations and employers you have had for the past 10 years:
_none_

17. Have you ever served in the military? ( ) Yes (✓) No.  If yes, please complete the following:

Branch: _____  Rank: _____  Dates: From _____ To _____

Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

~~RWDSU~~ _Retail, Wholesale and Department Store_
_union_

19. Describe any offices you have held in the organizations listed in question 18: _Shop stewart_

20. Have you ever served on a jury before? ( ) Yes (✓) No.  How many times? _____
What type of jury: ( ) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____

City and state where served: _____

What verdict was rendered? Civil case:    ( ) For plaintiff ( ) For defendant
Criminal case:   ( ) For state or federal government ( ) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes (✓) No

23.    Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (✓) No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24.    Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes  (✓) No.  If yes, explain: _____

_____

25.    Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes  (✓) No.   If yes, explain: _____

26.    Have you ever been arrested? (✓) Yes ( ) No

27.    Have you, a close relative, or a close friend ever been convicted of a crime? (✓) Yes ( ) No

28.    What newspaper(s) do you read regularly? *Dothan Eagle , Enterprise Ledger*

29.    What TV news programs do you watch frequently? *WTVY news*

30.    How many hours of TV do you watch per week? *35 hrs.*

31.    What radio programs do you listen to most? *Hot 105.7*

32.    Which do you find more interesting? (✓) Local news ( ) National news .

33.    To what periodicals or magazines do you subscribe? *PC magazine*

34.    Of the books you have read, which three are your favorites? *don't have any*

_____

35.    Please list your hobbies, spare–time activities, and outside interests: *Sports*

_____

36.    Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes (✓) No.
If yes, what do they say? _____

37.    In a group situation, once you have formed an opinion, do you usually:

    ( ) Change your mind if a number of people have a different opinion?

    (✓) Stand by your original opinion despite what others believe?

38.    Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (✓) No.  If yes, what are their names and relationship to you? _____

_____

39.    Based on your experience, what is your opinion of lawyers? ( ) Good ( ) Fair ( ) Poor

40.    Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes ( ) No.  If yes, explain: _____

_____

_____

41.    Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes ( ) No.  If yes, explain: _____

_____

42.    Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes ( ) No.  If yes, explain: _____

_____

43.    List any reason why you do not wish to serve or why you should not serve: _none_____

_____

44.    Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes ( ) No

45.    In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? ( ) Yes ( ) No.  If no, why not? _____

_____

46.    Have you or a close relative ever been the victim of a crime? ( ) Yes ( ) No.  If yes, please describe:

_____

_____

47.    Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes ( ) No.  If yes, please describe: ~~PAR~~

Enterprise police officer

48.    Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes ( ) No.  If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.    Do you belong to a church or otherwise have any religious affiliation? (✓) Yes ( ) No.  If yes, please
specify:  Pleasant Shade Missionary Baptist Church

50.    How often do you attend religious services? ( ) Regularly (✓) Occasionally ( ) Never

51.    Do you hold a special position in your religious organization? ( ) Yes (✓) No

52.    What is your political party preference?  Democrat

53.    Are you or is any member of your family a member of any victims rights organization? ( ) Yes (✓) No.
Of any anti–crime group or other similar organization? ( ) Yes (✓) No. Of any anti–weapons or gun-
control group? ( ) Yes (✓) No.

54.    Have you ever actively participated in a political campaign? ( ) Yes (✓) No.  If yes, ( ) Democrat?
( ) Republican? ( ) Other _____

830

APPENDIX

## RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: ETTA S. LaRue

2.  Place of birth: PITTSBURGH PENNA    Age 64    Sex: () Male (X) Female

3.  Race: (X) Caucasian/White  () African–American/Black  () Hispanic  () Other _____

4.  Do you: (X) Own home  () Rent home  () Rent apartment  () Live with friend or relatives  () Other

5.  What cities/states have you lived in during the past five years? Enterprise Alabama

6.  Marital status: () Single  (X) Married  () Divorced  () Separated  () Widowed. If you are married:

    Spouse's employer: U.S. ARMy (RETIRED)

    Number of years your spouse has worked there: 27 yrs

    Spouse's title and job responsibilities: Dr. J. Robert LaRue – Oral Surgeon (Retired)

    Educational background of your spouse, including any degrees or certificates earned:

    D.M.D. – Oral Maxilofacial Surgeon –

7.  Do you have children? (X) Yes () No. If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|----------------------|----------------|--------------------------|
    | 38 | Fm | Realtor | No | 16 yrs – AD |
    | 36 | Fm | Teacher | No | 18 yrs – Masters |
    | 28 | M | Work Supervisor | No | 12 yrs – HS |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) 12    College (1–4 or 5+) 12+3 = 15

    (b)  If college, what college, what degrees, and what was your major? Nursing

         Registered Nurse

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
         () Yes (X) No. If yes, what courses? _____

9.  Your present employment status (check all that apply):
    ( ) Full–time  ( ) Part–time  (X) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10. Your current or most recent occupation: *Supervisor – Registered Nurse*

11. Name of your current or most recent employer, or, if you are a student, your school and major:

    *Elba Nursing Home – Elba Ala.*

12. How long have you been employed by your current or most recent employer?  *11 yrs*

13. What are/were your specific duties and responsibilities on the job?  *Patient Care plus – Supervisor – LPN's – CNA's – Other Ancillary Staff*

14. Do/Did you supervise other employees?  (X) Yes  ( ) No.   If yes, how many?  *8–10*

15. Do/Did you have responsibility for hiring and firing?  ( ) Yes  (X) No

16. Please list all other occupations and employers you have had for the past 10 years:

    *Same As Above*

17. Have you ever served in the military?  ( ) Yes  (X) No.  If yes, please complete the following:

    Branch: _____  Rank: _____  Dates: From _____ To _____

    Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

    *N/A*

19. Describe any offices you have held in the organizations listed in question 18: _____

20. Have you ever served on a jury before?  ( ) Yes  (X) No.   How many times? _____
    What type of jury:  ( ) Grand jury  ( ) Civil trial jury  ( ) Criminal trial jury

21. If you have served on a <u>trial jury</u>, please state the following:  Year served: _____

    City and state where served: _____

    What verdict was rendered?  Civil case:       ( ) For plaintiff  ( ) For defendant
                                Criminal case:    ( ) For state or federal government  ( ) For defendant

22. Have you ever served as a <u>foreperson</u> on a grand jury or a trial jury?  ( ) Yes  ( ) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  ☒ No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  ☒ No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes  ☒ No.   If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  ☒ No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes ☒ No

28. What newspaper(s) do you read regularly? _Dothan  Eagle – Enterprise) Ledger_

29. What TV news programs do you watch frequently? _Fox  News –_

30. How many hours of TV do you watch per week? _28 hrs._

31. What radio programs do you listen to most? _– 100.5_

32. Which do you find more interesting? ( ) Local news ☒ National news

33. To what periodicals or magazines do you subscribe? _Readers Digest –_
_Parents Magazine –_

34. Of the books you have read, which three are your favorites? _Unable To Choose)_
_Any Three —_

35. Please list your hobbies, spare-time activities, and outside interests: _Gardening –_
_Sewing – Cooking_

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes ☒ No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

☒ Stand by your original opinion despite what others believe? _(depending the others beliefs )_

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes ☒ No.  If yes, what are their names and relationship to you? _____

_____

833

39.  Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

_____

43.  List any reason why you do not wish to serve or why you should not serve: _____

_____ N/A _____

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

_____

46.  Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No.  If yes, please describe:

_____

_____

47.  Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police?  ( ) Yes (X) No.  If yes, please describe: _____

48.  Have you taken any courses or had any training in medicine or other health–care field? (X) Yes ( ) No.  If yes, please explain: _____

_____ Registered Nurse) X 43 yrs _____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation?  ( ) Yes ( ) No. If yes, please specify: _____

50.  How often do you attend religious services? ( ) Regularly ( ) Occasionally ( ) Never

51.  Do you hold a special position in your religious organization? ( ) Yes ( ) No

52.  What is your political party preference? _____

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes ( ) No. Of any anti–crime group or other similar organization? ( ) Yes ( ) No. Of any anti–weapons or gun-control group? ( ) Yes ( ) No.

54.  Have you ever actively participated in a political campaign?  ( ) Yes ( ) No.  If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

835

SEP 2002
FILED
J.M. Curtis
Court Clerk
Coffee Co. AL

APPENDIX

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: _Mack L. Lott_

2. Place of birth: _Dale County_ Age _55_ Sex: (X) Male ( ) Female

3. Race: (X) Caucasian/White ( ) African-American/Black ( ) Hispanic ( ) Other _____

4. Do you: (X) Own home ( ) Rent home ( ) Rent apartment ( ) Live with friend or relatives ( ) Other

5. What cities/states have you lived in during the past five years? _____
   _New Brockton, Al._

6. Marital status: ( ) Single (X) Married ( ) Divorced ( ) Separated ( ) Widowed. If you are married:

   Spouse's employer: _Simply Southern_

   Number of years your spouse has worked there: _3_

   Spouse's title and job responsibilities: _Clerk_

   Educational background of your spouse, including any degrees or certificates earned:
   _B.S. Degree - Education Taught 25 yrs._

7. Do you have children? (X) Yes ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|----------------------|----------------|--------------------------|
   | 26  | M   | Material Specialist Sim Corp | No | 2 yrs. Junior College |
   | 23  | F   | Pharmacy Tech. | No | K-12 |
   |     |     |                      |                |                          |
   |     |     |                      |                |                          |

8. Your level of education: Specify the highest grade you completed:

   (a) Elementary or high school (1–12) _____ College (1–4 or 5+) _(1-4)_

   (b) If college, what college, what degrees, and what was your major? _____
   _E.S.J.C - Troy State University - BS - Social Studies_

   (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   ( ) Yes (X) No. If yes, what courses? _____

9.   Your present employment status (check all that apply):
     (X) Full-time  ( ) Part-time  ( ) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10.  Your current or most recent occupation: _Farmer_

11.  Name of your current or most recent employer, or, if you are a student, your school and major:
     _Self - Employed_

12.  How long have you been employed by your current or most recent employer? _____

13.  What are/were your specific duties and responsibilities on the job? _____
     _____

14.  Do/Did you supervise other employees?  ( ) Yes  (X) No.  If yes, how many? _____

15.  Do/Did you have responsibility for hiring and firing?  ( ) Yes  (X) No

16.  Please list all other occupations and employers you have had for the past 10 years:
     _Farmer - Self - Employed_

17.  Have you ever served in the military? (X) Yes  ( ) No.  If yes, please complete the following:

     Branch: _Army_          Rank: _E-5_     Dates: From _June 1966_ To _June 1972_
     _National Guard_
     Duties: ~~_____~~ _Cartography_     Type of discharge: _Honorable_

18.  What social, civic, professional, trade, union, or other organizations are you affiliated with?
     _____
     _____

19.  Describe any offices you have held in the organizations listed in question 18: _____

20.  Have you ever served on a jury before? (X) Yes  ( ) No.   How many times? _Called alot of times_
     What type of jury: ( ) Grand jury  (X) Civil trial jury  ( ) Criminal trial jury

21.  If you have served on a trial jury, please state the following: Year served: _(X) No_

     City and state where served: _N/A_

     What verdict was rendered?  Civil case:      ( ) For plaintiff  ( ) For defendant
                                 Criminal case:   ( ) For state or federal government  ( ) For defendant

22.  Have you ever served as a foreperson on a grand jury or a trial jury?  ( ) Yes  (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? (•) Yes ( ) No.
If yes, were you a witness for: (•) Plaintiff ( ) State or federal government (•) Defendant in a <u>civil</u> or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? (•) Yes ( ) No. If yes, explain: _Father sued timber co. for cutting timber over the line on his property._

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes (•) No.   If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (•) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes ( ) No

28. What newspaper(s) do you read regularly? _Enterprise Ledger - Dothan Eagle_

29. What TV news programs do you watch frequently? _~~History~~ - CNN_

30. How many hours of TV do you watch per week? _10_

31. What radio programs do you listen to most? _None_

32. Which do you find more interesting? ( ) Local news (•) National news

33. To what periodicals or magazines do you subscribe? _None_

34. Of the books you have read, which three are your favorites? _War & Peace_ _A Stillness At Appomattox_

35. Please list your hobbies, spare-time activities, and outside interests: _____ _Hunting, Fishing, Stockcar Racing_

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives? ( ) Yes (•) No. If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(•) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (•) No.   If yes, what are their names and relationship to you? _____

39.  Based on your experience, what is your opinion of lawyers? ( ) Good ( ) Fair (•) Poor

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? (•) Yes ( ) No.  If yes, explain: _____

*Sjogren's Syndrone – Eye sight & memory Significant Significiant hearing loss in right ear.*

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (•) No.  If yes, explain: _____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (•) No.  If yes, explain: _____

43.  List any reason why you do not wish to serve or why you should not serve: _____

*Medical*

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (•) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (•) Yes ( ) No.  If no, why not? _____

46.  Have you or a close relative ever been the victim of a crime? ( ) Yes (•) No.  If yes, please describe: _____

47.  Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (•) No.  If yes, please describe: _____

48.  Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (•) No.  If yes, please explain: _____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation?  (✓) Yes  ( ) No.  If yes, please
     specify: _____ *Methodist* _____

50.  How often do you attend religious services?  ( ) Regularly  (✓) Occasionally  ( ) Never

51.  Do you hold a special position in your religious organization?  ( ) Yes  (✓) No

52.  What is your political party preference?  *Republican* _____

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes (✓) No.
     Of any anti–crime group or other similar organization?  ( ) Yes (✓) No.  Of any anti–weapons or gun–
     control group? ( ) Yes  (✓) No.

54.  Have you ever actively participated in a political campaign?  ( ) Yes (✓) No.  If yes, ( ) Democrat?
     ( ) Republican? ( ) Other  _____

*Ph 337-735-23?*

APPENDIX

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: _MACK F. LOYX_

2. Place of birth: _Dale Co_____ Age _55_ Sex: (✓) Male ( ) Female

3. Race: (✓) Caucasian/White ( ) African–American/Black ( ) Hispanic ( ) Other _____

4. Do you: (✓) Own home ( ) Rent home ( ) Rent apartment ( ) Live with friend or relatives ( ) Other

5. What cities/states have you lived in during the past five years? _____
   _New Brockton AL_

6. Marital status: ( ) Single (✓) Married ( ) Divorced ( ) Separated ( ) Widowed. If you are married:

   Spouse's employer: _Net, med. Part time   Simply Souther._
   _teacher_
   Number of years your spouse has worked there: _2_

   Spouse's title and job responsibilities: _____

   Educational background of your spouse, including any degrees or certificates earned:
   _BS_

7. Do you have children? (✓) Yes ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|---------------------|----------------|--------------------------|
   | 26 | M | Ft. Rucher | No | Jr. Coll. |
   | 23 | F | Pham. Tech | No | HS |

8. Your level of education: Specify the highest grade you completed:

   (a) Elementary or high school (1–12) _____  College (1–4 or 5+) _4_

   (b) If college, what college, what degrees, and what was your major? _____
   _BS Troy St._

   (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   ( ) Yes (✓) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
   (✓) Full–time ( ) Part–time ( ) Retired ( ) Unemployed ( ) Student ( ) Homemaker

10. Your current or most recent occupation: _Farmer_

11. Name of your current or most recent employer, or, if you are a student, your school and major:
    _Self_

12. How long have you been employed by your current or most recent employer?

13. What are/were your specific duties and responsibilities on the job? _____

14. Do/Did you supervise other employees? ( ) Yes (✓) No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? ( ) Yes (✓) No

16. Please list all other occupations and employers you have had for the past 10 years:

17. Have you ever served in the military? (✓) Yes ( ) No. If yes, please complete the following:

    Branch: _Army NG_  Rank: _E-5_  Dates: From _June 68_ to _June 72_

    Duties: _Map making_   Type of discharge: _honorable_

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

19. Describe any offices you have held in the organizations listed in question 18: _____

20. Have you ever served on a jury before? (✓) Yes ( ) No. How many times? _1_
    What type of jury: ( ) Grand jury (✓) Civil trial jury ( ) Criminal trial jury

21. If you have served on a <u>trial jury</u>, please state the following: Year served: _____

    City and state where served: _____

    What verdict was rendered?  Civil case:     ( ) For plaintiff ( ) For defendant
                                Criminal case:  ( ) For state or federal government ( ) For defendant

22. Have you ever served as a <u>foreperson</u> on a grand jury or a trial jury? ( ) Yes (✓) No

842

23. Have you testified as a witness in any court proceeding? (✓) Yes   ( ) No.
If yes, were you a witness for: (✓) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes (✓) No.  If yes, explain: _Father sued over land lines_

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes (✓) No.   If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (✓) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (✓) No

28. What newspaper(s) do you read regularly? _None_

29. What TV news programs do you watch frequently? _CNN_

30. How many hours of TV do you watch per week? _10_

31. What radio programs do you listen to most? _None_

32. Which do you find more interesting? ( ) Local news (✓) National news

33. To what periodicals or magazines do you subscribe? _none_

_____

34. Of the books you have read, which three are your favorites? _none_

_____

35. Please list your hobbies, spare-time activities, and outside interests: _hunting_
_car racing_

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes (✓) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(✓) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (✓) No.   If yes, what are their names and relationship to you? _____

_____

39.    Based on your experience, what is your opinion of lawyers? ( ) Good ( ) Fair ( ) Poor

40.    Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes ( ) No.  If yes, explain:  _Back loss of_
_limbo m w o hal call slipped disc_
_could not sit wam-on loss problems_
_Concentrating_

41.    Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes ( ) No.  If yes, explain: _____

42.    Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes ( ) No.  If yes, explain: _____

43.    List any reason why you do not wish to serve or why you should not serve: _____

44.    Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes ( ) No

45.    In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? ( ) Yes ( ) No.  If no, why not? _____

46.    Have you or a close relative ever been the victim of a crime? ( ) Yes ( ) No.  If yes, please describe: _____

47.    Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes ( ) No.  If yes, please describe: _____

48.    Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes ( ) No.  If yes, please explain: _____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? (✔) Yes ( ) No. If yes, please specify: _United Methodist_

50. How often do you attend religious services? ( ) Regularly (✔) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? ( ) Yes (✔) No

52. What is your political party preference? _Republican_

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (✔) No. Of any anti–crime group or other similar organization? ( ) Yes (✔) No. Of any anti–weapons or gun–control group? ( ) Yes (✔) No.

54. Have you ever actively participated in a political campaign? ( ) Yes (✔) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

845

APPENDIX

# RECOMMENDED
# UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: Andrew McDurmont

2. Place of birth: Sherman, TX          Age 28    Sex: (X) Male () Female

3. Race: (X) Caucasian/White   () African–American/Black   () Hispanic   () Other _____

4. Do you: () Own home (X) Rent home () Rent apartment () Live with friend or relatives () Other

5. What cities/states have you lived in during the past five years? New Brockton, + Elba, AL.
   _____

6. Marital status: () Single (X) Married () Divorced () Separated () Widowed. If you are married:

   Spouse's employer: Royal Palm

   Number of years your spouse has worked there: 0

   Spouse's title and job responsibilities: Computer graphics artist

   Educational background of your spouse, including any degrees or certificates earned:

   High school grad, cosmetology degree, Air Base photography

7. Do you have children? (X) Yes () No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|----------------------|----------------|--------------------------|
   | 1yrs | F | | yes | N/A |
   | 1yrs | F | | yes | N/A |
   | 6yrs | F | | yes | elem. |
   | 9yrs | F | | yes | elem. |

8. Your level of education: Specify the highest grade you completed:

   (a) Elementary or high school (1–(12)) 1992     College (1–4 or 5+) _____

   (b) If college, what college, what degrees, and what was your major? _____

   (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
       () Yes (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
(X) Full–time () Part–time () Retired () Unemployed () Student () Homemaker

10. Your current or most recent occupation: Sales, installs

11. Name of your current or most recent employer, or, if you are a student, your school and major:

OFF Road Performance Center

12. How long have you been employed by your current or most recent employer? over 1½ years

13. What are/were your specific duties and responsibilities on the job? mechaniking, sales ect

14. Do/Did you supervise other employees? () Yes (X) No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? () Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years:
Utility Trailers, Williams Signs, Expost Tire, Branch ele, Speed unlimited, Dorsey Trailers, Bill's Tire Service.

17. Have you ever served in the military? () Yes (X) No. If yes, please complete the following:

Branch: _____    Rank: _____    Dates: From _____ To _____

Duties: _____    Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

_____

_____

19. Describe any offices you have held in the organizations listed in question 18: _____

_____

20. Have you ever served on a jury before? () Yes (X) No. How many times? _____
What type of jury: () Grand jury () Civil trial jury () Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____

City and state where served: _____

What verdict was rendered? Civil case:        () For plaintiff  () For defendant
                           Criminal case:     () For state or federal government () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X)No.
    If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  (X)No.  If yes, explain: _____

    _____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
    (X)Yes ( )No.  If yes, explain: __Bankruptcy Court_____

26. Have you ever been arrested? (X)Yes ( ) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? (X) Yes ( ) No

28. What newspaper(s) do you read regularly? __None_____

29. What TV news programs do you watch frequently? __Noit_____

30. How many hours of TV do you watch per week? __6-10_____

31. What radio programs do you listen to most? __106.7_____

32. Which do you find more interesting? (X)Local news (X) National news

33. To what periodicals or magazines do you subscribe? __N/A_____

    _____

34. Of the books you have read, which three are your favorites? __Geronimo, Louis L'Amour__
    __books_____

35. Please list your hobbies, spare-time activities, and outside interests: __4 wheeling, hunting__
    __Fishing, playing w/ my children, spending time w/ my wife__

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?   ( ) Yes (X)No.
    If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

    ( ) Change your mind if a number of people have a different opinion?

    (X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
    ( ) Yes (X) No.  If yes, what are their names and relationship to you? _____

    _____

39. Based on your experience, what is your opinion of lawyers? (X) Good ( ) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No. If yes, explain: _____

_____

_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No. If yes, explain: _____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No. If yes, explain: _____

_____

43. List any reason why you do not wish to serve or why you should not serve: _____

_____

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? (X) Yes ( ) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (X) Yes ( ) No. If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No. If yes, please describe: _____

_____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No. If yes, please describe: _____

_____

48. Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No. If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.    Do you belong to a church or otherwise have any religious affiliation? ☒ Yes ( ) No. If yes, please specify: I believe in God, I do not attend church regularly

50.    How often do you attend religious services? ( ) Regularly ☒ Occasionally ( ) Never

51.    Do you hold a special position in your religious organization? ( ) Yes ☒ No

52.    What is your political party preference? Republican

53.    Are you or is any member of your family a member of any victims rights organization? ( ) Yes ☒ No. Of any anti-crime group or other similar organization? ( ) Yes ☒ No. Of any anti-weapons or gun-control group? ( ) Yes ☒ No.

54.    Have you ever actively participated in a political campaign? ( ) Yes ☒ No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: _Dorothy Moore_

2. Place of birth: _Elba, AL_ _____ Age _65_ Sex: () Male (X) Female

3. Race: (X) Caucasian/White  () African–American/Black  () Hispanic  () Other _____

4. Do you: (X) Own home () Rent home () Rent apartment () Live with friend or relatives () Other

5. What cities/states have you lived in during the past five years? _Life time –_ _Alabama_

6. Marital status: () Single (X) Married () Divorced () Separated () Widowed. If you are married:

   Spouse's employer: _Retired from Dyncorp, Ft Rucker_

   Number of years your spouse has worked there: _43_

   Spouse's title and job responsibilities: _Sheet metal Mechanic on aircraft_

   Educational background of your spouse, including any degrees or certificates earned: _High School_

7. Do you have children? (X) Yes () No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|---------------------|----------------|--------------------------|
   | 43  | M   | Truck Driver        | No             | High school              |
   |     |     |                     |                |                          |
   |     |     |                     |                |                          |
   |     |     |                     |                |                          |

8. Your level of education: Specify the highest grade you completed:

   (a)  Elementary or high school (1–12) _High school_ College (1–4 or 5+) _1 yr_

   (b)  If college, what college, what degrees, and what was your major? _____
        _ESJC – no degree, no major_

   (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
        () Yes (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
   ( ) Full-time  ( ) Part-time  (X) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10. Your current or most recent occupation: _Home Maker_

11. Name of your current or most recent employer, or, if you are a student, your school and major:
    _Dept of Army_

12. How long have you been employed by your current or most recent employer? _25 years_

13. What are/were your specific duties and responsibilities on the job? _Secritary_

14. Do/Did you supervise other employees?  ( ) Yes  (X) No.  If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? ( ) Yes  (X) No

16. Please list all other occupations and employers you have had for the past 10 years:
    _None Other_

17. Have you ever served in the military? ( ) Yes  (X) No.  If yes, please complete the following:

    Branch: _____  Rank: _____  Dates: From _____ To _____

    Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
    _Home Maker Club, young-at-heart (church)_

19. Describe any offices you have held in the organizations listed in question 18: _3 yrs as_
    _President (Church)_

20. Have you ever served on a jury before? (X) Yes  ( ) No.  How many times? _4-5_
    What type of jury: ( ) Grand jury  (X) Civil trial jury  ( ) Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _Don't remember_

    City and state where served: _____

    What verdict was rendered?  Civil case:      (X) For plaintiff  ( ) For defendant
                                Criminal case:   ( ) For state or federal government  ( ) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes  (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X) No.
    If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? (X) Yes  ( ) No.  If yes, explain: _Sister sued former employer for_
    _Age Discrimination_

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)? ( ) Yes (X) No.   If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly? _Dothan Eagle, The Ledger_

29. What TV news programs do you watch frequently? _Today Show, Weather_

30. How many hours of TV do you watch per week? _10-12_

31. What radio programs do you listen to most? _Music_

32. Which do you find more interesting? (X) Local news ( ) National news

33. To what periodicals or magazines do you subscribe? _Family Circle, Southern Living_

34. Of the books you have read, which three are your favorites? _Left behind series, books by John Grisham_

35. Please list your hobbies, spare-time activities, and outside interests: _Gardening, reading, Church, attend adult Nutritional Center_

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives? ( ) Yes (X) No.
    If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

    ( ) Change your mind if a number of people have a different opinion?

    (X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
    ( ) Yes (X) No.  If yes, what are their names and relationship to you? _____

39. Based on your experience, what is your opinion of lawyers? ( ) Good ( ) Fair ( ) Poor *No experience*

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No. If yes, explain: _____

_____

_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No. If yes, explain: _____

_____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No. If yes, explain: _____

_____

43. List any reason why you do not wish to serve or why you should not serve: _____

_____

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (X) Yes ( ) No. If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No. If yes, please describe:

_____

_____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No. If yes, please describe: _____

_____

48. Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No. If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation?  (X) Yes  ( ) No.  If yes, please specify:  _Fro Baptist Church_

50.  How often do you attend religious services?  (X) Regularly  ( ) Occasionally  ( ) Never

51.  Do you hold a special position in your religious organization?  ( ) Yes  (X) No

52.  What is your political party preference?  _Republication_

53.  Are you or is any member of your family a member of any victims rights organization?  ( ) Yes  (X) No.  Of any anti–crime group or other similar organization?  ( ) Yes  (X) No.  Of any anti–weapons or gun–control group? ( ) Yes  (X) No.

54.  Have you ever actively participated in a political campaign?  ( ) Yes  (X) No.  If yes, ( ) Democrat?  ( ) Republican? ( ) Other  _____

855

<u>APPENDIX</u>

# RECOMMENDED
# UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: Bertha Page

2.  Place of birth: Coffee County           Age 58    Sex: ( ) Male (X) Female

3.  Race: ( ) Caucasian/White  (X) African–American/Black  ( ) Hispanic  ( ) Other _____

4.  Do you: (X) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5.  What cities/states have you lived in during the past five years? Enterprise, Al.

    _____

6.  Marital status: ( ) Single  ( ) Married  ( ) Divorced  ( ) Separated  (X) Widowed. If you are married:

    Spouse's employer: _____

    Number of years your spouse has worked there: _____

    Spouse's title and job responsibilities: _____

    Educational background of your spouse, including any degrees or certificates earned:

    _____

7.  Do you have children? (X) Yes  ( ) No. If yes, please complete the following:

| Age | Sex | School or occupation | Live with you? | Their level of education |
|-----|-----|----------------------|----------------|--------------------------|
| 34  | F   |                      | no             | 12th                     |
| 32  | m   | US navy              | no             | 12th                     |
| 31  | F   |                      | no             | 12th , Jr. College       |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) __12__    College (1–4 or 5+) _____

    (b)  If college, what college, what degrees, and what was your major? _____

    _____

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
         ( ) Yes  (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
(x) Full–time ( ) Part–time ( ) Retired ( ) Unemployed ( ) Student ( ) Homemaker

10. Your current or most recent occupation: _Q A tech._

11. Name of your current or most recent employer, or, if you are a student, your school and major:
_Conagra Poultry_

12. How long have you been employed by your current or most recent employer? _29 yrs._

13. What are/were your specific duties and responsibilities on the job? _Check Product_
_before being Shipped._

14. Do/Did you supervise other employees? ( ) Yes (x) No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? ( ) Yes (x) No

16. Please list all other occupations and employers you have had for the past 10 years:
_N/A_

17. Have you ever served in the military? ( ) Yes (x) No. If yes, please complete the following:

Branch: _____    Rank: _____    Dates: From _____ To _____

Duties: _____    Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

_____

_____

19. Describe any offices you have held in the organizations listed in question 18: _____

_____

20. Have you ever served on a jury before? (x) Yes ( ) No. How many times? _2_
What type of jury: ( ) Grand jury ( ) Civil trial jury (x) Criminal trial jury.

21. If you have served on a trial jury, please state the following: Year served: _1998_

City and state where served: _El Paino Al_

What verdict was rendered?  Civil case:       ( ) For plaintiff  ( ) For defendant
                           Criminal case:    (x) For state or federal government ( ) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes (x) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X)No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  (X)No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)? ( ) Yes  (X)No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes  (X)No

28. What newspaper(s) do you read regularly?  Southeast Sun

29. What TV news programs do you watch frequently?  WSTV - news - CNN

30. How many hours of TV do you watch per week?  10 Hrs.

31. What radio programs do you listen to most?  N/A

32. Which do you find more interesting?  (X) Local news ( ) National news

33. To what periodicals or magazines do you subscribe?  N/A

_____

34. Of the books you have read, which three are your favorites? _____

_____

35. Please list your hobbies, spare-time activities, and outside interests: _____

_____

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes  (X) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes  (X) No.  If yes, what are their names and relationship to you? _____

_____

39.  Based on your experience, what is your opinion of lawyers? (X) Good ( ) Fair ( ) Poor

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

43.  List any reason why you do not wish to serve or why you should not serve: *I work at night* *baby sit Grand Children all day.*

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes  ( ) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

46.  Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No.  If yes, please describe: _____

47.  Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No.  If yes, please describe: _____

48.  Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No.  If yes, please explain: _____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.     Do you belong to a church or otherwise have any religious affiliation? (X) Yes ( ) No. If yes, please specify: _____

50.     How often do you attend religious services? (X) Regularly ( ) Occasionally ( ) Never

51.     Do you hold a special position in your religious organization? ( ) Yes ( ) No

52.     What is your political party preference? Democrat _____

53.     Are you or is any member of your family a member of any victims rights organization? ( ) Yes ( ) No. Of any anti–crime group or other similar organization? ( ) Yes ( ) No. Of any anti–weapons or gun–control group? ( ) Yes ( ) No.

54.     Have you ever actively participated in a political campaign? ( ) Yes (X) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

APPENDIX

## RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: __Katherine M. Rasponi__

2. Place of birth: __Winterpark, Florida__ Age __26__ Sex: ( ) Male (X) Female

3. Race: (X) Caucasian/White ( ) African–American/Black ( ) Hispanic ( ) Other_____

4. Do you: ( ) Own home ( ) Rent home ( ) Rent apartment (X) Live with friend or relatives ( ) Other

5. What cities/states have you lived in during the past five years? _____
   __Auburn, AL & Enterprise, AL.__

6. Marital status: (X) Single ( ) Married ( ) Divorced ( ) Separated ( ) Widowed. If you are married:

   Spouse's employer: __n/a__

   Number of years your spouse has worked there: __n/a__

   Spouse's title and job responsibilities: __n/a__

   Educational background of your spouse, including any degrees or certificates earned:
   __n/a__

7. Do you have children? ( ) Yes (X) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|----------------------|----------------|--------------------------|
   | n/a |     |                      |                |                          |
   |     |     |                      |                |                          |
   |     |     |                      |                |                          |
   |     |     |                      |                |                          |

8. Your level of education: Specify the highest grade you completed:

   (a) Elementary or high school (1–12) _____ College (1–4 or 5+) __5+__

   (b) If college, what college, what degrees, and what was your major? _____
   __Auburn University BSBA & Troy State @ Dothan MBA__

   (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   (X) Yes ( ) No. If yes, what courses? __Business Law__

9. Your present employment status (check all that apply):
(X) Full–time ( ) Part–time ( ) Retired ( ) Unemployed ( ) Student ( ) Homemaker

10. Your current or most recent occupation: loan closing agent

11. Name of your current or most recent employer, or, if you are a student, your school and major:
Cassady Fuller & Marsh

12. How long have you been employed by your current or most recent employer? 3 yrs.

13. What are/were your specific duties and responsibilities on the job?
handling loan closing (beginning to end)
I use to be a legal assistant

14. Do/Did you supervise other employees? ( ) Yes (X) No.  If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? ( ) Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years:
ESSC: teaching assistant GED program
AU Vet library: student worker
Indigo Head: hostess
St. John's Catholic Church: youth minister

17. Have you ever served in the military? ( ) Yes (X) No.  If yes, please complete the following:

Branch: n/a _____ Rank: _____ Dates: From _____ To _____

Duties: n/a _____ Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
n/a _____

_____

19. Describe any offices you have held in the organizations listed in question 18:  n/a

_____

20. Have you ever served on a jury before? ( ) Yes (X) No.  How many times?  n/a
What type of jury: ( ) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21. If you have served on a trial jury, please state the following:  Year served:  n/a

City and state where served:  n/a _____

What verdict was rendered?  Civil case:      ( ) For plaintiff ( ) For defendant
                            Criminal case:   ( ) For state or federal government ( ) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes (X) No.
If yes, were you a witness for: ( ) Plaintiff ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes (X) No. If yes, explain: _____
    n/a

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes (X) No. If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly? The Dothan Eagle, The Enterprise Ledger, The Southeast Sun

29. What TV news programs do you watch frequently? none

30. How many hours of TV do you watch per week? less than 2 hrs

31. What radio programs do you listen to most? I do not listen to talk radio only music

32. Which do you find more interesting? (X) Local news ( ) National news

33. To what periodicals or magazines do you subscribe? n/a

34. Of the books you have read, which three are your favorites? Pride and Prejudice; The taming of the Shrew; The Grapes of Wrath

35. Please list your hobbies, spare-time activities, and outside interests: reading, movies, sports, going dancing

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives? ( ) Yes (X) No.
If yes, what do they say? n/a

37. In a group situation, once you have formed an opinion, do you usually:

    ( ) Change your mind if a number of people have a different opinion?

    (X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
    (X) Yes ( ) No. If yes, what are their names and relationship to you? _____
    no relatives but friends because I work for attorneys! (too numerous to mention)

39.  Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? (X) Yes ( ) No.  If yes, explain: _____

_I must eat regularly, because if I am excited, etc. my blood sugar goes nuts._

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

43.  List any reason why you do not wish to serve or why you should not serve: _____

_Will interfere with my job too much_

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

46.  Have you or a close relative ever been the victim of a crime? (X) Yes ( ) No.  If yes, please describe: _____

_My mother was sexually abused by her father._

47.  Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? (X) Yes ( ) No.  If yes, please describe: _____

_My father was a member of police reserves in Missouri & Alabama_

48.  Have you taken any courses or had any training in medicine or other health-care field? (X) Yes ( ) No.  If yes, please explain: _____

_CPR classes_

864

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.   Do you belong to a church or otherwise have any religious affiliation? (X) Yes ( ) No.  If yes, please
      specify: _____ *Catholic* _____

50.   How often do you attend religious services? (X) Regularly ( ) Occasionally ( ) Never

51.   Do you hold a special position in your religious organization? ( ) Yes (X) No

52.   What is your political party preference? _____

53.   Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No.
      Of any anti–crime group or other similar organization? ( ) Yes (X) No.  Of any anti–weapons or gun–
      control group? ( ) Yes (X) No.

54.   Have you ever actively participated in a political campaign? ( ) Yes (X) No.  If yes, ( ) Democrat?
      ( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
# UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: Jeffrey L. Reynolds (Address is 104 Crescent Dr. Enterprise)

2.  Place of birth: Enterprise AL.    Age 40    Sex: (X) Male ( ) Female

3.  Race: (X) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4.  Do you: (X) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5.  What cities/states have you lived in during the past five years?    Enterprise, AL.

6.  Marital status: ( ) Single  (X) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

    Spouse's employer:    Quality Printing

    Number of years your spouse has worked there:  3

    Spouse's title and job responsibilities:    Typesetter

    Educational background of your spouse, including any degrees or certificates earned:

    12th grade

7.  Do you have children? (X) Yes  ( ) No. If yes, please complete the following:

| Age | Sex | School or occupation | Live with you? | Their level of education |
|-----|-----|----------------------|----------------|--------------------------|
| 10  | F   | Hillcrest Elem       | yes            | 5th gr.                  |
| 7   | M   | "          "         | "              | 2nd gr.                  |
|     |     |                      |                |                          |
|     |     |                      |                |                          |

8.  Your level of education: Specify the highest grade you completed:

    (a)    Elementary or high school (1–12)   12th grade   College (1–4 or 5+) _____

    (b)    If college, what college, what degrees, and what was your major? _____

    (c)    Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
           ( ) Yes  (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
   (X) Full–time  ( ) Part–time  ( ) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10. Your current or most recent occupation:  _letter Carrier   USPS_

11. Name of your current or most recent employer, or, if you are a student, your school and major:

    _USPS_

12. How long have you been employed by your current or most recent employer?  _8yr_

13. What are/were your specific duties and responsibilities on the job?  _letter carrier_

    _____

14. Do/Did you supervise other employees?  ( ) Yes  (X) No.  If yes, how many?  _____

15. Do/Did you have responsibility for hiring and firing?  ( ) Yes  (X) No

16. Please list all other occupations and employers you have had for the past 10 years:
    _Gen. Mgr. Shoneys Rest._

    _____

17. Have you ever served in the military? (X) Yes  ( ) No.  If yes, please complete the following:

    Branch: _Army_    Rank: _E-4_    Dates: From _Oct 83_ To _Oct 87_

    Duties: _Tank mechanic_    Type of discharge: _Honorable_

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

    ~~____~~  _NALC_

    _____

19. Describe any offices you have held in the organizations listed in question 18:  _None_

20. Have you ever served on a jury before?  ( ) Yes  (X) No.  How many times?  _____
    What type of jury: ( ) Grand jury  ( ) Civil trial jury  ( ) Criminal trial jury

21. If you have served on a <u>trial jury</u>, please state the following: Year served:  _____

    City and state where served:  _____

    What verdict was rendered?  Civil case:       ( ) For plaintiff  ( ) For defendant
                                Criminal case:  ( ) For state or federal government  ( ) For defendant

22. Have you ever served as a <u>foreperson</u> on a grand jury or a trial jury?  ( ) Yes  (X) No

23.  Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X) No.
     If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or
     criminal case.

24.  Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes  (X) No.  If yes,
     explain: _____

     _____

25.  Have you ever been to court for any other reason (excluding divorce or traffic cases)?
     ( ) Yes  (X) No.   If yes, explain: _____

26.  Have you ever been arrested? ( ) Yes  (X) No

27.  Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes  (X) No

28.  What newspaper(s) do you read regularly?  _Dothan Eagle / Eprise Ledger_

29.  What TV news programs do you watch frequently?  _none_

30.  How many hours of TV do you watch per week?  _10 - 15_

31.  What radio programs do you listen to most?  _None_

32.  Which do you find more interesting? (X) Local news ( ) National news

33.  To what periodicals or magazines do you subscribe?  _US Weekly , TV Guide_

34.  Of the books you have read, which three are your favorites?  _Don't Read Books_

     _____

35.  Please list your hobbies, spare-time activities, and outside interests:  _lift weights , swim,_
     _cooking , family_

36.  Are there bumper stickers on the vehicles that you drive or that your spouse drives?     ( ) Yes  (X) No.
     If yes, what do they say? _____

37.  In a group situation, once you have formed an opinion, do you usually:

     ( ) Change your mind if a number of people have a different opinion?

     (X) Stand by your original opinion despite what others believe?

38.  Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
     ( ) Yes (X) No.  If yes, what are their names and relationship to you? _____

     _____

39.  Based on your experience, what is your opinion of lawyers? (✓) Good ( ) Fair ( ) Poor

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (✓) No.  If yes, explain: _____

_____

_____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (✓) No.  If yes, explain: _____

_____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (✓) No.  If yes, explain: _____

_____

43.  List any reason why you do not wish to serve or why you should not serve:  ___None___

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (✓) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (✓) Yes ( ) No.  If no, why not? _____

_____

46.  Have you or a close relative ever been the victim of a crime? ( ) Yes (✓) No.  If yes, please describe:

_____

_____

47.  Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (✓) No.  If yes, please describe: _____

_____

48.  Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (✓) No.  If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation? (✗) Yes ( ) No.  If yes, please specify: _Hillcrest Baptist member_

50.  How often do you attend religious services? ( ) Regularly (✗) Occasionally ( ) Never

51.  Do you hold a special position in your religious organization? ( ) Yes (✗) No

52.  What is your political party preference? _Democrat_

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes (✗) No.  Of any anti–crime group or other similar organization? ( ) Yes (✗) No.  Of any anti–weapons or gun–control group? ( ) Yes (✗) No.

54.  Have you ever actively participated in a political campaign? ( ) Yes (✗) No.  If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

870

APPENDIX

# RECOMMENDED
# UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: Mark R. Reynolds

2.  Place of birth: Opp. Al.    Age 37    Sex: (x) Male ( ) Female

3.  Race: (x) Caucasian/White  ( ) African–American/Black  ( ) Hispanic ( ) Other _____

4.  Do you: (x) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5.  What cities/states have you lived in during the past five years? Enterprise / Al

6.  Marital status: ( ) Single  (x) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

    Spouse's employer: Home maker

    Number of years your spouse has worked there: _____

    Spouse's title and job responsibilities: _____

    Educational background of your spouse, including any degrees or certificates earned:

    _____

7.  Do you have children? (x) Yes ( ) No. If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|----------------------|----------------|--------------------------|
    | 6   | M   | College Street       | yes            | 1st grade                |
    | 4   | F   | Eloise Preshool      | yes            | Pre-school               |
    |     |     |                      |                |                          |
    |     |     |                      |                |                          |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) _____    College (1–4 or 5+) 2

    (b)  If college, what college, what degrees, and what was your major? aviation maintenance technology

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
         ( ) Yes (x) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
   (X) Full–time ( ) Part–time ( ) Retired ( ) Unemployed ( ) Student ( ) Homemaker

10. Your current or most recent occupation: Aircraft mechanic

11. Name of your current or most recent employer, or, if you are a student, your school and major:

    DynCorp

12. How long have you been employed by your current or most recent employer? 17 yrs.

13. What are/were your specific duties and responsibilities on the job? Help perform test flights on aircraft

14. Do/Did you supervise other employees? ( ) Yes (X) No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? ( ) Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years:

    _____

    _____

17. Have you ever served in the military? ( ) Yes (X) No. If yes, please complete the following:

    Branch: _____  Rank: _____  Dates: From _____ To _____

    Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

    IAM union 2003

    _____

19. Describe any offices you have held in the organizations listed in question 18: _____

    _____

20. Have you ever served on a jury before? (X) Yes (X) No.  How many times? ___0___
    What type of jury: ( ) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____

    City and state where served: _____

    What verdict was rendered? Civil case:     ( ) For plaintiff ( ) For defendant
                               Criminal case:  ( ) For state or federal government ( ) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X)No.
    If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  (X)No.  If yes, explain: _____

    _____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
    ( ) Yes  (X)No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  (X)No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X)No

28. What newspaper(s) do you read regularly?  _None_____

29. What TV news programs do you watch frequently?  _None_____

30. How many hours of TV do you watch per week?  _3 hrs._____

31. What radio programs do you listen to most?  _____

32. Which do you find more interesting?  (X)Local news ( ) National news

33. To what periodicals or magazines do you subscribe? _____

    _____

34. Of the books you have read, which three are your favorites?  _____

    _____

35. Please list your hobbies, spare-time activities, and outside interests:  _Spend  time  with_
    _family_____

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes (X)No.
    If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

    ( ) Change your mind if a number of people have a different opinion?

    (X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
    ( ) Yes (X)No.  If yes, what are their names and relationship to you? _____

    _____

873

39.  Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent
     you from serving as a juror? ( ) Yes (X) No.  If yes, explain:  _____

     _____

     _____

     _____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror?
     ( ) Yes (X) No.  If yes, explain: _____

     _____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial
     juror? ( ) Yes (X) No.  If yes, explain:  _____

     _____

43.  List any reason why you do not wish to serve or why you should not serve:  _____

     _____

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to
     make it easier to convict? ( ) Yes  (X) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you
     agree with that principle? (X) Yes ( ) No.  If no, why not?  _____

     _____

46.  Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No. If yes, please describe:

     _____

     _____

47.  Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state
     trooper, prison guard, or military police?  ( ) Yes  (X) No. If yes, please describe:  _____

     _____

48.  Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No. If
     yes, please explain:  _____

     _____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.    Do you belong to a church or otherwise have any religious affiliation? (X) Yes ( ) No. If yes, please specify: _____

50.    How often do you attend religious services? (X) Regularly ( ) Occasionally ( ) Never

51.    Do you hold a special position in your religious organization? (X) Yes ( ) No

52.    What is your political party preference? _____

53.    Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No. Of any anti-crime group or other similar organization? ( ) Yes ( ) No. Of any anti-weapons or gun-control group? ( ) Yes ( ) No.

54.    Have you ever actively participated in a political campaign? ( ) Yes (X) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: Charles S. Richards

2. Place of birth: Samson, AL.    Age 58    Sex: (X) Male ( ) Female

3. Race: (X) Caucasian/White   ( ) African–American/Black   ( ) Hispanic  ( ) Other _____

4. Do you: (X) Own home ( ) Rent home ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5. What cities/states have you lived in during the past five years? N/A _____

6. Marital status: ( ) Single  (X) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

    Spouse's employer: City of Enterprise _____

    Number of years your spouse has worked there: 3½ yrs

    Spouse's title and job responsibilities: School Crossing Guard

    Educational background of your spouse, including any degrees or certificates earned:
    12th grade education  Enterprise High School (1968)

7. Do you have children? (X) Yes ( ) No. If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|----------------------|----------------|--------------------------|
    | 31  | M   | OLD NAVY (Manager)   | No             | Graduated Troy State University |
    |     |     |                      |                |                          |
    |     |     |                      |                |                          |
    |     |     |                      |                |                          |

8. Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12)  7th    College (1–4 or 5+) _____

    (b)  If college, what college, what degrees, and what was your major? _____

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
    ( ) Yes (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
(X) Full-time ( ) Part-time ( ) Retired ( ) Unemployed ( ) Student ( ) Homemaker

10. Your current or most recent occupation: MainTenance

11. Name of your current or most recent employer, or, if you are a student, your school and major:

ConAgra

12. How long have you been employed by your current or most recent employer? 24 yrs.

13. What are/were your specific duties and responsibilities on the job? Help Keep The plant
Running

14. Do/Did you supervise other employees? ( ) Yes (X) No.  If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? ( ) Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years:

_____

_____

17. Have you ever served in the military? ( ) Yes (X) No.  If yes, please complete the following:

Branch: _____    Rank: _____    Dates: From _____ To _____

Duties: _____    Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

None

_____

19. Describe any offices you have held in the organizations listed in question 18: None

_____

20. Have you ever served on a jury before? (X) Yes ( ) No.  How many times? ___1___
What type of jury: ( ) Grand jury ( ) Civil trial jury (X) Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: 1985

City and state where served: ENTerprise, AL

What verdict was rendered?  Civil case:      ( ) For plaintiff ( ) For defendant
                             Criminal case:  (X) For state or federal government ( ) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? (X) Yes  ( ) No.
    If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government (X) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? (X) Yes  ( ) No.  If yes, explain: SMALL CLAIMS COURT - Had TREES CUT dowN + limb got away From them + I had pROpERTy damage (boat)

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
    ( ) Yes (X) No.  If yes, explain: _____

26. Have you ever been arrested? (X) Yes  ( ) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly? Dothan Eagle + ENTERpRise LedgeR

29. What TV news programs do you watch frequently? WTVY - TV

30. How many hours of TV do you watch per week? 15 hRS

31. What radio programs do you listen to most? WTVY 95.5

32. Which do you find more interesting? (X) Local news ( ) National news

33. To what periodicals or magazines do you subscribe? Bass MasTeR

34. Of the books you have read, which three are your favorites? _____

35. Please list your hobbies, spare-time activities, and outside interests: Fishing, Camping

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?  ( ) Yes (X) No.
    If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

    ( ) Change your mind if a number of people have a different opinion?

    (X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
    ( ) Yes (X) No.  If yes, what are their names and relationship to you? _____
    _____

39.    Based on your experience, what is your opinion of lawyers? (X) Good ( ) Fair ( ) Poor

40.    Do you have any medical problems (for example, problems with your vision or hearing) that may prevent
       you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

       _____

       _____

41.    Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror?
       ( ) Yes (X) No.  If yes, explain: _____

       _____

42.    Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial
       juror? ( ) Yes (X) No.  If yes, explain: _____

       _____

43.    List any reason why you do not wish to serve or why you should not serve: _____

       _____

44.    Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to
       make it easier to convict? ( ) Yes (X) No

45.    In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you
       agree with that principle? (X) Yes ( ) No.  If no, why not? _____

       _____

46.    Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No.  If yes, please describe:

       _____

       _____

47.    Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state
       trooper, prison guard, or military police?  ( ) Yes (X) No.  If yes, please describe: _____

       _____

48.    Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No.  If
       yes, please explain: _____

       _____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.   Do you belong to a church or otherwise have any religious affiliation?  ( ) Yes ( ) No.  If yes, please
      specify: _____

50.   How often do you attend religious services? ( ) Regularly ( ) Occasionally ( ) Never

51.   Do you hold a special position in your religious organization? ( ) Yes ( ) No

52.   What is your political party preference? _____

53.   Are you or is any member of your family a member of any victims rights organization? ( ) Yes ( ) No.
      Of any anti–crime group or other similar organization? ( ) Yes ( ) No.  Of any anti–weapons or gun–
      control group? ( ) Yes ( ) No.

54.   Have you ever actively participated in a political campaign?  ( ) Yes ( ) No.  If yes, ( ) Democrat?
      ( ) Republican? ( ) Other _____

APPENDIX

## RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: _Joyce J. Roberts_

2.  Place of birth: _Enterprise (Coffee)_ ___ Age _66_ ___ Sex: () Male (X) Female

3.  Race: (X) Caucasian/White  () African–American/Black  () Hispanic () Other _____

4.  Do you: (X) Own home () Rent home () Rent apartment () Live with friend or relatives () Other

5.  What cities/states have you lived in during the past five years? _Enterprise_

6.  Marital status: () Single () Married () Divorced () Separated (X) Widowed. If you are married:

    Spouse's employer: _____

    Number of years your spouse has worked there: _____

    Spouse's title and job responsibilities: _____

    Educational background of your spouse, including any degrees or certificates earned:

    _____

7.  Do you have children? (X) Yes () No. If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|----------------------|----------------|--------------------------|
    | 48 | m | Preacher-Finances | No | High School |
    | 46 | F | Medical Records | NO | College (Boone) |
    | 45 | F | Unemployed | NO | College (Boone) |
    | 37 | m | Recycle Business | NO | college (Some) |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) _Ged_ ___ College (1–4 or 5+) _Some Course_

    (b)  If college, what college, what degrees, and what was your major? _____

        _ESJC    no degree_

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
        (X) Yes (X) No. If yes, what courses? _____

*881*

9.  Your present employment status (check all that apply):
() Full-time () Part-time (X) Retired () Unemployed () Student () Homemaker

10. Your current or most recent occupation: *Clerk – Coffee County Health Dept*

11. Name of your current or most recent employer, or, if you are a student, your school and major:

*Coffee County Health Department*

12. How long have you been employed by your current or most recent employer? *24 year – before retiring*

13. What are/were your specific duties and responsibilities on the job? 

*Waiting on the Public – Supervising other employees*

14. Do/Did you supervise other employees? (X) Yes () No.  If yes, how many? *5 – 6*

15. Do/Did you have responsibility for hiring and firing? (X) Yes () No

16. Please list all other occupations and employers you have had for the past 10 years:
*Auction – The Ole Barn – Dinner*

17. Have you ever served in the military? () Yes (X) No.  If yes, please complete the following:

Branch: _____  Rank: _____  Dates: From _____ To _____

Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

_____

_____

19. Describe any offices you have held in the organizations listed in question 18: _____

_____

20. Have you ever served on a jury before? (X) Yes () No.  How many times? *1*
What type of jury: () Grand jury (X) Civil trial jury () Criminal trial jury

21. If you have served on a trial jury, please state the following:  Year served: *1990?*

City and state where served: *Enterprise, Al.*

What verdict was rendered?  Civil case:        () For plaintiff (X) For defendant
                          Criminal case:    () For state or federal government () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes (X) No

882

23.  Have you testified as a <u>witness</u> in any court proceeding? (X)Yes  ( ) No.
     If yes, were you a witness for: (X) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or
     criminal case.

24.  Have you or anyone close to you ever sued or been sued in any type of lawsuit? (X)Yes ( ) No. If yes,
     explain: _I am in a class Action suit on behalf of my_
     _space - Rezulin -_

25.  Have you ever been to court for any other reason (excluding divorce or traffic cases)?
     ( ) Yes (X)No.   If yes, explain: _____

26.  Have you ever been arrested? ( ) Yes (X)No

27.  Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X)No

28.  What newspaper(s) do you read regularly? _Dothan Eagle_

29.  What TV news programs do you watch frequently? ___—___

30.  How many hours of TV do you watch per week? _very little      (3)_

31.  What radio programs do you listen to most? ___—___

32.  Which do you find more interesting? (X)Local news ( ) National news

33.  To what periodicals or magazines do you subscribe? _Country Woman_

34.  Of the books you have read, which three are your favorites? _Any thing written by_
     _Sandra Brown - (mirror Image)_

35.  Please list your hobbies, spare-time activities, and outside interests: _____
     ___—___

36.  Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes (X)No.
     If yes, what do they say? _____

37.  In a group situation, once you have formed an opinion, do you usually:

     ( ) Change your mind if a number of people have a different opinion?

     (X) Stand by your original opinion despite what others believe?

38.  Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
     (X) Yes ( ) No.  If yes, what are their names and relationship to you? _____
     _~~____~~ Friend of Mickey County_

883

39.   Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor

40.   Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41.   Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

42.   Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

_____

43.   List any reason why you do not wish to serve or why you should not serve: _____

_____

44.   Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45.   In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

_____

46.   Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No.  If yes, please describe:

_____

_____

47.   Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? (X) Yes ( ) No.  If yes, please describe: _____

_Son in Law - worked with Sheriff department - 4 years - ago_

48.   Have you taken any courses or had any training in medicine or other health-care field? (X) Yes ( ) No.  If yes, please explain: _with the health Dept - we had some_

_courses in birth Control & Hypertension -_

884

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation?  (X) Yes ( ) No.  If yes, please specify: _Open Door Baptist_

50.  How often do you attend religious services?  (X) Regularly ( ) Occasionally ( ) Never

51.  Do you hold a special position in your religious organization?  ( ) Yes (X) No

52.  What is your political party preference?  _____

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No. Of any anti–crime group or other similar organization? ( ) Yes (X) No. Of any anti–weapons or gun–control group? ( ) Yes (X) No.

54.  Have you ever actively participated in a political campaign?  ( ) Yes (X) No.  If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

885

APPENDIX

RECOMMENDED
UNIFORM JUROR QUESTIONNAIRE



AUG 2 '02
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: _Sara (Teresa) Rowe_

2. Place of birth: _Andalusia, Ala_ Age _47_ Sex: ( ) Male (✗) Female

3. Race: (✗) Caucasian/White ( ) African–American/Black ( ) Hispanic ( ) Other _____

4. Do you: (✗) Own home ( ) Rent home ( ) Rent apartment ( ) Live with friend or relatives ( ) Other

5. What cities/states have you lived in during the past five years? _Alabama_

6. Marital status: ( ) Single (✗) Married ( ) Divorced ( ) Separated ( ) Widowed. If you are married:

   Spouse's employer: _Retired ESJC_

   Number of years your spouse has worked there: _32_

   Spouse's title and job responsibilities: _Teacher – Retired_

   Educational background of your spouse, including any degrees or certificates earned:
   _~~~~ Phd_

7. Do you have children? (✗) Yes ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|----------------------|----------------|--------------------------|
   | 29 | M | Engineer | NO | College degree 4 yr. |
   | 35 | F | Realtor | NO | " " 4 yr. |
   | 33 | F | teacher | NO | " " 4 yr. |
   | 30 | F | Speech Therapy | NO | " " 4 yr. |

8. Your level of education: Specify the highest grade you completed:

   (a) Elementary or high school (1–12) _11_    College (1–4 or 5+) _2 yr._

   (b) If college, what college, what degrees, and what was your major? _ESJC_
   _Business_

   (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   ( ) Yes (✗) No. If yes, what courses? _____

886

9.   Your present employment status (check all that apply):
     (X) Full–time  ( ) Part–time  ( ) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10.  Your current or most recent occupation: *Business owner*

11.  Name of your current or most recent employer, or, if you are a student, your school and major:
     *Owner-operator   Memories Antique Shop*

12.  How long have you been employed by your current or most recent employer? *9 years*

13.  What are/were your specific duties and responsibilities on the job? *Buying, Selling*
     *Banking, inventory, Taxes, etc.*

14.  Do/Did you supervise other employees? (X) Yes ( ) No.  If yes, how many? *1 part time*

15.  Do/Did you have responsibility for hiring and firing? (X) Yes ( ) No

16.  Please list all other occupations and employers you have had for the past 10 years:
     *File Medical insurance*
     _____

17.  Have you ever served in the military? ( ) Yes (X) No.  If yes, please complete the following:

     Branch: _____  Rank: _____  Dates: From _____ To _____

     Duties: _____  Type of discharge: _____

18.  What social, civic, professional, trade, union, or other organizations are you affiliated with?
     *None*
     _____

19.  Describe any offices you have held in the organizations listed in question 18: _____

     _____

20.  Have you ever served on a jury before? ( ) Yes (X) No.   How many times? _____
     What type of jury: ( ) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21.  If you have served on a trial jury, please state the following: Year served: _____

     City and state where served: _____

     What verdict was rendered?  Civil case:      ( ) For plaintiff  ( ) For defendant
                                 Criminal case:   ( ) For state or federal government ( ) For defendant

22.  Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes (X) No

88

23. Have you testified as a witness in any court proceeding? ( ) Yes (X) No.
If yes, were you a witness for: ( ) Plaintiff ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes (X) No.  If yes, explain: _____
_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes (X) No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly? _Dothan Eagle_

29. What TV news programs do you watch frequently? _CNN_

30. How many hours of TV do you watch per week? _20_

31. What radio programs do you listen to most? _"music only"_

32. Which do you find more interesting? ( ) Local news (X) National news

33. To what periodicals or magazines do you subscribe? _Antique Weekly_
_Time Magazine_

34. Of the books you have read, which three are your favorites? _NA_
_____

35. Please list your hobbies, spare-time activities, and outside interests: _~~Dogs~~ My Dogs._
_Antiqueing - flea markets_

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes (X) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (X) No.  If yes, what are their names and relationship to you? _____
_____

39.  Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No. If yes, explain: _____

_____

_____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No. If yes, explain: _____

_____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No. If yes, explain: _____

_____

43.  List any reason why you do not wish to serve or why you should not serve: _____

_____

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (X) Yes ( ) No. If no, why not? _____

_____

46.  Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No. If yes, please describe:

_____

_____

47.  Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? (X) Yes ( ) No. If yes, please describe: _____
_Father    Coffee County, Game Warden_

48.  Have you taken any courses or had any training in medicine or other health-care field? (X) Yes ( ) No. If yes, please explain: _Worked in Several Doctors' offices_
_Took EMS Corses. – was a Medical Assonant_

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation? ( ) Yes (X) No.  If yes, please specify: _____

50.  How often do you attend religious services? ( ) Regularly (X) Occasionally ( ) Never

51.  Do you hold a special position in your religious organization? ( ) Yes (X) No

52.  What is your political party preference? ___Democrate_____

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No. Of any anti–crime group or other similar organization? ( ) Yes (X) No. Of any anti–weapons or gun–control group? ( ) Yes (X) No.

54.  Have you ever actively participated in a political campaign? ( ) Yes (X) No.  If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

890

<u>APPENDIX</u>

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE



*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: **Evelyn Leigh Ryan**

2. Place of birth: **Enterprise, AL**　　Age **37**　Sex: ( ) Male (X) Female

3. Race: (X) Caucasian/White　( ) African–American/Black　( ) Hispanic　( ) Other _____

4. Do you: (X) Own home　( ) Rent home　( ) Rent apartment　( ) Live with friend or relatives　( ) Other

5. What cities/states have you lived in during the past five years? **Enterprise, AL**
   _____

6. Marital status: ( ) Single　(X) Married　( ) Divorced　( ) Separated　( ) Widowed. If you are married:

   Spouse's employer: **Dunbarton**

   Number of years your spouse has worked there: **3**

   Spouse's title and job responsibilities: **National Sales Manager**

   Educational background of your spouse, including any degrees or certificates earned:
   **B.S. Computers / Business**

7. Do you have children? (X) Yes　( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|----------------------|----------------|--------------------------|
   | 14  | F   | Dauphin              | yes            |                          |
   | 9   | F   | Holly Hill           | yes            |                          |
   | 7   | F   | Holly Hill           | yes            |                          |

8. Your level of education: Specify the highest grade you completed:

   (a)　Elementary or high school (1–12) _____　College (1–4 or (5+) _____

   (b)　If college, what college, what degrees, and what was your major? _____
   **B.S. Business/Finance　M.A English Ed.**

   (c)　Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   ( ) Yes　(X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
   (X) Full–time  (X) Part–time  ( ) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10. Your current or most recent occupation: _Teacher_

11. Name of your current or most recent employer, or, if you are a student, your school and major:
    _First Baptist Church_

12. How long have you been employed by your current or most recent employer? _3 yrs._

13. What are/were your specific duties and responsibilities on the job? _____
    _Teach Preschool_

14. Do/Did you supervise other employees?  ( ) Yes  (X) No.  If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing?  ( ) Yes  (X) No

16. Please list all other occupations and employers you have had for the past 10 years:
    _____
    _____

17. Have you ever served in the military?  ( ) Yes  (X) No.  If yes, please complete the following:

    Branch: _____  Rank: _____  Dates:  From _____  To _____

    Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
    (X) _Chautauqua Club_ _____
    _____

19. Describe any offices you have held in the organizations listed in question 18: _____
    _____

20. Have you ever served on a jury before?  ( ) Yes  (X) No.  How many times? _____
    What type of jury:  ( ) Grand jury  ( ) Civil trial jury  ( ) Criminal trial jury

21. If you have served on a <u>trial jury</u>, please state the following:  Year served: _____

    City and state where served: _____

    What verdict was rendered?  Civil case:     ( ) For plaintiff  ( ) For defendant
                                Criminal case:  ( ) For state or federal government  ( ) For defendant

22. Have you ever served as a <u>foreperson</u> on a grand jury or a trial jury?  ( ) Yes  (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes (X) No.
    If yes, were you a witness for: ( ) Plaintiff ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes (X) No. If yes, explain: _____

    _____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
    ( ) Yes (X) No. If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly? _____ none

29. What TV news programs do you watch frequently? _____ 6:00 news

30. How many hours of TV do you watch per week? _____ 2 (maybe)

31. What radio programs do you listen to most? WKMX   AFR

32. Which do you find more interesting? (X) Local news ( ) National news

33. To what periodicals or magazines do you subscribe? Southern Living

    _____

34. Of the books you have read, which three are your favorites? To Kill A Mockingbird
    Pride + Prejudice    Proverbs

35. Please list your hobbies, spare-time activities, and outside interests: _____

    piano , reading

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives? ( ) Yes (X) No.
    If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

    ( ) Change your mind if a number of people have a different opinion?

    (X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
    ( ) Yes (X) No. If yes, what are their names and relationship to you? _____

    _____

39.   Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor *from an overhead projector, etc.*

40.   Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes ( ) No.  If yes, explain:  *I'm not sure.*
*I just had lasiks surgery + I need an enhancement, but I can see well enough to drive. I cannot read from across the room*

41.   Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

42.   Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

43.   List any reason why you do not wish to serve or why you should not serve: _____
*I'd rather be in my classroom teaching.*

44.   Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45.   In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

46.   Have you or a close relative ever been the victim of a crime? (X) Yes ( ) No.  If yes, please describe:
*My parents have had articles stolen from inside their beach house (purse, jewelry, etc)*

47.   Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? (X) Yes ( ) No.  If yes, please describe:  *brother,*
*Reserve police officer*

48.   Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No.  If yes, please explain: _____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation? (X) Yes ( ) No.  If yes, please specify: _____ First Baptist Church _____

50.  How often do you attend religious services? (X) Regularly ( ) Occasionally ( ) Never

51.  Do you hold a special position in your religious organization? (X) Yes ( ) No   Personel Committee

52.  What is your political party preference? _____ Independent _____

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No. Of any anti-crime group or other similar organization? ( ) Yes (X) No. Of any anti-weapons or gun-control group? ( ) Yes (X) No.

54.  Have you ever actively participated in a political campaign? ( ) Yes (X) No.  If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
# UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: Emmett J. Smith

2.  Place of birth: Coffe County _____ Age 54 _____ Sex: (X) Male ( ) Female

3.  Race: (X) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4.  Do you: (X) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5.  What cities/states have you lived in during the past five years? Enterprise Ala

6.  Marital status: ( ) Single  (X) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

    Spouse's employer: Conagra

    Number of years your spouse has worked there: 20

    Spouse's title and job responsibilities: QC

    Educational background of your spouse, including any degrees or certificates earned:

    12 grade

7.  Do you have children? (X) Yes ( ) No. If yes, please complete the following:

| Age | Sex | School or occupation | Live with you? | Their level of education |
|-----|-----|----------------------|----------------|--------------------------|
| 23  | M   | warehouse Manager    |                | 2 year College           |
|     |     |                      |                |                          |
|     |     |                      |                |                          |
|     |     |                      |                |                          |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) __7__    College (1–4 or 5+) _____

    (b)  If college, what college, what degrees, and what was your major? _____

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
         ( ) Yes  (X) No.  If yes, what courses? _____

9. Your present employment status (check all that apply):
(X) Full-time () Part-time () Retired () Unemployed () Student () Homemaker

10. Your current or most recent occupation: _Painter_

11. Name of your current or most recent employer, or, if you are a student, your school and major:

_Self_

12. How long have you been employed by your current or most recent employer?

13. What are/were your specific duties and responsibilities on the job? _5 years self employed_

14. Do/Did you supervise other employees? () Yes (X) No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? (X) Yes () No

16. Please list all other occupations and employers you have had for the past 10 years:

_~~Self~~ painting B R Baley Dothan Ala._

17. Have you ever served in the military? () Yes (X) No. If yes, please complete the following:

Branch: _____   Rank: _____   Dates: From _____ To _____

Duties: _____   Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

_None_

19. Describe any offices you have held in the organizations listed in question 18: _None_

20. Have you ever served on a jury before? () Yes (X) No.  How many times? _____
What type of jury: () Grand jury () Civil trial jury () Criminal trial jury

21. If you have served on a trial jury, please state the following:  Year served: _____

City and state where served: _____

What verdict was rendered?  Civil case:        () For plaintiff  () For defendant
                            Criminal case:     () For state or federal government () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes (X) No

897

23.    Have you testified as a <u>witness</u> in any court proceeding?  ( ) Yes   (X) No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24.    Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes (X) No.  If yes, explain: _____

_____

25.    Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes (X) No.  If yes, explain: _____

26.    Have you ever been arrested? (X) Yes ( ) No

27.    Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28.    What newspaper(s) do you read regularly?  __None__

29.    What TV news programs do you watch frequently?  __Chanel 12__

30.    How many hours of TV do you watch per week?  __4__

31.    What radio programs do you listen to most?  __96.9__

32.    Which do you find more interesting? (X) Local news ( ) National news

33.    To what periodicals or magazines do you subscribe?  __None__

_____

34.    Of the books you have read, which three are your favorites?  _____

_____

35.    Please list your hobbies, spare-time activities, and outside interests: _____

_____

36.    Are there bumper stickers on the vehicles that you drive or that your spouse drives?  ( ) Yes (X) No.
If yes, what do they say? _____

37.    In a group situation, once you have formed an opinion, do you usually:

    ( ) Change your mind if a number of people have a different opinion?

    (X) Stand by your original opinion despite what others believe?

38.    Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (X) No.  If yes, what are their names and relationship to you? _____

_____

39.  Based on your experience, what is your opinion of lawyers? ( ) Good ( ) Fair (X) Poor

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

_____

43.  List any reason why you do not wish to serve or why you should not serve: _____

_____

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

_____

46.  Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No.  If yes, please describe:

_____

_____

47.  Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No.  If yes, please describe: _____

_____

48.  Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No.  If yes, please explain: _____

_____

*899*

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.   Do you belong to a church or otherwise have any religious affiliation? ( ) Yes (X) No.  If yes, please
      specify: _____

50.   How often do you attend religious services? ( ) Regularly ( ) Occasionally (X) Never

51.   Do you hold a special position in your religious organization? ( ) Yes (X) No

52.   What is your political party preference? _____

53.   Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No.
      Of any anti–crime group or other similar organization? ( ) Yes (X) No.  Of any anti–weapons or gun–
      control group? ( ) Yes (X) No.

54.   Have you ever actively participated in a political campaign? ( ) Yes (X) No.  If yes, ( ) Democrat?
      ( ) Republican? ( ) Other _____

<u>APPENDIX</u>

# RECOMMENDED
# UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: ___JEFF SMITH___

2.  Place of birth: ___ELBA   ALABAMA___ Age _61_   Sex: (x) Male ( ) Female

3.  Race: (X) Caucasian/White   ( ) African–American/Black   ( ) Hispanic   ( ) Other _____

4.  Do you: (X) Own home   ( ) Rent home   ( ) Rent apartment   ( ) Live with friend or relatives   ( ) Other

5.  What cities/states have you lived in during the past five years? ___NEW BROCKTON   AL___

    _____

6.  Marital status: ( ) Single   (X) Married   ( ) Divorced   ( ) Separated   ( ) Widowed. If you are married:

    Spouse's employer: ___CIVIL  SERVICE___

    Number of years your spouse has worked there: _20_

    Spouse's title and job responsibilities: ___SECRETARY___

    Educational background of your spouse, including any degrees or certificates earned:

    _____12 YRS_____

7.  Do you have children? (X) Yes ( ) No. If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|----------------------|----------------|--------------------------|
    | 34 | MALE | COMPUTER PROGRAMER | NO | COLLEGE  4+YRS |
    | 32 | MALE | RESTAURANT OPERATOR | NO | COLLEGE  2YRS |
    | — | — | | | |
    | — | — | | | |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12)  _12YRS_     College (1–4 or 5+) _____

    (b)  If college, what college, what degrees, and what was your major? _____

    _____

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
         ( ) Yes (X) No. If yes, what courses? _____

9.  Your present employment status (check all that apply):
(x) Full–time  ( ) Part–time  ( ) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10.  Your current or most recent occupation:  __MEAT DEPARTMENT MANAGER__

11.  Name of your current or most recent employer, or, if you are a student, your school and major:

_____DECA   ARMY COMMISSARY   FT RUCKER_____

12.  How long have you been employed by your current or most recent employer?  17 YRS

13.  What are/were your specific duties and responsibilities on the job?  ___MANAGER OF THE

_DAY TO DAY OPERATION OF THE MEAT DEPARTMENT_____

14.  Do/Did you supervise other employees?  (x) Yes  ( ) No.  If yes, how many?  _8_

15.  Do/Did you have responsibility for hiring and firing?  (x) Yes  ( ) No

16.  Please list all other occupations and employers you have had for the past 10 years:
_____NONE_____

17.  Have you ever served in the military?  (x) Yes  ( ) No.  If yes, please complete the following:

Branch: __ARMY___    Rank: __SGT___    Dates: From _1965___ To __1967__

Duties: ____SUPPLIES_____    Type of discharge: __HONORABLE____

18.  What social, civic, professional, trade, union, or other organizations are you affiliated with?

_____NONE_____

19.  Describe any offices you have held in the organizations listed in question 18:  __N/A_____

20.  Have you ever served on a jury before?  (x) Yes  ( ) No.  How many times?  _____
What type of jury:  (x) Grand jury  ( ) Civil trial jury  (x) Criminal trial jury

21.  If you have served on a trial jury, please state the following: Year served:  LATE SEVENTY

City and state where served: ____ENTERPRISE  ALABAMA_____

What verdict was rendered?  Civil case:      ( ) For plaintiff  ( ) For defendant
Criminal case:   (x) For state or federal government  ( ) For defendant

22.  Have you ever served as a foreperson on a grand jury or a trial jury?  ( ) Yes  (x) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (x) No.
    If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  (x) No.  If yes, explain: _____

    _____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
    ( ) Yes  (x) No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  (x) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? (x) Yes ( ) No

28. What newspaper(s) do you read regularly? <u>EAGLE — SUNDAY,      SUN — WEDNESDAY</u>

29. What TV news programs do you watch frequently? <u>NATIONAL</u>

30. How many hours of TV do you watch per week? <u>10 — 14</u>

31. What radio programs do you listen to most? <u>NONE</u>

32. Which do you find more interesting? ( ) Local news  (x) National news

33. To what periodicals or magazines do you subscribe? <u>NONE</u>

    _____

34. Of the books you have read, which three are your favorites? <u>N/A</u>

    _____

35. Please list your hobbies, spare–time activities, and outside interests: <u>HORSES AND YARD WORK</u>

    _____

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?          ( ) Yes  (x) No.
    If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

    ( ) Change your mind if a number of people have a different opinion?

    (x) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
    ( ) Yes (x) No.  If yes, what are their names and relationship to you? _____

    _____

39.    Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor

40.    Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41.    Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

42.    Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No. If yes, explain: _____

_____

43.    List any reason why you do not wish to serve or why you should not serve: _____

_____**NONE**_____

44.    Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45.    In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (X) Yes ( ) No. If no, why not? _____

_____

46.    Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No. If yes, please describe: _____

_____

_____

47.    Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No. If yes, please describe: _____

_____

48.    Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No. If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation?  (X) Yes  ( ) No.  If yes, please specify: _____ BAPTIST _____

50. How often do you attend religious services? ( ) Regularly (X) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? ( ) Yes (X) No

52. What is your political party preference? _____ DEMOCRAT _____

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No. Of any anti–crime group or other similar organization? ( ) Yes (X) No. Of any anti–weapons or gun–control group? ( ) Yes (X) No.

54. Have you ever actively participated in a political campaign?  ( ) Yes (X) No.  If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: MARY JON SNECKENBERGER

2. Place of birth: CHARLOTTE NC          Age 57    Sex: ( ) Male (✗) Female

3. Race: (✗) Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4. Do you: (✗) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5. What cities/states have you lived in during the past five years? Enterprise AL

6. Marital status: ( ) Single  (✗) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

   Spouse's employer: LSI Inc.

   Number of years your spouse has worked there: 15

   Spouse's title and job responsibilities: Asst. Dir. Advance Division – Admin.

   Educational background of your spouse, including any degrees or certificates earned:
   B.S. Aeronautical Science

7. Do you have children? (✗) Yes ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|----------------------|----------------|--------------------------|
   | 24 | M | Troy State Un. | No | BS – Environmental Science |
   |  |  | Cumberland law school | 2nd yr. law school |  |
   | 29 | M | M.D. | No | Medical Doctor – Intervention Radiologist |

8. Your level of education: Specify the highest grade you completed:

   (a) Elementary or high school (1–12) _____    College (1–4 or 5+) 2 yrs

   (b) If college, what college, what degrees, and what was your major? Columbia College, Cola. S.C. / Assoc. Degree / English

   (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   ( ) Yes (✗) No. If yes, what courses? _____

9.    Your present employment status (check all that apply):
      ( ) Full-time  ( ) Part-time  ( ) Retired  ( ) Unemployed  ( ) Student  (✓) Homemaker

10.   Your current or most recent occupation: Admin. Asst.

11.   Name of your current or most recent employer, or, if you are a student, your school and major:
      Jeannie Phillips, City Clerk  Enterprise City Hall

12.   How long have you been employed by your current or most recent employer?  8 mo.

13.   What are/were your specific duties and responsibilities on the job? Update and correct
      city voter poll lists / assist in city elections & absentee voting

14.   Do/Did you supervise other employees? ( ) Yes (✓) No.  If yes, how many? _____

15.   Do/Did you have responsibility for hiring and firing? ( ) Yes (✓) No

16.   Please list all other occupations and employers you have had for the past 10 years:
      Chairman Coffee Co. Board of Registars - State of AL
      Meehandiser - Joanna Window Treatments / Merchandiser - Ft. Rucker PX

17.   Have you ever served in the military? ( ) Yes (✓) No.  If yes, please complete the following:

      Branch: _____    Rank: _____    Dates: From _____ To _____

      Duties: _____    Type of discharge: _____

18.   What social, civic, professional, trade, union, or other organizations are you affiliated with?
      a) Coffee County Arts Alliance / b) Piney Woods Arts Festival
      c) Beta Sigma Phi - d) Chautauqua  e) C.C. Republican Women

19.   Describe any offices you have held in the organizations listed in question 18: a) President - now Board member
      b) Chairman c) past President d) President e) member

20.   Have you ever served on a jury before? (✓) Yes ( ) No.  How many times?  Once
      What type of jury: ( ) Grand jury ( ) Civil trial jury (✓) Criminal trial jury

21.   If you have served on a trial jury, please state the following: Year served:  1997 - ?

      City and state where served:  Enterprise AL

      What verdict was rendered?  Civil case:        ( ) For plaintiff  ( ) For defendant
                                  Criminal case:     (✓) For state or federal government  ( ) For defendant

22.   Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes (✓) No

967

23.  Have you testified as a <u>witness</u> in any court proceeding? (✓)Yes  ( ) No.
     If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government (✓) Defendant in a (civil) or
     criminal case.

24.  Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  (✓)No.  If yes,
     explain: _____

     _____

25.  Have you ever been to court for any other reason (excluding divorce or traffic cases)?
     ( ) Yes (✓)No.   If yes, explain: _____

26.  Have you ever been arrested? ( ) Yes  (✓)No

27.  Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (✓)No

28.  What newspaper(s) do you read regularly? _Dothan Eagle - Birmingham - USA_

29.  What TV news programs do you watch frequently? _News, Law&Order, PBS shows_

30.  How many hours of TV do you watch per week?  _Varies_

31.  What radio programs do you listen to most?  _NPR_

32.  Which do you find more interesting? (✓)Local news (✓) National news

33.  To what periodicals or magazines do you subscribe? _Newsweek - Southern Living -_
     _Bottom Line - Jere Beasley Report - Reader's Digest - Guidepost_

34.  Of the books you have read, which three are your favorites? _I read constantly -_
     _generally enjoy mysteries, political science, biographies._

35.  Please list your hobbies, spare-time activities, and outside interests: _Reading, dinner parties,_
     _Church activities, football - high school & TSU, going to plays_

36.  Are there bumper stickers on the vehicles that you drive or that your spouse drives?  (✓)Yes ( ) No.
     If yes, what do they say? _BUSH/CHENEY    Bob Riley 4 Gov._

37.  In a group situation, once you have formed an opinion, do you usually:

     ( ) Change your mind if a number of people have a different opinion?

     (✓) Stand by your original opinion despite what others believe?

38.  Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
     ( ) Yes (✓)No.   If yes, what are their names and relationship to you? _____

     _____

908

39. Based on your experience, what is your opinion of lawyers? (x) Good ( ) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (x) No.  If yes, explain: _____

_____

_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (x) No.  If yes, explain: _____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (x) No.  If yes, explain: _____

_____

43. List any reason why you do not wish to serve or why you should not serve: ___N/A_____

_____

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (x) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (x) Yes ( ) No.  If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? (x) Yes ( ) No. If yes, please describe: _____

___Son - robbed - car break in_____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (x) No. If yes, please describe: _____

48. Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (x) No.  If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? ( ) Yes ( ) No. If yes, please specify: _St. Luke United Methodist_

50. How often do you attend religious services? ( ) Regularly ( ) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? ( ) Yes ( ) No

52. What is your political party preference? _Mostly Republican_

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes ( ) No. Of any anti–crime group or other similar organization? ( ) Yes ( ) No. Of any anti–weapons or gun–control group? ( ) Yes ( ) No.

54. Have you ever actively participated in a political campaign? ( ) Yes ( ) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

<u>APPENDIX</u>

## RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: __Nancy Spradley__

2.  Place of birth: __12-26-56__ Age __45__ Sex: ( ) Male (X) Female

3.  Race: ( ) Caucasian/White  ( ) African–American/Black  (X) Hispanic  ( ) Other _____

4.  Do you: (X) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5.  What cities/states have you lived in during the past five years? __Enterprise, Alabama__

6.  Marital status: ( ) Single  (X) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

    Spouse's employer: ~~Disabled~~ __Enterprise State Jr College__

    Number of years your spouse has worked there: __28__

    Spouse's title and job responsibilities: __Instructor__

    Educational background of your spouse, including any degrees or certificates earned:
    __Bachelor of Science & Master of Arts - Auburn University__

7.  Do you have children? (X) Yes  ( ) No. If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|----------------------|----------------|--------------------------|
    | 23  | F   | teacher              | no             | Bachelor of Science - Auburn |
    | 20  | F   | Auburn               | no             | Junior yr @ Auburn |
    |     |     |                      |                |                      |
    |     |     |                      |                |                      |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) _____  College (1–4 or 5+) __4 yrs of college__

    (b)  If college, what college, what degrees, and what was your major? __ESJC - Information Processing__

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
         ( ) Yes (X) No.  If yes, what courses? _____

9.   Your present employment status (check all that apply):
     (X) Full-time  ( ) Part-time  ( ) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10.  Your current or most recent occupation:  Child Support Coordinator

11.  Name of your current or most recent employer, or, if you are a student, your school and major:
     District Attorney, 12th Judicial Circuit

12.  How long have you been employed by your current or most recent employer?  8 yrs, 8 months

13.  What are/were your specific duties and responsibilities on the job?  deal w/ all aspects
     of child support, establishing & enforcing cs orders

14.  Do/Did you supervise other employees?  (X) Yes  ( ) No.  If yes, how many?  1

15.  Do/Did you have responsibility for hiring and firing?  ( ) Yes  (X) No

16.  Please list all other occupations and employers you have had for the past 10 years:
     legal secretary in Ozark, Alabama
     prior to DA's office

17.  Have you ever served in the military? ( ) Yes  (X) No.  If yes, please complete the following:

     Branch: _____   Rank: _____   Dates: From _____ To _____

     Duties: _____   Type of discharge: _____

18.  What social, civic, professional, trade, union, or other organizations are you affiliated with?
     none

19.  Describe any offices you have held in the organizations listed in question 18:

20.  Have you ever served on a jury before? ( ) Yes  (X) No.  How many times? _____
     What type of jury: ( ) Grand jury  ( ) Civil trial jury  ( ) Criminal trial jury

21.  If you have served on a <u>trial jury</u>, please state the following: Year served: _____

     City and state where served: _____

     What verdict was rendered?  Civil case:     ( ) For plaintiff  ( ) For defendant
                                 Criminal case:  ( ) For state or federal government  ( ) For defendant

22.  Have you ever served as a <u>foreperson</u> on a grand jury or a trial jury?  ( ) Yes  (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? (X) Yes ( ) No.
If yes, were you a witness for: ( ) Plaintiff (X) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes (X) No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes (X) No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly? *montgomery advertiser, dothan eagle atlanta journal*

29. What TV news programs do you watch frequently? *nbc nightly news, cnn*

30. How many hours of TV do you watch per week? *20*

31. What radio programs do you listen to most? *music - no talk radio*

32. Which do you find more interesting? ( ) Local news (X) National news

33. To what periodicals or magazines do you subscribe? *t.v. guide, people country living, rosie, redbook*

34. Of the books you have read, which three are your favorites? *mystery, crime romance*

35. Please list your hobbies, spare-time activities, and outside interests: *reading, gardening, decorating, shopping, pool*

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives? ( ) Yes (X) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
(X) Yes ( ) No.  If yes, what are their names and relationship to you? *Glenda Stout - attorney/friend Stan walker - attorney/friend, Jeff Kelley - attorney/friend*

39.  Based on your experience, what is your opinion of lawyers?  (X) Good ( ) Fair ( ) Poor

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

43.  List any reason why you do not wish to serve or why you should not serve: _____

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

46.  Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No.  If yes, please describe: _____

_____

47.  Have you or a close relative ever worked in a law enforcement-related job such as police, sheriff, state trooper, prison guard, or military police?  ( ) Yes (X) No.  If yes, please describe: _____

48.  Have you taken any courses or had any training in medicine or other health-care field? (X) Yes ( ) No.  If yes, please explain:  *courses in medicine for medical secretarial jobs*

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.   Do you belong to a church or otherwise have any religious affiliation?  ( ) Yes ( ) No.  If yes, please specify: _____

50.   How often do you attend religious services? ( ) Regularly ( ) Occasionally ( ) Never

51.   Do you hold a special position in your religious organization? ( ) Yes ( ) No

52.   What is your political party preference?_____

53.   Are you or is any member of your family a member of any victims rights organization? ( ) Yes ( ) No.   Of any anti–crime group or other similar organization? ( ) Yes ( ) No.  Of any anti–weapons or gun–control group? ( ) Yes ( ) No.

54.   Have you ever actively participated in a political campaign? ( ) Yes ( ) No.  If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
# UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: *Phillip D. Stuckey*

2.  Place of birth: *Enterprise, Al.*          Age *43*    Sex: (X) Male ( ) Female

3.  Race: (X) Caucasian/White  ( ) African-American/Black  ( ) Hispanic  ( ) Other _____

4.  Do you: (X) Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5.  What cities/states have you lived in during the past five years? *N/A*

6.  Marital status: ( ) Single  (X) Married  ( ) Divorced  ( ) Separated  ( ) Widowed. If you are married:

    Spouse's employer: *Housewife*

    Number of years your spouse has worked there: *N/A*

    Spouse's title and job responsibilities: *N/A*

    Educational background of your spouse, including any degrees or certificates earned:
    *A.A.S.*

7.  Do you have children? (X) Yes ( ) No. If yes, please complete the following:

| Age | Sex | School or occupation | Live with you? | Their level of education |
|-----|-----|---------------------|----------------|--------------------------|
| 13  | M   | New Brockton Hgh    | Yes            | 8th Grade                |
| 8   | M   | " Elementary        | Yes            | 3rd "                    |
|     |     |                     |                |                          |
|     |     |                     |                |                          |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) *12*      College (1–4 or 5+) _____

    (b)  If college, what college, what degrees, and what was your major? _____

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
         ( ) Yes (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
(X) Full–time ( ) Part–time ( ) Retired ( ) Unemployed ( ) Student ( ) Homemaker

10. Your current or most recent occupation: _PlAsMA OperAtor_

11. Name of your current or most recent employer, or, if you are a student, your school and major:
_UTility Trailers_

12. How long have you been employed by your current or most recent employer? _19yr. 3mon._

13. What are/were your specific duties and responsibilities on the job? _I run A computerised underwater Arc cutting machine_

14. Do/Did you supervise other employees? ( ) Yes (X) No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? ( ) Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years:
_N/A_

17. Have you ever served in the military? ( ) Yes (X) No. If yes, please complete the following:

Branch: _____ Rank: _____ Dates: From _____ To _____

Duties: _____ Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
_Member Bethany Baptist Church_
_Deacon_

19. Describe any offices you have held in the organizations listed in question 18: _____

20. Have you ever served on a jury before? ( ) Yes (X) No.   How many times? _____
What type of jury: ( ) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21. If you have served on a <u>trial jury</u>, please state the following: Year served: _N/A_

City and state where served: _____

What verdict was rendered? Civil case:       ( ) For plaintiff ( ) For defendant
                          Criminal case:     ( ) For state or federal government ( ) For defendant

22. Have you ever served as a <u>foreperson</u> on a grand jury or a trial jury? ( ) Yes (X) No

*917*

23.  Have you testified as a <u>witness</u> in any court proceeding?  (X) Yes  ( ) No.
     If yes, were you a witness for: (X) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24.  Have you or anyone close to you ever sued or been sued in any type of lawsuit?  ( ) Yes  (X) No.  If yes, explain: _____

     _____

25.  Have you ever been to court for any other reason (excluding divorce or traffic cases)?
     ( ) Yes  (X) No.   If yes, explain: _____

26.  Have you ever been arrested?  ( ) Yes  (X) No

27.  Have you, a close relative, or a close friend ever been convicted of a crime? (X) Yes ( ) No

28.  What newspaper(s) do you read regularly?  *Southeastern Sun, Dothan Eagle*

29.  What TV news programs do you watch frequently?  *WSFA*

30.  How many hours of TV do you watch per week?  *25 hrs*

31.  What radio programs do you listen to most?  *A. F. R.*

32.  Which do you find more interesting? (X) Local news ( ) National news

33.  To what periodicals or magazines do you subscribe?  *N/A*

     _____

34.  Of the books you have read, which three are your favorites?  *Black Stallion*
     *Louis Lamour series*

35.  Please list your hobbies, spare-time activities, and outside interests:  *Deer & Turkey Hunting*
     *Fishing Coaching Kid activities*

36.  Are there bumper stickers on the vehicles that you drive or that your spouse drives?    (X) Yes ( ) No.
     If yes, what do they say?  *Keep Elba dry  No lottery  And Auburn stickers*

37.  In a group situation, once you have formed an opinion, do you usually:

     ( ) Change your mind if a number of people have a different opinion?

     (X) Stand by your original opinion despite what others believe?

38.  Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
     (X) Yes ( ) No.  If yes, what are their names and relationship to you?  *Mark Fuller*

     _____

39.  Based on your experience, what is your opinion of lawyers? (X) Good ( ) Fair ( ) Poor

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain:  _____

_____

_____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain:  _____

_____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain:  _____

43.  List any reason why you do not wish to serve or why you should not serve:  _N/A_____

_____

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? (X) Yes ( ) No.

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not?  _____

46.  Have you or a close relative ever been the victim of a crime? (X) Yes ( ) No.  If yes, please describe:  _My WiFe was RAped_____

_____

47.  Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? (X) Yes ( ) No.  If yes, please describe:  _Nephew County Jailer_  _Brother-in-law Police Officer in Elba_

48.  Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No.  If yes, please explain:  _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation? (X) Yes ( ) No. If yes, please specify: _Bethany Baptist_

50.  How often do you attend religious services? (X) Regularly ( ) Occasionally ( ) Never

51.  Do you hold a special position in your religious organization? (X) Yes ( ) No

52.  What is your political party preference? _Republican_

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No. Of any anti–crime group or other similar organization? ( ) Yes (X) No. Of any anti–weapons or gun-control group? ( ) Yes (X) No.

54.  Have you ever actively participated in a political campaign? ( ) Yes (X) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

920

<u>APPENDIX</u>

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: <u>JAMES Thompson</u>

2. Place of birth: <u>Milton, FL.</u> Age <u>58</u> Sex: (X)Male ( ) Female

3. Race: (X)Caucasian/White ( ) African–American/Black ( ) Hispanic ( ) Other _____

4. Do you: (X)Own home ( ) Rent home ( ) Rent apartment ( ) Live with friend or relatives ( ) Other

5. What cities/states have you lived in during the past five years? <u>Westville, FL.</u> <u>Enterprise, AL.</u>

6. Marital status: ( ) Single (X)Married ( ) Divorced ( ) Separated ( ) Widowed. If you are married:

   Spouse's employer: <u>ARMY AND AIR FORCE EXCHANGE Service, Ft. Rucker</u>

   Number of years your spouse has worked there: <u>17</u>

   Spouse's title and job responsibilities: <u>Services And Vending Attendant</u>

   Educational background of your spouse, including any degrees or certificates earned: <u>2 years Community College</u>

7. Do you have children? (X)Yes ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|----------------------|----------------|--------------------------|
   | 33 | M | AIR CRAFT Tech. | | Hyps. Tech. College |
   | 32 | F | Correctional officer | | BA Degree Business |
   | | | | | |
   | | | | | |

8. Your level of education: Specify the highest grade you completed:

   (a) Elementary or high school (1–12) <u>12</u>  College (1–4 or 5+) <u>2</u>

   (b) If college, what college, what degrees, and what was your major? <u>L H Bates</u> <u>VOC/Tech College Consumer Electronics</u> <u>University of Maryland 57 semester hours</u>

   (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice? (X)Yes ( ) No. If yes, what courses? <u>Business Law I + II, Criminology</u>

9.    Your present employment status (check all that apply):
(x) Full–time ( ) Part–time ( ) Retired ( ) Unemployed ( ) Student ( ) Homemaker

10.    Your current or most recent occupation: *Electronic Digital Computer Mechanic WG 12*

11.    Name of your current or most recent employer, or, if you are a student, your school and major:
*Directorate of Information Management, Ft. Rucker*

12.    How long have you been employed by your current or most recent employer? *11 years*

13.    What are/were your specific duties and responsibilities on the job? *Repair Electronic equipment*

14.    Do/Did you supervise other employees? ( ) Yes (x) No.  If yes, how many? _____

15.    Do/Did you have responsibility for hiring and firing? ( ) Yes (x) No

16.    Please list all other occupations and employers you have had for the past 10 years:
_____
_____

17.    Have you ever served in the military? (x) Yes ( ) No.  If yes, please complete the following:
Branch: *ARMY*    Rank: *MSG E-8*    Dates: From *Jul 65* To *Nov. 85*

Duties: *Computer Maintenance Supervisor*    Type of discharge: *Honorable*

18.    What social, civic, professional, trade, union, or other organizations are you affiliated with?
*Disabled American Veterans, Wiregrass Metal Trades Union*

19.    Describe any offices you have held in the organizations listed in question 18: *None*
_____

20.    Have you ever served on a jury before? ( ) Yes (x) No.  How many times? _____
What type of jury: ( ) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21.    If you have served on a trial jury, please state the following: Year served: _____
City and state where served: _____

What verdict was rendered? Civil case:    ( ) For plaintiff ( ) For defendant
Criminal case:    ( ) For state or federal government ( ) For defendant

22.    Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes (x) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes   (X) No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes (X) No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
(X) Yes ( ) No.  If yes, explain: *Elegi'le Turn*

26. Have you ever been arrested? (X) Yes ( ) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly?  *Dothan Eagle*

29. What TV news programs do you watch frequently?  *NBC Evening News*

30. How many hours of TV do you watch per week?  *14 hrs*

31. What radio programs do you listen to most?  *Paul Harvey*

32. Which do you find more interesting? ( ) Local news  (X) National news

33. To what periodicals or magazines do you subscribe?  *None*

34. Of the books you have read, which three are your favorites?  *Summer of 42, 666*

35. Please list your hobbies, spare-time activities, and outside interests: *Restoring Antique vehicles*

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?   (X) Yes ( ) No.
If yes, what do they say?  *Proud To Be An American*

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?  *No*

( ) Stand by your original opinion despite what others believe?  *yes*

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (X) No.  If yes, what are their names and relationship to you? _____

_____

39. Based on your experience, what is your opinion of lawyers? ( ) Good (x) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? (x) Yes ( ) No. If yes, explain: _bAck problem ThAt prevents me from SiTTing in A STraight chAir for AN extended period of Time._

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (x) No. If yes, explain: _____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (x) No. If yes, explain: _____

43. List any reason why you do not wish to serve or why you should not serve: _____

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? (x) Yes ( ) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (x) Yes ( ) No. If no, why not? _____

46. Have you or a close relative ever been the victim of a crime? ( ) Yes (x) No. If yes, please describe: _____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? (x) Yes ( ) No. If yes, please describe: _DAughter works as A correctionAl officer in WAlton County._

48. Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (x) No. If yes, please explain: _____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation? (x) Yes ( ) No. If yes, please specify: _Member  Hill crest  Babtist Church_

50.  How often do you attend religious services? (x) Regularly  ( ) Occasionally  ( ) Never

51.  Do you hold a special position in your religious organization? ( ) Yes  (x) No

52.  What is your political party preference?  _Republican_

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes  (x) No.
Of any anti–crime group or other similar organization? ( ) Yes  (x) No.  Of any anti–weapons or gun–control group? ( ) Yes. (x) No.

54.  Have you ever actively participated in a political campaign?  ( ) Yes  (x) No.  If yes, ( ) Democrat?
( ) Republican? ( ) Other  _____

925

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: _MARY W. Thompson_

2. Place of birth: _MoBiLE, Al_ _____ Age _____ Sex: () Male (X) Female

3. Race: () Caucasian/(White) () African–American/Black () Hispanic () Other _____

4. Do you: (X) Own home () Rent home () Rent apartment () Live with friend or relatives () Other

5. What cities/states have you lived in during the past five years? _ENTERPRISE, Al_

6. Marital status: () Single (X) Married () Divorced () Separated () Widowed. If you are married:

   Spouse's employer: _RETIRED_

   Number of years your spouse has worked there: _____

   Spouse's title and job responsibilities: _____

   Educational background of your spouse, including any degrees or certificates earned:

   _Elementry, High School, 1 yr. College_

7. Do you have children? (X) Yes () No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|---------------------|----------------|--------------------------|
   | 40 | M | AuBurn Univ. CPA | No | |
   | 38 | F | AuBurn Univ PRODUCER-ESPN | No | |
   | 32 | F | Enterprise Jr. College | No | |
   | | | | | |

8. Your level of education: Specify the highest grade you completed:

   (a)   Elementary or high school (1–12) __X__   College (1–4 or 5+) _____

   (b)   If college, what college, what degrees, and what was your major? _____

   (c)   Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   () Yes (X) No. If yes, what courses? _____

9.   Your present employment status (check all that apply):
     ( ) Full–time  ( ) Part–time  (X) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10.  Your current or most recent occupation: _NURSE_____

11.  Name of your current or most recent employer, or, if you are a student, your school and major:
     _____NA_____

12.  How long have you been employed by your current or most recent employer?

13.  What are/were your specific duties and responsibilities on the job? _NURSING_____
     _____

14.  Do/Did you supervise other employees?  ( ) Yes  (X) No.  If yes, how many? _____

15.  Do/Did you have responsibility for hiring and firing? ( ) Yes  (X) No

16.  Please list all other occupations and employers you have had for the past 10 years:
     _NURSING_____
     _____

17.  Have you ever served in the military? ( ) Yes  (X) No.  If yes, please complete the following:

     Branch: _____   Rank: _____   Dates: From _____ To _____

     Duties: _____   Type of discharge: _____

18.  What social, civic, professional, trade, union, or other organizations are you affiliated with?
     _NONE_____
     _____

19.  Describe any offices you have held in the organizations listed in question 18:  _NA_____
     _____

20.  Have you ever served on a jury before? (X) Yes  ( ) No.  How many times? ___2___
     What type of jury: ( ) Grand jury  ( ) Civil trial jury  ( ) Criminal trial jury

21.  If you have served on a <u>trial jury</u>, please state the following: Year served: _Not sure_

     City and state where served: _ENTERPRISE_

     What verdict was rendered?  Civil case:      ( ) For plaintiff  (X) For defendant
                                Criminal case:   ( ) For state or federal government  ( ) For defendant

22.  Have you ever served as a <u>foreperson</u> on a grand jury or a trial jury? ( ) Yes  (X) No

23. Have you testified as a witness in any court proceeding? ( ) Yes (X) No.
If yes, were you a witness for: ( ) Plaintiff ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes (X) No. If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)? ( ) Yes (X) No. If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly? _ENTERPRISE, Dothan_

29. What TV news programs do you watch frequently? _CNN - FOX - NEWS - MONTGOMERY_

30. How many hours of TV do you watch per week? _6 hrs_

31. What radio programs do you listen to most? _NONE_

32. Which do you find more interesting? ( ) Local news (X) National news

33. To what periodicals or magazines do you subscribe? _ARTISTS MAGAZINE_

_____

34. Of the books you have read, which three are your favorites? _____

_____

35. Please list your hobbies, spare-time activities, and outside interests: _SEWING, PAINTING, READING_

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes (X) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

_NEITHER_
_DECIDE ON FACTS - EVIDENCE_ ( ) Change your mind if a number of people have a different opinion?
( ) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (X) No.  If yes, what are their names and relationship to you? _____

_____

39.    Based on your experience, what is your opinion of lawyers? (X) Good ( ) Fair ( ) Poor

40.    Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41.    Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

42.    Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

_____

43.    List any reason why you do not wish to serve or why you should not serve: _NONE_____

_____

44.    Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45.    In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

_____

46.    Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No.  If yes, please describe:

_____

_____

47.    Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No.  If yes, please describe: _____

_____

48.    Have you taken any courses or had any training in medicine or other health–care field? (X) Yes ( ) No.  If yes, please explain: _NURSING – 6 YRS_____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.    Do you belong to a church or otherwise have any religious affiliation?  (X) Yes  ( ) No.  If yes, please
       specify: _CATholic_

50.    How often do you attend religious services?  (X) Regularly  ( ) Occasionally  ( ) Never

51.    Do you hold a special position in your religious organization?  ( ) Yes  (X) No

52.    What is your political party preference? _DEMOCRAT_

53.    Are you or is any member of your family a member of any victims rights organization?  ( ) Yes (X) No.
       Of any anti–crime group or other similar organization?  ( ) Yes ( ) No.  Of any anti–weapons or gun–
       control group? ( ) Yes  ( ) No.

54.    Have you ever actively participated in a political campaign?  ( ) Yes (X) No.  If yes, ( ) Democrat?
       ( ) Republican? ( ) Other  _____

APPENDIX

# RECOMMENDED
# UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: _Larry Tidwell_

2.  Place of birth: _Opp    Alabama_   Age _43_   Sex: (✓) Male  ( ) Female

3.  Race: (✓) Caucasian/White   ( ) African–American/Black   ( ) Hispanic   ( ) Other _____

4.  Do you: ( ) Own home   ( ) Rent home   ( ) Rent apartment   (✓) Live with friend or relatives   ( ) Other

5.  What cities/states have you lived in during the past five years? _Enterprise, Alabama_
    _____

6.  Marital status: ( ) Single   ( ) Married   (✓) Divorced   ( ) Separated   ( ) Widowed. If you are married:

    Spouse's employer: _____

    Number of years your spouse has worked there: _____

    Spouse's title and job responsibilities: _____

    Educational background of your spouse, including any degrees or certificates earned:
    _____

7.  Do you have children? ( ) Yes   (✓) No. If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|----------------------|----------------|--------------------------|
    |     |     |                      |                |                          |
    |     |     |                      |                |                          |
    |     |     |                      |                |                          |
    |     |     |                      |                |                          |

8.  Your level of education: Specify the highest grade you completed:

    (a)   Elementary or high school (1–12) _____   College (1–4 or 5+) _2 years_

    (b)   If college, what college, what degrees, and what was your major? _ESJC (Associate)_
    _____

    (c)   Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
          ( ) Yes   (✓) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
(X) Full-time () Part-time () Retired () Unemployed () Student () Homemaker

10. Your current or most recent occupation: _Electrican_

11. Name of your current or most recent employer, or, if you are a student, your school and major:
_Goolsby Brothers Plumbing & Electric_

12. How long have you been employed by your current or most recent employer? _18 years_

13. What are/were your specific duties and responsibilities on the job? _Job forman_

14. Do/Did you supervise other employees? (X) Yes () No. If yes, how many? _1_

15. Do/Did you have responsibility for hiring and firing? () Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years: _N/A_

17. Have you ever served in the military? () Yes (X) No. If yes, please complete the following:

Branch: _____ Rank: _____ Dates: From _____ To _____

Duties: _____ Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
_N/A_

19. Describe any offices you have held in the organizations listed in question 18: _N/A_

20. Have you ever served on a jury before? () Yes (X) No.  How many times? _____
What type of jury: () Grand jury () Civil trial jury () Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____

City and state where served: _____

What verdict was rendered? Civil case:  () For plaintiff () For defendant
Criminal case:  () For state or federal government () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? (X) Yes    ( ) No.
   If yes, were you a witness for: (X) Plaintiff   ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  (X) No.   If yes, explain: _____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
   ( ) Yes (X) No.   If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly?   _Dothan Eagle_

29. What TV news programs do you watch frequently?   _Headline News Network_

30. How many hours of TV do you watch per week?   _20_

31. What radio programs do you listen to most?   _102.5 F.M._

32. Which do you find more interesting? ( ) Local news  (X) National news

33. To what periodicals or magazines do you subscribe?   _Alabama Game And Fish ; AMA motorcycle magazine._

34. Of the books you have read, which three are your favorites?   _Science Fiction_

35. Please list your hobbies, spare-time activities, and outside interests:   _Hunting ; Auto repair_

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?      ( ) Yes (X) No.
   If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

   ( ) Change your mind if a number of people have a different opinion?

   (X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
   ( ) Yes (X) No.   If yes, what are their names and relationship to you? _____
   _____

39.   Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor

40.   Do you have any medical problems (for example, problems with your vision or hearing) that may prevent
you from serving as a juror? ( ) Yes (X) No.   If yes, explain:   _____

_____

_____

41.   Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror?
( ) Yes (X) No.   If yes, explain: _____

_____

42.   Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial
juror? ( ) Yes (X) No.   If yes, explain: _____

_____

43.   List any reason why you do not wish to serve or why you should not serve: _____

_____

44.   Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to
make it easier to convict? (X) Yes  ( ) No

45.   In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you
agree with that principle? (X) Yes ( ) No.  If no, why not? _____

_____

46.   Have you or a close relative ever been the victim of a crime? (X) Yes ( ) No. If yes, please describe:
Tools   stolen   from   work   truck.

_____

47.   Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state
trooper, prison guard, or military police?  ( ) Yes (X) No.  If yes, please describe: _____

_____

48.   Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No. If
yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? ( ) Yes (X) No. If yes, please specify: _____

50. How often do you attend religious services? ( ) Regularly (X) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? ( ) Yes (X) No

52. What is your political party preference? ___Democrat_____

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No. Of any anti–crime group or other similar organization? ( ) Yes (X) No. Of any anti–weapons or gun–control group? ( ) Yes (X) No.

54. Have you ever actively participated in a political campaign? ( ) Yes (X) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: _Virgil Tindell_

2. Place of birth: _Geneva, Co._ _____ Age _60_ Sex: (X) Male ( ) Female

3. Race: (X) Caucasian/White ( ) African–American/Black ( ) Hispanic ( ) Other _____

4. Do you: (X) Own home ( ) Rent home ( ) Rent apartment ( ) Live with friend or relatives ( ) Other

5. What cities/states have you lived in during the past five years? _Enterprise, Al._

6. Marital status: (X) Single ( ) Married ( ) Divorced ( ) Separated ( ) Widowed. If you are married:

   Spouse's employer: _____

   Number of years your spouse has worked there: _____

   Spouse's title and job responsibilities: _____

   Educational background of your spouse, including any degrees or certificates earned:

   _____

7. Do you have children? (X) Yes ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|----------------------|----------------|--------------------------|
   | 35  | F   | Jr. College          | No             | Enterprise               |
   | 28  | M   | Ged                  | No             |                          |
   |     |     |                      |                |                          |
   |     |     |                      |                |                          |

8. Your level of education: Specify the highest grade you completed:

   (a) Elementary or high school (1–12) _9 Ged_ College (1–4 or 5+) _____

   (b) If college, what college, what degrees, and what was your major? _____

   (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   ( ) Yes ( ) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
(✗) Full–time  ( ) Part–time  ( ) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10. Your current or most recent occupation:  _Wal mark_

11. Name of your current or most recent employer, or, if you are a student, your school and major:

_____

12. How long have you been employed by your current or most recent employer?  _7 years_

13. What are/were your specific duties and responsibilities on the job?  _Tire & Lube_

_____

14. Do/Did you supervise other employees?  ( ) Yes  (✗) No.  If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing?  ( ) Yes  (✗) No

16. Please list all other occupations and employers you have had for the past 10 years:
_Roofing,_ _____

_____

17. Have you ever served in the military?  ( ) Yes  (✗) No.  If yes, please complete the following:

Branch: _____  Rank: _____  Dates: From _____ To _____

Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
_None_

_____

19. Describe any offices you have held in the organizations listed in question 18: _____

_____

20. Have you ever served on a jury before?  ( ) Yes  (✗) No.  How many times? _____
What type of jury: ( ) Grand jury  ( ) Civil trial jury  ( ) Criminal trial jury

21. If you have served on a trial jury, please state the following:  Year served: _____

City and state where served: _____

What verdict was rendered?  Civil case:      ( ) For plaintiff  ( ) For defendant
                            Criminal case:   ( ) For state or federal government  ( ) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury?  ( ) Yes  (✗) No

937

23. Have you testified as a <u>witness</u> in any court proceeding? (X) Yes ( ) No.
If yes, were you a witness for: (X) Plaintiff ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes ( ) No. If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)? ( ) Yes ( ) No. If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly? _____ *None* _____

29. What TV news programs do you watch frequently? _____ *Fox* _____

30. How many hours of TV do you watch per week? _____ *½ Hr* _____

31. What radio programs do you listen to most? _____

32. Which do you find more interesting? ( ) Local news (X) National news

33. To what periodicals or magazines do you subscribe? _____ *None* _____

_____

34. Of the books you have read, which three are your favorites? _____

*Don't Read Book*

35. Please list your hobbies, spare-time activities, and outside interests: _____

*Fishing*

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives? ( ) Yes (X) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (X) No. If yes, what are their names and relationship to you? _____

_____

39. Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? (X) Yes ( ) No. If yes, explain: _Have a MiGRAINe HeadAcHe_

_MAy Come oN AT ANy Time._

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No. If yes, explain: _____

_____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No. If yes, explain: _____

43. List any reason why you do not wish to serve or why you should not serve: _if I Have_ _A miGRbiNG Headache, I caN NoT THiNk STRab._

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No.

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (X) Yes ( ) No. If no, why not? _____

_____

46. Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No. If yes, please describe: _____

_____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No. If yes, please describe: _____

_____

48. Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No. If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.   Do you belong to a church or otherwise have any religious affiliation?  ( ) Yes ( ) No.  If yes, please specify: _____

50.   How often do you attend religious services? ( ) Regularly ( ) Occasionally ( ) Never

51.   Do you hold a special position in your religious organization? ( ) Yes ( ) No

52.   What is your political party preference? _____ R e p - _____

53.   Are you or is any member of your family a member of any victims rights organization? ( ) Yes ( ) No. Of any anti–crime group or other similar organization? ( ) Yes ( ) No. Of any anti–weapons or gun–control group? ( ) Yes ( ) No.

54.   Have you ever actively participated in a political campaign?  ( ) Yes ( ) No.  If yes, ( ) Democrat? ( ) Republican? ( ) Other  _____

940

FILED
AUG 5 2002
J.M. Counts
Court Clerk
Coffee Co. AL

APPENDIX

# RECOMMENDED
# UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1. Juror name/number: JIMMY C. TOMBERLIN

2. Place of birth: COFFEE COUNTY, AL  Age 58  Sex: ☒ Male ( ) Female

3. Race: ☒ Caucasian/White  ( ) African–American/Black  ( ) Hispanic  ( ) Other _____

4. Do you: ☒ Own home  ( ) Rent home  ( ) Rent apartment  ( ) Live with friend or relatives  ( ) Other

5. What cities/states have you lived in during the past five years? ONLY ENTERPRISE, ALABAMA

6. Marital status: ( ) Single  ( ) Married  ☒ Divorced  ( ) Separated  ( ) Widowed. If you are married:

   Spouse's employer: _____

   Number of years your spouse has worked there: _____

   Spouse's title and job responsibilities: _____

   Educational background of your spouse, including any degrees or certificates earned: _____

7. Do you have children? ☒ Yes  ( ) No. If yes, please complete the following:

   | Age | Sex | School or occupation | Live with you? | Their level of education |
   |-----|-----|----------------------|----------------|--------------------------|
   | 29  | M   | NONE                 | NO             | OVER 3 YEARS COLLEGE     |
   |     |     |                      |                |                          |
   |     |     |                      |                |                          |
   |     |     |                      |                |                          |

8. Your level of education: Specify the highest grade you completed:

   (a) Elementary or high school (1–12) 12    College (1–4 or 5+) UNDER 2 YEARS

   (b) If college, what college, what degrees, and what was your major? ENTERPRISE STATE JR. COLLEGE, NO DEGREE

   (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
   ( ) Yes  ☒ No. If yes, what courses? _____

9. Your present employment status (check all that apply):
(X) Full–time ( ) Part–time ( ) Retired ( ) Unemployed ( ) Student ( ) Homemaker

10. Your current or most recent occupation: OFFICE MANAGER, BOOKKEEPER

11. Name of your current or most recent employer, or, if you are a student, your school and major:
TOWNSEND BUILDING SUPPLY, INC.

12. How long have you been employed by your current or most recent employer? 1 YEAR AND 4 MONTHS

13. What are/were your specific duties and responsibilities on the job? MANAGE OFFICE PERSONNEL, COMPUTER ACCOUNTING

14. Do/Did you supervise other employees? (X) Yes ( ) No. If yes, how many? 2

15. Do/Did you have responsibility for hiring and firing? ( ) Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years:
ESMAC, INC — ACCOUNTANT AND COMPTROLLER

17. Have you ever served in the military? (X) Yes ( ) No. If yes, please complete the following:
Branch: USAR    Rank: SGT    Dates: From 1963 To 1969 (6 YEARS) APPROX
Duties: COMPANY CLERK CLERK TYPIST FINANCE    Type of discharge: HONORABLE

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
MEMBER, ALA. FOREST OWNERS ASSOCIATION

19. Describe any offices you have held in the organizations listed in question 18: NONE

20. Have you ever served on a jury before? (X) Yes ( ) No. How many times? 2 OR 3
What type of jury: (X) Grand jury (X) Civil trial jury (X) Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: 8 TO 10 YEARS AGO
City and state where served: ENTERPRISE, AL
What verdict was rendered? Civil case: (X) For plaintiff ( ) For defendant
Criminal case: ( ) For state or federal government (X) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X) No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  (X)No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes  (X)No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly?  *S. E. SUN*

29. What TV news programs do you watch frequently?  *NO CERTAIN ONES*

30. How many hours of TV do you watch per week?  *20*

31. What radio programs do you listen to most?  *MUSIC*

32. Which do you find more interesting? ( ) Local news (X) National news

33. To what periodicals or magazines do you subscribe?  *NONE*

_____

34. Of the books you have read, which three are your favorites?  *HAVE NOT READ A BOOK IN MANY YEARS.*

35. Please list your hobbies, spare-time activities, and outside interests:  *WORK AT TREE FARM, COLLECT LIMITED EDITION PRINTS, HOUSE IMPROVEMENTS.*

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes (X) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(X) Stand by your original opinion despite what others believe?  *UNLESS ADDITIONAL INFORMATION IS BROUGHT OUT.*

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (X)No.  If yes, what are their names and relationship to you? _____

_____

39.  Based on your experience, what is your opinion of lawyers? ( ) Good ( ) Fair ( ) Poor  *ANSWER ON NEXT PAGE*

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

_____

43.  List any reason why you do not wish to serve or why you should not serve: _____

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.  If no, why not? _____

_____

46.  Have you or a close relative ever been the victim of a crime? (X) Yes ( ) No. If yes, please describe:  *SEVERAL YEARS AGO ~~HAN~~ HAD AN UNCLE MURDERED IN ELBA*

47.  Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No.  If yes, please describe: _____

_____

48.  Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No.  If yes, please explain: _____

_____

944

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation? ( ) Yes (X) No.  If yes, please specify: _____

50.  How often do you attend religious services? ( ) Regularly ( ) Occasionally (X) Never

51.  Do you hold a special position in your religious organization? ( ) Yes (X) No

52.  What is your political party preference?  _NO CERTAIN ONE_

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No.
     Of any anti–crime group or other similar organization? ( ) Yes (X) No.  Of any anti–weapons or gun-control group? ( ) Yes (X) No.

54.  Have you ever actively participated in a political campaign? ( ) Yes (X) No.  If yes, ( ) Democrat?
     ( ) Republican? ( ) Other  _____

QUESTION NO. 39 ANSWER:
THIS QUESTION IS TOO GENERALIZED TO ANSWER BY
CHECKING ONE OF THE SELECTIONS YOU SHOW.
MY OPINION WOULD DEPEND ON THE LAWYER AND
ON THE SITUATION INVOLVING THE LAWYER AND
MAYBE ~~WHETHER~~ WHETHER I WAS A PLAINTIFF OR
DEFENDANT.

<u>APPENDIX</u>

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: Elizabeth TRAMMELL

2.  Place of birth: Enterprise, AL.    Age 51    Sex: ( ) Male (X) Female

3.  Race: (X) Caucasian/White    ( ) African–American/Black    ( ) Hispanic    ( ) Other _____

4.  Do you: ( ) Own home    (X) Rent home    ( ) Rent apartment    ( ) Live with friend or relatives    ( ) Other

5.  What cities/states have you lived in during the past five years? Enterprise only

6.  Marital status: ( ) Single    ( ) Married    (X) Divorced    ( ) Separated    ( ) Widowed. If you are married:

    Spouse's employer: _____

    Number of years your spouse has worked there: _____

    Spouse's title and job responsibilities: _____

    Educational background of your spouse, including any degrees or certificates earned:

    _____

7.  Do you have children? (X) Yes    ( ) No.  If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|----------------------|----------------|--------------------------|
    | 30  | M   | MORTGAGE BROKER      | No             | 16 years                 |
    | 21  | M   | ESJC                 | Yes            | 14 years (still going)   |
    |     |     |                      |                |                          |
    |     |     |                      |                |                          |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–(12)) _____    College ((1)–4 or 5+) _____

    (b)  If college, what college, what degrees, and what was your major? George Wallace
         Cosmetology

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
         ( ) Yes    (X) No.  If yes, what courses? _____

9. Your present employment status (check all that apply):
( ) Full-time ( ) Part-time ( ) Retired ( ) Unemployed ( ) Student ( ) Homemaker

10. Your current or most recent occupation: Loan Administrative Assistant

11. Name of your current or most recent employer, or, if you are a student, your school and major:
Community Bank & Trust

12. How long have you been employed by your current or most recent employer? 5 years

13. What are/were your specific duties and responsibilities on the job? Assisted to
Senior Lending Officers & Backup C.S.R.

14. Do/Did you supervise other employees? ( ) Yes (✓) No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? ( ) Yes (✓) No

16. Please list all other occupations and employers you have had for the past 10 years:
N/A
_____

17. Have you ever served in the military? ( ) Yes (✓) No. If yes, please complete the following:

Branch: _____ Rank: _____ Dates: From _____ To _____

Duties: _____ Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

_____

_____

19. Describe any offices you have held in the organizations listed in question 18: _____

_____

20. Have you ever served on a jury before? ( ) Yes (✓) No. How many times? _____
What type of jury: ( ) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21. If you have served on a <u>trial jury</u>, please state the following: Year served: _____

City and state where served: _____

What verdict was rendered? Civil case:    ( ) For plaintiff ( ) For defendant
                          Criminal case:  ( ) For state or federal government ( ) For defendant

22. Have you ever served as a <u>foreperson</u> on a grand jury or a trial jury? ( ) Yes (✓) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes (✗) No.
If yes, were you a witness for: ( ) Plaintiff ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( ) Yes (✗) No. If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes (✗) No. If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (✗) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (✗) No

28. What newspaper(s) do you read regularly? Mother Eagle

29. What TV news programs do you watch frequently? CNN & etc.

30. How many hours of TV do you watch per week? approximately 6-8

31. What radio programs do you listen to most? 99.9 (WOHW)

32. Which do you find more interesting? (✗) Local news ( ) National news

33. To what periodicals or magazines do you subscribe? Women's Magazines (S. Living)
Good Housekeeping, Family Circle, & Women's Day

34. Of the books you have read, which three are your favorites? N/A

_____

35. Please list your hobbies, spare-time activities, and outside interests: Cooking, Shopping,
Travelling & Walking

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives? ( ) Yes (✗) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(✗) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (✗) No. If yes, what are their names and relationship to you? _____

_____

39. Based on your experience, what is your opinion of lawyers? () Good (✓) Fair () Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? () Yes (✓) No. If yes, explain: _____
_____
_____

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? () Yes (✓) No. If yes, explain: _____
_____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? () Yes (✓) No. If yes, explain: _____
_____

43. List any reason why you do not wish to serve or why you should not serve: _____
_____

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? () Yes (✓) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (✓) Yes () No. If no, why not? _____
_____

46. Have you or a close relative ever been the victim of a crime? () Yes (✓) No. If yes, please describe: _____
_____
_____

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? () Yes (✓) No. If yes, please describe: _____
_____

48. Have you taken any courses or had any training in medicine or other health–care field? () Yes (✓) No. If yes, please explain: _____
_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? (✓) Yes ( ) No. If yes, please specify: _Allcrues   Church_

50. How often do you attend religious services? (✓) Regularly ( ) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? ( ) Yes (✓) No

52. What is your political party preference? _Republican_

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (✓) No. Of any anti–crime group or other similar organization? ( ) Yes (✓) No. Of any anti–weapons or gun-control group? ( ) Yes (✓) No.

54. Have you ever actively participated in a political campaign? (✓) Yes ( ) No. If yes, ( ) Democrat? (✓) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
# UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: _Russell James Washington_

2.  Place of birth: _Byron (Peach Co.) Georgia_ Age _47_  Sex: (X) Male ( ) Female

3.  Race: ( ) Caucasian/White  (X) African–American/Black  ( ) Hispanic  ( ) Other _____

4.  Do you: (X) Own home ( ) Rent home ( ) Rent apartment ( ) Live with friend or relatives ( ) Other

5.  What cities/states have you lived in during the past five years? _Alabama_

6.  Marital status: ( ) Single (X) Married ( ) Divorced ( ) Separated ( ) Widowed. If you are married:

    Spouse's employer: _Wiregrass Nursing Home_

    Number of years your spouse has worked there: _2_

    Spouse's title and job responsibilities: _LPN Shift Nurse In Nursing Home_

    Educational background of your spouse, including any degrees or certificates earned:
    _Licensed Practical Nurse     Pastor_

7.  Do you have children? (X) Yes ( ) No. If yes, please complete the following:

| Age | Sex | School or occupation | Live with you? | Their level of education |
|-----|-----|----------------------|----------------|--------------------------|
| 34  | FE  | Teacher              | NO             | College                  |
|     |     |                      |                |                          |
|     |     |                      |                |                          |
|     |     |                      |                |                          |

8.  Your level of education: Specify the highest grade you completed:

    (a)  Elementary or high school (1–12) _12_   College (1–4 or 5+) _1–4_

    (b)  If college, what college, what degrees, and what was your major? _Techincal College_
    _Mechanic / Air conditioner Repair_

    (c)  Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
    ( ) Yes (X) No. If yes, what courses? _____

9.  Your present employment status (check all that apply):
    ( ) Full–time  ( ) Part–time  (X) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10. Your current or most recent occupation: _US Army_

11. Name of your current or most recent employer, or, if you are a student, your school and major:

    _NONE_

12. How long have you been employed by your current or most recent employer? _18 years US Army_

13. What are/were your specific duties and responsibilities on the job? _Aircraft Technical_

    _Inspector_

14. Do/Did you supervise other employees? (X) Yes ( ) No.  If yes, how many? _Varied_

15. Do/Did you have responsibility for hiring and firing? ( ) Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years:

    _Substitute teacher_

17. Have you ever served in the military? (X) Yes ( ) No.  If yes, please complete the following:

    Branch: _Army_    Rank: _E6_    Dates: From _1974_  To _1991_

    Duties: _Aircraft Technician_    Type of discharge: _Honorable_

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

    _NONE_

    _____

19. Describe any offices you have held in the organizations listed in question 18: _NONE_

    _____

20. Have you ever served on a jury before? ( ) Yes (X) No.  How many times? _____
    What type of jury: ( ) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21. If you have served on a <u>trial jury</u>, please state the following:  Year served: _N/A_

    City and state where served: _N/A_

    What verdict was rendered?  Civil case:      ( ) For plaintiff  ( ) For defendant
                                Criminal case:   ( ) For state or federal government ( ) For defendant

22. Have you ever served as a <u>foreperson</u> on a grand jury or a trial jury? ( ) Yes (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X) No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes (X)No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
( ) Yes (X)No.  If yes, explain: _____

26. Have you ever been arrested? (X) Yes ( ) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly? *Enterprise Ledger*

29. What TV news programs do you watch frequently? *News*

30. How many hours of TV do you watch per week? *60*

31. What radio programs do you listen to most? *105.7*

32. Which do you find more interesting? ( ) Local news (X) National news

33. To what periodicals or magazines do you subscribe? *NONE*

34. Of the books you have read, which three are your favorites? *Dont Read Much.*

35. Please list your hobbies, spare–time activities, and outside interests: *Auto repair*

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes (X)No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

( ) Change your mind if a number of people have a different opinion?

(X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (X) No.  If yes, what are their names and relationship to you? _____

_____

39. Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor

40. Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? (X) Yes ( ) No. If yes, explain: *none, vision and hearing due to cancer and cancer treatments.*

41. Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No. If yes, explain: _____

42. Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No. If yes, explain: _____

43. List any reason why you do not wish to serve or why you should not serve: *NONE*

44. Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45. In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (X) Yes ( ) No. If no, why not? _____

46. Have you or a close relative ever been the victim of a crime? (X) Yes ( ) No. If yes, please describe: *Theft of property during repairs on our house*

47. Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? (X) Yes ( ) No. If yes, please describe: *Son-in-law is a corrections officer*

48. Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No. If yes, please explain: _____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation? (X) Yes ( ) No. If yes, please specify: _Holiness_

50. How often do you attend religious services? (X) Regularly ( ) Occasionally ( ) Never

51. Do you hold a special position in your religious organization? ( ) Yes (X) No

52. What is your political party preference? _Independent_

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No. Of any anti-crime group or other similar organization? ( ) Yes (X) No. Of any anti-weapons or gun-control group? ( ) Yes (X) No.

54. Have you ever actively participated in a political campaign? ( ) Yes (X) No. If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

APPENDIX

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: William C Weaver

2.  Place of birth: Cleveland Ohio     Age 80     Sex: (X) Male ( ) Female

3.  Race: (X) Caucasian/White   ( ) African–American/Black   ( ) Hispanic   ( ) Other _____

4.  Do you: (X) Own home   ( ) Rent home   ( ) Rent apartment   ( ) Live with friend or relatives   ( ) Other

5.  What cities/states have you lived in during the past five years? Enterprise AL _____

6.  Marital status: ( ) Single   ( ) Married   (X) Divorced   ( ) Separated   ( ) Widowed. If you are married:

    Spouse's employer: N/A _____

    Number of years your spouse has worked there: N/A _____

    Spouse's title and job responsibilities: N/A _____

    Educational background of your spouse, including any degrees or certificates earned:
    N/A _____

7.  Do you have children? (X) Yes ( ) No. If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    |-----|-----|----------------------|----------------|--------------------------|
    | 54 | F | High school | No | High School – 12 |
    | 50 | F | High school | X No | High School – 12 |
    | | | | | |
    | | | | | |

8.  Your level of education: Specify the highest grade you completed:

    (a)   Elementary or high school (1–12) 12 _____   College (1–4 or 5+) _____

    (b)   If college, what college, what degrees, and what was your major? _____

    (c)   Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
          ( ) Yes (X) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
() Full-time  () Part-time  (X) Retired  () Unemployed  () Student  () Homemaker

10. Your current or most recent occupation: _Flight Instructor - 1976_

11. Name of your current or most recent employer, or, if you are a student, your school and major:
_Doss Aviation - 1971_

12. How long have you been employed by your current or most recent employer? _8 Months_

13. What are/were your specific duties and responsibilities on the job? _Instruct Basic_
_Instrument Flying in Helicopters_

14. Do/Did you supervise other employees?  () Yes  (X) No.  If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing?  () Yes  (X) No

16. Please list all other occupations and employers you have had for the past 10 years:
_None_

17. Have you ever served in the military? (X) Yes  () No.  If yes, please complete the following:
Branch: _Army_     Rank: _Lt Col_     Dates: From _Mar 54_ To _Oct 1969_
Duties: _Usual Routine Army Assignments_  Type of discharge: _Honorable_

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?
_International Aerobatic Clubs, Harley Davidson_
_Owners Group_

19. Describe any offices you have held in the organizations listed in question 18: _Director - IAC - 1994_ _1996_

20. Have you ever served on a jury before?  () Yes  (X) No.  How many times? _____
What type of jury: () Grand jury  () Civil trial jury  () Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____
City and state where served: _____

What verdict was rendered?  Civil case:      () For plaintiff  () For defendant
                            Criminal case:   () For state or federal government  () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury?  () Yes  (X) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes    (X) No.
    If yes, were you a witness for: ( ) Plaintiff ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  (X) No.  If yes, explain: _____

    _____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
    ( ) Yes (X)No.   If yes, explain: _____

26. Have you ever been arrested? ( ) Yes  (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly? *Dothan Eagle - Enterprise Ledger*

29. What TV news programs do you watch frequently? *History - Local News*

30. How many hours of TV do you watch per week? *25*

31. What radio programs do you listen to most? *WSD HW*

32. Which do you find more interesting? ( ) Local news  (X) National news

33. To what periodicals or magazines do you subscribe? *Motorcycle - Aviation*

34. Of the books you have read, which three are your favorites? *None*

    _____

35. Please list your hobbies, spare-time activities, and outside interests: *Aviation - Motorcycles*

    _____

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?     (X) Yes ( ) No.
    If yes, what do they say? *NRA - Harley Davidson - AOPA*

37. In a group situation, once you have formed an opinion, do you usually:

    ( ) Change your mind if a number of people have a different opinion?

    (X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
    ( ) Yes (X) No.  If yes, what are their names and relationship to you? _____

    _____

39.   Based on your experience, what is your opinion of lawyers? ( ) Good (X) Fair ( ) Poor

40.   Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? (X) Yes ( ) No.   If yes, explain:   Diabetic - Heart Patient Semi-Incontinent - When it's time to urinate its time - or else - Blured vision dopervently pain "Blood sugar -

41.   Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.   If yes, explain: _____

42.   Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.   If yes, explain: _____

43.   List any reason why you do not wish to serve or why you should not serve:   See comments #40

44.   Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (X) No

45.   In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes ( ) No.   If no, why not? _____

46.   Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No.   If yes, please describe: _____

47.   Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (X) No.   If yes, please describe: _____

48.   Have you taken any courses or had any training in medicine or other health–care field? ( ) Yes (X) No.   If yes, please explain: _____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.    Do you belong to a church or otherwise have any religious affiliation?  (X) Yes  ( ) No.  If yes, please
       specify: _____

50.    How often do you attend religious services? ( ) Regularly  (X) Occasionally  ( ) Never

51.    Do you hold a special position in your religious organization? ( ) Yes  (X) No

52.    What is your political party preference?  _Republican_____

53.    Are you or is any member of your family a member of any victims rights organization? ( ) Yes  (X) No.
       Of any anti–crime group or other similar organization? ( ) Yes (X) No.  Of any anti–weapons or gun–
       control group? ( ) Yes  (X) No.

54.    Have you ever actively participated in a political campaign?  ( ) Yes  (X) No.  If yes, ( ) Democrat?
       ( ) Republican? ( ) Other  _____

960

<u>APPENDIX</u>

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.    Juror name/number: *Jerry G. Williams*

2.    Place of birth: *Enterprise, AL*            Age *34*    Sex: (✓) Male ( ) Female

3.    Race: (✓) Caucasian/White   ( ) African–American/Black   ( ) Hispanic   ( ) Other _____

4.    Do you: (✓) Own home ( ) Rent home ( ) Rent apartment ( ) Live with friend or relatives ( ) Other

5.    What cities/states have you lived in during the past five years? *Alabama*

6.    Marital status: (✓) Single ( ) Married ( ) Divorced ( ) Separated ( ) Widowed. If you are married:

    Spouse's employer: _____

    Number of years your spouse has worked there: _____

    Spouse's title and job responsibilities: _____

    Educational background of your spouse, including any degrees or certificates earned:

    _____

7.    Do you have children? ( ) Yes (✓) No. If yes, please complete the following:
    <u>Age</u>    <u>Sex</u>    <u>School or occupation</u>    <u>Live with you?</u>    <u>Their level of education</u>

    ____    ____    _____    _____    _____

    ____    ____    _____    _____    _____

    ____    ____    _____    _____    _____

    ____    ____    _____    _____    _____

8.    Your level of education: Specify the highest grade you completed:

    (a)    Elementary or high school (1–12) *12*    College (1–4 or 5+) *2*

    (b)    If college, what college, what degrees, and what was your major? _____

        *Alabama Aviation + Technical College*

    (c)    Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
        ( ) Yes (✓) No. If yes, what courses? _____

9.     Your present employment status (check all that apply):
(☑) Full–time () Part–time ( ) Retired ( ) Unemployed ( ) Student ( ) Homemaker

10.     Your current or most recent occupation: *Aircraft mechanic*

11.     Name of your current or most recent employer, or, if you are a student, your school and major:

*Pemco World Air Services, Inc.*

12.     How long have you been employed by your current or most recent employer? *14 years*

13.     What are/were your specific duties and responsibilities on the job? *perform aircraft maintenance on commercial aircraft*

14.     Do/Did you supervise other employees? ( ) Yes (☑) No.  If yes, how many? _____

15.     Do/Did you have responsibility for hiring and firing? ( ) Yes (☑) No

16.     Please list all other occupations and employers you have had for the past 10 years:
*none*

17.     Have you ever served in the military? ( ) Yes (☑) No.  If yes, please complete the following:

Branch: _____    Rank: _____    Dates: From _____ To _____

Duties: _____    Type of discharge: _____

18.     What social, civic, professional, trade, union, or other organizations are you affiliated with?

*International Association of Machinists*

19.     Describe any offices you have held in the organizations listed in question 18: *none*

20.     Have you ever served on a jury before? (☑) Yes ( ) No.   How many times? *1*
What type of jury: ( ) Grand jury (☑) Civil trial jury ( ) Criminal trial jury

21.     If you have served on a <u>trial jury</u>, please state the following: Year served: _____

City and state where served: *Enterprise, AL*

What verdict was rendered?  Civil case:     ( ) For plaintiff (☑) For defendant
                       Criminal case:   ( ) For state or federal government ( ) For defendant

22.     Have you ever served as a <u>foreperson</u> on a grand jury or a trial jury? ( ) Yes (☑) No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X) No.
If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes  (X) No.  If yes, explain: _____

_____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
(X) Yes  (X) No.  If yes, explain: *tried to prosecute a man for shooting a dog*

26. Have you ever been arrested? ( ) Yes  (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? (X) Yes ( ) No

28. What newspaper(s) do you read regularly? *Dothan Eagle*

29. What TV news programs do you watch frequently? *CNN*

30. How many hours of TV do you watch per week? *10*

31. What radio programs do you listen to most? *WTVY*

32. Which do you find more interesting? (X) Local news ( ) National news

33. To what periodicals or magazines do you subscribe? *Field & Stream, Buckmaster*

_____

34. Of the books you have read, which three are your favorites? *Pea River Reflections*
*Bible, AL VS Auburn - A War in Dixie*

35. Please list your hobbies, spare-time activities, and outside interests: *Riding horses,*
*hunting & Fishing*

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?  ( ) Yes (X) No.
If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

(X) Change your mind if a number of people have a different opinion?

(X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
( ) Yes (X) No.  If yes, what are their names and relationship to you? _____

_____

963

39.   Based on your experience, what is your opinion of lawyers? ( ) Good (✗) Fair ( ) Poor

40.   Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (✗) No.  If yes, explain: _____

_____

_____

41.   Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (✗) No.  If yes, explain: _____

_____

42.   Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (✗) No.  If yes, explain: _____

_____

43.   List any reason why you do not wish to serve or why you should not serve: _____

_____none_____

44.   Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? (✗) Yes  ( ) No

45.   In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (✗) Yes  ( ) No.  If no, why not? _____

_____

46.   Have you or a close relative ever been the victim of a crime? ( ) Yes (✗) No.  If yes, please describe: _____

_____

47.   Have you or a close relative ever worked in a law enforcement-related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (✗) No.  If yes, please describe: _____

_____

48.   Have you taken any courses or had any training in medicine or other health-care field? ( ) Yes (✗) No.  If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation?  ( ) Yes  (x) No.  If yes, please
     specify: _____

50.  How often do you attend religious services? ( ) Regularly  (x) Occasionally  ( ) Never

51.  Do you hold a special position in your religious organization? ( ) Yes  (x) No

52.  What is your political party preference?  _Republican_____

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes  (x) No.
     Of any anti–crime group or other similar organization? ( ) Yes (x) No. Of any anti–weapons or gun–
     control group? ( ) Yes  (x) No.

54.  Have you ever actively participated in a political campaign?  ( ) Yes  (x) No.  If yes, ( ) Democrat?
     ( ) Republican? ( ) Other  _____

<u>APPENDIX</u>

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: _Magnolia Williams_

2.  Place of birth: _Tunica, MS._ Age _64_ Sex: ( ) Male (X) Female

3.  Race: ( ) Caucasian/White (X) African–American/Black ( ) Hispanic ( ) Other _____

4.  Do you: (X) Own home ( ) Rent home ( ) Rent apartment ( ) Live with friend or relatives ( ) Other

5.  What cities/states have you lived in during the past five years? _None_ _____

6.  Marital status: ( ) Single (X) Married ( ) Divorced ( ) Separated ( ) Widowed. If you are married:

    Spouse's employer: _Retired_ _____

    Number of years your spouse has worked there: _N/A_

    Spouse's title and job responsibilities: _N/A_

    Educational background of your spouse, including any degrees or certificates earned:
    _____

7.  Do you have children? (X) Yes ( ) No. If yes, please complete the following:

    | <u>Age</u> | <u>Sex</u> | <u>School or occupation</u> | <u>Live with you?</u> | <u>Their level of education</u> |
    |------|------|------|------|------|
    | 47 | F | | | |
    | 45 | F | | | |
    | 38 | M | | | |
    | 33 | M | | | |

8.  Your level of education: Specify the highest grade you completed:

    (a) Elementary or high school (1–12) _High School_ College (1–4 or 5+) _____

    (b) If college, what college, what degrees, and what was your major? _____
    _____

    (c) Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
    (X) Yes ( ) No. If yes, what courses? _____

9. Your present employment status (check all that apply):
() Full-time () Part-time (X) Retired () Unemployed () Student () Homemaker

10. Your current or most recent occupation: _Conagra_

11. Name of your current or most recent employer, or, if you are a student, your school and major:

_____

12. How long have you been employed by your current or most recent employer?

13. What are/were your specific duties and responsibilities on the job? _____

_____

14. Do/Did you supervise other employees? () Yes () No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? () Yes () No

16. Please list all other occupations and employers you have had for the past 10 years:

_____

_____ _Conagra_ _____

17. Have you ever served in the military? () Yes (X) No. If yes, please complete the following:

Branch: _____ Rank: _____ Dates: From _____ To _____

Duties: _____ Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

_____ _none_ _____

_____

19. Describe any offices you have held in the organizations listed in question 18: ____ _none_

_____

20. Have you ever served on a jury before? () Yes (X) No.  How many times? _____
What type of jury: () Grand jury () Civil trial jury () Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____

City and state where served: _____

What verdict was rendered?  Civil case:      () For plaintiff  () For defendant
                           Criminal case:  () For state or federal government () For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes () No

23. Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X) No.
    If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24. Have you or anyone close to you ever sued or been sued in any type of lawsuit? (X) Yes ( ) No.  If yes, explain: _____
    _____ *Small Claims* _____

25. Have you ever been to court for any other reason (excluding divorce or traffic cases)?
    ( ) Yes (X) No.  If yes, explain: _____

26. Have you ever been arrested? ( ) Yes (X) No

27. Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes (X) No

28. What newspaper(s) do you read regularly? _____

29. What TV news programs do you watch frequently? *Enterprise Ledger Dothan Eagle*

30. How many hours of TV do you watch per week? _____ *4* _____

31. What radio programs do you listen to most? _____

32. Which do you find more interesting? ( ) Local news (X) National news

33. To what periodicals or magazines do you subscribe? _____
    _____

34. Of the books you have read, which three are your favorites? _____
    _____

35. Please list your hobbies, spare-time activities, and outside interests: *Fishing*
    _____

36. Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes (X) No.
    If yes, what do they say? _____

37. In a group situation, once you have formed an opinion, do you usually:

    ( ) Change your mind if a number of people have a different opinion?

    (X) Stand by your original opinion despite what others believe?

38. Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
    ( ) Yes (X) No.  If yes, what are their names and relationship to you? _____
    _____

39.     Based on your experience, what is your opinion of lawyers? (x) Good ( ) Fair ( ) Poor

40.     Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (x) No. If yes, explain: _____

_____

_____

41.     Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (x) No. If yes, explain: _____

_____

42.     Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (x) No. If yes, explain: _____

_____

43.     List any reason why you do not wish to serve or why you should not serve: _____

_____

44.     Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes (x) No

45.     In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence. Do you agree with that principle? (x) Yes ( ) No. If no, why not? _____

_____

46.     Have you or a close relative ever been the victim of a crime? ( ) Yes (x) No. If yes, please describe:

_____

_____

47.     Have you or a close relative ever worked in a law enforcement-related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes (x) No. If yes, please describe: _____

_____

48.     Have you taken any courses or had any training in medicine or other health-care field? ( ) Yes (x) No. If yes, please explain: _____

_____

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49.  Do you belong to a church or otherwise have any religious affiliation?  ( ) Yes ( ) No.  If yes, please specify: _____

50.  How often do you attend religious services? ( ) Regularly (X) Occasionally ( ) Never

51.  Do you hold a special position in your religious organization? ( ) Yes (X) No

52.  What is your political party preference? _____

53.  Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No.  Of any anti–crime group or other similar organization?  ( ) Yes (X) No.  Of any anti–weapons or gun–control group? ( ) Yes (X) No.

54.  Have you ever actively participated in a political campaign?  ( ) Yes (X) No.  If yes, ( ) Democrat? ( ) Republican? ( ) Other _____

<u>APPENDIX</u>

# RECOMMENDED
## UNIFORM JUROR QUESTIONNAIRE

*This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public information. If you need additional space to answer a question, attach additional sheets and number your answers to correspond to the questions.*

1.  Juror name/number: Helen A. Yager

2.  Place of birth: Germany    Age 49    Sex: () Male (X) Female

3.  Race: (X) Caucasian/White    () African–American/Black    () Hispanic    () Other _____

4.  Do you: () Own home    () Rent home    (X) Rent apartment    () Live with friend or relatives    () Other

5.  What cities/states have you lived in during the past five years? ENTERPRISE

6.  Marital status: (X) Single    () Married    () Divorced    () Separated    () Widowed. If you are married:

    Spouse's employer: _____

    Number of years your spouse has worked there: _____

    Spouse's title and job responsibilities: _____

    Educational background of your spouse, including any degrees or certificates earned:

    _____

7.  Do you have children? (X) Yes () No. If yes, please complete the following:

    | Age | Sex | School or occupation | Live with you? | Their level of education |
    | --- | --- | --- | --- | --- |
    | 30 | F | F.A.C.E.S | No | working on MASTER |
    | 9 | F | Holly Hill | Yes | 3rd Grade |
    |  |  |  |  |  |
    |  |  |  |  |  |

8.  Your level of education: Specify the highest grade you completed:

    (a)    Elementary or high school (1–12) _____    College (1–4 or 5+) ✓

    (b)    If college, what college, what degrees, and what was your major? ENTERprise-STATE Jr. College Business Information Processing Cert.

    (c)    Have you ever taken any courses in law, law enforcement, criminology, or criminal justice?
    () Yes (X) No. If yes, what courses? _____

971

9. Your present employment status (check all that apply):
(X) Full–time  ( ) Part–time  ( ) Retired  ( ) Unemployed  ( ) Student  ( ) Homemaker

10. Your current or most recent occupation: Line Worker

11. Name of your current or most recent employer, or, if you are a student, your school and major:

ConAgra

12. How long have you been employed by your current or most recent employer? 13 months

13. What are/were your specific duties and responsibilities on the job? Work the line

14. Do/Did you supervise other employees? ( ) Yes (X) No. If yes, how many? _____

15. Do/Did you have responsibility for hiring and firing? ( ) Yes (X) No

16. Please list all other occupations and employers you have had for the past 10 years:
Instructor/Worker   Aflac Shutmakers

17. Have you ever served in the military? ( ) Yes (X) No. If yes, please complete the following:

Branch: _____  Rank: _____  Dates: From _____ To _____

Duties: _____  Type of discharge: _____

18. What social, civic, professional, trade, union, or other organizations are you affiliated with?

19. Describe any offices you have held in the organizations listed in question 18: _____

20. Have you ever served on a jury before? ( ) Yes (X) No.  How many times? _____
What type of jury: ( ) Grand jury ( ) Civil trial jury ( ) Criminal trial jury

21. If you have served on a trial jury, please state the following: Year served: _____

City and state where served: _____

What verdict was rendered?  Civil case:       ( ) For plaintiff  ( ) For defendant
                            Criminal case:    ( ) For state or federal government ( ) For defendant

22. Have you ever served as a foreperson on a grand jury or a trial jury? ( ) Yes (X) No

23.  Have you testified as a <u>witness</u> in any court proceeding? ( ) Yes  (X)No.
     If yes, were you a witness for: ( ) Plaintiff  ( ) State or federal government ( ) Defendant in a civil or criminal case.

24.  Have you or anyone close to you ever sued or been sued in any type of lawsuit? ( )Yes (X)No.  If yes, explain: _____

     _____

25.  Have you ever been to court for any other reason (excluding divorce or traffic cases)?
     ( ) Yes (X)No.  If yes, explain: _____

26.  Have you ever been arrested? ( ) Yes (X)No

27.  Have you, a close relative, or a close friend ever been convicted of a crime? ( ) Yes ( ) No

28.  What newspaper(s) do you read regularly? _Dothan Eagle / Enterprise Ledger_

29.  What TV news programs do you watch frequently? _WTVY / NBC_

30.  How many hours of TV do you watch per week? _Maybe 10_

31.  What radio programs do you listen to most? _WOOF_

32.  Which do you find more interesting? ( ) Local news (X)National news

33.  To what periodicals or magazines do you subscribe? _Readers Digest_

     _____

34.  Of the books you have read, which three are your favorites? _____

     _____

35.  Please list your hobbies, spare–time activities, and outside interests: _Reading · Crafts_
     _Being with friends / Family_

36.  Are there bumper stickers on the vehicles that you drive or that your spouse drives?    ( ) Yes (X)No.
     If yes, what do they say? _____

37.  In a group situation, once you have formed an opinion, do you usually:

     ( ) Change your mind if a number of people have a different opinion?

     (X) Stand by your original opinion despite what others believe? _unless otherwise proven different_

38.  Do you have relatives or close personal friends who are judges, attorneys, or court personnel?
     ( ) Yes (X)No.  If yes, what are their names and relationship to you? _____

     _____

39.  Based on your experience, what is your opinion of lawyers? (X) Good  ( ) Fair  ( ) Poor

40.  Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

_____

_____

41.  Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? ( ) Yes (X) No.  If yes, explain: _____

42.  Is there any matter not covered by this questionnaire that could affect your ability to be a fair and impartial juror? ( ) Yes (X) No.  If yes, explain: _____

_____

43.  List any reason why you do not wish to serve or why you should not serve: _____

_____

44.  Are you or is any member of your family in favor of limiting the rights of those accused of a crime so as to make it easier to convict? ( ) Yes  (X) No

45.  In a criminal case, a defendant is presumed innocent until proven guilty based on the evidence.  Do you agree with that principle? (X) Yes  ( ) No.  If no, why not? _____

_____

46.  Have you or a close relative ever been the victim of a crime? ( ) Yes (X) No.  If yes, please describe:

_____

_____

47.  Have you or a close relative ever worked in a law enforcement–related job such as police, sheriff, state trooper, prison guard, or military police? ( ) Yes  (X) No.  If yes, please describe: _____

_____

48.  Have you taken any courses or had any training in medicine or other health-care field? ( ) Yes (X) No.  If yes, please explain: _____

_____

974

ANSWERS TO QUESTIONS 49 – 54 ARE OPTIONAL

49. Do you belong to a church or otherwise have any religious affiliation?  ( ) Yes (X) No.  If yes, please specify: _____

50. How often do you attend religious services?  ( ) Regularly (X) Occasionally  ( ) Never

51. Do you hold a special position in your religious organization?  ( ) Yes (X) No

52. What is your political party preference?  _Democrat_ _____

53. Are you or is any member of your family a member of any victims rights organization? ( ) Yes (X) No. Of any anti-crime group or other similar organization? ( ) Yes (X) No.  Of any anti-weapons or gun-control group? ( ) Yes (X) No.

54. Have you ever actively participated in a political campaign?  (X) Yes ( ) No.  If yes, (X) Democrat? ( ) Republican? ( ) Other  _____

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,
    Plaintiff;

VS.                      CASE NO.: CC-2002-M-179 & 180

ROBERT CONRAD,
    Defendant.

## DEFENDANT'S REQUESTED JURY INSTRUCTIONS

Now Comes the Defendant, ROBERT CONRAD, by and through undersigned counsel,

Sydney Albert (Al) Smith, Gary Bradshaw, and respectfully requests that this Court give the attached

Jury Instructions to the jury in the above-styled case.

**WHEREFORE,** Defendant respectfully requests that this Motion be granted.

Respectfully submitted this the 20th day of September, 2002.

Sydney Albert (Al) Smith     SMI098
Attorney at Law
P. O. Drawer 389
Elba, Al 36323
Phone:     334-897-3658
Fax:       334-897-8633

Gary D. Bradshaw    BAR074
Post Office Box 311412
Enterprise, Alabama 36331
Phone:     334-393-6439

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the
United States Mail, postage paid, and addressed as follows:

Page 1 of 42

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

Al Smith                                    9/20/02
Al Smith                                     Date

## CONTENTS OF ATTACHED
## DEFENDANT'S REQUESTED INSTRUCTIONS

1.   Preliminary Instructions Before Opening Statements
2.   Introduction
3.   Duty to Follow Instructions; Presumption of Innocence; Burden of Proof
4.   Definition of Reasonable Doubt
5.   Definition of Reasonable Doubt
6.   Credibility of Witness
7.   Credibility of Witness
8.   Impeachment; Inconsistent Statement
9.   Testimony of Interested Witness
10.  Law Enforcement Witnesses
11.  Number of Witnesses
12.  Expert Witnesses
13.  Statement or Conduct of Defendant
14.  Conclusion
15.  Capital Murder
16.  Lesser-Included Offenses
17.  Murder
18.  Murder (Felony)
19.  Manslaughter - Provocation
20.  Manslaughter
21.  Robbery (Jelaine Bowman Davis)
22.  Multiple Counts
23.  Robbery (Robert Ray Grimes)
24.  Theory of Defense Instruction
25.  No Burden of Present Evidence
26.  Rendering Verdict

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 1

### PRELIMINARY INSTRUCTIONS
### BEFORE OPENING STATEMENTS

"Members of the Jury:

You have now been sworn as the jury to try this case. By your verdict(s) you will decide the

disputed issues of fact. I will decide all questions of law that arise during the trial, and before you

retire to deliberate together and decide the case at the end of the trial, I will instruct you on the rules

of law that must follow and apply in reaching your decision.

Because you will be called upon to decide the facts of the case, you should give careful

attention to the testimony and evidence presented for your consideration during the trial, but you

should keep an open mind and should not form or state any opinion about the case one way or the

other until you have heard all of the evidence and have had the benefit of the closing arguments of

the lawyers as well as my instructions to you on the applicable law.

During the trial you must not discuss the case in any manner among yourselves or with

anyone else, and you must not permit anyone to attempt to discuss it with you or in your presence;

and, insofar as the lawyers are concerned, as well as others whom you may come to recognize as

having some connection with the case, you are instructed that, in order to avoid even the appearance

of impropriety, you should have no conversation whatever with those persons while you are serving

on the jury.

You must also avoid reading any newspaper articles that might be published about the case

now that the trial has begun, and you must also avoid listening to or observing any broadcast news

programs on either television or radio because of the possibility that some mention might be made

Page 4 of 42

of the case during such a broadcast now that the trial is in progress.

You should not seek to make any investigation of your own regarding this case. You should not visit the scene of any occurrence which is at issue in the case and you should not conduct any experiment regarding the case. You should not consult any resource material such as a law book, a dictionary, or encyclopedia about any issue in the case.

The reason for these cautions, of course, lies in the fact that it will be your duty to decide this case only on the basis of the testimony and evidence presented during the trial without consideration of any other matters whatever.

Now, in order that you might understand at the beginning of the case the nature of the decisions you will be asked to make and how you should go about making them, I would like to give you some preliminary instructions at this time concerning some of the rules of law that will apply.

Of course, the preliminary instructions I will give you now will not cover all of the rules of law applicable to this case. As stated before, I will instruct you fully at the end of the trial just before you retire to deliberate upon your verdict(s), and will probably restate at that time some of the rules I want to tell you about now. In any event, you should not single out any one instruction alone as stating the law, but should consider all of my instructions as a whole.

**Presumption of Innocence.** As you were told during the process of your selection, an indictment in a criminal case is merely the accusatory paper which states the charge or charges to be determined at the trial, but it is not evidence against the Defendant or anyone else. Indeed, the Defendant has entered a plea of Not Guilty and is presumed by the law to be innocent. The Government has the burden of proving him guilty beyond a reasonable doubt, and if it fails to do so, you must acquit him.

Page 5 of 42

**Burden of Proof.** Proof beyond a reasonable doubt is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

**Order of Proof - Defendant's Right Not to Testify.** Because the Government has the burden of proof, it will go forward and present its testimony and evidence first. After the Government finishes or "rests" what we call its "case in chief," the Defendant may call witnesses and present evidence if he wishes to do so. However, you will remember that the law does not require a Defendant to prove his innocence or produce any evidence at all, and no inference whatever may be drawn from the election of a Defendant not to testify in the event should he so elect.

**Credibility of the Witnesses.** As you listen to the testimony, you should remember that you will be the sole judges of credibility or "believability" of each witness and the weight to be given to his or her testimony. In deciding whether you believe or disbelieve any witness, you should consider his relationship to the Government or the Defendant; his interest, if any, in the outcome of the case; his manner of testifying; his opportunity to observe or acquire knowledge concerning the facts about which he testified; his candor, fairness and intelligence; and the extent to which he has been supported or contradicted by other credible evidence. You may, in short, accept or reject the testimony of any witness in whole or in part.

From time to time during the trial, I may be called upon to make rulings of law on motions or objections made by the lawyers. You should not infer or conclude from any ruling I may make that I have any opinions on the merits of the case favoring one side or the other. And if I sustain an objection to a question that goes unanswered by the witness, you should not speculate on what answer might have been given, nor should you draw any interferences or conclusions from the

question itself.

During the trial, it may be necessary for me to confer with the lawyers from time to time out of your hearing concerning questions of law or procedure that require consideration by the Court alone. On some occasions, you may be executed from the courtroom as a convenience to you and to us while I discuss such matters with the lawyers. I will try to limit such interruptions as much as possible, but you should remember at all times the importance of the matter you are here to determine and should be patient even though the case may seem to go slowly.

During the trial, it may be necessary for me to confer with the lawyers from time to time out of your hearing concerning questions of law or procedure that require consideration by the Court alone. On some occasions, you may be excused from the courtroom as a convenience to you and to us while I discuss such matters with the lawyers. I will try to limit such interruptions as much as possible, but you should remember at all times the importance of the matter you are here to determine and should be patient even though the case may seem to go slowly.

In that regard, as you were told during the process of your selection, we except the case to last four (4) days, but I will make every effort to expedite the trial whenever possible.

Now, we will begin by affording the lawyers for each side an opportunity to make opening statements to you in which they may explain the issues in the case and summarize the facts they expect the evidence will show. After all the testimony and evidence has been presented, the lawyers will then be given another opportunity to address you at the end of the trial and make their summations or final arguments in the case. The statements that the lawyers make now, as well as the arguments they present at the end of trial, are not to be considered by you either as evidence in the case (which comes only from the witnesses and exhibits) or as your instruction on the law (which

Page 7 of 42

will come only from me). Nevertheless, these statements and arguments are intended to help you understand the issues and the evidence as it comes in, as well as the positions taken by both sides. So I ask that you now give the lawyers your close attention as I recognize them for the purpose of making an opening statement."

Authority: Selected portions of <u>Pattern Jury Instructions – Criminal</u>, (Third Edition, 1994); ALI

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 2

## INTRODUCTION

MEMBERS OF THE JURY:

It is now my duty to instruct you on the rules of law that you must follow and apply in deciding this case. When I have finished, you will go to the jury room and begin your discussions - - what we call your deliberations.

It will be your duty to decide whether the State has proved beyond a reasonable doubt the specific facts necessary to find the defendant guilty of the crimes charged in the Indictment.

*Denied*
*[signature] Judge*

Page 9 of 42

DEFENDANT'S REQUEST JURY INSTRUCTION NO. 3

## DUTY TO FOLLOW INSTRUCTIONS

## PRESUMPTION OF INNOCENCE AND BURDEN OF PROOF

You must make your decision only on the basis of the testimony and other evidence presented here during the trial; and you must not be influenced in any way by either sympathy or prejudice for or against the Defendant or the Government.

You must also follow the law as I explain it to you whether you agree with that law or not; and you must follow all of my instructions as a whole. You may not single out, or disregard, any of the Court's instructions on the law.

The indictment or formal charge against the Defendant is not evidence of guilt. Indeed, the Defendant is presumed by the law to be innocent. The law does not require a Defendant to prove his innocence or produce any evidence at all; and if a Defendant elects not to testify, you should not consider that in any way during your deliberations. The State has the burden of proving a Defendant guilty beyond a reasonable doubt, and if it fails to do so, you must find the Defendant not guilty.

_Denied_
_for (Judge_

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 4

### DEFINITION OF REASONABLE DOUBT

As I have already told you, the burden is upon the State to prove the defendant guilty as charged. Before a conviction can be had in this case, the State must satisfy each and every member of the jury of the defendant's guilt beyond a reasonable doubt. Even if the state demonstrates a probability of guilt, if the State does not establish guilt beyond a reasonable doubt, you must acquit the defendant.

The phrase "reasonable doubt" is self-explanatory. Efforts to define it do not always clarify the term. It is not a mere possible doubt because everything relating to human affairs is open to some possible or imaginary doubt. A reasonable doubt is a doubt of a fair-minded juror honestly seeking the truth after careful and impartial consideration of all the evidence in the case. It is a doubt based upon reason and common sense. It does not mean a vague or arbitrary notion, but it is an actual doubt based upon the evidence, the lack of evidence, a conflict in the evidence, or a combination thereof. It is a doubt that remains after going over in your minds the entire case and giving consideration to all the testimony. It is distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture.

If after considering all the evidence, you are convinced of the Defendant's guilt beyond a reasonable doubt, the it would be your duty to convict the defendant. However, if you still have a reasonable doubt, the defendant is entitled to the benefit of it, and you should acquit him.


**Authority:**     Authority: Selected portions of <u>Pattern Jury Instructions – Criminal,</u> (Third Edition, 1994); ALI; I.4, Burden of Proof

*Denied [signature] Judge*

Page 11 of 42

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 5

### DEFINITION OF REASONABLE DOUBT

A "reasonable doubt" is a real doubt, based upon reason and common sense after careful and impartial consideration of all the evidence in the case.

Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs. If you are convinced that the Defendant has been proved guilty beyond a reasonable doubt, say so. If you are not convinced, say so.

_Denied ___ Judge_

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 6

### CREDIBILITY OF WITNESSES

You, as jurors, are the sole and exclusive judges of the credibility of each of the witnesses called to testify in this case and only you determine the importance or the weight that their testimony deserves. After making your assessment concerning the credibility of a witness, you may decide to believe all of that witness' testimony, only a portion of it, or none of it.

In making your assessment you should carefully scrutinize all of the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness, in your opinion, is worthy of belief. Consider each witness' intelligence, motive to falsify, state or mind, and appearance and manner while on the witness stand. Consider the witness's ability to observe the matters as to which he or she has testified and consider whether he or she impresses you as having an accurate memory or recollection of these matters. Consider also any relation a witness may bear to either side of the case, the manner in which each witness might be affected by your verdict, and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness or between the testimony of different witnesses may or may not cause you to disbelieve or discredit such testimony. Two or more persons witnessing an incident or a transaction may simply see or hear it differently. Innocent misrecollection, like failure of recollection, is not an uncommon experience. In weighing the effect of a discrepancy, however, always consider whether it pertains to a matter or importance or an insignificant detail and consider whether the discrepancy results from innocent error or from intentional falsehood.

Page 13 of 42

Afer making your own judgment or assessment concerning the believability of a witness, you can then attach such importance or weigh to that testimony, if any, that you feel it deserves. You will then be in a position to decide whether the state has proven the charge(s) beyond a reasonable doubt.

Refused by Judge

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 6

### CREDIBILITY OF WITNESSES

Now, in saying that you must <u>consider</u> all of the evidence, I do not mean that you must <u>accept</u> all of the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part. Also, the number of witnesses testifying concerning any particular dispute is not controlling.

In deciding whether you believe or do not believe any witness I suggest that you ask yourself a few questions: Did the witness impress you as one who was telling the truth? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? Did the witness seem to have a good memory? Did the witness have the opportunity and ability to observe accurately the things he or she testified about? Did the witness appear to understand the questions clearly and answer them directly? Did the witness's testimony differ from other testimony or other evidence?

### DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 7

### IMPEACHMENT

### INCONSISTENT STATEMENT

You should also ask yourself whether there was evidence tending to prove that [a] witness testified falsely concerning some important fact; or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, which was different from the testimony he or she gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people naturally tend to forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether that misstatement was simply an innocent lapse of memory or an intentional falsehood; and that may depend on whether it has to do with an important fact or with only an unimportant detail.

If a person is shown to have knowingly testified falsely concerning any important or material matter, you obviously have a right to distrust the testimony of such an individual concerning other matters. You may reject all of the testimony of that witness or give it such weight or credibility as you may think it deserves.

*[signature]*

Page 16 of 42

DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 8

## IMPEACHMENT

## INCONSISTENT STATEMENT AND FELONY CONVICTION

You should also ask yourself whether there was evidence tending to prove that a witness testified falsely concerning some important fact; or, whether there was evidence that at some other time a witness said or did something, or failed to say or do something, which was different from the testimony the witness gave before you during the trial.

The fact that a witness has been convicted of a felony offense, or a crime involving dishonesty or false statement, is another factor you may consider in deciding whether you believe that witness.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people naturally tend to forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether it was simply an innocent lapse of memory or an intentional falsehood; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

WITHDRAWN by Defense counsel - 7/27/200_

_Judge_

Denied _Judge_

Page 17 of 42

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 9

### TESTIMONY OF INTERESTED WITNESS

The testimony of some witnesses must be considered with more caution than the testimony of other witnesses.

The testimony of a witness who provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. The jury must determine whether this witness' testimony has been affected by interest, or by prejudice against the defendant.

For example, a paid informer, or a witness who has been promised that he or she will not be charged or prosecuted, or a witness who hopes to gain more favorable treatment in his or her own case, may have a reason to make a false statement because he wants to strike a good bargain with the Government.

So, while a witness of that kind my be entirely truthful when testifying, you should consider that testimony with more caution than the testimony of other witnesses.

*given by judge*

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 10

## LAW ENFORCEMENT WITNESSES

You have heard the testimony of several law enforcement officials. The fact that a witness may be employed by the state government, county government, or city government as a law enforcement official does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.

At the same time, it is quite legitimate for the defense counsel to try to attack the credibility of a law enforcement witness on the grounds that his or her testimony may be colored by a personal or professional interest in the outcome of the case.

It is your decision, after reviewing all the evidence, whether to accept the testimony of the law enforcement witness and to give to that testimony whatever weight, if any, you find it deserves.

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 11

### NUMBER OF WITNESSES

Your decision on the facts of this case should not be determined by the number of witnesses testifying for or against a party. You should consider all the facts and circumstances in evidence to determine which of the witnesses you choose to believe or not believe. You may find that the testimony of a smaller number of witnesses on one side is more credible than the testimony of a greater number of witnesses on the other side.

At all times, the burden of proof remains on the state to present proof beyond a reasonable doubt.

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 12

### EXPERT WITNESSES

When knowledge of a technical subject matter might be helpful to the jury, a person having special training or experience in that technical field - - one who is called an expert witness - - is permitted to state his or her opinion concerning those technical matters.

Merely because an expert witness has expressed an opinion, however, does not mean that you must accept that opinion. The same as with any other witness, it is up to you to decide whether to rely upon it.

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 13

### STATEMENT OR CONDUCT OF DEFENDANT

Evidence relating to any alleged statement, confession, admission, or act or omission alleged to have been made or done by a defendant outside of court and after a crime has been committed should always be considered by the jury with caution and weighed with great care. All such alleged statements, confessions, admissions or acts or omissions should be disregarded entirely unless the other evidence in the case convinces the jury beyond a reasonable doubt that the statement, confession, admission, or act or omission was made or done knowingly and voluntarily.

It is for the jury to decide (1) whether the particular defendant made the statement and (2) if so, how much weight to give it. In making those decisions you should consider all of the evidence about the statement, including the circumstances under which the particular defendant may have made it.

In determining whether any statement, confession, admission, or act or omission alleged to have been made by a defendant outside of court after a crime has been committed was knowingly and voluntarily made or done, the jury should consider the age, training, education, occupation, and physical and mental condition of the defendant, his or her treatment while in custody or under interrogation as shown by the evidence in the case, and all other circumstances in evidence.

If after considering the evidence you determine that a statement, confession, admission, or act or omission was not made or done knowingly or voluntarily you must ignore such statement, confession, admission or act or omission, and may give it no weight.

If after considering the evidence you determine that a statement, confession, admission or ac or omission was made or done knowingly and voluntarily, you may still give it such weight or not

as you feel it deserves under the circumstances in evidence.

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 14

### Conclusion

The defendant is charged with Capital Murder.

To convict, the State must prove beyond a reasonable doubt each of hte elements of Capital Murder charged beyond a reasonable doubt. If you find from the evidence that the State has proved beyond a reasonable doubt each of the elements of the offense of Capital Murder, as charged then you shall find the defendant guilty of Capital Murder.

If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of Capital Murder, then you cannot find the defendant guilty of Capital Murder.

Authority: Selected portions of <u>Pattern Jury Instructions – Criminal</u>, (Third Edition, 1994); ALI; I.7, COnclusion.

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 15

### Capital Murder

The Defendant is charged with capital murder. The law states that an intentional murder committed during a robbery in the first degree is capital murder.

A person commits an intentional murder if he causes the death of another person, and in performing the act or acts which cause the death of that person, he intends to kill that person.

A person commits a robbery in the first degree if, in the course of committing or attempting to commit a theft, he uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance, or threatens the imminet use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property, and in doing so, he is armed with a deadly weapon.

To convict, the State must prove beyond a reasonable doubt each of the following elements of an intentional murder during robbery in the first degree:

(1) That Jelaine Bowman Dennis is dead;

(2) That the defendant, Robert Conrad caused the death of Jelaine Bowman Dennis by shooting her with a pistol;

(3) That in committing the acts which caused the death of Jelaine Bowman Dennis the defendant intended to kill the deceased or another person. A person acts intentionally when it is his purpose to cause the death of another person. The intent to kill must be real and specific.

(4) That the defendant committed or attempted to commit theft of United States currency and/or United States coinage and/or checks;

(5) That in the course of committing or attempting to commit the theft, or in immediate flight after the attempt or commission, the defendant either used force, or threatened the imminent use of

Page 25 of 42

force against the person of Jelaine Bowman Dennis, or another person present, with the intent to overcome her physical resistance or physical power to resist, or to compel acquiescence to the taking of or escaping with the property.

(6) That the defendant was armed with a deadly weapon;

(7) That the murder took place "during" the robbery.

A person commits the crime of theft of property if he knowingly obtains or exerts unauthorized control over the property of another, with intent to deprive the owner of his property.

A person acts knowing with respect to conduct or to a circumstances when he is aware that his conduct is of that nature or that the circumstances exist.

A person acts intentionally with respect to a result or to conduct when his or her purpose is to cause that result or to engage in that conduct.

A deadly weapon is a firearm or anything manifestly designed, made or adapted for the purposes of inflicting death or serious physical injury.

"During" means in the course of the commission of or in connection with, or in immediate flight from the commission of robbery.

If you find from the evidence that the State has proved beyond a reasonable doubt each of the above elements of the offense of murder during robbery in the first degree, as charged, then you shall find the defendant guilty of capital murder.

If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of murder during robbery in the first degree, then you cannot find the defendant guilty of capital murder.

Authority: Selected portions of Pattern Jury Instructions – Criminal, (Third Edition, 1994); ALI; 5-25, Murder During Robbery in the First Degree or Attempt Thereof, (armed).

Page 26 of 42

*VOLUME 6*

COURT OF CRIMINAL APPEALS NO. __CR-02-0333__

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF ____COFFEE____ COUNTY, ALABAMA

CIRCUIT COURT NO. __CC-01-179, CC-01-180__

CIRCUIT JUDGE __Gary L. McAliley__

Type of Conviction / Order Appealed From: __Conviction, Capital Murder, Robbery 1st__

Sentence Imposed: __Life Without Parole, Life__

Defendant Indigent: ☒ YES  ☐ NO

Robert Thomas Conrad

__Gary Bradshaw__
(Appellant's Attorney)           (Telephone No.)
P. O. Box 311412
(Address)
__Enterprise__      __AL__         __36331__
(City)           (State)          (Zip Code)

NAME OF APPELLANT

Richard Waldrop
P. O. Box 310027
Enterprise, AL  36331

V.

STATE OF ALABAMA

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

NAME OF APPELLEE

_____

(For Court of Criminal Appeals Use Only)



## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 16

### Lesser Included Offenses

Within the offense of Capital Murder charged in the indictment is the lesser-included offense of Murder.

If after your consideration of the offense charged in the indictment in accordance with the instructions that I have given you, you are not convinced beyond a reasonable doubt that the defendant is guilty of the offense of Capital Murder as charged in the indictment, you cannot find the defendant guilty of that offense. Instead, you must next consider the evidence as to the lesser-included offense of Murder and determine whether the defendant has been proven guilty beyond a reasonable doubt of the lesser-included offense.

If you find from the evidence that the State has proved beyond a reasonable doubt each of the elements of the lesser-included offense, then you shall find the defendant guilty of Murder.

If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of Murder, then you cannot find the defendant guilty of the offense of Murder.

*Given*

Authority: Selected portions of Pattern Jury Instructions – Criminal, (Third Edition, 1994); ALI; I.6, Lesser-Included Offenses.

100²

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 17

### Murder (Intentional)

A person commits the crime of murder if he causes the death of another person, and in performing the act or acts which cause the death of that person, he intends to kill that person.

To convict, the State must prove beyond a reasonable doubt each of the following elements of murder:

(1) That Jelaine Bowman Dennis is dead;

(2) That the defendant, Robert Conrad caused the death of Jelaine Bowman Dennis by shooting her with a pistol;

(3) That in committing the acts which caused the death of Jelaine Bowman Dennis the defendant acted with intent.

A person acts intentionally when it is his purpose to cause the death of another person.

If you find from the evidence that the State has proved beyond a reasonable doubt each of the above elements of the offense of murder, as charged, then you shall find the defendant guilty of murder.

If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of murder, then you cannot find the defendant guilty of murder.

Authority: Selected portions of <u>Pattern Jury Instructions – Criminal</u>, (Third Edition, 1994); ALI; 6-1, Murder, Intentional.

1003

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 18

### Murder (Felony Murder)

A person commits the crime of murder if he commits or attempt to commit:

(1) robbery in any degree;

and;

(1) in the course of the crime;

(2) in furtherance of the crime;

or     (3) in immediate flight from the crime;

he is committing or attempting to commit, he causes the death of any person.

To convict, the State must prove beyond a reasonable doubt each of the following elements of murder:

(1) That Jelaine Bowman Dennis is dead;

(2) That the defendant, Robert Conrad caused the death of Jelaine Bowman Dennis by shooting her with a pistol;

(3) That in committing the acts which caused the death of Jelaine Bowman Dennis the defendant was acting in the course and in furtherance of the crime of

(a) robbery in any degree;

(4) That in doing the acts which constituted the commission or attempted commission of the felony of robbery in any degree:

(a) during the course of which;

(b) in the furtherance of which;

(c) in immediate flight from which;

the death of Jelaine Bowman Dennis was caused by Robert Conrad.

A person commits the crime of Robbery in the first degree if, in the course of committing a theft, he uses or threatens the imminent use of force against the person of the owner of the property or any person present with the intent to overcome that person's physical resistance or physical power of resistance, and in so doing he is armed with a deadly weapon.

(1) That the defendant, Robert Conrad, committed or attempted to commit theft of United States currency and/or United States coinage and/or checks;

(2) That in the course of committing or attempting to commit the theft, or in immediate flight after the attempt or commission, the defendant either used force, or threatened the imminent use of force against the person of Jelaine Bowman Dennis, or another person present, with the intent to overcome her physical resistance or physical power to resist, or to compel acquiescence to the taking of or escaping with the property; and

(3) That the defendant was armed with a deadly weapon.

A person commits the crime of theft of property if he knowingly obtains or exerts unauthorized control over the property of another, with intent to deprive the owner of his property.

A person acts knowing with respect to conduct or to a circumstances when he is aware that his conduct is of that nature or that the circumstances exist.

A person acts intentionally with respect to a result or to conduct when his or her purpose is to cause that result or to engage in that conduct.

A deadly weapon is a firearm or anything manifestly designed, made or adapted for the purposes of inflicting death or serious physical injury.

If you find from the evidence that the State has proved beyond a reasonable doubt each of the above elements of the offense of Murder - felony as a lessor-included offense, then you shall find the defendant guilty of Murder - felony.

1005

If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of Murder - felony, then you cannot find the defendant guilty of Murder - felony.

Authority: Selected portions of Pattern Jury Instructions – Criminal, (Third Edition, 1994); ALI; 6-5, Murder, Felony Murder.

1096

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 19

### Manslaughter

### As Lesser Included Offense of Intentional Murder with Provocation Defense)

A person commits the crime of manslaughter if he causes the death of another person under circumstances that ordinarily would constitute murder, except that he causes the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself

To convict, the State must prove beyond a reasonable doubt each of the following elements of manslaughter:

(1) That Jelaine Bowman Dennis is dead;

(2) That the defendant, Robert Conrad caused the death of Jelaine Bowman Dennis by shooting her with a pistol;

(3) That in committing the acts which caused the death of Jelaine Bowman Dennis the defendant acted with intent.; and

(4) That in so acting the defendant was lawfully provoked to do the act which caused the death of the deceased by a sudden heat of passion before a reasonable time for the passion to cool and for reason to reassert itself.

A person acts intentionally when it is his purpose to cause the death of another person.

Lawful provocation means that the defendant was moved to do the act which caused the death of the deceased by a sudden heat of passion and before there had been a reasonable time for the passion to cool and reason to reassert itself. The defendant must have been provoked at the time he did the act; that is, he must been deprived of self-control by the provocation when he received. The state of mind must be such that the suddenly excited passion suspends the exercise of judgment,



Page 32 of 42

but it is not required that the passion be so overpowering as to destroy volition. A killing in sudden passion, excited by sufficient lawful provocation, is manslaughter only. The law presumes that the passion disturbed the defendant's reasoning and led him to act regardless of the admonition of law.

If you find form the evidence that the Sate has proved beyond a reasonable doubt each of the above elements of the offense of manslaughter as a lesser included offense, then you shall find the defendant guilty of manslaughter.

If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of manslaughter, then you cannot find the defendant guilty of manslaughter.

Authority: Selected portions of Pattern Jury Instructions – Criminal, (Third Edition, 1994); ALI; 6-13, Manslaughter, As Lesser Included Offense of Intentional Murder with Provocation Defense and selected portions of 6-8, Murder, Intentional Murder with Provocation Defense.



## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 20

### Manslaughter

A person commits the crime of manslaughter if he recklessly causes the death of another person.

To convict, the State must prove beyond a reasonable doubt each of the following elements of manslaughter:

(1) That Jelaine Bowman Dennis is dead; and

(2) That the defendant, Robert Conrad, recklessly caused the death of Jelaine Bowman Dennis by shooting her with a pistol.

A person acts recklessly with respect to a result or to a circumstance when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or the at the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

If you find from the evidence that the State has proved beyond a reasonable doubt each of the above elements of the offense of manslaughter, as a lesser included offense, then you shall find the defendant guilty of manslaughter.

If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of manslaughter, then you cannot find the defendant guilty of manslaughter.

Authority: Selected portions of Pattern Jury Instructions – Criminal, (Third Edition, 1994); ALI; 6-11, Manslaughter.

Page 34 of 42

1009

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 21

### Robbery in the First Degree

A person commits the crime of Robbery in the first degree if, in the course of committing a theft, he uses or threatens the imminent use of force against the person of the owner of the property or any person present with the intent to overcome that person's physical resistance or physical power of resistance, and in so doing he is armed with a deadly weapon.

(1)  That the defendant, Robert Conrad, committed or attempted to commit theft of United States currency and/or United States coinage and/or checks;

(2) That in the course of committing or attempting to commit the theft, or in immediate flight after the attempt or commission, the defendant either used force, or threatened the imminent use of force against the person of Jelaine Bowman Dennis, or another person present, with the intent to overcome her physical resistance or physical power to resist, or to compel acquiescence to the taking of or escaping with the property; and

(3) That the defendant was armed with a deadly weapon.

A person commits the crime of theft of property if he knowingly obtains or exerts unauthorized control over the property of another, with intent to deprive the owner of his property.

A person acts knowing with respect to conduct or to a circumstances when he is aware that his conduct is of that nature or that the circumstances exist.

A person acts intentionally with respect to a result or to conduct when his or her purpose is to cause that result or to engage in that conduct.

A deadly weapon is a firearm or anything manifestly designed, made or adapted for the purposes of inflicting death or serious physical injury.

If you find from the evidence that the State has proved beyond a reasonable doubt each of

Page 35 of 42

the above elements of the offense of Robbery in the First degree as a lessor-included offense, then you shall find the defendant guilty of Robbery in the First degree.

If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of Robbery in the First degree, then you cannot find the defendant guilty of Robbery in the First degree.

Authority: Selected portions of Pattern Jury Instructions – Criminal, (Third Edition, 1994); ALI; 8-87, Robbery in the First Degree, Armed.

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 22

### CONCLUSION

### MULTIPLE COUNTS

In this case there are two (2) counts contained in the indictment. You are asked to reach a verdict on each count in the indictment. You must consider the evidence as to each count separately and determine whether the defendant has been proved guilty of the offense charged in each count beyond a reasonable doubt.

Authority: Selected portions of <u>Pattern Jury Instructions – Criminal</u>, (Third Edition, 1994); ALI; I-12, Conclusion, Multiple Counts.

## DEFENDANT'S REQUESTED JURY INSTRUCTION NUMBER 23

### Robbery In the First Degree

(Robert Ray Grimes)

A person commits the crime of Robbery in the first degree if, in the course of committing a theft, he uses or threatens the imminent use of force against the person of the owner of the property or any person present with the intent to overcome that person's physical resistance or physical power of resistance, and in so doing he is armed with a deadly weapon.

(1)  That the defendant, Robert Conrad, committed or attempted to commit theft of thirty dollars of United States currency the denominations of which were one (1) twenty dollar bill and one (1) ten dollar bill;

(2)  That in the course of committing or attempting to commit the theft, or in immediate flight after the attempt or commission, the defendant either used force, or threatened the imminent use of force against the person of Robert Ray Grimes, or another person present, with the intent to overcome his physical resistance or physical power to resist, or to compel acquiescence to the taking of or escaping with the property; and

(3)  That the defendant was armed with a deadly weapon.

A person commits the crime of theft of property if he knowingly obtains or exerts unauthorized control over the property of another, with intent to deprive the owner of his property.

A person acts knowing with respect to conduct or to a circumstances when he is aware that his conduct is of that nature or that the circumstances exist.

A person acts intentionally with respect to a result or to conduct when his or her purpose is to cause that result or to engage in that conduct.

A deadly weapon is a firearm or anything manifestly designed, made or adapted for the

Page 38 of 42

1013

purposes of inflicting death or serious physical injury.

If you find from the evidence that the State has proved beyond a reasonable doubt each of the above elements of the offense of Robbery in the First degree as a lessor-included offense, then you shall find the defendant guilty of Robbery in the First degree.

If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of Robbery in the First degree, then you cannot find the defendant guilty of Robbery in the First degree.



Authority: Selected portions of <u>Pattern Jury Instructions – Criminal</u>, (Third Edition, 1994); ALI; 8-87, Robbery in the First Degree, Armed.

## DEFENDANT'S REQUESTED JURY CHARGE NUMBER 24

### Defendant's Theory of Defense Charge

The Defendant will offer the Defendant's Theory of Defense Charge at the conclusion of the evidence for the State and the Defendant.

*[handwritten: No need for Judge to Rule on this Jury Judge]*

*[handwritten: WITHDRAWN 9/27/2002 by Defense Lawyer Smith]*

Authority:  *United States v. Terebecki*, 692 F.2d. 1345, 1351 (11th Cir. 1982) ( The defendant is entitled to have the court instruct the jury on his defense theory, 'assuming that the theory has foundation in the evidence and legal support.' *United States v. Conroy*, 589 F.2d 1258, 1273 (5th Cir. 1979).").

## DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 25

### NO BURDEN TO PRESENT EVIDENCE

As stated before, the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or of producing any evidence. The prosecution has the burden at all times to produce evidence of the alleged charge, which convinces you of guilt beyond a reasonable doubt. If the prosecution fails to produce such proof beyond a reasonable doubt of any of the elements of any of the crimes alleged and charged, you must find the defendant not guilty of that crime. The defendant is under no obligation at any time to produce any evidence.



**Authority:**    United States v. Richardson, 764 F. 2d 1514, 1529 (11th Cir.), cert denied, sub.nom. Crespo- Diaz v. United States, 474 U.S. 952 (1985).

## DEFENDANT'S REQUESTED JURY INSTRUCTION NUMBER 26

### Rendering Verdict

After you have received these instructions you will be given forms for recording your verdict and you will be taken by the bailiff to the jury room where you will begin your deliberations. When you have reached a verdict or verdicts in this case, then you will complete the appropriate verdict form given to you and one of you to be selected and designated by you, will sign the verdict (s) of the jury as the foreperson of the jury. Any verdict returned must be the verdict of all twelve of you; that it is must be a unanimous verdict. When you have reached a verdict it will be necessary for the jury to return to the courtroom and give your verdict(s).

It is your duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case do not hesitate to re-examine your own opinion and change your mind if you become convinced that you were wrong. But do not give up your honest beliefs solely because the others think differently or merely to get the case over with.

Remember, that in a very real way, you are judges - - judges of the facts. Your only interest is to seek the truth from the evidence in the case.

Authority: Selected portions of Pattern Jury Instructions – Criminal, (Third Edition, 1994); ALI; I.10, Rendering Verdict, and other selected instructions.

*Denied [signature] Judge*



ALABAMA
# DEPARTMENT OF FORENSIC SCIENCES

| REGIONAL LABORATORY | MEDICAL EXAMINER |
|---|---|
| P.O. BOX 210516 | P.O. BOX 240591 |
| MONTGOMERY, AL 36121-0516 | MONTGOMERY, AL 36124-0591 |
| (334) 242-2938 | (334) 242-3093 |
| FACSIMILE (334) 240-3284 | FACSIMILE (334) 260-8734 |

July 31, 2001

Re:   Case 01A-01-MM-00435
Jelaine Dennis, subject

MEMORANDUM:   To File

BY:   Joseph M. Saloom, Forensic Scientist

SUBJECT:   Firearms Evidence Examination / Laboratory Results

During the course of the investigation of the above styled case, the following items of evidence were received from Enterprise Police Department Detective Rick Hauser on Thursday, May 24, 2001, by the undersigned.

01.00   One sealed brown paper bag containing one Clerke 1st revolver, caliber .22 Long Rifle, serial number 294415. This revolver was test fired using laboratory standard ammunition.

01.01   Four (4) fired CCI brand cartridge cases, caliber .22 Long/Long Rifle, removed from the cylinder of Exhibit 01.00 by the undersigned. Laboratory examination revealed some similarities to test fired cartridge cases, however, it could not be determined whether or not these cartridge cases were fired in the chambers of the Clerke revolver described previously as Exhibit 01.00.

01.02   One unfired CCI brand cartridge, caliber .22 Long Rifle, removed from the cylinder of Exhibit 01.00 by the undersigned.

02.00   One sealed brown paper bag containing one screw-capped plastic specimen jar containing one fired, copper color coated lead bullet, identified to be from Robert Conrad. Laboratory examination of this .22 caliber bullet revealed that it has been fired through the barrel of the Clerke revolver described previously as Exhibit 01.00.

The following additional items of evidence were received from Enterprise Police Department Detective Rick Hauser on Tuesday, May 29, 2001, by the undersigned.

Page 1 of 4

STATE'S EXHIBIT

F3

Case Number 01A-01-MM-00435
Firearms Examination / Laboratory Results

03.00   One sealed brown paper bag labeled in part "removed from dumpster", containing one white, sleeveless tee shirt. Laboratory examination of this shirt revealed two holes located in the lower front. The lower hole has heavy deposits of soot around it on the outside of the shirt, while the upper hole has deposits of soot around it on the *inside* of the shirt. Also present on the front of the shirt is another pattern of soot. Present inside the front of the shirt are what appear to be dried blood stains. These patterns of holes and soot are consistent with one revolver gunshot through folded clothing at near contact range.

04.00   One sealed manila envelope containing:

04.01   One sealed plastic film canister labeled in part "34", containing cotton, and one fired, copper jacketed bullet, identified to be from the scene. Laboratory examination of this 9mm/.38 caliber bullet revealed that it has been fired through the barrel of the same firearm as the bullets described elsewhere as Exhibits 04.02, 04.03, and 04.04. This bullet could have been fired in (but not limited to) the following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

04.02   One sealed plastic film canister labeled in part "38", containing cotton, and one fired, copper jacketed bullet, identified to be from the scene. Laboratory examination of this 9mm/.38 caliber bullet revealed that it has been fired through the barrel of the same firearm as the bullets described elsewhere as Exhibits 04.01, 04.03, and 04.04. This bullet could have been fired in (but not limited to) the following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

04.03   One sealed plastic film canister labeled in part "41", containing cotton, and one fired, copper jacketed bullet, identified to be from the scene. Laboratory examination of this 9mm/.38 caliber bullet revealed that it has been fired through the barrel of the same firearm as the bullets described elsewhere as Exhibits 04.01, 04.02, and 04.04. This bullet could have been fired in (but not limited to) the following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

04.04   One sealed plastic film canister labeled in part "42", containing cotton, and one fired, copper jacketed bullet, identified to be from the scene. Laboratory examination of this 9mm/.38 caliber bullet revealed that it has been fired through the barrel of the same firearm as the bullets described elsewhere as Exhibits 04.01, 04.02, and 04.03. This bullet could have been fired in (but not limited to) the following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

Case Number 01A-01-MM-00435
Firearms Examination / Laboratory Results

04.05   One sealed plastic film canister labeled in part "32", containing cotton, and one fired, badly
        damaged, copper color coated lead bullet, identified to be from the scene. This .22 caliber
        bullet is too damaged for further identification.

04.06   One small sealed manila envelope labeled in part "21", containing one fired Winchester
        brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed
        that it has been fired in the chamber of the same firearm as the cartridge cases described
        elsewhere as Exhibits 04.07, 04.08, 04.09, and 04.10.

04.07   One small sealed manila envelope labeled in part "23", containing one fired Winchester
        brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed
        that it has been fired in the chamber of the same firearm as the cartridge cases described
        elsewhere as Exhibits 04.06, 04.08, 04.09, and 04.10 .

04.08   One small sealed manila envelope labeled in part "24", containing one fired Winchester
        brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed
        that it has been fired in the chamber of the same firearm as the cartridge cases described
        elsewhere as Exhibits 04.06, 04.07, 04.09, and 04.10.

04.09   One small sealed manila envelope labeled in part "25", containing one fired Winchester
        brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed
        that it has been fired in the chamber of the same firearm as the cartridge cases described
        elsewhere as Exhibits 04.06, 04.07, 04.08, and 04.10.

04.10   One small sealed manila envelope labeled in part "26", containing one fired Winchester
        brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed
        that it has been fired in the chamber of the same firearm as the cartridge cases described
        elsewhere as Exhibits 04.06, 04.07, 04.08, and 04.09.

04.11   One small sealed manila envelope labeled in part "22", containing one fired Federal brand
        cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed some
        similarities to the cartridge cases described elsewhere as Exhibits 04.06, 04.07, 04.08, 04.09,
        and 04.10, however, it could not be determined whether or not they were fired in the chamber
        of the same firearm.

The following additional items of evidence were received from State Medical Examiner Dr. Emily
Ward on Tuesday, June 5, 2001, by the undersigned.

Page 3 of 4

Case Number 01A-01-MM-00435
Firearms Examination / Laboratory Results

05.00  One small sealed manila envelope containing one fired, copper jacketed bullet identified to
be from the subject. Laboratory examination of this 9mm/.38 caliber bullet revealed similar
characteristics as the bullets described elsewhere as Exhibits 04.01, 04.02, 04.03, and 04.04,
however, it could not be determined whether or not they have all been fired through the
barrel of the same firearm. This bullet could have been fired in (but not limited to) the
following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

06.00  One small sealed manila envelope containing:

06.01  One white card labeled in part "Lt. lat. thigh", containing one tape lift, identified to be from
the subject. Laboratory examination of this tape lift revealed the presence of gunpowder
particles.

06.02  One white card labeled in part "Front Rt. hand", containing one tape lift, identified to be
from the subject. Laboratory examination of this tape lift revealed the presence of
gunpowder particles.

06.03  One white card labeled in part "Post chest", containing one tape lift, identified to be from
the subject. Laboratory examination of this tape lift revealed the presence of gunpowder
particles.

06.04  Six white cards labeled variously, each containing one tape lift, identified to be from the
subject. Laboratory examination of these tape lifts failed to reveal the presence of
gunpowder particles.

The following additional item of evidence was placed into a locked evidence locker on Friday, June
8, 2001, by Enterprise Police Department Captain William Moore, and retrieved on Tuesday, June
12, 2001 by the undersigned.

07.00  One sealed brown paper bag containing one navy blue, pull-over, collared shirt, identified
to be from Robert Conrad. Laboratory examination of this shirt revealed a hole located in
the front, just left of center. No gunpowder particles were found around this hole.

Unless otherwise indicated, all evidence in this case will be returned to the appropriate agency at the
earliest available opportunity.

Page 4 of 4

1021

**Medical Center Enterprise**
400 North Edwards Street
Enterprise, Alabama 36330

# Patient Summary

| PATIENT NUMBER | ROOM/TYPE | PT TYPE | SERV | ATTENDING PHYSICIAN | FAMILY PHYSICIAN | MR NUMBER |
|---|---|---|---|---|---|---|
| 01143-00094 | 207-02 | I/P | MED 2 | SAWYER,SAMUEL | SAWYER,SAMUEL | 0000041053 |

**PATIENT**

| ADMIT DATE/TIME | SEX | RACE | MS | DATE OF BIRTH /AGE | SOCIAL SECURITY NUMBER | EMPLOYMENT STATUS |
|---|---|---|---|---|---|---|
| 05/23/01 1448 | M | 2 | S | 09/27/80 20Y | 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 | |

| PATIENT | | EMPLOYER | |
|---|---|---|---|
| CONRAD,ROBERT | | MCDONALDS | |
| 36 NELL COURT | PHONE: | 625 BOLL WEEVIL CIR | PHONE |
| ENTERPRISE    AL 36330 | (334)308-2140 | ENTERPRISE    AL 36330 | (334)347-3417 |

| SMK | VETERAN | OCCUPATION | BRANCH OF SERVICE | PAY GRADE | MILITARY STATUS |
|---|---|---|---|---|---|
| | No | | | | |

**GUARANTOR**

| GUARANTOR | | GUARANTOR EMPLOYER | |
|---|---|---|---|
| CONRAD,DOROTHY A | | ENTERPRISE NURSING H | |
| 507 GLOVER AVENUE APT 35 | PHONE: | 300 PLAZA DR | PHONE: |
| ENTERPRISE    AL 36330 | (334)348-2150 | ENTERPRISE    AL 36330 | (334)347-9541 |

| RELATIONSHIP | SOCIAL SECURITY NUMBER | GUARANTOR OCCUPATION | | EMPLOYMENT STATUS |
|---|---|---|---|---|
| MOTHER | 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 | LAUNDRY/HOU | | |

**RELATIVE**

| RELATIVE/FRIEND (OTHER THAN GUARANTOR) | | RELATIVE/FRIEND EMPLOYER | |
|---|---|---|---|
| CONRAD,DOROTHY;A | | ENTERPRISE NURSING H | |
| 36 NELL COURT | PHONE: | 300 PLAZA DR | PHONE: |
| ENTERPRISE    AL 36330 | (334)347-9533 | ENTERPRISE    AL 36330 | |

| RELATIONSHIP | SOCIAL SECURITY NUMBER | GUARANTOR OCCUPATION | EMPLOYMENT STATUS |
|---|---|---|---|
| MOTHER | 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 | LAUNDRY/HOUSEKEEPI | |

**INS1**

| CARRIER | F/C | POLICY NUMBER | MAIL TO: PO BOX 7601 |
|---|---|---|---|
| AL MCD | D | 000419175095 | |
| INSURED NAME | | SOCIAL SECURITY NUMBER | |
| CONRAD,ROBERT | | | MONTGOMERY    AL 36107 |
| GROUP NUMBER | COMMENTS | | GROUP PHONE/EXT (800)688-7989 |

**INS2**

| CARRIER | F/C | POLICY NUMBER | MAIL TO: |
|---|---|---|---|
| | | | |
| INSURED NAME | | SOCIAL SECURITY NUMBER | |
| GROUP NUMBER | COMMENTS | | GROUP PHONE/EXT |

**INS3**

| CARRIER | F/C | POLICY NUMBER | MAIL TO: |
|---|---|---|---|
| | | | |
| INSURED NAME | | SOCIAL SECURITY NUMBER | |
| GROUP NUMBER | COMMENTS | | GROUP PHONE/EXT |

**INS4**

| CARRIER | F/C | POLICY NUMBER | MAIL TO: |
|---|---|---|---|
| | | | |
| INSURED NAME | | SOCIAL SECURITY NUMBER | |
| GROUP NUMBER | COMMENTS | | GROUP PHONE/EXT |

**MISC**

| DIAG CODE | DIAGNOSIS | ALLERGIES | ARD | ORG | PRC |
|---|---|---|---|---|---|
| | GUNSH T WOUND | NKDA | | | |

| ACCIDENT TYPE | ACCIDENT DATE | ACC TIME | PLACE OF ACCIDENT | PREVIOUS VISIT DATE | ARRIVAL MODE |
|---|---|---|---|---|---|
| | | | | 05/07/99 | PERSONAL |

| TRANSFERRING FACILITY | RELIGION | CHURCH | | ATC | LNK |
|---|---|---|---|---|---|
| | | | | | |

| COMMENTS | | CLK |
|---|---|---|
| | | PLA |

STATE'S
EXHIBIT
2

ER

micudist 2036 MGA Medical Center Enterprise

This is a taped interview between Sgt. Jeff Spence, Dwight Holley of the District Attorney's Office and Robert Conrad. Today's date is May 23, 2001. The time now is 14:13 hours. Located of interview is MCE Medical Center Enterprise.

SPENCE:    Okay,  Robert, I know your voice is kinda of low because everything that's happened, I'm going to lay this right here, all it is a tape recorder. Can you handle that right there.

CONRAD:   Yes, sir.

SPENCE:    Okay. That's just so we can pick you up, okay. Ah, before I turned on the tape, I advised you of your Miranda warning, which is you have the right to remain silent and those things right?

SPENCE:    Okay, there you go nodding, it don't pick up a nod. You're going to have to say yes or no, okay? Did I advise you of that?

CONRAD:   Yes.

SPENCE:    Okay. Did you understand your rights?

CONRAD:   Yes, sir.

SPENCE:    Okay, are you willing to talk to me about what happened yesterday?

CONRAD:   Yes, sir.

SPENCE:    All right in your own words, go on and tell me what happened?

CONRAD:   Okay. I was got dropped off at this girl's house on Methodist side. And I was leaving walking and on that road where that little park at, across from the cemetery and the unknown dude come running up behind me with a pistol in his hand cause when he shot me the first time in my arm and then he pushed me down and grabbed my pager, my phone and my money and then he shot me again and he got up and ran.

SPENCE:    Okay. And that's your story and your sticking to it?

CONRAD:   Sir.

SPENCE:    And that's your story.

CONRAD:   Yes sir. That's what happened.

**STATE'S EXHIBIT**

4a

S/C1

SPENCE:      Okay.  You know they removed one of the bullets from your arm, right?

CONRAD:      Yes sir.

SPENCE:      Do you know what we did with that bullet this morning?

CONRAD:      No sir.

SPENCE:      We took it to Alabama Department of Forensic Science in Montgomery.
             You know what they did took with?

CONRAD:      No sir.

SPENCE:      They compared it with weapon found at a robbery yesterday.  That pistol
             matched that bullet 100%.  Now you wanta tell me what happened?

CONRAD:      Its going to take just a minute.

SPENCE:      You know what I'm talking about, also Brian Smith and  Bryan Yoemans
             already told us what happened.

CONRAD:      What happened about what me getting shot?

SPENCE:      Mm.

CONRAD:      But they whutn around when I got shot.

SPENCE:      Yeah they were.

CONRAD:      (unintelligible)

SPENCE:      You want me to tell what the story, or do you wanta just go on and
             continue lying and make it worse, it don't matter to me.  Ya'll talked about
             doing a robbery at the Adult Toy Store, ya'll met in the corner, a truck
             went between you, your car, which is Brian Smith's car and BY's car
             when ya'll parked in the curve.  They go on in the store to act as your
             back-up, because that's what they told us that you wanted them to do, just
             in case something happened.  Am I hitting a nerve so far.  No.  Okay, well
             that's all I'm going to tell you. Um, all I got to say is the victim's gun that
             you shot and killed, when she shot you that bullet matched that gun.  You
             know what that means, right.  You're facing Capital Murder.  Do you
             know what Capital Murder means.

CONRAD:      No sir.

SPENCE:     Capital Murder means is punishable by death. The electric chair.

CONRAD:     But I ain't do nothing.

SPENCE:     Okay. Well, you can explain that in court. Okay, cause I'm sure Brian Smith and Bryan Yoemans going to testify differently along with that gentlemen that you put your arm around his neck, along with the witness that can identify you out at the car along with another gentlemen that seen you running up the road. You killed a woman yesterday.

CONRAD:     No sir, I didn't.

SPENCE:     Yes you did.

CONRAD:     I'm too afraid to kill anyone.

SPENCE:     Apparently not. Apparently she grabbed your gun, cause you, I don't think you intended to, I really don't, I just think something happened yesterday that shouldn't have happened and everything went awry and you wound up getting shot.

CONRAD:     I wasn't even (unintelligible)

SPENCE:     He wasn't even there.

HOLLEY:     How do you explain the bullet that was taken out of your arm matching up with the gun that was found at the scene that the lady used to shoot you with, how do you explain that?

CONRAD:     I don't know how to explain it. Person had the same kind of gun.

HOLLEY:     Must had the same kind of gun?

CONRAD:     Yes sir.

HOLLEY:     Can you tell us where you were at yesterday?

CONRAD:     What ya' mean where I was at. I mean

HOLLEY:     Can you tell us where you were at ah about say 1:00?

CONRAD:     At the girl's house.

HOLLEY:     And who was that girl?

CONRAD:     Ann (unintelligible)

HOLLEY:      Who?

CONRAD:      Tyiesha

HOLLEY:      Who?  Tyiesha who?

CONRAD:      I don't' know her last name.

HOLLEY:      Where does she live at?

CONRAD:      Methodist side.

HOLLEY:      Bennett side?

CONRAD:      Methodist side.

HOLLEY:      Methodist side.  Do you know an address?

CONRAD:      No sir.

HOLLEY:      You don't know what street it's on?

CONRAD:      Its just a street. Second block beside the one I got shot on.

HOLLEY:      But you don't know that name of the street?

CONRAD:      No, sir.

HOLLEY:      How long have you been living in Enterprise?

CONRAD:      Whole life.

HOLLEY:      All your life?

CONRAD:      Almost.

HOLLEY:      And this is a girlfriend of yours?

CONRAD:      A good type girlfriend.

HOLLEY:      Pardon?

CONRAD:      I said a good type girlfriend, friend thing.

HOLLEY:      And her name again, her first name is what?

| | |
|---|---|
| CONRAD: | Tyiesha? |
| HOLLEY: | Spell that? |
| CONRAD: | Tiesha, I guess? |
| HOLLEY: | S.H.A.? Tiesha. And she a good type girlfriend or yours? |
| CONRAD: | Yes sir. |
| HOLLEY: | But you don't know her last name. How long has she been a girlfriend of yours? |
| CONRAD: | We just started talking like a week ago. |
| HOLLEY: | Just started talking a week ago? |
| CONRAD: | Yes sir. |
| HOLLEY: | But you don't know her name? |
| CONRAD: | Don't know her last name? |
| HOLLEY: | And you don't know where she lives? |
| CONRAD: | Yeah she stay on the second to the next block on the same road as the park and the cemetery. |
| HOLLEY: | But you don't know what the address is? |
| CONRAD: | No sir. |
| HOLLEY: | Who does she live with? |
| CONRAD: | She stay with her cousin. |
| HOLLEY: | Her cousin? Who's her cousin? |
| CONRAD: | Her name is Betty. |
| HOLLEY: | Betty? Do you know what Betty's last name is? |
| CONRAD: | No sir. |
| HOLLEY: | Where does Tiesha, where does she work at? |

CONRAD:     Ah, she ain't got no job.

HOLLEY:     She got any kids?

CONRAD:     No sir.

HOLLEY:     And she doesn't work anywhere?

CONRAD:     No sir.

HOLLEY:     How does she live, how does she support herself?

CONRAD:     She like 18, her cousin take care of her and pay her money and stuff.

HOLLEY:     Her cousin takes care of her?

CONRAD:     Yes sir.

HOLLEY:     And her cousin is Betty?

CONRAD:     Yes.

HOLLEY:     But you don't know her last name either do you?

CONRAD:     I just might be, she might do got a job, but I ain't never seen her working nowhere.

HOLLEY:     Where does Betty work?

CONRAD:     She, I don't know.

HOLLEY:     Well, how old is Betty?

CONRAD:     She got a job though

HOLLEY:     Pardon?

CONRAD:     She got a job but I don't know where.

HOLLEY:     How old is Betty?

CONRAD:     She's in her thirties, I think 36

HOLLEY:     Does Betty have a car?

1028

CONRAD:     Yes sir.

HOLLEY:     What kind of car is it?

CONRAD:     It's a white Grand Am

HOLLEY:     A white Grand Am

CONRAD:     Yes sir.

HOLLEY:     Have you ever rode around with Betty and Tiesha on the white Grand Am?

CONRAD:     No sir.

HOLLEY:     Have you got another girlfriend?

CONRAD:     Yes.

HOLLEY:     What's her name?

CONRAD:     Lindell Brooks.

HOLLEY:     Who?

CONRAD:     Lindell Brooks.

HOLLEY:     Lindell?

CONRAD:     Yes sir.

HOLLEY:     Brooks?  Where does Lindell live at?

CONRAD:     She just came back from the ah Navy

HOLLEY:     Came back from the Navy?

CONRAD:     Yes sir.

HOLLEY:     Is she out of the Navy now or is she still in?

CONRAD:     She out two weeks vacation.

HOLLEY:     Where does Lindell live at?

CONRAD:     With her mom on Nance Circle.

1029

HOLLEY:      With her mom on Nance Circle?

CONRAD:      Yes sir.

HOLLEY:      What's her mom's name?

CONRAD:      Lois Brooks.

HOLLEY:      Lois Brooks?

CONRAD:      Yes sir.

HOLLEY:      Okay.  How old is Lindell?

CONRAD:      She not twenty or twenties

HOLLEY:      Twenty?

CONRAD:      Yes sir.

HOLLEY:      Okay.  And you were with Tiesha at about 1:00 o'clock yesterday?

CONRAD:      (unintelligible)

HOLLEY:      Pardon?

CONRAD:      See if I'm not wrong it was around that time?

HOLLEY:      What time did you leave Tiesha's residence?

CONRAD:      I don't even know, I didn't look at the clock

HOLLEY:      Would you say it was in the middle of the afternoon or late in the afternoon or what would be your best guess as to what time you left her house?

CONRAD:      I'd say about, I don't know.  I don't know sir.

HOLLEY:      Well, let me ask you something, how long have you been knowing Bryan Yoeman?

CONRAD:      Bryan Yoeman?

HOLLEY:      Yeah?

1030

CONRAD:     Three or four weeks.

HOLLEY:     Three or four weeks.  Do you know where Bryan lives?

CONRAD:     Bryan Yoeman?

HOLLEY:     Yeah, Bryan Yoeman?

CONRAD:     Greentrees.

HOLLEY:     Lives where?

CONRAD:     Greentree Apartments.

HOLLEY:     Where's Greentree Apartments at?

CONRAD:     On the road going toward Daleville on the left.

HOLLEY:     How long have you been knowing Brian Smith?

CONRAD:     For a long time.

HOLLEY:     You and Brian real close?

CONRAD:     Yes sir.

HOLLEY:     You think Brian would lie about you?

CONRAD:     I don't know.

HOLLEY:     Well if Brian Smith told us that you and he along with Bryan Yoeman was at the Toy Store yesterday afternoon about 1:30  and that you shot and killed that woman, is that a lie?

CONRAD:     Yeah it would be 'cause I ain't killed nobody.

HOLLEY:     No, I asked you is that a lie?

CONRAD:     Oh, yes sir.

HOLLEY:     You think Brian Smith would lie about that?

CONRAD:     He's got to be, (unintelligible) and wasn't there, what ever they did I wasn't in it.

HOLLEY:     How about Brian Smith's car, do you use Brian's car?

9

CONRAD:    No sir.

HOLLEY:    You never have driven Brian's car?

CONRAD:    Way back.

HOLLEY:    Where does Brian work at?

CONRAD:    Nowhere.

HOLLEY:    He don't work?  How about Bryan Yoeman?

CONRAD:    Unless he still working at KFC.

HOLLEY:    What kind of tennis shoes did you have on yesterday?

CONRAD:    White Reeboks.

HOLLEY:    White Reeboks?

CONRAD:    Yes sir.

HOLLEY:    How long have you had those white Reeboks?

CONRAD:    What ya mean how long?  I had 'em on

HOLLEY:    Yeah, how long have you had them?

CONRAD:    Ever since I woke up and I went outside and played basketball.

HOLLEY:    Do you know where you bought those white Reeboks at?

CONRAD:    They old

HOLLEY:    There old?

CONRAD:    Yes sir.

HOLLEY:    Real old?

CONRAD:    You can say that, to me they are.

HOLLEY:    What do you have a lot shoes?

1032

CONRAD:    No, them, some sandals and a pair of gray Reeboks and another pair of gray Reeboks.

HOLLEY:    And you had on those white Reeboks yesterday, is that correct?

CONRAD:    Yes sir.

HOLLEY:    What was you wearing, what kind of clothes were you wearing yesterday?

CONRAD:    A Fubu jersey and a Chaps shorts.

HOLLEY:    Okay, what color is your shirt?

CONRAD:    What color, black, orange and yellow.

HOLLEY:    You say the shirt was black

CONRAD:    Yeah, it had black, orange and yellow on it.

HOLLEY:    Black, orange and yellow?

CONRAD:    Yes sir.

HOLLEY:    What kind of pants did you have on?

CONRAD:    Some tan type shorts, Chaps shorts.

HOLLEY:    Had shorts on?  Tan colored?

CONRAD:    Yes.

HOLLEY:    You had those on all day?

CONRAD:    Yes sir.

HOLLEY:    What time did you get up yesterday morning?

CONRAD:    I'd say it was about between 8:30 to 9:30

HOLLEY:    8:30 to 9:30

CONRAD:    Yes sir.

HOLLEY:    What did you do when you got up?

11

1033

CONRAD:    Ate, stayed in the house for awhile, then watched TV and went a played a little basketball until the time I went over to the girl's house.

HOLLEY:    Where did you play basketball at?

CONRAD:    Around the corner from my mom's.

HOLLEY:    Around the corner from your mom's?

CONRAD:    Yes sir.

HOLLEY:    They have a basketball court at Greentree?

CONRAD:    At where?

HOLLEY:    Where were you at yesterday morning?

CONRAD:    Let's see, I stayed at Brian's house yesterday morning.

HOLLEY:    You stayed at Brian's house yesterday morning?

CONRAD:    Yes sir.

HOLLEY:    I thought you just told me that you go slept until about 8:00 or 8:30, sat around the house and watched TV

CONRAD:    I sure did.

HOLLEY:    And then went and played basketball?  Was you at your mother's house at Greentree or was you at Brian's house?

CONRAD:    Up at Brian's house (unintelligible)

HOLLEY:    Where was Brian at?

CONRAD:    Brian had left me there, he left me there for awhile.

HOLLEY:    Did Brian come back?

CONRAD:    Yes he came back.

HOLLEY:    So you and Brian was together?

CONRAD:    Not until after when I he got, when I got my other friend drop me off at my girl's house.

| | |
|---|---|
| HOLLEY: | So you and Brian didn't get together again after you got up and he left yesterday morning and you didn't see Brian again until after you left your girlfriend's house? |
| CONRAD: | Yes sir. |
| HOLLEY: | You |
| CONRAD: | I ain't seen him them but one of the officers said that there was a car the people picked me up in brought be to the hospital on. |
| HOLLEY: | People told you what? |
| CONRAD: | Officers said that the car, the car, officers said that the car was looked like Brian's mom's car that picked me up and they put me in the back seat and brought me to the hospital. |
| HOLLEY: | Well, who brought you to the hospital? |
| CONRAD: | Sir, I don't even know. |
| HOLLEY: | You don't know? |
| CONRAD: | No sir.  My eyes were   (unintelligible) I didn't see anything. |
| HOLLEY: | You said you knew Bryan Yoeman and known him for three or four months, is that correct? |
| CONRAD: | Weeks. |
| HOLLEY: | Three of four weeks? |
| CONRAD: | Yes sir. |
| HOLLEY: | What time did you see Bryan Yoeman yesterday? |
| CONRAD: | I really didn't see him yesterday.  Except that night before last night last time I seen him. |
| HOLLEY: | You didn't see him at all yesterday, which would have been Tuesday, the 23$^{rd}$? |
| CONRAD: | No sir. |
| HOLLEY: | Correction, I'm sorry that would have been Tuesday the 22$^{nd}$.  You didn't see Bryan Yoeman at all on Tuesday, the 22$^{nd}$? |

1035

CONRAD:     No

HOLLEY:     When Brian Smith and Bryan Yoeman said they brought you to the hospital, would you dispute that?

CONRAD:     I don't know, I didn't know who brought me.

HOLLEY:     You didn't know?

CONRAD:     No sir.

HOLLEY:     Nobody didn't talk to you when you were coming to the hospital?

CONRAD:     No, they just said take me to the hospital and we went to the hospital.

HOLLEY:     Okay, what street was it that you got shot on?

CONRAD:     I don't know the name of it, cause it the same street the cemetery on, on Methodist side.

HOLLEY:     Same street that the cemetary's on?

CONRAD:     Yes sir.

HOLLEY:     And that's where you were at?  What was happening when you got shot, what were you doing?

CONRAD:     Really, I was running halfway when he shot me in my arm and I fell and that's when the guy must have shot me in my stomach and I got up and trying to walk to get me some help and I fell down.

HOLLEY:     Just prior to him shooting you had you seen anybody?  Well where did this individual come from that shot you?

CONRAD:     Came out the woods.

HOLLEY:     Came out of the woods?

CONRAD:     He had to

HOLLEY:     Did he say anything to you?

CONRAD:     Yeah, he just said give me all your shit you got.

HOLLEY:     Ah, have you ever seen this individual before?

CONRAD:     No sir.

HOLLEY:     Ah, give me a description of the guy that shot you?

CONRAD:     He had a black, like a black ski mask over his head.

HOLLEY:     A black ski mask

CONRAD:     A black shirt and I believe some black jeans.

HOLLEY:     Black ski mask, a black shirt and what else did he have on?

CONRAD:     Had, look like some black pants.

HOLLEY:     Black pants?

CONRAD:     Yes sir.

HOLLEY:     What size fella was he?

CONRAD:     I don't know.

HOLLEY:     Was he as tall as you are?

CONRAD:     He's just about a little smaller than me.

HOLLEY:     Just a little bit smaller than you?

CONRAD:     Yes sir.

HOLLEY:     How much did he weigh?

CONRAD:     I don't know.

HOLLEY:     Well, did he weigh as much as you, or less than you, or more than you, or

CONRAD:     He had a little weight on him.

HOLLEY:     He had a little weight on him

CONRAD:     Yes sir.

HOLLEY:     Did he have any scars or tattoos or any kind of marks that you noticed on him?

| | |
|---|---|
| CONRAD: | No sir. |
| HOLLEY: | What kind of shoes did he have on? |
| CONRAD: | I don't know I wasn't paying no attention. |
| HOLLEY: | You didn't see his shoes? |
| CONRAD: | No sir. |
| HOLLEY: | And he just told you to give you all of your shit, is that what he said? |
| CONRAD: | Yes sir. |
| HOLLEY: | Did you give it to him? |
| CONRAD: | He snatched it really, my pager and my phone and my eighty-five dollars in my pocket. |
| HOLLEY: | You had eight-five dollars? |
| CONRAD: | Yes sir. |
| HOLLEY: | And you told me you didn't work?  Right? |
| CONRAD: | Yes sir. |
| HOLLEY: | Where did you get eight-five dollars? |
| CONRAD: | Saved up money.  My sister gave me money and (unintelligible) gave me some money |
| HOLLEY: | Your sister gave you money and other family members gave you money and you saved up eighty-five dollars? |
| CONRAD: | Yeah, I don't spend money really. |
| HOLLEY: | Where do you live at? |
| CONRAD: | My mom on  Garden  Oaks. |
| HOLLEY: | So that's out at 117 Greentree Apartments? |
| CONRAD: | No sir. |
| SPENCE: | Glover Avenue. |

HOLLEY:     Tell me again now where you live?

CONRAD:     Garden Oaks on Glover Avenue.

HOLLEY:     Garden Oaks. That's that new

CONRAD:     Apartments

HOLLEY:     Apartments over there?

CONRAD:     Yes sir.

HOLLEY:     Which one do you live in?

CONRAD:     35

HOLLEY:     When is the last time you spend the night over there?

CONRAD:     My mom's house.

HOLLEY:     Uh huh?

CONRAD:     The night

HOLLEY:     Pardon

CONRAD:     The night before last night. Because I supposed to have gone to an interview at Conarga then and it got postponed it till tonight

HOLLEY:     Where did you got to school at?

CONRAD:     Where?

HOLLEY:     Where did you go high school at?

CONRAD:     Enterprise Junior High.

HOLLEY:     You went to Enterprise Junior High?

CONRAD:     Yes sir.

HOLLEY:     What year did you quit school?

CONRAD:     I don't know, I reckon

1039

HOLLEY:     So you spend the night with Brian Smith the night of the 22nd, you got up between 8:00 and 8:30 yesterday morning, which would have been the 22nd

CONRAD:    Are you talking to me, yes sir.

HOLLEY:    And you were with Brian for how long?

CONRAD:    I wasn't with Brian, I was at the house by myself.

HOLLEY:    Brian wasn't there at all?

CONRAD:    No he had left

HOLLEY:    Well just a few minutes ago, you told me that you got up and you and Brian was together until he left to go somewhere?

CONRAD:    No, I didn't

HOLLEY:    Okay.  So you're telling me you didn't see Brian until after you left your girlfriend's house?

CONRAD:    I didn't even see him then.  I haven't seen him yet.

HOLLEY:    So you hadn't seen Brian at all yesterday then?

CONRAD:    No sir.

HOLLEY:    Is that what your telling me know?

CONRAD:    No sir, beside when he got up  said I'll be back

HOLLEY:    He did what?

CONRAD:    He said I'll be back, and that's when I went back to sleep before I got up.

HOLLEY:    Were you with your girlfriend ah the day before yesterday, was you with Tiesha on Monday?

CONRAD:    No sir.

HOLLEY:    What did you and Brian do Tuesday night?

CONRAD:    Tuesday night.

HOLLEY:    Yeah, the night you spent the night with him, what did ya'll do?

18

1040

CONRAD:    We stayed at the house and had a few females over, played cards and stuff.

HOLLEY:    Who did you have over to play cards?

CONRAD:    Who?

HOLLEY:    Yeah?

CONRAD:    Ah, two like girlfriends.

HOLLEY:    Who are they?

CONRAD:    One was named Courtney and the other was named Ashley.

HOLLEY:    Courtney and Ashley?

CONRAD:    Yeah.

HOLLEY:    Do you know their last name?

CONRAD:    No sir.

HOLLEY:    You don't?    So you have a bunch of girlfriends that you don't even know their last name, is that correct?

CONRAD:    Yes sir.  Call 'em by their first name or a nickname.

HOLLEY:    So what time did you leave Brian's house going over to your girlfriend's house yesterday?

CONRAD:    It was around about 10:30 or 11:00

HOLLEY:    Between 10:30 and 11:00?

CONRAD:    Yeah, when I left her house it was around like a little bit after 12:00 I believe

HOLLEY:    So you only stayed at her house just a little after 12:00?

CONRAD:    No sir.

HOLLEY:    Well what time did you leave, you got over there between 10:30 and 11:00, what time did you leave?

1041

CONRAD:    It was a little bit after, you know I don't quite know, it wasn't too long cause that's when

HOLLEY:    You did what?

CONRAD:    I said it wasn't too long after, because, when I left, that's when that dude came out of the woods on me, (unintelligible)

HOLLEY:    So you don't know where it was in the early afternoon or mid-afternoon?

CONRAD:    (unintelligible)          a little early

HOLLEY:    Little early?  Like early afternoon?

CONRAD:    Uh hum.

HOLLEY:    And that's when you left and you got attacked by this man that took your pager, and your telephone and your money?

CONRAD:    Uh hum.

HOLLEY:    And how much money did you say he took?

CONRAD:    Eighty-five dollars.

HOLLEY:    Eighty-five.  You don't remember anything else after he shot you?

CONRAD:    No sir.  I remember falling down and hitting the ground and that's when a car pulled up and they threw me in the backseat and took me to the hospital.

HOLLEY:    How long did you lay there before the car pulled up and brought you to the hospital?

CONRAD:    I'd say a good three of four minutes.

HOLLEY:    Do you know what time you arrived at the hospital?

CONRAD:    No sir.

HOLLEY:    But you're fairly sure that you left your girlfriend's shortly after lunch, you got shot and robbed and they brought you to the hospital almost immediately, is that correct?

CONRAD:    Yes sir.

1042

| | |
|---|---|
| HOLLEY: | You didn't see Bryan Yoeman at all yesterday? |
| CONRAD: | No sir. |
| HOLLEY: | When's the last time you saw Bryan Yoeman? |
| CONRAD: | Like that night before last night |
| HOLLEY: | Night before last night?  Who was with you and Bryan? |
| CONRAD: | When? |
| HOLLEY: | You said that it was the night before last night? |
| CONRAD: | Who was with me and Bryan Yoeman? |
| HOLLEY: | Yeah? |
| CONRAD: | (unintelligible)  B. Smith was with us for awhile, a girl came to his house, then he went down to his house. |
| HOLLEY: | Who was with you for awhile? |
| CONRAD: | Brian Smith. |
| HOLLEY: | So you and Brian Smith and Bryan Yoeman then went to Brian Smith's house? |
| CONRAD: | Uh huh.  A girl, she was at his house, reason I know, we went down to his house, me and Bryan Yoeman stayed at his house with his mom |
| HOLLEY: | Ya'll stayed at Bryan Yoeman's house? |
| CONRAD: | Yes sir, watching, me and Bryan Yoeman did |
| HOLLEY: | Okay, well now, did you, was you at Bryan Yoeman's house or was you at Brian Smith's house? |
| CONRAD: | Bryan Yoeman's house. |
| HOLLEY: | Okay.  Have you ever been to the Toy Store? |
| CONRAD: | Toy Store? |
| HOLLEY: | How about the Adult Toy Store?  Have you ever been to it? |

CONRAD:      No sir.

HOLLEY:      You never been with Brian Smith down to the Toy Store?

CONRAD:      No sir.

HOLLEY:      So Brian told us that you and he frequent the place quite often, he's lying then?

CONRAD:      Gotta be, cause I don't even know where the Toy Store at.

HOLLEY:      You don't know where the Toy Store is at?

CONRAD:      No sir.

HOLLEY:      Have you ever heard of it?

CONRAD:      No sir

HOLLEY:      Never heard of it?

CONRAD:      I heard Adult Store?

HOLLEY:      A what?

CONRAD:      An Adult Store.

HOLLEY:      A dork store?

CONRAD:      An Adult Store

HOLLEY:      Oh, an Adult Store, you've heard about it?

CONRAD:      Yeah, I've heard of an Adult Store.

HOLLEY:      Where did you hear that it was at?

CONRAD:      I just heard on going toward Geneva

HOLLEY:      Going toward Geneva?

CONRAD:      Yes sir.

HOLLEY:      Is that the one that Brian always went to?

CONRAD:      I don't know.  I ain't never went.

HOLLEY:     How about Bryan Yoeman, did he go down that quite a bit?

CONRAD:     I don't know sir.

HOLLEY:     Who told you about the Adult Store?

CONRAD:     Oh I heard women and girls taking about the books and dildos and all that.

HOLLEY:     Heard about the dildos and the books and all that kind of stuff?

CONRAD:     Women, the girls be talking about it.

HOLLEY:     Those girls talk about it.

CONRAD:     Yes, the girls.

HOLLEY:     How long ago was it you heard about the, heard about the Adult Store?

CONRAD:     Its just been awhile back.

HOLLEY:     Did the girls ever show you any of the dildos or anything that they bought down at the Adult Store?

CONRAD:     One girl showed me some Spanish Fly and some other type of stuff.

HOLLEY:     Who was that girl?

CONRAD:     Her name Erica

HOLLEY:     Pardon?

CONRAD:     Erica

HOLLEY:     That's another one of your girlfriend's Erica?

CONRAD:     Yes sir.

HOLLEY:     How long ago was that?

CONRAD:     Its been awhile back, when she told me that

HOLLEY:     Did Erica say that she went down there to the Store to get Spanish Fly and that kind of stuff?

CONRAD:     Yeah, that's what she said.

1045

HOLLEY:     Did Erica have a dildo?

CONRAD:     No sir.

HOLLEY:     All right, I want to go back over it one more time and I'm telling you now that Bryan Yeoman and Brian Smith have already given statements to us about the robbery and murder at the Adult Toy Store off the Geneva Highway yesterday. Do you understand that?

CONRAD:     Yes sir.

HOLLEY:     And Brian Smith and Bryan Yeoman both told us in their statement which is on tape that you were the one that went down there with them and that you shot that woman and took her money and the money of an older white male who was standing in the business also. Are they lying?

CONRAD:     They gotta be lying

HOLLEY:     They gotta be?

CONRAD:     Yes sir.

HOLLEY:     Well, why would both of them lie about you?

CONRAD:     They probably done something wrong and trying to pin it on me, just like yesterday, someone told me Bryan Yeoman said he never like me, he's not my friend anyway

HOLLEY:     Well, let me ask you something else, lets go back one more time, you understand that the doctor here at the hospital took a projectile out of your arm, you know that don't you?

CONRAD:     Yes sir.

HOLLEY:     And you know that we took that projectile and ah sent it to the Department of Forensic Science in Montgomery and they matched it with the gun that the lady used to shoot you with, do you understand that?

CONRAD:     (unintelligible)

HOLLEY:     Pardon

CONRAD:     She must have was the one that was in the woods, cause I ain't shoot nobody

24

1046

HOLLEY:     So they is a young white woman did not shoot you then, is that what's you saying?

CONRAD:     No sir, unless that was her that was dressed in all that black that came out of the woods.

SPENCE:     That's fine, let him hang himself. That's whats gonna happen. Because now he's gotta answer all the lies, hey, that's fine, cause when we get the Forensic people up on the stand, get Brian Smith and Bryan Yeoman up on the stand, he's going to look like the idiot and they going to have to put him out, were done. I'm done with him, you know, if he ain't going to help himself.

SPENCE:     Time now is 14:43 hours. Still at the same place, same parties present.

On _____ I reviewed the tape and made the necessary corrections to the Transcript. The corrected transcript is a true representation of the taped interview.


                              _____
                              Dwight Holley

Transcribed by Valerie McGuire
May 25, 2001

25

104.7

Name of Officer _Dwight Holley / Brian Matthews_  Place _MCE Room 207_

Title _Investigator_  Date _5-25-01_

Time _10:20_

## YOUR CONSTITUTIONAL RIGHTS ACCORDING TO THE MIRANDA WARNING

Before we ask you any questions, you must understand your rights.

1. You have the right to remain silent.

2. Anything you say can and will be used against you in a court of law.

3. You have the right to talk to a lawyer and have him present with you while you are being questioned

4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning i you wish.

5. You can decide at any time to exercise these rights and not answer any questions or make any statement

1. Do you understand each of these rights I have explained to you?    Yes __✓__ No _____

2. Having these rights in mind, do you wish to talk to us now?    Yes __✓__ No _____

## WAIVER OF RIGHTS

I have read, (or had read to me), this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promise or threats have been made to me and no pressure of any kind has been used against me to get me to make a statement.

Witness: _Dwight Holley_    Signed: _Robert Conrad_

Witness: _Matthews_    Date: _5/25/01_

Time: _____

Defendant's Name: _Robert Conrad_    Age: _20_    D.O.B. _9-3-80_

Address: _35 Garden Oaks_

Education: Grade completed - 1    2    3    4    5    6    7    8    (9)    10    11    12

College:    Yes _____ No __✓__

Can you read and comprehend the english language?    Yes __✓__ No _____

**STATE'S EXHIBIT**

5

1048

52301

1 OF 3

___ 5/23/01

**Medical Center Enterprise**
**PERIOPERATIVE RECORD**

Emergency ☑   Scheduled ☐   Add-On ☐

ADDRESSOGRAPH

## PREOPERATIVE ASSESSMENT

☑ Consent Correct, Signed, Witnessed, Dated
☑ H & P on Chart
☑ ID Bracelet
☑ Required Lab
☐ NPO / Last Oral Intake   "12 noon lunch"
Allergies: ☑ None ☐ Yes, List   N/A

Prosthesis: ☑ None
☐ Hearing Aid
☐ Glasses / Contacts
☐ Dentures
☐ Mobility
☐ Speech
☐ Other _____

| Emotional Status | Level of Consciousness | Skin Condition |
|---|---|---|
| Calm Relaxed............ ☐ | Alert ............ ☑ | Skin Intact, No Bruises or Lesions...... ☑ |
| Depressed ............ ☐ | Drowsy ............ ☐ | Flushed............ ☐ |
| Anxious ............ ☐ | Talkative ............ ☐ | Pale ............ ☐ |
| Confused ............ ☐ | Non-Responsive ............ ☐ | Diaphoretic............ ☐ |
| **Knowledge Level** | Responsive ............ ☑ | Dry............ ☐ |
| ☐ Well Informed (Verbalizes Understanding of Procedure | Other ............ | Cool............ ☐ |
| ☐ Lack of Information (_____ Child) | **Coping Mechanism Behavioral State   Yes** | Warm............ ☑ |
| ☐ Language Barrier | Cooperative ............ ☑ | Other _____ |
| ☐ Religious Beliefs Pertinent to Surgery | Crying ............ ☐ | GSW – (L) ↓ quad. |
| Comments: _____ | Withdrawn ............ ☐ | (L) bicep area |
| | Resistive ............ ☐ | foley – cath. |
| | Combative ............ ☐ | |
| | Other ............ | |

Family in Patient's Room  Yes ☐  List _____        No ☑
Comments: _____ see H+P

Signature of Admitting / Circulating Nurse   _Wayne Marlow_        Time _1440_

## NURSING CARE PLAN:        SURGICAL SERVICES NURSING PROCESS

| PATIENT CARE NEEDS / PROBLEMS | GOAL | NURSING INTERVENTION | EVALUATION | COMMENTS |
|---|---|---|---|---|
| Potential for anxiety | Decrease patient anxiety | ☑ explain all procedures to patient<br>☐ provide quiet, comfortable atmosphere<br>☐ remain at patient side until anesthetized<br>☑ allow patient to verbalize feelings<br>☑ be aware of non-verbal communication | ☑ Demonstrates decreased anxiety | |
| Potential for infection | Avoidance of patient infection | ☐ appropriate skin prep<br>☐ enforce strict aseptic technique<br>☑ monitor breaks in sterile techniques and take corrective actions | ☑ Procedure is performed with proper sterile technique | |

1049

MEDICAL CENTER ENTERPRISE
SURGICAL COUNT SHEET                    052301

OPERATION: *Diag. Lap – Expl. Lap*

5/23/01

SAWYER, SAMUEL

| | PRE-OP COUNTS | | 1ST | 2ND | 3RD | FINAL COUNT |
|---|---|---|---|---|---|---|
| 4 X 18 Lap Sponges | — | | | | | |
| 18 x 18 Lap Sponges | 10 | 5 | 15 | 15 | 15 | 15 |
| 4 x 4 Ray Tec. Sp. *Diag. Lap* / *Expl. Lap* | 10 / 10 | — | 10 / 10 | 10 / 10 | — | 10 / 10 |
| Cottonoids | — | | | | | |
| Tonsil Sponges | — | | | | | |
| Dental Rolls | — | | | | | |
| Suture Needles | — | 8+8 + 2+1 | 19 | 19 | 19 | 19 |
| Hyperdermic Needles | — | | | | | |
| Bovie Tips | 1 | | 1 | 1 | 1 | 1 |
| Bovie Tip Cleaners | 1 | | 1 | 1 | 1 | 1 |
| Knife Blades | 2 | | 2 2 | 2 | 2 | 2 |
| Dissectors | — | | | | | |
| Braided Cord Tape (umbilical) | — | | | | | |

SCRUB NURSE _____ *J. Hayden CST* _____

CIRCULATING NURSE _____ *K. Chambers RN* _____
OUTCOME OF NEEDLE, INSTRUMENT AND SPONGE COUNT REPORTED TO SURGEON.

PHYSICIAN _____ M.D.

(surotsht)

TOE250

MEDICAL CENTER ENTERPRISE    052301
SURGICAL COUNT SHEET

OPERATION _Diag. Lap, Expl. Lap_

5/23/01

| | PRE-OP | ADDED | POST-OP | | PRE-OP | ADDED | POST-OP |
|---|---|---|---|---|---|---|---|
| Knife Handle | 2 | | 3 | Crile (Ribbon) Ret. | | | |
| Curved Hemostats | 4 | | 4 | Suction Tip | 3 | | |
| Straight Hemostatis | | | | Rake Ret. | | | |
| Scissors | 4+1 | | 5 | Tenaculum | | | |
| Tissue Forceps | 1+4+3 | | 8 | Uterine Elevator | | | |
| Needle Holders | 2 | | 2 | Towel Clips | | | |
| | | | | Harrington Ret. | | | |
| Long Kelly Clamps | 2 | | 2 | Army/Navy's | | | |
| Short Kelly Clamps | 2 | | 2 | | | | |
| Straight Oschners | 4 | | 4 | Gelpis | | | |
| Allis Clamps | 2 | | 2 | Senn Ret. | | | |
| Babcocks | 2 | | 2 | Bladder Ret. | | | |
| Sponge Sticks | 1 | | 1 | Heaney Ret. | | | |
| Heaney Clamps | | | | Weitlander | | | |
| Ballintines | | | | Foss Ret. | | | |
| Right Angle Clamps | | | | Thompson Ret. | | | |
| Pennington | | | | Bookwalter | | | |
| Lahey Clamps | | | | Balfour/Upper Hand | | | |
| | | | | OConner/Sullivan | | | |
| Richardson's | 4 | | 4 | Gallbladder Inst. | | | |
| Deavers | | | | Intestinal Inst. | | | |

SCRUB NURSE _____

CIRCULATING NURSE _____

(surctins)

052301

PAGE 3 OF 3
DATE _5/23/01_

**Medical Center Enterprise**
**PERIOPERATIVE RECORD**

Lot # 51738

☐ N/A   ESU/LASER:
ESU# F9K 11395-A   GROUNDING PAD #: E7507
SITE: Lt. thigh   BY WHOM: J. Yarbrough RN
SETTINGS CUT: 45   COAG: 43   BIPOLAR: ___   POST SKIN INTEGRITY: Clean

☑ N/A   LASER UNIT: _____   LASER SETTING: _____   LASER SAFETY PRECAUTION: ☐ YES
☑ N/A   TOURNIQUET: SERIAL #: _____ ☐ LEG (RT./LT.) ☐ ARM (RT./LT.)   BY WHOM: _____
TIME ON: _____   TIME OFF: ___ ; ___   MMHG;   TIME ON: _____   TIME OFF: ___ ; ___   MMHG
☐ N/A   JOBST HOSE: ☑ YES   ☐ NO   (BOTH/RT./LT.)   BY WHOM: D. Smith, RN.
☐ N/A   ☐ X-RAY TAKEN   ☐ PORTABLE   ☐ C-ARM   X-RAY TECHNICIAN: _____
☑ N/A   ☐ MICROSCOPE (OPTH./ENT)   ☐ 35mm CAMERA   ☐ VIDEO (TAPE DISPOSITION:   ☐ SURGEON   ☐ PATIENT)

☑ N/A   SPECIMENS: SPECIMEN #: _____ ☐ SEND TO LAB   ☐ DISCARD PER SURGEON'S ORDER   ☐ SENT WITH PATIENT
☐ TAKEN BY SURGEON   ☐ TAKEN BY PATHOLOGIST   ☐ FROZEN SECTION   ☐ C & S (SITE: _____ )

☐ N/A   WOUND IRRIGATION: ☐ ANCEF   ☐ GU IRRIGANT   ☐ L/R 5000 HEPARIN   ☐ L/R 5000 HEPARIN / ANCEF   ☑ NS   ☐ L/R ANCEF
☐ H₂O   ☐ POLYBACTRIN   ☐ MEFOXIN   ☐ KANTREX   ☐ GENTAMYCIN   ☐ OTHER: _____

MEDICATIONS DURING SURGERY OTHER THAN ANESTHESIA:   See Anesthesia record

FAMILY INFORMED OF PATIENT'S STATUS @ TIMES _____

| DRAINS | SIZE | LOCATION | DESCRIPTION / DRAINAGE | DRAINS | SIZE | LOCATION | DESCRIPTION / DRAINAGE |
|---|---|---|---|---|---|---|---|
| ☐ Red Rubber | | | | ☐ Penrose | | | |
| ☐ Jackson Platt | | | | ☐ Hemovac Davol | | | |
| ☐ NG | | | | ☐ Chest Tube | | | |
| ☐ Other | | | | ☐ Other | | | |

☐ N/A   COUNTS:   SPONGE: ☑ CORRECT   ☐ INCORRECT   ☑ FINAL COUNTS CORRECT
☐ N/A   NEEDLE: ☑ CORRECT   ☐ INCORRECT   SCRUB NURSE: J. Parker CST
☐ N/A   INSTRUMENT: ☑ CORRECT   ☐ INCORRECT   CIRCULATING NURSE: J. Chamberlee RN
SURGEON NOTIFIED OF COUNTS   ☐ YES: IF UNRESOLVED X-RAY TAKEN (IF NO, WHY: _____ )   CLOSURE TIME 1643

POST-OPERATIVE DIAGNOSIS: Same
☐ N/A   DRESSINGS: ☑ 4X4's   ☐ STERISTRIPS   ☐ ABD   ☐ BANDAID   ☐ EYE PAD / SHIELD   ☐ KERLIX   ☐ KLING   ☐ MASTISOL
☐ TELFA   ☐ XEREFORM   ☐ ACE BANDAGES   ☐ ADAPTIC   ☐ COLLODIAN   ☐ VASELINE GAUZE   ☐ PERI PAD   ☐ VAG. PACKING
☐ NASAL STENTS   ☐ COTTON ROLL   ☐ ANTIBIOTIC OINTMENT   ☐ OTHER: _____
☐ PACKING SITE: _____
TAPE: ☑ PAPER   ☐ FOAM   ☐ PAPER   ☐ ELASTOPLAST   ☐ OTHER: _____   EXIT TIME 1656

CAST: ☐ ARM   ☐ LEG   ☐ RT.   ☐ LT.   ☐ PLASTER   ☐ FIBERGLASS   ☐ LONG   ☐ SHORT   ☐ SPICA   ☐ SPLINT   ☐ SLING
WOUND CLASSIFICATION: ☐ CLEAN (I)   ☑ CLEAN CONTAMINATED (II)   ☐ CONTAMINATED (III)   ☐ DIRTY (IV)

COMMENTS: Tolerated Procedure well -
Gottit   Bullet fragment to B. Bradley Enterprise Police Dept.

METHOD OF TRANSFER: ☑ ROLLER   ☐ SELF   ☐ WITH ASSISTANCE   ☐ NURSE'S ARMS   ☐ ANESTHESIA ARMS   X 2
TRANSFERRED BY: ☑ STRETCHER   ☐ ICU / CCU BED   ☐ UNIT BED   ☐ OTHER: _____ (WITH SR'S)
TRANSFER TO: ☑ PACU   ☐ ICU / CCU   ☐ ROOM   ☐ DAY SURGERY   ☐ OTHER: _____
PATIENT STATUS POST SURGERY: ☑ RESPONSIVE   ☐ NON RESPONSIVE   ☐ ALERT   ☐ SEDATED
REPORT TO: V. Thomas RN   A. Caminale RN   PACU NURSE A. Chambers RN
PRIMARY CIRCULATOR SIGNATURE: Judy Yeo   RELIEF CIRCULATOR SIGNATURE: A. Chambers RN

OR 50-3 (Rev. 7/98)

052301

INPATIENT RECORD
01143-0099...       1/2
SAWYER, SAMUEL
BOY   M   S    03/23/01
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
0000041 (addressograph)

# POST ANESTHESIA CARE UNIT RECORD

| Focus | Expected Outcomes | Actions | Focus | Expected Outcomes | Actions |
|---|---|---|---|---|---|
| ☐ Altered Respiratory status<br>☐ Artificial airway<br>☐ Difficulty breathing<br>☐ Secretions<br>☐ Surgical procedure<br>☐ Medications<br>☐ Preop-condition<br>☐ Other _____ | ☐ Patient maintains patent airway<br>☐ Oximeter reading 90% or greater c̄ /s O₂<br>☐ Patient respirations are even and effortless | ☐ Assess airway and maintain patency<br>☐ Administer oxygen as ordered upon admission<br>☐ Assess lungs upon admission and prn<br>☐ Monitor respiratory rate, rhythm, and depth q 15 min and prn<br>☐ Note symetry of chest movement<br>☐ Monitor oximeter reading q 15 min and prn<br>☐ Assess skin color, temp.<br>☐ Encourage C & DB<br>☐ Provide warmth to patient:<br>  ☐ warm blankets/thermodrape<br>  ☐ patient warming device<br>  ☐ limit exposure of skin<br>☐ Follow Policy & Procedure for maintenance and removal of airway and E.T. tube<br>☐ Elevate H.O.B. unless contraindicated<br>☐ Discharge patient from PACU c̄ O₂ at — L/N.C. or mask (circle) for 24° or until oximeter > 90%<br>☐ Oximeter readings prn | ☐ Alteration in comfort<br>☐ Physical pain from surgery<br>☐ Psychological response to surgery<br>☐ Immobility<br>☐ Position<br>☐ Nausea/ vomiting<br>☐ Other _____ | ☐ Patient verbalizes feelings of comfort or decrease in pain<br>☐ Vital signs in preop range<br>☐ Absence of restlessness<br>☐ Patient verbalizes decrease or elimination of nausea | ☐ Assess pain location, duration, intensity<br>☐ Medicate prn<br>☐ Assess effectiveness & tolerance of pain medication<br>☐ Assist patient with repositioning<br>☐ Provide comfort measures:<br>  ☐ warm blanket<br>  ☐ cool cloth<br>☐ Assess type and amount of anesthesia given<br>☐ Note emesis, color, amount<br>☐ Administer antiemetic<br>☐ Assess effectiveness of antiemetic<br>☐ Maintain NPO if applicable<br>☐ Assess abdomen for distention<br>☐ Maintain patency of NG and suction<br>☐ Provide emotional support |
| ☐ Alteration in Hemody-namics<br>☐ B.P.<br>☐ Pulse<br>☐ Arrythmia<br>☐ Urine output<br>☐ Other _____ | ☐ BP and pulse within preop range<br>☐ Skin warm & dry<br>☐ Oriented to person and place<br>☐ Urine output > 30 cc/hour | ☐ Monitor vital signs q 15 & prn<br>☐ Monitor EKG q 15 & prn<br>☐ Assess resp. status prn<br>☐ Monitor I & O<br>☐ Monitor lab values<br>☐ Administer fluids/blood as indicated<br>☐ Rewarm patient<br>☐ Administer O₂<br>☐ Use analgesic cautiously<br>☐ Position patient in Trendelenberg if symptomatic<br>☐ Maintain patency of IV(s)<br>☐ Monitor urine output prn | ☐ Altered Skin Integrity other than expected surgical incision<br>☐ Position<br>☐ Preop condition<br>☐ Other _____ | ☐ Patient maintains preop skin integrity status<br>☐ Dressing is dry and intact | ☐ Assess skin integrity - note redness, open areas<br>☐ Remove wet, wrinkled linen<br>☐ Reposition prn<br>☐ Assess dressing for drainage, note color, amount, prn<br>☐ Reinforce dressing prn<br>☐ Assess neurovascular status of _____ |
| ☑ Anxiety<br>☑ Post-op diagnosis<br>☑ Unfamiliarity with environment<br>☐ Separation from family/ significant other<br>☐ Other _____ | ☑ Patient verbalizes orientation to environ-ment, Patient expresses feelings, concerns, asks questions | ☑ Assess orientation<br>☑ Orient prn<br>☑ Instruct patient on monitoring equipment, procedures and document on orientation to PACU teaching record<br>☑ Provide emotional support<br>☑ Encourage patient to express fears and to ask questions<br>☑ Provide privacy | ☑ Potential for injury<br>☐ L.O.C.<br>☑ Age<br>☑ Precondition<br>☐ Mobility<br>☐ Other _____ | ☑ Patient remains injury-free | ☑ Assess L.O.C. prn<br>☑ Orient patient prn<br>☑ Monitor effects of anesthetic and analgesic<br>☑ Side rails up at all times<br>☐ Bed/cart locked<br>☐ Pad siderails prn<br>☐ Apply restraints prn<br>  ☐ posey ☐ leather<br>  ☐ wrist ☐ personnel<br>  ☐ ankle<br>☐ Check neurovascular status affected |

1053

# CONSENT FOR ANESTHESIA SERVICES

I, _____, acknowledge that my doctor has explained to me that I will have an operation, diagnostic or treatment procedure. My doctor has explained the risks of the procedure, advised me of alternative treatments and told me about the expected outcome and what could happen if my condition remains untreated. I also understand that anesthesia services are needed so that my doctor can perform the operation or procedure.

It has been explained to me that all forms of anesthesia involve some risks and no guarantee or promises can be made concerning the results of my procedure or treatment. Although rare, unexpected *severe complications* with anesthesia can occur and include the remote possibility of *infection, bleeding, drug reactions, blood clots, loss of sensation, loss of limb function, paralysis, stroke, brain damage, heart attack or death*. I understand that these risks apply to all forms of anesthesia and that additional or specific risks have been identified below as they may apply to a specific type of anesthesia. I understand that the type(s) of anesthesia service checked below will be used for my procedure and that the anesthetic technique to be used is determined by many factors including my physical condition, the type of procedure my doctor is to do, his or her preference, as well as my own desire. It has been explained to me that sometimes an anesthesia technique which involves the use of local anesthetics, with or without sedation, may not succeed completely and therefore another technique may have to be used including general anesthesia.

| ☑ General Anesthesia | Expected Result | Total unconscious state, possible placement of a tube into the windpipe. |
|---|---|---|
| | Technique | Drug injected into the bloodstream, breathed into the lungs, or by other routes. |
| | Risks | Mouth or throat pain, hoarseness, injury to mouth or teeth, awareness under anesthesia, injury to blood vessels, aspiration, pneumonia, death. |
| ☐ Spinal or Epidural Analgesia/ Anesthesia ☐ With sedation ☐ Without sedation | Expected Result | Temporary decreased or loss of feeling and/or movement to lower part of the body. |
| | Technique | Drug injected through a needle/catheter placed either into the spinal canal or immediately outside the spinal canal. |
| | Risks | Headache, backache, buzzing in the ears, convulsions, infection, persistent weakness, numbness, residual pain, injury to blood vessels, "total spinal", death. |
| ☐ Major / Minor Nerve Block ☐ With sedation ☐ Without sedation | Expected Result | Temporary loss of feeling and/or movement of a specific limb or area. |
| | Technique | Drug injected near nerves providing loss of sensation to the area of the operation. |
| | Risks | Infection, convulsions, weakness, persistent numbness, residual pain, injury to blood vessels, death. |
| ☐ Intravenous Regional Anesthesia ☐ With sedation ☐ Without sedation | Expected Result | Temporary loss of feeling and/or movement of a limb. |
| | Technique | Drug injected into veins of arm or leg while using a tourniquet. |
| | Risks | Infection, convulsions, persistent numbness, residual pain, injury to blood vessels, death. |
| ☐ Monitored Anesthesia Care (with sedation) | Expected Result | Reduced anxiety and pain, partial or total amnesia. |
| | Technique | Drug injected into the bloodstream, breathed into the lungs, or by other routes producing a semi-conscious state. |
| | Risks | An unconscious state, depressed breathing, injury to blood vessels, death. |
| ☐ Monitored Anesthesia Care (without sedation) | Expected Result | Measurement of vital signs, availability of anesthesia provider for further interventions. |
| | Technique | None. |
| | Risks | Increased awareness, anxiety and/or discomfort. |

I hereby consent to the anesthesia service checked above and authorize that it be administered by _____ or his/her associates, all of whom are credentialed to provide anesthesia services at this health facility. I also consent to an alternative type of anesthesia, if necessary, as deemed appropriate by them. I expressly desire the following considerations be observed (or write "none"):

---

## BLOOD TRANSFUSIONS

The likelihood of needing a blood transfusion for this procedure is:     ☐ highly unlikely,   ☐ possible,   ☐ probable.

I understand that there are potential risks from blood transfusions, though rare, and that some of these include transfusion reaction, hepatitis, and AIDS (Acquired Immune Deficiency Syndrome). *Initial in appropriate box:*

☑ I give consent to receive blood or blood products as determined by my anesthetist and doctor to be necessary for my well-being.
☐ I give consent to receive blood or blood products only as an emergency life-saving measure.
☐ I do not want to receive blood or blood products under any circumstance.

---

I certify and acknowledge that I have read this form or had it read to me, that I understand the risks, alternatives and expected results of the anesthesia service and that I had ample time to ask questions and to consider my decision.

| X _____ | _____ |
|---|---|
| Patient's Signature | Date and Time |
| Substitute's Signature | Relationship to Patient |
| Witness | Explained by |

1054

## MEDICAL CENTER ENTERPRISE

### INFORMED CONSENT

AUTHORIZATION FOR MEDICAL AND/OR SURGICAL TREATMENTS/PROCEDURES

I, _Robert Conrad_ , hereby authorize Doctor _____

and his/her assistants to perform upon _my Cell_

the following operative, diagnostic, or invasive procedure / treatments: _Diagonostic_

_Laparoscopy possible Laparotomy_

_____

_____

(description of operation / treatment in layman's language )

My doctor has explained the risks and benefits of the procedure/treatment, advised me of alternative treatments and has told me about the expected outcome and what could happen if my condition remains untreated. I understand that if any unforeseen condition arises in the course of the procedure/treatment calling for, in the physician's judgment, additional or different procedure/treatment from those I have consented to, I further request and authorize him/her to perform whatever procedure/treatment he/she deems necessary and advisable. Any tissue or body fluids may be disposed of by the hospital in accordance with the accustomed practice. Any photographs, video recordings deemed necessary during the procedure/treatment will be permitted.

I certify and acknowledge that I have read this form or had it read to me, that I understand the risks, alternatives and expected results of the procedure/treatment and that I had ample time to ask questions and to consider my decision.

_05|23 0/1425_

Date and Time

_Robert Conrad_

Patient Signature

_____

Witness

_____

Nearest Relative (Relation to Patient)

1055

**MEDICAL CENTER ENTERPRISE**

**INFORMED CONSENT**

AUTHORIZATION FOR MEDICAL AND/OR SURGICAL TREATMENTS/PROCEDURES

I, _Robert Conrad_, hereby authorize Doctor _S. Cony__
and his/her assistants to perform upon _MY Self_
the following operative, diagnostic, or invasive procedure / treatments: _Removal of_
_Bullet from (L) Arm and Abdomen_

_____

_____

(description of operation / treatment in layman's language)

My doctor has explained the risks and benefits of the procedure/treatment, advised me of
alternative treatments and has told me about the expected outcome and what could happen if my
condition remains untreated. I understand that if any unforeseen condition arises in the course of
the procedure/treatment calling for, in the physician's judgment, additional or different
procedure/treatment from those I have consented to, I further request and authorize him/her to
perform whatever procedure/treatment he/she deems necessary and advisable. Any tissue or body
fluids may be disposed of by the hospital in accordance with the accustomed practice. Any
photographs, video recordings deemed necessary during the procedure/treatment will be permitted.

I certify and acknowledge that I have read this form or had it read to me, that I understand the
risks, alternatives and expected results of the procedure/treatment and that I had ample time to ask
questions and to consider my decision.

_05/23/01_

Date and Time

_MD Stuff__

Witness

_X Robert Conrad_

Patient Signature

_____

Nearest Relative (Relation to Patient)

1050

**Medical Center Enterprise**

400 North Edwards Street
Enterprise, Alabama 36330

# Patient Summary

| PATIENT NUMBER | ROOM/TYPE | PT TYPE | SERV | ATTENDING PHYSICIAN | FAMILY PHYSICIAN | MR NUMBER |
|---|---|---|---|---|---|---|
| 01143-00094 | ER | ER | ER 94 | DREW,JOHN L | DREW,JOHN L | 0000041053 |

**P A T I E N T**

| UNIT DATE/TIME | SEX | RACE | MS | DATE OF BIRTH /AGE | SOCIAL SECURITY NUMBER | EMPLOYMENT STATUS |
|---|---|---|---|---|---|---|
| 05/23/01 1357 | M | 2 | S | 09/27/80 20Y | 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 | |

| PATIENT | | | EMPLOYER | | |
|---|---|---|---|---|---|
| CONRAD,ROBERT | | | MCDONALDS | | |
| 36 NELL COURT | | PHONE: | 625 BOLL WEEVIL CIR | | PHONE: |
| ENTERPRISE     AL 36330 | | (334)308-2140 | ENTERPRISE     AL  36330 | | (334)347-3417 |

| SMK | VETERAN | OCCUPATION | BRANCH OF SERVICE | PAY GRADE | MILITARY STATUS |
|---|---|---|---|---|---|
| | No | | | | |

**G U A R**

| GUARANTOR | | | GUARANTOR EMPLOYER | | |
|---|---|---|---|---|---|
| CONRAD,DOROTHY A | | | ENTERPRISE NURSING H | | |
| 507 GLOVER AVENUE APT 35 | | PHONE: | 300 PLAZA DR | | PHONE: |
| ENTERPRISE     AL 36330 | | (334)348-2150 | ENTERPRISE     AL 36330 | | (334)347-9541 |

| RELATIONSHIP | SOCIAL SECURITY NUMBER | GUARANTOR OCCUPATION | EMPLOYMENT STATUS |
|---|---|---|---|
| MOTHER | 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 | LAUNDRY/HOU | |

**R E L**

| RELATIVE/FRIEND (OTHER THAN GUARANTOR) | | | RELATIVE/FRIEND EMPLOYER | | |
|---|---|---|---|---|---|
| CONRAD,DOROTHY ;A | | | ENTERPRISE NURSING H | | |
| 36 NELL COURT | | PHONE: | 300 PLAZA DR | | PHONE: |
| ENTERPRISE     AL 36330 | | (334)347-9533 | ENTERPRISE     AL 36330 | | |

| RELATIONSHIP | SOCIAL SECURITY NUMBER | GUARANTOR OCCUPATION | EMPLOYMENT STATUS |
|---|---|---|---|
| MOTHER | 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 | LAUNDRY/HOUSEKEEPI | |

**I N S 1**

| CARRIER | F/C | POLICY NUMBER | MAIL TO: |
|---|---|---|---|
| AL MCD | D | 00041917595 | PO BOX 7601 |

| INSURED NAME | | SOCIAL SECURITY NUMBER | |
|---|---|---|---|
| CONRAD,ROBERT | | | MONTGOMERY     AL   36107 |

| GROUP NUMBER | COMMENTS | GROUP PHONE/EXT |
|---|---|---|
| | | (800)688-7989 |

**I N S 2**

| CARRIER | F/C | POLICY NUMBER | MAIL TO: |
|---|---|---|---|
| | | | |

| INSURED NAME | SOCIAL SECURITY NUMBER |
|---|---|
| | |

| GROUP NUMBER | COMMENTS | GROUP PHONE/EXT |
|---|---|---|
| | | |

**I N S 3**

| CARRIER | F/C | POLICY NUMBER | MAIL TO: |
|---|---|---|---|
| | | | |

| INSURED NAME | SOCIAL SECURITY NUMBER |
|---|---|
| | |

| GROUP NUMBER | COMMENTS | GROUP PHONE/EXT |
|---|---|---|
| | | |

**I N S 4**

| CARRIER | F/C | POLICY NUMBER | MAIL TO: |
|---|---|---|---|
| | | | |

| INSURED NAME | SOCIAL SECURITY NUMBER |
|---|---|
| | |

| GROUP NUMBER | COMMENTS | GROUP PHONE/EXT |
|---|---|---|
| | | |

**M I S C**

| DIAG CODE | DIAGNOSIS | ALLERGIES | AMB | ORG | PRC |
|---|---|---|---|---|---|
| GUNSH | T WD | NKDA | | | |

| ACCIDENT TYPE | ACCIDENT DATE | ACC TIME | PLACE OF ACCIDENT | PREVIOUS VISIT DATE | ARRIVAL MODE |
|---|---|---|---|---|---|
| | | | | 05/07/99 | PERSONAL |

| TRANSFERRING FACILITY | RELIGION | CHURCH | | ATC | INT |
|---|---|---|---|---|---|
| | | | | | |

| COMMENTS | | CLK |
|---|---|---|
| | | GDC |

**FORMS NEEL
SIGNATURE**

ER

## Medical Center Enterprise

**EMERGENCY DEPARTMENT**
**TRIAGE, ASSESSMENT AND FLOW SHEET**

Patient Name: Conrad, Robert
ER #:

Pt V.O. BM

DATE: 05/23/01
TRIAGE TIME: 1355
WT:
HT:

NON-URGENT:
URGENT: X
EMERGENT:

FAMILY PHYSICIAN:
ASSESSMENT TIME: 1355
ALLERGIES: NKA
IMMUNIZATIONS: CURRENT / NOT CURRENT

**MODE OF ARRIVAL:** ☑ WHEELCHAIR ☐ AMBULANCE
☑ AMBULATORY ☐ PARENT'S ARMS ☐ OTHER

### NURSING HISTORY

DATA SOURCE (INFORMANT): Pt + friends 2 Black males
CHIEF COMPLAINT: "Gunshot ABD/Legs Quad"
"Happened on Methodist side" "My friends found me"
ONSET: 15-20 min ago "Brought me here"
ACTIONS: STRAIGHT TO ROOM / TIME TO REGISTER
ICE ____ SPIT ____ DRESSING ____ IMMOBILIZE ____
WC ____ NPO EXPLAINED ____ ISOLATION PRECAUTIONS ____
TREATMENT PRIOR TO ARRIVAL:

**MEDICAL HISTORY:**
☑ NO CHRONIC ILLNESS
☐ DIABETES
☐ ____ URES
☐ ____ PERTENSION
☐ HEART
☐ OTHER
☐ SURGERY
☐ TRAUMA

**HOME MEDICATIONS:**
SEE ATTATCHED SHEET

**PAIN:** ☐ NO ☑ YES
LOCATION: L Arm, Rt Quadrant
DESCRIPTION: "Gunshot"
RADIATION:
REPRODUCED WITH MOVEMENT:
INTENSITY: MILD - 1 • 2 • 3 • 4 • 5 • 6 • 7 • 8 • 9 • 10 SEVERE

**TRAUMA - LOCATION-APPEARANCE:**
☐ NA
☐ ABRASION
☐ AVULSION
☐ CONTUSION
☐ DEFORMITY
☐ EDEMA
☐ LACERATION
☑ PUNCTURE WOUND
☐ BURN
FRONT   BACK   SUSPECTED ABUSE  Y ☐  N ☐

**COMMENTS:**
Gun shot wound
x 2

**SKIN:**
☑ WARM ☑ DRY ☐ COOL ☐ DUSTY
☐ PALE ☐ MOIST ☐ CLAMMY ☐ CYANOTIC ☐ OTHER
☐ INTACT
TURGOR: crisp   INTEGRITY ☐ DISRUPTED
**BLEEDING:** ☐ NO ☐ YES
LMP
LO_ATION:
☐ E ☐ MINIMAL ☐ MODERATE ☐ SEVERE
☐ GHT ☐ DARK ☐ CLOTS ☐ CONTROLLED
☐ OTHER

**NURSES INITIALS** | **NURSES SIGNATURES** | TRIAGE NURSE

### NURSING OBSERVATIONS

**NEUROLOGICAL:**
LEVELS OF CONSCIOUSNESS:
☑ ALERT ☑ ORIENTED
☐ LETHARGIC ☐ CONFUSED
☐ UNRESPONSIVE ☐ SEIZURES

LOSS OF CONSCIOUSNESS:
☐ NA
☑ NO ☐ YES DURATION ____

PUPILS: ☐ NA
SIZE in mm   SIZE R ____  L ____
☑ EQUAL ☑ REACTIVE
☐ UNEQUAL ☐ NON-REACTIVE
1  2  3  4  5  6  7

**RESPONDS TO STIMULI:**
☑ YES ☐ NO
☐ VERBAL ☐ PAINFUL

**VISUAL ACUITY:**
☑ NA ☐

**SPEECH:**
☐ SLURRED ☑ CLEAR
☐ OTHER ☐ APHASIC

**RESPIRATORY:**
☑ REGULAR ☐ ABSENT ☐ RAPID ☐ OTHER
☐ DYSPNEIC ☐ IRREGULAR ☐ COUGH
☐ SHALLOW ☐ HYPERVENTILATING ☐ USE OF ACCESSORY MUSCLES

**BREATH SOUNDS:**
☐ NA ☑ EQUAL ☐ UNEQUAL ☑ CLEAR
☐ RALES ☐ DIMINISHED ☐ WHEEZES ☐ RHONCHI

**CIRCULATION-CARDIAC-PULSES:**
☑ REGULAR
☐ PALPABLE
☐ ABSENT
☐ IRREGULAR
☐ WEAK
☐ CARDIAC RHYTHM
☐ HEART TONES
☐ CAPILLARY REFILL

**MOTOR FUNCTION/SENSORY:**
☐ EQUAL ☑ UNEQUAL
COMMENTS: "I can't hold
my legs up, I've
Blood Clot"

**ABD:**
☐ NA
☑ SOFT - tender to ABd.
☐ DISTENDED
☐ RIGIDITY
☐ BOWEL SOUNDS
☐ FHT

**GI:**
☐ NA
☐ VOMITING
☐ DIARRHEA
☑ NAUSEA

**EMESIS:** ☑ NO ☐ YES
PT. DESCRIPTIONS:
**STOOL:** ☑ NA
☐ NORMAL   LAST B.M.
☐ ABNORMAL (PT. DESCRIPTION)

**URINATION:** ☑ NA
☐ NORMAL ☐ FREQUENCY ☐ DYSURIA ☐ CATHETER ☐ HEMATURIA
☐ OTHER

**DISCHARGE:** ☑ NO ☐ YES
☐ VAGINAL
☐ URETHERAL
☐ OTHER

### NURSING DIAGNOSIS/ANALYSIS:
☐ ANXIETY
☐ BREATHING PATTERN INEFFECTIVE
☑ COMFORT/PAIN ALTERATION
☐ FLUID VOLUME-ALTERATION IN
☐ GAS EXCHANGE IMPAIRED
☐ HYPERTHERMIA/HYPOTHERMIA
☐ IMPAIRED MOBILITY
☐ INFECTION POTENTIAL
☐ SKIN INTEGRITY - IMPAIRMENT
☑ TISSUE PERFUSION ALTERATION
☑ VISUAL DEFICIT POTENTIAL
☐ KNOWLEDGE DEFICIT
☑ THOUGHT PROCESS ALTERATION
☐ NEURO, MUSCULAR, SKELETAL, DEFICIT
☐ CARDIAC OUTPUT ALTERATION

**SAFETY MEASURES:**
☐ SIDE RAILS UP
☐ ATTENDANT WITH PATIENT
☐ NURSE IN ATTENDANCE
☐ SAFETY STRAP
☐ PAPOOSE BOARD
☐ RESTRAINTS
   TYPE
☐ AMBULATORY
☐ NON-AMBULATORY

1055

**EDP History & Physical Worksheet**
- General Adult
TRAUMA

Addressograph

Identification

NAME   Conrad Robert   01143   02294   5-23-01

Level 1, 2, 3 Documentation - 1 to 3 elements | All elements not circled/struck/checked/annotated - were not pertinent | Level 4 - 4+ elements or 3 chronic or inactive conditions | Level 5: 4+ elements or 3 chronic or inactive conditions | Room

**Chief complaint:**

Time seen
by physician

Age 70

Sex M

□ Symptom/Location

□ Severity/Radiation Pain Severity (1-10)        /10

□ Modifying Factors

□ Context/Mechanism of injury

□ Quality

□ Duration

□ Timing                                    □ Risk

Pt. was seen By
Dr. Sansaufer

□ Associated Signs & Sx                     □ EMS Direction

| Level 1, 2, 3 Documentation - 1 system, problem pertinent | Level 4 Documentation - 2 to 9 systems | | | Level 5 Documentation - 10+ systems | | |
|---|---|---|---|---|---|---|
| ☐ All systems negative except as noted ☐ Unable to fully assess due to: ( ) altered LOC ( ) patient condition ( ) other | **ENT** sore throat hoarse N | nosebleeds throat swelling | rhinorrhea hearing loss | **GU** dysuria frequency hematuria | discharge irreg menses | dyspareunia flank pain |
| | | | | **PSY** change MS confusion | agitation depression | suicidal hostile |
| ☑ All normal   strike negatives   Circle positives | **CV** chest pain palpitations N | rapid ht beat slow ht beat | LE edema orthopnea | **MUS** myalgias arthralgias | neck/back pain inflammation | redness heat |
| | | | | **MET** fatigue weakness | polyuria polydipsia | hair change heat tolerance |
| **CON** fever chills high BP weight loss dizzy weak | **RES** SOB pleuritic CP hemoptysis N | prod. cough nonprod. cough | DOE PND | **SKIN** rash swelling | bruising lacerations | contusions abrasions |
| | | | | **HEME** bleeding bruising | nodes petechiae | |
| **EYE** redness discharge visual loss pain blurred vision change | **GI** nausea vomiting melena N | diarrhea constipation | pain bloating | **NEURO** headache weakness change speech | numbness change LOC | change funct paresthesias |
| | | | | **ALL** rhinorrhea asthma | atopic dermat. sneezing | |
| Level 1, 2, 3 Documentation - None | Level 4 Documentation - One area | | | Level 5 Documentation - 2 of 3 areas | | |

**Past Medical History**

**MED/SURG Hx**
DM    HBP    CAD    GI Bleed
CVA    CA    Recent Surgery
TETANUS
LMP    G__ P__    Contraception

**Fam Hx**
DM    HBP    CA
CAD    CVA

**Social Hx**
Tobacco    Marital Status
ETOH    Sub Abuse    Lives Alone

**ALLERGIES & MEDS**
☐ See Nurses Notes.

☐ See Nurses Notes.

Information gathering & documentation. Testing. Document abnormal findings.

**Diagnostic**

| Lab | | | | EKG | |
|---|---|---|---|---|---|
| ☑ CBC | ☑ CHEM   BMP | X-Ray KS | | ☐ 12 Lead | ☐ Rhythm Strip |
| ☐ HCG | ☐ Cardiac markers | KUB c cross table | | Rate | Rhythm |
| ☐ Amylase/Lipase | ☐ ABG ETOH/ASA | | | Axis | Intervals |
| ☐ PT/PTT | ☐ Culture | | | | |
| ☐ ESR | | | | Interpreted by: (Initials) | Time: |
| ☐ Review old charts | | | | | |
| ☐ Consultation   Dr. | Time Called | Time answered | Time arrived | ☐ Pulse oximetry and interpretation ☐ Repeat pulse oximetry and interpretation | |

© Copyright 2000 Team Health, Inc. All Rights Reserved. Not to be reproduced without permission

Version #99129

1057

**EDP History & Physical Worksheet**
~~General Adult~~
TRAUMA

Addressograph

Identification

Conrad Robert    0143-00094    5-23-01

NAME    All elements not circled/struck/checked/annotated - were not pertinent    Room

| Level 2, 3 – 2 to 4 body areas / organ systems | Level 4 – 5 to 7 body areas / organ systems | Level 5 – 8 or more body areas / organ systems |

## Physical Examination

☑ Normal  Circle positives and provide additional documentation

☐ Physical Examination incomplete due to critical condition of patient.

**CONS**
- ☐ Vital signs per nurses notes
- ☐ Well developed, well nourished
- ☐ No acute pain/distress
- ☐ Odor ETOH

**PSYC**
- ☐ Alert and oriented to TPP
- ☐ No abnormalities of mood or affect
- ☐ Memory (recent and remote) intact

more below ☐

**EYES**
- ☐ PERRL
- ☐ Conjunctivae and lids normal
- ☐ Fundi and discs normal
- ☐ EOM normal

more below ☐

**ENT**
- ☐ Otoscopic exam of external canal and TMs normal
- ☐ Nasal mucosa, turbinates, and septum normal
- ☐ Mouth, tongue, and pharynx normal
- ☐ Pharynx without edema, exudate, or injection

more below ☐

**NECK**
- ☐ Neck supple
- ☐ No JVD
- ☐ No thyromegaly
- ☐ No bruits

**CHEST**
- ☐ No masses or tenderness
- ☐ Breasts symmetric
- ☐ No discharge

more below ☐    more below ☐

**RESP**
- ☐ Normal respiratory effort and excursion
- ☐ No rales, ronchi or wheezes
- ☐ Normal to percussion
- ☐ Equal air entry

more below ☐

- ☐ Normal PMI with no thrills, RSR
- ☐ No murmurs or gallops
- Normal carotids ☐ normal abd aorta ☐ normal femorals ☐ normal pedals
- No edema or varicosities
- ☐ Normal capillary refill
- ☐ Distal pulses present

more below ☐

**NEUR**
- ☐ Normal speech
- ☐ CN II-XII intact
- ☐ DTRs normal, no pathologic reflexes
- ☐ Normal motor and sensory function

more below ☐

**GI**
- ☐ No masses, tenderness, rebound or guarding
- ☐ Normal liver, spleen, kidney
- ☐ No hernia
- ☐ Rectal, not indicated ☐ rectal normal ☐ hemoccult negative
- ☐ Normal bowel sounds

more below ☐

**GU**
- ☐ Genitalia normal to inspection
- ☐ No masses, tenderness or adenopathy
- ☐ Genitalia normal to palpation
- ☐ Normal cervix    Normal bimanual ☐ bladder ☐ uterus ☐ adnexa ☐

more below ☐

**LYMPH**
- ☐ No adenopathy of neck
- ☐ No adenopathy of axillae
- ☐ No adenopathy of groin
- ☐ No adenopathy, other _____

more below ☐

**MUS**
- ☐ Normal gait and station     ☐ No ligamentous injury
- ☐ Normal digits and nails     ☐ Normal to palpation
- ☐ No tendon injury            ☐ Normal strength/tone
- ☐ Proximal and distal joint normal  ☐ Neurovascular status intact
- ☐ No F.B. noted

more below ☐

**SKN**
- ☐ Normal to inspection
- ☐ Normal to palpation

more below ☐

### CRITICAL CARE MUST BE TIME DOCUMENTED

☐ Laceration    Length _____ cm.    Layered Y/N
☐
☐
☐
☐

**Procedures**

☐ CRITICAL CARE TIME BELOW **DOES NOT** INCLUDE TIME
FOR SEPERATELY BILLED PROCEDURES.

**CRITICAL CARE** Time _____ 30-74 minutes ☐    75-105 minutes ☐

**PHYSICIAN'S ORDERS**

**Documentation of Medical Decision Making process, including differential diagnoses, nature and severity of problem, risk of morbidity and mortality and other factors.**

Initial Impression/Differential Diagnoses

Additional history, exam, reassessments

| Primary Diagnosis | Secondary Diagnosis |
| Secondary Diagnosis | Secondary Diagnosis |

| Condition | Disposition | Prescriptions |
| ☐ Stable ☐ Improved | ☐ Disch. ☐ Admit ☐ AMA ☐ Transfer ☐ Exp.  Location | |

See D/C Instructions ☐

D/C Instructions/Sheet # _____

Chart complete when checked ☐

☐ NOTE DICTATED

Signature: _____

© Copyright 2000 Team Health, Inc. All Rights Reserved. Not to be reproduced without permission    Version #03196

1264

1060

STATE OF ALABAMA                                    *
                                                   *        COUNTY OF ____COFFEE____
OFFICE OF THE DISTRICT ATTORNEY                     *
                                                   *        DIVISION OF ____ENTERPRISE____
TWELFTH JUDICIAL CIRCUIT                            *
                                                   *
                                                   *              719-2055

# DISTRICT ATTORNEY'S SUBPOENA

¡TO ANY LAWFUL OFFICER OF THE STATE OF ALABAMA;

PURSUANT TO § 12-17-184 (18) AND § 12-21-245, CODE OF ALABAMA,

YOU ARE COMMANDED TO SUMMON:

KEEPER OF RECORDS; ENTERPRISE MEDICAL CENTER, ENTERPRISE, AL;   ANY AND ALL MEDICAL RECORDS,

LAB REPORTS, BLOOD, HAIR, SALIVA AND BODILY FLUIDS ON ROBERT CONRAD WHO WAS TREATED AT THIS

FACILITY ON MAY 23rd, 2001.
PERSONALLY TO BE AND APPEAR BEFORE ____District Attorney, Mark E. Fuller____

_____ AT

98 N. EDWARDS STREET, ENTERPRISE, AL
_____ ON

THE _____ DAY OF ____INSTANTA_____, 19 _____, AT _____ O'CLOCK

_____. M., AND UNTIL DULY DISCHARGED BY DUE PROCESS OF LAW.

WITNESS MY HAND, THIS _____23rd_____ DAY OF ____MAY_____, 19 __2001__

       ┌─            **Special Instructions**            ┐

         IN LIEU OF PERSONAL APPEARANCE, CERTIFIED        MARK E. FULLER
         COPIES MAY BE RELEASED TO THE SERVING            DISTRICT ATTORNEY
         OFFICER.                                         TWELFTH JUDICIAL CIRCUIT


                                                          BY _____

                                                              DISTRICT ATTORNEY

       └─                                     ┘

A COPY OF THIS SUBPOENA WAS SERVED TO THE PERSON NAMED ABOVE BY

_____ ON _____5-23-01_____
                                                        (Date)

                                                   _____
                                                   Signature of Server

1061

I, _Anita Messick_, hereby certify and affirm in writing that I am _Health Information Manager_ of _Medical Center Enterprise_, a hospital organized or operated pursuant to or under the laws of Alabama, located at _Enterprise_, Alabama, that I am custodian of the medical records of said hospital and that the within copy of said hospital records are an exact, full, true and correct copy of records pertaining to _Robert Conrad_. I further certify that these records are kept in the normal course of business at said hospital.

All of which I hereby certify and affirm on this _23rd_ day of _May_ _2001_.

_Anita Messick_

Sworn to and subscribed to before me this the _23rd_ day of _May_ _2001_.

_Martha M Adams_
Notary Public

My commission expires on _26th_ day of _April_, _2001_.

STATE OF ALABAMA

OFFICE OF THE DISTRICT ATTORNEY

TWELFTH JUDICIAL CIRCUIT

COUNTY OF ___COFFEE___

DIVISION OF ___ENTERPRISE___

# DISTRICT ATTORNEY'S SUBPOENA

TO ANY LAWFUL OFFICER OF THE STATE OF ALABAMA;

PURSUANT TO § 12-17-184 (18) AND § 12-21-245, CODE OF ALABAMA,

YOU ARE COMMANDED TO SUMMON:

KEEPER OF RECORDS; ENTERPRISE MEDICAL CENTER, ENTERPRISE, AL; ANY AND ALL MEDICAL RECORDS,

LAB REPORTS, BLOOD, HAIR, SALIVA AND BODILY FLUIDS ON ROBERT CONRAD WHO WAS TREATED AT THIS

FACILITY ON MAY 23rd, 2001.

PERSONALLY TO BE AND APPEAR BEFORE ___District Attorney, Mark E. Fuller___ AT

_____ ON

98 N. EDWARDS STREET, ENTERPRISE, AL

THE_____DAY OF ___INSTANTA___, 19_____, AT_____O'CLOCK

_____. M., AND UNTIL DULY DISCHARGED BY DUE PROCESS OF LAW.

WITNESS MY HAND, THIS___23rd___DAY OF ___MAY___, 19 2001

```
┌      Special Instructions      ┐

   IN LIEU OF PERSONAL APPEARANCE, CERTIFIED
   COPIES MAY BE RELEASED TO THE SERVING
   OFFICER.



└                                ┘
```

MARK E. FULLER
DISTRICT ATTORNEY
TWELFTH JUDICIAL CIRCUIT

BY _____
       DISTRICT ATTORNEY

A COPY OF THIS SUBPOENA WAS SERVED TO THE PERSON NAMED ABOVE BY

_____ ON __5-23-01__
                                                      (Date)

_____
Signature of Server

**STATE'S EXHIBIT**

3

# ENTERPRISE POLICE DEPARTMENT

CASE NUMBER: O1 05 3060

LOCATION: CID MCE

DATE: 05/24/01 TIME: 1408

## BEFORE YOU ARE ASKED ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

1.  You have the right to remain silent.

2.  Anything you say can be used against you in court or other proceedings.

3.  You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

4.  If you cannot afford a lawyer, one will be appointed without cost to you before any questioning, if you wish.

5.  If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time you wish.

## WAIVER OF RIGHTS

I have been advised of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

NAME: _Unable to sign_

SIGNATURE: _____

EDUCATION: _9th_

LANGUAGE: _English_

WITNESS: _____

WITNESS: _____

Enterprise P.D. Form 96-041

**STATE'S EXHIBIT**

4

1064

Medical Center Enterprise
400 North Edwards Street
Enterprise, AL  36330

May 23, 2001

Re:  Robert Conrad

To Whom It May Concern:

The enclosed copies of the medical record on patient Robert Conrad, date of birth
September 27, 1980 do not constitute a complete record.  When the health care providers
involved in this case have completed the records, this facility will provide a complete
copy of this patients file.  The enclosed certified copies cover the treatment rendered to
the patient to this point but again may not be totally complete.

Health Information Manager

/am

MC-263
REV. 2/00

# PHYSICIAN'S ORDERS

MC-___ (2/00)

**USE BALL POINT PEN ONLY AND PRESS FIRMLY!**

...LES

Weight

Another brand of generically equivalent product may be dispensed unless checked or initialed.

| CRT ORDER # | PHYSICIAN'S ORDERS | ADDRESSOGRAPH |

☐ Inpatient   ☐ Outpatient   ☐ OP surgery

5.23.01
2.45/p
Adt to Day surgery floor —
Dx: 954 plexes O&T forearm

| 1 | Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature | ADDRESSOGRAPH |

5.23.01
4.0/p

① To PL room
② VS q4h, I&O foley
③ NG to LIS, NPO x ice
④ Demerol PCA 25 load, 15 dose,
   6 min interval, 100 hourly limit
⑤ Phenergan 12 (IVP) q4h c N/V
⑥ D5 1/2 NS @ 100/h
⑦ Ancef 1.5 g IVPB q8h
⑧ Pump & wrap legs x 24h
⑨ CBC, CMP in am.

CONRAD, ROBERT
0143-0009-4

| 2 | Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature | ADDRESSOGRAPH |

DC pacu

V.O. Dr. Schwook / KThone RN
5/23/0 @ 1710

5/23/01

| 3 | Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature |

MEDICAL CENTER ENTERPRISE LABORATORY
DREW, JOHN L

CONRAD, ROBERT
Completed: 05/23/01 1437     VER
Spec. Type: Urine          Collected: 05/23/01 1421          [456908]

| Result name | Result | Reference Range |
|---|---|---|
| Color: | Yellow | |
| Clarity: | Clear | |
| Spec Gravity: | 1.020 | 1.001-1.035 |
| pH: | 5.0 | 5.0-8.0 |
| Leukocyte Esterase: | neg | neg |
| Nitrite: | neg | neg |
| Protein: | 100 mg/dl | neg |
| Glucose, Urine: | norm | Neg |
| Ketone, Urine: | neg | Neg |
| Urobilinogen: | norm | < 1.0 mg/dl |
| Bilirubin, Urine: | neg | Negative |
| Blood, Occult: | 50 /ul | Negative |
| Epithelial Cell( /LPF): | 3-5 | |

*ASAP*           E0114300094          ER                  DOB (09/27/1980)
URINALYSIS, ROUTINE                                                     1
---------------------------------------------------------------------

MEDICAL CENTER ENTERPRISE LABORATORY
DREW, JOHN L

CONRAD, ROBERT
Completed: 05/23/01 1437     VER
Spec. Type: Urine          Collected: 05/23/01 1421          [456908]

| Result name | Result | Reference Range |
|---|---|---|
| RBC( /HPF): | 0-2 | |
| WBC( /HPF): | 0-2 | |
| Bacteria( /HPF): | 0 | |
| Casts( /LPF): | 0 | |
| Crystals( /LPF): | Moderate Amorphous Urates | |
| Date/Time: | 05/23/01 1436 | |

End of Report!

*ASAP*           E0114300094          ER                  DOB (09/27/1980)
URINALYSIS, ROUTINE                                                     2
---------------------------------------------------------------------

```
                    MEDICAL CENTER ENTERPRISE LABORATORY
CONRAD,ROBERT                           DREW,JOHN L
Completed: 05/23/01 1409    VER
Spec. Type: Blood               Collected: 05/23/01 1405         [456909]

Result name                 Result                      Reference Range

WBC(1000/mm3):              8.8                         4.0-11.0
RBC(X 10(6)):              4.76                         4.7-6.1
Hemoglobin(gm/dl):        13.9 L                       14-18
Hct(%):                   41.7                         39-49
MCV(fl):                  87.6                         80-94
MCH(pg):                  29.2                         26-33
MCHC(%):                  33.3                         31-36
RDW(%):                   13.0                         10.2-15.5
Platelet Count(X(10)3):   209                          150-357
MPV(fl):                  11.8 H                       7.4-10.4
Lymph-Auto(%):            43.9                         16-46
Mono-Auto(%):              7.6                         2.9-10.0
Gran-Auto(%):             46.0 L                       50-87
*ASAP*                    E0114300094        ER               DOB (09/27/1980)
CBC/AUTO DIFF                                                       1
--------------------------------------------------------------------------
                    MEDICAL CENTER ENTERPRISE LABORATORY
CONRAD,ROBERT                           DREW,JOHN L
Completed: 05/23/01 1409    VER
Spec. Type: Blood               Collected: 05/23/01 1405         [456909]

Result name                 Result                      Reference Range

Auto Lymph Absolute(X(10)3: 3.86 H                      1.2-3.4
Auto Mono Absolute(X(10)3: 0.67 H                       0.11-0.59
Auto Gran Absolute(X(10)3: 4.04                         1.4-6.5
Auto Eos Absolute(X(10)3:  0.17                         0.0-0.7
Auto Basos Absolute(X(10)3: 0.05 L                      0.3-2.0
Date/Time:                 5/23/01 1409
Eos-Auto (%):              1.9                          0.5-4.6
Basos-Auto(%):             0.6                          0.3-2.0
                    End of Report!




*ASAP*                    E0114300094        ER               DOB (09/27/1980)
CBC/AUTO DIFF                                                       2
--------------------------------------------------------------------------
```

1068

MEDICAL CENTER ENTERPRISE LABORATORY

CONRAD,ROBERT                                          DREW,JOHN L
Completed: 05/23/01 1425    VER
   c. Type: Blood            Collected: 05/23/01 1405        [456909]

Result name              Result                    Reference Range

Alcohol, Ethyl(mg/dl):    2.0                        0-10
Date/Time:                05/23/01 1424
                    End of Report!


*ASAP*              E0114300094      ER              DOB (09/27/1980)
ALCOHOL, ETHYL SERUM                                            1
------------------------------------------------------------------------



MEDICAL CENTER ENTERPRISE LABORATORY

CONRAD, ROBERT
                                          DREW, JOHN L
Completed: 05/23/01 1425    VER
S. Type: Blood              Collected: 05/23/01 1405        [456909]

| Result name | Result | Reference Range |
|---|---|---|
| Glucose(mg/dl): | 155.0 H | 70-110 |
| BUN(mg/dl): | 9.0 | 9-20 |
| Creatinine(mg/dl): | 1.2 | 0.8-1.5 |
| Sodium(mmol/L): | 145.0 | 137-145 |
| Potassium(mmol/L): | 2.9 LP | 3.5-5.5 |
| Chloride(mmol/L): | 105.0 | 98-107 |
| $CO_2$(mmol/L): | 17.0 L | 22-30 |
| Anion Gap: | 25.0 | |
| BUN/Creat: | 7.5 | |
| Date/Time: | 05/23/01 1424 | |
| Calcium(mg/dl): | 9.1 | 8.4-10.2 |

End of Report!

*ASAP*              E0114300094        ER              DOB (09/27/1980)
PANEL,BASIC METABOLI                                            1
---------------------------------------------------------------------

MEDICAL CENTER ENTERPRISE LABORATORY

CONRAD, ROBERT                                          DREW, JOHN L
Completed: 05/23/01 1438    VER
S.    Type: Urine              Collected: 05/23/01 1421       [456908]

Result name                 Result                    Reference Range

Phencyclidine:              Negative                  None Detected
Benzodiazephine:           Negative                  None Detected
Cocaine:                    Negative                  None Detected
Amphetamine:               Negative                  None Detected
Cannabinoids:              Positive                  None Detected
Opiates:                    Negative                  None Detected
Barbiturate:               Negative                  None Detected
Comment:                    ER5
Date/Time:                  05/23/01 1438
Triage Comment:             ATTENTION-  The ingestion of natural herbal
                            and plant products containing
                            Ephedra/Ephedra metabolites can produce in
                            urine one or more substances capable of
*ASAP*                 E0114300094        ER              DOB (09/27/1980)
TRIAGE DRUG SCREEN P                                                    1
--------------------------------------------------------------------------------
                   MEDICAL CENTER ENTERPRISE LABORATORY
CONRAD, ROBERT                                          DREW, JOHN L
Completed: 05/23/01 1438    VER
Spec. Type: Urine              Collected: 05/23/01 1421       [456908]

P   lt name                 Result                    Reference Range

                            cross reacting with
                            amphetamine/methamphetamine immunoassays.
              End of Report!



*ASAP*                 E0114300094        ER
TRIAGE DRUG SCREEN P
-------------------------------------------------------

1071

MEDICAL CENTER ENTERPRISE LABORATORY
CONRAD,ROBERT                                    DREW,JOHN L
C pleted: 05/23/01 1425    VER
S   . Type: Blood          .    Collected: 05/23/01 1405       [456909]

Result name                 Result                  Reference Range

Alcohol, Ethyl(mg/dl):      2.0                     0-10
Comment:                    ER5 *&*
Date/Time:                  05/23/01 1424
                      End of Report!


*ASAP*              E0114300094        ER              DOB (09/27/1980)
ALCOHOL, ETHYL SERUM                                              1
----------------------------------------------------------------------

Developed by the American Association of Nurse Anesthetist - 1991

## PREANESTHESIA EVALUATION

| | Age | Sex | Height | | Weight | |
|---|---|---|---|---|---|---|
| | 70 | (M) F | 70 | in / cm | | lb / mg |

Prc    Procedure    Glap    GSW Abd

Pre-Procedure Vital Signs
B / P 121 / 100 P R T

**Previous Anesthesia / Operations** — umbilical Hernia ⊘    None ☐    **Current Medications** ⊘    None ☐

**Family History of Anesthesia Complications** — None ☐    **Allergies** — NKDA    NKDA ☐

**AIRWAY / TEETH / HEAD & NECK**    MLI chiptooth

History From:
☐ Patient    ☐ Significant Other
☐ Parent / Guardian    ☐ Chart
☐ Communication / Language Problems
☐ Poor Historian

| SYSTEM | WNL | COMMENTS | DIAGNOSTIC STUDIES |
|---|---|---|---|
| **RESPIRATORY**<br>Asthma / Productive Cough<br>Bronchitis / Recent URI<br>COPD / SOB<br>Dyspnea / Tuberculosis<br>Orthopnea<br>Pneumonia | ☐ | Tobacco Use: ☑ Yes ☐ No ___ Packs / Day for ___ Years | **EKG**<br><br>**Chest X-ray** |
| **CARDIOVASCULAR**<br>Abnormal EKG / Hypertension<br>Angina / MI<br>ASHD / Murmur<br>CHF / Pacemaker<br>Dysrhythmia / Rheumatic Fever<br>Exercise Tolerance / Valvular Disease | ☒ | | **Pulmonary Studies** |
| **HEPATO / GASTROINTESTINAL**<br>Bowel Obstruction<br>Cirrhosis<br>Hep / Jaundice<br>HH / Reflux<br>N / Vomiting<br>Ulc. | ☐ | Ethanol Use: ☐ Yes ☐ No  Frequency<br>"Street Drug" Use: ☐ Yes ☐ No  Frequency ⊘ CPA | **Other**<br>⊘ TWC |
| **NEURO / MUSCULOSKELETAL**<br>Arthritis / Muscle Weakness<br>Back Problems / Neuromuscular Dis.<br>CVA / Stroke / TIAs / Paralysis<br>DJD / Paresthesia<br>Headaches / ↑ ICP / Syncope<br>Loss of Consciousness / Seizures | ☒ | | **LABORATORY STUDIES**<br>Hgb / Hct / CBC |
| **RENAL / ENDOCRINE**<br>Diabetes<br>Renal Failure / Dialysis<br>Thyroid Disease<br>Urinary Retention<br>Urinary Tract Infection<br>Weight Loss / Gain | ☒ | | **Electrolytes**<br><br>**Urinalysis** |
| **OTHER**<br>Anemia / Immunosuppressed<br>Bleeding tendencies / Pregnancy<br>Cancer / Sickle Cell Dis. / Trait<br>Chemotherapy / Recent Steroids<br>Dehydration / Transfusion History<br>Hemophilia | ⊘ | | **Other** |

**Problem List / Diagnoses**    GSW Abd    Tobacco

**Planned Anesthesia / Special Monitors**    OGET-ASF

**Pre-Anesthesia Medications Ordered**

**Evaluator Signature** _____    **Date** 5/28/4    **Time** 1400

| PHYSICAL STATUS | 1 2 3 4 5 E |
|---|---|

## POSTANESTHESIA NOTE

Signed _____    Date ___/28/__    Time ___

**PATIENT IDENTIFICATION**    Robert Combs

FORM # ANE-41 / PICS # 0917610

1075

**MEDICAL CENTER ENTERPRISE**

## ANESTHESIA RECORD

Developed by the American Association of Nurse Anesthetists - 1991

PATIENT IDENTIFICATION

| | START | STOP |
|---|---|---|
| Anesthesia | 1540 | 1704 |
| Procedure | | |

Procedure: Glob / Laparotomy

OR No: Page of Surgeon(s):

Date:

Anesthesia Provider

### PRE-PROCEDURE
- ☐ Identified: ☐ ID Band ☐ Questioning
- ☐ Chart Reviewed ☐ Permit Signed
- ☐ NPO Since
- Pre-anesthetic State: ☐ Calm
- ☐ Awake ☐ Asleep
- ☐ Apprehensive ☐ Confused
- ☐ Uncooperative ☐ Unresponsive

### PATIENT SAFETY
- ☐ Anes. Machine # ☐ Checked
- ☐ Safety Belt On ☐ Axillary Roll
- ☐ Armboard Restraints ☐ Arms Tucked
- ☐ Pressure points checked and padded
- ☐ Eye Care: ☐ Ointment ☐ Saline
- ☐ Taped ☐ Pads ☐ Goggles

### MONITORS AND EQUIPMENT
- ☐ Steth: ☐ Precord ☐ Esoph ☐ Other
- ☐ Non-invasive B/P: ☐ Left ☐ Right
- ☐ Continuous EKG ☐ V Lead EKG
- ☐ Pulse Oximeter ☐ Oxygen Sensor
- ☐ End Tidal CO₂ ☐ Gas Analyzer
- ☐ Temp. ☐ Nerve Stimulator
- ☐ Warming Blanket ☐ EEG ☐ Doppler
- ☐ Airway Humidifier ☐ Fluid Warmer
- ☐ NG/OG Tube ☐ Foley Catheter
- ☐ Art. Line
- ☐ CVP
- ☐ PA Line
- ☐ IV(s)

### ANESTHETIC TECHNIQUE
- General: ☐ Pre-Oxygenation ☐ L.T.A.
- ☐ Rapid Sequence ☐ Cricoid Pressure
- ☐ Intravenous ☐ Inhalation
- ☐ Intramuscular ☐ Rectal
- Regional: ☐ Spinal ☐ Epidural
- ☐ Axillary ☐ Bier Block ☐ Ankle Block
- ☐ Position
- ☐ Prep ☐ Local
- ☐ Needle
- ☐ Drug(s)
- ☐ Dose ☐ Attempts x
- ☐ Site ☐ Level
- ☐ Catheter ☐ See Remarks
- Other: ☐ M.A.C. ☐

### AIRWAY MANAGEMENT
- Intubation: ☐ Oral ☐ Tube Size
- ☐ Stylet used ☐ Nasal ☐ Regular
- ☐ Magill's ☐ Direct ☐ TRAE
- ☐ Fiber optic ☐ Blind ☐ Armored
- ☐ Blade ☐ Laser
- ☐ Secured at ___ cm ☐ Endobronch.
- ☐ Attempts x ☐ ET CO₂ present
- ☐ Breath sounds
- ☐ Uncuffed, leaks at ___ cm H₂O
- ☐ Cuffed ☐ Min. occ. pres. ☐ Air ☐ NS
- Airway: ☐ Oral ☐ Nasal ☐ Difficult,
- Circuit: ☐ Circle ☐ NRB ☐ See Remarks
- ☐ Mask Case ☐ Nasal Cannula
- ☐ Via Tracheostomy ☐ Simple O₂ mask

### RECOVERY
Location Recovery Room Time 1656
B/P 73/44 O₂ Sat 100
P 75 R 513
- ☐ Awake ☐ Stable ☐ Nasal Oxygen
- ☐ Drowsy ☐ Unstable ☐ Mask Oxygen
- ☐ Somnolent ☐ Intubated ☐ T-piece Oxygen
- ☐ Unarousable ☐ Ventilator ☐ Oro/nasal airway

Recovery Notes

### FLUID TOTALS
Crystalloid 1500  EBL Min
Blood         Urine 100

TOTALS

REMARKS

Stable —

Resp @ enter pt

Spline 1532

1615 Unasyn 1.5gm

Extubated —

SX, SVC

RR >12 TV?

Spont Eye o

Rolled to gurne
to RR c O₂
Small (low)
Total Amt

SYMBOLS
- ✕ ANESTHESIA
- ⊙ OPERATION
- ∨ B/P CUFF PRESSURE
- ᛮ ARTERIAL LINE PRESSURE
- ▲ MEAN ARTERIAL PRESSURE
- • PULSE
- ○ SPONT RESP
- ∅ ASSISTED RESP
- ⊗ CONTROLLED RESP
- T TOURNIQUET

| TIME | | | | | | | | TOTALS |
|---|---|---|---|---|---|---|---|---|
| Oxygen (L/min) | | 30 | 1600 | 30 | | | | |
| N₂O ☐ Air (L/min) | | | | | | | | |
| Halo-En-For | | 60 | 9 | 9 | 9 | 4 | ✕ | |
| Sub-Mini-Stif mores | | | 50 | | | | | |
| Narce-Dipro-Dev | | | | | | | | |
| Tro-Nor-Pav | | | 2 | 4 | | | | |
| Vassed-Valium | | | | | | | | |
| Demerol | | | | | | | | |

AGENTS

Neostigmine mg
Robinal mg       0.6

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Turn | | 1000 | | | | | | |
| Urine (ml) | | | 100 | | | | | |
| EBL (ml) | | | | | | | | |

| EKG | SR | SR | SR | SR | SR | SR | | |
|---|---|---|---|---|---|---|---|---|
| % O₂ Inspired | .90 | 5 | 5 | 5 | 5 | 5 | | |
| O₂ Saturation | 100 | 100 | 100 | 100 | 100 | 100 | | |
| End Tidal CO₂ | 67 | 30 | 31 | 31 | | | | |
| Temp ☐ C ☐ F | 35.5 | | 44 | 44 | 4/4 = Sustain | | | |
| | 70? | | | | | | | |

MONITORS

### VITAL SIGNS

| Baseline Values | 200 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 180 | | | | | | | |
| | 160 | | | | | | | |
| B/P | 140 | | | | | | | |
| | 120 | | | | | | | |
| | 100 | | | | | | | |
| | 80 | | | | | | | |
| | 60 | | | | | | | |
| | 40 | | | | | | | |
| R | 20 | | | | | | | |

### VENT

| Tidal Volume | | 860 | 840 | 800 | 600 | 836 | 802 | | |
|---|---|---|---|---|---|---|---|---|---|
| Resp. Rate | | 5 | 5 | 5 | 5 | 5 | 5 | | |
| Peak Pressure | | 5 | 5 | 5 | 6 | 6 | 5 | | |
| PEEP | | | | | | | | | |

Symbols for Remarks

Position

CHART

052301

10⁷⁴

**Medical Center Enterprise**
**PERIOPERATIVE RECORD**

GE 2 OF 3
TE 5/23/01

| Potential for injury | Patient will remain free of injury | ☑ maintain proper body alignment / safety devices<br>☑ appropriate padding and support devices<br>☑ positioning done according to guidelines<br>☑ follow electrical / laser safety protocol | ☐ Total procedure performed with no apparent injury |
|---|---|---|---|

ADDRESSOGRAPH

| Potential for foreign body in surgical wound | Patient is free of any foreign body post-op | ☑ surgical count performed according to policy<br>☑ report discrepancy immediately and initiate corrective action | ☑ Patient is free of retained foreign body post-op |
|---|---|---|---|

Intraoperative Record:
Date: 5/23/01
OR #: 2

ROOM TIM
1500

| Potential for fluid volume deficit related to blood and fluid loss | Patient's fluid and electrolyte balance is maintained | ☑ check patient's lab values for baseline<br>☑ suction canisters & lap sponges in clear view<br>☑ calculate drainage from foley, N/G's and other drains<br>☑ assist with IV fluids and blood replacements | ☑ Patient fluid volume is monitored during surgery |
|---|---|---|---|

Moved to OR Table: ☑ Extra Help   ☐ s Diffic
☐ c̄ Difficulty   ☐ p̄ Induction   ☐ Nurses Arms
☐ c̄ Roller
OR Table Used: ☑ Regular   ☐ Fracture
☐ Stretcher   ☐ Cysto   ☐ C-Arm Table
ANESTHESIA: ☐ General / Mask
☑ General / Endotracheal   ☐ Spinal   ☐ Epidu
☐ Bier Block   ☐ Axillary Block
☐ Monitored Anesthesia Care (MAC)   ☐ Local
☐ Other _____

| Potential for lowered body temperature related to hypothermia | Patient will maintain body temperature within normal limits | ☑ apply warm blankets throughout procedure<br>☑ hyperthermia unit used if required<br>☑ expose only as much of patient as needed for prep and surgical site<br>☐ use warm irrigating solutions | ☑ Patient's body temperature within normal limits |
|---|---|---|---|

Signature: _Emily Joh L Rn._

Date/Time: 5/23/01 - 1500

**INTRAOPERATIVE DATA**
**PREOPERATIVE DIAGNOSIS:** Gunshot Wound to Abdomen + left arm

| | | | |
|---|---|---|---|
| SURGEON | S. Sawyer | , M.D. SURGEON | |
| SURGEON | S. Roder | , M.D. NURSERY RN | |
| PEDIATRICIAN | | , M.D. ANESTHETIST | G. Altman, CRNA |
| ANESTHESIOLOGIST | Schwock | ANESTHETIST | |

| CIRCULATOR | J. Yarbrough RN | OUT @ 1425 | IN @ |
| | | IN @ 1600 | OUT @ |
| CIRCULATOR | J. Chambers | OUT @ | IN @ |
| SCRUB | V. Smith RN | IN @ | OUT @ 1610 |
| SCRUB | A. Hovey, RN | IN @ 1610 | |
| SCRUB | J. Parker, CST | | |

LASER TECH:
OTHERS:
MEDICAL OBSERVERS:
SALES REP:

INCISIO
15

**PROCEDURE(S):** Diagnostic Laparoscopy, Exploratory Laparotomy, Repair of Gunshot Wound to Colon (Transverse) Removal of Bullet from Left ARM

**POSITIONS:** Safety Strap ☑ Yes ☐ No ☐ N/A   Location: mid thigh   ☐ Other _____
☑ Supine ☐ Prone ☐ Jack-Knife ☐ Frogleg ☐ Lateral (RT./LT.) ☐ Semifowler   ☐ Time Down: ___
☐ High Lithotomy (Time Up: ___ : Time Down: ___ ) ☐ Low Lithotomy (Time Up: ___ : Time Down: ___
**ARMS:** ☑ Tucked at side (RT./LT.) ☑ On Armboards (RT./LT.) ☐ On Handtable (RT./LT.) ☐ Padded Mayo (RT./LT.)
**SUPPORT DEVICES:** ☐ Chest Rolls ☐ Foot Board ☐ Axillary Rolls (RT./LT.) ☐ Chick Leg Holder ☐ Headrest ☐ Beanbag
☐ AOA Lateral Positioner ☐ Well Leg Holder ☐ Eggcrate Pads ☐ Shoulder Rolls ☐ Other _____
Location Left lateral By Whom: _____
Location Pubic area By Whom: _____
__ NA **SKIN PREP:** ☑ Betadine ☐ Hibiclens ☐ Alcohol ☐ Other _____   OR Room _____
__ NA **SKIN SHAVE:** ☑ Yes ☐ No ☐ Patient Unit   : _____ By Whom: _____
**CATHETERS:** __ NA ☐ Foley Catheter in OR; Size: _____ ; CC H₂O in balloon; Color of Urine yellow   Post Op. Color _____
__ NA ☐ Foley Catheter from Patient Unit: 150   CC in bag; Color of Urine _____   D/C'd _____
__ NA ☐ Straight Cath in OR: Time _____ ; By Whom: _____   Output: _____
PROSTHETIC DEVICE: ☐ Yes ☑ No (If Yes See Implant Sh
☐ Yes ☐ No (If Yes See Transfusion Sheet)

1075

Name of Officer _B. Mathews_   Place _MCB 207_
Title _Investigator_   Date _5-28-07_
Time _4:45_

## YOUR CONSTITUTIONAL RIGHTS ACCORDING TO THE MIRANDA WARNING

Before we ask you any questions, you must understand your rights.

1. You have the right to remain silent.

2. Anything you say can and will be used against you in a court of law.

3. You have the right to talk to a lawyer and have him present with you while you are being questioned

4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning you wish.

5. You can decide at any time to exercise these rights and not answer any questions or make any statemen

1. Do you understand each of these rights I have explained to you?   Yes ____✓____ No _____

2. Having these rights in mind, do you wish to talk to us now?   Yes __✓__ No _____

## WAIVER OF RIGHTS

I have read, (or had read to me), this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promise or threats have been made to me and no pressure of any kind has been used against me to get me to make a statement.

Witness: _Dwight Holley_   Signed: _Robert Conrad_

Witness: _____   Date: _5/25/07_

Time: _____

Defendant's Name: _____   Age: _____ D.O.B. _____

Address: _____

Education: Grade completed - 1   2   3   4   5   6   7   8   (9)   10   11   12

College:   Yes _____   No __✓__

Can you read and comprehend the english language?   Yes __✓__ No ____

STATE'S
EXHIBIT
6



| Mathews: | Today's date is 5-25 of 2001.  The time is 4:45 p.m.  We're in room 207 of the Medical Center Enterprise.  That's the room of Robert Conrad.  Present are uh' myself, Bruce Mathews, Investigator with the D.A.'s Office, Dwight Holley, Investigator of the D.A.'s Office, Rick Hauser, Investigator with Enterprise Police Department, Michael Hines, Deputy with Coffee County Sheriff's Department.  Mr. Conrad I have shown you and read to you this rights form and gone over these rights with you, is that correct? |
|---|---|
| Conrad: | Yes. |
| Mathews: | And your name is Robert Conrad correct? |
| Conrad: | Yes sir. |
| Mathews: | What 's your date of birth? |
| Conrad: | 9-30-80. |
| Mathews: | Okay.  And you have indicated to me that you understood these rights and that you having those rights in mind that you wish to talk to us, is that correct? |
| Conrad: | Yes sir, |
| Mathews: | Okay.  Again we're gonna show you a piece of clothing and let you identify what if anything you know about that clothing.  Can I lay this right here? |
| Conrad: | Yeah go ahead. |
| Mathews: | This tape recorder.  All right. |
| Hauser: | Uh' Mr. Conrad I'm showing you a blue pair of Nike Air blue and black pair of Nike Air tennis shoes, and you indicated to me earlier that these in fact are your shoes, is that correct? |
| Conrad: | Yes sir. |
| Hauser: | And that you told us that you had loaned these to who? |
| Conrad: | Brian Yeoman. |
| Hauser: | Okay and when was that sir? |
| Conrad: | Like a week after I met him. |



STATE'S
EXHIBIT

6 A

1

s/c3

| | |
|---|---|
| Hauser: | Okay. Where was the last place you saw these shoes at? |
| Conrad: | At his house. |
| Hauser: | And when was that sir? |
| Conrad: | Like (unintelligible) 6 days ago. |
| Hauser: | 6 days ago? And where does he live at? |
| Conrad: | In Green Tree Apartments. |
| Hauser: | Apartment number? |
| Conrad: | I, I don't know. |
| Hauser: | Okay. All right, anything else about the shoes? |
| Mathews: | Was he wearing those shoes at the robbery the other day? |
| Conrad: | I don't know sir. |
| Mathews: | You don't know. You wouldn't recognize your own shoes? |
| Conrad: | I wasn't paying attention to his feet (unintelligible). |
| Mathews: | All right. |
| Hauser: | This is a black Polo shirt. Sig Sigfield, Sig or whatever do you recognize this shirt sir? |
| Conrad: | No sir. |
| Hauser: | You never seen it before? |
| Conrad: | Um' um'. |
| Hauser: | You know anything about it, does it belong to you? |
| Conrad: | No sir. |
| Hauser: | Does it belong to Mr. Yeoman? |
| Conrad: | No sir. |

2

Hauser:     All right, you don't recognize any part of that shirt at all?

Conrad:     I don't (unintelligible)

Hauser:     Okay.

Group:      Mumbling (unintelligible)

Mathews:    You ever worn that shirt before?

Conrad:     No sir.  That's the God's truth.

Mathews:    Huh?

Conrad:     I said that's the God's truth.

Group:      Mumbling (unintelligible)

Hauser:     All right Mr. Conrad, this is a white tennis shirt, or tennis t-shirt, white t-shirt, short with the uh' sleeves removed, Ronald McKinnon foot ball camp.  Have you ever seen this shirt before?

Conrad:     Yes sir.

Hauser:     You know who's shirt this is?

Conrad:     That's the shirt I had on.

Hauser:     This is your shirt, this is the shirt you had on?

Conrad:     Yes sir.

Hauser:     Okay. When was the last time you wore this shirt?

Conrad:     The day that the robbery.

Hauser:     The day of the robbery.

Conrad:     Yes sir.

Hauser:     It's the day you were shot?

Conrad:     Yes sir.

Hauser:     Okay, this is in fact your shirt?

1080

Conrad:     Yes sir.

Hauser:     Okay.  And you recognize it as such.

Conrad:     Yes sir.

Hauser:     When was the last time you saw that shirt?

Conrad:     The day of the robbery, I had it on.

Hauser:     You had it on?

Conrad:     Yes sir, I got shot.

Hauser:     Okay.  You got any questions about it.

Mathews:    What happened with that shirt, where'd it, how did we find it? You know?

Conrad:     No that's

Mathews:    Well what'd you do with it?

Conrad:     Oh that's the shirt Brian Smith took off me.

Mathews:    Brian Smith took it off of you?  Where?

Conrad:     When I was in the back of the uh' LTD.

Mathews:    Where were you parked at?

Conrad:     At his house.

Mathews:    In Green Tree.  You don't know what he did with it?  Did he leave the car with it?

Conrad:     Sir.

Mathews:    Did he leave the car with it?

Conrad:     Hum?

Mathews:    Did he get out of the car after he took it off of you and take it anywhere?

Conrad:     Oh, oh yes sir.

4

Mathews:    You didn't see where he went?

Conrad:     I was laying down when he took it off, put my jersey on and I just
            laid back down in the back seat.

Mathews:    Okay.  Was there any other clothes he took off of you?

Conrad:     No sir.

Mathews:    What size are those shoes, do you know?

Conrad:     (unintelligible).

Mathews:    Those those black ones over there.

Conrad:     11 or 10 ½.

Mathews:    Can you look Investigator Hauser and see what size it says in em'?

Hauser:     According to this they are 11 ½.

Mathews:    Okay.  11 ½.

Conrad:     (unintelligible).

Hauser:     Is that about right?  Is that your foot size?

Conrad:     Yes sir, I can I can fit 10's and 11's and 9's.  But I haven't worn
            them shoes yet again.

Mathews:    You haven't what?

Conrad:     I haven't worn my shoes yet again.  Those are the ones I lent to
            Brian Yeoman.

Mathews:    Okay.

Hauser:     What did you have on?

Conrad:     My white Reebok's and some Chaps shorts and that white t-shirt,
            like jersey.

Hauser:     The ones that Detective Roberts recovered from you the night you
            were here in the emergency room?

| | |
|---|---|
| Conrad: | Yes sir. Beside that t-shirt when Brian took it off of me. |
| Mathews: | You got anything else. Is there anything else you thought of since we've been gone that you want to tell us. |
| Conrad: | No sir. |
| Mathews: | Anything else. |
| Conrad: | I'd just like to know um' how can I get my mom to sign this paper? |
| Mathews: | Sign what paper sir? |
| Conrad: | For um' for a lawyer? |
| Mathews: | Oh, |
| Conrad: | Or something like that. |
| Mathews: | I have no earthly idea, that's the man with the Sheriff's Department sitting right there, Deputy Hines. |
| Conrad: | Um' hum'. |
| Mathews: | You'll need to direct that question to him when we leave and I'm sure he'll check with his supervisor and find out how that works, I don't have a clue how it works.   Terminate the interview at 5:55. Correction 4:55. |

**Transcribed by Tonnya Walker**
**Transcribed on May 30, 2001**
**Reviewed by:_____**
**Reviewed on:_____**

Today's Date is May 25, 2001.  The time is 12:16 p.m.  We are in room 207 of the Medical Center Enterprise interviewing Mr. Robert Conrad.  Mr. Conrad's date of birth is September 3, 1980.  He is twenty years of age.  Present in the interview are Bruce Mathews, Dwight Holley and Kyle Hale.  Kyle Hale being of the Enterprise Police Department.

MATHEWS:  Mr. Conrad will you state your name, please?

CONRAD:    Robert Conrad.

MATHEWS:  All right, Mr. Conrad at approximately 10:20 this morning, I read to you
          and showed a form that I told you was your rights form, your Miranda
          Rights Form, do you remember that?

CONRAD:    Yes sir.

MATHEWS:  Okay, did you read that form?

CONRAD:    Yes sir.

MATHEWS:  Did you understand your rights?

CONRAD:    Yes sir.

MATHEWS:  And we've being talking to you off and on in between the nurses coming
          in checking on you and breaks that we've all taken for the last hour or so
          is that correct?

CONRAD:    Yes sir.

MATHEWS:  Did you sign this waiver form?

CONRAD:    Yes sir.

MATHEWS:  Okay, and you've been talking to us freely?

CONRAD:    Yes sir.

MATHEWS:  Has anybody threatened you?

CONRAD:    No sir.

MATHEWS:  Have we made you any promises to get you to tell us anything?

CONRAD:    No sir.



**STATE'S EXHIBIT**

5a

1

S/C2

MATHEWS:  Okay.  Now you understand that I'm about to tape this interview, don't you?

CONRAD:  Yes sir.

MATHEWS:  And what I want to do is I want to go back over what you've told us during our preliminary interview and let you in your own words tell us what happened at the Adult Toy Store some things prior to going there that day, some things prior to going there and that was on the 23rd, two days ago, on the 23rd.  I'm going to let you tell us, you know, what you've been telling us know, is that all right?

CONRAD:  Yes sir.

MATHEWS:  All right.  I'm going to lay this recorder down and you said right here is fine, is that correct.  Okay.  And Mr. Holley will get you started.

HOLLEY:  Go back and give your full name?

CONRAD:  Robert Thomas Conrad.

HOLLEY:  What's your date of birth Robert?

CONRAD:  9-30-80

HOLLEY:  Okay, how old are you?

CONRAD:  Twenty.

HOLLEY:  Okay, what's your social security number?

CONRAD:  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.

HOLLEY:  419-17-50 what?

CONRAD:  95

HOLLEY:  5095.  Where do you presently live, Robert?

CONRAD:  35 Garden Oaks

HOLLEY:  #35 Garden Oaks?

CONRAD:  Apartment 35

HOLLEY:  Apartment 35 and that's in Enterprise, Alabama, is that correct?

CONRAD:    Yes sir, Glover Avenue.

HOLLEY:    On Glover Avenue.  What grade did you complete in school, Robert?

CONRAD:    The ninth.

HOLLEY:    And you an read and write and understand the English language?

CONRAD:    Yes sir.

HOLLEY:    And you understand what we are saying to you today?

CONRAD:    Yes sir.

HOLLEY:    Okay.  Let's go back to May 23$^{rd}$, 2001, that would have been Tuesday

MATHEWS:   Wednesday

HOLLEY:    I'm sorry Wednesday, tell me where you were at on the morning of May the 23$^{rd}$?

CONRAD:    At Brian Smith's house.

HOLLEY:    Where does Brian live at?

CONRAD:    Greentree Apartments

HOLLEY:    Is that in Enterprise, Alabama?

CONRAD:    Yes sir.

HOLLEY:    And you spent the night with Brian?

CONRAD:    Yes sir.

HOLLEY:    What time did you get up?

CONRAD:    Approximately around 8:30 to 9:00 o'clock.

HOLLEY:    Was Brian there when you got up?

CONRAD:    No sir.

HOLLEY:    Where was Brian at?

1086

CONRAD:    He had left, he had told me would be leaving but he didn't tell me where. He just said he'd be back.

HOLLEY:    Was anybody with Brian when he left?

CONRAD:    Yes sir.

HOLLEY:    Who was with Brian?

CONRAD:    I heard Bryan Yeoman was

HOLLEY:    You heard Bryan Yeoman's voice?  You know Bryan Yeoman?

CONRAD:    Yes sir.

HOLLEY:    How do you know Bryan Yeoman?

CONRAD:    I met him through Brian, B. Smith.

HOLLEY:    How long have you known Brian Smith?

CONRAD:    For years, approximately about, a good 4 to 5 years.

HOLLEY:    Four to five years?  Did Brian tell you where he was going?

CONRAD:    No sir.

HOLLEY:    Who else was at the apartment at that morning?

CONRAD:    Brian Smith's mother.

HOLLEY:    What's Brian Smith's mothers name?

CONRAD:    Miss Fay

HOLLEY:    Miss Fay Smith?

CONRAD:    Yes sir.

HOLLEY:    You got up around 8:30 or 9:00?

CONRAD:    Yes sir.

HOLLEY:    What did you do then?

4

CONRAD:     I watched a little TV, ate, sat in the room until Brian Smith and them got back.

HOLLEY:     Did Brian Smith and Bryan Yeoman come back?

CONRAD:     Yes sir.

HOLLEY:     Do you know what time they came back?

CONRAD:     No sir.

HOLLEY:     What did you, did you three do when they got back?

CONRAD:     We sat down for a minute, that's when ah, that's when Brian, B. Smith said let's ride out to the Adult Store?

HOLLEY:     Brian Smith suggested ya'll go to the Toy Store?

CONRAD:     Yes sir.

HOLLEY:     Did ya'll go to the Toy Store?

CONRAD:     Yes sir.  He said he needed some, some little bags or a scale or something.

HOLLEY:     He wanted to get some little bags or scales?

CONRAD:     Yes sir.

HOLLEY:     What would he use the little bags or scales for?

CONRAD:     I don't know sir.

HOLLEY:     Did ya'll go to the Toy Store?

CONRAD:     Yes sir.

HOLLEY:     Who went to the Toy Store?

CONRAD:     All three of us.

HOLLEY:     Name the three that went?

CONRAD:     Me, B. Smith, and Bryan Yeoman

HOLLEY:     When we say B. Smith, were talking about Brian Smith is that correct?

5

| | |
|---|---|
| CONRAD: | Brian Smith, yes sir. |
| HOLLEY: | And when we say B. Yeoman, were talking about Bryan Yeoman, is that correct? |
| CONRAD: | Yes sir. |
| HOLLEY: | How did you go to the Toy Store? |
| CONRAD: | On the gray Corsica. |
| HOLLEY: | On a gray Corsica? |
| CONRAD: | Yes sir. |
| HOLLEY: | Who's vehicle is that? |
| CONRAD: | Bryan Yeoman's mother. |
| HOLLEY: | Bryan Yeoman's mother? |
| CONRAD: | Yes sir. |
| HOLLEY: | Who drove the vehicle? |
| CONRAD: | Bryan Yeoman |
| HOLLEY: | When you arrived at the Toy Store what did you do? |
| CONRAD: | We all three went in. |
| HOLLEY: | What did you do when you got inside? |
| CONRAD: | We walked around and looked at bags and stuff like that, some of the toy stuff, we actually walked around looking at stuff. |
| HOLLEY: | How long were you in the store? |
| CONRAD: | I don't know about 5 or 10 minutes. |
| HOLLEY: | What did you buy? |
| CONRAD: | We didn't buy anything, Brian was checking out the scales and the bags and stuff, and the pipes. |
| HOLLEY: | So nobody bought anything? |

| | |
|---|---|
| CONRAD: | No sir. |
| HOLLEY: | And ya'll stayed in the store 5 to 10 minutes? |
| CONRAD: | Yes sir. |
| HOLLEY: | What did you do next? |
| CONRAD: | Left, that's when we went all back, we all went back to the Greentrees Apartment |
| HOLLEY: | Greentree Apartments? |
| CONRAD: | Yes sir. |
| HOLLEY: | Whose residence is that? |
| CONRAD: | Brian Smith. |
| HOLLEY: | Who drove the vehicle back to the apartment? |
| CONRAD: | Bryan Yeoman |
| HOLLEY: | Bryan Yeoman drove it back? |
| CONRAD: | Yes sir. |
| MATHEWS: | Excuse me, do you know where Bryan Yeoman lives? |
| CONRAD: | Sir. |
| MATHEWS: | Do you know where Bryan Yeoman lives? |
| CONRAD: | Yes sir. |
| MATHEWS: | Where? |
| CONRAD: | Greentree Apartment. |
| MATHEWS: | Okay.  But the apartment that ya'll went back to was Brian Smith's apartment? |
| CONRAD: | Yes sir. |
| MATHEWS: | Okay.  Just wanted to get that on the record. |

HOLLEY:     What did you do when you got back to Brian Smith's apartment?

CONRAD:     That's when they were doing a little chatting to theirselves, that's when Brian said we fixing to go back to the Toy Store and he got in the L, and B. Y. told me to ride with him in the Corsica.

HOLLEY:     Okay now, you want to clarify just what you just said? Ya'll got back to Brian Smith residence and Brian Smith said we need to go back to the Toy Store, is that correct?

CONRAD:     Yes, he said he forgot something or something, or he needed to get something

HOLLEY:     And at that time ya'll left going back to the Toy Store, is that correct?

CONRAD:     Yes sir.

HOLLEY:     Being you, Brian Yeoman and Brian Smith?

CONRAD:     Yes sir.

HOLLEY:     Okay. How did you get back to the Toy Store?

CONRAD:     In the Corsica.

HOLLEY:     Who rode in the Corsica?

CONRAD:     Me and Bryan Yeoman.

HOLLEY:     Who drove, how did Brian Smith get there?

CONRAD:     He drove his mom's car.

HOLLEY:     What kind of car is that?

CONRAD:     The blue LTD, light blue LTD

HOLLEY:     Brian Smith drove his mother's car and you and Bryan Yeoman rode in Bryan Yeoman's mother's car, is that correct?

CONRAD:     Yes sir.

HOLLEY:     Did you stop anywhere before you got to the Toy Store?

CONRAD:     Yes, that's when, that's when Bryan Yeoman and B. Smith sticked there head out the window whispering something to each other.

HOLLEY:     Where was this at?

CONRAD:     Down the road from the Toy Store.

HOLLEY:     Do you know how far from the Toy Store it was?

CONRAD:     Like second or third light pole down or something like that.

HOLLEY:     What did they say to each other at that time?

CONRAD:     I don't know sir.

HOLLEY:     You didn't hear anything?

CONRAD:     No sir.  And I questioned him what we were about to do, he just said, just ride on with me and go in the store with me?

HOLLEY:     Who told you that?

CONRAD:     Bryan Yeoman.

HOLLEY:     Was you suspicious at that time that something might be happening?

CONRAD:     Yes sir.

HOLLEY:     What did you think?

CONRAD:     I really thought they was fixing to try to go in there and try and steal something.

HOLLEY:     You thought they were going in there and try to steal something?

CONRAD:     Yes sir.

HOLLEY:     What made you think that?

CONRAD:     They were whispering and not telling me anything.

HOLLEY:     After they got through whispering and Bryan Yeoman told you just to ride on to the Toy Store with him, what did ya'll do next?

CONRAD:     That's when we went inside the store.

HOLLEY:      You and Bryan Yeoman  went in the store?

CONRAD:      Yes sir.

HOLLEY:      Where was Brian Smith at?

CONRAD:      I don't know sir.  He just told us to go ahead and that's when Bryan Yeoman said, that's when I asked Bryan Yeoman what was going on, he just said ride with me, go in the store with me.  I don't if B. Smith parked or turned around or what.

HOLLEY:      After you got into the store you and Brian Yoeman got into the store, what did ya'll do?

CONRAD:      Walked around and looked at few things, then that's when ah, a good two minutes walking around looking at stuff, that's when B. Smith came and Bryan Yeoman went out.

HOLLEY:      So ya'll been there a couple of minutes and Brian Smith came in?

CONRAD:      Yes sir, about two or three minutes.

HOLLEY:      And Bryan Yeoman then left out of the store?

CONRAD:      Yes sir.

HOLLEY:      Okay.  What happened next?

CONRAD:      That's when we was all in the back looking at the tapes, me and Brian.
That's when Bryan Yeoman came in and said everybody get down.
So we got on the floor and that's when he went and grabbed, that's when he went towards the lady and that man, at that time, I was turning my head back the other way so I wasn't seeing nothing that was going on with, cause I wasn't trying to get involved in none of that, that they was doing.

HOLLEY:      Let's back up now.  Take is a step at a time.  When Bryan Yeoman walked out where did you and Brian Smith go in the store?

CONRAD:      Inside and to the back looking at the tapes.

HOLLEY:      Okay, how long was Bryan Yeoman outside?

CONRAD:      A good  four, three minutes?

HOLLEY:      A good three or four minutes?

CONRAD:     Yes sir.

HOLLEY:     And Bryan Yeoman came back in the store, is that correct?

CONRAD:     Yes sir.

HOLLEY:     Who else was in the store at the time Bryan Yeoman came back in?

CONRAD:     The female and the ah old couple, the old man.

HOLLEY:     So there was an old man and the lady that ran the store?

CONRAD:     Yes sir.

HOLLEY:     Was the man that was in the store, was he white or black?

CONRAD:     He was white.

HOLLEY:     Where was he standing at?

CONRAD:     I seen him standing, I believe on the outside of the counter, the glass counter.

HOLLEY:     Where was the woman standing?

CONRAD:     Behind the glass counter.

HOLLEY:     And Bryan Yeoman came back in the store, what did he do, what did Bryan Yeoman do when he walked back in the store?

CONRAD:     He came running in the store telling everybody to get down on the floor.

HOLLEY:     He told everybody to get down on the floor, what did everybody get down on the floor?

CONRAD:     He had a gun in his hand.

HOLLEY:     Did you see that gun?

CONRAD:     I only seen the tip of it.

HOLLEY:     What color was the tip that you saw?

CONRAD:     It was chrome.

HOLLEY:     And he told everybody to get down on the floor?

11

CONRAD:    Yes sir. And that's when he went toward the old man and the lady.

HOLLEY:    What did you see him do to the old man?

CONRAD:    I seen him push him down about that time is when I turned my head back around, and that's when he was grabbing the woman.

HOLLEY:    Did you see him grab the woman?

CONRAD:    Yes sir.

HOLLEY:    Okay. Go ahead

CONRAD:    Then that's when I said forget this and I got up fixing to run out the door, that's when the gun shots hurt me.

HOLLEY:    That's when you head the first gunshot?

CONRAD:    Yes sir.

HOLLEY:    What happened next?

CONRAD:    That's when I realized I was hit by a bullet, then hit twice, then hit again in the stomach.

HOLLEY:    Where were you at in the store in relationship to the front door, when you felt that you got shot?

CONRAD:    Where was I when I got shot?

HOLLEY:    Yeah? Were you close to the front door when you got shot?

CONRAD:    Yes sir. Forcing myself out the door.

HOLLEY:    Did what?

CONRAD:    Forcing myself out the door.

HOLLEY:    You forced yourself out the door?

CONRAD:    Yes sir. Cause I was in pain

HOLLEY:    Why did you force yourself, why did you have to force yourself out the door?

CONRAD:     Cause it was hard for me to push the door and I just fell out the door.

HOLLEY:     Where was Bryan Yeoman at when you forced yourself out the front door?

CONRAD:     He was still, still in, I don't know he was still in the building, after I got shot I just went and fell out the door, forced myself out the door.

HOLLEY:     Prior to the shots being fired and you were on the floor along with Brian Smith and the old white gentlemen, what happened?

CONRAD:     Sir, what ya' mean?

HOLLEY:     Did Bryan Yeoman come over to where you were laying at on the floor?

CONRAD:     I'm not quite sure, it was the first time when he came in I turned my head towards the tape wall, the wall where the tapes was on.

MATHEWS:   Did he ever come over and frisk you?  Check you pockets or anything like that?

CONRAD:     Yes sir.

MATHEWS:   What did he do?

CONRAD:     He just grabbed my pants pockets and that's when I said, I don't even know if he went by checking anybody else, I felt him when he grabbed my pants pockets, I just kept looking the other way.

MATHEWS:   Did you say anything to him?

CONRAD:     No sir.

MATHEWS:   Did he say anything to you?

CONRAD:     No sir.

MATHEWS:   Why did he do that?

CONRAD:     I don't know sir?

MATHEWS:   What did you tell us earlier the reason he did that?

CONRAD:     That he did what?

MATHEWS:   Came over and patted your pockets?

13

1096

CONRAD:      I don't

MATHEWS:   Didn't you say something about that being part of a plan, part of a cover-up, trying to make it look like ya'll were just customers?

CONRAD:      (unintelligible)

MATHEWS:   Do what?

CONRAD:      I don't remember sir.

MATHEWS:   Well whey did he come over and pat you down?

CONRAD:      I guess just to play it off

MATHEWS:   Play, Yeah, that was your words earlier wasn't it, play it off?

CONRAD:      Yes sir.

MATHEWS:   Okay.  That's what I was trying to ask you about?

CONRAD:      Okay.

HOLLEY:      Okay, after he came over and patted you down, what happened then?

CONRAD:      That's when he got up, I don't know where he was at, but that's when I jumped up and that's when I seen him with the woman, they was like struggling, struggling or something, I said man I ain't fixing to get involved in this I was about to run out the door, that's when gunshots went off.

HOLLEY:      Where did you see him and the woman struggling at?

CONRAD:      In front of the door, in front of the door, before you walk in front of the door

HOLLEY:      Was it near the counter?

CONRAD:      No sir, like on the left side over by the ah, you coming in on the right hand side of the wall

HOLLEY:      Was there any t-shirts close by?

CONRAD:      Ah----I don't quite remember if he left (unintelligible) the shirts that was on that thing that spin arounds that you look at 'em or something like, it was over by that way

1097

HOLLEY:     It was over next to the rack that, the round rack that had the t-shirts, is that correct?

CONRAD:     I guess so.

HOLLEY:     That's where he and

CONRAD:     I don't remember if there were t-shirts or not, but I know its like a rack thing, there was like a rack between that, little between that and the door.

HOLLEY:     And that's where he and the woman were struggling at?

CONRAD:     Yes sir, I believe so, sir

HOLLEY:     Pardon?

CONRAD:     I said, yes sir, I believe so, cause they was all running towards the door, that's when he bumped into me or something like that, that's when the gunshots went off.

HOLLEY:     How many shots did you hear?

CONRAD:     I only heard about, as he shot me in my, that's how I got hit in the stomach, I least heard about one or two more as I was going out the door.

HOLLEY:     So after you got shot in the stomach, you ran out the door?

CONRAD:     Yes sir.

MATHEWS:    How far away from you, from her were you when she shot you?

CONRAD:     Her and Bryan Yeoman was like right like on the front and on the side of me

MATHEWS:    Just right on you?

CONRAD:     Yes sir.

MATHEWS:    About as far away as I am from you?

CONRAD:     Yes sir.

MATHEWS:    About two feet, about foot and half, so I could reach out and touch you on the shoulder right now with my arm can't I?

15

CONRAD:      Yes sir.

MATHEWS:     Is that about how far away

CONRAD:      Yes sir.

MATHEWS:     She was when she shot you?

CONRAD:      Yeah about that close.

MATHEWS:     Did you see her stick the gun out at you?

CONRAD:      No sir.

HOLLEY:      You never did see the gun in the lady's hand?

CONRAD:      No sir.

HOLLEY:      And after you got shot and you were shot how many times?

CONRAD:      Twice.

HOLLEY:      Where were you shot at?

CONRAD:      Sir?

HOLLEY:      Where did she shoot you at?

CONRAD:      I first felt a shot into my arm, and that's when I grabbed by arm about to go out that door and I felt another shot hit in my stomach, so I came straight on down to the car and got in the back seat of the car.

HOLLEY:      Which car did you get into?

CONRAD:      The Corsica.

HOLLEY:      And you got in the back seat of the Corsica?

CONRAD:      Yes sir.

HOLLEY:      Which side of the back seat did you get in?

CONRAD:      On the passenger side.

HOLLEY:      How was the car pulled into the, to the parking lot?

CONRAD:    Like, pulled in like right on the side of it.

HOLLEY:    If your facing the store with the car, was the car parked on the right hand side or on the left hand side of the store?

CONRAD:    Facing the store, oh, on the left side, left-hand side.

HOLLEY:    So the passenger back, the back passenger door would have been next to where you ran out the door, is that correct?

CONRAD:    No sir, I had to run out the door and go around to the car like this, the Corsica was on the back from the side.

HOLLEY:    What did you do then?

CONRAD:    I laid down in the car until they came out, that's when I saw the top of B. Y, Brian Smith's head as it was running, then that's when Bryan Yeoman came jumped in the car and said he's calling the police

HOLLEY:    Who's calling the police?

CONRAD:    I don't know, that's all I heard him say he's calling the police

HOLLEY:    When you brought, you say Brian Smith run from the store?

CONRAD:    Yes sir.

HOLLEY:    Where did Brian Smith run to?

CONRAD:    I don't know sir, like he was running down toward the hill, towards that ah, chicken place, or whatever.  Um

HOLLEY:    Are there chicken houses across the road?

CONRAD:    Yes sir.  Whatever them things, them long chicken things are.  That's where I seen him, he was heading towards that way.

HOLLEY:    So you saw Brian Smith running?

CONRAD:    Yes sir.

HOLLEY:    And what did you say Bryan Yeoman did?

CONRAD:    He jumped in the car and said, he calling the police, and he pulled out.

17

HOLLEY:     How long from the time you ran out the door and got into the Corsica was it you saw Brian Smith run?

CONRAD:     It was a good three, three or four minutes.

HOLLEY:     Three or four minutes?

CONRAD:     Yes sir. It could have been around about, it wasn't too long, cause I remember I just laid down in the car, about the time I closed the door, that's when I saw Brian Smith running. Then Bryan Yeoman came and jumped in the car.

MATHEWS:    Did you ever see the old man come out of the store?

CONRAD:     No sir.

MATHEWS:    You didn't never see him come out and use the phone or anything?

CONRAD:     No sir, I was laying down in the back seat

MATHEWS:    But you said you saw Brian?

CONRAD:     Cause I was laying down in the back seat looking out the window, and I saw the top of Brian Smith's head running.

MATHEWS:    I got ya'. Was there any other vehicles parked there at the store when ya'll pulled up?

CONRAD:     Yes sir, I remember seeing a van and I believe a truck, or maybe two vans, yeah a van and a truck

MATHEWS:    Well if somebody came out and walked over to the van or the truck, would you not see 'em?

CONRAD:     If they would have came around the car like this, that's way

MATHEWS:    Did you hear anybody?

CONRAD:     No sir. I was just crying in the car, saying I'm hurting

MATHEWS:    Ya'll left then and headed back to the apartment, right?

CONRAD:     Yes sir.

MATHEWS:    What happened when you got back to the apartment?

18

CONRAD:      That's when Brian, B. Smith and Bryan Yeoman, they disappeared away from, from where, they had gotten me out the Corsica, and put me in the LTD and then Brian Smith disappeared, I don't know where they went. As I'm hollering for them to take me to the hospital, then they finally come back towards me and took me to the hospital.

HOLLEY:      Who took you to the hospital?

CONRAD:      Brian Smith and Bryan Yeoman.

MATHEWS:   You didn't go into either one of 'ems apartment after you got shot?

CONRAD:      No sir, I couldn't move.

MATHEWS:   All right, what did you, what else happened before they went to the hospital?

CONRAD:      I don't know, just saying they disappeared out of my sight, then they came back and that's when they took me to the hospital.

MATHEWS:   All right did you not change some clothes?

CONRAD:      No sir, except for they took my t-shirt off and gave me a jersey, helped me put my jersey on.

MATHEWS:   Where did that happen at?

CONRAD:      In the back seat of the LTD.

MATHEWS:   Where at?

CONRAD:      At Greentrees Apartment

MATHEWS:   Okay.  What happened with the t-shirt?

CONRAD:      I don't know sir.

MATHEWS:   What color t-shirt was it?

CONRAD:      White

MATHEWS:   Did it have anything on it?

CONRAD:      I don't know what

MATHEWS:   Like letters or a name on it, or?

19

CONRAD:      No sir.

MATHEWS:  Was it just ah, ah like a t- undershirt t-shirt?

CONRAD:      t-shirt

MATHEWS:  Tank top of what?

CONRAD:      Plain regular t-shirt.

MATHEWS:  All right.  How old was it?

CONRAD:      How old was what?

MATHEWS:  That shirt yeah?

CONRAD:      I don't know sir

MATHEWS:  It wasn't brand new?

CONRAD:      (unintelligible)

MATHEWS:  You worn it before?

CONRAD:      Yes sir, I believe it was washed and wore before

MATHEWS:  Okay.  And that happened in the car in the parking lot, correct?

CONRAD:      Yes sir.

MATHEWS:  Did you take your shoes off?

CONRAD:      No sir.

MATHEWS:  This is the shoes you showed up in hospital are the same shoes you had on at the Toy Store?

CONRAD:      Yes sir.

MATHEWS:  Did you take your shorts off, your pants or whatever?

CONRAD:      No sir.

MATHEWS:  What color pants were you wearing?

20

CONRAD:        Some beige, tan looking Chap shorts.

MATHEWS:   All right.  Brian was wearing what at the store?

CONRAD:        Which one, sir?

MATHEWS:   Brian Smith, I am sorry?

CONRAD:        I remember he had on a red shirt, I can't remember what else.

MATHEWS:   Don't remember if he had on long pants or short pants?

CONRAD:        It could have been long pants, but I don't know.

MATHEWS:   Did he have on any kind of hat or scarf or net?

CONRAD:        No, it was sticking up, I believe he had a bandana on a wave cap.

MATHEWS:   What color?

CONRAD:        It's a red and black.

MATHEWS:   All right.

CONRAD:        I think he had it, came around, I think he had it on, I can't remember, I
               believe he did have just braids.

MATHEWS:   Braids?  Yeah

CONRAD:        Kinda (unintelligible) remember

MATHEWS:   All right.  And B. Y. Bryan Yeoman had on what, when ya'll went in the
               store?

CONRAD:        Blue jeans and ah black or blue shirt

MATHEWS:   Dark colored, either way?

CONRAD:        Yes sir.

MATHEWS:   Did it have any writing on it?

CONRAD:        No sir.  Not that I know of.

MATHEWS:   Not that you know of or remember.  Did he wear his shirttail in or out?

CONRAD:       Out.

MATHEWS:   Have anything on his head?

CONRAD:       I don't think so, sir.  Can't remember.

MATHEWS:   What about his shoes?

CONRAD:       I don't remember.

MATHEWS:   Don't remember.  When they took you, before they took you to the hospital, did they change clothes?

CONRAD:       To tell you the truth sir, I don't even know, I wasn't even paying attention to them, I was just telling them to get me to the  hospital.

MATHEWS:   All right.  When you left the apartments which way did you go, going to the hospital?

CONRAD:       Up, up and out of the apartments and then went like through town I believe, no, they went in front of the courthouse.

MATHEWS:   All right, did you stop anywhere along there in front of the courthouse?

CONRAD:       I can't remember.

MATHEWS:   Do you remember if anybody got out of the car?

CONRAD:       Huh uh.

MATHEWS:   Were you hollering out the window or anything?

CONRAD:       I was just screaming, telling them to get me to the hospital, I was in pain, I remember hearing Bryan, Brian, B.Y. and Brian yelling., saying move out of the way, get out of the road and stuff like that.  That's about it.

MATHEWS:   Who was driving?

CONRAD:       B.Y.

MATHEWS:   Did Brian start off driving, Brian Smith?

CONRAD:       I don't think, I don't think so sir.

MATHEWS:   Okay.

22

HOLLEY:      So both of them was hollering get out of the way, get out of the way?

CONRAD:      Yes sir.

HOLLEY:      What else were they saying?

CONRAD:      I can't quite remember, I remember Brian Smith saying, we going to just drop him off and just leave man, we going to drop him off and just leave.

HOLLEY:      What size tennis shoes do you wear?

CONRAD:      Nines to tens and half.

HOLLEY:      Nines to tens and half?

CONRAD:      Yes sir.

HOLLEY:      And what kind of tennis shoes did you have on the day that the robbery went down?

CONRAD:      Reeboks.

HOLLEY:      What color were they?

CONRAD:      White.

HOLLEY:      Do you remember what happened when you got to the hospital?

CONRAD:      I remember getting put in the wheelchair and pushed down the hall.

HOLLEY:      Which one of them pushed you down the hall?

CONRAD:      If I'm not mistaken Brian Smith.   When we got back down by the emergency room, I remember I was going towards the wall and nobody behind me, like they pushed me and let me go running into, run into the emergency room.

HOLLEY:      Did they say anything to you as they were pushing you into the emergency room?

CONRAD:      No sir

HOLLEY:      I believe you told us earlier that one of them told you that you were on your own, is that what they said?

CONRAD:      Yes sir.

23

CONRAD:     They was saying that, they was saying that between the time when they said just going to push him down here and let him go or something like that?

HOLLEY:     Who was saying that?

CONRAD:     Brian Smith and B.Y. , both like, they were kinda trying to whisper it to each other, but I was hearing little by little

MATHEWS:    Now, Robert, this is not the same story you've told us on a couple of other interviews is it?

CONRAD:     Sir.

MATHEWS:    This is not the same story you've told us on a couple of other interviews is it?

CONRAD:     You talking like the first and second day, ya'll questioned me?

MATHEWS:    Yes sir.

CONRAD:     No, sir, it's not the same cause I was scared being involved in that, ah, folks saying I'm being involved in that.

MATHEWS:    I understand that and, and so, what you're telling me know is that you lied in those interviews, is that correct?

CONRAD:     Yes sir.

MATHEWS:    And none of that was true, right?

CONRAD:     No sir.

MATHEWS:    All right.  Let me ask you something, where, and think about this now, cause you been in this shop, where in that store would your fingerprints be?

CONRAD:     Mine

MATHEWS:    In other words, yeah, where would they be, what have you touched in that store that you're fingerprints would be on the place?

CONRAD:     Probably on some of the tapes I was looking at.

24

MATHEWS:    The ones that are for sale of rent?

CONRAD:     Yes sir.

MATHEWS:    Okay, what else?

CONRAD:     That's about it, cause also I had my hands behind my back as I was looking at stuff.

MATHEWS:    All right.   Would they be over there, have you ever bought anything in there?

CONRAD:     No sir.

MATHEWS:    Would there be any reason for your fingerprints to be on the counter?

CONRAD:     No sir.

MATHEWS:    What about the cash register?

CONRAD:     No sir.

MATHEWS:    Never touched the cash register?

CONRAD:     No sir.

HOLLEY:     Over there where they have that display stand that's got glass in it where the pipes are at, would your fingerprints be on that?

CONRAD:     No sir.

MATHEWS:    You didn't lean over on it looking in?

CONRAD:     No sir.  I just squatted down, I was looking at the bottom of the pipes that they was showing

MATHEWS:    So you're comfortable that your fingerprints won't be there?

CONRAD:     Yes sir.

MATHEWS:    And they won't be on the register on in the drawer where the money was?

CONRAD:     No sir.

MATHEWS:    You are sure about that?

25

CONRAD:     Yes sir.

MATHEWS:    All right.  You told me that B.Y., Bryan Yeoman had shown you a gun and told you about some other guns?

CONRAD:     Yes sir

MATHEWS:    Tell me about that again on this tape, please sir?

CONRAD:     I first met him, he was like always talking about guns and stuff, so I was like what ya' talking about, he was like check this out, and he showed me the .357 and he said, he said he got a 9 and 25 and he got some and he didn't name the other ones. He was like I got some more too.  So he only showed me the .357 though.  That's the only one I held.

MATHEWS:    Okay.  What is it look like?

CONRAD:     Its like black and brown a little light.

MATHEWS:    Okay.  Now, describe how the gun works?

CONRAD:     Sir.

MATHEWS:    Describe how the gun works?

CONRAD:     Ah, I ain't one no, I ain't open the thing or nothing, I don't know how it works.

MATHEWS:    You say you put, I know, but you what I'm saying is say, where you bullets is that gun that you saw?

CONRAD:     In the, what's the little thing that turns?

MATHEWS:    Is it round?

CONRAD:     Yes sir.

MATHEWS:    Okay.  Cylinder?

CONRAD:     Yes sir.

MATHEWS:    All right, that's what I needed you to do, is to describe the thing where you put the bullets?

CONRAD:     Okay.

26

MATHEWS:  So you prints could possibly be on that gun?

CONRAD:    Yes sir.

MATHEWS:  Have you held any other gun?

CONRAD:    No sir.

MATHEWS:  So your prints, there is no way your prints will be on that 9 mm he told you about?

CONRAD:    Yes sir.

MATHEWS:  How did he describe that 9 mm?

CONRAD:    He just said chrome with a black handle.

MATHEWS:  All right.  You never saw it?

CONRAD:    No sir.

MATHEWS:  Did it, does that look any, does that sound anything like the gun he had in his hands in the store?

CONRAD:    It could probably be because all I remember seeing is just ah, where the bullet come out at, that little chrome part of it, I just glanced and laid my head back down, I was scared.

MATHEWS:  All right.

CONRAD:    I ain't believe they would do something

MATHEWS:  What's your parents name?

CONRAD:    Dorothy Conrad

MATHEWS:  And your dad?

CONRAD:    Robert Conrad, but he stay in Columbus, Ohio.  But down here Anthony William my father, my step-father.

MATHEWS:  Okay.  Where does he live at?

CONRAD:    New Brockton.

MATHEWS:  What's his address?

CONRAD:     Sorry to tell you the truth, I never did know did the road.

MATHEWS:   Anthony Williams?

CONRAD:     Yes sir.

MATHEWS:   Go ahead and describe where its at?

CONRAD:     Like, taking the road down where the Health Department, it's a long ride before you get already down to the light well you fixin to go to Troy or Anniston or something like that that you make a left go around the curve his house there, like seven acres of land with some cars in the yard.

MATHEWS:   Okay.  Where does he work?

CONRAD:     I believe at Wal-Mart still, sir.

MATHEWS:   Okay.  Where's your mama work?

CONRAD:     At the Nursing Home.

MATHEWS:   Enterprise Nursing Home?

CONRAD:     Yes sir.

MATHEWS:   Okay, where does she live?

CONRAD:     35 Garden Oaks.

MATHEWS:   Okay, that's where you live, right?

CONRAD:     Yes sir.

MATHEWS:   You still live with mama.  Okay.

CONRAD:     I just mainly be staying with my mom or my sister or visiting another friend or something, staying around.

MATHEWS:   Well tell me something, if we go over there and we search your house, what we going to find?

CONRAD:     What ya' mean sir?

MATHEWS:   Are we going to find any guns?

CONRAD:     Oh, no sir.

MATHEWS:    You're not worrying about us finding any gun?

CONRAD:     No sir.

MATHEWS:    When's the last time you ever fired a gun?

CONRAD:     The only kind of gun I ever fired was a shotgun, it was like four or five months ago.

MATHEWS:    Where at?

CONRAD:     Our in the country.

MATHEWS:    At anybody's house or anything?

CONRAD:     Yes sir.

MATHEWS:    Did you say yes sir.?

CONRAD:     Yes sir.

MATHEWS:    Well whose was it?

CONRAD:     It was a friend of mine at Geneva.

MATHEWS:    Uh huh.

CONRAD:     And he had took us to his friends house, he had some shotguns, like rifle shotguns, bb guns, stuff like that.

MATHEWS:    Uh huh.

CONRAD:     And it was like ya'll want to shoot it and we just shooting it in the air.

MATHEWS:    Okay.  Didn't shoot at some targets or anything?

CONRAD:     No sir.

MATHEWS:    Did anybody have any pistols there?

CONRAD:     No sir, just shooting at like, well they was shooting at like stuff like trees and stuff.

MATHEWS:    But nobody had any pistols?

CONRAD:      No sir.

MATHEWS:   Have you ever shot a pistol?

CONRAD:      No sir.

MATHEWS:   Have you ever shot any kind of guns out at Mr. William's house?

CONRAD:      No sir.

MATHEWS:   Did anybody ever shoot guns out there that you know of?

CONRAD:      No sir, not that I know of.

MATHEWS:   You said he's got about seven acres doesn't he?

CONRAD:      Yes sir.

HOLLEY:      Who did you say your father was?

CONRAD:      My real father?

HOLLEY:      yes

CONRAD:      It's a, if I'm not mistaken he name is Robert Michael Conrad, from Columbus, Ohio

MATHEWS:   Columbus, Ohio

CONRAD:      Yes sir.

HOLLEY:      So his name is Robert Conrad also?

CONRAD:      Yes sir.

HOLLEY:      Are you a junior.

CONRAD:      Yes sir, junior the fourth.

HOLLEY:      So your Robert

CONRAD:      Thomas Junior Conrad the fourth.

HOLLEY:      The fourth?

30

1113

HOLLEY:    Yes sir.  And say that so it will catch, so it will pick it up on the tape recorder, what's your full name?

CONRAD:    Robert Thomas Junior Conrad, the fourth.

HOLLEY:    Okay.

MATHEWS:   Do you remember that man coming up when ya'll were out on the road and you said they were whispering back and forth right before you went to the Toy Store, do you remember that man coming up in that truck?  Pick-up truck?

CONRAD:    A white truck?

MATHEWS:   Yeah.

CONRAD:    Yes sir.

MATHEWS:   Did he look at ya'll kinda hard?

CONRAD:    If I'm not mistaken he was.

MATHEWS:   Where were you sitting when he looked at ya'll?

CONRAD:    On the passenger side of the Corsica.

MATHEWS:   You wasn't sitting over there in the LTD?

CONRAD:    No sir

MATHEWS:   Did you have any kind of a hat on that day, or scarf or do rag or anything?

CONRAD:    No sir.  Just my braids.

MATHEWS:   Any kind of jewelry?

CONRAD:    No sir.

MATHEWS:   Just your braids, same as they are now?

CONRAD:    Before I had to chain, I think the hospital took my chain off my neck.

HOLLEY:    You said Brian Smith had his hair in braids that day?

CONRAD:    Yes sir.

31

HOLLEY:   Were they like the braids that hang down that you, or were they braids like the ones cut close to, like your's on your?

CONRAD:   He's got his going to the back.

HOLLEY:   Are they long, do they hang down?

CONRAD:   Not that long. Got 'em going back to design or something.

MATHEWS:  And that's the way he had his hair that day?

CONRAD:   If I'm not mistaken, sir.

MATHEWS:  Can you think of anything else that you need to tell us about what happened that day, about what somebody said about doing anything or the money or the guns, or anything that you haven't told us. This is your opportunity to tell us whatever you need to tell us about what happened?

CONRAD:   I don't know. Like I said they wasn't even telling me nothing, cause, like I said a couple of weeks ago, when and I had first met B.Y. they was talking about doing something illegal, but they wouldn't never tell me. Its cause I told them I ain't trying to get in not more trouble, I just got out of jail for real, trying to get my life straight. That's why I was suppose to have went to the interview that night.

HOLLEY:   Where were you that night?

CONRAD:   Went to a job interview.

MATHEWS:  Oh, okay.

HOLLEY:   What were you in jail for?

CONRAD:   They found some drugs in my brother's house and they pinned it on me?

HOLLEY:   Found some what?

CONRAD:   Some reefer in my brother's house. And I got pinned for it.

HOLLEY:   You were charged with Possession of Marihuana?

CONRAD:   Yes sir.

MATHEWS:  Whose your brother?

CONRAD:   Rico.

MATHEWS: Rico Conrad?

CONRAD: Rico, he's my step-brother, Rico Edwards.

MATHEWS: Rico Edwards.

CONRAD: Yes sir.

MATHEWS: Where does he live?

CONRAD: He's gone now, I don't think nobody knows where he at.

MATHEWS: Where did he live then?

CONRAD: He was staying in the villas

MATHEWS: in 35, with you and your mama?

CONRAD: No sir, in the Villas.

MATHEWS: Villa Apartments?

CONRAD: Yes sir. D-4.

MATHEWS: D-4?

CONRAD: Yes sir.

MATHEWS: How did you get pinned with it, if it was in his apartment?

CONRAD: I, my brother had to go to work, and my sister stayed down there too, so I said just take me to the Villas and I visiting both of 'em. But the whole day I had a tooth ache, and I was just laying there on the bed asleep, the next thing I know, police coming in, rushing in the house

HOLLEY: How long did you serve in jail?

CONRAD: I think like three or four days, or a week?

MATHEWS: You haven't been to Court on it yet have you?

CONRAD: No sir. I, they postponed it, I'm supposed to go on June the 1st.

HOLLEY: So you were charged with Possession of Marihuana, 1st degree wasn't you?

33

CONRAD:   Yes sir. It wasn't mine, they said it was the owner of the house and just that I was just in his spot around where they found some weed at.

MATHEWS:   There wasn't any conversation on the way back to the apartments from the house, I know you're hurting but?

CONRAD:   Oh, I was questioning and asking what was they doing, why they was doing that, he's just like man, just forget it, just forget it, were going to get you to the hospital, were going to get you to the hospital. So what Brian and was saying.

HOLLEY:   You never did see the money?

CONRAD:   No sir.

HOLLEY:   You never did receive any part of the money?

CONRAD:   No sir.

HOLLEY:   And you don't know what they did with your white t-shirt when you changed shirts at Brian Smith's apartment?

CONRAD:   No, I was just laying in the back seat, it was like a shirt, fucked up or messed up or something

HOLLEY:   Did what know?

CONRAD:   He said my shirt was excuse my language, he said my shirt was messed up, tore up and I need to take it off, so he took it off of me and handed me that jersey.

HOLLEY:   Did you ever hear Bryan Yeoman say how much money he got?

CONRAD:   No sir, to tell you the truth all I heard one of 'em say it's a lot of money

HOLLEY:   Which one of them said it was a lot of money?

CONRAD:   Can't remember sir. Cause it was, it was like away from the car coming towards the car, saying it's a lot of money. That's when I was saying just take me to the hospital, take me to the hospital, then that's when he came up on a car and they were asking are you all right, I said no, just take me to the hospital man, take me to the hospital.

MATHEWS:   That's at the apartments?

34

CONRAD:      Yes sir.

MATHEWS:   What did they do, take the money up into Brian's apartment and count it?

CONRAD:      I don't even know sir, I was laying down in the back seat.

MATHEWS:   Was they gone long enough to do that?

CONRAD:      Yes sir, they was gone four minutes.

MATHEWS:   Were they gone long enough to change clothes?

CONRAD:      Could have been sir.

MATHEWS:   When you use the terminology minute, you don't really mean a minute do ya?

CONRAD:      Sir?

MATHEWS:   When you say they was gone for a minute, you don't' really mean a minute do you?

CONRAD:      No sir.   Its like another figure of speech, we say like 5 minutes, 10 minutes, whatever, something

MATHEWS:   Right.  So, ah, about how long would in your terminology for a minute be?

CONRAD:      I say a good like for close to almost 10 minutes?

MATHEWS:   Okay. Well, I, that's why I wanted to explain it, I knew what you were talking about, but I needed you to clarify that for somebody that might be listening on that, that doesn't understand it.

MATHEWS:   Dwight, I don't have anything else do you, at this time?

HOLLEY:      I have nothing else.

MATHEWS:   Its 1:00 o'clock p.m. we will terminate the interview.

On _____ I reviewed the tape and made the necessary corrections to the Transcript.  The corrected transcript is a true representation of the taped interview.

_____
Bruce Mathews

Transcribed by Valerie McGuire
May 29, 2001 and May 30, 2001

35

# ENTERPRISE POLICE DEPARTMENT

CASE NUMBER: _01 05 3060_

LOCATION: _M.C.E_

DATE: _05 23 01_  TIME: _20 05_

## BEFORE YOU ARE ASKED ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

1. You have the right to remain silent.

2. Anything you say can be used against you in court or other proceedings.

3. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

4. If you cannot afford a lawyer, one will be appointed without cost to you before any questioning, if you wish.

5. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time you wish.

## WAIVER OF RIGHTS

I have been advised of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

NAME: _Robert Conrad_

SIGNATURE: _Unable to sign_

EDUCATION: _9th_

LANGUAGE: _English_

WITNESS: _____

WITNESS: _____

Enterprise P.D. Form 96-041



**STATE'S EXHIBIT**

7

MEDICAL CENTER ENTERPRISE LABORATORY

CONRAD,ROBERT                                           DREW,JOHN L
C    leted: 05/23/01 1425    VER
S    . Type: Blood              Collected: 05/23/01 1405         [456909]

Result name                    Result                    Reference Range

Glucose(mg/dl):                155.0 H                   70-110
BUN(mg/dl):                    9.0                       9-20
Creatinine(mg/dl):             1.2                       0.8-1.5
Sodium(mmol/L):                145.0                     137-145
Potassium(mmol/L):             2.9 LP                    3.5-5.5
Chloride(mmol/L):              105.0                     98-107
CO2(mmol/L):                   17.0 L                    22-30
Anion Gap:                     25.0
BUN/Creat:                     7.5
Comment:                       ER5 *&*
Date/Time:                     05/23/01 1424
Calcium(mg/dl):                9.1                       8.4-10.2
                          End of Report!
*ASAP*                     E0114300094       ER              DOB (09/27/1980)
PANEL,BASIC METABOLI                                               1
-------------------------------------------------------------------------------

# MEDICAL CENTER ENTERPRISE
## ENTERPRISE, ALABAMA

### RADIOLOGIC CONSULTATION REQUEST/REPORT

PATIENT:        CONRAD, ROBERT
DATE:           05/23/01
PHYSICIAN:      SAWYER, SAMUEL F./DREW
HOSPITAL #:     0000041053
RM #:           207-02/ER
SEX:            M
EXAM DATE:      05/23/01
X-RAY #:        97323
JOB #:          30535

SPECIFIC REASON(S) FOR REQUEST:       GSW


SINGLE VIEW LEFT HUMERUS;

A metallic FB, rounded, is seen in the soft tissues of the medial distal upper arm. No associated fracture is seen.

IMPRESSION:  FB AS NOTED.


SUPINE, UPRIGHT ABDOMINAL FILMS;

There is gastric distension with fluid level present. Air is seen in the rectum but no free air is seen. There is a metallic FB compatible with bullet projecting near the acetabulum, superolateral to it, on the left side. No associated fracture is seen.

IMPRESSION:  GASTRIC DISTENSION AS NOTED.  FB AS NOTED.


DICTATED AND SIGNED BUT NOT REVIEWED IN ORDER TO EXPEDITE DISTRIBUTION.

_____
VINCENT E. MARTIN, M.D.

VEM/SP
DD: 05/23/01

1/22

052301

# POST ANESTHESIA
# CARE UNIT RECORD

Admitted to Post Anesthesia Care Unit: Date: 5-23-01  Time: 1056

Per: ☑ Cart  Procedure: Removal of bullet w/Arm. Dx lap + explor. lap.
Repair of Gunshot wound to Transverse colon

☐ Bed  Allergies: NKDA

Surgeon: Sam Sawyer

Accompanied by: G. Aughtman

☐ RN  ☑ Anesthetist  Pre-Op Vitals: B/P 101/88  P 90  R___  T___

☑ Anesthesiologist  ASA Classification  I  II(circled)  III  IV  V

Anesthesia:
☑ General
☐ Spinal
☐ MAC
☐ I.V. Block
☐ Local
☐ Topical
☐ Epidural
☐ Mask

Rx's on Chart, Number: 05/23/01

Temp:
Axillary Admit: 93³
Oral
Timpanic Disch: 95⁹

## PATIENT HISTORY

Check if Applies
( ) Renal Disease
( ) Diabetes
( ) Heart Disease
( ) Respiratory
      Disease
( ) Neurological
      Disorder
Other___
Dentures___

IV present/patient ☐
1. Site: RT FA
   Cath Size: 20G
   Type IVF: LR
   Amt. 150 cc
2. Site___
   Cath Size___
   Type IVF___
   Amt.___

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

Oximeter ............... ☐   100/99%

| | | |
|---|---|---|
| Patent Airway | | |
| Awake & Responsive | | |
| Deep Breathing | | |
| Respiratory Distress | Ø | Ø |
| Position | Ø | Ø |
| O₂ Therapy  10  L/min. | | |
| Aerosol - Mask - Cannula - E.T. | | RA |
| Cough, swallow, | | |
| Gag reflex, present | | |
| | | |
| Airway: Oral/Nasal d C'd at | Ø | Ø |
| Lungs Clear       R | | |
|                         L | | |
| ECG Monitor | SR | SR |
| Skin:           Warm | | |
|                  Cool | | |
|                  Dry | | |
|                  Diaphoretic | | |
| Warming Light | — | — |
| Spinal Level | | |
| N.'s Initials | TG | TG |

☑ Dressings present: ABD-midline
☑ Dressings present: RT Arm
Foley ☐  Irrigation  Output
CL yellow

☑ Drainage Admit: dry  Disch: scant
☑ Drainage Admit: dry  Disch: scant
Output
NG: low intern. suction
Hemovac - ☑/P:
Emesis:

ANESTHESIOLOGIST RELEASE

SPINAL LEVELS

KEY:
→ = No change
↙ = Yes
— = No
*NN = See nurses notes
∧ = Systolic BP
∨ = Diastolic
X = Arterial Line Pressure
● = Pulse
O = Resp.
Ø = not assessed
NA = non applicable

1123

## ENTERPRISE POLICE DEPARTMENT
## INTERVIEW SHEET

| | | |
|---|---|---|
| NAME (LAST, FIRST, MIDDLE) | ALIAS | CASE # 01 05 3060 |

**Conrad, Robert Thomas**

SUSPECT [X]  VICTIM [ ]  WITNESS [ ]
RELATIONSHIP TO SUSPECT:

START DATE 05/23/01
START TIME 2005
LOCATION OF INTERVIEW  MCE

SSN 419 17 5095     DL OR OTHER ID # /STATE

STOP DATE 05/23/01
STOP TIME 20 19

DOB 09 30 80     AGE 20     POB Germany

SEX M     RACE B     HGT 6'00     WGT 155     EYES BRO     HAIR BLK

ACJIC/NCIC CHECK
YES [ ]  NO [X]

SCARS [ ]   MARKS [ ]   TATOOS [ ]   AMPUTATIONS [ ]

TAPED INTERVIEW
YES [ ]  NO [X]
VIDEO [ ]  AUDIO [ ]

HOME ADDRESS  Apt 35 Garden Oaks  Enterprise Al

HOME PHONE  348-2150

EMPLOYER (NAME AND ADDRESS)

BUSINESS PHONE

RIGHTS GIVEN BY  Spence

SIO #          FBI #

INTERVIEW CONDUCTED BY  Mathews / Spence

FINGERPRINTED - YES [ ]  NO [ ]     PHOTOGRAPHED - YES [ ]  NO [ ]

STATEMENT

*(NARRATIVE sections — blank lines)*

**STATE'S EXHIBIT**

8

# MEDICAL CENTER ENTERPRISE
## ENTERPRISE, ALABAMA

### RADIOLOGIC CONSULTATION REQUEST/REPORT

PATIENT:     CONRAD, ROBERT
DATE:     05/23/01
PHYSICIAN:     SAWYER, SAMUEL F./DREW
HOSPITAL #:     0000041053
RM #:     207-02/ER
SEX:     M
EXAM DATE:     05/23/01
X-RAY #:     97323
JOB #:     30535

"A"
1/21/2002

SPECIFIC REASON(S) FOR REQUEST:     GSW

SINGLE VIEW LEFT HUMERUS;

A metallic FB, rounded, is seen in the soft tissues of the medial distal upper arm. No associated fracture is seen.

IMPRESSION: FB AS NOTED.

SUPINE, UPRIGHT ABDOMINAL FILMS;

There is gastric distension with fluid level present. Air is seen in the rectum but no free air is seen. There is a metallic FB compatible with bullet projecting near the acetabulum, superolateral to it, on the left side. No associated fracture is seen.

IMPRESSION: GASTRIC DISTENSION AS NOTED. FB AS NOTED.

DICTATED AND SIGNED BUT NOT REVIEWED IN ORDER TO EXPEDITE DISTRIBUTION.

_____
VINCENT E. MARTIN, M.D.

VEM/SP
DD: 05/23/01

1125

State of Alabama
Unified Judicial System

Case Number

# ORDER
## ON INITIAL APPEARANCE

Form C-80    Rev. 6/93

IN THE ___District___ COURT OF ___Coffee___, ALABAMA
(Circuit, District or Municipal)        (Name of County or Municipality)

☐ STATE OF ALABAMA       SS 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
☐ MUNICIPALITY OF _____    v. ___Robert Thomas Conrad___
                  9-30-80        28408      Defendant

The above-named defendant, charged with the criminal offense(s) of ___Capital Murder___
was duly brought before the Court for initial appearance on ___5-25-01___ at ___21:00___ o'clock
___P___.m., whereupon the Court did the following, as checked in the appropriate blocks:
(CHECK AS APPLICABLE):

**DEFENDANT'S EXHIBIT B**

☑ 1. Name and address of defendant.
  (a) Ascertained the true name and address of the defendant to be:
    35 E Garden Oaks
    Enterprise Al
  (b) Amended the formal charges to reflect defendant's true name.
  (c) Instructed the defendant to notify the Court promptly of any change of address.

☑ 2. Informed the defendant of the charges against him/her and ensured that the defendant was served with a copy of the charges.

☑ 3. Informed the defendant of the right to be represented by counsel, that he/she would be afforded time and opportunity to retain an attorney, and further advised the defendant that, if he/she were indigent and unable to obtain counsel, an attorney would be appointed by the Court to represent him/her.

☑ 4. Informed the defendant that he/she had the right to remain silent and that anything that he/she said could be used against him/her.

☑ 5. Bail
  (a) Determined that the defendant shall not be released from custody since charged with a non-bailable capital offense.
  (b) Determined that the defendant shall be released from custody pending further proceedings, subject to the mandatory conditions prescribed in Rule 7.3(a) A.R.Cr.P. and subject to the following additional conditions:
    1) Execution of an appearance bond (recognizance) in the amount of $ _____
    2) Execution of a secured appearance bond in the amount of $ _____
    3) Other conditions (specify) ___Bail denied___

☑ 6. If charged with a felony offense, informed the defendant of right to demand a preliminary hearing under Rule 5.1 A.R.Cr.P. and of the procedure by which that right may be exercised.

☐ 7. If charged with a felony offense a preliminary hearing was demanded with 30 days of date of arrest by the above named defendant, set a preliminary hearing to be held in the District Court of _____ on _____ (date) at _____ o'clock ___ m.
  (a) Notified the District Court that such demand was made.
  (b) Defendant made no demand for a preliminary hearing at the initial appearance hearings.

☐ 8. Other.

___5-25-01___                          _____
Date                              Judge/Magistrate

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,  )
    Plaintiff,  )
      )
VS.  )    CASE NO. CC 2001-M-17?
      )    CC 2001-M-18?
ROBERT THOMAS CONRAD,  )
    Defendant.  )

### STATE'S EXHIBIT LIST

| EXHIBIT NUMBER | DESCRIPTION OF EXHIBIT | Introduced | Admitted |
|---|---|---|---|
| 1 | Darby Car Tape   VHS | ✓ | ✓ |
| 2 | Chart of Toy Store  (outside), | — | — ✓ |
| 3 | Chart of Toy Store  (inside) | ✓ | ✓ |
| 4 | Chart of Toy Store  (inside with photos) | ✓ | ✓ |
| 5 | Chart of Toy Store (outside with photos) | — | — ✓ |
| 6 | Chart of blue car | — | — ✓ |
| 7 | Chart  -  photos of Robert Conrad in hospital showing Bullet wound area | ✓ | ✓ |
| 8 | Chart – photos of  wounds to Jelaine Dennis | ✓ | ✓ |
| 9 | Clerke .22 cal. Pistol | ✓ | ✓ |
| 10 | Four-(4) cartridge cases and one (1) unfired cartridge Exhibit #10  A – E collectively | ✓ | ✓ |
| 11 | Five projectiles collected at scene marked State's Exhibit #11 A – E collectively.  Appear to be From a 9mm or .380 cal pistol | ✓ | ✓ |
| 12 | Six cartridge casings collected at the scene.  Appear to be From a 9mm or .380 cal pistol.  Exhibit #12 A – F collectively | ✓ | ✓ |
| 13 | Photograph ----   projectile retrieved from underneath scene | ✓ | ✓ |
| 14 | Photograph ----   projectile retrieved from underneath building of scene | ✓ | ✓ |
| 15 | Photograph  ----  projectile retrieved from wooden beam marked #4 in photo | ✓ | ✓ |

| | | | | |
|---|---|---|---|---|
| 16 | Photograph ---- projectile retrieved from underneath carpet in building | ✓ | ✓ | |
| 17 | Photograph ----- blue LTD car | ✓ | ✓ | |
| 18 | Photograph ---- floor area directly behind cash register | ✓ | ✓ | |
| 19 | Photograph --- cash register area | ✓ | ✓ | |
| 20 | Photograph ---- def. 's left arm | ✓ | ✓ | |
| 21 | Photograph --- def's abdomen | ✓ | ✓ | |
| 22 | Photograph --- def.'s abdomen (2nd photo) | ---- | ---- | ✓ |
| 23 | Victim's Shirt | ---- | ---- | ✓ |
| 24 | Victim's Jeans | ---- | ---- | ✓ |
| 25 | White tee shirt retrieved from dumpster with bullet holes/ And blood stains | ✓ | ✓ | |
| 26 | Projectile from def.'s arm | ✓ | ✓ | |
| 27 | Projectile from victim | ---- | ---- | ✓ |
| 28 | 27a Search warrant for def.'s blood/ Medical Center 28 A Blood retrieved Fr. Hospital | ✓ | ✓ | |
| 29 | Tape register and receipts 28 B - Card | ---- | ---- | ✓ |
| 30 | Report ---- Phyllis Rollan – DNA | ---- | ---- | ✓ |
| 31 | Report ---- Dr. Emily Ward, Medical Examiner | ✓ | ✓ | |
| 32 | Report ---- Joseph Saloom, Firearms, Forensic Scientist | ---- | ---- | ✓ |
| 33 | Statement of Defendant May 24, 2001 at 14:13 p.m. | ---- | ---- | ✓ |
| 34 | Statement of Defendant May 25, 2001 at 12:16 p.m. | ---- | ---- | ✓ |

Initial contact was made by the undersigned with Mr. Smith on Friday, September 6, 2002 regarding our exhibit list. Said list was discussed. Exhibit lists were to be exchanged.

Respectfully submitted this the 19th day of September 2002.

*Glenda Stout*

Glenda Stout PAR 057
Assistant DA
12 Judicial Circuit
P.O. Box 311102
Enterprise, 36331-1102
(334)347-1142

## CERTIFICATE OF SERVICE

I, Glenda Stout, hereby do certify that I have served the following on the attorneys of record for the defendant, Robert Thomas Conrad by placing same in the United State Mail. Postage prepaid on this the 19th day of September 2002.

Also served by Fax on this day to the

Hon. Gary Bradshaw
Hon. Al Smith

Glenda Stout, Assistant DA

I Sheila Hanson certify I am delivering all exhibits in the case of State v Robert Conrad.

Oct. 9, 2002

Sheila Hanson

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

STATE OF ALABAMA,
    Plaintiff;

VS.                           CASE NO.: CC-2002-M-179 & 180

ROBERT CONRAD,
    Defendant.

## DEFENDANT'S EXHIBIT LIST

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | IDENTIFIED | OFFERED | ADMITTED |
|---|---|---|---|---|
| A | PHOTO OF OUTSIDE FRONT OF TOY STORE SHOWING DOOR OPEN AND SIGNS ON FRONT | ✓ | ✓ | ✓ |
| B | PHOTO OF INSIDE FROM BEHIND COUNTER TOWARD OPEN FRONT DOOR - SHOWS BLOOD ON COUNTER | | | ✓ |
| C | ROY GRIMES COMING OUT FRONT DOOR OF TOY STORE | ✓ | | ✓ |
| D | PHOTO FROM FRONT OF COUNTER SHOWING MAGAZINE AND DILDO DISPLAY AND PIPE COUNTER | | | ✓ |
| E | PHOTO CLOSE UP OF POOL OF BLOOD ON COUNTER FROM VIDEO. (NOT USE) | NOT | | ✓ |
| F | PHOTO OF PIPE COUNTER WITH BONG PROMINANT | | | ✓ |
| G | PHOTO O F BULLET HOLE IN WALL AND "QUESTION GOVERNMENT" and "BUTT NAKED" SIGNS | ✓ | ⊘ | ✓ |
| H | PHOTO OF SHELL CASING LABELED 26 NEXT TO RUBBER SIZED | | | ✓ |
| I | PHOTO OF SHELL CASING 22 AND 24 AND "INSTANT PUSSY" AND "INSTANT COCK" | ✓ | | ✓ |
| J | PHOTO FROM VIDEO OF BLOOD SPLATTERS ON WALL AND VINYL. | ✓ | | ✓ |
| K | PHOTO OF BLOOD ON WALL AND VINYL | | | ✓ |
| L | PHOTO FROM VIDEO OF BLOOD BY CHAIR BEHIND COUNTER | ✓ | | ✓ |
| M | PHOTO FROM VIDEO OF BLOOD BY CHAIR | | | ⊘ |
| N | PHOTO OF WALL WITH LABELED BLOOD SPLATTERS | | N | ✓ |
| O | PHOTO OF WALL WITH BLOOD SPLATTERS LABELED | ✓ | O | ✓ |
| P | PHOTO OF PISTOL ON FLOOR AND CASINGS ON FLOOR | | ✓ | ✓ |

*Not in Evid*



Page 1 of 2

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | IDENTIFIED | OFFERED | ADMITTED |
|---|---|---|---|---|
| Q | PHOTO OF BURN ON VICTIM'S HAND | | | |
| R | PHOTO OF CHEST WOUND OF VICTIM WITH SOOT | | | |
| S | PHOTO OF VICTIM'S LOWER WOUND WITH HANDS VISIBLE | | | |
| T | JOE SALOOM'S REPORT | | | |
| U | AUTOPSY REPORT | | | |
| V | PHYLLIS ROLLAN'S REPORT | ✓ | ✓ | ✓ |
| W | BRYAN YEOMANS' STATEMENT OF 5/23/01 | | | |
| X | BRYAN YEOMANS' STATEMENT OF 5/25/02 | | | |
| | | | | |
| | | | | |
| Y — Coull — not in list of people at scene | | | | |
| | | | | |
| Z — Ho rcds ✓ orig Robert cowan | | | | |
| | | | | |
| | | | | |
| | | | | |
| — irs med rcds ✗ | | | | |
| | | | | |

Page 2 of 2

I, Sheila Hanson, court reporter certify that I have on this date, October 10, 2002 delivered to the Clerk of Court, Mickey Counts, all of the exhibits entered in the case of STATE OF ALABAMA VS. ROBERT CONRAD, CASE NO: CC-2001-M-179 AND CC-2001-M-180.

_Sheila Hanson_

SHEILA HANSON
COURT REPORTER

_James M Counts by AT_        10-9-02

MICKEY COUNTS
CLERK OF COURT

EXHIBIT NO. _____1_____ For State

Darby Car Tape VHS

I, James M. Counts, Clerk Of the Circuit Court for Coffee County, Alabama,
do hereby certify that the Exhibit Number One
For The State is of such size and shape to make it difficult or impractical
to attach the same to a page of the record, and that this Exhibit is available
to be transmitted in a separate container under seal.

This the ...18th.....day of April, 2003    .

_James M. Counts_____
James M. Counts
Clerk Of The Circuit Court
Coffee County, Alabama

EXHIBIT NO. _____3_____ For State

Chart Of Toy Store(inside)

I, James M. Counts, Clerk Of the Circuit Court for Coffee County, Alabama, do hereby certify that the Exhibit Number __Three_____ For The State is of such size and shape to make it difficult or impractical to attach the same to a page of the record, and that this Exhibit is available to be transmitted in a separate container under seal.

This the __18th____day of April, 2003 __.

_James M. Counts_

James M. Counts
Clerk Of The Circuit Court
Coffee County, Alabama

EXHIBIT NO. _____4_____ For State

Chart Of Toy Store(Inside with photos)

I, James M. Counts, Clerk Of the Circuit Court for Coffee County, Alabama,

do hereby certify that the Exhibit Number __Four_____

For The State is of such size and shape to make it difficult or impractical

to attach the same to a page of the record, and that this Exhibit is available

to be transmitted in a separate container under seal.

This the ---18th-----day of April, 2003___ .

_James M. Counts_____

James M. Counts
Clerk Of The Circuit Court
Coffee County, Alabama

EXHIBIT NO. __7_____For State

Chart- photos of Conrad in hospital
showing Bullet wound area

I, James M. Counts, Clerk Of the Circuit Court for Coffee County, Alabama,
do hereby certify that the Exhibit Number ___Seven_____
For The State is of such size and shape to make it difficult or impractical
to attach the same to a page of the record, and that this Exhibit is available
to be transmitted in a separate container under seal.

This the --18th-------day of April, 2003___.


James M. Counts
James M. Counts
Clerk Of The Circuit Court
Coffee County, Alabama

EXHIBIT NO. _____8_____ For State

Chart – photos of wounds to

Jelaine Dennis

I, James M. Counts, Clerk Of the Circuit Court for Coffee County, Alabama,

do hereby certify that the Exhibit Number ____Eight_____

For The State is of such size and shape to make it difficult or impractical

to attach the same to a page of the record, and that this Exhibit is available

to be transmitted in a separate container under seal.

This the ___18th_____day of ___April, 2003____ .


*James M. Counts*

James M. Counts
Clerk Of The Circuit Court
Coffee County, Alabama

EXHIBIT NO. _____9_____For  State


_____Clerke .22 cal. pistol_____

I, James M. Counts, Clerk Of the Circuit Court for Coffee County, Alabama,
do hereby certify that the Exhibit Number ____Nine_____
For The State is of such size and shape to make it difficult or impractical
to attach the same to a page of the record, and that this Exhibit is available
to be transmitted in a separate container under seal.

This the  18th-------day of  April, 2003    .


_James M. Counts_____
James M. Counts
Clerk Of The Circuit Court
Coffee County, Alabama

EXHIBIT NO. _____10_____For State

4 Cartridge Cases – 1 unfired
cartridge

I, James M. Counts, Clerk Of the Circuit Court for Coffee County, Alabama,
do hereby certify that the Exhibit Number _____10_____
For The State is of such size and shape to make it difficult or impractical
to attach the same to a page of the record, and that this Exhibit is available
to be transmitted in a separate container under seal.

This the ...8th........day of May, 2003_____ .

James M. Counts
Clerk Of The Circuit Court
Coffee County, Alabama

EXHIBIT NO. _____11_____For  State

Five projectiles colleted at scene
marked State's Exhibit #11
A - E Collectively

I, James M. Counts, Clerk Of the Circuit Court for Coffee County, Alabama,

do hereby certify that the Exhibit Number __Eleven_____

For The State is of such size and shape to make it difficult or impractical

to attach the same to a page of the record, and that this Exhibit is available

to be transmitted in a separate container under seal.

This the ···18th······day of April, 2003 ___ .


_James M. Counts_____

James M. Counts
Clerk Of The Circuit Court
Coffee County, Alabama

*1148*

EXHIBIT NO. _____12_____ For State

Six cartridge cases collected at
the scene.Appear to be from a 9mm
or .380cal pistol.Exh.12 A-F
collectively

I, James M. Counts, Clerk Of the Circuit Court for Coffee County, Alabama,

do hereby certify that the Exhibit Number ____twelve_____

For The State is of such size and shape to make it difficult or impractical

to attach the same to a page of the record, and that this Exhibit is available

to be transmitted in a separate container, under seal.

This the ----18th---day of _April, 2003___ .


_James M. Counts_
James M. Counts
Clerk Of The Circuit Court
Coffee County, Alabama



STATE'S
EXHIBIT
13





STATE'S
EXHIBIT
15

STATE'S
EXHIBIT
16





STATE'S
EXHIBIT
17



STATE'S
EXHIBIT
18



STATE'S EXHIBIT 19



STATE'S
EXHIBIT
20



STATE'S
EXHIBIT
2

EXHIBIT NO. _____25_____ For State

White tee shirt from dumpster with
bullet holes and blood stains

I, James M. Counts, Clerk Of the Circuit Court for Coffee County, Alabama,
do hereby certify that the Exhibit Number _____twenty-five_____
For The State is of such size and shape to make it difficult or impractical
to attach the same to a page of the record, and that this Exhibit is available
to be transmitted in a separate container under seal.

This the ___18th___ day of ___April, 2003___.

_James M. Counts_

James M. Counts
Clerk Of The Circuit Court
Coffee County, Alabama

EXHIBIT NO. _____26_____ For State

Projectile from defendant's arm

I, James M. Counts, Clerk Of the Circuit Court for Coffee County, Alabama,
do hereby certify that the Exhibit Number __Twenty Six_____
For The State is of such size and shape to make it difficult or impractical
to attach the same to a page of the record, and that this Exhibit is available
to be transmitted in a separate container under seal.

This the ····18th····day of April, 2003___ .

_James M. Counts_____
James M. Counts
Clerk Of The Circuit Court
Coffee County, Alabama

EXHIBIT NO. _____27 A_____For  State

_____Projectile from victim_____

I, James M. Counts, Clerk Of the Circuit Court for Coffee County, Alabama,

do hereby certify that the Exhibit Number _____27A_____

For The State is of such size and shape to make it difficult or impractical

to attach the same to a page of the record, and that this Exhibit is available

to be transmitted in a separate container under seal.

This the ----8th----day of May, 2003_____.

*James M. Counts*

James M. Counts
Clerk Of The Circuit Court
Coffee County, Alabama

EXHIBIT NO. _____28-A_____ For State

Blood retrieved from hospital

I, James M. Counts, Clerk Of the Circuit Court for Coffee County, Alabama,
do hereby certify that the Exhibit Number ___Twenty Eight-A_____
For The State is of such size and shape to make it difficult or impractical
to attach the same to a page of the record, and that this Exhibit is available
to be transmitted in a separate container under seal.

This the __18th_____day of _April, 2003___.

_James M. Counts_
James M. Counts
Clerk Of The Circuit Court
Coffee County, Alabama

EXHIBIT NO. _____28-B_____ For State

_____Card_____

I, James M. Counts, Clerk Of the Circuit Court for Coffee County, Alabama,
do hereby certify that the Exhibit Number _____Twenty-Eight B_____
For The State is of such size and shape to make it difficult or impractical
to attach the same to a page of the record, and that this Exhibit is available
to be transmitted in a separate container under seal.

This the __18th____day of _April, 2003___.

_James M. Counts_____
James M. Counts
Clerk Of The Circuit Court
Coffee County, Alabama

115>



ALABAMA
DEPARTMENT OF FORENSIC SCIENCES

| REGIONAL LABORATORY | MEDICAL EXAMINER |
| P.O. BOX 210516 | P.O. BOX 240591 |
| MONTGOMERY, AL 36121-0516 | MONTGOMERY, AL 36124-0591 |
| (334) 242-2938 | (334) 242-3093 |
| FACSIMILE (334) 240-3284 | FACSIMILE (334) 260-8734 |

April 16, 2002

Honorable Mark Fuller
District Attorney 12th Judicial Circuit
P.O. Box 1102
Enterprise, Alabama 36331-1102

Re:  Case No. 01MM00435
     Evelyn Jelaine Dennis, subject

Dear Mr. Fuller:

The enclosed memoranda constitute our reports relevant to the examinations
conducted at your request in the above styled case.  We trust these
memoranda are self-explanatory.

If we may be of further assistance, please do not hesitate to contact us.

Sincerely yours,

Emily Wofford Ward, M.D.
Regional Medical Examiner

EWW:dp

Enclosures (4)

cc:  Coroner Rob Ward

     Investigator Bufford Roberts
     Enterprise Police Department

     Investigator Ben Moates
     Coffee County Sheriff's Office

STATE'S
EXHIBIT
31

F5



ALABAMA
# DEPARTMENT OF FORENSIC SCIENCES

REGIONAL LABORATORY
P.O. BOX 210516
MONTGOMERY, AL 36121-0516
(334) 242-2938
FACSIMILE (334) 240-3284

MEDICAL EXAMINER
P.O. BOX 240591
MONTGOMERY, AL 36124-0591
(334) 242-3093
FACSIMILE (334) 260-8734

## REPORT OF AUTOPSY

CASE NO.   01MM00435 (01AH30)   DATE/TIME:   May 24, 2001
                                             12:00 p.m.

COUNTY:   Coffee

**DECEDENT:**  Evelyn Jelaine Dennis

AGE: 39 Years   SEX: Female   LENGTH:  65 Inches   WEIGHT:   160 pounds

### FINAL ANATOMIC DIAGNOSES

I.   Multiple Gunshot Wounds.

   A.   Perforating gunshot wound of the chest with perforation of the right lung.
   B.   Perforating gunshot wound of the left buttock and hip.
   C.   Penetrating gunshot wound of the left thigh.

II.   Additional Anatomic Diagnoses.

   A.   Postmortem Toxicology – See Attached.

**CAUSE OF DEATH:**     Multiple Gunshot Wounds.

**MANNER OF DEATH:**    Homicide.

page 1 of 7

page 2 of 7
Case 01MM00435
AUTOPSY PROTOCOL

**AUTHORIZATION:**

At the request of Coffee County Coroner Tim Whitehead, and under the authority granted by District Attorney Mark Fuller, as defined in Section 36-18-2, Code of Alabama, 1975, a postmortem examination is performed on Evelyn Jelaine Dennis, at the Central Alabama Forensic Medicine Facility in Montgomery, Alabama, on May 24, 2001, commencing at 12:00 p.m.  Authorization was obtained May 23, 2001, at 3:45 p.m., from District Attorney Mark Fuller.

**IDENTIFICATION**

The body is identified by plastic white ID bracelets on the left wrist and right ankle imprinted with the name of the deceased.

**CLOTHING AND PERSONAL EFFECTS**

The clothing is partly cut-off of the body and includes a pair of blue denim jeans with bloodstains on the back and on the lateral aspect to the left thigh.  Holes are present in the left leg and the left rear pocket area which correspond to the gunshot entry wounds on the left thigh and left buttock, respectively.  Another hole is present on the left hip area which corresponds to the exit wound on the body.  A few particles of gunpowder are visible around the entrance defect on the left leg of the jeans.  All of the holes are also surrounded with copious amounts of blood soaked into the material.  A knit stripe short sleeve shirt is received which is soaked with blood.  The shirt also exhibits two holes, one of which is on the front of the right side of the chest of the shirt, and the other of which is on the right side near the arm seam.  The hole on the front of the shirt is approximately 1-1/4 inch in diameter.  It is surrounded by some dried black material, and a large amount of blood.  The edges of this hole in the front of the shirt have a burned appearance where some of the synthetic fibers appear to have melted together.  Part of a white bra is also received with the body.  The bra is soaked with blood and the right front of the bra is not identified with the other clothing articles.  One white athletic sock is present on the right foot which is noticeably not bloody.  The left sock is not identified. The clothing is all photographed, dried, and packaged for transfer to the laboratory.  A gold colored ring with small hearts on it is present on the left fourth finger.

**EVIDENCE OF INJURY**

The gunshot wounds described below are numbered arbitrarily.

page 3 of 7
Case 01MM00435
AUTOPSY PROTOCOL

GUNSHOT WOUND # 1:

A gunshot entrance wound is present on the right side of the front
of the chest. It is located 14-1/2 inches from the top of the head
and 1-1/2 inches to the right of the midline. The entrance wound
is round with a diameter of 3/8 inch, and it is surrounded by a
concentrically shaped area of abrasion and superficial burning of
the skin. The area of abrasion has a horizontal dimension of 1-1/2
inches and a vertical dimension of 1-1/4 inches. No gunpowder
particles are visible around the entrance wound. The abraded area
appears to have been discolored with black sooty material, although
the soot is not clearly distinguishable from the other skin
changes. The bullet passed through the right side of the chest
wall, through the right third rib, fracturing the rib in its
course. Then the bullet entered the right hemithorax and passed
through the right upper lobe, the right middle lobe, and passed
into the posterior chest wall through the right sixth intercostal
space. The bullet exited the right lateral aspect of the chest
lateral to the defect in the right sixth intercostal space. The
exit wound is irregular shaped with a diameter of 1/2 inch. No
soot, stippling abrasions, or gunpowder particles are visible
around the exit wound. The exit wound is located 18 inches from
the top of the head and 10 inches to the right of the midline. The
bullet passed through the body in a direction from left to right,
downward, and backward. A large right hemopneumothorax resulted.
Hemorrhage is visible in the right lung parenchyma surrounding the
wound track.

GUNSHOT WOUND # 2:

A gunshot entrance wound is present on the back of the left
buttock, 30 inches from the top of the head and 2 inches to the
left of the midline. The entrance wound is round with a diameter
of 3/8 inch, and it is surrounded by an eccentrically shaped
marginal abrasion which is widest medially. The abrasion has a
maximum dimension of 1/4 inch. No soot, stippling abrasions, or
gunpowder particles are visible around the entrance wound. The
bullet passed through the left buttock, through the fatty tissues,
and apparently struck the left pelvic bone, changing slightly in
direction, and it exited the lateral aspect of the left hip, 29
inches from the top of the head and 9 inches to the left of the
anterior midline plane. The exit wound is irregularly shaped with
a diameter of 1/2 inch. No soot, stippling abrasions, or gunpowder
particles are visible around the exit wound. The bullet passed
through the body in a direction from right to left, slightly
upward, and slightly forward. The bullet did not pass into the
peritoneal cavity or the pelvis area.

page 4 of 7
Case 01MM00435
AUTOPSY PROTOCOL

GUNSHOT WOUND # 3:

A gunshot entrance wound is present on the lateral aspect of the
left thigh.  It is located 26-1/2 inches from the bottom of the
left heel and 6-1/2 inches lateral to the anterior midline plane.
The entrance wound is round with a diameter of 3/8 inch and is
surrounded by an eccentrically shaped marginal abrasion which is
widest inferiorly.  The abrasion has a greatest dimension of 1/4
inch.  No soot or gunpowder particles are visible around the skin
of the entrance wound.  However, several tiny particles are visible
through the transparent tape which is pressed against the skin
around the wound.  The bullet passed through the left side of the
thigh, through the soft tissues of the thigh, and became lodged in
the posterior aspect of the left buttock. ˙ A small 1/2 inch
subcutaneous contusion is visible in the skin of the left buttock
at a point 32 inches from the top of the head and 4 inches to the
left of the posterior midline plane.  The medium caliber copper-
jacketed bullet is recovered from the subcutaneous tissues of the
left buttock just beneath the area of contusion.  The bullet passed
through the body in a direction upward, backward, and slightly from
left to right.  The bullet is cleaned, photographed, and packaged
for subsequent transfer to the laboratory for further evaluation.

**EVIDENCE OF MEDICAL INTERVENTION:**

An endotracheal tube is present in the oral cavity and in the
trachea.  Several EKG pads are stuck to the anterior aspect of the
chest wall.  An orange rectangular plastic device is also adherent
to the left side of the chest wall.  A chest tube is in place in
the right side of the chest through the right eighth intercostal
space in the anterior axillary line.  An intravascular catheter is
in place in the right antecubital fossa and the right groin area.
A foley catheter is in the urethra.

**EXTERNAL EXAMINATION**

The body is that of a middle-aged white female appearing to be the
stated age of 39 years with a length of 65 inches and a weight of
160 pounds.  The body is in full rigor mortis, and the skin is cool
to touch.  Minimal lividity is developed posteriorly.  The skin is
cold to touch.

The head is normally developed.  The head hair is long, thick,
wavy, and blonde with a greatest length of more than 20 inches.
The eyes are hazel in color with a small amount of make-up visible
including eyeliner and mascara.  No petechial hemorrhages are
visible in the conjunctiva or in the skin of the face or the buccal
mucosa.  A small amount of fluid is draining from the nose.  A

small amount of dried brown material is draining from the left side of the mouth. The permanent teeth in the mouth are in adequate repair. No abrasions or contusions of the neck or face are visible. The chest is symmetrically developed. Several striae are visible in the skin of the breasts. The abdomen is not distended or tense. The extremities are symmetrically developed. The hands are covered with brown paper bags.

Prior to further examination, the bags are cut from the hands, and the hands are examined for the presence of injury or foreign material. A 1-1/4 inch by 1/4 inch linear area of black sooty material is deposited on the palm of the left hand where the fingers join the hand across the left index and middle fingers. No distinct gunpowder particles are visible in this area of discoloration, and no contusion or edema of the skin underneath the soot is seen. The fingernails are neatly manicured with dark pink polish on the nails. A 1/2 inch abrasion is present on the medial aspect of the right wrist. No other injuries or foreign material is visible on the hands.

The lower extremities are symmetrically developed. The toenails are covered with the same dark pink polish that is visible on the fingernails. No abrasions or contusions of the lower extremities are visible other than those previously described associated with the gunshot wounds. The back and buttocks are not remarkable. The genitalia are that of a female adult. Some of the pubic hair has been partly shaved. No injuries or abnormalities of the perineum or perianal tissues are visible.

### INTERNAL EXAMINATION

BODY CAVITIES: Approximately 400 cc. of bloody fluid is present in the right pleural space. No significant fluid is present in the left pleural space or the pericardial sac. Also, no fluid is visible in the peritoneal cavity.

CARDIOVASCULAR: The heart weighs 350 grams. The epicardium is smooth and glistening. The coronary arteries course in the usual anatomic fashion with thirty percent narrowing of the left anterior descending artery. No other areas of atherosclerosis are visible. No hemorrhage or fibrosis is visible in the myocardium. The endocardium is thin and smooth. The left ventricular wall is 1.1 cm. in thickness. The cardiac valves are normally formed and delicate. No significant atherosclerosis of the aorta is demonstrable.

page 6 of 7
Case 01MM00435
AUTOPSY PROTOCOL

RESPIRATORY:  The right lung weighs 520 grams.  The left lung weighs 420 grams.  The trachea and major bronchi are opened and a small amount of bloody mucoid material is visible in the right mainstem bronchus, extending peripherally into the right lung. Otherwise, no abnormalities or occlusions of the airway are visible.  The pleural surfaces of the lungs are smooth.  Moderate anthracotic pigmentation is visible in the pleural lymphatics.  The cut surfaces of the lungs reveal hemorrhage in the right lung in the vicinity of the gunshot wound track.  No other areas of hemorrhage or consolidation are visible.  Mild emphysematous destruction is visible in the apices of the lungs bilaterally.

HEPATOBILIARY:  The 1570 gram liver has a smooth glistening capsule and a sharp edge.  The parenchyma is dark reddish-brown without any visible fatty degeneration, fibrosis, or focal lesions.  The gallbladder contains a small amount of liquid bile with no stones.

SPLEEN:  The spleen weighs 220 grams.  The capsule is smooth and thin.  The cut surfaces are soft and dark reddish-brown.

ENDOCRINE SYSTEM:  The thyroid and adrenal glands are unremarkable. The pancreas maintains its usual lobular architecture without any visible fibrosis, hemorrhage, necrosis, or calcification.

GASTROINTESTINAL: The stomach contents consist of about 100 cc. of thick brown mucoid material.  No ulceration or hemorrhage of the gastric mucosa is demonstrable.  The small and large intestines occupy their usual positions within the peritoneal cavity.  A few adhesions are encountered in the pelvic area and around the right inferior peritoneal area.  No other abnormalities to the gastrointestinal tract are identified.

INTERNAL GENITALIA:  Both ovaries are present in the pelvis. Adjacent to the ovaries are numerous small pieces of surgical suture material which are knotted together and covered with thick scar tissue.  The fallopian tubes and uterus are not identified. Several small simple cysts are present near the ovaries.

KIDNEYS:  The right kidney weighs 110 grams.  The left kidney weighs 110 grams.  The capsules strip easily.  The cortical surfaces are smooth.  The cut surfaces do not reveal any abnormalities in the cortex or medulla.  The collecting systems and ureters are not dilated.  The bladder is not hypertrophied.  No urine is present in the bladder.

NECK ORGANS:  The strap muscles of the neck are individually dissected.  No soft tissue hemorrhages or bruises are identified. No fractures of the hyoid bone or laryngeal cartilages are present.

page 7 of 7
Case 01MM00435
AUTOPSY PROTOCOL

The vocal cords and epiglottis are not edematous or discolored.  No
injury of the cervical spinal column is visible.

CENTRAL NERVOUS SYSTEM:    The brain weighs 1280 grams.    Upon
reflection of the scalp, no soft tissue hemorrhages are visible.
The skull cap is removed, and no abnormalities of the meninges are
visible.  The cerebral gyral pattern appears to have been normally
developed.   The meninges are thin and clear.   The vessels of the
Circle of Willis course in the usual anatomic fashion without any
significant  intracranial  atherosclerosis.    Multiple  coronal
sections  of  the  cerebral  cortex  do  not  reveal  any  areas  of
hemorrhage,  fibrosis,  or  contusion.    The  ventricles  are  not
dilated.   The cerebellum and brainstem are sectioned, and no
remarkable abnormalities are seen.  The dura is stripped from the
inner  table  of  the  skull.    No  skull  fracture  or  intracranial
hemorrhage is demonstrable.

*Emily Wofford Ward*

Emily Wofford Ward, M.D.
Deputy Medical Examiner

EWW:bw

ALABAMA DEPARTMENT OF
FORENSIC SCIENCES

Date 5/24/01        Case No. 01mm00435



ALABAMA
## DEPARTMENT OF FORENSIC SCIENCES

REGIONAL LABORATORY
P.O. BOX 210516
MONTGOMERY, AL 36121-0516
(334) 242-2938
FACSIMILE (334) 240-3284

MEDICAL EXAMINER
P.O. BOX 240591
MONTGOMERY, AL 36124-0591
(334) 242-3093
FACSIMILE (334) 260-8734

July 20, 2001

MEMORANDUM TO FILE:

RE:    Case No. 01MM00435
Evelyn Jelaine Dennis, subject

BY:  Emily Wofford Ward, M.D.
Deputy Medical Examiner

## MICROSCOPIC EXAMINATION

Sections of the skin of the gunshot wounds, the heart, the kidney,
liver, spleen, and lungs do not reveal any significant microscopic
abnormalities.

EWW:bw



ALABAMA
# DEPARTMENT OF FORENSIC SCIENCES

REGIONAL LABORATORY
P.O. BOX 210516
MONTGOMERY, AL 36121-0516
(334) 242-2938
FACSIMILE (334) 240-3284

MEDICAL EXAMINER
P.O. BOX 240591
MONTGOMERY, AL 36124-0591
(334) 242-3093
FACSIMILE (334) 260-8734

July 31, 2001

Re:    Case 01A-01-MM-00435
       Jelaine Dennis, subject

MEMORANDUM:    To File

BY:    Joseph M. Saloom, Forensic Scientist

SUBJECT:    Firearms Evidence Examination / Laboratory Results

During the course of the investigation of the above styled case, the following items of evidence were received from Enterprise Police Department Detective Rick Hauser on Thursday, May 24, 2001, by the undersigned.

01.00    One sealed brown paper bag containing one Clerke 1st revolver, caliber .22 Long Rifle, serial number 294415. This revolver was test fired using laboratory standard ammunition.

01.01    Four (4) fired CCI brand cartridge cases, caliber .22 Long/Long Rifle, removed from the cylinder of Exhibit 01.00 by the undersigned. Laboratory examination revealed some similarities to test fired cartridge cases, however, it could not be determined whether or not these cartridge cases were fired in the chambers of the Clerke revolver described previously as Exhibit 01.00.

01.02    One unfired CCI brand cartridge, caliber .22 Long Rifle, removed from the cylinder of Exhibit 01.00 by the undersigned.

02.00    One sealed brown paper bag containing one screw-capped plastic specimen jar containing one fired, copper color coated lead bullet, identified to be from Robert Conrad. Laboratory examination of this .22 caliber bullet revealed that it has been fired through the barrel of the Clerke revolver described previously as Exhibit 01.00.

The following additional items of evidence were received from Enterprise Police Department Detective Rick Hauser on Tuesday, May 29, 2001, by the undersigned.

Page 1 of 4

Case Number 01A-01-MM-00435
Firearms Examination / Laboratory Results

03.00   One sealed brown paper bag labeled in part "removed from dumpster", containing one white, sleeveless tee shirt. Laboratory examination of this shirt revealed two holes located in the lower front. The lower hole has heavy deposits of soot around it on the outside of the shirt, while the upper hole has deposits of soot around it on the *inside* of the shirt. Also present on the front of the shirt is another pattern of soot. Present inside the front of the shirt are what appear to be dried blood stains. These patterns of holes and soot are consistent with one revolver gunshot through folded clothing at near contact range.

04.00   One sealed manila envelope containing:

04.01   One sealed plastic film canister labeled in part "34", containing cotton, and one fired, copper jacketed bullet, identified to be from the scene. Laboratory examination of this 9mm/.38 caliber bullet revealed that it has been fired through the barrel of the same firearm as the bullets described elsewhere as Exhibits 04.02, 04.03, and 04.04. This bullet could have been fired in (but not limited to) the following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

04.02   One sealed plastic film canister labeled in part "38", containing cotton, and one fired, copper jacketed bullet, identified to be from the scene. Laboratory examination of this 9mm/.38 caliber bullet revealed that it has been fired through the barrel of the same firearm as the bullets described elsewhere as Exhibits 04.01, 04.03, and 04.04. This bullet could have been fired in (but not limited to) the following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

04.03   One sealed plastic film canister labeled in part "41", containing cotton, and one fired, copper jacketed bullet, identified to be from the scene. Laboratory examination of this 9mm/.38 caliber bullet revealed that it has been fired through the barrel of the same firearm as the bullets described elsewhere as Exhibits 04.01, 04.02, and 04.04. This bullet could have been fired in (but not limited to) the following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

04.04   One sealed plastic film canister labeled in part "42", containing cotton, and one fired, copper jacketed bullet, identified to be from the scene. Laboratory examination of this 9mm/.38 caliber bullet revealed that it has been fired through the barrel of the same firearm as the bullets described elsewhere as Exhibits 04.01, 04.02, and 04.03. This bullet could have been fired in (but not limited to) the following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

Case Number 01A-01-MM-00435
Firearms Examination / Laboratory Results

04.05  One sealed plastic film canister labeled in part "32", containing cotton, and one fired, badly damaged, copper color coated lead bullet, identified to be from the scene. This .22 caliber bullet is too damaged for further identification.

04.06  One small sealed manila envelope labeled in part "21", containing one fired Winchester brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed that it has been fired in the chamber of the same firearm as the cartridge cases described elsewhere as Exhibits 04.07, 04.08, 04.09, and 04.10.

04.07  One small sealed manila envelope labeled in part "23", containing one fired Winchester brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed that it has been fired in the chamber of the same firearm as the cartridge cases described elsewhere as Exhibits 04.06, 04.08, 04.09, and 04.10 .

04.08  One small sealed manila envelope labeled in part "24", containing one fired Winchester brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed that it has been fired in the chamber of the same firearm as the cartridge cases described elsewhere as Exhibits 04.06, 04.07, 04.09, and 04.10.

04.09  One small sealed manila envelope labeled in part "25", containing one fired Winchester brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed that it has been fired in the chamber of the same firearm as the cartridge cases described elsewhere as Exhibits 04.06, 04.07, 04.08, and 04.10.

04.10  One small sealed manila envelope labeled in part "26", containing one fired Winchester brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed that it has been fired in the chamber of the same firearm as the cartridge cases described elsewhere as Exhibits 04.06, 04.07, 04.08, and 04.09.

04.11  One small sealed manila envelope labeled in part "22", containing one fired Federal brand cartridge case, caliber 9mm. Laboratory examination of this cartridge case revealed some similarities to the cartridge cases described elsewhere as Exhibits 04.06, 04.07, 04.08, 04.09, and 04.10, however, it could not be determined whether or not they were fired in the chamber of the same firearm.

The following additional items of evidence were received from State Medical Examiner Dr. Emily Ward on Tuesday, June 5, 2001, by the undersigned.

Case Number 01A-01-MM-00435
Firearms Examination / Laboratory Results

05.00  One small sealed manila envelope containing one fired, copper jacketed bullet identified to be from the subject. Laboratory examination of this 9mm/.38 caliber bullet revealed similar characteristics as the bullets described elsewhere as Exhibits 04.01, 04.02, 04.03, and 04.04, however, it could not be determined whether or not they have all been fired through the barrel of the same firearm. This bullet could have been fired in (but not limited to) the following firearms: Jennings/Bryco, Hi Point, Astra, or Stallard Arms.

06.00  One small sealed manila envelope containing:

06.01  One white card labeled in part "Lt. lat. thigh ", containing one tape lift, identified to be from the subject. Laboratory examination of this tape lift revealed the presence of gunpowder particles.

06.02  One white card labeled in part "Front Rt. hand ", containing one tape lift, identified to be from the subject. Laboratory examination of this tape lift revealed the presence of gunpowder particles.

06.03  One white card labeled in part "Post chest ", containing one tape lift, identified to be from the subject. Laboratory examination of this tape lift revealed the presence of gunpowder particles.

06.04  Six white cards labeled variously, each containing one tape lift, identified to be from the subject. Laboratory examination of these tape lifts failed to reveal the presence of gunpowder particles.

The following additional item of evidence was placed into a locked evidence locker on Friday, June 8, 2001, by Enterprise Police Department Captain William Moore, and retrieved on Tuesday, June 12, 2001 by the undersigned.

07.00  One sealed brown paper bag containing one navy blue, pull-over, collared shirt, identified to be from Robert Conrad. Laboratory examination of this shirt revealed a hole located in the front, just left of center. No gunpowder particles were found around this hole.

Unless otherwise indicated, all evidence in this case will be returned to the appropriate agency at the earliest available opportunity.

Page 4 of 4                    -    Joseph M. Saloom



ALABAMA
# DEPARTMENT OF FORENSIC SCIENCES

991 WIRE ROAD                      P.O. BOX 3510
AUBURN, ALABAMA 36830      AUBURN, ALABAMA 36831-3510
(334) 887-7001                      FACSIMILE (334) 887-7531

## CERTIFICATE OF ANALYSIS

### TOXICOLOGY

DR. EMILY WARD
MEDICAL EXAMINER'S OFFICE
8160 UNIVERSITY DRIVE
MONTGOMERY AL 36117

CASE NUMBER: 01MM00435

AGENCY NUMBER: UNKNOWN

| SUBJECT(S) | RACE | SEX | BIRTH DATE | STATUS |
|---|---|---|---|---|
| Evelyn J Dennis | W | F | 04/10/1962 | Adult |

SERVICE REQUESTED: Toxicology

CHAIN OF CUSTODY:

| RELINQUISHED BY | RECEIVED BY | DATE | TIME |
|---|---|---|---|
| Emily Ward | Terrell Abrams | 05/30/2001 | 1000 |
| Terrell Abrams | Sarawanee C Parish | 05/30/2001 | 1100 |

DESCRIPTION OF EVIDENCE: Blood, vitreous humor, gastric, bile

RESULTS:                          DATES OF ANALYSIS: 05/31/2001 - 06/06/2001

| Blood | : Ethyl alcohol | Negative |
|---|---|---|
| | Lidocaine | 5.0 mg/L |
| | Citalopram | 0.48 mg/L |
| Vitreous Humor | : Ethyl alcohol | Negative |
| Gastric Contents | : Not Analyzed | |
| Bile | : Not Analyzed | |

Sworn to and subscribed before me this the _17th_ Day of _October_ 20 _01_ as true and correct.

_Sarawanee C Parish_

Sarawanee C Parish, Ph.D.
Forensic Scientist III

_[signature]_

Notary Public

Note: The specimen(s) listed above will be retained in the laboratory for a period of six (6) months
    from the date of this report unless a written request is received otherwise.

1

1    IN THE CIRCUIT COURT OF

2    COFFEE COUNTY, ALABAMA

3    ENTERPRISE DIVISION

4

5    STATE OF ALABAMA,                    )
          Plaintiff,                      )
6                                         )
     VS.                                  )    CC-2001-M-179
7                                         )    CC-2001-M-180
                                          )
8                                         )
     ROBERT THOMAS CONRAD,                )
9         Defendant.                      )

10

11

12        The above referenced testimony was heard before

13   Honorable Gary L. McAliley on the 26th day of

14   September, 2002, at the Coffee County Courthouse,

15   Enterprise, Alabama.

16

17                    * * * * *

18

19

20   APPEARANCES:

21   FOR THE STATE:              FOR THE DEFENDANT:

22   MRS. GLENDA STOUT              MR. GARETH LINDSEY
     Assistant D.A.                Attorney at Law
23   Enterprise, Alabama           Enterprise, Alabama

24   MR. LARRY JARRELL
     Assistant D.A.
25   Enterprise, Alabama

1    THE COURT:  The record will reflect we are out

2         of the hearing and presence of the jury.

3              You are Mr. Bryan

4    Yeoman?  Do I have that right?

5    THE WITNESS:  Yes, sir.

6    THE COURT:  And you are here with your attorney,

7         Mr. Gareth Lindsey?  Is that correct?

8    THE WITNESS:  Yes, sir.

9    THE COURT:  And also present is Assistant

10        District Attorneys, Glenda Stout and Larry

11        Jarrell.

12              It's my understanding

13        that some settlement offer has been

14        negotiated with you and your lawyer?  Is

15        that correct?

16    THE WITNESS:  Yes, sir.

17    THE COURT:  And I want somebody to recite the

18        terms of the settlement.

19    MR. LINDSEY:  Judge, the terms of the settlement

20        are they have agreed to allow him to --

21    THE COURT:  Who?  The State?

22    MR. LINDSEY:  Yes.  The State, the prosecution

23        people, have allowed him to plead to

24        robbery.

25    THE COURT:  Robbery in the first degree?

1    MR. JARRELL:  Yes, sir.

2    MR. LINDSEY:  And nolle prosequi the capital

3         murder charge.

4    THE COURT:  So that would be a lesser included

5         offense embraced within the capital charge

6         of robbery in the first degree?

7    MR. LINDSEY:  Yes, sir.

8    THE COURT:  And what would be the sentence?

9    MR. LINDSEY:  Twenty years.

10   THE COURT:  Okay.  Twenty years, cost of court,

11        all those things that have to be ordered,

12        the mandatory $50.00 Alabama Crime Victim's

13        Compensation Commission Assessment.

14   MR. LINDSEY:  We really haven't talked about

15        that.

16                      You got $50.00 on you?

17   THE COURT:  I just like to talk about those

18        things for any attorney fees the State is

19        caused to pay out.

20   MR. LINDSEY:  He's lucky.  I don't work cheap.

21        And in return for that he has agreed to

22        turn State's evidence, take the witness

23        stand and tell the truth.

24                      And his testimony --

25        you want to recite what that is in both

4

1           cases.

2     THE COURT:  Now, does that mean in this Robert

3           Thomas Conrad case, State versus him, the

4           one that I have going on at this time and

5           State of Alabama versus Brian Smith.  I

6           don't know his middle name.

7                          His first name is Bryan?

8           Is that correct?

9     THE WITNESS:  Yes, sir.

10    MR. LINDSEY:  Yes, sir.

11    THE COURT:  In each testify truthfully.

12    MR. LINDSEY:  Yes, sir.

13    THE COURT:  And what is the truth?

14    MR. LINDSEY:  The truth is that he knew and

15          heard these people planning this.

16    THE COURT:  Who are these people?  Brian Smith

17          and --

18    MR. LINDSEY:   These people are the

19          co-defendants that you just named.

20    THE COURT:  Brian Smith and Robert Conrad?

21    MR. LINDSEY:  Right.  And you correct me if I

22          mistate anything here, because we don't want

23          any question about what we are about to do.

24          He had heard them talking about this

25          previous -- about going to the Toy Box --

1    going to the Toy Store and doing a robbery,

2    and the reason that he heard was that Brian

3    Smith needed money for he and his mother to

4    move.

5    THE COURT:  Okay.

6    MR. LINDSEY:  And that on this occasion they

7    came to his home.  "They" being the

8    Defendants.

9    THE COURT:  Roberts Conrad and Smith?

10   MR. LINDSEY:  He and Smith.  And woke him up --

11   -- he has given a time that he thought that

12   they came which was his best judgment at the

13   time -- and enlisted him, Smith expressly

14   told him they were going to the Toy Store,

15   and he continued that they were -- Yeoman

16   was driving his mother's car.  Conrad was

17   driving --

18   THE COURT:  What kind of car was that?  Was that

19   the Ford LTD?

20   THE WITNESS:  Yes, sir.  Chevy Corsica.

21   MRS. STOUT:  It was Silver?  Is that right?

22   THE WITNESS:  Yes.

23   MRS. STOUT:  And that was your mom's car?

24   THE WITNESS:  Yes.

25   MR. LINDSEY:  He was -- he was driving that and

1            Smith was riding with him.

2    THE COURT:  Conrad was driving what kind of car?

3    THE WITNESS:  The blue LTD.

4    THE COURT:  What color was the LTD?  It's like a

5            sky blue.  Would that be about right?

6    THE WITNESS:  Yes, sir.

7    THE COURT:  Did it have any damage to it?

8    THE WITNESS:  Yes.  I know there was a dent on

9            the driver's side.

10   THE COURT:  I'm sorry.  I should not have asked

11           your questions.

12   MR. LINDSEY:  Well, I haven't heard any of the

13           evidence in this case.

14   THE COURT:  We have.

15   MR. LINDSEY:  And in the course of proceeding to

16           the Toy Store, Conrad, Brian Smith and Bryan

17           Yeoman -- Smith is in the car with Yeoman.

18           Conrad is in the car alone.  They separated,

19           but then they got back together near -- they

20           got back together near the place where the

21           Toy Store was and stopped in the road and

22           had a conversation.

23                   Smith got out of the

24           car, with Byran Yeoman, and went over and

25           talked with Conrad, and then came back and

```
1              got in the car.
2                        They went to the Toy
3          Store and went in there.  And then in the
4          course of the transaction that they were
5          making -- I think he gave Smith $4.00 -- is
6          that right?
7     THE WITNESS:  Yes, sir.  Yes, sir.
8     MR. LINDSEY:  -- to make some sort of purchase
9          in --
10    THE WITNESS:  In comes Conrad --
11    MRS. STOUT:  How is Conrad dressed?
12    THE WITNESS:  He had a black mask on, black long
13         sleeve shirt, black jeans and black shoes.
14    MRS. STOUT:  Do you know if he had on anything
15         under that black suit?  A t-shirt or
16         anything?
17    THE WITNESS:  Yeah.  He had to because I know
18         the detective showed me they found a shirt
19         in the dumpster.
20    MR. LINDSEY:  And he grabbed the old guy.  He
21         didn't know the man's name, and took money
22         from him, took money actually from Mr.
23         Yeoman, too.
24    THE COURT:  Who did that?
25    MR. LINDSEY:  Robert Conrad did that.  And then
```

```
 1              Conrad approached --
 2    THE COURT:  Took money from this man?
 3    THE WITNESS:  Yes, sir.
 4    MR. LINDSEY:  He robbed him.
 5    THE COURT:  I read that in the confessions.
 6    MR. LINDSEY:  And went there, and I think maybe
 7              at that time -- you tell the Judge then what
 8              happened.
 9    THE WITNESS:  Well, when he robbed me, and he
10              had went over there to the cash register
11              where the woman was, and he grabbed her.  So
12              she pulled out a gun, and they started
13              tussling.  And when she fell, she shot him
14              and he -- she -- I mean he shot her, and she
15              shot him so he jumped up and run out the
16              store.
17    MRS. STOUT:  Was the gun pressed against her?
18       Show me how it was pressed against --
19    THE WITNESS:  It's like she was laying like this
20              on the ground, and the gun was like about
21              like right here.
22    MRS. STOUT:  Was he standing over her?
23    THE WITNESS:  Well, he was like this
24              (indicating), going down like this, and he
25              shot her like that.
```

1    THE COURT:  Anything else?

2    MRS. STOUT:  What happened after y'all left

3         there?

4    THE WITNESS:  I asked the lady what could I do

5         to help her.  She said she felt like she was

6         fixing to die.  I went out.  The old guy

7         there, he was on his cell phone.  And he was

8         calling the police.  So I asked him what can

9         I do.

10                        He told me to leave, go

11        get help.  So I went down to the house down

12        the street from the Toy Store, got out

13        there, knocked on the door.  Nobody answered

14        the door, so I went home.

15   MRS. STOUT:  Did Smith say anything to you?

16   MR. JARRELL:  Smith was with you?

17   THE WITNESS: Yes.

18   MRS. STOUT:  You went home -- and that's where

19        you found --

20   THE WITNESS:  Yes, ma'am.

21   THE COURT:  Did you help get him to the

22        hospital?

23   THE WITNESS:  Yes, sir.  Me and Smith got back

24        to my apartment.  Smith told me that he

25        would be back.  So, he left my apartment and

1       he went to his apartment. When I looked out

2       the window, I seen Brian Smith mom's car

3       going down to where Smith stayed at.  And,

4       you know, they come back to my house I'd say

5       in about five minutes.

6               Robert Conrad had on

7       different clothes.  And he said that he had

8       been shot, he needed me to help take him to

9       the hospital because I was the only one with

10      license.

11  MRS. STOUT:  Did you know that he had been shot

12      until then?

13  THE WITNESS:  I didn't know that he was shot

14      until when I seen him shot for myself.

15  MRS. STOUT:  You said that she shot him?  You

16      said that she shot him?

17  THE WITNESS:  Yes.  In the store I didn't --

18  MR. JARRELL:  You --

19  MRS. STOUT:  You did not know in the store --

20  THE WITNESS:  I just heard two gun shots.

21  MRS. STOUT:  But whether you were in the store,

22      you don't know whether or not she fired

23      first, or he fired first or whatever?

24  THE WITNESS:  No, ma'am.  I just heard a lot of

25      gunshots.

1    MRS. STOUT:  But you saw him standing over her

2         pressing that gun against her chest?

3    THE WITNESS:  Yes.

4    MR. LINDSEY:  One other thing that I would like

5         the record to show, that he stated in here

6         that Brian Smith had communicated to him

7         that he had connections on the street.  If

8         he did talk, he could have something -- make

9         something happen to his mother, so he has

10        never told this to me before, until now,

11        that he is telling this now, and he did not

12        --

13   MRS. STOUT:  He did --

14   MR. LINDSEY:  And he did not relinquish that

15        until he called me.  He trusts her for some

16        reason.

17                  Let's go off record.

18                  Does your husband trust

19        you like that?

20   THE COURT:  It's on the record.

21   MRS. STOUT:  There is only one other thing that

22        I would like to get in the record.  We have

23        talked to the victims representatives, April

24        Gunnels and Lyn Bowman, but just for the

25        sake of the record, could we have them come

1    in here?

2    MR. LINDSEY:  And you made a good decision.

3    THE COURT:  Sure.

4        (Judge requested April Gunnels and Lyn

5        Bowman to approach).

6    THE COURT:  Again, the record will reflect that

7        we are out of the hearing and presence of

8        the jury.

9    MRS. STOUT:  These are the brother of the

10       deceased and the daughter of the deceased.

11   THE COURT:  And it's my understanding that y'all

12       know what's going on here?  Is that correct?

13   MR. BOWMAN:  That's correct.

14   MRS. GUNNELS:  Could you go over it one more

15       time.

16   THE COURT:  Let's go off the record for that

17       purpose.

18           (Off-record discussion).

19   THE COURT:  Back on the record.  What was your

20 comment?

21   MR. BOWMAN:  I support it.

22   THE COURT:  And do you understand the terms of

23       the settlement?

24   MR. BOWMAN:  Yes.

25   THE.COURT:  Do you also understand?

1    MS. GUNNELS:  Uh-huh.

2    THE COURT:  What I'm going to do, just so

3         everybody knows, I'm going out there before

4         the jury. But I will advise you of your

5         rights.  Your lawyer is going to be there.

6         And then you will need to make a

7         knowledgeable, intelligent waiver if you

8         elect to testify.  Okay?

9    THE WITNESS:  Okay.

10   THE COURT:  Let's get out there in the

11        courtroom.

12   MRS. STOUT:  Your Honor, off the record.

13   MRS. STOUT:  How long are we going to go

14        tonight?  I could use the time.

15   THE COURT:  I know you do.  But you are not

16        going do get a whole heap because we are

17        going to go on with this witness.  Now, as

18        far as cross examination or whatever, they

19        have the right to review the record, so we

20        will break after your examination.  Okay.

21        Let's go out in the courtroom.

22

23

24

25

1  STATE OF ALABAMA

2  12TH JUDICIAL CIRCUIT

3

4      I, Sheila Hanson, Official Court Reporter, do

5  hereby certify that the foregoing transcript, pages 1

6  through 13 is a true and correct transcript of the

7  testimony of Mr. Bryan Yeoman taken at said time and

8  place; and that the same was taken down by me in

9  stenograph shorthand, and transcribed by me personally

10  or under my personal supervision.

11      I further certify that I have no interest in this

12  matter, financial or otherwise, or how it may develop

13  or what its outcome may be.  I further certify that I

14  am not of counsel for any of the parties, nor am I

15  related to counsel or litigants or associated with

16  anyone connected with this cause to my knowledge.

17      Witnessed this 26th day of September, 2002.

18

19

20  _____

21  Court Reporter and Notary Public

22

23

24

25



DEFENDANT'S
EXHIBIT

CASE
NO.

EXHIBIT
NO.    A



DEFENDANT'S
EXHIBIT

CASE
NO.

EXHIBIT
NO.    *B*



MAY 23 2001
30 12 PM



**DEFENDANT'S EXHIBIT**

CASE
NO.

EXHIBIT
NO.    D



QUESTION
GOVERNMENT

STATE OF ALABAMA





DEFENDANT'S EXHIBIT



DEFENDANT'S
EXHIBIT

CASE
NO.

EXHIBIT
NO. *I*



MAY 23 2001
1:37:17 PM



DEFENDANT'S
EXHIBIT
3

MAY 23 2001
1:32:49PM





DEFENDANT'S EXHIBIT

DEFENDANT'S
EXHIBIT







ALABAMA
# DEPARTMENT OF FORENSIC SCIENCES



| REGIONAL LABORATORY | MEDICAL EXAMINER |
|---|---|
| P.O. BOX 210516 | P.O. BOX 240591 |
| MONTGOMERY, AL 36121-0516 | MONTGOMERY, AL 36124-0591 |
| (334) 242-2938 | (334) 242-3093 |
| FACSIMILE (334) 240-3284 | FACSIMILE (334) 260-8734 |

August 12, 2002

Re:   Case  01A-01MM00435
Jelaine Dennis, subject
Brian Smith, suspect
**JUVENILE**
Robert Conrad, suspect
Brian Yeoman, suspect

MEMORANDUM:   To File

BY:   Phyllis T. Rollan, Forensic Scientist

SUBJECT:   Examination of Biological Evidence

On May 29, 2001, Detective Rick Hauser of the Enterprise Police Department
delivered to the Montgomery Laboratory certain evidence identified as relative to
the above styled case.  The following is a description of the evidence and the
results of laboratory examinations and analyses:

3.   One (1) sealed plastic bag containing one (1) cardboard container containing
one (1) tube of blood (EDTA) labeled in part "Conrad, Robert".

4.   One (1) sealed manila envelope containing the following evidence identified
to be from the scene:

A.   One (1) sealed manila envelope labeled in part "entrance floor, #43"
containing one (1) manila envelope with two (2) cotton swabs bearing
reddish-brown stains.

Page 2                                                    August 12, 2002
Case 01A-01MM00435
Examination of Biological Evidence

   B.   One (1) sealed manila envelope labeled in part "counter top, #39"
        containing one (1) manila envelope with two (2) cotton swabs bearing
        reddish-brown stains.

   C.   One (1) sealed manila envelope labeled in part "bottom of counter
        register, #40" containing one (1) manila envelope with two (2) cotton
        swabs bearing reddish-brown stains.

5.  One (1) sealed manila envelope marked "#35" containing one (1) piece of
    gray colored duct tape bearing reddish-brown stains.

6.  One (1) sealed manila envelope marked "#36" containing one (1) piece of
    purple colored carpet bearing brown colored stains.

7.  One (1) sealed brown paper bag containing one (1) piece of purple colored
    carpet bearing reddish-brown stains.

8.  One (1) sealed brown paper bag marked "#33" containing one (1) hand
    towel bearing reddish-brown stains.

9.  One (1) sealed brown paper bag containing the following evidence identified
    to be from Brian Smith:

   A.   One (1) pair of shorts.

   B.   One (1) belt.

   C.   One (1) T-shirt.

   D.   One (1) right tennis shoe bearing stains on the sole measuring
        primarily 2mm-4mm at their widest point.

   E.   One (1) left tennis shoe bearing stains on the sole measuring primarily
        2mm-3mm at their widest point.

Page 3                                          August 12, 2002
Case 01A-01MM00435
Examination of Biological Evidence

10.   One (1) sealed brown paper bag containing the following evidence identified
      to be from Bryan Yeoman:

      A.   One (1) pair of shorts.

      B.   One (1) undershirt.

      C.   One (1) right tennis shoe.

      D.   One (1) left tennis shoe.

On March 29, 2002, Detective Rick Hauser of the Enterprise Police Department
resubmitted to the Forensic Biology Section of the Montgomery Laboratory the
following additional evidence:

11.   One (1) sealed brown paper bag labeled in part "removed from dumpster
      across from 228 Greentree Apts" containing one (1) white colored T-shirt
      bearing stains.

On June 8, 2001, Detective Rick Hauser of the Enterprise Police Department
delivered to the Montgomery Laboratory the following additional evidence:

15.   One (1) sealed brown paper bag containing the following items of evidence:

      A.   One (1) black colored right tennis shoe.

      B.   One (1) black colored left tennis shoe.

      C.   One (1) right shoe insert.

      D.   One (1) left shoe insert.

      E.   One (1) car cell phone charger.

Page 4                                                            August 12, 2002
Case 01A-01MM00435
Examination of Biological Evidence


On February 5, 2002, Detective Rick Hauser of the Enterprise Police Department resubmitted to the Forensic Biology Section of the Montgomery Laboratory the following evidence:

16.    One (1) sealed brown paper bag containing one (1) blue colored shirt identified to be from Robert Conrad

On July 13, 2001, Investigator Michael Lolley of the Enterprise Police Department delivered to the Montgomery Laboratory the following additional evidence:

17.    One (1) sealed manila envelope containing one (1) pair of glasses.

On December 17, 2001, Forensic Investigator Scott Belton of the Montgomery Medical Examiner's Office delivered to the Montgomery Laboratory the following additional evidence:

18.    One (1) sealed manila envelope containing one (1) bloodstain card labeled in part "Evelyn J. Dennis".


RESULTS:


The tube of blood identified to be from Robert Conrad (Item 3) and the bloodstain card identified to be from Evelyn J. Dennis (Item 18) were DNA profiled using the following PCR-based genetic systems:  CSF1PO, TPOX, AME, TH01, vWA, D16S539, D7S820, D13S317, and D5S818.

The stains from the following evidence contained human DNA and were DNA profiled using the following PCR-based genetic systems:  CSF1PO, TPOX, AME, TH01, vWA, D16S539, D7S820, D13S317, and D5S818:

       -swabs identified to be from the entrance floor (Item 4A)
       -swabs identified to be from the counter top (Item 4B)

*VOLUME 7* ✓

COURT OF CRIMINAL APPEALS NO. CR-02-0333

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

## CIRCUIT COURT OF _____COFFEE_____ COUNTY, ALABAMA

CIRCUIT COURT NO. CC-01-179, CC-01-180

CIRCUIT JUDGE _____Gary L. McAliley_____

Type of Conviction / Order Appealed From: Conviction, Capital Murder, Robbery 1st

Sentence Imposed: Life Without Parole, Life

Defendant Indigent: [X] YES  [ ] NO

Robert Thomas Conrad

Gary Bradshaw

(Appellant's Attorney)
P. O. Box 311412                    (Telephone No.)

(Address)
Enterprise          AL           36331
(City)            (State)          (Zip Code)

**NAME OF APPELLANT**

Richard Waldrop
P. O. Box 310027
Enterprise, AL  36331

**V.**

## STATE OF ALABAMA

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

**NAME OF APPELLEE**

_____

_____

(For Court of Criminal Appeals Use Only)



Page 5                                                    August 12, 2002
Case 01A-01MM00435
Examination of Biological Evidence

    -swabs identified to be from the bottom of counter register area (Item 4C)
    -tape identified to be from the scene (Item 5)
    -carpet (Item 6)
    -stain A from the carpet (Item 7)
    -stain B from the carpet (Item 7)
    -towel identified to be from the scene (Item 8)
    -right shoe identified to be from Brian Smith (Item 9D)
    -left shoe identified to be from Brian Smith (Item 9E)
    -stain b from the shirt identified to be from the dumpster (Item 11)

The stain marked "a" on the shirt identified to be from the dumpster (Item 11)
exhibited a positive result when tested for the presumptive presence of blood and
was analyzed for DNA; however, none was detected.

The following items exhibited a negative result when tested for the presumptive
presence of blood:

    -shorts identified to be from Brian Smith (Item 9A)
    -belt identified to be from Brian Smith (Item 9B)
    -T-shirt identified to be from Brian Smith (Item 9C)
    -shorts identified to be from Brian Yeoman (Item 10A)
    -undershirt identified to be from Brian Yeoman (Item 10B)
    -right shoe identified to be from Brian Yeoman (Item 10C)
    -left shoe identified to be from Brian Yeoman (Item 10D)
    -right shoe (Item 15A)
    -left shoe (Item 15D)
    -cell phone charger (Item 15E)
    -shirt identified to be from Robert Conrad (Item 16)
    -glasses (Item 17)

Page 6                                                  August 12, 2002
Case 01A-01MM00435
Examination of Biological Evidence

REMARKS:

The DNA profiles obtained from the human DNA from the stains identified to be from the entrance floor (Item 4A), the counter top (Item 4B), the bottom of the counter at the register area (Item 4C), the scene (Item 5) and the human DNA from the carpet (Item 6), stain A from the carpet (Item 7), stain B from the carpet (Item 7), the towel identified to be from the scene (Item 8), the right shoe identified to be from Brian Smith (Item 9D), the left shoe identified to be from Brian Smith (Item 9E), and stain b from the shirt identified to be from the dumpster (Item 11) were compared to the DNA profiles from the tube of blood identified to be from Robert Conrad (Item 3) and the bloodstain card identified to be from Evelyn J. Dennis (Item 18) with the following conclusions:

   -The DNA profile obtained from the human DNA from the stains identified to be from the entrance floor, the counter top, the bottom of the counter at the register area, the scene and the human DNA from the carpet, stain A from the carpet, stain B from the carpet, the towel identified to be from the scene, the right shoe identified to be from Brian Smith, and the left shoe identified to be from Brian Smith is consistent with the DNA profile from the bloodstain card identified to be from Evelyn J. Dennis.

   This combination of genetic traits occurs in approximately 1 of 46.1 million Caucasian and 1 of 34.4 million African American random unrelated individuals.

   -Robert Conrad could not be the source of the human DNA from the stains identified to be from the entrance floor, the counter top, the bottom of the counter at the register area, the scene and the human DNA from the carpet, stain A from the carpet, stain B from the carpet, the towel identified to be from the scene, the right shoe identified to be from Brian Smith, and the left shoe identified to be from Brian Smith

Page 7                                                August 12, 2002
Case 01A-01MM00435
Examination of Biological Evidence

-The DNA profile obtained from the human DNA from stain b on the shirt
identified to be from the dumpster is consistent with the DNA profile from
the tube of blood identified to be from Robert Conrad.

This combination of genetic traits occurs in approximately 1 of 282 billion
Caucasian and 1 of 5.52 billion African American random unrelated
individuals.

-Evelyn J. Dennis could not be the source of the human DNA from stain b
on the shirt identified to be from the dumpster.

The spattered stains on the soles of the right and left shoe identified to be from
Brian Smith (Items 9D and 9E) were of limited quantity and showed no direct
evidence as to how they were deposited.

The DNA extracts are being retained in the laboratory in the event they are needed
in future testing. All other evidence is being returned to the investigative agency.

_Phyllis T. Roll_____
Phyllis T. Rollan

/PTR

# Medical Center
### Enterprise

400 North Edwards Street
Enterprise, Alabama 36330

**ITEMIZED STATEMENT OF ALL CHARGES**

| TYPE OF BILL | DATE OF BILL | PAGE NO. |
|---|---|---|
| D1-I/P | 06/01/01 | 2 |

1206

| PATIENT NAME | PATIENT NUMBER | SEX | AGE | ADMISSION DATE | DISCHARGE DATE | DAYS |
|---|---|---|---|---|---|---|
| ßERT CONRAD | 01143-00094 | M | 21Y | 05/23/01 | 05/28/01 | |

| INSURANCE COMPANY NAME | GROUP NUMBER | POLICY NUMBER | PAYMENT AMOUNT |
|---|---|---|---|
| | | | |

| GUARANTOR NAME AND ADDRESS | |
|---|---|
| DOROTHY A CONRAD 507 GLOVER AVE APT 35 ENTERPRISE AL          36330 | ☐ MASTERCARD   CARD NO. \|_\|_\|_\|_\|_\|_\|_\|_\|_\|_\|_\|_\|_\|_\| ☐ VISA          EXPIRATION DATE _____ SIGNATURE _____ PLEASE DETACH AND RETURN THIS PORTION WITH YOUR REMITTANCE |

| DATE | ITEM NO. | DESCRIPTION | CLM. CODE | ORDER NO. | QTY | UNIT PRICE | TOTAL CHARGES |
|---|---|---|---|---|---|---|---|
| 05/25/01 | 75663 | NACL 100ML BAG | 250 | 4 | 1 | 41.00 | 41.00 |
| 05/25/01 | 75663 | NACL 100ML BAG | 250 | 4 | 1 | 41.00 | 41.00 |
| 05/25/01 | 75663 | NACL 100ML BAG | 250 | 4 | 1 | 41.00 | 41.00 |
| 05/26/01 | 4620 | DEMEROL INJ | 250 | 10 | 1 | 60.00 | 60.00 |
| 05/26/01 | 4620 | DEMEROL INJ | 250 | 10 | 1 | 60.00 | 60.00 |
| 05/26/01 | 46315 | ZINACEF 1.5G INJ. | 250 | 4 | 1 | 85.95 | 85.95 |
| 05/26/01 | 46315 | ZINACEF 1.5G INJ. | 250 | 4 | 1 | 85.95 | 85.95 |
| 05/26/01 | 46315 | ZINACEF 1.5G INJ. | 250 | 4 | 1 | 85.95 | 85.95 |
| 05/26/01 | 4939 | PHENERGAN 25MG INJ. | 250 | 3 | 1 | 26.00 | 26.00 |
| 05/26/01 | 4939 | PHENERGAN 25MG INJ. | 250 | 3 | 2 | 26.00 | 52.00 |
| 05/26/01 | 75663 | NACL 100ML BAG | 250 | 4 | 1 | 41.00 | 41.00 |
| 05/26/01 | 75663 | NACL 100ML BAG | 250 | 4 | 1 | 41.00 | 41.00 |
| /26/01 | 75663 | NACL 100ML BAG | 250 | 4 | 1 | 41.00 | 41.00 |
| 05/27/01 | 4620 | DEMEROL INJ | 250 | 10 | 1 | 60.00 | 60.00 |
| 05/27/01 | 46315 | ZINACEF 1.5G INJ. | 250 | 4 | 1 | 85.95 | 85.95 |
| 05/27/01 | 4939 | PHENERGAN 25MG INJ. | 250 | 3 | 4 | 26.00 | 104.00 |
| 05/27/01 | 75663 | NACL 100ML BAG | 250 | 4 | 1 | 41.00 | 41.00 |
| 05/28/01 | 4939 | PHENERGAN 25MG INJ. | 250 | 3 | -9 | 26.00 | -234.00 |
| | | TOTAL PHARMACY | | | | | 2,488.50 |
| | | | | | | | |
| 05/23/01 | 84822 | D5 1/2 NS 1000ML | 258 | 28 | 1 | 89.02 | 89.02 |
| 05/23/01 | 85951 | LACTATED RING 1000ML | 258 | 29 | 1 | 133.60 | 133.60 |
| 05/23/01 | 85951 | LACTATED RING 1000ML | 258 | 30 | 1 | 133.60 | 133.60 |
| 05/24/01 | 84822 | D5 1/2 NS 1000ML | 258 | 48 | 1 | 89.02 | 89.02 |
| 05/25/01 | 84822 | D5 1/2 NS 1000ML | 258 | 52 | 3 | 89.02 | 267.06 |
| 05/27/01 | 84822 | D5 1/2 NS 1000ML | 258 | 61 | 1 | 89.02 | 89.02 |
| 05/27/01 | 85951 | LACTATED RING 1000ML | 258 | 60 | 1 | 133.60 | 133.60 |
| | | TOTAL IV SOLUTIONS | | | | | 934.92 |
| | | | | | | | |
| 05/24/01 | 80440 | ROBINUL 0.4MG INJ. | 259 | 8 | 1 | 46.80 | 46.80 |
| 05/28/01 | 17934 | PERCOCET TABLET | 259 | 14 | 2 | 4.50 | 9.00 |
| 05/28/01 | 27734 | TYLENOL 325MG TABLET | 259 | 15 | 1 | 3.50 | 3.50 |
| 05/28/01 | 27734 | TYLENOL 325MG TABLET | 259 | 16 | 2 | 3.50 | 7.00 |
| | | TOTAL DRUGS/OTHER | | | | | 66.30 |
| | | | | | | | |
| 05/23/01 | 17516 | BOVIE HAND TROL DISP | 270 | 20 | 1 | 114.06 | 114.06 |

Continued

| PATIENT NUMBER | | TOTAL AMOUNT DUE |
|---|---|---|
| 01143-00094 | PLEASE REFER TO PATIENT NUMBER ON ALL INQUIRIES AND CORRESPONDENCE | |

ADDITIONAL PATIENT BILLING MAY BE NECESSARY FOR ANY CHARGES NOT POSTED WHEN THIS BILL IS PREPARED, OR IF ANY INSURANCE CARRIERS DO NOT PAY ANY AMOUNT OF THE AMOUNTS SHOWN.

PLEASE RETAIN FOR YOUR RECORDS

440 1999 MLL Medical Center Enterprise

# Medical Center
Enterprise

400 North Edwards Street
Enterprise, Alabama 36330

**ITEMIZED STATEMENT
OF ALL CHARGES**

| TYPE OF BILL | DATE OF BILL |
|---|---|
| D1-I/P | 06/01/01 |

| PAGE NO. |
|---|
| 3 |

| PATIENT NAME | PATIENT NUMBER | SEX | AGE | ADMISSION DATE | DISCHARGE DATE | DAYS |
|---|---|---|---|---|---|---|
| 'ERT CONRAD | 01143-00094 | M | 21Y | 05/23/01 | 05/28/01 | |

| INSURANCE COMPANY NAME | GROUP NUMBER | POLICY NUMBER |
|---|---|---|
| | | |

PAYMENT AMOUNT

| GUARANTOR NAME AND ADDRESS |
|---|
| DOROTHY A CONRAD |
| 507 GLOVER AVE |
| APT 35 |
| ENTERPRISE AL          36330 |

☐ MASTERCARD          CARD NO. |_|_|_|_|_|_|_|_|_|_|_|_|_|
☐ VISA                        EXPIRATION DATE _____

SIGNATURE _____
PLEASE DETACH AND RETURN THIS PORTION WITH YOUR REMITTANCE

| DATE | ITEM NO. | DESCRIPTION | CLM CODE | ORDER NO. | QTY | UNIT PRICE | TOTAL CHARGES |
|---|---|---|---|---|---|---|---|
| 05/23/01 | 18859 | TUBING INSUFFLTR FLT | 270 | 32 | 1 | 63.35 | 63.35 |
| 05/23/01 | 35308 | LINER SUCTION 1500ML | 270 | 36 | 1 | 16.49 | 16.49 |
| 05/23/01 | 57622 | KIT MONITOR CATH 7FR | 270 | 40 | 1 | 326.00 | 326.00 |
| 05/23/01 | 60129 | SET DOUBLE BASIN SURGI START | 270 | 43 | 1 | 103.85 | 103.85 |
| 05/23/01 | 64139 | TUBE SUMP SALEM 18FR | 270 | 23 | 1 | 60.80 | 60.80 |
| 05/23/01 | 71472 | LINER SUCTION 3000ML | 270 | 39 | 1 | 49.98 | 49.98 |
| 05/23/01 | 72074 | MASK MED ADULT | 270 | 25 | 2 | 49.48 | 98.96 |
| 05/23/01 | 75419 | SYRINGE CATH TIP 60CC | 270 | 42 | 1 | 2.45 | 2.45 |
| 05/23/01 | 81683 | TUBE ENDO 8.0 | 270 | 33 | 1 | 47.24 | 47.24 |
| 05/23/01 | 84786 | PAD GROUNDING DISP | 270 | 27 | 1 | 15.65 | 15.65 |
| 05/24/01 | 20035 | LAPSKY TRAY | 270 | 16 | 1 | 421.93 | 421.93 |
| 05/24/01 | 30801 | OXYGEN >30 MIN | 270 | 14 | 2 | 8.34 | 16.68 |
| /25/01 | 20001 | MAJOR INST. | 270 | 46 | 1 | 667.53 | 667.53 |
| | | TOTAL MED-SUR SUPPLIES | | | | | 2,004.97 |
| | | | | | | | |
| 05/23/01 | 18927 | STAPLER ETHICON PPW35 | 272 | 35 | 1 | 76.22 | 76.22 |
| 05/23/01 | 20479 | STYLET INTUBATING 14FR | 272 | 21 | 1 | 14.79 | 14.79 |
| 05/23/01 | 28991 | PROBE BODY & SPIKE SURGIFLEX | 272 | 22 | 1 | 145.80 | 145.80 |
| 05/23/01 | 48843 | PACK LAPAROTOMY | 272 | 37 | 1 | 386.85 | 386.85 |
| 05/23/01 | 49005 | NEEDLE ENDO VERRES 120 | 272 | 38 | 1 | 105.25 | 105.25 |
| 05/23/01 | 63296 | SPONGE 4X4 TRAYS | 272 | 41 | 2 | 3.75 | 7.50 |
| 05/23/01 | 68197 | CIRCUIT BREATHING ADULT | 272 | 24 | 1 | 94.01 | 94.01 |
| 05/23/01 | 83885 | WRAP CALF | 272 | 26 | 1 | 155.60 | 155.60 |
| 05/23/01 | 91213 | SPONGE 4X4 RAY-TEC | 272 | 31 | 1 | 9.79 | 9.79 |
| 05/24/01 | 20044 | SMALL SUTURE | 272 | 17 | 1 | 68.23 | 68.23 |
| 05/24/01 | 20045 | LARGE SUTURE | 272 | 18 | 6 | 98.81 | 592.86 |
| 05/24/01 | 20957 | TROCAR 12MM DISP | 272 | 34 | 1 | 179.25 | 179.25 |
| 05/24/01 | 32996 | SPONGE DRAIN 4X4 12 PLY 2'S | 272 | 47 | 2 | 2.55 | 5.10 |
| 05/27/01 | 63296 | SPONGE 4X4 TRAYS | 272 | 59 | 1 | 3.75 | 3.75 |
| | | TOTAL STERILE SUPPLY | | | | | 1,845.00 |
| | | | | | | | |
| 05/23/01 | 1015 | ALCOHOL QN | 301 | 1 | 1 | 210.81 | 210.81 |
| 05/23/01 | 1670 | BASIC METABOLIC PANEL | 301 | 1 | 1 | 137.24 | 137.24 |
| 05/23/01 | 1900 | PHENCYCLIDINE SCREEN | 301 | 1 | 1 | 39.59 | 39.59 |
| 05/23/01 | 1901 | BENZODIAZEPINES QL SQN | 301 | 1 | 1 | 39.59 | 39.59 |
| 05/23/01 | 1902 | COCAINE METABOLITES | 301 | 1 | 1 | 39.59 | 39.59 |

Continued

| PATIENT NUMBER |
|---|
| 01143-00094 |

*PLEASE REFER TO PATIENT NUMBER ON ALL INQUIRIES AND CORRESPONDENCE*

*ADDITIONAL PATIENT BILLING MAY BE NECESSARY FOR ANY CHARGES NOT POSTED WHEN THIS BILL IS PREPARED, OR IF ANY INSURANCE CARRIERS DO NOT PAY ANY AMOUNT OF THE AMOUNTS SHOWN.*

| TOTAL AMOUNT DUE |
|---|
| |

*PLEASE RETAIN FOR YOUR RECORDS*

640 1999 MLL Medical Center Enterprise

1208

# Medical Center
Enterprise

400 North Edwards Street
Enterprise, Alabama 36330

ITEMIZED STATEMENT
OF ALL CHARGES

| TYPE OF BILL | DATE OF BILL | PAGE NO. |
|---|---|---|
| D1-I/P | 06/01/01 | 4 |

| PATIENT NAME | PATIENT NUMBER | SEX | AGE | ADMISSION DATE | DISCHARGE DATE | DAYS |
|---|---|---|---|---|---|---|
| ERT CONRAD | 01143-00094 | M | 21Y | 05/23/01 | 05/28/01 | |

| INSURANCE COMPANY NAME | GROUP NUMBER | POLICY NUMBER |
|---|---|---|
| | | |

PAYMENT AMOUNT

| GUARANTOR NAME AND ADDRESS | |
|---|---|
| DOROTHY A CONRAD | ☐ MASTERCARD   CARD NO. \|\|\|\|\|\|\|\|\|\|\|\|\|\| |
| 507 GLOVER AVE | ☐ VISA   EXPIRATION DATE _____ |
| APT 35 | SIGNATURE _____ |
| ENTERPRISE AL          36330 | PLEASE DETACH AND RETURN THIS PORTION WITH YOUR REMITTANCE |

| DATE | ITEM NO. | DESCRIPTION | CLM. CODE | ORDER NO. | QTY | UNIT PRICE | TOTAL CHARGES |
|---|---|---|---|---|---|---|---|
| 05/23/01 | 1903 | AMPHETAMINES QL SQN | 301 | 1 | 1 | 39.59 | 39.59 |
| 05/23/01 | 1904 | THC CANNABINOIDS QL SQN | 301 | 1 | 1 | 39.59 | 39.59 |
| 05/23/01 | 1905 | OPIATES QL SQN | 301 | 1 | 1 | 39.59 | 39.59 |
| 05/23/01 | 1906 | BARBITURATES QL SQN | 301 | 1 | 1 | 39.59 | 39.59 |
| 05/24/01 | 1741 | COMP METABOLIC PANEL | 301 | 6 | 1 | 163.59 | 163.59 |
| 05/26/01 | 1741 | COMP METABOLIC PANEL | 301 | 51 | 1 | 163.59 | 163.59 |
| | | TOTAL LAB/CHEMISTRY | | | | | 952.36 |
| | | | | | | | |
| 05/23/01 | 2000 | CBC PLATELET AUTO DIFF | 305 | 1 | 1 | 106.51 | 106.51 |
| 05/24/01 | 2000 | CBC PLATELET AUTO DIFF | 305 | 6 | 1 | 106.51 | 106.51 |
| 05/26/01 | 2000 | CBC PLATELET AUTO DIFF | 305 | 50 | 1 | 106.51 | 106.51 |
| 05/28/01 | 2000 | CBC PLATELET AUTO DIFF | 305 | 56 | 1 | 106.51 | 106.51 |
| | | TOTAL LAB/HEMOTOLOGY | | | | | 426.04 |
| | | | | | | | |
| 05/23/01 | 2605 | UA W MICRO AUTO | 307 | 1 | 1 | 115.75 | 115.75 |
| | | TOTAL LAB/UROLOGY | | | | | 115.75 |
| | | | | | | | |
| 05/23/01 | 10008 | XR ABD, AP & OBLIQUE VIEWS | 320 | 5 | 1 | 171.43 | 171.43 |
| 05/23/01 | 10147 | XR HUMERUS | 320 | 5 | 1 | 208.26 | 208.26 |
| 05/25/01 | 10005 | XR ABD 1 VIEW (KUB) | 320 | 45 | 1 | 151.79 | 151.79 |
| | | TOTAL DX X-RAY | | | | | 531.48 |
| | | | | | | | |
| 05/28/01 | 10036 | XR CHEST PA & LAT. | 324 | 58 | 1 | 138.50 | 138.50 |
| | | TOTAL DX X-RAY/CHEST | | | | | 138.50 |
| | | | | | | | |
| 05/24/01 | 10200 | OR ROOM TIME 91-120 MIN. | 360 | 13 | 1 | 2798.78 | 2,798.78 |
| | | TOTAL OR SERVICES | | | | | 2,798.78 |
| | | | | | | | |
| 05/24/01 | 21200 | ANESTHESIA 91-120 MIN | 370 | 12 | 1 | 1259.20 | 1,259.20 |
| | | TOTAL ANESTHESIA | | | | | 1,259.20 |
| | | | | | | | |
| 05/23/01 | 89964 | ER LEVEL V | 450 | 8 | 1 | 170.00 | 170.00 |
| | | TOTAL EMERG ROOM | | | | | 170.00 |
| | | | | | | | |
| 05/24/01 | 27658 | SUBLIMAZE 5ML INJ. | 636 | 5 | 1 | 55.90 | 55.90 |
| | | TOTAL DRUGS/DETAIL CODE | | | | | 55.90 |

Continued

| PATIENT NUMBER | PLEASE REFER TO PATIENT NUMBER ON ALL INQUIRIES AND CORRESPONDENCE | ADDITIONAL PATIENT BILLING MAY BE NECESSARY FOR ANY CHARGES NOT POSTED WHEN THIS BILL IS PREPARED, OR IF ANY INSURANCE CARRIERS DO NOT PAY ANY AMOUNT OF THE AMOUNTS SHOWN. | TOTAL AMOUNT DUE |
|---|---|---|---|
| 01143-00094 | | | |

PLEASE RETAIN FOR YOUR RECORDS

448 1999 MLL Medical Center Enterprise

# Medical Center
Enterprise

400 North Edwards Street
Enterprise, Alabama 36330

**ITEMIZED STATEMENT
OF ALL CHARGES**

| TYPE OF BILL | DATE OF BILL | PAGE NO. |
|---|---|---|
| D1-I/P | 06/01/01 | 5 |

| PATIENT NAME | PATIENT NUMBER | SEX | AGE | ADMISSION DATE | DISCHARGE DATE | DAYS |
|---|---|---|---|---|---|---|
| ERT CONRAD | 01143-00094 | M | 21Y | 05/23/01 | 05/28/01 | |

| INSURANCE COMPANY NAME | GROUP NUMBER | POLICY NUMBER |
|---|---|---|
| | | |

**PAYMENT AMOUNT**

GUARANTOR NAME AND ADDRESS:
DOROTHY A CONRAD
507 GLOVER AVE
APT 35
ENTERPRISE AL          36330

☐ MASTERCARD
☐ VISA

CARD NO. |_|_|_|_|_|_|_|_|_|_|_|_|_|_|_|
EXPIRATION DATE _____
SIGNATURE _____

PLEASE DETACH AND RETURN THIS PORTION WITH YOUR REMITTANCE

| DATE | ITEM NO. | DESCRIPTION | CLM CODE | ORDER NO. | QTY | UNIT PRICE | TOTAL CHARGES |
|---|---|---|---|---|---|---|---|
| 05/23/01 | 32030 | PACU 30 MIN. | 710 | 9 | 1 | 644.70 | 644.70 |
| | | TOTAL RECOVERY ROOM | | | | | 644.70 |
| | | | | | | | |
| | | TOTAL CHARGES | | | | | 15,842.40 |
| 11/19/01 | A5030 | 706 CHARITY WO | | | | | -15,842.40 |
| | | | | | | | |
| | | TOTAL PAYMENTS/ADJUSTMENTS | | | | | -15,842.40 |

| PATIENT NUMBER | | | | | TOTAL AMOUNT DUE | |
|---|---|---|---|---|---|---|
| 01143-00094 | | | | | | 0.00 |

PLEASE REFER TO PATIENT NUMBER ON ALL INQUIRIES AND CORRESPONDENCE

ADDITIONAL PATIENT BILLING MAY BE NECESSARY FOR ANY CHARGES NOT POSTED WHEN THIS BILL IS PREPARED, OR IF ANY INSURANCE CARRIERS DO NOT PAY ANY AMOUNT OF THE AMOUNTS SHOWN.

PLEASE RETAIN FOR YOUR RECORDS

440 1999 HLL Medical Center Enterprise

# MEDICAL CENTER ENTERPRISE               DRG WORKSHEET

ME: Conrad, Robert

MR#: 41053

ADMIT DATE: 5·23·01

DISCH DATE: 5·28

AGE: 20   SEX: M

ATTENDING PHYSICIAN: J. Sawyer

INSURANCE: Caid

DISC. DISP: 05  Jail

## PRINCIPAL DIAGNOSIS                                              CODE

GSW LLQ of abdomen c̄ through + through    863.52
laceration of transverse colon

## OTHER DIAGNOSIS                                              CODES

1. Superficial GSW L upper arm – Gun battle c̄    880.13
2. police during robbery                          E970 | E849.6
3. Post-Op Ileus                                  997.4 | 560.1
4.
5.
6.
7.
8.
9.

## PRINCIPAL PROCEDURE                                        CODE

5.23.01  #2

Diagnostic laparoscopy – exploratory, laparotomy and    46.75
repair of colon, ligation of an artery                   38.86

## OTHER PROCEDURES                                           CODES

1. Removal of the bullet from L upper arm     86.05
2.
3.
4.
5.
6.
7.
8.

THIS INFORMATION HAS BEEN DISCLOSED TO YOU FROM RECORDS WHOSE CONFIDENTIALITY IS PROTECTED BY STATE STATUTE. STATE REGULATIONS LIMIT YOUR RIGHT TO MAKE ANY FURTHER DISCLOSURES OF THIS INFORMATION WITHOUT THE PRIOR WRITTEN CONSENT OF THE PATIENT/CLIENT TO WHOM IT PERTAINS.

FINAL DRG 148

R.W. 3.43470

FORM NO: PSRO-1A

Medical Center Enterprise
400 North Edwards St
Enterprise, Alabama 36330

**Patient Summary**

| P A | PATIENT NUMBER 01143-00094 | ROOM/TYPE 207-02 | PT TYPE I/P | SERV MED 2 | ATTENDING PHYSICIAN SAWYER, SAMUEL | | FAMILY PHYSICIAN SAWYER, SAMUEL | MR NUMBER 0000041053 |
|---|---|---|---|---|---|---|---|---|
| | ADMIT DATE/TIME 05/23/01 1448 | | SEX M | RACE 2 | MS S | DATE OF BIRTH /AGE 09/27/80 20Y | SOCIAL SECURITY NUMBER 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 | EMPLOYMENT STATUS |

| | |
|---|---|
| **I D E N T** | PATIENT CONRAD, ROBERT<br>36 NELL COURT<br>ENTERPRISE    AL 36330<br>PHONE: (334)308-2140<br>SMK  VETERAN  No    OCCUPATION | EMPLOYER MCDONALDS<br>625 BOLL WEEVIL CIR<br>ENTERPRISE    AL  36330    PHONE (334)347-3417<br>BRANCH OF SERVICE    PAY GRADE    MILITARY STATUS |

| | |
|---|---|
| **G U A R** | GUARANTOR CONRAD, DOROTHY A<br>507 GLOVER AVENUE APT 35<br>ENTERPRISE    AL 36330    PHONE: (334)348-2150<br>RELATIONSHIP MOTHER    SOCIAL SECURITY NUMBER 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    GUARANTOR OCCUPATION LAUNDRY/HOU | GUARANTOR EMPLOYER ENTERPRISE NURSING H<br>300 PLAZA DR<br>ENTERPRISE    AL 36330    PHONE (334)347-9541<br>EMPLOYMENT STATUS |

| | |
|---|---|
| **R E L** | RELATIVE/FRIEND (OTHER THAN GUARANTOR) CONRAD, DOROTHY;A<br>36 NELL COURT<br>ENTERPRISE    AL 36330    PHONE (334)347-9533<br>RELATIONSHIP MOTHER    SOCIAL SECURITY NUMBER 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    GUARANTOR OCCUPATION LAUNDRY/HOUSEKEEPI | RELATIVE/FRIEND EMPLOYER ENTERPRISE NURSING H<br>300 PLAZA DR<br>ENTERPRISE    AL 36330    PHONE<br>EMPLOYMENT STATUS |

| | |
|---|---|
| **I N S 1** | CARRIER AL MCD    F/C D    POLICY NUMBER 000419175095    SOCIAL SECURITY NUMBER<br>INSURED NAME CONRAD, ROBERT<br>GROUP NUMBER    COMMENTS | MAIL TO: PO BOX 7601<br><br>MONTGOMERY    AL    36107<br>GROUP PHONE/EXT (800)688-7989 |

| | |
|---|---|
| **I N S 2** | CARRIER    F/C    POLICY NUMBER<br>INSURED NAME    SOCIAL SECURITY NUMBER<br>GROUP NUMBER    COMMENTS | MAIL TO:<br><br>GROUP PHONE/EXT |

| | |
|---|---|
| **I N S 3** | CARRIER    F/C    POLICY NUMBER<br>INSURED NAME    SOCIAL SECURITY NUMBER<br>GROUP NUMBER    COMMENTS | MAIL TO:<br><br>GROUP PHONE/EXT |

| | |
|---|---|
| **I N S 4** | CARRIER    F/C    POLICY NUMBER<br>INSURED NAME    SOCIAL SECURITY NUMBER<br>GROUP NUMBER    COMMENTS | MAIL TO:<br><br>GROUP PHONE/EXT |

| | |
|---|---|
| **M I S C** | DIAG CODE    DIAGNOSIS GUNSH T WOUND    ALLERGIES NKDA    WRD    CKG    PRC<br>ACCIDENT TYPE    ACCIDENT DATE    ACC TIME    PLACE OF ACCIDENT    PREVIOUS VISIT DATE 05/07/99    ARRIVAL MODE PERSONAL<br>TRANSFERRING FACILITY    RELIGION    CHURCH    ATC    INT<br>COMMENTS    CLK PLA |

ER

MEDICAL CENTER ENTERPRISE    400 North Edwards Street    Enterprise, Alabama 36330

CONRAD, ROBERT
01143-00094    ER
REW, JOHN L
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    05/23/01

## CONDITIONS FOR TREATMENT

1. MEDICAL AND SURGICAL TREATMENT AND BLOOD TRANSFUSION CONSENT: A patient's care is under the control of his or her attending physicians and the Hospital is not liable for any act or omission in following the instructions of that physician. The undersigned consent to any radiological examination, laboratory procedure, anesthesia, Emergency Room treatment, medical, surgical or diagnostic treatment or hospital services rendered the patient under the general and special instructions of the physician. The undersigned recognized that all physicians furnishing services to the patient, including the radiologist, anesthesiologist, emergency room physician are independent contractors and are not employees nor agents of the Hospital.

2. RELEASE OF INFORMATION: The hospital may disclose all or any part (including Social Security number) of the patient's medical record to any person or corporation which is or may be liable under a contract to the Hospital or the patient or to a family member or employer of the patient for all or part of the Hospital's charge, including, but not limited to, Hospital or hospital utilization review entities, including the Peer Review Organizations that may perform Medicare/Medicaid/Champus review or those who have an agreement with the patient's employer, insurance companies, workmen's compensation carriers, veterans administration, welfare or the patient's employer. The Hospital may disclose any information concerning my case which is necessary or appropriate concerning my case which is necessary and/or appropriate for medical research. This authorization includes, but is not limited to, the release of information relating to drug, alcohol, HIV/AIDS, and/or psychiatric treatment as specified in Volume 42 of the code of Federal Regulations part 2. I further authorize any hospital, health care institution, or physician that attended me previously to furnish medical records including radiologic films and laboratory test results which may be requested by the Hospital or my attending physician. This constitutes my specific authorization and consent, under Alabama Statute, to release my prior medical records to Medical Center Enterprise and to my physician(s).

3. RELEASE FROM LIABILITY FOR VALUABLES: I have been made aware that Medical Center Enterprise provides facilities for the safekeeping of my valuables and, therefore, I release the Hospital from any responsibility due to loss or damage of my clothing, money, jewelry, glasses, dentures or other items of value that I might keep at my bedside, or that may be brought to me by my friends or relatives unless deposited with the Hospital for safekeeping.

4. GUARANTOR/FINANCIAL AGREEMENT: The undersigned and/or patient is entitled to Hospital and/or Physician's benefits of any type whatsoever arising out of any insurance policy or any other party liable to the patient, such benefits are hereby assigned to Medical Center Enterprise, and/or Physician having performed services for this patient during his/her stay at Medical Center Enterprise, and the Radiologist, Pathologist, Anesthesiologist and/or other attending or consulting Physicians, for application to the patient's bill. It is agreed that the Hospital and/or Physician may receipt for any such payment and such payment will discharge the said insurance company of all obligations under the policy to the extent of such payment. The undersigned and/or patient agrees to be responsible for charges not paid by the assignment. Should the account be referred for collection, the undersigned shall pay reasonable attorney's fees and collection expense. All delinquent accounts may be assessed interest at the legal rate.

5. ASSIGNMENT OF INSURANCE BENEFITS: In the event the undersigned is entitled to hospital benefits of any type whatsoever arising out of any policy of insurance insuring patient of any party liable to patient, such benefits are hereby assigned to Medical Center Enterprise for application on patient's bill, and it is agreed that the Hospital may receipt any such payment and such payment shall discharge the said insurance company of any and all obligation under the policy of the extent of such payment, the undersigned and/or patient being responsible for charges not covered by assignment.

6. PHYSICIAN INSURANCE ASSIGNMENT: I, the above name subscriber, hereby authorize payment directly to any physician examining or treating me or any group or individual surgical or medical radiologist, anesthesiologist, pathologist, emergency room physician and neonatologist benefits herein specified and otherwise payable to me for the services as described but not to exceed the reasonable and customary charge for these services.

7. NOTICE OF OCCUPATIONAL EXPOSURE: Occasionally healthcare workers may experience exposure to your blood or body fluids. If this type of exposure occurs it may be necessary to perform a blood test on you for the Hepatitis B Virus and the HIV (AIDS) Virus. The testing will be done in a manner intended to preserve your privacy and at no cost to you or your family. The test results will be treated as confidential medical information and will be placed in your hospital medical record. Test results will be reported to others only at your request and with your consent or as required by law and the policies of Medical Center Enterprise.

THE UNDERSIGNED CERTIFIES THAT HE/SHE HAS READ OR HAD THE FOREGOING INFORMATION EXPLAINED, HAS RECEIVED A COPY, AND IS THE PATIENT OR IS DULY AUTHORIZED BY THE PATIENT AS THE PATIENT'S GENERAL AGENT TO EXECUTE THE ABOVE AND ACCEPT ITS TERMS.

ASSIGNMENT OF MEDICARE BENEFITS: PATIENT CERTIFICATION,
AUTHORIZATION TO RELEASE INFORMATION AND PAYMENT REQUEST.

INITIAL BLOCK IF APPLICABLE

"I certify that the information given by me in applying for payment under XVIII of the Social Security Act is correct. I authorize any holder of medical or other information about me to release to the Social Security Administration or its' intermediaries or carriers any information needed to for this or a related claim. I request that payment of authorized benefits be made on my behalf. I assign the benefits payable for physicians services or authorize such physicians or organization to submit a claim to Medicare for payment to me. I understand that I am responsible for Part A deductible for each spell of illness, the Part B deductible for each year, the remaining 20% of reasonable charges and any personal charges incurred.

ACKNOWLEDGMENT OF MEDICAID

"I certify that I am a recipient of the Medicaid program, and request that payment of authorized benefits be made on my behalf. I authorize the treating physician, hospital and hospital insurance carrier to make available to the Alabama Department of the Medical Assistance and requested information concerning medical, insurance and financial records relating to my hospitalization. I hereby certify all hospital insurance shall be assigned to the hospital and/or treating physician for services provided.

| _____ | _____ |
| Patient Signature | Date |
| _____ | _____ |
| Guarantor or Guardian Signature | Date    5-23-01 |
| _____ | _____ |
| Witness | Date |

# MEDICAL CENTER ENTERPRISE
## GRAPHIC CHART AND PATIENT CARE RECORD

1213

SAWYER, SAMUEL    05/23/01

| DATE | 5-23-01 | 5/24/01 | 5/25/01 | 6/26 |
|---|---|---|---|---|
| HOSP. DAY | | | | |
| POST OP/PP DAY | | | | |

| | | AM | | | PM | | | AM | | | PM | | | AM | | | PM | | | AM | | | PM | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| HOUR | 12 MN | 4 | 8 | 12N | 4 | 8 | 12MN | 4 | 8 | 12N | 4 | 8 | 12MN | 4 | 8 | 12N | 4 | 8 | 12MN | 4 | 8 | 12N | 4 | 8 |

TEMPERATURE (C / F): 105, 104, 40°/103, 39°/102, 38°/101, 37°/100, 99, NORMAL 36°/98, 97, 96

| PULSE | 75 | 97 | 81 | 85 | 91 | | 68 | 64 | 70 | 87 | | 86 | 73 | 71 | 76 | | 70 | 64 | |
| RESP. | 16 | 16 | 20 | 20 | 20 | | 16 | 18 | 18 | 18 | 20 | | 20 | 20 | 20 | | 18 | 20 | |
| WEIGHT | | | | | | 172 | | | 170 | 166 | | NCL | | | | | | |
| ROUTINE B.P. | 166 | 139 | 149 | 127 | 124 | | 152 | 124 | 152 | 120 | 148 | | 134 | 134 | 136 | | 140 | 127 | |
| | | | 80 | 81 | 76 | 85 | 79 | | | | | 88 | | 79 | 78 | 65 | | 57 | 80 |

ADDITIONAL BLOOD PRESSURES

| SHIFT | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ORAL | | | | ICE CHIPS | NPO | NPO | | | | | NPO | sips | 300 |
| IV | | | | | 800 | 800 | 800 | | | 796 | 753 | 494 | 800 |
| 8 HOUR TOTAL | | | | | 800 | | | | | | | 494 | 1100 |
| 24 HOUR TOTAL | | | | | | | | | | | | |
| BLOOD COMPONENTS | | | | | | | | | | | | |

| SHIFT | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| URINE | | | | 100 | 1000 | 650 | 800 | 1050 | | | 200 | 600 | 650 |
| EMESIS | | | | | | | | | | | | |
| DRAINAGE | | | | | NG tube 200 | | | | | | | |
| OTHER | | | | | | | | | | | | |
| 8 HOUR TOTAL | | | | | 850 | | | | | | | |
| 24 HOUR TOTAL | | | | | | | | | | | | |

Died —

N-40 (REV. 3/88)

## VITAL SIGN SHEET

RAO, ROBERT
01143-00094
SAWYER, SAMUEL                    I/P

| L | TIME | TEMP | PULSE | RESP. | B/P | DRESSING/ LOCHIA | URINE/cc's/ FUNDUS | T & C & DB | OTHER |
|---|------|------|-------|-------|-----|------------------|--------------------|-----------|-------|
| -23-01 | 18:15 | 96⁷ | 75 | 16 | 155/80 | | | | |
| | 18³⁰ | 96² | 76 | 20 | 152/92 | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

N-41 (REV. 5/88)

MC-263
REV. 2/00

**PHYSICIAN'S ORDERS**
MC-263 (2/00)

USE BALL POINT PEN ONLY AND PRESS FIRMLY!

ALLERGIES

Weight

Another brand of generically equivalent product may be dispensed unless checked or initialed.

CRT ORDER #                   PHYSICIAN'S ORDERS                 ADDRESSOGRAPH

☐ Inpatient   ☐ Outpatient   ☐ OP surgery

5-28-01
7A

PA/LAT CXR, UA, CBC
Now

Noted P.M. 05-28-01
0213

**1** | Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature | ADDRESSOGRAPH

5-28-01
7A

① Prescrip.
② Cancel UA (Done)
② pt to shower, remove dsgs
② Levaquin 500 po now
③ EST to po now
④ ~~Also~~ Release to custody of the Police.
⑤ RTC we Weds for.

**2** | Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature | ADDRESSOGRAPH
KT 0518 5-28-01

**3** | Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature |

ADDRESSOGRAPH

DO NOT WRITE BELOW THIS POINT

124

MC-263
REV. 2/00

**PHYSICIAN'S ORDERS**
MC-263 (2/00)

USE BALL POINT PEN ONLY AND PRESS FIRMLY!

ALLERGIES | Weight

Another brand of generically equivalent product may be dispensed unless checked or initialed.

PHYSICIAN'S ORDERS | ADDRESSOGRAPH

☐ Inpatient   ☐ Outpatient   ☐ OP surgery

5·26·01

① 6 IM med to Demerol 50mg
& Phengn 25 mg 1 IM q 3h p̄ p̄

② OOB, amb c̄ room TID

③ CBC, CMP today

④ Sips of clear liq
from fridge - no tray

Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature

---

5·27·01

① Full liq + crackers

② HL .IV

③ Percocet ī - īī po q 4h p̄ p̄

④ D/C Demerol / Phen.

⑤ Phengn 25 1 IM q 4h p̄ x 2N.

Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature

---

⑥ D/C Zinacef.

⑦ Δ dsg (Bacitracin)
on q SWD's (2)

Noted by J. McKenzie
R. McKenzie LPN 5·27·01
1730

Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature

DO NOT WRITE BELOW THIS POINT

MC-263
REV. 2/00

**PHYSICIAN'S ORDERS**
MC-263 (2/00)

USE BALL POINT PEN ONLY AND PRESS FIRMLY!

ALLERGIES                                                                Weight

Another brand of generically equivalent product may be dispensed unless checked or initialed.

CAT ORDER #                          PHYSICIAN'S ORDERS                          ADDRESSOGRAPH

☐ Inpatient   ☐ Outpatient   ☐ OP surgery

5/24  Only four visitors in the room
@ any one time
pea D.S. Sawyer / Madden

**1**  Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature                    5/24/01

5/24  Strictly enforce, 4 visitors @ a time
in the room. All other visitors
must wait outside of hospital in
front. Visitors in room must remain
quiet + sitting in chairs.

         T.O. Dr. S. Sawyer | Pinnicom LPN

NOTED RN
PHILLIPS
5-24-01
8 PO

**2**  Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature                    5/24/01

5-25-01  ① Portable KUB   today [45]
①A       ② NPO

**3**  Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature
                                    JST 0914 5-25-01

DO NOT WRITE BELOW THIS POINT

1218

MC-263
REV. 2/00

**PHYSICIAN'S ORDERS**
MC-263 (2/00)

USE BALL POINT PEN ONLY AND PRESS FIRMLY!

ALLERGIES | Weight

Another brand of generically equivalent product may be dispensed unless checked or initialed.

| CRT / ORDER # | PHYSICIAN'S ORDERS | ADDRESSOGRAPH |
|---|---|---|

☐ Inpatient  ☐ Outpatient  ☐ OP surgery

**1**

5/23
1820

Demerol 75 mg + Phenergan 12.5 mg   IM   Q3° prn pain
P.O. Dr. S. Sawyer                     Written order

| Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature | ADDRESSOGRAPH |
|---|---|---|---|---|

**2**

5.24.01   ① D/C NGT, Foley, Abdo dsg
         ② ↓ gSW dsg8.
         ③ OOB.

| Date Ordered | Time Ordered | Transcriber Initials / Time: KT 0928 5.24.01 | Physician Signature | ADDRESSOGRAPH |
|---|---|---|---|---|

**3**

5/24/01↑ Demerol to 100mg c̄ Phenergan 25 mg
1445  Im Q3° prn pain.
      ↑o per Dr. Sam Sawyer.
      C. Lentz RN

Noted C. Lentz RN
5/24/01
1445

| Date Ordered | Time Ordered | Transcriber Initials / Time: 1445  5/24/01 | Physician Signature |
|---|---|---|---|

DO NOT WRITE BELOW THIS POINT

**PHYSICIAN'S ORDERS**
MC-263 (2/00)

USE BALL POINT PEN ONLY AND PRESS FIRMLY!

| ALLERGIES | | Weight |
|---|---|---|

Another brand of generically equivalent product may be dispensed unless checked or initialed.

| CRT ORDER # | PHYSICIAN'S ORDERS | ADDRESSOGRAPH |
|---|---|---|

☐ Inpatient   ☐ Outpatient   ☐ OP surgery

5-23-01  Adm to Day Surgery floor
2-45 /P  Dx: gsw thru ɛ forearm

| Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature |
|---|---|---|---|
| **1** | | | |

5-23-01  ① To PR room
CW 15 P  ② VS q4h, I & O q shift
         ③ N9 to LIS, WPO x ine
         ④ Demerol PCA 25/load, 15 dose,
            6 min interval, 100 hourly limit
         ⑤ Phenergan 12 IVP q4h ɛ NTU
         ⑥ D5 1/2 NS @ 100/hr
         ⑦ Zinacef 1.5 IVPB q8h.
         ⑧ Bump & mode legs q2h
            CBC, CMP = Am ⑥

| Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature |
|---|---|---|---|
| **2** | | | |

DC PACU

V.O. Dr. Schwack/K Thorn RN
5/23/01 @ 1710

5/23/01

95²
(5/2)

| Date Ordered | Time Ordered | Transcriber Initials / Time | Physician Signature |
|---|---|---|---|
| **3** | | | |

DO NOT WRITE BELOW THIS POINT

## NURSE'S ASSESSMENT AND CARE PLAN

PT ID: CONRAD, ROBERT
01143-00094          I/P
SAWYER, SAMUEL
PATIENT S    05/23/01

| P #9 | ALTERATION GI FUNCTIONING DUE TO |
|---|---|
| ABD | _____ |
| BOWEL SOUNDS | _____ |
| NG DRAINAGE/POSITION VERIFIED | _____ |
| RESIDUAL | _____ |
| STOOL | _____ |
| EMESIS | _____ |
| DRSG/DRAINS | _____ |

**SHIFT ASSESSMENT   DATE: 5/28   TIME: 0800**

**P #1   IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR _____
INTEGRITY/PRESSURE ULCER EVALUATION _____
EDEMA _____
ADDED OBSERVATIONS _____

| P #10 | ALTERATION IN GU FUNCTIONING DUE TO |
|---|---|
| URINE | _____ |
| CATHETER | _____ |
| MENSES | _____ |
| VAGINAL PACKING | _____ |

**P #2   ALTERATION IN THOUGHT PROCESS DUE TO**

LOC   A + O x 3

**P #11   ALTERATION IN COMFORT LEVEL DUE TO**
0800 FST PO

**P #3   ALTERED COPING LEVEL DUE TO**

COOPERATIVE _____
ANXIOUS/COMBATIVE _____
OTHER _____
PEDIATRIC PLAY WNL _____

**P #12   ALTERED SKIN INTEGRITY OR FLUID OVERLOAD DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|---|---|---|---|---|---|
| PERIPHERAL | | | | | |
| HEPLOCK | | | | | |
| CENTRAL | | | DATE DSG CHANGE | | |
| IV SITE  PEDS  Q1H | | | | | |
| IV SITE WNL  Q2H | | | | | |
| INFUSION DEVICE | | | | | |
| TUBING CHANGES | | | | | |

**P #4   NEURO/MUSCULAR/SKELETAL DEFICIT DUE TO**

PUPILS _____
MOTOR _____
TRACTION/ETC. _____
ADDED OBSERVATIONS _____

**P #13   PATIENT/FAMILY KNOWLEDGE DEFICIT DUE TO**

**P #5   IMPAIRED COMMUNICATION DUE TO**

CLEAR _____
SLURRED _____
APHASIC _____
OTHER _____

**P #14   SELF CARE DEFICIT DUE TO**

**P #15   ACTIVITY TOLERANCE DUE TO**

| BEDREST | _____ | TURN Q2H | _____ |
|---|---|---|---|
| DANGLE | | COMMODE | |
| CHAIR | | BRP | |
| AMBULATING | | EGGCRATE | |
| AIRMATTRESS | | | |

**P #6   INEFFECTIVE BREATHING PATTERNS DUE TO**

BREATH SOUNDS _____
RESPIRATIONS _____
COUGH/SPUTUM _____
OXYGEN TYPE/CROUP TENT _____
ADDED OBSERVATIONS _____

**P #16   DECREASED SAFETY DUE TO**

| HIGH RISK IDENTIFIED | _____ |
|---|---|
| SIDE RAILS UP 1/2 | _____ |
| UP FULL | _____ |
| CALL LIGHT IN REACH | _____ |
| BED POSITION UP | _____ |
| DOWN | _____ |
| RESTRAINT RELEASE | _____ |
| BED CHECK | _____ |
| X-PAD CHECK | _____ |
| CRIB | _____ |

**P #7   ALTERED PERIPHERAL TISSUE PERFUSION DUE TO**

**P #8   ALTERATION IN CARDIAC OUTPUT DUE TO**

HEART SOUNDS _____
RHYTHM _____
PULSES (R/L)  RADIAL _____  DP _____
PT _____  NAILBEDS _____
CAPILLARY REFILL _____
SUPPORT STOCKINGS _____
MONITOR _____

**P #17   ALTERATION IN NUTRITION DUE TO**

| TYPE | _____ |
|---|---|
| AMOUNT | _____ |
| SNACK-DIABETIC | _____ |
| CIRCLE  SELF  FEED  NG  GTUBE  PUMP | _____ |
| NURSE | _____ |
| NURSE | _____ RN |
| CARE PLAN UPDATED          YES     NO | |
| ACUITY SCORE | _____ |

# NURSE'S ASSESSMENT AND CARE PLAN

CONRAD, ROBERT
01143-00034          I/P
SAWYER, SAMUEL
BOY   M   B      05/23/01
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
0103 71055

## SHIFT ASSESSMENT   DATE: _____  TIME: 19:30

**P #1   IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR _____
_____
INTEGRITY/PRESSURE ULCER EVALUATION _____
_____
EDEMA _____
ADDED OBSERVATIONS _____

**P #2   ALTERATION IN THOUGHT PROCESS DUE TO**

LOC _____

**P #3   ALTERED COPING LEVEL DUE TO**

COOPERATIVE _____
ANXIOUS/COMBATIVE _____
OTHER _____
TRIC PLAY WNL _____

**P #4   NEURO/MUSCULAR/SKELETAL DEFICIT DUE TO**

PUPILS _____
MOTOR _____
TRACTION/ETC. _____
ADDED OBSERVATIONS _____

**P #5   IMPAIRED COMMUNICATION DUE TO**

CLEAR _____
SLURRED _____
APHASIC _____
OTHER _____

**P #6   INEFFECTIVE BREATHING PATTERNS DUE TO**

BREATH SOUNDS _____
RESPIRATIONS _____
COUGH/SPUTUM _____
OXYGEN TYPE/CROUP TENT _____
ADDED OBSERVATIONS _____

**P #7   ALTERED PERIPHERAL TISSUE PERFUSION DUE TO**

**P #8   ALTERATION IN CARDIAC OUTPUT DUE TO**

SOUNDS _____
M _____
PULSES (R/L)   RADIAL _____   DP _____
PT _____   NAILBEDS _____
CAPILLARY REFILL _____
SUPPORT STOCKINGS _____
MONITOR _____

**P #9   ALTERATION GI FUNCTIONING DUE TO**

ABD _____
BOWEL SOUNDS _____
NG DRAINAGE/POSITION VERIFIED _____

RESIDUAL _____
STOOL _____
EMESIS _____
DRSG/DRAINS _____

**P #10   ALTERATION IN GU FUNCTIONING DUE TO**

URINE _____
CATHETER _____
MENSES _____
VAGINAL PACKING _____

**P #11   ALTERATION IN COMFORT LEVEL DUE TO**

_____
_____

**P #12   ALTERED SKIN INTEGRITY OR FLUID OVERLOAD DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|------|--------|------|------|------------|--------------|
| PERIPHERAL | | | | | |
| HEPLOCK | | | | | 3/26 |
| CENTRAL | | | | DATE DSG CHANGE | |
| IV SITE PEDS  Q1H | | | | | |
| IV SITE WNL Q2H | 1930 | 20 | 22 | 0001 | 0204 |
| INFUSION DEVICE | | | | | |
| TUBING CHANGES | | | | | |

**P #13   PATIENT/FAMILY KNOWLEDGE DEFICIT DUE TO**

**P #14   SELF CARE DEFICIT DUE TO**

**P #15   ACTIVITY TOLERANCE DUE TO**

BEDREST _____    TURN Q2H _____
DANGLE _____    COMMODE _____
CHAIR _____    BRP _____
AMBULATING _____    EGGCRATE _____
AIRMATTRESS _____

**P #16   DECREASED SAFETY DUE TO**

HIGH RISK IDENTIFIED _____
SIDE RAILS UP 1/2 _____
UP FULL _____
CALL LIGHT IN REACH _____
BED POSITION UP _____
DOWN _____
RESTRAINT RELEASE _____
BED CHECK _____
K-PAD CHECK _____
CRIB _____

**P #17   ALTERATION IN NUTRITION DUE TO**

| TYPE | | B | L | S |
|------|---|---|---|---|
| AMOUNT | | | | |
| SNACK-DIABETIC | | | | |

CIRCLE   SELF   FEED   NG   G TUBE   PUMP
NURSE _____
NURSE _____   RN _____
CARE PLAN UPDATED _____   YES _____   NO _____
ACUITY SCORE _____

# NURSE'S ASSESSMENT AND CARE PLAN

CONRAD, ROBERT
01143-002XX                I/P
SAWYER, SAMUEL
                        01/23/01

201

**SHIFT ASSESSMENT    DATE:** 5/25  **TIME:** 0800

**P  #1    IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION**
                    **DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR  WNL Warm
_no / color_
INTEGRITY/PRESSURE ULCER EVALUATION
EDEMA  Ø
ADDED OBSERVATIONS  Ø

**P  #2    ALTERATION IN THOUGHT PROCESS**
                    **DUE TO**

LOC  alert x3

**P  #3    ALTERED COPING LEVEL**
                    **DUE TO**

COOPERATIVE  yes
ANXIOUS/COMBATIVE
ER
TRIC PLAY WNL

**P  #4    NEURO/MUSCULAR/SKELETAL DEFICIT**
                    **DUE TO**

PUPILS  equal & react to light
MOTOR  m a f
TRACTION/ETC  Ø
ADDED OBSERVATIONS  Ø

**P  #5    IMPAIRED COMMUNICATION**
                    **DUE TO**

CLEAR  yes
SLURRED
APHASIC
OTHER

**P  #6    INEFFECTIVE BREATHING PATTERNS**
                    **DUE TO**

BREATH SOUNDS
RESPIRATIONS
COUGH/SPUTUM
OXYGEN TYPE/CROUP TENT
ADDED OBSERVATIONS

**P  #7    ALTERED PERIPHERAL TISSUE PERFUSION**
                    **DUE TO**

**P  #8    ALTERATION IN CARDIAC OUTPUT**
                    **DUE TO**

UNDS
IM
PULSES (R/L)    RADIAL    /        DP    /
PT            NAILBEDS
CAPILLARY REFILL
SUPPORT STOCKINGS
MONITOR

**P  #9    ALTERATION GI FUNCTIONING**
                    **DUE TO**

ABD  soft staples intact dsg intact
BOWEL SOUNDS  hyperactive
NG DRAINAGE/POSITION VERIFIED  Ø
RESIDUAL  Ø
STOOL  +
EMESIS
DRSG/DRAINS

**P  #10    ALTERATION IN GU FUNCTIONING**
                    **DUE TO**

URINE
CATHETER  Ø
MENSES  Ø
VAGINAL PACKING

**P  #11    ALTERATION IN COMFORT LEVEL**
                    **DUE TO**

**P  #12    ALTERED SKIN INTEGRITY OR FLUID OVERLOAD**
                    **DUE TO**

| SITE    FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|---|---|---|---|---|
| PERIPHERAL  D5 ½ @ 100 | | LT R site | | 5/26 |
| HEPLOCK | | | | |
| CENTRAL | | DATE DSG CHANGE | | |
| IV SITE  PEDS  Q1H | | | | |
| IV SITE WNL Q2H | | | | |
| INFUSION DEVICE  pump | | | | |
| TUBING CHANGES | | | | |

**P  #13    PATIENT/FAMILY KNOWLEDGE DEFICIT**
                    **DUE TO**

**P  #14    SELF CARE DEFICIT**
                    **DUE TO**

**P  #15    ACTIVITY TOLERANCE**
                    **DUE TO**

| BEDREST | TURN Q2H |
|---|---|
| DANGLE | COMMODE |
| CHAIR | BRP |
| AMBULATING | EGGCRATE |
| AIRMATTRESS | assisted |

**P  #16    DECREASED SAFETY**
                    **DUE TO**

HIGH RISK IDENTIFIED
SIDE RAILS UP 1/2  ✓
            UP FULL
CALL LIGHT IN REACH  ✓
BED POSITION UP
            DOWN  ✓
RESTRAINT RELEASE
BED CHECK
K-PAD CHECK
CRIB

**P  #17    ALTERATION IN NUTRITION**
                    **DUE TO**

TYPE  NPO p sip cl Q 4°        L        S
AMOUNT
SNACK-DIABETIC
CIRCLE    SELF    FEED    NG    G TUBE    PUMP
NURSE  D Walker
NURSE                                    RN
CARE PLAN UPDATED            YES    NO
ACUITY SCORE

# NURSE'S ASSESSMENT AND CARE PLAN

P A T I E N T   L A B E L:
CONRAD, ROBERT
01143-0009  I/P
SAWYER, PAUL L
BOY M S   05/23/01

---

**SHIFT ASSESSMENT   DATE:** 5-26 **TIME:** 1920

**P #1   IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR _Mal maintances_
_Pink & Moist_
INTEGRITY/PRESSURE ULCER EVALUATION _WSG @ Taim -_
_L ↓ quad mid line incision open_
EDEMA _WD_ _air_
ADDED OBSERVATIONS _None_

**P #2   ALTERATION IN THOUGHT PROCESS DUE TO**

LOC _A - 0 X 3_

**P #3   ALTERED COPING LEVEL DUE TO**

COOPERATIVE _yes_
ANXIOUS/COMBATIVE _____
OTHER _____
TRIC PLAY WNL _WD_

**P #4   NEURO/MUSCULAR/SKELETAL DEFICIT DUE TO**

PUPILS _Reml_
MOTOR _MAE_
TRACTION/ETC. _WD_
ADDED OBSERVATIONS _None_

**P #5   IMPAIRED COMMUNICATION DUE TO**

CLEAR _yes_
SLURRED _____
APHASIC _____
OTHER _____

**P #6   INEFFECTIVE BREATHING PATTERNS DUE TO**

BREATH SOUNDS _Clear_
RESPIRATIONS _no_
COUGH/SPUTUM _no_
OXYGEN TYPE/CROUP TENT _no_
ADDED OBSERVATIONS _HOB ↑ -_

**P #7   ALTERED PERIPHERAL TISSUE PERFUSION DUE TO**

**P #8   ALTERATION IN CARDIAC OUTPUT DUE TO**

SOUNDS _Lub dub_
M _Reg_
PULSES (R/L)   RADIAL _L,t,t,+_   DP _____
RT _+ L,rt_ NAILBEDS _Pink_
CAPILLARY REFILL _L 3 Sec_
SUPPORT STOCKINGS _no_
MONITOR _none_

---

**P #9   ALTERATION GI FUNCTIONING DUE TO**

ABD _Soft_
BOWEL SOUNDS _@ X 4 quad_
NG DRAINAGE/POSITION VERIFIED _____
RESIDUAL _____
STOOL _____
EMESIS _____
DRSG/DRAINS _____

**P #10   ALTERATION IN GU FUNCTIONING DUE TO**

URINE _Voided_
CATHETER _____
MENSES _____
VAGINAL PACKING _____

**P #11   ALTERATION IN COMFORT LEVEL DUE TO**

_Voices no C/O @ present_

**P #12   ALTERED SKIN INTEGRITY OR FLUID OVERLOAD DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|------|--------|------|------|------------|--------------|
| PERIPHERAL | D5 4.2 NS @ 100cc/hr | | @ arm | | 5/26 |
| HEPLOCK | | | | | |
| CENTRAL | | DATE DSG CHANGE | | | |

IV SITE PEDS Q1H _____
IV SITE WNL Q2H _1920 20 22 000 02 0406_
INFUSION DEVICE _Pump_
TUBING CHANGES _____

**P #13   PATIENT/FAMILY KNOWLEDGE DEFICIT DUE TO** _Hospital 12/wkr IEV plan_
_TX & procedure pre to day_

**P #14   SELF CARE DEFICIT DUE TO** _NA_

**P #15   ACTIVITY TOLERANCE DUE TO**

BEDREST _yes_   TURN Q2H _Self_
DANGLE _____   COMMODE _urinal_
CHAIR _____   BRP _yes_
AMBULATING _____   EGGCRATE _____
AIRMATTRESS _____

**P #16   DECREASED SAFETY DUE TO** _Police Guard_
_In Room_

HIGH RISK IDENTIFIED _NU_
SIDE RAILS UP 1/2 _yes_
UP FULL _NO_
CALL LIGHT IN REACH _yes_
BED POSITION UP _WD_
DOWN _yes_
RESTRAINT RELEASE _____
BED CHECK _____
K-PAD CHECK _____
CRIB _____

**P #17   ALTERATION IN NUTRITION DUE TO**

| TYPE | _Clr Sips_ | B | L | S |
|------|-----|---|---|---|
| AMOUNT | | | | |

SNACK-DIABETIC _____
CIRCLE _SELF_ FEED NG G TUBE PUMP
NURSE _E J Mishill LPN_
NURSE _____ RN
CARE PLAN UPDATED _____ YES NO
ACUITY SCORE _____

# NURSE'S ASSESSMENT AND CARE PLAN

P A T I E N T   L A B E L

CONRAD, ROBERT
01143-00094          I/P
SAWYER, SAMUEL
207  M  S      05/23/01
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
I 0041155

207B

## SHIFT ASSESSMENT    DATE: 5/26/0   TIME: 0500

**P #1    IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR ___ Warm, Dry ___

INTEGRITY/PRESSURE ULCER EVALUATION ___ intact ___

EDEMA ___

ADDED OBSERVATIONS ___ Staples ___ ABD ___

**P #2    ALTERATION IN THOUGHT PROCESS DUE TO**

LOC ___ awake/oriented ___

**P #3    ALTERED COPING LEVEL DUE TO**

COOPERATIVE ___ yes ___

ANXIOUS/COMBATIVE ___ N/A ___

OTHER ___

ATRIC PLAY WNL ___

**P #4    NEURO/MUSCULAR/SKELETAL DEFICIT DUE TO**

PUPILS ___

MOTOR ___ MAE slowly ___

TRACTION/ETC. ___

ADDED OBSERVATIONS ___

**P #5    IMPAIRED COMMUNICATION DUE TO**

CLEAR ___ yes ___

SLURRED ___ NO ___

APHASIC ___

OTHER ___

**P #6    INEFFECTIVE BREATHING PATTERNS DUE TO**

BREATH SOUNDS ___

RESPIRATIONS ___ unlabored ___

COUGH/SPUTUM ___

OXYGEN TYPE/CROUP TENT ___

ADDED OBSERVATIONS ___ TS 92° while awake ___

**P #7    ALTERED PERIPHERAL TISSUE PERFUSION DUE TO**

**P #8    ALTERATION IN CARDIAC OUTPUT DUE TO**

SOUNDS ___

RHYTHM ___

PULSES (R/L)    RADIAL ___    DP ___

PT ___    NAILBEDS ___

CAPILLARY REFILL ___ not assessed ___

SUPPORT STOCKINGS ___

MONITOR ___

**P #9    ALTERATION GI FUNCTIONING DUE TO**

ABD ___ soft ___

BOWEL SOUNDS ___

NG DRAINAGE/POSITION VERIFIED ___

RESIDUAL ___

STOOL ___

EMESIS ___

DRSG/DRAINS ___ Staples c Steri dog to ABD ___

**P #10    ALTERATION IN GU FUNCTIONING DUE TO**

URINE ___ voiding ___

CATHETER ___

MENSES ___ N/A ___

VAGINAL PACKING ___

**P #11    ALTERATION IN COMFORT LEVEL DUE TO**

IV Demerol 50mg + Phenergan 25mg q 1

**P #12    ALTERED SKIN INTEGRITY OR FLUID OVERLOAD DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|------|--------|------|------|------------|--------------|
| PERIPHERAL | | | | WNL | 5/23 |
| HEPLOCK | D5/2NS | @ 100 | | DFA | |
| CENTRAL | | | DATE DSG CHANGE | | |
| IV SITE PEDS Q1H | | | | | |
| IV SITE WNL Q2H | | 5-23 | | | |
| INFUSION DEVICE | Baxter pump | | | | |
| TUBING CHANGES | | | | | |

**P #13    PATIENT/FAMILY KNOWLEDGE DEFICIT DUE TO**

**P #14    SELF CARE DEFICIT DUE TO**

**P #15    ACTIVITY TOLERANCE DUE TO**

BEDREST ___          TURN Q2H ___

DANGLE ___          COMMODE ___

CHAIR ___          BRP ___

AMBULATING ___          EGGCRATE ___

AIRMATTRESS ___

**P #16    DECREASED SAFETY DUE TO**

HIGH RISK IDENTIFIED ___

SIDE RAILS UP 1/2 ___

UP FULL ___

CALL LIGHT IN REACH ___

BED POSITION UP ___

DOWN ___

RESTRAINT RELEASE ___

BED CHECK ___

K-PAD CHECK ___

CRIB ___ N/A ___

**P #17    ALTERATION IN NUTRITION DUE TO**

TYPE ___ clear liq ___

AMOUNT ___ sips only ___

SNACK-DIABETIC ___

CIRCLE    SELF    FEED    NG    GTUBE    PUMP

NURSE ___

NURSE ___          RN

CARE PLAN UPDATED ___          YES ___ NO ___

ACUITY SCORE ___

# NURSE'S ASSESSMENT AND CARE PLAN

CONRAD, ROBERT
01143-00094          I/P
SAWYER, SAMUEL
NTH  M  S    05/23/01
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
01161003

## SHIFT ASSESSMENT  DATE: 05/25/01  TIME: 2330

**P #1 IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION DUE TO**
APPEARANCE/COLOR/TEMPERATURE/TURGOR  pnc/warm/dry
INTEGRITY/PRESSURE ULCER EVALUATION  midline incision c̄
staples
EDEMA  Ø
ADDED OBSERVATIONS

**P #2 ALTERATION IN THOUGHT PROCESS DUE TO**
LOC  Alert / Oriented

**P #3 ALTERED COPING LEVEL DUE TO**
COOPERATIVE  yes
ANXIOUS/COMBATIVE  Ø
OTHER  Ø
TRIC PLAY WNL  Ø

**P #4 NEURO/MUSCULAR/SKELETAL DEFICIT DUE TO**
PUPILS  Equal
MOTOR  MAE
TRACTION/ETC.  Ø
ADDED OBSERVATIONS  Ø

**P #5 IMPAIRED COMMUNICATION DUE TO**
CLEAR  yes
SLURRED  Ø
APHASIC  Ø
OTHER  Ø

**P #6 INEFFECTIVE BREATHING PATTERNS DUE TO**
BREATH SOUNDS  clear
RESPIRATIONS  even + reg
COUGH/SPUTUM  Ø
OXYGEN TYPE/CROUP TENT  Ø
ADDED OBSERVATIONS  shallow breathing

**P #7 ALTERED PERIPHERAL TISSUE PERFUSION DUE TO**

**P #8 ALTERATION IN CARDIAC OUTPUT DUE TO**
INDS
PULSES (R/L)  RADIAL  + +  DP + +
PT  NAILBEDS  pnk
CAPILLARY REFILL  <2sec
SUPPORT STOCKINGS  Ø
MONITOR  Ø

**P #9 ALTERATION GI FUNCTIONING DUE TO**
ABD  soft/untend/not distend
BOWEL SOUNDS  active x4 quadrants
NG DRAINAGE/POSITION VERIFIED  Ø
RESIDUAL  Ø
STOOL  Ø
EMESIS  Ø
DRSG/DRAINS  Ø

**P #10 ALTERATION IN GU FUNCTIONING DUE TO**
URINE  yellow
CATHETER  Ø
MENSES  Ø
VAGINAL PACKING  Ø

**P #11 ALTERATION IN COMFORT LEVEL DUE TO**

**P #12 ALTERED SKIN INTEGRITY OR FLUID OVERLOAD DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|------|--------|------|------|------------|--------------|
| PERIPHERAL | D5½NS | @10 | LFA | WNL | 5/23 |
| HEPLOCK | | | | | |
| CENTRAL | | | DATE DSG CHANGE | | |
| IV SITE PEDS Q1H | | | | | |
| IV SITE WNL Q2H | | | | | |
| INFUSION DEVICE | Baxter | | | | |
| TUBING CHANGES | | | | | |

**P #13 PATIENT/FAMILY KNOWLEDGE DEFICIT DUE TO**

**P #14 SELF CARE DEFICIT DUE TO**

**P #15 ACTIVITY TOLERANCE DUE TO**
BEDREST                TURN Q2H
DANGLE                 COMMODE
CHAIR                  BRP self
AMBULATING             EGGCRATE
AIRMATTRESS

**P #16 DECREASED SAFETY DUE TO**
HIGH RISK IDENTIFIED  Ø
SIDE RAILS UP 1/2  yes
UP FULL  Ø
CALL LIGHT IN REACH  yes
BED POSITION UP  Ø
DOWN  yes
RESTRAINT RELEASE  Ø
BED CHECK  Ø
K-PAD CHECK  Ø
CRIB

**P #17 ALTERATION IN NUTRITION DUE TO**

| TYPE NPO | B | L | S |
|----------|---|---|---|
| AMOUNT | | | |
| SNACK-DIABETIC | | | |

| CIRCLE | SELF | FEED | NG | GTUBE | PUMP |
|--------|------|------|----|----|------|
| NURSE | | | | | |
| NURSE | | | | | RN |
| CARE PLAN UPDATED | | YES | NO | | |
| ACUITY SCORE | | | | | |

# NURSE'S ASSESSMENT AND CARE PLAN

CONRAD, ROBERT
01143-00794          I/P
SAWYER, SAMUEL
ADM  M  5    05/23/01
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

---

**SHIFT ASSESSMENT    DATE:** 25 my **TIME:** 11 45

**P  #1    IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION**
**DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR _____

INTEGRITY/PRESSURE ULCER EVALUATION _____

EDEMA _____
ADDED OBSERVATIONS _____

**P  #2    ALTERATION IN THOUGHT PROCESS**
**DUE TO**

LOC _____

**P  #3    ALTERED COPING LEVEL**
**DUE TO**

COOPERATIVE _____
ANXIOUS/COMBATIVE _____
OTHER _____
ATRIC PLAY WNL _____

**P  #4    NEURO/MUSCULAR/SKELETAL DEFICIT**
**DUE TO**

PUPILS _____
MOTOR _____
TRACTION/ETC. _____
ADDED OBSERVATIONS _____

**P  #5    IMPAIRED COMMUNICATION**
**DUE TO**

CLEAR _____
SLURRED _____
APHASIC _____
OTHER _____

**P  #6    INEFFECTIVE BREATHING PATTERNS**
**DUE TO**

BREATH SOUNDS _____
RESPIRATIONS _____
COUGH/SPUTUM _____
OXYGEN TYPE/CROUP TENT _____
ADDED OBSERVATIONS _____

**P  #7    ALTERED PERIPHERAL TISSUE PERFUSION**
**DUE TO**

**P  #8    ALTERATION IN CARDIAC OUTPUT**
**DUE TO**

SOUNDS _____
RHYTHM _____
PULSES (R/L)  RADIAL ___  DP ___
PT ___  NAILBEDS ___
CAPILLARY REFILL _____
SUPPORT STOCKINGS _____
MONITOR _____

**P  #9    ALTERATION GI FUNCTIONING**
**DUE TO**

ABD _____
BOWEL SOUNDS _____
NG DRAINAGE/POSITION VERIFIED _____

RESIDUAL _____
STOOL _____
EMESIS _____
DRSG/DRAINS _____

**P  #10    ALTERATION IN GU FUNCTIONING**
**DUE TO**

URINE _____
CATHETER _____
MENSES _____
VAGINAL PACKING _____

**P  #11    ALTERATION IN COMFORT LEVEL**
**DUE TO**

**P  #12    ALTERED SKIN INTEGRITY OR FLUID OVERLOAD**
**DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|------|--------|------|------|------------|--------------|
| PERIPHERAL | | | | | |
| HEPLOCK | | | | | |
| CENTRAL | | | DATE DSG CHANGE | | |
| IV SITE  PEDS  Q1H | | | | | |
| IV SITE WNL Q2H | | | | | |
| INFUSION DEVICE | | | | | |
| TUBING CHANGES | | | | | |

**P  #13    PATIENT/FAMILY KNOWLEDGE DEFICIT**
**DUE TO**

**P  #14    SELF CARE DEFICIT**
**DUE TO**

**P  #15    ACTIVITY TOLERANCE**
**DUE TO**

BEDREST ___  TURN Q2H ___
DANGLE ___  COMMODE ___
CHAIR ___  BRP ___
AMBULATING ___  EGGCRATE ___
AIRMATTRESS ___

**P  #16    DECREASED SAFETY**
**DUE TO**

HIGH RISK IDENTIFIED _____
SIDE RAILS UP 1/2 _____
UP FULL _____
CALL LIGHT IN REACH _____
BED POSITION UP _____
DOWN _____
RESTRAINT RELEASE _____
BED CHECK _____
K-PAD CHECK _____
CRIB _____

**P  #17    ALTERATION IN NUTRITION**
**DUE TO**

| TYPE | | B | L | S |
|------|--|---|---|---|
| AMOUNT | | | | |
| SNACK-DIABETIC | | | | |
| CIRCLE | SELF | FEED | NG | G TUBE | PUMP |

NURSE _____
NURSE _____ RN
CARE PLAN UPDATED ___  YES ___  NO ___
ACUITY SCORE _____

# NURSE'S ASSESSMENT AND CARE PLAN

PATIENT:
CONRAD, ROBERT
01143-00084
SANDER, SAMUEL
03/23/01

I/2  207

---

| P | #9 | ALTERATION GI FUNCTIONING |
| | | DUE TO |

ABD _tender @ surgical site_
BOWEL SOUNDS _____
NG DRAINAGE/POSITION VERIFIED _____
RESIDUAL _Staples intact; small asx to Ⓛ_
STOOL _incidence; Ⓞ_
EMESIS _Ø_
DRSG/DRAINS _Dry; intact to Ⓛ of Suture line_

| P | #10 | ALTERATION IN GU FUNCTIONING |
| | | DUE TO |

URINE _per BR_
CATHETER _____
MENSES _____
VAGINAL PACKING _____

| P | #11 | ALTERATION IN COMFORT LEVEL |
| | | DUE TO _Surgery_ |

_1415 - Demerol 100mg / Phenergan 25 mg IM_

| P | #12 | ALTERED SKIN INTEGRITY OR FLUID OVERLOAD |
| | | DUE TO |

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|------|--------|------|------|------------|--------------|
| PERIPHERAL | D5 1/2 @ 100cc/hr | | RFA | | 3/23 |
| HEPLOCK | | | | | |
| CENTRAL | | | DATE DSG CHANGE | | |
| IV SITE PEDS Q1H | | | | | |
| IV SITE WNL Q2H | 0800, 1000, 1200, 1400 | | | | |
| INFUSION DEVICE | Buxter | | | | |
| TUBING CHANGES | | | | | |

| P | #13 | PATIENT/FAMILY KNOWLEDGE DEFICIT |
| | | DUE TO |

| P | #14 | SELF CARE DEFICIT |
| | | DUE TO _Surgery_ |

| P | #15 | ACTIVITY TOLERANCE |
| | | DUE TO |

BEDREST _____   TURN Q2H _____
DANGLE _____   COMMODE _____
CHAIR _1000 - 1130_   BRP _____
AMBULATING _to BR_   EGGCRATE _____
AIRMATTRESS _____

| P | #16 | DECREASED SAFETY |
| | | DUE TO |

HIGH RISK IDENTIFIED _yes_
SIDE RAILS UP 1/2 _yes_
UP FULL _____
CALL LIGHT IN REACH _yes_
BED POSITION UP _____
DOWN _yes_
RESTRAINT RELEASE _____
BED CHECK _____
K-PAD CHECK _____
CRIB _____

| P | #17 | ALTERATION IN NUTRITION |
| | | DUE TO |

| TYPE | | B | L | S |
|------|---|---|---|---|
| AMOUNT | NPO | | | |
| SNACK-DIABETIC | | | | |
| CIRCLE | SELF | FEED | NG | GTUBE | PUMP |

---

## SHIFT ASSESSMENT    DATE: 5/23  TIME: 10⁰⁵ am

| P | #1 | IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION |
| | | DUE TO |

APPEARANCE/COLOR/TEMPERATURE/TURGOR _Warm intact_
INTEGRITY/PRESSURE ULCER EVALUATION _____
EDEMA _Ø_
ADDED OBSERVATIONS _Small dsg to upper inner @arm D/T_

| P | #2 | ALTERATION IN THOUGHT PROCESS |
| | | DUE TO |

LOC _A&O_

| P | #3 | ALTERED COPING LEVEL |
| | | DUE TO |

COOPERATIVE _yes_
ANXIOUS/COMBATIVE _____
OTHER _____
    ATRIC PLAY WNL _____

| P | #4 | NEURO/MUSCULAR/SKELETAL DEFICIT |
| | | DUE TO |

PUPILS _PER_
MOTOR _MAEW_
TRACTION/ETC. _____
ADDED OBSERVATIONS _____

| P | #5 | IMPAIRED COMMUNICATION |
| | | DUE TO |

CLEAR _yes_
SLURRED _____
APHASIC _____
OTHER _____

| P | #6 | INEFFECTIVE BREATHING PATTERNS |
| | | DUE TO |

BREATH SOUNDS _Clear_
RESPIRATIONS _easy; unlabored_
COUGH/SPUTUM _Ø_
OXYGEN TYPE/CROUP TENT _Ø_
ADDED OBSERVATIONS _Encouraged to deep breathe, splint and cough._

| P | #7 | ALTERED PERIPHERAL TISSUE PERFUSION |

| P | #8 | ALTERATION IN CARDIAC OUTPUT |
| | | DUE TO |

SOUNDS _S₁ S₂_
M _____
PULSES (R/L)  RADIAL _+ / +_  DP _/_
PT _+ / +_  NAILBEDS _pink_
CAPILLARY REFILL _< 3 sec._
SUPPORT STOCKINGS _____
MONITOR _____

NURSE _____  RN
NURSE _(signature), RN_  RN
CARE PLAN UPDATED )     YES    NO
ACUITY SCORE _____

## NURSE'S ASSESSMENT AND CARE PLAN

P I    COTTAO, ROBERT                     I/P
E L    [illegible handwriting]     EC
N A    [illegible]        05/23/01
T T    [illegible]
S E    [illegible]

**SHIFT ASSESSMENT   DATE:** 3/24  **TIME:** 1900

**P  #1    IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR _wd/s to tort_
_pink fin_
INTEGRITY/PRESSURE ULCER EVALUATION _Dsg (1) 9 m. + c-b-d_
_s/p GSW_
EDEMA _____
ADDED OBSERVATIONS _____

**P  #2    ALTERATION IN THOUGHT PROCESS DUE TO**
LOC _A & O_

**P  #3    ALTERED COPING LEVEL DUE TO**
COOPERATIVE _yes_
ANXIOUS/COMBATIVE _0_
OTHER _____
TRIC PLAY WNL _____

**P  #4    NEURO/MUSCULAR/SKELETAL DEFICIT DUE TO**
PUPILS _PERRL_
MOTOR _MAE_
TRACTION/ETC. _____
ADDED OBSERVATIONS _____

**P  #5    IMPAIRED COMMUNICATION DUE TO**
CLEAR _yes_
SLURRED _0_
APHASIC _____
OTHER _____

**P  #6    INEFFECTIVE BREATHING PATTERNS DUE TO**
BREATH SOUNDS _cn clr_
RESPIRATIONS _un-labed_
COUGH/SPUTUM _____
OXYGEN TYPE/CROUP TENT _____
ADDED OBSERVATIONS _____

**P  #7    ALTERED PERIPHERAL TISSUE PERFUSION DUE TO**

**P  #8    ALTERATION IN CARDIAC OUTPUT DUE TO**
SOUNDS _S.S.z_
4M _uc_
PULSES (R/L) _+/+_  RADIAL _+/+_      DP _/_
PT _+/+_    NAILBEDS _pink_
CAPILLARY REFILL _c.O₂_
SUPPORT STOCKINGS _0_
MONITOR _____

**P  #9    ALTERATION GI FUNCTIONING DUE TO**
ABO _Soft & tnd._
BOWEL SOUNDS _(+) L4 Quame_
NG DRAINAGE/POSITION VERIFIED _____
RESIDUAL _____
STOOL _____
EMESIS _____
DRSG/DRAINS _____

**P  #10   ALTERATION IN GU FUNCTIONING DUE TO**
URINE _yellow_
CATHETER _0_
MENSES _____
VAGINAL PACKING _____

**P  #11   ALTERATION IN COMFORT LEVEL DUE TO**

**P  #12   ALTERED SKIN INTEGRITY OR FLUID OVERLOAD DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|------|--------|------|------|------------|--------------|
| PERIPHERAL | D5/2 | @100 | (R) FA | intact | 3/23 |
| HEPLOCK | | | | | |
| CENTRAL | | | DATE DSG CHANGE | | |
| IV SITE PEDS Q1H | | | | | |
| IV SITE WNL Q2H | | | | | |
| INFUSION DEVICE | | | | | |
| TUBING CHANGES | | | | | |

**P  #13   PATIENT/FAMILY KNOWLEDGE DEFICIT DUE TO**

**P  #14   SELF CARE DEFICIT DUE TO** _+_

**P  #15   ACTIVITY TOLERANCE DUE TO**
BEDREST _____        TURN Q2H _____
DANGLE _____         COMMODE _____
CHAIR _____          BRP _____
AMBULATING _____     EGGCRATE _____
AIRMATTRESS _____

**P  #16   DECREASED SAFETY DUE TO**
HIGH RISK IDENTIFIED _____
SIDE RAILS UP 1/2 _✓_
UP FULL _____
CALL LIGHT IN REACH _✓_
BED POSITION UP _✓_
DOWN _✓_
RESTRAINT RELEASE _____
BED CHECK _____
K-PAD CHECK _____
CRIB _____

**P  #17   ALTERATION IN NUTRITION DUE TO**
TYPE _NPO_        B        L        S
AMOUNT _____
SNACK-DIABETIC _____
CIRCLE   SELF   FEED   NG   G TUBE   PUMP
NURSE _[signature]_
NURSE _____ RN
CARE PLAN UPDATED            YES    NO
ACUITY-SCORE _____

## NURSE'S ASSESSMENT AND CARE PLAN

P I
E L
N A
T T
S E

05/23/01

I/P

---

**P #9   ALTERATION GI FUNCTIONING**
**DUE TO**

ABD _____
BOWEL SOUNDS _____
NG DRAINAGE/POSITION VERIFIED _____

RESIDUAL _____
STOOL _____
EMESIS _____
DRSG/DRAINS _____

**SHIFT ASSESSMENT   DATE:** 24/m   **TIME:** 1540

**P #1   IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION**
**DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR _____
INTEGRITY/PRESSURE ULCER EVALUATION _____
EDEMA _____
ADDED OBSERVATIONS _____

**P #2   ALTERATION IN THOUGHT PROCESS**
**DUE TO**

LOC _____

**P #3   ALTERED COPING LEVEL**
**DUE TO**

COOPERATIVE _____
ANXIOUS/COMBATIVE _____
OTHER _____
ATRIC PLAY WNL _____

**P #4   NEURO/MUSCULAR/SKELETAL DEFICIT**
**DUE TO**

PUPILS _____
MOTOR _____
TRACTION/ETC. _____
ADDED OBSERVATIONS _____

**P #5   IMPAIRED COMMUNICATION**
**DUE TO**

CLEAR _____
SLURRED _____
APHASIC _____
OTHER _____

**P #6   INEFFECTIVE BREATHING PATTERNS**
**DUE TO**

BREATH SOUNDS _____
RESPIRATIONS _____
COUGH/SPUTUM _____
OXYGEN TYPE/CROUP TENT _____
ADDED OBSERVATIONS _____

**P #7   ALTERED PERIPHERAL TISSUE PERFUSION**
**DUE TO**

**P #8   ALTERATION IN CARDIAC OUTPUT**
**DUE TO**

SOUNDS _____
IM _____
PULSES (R/L)   RADIAL _____   DP _____
PT _____   NAILBEDS _____
CAPILLARY REFILL _____
SUPPORT STOCKINGS _____
MONITOR _____

**P #10   ALTERATION IN GU FUNCTIONING**
**DUE TO**

URINE _____
CATHETER _____
MENSES _____
VAGINAL PACKING _____

**P #11   ALTERATION IN COMFORT LEVEL**
**DUE TO**

**P #12   ALTERED SKIN INTEGRITY OR FLUID OVERLOAD**
**DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|------|--------|------|------|------------|--------------|
| PERIPHERAL | 20 | | | | |
| HEPLOCK | | | | | |
| CENTRAL | | | DATE DSG CHANGE | | |
| IV SITE  PEDS  Q1H | | | | | |
| IV SITE WNL Q2H | | | | | |
| INFUSION DEVICE | | | | | |
| TUBING CHANGES | | | | | |

**P #13   PATIENT/FAMILY KNOWLEDGE DEFICIT**
**DUE TO**

**P #14   SELF CARE DEFICIT**
**DUE TO**

**P #15   ACTIVITY TOLERANCE**
**DUE TO**

| | |
|---|---|
| BEDREST | TURN Q2H |
| DANGLE | COMMODE |
| CHAIR | BRP |
| AMBULATING | EGGCRATE |
| AIRMATTRESS | |

**P #16   DECREASED SAFETY**
**DUE TO**

HIGH RISK IDENTIFIED _____
SIDE RAILS UP 1/2 _____
UP FULL _____
CALL LIGHT IN REACH _____
BED POSITION UP _____
down _____
RESTRAINT RELEASE _____
BED CHECK _____
K-PAD CHECK _____
CRIB _____

**P #17   ALTERATION IN NUTRITION**
**DUE TO**

| TYPE | | B | L | S |
|------|--|---|---|---|
| AMOUNT | | | | |
| SNACK-DIABETIC | | | | |

| CIRCLE | SELF | FEED | NG | G TUBE | PUMP |
|--------|------|------|-----|--------|------|
| NURSE | | | | | |
| NURSE | | | | | RN |
| CARE-PLAN UPDATED | | | | YES | NO |
| ACUITY-SCORE | | | | | |

NURSE'S ASSESSMENT AND CARE PLAN

P I    CONRAD, ROBERT
       01143-00094            I/P
E  L
N  A   SAWYER, SAMUEL
T  T   XXX  M  S     05/23/01
S  E   XXX-XX-9785

207B

---

**SHIFT ASSESSMENT   DATE** 5/24/01 **TIME:** 0810

**P  #1    IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR _mucus membrane pink, skin turgor <2sec, warm_

INTEGRITY/PRESSURE ULCER EVALUATION _midline incision blood noted on drsg middle to lower_

EDEMA _no_

ADDED OBSERVATIONS _drsg. on ® upper inner arm, sm. amt. of blood noted._

**P  #2    ALTERATION IN THOUGHT PROCESS DUE TO**

LOC _Oriented x 3_

**P  #3    ALTERED COPING LEVEL DUE TO**

COOPERATIVE _yes_
ANXIOUS/COMBATIVE _no_
OTHER
\TRIC PLAY WNL

**P  #4    NEURO/MUSCULAR/SKELETAL DEFICIT DUE TO**

PUPILS _Perrla_
MOTOR _MAE_
TRACTION/ETC
ADDED OBSERVATIONS

**P  #5    IMPAIRED COMMUNICATION DUE TO**

CLEAR _yes_
SLURRED
APHASIC
OTHER

**P  #6    INEFFECTIVE BREATHING PATTERNS DUE TO**

BREATH SOUNDS _Clear bilat._
RESPIRATIONS _reg. unlabored_
COUGH/SPUTUM _no_
OXYGEN TYPE/CROUP TENT
ADDED OBSERVATIONS

**P  #7    ALTERED PERIPHERAL TISSUE PERFUSION DUE TO**

**P  #8    ALTERATION IN CARDIAC OUTPUT DUE TO**

SOUNDS _S₁ S₂ @ PMI_
    M _reg. unlabored_
PULSES (R/L)  RADIAL _+2, +2_  DP _+2, +2_
PT
CAPILLARY REFILL _<2sec._
SUPPORT STOCKINGS
MONITOR

---

**P  #9    ALTERATION GI FUNCTIONING DUE TO**

ABD _nondistended, nontender_
BOWEL SOUNDS _present +4    midline_
NG DRAINAGE/POSITION VERIFIED _quads. drsg._
                                          _see_
RESIDUAL _no_                           _back_
STOOL _no_
EMESIS _no_
DRSG/DRAINS _NGT to L.I.S._

**P  #10    ALTERATION IN GU FUNCTIONING DUE TO**

URINE
CATHETER _light yellow - no sediment_
MENSES
VAGINAL PACKING

**P  #11    ALTERATION IN COMFORT LEVEL DUE TO** _0910 - Dem. 0.7_
                                               _1210 Dem.75 mg_

_5 c/o pain, 5 c/o nausea &_
_vomiting_

**P  #12    ALTERED SKIN INTEGRITY OR FLUID OVERLOAD DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|------|--------|------|------|------------|--------------|
| PERIPHERAL | ® Forearm | | | redness | 5/23 |
| HEPLOCK | D5½NS @100 | | | edema &  | |
| CENTRAL | | | | | no pain |
| IV SITE  PEDS  Q1H | DATE DSG CHANGE | | | | |
| IV SITE WNL Q2H | 0810  1214 | | | | |
| INFUSION DEVICE | | | | | |
| TUBING CHANGES | 5/23 | | | | |

**P  #13    PATIENT/FAMILY KNOWLEDGE DEFICIT DUE TO**

**P  #14    SELF CARE DEFICIT DUE TO**

**P  #15    ACTIVITY TOLERANCE DUE TO**

| BEDREST | TURN Q2H |
|---------|----------|
| DANGLE | COMMODE |
| CHAIR | BRP |
| AMBULATING | EGGCRATE |
| AIRMATTRESS | |

**P  #16    DECREASED SAFETY DUE TO**

HIGH RISK IDENTIFIED _no_
SIDE RAILS UP 1/2 _yes_
    UP FULL _yes_
CALL LIGHT IN REACH _yes_
BED POSITION UP _yes_
    DOWN _yes_
RESTRAINT RELEASE
BED CHECK _yes_
K-PAD CHECK
CRIB

**P  #17    ALTERATION IN NUTRITION DUE TO**

TYPE _NPO_    B _NPO_  L _NPO_  S
AMOUNT
SNACK-DIABETIC
CIRCLE  (SELF)  FEED  NG  G TUBE  PUMP
NURSE
NURSE _C. Lentz RN_    RN
CARE PLAN UPDATED        YES      NO
ACUITY SCORE

CONRAD, ROBER NURSE'S ASSESSMENT AND CARE PLAN
C.143-00094        I/P
SAWYER, SAMUEL
         S      05/23/01
   -   -

E
N
A
T
S E

207B

## SHIFT ASSESSMENT   DATE:        TIME:

**P  #1   IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION**
           **DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR _____

INTEGRITY/PRESSURE ULCER EVALUATION _____

EDEMA _____
ADDED OBSERVATIONS _____

**P  #2   ALTERATION IN THOUGHT PROCESS**
           **DUE TO**

LOC _____

**P  #3   ALTERED COPING LEVEL**
           **DUE TO**

COOPERATIVE _____
ANXIOUS/COMBATIVE _____
OTHER _____
    ATRIC PLAY WNL _____

**P  #4   NEURO/MUSCULAR/SKELETAL DEFICIT**
           **DUE TO**

PUPILS _____
MOTOR _____
TRACTION/ETC. _____
ADDED OBSERVATIONS _____

**P  #5   IMPAIRED COMMUNICATION**
           **DUE TO**

CLEAR _____
SLURRED _____
APHASIC _____
OTHER _____

**P  #6   INEFFECTIVE BREATHING PATTERNS**
           **DUE TO**

BREATH SOUNDS _____
RESPIRATIONS _____
COUGH/SPUTUM _____
OXYGEN TYPE/CROUP TENT _____
ADDED OBSERVATIONS _____

**P  #7   ALTERED PERIPHERAL TISSUE PERFUSION**
           **DUE TO**

**P  #8   ALTERATION IN CARDIAC OUTPUT**
           **DUE TO**

   OUNDS _____
   (M _____
PULSES (R/L)   RADIAL _____   DP _____
PT _____   NAILBEDS _____
CAPILLARY REFILL _____
SUPPORT STOCKINGS _____
MONITOR _____

**P  #9   ALTERATION GI FUNCTIONING**
           **DUE TO**

ABD _____
BOWEL SOUNDS _____
NG DRAINAGE/POSITION VERIFIED _____

RESIDUAL _____
STOOL _____
EMESIS _____
ORSG/DRAINS _____

**P  #10  ALTERATION IN GU FUNCTIONING**
           **DUE TO**

URINE _____
CATHETER _____
MENSES _____
VAGINAL PACKING _____

**P  #11  ALTERATION IN COMFORT LEVEL**
           **DUE TO**

**P  #12  ALTERED SKIN INTEGRITY OR FLUID OVERLOAD**
           **DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|------|--------|------|------|------------|--------------|
| PERIPHERAL | | | | | |
| HEPLOCK | | | | | |
| CENTRAL | | | DATE DSG CHANGE | | |
| IV SITE  PEDS  Q1H | | | | | |
| IV SITE WNL  Q2H | | | | | |
| INFUSION DEVICE | | | | | |
| TUBING CHANGES | | | | | |

**P  #13  PATIENT/FAMILY KNOWLEDGE DEFICIT**
           **DUE TO**

**P  #14  SELF CARE DEFICIT**
           **DUE TO**

**P  #15  ACTIVITY TOLERANCE**
           **DUE TO**

BEDREST _____   TURN Q2H _____
DANGLE _____   COMMODE _____
CHAIR _____   BRP _____
AMBULATING _____   EGGCRATE _____
AIRMATTRESS _____

**P  #16  DECREASED SAFETY**
           **DUE TO**

HIGH RISK IDENTIFIED _____
SIDE RAILS UP 1/2 _____
            UP FULL _____
CALL LIGHT IN REACH _____
BED POSITION UP _____
            DOWN _____
RESTRAINT RELEASE _____
BED CHECK _____
K-PAD CHECK _____
CRIB _____

**P  #17  ALTERATION IN NUTRITION**
           **DUE TO**

| TYPE | | B | L | S |
|------|---|---|---|---|
| AMOUNT | | | | |
| SNACK-DIABETIC | | | | |
| CIRCLE | SELF | FEED | NG | G TUBE | PUMP |
| NURSE | | | | | |
| NURSE | | | | | RN |
| CARE PLAN UPDATED | | | YES | NO | |
| ACUITY SCORE | | | | | |

## NURSE'S ASSESSMENT AND CARE PLAN

CONRAD, ROBERT
01143-00094          I/P
SAWYER, SAMUEL
                    05/23/01
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

**SHIFT ASSESSMENT    DATE: 3/23    TIME: 1725**

**P  #1    IMPAIRMENT OF SKIN INTEGRITY OR PERFUSION**
            **DUE TO**

APPEARANCE/COLOR/TEMPERATURE/TURGOR _W + 5  to tort_
_pink  fa_
INTEGRITY/PRESSURE ULCER EVALUATION _Dng to (d) au  +_
_red abd_
EDEMA
ADDED OBSERVATIONS

**P  #2    ALTERATION IN THOUGHT PROCESS**
            **DUE TO**

LOC _Alrt_

**P  #3    ALTERED COPING LEVEL**
            **DUE TO**

COOPERATIVE _yes_
ANXIOUS/COMBATIVE
OTHER
ATRIC PLAY WNL

**P  #4    NEURO/MUSCULAR/SKELETAL DEFICIT**
            **DUE TO**

PUPILS _PERRL_
MOTOR _PMTE_
TRACTION/ETC
ADDED OBSERVATIONS

**P  #5    IMPAIRED COMMUNICATION**
            **DUE TO**

CLEAR _yes_
SLURRED
APHASIC
OTHER

**P  #6    INEFFECTIVE BREATHING PATTERNS**
            **DUE TO**

BREATH SOUNDS _es clea_
RESPIRATIONS _even - labrd_
COUGH/SPUTUM
OXYGEN TYPE/CROUP TENT
ADDED OBSERVATIONS

**P  #7    ALTERED PERIPHERAL TISSUE PERFUSION**
            **DUE TO**

**P  #8    ALTERATION IN CARDIAC OUTPUT**
            **DUE TO**

OUNDS _S-S2_
M _re_
PULSES (R/L)  RADIAL _+ + +_    DP
PT _+ +_    NAILBEDS _pink_
CAPILLARY REFILL _brdy_
SUPPORT STOCKINGS _b_
MONITOR

**P  #9    ALTERATION GI FUNCTIONING**
            **DUE TO**

ABD _Soft  c  total_
BOWEL SOUNDS _(B) X 4 quad_
NG DRAINAGE/POSITION VERIFIED

RESIDUAL
STOOL
EMESIS
DRSG/DRAINS

**P  #10    ALTERATION IN GU FUNCTIONING**
            **DUE TO**

URINE
CATHETER _foley_
MENSES
VAGINAL PACKING

**P  #11    ALTERATION IN COMFORT LEVEL**
            **DUE TO**

**P  #12    ALTERED SKIN INTEGRITY OR FLUID OVERLOAD**
            **DUE TO**

| SITE | FLUIDS | RATE | SITE | APPEARANCE | DATE STARTED |
|------|--------|------|------|------------|--------------|
| PERIPHERAL | D5¼ @ 100 | (R) | FA | intact | 3/23 |
| HEPLOCK | | | | | |
| CENTRAL | | | DATE DSG CHANGE | | |
| IV SITE PEDS Q1H | | | | | |
| IV SITE WNL Q2H | | | | | |
| INFUSION DEVICE | | | | | |
| TUBING CHANGES | | | | | |

**P  #13    PATIENT/FAMILY KNOWLEDGE DEFICIT**
            **DUE TO**

**P  #14    SELF CARE DEFICIT**
            **DUE TO**

**P  #15    ACTIVITY TOLERANCE**
            **DUE TO**

| BEDREST | | TURN Q2H |
| DANGLE | | COMMODE |
| CHAIR | | BRP |
| AMBULATING | | EGGCRATE |
| AIRMATTRESS | | |

**P  #16    DECREASED SAFETY**
            **DUE TO**

HIGH RISK IDENTIFIED
SIDE RAILS UP 1/2
                UP FULL
CALL LIGHT IN REACH
BED POSITION UP
                DOWN
RESTRAINT RELEASE
BED CHECK
K-PAD CHECK
CRIB

**P  #17    ALTERATION IN NUTRITION**
            **DUE TO**

| TYPE _N PO_ | | B | L | S |
| AMOUNT | | | | |
| SNACK-DIABETIC | | | | |
| CIRCLE | SELF | FEED | NG | G TUBE | PUMP |
| NURSE _Willished_ | | | | |
| NURSE | | | | RN |
| CARE PLAN UPDATED | | | YES | NO |
| ACUITY SCORE | | | | |

1233

# MEDICAL CENTER ENTERPRISE

## PROBLEM RESOLUTION SUMMARY

I/P
05/23/01

ADDRESSOGRAPH

| LEGEND |
|---|
| I = IDENTIFIED    R = RESOLVED    U = UNRESOLVED |

| PRIORITIZE | I | R | U* | PRIORITIZE | I | R | U* |
|---|---|---|---|---|---|---|---|
| P1-Impairment of skin integrity or perfusion due to* IV. dx | 5/24 CL | | 5/28 PD | P10-Alteration in GU functioning due to* | | | |
| P2-Alteration in thought process due to* pain dx | 5/24 CL | 5/28 PD | | P11-Alteration in comfort level due to* pain. dx. | 5/24 CL | | 5/28 PD |
| P3-Altered coping level due to* + dx. pain. post op. | 5/24 CL | 5/28 PD | | P12-Alteration skin integrity/fluid overload due to* IV | | 5/28 PD | |
| P4-Neuro/muscular/skeletal deficit due to* | | | | P13-Patient/Family knowledge deficit due to* postop | | 5/28 PD | |
| P5-Impaired communication due to* | | | | P14-Self-care deficit due to* dx. | 5/24 CL | 5/28 PD | |
| P6-Ineffective breathing patterns due to* | | | | P15-Activity intolerance due to* post op surgery dx | 5/24 CL | 5/28 PD | |
| P7-Altered peripheral tissue perfusion due to* | | | | P16-Decreased safety due to* | | | |
| P8-Alteration in cardiac output due to* | | | | P17-Alteration in nutrition due to* NPO status | 5/24 CL | 5/28 PD | |
| P9-Alteration in GI functioning due to* dx. post op | 5/24 CL | 5/28 PD | | P18-* | | | |

| INIT. | SIGNATURE | INIT. | SIGNATURE |
|---|---|---|---|
| CL | C. Lentz RN | PD | Penny Kimler LPN |
| | | | |
| | | | |

*Comments: _____
_____
_____
_____

**Standard of Care:** Was the expected patient outcome identified on admission met? . . . . . . . . . . . . . ☒ Yes   ☐ No
If **No***, comment below:

_____
_____
_____

Discharge Date 5/28/01    Discharge Nurse Signature Penny Kimler

Form #SUMMARY-2

Medical Center Enterprise

1234

| Patient Name | |
|---|---|

**SOCIAL SERVICES REFERRAL**      HBO Order #   Na.

- ☐ Suspected abuse/neglect ☐ Nursing home, domicillary or rehab hospital
- ☐ Financial assistance ☐ Transfer to other acute facility/transportation
- ☐ Hospice ☐ Counseling aimed at various patients or family needs
- ☐ Mental Health Referrals ☐ Assistance with adoptions
- ☐ Crisis intervention ☐ Young mother with little support, all mothers age 16 and under.
- ☐ Discharge planning to include home health nursing, durable medical equipment, respiratory equipment, home IV and TPN therapy.

**DIETARY REFERRALS**      HBO Order #   Na.

- ☐ Diet/Nutrition orders of: Tube Feeding, TPN, Calorie Count
- ☐ NPO status or unsupplemented clear liquid greater than 72 hours.
- ☐ Regular consumption of less than 50% of meals for 2-3 days
- ☐ Albumin level of 2.5 gm/dl or less
- ☐ Admitting diagnosis of: Malnutrition, Failure to Thrive, Cancer, Pressure Ulcer, Malabsorption, Sepsis, and newly diagnosed Diabetic
- ☐ Data from Admission Record of: Difficulty chewing and/or Swallowing, Unplanned weight loss of 10 pounds or more in 2 months. Severely underweight by appearance.

**PHYSICAL THERAPY /**
**OCCUPATIONAL THERAPY** *(Obtain MD order PRIOR to consult)*    HBO Order #   Na.

- ☐ Patients who need training with a specific walking device, rehabilitation equipment.
- ☐ Patients who need splinting of the upper extremity.
- ☐ Admitting diagnosis of: New CVA, orthopedic problems (fractures, major joint replacement, arthroscopy, back injuries/back pain, sprains, dislocations, amputations.)
- ☐ New diagnosis of muscular/skeletal or neurological diseases to include, but not limited to: Parkinson's, arthritis/DSD, MS, MD or exacerbation of these diseases with recent loss of function.
- ☐ Major wounds which cannot be managed with basic nursing dressing changes (i.e., diabetic ulcer, decubitus ulcers, burns, stasis ulcers, traumatic lacerations).
- ☐ Patients whose functional status has decreased significantly due to admitting dx/complications, and have potential to regain that function.

**SPEECH PATHOLOGY** *(Obtain MD order PRIOR to consult)*    HBO Order #   Na.

- ☐ Need for assistive communication devices.
- ☐ Patient with recent hearing loss
- ☐ New diagnosis of speech disorders that involve problems with articulation, voice and fluency, swallowing, cognitive communication.

**CARDIO-PULMONARY**      HBO Order #   Na.

- ☐ Asthma ☐ COPD ☐ Pneumonia ☐ Shortness of Breath

**PHARMACY**      HBO Order #   Na.

- ☐ Patients who are started on insulin for the first time.
- ☐ Patients who are taking 11 or more routine medications, including eye medications (PRN medications not included).
- ☐ Patients taking investigational drugs

**INFECTION CONTROL**      HBO Order #   Na.

- ☐ Patient placed in isolation (Contact, Droplet, Air)
- ☐ Patient admit with pressure ulcer
- ☐ Neonate admission under 28 days old with dx: FUO, sepsis, pneumonia
- ☐ Patient with admitting dx of: TB, wound infection, IV site infection, POP, MRSA
- ☐ Patient placed on ventilator
- ☐ Patient with orders of vancomycin

**PERINATAL NURSE EDUCATOR**    (2EAST PRINTER)      HBO Order #   Na.

- ☐ Sick newborn that is transferred
- ☐ Infant with poor prognosis
- ☐ Breastfeeding newborn with failure to gain weight
- ☐ Breastfeeding infant with failure to thrive
- ☐ Breastfeeding mom who is admitted or re-admitted to hospital during post partum
- ☐ Breastfeeding infant that is re-admitted
- ☐ Basic Life Support Referral (Infant CPR)
- ☐ Parinatal loss (Miscarriage, ectopic, stillborn, neonatal)

(IMPRINT CARD BELOW)

C. Leutz PU
Screening completed by

5/24/0
Date

05/23/01
I/p

J:Nursing/Nursadm/Forms/Screening criteria

PATIENTS' ID PLATE

```
TARA & ROBERT
0143-00094
MYER, SAMUEL          I/P
        5       05/23/01
```

| SITE CODE | C) Rt. Gluteal | G) Rt. Ven. Th |
|---|---|---|
| | D) Lt. Gluteal | H) Lt. Ven. Th |
| A) Rt. Deltoid | E) Rt. Lat. Thigh | I) Abdomen |
| B) Lt. Deltoid | F) Lt. Lat. Thigh | J) |

| OMITTED DOSE |
|---|
| 1. Patient Refused |
| 2. Absent from Department |
| 3. NPO Diagnostic |
| 4. NPO Surgery |
| 5. Vomited |
| 6. Hold Dose    7. Sleepin |

| ALLERGIES | DIAGNOSIS |
|---|---|
| NKDA | Gun shot to arm |
| | & abdoman |

# CLINICAL RECORD THERAPEUTIC DOCUMENTATION CARE PLAN ( Medications )    Mo. May  Yr. 2001

| ORDER DATE | EXP. DATE | TRANS-SCRIBER | ROUTINE MEDICATIONS ROUTE, DOSE, FREQUENCY | 11-7 | 7-3 | 3-11 | 5/23 | 5/63 | 5/63 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/29 | / | DW | Augmentin 500mg PO TID | | | 09 | — | | | | | | | |
| | / | | | | | 13 | | | | | | | | |
| | / | | | | | 18 | | | | | | | | |
| 5/31 | / | DW | Prilosec 20m PO g day | | | 09 | | | | | | | | |
| | / | | | | | | | | | | | | | |

VERIFY BY INITIALING

Init. Proper Column After Each Administration
DATE DISPENSED

| INITIAL | NURSE'S SIGNATURE | INITIAL | NURSE'S SIGNATURE | INITIAL | NURSE'S SIGNATURE |
|---|---|---|---|---|---|
| Ch | | SP | S Parker (RN) | BM | Paula McKenna |
| CL | C. Lentz RN | | | DW | |
| | | BC | Betty Callender | DL | L. Lemor RN LPN |

Form N - 49 REV. 12/93

**Medical Center Enterprise**

PATIENT ID PLATE

01143-0009▢
EAST R. SAMUEL
▢ Y ▢ S   05/23/01
▢▢▢▢▢▢▢▢
▢▢▢▢▢▢

ALLERGIES _____

_____

| ORDER DATE | EXP DATE | TRANS-SCRIB-ER | P.R.N. MEDICATION | DATE | ROUTE/SITE | FREQUENCY | REASON TO BE GIVEN |
|---|---|---|---|---|---|---|---|
| 5/23 | | by | Demerol 75 & Phenga 12½ | | IM | Q3° | pain |
| 5/23 | | by | Phenga 12 y | | IVP | Q4° | N/V |
| 5/24 | | cy | Demerol 100 mg & Phenga 25 mg Im | | | Q3° | pain n/v |
| 5/26 | | by | Demerol 50 mg & Phenga 25 | | IM | q 3° | pin pain |
| 5/27 | | by | Percocet ½ or 4 ℞ | | PO | q 4° | pain |
| 5/27 | | by | Phenga 25 mg | | IM | q 4° | N/V |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

MEDICAL CENTER ENTERPRISE

**SINGLE ORDERS + PRE-OPERATIVE**

| Or. Date Initials | MEDICATION - DOSAGE | ROUTE | TO BE GIVEN DATE | TIME | Nurse Initial | Or. Date Initials | MEDICATION - DOSAGE | ROUTE | TO BE GIVEN DATE | TIME | Nurse Initial |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

Addressograph:

Braden Scale / Skin Assessment Tool

Date: _5/30/01_

| Skin / Braden Scale | 11-7 | 7-3 | 3-11 |
|---|---|---|---|
| Intact | | | |
| Non-Intact | ✓ | | |
| Site:          Stage: Lisa (L)T arm — (L) quad | | | |
| Site:          Stage: Mid line incise staple o | | | |
| Additional observations:  W to A — open to air | | | |
| | | | |
| | | | |
| | | | |
| Sensory Perception: 1=Completely Limited 2=Very Limited 3=Slightly Limited  4=No Impairment | 4 | 4 | |
| Moisture: 1=Constantly Moist 2=Moist 3=Occasionally Moist  4=Rarely Moist | 4 | 4 | |
| Activity: 1=Bedfast 2= Chair fast 3=Walks occasionally 4=Walks Frequently | 3 | 3 | |
| Mobility: 1=Completely Immobile 2=Very Limited 3=Slightly Limited 4=No Limitation | 3 | 3 | |
| Nutrition: 1=Very Poor 2=Probably Inadequate 3=Adequate 4=Excellent | 2 | 3 | |
| Friction and Shear: 1=Problem 2=Potential Problem 3=No apparent Problem | 3 | 3 | |
| Braden Score | 19 | 19 | |
| For score ≤ 14, initiate Pressure Ulcer Protocol | | | |
| - Dietary consult (Date) | | | |
| -Skin Prep used when taping required | | | |
| -Incontinence precautions | | | |
| -Turning q2 | | | |
| Pressure relief measures | | | |
| -Wedges | | | |
| -Pillows | | | |
| -Heel protectors | | | |
| -Elbow Protector | | | |
| -Air mattress | | | |
| -Egg Crate | | | |
| -Floating of Feet | | | |
| | | | |
| Pressure ulcer present on admission   (Circle one) Yes    No | | | |
| Ulcer / Wound photo (admission or hospital acquired)     Date: | | | |
| Ulcer / Wound photo at discharge   Date: | | | |
| | | | |
| Nurse signature / Initials 11-7   J. Jones (?) LPN | CJ | CJ | |
| Nurse signature / Initials 7-3 | | | |
| Nurse signature / Initials 3-11 | | | |

Jdrive:Nursing/Nursadm/Forms/Braden Scale Assessment form

Addressograph

## Braden Scale / Skin Assessment Tool

Date: 5-28-01

| Skin / Braden Scale | 11-7 | 7-3 | 3-11 |
|---|---|---|---|
| Intact: | CV | W | |
| Non-Intact: | | | |
| Site          Stage: | | | |
| Site:          Stage: | | | |
| Additional observations: | | | |
| | | | |
| | | | |
| | | | |
| Sensory Perception: 1=Completely Limited 2=Very Limited 3=Slightly Limited  4=No Impairment | 4 | 4 | |
| Moisture: 1=Constantly Moist 2=Moist 3=Occasionally Moist  4=Rarely Moist | 4 | 4 | |
| Activity: 1=Bedfast 2= Chair fast 3=Walks occasionally 4=Walks Frequently | 3 | 3 | |
| Mobility: 1=Completely Immobile 2=Very Limited 3=Slightly Limited 4=No Limitation | 4 | 3 | |
| Nutrition: 1=Very Poor 2=Probably Inadequate 3=Adequate 4=Excellent | 3 | 3 | |
| Friction and Shear: 1=Problem 2=Potential Problem 3=No apparent Problem | 3 | 3 | |
| Braden Score | 20 | 20 | |
| For score < 14, initiate Pressure Ulcer Protocol | | | |
| - Dietary consult (Date) | | | |
| -Skin Prep used when taping required | | | |
| -Incontinence precautions | | | |
| -Turning q2 | | | |
| Pressure relief measures | | | |
| -Wedges | | | |
| -Pillows | | | |
| -Heel protectors | | | |
| -Elbow Protector | | | |
| -Air mattress | | | |
| -Egg Crate | | | |
| -Floating of Feet | | | |
| | | | |
| Pressure ulcer present on admission   (Circle one) Yes    No | | | |
| Ulcer / Wound photo (admission or hospital acquired)     Date: | | | |
| Ulcer / Wound photo at discharge   Date: | | | |
| | | | |
| Nurse signature / Initials 11-7  Jknight LPN | CV | | |
| Nurse signature / Initials 7-3 | | W | |
| Nurse signature / Initials 3-11 | | | |

Jdrive:Nursing/Nursadm/Forms/Braden Scale Assessment form

1239

Addressogra

## Braden Scale / Skin Assessment Tool

BAD, ROBERT
13-00034                                I/8

Date: 052601

| Skin / Braden Scale | 11-7 | 7-3 | 3-11 |
|---|---|---|---|
| Intact | | | |
| Non-Intact: | pmc | SP | |
| Site          Stage: | | | |
| Site:          Stage: | | | |
| Additional observations: midline mass, | pmc | SP | |
| | | | |
| | | | |
| | | | |
| **Sensory Perception:** 1=Completely Limited 2=Very Limited 3=Slightly Limited  4=No Impairment | 4 | 4 | |
| **Moisture:** 1=Constantly Moist 2=Moist 3=Occasionally Moist  4=Rarely Moist | 4 | 4 | |
| **Activity:** 1=Bedfast 2= Chair fast 3=Walks occasionally 4=Walks Frequently | 3 | 3 | |
| **Mobility:** 1=Completely Immobile 2=Very Limited 3=Slightly Limited 4=No Limitation | 3 | 3 | |
| **Nutrition:** 1=Very Poor 2=Probably Inadequate 3=Adequate 4=Excellent | 3 | 3 | |
| **Friction and Shear:** 1=Problem 2=Potential Problem 3=No apparent Problem | 3 | 3 | |
| **Braden Score** | 20 | 20 | |
| **For score ≤ 14, initiate Pressure Ulcer Protocol** | | | |
| - Dietary consult (Date) | | | |
| -Skin Prep used when taping required | | | |
| -Incontinence precautions | | | |
| -Turning q2 | | | |
| Pressure relief measures | | | |
| -Wedges | | | |
| -Pillows | | | |
| -Heel protectors | | | |
| -Elbow Protector | | | |
| -Air mattress | | | |
| -Egg Crate | | | |
| -Floating of Feet | | | |
| | | | |
| Pressure ulcer present on admission   (Circle one) Yes    No | | | |
| Ulcer / Wound photo (admission or hospital acquired)      Date: | | | |
| Ulcer / Wound photo at discharge   Date: | | | |
| | | | |
| Nurse signature / Initials 11-7  Taylor McKinny RN | pmc | SP | |
| Nurse signature / Initials 7-3  SPankhva | | | |
| Nurse signature / Initials 3-11 | | | |

Addressograph

## Braden Scale / Skin Assessment Tool

Date: 5/25/0

| Skin / Braden Scale | 11-7 | 7-3 | 3-11 |
|---|---|---|---|
| Intact | | | |
| Non-Intact: _Dr (L) Teen of abd s/p GSW (exp lap)_ | _h_ | _K_ | _A_ |
| Site            Stage: | | | |
| Site:            Stage: | | | |
| Additional observations: | | | |
| | | | |
| | | | |
| | | | |
| Sensory Perception: 1=Completely Limited 2=Very Limited 3=Slightly Limited  4=No Impairment | 3 | 3 | 3 |
| Moisture: 1=Constantly Moist 2=Moist 3=Occasionally Moist  4=Rarely Moist | 4 | 4 | 4 |
| Activity: 1=Bedfast 2= Chair fast 3=Walks occasionally 4=Walks Frequently | 3 | 3 | 3 |
| Mobility: 1=Completely Immobile 2=Very Limited 3=Slightly Limited 4=No Limitation | 3 | 3 | 3 |
| Nutrition: 1=Very Poor 2=Probably Inadequate 3=Adequate 4=Excellent | 3 | 3 | 3 |
| Friction and Shear: 1=Problem 2=Potential Problem 3=No apparent Problem | 2 | 2 | 2 |
| Braden Score | 18 | 18 | 18 |
| For score < 14, initiate Pressure Ulcer Protocol | | | |
| - Dietary consult (Date) | | | |
| -Skin Prep used when taping required | | | |
| -Incontinence precautions | | | |
| -Turning q2 _self_ | _h_ | _K_ | _A_ |
| Pressure relief measures | | | |
| -Wedges | | | |
| -Pillows | | | |
| -Heel protectors | | | |
| -Elbow Protector | | | |
| -Air mattress | | | |
| -Egg Crate | | | |
| -Floating of Feet | | | |
| | | | |
| Pressure ulcer present on admission   (Circle one) Yes / No | _h_ | _K_ | _A_ |
| Ulcer / Wound photo (admission or hospital acquired)     Date: | | | |
| Ulcer / Wound photo at discharge   Date: | | | |
| | | | |
| Nurse signature / Initials 11-7  _Nurse sig_ | _h_ | | |
| Nurse signature / Initials 7-3  _Betty Cala de RN_ | | _K_ | |
| Nurse signature / Initials 3-11  _sig_ | | | _A_ |

Jdrive:Nursing/Nursadm/Forms/Braden Scale Assessment form

Addressograph

## Braden Scale / Skin Assessment Tool

Date: 5/24/01

| Skin / Braden Scale | 11-7 | 7-3 | 3-11 |
|---|---|---|---|
| Intact | | | |
| Non-Intact: *incision in lower abd. quad.* | | CL | |
| Site          Stage: *Gunshot wound on (L)* | | | |
| Site:         Stage: *side of incision on abd* | | | |
| Additional observations: *Gunshot exit wound on* | | | |
| *(L) upper arm* | | | |
| | | | |
| | | | |
| Sensory Perception: 1=Completely Limited 2=Very Limited 3=Slightly Limited 4=No Impairment | | 4 | |
| Moisture: 1=Constantly Moist 2=Moist 3=Occasionally Moist 4=Rarely Moist | | 4 | |
| Activity: 1=Bedfast 2= Chair fast 3=Walks occasionally 4=Walks Frequently | | 2 | |
| Mobility: 1=Completely Immobile 2=Very Limited 3=Slightly Limited 4=No Limitation | | 3 | |
| Nutrition: 1=Very Poor 2=Probably Inadequate 3=Adequate 4=Excellent | | 1 | |
| Friction and Shear: 1=Problem 2=Potential Problem 3=No apparent Problem | | 3 | |
| Braden Score | | 17 | |
| For score < 14, initiate Pressure Ulcer Protocol | | | |
| - Dietary consult (Date) | | | |
| -Skin Prep used when taping required | | | |
| -Incontinence precautions | | | |
| -Turning q2 | | | |
| Pressure relief measures | | | |
| -Wedges | | | |
| -Pillows | | | |
| -Heel protectors | | | |
| -Elbow Protector | | | |
| -Air mattress | | | |
| -Egg Crate | | | |
| -Floating of Feet | | | |
| | | | |
| Pressure ulcer present on admission   (Circle one) Yes/ No | | | |
| Ulcer / Wound photo (admission or hospital acquired)   Date: | | | |
| Ulcer / Wound photo at discharge   Date: | | | |
| | | | |
| Nurse signature / Initials 11-7 | | | |
| Nurse signature / Initials 7-3   *C. Lentz RN* | | CL | |
| Nurse signature / Initials 3-11 | | | |

MEDICAL CENTER ENTERPRISE LABORATORY
400 NORTH EDWARDS STREET
ENTERPRISE, ALABAMA 36330
CLIA ID#s MCE: 01D0304933, RHA:01D0932794
Discharge Cumulative Trend Report from 05/23/01 1405 to 05/28/01 0723

Patient Name:     CONRAD, ROBERT                        All Sections-Page 1
Med Rec #:        0000041053                            Adm: 05/23/01
Dis Date         05/28/01
Phys-Service:     SAWYER, SAMUEL - MEDICAL
Acct #: .         E0114300094
************************************************************************

### Routine Chemistry Profile

| Date: | 05/26 | 05/24 | 05/23 | | | Reference Range | |
|---|---|---|---|---|---|---|---|
| Time: | 1125 | 0550 | 1405 | | | | |
| New Work: | | | | | | | |
| Glucose | 99.0 | 110.0 | 155.0 H | | | 70-110 | (mg/dl) |
| BUN | 7.0 L | 7.0 L | 9.0 | | | 9-20 | (mg/dl) |
| Creatinine | 1.0 | 0.9 | 1.2 | | | 0.8-1.5 | (mg/dl) |
| Sodium | 141.0 | 138.0 | 145.0 | | | 137-145 | (mmol/L) |
| Potassium | 3.8 | 3.8 | 2.9 LP | | | 3.5-5.5 | (mmol/L) |
| Chloride | 101.0 | 101.0 | 105.0 | | | 98-107 | (mmol/L) |
| CO2 | 32.0 H | 29.0 | 17.0 L | | | 22-30 | (mmol/L) |
| Calcium | 8.7 | 9.1 | 9.1 | | | 8.4-10.2 | (mg/dl) |
| Prot Total | 7.2 | 7.0 | | | | 6.3-8.2 | (gm/dl) |
| Albumin | 3.3 L | 3.5 | | | | 3.5-5.0 | (gm/dl) |
| ALT/SGPT | 31.0 | 31.0 | | | | 21-72 | (U/L) |
| Alk Phos | 54.0 | 62.0 | | | | 38-126 | (U/L) |
| AST/SGOT | 95.0 H | 35.0 | | | | 10-45 | (U/L) |
| T Bili | 0.6 | 0.6 | | | | 0.2-1.3 | (mg/dl) |
| /Creat | 6.8 | 7.8 | 7.5 | | | | |
| Anion Gap | | | 25.0 | | | | |
| A/G Ratio | 0.9 | 1.0 | | | | | |

### Routine Chemistry Comments

| | | | | |
|---|---|---|---|---|

- - - - - - - - - - - - - - General Comments- - - - - - - - - - - - - -
05/23/01 1405|PANEL,BASIC METABOLIC-Comment: ER5 *&*

CONRAD, ROBERT
0000041053

Ed Benak, MD, Pathologist
  DO NOT DISCARD **
Discharge Cumulative Trend Report

(M-09/27/80)
Dr. SAWYER, SAMUEL

MEDICAL CENTER ENTERPRISE LABORATORY
400 NORTH EDWARDS STREET
ENTERPRISE, ALABAMA 36330
CLIA ID#s MCE: 01D0304933, RHA:01D0932794
Discharge Cumulative Trend Report from 05/23/01 1405 to 05/28/01 0723

Patient Name:      CONRAD,ROBERT                    All Sections-Page 2
Med Rec #:         0000041053                       Adm: 05/23/01
Dis Date           05/28/01
Phys-Service:      SAWYER,SAMUEL - MEDICAL
Acct #:            E0114300094
****************************************************************************

In:  05/23/01 1405     ------------------------                Spec: Blood
Out: 05/23/01 1425     | ALCOHOL, ETHYL SERUM |Techs: VER TBWW7582,JAC2919
Coll Time: 05/23/01 1405   ------------------------
Order Phys: DREW,JOHN L                                  [E0114300094/456909]

Result Name               Result                  Reference Range

Alcohol, Ethyl(mg/dl):    2.0                      0-10
Comment:                  ER5 *&*
Date/Time:                05/23/01 1424

-----------------------------------------------------------------------

In:  05/23/01 1421     ------------------------------------     Spec: Urine
Out: 05/23/01 1438     | TRIAGE DRUG SCREEN PANEL,QUALITAT |Techs: VER TBWW7582,JAC
Coll Time: 05/23/01 1421------------------------------------
Order Phys: DREW,JOHN L                                  [E0114300094/456908]

Result Name               Result                  Reference Range

Phencyclidine:            Negative                 None Detected
Benzodiazephine:          Negative                 None Detected
Cocaine:                  Negative                 None Detected
Amphetamine:              Negative                 None Detected
Cannabinoids:             Positive                 None Detected
Opiates:                  Negative                 None Detected
Barbiturate:              Negative                 None Detected
Comment:                  ER5
Date/Time:                05/23/01 1438
Triage Comment:           ATTENTION-  The ingestion of natural herbal
                          and plant products containing
                          Ephedra/Ephedra metabolites can produce in
                          urine one or more substances capable of
                          cross reacting with
                          amphetamine/methamphetamine immunoassays.

-----------------------------------------------------------------------

                                   CONRAD,ROBERT
                                   0000041053

Ed Benak,MD, Pathologist
** DO NOT DISCARD **               (M-09/27/80)
Discharge Cumulative Trend Report  Dr. SAWYER,SAMUEL

MEDICAL CENTER ENTERPRISE LABORATORY
400 NORTH EDWARDS STREET
ENTERPRISE, ALABAMA 36330
CLIA ID#s MCE: 01D0304933, RHA:01D0932794
Discharge Cumulative Trend Report from 05/23/01 1405 to 05/28/01 0723

Patient Name:      CONRAD,ROBERT                    All Sections-Page 3
Med Rec #:         0000041053                       Adm: 05/23/01
Dis Date           05/28/01
Phys-Service:      SAWYER,SAMUEL - MEDICAL
Acct #:            E0114300094
**********************************************************************

### Hematology

| Date: | 05/28 | 05/26 | 05/24 | 05/23 | | | Reference Range |
|-------|-------|-------|-------|-------|---|---|-----------------|
| Time: | 0723 | 1125 | 0550 | 1405 | | | |
| New Work: | * | | | | | | |
| WBC | 3.5 L | 5.3 | 12.2 H | 8.8 | | 4.0-11.0 | (1000/mm |
| RBC | 3.98 L | 4.31 L | 4.45 L | 4.76 | | 4.7-6.1 | (X 10(6) |
| Hemoglobin | 11.5 L | 12.5 L | 12.9 L | 13.9 L | | 14-18 | (gm/dl) |
| Hct | 34.4 L | 37.9 L | 38.7 L | 41.7 | | 39-49 | (%) |
| MCV | 86.4 | 87.9 | 87.0 | 87.6 | | 80-94 | (fl) |
| MCH | 28.9 | 29.0 | 29.0 | 29.2 | | 26-33 | (pg) |
| MCHC | 33.4 | 33.0 | 33.3 | 33.3 | | 31-36 | (%) |
| RDW | 12.8 | 13.0 | 13.2 | 13.0 | | 10.2-15.5 | (%) |
| Platelet | 127 L | 108 L | 125 L | 209 | | 150-357 | (X(10)3) |
| MPV | 10.8 H | 11.4 H | 11.9 H | 11.8 H | | 7.4-10.4 | (fl) |
| Gran-Auto | 61.6 | 68.5 | 79.9 | 46.0 L | | 50-87 | (%) |
| Lymph-Auto | 17.6 | 16.6 | 10.2 L | 43.9 | | 16-46 | (%) |
| Mono-Auto | 17.6 H | 10.9 H | 9.5 | 7.6 | | 2.9-10.0 | (%) |
| Eos-Auto | 2.9 | 3.4 | 0.2 L | 1.9 | | 0.5-4.6 | (%) |
| Bos-Auto | 0.3 | 0.6 | 0.2 L | 0.6 | | 0.3-2.0 | (%) |
| Abs Gran | 2.14 | 3.64 | 9.75 H | 4.04 | | 1.4-6.5 | (X(10)3) |
| Abs Lymp | 0.61 L | 0.88 L | 1.25 | 3.86 H | | 1.2-3.4 | (X(10)3) |
| Abs Mono | 0.61 H | 0.58 | 1.16 H | 0.67 H | | 0.11-0.59 | (X(10)3) |
| Eos Absl | 0.10 | 0.18 | 0.03 | 0.17 | | 0.0-0.7 | (X(10)3) |
| Abs Baso | 0.01 L | 0.03 L | 0.03 L | 0.05 L | | 0.3-2.0 | (X(10)3) |
| WBC Morph | | | # | | | | |
| RBC Morph | | | # | | | | |

- - - - - - - - - - - - - - - - - - - - - - Specific Comments - - - - - -
05/24/01 0550 CBC/AUTO DIFF-WBC Morph: 1+ Toxic Granulation
05/24/01 0550 CBC/AUTO DIFF-RBC Morph: 1+ Anisocytosis, Few Polychromasia
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### Urinalysis

| Date: | 05/23 | | | | | Reference Range |
|-------|-------|---|---|---|---|-----------------|
| Time: | 1421 | | | | | |
| New Work: | | | | | | |
| Color | Yellow | | | | | |
| Clarity | Clear | | | | | |
| Spec Gravity | 1.020 | | | | | 1.001-1.035 |

Continued next page
CONRAD,ROBERT
0000041053

Ed Benak,MD, Pathologist
** DO NOT DISCARD **                        (M-09/27/80)
Discharge Cumulative Trend Report          Dr. SAWYER,SAMUEL

1245

MEDICAL CENTER ENTERPRISE LABORATORY
400 NORTH EDWARDS STREET
ENTERPRISE, ALABAMA 36330
CLIA ID#s MCE: 01D0304933, RHA:01D0932794
Discharge Cumulative Trend Report from 05/23/01 1405 to 05/28/01 0723

Patient Name:      CONRAD,ROBERT                     All Sections-Page 4
Med Rec #:         0000041053                        Adm: 05/23/01
Dis Date           05/28/01
Phys-Service:      SAWYER,SAMUEL - MEDICAL
Acct #: .          E0114300094
**********************************************************************

Urinalysis                                          (Cont)

| Date: | 05/23 | | | | | Reference Range |
| Time: | 1421 | | | | | |
| New Work: | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| pH | 5.0 | | | | | 5.0-8.0 |
| Leukocyt | neg | | | | | Negative |
| Nitrite | neg | | | | | Negative |
| Protein | # | | | | | Negative |
| Glucose | norm | | | | | Negative |
| Ketone | neg | | | | | Negative |
| Urobilinogen | norm | | | | | < 1.0 mg/dl |
| Bili | neg | | | | | Negative |
| Blood, Occult | 50 /ul | | | | | Negative |
| Epitheli | 3-5 | | | | | ( /LPF) |
| RBC | 0-2 | | | | | ( /HPF) |
| WBC | 0-2 | | | | | ( /HPF) |
| Bacteria | 0 | | | | | ( /HPF) |
| Casts | 0 | | | | | ( /LPF) |
| ystals | # | | | | | ( /LPF) |

- - - - - - - - - - - - - - Specific Comments - - - - - - - - - - - - -
05/23/01 1421|URINALYSIS, ROUTINE W/ MICROSCOPI-Protein:  100 mg/dl
05/23/01 1421|URINALYSIS, ROUTINE W/ MICROSCOPI-Crystals:  Moderate Amorphous
              Urates
------------------------------------------------------------/--------------

Urinalysis Comments

| | | | |

- - - - - - - - - - - - - - General Comments- - - - - - - - - - - - - -
05/23/01 1421|URINALYSIS, ROUTINE W/ MICROSCOPI-Comment:  ER5 *&*
------------------------------------------------------------------------

End of Report

                                        CONRAD,ROBERT
                                        0000041053

Ed Benak,MD, Pathologist
    DO NOT DISCARD **                   (M-09/27/80)
Discharge Cumulative Trend Report      Dr. SAWYER,SAMUEL

MEDICAL CENTER ENTERPRISE LABORATORY
400 NORTH EDWARDS STREET
ENTERPRISE, ALABAMA 36330
MCE Laboratory CLIA ID# 01D0304933
Cumulative Trend Report from 05/23/01 1405 to 05/26/01 1125

Patient Name:        CONRAD,ROBERT                    All Sections-Page 1
Location:            2NO 207 02                       Adm: 05/23/01
Acct #:              E0114300094
Med Rec #:           0000041053
Phys-Service:        SAWYER,SAMUEL - MEDICAL
**********************************************************************

### Routine Chemistry Profile

| Date:<br>Time:<br>New Work: | 05/26<br>1125<br>* | 05/24<br>0550 | 05/23<br>1405 | | | Reference Range | |
|---|---|---|---|---|---|---|---|
| Glucose | 99.0 | 110.0 | 155.0 H | | | 70-110 | (mg/dl) |
| BUN | 7.0 L | 7.0 L | 9.0 | | | 9-20 | (mg/dl) |
| Creatinine | 1.0 | 0.9 | 1.2 | | | 0.8-1.5 | (mg/dl) |
| Sodium | 141.0 | 138.0 | 145.0 | | | 137-145 | (mmol/L) |
| Potassium | 3.8 | 3.8 | 2.9 LP | | | 3.5-5.5 | (mmol/L) |
| Chloride | 101.0 | 101.0 | 105.0 | | | 98-107 | (mmol/L) |
| CO2 | 32.0 H | 29.0 | 17.0 L | | | 22-30 | (mmol/L) |
| Calcium | 8.7 | 9.1 | 9.1 | | | 8.4-10.2 | (mg/dl) |
| Prot Total | 7.2 | 7.0 | | | | 6.3-8.2 | (gm/dl) |
| Albumin | 3.3 L | 3.5 | | | | 3.5-5.0 | (gm/dl) |
| ALT/SGPT | 31.0 | 31.0 | | | | 21-72 | (U/L) |
| Alk Phos | 54.0 | 62.0 | | | | 38-126 | (U/L) |
| AST/SGOT | 95.0 H | 35.0 | | | | 10-45 | (U/L) |
| T Bili | 0.6 | 0.6 | | | | 0.2-1.3 | (mg/dl) |
| /Creat | 6.8 | 7.8 | 7.5 | | | | |
| Anion Gap | | | 25.0 | | | | |
| A/G Ratio | 0.9 | 1.0 | | | | | |

### Routine Chemistry Comments

-----------------------------------------------------------------
- - - - - - - - - - - - - General Comments- - - - - - - - - - - - - - -
05/23/01 1405 PANEL,BASIC METABOLIC-Comment:  ER5 *&*
-----------------------------------------------------------------

F□ Benak,MD, Pathologist

Cumulative Trend Report

CONRAD,ROBERT
0000041053
2NO 207 02
(M-09/27/80)
Dr. SAWYER,SAMUEL

1247

MEDICAL CENTER ENTERPRISE LABORATORY
400 NORTH EDWARDS STREET
ENTERPRISE, ALABAMA 36330
MCE Laboratory CLIA ID# 01D0304933
Cumulative Trend Report from 05/23/01 1405 to 05/26/01 1125

Patient Name:      CONRAD,ROBERT                    All Sections-Page 2
Location:          2NO 207 02                       Adm: 05/23/01
Acct #:            E0114300094
Med Rec #:         0000041053
Phys-Service:      SAWYER,SAMUEL - MEDICAL
*********************************************************************
In:  05/23/01 1405   ------------------------            Spec: Blood
Out: 05/23/01 1425   | ALCOHOL, ETHYL SERUM |Techs: VER TBWW7582,JAC2919
Coll Time: 05/23/01 1405   ------------------------
Order Phys: DREW,JOHN L                             [E0114300094/456909]

Result Name              Result              Reference Range

Alcohol, Ethyl(mg/dl):   2.0                 0-10
Comment:                 ER5 *&*
Date/Time:               05/23/01 1424

--------------------------------------------------------------------

In:  05/23/01 1421   ------------------------------------    Spec: Urine
Out: 05/23/01 1438   | TRIAGE DRUG SCREEN PANEL,QUALITAT |Techs: VER TBWW7582,JAC
Coll Time: 05/23/01 1421------------------------------------
Order Phys: DREW,JOHN L                             [E0114300094/456908]

Result Name              Result              Reference Range

Phencyclidine:           Negative            None Detected
  Benzodiazephine:       Negative            None Detected
Cocaine:                 Negative            None Detected
Amphetamine:             Negative            None Detected
Cannabinoids:            Positive            None Detected
Opiates:                 Negative            None Detected
Barbiturate:             Negative            None Detected
Comment:                 ER5
Date/Time:               05/23/01 1438
Triage Comment:          ATTENTION-  The ingestion of natural herbal
                         and plant products containing
                         Ephedra/Ephedra metabolites can produce in
                         urine one or more substances capable of
                         cross reacting with
                         amphetamine/methamphetamine immunoassays.

--------------------------------------------------------------------


                                    CONRAD,ROBERT
                                    0000041053
Ed Benak,MD, Pathologist            2NO 207 02
                                    (M-09/27/80)
Cumulative Trend Report             Dr. SAWYER,SAMUEL

MEDICAL CENTER ENTERPRISE LABORATORY
400 NORTH EDWARDS STREET
ENTERPRISE, ALABAMA 36330
MCE Laboratory CLIA ID# 01D0304933
Cumulative Trend Report from 05/23/01 1405 to 05/26/01 1125

```
Patient Name:      CONRAD,ROBERT                    All Sections-Page 3
Location:          2NO 207 02                       Adm: 05/23/01
Acct #:            E0114300094
Med Rec #:         0000041053
Phys-Service:      SAWYER,SAMUEL - MEDICAL
```
*****************************************************************************

## Hematology

| Date: | 05/26 | 05/24 | 05/23 | | | Reference Range |
|-------|-------|-------|-------|---|---|-----------------|
| Time: | 1125 | 0550 | 1405 | | | |
| New Work: | * | | | | | |
| WBC | 5.3 | 12.2 H | 8.8 | | | 4.0-11.0 (1000/mm |
| RBC | 4.31 L | 4.45 L | 4.76 | | | 4.7-6.1 (X 10(6) |
| Hemoglobin | 12.5 L | 12.9 L | 13.9 L | | | 14-18 (gm/dl) |
| Hct | 37.9 L | 38.7 L | 41.7 | | | 39-49 (%) |
| MCV | 87.9 | 87.0 | 87.6 | | | 80-94 (fl) |
| MCH | 29.0 | 29.0 | 29.2 | | | 26-33 (pg) |
| MCHC | 33.0 | 33.3 | 33.3 | | | 31-36 (%) |
| RDW | 13.0 | 13.2 | 13.0 | | | 10.2-15.5 (%) |
| Platelet | 108 L | 125 L | 209 | | | 150-357 (X(10)3) |
| MPV | 11.4 H | 11.9 H | 11.8 H | | | 7.4-10.4 (fl) |
| Gran-Auto | 68.5 | 79.9 | 46.0 L | | | 50-87 (%) |
| Lymph-Auto | 16.6 | 10.2 L | 43.9 | | | 16-46 (%) |
| Mono-Auto | 10.9 H | 9.5 | 7.6 | | | 2.9-10.0 (%) |
| Eos-Auto | 3.4 | 0.2 L | 1.9 | | | 0.5-4.6 (%) |
| Bas-Auto | 0.6 | 0.2 L | 0.6 | | | 0.3-2.0 (%) |
| Abs Gran | 3.64 | 9.75 H | 4.04 | | | 1.4-6.5 (X(10)3) |
| Abs Lymp | 0.88 L | 1.25 | 3.86 H | | | 1.2-3.4 (X(10)3) |
| Abs Mono | 0.58 | 1.16 H | 0.67 H | | | 0.11-0.59 (X(10)3) |
| Eos Absl | 0.18 | 0.03 | 0.17 | | | 0.0-0.7 (X(10)3) |
| Abs Baso | 0.03 L | 0.03 L | 0.05 L | | | 0.3-2.0 (X(10)3) |
| WBC Morph | | # | | | | |
| RBC Morph | | # | | | | |

- - - - - - - - - - - - - - - - Specific Comments - - - - - - - - - - - - -
```
05/24/01 0550 CBC/AUTO DIFF-WBC Morph:  1+ Toxic Granulation
05/24/01 0550 CBC/AUTO DIFF-RBC Morph:  1+ Anisocytosis, Few Polychromasia
```
-----------------------------------------------------------------------

## Urinalysis

| Date: | 05/23 | | | | Reference Range |
|-------|-------|---|---|---|-----------------|
| Time: | 1421 | | | | |
| New Work: | | | | | |
| Color | Yellow | | | | |
| Clarity | Clear | | | | |
| Spec Gravity | 1.020 | | | | 1.001-1.035 |

Continued next page

```
                              CONRAD,ROBERT
                              0000041053
Ed Benak,MD, Pathologist      2NO 207 02
                              (M-09/27/80)
Cumulative Trend Report       Dr. SAWYER,SAMUEL
```

MEDICAL CENTER ENTERPRISE LABORATORY
400 NORTH EDWARDS STREET
ENTERPRISE, ALABAMA 36330
MCE Laboratory CLIA ID# 01D0304933
Cumulative Trend Report from 05/23/01 1405 to 05/26/01 1125

```
Patient Name:     CONRAD,ROBERT              All Sections-Page 4
Location:         2NO 207 02                 Adm: 05/23/01
Acct #:           E0114300094
Med Rec #:        0000041053
Phys-Service:     SAWYER,SAMUEL - MEDICAL
```
*************************************************************************

<div align="center">Urinalysis                                         (Cont)</div>

```
Date:        | 05/23 |       |       |       |       |
Time:        | 1421  |       |       |       |       |      Reference Range
New Work:    |       |       |       |       |       |
-----------------------------------------------------------------------
pH             5.0                                           5.0-8.0
Leukocyt       neg                                           Negative
Nitrite        neg                                           Negative
Protein        #                                             Negative
Glucose        norm                                          Negative
Ketone         neg                                           Negative
Urobilinogen   norm                                          < 1.0 mg/dl
Bili           neg                                           Negative
Blood, Occult  50 /ul                                        Negative
Epitheli       3-5                                           ( /LPF)
RBC            0-2                                           ( /HPF)
WBC            0-2                                           ( /HPF)
Bacteria       0                                             ( /HPF)
Casts          0                                             ( /LPF)
Crystals       #                                             ( /LPF)
```
- - - - - - - - - - - - Specific Comments - - - - - - - - - - - - - -
05/23/01 1421|URINALYSIS, ROUTINE W/ MICROSCOPI-Protein:  100 mg/dl
05/23/01 1421|URINALYSIS, ROUTINE W/ MICROSCOPI-Crystals:  Moderate Amorphous
             |          Urates
-----------------------------------------------------------------------


<div align="center">Urinalysis Comments</div>

|       |       |       |       |       |
-----------------------------------------------------------------------
- - - - - - - - - - - - General Comments- - - - - - - - - - - - - - -
05/23/01 1421|URINALYSIS, ROUTINE W/ MICROSCOPI-Comment:  ER5 *&*
-----------------------------------------------------------------------


<div align="center">End of Report</div>


```
                                    CONRAD,ROBERT
                                    0000041053
Ed Benak,MD, Pathologist            2NO 207 02
                                    (M-09/27/80)
Cumulative Trend Report             Dr. SAWYER,SAMUEL
```

# MEDICAL CENTER ENTERPRISE
## ENTERPRISE, ALABAMA

### RADIOLOGIC CONSULTATION REQUEST/REPORT

PATIENT:        CONRAD, ROBERT
DATE:           05/23/01
PHYSICIAN:      SAWYER, SAMUEL F./DREW
HOSPITAL #:     0000041053
RM #:           207-02/ER
SEX:            M
EXAM DATE:      05/23/01
X-RAY #:        97323
JOB #:          30535

SPECIFIC REASON(S) FOR REQUEST:    GSW

SINGLE VIEW LEFT HUMERUS;

A metallic FB, rounded, is seen in the soft tissues of the medial distal upper arm.  No associated fracture is seen.

IMPRESSION:  FB AS NOTED.

SUPINE, UPRIGHT ABDOMINAL FILMS;

There is gastric distension with fluid level present.  Air is seen in the rectum but no free air is seen.  There is a metallic FB compatible with bullet projecting near the acetabulum, superolateral to it, on the left side.  No associated fracture is seen.

IMPRESSION:  GASTRIC DISTENSION AS NOTED.  FB AS NOTED.

DICTATED AND SIGNED BUT NOT REVIEWED IN ORDER TO EXPEDITE DISTRIBUTION.

_____
VINCENT E. MARTIN, M.D.

VEM/SP
DD: 05/23/01

1251

# MEDICAL CENTER ENTERPRISE
## ENTERPRISE, ALABAMA

KM
5-25-01

### RADIOLOGIC CONSULTATION REQUEST/REPORT

PATIENT:        CONRAD, ROBERT
DATE:           05/23/01
PHYSICIAN:      SAWYER, SAMUEL F.
HOSPITAL #:     0000041053
RM #:           207-02
SEX:            M
EXAM DATE:      05/25/01
X-RAY #:        97323
JOB #:          30780

SPECIFIC REASON(S) FOR REQUEST:  GUNSHOT WOUND.

ABDOMEN;

25 May 01. Surgical staples are seen along the low abdomen and pelvic region in the midline. Foreign body is seen superolateral to the left acetabulum as noted on previous films. There is slight dilation of ascending colon and parallel loops of small bowel and left upper quadrant is slightly dilated as well as a couple of parallel loops in the left lower quadrant. Air is seen all the way to the rectum, however. No mass effect is seen.

IMPRESSION: FINDINGS SUGGEST MILD POST OP ILEUS.

DICTATED AND SIGNED BUT NOT REVIEWED IN ORDER TO EXPEDITE DISTRIBUTION.

VEM
_____
VINCENT E. MARTIN, M.D.

VEM/SS
DD:  05/25/01
DT:  05/25/01



# MEDICAL CENTER ENTERPRISE
## ENTERPRISE, ALABAMA

### RADIOLOGIC CONSULTATION REQUEST/REPORT

PATIENT:        CONRAD, ROBERT
DATE:           05/23/01
PHYSICIAN:      SAWYER, SAMUEL F./DREW
HOSPITAL #:     0000041053
RM #:           207-02/ER
SEX:            M
EXAM DATE:      05/23/01
X-RAY #:        97323
JOB #:          30535

SPECIFIC REASON(S) FOR REQUEST:     GSW

SINGLE VIEW LEFT HUMERUS;

A metallic FB, rounded, is seen in the soft tissues of the medial distal upper arm.  No associated fracture is seen.

IMPRESSION:  FB AS NOTED.

SUPINE, UPRIGHT ABDOMINAL FILMS;

There is gastric distension with fluid level present.  Air is seen in the rectum but no free air is seen.  There is a metallic FB compatible with bullet projecting near the acetabulum, superolateral to it, on the left side.  No associated fracture is seen.

IMPRESSION:  GASTRIC DISTENSION AS NOTED.  FB AS NOTED.

DICTATED AND SIGNED BUT NOT REVIEWED IN ORDER TO EXPEDITE DISTRIBUTION.

*VEM*

VINCENT E. MARTIN, M.D.

VEM/SP
DD: 05/23/01
DT: 05/23/01



# MEDICAL CENTER ENTERPRISE
## ENTERPRISE, ALABAMA

### RADIOLOGIC CONSULTATION REQUEST/REPORT

PATIENT:        CONRAD, ROBERT
DATE:           05/23/01
PHYSICIAN:      SAWYER, SAMUEL F.
HOSPITAL #:     0000041053
RM #:           207-02
SEX:            M
EXAM DATE:      05/26/01
X-RAY #:        97323
JOB #:          31017

SPECIFIC REASON(S) FOR REQUEST:        GSW

PA & LATERAL CHEST;

The trachea is midline. The cardiac shadow is normal in size. The lungs are expanded with no free air beneath the diaphragms, there is no atelectasis identified.

IMPRESSION: NO ACUTE PULMONARY PATTERN APPRECIATED.

DICTATED AND SIGNED BUT NOT REVIEWED IN ORDER TO EXPEDITE DISTRIBUTION.

PAUL J. ANDERSON, M.D.

PJA/SP
DD: 05/28/01
DT: 05/28/01



CONR __ ,ROBERT
01143 J0094
DREW,JOHN L
__ __ __ __    05/23/01

1   1414   BED 5   II  HR 87  NBP 146/90( __ )   Sa02 98

3   1430   BED 5   II  Sa02 LOW SIGNAL   HR 59   NBP 133/48(75)  Sa02 96

<8A> 23 MAY 01  1447   BED 5   II  Sa02 NON-PULSATILE  HR 63   NBP -?-   Sa02 -?-

3 MAY 01  1448   BED 5   II  Sa02 NON-PULSATILE   HR 56   NBP 154/89(109)   Sa02 -?-

MAY 01  1457   BED 5   II  HR 60   NBP 157/90(111)  | Sa02 98

# MEDICAL CENTER ENTERPRISE
## ENTERPRISE, ALABAMA

### DISCHARGE SUMMARY

PATIENT:            CONRAD, ROBERT
ROOM #:             207
HOSPITAL #:         0000041053
ATTENDING PHYSICIAN: SAWYER, SAMUEL F.
DATE OF ADMISSION:   05/23/01
DATE OF DISCHARGE:   05/28/01

DIAGNOSIS:    GSW LLQ and the abdomen with through and through laceration of the transverse colon and superficial GSW left arm.

OPERATIVE PROCEDURE:  05/23/01 - Exploratory laparotomy with repair of the colon.  Also on that same day removal of the bullet from the left upper arm.

BRIEF HISTORY:    20 year old black male was involved in a gun battle during a robbery.  He presented to the ER.  He was hemodynamically stable but had peritoneal signs.

HOSPITAL COURSE:    He was taken to surgery and the above injury found and repaired.

POST OPERATIVE COURSE:    Uneventful.  Ileus resolved, he was fed.  Bowels were moving.  He was running some temperature of around 100.5 at the time of discharge but chest x-ray and CBC were both completely normal.  UA was not done but he did not have dysuria.

DISCHARGE PLAN:    He will be discharged to the custody of the local police.  He is given Levaquin 500mg now and will get it qd x 4 more days.  I will see him in the office at 1 week post op for removal of his staples and sutures.  No lifting or straining.  Regular diet.

SAMUEL F. SAWYER, M.D.

SFS/SP/31015
DD: 05/28/01
DT: 05/28/01

# MEDICAL CENTER ENTERPRISE
## DISCHARGE INSTRUCTIONS

ADDRESSOGRAPH

DATE OF DISCHARGE: _28 May '01_ TIME_____ ACCOMPANIED BY: _Policeman_

DISCHARGED: ☐ Home  ☐ Nursing Home  ☒ Other (Specify) _Enterprise Jail_

HOW: ☐ Car ☐ Ambulance ☐ Other    MODE OF EXIT: ☐ Wheelchair ☐ Ambulatory ☐ Stretcher

DATE OF PHYSICIAN FOLLOW-UP _Wiens, May 30 '01 - Call for appt time._

DISCHARGE STATUS: ☒ Stable ☐ Fair ☐ Poor

DATE OF LAST BM _____ VITAL SIGNS T _99.8_ P _66_ R _22_ BP _108/60_

INCISION/OTHER DESCRIBE _Staples intact to abdomen, small hole @ distal_ NONE_____
_his small hole to upper arm._

TYPE OF DRAINAGE _____ NONE _X_ TYPE OF DRESSING _____ NONE_____

| MEDICATION | DOSAGE | ROUTE | FREQUENCY | TIME(S) |
|---|---|---|---|---|
| Levaquin 500 mg | 1 tab | by mouth | every day | AM (begin 5/29. |
| Darvocet N 100 | 1 or 2 tab | by mouth | every 4 hours | as needed |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

List Food Drug Interaction Handouts Given:_____

Physician Instruction/Activity Instructions: _Remove dressings tomorrow and_
_may shower then. Do not replace dressings_
_____
_____
_____
_____

Dietary Instruction/Physical Therapy:_____

Social Service/Respiratory Therapy:_____

Has the telemetry been removed and returned to unit? . . . . . . . . . . . . . . . ☐ Yes ☐ No ☒ NA
Has heparin lock been removed? . . . . . . . . . . . . . . . . . . . . . . . . ☒ Yes ☐ No ☐ NA
ave the home medications been returned to patient and/or significant other? . . . . . . ☐ Yes ☐ No ☒ NA
Have valuables been returned to patient and/or significant other? . . . . . . . . . . . . ☐ Yes ☐ No ☒ NA

**Patient and/or responsible party has communicated an understanding of discharge instructions and has been given a copy.** _X_____ _Betty Calander RN_

Patient Signature                                    Completed By

DIS-7                                                Form #7

1256

## PROGRESS NOTES

Conrad

| Date | Notes Should Be Signed by Physician |
|------|-------------------------------------|
| 5-23-01 | 20 BM shot in abdo & (L) arm in robbery attempt |
| | c/o abdo pain LLQ |
| | PMH - unobtainer |
| | Exam - Abdo tender low ABC & LLQ. |
| | Will to OR for lpsky, poss lply. |
| 5-23-01 | Op Note Dx: GSW (T) colon, (L) arm Proc: Laparotomy repair (T) colon Rem FB (L) arm. |
| | BPS / SLR |

Dr. _____

GIRARD,ROGER
L1183-00094
SAYTER,SAMUEL
002   m   S        05/23/01
41-17-0065
05/23/1953

## PROGRESS NOTES

| Date | Notes Should Be Signed by Physician |
|------|-------------------------------------|
| 5-27-01 | *[handwritten clinical notes, largely illegible]* |

## PROGRESS NOTES

| Date | Notes Should Be Signed by Physician |
|------|-------------------------------------|
| 5·24·01 | Afeb TSS. *(illegible handwritten notes)* |
| 5·25·01 | Afeb.- USS- + gas, distn wd dr. *(illegible handwritten notes)* |
| 5·26·01 | Afl USS Some nausea less distn, +/- BS. wd dr. KUB - dr *(illegible handwritten notes)* |

Dr. _____    Signature _____

1259

Km
5-24-01

# MEDICAL CENTER ENTERPRISE
## ENTERPRISE, ALABAMA

### OPERATIVE REPORT

PATIENT:        CONRAD, ROBERT
MR#:            0000041053
RM#:            207-02
DATE OF SURGERY:    05/23/01

PREOPERATIVE DIAGNOSIS:
1.  Gunshot wound to the abdomen, through and through injury to the transverse colon and with laceration of the right gastroepiploic artery.
2.  Also gunshot wound, superficial, to the left arm.

SURGEON:  SAMUEL F. SAWYER, M.D.

ASSISTANT: SHERRY L. ROACH, M.D.

PROCEDURE:  Diagnostic laparoscopy followed by exploratory laparotomy and repair of colon, ligation of an artery.  Also, removal of the bullet from the left upper arm.

PROCEDURE IN DETAIL:  General endotracheal anesthesia was established and then his abdomen was prepped and draped sterily.  He had a gunshot wound in his left lower quadrant. The abdomen was insufflated using a Verres needle.  A 10 mm trocar was then placed in the umbilicus.  Laparoscopic evaluation revealed that the bullet had entered the abdominal cavity in a lateral inferior direction from the cutaneous entrance wound and then exited the abdomen through the left pelvic musculature going into the muscles of the hip.  There was also a fair amount of hemoperitoneum.  The laparoscope was thus withdrawn and the abdomen was entered through a lower midline incision. Hemoperitoneum was evacuated.  Exploration was carried out and the above injuries were found.  The colon edges were good and healthy.  We closed both of these wounds with interrupted 3-0 Vicryl, single layer, full thickness - this was after irrigation and debridement.  We then wrapped the colon with omentum buttressing our colorrhaphy (colon repair).  First, of course, we ligated the ends of the gastroepiploic artery.  The small bowel was examined, and there was no injury.  The left colon was also carefully examined, and there was no injury.  Hemostasis was checked and then the abdomen was thoroughly irrigated. The abdomen was then closed using a running 0 Prolene on the fascia and staples on the skin.  Once the abdomen was dressed, the left arm was prepped and a short incision was made over the subcuticular foreign body (the bullet).  This was removed carefully, without touching its outer surface with any metal instrument.  This

1260

PATIENT:              CONRAD, ROBERT
MR#:                  0000041053
RM#:                  207-02

bullet was given directly to a law officer present in the operating room who observed my removal of the bullet from the arm.  The wound was then cleaned and closed with Ethilon. This was dressed appropriately.  He tolerated the surgery well.


_____
                          SAMUEL F. SAWYER, M.D.

SFS/IB/30554
DD:  05/23/01
DT:  05/24/01

Developed by the American Association of Nurse Anesthetist - 1991

# PREANESTHESIA EVALUATION

| Age | Sex | Height | | Weight | |
|-----|-----|--------|---|--------|---|
| 70 | M F | 70 | in / cm | 155 | lb / mg |

**Proposed Procedure** Ex Lap  CSW (Abd)

**Pre-Procedure Vital Signs**
B / P 130 / 100  P 90  R  T

**Previous Anesthesia / Operations** None ☐
Umbilical Hernia

**Current Medications** None ☐
∅

**Family History of Anesthesia Complications** None ☐
∅

**Allergies** NKDA ☐
NKDA

**AIRWAY / TEETH / HEAD / NECK**
MLI   ↑ Dentition   1 cm Front   Upper teeth

**History From:**
☐ Patient          ☐ Significant Other
☐ Parent / Guardian ☐ Chart
☐ Communication / Language Problems
☐ Poor Historian

| SYSTEM | WNL | COMMENTS | DIAGNOSTIC STUDIES |
|--------|-----|----------|--------------------|
| **RESPIRATORY**<br>Asthma — Productive Cough<br>Bronchitis — Recent URI<br>COPD — SOB<br>Dyspnea — Tuberculosis<br>Orthopnea<br>Pneumonia | | Tobacco Use: ☑ Yes ☐ No ___ Packs / Day for ___ Years | EKG<br><br>Chest X-ray |
| **CARDIOVASCULAR**<br>Abnormal EKG — Hypertension<br>Angina — MI<br>ASHD — Murmur<br>CHF — Pacemaker<br>Dysrhythmia — Rheumatic Fever<br>Exercise Tolerance — Valvular Disease | ✓ | | Pulmonary Studies |
| **HEPATO / GASTROINTESTINAL**<br>Bowel Obstruction<br>Cirrhosis<br>Hepatitis / Jaundice<br>Hernia / Reflux<br>Vomiting | | Ethanol Use: ☐ Yes ☐ No  Frequency<br>*Street Drug* Use: ☐ Yes ☑ No  Frequency<br><br>∅ CP2 | Other<br>∅ TNC |
| **NEURO / MUSCULOSKELETAL**<br>Arthritis — Muscle Weakness<br>Back Problems — Neuromuscular Dis.<br>CVA / Stroke / TIAs — Paralysis<br>DJD — Paresthesia<br>Headaches / ↑ ICP — Syncope<br>Loss of Consciousness — Seizures | ✓ | | **LABORATORY STUDIES**<br>Hgb / Hct / Dec   13   205<br>0.38<br>Electrolytes<br>145  105  155<br>29  (7.29(1.2)<br>Urinalysis |
| **RENAL / ENDOCRINE**<br>Diabetes<br>Renal Failure / Dialysis<br>Thyroid Disease<br>Urinary Retention<br>Urinary Tract Infection<br>Weight Loss / Gain | ✓ | | Other |
| **OTHER**<br>Anemia — Immunosuppressed<br>Bleeding tendencies — Pregnancy<br>Cancer — Sickle Cell Dis. / Trait<br>Chemotherapy — Recent Steroids<br>Dehydration — Transfusion History<br>Hemophilia | | | |

**Problem List / Diagnoses**
CSW (Abd)
Tobacco

**Planned Anesthesia / Special Monitors**
∅ GET - NSR

**Pre-Anesthesia Medications Ordered**

**PHYSICAL STATUS**  2 / 3 / 4 / 5 / E

# POSTANESTHESIA NOTE

Signed _____ Date 5/28/__ Time

**PATIENT IDENTIFICATION**
Robert Combs

**Evaluator Signature** _____ Date 5/28/__ Time 14__

# MEDICAL CENTER ENTERPRISE

## ANESTHESIA RECORD

PATIENT IDENTIFICATION

Developed by the American Association of Nurse Anesthetists - 1991

| Procedure | GYN Ablation | | | | | | | Anesthesia | 1704 |
| Procedure | GYN / Laparotomy | | | | | | | Procedure | 1540 1443 |
| Date | OR No. | Page of | Surgeon(s) | | Anesthesia Provider | | | Location Procedure Room | Time 1656 |

FORM ANE-40 / PICS# 091030

CHART

1263

PAGE 1 OF 3    5/23/01

## Medical Center Enterprise
## PERIOPERATIVE RECORD

Emergency ☑    Scheduled ☐    Add-On ☐

ADDRESSOGRAPH

## PREOPERATIVE ASSESSMENT

☑ Consent Correct, Signed, Witnessed, Dated
☑ H & P on Chart
☑ ID Bracelet
☑ Required Lab
☐ NPO / Last Oral Intake  "12 noon lunch"
Allergies: ☑ None ☐ Yes, List  NKA

Prosthesis: ☑ None
☐ Hearing Aid
☐ Glasses / Contacts
☐ Dentures
☐ Mobility
☐ Speech
☐ Other _____

**Emotional Status**
Calm Relaxed.......................... ☐
Depressed............................. ☐
Anxious............................... ☑
Confused.............................. ☐

**Knowledge Level**
☐ Well Informed (Verbalizes Understanding of Procedure
☐ Lack of Information (_____ Child)
☐ Language Barrier
☐ Religious Beliefs Pertinent to Surgery
Comments: _____

**Level of Consciousness**
Alert .................................. ☑
Drowsy ................................ ☐
Talkative ............................. ☐
Non-Responsive ....................... ☐
Responsive ........................... ☑
Other _____

**Coping Mechanism Behavioral State**      Yes
Cooperative ........................... ☑
Crying ................................ ☐
Withdrawn ............................. ☐
Resistive ............................. ☐
Combative ............................. ☐
Other ................................. ☐

**Skin Condition**
Skin Intact; No Bruises or Lesions......... ☑
Flushed................................. ☐
Pale.................................... ☐
Diaphoretic............................. ☐
Dry..................................... ☐
Cool.................................... ☐
Warm.................................... ☑
Other _____

GSW - L ↓ quad.
L bicep area
foley-cath.

Family in Patient's Room  Yes ☐  List _____   No ☑
Comments: _____  See H'8

Signature of Admitting / Circulating Nurse   Wayne Marler RN   Time 1440

## NURSING CARE PLAN:    SURGICAL SERVICES NURSING PROCESS

| PATIENT CARE NEEDS / PROBLEMS | GOAL | NURSING INTERVENTION | EVALUATION | COMMENTS |
|---|---|---|---|---|
| Potential for anxiety | Decrease patient anxiety | ☑ explain all procedures to patient ☑ provide quiet, comfortable atmosphere ☐ remain at patient side until anesthetized ☐ allow patient to verbalize feelings ☐ be aware of non-verbal communication | ☑ Demonstrates decreased anxiety | |
| Potential for infection | Avoidance of patient infection | ☑ appropriate skin prep ☐ enforce strict aseptic technique ☐ monitor breaks in sterile techniques and take corrective actions | ☑ Procedure is performed with proper sterile technique | |

## POST ANESTHESIA
## CARE UNIT RECORD

Admitted to Post Anesthesia Care Unit: Date: 5-23-01   Time 1656

Per:  ☑ Cart   Procedure Removal of bullet Lt Arm, Ex lap + exploration
      ☐ Bed   Allergies NKDA
      Surgeon Sam Sawyer
Accompanied by:
☐ RN  ☑ Anesthetist  Pre-Op Vitals: B/P 157/88 P 90  R    T
☐ Anesthesiologist   ASA Classification   I   II   III   IV   V

Anesthesia
☑ General
☐ Spinal
☐ MAC
☐ I.V. Block
☐ Local
☐ Topical
☐ Epidural
☐ Mask

Rx's on Chart Number

Temp:  93
Axillary Admit: 95
Oral
Timpanic  Disch: 95.9

### PATIENT HISTORY

Check if Applies
( ) Renal Disease
( ) Diabetes
( ) Heart Disease
( ) Respiratory
     Disease
( ) Neurological
     Disorder
Other
Dentures

IV present/patient ☐
1. Site R FA
   Cath Size 20 G
   Type IVF LR
   Amt. 150 cc
2. Site
   Cath Size
   Type IVF
   Amt.

| Time | 1600 | 15 | 30 | 1700 | 15 | 30 | 45 | | 15 | 30 | 45 | | 15 | 30 |

Oximeter .......... ☐   100% 99%

| | | | | | |
|---|---|---|---|---|---|
| Patent Airway | | ✓ | ✓ | | |
| Awake & Responsive | | ✓ | ✓ | | |
| Deep Breathing | | ✓ | ✓ | | |
| Respiratory Distress | | Ø | Ø | | |
| Position | | Ø | Ø | | |
| O₂ Therapy 10 L/min. | | | | | |
| Aerosol - Mask - Cannula - E.T. | | ✓ | RA | | |
| Cough, swallow, | | ✓ | ✓ | | |
| Gag reflex, present | | ✓ | ✓ | | |
| Airway: Oral/Nasal d C'd at | | Ø | Ø | | |
| Lungs Clear     R | | ✓ | ✓ | | |
| L | | ✓ | ✓ | | |
| ECG Monitor | | SR | SR | | |
| Skin:  Warm | | ✓ | ✓ | | |
| Cool | | | | | |
| Dry | | ✓ | ✓ | | |
| Diaphoretic | | | | | |
| Warming Light | | | | | |
| Spinal Level | | Ø | Ø | | |
| N.'s Initials | | ✓ | ✓ | | |

SPINAL LEVELS

Dressings present: ABD - midline   ☑ Drainage Admit dry   Disch: scant
☑ Dressings present: Lt Arm        ☑ Drainage Admit dry   Disch: scant
Foley ☑          Irrigation       Output
cl yellow                                   NG: ☑ low interm suction
                                            Hemovac - J/P:
ANESTHESIOLOGIST RELEASE                     Emesis:

KEY: → = No change
     ✓ = Yes
     — = No
*NN = See nurses notes
     V = Systolic BP
     ∧ = Diastolic BP
     X = Arterial Line Pressure
     ● = Pulse
     O = Resp.
     ⊘ = not assessed
     NA = non applicable

PACUR-1

# POST ANESTHESIA CARE UNIT RECORD

CONRAD, ROBERT
01143-00094                    I/P
SAWYER, SAMUEL
207   M   S    05/23/01
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
0000041   @addressograph

| Focus | Expected Outcomes | Actions | Focus | Expected Outcomes | Actions |
|---|---|---|---|---|---|
| ☐ Altered Respiratory status<br>☐ Artificial airway<br>☐ Difficulty breathing<br>☐ Secretions<br>☐ Surgical procedure<br>☐ Medications<br>☐ Preop-condition<br>☐ Other ___ | ☐ Patient maintains patent airway<br>☐ Oximeter reading 90% or greater c̄ /s̄ O₂<br>☐ Patient respirations are even and effortless | ☐ Assess airway and maintain patency<br>☐ Administer oxygen as ordered upon admission<br>☐ Assess lungs upon admission and prn<br>☐ Monitor respiratory rate, rhythm, and depth q 15 min and prn<br>☐ Note symetry of chest movement<br>☐ Monitor oximeter reading q 15 min and prn<br>☐ Assess skin color, temp.<br>☐ Encourage C & DB<br>☐ Provide warmth to patient:<br>   ☐ warm blankets/thermodrape<br>   ☐ patient warming device<br>   ☐ limit exposure of skin<br>☐ Follow Policy & Procedure for maintenance and removal of airway and E.T. tube<br>☐ Elevate H.O.B. unless contraindicated<br>☐ Discharge patient from PACU c̄ O₂ at — L/N.C. or mask (circle) for 24° or until oximeter ＞ 90%<br>☐ Oximeter readings prn | ☐ Alteration in comfort<br>☐ Physical pain from surgery<br>☐ Psychological response to surgery<br>☐ Immobility<br>☐ Position<br>☐ Nausea/ vomiting<br>☐ Other ___ | ☐ Patient verbalizes feelings of comfort or decrease in pain<br>☐ Vital signs in preop range<br>☐ Absence of restlessness<br>☐ Patient verbalizes decrease or elimination of nausea | ☐ Assess pain location, duration, intensity<br>☐ Medicate prn<br>☐ Assess effectiveness & tolerance of pain medication<br>☐ Assist patient with repositioning<br>☐ Provide comfort measures:<br>   ☐ warm blanket<br>   ☐ cool cloth<br>☐ Assess type and amount of anesthesia given<br>☐ Note emesis, color, amount<br>☐ Administer antiemetic<br>☐ Assess effectiveness of antiemetic<br>☐ Maintain NPO if applicable<br>☐ Assess abdomen for distention<br>☐ Maintain patency of NG and suction<br>☐ Provide emotional support |
| ☐ Alteration in Hemody-namics<br>☐ B.P.<br>☐ Pulse<br>☐ Arrythmia<br>☐ Urine output<br>☐ Other ___ | ☐ BP and pulse within preop range<br>☐ Skin warm & dry<br>☐ Oriented to person and place<br>☐ Urine output ＞ 30 cc/hour | ☐ Monitor vital signs q 15 & prn<br>☐ Monitor EKG q 15 & prn<br>☐ Assess resp. status prn<br>☐ Monitor I & O<br>☐ Monitor lab values<br>☐ Administer fluids/blood as indicated<br>☐ Rewarm patient<br>☐ Administer O₂<br>☐ Use analgesic cautiously<br>☐ Position patient in Trendelenberg if symptomatic<br>☐ Maintain patency of IV(s)<br>☐ Monitor urine output prn | ☐ Altered Skin Integrity other than expected surgical incision<br>☐ Position<br>☐ Preop condition<br>☐ Other ___ | ☐ Patient maintains preop skin integrity status<br>☐ Dressing is dry and intact | ☐ Assess skin integrity - note redness, open areas<br>☐ Remove wet, wrinkled linen<br>☐ Reposition prn<br>☐ Assess dressing for drainage, note color, amount, prn<br>☐ Reinforce dressing prn<br>☐ Assess neurovascular status of_____ |
| ☑ Anxiety<br>☑ Post-op diagnosis<br>☑ Unfamiliarity with environment<br>☐ Separation from family/ significant other<br>☐ Other ___ | ☐ Patient verbalizes orientation to environ-ment, Patient expresses feelings, concerns, asks questions | ☑ Assess orientation<br>☑ Orient prn<br>☑ Instruct patient on monitoring equipment, procedures and document on orientation to PACU teaching record<br>☑ Provide emotional support<br>☑ Encourage patient to express fears and to ask questions<br>☑ Provide privacy | ☑ Potential for injury<br>☑ L.O.C.<br>☑ Age<br>☑ Precondition<br>☑ Mobility<br>☐ Other ___ | ☐ Patient remains injury-free | ☑ Assess L.O.C. prn<br>☑ Orient patient prn<br>☑ Monitor effects of anesthetic and analgesic<br>☑ Side rails up at all times<br>☑ Bed/cart locked<br>☐ Pad siderails prn<br>☐ Apply restraints prn<br>   ☐ posey    ☐ leather<br>   ☐ wrist    ☐ personnel<br>   ☐ ankle<br>☐ Check neurovascular status affected |

PAGE 3 OF 3
DATE _3/23/01_

## Medical Center Enterprise
## PERIOPERATIVE RECORD

Lot #51738

- [ ] N/A  ESU/LASER:
ESU#: _F9K 11395-A_  GROUNDING PAD #: _E7507_
SITE: _Lr. thigh_  BY WHOM: _J. Hairbrough RN_
SETTINGS CUT: _45_  COAG: _43_  BIPOLAR: ___  POST SKIN INTEGRITY: _Clean_
- [x] N/A   LASER UNIT: _____  LASER SETTING: _____  LASER SAFETY PRECAUTION: [ ] YES
- [x] N/A  TOURNIQUET: SERIAL #: _____  [ ] LEG (RT./LT.)  [ ] ARM (RT./LT.)  BY WHOM: _____
  TIME ON: _____  TIME OFF: _____  ; _____ MMHG; TIME ON: _____  TIME OFF: _____ ; _____ MMHG
- [ ] N/A  JOBST HOSE: [ ] YES  [ ] NO  (BOTH/RT./LT.)  BY WHOM: _D. Smith, RN._
- [ ] N/A  [ ] X-RAY TAKEN  [ ] PORTABLE  [ ] C-ARM  X-RAY TECHNICIAN: _____
- [x] N/A  [ ] MICROSCOPE (OPTH./ENT)  [ ] 35mm CAMERA  [ ] VIDEO (TAPE DISPOSITION:  [ ] SURGEON  [ ] PATIENT)
- [x] N/A  SPECIMENS: SPECIMEN #: _____  [ ] SEND TO LAB  [ ] DISCARD PER SURGEON'S ORDER  [ ] SENT WITH PATIENT
  [ ] TAKEN BY SURGEON  [ ] TAKEN BY PATHOLOGIST  [ ] FROZEN SECTION  [ ] C & S (SITE: _____ )
- [ ] N/A  WOUND IRRIGATION: [ ] ANCEF  [ ] GU IRRIGANT  [ ] L/R 5000 HEPARIN  [ ] L/R 5000 HEPARIN / ANCEF  [ ] NS  [ ] L/R / ANCEF
  [ ] H2O  [ ] POLYBACTRIN  [ ] MEFOXIN  [ ] KANTREX  [ ] GENTAMYCIN  [ ] OTHER: _____

MEDICATIONS DURING SURGERY OTHER THAN ANESTHESIA: _See Anesthesia record_

...LY INFORMED OF PATIENTS STATUS @ TIMES

| DRAINS | SIZE | LOCATION | DESCRIPTION / DRAINAGE | DRAINS | SIZE | LOCATION | DESCRIPTION / DRAINAGE |
|---|---|---|---|---|---|---|---|
| [ ] Red Rubber | | | | [ ] Penrose | | | |
| [ ] Jackson Platt | | | | [ ] Hemovac Davol | | | |
| [ ] NG | | | | [ ] Chest Tube | | | |
| [ ] Other | | | | [ ] Other | | | |

- [ ] N/A  COUNTS:  SPONGE: [x] CORRECT  [ ] INCORRECT  [x] FINAL COUNTS CORRECT  CLOSURE TIME
- [ ] N/A  NEEDLE: [x] CORRECT  [ ] INCORRECT  SCRUB NURSE: _A Parker CST_  _1643_
- [ ] N/A  INSTRUMENT: [x] CORRECT  [ ] INCORRECT  CIRCULATING NURSE: _J Chambers RN_
SURGEON NOTIFIED OF COUNTS [ ] YES:  IF UNRESOLVED X-RAY TAKEN (IF NO, WHY: _____ )

POST-OPERATIVE DIAGNOSIS: _Same_
- [ ] N/A  DRESSINGS: [x] 4X4's  [ ] STERISTRIPS  [ ] ABD  [ ] BANDAID  [ ] EYE PAD / SHIELD  [ ] KERLIX  [ ] KLING  [ ] MASTISOL
  [ ] TELFA  [ ] XEROFORM  [ ] ACE BANDAGES  [ ] ADAPTIC  [ ] COLLODIAN  [ ] VASELINE GAUZE  [ ] PERI PAD  [ ] VAG. PACKING
  [ ] NASAL STENTS  [x] COTTON ROLL  [ ] ANTIBIOTIC OINTMENT  [ ] OTHER: _____
  [ ] PACKING SITE: _____  EXIT TIME _1656_
TAPE: [ ] SILK  [ ] FOAM  [ ] PAPER  [ ] ELASTOPLAST  [ ] OTHER: _____
CAST: [ ] ARM  [ ] LEG  [ ] RT.  [ ] LT.  [ ] PLASTER  [ ] FIBERGLASS  [ ] LONG  [ ] SHORT  [ ] SPICA  [ ] SPLINT  [ ] SLING
WOUND CLASSIFICATION: [ ] CLEAN (I)  [x] CLEAN CONTAMINATED (II)  [ ] CONTAMINATED (III)  [ ] DIRTY (IV)

COMMENTS: _Tolerated Procedure well -_
_Bullet fragment to B. Bradley - Enterprise Police Dept._

METHOD OF TRANSFER: [x] ROLLER  [ ] SELF  [ ] WITH ASSISTANCE  [ ] NURSE'S ARMS  [ ] ANESTHESIA ARMS
TRANSFERRED BY: [x] STRETCHER  [ ] ICU / CCU BED  [ ] UNIT BED  [ ] OTHER: _____  (WITH SR'S) _X2_
TRANSFER TO: [x] PACU  [ ] ICU / CCU  [ ] ROOM  [ ] DAY SURGERY  [ ] OTHER: _____
PATIENT STATUS POST SURGERY: [x] RESPONSIVE  [ ] NON RESPONSIVE  [x] ALERT  [ ] SEDATED
REPORT TO: _K Thomas RN  L Caminale RN_  PACU NURSE _A Chambers RN_
PRIMARY CIRCULATOR SIGNATURE: _Judy Yard_  RELIEF CIRCULATOR SIGNATURE: _J Chambers RN_

OR 50-3 (Rev. 7/98)

1267

052301

PAGE 2 OF 3    TE _5/23/01_

# Medical Center Enterprise
## PERIOPERATIVE RECORD

| | | | |
|---|---|---|---|
| Potential for injury | Patient will remain free of injury | ☑ maintain proper body alignment / safety devices<br>☑ appropriate padding and support devices<br>☑ positioning done according to guidelines<br>☐ follow electrical / laser safety protocol | ☑ Total procedure performed with no apparent injury |
| Potential for foreign body in surgical wound | Patient is free of any foreign body post-op | ☑ surgical count performed according to policy<br>☐ report discrepancy immediately and initiate corrective action | ☑ Patient is free of retained foreign body post-op |
| Potential for fluid volume deficit related to blood and fluid loss | Patient's fluid and electrolyte balance is maintained | ☑ check patient's lab values for baseline<br>☑ suction canisters & lap sponges in clear view<br>☑ calculate drainage from foley, N/G's and other drains<br>☑ assist with IV fluids and blood replacements | ☑ Patient fluid volume is monitored during surgery |
| Potential for lowered body temperature related to hypothermia | Patient will maintain body temperature within normal limits | ☑ apply warm blankets throughout procedure<br>☐ hyperthermia unit used if required<br>☑ expose only as much of patient as needed for prep and surgical site<br>☐ use warm irrigating solutions | ☑ Patient's body temperature within normal limits |

ature: _Cindy Wade, L Rn._

Date/Time: _5/23/01 1500_

ADDRESSOGRAPH

Intraoperative Record:
Date: _5/23/01_
OR #: _2_

ROOM TIME
_1500_

Moved to OR Table: ☐ c̄ Extra Help   ☐ s̄ Difficulty
☐ c̄ Difficulty   ☐ p̄ Induction   ☐ Nurses Arms
☐ c̄ Roller

OR Table Used: ☑ Regular   ☐ Fracture
☐ Stretcher   ☐ Cysto   ☐ C-Arm Table

ANESTHESIA: ☐ General / Mask
☑ General / Endotracheal   ☐ Spinal   ☐ Epidural
☐ Bier Block   ☐ Axillary Block
☐ Monitored Anesthesia Care (MAC)   ☐ Local
☐ Other _____

---

## INTRAOPERATIVE DATA

PREOPERATIVE DIAGNOSIS: _Gunshot Wound to Abdomen + Left arm_

| | | | |
|---|---|---|---|
| SURGEON | _J. Sawyer_ | , M.D. | SURGEON , M.D. |
| SURGEON | _J. Rodel_ | , M.D. | |
| PEDIATRICIAN | | | , M.D. NURSERY RN |
| ANESTHESIOLOGIST | _Schwock_ | , M.D. ANESTHETIST _G. Altman, CRNA_ | ANESTHETIST |

| CIRCULATOR | _J. Yarbrough RN_ | OUT @ _1425_ | IN @ |
| CIRCULATOR | _J. Chambers_ | IN @ _1600_ | OUT @ |
| SCRUB | _D. Smith RN_ | OUT @ | IN @ |
| SCRUB | _A. Howe, RN_ | IN @ | OUT @ _1610_ |
| SCRUB | _J. Parker, CST_ | IN @ _1610_ | OUT @ |

MEDICAL OBSERVERS:                              LASER TECH:

SALES REP:                                      OTHERS:

PROCEDURE(S): _Diagnostic Laparoscopy, Exploratory Laparotomy,_
_Repair of Gunshot Wound to Colon (Transverse) Removal of_
_Bullet from Left arm_

INCISION TIME
_1540_

POSITIONS: Safety Strap ☑ Yes ☐ No ☐ N/A Location: _mid thigh_
☑ Supine ☐ Prone ☐ Jack-Knife ☐ Frogleg ☐ Lateral (RT./LT.) ☐ Semifowler ☐ Other
☐ High Lithotomy (Time Up: ___ : Time Down: ___ ) ☐ Low Lithotomy (Time Up: ___ : Time Down: ___ )
ARMS: ☑ Tucked at side (RT./LT.) ☑ On Armboards (RT./LT.) ☐ On Handtable (RT./LT.) ☐ Padded Mayo (RT./LT.)
SUPPORT DEVICES: ☐ Chest Rolls ☐ Foot Board ☐ Axillary Rolls (RT./LT.) ☐ Chick Leg Holder ☐ Headrest ☐ Beanbag ☑ Pillow
☐ OA Lateral Positioner ☐ Well Leg Holder ☐ Eggcrate Pads ☐ Shoulder Rolls ☐ Other _____

__ NA SKIN PREP: ☐ Betadine ☐ Hibiclens ☐ Alcohol ☐ Other _____ Location _____ By Whom: _____
__ NA SKIN SHAVE: ☐ Yes ☐ No ☐ Patient Unit ☐ OR Room Location _Pubic area_ By Whom: _____

CATHETERS: __ NA ☐ Foley Catheter in OR; Size: ___ ; ___ CC H₂O in balloon; Color of Urine _____ ; By Whom: _____
__ NA ☑ Foley Catheter from Patient Unit _150_ CC in bag; Color of Urine _yellow_ Post Op. Color _____
__ NA ☐ Straight Cath in OR: ___ e ___ ; B ___ hom: ___ Output: ___ D ___ d ___

BLOOD GIVEN IN OR: ☐ Yes ☑ No (If Yes See Transfusion Sheet)   PROSTHETIC DEVICE: ☐ Yes ☑ No (If Ye ___ e Implant Sheet)

MEDICAL CENTER ENTERPRISE
SURGICAL COUNT SHEET

OPERATION: _Diag. Lap - Expl. Lap_

5/23/01

| | PRE-OP COUNTS | | 1ST | 2ND | 3RD | FINAL COUNT |
|---|---|---|---|---|---|---|
| 4 X 18 Lap Sponges | — | | | | | |
| 18 x 18 Lap Sponges | 10 | 5 | 15 | 15 | 15 | 15 |
| 4 x 4 Ray Tec. Sp. _Diag. Lap_ _Expl. Lap_ | 10 / 10 | | 10 / 10 | 10 / 10 | — | 10 / 10 |
| Cottonolds | — | | | | | |
| Tonsil Sponges | — | | | | | |
| Dental Rolls | — | | | | | |
| Suture Needles | — | 8 + 8 + 2 + 1 | 19 | 19 | 19 | 19 |
| Hypodermic Needles | — | | | | | |
| Bovie Tips | 1 | | 1 | 1 | 1 | 1 |
| Bovie Tip Cleaners | 1 | | 1 | 1 | 1 | 1 |
| Knife Blades | 2 | | 2 | 2 | 2 | 2 |
| Dissectors | — | | | | | |
| Braided Cord Tape (umbilical) | — | | | | | |

SCRUB NURSE _J. Shirley CST_

CIRCULATING NURSE _A. Chambers RN_

OUTCOME OF NEEDLE, INSTRUMENT AND SPONGE COUNT REPORTED TO SURGEON.

PHYSICIAN _____ M.D.

MEDICAL CENTER ENTERPRISE 52301
SURGICAL COUNT SHEET

OPERATION  *Diag. Lap, Expl. Lap*

5/23/01

SAWYER, SAMUEL

| | PRE-OP | ADDED | POST-OP | | PRE-OP | ADDED | POST-OP |
|---|---|---|---|---|---|---|---|
| Knife Handle | 2 | | 3 | Crile (Ribbon) Ret. | | | |
| Curved Hemostats | 4 | | 4 | Suction Tip | 3 | | |
| Straight Hemostatis | | | | Rake Ret. | | | |
| Scissors | 4+1 | | 5 | Tenaculum | | | |
| Tissue Forceps | 1+4+3 | | 8 | Uterine Elevator | | | |
| Needle Holders | 2 | | 2 | Towel Clips | | | |
| | | | | Harrington Ret. | | | |
| Long Kelly Clamps | 2 | | 2 | Army/Navy's | | | |
| Short Kelly Clamps | 2 | | 2 | | | | |
| Straight Oschners | 4 | | 4 | Gelpis | | | |
| Allis Clamps | 2 | | 2 | Senn Ret. | | | |
| Babcocks | 2 | | 2 | Bladder Ret. | | | |
| Sponge Sticks | 1 | | 1 | Heaney Ret. | | | |
| Heaney Clamps | | | | Weitlander | | | |
| Ballintines | | | | Foss Ret. | | | |
| Right Angle Clamps | | | | Thompson Ret. | | | |
| Pennington | | | | Bookwalter | | | |
| Lahey Clamps | | | | Balfour/Upper Hand | | | |
| | | | | OConner/Sullivan | | | |
| Richardson's | 4 | | 4 | Gallbladder Inst. | | | |
| Deavers | | | | Intestinal Inst. | | | |

SCRUB NURSE _____ *J. Parker CST* _____

CIRCULATING NURSE _____ *R. Chambers* _____

(surctins)

CASE MANAGEMENT

## PROGRESS NOTES:

| DATE | |
|------|---|
| 5/24/01 | Robert Conrad 20 y/o male. Med Rec # 41053. Twenty year old black male assigned gun shot wound to left lower quadrant of abdomen & (L) upper arm. Recovering from surgery. No discharge needs anticipated. —— Sevier RN/CM |

# MULTIDISCIPLINARY TEACHING RECORD FOR PATIENT/CARE GIVER

CONRAD, ROBERT                  I/P
05/23/01

**EDUCATIONAL ASSESSMENT** for patient to complete and give to nurse.

Please check if you need more information regarding the following:

◻ My diagnosis

◻ My medications

◻ My diet

◻ Other: _____
_____

Please state the reason for your hospital visit: _____
_____

| | |
|---|---|
| ◻ Breathing Treatments/Respiratory Equipment | ◻ Activity |
| ◻ Plan for Discharge | ◻ Smoking Cessation |
| ◻ Diabetic Education | ◻ Coumadin Education |
| ◻ Tube Feeding | ◻ Skin Care |
| ◻ IV Therapy | ◻ Rehabilitation |
| ◻ Assistive Devices (such as walker, cane, etc. | ◻ Other: _____ |

## Completed By: _____

◻ **Patient**        ◻ **Other:** _____
(Relationship to Patient)

---

**NURSE REVIEW AND VERIFICATION:** The following goals to be completed by nurse.

1) Patient/Care Giver will be prepared for: ◻ minimal,    ◻ moderate,    ◻ high level of assistance.
2) Patient/Care Giver demonstrates knowledge base to care for patient/equipment at home.

Knowledge Level:  Prior to the teaching program, patient/care giver exhibits ◻ 25% ◻ 25 – 50% ◻ 50 – 75%
◻ > 75% knowledge of health problem and how to deal with it.

Motivational Level:    ◻ Asks questions    ◻ Eager to learn    ◻ Seems interested
◻ Uncooperative    ◻ Extremely anxious    ◻ Denies need for education

Comprehension Level:  Ability to grasp concepts and respond to questions: ◻ High, ◻ Medium, ◻ Low

Staff Member Completing Form: _____
Signature                          Title                    Date

J:Nursing\Nursadm\Forms\MultDiscip Teach

## MEDICAL CENTER ENTERPRISE

### INFORMED CONSENT

AUTHORIZATION FOR MEDICAL AND/OR SURGICAL TREATMENTS/PROCEDURES

I, _Robert Conrad_ , hereby authorize Doctor _S. Conya_
and his/her assistants to perform upon _myself_
the following operative, diagnostic, or invasive procedure / treatments: _Removal of_
_bullet from (L) Arm and Abdomen_

_(description of operation / treatment in layman's language )_

My doctor has explained the risks and benefits of the procedure/treatment, advised me of
alternative treatments and has told me about the expected outcome and what could happen if my
condition remains untreated. I understand that if any unforeseen condition arises in the course of
the procedure/treatment calling for, in the physician's judgment, additional or different
procedure/treatment from those I have consented to, I further request and authorize him/her to
perform whatever procedure/treatment he/she deems necessary and advisable. Any tissue or body
fluids may be disposed of by the hospital in accordance with the accustomed practice. Any
photographs, video recordings deemed necessary during the procedure/treatment will be permitted.

I certify and acknowledge that I have read this form or had it read to me, that I understand the
risks, alternatives and expected results of the procedure/treatment and that I had ample time to ask
questions and to consider my decision.

_05/23/01_
Date and Time

_M D Shuya_
Witness

_Robert Conrad_
Patient Signature

_____
Nearest Relative (Relation to Patient)

## MEDICAL CENTER ENTERPRISE

### INFORMED CONSENT

AUTHORIZATION FOR MEDICAL AND/OR SURGICAL TREATMENTS/PROCEDURES

I, _Robert Conrad_, hereby authorize Doctor _____

and his/her assistants to perform upon _My Cell_

the following operative, diagnostic, or invasive procedure /treatments: _Diagnostic_

_Laparoscopy possible Laparotomy_

_____

_____

(description of operation / treatment in layman's language )

My doctor has explained the risks and benefits of the procedure/treatment, advised me of alternative treatments and has told me about the expected outcome and what could happen if my condition remains untreated. I understand that if any unforeseen condition arises in the course of the procedure/treatment calling for, in the physician's judgment, additional or different procedure/treatment from those I have consented to, I further request and authorize him/her to perform whatever procedure/treatment he/she deems necessary and advisable. Any tissue or body fluids may be disposed of by the hospital in accordance with the accustomed practice. Any photographs, video recordings deemed necessary during the procedure/treatment will be permitted.

I certify and acknowledge that I have read this form or had it read to me, that I understand the risks, alternatives and expected results of the procedure/treatment and that I had ample time to ask questions and to consider my decision.

_05/23/0/1426_

Date and Time

_[signature]_

Witness.

_[signature] Robert Conrad_

Patient Signature

_____

Nearest Relative (Relation to Patient)

## CONSENT FOR ANESTHESIA SERVICES

I, _____ acknowledge that my doctor has explained to me that I will have an operation, diagnostic or treatment procedure. My doctor has explained the risks of the procedure, advised me of alternative treatments and told me about the expected outcome and what could happen if my condition remains untreated. I also understand that anesthesia services are needed so that my doctor can perform the operation or procedure.

It has been explained to me that all forms of anesthesia involve some risks and no guarantee or promises can be made concerning the results of my procedure or treatment. Although rare, unexpected *severe complications* with anesthesia can occur and include the remote possibility of *infection, bleeding, drug reactions, blood clots, loss of sensation, loss of limb function, paralysis, stroke, brain damage, heart attack or death.* I understand that these risks apply to all forms of anesthesia and that additional or specific risks have been identified below as they may apply to a specific type of anesthesia. I understand that the type(s) of anesthesia service checked below will be used for my procedure and that the anesthetic technique to be used is determined by many factors including my physical condition, the type of procedure my doctor is to do, his or her preference, as well as my own desire. It has been explained to me that sometimes an anesthesia technique which involves the use of local anesthetics, with or without sedation, may not succeed completely and therefore another technique may have to be used including general anesthesia.

| ☑ General Anesthesia | Expected Result | Total unconscious state, possible placement of a tube into the windpipe. |
| | Technique | Drug injected into the bloodstream, breathed into the lungs, or by other routes. |
| | Risks | Mouth or throat pain, hoarseness, injury to mouth or teeth, awareness under anesthesia, injury to blood vessels, aspiration, pneumonia, death. |
| ☐ Spinal or Epidural Analgesia/ Anesthesia    ☐ With sedation    ☐ Without sedation | Expected Result | Temporary decreased or loss of feeling and/or movement to lower part of the body. |
| | Technique | Drug injected through a needle/catheter placed either into the spinal canal or immediately outside the spinal canal. |
| | Risks | Headache, backache, buzzing in the ears, convulsions, infection, persistent weakness, numbness, residual pain, injury to blood vessels, "total spinal", death. |
| ☐ Major / Minor Nerve Block    ☐ With sedation    ☐ Without sedation | Expected Result | Temporary loss of feeling and/or movement of a specific limb or area. |
| | Technique | Drug injected near nerves providing loss of sensation to the area of the operation. |
| | Risks | Infection, convulsions, weakness, persistent numbness, residual pain, injury to blood vessels, death. |
| ☐ Intravenous Regional Anesthesia    ☐ With sedation    ☐ Without sedation | Expected Result | Temporary loss of feeling and/or movement of a limb. |
| | Technique | Drug injected into veins of arm or leg while using a tourniquet. |
| | Risks | Infection, convulsions, persistent numbness, residual pain, injury to blood vessels, death. |
| ☐ Monitored Anesthesia Care (with sedation) | Expected Result | Reduced anxiety and pain, partial or total amnesia. |
| | Technique | Drug injected into the bloodstream, breathed into the lungs, or by other routes producing a semi-conscious state. |
| | Risks | An unconscious state, depressed breathing, injury to blood vessels, death. |
| ☐ Monitored Anesthesia Care (without sedation) | Expected Result | Measurement of vital signs, availability of anesthesia provider for further interventions. |
| | Technique | None. |
| | Risks | Increased awareness, anxiety and/or discomfort. |

I hereby consent to the anesthesia service checked above and authorize that it be administered by _____ or his/her associates, all of whom are credentialed to provide anesthesia services at this health facility. I also consent to an alternative type of anesthesia, if necessary, as deemed appropriate by them. I expressly desire the following considerations be observed (or write "none"):

---

### BLOOD TRANSFUSIONS

The likelihood of needing a blood transfusion for this procedure is:    ☐ highly unlikely,    ☐ possible,    ☐ probable..

I understand that there are potential risks from blood transfusions, though rare, and that some of these include transfusion reaction, hepatitis, and AIDS (Acquired Immune Deficiency Syndrome). *Initial in appropriate box:*

☐ I give consent to receive blood or blood products as determined by my anesthetist and doctor to be necessary for my well-being.
☐ I give consent to receive blood or blood products only as an emergency life-saving measure.
☐ I do not want to receive blood or blood products under any circumstance.

---

I certify and acknowledge that I have read this form or had it read to me, that I understand the risks, alternatives and expected results of the anesthesia service and that I had ample time to ask questions and to consider my decision.

X _____
Patient's Signature

_____
Substitute's Signature

_____
Witness

_____
Date and Time

_____
Relationship to Patient

_____
Explained By

ED History Physical Worksheet
General Adult
TRAUMA

Address

Identification

NAME  Conrad Robert  0143-00094  5-23-01
All elements not circled/struck/checked/annotated - were not pertinent
Room

Level 2, 3 – 2 to 4 body areas / organ systems    Level 4 – 5 to 7 body areas / organ systems    Level 5 – 8 or more body areas / organ systems

## Physical Examination
☑ Normal   Circle positives and provide additional documentation

☐ Physical Examination incomplete due to critical condition of patient.

**CONS**
- ☐ Vital signs per nurses notes
- ☐ Well developed, well nourished
- ☐ No acute pain/distress
- ☐ Odor ETOH                                          more below ☐

**PSYC**
- ☐ Alert and oriented to TPP
- ☐ No abnormalities of mood or affect
- ☐ Memory (recent and remote) intact              more below ☐

**EYES**
- ☐ PERRL
- ☐ Conjunctivae and lids normal
- ☐ Fundi and discs normal
- ☐ EOM normal                                        more below ☐

**ENT**
- ☐ Otoscopic exam of external canal and TMs normal
- ☐ Nasal mucosa, turbinates, and septum normal
- ☐ Mouth, tongue, and pharynx normal
- ☐ Pharynx without edema, exudate, or injection       more below ☐

**NECK**
- ☐ Neck supple
- ☐ No JVD
- ☐ No thyromegaly
- ☐ No bruits                      more below ☐

**CHST**
- ☐ No masses or tenderness
- ☐ Breasts symmetric
- ☐ No discharge                  more below ☐

**RESP**
- ☐ Normal respiratory effort and excursion
- ☐ No rales, ronchi or wheezes
- ☐ Normal to percussion
- ☐ Equal air entry                                    more below ☐

- ☐ Normal PMI with no thrills, RSR
- ☐ No murmurs or gallops
- ☐ Normal carotids   ☐ normal abd aorta   ☐ normal femorals   ☐ normal pedals
  ☐ No edema or varicosities
  ☐ Normal capillary refill
- ☐ Distal pulses present                              more below ☐

**NEUR**
- ☐ Normal speech
- ☐ CN II-XII intact
- ☐ DTRs normal, no pathologic reflexes
- ☐ Normal motor and sensory function                 more below ☐

**GI**
- ☐ No masses, tenderness, rebound or guarding
- ☐ Normal liver, spleen, kidney
- ☐ No hernia
- ☐ Rectal, not indicated  ☐ rectal normal  ☐ hemoccult negative
- ☐ Normal bowel sounds                                more below ☐

**GU**
- ☐ Genitalia normal to inspection
- ☐ No masses, tenderness or adenopathy
- ☐ Genitalia normal to palpation
- ☐ Normal cervix   Normal bimanual ☐ bladder ☐ uterus ☐ adnexa ☐     more below ☐

**LYM**
- ☐ No adenopathy of neck
- ☐ No adenopathy of axillae
- ☐ No adenopathy of groin
- ☐ No adenopathy, other _____                    more below ☐

**MUS**
- ☐ Normal gait and station     ☐ No ligamentous injury
- ☐ No tendon injury            ☐ Normal to palpation
- ☐ No tendon injury            ☐ Normal strength/tone
- ☐ Proximal and distal joint normal  ☐ Neurovascular status intact
- ☐ No F.B. noted                                      more below ☐

**SKN**
- ☐ Normal to inspection
- ☐ Normal to palpation                                more below ☐

### CRITICAL CARE MUST BE TIME DOCUMENTED

**Procedures**
- ☐ Laceration   Length _____ cm.   Layered Y/N
- ☐
- ☐
- ☐

☐ CRITICAL CARE TIME BELOW **DOES NOT** INCLUDE TIME FOR SEPERATELY BILLED PROCEDURES.

**CRITICAL CARE**  Time _____  30-74 minutes ☐   75-105 minutes ☐

PHYSICIAN'S ORDERS

### Documentation of Medical Decision Making process, including differential diagnoses, nature and severity of problem, risk of morbidity and mortality and other factors.

Initial Impression/Differential Diagnoses

Additional history, exam, reassessments

Primary Diagnosis                          Secondary Diagnosis

Secondary Diagnosis                        Secondary Diagnosis

| Condition | Disposition | Prescriptions |
|---|---|---|
| ☐Stable ☐Improved | ☐Disch. ☐Admit ☐AMA ☐Transfer ☐Exp.  Location | |

See D/C Instructions ☐

D/C Instructions/Sheet # _____

Chart complete when checked ☐

Signature: _____        ☐ NOTE DICTATED

© Copyright 2000 Team Health, Inc. All Rights Reserved. Not to be reproduced without permission

Version #99129

(Page 2 of 2)

ED History & Physical Worksheet

General Adult

TRAUMA

NAME Conral Robert 01/42 000094 5-0301    Room

Level 1, 2, 3 Documentation - 1 to 3 elements | Level 4 - 4+ elements or 3 chronic or inactive conditions | Level 5 - 4+ elements or 3 chronic or inactive conditions

All elements not circled/struck/checked/annotated - were not pertinent

**Chief complaint:**

Time seen by physician

Age 70

Sex M

□ Symptom/Location

□ Severity/Radiation Pain Severity (1-10) ___/10

□ Modifying Factors

□ Context/Mechanism of injury

□ Quality

Pt. was seen By
Dr. Sanawyer

□ Duration

□ Timing                                    □ Risk

□ Associated Signs & Sx                      □ EMS Direction

Level 1, 2, 3 Documentation - 1 system, problem pertinent | Level 4 Documentation - 2 to 9 systems | Level 5 Documentation - 10+ systems

| □ All systems negative except as noted | sore throat | nosebleeds | rhinorrhea | dysuria | discharge | dyspareunia | change MS | agitation | suicidal |
| □ Unable to fully assess due to: | hoarse | throat swelling | hearing loss | frequency | irreg menses | flank pain | confusion | depression | hostile |
| ( ) altered LOC ( ) patient condition ( ) other | | | | hematuria | | | | | |
| | chest pain | rapid ht beat | LE edema | myalgias | neck/back pain | redness | fatigue | polyuria | hair change |
| All normal    strike negatives    circle positives | palpitations | slow ht beat | orthopnea | arthralgias | inflammation | heat | weakness | polydipsia | heat tolerance |
| fever   chills   high BP | SOB | prod. cough | DOE | rash | bruising | contusions | bleeding | nodes | |
| weight loss  dizzy  weak | pleuritic CP | nonprod. cough | PND | swelling | lacerations | abrasions | bruising | petechiae | |
| | hemoptysis | | | | | | | | |
| redness  discharge  visual loss | nausea | diarrhea | pain | headache | numbness | change funct | rhinorrhea | atopic dermat. | |
| pain  blurred  vision change | vomiting | constipation | bloating | weakness | change LOC | paresthesias | asthma | sneezing | |
| | melena | | | change speech | | | | | |

Level 1, 2, 3 Documentation - None | Level 4 Documentation - One area | Level 5 Documentation - 2 of 3 areas | ALLERGIES & MEDS

□ See Nurses Notes.

DM    HBP    CAD    GI Bleed

CVA    CA    Recent Surgery

TETANUS

LMP    G___P___    Contraception

DM    HBP    CA

CAD    CVA

Tobacco    Marital Status

ETOH   Sub Abuse   Lives Alone

□ See Nurses Notes.

Information gathering & documentation. Testing. Document abnormal findings.

Lab    X CBC    X CHEM / BMP    X-Ray- B    EKG

X UA    □ Cardiac markers    X KUB  cross    □ 12 Lead   □ Rhythm Strip
                                  table
□ HCG    □ ABG                              Rate    Rhythm

X Amylase/Lipase    □ Tox screen                     Axis    Intervals

□ PT/PTT    □ Culture                               Interpreted by:    Time:

□ ESR                                               □ (Initials)

□ Review old charts                                 □ Pulse oximetry and interpretation

□ Consultation    Dr.    Time Called    Time answered    Time arrived    □ Repeat pulse oximetry and interpretation

© Copyright 2000 Team Health, Inc. All Rights Reserved. Not to be reproduced without permission    Version #99129

(Page 1 of 2)

Medical Center
Enterprise

**EMERGENCY DEPARTMENT**
**TRIAGE, ASSESSMENT AND FLOW SHEET**

20 y.o. B M

Patient Name _____    ER # _____

Conrad  Robert

NON-URGENT: _____

DATE: 05/23/01

FAMILY PHYSICIAN: _____

URGENT: _____

TRIAGE TIME: 1355

ASSESSMENT TIME: 1355

EMERGENT: X

WT: _____

ALLERGIES: NKA

IMMUNIZATIONS: CURRENT ☑ NO

HT: _____

HEAD CIRC < 3 YEAR OLD

NOT CURRENT

**MODE OF ARRIVAL:** ☑ WHEELCHAIR ☐ AMBULANCE
☑ AMBULATORY ☐ PARENT'S ARMS ☐ OTHER _____

**NURSING HISTORY**

DATA SOURCE (INFORMANT:) Pt + friends 2 block males

CHIEF COMPLAINT: "Gunshot ABD lower Qvod"

"Happened on Methodist side" "My friends passive"

ONSET: 15-20 min ago + brought me here"

ACTIONS: STRAIGHT TO ROOM ___ ENS TO REGISTER ___

ICE: ___ SPIT ___ DRESSING ___ IMMOBILIZE ___

WC ___ NPO EXPLAINED ___ ISOLATION PRECAUTIONS ___

TREATMENT PRIOR
TO ARRIVAL: _____

**MEDICAL HISTORY:**        **HOME MEDICATIONS:**
☐ NO CHRONIC ILLNESS        SEE ATTACHED SHEET
☐ DIABETES
☐ SEIZURES
☐ HYPERTENSION               " Ø "
☐ HEART
☐ OTHER _____
☐ SURGERY _____
☐ TRAUMA _____

**PAIN:** ☐ NO ☑ YES
LOCATION: R arm, Ab Quadrant
DESCRIPTION: Gunshot
RADIATION: Ø
REPRODUCED WITH MOVEMENT: Ø
INTENSITY: MILD - 1 • 2 • 3 • 4 • 5 • 6 • 7 • 8 • 9 • 10 SEVERE

**TRAUMA - LOCATION-APPEARANCE:**    **COMMENTS:**
Gunshot wound
x 2

☐ NA
☐ ABRASION
☐ AVULSION
☐ CONTUSION
☐ DEFORMITY
☐ EDEMA
☐ LACERATION
☐ PUNCTURE WOUND
☐ BURN

FRONT    BACK    SUSPECTED ABUSE Y ☐ N ☐

**SKIN:**
☑ WARM ☑ DRY ☐ COOL ☐ DUSTY
☐ PALE ☐ MOIST ☐ CLAMMY ☐ CYANOTIC ☐ OTHER ___
☐ INTACT
TURGOR: C spp    INTEGRITY ☐ DISRUPTED

**BLEEDING:** ☐ NO ☐ YES
LOCATION: Ø        LMP ___
☐ ONE ☐ MINIMAL ☐ MODERATE ☐ SEVERE
☐ RIGHT ☐ DARK ☐ CLOTS ☐ CONTROLLED
☐ OTHER ___

**NURSES INITIALS**        **NURSES SIGNATURES**
TRIAGE NURSE

**NURSING OBSERVATIONS**

**NEUROLOGICAL:**        **RESPONDS TO STIMULI:**
LEVELS OF CONSCIOUSNESS:    ☑ YES        ☐ NO
☑ ALERT        ☐ ORIENTED    ☑ VERBAL    ☐ PAINFUL
☐ LETHARGIC    ☐ CONFUSED    **VISUAL ACUITY:**
☐ UNRESPONSIVE ☐ SEIZURES    ☑ NA
**LOSS OF CONSCIOUSNESS:**    **SPEECH:**
☐ NA                ☐ SLURRED    ☑ CLEAR
☑ NO ☐ YES DURATION ___    ☐ OTHER ___ ☐ APHASIC
**PUPILS:** ☑ NA ___ SIZE IN mm SIZE R ___ L ___
☑ EQUAL ☑ REACTIVE
☐ UNEQUAL ☐ NON-REACTIVE   1  2  3  4  5  6  7

**RESPIRATORY:**
☑ REGULAR ☐ ABSENT ☐ RAPID ☐ OTHER ___
☐ DYSPNEIC ☐ IRREGULAR ☐ COUGH
☐ SHALLOW ☐ HYPERVENTILATING ☐ USE OF ACCESSORY MUSCLES

**BREATH SOUNDS:**
☐ NA ☑ EQUAL ☐ UNEQUAL ☑ CLEAR
☐ RALES ☐ DIMINISHED ☐ WHEEZES ☐ RHONCHI

**CIRCULATION-CARDIAC-PULSES:**    **MOTOR FUNCTION/SENSORY:**
☑ REGULAR                ☐ EQUAL ☑ UNEQUAL
☐ PALPABLE                COMMENTS: "I cant hold
☐ ABSENT                my leg up, I've
☐ IRREGULAR                Blood [shot]"
☐ WEAK
☐ CARDIAC RHYTHM
☐ HEART TONES
☐ CAPILLARY REFILL
**ABD:**                **GI:**
☐ NA                ☐ NA
☑ SOFT - tender to Abd    ☐ VOMITING
☐ DISTENDED            ☐ DIARRHEA
☐ RIGIDITY            ☑ NAUSEA
☐ BOWEL SOUNDS
☐ FHT
**EMESIS:** ☑ NO ☐ YES
PT. DESCRIPTIONS ___
**STOOL:** ☑ NA
☐ NORMAL ___ LAST B.M. ___
☐ ABNORMAL (PT. DESCRIPTION) ___
**URINATION:** ☑ NA
☐ NORMAL ☐ FREQUENCY ☐ DYSURIA ☐ HEMATURIA
☐ OTHER ___
**DISCHARGE:** ☑ NO ☐ YES
☐ VAGINAL ___
☐ URETHERAL ___
☐ OTHER ___

**NURSING DIAGNOSIS/ANALYSIS:**    **SAFETY MEASURES:**
☐ ANXIETY                ☐ SIDE RAILS UP
☐ BREATHING PATTERN INEFFECTIVE    ☐ ATTENDANT WITH PATIENT
☑ COMFORT/PAIN ALTERATION        ☐ NURSE IN ATTENDANCE
☐ FLUID VOLUME-ALTERATION IN    ☐ SAFETY STRAP
☐ GAS EXCHANGE IMPAIRED        ☐ PAPOOSE BOARD
☐ HYPERTHERMIA/HYPOTHERMIA    ☐ RESTRAINTS
☐ IMPAIRED MOBILITY            TYPE ___
☐ INFECTION POTENTIAL            ☐ AMBULATORY
☐ SKIN INTEGRITY - IMPAIRMENT    ☐ NON-AMBULATORY
☑ TISSUE PERFUSION ALTERATION
☐ VISUAL DEFICIT POTENTIAL
☐ KNOWLEDGE DEFICIT
☑ THOUGHT PROCESS ALTERATION
☐ NEURO, MUSCULAR, SKELETAL, DEFICIT
☐ CARDIAC OUTPUT ALTERATION



**STATE OF ALABAMA**
**BOARD OF PARDONS AND PAROLES**

**Coffee Co. Courthouse, 1st Floor**
**99 Edwards Street**
**Enterprise, Alabama 36330**

PROBATION AND PAROLE OFFICE
334-347-4364



Al Smith, Attorney at Law
P.O. Drawer 389
Elba, Alabama 36323


received
9/4/2001

**DEFENDANT:** Robert Thomas Conrad          **CASE#** Coffee/Enterprise CC 2001-179, 180

**JUDGE:** Gary McAliley

**HEARING DATE/TIME:** Youthful Offender Hearing   09/6/01 at 9:00 a.m.

**ATTACHMENTS:**

       **X**       **YOUTHFUL OFFENDER/PSI DATED**   **8/30/2001**

       _____       **DELINQUENCY REPORT(S) DATED**

       _____       **ORDER SETTING HEARING**

       _____       **PETITION TO REVOKE PROBATION**

       _____       **OTHER -**

**REMARKS:**

**WILLIAM D. TAYLOR, JR.**          8-30-01
                                    **DATE**

# ALABAMA BOARD OF PARDONS AND PAROLES
## REPORT OF INVESTIGATION

Type of Investigation  YOUTHFUL OFFENDER                    Date Dictated _____

Name  ROBERT THOMAS CONRAD                 True name  ROBERT THOMAS CONRAD, JR.

Alias _____

RSA  BM-20 _____ DOB  9/30/80 _____ Height and Weight  6' 155 LBS.

Complexion _____ Color of Hair  BLACK _____ Color of Eyes  BROWN

Bodily Marks  TATTOO-"TRE" ON STOMACH; MULTIPLE TATTOOS ON FOREARMS

Driver's License #  NONE _____ SSN  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

AIS# _____ FBI# _____ SID# _____

Address  GARDEN OAKS APARTMENTS #35 _____ Phone #  334-348-2150
         GLOVER AVENUE
         ENTERPRISE, ALABAMA  36330

County  COFFEE/ENTERPRISE _____ Case #  CC 2001-179, 180

Offense(s)  CAPITAL MURDER; ROBBERY I _____

Sentence(s) _____

Date of Sentence _____ Date Sentence Began _____

Date of Arrest  5/24/2001 _____ Date of Bond _____ Bond Amount $ _____

Judge  GARY MCALILEY _____ D.A.  MARK FULLER

Attorney  AL SMITH AND GARY BRADSHAW _____ Retained _____ Appointed  X

Court Ordered Restitution $ _____

Barred From Parole          Yes  X (IF CONVICTED OF    No _____
                                  CAPITAL OFFENSE)

Date Copies Sent to Central Records _____

NOTES:
5/31/2001  INDICTED.
7/31/2001  APPLICATION FOR YOUTHFUL OFFENDER STATUS.

PBF 203

## PRESENT OFFENSE(S)

County, Court, and Case Number

Coffee/Enterprise CC 2001-179

Offense:

Capital Murder

Sentence:


Date of Sentence:


Details of Offense:

Information indicates that on 5/23/01 at approximately 1:25 p.m., Enterprise police officers were dispatched to a report of a robbery and shooting at The Toy Store located at 643 County Road 711. While enroute, officers were told that the suspect was last seen running west on County Road 711 and was described as a black male wearing all black clothing. Upon arrival at The Toy Store, Officer Lennis Darby was met by Robert Grimes who stated that he had been robbed and that "she" (later identified as Jelanie Bowman Dennis) had been shot. Officer Darby entered the store and found Ms. Dennis lying behind the counter bleeding profusely from the chest. Ms. Dennis stated that she had also shot the suspect. Officer Darby then requested rapid response from rescue personnel. Officer Darby observed that the cash register drawer was slightly open, and there was no money in the drawer. The Enterprise Rescue Squad arrived and transported Ms. Dennis to the Medical Center Enterprise where she later died.

Officer Darby was told by Robert Grimes that during the robbery, two black males were present in the business when the suspect entered and forced him to the floor. After the suspect obtained Grimes' wallet containing $30.00 and money from the register, the suspect went to where the two black males were on the floor and demanded their money. Grimes then heard gun fire. Ms. Dennis then told Grimes that she shot the suspect. Grimes reported that he then went to his vehicle where he placed a 911 call. The two black males exited the business and asked what they could do. Grimes told them to go get help, and the two black males departed.

2

While Officer Michael Petty was in route to The Toy Store, he observed a light blue Ford LTD that he recognized as belonging to Brian Smith. The vehicle was traveling north on Geneva Highway at a high rate of speed, but Officer Petty did not recognize the driver of the vehicle.

At approximately 1:50 p.m., Robert Conrad was dropped off by two black males at Medical Center Enterprise for treatment of gunshot wounds. Off duty Enterprise Police Officer Matt Key was in the parking lot of the hospital and observed Brian Smith and another black male, that he later identified as Bryan Yeoman, in the parking lot in Smith's vehicle. Officer Key was unaware of the robbery and had a brief conversation with Smith and then departed.

At approximately 3:00 p.m., Brian Smith's vehicle was at his residence at Green Tree Apartments in Enterprise, Alabama. Investigator Jeff Spence spoke with Smith's mother who stated that Robert Conrad had spent the night of 5/22/01, and that when she returned home from work, he was not at home. She stated that Smith and Bryan Yeoman came in at approximately 2:15 p.m. and walked to Yeoman's residence. Investigator Spence and Lt. Mike Lolley attempted to contact Yeoman and Smith at Yeoman's apartment, but they were not there.

During the evening hours of 5/23/01, Investigator Spence and District Attorney Investigator Bruce Matthews interviewed Conrad at Medical Center Enterprise. Conrad stated that he was walking near the cemetery on Bell Street when a subject jumped from the bushes and robbed him of his pager and cell phone and that when he attempted to flee he was shot. He stated he could only recall being loaded into a vehicle and taken to Medical Center Enterprise but could not remember who took him.

Investigator Spence and Investigator Matthews then went to the Enterprise Police Department and interviewed Brian Smith. Smith first stated that Conrad had borrowed his car and that he was unaware of his activities. Smith stated that while he was at Yeoman's playing video games, Conrad came in stating that he had been shot and needed transportation to the hospital. Smith was confronted with the fact that his vehicle and a vehicle matching Bryan Yeoman's was observed by two witnesses approximately one quarter of a mile from The Toy Store just prior to the robbery, and that the witness in the store could identify the two black males who had been in the business. Smith then sighed and stated that he had been home that morning with Conrad. He stated that when he had returned home from making arrangements of restitution payments in a previous matter at the District Attorney's Office, Conrad stated let's do a "hit" and he needed "backup". Smith stated that they then got Yeoman and planned what would happen. He stated that he and Yeoman went into The Toy Store, and approximately five minutes later, Conrad entered, demanded everyone to the floor and came over to where Smith and Yeoman were located. Smith stated that Conrad struck him on the back of the head

and demanded money. He stated that as Conrad was leaving, he heard gunfire but did not raise up to watch. He stated that they went outside and asked a man what they could do, and the man replied to go get help. Smith stated that they then went to the house next to The Toy Store but could not get anyone to the door. He stated that they then returned home and found that Conrad had been shot. He said they took him to Medical Center Enterprise and returned home where they went to Yeoman's apartment and later went to Dothan with Yeoman's mother.

Captain Bill Moore of the Enterprise Police Department and Officer Key interviewed Bryan Yeoman who gave a statement that was consistent with Smith's first statement. Yeoman and Smith were then brought together, and Smith stated to Yeoman "go ahead and tell the truth, they know." Yeoman then stated to Captain Moore that he overheard Smith and Conrad talking about doing a robbery. Yeoman stated that he then went with Smith to The Toy Store, however, he was unaware they were going to commit a robbery. Yeoman stated that while inside The Toy Store, he observed Conrad rob and shoot Dennis. He said they then left The Toy Store and went to the residence next door to get assistance. When no one would answer the door, he stated that they returned home and discovered that Conrad had been shot. Yeoman stated they took Conrad to the hospital and returned home. Yeoman said they then accompanied his mother to Dothan.

On 5/24/2001, Conrad was arrested. On 5/31/2001, Conrad was indicted for Capital Murder. On 7/13/2001, application was made for Youthful Offender status.

Bars to Parole:

13A-5-39 prohibits a person convicted of a capital offense from being eligible for parole.

Subject's Statement:

Since this is a Youthful Offender Investigation, a statement was not obtained.

Case Status of Co-Defendants:

Brian James Smith was indicted for Capital Murder. The case is pending in Coffee/Enterprise CC 2001-177.

Bryan Glenn Yeoman was indicted for Capital Murder. The case is pending in Coffee/Enterprise CC 2001-181.

Location of Offense:

Enterprise, Alabama.

Court Ordered Restitution:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

County, Court, and Case Number

Coffee/Enterprise CC 2001-180

Offense:

Robbery I

Sentence:

Date of Sentence:

Details of Offense:

The details for this case are the same as found in case number CC 2001-179. This particular case involves the robbery of Robert Grimes.

Bars to Parole:

None.

Subject's Statement:

Since this is a Youthful Offender Investigation, a statement was not obtained.

Case Status of Co-Defendants:

Brian James Smith was indicted for Robbery I. The case is pending in Coffee/Enterprise CC 2001-178.

Bryan Glenn Yeoman was indicted for Robbery I. The case is pending in Coffee/Enterprise CC 2001-182.

Location of Offense:

Enterprise, Alabama.

Court Ordered Restitution:

## RECORD OF ARREST(S)

| | | | |
|---|---|---|---|
| 9/4/96 | Coffee Co.<br>JU 96-146.01 | CHINS/<br>Ungovernable | Consent decree. |
| 3/8/97 | Coffee Co.<br>JU 96-146.02 | Motion to Set Aside | 12 months<br>probation. |
| 9/8/97 | Coffee Co.<br>JU 96-146.03 | Petition to Revoke | Committed to DYS. |
| 6/29/98 | Enterprise<br>Municipal Court<br>TR 1998-1821 | Driving Without<br>First Obtaining a<br>License | $152.50 fine plus<br>court costs. |
| 8/17/98 | Enterprise<br>Municipal Court<br>TR 1998-2293 | Driving Without<br>First Obtaining a<br>License | Paid $152.00 fine<br>plus court costs. |
| 12/13/99 | Enterprise<br>Municipal Court<br>TR 1999-1930 | Driving Without<br>First Obtaining a<br>License | $182.50 fine and<br>costs. |
| 1/31/2000 | Enterprise<br>Municipal Court<br>TR 2000-25 | Seatbelt Violation | $10.00 fine. |
| 1/31/2000 | Enterprise<br>Municipal Court<br>TR 2000-26 | Driving Without<br>First Obtaining a<br>License | $182.50 fine and<br>costs. |
| 2/19/2000 | Enterprise<br>Municipal Court<br>MC 2000-238 | Assault III<br>(Domestic<br>Violence) | Guilty. 10 days jail,<br>suspended. |

| 7/19/2000 | Enterprise Municipal Court MC 2000-945 | Giving False Information to Law Enforcement Officer | Guilty. Credit for 20 days served. |
|---|---|---|---|
| 7/19/2000 | Enterprise Municipal Court MC 2000-946 | Contempt/ Failure to Pay Fines | Guilty. Credit for time served. |
| 4/19/2001 | Coffee/Enterprise DC 2001-395 | Possession of Marijuana I | Pending grand jury. |
| 4/19/2001 | Coffee/Enterprise DC 2001-396 | Giving False Name to Law Enforcement | Pending grand jury. |

## PERSONAL / SOCIAL HISTORY

Subject:

Robert Thomas Conrad, Jr. is a black male, 20 years old, with a date of birth of 9/30/80. Conrad stated that he was born in Germany while his father was stationed there in the U.S. Army. Conrad stated that he was raised primarily by his mother. He stated that he has three brothers and one sister. Conrad stated that his parents divorced when he was approximately nine or ten years old.

Conrad stated that he lived in Germany from his birth until he was approximately two years old. He stated that he moved to Enterprise, Alabama when he was approximately two years old and remained in Enterprise, Alabama until he was approximately eleven years old. He stated that he then moved to Connecticut for approximately three months. He stated that he returned to Enterprise, Alabama and lived there from age eleven and a half until he was approximately thirteen years old. He stated that he then moved to Lansing, Michigan where he lived for approximately one year. He stated that he returned to Enterprise, Alabama when he was fourteen years old and remained there until he was approximately sixteen years old. He stated that he then moved to Boston, Massachusetts for a couple of months before returning to Enterprise, Alabama for a brief period. He stated that he then moved to Birmingham, Alabama for approximately four or five months. He stated that he then returned to Enterprise, Alabama for a couple of months and then went back to Birmingham, Alabama for approximately five months before returning to Enterprise, Alabama.

Marital Status / History:

Conrad stated that he has never been married and that he has never fathered any children.

Health:

Conrad stated that he is presently taking medication for having been exposed to TB. He stated that he was otherwise in good health and that he did not suffer from any physical or mental disabilities. He stated that he saw a female psychiatrist in Enterprise, Alabama when he was fourteen or fifteen years old. He stated that he saw the psychiatrist one time for "playing with fire". He stated that he did not know the psychiatrist's name.

Concerning substance abuse, Conrad denied having a drug or alcohol problem. He stated that he has smoked marijuana with the first time being while he was living in Birmingham in 1997. He stated that he smoked marijuana off and on since 1997 with the last time being approximately two weeks before his arrest in the instant offense. He denied use of any other drugs.

Education:

Conrad stated that he last attended school at Enterprise Junior High School in Enterprise, Alabama in the ninth grade. He stated that he did not go back to school after the ninth grade.

Enterprise Junior High School records indicate that Conrad was suspended on at least four occasions. He was suspended on September 12, 1996 for failure to follow school rules; from January 28, 1997 through January 30, 1997 for fighting; from February 4, 1997 through February 6, 1997 for belligerent behavior; and from March 17, 1997 through March 19, 1997 for disobedience.

Conrad stated that he started a GED course at Enterprise State Junior College but didn't finish the course and has never taken the GED exam. He did not report any additional education.

Financial Status:

Conrad is presently in custody at the Coffee County Jail and is not receiving any monthly income. The only asset he reported owning was a 1989 Ford Ltd. He did not report any debts.

Employment History:

Conrad is currently in custody and is unemployed. The only employment history that he reported was that he worked for his step-father, Thomas Anthony Williams, at Triangle Auto Sales in Enterprise, Alabama for approximately five months in 2000. He stated that he worked there detailing cars and earned $150.00 per week. He stated that he left employment there because the business closed.

Military Record:

Conrad has never served in any branch of the U.S. Armed Forces.

Offender's Family:

Father: Robert Thomas Conrad, circa 41 years old, resides in Columbus, Ohio. The subject stated that he has not seen his father since 1994 or 1995.

Mother: Dorothy Ann Conrad, circa 39 years old, resides at Garden Oaks Apartments #35 in Enterprise, Alabama and is employed at Enterprise Nursing Home.

As mentioned previously, Conrad stated that his parents divorced when he was approximately nine or ten years old. Conrad also stated that his mother had previously been married to Thomas Anthony Williams but that they are now divorced.

Siblings:

Brother: James Rockshaun Conrad, 13 years old, resides with his mother at Garden Oaks Apartments #35 in Enterprise, Alabama and is a junior high school student.

Brother: Jermaine Shunell Conrad, 13 years old, resides with his mother at Garden Oaks Apartments #35 in Enterprise, Alabama and is a high school student.

Brother: Michael Alexander Conrad, 19 years old, resides with a girlfriend on Pine Street in Enterprise, Alabama and is employed at Southland Broilers in Coffee County, Alabama.

Sister: Connie Conrad, 21 years old, resides at 712 Damascus Road in Enterprise, Alabama and is employed at Grocery Outlet in Enterprise, Alabama.

## EVALUATION OF OFFENDER

Psychological Reports:

None known.

Reputation and Community Activities:

Conrad provided one character reference. I contacted that reference, Lois Brooks, who said that she was a friend of Conrad's family and had known Conrad since he was in elementary school. She stated that he was "real quiet", that he was a "good boy", and that he was "always respectable" to her.

Conrad reported that he attends the Pleasant Grove Baptist Church in Enterprise, Alabama. He did not report membership in any clubs or civic groups. He stated his hobbies were playing basketball and working on cars.

Probation and Parole Officer's Remarks:

None.

## PROBATION PLAN

Home:

If granted probation, Conrad stated that he would live with his mother at Garden Oaks Apartments #35 on Glover Avenue in Enterprise, Alabama.

Employment:

Would have to obtain.

Signed and dated at Enterprise, Alabama this the 30th day of August, 2001.


William D. Taylor, Jr.
Alabama Probation & Parole Officer

WDT:at

10

In the Circuit Court of
Coffee County, Alabama
Enterprise Division

State of Alabama,

vs.

Robert Conrad

CC-2001-179-180

Motion for Transcript

COMES NOW the Defendant, Robert Conrad, and moves for a transcript at State expense of the plea discussion / agreement of Brian Yeoman taken at 6:45 PM, 9/26/02, and said transcript be provided immediately. Further, that the Youthful Offender Report and criminal history of Brian Yeoman be provided.

Al Smith
Attorney for Robert Conrad

9/26/02
6:45 PM

SEP 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

ORDERED

9/26/2002 It is hereby ordered that pre-approval request is granted for expenses necessitated for the immediate preparation by the official court reporter of a transcript of the settlement negotiations conducted this day between Brian Yeomans, capital co-d. G.A. Lindsey, his attorney, Glenda Stovt and Larry Jahrell, Assistant

Judge

It is Further Ordered that the expenses are approved to the extent of not in excess of ($100.00) one hundred Dollars.

_____
Circuit Judge

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PLAINTIFF, | ) | COFFEE COUNTY, ALABAMA |
| | ) | |
| VS. | ) | ENTERPRISE DIVISION |
| | ) | |
| ROBERT THOMAS CONRAD, | ) | |
| | ) | |
| DEFENDANT. | ) | CASE NUMBER CC-2001-M-179 |
| | | CC-2001-M-180 |

## V E R D I C T

**We, the jury, find the Defendant, ROBERT THOMAS CONRAD** *"GUILTY" of the CAPITAL OFFENSE of INTENTIONAL MURDER* **by the Defendant of Jelaine Bowman Dennis during a robbery in the first degree committed by the Defendant in violation of Section 13A-5-40(a)(2),** *The Code of Alabama,* **1975, as amended.**

_____
**FOREPERSON**

*1293*

STATE OF ALABAMA,        )    IN THE CIRCUIT COURT OF
)
        PLAINTIFF,    )    COFFEE COUNTY, AL
)
VS.               )    ENTERPRISE DIVISION
)
ROBERT THOMAS CONRAD,    )
)
        DEFENDANT.    )    CASE NO. CC-2001-M-179.

## V E R D I C T

We, the jury, recommend that the Defendant, Robert Thomas Conrad, be punished by life imprisonment without parole. The vote is as follows:

_____4_____ Death        _____8_____ Life without parole

_____
FOREPERSON

1394

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PLAINTIFF, | ) | COFFEE COUNTY, AL |
| | ) | |
| VS. | ) | ENTERPRISE DIVISION |
| | ) | |
| ROBERT THOMAS CONRAD, | ) | |
| | ) | |
| DEFENDANT. | ) | CASE NO. CC-2001-M-179. |

## **V E R D I C T**

    We, the jury, recommend that the Defendant, **Robert Thomas Conrad**, be punished by death.  The vote is as follows:


_____**Death**        _____**Life without parole**



_____
**FOREPERSON**

*1298*

| | |
|---|---|
| STATE OF ALABAMA,    ) | IN THE CIRCUIT COURT OF |
|    ) | |
| PLAINTIFF,    ) | COFFEE COUNTY, ALABAMA |
|    ) | |
| VS.    ) | ENTERPRISE DIVISION |
|    ) | |
| ROBERT THOMAS CONRAD,) | |
|    ) | |
| DEFENDANT.    ) | CASE NUMBER CC-2001-M-179 |
| | CC-2001-M-180 |

## V E R D I C T

     **We, the jury, find the Defendant, ROBERT THOMAS CONRAD** *"NOT GUILTY" of the CAPITAL OFFENSE of INTENTIONAL MURDER* **by the Defendant of Jelaine Bowman Dennis during a robbery in the first degree committed by the Defendant in violation of Section 13A-5-40(a)(2),** ***The Code of Alabama,*** **1975, as amended and** *"NOT GUILTY"* **of any lesser but included offense embraced therein.**

 

_____

**FOREPERSON**

STATE OF ALABAMA,      )      IN THE CIRCUIT COURT OF
)
      PLAINTIFF,      )      COFFEE COUNTY, ALABAMA
)
VS.             )      ENTERPRISE DIVISION
)
ROBERT THOMAS CONRAD,)
)
      DEFENDANT.      )      CASE NUMBER CC-2001-M-179
                                    CC-2001-M-180

## V E R D I C T

    We, the jury, find the Defendant, **ROBERT THOMAS CONRAD** *"NOT GUILTY" of the CAPITAL OFFENSE of INTENTIONAL MURDER* **by the Defendant of Jelaine Bowman Dennis during a robbery in the first degree committed by the Defendant in violation of Section 13A-5-40(a)(2),** *The Code of Alabama,* **1975, as amended.**

    However, **We, the jury, find the Defendant, ROBERT THOMAS CONRAD** *"GUILTY"* **of the lesser but included offense embraced therein of** *MURDER* **of Jelaine Bowman Dennis in violation of Section 13A-6-2(a)(1),** *The Code of Alabama*, **1975, as amended.**


**FOREPERSON**

STATE OF ALABAMA,              )    IN THE CIRCUIT COURT OF
                              )
    PLAINTIFF,             )    COFFEE COUNTY, ALABAMA
                              )
VS.                           )    ENTERPRISE DIVISION
                              )
ROBERT THOMAS CONRAD,)
                              )
    DEFENDANT.             )    CASE NUMBER CC-2001-M-179
                                                CC-2001-M-180


# V E R D I C T


    **We, the jury, find the Defendant, ROBERT THOMAS CONRAD** *"NOT GUILTY" of the CAPITAL OFFENSE of INTENTIONAL MURDER* **by the Defendant of Jelaine Bowman Dennis during a robbery in the first degree committed by the Defendant in violation of Section 13A-5-40(a)(2),** *The Code of Alabama,* **1975, as amended.**

    **However, We, the jury, find the Defendant, ROBERT THOMAS CONRAD** *"GUILTY"* **of the lesser but included offense embraced therein of** *FELONY MURDER* **of Jelaine Bowman Dennis in violation of Section 13A-6-2(a)(1),** *The Code of Alabama*, **1975, as amended.**


_____
**FOREPERSON**

| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
|---|---|---|
| PLAINTIFF, | ) | COFFEE COUNTY, ALABAMA |
| VS. | ) | ENTERPRISE DIVISION |
| ROBERT THOMAS CONRAD, | ) | |
| DEFENDANT. | ) | CASE NUMBER CC-2001-M-179 |
| | | CC-2001-M-180 |

# V E R D I C T

 We, the jury, find the Defendant, **ROBERT THOMAS CONRAD** *"NOT GUILTY" of the CAPITAL OFFENSE of INTENTIONAL MURDER* by the Defendant of Jelaine Bowman Dennis during a robbery in the first degree committed by the Defendant in violation of Section 13A-5-40(a)(2), *The Code of Alabama,* 1975, as amended.

 However, We, the jury, find the Defendant, **ROBERT THOMAS CONRAD** *"GUILTY"* of the lesser but included offense embraced therein of *ROBBERY IN THE FIRST DEGREE* of Jelaine Bowman Dennis in violation of Section 13A-8-41(a)(1), *The Code of Alabama*, 1975, as amended.

_____
**FOREPERSON**

STATE OF ALABAMA,     )    IN THE CIRCUIT COURT OF
                            )
       PLAINTIFF,     )    COFFEE COUNTY, ALABAMA
                            )
VS.               )    ENTERPRISE DIVISION
                            )
ROBERT THOMAS CONRAD,)
                            )
      DEFENDANT.    )    CASE NUMBER CC-2001-M-179
                                             CC-2001-M-180

## V E R D I C T

     **We, the jury, find the Defendant, ROBERT THOMAS CONRAD** *"NOT GUILTY" of the CAPITAL OFFENSE of INTENTIONAL MURDER* **by the Defendant of Jelaine Bowman Dennis during a robbery in the first degree committed by the Defendant in violation of Section 13A-5-40(a)(2),** ***The Code of Alabama,*** **1975, as amended.**

                _____

                **FOREPERSON**

REV. 4/1/97

.1300

## NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
### BY THE TRIAL COURT CLERK

Robert Thomas Conrad _____    V.    [X] STATE OF ALABAMA
**APPELLANT'S NAME**                          [ ] CITY OF _____
(as it appears on the indictment)                    **APPELLEE**

[X] CIRCUIT    [ ] DISTRICT    [ ] JUVENILE COURT OF Enterprise Div.–Coffee COUNTY
CIRCUIT/DISTRICT/JUVENILE JUDGE:  Gary L. McAliley

DATE OF NOTICE OF APPEAL:  10-7-02
(NOTE: If the appellant is incarcerated and files notice of appeal, this date should be the date on the certificate of service, or if there was no certificate of service, use the postmark date on the envelope.)

**INDIGENCY STATUS:**
Granted Indigency Status at Trial Court:                 [X] Yes [ ] No
Appointed Trial Counsel Permitted to Withdraw on Appeal:  [ ] Yes [X] No
Indigent Status Revoked on Appeal:                        [ ] Yes [X] No

**DEATH PENALTY:**
Does this appeal involve a case where the death penalty has been imposed?   [ ] Yes [X] No

**TYPE OF APPEAL:** (Please check the appropriate block.)
[X] State Conviction         [ ] Pretrial Appeal by State     [ ] Juvenile Transfer Order
[ ] Rule 32 Petition          [ ] Contempt Adjudication        [ ] Juvenile Delinquency
[ ] Probation Revocation      [ ] Municipal Conviction         [ ] Habeas Corpus Petition
[ ] Mandamus Petition         [ ] Writ of Certiorari           [ ] Other(specify) _____

IF THIS APPEAL IS FROM AN ORDER DENYING A PETITION (I.E., RULE 32 PETITION, WRIT OF HABEAS CORPUS, ETC.) OR FROM ANY OTHER ORDER ISSUED BY THE TRIAL JUDGE, COMPLETE THE FOLLOWING:

TRIAL COURT CASE NO.: _____

DATE ORDER WAS ENTERED: _____    PETITION: [ ] Dismissed  [ ] Denied  [ ] Granted

IF THIS IS AN APPEAL FROM A CONVICTION, COMPLETE THE FOLLOWING:
DATE OF CONVICTION: 9-27-02          DATE OF SENTENCE: 9-27-02
YOUTHFUL OFFENDER STATUS:
Requested:  [ ] Yes [X] No     Granted:  [ ] Yes [ ] No
LIST EACH CONVICTION BELOW: *(attach additional page if necessary)*
1.  Trial Court Case No. CC-01-179    CONVICTION: Capital Murder
    Sentence: Life Without Parole
2.  Trial Court Case No. CC-01-180    CONVICTION: Robbery, 1st
    Sentence: ?
3.  Trial Court Case No. _____  CONVICTION: _____
    Sentence: _____

POST-JUDGMENT MOTIONS FILED: (complete as appropriate)    Date Filed    Date Denied    Continued by Agreement To *(Date)*
[X] Motion for New Trial .................................    10-7-02     pending
[ ] Motion for Judgment of Acquittal ....................
[ ] Motion to Withdraw Guilty Plea ......................
[ ] Motion in Arrest of Judgment ........................
[ ] Other _____

COURT REPORTER(S): ........  Sheila Hanson
ADDRESS: ..................  1600 Oak Lake Drive
                            Enterprise, AL 36330
APPELLATE COUNSEL: ........  Sydney Albert Smith        Gary Bradshaw
ADDRESS: ..................  P. O. Drawer 389           P. O. Box 311412
                            Elba, AL 36323             Enterprise, AL 36331
APPELLANT: (IF PRO SE) .....  AIS# _____
ADDRESS: ..................  _____

APPELLEE (IF CITY APPEAL): ..  _____
ADDRESS: ..................  _____

I certify that the information provided above is accurate
to the best of my knowledge and I have served a copy of this
Notice of Appeal on all parties to this action on
this  21  day of  November , 2002 .

*James M. Counts*
CIRCUIT COURT CLERK

P. O. Drawer 389
Elba, Al 36323
Phone:       334-897-3658
Fax:          334-897-8633

Gary D. Bradshaw      BRA074
Attorney at Law
P. O. Box 311412
Enterprise, AL 36331-1412

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing the date above by placing same in the United States Mail, postage paid, and addressed as follows:

Honorable Mark E. Fuller
District Attorney
P. O. Box 311102
Enterprise, AL 36331

_____     10/1/02
Al Smith                      Date

STATE OF ALABAMA,      )     IN THE CIRCUIT COURT OF

                         )

      PLAINTIFF,       )     COFFEE COUNTY, ALABAMA

                         )

VS.                  )     ENTERPRISE DIVISION

                         )

ROBERT THOMAS CONRAD,)

                         )

      DEFENDANT.     )     CASE NO CC-2001-M-179 & 180

## <u>ORDER</u>

    Sydney Albert Smith's "Motion to Withdraw" as counsel for Defendant, Robert Thomas Conrad, is granted.  Sydney Albert Smith owes no future legal duty to represent the Defendant as counsel herein.

    Any post sentencing order earlier issued to the contrary is hereby set aside.

    It is further Ordered  that attorney Richard Waldrop is appointed to assist Gary Bradshaw, attorney at law on appeal.

    Gary Bradshaw remains appointed to represent the Defendant in his appeal.

Done and Ordered this the 11th day of December, 2002.

                    Gary L. McAliley, Circuit Judge
                    Twelfth Judicial Circuit
                    State of Alabama

DEC 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP-14    Rev. 11/91 | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number<br>CR-02-0333 |
|---|---|---|

| TO: THE CLERK OF<br>    THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL:    10-07-02 |
|---|---|

**APPELLANT**
    Robert Thomas Conrad

**v.    STATE OF ALABAMA**

---

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of _____ pages) ( __14__ volumes of 200 pages each and one volume of __123__ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this _____13th_____ day of ____May_____, ____2003____.


_James M. Camito_____
Circuit Clerk

1          COFFEE COUNTY, ALABAMA

2          ENTERPRISE DIVISION

3

4

5    ROBERT THOMAS CONRAD,          )
           APPELLANT,               )
                                    )
6    VS.                            )    CC-2001-M-179
                                    )    CC-2001-M-180
7    STATE OF ALABAMA,              )
                                    )
8         APPELLEE.                 )

9

10

11        The above referenced testimony was heard

12   before Honorable Gary L. McAliley on the 23rd

13   day through the 27th day of September, 2002, at

14   the Coffee County Courthouse, Enterprise,

15   Alabama.

16                    *   *   *   *   *

17

18

19   APPEARANCES:

20   FOR THE APPELLANT:              FOR THE STATE:

21   MR. ALBERT SMITH                MRS. GLENDA STOUT
     Attorney at Law                 Assistant D.A.
22   Elba, Al.                       Enterprise, Al.

23   MR. GARY D. BRADSHAW            MR. LARRY JARRELL
     Attorney at Law                 Assistant D.A.
24   Enterprise, Al.                 Enterprise, Al.

25

COPY

1                    REPORTER'S INDEX

2     Voir Dire........................ Page    4
      Opening Statements by Mrs. Stout.. Page 505
3     Opening Statements by Mr. Bradshaw Page 510

4     WITNESSES:          DIR.    CROSS   REDRT  RECROSS

5     Lennis Darby         518     544     564
      Robert Grimes        567     580     596
6     Donald Smith, Jr.    599     608     613
      Eric Kormylo         615     621     626
7     Michael Petty        628     630
      Rick Hauser          637     677     726     734
8     Jeff Spence          737     752     753     753
      Chris Schwan         754     764
9     Dr. John Drew        768     774     778
      Mark Day             783
10    Dr. Samuel Sawyer    786     794     808
      Buford Roberts       813     818     819
11    Dr. Emily Ward       822     848     861     863
                                           867
12    Brooke Reen          882     893     894     895
      Glenda Allums        896     902
13    Jeff Spence                          904     907
      Bruce DeVane         920     920
14    Pyllis Rollan       1011    1044    1053    1055
      Rick Hauser         1062
15    Joe Saloom          1067    1100
      Bryan Yoeman        1139    1160
16    -- Al Smith --
        (In-camera)       1258
17    George Roberson     1264    1280    1301    1306
                                          1309    1310
18    Ronnie Vaughen      1312

19    Closing Statemets by Mr. Jarrell....Page   1358
      Closing Statements by Mr. Smith.....Page   1379
20    Closing Statemens by Mr. Bradshaw...Page   1391
      Closing Statements by Mrs. Stout....Page   1414
21    Judge's Charge to the Jury..........Page   1431
      Verdict of the Jury.................Page   1536

22

23

24

25

1  SENTENCING PHASE:

            Opening Statments by Mr. Jarrell:    1543
2           Opening Statements by Mr. Smith:     1545

3  Ray Grimes            1546
   Dorothy Conrad        1552
4
            Closing Statements by Mrs. Stout:    1556
5           Closing Statements by Mr. Smith:     1559
            Closing Statments by Mr. Jarrell:    1566
6           Judge's Charge to the Jury:          1570
            Verdict of the Jury:                 1601
7           Sentencing by the Court:             1607

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    September 23, 2002

2              THE COURT:  This court will come to

3              order.

4                      Ladies and gentlemen of

5              the jury, this is the next case

6              that will be tried.  As you see

7              it's voluminous.  I'm not going

8              to go through everything with

9              you.  But I will tell you who

10             the people that are going to be

11             involved in the trial of this

12             case are, so you will have

13             knowledge of who is going to be

14             involved in the trial of this

15             case, and who is on trial in

16             this particular case, so you

17             will know a little bit about the

18             allegations of this case.  And,

19             likewise, these attorneys are

20             going to have a right to know a

21             little bit about you before they

22             select a jury.

23                      Now, Judge Barr has

24             already selected a jury in one

25             matter.  You saw how that was

1          conducted.  This matter is going

2          to be a little different in the

3          way that we will select a jury

4          in comparison with the other

5          case.

6                    You will notice that

7          we have court reporters who are

8          seated here taking down every

9          official word that's being

10         stated in this courtroom,

11         official word, that's being

12         stated.  We have two court

13         reporters here today for that

14         purpose.

15                   The indictment, I have

16         it in my hand at this time,

17         reads as follows.  And it's a

18         two-offense indictment.  Is that

19         your understanding?  Mr.

20         Bradshaw?  Mr. Smith?

21    MR. SMITH:  Yes, sir, Your Honor.

22    MR. BRADSHAW:  Yes, Your Honor.

23    THE COURT:  I wanted to hear you say that

24         for the record.

25                   The indictment reads

1      as follows, Offense One reads:

2      The Grand Jury of said county

3      charges that before the finding

4      of this indictment that Robert

5      Thomas Conrad, whose name is to

6      the Grand Jury otherwise

7      unknown, did intentionally cause

8      the death of another person, to

9      wit, Jelaine Bowman Dennis, by

10     shooting her with a pistol, and

11     the said Robert Thomas Conrad

12     caused the death during the time

13     that he was in the course of

14     committing a theft of property,

15     to wit, United States currency

16     and/or United States coinage

17     and/or checks, the property of,

18     to wit, Jelaine Bowman Dennis,

19     by use of force or by

20     threatening the imminent use of

21     force against the person of the

22     said Jelaine Bowman Dennis or

23     another person present, with the

24     intent to overcome her physical

25     resistance or physical power of

1    resistance or to compel

2    acquiescence to the taking of or

3    the escaping with the property,

4    while the said Robert Thomas

5    Conrad was armed with a deadly

6    weapon or a dangerous

7    instrument, to wit, a pistol, in

8    violation of Section 13A-5-40 of

9    the Code of Alabama, against the

10   peace and dignity of the State

11   of Alabama.

12            This offense charges

13   Mr. Robert Thomas Conrad with

14   the capital offense of murder of

15   robbery in the first degree,

16   where the victim is

17   intentionally killed.  That's a

18   capital offense in Alabama.

19            To this charge Mr.

20   Conrad has entered a plea of not

21   guilty so this matter is at

22   issue.  And it's ready to be

23   tried.

24            Forgive my voice, as

25   you hear, I have got laryngitis

1 or something today, so I will

2 just have to do the best I can.

3 But, you, unfortunately, will

4 have to put up with me in this

5 condition.

6   Offense Two of this

7 indictment, and this indictment

8 comes from the May Term, 2001

9 Coffee County, Enterprise

10 Division Grand Jury.  Count Two

11 of the indictment reads as

12 follows:  The Grand Jury of said

13 county charges that before the

14 finding of this indictment that

15 Robert Thomas Conrad, whose name

16 is to the Grand Jury otherwise

17 unknown, did in the course of

18 committing a theft of property,

19 to wit, $30.00 in United States

20 currency, the denominations of

21 which are one twenty-dollar bill

22 and one ten-dollar bill, the

23 property of, to wit, Robert Ray

24 Grimes, did use force or

25 threatened the imminent use of

1    force against the person of the

2    said Robert Ray Grimes, or

3    another person present, with

4    intent to overcome his physical

5    resistance or physical power of

6    resistance or to compel

7    acquiescence to the taking of or

8    escaping with the property,

9    while the said Robert Thomas

10    Conrad was armed with a deadly

11    weapon or dangerous instrument,

12    to wit, a pistol, in violation

13    of Section 13A-8-41, of the Code

14    of Alabama, against the peace

15    and dignity of the State of

16    Alabama.

17           This second offense

18    charges Mr. Conrad with robbery

19    in the first degree. And to

20    this charge, Mr. Conrad has

21    entered a plea of not guilty.

22           So these two cases are

23    ready for trial by a jury. Just

24    so you will know this, we will

25    have 14 people who will serve on

```
 1              this trial jury.  Two of the

 2              individuals will be alternates.

 3              We certainly hope no one gets

 4              sick or has a problem during the

 5              course of this trial.

 6                   The trial is expected

 7              to take approximately four

 8              days.  And I need to let you

 9              know that in advance.  So if you

10              are selected to serve on the

11              trial jury of this case, you

12              will be involved for the

13              remainder of this week.

14                   I have some questions

15              that I'm going to ask of you in

16              just a few minutes.  And then I

17              will allow the attorneys to ask

18              you some questions.  But before

19              I do that, I want you to at

20              least meet who is going to be

21              involved in the trial of this

22              case.

23                   Mr. Robert Thomas

24              Conrad, will you please stand up

25              and let everybody see who you
```

```
 1              are?

 2                   Mr. Conrad is

 3              represent by Mr. Al Smith, who

 4              is on my right and your left.

 5              And Mr. Gary Bradshaw, who is

 6              now standing, also.

 7                   Y'all can have a seat,

 8              if you will.

 9                   On the other hand, the

10              Prosecutors in this case will be

11              Mr. Larry Jarrell.  Mr. Jarrell,

12              will you stand up?  Mrs. Glenda

13              Stout, who is likewise now

14              standing.  And, of course, our

15              District Attorney is Mr. Mark

16              Fuller, who is standing.  I

17              doubt Mr. Fuller is going to be

18              involved much in the trial of

19              this matter.

20         MR. FULLER:  I have to be out of

21              town tomorrow.

22         THE COURT:  He has to be out of

23              town.  These two lawyers will be

24              the prosecutors in this case.

25              The Alabama law allows a
```

```
 1                    victim's representative to sit

 2                    at the counsel table during the

 3                    entire course of this trial.

 4                    The victim's representative is

 5                    April Gunnels.

 6                           Mrs. Gunnels, did I

 7                    get that correct?

 8       MS. GUNNELS:  (Nodding head in the

 9                    affirmative).

10       THE COURT:  Mrs. Gunnels is pregnant

11                    and she may be in and out at

12                    times, so we all understand

13                    that.

14                           Mrs. Gunnels, you can

15                    have a seat, if you will.

16                    Okay.  I have some questions

17                    that I'm going to ask of you.

18                    And, likewise, these attorneys

19                    are going to, at some point in

20                    time, ask you some questions.

21                    I'm going to get some general

22                    things out of the way, first.

23                           All of you were sent a

24                    questionnaire.  Some of you have

25                    not turned in the answers to
```

```
 1              those questions.  And as a

 2              result of that, you will be on

 3              the last panel.  That's the last

 4              group of people that I will talk

 5              to about this matter, that we

 6              will interview in reference to

 7              the allegations and the issues

 8              before this Court.

 9                      Is Charlene Goolsby in

10              courtroom?

11    POTENTIAL JUROR:   I never received a

12              questionnaire.

13    THE COURT:  That's all right.  And,

14              Charlene, it's not a form of

15              punishment.  It's just that all

16              of these lawyers have the right

17              to have the answers and

18              responses and to collate those

19              answers and responses before we

20              conduct -- it's called voir dire

21              of venire.  You are venire

22              members.  And they will have the

23              right to get these things.

24                      Harold K. Insley, Jr.

25              Okay.  Tommy L. Jones.  And Mack
```

14

1                       Lott.  Mr. Lott is here.

2              Cathy Marcum.

3                    Mr. Counts, do you

4            have enough copies to give to

5            these five?

6        MR. COUNTS:  Yes, sir.

7      THE COURT:  If y'all will, please fill

8           them out.  Keep your seats.

9           Fill them out.  They are easy to

10         fill out.  We are not going to

11         count off if you misspell a word

12         or anything like that.  We just

13         need those responses before we

14         can get to you.  We will have to

15         run a copy off for the

16         attorneys involved.  And they

17         will have to match them up with

18         the other information they

19         tabulate before we can get with

20         you.

21                Now, I'm going to

22         ask you a few questions at this

23         point in time.  Before the

24         attorneys will be allowed to ask

25         you any questions, we will break

1    you down into panels.  And I

2    will give you a specific time

3    for each panel to be here in

4    this courtroom.  And when it's

5    your turn, if you will come,

6    just have a seat in the jury

7    box?  And we will take about 12

8    folks at the time.  If we need

9    then, of course, the last panel

10   will be a little larger than

11   twelve.  That's just so we won't

12   have to take up another

13   hour-and-a-half with a panel of

14   less than 12.

15           Were any of you on the

16   Grand Jury of Coffee County, who

17   return the indictment in this

18   case, that being during the May

19   term 2001 Grand Jury.  And I

20   cannot read the name of the

21   foreperson of the Grand Jury.

22   They write like I do.

23           I've had that

24   interpreted.  I wish y'all could

25   see it.  Charles M. Cannon, III,

1    served as foreperson of this

2    Grand Jury.  You see I have to

3    ask that question because the

4    Alabama law would not allow you

5    to serve both on a petit jury

6    and on the Grand Jury that

7    returned the indictment.

8    Because some things are

9    admissible to the Grand Jury

10   that are not admissible in the

11   trial of this case.  Anyone?  No

12   one.

13          Have any of you at any

14   time been indicted, and

15   especially within the last 12

16   months of a felony or offense of

17   the same character of the one

18   that Mr. Conrad is now before

19   this court charged?  No one.

20          Are any of you

21   friendly with, associated with,

22   or related by blood or by

23   marriage to Mr. Robert Thomas

24   Conrad, who you have met

25   earlier?  I'm speaking only to

```
 1              those of you who are jurors.

 2                      Are you on the jury

 3          venire?

 4      POTENTIAL JUROR:  Yes.

 5      THE COURT:  Okay.  And you are related

 6          to Mr. Conrad?

 7      POTENTIAL JUROR:  I know him.

 8      THE COURT:  You know him.  Your name

 9          for the record is what, please,

10          ma'am?

11      POTENTIAL JUROR:  Sue Fluellen.

12      THE COURT:  Okay.  Ms. Fluellen.  We

13          live in a small community.  And

14          we know each other.  And it's

15          certainly okay to know someone

16          and still serve on a jury in

17          this state.  But, Ms. Fluellen,

18          I have to ask you, the fact that

19          you know Mr. Conrad, do you feel

20          that would affect your ability

21          to sit in judgment and to decide

22          this case based solely on the

23          law and the evidence?

24                      In other words, could

25          you brush aside the fact that
```

```
 1              you know Mr. Conrad and agree to
 2              decide this case solely upon the
 3              law and the evidence.
 4        POTENTIAL JUROR:  I don't feel like I
 5              could because he stayed at my
 6              house one time.  And I consider
 7              him as one of my children.
 8        THE COURT:  Thank you for being honest
 9              with me.  That's all we want.
10              We want honesty as far as these
11              questions that I ask of you.
12                     If I were seated out
13              there where you are, I would
14              feel maybe embarrassed to answer
15              some of these questions.  But
16              it's very, very important that
17              we know the answers to these
18              questions.  Again, we are going
19              to break you down into panels in
20              a few minutes.  And we will give
21              each panel, each ground a time
22              to be here.  And you can let me
23              know anything that you feel you
24              privately need to let me know at
25              that time, if you choose to do
```

1          that.

2          So, if anything, any question

3          that I ask of you, if any

4          question, or if any response to

5          the question, would tend to

6          embarrass you, you can certainly

7          save that response until we have

8          just a few folks in the

9          courtroom.

10      POTENTIAL JUROR:  That would be

11          better for me.

12      THE COURT:  That will be fine, Mrs.

13          Fluellen.

14          Anyone else?  No one else.

15          Are any of you friendly with,

16          associated with, or related by

17          blood or by marriage to the

18          attorneys for Mr. Conrad?  They

19          are, again, Mr. Al Smith or Mr.

20          Gary Bradshaw?

21          A lot of times I ask

22          that question, and nobody raises

23          their hand.  And I will say, let

24          the record show these lawyers

25          have no friends.  But we won't

```
 1                    do that today.  I will ask the

 2                    question, again.  Are any of you

 3                    friendly with, associated with,

 4                    or related by blood or by

 5                    marriage to Mr. Al Smith or Mr.

 6                    Gary Bradshaw?

 7                            We have Warren Rowe.  He

 8                    has his hand up.

 9          POTENTIAL JUROR:  I am associated with

10                    both, not friendly with them.

11          THE COURT:  Okay.  Mr. Rowe, the fact

12                    that you are associated with

13                    these two lawyers, would that

14                    affect your ability to sit in

15                    judgment and to decide this case

16                    based solely upon the law and

17                    the evidence?

18          POTENTIAL JUROR:  No.

19          THE COURT:  Anyone else?

20          POTENTIAL JUROR:  I know Gary Bradshaw

21                    through working with the R.A.'s

22                    at church and seeing him and

23                    talking to him.

24          THE COURT:  Your name for this record?

25          POTENTIAL JUROR:  Phillip Stuckey.
```

```
1         THE COURT:  Mr. Stuckey, the same
2              question.  The fact that you
3              know him, as far as in church
4              relationships, R.A's and all of
5              that, would that affect your
6              ability to sit in judgment and
7              to decide this case based solely
8              on the law and the evidence?
9    POTENTIAL JUROR: No, sir.
10   THE COURT:  Anyone else?  Yes?
11   POTENTIAL JUROR: How close blood
12              related are you talking about?
13   THE COURT:  Within the fifth degree,
14              but you just tell us, how are
15              you related to --
16   POTENTIAL JUROR:  Third degree.
17   THE COURT:  Third degree?  Sort of like
18              a third degree burn?  Would that
19              be to Mr. Bradshaw?
20   POTENTIAL JUROR:  Yes.
21   THE COURT:  All right.  Your name for
22              this record?
23   POTENTIAL JUROR:  Jessica Hanson.
24   THE COURT:  Ms. Hanson.  Are you
25              related to my court reporter?
```

1          POTENTIAL JUROR:  Yes.

2          THE COURT:  How are you related to

3               her?

4          POTENTIAL JUROR:  Marriage.

5          THE COURT:  The fact that you are

6               related to that degree to Mr.

7               Bradshaw, and the fact that you

8               may be related, by marriage, to

9               my court reporter, Mrs. Sheila

10              Hanson, would those facts affect

11              your ability to sit in judgment

12              and to decide this case based

13              solely on the law and the

14              evidence?

15         POTENTIAL JUROR:  No, sir.

16         THE COURT:  Give me just a minute.

17              Anyone else?

18         POTENTIAL JUROR:  One more thing.

19         THE COURT:  Yes, sir.

20         POTENTIAL JUROR:  I want to clarify one

21              more thing.  Me and Mark Fuller

22              graduated together.

23         THE COURT:  So you know Mr. Mark

24              Fuller, the Prosecutor in this

25              case?  And the fact that you

```
 1              graduated with Mr. Fuller, would

 2              that affect your ability to sit

 3              in judgment and to decide this

 4              case based solely upon the law

 5              and the evidence?

 6         POTENTIAL JUROR:  No, sir.

 7         THE COURT:  Would not.  Anyone else?

 8                         Are any of you

 9              friendly with, associated with,

10              or related by blood or by

11              marriage to the alleged victim

12              in the robbery case?  And that

13              individual's name the Robert Ray

14              Grimes.  Robert Ray Grimes?  I

15              believe most folks call him Ray

16              Grimes.  No one.

17                        Were any of you

18              friendly with, associated with,

19              or related by blood or by

20              marriage to the deceased in this

21              case the first case?  Jelaine

22              Bowman Dennis?

23                        We have several

24              hands up.  Yes, ma'am?

25         POTENTIAL JUROR:  I work at the bank,
```

1           and she was a customer of mine.

2                And, plus, I was friendly with

3                her brother.  I knew her brother

4                in school.

5     THE COURT:  That's Lynn Bowman?  Is

6                that correct?

7     POTENTIAL JUROR:  Yes.

8     THE COURT:  And your name for this

9                record?

10    POTENTIAL JUROR: Elizabeth Tramell.

11    THE COURT:  Okay.  I know you.  And I

12                know a lot of you.  But I have

13                to get your name in the record

14                every time I come back to you

15                and get another response.  So

16                please forgive me for that.  We

17                have to do that.

18                     Ms. Tramell, the

19                fact that she was a bank

20                customer, the fact that you know

21                Lynn Bowman, the deceased

22                brother, would those facts

23                affect your ability to sit in

24                judgment and to decide this case

25                based solely upon the law and

```
 1                    the evidence?
 2        POTENTIAL JUROR:  No.
 3        THE COURT:  Mr. Warren Rowe?
 4        POTENTIAL JUROR:  She was a client of
 5               mine, Your Honor, in the past.
 6        THE COURT:  You feel that would affect
 7               your ability to sit in judgment?
 8        POTENTIAL JUROR:  Most likely.
 9        THE COURT:  It would.  I will make
10               note of that.
11                         And I was
12               earlier aware of that because
13               of state matters and whatnot.
14               Anyone else?  Yes, ma'am?
15        POTENTIAL JUROR:  Ruth Barnard.
16               Jelaine and I were friends in
17               elementary school.  But I did
18               not know her later on.
19        THE COURT:  The fact that you were
20               friends in elementary school,
21               and maybe you went separate
22               ways, probably -- did you have
23               much interaction with her after
24               elementary school?
25        POTENTIAL JUROR:  No.
```

```
 1          THE COURT:  Did not.  And your name,

 2              again?

 3      POTENTIAL JUROR:  Ruth Ann Barnard.

 4      THE COURT:  Ms. Barnard, those facts,

 5              would they affect your ability

 6              to sit in judgment and to decide

 7              this case based solely upon the

 8              law and the evidence?  In other

 9              words, could you push that

10              aside?

11      POTENTIAL JUROR:  I could push that

12              aside.  I would not have a

13              problem.

14      THE COURT:  I didn't say his name, but

15              Warren Rowe earlier responded.

16              And I called him Mr. Rowe, and I

17              need to maintain a record.  Yes,

18              ma'am?

19      POTENTIAL JUROR: Katherine Rasponi.

20              One of the attorneys in my law

21              firm also did work for Mrs.

22              Dennis at one time.  But I was

23              not personally involved.

24      THE COURT:  Would that fact affect your

25              ability to sit in judgment and
```

1        decide this case based solely on

2        the law and the evidence?

3    POTENTIAL JUROR: No, sir.

4    THE COURT:  So she was not your direct

5        customer or client or anything

6        like that?  Is that correct?

7    POTENTIAL JUROR:  Yes, sir.

8    THE COURT:  Anyone else?  I believe

9        somebody else started -- Okay?

10   POTENTIAL JUROR:  April and I share a

11       niece and nephew.  And I'm close

12       to her dad.

13   THE COURT:  Would you state that one

14       more time?  I'm sorry.

15   POTENTIAL JUROR:  April and I share a

16       niece and nephew in common.

17   THE COURT:  Okay.  I'm aware.  Mrs.

18       Reynolds?

19   POTENTIAL JUROR:  Jones.

20   THE COURT:  Jones.  Forgive me.  My

21       gracious.  Judges are always

22       messing up.  I went to Hardees

23       one morning, and I had a woman

24       on one of my juries that went to

25       Hardees.  And I saw who I

1    thought was her son.  And I came

2    back, and I said:  I saw your

3    son at Hardees.

4                    And she said:  I don't

5    have a son.  That's my husband.

6

7                    So, I'm always messing

8    up like that.  So forgive me,

9    Mrs. Jones.  And your first

10   name?

11   POTENTIAL JUROR:  Joyce.

12   THE COURT:  And are you saying to me

13   that that fact would affect your

14   ability to sit in judgment?  I

15   know the two girls.

16   POTENTIAL JUROR:  A girl and boy.

17   THE COURT:  A girl and a boy.  Forgive

18   me, again.  "Jones"?  Is that

19   correct.

20   POTENTIAL JUROR:  Yes.

21   THE COURT:  Well, I hope everything

22   doesn't go this way with

23   everybody I talk to.  Again, Ms.

24   Jones --

25   POTENTIAL JUROR:  It would.

```
 1        THE COURT:  I felt like it might.  So

 2            for heaven sakes, if any of you

 3            feel that something would affect

 4            your ability to sit in judgment,

 5            please let me know.  Yes, ma'am?

 6        POTENTIAL JUROR:  I'm a co-worker of --

 7        THE COURT:  I'm sorry.  Would you

 8            please stand up? It's hard to

 9            hear up here.

10        POTENTIAL JUROR:  I'm a co-worker of

11            Mrs. Dennis's stepdaughter

12        THE COURT:  And if you are a

13            co-worker, and you have to work

14            continually will someone, do you

15            think it would put you in an

16            awkward position or not, to have

17            to sit in judgment in a case

18            that involves a relative of a

19            co-worker?  Or could you push

20            that aside and agree to decide

21            this case based solely upon the

22            law and the evidence?

23        POTENTIAL JUROR:  I could push that

24            aside.

25        THE COURT:  And your name, again?
```

1       POTENTIAL JUROR:  Helen Yager.

2       THE COURT:  Is that Y-e-a-g-e-r?

3       POTENTIAL JUROR:  Y-a-g-e-r.

4       THE COURT:  Y-a-g-e-r.  Anyone else?

5               I would imagine that I

6           will get a lot of responses with

7           this next question that I'm

8           going to ask of you, so until we

9           get your response, I ask that

10          you just please remain standing.

11              Have any of you read

12          in the newspapers?  I see we

13          have a newspaper lady here.

14          Have any of you read anything in

15          the newspapers?  Have you heard

16          anything on the radio?  Have you

17          seen anything on the television

18          about the allegations of either

19          of these two cases?  If so,

20          please stand up.

21              You see, the Alabama

22          law provides that it's not

23          grounds to disqualify a person

24          as long as they can agree to

25          listen to the evidence, consider

```
 1              the evidence, listen to the law

 2              as explained to you by the

 3              Judge, and agree to push

 4              whatever it was that you read or

 5              heard aside, and to decide this

 6              matter based solely upon the

 7              evidence and the law.

 8                   Mr. Rowe, I'm not

 9              going to start with you.  We are

10              going to start on left-hand

11              side.  Now, of course, I know

12              you.  I work with you.  But

13              could you state your name for

14              this record?

15      POTENTIAL JUROR: Nancy Spradley.

16      THE COURT:  Ms. Spradley, please, for

17              heaven sakes, and this applies

18              to the rest of you.  Don't tell

19              us what you know or what you

20              have heard.  And, again, you

21              work with the District

22              Attorney's Office.  And you may

23              have gathered information as a

24              result of working there.  Would

25              that be accurate?
```

```
 1          POTENTIAL JUROR: I suppose.

 2       THE COURT:  Somewhat.  And have you

 3              heard anything, or heard

 4              anything through the news media

 5              about the merits of this matter?

 6       POTENTIAL JUROR: Anything I've read,

 7              it's only been through the

 8              media.

 9       THE COURT:  The fact that you may have

10              read something, would that

11              affect your ability to sit in

12              judgment, and to decide this

13              case based solely upon the law

14              and the evidence?

15       POTENTIAL JUROR: No, sir.

16       THE COURT:  Would not.  While I have you

17              standing, the fact that you work

18              in the District Attorney's

19              Office?  Is that correct?

20       POTENTIAL JUROR: Yes, sir.

21       THE COURT:  And you worked primarily in

22              child support?  Is that right?

23       POTENTIAL JUROR: Only in child support.

24       THE COURT:  And you don't have anything

25              to do with the criminal
```

1              prosecutions, other than child

2              support prosecutions?  If

3              somebody is charged in that

4              regard?  Is that correct?

5        POTENTIAL JUROR: Correct.

6        THE COURT:  But are you saying to me

7              that you have gained nothing

8              from the working in the District

9              Attorney's Office about the

10             merits of this case or the facts

11             of this case?

12       POTENTIAL JUROR: I have not.

13       THE COURT:  Thank you, Ms. Spradley.

14             Yes, ma'am.

15        POTENTIAL JUROR:  My name is Carolyn

16             Bryan.  Just what I read in the

17             newspaper.

18       THE COURT:  Okay.  Mrs. Bryan, the fact

19             that you may have read something

20             in the newspaper, would that

21             affect you -- could you agree to

22             push whatever it was aside and

23             agree to listen to the evidence,

24             consider the evidence, listen to

25             the law as explained to you by

1           the Court, and agree to decide

2           this case based solely upon the

3           law and the evidence,

4           disregarding whatever it was

5           that you have may have read in

6           newspaper?

7   POTENTIAL JUROR: Yes.  I should have

8           stood up earlier.  I guess I was

9           asleep.  But Mrs. Conrad is

10          neighbor.  I just found that out

11          earlier.

12  THE COURT:  I see.  Now that is the

13          mother of Robert Thomas Conrad?

14  POTENTIAL JUROR: I found out when I

15          went home for lunch.  She lives

16          directly behind me.

17  THE COURT:  Do you socialize with

18          her?

19  POTENTIAL JUROR: When I see her, I

20          speak with her.

21  THE COURT:  So you know her when you

22          see her?

23  POTENTIAL JUROR: Yes.

24  THE COURT:  Do you feel that it

25          would put you in a rough -- I

1          know I had to move from my

2          neighbor one time, because I

3          sent my next door neighbor to

4          the penitentiary.  So I know

5          sometimes it's rough living

6          somewhere, you know, when you

7          might be called upon to sit in

8          judgment as far as that person

9          is concerned.  Would that put

10          you in a bad position if you

11          were selected to serve on the

12          trial jury of this case, seeing

13          her.

14     POTENTIAL JUROR: Somewhat, because

15          her sister and I both work with

16          the school system.  And we

17          really communicate every day,

18          yes.

19     THE COURT:  All right.  And your

20          full name?

21     POTENTIAL JUROR: Carolyn Wilkerson

22          Bryan.

23     THE COURT:  Thank you, ma'am.  Yes,

24          ma'am?

25     POTENTIAL JUROR: I have just read,

```
 1                    what I have read in the

 2                    newspaper.

 3          THE COURT:  Your name for the record?

 4          POTENTIAL JUROR: Magnolia Brown.

 5          THE COURT:  Okay.  Ms. Brown,

 6                    whatever it was that you read in

 7                    the paper, and I don't want to

 8                    know what that is, for heaven

 9                    sakes, but could you agree to

10                    push that aside and decide this

11                    case based solely upon the law

12                    and the evidence, disregarding

13                    whatever you may have read in

14                    the newspaper?

15          POTENTIAL JUROR: Yes.

16          THE COURT:  You can agree to do

17                    that?

18          POTENTIAL JUROR: Yes.

19          THE COURT:  Thank you, Ms. Brown.

20                         Yes, ma'am, Ms.

21                    Trammel?

22          POTENTIAL JUROR: Just what I've read

23                    in the newspaper.

24          THE COURT:  Same question.  Would you

25                    agree to push that aside and
```

1          decide this matter solely on the

2          law and the evidence?

3          POTENTIAL JUROR: Yes.  Betty Hicks.

4              What I've read in the newspaper.

5          THE COURT:  Same question.  Could

6              you agree to push that aside,

7              not consider it in any decision

8              that's rendered in the trial of

9              this case, if you are selected

10             to serve on this trial jury?

11         POTENTIAL JUROR: I believe I could.

12         THE COURT:  Right behind her?

13         POTENTIAL JUROR: Celeste Kelley.  I

14             have read newspapers.

15         THE COURT:  I know you are making

16             this newspaper lady feel good.

17             That means somebody is reading

18             what she is writing.  Ms.

19             Kelley, the same question?

20         POTENTIAL JUROR: I could be

21             objective.

22         THE COURT:  You could be objective,

23             and you could agree to push

24             whatever it was that you read

25             and decide this matter solely

1              upon the law and the evidence?

2          POTENTIAL JUROR: Yes, sir.

3          POTENTIAL JUROR: Peggy Contreras.

4              Only what I've heard in the

5              newspapers.  And I have no

6              problem pushing that aside and

7              basing it on the evidence.

8          THE COURT:  Peggy, are you connected

9              to law enforcement at this time?

10         POTENTIAL JUROR: Yes.

11         THE COURT:  And which department?

12         POTENTIAL JUROR: Department of Public

13             Safety Crime Analysis and

14             Information.

15         THE COURT:  Do you feel that fact

16             would affect your ability to sit

17             in judgment and decide this case

18             based solely upon the law and

19             the evidence?

20         POTENTIAL JUROR: No.

21         THE COURT:  You could decide it

22             objectively, disregarding that?

23         POTENTIAL JUROR: Yes.

24         THE COURT:  Yes, ma'am?

25         POTENTIAL JUROR: Annette Blevins.  And

```
1              I remember hearing the initial

2              news cast.

3       THE COURT:  Was that radio or

4              television?

5       POTENTIAL JUROR: Television.

6       THE COURT:  And the same question.

7              Could you agree to push that

8              aside and base your decision, if

9              you are selected to serve on the

10             trial jury of this case, based

11             solely on the law and the

12             evidence?

13      POTENTIAL JUROR: Yes, sir.

14      THE COURT:  Okay.

15      POTENTIAL JUROR: Mary Jones

16             Sneckenberger.  I have heard it

17             on the TV and newspapers.  And I

18             could be objective.

19      POTENTIAL JUROR:  Ina Pearson.  I could

20             be objective.

21      THE COURT:  Thank you.

22      POTENTIAL JUROR: (Inaudible)  What I

23             saw on the news.  But I know the

24             mother and close to her aunts.

25      THE COURT:  Okay.  Again, it's not
```

```
 1                    grounds to disqualify someone
 2                    just because they know someone.
 3                    We know a lot of people in this
 4                    community, and we should.  But
 5                    the fact that you know them,
 6                    would that cause you some
 7                    concern over being objective?
 8          POTENTIAL JUROR:  No.
 9          THE COURT:  It would not.  You could
10                    agree to push that knowledge
11                    aside and agree to decide this
12                    case based solely upon the law
13                    and the evidence.  Ms. Helms?
14          POTENTIAL JUROR:  I heard it on the new
15                    originally, when it first came
16                    out.  That's all.
17          THE COURT:  Same question?
18          POTENTIAL JUROR:  I could be objective,
19                    yes, sir.
20          POTENTIAL JUROR:  James E. Cobb.  I saw
21                    it on the television.  And I
22                    also read it in the newspaper.
23          THE COURT:  Okay.  The fact that you
24                    may have seen it on television
25                    and read something in the
```

1          newspaper, could you agree, if

2          you are selected on this trial

3          jury, to push that aside,

4          whatever it was that you read or

5          heard and decide this case

6          solely on the law and the

7          evidence?

8     POTENTIAL JUROR: Yes, sir.

9     POTENTIAL JUROR: Betty Herring. From

10         the newspapers and the news. I

11         could be objective.

12    THE COURT: Thank you.

13    POTENTIAL JUROR: Barbara Dyess.

14         Television and newspaper. And I

15         believe I could be objective.

16    THE COURT: Okay.

17    POTENTIAL JUROR: Ann Thompson. I read

18         it the newspaper. But I feel

19         like I could be objective.

20    POTENTIAL JUROR: Ben Henderson. I saw

21         it on television. And I read

22         all the newspapers. And I feel

23         that I could be objective.

24    THE COURT: Y'all sure read a lot of

25         newspapers around here. Thank

1          you.  Yes, ma'am?

2              POTENTIAL JUROR:  Etta Larue.  And I

3                  heard from the media, but I feel

4                  I could be objective.

5          THE COURT:  Okay.  But you could be

6                  objective?  You could be that

7                  aside as agreed and to decide

8                  this case solely on the law and

9                  the evidence if you are selected

10                 to served?

11         POTENTIAL JUROR: Yes, sir.  I also

12                 heard --

13         THE COURT:  Don't tell me what you've

14                 heard now.  I promise you we

15                 will give you a chance when you

16                 are on a panel to bring to my

17                 attention anything in private.

18         POTENTIAL JUROR: Bertha Page.

19                 Television.  I also know the

20                 family.

21         THE COURT:  How do you know the family,

22                 please, ma'am?

23          POTENTIAL JUROR: I mean, I'm not close

24                 to them.

25          THE COURT:  So you are not close

```
 1                    friends, but you know the

 2                    family?  Is that correct?

 3           POTENTIAL JUROR: (Nodding head in the

 4                    affirmative).

 5           THE COURT:  Do you feel that you can

 6                    agree if you are selected to

 7                    serve on this trial jury to push

 8                    that knowledge of the family

 9                    aside and to decide this matter

10                    solely upon the law and the

11                    evidence?

12           POTENTIAL JUROR: Yes.

13           THE COURT:  You can do that?  Thank

14                    you.  What was your name,

15                    please, ma'am?  I'm sorry.

16           POTENTIAL JUROR: Bertha Page.

17           THE COURT:  Is that P-a-i-g-e?

18           POTENTIAL JUROR: P-a-g-e.

19           THE COURT:  P-a-g-e.  Yes, sir.

20           POTENTIAL JUROR: Earl Jackson.  I heard

21                    it on television and read the

22                    newspaper.

23           THE COURT:  Okay.  Is it  Mr. Jasper?

24           POTENTIAL JUROR: Jackson.

25           THE COURT:  Jackson.  As you get older,
```

```
 1              you get more hard of hearing.

 2              Could you agree to push whatever

 3              it was that you heard or read

 4              aside and to decide this matter

 5              solely upon the law and the

 6              evidence?

 7       POTENTIAL JUROR: Yes, sir.

 8       THE COURT:  Thank you.  Mr. Henderson?

 9

10       POTENTIAL JUROR: Ben Henderson.  I saw

11              it on the media.  I could by

12              objectionable.

13       THE COURT:  Thank you.

14       POTENTIAL JUROR: Mack Lott.  Newspaper

15              accounts.  I could be objective.

16        THE COURT:  You could agree to push

17              that aside and decide it on the

18              law.  Yes, sir.

19        POTENTIAL JUROR: Walter Brooks.  News

20              media.  I think I can be

21              objective.

22       THE COURT:  Okay.  Fine.  Mr. Warren

23              Rowe.

24        POTENTIAL JUROR: I have heard it every

25              direction.  Newspaper, radio, TV
```

```
 1              and other sources.  I could

 2              probably listen to the evidence

 3              with the exception of my

 4              relationship with my client.

 5      THE COURT:  Sure.  Thank you, Mr. Rowe.

 6

 7      POTENTIAL JUROR:  Phillip Stuckey.  I

 8              heard it on the TV, first,

 9              where I work and the newspaper.

10              But I believe I could be

11              objectionable.

12      THE COURT:  Thank you, sir.

13      POTENTIAL JUROR: Ruth Ann Barnard.  I

14              heard it originally on TV and

15              read it in the newspaper.  And I

16              could be objective.

17      POTENTIAL JUROR: Jimmy Tomberlin.  I

18              read it in the newspaper, like a

19              lot of other people.  Also, I

20              work with Townsend Building

21              Supply.  Ms. Dennis has a

22              brother, Mike Bowman, who is

23              employed there with us.

24              Possibly that's where I first

25              heard it.  I'm not sure.
```

1          THE COURT:  Did he tell you things

2                     about the matter that maybe

3                     other folks would not know since

4                     he was related --

5     POTENTIAL JUROR: Pardon?

6     THE COURT:  Did he share with you

7                     things about the allegations,

8                     maybe, that the average person

9                     walking down the street would

10                    not have been informed of?

11    POTENTIAL JUROR: No.  I didn't talk

12                    with Mike much about it.  Of

13                    course, it was a general

14                    conversation in the store, being

15                    that employee's sister.

16    THE COURT:  So you didn't talk to him

17                    specifically?

18    POTENTIAL JUROR: I did not specifically

19                    talk to him directly.

20    THE COURT:  The fact that you work with

21                    him, would that affect your

22                    ability to sit in judgment?

23    POTENTIAL JUROR: I don't think so, even

24                    though it makes it a little more

25                    personal being within the

```
 1              company that you work with a

 2              relative.

 3     THE COURT:  We might ask you a few

 4              more questions when we have

 5              panels.  Thank you, sir.

 6     POTENTIAL JUROR: Angela Hughes.

 7              Initially, TV.  I could be

 8              objective.

 9     THE COURT:  Angela, could you agree to

10              push whatever it was that you

11              heard, saw on TV and agree to

12              decide this solely on the law

13              and the evidence?

14     POTENTIAL JUROR: Yes.

15     POTENTIAL JUROR: Katherine Rasponi.

16              TV and radio and newspaper.

17              And I could be objectionable.

18     THE COURT:  Okay.

19     POTENTIAL JUROR: Mark Reynolds.  On TV

20              and newspaper.  I could be

21              objectionable.

22     POTENTIAL JUROR: Joyce Roberts.

23              Newspaper and the TV.  And I

24              could be objectionable.

25     POTENTIAL JUROR: Charlene Goolsby.
```

```
 1              THE COURT:  Charlene is one of my next
 2                   door neighbors.  She may make me
 3                   move after today.
 4         POTENTIAL JUROR: I want to know why I
 5                   did not get one of these forms.
 6         THE COURT:  That's okay.  Don't you
 7                   worry about it.  They probably
 8                   thought, well, she lives too
 9                   close to Judge McAliley.
10         POTENTIAL JUROR:  Newspaper,
11                   television, and I could be
12                   objectionable.
13         THE COURT:  I probably got your
14                   questionnaire.  They deliver a
15                   lot of mail to my box that's
16                   suppose to go to you.  And I
17                   imagine you get mine.  Thank
18                   you.
19         POTENTIAL JUROR:  Fluellen.  I heard it
20                   on the radio, TV and newspaper
21                   and from my son, because Robert
22                   is at my son's work.
23         THE COURT:  Thank you.  Could you
24                   agree to push whatever you read
25                   aside, other than what you said
```

```
 1                    earlier, and decide this solely
 2                    on the law and the evidence, Ms.
 3                    Fluellen?
 4          POTENTIAL JUROR: Well, I don't know.
 5                    And you said that I could talk
 6                    to you?
 7          THE COURT:  We will talk more.  I have
 8                    down your earlier responses.
 9          POTENTIAL JUROR: Helen Yager.  And I
10                    heard it on TV and newspapers.
11          THE COURT:  And you could be
12                    objective?
13          POTENTIAL JUROR:  Yes.
14          POTENTIAL JUROR:  Harold Insley.  I saw
15                    it on TV and newspaper.  I could
16                    be objective.
17          THE COURT:  Thank you.
18          POTENTIAL JUROR:  Lucille Edwards.
19                    Media, newspaper.  I knew the
20                    family.  But I believe I can't
21                    be objectionable.
22          THE COURT:  You say you knew the
23                    family?  Is that right?
24          POTENTIAL JUROR:  Yes.
25          THE COURT:  Is that Conrad family?
```

1        POTENTIAL JUROR: Yes.  Conrad family.

2        THE COURT:  The fact that you know them

3              you say that if you are selected

4              on this trial jury that you can

5              push that knowledge aside and

6              agree to decide this case based

7              solely upon the law and the

8              evidence?  Is that correct?

9        POTENTIAL JUROR: Yes.

10       THE COURT:  Thank you, ma'am.  Yes,

11             sir.

12       POTENTIAL JUROR:  Andrew McDurmont.

13             Newspaper and television and the

14             radio.

15       THE COURT:  And the same question.  You

16             can be objective?

17       POTENTIAL JUROR: Yes.

18       THE COURT:  Thank you, sir.

19                   Are any of you a

20             witness in the trial of this

21             case?  And I'm speaking only to

22             those of you who have been

23             selected to serve on the trial

24             jury of this case.  No one is.

25                   Are any of you

```
 1                    related to

 2                    Ms. April Gunnels, who you met

 3                    earlier?

 4                              (No response).

 5                              And my last

 6                    question of you before we divide

 7                    you up into panels, and I have

 8                    an emergency matter, they just

 9                    came to the door and told me,

10                    and I have been expected there,

11                    that I have to take care of so.

12                    In just a minute our Clerk of

13                    Court is going to divide you up

14                    into panels.  And I'm going to

15                    give him some times for each

16                    panel to come and have a seat

17                    in the jury box.

18                              But my last

19                    question of you is have any of

20                    you made any promises, have you

21                    given any assurances that if you

22                    are selected to serve on the

23                    trial jury of this case, that

24                    you would have a propensity to

25                    convict or to acquit the
```

1       Defendant of the charge or

2       charges for which he is before

3       this Court today?  No one.

4                   Mr. Counts, if

5       you will come up, we will do

6       that.  And I will run handle my

7       matter.

8                   Just for your

9       knowledge, the first panel, we

10      will start at 3:30.  I may be

11      just a few minutes late getting

12      back.  The next panel will come

13      in 5:00 o'clock today.  The next

14      panel will be at 6:30 today.

15      And so we will go until about

16      8:00 o'clock tonight.  All of

17      you are not going to be here,

18      just the 12 of you at the time.

19                  Tomorrow we will have

20      panels at 9:00 o'clock.  We

21      will have one about 10:30

22      tomorrow morning.  We will have

23      one at 1:00 o'clock, and one at

24      2:30.

25                  After we have all of

1    the panels completed, it will

2    take the lawyers somewhere

3    around two hours to select a

4    jury, I would guess.  So we will

5    have a jury about 4:30 tomorrow.

6    Just so the lawyers and the

7    parties and the jurors will

8    know, if you are selected to

9    serve on the trial jury, if you

10   will please come prepared to

11   stay until 8:00 o'clock or 9:00

12   o'clock tomorrow night.

13            As we bring you

14   in on panels, we will need your

15   telephone number so we can get

16   up with you to tell you whether

17   or not you have been selected to

18   serve.  For heaven sakes have

19   somebody available about 4:30.

20   I had one capital murder matter

21   where we called and somebody had

22   gone to Tennessee.  And that

23   certainly presented us with a

24   problem.  That caused a delay in

25   the matter.  And they didn't

1    feel comfortable at all.  And

2    the other jurors didn't either,

3    having to wait.

4              So, for heaven

5    sakes, we don't want you to have

6    to sit down here and twiddle

7    your thumbs while you wait for

8    two days to see whether or not

9    you are on a jury.  You can go

10   and do whatever you need to do,

11   until your panel is going to be

12   interviewed.  But with that, I

13   need a promise from you that,

14   number one, that you will be

15   here when it's time for you to

16   be here, so we don't have to sit

17   and wait a long time, so we

18   don't back up and waste

19   everybody else's time so we are

20   going to need your telephone

21   numbers.  Would you call out

22   the panels?  And if you will

23   please stand when your name is

24   called out so we can make sure

25   that you are here.

1              (Clerk of Court called the names

2          of the panels and there was a

3          brief recess).

4      THE COURT:  This court will come

5          back to order.

6                  Ladies and gentlemen,

7          all of you are still under oath.

8          And I'm going to ask you some

9          questions.  And then, I will

10         certainly allow the attorneys

11         to do likewise.  And let me move

12         this so I can see these lawyers

13         sitting over here.

14                 First of all, if you

15         will, we are going to start on

16         the bottom row, on my left-hand

17         side.  If you will, please state

18         your name for the record.  And I

19         hate to ask you woman to do

20         this, but if you will give me

21         your rough age, you can say 40

22         or 30 or 35.  You don't have to

23         give me your exact age.  You can

24         round it, if you will.  I just

25         need to know for the record.  We

1          have older folks, younger

2          people, so when we start

3          striking a jury that information

4          can be available to the lawyers.

5                    So if you will

6          give me that.  And if you will

7          go slowly so I can jot this

8          stuff down.  Give me your name,

9          give me your rough age, give me

10         where in the Enterprise Division

11         of Coffee County you live.  And

12         tell me, if you will, what you

13         do for a living, what your

14         occupation, profession, or means

15         of a livelihood may be.  You

16         don't have to remember all of

17         that.  I will ask as with we go

18         through it.  But that is the

19         bottom line.  We start on the

20         left?

21    POTENTIAL JUROR:    Ruth Ann Barnard.

22    THE COURT:  How do you spell that last

23         name?

24    POTENTIAL JUROR: Barnard,

25         B-a-r-n-a-r-d.

1    THE COURT:  Your and age?

2    POTENTIAL JUROR: Thirty nine, true age.

3    THE COURT:  That's right on the money.

4         I would have said 35 or

5    -        something like that.

6    POTENTIAL JUROR: I just don't want my

7         next birthday to get here.

8    THE COURT:  Right.

9    POTENTIAL JUROR:  Okay.  Where in the

10        Enterprise Division of Coffee

11        County do you live?  Do you live

12        in town?  Do live in the

13        country.

14   POTENTIAL JUROR:  Rural.  In the

15        southeast corner of Coffee

16        County, off of Bellwood Road,

17        just inside the Geneva County

18        line -- not Geneva County,

19        Coffee County.

20   THE COURT:  In Coffee County?

21   POTENTIAL JUROR:  Yes.

22   THE COURT:  We have a lady in the

23        courtroom, I ask that question

24        -- she left.  Okay.  I ask that

25        question.  You see, we have to

1      have somebody from the

2      Enterprise Division of Coffee

3      County. Everybody that sits on

4      a jury has to be from the

5      Enterprise Division. And I have

6      to ask that question.

7                  I have had two cases

8      where we went all the way

9      through a trial and found out

10     that the person lived right

11     across the line. So that

12     presents us with a terrible

13     problem. And she was here

14     earlier today. She came with

15     this court reporter.

16                  So, as far as your

17     occupation, profession or means

18     of a livelihood?

19     POTENTIAL JUROR: I'm an aircraft

20          scheduler with Dyncorp.

21     THE COURT: Okay. We will go to juror

22          number two?

23     POTENTIAL JUROR: I'm Annette Blevins.

24          I'm 35.

25     THE COURT: Okay. Where in the

1         Enterprise Division of Coffee

2         County do you live?

3    POTENTIAL JUROR:  It's rural.  It's off

4         Highway 134, like you would be

5         going to Opp.

6    THE COURT:  What is your profession,

7         occupation, means of a

8         livelihood?

9    POTENTIAL JUROR:  I'm Customer service

10        representative for Unicel.

11   THE COURT:  Where?

12   POTENTIAL JUROR:  Okay.  Unicel.

13   THE COURT:  Unicel.  I just finished a

14        Cellular One class action

15        lawsuit.  So I've heard about

16        all I ever want to hear about

17        cellular telephones.

18   POTENTIAL JUROR:  Dolores Blien.

19   THE COURT:  How do you spell that last

20        name?

21   POTENTIAL JUROR:  B-l-i-e-n.

22   THE COURT:  And your first name, again?

23   POTENTIAL JUROR:  Delores.

24   THE COURT:  Mrs. Blien, what do you do

25        as a means of livelihood?

1    POTENTIAL JUROR:  I'm retired.

2   THE COURT:  Okay.  Retired from what,

3      please, ma'am?

4   POTENTIAL JUROR:  Well, a homemaker.

5   THE COURT:  Homemaker.  Okay.  I didn't

6      know you could retire from that.

7   POTENTIAL JUROR:  Well, you know.

8      Mother and secretary.

9   THE COURT:  Okay.  You are retired from

10      being a secretary?

11   POTENTIAL JUROR: (Nodding head in the

12      affirmative).

13   THE COURT:  Where did you work when you

14      were a secretary?  Was it in the

15      State or --

16   POTENTIAL JUROR:  Yes.  Enterprise and

17      Fort Rucker.

18   THE COURT:  Did you work -- if you

19      will, give me who you worked

20      with?

21   POTENTIAL JUROR:  I worked with USIAA on

22      Rucker Boulevard for eight

23      years.  And I worked at the

24      Safety Center for four years.

25      And I also had a few jobs after

61

```
1                        that.

2           THE COURT:  Okay.  Good.  This

3                   gentlemen worked at the Safety

4                   Center.  And he is helping me

5                   today.

6          POTENTIAL JUROR:  He was so-called my

7                   boss.

8           THE COURT:  He was your boss?

9          POTENTIAL JUROR:  Kind of.

10          THE COURT:  He is a good guy.  And your

11                  rough age, please, ma'am?

12         POTENTIAL JUROR: Seventy's

13          THE COURT:  You are mighty young

14                  seventy.  Okay.  Next juror?

15         POTENTIAL JUROR:  Edan Blair.

16          THE COURT:  Ms. Blair.  And your

17                  occupation, profession or means

18                  of a livelihood?

19         POTENTIAL JUROR:  I'm a homemaker and

20                  work part time.

21          THE COURT:  Have you retired from being

22                  a homemaker?

23         POTENTIAL JUROR:  No.  No.

24          THE COURT:  I didn't think so.  Where in

25                  Coffee County do you live?
```

```
 1            POTENTIAL JUROR:  New Brockton.  And I

 2                    live on Church Street.  Its

 3                    right behind the armory.

 4        THE COURT:  I just need to hear in my

 5                    mind and make sure that you live

 6                    in this division.  And your

 7                    rough age?

 8        POTENTIAL JUROR:  My age?  Sixty-two, and

 9                    proud of it.

10        THE COURT:  I'm proud of my age.  I hope

11                    I get a little further along.

12                    Okay.  Yes, sir?

13        POTENTIAL JUROR:  James Bedsole.  I'm

14                    72.  New Brockton.  I'm

15                    semi-retired.

16                    THE COURT:  From what, Mr.

17                    Bedsole?

18        POTENTIAL JUROR:  I'm a consultant with a

19                    subcontractor at Farley Nuclear

20                    Plant.

21        THE COURT:  Okay.  Yes, ma'am?

22        POTENTIAL JUROR:  Clarece Bass.

23        THE COURT:  Ms. Bass, your first name,

24                    again?

25        POTENTIAL JUROR:  Clarece.
```

1          THE COURT:  Is that C-1 --

2          POTENTIAL JUROR:  C-l-a-r-e-c-e.

3          THE COURT:  And your profession,

4                      occupation, means of a

5                      livelihood?

6          POTENTIAL JUROR:  I'm retired.

7          THE COURT:  From?

8          POTENTIAL JUROR:  Southland.

9          THE COURT:  And your age, please, ma'am,

10                      Mrs. Bass?

11         POTENTIAL JUROR:  Fifty-eight.

12         THE COURT:  Okay.  Yes, ma'am?

13         POTENTIAL JUROR:  Vivian Diane Bass.

14         THE COURT:  Are y'all related?

15         POTENTIAL JUROR:  No.

16         THE COURT:  And your age, Ms. Bass?

17         POTENTIAL JUROR:  Forty-six.

18         THE COURT:  And occupation, profession

19                      or means of livelihood?

20         POTENTIAL JUROR:  I work for for

21                      Daleville School Systems in the

22                      cafeteria.

23         THE COURT:  Okay.  We will start on the

24                      top left.

25         POTENTIAL JUROR:  My name is Walter

```
 1              Brooks.  Fifty-four, roughly.

 2              Retired military.  Currently

 3              employed with Air Safety

 4              Services as a flight instructor.

 5              And I live downtown Enterprise.

 6         THE COURT:  Okay.  Yes, sir?

 7         POTENTIAL JUROR:  Joseph Baril, Jr.

 8         THE COURT:  How do you spell that last

 9              name?

10    POTENTIAL JUROR:  B-a-r-i-l.  I'm a

11              flight mechanic at Dyncorp and

12              I'm 30.

13    THE COURT:  And where in Coffee County

14              do you live?

15    POTENTIAL JUROR:  Northern right before

16              you get to Gateway Estates.

17    THE COURT:  In Coffee County?

18    POTENTIAL JUROR:  Yes, sir.

19    THE COURT:  Not Dale County?

20    POTENTIAL JUROR:  No, sir.

21    THE COURT:  Yes, ma'am?

22    POTENTIAL JUROR:  Carolyn Bryant.  I work

23              with the Enterprise City System

24              as a cafeteria manager, 51.

25    THE COURT:  How do you spell your last
```

1               name?

2       POTENTIAL JUROR:  B-r-y-a-n-t.

3       THE COURT:  And where do you live, Mrs.

4               Bryant?

5       POTENTIAL JUROR:  Off of Rucker Boulevard

6               on 106 Daleville Road.

7       THE COURT:  Okay.  Yes, ma'am.

8       POTENTIAL JUROR:  Jessica Bradshaw

9               Hanson.

10      THE COURT:  And your rough age, please?

11      POTENTIAL JUROR:  I'm 25.

12      THE COURT:  Boy.  You are young. Good

13              gracious alive.

14      POTENTIAL JUROR:  I live off Highway 27

15              on Macon Street.

16      THE COURT:  What is your occupation,

17              profession, means of a

18              livelihood?

19      POTENTIAL JUROR:  Enterprise City

20              Schools.  Math teacher.

21      THE COURT:  Which school?

22      POTENTIAL JUROR: The high school.

23      THE COURT:  Are you missing your kids

24              today?

25      POTENTIAL JUROR:  (Nodding head in the

1              affirmative).

2        THE COURT:  Yes, sir?

3        POTENTIAL JUROR:  Joseph L. Brouillard.

4        THE COURT:  How do you spell that last

5              name?

6        POTENTIAL JUROR:  B-r-o-u-i-l-l-a-r-d

7        THE COURT:  If I mispronounce your name,

8              please forgive me.

9        POTENTIAL JUROR:  I can't say it myself

10             sometimes.

11       THE COURT:  People have a hard time

12             pronouncing McAliley.  And I

13             have been called a lot of things

14             since I've been a judge.  And

15             your occupation, profession,

16             means of --

17       POTENTIAL JUROR:  Retired.

18       THE COURT:  Where do you live in the

19             Enterprise Division of Coffee

20             County?

21       POTENTIAL JUROR:  Highway 84, about a

22             tenth of a mile from the New

23             Brockton line.

24       THE COURT:  All right.  Good enough.

25                   Do any of you have an

1    interest in the conviction of or

2    the acquittal of the Defendant,

3    Mr. Conrad.

4          If anyone has a

5    response to this, please let me

6    know.

7          Do any of you have you

8    a fixed opinion of Mr. Conrad's

9    guilt or innocence prior to

10    trial?  If so, raise your hands.

11          Let the record reflect

12    that no one responded.

13          Have any of you

14    discussed the merits of this

15    case with the Prosecution or any

16    law enforcement officer?  With

17    anyone, other than just a

18    normal citizen talking about

19    what you hear happened in your

20    community?  No one.

21          Now, these lawyers and

22    these law enforcement officers

23    and the Defendant, the

24    Defendants family, they are not

25    going to be talking to you.  If

1          you see them during a break, and

2          you feel they are rude because

3          they are not speaking to you,

4          let me let you know they are --

5          everyone is under an order not

6          to discuss anything with any

7          juror.  So, certainly, that

8          doesn't mean that they are rude

9          or have a bad personality or

10         anything like that.  I wanted

11         you to know that right off the

12         bat.

13              Did any of you know the

14         deceased?

15              Ms. Ruth Ann Barnard,

16         you have your hand up.  And have

17         you told us about that?

18   POTENTIAL JUROR:  I did.  She and I were

19         friends in elementary school.

20   THE COURT:  Okay.  And you have not had

21         any contact with her after the

22         elementary education experience?

23         Is that correct?

24   POTENTIAL JUROR:  Right.  Right.

25   THE COURT:  Do any of you know the

1    alleged victim of the robbery,

2    that person being Robert Ray

3    Grimes?  Most folks refer to him

4    as Ray Grimes, I've heard him

5    called.  No one.

6         Do any of you have

7    anything that you feel that you

8    should tell me that would aide

9    me in deciding whether or not to

10   have you serve on the trial jury

11   of this case?

12        Now, if any of you at

13   any time want to tell me

14   something in private, or have a

15   response that you don't want the

16   rest of the world to hear, you

17   can at any time get my attention

18   and come down and state whatever

19   you have you want to state into

20   the court record.

21        But do any of you know

22   of any reason that I should be

23   aware of that would have a

24   bearing on your ability to serve

25   on the trial jury of this case?

```
 1                        No one.

 2                                Does the State have any

 3                        questions of this panel?

 4              MRS. STOUT:  Yes, Your Honor.

 5              THE COURT:  Mrs. Glenda Stout is an

 6                        Assistant Prosecutor.  And the

 7                        State has a right to ask you

 8                        some questions at this time.

 9                  MRS. STOUT:   May it please the

10                        Court, counsel, ladies and

11                        gentlemen, I'm Glenda Stout.

12                        I'm one of the Assistant D. A.'s

13                        that will be trying this case,

14                        along with Mr. Larry Jarrell.

15                                And I would like to

16                        reintroduce April Gunnels, who

17                        is the daughter of Jelaine

18                        Dennis.

19                                I work with Mr. Mark

20                        Fuller, as Mr. Larry Jarrell

21                        does.  And as I go through and

22                        ask you some questions, I may

23                        ask some of you individually

24                        some questions.  Please don't

25                        feel like I'm picking on you.
```

1              I used to be a school

2       teacher and some students used

3       to think I was picking on them

4       when I would point them out

5       individually.  But please don't

6       feel that way.

7    THE COURT:   Sometimes Mrs. Stout thinks

8       I'm picking on her.

9    MRS. STOUT:  Sometimes he does.  I'm just

10      kidding, Judge.  Voir dire, and

11      what we are doing now is a very,

12      very important process.  And I

13      know that you feel like you have

14      been hanging around the

15      courtroom today and answering

16      questions.  But it's so

17      important because when we

18      select, when we go through the

19      process of choosing 12 jurors,

20      and I believe we will chose two

21      alternates in this particular

22      case.

23              But there will be 14 of

24      you to listen to this case, it's

25      so important that we know

1    certain feelings that you have.

2    Everyone of us walk into a

3    courtroom with certain biases,

4    certain prejudices.  And it's

5    important that we know about

6    those, so that we can select

7    those people that will be able

8    to put aside those biases and

9    put aside those prejudices and

10   listen to the evidence and apply

11   the law.

12             And so as we ask these

13   questions, that is what we are

14   probing for, not to get into

15   your personal lives or anything

16   of that nature, but to select

17   those jurors that can do that.

18   And that is what voir dire is

19   all about.

20             As the Judge said, if

21   we ask too private questions,

22   that you don't want to answer in

23   front of all of us, feel free at

24   the end of your panel's

25   questioning to approach the

```
 1          Court and respond to those

 2          questions.

 3                  We want, both the State

 4          and the Defense, 12 jurors that

 5          will return a just verdict; a

 6          just verdict, for the State of

 7          Alabama, the people of Alabama,

 8          you, the people of Alabama, and

 9          a just verdict for the

10          Defendant.

11                  Now I know that all of

12          you are probably a little

13          nervous about this.  Is that

14          correct?  Are you a little

15          nervous about this?  I have been

16          doing this a long time, and

17          every time I stand before a

18          group, I'm a little nervous,

19          too, okay?  So that is all right

20          to be a little nervous.

21                  I'm nervous because we

22          have a huge burden on our

23          shoulders, as being the State of

24          Alabama.  That burden is a

25          burden beyond a reasonable
```

1       doubt.  This is a capital murder

2       case, a capital murder case.

3       Our burden is still beyond a

4       reasonable doubt.  The burden is

5       not higher because it's a

6       capital case.

7                Now, is there anyone

8       among you that feel that because

9       this is a capital case that the

10      State should be held to a higher

11      burden than reasonable doubt?

12               The law says that the

13      burden is the same; if it's a

14      capital case, or if it's a

15      shoplifting case at Wal-Mart,

16      the burden does not change.

17      It's still reasonable doubt.

18               Now, is there anyone

19      among you that feels that

20      because this is a capital murder

21      case that the State of Alabama

22      should be held to a higher

23      burden?  If you do, raise your

24      hand and let us know.  Negative

25      response.

1              I know earlier some of

2          you mentioned that you knew the

3          Defendant's mother and aunts, I

4          believe, and some other people.

5          The Defendant also has a sister.

6          I believe her name is Constance.

7          Is there anyone that knows her?

8    THE COURT:  What is her last name?

9    MRS. STOUT:  Constance Conrad?

10                        He also has

11          a brother named Michael Conrad.

12          Is there anyone that knows his

13          brother and sister?

14   POTENTIAL JUROR:  I know them.

15   MRS. STOUT:  I believe that's Carolyn

16          Bryant?  Is that correct?

17   POTENTIAL JUROR:  That's correct.

18   MRS. STOUT:  Anyone else?  Do you know

19          them?

20   POTENTIAL JUROR:  I know his mother and

21          his aunt.

22   MRS. STOUT:  His mother and aunt?

23   POTENTIAL JUROR:  (Nodding head in the

24          affirmative).

25   MRS. STOUT:  You don't know brothers or

1           sisters?

2       POTENTIAL JUROR:  No.

3       MRS. STOUT:  Thank you.

4               I believe that the

5           Judge has already asked you

6           about the attorneys.  Is there

7           anyone that knows  Mr.

8           Bradshaw's family members?  Or

9           associates with any of his

10          family members?  Or Mr. Al

11          Smith?

12              Now, Mr. Smith used to

13          be a Prosecutor with the State

14          of Alabama.  Is there anyone

15          that remembers him from that

16          point in time?  No?  Negative

17          response.

18              In this case we expect

19          quite a few people from the

20          Enterprise Police Department to

21          testify.  Now, we have spoken to

22          jurors before where they have

23          had some problems with the

24          Enterprise Police Department.

25          Have any of you ever had a bad

1    experience with someone with

2    Enterprise Police Department?

3    If you have, raise your hand.  A

4    bad experience with a person in

5    the Enterprise Police

6    Department?  With any law

7    enforcement agency, not just in

8    Alabama, but in Florida or

9    Georgia or anywhere?  Negative

10   response.

11           Have any of you had

12   any negative dealings with the

13   District Attorney's Office in

14   any way?  Any negative dealings

15   with the District Attorney's

16   Office, with Mr. Fuller, with

17   myself, with any one of the

18   Investigators, Mr. Holley?  Mr.

19   Matthews?  Mr. Norris?  Mr.

20   Jarrell?  Anyone in child

21   support that has had just a

22   negative dealing with our

23   office?  Negative response.

24           I'm going to talk a

25   little bit about this crime and

1      where it took place.  This is a

2      robbery/murder.  And it took

3      place at a place called the Toy

4      Store.

5              Now, the Toy Store was

6      an adult, what we call, novelty

7      store.  And it sold adult

8      items.  It sold adult videos

9      and adult items that some people

10     might find offensive.

11             I'm going to need for

12     you to really think about the

13     next question that I'm going to

14     ask you.  Would the fact that

15     Mrs. Dennis was killed during a

16     robbery in that kind of store

17     have any affect on you when you

18     are listening to this case?   Is

19     there anyone that your moral

20     beliefs or the way you feel

21     about that kind of material,

22     that you couldn't put that aside

23     and listen to what occurred, a

24     robbery took place, a murder

25     took place; and put aside the

```
 1                    fact that it took place in an

 2                    adult store where certain

 3                    materials were sold?  Could you

 4                    do that?

 5                          Could you do that, Mrs.

 6                    Bryant?

 7          POTENTIAL JUROR:   (Nodding head in the

 8                    affirmative).

 9          MRS. STOUT:  Mrs. Blevins?

10          POTENTIAL JUROR:  Yes, ma'am, I could.

11          MRS. STOUT:  Mr. Brooks?

12          POTENTIAL JUROR:  Of course.

13          MRS. STOUT:  Thank you, sir.  Mr.

14                    Bedsole?

15          POTENTIAL JUROR:  Yes.

16          MRS. STOUT:  Those of you that are

17                    selected to serve on this jury,

18                    I always tell everyone that

19                    there are 13 judges that sit in

20                    a courtroom.

21                          This Judge up here is

22                    going to rule on the law.  You

23                    are going to rule on the facts.

24                    And you will take those facts

25                    and must apply the law to those
```

80

1    facts.  If you don't agree with

2    the law, can you still put aside

3    your personal opinions and apply

4    the facts and the law as this

5    Judge instructs you?  Can you

6    leave your biases and your

7    opinions out, and do what the

8    Judge tells you to do with the

9    facts that are presented?

10         If you can do that,

11   raise your hand.  I don't want

12   you to feel like you are in

13   grade school.  Okay?  But that

14   just lets me know that everybody

15   is telling me that he can do

16   that.  Thank you.

17         Can all of you listen

18   to the facts and apply the law,

19   and not let sympathy come into

20   play?  Sympathy has nowhere in a

21   jury room.

22         This Defendant is

23   young.  Can you put that aside

24   and listen to the facts and the

25   law and not be influenced by

1    sympathy?  How many of you can

2    do that?  Raise your hands.

3                 Mrs. Bryant, do you

4    think you can do that?

5    POTENTIAL JUROR:  (Nodding head in the

6    affirmative).

7    MRS. STOUT:  You think so.

8    POTENTIAL JUROR:  I think so.

9    MRS. STOUT:  I will come back to you.

10

11   POTENTIAL JUROR:  Come back to me.

12   MRS. STOUT:  Okay.

13                This next question, I

14   think, is a tough question.  And

15   it's one that you may have to

16   think about for a couple of

17   minutes.

18                The Judge said this

19   will probably be a four-day

20   trial.  And we may go long

21   sometimes.  And that is tough

22   for you because you are giving

23   up a week of your life to sit

24   and listen to this case.  This

25   is a most important case.  It is

1          a capital case.  When you enter

2          this courtroom each day, can you

3          put aside whatever happened at

4          home, whatever is happening in

5          your family and devote your

6          attention to this case?  Can you

7          all do that?  Raise your hands.

8          Thank you.

9                A capital case.  There

10         are two punishments in a capital

11         case and this next question is

12         very important.  One of those

13         punishments is life without.

14         The other is the death penalty.

15               Is there anyone among

16         you that does not believe in the

17         death penalty?

18               Mrs. Bass, do you believe

19         in the death penalty?

20    POTENTIAL JUROR:  No.

21    THE COURT:  Let me interrupt and ask it

22         in another way.

23                   Do any of you

24         have a fixed opinion against

25         punishment by death?  Go ahead.

1      MRS. STOUT:  Do you, Mrs. Bass?

2      POTENTIAL JUROR:  I do.

3      MRS. STOUT:  Do you have a fixed opinion?

4      POTENTIAL JUROR:  No.

5      MRS. STOUT:   Anyone?  Do you have a

6              fixed opinion against death as a

7              punishment?  Is there any one

8              among you for religious reasons

9              or personal reasons or whatever

10             they may be, that you do not

11             feel that you can sit in

12             judgment on someone or on this

13             Defendant?

14                 Mrs. Bryant, I know you

15             stated earlier that you are

16             friends with his family and I

17             believe his aunt?  Is that

18             correct

19     POTENTIAL JUROR:  That's correct.  I know

20             all of them.  I was classmates

21             with two of his sisters.

22     MRS. STOUT:  Do you feel knowing all of

23             his family and being friends,

24             and I believe you said that you

25             lived near them?

1          POTENTIAL JUROR: Yes, I do.

2      MRS. STOUT:  Do you feel that you could

3              sit on this jury and in this

4              case?

5          POTENTIAL JUROR:  I don't think so.

6      MRS. STOUT:  Thank you for your honesty.

7              I appreciate that, Mrs. Bryant.

8                  Is there anyone else?

9              I believe, Mrs. Bass, you said

10             that you knew his family, also?

11             Is that correct?

12         POTENTIAL JUROR:  Yes.

13     MRS. STOUT:  Given that fact, and that

14             you know his family --

15     THE COURT:  Are you directing your

16             comments to Vivian Bass or

17             Clarece Bass?

18     MRS. STOUT:  Clarece Bass.  I apologize,

19             Your Honor.  Ms. Clarece Bass,

20             given those facts, and because

21             you are friendly with them, was

22             it his aunt that you are close

23             friends with?

24         POTENTIAL JUROR:  And church members.  We

25             live close to them.

1      MRS. STOUT:  Do you do a lot of things

2           together?

3    POTENTIAL JUROR:  Well, we talk.

4    MRS. STOUT:  Given that fact, would it be

5           difficult for you to sit on this

6           kind of case?

7    POTENTIAL JUROR:  Yes, it would.

8    MRS. STOUT:  Do you think that if you

9           heard the facts and were

10          instructed by this Judge, that

11          you could put that aside?  The

12          friendship with them, and sit on

13          this case?

14               And, again, I know this

15          is tough.  But this is an

16          important case.  And that's why

17          the State needs to know and the

18          Defendant needs to know if you

19          could put that aside.

20    POTENTIAL JUROR:  It would be hard to

21          do.

22    MRS. STOUT:  Thank you so much for your

23          honesty.  Judge, if you can give

24          me one moment.

25    THE COURT:  Sure.  While you are

```
 1              looking over your notes, I have

 2              a question or so before I go to

 3              the Defense.  Would the fact

 4              that the alleged victim of the

 5              alleged crime was a white

 6              person, and the Defendant was

 7              black, prohibit any of you from

 8              trying this case on the basis of

 9              the evidence and disregard the

10              issue of race?  No response.

11      THE COURT:  I just want to clarify

12              this before Mrs. Stout asks you

13              something else, or while she is

14              looking over her notes.  The

15              jury will not be sequestered in

16              this case.  Sequestered means to

17              put you up in a hotel overnight.

18              We are not going to do that.

19                   At the end of each day,

20              you will go home, if you are

21              selected to serve on the trial

22              jury of this case.  You will be

23              with your family.

24                   However, I would give

25              an instruction at the end of
```

```
 1              each day not to discuss this

 2              matter among yourselves, nor to

 3              allow anyone to discuss it with

 4              you, as long as you promise

 5              that, the jury would not be

 6              sequestered.  That may make some

 7              of you feel a little bit better.

 8     MRS. STOUT:  That's all, Your Honor.

 9              Thank you.

10     THE COURT:  Any questions by the Defense?

11              Mr. Gary Bradshaw.

12     MR. BRADSHAW:  Thank you, Your Honor.

13                   Ladies and gentlemen,

14              as the Judge told you earlier,

15              name is Gary Bradshaw.  I am an

16              attorney.  My office is across

17              the street from where the old

18              post office building used to be.

19              Co-counsel on this case is Mr.

20              Al Smith with gray hair.  Al

21              represents Mr. Robert Conrad,

22              just like I do.

23                   And right now, Mr.

24              Robert Conrad sits before you an

25              innocent man.  Al was at the
```

1              District Attorney's for many

2              years.  Now he is in private

3              practice in Elba.

4                    Have any of you had the

5              pleasure of him representing you

6              or any family member?

7                    My office is across the

8              street.  It's been there almost

9              six years.  And I should know

10            who all I've represented.

11                  But have any of you

12            been in my office for any kind

13            of representation.

14     POTENTIAL JUROR:  Clarece Bass.  I was

15            there with my grandson.

16     MR. BRADSHAW:  Ms. Bass.  Dorian Bass?

17     POTENTIAL JUROR:  Yes.

18     MR. BRADSHAW:  I know your first name

19            started with a "D".  Would the

20            fact that I represented your

21            grandson in juvenile court, Ms.

22            Bass, is that going to prevent

23            you from sitting impartial on

24            this jury for Mr. Conrad?

25     POTENTIAL JUROR:  No.

1  MR. BRADSHAW: Would that taint your

2    judgment in any way?

3  POTENTIAL JUROR: No.

4  MR. BRADSHAW: The record reflects that

5    she was shaking her head and

6    said no. I don't know if you

7    could hear that.

8      The District Attorney's

9    Office is comprised of some

10    lawyers, all of who were in

11    private practice at one time.

12    As Mrs. Stout told you, it's

13    important for us to know about

14    the relationships, because all

15    of us are human. And we have

16    tendencies and natures about us

17    that we can't sometimes

18    completely shed.

19      So I would like to ask,

20    if any of you, at any time have

21    been represented by Ms. Glenda

22    Stout when she was in private

23    practice? I believe at that

24    time it was Glenda Parker.

25  POTENTIAL JUROR: Yes.

1      MR. BRADSHAW:  Ms. Bryant, you said yes?

2      POTENTIAL JUROR:  Yes.  I know her

3            daughter.

4      MR. BRADSHAW:  You know her daughter?

5            Did Ms. Parker or Ms. Stout ever

6            represent you or your family

7            members?

8      POTENTIAL JUROR:  No.  No

9      MR. BRADSHAW:  You just know her?

10     POTENTIAL JUROR:  That's all.  Just know

11           the family.

12     MR. BRADSHAW:  The fact that you know

13           the family, is that going to

14           taint your judgment in any way?

15     POTENTIAL JUROR:  No.

16     MR. BRADSHAW:  Mr. Larry Jarrell.  Larry

17           had a private practice in Troy

18           before going to work with the

19           State as a Prosecutor have any

20           of you had occasion to go Troy

21           and be represented by him?

22                 Mark Fuller, our

23           District Attorney, worked with

24           the law firm of Cassady, Fuller

25           and Marsh.

1          My first question is:

2      Have you ever been represented

3      by Mark?  Or anyone in your

4      family or yourself ever been

5      represented by Mark Fuller when

6      he was in private practice?  No

7      response.

8          Now, I would like to

9      ask you about this law firm of

10     Cassady, Fuller and Marsh.

11     Again, I don't want to know the

12     nature of representation, but if

13     anyone in that law firm, Rainer

14     Cotter, Chad Tindol, Joe

15     Cassady, Sr. and Jr., Kenneth

16     Fuller and Dale Marsh.

17          Have you ever been

18     represented by any of those

19     individuals in that firm?

20          Scherryl Harrison is

21     another attorney with the

22     District Attorney's Office.  She

23     is in Troy.  Have you ever had

24     the pleasure of being

25     represented by her in anything?

```
 1                      Are any of you, and I know the

 2              answer, partial answer to this.

 3                      Are any of you you in a

 4              civic organization, a social

 5              club, a church-related activity

 6              or association with any of those

 7              individuals that I mentioned,

 8              the attorneys from the District

 9              Attorney's Office?  Go to church

10              with, Sunday school with, or you

11              are in the Kiwanis Club or Roll

12              Tide Club or War Eagle Club with

13              any of those people?

14                      The same question that

15              I would like to ask you in

16              relation to any of the other

17              employees with the District

18              Attorney's Office?  Dwight Holly

19              to Nancy Spradley, to anyone

20              that you know that works in the

21              District Attorney's Office?

22                      Yes, ma'am?  Ms.

23              Blevins?

24       POTENTIAL JUROR:  I did work with Crys

25              Fuller with the Regions Bank for
```

```
 1              a short period of time.

 2                   Probably for about six months.

 3    MR. BRADSHAW:  Okay.  You worked with

 4              Crys, who is now Mark's

 5              secretary?

 6    POTENTIAL JUROR:  Right.

 7    MR. BRADSHAW:  Region's Bank, here in

 8              Enterprise?

 9    POTENTIAL JUROR:  Yeah.  I worked there

10              four-and-a-half years.

11    MR. BRADSHAW:  Would you consider Crys to

12              be a friend?

13    POTENTIAL JUROR:  Not really, just

14              acquaintance.

15    MR. BRADSHAW:  You just know her face?

16    POTENTIAL JUROR:  I just know her face.

17    POTENTIAL JUROR:  Y'all wouldn't stop and

18              have a cup of coffee and talk

19              about what's going in your life?

20    POTENTIAL JUROR:  We might stop and chat,

21              but we rarely run into each

22              other any more.

23    MR. BRADSHAW:  Would the fact that you

24              know her in that way prevent you

25              from sitting impartially on this
```

1              jury?

2         POTENTIAL JUROR:  No.

3         MR. BRADSHAW:  Mr. Brooks, you raised

4              your hand?

5         POTENTIAL JUROR:  Yes.  I think I know

6              her.  I'm not sure.  If her

7              husband's name is Ronny, I know

8              her.

9         MR. BRADSHAW:  Know who?

10        POTENTIAL JUROR:  Crys.

11        MR. BRADSHAW:  Oh.  Crys Fuller.  She was

12             in here earlier.  She has short

13             hair, tall, attractive lady?  I

14             don't know her husband's name.

15        POTENTIAL JUROR:  It's Ronny.  Okay.

16        POTENTIAL JUROR:  She's friends of my

17             ex-wife's.

18        MR. BRADSHAW:  You and Crys are friends?

19             Or Crys and your ex-wife are

20             friends?

21        POTENTIAL JUROR:  Both.  And her

22             husband.

23        MR. BRADSHAW:  Both.  And her husband.

24             Mr. Brooks, The same question to

25             you.  Would that in any way

1               hinder you from sitting on this

2               jury and rendering a decision

3               based just on the facts?

4       POTENTIAL JUROR:   No.

5       MR. BRADSHAW:   There are several police

6               officers that have been

7               mentioned or that will be

8               mentioned to you.  And you have

9               been questioned to death, ever

10              since 9:00 o'clock.  And I'm the

11              last one to question you before

12              you get to go home, and tomorrow

13              you will find out if you are

14              selected on this jury.  But what

15              I would like to do for remedy

16              and for your sake is to try to

17              consolidate this.

18                   I'm going to call a

19              list of names that we expect the

20              State to put up as witnesses.

21              As I call them, and I will go

22              slowly, if you are related in

23              any way to any of them or good

24              friends or acquaintances with

25              them or, again, associated in a

1           club organization or a church

2           activity with them, we would

3           like to know that.

4                   As I was telling Ms.

5           Blevins, everybody, due to

6           publicity, you may know Mark

7           Fuller's face.  And I don't mean

8           would you just know Mark Fuller.

9           I mean would you know him good

10          enough that you would stop and

11          have a conversation, or you work

12          with him somewhere, or some

13          relationship, other than just

14          knowing that name and face?

15          These people would be Buford

16          Roberts, with the Enterprise

17          Police Department.  Michael

18          Petty, Rick Hauser, Jeff Spence,

19          Captain Tom Braun, Matt Key,

20          W. R. or better known as Buddy

21          Ammons?

22    POTENTIAL JUROR:  I know him.  We use to

23          be neighbors.

24    MR. BRADSHAW:  Ms. Blair, how long were

25          you neighbors of Buddy's?

1    POTENTIAL JUROR:  Probably about 15 or 20

2              years.

3    MR. BRADSHAW:  Do you know his brother

4              Hays and his brother Jeff?

5    POTENTIAL JUROR:  He is the only one that

6              I know.  The immediate family.

7    MR. BRADSHAW:  Just immediate family.

8    POTENTIAL JUROR:  Yes.

9    MR. BRADSHAW:  Ms. Blair, would the fact

10             that you know him, would that

11             cause in any way to tend to want

12             to believe more of what he says

13             on that stand than anyone else?

14   THE COURT:  Or disbelieve, one or the

15             other?

16   POTENTIAL JUROR:  Say again, please?

17   MR. BRADSHAW:  The fact that you are

18             neighbors with Buddy Ammons --

19   POTENTIAL JUROR:  Would not make any

20             reason.

21   MR. BRADSHAW:  That wouldn't make any

22             difference to you?  You could

23             still just listen to all of the

24             facts?  Regardless of the fact

25             that it's coming out of Buddy

*VOLUME 8*

COURT OF CRIMINAL APPEALS NO. __CR-02-0333__

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF _____COFFEE_____ COUNTY, ALABAMA

CIRCUIT COURT NO. __CC-01-179, CC-01-180__

CIRCUIT JUDGE ____Gary L. McAliley____

Type of Conviction / Order Appealed From: __Conviction, Capital Murder, Robbery 1st__

Sentence Imposed: __Life Without Parole, Life__

Defendant Indigent: [X] YES [ ] NO

Robert Thomas Conrad

NAME OF APPELLANT

Gary Bradshaw
(Appellant's Attorney)                                    (Telephone No.)
P. O. Box 311412
(Address)
Enterprise          AL          36331
(City)              (State)     (Zip Code)

Richard Waldrop
P. O. Box 310027
Enterprise, AL  36331

V.

STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____
_____
_____

(For Court of Criminal Appeals Use Only)



1          Ammons' mouth is not going to

2          matter to you?

3   POTENTIAL JUROR:  Not going to matter,

4          no, sir.

5   MR. BRADSHAW:  Okay.  Sergent Lennis

6          Darby, with the Enterprise

7          Police Department;  William or

8          Bill Moore, who is now retired,

9          and is an attorney.  Bruce

10          Mathews.  Mr. Eddie Pennington.

11          Dwight Holly?

12              Let me ask you about

13          some other individuals that are

14          all not related in police work?

15          Mike Stanley.  Richard Bray.

16          Eric Cormellow (sic).

17              I know a lot of you may

18          recognize this name.  I want you

19          to remember if what I asked you.

20          I want to know if you have some

21          type of relationship to Dr. Sam

22          Sawyer, who is a doctor at

23          Medical Center Enterprise;  Dr.

24          John Drew.  He is an emergency

25          room doctor.  Joseph Saloom, a

1          graduate of Enterprise High

2          School, who will be testifying.

3          Mark Day.  Rob Ward.  Chad

4          Trout.  Chris Swan.

5               I think Judge has

6          already asked you about Mr. Ray

7          Grimes.  Mr. Grimes used to have

8          a store and business near

9          ConAgra.  And I know some of you

10         use to work at ConAgra.  I think

11         Mr. Brouillard.  Mr. Grimes had

12         a store down the hill from

13         ConAgra?

14   POTENTIAL JUROR:  I had changed my tires

15         there one time.

16   MR. BRADSHAW:  Changed your tires?

17   POTENTIAL JUROR:  (Nodding head in the

18         affirmative).

19   MR. BRADSHAW:  This adult toy store that

20         Mrs. Stout mentioned to you,

21         used to be located next to that.

22         Did you happen to know Mr.

23         Grimes when that store was

24         located next to the service

25         station?

```
 1          POTENTIAL JUROR:  Yes.

 2       MR. BRADSHAW:  Did you know him well

 3             enough that if he walked in

 4             today, you would recognize him?

 5       POTENTIAL JUROR:  A tall man and very

 6             out-spoken man, yeah, I think

 7             so.

 8       MR. BRADSHAW:  You would recognize him.

 9             Would the fact that you know him

10             and recognize him prevent you

11             from sitting on a jury as an

12             impartial manner?

13       POTENTIAL JUROR:  No.

14       MR. BRADSHAW:  It would not affect your

15             judgment at all?

16       POTENTIAL JUROR:  No.

17       MR. BRADSHAW:  Phyllis Roland.  Dr.

18             Emily Ward.

19                    Mrs. Stout explained to

20             you very well the burden they

21             have to prove that's beyond a

22             reasonable doubt, Mr. Conrad is

23             sitting here, I'm telling you,

24             as an innocent individual, just

25             like you and I.  Because our
```

1   nation and our society, thank

2   goodness, still subscribes to

3   innocent until proven guilty.

4           He has a constitutional

5   right to sit in that chair,

6   through this whole trial, and

7   not take that stand and testify,

8   if he chooses to do that.

9           And I need to know from

10  you, if he chooses to do that,

11  is that going to make you in

12  your mind that he must have

13  something to hide because he

14  won't take the stand and talk?

15  Anybody?

16          He has a constitutional

17  right to do that.  And if he so

18  exercises that right, is that

19  going to make you think that he

20  has something to hide or keep

21  from you as a jury?  Nobody.

22          Does it make you tend

23  to believe there may be some

24  guilt, just because he doesn't

25  get up there and raise his right

1    hand and testify?  That's the

2    same right that you have and

3    that I have.  And nobody can

4    take away or force you to do

5    that.

6              This is very awkward to

7    ask you and I was kind of

8    getting into it with Mr.

9    Brouillard.

10              Now, I think the

11   Assistant District Attorney has

12   broken the ice.  This was with

13   a store, an adult toy store,

14   novelty store.  And you are

15   going to hear it referred to in

16   some other ways.  I am not

17   trying to get into your personal

18   life this much, but for the sake

19   of my client, have any of you

20   ever been in that store while it

21   was located on County Road 6736,

22   which was old 14, down from

23   ConAgra, or at the location

24   where this incident occurred on

25   County Road 711?  Have you ever

1       been in this store on purpose or

2       by mistake?

3   THE COURT:  You are not talking about the

4       building connected to that, down

5       from ConAgra?  Grimes Grocery?

6   MR. BRADSHAW:  Right.  I'm not talking

7       about the grocery store where

8       they sell soft drinks.  I'm

9       talking about where the adult

10      novelty, magazines, tapes and

11      paraphernalia was sold.

12          Have any of you ever

13      been a tenant or employee of

14      DogWood Acres, which is a mobile

15      home park, that I believe

16      Ms. Dennis had some affiliation

17      with out east of town?  You or

18      your relatives tenants or

19      employees of Dogwood Acres?

20          As the Judge told you

21      the family representative is

22      April Dennis, now Gunnels -- I

23      thought they said Gowins

24      earlier.

25          April has a sister named

```
1              Monica and a brother named
2         Damon.  And there were some
3         people in the venire earlier
4         that said they had a niece and
5         nephew in common.
6              Do any of you know
7         April, her new husband, or
8         Monica Dennis, which is just a
9         little younger, or Damian, who
10        is the youngest?  Mr. Randy
11        Dennis?
12             Let me ask if anyone in
13        here knows Mr. Ed Mock, the
14        owner of Batten's Paint and Body
15        Shop?
16             Mr. Brooks, you know
17        Mr. Mock?
18   POTENTIAL JUROR:  Yes.  Business.
19   MR. BRADSHAW:  Does he work on your car?
20   POTENTIAL JUROR:  Back and forth on it.
21        I was in business, doing
22        upholstery.
23   MR. BRADSHAW:  So you had a business
24        relationship?
25   POTENTIAL JUROR:  Yes.
```

1        MR. BRADSHAW:  Would the fact that Mr.

2                      Mock has a relationship with the

3                      victim in this.  In that he was

4                      very close to her, would that

5                      affect your judgment in any way?

6

7        THE COURT:  Mr. Mock divorced her 25-plus

8                      years ago.  That's the only

9                      relationship that I know of.

10                     You may correct me, but I had

11                     that divorce 27 years ago, I

12                     think.  Do you have anything

13                     other than that?  They were

14                     married at one time.  But they

15                     have been divorced 25-plus

16                     years.

17       MR. BRADSHAW:  Well, fact that he is a

18                     prominent businessman in town,

19                     is well known.

20       THE COURT:  There are a lot of business

21                     people.  If there are

22                     objections, as we go, we will go

23                     through it.  But go ahead.

24       MR. BRADSHAW:  I don't know if I finished

25                     the question.  But the fact

```
 1                    that you knew him and had a

 2                    business relationship, however

 3                    brief or long, would that affect

 4                    you in any way?

 5          POTENTIAL JUROR:  No.

 6      MR. BRADSHAW:  Okay.  Green's Grass

 7                    Farm, down in Bellwood, Alabama,

 8                    one of it's owners, the brother

 9                    of the victim, Mr. Lynn Bowman,

10                    have any of you ever done

11                    business with them, purchased

12                    sod from him or worked with him?

13                    Green's Grass Farm?

14                         As the Judge mentioned

15                    to you, right before I stood up,

16                    it's not hard to see that Mr.

17                    Conrad is a black male.  The

18                    victim in this case, Ms. Jelaine

19                    Dennis, was a white female.

20                         What I would like to

21                    ask you, and you've all stated

22                    where you are working and where

23                    you are employed.  I would like

24                    to know if any of you are

25                    subjected to at work racial
```

1             slurs, racial jokes, literature,

2             that you are subject to in your

3             work place?

4             No response.  Yes?

5    POTENTIAL JUROR:  Earlier, when you asked

6             about an acquaintance, I also

7             met you --

8    THE COURT:  Please speak up, if you will.

9             The court reporters have to

10            hear you.

11   POTENTIAL JUROR:  I'm sorry.  And have

12            also met the acquaintance of

13            Mark Fuller and Mr. Bradshaw at

14            Regions Bank when I was there.

15   THE COURT:  But would that affect your

16            ability to sit in judgment?

17   POTENTIAL JUROR:  No, sir.

18   THE COURT:  Just for the record, you are

19            Annette Blevins?

20   POTENTIAL JUROR:  Yes, sir.

21   MR. BRADSHAW:  There have been a couple

22            of questions asked of you.  One,

23            in particular, about if you had

24            a fixed opinion concerning the

25            death penalty.  And the State is

1          charging our client with a crime

2          that is punishable by death.

3                    I want to simplify this

4          question to you as much as I

5          can.  Does anyone subscribe to

6          theory, the absolute theory, and

7          what I mean by "absolute theory"

8          is regardless of conditions, and

9          eye for an eye?  Mr. Bedsole?

10   POTENTIAL JUROR:  No.

11   MR. BRADSHAW:  Ms. Bass?

12   POTENTIAL JUROR:  No.

13   MR. BRADSHAW:  Regardless of any

14          conditions or circumstances, you

15          subscribe to an eye for an eye?

16   MR. BRADSHAW:  You answered Mrs. Stout's

17          question that you didn't think

18          that regardless of what type of

19          business that Ms. Dennis was

20          involved in that, that would

21          affect your judgment or warrant

22          any type of crime upon her?

23                    Is there anyone in this

24          jury, under this panel right

25          now, that thinks that property

1       comes before life, that personal

2       property comes before life

3       itself?  No response.

4               May I have just a

5       moment?  I am almost finished.

6   THE COURT:  Sure.

7   MR. BRADSHAW:  My co-counsel reminded me

8       there is an attorney with the

9       District Attorney's Office that

10      I forgot.  Don't tell her.  Ms.

11      Marty Weatherford, daughter of

12      Jim Weatherford.  She is now

13      Marty Williams.  And she does a

14      lot of work in real estate and

15      she prosecutes part time for the

16      District Attorney's Office.

17      Have any of you had the pleasure

18      of being represented by Marty?

19      No response.

20              Thank you so much for

21      sitting here a all day.  Have

22      any of you -- and this is my

23      final question -- besides me, if

24      you have children, have you

25      ever, and I admitted that I

1    have, given into that child when

2    they go on and on and on, and

3    they are wanting something they

4    shouldn't have, either to eat,

5    or they want something in

6    Wal-Mart?  Or you go through

7    Food World, and those marketers,

8    as good as they are, they put

9    all the stuff they know kids

10   want right there where you have

11   to wait in line at the cash

12   register.

13            And I have on occasion

14   said okay, just so I wouldn't

15   have to hear give me, give me,

16   give me any more.  I have given

17   in.  I don't suppose they makes

18   me a bad father to give in to a

19   Snicker Bar on top of potato

20   chips.

21            The point I'm making

22   here is you have been instructed

23   that we are going to be here

24   until 8:00 o'clock, or maybe

25   later on some nights, can you

1    put that aside?  And I know all

2    of you have busy lives, children

3    and jobs and things that you

4    would much rather do.  But can

5    you put that aside as we get

6    into Friday night, and

7    Enterprise is playing and is

8    Elba playing, and you want to go

9    watch that high school football,

10   can you put that aside and still

11   give a verdict based on the

12   facts that you have heard and

13   seen from this stand, rather

14   than I want to go home syndrome?

15          Thank you so much.

16   THE COURT: Ladies and gentlemen, to keep

17   you from coming back in here at

18   some designated time, the Clerk

19   of Court and his staff already

20   have your telephone numbers.

21   And, of course, we are going

22   late today.  And you are not

23   going to be here.  Y'all are the

24   first panel, y'all get to go

25   home and be with your family and

112

```
1              that kind of thing.

2                   But some time around

3         tomorrow at 4:30, we are going

4         to call the 14 people who have

5         been selected to serve on this

6         trial jury of this case.

7                   If you will be close to

8         the phone between 4:30 and 5:00,

9         we will call you, if you have

10        been selected to serve.

11        Otherwise, you will not have to

12        come back down here.  I think

13        that's the easiest way to do it.

14        That's the best way to keep a

15        lot of you from having to take

16        off needlessly and come sit down

17        here and twiddle your thumbs

18        while we go through the process

19        of selecting a jury.

20                  So, please, please,

21        please, be around the phone

22        between 4:30 and 5:00, somewhere

23        around there.  Because the trial

24        of this case will begin when all

25        of the jurors are here 5:15,
```

```
1        5:20.  And we will go late
2    tomorrow.  We will go until at
3    least 8:00 o'clock.  We might
4    even go further than that.
5                   My job is to
6    make sure that this matter stays
7    on schedule and is moved along.
8    And that will probably be the
9    latest that we will go during
10   the trial of this case, as long
11   as lawyers and witnesses move
12   along and this case, the trial
13   of this case flows well.
14                   Are there any
15   questions?  Yes, sir?
16   POTENTIAL JUROR:  Will you call one way
17   or the other?
18   THE COURT:  We will call the 14 of you
19   who have been selected to serve,
20   if we can't find you, see those
21   gentlemen, and there's the
22   Sheriff of Coffee County, I
23   guarantee you, he will be
24   camping out at somebody's house
25   if we can't get up with you.  So
```

1          we will find you somehow.  But I

2          would rather be able to call you

3          instead of having these fellows,

4          who have a lot of other

5          responsibilities, going and

6          finding you.   Yes, sir?

7      POTENTIAL JUROR:  That's the time, I work

8          the second shift.  That's the

9          time I'm leaving the house at

10         4:30.  I start my job at 5:30.

11     THE COURT:  I promise I will make a note

12         of that.  And the minute we have

13         a jury, if you are on that jury,

14         I will give you a call first.

15     POTENTIAL JUROR:  Thank you, Your Honor.

16     THE COURT:  I cannot say that the

17         attorneys will have a jury by

18         that time.  I expect, knowing

19         what I know, that they will.

20              And I'm going to do

21         things after you leave here

22         before the next panel comes in,

23         I'm going to do some things that

24         are even going to expedite

25         things a little bit better, so

1           we will be at least more sure.

2           I have never done this because

3           this is the first time.  But you

4           go to work at 4:30?

5     POTENTIAL JUROR:  Yes, sir.

6     THE COURT:  About that time?

7     POTENTIAL JUROR:  Yes, Your Honor.

8     THE COURT:  I have noted that.  Yes, sir.

9     POTENTIAL JUROR:  My shift is the

10          opposite problem.  I'm in the

11          middle of my shift then.  So do

12          I just stay home and not work?

13    THE COURT:  You are on jury duty.  We

14          will give an excuse, if you need

15          an excuse, let us know.

16    POTENTIAL JUROR:  Give one to me.

17    THE COURT:  I don't see Mr. Counts in

18          here.  But those ladies right

19          there will give you that.  If

20          they don't, you see that lady

21          standing right there in the

22          door, if any of you need an

23          excuse for your employment, she

24          will give you one.  She is my

25          assistant.  Anything else?  Good

1          question.

2                    Y'all have a good day.

3          If the lawyers will remain in

4          the courtroom.

5          (Panel exited the courtroom).

6     THE COURT:  Do we have any juror in the

7          courtroom?

8                    Just out of an

9          abundance of caution, if you

10         will refer to numbers.  Are

11         there any challenges for cause

12         as to panel number one?  By

13         numbers.  You don't have to

14         state a reason at this time.

15    MRS. STOUT:  Yes, sir.

16    THE COURT:  We will go with the State,

17         first.  Take your time and look

18         through and see if there are any

19         challenges for cause.

20                    I want to do this this

21         way for several reasons.  Number

22         one, it will expedite matters;

23         number two, your minds are a

24         little more refreshed on each of

25         the panel members.

1    MRS. STOUT:  Yes, sir.  Give me just a

2         minute.

3    THE COURT:  If you will give the number

4         as you go.

5    MRS. STOUT:  We are not stating reasons

6         at this time, though?

7    THE COURT:  No reasons necessary at this

8         moment.

9    MRS. STOUT:  Number 13.

10   THE COURT:  Number 13.  Give me a

11        second.  Okay.

12   MRS. STOUT:  And number 37.

13   THE COURT:  And 37.

14             Does the Defense

15        take exception to that?

16   MR. SMITH:  Yes, Your Honor.

17   THE COURT:  Exception is denied.

18        Challenge is granted.  I know

19        the reason.  It's very obvious

20        to the Court.  I will state it

21        for the record, if necessary.

22   MRS. STOUT:  I think it would be better.

23   THE COURT:  The record speaks for itself.

24        But it would be the basis for

25        the objection, as far as the

1           second one, I believe number 37

2           knows the Defendant's brother

3           and sister, are neighbors of the

4           Defendant's brother, does not

5           feel that she can sit in

6           judgment, and, of course, knows

7           Mrs. Stout's daughter.

8      THE COURT:  I will move to number 13.

9           Number 13 stated that she is a

10          family friend of the

11          Defendant's, that it would be

12          hard to sit in judgment in this

13          case.  Are those the reasons?

14     MRS. STOUT:  Yes, Your Honor.

15     MR. SMITH:  Judge, we certainly object

16          to that.  We don't think that

17          standard is made.  She did not

18          say that she could not serve and

19          be fair.  She said that it would

20          be difficult.  I would like the

21          record to reflect that she is

22          also the same ethnic racial

23          background as the Defendant.  I

24          don't think that the State's

25          challenge has been met, Your

```
 1                    Honor.

 2          THE COURT:  If that is a valid argument,

 3                    then the Court finds there are

 4                    race-neutral reasons for the

 5                    strikes that have been clearly

 6                    established.  The objection is

 7                    overruled.

 8                         Any additional

 9                    strikes by the State, challenges

10                    for cause?

11          MRS. STOUT:  Just a minute. Your Honor.

12                    Judge, number 27.  And would you

13                    like for me to --

14          THE COURT:  No.  Objection?

15          MR. BRADSHAW:  We would like to hear.

16                    She said that she knew Mrs.

17                    Stout.  Apparently, they had

18                    some relationship in teaching

19                    from what Mrs. Stout's question

20                    was.

21          THE COURT:  Is that an objection?

22          MR. BRADSHAW:  I'm objecting to the

23                    challenge.

24          THE COURT:  Sustained.  That's what I'm

25                    asking for.  Do you have
```

1                        objection to the challenge?

2          MR. BRADSHAW:  Yes.

3          THE COURT:  Sustained.  No basis has been

4                  established.

5          MRS. STOUT:  May I state the reason for

6                  that?

7          THE COURT:  Yes, please do.

8          MRS. STOUT:   On 27, I believe that in

9                  voir dire, earlier today, she

10                 stated that it was in third

11                 degree relationship to Mr.

12                 Bradshaw.

13         THE COURT:  Anything further?

14                 Sustained.

15         MR. SMITH:   The objection is sustained?

16                 The challenge is overruled?

17         THE COURT:  Correct.

18         MR. SMITH:  I just wanted to make sure I

19                 was on the correct sheet of

20                 paper.

21         THE COURT:  Sure.  And the rational, I

22                 will adopt the statements that

23                 were earlier made by her.

24         MRS. STOUT:  Thank you, Your Honor.

25         THE COURT:  Anything further by the

```
 1              State?

 2    MRS. STOUT:  No, Your Honor.

 3    THE COURT:  By the Defense

 4    MR. SMITH:  No, Your Honor.

 5    THE COURT:  We are ready for the next

 6           panel.

 7    (The next panel entered the courtroom).

 8    THE COURT:  Ladies and gentlemen, what

 9           we will start off doing, is we

10           will start on the bottom.

11           Normally, we start with ladies,

12           first, but we will start on the

13           bottom row and work from left to

14           right.

15                  If you will would

16           you please state your name,

17           first of all.  And then tell me

18           what you do as a means of

19           livelihood, your occupation,

20           profession or means of

21           livelihood.  Tell me also where

22           in Coffee County, the Enterprise

23           Division, you live.  And give us

24           your approximate age.  You men

25           don't mind that.  But a lot of
```

1    women might want to give me an

2    approximate age. And that's all

3    I need 40, 50, 60, whatever, if

4    you will.

5         So we will start, and

6    if you go will go rather slowly,

7    I would appreciate it, because

8    these ladies down here can take

9    fast, fast notes. And they can

10   keep up with you, and they have

11   to take down everything we say.

12   But I'm a slow, slow writer, so

13   please forgive me.

14         Mr. Dawkins?

15   POTENTIAL JUROR: I work with Southern

16         Railroad. I'm a supervisor. I

17         live in downtown Enterprise on

18         Wyman Street.

19   THE COURT: Let me tell y'all why I'm

20         asking you that question. I

21         have to hear you say that you

22         live in Enterprise the

23         Enterprise Division of Coffee

24         County. And I'm going to try to

25         picture the area that each of

1          you live in so that I can get in

2          my mind that you do in fact do.

3               Because before anyone

4          can sit on the trial jury of

5          this case, they have to have

6          lived in Coffee County for a

7          period of time.

8               And even though we have

9          asked that question over and

10         over, again, over the years,

11         from time to time we have had

12         somebody who lives right across

13         the county line or over in the

14         Elba Division.  And the Elba

15         Division is treated as a

16         separate county for legal

17         purpose.  And your approximate

18         age?

19    POTENTIAL JUROR:  I will be 45 November

20         18th.

21    THE COURT:  Yes, sir?

22    POTENTIAL JUROR:  Darrell Dixon.

23    THE COURT:  Mr. Dixon, where do you

24         live?

25    POTENTIAL JUROR:  East Lee Street.

124

1    THE COURT:  And your profession,

2              occupation, means of a

3              livelihood?

4    POTENTIAL JUROR:  I'm a truck driver.

5    THE COURT:  And approximate age?

6    POTENTIAL JUROR:  Fifty-three.

7    THE COURT:  Okay.  Yes, sir?

8    POTENTIAL JUROR:  James E. Cobb.  I live

9              on Elm Street, here in

10             Enterprise.  I'm retired.

11   THE COURT:  Mr. Cobb, what did you

12             retire from, please?

13   POTENTIAL JUROR:  I worked in the

14             civilian personnel office Fort

15             Rucker.  I was in

16             labor-management relations.

17   THE COURT:  And your approximate age?

18   POTENTIAL JUROR:  I'm 73, at least for

19             the next three weeks.

20   THE COURT:  You are fixing to graduate

21             up one?  Well, I hope you have

22             many more of those.  Yes, ma'am?

23   POTENTIAL JUROR:  Evelyn Cooley.

24   THE COURT:  How do you spell that last

25   POTENTIAL JUROR:  C-o-o-l-e-y.  I live in

```
 1                        Mount Pleasant Community, out in

 2                        Enterprise.  I'm a nurse.  And

 3                        I'm in my 40's.

 4          THE COURT:  See there.  I told you.

 5                        Good answer.  Okay?  Your name,

 6                        please, sir?

 7          POTENTIAL JUROR:  Willie J. Currie.  I

 8                        live at 113 Springdale Drive,

 9                        Enterprise.  I'm retired from

10                        Purdue Farms in Dothan.  And I'm

11                        a minister.  I'm 54 years old.

12          THE COURT:  We will go to the top back?

13          POTENTIAL JUROR:  Barbara Dyess.

14          THE COURT:  Is that D-y-e-s-s?

15          POTENTIAL JUROR:  Correct.

16          THE COURT:  Okay.

17          POTENTIAL JUROR:  Red Cliff Circle in

18                        Enterprise.

19          THE COURT:  Employment?

20          POTENTIAL JUROR:  Housewife.  Retired

21                        housewife.

22          THE COURT:  You know you are the second

23                        person I've heard say that.

24          POTENTIAL JUROR:  Yeah.  I heard her

25                        earlier today.  That's why I
```

```
 1              picked up on it.  Of course, I'm

 2              not finding any difference from

 3              when I was actively a housewife

 4              from retired housewife.

 5     THE COURT:  I sure hope my wife doesn't

 6              pick up on that.

 7     POTENTIAL JUROR:  And your approximate

 8              age?

 9     POTENTIAL JUROR:  Sixty-six.

10     POTENTIAL JUROR:  Juleigh Ayer.  My first

11              name is spelled J-u-l-e-i-g-h.

12              My last name is spelled A-y-e-r.

13              I'm an office manager.  And I

14              live on County Road 627 off of

15              Highway 27 South, and I'm 27.

16     THE COURT:  Okay.

17     POTENTIAL JUROR:  Mary Drown.  I live on

18              East Lee Street.  Housewife.

19              And I'm 70.

20     THE COURT:  You're not a retired

21              housewife, are you?

22     POTENTIAL JUROR:  No.  I don't think I

23              will ever retire on that.

24     THE COURT:  And your last name, again?

25     POTENTIAL JUROR:  Drown.  D-r-o-w-n.
```

1          THE COURT:  Okay.

2          POTENTIAL JUROR:  Craig Cameron.  And I

3                   live on Laurel Breeze Drive in

4                   Gateway.  And I'm a standard --

5                   Civil Service standard guy that

6                   does flight instructions

7                   standards for the Army.  I

8                   write A.R. 951 pilots manuals.

9          THE COURT:  Approximate age?

10         POTENTIAL JUROR:  Approximately 58.

11         THE COURT:  Okay.  Yes, ma'am?

12         MR. JARRELL:  I missed his name.

13         THE COURT:  Craig Cameron.

14                  C-a-m-e-r-o-n.  I'm not sure,

15                  but I think, and correct me if

16                  I'm wrong.  He was on another

17                  venire at one time.  And he got

18                  it postponed until this term.

19         POTENTIAL JUROR:  (Nodding head in the

20                  affirmative).

21         THE COURT:  Yes, ma'am?

22         POTENTIAL JUROR:  Lucille Edwards.  I

23                  work for R. S. International.

24                  Sewing machine operator.

25         THE COURT:  And your first name, again?

```
1           POTENTIAL JUROR:  Lucille.

2       THE COURT:  And your approximate age,

3               please ma'am?

4           POTENTIAL JUROR:  Forty-eight.

5       THE COURT:  Where do you live, please?

6           POTENTIAL JUROR:  New Brockton, 349

7               McGowan Street, New Brockton.

8       THE COURT:  Is that in the New Brockton

9               town there?

10          POTENTIAL JUROR:  That's in town.

11      THE COURT:  Okay.  That's the Enterprise

12              Division.  Yes, ma'am.

13         POTENTIAL JUROR:  Peggy Contreras.

14              (Inaudible) I also work for the

15              Department Public Safety.  I

16              live at 216 Damascus Road, here

17              in Enterprise.  I'm 43.

18       THE COURT:  And did you give your age?

19        POTENTIAL JUROR:  I'm 43.

20       THE COURT:  Okay.

21      POTENTIAL JUROR:  Betty Herring.  I live

22              in Enterprise, off Foster

23              Street, on Regan.  I work at Van

24              Huesen shirt factory in Ozark.

25              I'm 45 years old.
```

1    THE COURT:  Thank you.  I'm going to

2    ask each of you some questions.

3    And then I will certainly allow

4    the attorneys to ask you some

5    questions.

6    Did any of you know the

7    deceased, Jelaine Bowman

8    Dennis?  Raise your hand, if you

9    did?  Let record the reflect no

10   response, no hand raised.

11   Did any of you know

12   Robert Ray Grimes, or do you

13   know him?  Again, people call

14   him Ray Grimes.  He is contended

15   to be the victim of the

16   robbery.  Raise your hand if any

17   of you know him.  No one has

18   responded.

19   Will the fact that the

20   Defendant is a black person and

21   the victim or victims in this

22   case are white people, would

23   that affect any person's ability

24   or judgment in this case?  Raise

25   your hand if it would.  No hand

1    is raised.

2              I will just make the

3    statement to you, and it may

4    help some of you relax a little

5    bit, in many capital murder

6    cases, the jury is sequestered.

7    That means placed in a hotel

8    overnight.  I know some of you

9    would probably like to be in a

10    hotel overnight at the

11    tax-payers expense.  But that

12    will not happen in this case, if

13    you are selected to serve on the

14    trial jury of this case.  At the

15    end of each day, we are going to

16    go home and be with our

17    families.  So that may make some

18    of you feel a little bit

19    better.

20              Of course, the Court

21    will give instructions to the

22    jury not to discuss this matter,

23    nor allow anyone to discuss it

24    with you.  So with that

25    understanding we will go on home

1      each day.

2              The trial is going to

3      take approximately four days.

4      So we should finish up somewhere

5      around some time Friday,

6      hopefully.  We might go a little

7      further.  But my best estimate

8      would be some time Friday.

9      Tuesday night, tomorrow night,

10     if you are selected to serve on

11     the trial jury, then we are

12     going at least until 8:00

13     o'clock.  We might go a little

14     bit further so we can get back

15     on schedule.  So we will have

16     this matter resolved, hopefully,

17     some time Friday.

18             It's my job to make

19     sure that the train stays on the

20     tracks, you might say, and

21     moving along.  And we will do

22     that.  We will do that.

23             Knowing those things,

24     would that affect any of your

25     ability to serve on the trial

```
 1              jury in this case?  If so, raise

 2              your hand.  No hands are

 3              raised.

 4                   I'm going to say to you

 5              some other things after I allow

 6              the District Attorneys and the

 7              Defense Lawyers to ask you a few

 8              questions.  I will reserve my

 9              additional comments until after

10              then.  We will see what they

11              have to cover.  Is the State

12              ready?

13    MRS. STOUT:  The State is ready, Your

14              Honor.

15    THE COURT:  Go ahead.

16    MRS. STOUT:  May it please the Court,

17              counsel, ladies and gentlemen,

18              I'm Glenda Stout.  I'm an

19              assistant D. A.

20                   And I would like to

21              introduce Mr. Larry Jarrell.  He

22              is another D. A. that will be

23              trying this case with me.  We

24              work with your elected District

25              Attorney, Mr. Mark Fuller.
```

1           The victim's

2    representative, April Gunnels,

3    was here earlier.  She is the

4    daughter of Jelaine Dennis.  She

5    is also expecting a baby.  We

6    sent her home because it is

7    getting late.  She will be here

8    during the course of this trial,

9    however.

10          The purpose of voir

11   dire is the time that I get to

12   talk with you.  If you are

13   selected on this jury, there

14   will be no other time that I get

15   to speak to you, until this

16   trial is over an a verdict is

17   in.

18          And the sole purpose is

19   to select 12 people.  Actually,

20   we will be selecting 14.  There

21   will be two alternates.  There

22   will be twelve people that will

23   listen to the evidence and then

24   render a verdict, a just

25   verdict, for the Defendant and

1    for the State based on the

2    evidence and based on the law as

3    the Judge instructs you.  And

4    that is why we are up here

5    talking.  And I know you've

6    heard talking all day.  And I

7    know that you are sick of

8    hearing talking.  But this is

9    important.

10        Now, I know that some of

11   you may be a little nervous with

12   this being a capital case.  Is

13   that a true statement?  Are some

14   of you a little nervous with

15   this being a capital case?

16        Well, I told the panel

17   before I have been doing this a

18   long time.  And I don't think I

19   ever stand before a group of

20   people that I'm not a little

21   nervous.  Because I know a lot

22   about my case, but I don't know

23   a lot about you.  So this is my

24   chance to learn about you.

25        When each of you walked

1       into this courtroom, you came in

2       with your own biases, your own

3       opinions, your own feelings

4       about things.  And that's

5       okay.  All right.  It's okay.

6            The problem that you

7       have is when you serve on a

8       jury, you've got to set aside

9       those biases, you've got to set

10      aside those opinions, you've got

11      to set aside sympathy.  And you

12      have got to base everything that

13      you discuss on the evidence and

14      the applications of the law to

15      that evidence.

16            Now, as I said, this

17      is a capital case, a capital

18      murder case, the most serious of

19      all cases.  And that puts a

20      burden, a heavy burden, on the

21      State.  But that does not change

22      the standard for which we have

23      to prove our case.

24            How many of you watch

25      TV, and you watch Law and Order

1    and those kinds of shows or see

2    them?  You do.  Okay.

3    Everything happens like this

4    doesn't it (snapping fingers)?

5    Well, that's not the real world.

6    Okay.  It's not the way it

7    happens.  Things have to move

8    slowly and methodolocally

9    because of our constitution.

10           So when we talk about

11   our standard beyond a reasonable

12   doubt, that standard is the same

13   standard, whether it's a capital

14   murder case, or whether it's a

15   case involving shoplifting at

16   Wal-Mart.  The standard never

17   changes.  It's still beyond a

18   reasonable doubt.

19           Now, that's what the

20   law says.  Now, I'm going to ask

21   you some questions.  And,

22   please, if you disagree with me,

23   that's okay.  All right.

24   Because we want to select those

25   12 people, 14, with 2 alternates

1     that will be fair and just to

2     the State of Alabama and to this

3     Defendant sitting over here.

4          Is there anyone among

5     you that believes because this

6     is a capital murder case, that

7     that standard beyond a

8     reasonable doubt should be

9     higher, that it should be beyond

10    all doubt, beyond any doubt?  Is

11    there anyone that believes that

12    way?  If you do it's okay.

13    Raise your hand.  That's your

14    opinion.

15         Do you all promise to

16    hold the State to standard of

17    reasonable doubt and nothing

18    higher?  Can y'all do that?  Can

19    you raise your hand and promise

20    me that you will do that if you

21    are selected on this jury?

22    Thank you.

23         Now, I believe, Ms.

24    Edwards, you said that you know

25    the Defendant?  Is that correct?

1               And his family?

2        POTENTIAL JUROR:  His family.

3        MRS. STOUT:  Is there anyone else among

4               you that knows this Defendant?

5               Ms. Council.  I'm sorry.  I'm

6               not giving you credit for your

7               new name.  Ms. Herring.

8        POTENTIAL JUROR:  It's Herring.

9        MRS. STOUT:  Do you know the Defendant's

10              family?

11       POTENTIAL JUROR: Yes, I do.

12       MRS. STOUT:  I will come back and

13              probably ask you questions

14              about that in just a few

15              minutes.  Okay.

16       POTENTIAL JUROR:  I'm not sure if I know

17              the Defendant's family or not.

18              It that his family over there?

19       MRS. STOUT:  Yes, sir.

20       POTENTIAL JUROR:  Is that the Defendant?

21       MRS. STOUT:  Yes, sir.

22       POTENTIAL JUROR:  I know of the family.

23              I know all the family.  But I

24              didn't know him right there.   I

25              know them, but I didn't know

```
 1                          him.
 2            POTENTIAL JUROR:  I know the family.
 3            MRS. STOUT:  Okay.
 4            THE COURT:  We need to identify the names
 5                        for the record.  That was
 6                        Reverend Willie Currie that just
 7                        made a comment.
 8            MRS. STOUT:  And Ms. Council.
 9            THE COURT:  And the State has been
10                        talking to, was it Betty --
11            MRS. STOUT:  Betty Herring.
12            THE COURT:  And also Ms. Lucille Edwards?
13            MRS. STOUT:  Edwards.  And Ms. Contreras
14                        says that she knows the
15                        family.
16                             Let me just stop here
17                        since some of you said that you
18                        know the family or you know the
19                        defendant.  And I will start
20                        with Ms. Edwards.  The fact that
21                        you know the family of this
22                        Defendant, Robert Conrad, is
23                        that going to have any affect
24                        for you if you are selected for
25                        this jury, to sit on this jury
```

```
 1                      and to listen to the evidence
 2                      presented in this case, and to
 3                      listen to the evidence in this
 4                      case, and listen to the law as
 5                      the Judge will instruct you, and
 6                      base your opinion on that?  Is
 7                      that going to affect you?  Are
 8                      you going to be able to do that?
 9        POTENTIAL JUROR:  Honestly --
10        THE COURT:  I can't hear her?
11        MRS. STOUT:  She said honestly, she's not
12                      sure.
13        POTENTIAL JUROR:  I'm not sure that I
14                      can.  I don't feel comfortable
15                      doing that.
16        MRS. STOUT:  She doesn't feel comfortable
17                      doing that.  Thank you for your
18                      honesty.
19        MRS. STOUT:  Peggy, you indicated that
20                      you know his family?  And this
21                      is Peggy Contreras.  The fact
22                      that you know his family -- you
23                      said that you did not know the
24                      Defendant?
25        POTENTIAL JUROR:  No.
```

1   MRS. STOUT:  But the fact that you know

2   the family, would that affect

3   your ability to sit on this jury

4   and to listen to the facts,

5   apply the law and base your

6   verdict solely on the facts and

7   the law?

8   POTENTIAL JUROR:  No, it wouldn't.

9   MRS. STOUT:  It will not.  Okay.  Ms.

10   Herring, and I got it right.  I

11   apologize.  The same question:

12   The fact that you know -- do you

13   know the Defendant, also?

14   POTENTIAL JUROR:  Not since he's grown

15   up.  When he was a little boy.

16   MRS. STOUT:  You knew him when he was

17   little?

18   POTENTIAL JUROR:  Yes.  Not grown up.

19   MRS. STOUT:  The fact that you know the

20   Defendant's family, would that

21   affect your ability to sit on

22   this jury and listen to the

23   facts, and then apply the law as

24   the Judge instructs you to apply

25   the law, and then render your

```
 1                    verdict based solely on that?

 2          POTENTIAL JUROR:  It wouldn't have any

 3                    effect.

 4          MRS. STOUT:   It would not have any

 5                    effect?  Thank you for your

 6                    honesty.

 7                          The same question,

 8                    Reverend Currie, would the fact

 9                    that you now realize and know

10                    the Defendant's family, would

11                    that affect your ability to sit

12                    on this jury, listen to the

13                    facts, apply the law, and then

14                    render your verdict based solely

15                    on the facts and the law?

16          POTENTIAL JUROR:  Honestly, I don't know

17                    what relationship the Defendant

18                    is to the family.  I know the

19                    family.  But I preach to some of

20                    the family in the course of

21                    time.  I'm not sure I could

22                    really serve.  Biasly, you know,

23                    under those circumstances

24                    because I have preached to the

25                    family.
```

1          MRS. STOUT:  So you are not sure that you

2                 could do that and be unbiased?

3          POTENTIAL JUROR:  I'm not sure that I

4                 could.

5          MRS. STOUT:  I appreciate your honesty.

6                         Is there anyone else?

7                 Thank you for your honesty.

8                         This particular crime

9                 took place in a store that sold

10                merchandise that some of you

11                might find rather offensive.  It

12                was called the Toy Store.  And

13                it sold adult novelty items,

14                some tapes of pornographic

15                nature, some items of -- adult

16                novelty items.

17                        And I'm sure that you

18                will hear about that throughout

19                this trial, where this crime

20                took place and some of the items

21                that were in the store.

22                        Now, this question is

23                very important.  Will the fact

24                that Ms. Dennis was killed in

25                this kind of business, and it

1            was a business, the fact that

2            she was killed in the this kind

3            of business affect you in

4            listening to the evidence and

5            rendering your verdict on the

6            evidence and the law?

7            In other words will you

8            push aside the fact that this

9            was an adult novelty store that

10           sold pornographic tapes and

11           things of that nature?  Is there

12           anyone that cannot do that,

13           cannot push that aside?

14           Can you all raise your

15           hand and promise that you can

16           forget where it happened, forget

17           that she sold these materials,

18           and base your opinion solely on

19           that?  All of you can.  Thank

20           you.

21           Now, Mr. Bradshaw has a

22           law practice here.  Have any of

23           you, and I don't want to know

24           what he has done for you,  okay,

25           in his law practice.  But have

1      any of you ever been represented

2      by Mr. Bradshaw?  Are any of you

3      good friends with Mr. Bradshaw,

4      or Mr. Bradshaw's wife or their

5      children?

6              What about Mr. Al

7      Smith?  Have any of you ever

8      been represented by Mr. Al

9      Smith?

10             There will be several

11     police officers from the

12     Enterprise Police Department

13     that will testify in this case.

14     And I know that some of us have

15     had some experiences with law

16     enforcement that may not be

17     good, be it a speeding ticket or

18     whatever.  Right?  Is there

19     anyone that has had a negative

20     experience with law enforcement,

21     particularly the Enterprise

22     Police Department, to such an

23     extent that you couldn't listen

24     to law enforcement officers?

25     And it would create some kind

1              of bias on your part?  Anyone?

2         POTENTIAL JUROR:  I have had negative

3              experiences with them, but as

4              far as, you know, not with

5              Enterprise.

6         MRS. STOUT:  Not with Enterprise?

7         POTENTIAL JUROR:  Not with the Enterprise

8              Police Department.

9         MRS. STOUT:  You have had a negative

10              experience with some other --

11         POTENTIAL JUROR:  With a state trooper.

12         MRS. STOUT:  But that would not influence

13              you in this case?

14         POTENTIAL JUROR:  No.  No.

15         MRS. STOUT:   May the record reflect

16              that is Reverend Currie.

17                  Anyone else?  Now this

18              next one, and I always hate to

19              ask because I'm afraid somebody

20              might raise their hand.  Has

21              anyone had a negative experience

22              with the District Attorney's

23              Office or me or Mr. Jarrell?

24         THE COURT:  You mean, other than the

25              Judge.

1          MRS. STOUT:  Sir?

2      THE COURT:  Never mind.  Go on.

3      MRS. STOUT:  I prosecute child support

4              cases, too.  Has anyone had a

5              negative experience with anyone

6              in the District Attorney's

7              Office?  No response.

8                  This, as I stated, is a

9              capital murder case.  And we

10             consider those the highest, most

11             serious crime that we try

12             someone for.  There are only two

13             kinds of punishments in a

14             capital murder case.  Life

15             without the possibility of

16             parole and death.

17                 Is there anyone that

18             has such a fixed opinion about

19             death, that you cannot sit on

20             this jury?  Raise your hand?

21     MRS. STOUT:  Ms. Edwards.  Is there

22             anyone else?

23     THE COURT:  Ms. Edwards, your comment

24             was, no, you don't have an

25             opinion?

1       MRS. STOUT:  Yes, she does.

2       THE COURT:  She does?  Okay.

3       MRS. STOUT:  Ms. Edwards, do you have

4                   such a fixed opinion about

5                   death, that you could not serve

6                   on this jury?  Is that correct?

7         POTENTIAL JUROR:  (Nodding head in the

8                   affirmative).

9       THE COURT:  I need you to answer audibly.

10                  Because, you see, these court

11                  reporters down here need to hear

12                  what you're saying.

13      POTENTIAL JUROR:  I do.

14      MRS. STOUT:  Ms. Herring, do you have

15                  such a fixed opinion about death

16                  that you could not serve on this

17                  jury?

18      POTENTIAL JUROR:  That's correct.

19      MRS. STOUT:   That was Ms. Herring.  And

20                  her answer was that she has

21                  such a fixed opinion about death

22                  that she could not serve on this

23                  jury.

24      POTENTIAL JUROR:  Are you saying give a

25                  verdict, a sentence of death?

1       MRS. STOUT:  In a capital case there are

2                   two options.  And I'm asking is

3                   your opinion so fixed about the

4                   death sentence that you could

5                   not serve on this jury?

6       THE COURT:  In other words, would you

7                   automatically vote against the

8                   death penalty without regard to

9                   any evidence at trial?  Do you

10                  want me to restate that?

11      POTENTIAL JUROR:  No, I understand it.

12                  No.  I would have to go with

13                  the evidence.

14      THE COURT:  So you would base your

15                  decision on the evidence?

16      POTENTIAL JUROR:  Yes.

17      MRS. STOUT:  Okay.  Thank you, Ms. Dyess.

18                  Anyone else.  Ms. Cooley?

19      POTENTIAL JUROR:  I don't have a problem.

20                  I will base it on the evidence.

21      MRS. STOUT:  Thank you.  Anyone else?

22                  Mr. Cameron?

23      POTENTIAL JUROR:  No.

24      MRS. STOUT:  No problem.  Any problem

25                  with the death penalty?

1    POTENTIAL JUROR:  No.  I will do it on

2         the evidence.

3    MRS. STOUT:  Thank you, sir.  Now, I'm

4         going to soon shut up and sit

5         down.  One last question.  Is

6         there anyone that feels that you

7         can't sit in judgment of another

8         person?  You just can't sit in

9         judgment?  Ms. Edwards?  Thank

10        you.  Anyone else?

11             Thank you, ladies and

12        gentlemen.

13   THE COURT:  The Defense, any questions?

14   MR. BRADSHAW:  Yes, sir.

15             Ladies and gentlemen, I

16        am Gary Bradshaw, as the Judge

17        told you earlier.  And I'm one

18        of the counsel for Robert

19        Conrad, sitting over here to my

20        left.  He is sitting over here

21        as an innocent man.  He is

22        charged, but he is not guilty as

23        he sits before you.  Is there

24        anyone that disagrees with me,

25        that just because we are here

1    selecting a jury that you think

2    he is already guilty?

3              Do you think that just

4    because the newspaper wrote

5    something about it, or the TV or

6    radio reported something about

7    it, that he is here sitting at

8    this table, and he is guilty?

9              As Mrs. Stout told you,

10   we are trying to find as

11   impartial a jury as we can

12   possibly put together, for the

13   State, and as she said for the

14   Defendant.  But this Defendant

15   is the State.  He is just like

16   one of us.  Just like he has

17   been charged does not separate

18   him or segregate him or put him

19   off to the side.  He is still

20   the State of Alabama and the

21   people of Alabama, and he is a

22   human being.

23             Would you agree with me

24   on that, and if so I would like

25   to see your hand, that he is a

1          human being, and he has rights.

2                    In the course of his

3          trial, he has a constitutional

4          right not to take that stand,

5          not to get up there and be

6          questioned.  And if you work in

7          a crime analysis, you know

8          that.

9                    If Mr. Conrad chooses

10         to exercise his right not get on

11         the stand and testify, is that

12         going to make you think in your

13         mind he is hiding something, or

14         there is some guilt there

15         somewhere?

16                   Does anybody have a

17         problem with the same right that

18         you all have of exercising that

19         right?  Is that a problem, Mr.

20         Cameron?

21    POTENTIAL JUROR:  Not a problem with me.

22    MR. BRADSHAW:  All right.  Let me ask you

23         if any of you have ever been

24         represented by the attorneys in

25         the District Attorney's Office

1    while they were in private

2    practice?  That would be Mark

3    Fuller.  Glenda Stout or Glenda

4    Parker Stout, formally Ms.

5    Parker, when she was in private

6    practice.  Larry Jarrell.

7    Scherryl Harrison.  And Marty

8    Williams; she was Marty

9    Weatherford, Jim Weatherford's

10   daughter.  Have any of you, and

11   not what you were represented

12   for, but have you ever had

13   occasion to be represented by

14   any of these individuals in the

15   area of law?  Has your family

16   been represented by them?

17           Years ago, before I

18   started practicing law, six

19   years ago, I was an insurance

20   adjuster with what was at one

21   time Farm Bureau, now it's Alfa.

22   And I know I represented claims

23   on some of you like Kenneth.  I

24   may have represented John Dyess.

25   I'm not sure.  But if any of you

1    remember me handling a claim on

2    you, besides Kenneth, would you

3    let me know.   Is the fact that I

4    handled an insurance claim on

5    you going to cause you to think

6    differently on the evidence from

7    the stand?

8    POTENTIAL JUROR:  No, sir.  Not a

9    problem.

10   MR. BRADSHAW:  I have a list of witnesses

11   that we expect the State to put

12   on the stand and testify.  And I

13   would like to find out if you

14   have a relationship to them or

15   know them, other than just their

16   names.  And what I want to know

17   from you, and I'm going to kind

18   of lump it together, is if you

19   have any relation, cousin,

20   in-law, uncle, brother, sister,

21   or you know them in any way,

22   such as civic organization, or a

23   social club, or a church

24   affiliation together.  If you

25   know these people, I'll just

1             call the laundry list of people

2             out to you.  And if at any time,

3             if you recognize the name of

4             somebody you know, I would like

5             for you to tell me so that we

6             can find out how you know them.

7             Lennis Darby, with Enterprise

8             Police Department.

9      THE COURT:  Peggy has her hand up.

10     MR. BRADSHAW:  And how do you know him?

11     POTENTIAL JUROR:  Co-worker.

12     MR. BRADSHAW:  Co-worker from when you

13            worked at E.P.D or at Rucker?

14     POTENTIAL JUROR:  E.P.D.

15     MR. BRADSHAW:  How long did you work for

16            him?

17     POTENTIAL JUROR:  Like, 12 years.

18     MR. BRADSHAW:  That you worked with

19            Officer Darby?

20     POTENTIAL JUROR:  I was there before he

21            got there.

22     MR. BRADSHAW:  The fact that you were a

23            co-worker with Officer Darby

24            cause you to give more credence

25            to his testimony than anyone

1          else?

2          POTENTIAL JUROR:  I would base it on the

3                  facts.

4          MR. BRADSHAW:  Ma'am?

5          POTENTIAL JUROR:  I would base it on the

6                  facts.

7          MR. BRADSHAW:  The fact that you know

8                  him would not in any way keep

9                  you from sitting impartially on

10                 the jury?

11         POTENTIAL JUROR:  No.

12         MR. BRADSHAW:  Captain Mike Lolley?  The

13                 same thing?

14         POTENTIAL JUROR:  Same thing.

15         MR. BRADSHAW:  No problem there?

16         POTENTIAL JUROR:  No problem with that.

17                 Jeff Spence?

18         THE COURT:  Peggy has her hand up.  You

19                 are going to know all of these

20                 people?

21         POTENTIAL JUROR:  Yeah.

22         MR. BRADSHAW:  Detective W. R., or better

23                 known as Buddy Ammons.

24         POTENTIAL JUROR:  Same thing.

25         MR. BRADSHAW:  Does anyone else know

1          Buddy Ammons?  We had a lady in

2          the last panel that said she

3          lived next to him.  Rick or

4          Richard Hauser, a Detective with

5          the Enterprise Police

6          Department.  Peggy knows him.

7          Earl Pennington.  Peggy.  Buford

8          Roberts.  Anyone other than

9          Peggy?  Officer Michael Petty?

10   POTENTIAL JUROR:  Petty.

11   MR. BRADSHAW:  Officer Mathew Key.  I saw

12          somebody else hand?  You know

13          Michael Petty?

14   POTENTIAL JUROR: Yes.

15   MR. BRADSHAW:  Ms. Herring, how do you

16          know Michael?

17   POTENTIAL JUROR:  Well, we all live in

18          Enterprise.  Everybody knows

19          everybody.

20   MR. BRADSHAW:  Do you know him as a close

21          friends or --

22   POTENTIAL JUROR:  No.  I just know his

23          family.

24   MR. BRADSHAW:  Would that fact keep you

25          from listening to the facts or

```
 1                    rendering a fair or impartial

 2                    verdict?

 3         POTENTIAL JUROR:  No.

 4         MR. BRADSHAW:  Officer Michael Hines.

 5                    Officer Steve Key.  Peggy knows

 6                    Steve Key.  Investigator Bruce

 7                    Mathews.

 8         POTENTIAL JUROR:  Michael Hines.  Is that

 9                    the young Michael Hines, the new

10                    cop?

11         MR. BRADSHAW:  He's fairly new.

12         POTENTIAL JUROR:  I know him from when he

13                    was in school with my daughter,

14                    when she was in school.

15         THE COURT:  For the record that's Kenneth

16                    Dawkins speaking.

17         MR. BRADSHAW:  Kenneth, I ask you the

18                    same question.  Would that fact

19                    cause you to be unable to sit

20                    without bias, without prejudice

21                    on the jury?

22         POTENTIAL JUROR:  No.  I would let the

23                    record speak for itself.

24         MR. BRADSHAW:  Okay.  Dwight Holly.

25                    Peggy knows Dwight.
```

```
 1                          And the Court as
 2            already asked you, and I
 3            apologize for being redundant.
 4            But Mr. Ray Grimes, we
 5            anticipate him being a witness
 6            in this trial.  And Mr. Ray
 7            Grimes owned a station just I
 8            want to say east of ConAgra
 9            Poultry, Grimes Grocery or
10            Grimes Service Station, for many
11            years.  He was also, he was also
12            a silent partner in the business
13            with the victim in this case.
14            Does anyone know Mr. Ray Grimes,
15            or ever did business at his
16            service station, gas station,
17            there near ConAgra?
18                          Just a few other people
19            that I would like to find out if
20            you are aware of or know of.
21            Mr. Buddy Ammons has a brother
22            we expect to testify, Hays
23            Ammons.  Eric Carmilo, Donald
24            Smith, has a farm on --
25       POTENTIAL JUROR:  I know Donald Smith.
```

```
 1        MR. BRADSHAW:  Senior or Junior?

 2     POTENTIAL JUROR:  The son.

 3      MR. BRADSHAW:  The son.  He is going to

 4             testify.  How do you know him?

 5      POTENTIAL JUROR:  He attends the church

 6             that I go to.

 7      MR. BRADSHAW:  Is that Mount Pleasant?

 8      POTENTIAL JUROR:  Yes.  But I would not

 9             have a problem.

10      MR. BRADSHAW:  You would not have a

11             problem?

12      POTENTIAL JUROR:  I would not have a

13             problem.  And I would base my

14             verdict on the evidence.

15      MR. BRADSHAW:  Okay.  You raised your

16             hand.  Do you know Donald Smith?

17      POTENTIAL JUROR:  I know his family.  I

18             grew up on a farm.  And my dad

19             worked for his dad several

20             years.  And we kind of grew up

21             together.

22      MR. BRADSHAW:  Would that fact cause you

23             to lean possibly credibility to

24             his testimony than anyone else?

25      POTENTIAL JUROR:  No.
```

```
 1          MR. BRADSHAW:  Can you still sit in fair
 2                    judgment on this case?
 3     POTENTIAL JUROR:  Yes.
 4     MR. BRADSHAW:  Dr. Sam Sawyer.
 5     POTENTIAL JUROR:  I do.
 6     MR. BRADSHAW:  Ms. Dyess, you know Dr.
 7                    Sawyer?  Ms. Brown.  Somebody
 8                    else raised their hand. Ms.
 9                    Edwards.  Ms. Cooley.  Peggy.
10                         And we expect him to
11                    testify on the medical evidence.
12                    The fact that you know him,
13                    would that cause any of you to
14                    be biased?
15     POTENTIAL JUROR:  No.
16     MR. BRADSHAW:  Ms. Dyess?
17     POTENTIAL JUROR:  No.
18     MR. BRADSHAW:  John Howard Bush.  John
19                    Howard Bush was also an employee
20                    at adult Toy Store and a male
21                    friend with Ms. Dennis.  Does
22                    anyone know Mr. John Howard
23                    Bush?  No response.
24                         I explained to the
25                    earlier panel, and it's kind of
```

1    awkward for me to ask, but I

2    feel that it's imperative to do

3    so for our client's sake.  If at

4    one time this adult toy store

5    was located next to Grime's

6    Service Station near ConAgra,

7    and later moved out to County

8    Road 636, out there, I believe

9    it moved out to County Road 711

10    near the Cannon Station, which

11    is where you grew up, have any

12    of you ever been inside of that

13    store at either location?

14    POTENTIAL JUROR:  Not the Toy Store, the

15    Cannon Station.

16    THE COURT:  Sometimes you raise your

17    hand too quickly.

18    POTENTIAL JUROR:  That's right.  The

19    Cannon Station.

20    MR. BRADSHAW:  That is the question I was

21    asking, and I apologize if that

22    may seem to embarrass you.  It

23    does to me to ask you, but if

24    you have been in that store at

25    either location.

1          The victim in this case

2     at one time also had an

3     affiliation and part ownership

4     in Dogwood Acres, a mobile home

5     park east of Enterprise.  Have

6     any of you ever been a resident

7     or a tenant there or an employee

8     of Dogwood Acres?  No response.

9          She has a brother by

10    the name Lynn Bowmen, who grew

11    up in the Bellwood Area, had

12    Green's Farm.  Were you raising

13    you hand?

14  POTENTIAL JUROR:  No.

15  MR. BRADSHAW:  Just straightening your

16    glasses.

17         Does anyone know Mr.

18    Lynn Bowman, friends with or

19    acquaintance with him?  No

20    response.

21         Mr. Ed Mock owns

22    Batten's Paint and Body Shop,

23    here in Enterprise, located down

24    just around Mount Pleasant

25    Church.  Does anyone know Mr. Ed

```
 1                   Mock?  No response.
 2            THE COURT:  Just for your
 3                   information, the deceased was
 4                   married to Ed Mock.  I had his
 5                   divorce 25-plus years ago.  Is
 6                   that the basis of your question?
 7            MR. BRADSHAW:  They had a child
 8                   together, the victim and Mr. Ed
 9                   Mock had a child together, and
10                   the State has named her, I
11                   believe, as the family
12                   representative.
13            THE COURT:  Okay.  Go ahead.  Anyone
14                   affiliated with Ed Mock?  He has
15                   a twin brother named Shelly
16                   Mock.  And both are in the auto
17                   body repair work.
18                        You've all told the
19                   Court that it's not going to
20                   affect you in any way, the fact
21                   that our client is a black male,
22                   and the victim or victims
23                   alleged in this case are a white
24                   female and a white male.
25                        What I would like to
```

1      ask you is, unfortunately, in

2      our world, our society, and I

3      guess ever since Moses got in

4      that fight with Egyptians, there

5      has been prejudice and bias in

6      people's hearts.  There will be

7      a day when that is gone.  That

8      day has not come, yet.  I'm

9      asking you, in your work place,

10     in your environment where you go

11     to work every day, are you

12     subjected to racial slurs,

13     racial bias, racial literature

14     or racial literature or racial

15     jokes that may somehow play like

16     a bad recording in your minds

17     and in your heart that would

18     affect you in this matter?  No

19     response.

20          These are tough

21     questions that I have to ask

22     you, but I hope you understand

23     the seriousness of what our

24     client is looking at.

25          Mrs. Stout told you the

1          only punishment for what the

2          State has charged our client

3          with is death or life without

4          parole. That is not the only

5          outcome of this trial.

6               There is also something

7          called not guilty. That's the

8          third outcome. You are also

9          going to hear from this Court

10         some charges on what's called

11         lesser-included offenses.

12              Therefore, the only

13         options available are not life

14         without parole -- which could be

15         worse than death -- and death.

16         Those are not the only outcomes

17         of the trial. And some of you

18         have indicated that you could

19         not sit in judgment because of

20         that.

21              But I wanted you to

22         know that. And if you were

23         thinking that's my only two

24         options, and I just have a fixed

25         opinion about death, I want you

```
 1                      to know there are other options

 2                      based on the evidence.

 3                           And I ask you now if

 4                      that would change anyone's

 5                      opinion, now that you know

 6                      legally when you hear the facts

 7                      that you can find a

 8                      lesser-included offense, you can

 9                      find --

10            MR. JARRELL:  I object.  He is arguing.

11            THE COURT:  Let me rule on that.  There

12                      is an objection.  Normally, I

13                      would have sustained the

14                      objection.  However, the State

15                      got into that.  This is what is

16                      called a response in kind.  It's

17                      made for the purposes of

18                      clarification.  It's allowable.

19                      Objection overruled.

20            MR. BRADSHAW:  You have other options.

21                      So what I would like to ask you,

22                      if in your minds, and even if

23                      you didn't respond earlier to

24                      Mrs. Stout's question, knowing

25                      that fact now, and I don't mean
```

```
 1                        to -- please don't

 2                        misunderstand, insult anyone's

 3                        intelligence.  I know some of

 4                        you deal in criminal aspects.

 5                             And you may have

 6                        already known that.  But some of

 7                        you may not.  But now knowing

 8                        that, and knowing that he comes

 9                        into this room and into this

10                        trial, clothed with innocence,

11                        and there are many other

12                        options, would that change

13                        anyone's opinions on the idea

14                        of, if I have to vote for death?

15           THE COURT:  For the record, Ms. Herring

16                        raised her hand.

17      MR. BRADSHAW:  Do you feel like, Ms.

18                        Herring, you could sit in this

19                        trial and listen to all of the

20                        evidence that you are going to

21                        hear from the State, and listen

22                        to it, and not have to make a

23                        decision until you have heard

24                        that, and your decision would

25                        not be fixed that I won't vote
```

```
 1              for death, because there are

 2              other options?

 3      POTENTIAL JUROR:  Say that again.

 4      MR. BRADSHAW:  Do you feel like you can

 5              sit in this case, right now, and

 6              not have a fixed opinion on

 7              death, that you can listen to

 8              the evidence, and knowing that

 9              the only options are not life

10              without and death, that you can

11              sit fairly and listen to the

12              instructions, not the facts.

13              The instructions will come from

14              the bench.

15      THE COURT:  From the Judge.  A lot of

16              people don't know what the bench

17              is.

18      MR. BRADSHAW:  I'm sorry.  And have no,

19              problem based on the

20              instructions he gives?

21      POTENTIAL JUROR:  That's right.  Yes, I

22              could.

23      THE COURT:  I didn't hear your answer.

24      POTENTIAL JUROR:  Yes, I could

25      THE COURT:  Okay.  Yes, you could.  We
```

1              thank you, Ms. Herring.

2      POTENTIAL JUROR:  But given the

3              situation, and all of the

4              evidence, and once the elements

5              say it's proven, either way,

6              then those two options are still

7              sustained?  Right?

8      MR. BRADSHAW:  They are still there.  But

9              it's just not the only ones

10             there.

11     POTENTIAL JUROR:  Okay.  Granted, if the

12             State proves their case, and the

13             elements are met, then you are

14             saying there are other options,

15             other than to --

16     MR. BRADSHAW:  To capital murder, no.

17             In that -- let me see if this

18             question will help to clarify.

19             I want to know if you subscribe

20             to theory of, without any

21             mitigating or other contributing

22             facts, if you subscribe to

23             theory an eye for an eye?  A

24             life for a life?

25                      And that's dangerous

1   for me to ask.  And I'm

2   certainly not giving you the

3   impression that Mr. Robert

4   Conrad is guilty right now.  He

5   is not.

6           But the State, having

7   told you that death comes with

8   capital murder, I'm asking you,

9   just because someone

10  unfortunately lost their life on

11  May 23rd last year, would you

12  automatically say that somebody

13  else ought to loose their life,

14  without knowing anything other

15  than the fact that a human being

16  is deceased?

17  THE COURT:  Is your question, raise your

18          hand if you feel that has to be

19          a life for a life?

20  MR. BRADSHAW:  Yes.  Please raise your

21          hand if you feel there has to be

22          a life for a life.  Nobody

23          raised their hand.

24              I certainly appreciate

25  your time to sit here listening.

```
 1                         It's way past 5:00 o'clock news.

 2                         And I'm the last one that you

 3                         have to listen to today.  Should

 4                         you be chosen, I will get the

 5                         pleasure to talk to you two more

 6                         times.  Thank you

 7          MRS. STOUT:  May I do a follow-up?

 8

 9          THE COURT:   Yes.  I think it's important

10                       to follow-up to this area, only.

11          MRS. STOUT:  Yes, it is.

12                              Ms. Herring, do you

13                       realize, as we sit here today,

14                       that the Defendant is charged

15                       with capital murder?

16          POTENTIAL JUROR:  Yes.

17          MRS. STOUT:  And when I asked my

18                       question, it was based on the

19                       Defendant being charged with

20                       capital murder.

21          POTENTIAL JUROR:  But, what I was

22                       interpreting was that until you

23                       hear the evidence, and it's

24                       proven that he --

25          MRS. STOUT:  Right.  But he is charged
```

1               with capital murder.  Do you

2               understand that as we sit here

3               today, he is charged with

4               capital murder?  He is not

5               charged with a lesser offense,

6               that the Defense counsel is

7               talking about.  He is not

8               charged with anything but

9               capital murder.

10                  And you don't know, and

11              no one will know, until this

12              trial is over, if there is

13              anything else that this

14              Defendant, that you won't be

15              instructed on, this Defendant

16              can be found guilty of.

17                 But, as you sit here,

18              right now, he is charged with

19              capital murder.  That was my

20              question.

21      POTENTIAL JUROR:  I would have to hear

22             the evidence and -- just hear

23             the evidence.

24     MRS. STOUT:  And when I asked you about

25             the death penalty, it was based

1              on the fact that he is charged

2              with capital murder.  Do you

3              understand?

4    POTENTIAL JUROR:  You are saying that at

5              the very end, if he is found

6              guilty of capital murder, how

7              would I feel about the death

8              penalty?

9    MRS. STOUT:  Right.  How do you feel?

10   POTENTIAL JUROR:  (Shaking head from

11              side to side).

12   MRS. STOUT:  You couldn't?

13   THE COURT:  I didn't hear her answer.

14   POTENTIAL JUROR:  I don't feel that I

15              could.  I don't feel good about

16              the death penalty.

17   MRS. STOUT:  Did you hear that?

18   THE COURT:  Yes.

19   MRS. STOUT:  Thank you.

20   THE COURT:  Would be an accurate

21              statement if I said, and I'm

22              trying to get your feelings into

23              the record in a different

24              manner, just so I can understand

25              you.  Would you, based on your

1        feelings, if you found that the

2        State proved the guilt of the

3        Defendant beyond a reasonable

4        doubt?

5        POTENTIAL JUROR:  Beyond a reasonable

6             doubt, after I sit here and hear

7             it, and there is no, you know,

8             reasonable doubt.  But, right

9             now, to prejudge what I feel, I

10            can't.

11       THE COURT:  I understand that.  But no

12            matter what the evidence

13            reflects, do you have such a

14            fixed opinion that you could

15            never, under any circumstances,

16            render a punishment as being

17            death?

18       POTENTIAL JUROR:  (Shaking head from

19            side to side).

20       THE COURT:  You are shaking your head

21            sideways.  I need to hear what

22            you are saying.

23            POTENTIAL JUROR:  I couldn't

24       recommend capital punishment,

25       being death.

```
 1          THE COURT:  Under any circumstances?
 2          POTENTIAL JUROR:  Under any
 3               circumstances.
 4          THE COURT:  No matter what the facts
 5               were?
 6          POTENTIAL JUROR:  No matter.
 7          THE COURT:  So you have a fixed
 8               opinion?  Is that what you're
 9               saying, against against
10               punishment by death, no matter
11               what the circumstances may be.
12          POTENTIAL JUROR:  That sounds like two
13               or three questions in one.
14               Seems like either way I answer
15               it it's just -- can I say it one
16               more time the way I'm feeling.
17          THE COURT:  Sure.
18          POTENTIAL JUROR:  If someone is proven
19               without a shadow of a doubt --
20          THE COURT:  That's not what I'm asking.
21          POTENTIAL JUROR:  I would have no
22               problem with the sentence.  But
23               just to, you know, thinking
24               that's why I'm up here, I'm
25               going to say life or death, I
```

 1                      have a problem with that.  But

 2                      like the other man sitting

 3                      there, there's other options?

 4          THE COURT:  There would be.  We don't

 5                      know what they are, yet.

 6          POTENTIAL JUROR:  That cleared me a

 7                      little bit from within.  But for

 8                      me to sit up here, and say I'm

 9                      up here for life or death, I

10                      have a problem with that.

11          THE COURT:  Thank you, Ms. Herring.

12                              Any other follow-up

13                      questions to Ms. Herring?

14     MS. STOUT:  No, sir.

15     MR. SMITH:  No, sir.

16     MR. BRADSHAW:  No, sir.

17     THE COURT:  Let me tell you what to

18                      expect.  Sometimes we have

19                      jurors sit out there and twiddle

20                      their thumbs while we go through

21                      this.  We are not going to make

22                      you do that.  We are going to

23                      try to use your time just as

24                      efficiently and wisely as we

25                      can.  We don't want you down

1       here wasting your time, when you

2       could be elsewhere doing other

3       things.  But, with that comes a

4       need for you to promise me that

5       you are going to accessible to

6       us, if we need you, if you are

7       selected to serve on the trial

8       jury of this case.

9               I anticipate that we

10      will be to a point where

11      tomorrow around 4:30 or 5:00,

12      somewhere in that area, we are

13      going to have a jury selected.

14              And we will get on the

15      phone, and we have your

16      telephone numbers.  Did y'all

17      give that to Mr. Counts?  Okay.

18      We have your telephone numbers.

19      If you will be by that telephone

20      at 4:30 or 5:00 to see if I call

21      you or see if we call you.

22              If we do not, then you

23      need not come back down here.

24      If we do, you would need to come

25      down as soon as you could get

1 here.  Because we will start the

2 trial of this case tomorrow at

3 5:00 o'clock or as soon as the

4 last juror gets here, as we

5 possibly can.

6    We will go tomorrow

7 night until, if you are selected

8 to serve on this trial jury,

9 until 8:00 o'clock or 9:00

10 o'clock.  So we will be back on

11 track.  And I will move this

12 case along.  And I know that

13 would pose a hardship.  But

14 maybe that will be the only

15 night that we will have to go

16 late,  if you are selected to

17 serve on the trial jury of this

18 case.

19    So,  for heaven sakes,

20 if you will be close by a phone

21 by 4:30 or 5:00 so that those

22 gentlemen,  that deputy sheriff,

23 won't have to go out and round

24 you up.

25    I had one one type in a

1    capital murder where one juror,

2    we found him in Tennessee. He

3    had already escaped us. And it

4    is sure antagonizing for the

5    other jurors to have to come sit

6    down here until they came back.

7    So, for heaven sakes, if you

8    will be close to a phone about

9    4:30 or 5:00 tomorrow, we should

10   be able to let you know. We

11   will get started in the trial of

12   this case tomorrow at 5:00

13   o'clock, 5:15, whenever the last

14   juror gets here. And if you are

15   selected to serve, there is know

16   need for me to tell you what to

17   expect then, but I will, if you

18   are selected to serve what to

19   expect in the order of this

20   trial at that time.

21           Any questions by any of

22   you?

23   POTENTIAL JUROR: Will they get up  with

24   us at work.

25   THE COURT: If there's a telephone

1                    number that you gave.

2        POTENTIAL JUROR:  I have my home number

3                    and work number.

4        THE COURT:  Okay.  As long as you can get

5                    down here.

6         POTENTIAL JUROR:  That wouldn't be a

7                    problem.

8        THE COURT:  We want you to utilize this

9                    time as effectively as you can.

10                   You may not hear from us.  You

11                   may.  Any other questions?  That

12                   was a very good question.

13                        Have I good evening.

14            (Panel exited the courtroom).

15       THE COURT:  Let the record reflect that

16                   we are now out of the hearing

17                   and presence of each of the

18                   venire members.  Are there any

19                   challenges for cause by the

20                   State?

21       MRS. STOUT:  Number 67, 54 and 58.

22       THE COURT:  Objections by the Defense?

23       MR. SMITH:  Just a moment, sir.

24       THE COURT:  Sure.  We will take number

25                   67, first.  I'm inclined to

1                    grant the challenge.

2                         Just for the record,

3               she said that she has a friend,

4               a fixed opinion about the death

5               penalty.  She cannot serve as a

6               result of that.  She was very

7               clear in that.  She says that

8               she knows the Defendant's

9               family.  She said that she is

10              not sure she will feel

11              comfortable serving.  And she

12              also said that she does not

13              believe it sitting in judgment

14              on anyone.

15      MR. SMITH:  From her questionnaire, and,

16              Judge, I heard different in the

17              courtroom, I didn't see that she

18              is member of any of the

19              religious groups that we

20              recognized as a part of their

21              doctrine or faith as

22              anti-judgment, if you will.  I

23              had that she doesn't feel

24              comfortable, which certainly

25              would not be a standard that she

1          couldn't serve because she knew

2          the family.  So we would object

3          to that, to be granted on those

4          grounds.  Thank you, Judge.

5      MR. BRADSHAW:  Also, earlier in general

6          voir dire, when asked by the

7          Court about knowing the family,

8          she said that she did know the

9          family, and that she would not

10         be a problem for her.  She

11         answered that time that she

12         could have fair judgment based

13         on the facts.

14     THE COURT:  Anything further?

15     MR. BRADSHAW:  No, sir.

16     THE COURT:  Just based solely on her

17         response about fixed opinions

18         against death, when asked, the

19         Court would sustain the

20         objection on that basis, alone.

21         Considering the totality of all

22         of the circumstances, the Court

23         finds that the challenge for

24         cause should be and hereby is

25         granted.

```
 1                        We will take the next

 2              one.  What number do y'all want

 3              to take up next

 4      MR. FULLER:  For the record, Your Honor,

 5              that's the lady I told you about

 6              that takes that out of issue.

 7      THE COURT:  Sure.  When I heard her

 8              responses, I did mean to make

 9              that known.  For the record,

10              just so you know, she works with

11              Mr. Fuller.  She didn't respond

12              to that.

13      MR. BRADSHAW:  The second number they

14              called out, I believe was 54?

15      THE COURT:  For Mr. Fuller'S company.

16              You say 54 and 58.  Let's do it

17              one at the time.  Number 54.

18      MR. BRADSHAW:  Judge, we would object to

19              that challenge.  Ms. Herring

20              answered both in general voir

21              dire that she did know the

22              family.  She said that would not

23              in any way be a problem.

24      THE COURT:  She did.  I agree with you on

25              that.
```

185

```
1          MR. BRADSHAW:  And I think she was
2                         rehabilitated as to her
3                         confusion about she said that,
4                         yes, her last -- right at the
5                         end of her statement was that if
6                         that's the way it came down, she
7                         would have no problems with
8                         that.  But trying to sit here
9                         ahead of time trying to prejudge
10                        on life or death, she would have
11                        a problem with that.  That she
12                        would have to hear all of the
13                        facts.  After hearing all of the
14                        facts, she did not say that she
15                        could not vote for the death
16                        penalty.
17        THE COURT:  Mr. Jarrell?  Mrs. Stout?
18        MR. JARRELL:  I believe she was very
19                        clear when she got down to the
20                        point of conviction, she would
21                        enter based on the evidence,
22                        that it was a capital murder,
23                        that she could not vote for the
24                        death penalty.  I think she was
25                        clear on that.
```

1    THE COURT:  Anything further?

2    MR. BRADSHAW:  Judge, she said, can I

3            tell the Court one more time the

4            way I feel?  And she said that

5            if at the end, it's beyond a

6            reasonable doubt then, yes, I

7            could do it.

8    THE COURT:  Okay.  The challenge is

9            denied.

10    MRS. STOUT:  Number 58.

11    MR. BRADSHAW:  We object to number 58.

12            Mr. Currie said that he did not

13            know the Defendant, that he knew

14            of the people.

15    THE COURT:  He says that he knows the

16            Defendant's family.

17    MR. BRADSHAW:  And preaches to them.

18    THE COURT:  That he preaches to some

19            family.

20    MR. BRADSHAW:  And they may be out in the

21            congregation.

22    THE COURT:  He says that, preaches to

23            some of the Defendant's family.

24            He went further and said that he

25            is not sure that he could sit in

```
 1                    judgment.  I don't think that is

 2               clear enough.

 3        MRS. STOUT:  He also says that he could

 4               not be unbiased.

 5        THE COURT:  Anything further?  Challenge

 6               is denied.

 7                         Anything else by the

 8               State?

 9        MRS. STOUT:  No, Your Honor.

10        THE COURT:  By the Defense?

11        MR. BRADSHAW:  No, sir, Your Honor.

12        THE COURT:  Okay.  We have about 15

13               minutes until the next panel

14               comes in.  Are they here now?

15        THE BAILIFF:  Just one is here.

16        THE COURT:  One is here.  We are a little

17               ahead of schedule.  We are going

18               to take about a ten-minute

19               break, and then we will bring

20               them in and get started.

21               Hopefully, they will all be

22               here.

23            (A short break was taken.

24               Thereafter, the next panel

25               entered the courtroom).
```

1          THE COURT:  I know y'all are tired, and

2                      you want to go home.  And I

3                      assure you we have been here for

4                      a while now.  But there are

5                      certain things that we need to

6                      ask of you, and some information

7                      that we need to get before we

8                      decide who is going to serve on

9                      this trial jury.

10                          So I'm going to ask you

11                     a few questions.  And then these

12                     lawyers are going to ask you a

13                     few questions, also.  I know

14                     many of you.  But first of all,

15                     I am going to start on the

16                     bottom row.  And if you please

17                     tell me your name, where in

18                     Coffee County, Enterprise

19                     Division you live.  And I will

20                     tell you why I need that

21                     information in just a minute.

22                     If you forget some of this, I

23                     will get that.  But tell me if

24                     you are retired, or tell me what

25                     your occupation, means of a

```
 1              livelihood may be, where you

 2              work, if you do.  And you women

 3              may come over here and hit me

 4              when this is all over.  But I

 5              don't need to know your exact

 6              age, but I need to know 30's,

 7              40's, 50's, 60's, 70's,

 8              whatever.  Round it off.  That's

 9              enough for me for what I need.

10                   So we will start, if

11              you will, give me your name.

12              And I can't write as fast as

13              these two ladies seated right

14              down here taking everything

15              down.  So if you will go real

16              slowly with me, I sure would

17              appreciate that.

18       POTENTIAL JUROR:  My name is Ingrid

19              Elliott.

20       THE COURT:  Okay.  Ms. Elliott, are you

21              employed?

22       POTENTIAL JUROR:  No, I'm not.

23       THE COURT:  Are you a housewife?

24       POTENTIAL JUROR:  Well, yeah.

25       THE COURT:  We have had two panels so
```

```
 1                        far.  And on each panel, we've

 2                        had two ladies that said they

 3                        were retired housewives.  I

 4                        don't know how you get to that

 5                        point.

 6        POTENTIAL JUROR:  You just have to do

 7                        everything in your life.

 8        THE COURT:  That sounds good to me.  I

 9                        hope my wife does not find out

10                        about that.  Where in Coffee

11                        County, Enterprise Division do

12                        you live?

13        POTENTIAL JUROR:  I live on 508 Cedar

14                        Drive.  I don't know what

15                        division.

16        THE COURT:  That's good enough for me.

17                        I just need to picture in my

18                        mind where you live, because I

19                        have been a Judge 27 years.  And

20                        I have had a lot of cases,

21                        thousands and thousands, many.

22                        And I have had two cases over

23                        the 27 years, where we've asked

24                        these questions, and at the

25                        conclusion of the trial, we
```

```
 1              found that somebody lived right

 2              across the line in another

 3              county or over in the Elba

 4              Division, which is considered

 5              totally another county for legal

 6              purposes.

 7                      And the law requires

 8              that before anyone can serve on

 9              a criminal jury trial, they have

10              to be a resident, citizen, of

11              the Enterprise Division for a

12              period of time.  Okay.  And your

13              rough age?

14      POTENTIAL JUROR:  I will be 60 on the

15              10th of October.

16      THE COURT:  Good enough.  Thank you, so

17              much.

18      POTENTIAL JUROR:  Ida Gutherie.

19      THE COURT:  Okay.  Ida.  And where are

20              you employed, please ma'am?

21      POTENTIAL JUROR:  Office associate at

22              J. C. Penny's.

23      THE COURT:  And your rough age?

24      POTENTIAL JUROR:  Fifty-nine.

25      THE COURT:  I would have said 50.
```

```
1           POTENTIAL JUROR:  Thanks.

2       THE COURT:  And where in Coffee County,

3               Enterprise Division do you

4               reside?

5       POTENTIAL JUROR:  I live in Heritage

6               Heights off Rucker Boulevard.

7       THE COURT:  Okay.  That's fine.

8                   How are you?

9       POTENTIAL JUROR:  Susan Helms.  And I

10              teach at College Street

11              Elementary School.

12      THE COURT:  With my wife for many years.

13              Many years.  Are you going to

14              tell her I made you say your

15              age?

16      POTENTIAL JUROR:  Fifty-four.

17      THE COURT:  And I know where you live.

18              You live in the Enterprise

19              Division of Coffee County.

20      POTENTIAL JUROR:  We've moved.  We're

21              not at --

22      THE COURT:  I'm aware.  I know where you

23              used to live.  You used to live

24              over in Geneva County way on

25              back.  Because I have been to
```

```
 1              your home.  Okay.  A school

 2              teacher.  Yes, ma'am?

 3    POTENTIAL JUROR:  Betty Hicks.

 4    THE COURT:  Okay.  Mrs. Hicks.

 5    POTENTIAL JUROR:  I live in New Brockton.

 6    THE COURT:  Do you live in the town of

 7              New Brockton?

 8    POTENTIAL JUROR:  Yes.

 9    THE COURT:  Okay.  So that would be the

10              Enterprise Division.  Are you

11              gainfully employed?

12    POTENTIAL JUROR:  I'm employed with the

13              Elba Public Library in Elba.

14              And I'm 64-years-old.

15    THE COURT:  Thank you, ma'am.  Yes,

16              ma'am?

17    POTENTIAL JUROR:  Dorothy Hamilton.

18    THE COURT:  Ms. Hamilton.

19    POTENTIAL JUROR:  And I live at 202

20              Lakeview Road and I'm 66.

21    THE COURT:  Okay.  And where are you

22              employed?

23    POTENTIAL JUROR:  I'm just a mom,

24              homemaker.

25    THE COURT:  And you are not retired,
```

```
 1                  either?

 2        POTENTIAL JUROR:  No.

 3        THE COURT:  You can talk to my wife

 4                  then.  Okay.

 5        POTENTIAL JUROR:  Beth Ellis.  George

 6                  Wallace Drive. And I'm 76 years

 7                  old.

 8        THE COURT:  Are you gainfully employed

 9                  somewhere?

10        POTENTIAL JUROR: No, I'm not.

11        THE COURT:  All right.

12        POTENTIAL JUROR:  Larry Gentner.  I live

13                  off on the corner of Dauphin

14                  Street and Chestnut in

15                  Enterprise.  I work for Dyncorp,

16                  aircraft maintenance foreman.

17        THE COURT:  Good to see.

18        POTENTIAL JUROR:  Yes, sir.

19        THE COURT:  We will start on the back

20                  left.

21        POTENTIAL JUROR:  Chris Hartley.  I'm in

22                  the city limits of Enterprise.

23                  I work for the Dothan City

24                  School, technology teacher.  And

25                  I'm 53.
```

```
1         THE COURT:  Okay.  Good enough.

2         POTENTIAL JUROR:  I'm Don Franks.  I'm

3              employed at Fort Rucker, Civil

4              Service.  I live in Indian Lakes

5              Subdivision in Enterprise.  And

6              I'm 58.

7         THE COURT:  Okay.  Mr. Henderson.

8         POTENTIAL JUROR:  Ben Henderson.  I live

9              on Red Cliff Circle, 57.  And I

10             work at Tartan Pines.

11        POTENTIAL JUROR:  Wilola Fluellen, 1420

12             Rucker Boulevard.  I work with

13             Volunteers of America where I'm

14             a facility trainer, and I'm 45.

15        THE COURT:  I'm chairman of the board of

16             your group.  You said Volunteers

17             of America?

18        POTENTIAL JUROR:  Yes.

19        THE COURT:  Behind Winn Dixie?

20        POTENTIAL JUROR:  No.  The one of

21             Bellwood Road.

22        THE COURT:  Okay.  And your age, again?

23        POTENTIAL JUROR:  Forty-five.

24        THE COURT:  Forty-five.

25                  Chris, come on in and
```

```
 1                    have a seat.  This young man has

 2                    worked with me in the afternoon.

 3                    He's a college student at Troy

 4                    State.  Okay.  Yes, sir?

 5     POTENTIAL JUROR:  My name is William

 6                    Haglund.

 7     THE COURT:  I'm sorry.  I didn't get your

 8                    first name?

 9     POTENTIAL JUROR:  William.

10     THE COURT:  Okay.

11     POTENTIAL JUROR:  I work part time for

12                    I.M.S. Security on Fort Rucker.

13                    And I'm 23-years old.  And I

14                    live in Harrand Creek

15                    Subdivision.

16     THE COURT:  Okay.  I'm going to ask each

17                    of you a few questions.  And

18                    I'm going to let the attorneys

19                    for each side ask you some

20                    questions, also.  My voice is

21                    about to go, so I will probably

22                    end up letting them ask most of

23                    the questions, because they

24                    normally cover everything.  But

25                    have any of you formed an
```

1    opinion as to the guilt or

2    innocence of the Defendant prior

3    to trial?  If so, raise your

4    hand.  No one has.

5         Would each of you

6    fairly try this case on the

7    basis of the evidence,

8    disregarding the Defendant's

9    race?  Is there anyone that

10    cannot do that, raise your

11    hand.  The record will reflect

12    that no one has raised their

13    hand.

14         Would the fact that the

15    victim or victims in these two

16    cases are white or Caucasian

17    race, and that the Defendant is

18    a black individual, would that

19    affect any of your abilities to

20    sit in judgment in the trial of

21    this case?  Would that have any

22    bearing whatsoever?  It would

23    not.

24         I'm going to make this

25    statement just so some of you

1    can relax.  If you are selected

2    to serve on the trial jury of

3    this case:  In many capital

4    cases, the jury is sequestered,

5    that means put in a hotel/motel

6    overnight until we finish.

7         That is not going to

8    happen, if you are selected to

9    serve on the trial jury of this

10   case.  Each of you would be able

11   to go home at night, just like I

12   would, and be with your family,

13   and come back the next day.

14        Of course, I would give

15   an instruction if you are

16   selected to serve for you not to

17   discuss this matter among

18   yourselves, nor allow anyone to

19   discuss it with you.  And I

20   would give you some other

21   instructions as long as you

22   would agree to do that, then we

23   would not sequester this jury.

24   So maybe that will help some of

25   you.

```
 1              The trial of this case
 2      will last about four days.
 3      Probably, we will finish up some
 4      time Friday.  And I let you know
 5      that because I know that people
 6      have different things that might
 7      keep them from being able to
 8      serve, if they know that we are
 9      going to be involved that long.
10              Do any of have you a
11      problem that would keep you from
12      being unable to serve knowing
13      that this matter will go until
14      about Friday, some time Friday?
15              I know that these
16      attorneys are going to focus in
17      on fixed opinions on death and
18      that kind of thing, but I will
19      let them ask that kind of
20      question.
21              Have any of you had a
22      family member that has been
23      charged with or victim of any
24      capital offense, raise your hand
25      if so.  No one.
```

1          Do any of you have a
2     family member who has been a
3     victim of a capital offense,
4     raise your hand if so.  No hand
5     is up.
6          Did any of you know the
7     victim, alleged victim of the
8     robbery?  And his name is Robert
9     Ray Grimes.  Most people refer
10     to him as Ray Grimes.  And just
11     so you will know, he had a, and
12     may have now, but I know he had
13     had a store close to ConAgra,
14     Grimes Grocery, I believe, was
15     the name of it, something on
16     that line.  Did any of y'all
17     know him, or do you know him?
18     Raise your hand if so.  No hand
19     is up.
20          Are any of you, were
21     any of you friendly with, and I
22     asked this when we had the
23     entire venire here, but were any
24     of you friendly with, associated
25     with or associated with Jelaine

1       Bowman Dennis, the deceased in

2       this capital murder charge?  Did

3       any of y'all know her?  No hand

4       is up.

5            And this might be

6       embarrassing, might not.  I

7       don't know.  But have any of you

8       ever been in her place of

9       business?  Raise your hand, if

10      so.  No hand is up.

11           Have any of you ever

12      been in Grimes Grocery out by

13      ConAgra?  The reason I ask that

14      is at one time, I understand

15      that these businesses were

16      adjacent to each other.  And

17      then later Ms. Dennis moved her

18      business to another location.

19      And I don't know this to be

20      fact, but one of the attorneys

21      has told another panel that Mr.

22      Grimes may have been a silent

23      partner with Ms. Dennis in her

24      business.  So that may come out.

25      It may not.  I don't know.  We

1          will have to wait and see.

2                         But have any of

3          you ever been in business with

4          or done business with either

5          Robert Ray Grimes or Ms. Jelaine

6          Bowman Dennis, now deceased?  No

7          one has signified they have.

8                         There is a mobile home

9          park that one of these

10         individuals may have interest in

11         or owned.  Dogwood Acres.  Have

12         any of you y'all ever done

13         business, rented a mobile home,

14         had a mobile home lot there or

15         anything from Dogwood Acres or

16         had any business with them?

17                         Are there any questions

18         by the State?

19     MR. JARRELL:  Yes, Your Honor, may it

20         please the Court, counsel,

21         ladies and gentlemen, my name is

22         Larry Jarrell.  And I'm one of

23         the Assistant District

24         Attorneys that serves you here

25         in this county.  And I will be

1           assisting Mrs. Glenda Stout, who

2           is another Assistant D. A. in

3           the trial of this case.

4                    We also have, as a part

5           of our prosecution team, Mr.

6           Dwight Holly an investigator

7           with us.

8                    Earlier, and I don't

9           know if any of you saw before

10          you left to come back, there was

11          a young lady sitting here with

12          us.  That is Mrs. April Gunnels.

13          Am I saying that right?

14   MRS. STOUT:  Yes.

15   MR. JARRELL:  I misunderstood, I thought

16          they said earlier Gowins.  And I

17          was confused when I heard the

18          word "Gunnels" later on.  And

19          she will probably be with us

20          through most of the trial or at

21          least part of it in this case,

22          if she can.

23                    What we are going to do

24          now is go through in legal terms

25          is call voir dire.  That's a

1       fancy word for saying we want to

2       learn a little bit more about

3       you, so that we can do our best,

4       as well as the Defense lawyers

5       can do their best to learn you

6       and learn some of the things

7       that might influence you one way

8       or the other, and help us to

9       select the jury that will come

10      up with a just verdict, not

11      necessarily fair, just justice

12      for both that gentleman, who is

13      sitting on trial today, and

14      justice for the family of the

15      victim in this case and Mr.

16      Grimes.

17              This is a very serious

18      case.  They don't come any more

19      serious than a capital case.

20      That is not all that's involved.

21      There is a robbery case that's

22      involved.  And it is a very

23      serious case.

24              But the point I want to

25      make is there is a standard of

1      proof.  And you have heard this

2      probably since citizenship

3      class many years ago that the

4      burden is on the state to prove

5      someone's guilt or innocence.

6      And that burden is beyond a

7      reasonable doubt.  Not beyond

8      all doubt, just beyond a

9      reasonable doubt.

10            But it matters not

11     whether it's a capital murder

12     case or a shoplifting case, the

13     burden is still the same.  It's

14     on the State.  We accept that

15     burden.

16            Can you tell me here

17     today, raise your hand, that you

18     will not hold the State to any

19     higher standard than beyond a

20     reasonable doubt, just because

21     this is a capital case?  Can you

22     do that for me.  Thank you very

23     much.

24            This question has

25     probably been asked before.  I

1           want to ask it, again, just to

2           be sure.  Are any of you related

3           or know the Defendant, Mr.

4           Robert Conrad?

5    POTENTIAL JUROR:  I do.

6    MR. JARRELL:  Ms. Fluellen?

7    POTENTIAL JUROR:  Yes.

8    MR. JARRELL:  Would the fact that you

9           know Mr. Conrad, would that in

10          any way influence or prevent you

11          from being able to listen to the

12          evidence as it is presented and

13          the instructions from the Judge

14          as to the law, applying those

15          two things together to come up

16          with a verdict?

17   POTENTIAL JUROR:  I don't think that I

18          could do that.  He lived in my

19          house for six months.

20   MR. JARRELL:  You feel that knowledge of

21          him and that -- did you have a

22          close relationship with him?  He

23          was like a child?

24   POTENTIAL JUROR:  Yes.  He was just like

25          a son to me.

1       MR. JARRELL:  And that would make it hard

2              for you or impossible for you?

3       POTENTIAL JUROR:  Yes, it would.

4       MR. JARRELL:  Thank you, Ms. Fluellen,

5              and I appreciate that.

6                    Not only Mr. Conrad,

7              but what about any of his

8              family?  Do any of know any of

9              his family?  No response.

10                   The Defense Attorney,

11             Mr. Gary Bradshaw, the one that

12             just waved to you, and Mr.

13             Smith, sitting there, Mr. Smith

14             practices over in Elba.  He used

15             to be an assistant D.A., doing

16             what I'm doing here today.  As a

17             matter of fact, the first case

18             that I tried in this county, he

19             and I tried it together.  I

20             assisted him.

21                   And my question,

22             though, is do any of you, are

23             any of you affiliated with any

24             organizations or church or

25             anything like that with either

1    one of these individuals?  Have

2    any of you been represented by

3    either one of the these

4    individuals?  I don't want to

5    know what for.  But have any of

6    you used either one of these two

7    fine lawyers as your attorney?

8    No response.

9         The Enterprise Police

10   Department will obviously play a

11   big part in this case.  And we

12   would expect that we are going

13   to call certain officers to the

14   stand.  Have any of you had any

15   problems with the Enterprise

16   Police Department, something

17   that upset you that caused you

18   grief in any way?

19         Have any of you had

20   any problems with the District

21   Attorney's Office?  I haven't

22   insulted anybody yet?

23         One question I was

24   going to ask, it's going to be

25   close to 8:00 o'clock before we

```
 1                    get out of here.  Which one of
 2                    you ladies are going to cook
 3                    supper?
 4        POTENTIAL JUROR:  Not me.
 5        THE COURT:  I believe we've already
 6                    answered that question.
 7        MR. JARRELL:  I've asked you about the
 8                    Enterprise Police Department and
 9                    the District Attorney's Office.
10                    Any other law enforcement agency
11                    that you have had any problems
12                    with that might cause you to
13                    have biases against the
14                    testimony given by a police
15                    officer?  No response.
16                        The place where this or
17                    these crimes took place was in a
18                    store out in the county called
19                    the Toy Store.  Now, the Toy
20                    Store is a store that the
21                    merchandise in that store, it's
22                    very possible could offend some
23                    people.  It is called an adult
24                    Toy Store.  It sold tapes,
25                    novelty items, books that most
```

1    folks probably wouldn't want to

2    be associated with in any

3    manner.

4              Is there any of you

5    that feel that because of that,

6    that that would raise some sort

7    of bias or prejudice in your

8    heart, that would make you

9    uncomfortable about trying this

10   case or sitting on this jury or

11   rendering a judgment after

12   hearing all the facts on the

13   law?  Does that bother anyone?

14              Now, something

15   that always comes up in a

16   capital murder case is should

17   you be convinced somewhere down

18   the line, after hearing all of

19   the evidence that will be

20   presented from the witness box,

21   the physical evidence that will

22   be presented for you, and

23   hearing the instructions that

24   the Judge will give you as to

25   how you are, or what law you are

1          suppose to apply to this, should

2          you find that the Defendant was

3          guilty of capital murder, do any

4          of you have a fixed opinion

5          about the death penalty that

6          would cause you a problem in

7          rendering that verdict of guilty

8          of a capital offense?  Mr.

9          Gentner?

10   POTENTIAL JUROR:  No, sir.

11   MR. LARRY:  What about you, Ms. Hamilton?

12          Can you handle that?

13   POTENTIAL JUROR:  (Nodding head in the

14          affirmative).

15   MR. JARRELL:  Many of us, who have years

16          of being taught by our parents

17          and Sunday school teachers and

18          school room teachers, sometimes

19          we get instructed early on about

20          sitting in judgment of other

21          people.  And there are some

22          people, and they have every

23          right to do so, feel that they

24          cannot sit in judgment of

25          someone else, either because of

```
 1                    moral, or training beliefs they
 2                    hold in their heart?  Do any of
 3                    you feel like you could not sit
 4                    in judgment of another person?
 5        POTENTIAL JUROR:  I do.
 6        MR. JARRELL:  Ms. Fluellen, thank you for
 7                    your honesty.
 8        POTENTIAL JUROR:  I do, too.
 9        MR. JARRELL:  You are Ms. Hicks.
10        THE COURT:  Ms. Hicks, I'm sorry.  I
11                    didn't hear your response.
12        POTENTIAL JUROR:  I said I also -- I have
13                    a problem with that.
14        THE COURT:  Is that a religious belief or
15                    is that --
16        POTENTIAL JUROR:  Yes.
17        THE COURT:  It's a religious belief?
18        POTENTIAL JUROR:  Right.
19        THE COURT:  That you cannot sit in
20                    judgment and should not sit in
21                    judgment of others?
22        POTENTIAL JUROR:  Right.
23        THE COURT:  Okay.  And, Ms. Fluellen, is
24                    that a religious belief or just
25                    personal?
```

213

```
 1            POTENTIAL JUROR:  Yes.  Religious belief.

 2       THE COURT:  Thank you, Ms. Fluellen.

 3       MR. JARRELL:  If you would give me one

 4               moment to confer with

 5               co-counsel.  That may be all I

 6               need to ask.

 7                    I do know one other

 8               question that I need to ask.

 9               Mr. Bradshaw, at one time, was

10               an insurance agent, adjuster, I

11               believe?  Is that correct?

12       MR. BRADSHAW:  Yes.

13       MR. JARRELL:  Did any of you have any

14               dealings with Mr. Bradshaw?  I

15               believe he was with Farm Bureau

16               before it became Alfa?  Did any

17               of you have any dealings with

18               Mr. Bradshaw in that aspect?

19                    Thank you, very much.

20       THE COURT:  The Defense?

21       MR. BRADSHAW:  Yes, Your Honor.

22                    Ladies and gentlemen,

23               my name is Gary Bradshaw.  I'm

24               one of the attorneys

25               representing Mr. Robert Conrad.
```

1    Al Smith is the other one.  We

2    have been introduced to you one

3    time earlier today, when it was

4    daylight.

5        Mr. Conrad is sitting

6    over there in front of you as an

7    innocent man, just like you,

8    would be, Mr. Hartley, and you,

9    just like you would be until

10   proven guilty.

11       My first question, of

12   course, has already been asked

13   to you in other ways.  There has

14   been TV, radio, newspapers,

15   there's been a raid of people

16   come through here today.  And he

17   is sitting over there.  Do all

18   those facts make your mind in

19   the least bit say he must be

20   guilty?  It's very important.

21   That's a hard humanistic thing

22   to do.  It's hard as a human

23   being for those things to filter

24   in.  Because we're not a

25   computer, where you can go in

```
1         and delete things out.  Those

2         things are still there.  It's

3         hard.  And that's why I ask you

4         that question:  Is your thinking

5         already the slightest bit

6         tainted because of the way our

7         system is?

8              We read things, and we

9         see things in the paper.  And I,

10        unfortunately, I have been

11        guilty in the past to pick up

12        the Birmingham News or

13        newspaper, and read that

14        something happened, and think,

15        Oh.  He must be guilty.  Nobody

16        here has that feeling?

17             Mr. Jarrell talked to

18        you about myself and what my

19        former past was.  All of the

20        attorneys are good attorneys in

21        the District Attorney's Office

22        at one time were in private

23        practice.  We need to know if

24        you have ever had dealings with

25        or representation by any of
```

1              those attorneys.  I will call

2              them out.  And you can let me

3              know if you have.

4                        Mark Fuller, our

5              District Attorney.  He used to

6              be in private practice with

7              Cassady, Fuller and Marsh.

8    THE COURT:  And, again, it's none of our

9              business how they represented

10             you, or what they represented

11             you for, what legal advice they

12             provided you with, just have you

13             been represented by any of those

14             people.

15   MR. BRADSHAW:  Just look and see if there

16             is an attorney/client

17             relationship.  Mr. Fuller.

18             What about the firm that he

19             worked for Cassady, Fuller and

20             Marsh?  Yes, ma'am.  Ms.

21             Guthrie?

22   POTENTIAL JUROR:  Joe Cassady, Jr.

23   MR. BRADSHAW:  He represented you.

24   POTENTIAL JUROR:  Yes.

25   MR. BRADSHAW:  Anyone else?  Yes, sir.

217

```
 1                    Mr. Henderson.
 2         POTENTIAL JUROR:  Joe, Sr.
 3         MR. BRADSHAW:  Anyone else?  Was Mr.
 4              Fuller, at that time, was he
 5              over there practicing law or
 6              was he D.A., or both?
 7         POTENTIAL JUROR:  Over there.
 8         MR. BRADSHAW:  Ms. Helms?
 9         POTENTIAL JUROR:  (Inaudible).
10         MR. BRADSHAW:  Right.  Those of you who
11              answered that --
12         POTENTIAL JUROR:  Mr. Cassady did, but
13              that was after Mr. Fuller was
14              District Attorney.  It was not
15              while he was over there, it was
16              way before.
17         MR. BRADSHAW:  Well, I'm sure you can
18              tell my question is going to be
19              the fact that you had
20              representation by their law
21              firm, is that going to, in any
22              way, keep you from sitting here
23              as an impartial panel, impartial
24              juror, and just listen to the
25              facts that you hear from right
```

```
 1                    up there and the instructions

 2                    from the Judge?  Would that keep

 3                    you from doing that in any way?

 4

 5        POTENTIAL JUROR:  No.

 6        MR. BRADSHAW:  Larry Jarrell, the man

 7                    that just spoke to you, and

 8                    y'all probably know this.  Larry

 9                    used to practice in Troy,

10                    Alabama, in Pike County, so that

11                    reduces the chances of you

12                    knowing him.  Mrs. Glenda Stout,

13                    which she was in private

14                    practice.  She was Glenda

15                    Parker.  I think her office was

16                    in the same building where mine

17                    in now.  Were you ever

18                    represented Glenda? That's her.

19                    Ms. Scherryl Harrison, again,

20                    from Pike County.  And Marty

21                    Williams.  She use to be Marty

22                    Weatherford.  Mr. Jim

23                    Weatherford's daughter is an

24                    Assistant Prosecutor.  Have you

25                    ever been represented by her?
```

1           A couple of other names

2      that I want to ask you, or a

3      couple of other areas that I

4      want to ask you about those same

5      individuals and the people that

6      work with them, such as Mr.

7      Dwight Holly, an investigator

8      with the District Attorney's

9      Office, as is Bruce Matthews.

10     And many other people that work

11     in that office.

12           And to try to get

13     through this quickly, I want to

14     call out some names.  And if you

15     have had those lawyers that I

16     just mentioned or those people

17     affiliated with the D.A's

18     office, the police department or

19     Sheriff's Department.  If you

20     are distantly related, closely

21     related, have a good friendship

22     with, go to the same church,

23     Sunday school, Bible study,

24     civic organization or social

25     club, Alabama club or War Eagle

```
 1                    club or even better, the best

 2                    Troy State club?  Where is

 3                    Chris.

 4        THE COURT:  He stepped out.

 5        MR. BRADSHAW:  I would like to know if

 6                    you have any affiliation like

 7                    that?

 8        POTENTIAL JUROR:  I'm good friends with

 9                    Marty Williams.

10        MR. BRADSHAW:  Good friends with Marty

11                    Williams?

12        POTENTIAL JUROR:  Yes.

13        MR. BRADSHAW:  Would that friendship

14                    taint your judgment in this

15                    case?

16        POTENTIAL JUROR:  Oh.  No.

17        MR. BRADSHAW:  Anybody else?  None of

18                    those clubs.  There are going to

19                    be some witnesses on the stand.

20                    And the same criteria that I

21                    just outlined to you, clubs,

22                    church, friends, your kids are

23                    friends?  Any type of a

24                    affiliation like that with

25                    anyone in the Enterprise Police
```

```
 1              Department, such as Lennis

 2              Darby, Captain Mike Lolley,

 3              Thomas Braun, W. R. Buddy

 4              Ammons, Rick or Richard Hauser,

 5              Earl Pennington, Eddie

 6              Pennington, Mr. Dwight Holley

 7              sitting here in front of you?

 8      POTENTIAL JUROR:  I know Tom Braun.

 9      MR. BRADSHAW:  Do you know by just

10              knowing him, or is he a -- or

11              you well acquainted with him?

12      POTENTIAL JUROR:  No.

13      MR. BRADSHAW:  Just know who is he is?

14      POTENTIAL JUROR:  Years ago, he had a

15              girl in my class.  That's

16              probably been 20 years or more.

17      MR. BRADSHAW:  While you've mentioned

18              that, in the classroom, Ms.

19              Helms, your relationship in

20              teaching with Janet McAliley,

21              and knowing Judge McAliley, the

22              25, 26, 27 years that he served

23              as a Judge in District and

24              Circuit Court, and all the

25              justice that he has rendered out
```

1          from the bench, would that in

2          any way cause you to be in the

3          slightest bit impartial or not?

4     POTENTIAL JUROR:  No.  It would have no

5          affect at all.

6     MR. BRADSHAW:  Are you raising your hand?

7     POTENTIAL JUROR:  No.  Just stretching.

8     MR. BRADSHAW:  Okay.  The other people

9          that I wanted to ask you about:

10         Jeff Spence is going to have

11         some testimony in this trial.

12         Does anyone know Jeff Spence or

13         Quality Printing?  No response.

14    MR. BRADSHAW:  Matt Key or Steve Key?

15         The Judge, the Court asked you

16         about the Adult Toy Store.  And

17         have any of you ever been in

18         there?  And, yes, it was located

19         next to Mr. Ray Grimes Grocery,

20         just a few hundred yards down

21         the hill from ConAgra at one

22         time before it moved to County

23         Road 711.

24              Again, I will ask you

25         if you've ever been in there on

223

1          purpose or by mistake?

2                    Would you agree with me

3          and think about this, if you

4          would:  Would you agree with me

5          that life is more valuable than

6          property?  Is there any

7          disagreement that life is more

8          valuable than property?

9                    We are just about

10         finished.  I need to ask you, in

11         asking if life is more valuable

12         than property, and a couple of

13         convictions that have been

14         stated.

15                   I want to maybe

16         rephrase a question.  Without

17         any other knowledge, other than

18         a life that has been gone, and

19         unfortunately, in this instance,

20         there is a life that's gone, do

21         you subscribe to the belief that

22         because one life is gone, that

23         somebody else's life has got to

24         go?  Just because a life is

25         gone, and you know nothing else,

1          does that make you think

2          somebody has got to give up a

3          life?  Is there anybody out of

4          you 12 that feel that way?  And

5          the reason I ask is because this

6          is a capital murder case.  And

7          it's a very serious case.

8                    And, although, Mr.

9          Robert Conrad sits before you

10         innocent, he won't go home to

11         his home tonight.  He has to

12         have a jury of his peers to

13         decide the charges against him.

14         And if he is found guilty by a

15         jury of capital murder, the

16         option will be life without

17         parole or death.  As I was

18         explaining to another panel,

19         there will be more options for a

20         jury, that you are not going to

21         be left with just those two

22         options.  There is another

23         charge against him.  And there

24         will be requested jury charges

25         from the Defense to the Judge to

1       give to you called

2       lesser-included offenses.

3       Meaning, that he may not be

4       guilty of capital murder.  There

5       is always not guilty.  That's

6       what I would subscribe to you.

7       And I want you to know that.

8       That when you go home tonight

9       and you're laying there staring

10      at your ceiling fan, thinking,

11      well, if I'm picked on that

12      jury, I'm going to be deciding

13      whether a man goes to prison for

14      life without the possibility of

15      parole, or whether he is going

16      to be electrocuted.

17              There are other

18      options, and I want you to be

19      able to hear all of the other

20      facts.  Mr. Haglund, you said

21      that you had a problem, well,

22      not a problem, but that you

23      would believe a police officer's

24      testimony or word above a

25      non-police officer?  Do you

```
 1                        still --
 2          POTENTIAL JUROR:  Yes, sir.
 3          MR. BRADSHAW:  So if a police officer
 4                  gets on that stand and says it's
 5                  gray.  And Mr. Conrad gets on
 6                  that stand and says it's blue,
 7                  would that mean that you would
 8                  believe it's gray,
 9                  automatically?
10          POTENTIAL JUROR:  Not automatically.  I
11                  would like to see for myself if
12                  it was or not.  But if I didn't
13                  have the opportunity to see it,
14                  I would believe a police officer
15                  over a non-police officer.
16          MR. BRADSHAW:  So, if you've just got the
17                  words, both of them in this
18                  case, having been sworn, you are
19                  going to believe the officer
20                  over the non-officer?
21          POTENTIAL JUROR:  Yes, sir.
22          MR. BRADSHAW:  That brings me to almost
23                  the end of my questions.  You
24                  have a right not to testify if
25                  you are accused.  Robert Conrad
```

```
 1                    has that right.  If he chooses
 2                    to sit in that chair over there
 3                    this whole week and listen to
 4                    the accusations and charges
 5                    against him, and not take that
 6                    stand and raise his hand and
 7                    give testimony, if he chooses
 8                    not to do that, does that make
 9                    you think he is guilty?  Ms.
10                    Helms?
11          POTENTIAL JUROR:  No, sir.
12          MR. BRADSHAW:  (Inaudible).
13          POTENTIAL JUROR:  No, sir.
14          MR. BRADSHAW:  (Inaudible).
15          POTENTIAL JUROR:  No, sir.
16          MR. BRADSHAW:  You have expressed
17                    concern that you can't sit in
18                    judgment, Ms. Hicks -- I don't
19                    know why I called you Ms. Hicks
20                    -- Ms. Fluellen?  What you are
21                    going to be asked to do is to
22                    listen to facts.  The Judge is
23                    going to be the Judge over the
24                    law.  And he will instruct you
25                    on that.  What you are going to
```

1    listen to for several days and

2    several people's testimony and

3    papers and documents. And you

4    are going to watch people and

5    see people, and see their

6    reactions. But what you are

7    going to be judging is the facts

8    as they are presented to you.

9        The State has a burden

10   that Mr. Jarrell talked to you

11   about. And if you will indulge

12   me here. There is a hurdle

13   here, and they have to get over

14   that hurdle by presenting you

15   facts, Ms. Fluellen. They have

16   to give you those facts.

17       If they give you those

18   facts, to where you say well,

19   they got over that hurdle, and

20   what you are judging are the

21   facts. Or if you say, they went

22   right up under that hurdle, a

23   lesser included offense maybe,

24   or, man, they didn't get off the

25   ground. Not guilty.

229

```
 1                        You are judging the

 2            facts.  In looking at it from

 3            that perspective, and I

 4            appreciate it, the religions

 5            faith and convictions.  But

 6            could you sit and honestly

 7            listen to the facts on this man

 8            on his life and render a

 9            judgment of just whether or not

10            the State met that burden beyond

11            a reasonable doubt?  Could you

12            do that, and feel like you were

13            not sitting in judgment of a

14            person, Ms. Fluellen?

15    POTENTIAL JUROR:  I don't think I can.

16    MR. BRADSHAW:  That's what I wanted to

17            know.  But I don't know how to

18            explain it any other way.

19    POTENTIAL JUROR:  Well, you would still

20            have to make a judgment.

21    MR. BRADSHAW:  You would still have to

22            make a judgment call of whether

23            the State met their burden.

24            They are going to lay it out to

25            you.
```

1       POTENTIAL JUROR:  I would still have to

2              vote one way or the other.

3      MR. BRADSHAW:  You will have to vote not

4              guilty or guilty or not guilty

5              on something or guilty on

6              something else, yes, you will

7              have to render a decision, a

8              verdict.

9       POTENTIAL JUROR:  I had rather not do

10             that.

11      MR. BRADSHAW:  You had rather not do it.

12             That is a religious conviction?

13       POTENTIAL JUROR:  (Nodding head in the

14             affirmative).

15      MR. BRADSHAW:  Just a minute out.

16               I asked the first panel

17             this, and I just wanted to ask

18             you, too, especially in light of

19             what time it is.  And the Judge

20             has already hinted on this.

21             Matter of fact he did more than

22             hint.  The way I explain that

23             is, I often give into my

24             six-year old when he asks for

25             the 19th time for something that

```
1              he really shouldn't have, like

2              second Coke or third Snickers

3              bar, and I give in to him, so

4              he doesn't ask me any more.  You

5              know, you are ready for

6              something to stop.

7                   I tell you that little

8              scenario, because if we are here

9              on Friday night, and the

10             Wildcats are out there playing

11             Prattville, and hopefully

12             winning.  And Elba is over there

13             playing Luverne, and we are

14             here, is the fact that you just

15             want to get out of here, are you

16             going to let that enter into

17             your judgment on this man's due

18             process and his freedom?  Ms.

19             Helms?

20     POTENTIAL JUROR:  I can be fair.

21     MR. BRADSHAW:  I thought you all could.

22                  Thank you so much for your time.

23     THE COURT:  Okay.  Now, ladies and

24             gentlemen, there is no need to

25             keep you here any longer.  This
```

1    is what is going to occur:  We

2    have three or four more panels

3    that we are going to talk to

4    tomorrow.

5         And I would guess, my

6    best guess, in courts and what

7    we are doing now is never a

8    definite thing, as y'all know.

9    But my best guess, as 27 years

10   of judging, is somewhere around

11   4:30 to 5:00 tomorrow, we should

12   have a jury.  Okay.  We don't

13   want y'all to have to sit out

14   there and waste time when you

15   could be doing something else.

16        So at 4:30 or 5:00,

17   somewhere in between, hopefully,

18   we will call the 14 of you, or

19   14 citizens, who have been

20   selected to serve on the trial

21   jury.  We will get started in

22   the trial of this case some time

23   tomorrow, I would say around

24   5:30 or so, when that last juror

25   arrives at this courthouse.  And

1    we are going until 8:00 or 9:00

2    o'clock tomorrow night.  It's my

3    job to make sure the train

4    doesn't derail, and we get

5    things over with, after allowing

6    everybody an opportunity to

7    present the evidence in this

8    case, these cases.

9            So, I ask that you

10   please be by your phone tomorrow

11   between 4:30 and 5:00.  And we

12   will give you a call if you have

13   been selected to serve on the

14   trial jury.  And if you are

15   selected, to come on down and we

16   will get started when the last

17   person gets here.

18            I had a capital case

19   years ago, where one juror did

20   not hear that, and they were

21   selected to serve.  And when we

22   found them they were in

23   Tennessee and the rest of the

24   jurors were mighty, mighty upset

25   having to sit there and wait to

```
 1              get started.  So with that, for
 2              heaven sakes -- I don't want you
 3              to have to sit out there.  I
 4              could have you sit out there and
 5              wait all day long.  But that is
 6              just a waste of your time.  And
 7              we don't want to do that.
 8                   So you can go to work.
 9              You can work, if you choose, or
10              you can work around the house.
11              You can do whatever you are
12              going to do, as long as you are
13              by the telephone that you gave
14              to Mr. Counts, our Clerk of
15              Court and his staff.  Any
16              questions?
17                   Y'all have a good
18          evening.
19          (Panel exited the courtroom.
20          Potential juror approached the
21          Court).
22      THE COURT:  I need to get this on
23              the record.  Mr. Ben Henderson's
24              wife was on the Grand Jury that
25              returned the indictment in this
```

```
 1              case.  And we didn't ask that
 2              question.  That is a very good
 3              point and I appreciate you
 4              letting us know.  Mary Henderson
 5              is his wife.  Thank you, Mr.
 6              Henderson.
 7                   Let the record reflect
 8              that we are now out of the
 9              hearing and presence of all of
10              the venire members.  Any
11              challenges by the State?
12      MRS. STOUT:  Yes, Your Honor.  Number 73
13              and number 93.
14      THE COURT:  Okay.  We will go with 73,
15              first.  Any objection by the
16              Defense?
17      MR. BRADSHAW:  To 73?  No, sir.
18      THE COURT:  That challenge is granted.
19              She said that she knows the
20              Defendant.  She could not
21              disregard that fact.  The
22              Defendant lived in her home;
23              that the Defendant was like a
24              son to her.  And she also says
25              that she has a religious belief
```

1              that causes her not to be able

2              to sit in judgment of anyone.

3    THE COURT:  Okay.  And your next

4              challenge is 93?

5    MRS. STOUT:  Correct.

6    THE COURT:  By the Defense?

7    MR. BRADSHAW:  No objection.

8    THE COURT:  She says that she has a

9              religious belief that causes her

10             to be unable to sit in judgment.

11             The record will so reflect.

12             Challenge is granted.  Any other

13             challenge by the State?

14   MRS. STOUT:  No, Your Honor.

15   THE COURT:  By the Defense.

16   MR. SMITH:  Number 92, by virtue of his

17             wife having been on the Grand

18             Jury that returned this

19             indictment.

20   THE COURT:  That challenge is granted

21             for the reasons enumerated.

22             Anyone else?

23   MR. SMITH:  Yes.  Number 84.  He stated a

24             couple of times that he would

25             believe a police officer over a

1          lay witness at any time.

2     THE COURT:   Comment by the State?

3     MRS. STOUT:   Your Honor, I don't believe

4          that's a proper Batson

5          challenge.   I believe the

6          Defense counsel can strike him,

7          if they choose.   But I do not

8          believe that's a proper Batson

9          challenge

10    THE COURT:   Challenge is granted over

11         objection.   It is proper

12         objection.   You should have one

13         more, I think.   I'm sorry.   That

14         was it.   Anything else?

15              Have a good night.

16    MR. SMITH:   Thank you, Your Honor.

17    THE COURT:   We will start tomorrow

18         morning at 9:00 o'clock sharp.

19    MRS. STOUT:   Thank you, Your Honor.

20         (Court was recessed until the

21         following day).

22

23

24

25

```
 1                        September 24, 2002
 2        THE COURT:   This court will come to
 3                     order.   Have a seat.   There are
 4                     certain things that we need to
 5                     gather from each of you before
 6                     we begin the process of striking
 7                     or selecting a jury.   The first
 8                     thing that I would like to do,
 9                     so we can get to know you just a
10                     little bit better, would be for
11                     us to go around the bottom of
12                     the jury here, this jury panel,
13                     and for each of you to please,
14                     number one, state your name.
15                     And then tell, if you will, what
16                     you do as a means of a
17                     livelihood, your profession,
18                     occupation, again, what you do
19                     as a means of a livelihood.
20                          We have had two panels,
21                     where on each panel we had a
22                     woman say that she is a retired
23                     housewife.   I didn't know what
24                     she meant by that.   I didn't
25                     know she could have ever retired
```

1    from that.  But we had two

2    separate panels where that was

3    stated.

4              Then tell us if you

5    will, and don't worry about all

6    of this, I will jog your memory

7    if you forget.  Tell me where in

8    Coffee County, Enterprise

9    Division, you live.  Because I

10   just need to have in my mind

11   that you live in the Enterprise

12   Division of Coffee County.

13             I have had two juries

14   over the years where we asked

15   that question.  And at the end

16   of the trial, we found that one

17   person lived right over the line

18   or something like that.

19             And it certainly

20   presented some problems.

21   Because the law of Alabama

22   requires that before anyone can

23   sit on a criminal trial jury,

24   they have to have been a

25   resident citizen of that county

```
 1              or that division for a statutory
 2              period of time.  If you would do
 3              that, I would appreciate it.
 4                   We will start at the
 5              bottom left.
 6      POTENTIAL JUROR:  My name is Billie
 7              Holloway.
 8      THE COURT:  If you will go real slowly,
 9              so that these ladies can take
10              down everything you say very
11              rapidly.  But I'm just an
12              old-worn out Judge.  I write
13              slowly.
14      POTENTIAL JUROR:  Billie Holloway.
15      THE COURT:  B-i-l-l --
16      POTENTIAL JUROR:  -- i-e.  Holloway.
17      THE COURT:  Ms. Holloway, what do you do
18              as a means of livelihood?
19      POTENTIAL JUROR:  I'm a phlebotomus.
20      THE COURT:  What in the world is that?
21      POTENTIAL JUROR:  I work in the lab and
22              draw blood.
23      MR. SMITH:  A vampire, Judge.
24      THE COURT:  I've got you.  And where in
25              Coffee County, Enterprise
```

```
 1                  Division, do you are reside?

 2          POTENTIAL JUROR:  I live at 7781 County

 3                  Road, 514 New Brockton.

 4          THE COURT:  Is that on this side of New

 5                  Brockton?

 6          POTENTIAL JUROR:  It's on this side by

 7                  Wooten Chapel Church.

 8          THE COURT:  Where now?

 9          POTENTIAL JUROR:  Wooten Chapel Church.

10          THE COURT:  Okay.  That's in the

11                  Enterprise Division.

12                          And you ladies are

13                  probably going to hit me for

14                  this.  I need age range, 20

15                  years, 30 years, 40 years,

16                  whatever?

17            POTENTIAL JUROR:  I will be 40.

18          THE COURT:  Yes, ma'am?

19          POTENTIAL JUROR:  Barbara Oglesby.  I

20                  work with Phillips Van Heusen.

21          THE COURT:  Okay.

22          POTENTIAL JUROR:  I live at 795 County

23                  Road 148, New Brockton.

24            THE COURT:  Is that on the southern

25                  side of New Brockton or where in
```

1          the county?

2          POTENTIAL JUROR:  It's on the other

3              side of New Brockton.

4       THE COURT:  On the other side.  We need

5              to have someone check on that

6              just to make sure, if you will.

7              I will come back to that.

8                   And your age range,

9              please, ma'am.

10         POTENTIAL JUROR:  Fifty-two.

11         THE COURT:  Yes, ma'am.

12         POTENTIAL JUROR:  Etta Larue.

13         THE COURT:  Would you say that, again?

14              How do you spell your last name?

15         POTENTIAL JUROR:  L-a-r-u-e.  I'm a

16              registered nurse, semi-retired.

17         THE COURT:  Okay.  And where in Coffee

18              County do you live?

19         POTENTIAL JUROR:  At Gateway.

20         THE COURT:  And your age range?

21         POTENTIAL JUROR:  Sixty-four.

22         THE COURT:  Yes, sir.

23         POTENTIAL JUROR:  I'm Jack Hill,

24              H-i-l-l.  I'm retired.

25         THE COURT:  From what, Mr. Hill?

1        POTENTIAL JUROR:  From Sikorsky Aircraft

2                and the Army.  And the work I do

3                is what my wife tells me to do.

4        THE COURT:  I understand that very

5                much.

6        POTENTIAL JUROR:  I'm 71.

7        THE COURT:  So you are not really

8                retired, are you?  Age?

9        POTENTIAL JUROR:  Seventy-one.

10       POTENTIAL JUROR:  Angela Hughes, County

11               Agent with the Extension system.

12       THE COURT:  Everybody knows you,

13               Angela.

14       POTENTIAL JUROR:  1016 County Road 151,

15               New Brockton.

16       THE COURT:  Where is that?

17       POTENTIAL JUROR:  Towards Ariton, it's

18               between 167 and 51, going

19               towards Arrington.

20       THE COURT:  I believe that would be in

21               Enterprise Division?

22       POTENTIAL JUROR:  Yeah.

23       THE COURT:  It is all right.  And your

24               age range?

25       POTENTIAL JUROR:  Fifty-one.

```
 1          THE COURT:  Thank you.

 2          POTENTIAL JUROR:  Eliz Hutchinson.  I am

 3                  a homemaker, and I teach

 4                  volunteer courses at SAC, Fort

 5                  Rucker.  And I live in Valley

 6                  Hills, and I'm 48.

 7          THE COURT:  Thank you.  All right.

 8          POTENTIAL JUROR:  I'm Sarah Hiers.  I'm

 9                  a customer service manager at

10                  Wal-Mart.  And I'm 48.  And I

11                  live at 362 County Road 257, New

12                  Brockton.

13          THE COURT:  Where is that, again,

14                  please?

15          POTENTIAL JUROR:  It's out 167, the Old

16                  Jetter subdivision.

17          THE COURT:  Okay.  Okay.

18                  (Off-record discussion).

19                          Mrs. Oglesby, you are

20                  definitely in the Enterprise

21                  Division, right on the line

22                  there.

23          THE COURT:  Okay.  We will start back

24                  left row.

25          POTENTIAL JUROR:  Joyce Jones.  I'm an
```

1          insurance agent.  Fifty-seven.

2          and I live in  Enterprise, 110

3          Laurel Circle.

4     POTENTIAL JUROR:  Earl Jackson.

5     THE COURT:  And where do you work,

6          please, sir?

7     POTENTIAL JUROR:  ConAgra Feed Mill.  I'm

8          the head man there.

9     THE COURT:  And your age is?

10    POTENTIAL JUROR:  Fifty-seven.

11    THE COURT:  Where in Coffee County do you

12         reside?

13    POTENTIAL JUROR:  105 Madison Lane.

14    THE COURT:  Here in Coffee County,

15         Enterprise.  Yes, sir?

16    POTENTIAL JUROR:  Roy Mitchell.  Work for

17         Alfred Saliba Homes, out of

18         Dothan.  My address is 1005

19         County Road 660, Chancellor,

20         Alabama.  And I'm 58.

21    THE COURT:  Chancellor?  But you live in

22         Coffee County?  Is that correct?

23

24    POTENTIAL JUROR:  Yes, sir.  Two or

25         three miles from the line.

1    THE COURT:  Okay.  Good.  Yes, sir.

2    POTENTIAL JUROR:  Andrew McDurmont.

3    THE COURT:  Your last name, again?

4    POTENTIAL JUROR:  McDurmont.  I'm 28.

5         I'm looking forward to

6         retirement.  I live on County

7         Road 533.  But somebody smashed

8         my mailbox after I put E11

9         address on there.

10   THE COURT:  We will tell the law

11        enforcement officer about that.

12   POTENTIAL JUROR:  I have reported it,

13        but it was a while back.

14   THE COURT:  Yes, ma'am?

15   POTENTIAL JUROR:  My name is Dorothy

16        Moore. I'm retired civil

17        service.  I'm 66.  And I live

18        out Turn's Cross Roads, out 134.

19   THE COURT:  Okay.  I have a few

20        questions that I'm going to ask

21        of you.  And then I'm going to

22        let these attorneys ask you a

23        few things.  My first question

24        is:  Did any of you know the

25        deceased, Jelaine Bowman Dennis?

```
 1                    Did you know her?  If you passed
 2                    her on the street, would you
 3                    have known her?  Joyce?
 4      POTENTIAL JUROR:  Just like in passing.
 5      THE COURT:  In passing.  So you were
 6                    not, let's say a social
 7                    acquaintance of hers, not a
 8                    close friend?
 9      POTENTIAL JUROR:  No.
10      THE COURT:  Would the fact that you
11                    knew her, would that affect your
12                    ability in any way to sit in
13                    judgment in this case?  That
14                    fact alone?
15      POTENTIAL JUROR:  Not that fact.
16      THE COURT:  We will go to other things
17                    in just a few minutes.  Are any
18                    of you friendly with, associated
19                    with Robert Ray Grimes, the
20                    alleged victim of the robbery,
21                    first degree?  Raise your hands
22                    if so.  No hands are up.
23                    Do any of you have a
24                    fixed opinion against punishment
25                    by death, which would cause you
```

```
 1                      to automatically vote against

 2                      the death penalty, well vote in

 3                      favor -- well vote against the

 4                      death penalty without regard to

 5                      any evidence presented at trial?

 6                      Do you want me to state that

 7                      again?

 8                          We have one hand up.

 9                      Ms. Hutchinson?  Is that

10                      correct?

11          POTENTIAL JUROR:  (Nodding head in the

12                      affirmative).

13          THE COURT:  In other words, no matter

14                      what the evidence was in any

15                      trial that you sat on, would

16                      your opinion be so fixed that

17                      you could not recommend a

18                      sentence of death?

19          POTENTIAL JUROR:  I believe so, yes.

20          THE COURT:  Okay.  These lawyers will

21                      probably ask you more questions

22                      about that in a few minutes.

23                          Anyone else?  Do you

24                      want me to restate the question,

25                      again?  Anyone?  If you want me
```

1 to restate in again, I will.  I

2 know I messed it up there.

3   Okay.  Have any of you

4 made any promises, have any of

5 you given any assurances that if

6 you are selected to serve on the

7 trial jury of this case that you

8 would have a propensity to

9 acquit Mr. Conrad of the charges

10 against him or to convict him of

11 the charge or charges against

12 him?  If so, raise your hand.

13 No one.

14   Would the fact that the

15 Defendant is a black person, and

16 that the alleged victims are

17 white, would that in any way

18 affect any of your judgments in

19 this case?  If so, raise your

20 hand.  No one.

21   Now, I will just say

22 this so some of you will relax a

23 little bit.  In many capital

24 cases, we sequester the jury.

25 That means when they are

1    selected, we put them in a

2    hotel, motel overnight, until we

3    finish the case, and not let

4    them go home until the matter is

5    over.  I'm sure all of you are

6    aware of that.

7              But in this case, the

8    jury will not be sequestered.

9    We will all go home at night, be

10   with our families.  And there

11   will be some limitations.  I

12   will tell the jurors not to

13   discuss this matter, nor allow

14   anyone to discuss the matter

15   with them.

16             I noticed in the

17   newspaper last night, they had

18   -- the news man had the names of

19   the jurors that are seated in

20   the adjoining room.  They

21   normally don't do that.  So we

22   are going to talk to them about

23   that and ask them not do that.

24   It just puts the jurors in a bad

25   position.  Because their friends

1    call, and say, I hear you are on

2    the jury. And want to talk to

3    them about the matter, when they

4    are instructed not to discuss

5    the matter. It just puts the

6    jurors in a bad position. So we

7    are going to ask them not to do

8    that. If the news people were

9    here, I would do that right now.

10   But when we see them, we will do

11   that. But, again, there will be

12   some limitations.

13            Do any of you have an

14   interest in the conviction of or

15   the acquittal of Mr. Conrad? No

16   one.

17            Have any of you ever

18   been in business or done

19   business with Mr. Conrad before

20   in your lifetime?

21            Would any of you know

22   Mr. Conrad if you passed him on

23   the street prior today's date or

24   prior to yesterday, to come

25   serve as potential juror?

1              Okay.  Are there any

2       questions of this panel by the

3       State?

4    MR. JARRELL:  Yes, sir.

5    THE COURT:  Okay.  Mr. Larry Jarrell.

6    MR. JARRELL:  May it please the Court.

7       Good morning.  Let me ask you

8       some questions that will require

9       raising you hand, let's see how

10       this works.  Who had rather not

11       be here this morning.  Okay.

12       Good deal.

13    THE COURT:  I raised my hand, too.

14    MR. JARRELL:   My name is Larry Jarrell,

15       as the Judge told you.  And I'm

16       one of Assistant D.A.'s that

17       work for your elected D.A., Mr.

18       Mark Fuller.

19              And I will be assisting

20       Glenda Stout, another Assistant

21       D.A. that works with Mr. Fuller.

22       And it's our purpose here today

23       to represent the State of

24       Alabama, which is all of us, in

25       this trial.

253

1      Also, at our table will

2   be Mr. Dwight Holley, who is one

3   of the criminal investigators

4   with our office.  This portion

5   of the proceedings has a legal

6   word.  It's called voir dire,

7   voir dire.  I have heard it

8   pronounced many different ways.

9   It's kind of a fancy word for an

10  opportunity for us to get to

11  know you a little better, so

12  that we can make a more

13  intelligent selection when we

14  start selecting the jury, and to

15  let us know about your thoughts

16  and biases and opinions, so that

17  we can get to know you better.

18      It's not, and please

19  forgive me if I sound like I'm

20  meddling.  I'm not trying to pry

21  into your personal lives.  But

22  I'm trying to do my job such

23  that I can better understand you

24  and know you.  And, of course,

25  that's what the Defense

1    attorneys over here will be

2    doing the same thing with the

3    same purpose.  We want to get a

4    jury on this case that will

5    render a just verdict.

6        We want justice for the

7    State.  Mr. Conrad wants justice

8    for himself.  This is a capital

9    murder case.  And, of course,

10   the penalties for that are

11   rather severe.  But it is still

12   just a criminal case, and the

13   State, as in all criminal cases,

14   has the burden of proof.  That's

15   our responsibility.  That burden

16   of proof is beyond a reasonable

17   doubt.  Not beyond all doubt,

18   not beyond a shadow of doubt.

19        And that's the same

20   burden that we would have if we

21   were trying a shoplifting case

22   at Wal-Mart.  It's no

23   different.  And this is one

24   question that I'm going to ask

25   you to raise your hand on.  If

1   you will tell me, promise me

2   that if after listening to this

3   case, listening to the

4   instructions from the Judge,

5   hearing all of the evidence that

6   you will not hold the State to

7   any higher burden than a

8   reasonable doubt.  Can you do

9   you that?  Thank you.

10          I think the Judge has

11  asked this earlier, when

12  addressing the entire panel out

13  here.  And I think he said it,

14  again, this morning.  But do any

15  of you know Mr. Conrad?  I will

16  go a step forward, and I don't

17  thing anybody answered that

18  question a while ago.  Do any of

19  you know his family?

20          We had several jurors

21  yesterday that did not know Mr.

22  Conrad, but they knew his folks,

23  his family.  No response to

24  that.

25          Mr. Conrad is

1    represented by Al Smith, an

2    attorney from Elba. He used to

3    be an Assistant D.A., the same

4    job that I'm doing now, and a

5    fine one.

6         And Mr. Gary Bradshaw,

7    who is also one of the Defense

8    attorneys, his practice is here

9    in Enterprise.

10        Have any of you, and I

11   don't want to know for what

12   reason, but have any of you ever

13   been represented by either one

14   of these two attorneys?  No

15   response.

16        Mr. Bradshaw was also

17   an insurance adjuster, I believe

18   at one time.  He may have denied

19   you a new roof or something like

20   that.  No.  I'm sure he was fair

21   with you.  Were any of you ever

22   associated with him in that

23   capacity?

24   THE COURT:  In other words, did he ever

25        adjust a claim where he was the

1          adjuster?

2     MR. JARRELL:  Yes, sir.  That was my

3          question.  No response.

4               In this particular

5          trial, as you would expect, we

6          are going to have a lot of

7          police officers that will be

8          taking the stand and giving

9          testimony.  Have any of you ever

10         had any problems with anyone in

11         the Enterprise Police Department

12         that left a  bad taste in your

13         mouth, how they handled

14         something for you or talked with

15         you or dealt with you?  No

16         response.

17              Have any of you, and I

18         hate to ask this question.  Has

19         anybody ever had any problems

20         with the D.A.'s office, in child

21         support or bad check unit,

22         criminal investigations?  Okay.

23         Thank you.

24              If you did, and just

25         didn't want to raise your hand,

1        please don't let that affect the

2        outcome of this jury, this

3        trial.

4              Now, this crime is a

5        crime -- actually there are two,

6        a capital murder of Mrs. Jelaine

7        Dennis and, also, a robbery of

8        Mr. Ray Grimes.  This took place

9        under a little store out here

10       south of Enterprise, County Road

11       711, that was called an adult

12       toy store.

13             The name of the store

14       was the Toy Store, an adult toy

15       store.  They sold things like

16       tapes, adult tapes, adult books

17       and paraphernalia that might

18       embarrass, or to make you

19       uncomfortable about that or

20       might offend you.

21             Does anyone, or would

22       any of you let that be a part of

23       your consideration in deciding

24       this case?  Would it affect you

25       in any way?  How about it, Ms.

1                    Larue?

2          POTENTIAL JUROR:  No.

3          MR. JARRELL:  Thank you.   How about you?

4          POTENTIAL JUROR:  No.

5          MR. JARRELL:  We expect this case is

6                    going to take a few days.  It's

7                    not going to be over tomorrow.

8          THE COURT:  We will probably be finished

9                    about Friday.

10         MR. JARRELL:  Hopefully.  And I'm sure if

11                   the Judge has anything to do

12                   with it, he will keep us on

13                   track, and in which he does.  He

14                   has everything to do with it.

15                        Now, would the fact

16                   that this case may run for

17                   several days, can y'all promise

18                   me, again, by raising your hand

19                   that you can set aside your

20                   problems at home, worrying about

21                   the kids, worrying about your

22                   job, the amount of money you are

23                   losing because you are not at

24                   your job today, and still give

25                   this, the State and Mr. Conrad

1           your full attention?

2                   Is anyone going to have

3           a problem in being able to do

4           that?  This is going to take

5           some asserted attention on your

6           part.  Is anyone going to have a

7           problem with that?

8                   I believe there was one

9           lady who had a problem, and you

10          said that you started to answer

11          a little bit further on that?

12          If this case, after you hear all

13          of the testimony, and you hear

14          the instructions that the Judge

15          is going to give you at the end,

16          and should this panel be -- not

17          this panel, but you, the jury,

18          be convinced that the State has

19          proven the elements of capital

20          murder, would it affect you're

21          ability to be able to find a

22          person guilty based on the fact

23          that you know death may be a

24          possibly punishment?

25          POTENTIAL JUROR:  I'm not exactly sure

1          what the law is.  I don't even

2          know if that is a decision we

3          make, or if that's a decision

4          that the Judges make or

5          whatever.  I am so out of it.

6          If I was left with the

7          responsibility to decide, I

8          believe I could not do it.

9     MR. JARRELL:  Let me rephrase just a

10          little bit.  The gentleman up

11          there in the black robe is the

12          one that's going to make the

13          ultimate decision, as far as

14          punishment is concerned.

15               But if you convict, if

16          the jury decides to convict

17          based on the evidence and the

18          law, that a person is guilty of

19          capital murder, then there are

20          two possible punishments that he

21          could get:  Life without parole

22          and the death penalty.

23     THE COURT:  If you will, speak up.  The

24          court reporters are having

25          trouble hearing you.

1    MR. JARRELL:  I'm sorry.  Yes.  Knowing

2            that that is one of, that that

3            is a possible punishment, would

4            that affect your ability to be

5            able to find him guilty of a

6            capital offense?

7    POTENTIAL JUROR:  I hate to say.  I don't

8            know.  It would be weighted in

9            the back of my mind.

10   MR. JARRELL:  Thank you.  I appreciate

11           your honesty about that.  One

12           other question.

13             Many of us have been taught

14           for years in our Sunday school

15           and going to church, that we

16           shouldn't judge one another.

17           But you, if you are picked on

18           this jury, will be a judge.  You

19           will be a judge of the facts of

20           this case.  That gentlemen up

21           there in the robe will be the

22           Judge of the law.  You will be

23           the judge of the facts.

24                   Do any of you have any

25           moral, ethical or religious

```
1              beliefs that it would be
2              rendered by you, that you could
3              not sit on a jury and make that
4              judgment?  Okay.  Thank you.
5                   Just one moment.  And I
6              will see if Ms. Stout has any
7              other questions  she might want
8              me to ask.
9    MR. JARRELL:  I believe it was Ms. Jones
10             who indicated to the Judge's
11             question that he asked, I
12             believe, that you are an
13             acquaintance or you knew of Ms.
14             Jelaine, that you said not just
15             that fact, but there was some
16             other factor that pertained to
17             that question --
18   THE COURT:  And, let me say, if you
19             would rather discuss that in
20             private, we will be glad to do
21             that.
22   POTENTIAL JUROR:  Well, what I meant was
23             I really didn't know.  I would
24             know Jelaine if I saw her.  But
25             I know her daughter more than I
```

1          do her.

2     THE COURT:  April?

3     POTENTIAL JUROR:  Yes.  April.  That's

4          what I was saying another

5          factor, that would enter into my

6          decision.

7     MR. JARRELL:  Let me take that a bit

8          further then, did you see the

9          young lady that was sitting at

10         the counsel table?  Mrs. April

11         Gunnels?  Is that who you are

12         talking about?

13    POTENTIAL JUROR:  April.

14    MR. JARRELL:  Was that who you were

15         talking about?

16    POTENTIAL JUROR:  Uh-huh.

17    MR. JARRELL:  Would the fact that you

18         know her more than Jelaine

19         influence you in any way in

20         making a decision in this case?

21    POTENTIAL JUROR:  I feel like I would be

22         very sympathetic to her like.  I

23         said yesterday, we have

24         relatives in common with each

25         other.

265

```
 1        MR. JARRELL:  Share a nephew and a niece?

 2

 3    POTENTIAL JUROR:  I have a niece and

 4              nephew that are first cousins

 5              with April.  And April's father

 6              is their uncle.  That's

 7              confusing.

 8    THE COURT:  That would be Ed Mock?

 9    POTENTIAL JUROR:  Yes.

10    MR. JARRELL:  Would that make you

11              uncomfortable serving --

12    POTENTIAL JUROR:  Yes.

13    MR. JARRELL:  Thank you.  That's all I

14              have.

15    THE COURT:  Mr. Bradshaw, for the

16              Defense.

17    MR. BRADSHAW:  Good morning, ladies and

18              gentlemen, I'm Gary Bradshaw.  I

19              have been introduced to you once

20              before, as has my co-counsel,

21              Mr. Al Smith.

22                   And, Robert, would you

23              stand up.  There is Robert

24              Conrad.  He's a 21-year old

25              young man that Al and I have the
```

1    pleasure of representing before

2    whomever gets picked on this

3    jury.

4         Mr. Conrad is sitting

5    over there before you as an

6    innocent man.  He is just as

7    innocent as you and I.  The only

8    difference is that right now he

9    is being charged.  And him being

10   charged means that he doesn't

11   get to go home and put his head

12   on his pillow until our justice

13   system has a trial and says so.

14   That is why it is so important

15   that we find out about each

16   other.  You've heard about him.

17   You've heard about charges

18   against him.  And because we are

19   humans, we want to find out

20   about you, to see, because we

21   are different.  Thank goodness

22   we are all different.  We are

23   all raised different.  We have

24   different opinions, different

25   biases and prejudices that we

```
 1        grow up with.  That doesn't make

 2        anybody a bad person in and of

 3        itself.

 4                 But for this particular

 5        trial, just like sympathy may

 6        come into it, and I would have

 7        sympathy if it were a relative

 8        that I knew or friends of my

 9        children, I would have sympathy.

10        And that would weigh into my

11        mind.

12                 And I appreciate you

13        sharing that, Ms. Jones, because

14        I would be the same way.  And it

15        wouldn't really be fair to

16        someone, when you've got that

17        playing into your mind, because

18        we want to -- a computer doesn't

19        have common sense, but we want

20        to almost be like a computer, be

21        able to put information into

22        you, weigh it against what you

23        have got to decide.  And what

24        you've got to decide is whether

25        or not the State has met its
```

1    burden to prove it's case.  So

2    we are trying to get as close to

3    that as we can.

4              And I have just a few

5    questions, because I'm the last

6    person to question you, and I

7    know you were questioned all day

8    yesterday.  And this morning, I

9    will be the last one.  And you

10   will be able to go home and

11   either get a call or not get a

12   call.

13             Is there anyone that

14   thinks because we are here, and

15   you heard a similar question

16   yesterday, because we are here

17   in the courtroom, and because

18   Mr. Conrad is sitting over

19   there, and the deputy sheriff is

20   over here, and he's got

21   attorneys round him, and we've

22   gotten to this point, that

23   there's some flame or fire

24   somewhere.  There's some guilt

25   to some degree?  No response.

1               Does anybody believe

2        that because the news media

3        incorrectly printed some

4        information about our client

5        that was in the paper for all of

6        Enterprise and Coffee County to

7        read this morning, does that

8        make you think that he must have

9        some degree of guilt?

10               Ms. Larue, are you

11        stretching or nodding your head.

12   POTENTIAL JUROR:  I was stretching.

13   MR. BRADSHAW:  I saw your head go up and

14        down.

15               Nobody believes because

16        of incorrect published

17        information that he is guilty of

18        anything?  No response.

19   POTENTIAL JUROR:  Not guilty of anything?

20        I don't know what else he's

21        done.

22   MR. BRADSHAW:  That's a good point.  Let

23        me rephrase, of the charges that

24        you've heard this Judge read?

25        Do you all accept that?

```
 1          POTENTIAL JUROR:  I accept that.  I'm not

 2                  going to say he is not guilty of

 3                  anything.  I may be guilty of

 4                  something, and just don't know

 5                  about it.

 6      MR.  BRADSHAW:  Right.

 7      MR.  BRADSHAW:  The attorneys for the

 8                  State, Larry was introduced to

 9                  you.  And Glenda has introduced

10                  herself.  Mark Fuller is one.

11                  And Scherryl Harrison is in

12                  Troy.  And Scherryl and Larry

13                  work in the Troy District

14                  Attorney's Office.  Actually,

15                  they work both.  And Marty

16                  Williams, who is Jim

17                  Weatherford's daughter, you may

18                  have heard of Jim Weatherford or

19                  know him.  Those are the five

20                  attorneys in the District

21                  Attorney's Office.

22                      Have any of you ever

23                  had any representations by any

24                  of those lawyers, because they

25                  were all in private practice at
```

1        one time. Marty Williams, Marty

2        Weatherford Williams, is still

3        in private practice. She does

4        work in real estate closing and

5        other work. But she also a

6        part-time Assistant District

7        Attorney.

8            So I would like to know,

9        not what they did for you, but

10       just if they ever did anything

11       for you. Ms. Larue?

12     POTENTIAL JUROR: Weatherford.

13     MR. BRADSHAW: Weatherford. Okay.

14        Anyone else? Ms. Jones?

15     POTENTIAL JUROR: Weatherford.

16     MR. BRADSHAW: Anybody else?

17         Now, all of the

18       attorneys, I think Glenda was in

19       by herself, but Mark Fuller was

20       in with a law firm across the

21       street from the Ledger over

22       here. Cassady, Fuller and

23       Marsh. And, again, not really

24       even which attorney there, and

25       certainly not what they did for

1           you.  But has anyone had any

2           representation by that law firm

3           that Mark used to be associated

4           with?  Mrs. Hutchinson?

5    POTENTIAL JUROR:  Yes.

6    MR. BRADSHAW:  Anybody else?  All right.

7           The same question.  And I have

8           been trying to find a way to

9           condense this further than what

10          I've already tried to do.  There

11          are several staff members,

12          support staff, with the District

13          Attorney's Office.  And I hope

14          they won't mind be labeling them

15          that way.  But Investigator

16          Dwight Holly is a support staff

17          for the District Attorney's

18          Office.  And there are many of

19          them.

20    THE COURT:  Mr. Holley always wears nice

21          shirts.  And he blushes red.

22    MR. BRADSHAW:  That's what I was waiting

23          to see.

24               Is there anyone here

25          that's related to Dwight Holley,

1          Bruce Mathews, Bruce DeVane, Mr.

2          Pennington, Nancy Spradley.  And

3          the list goes on and on, Tonya

4          Walker?   Yes, ma'am?

5   POTENTIAL JUROR:  Bruce DeVane, first

6          cousin.

7   MR. BRADSHAW:  You are cousins to Mr.

8          Bruce DeVane.  And for the

9          record, your name?  Ms. Oglesby?

10          Barbara Oglesby?

11   POTENTIAL JUROR:  Uh-huh.

12   MR. BRADSHAW:  Ms. Oglesby, the fact that

13          you and Bruce are first cousins,

14          and he is working with him, in

15          all those capacities, as I

16          understand, would that affect

17          your ability to sit in judgment

18          on Mr. Conrad's case?

19   POTENTIAL JUROR:  No.

20   MR. BRADSHAW:  Would you speak up?

21   POTENTIAL JUROR:  No.

22   MR. BRADSHAW:  Okay.  In no way would

23          that enter into your decision?

24          The fact that you are first

25          cousins and he is on that team?

1            POTENTIAL JUROR:  No.

2        MR. BRADSHAW:  The question that I wanted

3                to ask you is out of that list

4                of people, and Ms. Oglesby

5                answered that she is a relative,

6                first of all I want to know if

7                you are related to anyone in

8                that capacity, in any degree?

9                    I would like to know

10               secondly if you are affiliated

11               in a club, civic, civil

12               organization, religious

13               organization, church, Bible

14               study, fellowship together, in

15               any way have that kind of

16               relationship with anybody in the

17               District Attorney's office or

18               that support staff that I

19               mentioned?  Yes?

20       POTENTIAL JUROR:  I was in an

21               organization with Marty

22               Weatherford --

23       MR. BRADSHAW:  With Marty Weatherford.

24       POTENTIAL JUROR:  -- or Williams.

25       MR. BRADSHAW:  I do the same thing.

1          Okay.  You were in an

2          organization with her.  What

3          organization, if you don't mind

4          sharing that?

5     POTENTIAL JUROR:  (inaudible).  It's a

6          lady's club, social club.

7     MR. BRADSHAW:  All right.  And I ask you

8          the same question that I was

9          asking Ms. Oglesby.  Would that

10         relationship enter into your

11         mind in any way and prevent you

12         from sitting fairly and

13         impartially on this jury?

14    POTENTIAL JUROR:  (Shaking head

15         negatively).

16    MR. BRADSHAW:  Anyone else, that you have

17         a relationship in any way, or

18         associated with anyone in that

19         District Attorney's Office or

20         their support staff?

21              I would ask you the

22         same question concerning our

23         Enterprise Police Department and

24         Coffee County Sheriff's

25         Department.  Because there are

```
 1                    going to be gentlemen and/or
 2                    ladies from both agencies that
 3                    we expect to testify.  Let me
 4                    just give you a list.
 5                         Jeff Spence.  Buddy
 6                    Ammons, W. R. Ammons, better
 7                    known as Buddy Ammons.
 8        POTENTIAL JUROR:  Is that his father?
 9                    There's a Buddy Ammons that I
10                    know.
11        MR. BRADSHAW:  I think Buddy Ammons is in
12                    his 50's.
13        POTENTIAL JUROR:  No.  I'm sorry.
14        MR. BRADSHAW:  A-m-m-o-n-s.
15        POTENTIAL JUROR:  No, I don't.
16        MR. BRADSHAW:  Somebody different?  He is
17                    originally from Elba.  He has a
18                    brother names Hays Ammons that
19                    we expect to testify.  Matt Key.
20                    Steve Key.  Captain Braun.
21                    Captain Mike Lolley.  Lennis
22                    Darby.  Rick Hauser.  Michael
23                    Petty.
24                         Do any of these names
25                    ring a bell that you have a
```

```
 1                    relationship with, other than

 2                    just recognizing a name?

 3                         Now, Mrs. Jones, you've

 4                    already indicated that you

 5                    either know of, or aware of or

 6                    acquainted with, have a

 7                    relationship with Mr. Ed Mock?

 8                    Is that right?

 9       POTENTIAL JUROR:  Yes.

10       MR. BRADSHAW:  Is there anyone else in

11                    here?  Because Mr. Ed Mock had a

12                    relationship with the victim.

13                    They had a child together.  And

14                    she may possibly be sitting at

15                    this table during the trial as

16                    the family representative.  Mr.

17                    Ed Mock owns a business here, a

18                    good business called Batten's

19                    Paint and Body.  He does repairs

20                    on cars and body work.  Does

21                    anyone know Mr. Ed Mock?

22       POTENTIAL JUROR:  I know him, because I

23                    know his brother, Shelly --

24       MR. BRADSHAW:  They look just a like,

25                    don't they?
```

```
 1          POTENTIAL JUROR:   -- And his ex-wife were

 2                    neighbors of mine at one time.

 3          THE COURT:  Shelly and his ex-wife what?

 4          POTENTIAL JUROR:  Were neighbors of mine.

 5          MR. BRADSHAW:  And I think that I know

 6                    Shelly was married twice.  Which

 7                    ex-wife?

 8          POTENTIAL JUROR:  Angie.

 9          MR. BRADSHAW:  Angie.  Okay.  And you

10                    knew Ed through that

11                    relationship of knowing Angie?

12          POTENTIAL JUROR:  Yes.

13          MR. BRADSHAW:  Sarah, would that fact

14                    keep you from sitting up here

15                    and being unbiased and rendering

16                    a fair decision based just on

17                    facts?

18          POTENTIAL JUROR:  No, it wouldn't.

19          MR. BRADSHAW:  I thought I saw another

20                    hand.  Yes, sir?

21          POTENTIAL JUROR:  I knew him before they

22                    moved from Battens to

23                    Enterprise, he was on the

24                    volunteer fire department in

25                    Battens with us.
```

```
1        MR. BRADSHAW:  Does he still serve in

2                that capacity?

3    POTENTIAL JUROR:  No, not as of right

4                now.  You know, he stays busy.

5                But he still goes some time and

6                all.  He used to be real active

7                when they were down there.  He'd

8                close up, and go in the daytime,

9                you know, when we had to go.  He

10                would close up the shop and go.

11        MR. BRADSHAW:  And you live in

12                Chancellor?

13    POTENTIAL:  No.  I live down close to

14                your father-in-law 661

15                (inaudible).

16        MR. BRADSHAW:  Would the fact that you

17                served on the volunteer fire

18                department with Ed, and drove

19                through that neighborhood and

20                that community and served with

21                him, and the fact that Ed is the

22                father of the victim's child,

23                Mr. Mitchell, is that going to

24                be ticking away at your mind,

25                and maybe cause you to lien one
```

```
 1                          side or the other, if you sat on

 2                          the jury?

 3          POTENTIAL JUROR:  I don't believe so.

 4          MR. BRADSHAW:  And asking it another way,

 5                          could you totally push that

 6                          aside, as if you never knew Ed

 7                          Mock, and knew that this was his

 8                          daughter, who is sitting at the

 9                          table, could you push that aside

10                          and still listen to the facts

11                          and render a fair and impartial

12                          verdict?

13          POTENTIAL JUROR:  Yes.

14          POTENTIAL JUROR:  Mr. Bradshaw?

15          MR. BRADSHAW:  Yes, sir.

16          POTENTIAL JUROR:  I had a question about

17                          a police officer, that you said

18                          might be going to testify Matt

19                          and Steve Key?

20          THE COURT:  Would you please speak up?

21                          The court reporters are having

22                          trouble hearing what you're

23                          saying.

24          POTENTIAL JUROR:  Some of the police

25                          officers that he mentioned, I
```

1              guess that were going to

2              testify, they have been clients

3              of mine at my job.  That's

4              really it.

5      MR. BRADSHAW:  And that's Matt and Steve?

6      POTENTIAL JUROR:  Yes, sir.

7      MR. BRADSHAW:  Andrew, would that fact

8              that they were going to get up

9              here and raise their right hand

10             and answer to tell the truth,

11             and they are going to give

12             testimony, is that going to

13             affect your judgment in any way

14             in keeping you from rendering a

15             fair and impartial verdict?

16     POTENTIAL JUROR:  Not a bit.

17     MR. BRADSHAW:  And how long have they

18             been clients of yours?

19     POTENTIAL JUROR:  Four-and-a-half -- I

20             worked on their four wheelers

21             this summer.  I don't see them

22             that often.

23     MR. BRADSHAW:  I'm glad that you

24             mentioned that, Andrew.  We had

25             a gentlemen earlier, and this

```
 1              question was asked to every
 2              panel.  Is there anyone here who
 3              would tend to believe a police
 4              officer, because he is wearing a
 5              badge,  or because of what this
 6              other gentleman said, that he is
 7              sworn an oath to uphold the law?
 8              Is there anyone that would tend
 9              to believe an officer over a
10              non-officer, just because he is
11              an officer or sheriff?  No
12              problems?
13    POTENTIAL JUROR:  My husband knows Matt
14              Key, also.  He is a friend of
15              Matt's.
16    MR. BRADSHAW:  Your husband is?  Do you
17              know him?
18    POTENTIAL JUROR:  He has been to my home
19              before, but I don't -- if I see
20              him, I would know who he is.  I
21              don't --
22    MR. BRADSHAW:  Okay.  I must ask you the
23              same question, too.  Is that
24              going to affect your judgment?
25    POTENTIAL JUROR:  No.
```

```
 1          MR. BRADSHAW:  Could you push aside the
 2                    fact that your husband knows
 3                    Matt?
 4          THE COURT:  And for the record, so that
 5                    we can maintain a record, you
 6                    are Billie Holloway?  Is that
 7                    correct?
 8          POTENTIAL JUROR:  Yes, sir.
 9          POTENTIAL JUROR:  Can I say something,
10                    Mr. Bradshaw?
11          MR. BRADSHAW:  Please.
12          POTENTIAL JUROR:  I didn't know until you
13                    mentioned a few minutes ago, I
14                    never knew that Ed was married
15                    to Jelaine.
16          THE COURT:  He married her, and I
17                    divorced them 26 or 27 years
18                    ago, just for your information.
19          MR. BRADSHAW:  Sarah, you mentioned that
20                    you knew Ed through Shelly,
21                    through Angie?
22          POTENTIAL JUROR:  And Shelly.
23          MR. BRADSHAW:  By you bringing that up,
24                    does that weigh on your mind in
25                    any way?
```

1    POTENTIAL JUROR:  No.  I just wanted you

2    to know that I never knew it.  I

3    know Ed when I see him, but it's

4    not like he would be a close

5    friend or something like that.

6    MR. BRADSHAW:  Can you tell them apart?

7    POTENTIAL JUROR:  Yeah.  Because of the

8    hair.

9    MR. BRADSHAW:  Mr. Larry Jarrell touched

10    on this subject.  And it's very

11    awkward for me to ask you about

12    the adult Toy Store, and in

13    there are sold adult magazines,

14    movies, paraphernalia and

15    merchandise.  And it was located

16    on County Road 636, the same

17    county road that Battens Fire

18    Department is on.  It was

19    located just down from ConAgra

20    Poultry, and it was located next

21    to Grimes Grocery.  They were

22    separate.  You could go in one

23    building without going in the

24    other.  One was a service

25    station.  You could purchase

1          soft drinks, peanuts and potato

2          chips.   The other one was the

3          adult Toy Store.

4                    Did anyone ever have

5          occasion to go into the adult

6          Toy Store when it was located on

7          County Road 636, located next to

8          Grimes Grocery.  No response.

9                    It later moved to

10         County Road 711, which is right

11         by, near that community where

12         Mr. Donald Smith lives and has

13         chicken houses.  And there used

14         to be a dirt road.  It had

15         recently been paved in the past

16         couple of years.  And there's a

17         Cannon Station below the grave

18         yard, that's on the left, on

19         that road.  Had anyone ever been

20         by there on frequented that

21         store?  No response.

22                    Mr. Grimes.  And the

23         Court asked if anyone knew him

24         or would recognize him, carry on

25         a conversation with him.  He

 1              owned the grocery store next to

 2              the toy store.  And there has

 3              been some information that he

 4              was helping Mrs. Dennis to start

 5              up or may have been a partner

 6              with her in the adult Toy Store.

 7              Do any of you know Mr. Grimes,

 8              where you would carry on a

 9              conversation with him?  Or you

10              may know President Bush, because

11              he walked in here, you may say

12              oh, that's President Bush.  But

13              you wouldn't sit down and talk

14              to him, because you don't know

15              him.  I'm asking if you know

16              somebody in that kind of way,

17              where you would or your children

18              or your spouse or that kind of

19              thing?  No response.

20                   Mrs. Dennis also at

21              one time had an affiliation with

22              Dogwood Acres Trailer Court or

23              Mobile Home Park, east of

24              Enterprise.  Have any of you

25              ever been a tenant or employee

1          of that mobile home park or have

2          a relative that stayed there?

3          No response.

4                 Green's Grass Farm was

5          at one time owned by Mrs.

6          Dennis's brother, Lynn Bowman.

7          Lynn Bowman is a tall gentleman,

8          a big gentleman, that owned that

9          and the Bent Can Store located

10         in Bellwood.  Have any of you

11         had any affiliation with Green's

12         Grass Farm?  They sodded your

13         yard?  Or you worked for them in

14         any way.

15               Two other areas that I

16         need to ask you about.  It was

17         explained to you on more than

18         one occasion.  This is a capital

19         murder case.  That's one of the

20         charges against our client.  And

21         you have been told, and have

22         been told correctly and

23         completely that the options will

24         be, and, Ms. Hutchinson, maybe

25         this will help you, I hope.

1    That the options would be life

2    without parole.  That's going to

3    prison.  You are going to die in

4    prison.  Or death, under

5    electrocution or whatever form

6    by that time the State of

7    Alabama chooses to do.  Death or

8    life without.

9         But I don't want you to

10   get the misconception that just

11   being on a jury, that's going to

12   be my job sometime, Friday,

13   Saturday or Monday, is to decide

14   between that, too.

15        Because, ladies and

16   gentlemen, guess what?  There's

17   another option.  It's called not

18   guilty.  Because that is what he

19   is right now.  He is not

20   guilty.  And not only that,

21   there are options that you will

22   hear from the Judge on what we

23   call lesser included offenses.

24   Because of what somebody is

25   charged with, that doesn't

1     necessarily mean they are

2     guilty.  That doesn't

3     necessarily mean they are guilty

4     of that crime.  They may have

5     done something else that you

6     know about.

7              So you will have an

8     option.  And I know some people

9     have, for lack of a better word,

10    a hang up, about, you know, the

11    death penalty.  But there are

12    other options.

13             I would address this to

14    all of you, Mrs. Huchinson,

15    especially, to you.  Your job on

16    the jury is going to be to

17    decide, well, they've chosen

18    what to charge him with.  Here's

19    the elements.  Here's the

20    building blocks, that they have

21    got to get over this hurdle, to

22    say he is guilty of that.

23             Now, if they don't do

24    that.  If they don't even get

25    off the ground, he's going to be

1      not guilty.  But if they get off

2      the ground, and they don't get

3      over that hurdle that they have

4      built, and they have the burden

5      to do, you may find that he is

6      guilty of something else.

7            And nothing else in our

8      State carries those two options,

9      life without, and the death

10     penalty.  So I want you to know

11     that you are not bound with just

12     that option.  And I want you to

13     know that all you are is the

14     judge of the facts.

15           And Mr. Larry Jarrell

16     told you the ultimate decider of

17     the punishment in capital

18     punishment, is the Judge.  So

19     you are going to hear a bunch of

20     facts, a whole bunch of

21     testimony.  And then you will

22     get to decide what to do.  Did

23     they prove it?  Did they not.

24     If they didn't, did they prove

25     anything.  If they did, what did

```
 1                    that prove.  I tried to simplify

 2                    that.  It might have been

 3                    convoluted for you.

 4                          Based on that, Mrs.

 5                    Huchinson, are you still, in

 6                    your mind, have a -- if you get

 7                    back there, and 11 or 12 of you

 8                    vote, and say, boy the State met

 9                    that burden of capital murder,

10                    and you have those two options

11                    --

12      POTENTIAL JUROR:  I can't say without

13                    knowing the facts.  I can't say.

14                    I mean to be perfectly honest,

15                    this is most stressful situation

16                    I've ever been in in my life,

17                    and I feel like I'm on trial.

18      MR. BRADSHAW:  I'm sorry.

19      POTENTIAL JUROR:  And I just -- I just

20                    can't say.  I'm not exactly sure

21                    what you are trying to get at.

22      MR. BRADSHAW:  Does it help you to know

23                    there are other options?

24      POTENTIAL JUROR:  Yes.  It helps me to

25                    know there are other options.
```

```
 1          MR. BRADSHAW:  Would it help you to know,

 2                  if I took my coat off, you would

 3                  know I'm about as stressed as

 4                  you are.

 5          POTENTIAL JUROR:  Possibly.

 6          MR. BRADSHAW:  I just want you to know

 7                  that.  We are human beings, just

 8                  like Mr. Conrad there.  You

 9                  don't make that decision,

10                  hopefully, not more than once in

11                  your life, if you are picked on

12                  a jury.

13                          In talking about that,

14                  Mr. Larry Jarrell asked you one

15                  side of the fence, are you so

16                  fixed in your opinion, that you

17                  just couldn't be a part of any

18                  group that voted to have

19                  somebody put to death.

20                          The other side of that

21                  equation that I want to ask you

22                  about is, are you so fixed in

23                  your mind that if there is a

24                  life that is lost, and there has

25                  been one here, a life was lost
```

1          on May 23rd of last year, but

2          based on that, and that alone,

3          is it in your opinion that

4          somebody else ought to lose

5          their life just because there is

6          one life gone, somebody ought to

7          lose another life?  Ms. Larue?

8     POTENTIAL JUROR:  No.

9     MR. BRADSHAW:  Ms. Jackson?

10    POTENTIAL JUROR:  No?

11    MR. BRADSHAW:  You don't feel that just

12         because, with no other facts,

13         that somebody lost their life

14         that another life needs to

15         perish?

16    POTENTIAL JUROR:  No.

17    MR. BRADSHAW:  Would all of you agree, if

18         you disagree with me, raise your

19         hand, that life should be more

20         valuable than property?  Nobody

21         is raising their hand.  So I

22         assume that if you are nodding

23         with me that you agree.

24              The Judge asked you,

25         and if you want to respond to

1      this, and you want to come up to

2      the Judge and do this in private

3      or back somewhere else, we can

4      do that, if this will embarrass

5      you.  Mr. Conrad -- you would

6      have to be colored blind -- you

7      can tell that he is a black

8      male.  You can see that I'm a

9      white male.  My children tell me

10     I'm real white.  I'm pale.  I'm

11     a light complexion.  But the

12     alleged victims in this case

13     were white, Caucasians.  And our

14     society has never rid itself of

15     prejudice and bias, and I doubt

16     that we ever will completely.

17                  Are any of you

18     subjected where you work and

19     your place of business, as a

20     Coffee County Extension agent or

21     Flowers Hospital.  Are you

22     subjected to racial slurs,

23     comments, jokes, literature in

24     any way?

25        Do you have any opinion -- and

1          racism can work both ways,,

2          black/white white/black

3          Oriental/non-Oriental.  Do you

4          have any opinions, either way,

5          about race that may enter into

6          this case, if you are chosen to

7          serve on this jury?  Because,

8          ladies and gentlemen, we cannot

9          change the race of the parties

10         involved.  Anyone?  Mrs.

11         Holloway?

12    POTENTIAL JUROR:  No.

13    MR. BRADSHAW:  There is nothing in your

14         mind that makes you think more

15         of one race or less of one race

16         or that a certain race has

17         prejudices?

18    POTENTIAL JUROR:  No.  I have had

19         problems in the past with a boy

20         that harassed my daughter.  I

21         mean, I really didn't like it.

22         And I could never convince him

23         -- you know, my point, he cussed

24         me from one, you no, area to

25         there.  But know I mean, no,

```
 1              that would not have any affect
 2              on my opinion in this.  I really
 3              don't know a lot about this.
 4              I'm so busy with my children, I
 5              don't read the paper a lot.
 6    MR. BRADSHAW:  That may be a good thing
 7              there.  But what we do know, and
 8              that's why I'm asking it in this
 9              way, what we do know is that
10              Robert Conrad is a black male.
11    POTENTIAL JUROR:  Right.
12    MR. BRADSHAW:  Jelaine was a white
13              female, and Ray Grimes is a
14              white male.  What I want to know
15              from you and all the questions
16              that you've answered and turned
17              in, and the questions we are
18              asking here today, do you have
19              any opinions in your heart,
20              because Robert is a black male
21              that he may be prejudice, or
22              because I'm white, that I may
23              have been prejudice?  Do you
24              have any feelings like that?
25    POTENTIAL JUROR:  No, not towards him,
```

1              no.

2    MR. BRADSHAW:  Not towards him.  Towards

3              anyone of the black race?

4    POTENTIAL JUROR:  The boy that I have had

5              problems with, yes.

6    MR. BRADSHAW:  Is that because of his

7              race?

8    POTENTIAL JUROR:  No.

9    MR. BRADSHAW:  Ladies and gentlemen,

10             thank you so much.

11   POTENTIAL JUROR:  Mr. Bradshaw, years ago

12             I work William's signs in Elba.

13             And there was a gentlemen with

14             the last name Mock there I don't

15             know if it's the same fellow or

16             not.

17   THE COURT:  Could you speak up?  I can't

18             hear you.

19   POTENTIAL JUROR:  A long time ago, I

20             worked with William's Signs in

21             Elba, on the hill there.  And

22             there was a guy named Mock.  I

23             don't know if it was the same

24             fellow or not.

25   MR. BRADSHAW:  If you don't know him that

*VOLUME 9*

COURT OF CRIMINAL APPEALS No. CR-02-0333

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF _____ COFFEE _____ COUNTY, ALABAMA

CIRCUIT COURT NO. CC-01-179, CC-01-180

CIRCUIT JUDGE _____ Gary L. McAliley _____

Type of Conviction / Order Appealed From: Conviction, Capital Murder, Robbery 1st

Sentence Imposed: Life Without Parole, Life

Defendant Indigent: [X] YES [ ] NO

Robert Thomas Conrad

**NAME OF APPELLANT**

Gary Bradshaw
(Appellant's Attorney)
P. O. Box 311412          (Telephone No.)
(Address)
Enterprise          AL          36331
(City)          (State)          (Zip Code)

Richard Waldrop
P. O. Box 310027
Enterprise, AL  36331

**V.**

## STATE OF ALABAMA

**NAME OF APPELLEE**

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)



```
1                      well, I don't think that would

2                      come into play, but I appreciate

3                      that.

4       THE COURT:  For the record, that was Mr.

5                      McDurmont.

6       MR. SMITH:  Judge, may we approach the

7                      bench?

8       THE COURT:  Yes, sir, you may.  Let the

9                      record reflect that we are in

10                     the presence of the jury panel,

11                     but out of their hearing.

12      MR. SMITH:  There were four jurors, that

13                     based on their questionnaires,

14                     and mostly questionnaire

15                     answers, some things that were

16                     brought up here that I think we

17                     need to take individually,

18                     because they could be

19                     embarrassing.  One was a comment

20                     of the lady that was just

21                     questioned.  One is that he

22                     can't read and write, things of

23                     that nature. There are four

24                     jurors.

25      THE COURT:  Will we have reading and
```

1                        writing?

2        MR. SMITH:  Yes, sir, we are.  I think

3                    there will be some transcribed

4                    statements that will be produced

5                    and some forensic reports.

6        THE COURT:  You can submit on the

7                    responses.  I'll be glad to

8                    consider it.

9        MR. SMITH:  Mrs. Hiers' mother was a

10                   victim of a very heinous crime.

11                   And I did not want to ask her

12                   about that in the presence of

13                   the jurors.

14       THE COURT:  Sure.

15       MR. SMITH:  Ms. Holloway, number 97, "I

16                   have come to believe that all

17                   black people are racist against

18                   white people."

19                        That was a quote from

20                   her questionnaire.

21       THE COURT:  Ms. Holloway, would you come

22                   up, please ma'am.

23       POTENTIAL JUROR:  I know what you're

24                   talking about.

25       THE COURT:  Just come on up and keep

1          things low.

2                    You made a statement

3          in your --

4     POTENTIAL JUROR:  Because I didn't want

5          to serve on a jury.

6     THE COURT:  Was that the principal reason

7               --

8     POTENTIAL JUROR:  Yes.  I was told if I

9          wrote something like that I

10         would not have to serve.

11    THE COURT:  Are those your true --

12    POTENTIAL JUROR:  Yes.

13    THE COURT:  -- feelings?

14    POTENTIAL JUROR:  No.  No. I have

15         relatives that are black.

16    THE COURT:  So it's not your feelings?

17    POTENTIAL JUROR:  No.

18    THE COURT:  Thanks for explaining that.

19         That's all we are going to do.

20    MR. SMITH:  Ms. Hiers?

21    THE COURT:  Hires.  Ms. Hiers, Sarah.

22         Come on up and these ladies

23         need to hear what you have to

24         say.  You have a family member

25         who was a victim of --

```
1              POTENTIAL JUROR:  Rape.

2        THE COURT:  -- rape.  Do you feel that

3                   fact would affect your ability

4                   to sit in judgment in this case

5                   at all?

6        POTENTIAL JUROR:  No, not whatsoever.

7        MR. SMITH:  Ms. Hiers, I'm Al Smith.  I

8                   haven't talk to you, but from

9                   your questionnaire, it was a

10                  horrible, horrible crime --

11       POTENTIAL JUROR:  Yes, it was.

12       MR. SMITH:  -- That was inflicted on your

13                  mother.  Part of that, according

14                  to your questionnaire, was

15                  robbery?

16       POTENTIAL JUROR:  Uh-huh.  She was

17                  robbed, kidnapped, assaulted and

18                  raped.

19       MR. SMITH:  That's a horrible crime.

20       THE COURT:  Did I have this case?

21       POTENTIAL JUROR:  No.  This was in

22                  Georgia.

23       THE COURT:  In Georgia.  Okay.

24       POTENTIAL JUROR:  Would the fact that

25                  this young man is also charged
```

1           with robbery, and that was a

2           part of this horrible, horrible

3           crime against your mother, would

4           that sit in the back of your

5           mind, if you are picked as a

6           juror?

7   POTENTIAL JUROR:  No.  To me it's been

8           done.  And he has been

9           convicted.  He is in prison.

10          And it's over with.

11  MR. SMITH:  We didn't want to bring this

12          up in front of any other person.

13  MR. BRADSHAW:  That was the reason I

14          didn't ask you that.

15  MR. SMITH:  I apologize for having to

16          bring that up.

17  MRS. STOUT:  I have no question.

18  THE COURT:  Thank you, ma'am.

19  MR. SMITH:  Judge, Mr. Mitchell is the

20          juror that cannot read and

21          write.  And Mr. McDurmont,

22          number 126, made a statement on

23          his questionnaire that he was in

24          favor of limited Defendant's

25          rights.  And I didn't want to

1          him to be asked questions in the

2          presence of other panel members

3          about his feelings in that

4          regard.

5     THE COURT:  Mr. McDurmont, would you come

6          up, please, sir?

7     POTENTIAL JUROR:  Yes, sir.

8     THE COURT:  Come on around, please, sir.

9          If you will speak so that these

10         two ladies can take down what

11         you have to say.  You have

12         something in your questionnaire

13         where you said something like

14         you felt that Defendant's rights

15         should be in some way limited.

16         Do you recall that?

17    POTENTIAL JUROR:  No, I don't.  I'm not

18         familiar with this.  I guess

19         this was something about

20         evidence, one or the other.

21    THE COURT:  Do you have a copy of that?

22    MR. SMITH:  Yes, sir, I can get to that.

23    THE COURT:  I just want you to explain

24         your comments there at that

25         particular point.

1    POTENTIAL JUROR:  This is the first time

2         I have done this.  I'm just kind

3         of nervous.  I still am.

4    THE COURT:  Don't worry about it.  I

5         understand.

6         At least you don't have to wear

7         a dress to work.

8    POTENTIAL JUROR:  No, I don't.  My wife

9         may have something to say about

10        that.

11   MR. SMITH:  Question 44.  Are you or any

12        member of your family in favor

13        of limited rights of those

14        rights so as to make it easier

15        to convict?  Yes.  It's checked

16        yes.

17   POTENTIAL JUROR:  Okay.  I don't know

18        what I was thinking there.

19   THE COURT:  Do you understand that

20        people charged with the

21        commission of a crime come into

22        the courtroom cloaked in a

23        presumption of innocence, and

24        that the burden is on the State,

25        the District Attorney, to prove

1          a person's guilt beyond a

2          reasonable doubt?

3     POTENTIAL JUROR:  Absolutely.

4     THE COURT:  And you would agree or not

5          agree to abide by that if you

6          are selected to serve?

7     POTENTIAL JUROR:  I would abide by that.

8     THE COURT:  Thank you, sir.

9               What was the

10         gentleman's name that can't read

11         and write?

12    MR. STOUT:  Roy Mitchell.

13    THE COURT:  Ladies and gentlemen, let

14         me explain to you what to

15         expect.  Would Mr. Mitchell

16         remain behind.  I have one

17         question that I'm going to ask

18         of him. But here is what is

19         going to happen.  Probably at

20         around 4:30 today, around that

21         time, 4:30 or 5:00 we will have

22         a jury selected.  And we will

23         take that long for us to get a

24         jury.  The trial of this matter

25         will begin today.  It will begin

1       around 5:00 or 5:30, when the

2       last juror gets here.

3              There is no need for

4       all of you to have to come down

5       here and sit and wait while we

6       do what we do.  We have all of

7       your telephone numbers.   And if

8       you will simply be by the

9       telephone at 4:30 or 5:00, we

10      will give the 14 jurors who have

11      been selected to serve a

12      telephone call.  That way it

13      would be better for everybody.

14      And y'all can get some things

15      done in your lives, and not have

16      to come down here and sit and

17      wait.

18             I did that one time,

19      and, apparently, a juror did not

20      understand that.  And when we

21      found them, they were in

22      Tennessee.  And it really

23      antagonized the others to have

24      to sit and wait on them to get

25      back.  So for heaven sakes, I

1           want to accommodate you, and I

2           want to use your time just as

3           efficiently and wisely as we can

4           possibly can.

5                 But I do need you

6           available by that telephone that

7           you gave to the Clerk of Court

8           so if you are selected to serve

9           on the trial jury that we can

10          notify you.

11                Otherwise, those deputy

12          sheriffs right there, some of

13          them will be out running you

14          down.  We just don't want to go

15          through that.  Any questions?

16          Yes?

17    POTENTIAL JUROR:  The 14, does that make

18          up those back-up jurors?

19    THE COURT:  Correct.

20    POTENTIAL JUROR:  Do they still show up?

21    THE COURT:  Yes, sir.  The state law

22          provides there at are at least

23          two back-up, as you say, jurors.

24          They are called alternates, to

25          be selected in the trial of a

1                    capital matter, so that if

2                    somebody gets sick, then one of

3                    the alternates would fill in

4                    that slot and serve and

5                    deliberate and decide this case.

6

7        POTENTIAL JUROR:  If we have not heard

8                    anything by 5:00 --

9        THE COURT:  5:00 or around 5:00.  I can't

10                   promise your for sure that these

11                   lawyers are going to have a jury

12                   selected by then.  But after 27

13                   years of being a Judge, that is

14                   my best guess.  4:30 or 5:00,

15                   somewhere in there.

16       POTENTIAL JUROR:  If we are selected, we

17                   come back at 5:30?

18       THE COURT:  We will come back.  We will

19                   have opening remarks to the jury

20                   by the different sides.  I will

21                   basically summarize for the

22                   jurors what to expect in the

23                   trial of a case, the steps of a

24                   trial, so they will know where

25                   they are, and how many steps we

```
 1              have to go before we are

 2              finished.  Then we will start

 3              with opening remarks.  We might

 4              get to the first witness.  But I

 5              will go until about 8:00 o'clock

 6              tonight or 9:00, somewhere in

 7              between, so we can get on track

 8              and make sure that we are in a

 9              position to finish this matter.

10     POTENTIAL JUROR:  Would we have to eat

11              before we showed up?  Is that

12              what you are saying?

13     THE COURT:  Yes, sir.

14     POTENTIAL JUROR:  That's my bed time.

15     THE COURT:  You can bring it with you, if

16              you would like.  That would be

17              fine with me.  Just tell the

18              bailiff I said so, if he gives

19              you a hassle.  The Judge is

20              hungry.  Any other questions?

21     POTENTIAL JUROR:  This is just from

22              ignorance, but will anyone that

23              wants to come and sit in on this

24              case be able to?

25     THE COURT:  Sure.
```

310

```
 1            POTENTIAL JUROR:  Or is this closed?
 2        THE COURT:  No, ma'am.  The only matters
 3              that I hear that are closed are
 4              youthful offender matters.  All
 5              of these cases that I hear are
 6              public.  And a Defendant charged
 7              under our constitution, charged
 8              with the commission of a crime,
 9              any crime, has a right to a
10              public trial by jury, not any
11              crime, but this crime as
12              alleged.  Any other questions?
13                   Have I good day.
14             Mr. Mitchell, if you will stay,
15              and let me ask one question of
16              you.
17              (The panel exited the
18              courtroom).
19         THE COURT:  Mr. Mitchell, I didn't want
20              to in any way embarrass you.
21              But you put in your
22              questionnaire that you can't
23              read and write?  Is that
24              correct?
25         POTENTIAL JUROR:  Yes, sir.  I don't have
```

1           a bit of education.

2       THE COURT:  We are going to have some

3                   documents and things that might

4                   go into evidence.  Is that

5                   correct?

6                       Is the State going to

7                   submit any documents?

8       MRS. STOUT:    There will be documents

9                   submitted.

10      THE COURT:  There will be documents and

11                  things that have been

12                  transcribed or whatever, do you

13                  feel that would present you with

14                  a problem?

15      POTENTIAL JUROR:  Yes, sir.   The

16                  education.  I'm not -- I don't

17                  really feel that I'm handicapped

18                  because I don't have an

19                  education.  I'm 58-years old.

20                  And I have made it through the

21                  world with a good life and good

22                  living.  But, I don't really,

23                  because I don't have the

24                  education, I don't feel like I'm

25                  really handicapped, but I just

1              don't feel like I am not up to

2              par.

3      THE COURT:  That's fine.  If any document

4              goes into evidence, and if I had

5              someone sit and read that

6              document, do you think that

7              would put you back on line with

8              everybody else?

9      POTENTIAL JUROR:  Let me say something

10             else, I think they were in the

11             letter that I got.  It mentioned

12             something about television, you

13             know, and I that's the reason I

14             don't have a education.  I don't

15             watch that much television.  I

16             don't watch news and weather and

17             I can't read the papers.  And

18             I'm kind of in the dark with

19             things.

20      THE COURT:  Well, that's okay.

21      POTENTIAL JUROR:  There were 14 in my

22             family.  And I was raised up

23             hard to work, you know.

24      THE COURT:  Sure.  Sure.  But if a

25             document did come into evidence,

```
 1                    and if it's something that we

 2                    had written that comes into

 3                    evidence, and if I had somebody

 4                    read that to the ladies and

 5                    gentlemen of the jury, do you

 6                    think you would be able to serve

 7                    as a juror and to consider

 8                    what's in that document and use

 9                    it to decide the outcome of this

10                    case?

11      POTENTIAL JUROR:  Well --

12      THE COURT:  Or do you not feel that you

13                    would not be able to?

14      POTENTIAL JUROR:  I don't feel up to it,

15                    really, sir.

16      THE COURT:  I didn't understand you?

17      POTENTIAL JUROR:  I don't really feel,

18                    you know, up to it, really.

19      THE COURT:  Okay.  Thank you a lot.  I

20                    appreciate you coming down here.

21                    You have a good day.

22                         Let the record reflect

23                    that we are now out of the

24                    hearing and presence of any

25                    panel venire member.  Are there
```

```
1              any challenges for cause by the

2              State?

3    MR. JARRELL:   Yes, sir.   Juror number

4              104.

5    THE COURT:  104.  And the basis for your

6              challenge would be a fixed

7              opinion against this?

8    MR. JARRELL:  Yes, sir.

9    THE COURT:  Response by the defense?

10             Objection?

11   MR. SMITH:  No objection, your Honor.

12   THE COURT:  That challenge is granted,

13             as to juror number 104.  Any

14             other challenge by the State?

15   MR. JARRELL:  No, sir.

16   THE COURT:  Any challenges by the

17             Defense?

18   MR. SMITH:  Yes, sir, Your Honor.  Number

19             97, Holloway.  The

20             questionnaire, and we would ask

21             the Clerk to make that a part of

22             the record.

23   THE COURT:  It is.

24   MR. SMITH:  But mark that as Defendant's

25             Exhibit.
```

1          THE COURT:  Which question?

2          MR. SMITH:  That I have got to believe

3                      that all black people are racist

4                      against white people.  She came

5                      up here and stated that she lied

6                      to get out of jury duty.  It's

7                      kind of -- was she lying then,

8                      or is she lying now?

9                           We think that her

10                     conduct is inexcusable,

11                     whichever it is, and that she

12                     should not serve as a juror in

13                     this case.

14         MR. BRADSHAW:  And, Judge, if I may add

15                     one thing to corroborate that I

16                     believe what she put on her

17                     questionnaire was more true,

18                     based on the comment from the

19                     voir dire concerning her

20                     involvement with the members of

21                     the black race.

22         THE COURT:  She made it very clear when

23                     she came up, that she was told

24                     to put that down in order to get

25                     out of serving on the trial

1          jury.  And she said that that

2          was not her feelings at all,

3          that she just did that because

4          she was told to do that.

5                   Any objection by the

6          State?

7     MRS. STOUT:  No objection.

8     THE COURT:  No objection?

9     MRS. STOUT:  No objection to number 97.

10    THE COURT:  Okay.  Challenge is granted

11         as to juror number 97.  If y'all

12         will just use numbers, I would

13         appreciate it.

14    MR. SMITH:  Judge, just give me just half

15         a second, please, sir. I have

16         gotten slow in my old age.

17    THE COURT:  Me, too.  You have 110?

18    MR. SMITH:  110.  Judge, her nephew --

19         well she is he related, I think,

20         within a prohibited degree of

21         the victim's family.  And we

22         challenge her.

23    MRS. STOUT:   What is the number?

24    THE COURT:  110.  She said that she

25         would also be sympathetic with

1                    April's situation.

2          MRS. STOUT:  Right.  We do not.  There is

3                    no objection.

4          THE COURT:  I had their divorce.  It was

5                    awful.  They threw a sack of

6                    poop over my fence, as I result

7                    of it.

8          MR. SMITH:  Judge, we could challenge

9                    number 126 -- I'm sorry.  I

10                   withdraw that by virtue of his

11                   correction of the comment on his

12                   questionnaire.

13                         Number 131.

14         THE COURT:  Are you as to 131?

15         MR. SMITH:  Yes, sir.  I challenge 131.

16         THE COURT:  Response by the State?

17         MRS. STOUT:   No objection.

18         THE COURT:  Juror number 131 challenge

19                   is granted.

20         MR. SMITH:  Judge, number 139, we would

21                   challenge.  Bruce DeVane is her

22                   first cousin.  He is, of course,

23                   a member of the District

24                   Attorney's staff, and from the

25                   discovery we received in this

1          case was actually a participate

2          in the investigation.  I think

3          he even walked the prosecutor

4          through the scene.  And because

5          of his long-time relationship

6          with the D. A.'s office, whether

7          he actually testifies or not as

8          a witness in this case, and I

9          think under the -- I can't

10         recall her name.  Judge, the

11         case that we tried, and had to

12         retry two or three time, that

13         you and I tried in Troy, the

14         murder from Enterprise.

15    THE COURT:  Oh.  LaDonna Lynn Tucker.

16    MR. SMITH:  LaDonna Lynn Tucker.

17    THE COURT:  I didn't try but one.  Y'all

18         tried it three times.

19    MR. SMITH:  That case established some

20         laws of a juror's relationship

21         to a witness.  It prohibits them

22         from sitting.

23    MRS. STOUT:  No objection.

24    THE COURT:  Challenge is granted.  That's

25         139.  Anything else?  Any other

1          challenge by the Defense?

2     MR. SMITH:  I don't believe, so, Judge.

3     THE COURT:  Okay.  We will take a

4          few-minute's break, and then, we

5          will back to the next panel.

6          (A short break was taken,

7          thereafter, the next panel

8          entered).

9     THE COURT:  Ladies and gentlemen, I know

10          some of you, but I don't know

11          all of you.  And these lawyers

12          need to get to know you a little

13          bit better, and I do, also.

14               I need to make sure

15          that each of you live in the

16          Enterprise Division of Coffee

17          County.  So if you will, you

18          will start at the bottom left

19          over here, my left.

20               And if you will, give

21          me your name.  And if you will,

22          tell me what you do as a means

23          of livelihood, in other words,

24          where you work.  Tell me where

25          in Coffee County you live, where

```
 1        you reside.  I want to see in my

 2        mind where you live.  Because I

 3        have had two trials over my many

 4        years as a Judge where we asked

 5        that question.

 6             And at the end we find

 7        that somebody lived right across

 8        the line.  Like this last time,

 9        I believe we had a lady that

10        lived right on the line.  So

11        we've had to verify that she in

12        fact lived in this division.

13             You see, before a Judge

14        can sit with proper jury in the

15        trial of a capital matter, we

16        have to make sure that everybody

17        has been a resident of the

18        Enterprise Division of Coffee

19        County for a requisite period of

20        time.

21             And Coffee County is a

22        little different from other

23        counties, because we have two

24        divisions, the Enterprise

25        Division and the Elba Division.
```

1              We are treated for legal

2              purposes as too entirely

3              separate counties.  So that

4              presents a problem for us

5              sometimes.

6                      If you will, please,

7              sir, give us your name.

8       POTENTIAL JUROR:  Jeff Smith.  I think on

9              the record it's Jeffery E.

10             Smith.  I manage the meat

11             department for Fort Rucker

12             Commissary.

13      THE COURT:  And where in Coffee County,

14             Enterprise Division, do you

15             live?

16      POTENTIAL JUROR:  1751 County Road 531.

17      THE COURT:  Where is that?

18      POTENTIAL JUROR:  Bethany Church.  Are

19             you familiar with that?

20      THE COURT:  And your age range?  I don't

21             need to know 55, 35 or anything

22             like that.  The 30- 40- 50-year,

23             60-year range.

24      POTENTIAL JUROR:  I'll be 62 in November.

25             I'm 61, now.

1        THE COURT:  Okay.

2        POTENTIAL JUROR:  Jeffery L. Reynolds.

3        THE COURT:  Do you go by Jeff Reynolds?

4        POTENTIAL JUROR:  Yes.  Jeff Reynolds.

5        THE COURT:  Okay.  Where in Coffee

6              County do you live?

7        POTENTIAL JUROR:  104 Crescent Drive.

8        THE COURT:  And where do you work?  What

9              is your --

10       POTENTIAL JUROR:  I'm a letter carrier

11             for the United States Postal

12             Service.

13       THE COURT:  Okay.  And your age?

14       POTENTIAL JUROR:  I'm forty.

15       THE COURT:  Okay.

16       POTENTIAL JUROR:  Teresa Rowe.  And a

17             live at 13593 Highway 167.  I

18             live out about four-and-a-half

19             miles, 167 North.

20       THE COURT:  Okay.  That would be in the

21             Enterprise Division.  Where are

22             employed, if you are?

23       POTENTIAL JUROR:  At home.  And I own

24             Memories Antiques here in

25             Enterprise.

```
 1              THE COURT:  Okay.
 2          POTENTIAL JUROR:  I am Evelyn L. Ryan.
 3                  I'm thirty-something.
 4          THE COURT:  That's good enough.
 5          POTENTIAL JUROR:  And I live out at
 6                  Gateway.  And I teach preschool
 7                  at First Baptist Church.
 8          THE COURT:  Okay.  Thank you.
 9          POTENTIAL JUROR:  Joyce Roberts.  I live
10                  at 312 Bell Street.  I'm
11                  retired, Coffee County Health
12                  Department.  And I'm less than
13                  100.  I'm 65.
14          THE COURT:  That's the way I feel, too.
15                  Coffee County Health Department?
16
17          POTENTIAL JUROR:  Retired.
18          THE COURT:  I had two ladies on two
19                  different panels.  They told me
20                  they were retired housewives.  I
21                  don't know what that means.  I
22                  hope my wife doesn't hear about
23                  it.
24          POTENTIAL JUROR:  I know what that means.
25                  They don't cook no more.
```

324

```
 1              THE COURT:  Okay.  Warren.
 2         POTENTIAL JUROR:  Warren Rowe, Attorney.
 3                   Gateway Estates, 58.
 4         MR. SMITH:  Can we see some
 5                   identification for that, please?
 6         POTENTIAL JUROR:  That's what they told
 7                   me any way.
 8         THE COURT:  Good enough.
 9         POTENTIAL JUROR:  Emit Smith,
10                   painter/contractor.
11                   Self-employed.  County Road 730,
12                   live down close to Sardis
13                   Methodist Church.
14         THE COURT:  And your age?
15         POTENTIAL JUROR:  Fifty-four.
16         THE COURT:  Okay.  Yes, sir?
17         POTENTIAL JUROR:  Charles Richards.  I
18                   work with ConAgra, in
19                   Enterprise, 200 Airport Road.
20         THE COURT:  Okay.  Fifty-eight.  Good
21                   enough.
22         POTENTIAL JUROR:  Ina Pearson, 268 County
23                   Road 603.  My husband and I have
24                   a trucking business.  I'm
25                   sixty-three.
```

1          THE COURT:  You have a nice son, too.

2          POTENTIAL JUROR:  Yes.

3          THE COURT:  Okay.

4          POTENTIAL JUROR:  Mark Reyonlds.

5                    Aircraft flight mechanic with

6                    Dyncorp.  I live on County Road

7                    651, a mile off 27, in Mount

8                    Pleasant Community.

9          THE COURT:  Thank you, sir.  Yes, ma'am?

10

11         POTENTIAL JUROR:  Bertha Page.  And I

12                    live here in the City of

13                    Enterprise.  I'm fifty-plus.

14                    And I work at ConAgra Poultry.

15         POTENTIAL JUROR:  My name is Katherine

16                    Rasponi.  I go by Katherine.  I

17                    live on 101 Highland Drive, just

18                    a few blocks from here.  I'm 26.

19                    And I'm a loan closer, slash,

20                    legal assistant with Cassady

21                    Fuller and Marsh.

22         THE COURT:  Okay.  I have a few

23                    questions that I'm going to ask

24                    of each of you.  And I will tell

25                    you what to expect, also.  First

1          of all, it may help some of you

2          to know that many capital juries

3          are sequestered, placed in a

4          hotel or motel overnight.  And

5          when we finish a case, they go

6          home.  And they are there until

7          that is accomplished.

8                That will not happen in

9          this case.  Everyone will go

10         home at the end of day.  They,

11         of course, will receive

12         instructions not to discuss this

13         matter among themselves, nor to

14         allow anyone to discuss it with

15         them.  As long as jurors promise

16         to do that, we will be going

17         home at the end of each day,

18         until this trial is finalized.

19                How long will the trial

20         take?  It will take about four

21         days.  We will finish up,

22         hopefully, some time Friday

23         night.  That's my best guess or

24         estimate.  Nothing is ever

25         definite in this work.

1          I have some questions

2     that I'm going to ask each of

3     you.  And then the attorneys

4     will also have an opportunity to

5     get to know you a little bit

6     better and ask you some

7     questions.

8          Do any of you have any

9     religious belief or any personal

10    feeling that causes you to be

11    unable to sit in judgment

12    against anyone?

13         Over the years, I have

14    had people come up to me, and

15    say, Judge it's my religious

16    belief that I should not sit in

17    judgment.  And we certainly

18    understand that.

19         Do any of you know,

20    or did you know the deceased in

21    this capital case, Jelaine

22    Bowman Dennis?

23         Mr. Warren Rowe told us

24    yesterday that he was the

25    attorney for Mrs. Dennis.  And

1                        that he knew her in that way.

2                        Okay.  Anyone else?

3        POTENTIAL JUROR:  She has been into the

4                        health department with her

5                        children when I was working,

6                        just like --

7        THE COURT:  Just like a lot of other

8                        citizens?

9        POTENTIAL JUROR:  Yes, sir.  Not anything

10                       personal.  Work-related.

11       THE COURT:  Ms. Roberts, the fact that

12                       she had been to the health

13                       department like many, many

14                       citizens in this county, and you

15                       may have given her a shot or

16                       helped her and her children in

17                       some way.  Would that affect in

18                       any way your ability to sit in

19                       judgment and to decide this case

20                       based solely upon the law and

21                       the evidence?

22       POTENTIAL JUROR:  No.

23       THE COURT:  It would not.  Anyone else?

24                       Let me ask:  Would any of you

25                       have known her had you passed

1    her on the street?  No one.

2                Do any of you know

3    Robert Ray Grimes or would you

4    know him or have known him if

5    you passed him on the street?

6    Robert Ray Grimes.  Mr. Grimes,

7    I believe goes by the name of

8    Ray Grimes.  We have two hands

9    up.

10               Mr. Reyonlds, I

11    believe, did you have your up?

12   POTENTIAL JUROR:  Yes.

13   THE COURT:  How do you know Mr. Grimes?

14

15   POTENTIAL JUROR:  He owns a store around

16        ConAgra.

17   THE COURT:  I have been in his store,

18        myself.  Are you saying that you

19        have been to that store?

20   POTENTIAL JUROR:  I have been to it.  As

21        far as personally knowing him, I

22        don't know him.

23   THE COURT:  So he is not a close friend

24        of yours?

25   POTENTIAL JUROR:  No.

1       THE COURT:  The fact that you know him,

2              the fact that you know he has a

3              store, would that in any way

4              affect your ability to sit in

5              judgment and decide this case

6              based solely upon the law and

7              the evidence?

8       POTENTIAL JUROR:  No, sir.

9       THE COURT:  Let me let y'all know, and I

10             don't know this to be fact, but

11             maybe establish in some way, the

12             lawyers have made known to me

13             that this may be established:

14             At one time Grimes' Grocery was

15             right next to, and probably

16             attached to this Toy Store,

17             adult Toy Store --

18      POTENTIAL JUROR:  It was next to it.

19      THE COURT:  Okay.  It was next to it.

20             And later it moved, I guess to

21             County Road 711.  It may come

22             out that Mr. Grimes was a silent

23             partner with Mrs. Dennis.

24                  So, you are saying that

25             your knowledge of him in no way

1           would affect your ability to sit

2           in judgment and decide this case

3           based solely upon the law and

4           the evidence, Mr. Reyonlds?

5    POTENTIAL JUROR:  No, sir.

6    THE COURT:  It would not.  I believe

7           somebody else had their hand up.

8           Ms. Roberts had her hand up a

9           few minutes ago as far as

10          knowing Mr. Grimes.

11   POTENTIAL JUROR:  I have known him as

12          passing by for years.  He and I

13          have lived here for most all his

14          life -- and I have, too, but not

15          too close.

16   THE COURT:  Did he, in your past work,

17          before you retired, I imagine

18          that you met a lot of people and

19          knew a lot of people.  Would the

20          fact that you knew him, and, of

21          course, it's okay to know

22          somebody in your community.  We

23          are not in New York City.  We

24          know each other.  Would that in

25          any way affect your ability to

1              sit in judgment and decide this

2              case based solely upon the law

3              and the evidence?

4      POTENTIAL JUROR:  No.

5      THE COURT:  You are saying no it would

6              not.

7                  Would the fact the

8              deceased and Mr. Grimes, the

9              alleged victims of these alleged

10             crimes, would the fact they are

11             white, and that the Defendant is

12             a black person, prohibit you

13             from trying the case on the

14             basis of the evidence and

15             disregarding the issue of race?

16             Is there any person that would

17             have a problem with that?  If so

18             are raise your hand.  No hand is

19             up.

20                 Have any of you made

21             any promises, have any of you

22             given any assurances that if you

23             are selected to serve on the

24             trial jury of this case, that

25             you would have a propensity to

1          convict Mr. Conrad or to acquit

2          Mr. Conrad of the charge or

3          charges against him.  No one.

4               Do any of you have an

5          interest in the out come of

6          these two criminal cases?  No

7          response.

8               Does the State have any

9          question of this venire panel?

10    MR. JARRELL:   Yes, sir.

11               May it please the

12          Court, opposing counsel.  Good

13          morning.  My name is Larry

14          Jarrell.  And I'm one of the

15          Assistant District Attorney's

16          that will be helping try this

17          case, along with Ms. Glenda

18          Stout and Investigator Dwight

19          Holley.  It's our pleasure to

20          serve the State and serve you as

21          citizens of the State in the

22          process of prosecuting this

23          case.

24               What we are going to do

25          now is called the voir dire

```
 1            session.  And it's just a fancy

 2            word for allowing us to get to

 3            know you as potential jurors.

 4            It's our responsibility, as it

 5            is the responsibility of the

 6            Defense attorneys, to try to

 7            learn a little bit about you, to

 8            the point that we can make an

 9            intelligent and an educated

10            determination when we go to

11            selecting the final 12 or 14

12            that we will pick for this

13            jury.

14                 It is not, and let me

15            reiterate, it's not intended to

16            embarrass you with a question

17            that we ask.  One lady said

18            earlier today that she felt like

19            she was on trial, because we

20            were asking her specific

21            questions that came about as a

22            result of one of her answers.

23                 Please don't think that

24            we are trying to put you on

25            trial.  This is just our only
```

```
1              means of really being able to

2              get to know you, and know

3              whether or not we feel like you

4              would be one on the jury or

5              not.  It's as simple as that.

6                   The State by law has

7              the burden, the burden of

8              proving the guilt of the

9              Defendant.  And that burden is a

10             standard.  It's a high jump bar

11             that we have to get over.  But

12             what I want to try to get from

13             you is first off, that burden is

14             beyond a reasonable doubt.  Not

15             beyond all doubt.  Just beyond a

16             reasonable doubt.

17                   I guess I need to ask

18             it this way:  Since the burden

19             is beyond a reasonable doubt,

20             that's the same burden that we

21             would have to attain, the same

22             height bar that we would have to

23             obtain, if we were trying a

24             shoplifting case from Wal-Mart.

25             There is no difference just
```

1              because this is a capital murder

2              case.  Okay.

3                     If you would, please

4              raise your hand if you will not

5              hold the State to any higher

6              burden than you would in any

7              other case?  If you can't,

8              that's understandable.  But if

9              you would promise me that you

10             would not hold the State to any

11             higher burden than you would in

12             any other case.

13   MR. JARRELL:   Everybody.  Thank you.  I

14             appreciate that.

15                     Mr. Gary Bradshaw is

16             one of the defense attorneys.

17             And Mr. Al Smith is the other

18             defense attorney for Mr.

19             Conrad.  They both have civil

20             practices, as well as doing

21             criminal work.  Mr. Smith works

22             out of Elba.  He use to be an

23             Assistant D.A. here.  You may

24             recognize him by that he if you

25             have been down here before.

1          Have any of you, and I

2     don't want to know what for --

3     it's none of my business.  Have

4     any of you ever been represented

5     by, or anyone in your family

6     been represented by either of

7     these two attorneys?  No

8     response.

9          Mr. Bradshaw also was

10    an insurance adjuster, I

11    believe, for Farm Bureau or

12    Alpha before they changed the

13    name.  Have any of you ever had

14    any dealings with Mr. Bradshaw

15    in that capacity?

16  MR. JARRELL:  Mr. Rowe.  And you are Mr.

17    Smith?

18  POTENTIAL JUROR:  Jeff Smith.

19  MR. JARRELL:   Would the fact that you

20    had dealings with him in any

21    way, in that capacity, affect

22    your ability to fairly judge

23    this trial?

24  POTENTIAL JUROR:  No.

25  POTENTIAL JUROR:  No.

1    MR. JARRELL:  We expect that there will

2        be -- obviously, that there will

3        be some police officers from the

4        Enterprise Police Department

5        that will be giving testimony

6        here whenever we start.

7            Have any of you had any

8        problems that would cause you to

9        maybe have some ill feelings

10       toward the Enterprise Police

11       Department that would affect

12       your ability to be fair and just

13       in your determination.  No one.

14       Thank you.

15            This is a question that

16       I hate to ask, but I guess I

17       need to ask it.  Has anyone in

18       the District Attorney's Office

19       done anything to upset you that

20       might affect your ability to sit

21       in fair judgment?  No response.

22            Mr. Richard?  Have we

23       offended you?

24    POTENTIAL JUROR:  No.

25    MR. JARRELL:  Thank you.  Mr. Smith, I

1    was looking at the wrong person

2    and called the wrong name.  I'm

3    a little cross-eyed.

4         The crimes charged here

5    against Mr. Conrad occurred out

6    on County Road 711 at a store

7    called the Toy Store.  The Toy

8    Store dealt with merchandise

9    that some of you might consider

10   offensive, an adult toy store, a

11   novelty store.  They sold adult

12   magazines, adult paraphernalia,

13   things that might embarrass some

14   folks if they saw them or knew

15   about them.

16        Would the fact that

17   Mrs. Dennis owned and operated

18   that type of store, would that

19   in any way prevent you from

20   fairly and justly listening to

21   the evidence and applying the

22   law as the Judge gives?  Anyone?

23   No response.

24        In any case like this,

25   where we have a jury, there are

```
 1                    basically 13 judges in a case.

 2                    You have the one Judge that sits

 3                    up there in the black robe, who

 4                    is the Judge of the law.  The

 5                    rest of you, if you were picked

 6                    to serve on this jury, would be

 7                    judges of the fact.  And it will

 8                    be your responsibility to make a

 9                    judgment that is going to affect

10                    someone's life in one way or the

11                    other.

12                         Do any of you have any

13                    religious, ethical, moral

14                    feelings about sitting in

15                    judgment of another person, or

16                    sitting in judgment on the facts

17                    which might lead to him being

18                    convicted or not?  Anyone?

19          THE COURT:  Please speak up, if you

20                    will.  The court reporters are

21                    having difficulty hearing you.

22

23          MR. JARRELL:  Yes, sir.

24                         This, as I said, is

25                    a capital murder case.  Please
```

```
 1                    listen carefully to this
 2                    question.  It may get a little
 3                    confusing.  Should the State
 4                    meet its burden, and get over
 5                    that high bar of proving to you
 6                    all of the elements necessary to
 7                    convict a person of capital
 8                    murder, then the possible
 9                    punishments for that, if we
10                    reach that goal, and if the jury
11                    so finds, is either death or
12                    life without parole.
13                         Knowing that fact at
14                    this point, would that in any
15                    way affect your ability to sit,
16                    listen to the evidence, make a
17                    judgment on that evidence, apply
18                    the law as the Judge gives it to
19                    you, and render a decision?
20                    Would that affect you in any
21                    way, your ability to render that
22                    decision?  Yes, ma'am.
23          THE COURT:  Ms.  Rasponi.
24          POTENTIAL JUROR:  It's against my
25                    religion, the capital
```

1           punishment, murder.

2     MR. JARRELL:  So you are saying that it

3           would affect you?

4     POTENTIAL JUROR:  It would.

5     MR. JARRELL:   Thank you for your

6           honesty.  I appreciate that.

7

8     MR. JARRELL:   That's all the questions

9           I have at this point.  Thank

10          you.

11    THE COURT:  Before Mr. Bradshaw gets

12          you up and asks you some

13          questions, my comment, my

14          question is directed primarily

15          to Ms. Rasponi; but any of you

16          feel free to respond.

17              Ms. Rasponi, do you

18          have a fixed opinion because of

19          your religious beliefs or

20          otherwise, do you have a fixed

21          opinion against punishment by

22          death, which would automatically

23          cause you to vote against the

24          death penalty without regard to

25          any evidence presented at trial?

```
 1                    First of all, do you have a

 2               fixed opinion against punishment

 3               by death because of your

 4               religious beliefs or otherwise?

 5          POTENTIAL JUROR:  Yes, sir.

 6          THE COURT:  Okay.  And would your

 7               fixed opinion cause you to

 8               automatically vote against the

 9               death penalty without regard to

10               any evidence presented in the

11                trial of this case?

12          POTENTIAL JUROR:  Without evidence

13               presented?

14          THE COURT:  Assuming that the State

15               proved beyond a reasonable doubt

16               the guilt of the Defendant.  And

17               you were satisfied that all of

18               the elements of the capital

19               offense had been proven beyond a

20               reasonable doubt to be fact,

21               would you have a fixed opinion

22               against punishment by death, to

23               the extent that it would cause

24               you to automatically vote

25               against the death penalty
```

1           without regard to any evidence,

2           whatever that evidence maybe,

3           how bad that evidence maybe, the

4           facts maybe?

5    POTENTIAL JUROR:  I'm going to say, no,

6           but I have never been put in a

7           position to do that.

8    THE COURT:  Sure.  And hopefully none

9           of us will again.

10   POTENTIAL JUROR:  Right.

11   THE COURT:  No, what?  Explain your

12          answer to me, if you will?

13   POTENTIAL JUROR:  I guess right now my,

14          I guess my opinion, and if live

15          upon it, as against my religion,

16          but if they proved would without

17          a doubt or reasonable doubt, as

18          you say, and I felt comfortable

19          with it, I guess I could say

20          yes.

21   THE COURT:  Okay.  Thank you.  I just

22          needed to clarify that.  I

23          appreciate that Ms. Rasponi.

24          And I hate to pick on anyone.

25          But there are certain things

1              that I need to get from each of

2        you before we can select a jury.

3                   Mr. Bradshaw.

4      MR. BRADSHAW:  Thank you, Your Honor.

5                      Good morning, ladies

6        and gentlemen.  I am Gary

7        Bradshaw.  I know some of you.

8        I'm trying to find out a little

9        more about some of you in just a

10       moment.

11                  I, along with Al

12       Smith, represent Robert Thomas

13       Conrad, Jr.  This is Al.  And

14       this is Robert Conrad, a 21-year

15       old man standing right here.  He

16       is sitting before you as an

17       innocent man.  You can ask this

18       question in another way:  If you

19       feel anywhere in your heart or

20       mind this morning that he is

21       sitting over there with the

22       least bit of guilt, would you

23       let me know right now?  Just

24       raise your hand.

25                  There are any number

1           of circumstances that can cause

2           a human being to think that he

3           may be guilty of something.  He

4           has been arrested.  He has been

5           held.  It has been written

6           about.  It's been on the media.

7           There is even an incorrect

8           article in the newspaper this

9           morning about it, very

10          incorrect.  Do any of those

11          facts cause you to think that

12          man must be guilty of something

13          that he is charged with.  And as

14          a gentlemen reminded me this

15          morning, that we need to narrow

16          this down, to what the State has

17          charged him with, capital murder

18          and robbery.

19                  So we all agree that

20          he is sitting innocent of

21          everything that he is charged

22          with?  Give me nod if you are in

23          agreement of what I said?

24                  Mr. Richards, do you

25          agree with that?

1          POTENTIAL JUROR:  (Nodding head in the

2               affirmative).

3      MR. BRADSHAW:  You are sure about that?

4

5          POTENTIAL JUROR:  Yes.

6      MR. BRADSHAW:  I just wanted to make

7               sure.  You just seemed a little

8               uneasy about answering that.

9               And  that's all right.  I just

10              wanted to know your true

11              feelings.  But you are convinced

12              right now he is innocent?

13         POTENTIAL JUROR:  Right.

14     MR. BRADSHAW:  Right now.  All right.

15              In this case Mr. Larry Jarrell

16              told you that in a capital

17              murder, they are going to put on

18              the evidence.  They have to put

19              it on beyond a reasonable doubt.

20              The people that are going to put

21              on the evidence are Glenda

22              Stout, Larry Jarrell.

23                   There are three other

24              attorneys in the District

25              Attorney's Office:  Mark Fuller,

1              Scherryl Harrison and Marty

2          Weatherford Williams.  Have any

3          of you had the privilege of ever

4          being represented by those

5          individuals while they were in

6          private practice?  Mark was in

7          practice at Cassady, Fuller and

8          Marsh.  Mr. Larry -- and

9          Scherryl Harrison is a young

10         black lady who was in here

11         yesterday.  You may have seen

12         her.  And you may know Marty

13         Weatherford, Jim Weatherford's

14         daughter, and Glenda.

15         Have any of you ever been

16         represented by them?  Yes,

17         ma'am?

18    POTENTIAL JUROR:  We worked through an

19         insurance case for our -- our

20         truck had hit another person's

21         truck.  We both had the same

22         insurance.  But he represented

23         us with them.

24    THE COURT:  Which one?

25    POTENTIAL JUROR:  Mr. Fuller.

```
1          MR. BRADSHAW:  And you are Ms.

2               Pearson?

3    MR. PEARSON:  Right.

4    MR. BRADSHAW:  Is your trucking company

5               down in Kinston?

6    POTENTIAL JUROR:  Goodman.

7    MR. BRADSHAW:  Goodman.  Okay.  Would

8               the fact that Mr. Fuller had

9               represented you, your company,

10              and he is your District

11              Attorney, would that cause you

12              to have any prejudices or biases

13              towards the State's case?

14   POTENTIAL JUROR:  No.

15   MR. BRADSHAW:  Would you be able to sit

16              up here and fairly give justice

17              based on the facts?

18   POTENTIAL JUROR:  Right.

19   MR. BRADSHAW:  Anyone else?

20   POTENTIAL JUROR:  Marty Weatherford

21              represented me for a piece of

22              property.

23   THE COURT:  And that's Ms. Joyce

24              Roberts?

25   POTENTIAL JUROR:  Yes, sir.
```

1          MR. BRADSHAW:  Joyce Roberts.  And

2                  Marty is still in private

3                  practice.  She is a part-time

4                  District Attorney.  And these

5                  other lawyers are full time.

6                  The same question I was asking

7                  Ms. Pearson.  Is that going to

8                  affect you?

9          POTENTIAL JUROR:  No.

10         MR. BRADSHAW:  Anyone else.  I know

11                 that you work with Cassady,

12                 Fuller and Marsh.  And I know

13                 Mr. Rowe's situation.

14                      Let me ask this

15                 question, and if I may, Your

16                 Honor, for the purposes that we

17                 already know Mr. Rowe's

18                 situation and keep him from

19                 having to answer in affirmative

20                 every time, he won't have to.

21         THE COURT:  Sure.  Are you saying

22                 that you don't want to hear from

23                 Mr. Rowe?

24         MR. BRADSHAW:  Exactly.

25         MR. ROWE:  I would imagine that's what

1              it is.

2         MR. BRADSHAW:  Are any of you related

3              to any of those attorneys that I

4              just mentioned?  Those five?

5              Mark Fuller, Glenda and Larry

6              sitting here before you, Marty

7              Williams, Scherryl Harrison?

8              Are you related to them or any

9              of the support personnel that

10             work for them?  Here is one of

11             them right here.  Mr. Dwight

12             Holley in the pink shirt.  And

13             there are others in his office.

14             Nancy Spradley, Mr. Mathews, Mr.

15             Pennington, Tonya Walker.  There

16             are a lot of people employed by

17             that office.  I want to know if

18             you are related to them in any

19             degree.  Ms. Pearson?

20        POTENTIAL JUROR:  Dwight.  He is my

21             husband's cousin.

22        MR. BRADSHAW:  On the record she is

23             admitting that she is related to

24             Dwight.

25        THE COURT:  Dwight, not many people

1          would do that.

2               POTENTIAL JUROR:  We have fun.

3               THE COURT:  For the record that was

4                    Ms. Pearson.

5               MR. BRADSHAW:  Ms. Pearson has

6                    admitted that she is related to

7                    Dwight.  Is there anyone else

8                    that is related to anyone that

9                    works in the D.A's office?

10                              And is knowing

11                   Dwight going to affect your

12                   judgment in any way --

13              POTENTIAL JUROR:  No.

14              MR. BRADSHAW:  -- the fact that you're

15                   a cousin? Are you a cousin or

16                   inlaw?

17              POTENTIAL JUROR:  He is my husband's

18                   first cousin.

19              MR. BRADSHAW:  First cousin.  The same

20                   group of people that I'm asking

21                   you about, except of being

22                   related, I want to know if you

23                   are in any civic organization,

24                   society club, church

25                   organization, or church, period,

```
1                    with any of those individuals or

2                    maybe you are in some college

3                    football club, Alabama Fever or

4                    Auburn Club or Trojan Club, with

5                    any of those individuals?

6           POTENTIAL JUROR:  I go to church with

7                    Mark Fuller.

8           MR. BRADSHAW:  Church with Mark.

9                    Anybody else?  Okay.

10                           Lee, would that

11                   fact cause you to have prejudice

12                   towards the State's case?

13          POTENTIAL JUROR:  No.

14          MR. BRADSHAW:  You could push the fact

15                   that you and he attend the same

16                   church aside, and listen to the

17                   evidence and judge based on this

18                   evidence.

19          POTENTIAL JUROR:  Yes.

20          MR. BRADSHAW:  I've got one other group

21                   of people that I need to cover

22                   with that same thing.  I just

23                   want to know if you have a

24                   relationship with these people,

25                   not if they walk in that back
```

1    door that you would recognize

2    their face and you say, oh,

3    that's Mark Fuller or, oh,

4    that's Bruce Mathews.  I want to

5    know if you have something

6    beyond recognition, a

7    relationship with these people.

8    Here are people that we expect

9    to get in here and raise their

10   hand to tell the truth.  And I

11   want to know if you have a

12   relationship with them.  One of

13   them would be Captain Mike

14   Lolley, Enterprise Police

15   Department.  Sergent Lennis

16   Darby.  Captain Thomas Braun.

17   THE COURT:  Of course, Mr. Rowe is

18        going to know all of them.

19   POTENTIAL JUROR:  I thought he told me

20        that I didn't need to answer.

21   MR. BRADSHAW:  That's right.

22   POTENTIAL JUROR:  I thought Braun was a

23        captain.

24   MR. BRADSHAW:  He is ranked Captain.

25        I'm sorry.  Yes, ma'am?  Ms.

1                  Rasponi?

2        POTENTIAL JUROR:  I know Captain

3                Braun's daughter.  One daughter,

4                I went to high school with.

5        THE COURT:  Ms. Rasponi, would that

6                fact in any way affect your

7                ability to sit in judgment, the

8                fact that you know the daughter

9                or whatnot?

10       POTENTIAL JUROR:  No.

11       MR. BRADSHAW:  Some other witnesses

12              that I would like to ask you

13              about would be Jeff Spence.  I

14              would leave off the rank and

15              designation.  I might get those

16              wrong.  Jeff Spence, Earl

17              Pennington.  Richard or Rick

18              Hauser. Buford Roberts.  Michael

19              Petty.  Michael Hines.  Steve

20              and brother, Matt Key -- Steve

21              Key or Matt Key.

22       POTENTIAL JUROR:  I know them from

23              school.

24       MR. BRADSHAW:  You went to high school

25              with them?

1          POTENTIAL JUROR:  I went to high

2                school with them.  But I know

3                Steve from Matt, but not enough

4                to hang out with them.

5       MR. BRADSHAW:  Okay.  In fact, you

6                don't hang out with them, but

7                you know them, is that going to

8                affect your ability to sit in

9                judgment?

10      POTENTIAL JUROR:  No.

11     MR. BRADSHAW:  We've already asked you

12              about Dwight.  Does anyone

13              besides Ms. Pearson want to

14              claim Dwight?

15                      Mr. Richard Bray.

16              I know some of you live in, what

17              I call, the Mount Pleasant

18              Community.  I know Mark does.

19              Do you know Mr. Richard Bray?

20              Donald Smith, Jr?  Do you know

21              him?

22      POTENTIAL JUROR:  Yes.

23     MR. BRADSHAW:  Do you know him well?

24      POTENTIAL JUROR:  We go to church

25              together.

357

```
 1              MR. BRADSHAW:  He goes to church at

 2                   Mount Pleasant with you?

 3         POTENTIAL JUROR:  (Nodding head in the

 4                   affirmative).

 5         MR. BRADSHAW:  Would that fact, the

 6                   fact that we expect he will

 7                   testify, is that going to have a

 8                   negative affect on you, or keep

 9                   you from sitting here as an

10                   impartial juror?

11         POTENTIAL JUROR:  No, sir.

12         MR. BRADSHAW:  A couple more

13                   individuals:  Eric Carmellow.  I

14                   may mispronounce these names.

15                   Buddy Ammons, W. R. Or Buddy

16                   Ammons.  Howard Jones.  Tia

17                   Cage, T-i-a, last name C-a-g-e.

18

19                        We have had this

20                   question answered affirmatively

21                   on another panel.  Is there

22                   anyone who would take the

23                   testimony of a police officer

24                   and give it more credence or you

25                   would tend to believe it before
```

1        you would a non-police officer?

2        And we had one gentlemen that

3        just admitted in his heart that

4        he would.  And that is kind of

5        important, not just "kind of."

6        It's real important.  Anyone who

7        tends to -- all you have is one

8        word against a word, you would

9        believe a police officer over a

10       non-police officer?  That

11       non-police officers' group would

12       be a lot of people to include

13       Mr. Conrad or myself.  Anybody?

14       No response.

15       You have answered some

16       questions from the Judge

17       concerning your knowledge and

18       your involvement with Mr. Ray

19       Grimes.

20       And, Mark, I direct

21       this question to you, but,

22       really to everybody, just

23       because you live in that

24       community:  Did you frequent

25       Grimes' Grocery?  Did you trade

```
 1                     there?  Did you buy your gas

 2                     there or your groceries there?

 3          POTENTIAL JUROR:  Usually, I would go

 4                     by when I went to my

 5                     grandmother's house.  I probably

 6                     stopped in there in my lifetime,

 7                     two or three times.

 8          MR. BRADSHAW:  Okay.  This is a

 9                     question, and please understand

10                     where I'm coming from.  I'm

11                     certainly not prying into your

12                     personal life, but I need to

13                     know, for my client, I need to

14                     know if you ever had occasion --

15                     and I would like to put Mr.

16                     Warren Rowe back into this

17                     answering group.  Have you ever

18                     had occasion to go into the

19                     adult Toy Store while it was on

20                     County Road 636, by Mr. Grimes'

21                     store or on County Road 711,

22                     which is in front of the Cannon

23                     Station?  I know she was your

24                     client.

25          POTENTIAL JUROR:  I went in there.
```

1      MR. BRADSHAW:  Anyone else?

2      POTENTIAL JUROR:  Didn't embarrass me,

3           either.

4      MR. BRADSHAW:  I didn't want to

5           embarrass you.  Yes, sir?

6      POTENTIAL JUROR:  I have been there

7           twice.

8      MR. BRADSHAW:  You went in there twice?

9      POTENTIAL JUROR:  Right.

10     THE COURT:  For the record, Warren Rowe

11          acknowledged, and so has Mr.

12          Richards, Charles Richards.

13     MR. BRADSHAW:  Anyone else?

14                    Now, Mrs. Dennis

15          at one time or another had some

16          affiliation with Dogwood Acres

17          Mobile Home Park out east of

18          Enterprise.  Have any of you

19          ever been a tenant or your

20          family members been a tenant

21          there?  Have you been an

22          employee there?

23                    Mrs. Dennis'

24          brother, Lynn Bowman, some of

25          you may know Lynn, at one time

1          owned a Green Grass Farm, down

2          in the Bellwood Community, has

3          some affiliation with the Bent

4          Can Store that I used to visit.

5          Do any of you know Mr. Lynn

6          Bowman? No response.

7     THE COURT: Mr. Warren Rowe had his

8          hand up.

9     MR. BRADSHAW: I'm sorry.

10     POTENTIAL JUROR: I'll quit answering

11          when you tell me to.

12     MR. BRADSHAW: You saw a lady sitting

13          at the table, where Dwight is

14          sitting, yesterday named April

15          Gunnels. She was April Dennis.

16          That was Mrs. Dennis' oldest

17          daughter. There were three

18          children: April, Monica and

19          Damon. Damon is over at

20          Enterprise Jr. High. Did any of

21          you or your children know April

22          or Monica or Damon?

23     POTENTIAL JUROR: (Nodding head in the

24          affirmative).

25     MR. BRADSHAW: Mr. Rowe you are

1           nodding.  Did any one else know

2           the children, play with them,

3           went to school with them, play

4           ball with Damon, dance or

5           anything with their girls?

6                    Do any of you know

7           Mrs. April Gunnels, her husband?

8           No response.

9                    Ed Mock.  He owns a

10          business called Batten's Paint

11          and Body, used to be down at

12          Batten's Cross Roads.  Do any of

13          you know, or are you friends

14          with, or associated with Mr.

15          Mock?  Do you know him at all?

16

17     POTENTIAL JUROR:  Just know where his

18          business was.

19     THE COURT:  That was Mr. Warren Rowe

20          has his hand up.

21     MR. BRADSHAW:  Never had your vehicle

22          worked there?  Jeff Smith.  Any

23          relation?

24     POTENTIAL JUROR:  No.

25     MR. BRADSHAW:  Any relation, Mr. Rowe?

1              POTENTIAL JUROR:  No.

2              POTENTIAL JUROR:  Wouldn't no body

3                   claim to be kin to me.  You know

4                   better than that.

5         MR. BRADSHAW:  Mr. Jarrell told you the

6                   charges in this case.  The Judge

7                   told you the very first hour

8                   that we were here yesterday,

9                   capital murder and robbery.

10                  And, yes, the possible

11                  punishments for capital murder,

12                  if guilty of it, are life

13                  without parole and death.

14                       I want to let you know

15                  there are other alternatives.

16                  There's always the alternative

17                  of not guilty.  Mr. Conrad is

18                  not guilty right now.  So I want

19                  you to know, and as Kathrine

20                  said this thing about do I have

21                  to deal with the death penalty.

22                       There are other

23                  alternatives, such as not

24                  guilty.  There will be

25                  alternatives for the jury, such

```
 1              as lesser included offenses.  I
 2              don't want anybody to think that
 3              is the only thing that I have to
 4              do with this man.  Because that
 5              is certainly not true.  That is
 6              not true.  They have a hurdle.
 7              And I explained to the other
 8              panels.  You stack a bunch of
 9              blocks up here.  And they have
10              to get over those blocks.  Those
11              blocks are the elements of
12              offense.  And they have to prove
13              to you from that chair, through
14              witnesses, and the testimony,
15              that what they have charged with
16              him, he did, every element.
17                   You can leave a little
18              salt or maybe one egg instead of
19              four out of a cake, and you
20              can't taste a lot of difference.
21                   You can't do that
22              here.  All the blocks have to be
23              here.  They have to prove them.
24              In other words they have to get
25              over that hurdle.  If they
```

1    don't, and they don't get off

2    the floor, it's not guilty.  If

3    they get the blocks midway,

4    that's a lesser included

5    offense.  So those options will

6    be available to you.  Not death,

7    not life without.

8              And is it going to

9    bother you -- is it going to

10   bother you when Robert Conrad

11   sits in that chair, and you sit

12   in this chair for three days or

13   four days?  And he sits in this

14   chair and never takes that

15   chair?  The fact that he doesn't

16   get up there and swear under

17   oath and testifies against any

18   accusation against him, is that

19   going to make you think when you

20   go back to deliberate, that he

21   is guilty of something.  If I

22   was charged with that, I would

23   have gotten up there and said

24   something?

25              Does that make you

1    think that way?  Any of you?

2    Does it make you think that way

3    at all?  There was a question to

4    you from the Judge from the

5    bench about race.  And I just

6    want to cover that one more time

7    because we've dealt with that in

8    earlier issues.

9         Mr. Conrad is a black

10   male.  Mrs. Dennis is a white

11   female.  And Mr. Ray Grimes is a

12   white male.  Do any of you,

13   where you work, you've all told

14   us where you work, are you

15   subjected to, where you work to

16   racial slurs, literature?

17        And, ladies and

18   gentlemen, I'm a white male, and

19   coming from me, you may think

20   that I'm talking about whites,

21   making jokes about blacks.  But

22   I'm asking if you hear any about

23   blacks or whites or Mexicans or

24   Orientals?  We are a diverse

25   nation.  Are any of you

1          subjected to that in your work

2          place?

3     POTENTIAL JUROR:  I think every work

4          place you hear that, where you

5          work, when you work with people.

6     MR. BRADSHAW:  When you work with who?

7     POTENTIAL JUROR:  When you work with

8          people, you are going to hear

9          it.  You're always going to hear

10         that.

11    THE COURT:  Let the record reflect

12         that's Bertha Page.

13    POTENTIAL JUROR:  Yes.

14    THE COURT:  I just have to maintain a

15         record of who is talking.

16    MR. BRADSHAW:  And, Ms. Page, I think

17         you would be

18         foregoing a conclusion that our

19         nation has not been eradicated

20         of bias or prejudices based on

21         skin color or gender?

22              But the fact that you

23         hear that, does that cause you

24         to have that in your heart

25         because you subjected to that at

1     work?

2              And that is my

3     question to all of you?  Does

4     anybody have any of that because

5     Robert is a black male?  And the

6     alleged victims are white?  No

7     response.

8              Ladies and gentlemen,

9     in this case, you have already

10    all answered in the affirmative

11    that because of this adult Toy

12    Store that sold merchandise,

13    that you don't see in Wal-Mart

14    -- I don't know how to describe

15    it -- that it's not going to

16    affect your decision?

17             I want to ask you one

18    last question.  The fact that a

19    life was lost, is there anybody

20    up here that thinks that because

21    somebody else's life ought to be

22    lost?  An eye for an eye, is

23    what I'm asking?

24             Do you think that

25    without any other circumstances,

1                              that if somebody says there is

2                              one life gone, somebody else's

3                              life ought to go and make it

4                              even?  Do you feel that way?

5              POTENTIAL JUROR:  Unless it's proven?

6              MR. BRADSHAW: Sir?

7              POTENTIAL JUROR:  Unless it's proven.

8              MR. BRADSHAW:  Unless it's proven what?

9              POTENTIAL JUROR:  Either way.

10             MR. BRADSHAW:  Is there anybody else

11                             that feels there ought to be an

12                             eye for an eye, another life

13                             gone?  And you don't know any of

14                             the circumstances surrounding

15                             it?

16             THE COURT:  That was Mr. Jeff Smith

17                             that responded?

18             MR. BRADSHAW:  Yes, sir.  Anybody else?

19                                 Judge, may have just a

20                         moment?

21                             Ladies and gentlemen, thank

22                         you, very much.

23             THE COURT:  Mr. Jarrell.

24             MR. JARRELL:   Yes.  I have one more

25                             question, if I could.  Based on

1           an answer that was given

2           yesterday when the Judge was

3           talking to you, and you were all

4           out here in front, Ms. Page, I

5           believe you indicated that you

6           knew the Defendant's family?

7      POTENTIAL JUROR:  Yes.

8      THE COURT:  Could you please speak up?

9           The court reporter needs to

10          hear.  What was your question?

11     MR. JARRELL:  That surprises me, Judge,

12          I have always been told I'm a

13          loud one.

14     THE COURT:  You sort of taper off at

15          the very end.

16     MR. JARRELL:  Okay.  I will try to do

17          better.

18                    Ms. Page, you

19          indicated that you knew the

20          Defendant's family?

21     POTENTIAL JUROR:  The mother, yes.

22     MR. JARRELL:  Would the fact that you

23          know the mother of Mr. Conrad,

24          would that in any way affect

25          your ability to fairly listen to

1    the evidence and apply the

2    evidence to the law?

3 POTENTIAL JUROR:  No.

4 THE COURT:  Your answer was no, it

5    would not?

6 POTENTIAL JUROR:  No, it would not.

7 MR. JARRELL:  Thank you.

8 THE COURT:  Ladies and gentlemen, let

9    me explain to you what to

10    expect.  Sometimes we have

11    jurors that have to sit in the

12    courtroom and wait while we

13    select a jury.  And we want to

14    use your time just as

15    efficiently and wisely as we

16    possibly can.  We don't want you

17    to have to sit down here, if we

18    don't really need you down here.

19    So we are going to let you go

20    home or do whatever you wish to

21    do.

22     It's my belief that we

23    will have a jury somewhere

24    around 4:30 today.  Our Clerk of

25    Court, Mr. Counts, has all of

1          your telephone numbers.  We are

2          not going to have to have you

3          back down here unless we call

4          you today at 4:30 or 5:00,

5          somewhere in between there,

6          probably to let you know you are

7          on the jury.  So I ask that you

8          be close to the telephone, that

9          number that you gave to your

10         Clerk of Court, so that if you

11         are in fact selected that you

12         can come on down.

13                 The trial of this case

14         will begin today.  I anticipate

15         that it will begin somewhere

16         around 5:30 or after that last

17         juror gets here.  And I have had

18         a case where we did that, worked

19         things this way.  And one of our

20         jurors apparently didn't hear me

21         and went to Tennessee, and made

22         all the other jurors upset to

23         have to sit and wait for that

24         juror to come back here.

25                 So, for heaven sakes,

1              we don't want to waste your

2              time, so be close to that

3              telephone so that those deputies

4              sitting right over there and

5              that Sheriff sitting right

6              there, Sheriff Moates, doesn't

7              have to run out and find you or

8              look you up somewhere.  That

9              would be mighty embarrassing.

10             We don't want that to happen.

11                    Have a good lunch.  If

12             we call you, we will see you

13             around 5:30.

14             (Panel exited the courtroom).

15     THE COURT:  Let the record reflect we

16             are now out of the hearing and

17             presence of venire panel.  Are

18             there any challenges for cause?

19             If you will go by number only.

20     MR. JARRELL:  Number 151.

21     THE COURT:  Okay.  The State says 151.

22             Is that on a capital punishment,

23             I believe?

24     MR. JARRELL:  Yes, sir.

25     THE COURT:  Any argument?

1        MR. SMITH:  We object.

2        THE COURT:  Objection sustained.  Let's

3              go on.

4        MR. JARRELL:  That's all we have.

5        THE COURT:  What says the Defense?

6        MR. SMITH:  Judge, we would challenge

7              number 144.  In spite of

8              honesty, I think under the

9              Tucker rational, within the

10              fifth degree, she would be due

11              to be taken off the jury.

12      THE COURT:  Any objection.

13      MRS. STOUT:  I think that would be to his

14              advantage to keep her on.  But

15              we are not going to object.

16      MR. SMITH:  That's probably true.

17      THE COURT:  The challenge to number 144

18              is granted.  Any other

19              challenges by the Defense?

20       MR. SMITH:  Yes, Your Honor.  Mr. Rowe,

21              number 160, former client and on

22              general voir dire, that is when

23              the entire pool was here, he

24              indicated that because she was

25              his client, it would affect his

1          ability to serve.

2    MRS. STOUT:    No objection.

3    THE COURT:  No objection.  Number 160,

4              that challenge is granted.  Any

5              additional challenges by the

6              Defense?

7    MR. SMITH:  Yes, sir.  Number 167.  And

8              the questioning of an eye for an

9              eye, that is the first of the

10             never vote for the death penalty

11             question --

12   THE COURT:  Objection?

13   MRS. STOUT:  Maybe I understood this

14             wrong.  I believe his response

15             was unless it is proven.

16   THE COURT:  Is that an objection?

17   MRS. STOUT:    I object.

18   THE COURT:  Sustained.  That challenge

19             is not granted.

20   MRS. STOUT:  That's all, your Honor.

21   THE COURT:  This court is adjourned until

22             1:00.  We have one more panel at

23             1:00 o'clock.

24                  Hopefully, we will be

25             finished by around 2:30 or maybe

1        a little bit before.  I don't

2        want folks to drag around.  I

3        want us to get right down to the

4        striking process so I can keep

5        my word to the venire and be

6        able to call them at 4:30 or

7        5:00.

8        Y'all have a good lunch.

9                Just for your

10       knowledge, the last panel will

11       be a larger panel.  It will be a

12       panel of 19.  There are 14 seats

13       there, so we will get a few

14       extra chairs there before they

15       come in.  Have a good lunch.

16

17                (A lunch recess was taken).

18

19

20

21

22

23

24

25

```
 1          THE COURT:   This court will come back to
 2              order.   You may be seated.
 3                   Ladies and gentlemen, I
 4              know y'all want to go about your
 5              business and do whatever you
 6              were doing before you were
 7              called to serve in the way you
 8              are being called to serve.
 9                   The lawyers need
10              certain information from you
11              before they can select a jury to
12              serve in the trial of these two
13              cases.   I need some information,
14              also, from you.
15                   If you will, what we
16              will do, is I will go around the
17              room and start with the fellows
18              on the bottom, here.   And if you
19              will, if you will tell me your
20              names and tell me what you do as
21              a means of a livelihood.   If you
22              are retired, tell me what you
23              are retired from.
24                   We had two panels where
25              two different women told me
```

 1          they were retired housewives.  I

 2      don't know what that means.

 3      Maybe y'all do.  I hope my wife

 4      doesn't find out about that.

 5      Tell me what you do as a means

 6      of a livelihood.

 7                Also, tell me where in

 8      Coffee County, Enterprise

 9      Division you live.  You see,

10      before anyone can serve on a

11      criminal trial jury at this

12      courthouse, they have to have

13      been a resident of the

14      Enterprise Division of Coffee

15      County for a period of time.

16                I have been a Judge now

17      27 years.  And I've had two

18      cases where we've asked those

19      questions, or that question, and

20      got no responses.  And at the

21      end of the trial, we found out

22      that an individual lived right

23      across the line in another

24      county.

25                Coffee County is

```
 1                         divided into two divisions.  And

 2                         for all practical legal

 3                         purposes, we are considered two

 4                         separate counties.  So that

 5                         presents us with a problem

 6                         sometimes.  So I just want to

 7                         have in my mind where each of

 8                         you live so that I can make sure

 9                         that everybody is from the

10                         Enterprise Division of Coffee

11                         County.

12                              So we will start on the

13                         bottom row, the first gentleman

14                         on my left.  If you will tell us

15                         what your your name is, please?

16          POTENTIAL JUROR:  Greg Williams.

17          THE COURT:  Is that Williams or

18                         Williamson?

19          POTENTIAL JUROR:  Williams.

20          THE COURT:  Williams.  And Mr. Williams,

21                         where are you gainfully

22                         employed?

23          POTENTIAL JUROR:  I work at Pempco World

24                         Air Services in Dothan.

25          THE COURT:  And where in Coffee County do
```

1              you reside?

2        POTENTIAL JUROR:  I live in New Brockton.

3        THE COURT:  What part of New Brockton?

4              The town of New Brockton?

5        POTENTIAL JUROR:  Off of Highway 51.

6        THE COURT:  Going in which direction?

7        POTENTIAL JUROR:  Right at the

8              intersection of 167.  County

9              Road 255.

10       THE COURT:  Okay.  That would be the

11             Enterprise Division of Coffee

12             County.

13                  Some of you women may

14             want to come up and hit me

15             because of this.  But I need

16             your age range, 20's, 30's,

17             40's, 50's, 60's, 70's, or

18             whatever.  You are?

19       POTENTIAL JUROR:  Thirty-four.

20       THE COURT:  Yes, sir.

21       POTENTIAL JUROR:  Philip Stuckey.  I'm a

22             plasma operator at Utility

23             Trailers.  I live near about

24             where he does.  We live on

25             opposite sides of the road.

```
 1              THE COURT:  Okay.

 2              POTENTIAL JUROR:  And I'm 43 years old.

 3              THE COURT:  Okay.  You are getting

 4                    married this Saturday?

 5              POTENTIAL JUROR:  Yes, sir.

 6              THE COURT:  Well, best wishes to you.  We

 7                    are going to have you out of

 8                    here, I assure you.

 9                          So you lawyers make

10                    note of that.  Yes, sir?

11              POTENTIAL JUROR:  Harold Insley.  I work

12                    for Boland Lanes.  And I'm

13                    retired U.S. Army.  I live at

14                    111 West Emerald, Enterprise

15                    here.  And I'm 59.

16              POTENTIAL JUROR:  I'm Jimmy C.

17                    Tomberlin.  I live in Enterprise

18                    the past 40 years or so.  I work

19                    for Townsend Building Supply,

20                    office manager, accountant.

21                    November 30th, I will be

22                    59-years old.

23              THE COURT:  Okay.  I hope you reach many

24                    more of them.

25              POTENTIAL JUROR:  Me, too.
```

1          THE COURT:  Virgil Tindol.  I work at

2                    Enterprise Wal-Mart Tire, Lube,

3                    Express.  And I've been here

4                    approximately 40 years.  I'm

5                    60.

6          THE COURT:  Thank you.

7          POTENTIAL JUROR:  Elizabeth Trammell.  I

8                    work at CB&T here in Enterprise.

9                    I live at 111 Spruce.

10         THE COURT:  I just sold my truck the

11                    other day.  And CB&T loaned

12                    money to the fellow that bought

13                    it.  So I want to say

14                    personally, "thank you".

15         POTENTIAL JUROR:  We're waiting for the

16                    title.

17         THE COURT:  I heard that, that they

18                    needed the title, they needed it

19                    badly.  And we had mailed it.

20         POTENTIAL JUROR:  Oh.  You've already

21                    mailed it?

22         THE COURT:  Yes.  The banker at some

23                    other bank called and told y'all

24                    over there. Sheila, I think, was

25                    her name.

383

1                      And you still live in

2              the same place?

3      POTENTIAL JUROR:  Yes.

4      THE COURT:  I know you live in the

5              Enterprise Division of Coffee

6              County.

7      POTENTIAL JUROR:  Fifties, forty-nine.

8      THE COURT:  Okay.

9      POTENTIAL JUROR:  I'm Helen Yager.  I

10             live in Enterprise, Plaza

11             Drive.  I'm 49.

12     MR. JARRELL:  I didn't hear her.

13     THE COURT:  She says she's 49.  She

14             lives in Enterprise.  She lives

15             in the Enterprise Division of

16             Coffee County.

17                     Where do you work?

18     POTENTIAL JUROR:  I work for ConAgra.

19     THE COURT:  ConAgra.  Okay.

20     POTENTIAL JUROR:  Nancy Spradley.

21     THE COURT:  Of course, we know each

22             other.  We've worked together.

23             And I know you live in the

24             Enterprise Division of Coffee

25             County.  And you work with the

1          District Attorney's Office.  We

2          have all of that information.

3          So we can jump over that.

4              And there's my

5          neighbor.  I picked on her

6          yesterday.  So I'm going to have

7          to somehow come up with a

8          reprieve, or get a reprieve.

9    POTENTIAL JUROR:  Charlene Goolsby.  I'm

10          53 years old.  I live at 500

11          West College Street.  I'm a

12          small business owner, plumbing

13          and electrical contractors.

14   THE COURT:  I will never be invited to

15          perform a marriage ceremony at

16          her house again.

17   POTENTIAL JUROR:  Not again.

18   THE COURT:  Okay.

19   POTENTIAL JUROR:  I'm Mary John

20          Sneckenberger, active housewife.

21          I'm 57.  And I live in the

22          Enterprise Division.

23   POTENTIAL JUROR:  I'm Mary W. Thompson.

24          I'm a retired nurse.  I live in

25          Enterprise.  I'm 68-years old.

1       THE COURT:  All right.  Magnolia Brown.

2                   I live at 101 Azalea Drive,

3                   Enterprise.  I'm retired from

4                   ConAgra.  And I'm 64-years old.

5       THE COURT:  What did you retire from,

6                   Mrs. Brown?

7       POTENTIAL JUROR:  ConAgra.

8       THE COURT:  ConAgra.  Okay.  We will

9                   start with the top left.

10      POTENTIAL JUROR:  Mack Lott.  I live in

11                  the Old Tabernacle Community,

12                  Highway 51.  I'm a farmer.  And

13                  I'm 55-years old.

14      POTENTIAL JUROR:  Russell Washington.

15                  I'm 47.  Retired, Army.  And I

16                  live at 304 Dixie Drive.

17      THE COURT:  All right.

18      POTENTIAL JUROR:  Katie Marcum.  I live

19                  at 1261 Bellwood Road.

20                  Homemaker/grandbaby sitter.

21      THE COURT:  You are not a retired

22                  homemaker, are you?

23      POTENTIAL JUROR:  No, not really.  I

24                  would have been better off to

25                  stay working.  And I'm 56.

```
 1          POTENTIAL JUROR:  Tommie Jones.  And I

 2                  work at Enterprise Medical

 3                  Center in housekeeping.  And I'm

 4                  42.  And I stay in Enterprise.

 5          THE COURT:  I didn't get your last name.

 6          POTENTIAL JUROR:  Jones.

 7          POTENTIAL JUROR:  I'm James Thompson.  I

 8                  live two-and two-tenths miles

 9                  from here on Highway 84.  I'm 58

10                  years old.  I work for the

11                  Department of the Army, Fort

12                  Rucker.

13          THE COURT:  Okay.  Thank you.

14          POTENTIAL JUROR:  Weaver, William C.,

15                  Retired U.S. Army.  303 North

16                  Side Drive. Eighty-years old.

17          POTENTIAL JUROR:  Larry Tidwell.  I work

18                  at Goolsby Plumbing and

19                  Electric.  I live in Enterprise.

20                  And I'm 43.

21          THE COURT:  Two out of work today.

22          POTENTIAL JUROR:  Absolutely.

23          THE COURT:  We will see what we can do

24                  about that.  I know Charlene

25                  will be glad when you get back.
```

1    Okay.  I have a few

2    questions that I'm going to ask

3    of you.  I'm not going to ask

4    many questions.  We already have

5    the answers to many of the

6    things that we need.  And then I

7    will allow the attorneys to ask

8    you some questions, also,  some

9    information they need in order

10   to strike a jury.

11        It may help some of you

12   who are selected to serve on the

13   trial jury in this case that

14   this jury will not be

15   sequestered.  You are not going

16   to be kept in a hotel, motel

17   overnight and kept there until

18   the end of the trial.  I know a

19   lot of people worry about that

20   when we have capital matters.

21   That will not occur in this

22   case.

23        Of course, we will all

24   go home at the end of the day

25   and be with our families and

1    whatnot.  The Court will give an

2    instruction to those who are

3    selected to serve, of course,

4    not to discuss this matter among

5    themselves, nor to allow anyone

6    to discuss it with them.

7              I've talked to the

8    newspaper, media people.  They

9    ran the names of the people who

10   served on the jury in Judge

11   Barr's courtroom.  And they have

12   agreed not to do that in this

13   case.  It places a hardship on

14   the jurors because their friends

15   read that they are on a jury.

16   And if one of your best friends

17   were on a jury, you might want

18   to call them.  And you hear they

19   are on a jury, and you might

20   want to call them and tell them

21   what you know about somebody or

22   something.  So we have asked

23   them not to do that.  We have

24   had calls from various news

25   people.  And they are not going

1       to do that.  And we are very

2       sorry that happened.  But that's

3       not going to happen in this

4       case.

5                    I have to ask you a few

6       questions, just to make sure

7       that you could serve on this

8       trial jury.  And one of those is

9       do any of you have a religious

10      conviction or any other

11      conviction/belief that could

12      cause you not to be able to sit

13      in judgment on anyone?

14                   Over the years, I've

15      had people that say my religion

16      will just not allow me to sit in

17      judgment on anyone or concerning

18      anything.  Do any of you have

19      such a religious or personal

20      conviction?  Raise your hand, if

21      so.  No hands are up.

22                   Would the fact that the

23      alleged victims, the deceased,

24      Mrs. Dennis and Mr. Grimes, Ray

25      Grimes, I believe his name is,

```
 1                      would the fact that they are

 2                      white, and that the Defendant is

 3                      black prohibit any of you from

 4                      trying this case on the basis of

 5                      evidence, and disregarding the

 6                      issue of race?  Would any of you

 7                      have a problem as a result of

 8                      that?

 9          POTENTIAL JUROR:  I don't have a problem.

10                      But I need to approach the bench

11                      and discuss something with you.

12          THE COURT:  Okay.  That brings up

13                      something else.  If any of you

14                      at any time need to make

15                      something known to the Court in

16                      private, just please get my

17                      attention in the way that Mr.

18                      Stuckey --

19          POTENTIAL JUROR:  Yes, sir.

20          THE COURT:  -- has done.  And we will be

21                      glad to take that up out of the

22                      hearing of the others.  So if

23                      you will come up, you and I will

24                      talk.

25                              Your name is Philip
```

1          D. Stuckey.  You can keep your
2          voice down.  Let the record
3          reflect that we are in the
4          presence of the jury panel
5          venire, but out of the jury
6          panel venire's hearing.
7     POTENTIAL JUROR:  My wife was raped by a
8          black man over 20 years ago, and
9          I understand it does not have a
10         bearing on this case.  But I
11         wanted y'all to know before
12         somebody may ask something.
13    THE COURT:  That fact that that
14         occurred, do you feel that you
15         could push that aside and agree
16         to decide this case based solely
17         upon the law and the evidence?
18    POTENTIAL JUROR:  Yes, sir.  But I wanted
19         it brought forward because I
20         don't want to cause a mistrial.
21    THE COURT:  Any questions by the State?
22    MRS. STOUT:  You said that your wife was
23         raped by a black man?
24    POTENTIAL JUROR:  Yes, ma'am.
25    MR. BRADSHAW:  Do you understand that

```
 1              what we are asking you, if you

 2              can erase that from your memory?

 3              Because that man sitting over

 4              there is black, and a white

 5              woman is the victim.  Could you

 6              sit in fair judgment?

 7    POTENTIAL JUROR:  Yes, sir.

 8    THE COURT:  Thank you.  I appreciate you

 9              coming up and letting me know

10              that.

11              (The following was heard in the

12              hearing and presence of the the

13              panel).

14    THE COURT:  Would any of you have known

15              the deceased, Jelaine Bowman

16              Dennis, had you passed her on

17              the street prior to her death?

18              Is so, raise your hand.

19                   Ms. Trammell, was she a

20              customer at the bank?  Is that

21              basically it?

22    POTENTIAL JUROR:  Yes.

23    THE COURT:  Were you a personal friend

24              of hers?

25    POTENTIAL JUROR:  Not a personal friend
```

1              of hers, but her brother's.

2        THE COURT:  The fact that you knew her

3              in that way, would that affect

4              your ability to sit in judgment

5              and decide this case based

6              solely on the law and the

7              evidence?

8        POTENTIAL JUROR:  No, sir.

9        THE COURT:  It would not.  Anyone else?

10       POTENTIAL JUROR:  Yesterday, you asked a

11             question on if we had, you

12             know, seen it in the media or

13             anything.

14       THE COURT:  Sure.

15       POTENTIAL JUROR:  I didn't stand because

16             it didn't click with me

17             yesterday.  But now, this

18             morning, when I turned the TV on

19             at 6:00, it was on the TV,

20             between 6:00 and 6:30.  And I do

21             remember I saw it on TV and read

22             it in the newspaper.  So I'm

23             going to be honest with you.

24       THE COURT:  Sure.  You are Ms. Marcum?

25       POTENTIAL JUROR:  Marcum.

1       THE COURT:  Okay.  Ms. Marcum, again,

2               it's okay for someone to see

3               something on television or read

4               something in the newspaper or

5               hear something on the radio.

6               That is not the test that we

7               use to determine whether

8               somebody can serve on a jury.

9                   The test is, can you

10              agree to put aside whatever it

11              was that you --

12      POTENTIAL JUROR:  I understand.  I don't

13              think I can.  I'm sorry.

14      THE COURT:  So you could not brush that

15              aside --

16      POTENTIAL JUROR:  I can't.  I don't think

17              I could.

18      THE COURT:  -- and decide this solely on

19              the evidence that comes out in

20              court?  Anyone else?

21      POTENTIAL JUROR:  May we go back to the

22              previous question?

23      THE COURT:  Yes, sir.

24      POTENTIAL JUROR:  I would like to talk to

25              you personally.

1        POTENTIAL JUROR:  Me too.

2        THE COURT:  Yes, sir.

3        POTENTIAL JUROR:  This is just a physical

4               matter.  It has nothing to do

5               with --

6        MR. BRADSHAW:  The same thing he told

7               Judge Barr about, we can handle

8               that.

9               (Off-record discussion).

10       THE COURT:  If you are selected to serve,

11              you can sit on the side, and I

12              will show you where --

13       POTENTIAL JUROR:  No problem.

14       THE COURT:  That was just a physical

15              matter that needed just a matter

16              of convenience.  It has nothing

17              to do with the merits of this

18              case.  Come on up, please,

19              ma'am.

20       POTENTIAL JUROR:  My problem is I'm a

21              Christian.  And I just don't --

22              some things I believe, like,

23              thou shall not kill.  I don't

24              believe in that, but I believe

25              to serve time.  But as far as

```
 1                    the electric chair, I don't

 2                    believe --

 3         THE COURT:  Are you saying to me that you

 4                    have such a fixed opinion of

 5                    death that you could not, under

 6                    any circumstances, vote to

 7                    return that recommendation to

 8                    the Court?  Is that correct?

 9         POTENTIAL JUROR:  Yes.  That's right.

10         THE COURT:  Your name for this record is?

11         POTENTIAL JUROR:  Tommie Jones.

12         THE COURT:  When I ask that question in a

13                    minute, you don't have to

14                    respond.  You have gotten your

15                    response here.  If these lawyers

16                    have a followup question -- if

17                    you want to do that, you can or

18                    wait.

19         MR. SMITH:  Sure.  Ms. Jones, that be

20                    under any type of circumstance

21                    under which you could vote for

22                    the death penalty?

23         POTENTIAL JUROR:  I can't do it.  I can't

24                    do it.  I prayed about it last

25                    night because I prayed, I can't
```

1              do it.

2    THE COURT:  Thank you for letting us

3              know.

4              (The following was in the hearing

5              and presence of the jury panel).

6    THE COURT:  Ms. Jones just answered a

7              question that I was fixing to

8              ask each of you next.  And that

9              question is, do any of you have

10             a fixed opinion against

11             punishment by death which would

12             cause you to automatically vote

13             against the death penalty

14             without regard to whatever the

15             evidence may be?

16                   Do you have a fixed

17             opinion against punishment by

18             death?

19                   And Ms. Jones said that

20             she does.  And she has

21             expressed that.  And that's

22             fine.  We want to hear that.  So

23             if any of you have such a fixed

24             opinion, raise your hands, other

25             than Ms. Jones.  Okay.  No one.

1    THE COURT:  Any questions of this venire

2                panel by the State?

3    MRS. STOUT:  Yes, sir.

4                May it please the

5    Court, Counsel.  Ladies and

6    gentlemen of the venire, I am

7    Glenda Stout.  And I'm an

8    Assistant D A.  I work for Mr.

9    Mark Fuller, who is your elected

10   D.A.

11               I hope you gentlemen

12   down here don't feel like I'm

13   standing on top of you.  If you

14   do, tell me, and I'll back up.

15               Mr. Larry Jarrell is

16   going to be assisting in the

17   trial of this case.  He is an

18   Assistant D.A, who also works

19   for Mr. Mark Fuller.

20               The first thing that I

21   want to say is we have had the

22   youngest-looking people on this

23   venire that I think I have ever

24   seen.  And after this is all

25   over, I'm going to call somebody

1                    --

2        THE COURT:  Maybe that's because we are

3                    getting older, Mrs. Stout.

4        MRS. STOUT:  And, Charlene, I won't tell

5                    them.  We know each other, don't

6                    we.

7        POTENTIAL JUROR:  Right.

8        MRS. STOUT:  It's been a long time ago.

9                    But we were in high school

10                   together.

11                        This is a very serious

12                   case.  And this is the only

13                   opportunity that the State,

14                   until the end of this, and the

15                   verdict is returned, that we get

16                   to talk to you.  This is it.

17                   It's called voir dire or voir

18                   dire, whatever region of the

19                   country you come from.  And it's

20                   our opportunity to ask questions

21                   and let you answer questions.

22                   A long time ago, I was a

23                   teacher.  And if I called on

24                   somebody, a lot of kids thought

25                   I was picking on them.  So if I

1          call on you today, please don't

2          feel like I'm picking on you.

3          Okay?  It's just very important

4          when we are talking with you,

5          that we select 12 people who can

6          sit on this jury, and, actually,

7          there will be 14 that sit.

8          There will be two alternates,

9          that can sit on this jury, can

10         listen to the facts, apply the

11         law and return a just Verdict.

12              And when I say a "just

13         verdict," I mean a just verdict

14         for the Defendant, because

15         that's promised by the

16         Constitution of our United

17         States and the Constitution of

18         the State of Alabama, and a just

19         verdict for the State of

20         Alabama.

21              And all of us, as we

22         enter this courtroom today, we

23         bring with us certain biases and

24         certain opinions.  And that's

25         normal.  And no one should feel

1    guilty because they have those

2    certain biases and opinions.

3            But the thing that we

4    have to be able to do, if we are

5    selected to serve on a jury is

6    to put aside those biases, to

7    put aside those opinions and

8    listen only to the facts, only

9    to the evidence that's brought

10   before you, to the law as this

11   Judge, what we call the 13th

12   Judge, because you will be the

13   judges of the facts.

14           You will judge the

15   facts in this case.  You will

16   decide if the State meets its

17   burden.  And you will take those

18   facts and apply it, as the 13th

19   judge, Judge McAliley instructs

20   you to do, and determine whether

21   or not we've met our burden for

22   capital murder, which is what

23   Mr. Conrad is charged with, or

24   as I'm sure defense counsel is

25   going to get up here and talk

1    about, because he has with every

2    other panel, something called

3    lesser included, which I'm sure

4    this Judge is going to instruct

5    you on.  And that's why we ask

6    these questions.

7              Now, how many of you

8    sitting here are nervous about

9    being here and being asked

10   about a capital murder case?  Is

11   anybody a little nervous about

12   thinking about serving on one?

13             Well, when I was

14   teaching, I used to tell my

15   children, there's not a day on

16   that first day of school that I

17   was not nervous.  I've been

18   doing this going on seven years.

19   And there's not a day that I

20   stand up before a jury and I'm

21   not a little bit nervous.  So

22   that's okay.  Because this is an

23   important case, the most

24   important case that the State of

25   Alabama tries, a capital case.

1           And in a capital case,

2    and as I said, Defense Counsel

3    is going to talk about lesser

4    includeds, and you will be

5    charged on something called

6    lesser includeds.

7           But in a capital case,

8    that is the highest, the most

9    serious of all crimes.  But the

10   burden that the State has in a

11   capital case never changes.

12          In other words do any

13   of you watch Law and Order shows

14   on TV?  I do, too.  I eat them

15   up.  Even though I sit there and

16   I go, Oh, my God.  That is so

17   wrong.

18          But the burden is

19   reasonable doubt.  And any time

20   that you watch a show on TV,

21   it's reasonable doubt.  And any

22   time you come to a criminal

23   case, it's reasonable doubt.

24          I always use the

25   example, it does not matter if

1      we are trying a capital murder

2      case or a shoplifting case at

3      Wal-Mart.  Our burden of proof

4      is still reasonable doubt.

5              Now, I'm going to ask a

6      very serious question.  And if

7      your answer is yes, it's okay.

8      I'm not going to get mad at you.

9      Okay?  Nobody here is going to

10     be upset about you having your

11     own opinion about something.

12     But is there anyone sitting

13     among you that feels because

14     this is a capital case that you

15     should hold the State to a

16     higher standard beyond all

17     doubt, beyond a shadow of a

18     doubt, beyond any doubt?  Is

19     there anyone that feels that

20     burden should be much greater

21     because this is a capital case?

22     No one?

23              Can you all promise to

24     hold the State to that same

25     burden?  That burden being the

1    same one that if we were trying

2    Mr. Conrad for theft of

3    property, in the third degree,

4    shoplifting at Wal-Mart?  Can

5    you all promise that you will

6    hold the State to that same

7    degree, reasonable doubt?  Can

8    you do that?

9          And I hate to make you

10   feel like little kids in

11   kindergarten, but can you do

12   that by showing me that you will

13   do that, by raising your hands

14   or nodding your head or

15   something?  Thank you.

16         Mr.  Bradshaw is one of

17   the attorneys in this case, and

18   Mr. Smith.

19         Mr. Smith used to be in

20   your office as a Prosecutor, and

21   a very good Prosecutor.

22         Mr. Bradshaw has been

23   in practice for about six years

24   here in Enterprise.  I'm not

25   asking you -- Mr. Smith is now

```
 1              in private practice in Elba.

 2              And he has been there about four

 3              years?

 4    MR. SMITH:  Correct.

 5    MRS. STOUT:  I'm not asking you for

 6              what, but have any of you ever

 7              sought the services, the legal

 8              services of either Mr. Bradshaw

 9              or Mr. Smith?  No response.

10                  Does anyone -- before

11              Mr. Bradshaw decides to be an

12              attorney, he was associated

13              with, I think it was Farm Bureau

14              at the time.  It's Alfa now.

15              Were any of you ever associated

16              with Mr. Bradshaw when he was

17              with Alfa or Farm Bureau,

18              whichever it is?

19                  Mr. Stuckey.  Okay.

20              Does the fact that you were

21              associated with Mr. Bradshaw at

22              that time, would it have any

23              effect on you sitting on this

24              jury?

25    POTENTIAL JUROR:  No, ma'am.
```

1    MRS. STOUT:  Thank you, sir.

2                    Is there anyone else

3           that was associated with Mr.

4           Bradshaw during the time that

5           he was in the insurance

6           business?  No response.

7                    Mr. Bradshaw is very

8           active at the church at

9           Hillcrest.  Is there anyone that

10          attends church with Mr.

11          Bradshaw?

12                   Ms. Trammell?  Anyone

13          else?  Would the fact, Mr.

14          Thompson and Ms. Trammell, that

15          you attend church with Mr.

16          Bradshaw have any effect if you

17          are selected for this jury, to

18          sit on this jury, and listen to

19          the facts, apply the law as our

20          13th Judge will instruct you to

21          do, then base your decision on

22          the facts and the law?

23   POTENTIAL JUROR:  No.

24   POTENTIAL JUROR:  No.

25   MRS. STOUT:  It wouldn't have any

1    effect.  Thank you.

2                Now, there are going to

3    be several police officers from

4    the Enterprise Police

5    Department that are going to

6    testify.  And I know that some

7    people may have had a speeding

8    ticket with a State Trooper or

9    have been stopped by the Coffee

10   County Sheriff's Department or

11   may have encountered someone

12   else in law enforcement that you

13   felt that you were not treated

14   right or whatever the case may

15   be.

16                Is there anyone among

17   you that feels that you have had

18   some kind of negative or bad

19   experience with a police

20   officer, either with the

21   Enterprise Police Department or

22   any police agency?  If you do,

23   that's okay.

24                Remember, I told you

25   when you walked in here it's all

1          right to have an opinion.

2                    I taught my 22-year old

3          daughter that.  And sometimes I

4          wish I had not taught her that.

5          It's okay to have an opinion.

6          Negative response.

7                    Part of what I do at

8          the District Attorney's Office

9          is I prosecute child support.

10         And sometimes I get rather

11         aggressive doing that.  Have I

12         ever prosecuted anyone on this

13         panel or represented anybody in

14         child support where I've upset

15         anybody, or anyone at the

16         District Attorney's Office has

17         upset anybody, so that you would

18         have negative feelings towards

19         me or Mark Fuller, Larry

20         Jarrell, Scherryl Harrison?  Any

21         of us at the District Attorney's

22         Office?  And, again, it's okay.

23         I don't like to ask that

24         question.  Because I don't like

25         to know that people don't like

1      me.  But is there anyone?

2      Negative response.

3            This next question,

4      ladies and gentlemen, I really

5      need for you to think about.

6      It's very important.

7            This particular crime

8      took place at a store called the

9      Toy Store.  And the Toy Store is

10     out on County Road 711.  It sold

11     adult movies, adult

12     paraphernalia, adult novelty

13     items, things that maybe some of

14     us would not find in good taste,

15     a place that we probably

16     wouldn't go to, that was Jelaine

17     Dennis' store.  Now I need for

18     you to think before you respond

19     to this question.

20            Would the fact that

21     Mrs. Dennis owned and operated

22     that store have any bearing on

23     your ability to sit and listen

24     to the evidence, and put the

25     facts with the law, and then

1    return your verdict based on the

2    facts and the law?  Could you

3    put aside the kind of store that

4    she ran?  Could you think of it

5    as a business or like any other

6    business, and put aside that

7    fact?  Or is that going to be

8    sticking in the back of your

9    head?  Because if it is, we need

10   to know.

11           If you have some moral

12   convictions about that kind of

13   material that's going to affect

14   you when you are sitting in

15   there, we need to know.

16           Can you all raise your

17   hands, like kindergarten class,

18   that you will promise me that

19   that won't have an effect on you

20   if you are selected on this

21   jury?  That you can put that

22   aside and think of it as any

23   other business?  Can you do

24   that?  Thank you.

25           Is there anyone among

1              you that knows the Defendant's

2              family?  Mr. Conrad's family?

3              His mother?  His aunt?  Any of

4              his family members?  Any of them

5              seated out here today?

6                   Do you know his family

7              members?

8     POTENTIAL JUROR:  Uh-huh.

9     MRS. STOUT:  That's Ms. Tommie Jones.

10

11    POTENTIAL JUROR:  Right.

12    MRS. STOUT:  Ms. Jones, again, I'm not

13             trying to pry, so when I ask you

14             questions, please don't feel

15             that we are trying to pry into

16             your private lives.  We just

17             need to know these things in

18             order to pick a jury that will

19             render a just verdict.

20                   So, Ms. Tommie Jones,

21             who do you know in Mr. Conrad's

22             family?

23    POTENTIAL JUROR:  I know his mom, his

24             aunt, and I know some of his

25             cousins.

1          MRS. STOUT:   His mom and aunt, and some

2               of his cousins.

3                    Mr. Washington, do you

4          know some of Mr. Conrad's

5          family?

6     POTENTIAL JUROR:   I know Betty.

7     MRS. STOUT:   And Betty is his?

8     POTENTIAL JUROR:   Aunt, I believe.

9     MRS. STOUT:   His aunt.   This question is

10         directed to Ms. Washington and

11         Ms. Jones.

12                   I'm sorry.   Excuse me.

13         Yes, ma'am.

14    POTENTIAL JUROR:   I know his aunt.

15    MRS. STOUT:   Ms. Brown?

16    THE COURT:   Ms. Magnolia Brown.

17    MRS. STOUT:   Ms. Brown, who do you know?

18    POTENTIAL JUROR:   His aunt.

19    MRS. STOUT:   Let me ask all of you this

20         question:   The fact that you

21         know his aunt, and that you know

22         Mr. Conrad's aunt, and that you

23         know several members of his

24         family, his mother, his aunt,

25         and some cousins, would that

1          affect your ability to sit on

2          this jury, listen to the facts,

3          then listen to the law as this

4          Judge instructs you to do, put

5          aside the fact that you know

6          these people, and then apply the

7          law to the facts, and then

8          render your decision?

9               Do you need to think

10         about that a minute?

11    POTENTIAL JUROR:  I think it would be

12         hard for me, by knowing her.

13    MRS. STOUT:  You think it would be hard

14         since you know his aunt?

15    POTENTIAL JUROR:  Yes.

16    MRS. STOUT:  Thank you for your honesty,

17         Mr. Washington.

18               Ms. Jones?

19    POTENTIAL JUROR:  Well, like I said, I

20         got different emotions, so

21         therefore, you know, I don't --

22         it's like in the middle to do

23         right.  But still, I can't -- it

24         kind of makes -- I can't

25         express.  It's kind of, you

```
 1              know.  I don't know.  I will be
 2              honest.  I don't know.  I just
 3              don't know right now, you know.
 4   MRS. STOUT:  Would you rather address it
 5              in private?
 6   THE COURT:  It's not necessary.  Let's go
 7              to Ms. Brown.
 8   MRS. STOUT:  Mrs. Brown?
 9   POTENTIAL JUROR:  I think I could listen
10              to the evidence and make a
11              decision.
12   THE COURT:  I'm sorry.  I didn't hear
13              you, Ms. Brown.
14   POTENTIAL JUROR:  I think that I could
15              listen at the evidence and make
16              a just decision.
17   THE COURT:  Thank you, Ms. Brown
18   MRS. STOUT:  Thank you, ladies and
19              gentlemen.
20   THE COURT:  The Defense?  Mr. Gary
21              Bradshaw?
22   MR. BRADSHAW:  Thank you, Judge.
23                  Let me find a spot,
24              ladies and gentlemen, to get
25              where I won't step on anybody.
```

1           I am Gary Bradshaw, an

2      Attorney, here in Enterprise.

3      I'm across the street from the

4      old post office. And I've been

5      here five-and-half, six years,

6      as an attorney.

7           As Glenda has told you,

8      I represent Robert Thomas

9      Conrad, Jr. This is him, a

10     21-year-old man standing before

11     you.

12          Al Smith is our

13     Co-counsel, lead counsel. He

14     is an attorney in Elba.

15          We represent an

16     innocent man. I tell you that

17     because he is sitting over there

18     in that chair, just as innocent

19     as Liz is, and just as innocent

20     as you, Philip. That's our

21     system.

22          The first question is

23     one that was already posed to

24     you earlier. If something has

25     happened since May 23rd of last

1           year, whether it's an adequate,

2           correct or incorrect media

3           report, or your own knowledge in

4           talking with somebody, or as

5           Glenda adequately said, your own

6           raising, biases, your

7           prejudices, your own character,

8           anything that makes you think

9           other than he is just as

10          innocent as you right now,

11          please let us know that.  This

12          is very important.

13                  And I ask you that,

14          not being presumptious that you

15          may have a bias.  I ask you that

16          because it's a fact that human

17          beings are raised with biases.

18          We had one president that didn't

19          like broccoli.  Some people

20          don't care if Auburn looses the

21          next 112 games they play.  You

22          are just prejudice, or don't

23          like certain things.  And that

24          carries over into our ability to

25          judge facts.

```
 1                    So you all agree with

 2       me, just by giving me a nod,

 3       that Robert Thomas Conrad, Jr,

 4       is sitting before you as an

 5       innocent man?

 6                    I need to cover some

 7       relationships that you may have

 8       with some key players in this

 9       trial.  Our District Attorney's

10       Office is comprised of five

11       lawyers and dozens of support

12       staff.

13                    I would like to know,

14       first of all, if any of the 19

15       of you have ever been

16       represented by any of these five

17       lawyers when they were in a

18       private practice?  One of them

19       having been in a firm, that

20       being Mark Fuller.  Glenda had a

21       private practice.  She was

22       Glenda Parker at that time.

23       Larry Jarrell and Scherryl

24       Harrison were in Troy in private

25       practice.  And Marty Weatherford
```

1                    Williams is still in private

2                    practice, but she is part-time

3                    Assistant D.A. Would you let me

4                    know if you've ever had the

5                    privilege of being represented

6                    by them in the past?  You or any

7                    member of your family for any

8                    reason?

9                         Don't tell me the

10                   reason, but just if you have

11                   been represented by Mark,

12                   Glenda, Larry, Scherryl or

13                   Marty.  No response.

14                        Are any of you related

15                   in any way to any of those five

16                   individuals?  Any relation to

17                   Mark Fuller?  I think somebody

18                   in this panel in general voir

19                   dire said they were related to

20                   Mark.  I could have been

21                   mistaken.

22                        Was that you, Philip?

23      POTENTIAL JUROR:  I went to school with

24                   him.

25      MR. BRADSHAW:  You just went to school

1               with him, but you are not

2               related to him?

3      POTENTIAL JUROR:   No.

4      MR. BRADSHAW:  Anyone else?  The same

5               question would apply to the

6               support staff.  Nancy Spradley,

7               she has a job title, but I'm

8               going refer to her as support

9               staff.  She's not an attorney.

10              Like, Dwight Holy sitting here

11              is an investigator.  So if you

12              will bear with me calling Nancy

13              and Dwight and Mr. Mathews,

14              Tonya, all of the people, as

15              support staff.  Are any of you

16              related to any of those people?

17              Do any of you belong to any

18              religious organization, a

19              church, a civic club, a social

20              club, fan club or anything else

21              with any of those same people in

22              the D. A's office?

23              Yes, Charlene?

24      POTENTIAL JUROR:  Republican Party.  Mark

25              Fuller and --

1      MR. BRADSHAW:  Are you an officer in that

2              club?

3      POTENTIAL JUROR:  No.

4      MR. BRADSHAW:  Republican Party and the

5              Coffee County Arts Alliance.

6              Mark.

7      Anybody else?  Anybody else besides

8              Charlene and Mary.

9      THE COURT:  For the record, Mary John

10             Sneckenberger and Charlene

11             Goolsby responded.  I have a

12             rather, what I call extensive

13             list of people that we expect to

14             testify.  That same criteria,

15             that I just asked you about,

16             being a relative or friend with,

17             or being associated with in some

18             way or another in a club

19             organization, church, as far as

20             to say your children maybe in

21             the same pee-wee football team

22             as mine are with some people.

23             And if you have that

24             relationship, as I call these

25             names out to you, if you

1          recognize the name, say, yeah, I

2          know them pretty good, or I'm

3          involved with them in this.  I

4          would like for you to let me

5          know.  Maybe this will be

6          quickest way for you and for us.

7                    Sergent Lennis Darby,

8          with the Enterprise Police

9          Department.

10                   And I know that Nancy

11         is going to know most of these,

12         if we can do what we did with

13         Warren Rowe, to keep you from

14         raising your hand every time.

15    THE COURT:  Sure.  That will be fine.

16    MR. BRADSHAW:  Anyone else?  Sergeant

17         Lennis Darby.  Tom Braun.

18         Captain, retired, William Moore

19         or Bill Moore.  Mike Lolley,

20         Captain Mike Lolley.

21    POTENTIAL JUROR:  I went to school with

22         Mike.

23    THE COURT:  Mr. Stuckey.

24    POTENTIAL JUROR:  Same church.

25    MR. BRADSHAW:  Went to school with Mike.

```
 1                    Liz Trammell goes to church with

 2            Mike.

 3                    The fact that the two

 4            of you know Mike, is that going

 5            to keep you from sitting in

 6            judgment and rendering a fair

 7            and impartial verdict?

 8       POTENTIAL JUROR:  No.

 9       MR. BRADSHAW:  Liz?

10       POTENTIAL JUROR:  No.

11       MR. BRADSHAW:  Buddy Ammons or W. R. --

12            I'm sorry.

13       POTENTIAL JUROR:  Any of the police

14            officers.  I used to work at the

15            Enterprise Ledger.  And I know

16            them.

17       MR. BRADSHAW:  You know them all?

18       THE COURT:  Mary J. Sneckenberger.

19       MR. BRADSHAW:  You having worked there

20            and knowing all of them, is that

21            going to taint your judgment in

22            any way?

23       POTENTIAL JUROR:  I don't think so.

24       MR. BRADSHAW:  You could put aside the

25            fact when you see them sitting
```

```
 1              up there, and they raise their

 2              hand, and you know that you've

 3              worked beside them, you may have

 4              interviewed or written

 5              something on them, or been to

 6              the police station and been

 7              around them, is any of that

 8              going to keep you from putting

 9              more weight on what they say,

10              more than what somebody else

11              says?

12    POTENTIAL JUROR:  I don't think so.

13    MR. BRADSHAW:  Rick or Richard Hauser.

14              Let's go back to Buddy Ammons.

15              Somebody always seems to know

16              Buddy.

17    POTENTIAL JUROR:  He's a customer of mine

18              at the bank.

19    MR. BRADSHAW:  Customer of yours at the

20              bank.  Does he come inside, or

21              does he just drive through?

22    POTENTIAL JUROR:  Inside.

23    MR. BRADSHAW:  He comes inside.  Ms.

24              Trammell, the fact that you know

25              him, the same question.  Is that
```

1          going to be a problem for you to

2          sit here?

3     POTENTIAL JUROR:  No.

4     MR. BRADSHAW:  Earl Pennington.  Buford

5          Roberts.  Michael Petty.

6               The same thing, Mary?

7     POTENTIAL JUROR:  He also went to school

8          with my son, and I know Michael

9          because of soccer.

10    MR. BRADSHAW:  Okay.  So you have an

11         additional relationship or

12         attachment knowing him?

13    POTENTIAL JUROR:  Way back then.

14    THE COURT:  Mary John Sneckenberger.

15    MR. BRADSHAW:  Ms. Sneckenberger, does

16         that fact keep you from sitting

17         in impartial judgment?

18    POTENTIAL JUROR:  I don't think so.

19    MR. BRADSHAW:  I don't mean to keep

20         prying, but when you say, I

21         don't think so, are you sure?

22    POTENTIAL JUROR:  I have never had a

23         negative relationship with any

24         of them, so I can't say that I

25         would think negatively of them.

1          MR. BRADSHAW:  I'm probably trying to go
2                      on the other side of the
3                      spectrum, because I figured that
4                      you have had a positive
5                      relationship with most of them.
6                      And should they testify versus
7                      somebody that the Defense puts
8                      on the stand to testify, that
9                      you may not know, that's what
10                     I'm asking, is your relationship
11                     with those people going to make
12                     you tend to believe people you
13                     know versus the ones that you
14                     don't?
15         POTENTIAL JUROR:  I think human nature,
16                     yes.
17         MR. BRADSHAW:  That's what I'm asking.
18                     So you think you may be inclined
19                     to believe Michael Petty or the
20                     officers that you may have done
21                     a writeup for and you know
22                     something about them?
23         POTENTIAL JUROR:  Probably.
24         MR. BRADSHAW:  Thank you for being honest
25                     with me on that.

1                          A couple of other

2                  people.  Mathew Key.  Steve Key.

3                  Michael Hines.

4       POTENTIAL JUROR:  I know Michael Hines.

5       MR. BRADSHAW:  With the Sheriff's

6                  Department, I believe?

7       POTENTIAL JUROR:  Yeah.  But I know him

8                  from when he was a little boy.

9       THE COURT:  For the record, that was Mr.

10                  Stuckey.

11      MR. BRADSHAW:  And, Philip, is that going

12                  to cause you a problem to sit on

13                  this jury?

14      POTENTIAL JUROR:  No, sir.

15      MR. BRADSHAW:  Mr. Insley, were you

16                  raising your hand?

17      POTENTIAL JUROR:  No, sir.

18      MR. BRADSHAW:  Dwight Holly, sitting here

19                  before you?

20      THE COURT:  We had somebody admit they

21                  were related to him on the last

22                  panel.

23      POTENTIAL JUROR:  I knew Dwight when his

24                  wife was Mayor of New Brockton,

25                  plus, seeing him around New

1              Brockton.

2         MR. BRADSHAW:  Did you campaign for his

3              wife?

4         POTENTIAL JUROR:  I take the Fifth on

5              that.

6         MR. BRADSHAW:  Very good answer.

7                        Mr. Lott?  Yes,

8              sir.

9         POTENTIAL JUROR:  I've known Dwight for a

10             number of years, when I was a

11             student at the junior college.

12             And, well, I would call him a

13             friend or casual acquaintance.

14        MR. BRADSAHW:  Mr. Lott, would that fact

15             --

16        POTENTIAL JUROR:  I don't go to church

17             with him or go to lunch with

18             him.  We see each other fairly

19             regular, and we talk.

20        MR. BRADSHAW:  Do you come out of

21             Wal-Mart, and he's going in, you

22             know that's Dwight Holley?

23        POTENTIAL JUROR:  Well, I ran into him at

24             Lowe's the last time, yes.

25        MR. BRADSHAW:  Well, if it's Wal-Mart or

```
1              Lowes.  So you see him at Lowes?

2              But that fact, that you do know

3              him, is that going to -- if he

4              is up here testifying, or like

5              he's sitting at that table next

6              to Glenda, and the victim's

7              family representative is April,

8              is that going to in any way make

9              you more apt to believe him?

10   POTENTIAL JUROR:  No.

11   MR. BRADSHAW:  Thank you for telling me

12              that.

13              Just a couple other

14              people.  And I believe the Judge

15              has asked this, because he asked

16              it in other panels.  And they

17              are starting to run together.

18              Mr. Ray Grimes, Robert

19              Ray Grimes, who use to own, or

20              may still, Grimes Grocery near

21              ConAgra on County Road 636?

22              Linda Knighten?

23              Do you know Ms. Linda

24              Knighten, Ms. Trammell?

25   POTENTIAL JUROR:  (Nodding head in the
```

```
 1                    affirmative).

 2          MR. BRADSHAW:  From the bank.  Not your

 3                    bank?

 4          POTENTIAL JUROR:  No.

 5          MR. BRADSHAW:  Tia Cade?  T-i-a, C-a-d-e?

 6                    Ms. Fay Smith.  Do any of you

 7                    know Ms. Fay Smith?  She is the

 8                    mother of a Co-defendant.

 9                    Buford Roberts.

10                         And going back to what

11                    I asked you, Ms. Sneckenberger,

12                    I would like -- I may not have

13                    done a good enough job asking

14                    all of you.  There are going to

15                    be a lot of officers that will

16                    testify.  And I would like to

17                    ask you, again, if there's going

18                    to be some pathologist, doctors,

19                    people who have done all kinds

20                    of scientific work.  Does

21                    anybody's testimony like that

22                    seem to you to be more credible

23                    and reliable than the ordinary

24                    person testifying?  Ms.

25                    Sneckenberger?
```

1    POTENTIAL JUROR:  My son is a doctor, so

2    I believe what they say.

3    MR. BRADSHAW:  You believe what they say.

4    So that's the gospel to you?

5    POTENTIAL JUROR:  Yes.  If he's

6    testifying in his field, you

7    would certainly put more credit

8    in his expertise and knowledge

9    in that field, rather than just

10    someone without that knowledge.

11

12    MR. BRADSHAW:  Right.  Anyone else?

13    That's Mr. Tomberlin.  Nancy?

14    POTENTIAL JUROR:  If it's in their field.

15    I agree with Mr. Tomberlin.

16    MR. BRADSHAW:  Dwight?

17    POTENTIAL JUROR:  I think that he would

18    know more if it was in his

19    field, that knowledge.

20    MR. BRADSHAW:  Right.  I'm not talking

21    about the extent of his

22    knowledge.  I'm just talking

23    about the truthfulness of it.

24    If you put me on the

25    stand, and ask me a question,

1           I'm going to give you truth,
2           and that's going to be, I don't
3           know.  And that's not going to
4           knowledge, but the truthfulness
5           of it. Mr. Washington?
6    POTENTIAL JUROR:  No.
7    MR. BRADSHAW:  You don't believe anybody
8           over anybody?  You can take them
9           at face value?
10   POTENTIAL JUROR:  Yes.
11   MR. BRADSHAW:  Okay.  As Glenda explained
12          to you pretty well, this alleged
13          crime happened at a place called
14          the adult Toy Store.  And they
15          sold merchandise.  They sold
16          adult merchandise.  And you have
17          already answered a question that
18          that would not taint your
19          judgment in any way.
20              I want to ask you a
21          question, and it would take just
22          a couple of seconds to think
23          about.  Would you agree with me
24          -- I tell you what, if you
25          disagree with this, just raise

1         your hand.  Life should come

2         before property.  The value of

3         life is greater than the value

4         of property.  If you disagree

5         with that, would you raise your

6         hand?  No response.

7              The charge that is

8         brought by the State, the charge

9         as it has been read to you on

10        the indictment, and will be read

11        to you, again, and I think you

12        will get a copy of it.  But the

13        charge against Robert Conrad is

14        capital murder and robbery.  And

15        there have been some questions

16        posed to you about the

17        punishment for capital murder.

18        Life without parole.  That's to

19        prison and you stay there until

20        you die or death.

21             But there are going to

22        be some options in this trial,

23        ladies and gentlemen, that are

24        beyond that.  And one that seems

25        to get overlooked until we get a

1    chance to talk to you is the

2    option of not guilty.  As I told

3    you, and you agreed with me,

4    Robert is not guilty right now.

5    And a jury can come back with a

6    not guilty verdict, because it

7    is incumbent on the State, their

8    job, their burden to prove to

9    you, as I was telling the last

10   panel, it's almost like baking a

11   cake or casserole.  You have to

12   put these ingredients to make it

13   come out right.  They have

14   elements.  They have to describe

15   to you, they have to give you

16   evidence, and these meet the

17   elements.  And this testimony

18   meets this elements.  And they

19   have to stack them up like a

20   stack of blocks.  They have to

21   get it all done.

22            And I told the last

23   panel if it calls for four

24   years, and you leave one out,

25   nobody is going to know it.  But

1    if you leave out a block in

2    this, what we are talking about,

3    a man's life, or a man's

4    freedom, it doesn't come out

5    right.  It doesn't come out of

6    the oven just right.  So if they

7    don't meet that burden, you have

8    the option of coming back with a

9    not guilty.  You have an option

10   of coming back as she adequately

11   told you, of lesser included

12   offenses.

13           You know, if you watch

14   football, sometimes they throw a

15   flag or a face mask.  Sometimes

16   they mark them off 15 yards,

17   sometimes they mark them off

18   five.  Five is a lesser

19   included offense.  I'm not

20   suggesting to you that he is

21   guilty of any lesser included

22   offense.  I'm just telling you

23   that I want you to know now,

24   because I can tell you take this

25   seriously by your comments and

1    your questionnaire that you

2    turned in. There will be other

3    options besides life without and

4    the death.

5            April Dennis Gunnels

6    sat here yesterday.  Does

7    anybody know April?  April is

8    the daughter of Jelaine Dennis.

9    April's father, Mr. Ed Mock,

10   owns Batten's Paint and body.

11   It used to be down at Batten's

12   Cross Rodes.  Now it's here in

13   town, I believe.  Do any of you

14   know, have a relationship with

15   Mr. Ed Mock?

16   POTENTIAL JUROR:  Yes.

17   MR. BRADSHAW:  Mr. Tomberlin, do you know

18       Ed Mock?

19   POTENTIAL JUROR:  Yes.

20   MR. BRADSHAW:  And how do you know him,

21       Mr. Tomberlin?

22   POTENTIAL JUROR:  I've been knowing him

23       for years.  He used to work for

24       ESMAC.  His brother, Gary,

25       married into that family.  I

```
1                    saw Edward a lot.  And he would

2                    come over.  He did work for

3                    ESMAC, with their vehicles.

4                    And just been doing that quite a

5                    few years.

6        MR. BRADSHAW:  Charlene?

7        POTENTIAL JUROR:  He is my customer.  And

8                    I am his customer.

9        MR. BRADSHAW:  Okay.  You wreck your

10                   cars, and you fix his plumbing?

11       POTENTIAL JUROR:  Right.  Absolutely.

12       THE COURT:  He recommends Goolsby

13                   Plumbing, highly.

14       POTENTIAL JUROR:  Yes, sir.

15       POTENTIAL JUROR:  He fixed my car.

16       MR. BRADSHAW:  He fixed your car?

17       POTENTIAL JUROR:  I do.

18       MR. BRADSHAW:  And, Liz, you raised your

19                   hand, and you know him through

20                   banking?

21       POTENTIAL JUROR:  (Nodding in the

22                   affirmative).

23       MR. BRADSHAW:  Any other way?

24       POTENTIAL JUROR:  No.

25       MR. BRADSAHW:  Let me ask --
```

```
1           POTENTIAL JUROR:  I just know him.

2      MR. BRADSHAW:  Nancy?

3      POTENTIAL JUROR:  I usually see him at

4           the courthouse and speak.

5      MR. BRADSHAW:  Let me ask Mr. Tomberlin,

6           first.  Your relationship with

7           him -- let me just ask all of

8           you, your relationship with him,

9           and the fact that you know him,

10          went to school with him, and the

11          fact that his daughter may be

12          sitting at this table, and

13          carrying his granddaughter of

14          the daughter of the victim that

15          we are talking about, is that

16          going to in any way get back in

17          the back of your mind and cause

18          the sympathy factor that is in a

19          human being to rise up?

20     POTENTIAL JUROR:  I don't think so.

21     MR. BRADSHAW:  Mr. Tomberlin says that he

22          doesn't think so.

23     MR. BRADSHAW:  Ms. Trammell?

24     POTENTIAL JUROR:  I don't think so.

25     THE COURT:  Just so y'all know, I
```

1          divorced the deceased and Mr.

2          Mock 27 years ago.  So they have

3          been divorced that long.

4     MR. BRADSHAW:  You said?

5     POTENTIAL JUROR:  No.  I said no before.

6     MR. BRADSHAW:  you said, no, before.

7          Okay.  Charlene says no.  Anyone

8          else?

9               The last two issues

10          that I need to ask you about --

11          well, let me ask you about

12          Monica and Damon.  They were

13          the two younger children.  Do

14          any of you know those children

15          or do your children know them or

16          go to school with them?

17    POTENTIAL JUROR:  I work with Monica.

18    MR. BRADSHAW:  You work with Monica?

19    THE COURT:  Ms. Yager?

20    MR. BRADSHAW:  Ms. Helen Yager.  Would

21          that cause you to have a hard

22          time sitting on this jury?

23    POTENTIAL JUROR:  No.

24    MR. BRADSHAW:  One of the jury panels was

25          asked earlier how many of you

1              didn't want to be here.

2              Everybody raised their hand,

3              including some people behind

4              me.

5       THE COURT:  I raised my hand, also.  How

6              many of you agree with me that

7              this is hard?  Do you think this

8              is just hard?  I mean, you had

9              rather be playing golf, or you

10             had rather be counting up Dale

11             Townsend's profits, or you had

12             rather be spending time doing

13             something besides this?  It's

14             hard.

15                    Nancy, most of your

16             work with the D. A.'s Office

17             involved working side by side

18             with Glenda?

19      POTENTIAL JUROR:  Yes.

20      MR. BRADSHAW:  Y'all do a lot of that

21             child support stuff together,

22             don't you?

23      POTENTIAL JUROR:  Yes.

24      MR. BRADSHAW:  If you have already

25             answered this question, Ms.

1          Jones, and some of you, the rest

2          of you that have come up, and I

3          don't want you -- you don't have

4          to share this.  You were asked

5          if you had a fixed opinion so

6          that you were a opposed to the

7          death penalty for any reason.

8          How many of you think that if we

9          found Osoma Ben Ladin, and had a

10         trial, and there was evidence to

11         prove he was guilty, and our

12         laws said what it says, you

13         could vote for the death

14         penalty?

15   POTENTIAL JUROR:  Yes.  And quickly.

16   THE COURT:  Let's see.  Ms. Jones, did

17         you raise your hand just then?

18   POTENTIAL JUROR:  No, sir.

19   MR. BRADSHAW:  The record will show that

20         everybody but Ms. Tommie Jones

21         raised their hand.  We have that

22         established.  I want to go to

23         the other end of the field.  How

24         many of you think because in

25         this case, and it's going to be

1           undisputed that a life was lost.

2           And that's tragic.  How many of

3           you think that because a life

4           was lost, and that's all you

5           know, that a life was lost, that

6           somebody else's life ought to be

7           lost or taken?  Just on that

8           fact, would you raise your hand?

9           In other words, putting it

10          another way, I'm asking you, do

11          you believe an eye for an eye,

12          without any explanation?

13    POTENTIAL JUROR:  I do.

14    MR. BRADSHAW:  You believe an eye for an

15          eye?

16    POTENTIAL JUROR:  I'm sorry.  That's the

17          way I feel.

18    MR. BRADSHAW:  Please do not apologize

19          for the way you feel.  We would

20          have to live in another country

21          if we had to apologize for your

22          own freedom of speech.  So,

23          please, don't apologize for

24          that.

25    THE COURT:  That was Katie Martin.

1    MR. BRADSHAW:  Mr. Lott?

2    POTENTIAL JUROR:  The way you say that,

3         are you saying do we believe it

4         capital punishment?

5    MR. BRADSHAW:  No, sir.  And I did a poor

6         job of asking that question.

7         I'm stating without knowing all

8         of the underlining

9         circumstances, you know, when my

10        kids come and say, Dad, I made a

11        "D" in this and this.  And then

12        we get to digging to see why, he

13        made a "D" before you get

14        three-week's restriction. But

15        once it's explained, and you

16        find out all the details about

17        the class and the teacher, and

18        they had been sick -- and I'm

19        asking you, without knowing all

20        of the underlining

21        circumstances, and all you know

22        is that a life has been lost,

23        and you think that somebody else

24        ought to lose their life in

25        that?  Mr. Lott?

```
 1        POTENTIAL JUROR:  Not when you state it
 2                   that way.  I thought you were
 3                   giving an analogy to capital
 4                   punishment by the way you put
 5                   it.
 6     MR. BRADSHAW:  My analogy is to the death
 7                   penalty.  We are talking about a
 8                   trial.  But I guess the best way
 9                   to ask you is in every case,
10                   when we have a capital murder
11                   case, where there has been a
12                   life taken, do you think there
13                   should be another life taken?
14     POTENTIAL JUROR:  I'm not saying
15                   automatically.  But I'm just
16                   saying that I do believe in the
17                   death penalty.
18     MR. BRADSHAW:  I understand.  Maybe the
19                   key word is "automatic," is what
20                   I'm asking?
21     POTENTIAL JUROR:  Not automatically, no.
22     MR. BRADSHAW:  Are you so predisposed to
23                   say, well, it's a murder case, a
24                   death penalty is available.
25                   That's what I want?
```

```
 1                         Ms. Martin, do you

 2              still feel that way?

 3         POTENTIAL JUROR:  I still feel that way,

 4              because that person did not

 5              deserve to die.  Really, she

 6              didn't, you know, and so --

 7         MR. BRADSHAW:  Okay.  But, please, don't

 8              ever apologize for the way you

 9              feel.  I appreciate that.

10         POTENTIAL JUROR:  My opinion when it

11              first came out on TV, and this

12              morning brought it all back up.

13              And I know her brother.  He does

14              yard work.  I know of him

15              because he did it for my

16              daughter.

17         MR. BRADSHAW:  Right.

18         THE COURT:  So you know, is that Lynn

19              Bowman, her brother?

20         POTENTIAL JUROR:  Yes.

21         THE COURT:  He owns a grass company or

22              something like that?

23         POTENTIAL JUROR:  Right.

24         MR. BRADSHAW:  I finally found somebody

25              that knew Green's Grass Farm.
```

```
 1              Anyone else?  Has anyone else
 2              done any business with Green's
 3              Grass Farm in Bellwood?  Has
 4              anyone else ever been a tenant
 5              or a worker with Dogwood Acres,
 6              a mobile home park, east of
 7              town, that Ms. Dennis was
 8              affiliated with.  Has anybody
 9              else worked with a family member
10              or a relative?
11                   Mr. Tomberlin, I think
12              you said that you worked with
13              her brother?
14    POTENTIAL JUROR:  Yes.  Her brother works
15              at Townsend.
16    MR. BRADSHAW:  Townsend Building Supply.
17              Does he still work there?
18    POTENTIAL JUROR:  Yes.
19    MR. BRADSHAW:  And you have heard
20              conversations about the case
21              there?
22    POTENTIAL JUROR:  Yes.  It's been talked
23              in the store when it happened.
24              Small, just a small group of
25              employees.
```

```
 1          MR. BRADSHAW:  Yes.  You said that you
 2                   worked in accounting and you're
 3                   an office manager?
 4          MR. BRADSHAW:  Is his name Mike?
 5          POTENTIAL JUROR:  Right.
 6          MR. BRADSHAW:  Where does Mike work?
 7          POTENTIAL JUROR:  He is IN warehouse,
 8                   truck driving.
 9          MR. BRADSHAW:  Do you have occasion to
10                   dispatch or talk to him?
11          POTENTIAL JUROR:  I see him several times
12                   a day and speak to him.  I don't
13                   work directly with him, but I
14                   write his pay checks and
15                   personnel matters.
16          MR. BRADSHAW:  Is it going to make it
17                   difficult for you if you are
18                   picked on this jury to go back
19                   into Townsend Building Supply
20                   and talk to him several times a
21                   day?
22          POTENTIAL JUROR:  Well, it could.  It
23                   depends on how it comes out.
24          MR. BRADSHAW:  Right.  If it comes out
25                   not guilty or no capital
```

1              punishment, that's going to make

2              it hard for you, isn't it?

3         POTENTIAL JUROR:  It could.

4         MR. BRADSHAW:  So the fact that you work

5              with Mike and see him so often,

6              as Ms. Mary put it, so well, we

7              are humans, does that make it

8              difficult for you to sit here in

9              judgment of a friend's relative

10             --

11        POTENTIAL JUROR:  Let me put it this

12             way:  I would not let that fact

13             distort the facts as I saw them.

14             Yes, it does make it somewhat

15             difficult.

16        MR. BRADSHAW:  But you could push that

17             aside and still sit and judge

18             justifiably and fairly?

19        POTENTIAL JUROR:  Yes.  I would do it, if

20             I was called on to do it.

21        MR. BRADSHAW:  Mrs. Goolsby, the fact

22             that you and Ms. Parker went to

23             school together, is that going

24             to cause you any problems in

25             sitting in judgment on this

1              case?

2         POTENTIAL JUROR:  Absolutely not.  She is

3              so much younger than I am.

4    MRS. STOUT:    Thank you.

5    MR. BRADSHAW:  You are not under oath, yet,

6              are you?

7                   Give me just a moment.

8              Ladies and gentlemen, I think we

9              will be able to let you go in

10             just a minute.

11                  That's all.  Thank you,

12             ladies and gentlemen, very much.

13             Thank you for listening to us.

14   THE COURT:  Mrs. Stout.  Mr. Jarrell?

15             Anything else?

16   MRS. STOUT:  No, Your Honor.

17   MR. JARRELL:  No, Judge.

18   THE COURT:  Let me let you know what to

19             expect, ladies and gentlemen.  I

20             would guess that at about 4:30

21             today we will have a jury

22             selected to serve in the trial

23             of this case. There will be 14

24             people selected to serve.

25                  I know these lawyers

1          referred to me as the 13th

2          Judge.  I've never been

3          referred to that before.  So I

4          have been called a lot of things

5          since I've been a Judge.  That

6          is not one of them.

7                    So at about 4:30 or

8          5:00 we will call those of you

9          who have been selected to serve

10         on the trial jury of this case.

11         And I believe our Clerk of

12         Court, Mr. Mickey Counts, has

13         all of your telephone numbers.

14         If you will please be by the

15         phone.

16                    We are not going to

17         require you to come back down

18         here to sit and wait and twiddle

19         your thumbs while we go through

20         the selection process.

21         Sometimes we do that, but we

22         want to use your time as just as

23         efficiently and wisely as we

24         can, and have Charlene and her

25         worker back at work doing

1    whatever they are doing,

2    whatever y'all need to be

3    doing, other than sitting down

4    here.  But if you does need an

5    excuse I will be glad to give

6    you one.

7            So we are going to call

8    those who have been selected to

9    serve between 4:30 and 5:00.  I

10   did this one time ago, many

11   years ago in a capital murder

12   matter.  And one of the jurors

13   apparently didn't understand me.

14   And when we found them they were

15   in Tennessee.  And that

16   certainly upset the other jurors

17   to have to wait for them to get

18   back to Alabama.  So please be

19   by the phone, the number that

20   you gave our Clerk, so that we

21   can get up with you.

22           Otherwise, these

23   gentlemen in these deputy

24   sheriff uniforms will be out

25   running around looking for you.

1              Y'all have a good day.

2         If you are selected to serve, if

3         you will come down here

4         immediately.  Because the trial

5         of this case will begin around

6         5:00 o'clock, or when the last

7         juror arrives here.  And we will

8         go to some time around 8:00

9         o'clock or 9:00 o'clock

10        tonight.

11              And I'm going to call

12        Charlene Goolsby whether she's

13        selected to serve or not.  Have

14        a good day.

15      (Jury panel exited the

16        courtroom).

17   THE COURT:  The record will reflect

18        that we are now out of the

19        hearing and presence of any

20        juror, potential juror, venire

21        member.

22              Are there any

23        challenges for cause by the

24        State as to anyone on this

25        panel?

```
 1        MRS. STOUT:  Yes, Your Honor.  The State
 2                would challenge juror number
 3                111.
 4        THE COURT:  Give me just a minute.  What
 5                would be the basis of that
 6                challenge?
 7        MRS. STOUT:  Her response to the death
 8                penalty.  Additionally, she
 9                knows the family.  And I believe
10                she said that she could not push
11                that fact aside.  She knows the
12                Defendant's mother, his aunts,
13                and his cousins.
14        THE COURT:  You say that's 111?
15        MRS. STOUT:  Yes, Your Honor.  Juror 111.
16        THE COURT:  Okay.  That's right.
17                Objection by the Defense?
18        MR. SMITH:  Yes, Your Honor, we object.
19        THE COURT:  Objection is overruled.  The
20                challenge is granted.  She does
21                have, this Court finds, a fixed
22                opinion against punishment by
23                death.  She made that very, very
24                clear to the Court.  She also
25                said that she knows the
```

```
 1                    Defendant's family, mother and
 2                    cousins, I believe.  So that
 3                    challenge is granted.
 4         MRS. STOUT:  Number 193.
 5         THE COURT:  Give me just a minute, and
 6                    let me mark off 111.  193.
 7                    Okay.
 8         MRS. STOUT:  He knows the aunt of the
 9                    Defendant.  And when I asked him
10                    further could he put that aside,
11                    he said that he did not think
12                    that he could do that.
13         THE COURT:  He said that it would be
14                    hard for him to serve since he
15                    knows the Defendant's aunt.  Any
16                    objection?
17         MR. BRADSHAW:  Yes.  We would object.
18                    All 19 asked raised their hand
19                    if it was going to be hard to
20                    serve.  And that's all he was
21                    saying.  He didn't say it would
22                    be impossibly.  He just said it
23                    would be hard.
24         THE COURT:  Objection is sustained.
25                         Any additional
```

1                challenges by the State?

2          MRS. STOUT:  No, Your Honor.

3          THE COURT:  By the Defense?

4          MR. SMITH:  Number 122, may it please the

5                Court.  She indicated somewhat

6                that it was personal to this

7                case that she would vote for the

8                death penalty in this case,

9                regardless.  She says that she

10               had formed her opinion when she

11               first saw the TV report, and

12               this morning it came back to

13               her.  And she had a fixed

14               opinion of the Defendant's

15               guilt.  I'm paraphrasing.

16         THE COURT:  She said that she could not

17               put that aside.  Okay.  That

18               challenge is granted.  Number

19               122.

20         MR. SMITH:  One-half moment, please.

21         THE COURT:  Take your time.

22         MR. SMITH:  Number 179.  His

23               questionnaire had a statement

24               that he would limit the rights

25               of a Defendant, and for that

1          reason we challenge him.

2      THE COURT:  Challenge is denied.

3      MR. SMITH:  Number 171.  She actually

4          works for and with one of the

5          Prosecutors, works in the D.A.'s

6          office.

7      THE COURT:  Okay.  What says the State?

8      MR. JARRELL:  She didn't say that she

9          couldn't.

10     THE COURT:  I asked when we had the

11         general voir dire.  And she said

12         that she talked about her lack

13         of knowledge and her lack of

14         discussions about it in the

15         office.  And she said that she

16         would put that aside and decide

17         this matter on the evidence and

18         the law, disregarding that.

19     MR. SMITH:  Judge, she actually works for

20         the lead Prosecutor in this

21         case.  We think that

22         presumptively --

23     MRS. STOUT:  May I respond?

24     THE COURT:  Yes.

25     MRS. STOUT:  She works in child support.

```
 1            And she has no information and

 2            does not deal in any way with

 3            criminal matters.  My secretary

 4            in that matter is Tonya Walker.

 5            So this particular venire person

 6            only deals with me in child

 7            support.

 8       THE COURT:  Okay.  So you object to

 9            that.  Objection sustained.

10                 Who else?

11       MR. SMITH:  Number 182.  He indicated

12            that because of his relationship

13            and knowledge of the victim's

14            relative, it would be very

15            difficult or hard if he didn't

16            convict the Defendant as the

17            charges were stated.

18       THE COURT:  Objection?

19       MR. JARRELL:  Yes, sir.

20       THE COURT:  You don't need to state why.

21            He very clearly stated that,

22            sure, he worked with this

23            relative.  But he said he it

24            would be hard, but he could push

25            it aside and he could decide it
```

```
 1                    based on the evidence and the

 2                    law.

 3        MR. BRADSHAW:  Mr. Tomberlin did say that

 4                    depending on the outcome, would

 5                    imply that he would be inclined

 6                    to find the Defendant guilty,

 7                    so that he could go back and

 8                    enjoy a peaceful relationship

 9                    with his co-workers.

10        THE COURT:  The Court finds, in

11                    considering all of the

12                    statements of Mr. Tomberlin,

13                    that the challenge should be

14                    denied, and hereby is ordered

15                    denied.

16                        Any additional challenges

17                    by the Defense?

18        MR. SMITH:  No, Your Honor.

19        THE COURT:  By the State?

20        MRS. STOUT:  No, Your Honor.

21        THE COURT:  Collectively, now, looking

22                    past, over all, are there any

23                    that you would now have a chance

24                    to reflect on and need to

25                    challenge?  Anyone else.
```

1              Collectively?  Whether they are

2              on this last panel or not.

3                    None?  by the Defense?

4    MR. BRADSHAW:  No.

5    THE COURT:  By the State?  None?

6    MRS. STOUT:  None.

7    THE COURT: Y'all know what the time

8              constraints are.  We are on

9              schedule.  We are two minutes

10             ahead of schedule.  So y'all

11             may begin the process of

12             selecting a jury.

13                    There will be 14.  Of

14             course, the last two will be

15             alternates.  The Court orders no

16             one to divulge who the

17             alternates will be.  They will

18             go through this trial.  And at

19             the conclusions, before the jury

20             deliberates and decides this

21             case, we will identify the

22             alternates only at that point in

23             time.  They won't be notified

24             who they are, because they would

25             have maybe have a tendency not

1              to be attentive or what not,

2              thinking their decision is not

3              going to be important.

4              (Jury selection began and the

5              jurors were called).

6         THE COURT:  This Court will come to

7              Order.  You may be seated.

8                   Ladies and gentlemen, first

9              of all I will swear you in.

10             Would all of you please raise

11             your right hand and be sworn.

12                  Do you swear or affirm that

13             you will well and truly trial

14             this case, or these two cases,

15             and true verdict or verdicts

16             render according to the legal

17             and competent evidence so help

18             you God?

19                  All have signified that

20             they will.

21                  I don't know about you, but

22             I have never been on a jury

23             before.  I have had hundreds and

24             hundreds of juries, but I have

25             never been a juror before.

1      When I'm in a place doing

2      something that I've never done,

3      I always like for someone who

4      has been there and done that,

5      you might say, to explain what

6      to expect so that I will know

7      what's going on and what's going

8      to happen.  And I always try to

9      place myself in the shoes of

10     jurors and ask what would I want

11     to know had I found myself where

12     you find yourself today or

13     tonight.

14         So, I'm going to give you a

15     rough outline of the steps of a

16     guilty phase, we call it a

17     guilty phase, or not guilty,

18     whatever, of a criminal trial,

19     so that you will know as we move

20     through where we are and how far

21     we have before we finish that

22     phase of the trial.

23         In a little while the

24     attorneys are going to come

25     before you.  And they are going

1    to make what we call their

2    opening remarks to you, the

3    ladies and gentlemen of this

4    jury.

5    Let me caution, however,

6    that attorneys statements, and

7    they are allowed to make

8    statements, and they are allowed

9    to summarize to aid you, but

10    attorneys' statements are not

11    evidence.  And you are to

12    disregard any comment that any

13    attorney makes that you find is

14    not supported by the legal and

15    competent evidence presented in

16    the trial of this case.

17    Now, the evidence from

18    which you will base your

19    decision will come from three

20    places.  It will come from

21    witnesses who appear here and

22    present live testimony to you,

23    before you.  They will all raise

24    their hands and place their hand

25    on this Bible and swear to tell

1    the truth, the whole truth, and

2    nothing but the truth so help

3    them God.   That's one place the

4    evidence will come from, from

5    the testimony of witnesses.

6         Evidence will also come

7    from things that are actually

8    admitted into evidence.  And you

9    will hear the Court say that

10   State's Exhibit A is admitted

11   into evidence or whatever the

12   number may be.  And it's

13   admitted into evidence.  And

14   there will a lot of times be

15   demonstrative tools, things that

16   you can put your hands on,

17   things that you can look at,

18   things that you can pass around

19   among yourselves.  And they will

20   all go with you to the jury room

21   and be used by you during your

22   deliberations and decisions in

23   this case.  So that's the second

24   place that evidence will come

25   from.   That's the second place

1    where you will draw the answers

2    you need to render a verdict or

3    verdicts in these two separate

4    cases.

5         The third place the

6    evidence will come from, and

7    it's a little more complicated

8    to understand, is called

9    presumptions of the law.  There

10   are presumptions in the law that

11   will be applicable in this case.

12   You don't have to know them at

13   this time.  You don't have to

14   worry yourself with those things

15   at this time.  It will be my

16   job to tell you what those

17   things are when I talk to you

18   about the law in this case.  And

19   I will explain those things to

20   you.  But they are also

21   considered as evidence in the

22   trial of this case.

23        Now, you note that there

24   are 14 of you.  The State law,

25   the State's statute requires

1    that in a capital trial, as this

2    one is, that there be 12 jurors

3    selected, plus two alternates.

4    And I note that there are two of

5    you who are alternates.  We hope

6    nobody gets sick.  We hope that

7    nobody has problems.  We have a

8    hurricane on the way.  And I had

9    one matter in Pike County where

10   Hurricane Opal came through, and

11   it took us seven or nine days to

12   get all of the jurors back.  One

13   of them was injured, but had

14   that one person been injured to

15   the extent they couldn't

16   continue to serve, then we would

17   have used one of the alternates.

18   So you will not know which two

19   of you are the alternates.  And

20   there is a reason for that.  If

21   you knew who the alternates

22   were, then those two alternates

23   might not be as focused or

24   interested, because you might

25   think that you are never going

1          to get to deliberate and decide

2          this case.  But I have had

3          many, many cases, trials, over

4          the years where the alternates,

5          or all of the alternates ended

6          up serving and deliberating and

7          deciding the case, because

8          certain others got sick or

9          whatever.

10             So, on that point, I notice

11         there was another case that

12         Judge Barr had this week where

13         the list of the jurors came out

14         in the newspaper.  For 45 years

15         Joe Cassady, Sr., has been a

16         lawyer, and he told us that he

17         has never seen that done before

18         here.  And it will not be done

19         in this case.  And the news

20         media people tell me that that

21         was probably a mistake and that

22         won't happen.

23             The Court in open court

24         orders the prosecutors and the

25         defense lawyers and anyone, the

1      court workers, anyone that has a

2      copy of jury lists, your names

3      are not to in any way

4      disseminate them to anyone.  So

5      your names will not come out in

6      the newspapers or otherwise.  It

7      just puts a jury in a bad, bad

8      position, especially in a trial

9      such as this, that is expected

10     to take four days for friends to

11     read about them and see they are

12     doing their civic duty in coming

13     down here and serving on a jury

14     in a very complicated matter.

15          And their friends call.  It

16     is just human nature.  Your

17     friends want to call and say,

18     "Hey.  I hear you are on these

19     juries.  This is what I know

20     about these witnesses," or "Tell

21     me what you know."

22          And you are going to be

23     instructed every time we take a

24     break not to discuss this matter

25     among yourselves, nor to allow

1    anyone to discuss it with you

2    before you can go home at night.

3    We are not going to sequester

4    you.  We are not going to put

5    you in a motel or hotel or

6    whatever.  You are going to get

7    to go home and be with your

8    family members, or whoever else

9    you want to be with.  But there

10   will be that limitation on your

11   part.  You will have to promise

12   the Court you will not discuss

13   this matter among yourselves,

14   nor to allow anyone to discuss

15   it with you.

16        We certainly, certainly

17   don't want to go through a

18   trial such as this one, and have

19   anyone be in any position to say

20   that the verdict of this jury

21   was tainted by some outside

22   factor or influence.  So please,

23   please understand that.

24        So that's the place that

25   the evidence is going to come

1          from.  Ultimately, you, the

2          jury, will decide the issues in

3          these two cases.

4              I like to think of you as

5          judges.  You are judges.  I like

6          to think of you as judges

7          without robes.  Your job is to

8          decide the facts, what really

9          happened in these two cases,

10         what really happened.  What are

11         the facts.  And I'm the Judge of

12         the law.  Some of you were on

13         the panel where the Prosecutor

14         called me the 13th Judge.  In

15         this case, I guess I would be

16         the 15th Judge.

17             I'm the Judge of the law,

18         and it's my job to make sure the

19         trial of this case is conducted

20         according to the laws of this

21         state and this nation.  And it's

22         my job to rule on points of law

23         that are called to my attention

24         during the course of this trial

25         and to make sure that a fair

1           trial is provided.

2                And you are also judges.  Again,

3           you are judges of the facts.

4           And it's my job to tell you what

5           the law is.  You don't have to

6           know one single thing about the

7           law in this country to serve on

8           a jury.  It's my job to explain

9           the law to you.  And I will do

10          that as we go through this case.

11          And, hopefully, before we

12          finish, you will understand

13          what the law of Alabama and this

14          country is as to issues that you

15          are going to be called on to

16          decide.            So you

17          will take the facts as you find

18          them to be, and you will apply

19          the facts to the law as I tell

20          you the law is, as I instruct

21          you as to the law.  And you will

22          reach two separate verdicts that

23          are consistent with the law and

24          the facts.  It sounds

25          complicated, but it's not

1    really.

2        The first thing that's

3    really going to happen is, as I

4    said, the attorneys are going to

5    come before you and make their

6    opening remarks to you.  And

7    then they are going to have a

8    seat.  The prosecution, in their

9    opening remarks, I have not

10    mentioned this to you, will go

11    first, because the burden of

12    proof is on the State to prove

13    the Defendant, Mr. Conrad,

14    guilty beyond a reasonable

15    doubt.  So they have that

16    hurdle.  They have that burden

17    of proof.  And, therefore, they

18    go first because they have that

19    burden of proof.

20        After they sit down, then

21    the defense attorneys will stand

22    up, and they will make their

23    opening remarks to you, also.  I

24    don't know what either side is

25    going to say.  But in most cases

1          that I've had over the years,

2          the Prosecutor simply summarizes

3          what they feel they are going to

4          be able to prove beyond a

5          reasonable doubt.  And I don't

6          know what the defense lawyers

7          are going to say.  But over the

8          years that I've had jury trials,

9          most defense lawyers stand up.

10         And they say, and tell you what

11         they feel the evidence is not

12         going to be able to prove beyond

13         a reasonable doubt.  And after

14         everybody sits down, we will

15         start with the witnesses.

16              And I told you they will

17         all appear live in front of you

18         because the Constitution of the

19         United States says that a person

20         charged with the commission of a

21         felony -- it doesn't use that

22         term.  But that's for sure one

23         of the things that it means --

24         has a right to a public trial by

25         jury and has the right to

1    confront and to cross examine

2    all witnesses against him or

3    her.  That's a constitutional

4    right that we have in this

5    country.

6        So every witness is going

7    to come in.  And they are going

8    to appear live in front of you.

9    And they are going to put their

10   hand on that Bible.  And they

11   are going to promise in front of

12   you to tell the truth.

13       Now, again, I have been a

14   Judge 27 years.  I have had

15   80-something-thousand cases.

16   That's a lot of cases.  And I

17   have never had a jury trial

18   where there was not an objection

19   made.  And I don't expect this

20   trial to be any different.  It's

21   an attorney's duty to object to

22   what's being asked and offered

23   as evidence if that attorney

24   feels that it is improper.  And

25   it is my job to rule on those

1          objections as they make them.

2               Sometimes, I think that

3          jurors may feel, "Well, the

4          Judge leans one way or the other

5          because the Judge has ruled more

6          favorably to one side than the

7          other.  But I assure you that

8          the Court's rulings are governed

9          by what we call Alabama Rules of

10         Evidence.  I don't have much

11         discretion as to how I rule on

12         these things.  My rulings are

13         governed by Alabama Rules of

14         Evidence, and the precedent

15         that's set by Appellate Courts

16         of this state and nation.  So,

17         just because, and I don't know

18         that this is going to happen,

19         but if the Court rules more

20         favorably and more often for

21         one side than the other, it

22         certainly doesn't mean that your

23         Judge leans one way or the

24         other, or believes that your

25         verdict should be one way or the

475

1    another.  Because I assure you

2    that is not the case.  It makes

3    absolutely, positively no

4    difference what I think your

5    verdict should be.  It's your

6    decision that counts, not mine,

7    so please understand that.

8         After the State has called

9    all of the State's witnesses,

10   you will hear the State say the

11   State rests its case.  They will

12   stand up in court and make that

13   statement in your presence.

14        And at that moment they are

15   saying to the Court, "Judge, the

16   State feels that it's presented

17   evidence that substantiates each

18   of the elements that we, the

19   State, are required to prove

20   beyond a reasonable doubt."

21        And at that point in the

22   trial there are at least two

23   points where this is going to

24   occur.  That is the first place

25   where the law requires that I

1       hear matters outside of your

2       hearing and presence.  So, at

3       that point in time, and we don't

4       have a bailiff right now,

5       because our bailiff was just

6       activated right outside of

7       Atlanta, Georgia.  We lost him,

8       and the State is broke so they

9       haven't provided another one.

10      But these deputies are going to

11      take you back at that point in

12      time.  I wish that I could go

13      with y'all.  But I will be

14      required to sit here with these

15      lawyers, and hear them argue

16      certain legal points that will

17      be brought to my attention.  And

18      I will rule on those points as

19      I'm required to do.  And then

20      you will come back in and we

21      will go forward, again.

22           After all of the witnesses

23      have testified, after both sides

24      have rested, then that will be

25      at the second place where I will

1    be required to take up such

2    motion or motions outside of

3    your hearing of your presence.

4         Now, there will be other

5    periods, other times, when I'm

6    required to hear and rule on

7    certain legal matters.  But you

8    will notice during those periods

9    of times that I'm not required

10   to do that outside of your

11   presence.  I can do that outside

12   of your hearing.  And at those

13   times I will ask the attorneys

14   to approach the bench.

15        I might even go around and

16   stand next to the court reporter

17   so we can keep our voices down.

18   I might sit right here or stand

19   right here and lean over the

20   Judge's bench and listen to

21   their legal arguments and rule

22   on those arguments as they are

23   made, to keep you from having to

24   be ushered in and out so much.

25        So I ask that you

1    understand that that is provided

2    for by law.  It's not that we

3    are trying to hide certain

4    things from you.  We just want

5    to make sure that only the

6    things go to you that are proper

7    and legal for your consideration

8    in this case.

9        Now, after all of the

10   evidence is in, after everything

11   has been submitted to you, and

12   all of the motions have been

13   ruled on, then the attorneys

14   have the right to have with me

15   what's called a charge

16   conference.

17       I will go over things with

18   them in a nutshell not to the

19   extent that I'm going over

20   things with you, but I will go

21   over with them in a nutshell,

22   what I intend to say to you when

23   I talk to you about the law.

24   And they have the right to say,

25   "Judge, but would you add this,

479

```
 1          or would you take away that," or
 2          whatever.  That's called the
 3          Judge's Charge Conference with
 4          the attorneys.  So you can take
 5          a break while that is going on.
 6          That will take me 30 minutes to
 7          an hour to two hours.  A lot of
 8          legal points are going to have
 9          to be covered.  It would present
10          a problem if I didn't cover them
11          all.  So for heaven sakes
12          forgive me for having to go
13          through everything with you.
14          But after I have that charge
15          conference, then we will come
16          back out, the attorneys will
17          have made their closing remarks
18          to you.
19               Again, they are going to
20          summarize what they feel has
21          been able to be proven beyond a
22          reasonable doubt.  The State
23          will and the Defense will argue
24          with you and summarize for you
25          what they feel the State has not
```

1     been able to prove beyond a

2     reasonable doubt.  Then I will

3     give you the Judge's

4     instructions on the law.  The

5     Judge's charge to the jury most

6     lawyers refer to it as.  I

7     simply explain to you the law.

8     And I will go over with you the

9     possible verdicts, every verdict

10    that's possible as it relates to

11    these two cases.  I will go over

12    and explain them to you.  You

13    don't have to be a lawyer.  And

14    you don't have to be able to put

15    a verdict in a legal form or

16    write one out yourself.  We will

17    do all that for you, every

18    possibility, we will go over

19    with you.  And we will send them

20    back with you to be used by you

21    in deliberating and deciding

22    these two cases.  But I will go

23    over with you the law.

24         Then the attorneys will

25    have an opportunity, you will

1     see me call them up, and say are

2     there any exceptions, and they

3     can say, "Judge, you left this

4     out," or "Judge, you need to

5     explain this a little bit

6     better," or whatever.  Whatever

7     they say I will rule on that.  I

8     get to rule on these things that

9     these folks argue.  And if I

10    need to go over things better,

11    or if I left something out, then

12    I will explain that to you.  And

13    then you will retire back to the

14    jury room.

15        Probably, the first thing

16    that you should do would be

17    select one of your number to

18    serve as foreperson of this

19    jury.  That person would serve

20    as the spokesperson and would

21    also sign any verdict or

22    verdicts rendered by this jury.

23        At that time we will

24    identify the two of you who are

25    the alternates.  I don't know

1     how you two are going to feel.

2     Hopefully, the 12 of you who

3     will end up deciding this case,

4     hopefully none of you will get

5     sick.  But if you do, then we

6     will fill your spot by the use

7     of alternates.

8         If an alternate does not

9     get to deliberate and decide

10    this case, I will call you up,

11    and we will just see how you

12    feel.  Over the years some

13    jurors have said to me,

14    alternates have said to me, "My

15    gracious.  I went through all of

16    this, and I don't get to decide.

17    And I'm disappointed.

18        And then, some folks say,

19    "Thank you, Lord"  So we will

20    see.

21        After you reach a verdict

22    in each of these cases you can

23    come back out.  And we will

24    receive your verdict and go from

25    there.

1          Now, those are the steps of

2     what we call the guilt phase of

3     a criminal jury trial.

4          Are there any questions by

5     the ladies and gentlemen of the

6     jury as to any of the steps?  I

7     want you to be able to hear

8     everything that's going to be

9     said in this courtroom.  We have

10    microphones and all of that.

11    Some people are just soft

12    spoken, I will have to ask them

13    to please speak up, and speak

14    into the microphone, because I

15    want y'all to hear every single

16    word spoken in this courtroom.

17         And if you find it hard to

18    hear what a witness is

19    testifying to, you don't have to

20    say a word, I'll watch you.  You

21    get my attention in this fashion

22    (indicating).  And sometimes 10

23    or 15 times, I will have them to

24    speak louder.  Because I want

25    you to hear everything.

1      Also, we want to do things,

2    we want to have you just as

3    comfortable as we possibly can

4    during the course of this

5    trial.   So, if any of you need

6    to take a restroom break or

7    stretch break or whatever, you

8    just get my attention in that

9    fashion, and we will take a

10   break for as long as you need.

11   I want you to be as comfortable

12   as you possibly can be.

13      Okay.  Now, I have some

14   other prepared comments that in

15   a capital matter I'm required to

16   go over with you and have and

17   will.  Those were mine from my

18   heart.  And these are what is

19   recommended.

20      And I will read this to

21   you:  You now have been sworn

22   into this case.  By your verdict

23   you will decide this disputed

24   issues of fact.  I will decide

25   all questions of law that arise

1     during the trial. And before

2     you retire to deliberate

3     together and decide this case at

4     the end of the trial, I will

5     instruct you on the rules of law

6     that you must follow and apply,

7     that you must apply in reaching

8     your decision. Because you will

9     be called upon to decide the

10     facts of this case. You should

11     give careful attention to the

12     testimony and the evidence

13     presented for your consideration

14     during the trial. But you

15     should keep an open mind and

16     should not form or state any

17     opinion about the case one way

18     or the other, until you have

19     heard all of the evidence, and

20     have had the benefit of the

21     closing arguments of the

22     lawyers, as well as my

23     instructions to you on the

24     applicable law.

25     During the trial you must

1     not discuss this case in any

2     manner among yourselves or with

3     anyone else.  And you must not

4     permit anyone to attempt to

5     discuss it with you or in your

6     presence.  And as far as the

7     lawyers are concerned, as well

8     as others whom you may come to

9     recognize as having connections

10     with this case, you are

11     instructed that in order to

12     avoid even the appearance of

13     impropriety, you should have no

14     conversations whatsoever with

15     those persons while you are

16     serving on the jury.

17     Now, we are going to try to

18     keep most folks away from you.

19     But sometimes people just out of

20     ignorance or misunderstanding

21     don't know that they can't talk

22     to you.

23     And these lawyers have

24     asked me to tell you that they

25     are not being rude if they don't

1    speak to you.  They are under a

2    Court Order, all of them are

3    under a Court Order, not to

4    communicate with you, not even

5    to say, "Hello."  So please

6    understand,  if you say, "Hey,"

7    to one of them, and they don't

8    say anything back, they are

9    under an order not to do so.

10        Now, we have people on both

11    sides who are interested in both

12    sides.  Some of them are seated

13    here tonight, or they wouldn't

14    be here.  And they may want to

15    say "Hey," to you, or they may

16    want to say something to you.

17        If that occurs, stop them,

18    tell them you are on this trial

19    jury, and you are not allowed to

20    discuss anything with anyone.

21    And if you will let me know if

22    that occurs, I will make sure

23    that they don't talk to you,

24    whether or not it's out of just

25    ignorance on their part, or an

1          intentional thing, or whatever

2          it may be.  No one is allowed to

3          discuss anything with you while

4          you serve on this jury, until

5          you finish your service.

6               Also, I see we have news

7          medica folks here, and they do a

8          great job of covering things.

9          But I'm required to instruct you

10         that you must also avoid reading

11         any newspaper articles that

12         might be published about this

13         case, now that the trial has

14         begun.  And you must also avoid

15         listening to or avoid broadcast

16         news programs on either

17         television or radio because of

18         the possibility that some

19         mention might be made of this

20         case during such broadcast now

21         that this trial has begun or is

22         now in progress.

23              I know, I heard, I didn't

24         see it, because I don't normally

25         make it out to the television

1    room.   There's my wife sitting

2    over there.   And she tell you,

3    I'm not out stirring at 6:00,

4    watching TV.   But a lot of

5    people told me this morning at

6    6:00 they had news coverage on

7    this very case.   And as things

8    progress, I'm sure they are

9    going to become more and more

10   focused and probably come down

11   here with cameras and all kinds

12   of things to record what's being

13   done here.   And it's their job

14   under the First Amendment of the

15   United States Constitution to do

16   that.   And they do a wonderful

17   job.   Thank goodness we can do

18   that in this country.

19        But we have to take

20   precautions to make sure that

21   you decide these two cases only

22   based on the evidence that's

23   presented in the trial of this

24   case and not by some outside

25   information.   So please

1    understand that.

2         You should not seek to make

3    any investigations on your own

4    regarding this case.  Over the

5    years we have had jurors that

6    have gone out to the scene and

7    that kind of thing.  That is not

8    allowed.  So for heaven sakes,

9    you are going do be able to

10   leave here at the end of the

11   day.  You might be tempted to

12   ride out to this location that

13   is testified to or whatever, to

14   see for yourself or conduct your

15   own investigation or whatever.

16        So for heaven sakes, you

17   should not visit the scene of

18   any occurrence which is at issue

19   in this case, and you should not

20   conduct any experiments

21   regarding this case.  You should

22   not consult reference materials,

23   such as law books, dictionaries,

24   Encyclopedias, about any issue

25   in this case.

1        I will talk to you about

2    the law, and I will explain to

3    you the law.  And I will answer

4    any other questions that you may

5    need legally, if I'm legally

6    able to do that as this trial

7    progresses.

8        The reason for these

9    cautions, of course, lies in the

10   fact that it would be your duty

11   to decide this case only on the

12   basis of the testimony and the

13   evidence that is presented

14   during the trial without

15   consideration of any other

16   matters whatsoever.

17       Now, in order that you

18   might understand at the

19   beginning of this case the

20   nature of the decision you will

21   be asked to make, and how you

22   should go about making them, I

23   would like to give you some

24   preliminary instructions

25   concerning some rules of law

492

1    that would apply.

2          Of course, the preliminary

3    instructions that I will give

4    you now will not cover all of

5    the rules of law that are

6    applicable to this case.  As

7    I've already stated, I will

8    instruct you fully at the end of

9    the trial just before you retire

10   to deliberate upon your verdicts

11   and to decide these two separate

12   cases.

13         Presumption of innocence

14   would be the first thing that I

15   would talk about to you.  As you

16   were told during the process of

17   your selection, an indictment --

18   remember I held up the

19   indictment?  There it is.  Right

20   there.  The blue indictment sets

21   out the charges.

22         In this country a person

23   charged with a crime has a right

24   to specific notice of what they

25   are charged with, what they are

1    called upon to come in and

2    defend against.

3        So, we do that in this state

4    and in most states by way of an

5    indictment.  An indictment is

6    merely an accusatory paper,

7    which states the charge or

8    charges to be determined at the

9    trial.

10       But an indictment is not

11   evidence against this Defendant,

12   or evidence against anyone else.

13   Indeed, a Defendant in this case

14   has entered a plea of not guilty

15   and is presumed by law to be

16   innocent.  The Government in

17   this case, the District

18   Attorney's office, Mrs. Stout,

19   Mr. Jarrell have the burden of

20   proving the Defendant, Mr.

21   Conrad, guilty beyond a

22   reasonable doubt.  And if the

23   State fails to do that, you must

24   acquit him.

25       The burden of proof.  Who

1  has that burden of proof?  Proof

2  beyond a reasonable doubt is

3  proof of such a convincing

4  charge that you would be willing

5  to rely and act upon it without

6  hesitation in the most important

7  of your own affairs.  I will

8  talk to you more about the

9  burden of proof.  But suffices

10  to say, and you all know this

11  already, the burden of proof is

12  on the State to prove the guilt

13  beyond a reasonable doubt.

14       Now, as far as an order of

15  proof and the Defendant's right

16  not to testify, because the

17  Government, because the State,

18  has the burden of proof, it

19  would go forward, the State

20  would go forward and present

21  evidence and testimony first.

22       After the Government, after

23  the State, finishes or rests

24  what we call its case in chief,

25  the Defendant may, and I

1      emphasize "may," call witnesses

2      and present evidence if he

3      wishes to do so; however, you

4      will remember that the law does

5      not require a Defendant in any

6      criminal case in this state and

7      in this nation to prove his

8      innocence, because the burden of

9      proof is on the State to prove

10     the guilt beyond a reasonable

11     doubt.  And no inference

12     whatsoever may be drawn from the

13     election of a Defendant in this

14     State and this nation not to

15     testify in the event he elects

16     not to do so.

17          Now credibility of

18     witnesses.  Who you should you

19     believe, and who should you not

20     believe?  As you listen to the

21     testimony of each witness, you

22     should remember that you will be

23     the sole judges of the

24     credibility of each witness.

25     And it will be up to you, the

1    jury, to weigh the witnesses'

2    testimony, each witness's

3    testimony.  In deciding whether

4    you believe or disbelieve any

5    witness you should consider his

6    relationship to the State, to

7    the Government, or his

8    relationship or her relationship

9    to the Defendant, his interest,

10   if any, in the outcome of these

11   two cases, his manner of

12   testifying, his opportunity to

13   observe or acquire the knowledge

14   concerning the facts about which

15   he is testifying to, his candor,

16   his fairness, his intelligence,

17   and the extent to which he has

18   been supported or contradicted

19   by other credible witnesses.

20        You may, in short, accept

21   or, as jurors, or you may reject

22   the testimony of any witness and

23   hold in part, because you are --

24   again, remember I said you were

25   judge's of the facts.  And you

1       may accept or you may reject any

2       witnesses' testimony.  And you

3       should only accept the testimony

4       of witnesses that you find to be

5       worthy of belief.

6           Now, when you became a

7       juror, you didn't leave your

8       common sense outside on the

9       courthouse steps, when you came

10      in here.  We have all had

11      experiences over our lifetimes

12      dealing with people:  People who

13      tell the truth, and people who

14      don't tell the truth.  We have

15      all sized folks up.

16          You bring with you your

17      experiences in life in serving

18      on this jury.  And you will use

19      that in deciding what the truth

20      is in these two separate cases.

21          From time to time during

22      the trial, I may be called upon

23      to make rulings of law on

24      motions or objections that are

25      made by the lawyers.  You should

COURT OF CRIMINAL APPEALS NO. __CR-02-0333_____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

## CIRCUIT COURT OF _____COFFEE_____ COUNTY, ALABAMA

CIRCUIT COURT NO. __CC-01-179, CC-01-180_____

CIRCUIT JUDGE ____Gary L. McAliley_____

Type of Conviction / Order Appealed From: __Conviction, Capital Murder, Robbery 1st__

Sentence Imposed: __Life Without Parole, Life__

Defendant Indigent: [X] YES [ ] NO

Robert Thomas Conrad
_____
NAME OF APPELLANT

Gary Bradshaw
_____
(Appellant's Attorney) P. O. Box 311412
_____
(Address)
Enterprise          AL          36331
_____
(City)          (State)          (Zip Code)

(Telephone No.)

Richard Waldrop
P. O. Box 310027
Enterprise, AL  36331

V.

## STATE OF ALABAMA
_____
NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____
_____

(For Court of Criminal Appeals Use Only)



COPY

1    not infer or conclude from any

2    ruling that I make that I have

3    an opinion on the merits of the

4    case favoring one side or the

5    other.  If I sustain an

6    objection to a question that

7    goes unanswered by the

8    witnesses, then you should not

9    speculate on what answer might

10   have been given, nor should you

11   draw any inferences or

12   conclusions from the question

13   itself.

14       During the trial it may be

15   necessary for me to confer with

16   the lawyers from time to time

17   out of your hearing concerning

18   questions of law or procedures

19   that require consideration by

20   the Court, alone.

21       On some occasions you may

22   be excluded from the courtroom,

23   as a convenience to you and to

24   us while I discuss such matters

25   with the lawyers.  I will try to

1    limit such interruptions as much

2    as possible.

3        But you should remember at

4    all times the importance of the

5    matter that you are hear to

6    determine and should be patient

7    even though the case may seem to

8    move slowly.

9        During the trial it may be

10   necessary for me to confer with

11   the lawyers from time to time

12   out of your hearing concerning

13   questions of law or procedures

14   that require consideration by

15   the Court alone.

16       And I promise you that I

17   will move things along as

18   rapidly as possible.  But,

19   again, there will be times that

20   we will slow down.  You will

21   again note that we will be

22   required to do things in a

23   criminal jury trial, such as

24   this, in a required orderly

25   fashion.

1              And you will note that we

2        have court reporters seated down

3        right now in front of me taking

4        down every official word that is

5        being spoken in this courtroom.

6              Now, I told you earlier

7        that we expect the trial of

8        this case to take three or four

9        days.  I'm including today in

10       that.  I hope we will be able to

11       finish the trial of this case

12       this Friday.  That would be my

13       objective.  I've missed my

14       objective many times over the

15       years.  But it will be my

16       objective to move this case so

17       that we can finish up.

18             Of course, we can't help

19       things like hurricanes and bad

20       weather.  But that will be what

21       we will move towards.

22             Now, we are gone to begin

23       by affording the lawyers for

24       each side an opportunity to make

25       an opening statement to you, in

1    which, again, they will explain

2    the issues in this case.  They

3    may summarize the facts they

4    expect the evidence will prove

5    beyond a reasonable doubt, or

6    what they feel the evidence will

7    not be able to prove beyond a

8    reasonable doubt.

9        After all of the testimony

10   and evidence have been given,

11   the lawyers will then be given

12   another opportunity to address

13   you at the end of this trial and

14   make their summations or final

15   arguments to you in this case.

16       The statements, again, that

17   lawyers make now, as well as the

18   arguments that they present at

19   the end of this trial, are not

20   to be considered by you either

21   as evidence in this case in

22   support of or against any

23   verdict that you may render,

24   because the evidence from which

25   you will decide the issues of

1          these two cases will come only

2          from the witnesses, from the

3          exhibits, and from the

4          presumptions of law that I've

5          talked to you about before.

6              Is the State ready to begin

7          its opening remarks?

8      MRS. STOUT:  The State is ready, Your

9          Honor.

10     THE COURT:  Is the Defense ready to begin

11         opening remarks?

12     MR. BRADSHAW:  We are ready, Your Honor.

13     THE COURT:  You may.

14     MRS. STOUT:  Your Honor we would like to

15         invoke the rule.

16     THE COURT:  I will explain that to the

17         jury.  It's a discretionary call

18         on the part of the Court to

19         determine whether or not the

20         rule is invoked.  That simply

21         means that all witnesses who

22         will be allowed to testify will

23         be excluded from the courtroom.

24             It's been my experience

25         over the years that when that is

1           done, the witnesses can't sit

2           out and match their testimony up

3           to other witnesses' testimonies.

4           And it aids a jury, it aids a

5           Judge in deciding wherein the

6           truth lies.  You see it's

7           witnesses who have not been

8           coached or whatever.

9               So the burden will be on

10          the State, the burden will be on

11          the Defense to he make sure that

12          any witness that you intend to

13          call is excluded from the

14          courtroom.

15              If they remain, they will

16          not be allowed to testify.

17          That's with the exceptions.  The

18          State law has one exceptions, or

19          has two exceptions.  But the

20          main exception is that the

21          alleged victim's representative

22          has the right to remain in the

23          courtroom, even if -- in this

24          case Mrs. Gunnels would be the

25          victim's representative?  Is

1              that correct?

2       MRS. STOUT:  That is correct.

3       THE COURT:  I don't know whether she is

4              going to end up testifying.  But

5              State law provides that she may

6              remain in the courtroom.

7                   If you will make sure that

8              your witnesses are out.

9                   All of the State's

10              witnesses are out of the

11              courtroom, except Mrs. Gunnels?

12       MRS. STOUT:  Yes, sir, Your Honor.

13       THE COURT:  Are all of the Defense

14              witnessess out of the courtroom?

15       MR. BRADSHAW:  Out of courtroom, yes,

16              sir.

17       THE COURT:  You may begin.

18       MRS. STOUT:  Thank you, Your Honor.

19       THE COURT:  Here is what I'm going to

20              do.  I have been going a while.

21              I know you are tried of sitting

22              there.  We are going to hear the

23              State's Opening Remarks.  We are

24              going to take a break.  If any

25              of you need to take a break in

1          the middle of that, you get my

2          attention.  And we will take a

3          break.

4                    OPENING STATEMENTS

5    BY MRS. STOUT:

6                    May it please the Court,

7          counsel.  Ladies and gentlemen

8          of the jury, good evening.  It's

9          been a long two days.  I know

10         it's probably going to be a long

11         three days.  I want you to know

12         that we appreciate, the State of

13         Alabama, appreciates your

14         service.  It is a sacrifice, but

15         it's one that must be made.  As

16         I said in voir dire or Mr.

17         Jarrell said, it's necessary in

18         order for our system to work,

19         not only for the State of

20         Alabama but also for the

21         Defendant.  And it is because of

22         you, those of you sitting in

23         this box that this system will

24         work.

25                   This is a case that

1    involves money, murder, and a

2    mother.  Jelaine Dennis was a

3    mother, a business woman.  And

4    on May 23rd of 2001, on a sunny

5    afternoon, somewhere between

6    1:00 and 1:15, 1:20, Robert

7    Thomas Conrad decided he would

8    make some money the easy way;

9    that he would take a gun, and he

10   would go to the business where

11   Jelaine Dennis was earning a

12   living to help her daughter go

13   through school at Auburn

14   University.  And he would get

15   his money the easy way.  He

16   would rob her.

17        He entered that store.  He

18   put a gun to the head of Mr. Ray

19   Grimes who was in that store,

20   there with Jelaine Dennis,

21   grabbed the money from the cash

22   register.  Put Mr. Ray Grimes

23   down on the floor; took $30.00

24   -- $30.00 from Mr. Grimes.  And

25   then he started to exit the

1    store.

2         Somewhere along the lines,

3    something happened.  Jelaine had

4    a gun.  He had a gun.  Jelaine

5    wound up with a contact wound to

6    the chest, right along here

7    (indicating), a wound that

8    killed her.  The Defendant wound

9    up with two wounds also:  One to

10    the arm and one to the gut.

11         The bullet to the gut he

12    still carries around with him.

13    The one to the arm matched

14    Jelaine's gun.

15         Jelaine was also shot two

16    more times.  Not only the

17    contact wound, the contact wound

18    to the chest.  She was also shot

19    in the left thigh and in the

20    left hip.  Six cases were

21    retrieved there, six cases and

22    five bullets in that business.

23         Money, murder, and a

24    mother  trying to earn a

25    living.  Whether you like the

1          way she was earning a living or

2          not, she was earning a living to

3          send her daughter to college.

4               Jelaine Dennis arrived at

5          the hospital at approximately 10

6          minutes 'til 2:00.  At 10 after

7          2:00, she was dead.

8     THE COURT:  If you could speak up just a

9          little bit.  The court reporters

10          are having trouble hearing you.

11          They need to take down

12          everything you say.

13     MRS. STOUT:  Jelaine arrived at the

14          hospital at about 10 minutes

15          until 2:00.  At 10 after 2:00

16          she was dead.

17               He arrived at the hospital

18          about 5 minutes 'til 2:00.  Five

19          minutes after Jelaine was

20          there, after the police

21          responded, after the rescue

22          squad got there, hurried her to

23          the hospital, and he was on his

24          way across the room from where

25          she was.

1     As we told you in voir

2     dire, we have the burden.  The

3     State has the burden of proof.

4     The Constitution of the United

5     States puts that burden squarely

6     on the shoulders of the State of

7     Alabama.

8         We represent the people of

9     Alabama.  We accept that burden.

10    We welcome that burden.  That

11    burden is beyond a reasonable

12    doubt, not all doubt, not every

13    doubt, not a shadow of a doubt,

14    but beyond a reasonable doubt a

15    doubt for which you can attach a

16    reason.

17        I submit to you, ladies and

18    gentlemen, that when you hear

19    the evidence, when you hear the

20    doctors, when you hear the

21    pathologist, when you hear about

22    the casings, when you hear about

23    the bullets that were retrieved

24    from the scene, or the

25    projectiles that were retrieved

1                     from the scene, when you hear

2                     about the cars that were seen

3                     parked down the road, when they

4                     were on talking -- seen just

5                     seconds later. When all of this

6                     is put together, and when we

7                     stand before you, and Mr.

8                     Jarrell asks --

9       THE COURT: Again, please, speak up.

10      MRS. STOUT: We will have met that burden

11                     beyond a reasonable doubt, not

12                     of a lesser included, as you

13                     have heard, but of capital

14                     murder. Three shots in Jelaine

15                     Dennis in her store, taking her

16                     money and Mr. Grimes'.

17                       Thank you.

18       THE COURT: The Defense?

19                  OPENING STATEMENTS

20  BY MR. BRADSHAW:

21                     Thank you, Judge. Good

22                     evening. Again, I've talked to

23                     most of you today. You've heard

24                     what we've had to say about the

25                     cases. And the Judge has

1    instructed you that one thing,

2    it's going to take an

3    hour-and-a-half, to two hours,

4    to tell you about the points of

5    law.  That lets you know that

6    you have a rather long movie to

7    watch, a lot of points to

8    consider.

9        I want you to consider

10    this:  The Judge told you that

11    what Glenda tells you, and what

12    I tell you at this stage is not

13    fact.  And that's a good thing.

14    So I'm not going to stand up

15    here and fill you with my

16    opinions.  I will tell you what

17    I expect, because the State has

18    the facts just a little off.

19        One thing that is for

20    certain is Mrs. Jelaine Dennis

21    lost her life, and that is very

22    tragic.  It can't be undone,

23    and I wish that it could.

24        But the fact remains that

25    all of you agree with me that

1          Mr. Robert Conrad was innocent

2          until proven guilty and proven

3          beyond a reasonable doubt.  I'm

4          going to wait and let you see

5          and hear the evidence from the

6          three sources that the Judge

7          told you they would come from.

8     THE COURT:  Excuse me, ma'am.  You need

9          to have a seat.  Nobody will

10         come or go while these folks are

11         talking to this jury.  Go ahead.

12    MR. BRADSHAW:  Consider only those three

13         sources of evidence, not what I

14         tell you.  And that's why I'm

15         not going to bother to run

16         through.  I will tell you they

17         are not going to prove beyond a

18         reasonable doubt or any doubt

19         that Robert Conrad is guilty of

20         capital murder.

21             You are going to hear the

22         instructions on the law.  Murder

23         is with intent.  You are going

24         to hear there were two other men

25         arrested.  The two other men

1              arrested for these same crimes

2              that were in that building.  And

3              then we are going to see the

4              murder weapon or a gun that was

5              supposedly in this man's hand.

6              You never will, never will

7              beyond a reasonable doubt.  What

8              they are telling you is that

9              with an intent going into that

10             store with the intent to kill

11             somebody that Robert Thomas

12             Conrad did that, that Robert

13             went in there, you won't hear or

14             see anything like that you can

15             say that's beyond a reasonable

16             doubt.

17       MR. JARRELL:   I object to that last

18             statement.  That is incorrect

19             statement of law.

20      THE COURT:  Sustained.  The Court has

21             already given instructions to

22             the jurors that what attorneys

23             say is not evidence.

24          Go ahead, Mr. Bradshaw.

25      MR. BRADSHAW:   As we discussed on voir

514

```
 1          dire, and each one of you sat on
 2          different panels, what you have
 3          already heard about life
 4          without, versus death, nobody
 5          except myself wants to inform
 6          you and tell you about lesser
 7          included offense. And you are
 8          going to hear that, too, and
 9          know that you have an option to
10          do that.
11              When it's all said and
12          done, myself and Mr. Al Smith,
13          we will come back up and get
14          another chance to talk to you,
15          as the Judge told you, in
16          closing arguments. We will
17          spend a whole lot more time
18          then, after you have had the
19          privilege of sifting and
20          listening to the evidence.
21              But for now, I just ask you
22          to clear your mind, listen to
23          what you hear from up here, not
24          from anywhere else, but from
25          right up here.
```

```
1              Think of it, if you will,

2         as I told some of you, about the

3         blocks.  You are going to hear

4         the State start to build their

5         case.  All of their witnesses

6         will come up.  And if you want

7         to think of it as just pouring

8         water in a glass.  And after

9         each witness, Mr. Smith and I

10        will try to take a little bit of

11        water out of that glass.

12             But for the first day or

13        so, it's going to seem like,

14        whoa, their staking stuff

15        against them, because they have

16        that burden, they go first.

17        Please hang on to all of your

18        thoughts until the Judge turns

19        the case over to you.

20             Thank you very much.

21   THE COURT:  Ladies and gentlemen, we

22        have been going for a while

23        now.  I'm sure that you are

24        tired and would like to take a

25        few minutes before we get
```

1    started with our first witness.

2    We will at least call one

3    witness tonight.  We might get

4    to two.  I don't know.  We'll

5    see.

6    But we will take about ten

7    minutes.  If any of need longer,

8    I told you, and I've shown you,

9    where the restrooms are.  Some

10   of these deputies will take you

11   down to your jury room where you

12   will deliberate and stay during

13   this entire trial when you are

14   not in this room, in this

15   courtroom.

16   Just so you will know, we

17   will probably take a break about

18   once every hour during the

19   course of this trial.  We might

20   go a little over that until we

21   get to some breaking point each

22   time.  But we will try to shoot

23   for about once every hour.  Do

24   any of you have any questions

25   before we take our first break?

1917

```
 1                    Okay.  Sheriff, if you will
 2          take the jurors back.
 3               If everyone will rise.
 4             (Jurors exited the courtroom).
 5               This Court is in recess for
 6          at least ten minutes.  Of
 7          course, people can come and go
 8          during a recess.  When we get
 9          started in the matter, everybody
10          can come in and have a seat.
11          But once we get started, then
12          nobody is going to leave or come
13          or go.
14               Thank you.
15             (A short recess was taken).
16     THE COURT:  This court will come to
17          order.
18               Will the State call your
19          first witness?
20     MRS. STOUT:  The State calls Lennis
21          Darby.
22     THE COURT:  Would you come up, please.
23          Will you raise your right hand
24          and place your left hand on the
25          Bible.
```

1

2                          <u>LENNIS DARBY</u>

3          Whereupon, this witness, after first

4     being duly sworn to tell the truth, the whole

5     truth, and nothing but the truth, testified as

6     follows, to-wit:

7          THE COURT:  You can bend that microphone

8                        around.  Maybe that microphone

9                        will help.  If if you will scoot

10                       up to it, and speak loudly

11                       enough so that all of the jurors

12                       can hear what you have to say.

13                           Before you ask your first

14                       question, Mrs. Stout, we have,

15                       and I want the jury to note who

16                       is here.

17                           Remember I told you that

18                       State law provides that a

19                       victim's representative can be

20                       present in this courtroom at all

21                       times.

22                           We have two criminal

23                       offenses charged, as you now.

24                       You have met April Gunnels

25                       already.

```
 1                          Mr. Robert Ray Grimes is
 2                  also here.  He has the right to
 3                  be present in the courtroom.  He
 4                  has told me that he has been
 5                  sick to some degree.
 6                      And at any time, Mr.
 7                  Grimes, that you need to leave
 8                  -- he will leave out of here,
 9                  and he can come and go during
10                  the trial.  And you can come and
11                  go any time that you feel that
12                  you need that.
13                      But I wanted you to know
14                  who he is and why he is here.
15                  Okay.  You may proceed.
16                     DIRECT EXAMINATION
17  BY MRS. STOUT:
18        Q      State your name, please?
19        A      Lennis Darby.
20        Q      Where are you employed?
21        A      Enterprise Police Department.
22        Q      How long have you been employed
23  with the Enterprise Police Department?
24        A      Five years, eight months.
25        Q      How long have you been connected
```

1    with law enforcement, all together?

2         A    Six years.

3         Q    Back on May 23rd of 2001, were you

4    employed with the Enterprise Police Department?

5         A    I was.

6         Q    And in what capacity were you

7    employed with them?

8         A    I was a field training officer.

9         Q    Were you on duty that day?

10        A    I was.

11        Q    And were you on duty at

12   approximately 1:00 p.m. that day?

13        A    I was.

14        Q    Do you recall where you were on

15   May 23rd of 2001, between 1:00 and 1:30?

16        A    I was on White Street, south side

17   of Enterprise at White Street Apartments.

18        Q    While you were at the White Street

19   Apartments, were you -- did you receive a call

20   to report to County Road 711?

21        A    Yes, ma'am.

22        Q    Do you recall approximately the

23   time you received that dispatch?

24        A    I would say it was probably around

25   1:00, 1:00 to 1:30, in that area.

1      Q       Somewhere between that time frame?

2   Is that correct?

3      A       Yes, ma'am.

4      Q       Now, when you received this call,

5   what did you do?

6      A       The call came out with an alert

7   call, which our process for alerting there is

8   an emergency call.  I completed as quickly as I

9   could the assignment that I was working on, got

10  in my patrol car and headed in the direction of

11  the reported crime.

12     Q       Now, where is White Street in

13  conjunction with where you had to go?  Where

14  you had to report to?

15     A       White Street is approximately one

16  block of off Geneva Highway, if you are

17  familiar with the retail outlet on Geneva

18  Highway, approximately a block from there.

19     Q       And is Geneva Highway near County

20  Road 711?

21     A       Yes, ma'am.  711 turns east off of

22  Geneva Highway, south of the bypass.

23     Q       Once you received this call,

24  approximately how long did it take you to get

25  to that location?

1      A      Approximately two minutes.

2      Q      Now, when you arrived at the

3  location, what was the first thing that you saw

4  or the first person that you encountered?

5      A      Approaching the scene -- as I

6  approached the scene, over the hill on the

7  rise, I saw two white males exiting a pickup

8  truck, looking off towards the south.  I pulled

9  up in front of them.  One of them ran over to

10 me and said --

11     MR. BRADSHAW:   Objection.

12     THE COURT:  Sustained.

13     Q      Just tell me what you observed.

14 Okay?  Not what someone told you.

15     A      Yes, ma'am.   Two white males

16 exiting a pickup truck looking southward.

17     Q      After you had a conversation with

18 these individuals, what did you proceed to do?

19     A      Proceeded on to the location of

20 this crime.

21     Q      And that location was where?

22     A      The Toy Store.

23     Q      When you arrived at that location,

24 what was the first thing that you did?

25     A      Got out of my patrol car, ran to

1 check on the victim and possible suspect inside

2 the building.

3  Q When you ran into the building, who

4 did you see?

5  A I saw Mr. Grimes.

6  Q Where was Mr. Grimes?

7  A Standing directly in the front of

8 the front door.

9  Q I'm going to ask you to step down.

10 And if you would, could you give us a sketch of

11 the inside of the Toy Store, the counter area,

12 and where Mr. Grimes was?  And you said you

13 encountered the victim?  Is that correct?

14  A I'm sorry.  What was the question.

15  Q You said that you encountered the

16 victim?  Is that correct?

17  A I saw the victim, yes, ma'am.

18  THE COURT:  And you can turn that so that

19   the jurors can see.  We can move

20   it if we need to.

21  A This would be facing north

22 (indicating).  I came in County Road 711.  It

23 runs this way.  I came in off 711 into the

24 driveway, by the driveway.  There is a beam of

25 some sort -- there was a beam of some south

1    laying here.  I parked my car here.  The front

2    door was facing southward.  This is the outline

3    of the building.  The front door opens outward.

4         Q     Lennis, I hate to stop you, but

5    could you do it bigger?

6         A     Yes.  Yes.  I'm sorry.  I'm sorry.

7    Yes, ma'am.

8         Q     Real big, so the jurors can see.

9    Thank you?  That's better.

10        A     The front door, facing southward,

11   opens out.  I opened the door and looked in.

12   Mr. Grimes was standing directly in front of

13   the front door.  He spoke to me.  I stepped in.

14   There was blood on the floor in various

15   places.

16             There was a counter here, cash

17   register right there.  There was a second

18   counter that comes along this way, all the way

19   to the wall, I believe.

20             I looked over to the left.  I saw

21   the victim laying in this position here.  There

22   was a clothing rack, circular here, another

23   rack with some other items back in this way.

24             I ran in, verified that no one else

25   was in the building, looking for suspects.

1    There was a door here; verified no one was

2    hiding behind that door.

3              There was no response from the

4    victim at this time.  So I ran back to my

5    patrol car to have emergency personnel to

6    respond quickly.

7         Q      And you immediately ran back out to

8    the patrol car?  Is that correct?

9         A      Yes, ma'am.

10        Q      You may have a seat.  Thank you.

11        A      Thank you.

12        Q      When you ran back out to your

13   patrol car, what did you do?

14        A      I called for rescue personnel to

15   step it up, because the victim had been shot in

16   the chest.

17        Q      Okay.  And who else did you radio

18   at that time?

19        A      A contact was made to me by my

20   Sergeant to secure the scene.

21        Q      And did you do that?

22        A      That was the process I was in, yes,

23   ma'am.

24        Q      How did you go about securing that

25   scene?

1          A      To us that means verifying that

2     there's no suspects around.  That it's going to

3     be safe for emergency personnel when they

4     respond.

5          Q      What did you do next, after you had

6     called for help, secured the scene, and were

7     waiting for your rescue people to arrive?

8          A      At that time, I assumed that the

9     victim was already deceased, already dead.  I

10    detached my video camera from the patrol car

11    and proceeded to tape the crime scene.

12         Q      Now, where was Mr. Grimes during

13    this time?

14         A      He was originally in the store when

15    I ran outside.

16         Q      Now, when you went in with your

17    video camera, at that point did you realize

18    that the victim was not in fact deceased?

19         A      Yes, ma'am.  As I opened the door

20    to go in the second time, I could hear her

21    moaning, crying for help.

22         Q      Okay.  And what did you hear when

23    you heard her crying for help?

24         Q      She had not moved.  But I could

25    tell that she was still laying behind the

1    counter.  She was making statements to the fact

2    of "Help me.  Help me, I've been shot.  Help

3    me," to that nature.

4        Q    And shortly after you heard this,

5    did the rescue squad arrive?

6        A    Yes, ma'am.  They were almost

7    directly behind me when I went in the second

8    time.

9        Q    And what did you see when you

10   looked at the victim?

11       A    She was lying with her head facing

12   towards the west.  Her head was somewhat

13   underneath a chair, a rolling caster-the chair,

14   similar to the one over in the corner that the

15   deputy is sitting in.

16            There was a great deal of blood on

17   the floor between where I was at and where she

18   was at.  There was blood on the counter.  She

19   was holding a rag to her chest that was covered

20   in blood.

21            There were shell casings on the

22   floor.  There was a revolver on the floor.

23            I was trying to videotape this all

24   at one time while the emergency personnel were

25   working.

1    Q    Now, during that time, did you hear

2  the victim make any other statements while you

3  were in there?

4    A    She just continually asked for

5  help, crying, "Help me".

6    Q    Now, you said that you videotaped

7  this?  Is that correct?

8    A    That's correct.

9    Q    And you used the videotape that was

10  out of your vehicle?

11    A    Yes, ma'am.

12    Q    When you get in your car each day,

13  do you check your video equipment?

14    A    Yes, ma'am.  That's our department

15  policy.

16    Q    Did you make sure that video

17  equipment is working properly?

18    A    Yes, ma'am.

19    Q    Did you do that on this day?

20    A    Yes, ma'am.

21    Q    And did you -- was it working

22  properly on that day?

23    A    Yes, ma'am.

24    Q    Had you received some type of

25  training from the police department on the use

1    of your video equipment in your car?

2        A    Yes, ma'am.  When we got those

3    video cameras, they came already installed in

4    the new cars we got back in 1999.  Excuse me.

5    The policy was that they would be used at all

6    times on response to priority calls.  They

7    instructed us how to change the tapes, how to

8    change the batteries.

9        MR. SMITH:  May it please the Court, I'm

10                    not trying to -- we stipulate

11                    that he knows how to use tapes.

12                    And we stipulate within the

13                    Court's ruling the tape they

14                    will show is the same.

15       THE COURT:  You may do that without

16                    laying additional predicate?  Is

17                    that what you're saying?

18       MR. SMITH:  Yes, sir.

19       THE COURT:  Ladies and gentlemen, we

20                    have already had a hearing on

21                    all of this.  And the Judge has

22                    ruled that tape is admissible

23                    anyway.

24                        So a stipulation is

25                    just basically an agreement

```
 1              where the parties say without
 2              the necessity of dragging
 3              things out further in your
 4              presence, the parties stipulate
 5              to whatever they have
 6              stipulated to.  And they have
 7              agreed that the tape may be
 8              played to you and seen by you.
 9                   Now, I have ruled that
10              the audio portion of the tape
11              will not be heard by you.
12              Remember, I told you that the
13              Constitution of the United
14              States provides that people have
15              the right to confront and cross
16              examine all witnesses against
17              them.  There may be some person
18              that states something in that
19              audio portion that might not
20              testify, and that would be a
21              denial of this Defendant's
22              constitutional rights.
23                   So I have ruled that
24              that part will not be considered
25              by you.  So it can be shown to
```

```
1                        you.  And the people who were

2                        there, that witnessed this can

3                        tell you what they saw, and what

4                        he was taking a video of and

5                        explain that.

6                            And the Prosecutor would have

7                        a right to examine him and these

8                        defense lawyers will have a

9                        right to cross examine him on

10                       this.

11                           So you may do that whenever

12                       you wish, Mrs. Stout.

13          MRS. STOUT:    Thank you.

14          Q     Now, you said that you were in the

15    store and you saw shell casings?  Is that

16    correct?

17          A     Yes, ma'am.

18          Q     And you saw a gun?

19          A     Yes, ma'am.

20          Q     Is that correct?  And you saw --

21    what else did you see that appeared -- let me

22    back up.  Strike that.  Did you see anything

23    else that appeared to be out of the ordinary in

24    that building?

25          A     The amount of blood was
```

1   extraordinary.

2        Q     Did you see any property that had

3   been damaged inside the building?

4        A     The cash register was open.   I

5   noticed that almost immediately.   There was a

6   bullet mark or two in the floor that I

7   remember.

8        THE COURT:  A bullet what?

9        THE WITNESS:  A bullet mark.  Appeared to

10                be where a bullet struck the

11                floor.

12       Q     What did you -- did you check with

13   the phone?  Did you check to see if there was a

14   phone available?

15       A     No, ma'am.  I didn't think to check

16   for one.

17       Q     Did you check the cash register?

18       A     I did look at the cash register and

19   saw the drawer was open.

20       Q     Did you check to see if there was

21   any money in the cash register?

22       MR. SMITH:  We request that the

23                Prosecutor not lead the witness.

24       THE COURT:  You are leading your witness

25                to some degree.  Sustained.

```
1          Q      Did you determine where this Toy

2   Store was located, in Coffee County?

3          A      Yes, ma'am.

4          Q      In the Enterprise Division of

5   Coffee County?

6          A      Yes, ma'am.

7   MRS. STOUT:   Your Honor at this time,

8                 I'm going to ask that we play

9                 the video.

10  THE COURT:  What is that marked?

11  MRS. STOUT:  State's Exhibit No. 1.

12  THE COURT:  State's Exhibit No. 1.  And,

13                 again, I will allow you to stop

14                 the video at any time and have

15                 this witness watch it and

16                 explain whatever it may be that

17                 he is showing, in lieu of the

18                 audio portion.

19  MRS. STOUT:  Yes, Your Honor.

20  THE COURT:  I want to make sure that all

21                 of you can see this.  If any of

22                 you have difficulty seeing, let

23                 me know.

24                 (Video was played for the jurors).

25  THE COURT:  For the record, the record
```

1               will reflect that State's

2               Exhibit No. 1 is in evidence.

3                       I want to make myself

4               clear.  Y'all can stop this at

5               any time so that this witness

6               can orientate the jury.  I saw,

7               did you just pass the Gulf

8               Station headed out the Geneva

9               Highway.

10      THE WITNESS:  The B P. Station.

11      THE COURT:  B.P.  I'm an ole-time fellow.

12               Just so I know, and so the jury

13               will know, this is mounted in

14               your vehicle?

15      THE WITNESS:  Yes, sir.  It's mounted on

16               the dash, yes, sir.  What

17               happened, I just turned the

18               corner.

19          (Video continued playing).

20      THE COURT:  Are you approaching the

21               cemetery here?

22      THE WITNESS:  Yes, sir.  That's correct.

23               The cemetery is coming up on the

24               right by the tree.

25      THE COURT:  And the State, y'all can ask

1                    any questions as we proceed.

2          MRS. STOUT:   Thank you.

3          THE COURT:   And the Defense can do so.

4          Q      (Mrs. Stout) Now, you are

5    approaching what station on the right?

6          A      The Cannon Station on the

7    right-hand side.  Coffee County 711 veers off

8    just to the left.

9          Q      Now, you are on 711?

10         A      That's correct.

11         Q      Now, who are these individuals that

12   you have approached right here?

13         A      I don't know their names.  They

14   were the ones that I seen coming over the rise

15   when I first arrived.  They were getting out of

16   their vehicle, looking towards the south.

17         Q      And you spoke to them?  Is that

18   correct?

19         A      Yes, ma'am.

20         Q      What did you do after you spoke to

21   them?

22         A      Left this location.  I looked

23   around a little bit.  They told me they were

24   looking --

25         MR. BRADSHAW:  Object to what they told

1                    him.

2          MRS. STOUT:  Don't tell me what they told

3                    you.  Okay.

4          A    Yes, ma'am.  I backed up and was

5    looking as well and carried on towards the Toy

6    Store.

7          THE COURT:  So are you talking at this

8                    moment?

9          THE WITNESS:  Yes, sir.  The whole time

10                    that I'm -- I'm sorry.  Judge,

11                    if I can answer in more detail.

12          THE COURT:  Just don't say what they

13                    said.

14          THE WITNESS:  Yes, sir.  Yes, sir.  The

15                    whole time I'm sitting here, I'm

16                    either talking to them or

17                    talking on my communications

18                    radio.

19               (Video continued playing).

20          MR. BRADSHAW:  May I ask, was that -- the

21                    direction of your vehicle

22                    pointing and that truck sitting

23                    there, is that south?

24          THE WITNESS:   The truck was sitting on

25                    the south side of the road, yes,

```
 1                        sir.

 2            MR. BRADSHAW:  Was that the direction you

 3                  turned and looked?

 4       THE WITNESS:  Correct.

 5       THE COURT:  I need to know, where are we

 6                  now?

 7       THE WITNESS:  We are at the Toy Store.

 8       THE COURT:  So that is it?

 9       THE WITNESS:  Yes, sir.

10       Q    When you entered the store, at this

11  time, what did you do?  When you first entered

12  this building right then?

13       A    Looking around, making sure there

14  are no other suspects in the building, locate

15  the victim.

16            Mr. Grimes was standing directly in

17  front of me.  He spoke.  I looked around at the

18  different racks and different things that were

19  laying about, just to verify there were no

20  suspects in the building.

21       Q    And at that time, you thought the

22  victim was what?

23       MR. SMITH:  Objection.

24       THE COURT:  Sustained.  Would you

25                  rephrase?
```

1    Q    Did you see the victim?

2    A    I saw the victim, yes, ma'am.

3    Q    What was your opinion of the victim

4  at that time?

5    A    I thought the victim was dead.

6    Q    What are you doing at this time?

7    A    At this time, I'm communicating to

8  go ahead and get emergency to respond quickly,

9  because she had been chest shot.  I considered

10  it be a grievous injury, of course, trying to

11  get communications from my Sergent, verifying

12  that I'm doing everything that I'm suppose to

13  the be doing.

14    Q    Explain what you are doing here?

15    A    To dismount the camera from the

16  dash mount, you have to turn it, and undo the

17  two screws on the side.  That's what I'm doing

18  here.

19    Q    Now where are you?

20    A    I'm back in the store, holding the

21  camera.  I had planned to go into the store and

22  film.  But when I went back the second time, I

23  could hear her.  And it surprised me.  So I was

24  leaning over the counter.  I was leaning over

25  the counter, speaking to her, telling her that

1    help was on the way.

2             She was crying for help.  This is

3    -- I'm sorry can I continue on.  This is

4    Captain Tom Broughen that came in behind me.

5         Q    Who are these people entering now?

6         A    These are the emergency personnel.

7    They arrived just as soon as I had gotten back

8    into the store.  And in a moment you will see

9    me back up and focus.  And I will actually be

10   conducting the video while they were working on

11   her, trying to conduct the video.

12        THE COURT:  What was that, that we just

13                   looked at?

14        THE WITNESS:  I believe that was the

15                   shell casings, what you were

16                   referring to, Your Honor.

17        THE COURT:  On the floor or where?

18        THE WITNESS:  Yes, sir.  It was on the

19                   floor.  This is the end of the

20                   counter, when you walk in, it's

21                   probably two or three feet

22                   ahead of the counter.

23                        This, when it stops, is

24                   probably conversation, someone

25                   asking me questions.  I'm losing

```
1                       focus on what I'm trying to do.

2                       It's a very tight space, as well

3                       as not much room to work in.

4           Q       Now, what is this?

5           A       It's the same shell casing, I

6    believe Your Honor was talking about.

7           Q       Who is this?

8           A       This is emergency personnel.

9           Q       And who is this?

10          A       This is the victim.

11          Q       Jelaine Dennis?

12          A       Yes, ma'am.

13          Q       And what are these?

14          A       Shell casings and marked by -- that

15   I thought may have been a gunshot marked to the

16   floor and the revolver.

17          Q       And what is this?

18          A       This is the side of the counter.

19   If you walk into the front door, the counter is

20   here.  This is the side of the counter, I

21   believe.

22          Q       And what did you do when you looked

23   at that counter?  What are these?

24          A       Referring to -- during the video?

25   What appeared to be the cast-off marks on the
```

1    side of the counter.

2          THE COURT:   What kind of marks?

3          THE WITNESS:   Cast-off.   Where someone

4                   was moving an object, and it

5                   flies off the object.   It will

6                   strike and make an oblong mark

7                   like those are.

8          Q      And what did all these dark red

9    stains appear to you to be?

10          A      Appeared to be blood stains.   The

11    turns -- it's to try to get a bearing on where

12    all the marks are in relation to one another.

13          Q      And what is that?

14          A      That's the rag that she was holding

15    against her chest.

16          Q      And where was she holding it?

17    Against her chest?

18          A      On her chest.   You can see the

19    caster.   This is the chair that I related to

20    that she was behind.

21          THE WITNESS:   Your Honor, at this point,

22                   it's just me walking around.

23          THE COURT:   If you will wait just a

24                   minute.   Go ahead.

25          MRS. STOUT:   This is going to be State's

```
 1                      Exhibit No. 2.
 2            THE COURT:  Before you show that to the
 3                        jury, is there going to be an
 4                        objection?
 5            MR. SMITH:  Not of No. 2, Your Honor.
 6            Q     Let me show you what we have marked
 7      as State's Exhibit No. 2, and ask if you
 8      recognize that?
 9            A     Yes, ma'am.
10            Q     And what do you recognize State's
11      Exhibit No. 2 to be?
12            A     Appears to be layout of the Toy
13      Store.
14            Q     And does it fairly and accurately
15      depict what you saw when you entered the Toy
16      Store on the afternoon of May the 23rd of 2001?
17            A     Yes, ma'am.
18            Q     Complete with shell casings, and
19      revolver, and everything?  Is that correct?
20            A     Yes, ma'am, I believe so.
21            MRS. STOUT:  Okay.  We would move to a
22                         admit State's Exhibit No. 2.
23            THE COURT:  Any objection?
24            MR. SMITH:  No. 2 is the interior
25                        diagram?  Is that correct?
```

```
 1              MRS. STOUT:  It should be the exterior,

 2                    so if you will mark that out.

 3         MR. SMITH:  I'm sorry.  I'm confused.  I

 4                    apologize.  I was looking at

 5                    your exhibit list.

 6         THE WITNESS:  It's showing the inside.

 7         MR. SMITH:  Should be No. 3?

 8         MRS. STOUT:  Yes.  I marked it wrong.

 9         MR. SMITH:  I have no objection to No.

10                    3, Your Honor.

11         THE COURT:  Okay.  State's Exhibit No. 3

12                    is in evidence, and you may

13                    publish it to the jury.

14                    Are you going to need the

15                    witness to come around while you

16                    ask him questions there?  Or is

17                    he going to be able to sit

18                    where he is now?

19         MRS. STOUT:  I think that's going to be

20                    it, no, sir.

21         Q      Officer Darby, once you had

22    returned to your car to put the video up, what

23    did you do next?

24         A      Began to put the crime tape up of

25    the scene, giving directions to different
```

1    officers who arrived on the scene, as to what I

2    needed for them to do to assist them.

3        Q    What do y'all call that?  Securing

4    the scene?

5        A    Securing the scene.  Basically, we

6    call it roping off the scene.

7        Q    Once you secured the scene, who did

8    you then turn that scene over to?

9        A    Rick Hauser of Investigations.

10       Q    And did you hold that scene until

11   you actually turned it over to him?

12       A    Yes, ma'am.

13       MRS. STOUT:  Your witness.

14       THE COURT:  Mr. Smith.

15       MR. SMITH:  Thank you, Your Honor.

16              CROSS EXAMINATION

17   BY MR. SMITH:

18       Q    Mr. Darby, you and I met at least

19   one time before, I think?

20       A    Yes, sir.

21       Q    I do have some questions of you.

22   Would you, on the State's Exhibit No. 3 here,

23   please, and I guess I need you to come down and

24   point out to the jury, please, sir, the front

25   door?

1        A       The front door should be right in

2    this black area, in that area there.

3        Q       All right.  And from this black

4    area of the front door, to this area over here,

5    and there is a diagram saying hand-held

6    telephone, can you show us or give us an idea

7    or reference point of how much space we are

8    talking about there?  Just use a reference here

9    in the courtroom from the Judge, to the jury,

10   to the counsel table?  Just kind of give us a

11   frame of reference, if you would, please?

12       A       Keep in mind Mr. Smith, this is the

13   only time that I have been in this building.

14   So it may be a little off.

15       Q       I understand, sir.

16       A       The area that you are referring to,

17   would be approximately from me to where the

18   deputy is sitting.

19       Q       All right.  From the door to back

20   here where the telephone is would be about this

21   distance in your best judgment?  Did I

22   understand you correctly?

23       A       The way I remember the telephone

24   was laying just behind it.

25       Q       And this counter, from the front

1    door, would be about how far?

2         A    The brown counter here?

3         Q    Yes, sir?

4         A    It would be, when you walk into the

5    door, you have the counter.  This one, where

6    the cash register is at is right here by

7    you.

8         Q    All right.  Now, I'm at the front

9    door.  Where's the counter?

10        A    Here.

11        Q    This close?  I could reach over

12   here and touch it?

13        A    The cash register would be right

14   here.  You could probably lean over and touch

15   it.

16        Q    This is the brown counter?

17        A    Right.

18        Q    What's illustrated as brown --

19        A    Correct.

20        Q    -- In State's Exhibit No. 3?

21        A    Correct.

22        Q    Now, there is, back to the front

23   door, there is a clothing rack here.  Tell me

24   how far that is?  Give me a frame of reference

25   in your best judgment?

1      A      It seems to me like it was

2   relatively close.  But in my frame of mind,

3   looking for a suspect, everything seems like

4   it's real close.

5      Q      Yes, sir?

6      A      And I came around the front side

7   and looked over.  Mr. Grimes was standing

8   approximately, number 6, the, right there in

9   front of the door.  So it was two or three

10  feet.  That close to you.

11     Q      The clothing racks would have been

12  two or three feet over?

13     A      No, sir.  If you walk into the

14  front door this way, it would be right over

15  here.

16     Q      Okay.  Now, what are these two gray

17  bars there?

18     A      All I remember them being were

19  obstacles that someone could be behind.

20     Q      All right.  And you checked there?

21     A      Yes, sir.

22     Q      You mentioned something about a

23  door in some other part?  Would you tell me

24  what you were referring to there?

25     A      Looked like a closet to me, to my

```
 1    right-hand side, I preserved it as directly

 2    behind the clothing rack.  That would be this

 3    area over here marked "storage room."

 4         Q      That would be a door here?

 5         A      A door opening, yes, sir.

 6         Q      Now, magazine racks here?  That's

 7    where books, or magazines, or pamphlets, or

 8    something of that nature?  Or do you recall

 9    that?

10         A      All I recall that being is a

11    wall.  I paid no attention to what was on it.

12         MR. SMITH:  You can have a seat again,

13              please.

14         Q      One thing that I did want to ask

15    you, when Mrs. Dennis -- when you saw Mrs.

16    Dennis, did she tell you that she had shot

17    somebody?

18         A      No, sir.

19         Q      She did not?  Let me show you

20    Defendant's Exhibit No. A and ask if you

21    recognize what that photograph depicts?

22         A      Front of the Toy Store.

23         Q      All right.  And does that

24    photograph accurately depict the front of the

25    Toy Store, as you observed it on that day,
```

1    except perhaps there's an evidence technician's

2    bag out there in the front yard?

3         A    Crime scene tape, other than that,

4    yes, sir.  That's the way it looked.

5         Q    Would that be crime scene tape like

6    you would put out?

7         A    Would be one that I put up, yes,

8    sir.

9         MR. SMITH:  Your Honor, we offer

10              Defendant's Exhibit A.

11        MRS. STOUT:  No objection.

12        THE COURT:  Defendant's Exhibit A is in

13              evidence over no objection by

14              the State.

15        MR. SMITH:  We ask to publish that to the

16              jury.

17        THE COURT:  You may.

18        Q    And you entered in through the

19   front door?  And let me show you Defendant's

20   Exhibit B.  And you can pick it up and look at

21   it, if you want to, and ask if you recognize

22   what that photograph depicts?

23        A    That's facing eastward.  The front

24   door is on the right-hand side.  That's the

25   cash register.

```
 1          Q       Does that photograph accurately

 2   depict the interior of the Toy Store as you saw

 3   it on May 23rd?

 4          A       I never saw it from this angle.

 5          Q       Well --

 6          A       Yes, as far as I know, that's the

 7   inside of the Toy Store.

 8          Q       And from perhaps the reverse angle,

 9   it is a reverse angle of the front door, is it

10   not?

11          A       That's correct.

12          Q       So that photograph would be taken

13   from this angle in viewpoint here?  Would that

14   be correct?

15          A       Almost directly straight down.

16          Q       Almost directly straight down from

17   here?

18          A       Yes, sir -- no, sir.

19          Q       Better for you to come show the

20   jury so we get it exactly correct.

21          A       That video would have been taken

22   this way.

23          Q       You mean that photograph?

24          A       Yes, sir.  I'm sorry.

25          Q       From behind the cash register in
```

1    that direction?

2         A     Correct.

3         MR. SMITH:  Your Honor, we offer

4              Defendant's Exhibit B.

5         THE COURT:  Defendants Exhibit B.

6                   Any objection?

7         MRS. STOUT:  No objection.

8         THE COURT:  It's in evidence over no

9              objection.  You may publish it

10              to the jury whenever you

11              desire.

12         Q     Now this is the cash register?  Is

13    that correct?

14         A     Yes, sir.

15         Q     And did you go behind the counter

16    at all?

17         A     No, sir, I did not.

18         Q     Looking behind the cash register

19    from this angle, behind the cash register,

20    towards the front door is the Defendant's

21    Exhibit No. B, it depicts.  What did you notice

22    or observe on this wall, which would be the

23    right side of Defendant's Exhibit B?

24         A     As far as the wall itself, I

25    noticed nothing in particular.

1        Q        You didn't examine the wall that

2    closely, as maybe other evidence technicians,

3    like, Rick Hauser or some of the other ones

4    did?    Correct.

5        A        That's correct.

6        Q        And this area here, that I'm

7    showing you, directly across from the cash

8    register, could you come point out to us what

9    on the Defendant's Exhibit B, this section, is

10   depicting?    And I will show you this dark area

11   here?

12       A        All right.    The dark area that you

13   are referring to there?    That appears to be

14   this clothing rack.

15       Q        And this wall would be this wall

16   here?

17       A        To the best of my knowledge.    If it

18   doesn't have somewhere to hide a suspect, I'm

19   pretty well not paying attention to it.

20       Q        Lost your attention then at that

21   point?

22       A        Yes, sir.

23       MR. SMITH:    You can take a seat.

24                   And I believe, Judge, you

25                   said that we could publish it?

1          THE COURT:  You may.

2          Q      Let me show you Defendant's

3    Exhibit C and ask if you recognize what that is

4    a photograph of?

5          A      It appears to be a photograph taken

6    from my video camera.

7          Q      All right.  And does it have the

8    date and the time that your video camera was

9    recording?

10          A      Yes, sir, it does.

11          Q      And we saw the video tape, of

12    course, a moment ago.  Do you recognize the

13    persons depicted in that photograph?

14          A      Simply knowing the time frame of

15    events, that would have to be Mr. Grimes.

16          Q      That would have to be Mr. Grimes?

17    Mr. Ray Grimes there, would it not?

18          A      (Nodding head in the affirmative).

19          MR. SMITH:  Your Honor, we would offer

20                Exhibit C. in evidence.

21          MR. JARRELL:  No objection.

22          THE COURT:  Defendant's Exhibit C is in

23                evidence over no objection.  You

24                may publish it to the jury.

25          Q      And, of course, that's 1:30 and 12

1    seconds p.m., would that be the time, according

2    --

3        A    Yes, sir.

4        Q    Let me show you Defendant's

5    Exhibit D, and ask if you recognize that

6    photograph?  Or what is depicted in that

7    photograph?

8        A    Would be almost standing directly

9    in the doorway taking a photo to an angle, to

10   your left.

11       Q    Would you come down and show us,

12   please, sir, on this, State's Exhibit No. 3,

13   the angle that that photograph, Defendant's

14   Exhibit C depicts?

15       A    Standing approximately right here.

16   The photograph this way.

17       Q    All right.  This object here would

18   be which object there?

19       A    This counter.

20       Q    The counter as shown there?  Now,

21   back here, what does this part of the

22   photograph depict?

23       A    It depicts -- from the angle of the

24   photograph, this would be a little bit shorter,

25   and a little open area right here, between the

 1    counter and this wall.

 2         Q       Would it be correct, this brown

 3    area here is shown in Defendant's Exhibit D as

 4    this display counter here?  Would that be

 5    correct?

 6         A       Yes, sir.

 7         Q       And this area here would be a wall

 8    located where?

 9         A       Approximately right here.

10         Q       This wall here?

11         A       Where it's marked, yes, sir.

12         Q       And this area here would be, in

13    Defendant's Exhibit D, is correlated to State's

14    Exhibit No. 3 where?

15         A       This wall area here?

16         Q       Yes, sir, this wall area here?

17         A       Right.

18         Q       This would be in the other room?

19         A       I guess you could call it that,

20    yes, sir.

21         Q       And does that accurately depict the

22    scene as you observed it?

23         A       Fairly, sir.

24         MR. SMITH:    We offer Defendant's

25    Exhibit D.

1            MRS. STOUT:  No objection.

2            THE COURT:  It's in evidence over no

3                    objection.  You may publish it

4                    to the jury.

5        Q    Let me show you Defendant's Exhibit

6    No. F and ask do you recognize what that

7    photographs depicts?

8        A    Not from memory, no, sir.  It

9    appears to be a face of some sort.

10       Q    I'm sorry.

11       A    It's a sculpture.

12       Q    The area here that's depicted, this

13   counter area here, can you correlate to the

14   State's Exhibit No. 3 where that is located?

15       A    No, sir, I can't, not from this

16   photo.  I'm sorry.

17       Q    All right.  Let me show you

18   Defendant's Exhibit G  and ask if you recognize

19   that photograph?

20       A    It's a wall.  That's all I know,

21   Mr. Smith.

22       Q    Do you recognize any of the area

23   depicted?

24       A    It's a pink wall.  And it's got

25   some sticker-type posters on them.  I couldn't

1    say.  It was probably from the Toy Store.  But

2    other than being able to see it on the video

3    and tell you from that, I couldn't say.

4          Q      All right.  Let me show you

5    Defendant's Exhibit H, and ask if you recognize

6    what is depicted in that photograph?

7          A      That's a shell casing.

8          Q      And that is a shell casing located

9    from where?

10         A      It's specifically in the store.  I

11   could not say.

12         Q      Is that a photograph of the Toy

13   Store with the shell casing labeled by one of

14   the officers?

15         A      If it's one of our labeling tags, I

16   could not stand here and tell you this one came

17   from the Toy Store.

18         Q      All right.  I show you Defendant's

19   Exhibit I and ask if you recognize what is

20   depicted in that photograph?

21         A      Okay.  This is the circular rack

22   that's directly on the left.  It's two or our

23   identifying tags for identifying evidence, and

24   where the room separates, it appears.

25         Q      Would you point out to the members

1       of the jury, please, sir, on these photograph

2       -- excuse me on State's Exhibit No. 3, where

3       Defendant's Exhibit I, shows.

4            A       Appears to be standing or relating

5       to the photograph of someone standing here,

6       taking a photograph back this way.

7            Q       All right.  And these two shell

8       casing would be depicted apparently here and

9       here?  Would that be correct?

10           A       That would be my guess.

11           MR. SMITH:  Your Honor, we offer

12                      Defendant's Exhibit No. I.

13           MRS. STOUT:  No objection.

14           THE COURT:  It's in evidence over no

15                      objection.  You may publish it.

16           Q       I show you Defendant's Exhibit J

17      and ask if you recognize that?

18           A       That's what we call cast-off marks

19      in the interior of the Toy Store.

20           Q       All right.  We will just call them

21      marks.  Would you relate to the members of the

22      jury from State's Exhibit No. 3 where

23      Defendant's Exhibit J. reflects?

24           A       This came from video camera?

25           Q       Yes, sir.

1      A      It would be when I first came in,

2    the camera came on down, probably standing a

3    step or two inside the doorway -- no more than

4    a step, approximately in the doorway itself.

5    The counter angles down, pointing here, towards

6    the counter.

7      Q      Does that accurately depict what

8    your video camera showed a few moments ago?  A

9    still shot at 1:37, point, 17 seconds p.m. on

10   May 23rd?

11     A      Yes, sir.

12     MR. SMITH:  Your Honor, we offer

13              Defendant's Exhibit No. J.

14     MRS. STOUT:  No objection.

15     THE COURT:  It's in evidence.

16     Q      Now, let me hold this here.  And

17   would you show the members of the jury these

18   marks on this white surface, point to them on

19   State's Exhibit No. 3, please?

20     A      At the bottom, this overhead view

21   would be the bottom, along right here.

22     Q      All right.  And this area here,

23   again, a lighter colored surface.  There's some

24   spots.  Would you show us where that is?

25     A      The lighter colored area is the

1    area of the door, where the door swings open,

2    and the carpet is in this area, here.

3         Q       So there's some vinyl tile there?

4         A       I believe it's vinyl.  I'm not

5    sure.

6         Q       And this is the carpet here?

7         A       Yes.

8         Q       And it would be in this area here?

9    Is that correct?

10        A       Right here.

11        Q       All right.  I show you Defendant's

12   Exhibit L and ask if you recognize what that

13   depicts?

14        A       It's blood stains on the carpet.

15        Q       And would you show -- in fact, is

16   that a still shot from your video camera?

17        A       Yes, sir, I appears to be.

18        Q       And does it accurately reflect what

19   you saw and what, in fact, we saw a moment ago?

20        A       Yes, I believe, it does.

21        MR. SMITH:  We offer Defendant's

22   Exhibit L, Your Honor.

23        MRS. STOUT:  No objection.

24        THE COURT:  Defendant's Exhibit L is in

25                  evidence.

1       Q       Would you show the members of the

2   jury where Defendant's Exhibit L. correlates to

3   the State's Exhibit No. 3?

4       A       The only point of reference I have

5   from that photograph would be casters from the

6   chair.  I would have to assume that's the same

7   chair and counter.

8       Q       In your best judgment, and I submit

9   to you that's just the picture that you took --

10  no tricks there.

11      A       I don't know if there were other

12  chairs in the room or not.  All I know is that

13  she was laying under one.  This could be the

14  one.  If that were the case, it would be back

15  here behind this counter here.

16      Q       Now, when you say behind this

17  counter, that would be in this area here?

18      A       It would be back around this area,

19  where the "H" is at.  Right here.

20      Q       And Defendant's Exhibit L, is that

21  also, in fact, just -- well, it's the same

22  picture from a different angle.

23      A       Same picture.

24      MR. SMITH:  Just ignore that.

25                      We offer Defendant's

```
 1                        Exhibit L.
 2            THE COURT:  Defendant's Exhibit L is in
 3                    evidence over no objection.
 4       Q       Officer Darby, I show you
 5   Defendant's Exhibit P, and ask if you recognize
 6   what is depicted in that photograph?
 7       A       Silver revolver.  Appears to be a
 8   -- either a round from -- an ejected round or a
 9   shell casing, appears to be some blood stains.
10   And I'm not sure if that's what I assume to be
11   a bullet mark in the floor or not.
12       Q       Would you relate to the members of
13   the jury, please, sir, and particularly what is
14   this item here on Exhibit P?
15       A       The revolver.
16       Q       Would you correlate that to State's
17   Exhibit No. 3, where that photograph shows the
18   gun?
19       A       Back here in the back.  I would
20   have to say this picture was probably taken,
21   just from assuming the angle, probably taken
22   from this way looking back.
23            MR. SMITH:  We offer Exhibit P, Your
24                    Honor.
25            MR. JARRELL:   No objection.
```

```
 1            THE COURT:  Defendant's Exhibit P is in

 2                  evidence.  You may publish it.

 3            MR. SMITH:  You can have a seat, Officer

 4                  Darby.

 5            Q       Officer Darby, again, the area in

 6    the Toy Store, that is a relatively small area,

 7    is it not?

 8            A       It is.

 9            Q       It has the appearance, and I may be

10    completely wrong.  But it has the appearance,

11    doesn't it, of prefabricated mobile building

12    that have been joined together?

13            A       Yes, sir.

14            Q       And those would be -- do you have a

15    judgment or opinion as to what size we are

16    talking about there?

17            A       I would hate to estimate.

18            Q       But the whole area, we have already

19    established that this area here, the lower half

20    here, is roughly from the witness box over to

21    the deputy?  Would that be correct?

22            A       On an angle, yes, sir.

23            Q       And from the -- not-to-scale

24    photograph or Exhibit 3 of the State's, the

25    back building, and you've talked about where
```

1  the floor separated, we have seen pictures

2  there, this is even a smaller structure than

3  the front, is it not?

4       A    From my memory, it didn't appear to

5  be a smaller area.

6       MR. SMITH:    Thank you, sir.

7       THE COURT:   State?

8                REDIRECT EXAMINATION

9  BY MRS. STOUT:

10      Q    Officer Darby, could you step down

11 here, please?

12      A    Yes, ma'am.

13      Q    Could you show me on this diagram

14 the different places throughout the building

15 that you saw blood?

16      A    To my memory, it only extended to a

17 certain point here, and most of it was here in

18 this area here.  And it trailed off back this

19 way behind the counter.  Most of it was --

20 well, not most of it, excuse me, a good deal of

21 it was on the counter, but in this general area

22 here.

23      Q    And you were primarily there to

24 secure the scene until Hauser arrived?  Is that

25 correct?

1      A    After the initial assurance that no

2   suspects were there, yes, ma'am.

3        MRS. STOUT:  That's all.

4        MR. SMITH:  No rebuttal.

5        THE COURT:  Should this witness be

6                   excused?

7        MRS. STOUT:  Judge, we may need to

8                    recall him, so we will ask that

9                    he stay.

10       MR. SMITH:  We respectfully ask, also,

11                   that he be subject to recall.

12       THE COURT: Sure.  You are subject to

13                  recall.  If you will call your

14                  next witness.

15                      Ladies and gentlemen,

16                  I'm going to swear this witness

17                  in, and we will take a few

18                  minutes' break.  We probably

19                  won't finish with this witness.

20                  I don't know.  We will see

21                  whether or not it's going to be

22                  a lengthy witness or not.  I

23                  don't know.  We will try to get

24                  through with this witness, if we

25                  can.

1          But we will take about
2     a ten-minute break at that time.
3     If you need longer, you take it.
4          The Court is required
5     to instruct you since the trial
6     has begun, and we have started
7     taking evidence, the Court
8     instructs you not to discuss
9     this matter among yourself, nor
10    allow anyone to discuss it with
11    you.
12          You can file back to
13    the jury room with the Deputy
14    Sheriff.
15       (Jurors exited the
16    courtroom).
17          This Court is in recess
18    for at least ten minutes.
19    (A short recess was taken).
20  THE COURT:  This court will come back to
21    order.  You may be seated.  Call
22    your next witness.
23  MR. JARRELL:  The State calls Mr. Robert
24    Grimes.
25  THE COURT:  Mr. Robert Ray Grimes?  If

```
 1                        you will, raise your right hand

 2                        and place your left hand on the

 3                        Bible.

 4                   ROBERT GRIMES

 5        Whereupon, this witness, after first being

 6   duly sworn to tell the truth, the whole truth,

 7   and nothing but the truth, testified as

 8   follows, to-wit:

 9        THE COURT:  Have a seat, Mr. Grimes.  If

10                   you need to take a break for

11                   whatever reason, you let me

12                   know, and we will take a break?

13        MR. JARRELL:  Scoot up good and close.

14                   DIRECT EXAMINATION

15   BY MR. JARRELL:

16        Q    If you would, sir, state your name

17   and where you live?

18        A    Robert Ray Grimes, 1208 Park

19   Avenue, Enterprise.

20        Q    Mr. Grimes, are you familiar with

21   the store that was on County Road 711, that was

22   called the Toy Store?

23        A    Yes, sir.

24        Q    And were you familiar with Mrs.

25   Jelaine Dennis?
```

1          A       Yeah, I was.

2          Q       And what was your relationship with

3     Mrs. Dennis?

4          A       She worked with me for a long time.

5     We had worked together.

6          Q       You worked together?  Were you

7     friends?

8          A       Huh?

9          Q       Were you friends?

10         A       Yeah.

11         Q       Back on May the 23rd of last year,

12    were you in the store called the Toy Store?

13         A       I was.

14         Q       And I'm going -- I hate to do this

15    to you.  You just got seated, but I need you to

16    step down here, if you would please.

17         A       (Witness did as requested).

18         Q       I'm going to show you this diagram

19    that has been marked as State's Exhibit No. 3

20    and ask you if that fairly, closely -- I know

21    it's not to scale.  But does that represent

22    kind of the interior of that store?

23         A       Some of it.

24         Q       Is there anything that is

25    incorrect?

```
1          A      Well, this is the door?  Right?
2    This door?
3          Q      I believe it was testified that
4    this was the door, and this was a counter?
5          A      The register sat on the counter.
6          Q      Yes.  The register sat over here on
7    the counter.
8          A      Okay.
9          Q      Does that fairly represent it?
10         A      Yeah.
11         Q      Okay.
12         A      Close.
13         Q      Now, it's been testified to that
14   this is the front door, and this is the counter
15   top where cash register was sitting.  Where
16   were you sitting?  Or were you sitting in that
17   store on that date?
18         A      End of this counter right here.
19         Q      Were you sitting in a chair?
20         A      Sitting in a chair right here at
21   the end of this counter.
22         Q      Was Jelaine Dennis in the store?
23         A      She was.
24         Q      Where was she located?
25         A      She was sitting behind the cash
```

1    register.

2          Q      Was she also in a chair?

3          A      Yes, sir.  Come close together.

4          Q      Close together?  About how close

5    would you say they were?

6          A      I would say about like that.

7          Q      Room enough for a person to walk

8    through?

9          A      Yeah, to walk through.

10          Q      Now, I know that something happened

11    on that date?

12          A      It sure did.

13          Q      Something out of the ordinary

14    happened on that day that you are here to

15    testify about today?

16          A      (Nodding head in the affirmative).

17          Q      And you take your time, sir.

18          A      Tell you what happened?

19          Q      First all, let me ask you this way:

20    You say that you were sitting here?

21          A      That's right.

22          Q      And Jelaine was over there.  Was

23    there anyone else in the store prior to the --

24    whatever happened that was traumatic for you?

25          A      There was two in the store, back in

1   the back of the store.

2        Q     Would it be fair to say they were

3   over here in this area?

4        A     Uh-huh.

5        Q     All right.

6        A     I was sitting here.

7        Q     You were sitting here?  Did

8   somebody else come in?

9        A     The front door popped open.  I

10  looked.  He looked and turned, and said, "Don't

11  move back."

12       Q     Can you describe how that person

13  looked to you, what you observed?

14       A     Totally black.  Black clothes.

15       Q     Did he have anything on his head

16  that was black?

17       A     Everything was black.  All I seen

18  was black.

19       Q     Did you also see the gun?

20       A     Yes.

21       Q     What was he doing with the gun?

22       A     He had it on me.  He walked around.

23       Q     Let me stop you just a moment.  How

24  was he holding the gun?

25       A     He was holding the gun like this.

1          Q       Both hands?

2          A       Well, his back door had one hand,

3    and then, he come around, got me around the

4    neck.

5          Q       You were sitting here?

6          A       That's right.  Had the gun to my

7    head right here.

8          Q       Did he say anything to you at that

9    point?

10         A       No.  He just told her to give him

11   the money.  And she opened the draw and laid

12   the money on the drawer.

13         Q       Now, this picture shows a cash

14   register drawer opened.  And I believe one of

15   the Defendants has got a picture here of a cash

16   register.  This is Defendant's Exhibit B.  It

17   shows the drawer of that cash register

18   partially opened.  Is that the way you recall

19   it?

20         A       She had it all the way open.

21         Q       She had it all the way open?

22         A       Had it all the way open and laid

23   the money on the top of the drawer.

24         Q       All right.  When she laid the money

25   on the top of the drawer, what did the person

1    do?

2        A    He reached over, pulled me over and

3    got me.

4        Q    Leaned over you?  Is that what

5    you're saying?

6        A    Pulled me over.  And this thing is

7    only about three foot here.  And he was

8    standing behind here.  Right here.  He reached

9    over.

10       Q    Did you see him take the money?

11       A    Yes, sir.

12       Q    And what did he do with that?

13       A    I don't know what he done with it.

14       Q    Was there -- do you have an

15   estimation of how much money there was?

16       A    I don't know just how much money

17   she had in there.

18       Q    Let me ask you this:  Was there

19   more than one bill?

20       A    Oh.  Yeah.  She had 3- or $400.00

21   in her register.  I don't know how much.  I

22   would say around 400.

23       Q    So there would have been several

24   bills?

25       A    Yeah, several bills.

1        Q        And he grabbed the money and did

2    something with it?

3        A        Yeah.

4        Q        And he was holding you still around

5    the neck?

6        A        That's right.

7        Q        Did he do anything else in that

8    area?

9        A        He reached over her.  Still had me.

10   Pulled the telephone wire out of the wall.

11       Q        Was it a hand-held phone?

12       A        I don't know.  It was a telephone.

13       Q        Did it hang on the wall?

14       A        Had a thing on the wall.  He pulled

15   it out of the wall.

16       Q        Did it hang on the wall?

17       A        Yeah.

18       Q        It wasn't sitting on the counter?

19       A        No.  It wasn't on the counter.  It

20   was hanging on the wall.

21       Q        All right.  After he did that, what

22   did he do?

23       A        He taken me and walked to the back,

24   back to this building right in here.

25       Q        Okay.

1    A    This part of it.  Told me to lay

2    down.

3    Q    Face them when you are talking so

4    they can hear you better.

5    A    I laid down on the floor.  He told

6    me to keep my head down.  I had my arm like

7    this.  He went in my pocket and got my billfold

8    and got my money and throw my billfold down.

9    Q    Do you recall how much money you

10   had in your wallet?

11   A    I believe $30.00.

12   Q    Do you know what the denominations

13   were?

14   A    No.

15   Q    All right.  After he took your

16   wallet, and got your money out of it, where did

17   he go then?

18   A    I don't know whether he went back

19   to the other two guys that was in there or not.

20   The next thing I heard was firing.

21   Q    You heard gun firing?

22   A    Gun fire.

23   Q    What did you do next?

24   A    Heard Jelaine say, "Ray I'm dying."

25   And I went to her.

```
 1          Q      That's when you went to her?

 2          A      I got up off the floor and went to

 3     her.

 4          Q      Where was she then when you went to

 5     her?

 6          A      She was laying behind the counter.

 7          Q      She was back over here behind the

 8     counter?

 9          A      Right.

10          Q      What did you do at that point?

11          A      We ain't got no telephone.  I said,

12     "Hold on, baby.  I got to go call."

13                 I run out to my truck and called

14     911.

15          Q      When you went out to your truck to

16     call, do you recall -- you said there were two

17     other gentlemen in there?  Do you recall what

18     they did?

19          A      They come out.

20          Q      They came out?  Do you recall if

21     either one, of those gentlemen was dressed in

22     black?

23          A      Neither one of them was dressed in

24     black.

25          Q      What did they do when they got out.
```

1    Don't tell me what they said, but what did they

2    do?

3         A    Got in the car and left.

4         Q    There was conversation between the

5    two of you, though?  Is that correct?

6         A    Between them?

7         Q    And you?

8         A    No.

9         Q    You didn't --

10        A    No -- yeah, there was.  They said,

11   "We going to see if we can find help, some

12   help."

13              So I was on the telephone with 911,

14   trying to get help for Jelaine.

15        Q    When you got off the phone, what

16   did you do?

17        A    I went back inside.

18        Q    What did you do after you went back

19   inside?

20        A    I checked on her and talked to her.

21   And told her, I said, "Give me your mother's

22   telephone number."

23              I didn't know her mother's phone

24   number.  And she give it to me.

25        Q    Okay.

1         A        And I went back to my truck.   I

2    couldn't get her, and I turned around and

3    called her friend.   I couldn't get her husband.

4    And I couldn't get none of them.   I turned

5    around, called a friend and she come.

6         Q        Okay.

7         A        She come on down.

8         Q        Did you go back into the store

9    then?

10        A        That's right.

11        Q        That did you do?

12        A        I went back to her.   Trying to take

13   care of her as best I could.

14        Q        While you were on the floor, back

15   over here, you said you heard gunshots?

16        A        Right.

17        Q        That was before you got up off the

18   floor?

19        A        That's right.

20        Q        Did you hear any more gunshots,

21   after you got up off the floor?

22        A        No more.   It was all when I was on

23   the floor.

24        Q        When you went back in the last

25   time, that you just testified about, what did

```
1   you do?

2         A      I stayed in there with her until

3   the officer got there.

4         Q      The officer got there?  Was it very

5   long after you made the 911 call?

6         A      It seemed like a long time.  But it

7   wasn't but a short time.

8         Q      I'm sure you were quite scared.

9         A      I was upset and all.

10        Q      What was going through your mind

11  when you were lying back there?

12        MR. SMITH:  Objection.

13        THE COURT:  Sustained.

14        MR. JARRELL:  You may have a seat back

15                   up there.

16        THE COURT:  If you would like, Mr.

17                   Jarrell, you can push that out

18                   of the way, Mr. Jarrell, a

19                   little bit, so the jurors can

20                   see the witness a little bit

21                   better.  Just a hair more.  If

22                   you would, move it just a little

23                   more.  Thanks.

24        MR. JARRELL:   Your witness.

25        THE COURT:  Mr. Smith.
```

580

1          MR. SMITH:  Thank you, Your Honor.

2                CROSS EXAMINATION

3     BY MR. SMITH:

4          Q     Mr. Grimes, I'm Al Smith.  I don't

5     think we have ever met before.  I wanted you to

6     know who I am.

7          A     I don't believe I've ever met you.

8          Q     Mr. Grimes, you had known

9     Mrs. Dennis a long time?  Is that right?  Y'all

10    worked together?

11         A     Uh-huh.

12         Q     How had y'all worked together,

13    sir?

14         A     She was a nurse for me for five

15    years, and stayed with my wife.

16         Q     All right.

17         A     And when she passed away, we ran

18    the store business.

19         Q     You went into the store business?

20         A     (Nodding head in the affirmative).

21         Q     The Toy Store used to be down there

22    next to Grimes Grocery?  Near ConAgra?  Didn't

23    it?

24         A     Yes, sir.

25         Q     And you and Mrs. Dennis were in

1    business there?  Is that correct?

2         A    In the grocery business.

3         Q    All right.  And then she eventually

4    moved the Toy Store up to County Road 711?

5         A    Uh-huh.

6         Q    Now, you had a financial interest

7    in the Toy Store, did you not?

8         A    No, sir.

9         Q    You didn't have any interest?

10        A    No interest.

11        Q    You just frequented and visited

12   with her?  Is that correct?

13        A    It was all hers.  I didn't have no

14   interest.

15        Q    But you did have occasion to go up

16   there often and visit with her?

17        A    Oh.  Yeah.  I would go see her.  I

18   had been with her 15 years.

19        Q    But it's your testimony that you

20   had no business interest in the Toy Store?

21        A    No interest.

22        Q    Now, there were two others?

23   Besides yourself and Mrs. Dennis in the store,

24   there were two young black men in there, too,

25   were there not?

```
 1          A      Right.

 2          Q      You testified, and I apologize.  I

 3   guess I'm getting hard of hearing in my old

 4   age.  But I didn't quite hear your answer.

 5   They were somewhere in this back room on the

 6   floor with you?  Is that correct?

 7          A      Back in the back room.  I don't

 8   know whether they were on the floor or not.  I

 9   couldn't say that.  I don't now.

10          Q      You have since learned, have you

11   not, that they were Brian Smith and Brian

12   Yoeman, and also charged by the State with this

13   robbery and capital murder?  You know that to

14   be true today, don't you, sir?

15          A      I don't know.

16          Q      You don't know these other two men

17   have been charged with this offense, also?

18          A      I don't know what they are charged

19   with.  I don't know.

20          Q      Okay.  But you know they were

21   charged?  Is that correct?

22          A      Yeah.

23          Q      And had you learned that their

24   names are Brian Smith and Brian Yoeman?

25          A      I don't know them.
```

1          Q     Didn't know the names?  All right.

2    Now, and I don't question for a second that you

3    were frightened.  I'm sure you were.  But I

4    believe you told the officers when this first

5    occurred, did you not, Mr. Ammons and Mr.

6    DeVane that you could not even tell where the

7    person dressed in black was a white man or a

8    black man?  Is that correct?

9          A     That's right.

10         Q     The person was all covered up?

11         A     (Nodding head in the affirmative).

12         Q     Now, when you heard the gun fire,

13   and --

14         MR. SMITH:  And, Judge, I'm going to beg

15                your pardon to bring this back

16                out a little bit.

17         THE COURT:  Sure.  You can move that TV.

18                Maybe position it behind him so

19                the jurors can see.

20         MR. SMITH:  Excuse me.  Thank you, sir.

21         THE COURT:  And while they are shifting

22                that around, one of the jurors

23                sent me a message earlier that

24                they couldn't see.

25                     If you have trouble

```
1              seeing, get my attention in some
2              manner.  And I will be glad to
3              have people shift around and
4              move so you can.
5                  I remind you, though,
6              that all these things that
7              actually go into evidence will
8              be back with you.  You can look
9              them over.  You can watch videos
10             over, again.  You can do
11             whatever you wish to do with
12             them during that time and get a
13             better view of them at that
14             time.
15        THE COURT:  Go ahead.
16        MR. SMITH:  Thank you, Your Honor.
17        Q     Mr. Grimes, you came in through the
18   front door when you came in?  And Mrs. Dennis
19   was sitting in the chair behind the counter,
20   did I understand?
21        A     No.  I sat at the end of the
22   counter.
23        Q     You sat at the end of the counter?
24        A     Yeah.
25        Q     Down here?
```

1          A      Yeah.

2          Q      And where was she, please, sir?

3          A      Behind the counter.

4          Q      All right.  She is behind the

5    counter.  I apologize.  My question wasn't

6    clear to you.  I thought that's what I asked

7    you.

8                 Now, you sat there and chatted with

9    Mrs. Dennis for a while?

10         A      That's right.

11         Q      And this person dressed in black

12   came in and grabbed you?

13         A      Pardon me?

14         Q      And Mrs. Dennis, if I understand

15   your testimony, handed him the money, from the

16   testimony?

17         A      No.  Laid it on the drawer.

18         Q      Laid it on the drawer.  Now, when

19   you say "drawer" will you tell me what you're

20   referring to?

21         A      The drawer to the cash register.

22   The cash register come out.  And she laid it

23   right there.

24         Q      And this person reached over and

25   picked it up?  Is that correct?

```
 1          A     Uh-huh.

 2          Q     I think the Judge is trying to tell

 3    us that the jurors can't hear.  Maybe you need

 4    to talk in to the microphone?

 5          A     All right.

 6          Q     Now, Mr. Grimes, you said that you

 7    were scared, or he took you back over here in

 8    the back area?

 9          A     That's right.

10          Q     Where was Mrs. Dennis at this time?

11          A     She was behind the counter.

12          Q     She was still behind the counter.

13    And I know it probably seemed like forever.

14    But do you have a judgment or opinion of how

15    long it was from the time that you went back in

16    this back section, until you heard shots?

17          A     It wasn't long.

18          Q     All right.

19          A     I don't know how long.

20          Q     And your head was down, and you

21    were not looking?  Is that correct?

22          A     Didn't see nothing.

23          Q     Now, Mr. Grimes, are you familiar

24    with guns?  Have you shot guns in your

25    lifetime?
```

```
 1          A      Not familiar with guns.

 2          Q      Have you ever shot a gun?

 3          A      Yeah.

 4          Q      Have you ever shot a .22 gun?   A

 5     .22?

 6          A      A .22 rifle.

 7          Q      Have you ever shot a larger Caliber

 8     gun?

 9          A      A .25.

10          Q      Anything any bigger than that?

11          A      Not no shotgun.

12          Q      All right.   There's a lot of

13     difference in the sound of a .22 and a shotgun,

14     isn't there, sir?

15          A      I don't know about in that

16     building.

17          Q      Well, I wasn't trying to say a

18     shotgun was shot in there.   But there is a

19     difference in the sound that a .22 and a

20     shotgun makes, isn't there?

21          A      Outside there would, yes.

22          Q      All right.   The shots that you

23     heard -- do you know how many shots you did

24     hear?

25          A      No.
```

```
 1          Q      There was more than one?  Correct?

 2          A      Yeah.

 3          Q      A lot?

 4          A      I don't know how many.

 5          Q      Was there any difference in the

 6   sounds of them?  One lounder than the other?

 7          A      No difference.

 8          Q      None that you could tell?

 9          A      No difference.

10          Q      You don't know how many were fired

11   or any difference in the sound?

12          A      I don't know.

13          Q      Mr. Grimes, you knew that Mrs.

14   Dennis kept the gun in the store, didn't you?

15          A      No, sir.

16          Q      You did not know that?

17          A      Didn't know she had a gun in there.

18          Q      You had never seen her with a gun

19   or talked to her about a gun?

20          A      Not since she was up there, no.

21          Q      What about when she was down at the

22   other place?

23          A      She kept one there.  I had a little

24   .25, and she had a .38, I believe, or something

25   like that.
```

1       Q       What color was it?  Do you recall?

2       A       (Shaking head in the negative).

3       Q       You're shaking your head?  Is that

4   "No"?

5       A       No, sir, I don't know.

6       Q       What color was the gun that the man

7   dressed in black had?

8       A       It looked black to me.

9       Q       Did you get a good look at it?

10      A       Looked down the barrel of it.

11      Q       About that big, probably

12  (indicating)?

13      A       Looked that big.

14      Q       You think it was a black-looking

15  gun, though?

16      A       It was a black-looking gun, yeah.

17      Q       Now, the gun that was on the floor

18  there, was a silver-colored gun, wasn't it?

19      A       I don't know what the one on the

20  floor was.

21      Q       You didn't see that one?

22      A       No.

23      Q       You didn't have a gun, did you?

24      A       No.

25      MR. SMITH:  Thank you, very much.

1    THE COURT: Mr. Jarrell?

2    MR. JARRELL:    Nothing.

3    THE COURT:  That's it.  Okay.

4                        Do you reserve the

5                right to recall this witness?

6    MR. JARRELL:  Yes, sir.

7    THE COURT:  Defense?

8    MR. SMITH:  No, Your Honor.

9    THE COURT:  Thank you.  Mr. Grimes, you

10               can go back and have a seat.

11                    We will start one more

12               witness, and we will break some

13               time within the next 15 or so

14               minutes.

15                    Call your next witness.

16   MR. JARRELL:    Just a moment.

17                    I'm sorry.  Judge, when you

18               said we were going to just do

19               one more witness, we let our

20               other one go.

21   THE COURT:  Okay.  I said we would break

22               within the next 15 minutes.  We

23               are going to break now.  I did

24               tell them that I wanted to

25               finish at least two witnesses

1    today.  So they probably put

2    those witnesses on notice to be

3    here.

4         If you will have other

5    witnesses here tomorrow.  And we

6    will start tomorrow morning at

7    9:00 o'clock.  That will allow

8    y'all to take care of some

9    things at home before you come

10    here and whatnot.

11         Again, the Court is

12    required to instruct you and

13    does instruct you not to discuss

14    this matter among yourselves,

15    nor to allow anyone to discuss

16    it with you.

17         It will not be uncommon

18    for someone who hears that you

19    are on this jury to want to tell

20    you about something that they

21    may know about the matter, or

22    what they know about the people

23    involved or places involved or

24    something like that.

25         For heaven sakes, if

```
 1              that occurs, stop them.  Tell
 2              them you are on the trial jury
 3              of this case, and you are not
 4              allowed to discuss this matter
 5              with them at all.
 6                   If they continue, if
 7              you will please let me know.  I
 8              promise y'all that they will not
 9              be talking to you any more
10              during the course of this
11              trial.
12                   Any questions by the
13              ladies and gentlemen of the jury
14              before we adjourn for the night?
15    MR. SMITH:  Your Honor, may I suggest
16              they might want to leave their
17              notes with the bailiff, just put
18              their names on them.
19    THE COURT:  Everything in your jury room
20              will be secured for you.  And
21              you may leave everything in
22              there tonight.  Nobody will be
23              allowed in that room to go
24              through anything.  But you can
25              leave notes or whatever there.
```

```
 1                    And they will be locked up by

 2                    our Deputy Sheriff, Dennis, in

 3                    the back.

 4                         Anything else?

 5         MR. SMITH:   Nothing, Your Honor.

 6         THE COURT:   Okay.   You are excused for

 7                    the night.

 8                         If everyone remain

 9                    while the jurors exit the

10                    courtroom.

11                    (Jurors exited the courtroom).

12         THE COURT:   Court is adjourned until 9:00

13                    o'clock tomorrow morning.
```

1                     September 25, 2002

2        THE COURT:  This court will come to

3                    order.  Y'all can have a seat,

4                    if you will.

5                         We were a few minutes

6                    late this morning for several

7                    reasons.  One reason is that we

8                    understand that most of you

9                    wanted a note pad to write on,

10                   and it took us a few minutes to

11                   sharpen the pencils.

12                        It has not been many

13                   years in Alabama that jurors

14                   were allowed to take notes.

15                   I've never understood that.  I

16                   understand there was a reason

17                   for that rule.  But, up until

18                   very recently, the last 15

19                   years, jurors were not allowed

20                   to take notes.

21                        And the history of that

22                   rule was not everyone was able

23                   to read and write in this state.

24                   And only recently most people

25                   can read and write.  At one time

1    in this state, the majority of

2    people could not read and write.

3    And people who could, and could

4    take notes, were in a better

5    position to say, "I took notes

6    here," and show the other

7    jurors, and basically place undo

8    influence on other jurors as a

9    result of that.  So we haven't

10   been able to take notes until

11   just recently.  Some Judges in

12   Alabama to this very day will

13   not allow jurors to take notes.

14        I take notes in every

15   case that I have.  And I can't

16   understand why jurors shouldn't

17   be allowed to do likewise.  We

18   take notes so that we can get to

19   the truth of the matter, and you

20   are welcome to do so.

21        However, when you

22   finish with your jury notes, we

23   will get a trash bag and throw

24   everything in it, and secure it,

25   or tear it up, or burn it, or

1                      whatever you want to do.  We

2                      just need to make sure they are

3                      destroyed.

4                      Okay.  Is the State ready to

5                      proceed?

6          MRS. STOUT:  Yes, sir.

7          MR. JARRELL:  Yes, sir.

8          THE COURT:  Is the Defense?

9          MR. SMITH:  Yes, sir, Your Honor.

10         THE COURT:  You may.

11         MR. JARRELL:  Your Honor, we recall Mr.

12                      Ray Grimes to the stand.

13         THE COURT:  Sure.  Mr. Grimes is still

14                      under oath.

15                      REDIRECT EXAMINATION

16  BY MR. JARRELL:

17         Q     Mr. Grimes, yesterday you testified

18  that there were two other gentlemen in the

19  store, besides you and Mrs. Jelaine?

20         A     That's right.

21         Q     Do you recall approximately where

22  they were in the store?

23         A     They were back in the store.

24  Somewhere back in the back.

25         Q     Back in this area (indicating)?

1          A       Yeah.

2          Q       And the other question that I

3    wanted to ask you was:  You said after you got

4    up off the floor and saw that she was injured,

5    you went outside to call for help?  Is that

6    correct?

7          A       That's right.

8          Q       Did you see anyone outside the

9    store when you went out?

10         A       Seen the guy going up the road.

11         Q       The guy going up the road?  How was

12   he dressed?

13         A       Black.

14         Q       And which direction was he going?

15         A       He was going towards the Geneva

16   Highway towards --

17         Q       Highway 27?

18         A       Uh-huh.

19         Q       Which side of the road was he on?

20         A       On the right side.

21         Q       On the same side as the Toy Store?

22         A       That's right.

23         Q       Approximately how far was he away

24   from the store when you saw him?

25         A       A hundred yards.  Might have been a

598

```
 1    little --
 2         Q      Was he walking or running?
 3         A      Well, he was in a fast walk.  I
 4    mean, you know, he was --
 5         Q      Just moving?
 6         A      Moving.
 7         Q      Okay.  When you went outside the
 8    first time to make your call to 911, was that
 9    when the other two individuals came out of the
10    store?
11         A      I believe it was.  I'm not sure.  I
12    went twice.  But it seems like someone was
13    coming out the first time.  I'm not sure about
14    that.  But they come out when I was on the
15    telephone.
16         MR. JARRELL:   Thank you.
17         MR. SMITH:  No questions.
18         THE COURT:  Okay.
19         MR. JARRELL:  You may step down, Mr.
20              Grimes.
21         THE COURT:  Are you reserving the right
22              to recall Mr. Grimes?
23         MR. JARRELL:  Yes, sir.
24         THE COURT:  Thank you, Mr. Grimes.
25         MR. SMITH:  Yes, sir.
```

1          THE COURT:  Call your next witness.

2          MR. JARRELL:  Don Smith.

3          THE COURT:  If you will come around.  And

4                     I'll swear you in.  Raise your

5                     right hand and place your left

6                     hand on the Bible.

7                     DONALD SMITH, JR.

8          Whereupon, this witness, after first

9    being duly sworn to tell the truth, the whole

10   truth, and nothing but the truth, testified as

11   follows, to-wit:

12         THE COURT:  Have a seat, Mr. Smith.  And

13                    you can adjust that microphone.

14                    If you will, speak loud so that

15                    the ladies and gentlemen of the

16                    jury can hear everything that

17                    you have to say.

18                    DIRECT EXAMINATION

19   BY MR. JARRELL:

20         Q     State your name and where you live?

21         A     Donald N. Smith, Jr.  555 County

22   Road 715, Enterprise.

23         Q     Mr. Smith, do you have some sort of

24   a farming operation that would be located on

25   Highway 711?

600

```
1          A      Yes.

2          Q      What kind of operation is that,

3    sir.

4          A      I farm, and I have poultry houses.

5          Q      And those poultry houses, where

6    would they be located in relationship to the

7    Toy Store?

8          A      Almost across the road.

9          Q      And do you have other buildings or

10   barns or anything like that located on that

11   road?

12         A      Yes.

13         Q      Where would they be?

14         A      Just maybe a half mile down the

15   road.

16         Q      Which direction down the road, sir?

17         A      Towards 27.

18         Q      Back towards Geneva Highway?

19         A      Yes.

20         Q      On May 23rd, were you on that

21   Highway 711, somewhere in the noontime or there

22   after?

23         A      Yes.

24         Q      And when you -- where did you go

25   for lunch that day?
```

```
 1          A      Home.

 2          Q      Back on 715?

 3          A      Yes.

 4          Q      When you came back to work, did you

 5   have to come back down Geneva Highway, then on

 6   Highway 27?

 7          A      No, I didn't.

 8          Q      How did you get back towards your

 9   chicken houses?

10          A      We have a cut through from my

11   barnyard to my house.  It's sort of through the

12   field.

13          Q      Does it come out near where the

14   barns are or where the chicken houses are?

15          A      Where my barn is.

16          Q      Did you follow that route that day

17   after lunch?

18          A      Yes, I did.

19          Q      And as you came back from the barn,

20   did you go from the barn then down to the

21   chicken houses?

22          MR. SMITH:  At this point, we request

23                 that the witness not be led.

24          THE COURT:  Sustained.  That question is

25                 leading.
```

002

```
 1          Q      Explain to us, if you will, what

 2    you observed when you came from your barn down

 3    towards the chicken houses?

 4          A      I was going to the chicken houses

 5    from the barn.  I saw two cars, like they had

 6    sort of met, and passed each other a little

 7    bit.  They were sort of still in the road.  I

 8    had to drive between them to go to my chicken

 9    houses.

10          Q      Can you describe those cars?

11          A      One was a light blue big car, and

12    the other one was a small silver car.  I don't

13    know the type.

14          THE COURT:  Light blue and silver?

15          THE WITNESS:  Yes.

16          Q      And did you observe the individuals

17    in the car, if there were any?

18          A      I saw there was one in the blue

19    car, in the light blue car.  A description, I

20    couldn't.  I couldn't.  I didn't pay attention.

21    I saw there were two in the silver car.

22          Q      What appeared to you was going on

23    there?

24          A      Nothing, that they were talking.

25          Q      Conversation between the two?
```

1          A     Not on that trip.  They had passed

2    each other.

3          Q     Okay.

4          A     I had to turn around and come back.

5          Q     You said you went between the cars?

6    Did you go on through?

7          A     Yes.

8          Q     Where did you go?

9          A     To my poultry houses.

10         Q     At any time did you return?

11         A     Yes, I did.

12         Q     Why was that?

13         A     I had to have some tools.  I forgot

14   them.  And I had to come back to my barn to get

15   my tools I needed, I realized.

16         Q     How long after you had gone through

17   the first time that you came back?

18         A     A couple of minutes at the most.

19         Q     In other words, you just got to

20   your barn and realized you didn't have your

21   tools and went back?  Is that right?

22         A     Got to the chicken houses and

23   realized it and came back.

24         Q     To the chicken houses?  And what

25   was going on with the cars at that time?

1        A       At this time they were back beside

2    each other.  And they were leaning out the

3    windows, talking.

4        Q       Where did you go then?

5        A       I went back between them and went

6    to my barn and got my tools.

7        Q       Okay.  Did you stay at the barn

8    very long?

9        A       No.  No, sir.  Grabbed my tools,

10   got right back in my truck within a minute or

11   two and headed back towards my chicken houses.

12       Q       You came back towards the chicken

13   houses?

14       A       Yes, sir.

15       Q       Were the cars still there?

16       A       One of them was.  The little silver

17   car was pulling off.  As I was approaching him

18   he was pulling on out in front of me.

19       Q       Was that the car with two  or one?

20       A       Two were in it.

21       Q       Did you see anyone in the blue car

22   when you passed it?

23       A       No, I did.

24       Q       Did you see anybody get out of

25   either cars?

1          A       No, I didn't.

2          Q       Now, where did the little silver

3     car go?

4          A       He went up the road.   As I turned

5     into my chicken house, I noticed that he pulled

6     into the Toy Store.

7          Q       You say that this was right across

8     the road from the chicken houses?

9          A       Yes, sir.   Almost.   It's within --

10    the driveways are within 50 yards.

11         Q       Did you see anyone get out of those

12    cars?

13         A       I didn't pay attention.   I never

14    looked back up.

15         Q       You just turned back into your

16    driveway?

17         A       Yes, sir.

18         Q       The individuals that you observed

19    in these cars, were they black or white?

20         A       Black.

21         MR. JARRELL:   Your Honor, at this time I

22                 would like to reshow part of

23                 this video and maybe he can

24                 explain from where he saw them.

25         THE COURT:   You can do that.

```
 1                        Ladies and gentlemen of
 2              the jury, so you will know, I
 3              have ruled that the audio
 4              portion of the video is not to
 5              be played to you.  It's obvious
 6              you are going to see at some
 7              point this person, this witness,
 8              or someone else who was talking
 9              in it.
10                        And I've told both
11              sides they can have their
12              witness come and explain to you
13              what they observed at that
14              particular point in time with
15              the video.  And this was just
16              going to be a short segment, the
17              very first part.
18                        If you would like you
19              can step down and go around, and
20              they will lead you down there.
21         MR. JARRELL:  Let me back up just a
22              little bit.
23         Q    Are you familiar with this stretch
24    of highway here?
25         A    Yes, sir.
```

1          Q       What would that be?

2          A       It's Meadow Lawn Cemetery on the

3     right there, appears to be.  I think.

4          Q       If you would, just describe when

5     the car turns here what you are seeing, and how

6     it relates to your testimony of your property?

7          A       That's County Road 711.

8          MR. SMITH:   Could we ask the witness to

9                   speak up, Your Honor?

10         A       This is County Road 711.  It's just

11    turning on the right, that driveway there, and

12    this next driveway is the driveway into my

13    barnyard, headed towards my chicken houses.

14                 This curve right in here is about

15    where I saw the two vehicles, right in this

16    area here.  Right in this curve.

17         Q       And I'm going to move it on down

18    here for just a minute.

19         A       Those are my poultry houses there

20    on the right.  And there is the driveway to

21    them.

22         Q       So from that curve, down to the

23    driveway, here where it turns into the Toy

24    Store, approximately how far would that be?

25         A       I'm not sure.  A couple hundred

1    yards, maybe, from that curve to the driveway.

2    Maybe 300 yards back up there.

3         THE COURT:  You can scoot your chair up

4                    just a little bit so the jurors

5                    can hear you.

6         MR. JARRELL:   Your witness.

7         THE COURT:  Mr. Bradshaw.

8         MR. BRADSHAW:  We want to retrieve the

9                    dry erase board that was taken

10                   out on wheels.

11        MR. JARRELL:   Gary, excuse me.  Are you

12                   going to use that?  Do you need

13                   the video?

14        MR. BRADSHAW:  No.  We can get that out

15                   of the way.

16                   CROSS EXAMINATION

17   BY MR. BRADSHAW:

18        Q    Donald, I'm Gary Bradshaw.  I'm one

19   of the attorneys for Mr. Robert Conrad.  I

20   think you and I know each other?

21        A    We do.

22        Q    And I apologize for having to do

23   this, but I'm a picture person.  And I just

24   want to get something in my mind about where

25   you were.  And I appreciate you doing that on

1    the video.

2        A    Yes, sir.  I can't see it.  Do I

3    need to step down?

4        Q    You can.  And I'm just going to ask

5    you to look at it in just a minute to see if

6    it's right.

7        A    Yes.

8        Q    Would you step down here for me?

9    Let me get out of the way of the jurors.

10   What I'm trying to draw you or show you to get

11   a picture in my mind of County Road 711, and I

12   know back down here there is a driveway for

13   your barn or actually two driveways, were there

14   not?

15       A    Yes, sir.

16       Q    And your poultry houses -- the

17   driveway is 50, 60, 70 yards, which would be

18   east, or excuse me, west of the Toy Store

19   driveway, would it not?

20       A    Correct.

21       Q    Okay.  I've got my bearings right.

22   These poultry houses, are they -- when you turn

23   into them, do you have to come back this way to

24   get to them?

25       A    Yes.

1          Q      So they are not over here, more

2     like this?

3          A      Well, this way.

4          Q      This way.  Okay.  That's right.

5     The poultry company makes you run them east

6     and west?

7          A      Yes, sir.

8          Q      At any time did you see any

9     individuals out of the vehicles?

10         A      No, sir.  I don't think I did.

11         Q      Did you, and you said that you

12    couldn't recognize them?

13         A      No, sir.

14         Q      And you actually, you remember

15    telling Officer Spence that you couldn't even

16    tell if the second person in the silver car was

17    male or female?

18         A      That's correct.

19         Q      And was there something about the

20    tint on the silver car that kept you from

21    seeing if anybody was in the back?

22         A      That's correct.  The best I can

23    remember, the windows were tinted.

24         Q      On your trip down here, and then on

25    your trip back to get your tools, and the third

1    time coming back by, did you see these vehicles

2    at any other time?

3         A      I don't understand the question.

4         Q      From what I understand you were

5    telling, you were coming back from lunch, or

6    coming back from somewhere, and to your chicken

7    houses?  And that was one pass through this

8    curve?

9         A      Right.

10        Q      Got your tools?  That's the second

11   pass?

12        A      Right.

13        Q      Got your tools, that's the third

14   pass?

15        A      Right.

16        Q      And you saw these vehicles on each

17   time?

18        A      Right.

19        Q      And where you saw them setting,

20   would you have had visual contact with the Toy

21   Store?  Or would it have been too far away?

22        A      It would be around the curve.

23        Q      Around the curve.  So you couldn't

24   have gotten out of your truck and said, "Oh.

25   There's the Toy Store"?

1      A     No.

2      Q     Did you see them anywhere else,

3  again, other than that spot?

4      A     No, sir.

5      Q     You said in that statement that you

6  came up right behind them and followed the

7  silver car?

8      A     Correct.

9      Q     Where did they go?

10     A     To the store.  The Toy Store.

11     Q     You saw them up close?  And you

12  could see them turn in, couldn't you, sir?

13     A     Yes, sir.

14     Q     You turned on into your chicken

15  houses?

16     A     Right.

17     Q     And that was it?  You didn't

18  recognize anybody?

19     A     No, sir.

20     Q     Couldn't tell if it was male or

21  female?

22     A     Two of them, I knew were male.

23     Q     Male. Okay.  And you couldn't tell

24  if there was four or five or if somebody was in

25  the back seat of that silver car?

613

```
1            A      No, sir.

2            Q      What was the weather like that day,

3   if you remember?

4            A      I don't remember.

5            MR. BRADSHAW:  Thank you.  No other

6                   questions.

7            THE COURT:  Mr. Jarrell?

8                   REDIRECT EXAMINATION

9   BY MR. JARRELL:

10           Q      Mr. Smith, when you observed the

11  two cars, and you described one of them as

12  being a big car?

13           A      Yes, sir.  Correct.

14           Q      Was there anything about that car

15  that caught your attention, that was unusual?

16           A      I remember it having a dent in the

17  front of it.

18           Q      Did that cause you any particular

19  -- I mean, why did that stand out to you?

20           A      Well, when I really saw them, when

21  I was coming from my barn, the way they were, I

22  didn't know but what they may have had a wreck

23  or something, I guess, is why, when I first got

24  to them is really the only reason I paid any

25  attention to them at all.
```

1          But as I got closer, I realized it

2    wasn't a fresh dent or scrap; that they were

3    just talking.

4          Q    I'm going to show you what's been

5    marked as State's Exhibit 17 and ask if you can

6    identify that, sir?

7          A    Yes, sir.  I would say that's it.

8          Q    Is this the car that you saw on

9    that date?

10         A    Yes, sir.

11         Q    Does it accurately depict the dent

12   and all that you saw?

13         A    Yes, sir.

14         MR. JARRELL:  We offer State's Exhibit

15              No. 17.

16         MR. SMITH:  No objection.

17         THE COURT:  It's in evidence, and you may

18              publish it to the jury.

19         MR. JARRELL:  That's all.

20         MR. BRADSHAW:  Nothing further.

21         THE COURT:  Is there any reason that

22              Mr. Smith should not be excused?

23         MR. JARRELL:  You can be excused.

24         THE COURT:  None from the State?

25         MR. SMITH:  Nothing further.

615

```
 1            THE COURT:  Call your next witness.
 2        MR. SMITH:  Judge, can we ask the deputy
 3                to move the eraser board out of
 4                the way?
 5        THE COURT:  Sure.
 6        MR. JARRELL:  I may use that.
 7        MR. SMITH:  Oh.  I'm sorry.  That's fine.
 8        THE COURT:  Sheriff, they are changing
 9                their minds.
10        MR. JARRELL:  Eric.
11        THE COURT:  If you will raise your right
12                hand, please, sir, and place
13                your left hand on the Bible.
14                    ERIC KORMYLO
15        Whereupon, this witness, after first
16    being duly sworn to tell the truth, the whole
17    truth, and nothing but the truth, testified as
18    follows, to-wit:
19                DIRECT EXAMINATION
20    BY MR. JARRELL:
21            THE COURT:  Have a seat, please, sir.  If
22                you will, speak into that
23                microphone so that the ladies
24                and gentlemen of the jury can
25                hear you.
```

1          Q       State your name, sir, and where

2    you live.

3          A       I'm Eric Kormylo, live at 662

4    County Road 711.

5          Q       Would you spell that last name for

6    the court reporters?

7          A       K-O-R-M-Y-L.

8          Q       Thank you.  And if I mispronounce

9    your name, excuse me.  Is it all right if I

10   call you Eric?

11         A       That'll be fine.

12         Q       Eric, on May the 23rd, some time

13   around the noontime, mid day --

14         THE COURT:  Of what year?

15         MR. JARRELL:  Of 2001.  Excuse me.

16         Q       Do you recall there being an

17   incident that occurred down at the Toy Store?

18         A       Yes, sir.

19         Q       And on that day, did you see

20   anything unusual or going on, around, about

21   that time, that came to your attention?

22         A       Yes, sir.

23         Q       What first brought it to your

24   attention?

25         A       I was down -- I have a shop down

```
 1    behind my house.  And I was back there working
 2    with a friend of mine and heard a popping
 3    sound, about three or four.  And I didn't think
 4    anything about it, because Jelaine's boyfriend
 5    was always up there working on that tin
 6    building.
 7              And a couple of seconds later, I
 8    seen a black male running towards Highway 27.
 9    And that was the first indication that
10    something wasn't just quite right.
11        Q     All right.  And if you would,
12    please step down here.  And I hate to do this.
13    But Mr. Bradshaw just drew a little diagram
14    here on the board.
15         THE COURT:  Mr. Jarrell, would it be
16                   possible if you could come stand
17                   next to him, so that the jurors
18                   can see?
19         MR. JARRELL:    Sure.  Can everybody see?
20        Q     And he pointed out the Toy Store
21    being here and Mr. Smith's chicken houses down
22    here.  Does that somewhat depict the curve in
23    the roadway and all to the best of your
24    recollection?
25        A     Yes, sir.  This is just a little
```

1    longer distance.  This is my driveway.

2         Q    Here Mr. Smith indicated this is

3    his driveway not your driveway.

4         A    Yes, sir.

5         Q    So yours is maybe more up front

6    here?

7         A    Their driveway is right across from

8    mine.

9         Q    Would it be fair to say that your

10   driveway is here?

11        A    Yes, sir.

12        Q    And you have a shop over here?

13        A    Yes, sir.

14        Q    And you were in the shop?

15        A    Yes, sir.

16        Q    And you heard the popping sound?

17        A    Yes, sir.

18        Q    What did you do when you heard the

19   popping sound?

20        A    I looked at my friend, and said,

21   "Something's not right."

22             We were on our way to lunch.  We

23   got in his truck, went this way, out the

24   driveway.  I seen a black male running between

25   these two driveways.

1              And we took a left and went all the

2    way to the curve, still couldn't see him

3    running.  So we turned around and went back.

4         Q     Went back to the Toy Store?

5         A     Yes, sir.

6         Q     What did you observe when you went

7    into the Toy Store?

8         A     Mr. Grimes was on the phone at the

9    time.  And I asked if everything was all right.

10   And he said that Jelaine has been shot.

11        MR. SMITH:  Objection.

12        THE COURT:  Sustained.

13        Q     Don't tell me what Mr. Grimes said.

14   Tell me what you observed when you went into

15   the Toy Store?

16        A     I opened the door and --

17        THE COURT:  Are you going to need him

18             there, Larry?

19        MR. JARRELL:  Excuse me?

20        THE COURT:  Are you going to need him

21             there?

22        MR. JARRELL:  Let me backup, and I will

23             ask him another question.  Then

24             he can move back.

25        Q     You said that you saw a black man

```
 1   running?

 2          A       Yes, sir.

 3          Q       Where did he run through?

 4          A       He was running between my driveway

 5   and this driveway on this side of the road.

 6          Q       Where did he go from there?

 7          A       I didn't see.

 8          Q       Did you later on meet a police car

 9   in this area here?

10          A       Yes, sir.

11          Q       And did you see any vehicles in

12   that area?

13          A       No, sir.

14          MR. JARRELL:  All right.  Thank you.  You

15          can have a seat.

16          Q       Back to my question about what you

17   observed when you went into the Toy Store.

18          A       I opened the door.  And there was a

19   counter to the left, a short counter.  And I

20   went around the counter.  Jelaine was curled up

21   in a ball behind the counter.

22                  And she was crying.  And I knew

23   there was nothing I could do.  And I could hear

24   sirens in the background.  And I told her to

25   lay there.
```

1      Q      Did you leave from there?

2      A      Yes, sir.  As soon as the ambulance

3   got there, I went back outside.

4      Q      Where did you go?  Did you go on to

5   lunch?

6      A      No.  The police officers ask if we

7   had seen anything.  And originally I guess they

8   thought at that time --

9      MR. SMITH:  Objection to what somebody

10                    else thought.

11      THE COURT:  Sustained.

12      Q      Did he -- don't talk about

13   conversations between you and police officer,

14   other than the fact they kept you there.

15      A      Yes, sir.

16      MR. JARRELL:   Your witness.

17      THE COURT:  Mr. Bradshaw?

18                  CROSS EXAMINATION

19   BY MR. BRADSHAW:

20      Q      Is it all right if I call you Eric

21   also.

22      A      That's fine.

23      Q      I tried for awhile to learn your

24   last file.  Eric, my name is Gary Bradshaw.

25   And I represent Robert Conrad, along with Al

1    Smith.

2               Do you remember giving a written

3    statement to police officers about where your

4    driveway was, and about what you saw that day?

5        A    Yes, sir.

6        Q    On the diagram you are showing this

7    Court and this jury that your driveway is

8    directly across?  In other words, you could

9    drive by the Toy Store's driveway and go

10   straight into yours?

11       A    Yes, sir.

12       Q    Let me show you a report that

13   Detective Spence did with you.  Is that your

14   drawing or his drawing?

15       A    That's his drawings.

16       Q    His drawings.  Okay.  So he has it

17   wrong when he has your driveway west of his?

18       A    Yes, sir.

19       Q    Is your barn -- when you turn into

20   your driveway, how far off County Road 711 is

21   your barn?

22       A    Seventy-five yards.

23       Q    Seventy-five yards?  Is it on the

24   same level with the highway?  Or does it down

25   in a bottom?

```
 1        A      It's down in a bottom.  You would
 2   be looking up to it from my shop.
 3        Q      Can you see the Toy Store?
 4        A      No, sir.
 5        Q      It's too far down in the bottom, or
 6   are there trees?
 7        A      There's trees to the right.  And
 8   you can't see the store.
 9        Q      Is the only thing that you can see
10   the tunnel of your driveway?
11        A      Basically -- from?
12        Q      From your barn I'm talking about?
13        A      Right.  It's from my driveway to
14   Donald's chicken houses, is what I can see, to
15   the front of the corner there.
16        Q      Okay.  When you heard that sound,
17   had you guys been there working all day?
18        A      Yes, sir.
19        Q      Had you just come back from lunch?
20   Mr. Smith was telling us that he had just taken
21   a lunch break.
22        A      We were going to lunch.  We hadn't
23   been to lunch, yet.
24        Q      Okay.  You remember, you described
25   there was a tapping sound that you thought was
```

```
 1    a hammer?  And you said that Jelaine's

 2    boyfriend often worked on that metal building.

 3    Do you know how many sounds you heard?

 4         A     Three or four.

 5         Q     Have you ever fired a gun?

 6         A     Yes, sir.

 7         Q     The three or four that you heard,

 8    were they all the same pitch or loudness?  Or

 9    were there any difference in them?

10         A     It sounded the same.

11         Q     All sounded the same to you?

12         A     Yes, sir.

13         Q     I think you answered this when you

14    said that you saw -- there was a black male,

15    you said?

16         A     Yes, sir.

17         Q     And you are how far away?

18         A     Seventy-five yards.

19         Q     Seventy-five yards.  And you

20    described in your written statement or

21    transcribed statement that you couldn't see the

22    whole person?  How much of him could you see?

23         A     About the waist up.

24         Q     About the waist up?  Was he on the

25    south side or north side of the road?
```

```
 1          A      He was on this side, the side

 2    closest to my driveway.

 3          Q      Which means, if he had come from

 4    the Toy Store, he would have crossed the road?

 5          A      Yes, sir.

 6          Q      When you left, did you see a blue,

 7    a light blue, LTD parked on the side of the

 8    road?

 9          A      I didn't see any vehicles.

10          Q      You didn't see any vehicles?  From

11    where you were, are you sure that this

12    individual was on the south side of 711?

13          A      I'm not positive.

14          Q      Not positive.  From seeing him from

15    only the waist up, does County Road 711 have a

16    crest in it?

17          A      It's pretty flat.

18          Q      Pretty flat.  But you couldn't tell

19    from seeing from the waist up, you couldn't

20    describe him to anybody?

21          A      No, sir.

22          Q      You couldn't tell how he was

23    dressed?

24          A      No, sir.

25          Q      But you are sure it was a black
```

626

```
 1    person?
 2           A      Yes, sir.
 3           Q      Are you sure it was a male?
 4           A      I couldn't tell from that far away.
 5           Q      Right.  But you knew it wasn't a
 6    pale, white man?
 7           A      No, sir.
 8           MR. BRADSHAW:  Thank you.  No other
 9                  questions.
10           THE COURT:  Mr. Jarrell.
11                  REDIRECT EXAMINATION
12    BY MR. JARRELL:
13           Q      Eric, if I understood your
14    testimony just then, you are not sure whether
15    he was on the south side or the north side of
16    the road?
17           A      No, sir.  I mean --
18           Q      So he could have been on the other
19    side?
20           A      He could have been on the other
21    side of the street.
22           Q      And Gary has erased the drawing
23    here, but I showed you a curve?
24           A      Yes, sir.
25           Q      Can you see beyond that curve from
```

1    your vantage point, where you were when you saw

2    the black man run?

3           A     No, sir.

4           Q     So you don't know whether or not

5    there was a car down there or not?

6           A     No, sir.

7           MR. JARRELL:    Thank you.

8           THE COURT:  Mr. Bradshaw?

9           MR. BRADSHAW:  Nothing further.

10          THE COURT:  Is there any reason this

11                    witness should not be excused by

12                    the State?

13          MR. JARRELL:    No, sir.

14          THE COURT:  By the defense?

15          MR. SMITH:  No, sir.

16          THE COURT:  You are excused.

17                    Thank you.

18                    Call your next witness.  Who

19                is your next witness?

20          MR. JARRELL:    Michael Petty.

21          THE COURT: Officer Petty, if you will

22                    come around, and I will swear

23                    you in.  If you will, raise your

24                    right hand and place your left

25                    hand on the Bible.

<u>MICHAEL PETTY</u>

1

2          Whereupon, this witness, after first

3     being duly sworn to tell the truth, the whole

4     truth, and nothing but the truth, testified as

5     follows, to-wit:

6              <u>DIRECT EXAMINATION</u>

7     BY MR. JARRELL:

8          THE COURT:  Have a seat, Officer Petty,

9                 and speak into the microphone,

10                if you will.

11         Q     State your name, sir, and what you

12    do for a living.

13         A     Michael Petty.  I'm an Enterprise

14    police, police officer.

15         Q     On May 23rd 2001, some time right

16    after 1:00 o'clock, where were you?

17         A     I was working in a special detail

18    at Enterprise Jr. High School.

19         Q     And where's that located?

20         A     Off of College Street.

21         Q     Did you hear a radio call

22    concerning something going on out on County

23    Road 711?

24         A     Yes.

25         Q     What did you do in response to

1    that?

2         A    I left my special detail due to the

3    nature of the call being a robbery and a

4    shooting.  And I left, going down Dawster

5    Street, Towards Geneva Highway, which is 27

6    South.

7         Q    Did you get on Geneva Highway?

8         A    Yes, sir.

9         Q    I want to show you what's been

10   marked as State's Exhibit No. 17 and ask you if

11   you can identify that picture?

12        A    Yes, sir.  That was the vehicle

13   that I passed on 27 South, approximately near

14   the area of the Masonic Lodge, is on 27, close

15   to Good-To-Go Gas Station.

16        Q    Was there anything that brought

17   that to your attention?

18        A    That had been a construction area.

19   And the vehicle was running at an un-normal

20   speed in the area, which due to construction I

21   had slowed down.  And they were doing

22   construction on the right-hand side, which is

23   the southbound side of 27.

24        Q    What do you mean buy un-normal

25   speed?

1          A      They were, the car -- everybody

2     else was driving slow due to the construction

3     area.  And this vehicle was driving unusually,

4     kind of fast, past.  But it was unknown how

5     fast it was going.

6          Q      Have you seen that vehicle before?

7          A      Yes, sir.

8          Q      Did you recognize it at that time?

9          A      Yes, sir.

10         Q      And whose did you recognize that to

11    be?

12         A      I recognized the vehicle as dealing

13    with -- unknown the owner of the vehicle.  I've

14    answered several calls due to this vehicle

15    being involved in different things as a suspect

16    vehicle on different calls in my area, which is

17    the area that I work.

18         MR. JARRELL:   Your witness.

19                CROSS EXAMINATION

20    MR. BRADSHAW:

21         Q      You recognize that vehicle

22    belonging to Brian Smith, don't you, Officer

23    Petty?

24         A      Yes, sir.

25         Q      His mother, Fay Smith?

1        A        I don't know his mother, sir.

2        Q        You know Brian Smith?

3        A        No, sir, I do not know him

4    personally.

5        Q        You don't know him personally?

6        A        Just in association with the

7    vehicle.   Like I said, as far as having dealing

8    with that vehicle as being suspect vehicles,

9    and different types of activities going on in

10   the area, where I worked.

11       Q        And you normally knew it to be

12   driven by Brian Smith, didn't you?

13       A        No, sir.  Unknown who drives the

14   vehicle; never seen any particular person

15   driving the vehicle.  Just like I said, just

16   associated with.

17       Q        Do you know why Officer Jeff Spence

18   would put an affidavit to this Court that you

19   knew that vehicle to be a vehicle normally

20   driven by black male, Brian Smith?  And this

21   Court would sign a search warrant?

22       MRS. STOUT:  Objection as to what Jeff

23              Spence put in that affidavit.

24       THE COURT:  Objection is overruled.  Do

25              you know of any reason why an

1           officer would say that?

2     THE WITNESS:   No, sir.

3     MR. BRADSHAW:    Thank you.

4     THE COURT:   I will get into the record

5           the reason for my ruling.  The

6           test for that is the totality of

7           the circumstances.

8                The Alabama Supreme

9           Court of the United States looks

10          at the totality of the

11          circumstances.  You put all of

12          the law enforcement officers

13          together for that purpose.

14    MR. SMITH:  May it please the Court, we

15          are not challenging that.  We

16          just for recollection --

17    THE COURT:   I understand that.  For

18          future purposes of establishing

19          that before a Judge.

20     Q     Officer Petty, when you said that

21   was an unusual rate of speed, would it have

22   been over the speed limit that you observed

23   this speed limit going?

24     A     No, sir, not over the speed limit.

25     Q     It wasn't speeding then?  You said

1    there was construction in the southbound lane?

2         A    Yes, sir.  And there were

3    construction signs on both sides of the

4    roadway.

5         Q    Did you have an occasion a few days

6    after this, maybe as much as a week or so up

7    there to participate in a search of Bryan

8    Yoeman's apartment?

9         A    No, sir.

10        Q    You were not part of that search?

11        A    No, sir.

12        MR. BRADSHAW:  Nothing further.

13        MR. JARRELL:  Nothing further.

14        THE COURT:  Do you release this witness?

15        MR. JARRELL:  Yes, sir.  Is the witness

16                  subject to recall by the

17                  Defense?

18        MR. SMITH:  Yes, Your Honor.

19        THE COURT:  Yes?  Okay.

20        MR. SMITH:  We certainly don't ask him to

21                  be at the courthouse, just

22                  available on an hour's notice.

23        THE COURT:  That's fine.  Call your next

24                  witness.

25        MRS. STOUT:  The State calls Rick Hauser.

```
 1          THE COURT:  This will be our last witness
 2                    before we take a break.  We may
 3                    not finish.
 4      MR. JARRELL:  This is going to be a long
 5                    witness, Judge.
 6          THE COURT:  We will take a break shortly
 7                    after we swear him in and hear a
 8                    little from him.
 9                            We are well ahead of
10                    schedule all just to let you
11                    know.  We are moving very
12                    rapidly through the witnesses.
13                    It could be possible that we
14                    finish the State's case today.
15                    It's possible.
16                            Just to let you know,
17                    and I'm sure the attorneys don't
18                    mind me letting you know, there
19                    is a physician.
20      MRS. STOUT:  Yes, Your Honor.  And she
21                    has testified at three different
22                    courthouses today.  So we will
23                    be dependent on when we can get
24                    her here.  And that's three
25                    different courthouses around the
```

```
 1                          State.
 2        MR. JARRELL:  They have to move several
 3                 pieces in, Judge.
 4        THE COURT:  Okay.  I tell you what, we
 5                 will just take a break now.
 6                 That will give y'all a chance to
 7                 bring that in.
 8        MRS. STOUT:  Yes, Your Honor.
 9        THE COURT:  We will take a break for
10                 about five minutes.
11                      Again, ladies and
12                 gentlemen of the jury, the Court
13                 is required to instruct you and
14                 does instruct you not to discuss
15                 this matter among yourselves,
16                 nor allow anyone to discuss it
17                 with you.
18                      Take at least ten
19                 minutes.  If any of you need
20                 longer, we will wait until all
21                 of you are ready to come back to
22                 the jury box.
23                      If everyone will remain
24                 while the jurors exit the
25                 courtroom.
```

1           (Jurors exited the courtroom).

2      THE COURT:  This Court is in recess for

3              at least ten minutes.

4           (A short recess was taken).

5      THE COURT:  One of the jurors is not

6              feeling well right now.  We will

7              give her a few more minutes.

8           (A short break was taken).

9      THE COURT:  I've had them move the easel

10             around so you could see a little

11             bit better.

12             Who is your next witness?

13     MRS. STOUT:  Sergent Hauser.

14     THE COURT:  If you will raise your right

15             hand and place your left hand on

16             the Bible.

17

18

19

20

21

22

23

24

25

<u>SERGENT HAUSER</u>

1

2          Whereupon, this witness, after first

3     being duly sworn to tell the truth, the whole

4     truth, and nothing but the truth, testified as

5     follows, to-wit:

6                    <u>DIRECT EXAMINATION</u>

7     <u>BY MRS.  STOUT:</u>

8          THE COURT:  One other thing, ladies and

9                    gentlemen, just so you will know

10                   the order that we are going to

11                   take things.  I have told the

12                   State and the Defendant there is

13                   one doctor that is going to

14                   testify.  He is at the emergency

15                   room right now.  We are going to

16                   have to work around him.

17                        The State is going to

18                   call some witnesses basically

19                   out of turn.  They normally

20                   would call that physician to

21                   come testify.  But he is stuck

22                   at the emergency room right now.

23                   And it will be after lunch

24                   before he can be called.  So we

25                   are going to work around that.

```
 1                    We might take an early lunch, if
 2                we get to a point where we have
 3                to have that particular
 4                individual as the only witness
 5                left by the State.  So we will
 6                see.
 7                    Go ahead.
 8        Q       Tell the ladies and gentlemen of
 9   the jury who you are?
10        A       My name is Richard L. Hauser.  I'm
11   a criminal investigator with the Enterprise
12   Police Department.
13        Q       How long have you been with the
14   Enterprise Police Department?
15        A       Almost nine years.
16        Q       And prior to coming to work with
17   the Enterprise Police Department, where were
18   you employed?
19        A       With the United States Army.
20        Q       And while you were employed with
21   the United States Army, what did you do?
22        A       I was an air-traffic controller.
23        Q       Upon entering the Enterprise or
24   police work, law enforcement, did you go
25   through several training courses and that kind
```

639

1     of thing to prepare you to enter the law

2     enforcement field?

3          A     Yes, ma'am.  I was hired by the

4     Enterprise Police Department in November of

5     '93, as a recruit officer.

6                I attended the Southeast Alabama

7     Police Academy.  I graduated from that.  I

8     worked my way through patrol division as a FTO.

9          Q     What is FTO?

10         A     Field training officer.

11         Q     Okay.

12         A     And in December of 1996, I was

13    assigned to the criminal investigations

14    division.

15         Q     You have been in the criminal

16    investigations division every since?  Is that

17    correct?

18         A     Yes, ma'am.  I am currently the

19    supervisor of criminal investigations.

20         Q     You are now a sergeant?  Is that

21    correct?

22         A     That's correct.

23         Q     Sergeant Hauser, you have also had

24    some special training in gathering evidence?

25    Is that correct?  At crime scenes?

840

```
 1        A      Yes, ma'am.  I have attended at

 2   least two crime scene investigation courses.

 3   One at the Northeast Alabama University,

 4   Jackson University, and recently one in Biloxi,

 5   Mississippi.

 6        Q      Sergeant Hauser, back on May the

 7   23rd of 2001, you were working with the

 8   Enterprise Police Department as a criminal

 9   investigator?  Is that correct?

10        A      That's correct.

11        Q      And on that date, were you called

12   to a scene at the Toy Store at County Road 711?

13        A      I was.

14        Q      And for what purpose were you

15   called to that scene?

16        A      At the same time I was assigned to

17   the department's crime scene investigations

18   technician.  And I was requested to bring my

19   equipment and crime scene ban to that location

20   to process the scene.

21        Q      And did do you that?

22        A      I did.

23        Q      Do you recall approximately what

24   time you arrived at the scene?

25        A      I'd say approximately 1400, 2:00
```

1    o'clock in the afternoon.

2         Q      When you arrived, who had secured

3    that scene for you?

4         A      Officer Louis Darby.

5         Q      And did he hold that scene until

6    you arrived?

7         A      That's correct.

8         Q      When you say that you began to

9    process the scene --

10        THE COURT:  Excuse me just a minute?

11        JUROR:  I'm going to need to take a

12             break.

13        THE COURT:  Go right ahead.  If y'all

14             would like to stand and stretch

15             a minute, feel free to do so.

16                  This Court will come

17             back to order.  One of our

18             jurors is very sick, and the

19             Court is going to excuse her

20             from service.  Okay.  We will go

21             on.  You may continue.

22        Q      (By Mrs. Stout) Sergeant Hauser, I

23    believe I had asked you, what process do you go

24    through when you are processing a scene?  What

25    is the first thing that you do when you arrive

1    on a scene?

2        A    Obviously, the scene is secure.

3    And we are basically, or I was basically given

4    a brief scenario of what was known at the time

5    that there was --

6        MR. SMITH:  Objection.

7        THE COURT:  Did you say object?

8        MR. SMITH:  Yes, Your Honor.  Hearsay.

9        THE COURT:  Is this officer offering this

10                for the truthfulness of the

11                matter asserted?

12        MRS. STOUT:  No.

13        THE COURT:  Objection is overruled.

14        MRS. STOUT:  Yes, sir.

15        A    I was briefed by the officers on

16    the scene as to what had allegedly happened;

17    that there was a supposed robbery; that the

18    victim had been shot; and that she had been

19    taken to medical center; that her prognosis was

20    very bad.

21            I was escorted through the scene

22    and basically shown highlights on areas of

23    evidence that was brought to my attention.  In

24    normal instances like this, as crime scene

25    investigator, the officer would walk me through

1    the scene, highlight the areas that they wanted

2    me to be sure I saw the evidence for collection

3    purposes.

4              And in process like this, there is

5    a very basic outline.  Obviously, we go through

6    a video-taping process.  In this case, Officer

7    Darby told me that a video tape was done.  That

8    was handed over to me.  Therefore, I did not

9    have to conduct or do a video of the scene.

10             Photograph work is very expensive.

11   35-millimeter digital photography work was

12   completed.

13             Again, all areas of evidence

14   highlighted were marked in accordance with

15   normal procedures, the yellow markers.

16        Q    Was that the yellow markers?

17        A    In cases like this, we go through,

18   and we photograph the evidence as we see it,

19   and then, we come back through, again.  And it

20   will be highlighted with numbers, utilizing the

21   numbers system.  And, again, it will be

22   photographed.

23             Finally, the evidence is collected,

24   bagged up, sealed up.  And the final process is

25   normally a fingerprinting of most of the scene.

```
 1          Q      And that takes some period of time

 2   at a scene like this?  Would that be a true

 3   statement?

 4          A      That's correct.

 5          Q      Now, did you have anyone, or were

 6   you the lead investigator that was processing

 7   the scene?

 8          A      Yes, ma'am.  Myself, and Detective

 9   Ammons was present, and he assisted me in the

10   process.

11          Q      He assisted you?

12          A      That's correct.

13          Q      But did you collect the evidence?

14          A      I collected the evidence, yes.

15          Q      What was the first -- after you had

16   gone through the photographing and the assuring

17   that it had been secured, now tell the ladies

18   and gentlemen of the jury, if you would, how

19   you made sure the scene would have been secure?

20          A      Again, there was an armed officer

21   present at the time Officer Darby -- he had

22   already taped off the scene, and the yellow

23   crime scene tape was around the entire

24   building.

25                 And access to the scene was
```

```
 1   controlled, very controlled.  There was nobody,

 2   basically, other than police officers.  And,

 3   obviously, the chain of command in the police

 4   department was allowed on the scene.

 5        Q    Okay.  Now, the first thing that

 6   you did to start processing the scene, to

 7   actually go in there and process what you saw

 8   in there, would have been what?

 9        A    I started with my photography work.

10        Q    With your photography work?

11        A    That's correct.

12        Q    Now, I'm going to show you some

13   items that have been marked.  And I'm going to

14   ask if you can identify these particular items

15   First, State's Exhibit No. 15?

16        A    Yes.

17        Q    And how can you identify State's

18   Exhibit No. 15?

19        A    I took the photograph.  I remember.

20   That's my screwdriver in the photograph.

21        Q    Why did you use a screw driver in

22   your photograph?

23        A    It highlights and points to the

24   projectile.

25        Q    And was that something that you
```

1   found initially, or that you had to go back and

2   look for?

3       A    I had to go back and look for that

4   later.

5       Q    Okay.  This photograph was not

6   initially taken?  Would that be a true

7   statement?

8       A    That's correct.

9       Q    But, does this photograph fairly

10  and accurately depict what you went back and

11  looked for at a later time?

12      A    Yes, it does.

13      MRS. STOUT:  We would offer State's

14          Exhibit No. 15.

15      THE COURT:  Any objection?

16      MRS. SMITH:  No objection.

17      THE COURT:  It's in evidence.  You may

18          publish it to the jury.

19      MRS. STOUT:  Thank you, Your Honor.

20      Q    Let me show you State's Exhibit

21  No. 16, and ask if you recognize State's

22  Exhibit No. 16?

23      A    I do.

24      Q    And what do you recognize State's

25  Exhibit No. 16 to be?

1    A    I recognize that as the floor

2    covering and the store carpeting and the matter

3    area.

4    Q    Again, this was not one of those

5    initial photographs that you took?  Is that

6    correct?

7    A    That's correct.

8    Q    When did you take this photographs?

9    A    This photograph was probably taken

10    the day or so later.

11    Q    Why did you come back and take

12    pictures or look for further evidence?

13    A    At the time, we had a -- the scene

14    indicated that possibly some type of gun battle

15    or a shooting had taken place.  Initial

16    evidence indicated that there were six

17    cartridges laying on the floor of the Toy

18    Store.

19    We had to account for all of the

20    projectiles.  And that's what I had to do.

21    Q    And is that what this exhibit,

22    State's Exhibit No. 16 represents?

23    A    Yes, ma'am.

24    Q    Okay.  Does this fairly and

25    accurately depict that projectile as you found

648

1    it on the following day?

2         A    It does.

3         MRS. STOUT:  We offer State's Exhibit No.

4              16.

5         MR. SMITH:  No objection.

6         THE COURT:  It's in evidence.  You may

7              publish it.

8         Q    State's Exhibit No. 18, I ask if

9    you recognize it?

10        A    I do.

11        Q    What do you recognize State's

12   Exhibit No. 18 to be?

13        A    This is the area behind the

14   register of the Toy Store, in which we found,

15   as you can see from the photograph, a bloody

16   rag, and towels, and some other items that were

17   laying on the floor.

18        Q    And does this photograph fairly and

19   accurately depict the scene as you saw it when

20   you entered it, and begin to process the scene

21   on May the 23rd of 2001?

22        A    It does.

23        MRS. STOUT:  We offer State's Exhibit

24   No. 18.

25        THE COURT:  Any objection?

1          MR. SMITH:  We object to the prejudicial

2                     effect; outweighs the probative

3                     value.

4          THE COURT:  The objection is overruled.

5                     It's in evidence.  You may

6                     publish it.  The Court finds

7                     that probative value outweighs

8                     any prejudicial affect.

9          Q     I ask you to look as State's

10    Exhibit No. 19 and ask you if you can identify

11    State's Exhibit No. 19?

12         A     I do.  I can.

13         Q     And how can you identify State's

14    Exhibit No. 19?

15         A     Again, this is my hammer laying

16    here on the -- next to the cash register.

17         Q     And when did you take this picture

18    of State's Exhibit No. 19?

19         A     It was taken on the 23rd.

20         Q     During the time that you were

21    processing the scene?

22         A     Correct.

23         Q     And does this picture fairly and

24    accurately depict the scene as you saw it on

25    May the 23rd, 2001?

650

1        A        It depicts the cash register area,

2    yes, ma'am.

3            MRS. STOUT:  We offered State's Exhibit

4                    No. 19.

5            MR. SMITH:  No objection.

6            THE COURT:  It's in evidence.

7        Q        Now, as you were processing the

8    scene at the Toy Store, located at County Road

9    711, you mentioned that you found some casings

10   Is that correct?

11       A        Yes, ma'am.

12           THE COURT:  Those are shell casings?

13           THE WITNESS:  Sir?

14           THE COURT:  Shell casings?

15           THE WITNESS:  Yes, shell casings.

16       Q        I ask you to look at what's been

17   marked on the outside as State's Exhibit No. 11

18   and 12.  With the Court's permission, may we

19   open that?

20           THE COURT:  You may.

21       Q        Now, I ask you to look at what we

22   have marked as State's Exhibit No. 12(a)

23   through (e).  I'm sorry, (a) through (f)

24   collectively.  Can you identify 12(a)

25   through (f) collectively?

1    A    These appear to be the shell --

2  well, the Manila envelopes, which I collected

3  and placed the shell casings which were located

4  at the scene on the 23rd.

5    Q    Okay.  Now, how can you identify

6  these?

7    A    Each one of these has a

8  corresponding number 21, 22, 23, which matches

9  the numbers in the photographers.  Also, this

10  is my handwriting.

11    Q    After you collected those shell

12  casings, what did you do with those shell

13  casing that you collected at the scene?

14    A    They were placed into evidence.

15    Q    After they were placed into

16  evidence, what did you do with them?

17    A    They were eventually taken to the

18  Department of Forensic Sciences.

19    Q    Do you know who received them at

20  the Department of Forensic Sciences for

21  testing?

22    A    Dr. Joe Saloom.

23    Q    Okay.  After they were tested, were

24  they returned to you?

25    A    That's correct.

1    Q    And have they been in your care,

2  custody, and control since they were returned

3  to you from the Department of Forensic

4  Sciences?

5    A    They have.

6    Q    Are they like they were when they

7  were returned to you?

8    A    Without opening, they appear to be.

9  Obviously, they have been opened.  Those appear

10  to be Mr. Saloom's initials, where he has

11  opened them.  And this area has the Department

12  of Forensic Science Case number.

13    Q    Other than Mr. Saloom's initials on

14  there, the Manila envelopes appear to be in the

15  same condition?  Is that correct?

16    A    That's correct.

17    MRS. STOUT:  We introduce these, Your

18         Honor, at this time, only.

19    THE COURT:  You are offering them?

20    MRS. STOUT:  Only introduced.

21    THE COURT:  You may have that marked.

22    MRS. STOUT:  We have them marked, yes,

23         sir.

24    Q    I ask you to look at what we have

25  marked as State's Exhibit No. 11(a) through (e)

1    collectively.  Can you identify State's Exhibit

2    (a) through (e)?

3            THE COURT:  11(a) through (e)?

4            MRS. STOUT:  11(a) through (e).  I

5                        apologize, Your Honor.

6        A        These are 35 millimeter film

7    containers.  They appear to have my signature

8    and daytime stamp on the top.  They are sealed.

9                These are what we normally use when

10   we collect projectiles from the scene.  Inside

11   there, each one of those containers is a piece

12   of yellow -- I'm sorry.  A piece of cotton ball

13   or cotton material.  And it appears or sounds

14   like at least one projectile in each one of

15   those containers.

16       Q        Okay.  And were these the

17   projectiles, or appear to be the projectiles

18   that you collected at the scene on May the 23rd

19   of 2001?

20       A        They are.

21       Q        And how can you tell?

22       A        Again, they have my initials on the

23   container and my daytime stamp.

24       Q        Now, after you collected these

25   projectiles at the scene, of the Toy Store,

1    what did you do with those projectiles?

2        A    Again, they were placed into

3    evidence. And several days later they were

4    taken to the Department of Forensic Sciences.

5        Q    When they were taken to the

6    Department of Forensic Sciences, do you know

7    who these were turned over to?

8        A    I could tell you they were turned

9    over to the receptionist clerk in the front,

10    reception area where we turn in to our evidence

11    too.

12        THE COURT: I want to know who took them

13             there.

14        Q    Who took them to the Department of

15    Forensic Sciences?

16        A    I did.

17        Q    Who took all the evidence in this

18    case to the Department of Forensic Sciences?

19        A    I did.

20        Q    Did you also take the shell

21    casings?

22        A    I did.

23        Q    State's Exhibit No. 12(a) through

24    (f) collectively, to the Department of Forensic

25    Sciences?

1      A     I did.

2      Q     Now, do you have knowledge of who

3  at the Department of Forensic Sciences did any

4  testing on State's Exhibit (a) through (e)?

5      A     All I can testify to is the fact

6  that I'm aware that Mr. Saloom did all

7  ballistics testing in this case.

8      Q     After that testing was done, did

9  you receive these back to be placed into

10  evidence?

11      A     I did.

12      Q     And when you received those to be

13  placed in evidence, have they been under your

14  care, custody and control since that time?

15      A     They have.

16      Q     And since you received them from

17  Mr. Saloom or Department of Forensic Sciences,

18  are they in the same condition as when you got

19  them?

20      A     Without opening the containers, I

21  would have to say that they are.  But I would

22  have to open the containers to look.

23      Q     Have they been opened since you

24  received them from Department of Forensic

25  Sciences?

1    A    Oh.  No.  No, they have not.

2    Q    Let me also show you what has been

3  marked as State's Exhibit No. 9.  Do you

4  recognize State's Exhibit No. 9?

5    A    I recognize the handwriting and the

6  packaging of this container.  This also bears

7  my initials.

8    Q    And with the Court's permission,

9  may we open State's Exhibit No. 9?

10    THE COURT:  You may.

11    Q    Can you identify what has been

12  marked as State's Exhibit No. 9?

13    A    It's a .22 Caliber Clerk Revolver.

14    Q    And where did you collect State's

15  Exhibit No. 9?

16    A    This was found on the floor of the

17  Toy Store the morning, or the afternoon, of the

18  23rd.

19    Q    Did you collect State's Exhibit No.

20  9 as evidence in this case?

21    A    I did.

22    Q    And did you deliver it to the

23  Department of Forensic Sciences for testing?

24    A    I did.

25    Q    You carried it there?

1          A       I personally carried it to the

2    Department of Forensic Sciences, yes.

3          Q       And you delivered it there for

4    testing?  Is that correct?

5          A       That's correct.

6          Q       And looking at State's Exhibit

7    No. 9, is it in the same condition as it was

8    when you delivered it to the Department of

9    Forensic Sciences?

10         A       It appears to be, yes.

11         Q       And it was returned to you?  Is

12   that correct?

13         A       Yes, ma'am.

14         Q       And it has been placed in evidence?

15   Is that correct?

16         A       That's correct.

17         Q       Is it in the same condition as it

18   was at the time that you delivered it there?

19         A       It appears to be, yes.

20         Q       Now, you mentioned that you have an

21   evidence vault?

22         A       We do, yes.

23         Q       Who is in charge of that evidence

24   vault?

25         A       Primarily, myself and Captain

1    Lolley.

2        Q    Does anyone else have access to

3    that evidence vault?

4        A    Captain Lolley.

5        Q    And no one else has a key to it?

6        A    That's correct.

7        Q    And it's your testimony that you

8    have been in charge of this evidence?  And is

9    it in the same condition as it was when you

10   collected it?

11       A    That's correct.

12       Q    Thank you.  I ask you to look at

13   State's Exhibit No. 26.  Do you recognize that?

14       A    I do.

15       Q    And how do you recognize that?

16       A    Again, it bears my handwriting and

17   my initials on the seal.

18       Q    Who did you receive that from?

19       A    I received this from Detective

20   Buford Roberts on the evening of the 23rd.

21       Q    And once you received it from

22   Detective Buford Roberts, what did do you with

23   State's Exhibit No. 26?

24       A    It was taken to the police

25   department and sealed in the evidence vault.

659

1    The next morning it was taken personally by me

2    to the Department of Forensic Sciences in,

3    Montgomery.

4        Q    And it was turned over to the

5    Department of Forensic Sciences for?

6        A    Testing.

7    MR. SMITH:  That's 26, may it please the

8        Court?

9    THE COURT:  That's correct.

10       Q    I ask you to look at State's

11   Exhibit No. 25.  Can you identify State's

12   Exhibit No. 25?

13       A    Yes, ma'am.

14       Q    How can you identify State's

15   Exhibit No. 25?

16       A    Again, it bears my handwriting and

17   my initials on the paperwork or on the paper.

18       Q    And who did you received State's

19   Exhibit No. 25 from?

20       A    Again, I received this from

21   Detective Roberts on the evening of the 23rd of

22   May, 2001.

23       Q    Once you received State's Exhibit

24   No. 25 from Detective Roberts, what did you do

25   with it?

1     A     This along with several other items

2  were packaged up and placed in our evidence

3  vault for safe keeping.

4     Q     At some time did you take State's

5  Exhibit No. 25 to the Department of Forensic

6  Sciences?

7     A     I did at the request of the

8  district attorney's office, this item was taken

9  out of evidence and taken in to the Department

10  of Forensic Sciences for testing.

11     Q     And after it had been tested, was

12  it then returned to you?

13     A     That's correct.

14     Q     Was it placed in the evidence

15  locker after it was returned to you?

16     A     It was.

17     Q     And is it in the same condition as

18  it was when it was returned to you?

19     A     Other than taking it out for

20  discovery purposes, yes.

21     MR. JARRELL:   Was that 25?

22     THE COURT:   Correct.

23     MRS. STOUT:   That was 25.

24     Q     I ask you to look at State's

25  Exhibit No. 27 and 27(a).   And I ask you to

1    look at those.   From whom did you receive

2    State's Exhibit No. 27 and 27(a)?

3         A      Again, these were sent back to the

4    Department of Forensic Sciences.

5         Q      And have they been in your care,

6    custody, and control since you received these

7    items from the Department of Forensic Sciences?

8         A      They have.

9         Q      Now, Detective Hauser, I'm going to

10   ask you to step down.   And I'm going to ask you

11   if you recognize what I've marked as State's

12   Exhibit No. 4?   Do you recognize this?

13        A      I do.

14        Q      And do you recognize the inserts on

15   this chart?

16        A      I do.

17        Q      What do you recognize this chart

18   and inserts on this chart to be?

19        A      This is a drawing, not to scale, of

20   the layout of the Toy Store building on County

21   Road 712, the afternoon of the way we found it.

22               Obviously, the photograph depicts

23   several photographs that were taken while at

24   the scene.   They bear identification numbers of

25   various items of evidence.

1    Q    Now, when you arrived on the scene,

2    and the shell casings that we have talked about

3    and the projectiles, could you explain to the

4    ladies and gentlemen of the jury -- we have

5    talked about finding the shell casings and guns

6    and things of that nature.

7         Take us through what you saw as you

8    were preparing this scene to collect evidence?

9    A    Initially on entry, obviously, we

10   found a lot of blood in this area here.  This

11   cash register was open.  As I looked back in

12   this general direction, there was a crumpled

13   cigarette package in this area.  There was a

14   cell phone laying on the floor there.

15        Walking back through the area,

16   obviously, I saw the revolver laying on the

17   floor.  And there were various shell casings

18   laying all over.  Again, in this general area

19   coming back out towards the exit here.

20        This was a clothing rack that had a

21   large number of T-shirts and other novelty

22   items shirts hanging on it.  And, again, on the

23   racks were different kinds of paraphernalia and

24   merchandise and magazines and all the stuff.

25

1           It was a typical aluminum storage

2    building with the door it in, with the added

3    room on the back and on the side.

4        Q    Now, this photograph here, is this

5    Mr. Ammons that was assisting you?

6        A    That's correct.

7        Q    What is this photograph here

8    depicting in relationship to the clothing rack?

9        A    Well, as I said earlier, we

10   realized that we had a large number of shell

11   casings.  And there were a lot of projectiles.

12   There had been a lot of shooting in here.  And

13   we feel like we had to be all --

14       MR. SMITH:  We object to what he feels.

15       THE COURT:  It's not offered for the

16                truthfulness of the matter

17                asserted.  It's offered for

18                stating a reason why he did

19                whatever it was he did.  The

20                objection is overruled.

21       A    We had a number of shell casings.

22   And we had to locate all the projectiles in a

23   case like this.  While looking at this area

24   here, we came across several shirts that had

25   what appeared to be bullet holes in them where

1  projectiles had passed through at least several

2  shirts, headed back in this general direction.

3       Q     So, again, for, and I hate to

4  repeat myself. Could you tell the ladies and

5  gentlemen of the jury what these numbers

6  represent on the chart? The 1, 2, 3, 4, 5, 6?

7       A     They depict the number of

8  projectiles that we found, starting from the

9  back.

10      Q     Are they projectiles or shell

11 casings?

12      A     Oh. I'm sorry. Shell casings, 1,

13 2, 3, 4, 5, 6, shell casings that was located.

14      Q     And in direction, is that the way

15 that you received those? Is that correct?

16      A     That's correct.

17      Q     Now, when you said that you

18 retrieved, I believe, 5 projectiles, what is

19 the difference between a casing and a

20 projectile?

21      A     A shell casing is basically the

22 container for the powder and the brass, which

23 contains both the powder and the projectile.

24 They are ejected from the weapon when it's

25 fired.

1          The projectile itself being the

2    copper, lead shielded bullet itself, which is

3    exited from the casing and exits the barrel of

4    the weapon.

5          Q    So, if I fire a weapon, the casing

6    goes that way, and the projectile goes that

7    way?

8          A    That's basically correct.  It's

9    depending on the type of weapon and the charred

10   and a lot of ballistic stuff that I'm not real

11   familiar with or whatever, a weapon tends to

12   eject a projectile up and out.

13         Q    You said that you had nine years

14   experience as a -- well, in law enforcement?

15         A    Correct.

16         Q    And a number of years as a criminal

17   investigator?  Is that correct?

18         A    Correct.

19         Q    Part of your experience has dealt

20   with recognizing types of weapons that are used

21   when a crime is being committed?  Is that

22   correct?

23         A    That's correct.

24         Q    Can you usually look at a shell

25   casing and determine what type of weapon has

1    been used?

2         A    We make -- I would make, a general

3    assumption and that's all.

4         Q    Okay.  Could you look at those

5    shell casings and make a general assumption as

6    to what type of weapon was used or that these

7    shell casings came from?

8         A    Yes.

9         Q    And what kind of weapon did you

10   assume those had come from?

11        MR. SMITH:  Objection to "assume".

12                  However, Your honor, we

13                  stipulate that Rick is a very

14                  competent investigator and a

15                  very honorable man.  But I

16                  object to an assumption, at this

17                  time.

18        THE COURT:  Sustained.

19

20   Q    Could you look at these shell casings and

21   tell that they did not come from that revolver?

22        A    Yes.

23        Q    Now, you began looking for

24   projectiles?

25        A    Well, as I said, in a case like

1    this, I had six shell casings.  That meant that

2    I had six projectiles somewhere.

3                In a case of this magnitude,

4    obviously, to do a thorough job, I would have

5    to locate six of those projectiles.

6        Q      What did you do while you were --

7    and I know that several of you got together to

8    discuss how you were going to go do this.  How

9    did you start looking and finding these casings

10   where they were?  What did you do to begin

11   searching for those projectiles?

12       A      We began by obviously checking this

13   area right here, because of the fact that there

14   was three projectiles and the weapon here, we

15   looked at the fact that that was possibly where

16   some type of confrontation had taken place.

17   .cq 0 15 0

18           MR. SMITH:  Your Honor, may I, and I

19               apologize.  I object.  I think

20               Rick misstated "projectile" for

21               casing, and I just ask that be

22               clarified.

23           THE COURT:  Sure.  Would you clarify

24               that, if you did.

25           MR. SMITH:  If I misunderstood you, I

```
 1                      apologize.

 2          THE COURT:  You found what in that

 3                      location, again?

 4          THE WITNESS:  The first three projectiles

 5                      -- casings were located here,

 6                      along with the weapon.  Those

 7                      shell casings were located in

 8                      this area.  These shell casings

 9                      were located further out from --

10                      in this area.  And it looked

11                      like there were possibly a trail

12                      of some type, leading back out

13                      through the door.

14          Q    But you were sure that these casings

15   did not come from this weapon?

16          A    Oh, yeah.  I was positive about

17   that.

18          Q    So, where did you begin your search

19   for the projectiles?

20          A    In this area right here.

21          Q    How did you begin your search?

22          A    We started with bullet holes in the

23   floor.

24          Q    And what did you do as you started

25   with the bullet holes in the floor?
```

1       A       Again, we were able to locate

2   several holes which appeared to be the

3   projectile holes in the floor.  That entailed

4   trying to locate those items of this entire

5   area.

6               The floor of this building was

7   taken out, lifted up and exposed, and the

8   ground work and the framing underneath.  And we

9   were able to locate the projectiles there.

10      Q       Now, how many projectiles did you

11  locate that first day?

12      A       There were obviously -- there were

13  two.  One of them had not penetrated the floor

14  completely.  And we were able to locate that

15  one by feeling basically underneath the

16  carpeting.

17              This was one photograph of the one

18  projectile that's under the padding, but not

19  into the floor itself.  The rest of them, we

20  had to physically go underneath the floor to

21  locate.

22      Q       Let me show you what I've marked as

23  State's Exhibit No. 13 and ask you if you can

24  identify that?

25      A       Yes.

1          Q       And how can you identify State's

2     Exhibit No. 13?

3          A       By the grading in the leaves under

4     here.  We procured the grading with the help of

5     the Dothan Police Department.

6          Q       And why did you do that?

7          A       Underneath the building was a large

8     accumulation of leaves, material, straw, dirt.

9     We had to sift through all of that debris,

10    basically, to locate the projectile.  It was

11    basically a thumb and sift operation.

12         Q       And did you locate the projectiles?

13         A       I did.

14         Q       And does that picture fairly and

15    accurately depict one of the projectiles that

16    you located underneath the building?

17         A       It does.

18         MRS. STOUT:  We offer State's Exhibit

19    No. 13.

20         THE COURT:  Objection?

21         MR. SMITH:  None.

22         THE COURT:  It's in evidence, and you may

23             publish it to the jury whenever

24             you decide.

25         Q       I also ask you to look at what's

1    marked State's Exhibit No. 14.  Can you

2    identify State's Exhibit No. 14?

3        A    I can.

4        Q    How can you identify State's

5    Exhibit No. 14?

6        A    Again, with our numbers, number

7    blocks right there.  And that's my screw

8    driver.

9        Q    Again, why do you use a screw

10   driver in a picture like this?  It's

11   emphasizing the fact that it's pointing to the

12   projectile that we located under the floor.

13       Q    '  And where did you locate this?

14       A    Again, this was located under the

15   floor in this general area right here, of the

16   Toy Store.

17       Q    Both of those were located where;

18   both of those projectiles?

19       A    Under the floor.

20       Q    In this general area?

21       A    That's correct.

22       Q    And does this picture fairly and

23   accurately depict what you saw as you were

24   looking for that projectile under that floor?

25       A    It does.

1           MRS. STOUT:  We offer State's Exhibit

2    No. 14.

3           THE COURT:  Any objection?

4           MR. SMITH:  No, Your Honor.

5           THE COURT:  It's in evidence.  You may

6                   publish it whenever you decide.

7           Q     Now, initially, you found how many

8    projectiles?

9           A     Initially, we found three.

10          Q     Okay.  And did you have occasion to

11   come back?

12          A     I did.

13          Q     And why? .

14          A     At this point the deceased had

15   passed away.  I knew, and we all knew, that we

16   had six casings.  And that would mean that

17   there were six projectiles.  We had located

18   three initially.

19              After an autopsy was completed, and

20   we were informed that one projectile had been

21   recovered, that left two unaccounted for.

22          Q     How many did you ultimately find?

23          A     I found 5.

24          Q     And all of the ones that you found,

25   all of the projectiles that you found, were in

1    what location?

2         A    This area right in here, either in

3    the floor, under the floor, or in -- this one

4    photograph depicted it actually embedded in the

5    framework of the building.

6         Q    But all in this area?

7         A    That's correct.

8         Q    Now, as you continued your

9    investigation or your collection of evidence,

10   what else did you do after you collected the

11   casings, the projectiles, the blood evidence?

12   Was there anything else that you did in

13   collecting evidence from this scene?

14        A    I collected a large piece of

15   carpeting from this area here.  There were

16   blood samples taken from the blood that was

17   located along on the floor, in the entrance way

18   here and on the bottom of the register stand or

19   whatever.  And we did take fingerprints from

20   the door itself.

21        Q    Were we successful in obtaining --

22        A    There were no latents available.

23        Q    Were there any other bullet holes

24   found in this building?

25        A    We located several other bullet

1   holes, yes.

2       Q     Where did you locate any other

3   bullet holes?

4       A     A bullet hole was located in this

5   general area here in the woodwork.  And the

6   bullet appeared to have passed through the

7   chamber -- passed though a Chamber of Commerce

8   plaque and lodged back -- had gone through the

9   plaque, through the back wall and fallen

10  between the frame and the building.

11      Q     Were you able to retrieve that

12  bullet?

13      A     No.

14      Q     Or that projectile?

15      A     No.

16      Q     Were there any other areas where

17  you saw any bullet holes or any holes that

18  appeared to have been made by some type of

19  projectile?

20      A     We recovered a large paraphernalia

21  bong that had been on the shelf up in this

22  area.  And it had also been hit by a bullet.

23      Q     Did you retrieve that projectile?

24      A     That projectile is still located in

25  that item.

1       Q       That was sitting here on --

2       A       It was on a shelf in this area here

3   up above that area.

4       Q       Now, these pictures were all taken

5   by you?  Is that correct?

6       A       That's correct.

7       Q       And they depict the scene on this

8   diagram?

9       A       This is the area of the cash

10  register, the cash register area.  This is the

11  cash register itself, along on the counter

12  there.

13          This was a picture looking back

14  from the entrance of the building over the

15  counter here, back into the area where various

16  items were for sale, with all the

17  paraphernalia, and the property, all that

18  stuff.

19          This is a picture of the cell phone

20  that was located in this area here on the

21  floor; picture of the revolver, again, on the

22  floor; the rack with the shirts.  And this is

23  coming, depicts the entrance coming into the

24  shirt rack and the counter right there in the

25  front.

1          Q     Okay.  And that's where you located

2   that particular -- I'm sorry.  I'm in your way?

3          A     That shell casing, number 25.

4          Q     And the shirt rack?

5          A     That's correct.

6   MRS. STOUT:  Just a minute.  Just a

7                minute, Your Honor.

8          THE COURT:  Sure.

9          Q     Let's go over one more thing.  You

10  collected five projectiles?

11         A     That's correct.

12         Q     And, again, where were those

13  projectiles all collected?

14         A     In the floorboard and underneath

15  the flooring, in this general area of the

16  building.

17         Q     Where, during your investigation,

18  did you see blood evidence?

19         A     There was some blood evidence in

20  this area here as you can see by this

21  photograph.  This is blood here.  There was a

22  large trail of blood leading from this area

23  back towards the register here, a

24  conglomeration in this area and back behind the

25  register, back in here, where the victim was

1    found.

2         Q    What about the counter area?

3         A    There was blood on the counter

4    there, also.

5         MRS. STOUT:  Your witness.

6                   CROSS EXAMINATION

7    BY MR. SMITH:

8         MR. SMITH:  You can take the witness

9                    chair back.

10         THE COURT:  You are getting ready, Mr.

11                    Smith, to ask questions?  One of

12                    the jurors wants this witness to

13                    explain the difference between a

14                    projectile and a casing.

15         MR. SMITH:  I'm going to go over that.

16                    I'm going to use that also in a

17                    moment.

18         Q    Good morning.

19         A    Sir.

20         Q    Rick, you are now the case agent on

21    this case?  Is that correct?

22         A    That's correct.

23         Q    And you were not the original case

24    agent?

25         A    No, I was not.

1          Q       You were originally the evidence

2     technician.  And due to charges in personnel

3     and promotions and reassignments, you then

4     became the case agent of the case?  Is that

5     correct?

6          A       Yes, sir.

7          Q       Not only are you the keeper of the

8     evidence, but you're the keeper of the records

9     and files and the papers and so forth?

10         A       Yes, sir.

11         Q       Now, you also testified on direct,

12    if I understood, that the scene was controlled,

13    and a number of people were, with controlled

14    access, allowed onto the premises?  Is that

15    correct?

16         A       Yes.

17         Q       And was a record kept of persons

18    that were -- that came into and out of the

19    place?

20         A       Yes.

21         Q       And is that done in the normal

22    course of business of being a police officer

23    and a crime scene technician?

24         A       In a crime scene such as this, yes.

25    A record is kept.

1     Q     All right.  And let me show you

2   these three pages, please, sir.  And we will,

3   with apologies to the court reporter, we will

4   call that Defendant's Exhibit No. Y,

5   collectively.

6        THE COURT:  "Y"?

7        MRS. SMITH:  Yes, sir.  "Y" as in Yoeman.

8     Q     Would you relate to the members of

9   the jury, please, sir, the documentation of who

10   entered that crime scene?

11     A     According to this list --

12     Q     Could you just read it to us,

13   please?

14     A     Adair Lee; myself, is down here

15   twice; Officer Lee; Officer Landingham; Officer

16   Pearson; Office Landingham; Officer Early;

17   Officer Pearson; Sergeant Pennington; Detective

18   Griswold; Detective Purvis; Mr. Bruce DeVane;

19   Mr. Bruce Mathews; Mark Fuller; Patric Norris;

20   Eddie Pennington; Mrs. Parker; Carl Watson;

21   Chris -- Carla Jones; Buddy Ammons;

22   Larry-somebody.  I can't read that.  Earl

23   Pennington; Bruce DeVane; Mrs. Stout; Buddy

24   Ammons, again; Captain-somebody.  I don't

25   recognize that name; Mike Lagston; Kyle Hale.

1          Q          All right.  I'm sorry.  The last

2     name you read there, please?

3          A          Kyle Hale.

4          Q          Do you know who that is?

5          A          Officer Hale, yes.

6          Q          Now, each time that you read a

7     name, does that reflect that that person

8     entered?

9          A          No.  That reflects that that person

10    was there.

11         Q          Now, you've named several names a

12    couple of times.  Bruce DeVane, Glenda Stout.

13    Would each entry be when that person entered

14    the premises?

15         A          No.  Each one of those persons was

16    there.  This officer was very -- obviously, he

17    was very concerned with keeping track of who

18    was at the scene.  That would accurately depict

19    who actually entered the scene.  That was my

20    scene.

21         Q          All right.

22         A          I controlled access to it.

23         Q          Now, this list doesn't reflect the

24    fact that there was Bryan Yoeman and Brian

25    Smith in this scene before you officers

1  arrived?  Correct?

2        A      No, sir, it does not.

3        Q      And it also doesn't reflect that

4  Mr. Eric Carmillo entered the scene before you

5  arrived?  Correct?

6        A      That's -- no, sir.

7        Q      Did you document the rescue squad

8  personnel that entered the scene?

9        A      Again, the rescue squad had already

10 come and gone by the time that I arrived there.

11 A note was properly made to the case agent as

12 to what rescue squad personnel had actually

13 entered the scene and transported the victim.

14 I did not document that, no.

15       Q      All right.  In response to the

16 Judge's comment a moment ago, that one of the

17 jurors had a question of the difference between

18 a projectile and a casing, you, as a police

19 officer, are armed with a firearm, are you

20 not?

21       A      That's correct.

22       Q      And do you have that with you

23 today?  I do.

24       Q      Do you have any additional

25 ammunition that you wouldn't have to remove

1      from your gun?

2              A      I do.

3              Q      Would you take a round out of your

4      magazine, or ever how you have it?  Would you

5      tell us the caliber that you are assigned as a

6      police officer?

7              A      Currently, as of have yesterday, we

8      were assigned .40 Caliber Glock 22's.

9              Q      And that is .40 Caliber that you

10     just put on the table in front of you?

11             A      That is a .40 Caliber bullet, yes,

12     sir.

13             Q      I know it's small, in fact I'll let

14     you come over here, and would you show the jury

15     the difference between a projectile and a shell

16     casing?

17             A      As I said, the bullet is made up of

18     two pieces, a cooper portion up here is what is

19     considered a projectile.  The silver portion is

20     considered the shell casing.

21             Q      All right.  Just walk it down the

22     jury, if you would, so that they can all see

23     it.

24             MR. SMITH:  Judge, for safety, obviously,

25                     I'm not going to offer that.

```
1                              Thank you, Rick.  You

2                      can take that.  Don't put that

3                      away, yet.

4         THE WITNESS:  Okay.

5         Q      You mentioned the type of weapon

6    that you are assigned.  The mechanism by which

7    that weapon works is called a self-loading, or

8    more commonly, a semi-automatic weapon?  Is

9    that correct?

10        A      That's correct.

11        MR. SMITH:  And, Judge, could I ask him

12                     to step out and clear his weapon

13                     and then come back in for a

14                     demonstration process?

15        THE COURT:  Sure.

16                             When you do

17                     demonstrate it, I know you will

18                     point it down?

19        MR. SMITH:  I sincerely request that.

20        THE COURT:  The last case we had, it was

21                     pointed at the jurors or the

22                     Judge, and neither liked that.

23        MR. SMITH:  I'm on the that list, too.

24        THE COURT:  Right.  I wanted you to make

25                     sure it's clear.
```

```
1              MR. SMITH:  Absolutely.

2                          Thank you.   I

3                      appreciate that.

4         Q     Now, you said that was locked, but

5     the operation is self-loading or

6     semi-automatic?  Is that correct?

7         A     Yes, sir.

8         Q     And this is a 40 caliber.  A 40

9     caliber is what size bullet?  Is it four-tenths

10    of an inch in diameter?  Is that correct?

11        A     I couldn't tell you, sir.

12        Q     All right.  It's the same as a 10

13    millimeter in diameter, is it not?

14        A     It's big.

15        Q     All right.  It's a little bigger

16    than a 9 millimeter?

17        A     Yes, it is.

18        Q     I don't mean to be silly, but a 10

19    millimeter would be one millimeter bigger from

20    a 9 millimeter?

21        A     That's correct.

22        Q     Now the projectiles that you

23    recovered, the bullet part, that you recovered

24    in the store, was what caliber?  Or have you

25    been told what caliber it was?
```

1   A  I have been told that it's a 9

2 millimeter.

3   Q  All right.  And do you know that a

4 9 millimeter is generally .355 thousands of an

5 inch in diameter?  Are you aware of that?

6   A  No.

7   Q  Okay.  Would you tell the jury a

8 little bit about how the semi-automatic or

9 self-auto loading pistol works; how it

10 functions, please, sir?

11   A  I'm not a -- other than basically

12 being familiar with some the semi-automatic

13 pistol is magazine fed.

14   Q  Tell us what that is, please?

15   A  This portion of the weapon is

16 considered the magazine.  It is loaded with the

17 bullets and for law enforcement purposes, this

18 magazine carries approximately 15 rounds or 15

19 bullets.

20     The weapon, to fire, must have the

21 magazine inserted.  You chamber one round, in

22 this case, by allowing the slide to go forward.

23   Q  Rick, I can see the hole, but,

24 please point it that way if you would or

25 straight down?

1      A      You place, and let the slide go

2   forward, which chambers a round in the --

3      Q      Hold it up like that.

4      A      -- in the barrel, per se, and then,

5   the weapon would be ready to fire.

6      Q      When you pulled the trigger, what

7   happens, with a self-auto loading or

8   semi-automatic pistol?

9      A      The weapon fires, the projectile

10   leaves the barrel.  The shell casing is

11   extended.  And another round is automatically

12   chambered in that.

13      Q      Turn the gun and show the jury the

14   ejection point there, please, sir, where the

15   extended shell casing comes out.

16      A      (Witness did as requested).

17      Q      All right.  And put your finger on

18   it, please, sir?  And that's the part where the

19   shell casing that you have testified to is

20   thrown out of the gun?

21      A      Yes, sir.

22      MR. SMITH:  I think I'd rather you point

23            that at me than the jury, if it

24            has to point.

25      THE COURT:  Me too.

1          MR. SMITH:  I left that open, didn't I,

2               Judge.

3          MR. SMITH:  Rick, to break the tension we

4               humor sometimes.  But this is a

5               serious matter, and we all know that.

6          THE WITNESS:  Yes, sir.

7     Q         When that weapon fires, and the

8     projectile goes out the barrel, that shell

9     casing is then tossed out, is it not?

10        A         That's correct.

11        Q         And depending on where the weapon

12    is held, that shell casing may go here?  And it

13    may go there?  And it may go there?  Correct?

14        A         Yes, sir.

15        Q         And it also would depend on how the

16    weapon was held, whether it was what they refer

17    to as limp-wristed or held stiff, would affect

18    how far that shell casing is ejected, would it

19    not?  Have you not found that to be true during

20    your years of shooting?

21        A         I've never found that depending on

22    how the weapon is held -- again, that

23    mechanism, itself, the strength of the spring

24    and the injection port, all those factors in

25    there -- I could, you know, on a guess, how you

688

1    would hold it might have some effect on it.   I

2    know it does when you shoot, obviously.

3           Q       As a trained officer, of course,

4    you try to hold it correctly every time so that

5    you hit what you are shooting at?

6           A       I try, yes, sir.

7           Q       I'm not going to ask you how you

8    score.

9                   If you would come down here, and

10   I'll let you take your weapon out and secure it

11   however you feel is appropriate and best,

12   please, sir.

13           THE COURT:   Is he going to need it,

14                   again?

15           MR. SMITH:  No, sir.  He will not, as far

16                   as I'm concerned.

17           Q       Rick I show you State's Exhibit

18   No. 9 and make sure that is safe and has no

19   rounds in it, if you would, by whatever you

20   please, if you need to do so?

21           A       All right.

22           Q       State's Exhibit No. 9 is the .22

23   caliber Clerk pistol that you recovered from

24   the Toy Store?  Is that correct?

25           A       Yes, sir.

1        Q      And you recovered that.  I believe,

2   you identified that as Mrs. Jelaine Davis'

3   pistol?

4        A      Correct.

5   MR. JARRELL:    "Dennis."

6   MR. SMITH: "Dennis."   I apologize.

7        Q      You've identified that as her

8   pistol.  And tell the jury, please, sir, how

9   that differs from the firearm that you were

10  just describing to the jury, that's your duty

11  firearm?

12       A      This is a revolver.  Obviously, it

13  has five cylinders.  And, occasionally, in a

14  weapon such as this, when the trigger is pulled

15  back, the hammer comes back.  And at that

16  moment the hammer goes forward, strikes the end

17  of the cartridge and, again, the projectile

18  would be exited from the barrel.

19            The main difference between this

20  weapon, obviously, well, there's two.  It only

21  carries or holds five rounds in what's called

22  the chamber or the cylinder.  It carries or

23  holds five rounds.

24            This weapon, the shell casings

25  would not be ejected from this weapon.  The

1    shell casings would remain in the cylinder

2    until someone physically removes them.

3        Q    Now, there are no shell casings or

4    projectiles in there right now?  Correct?

5        A    No, there's not.

6        Q    Were there any in there when you

7    recovered that weapon?

8        A    Yes.

9        Q    Would you tell the jury, please,

10   sir, what mix, if any, of life of expended

11   rounds were in there?

12       A    There was one live round and four

13   casings inside this weapon.

14       Q    All right.  Which would indicate

15   that four rounds had been fired out of that

16   weapon?  Is that correct?

17       A    That's correct.

18       Q    Unless someone had put four empty

19   rounds in there, which doesn't make a whole lot

20   of sense?

21       A    That's true.

22       Q    Now, you said that the shell casing

23   does not automatically eject out of the

24   revolver, in State's Exhibit No. 9?  Is that

25   correct?

1        A       That's correct.

2        Q       And what is the caliber of State's

3    Exhibit No. 9?

4        A       This is a .22 caliber.

5        Q       And would it be correct that the

6    diameter of that bullet would be .22 hundreds

7    of an inch in diameter of the .22?

8        A       Yes, sir.

9        Q       Considering -- well I'll let you

10   put it back in the envelope, if you would,

11   please, sir?

12       A       All right.

13       Q       Did you find -- you testified that

14   you found a projectile in this wall over here.

15   Is that correct?

16       A       I found a bullet hole in the

17   Chamber of Commerce plaque which was located

18   just above the cash register here on this wall.

19       Q       It would have been right above the

20   cash register on this wall?

21       A       Correct.

22       Q       Right in here?

23       A       In that general area, yeah.

24       Q       All right.  I show you Defense

25   Exhibit G and ask if you recognize that?

1        A      I do.

2        Q      And would you tell the jury,

3   please, sir, what you recognize Defendant's

4   Exhibit No. G to be?

5        A      The area above the cash register

6   where we located that bullet hole behind or

7   underneath the Chamber of Commerce plaque, when

8   I removed it from the wall.

9        MR. SMITH:  Your Honor, we would offer

10            Defense Exhibit G.

11       THE COURT:  Any objection by the State?

12       MRS. STOUT:  No, Your Honor.

13       THE COURT:  G is in evidence.

14       MR. SMITH:  Thank you.

15       Q      Now you said that you were not able

16   to recover that projectile?

17       A      I would have to have physically

18   removed this entire wall and basically go

19   through all the insulation and all those other

20   items.  We would have to physically damage the

21   building.

22       Q      Did you make any determination as

23   to the size of the hole in the wall that

24   Defense Exhibit No. G depicts?

25       A      Other than looking at and

693

```
 1    determining that it was smaller than the hole

 2    we found in the floor.

 3         Q    All right.  And it did not match?

 4    Did it appear to be smaller than the 9

 5    millimeter casings that you found in the store?

 6         A    Yes, it did.

 7         Q    All right.  Was it consistent with

 8    the size that State's Exhibit No. 9, the Clerk

 9    .22 would have fired?

10         A    It was consistent with a .22, yes,

11    sir.

12         Q    I show you Defendant's Exhibit (f)

13    and ask if you recognize what that is a

14    photograph of?

15         A    It's a photograph of the bong that

16    was recovered in the Toy Store.

17         Q    And you testified there was a

18    bullet that hit that bong?

19         A    Yes, sir.  There's a hole.  You can

20    see the hole in the side of the bong itself.

21         Q    What size hole was there in the

22    bong, in regard to the difference between a

23    .22, such as the Clerk .22 that was recovered,

24    and the shell casings of the 9 millimeter that

25    were recovered?
```

1        A        I would say that it was a hole

2    consist with a smaller caliber weapon.

3        Q        Consistent with the .22, such as

4    State's Exhibit No. 9, that you recovered?

5        A        Yes, sir.

6        MR. SMITH:   We offer Defendant's Exhibit

7                    No. (f), Your Honor.

8        THE COURT:   Any objection?

9        MR. JARRELL:   No, sir.

10        THE COURT:   It's in evidence.   You may

11                    publish it to the jury.

12        Q        Now, these items here, behind the

13    bong, that are depicted in Defendant's Exhibit

14    (f), can you tell me what those are?

15        A        Those are basically various items

16    that were for sale in the store.

17        Q        These appear to be glass pipes of

18    some kind?

19        A        Some type of paraphernalia, yes.

20        Q        Actually drug paraphernalia?

21        MR. JARRELL:   Objection.

22        MRS. STOUT:   Objection.

23        THE COURT:   Sustained.

24        Q        Do you have opinion as to, based on

25    your experience as a law enforcement officer,

1    what those are?

2         MRS. STOUT:  Objection.

3         MR. JARRELL:    Irrelevant.

4         THE COURT:  I will allow that.  Do you

5              have an opinion?

6         A    Most of -- a large portion of items

7    that were sold in that store were basically

8    novelties and sex items.  And they could have

9    been used as drug paraphernalia.

10        Q    I show you Defendant's Exhibit (h)

11    and ask if you recognize that photograph, what

12    that depicts?

13        A    It depicts number 26 in my evidence

14    list, that appears to be a shell casing from a

15    9 millimeter or one of the shell casings that

16    were recovered at the scene.

17        Q    Where does that exhibit correlate

18    to you on the diagram Government's Exhibit --

19        A    Here.

20        Q    Number 5?

21        A    Uh-huh.

22        Q    In this area?

23        A    Yes.

24        Q    And does that --

25        A    This is the corner of the building.

1    In that area.

2        MR. SMITH:  We offer Defendant's Exhibit

3            (h), may it please the Court.

4        THE COURT:  Any objection?

5        MRS. STOUT:  No, Your Honor.

6        THE COURT:  It's in evidence.

7        Q    Now, if you would --

8        MR. SMITH:  One moment, please, Your

9            Honor.

10        Q    Did you make any kind of diagram

11    that showed the holes in the floor, in the Toy

12    Store?

13        A    No.

14        Q    Would you point out to the members

15    of the jury, please, sir, you said there were

16    five bullet holes in the floor in this area?

17        A    Correct.

18        Q    Do you recall where specifically

19    each bullet hole was in the store?

20        A    I couldn't specifically say or

21    state in detail.  As I said there were a number

22    of holes in this general area.  One appeared to

23    have gone straight down.  Another -- several

24    came in different angles.  As I said, in that

25    one photograph, there was a two-by-four that

1    supported this back portion of this area that

2    had been added on.  And there was a projectile

3    that we found actually lodged up inside that

4    two-by-four, facing the other direction, facing

5    back toward the front of the building.

6        Q   Do you know whether or not that was

7    a ricochet or direct entry?  Or do you have any

8    way of knowing that?

9        A   I feel there was really no way for

10   me to tell.

11       Q   All right.  And if I understand

12   your testimony correctly, the bullet holes were

13   all over the place?

14       A   As I said, there was several.  All

15   those five projectiles in this area, they were

16   all scattered all over in this general area

17   here.

18       Q   Scattered all over in what we call

19   the back room or the magazine room?

20       A   In the entrance to this little

21   storage room here, yes, sir.

22       Q   All right.  Now, as far as the

23   shell casings, that is the brass part that

24   holds the bullet and the powder, you have one,

25   two, three, four, five, and six?  Do you have

COURT OF CRIMINAL APPEALS NO. _CR-02-0333_____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

## FROM

CIRCUIT COURT OF _____COFFEE_____ COUNTY, ALABAMA

CIRCUIT COURT NO. _CC-01-179, CC-01-180___

CIRCUIT JUDGE ___Gary L. McAliley_____

Type of Conviction / Order Appealed From: ___Conviction, Capital Murder, Robbery 1st__

Sentence Imposed: _Life Without Parole, Life_____

Defendant Indigent: [X] YES ☐ NO

Robert Thomas Conrad
_____
                                                    NAME OF APPELLANT

Gary Bradshaw
_____
(Appellant's Attorney)                   (Telephone No.)
P. O. Box 311412                            Richard Waldrop
_____            P. O. Box 310027
(Address)                                   Enterprise, AL  36331
Enterprise         AL        36331
(City)            (State)        (Zip Code)

                        V.

STATE OF ALABAMA
_____
                                                    NAME OF APPELLEE
(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____
_____
_____

(For Court of Criminal Appeals Use Only)



1    any way of knowing the order that one, two,

2    three, four, five, and six were fired?  Or is

3    that just an arbitrary numbering for the sake

4    of numbering?

5         A    I would have no way of knowing how

6    those bullets were fired.  All this was, was a

7    way for us to collect.  We collected from the

8    front to the back.

9         Q    That's simply a reference point for

10   you?  It's no indication of the order of

11   firing?

12        A    No, it's not.

13        Q    And as far as the shell casing

14   number one, and any bullet that you recovered

15   whatever that exhibit, State's Exhibit No. 11

16   or 12(f) -- 12(a) through(f), the projectiles,

17   you don't have any way of knowing which one

18   goes with or 12(a) or (f), do you?

19        A    I don't know.

20        Q    Or, and I'm not going to do this

21   for each one?

22        A    I don't know.

23        Q    Or that three goes with any

24   particular projectile?

25        A    No.

1      Q      And we know that the type of weapon

2   that fires a 9 millimeter, similar to your 40

3   caliber, ejects those shell casings out?  And

4   who knows where they go?  Correct?

5      A      That's correct.

6      MR. SMITH:  You can take the witness

7              chair, again, please.

8      Q      Rick I show you Defendant's

9   Exhibit (n) and ask you to take a look at that

10  photograph.  And tell me if you know what that

11  depicts?

12     A      This depicts the blood spatter

13  along the floor area and the counter containing

14  the register at the Toy Store.

15     Q      Now, there are labels on those,

16  what you have referred to as blood spatters?

17  Is that correct?

18     A      Yes, sir.

19     Q      Who put the labels on there?

20     A      I did.

21     Q      And why did you do you that?

22     A      Again, there's a number of spatters

23  there.  Obviously, we wanted to mark and

24  exhibit each one of the spatters.  That's why

25  each was given a label.

1          Q      I show you Defendant's Exhibit (o)

2      and ask if you recognize that?  And would you

3      tell the jury how it compares with Exhibit (n)

4      that I handed you just before?

5          A      Again, it depicts blood spatter on

6      the corner area of the counter that contains

7      the register area.  Obviously, there's a number

8      of spatters that have not been labelled.

9      Again, that's because of the number that was

10     basically in that general area.

11         Q      And did you label the ones there,

12     also?

13         A      Yes.

14         Q      Actually, it shows the same, but

15     just a little wider angle than the other?

16     Correct?

17         A      It's the corner of the area where

18     the register was.

19         MR. SMITH:  We offer (n) and (o), Your

20              Honor.

21         MR. JARRELL:  No objection.

22         THE COURT:  They are in evidence over no

23              objection.

24         Q      Would you come down and show us,

25     please, sir?  And I'm going to ask you to bring

1    the photographs because I want to show this to

2    the jury.

3              Show me where on State's Exhibit 4

4    -- where does that correlate with (n) and (o)

5    Defendant's Exhibits that we have just

6    introduced?

7         A    Well, obviously, this is the

8    counter area that we've been talking about,

9    this exhibit on the blood spatters, the close

10   up there; (k), (l), (m), (o) would be located

11   in this area right here.

12        Q    Now, you've circled the corner.

13   But we're talking about a flat surface there?

14   Would you tell me -- direct my pointer, if you

15   would, to the flat surface that (n) and (o)

16   depict?

17        A    Right here.

18        Q    All right.  This surface here?

19        A    Yes.

20        Q    And that's right by the front door?

21   Correct?

22        A    That's correct.

23        Q    One of those photographs, and I

24   apologize to you and the jury, shows linoleum,

25   looks like linoleum tile at the entrance, that

1    I believe we have had testimony, is the

2    entrance or was the entrance of the Toy Store

3    there?  Correct?

4         A    Yes, sir.

5         Q    Would that be the linoleum that is

6    right here in the front entrance of the Toy

7    Store?

8         A    Yes, sir.  The way that door was,

9    it appears whoever put the carpeting in and the

10   flooring down, the carpeting would have

11   interfered with the opening and closing of the

12   door, that way they just laid tile there.

13        Q    All right.  Would you hand those

14   photographs to the jury, please, sir?

15             Now you testified that there was a

16   projectile path through some of the shirts in

17   this T-shirt rack?  Is that correct?

18        A    Yes.

19        Q    Would you relate to me or

20   illustrate to us how this path occurred?

21        A    These T-shirts were hanging in this

22   general area.  Okay?  On the rack.  It appeared

23   that a projectile had passed through at least

24   several of them going in this general

25   direction.

1    Q    From here?  This direction?

2    A    Yes, sir.

3    Q    Is that correct?

4    A    Correct.

5    Q    All right.  You can take the

6    witness chair, again, please.

7         JUROR:  Your Honor, I was looking at the

8              picture.  I missed that.  What

9              direction was that?

10        THE COURT:  Would you step back down and

11             go over that again?

12        MR. SMITH:  I will let you -- if you want

13             to use the pointer you can.  You

14             don't have to.

15        THE WITNESS:  As I said, the shirts were

16             all in this area here.  And it

17             appeared that a projectile had

18             passed through the shirts going

19             back in this general direction.

20

21        Q    Rick, I show you what is already in

22   evidence as Defendant's Exhibit (a) and

23   Defendant's Exhibit (c) and ask you to take a

24   look at those two exhibits.  And tell me if you

25   recognize having seen what they depict

1    previously, with exception, of course, of

2    Mr. Grimes, as taken from the video tape.  And

3    I know that you didn't see that.

4           A      I have seen that.

5           Q      Oh.  You have seen the sculpture

6    there?

7           A      Yes, sir.

8           Q      But, now --

9           A      This photograph depicts the front

10   of the Toy Store, as we arrived.  And it's been

11   marked with crime-scene tape.  I recognize this

12   photo I took it.

13          Q      Hold up (a) if you would, please,

14   sir, so the jury can see it, and so you can

15   reference it yourself, also.  Tell us what the

16   front door was like?

17          A      The front of the door and the front

18   door itself, there was iron bars or bars on the

19   windows.  There was an iron bar system on the

20   front of the door, along with the screen door.

21          Q      A screen door?

22          A      Yes, sir.  Covered by the iron

23   bars.

24          Q      All right.  And was that like a

25   storm door, except it had, as you said,

```
1    security bars over it?

2         A      Correct.

3         Q      And it was transparent, visible

4    through it?

5         A      Yes.  It had glass in there.

6         Q      In fact, does not, Defendant's

7    Exhibit (c), show this door as Mr. Grimes is

8    coming out of it?  And you can see the storm

9    door that you can see clearly through?

10        A      Yes.

11        Q      And you have the barred door that's

12   kind of like a gate, that's separate from the

13   clear, glass storm door?  Correct?

14        A      Yes.

15        Q      So you have a door, you have

16   security bars that obviously are open, or you

17   couldn't get in it?

18        A      Correct.

19        Q      And then you have a clear, that you

20   can see through, storm door?

21        A      Yes.

22        Q      Is there another door that was

23   open?

24        A      I don't recall any other doors.

25        Q      But you would agree with me, that
```

1    you can see through the front door, that storm

2    door, that clear glass, that screen, into the

3    Toy Store?  In fact here, you can see the front

4    counter?

5         A    That's correct.

6         MR. SMITH:  Judge, we would ask to

7                   publish these to the jury.

8         THE COURT:  Any objection?  None?  They

9                   are in evidence.  They are (a)

10                  and (c), did you say?

11        MR. SMITH:  Yes, Your Honor.  They were

12                  introduced before, but I wanted

13                  to refurnish them at this time.

14        THE COURT:  Sure.

15        Q    Now, the labels -- the blood

16   spatters, as you referred to them, that were on

17   the front of the counter, that were introduced

18   the two photographs a moment ago as (a) through

19   whatever letter, that you said that you labeled

20   those spatters?  Is that correct?

21        A    Yes.

22        Q    And did you recover samples of

23   those?

24        A    I did.

25        Q    And did you recover samples from

1    other places in the business?

2        A    We removed a large amount of

3    carpeting from of all of the areas in question

4    that we did find blood spatters and blood

5    stains.

6        Q    All right.  Now, as case agent --

7    well, let me back up.  Brian Smith and Bryan

8    Yoeman were ultimately arrested for capital

9    murder and robbery of this offense, as well as

10    Mr. Robert Conrad?  Is that correct?

11        A    They are the Co-Defendants in this

12    case, yes.

13        Q    And just so, for any member of the

14    jury that doesn't understand what a

15    Co-Defendant is, they are also charged

16    separately with the same crime?  Is that

17    correct?

18        A    Yes, sir.

19        Q    And their cases are pending, are

20    they not?  You know that be true?

21        A    Yes, sir, they are.

22        Q    Now the LTD Ford that is in this

23    photograph, State's Exhibit 17, is already in

24    evidence, whose vehicle is that?

25        A    I have been told it's Brian

1    Smith's, but I don't know.

2         Q     All right.  And do you know where

3    that vehicle was parked, when that photograph

4    was taken?

5         A     This vehicle has been photographed

6    at the Green Tree Apartments on East Park

7    Avenue.

8         Q     Bryan Yoeman lived at the Green

9    Tree Apartments, did he not?

10        A     Yes, sir.

11        Q     Is that correct?  Yes, he did?

12        A     I believe, he did, yes.

13        Q     All right.  Did you participate in

14   a search or learn of a search of Bryan Yoeman's

15   residence?

16        MRS. STOUT:  Objection.  Beyond the scope

17              of direct.

18        THE COURT:  We will have to have a

19              side-bench conference on this

20              issue and discuss it further.

21                   We have reached a point

22              in time we can take a lunch

23              break.  There is no need for the

24              jurors to have to sit there

25              while we do this.

1           I will hear this

2           outside of your hearing and

3           presence.  We will see where we

4           are going with this before the

5           Court rules.

6                Our doctor is not going

7           to be here until 1:15 or so?

8      MRS. STOUT:  1:15.

9      THE COURT:  1:15.  Why don't we make it

10          1:30.  You will have a little

11          extra time at lunch.  At 1:30 we

12          will be back in here, and we

13          will get started, again.

14     MR. SMITH:  Judge, I have no objection,

15          because of the nature of his

16          very valuable and important

17          service to bring him on before I

18          finish my cross examination.

19     THE COURT:  We may end up doing that.  We

20          might end up taking the doctor

21          out of turn -- stopping with

22          this witness, taking the doctor,

23          so that the doctor can get back

24          to the emergency room for his

25          professional work.  That is

710

1    badly needed, I'm sure.

2              And then we will get

3    started with this law

4    enforcement officer.

5              So the Court is

6    required to instruct you and

7    does instruct you not to discuss

8    this matter with, nor allow

9    anyone to discuss it with you.

10             One of the jurors sent

11   me word and asked could you eat

12   anywhere.  Certainly you may.

13             There will be people in

14   the community, if they know you

15   are on this jury, they will want

16   to know about it, want to know

17   about what you've heard, want to

18   know what you think.

19             So, again, please stop

20   them, and tell them you are on

21   this trial jury.  And you are

22   not allowed to discuss anything

23   with anyone.

24             Y'all have a good

25   lunch.  We will see you back in

1          here at 1:30.

2                    If everybody will rise

3          while the jury exits the

4          courtroom.

5                    (Jury exited the courtroom).

6     THE COURT:  The record will reflect that

7          we are now out of the hearing

8          and presence of the jury.  I

9          will hear argument on the

10         motion.

11                   Your question, again,

12         Mr. Smith, was what?  Did he

13         participate in a search?

14    MR. SMITH:  Or was he aware of a search

15         that was conducted at Bryan

16         Yoeman's residence, first.

17    THE COURT:  Where are you headed with

18         this?

19    MR. SMITH:  Judge, Well, let me make two

20         statements.  Your Honor, one in

21         Alabama, of course, you have a

22         wide open cross examination

23         scope that is not limited by

24         what was brought into direct.

25         That's number one.

```
1          THE COURT:  So you are trying to show

2                    something exculpatory in nature?

3      MR. SMITH:  We feel like it is, yes.

4                         And, secondly, I would

5                    respectively ask the Court not

6                    to make me say where this is

7                    going, because it would tend to

8                    give the defense' strategy away

9                    prematurely.

10                        We think, because cross

11                   examination is wide open in

12                   Alabama state court, and it is

13                   relevant, and I will tie it

14                   together, that I have a right to

15                   ask him questions about this.

16                        I'm going to weapons

17                   that were recovered,

18                   attributable to one of the

19                   Co-Defendants.

20     THE COURT:  Okay.  And what says the

21                   State?

22     MRS. STOUT:  Quite honestly, this was a

23                   fishing expedition to try to

24                   shed light on Mr. Yoeman and to

25                   confuse this jury based on those
```

```
 1                    two Co-Defendants.

 2                         And I, representing the

 3                    State of Alabama, would be at

 4                    fault if he got into the search

 5                    of that apartment, unless he can

 6                    tell what weapon it is that has

 7                    anything to do with this murder.

 8                         If he can tell the

 9                    Court that, that there was any

10                    weapon retrieved, that had

11                    anything to do with this murder,

12                    he should have come and let the

13                    State know it.

14         THE COURT:  Okay.  So you have an

15                    objection?  Objection is

16                    overruled.  It's obvious that if

17                    the predicate is laid that this

18                    law enforcement officer

19                    participated in the search of

20                    someone who has some connection

21                    or alleged connection with the

22                    on-site and robbery that are

23                    alleged, then the Court will

24                    allow that.

25         MR. SMITH:  Thank you, Your Honor.
```

1        THE COURT:  However, after the State

2                    leaves, I want the defense to

3                    share with the Court, outside of

4                    the hearing of the State, where

5                    you are headed with this.

6        MR. SMITH:  I have no objection.

7        THE COURT:  And I'm going to be fair

8                    with the State.  You have that

9                    right.

10                        Okay.  This Court is in

11                    recess until 1:30.

12       THE COURT:  And whatever you are going to

13                    say, we will state it on the

14                    record.

15       MR. SMITH:  Certainly, Your Honor,

16                    whenever you want me to.

17       THE COURT:  Just a minute.

18                    (The following was heard outside

19                    of the hearing and presence of

20                    the jury).

21       THE COURT: Let the record reflect that we

22                    are out of the hearing and

23                    presence of the jury during

24                    this.

25                    (Off-record discussion).

715

1    THE COURT:  Also, we are out of the

2              hearing and presence of the

3              State.

4    MR. SMITH:  Thank you, Your Honor.

5    THE COURT:  And it's just a proffer, if

6              you will.

7    MR. SMITH:  Judge, I will tell you, the

8              evidence will show, of course,

9              we have established the evidence

10             that Brian Smith and Bryan

11             Yeoman were a part of this

12             offense.

13   THE COURT:  Charged, in custody, et

14             cetera?

15   MR. SMITH:  We will show that the rifle

16             was recovered from the residence

17             of Bryan Yeoman's, that the

18             rifle was stolen at the same

19             time a 9 millimeter pistol was

20             stolen.  Bryan Yeoman had

21             access, and only Bryan Yeoman,

22             of these Defendants, had access

23             to that residence.

24   THE COURT:  You are going to show that

25             through law enforcement?

716

```
 1          MR. SMITH:  Law enforcement, not --

 2         MR. BRADSHAW:  I thought you said this

 3                 was through law enforcement.

 4        THE COURT:  Okay.  There is a problem.

 5         MR. SMITH:  Any time you have

 6                 Co-Defendants, it's a good idea

 7                 to be pointing to each other.

 8        THE COURT:  Okay.  Let the record reflect

 9                 that we were out of the hearing

10                 and presence of the jury during

11                 this.

12         MR. SMITH:  Judge, obviously, I'm not

13                 going to -- that was in jest.

14                 That's doesn't have to be a part

15                 of the record.

16        THE COURT:  I want it in there.  He did

17                 it over protest, we will say.

18                 It was also out of the hearing

19                 and presence of the State.

20         MR. SMITH:  Thank you, Your Honor.

21        THE COURT:  Okay.  And this was just a

22                 showing, above if you will.

23                 (The following was heard in the

24                 hearing and presence of the

25                 jury).
```

1          THE COURT:  This court will come to

2                     order.  Have a seat, if you

3                     will.

4          THE COURT:  Ladies and gentlemen, I hope

5                     each of you had a good lunch.

6                          Mr. Smith, you may

7                     continue.

8          Q      (By Mr. Smith) Mr. Hauser, in the

9     course of your investigation, and you taking

10    this case, as case agent, and keeper of the

11    records and files and the evidence, did you

12    also come to participate in, or learn of a

13    search of the residence of Bryan Yoeman?

14         A      After the fact, yes.

15         Q      And was a piece of evidence that was

16    recovered by officers during the course of that

17    search, that being a SKS rifle, turned over to

18    you?

19         A      Yes.

20         Q      And in the course of your receiving

21    that, was that gun, that rifle, identified to

22    you as being recovered from the residence of

23    Bryan Yoeman's?

24         A      Yes.

25         Q      Did you also receive information or

718

1    determine that that rifle had been stolen?

2         A     That weapon was reported stolen in

3    a burglary, yes, sir.

4         Q     And that weapon had been, in fact,

5    stolen from a gentlemen -- if you will bear

6    with me just a moment, please.  Do you recall

7    the name as a Mr. James Morgan?

8         A     Yes.  I remember a burglary report

9    that had been filed by this Mr. Morgan prior to

10   this incident.

11        Q     And that SKS rifle that was

12   recovered during the course of this

13   investigation of this crime was recovered from

14   the residence of Bryan Yoeman?  Correct?

15        A     Correct.

16        Q     Did Mr. Morgan also, or Mr. Morgan

17   also had a 9 millimeter pistol that had been

18   reported stolen at the same time that SKS rifle

19   was stolen?  Correct?

20        A     I'm not familiar with what's on

21   that report.  I remember the SKS --

22        THE COURT:  If you don't know, please

23   state you don't know.

24        A     I don't know.

25        Q     You said that you were familiar

1    that the rifle had been reported stolen Mr.

2    Morgan?

3         A    I was familiar with that report and

4    the digression that was conducted in criminal

5    investigations during the course of this

6    investigation, several days later that the

7    weapon, I remember the SKS primarily, because I

8    did see it.

9         Q    You said "primarily". Do you now

10   recall that it was also reported that the

11   9 millimeter was reported stolen?

12        A    No, I do not.

13        Q    You don't recall that. Would it be

14   in your records or reports anywhere?

15        A    No, sir. The only thing that would

16   be in the report would be the initial

17   Incident/Offense report that was filed by the

18   victim.

19        Q    That would list what was stolen?

20   Correct? Of what he reported stolen? The form

21   would do that?

22        A    That's correct.

23        Q    Now, you also took, and I may have

24   misunderstood your testimony on direct. But

25   you also did lift latent prints from the Toy

1    Store, did you not, from the inside?

2         A    Correct.  We lifted several latent

3    prints from the area of the front window and

4    the front door of the building.

5         Q    You checked for prints?  And tell

6    the jury, please, sir, what a latent print is,

7    please, sir.  They may not understand too much

8    about that?

9         A    Obviously, everyone has

10   fingerprints.  And it has been determined that

11   fingerprints are unique to individuals.  When

12   we talk about or refer to latent prints, latent

13   prints are residue of fingerprint material left

14   on an object by a hard service, or in this

15   case, the glass window of the front of the

16   business.

17        Q    And you submitted those prints to

18   the Alabama Bureau of Investigation, Shannon

19   Fitzgerald, of latent print unit?

20        A    I did.

21        Q    And in the course of your

22   investigation, you also sent up the prints of

23   Mr. Robert Conrad, did you not?

24        A    In cases like this, major case

25   prints are taken of all of the suspects, yes.

1      Q      All right.  And you received a

2  report back from Ms. Fitzgerald that said that

3  they did not identify Mr. Robert Conrad's

4  prints?  Is that correct?

5      A      If I recall correctly, there were

6  no latents of value identified, or none of the

7  suspects prints were identified.

8      Q      But, specifically that report said

9  Robert Conrad's prints were not identified?

10      A      That's correct.

11      Q      Rick, the inside of the Toy Store,

12  I believe you testified, if I recall, on direct

13  that it was a -- bear with me and let me look

14  again and make sure I get it correctly -- like

15  a metal storage building?  Did I hear you say

16  that?

17      A      If you refer to the photographs,

18  the initial building itself is a metal,

19  storage-type building, with two additions added

20  onto it.

21      Q      Did you make any measurements or

22  come to have possession of measurements of the

23  side of that building?

24      A      Measurements were taken, yes.

25      Q      All right.  Would you tell the

722

1    jury, please, sir, the measurement of the metal

2    storage building, and I will let you refer to

3    Defendant's Exhibit (a)?

4        A    I would have to refer to my notes

5    of the case files.

6        THE COURT:  You may refer to notes to

7                    refresh your recollection, if

8                    you have them.

9        MR. SMITH:  I might be able to help you.

10       Q    Do any of these help you any?

11       A    This is my crime-scene sketch of

12   the Toy Store, yes, sir, this is.

13       Q    Does that refresh your recollection

14   of the measurements --

15       A    Yes, sir.

16       Q    -- of the --

17       A    It contains the measurements of the

18   building.

19       Q    All right.  I realize this is a

20   good distance.  But they've seen it, and we

21   will let them see it again in a moment.  I'm

22   referring to Defendant's Exhibit (a).

23       THE COURT:  Which one?

24       MR. SMITH:  It's (a); "a" as in "apple"

25                   or "A1".

1        Q    Would you tell us the measurements

2  across the front of the Toy Store, how far

3  across are the measurements?

4        A    According to my measurements, 28

5  feet, 4 inches.

6        Q    Is that outside?

7        A    That's outside measurements from

8  the corner to corner.

9        Q    Obviously, you would have studs that

10  would take up space on the inside, and whatever

11  dimensions of the wall was, your inside

12  dimensions would be reduced by that amount?

13        A    Yes, sir.

14        Q    And the depth of the original

15  building?

16        A    The metal building, itself, was 18

17  feet, 1 inch, according to my measurements.

18        Q    So you are talking about 18 feet by

19  28 feet?

20        A    Would have been the length of the

21  metal building itself.

22        Q    And you take a foot off, roughly,

23  of the inside each way for the wall thickness,

24  each two walls, four walls?

25        A    Again, that taken out, insulation

1    and studs and all that, that would be

2    approximately correct.

3        Q    All right.  Now, there are two

4    additions built on to this?  Is that correct?

5        A    Yes, sir.

6        Q    And Exhibit (b), Defense Exhibit

7    (b) -- do you have your orientation there?

8        A    Uh-huh.

9        Q    Would you point out to the jury or

10   tell the jury in (b) what the addition, if an

11   addition, is shown there?

12       A    It's not shown in that photograph.

13       Q    Not shown in that one.  All right.

14   Defendant's Exhibit (d), delta, would you point

15   out the addition here, if you would for the

16   members of the jury?

17       A    As you can see where this white

18   stud is right here, that's part of the original

19   metal building itself.

20            This portion right back here that

21   would you have been one of -- the back addition

22   added onto the building.

23       Q    All right.  This portion here?

24       A    Correct.

25       Q    And looking through the paper, you

1    see I'm tucking that in the right place?

2    Correct?

3         A       Yes, sir.

4         Q       What is the dimension of that part?

5         A       Well, the length of the addition is

6    28 feet, 8 inches.  I'm trying to decipher my

7    own notes here.

8              The overall, entire length of the

9    building, the width of the building, starting

10   from the front, all the way to the rear and

11   though that back wall of that addition would

12   have been 34 feet.

13        Q       All right.

14        A       So if you subtract the 18 foot, 1'

15   inch, from 34, you would have the length of

16   that, or the width, of that back room.

17        Q       And I'm not going to ask you to do

18   that.  The storage room, did you make a

19   measurement of the storage room?

20        A       Yes, sir.  It's 5 foot, 1 inch wide

21   by approximately about 3 feet.

22        Q       That's 5' by 3'?  So it's very,

23   very small?  Is that correct?

24        A       Yes.  It's just -- almost a

25   closet-size room.

1        Q       And my point of all of that is you

2    are talking about a rather small total area of

3    the area of the Toy Store that has merchandise

4    in it?

5        A       Correct.

6        Q       That's fairly close quarters?

7        A       Correct.

8        MR. SMITH:  Thank you, sir.

9                    REDIRECT EXAMINATION

10   BY MRS. STOUT:

11       Q       Sergeant Hauser, were you present

12   when the search warrant was executed on the

13   residence of Bryan Yeoman's?

14       A       No, I was not.

15       Q       Do you have an independent

16   recollection of what was seized at the

17   residence of Bryan Yeoman?

18       A       Based on my review of the property

19   receipts, a number of items were seized, both

20   in the residence and on top of the residence,

21   the SKS being one of them, a lot of -- some

22   magazines for that weapon, some ammunition,

23   some clothing items.

24                There were a number of items that

25   were seized from the apartment and on top of

1    the apartment, on the roof structure at Green

2    Tree.

3              THE COURT:  For this jury, you say "SKS"?

4                        And I know what they look like.

5                        You know what they look like.

6                        The Prosecutor and Defense know

7                        what SKS rifles look like; but

8                        would you please describe one to

9                        the ladies and gentlemen of the

10                        jury, so they will have an idea?

11         A    The SKS is the Chinese version of

12    the Russian AK-47 assault rifle.  It's 7.62

13    millimeter semi-automatic, full-automatic

14    weapon.  It has a bayonet attachment to it.

15    It's wood.

16         THE COURT:  Length?

17         THE WITNESS:  Approximately --

18         THE COURT:  If you will do your hands.

19         THE WITNESS:  Approximately that long,

20                        without the bayonet

21                        (indicating); full bayonet mode,

22                        about this long.

23                        If anyone has seen

24                        television or remembers the

25                        Vietnam War, the SKS and AK-47,

2128

```
 1                    a standard issued communist

 2                    Russian weapon.

 3          Q     Do you recall when that search was

 4    executed?

 5          A     It was executed late in the evening

 6    of the 23rd --

 7          Q     Or early morning --

 8          A     -- or the early morning hours of

 9    the 24th.

10          Q     Do you recall if any other weapons

11    were found in the area?  And I believe

12    Mr. Yoeman lived at Green Tree Apartments?  Is

13    that correct?

14          A     Correct.

15          Q     So did Mr. Smith?

16          A     Correct.

17          Q     Near each other?  Is that correct?

18          A     Yes.

19          Q     Do you recall if any other weapons

20    were retrieved?

21          A     I believe a rifle was also

22    recovered either in a wooded area behind the

23    apartment building or in the general proximity

24    to the apartments.

25          Q     And do you have an independent
```

1    recollection of when those, or let me rephrase,

2    when that weapon was retrieved?

3         A    Again, that was recovered either in

4    the evening of the 23th or the early morning of

5    the 24th, while officers were in the area of

6    Green Tree Apartments conducting this search

7    warrant and basically conducting searches in

8    the area.

9         Q    Now, counsel for the Defendant

10   asked you some questions about individuals that

11   were at the scene upon arrival, asking you

12   about the log?  I believe they even asked you

13   about me being there, didn't they?

14        A    Correct.

15        Q    And I believe they have marked --

16   is that correct?  Let me show you what they

17   have marked as Defendant's (y) and let you look

18   at these carefully.  Do you recognize this?

19        A    It's one of the logs that was used

20   in the investigation of this particular

21   incident.

22        Q    And looking at this one, would that

23   be the first log that was started?  The second

24   log that was started?  Which log?

25        A    This appears to be the first log

1    that was started by Officer Lennis Darby when

2    he arrived at the scene.

3         Q     And on that, is it kept until you

4    arrive?

5         A     That's correct.

6         Q     And once you arrived at the scene,

7    did you control who came and went in that

8    scene?

9         A     I physically controlled who came

10   and went in that scene, yes.

11        Q     And did you allow anyone in that

12   scene --

13        A     No.

14        Q     -- Until you had collected your

15   evidence, gathered it, and made sure that you

16   had everything that you needed?

17        A     Myself and Detective Ammons, along

18   with two other investigators that are indicated

19   on that were actually, physically present

20   inside the building.

21        Q     So when counsel made reference to

22   all these people coming into the scene, was

23   that in here or on the peripheral?

24        A     That was on the peripheral.  I know

25   the officer who did this, Officer Chris Hurly,

1    who now works for me.  He was brand new at the

2    time.  He was a brand new officer.  He has just

3    been out on the road not very long.

4         He was probably very exited.  This was

5    one of his initial calls in which a major crime

6    had occurred.  And, obviously, he was very

7    diligent in the fact that he logged everybody

8    who showed up at the scene.  These scenes have

9    a tendency to attract people, especially law

10   enforcement officers.  We have a tendency to

11   like to go to the scenes and see what's going

12   on.

13        And in these cases, most of these

14   officers were on shift that day.  Their shift

15   supervisor was there.  Their shift sergeant was

16   there.  They were receiving instructions from

17   them.  They were also being detailed to do

18   certain things.

19        None of those people were allowed

20   inside the crime scene itself.  They were on

21   the peripheral, on the outside.

22        As you see, your name was actually

23   indicated there.  I remember you being there.

24   You were outside, and you were not allowed on

25   my scene.

1        Q        And your scene was protected?

2        A        That's correct.

3        Q        Thank you.  Now, Defense also

4    showed you a picture?  If I may, Judge, if you

5    will give me just a moment.

6        THE COURT:  Sure.

7        Q        Let me show you what has been

8    marked as Defendant's Exhibit (f).  And he made

9    reference to the straws in these brackets.

10   Have you seen these at any other stores around

11   town or something similar at Mr. Henry's,

12   maybe?

13       A        I don't recall that if there are

14   any other stores --

15       MR. BRADSHAW:  I object to leading the

16                witness and suggesting an answer

17                for him.

18       THE COURT:  Overruled.

19       Q        You may continue.

20       A        I don't recall any other stores in

21   town that had this kind of merchandise.  From

22   this photograph, I couldn't tell you exactly

23   what those items were.  As to seeing them at

24   any other store in Enterprise, I don't think

25   so.

733

```
 1        Q      But you don't know what they are
 2   used for, do you?
 3        A      As the Defense Counsel indicated, I
 4   know what was in that store.  I saw the
 5   merchandise in that store.  As to my judgment
 6   or view of what that merchandise was for or
 7   used for --
 8        Q      You don't know?
 9        A      I can speculate, but I can't say
10   for sure.
11        Q      Now, the fingerprints that you
12   took, you submitted Brian Smith's fingerprints?
13   Is that correct?
14        A      That's correct.
15        Q      Bryan Yoeman's fingerprints?
16        A      That's correct.
17        Q      And the Defendant's fingerprints?
18        A      That's correct.
19        MR. SMITH:  Object to leading, may it
20               please the Court.
21        THE COURT:  Overruled.
22        Q      Were there any matches?
23        A      No.
24        Q      Was anybody excluded?
25        A      No.
```

1        Q      They just couldn't be patched,

2   could they?

3        A      That's correct.  As I stated in

4   this case, the report came back that there were

5   no latents of value.  That's not usual from the

6   Department of Forensic Sciences or the latent

7   print unit.

8              All that means is that those

9   fingerprints that we were able to lift were not

10  good enough to be examined to compare with

11  anybody, neither the suspect or anybody else.

12  They were not of any value.

13       Q      So they couldn't match them, but

14  you couldn't exclude them?

15       A      That's correct.

16  MRS. STOUT:  Thank you.

17  THE COURT:  Any other questions, Mrs.

18            Stout?

19  MRS. STOUT:  No, Your Honor.

20  THE COURT:  Mr. Smith?

21

22

23

24

25

1              RECROSS EXAMINATION

2    BY MR. SMITH:

3         Q     The report actually says that the

4    latent fingerprint of value found on lift label

5    front door, market number two and number three

6    and number four, were unidentified?  Is that

7    not correct?

8         A     Yes.

9         Q     Now, you made mention of a bong

10   when we were talking earlier.  You described

11   the interesting looking object that's in

12   Defendant's Exhibit (p), the photograph that

13   had a .22 bullet in it as a bong.  Would you

14   tell the jurors, please, sir, what a "bong" is?

15        MR. JARRELL:   Object to relevance.

16        THE COURT:  Overruled.

17        A     In my experience as a law

18   enforcement officer, I've worked several cases

19   involving narcotics, drug paraphernalia, et

20   cetera.  A bong is a type of smoking device

21   which is used to smoke marijuana.

22        Q     Rick, prior to your securing the

23   scene, and starting the log that has been

24   identified as Defendant's Exhibit (y), but is

25   in evidence, and I put it in evidence, in we

1    offer it.

2          THE COURT:  Any objection?

3          MRS. STOUT:  To the log?

4          THE COURT:  To the log.

5          MRS. STOUT:  No objection.

6          THE COURT:  It's in evidence.

7          Q    You don't have any personal

8    knowledge of how many times Mr. Ray Grimes went

9    in and out of that building and by the front

10   door, where you observed blood spots, do you?

11   Prior to your securing the scene?  Do you have

12   personal knowledge?

13         A    Oh.  No.  Prior to our securing the

14   scene, no, sir.

15         Q    And prior to your securing the

16   scene, and this log being started at your

17   direction and your control, you don't know how

18   many times Brian Smith or Bryan Yoeman walked

19   in and out of that store, or where they walked

20   inside that store, do you?

21         A    I would have no knowledge of that,

22   no.

23         Q    And that would also be true of the

24   rescue squad personnel that attended to

25   Mrs. Dennis and anyone else for that matter?

1      A      That's correct.

2      MR. SMITH:  Thank you very much, sir.

3      THE COURT:  Mrs. Stout?

4      MRS. STOUT:  Just a moment, Your Honor.

5            No, Your Honor, but we would

6            like to have him on standby.

7      THE COURT:  To recall?  Sure.

8      MRS. STOUT:  Thank you, sir.

9      THE COURT:  Call your next witness.

10     MRS. STOUT:  The State calls Jeff Spence.

11     THE COURT:  Please raise your right hand

12           and place your left hand on the

13           Bible.

14                    JEFF SPENCE

15     Whereupon, this witness, after first

16  being duly sworn to tell the truth, the whole

17  truth, and nothing but the truth, testified as

18  follows, to-wit:

19                 DIRECT EXAMINATION

20  BY MRS. STOUT:

21     Q      State your name for the ladies and

22  gentlemen of the jury, please?

23     A      Jeffery D. Spence.

24     Q      And where are you employed?

25     A      Enterprise Police Department.

1    Q    How long have you been employed

2  with the Enterprise Police Department?

3    A    Almost 14 years.

4    Q    And, Jeff, during your tenure with

5  the Enterprise Police Department, tell the

6  ladies and gentlemen how many different

7  divisions you've worked with?

8    A    I worked the first year in

9  communications.  The second year I started

10  patrol.  I worked with patrol from '89 to 1993,

11  where I got assigned to criminal

12  investigations.  I worked criminal

13  investigations from 1993 to 1997.  I came back

14  to patrol, where I took over the FTO and K-9

15  program.

16    THE COURT:  What is that?

17    THE WITNESS:  Field training officer.

18    A    From 1999, promoted to sergeant,

19  criminal investigations division.

20    MRS. STOUT:  I'm going to ask you do

21          something I always do.  I'm

22          going to ask you to slow down

23          just a little bit for my court

24          reporter.  Okay?

25    THE WITNESS:  Yes, ma'am.

1          A        From 1999, to this year, I was

2    sergeant over the criminal investigations

3    division.  And I got promoted to lieutenant and

4    went back to patrol.

5          Q        Back on May 23rd of 2001, what were

6    your duties with the Enterprise Police

7    Department?

8          A        Sergeant over criminal

9    investigations division.

10          Q        Do you recall that date May 23rd

11    2001?

12          A        Yes, I do.

13          Q        Were you dispatched to County Road

14    711, to a place called the Toy Store?

15          A        I was.

16          Q        And for what purpose?

17          A        Due to a robbery and a shooting.

18          Q        Approximately what time did you

19    arrive at the scene?

20          A        I don't recall the exact time.  But

21    I believe it was around, approximately 1:30.

22    Maybe 1:30, 2:00.

23          Q        Somewhere in that time frame?

24          A        Yes.

25          Q        Now, were you the case agent at the

1    time of this case?

2         A       I was.

3         Q       And who is the case agent now?

4         A       Sergeant Rick Hauser.

5         Q       And why are you no longer the case

6    agent?

7         A       Because I have been promoted

8    lieutenant and in patrol division.

9         Q       Explain to the ladies and gentlemen

10   what happens when you move from one division to

11   another division?

12        A       Access to the records are limited.

13   Not only that.  My work hours are restructured.

14   I'm responsible for patrol functions.

15   My day's work, or normal duty hours are now

16   12-hour shifts, four days on, four days off.

17   And we rotate between nights and days.  So it's

18   difficult to follow up on any type leads.

19        Q       So what do you do with a case?  If

20   you are involved in a case like this, what do

21   you do with that case if you are the case

22   agent?

23        A       In circumstances like this, it

24   would be handed over to the next one who is

25   most familiar with the type case it is.

```
 1          Q       And in this particular situation,

 2    that was whom?

 3          A       Sergeant Hauser.

 4          Q       Now, prior to going to patrol, you

 5    did quite a bit in this particular case?  Is

 6    that correct?

 7          A       That's correct.

 8          Q       And what did you initially do when

 9    you reported to County Road 711, on May the

10    23rd 2001?

11          A       I was briefed by Sergeant Hauser

12    and Captain Moore, who were already at the

13    scene.  And they explained what had transpired.

14    At which time I was notified that I was needed

15    at the hospital.  And I responded to the

16    hospital.

17          Q       And when you arrived at the

18    hospital, what did you do then?

19          A       I was advised that a subject had

20    came into the hospital that had been shot, as

21    well as the victim in the shooting.

22          Q       And after you had received

23    information regarding this information, what

24    was your next step in regarding physical

25    evidence?
```

1    A    Fingerprinted the wheelchair that

2    the person was brought on.

3    Q    What, if anything, did you receive

4    from that, as far as evidence?

5    A    No latents of value.

6    Q    When you arrived, did you also

7    receive some information regarding a particular

8    car?

9    A    Yes.

10    Q    Okay.  Now, I'm going to show you

11    what's been marked as State's Exhibit 17.  And

12    ask you if you can identify that?

13    A    Yes.

14    Q    How can you identify State's

15    Exhibit No. 17?

16    A    That's the vehicle commonly driven

17    by Brian Smith.

18    Q    And did you receive information

19    through your investigation of what had occurred

20    at County Road 711 regarding this car?

21    A    Yes.

22    Q    What information did you receive

23    for your investigation when you arrived at the

24    hospital that day?

25    A    That also two witnesses were down

1    at the police department to give statements

2    regarding what they had observed.  One being

3    Donald Smith and the other one Eric -- I cannot

4    pronounce his last name -- at which time I went

5    to the police department.  And they described,

6    or Donald Smith described that vehicle, along

7    with another vehicle on the county road parked.

8    And three subjects were speaking to one

9    another.

10        Q     After you obtained this

11   information, as you followed through with your

12   investigation, did you later identify Brian

13   Smith and Bryan Yoeman as suspects?

14        A     Yes.

15        Q     How did you do that?

16        A     An officer had observed them at the

17   hospital, along with that vehicle was observed

18   by Michael Petty leaving or coming north on

19   Geneva Highway.

20        Q     Can you say that again?  The

21   vehicle had been observed at the hospital?

22        A     Yes.  By Officer Matt Key.

23        Q     And do you know approximately what

24   time that vehicle, through your investigation

25   in obtaining that information, for your

1  investigation, that that vehicle had been seen

2  at the hospital?

3      MR. SMITH:  Objection, Your Honor

4      THE COURT:  Overruled.

5      A    I believe it was around,

6  approximately 2:00 o'clock, maybe.

7      Q    Now, having obtained this

8  information, that Brian Smith's vehicle has

9  been at the hospital and seen shortly after, at

10  the scene, did he become someone that you

11  wanted to talk to you?

12      A    Yes.

13      Q    How long after 2:00 o'clock was it

14  before you were able to find Brian Smith?

15      A    I was notified at approximately

16  8:00 p.m. that night that narcotics officers

17  had located Brian Smith, along with Bryan

18  Yoeman exiting Wal-Mart.

19      Q    And when those officers located

20  Brian Smith and Bryan Yoeman, what did those

21  officers do?

22      A    They detained them and brought them

23  to the police department for questioning.

24      Q    And did you talk with those

25  individuals?

745

```
 1          A     I spoke with Brian Smith and

 2   briefly with Bryan Yoeman.

 3          Q     After speaking with Brian Smith and

 4   Bryan Yoeman did it become necessary to obtain

 5   a search warrant?

 6          A     Yes, sir, it did.

 7          Q     And did you do that?

 8          A     Yes.

 9          Q     And for whose homes did you obtain

10   search warrants?

11          A     Brian Smith and Brian -- or Bryan

12   Yoeman and the vehicle that Brian Smith

13   commonly drove.

14          Q     Do you have independent

15   recollection as to what was retrieved -- let me

16   rephrase.  Do you have independent recollection

17   as to whether anything was retrieved from Brian

18   Smith's home?  Or do you need to look at the

19   search warrant?

20          A     I would need to look.

21          Q     And the returns?

22          A     Correct.

23          MRS. STOUT:  May I, Your Honor.

24          THE COURT:  You may.

25                              Did you make the
```

1                    return?

2          THE WITNESS:  I believe I did.

3          THE COURT:  Just so you know, ladies and

4                    gentlemen of the jury, when a

5                    search warrant is issued, the

6                    law enforcement officer, who was

7                    provided a search warrant by the

8                    Judge has to make a return to

9                    the Court within so many days.

10         THE COURT:  That return would list

11                   whatever was found incident to

12                   the search.

13         MRS. STOUT:  I apologize, Your Honor, I

14                   apparently mixed them up.  If

15                   you would give me just a moment.

16         THE COURT:  Take your time.

17         MR. SMITH:  Your Honor, may we correctly

18                   assume that the witness is being

19                   shown these search warrants?

20         MRS. STOUT:  These are search warrants --

21         THE COURT:  The record so reflects.

22         MRS. STOUT:  -- to Brian Smith and Bryan

23                   Yoeman's home for the purposes

24                   of refreshing the witness'

25                   recollection.

1              THE COURT:   Lieutenant Spence, after you

2                           look at those, tell the Court

3                           whether your memory has been

4                           refreshed.  And during the

5                           questioning, you may refer to

6                           those documents to refresh your

7                           recollection as you need to.

8                              Has your recollection

9                           been refreshed?

10         THE WITNESS:   Yes.

11         Q     When you searched the home of Brian

12   Smith, did you find anything?  Now, Brian

13   Smith, not Yoeman?

14         A     No.

15         Q     Now, when you searched the home of

16   --

17         THE COURT:   Is this a home, or is this an

18                      apartment?

19         MRS. STOUT:   I apologize.  When you

20                       searched the apartment that

21                       actually belonged to Brian

22                       Smith's mother, I believe, Fay?

23                       Is that correct?

24         MR. SMITH:  Object.  Leading, Your Honor.

25         A     That's correct.

```
 1          THE COURT:  You are.  Sustained.

 2     Q     What, if anything, did you find?

 3     A     Nothing.

 4     Q     Did you search the home of Bryan

 5  Yoeman?

 6     A     Yes.

 7     Q     What, if anything, did you find?

 8     A     One 30-round magazine for an

 9  assault-type weapon, containing 7.62

10  ammunition.  One 10-round magazine for an

11  assault-type weapon.  One flash suppressor

12  an assault-type weapon.

13        THE COURT:  Was that a home or an

14              apartment?

15        THE WITNESS:  An apartment.

16     Q     Did you find a weapon?

17     A     No.

18     Q     Okay.  I'll mark this as State's

19  Exhibit No. 35 and ask if that looks familiar?

20     A     Yes, it does.

21     Q     Now, on what I've marked as State's

22  Exhibit No. 35, what is that?

23     A     It is a property receipt at the

24  Enterprise Police Department, using to document

25  property that we have taken from an individual.
```

1          Q        Okay.  What is listed on there, or

2    let me rephrase.  What does that property

3    receipt reference?

4          A        The case number is 01053060; the

5    location where the property was obtained and

6    the type property.

7          Q        Okay.  And where was that obtained?

8          A        117 Green Tree Apartment.

9          Q        Does it have any weapons listed on

10   there?

11         A        No, it does not.

12         Q        And that apartment was the

13   apartment of Bryan Yoeman?

14         A        That's correct.

15         Q        So are you telling this court there

16   was never a weapon taken from the apartment of

17   Bryan Yoeman?

18         A        Not that I recall.

19         Q        Do you have any records to show

20   there was ever any weapon taken from the home

21   of Bryan Yoeman?

22         A        No.

23         Q        Do you have any independent

24   recollection as to whether there was any weapon

25   retrieved in the area of Green Tree Apartments?

1        A      Yes.

2        Q      And where were those weapons

3   retrieved?

4        A      I believe along the wood line of

5   the apartment complex.

6        Q      And that wood line near the

7   apartment complex, whose apartment is near that

8   wood line?  Bryan Yoeman or Brian Smith?

9        A      If my memory serves me correctly,

10  it was Brian Smith's apartment.

11       Q      Thank you.  One other question, if

12  I may.  Captain -- is it captain?

13       A      Lieutenant.

14       MRS. STOUT:  I just bumped you up.

15       THE COURT:  You'll take it, won't you,

16             though, won't you, Jeff?

17       MR. SMITH:  We stipulate that he deserves

18             it, Your Honor.

19       MRS. STOUT:  If I start paying, he

20             probably would.

21       Q      Lieutenant, you have been doing

22  this a long time, haven't you?

23       A      Yes, ma'am.

24       Q      What -- and based on your

25  experience, your training, and over the course

1   of you're 14-and-a-half years with the

2   Enterprise Police Department, approximately how

3   how many homicide cases have you worked?

4        A      Assisted working, along with worked

5   six or seven.

6        Q      And in those six or seven homicide

7   cases that you have worked, how often did you

8   find the weapon that was used to kill the

9   individual?

10       MR. SMITH:  Judge, I object.

11       THE COURT:  Sustained.

12       Q      Over the course of your experience,

13  your time working with the Enterprise Police

14  Department, when there is a period of time

15  before you arrest an individual for a crime,

16  what happens often to evidence during that

17  period of time?

18       MR. SMITH:  Objection, Your Honor.

19       THE COURT:  Sustained.

20       MRS. STOUT:  No further questions.

21       THE COURT:  Mr. Smith?

22

23

24

25

<u>CROSS EXAMINATION</u>

<u>BY MR. SMITH:</u>

    Q    Jeff, you start putting gray color in your hair when you moved to Lieutenant to look distinguished?

    A    I got that when I became sergeant.

    Q    Okay. Just one second, please.

    MR. SMITH:  Just one second.  I think my "gray hair" question is the only one that I have of him.

    THE COURT:  So you have no more questions?

    MR. SMITH:  No, Your Honor.

    THE COURT:  Subject to recall?

    MRS. STOUT:  I only have one that I would like to ask, may I?

    THE COURT:  If there is an objection, I would sustain.

    MR. SMITH:  I'm sorry.

    THE COURT:  That State would like to ask another question.  If there is an objection, I would sustain it.

    MR. SMITH:  Judge, out of fairness, I did ask him a question.  I'm not

753

```
 1                    going to object to it.
 2                 REDIRECT EXAMINATION
 3   BY MRS. STOUT:
 4        Q     Was there any connection made
 5   between the weapons that were retrieved and
 6   this murder?
 7        A     No.
 8        MRS. STOUT:   Thank you.
 9                 RECROSS EXAMINATION
10   BY MR. SMITH:
11        Q     Jeff, that certainly did bring up
12   another question, other than the gray hair
13   question.  During your investigation, didn't
14   you learn that Mr. Morgan, from whom that SKS
15   was stolen, also had a 9 millimeter pistol
16   stolen?
17        A     I want to believe that is correct.
18   I would have to review the report to see.
19        Q     And isn't it correct that your
20   investigation or the police investigation
21   further determined that a female that had
22   access to Mr. Morgan's residence was dating
23   Bryan Yoeman?
24        A     That, I can't recall.
25        MR. SMITH:   Thank you, sir.
```

1          THE COURT:  Mrs. Stout.

2          MRS. STOUT:  No further questions.

3          THE COURT:  You may step down.  You

4                better leave before they change

5                their minds.

6                     Call your next witness.

7          MRS. STOUT:  Chris Schwan.

8          THE COURT:  How do you pronounce that

9                last name, again?

10         MRS. STOUT:  Schwan.

11         THE COURT:  If you will, if you will come

12               up, I'll swear you in.  If you

13               will raise your right hand and

14               place your left hand on the

15               Bible.

16                    CHRIS SCHWAN

17         Whereupon, this witness, after first

18    being duly sworn to tell the truth, the whole

19    truth, and nothing but the truth, testified as

20    follows, to-wit:

21                  DIRECT EXAMINATION

22    BY MRS. STOUT:

23         Q     Chris, tell these ladies and

24    gentlemen of the jury who you are?

25         A     My name is Christopher Schwan.

1      Q    And would you spell that last name

2  for the court reports, please?

3      A    That's S-c-h-w-a-n.

4      Q    And where are you employed?

5      A    I'm employed with Haynes Ambulance

6  out of Troy, Alabama.

7      Q    And what is your title?

8      A    I'm a paramedic.

9      Q    Can you tell the ladies and

10  gentlemen of the jury a little bit about your

11  training and your expertise as a paramedic?

12     A    My training involves transporting

13  the sick and injured from various locations,

14  residence and throughout the community to the

15  nearest facilities, like hospitals.  And, also,

16  we also do inner-hospital transfers of the sick

17  and injured.

18     Q    Where did you receive your training

19  as a paramedic?

20     A    I received my training as a

21  paramedic in Andalusia in 1997.

22     Q    And do you receive some kind of

23  degree for being a paramedic?

24     A    We get a certificate of completion.

25  It's a two-year program.  And then we get

1    licenses through the State to practice.

2          Q      It's a two-year program?

3          A      Yes, it is.

4          Q      And when you say that you are

5    licensed through the State, tell me about that?

6          A      What you have to do is you have to

7    take a test, and it's a written test.  And then

8    there is a hands-on test to test your skills to

9    make sure that you know what you're doing.

10                And after you pass all of that,

11   then you get a licenses to practice.

12         Q      Just like to practice law?  Is that

13   correct?

14         A      That's correct.

15         Q      Now, you have been a paramedic how

16   long?

17         A      Since '97.  I graduated -- I got my

18   license in June of 1997.

19         Q      On May 23rd of 2001, with whom were

20   you working?

21         A      I was working with Enterprise

22   Rescue.

23         Q      That's here in Enterprise?

24         A      Yes, it is.

25         Q      Do you have a partner or a specific

1    person that you are assigned to work with?

2         A    Yes.

3         Q    And on that date did you have a

4    specific person that you were assigned to work

5    with?

6         A    Yes.

7         Q    Who was that?

8         A    That was Chad Trout.

9         Q    Did you receive a dispatch on that

10   date or a call?

11        A    Yes, we did.

12        Q    In fact, you received several calls

13   that day, didn't you?

14        A    Yes, it was a pretty busy day that

15   day.

16        Q    Do you recall one that you received

17   somewhere between 1:00 and 1:30?

18        A    We had a lot of calls throughout

19   the day.  Yes.  I believe that we had a call

20   about that time.

21        Q    And do you recall where that

22   dispatch was to?

23        A    It was to the Toy Store.  I do

24   believe that's off of 27 south.

25        Q    County Road 711?

1    A    I think so, yes.

2    Q    Now, do you recall approximately

3  how long -- let me back up.  Where is the

4  Enterprise Rescue Squad located here in

5  Enterprise?

6    A    It's off of Lee Street, just over

7  the railroad tracks.  It's West Lee.  About a

8  block south of Main Street.

9    Q    Okay.  Do you recall approximately

10  how long it took you to get from where you were

11  to the location of the Toy Store?

12    A    We left immediately.  I would say

13  it took five minutes, six minutes, at the most.

14  I think it might have been a little sooner than

15  that.

16    Q    When you arrive at a scene -- what

17  was the dispatch for this call?

18    A    What was the nature of the call?

19    Q    Yes.

20    A    The nature of the call came out as

21  a shooting, that shots were fired.  It was a

22  possible shooting.

23    Q    When you receive a call of this

24  nature, what do you do before you go rushing to

25  the scene?

1       A    What we do is we stage to make sure

2   that it's -- so that law enforcement can enter

3   and make sure that it's clear and safe for us

4   to enter.

5       Q    Was it necessary to do that on this

6   particular day?

7       A    We were going to go ahead and

8   stage.  But it wasn't necessary, because police

9   officers, I believe, were already on the scene.

10  And they cleared us to come on in.  So we never

11  had any delay in that.  We just went straight

12  in.

13      Q    I'm going to ask you to describe

14  staging just a little bit better.  You go

15  there, and you do what?

16      A    Okay.  What we do is we go to a

17  specific area.  It can be any location, but

18  primarily away from the location of where the

19  action is going.  You want to be -- what it

20  serves is that you don't want to be in the

21  middle of, like, fire.

22      THE COURT:  Could the attorneys approach

23            the bench for a minute?

24            (The following was heard out of

25            the hearing and presence of the

1              jury).

2              THE COURT:  I wanted to let you know that

3                   the doctor is here.

4         MRS. STOUT:  Thank you.

5         MR. SMITH:  Thank you.

6         Q       Okay?

7         A       Staging is where you want to be far

8    enough away from a shooting or whatever it is,

9    so that you're not endangering yourself or crew

10   until that area is cleared.  And once it's

11   cleared, then you proceed to go in.

12        Q       But on this occasion, the officers

13   were already there?

14        A       The officers were there.  Correct.

15        Q       Now, you arrived at the scene?

16   Correct?

17        A       Yes.

18        Q       Take me from the time that you

19   arrived at the scene.  What did you do?

20        A       My partner and I, we got out.  And

21   there was a police officer there at the door.

22   He waived us in.  And we walked in.  As we were

23   walking in, the police officer pointed on the

24   ground.  And he mentioned that there was a

25   weapon on the ground.

1          And then he said there was somebody

2   behind the counter.  And then, I proceeded to

3   go around the counter.  And that's where I

4   found my patient, who was on her back,

5   apparently she had been shot in the chest.

6          Q     When you saw this, using your

7   information, your training as a paramedic, what

8   did you determine that you needed to do

9   regarding this patient?

10         A     After I had done my assessment?  My

11  initial assessment?

12         Q     Right.

13         A     I determined that we needed to go

14  quickly, that it was a load and go.  We didn't

15  want to waste any time.

16         THE COURT:  It was a what?

17         A     It was a load and go.  A load and

18  go is a term that EMS uses.  It's slang.  It's

19  -- what a "load and go" is, is that there's a

20  time period.

21              You don't want to stay on scene any

22  more than 10 minutes.  you do a quick

23  assessment of the airway, breath and

24  circulation.

25              And if you determine that this

1    patient needs to be taken to the hospital in an

2    expedient manner, you go ahead and put them on

3    a cot.  And you get going quickly.  And you do

4    everything that you need to do to stabilize

5    that patient and get her out.

6         Q    Is that what you did with this

7    patient?

8         A    Yes, we did.

9         Q    What was the condition of the

10   patient in route?

11        A    She was -- she wasn't conscious.

12   she was semi-conscious.  She was going in and

13   out of consciousness.

14        Q    What, if anything, did you do when

15   she would go out of consciousness?

16        A    I would arouse her.  I would --

17        Q    How?

18        A    We do a thing called a sternum rub,

19   where we rub the sternum.  It's a painful

20   stimulant.  We do that to see if they respond

21   to pain.

22             Sometimes people can become

23   unconscious.  But they are still responsive to

24   pain.  And that's something that we need to

25   know.

1    Q    Continue.

2    A    I noticed that she had some labored

3    breathing.  She was complaining that she

4    couldn't breathe.  She was very pale and very

5    sweaty, sweatiness, which is an indication of

6    massive blood loss.

7         I tried her blood pressure.  I

8    couldn't get a blood pressure on her, which was

9    also a sign of major blood loss.  I also

10   noticed there was a hole in her chest.

11   Q    What if any monitors do you have

12   within your vehicle to check them?  Any heart

13   monitor or anything of that nature?

14   A    We have what they call an EKG

15   machine, an electrocardiogram.  And you put the

16   leads on her chest.  And what it does, is it

17   shows the electrical activity in the heart.

18   Q    And what was the --

19   A    It showed a fast-pass rhythm.  I

20   think the rate was like 110 or 120.  That is

21   also an indication of massive blood loss.

22   Q    What, if anything, did she say to

23   you while you were in route to the hospital?

24   A    She was concerned with her life.

25   She told me that she felt like she was going to

1    die.  She told me that she didn't want to die.

2    Things of that nature.

3           THE COURT:  That she did not want to?

4           THE WITNESS:  She did not want to die.

5           A       She asked for me to help her.

6           Q       Do you recall if she was still

7    conscious at the time that you arrived at the

8    hospital.

9           A       She was still in and out of

10   consciousness at the hospital.  But she was

11   declining rapidly.  I noticed that it took --

12   there was more time that she was unconscious

13   than she was conscious.

14               And it was to the point where even

15   with painful stimuli I couldn't get her to

16   rouse.  But she would still move her arms and

17   her legs.

18           MRS. STOUT:  Your witness.

19                   CROSS EXAMINATION

20   BY MR. BRADSHAW:

21           Q       Mr. Schwan, you said that when you

22   came in from that staging thing that one of the

23   officers pointed out to you there was a weapon?

24   Would that have been so that you wouldn't step

25   on it or kick it?

```
 1        A     I believe so.  I think it's so that
 2   -- it's to preserve evidence.  I know a lot of
 3   these police officers just tell us, you know,
 4   "Watch your step."
 5             And I think the police officer was
 6   pretty much saying there's a weapon on the
 7   floor and there's your patient.
 8        Q     Do you remember where that weapon
 9   was on the floor when you came in?
10        A     As I was walking in, I do believe
11   it was to the -- it was either straight ahead
12   of me or just a little bit of my right as
13   you're walking in the door, if I'm not
14   mistaking.
15        Q     Did you have to step over it or
16   make a concert effort to --
17        A     No.  No, I didn't have to step over
18   it.
19        Q     Did it get in your way any way?
20        A     No.
21        Q     How close would you say you were to
22   it when you walked by it?
23        A     I would say from where I'm sitting
24   to the edge right there, to the edge of that
25   bench.  I would say about that far, about six
```

1    feet or so, maybe.

2         Q    I want to show you State's Exhibit

3    No. 3, and I ask you if you will, to step down

4    so the jury can see.  And let me get out of

5    their way.

6              It's already been testified to that

7    the front door was here.  And there was a

8    little counter and cash register here.  Does

9    that look familiar to you?

10        A    This door here?

11        Q    Yes.

12        A    And this is the counter.

13        Q    And there was testimony from

14   Lieutenant Darby that Mrs. Dennis was laying

15   here behind this counter.  And, also, there was

16   a video shown to where -- you can see the back

17   -- I don't know if it was you, but the

18   Enterprise Rescue personnel.

19              This is a two-or three-foot

20   counter.  They went around here and came back

21   out?  Would that be correct?

22        A    Yes.

23        Q    That's consist with what you

24   remember?

25        A    Yes.

1      Q      So you are saying that pistol would

2    have been somewhere in this area, but you

3    didn't have to step over it?

4      A      Right.  As I walked through here,

5    it was -- I believe it was in this area.  I

6    remember as I was walking in, I remember

7    something over here.  And I remember seeing a

8    weapon or a pistol on this side.

9      Q      Do you remember a color?

10     A      No.

11     Q      Would you happen to know if that

12   may have been what you saw?

13     A      I can't say.

14     Q      You just remember a weapon?

15     A      I remember a weapon.  I remember

16   the police officer pointing it out to me.  And

17   I remember it was to the right.  That's all I

18   remember.

19     Q      You remember it somewhere in this

20   area?

21     A      Yes.

22     Q      Thank you.

23     THE COURT:  Do you have anymore questions

24          of this witness, Mr. Bradshaw?

25     MR. BRADSHAW:  No, sir.

1       THE COURT:  By the State?

2       MRS. STOUT:  No, sir.

3       THE COURT:  Is there any reason this

4            witness should not be excused?

5       MRS. STOUT:  No, Your Honor.

6       THE COURT:  You are excused.  From the

7            Defense?

8       MRS. STOUT:  No, Your Honor.

9       THE COURT:  Call your next witness.

10              MRS. STOUT:  Dr. John

11          Drew.

12                  DR. JOHN DREW

13          Whereupon, this witness, after first

14  being duly sworn to tell the truth, the whole

15  truth, and nothing but the truth, testified as

16  follows, to-wit:

17              DIRECT EXAMINATION

18  BY MR. JARRELL:

19       MR. JARRELL:  Dr. Drew, I have a copy

20          here of the medical reports that you

21          had asked for?

22       THE WITNESS:  Thank you.

23       Q       State your name, sir, and where you

24  are employed?

25       A       My name is John Drew.  I'm a

```
1    physician at Medical Center Enterprise.

2         Q    And do you have regular hours

3    there, or are you an emergency room physician?

4         A    I just work in the emergency room.

5         Q    If you would, give us the benefit

6    of your credentials and training?

7         A    I went to medical school at

8    Oklahoma State University College of

9    Osteopathic Medicine.  I did a rotating

10   internship --

11        MR. SMITH:  Excuse me.  May it please the

12             Court, I certainly don't want to

13             cut the witness off, but we will

14             stipulate to his expertise as an

15             emergency room doctor.

16        THE COURT:  Okay.  This Court declares

17             this witness to be an expert and

18             will allow this witness to

19             express his opinions based upon

20             his field of expertise.

21

22        MR. JARRELL:  I would like for him to

23             give a little bit of his

24             experience and training to the

25             ladies and gentlemen of the
```

```
 1                        jury, just not so much detail as
 2                        you usually do.
 3          A      Okay.  Well, I've been practicing
 4    full-time emergency medicine since about 1991,
 5    in various emergency rooms around the area.  I
 6    did a year in the Army at Fort Knox, Kentucky.
 7          Q      And in working in the emergency
 8    room, I assume that you have a lot of fairly
 9    traumatic problems that you encounter?  Is that
10    correct?
11          A      Yes, sir.
12          Q      Do you ever have any gunshot
13    wounds?
14          A      Yes, sir.
15          Q      Over your period of years, as an
16    emergency room physician, could you give me an
17    estimate of how many gunshot wounds you have
18    treated?
19          A      I really have no idea.  Probably
20    maybe ten a year.  So maybe a hundred.  More
21    than I should have to.
22          Q      On May 23rd of 2001, were you
23    working in the emergency room at Enterprise
24    Medical Center on that day?
25          A      Yes, sir.
```

1        Q        Did you have occasion to have to

2    administer to Mrs. Jelaine Dennis?

3        A        Yes, sir.

4        Q        And who brought Mrs. Dennis in?

5        A        Enterprise Rescue Squad brought her

6    in.  They were called out to a gunshot, robbery

7    gunshot.  And they called when they left the

8    scene and let us know they were bringing in a

9    victim of a gunshot wound, a pretty serious

10   injury.

11       Q        And when someone calls in to you

12   like that from the EMT ambulance or wherever

13   they call from, do you -- what do you do?  Do

14   you meet them, or do you wait until your called

15   after they get there, just explaining what the

16   procedure is?

17       A        Usually meet them.  If they give us

18   that kind of warning that somebody is in

19   extreme, we wait for them to come into the

20   door.

21       Q        And did you do that on this

22   occasion?

23       A        Yes, sir.  And we also called the

24   general surgeon and the anesthesiologist to

25   come in.

1    Q    And what condition did you observe

2    Jelaine Dennis in when she arrived at the

3    Medical Center Emergency Room?

4    A    She had a panic look on her face.

5    She had a scared look.  She was saying, "Help.

6    Help me."

7         I note in the record, I wrote down

8    that she said that she was going to die.  And

9    she was in extreme -- very, very scared.

10   Q    Can you describe the wound or

11   wounds that you saw on her?

12   A    Initially, we saw one gunshot wound

13   just to the right of the sternum, the interior

14   chest.

15         THE COURT:  Could you point on your your

16              body where?

17         THE WITNESS:  As I recall, I didn't draw

18              it on the chart, but as I

19              recall, it was maybe about right

20              here.

21   Q    Did you observe any other gunshot

22   wounds?

23   A    After further examination, we saw

24   more.

25   Q    And where were they, sir?

```
 1        A      I would have to look on the chart

 2   to refresh my memory.  Let's see.  I believe

 3   there was one on the left hip and the right

 4   chest, pelvis.

 5             I didn't write it down on my chart.

 6   The main one I was worried about was the one

 7   here.  There were two others, I believe, on the

 8   leg or --

 9        Q      Were you able to do anything to

10   assist her?

11        A      Well, as soon as she was placed

12   from the ambulance cot to the E.R. bed, she

13   lost consciousness.  And so Dr. Sawyer was

14   there.  And she didn't have an I.V. when she

15   came in.  He tried to place a central line.

16             We were assisting her ventilation

17   with a bag value mask.  She still had a pulse

18   at that time, but soon she lost that.  And we

19   started doing C.P.R then, when she lost her

20   pulse.

21        Q      You say that she lost her pulse,

22   and she lost consciousness?  Were you ever able

23   to revive her?

24        A      No, sir.  Revive her to

25   consciousness, no.
```

1    Q    How long was it from the time that

2    she was brought in, until she was pronounced?

3    A    She came in at 1:40, according to

4    the nurses notes.  And I think we pronounced

5    her at 2:10.

6    MR. JARRELL:    Your witness.

7                    CROSS EXAMINATION

8    BY MR. SMITH:

9    Dr. Drew, I'm Al Smith.  And I'm one of

10   the attorneys for Mr. Conrad today.  I don't

11   think that we have met.  And, candidly, I hope

12   I never see you, again, except for perhaps in a

13   restaurant, except for today.  And I'm sure you

14   know why I said that.

15   A    Yes, sir.

16   Q    I have to confess that I am

17   addicted to the trauma shows on television.

18   And we have already told this jury that the

19   legal TV shows are bunk, not to believe them.

20   But from the standpoint of these T.V. emergency

21   shows, like on the learning channel and what

22   have you, do you have various trauma levels at

23   the Enterprise Medical Center or the Medical

24   Center Enterprise?

25   A    No, sir.

1     Q     When they have on one of these

2 shows and they talk about a level one trauma

3 center, what does that mean in the real world?

4     A     Well, it's just the level that your

5 trauma center is graded on, as far as your

6 availability of services.

7     Q     And your emergency room at the

8 Medical Center Enterprise, is it graded?

9     A     I don't believe so.  We are not a

10 trauma center, so to speak.

11     Q     But you have had much experience

12 with trauma, unfortunately, as an E.R. doctor?

13     A     That's correct.

14     Q     The wounds to Mrs. Dennis chest,

15 you said that it was a large wound, I think?

16 Or I believe it was described as a large wound

17 by somebody?  Would that be correct?

18     A     There was a defect in the chest

19 wall.  It was pretty big.

20     Q     Does that -- well, tell us what

21 muscle structures, and what bone structures

22 does a bullet going into here violate?

23     A     Well, there's the skin, and the

24 pectoralis muscles.  There's, of course,

25 sternum, breast bone.  And underneath that is,

776

1    depending on the angle it travels, the lung,

2    the esophagus, the trachea.

3         Q    Now, you did not perform any

4    evasive procedures in trying to save

5    Mrs. Dennis' life?  Is that correct?

6         A    That's correct.

7         Q    And the only reason I ask that is

8    you didn't determine what muscle and bone

9    structures actually were violated?

10        A    Well, we knew it was a major wound.

11   I mean sometimes a gunshot wound will hit

12   somebody's sternum and glance off if it's a low

13   caliber.  And sometimes it will hit and travel

14   in subtanious tissue under the skin.

15             But in her case, we were fairly

16   certain with her, the way she lost

17   consciousness so fast, that she suffered a

18   major injury.

19        Q    All right.  My anatomy was a long,

20   long time ago.  But the pectoralis muscle,

21   you've described that it had been penetrated

22   and violated?

23        A    I'm sure it had, yes.

24        Q    What does that do?

25        A    It's a chest muscle that moves your

1    shoulder, turns your trunk.  It's the big

2    muscle here.

3         Q    All right.  The big muscle here?

4    And her wound, I believe you've described, let

5    me turn around, was to the right side of her

6    chest?

7         A    Just to the right of the sternum.

8         Q    And that would affect the movement

9    of the shoulder, the right shoulder, would it

10   not, sir?

11        A    Correct.

12        Q    And in "extreme," you used that

13   term.  Would you tell me what that means,

14   please?

15        A    Bad off.  A lot of times they say

16   they think they are dying; and you know they

17   are not.  A lot of people say they think they

18   are dying; and you can look in their face and

19   tell they are.

20        Q    And from your observation of that

21   wound, it was a major debilitating wound?

22   Correct?

23        A    If I just looked at it, I knew it

24   had the potential to be a major debilitating

25   wound.

1          Q      Yes, sir.  And certainly would have

2     affected this area and the right shoulder here?

3          A      It could, uh-huh.

4          MR. SMITH:  Thank you very much, sir.

5          THE COURT:  Mr. Jarrell?

6                    REDIRECT EXAMINATION

7     BY MR. JARRELL:

8          Q      Dr. Drew, from what you have

9     explained that you did to her, your first

10    purpose was to try to get her heart beating

11    again?  You said that she lost a pulse?

12         A      Well, it's always A, B, C:  Airway.

13    Breathing.  Circulation.  Correct.

14         Q      And it wasn't your position at that

15    point to feel that you had to do anything

16    invasive, was it?

17         A      No, sir.  Dr. Sawyer was there.

18    And I think we considered E.D. thoracotomy,

19    where you cut somebody's chest open and perform

20    open cardiac massage.  But by the time we got

21    to that point, Dr. Sawyer didn't feel like it

22    would be a life-saving technique.

23         Q      And when you pronounced her dead,

24    you said it was 2-something?

25         A      I think it was 2:10, 14:10.

1          Q      2:10?  Once you pronounce a death,

2    what happens with the body?

3          A      Well, we contact the coroner.  The

4    coroner comes in, and this case the District

5    Attorney came in, also.  And they make all the

6    arrangements for the body.

7          Q      Would you have released the body to

8    the coroner?

9          A      That's correct.  Myself or somebody

10   in the E.R., E.R. staff

11        MR. JARRELL:   No further questions.

12        MR. SMITH:  No recross, Your Honor.

13        THE COURT:  Is there any reason that

14              Dr. Drew should not be excused

15              from the State?

16      MR. JARRELL:  No, Your Honor.

17      THE COURT:  From the Defense?

18      MR. SMITH:  Absolutely not.  He needs to

19              go to back to the hospital.

20      THE COURT: You are excused.

21      THE WITNESS:  Thank you.

22      THE COURT:  Call your next witness.

23      MRS. STOUT:  Rob Ward.

24      MR. SMITH:  I'm not trying to cut the

25              State off, but, to stipulate to

780

1           the custody of Mrs. Dennis'

2           body.  We are not going to make

3           issue with that.

4      MR. JARRELL:  That's fine.  We will

5           stipulate that Dr. Drew turned

6           the body over to Mr. Rob Ward,

7           who's the coroner.  And Mr. Ward

8           turned the body, released the

9           body to Mark Day?

10     THE COURT:  And Mark Day, just so these

11          ladies and gentlemen of the jury

12          know, is who?

13     MR. JARRELL:  He is the person with the

14          Department of Forensic Science,

15          who transports bodies, when they

16          are released by the coroner.

17     THE COURT:  That is stipulated?

18     MR. SMITH:  Absolutely.  I stipulate and

19          even through Mr. Day, I'm sure

20          Mr. Day released her to Dr.

21          ward?

22     MR. JARRELL:  Yes.

23     MR. SMITH:  We make no issue with that,

24          and we stipulate to that.

25     THE COURT:  Okay.  It is so stipulated,

1    and the Court so finds.

2    Ladies and gentlemen, I

3    will explain what a stipulation

4    is: Parties, sometimes in order

5    to save time, so that we don't

6    have to go through step by step,

7    they can stipulate as to certain

8    facts. You have just heard the

9    stipulations of the State and

10    the Defense.

11    That saves witnesses,

12    perhaps, to sit here and go

13    through the testimony. And you

14    are to consider the stipulated

15    fact as being fact when you go

16    and deliberate and decide this

17    case, just as you would consider

18    the things that you would later

19    determine to be fact. You will

20    put the stipulation of what else

21    you find to be fact in reaching

22    a verdict or verdict in these

23    two separate cases.

24    Any questions by the

25    ladies and gentlemen of the

1           jury?

2       THE COURT:  I will go through that,

3              again, with you, as I talk to

4              you about the law.

5                     Call your next witness.

6       MR. JARRELL:  Our next witness would have

7              been Mark Day.  And I think he

8              is available.

9       THE COURT:  He is.

10      MR. JARRELL:  But they have said they

11             are willing to stipulate, as

12             well --

13      MR. SMITH:  Yes.  There is no point of us

14             making an issue of Mark Day.  We

15             know who he works for.  And we

16             stipulate that she was turned

17             over to Mr. Day, and he turned

18             her over to Dr. Ward, the

19             pathologist.

20      THE COURT:  Okay.  If you will come on

21             in.

22                    Would you raise your

23             right hand?

24

25

1

2                          <u>MARK DAY</u>

3          Whereupon, this witness, after first

4    being duly sworn to tell the truth, the whole

5    truth, and nothing but the truth, testified as

6    follows, to-wit:

7                        <u>EXAMINATION</u>

8    <u>BY THE COURT</u>:

9          Q    You can just stand right there.

10   Your name is what?

11         A    Mark Day.

12         Q    And who do you work with?

13         A    Department of Forensic Sciences.

14   THE COURT:  I just wanted the ladies and

15              gentlemen of the jury to see Mr.

16              Day.  And the stipulation,

17              again, is what?

18   MR. SMITH:  We stipulate to the chain of

19              custody --

20   THE COURT:  Of the body?

21   MR. SMITH:  --  of the body, yes, Your

22              Honor.

23   THE COURT:  And that the body was turned

24              over to Mark Day with the

25              Department of Forensic Science?

1              MR. SMITH:  And there's no need for him

2                    to testify to that.  We make no

3                    issue with the custody.

4         MR. JARRELL:   And that he turned over to

5                    Dr. Ward, who did the pathology

6                    work on her.

7         MR. SMITH:  Right.

8         THE COURT:  Okay.  It is so stipulated.

9                    Again, ladies and gentlemen,

10                    that saves some time.  We are

11                    moving along.  We are way ahead

12                    of schedule, if you want to

13                    know.

14                          We are going to take a

15                    break about now.  I'm sure the

16                    District Attorneys are going to

17                    need to run back and see who

18                    they have standing in line back

19                    there.

20                          We will take at least a

21                    10-minute break, probably a

22                    15-minute break, as long as you

23                    need.

24                          When you get ready to

25                    come back in, within the next 15

```
 1              minutes, if you will notify our

 2              deputy sheriff, we will bring

 3              you back in and get started,

 4              again.

 5                   Again, the Court is

 6              required to instruct you and

 7              does instruct you not to discuss

 8              that matter among yourselves,

 9              nor to allow anyone to discuss

10              it with you.

11      THE COURT:  This Court is in recess for

12              10 minutes or 15 minutes.

13              (Court was recessed).

14      THE COURT:  This court will come to

15              order.

16                   You may be seated. Call your

17              next witness.

18      MR. JARRELL:  Dr. Sawyer.

19      THE COURT:  If you will come up, please,

20              sir.  If you will raise your

21              right hand, and  place your left

22              hand on the Bible.

23

24

25
```

1

2                      DR. SAMUEL SAWYER

3              Whereupon, this witness, after first

4    being duly sworn to tell the truth, the whole

5    truth, and nothing but the truth, testified as

6    follows, to-wit:

7                      DIRECT EXAMINATION

8    BY MR. JARRELL:

9          Q       State your name and your

10   occupation?

11         A       Samuel F. Sawyer.  I'm a general

12   surgeon.

13         Q       Where do you practice your general

14   surgery?

15         A       Medical Center, Enterprise.

16         Q       Would you give us the benefit of

17   your education and training experience?

18         A       Enterprise High School --

19         MR. SMITH:  Excuse me.  Your Honor,

20                   Again, we will certainly

21                   stipulate to Dr. Sawyer's

22                   expertise.  He is a very

23                   competent and thorough surgeon.

24         MR. JARRELL:  Thank you.  That's fine.

25         THE COURT:  Okay.  Let me get something

1              in the record.  The Court

2              declares this witness to be an

3              expert, and will allow this

4              witness to express his opinions

5              and testify in his field of

6              expertise.

7         Q     I would still like for you, sir, to

8    give basically a little bit of experience, but

9    not as mush detail as you were getting ready to

10   give.

11        A     Okay.  I graduated from Medical

12   School at the University of Alabama, in

13   Birmingham.  I did my general surgery training

14   and chief surgery fellowship at Oxford Clinic

15   in New Orleans.  And I have been a general

16   surgeon in Enterprise for 16 years.

17        Q     On May the 23rd of 2001, were you

18   practicing your surgery medicine at the

19   Enterprise Medical Center?

20        A     Yes.

21        Q     On that particular date, did you

22   administer in any way to Robert Conrad?

23        A     Yes.

24        Q     And under what circumstances did

25   you come in contact with Mr. Conrad?

1          A       He was brought into the emergency

2     room shot.

3          Q       And do you recall the locations of

4     his wound or wounds?

5          A       Do you have the medical records?

6          Q       We do.  And while we are getting

7     that out, if you would, let me show you what

8     has been marked as State's Exhibit 20 and 21

9     and ask if you can identify those photographs?

10         A       This photograph shows a gunshot

11    wound to the lower abdomen.

12         Q       That's which one?

13         A       Number 21.

14         Q       Number 21.

15         A       And number 20 is consistent with a

16    gunshot wound to the left upper arm.

17         Q       And I will show you a copy of the

18    medical records that you can use to refresh

19    your memory, if you would, and we will.

20         MR. JARRELL:  At this time, offer State's

21                 Exhibit 20 and 21 into evidence.

22         THE COURT:  Any objection to the

23                 admissibility of 20 and 21?

24         MR. SMITH:  Let me refresh my

25                 recollection, Judge, please.

1                              No, Your Honor.

2              THE COURT:   No objection?   They are both

3                    in evidence, and you may publish

4                    them to the jury whenever you

5                    desire.

6          MR. JARRELL:    Thank you.

7          Q     You tell me when you are ready to

8    go.

9          A     Okay.

10         Q     On May 23rd of 2001, when you were

11   administering to Mr. Conrad, when you

12   discovered these wounds, what type of treatment

13   did you provide him?

14         A     The gunshot wound to the abdomen

15   had obviously penetrated the perineal cavity,

16   so we went to surgery.

17         THE COURT:   What is that, Doctor?

18         THE WITNESS:   I'm sorry.   Penetrated the

19                    inside of the abdomen.

20         A     So we went to surgery to see what

21   internal organs were damaged.

22         Q     And did you remove any projectile

23   from his stomach?

24         A     No.

25         Q     Is it still there?

1          A       Yes.   Let me say that it's not in

2    his stomach or his abdomen.    It's in the tissue

3    and muscles of the back.

4          Q       Was there any reason to remove it?

5          A       No.

6          Q       Did you do a right evasive

7    procedure there?   Or, did you elect not to

8    because of some reason?   Did you do an invasive

9    procedure?   Did you cut him open and look for

10   the bullet?

11         A       Yes.   Yes.

12         Q       And you did this in accordance with

13   obviously the standards of procedure that you

14   normally use at the hospital?

15         A       Correct.

16         Q       What about the wound to the arm?

17         A       The wound to the arm, as you can

18   see in that exhibit, you can see not only the

19   entry wound.   But you can see the bullet itself

20   has run under the skin of the arm.

21         Q       And did you remove that projectile?

22         A       Yes.

23         Q       And what did you do with it?

24         A       I gave it to the police officer.

25   Mr. Roberts.

1       Q       Which police officer?

2       A       Buford Roberts.

3       Q       And I believe the pictures have

4  circulated.  If you would, I think the wound on

5  the arm and in State's Exhibit No. 20, is

6  fairly clear.  But could you point out to the

7  ladies and gentlemen of the jury on this

8  photograph where the -- which is the stomach

9  wound or the lower abdomen wound, whatever you

10  want to call it?

11      A       The patient is lying with his feet

12  in this direction, his head in this direction.

13  Here is his left arm, arm pit, nipples.  This

14  is the abdomen.  And you can see a small bullet

15  wound there in the lower abdomen.

16      Q       Would that be the darker dot or the

17  lighter dot?

18      A       Lighter dot.

19      MR. JARRELL:    We are getting another

20              chart now.

21      THE COURT:  Can I look at that?

22              Before you show that to the

23              jury, would you make sure that

24              it goes into evidence if you

25              intend to offer it?

1      MR. SMITH:  Your Honor, we just refer to

2                 the comments that were made in

3                 the earlier procedures.

4      THE COURT:  Sure.  There's no need to go

5                 through them all.  You just

6                 readopt what was earlier said.

7      MR. JARRELL:   I'm going to put what has

8                 been marked as State's Exhibit

9                 No. 7 on the board.

10     THE COURT:  Let me explain something to

11                the jury.  To save your time,

12                these lawyers have already

13                appeared before the Court, the

14                doctor, et cetera, et cetera.

15                And they have already argued

16                admissibility of certain things.

17                And the Court has already ruled

18                on the admissibility of certain

19                items.  This composite is one of

20                those things.

21     Q    Dr. Sawyer, I ask you also, if you

22  would -- Judge, would you ask the jury if they

23  had rather have him over there or over here.

24     THE COURT:  Where?  They want it over

25                here.

1          MR. SMITH:  Okay.

2          Q     If you would, can you identify

3    those photographs?

4          A     Okay.  This would be the left arm,

5    the entrance wound.  Now the small photograph

6    shows this better.  But right up under the skin

7    here is where the bullet lay.  I'm not sure we

8    see anything on this one.

9          Q     It doesn't show up very well on

10   that one?

11         A     I mean, that could get -- it's just

12   not a good picture.  This is a better picture.

13   You see here the belly button here.

14         Q     Now, in comparing this chart

15   picture with this picture, I ask -- the light

16   was on the -- is that the belly button or the

17   bullet hole?

18         A     The bullet hole is a little dark,

19   here.

20         Q     Do those pictures accurately

21   dictate the wounds as you saw them on May 23rd

22   2001?

23         A     Yes.

24         MR. JARRELL:  And we offer State's

25              Exhibit No. 7 into evidence.

```
 1          THE  COURT:   And  the  Defense  has  the  same

 2                   argument?

 3      MR.  SMITH:   And  we  refer  to  what  we

 4                   argued  before,  Your  Honor.

 5      THE  COURT:   Objection  is  overruled.   They

 6                   are  in  evidence.

 7      Q      Could  you  tell  from  either  of  these

 8  wounds  if  they  are  what  we  call  contact  wounds?

 9      A      They  don't  look  like  contact

10  wounds.

11      MR.  JARRELL:   Thank  you.   Your  witness.

12               CROSS  EXAMINATION

13  BY MR. SMITH:

14      Q      Dr.  Sawyer,  I'm  Al  Smith.   We  have

15  met  before,  but  I  don't  know  if  you  recall.

16      A      Yes.

17      Q      When  Mr.  Conrad  presented  to  you,

18  was  he  in  pain?

19      A      Yes.

20      Q      And  in  your  experience  as  a

21  surgeon,  have  you  treated  a  lot  of  gunshot

22  wounds?

23      A      Yes.

24      Q      And  it  seems  like  a  silly  question.

25  But  I'm  going  to  ask  it  anyway.   Do  gunshot
```

1    wounds tend to hurt people?

2         A     Yes.

3         Q     And they would be in pain?

4         A     Yes.

5         Q     Now, when he presented to you, and

6    again, if this reflects, immediately get my

7    attention, and I will quit using it.

8               But if you look at the chart there,

9    please, sir, where I'm illuminating with the

10   pointer?

11        A     Oh.  Okay.

12        Q     This is the area where you found a

13   wound to Mr. Conrad's belly?

14        A     Right here.

15        Q     Right there?

16        A     Uh-huh.

17        Q     If I was steadier with this thing,

18   I could hold it still.  And that penetrated

19   into his gut?  Is that correct?

20        A     Into his abdomen.  And it

21   penetrated the transverse colon, which is his

22   gut.

23        Q     And my anatomy was a long time ago.

24   And I don't remember well, apparently.  But

25   that would be a painful wound, would it not?

796

```
 1         A     Yes.

 2         Q     And, obviously, this is before you

 3  performed any surgery on him?  Is that correct?

 4  When this photograph was taken?

 5         A     That's correct.

 6         Q     Now, you can go ahead and take the

 7  witness chair, again.

 8         THE COURT:  Are y'all going to need this

 9               composite, again?

10         MR. SMITH:  No, sir, I'm not.

11         Q     From your medical records there

12  before you, can you tell me what time

13  approximately, and just a general idea.  I'm

14  not going to ask you to put it down to the

15  moment, that you first saw him.  But

16  approximately when did you first start treating

17  him, first see him?

18         A     2:00 o'clock in the afternoon.

19         Q     All right.  And he was in pain at

20  that time?  Is that correct?

21         A     Yes.

22         Q     Now, at one point did you take him

23  to surgery?

24         THE COURT:  You mean at what time of

25               day?
```

```
 1          MR. SMITH:  Yes.
 2      A       Okay.  Anesthesia began to the
 3  case, it looks like at 3:00 o'clock.
 4      Q       Did you prescribe any medication
 5  for him between the time he presented and the
 6  time you took him to surgery?
 7              Let me do it this way.  Let me show
 8  you what has been presented to me by the State
 9  as a certified copy of all of the medical
10  records.  And I identify this as Defendant's
11  Exhibit (z).
12              This is what they have told me is a
13  copy of what you hold in your hand, the medical
14  records?
15      A       Okay.
16      Q       Looking at this page, would you
17  tell the members of the jury, please, sir, what
18  from Defendant's Exhibit (z) medications were
19  prescribed to him while he was staying there in
20  the hospital?
21      A       During the whole stay?
22      Q       Yes.  From that page there, just
23  during that whole stay?
24      A       Demerol, Zinacef, which is an
25  antibiotic, Phenergan, for nausea, Anectine,
```

1    Neostigmine and Diprivan were anesthetic

2    agents.

3         Q    Those three that I can't pronounce

4    that you just mentioned would be items that

5    were given by anesthesiologist to put him to

6    sleep for surgery?

7         A    That's correct.

8         Q    Okay.  Go ahead, please.

9         A    I.V. fluids, and just repeated the

10   same Perkadan and the different types of pain

11   medicine, Tylenol, Robinul would also be given

12   to put him to sleep.

13        Q    And that's the third page of the

14   Exhibit (z) of the medication list?  Is that

15   correct?

16        A    Yes.

17        Q    And what appears on that page as

18   far as pain relieving or anesthesia-type drugs?

19        A    Benzodiazephines is a pain medicine

20   like Valium.  I'm not sure what's listed here

21   as cocaine metabolites.  I don't know what that

22   is the urine -- I think that's probably -- we

23   are probably down now into the lab work, the

24   urine test.

25        Q    Those would be agents used to test

1  certain drugs or what have you that were

2  present?

3         A      To test the urine, to see if

4  certain drugs were there.

5         Q      That was a poorly-worded question,

6  but you got the answer that I was looking for.

7         A      You can see it's better in this

8  chart, as far as the urine drug screen that was

9  --

10        Q      They are here, also.  But I wanted

11 you to go over these drugs that prescribed by

12 you.

13               Now in Exhibit (z), I've opened --

14 well, let me back up.  The four pages or so

15 listed of the drugs has a date by the type of

16 drug.  Would that be the date that these were

17 administered?

18        A      This is a billing sheet.  So I have

19 no idea of the timing.  That maybe the time

20 that the billing office got the sticker.  So go

21 to the orders.

22        Q      Let's do that.  Let's go to the

23 page that I've flagged.  And can you tell me

24 from this page the date and, if you can the

25 time, that he was given any pain relieving or

1    narcotic-type medication?

2        A    Are we going back to the emergency

3    room.

4        Q    Well, from the record, I want to

5    ask you, you recognize that to be a medical

6    record, do you not?

7        A    Yes.  Yes.  This is my handwriting,

8    my orders.

9        Q    Would you tell us what I have

10   highlighted there, please, sir?

11       A    Yes.  The 27, Percocet.

12       Q    That's a narcotic-type drug?  Is

13   that correct?

14       A    Yes.  Demerol and Phenergan I.V's

15   were discontinued.

16       Q    Now, tell the jury, please, sir,

17   what Demerol is.

18       A    Narcotic.

19       Q    It's a strong narcotic, isn't it?

20       A    Yes.

21       Q    And Phenergan is given with that?

22   Is that correct?  Many times?

23       A    Right.

24       Q    Phenergan is to keep you from being

25   nauseated?

1        A       Correct.

2        Q       I've had kidney stones.   And I

3    don't wish those on anybody --

4        MRS. STOUT:   Objection to counsel telling

5             us about his kidney stones.

6        THE COURT:   Let's go on.

7        Q       When Demerol and Phenergan are

8    given together, it makes a person pretty

9    whoozy, doesn't it?

10       A       Depends on the amount, but it can.

11       Q       All right.   And go ahead, please,

12   sir, to the next tabbed page.   There you are

13   here.   Tell us what is highlighted there?

14       A       This is on the 24th.   Increased the

15   Demerol to 100 milligrams and the Phenergan to

16   25 milligrams every three hours as needed for

17   pain.

18       Q       So on the 24th, would it be correct

19   to say that you up the Demerol dose?

20       A       Yes.

21       Q       You look like you are searching for

22   something?

23       A       No.   I'm waiting for the next

24   question.

25       Q       I'm sorry.   If you would go on to

1    the next tab, and tell us what the entry

2    highlighted there is, please?

3          A     Okay.  This is post-operative

4    orders written on 5/23 on 4:45 p.m.

5          Q     What medications are referenced

6    there, please?

7          A     Demerol and Phenergan.

8          Q     And those were to be administered

9    to Mr. Conrad?

10         A     That's correct.  As necessary for

11   pain.

12         Q     You wrote those orders?

13         A     Yes.

14         Q     If you would move to the next tab

15   and highlighted area of Exhibit (z), please,

16   sir?

17         A     These are nurses notes.

18         Q     That's part of the medical records

19   and medical file, isn't it?

20         A     Yes.

21         Q     And what is highlighted there is a

22   medicine administration?  Is that correct?

23         A     That's correct.

24         Q     And that would be pursuant to your

25   order?

1           A       Yes.

2           Q       Can you tell me when and what was

3    administered then?

4           A       I can't tell you when from this.

5           Q       Go back a page, and see if that

6    will give you a date?

7           A       This would have been approximately

8    the 27th, and would probably be that morning.

9           Q       All right.  And what was

10   administered?

11          A       According to this, Darvocet?

12          Q       And what is Darvocet?

13          A       It is a milder narcotic.

14          Q       All right.  Go to the next tab and

15   highlighted place, please?

16          A       Demerol and Phenergan.

17          Q       And can you tell me when that was

18   administered?  I believe there is a date on the

19   page previous?

20          A       Okay.  This is the 26th.

21          Q       All right.  And what amount of

22   Phenergan and Demerol?

23          A       50 Demerol and 25 Phenergan.

24          Q       All right.  And go ahead to the

25   next highlighted place, please, sir?

1          A       Demerol and Phenergan given on 5/25

2    at 2:15.

3          Q       And the next, please?

4          A       Demerol and Phenergan on -- that's

5    the same dose.  It's just documented twice.

6          Q       And the next, please?

7          A       Demerol and Phenergan on the 24th.

8          Q       Next, please?

9          A       Demerol and Phenergan twice on the

10   24th.

11         Q       Again, please?  Next?

12         A       Increases Demerol and Phenergan.

13   And that's in the nurse's notes.  I could look

14   back to the orders and tell you what day that

15   was.  They called me to increase the dose,

16   either on the 23rd or 24.

17         Q       All right.  Next please?

18         A       Demerol and Phenergan given.  Looks

19   like on the 23rd.

20         Q       And next, please?

21         A       This is the med. sheet, the RN's

22   med. sheet, or as necessary med. sheet showing

23   the various doses that were ordered at various

24   times.

25         Q       Would you relate what's reflected

1    there to the jury, please?

2         A    Various doses of Demerol and

3    Phenergan.

4         Q    And when, if you can tell from that

5    document?

6         A    The order for I.M. or shot in the

7    muscle, Demerol and Phenergan on the 23rd.  And

8    we gave I.V.'s or ordered I.V. Phenergan on the

9    23rd; increased the dose of Demerol and

10   Phenergan on the 24th; decreased it on the

11   26th; ordered Percocet on the 27th and

12   Phenergan on the 27th.

13        Q    The next entry, please, that is

14   tabbed and highlighted?

15        A    This is a list of when he got

16   various meds.

17        Q    Would you relate that, as far as

18   narcotic pain relievers that were administered?

19   Is that what's reflected on that page?

20        A    Yes.  This is every dose of

21   narcotics during the hospital stay.  He got

22   Demerol and Phenergan on the 23rd.  He got it

23   one, two, three, four, five times on the 24th;

24   and, one, two, three -- three times on the

25   25th; twice on the 26th; and he got Percocet on

1    the 27th and Tylenol on the 28th.

2        Q    Now, on the 23rd, he also had the

3    Anesthesia for putting him asleep for the

4    surgery itself?  Correct?

5        A    Correct.

6        Q    And the next tab -- I believe,

7    there is only on more.  What is that, please?

8        A    Dose of Demerol that he got in the

9    recovery room.

10       Q    That was on the 23rd?

11       A    Yes.

12       MR. SMITH:  All right.  Thank you,

13              Doctor.

14                      Your Honor, we would

15              offer (z), which I believe it's

16              just a copy.  But it has been

17              tabbed and highlighted.

18       THE COURT:  Objection?

19       MRS. STOUT:  I object to anything that's

20              been highlighted and tabbed.  I

21              do not object to it coming in.

22              If it's tabbed and highlighted,

23              I do object.

24       THE COURT:  Okay.  With that, sustained.

25              It will come in.  It is

```
 1                    admissible.  However, y'all will
 2                    need to make a copy without it
 3                    being highlighted and tabbed.
 4         MR. SMITH:  Has the original been
 5                    offered?
 6         MRS. STOUT:  No.
 7         THE COURT:  No.
 8         MR. SMITH:  We would offer the original,
 9                    certified records then and
10                    substitute my copy for the
11                    original.
12         THE COURT:  Is your copy highlighted?
13         MR.  SMITH:  My copy (z) that's
14                    highlighted and tabbed, that's
15                    what Dr. Sawyer just testified
16                    from.
17                         And since they have
18                    objected to the part that's
19                    highlighted that he has already
20                    testified to, which we feel is
21                    admissible, but accept Your
22                    Honor's ruling, we move to
23                    substitute the original record
24                    for (z).
25                         I mean, if you don't
```

1          want the highlighted copy, let's

2          put the original in.

3     MRS. STOUT:  I will by happy to make a

4          copy of the original.  I only

5          object to the highlighted

6          portions of what Defense is

7          offering.

8     THE COURT:  It will come in as evidence.

9          But it will not be highlighted

10         nor tabbed.

11    MRS. STOUT:  Thank you.

12    THE COURT:  And you can substitute a

13         copy.

14    MRS. STOUT:  I will make a copy of that.

15    MR. SMITH:  That's all the questions I

16         have.

17    THE COURT:  And other questions of this

18         witness?

19    MR. JARRELL:  Yes, sir.

20              REDIRECT EXAMINATION

21 BY MR. JARRELL:

22    Q     You stated there were several doses

23 of Demerol and --

24    A     Phenergan.

25    Q     -- Phenergan, whatever it was, over

1  a period of time there.  Were these rather

2  large doses or small doses?

3      A    In different people pain tolerances

4  are different.  That was -- that's on the large

5  side, but it's not unusual, though.

6      Q    Are these mind-altering type drugs?

7      A    Yes.

8      Q    To what degree?

9      A    I'm sorry?

10      Q    To what degree?

11      A    They are narcotics and phenotizens.

12  You know a dose of Demerol would put some

13  people to sleep for five or six hours.  And

14  others it's just enough to relieve their pain.

15      Q    So, depending upon the person is

16  what makes the effect of the drug?

17      A    Yes.

18      Q    How it effects them?

19      A    Yes.  Yes.

20      Q    Did you observe Mr. Conrad during

21  the time that he was taking these drugs?

22  Or were you prescribing these based on reports

23  from the nurses that he was complaining with

24  pain?

25      A    That's correct.

1    Q    You said that you recovered a

2    bullet that was in the arm?

3    A    That's correct.

4    Q    Was there a reason for recovering

5    it?

6    A    Contrast to two bullet wounds, you

7    have one bullet, a deep wound to muscles in the

8    back, where it would never cause him any

9    symptoms.

10    You have another bullet right

11    underneath the skin.  And that was the one

12    that was going to irritate the skin and going

13    to be painful.  And it would have to be

14    removed.  And removing it while he was under

15    general anesthesia seemed best for him.

16    Q    And when you removed the bullet,

17    you said that you gave it to Buford Roberts,

18    the police officer that was there?

19    A    That's correct.

20    Q    Did you sign any package or

21    anything that he would have put it in?

22    A    No.

23    Q    Or did you just hand it directly to

24    him?

25    A    Just handed it directly to him.

```
 1          MR. JARRELL:  Thank you.

 2       THE COURT:  Mr. Smith?

 3       MR. SMITH:  No further questions, Judge.

 4       THE COURT:  Is there any reason that this

 5                   witness should not be excused by

 6                   the State?

 7       MR. JARRELL:  No, Judge.

 8       THE COURT:  By the Defense?

 9       MR. SMITH:  No, Your Honor.

10       THE COURT:  Call your next witness.

11       MR. SMITHI:  Judge, I would, again,

12                   though, request, and this

13                   doesn't involve Dr. Sawyer.  We

14                   are through with him.  But the

15                   best evidence is the original

16                   record that is sitting there.

17                       And if they object to a

18                   highlighted copy that they have

19                   provided me, I want the jury to

20                   have the best evidence.

21       MR. JARRELL:  The best evidence, Your

22                   Honor, was his testimony.

23       MRS. STOUT:  Your Honor, I have no

24                   problem with doing that.

25       THE COURT:  Okay.  The original?
```

812

```
 1           MRS. STOUT:  I'll make a copy from my

 2                    records.  And I will provide the

 3                    original to the Court?

 4       THE COURT:  Back to the Court?

 5       MRS. STOUT:  Yes, sir, I will.

 6       THE COURT:  And mark it as what number?

 7       MR. SMITH:  Defendant's Exhibit (z).

 8       THE COURT:  (z).  It's in evidence, the

 9                    original.

10       MR. SMITH:  Thank you, Your Honor.

11       THE COURT:  Your next witness?

12                            Just so the jury can

13                    here you say this, and I'm

14                    talking to the State,

15                    approximately how many more

16                    witnesses does the State have

17                    before you rest?

18       MRS. STOUT:  Your Honor, we have three

19                    witnesses traveling from

20                    Montgomery.  They are in route.

21                    We have our pathologist, our DNA

22                    specialist and our firearm

23                    specialist.

24       MR. JARRELL:  And we have one other one,

25                    this officer.
```

1      MRS. STOUT:  And this officer, for

2                  tonight.

3      THE COURT:  I understand.

4                       Would you raise your

5                  right hand and place your left

6                  hand on the Bible?

7                  BUFORD ROBERTS

8         Whereupon, this witness, after first

9   being duly sworn to tell the truth, the whole

10   truth, and nothing but the truth, testified as

11   follows, to-wit:

12                  DIRECT EXAMINATION

13   BY MR. JARRELL:

14       Q      State your name, sir, and where

15   you are employed?

16       A      Buford Roberts, Enterprise Police

17   Department.

18       Q      How long have you been a police

19   officer, sir?

20       A      I have been a police officer for 28

21   years.

22       Q      Back on May 23rd of 2001, were you

23   at the Enterprise Medical Center where

24   Mr. Robert Conrad was brought to be

25   administered to?

1      A      I was dispatched there after he was

2  brought in.  But, yes, sir, I was there while

3  he was there.

4      Q      He was there already when you got

5  there?

6      A      Yes.

7      Q      And did you accompany Mr. Conrad

8  and doctors to the surgery?

9      A      I did.

10      Q      Were you present when a projectile

11  was removed from Mr. Robert Conrad's arm?

12      A      I was, sir.

13      Q      And what happened to that

14  projectile?

15      A      That projectile -- I was holding a

16  vial in surgery.  Once it was removed from

17  Mr. Conrad, the doctor dropped it into the

18  vial.  And it was sealed.

19              It was later given to Sergeant Rick

20  Hauser, who took it to Montgomery, Alabama.

21      Q      Okay.  I'm going to show you what's

22  been marked as State's Exhibit No. 26 and ask

23  you to look at that first, and see if you can

24  identify that package?

25      A      Yes, sir.

1    Q    And what is that?

2    A    That is the packaging where the

3    vial and projectile was packaged up to take to

4    Montgomery.

5    MR. JARRELL:    Okay.  And I'm going to

6                    ask you, with the permission of

7                    the Court, to open package the

8                    package.

9    THE COURT:  Yes, sir.

10   A    I'm not really good with knives.

11   Q    Now, is this the container that you

12   placed the bullet in?

13   A    Yes, sir, it is.

14   Q    How can you tell that?  What about

15   that container that tells you that?

16   A    It has the markings on it, where it

17   was packaged as evidence by our department.

18   Q    Does it appear to have been opened

19   and examined?

20   A    Yes, sir.

21   Q    And whose initials appear to be on

22   top?  Or is there somebody's initials on top?

23   A    There are some initials.  I can't

24   --

25   Q    Let me ask you this questions:  But

1    the container that you have there, other than

2    it looks like it's been open one time -- and

3    the next witness will testify to that -- is

4    that the condition that you presented it to

5    Rick Hauser?

6          A    It appears to be, yes, sir.

7          MR. JARRELL:  And I believe we said that

8                 this was marked as State's

9                 Exhibit No. 26.

10         Q    Was that your only involvement as

11   far as that bullet was concerned?  You received

12   it from the doctor and returned it to Rick

13   Hauser for transportation?

14         A    Yes, sir.

15         MR. JARRELL:   Your witness.  Excuse me.

16                I have another question.

17         THE COURT:  Sure.

18         Q    I believe you were also a part of

19   the search that went on over on Green Tree

20   Apartments, were you not?

21         A    I was, yes, sir.

22         Q    And what area did you search?

23         A    We searched the dumpster area

24   outside of the apartments.  I don't recall the

25   apartment number right off hand.  But outside

1    of some apartments and some wooded area behind

2    some apartments.

3        Q    I'm going to show you what has been

4    marked as State's Exhibit No. 25 and ask if you

5    can identify that, sir?

6        A    Yes, sir.  It's where -- I don't

7    see exactly what it was.  But something was

8    removed from the dumpster behind apartment

9    number 228 at Green Tree Apartments.  That

10   appears to be my writing on the package.

11       Q    I'm going to, with the Court's

12   permission, ask you to open that package and

13   remove the item?

14       A    Yes.

15       Q    And can you identify this item,

16   sir.

17       A    Yes, sir.  It's a T-shirt that was

18   removed from a dumpster behind apartment number

19   228.

20       Q    And what did you do with that

21   t-shirt?

22       A    It was packaged and later given to

23   Detective, Sergent Hauser to be transported to

24   Montgomery.

25       Q    Was there a reason that particular

1    shirt was sent to Montgomery?

2         A    It appeared to have blood stains on

3    it or some type of stains on it, which we felt

4    was blood.

5         Q    And, again, you turned that over to

6    Detective Hauser to be transported?

7         A    Yes, sir.

8         Q    And that's State's Exhibit No. 25?

9         A    (Nodding in the affirmative).

10        MR. JARRELL:  Your witness.

11                   CROSS EXAMINATION

12   BY MR. SMITH:

13        Q    Buford, did you recover State's

14   Exhibit No. 25 yourself?

15        A    Which was the t-shirt?

16        Q    Yes, sir.

17        A    I'm not sure.  It was there --

18   there were three or four of us right there at

19   the dumpster.  And either myself or -- I think

20   Eddie Pennington was there.  One of the two of

21   us would have recovered it.  And it was handed

22   directly to me.

23        Q    But you don't recall whether

24   yourself or someone else recovered it?

25        A    No, sir.  I don't recall who took

1    it out of the dumpster.

2         MR. SMITH:  Nothing further.  Thank you.

3              Mr. Roberts, I'm glad to see you

4              looking healthy.

5         THE WITNESS:  Thank you.

6              REDIRECT EXAMINATION

7    BY MR. JARRELL:

8         Q    If you didn't actually pick it up,

9    did you see someone else pick it up?

10        A    Yes, sir.  I was present when it

11   was recovered from the dumpster, so I would

12   have seen it when it was picked up.

13        MR. JARRELL:  Thank you.  Nothing

14              further.

15        THE COURT:  Is there any reason this

16              witness should not be excused?

17        MR. SMITH:  No, Your Honor.

18        THE COURT:  No?

19        MR. JARRELL:  We can get back up with him

20              if we need to.

21        THE COURT:  Okay.  You are excused.

22                   Call your next witness.

23        MR. JARRELL:  Judge,  I think we are down

24              to the folks we were waiting on

25              from Montgomery.

1    THE COURT:  There's no need for you to

2    have to sit there and twiddle

3    your thumbs while we wait for

4    them to get here.  You can go

5    back and relax a few minutes.

6    As soon as they get here, we

7    will bring you back out and

8    continue on, until we finish

9    with their testimonies.

10                And then we will

11    adjourn for the day.  There

12    should be one or two more

13    witnesses for the State, I would

14    anticipate, based on my

15    understanding.

16                So, again, the Court is

17    required to instruct you and

18    does instruct you not to discuss

19    this matter among yourselves nor

20    to allow anyone to discuss it

21    with you.

22                This Court is in recess

23    until the State's experts

24    arrive.

25    MR. SMITH:  Because Mr. Conrad has been

1          incarcerated, we have been

2          restricted in going over

3          evidence with him.

4                    Could we take this last

5          exhibit, this t-shirt, and I

6          ask Mr. Holly to monitor.  I

7          don't mind him being with us.

8     THE COURT:  Sure.  Dwight Holly, would

9          you take custody of the t-shirt.

10          And it hasn't gone into

11          evidence, yet, and y'all are not

12          going to make issue of this

13          change for court purpose by

14          this?

15     MR. SMITH:  Absolutely not.

16               (A short recess was taken).

17     THE COURT:  This court will come to

18          order.  You may be seated.

19                    Ladies and gentlemen,

20          while you have been out there a

21          while, waiting and relaxing and

22          stretching for a few minutes,

23          just so you will know where we

24          are, and I know you already know

25          what we intend to do.  But I'm

1           just going to run through it,

2           again.

3                We have three more

4           witnesses before we finish for

5           the day.  One is here.  The

6           other two are about 20 minutes,

7           I understand, behind this

8           witness.  So by the time we

9           finish with this witness,

10          hopefully, they will be here.

11                If you will come up,

12          I'll swear you in.  Raise you

13          right hand and place your left

14          hand on the Bible.

15              DR. EMILY WARD

16       Whereupon, this witness, after first

17   being duly sworn to tell the truth, the whole

18   truth, and nothing but the truth, testified as

19   follows, to-wit:

20          THE COURT:  She told me back in the

21               back, she has been all over the

22               state today,  and that this is

23               definitely the nicest

24               courthouse?  Is that right?

25          THE WITNESS:  Yes, sir.

1

<u>DIRECT EXAMINATION</u>

<u>BY MR. JARRELL:</u>

Q      State your name and where you live?

A      My name is Dr. Emily Ward.  And I
live in Montgomery.

Q      What is your occupation or
profession?

A      I'm a forensic pathologist, a
physician employed by the Alabama Department of
Forensic Sciences.

Q      So you are, is it fair to say, a
licensed physician?

A      Yes, sir.

Q      Are you licensed in this state?

A      Yes.

Q      How long have you been licensed to
practice medicine?

A      Since 1982.

Q      And where did you go through
medical school?

A      I went to medical school in
Philidelphia, Pennsylvania, at Jefferson
Medical College.

Q      And where did you do your

824

```
1    residency?

2         A       I did my pathology residency at the

3    University of Mississippi Medical Center in

4    Jacksonville, Mississippi.   And I did my

5    subspecialty training in forensic pathology at

6    the University of Alabama, at Birmingham.

7         Q       Are are you a medical examiner in

8    terms that are commonly used?

9         A       Yes, sir.   My title with the State

10   is State Medical Examiner.

11        Q       Does that work as a medical

12   examiner include doing autopsy?

13        A       Yes, it does.

14        Q       Do you have an estimate as to how

15   many autopsies you have performed during the

16   course of your work as a medical examiner or in

17   the field of pathology?

18        A       I have performed about 4,000

19   autopsies during the years.

20        Q       And I assume that this question has

21   probably already been answered.   But your

22   specialty is in pathology?   Is that right?

23        A       That's right.

24        Q       And particularly, forensic

25   pathology?
```

1          A      That's right.

2          Q      Are you certified by any boards?

3          A      Yes.  I am certified by the

4    American Board of Pathology and general

5    pathology, which they call anatomic and

6    clinical pathology.  And then, also, in the

7    subspecialty of forensic pathology.

8          Q      For the benefit of the ladies and

9    gentlemen of the jury, could you give us a

10   description or definition, really, of what

11   forensic pathology is?

12         A      Yes.  Pathology is really just a

13   study of disease and the diagnosis of disease.

14   A pathologist is a doctor trained to make

15   diagnosis by use of the laboratory in the

16   hospital and the microscope to look at biopsies

17   under the microscope and tissues removed at

18   surgery.  A pathologist does pap smears and

19   analyzes blood samples that are removed from

20   patients and sent to the hospital laboratories.

21              And then there's a small area of

22   pathology referred to as autopsy pathology,

23   where the doctor is specially trained to

24   examine the body of somebody who has died to

25   try to determine why the person died, what the

1    cause of death is.

2              And forensic pathology is more

3    specifically aimed at examining the body of

4    someone who had died outside of the hospital,

5    not when they have been treated for cancer or a

6    heart attack or something, but died as a result

7    of something suddenly and unexpectedly.  So

8    anybody who does die as a result of violence of

9    any type is examined by a forensic pathologist

10   to try to determine why that person died.

11        MR. JARRELL:   Your Honor, at this time

12                  we ask that Dr. Ward be declared

13                  an expert in the area of

14                  forensic pathology.

15        MR. SMITH:  We agree.

16        THE COURT:  It is to stipulated and the

17                  Court so finds.  This Court

18                  declares Dr. Emily Ward to be an

19                  expert in this specialized

20                  field, and will allow this

21                  expert to express her opinions

22                  based on her field of expertise,

23                  and I will call it autopsy

24                  pathology.

25        Q    Dr. Ward, back in and around May,

1    soon thereafter, May the 23rd, 2001, did you

2    perform an autopsy on Jelaine Dennis?

3        A    Yes, sir.  I performed it on

4    May 24th.

5        Q    Where did this take place?

6        A    At the facility at the Department

7    of Forensic Sciences there in Montgomery.

8        Q    Would you explain to the ladies and

9    gentlemen of the jury what you found during the

10   course of your autopsy of Jelaine?

11       A    We performed an autopsy basically

12   in two steps.  The first step, we refer to as

13   the external examination.  We look, first, at

14   the body, with the clothing on the body, or if

15   it's received with the body.

16            And then we look at the body for

17   general physical characteristics, how tall she

18   was, what state of health, or nutrition she was

19   in.

20            Then we look specifically for any

21   injuries that are present on the body.  And if

22   there are injuries, then we take a photograph

23   of the injuries and measure them and examine

24   them so that we can get as much information as

25   possible about the injuries, and where they are

1    inflicted on the body, and how they were

2    inflicted.

3               And then the second part of the

4    autopsy examination is the internal

5    examination, where we look inside the body,

6    sort of like what a surgeon does, in the

7    operating room to see what the injuries are

8    inside the body and to see if we can correlate

9    those things that we found on the skin with

10   injuries to the internal organs that may

11   account for why she died.

12              And we did that in this case, of

13   this person.

14       Q     And would you describe to the

15   ladies and gentlemen of the jury what

16   particular wound or wounds you found upon the

17   body of Jelaine Dennis?

18       A     Yes, sir.  Mrs. Dennis had three

19   gunshot wounds on her body.  The first wound,

20   and in my report I've numbered them just

21   arbitrarily so that I can keep them straight

22   when I'm talking about them.

23              So the first wound, that I called

24   gunshot wound number 1, is a wound on the front

25   of her chest.  It's just a little bit to the

```
 1    right of her breast bone, right in the middle

 2    of her chest.  And it's a round wound with a

 3    defect in the middle of it.  A bullet traveled

 4    through her chest into the right side of her

 5    chest, through the right lung.  And then it

 6    exited the right side of her back, almost under

 7    her armpit.  But more to the outside of her

 8    body than the middle like the wound on the

 9    front was.

10             So we have an entrance wound that

11    is traced through the body, through the lung,

12    and a corresponding exit wound on the lateral

13    aspect of the chest.

14             And I group together and called

15    that gunshot wound number one.

16        Q    Let me stop you just a moment.

17        A    Okay.

18        Q    In your numbering of these gunshot

19    wounds, you are not reoffering to the order in

20    which they occurred, are you?

21        A    No.

22        Q    Just the order in which you took

23    them in?

24        A    That's right.  I just described

25    them and gave them an arbitrary number when I
```

1    described them.

2          Q      You may proceed.

3          A      The second wound on the body of

4    Mrs. Dennis was on the left side of her

5    buttocks, just a little bit to the left of the

6    midline, and on the left buttock.  And the

7    bullet that caused that wound also caused a

8    hole in the skin on the left buttock.  The

9    bullet went through the left side of the

10   buttock and hit the left pelvic bone and sort

11   of changed directions just a little bit when it

12   hit that bone.  And then it exited on the

13   outside of her left thigh.

14               We traced the bullet as it -- the

15   path that it left when it traveled through the

16   buttock and the left thigh, and could see that

17   there was some hemorrhage in the wound track

18   there where the bullet had passed indicating

19   that there was some bleeding associated with

20   that wound.

21               And then we had another wound,

22   which I called gunshot wound number three.  And

23   it was a little bit closer to the bottom of her

24   heel on the left leg, and a little bit further

25   out.  But it also was on the left leg and

831

1    traveled through the fatty tissue and muscles

2    of the left thigh and became lodged in the left

3    buttock there.

4         Q    Where did you say the entrance was

5    for that one?

6         A    The entrance on gunshot number

7    three is on the outside of the left thigh.

8         Q    And it traveled downward?  Did I

9    understand you correctly?

10        A    Actually, the wound that we are

11   calling number three traveled a little bit

12   upward and backward.  The bullet was lodged in

13   buttock.

14        Q    Did you determine from your

15   examination of Mrs. Dennis the cause of death?

16        A    Yes, I did.

17        Q    What was that?

18        A    It's my opinion that Mrs. Dennis

19   died as a result of multiple gunshot wounds.

20        Q    Thank you.  Now, you mentioned in

21   gunshot wound number two, that there would have

22   been a lot of bleeding from that wound?  Is

23   that correct?

24        A    Well, I did mention there was

25   bleeding associated with that wound.  But

```
 1    probably not as much with that wound as the

 2    wound of her chest.  But there is some

 3    hemorrhage associated with all there of the

 4    wounds.

 5         Q      Well, that's my next question.  The

 6    chest wound, would it have been a wound that

 7    would have caused a lot of bleeding, or would

 8    have been a lot of bleeding from?

 9         A      Yes, it would.

10         MR. SMITH:  Your Honor, we would

11                     republish, if I may, our

12                     statements previously about the

13                     exhibit.

14         THE COURT:  Sure.  Ladies and gentlemen,

15                     again, to save time, to save

16                     your time, the Court has already

17                     heard legal argument as to

18                     probably the next State's

19                     Exhibit.

20                          The Court has already

21                     ruled it to be admissible and to

22                     save a lot of time, the Defense

23                     would just simply say for the

24                     record they reassert their

25                     earlier arguments that was made
```

```
 1                        outside of your hearing and

 2                        presence.

 3                            Is that correct?

 4        MR. SMITH:  Yes, Your Honor.

 5        MR. JARRELL:  Thank you, Your Honor.

 6        THE COURT:  And I also tell you that some

 7                        of these are -- I don't know

 8                        what word to use.  And that's

 9                        probably why certain folks have

10                        left the courtroom, for their

11                        benefit.

12        Q     Dr. Ward, you said you removed a

13   projectile that was found when you examined the

14   wound number three, as you call it?  Is that

15   correct?

16        A     That's correct.

17        Q     And what did you do with that

18   projectile?

19        A     We, as much as possible, we cleaned

20   the blood and tissue off of it, and then put it

21   in an envelope and labeled that envelope, and

22   transferred it to the other branch of the

23   Department of Forensic Sciences to Mr. Joe

24   Saloom.

25        Q     I'm going to ask you to look at
```

1    State's Exhibit No. 27.  And can you tell me

2    what that is, please?

3         A    Yes.  This is the envelope that

4    contains the bullet that we removed from

5    Mrs. Dennis's body.

6         Q    And does that envelope have any

7    markings on it or anything that you put on

8    there?

9         A    Yes.  This little green sticker,

10   with an autopsy number, her name and the date,

11   and there are my initials in the corner of this

12   sticker.

13             And we also put this red evidence

14   tape on the envelope.  Some of the writing was

15   probably put on subsequently when it left the

16   autopsy room.  But that is definitely my

17   initials right there.

18        Q    Okay.  But it was obviously opened

19   by the next person who examined it and

20   resealed?  Is that correct?

21        A    I think so, yes.

22        Q    I also show you what has been

23   offered as State's Exhibit No. 27(a) and ask if

24   you can identify that?

25        A    Yes.  This envelope is also marked

1    in the top with medical examiner, has the

2    autopsy number and the name of the deceased and

3    the words "tape lift."

4         Q     And what are tape lifts, please?

5         A     In some autopsies, we try to

6    preserve tiny bits of evidence that we might

7    not be able to see with the naked eye.  And we

8    do it by taking a piece of heavy scotch tape,

9    and pressing it against the skin of the palms

10   of the hands or against the wounds, and then

11   lifting the tape off real quickly.

12              We call that a tape lift, hoping

13   that if there's any evidence there on her

14   palms, it will stick to the tape.  And then we

15   take the sticky part of the tape and put it

16   down on an index card and label it so that we

17   can tell where it came from.

18        Q     And I'm going to ask you if this

19   has been sealed by you on one end, you said

20   with the red tape?

21        A     That's right.

22        Q     And apparently it was opened and

23   resealed on the other end by someone else?

24        A     That's what it looks like to me,

25   yes.

1        MR. JARRELL:  With the Court's

2                       permission, I would like to open

3                       this.

4        THE COURT:  You may.

5        MR. JARRELL:  I should have brought a

6                       sharper knife.

7        Q      And I ask if you would remove the

8    contents and tell me if those are the lifts

9    that you lifted from Jelaine Dennis?

10       A      Yes.  These are the tape lifts that

11   we took.  There's one card each from the back

12   of the hands, and one card each from the front

13   of the hands, and then one from the back of the

14   chest, and one from the lateral part of the

15   thigh, the left buttocks.

16              And this last card, I'm not sure

17   what that reads.  But there is a round area of

18   blood stain.  And it was probably lifted from

19   the wound itself.

20       Q      Okay.  And I ask you, are those in

21   the same condition as they were when you turned

22   them over to the next person at the Department

23   of Forensic Science?

24       A      Basically the same condition.

25   There's more writing on the card than when I

1      submitted them, but probably because --

2          Q      Is that the only difference?

3          A      Yes, sir.

4          Q      Did you turn these over to who?

5          A      To Joe Saloom at the Department of

6      Forensic Sciences.  He is a firearm's examiner.

7          Q      Did you turnover State's Exhibit

8      No. 27, the bullet that you took from her leg?

9          A      Yes, I did.

10         Q      To Joe Saloom?

11         A      Yes.

12         Q      If I open that bullet, there would

13     be no other marking on that, that you would

14     have put on the bullet?

15         A      No.

16         Q      But it's in the package that you

17     put it in.  And it was just open one time since

18     you gave it to Joe Saloom?

19         A      That's correct.  We don't -- I'm

20     sorry.  There are two other cards beneath the

21     card mark left buttocks.  I just didn't

22     separate them all at first.  They were stuck

23     together.  I just want to make sure not to

24     confuse the jury.

25               Yes, in answer to your question, I

858

1    do not mark the bullets, because I do not want

2    to put any more marks on there since Joe is

3    going to examine them and look at it under a

4    microscope.

5          MR. JARRELL:  Thank you.  I'm going to

6                     ask you to step down, if you

7                     would, please.

8                        And I apologize to the

9                     ladies and gentlemen of the jury

10                    for what I have to show here,

11                    but I feel like it is necessary.

12         Q     I ask, if you would, examine those

13    six photographs and tell me, if you can, if you

14    recognize who these depict, and who they are

15    of?

16         A     Yes.  I recognize the photographs

17    as those of the lady who was identified as

18    being Mrs. Dennis.

19         Q     I will ask you to look what we will

20    call up in the upper left hand corner, number

21    one.  What would that depict?

22         A     This photograph is a picture of the

23    right side of the back of her chest, with a

24    plastic chest tube in the lower part of the

25    photograph, which the doctors in the emergency

1  room probably put in, in an attempt to treat

2  her in emergency.

3           And the top part of the photograph

4  shows the exit wound corresponding with the

5  gunshot wound, which I described to you as

6  gunshot wound number 1, in the chest.  In the

7  top right photograph, the exit wound from that

8  bullet, that went through her chest.

9       Q     Let me interrupt you for a moment.

10  I failed to identify this as State's Exhibit

11  No. (b) on our list here, but it maybe marked

12  different on the sheet that we gave.

13           It's State's Exhibit 8.  Let me

14  change that.  And if you would, we will call

15  this area number two, picture number two.

16  Would you describe that?

17       A     Yes, sir.  Picture number two shows

18  the face and top of the torso of the body of

19  Mrs. Dennis.  And right in the middle of the

20  chest, a little bit in the midline shows the

21  wounds that I described to you before, which is

22  the entrance wound of the gunshot wound to the

23  chest.

24           You can see in the center of the

25  wound is a small round defect, that's about

1    three-eights of an inch in diameter.  And it is

2    surrounded by a larger circular area

3    circumferential abrasion in the skin all the

4    way around the defect in the sin.

5              There are also spots of blood on

6    the skin.  But the blood on the skin is easy to

7    differentiate from the entrance wound itself.

8       Q    I want to refer you down to one at

9    the bottom corner.  Is that a picture of the

10   same wound?

11      A    Yes, sir.  That photograph in the

12   bottom corner is also a photograph of the

13   chest.  But it's a much closer view of the

14   gunshot wound itself.  And, again, you can see

15   the central defect of where the bullet went

16   through the skin and then scrapes the skin in a

17   circle action around the defect.

18      Q    What is that indicative of?

19      A    It's my opinion that this scrape in

20   the skin around the central defect was made by

21   the gun, that it was so close to the skin.

22             And then there's a shirt that was

23   on the body between the gun and the skin.  And

24   I think that the red mark around the skin is a

25   combination of the skin being burned by the gun

1    powder end of the gun, and possibly some of the

2    shirt was burning, too.  It was a

3    polyester-type synthetic shirt.

4              So all of that is to say, I think

5    it's a mark that indicates that it's a contact

6    gunshot wound.

7        Q      Also, I notice on this photograph

8    here -- would you describe what that is,

9    please?

10       A      Yes, sir.  The middle photograph on

11   the left-hand side of the poster is a

12   photograph of the inside of Mrs. Dennis' left

13   palm.  And right where the finger is joined,

14   the palm of the hand is a linear mark of black

15   soot material.  It's about an inch and a

16   quarter long and about a quarter inch wide.

17   And it's just a small realm of black soot

18   that's deposited on the inside of the palm.

19       Q      Was that one of the lifts that you

20   took?

21       A      We did take a tape lift of the palm

22   area, but it probably covered just a little bit

23   more than just this black soot area.  I'm sure

24   it covered that area.

25       Q      Okay.  Thank you.  I asked you

1    about this picture.  Can you describe that for

2    us, please?

3         A      The picture in the lower right-hand

4    part of the poster, this is a photograph, which

5    you can get your anatomic landmarks by seeing

6    the belly button right at the top of the

7    photograph and the EKG leads that would be on

8    the left side of the chest here.

9              So this is the wound that was right

10   on the left side of her thigh or left side of

11   the hip area and the exit wound of gunshot

12   wound number two that we described above.

13        Q      Okay.  And we haven't covered this

14   one, but I think your other photographs may be

15   the same?  Describe it too?

16        A      The other middle photograph on

17   poster is a photograph of the right side of her

18   torso, with the plastic chest tube and

19   electrocardiograph leads.  You can see her

20   right breast in the bottom part of the photo.

21             And the top part of the photo shows

22   the exit wound from the gunshot wound to the

23   chest.

24             The entrance wound was on the front

25   of the chest and the exit wound is underneath

1    the right arm, just outside of the armpit area,

2    on the right side of the back.

3        Q    Thank you.  You called this a

4    contact wound.  Again, if you would for the

5    ladies and gentlemen of the jury, explain what

6    a contact wounds is?

7        A    Well, when we describe gunshot

8    wounds, we try to classify them in three

9    different categories.  One is the contact

10   wound, another wound is a close-range wound,

11   but not where the barrel of gun is -- not in

12   contact with the skin.  And the third category

13   is a distant wound.  And we leave that for

14   wounds where we can't see any changes on the

15   skin made by a gun or gun powder particles.

16                I've called it a contact gunshot

17   wound because the injuries around the wound is

18   directly related to the defect left by the

19   bullet itself.  In other words, it's all one

20   big wound, the defect made by the bullet and

21   then the burning around the skin around it.

22                The defect made by the bullet is

23   just a little smaller, but still a circular

24   injury.  And so is the injury in the skin, a

25   circular injury.  And this is a combination of

1    what we call an abrasion, which is just the top

2    part of the skin scrapped off by the burning

3    part of gun powder as it comes through the

4    shirt and then through the skin, leaving a mark

5    on the asking.  And there is a little bit of

6    burning and a little bit of soot material

7    that's deposited in the skin there.  So it's

8    discolored by the skin being scrapped off and

9    by particles of gun powder actually burning the

10   skin.

11            When the bullet comes out of the

12   end of the gun and comes out of the gun there's

13   a lot of smoke and gun powder.  So it's very

14   hot.  And it will burn anything that's within a

15   inch or two of the end of the barrel when the

16   trigger is pulled.

17            So this burning indicates to me

18   that the gun was firmly pressed against her

19   when the trigger was pulled.  And the shirt

20   that was between the skin and the end of the

21   bullet -- excuse me, the end of the barrel

22   burned the synthetic tissue of the shirt and

23   caused the imprint on the skin.

24            MR. JARRELL:  We offer, Your Honor, at

25                    this time, State's Exhibit No.

1                          8.

2              THE COURT:  Objection?

3              MR. SMITH:  Same objection.

4              THE COURT:  Objection is overruled.  It's

5                    in evidence.

6         Q    I think we can do this without you

7    having to move up.  I ask you to examine

8    State's Exhibit No. 31, and tell me what that

9    is, please?

10        A    Yes.  This Exhibit No. 31 is a copy

11   of the autopsy report.

12        Q    Is that a true and accurate copy to

13   the best of your knowledge?

14        A    Yes.

15             MR. JARRELL:  We ask the Court to admit

16                   at this time, State's Exhibit

17                   No. 31 and use a copy as opposed

18                   to the Examiner's.

19             MR. SMITH:  We object to page one, may it

20                   please the Court.  It has a

21                   conclusion that ultimately that

22                   invades the province of the

23                   jury.

24             THE COURT:  You need to lay an additional

25                   predicate if you want to try to

1                   get in page one.

2          MR. SMITH:  It's Page 2, may it please

3                   the Court.  Page 1 for the

4                   record is a cover page.  Page 2

5                   contains two conclusions, one of

6                   which would be the medical

7                   doctors conclusion.  The other

8                   one is the ultimate decision of

9                   this jury.

10      Q      In your examination of this body of

11  Jelaine, do you have an opinion as to the cause

12  of death?

13      A      Yes, I do.

14      Q      And it was what?

15      A      The cause of death was multiple

16  gunshot wounds.

17      Q      Do you have an opinion as to the

18  manner of death?

19          MR. SMITH:  Objection.

20      A.      Yes, sir, I do.

21          THE COURT:  Overruled.

22      Q      You may answer.

23      A      Yes, I do have an opinion about the

24  manner of death.

25      Q      And what was that?

1     A     My opinion is that the manner of

2   death of Mrs. Dennis was homicide.

3     Q     And what does the term of homicide

4   mean to you?

5     A     As a general protocal in handling

6   everybody that comes through the medical

7   examiner's office, part of our responsibility

8   is to determine the manner of death on any

9   individual.

10          And the State categorizes death in

11   basically five different categories, either

12   death from natural disease, death as a result

13   of homicide, suicide, accident.  And then

14   there's the fifth category which is called

15   undetermined, which we don't use very often.

16   Usually there is enough information found to be

17   able to put it into one of those four

18   categories.

19          And for the purposes of determining

20   what her manner of death was, the only criteria

21   that I use in the autopsy room is just the

22   standard that death was at the hand of another

23   individual, that somebody other than

24   Mrs. Dennis caused her death.

25          And for that reason, we say that

1    the manner of death was determined to be a

2    homicide.

3         MR. JARRELL:    Thank you.  And, again, we

4              offer State's Exhibit No. 31.

5         MR. SMITH:  Objection only as to Page 2.

6              I'm not objecting to the whole

7              report.

8         THE COURT:  Sure.  Objection is

9              overruled.  State's Exhibit No.

10             31 is in evidence.

11                  Any other questions of

12             this witness?

13        MR. JARRELL:    You overruled his

14             objection?

15        THE COURT:  Yes.  It's in evidence.

16             <u>CROSS EXAMINATION</u>

17   <u>BY MR. SMITH</u>:

18        MR. SMITH:  Dr. Ward, you can take the

19             stand, again, please.

20        THE COURT:  Mr. Smith, you can hand that

21             up here.  When you need it, let

22             me know.  I will keep it right

23             here.

24        MR. JARRELL:  If he's not going to use

25             it, we can put the rubberband

1          back on it.  I'll just hand that

2               to you, Judge.

3        Q     Dr. Ward, I'm Al Smith.  And I'm

4   one of the attorneys for the defendant,

5   Mr. Conrad, in this case.  And I have a couple

6   of questions to ask of you.  If you would look

7   at your report, and at this time of day my

8   memory has gotten short, and I've forgotten

9   what State Exhibit Number that is.  Would you

10  read it off, please?

11       A     It's State's Exhibit No. 31.

12       Q     State's Exhibit No. 31.  Would you

13  look at Page 2 of 7 of your report, please?

14       A     Yes, sir.

15       Q     Under the heading "Clothing and

16  Personal Effects."  And go to the section there

17  that says a "few particles," and then right

18  below that a "knit striped, short-sleeve

19  shirt," do you see that section?

20       A     Yes.

21       Q     Would you read that down through

22  the end of the sentence "arm seam," please?

23       A     "A knit-striped, short-sleeved

24  shirt is received which is soaked with blood.

25  The shirt also exhibits two holes, one of which

1    is on the front of the right side of the shirt,

2    and the other, which is on the right side near

3    the arm seam."

4        Q    And then go down to the "it's

5    surrounded by some" -- would you read that one

6    sentence, please?

7        A    It's referring to the hole in the

8    shirt, on the front of the shirt, "it's

9    surrounded by some black" -- "some dried black

10   material and a large amount of blood.  The

11   edges of this hole in the front of this shirt

12   have a burned appearance where some of the

13   synthetic fibers appear to have melted

14   together."

15       Q    Then turn over to Page 3.  And the

16   portion of the sentence that reads "from

17   gunshot wound number one, "The entrance wound

18   is round," would you read that sentence,

19   please?

20       A    "The entrance wound is round with

21   the diameter of three-eighths inch, and it is

22   surrounded by concentrically shaped area of

23   abrasion and superficial burning of the skin.

24   The area of abrasion has a horizontal dimension

25   of one-and-a-half inches and a vertical

1    dimension of one-and-a-quarter inches.  No gun

2    powder particles are visible around the

3    entrance wound.  The abraded area appears to

4    have been discolored with black sooting

5    material, although the soot is not clearly

6    distinguishable from the other skin changes."

7         Q    Now let me interrupt you.  Your

8    report says no gun powder particles are visible

9    around the entrance wound?  Correct?

10        A    Yes, it does.

11        Q    And it says the abraded area

12   appears to be have been discolored by black

13   sooty material.

14             What was that black sooty material?

15   Can you tell us what that was?

16        A    Yes.  I can tell you what it was.

17   The black sooty material is the bi-product of

18   smoke coming out of the end of the barrel.  And

19   it indicates that the end of the barrel was so

20   close to the skin when the trigger was pulled

21   that this soot coming out of the barrel was

22   deposited on the skin.  The gun powder

23   particles kept traveling with the bullet

24   through the body, most of them, as they came

25   out of the end of the gun.  Because this is a

 1    contact gunshot wound, sometimes we have wounds

 2    where we can see gun powder particles some

 3    distance away from the defect or maybe some

 4    stifling abrasions' injuries made by the flying

 5    particles of gun powder that are separate from

 6    the bullet.

 7              But in a wound like this, where the

 8    black sooty material is visible on the skin,

 9    and no gun powder particles, that's further

10    indication that the end of the gun was closely

11    pressed against her chest when the trigger was

12    pulled.

13         Q    Very, very close, and everything

14    was burned up that was going to make contact

15    with her skin?  Is that what I'm saying

16    correctly?

17         A    You mean the particles of gun

18    powder were burned?

19         Q    Yes?

20         A    No, I don't mean they were burned

21    up.  I mean that what was left on the skin was

22    a deposit of smoke, the gun powder particles

23    and the bullets were traveling together through

24    the chest.

25         Q    Skip down to the sentence that

853

1    begins with right after, "Diameter of one-half

2    inch" and "no soot."  Read that sentence,

3    please?

4         A    No soot, stifling abrasions or gun

5    powder particles are visible around the exit

6    wound.

7         Q    So, there was no gun powder

8    particles around the exit wound or soot or

9    stifling?  What is a stifling abrasion?

10        A    Little tiny strapes in the skin

11   made by individual particles of gun powder as

12   they actually pass to the skin, fly into the

13   skin.  Stipple abrasions are usually separate

14   distinct injuries from the central defect

15   itself.

16             And in Mrs. Dennis' wounds,

17   everything coalesced together.  The skin is

18   scrapped off and the soot deposited there.

19   It's clearly a contact wound, as opposed to a

20   gun that would -- an injury that would show the

21   gun powder stifling abrasions.

22        Q    All right.  And skip down to, on

23   the same page, gunshot wound number two.  You

24   found no soot stifling abrasions, or gun powder

25   particles are visible around the entrance

1    wounds.  And what wound are you referring to

2    there?

3        A      The entrance wound that I

4    arbitrarily numbered, number two, is the one on

5    the back of her left buttocks.

6        Q      And the sentence I read is there in

7    your report under the description of that

8    wound, is it not?

9        A      The sentence is there.

10       Q      All right.  Look to number three,

11   if you would, please ma'am, on Page 4 of 7.

12   And go down to the sentence that says no soot

13   or gun powder particles are visible around the

14   skin of the entrance wound.  Would you tell us

15   what wound you are describing there?

16              Did you find the sentence that I

17   just read?

18       A      Not exactly.  Is that right before

19   the part that says, "Several tiny particles are

20   visible" --

21       Q      Let me show you where I'm talking

22   about then.  Right here.  This sentence.

23   Gunshot wound number three.  Page 4 of 7.  "No

24   soot or gun powder particles are visual around

25   the skin of the entrance wound."

1              That's your finding to which wound?

2      A      Wound number three.

3      Q      And I understand it was arbitrarily

4  number by you.  Which wound is number three?

5      A      It's the wound on the outside of

6  her left thigh.

7      Q      All right.  Going back to the

8  gunshot wound number one.  That bullet, again,

9  I understand they are arbitrarily numbered.

10  That wound was where on her body, please?

11      A      Right in the middle of her chest.

12      Q      Here?  Would that be correct?

13      A      Yes.

14      Q      What muscle structures did that

15  bullet penetrate?

16      A      It penetrated the right side of her

17  chest.  It went through her pectoralis muscles

18  and through the right side of the rib cage and

19  through the right lung.  And then it exited

20  through more muscles and ribs on the back of

21  the right side of the chest.

22      Q      All right.  My anatomy was a long

23  time ago.  And tell us, the pectoralis muscle

24  -- did I understand you correctly?

25      A      That's name of muscle that goes

1    from the shoulder blade to the breast bone

2    across the side of the chest.

3         Q    All right.  It connects from the

4    shoulder blade in the back?

5         A    Actually it connects with the

6    clavicle, the collar bone.  And part of it

7    connects with the shoulder joint, the top of

8    the humerus.  And the muscle is a big,

9    fan-shaped muscle that goes all the way across

10   the front of the chest.

11             It's not the important part of the

12   wound to Mrs. Dennis, because the important

13   part was the lung that was punctured that --

14        Q    I understand.  But at this moment,

15   I'm asking you about the muscle, the pectoral

16   muscle.  And your testimony is that it's a

17   large fan-shaped muscle that goes -- it's

18   attached to the breast bone and the sternum,

19   which is in the very center of the chest?  Is

20   that correct?

21        A    The breast bone is in the very

22   middle of the chest, yes, sir.

23        Q    And the pectoralis muscle then

24   attaches to the collar bone, the clavicle.

25   This bone here?  Am I saying that correctly?

1      A      You are saying the word "clavicle"

2   correct.  You're pointing to a different part

3   of the clavicle from where I was pointing.  I

4   just don't want to mislead the jury.

5      Q      Absolutely not.  Again, my

6   knowledge of anatomy was a very long time ago.

7   And I apparently don't remember it real well.

8           You are saying that the part of the

9   bone, the clavicle, the collar bone to be over

10  here more to the shoulder?

11     A      I guess I'm just confused about the

12  discussion of the pectoralis muscles, when

13  really, the important part of the wound is that

14  it went through her lung.

15     Q      I understand that.  But I'm talking

16  about the pectoralis muscle.

17          Let me get you to stand up, if you

18  would, please, ma'am.  It might be better if

19  you step down on this step.

20     A      Okay.

21     Q      Would you point to me, on my chest,

22  where the entrance wound, or wound number one

23  was on Mrs. Dennis?

24     A      Point on your chest to where the

25  wound was on Mrs. Dennis?

858

```
1         Q      Yes, ma'am.

2         A      I would say it's about right there.

3         Q      I won't break.  I promise.  You can

4    touch me.  And I won't bite, either.  Would you

5    point to it, again, please?

6         A      It's about right there on the

7    chest.  The same area of the chest that you saw

8    in those photographs is where the entrance

9    wound is, it's basically between the two

10   breasts on the front of the chest, two inches

11   to the right of the midline, a little bit to

12   the right.

13        Q      All right.  Now, the pectoral

14   muscle that it penetrated, would you

15   demonstrate on me where that muscle is on that

16   right side that that bullet penetrated?  Can

17   you just point to the areas on my body to show

18   where that muscle would be?

19        A      The bullet went through the chest

20   about right there, between the breast, and

21   little bit to the right of the midline in the

22   chest.

23        Q      And that muscle is attached to the

24   clavicle, the collar bone where?

25        A      The pectoralis muscle is attached
```

1    to several different places.   It's attached to

2    the breast bone.   And then it fans out.   And

3    then it attaches partly to the collar bone up

4    here and partly to the shoulder bone here.

5    But, again, it's not the important part of the

6    wound.   The bullet didn't --

7        Q    Well, let me --

8        A    -- go through the shoulder blade.

9        Q    Dr. Ward, if I may, just answer my

10   question, please.   And we are talking about the

11   pectoralis muscle right now.   Now, what does

12   that muscle do?   And you can sit back down.

13   Could you tell us what muscle does?

14       A    What the pectoralis muscles does?

15       Q    Yes, ma'am?

16       A    Well, it protects the chest and it

17   assists in respiration, in breathing in and

18   out.   It also mainly functions to allow the arm

19   to move and to keep the chest up right.

20       Q    And it does have function with arm

21   movement?   Is that your testimony?

22       A    Yes, sir, it is.

23       Q    Now, the bullet also penetrated a

24   rib, if I read your report correctly?

25       A    Yes.   Let me refer to my notes, if

```
1    you don't mind.
2         Q    Please do.
3         A    It went through the right third
4    rib.
5         Q    Now, where would that be?  And I
6    guess I need to be the ginny pig.  Would you
7    point on me where that rib would be?
8         A    That's where the bullet went
9    through the chest.  Right there.  Between the
10   two breast, just a little bit to the right of
11   the midline.  You can feel the breast bone.
12   Anybody can feel their own breast bone right
13   there.  And the ribs attach to the beast bone.
14              And the bullet went through the
15   third rib, right about right there on her
16   chest.
17        Q    All right.  Did it penetrate a rib
18   on the backside?
19        A    Actually, it went through, between
20   the sixth and seven rib, on the right side.  It
21   didn't hit the rib.  It went through what we
22   call the intercostal space.
23        Q    Is that in the back or the front?
24   Ribs wrap around, do they not?  Most of them
25   anyway?
```

1        A       Yes, they do.

2        Q       And on the backside, you said that

3   it went between two ribs, but on the front side

4   it actually struck a rib?   Correct?

5        A       Yes, it did.   It went through the

6   right third rib on the front of the chest.

7   .cq 0 15 0

8        MR. SMITH:   Thank you very much.   No

9   further questions.

10        THE COURT:   Mr. Jarrell.

11        MR. JARRELL:   Yes, sir.

12                 REDIRECT EXAMINATION

13   BY MR. JARRELL:

14        Q       May it please the Court.   In

15   answering Defense Counsel's question about the

16   gun powder residue or unburned power, whatever

17   it was that he was asking you, you said that

18   you didn't see any in that contact wound?

19        A       That's right.   I didn't see any

20   individual particles of gun powder.

21        Q       Did you do that under a microscope?

22        A       Did I look at her wounds under a

23   microscope?   No, I did not.

24        Q       And did you take a tape lift over

25   that wound?

```
 1          A      Yes, I did.

 2          MR. JARRELL:    Thank you.  No further

 3                      questions.

 4          MR. SMITH:  Nothing further.

 5          MR. JARRELL:  I lost my train of thought.

 6                      One more thing.

 7          Q      (By Mr. Jarrell) Would the fact

 8     that the bullet that penetrated the chest,

 9     going through the pectoralis muscle, would that

10     render that muscle unusable?

11          A      No, sir, not at all.

12          Q      Would it, the fact that it went

13     through that muscle, and went through a rib,

14     through the lungs, between the tissue, between

15     the ribs in the back and out the back, would

16     that have slowed that bullet down any?

17          A      Would the pectoralis muscle have

18     slowed it down?

19          Q      With all of that together?  The

20     path that bullet followed, as it entered and

21     exited, would that have slowed that bullet down

22     any?

23          A      Yes, it would have.

24          MR. JARRELL:  That's all.

25          MR. SMITH:  I'm still through.
```

1          THE COURT:  Is there any reason that this

2                    witness should not be excused

3                    from the State?

4        MR. JARRELL:  None.

5        THE COURT:  From the Defense?

6        MR. SMITH:  None whatsoever.

7        THE COURT:  Dr. Ward, you are excused.

8                    Thank you.

9        MR. JARRELL:  Thank you, Dr. Ward.

10       THE COURT:  Would you check to see if

11                    your next witnesses are here?

12       MR. JARRELL:  They are here, Judge.

13       THE COURT:  Call your next witness.

14       MRS. STOUT:  Judge, I want to recall Rick

15                    Hauser just to tie up something

16                    before I call the other experts.

17       THE COURT:  For the record this witness

18                    is still under oath.

19

20            REDIRECT EXAMINATION

21  BY MRS. STOUT:

22       Q     Sergeant Hauser, on May 25th,

23  2001, did you serve a search warrant at the

24  Medical Center Enterprise?

25       A     I did not.

1      Q      You did not serve the search

2  warrant?

3      A      No, ma'am.

4      Q      Okay.  Who served that search

5  warrant?

6      A      I believe Lieutenant Spence did.

7      Q      Okay.  Did you receive anything

8  from Lieutenant Spence once he had served the

9  search warrant?

10     A      I received a vial of blood from

11  him.

12     Q      And once you received that vial of

13  blood, what did you do with it.

14     A      It was placed in our evidence vault

15  in the cooler.  And it was taken to the

16  Department of Forensic Sciences on the 29th of

17  May.

18     Q      And who did you turn that vial of

19  blood over to, once you got to the Department

20  of Forensic Sciences?

21     A      The receptionist up there, who took

22  all the evidence that day.

23     Q      And is that your normal procedure,

24  once you take evidence to the Department of

25  Forensic Sciences, is that how you turn your

1    items of evidence over?

2         A    That's correct.   They have a

3    receptionist at the front office area at the

4    Department of Forensic Sciences, who

5    inventories the evidence with us, goes over it,

6    signs for it and gives us a receipt back.

7         Q    And did you do that on that date?

8         A    I did.

9         Q    I'm going to show you what I've

10   marked as State's Exhibit No. 27(a), and ask if

11   you can identify that.

12        A    A plastic bag with it appears to be

13   a stopper of blood insides this tube, along

14   with some swabs that were collected at the

15   scene.

16             This is my initials on the back.

17   It was sealed up when it was returned from the

18   Department of Forensic Sciences.  It also bears

19   the Department of Forensic Science case number,

20   which is associated with this case.

21        Q    And is that the blood that you

22   received after Sergent Spence served a search

23   warrant on the Medical Center in Enterprise?

24        A    Without physically opening this bag

25   and taking it out of this container, I couldn't

1    tell you.

2            MRS. STOUT:   May we do that?

3            THE COURT:   Go ahead.

4            MRS. STOUT:   It's 28(a).

5            Q      When you received it, did you

6    place it in that container?

7            A      Yes.

8            Q      Was it given to you in that

9    container?

10           A      Yes.

11           Q      And other than it being sealed with

12   this pink tab that says "bodily fluids," is it

13   in the same condition that it was?

14           A      It appears to be, yes.

15           Q      Did you have anymore contact with

16   that item, that I've asked you to look at?

17           A      I received it back from the

18   Department of Forensic Sciences and placed it

19   back into evidence.

20           Q      Has it been there under your care,

21   custody and control since you received it back

22   from Department of Forensic Sciences?

23           A      Other than me taking it out for

24   discovery in this case, yes.

25           MRS. STOUT:   Thank you.   Your witness.

```
1            MR. SMITH:  No questions.

2            THE COURT:  Okay.  Thank you.

3                   Call next witness.

4            MR. JARRELL:  Jeff Spence.

5            THE COURT:  The record will reflect that

6                   this next witness is still under

7                   oath.

8            MR. SMITH:  And still has gray hair.

9                   REDIRECT EXAMINATION

10   BY MRS. STOUT:

11       Q       Lieutenant?  I didn't call you

12   "Captain" that time.  On May the 25th of 2001,

13   did you execute a search warrant at Medical

14   Center Enterprise?

15       A       Yes.

16       Q       And for what purpose did you

17   execute a search warrant at Medical Center

18   Enterprise?

19       A       To obtain Robert Conrad's blood

20   that was taken.

21       Q       And from whom, from what Judge did

22   you obtain a search warrant to obtain that

23   blood sample?

24       A       Judge Blair.

25       Q       Did you go to Medical Center
```

1    Enterprise and obtain that sample?

2        A    Yes.

3        Q    Look at what is in front of you as

4    State's Exhibit No. 28(a), and can you identify

5    that?

6        A    I believe the container was inside

7    here.

8        Q    So without exposing this that has

9    been marked "Caution," is that what you are

10    telling this Court?

11        A    Right.

12        MR. SMITH:    Judge, objection to the

13            leading.

14        THE COURT:    You are.    Sustained.

15        Q    Okay.    Tell the Court and the

16    ladies and gentlemen of the jury how it was

17    placed when you received it?

18        A    In a --- what I call a purple top,

19    E.D.T.A tube of blood, had a purple cap on it.

20        Q    How was it packaged for

21    transportation to the Department of Forensic

22    Sciences?

23        A    It was placed in a evidence bag and

24    kept in the refrigeration unit in the evidence

25    room, until it was transported by Detective

1    Hauser.

2         MRS. STOUT:  Your witness.

3         MR. SMITH:  No questions.

4         THE COURT:  Can I have both of y'all

5              approach the bench, please.

6              (Counsel approached the bench).

7         THE COURT:  The record will reflect that

8              we are in the presence of the

9              jury, but out of the jury's

10             hearing.

11                  Are you going to expect

12             to have somebody give an opinion

13             with respect to the blood?

14        MRS. STOUT:  Yes, sir, Your Honor.

15        THE COURT:  You are not going to be able

16             to get it in.  I'm telling you

17             that you are not going to be

18             able to get it in.  I don't want

19             anyone to be shocked here.  Are

20             you going to give any evidence

21             with respect to  --

22        MRS. STOUT:  I understand.  Just give me

23             just a second.

24        THE COURT:  Do you need a minute?

25        MRS. STOUT:  Will you give me just a

```
1              minute?

2      THE COURT:  Sure.

3              (The following was heard in the

4              hearing and presence of the

5              jury).

6      THE COURT:  If any of you would like to

7              stand and stretch, please feel

8              free to do so.

9                   Do any of you need to

10             go to the restroom?  Okay.  We

11             will take a short break.  When

12             all of you are back in the jury

13             box, we will get started, again.

14                  Again, the Court is

15             required to instruct you not to

16             discuss this matter among

17             yourselves, nor to allow anyone

18             to discuss it with you.

19                  As soon as you are

20             ready to come back in, I will

21             leave that up to you, we will

22             get started, again.

23                  This court is in

24             recess.

25             (A short recess was taken).
```

1        THE COURT:  This court will come back to

2        order.

3        We need one thing

4        before we can go forward, and

5        they have gone to get that at

6        this time.  So give us another

7        minute or two.

8        Just so you know, we

9        are way ahead of schedule.  And

10        I hope we stay that way.  I

11        didn't plan to go this late

12        tonight.  Things occurred that

13        caused that to be necessary.

14        You may continue.

15     MRS. STOUT:  Thank you.  I apologize to

16        the Court.

17     Q    Lieutenant, I would ask you to

18  remove the red cardboard tube.  And if you

19  would take -- I believe Mr. Jarrell left a

20  knife up here somewhere?

21     A    I don't need one.

22     Q    Okay.  Could you remove that?

23     A    (Witness did as requested).

24     Q    Now, what have you removed from

25  this cardboard tubing?

```
 1          A     One purple stopped tube of blood.

 2          Q     Now, that's what you have removed

 3   from this cylinder that was in this plastic bag

 4   that I have marked as State's Exhibit 28(a)?

 5          A     Yes.

 6          Q     Do you recognize what I have marked

 7   as State's Exhibit No. 28(a)?

 8          A     Yes.

 9          Q     And what do you recognize what I

10   have marked as State's Exhibit No. 28(a) to be?

11          A     One purple stopper tube of blood

12   from Robert Conrad.

13          Q     And where did you receive that tube

14   of blood marked State's Exhibit No. 28(a)?

15          A     Medical Center Enterprise.

16          Q     Now, there are some other --

17          THE COURT:  Do you recall who at Medical

18                  Center Enterprise handed you

19                  that?

20          THE WITNESS:  I want to say it was

21                  Ms. Allen, the lab technician, I

22                  believe.

23          Q     Ms. Allen, at Medical Center

24   Enterprise?

25          A     Correct.
```

1        Q        Now, is there other information in

2    that plastic packet?

3        A        Yes.

4        Q        Would you remove that so that I can

5    go ahead and mark it?  Do you have any idea

6    what you have just removed is?

7        A        Just what it says on the labeling.

8        MRS. STOUT:  I'm going to go ahead and

9                  mark that as State's Exhibit No.

10                 28(b).  And that is

11                 blood-stained card from the

12                 purple stopper.

13       MR. SMITH:  Can we ask the witness to

14                 testify rather that the

15                 Prosecutor?

16       MRS. STOUT:  That was for identification

17                 purposes only.

18       THE COURT:  Let's go on.

19       Q        Did you have anything to do with

20    State's Exhibit No. 28(b)?

21       A        No.

22       MRS. STOUT:  Thank you.

23       THE COURT:  Since we have a break, while

24                 you are looking at that, would

25                 you state, again, what you did

1              with that vial that you have

2              just identified?

3         A      Collected it.  And it was placed in

4    evidence, which we have a refrigerator in

5    evidence.  And that's where it was kept until

6    it was taken to the lab in Montgomery.

7         Q      Who did you turn it over to?

8         A      Rick Hauser.

9         Q      Did Rick Hauser placed what was

10   just marked as State's Exhibit No. 28(a) in the

11   -- how did he place it for safe keeping, until

12   it was transferred to the Department of

13   Forensic Sciences?

14        MR. SMITH:  If he has personal knowledge,

15              may it please the Court.

16        THE COURT:  Only.  First of all, do you

17              have personal knowledge?

18        THE WITNESS:  It was kept in the evidence

19              locker in the refrigerator until

20              it was removed and given to

21              Detective Hauser on the day that

22              he took it to Forensic Sciences.

23

24        THE COURT:  Was that your question?

25        MRS. STOUT:  Yes.

1           THE COURT:  I thought your question was

2                    how did Detective Hauser, what

3                    did he do with it.  How did he

4                    package it?  Did he package it

5                    in the red container.

6       Q       Did you package it for safety,

7   until it was transported to the Department of

8   Forensic Sciences?

9       A       No.

10      Q       Who packaged it?

11      THE COURT:  If you know?

12      THE WITNESS:  In this red container?

13      THE COURT:  Yes.

14      THE WITNESS:  I do not know.

15      Q       You don't know who put it in that

16  red container?

17      A       No, I do not.

18      MRS. STOUT:  Thank you.

19      THE COURT:  Any other questions of this

20                    witness?

21      MR. SMITH:  I don't have any, Your Honor.

22      MRS. STOUT:  May we approach?

23      THE COURT:  Sure.

24                    The record will reflect

25                    we are in the presence of the

1          jury, but out of the jury's

2          hearing.

3     MR. SMITH:  I really hesitate to do this.

4          Your Honor, I've known you for

5          many, many years.  I have the

6          utmost respect for you.  But I

7          have got to represent my client

8          and interpose an objection to

9          Your Honor asking questions that

10         tend to cross over to making the

11         Prosecution's case.  And the

12         last thing in the world I want

13         to do is insult the Court or

14         cause anything that sounds like

15         I don't have absolutely the

16         utmost respect.  Because I have

17         much respect.  But I have to put

18         in an objection at this time.

19         And we have to object at this

20         time.

21    THE COURT:  Objection is overruled.  When

22         we had a break, I want the

23         record to reflect, there was

24         testimony based solely on what I

25         asked for and clarification that

1          needed to be made known to the

2          jury.  But I want the State to

3          know that you have a missing

4          link so far.

5    MRS. STOUT:  Yes, sir, Your Honor.

6    MR. JARRELL:  And, Judge, based on that,

7          and due to the hour it's

8          getting, we would have to get

9          Ms. Allen.  And I think they

10         tendered it over to him is the

11         only other length that we have.

12   MR. SMITH:  The phlebotomist lab

13         technician?

14   MR. JARRELL:  Yes.

15              And we ask that if we

16         could break for the evening and

17         pick up fresh in the morning.

18   THE COURT:  You can certainly do that.

19         If you need a few minutes to see

20         if you can get that individual

21         down here.  Do you have any

22         other witnesses that we can go

23         with until --

24   MR. JARRELL:  Both of the next two

25         witnesses would probably testify

1                   --

2          THE COURT:  Next two?  You have a

3                   forensic firearms expert and a

4                   DNA expert?

5                   (Off-record discussion.)

6          THE COURT:  Ladies and gentlemen, it's

7                   5:00 o'clock.  So, y'all can go

8                   home.  We kept you down here

9                   real, real late last night.

10                       We have come to a

11                   point where we are going to have

12                   to take a break at this time.

13                   We will start back tomorrow

14                   morning at 9:00 o'clock.

15                       Again, the

16                   Court is required to instruct

17                   you and does instruct you not to

18                   discuss this matter among

19                   yourselves, nor to allow anyone

20                   to discuss it with you.

21                       Y'all have a

22                   good night.  Again, it's very

23                   common for people to want to

24                   talk to their friends or

25                   whatever about their service on

1    a jury.  If that happens, stop

2    them, tell them you are on this

3    jury, and that you are not

4    allowed to discuss anything with

5    them.

6              Y'all have a good

7    night.

8              If everyone will remain

9    while the jurors exit the

10   courtroom.

11             Court is recessed until

12   9:00 o'clock tomorrow morning.

13

14

15

16

17

18

19

20

21

22

23

24

25

880

1       September 26, 2002

2       THE COURT:  This court will come to

3              order.  You may be seated.

4                     I know each of you are

5              tired.  I told you that we

6              expected this matter to be over

7              with some time Friday.  We are

8              way ahead of schedule.  I hope

9              that makes some of you feel a

10             little bit better.

11                    It's possible, and we

12             never really know for sure

13             what's going to happened in a

14             courtroom, but it is possible

15             that all of the evidence will be

16             completed some time today.  It's

17             possible.

18                    And at that point in

19             time then, of course, we will

20             have left the closing remarks to

21             you, the jury, by the

22             attorneys.  And then we will

23             have a charge conference.

24                    The attorneys, and I

25             know you probably don't know

1          this, but they have worked hard

2          to make this thing move

3          smoothly.  And they have already

4          submitted those requested

5          charges, or most of them, and

6          they have the right to submit

7        more.

8                And I have reviewed

9          them.  So that's not going to

10         take as long as it normally does

11         because of the work they have

12         done.  And they have done a

13         mighty fine job, both sides.

14                And then the last thing

15         will be for me to talk to you

16         about the law,  and then for

17         you to retire, deliberate and

18         decide these two separate cases

19         by returning two separate

20         verdicts.

21                Is the State ready to

22         continue?

23    MRS. STOUT:   The State is ready, Your

24         Honor.

25    THE COURT:  And is the Defense?

```
 1              MR. SMITH:  The Defense is ready.

 2              THE COURT:  You may proceed.

 3                          If you step up and

 4                      raise your right hand and place

 5                      your left hand on the Bible.

 6                          BROOKE REEN

 7              Whereupon, this witness, after first

 8   being duly sworn to tell the truth, the whole

 9   truth, and nothing but the truth, testified as

10   follows, to-wit:

11                  DIRECT EXAMINATION

12   BY MRS. STOUT:

13              THE COURT:  Have a seat please.

14                      If you will scoot your chair up

15                      and speak into the microphone,

16                      so that all these ladies and

17                      gentlemen of the jury can hear

18                      you.

19      Q       Would you state your name, please?

20      A       My name is Brooke Reen.

21      Q       And where are you employed, Ms.

22   Reen?

23      A       Dothan Medical Associates,

24   Southeast Alabama Medical Center in Dothan.

25      Q       How are you employed there?
```

1          A       I am a lab tech.

2          Q       And could you tell the ladies and

3   gentlemen of the jury what a lab tech does?

4          A       A lab tech is authorized to draw

5   blood from patients and then take that same

6   blood and analyze it for whatever tests the

7   doctors have ordered.

8          Q       And could you give us an example of

9   what a test would be that a doctor would order

10  a lab tech to pull blood for and analyze?

11         A       They could order a complete blood

12  count, any chemistry test for sodium or any --

13  basically anything that can float around in

14  your blood, we can probably find it.

15         Q       What kind of training and

16  experience is necessary for you to become a lab

17  tech?

18         A       My degree is an associates of

19  science degree.  It's a two-year college

20  degree.

21         Q       And do you have to have any kind of

22  job training, also, before you begin?

23         A       We have to have, I believe, it's

24  six weeks' clinical training, where we actually

25  work in a hospital or -- well, most of the time

884

1  it's in a hospital.

2      Q    Now, were you working in the

3  Enterprise Medical Center, or excuse me,

4  Medical Center Enterprise, I believe, is the

5  correct terminology, back on May 23, 2001?

6      A    Yes, I was.

7      Q    And what was your occupation or

8  profession when you were working back on

9  May 23, 2001?

10     A    I was a lab tech.

11     Q    Were you working there

12 approximately 1:00 to 3:00 in the afternoon on

13 that date?

14     A    Yes.

15     Q    Do you recall?

16     A    Yes.

17     Q    Were you asked to go to the

18 emergency room on that date?

19     A    Yes, I was.

20     Q    And do you recall why you were

21 asked to go to the emergency room on that date?

22     A    I had to draw blood on a patient.

23     Q    Do you recall who that patient was?

24     A    Yes.

25     Q    And who was that?

1      A      That was Robert Conrad.

2      Q      And did you do that?

3      A      Yes, I did.

4      Q      Now, I'm going to show you what's

5   been marked State's Exhibit No. 28(a).  And we

6   have some gloves here that you may use.  I will

7   ask you if you would remove the item that's in

8   the red cardboard container, please.

9           MRS. STOUT:  With the Court's permission?

10           THE COURT:  Sure.

11      A      Okay.

12      Q      Do you recognize what has been

13   marked as State's Exhibit No. 28(a), once you

14   have removed it from the red cardboard

15   container?

16      A      I do.

17      Q      How do you recognize that?

18      A      It's a tube of blood drawn from the

19   patient of --

20           MR. SMITH:  The question was, I believe,

21              how do you recognize that.

22           THE COURT:  Sustained.

23           THE WITNESS:  Oh.  Sustained.

24      Q      How do you recognize it?

25      A      Because I drew it.  It's got my

```
 1    initials on it.

 2              Q      What is State's Exhibit No. 28(a)?

 3              A      It is a tube of blood drawn from

 4    the patient, Robert Conrad, May 23 at 14:05.

 5              Q      And 14:05 is?

 6              A      2:05 p.m.

 7              Q      2:05 p.m.

 8              A      Yes.

 9              Q      Now, is there a specific color code

10    that you have or you use at the hospital for

11    certain things that you are going to do for

12    blood analysis?

13              A      Yes.  There's a tube color coded,

14    as well as a label color coded, if that's --

15              Q      Yes.

16              Q      Would you explain that, please?

17              A      The tube color code is, basically,

18    the top is going to be a different color for

19    what anticoagulants or any other additives that

20    may be in the tube, or if there is no additives

21    at all.

22                     The label color code is just simply

23    stat or now, which is going to usually be

24    emergency room test or bar coded with an orange

25    band.
```

1    Q      Now, how was that particular -- let

2    me rephrase.  I'm sorry.  How was that tube

3    color coded according to the top?

4        A      According to the top, this is a

5    purple top tube, which means that it has an

6    EDTA Anticoagulates additive.

7        Q      Do you have knowledge of what that

8    is indicative of?  "Yes," or "No?"

9        A      Yes.

10        Q      What is that indicative of?

11        A      It's indicative of -- it's used for

12    certain test.  I'm not sure exactly what you

13    are asking.

14        Q      What test is that used for?

15        A      It can be used for complete blood

16    counts, or for typing of blood, other counts,

17    cell counts, reticulocytes counts.  And there

18    are a few other tests that you can actually use

19    it for.  But those are the main uses.

20        Q      Now, there is another label on

21    there, also?  Is that correct?

22        A      Yes.

23        Q      And explain what that label is for?

24        A      The label that is around the tube

25    is a bar-coded label that is printed from the

1    hospital computer system, with the patient's

2    information.  It has the name, the patient

3    number that the hospital gives them, and an a

4    session number used by the lab that is included

5    with the bar code that the machines can read a

6    bar code and it interacts with the computer,

7    just to give the results straight to a

8    computer.

9         Q     What, if any identifying marks, did

10   you personally put on that tube?

11        A     I put my initials, the date, and

12   the time of draw on the bottom of the label.

13        Q     Now, what, if any instructions,

14   were you specifically given by hospital

15   personnel if a person came in the hospital with

16   a gunshot wound or something of this nature?

17   Were you given any special instructions

18   regarding blood draws?

19        A     Not normally.  There were times

20   when, if we had to draw for an alcohol test

21   that we had to use a difference cleaner to

22   clean the arm before drawing the blood.  But

23   other than that, you know, maybe, just in this

24   case specifically, it was just that we may need

25   to be careful.

1          Q       And were you?

2          A       Yes.

3          Q       And when you say that you were

4    careful, could you explain how you were

5    careful?

6          A       When you come in, you are more

7    aware of the surroundings, you know, where you

8    put needles and any other sharp objects that

9    you would have on your trays.  Phlebotomy trays

10   have many needles and all kinds of things that

11   you can grab and use against someone if you

12   needed to, so you just keep the tray away from

13   the patient.

14         Q       Now, once you have drawn this

15   blood, which you have identified drawing from

16   the patient identified as Robert Conrad, in the

17   emergency room, did you take this blood --

18   where did you take this blood?

19         A       Back to the lab.

20         Q       Explain the lab restrictions.

21         A       The lab restrictions -- well, there

22   are no locks on the door of the lab.  But there

23   are signs outside every door that are labeled

24   "Biohazard.  Restricted.  Authorized personnel

25   only."

```
 1              And the fact that there are always

 2   techs in the lab to note unauthorized people

 3   would be in and out of there.

 4        Q     What would happen if I just

 5   wondered into the lab?

 6        MR. SMITH:   objection.

 7        THE COURT:   Sustained.

 8        Q     Are unauthorized people allowed in

 9   the lab?

10        A     No.

11        Q     Now, where was this blood placed

12   once you took it back to the lab?

13        A     This particular blood was taken to

14   the hematology department where it was tested

15   for a complete blood count.  And then it would

16   have been placed in a --

17        MR. SMITH:   Your Honor, since the

18                     comment is "would have been

19                     placed," unless she has personal

20                     knowledge, we object.

21        THE COURT:   Objection is overruled.

22        A     And it would have been placed in a

23   tube rack, with the other tested blood.

24              In this case specifically, if it

25   was requested to be held out as a, you know,
```

1    just-in-case measure, sometimes that could be

2    for possible other testing.  They say go ahead

3    and hold it out, just in case, and we will look

4    at it again later.

5                Or, possibly in this case, because

6    it would be used later, they hold it out, just

7    separate from the other tubes just to find it

8    easier, not necessarily for any other reasons.

9         Q     Was that done in this case?

10        A     I will be honest, I'm really not

11   sure.  I don't remember.

12        Q     Where is the storage unit in the

13   hospital?

14        A     It's in the lab.

15        Q     And are you talking about the lab

16   in this restricted area?

17        A     Right.  The main restricted lab.

18        Q     Okay.  At some -- was that where

19   this tube was placed?

20        A     It would have been placed in a rack

21   that is on the counter in the restricted lab

22   until --

23             MR. SMITH:  Again, Your Honor, unless

24                  she has personal knowledge that

25                  that was done with this tube, I

```
 1                      would have to object.

 2            THE COURT:  Sustained.

 3            MRS. STOUT:    Thank you.

 4            THE WITNESS:  Thank you.

 5            Q      But this blood is kept in the lab?

 6    Is that correct?

 7            A      Yes.

 8            Q      And what is the policy and

 9    procedure for the hospital regarding the blood

10    that's kept in the lab racks?

11            THE COURT:  do you mean at this time, or

12                       back on that date?

13            MRS. STOUT:  Back on that date.

14            A      It's just -- I mean, it's just

15    stored there.  I'm not sure exactly what you --

16            Q      You said that it was placed in the

17    lab rack?  Is that right?

18            A      Right.

19            Q      And it is kept there, in case it's

20    needed for other testing?

21            A      Right.

22            Q      How is it secured in case it's

23    needed for other testing?

24            MR. SMITH:    Object.  Again, it's the

25                       same question.
```

1          Q       What is the policy?

2          A       The policy would be after it's

3     tested for whatever is labeled on the tube, the

4     rack actually sits right beside the machine.

5     It's just basically an incoming rack and an

6     outgoing rack.

7                  And they are then kept for seven

8     days after that, at a certain hour, usually

9     right around midnight, we change the racks over

10    for the day.  And they would go into the

11    refrigeration unit for seven days.

12         MRS. STOUT:   Thank you.

13         THE COURT:  Mr. Smith.

14         MR. SMITH:  Thank you, Judge.

15                  CROSS EXAMINATION

16    BY MR. SMITH:

17         Q       I'm wearing trifocals.  I've got

18    to try to find where I can see.  I'm sorry.  My

19    arms got too short.

20                  This tube that I think is 28(a),

21    you said that you drew the tube?

22         A       Yes, I did.

23         Q       And then it was put into this red

24    tube?

25         A       It would have been, after testing,

1    yes.

2          Q      Did you put it into the red tube?

3          A      I did not, no.

4          Q      Did you see it put into the red

5    tube?

6          A      No.  I don't believe I did.

7          Q      We have had testimony here about

8    securing a scene.  And there were logs kept of

9    every person that went inside a doorway and

10   visited a place.

11               That's not done and wasn't done on

12   May 23rd, and seven days thereafter, in this

13   lab where this blood was located, was it?

14         A      It was not specifically logged, you

15   know, everyone that came in and out, no.

16         MR. SMITH:  Thank you very much.

17         THE COURT:  Mrs. Stout?

18               REDIRECT EXAMINATION

19   BY MRS. STOUT:

20         Q      Just one more question.  Are people

21   allowed to come in and out and visit in the

22   lab?

23         A      No.

24         Q      In your lab?

25         A      No.

```
 1          Q      Who is allowed in and out of this

 2    lab?

 3          A      Laboratory personnel.  Doctors may

 4    come in.  They usually won't.  And nurses

 5    personel can, but, again, usually don't

 6          MRS. STOUT:   Thank you.

 7          THE COURT:  Mr. Smith.

 8                  RECROSS EXAMINATION

 9    BY MR. SMITH:

10          Q      Who empties the trash can at night

11    and so forth?

12          A      The janitorial staff.  And, yes,

13    they do come in and out, also.

14          THE COURT:  Mrs. Stout.

15          MRS. STOUT:  No further questions of this

16              witness.

17          THE COURT:  Is there any reason that this

18              witness should not be excused?

19          MRS. STOUT:  No, Your Honor.

20          THE COURT:  From the Defense?

21          MR. SMITH:  Certainly not from us, Judge.

22          THE COURT:  You are excused.  Have a good

23              day.

24                      Call your next witness.

25          MRS. STOUT:  Ms. Allums.
```

1                        Judge, I believe she is

2               in a cast.  It may take a while

3               to get down the hallway.

4         THE COURT:  That's okay.  And if she

5               needs to sit down by the court

6               reporters, she is welcome to do

7               that.

8         MRS. STOUT:  Thank you, Your Honor.

9         THE COURT:  Mrs. Allums, if you will come

10              have a seat right down here.

11              While you are seated I will

12              swear you in.  That way, we

13              won't have to worry with your

14              crutches.

15                    Will you raise your

16              right hand and place your left

17              hand on the Bible?

18                  GLENDA ALLUMS

19        Whereupon, this witness, after first

20  being duly sworn to tell the truth, the whole

21  truth, and nothing but the truth, testified as

22  follows, to-wit:

23        THE COURT:  If you would, Mrs. Allums,

24              these ladies behind you are

25              taking down everything you say.

```
 1                    Some folks are just soft spoken,
 2               so please speak loudly enough so
 3               that they can hear what you have
 4               to say, and so that these ladies
 5               and gentlemen of the jury can
 6               hear what you have to say.  All
 7               right?
 8        THE WITNESS:  Okay.
 9                  DIRECT EXAMINATION
10   BY MRS. STOUT:
11        Q    Good morning, Mrs. Allums.
12        A    Hi.
13        Q    I'm Glenda Stout with the D.A.'s
14   Office.  Would you state your name for the
15   ladies and gentlemen of the jury and for the
16   court record.
17        A    I'm Glenda Allums.
18        Q    And would you tell the ladies and
19   gentlemen of the jury where you work?
20        A    At Medical Center Enterprise, in
21   the laboratory.
22        Q    I may have to ask you to speak up
23   because you are kind of soft spoken.
24        A    Okay.
25        Q    How long have you worked at the
```

VOLUME 12

COURT OF CRIMINAL APPEALS NO. CR-02-0333

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF _____COFFEE_____ COUNTY, ALABAMA

CIRCUIT COURT NO. CC-01-179, CC-01-180

CIRCUIT JUDGE _____Gary L. McAliley_____

Type of Conviction / Order Appealed From: ___Conviction, Capital Murder, Robbery 1st___

Sentence Imposed: ___Life Without Parole, Life___

Defendant Indigent: [X] YES [ ] NO

Robert Thomas Conrad
_____
NAME OF APPELLANT

Gary Bradshaw
_____
(Appellant's Attorney)          (Telephone No.)
P. O. Box 311412
_____
(Address)
Enterprise          AL          36331
_____
(City)          (State)          (Zip Code)

Richard Waldrop
P. O. Box 310027
Enterprise, AL  36331

V.

## STATE OF ALABAMA
_____
NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)



```
 1   Medical center Enterprise?

 2        A      Thirteen years, little over.

 3        Q      A little over 13 years?

 4        A      Right.

 5        Q      What do you do at the Medical

 6   Center Enterprise?

 7        A      I'm a med tech, lab tech.

 8        Q      What does a med tech, lab tech do?

 9        A      We analyze blood samples or, you

10   know, other specimens.

11        Q      Do you actually do any drawing of

12   blood from patients?

13        A      On occasion.

14        Q      Were you working in the lab during

15   the period of time of May 23, 2001, through

16   May 25 of 2001?  Were you working at Medical

17   Center Enterprise during that period of time?

18        A      Yes.

19        Q      Are you over the lab in any way?

20        A      No, ma'am.

21        Q      You just work there?

22        A      Right.

23        Q      Is that correct?

24        A      Right.

25        Q      Do you have any independent
```

1    recollection of being served with a search

2    warrant for some specific blood on a patient

3    there?

4         A    Yes.

5         Q    And what is your recollection of

6    that?

7         A    I remember Mr. Stout --

8         Q    Who?

9         A    I'm sorry.  I don't remember his

10   name.

11        Q    I started to say, what?

12        A    A gentlemen came in to get a blood

13   specimen a couple days prior.  I believe it was

14   the 25th.  And the specimen was drawn on the

15   23rd, with a search warrant.  And I turned over

16   the sample to them.

17        Q    And how many officers -- how many

18   officers were there?  Were there two?

19        A    If I remember, there were two.

20        Q    And who did you turn that blood

21   over to?

22        A    Is it Mr. Buck?  I'm sorry.

23        Q    That's fine.  There were two

24   officers?

25        A    Two officers.

1      Q      And you turned that blood over to

2  them?

3      A      Yes.

4      Q      Now, where did you go to retrieve

5  that blood that you turned over to those

6  officers?

7      A      To our storage refrigerator.

8      Q      Can you explain how your storage

9  refrigerator works in your lab?  The procedure?

10  The security?

11      A      We draw samples.  And then they are

12  stored in a refrigerator, usually three days.

13  Actually, part of them were stored seven days.

14  And part of them are thrown out after three

15  days.                                          -

16          And they -- our blood bank

17  refrigerator is in the blood bank department.

18  And there's a tech in the lab at all times.

19      Q      I'm going to show you what we have

20  marked as State's Exhibit No. 28(a).

21      THE COURT:  28(a)?

22      MRS. STOUT:   28(a).

23      MR. JARRELL:   You might want to give her

24  some gloves.

25      Q      Do you need gloves to look at this?

1    Let me give you a pair of gloves.  Here you go.

2    I'm going to ask you, can you identify that?

3         A      That is a tech that worked in our

4    inventory.

5         THE COURT:  Say that, again?  I couldn't

6                   hear, and I'm not sure the

7                   jurors could.

8         THE WITNESS:  It's identified with our

9                   identification procedure that we

10                   use at the hospital.  And it has

11                   a tech that was working in the

12                   lab at the time.  And that's how

13                   we identify our tubes of blood.

14                   I would say, yes, this is a

15                   specimen.

16         Q      Is this a specimen that you went to

17    the refrigerator and retrieved pursuant to a

18    search warrant?

19         A      I'm assuming this is the sample

20    that --

21         MR. SMITH:  Object to "assuming," Your

22                   Honor.

23         THE COURT:  Sustained.

24         Q      Pursuit to the identification on

25    there?

1        A       Exactly.

2        Q       And you gave it to the police

3    officers?

4        A       Right.

5        Q       And that's stored in a restricted

6    facility?  A restricted area?

7        A       Right.

8        MRS. STOUT:  Your witness.

9        THE COURT:  Mr. Smith?

10       MR. SMITH:  Thank you, Your Honor.

11                     CROSS EXAMINATION

12   BY MR. SMITH:

13       Q       Mrs. Allums, I'm Al Smith.  I'm

14   going to retrieve that in one second.  I'm

15   going to stand over here because you are soft

16   spoken.  And I want the jury to hear.  Yell at

17   me, and I won't be offended.  All right?  This

18   tube of blood, you didn't put any markings on

19   this yourself, did you?

20       A       No, sir.

21       Q       You didn't put anything to uniquely

22   identify it for your possession, would that be

23   correct?

24       A       No, sir.

25       Q       And have you ever seen this red

1    tube?

2         A    Yes.  We use containers like that

3    in the lab.

4         Q    But there are no marking there that

5    are unique to, and I apologize for yelling

6    right there in your face.  I'm an old school

7    teacher, too, and I'm talking loud for the

8    jury.  There are no markings on here that are

9    unique to yourself?  Is that correct?

10        A    No, sir.

11        Q    And you aren't and were not from

12   May 23 until May 25 in the lab 24 hours, were

13   you?

14        A    I was not.

15        Q    And janitorial personnel have

16   access to it to clean and empty trash cans?  Is

17   that correct?

18        A    Yes.

19   MR. SMITH:   Thank you so much.

20   THE COURT:  Mrs Stout?

21   MRS. STOUT:   Nothing further.

22   THE COURT:  Is there any reason that this

23             witness should not be excused?

24   MRS. STOUT:  No, Your Honor.

25   MR. SMITH:  Absolutely not.

```
 1          THE COURT:  Thank you, Mrs. Allums.

 2          THE COURT:  Call your next witness.

 3          MRS. STOUT:  I'm going to recall Jeff

 4               Spence, just to clarify a few a

 5               few steps.

 6          THE COURT:  The record will reflect that

 7               Jeff Spence is still under oath.

 8          MR. SMITH:  And getting gray.

 9          THE COURT:  We all agree.

10          MRS. STOUT:   Including the Prosecutor.

11                  REDIRECT EXAMINATION

12   BY MRS. STOUT:

13          Q     Lieutenant Spence, I just want to

14   clarify a few things regarding the chain of

15   this blood.  Okay?

16          A     Yes.

17          Q     You arrived at the hospital with a

18   search warrant?  Is that correct?

19          A     That is correct.

20          Q     Who was with you?

21          A     Detective Rick Hauser.

22          THE COURT:  Rick Hauser?  I just

23               couldn't hear you.  If you will,

24               scoot up just a hair more?

25          THE WITNESS:  Yes, sir.
```

1      Q      When you arrived at the hospital

2    with a search warrant, that search warrant

3    asked for a specific color-coded tube of blood?

4    Is that correct?

5          A      That is correct.

6          Q      What color was that?

7          A      A purple stopper.

8          Q      And who did you present that search

9    warrant to?

10         A      I believe yesterday I testified to

11   a Ms. Allen, but it was a Ms. Allums.

12         Q      And when you presented that search

13   warrant to Mrs. Allums, what did Mrs. Allums

14   do?

15         A      Handed us the purple stopper tube

16   of blood.

17         Q      And I showed you that tube of blood

18   yesterday?  Is that correct?

19         A      That is correct.

20         Q      And we opened it?  Is that correct?

21         A      That is correct.

22         Q      Do you recall it being placed in

23   this?

24         A      No, I do not.

25         Q      How do you recall getting that tube

1    of blood?

2        A    Just like it is right here.

3        THE COURT:  Hold whatever it is "right

4              here," up, so we can see.  I

5              can't see it.

6        THE WITNESS:  A tube of blood with a

7              purple stopper.

8        Q    Now, once you received it from Mrs.

9    Allums in the condition that you have just

10   shown to us, what did you do with that purple

11   stopper tube of blood, that you received

12   pursuant to your search warrant?

13       A    Upon Detective Rick Hauser

14   completing a property receipt, he and I went

15   back to the Enterprise Police Department, at

16   which time I was in charge of the evidence room

17   or property room.

18            And he and I both went in there and

19   placed that tube of blood into the

20   refrigeration unit.

21       Q    And did you have any more contact

22   or anything to do with that purple stopper tube

23   of blood?

24       A    Yes.

25       Q    What?

1          A      On the day that Detective Hauser

2     went to Montgomery with the stopper, he and I

3     went back to the evidence room and retrieved

4     that from the refrigerator.

5          Q      What did you do once you retrieved

6     that purple stopper tube of blood from the

7     refrigeration unit in the evidence locker?

8          A      Detective Hauser took control of

9     it.  From that that point he was in charge of

10    it.

11         MRS. STOUT:    Thank you.

12         THE COURT:  Any other questions, Mrs.

13              Stout?

14         MRS. STOUT:  No, your honor.

15         THE COURT:  Mr. Smith?

16              RECROSS EXAMINATION

17    BY MR. SMITH:

18         Q      Jeff, in connection with this

19    case, State versus Robert Conrad, and this

20    incident, are you aware, or have you become

21    aware, or do you know of an Enterprise Police

22    Department internal investigation report

23    concerning this case?

24         MRS. STOUT:  Objection.

25         THE COURT:  Objection is overruled.

```
 1          MR. JARRELL:  Can we have side bar?

 2          MRS. STOUT:  Objection.  Side bar.

 3          THE COURT:  Come up, if you will.

 4                                      The

 5                    record will reflect that we are

 6                    in the presence of the jury, but

 7                    out of the jury's hearing.  Keep

 8                    your voices down, if you will.

 9          MRS. STOUT:  Unless it relates to this

10                    purple stopper tube of blood, or

11                    it relates to some kind of

12                    contamination with this purple

13                    stopper tube of blood, I

14                    vigorously object, and request

15                    that anything that he has, we do

16                    in a hearing outside of the

17                    presence of the jury.

18          THE COURT:  Ladies and gentlemen, you get

19                    to take just a few minutes.  We

20                    will send for you.

21                            I will have what we

22                    call an in-camera hearing, and

23                    see where we are headed, and see

24                    if things are admissible.

25                            The Court is required
```

1              to instruct you and does

2              instruct you not to discuss this

3              matter among yourselves, nor

4              allow anyone to discuss it with

5              you.

6         (Jurors exited the courtroom).

7    THE COURT:  If y'all will all have a

8              seat.  You may continue with

9              your questioning.

10   Q    (By Mr. Smith) Jeff, my question to

11   you before we stopped --

12   THE COURT:  Let the record reflect we

13             are now out of the hearing and

14             presence of the jury.

15   Q    In connection of this case, State

16   of Alabama versus Robert Conrad, this

17   investigation, this death of Jelaine Dennis

18   that we are all here about this week, do you

19   know, have you heard, are you aware of an

20   Enterprise Police Department internal

21   investigation report concerning this case?

22   A    I have heard of one, yes.

23   THE COURT:  Concerning this case?

24   THE WITNESS:  Yes, sir, this case.

25   Q    How did you hear of it?

1          A       From, I believe it was Captain

2    Moore.

3          Q       Who made the report?

4          A       That I could not tell you.  I do

5    not know.

6          Q       What is the subject matter of the

7    report?

8          A       An officer possibly having

9    knowledge of the crime before it took place.

10   That's all I can say.

11         Q       Do you know what the officer is?

12         A       Detective Hauser.

13         Q       Do you know where that report might

14   be?

15         A       That, I do not know.

16         Q       Do you know if it was ever released

17   to the District Attorney's Office?

18         A       That, I do not know.

19         MR. SMITH:  That's all at this time.

20         THE COURT:  Sure.  Mrs. Stout or Mr.

21              Jarrell?

22              RECROSS EXAMINATION

23         Q       Did you ever participate in any

24   report of that nature?

25         A       No.

1        Q       Were you ever called to testify?

2        A       No.

3        Q       Do you have any personal knowledge

4    of anything that went on internally with the

5    police department in that?

6        A       No.

7        Q       Did Detective Hauser ever discuss

8    anything with you about an internal report?

9        A       Just in passing.  But I can't even

10   remember, recall what the conversation was.

11       Q       Do you have any knowledge of

12   anything regarding any blood?

13       A       No.

14       Q       Or this stopper of blood?

15       A       No.

16       THE COURT:  Mrs. Stout?  Anything else?

17       MRS. STOUT:  No, sir.

18       THE COURT:  Mr. Smith?

19                   RECROSS EXAMINATION

20   BY MR. SMITH:

21       Q       Jeff, when, and I'm talking a broad

22   approximation and your best recollection or

23   judgment did your conversation with Mr. Hauser

24   about this internal affairs report occur?

25       A       A month-and-a-half, two months

1    after this crime had occurred.

2            Q      Can you tell me the context of that

3    conversation?  How it came about, why it came

4    about?

5            A      I can't remember.  It was just in

6    passing because -- I want to say it was an

7    interview that he had to do.

8            THE COURT:  It was an interview with

9                    that?

10           THE WITNESS:  An interview that he had to

11                   do, complete.

12           Q      With whom?

13           A      I want to say it was A.B.I.  And it

14   was scheduling for him to go to that.

15           Q      Do you know who from A.B.I.

16   conducted an investigation?

17           A      I don't.

18           Q      That's Alabama Bureau of

19   Investigation, for the record?

20           A      That's correct.

21           Q      Was there any discussion of any

22   other state agency or local agency, other than

23   A.B.I., any other agency referenced?

24           A      No.

25           MR. SMITH:  That's all.

1  THE COURT:  Let me say for the attorneys

2  involved, if there is any issue

3  that needs to be made of this, I

4  want it resolved before anything

5  comes out about this before the

6  jury.  So if there are any other

7  witnesses that need to be

8  questioned, like Hauser or

9  Officer Moore, former officer

10  Bill Moore, or whomever, I would

11  like for that to be done right

12  now.

13  If y'all want to huddle

14  among yourselves and see.

15  MR. SMITH:  Judge, I think it's obvious

16  that it's got to be employed by

17  someone.

18  THE COURT:  My point is, I want it done

19  right now.  I want the law

20  enforcement folks to get them

21  down here right now.

22  MR. SMITH:  There is obviously a report.

23  THE COURT:  I want them to lineup right

24  there and bring the records on

25  this.  And if there's anything

1           exculpatory, the State has the

2           duty to produce that to the

3           Defense, and has had a duty to

4           produce that to the Defense.

5                So, if there is

6           anything exculpatory, I want it

7           here now so we can have that for

8           the benefit of this jury.

9       MR. SMITH:  To expand on what Your Honor

10          has said, it's obviously

11          incumbent on the State, the

12          Prosecution, and Your Honor told

13          me when I was a Prosecutor many

14          times, to seek justice, not

15          conviction.

16      THE COURT:  Well, I've ordered that

17          anything exculpatory many, many,

18          many, months ago be produced to

19          the Defense.  That is the law of

20          this Nation.

21      MR. SMITH:  It appears, at least as far

22          as Jeff Spence goes, I don't see

23          any more relevance to the blood

24          tube.  But we have an issue here

25          that I think the burden has

```
 1                    shifted to the State to get in
 2                    before us.
 3        THE COURT:  The burden is on the State to
 4                    produce anything exculpatory.
 5                    I don't know whether there is or
 6                    isn't.  But I want the State to
 7                    know in a few minutes whether
 8                    there is or isn't anything
 9                    exculpatory.
10        MRS. STOUT:  There is nothing exculpatory
11                    that the Defense has not been
12                    given.
13        THE COURT:  Okay.
14        MR. SMITH:  Judge, I would love to know if
15                    they knew about this internal
16                    investigation of the A.B.I.
17         THE COURT:  Did y'all know about the
18                    investigation?
19        MR. JARRELL:  Yes.  We knew about the
20                    investigation.
21         THE COURT:  Did you check --
22        MRS. STOUT:  I want to go on the record
23                    --
24         THE COURT:  -- to see if there was
25                    anything exculpatory?
```

1      MRS. STOUT:  ' Absolutely.  And this D. A.

2                  found out it about it last week.

3      MR. JARRELL:    Thursday or Friday.

4      MRS. STOUT:    Thursday or Friday.  And

5                  this D. A. met with the D. A.

6                  and Mr. Bruce DeVane.  And the

7                  decision was made by the

8                  District Attorney what would be

9                  done with that information,

10                 after we met for several hours.

11                 And I want that on the record.

12                 So, therefore, we will get Mr.

13                 Bruce DeVane down here.

14     THE COURT:  I want him down here.

15     MRS. STOUT:   He is on his way.

16     THE COURT:  I want Bill Moore on his way.

17     MRS. STOUT:   But there is nothing

18                 exculpatory in those internal

19                 documents that were generated

20                 by A.B.I.

21     THE COURT:  I want Officer Hauser on his

22                 way down here.

23     MR. JARRELL:  Yes, sir.  And we are going

24                 to ask for one other thing, if

25                 the Court would indulge us.  We

917

1          want the courtroom cleared.

2                    A man's reputation is

3          on the line here.  They have

4          brought it up. It's not

5          something that should be public

6          record.

7      MRS. STOUT:  This has already been

8          presented to a grand jury.

9      MR. SMITH:    Judge, at a minimum, under

10         Kyles United States Supreme

11         Court precedent, this is

12         impeachable information.  The

13         fact that there was an A.B.I.

14         investigation conducted, I am

15         absolutely outraged.

16                    And I move right now,

17         based on prosecutorial

18         misconduct, and the imputed

19         knowledge that the police

20         department and law enforcement

21         in this State, is imputed

22         through this prosecution to

23         find out what is going on.  Your

24         Honor has ordered they find out

25         what's going on.  I move for a

```
 1                      dismissal based on the imputed
 2                      knowledge of the District
 3                      Attorney's Office.
 4        THE COURT:  Motion is denied.  There's
 5                      not been shown any prosecutorial
 6                      misconduct before this Court.
 7                      But we will get down to the
 8                      bottom of this right here in a
 9                      few minutes.
10        MR. SMITH:  I want to put on the record
11                      why I asked the question of Mr.
12                      Spence.
13                           Last night a good
14                      friend of mine and a neighbor,
15                      called me about 10:00 o'clock.
16                      And this may cost somebody their
17                      head.  I don't know.  But at
18                      this point, I don't care.  A
19                      good friend called me at 10:00
20                      o'clock, and said that he had
21                      had a telephone call.  And Your
22                      Honor knows the man.  I will
23                      tell you who it is, if you want
24                      me to, if you order me to, and
25                      that he had had an anonymous
```

```
 1                  phone call.  In fact, the
 2                  caller I.D. had been block.
 3                  He's got caller I.D.  And it had
 4                  been blocked.
 5                       They told him, said you
 6                  need to call Al Smith and tell
 7                  him that he needs the internal
 8                  investigative report of the
 9                  Enterprise Police Department
10                  concerning Conrad.
11                       And he was incredulous.
12                  He asked them, again.  And they
13                  said, "Do you know Al Smith?"
14                       They said, "Yes.  Know
15                  his home telephone number.  But
16                  I'm not calling him.  You need
17                  to tell him he needs to get that
18                  report."
19        MR SMITH:  That was last night at 10:00
20                  o'clock at my home.
21        THE COURT:  If y'all will make sure the
22                  internal documents get down here
23                  ASAP.  We will take a recess
24                  until that time.
25                       Court is adjourned
```

1           until that information is

2           before this Court.

3           (Court was recessed).

4       THE COURT:  Could will come back to

5           order.

6               Call your first

7           witness.

8       MR. JARRELL:  Bruce DeVane.

9       THE COURT:  Would you raise your

10          right hand and place your left

11          hand on the Bible?

12              BRUCE DEVANE

13      Whereupon, this witness, after first

14  being duly sworn to tell the truth, the whole

15  truth, and nothing but the truth, testified as

16  follows, to-wit:

17              DIRECT EXAMINATION

18  BY MR. JARRELL:

19      Q     State your name, sir, and where you

20  are employed?

21      A     Bruce DeVane.  District Attorney's

22  Office, Twelve Judicial Circuit.

23      Q     What is your capacity there at the

24  District Attorney's Office?

25      A     The Chief Investigator and

1    Administrator.

2        Q    Bruce, I want to ask you about an

3    investigation that was concerning a police

4    officer with the Enterprise Police Department,

5    that was brought to your attention.

6        Would you tell us how that

7    information came to you first?

8        A    A telephone call.

9        Q    And who was that from?

10        A    An individual that identified

11    himself as George Roberson.

12        Q    And what did you first do with that

13    information?

14        A    I discussed the information with

15    Mark Fuller, the District Court.

16        Q    And whom else did you discuss it

17    with?

18        A    T.D. Jones, the Chief of Police of

19    Enterprise.

20        Q    What was the District Attorney's

21    Office position as far as that information was

22    concerned? Were you going to investigate it?

23        A    Initially, we tried to establish

24    what the complaint was, did a preliminary

25    investigation. And the District Attorney

1      recused the office.

2              THE COURT:  Recused?  What do you mean

3                      by that?

4              THE WITNESS:  By recusing the office, he

5                      choose that there was a conflict

6                      of interest, or it could be

7                      looked at with a possible

8                      conflict, the person that was

9                      complained about was a witness

10                     for the State of Alabama in a

11                     case that we were investigating

12                     and prosecuting.

13         Q      Do you know whether or not the

14     Enterprise Police Department also recused

15     themselves?

16         A      I'm sorry.  I can't hear you,

17     Larry.

18         Q      Do you know whether or not the

19     Enterprise Police Department also recused

20     themselves?

21         A      Yes, I do know.

22         Q      And what did they?

23         A      Chief Jones made the decision since

24     it involved one of his officers, that his

25     department, the Enterprise Police Department

1   should not be involved.   And therefore recused

2   his department from the investigation.

3          Q       Who ultimately did the

4   investigation?

5          A       The Alabama Attorney General's

6   Office and the Alabama Bureau of Investigation.

7          Q       After their investigation was

8   complete, did they present this information

9   that they had found in their investigation to a

10  Coffee County, Enterprise Division Grand Jury?

11         A       Yes.

12         Q       And I know you are bound by law not

13  to divulge what was said at the Grand Jury.

14  But can you tell us what the result was?

15         A       That particular Grand Jury found no

16  wrongdoing on behalf of anyone and issued a no

17  bill.

18         MR. JARRELL:   Your witness.

19         THE COURT:   Mr. Smith?

20                 CROSS EXAMINATION

21  BY MR. SMITH:

22         Q       Bruce, the name of the person that

23  you received a telephone call from was whom?

24         A       George Roberson.

25         Q       Did you know that person?

```
 1          A      No.

 2          Q      Ever had any contact prior to then

 3   with that person?

 4          A      No.

 5          Q      Did you personally have any contact

 6   with this George Roberson person?

 7          A      After the phone call.

 8          Q      Did you interview that person?

 9          A      Yes.

10          Q      You did interview the person?

11          A      Yes.

12          Q      Where did that interview take

13   place?

14          A      Office of the District Attorney,

15   here at the Enterprise Office.

16          Q      When did that occur?

17          A      Within ten days of the homicide

18   that we are here on.

19          Q      When did the call occur in relation

20   to the time that you interviewed Mr. Roberson?

21          A      Approximately seven to ten days

22   afterwards.

23          Q      Did you make records or notes of

24   that telephone call and the interview?

25          A      Most likely.
```

1        Q        Do you have those with you today?

2        A        I've got the file, yes.

3        Q        Would you look in the file and see

4   if you made notes or have notes of the call and

5   the interview?

6                 Bruce, while you are looking, would

7   you identify what you are looking through

8   there, please?

9        A        This is an internal file with the

10  District Attorney's office --

11       Q        Is it --

12       A        -- containing statements and

13  reports.

14       MR. SMITH:  For reference, may we have

15              that marked as Defendant's

16              In-camera One, Your Honor?

17       THE COURT:  Sure.

18       Q        Bruce, I'll quit asking you

19  questions if it distracts you from looking at

20  those dates.  But you have two file folders

21  there in front of you.  Is that part one file,

22  the internal file with the D.A.'s office?  Or

23  is it two separate files?

24       A        It's one file.  It just happens to

25  be in two containers.  It must have been

1   July 6th.

2          Q       Would that be the date?

3          A       There or about.  I'd have to, you

4   know --

5          Q       That date is the date of the

6   telephone call to the best of your judgment?

7          A       It would have been that day or the

8   day before.

9          Q       Did you tape record the interview

10  that you had with Mr. Roberson?

11         A       No.

12         Q       Did you make any notes of the

13  interview with Mr. Roberson?

14         A       Apparently not.

15         Q       Did you dictate or have typed or

16  summarize any of your conversation with

17  Mr. Roberson?

18         A       No.

19         Q       You did not put it in writing in

20  any manner?

21         A       I don't see it.  I would have to

22  say that I didn't.

23         Q       Who did you discuss that telephone

24  call with?

25         A       Initially.

1        Q     Yes, sir?

2        A     Mark Fuller.

3        Q     And also, I believe, you testified

4 with T. D Jones, who is the Chief of Police

5 with Enterprise?

6        A     I had a subsequent conversation

7 with him, yes.

8        Q     And who else did you discuss it

9 with?

10       A     Time frame?  Are you talking about

11 initially?

12       Q     Well, let's say between the time

13 that you got the telephone call and the D. A.

14 Recused your office from the investigation, who

15 did you discuss it with?

16       A     I know I assigned Investigator

17 Patrick Norris to do an interview.

18       Q     Who was that interview with you?

19       A     George Roberson.

20       Q     All right.  Let me make a statement

21 here in preference of a question.  When we get

22 to the point of the officer that was under

23 question, I do not want you to speak that

24 officers name out loud.  I'm going to ask you

25 to write it down if it's not on a document

1    somewhere.  I want to be very clear about that,

2    please?

3         A       Thank you.

4         Q       If you would continue on?  Who else

5    besides Patrick Norris that you instructed to

6    do an interview with George Roberson?

7         A       Say that, again.

8         Q       Let me ask you this first:  Did

9    Investigator Patrick do an interview with

10   George Roberson?

11        A       Yes, he did.

12        Q       Did he tape record it?

13        A       Yes, he did.

14        Q       Was it transcribed?

15        A       Yes, it was.

16        Q       Do you have the transcription of

17   that interview?

18        A       Yes, I do.

19        Q       Do you have the original tape?

20        A       Yes, I did.

21        Q       Then, back to the question that I

22   had asked.  Who else, between the time that you

23   got the call and the time that the D. A.

24   recused your office from the investigation, who

25   else did you discuss it with?

929

1        A        Eddie Pennington, an investigator

2    with the District Attorney's Office; Major Ken

3    Halford, who at that time was the Chief of

4    A.B.I. Division, Department of Public Safety.

5        Q        Did you call Chief Halford?

6        A        I did.

7        Q        What did you request of him?

8        A        I asked that his department come in

9    and conduct an investigation on a complaint

10   that Mr. George Roberson had phoned in and

11   later come in and made --

12       Q        What connection, if any, does Mr.

13   George Roberson have with the Enterprise Police

14   Department, if you know?

15       A        Absolutely none, that I know of.

16       Q        What connection, if any, does he

17   have with anyone involved in this case, if you

18   know or have learned?

19       A        He was a co-worker of the Defendant

20   Yoeman.

21       Q        And where did he work with

22   Defendant Yoeman?

23       A        Kentucky Fried Chicken.

24       Q        Here in Enterprise?

25       A        Yes.

```
 1        Q      After you talked to Major Halford,

 2   who else did you discuss, and, again, I'm

 3   talking to the point that Mr. Fuller recused

 4   the office, who else did you discuss this case

 5   with?  Mr. Norris; Mr. Pennington; obviously,

 6   the District Attorney; D.T. Jones, the chief.

 7   And I missed a name that you mentioned.  Who

 8   else, please, sir?

 9        A      I don't recall any names.  Someone

10   with the Attorney General's Office.

11        Q      An investigator, or just the

12   Attorney General, or do you know?

13        A      I believe he was an Assistant

14   Attorney General.

15        Q      How did that conversation come

16   about?

17        A      I believe he called me.

18        Q      Do you know how he knew to call

19   you?

20        A      Mr. Fuller had contacted Attorney

21   General Prior and requested that the Attorney

22   General step in the shoes of the D. A. for this

23   case.

24        Q      Was that done in writing?

25        A      Yes, it was.
```

1        Q       Do you have a copy of the

2   correspondence that that request was made?

3        A       I'm sure I do, Al.  That's a fairly

4   routine letter written requesting assistance in

5   -- I'm looking.  And I see, with a letter where

6   a letter was sent back from Halford.

7        Q       And what was the substance of that

8   letter?  And, again, Bruce any time my question

9   or your response has the name of the officer

10  under investigation, I do not want you to speak

11  that name?

12       A       Just that they received a letter.

13  You know, a certain agent had been assigned to

14  the case to look into it.

15       Q       Who was that agent?

16       A       David Watson.

17       Q       Do you know where he's assigned

18  from?

19       A       Do you know --

20       Q       Where he works out of?

21       A       At that time Dave was working out

22  of either Montgomery or Prattville.

23       Q       Is he A.B.I. or Attorney General?

24       A       He's corporal with the A.B.I.

25       Q       And was this about the same time

1    that Mr. Fuller recused the office?  Was this

2    about the same time that Mr. Fuller recused the

3    office when the A.B.I. agent was assigned or

4    was that later?

5         A    It was in a matter of just days.

6         Q    Did Mr. Fuller memorialize any

7    documents that, or prepare any documents that

8    formally recused the D. A.'s office from that

9    investigation?

10        A    By "formally," do mean in writing,

11   is that what you're talking about?

12        Q    A poor way of asking that simple

13   question, yes, sir.

14        A    I don't recall any writing.

15        Q    Did you participate, or were you

16   present in any further interviews or

17   investigation of this matter?

18        A    I honestly don't recall.

19        Q    Do you know if you had any

20   conversations with the A.B.I. investigator or

21   if you had any conversations with Chief T. D

22   Jones?

23        A    Yes.

24        Q    Both?

25        A    Yes.

1    Q    And was that during the course of

2    your investigation?

3    A    Yes.

4    Q    Do you know of any of your

5    investigators, other than Mr. Norris, had any

6    further involvement in the investigation?

7    A    Did not.

8    Q    Any other investigators with your

9    office?

10   A    Not to any substance. I could of

11   asked most likely Investigator Pennington to go

12   to Mr. Roberson's home and pick him up and

13   bring him to the office. Something like that.

14   Q    All right. How many times was

15   Mr. Roberson interviewed by your office? The

16   D. A.'s office?

17   A    Several.

18   Q    Were they recorded each time?

19   A    The initial interview that I had

20   with him was not recorded.

21   Q    I understand that. I apologize if

22   I was confusing you.

23   A    And he was immediately -- and there

24   was probably no notes that were recorded myself

25   since my intentions were to assign Investigator

```
 1   Norris to take the statement.
 2        Q      Bruce, are you still a full-time
 3   employee with the D. A.'s office?
 4        A      Yes, I am.
 5        Q      Okay.  Was any of this material, to
 6   your knowledge, concerning the investigation of
 7   a complaint by Mr. Roberson, the coworker of
 8   co-defendant of and Conrad's, Yoeman -- do you
 9   follow that?
10        A      (Nodding in the affirmative).
11        Q      Was any of that disclosed to any of
12   the Defense Attorneys of Mr. Conrad?
13   Mr. Yoeman?  Or Mr. Brian Smith.
14        THE COURT:  By this witness?
15        MR. SMITH:  By you or to your knowledge?
16        A       It was not disclosed by myself.
17   And I do not have any knowledge of it ever
18   being disclosed.
19        Q      Were you present, or did you
20   participate in any conversation concerning this
21   material being disclosed or not, to defense
22   counsel?
23        A      I did.
24        Q      Who was that conversation with?
25        A      District Attorney Mark Fuller and
```

1    Assistant District Attorney Glenda Stout.

2         Q      When -- was that the same

3    conversation or two different conversations?

4         A      It was the three of us together.

5         Q      When did that occur?

6         A      If I recall correctly, it was this

7    past Tuesday, one week ago.

8         Q      And even though the D. A.'s office

9    recused itself from this investigation, you

10   have maintained, and continued to maintain the

11   file that is there before you, that is

12   identified and marked as in-camera Defense

13   Exhibit No. 1?  Is that correct?

14               Did I confuse you?

15         A      There's certainly been a file

16   maintained, yes.  I have the file.

17         Q      Where was that file kept?

18         A      Where?

19         Q      Yes, sir?

20         A      In a file cabinet under sensitive

21   matters.

22         Q      It was not kept with the case file

23   of this homicide of Jelaine Dennis?

24         A      No, it wasn't.

25         Q      Were there any copies of the report

1      or investigation in that case file?

2           A      Not to my knowledge.

3           Q      What was the decision made when you

4      had the conversation last Tuesday with Mark

5      Fuller and Assistant D.A. Parker -- Stout,

6      excuse me, regarding disclosure to the Defense

7      Counsel last Tuesday before this trial started

8      Monday?        A      Mrs. Parker   --

9           THE COURT:  Mrs. Stout.

10          THE WITNESS:  I'm sorry.  Glenda.

11          MR. SMITH:  That works.

12          A      Glenda just made some general

13     references to the case and last minute things

14     had been done, this and that and the other.

15     And this was thoroughly discussed by herself

16     and Mark Fuller and me, in making a decision

17     that it in no way was exculpatory, and in no

18     way did the information -- that the information

19     would be discoverable under

20     Rule 16.1, I believe it is.

21          Q      And was any discussion made since

22     concerns, allegations of a co-worker of one of

23     the Defendants, that is Mr. Yoeman's, was there

24     any discussion under Kyles v. Whitley (sic)

25     that it might contain impeachment information

1    that was due to be disclosed to the Defense?

2              Bruce, leaving out the citation,

3    which you may or may not be familiar with,

4    knowing you, you probably are, was their any

5    discussion of whether there was impeaching

6    information that might to be due to be

7    disclosed to Defense Counsel?

8         A    I'm sure that was it was discussed.

9    And there was a great, lengthy, several-hours

10   conversation in an effort to make a decision

11   and comply with the rules of law and its

12   procedure and any of this Court's Orders.

13             Mr. Fuller, you know, openly said,

14   "I will be the one who makes the final decision

15   on it."

16             Glenda, she may have looked at some

17   cases.  I remember pulling -- I mean, we even

18   got down to the point of pulling Black's Law

19   Dictionary.

20        Q    Bruce, let me interrupt you,

21   please, sir, and ask was a decision made not to

22   disclose any of that material to the Defense

23   team?

24        A    A decision was made.

25        Q    What was that decision?  That it

1    would or it would not be disclosed?

2        A    That it would not be disclosed

3    because --

4        Q    All right.  And was any decision

5    made whether or not to file it in-camera with

6    the Court.

7        THE COURT:  First of all, was that

8                   decided?

9        THE WITNESS:  Pardon me?

10       THE COURT:  First of all, was that issue

11                  discussed, whether or not to

12                  file it in-camera with the

13                  Court?

14       A    I believe it may have been.

15       Q    It may have been discussed?

16       A    It may have.

17       Q    Was it filed in-camera with the

18   Court?

19       A    Not to my knowledge.

20       Q    Bruce, at the time that the D. A.'s

21   file of the prosecution of Robert Conrad,

22   Yoeman and Brian Smith, at the time the D. A.'s

23   file was made available to Defense Counsel at

24   the D. A.'s office for discovery purposes, was

25   Defendant's in-camera Exhibit No. 1 in with the

1    other file material, or was it kept separate in

2    a sensitive file cabinet?

3         A      Repeat that, and make sure that I

4    got that.  Al, I have hearing impairment.

5         Q      I apologize.  I've been told I

6    mumble, too, Bruce.

7                You've testified earlier that that

8    file, Exhibit In-camera One of the Defense was

9    in a separate file cabinet marked sensitive?

10   Correct?

11        A      I don't know that it was marked

12   sensitive.

13        Q      Containing sensitive material.

14   I may have been misunderstood?  Is it locked?

15        A      It is.

16        Q      Who has access and a key to it?

17        A      Myself, the District Attorney, and

18   my secretary, or office manager.  The office

19   manager serves as my secretary.

20        Q      Did you ever have an occasion to

21   direct that that file or a duplicate of it or

22   copies of it be placed in the criminal case

23   file that was present with and Defense

24   Attorneys were allowed to review it in

25   discovery?

```
 1          A      At that time, or any other time,
 2   this file has not been copied.
 3          Q      Would it be to the best of your
 4   knowledge that that file remained in your
 5   locked cabinet and was not ever a part of the
 6   criminal case file?
 7          A      Yes, it is.
 8          MR. SMITH:  Judge, I'm going to ask to
 9                  review, and I also move to
10                  introduce in-camera Exhibit No.
11                  1, for the Court's inspection.
12          THE COURT:  For the purposes of seeing
13                  if there is anything exculpatory
14                  or impeachable, or or tends to
15                  be impeachable exculpatory.  I
16                  think the testimony is that
17                  concerns of allegations
18                  regarding one of the
19                  Co-defendants in this case.  And
20                  for that reason, alone, I think
21                  we are entitled to it.  But at a
22                  minimum, I want it as a part
23                  for the Court to review it and
24                  a part of the Court file.
25          THE COURT:  Okay.
```

1          MR. JARRELL:   Judge, the State's position

2                is there is nothing contained in

3                this file that dealt with this

4                Defendant, one.  And number two,

5                obviously, the officer's name

6                that was alleged to have been

7                some sort of misconduct on his

8                part is that file.

9                     We would ask that if it

10               is reviewed, that it is reviewed

11               by the Court.  I've never seen

12               the file.  Mrs. Stout has never

13               seen the file.  And I don't know

14               that Mr. Smith or Mr. Bradshaw,

15               either one, personally, have any

16               reason to see the contents of

17               that file.

18                  If the Court is satisfied

19               that it's not exculpatory or

20               impeachable information,

21               involved in it, we would be

22               satisfied with the Court's

23               judgment.

24                  But, as far as every Tom,

25               Dick and Harry looking at that

1    file, an it being made a part of

2    public record, we do not believe

3    that is necessary.

4    MR. SMITH:  My name is Al Smith.  His

5    name is Gary, may it please the

6    Court.

7    THE COURT:  Here is what we are going to

8    do:  It will go into evidence

9    for an in-camera investigation

10   reviewed by the Court, as I'm

11   reviewing Tom and Dick and Harry

12   can sit there next to me.  And

13   when I review a document I will

14   hand it to them.  And you can

15   sit there, since you haven't any

16   knowledge of it.  And I will

17   make a circle there.  And y'all

18   can stick it back when you look

19   at it, to me, and it will stay

20   there.  And I will rule on

21   whether or not anything is

22   exculpatory or impeachable

23   that's contained in that file.

24   MR. SMITH:  And, Judge, obviously, if I

25   wasn't sensitive to the

1          officer's name, I wouldn't have

2          requested that it not be spoken

3          aloud.  I am very sensitive to

4          that.  But, Your Honor,

5          appointed me to represent this

6          man.

7     THE COURT:  Sure.  I did.  And you are

8          going a good job.  You are doing

9          a good job.

10    MR. JARRELL:   May I ask one other

11         question of this witness?

12     THE COURT:  Yes, sir

13    Q     (By Mr. Jarrell) Mr. DeVane, you

14  made the decision to not disclose any of this

15  material to Defense Counsel?

16    A     The ultimate decision was the

17  District Attorney, Mr. Fuller.

18    Q     Did Mrs. Stout or myself have any

19  involvement in that final decision?

20    A     His exact words:  "I am the

21  District Attorney.  After hearing, seeing,

22  reading, knowing what is in that file, I am of

23  the opinion it is not exculpatory.  It doesn't

24  fall within Rule 16, therefore, I direct it not

25  to be disclosed."

1      Q    And you never had shown me that

2  file?  I've never seen it until you brought it

3  up here today?  Is that correct?

4      A    I don't think you and Mrs. Stout,

5  either one, have either seen this file.

6      Q    Thank you.

7      THE COURT:  Any other questions, Mr.

8           Smith?  Mr. Bradshaw?

9      MR. SMITH:  No, Your Honor.

10     Q    (By Mr. Jarrell) We learned of this

11  when, sir?  Mrs. Stout and I?

12     A    Of the file?

13     Q    Yes?

14     A    I believe it was last Tuesday

15  morning.

16     MR. JARRELL:   Thank you.

17     THE COURT:  Okay.  Mr. Smith, any other

18           question of this witness?

19     MR. SMITH:  No, sir.

20     THE COURT:  All right.  I'm going to

21           review that in chambers.  And

22           y'all will be there when I do

23           that.  And when I look at a

24           document and finish with it, we

25           will circulate it around, and

```
 1                    each of us, Tom, Dick and Harry,

 2                    can look at that, as you said.

 3        MR. SMITH:  Judge, I just want to make

 4                    sure, we only put one label, as

 5                    it's one file, even though

 6                    there's two covered there.

 7        THE COURT:  I understand.  But there are

 8                    some other witnesses that are

 9                    here for this purpose.  I want

10                    y'all to exhaust those

11                    witnesses.  I'm going to take

12                    the court reporters back.  Y'all

13                    can go back with me if you

14                    choose.  But I am simply going

15                    to tell the jurors that there is

16                    no need for y'all to sit back

17                    here in this jury room.  You are

18                    excused until 2:00 o'clock.  It

19                    will take that long to do what

20                    we need to do here.  If we need

21                    to go through the lunch time, we

22                    will do that.  You are excused

23                    until 2:00 o'clock.  That's all

24                    I'm going to say.

25                        I'm just going to
```

1    excuse them.   There's no need

2    for them to sit back there and

3    waste their time.

4

5    (The following was heard out of

6    the hearing and presence of the

7    jury).

8    THE COURT:  Y'all can just relax.   If you

9    have something to say, just let

10    the court reporters know.

11    MR. SMITH:  Judge, I would like the

12    record to reflect that the

13    document I'm looking at is from

14    Major Ken Halford, Chief Alabama

15    Bureau of Investigations, to

16    Mark Fuller, dated October 30th

17    2001, and attached is a case

18    transmittal form.   It's the

19    special inquiry report conducted

20    by A.B.I.   I just want that

21    date to be reflected.

22    THE COURT:  Certainly.

23    MR. SMITH:  And this document is dated

24    11/5/2001.   I recognize Bruce

25    DeVane's signature as having

1                           received the report.

2        THE COURT:  And it just sets forth that

3                    it's in reference to allegations

4                    hat a detective was informed

5                    about a robbery

6                    that was to occur at the Toy

7                    Store.

8        MR. SMITH:   May I read over your

9                    shoulder, Judge?

10       THE COURT:  Yes.  That will save a few

11                   minutes.

12                          The person who

13                   allegedly informed the law

14                   enforcement, his full name is George

15                   Carlee, C-a-r-l-e-e, Roberson,

16                   R-o-b-e-r-s-o-n.

17       MR. BRADSHAW:  Does it give any race?

18       THE COURT:  Not yet.

19                          And it says that he

20                   informed a law enforcement officer,

21                   and he named that law enforcement

22                   officer, that a robbery was to occur

23                   at the Toy Store, a business in

24                   Enterprise, Alabama, approximately

25                   one week prior to the crime actually

1    occurring.

2              That this Roberson had

3    been hospitalized for a mental

4    disorder.  And he also has a bullet

5    lodged in his heart.

6    MR. SMITH:  Left lung, may it please the

7    court.  Sorry.  Excuse me

8    THE COURT:  That it was ascertained that

9    this reporting person has a disorder

10   with paranoia, impulsivity, mood

11   swings anxiety, emotional

12   instability, poor judgment; that he

13   had been attended by a psychiatrist.

14   That psychiatrist had recommended

15   follow-up treatment at mental health

16   facilities, but that the reporting

17   individual, Roberson, did not attend

18   follow-up treatments.  That Roberson

19   possibly had a bullet also lodged in

20   his left lung.  That a polygraph

21   examination was performed on the

22   officer that allegedly was provided

23   this advance notice, and that the

24   officer was reported by the polygraph

25   examiner as answering truthful to all

949

```
 1              relevant questions.
 2                           That the District
 3              Attorney was informed of the results
 4              of the Alabama Department Bureau of
 5              Investigation results.
 6                           Al, you can make any
 7              other statement that you wish.
 8      MR. SMITH:  Judge, according to this
 9              summary, the allegation was that
10              Roberson told the detective prior to
11              the robbery of the Toy Store taking
12              place, that it was to occur.  That's
13              just a summary.
14      THE COURT:  Sure.  That's just a summary
15              of what's in this package.
16      MR. SMITH:  This document is an Alabama
17              Uniform Incident/Offense report,
18              dated 7/12/01, reported by T. D.
19              Jones for a special inquiry of law
20              enforcement.  The only notation on
21              11, July, 2001, Lieutenant Lloyd
22              Arrington instructed Corporal, it
23              look like, D. O. Watson, to conduct a
24              special investigation on an
25              Enterprise Police Officer, officer
```

1    investigation pending.

2         MR. BRADSHAW:  I would like to be on the

3              record that the hospitalization for a

4              positive mental disorder that was

5              entered into the record earlier on

6              George Carlee Roberson was in 1980

7              and doesn't say when the follow-up

8              treatment was recommended.  But

9              assumes it would be right after the

10             hospitalization.  But there is

11             nothing concerning his mental

12             capacities in the year 2001 listed in

13             here.

14        THE COURT:  The law enforcement officer

15             gave a statement.  And in a nutshell

16             said that he had been provided this

17             information.  But that it did occur

18             about two or three days after the

19             robbery, murder took place, and not

20             before;  that this individual,

21             Roberson, provided him with

22             information, but that the information

23             was provided two or three days after

24             the robbery, murder, not before.  And

25             that he discussed giving this

```
 1              information.  He gave the information
 2              two or three days after the robbery
 3              to Jeff Spence, the case agent, to
 4              the Enterprise Police Department,
 5              after the robbery, murder.
 6      MR. BRADSHAW:  That report just
 7              summarizes, saying that Roberson gave
 8              it to Spence?
 9      THE COURT:  No.  The law enforcement
10              officer in question, who was supposed
11              to have received the information,
12              says that he did receive this
13              information from this individual and
14              others; but he received it two or
15              three days after the robbery, murder,
16              not before.  That he passed the
17              information to Jeff Spence, the case
18              agent, for the Enterprise Police
19              Department on this case.
20      MR. SMITH:  Judge, as an officer of the
21              Court, I want to just say to the
22              Court that nothing we have been
23              given, the Defense, ever identified
24              this Roberson person or information
25              concerning Mr. Yoeman, one of the
```

1            Co-Defendants, provided to any of the

2            police officers.

3      THE COURT:  This is a written statement

4            by the law enforcement officer who

5            supposedly received the information

6            from George Roberson.  The officer

7            gives a written statement.  Part of

8            it is that the individual who

9            Roberson advised that he had provided

10           information to other state agencies

11           in another state and received monies

12           for that, and that he had made

13           inquiry to this law enforcement

14           officer, basically, as to whether or

15           not he could be compensated for his

16           information in this case.

17                That's Yoeman,

18           Co-defendant Yoeman told him that he

19           had planned on doing something like

20           that for a while.  That Yoeman had

21           been one of the boys that had worked

22           for him at KFC.

23      MR. SMITH:  That would be Kentucky Fried

24           Chicken, Judge.

25      THE COURT:  Correct, I assume.  And it

1  later spells out Kentucky Fried

2  Chicken.

3            That document is just

4  simply a recollection by the law

5  enforcement officer, very extensive

6  recollection that a day after the

7  robbery, murder that this George

8  Roberson told him that someone tried

9  to rob KFC.  And that the robbery was

10 not consummated.  And that the law

11 enforcement officer said that he

12 would pass that information onto the

13 case agent.

14            The law enforcement

15 officer said that he did provide Jeff

16 Spence, the case agent, with

17 information on Tuesday at our regular

18 morning meeting.

19            I brought up the

20 conversation I had with George in the

21 meeting --  meaning George Roberson.

22 MR. SMITH:   Judge, this Page 3 of 6, of

23 the statement of the officer under

24 investigation.  And it says

25 continuing from the prior page:   The

1    boys were planning on doing something

2    like that for a while, when he talks

3    about it, on Page 2, the Toy Store

4    being robbed and Mrs. Dennis being

5    killed.

6                I remember that George

7    told me that Yoeman was one of the

8    boys that had worked at KFC.  George

9    told me that something happened at

10   Kentucky Fried chicken the night

11   before the incident at the Toy Store.

12   This would have been Tuesday, May 22.

13   George told me that someone had tried

14   to rob the manager.  But they locked

15   the doors, and that the robber

16   couldn't get it, or somehow failed

17   the robbery.  George told me this.  I

18   tried to remember if the police

19   department had been notified by

20   Kentucky Fried Chicken.  And I could

21   not remember the incident being

22   reported.  I told George the

23   information he had about the planning

24   by Yoeman would be important to the

25   case.  I told him I would get this

1    information to the case agent, and

2    get him in touch with George, and I

3    set up an interview.  Then George

4    expressed his reluctance with being

5    interviewed and becoming directly

6    involved.  George told me that he was

7    closely involved with the black

8    community.  And he didn't want to get

9    directly involved.  I told George

10   that I would try to figure out how to

11   pass this information along without

12   his direct involvement.  I told

13   George that I would get back with

14   him.  And the conversation ended.

15   Again, this was about two or three

16   days after this incident, the

17   incident at the Toy Store.

18                 And, of course, the

19   importance that I place on that, Your

20   Honor, is the planning by Yoeman,

21   would be important to the case,

22   regardless of when that information

23   came to the officer.  We expect and

24   apparently since his attorney has

25   been up here, too, Mr. Yoeman may be

1           a witness against our client.

2      THE COURT:  It would be.  It would be

3           certainly impeachable information

4           that would have needed to be turned

5           over to the Defense.

6      MR. BRADSHAW:  It is very contradictory

7           statements that we have already been

8           given by Mr. Yoeman.

9      MR. SMITH:  Judge, this Page 4 of 6 goes

10          on to discuss discussion with the

11          district attorney's office and

12          getting the information from George

13          before a Grand Jury and being

14          interviewed.  I think this has got to

15          be a part of the court file, Judge.

16          I don't see how it cannot.

17     THE COURT:  There is no question.

18     MR. SMITH:  I'm going to say for the

19          record, in here, I don't see anything

20          that this officer under investigation

21          has done improperly.  But there was

22          information that absolutely was

23          essential that it be provided to the

24          Defense.

25     MR. JARRELL:  I'm going to make this

1          statement.  Based on the fact that we

2          haven't seen the entire file, yet, as

3          to whether or not this information

4          was credible --

5     THE COURT:  It still would have needed to

6          be made available.  Credibility is

7          left to a jury to determine.  It's

8          definitely not only exculpatory in

9          nature.  It's impeachment information

10         that should have been turned over.

11                   No question.

12         Absolutely.  Just those documents.  I

13         haven't looked at these other ones,

14         yet, there is no question.

15                   It's exculpatory in

16         nature because it shows that some

17         other individual, i.e., Yoeman, may

18         have been more involved in a planning

19         of the thing; may have been involved.

20         There is a question as to who the

21         shooter was.  And I imagine we are

22         going to go further and hear more

23         about that a little later.  But it

24         would shed light on maybe who that

25         was.

1              I don't know whether

2        the State is going to call

3        Co-Defendant Yoeman, as a State's

4        witness.  But I would guess that they

5        are, since I have seen his lawyer

6        seated out in the courtroom watching

7        this.  I imagine that lawyer is going

8        to be here to make sure his client's

9        rights are protected.  And it

10       certainly would have been impeachment

11       material there.  And, certainly, this

12       Roberson could have been subpoenaed

13       in advance and his statement taken

14       and that information used before a

15       jury to show that, to better shed

16       light on who in fact planned and

17       carried out the crimes made the basis

18       of these two offenses.

19   THE COURT:  This next document that I

20       have appears to be a transcription of

21       an interview taken by Corporal David

22       O. Watson, Alabama Bureau of

23       Investigation.  The interview was of

24       George Carlee Roberson on the 16th

25       day of July, 2001, at 10:23 a.m.

1          MR. SMITH:   Judge, the document that I'm

2               looking at is the Bureau of

3               Investigation form.  It appears to be

4               kind of a cover for an interview

5               discussing the statement by George

6               Carl Roberson, dated 7/16/01.

7                    The final sentence on

8               that report appears to be signed by

9               Corporal D.O. Watson:  The

10              transcribed statement will be

11              attached when completed by staff

12              member of the Coffee County District

13              Attorney's Office.  End quote.

14                    I was trying not to

15              snatch out of your hand, Judge.

16                    To just kind of keep my

17              reference, this question by

18              Investigator Watson on July 16th of

19              2001, references two prior tape

20              recorded statements.  One on June 8

21              and one on June 28, at the District

22              Attorney's Office.

23      THE COURT:  By him though?

24      MR. BRADSHAW:  By Watson?  Or the

25              District Attorney?  Bruce DeVane?

960

```
 1        MR. SMITH:  I don't know.  I'm just
 2            putting for the dates, not
 3            necessarily who did it.
 4        THE COURT:  It's going to be in here.  We
 5            will find out in a minute.
 6        MR. SMITH:  It appears from this
 7            interview that Mr. Roberson was
 8            talking about Bryan Yoeman and a
 9            Steven Brown making plans of --
10        THE COURT:  The next page sheds more
11            light on that.
12        MR. SMITH:  There was a discussion with
13            Bryan Yoeman and this Steven
14            character, a person; but then it goes
15            on and is only talking about Bryan
16            Yoeman and doesn't know who the other
17            persons were, it appears.
18        MR. BRADHSHAW:  Judge, you mentioned
19            earlier about a polygraph done on the
20            officer in question.  This is the
21            second time I have seen about a
22            polygraph on Mr. Roberson.  Do you
23            know if the file contains any
24            results.
25        THE COURT:  We will know when we finish.
```

1           MR. JARRELL:    I think if you recall back

2                   to the first document, it says they

3                   were not able to, for medical

4                   reasons.

5           MR. SMITH:    I'm still on the interview

6                   that I just referenced a moment ago.

7                   That pages are not numbered.  But the

8                   interview was by Watson and Norris.

9                   And Mr. Roberson discusses that a

10                  conversation he had with Bryan Yoeman

11                  about a possible robbery of the KFC.

12                  Then he talks about that Yoeman says

13                  that he's got a place picked out out

14                  on the Geneva Highway.  And I said,

15                  are you talking about the Toy Store.

16                  And then another name he calls it.

17                  And Yoeman reportedly said, yeah,

18                  yeah, the Toy Box.

19                          More discussions with

20                  Mr. Roberson about Yoeman stating

21                  that the Toy Box, the Toy Store.

22                  More discussions here about the

23                  conversation was after the Toy Store

24                  robbery, but still conversation that

25                  Yoeman was planning a robbery of the

```
 1              Toy Store.  I'm little unclear

 2              quickly reading this.  But clearly

 3              it's an interview discussion,

 4              conversations that Bryan Yoeman had

 5              with this Roberson person of planning

 6              to rob the Toy Store.

 7                         I'm worried about

 8              Larry.  He's a slow reader.

 9      MR.  JARRELL:  That's Tom and Dick.

10      MR.  SMITH:  Dick doesn't have anything to

11              say?

12                         Mr. Roberson explains

13              that his mental diagnosis was in '79

14              or '78, when his lawyer told him to

15              claim that to try to get out of some

16              of his domestic problems up there.

17      MR.  BRADSHAW:  Assault on his wife.

18      MR.  CHIRICO:  Is that the reference to

19              the bullet in his chest?

20      MR.  BRADSHAW:  I don't know if his wife

21              shot him or what happen.

22      MR.  SMITH:  I thought he was talking

23              about me, because I got shot behind

24              another man's girl friend.

25      THE  COURT:  And in this portion of his
```

```
 1              statement:  "The bullet is lodged in

 2         my heart," he said.

 3                       "In your heart?"

 4                       "In my actual heart."

 5                              "So,

 6         obviously, it's not a very big

 7         bullet?"

 8                       "It's a .22, looks

 9         like."

10                       He said that he asked

11         the man which shooted me.  Durham

12         Regional Hospital Dix Medical Center,

13         in '79.

14    MR. SMITH:  I said that man needs to go

15         to Church, if he has been shot in his

16         heart.

17    THE COURT:  He has an irregular

18         heartbeat.

19    MR. SMITH:  He has more lead in his

20         pencil than I do.  You didn't put

21         that down, did you?

22    THE COURT:  Yeah.  Everything's being

23         recorded here, "lead" and everything.

24    MR. SMITH:  Y'all, please don't tell my

25         wife I'm saying this.
```

```
 1          THE COURT:  We are going to give her a

 2          copy of that.

 3          MR. SMITH:  She will never look at me,

 4          again.

 5                  (Off-record discussion).

 6          MR. SMITH:  Judge, again, preliminarily,

 7          from what I see, it's clear from what

 8          I see the focus of this investigation

 9          was whether Hauser had prior

10          knowledge that the robbery was going

11          to occur.  And that is not the focus

12          of our inquiry.

13          THE COURT:  I understand.

14          MR. SMITH:  Our request --

15          THE COURT:  It's whether --

16          MR. SMITH:  -- exculpatory, impeachable

17          material that should have been

18          disclosed to the Defense, or whether

19          it's material or not, Your Honor has

20          already made that ruling.

21                  Judge, again, these

22          pages are unnumbered.  But this is a

23          long conversation.  Roberson is

24          stating that he had a discussion with

25          Bryan Yoeman.
```

1                              This discussion talks

2              about Mr. Roberson having a

3              discussion with Bryan Yoeman, that if

4              you got fire, and they got fire, you

5              try to take their belongings, they

6              are going to fire, first.  And when

7              the lead gets to blowing, you going

8              to fire back, even if you are not

9              holding a gun.  You already said that

10             they had guns, say, even though you

11             not holding the gun, or pulling the

12             trigger, if he's killed, or if he

13             kills them --

14       THE COURT:  Slow down.  Just a hair.

15       MR. SMITH:  Excuse me.  If he kills them

16             then you're just as guilty as the

17             individual pulling the trigger.  A

18             discussion of punishment.  And then

19             on the next page there's talk about

20             Bryan Yoeman being -- talking about

21             more than one individual, thinking

22             about hitting the Tool Box -- the Toy

23             Store, the Toy Store on Geneva

24             Highway, and; like, there was no

25             business around that, other than

```
 1              that, I think is what it's suppose to

 2              say.

 3                        This discussion is that

 4              Mr. Watson, I mean, Mr. Roberson is

 5              apparently relating a conversation

 6              with the officer after the Toy Store

 7              robbery, and says, don't let them get

 8              off.  And they have further

 9              discussions about the Toy Store and

10              Yoeman's conversations.

11     THE COURT:  That's the end of the

12              interview, the last page that I

13              handed you.

14     MR. SMITH:  Judge, there is something

15              here that I want to bring out because

16              it's rattling around in the back of

17              my head with the other rocks.

18                        This Steve Brown, there

19              has been some discussion about bail

20              bondsmen, and Steve getting out of

21              jail on bond.  And I do remember some

22              interviews with a subject.  And there

23              was a bondsman that got a subject out

24              that they wanted to -- the police

25              wanted to get some information from
```

1          regarding some of these

2          Co-Defendants.  I don't have a very

3          exact recognition.  But I think his

4          name was Steve.

5              (Mrs. Stout entered chambers).

6      MRS. STOUT:  I apologize, Your Honor.

7      THE COURT:  Sure.  Would you roll in a

8          chair?  There should be one right

9          there.  The last page of this

10         interview indicates it was

11         transcribed by Crys Fuller, C-r-y-s

12         Fuller, July 17, 2001.

13     THE COURT:  And she is the District

14         Attorney's secretary?

15     MR. SMITH:  She is the District

16         Attorney's secretary.

17     THE COURT:  Personal secretary.  And

18         that's District Attorney Mark Fuller?

19     MR. SMITH:  Yes, sir.

20     THE COURT:  Here comes a second

21         interview, taped interview, of George

22         Carlee Roberson on June 8, 2001, by

23         Norris.  Norris is, I guess, an

24         investigator for the District

25         Attorney's Office.

1        MR. SMITH: The synopsis here if it has a

2        date, I can't find it, but it says

3        reviewed by -- I'm sorry. Here's the

4        date 9/22/2001, quote, the statements

5        also contain information about one of

6        the alleged perpetrators of the

7        crime, Bryan Yoeman, end quote.

8              This appears to be a

9        chain of custody form, Alabama Bureau

10       of Investigation. Name of victim,

11       Jelaine Dennis; name of you suspect,

12       Robert Conrad; 7/12/02; property

13       obtained District Attorney's Office

14       Enterprise; transcribed statement of

15       George Roberson, dated June 8, 2001,

16       consisting of six pages.

17     MRS. STOUT: May I, for record, Mr.

18       Gareth Lindsey, who represents Bryan

19       Yoeman --

20     THE COURT: I invited him to come back

21       here. He told me that he did not

22       want to.

23     MRS. STOUT: He did. I have spoken to

24       him earlier today.

25     THE COURT: He said that it was going to

```
 1              be recorded.
 2         MRS. STOUT:  Right.
 3         THE COURT:  And that he was going to get
 4              a transcript of the recording.
 5         MRS. STOUT:  Right.  One thing that was
 6              not brought out to Mr. DeVane, at the
 7              time, Tuesday was a week ago, when I
 8              was first made aware that these
 9              documents existed, I was emphatic
10              that Bryan Yoeman's attorney should
11              get at least a copy of this.
12         THE COURT:  I have already ruled that
13              some of the documents are both
14              exculpatory, and impeachment material
15              that should have been turned over
16              some of the documents that we have
17              already seen.  There's no question.
18         MR. SMITH:  Judge, this transcript, which
19              is handwritten on top of it:  "Copy,
20              for me.  Do not copy this document.
21              Confidential."
22                      I have no idea, of
23              course, who wrote that.  But it's an
24              interview with Patrick Norris and Mr.
25              Roberson dated June 8, 2001.  There
```

```
 1              is conversation about Mr. Bryan

 2              Yoeman, a co-worker at Kentucky Fried

 3              Chicken, in talking about plans to

 4              rob the isolated Toy Box, as he

 5              phrases it out on Geneva Highway.

 6                      I'm not going to read

 7              all of this in, because I think by

 8              now it's obvious that Your Honor will

 9              hopefully make this a part of the

10              Court file whether under seal or not.

11         THE COURT:  Not.  There's absolutely no

12              question.  None whatsoever.

13                      And if you need it, the

14              Defense or the State needs Roberson,

15              you need to let me know so I can have

16              the Sheriff go get him.  And there

17              won't be any talk.  I don't want him

18              to be able to get away from here.  I

19              have a jury.  I have to think of the

20              time frame, and whatnot, and their

21              time.  If y'all need additional time

22              to interview him, that's wonderful.

23              I'm going to make him available to

24              the Defense for that purpose.

25         MR. SMITH:  I would request a copy of
```



1            this file.

2       THE COURT:  You are going to get it.

3       MR. SMITH:  I also request a bench

4            subpoena for Mr. Roberson.

5       THE COURT:  Certainly.  But I would like

6            to get that in the process right now,

7            if we can.  I mean, if you are going

8            to ask for that.

9       MR. SMITH:  I do at this time.

10                     Whether we have to call

11           him as a witness, of course, will

12           certainly depend on the further

13           course of the State's case.

14      THE COURT:  Sure.  But my point is, I

15           want him down here until we finish

16           with him.

17      MR. SMITH:  I could not agree more, Your

18           Honor.

19      THE COURT:  This is on the Toy Store.

20           Here is much information on the gun.

21

22      MR. SMITH:  Let me read this into the

23           record.  This is Page 7 of that June

24           8th interview.

25                     Norris:  Okay.  How did

1    firearms get brought up in this

2    conversation to begin with?

3                    Roberson:  By --

4    firearms was brought up by me.  I

5    said, man you know they have guns out

6    there.  And that's when he explained

7    that, uh,  they got a gun.  He says,

8    my friend has a gun.

9                    Norris:  Who said that?

10                   Roberson:  Bryan did.

11                   Norris:  Bryan said --

12                   Roberson:  Bryan said.

13                   Norris:  -- his friend

14   had a gun?

15                   Roberson:  His friend

16   had a gun, yes.

17   THE COURT:  Here is something on the car

18         that they were supposedly were

19         driving.

20   MR. SMITH:  Here's discussion that if

21         they do it, and it gets hot in a

22         chase, for him to go to Wal-Mart so

23         he can be arrested in a public place.

24   THE COURT:  This is about when he talked

25         to the officer involved.  That's just

973

```
 1            where they flipped the tape.
 2     MR. BRADSHAW:   Your Honor, you mentioned
 3            earlier about a car.  Are you talking
 4            about this gray Corsica?
 5     THE COURT:   Yes.  Saying they went on
 6            another car, other than that.  Here
 7            he starts talking about Brian Smith.
 8            But he says in summary that he has no
 9            information on him, except that he's
10            just soft, low keyed, but a devious
11            individual underneath.
12                    And then, he shed
13            further lights on whether he was made
14            aware that Bryan -- who the unknown
15            friend or friends of Bryan Yoeman
16            were, that they planned on robbing
17            the Toy Store.  He said it was
18            totally preplanned.  And this is
19            Roberson talking.  That it was
20            totally preplanned, totally
21            premeditated, the whole thing.
22                    Here is another
23            interview conducted by Patrick Norris
24            of the District Attorney's Office of
25            Mr. George Carlee Roberson.  And the
```

1           date of this interview was June 28,

2           2001, at 10:00 o'clock.

3    MR. SMITH:  Your Honor, the statement

4           that I have been reading is an

5           affidavit signed by Mr. Roberson from

6           the June 8th and June 28th

7           statements; apparently sworn to on

8           July 5, 2001, notarized by Valerie

9           McGuire, who I know to be an employee

10          of the District Attorney's Office.

11    THE COURT:  Right.

12    MR. SMITH:  Which ties back those two

13          dates that I had mentioned earlier

14          and put into the record.

15    THE COURT:  And in this statement, it was

16          made known to the District Attorney

17          that Roberson stated that Yoeman told

18          Roberson his plans to rob the Toy

19          Store on May the 13th.  And he talked

20          about where he was when he was told

21          by Yoeman that.

22                This document sets out

23          how Roberson was told by Yoeman how

24          they had cased the joint, and when

25          they had cased the joint.  And that

1      while they were casing the joint,

2      they didn't see any cameras; that

3      they talked about the problems and

4      the security, the surveillance, the

5      firearms.  And, again, how they were

6      to drive to Wal-Mart if the police

7      got behind them and make a lot of

8      noise.  At least that way you would

9      have your life to look at another

10      day; that they anticipated that the

11      place would probably have a pistol or

12      a gun on the premises.  But that his

13      friend had a gun, and would not

14      identify his friend who had the gun;

15      That it was discussed that if the

16      propriety had a gun, then more than

17      likely, there would be a gun fight,

18      and there was a high possibility that

19      someone might be killed; and that if

20      that was the situation, that you're

21      going to be out to shoot first, than

22      the proprietor.  You know when you

23      see the proprietor go for it, cause

24      you have your's drawn.  You see them

25      go for her's.  That's when they

*mentioned for first time by Roberson*

1    discussed the possibility of

2    premeditated murder; that Yoeman told

3    him -- this is Roberson talking.  He

4    just kind of got quiet at that point

5    in time.  He got quiet.  And that's

6    when I spoke to him, about, well, it

7    seems like your mind is made up.  If

8    you do it, and you get killed, and

9    the police get in behind you, go to

10   Wal-Mart.  Make a specticale of

11   yourself so people would turn their

12   attention towards you.  And you get

13   out, your hands showing.  Make sure

14   that they see your hands, cause if

15   you don't, they might shoot you and

16   kill you, and take a life, you know,

17   and whose to say what happened.

18            Conrad is mentioned for

19   the first time.  Norris, the

20   Investigator Norris, with the D.A.'s

21   office says, do you -- did you --

22   know of any of his friends by name.

23   I know Conrad.  I seen Conrad in the

24   area of Green Tree Apartments, Green

25   Tree Apartments, I seen him in the

1    area. I seen them speak to one

2    another. But I'm not sure why they

3    was. I did know at the time they

4    were friends. And I also knew that

5    during that part of time that --

6    later I found out that during that

7    part of time, Bryan was selling

8    reefer.

9            Bryan, asked the

10    investigator.

11            Bryan Yoeman selling

12    reefer out of his apartment. And his

13    mother knew it. And that struck me

14    kind of strange, you know. I told

15    Rick Hauser, Detective for Enterprise

16    Police Department on May the 14th.

17    And he stated that's the date after

18    he had the conversation with Yoeman.

19    I told him I'm not sure how serious

20    this guy was about doing it. But he

21    might want to put an eye on that

22    place. You know, I didn't know how

23    serious he was. To look at Bryan, he

24    looked kind of reserved and civilized

25    and level headed. But that's been

1          proved different. I talked to Hauser
2          during the a.m.  He's my next door
3          neighbor.  A bush divides our
4          property.  And we were standing right
5          there.
6      THE COURT:  I didn't read that.  You can,
7          if you choose.
8              The next document is an
9          interview of the manager of KFC to
10         see if the attempted -- we will call
11         it the attempted robbery of KFC
12         occurred.  And so far, she's just
13         said that something did happened.
14         But it was a robbery or attempted
15         robbery of the bug man, the bug man,
16         that had been waiting to spray KFC
17         after KFC closed.
18              I guess he's a bug
19         fighter, because the guys jumped on
20         the bug man, but he knocked them off.
21         The bug man then ran into the store,
22         locked the door and called the
23         police.
24     MR. SMITH:  This document also indicates
25         there's some documentation dated --

1    which are dates prior to May 23,

2    2001, the date this offense occurred.

3    Discussions of documentation of what

4    Mr. Yoeman was fired on the 21st,

5    after being a no-show for work on the

6    19 and 20th.

7        THE COURT:    Results of the polygraphs,

8    again, saying that Hauser was

9    truthful in answering the relevant

10   questions.   This is the Polygraph

11   examination materials.

12           On 9/7/2001 at 9:17 in

13   the morning, he submitted to a

14   polygraphs voluntarily.   That

15   polygraphs questions, he was shown

16   the report that he had filed where he

17   denied having information, received

18   information earlier.   And he was

19   asked:   Did you lie on this report.

20   And he was shown another one:   Did

21   you lie on this report in July; and

22   did you lie on this report to protect

23   yourself.

24           He answered, "No," to

25   all three of those questions.

polygraph

1          They list all of the

2     possibilities of the polygraphs

3     results.  And he was determined to be

4     truthful.  The examinee's chart

5     showing no strong or inconsistent

6     unresolved responses to above listed

7     relevant questions.

8     THE COURT:  This is where an N.C.I.C. was

9          returned on George C. Roberson;

10         basically nothing, as far as criminal

11         history.

12              I'm going need you to

13         save that for me when I issue a

14         pickup order.  I can have his social

15         security number and everything.  This

16         shows his assault on a female, Durham

17         County District Court, plead guilty,

18         found guilty, sentenced to six months

19         suspended.

20              He has been arrested

21         on forgery, three counts, and what

22         would be our negotiating worthless

23         negotiable instruments.  They call it

24         uttering a check, three counts; maybe

25         the possession of a forged instrument

1 in Alabama.  He was found guilty of

2 uttering and sentenced to seven

3 years.  He was found guilty of

4 uttering, three counts, a felony

5 sentence, two to five years.  Found

6 guilty of another uttering, a felony,

7 and sentenced to two years.  Assault

8 on a female, sentenced to six months.

9 Communicating threats.  He was

10 charged with, found guilty.  I don't

11 see the sentence.  But you may find

12 it.

13 MR. SMITH:  1981.

14 THE COURT:  Offense, common law

15 robbery.  Dismissed, with leave to

16 reinstate.  Safe cracking, a felony,

17 dismissed without leave.  I guess

18 without leave to reinstate.

19   Intimidating a

20 witness.  Dismissed without leave.

21 Intimidating a witness, a felony.  No

22 true bill returned.

23   And there is a note at

24 the bottom a handwritten note,

25 appears to have been charged with two

1           counts of intimidating a witness,

2           either 2-11-98 on or 2-19-98.  It

3           looks like the 19 was turned into a

4           an 11 Durham Police Department, case

5           number 9813240.

6                     These are just potential

7           aliases.

8       THE COURT:  These are just the

9           vehicles that he has owned.  This is

10          just a national history search.  It

11          shows that there is somebody in Texas

12          named George Roberson for additional

13          Texas Criminal histories.  That's a

14          FAX cover sheet from Criminal

15          Information Center A.B.I., July 12,

16          2001; subject, George C Roberson.

17                     This is a statement of

18          the polygraphs operator stating that

19          he would not examine George Carl

20          Roberson based on certain factors.

21          One, he had been diagnosed with

22          paranoia schizophrenia.  He had a

23          bullet in his heart, according to

24          him, according to Roberson.

25      THE COURT:  That's dated 9/22/2001.

1          MR. SMITH:   Judge, that report also

2              seems to indicate that this

3              investigation is a criminal

4              investigation of George Roberson,

5              false reporting of incident.

6          THE COURT:   Information obtained from

7              the City of Durham did acknowledge

8              that Roberson had worked for them

9              approximately five years and provided

10             assistance and information on ten

11             separate occasions.

12         MR. SMITH:   As an undercover agent.

13         THE COURT:   This is a letter from

14             George, supposedly from George

15             Roberson, requesting that they pay

16             him $21,000.00 for his assistance.

17             And each time they have paid him

18             $550.00 taxable income.

19         MR. CHIRICO:   A letter to Durham.

20         THE COURT:    I'm sorry.  This is a

21             letter from City of Durham to him,

22             saying they acknowledge his request

23             for $21,000.00.  They have paid him

24             $550.00 each time.  And they are

25             stating that there is no record of

1              money being promised to you, other

2              than that which you have received.

3              Thank you for your help.

4         MR. JARRELL:  Your Honor, just to make

5              sure the record is clear on the

6              statement that Al made just a moment

7              ago about undercover agent, that was

8              a statement given by Roberson, City

9              of Durham acknowledged that Roberson

10             worked for them, provided assistance,

11             not necessarily as an undercover

12             agent.

13         THE COURT:  Okay.  And here is the letter

14             from Roberson to the Chief of Police

15             of Durham Police Department, dated

16             January 13, 2000; claiming that he

17             still owed a $21,000.00 debt, for my

18             services I rendered the city and

19             county of Durham from 11/96 to 11/99

20             for assisting the city and county of

21             Durham in reducing the crime rate

22             through the police department O.C.D.

23             And it's supposedly signed by George

24             Roberson.  Here is a receipt of

25             medical records from Riley North

1              Carolina on George Carlee Roberson,

2              the individual who provided medical

3              records was Dorothy Dix Hospital, in

4              Riley, North Carolina that.  It

5              reflects that Roberson was admitted

6              to Dix Hospital in Riley on May 19th.

7         MR. BRADSHAW:  That's the hospital?

8         THE COURT:  D-i-x.  On May 19, 1998.  And

9              that he was discharged nearly a month

10             later, June 6, 1980.  The admission

11             was for assaulting his wife.  He was

12             referred for the purpose of

13             evaluations regarding competency to

14             proceed to trial.  He was evaluated

15             by a forensic psychiatrist who

16             determined that he has a personality

17             disorder with paranoia, impulsivity,

18             mood swings, anxiety, instability,

19             emotional instability and poor

20             judgment.  The medical report

21             contains a physical diagnosis of a

22             foreign body superimposed on the

23             medial aspect of the left lung.

24        MR. CHIRICO:  That's a bullet, the

25             foreign body?

```
 1        MR. JARRELL:  Bullet.

 2        THE COURT:  And here are those documents,

 3             the medical documents, psychiatric

 4             evaluations.  I'm going to hand them

 5             all to you.  I'm not going to read

 6             all of them.  There is the rest of

 7             them.

 8                       This is just a letter

 9             from Mark Fuller, Eddie Pennington to

10             Wade County District Attorney's

11             Office, Riley, North Carolina, dated

12             July 16, 2001, asking for the medical

13             records.

14        MR. SMITH:  Referencing a gun shot wound

15             to the chest.

16        THE COURT:  And here's a medical

17             authorization that was obtained by

18             Eddie Pennington, witnessed, of

19             George C. Roberson's signature,

20             authorizing them to furnish those

21             medical records.

22                       And here's another

23             medical authorization that appears to

24             be the same thing.  That is

25             everything in file number one.
```

1          Now, we are going to

2     move onto file number 2, which says

3     in the matter of Rick Hauser.

4     THE COURT:  This is just another copy of

5     June 28, 2001, obtained by

6     Investigator Patrick Norris of the

7     Twelfth Circuit District Attorneys

8     Office of Mr. George Carlee Roberson.

9     And on the top of it, there is an

10    affidavit by George C. Roberson

11    swearing that everything contained

12    therein is the truth.

13          We have already passed

14    that around in other documents.  It

15    appears to be the same.

16          And the next document

17    is where George C. Roberson swears,

18    before Valerie McGuire of the

19    District Attorney's Office, that

20    everything he's stated in his

21    statement to Patrick Norris,

22    Investigator for the District

23    Attorney's Office, Twelfth Circuit,

24    on June the 8th, 2001 at 3:04 is the

25    truth.  And we have already looked at

1           that document in the other file.

2                     The next document is

3       just a letter asking for medical

4       records from Durham by A.B.I.

5                     A letter from Mark

6       Fuller, District Attorney Twelfth

7       Circuit, to Major Ken Halford, saying

8       I am in receipt of your letter dated

9       July 10, 2001, in reference to the

10      polygraphs report on George Roberson.

11      I received the report.  But the case

12      transmittal form that you wanted me

13      to sign and return was not enclosed,

14      signed Mark Fuller, District

15      Attorney.

16                    This is the letter from

17      A.B.I, to the District Attorney, Mark

18      Fuller,  stating attached is a copy

19      of the polygraph report conducted by

20      this division, and a case transmittal

21      form.  And that's signed Major Ken

22      Halford, dated July 10th, 2001.

23                    This is a letter from

24      Eddie Pennington, Investigator,

25      District Attorney's Office, Twelfth

1            Judicial Circuit, dated July 16th,

2       2001, asking for medical records of

3       George Carlee Roberson, a black male,

4       date of birth, November 5, 1957.

5       Duke Medical Center for a gunshot

6       wound to the chest and Dix, Dorothy

7       Dix Hospital, after being arrested

8       for assaulting his wife.  And medical

9       authorizations enclosed supposedly

10      signed by George C. Roberson,

11      witnessed by Eddie Pennington, to

12      both of these hospitals.

13                  Chain of custody

14      letter.  This is the A.B.I. statement

15      of Richard Hauser.  We have already

16      seen this.

17                  This is another copy to

18      M. E. F., I assume that's Mark

19      Fuller, in which it's written:  Do

20      not copy.  This document,

21      confidential.

22                  I can't read it.  It

23      looks like Mark Fuller's writing.  I

24      think that appeared to be the same

25      document.

1          MR. SMITH:  It is.

2          MR. BRADSHAW:  Says do not copy and place

3               that copy for me.  We have had one

4               like that.

5          MR. SMITH:  Judge, I don't remember the

6               other having in red ink, M.E.F.,

7               6/12/01 at 11:35 a.m.

8          THE COURT:  It's red.  So it may not

9               have shown up.

10                              Here's a letter

11               from Mark Fuller to Major Ken

12               Halford, asking for a polygraph

13               examination, dated June 15, 2001,

14               signed by Mark Fuller, District

15               Attorney.

16          MR. SMITH:  It looks like a photo copy.

17          THE COURT:  This is just a telephone

18               message received from Crys Fuller to

19               Mark, dated 6/25/2001 at 10:34 in the

20               morning.  Supposedly a Carl

21               Youngblood from A.B.I. was calling:

22               Please call.  Corporal Youngblood

23               attempted to call.  Also, at 11:00

24               o'clock in the the morning, left

25               message.  Bruce L. DeVane.

1              This is a just an

2        acknowledgment from Major Ken Halford

3        saying to Mark Fuller, District

4        Attorney, Twelfth Circuit of Alabama.

5        I am in receipt of your letter dated

6        July 10, 2001, in which you request

7        an investigation to a witness

8        providing an Enterprise investigator

9        information prior to a capital

10       murder.

11              This is a letter from

12       Mark Fuller and T.D. Jones, Chief,

13       Enterprise Police Department to Major

14       Ken Halford.  You can read it.

15              I will put these back

16       in the same order.

17    THE COURT:  When everybody has looked at

18       the rest of the documents, y'all can

19       say anything for the record that you

20       wish, or make any motion you wish.

21    MR. BRADHSHAW:  I just want to state on

22       the record, June 15th, 2001, the

23       District Attorney considered this man

24       a witness in this trial or in this

25       case.  June 15th.  And another

```
 1              reference to him being a witness on

 2              July 10th, 2001.

 3         THE COURT:  Okay.

 4         MR. SMITH:  Judge, I move that a copy of

 5              Defendant's Exhibit in-camera one, a

 6              copy be made in its entirety for the

 7              Defense.  You have in your hands some

 8              envelopes that I think are sealed and

 9              have cassette tapes, probably, the

10              tapes were transcribed from.  I don't

11              ask that those be opened at this

12              time, but the envelopes be copied,

13              also, with the statements.

14         THE COURT:  Any response by the State?

15         MR. SMITH:  There are notations on one

16              side of one of the files.  And we ask

17              that be copied, also.

18         MR. JARRELL:  Is this being copied for

19              the purpose of it being made a part

20              of public record?

21         THE COURT:  Not at this time.  If it goes

22              into evidence, it will.

23                             There will be a

24              copy made and sealed for the purposes

25              of this in-camera hearing.  That's
```

```
 1              the first thing.  I don't know
 2              whether it's going into evidence, any
 3              of it.  We will just have to wait and
 4              see.  But argue that point, if you
 5              choose.
 6         MR. JARRELL:   Well, as far as it going
 7              into public record --
 8         THE COURT:  It will be sealed for that
 9              purpose.  This is an in-camera
10              hearing.  At this time it will not go
11              to the jury.  This is a discovery
12              matter at this point in time.
13         MR. JARRELL:  But should it be part of
14              something going to the jury --
15         THE COURT:  We will take that up at that
16              time.  Let's not anticipate.  Until
17              we get back together on that.
18         MR. JARRELL:  Let me ask the Court for a
19              little clarification on something?
20         THE COURT:  I haven't ruled, yet.  I
21              have given y'all an indication.
22         MR. JARRELL:  I'm sorry.
23         THE COURT:  I am just giving y'all a
24              chance to state anything else at this
25              point in time.
```

*(handwritten note:)* "this is an in-camera hearing"

1          MR. JARRELL: Your Honor, it's our

2      position that this material, as far

3      as Mr. Conrad is concerned is not

4      exculpatory.  It does not include him

5      from being a group of individuals

6      that this other individual has named.

7

8                According to the

9      officer who this information came to,

10     who this information was given to him

11     after the event occurred, which means

12     it was after it had already -- all of

13     this information had been put in the

14     newspaper.  And as far as impeachment

15     -- let me get back to that point.  It

16     is clear that the evidence that was

17     found on the Mr. Roberson, that he

18     suffers from mental problems; that he

19     is a convicted felon, which makes his

20     information even more unreliable.

21     There has been nothing in the course

22     of this trial that has indicated in

23     any way that Mr. Conrad was operating

24     alone.

25                In fact, the

1    information that has been before the

2    Court already is that Mr. Yoeman and

3    Mr. Brian Smith have also been

4    indicted for this same offense.

5    There has been no witness, thus far

6    in this trial, that any

7    impeachability could be -- that could

8    be impeachable by any of this

9    information.

10                    And I know the Defense

11   Attorney had asked for a mistrial.

12   And I don't know if I remember the

13   Court ruling on that, or not.

14   THE COURT:  I haven't heard for a

15   mistrial.  I heard motion to dismiss.

16   MR. JARRELL:  Right.  And to be honest,

17   through the confusion I don't

18   remember whether you ruled on that or

19   not.

20   THE COURT:  I said I would wait and see.

21   I will rule in a minute.

22   MR. JARRELL:  But at this point, I don't

23   feel there has been anything at this

24   point that has prejudiced this trial

25   in any way.

1     MRS. STOUT: May I, Judge?

2     THE COURT: Sure.

3     MRS. STOUT: Although, I was not in here

4     at the beginning of this, from the

5     point that I walked in, everything

6     that I have looked at cummulative to

7     what --

8     THE COURT: You weren't here when the

9     worse came out.

10    MRS. STOUT: A great deal of what I have

11    seen has been cummulative. And,

12    again, I can only respond to that

13    point. From what I saw of the

14    medical records and from the

15    convictions of Mr. Roberson, he has

16    been apparently convicted at least

17    twice of crimes that involve

18    untruthfulness.

19               And if we are talking

20    about impeaching Sergeant Hauser, and

21    that that's what Mr. Smith has

22    argued, Sergeant Hauser has, at least

23    by polygraphs, shown truthfulness.

24    He has already been before the Grand

25    Jury. And they found no wrongdoing,

1      at least according to files that

2      we've just learned about.

3                      And, again, I can only

4      let Mr. Jarrell respond to the first

5      portion. Your Honor, and I'm only

6      going to respond to, from where this

7      Assistant D.A. sits and Mr. Jarrell.

8      When we found out about this, we took

9      it to the person that is in charge of

10     the District Attorney's office, and

11     --

12     THE COURT: The District Attorney?

13     MRS. STOUT: The District Attorney. And,

14     as I have said behind locked doors,

15     he made that decision.

16     THE COURT: I understand that.

17     MRS. STOUT: Yes, sir. And it has always

18     been my policy that perhaps

19     everything should be reviewed in

20     camera. But that's beyond and water

21     under the bridge. I don't know

22     what's in that first portion;

23     therefore, I let Mr. Jarrell argue

24     that.

25     THE COURT: Anything further?

1       MR. SMITH: Judge, these two prosecutors

2       have been my friends and colleagues

3       for a long time. And I believe them

4       to be ethical and good lawyers.

5       Mrs. Parker --

6       THE COURT: STOUT.

7       MR. SMITH: I'm sorry. Stout, didn't see

8       what made all of our eyes get large

9       when she was busy, otherwise when she

10       came in here. I don't believe she

11       would make that argument if she had

12       seen that.

13       The documents -- of

14       course, the motion on the table is

15       for copies for the Defense of those

16       documents. My second motion that I

17       renew is for a Motion to Dismiss

18       because of what we've seen here and

19       the documents and the notations that

20       have been written on the documents

21       scream for themselves. I don't need

22       to talk about them anymore. I'm just

23       very disappointed.

24       THE COURT: Sure. I have heard enough.

25       MR. SMITH: There is another motion. But

*[handwritten: motion to dismiss]*

1        I would like to wait for you to rule

2        on that.

3    THE COURT:  Okay.  First of all, this

4        Court finds there is absolutely

5        positively no question.  The

6        documents, in total, when considered

7        in total are both exculpatory in

8        nature and also have of value for

9        impeachment purposes.

10               The second thing,

11       discovery should have been provided

12       by the District Attorney's Office to

13       the defense, all three Defendants of

14       the material that the Court has just

15       reviewed in camera.  And I want the

16       record to reflect that all of this

17       has been done outside of the hearing

18       and presence of the jury.

19               From what I have seen

20       you, Defense lawyers, and State's

21       Assistant D.A.'s, as we were coming

22       down the hall, one of you, Mr. Smith

23       said to Mrs. Stout, right outside of

24       this office, that she had represented

25       to him that she had an open-file

1    policy in this case.

2                    And that has not been

3    accomplished.  And this is a part of

4    this case.  It should have been a

5    part of this case, even though Bruce

6    DeVane testified that he kept it

7    apart from this file.

8                    So, even though Mrs.

9    Stout allowed, I assume, the Defense

10   lawyers to look at the file --

11   MR. SMITH:  She made them available

12   yesterday.  And to her credit,

13   apparently this was even kept from

14   her.

15   THE COURT:  And she didn't know of this

16   until just recently.  She discussed

17   with her boss certain things, as did

18   other people.  And he made the final

19   decision not to turn it over.

20                    But this Court finds

21   that the materials in total are both

22   exculpatory in nature and the

23   evidence can be used for impeachment

24   purposes.

25                    The second part of this

Ct's ruling-
evid is
exculpat
; impeach

```
 1              Court's finding is that I can see why

 2         the prosecutor would think that it's

 3         not discoverable.  Maybe that's why

 4         Judges are encouraged to have an

 5         open-file policy.  And I assure

 6         y'all, you can tell folks down at the

 7         D.A.'s office in the future, and I

 8         hope I never have another capital

 9         matter.  But I will issue an Order

10         that it be open file policy from now

11         on as a result of this.  So there

12         won't be any misinterpretation as to

13         what is producible or not.  People

14         can always consider something in

15         their own minds as not being

16         exculpatory.

17                    And sometimes, like

18         with the Robert Earl Council case, on

19         Sunday, prior to that trial

20         beginning, we met.  And I reviewed

21         the entire file.

22    MR. SMITH:  The police file, may it

23         please the Court, because I was

24         involved in that case.

25    THE COURT:  I know it.  And I found
```

1    forty-something different places of

2    exculpatory material that had not

3    been turned over, merely because of

4    an interpretation.

5                    So things might appear

6    not to be exculpatory early on.  As

7    things flow, the trial flows, they

8    may become apparently exculpatory.

9                    This Court finds that

10   that's the case here.  This Court

11   finds no prosecutorial misconduct.  I

12   want the record to reflect that.

13                   The Motion to Dismiss

14   is denied.  The documents are ordered

15   produced, a copy of all of these

16   documents are ordered produced to the

17   Defense Attorneys in all three cases.

18   And they are not to be disseminated.

19   There will be an attached order that

20   says that they will be in no way

21   disseminated by any lawyers or copies

22   allowed to be made, except by Court

23   Order.

24   MRS. STOUT:  Judge, May I put one more

25   thing on the record?

1      THE COURT:  Sure.  It's always been my

2            policy, even though that's not

3            necessarily the policy of the

4            District Attorney's Office.  But I

5            think Mr. Smith will admit it's

6            always been my policy to have an

7            open-file policy with him.

8      THE COURT:  When you know about it.

9      MRS. STOUT:  He has been to the office

10           and allowed to look at my file.  Is

11           that not correct, Mr. Smith?

12     THE COURT:  But you represented to him

13           that that was everything, thinking

14           that it was everything.

15     MRS. STOUT:  Until Tuesday, a week, it

16           was.

17     THE COURT:  It was from your view.  But

18           it wasn't from the Office of the

19           District Attorney --

20     MRS. STOUT:  Yes.  But I --

21     THE COURT:  -- who had this information

22           as far back as 2001.

23     MRS. STOUT:  And I understand that, Your

24           Honor.  But as lead Prosecutor of

25           this and sitting here and only

1    looking at the record, I must

2    apologize to the Court.

3    THE COURT:  Lets get on with this.

4    Copies should be made.  Connie,

5    you've got plenty of time to make it.

6

7    Y'all need to assume

8    on.  But we have probably more people

9    who are coming.

10    MR. SMITH:  Judge, I would next move

11    that the State be prohibited from

12    calling Bryan Yoeman because of

13    failure to disclose the impeachable

14    and exculpatory material.

15    THE COURT:  Motion is denied.  The

16    Defense now has available to it

17    everything that has been represented

18    that the District Attorney has.

19    If it turns out that

20    that's not the case and that there is

21    something extra, some folks are going

22    to have some mighty serious problems

23    down there.

24    I further request that

25    the Court order the Police Department

1        to produce for its in-camera

2        inspection, all computerized or hard

3        copy documents relating to this

4        entire investigation, the homicide of

5        Jelaine Dennis.

6    THE COURT:  Are you saying that they

7        might have something else that hasn't

8        been provided?  I just simply order

9        the District Attorney, the umbrella

10       is over y'all.  And it goes over the

11       police.  And I order the District

12       Attorney to make known anything like

13       that that has just been requested

14       available, which should have been,

15       under my Order that issued, I don't

16       know how many, many, many, months ago

17       that it be produced in the first

18       place.

19    MRS. STOUT:  May I add to that, Your

20       Honor, sometimes back, Judge Barr

21       issued an Order that we write all the

22       departments, in his case, Brian

23       Smith.  The District Attorney did

24       that.  I cannot sit here before this

25       Court and promise you --

1           THE COURT:  The D.A.'s office is held

2               responsible.

3           MRS. STOUT:  I understand that.  And,

4               again -- I understand that.  So we

5               will reiterate to the Police

6               Department that they need to make

7               sure that their files have produced

8               anything to this Defendant and the

9               other Defendants.

10          MR. SMITH:  Again, I ask for a bench

11              subpoena for Mr. Roberson.

12          THE COURT:  Let's go to lunch.  We will

13              do that.  I order that nobody divulge

14              that is going to be issued.  If he

15              hides, we are going to wait.  I don't

16              care if it's Christmas for him to be

17              here with that jury, if he is needed.

18          MRS. STOUT:  Your Honor, let me go on the

19              record on this.  Bruce DeVane told me

20              that he had gotten a call from

21              Colorado that this guy was out there,

22              because he is wanting to be used as a

23              C.I. out there with their people.  So

24              I don't even think he is in this

25              area.

1          And Valerie McGuire

2     informed me that this guy had called

3     and left his new address.  I didn't

4     know who he was.  So I had no idea

5     who he was.

6     MR. SMITH:  If he's not available, I

7     again ask that Mr. Yoeman be

8     prohibited from testifying for the

9     failure to give us information that

10    would have prepared us to cross

11    examine.

12    THE COURT:  I won't rule on that until we

13    see his availability.  At 2:00

14    o'clock, we are going to start up.

15              I order that this not

16    leave your hands until it gets back

17    to mine.

18    JUDICIAL ASSISTANT:  Okay.

19    THE COURT:  Except for copying purposes.

20    And I want you to be alone in that

21    room when you copy it.

22         (A lunch recess was taken).

23    THE COURT:  This court will come back to

24    order.  You may be seated.

25              Ladies and gentlemen,

```
 1              I'm sorry for the delay that you had

 2         to go through.  As I told you

 3         earlier, we were on track, and we

 4         were way ahead of things.  But we

 5         have had several hours, three hours

 6         or so slow up.  I knew better than to

 7         say that to you.  But we are now

 8         ready to go forward.

 9                   Is the State ready to

10         continue?

11     MRS. STOUT:  Yes, Your Honor.

12     THE COURT:  Is the Defense ready to

13         continue?

14     MR. BRADSHAW:   The Defense is ready.

15     THE COURT:  You may.

16     MRS. STOUT:  The State calls Phyllis

17         Rollan.

18     MR. SMITH:  Your Honor, can we get one

19         short side bar while she's coming?

20     THE COURT:  Yes, sir.

21     MR. SMITH:  I assume that Mrs. Rollan is

22         going to testify about  DNA as

23         relates to Mr. Conrad and State's

24         Exhibit No. 26(a), the blood vial.

25         Under Kyles versus State, that Your
```

1        Honor is so familiar, I object to the

2        chain of custody not shown.

3    THE COURT:  Missing link?

4    MR. SMITH:  Yes, Your Honor.

5    THE COURT:  Argument by the State?

6    MRS. STOUT:    Yes, sir.  We object, and

7        if you would give me a moment I will

8        put case -- I have done research,

9        one, with DNA Expert Phyllis Rollan,

10        I believe we will complete the chain

11        with our lab tech.  She was able to

12        identify that she pulled the blood

13        from Mr. Conrad, that she went and

14        put that blood in an area where it

15        was secure.  It was placed in a

16        secured area in the hospital where

17        the lab tech was.  No one came and

18        went in that area.  Although a person

19        emptied the trash, a person was

20        always in that area to make sure that

21        it was kept secure.  It was placed in

22        refrigerator there.

23            There was a lady that

24        was a med tech that went to pull that

25        blood pursuant to a search warrant.

1    It was then given to those officers

2    that took that blood, as they

3    testified, to the Department of

4    Forensic Sciences.

5                    Case law, says

6    specifically and, although I think

7    that there are some strong language

8    in there, they don't particularly

9    like it.  They say that even a

10   hospital, I believe, they noted that

11   particular case dealt with blood

12   alcohol in an accident; but it said

13   in that case, that is sufficient as

14   long as you can show that there were

15   safeguards there, and that safeguards

16   were attended to, and that the blood

17   was not tainted in any way, in

18   particular, it later talked about

19   forms of evidence such as blood,

20   semen, and that kind of thing.

21                    The State has

22   definitely met its chain.  It may be

23   a weak link, that goes to the

24   credibility of the evidence and does

25   not go to admissibility.

```
 1          THE COURT:  Further argument?  Now, how
 2          did you couch that motion?
 3      MR. SMITH:  It was a motion as to the
 4          hospital link, anticipating Mrs.
 5          Rollan may testify about the analysis
 6          of Mr. Conrad.  We object to any of
 7          that being done.  So it's an
 8          objection.
 9      THE COURT:  Objection.  Okay.  First of
10          all, the Court finds there is a weak
11          link, not a missing link.  The Court
12          also finds that certain safeguards
13          have been testified to.  The Court is
14          satisfied that the evidence is
15          admissible when offered and will
16          allow the testimony of this  DNA
17          expert, I assume she is a DNA expert.
18      MRS. STOUT:  Yes, Your Honor.
19      THE COURT:  Over objection by the
20          Defense.
21      MR. SMITH:  We will not make further
22          objection if Your Honor will give us
23          a standing objection.
24      THE COURT:  Sure.  You have a standing
25          objection.
```

1          MR. SMITH:    Thank you, sir.

2          THE COURT:    If you will, please raise

3              your right hand and place your left

4              hand on the Bible.

5                      PHYLLIS ROLLAN

6          Whereupon, this witness, after first

7    being duly sworn to tell the truth, the whole

8    truth, and nothing but the truth, testified as

9    follows, to-wit:

10                    DIRECT EXAMINATION

11   BY MRS. STOUT:

12         THE COURT:  If you will, if you scoot up.

13              I have had you testify before?  You

14              do a very fine job.  And you are not

15              soft spoken, but if you will speak

16              into that microphone, I would

17              appreciate it.

18         Q    Would tell the ladies and gentlemen

19   of the jury who you are?

20         A    My name is Phyllis T. Rollan.

21         Q    And Mrs. Rollan, where are you

22   employed?

23         A    I'm employed by the Alabama

24   Department of Forensic Sciences in Montgomery,

25   Alabama.

1        Q       And what is your job title or your

2    professional title with the Department of

3    Forensic Sciences?

4        A       I'm employed as a forensic

5    scientist in the area of forensic biology.

6        Q       And if you could, in laymen's

7    terms, tell us what that means?

8        A       In the forensic biology section of

9    the laboratory, we examine items of evidence

10   for the presence of blood and other biological

11   fluids, usually seen in saliva.  These are in

12   stain form most of time on items of evidence,

13   such as clothing, bricks, weapons, all kinds of

14   different things.

15           We first have to identify the stain

16   as a biological fluid.  And then we attempt to

17   characterize the stain into groups using DNA

18   typing.

19           Once we get the result of the DNA

20   typing from the evidence, we compare that

21   result to the DNA typing from tubes of blood or

22   oral standards that we get from individuals who

23   could have been contributors to that stain,

24   that are involved in the case that are also

25   submitted to us.

1    Now, if this person or that sample

2  has the same DNA type as that evidence then

3  that person could have been the source of

4  biological stain.

5    If those DNA types are different,

6  then that person could not have been the source

7  of that biological stain.

8    Q    What kind of education and training

9  is required to become a forensic scientist

10  specializing in DNA analysis?

11    A    I have a Bachelor of Science Degree

12  in laboratory technology from Auburn

13  University, Auburn, Alabama.

14    Q    I have also attended graduate level

15  courses in the area of forensic serology with

16  the F.B.I Academy in Quantico, Virginia.  I

17  have also attended DNA typing, preliminary

18  chain reaction classes with the FBI academy in

19  Quantico, Virginia.  And I have also attended

20  graduate level courses with the University of

21  Alabama at Birmingham in the area of molecular

22  biology and population genetics.

23    Q    How long have you been with the

24  Department of Forensic Sciences in Alabama?

25    A    Over 20 years.

1    Q    And have you spent you're entire

2  career in this field with the Department of

3  Forensic Sciences in Alabama?

4    A    Yes.  Prior to being employed by

5  the Alabama Department of Forensic Sciences, I

6  worked for a short time after my graduation

7  with the University of Alabama at Birmingham in

8  the area of research.

9    Q    Over the course of 20 years with

10  the Department of Forensic Sciences, have you

11  testified in Circuit Courts throughout the

12  State of Alabama as to DNA analysis findings?

13    A    Yes, I have.

14    Q    And in those Circuit Courts

15  throughout the State of Alabama, have you been

16  declared an expert witness as to DNA analyses

17  and your findings as to those DNA analyses?

18    A    Yes.  In every testimony I have.

19  MRS. STOUT:  Your Honor, at this time we

20         would ask that Mrs. Rollan be

21         declared an expert witness.

22  THE COURT:  Objection?

23  MR. SMITH:  Certainly none, Your Honor,

24         except I think there has only

25         been one prong of the Perry

1              Standard met at this point.  But

2              Phyllis has taught me what

3              little I know about the DNA

4              subject.  No objection.

5         THE COURT:  No objection.  This court

6              declares this witness to be an

7              expert and will allow this

8              witness to express her opinions

9              based upon  her field of

10             expertise.

11        Q      Now, in this particular case, did

12   you receive some blood evidence from Detective

13   Hauser with the Enterprise Police Department?

14   And I believe that was received in on May the

15   29th?

16        A      Yes.  Of 2001.

17        Q      Of 2001.  And how is that received

18   at the Department of Forensic Sciences?

19        A      When evidence is brought into the

20   laboratory, it's given a unique identifier,

21   meaning a unique case number.  And each item is

22   given an item number.  When it's received into

23   the laboratory, a business record is formed

24   that shows who brought it into the laboratory,

25   what date, and who signed for it in the lab,

1    and actually a description of that evidence, a

2    short description of the evidence.

3        Q    I'm going to ask you to look at

4    what we have  marked as State's Exhibit No.

5    28(a), and ask if there is any way that you can

6    identify State's Exhibit No. 28(a)?

7        A    Yes, I can.  It bears our case

8    number, the item number, and also my initials

9    on the outer package, as well as the inner

10   packaging.

11       Q    And from whom did you receive or

12   the receptionist at the Department of Forensic

13   Sciences received State's Exhibit No. 28(a)?

14       A    Detective Rick Hauser of the

15   Enterprise Police Department delivered that

16   item to our laboratory.

17       Q    When this item was brought to you

18   by Detective Hauser, what did you do with this

19   item?

20       A    The item was taken into the

21   laboratory and put into a locked facility,

22   until such time we were able to work on and it.

23       Q    When you say that you worked on

24   it, what did you do when you worked on it?

25       A    The first thing that's done to a

1    sample like this -- this is a tube of blood

2    that's identified to be from an individual.

3    This tube of blood can be maintained in a

4    refrigerator.  However, it's much easier to

5    work with if we make it into a dried stain.

6              So that is the first thing that

7    happens to this type of evidence.  The tube of

8    blood is described and the package is unsealed

9    to retrieve the tube of blood.  And then a

10   stained card, it's like a flip piece of paper

11   with a cover, kind of a folded piece of paper.

12   And it has a specialized piece of paper in the

13   center and an area to label.

14             And some of the blood is removed

15   from that tube of blood and placed onto that

16   special paper, allowed to air dry.  And then

17   that way, it can be stored in the laboratory,

18   locked in a locked facility, of course, but not

19   have to be refrigerated.  And it is in much

20   better shape when we work on it than a tube of

21   blood that sets out for months or years,

22   whenever we can get to it.  So that's the first

23   thing that's done to this particular type of

24   evidence.

25        Q    I'm going to ask you to look at

```
 1    what we have marked as State's Exhibit 28(b),

 2    and I ask if you can identify what they have

 3    marked as State's Exhibit

 4    No. 28(b)?

 5         A    Yes, I can.  It bears my case

 6    number, my item numbers, my initials, and also

 7    my seal.  And this is the actual sealed Manila

 8    envelope that has the blood-stained card inside

 9    the sealed Manila envelope, that was made from

10    this tube of blood, which is identified to be

11    from Robert Conrad.

12         Q    Now, looking at State's Exhibit No.

13    28(b), is it in the same condition as it was

14    when you sealed it, after you finished working

15    with it at the lab?

16         A    Yes, it is.  It's still in a sealed

17    condition.

18         Q    And how do you know that it has not

19    been opened or in any way --

20         A    The sealed tape does not appear to

21    be broken in any way.  My initials are over the

22    seal.  And, also, my initials are over actually

23    both ends, with two separate seals, where it

24    was opened two separate times in the

25    laboratory.  Both of these seals are intact.
```

1    Q    Now, I'm going to ask you, and if

2    you would like to use gloves, you may.  If you

3    would remove what is inside this tube, this red

4    cardboard tube, and ask you to look at that.

5    And I'm referring you to State's Exhibit

6    No. 28(a).

7    Q    Can you identify what was inside

8    the red carton or tube inside the package

9    marked State's Exhibit

10   No. 28(a)?

11   A    Yes.  It contains a purple-topped

12   tube that bears our case number on the tube

13   itself that we placed there.  And, also, bears

14   a label that says, Conrad, Robert,  with other

15   items printed on it.  But it does state a name.

16   Q    Now, if you are receiving a tube

17   from a hospital facility, is there any

18   particular color-coded tube that you would

19   request a police officer to get from the

20   hospital facility?

21   A    We like to get purple-topped tubes,

22   because they have an item called an

23   anti-coagulate that keeps the blood from

24   clotting up.  Because if you have a clotted

25   sample, all of the cells that were unique for

1    DNA typing go into this clot.  And it makes it

2    harder for us to work with it.  So it has an

3    anti-coagulate that prevents that clotting from

4    occurring.  The other thing that it has in it

5    is a preservative that helps the blood stay

6    fresh.

7         Q    And what is the color of the tube

8    that you received from Detective Hauser?

9         A    It's purple-topped.

10         Q    Now, how did you make the slide

11    that you have identified in State's Exhibit No.

12    28(b)?  Where did you obtain the blood sample

13    to make those stains?

14         A    The blood was removed from this

15    particular tube of blood that was identified to

16    be from Robert Conrad and placed onto the paper

17    of the blood-stained card, allowed to air dry

18    and packaged in this sealed Manila envelope

19    that you see right here, which is State's

20    Exhibit No. 28(b).

21         Q    Now, are there different ways of

22    typing DNA, different methods that you use?

23         A    There are two primary methods.

24    They method that we use in our laboratory is

25    called PCR or preliminary chain reaction.

1        Q        Which method did you use in --

2    strike that, please.  At some point did you

3    receive other materials from Detective Hauser

4    regarding this particular Defendant?

5        A        Yes.

6        Q        And I'm going to ask you to look

7    at what's been marked as State's Exhibit No.

8    25, and ask if you can identify what's been

9    marked as State's Exhibit

10    No. 25?

11        A        Yes, I can.  It bears our case

12    number, our item number, and my initials, and,

13    also, my initials on the seal.  This is a shirt

14    that was identified to be from a dumpster.

15        Q        Now, I'm going to ask you to remove

16    it.  It's already been opened in court.  If you

17    would remove that?  And can you identify that?

18        A        Yes.  The item itself bears my case

19    number, item number, and, also, my initials.

20        Q        When did you received that shirt

21    from Detective Hauser?  On what date?

22        A        On March 29th 2002.

23        Q        Were you asked to perform or

24    requested to perform certain forensic testing

25    on that shirt?

1        A      Yes.   We were asked to identify any

2    biological stains, such as blood stains that

3    were possibly present on the shirt.

4        Q      And what testing did you perform on

5    the shirt?

6        A      The shirt was examined for the

7    presence of blood or blood stains.   We found

8    using a presumptive testing reagent there were

9    stains that gave an indication of blood.

10                And then those two stained areas

11    were cut out of the garment, placed in a sealed

12    Manilla envelope, and taken to the DNA units,

13    where I performed DNA analysis on the

14    two-stained areas.

15        Q      Now, again, Ms. Rollan, for the

16    benefit of the jury, what is DNA?

17        A      DNA stands for deoxyribonucleic

18    acid.  And it's actually what makes you unique

19    from everyone else.  You get half of your DNA

20    from your mother and half of your DNA from your

21    father.  And it is present in every cell of

22    your body, except for the red blood cells.  So

23    all of these cells contain DNA throughout your

24    body, such as cells that are in your blood.

25    Cells that are a part of your skin tissue,

1    cells that are in your bones and organs.   And

2    all of those cells contain DNA in your body

3    that is the same type.

4                  So if I were to take a hair

5    root, or a tube of blood, or a swab of the

6    inside of someone's mouth, and it be from the

7    same person, then that DNA type would be the

8    same throughout that person's body.

9                  So I would get the same DNA type

10   from all of those samples.   We can take DNA out

11   of those cells, and are able to DNA type them

12   in the laboratory for comparison purposes.

13       Q       Is it possible for two people to

14   have the same DNA?

15       A       Yes.  Actually, identical twins

16   with the DNA that we know about right now have

17   identical DNA, because they share the same egg

18   and the same sperm that created them.   So that

19   is just split apart between the two

20   individuals.   And their DNA is the same.   Other

21   than that, everyone's DNA is different.

22       Q       Now, you said you used what method

23   in your laboratory to do it DNA testing on this

24   shirt when you received it?

25       A       We used a method called preliminary

1   change reaction or PCR for short.

2        Q     Can you explain what that is?  And

3   use laymen's terms, if you can?

4        A      Yes.   There are basically three

5   steps to perform a DNA testing on a sample.

6   The PCR part of it is the second step.

7                 The first step is called

8   extraction.  And what that is, is just taking

9   the DNA Out of whatever it's on.  If it's in a

10  blood stain that's on a shirt, such as this one

11  or on a cotton swab from a stain that was

12  removed from a crime scene or something to that

13  effect, then what we have to do, once we

14  identify that it is a biological fluid, we have

15  to remove that DNA or those cells from that

16  fabric, material, swab or whatever it's on.

17                 So we use chemicals in order to do

18  that.  And the DNA, the cells, where the DNA is

19  housed pops open.  The DNA floats out into this

20  chemical liquid.

21                 And then, what we do is clean that

22  DNA up so that once you are finished with the

23  extraction step of the procedure, you have

24  clean, pure DNA.

25                 And if you have had soil mixed with

1    that, paint or anything else, that is on a

2    forensic sample, such as from a shirt, all of

3    that has been taken that way from the chemical.

4    And you have pure, clean DNA.

5              The second step that you go to,

6    other than -- well, this is actually part of

7    extraction.  I want to find out whether or not

8    I have any DNA in that tube from that stain,

9    and whether that DNA is human or not.

10             So that is basically the next step

11   that I do, is determine about how much DNA is

12   in that sample, and if it's human.  If it's

13   human, then what I'll do, is continue on, and

14   go to that second step that involves PCR.  And

15   this is a step by which we can target different

16   areas of DNA.  And we actually run eight areas

17   of DNA, plus, the area of DNA that tells us

18   whether or not that sample came from a male or

19   a female.

20             We target those different areas of

21   DNA.  And we effectively Xerox them in several

22   modes, using the building blocks of DNA, we

23   Xerox that DNA.

24             THE COURT:  Would you explain what that

25             means?

1        THE WITNESS:  Okay.  Sure.

2        A       The DNA is made up of basically

3    four different substances.  And they are all

4    A, T, C, and G, for short.  Okay?

5                 And the A's and the T's pair

6    together.  And the C's and the G's pair

7    together.  And your DNA molecule actually looks

8    like a twisted ladder.  And the A's and the T's

9    and the C's and the G's are like the ladder

10   rungs.  Okay?

11                Now, in the PCR method, what

12   happens, is we apply heat to the DNA that's in

13   a tube.  And we tell that DNA where we want to

14   target by adding what is called a primer.  It

15   attaches to the DNA molecule at certain areas

16   where it matches the C's, T's, G's and A's

17   Okay?

18                So that primer will attach to that

19   area of DNA molecule.  And we apply heat, and

20   what happens with the heat is that ladder comes

21   undone.  It's like unzipping a zipper.  Those

22   rungs will split so you have these open A's,

23   T's, C's and G's.  And we use the preliminary

24   enzymes, thus, the term preliminary chain

25   reaction.

1       The preliminary enzymes, along with

2   the building blocks that we have put that into

3   that tube A's, T's, C's and G's, by themselves.

4   And that preliminary will go through that DNA

5   molecule. Say, we've got four prongs here that

6   are open. Those A's, T's, C's and G's will

7   float through. And that preliminary will help

8   them attach to that DNA molecule.

9       And so what we do is we create a

10  new DNA molecule, so we have double what we

11  started off with.

12      And then we will heat it up again.

13  They will unzip. That A's, T's and C's and G's

14  will attach again. And we've married another

15  new molecule.

16      So every time that we unzip the

17  DNA, add those A's, T's C's and G's and zip it

18  back by a cooling it down, we have created or

19  xeroxed an area of DNA, you've created a new

20  DNA molecule.

21      And this could be important when

22  you've got a small amount of sample, you are

23  actually making or Xeroxing enough DNA in order

24  to be able to DNA type it.

25      We PCR all of our samples so that

1    we have all of this DNA in the tube for those

2    eight different areas of DNA that we have

3    looked at.

4                And then all we need is a way to

5    look at the DNA, when we are finished in order

6    to actually DNA type it.  So what we do is put

7    out a sample on a thin slab of jello.  And this

8    step is called visualization.  The sample is

9    put into a place that's cut out in the top of

10   the jello, and we actually --

11       Q     When you say "jello", you are not

12   talking about "Jello"?

13       A     No.  I'm talking about a very

14   specific jello.

15       Q     Right.

16       A     And the reason I say "jello," is

17   because if you were to take it off the slab

18   plate that we put it on, it acts like jello.

19   But it's poured out very thinly in between two

20   glass plates.  And the reason why we use a

21   substance like this, is we attached, kind of

22   like attaching it to a battery.

23                And we run voltage through that

24   jello-type material.  And samples can run

25   through that jell.  As it runs through that

1    jell, it separates out by size.  Because when

2    you are running through the jell, then the

3    smaller areas of DNA are able to run a lot

4    faster than the larger areas of DNA.

5                It's almost like walking or running

6    through a room that's only got a few amount of

7    people, versus a whole crowd of people.  It's

8    harder to get through a large crowd of people

9    versus only a few people that are present in

10   the room.

11               So the smaller fragments can run

12   very quickly.  And what we are doing, is we're

13   separating out those different areas of DNA.

14   Now, if you remember, I told you that half of

15   your DNA comes from your mother.  And half of

16   it comes from your father.  These can be the

17   same types, or they can be different types.

18   Okay?

19               So on each area of DNA that we are

20   looking at, we expect to see one or two bands.

21   And a band is just a line in the jell that is

22   our DNA fragment that has moved through that

23   lane or moved through that particular area that

24   the sample moved through in a jell.

25               So we look at a particular area of

1    DNA.  There can be two bands, one from the

2    mother, one from the father of that individual.

3    Or there can be one band when the mother and

4    father gave the same DNA type to that

5    individual.

6           And we are able to see these bands

7    on the jell through fluorescence.  We run a

8    razor over the jell.  And it actually brings an

9    image that comes up on the computer.  And we

10   are able to look at those banding patterns and

11   be able to read that DNA type.

12          Then once we get that DNA type from

13   the evidence and record it, then we get the DNA

14   type from any of the samples from tubes of

15   blood or oral swabs that are what we call known

16   samples, because we know where they came from.

17   They were identified as being from an

18   individual.

19          We look at that DNA type running

20   that sample with the same way that we ran the

21   evidence sample, except we are running at

22   different times.  And the evidence samples are

23   always run twice so that we can make sure that

24   we are getting a good reading on these same

25   results twice.

1              Those DNA types are compared to see

2   if that person could be the source of that

3   stain or not.

4        Q     And you say that you always run

5   those twice?

6        A     I run the evidence samples twice,

7   yes.

8        Q     Now, are these PCR forms, the DNA

9   typing used for other fields besides criminal

10  investigations or criminal cases such as those

11  that you are you here for today?

12       A     Yes.  The PCR method of -- it's

13  actually called amplification, is used in

14  veterinary medicine, in agriculture, how to

15  grow better vegetables in vegetable medicine,

16  in diagnostic diseases in animals, as well as

17  humans.  It's used in medical schools.  It's

18  used in HIV testing for AIDS.  And it's used in

19  public health.  It's also used in research all

20  across the world  So this is a method that has

21  been utilized for a lot of different purposes,

22  as well as forensics.

23       Q     And are there certain controls that

24  you must go by when you are using this

25  particular method of DNA testing?

1       A       Yes.  A control is like a red flag.

2    When you perform a procedure often, you kind of

3    know when something is going wrong.  But it

4    helps if you have a red flag that will tell you

5    something is going wrong.

6              And it's really important for us to

7    employ these when we're running forensic

8    samples.  So what we do, is we what is call a

9    reagent blank that is run every run.  And that

10   is to insure that all of the chemicals that go

11   through the entire procedure are not

12   contaminated.  All it is a tube that has every

13   single chemical, and we do to that reagent

14   blank what we do to every one of the samples in

15   that batch of run, and look at it in the end.

16   And it should be blank.  If it's not blank,

17   then that's an indication there is some kind of

18   contamination and that entire run cannot be

19   used.

20             The other thing that we use is an

21   amplification blank.  That is all of the

22   chemicals that are used in the PCR process, the

23   amplification process, in that second step when

24   are xeroxing DNA.  This should also be blank.

25   And it's when it's put on that jell in the

1  final end, it should not have any DNA in it at

2  all, either.  If it does then you've got a

3  problem.  You've got some kind of

4  contamination.

5           It is to insure that we are not

6  growing DNA from the air or something like

7  that.  It shows us that we are in a controlled

8  environment, and all of our chemicals are okay

9  and not contaminated.  And there's not DNA

10 lying around somewhere that we are growing or

11 xeroxing.  So that control is used every time.

12           And also a positive control is

13 used.  This is a sample that we know the DNA

14 type of.  It's run with every single batch that

15 we run.  It's to insure that the typing results

16 are working properly.

17           So we don't get a type on that

18 positive control, again, that entire batch is

19 not used, because that positive control should

20 work.  And if it works properly, that's also an

21 indication that your samples are working

22 properly.

23      Q    Now, what kind of results can you

24 get from a PCR testing?  How are they termed?

25 Conclusive?

1    A    Okay.  You can get no result, with

2    a degraded sample or a sample where there may

3    not be enough DNA.  Even once you amplify it,

4    you may not have enough DNA to use.  Or it

5    maybe inhibited by some factor that we just

6    could not purify it enough.

7              So what will happen there, is you

8    will get no results.  That means you won't get

9    any bands or you may get some bands of some

10   areas of DNA, and not have any bands in other

11   areas of DNA.

12             Usually, the larger areas of DNA

13   will degrade.  And we won't get a result there

14   before the smaller areas of DNA.  They hang on

15   a little bit longer.  So you can get a result

16   like that.

17             You can get an inconclusive result,

18   which is a result whereby, like I said, we ran

19   the evidence samples twice.  We might get an

20   inconclusive result in some of those areas of

21   DNA if we were not able to reproduce that type,

22   if we did not feel comfortable with the result

23   that we got on both of those samples.

24             And then you can get an inclusion;

25   which means that that person could be the

1    source of the DNA evidence.  Or you can get an

2    exclusion; that means that person could not be

3    the source of the that DNA of that evidence.

4         Q      Now, is there anything that can

5    make DNA in a sample change from one type to

6    another?

7         A      No.  Usually what you get is no

8    result.  We don't find that DNA types change

9    with age or with anything else.  The only thing

10   where we have seen a DNA change is, if someone

11   gets blood from somebody else, and then what we

12   see is actually a mixture of their own blood

13   with the blood that they have received from the

14   hospital.

15            So that would be the only time that

16   I have seen a situation or where I know of a

17   situation in the literature, where the DNA

18   results change.  Otherwise, what happens, is

19   it's degraded.  It does not change you get

20   nothing.  You get no result at all.

21        Q      Now, again, explain what degraded

22   means?  What can cause the samples to be

23   degraded?

24        A      Since we are involved in forensic

25   samples, they may break down because they're

1  out in the environment, or they are on

2  artificial clothing.  They are on a car sitting

3  out in the hot sun in August in Alabama, things

4  like that.

5          We have found, though, that DNA is

6  actually protected since it is in the core of

7  the cell.

8          A cell kind of looks like fried

9  egg.  And DNA is present in the yolk.  So there

10  are two barriers.  There's the outside barrier

11  and the inside barrier that keeps the DNA from

12  breaking down a lot less than what we used to

13  have with blood samples where we were trying

14  samples that were on the outside of cells, or

15  sample that were floating on liquid.  So things

16  like that can cause a DNA, what I call DNA

17  degrade.

18          There's also inner-fluids and

19  fingerprint powder, and things like that can be

20  placed on our samples.  Those don't tends to

21  give us a problem.  But there are times that we

22  do have some deprivation in our samples.  And

23  you can see it in your results.

24      Q    Now, your laboratories have to meet

25  certain standards, too?  Is that correct?

1    A    Yes.   The DNA Advisory Board issued

2    F.B.I. Standards, in October of 1998, which

3    were guidelines on the certain points that they

4    feel are important in performing DNA analysis

5    in forensic laboratories, as well as the

6    qualifications of the people that are

7    performing those testings.  And those are

8    federally mandated, which means that the

9    Federal Government says that you have to follow

10   these guidelines.  And we have been following

11   those guidelines way before 1998.

12       Q    And that would have so do with

13   proficiency testing and that kind of quality

14   assurance in the lab?  Is that correct?

15       A    Yes.   There have been quality

16   assurance with the procedures themselves.  And

17   there's also quality assurance with the

18   scientist that perform the analyses of the

19   samples.

20       Q    Now, the articles that you received

21   from Detective Hauser, the blood, which is

22   State's Exhibit No. 28(a), and the shirt, which

23   is State's Exhibit No. 25, did you run some

24   samples of stains or remove some lifts to run

25   those on the shirt, which is State's Exhibit

1    No. 25?

2        A    Yes.  There were two stained areas,

3    both on the front.  One has been marked 11(a).

4    And the second is on the inside surface.  And

5    it's marked 11(b), just arbitrarily; 11 is the

6    item number of this shirt itself.  So these are

7    stain (a) and stain (b).  I ran a DNA typing on

8    both of these stained areas.

9        Q    And how did you do that?  How did

10   you run these DNA typings on those stained

11   areas?

12       A    I performed the steps that I told

13   you about, cutting the stains out, putting them

14   in sealed Manila envelopes, and taking them to

15   the DNA Area where I performed the DNA typing,

16   using those three steps, the extraction step,

17   the amplification step, and the visualization

18   step to attempt to get a DNA type from these

19   stained areas.

20       Q    Were you able to do that?

21       A    Stain 11(a), I was not able to

22   isolate any DNA from that area.  So I went

23   through the extraction step and looked to see

24   if I had human DNA present.  And I did not see

25   any.  So I discontinued running that sample and

1　　continued with the stain (b), that is on the

2　　inside of the shirt.  Because I did find human

3　　DNA present in that stained sample.

4　　　　　　　So I performed PCR analysis on that

5　　stand and ran it on jell for DNA typing.

6　　　　　Q　　And you did follow the quality

7　　control standards that you mentioned earlier in

8　　explaining to the ladies and gentlemen of the

9　　jury?  Is that correct?

10　　　　　A　　Yes.  I ran all the controls that I

11　　explained to you.  And they worked properly.

12　　　　　Q　　Now, how did you make your

13　　comparison to what I have introduced as State's

14　　Exhibit 28 (a)?  How did you make any

15　　comparison -- strike that.

16　　　　　　　Did you make a comparison with what

17　　you ran that you had extracted from State's

18　　Exhibit No. 25, with any information that you

19　　received or items you had received on State's

20　　Exhibit No. 28(a)?

21　　　　　A　　Yes.  I performed DNA typing on the

22　　blood sample that was identified to be from

23　　Robert Conrad, and compared that DNA type from

24　　that sample to the DNA type from stain (b) on

25　　the T-shirt, which is my item number 11,

1   State's Exhibit No. 25, and found that the DNA

2   profile from stain (b), in State's Exhibit

3   No. 25, is consistent with the DNA profile from

4   the sample identified to be from Robert Conrad,

5   which is State's Exhibit No. 28(a).

6        MRS. STOUT:  Thank you.

7        THE COURT:  Mr. Smith, I know you said

8                    that you wanted a standing

9                    objection?

10       MR. SMITH:  Yes, Your Honor.  For the

11                   reasons that we put into the

12                   record.

13       THE COURT:  Sure.  I need to get one

14                   other thing in the record at

15                   this point before we go further.

16                   If I had known we were going to

17                   have an opinion express, I would

18                   have stated it earlier.

19                        But the Court has

20                   considered the United States

21                   decision of Duaburt and Frye.

22                   And, of course, this Court is

23                   the gatekeeper of such evidence

24                   and determines whether or not to

25                   allow such expertise to be

1    presented to a jury.  But I have

2    to make that determination,

3    really, before it comes out any

4    further.

5            First of all, this

6    Court finds that the preliminary

7    chain reaction  method of DNA

8    analysis, otherwise I believe

9    you referred to it as the PCR

10   method of analysis is

11   scientifically recognized and

12   accepted in the field of DNA

13   analysis.

14            This Court further

15   finds that this witness has

16   testified that the DNA steps,

17   the PCR method of analysis have

18   in fact been used by her

19   arriving at any opinion that she

20   may have.

21            The Court finds that

22   lab guidelines and quality the

23   assurance procedures have been

24   established to the satisfaction

25   of this Court.  And the Court

1          finds that the expertise should

2          be allowed to be presented to

3          this Court as the gatekeeper.

4               Go ahead.

5     MRS. STOUT:  At this time, we would move

6          to admit State's Exhibit No.

7          28(a) into evidence, State's

8          Exhibit No. 28(b) into evidence,

9          and State's Exhibit No. 25(b)

10         into evidence.

11    THE COURT: And the Defense has a standing

12         objection?  Is that correct?

13    MR. SMITH:  Yes, sir.

14    THE COURT:  And you reassert the same

15         rational for your objections?

16         Is that correct?

17    MR. SMITH:  Yes, Your Honor.

18    THE COURT:  The Court has considered all

19         that.  The objection is

20         overruled.  These items of

21         evidence are in fact admitted

22         into evidence and may be

23         considered by the jury and used

24         by the jury in any decision that

25         may be rendered in these two

1      separate cases.  And I also find

2      Darrel D. Moreland versus State,

3      574 So.2d, 1953.

4          MRS. STOUT:  Thank you, Your Honor.  Your

5          witness.

6              CROSS EXAMINATION

7   BY MR. SMITH:

8          Q     Hello, again.  As I told you

9   earlier the years I've known you, you stay the

10  same, I just keep getting older.

11             Phyllis, you prepared a report of

12  your work in this case, did you not?

13         A     I did.

14         Q     And do you have that report here

15  with you today?  It's dated August 12, 2002?

16         A     I do.

17         Q     And that report was basically made

18  to the file but also made available to the

19  District Attorney?  And they made it available

20  to me, I submit to you.  Would that be the

21  normal course of events?

22         A     Yes, sir.

23         Q     I show you what I have marked for

24  identification as Defendant's Exhibit (V),

25  victory, and ask is that the same report that

1    you prepared?

2         A    Yes, sir.  This appears to be a

3    copy of my report.

4         Q    You have the original there?  Is

5    that correct?

6         A    It is the file copy, yes.

7         Q    If you would look to Page 3 of your

8    report, I think it's under Paragraph (10), or

9    maybe it precedes number Paragraph (11),

10   whichever.  I'm sorry.

11             Anyway, the section that says on

12   March 29, 2002, Detective Rick Hauser

13   resubmitted to the forensic biology section the

14   following evidence of -- and it identifies item

15   11 as one sealed brown paper bag, labeled in

16   part, removed from dumpster.

17             Would that be what you've

18   identified as State's Exhibit No. 25?  Is that

19   right.

20         A    Yes.

21         Q    Is that what you were referring to?

22         A    Yes, sir.

23         Q    Now, it says resubmitted by

24   Mr. Hauser, which seems to mean to me that it

25   had been there once and gone?

 1        A        That's correct.  It was submitted

 2   to Forensic Scientist, Joe Saloom, for

 3   firearm's examination, and was returned

 4   inadvertently.  I believe there was a request

 5   for it to be examined for blood.

 6              Therefore, we contacted them to

 7   return it back to our laboratory for further

 8   analysis.  And that's when I performed the

 9   analysis on it.

10        Q        So it went from Enterprise P.D. to

11   Joe Saloom, and then back to Enterprise P.D.,

12   well, you assume.  But it left the forensic

13   science?  And then it came back to forensic

14   science to you?  Would that be correct?

15        A        Yes.

16        Q        Do you know where it was, or what

17   happened to it, or what was done with it, if

18   anything, during the time that it left Mr.

19   Saloom and came back to you?

20        A        No.  I just know that it was in a

21   sealed condition when it was brought back to

22   the laboratory.

23        MR. SMITH:  Judge, we move to exclude it.

24        THE COURT:  Motion is denied.

25        Q        You received a number of things,

1    did you not, from the Enterprise Police

2    Department over the course of this case?

3         A    Yes.    That's correct.

4         Q    And your report indicates that --

5    if you would look with me to Page 5 -- several

6    items, including the item 11, that we've

7    already mentioned, stain (b) for the shirt, you

8    analyzed that?    Correct?

9         A    Yes, sir.

10        Q    And stained (a) from the shirt,

11   State's Exhibit No. 25, you said was analyzed

12   for DNA, but none was detected?

13        A    Yes.

14        Q    Now, right below that paragraph,

15   there were a number of other items that were

16   negative results when tested for the

17   presumptive presence of blood.    And then drop

18   down to the next to the last sentence on that

19   page in that paragraph.    Shirt identified to be

20   from Robert Conrad, item 16.    The item that was

21   identified as the shirt from Mr. Conrad, item

22   16, you didn't find any blood on?    Is that my

23   understanding?

24        A    That's correct.

25        Q    The next item, glasses, Item 17,

1   did you receive glasses that were identified to

2   be Mr. Robert Conrad glasses?

3        A    I did receive a pair of glasses.

4   They were not identified as coming from anyone.

5   I did examine those pair of glasses and found

6   there was no blood present on them.

7        Q    How were the pair of glasses

8   identified to you?

9        A    There was a sealed Manila envelope

10  that was brought into the laboratory.  It was

11  our Item number 17.  There was not an

12  indication on the outer packaging of the sealed

13  Manila envelope.

14       Q    There was not an indication of

15  where the glasses came from, as far as what you

16  received?  Is that what you are telling me?

17       A    That's correct.  And on the chain

18  of custody receipt, there was not an indication

19  as to where the glasses were retrieved from.

20  And on the evidence submission form, there is

21  not an indication.  It just says one sealed bag

22  containing glasses with the request to look for

23  blood.

24       Q    That chain of custody is Mike

25  Lolley, to Bryan K. Wilson?  Would that be

1    correct?

2          A       That's correct.

3          Q       You found no blood on either the

4    shirt identified from Robert Conrad or the

5    glasses, item 16 and 17?  Correct?

6          A       That's correct.

7          Q       Now, additionally, you received

8    other items.  If you would look to Page 6 with

9    me, please?  And would you tell us what items

10   you received according to your report there in

11   the first paragraph?

12         A       On Page 6.

13         Q       Yes, ma'am?

14         A       In the remark's section?

15         Q       Yes, ma'am?

16         A       The samples that are listed on

17   Page 6 are samples that I performed DNA typing

18   on.  They were stains that were identified to

19   be from the entrance floor, the counter top --

20         Q       Let me slow you down just a little

21   bit.  From the entrance floor, and item

22   numbers, please?

23         A       Yes, sir.  Entrance floor, which is

24   my item 4(a); the counter top, which is my

25   item 4(b); the bottom of the counter at the

1  register area, which is my item 4(c); the

2  scene, which is item 5, and that's actually a

3  piece of tape removed from the scene, duct

4  tape-type material; a piece of carpet, which is

5  my item number 6; and two stains, which are

6  marked (a) and (b) from a separate piece of

7  carpet, is my item number 7; a towel that

8  identified to be from the scene, which is my

9  item number 8; the right shoe, identified to be

10  from Brian Smith, which is Item 9(d).

11      Q      Item 9(d) is a right shoe from

12  Brian Smith?

13      A      That's how it --

14      Q      Identified to you as Brian Smith?

15      A      That's correct.

16      Q      Go ahead, please.

17      A      The left shoe identified to be from

18  Brian Smith, item 9(e); and stain(b) from the

19  shirt that was identified to be from the

20  dumpster, which was my number 11.

21      Q      And they were compared with what?

22  Those items you just read?

23      A      Those items were compared with the

24  sample that was identified to be from Robert

25  Conrad, which is State's Exhibit No. 28(a), and

1    also from a sample that was identified to be

2    from Evelyn J. Dennis, which I received from

3    the medical examiner's office.

4         Q        Which is a part of the forensic

5    science laboratory?  Is that correct?

6         A        That's correct.

7         Q        Was Robert Conrad's blood

8    identified on the shoes of Brian Smith or any

9    of those other items, except item 11, the shirt

10   from the dumpster that you testified about?

11        A        No.

12        Q        Whose blood did you identify from

13   the carpet and from Brian Smith's shoes?

14        A        The DNA profile from those items,

15   the carpet and Brian Smith's shoes, was

16   consistent with the DNA profile that I obtained

17   from a sample that identified to be from Evelyn

18   J. Dennis.

19        Q        And the bottom paragraph, of that

20   page, Page 6, would you read your finding as

21   you recorded them there, please?

22        A        Robert Conrad could not be the

23   source of the human DNA from the stains

24   identified to be from the entrance floor, that

25   counter tops, the bottom of the counter, the

1    register area the, scene, which is the tape,

2    and the human DNA from the carpet, stain (a)

3    from the carpet, and stain (b) from the carpet,

4    the towel identified to be from the scene, the

5    right shoe to be from Brian Smith, and the left

6    shoe identified to be from Brian Smith.

7         Q    The blood identified to you as

8    being from the crime scene and from the shoes

9    of Brian Smith could not be Robert Conrad's

10   blood?  Is that your finding?

11        A    Yes.

12        Q    If you would look to Page 7 of your

13   report, please, the paragraph that states

14   Evelyn J. Dennis.  Read that as you recorded

15   your findings, please?

16        A    Evelyn J. Dennis could not be the

17   source of the human DNA from stain (b) on the

18   shirt identified to be from the dumpster.

19        Q    Mrs. Jelaine Dennis, and I submit

20   to you her middle name was "Jelaine," Dennis'

21   blood was not on Robert Conrad's shirt.  the

22   shirt identified to you as being from Robert

23   Conrad?

24        A    From the shirt identified to be

25   from the dumpster.

1    Q    From the dumpster.  Robert Conrad's

2  blood was not on any of the items submitted to

3  you identified as being recovered from the

4  carpet, the counter, and the crime scene?

5    A    Of the stains that I typed, none

6  were found to be consistent with that sample

7  identified to be from Robert Conrad.

8    Q    Whose blood was on the shoes that

9  you identified as -- or that were identified to

10  you as being Brian Smith's shoes?

11    A    The DNA profile from the human DNA

12  -- excuse me, retrieved from the right and left

13  shoe, identified to be from Brian Smith is

14  consistent with the DNA profile from the sample

15  identified to be from Evelyn J. Dennis.

16    MR. SMITH:  Thank you.

17    THE COURT:  Mrs. Stout?

18    MRS. STOUT:  Thank you.

19    REDIRECT EXAMINATION

20  BY MRS. STOUT:

21    Q    You received a lot of samples to

22  type, did you not?

23    A    Yes.

24    Q    And did you type all of those

25  samples?

1054

1    A    All of the sample that gave

2    indication of blood, I performed DNA typing on.

3    The carpet samples had numerous stains on them.

4    Especially the item number 7.  I looked at the

5    stains on item number 7 and chose two different

6    areas of blood stain and performed DNA typing

7    on those samples.

8        Q    When you say "item number 7," what

9    was item number 7?

10       A    It is a large piece of carpet that

11   bore several different areas of blood stains.

12       Q    And you did type those areas?  Is

13   that correct?

14       A    Yes.  I isolated the areas that I

15   felt would be primary areas.  Some of the areas

16   appeared to be smearing.  And I chose two of

17   the areas that I felt like would be the best

18   blood stained areas and found that both of

19   those areas were consistent with that sample

20   identified to be from Mrs. Dennis.

21       Q    Now, did you check or did you type

22   to see if any of Mrs. Dennis's blood was on

23   this shirt?

24       A    I did perform DNA typing on the two

25   stains that were present on the shirt.  One of

1    them, I did not isolate DNA from.  And one of

2    them, I did, which I did compare to the DNA

3    type of Mrs. Dennis, yes.

4         Q    But it wasn't Mrs. Dennis's was it?

5         A    That's correct.

6         Q    It was Mr. Conrad's?  Is that

7    correct?

8         A    Yes.

9         MRS. STOUT:  Thank you.

10        THE COURT:  Mr. Smith?  While Mr. Smith

11                   is talking to co-counsel, I want

12                   to finish with this witness, if

13                   we can, before we take a break.

14                   We are getting close to taking a

15                   break.

16              RECROSS EXAMINATION

17   BY MR. SMITH:

18        Q    Just so that everything is kosher,

19   this is another copy of the Exhibit (V) that I

20   just showed you, to take some highlighting and

21   notations that I've made.  And I put a new

22   Exhibit (V) label on it.

23              Would you run through it and make

24   absolutely certain sure, that that is exactly

25   the report that you prepared?

1    MR. SMITH:  And, Judge, when she does

2         that, assuming that she finds it,

3         the same, we offer it.

4    MR. JARRELL:  We would object to any item

5         highlighted --

6    MR. SMITH:  It's not.  That's the reason

7         we're substituting it.

8    MR. JARRELL:  I misunderstood.  Excuse me

9    THE COURT:  So, there is going to be no

10        objection, with that

11        understanding?

12   MR. JARRELL:  No objection with that

13        understanding.

14   THE COURT:  While the witness is looking

15        at that, could I have the

16        attorneys approach the bench for

17        just a moment?

18   MRS. STOUT:  Yes, Your Honor.

19   THE COURT:  The record will reflect we

20        were in the presence of the

21        jury, but out of the jury's

22        hearing.

23        Just so the jury is not

24        confused, can there be a

25        stipulation that Evelyn J.

1                    Dennis and Jelaine Dennis are

2                    one in the same.

3        MR. JARRELL:  Absolutely.

4        MRS. STOUT:  Yes, Your Honor.

5        MR. SMITH:  Yes, Your Honor.

6        THE COURT:  Ladies and gentlemen, just so

7                    there is no confusion, there was

8                    a stipulation reached by and

9                    between the parties that Evelyn

10                   J. Dennis is one and the same as

11                   Jelaine Bowman Dennis.

12       Q      Is it the same?

13       A      Yes.

14       Q      I appreciate your thoroughness.

15  .cq O 15 O

16       MR. SMITH:  Your Honor, we offer that.

17       THE COURT:  Over no objection, it's in

18  evidence.

19       MR. SMITH:  That's all I have.

20       THE COURT:  What number is that?

21       MR. SMITH:  (V).

22       THE COURT:  (V).  Any other questions of

23  this witness?

24       MRS. STOUT:  No, Your Honor.

25       THE COURT:  Is there any reason this

1058

```
 1   witness should not be excused by

 2   the State?

 3         MRS. STOUT:  No, Your Honor.

 4         THE COURT:  By the Defense?

 5         MR. SMITH:  No, Your Honor.  I think

 6   she's riding with Joe.

 7         THE COURT:  You are excused.  Thank you.

 8              Ladies and gentlemen,

 9   we are going to take a break at

10   this time.  If you will be back

11   in here at 25 'til 4:00, and if

12   you need a little longer, please

13   take it, and we will get

14   started.

15                      Again, the Court is

16   required to instruct you and

17   does instruct you not to discuss

18   this matter among yourselves,

19   not to allow anyone to discuss

20   it with you.

21         THE COURT:  If everyone will remain while

22   the jurors exit the courtroom.

23              (Jurors exited the courtroom).

24         THE COURT:  This Court is in recess for a

25   least 15 minutes.
```

1    MR. SMITH:  Judge, could I get one thing

2  in the record?

3    THE COURT:  Sure.  Come on up.

4        (Counsel approached the bench).

5    THE COURT:  Let the record reflect that

6  we are out of the hearing and

7  presence of the jury.

8    MR. SMITH:  Judge, I again just want move

9  to exclude Exhibit No. 25, the

10  shirt identified from the

11  dumpster as being an incomplete

12  chain of custody made based on

13  gone through the lab and back

14  in.  There is no tying up of

15  that.

16                We move to exclude, and

17  we move to strike the portion of

18  Mrs. Rollan's testimony

19  concerning that shirt and redact

20  from that (V), the references to

21  that shirt from her report.

22    THE COURT:  Any response by the State?

23    MRS. STOUT:  Should the

24  Court rule against us, and allow

25  that, we ask to be allowed to

1060

1   get Mike Lolley down here to

2   testify about what occurred.  It

3   is clear that this has been

4   marked.  It was sealed.  It's

5   been sealed.  It was only opened

6   to be examined by Defense

7   counsel for preparation of the

8   trial.

9                Mrs. Rollan explained

10  what happened.  It was sent back

11  before completion of testing

12  from the Department of Forensic

13  Sciences.  Nobody went and stole

14  his blood and put anything on

15  it.  So if the Court is inclined

16  to rule against the State, we

17  respectfully ask that we get

18  Mike Lolley down here to testify

19  that that shirt has not been

20  tampered with, that Mike took it

21  back to the Department of

22  Forensic Sciences.  We argue

23  that is only a weak link, and

24  does not in any way affect the

25  integrity of the evidence going

```
 1    to the weight and not

 2    admissibility.

 3         THE COURT:  Anything else, Mr. Smith?

 4         MR. SMITH:  No, sir.

 5         THE COURT:  Both motions are at this time

 6    denied.  However, I'm not saying

 7    to the State that you don't need

 8    to clarify that to make it a

 9    situation where there is no

10    prejudice, I'm not going to tell

11    you to do that or not.

12              (A lunch recess was taken).

13         THE COURT:  You maybe seated.  Ladies and

14    gentlemen of the jury, we were

15    out a little long.  But I assure

16    you there was a reason for that.

17    It was not in vain.  Is the

18    State ready to continue?

19         MRS. STOUT:  Yes, Your Honor.

20         THE COURT:  Call your next witness.

21         MRS. STOUT:  Detective Hauser.

22         THE COURT:  This witness is still under

23    oath.

24

25
```

1062

1

2

3                    REDIRECT EXAMINATION

4  BY MRS. STOUT:

5       Q      Detective Hauser, you have already

6  identified State's Exhibit No. 25?  Is that

7  correct?

8       A      Yes, ma'am.

9       Q      And how could you identify State's

10 Exhibit

11 No. 25?

12      A      Again, it bears my handwriting and

13 my initials on the seals.

14      Q      Now, Detective Hauser, did you have

15 occasion to take State's Exhibit No. 25, what

16 has already been entered into evidence, to the

17 Department of Forensic Sciences on two

18 occasions?

19      A      I did.

20      Q      And could you tell the ladies and

21 gentlemen of the jury the two occasions that

22 you took it to the Department of Forensic

23 Sciences?

24      A      On the first occasion, this was

25 part of the initial evidence involved in this

1    case.  It was taken up to the Department of

2    Forensic Sciences on the 29th of May of last

3    year.  It was sent back to the Department,

4    along with all the other evidence and placed

5    into evidence and held in my custody.

6              Earlier this year, I believe

7    somewhere around the end of March, I was

8    contacted by the District Attorney's office and

9    asked if I could take this piece of evidence

10   back out of evidence and take it to the

11   Department of Forensic Sciences for further

12   testing.  And that is what I did.

13        Q    When you took it to the Department

14   of Forensic Sciences, did you turn it over to

15   the secretary there, as you normally do?

16        A    Yes.  Again, it was taken to the

17   receptionist and turned over on a property

18   receipt.

19        Q    When you received it, did they mail

20   it back to you, or did you pick it up?  Do you

21   recall?

22        A    It was mailed back to me.

23        Q    And when it was mailed back to you,

24   what did you do with that piece of evidence?

25        A    It was again placed back into

```
 1    evidence.

 2              THE COURT:  It was again place back into

 3                   where?

 4         A      Back into evidence.

 5         Q      And is it in the same state that it

 6    was when you took it up there, except for the

 7    testing that was done on it?

 8         A      It appears to be, yes.

 9         Q      And it has been under your care

10    custody and control since it was returned from

11    the Department Forensic Sciences?  Is that

12    correct?

13         A      Yes, ma'am.

14         Q      And from the time that you first

15    took it to the Department of Forensic Sciences

16    and it was sent back, was it in your care,

17    custody and control?

18         A      It was.

19         Q      And it was placed where?

20         A      Back in our evidence vault.

21         Q      And you've already testified who

22    has keys to that evidence vault?

23         A      In that case --

24         Q      Back on, I believe, May 29, 2001?

25    Is that correct?
```

```
1         A       Captain Clark, Captain Lolley,

2    Sergeant Spence.

3         Q       At that time?

4         A       Yes, ma'am.

5         Q       And when you took over the evidence

6    locker or vault, who had keys?

7         A       The evidence locker, the electronic

8    combination was changed.  And I was issued keys

9    and I was given the electronic combination to

10   the evidence vault.

11        Q       Do you recall when that was?

12        A       Probably about the time I got

13   promoted, which would have been in the middle

14   of March of this year.

15        Q       Looking at that packaging, and your

16   initials on that packaging, can you tell the

17   ladies and gentlemen of the jury that that

18   piece of evidence has been under your care,

19   custody and control?

20        A       It has.  This package is in the

21   same evidence package as it was initially

22   collected in.

23        Q       And has State's Exhibit No. 25 been

24   altered in any way, other than the testing that

25   has been done at the Department of Forensic
```

1   Sciences?

2        A      Not to my knowledge.

3        Q      And have you examined State's

4   Exhibit No. 25?

5        A      I have had occasion to look at it,

6   along with both yourself and the Defense

7   attorneys in this case.

8        MRS. STOUT:   Thank you.

9        THE COURT:   Are you reoffering it or

10               what?

11       MRS. STOUT:   I'm reoffering it, Your

12               Honor, State's Exhibit No. 25.

13               I would offer that into

14               evidence, or reoffer it into

15               evidence.

16       THE COURT:   Same objection?

17       MR. SMITH:   Same objection.

18       THE COURT:   It's in evidence over

19               objection.

20       MR. SMITH:   You may step down.

21       MRS. STOUT:   Thank you, Your Honor.

22       THE COURT:   Call your next witness.

23       MRS. STOUT:   The State calls Joe Saloom.

24       THE COURT:   Please raise your right

25   hand?

1

2

3                          JOE SALOOM

4          Whereupon, this witness, after first

5    being duly sworn to tell the truth, the whole

6    truth, and nothing but the truth, testified as

7    follows, to-wit:

8                    DIRECT EXAMINATION

9    BY MRS. STOUT:

10         Q      Would you state your name, please?

11         A      My my is Joe Saloom.

12         Q      And where are you employed,

13   Mr. Saloom?

14         A      I'm employed with the Alabama

15   Department of Forensic Sciences in Montgomery.

16         Q      How long have you been employed

17   with the Department of Forensic Sciences?

18         A      Twenty-three-and-a-half years.

19         Q      And would you tell the ladies and

20   gentlemen of the jury what your education is,

21   please?

22         A      I have a bachelors degree in

23   chemistry from Birmingham Southern College.

24   And I attended graduate school, also in

25   Chemistry at Mississippi State University.   For

 1   four years after I went to graduate school, I

 2   was a toxicologist at a private clinical

 3   laboratory.  Since, I have been working with

 4   the Department of Forensic Sciences.

 5            I trained for two years with four

 6   different examiners in the State of Alabama in

 7   the examination of firearms and tool mark

 8   evidence.

 9            I have been to armor schools put on

10   by Smith and Wesson, Glock, Sig, Heckler and

11   Koch, Remmington, and others.  I can't remember

12   them all.

13            I have been to the F.B.I. Academy

14   in gunshot and prima residues.  And for four

15   years I taught firearm classes here at

16   Enterprise State Jr. College.

17       Q    And during this period of time that

18   you have worked with the Department of Forensic

19   Sciences, you have continued to receive

20   training?  Is that correct?

21       A    That's correct.

22       Q    And at the present, you are working

23   out of the Montgomery lab?  Is that correct?

24       A    That's correct.

25       Q    Over that 23-year period of time,

1    you've testified many times throughout the

2    Circuit Courts of the State of Alabama?    Is

3    that correct?

4         A     Yes, ma'am, it is.

5         Q     And you've testified as an expert,

6    a firearms expert?  Is that correct?

7         A     That's correct.

8         Q     And you have been declared as an

9    expert in --

10         MR. SMITH:  We object to leading the

11                 witness.

12         THE COURT:  Your are leading the witness.

13         Q     And have you been declared an

14    expert in that field?

15         A     Yes, I have.

16         MRS. STOUT:  Your Honor, at this time, we

17                 would ask that Mr. Saloom be

18                 declared an expert in the field

19                 of firearm's examination and

20                 analysis.

21         MR. SMITH:  He's forgotten more than I

22                 will ever be able to learn in a

23                 lifetime.  No objection.

24         THE COURT:  This Court declares this

25                 witness to be an expert and will

1           allow this witness to express

2           his opinions based upon his

3           field expertise that have just

4           been described.

5      Q    Now, Mr. Saloom, I'm going to ask

6    you to step down.  And if you would roll that

7    board in for us, please.  I don't want to

8    insult any of the women of the jury, but I know

9    sometimes we might not quite understand as much

10   about firearms.

11          So, if you will explain to us, and

12   everyone else, please --

13      MR. JARRELL:  You might want to put it

14           this way.

15      MRS. STOUT:  I can't do anything simple,

16           can I.  Thank you.

17      Q    Now, would you step up here and

18   explain, when we are talking about firearm

19   identification, and explaining how to make a

20   firearm indication, explain the procedure,

21   first of all, in making firearms?

22      A    When a manufacturer makes a rifle

23   firearm, and the reason that they make a rifle

24   firearm is they are going to cut grooves in a

25   barrel.  And we will explain that in just a

1   minute.  They cut grooves in a barrel in part

2   to in part pin to the bullet, which gives the

3   stability.

4                  The scientific principle that we

5   operate under is that now two man-made items

6   are microscopically identical.

7                  We can illustrate that basically

8   and tell about it by telling you the process of

9   manufacturing a rifle firearm.

10                  Basically, the manufacturer takes a

11  steel blank.  It's a steel rod.  And they drill

12  a hole in the end of it.  Once they drill a

13  hole in the end of it, as they are drilling a

14  hole, the steel -- the drill bit itself creates

15  marks as it's going down the barrel.  The steel

16  itself may or may not be uniform and consistent

17  in its composition.  So there are soft spots in

18  the steel.  And there are hard spots in the

19  steel.

20                  As the drill bit passes through

21  that bar of steal, it creates those tiny little

22  marks.

23                  Once the hole is drilled into the

24  barrel blank, we call it, then the manufacturer

25  comes back and cuts grooves into the barrel.

1       And if you look down did the end of

2   a barrel, and I'm sorry I'm not an artist, but

3   I will try to illustrate this.

4       This would be the outside.  And you

5   are looking into inside of the barrel.  And

6   here is the other end, just looking down

7   through it.

8       The manufacturer cuts a set of

9   spiral grooves into the metal.  And as you look

10  down the barrel, you can see these grooves.

11  And the raised spots that are not cut are

12  called lands.  The parts that are cut and they

13  are actually recessed into the barrel, they are

14  called grooves.  So you have lands and grooves.

15      Now, the manufacturer has a set of

16  standards that they use.  They will cut a set

17  number of lands grooves into a barrel.  And

18  each one of these lands that they cut has a

19  certain width.

20      And the combination of the number

21  of lands and grooves that are cut.  And the

22  measurement of those lands and grooves that are

23  cut are what we use when we call class

24  characteristics.

25      So each manufacturer has their own

```
 1   sets of class characteristics.  For example,
 2   this particular one that I have drawn up here,
 3   very inadequately, unfortunately, has four
 4   lands and grooves.
 5       Q    Do you mind writing that on there
 6   so that the jury see, class characteristics,
 7   and how many you are showing there?  And I hate
 8   to interrupt you, because you are doing such a
 9   good job.  Thank you.
10       A    And this has four lands and
11   grooves.  And if you will kind of look at it,
12   it turns to the right.  Well, they could only
13   cut it one way or the other, right or left.
14           And in the this particular one, it
15   has four lands and grooves, with a right-hand
16   twist.
17           Smith and Wesson, for example cuts
18   their barrels generally with 5 lands and
19   grooves with a right-hand twist.  And both
20   lands and the grooves have a certain
21   measurement that Smith and Wesson uses for
22   their quality control.
23           Colt manufactures their barrels
24   with six lands and grooves with a left-hand
25   twist, and so on.  Each manufacturer has their
```

1    own sets of standards.

2              Now, there are some overlaps,

3    obviously, because there are a fine number of

4    things that you can do when you cut into a

5    barrel.  But for the most part, we as firearms

6    examiners can use these class characteristics

7    as part of our identification.

8              And I'm sorry I'm jumping around a

9    little bit.  But once the rifling is cut into

10   the barrel, the cutting tools also leave

11   microscopic marks.  And those microscopic marks

12   combined with the microscopic marks that are

13   left from the drilling process create a unique

14   signature that each barrel has microscopically.

15             It would be just like everybody in

16   the world has a separate set of fingerprints

17   that no one else has.  A rifle firearm barrel

18   has its set of microscopic marks that are

19   unique to that barrel.  So its kind of like a

20   fingerprint.

21             So what we do in the laboratory is

22   we examine firearms that are submitted.  And we

23   examine the bullet and cartridge that are

24   submitted.  And we test fire the firearm, and

25   we recover the test-fired bullets.  And we use

1    a comparison microscope, which is a microscope

2    that allows us to see two things at one time,

3    to see if the microscopic marks on the

4    test-fired bullets are essentially the same as

5    they were on the evidence bullets.  And that's

6    how we make our identification.

7              The same thing happens when you do

8    cartridge cases.  The manufacturers make the

9    receivers.  That's what we call the part of the

10   firearm.  And in the manufacturing process

11   these receivers have microscopic marks on them

12   that also are unique.  And when a firearm is

13   fired, those unique markings are left on the

14   cartridge case.

15             And we can use those microscopic

16   markings to make comparisons in cartridge

17   casings, as well as bullets.

18        MRS. STOUT:  Thank you.

19        THE COURT:  Are you going to need that

20             board, again?

21        MRS. STOUT:  I may.

22        Q    Mr. Saloom, on May the 29th of

23   2001, you were employed with the Department

24   Forensic Sciences in Montgomery as a firearm's

25   expert?  Is that correct?

1       A       Yes, it is.

2       Q       Did you receive some items of

3    evidence from the Enterprise Police Department,

4    specifically, Rick Hauser?

5       A       I did.

6       Q       And I'm going to show you some

7    things that have been marked.  I'm going to

8    show you what has been marked as State's

9    Exhibit No. 12(a) through (f).  And I'm going

10   to ask you, can you identify what's been marked

11   as State's Exhibit (a) from (f)?

12       MRS. STOUT:  12(a) through (f).  I'm

13              sorry, Your Honor.

14       A       Yes, ma'am, I can.

15       Q       And how can you identify what has

16   been marked as State's Exhibit No. 12(a)

17   through (f)?

18       A       They have my markings.

19       Q       And are they in the same container

20   or envelope that you placed them in once you

21   received them?  And did you complete an

22   analysis or some kind of examination on those

23   items?

24       A       They are in the same envelopes in

25   which I received them.  And, yes, I did do an

1    examination on them.

2         Q    What kind of examination did you do

3    on State's Exhibit No. 12(a) through (f)

4    collectively?

5         A    Of the envelopes that are labeled

6    12(a) through 12(f), each contain a fired

7    cartridge case.  I did not have a firearm to

8    compare to these cartridge cases, so I compared

9    them to each other.  And I managed to form an

10   opinion upon that.

11        Q    Now, how do you go about when you

12   don't have a firearm, but several cartridge

13   cases have been retrieved from a scene, how do

14   you go about comparing the cartridge cases to

15   each other?

16        A    We do it the same way we would

17   compare an evidence cartridge case to a

18   test-fired cartridge case.  We examine two of

19   them under the comparison microscope.  And I

20   just look at all of them.

21        Q    Okay.  And when you compared those

22   cartridge cases, what did your examination

23   reveal?

24        A    12(a), 12(c), 12(d), and 12(e) were

25   all fired in the chamber of the same firearm.

1   12(b) has some microscopic marks that are

2   similar. But there were insufficient marks for

3   me to call it a match.

4        Q    Can you explain what you mean by

5   they had similar characteristics, but you

6   couldn't call it a match?

7        A    Sure. As I said, these microscopic

8   markings can be compared to fingerprints of

9   individuals. Sometimes a firearm will create

10  really nice markings that are easy to see. And

11  sometimes they do not. And it depends on a lot

12  of factors.

13       But, in a case where I have enough

14  microscopic markings to say that it was a

15  match, then that's what I call. If there's a

16  situation where there are some markings, but

17  there are not enough for me to call a match,

18  then they have what I will call similar

19  characteristics.

20       In other words, there's nothing

21  that actually disagrees with them being fired

22  from the same firearm. But there's not enough

23  there for me to say they were actually fired

24  from the same firearm.

25       Q    Would it be possible to have five

1   cartridge cases that you could reach an opinion

2   on, based on your expertise that had been fired

3   from the same weapon, test the sixth cartridge

4   casing and only be able to find similar

5   characteristics.  But that cartridge casing

6   would still come from that weapon?  You just

7   couldn't make the match?  Would that be

8   possible?

9        A    Yes, ma'am.

10       Q    Could you explain to the ladies and

11   gentlemen of the jury how that could be

12   possible?

13       A    Well, I believe I have already

14   explained that.  Some times they just don't

15   mark as well as other time.

16       Q    Well, and I told you, I'm slow.  It

17   just doesn't work as well as it does other

18   times?  Is that correct?

19       A    It just doesn't mark as well as

20   other times.

21       Q    Okay.  So, a cartridge casing could

22   be ejected and the marks aren't as clear?

23       A    That's correct.

24       Q    Even though one has just been

25   fired, that was?

1       MR. SMITH:  Leading, Your Honor.

2       THE COURT:  You are.  Sustained.  If you

3   will rephrase.

4       Q   Explain cartridge casing one, that

5   has been fired, cartridge casing two, has been

6   fired.  One is clear.  Two is not.  Explain how

7   that could come about?

8       A   Well, again, I have actually

9   already explained that.  But sometimes they

10  won't mark as well as other times.  So you can

11  have two consecutive fired cases that will --

12  one of them will mark well, and the other will

13  not.

14      You can have three that mark well,

15  and one that won't.  You can have all five or

16  six of them that mark well.  It just depends.

17      Q   That's what I wanted to hear.  Two

18  consecutive that do not mark as well?  Is that

19  correct?

20      A   Yes.

21      MRS. STOUT:  At this time we would offer

22          into evidence State's Exhibit

23          No. 12,(a) through (f).

24      THE COURT:  Any objection?

25      MR. SMITH:  None.

1        THE COURT:   They are in evidence.

2        Q        Now, I ask you to look at what's

3   been marked State's Exhibit 11(a) through (e)

4   collectively.

5            And I ask you, can you identify

6   State's Exhibit 11(a) through (e) collectively?

7        A        Yes, I can.

8        Q        And how can you identify what has

9   been marked as State's Exhibit 11(a) through

10  (e)?

11       A        They have my markings.

12       Q        Are those exhibits in the same

13  condition as they were after -- strike that.

14           Did you perform any analysis on

15  State's Exhibit 11(a) through (e)?

16       A        Yes, I did.

17       Q        What analysis did you perform on

18  State's Exhibit 11(a) through (e)?

19       A        I compared Exhibits 11(a), 11(b)

20  11(c) and 11(d) to each other.  I found that --

21  do you want me to give my results, as well?

22       Q        Please?

23       A        I found that State's Exhibit 11(a)

24  11(b), 11(c) and 11(d) 9 millimeter or 38

25  caliber type bullets, were all fired through

1    the barrel of the same firearm.

2            I did not have a firearm to compare

3    them to.  But the class characteristics, as

4    I've spoken about previously, indicated that

5    the weapons -- that there's a possibility of

6    more than one firearm having those class

7    characteristics.

8            And I did find that each one of

9    them could have been fired in either a

10   Jennings/Bryco semi-automatic pistol, Highpoint

11   semi-automatic pistol, an Astro or a Stallard

12   Arms.

13           But 11(a), 11(b), 11(c) and 11(d)

14   were all fired through the barrel of the same

15   firearm.  And that barrel could have been the

16   Highpoint, Jennings/Bryco, Astro or Stallard

17   Arms.

18       Q     But they were all fired with the

19   same firearm?

20       A     They were.

21       THE COURT:  How do you spell Stallard

22   Arms?  I know how to spell "Arms," but

23   "Stallard."

24       THE WITNESS:  S-t-a-l-l-a-r-d.

25       THE COURT:  And how do you spell

1    Jennings?

2          THE WITNESS:  With two "n"s.

3          THE COURT:  And is that with a "G" or

4    "J"?

5          THE WITNESS:  J-e-n-n-i-n-g-s.

6          THE COURT:  Okay.

7          THE WITNESS:  Bryco is spelled with a

8    "y".  B-r-y-c-o.

9          Q     Now, when you completed your

10   analysis, did you place those items back in the

11   canisters that are like a film canister?

12         A     Yes, I did.  And I haven't finished

13   telling you about 11(e).

14         Q     I'm sorry.  I apologize for

15   interrupting you.

16         A     That's okay.  11(e), which is here

17   (indicating), has a different size bullet than

18   11(a), (b), and (c).  It is a .22 caliber

19   bullet.  And it was too badly damaged for me to

20   say anything more about it.

21         Q     So you could make no comparisons on

22   that at all?  Is that correct?

23         A     That's correct.

24         Q     But these were fired through the

25   same firearm?  This was a 9 millimeter?

1       A       Probably a 9 millimeter.

2       Q       Probably a 9 millimeter.  Are these

3  in the same condition as they were when you put

4  them back in the canisters and taped them up

5  and put your name on them?

6       A       Except for the State's Exhibit

7  stickers that are on there.

8       MRS. STOUT:  We move at this time to

9               admit State's Exhibit 11(a)

10              through (e), collectively.

11      THE COURT:  Any objection?

12      MR. SMITH:  (e) or (d)?

13      THE COURT:  (e) through (d)

14      MR. SMITH:  I understood that (e) was not

15              identified.  I would object to

16              that.

17      THE COURT:  Objection is overruled.

18              State's Exhibit (a) through (e)

19              are in evidence.

20      Q       You were also provided at that

21  time, I believe, a shirt?  Is that correct?

22      A       Yes, I was.

23      Q       I'm going to ask you to look at

24  what is marked as State's Exhibit No. 25, and

25  the packaging.  Can you identify State's

1    Exhibit No. 25?

2        A    Yes, I can.

3        Q    How can you identify State's

4    Exhibit No. 25?

5        A    It has my markings.

6        Q    And when you were delivered State's

7    Exhibit

8    No. 25, what were you asked to -- what types of

9    analysis were you asked to perform on State's

10   Exhibit No. 25?

11       A    I was asked to examine this shirt

12   for any residuals of gunshots.

13       Q    Did you do that?

14       A    I did.

15       Q    And could you tell the ladies and

16   gentlemen of the jury, did you make an

17   analysis?

18       A    I did examine the shirt.

19       Q    Can you tell the ladies and

20   gentlemen of the jury what your analysis was

21   after examining State's Exhibit No. 25?

22       A    I found two areas on this shirt

23   that had a heavy deposit of soot, which is one

24   of the bi-products of gunpowder burning.

25            These holes -- the soot deposited

1   on these holes leaves me to believe that the

2   shirt was actually folded over.  And it was

3   actually done with one shot.

4            The soot deposit also leads me to

5   believe that the barrel of the firearm that

6   left this deposit was very close, near contact

7   or just barely away from the cloth.

8        Q     Now, during your analysis of this

9   soot that was on that shirt, where, and when

10   I'm referring to where, inside, outside, where

11   did you find the soot deposits?

12       A     The lower hole, and I will --

13       Q     Please do.

14       A     The lower hole is the one that had

15   the heaviest deposit of soot on the outside of

16   the shirt.  The upper hole, which is located

17   right here, has a deposit of soot on the

18   inside.  And that leads me to believe that

19   these two holes were made at the same time,

20   with the barrel of the firearm being held very

21   closely to the lower hole.  And the soot

22   passing through the outside of the shirt

23   through to the inside.

24       Q     Now, you have examined the size of

25   those holes that were made?  Is that correct?

1    Is that your statement?

2         A      Yes, I did.

3         Q      Do you have a judgment or an

4    opinion as to the caliber of weapon that would

5    have made that size hole?

6         A      I don't.

7         Q      Would it have been a large caliber

8    weapon?

9         MR. SMITH:  Judge, he said that he didn't

10   have an opinion.

11        THE COURT:  Is that an objection?

12        MR. SMITH:  Yes, sir.

13        THE COURT:  Sustained.

14        Q      Now, there was one area, I believe,

15   of soot?  Do you have a judgment or an opinion

16   as to how this soot could have been left or

17   deposited on the shirt?

18        A      Yes, I do.

19        Q      And could you tell us what your

20   judgment or opinion as to how that soot on this

21   part of the shirt was made?

22        A      This item of soot is consistent

23   with one of two things.  One, the shirt being

24   folded up so closely that a small amount of

25   soot from the barrel, into the barrel, was

1    deposited, or it is also consistent with soot,

2    which would be driven out between the cylinder

3    and the barrel or a revolver, what we call a

4    cylinder gap.

5        Q    And you said a revolver?

6        A    I did.

7        Q    Is that correct?

8        A    I did.

9    MRS. STOUT:  And, Your Honor, I believe

10                State's Exhibit No. 25 is

11                already in evidence.

12   THE COURT:  That's correct.

13   MR. SMITH:  Subject to our same

14                objection, may it please the

15                Court.

16   THE COURT:  Sure.  It's in evidence.  I

17                just want to clarify that.

18                State's Exhibit No. 25 is in

19                evidence over objection.

20       Q    Let me show you what's been marked

21   as State's Exhibit No. 9 and State's Exhibit

22   No. 10.  I ask you can you identify State's

23   Exhibit No. 9 and 10.

24       A    Yes, I can.

25       Q    And how can you identify State's

1    Exhibit No. 9 and 10?

2         A    Well, they both have my markings.

3    And State's Exhibit No. 9 has the same serial

4    number on the revolver that I received on

5    May 24, 2001?

6         A    And who brought you that revolver

7    on May 24th of 2001?

8         A    Rick Hauser.

9         Q    And I want you just to look at it.

10   Do not give me any test analysis or anything at

11   this time.  Just look at it and tell me if it's

12   in the same condition?  And if you would, check

13   it.  Is it in the same condition as it was when

14   you received it on that date?

15        A    It is not.

16        Q    Okay.  What is different?

17        A    When I received it, it had fired

18   and unfired cartridges in the cylinder.

19        Q    And what did you do you when you

20   checked it on that date?

21        A    I took the cartridges out.

22        Q    When you took the cartridges out,

23   where did you place those cartridges?

24        A    In this envelope here.

25        Q    And would you please look at that

1    with those?

2         A       Yes, I did.

3         Q       Could you tell us what kind of

4    analysis you did on State's Exhibit No. 27(a)

5    collectively?

6         A       I examined each of these.  There

7    were three of them that I found -- well, there

8    are actually nine of them.  I made a mistake

9    when I said four.

10              There are nine cards.  Each of them

11   have a tape lift that were identified to be

12   from the subject.  I examined each of these

13   tape lifts for the presence of gun powder

14   particles.  I found three of these that had gun

15   powder particles on them.  And the other six

16   did not.

17        Q       Could you tell us which three had

18   the gun powder particles, and, if you would, if

19   you will separate those out?

20        A       These are the three that had gun

21   powder particles on them.

22        Q       Now, could you look at your report

23   and tell us what your analysis or examination

24   revealed from your examination, and from where

25   those gun powder particles came in reference to

1    the wounds?

2        A    I can only tell you what is written

3    on these cards.  The ones that I found powder

4    particles on -- let's see.  I have got the

5    front right hand, left lateral thigh, I think

6    that's what it stands for.  It's spelled "lt.

7    lat. thigh," and "post. chest," which I assume

8    is posterior chest.

9        Q    If you could explain to the jury

10   how these tape lifts and powder particles work?

11       A    Well, Dr. Ward, during the

12   examination of the body, will take a tape lift,

13   or just take a piece of this wide, just scotch

14   tape basically, and touch it to an area which

15   she labels.

16           And then we look at it for the

17   presence of gun powder particles.  And we look

18   at it microscopically and examine it for gun

19   powder particles?

20       Q    What is it indicative of when you

21   find gun powder particles on a wound area?

22       A    Its indicative of a gun shot that

23   was close enough to deposit that gun powder.

24       Q    And when you are labeling gunshot

25   wounds, are they normally labelled contact,

1     close contact?  How are they labeled normally,

2     if they are?

3          A      You mean, how do I label them?

4          Q      How do you label them?

5          A      I don't.  The pathologist usually

6     does that.

7          Q      I noticed in one of your reports,

8     it was a mere contact?

9          A      That was on a shirt.

10         Q      On a shirt?

11         A      Right.

12         Q      Could you, and let me rephrase

13    that.  Could you make an analysis based on your

14    expertise as a firearm's expert, looking at

15    these particles that have been lifted from

16    these wounds, as to whether there was a near

17    contact, release of gun powder particles --

18         THE COURT:  This calls for only a "Yes,"

19               or "No." at this point?

20         A      No, I cannot

21         Q      Thank you.  But there were gun

22    powder particles found in that area?

23         A      Yes, there were.

24         Q      And that's usually indicative of

25    what?

1         A     A firearm being discharged within

2  the range that it would deposit gun powder.

3         Q     Which three of these are the ones

4  where you found?

5         A     These three.

6        THE COURT:  Your answer, again?  I heard

7                you say "These three"?  For the

8                record if you will identify the

9                number, markings?

10       THE WITNESS:  Well, they are not marked

11               as -- they are all in one

12               envelope, State's  Exhibit No.

13               27(a).  But they have my

14               markings on them.  My evidence

15               number is 06.03 --

16       THE COURT:  Just for record purpose?

17       THE WITNESS:  06.02, and 06.01.

18        Q     And, again, for the purposes of the

19  record, those numbers indicate what, Mr.

20  Saloom?

21         A     Those are the tape lifts that I

22  found gun powder particles inside.

23         Q     And that's State's Exhibit

24  No. 27(a)?

25         A     A part of 27(a), yes, ma'am.

COURT OF CRIMINAL APPEALS NO. CR-02-0333

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

## FROM

## CIRCUIT COURT OF _____ COFFEE _____ COUNTY, ALABAMA

CIRCUIT COURT NO. CC-01-179, CC-01-180

CIRCUIT JUDGE _____ Gary L. McAliley _____

Type of Conviction / Order Appealed From: _____ Conviction, Capital Murder, Robbery 1st

Sentence Imposed: Life Without Parole, Life

Defendant Indigent: [X] YES [ ] NO

Robert Thomas Conrad
_____
NAME OF APPELLANT

Gary Bradshaw
(Appellant's Attorney)          (Telephone No.)
P. O. Box 311412

(Address)
Enterprise          AL          36331
(City)          (State)          (Zip Code)

Richard Waldrop
P. O. Box 310027
Enterprise, AL  36331

V.

## STATE OF ALABAMA
_____
NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____
_____

(For Court of Criminal Appeals Use Only)



COPY

1    Q    A part of 27(a).  Thank you.  Now,

2  on May 24th of 2001, and you've already looked

3  at a revolver that was brought to you?  Is that

4  correct?

5    A    Yes, ma'am.

6    Q    And this is State's Exhibit No. 9?

7    A    Yes, it is.

8    Q    Let me show you what's also been

9  marked as State's Exhibit No. 26 and ask if you

10  can identify that.

11    A    Yes, I can.

12    Q    And how can you identify State's

13  Exhibit No. 26?

14    A    It has my markings.

15    Q    And who did you receive State's

16  Exhibit No. 26 from?

17    A    I received it from Rick Hauser.

18    Q    And he's with the Enterprise Police

19  Department?

20    A    Yes, ma'am, he is.

21    Q    Now, when you received these pieces

22  of evidence, was there a request made to do

23  something with these pieces of evidence?

24    A    Yes, ma'am.

25    Q    And what was that request?

1      A      The standard request is to compare

2   any bullets or cartridge cases to any submitted

3   firearms, which is what I did.

4      Q      And did you test State's Exhibit

5   No. 9, a revolver, a .22 caliber with State's

6   Exhibit No. 26?

7      A      I compared them, yes.

8      Q      Did you compare those?  And where

9   was State's Exhibit No. 26?  Is it indicated

10  where State's Exhibit No. 26 came from?

11     A      It was identified to be from Robert

12  Conrad.

13     Q      And did you compare the bullet from

14  Robert Conrad to State's Exhibit No. 9?

15     A      I did compare State's Exhibit

16  No. 26 to test fired bullets, which if fired

17  through State's Exhibit No. 9, yes, I did.

18     Q      And that would be the procedure

19  that you have already explained to the ladies

20  and gentlemen of the jury?  Is that correct?

21     A      That's correct.

22     Q      And when you test fired bullets,

23  through State's Exhibit No. 9, and compared

24  those test fired projectiles with State's

25  Exhibit No. 27, a projectile from Robert

1    Conrad, what was your analysis?

2         THE COURT:  If you have one?

3         MRS. STOUT:  If you have one.

4         A    I found that State's Exhibit No. 26

5    was fired through the barrel of State's Exhibit

6    No. 9.

7         MRS. STOUT:  Your witness.

8         THE COURT:  Mr. Smith.

9         MR. SMITH:  Thank you, sir.

10                   CROSS EXAMINATION

11   BY MR. SMITH:

12        Q    Joe, you received that State's

13   Exhibit No. 9, that Clerke .22 pistol?  And it

14   had live rounds and expended rounds it in?

15        A    It had four fired cartridges and

16   one unfired cartridge in it.

17        Q    Even though you took the fired

18   cartridges out of the gun, when you examined

19   them, you couldn't tell that it had been fired

20   in that gun, could you?

21        A    That's correct.

22        Q    And is that partially because

23   that's a kind of a loose tolerant-type built

24   gun, maybe, to be charitable?

25        A    There maybe a combination of

1    things.  And that may be one of the

2    contributing factors.

3        Q     Now, how many 9 millimeter

4    cartridge casings did you examine?

5        A     Six.

6        Q     And did I understand you to you say

7    that one of them, you could not determine was

8    fired from the same gun as the others?

9        A     Yes, sir.

10       Q     That was a correct statement that I

11   made?

12       A     That's correct.

13       Q     And the bullet that Dr. Ward sent

14   to you, that was identified as coming from Mrs.

15   Dennis, that I understand that you could not

16   identify that as being fired from the same gun

17   as the other bullets, the 9 millimeter, 38

18   bullets that were given to you?

19       A     That's correct.

20       Q     A smokeless powder cartridge, such

21   as a 9 millimeter is propelled by hot gases

22   ignited; power being ignited and creating hot

23   gas, is it not?

24       A     Basically, that's true.

25       Q     If you get more complicated than

1    that, I'm not going to understand you.  These

2    gases are the result of burning powder,

3    combustion?  Is that correct?

4         A       That's correct.

5         Q       And depending on the length of the

6    barrel, you are going to have fire and hot

7    gases?  And then unburned particles of powder?

8    Would that be a correct general statement of

9    the course of action of a firearm being fired?

10         A       Are you talking about from the

11   muzzle end of the firearm?

12         Q       Yes, from the muzzle end?

13         A       That's correct.

14         Q       Hopefully, it doesn't come out the

15   back end.  Now, does generally all the

16   smokeless powder burn up when a cartridge is

17   fired?

18         A       No, sir.

19         Q       And these particles -- I know I

20   have seen them, and they look like little flat

21   flakes.  Is that what most powder looks like?

22         A       Well powder can come in different

23   kinds.  Flat flakes is one of them.  They can

24   come in round ball or cylindrical types.

25   Flattened ball powder.  They can come in all

1    different varieties.

2         Q    The lifts that you have been

3    testifying about, where you obtained gun powder

4    particles, what kind of particles were those?

5         A    I don't recall.

6         Q    These particles were not burned?

7    Is that correct?

8         A    They were not consumed.

9         Q    All right.  And so they would have

10   been further down the distance chain from the

11   muzzle of the gun, if they were not consumed or

12   burned, would they not?  Farther down from the

13   area of fire and hot gases?

14        A    I'm not quite sure I understand

15   your question.

16        Q    Me either.

17        A    Good.

18        Q    Try, again.  These flakes are --

19   these gun powder particles come out of the

20   muzzle end of the gun?

21        A    Yes, they do.

22        Q    And they are behind the bullet?

23        A    Some of them are.

24        Q    Can some of them get ahead of the

25   bullet?

1104

1    A    Yes, sir.

2    Q    And would it be correct that they

3  kind of float out there on the air?

4    A    No, sir.

5    Q    Tell me how they get from muzzle

6  out here?

7    A    Okay.  You could have saved

8  yourself a lot of time and just asked me to

9  explain it.  And that's what I will try to do.

10    Q    Okay.

11    A    When a cartridge is fired, what

12  happens is the firing pin hits and priming

13  mixture, which is an explosive mixture.  That

14  in turn, it makes the powder, which, as I

15  previously stated can come in different types.

16  It can be in ball shaped, or it can be disc

17  shaped, or flaked, or odd shaped flakes,

18  depending.

19            The powder doesn't explode like a

20  lot of people think.  It just burns very

21  rapidly.  As it's burning, it pushes the bullet

22  out because it creates this huge volume of gas,

23  and there is just no room for it to go, except

24  out the front of the gun.

25            As this gas and burning powder

```
 1    travels down the barrel, and it exits the

 2    muzzle, there are particles of powder that are

 3    still burning.  There are some that will never

 4    burn.  And they can be any present from right

 5    outside the barrel to a certain distance that

 6    they actually fly, because they are being

 7    propelled, just like the bullet is.  They are

 8    being pushed out by this gas, as well as the

 9    bullet.  So they are flying at a significant

10    velocity.

11              However, their air resistance is

12    much higher than the bullet.  And, of course,

13    they are much lighter.  So they don't fly

14    nearly as far.  So you will have powder

15    deposited on a target anywhere from the muzzle

16    out to the distance where the furtherest piece

17    of powder will fly.

18              And that depends, as Mr. Smith

19    said, on the length of the barrel, the type of

20    cartridge, and the type of powder.

21         Q    Would it be correct that these

22    particles disburse out into the air?  And then,

23    as gravity gets all of us, some of us more than

24    others, it settles to the floor?

25         A    That would be a true statement,
```

1    yes, sir.

2         Q    Would it also be correct that there

3    is simply no way that you can determine,

4    without knowing wind currents, the size of the

5    charge, whether it's a magnum charge, or a sqib

6    charge, there is really no way you can

7    determine how far out those particles are going

8    to get?

9         A    Not to a scientific certainty, no,

10   sir.

11        MR. SMITH:  One moment, may it please the

12              Court.

13        THE COURT:  Sure.

14        MR. SMITH:  Thank you very much.

15        MR. JARRELL:  May we have just a minute?

16        THE COURT:  Sure.  Ladies and gentlemen,

17              if you would like to stand and

18              stretch just a minute.  We are

19              going to take a break very soon.

20                   This court will come

21              back to order.

22        MRS. STOUT:  Your Honor, I believe all we

23              need to do is move to admit

24              State's Exhibit No. 9 into

25              evidence, State's Exhibit No. 10

1107

1            into evidence and State's

2            Exhibit No. 26 into evidence.

3       MR. SMITH:  We observe the previous

4            objections on No. 26, may it

5            please the Court, that was

6            conducted in the previous

7            proceedings.

8       THE COURT:  Sure.

9                    State's Exhibit No. 9

10           and 10 are in evidence over no

11           objection.  Did I understand

12           that to be correct?

13      MR. SMITH:  That is correct, Your Honor.

14      THE COURT:  State's Exhibit No. 26 is in

15           evidence over objection by the

16           Defense.

17      MRS. STOUT:  And I believe number 27(a),

18           with the numbers that were read

19           by Mr. Saloom, as being relevant

20           to this case.

21      THE COURT:  Any objection?

22      MR. SMITH:  Judge, I think it's mighty

23           confusing, the record is

24           confusing, if the three that

25           he's testified to are not

1                     somehow sub-identified.

2        THE COURT: They are.  He read off his

3                     case numbers on those.

4        MR. SMITH:  That's fine.

5        THE COURT:  So, 27(a), and I do not

6                     recall the numbers, but the

7                     record reflects the numbers that

8                     this witness testified to as his

9                     personal numbers.  They are in

10                    evidence over --

11       MR. SMITH:  No objection.

12       THE COURT:  -- over no objection.

13       MRS. STOUT:  I have no further questions

14                    of Mr. Saloom.

15       THE COURT:  Mr. Smith?

16       MR. SMITH:  Nothing.  I've been through.

17       THE COURT:  Do you have any reason this

18                    witness should not be excused

19                    State?

20       MR. JARRELL:  Yeah, Judge, we'd like for

21                    him to stay around.  None.

22       THE COURT:  From the Defense?

23       MR. SMITH:  Absolutely not, Judge.

24       THE COURT:  You are excused.  Have a good

25                    day.

1              Okay.  Ladies and

2       gentlemen of the jury, I want

3       you to know where we are going

4       to go, and what we are going to

5       do.  At this point in time I

6       will swear in the next witness.

7       Then there are some things that

8       are to be taken up out side of

9       the hearing and presence of you.

10      There are some things that are

11      going to have to be taken out of

12      the presence of you.

13  MR. SMITH:  May we approach?

14  THE COURT:  Sure.

15      (Counsel approached the bench).

16  THE COURT:  We are in the presence of the

17      jury, but out of the jury's

18      hearing.

19  MR. SMITH:  Judge, assumptions are always

20      dangerous.  But I'm making an

21      assumption that this person is

22      Mr. Yoeman.

23  THE COURT:  Right.

24  MR. SMITH:  And we would object to him

25      even taking the stand before it

```
 1                is determined that he is going

 2                to testify.

 3        THE COURT:  Sure.  I'm going to make that

 4                determination.  We are going to

 5                go back here, and in just minute

 6                we are going to have a

 7                conference with his attorney, et

 8                cetera, and get certain things

 9                into the record.

10        MR. SMITH:  I may have misunderstood.

11        THE COURT:  I may have misstated it, but

12                I've talked with Mr. Lindsey,

13                and told him that would be done.

14        MR. SMITH:  I understood that you were

15                going to swear him in, first.

16                I'm brain dead.

17        THE COURT:  I will break, first.

18        MR. BRADSHAW:  That's what we objected

19                to, Your Honor.

20        THE COURT:  Do you have your next witness

21                available?  Do you have him?

22        MR. JARRELL:  They are supposed to be

23                bringing him.

24        MR. LINDSEY:  Excuse me, Judge.

25        THE COURT:  Yes, sir.
```

```
 1          MR. LINSDEY:  There are some preliminary

 2                   matters we don't need to address

 3                   before we get into the record,

 4                   before we get into this matter.

 5          THE COURT:  That will be done.  That will

 6                   be fine.

 7                        Ladies and gentlemen,

 8                   you can go eat at this point in

 9                   time.  And there are a lot of

10                   things that we are going to be

11                   doing while you are gone.  And

12                   we are not allowed to do those

13                   things in your presence.

14                           So you will

15                   take a break.  Unfortunately, we

16                   will come back and take the

17                   testimony of the next witness,

18                   whoever that witness may be for

19                   the State tonight.  I don't have

20                   my glasses on.  It's 5:30.  We

21                   will start back at 7:00 o'clock.

22                   We will start back at 6:30, if

23                   any of you prefer.  Would y'all

24                   huddle among yourselves and

25                   decide whether 6:30 or 7:00.
```

1          6:30 is a little over an hour

2          from now.

3              (Jurors talked among themselves).

4     JUROR:   6:30.

5     THE COURT:  Okay.  At 6:30 we will get

6          started.

7                   Again, the Court is

8          required to instruct you and

9          does instruct you not do discuss

10          this matter among yourselves,

11          nor to allow anyone to discuss

12          it with you.

13                   If everyone will remain

14          while the jurors exit the

15          courtroom.

16              (Jurors exited the courtroom).

17     THE COURT:  The record will reflect that

18          we are now out of the hearing

19          and presence of the jury.  I

20          would like the next person who

21          the State expects to call, name,

22          at this time.

23     MRS. STOUT:  Pursuant to discussions, it

24          will be Bryan Yoeman.

25     THE COURT:  Bryan Yoeman, Co-defendant?

1113

```
1                    Correct?
2        MRS. SMITH:  Yes, Your Honor.
3        THE COURT:  If you will bring him in.
4                    MR. LINDSEY:   We have to
5              talk about this first.
6        MRS. STOUT:  We have been trying to talk
7              all day, and because of matters
8              that have come up --
9        THE COURT:  Why don't y'all go into that
10             room, and then, we will come
11             back and take down anything that
12             y'all agree upon.  But y'all
13             have to agree first.  And I want
14             Mr. Yoeman in that room, also,
15             with his lawyer.
16       THE COURT:  The record will reflect we
17             are out of the hearing and
18             presence of the jury.
19                    You are Mr. Bryan
20             Yoeman?  Do I have that right?
21       THE WITNESS:  Yes, sir.
22       THE COURT:  And you are here with your
23             attorney, Mr. Gareth Lindsey?
24             Is that correct?
25       THE WITNESS:  Yes, sir.
```

1    THE COURT:  And also present is Assistant

2              District Attorneys, Glenda Stout

3              and Larry Jarrell.

4                  It's my understanding

5              that some settlement offer has

6              been negotiated with you and

7              your lawyer?  Is that correct?

8    THE WITNESS:  Yes, sir.

9    THE COURT:  And I want somebody to recite

10             the terms of the settlement.

11    MR. LINDSEY:  Judge, the terms of the

12             settlement are they have agreed

13             to allow him to --

14    THE COURT:  Who?  The State?

15    MR. LINDSEY:  Yes.  The State, the

16             prosecution people, have allowed

17             him to plead to robbery.

18    THE COURT:  Robbery in the first degree?

19    MR. JARRELL:  Yes, sir.

20    MR. LINDSEY:  And nolle prosequi the

21             capital murder charge.

22    THE COURT:  So that would be a lesser

23             included offense embraced within

24             the capital charge of robbery in

25             the first degree?

```
 1          MR. LINDSEY:  Yes, sir.

 2          THE COURT:  And what would be the

 3                   sentence?

 4          MR. LINDSEY:  Twenty years.

 5          THE COURT:  Okay.  Twenty years, cost of

 6                   court, all those things that

 7                   have to be ordered, the

 8                   mandatory $50.00 Alabama Crime

 9                   Victim's Compensation Commission

10                   Assessment.

11          MR. LINDSEY:  We really haven't talked

12                   about that.

13                            You got $50.00 on

14                   you?

15          THE COURT:  I just like to talk about

16                   those things for any attorney

17                   fees the State is caused to pay

18                   out.

19          MR. LINDSEY:  He's lucky.  I don't work

20                   cheap. And in return for that he

21                   has agreed to turn State's

22                   evidence, take the witness stand

23                   and tell the truth.

24                            And his testimony

25                   -- you want to recite what that
```

1116

1           is in both cases.

2      THE COURT:  Now, does that mean in this

3           Robert Thomas Conrad case, State

4           versus him, the one that I have

5           going on at this time and State

6           of Alabama versus Brian Smith.

7           I don't know his middle name.

8                     His first name is

9           Bryan?  Is that correct?

10     THE WITNESS:  Yes, sir.

11     MR. LINDSEY:  Yes, sir.

12     THE COURT:  In each testify truthfully.

13     MR. LINDSEY:  Yes, sir.

14     THE COURT:  And what is the truth?

15     MR. LINDSEY:  The truth is that he knew

16          and heard these people planning

17          this.

18     THE COURT:  Who are these people?  Brian

19          Smith and --

20     MR. LINDSEY:  These people are the

21          co-defendants that you just

22          named.

23     THE COURT:  Brian Smith and Robert

24          Conrad?

25     MR. LINDSEY:  Right.  And you correct me

```
1                    if I mistate anything here,

2                    because we don't want any

3                    question about what we are about

4                    to do.  He had heard them

5                    talking about this previous --

6                    about going to the Toy Box --

7                    going to the Toy Store and doing

8                    a robbery, and the reason that

9                    he heard was that Brian Smith

10                   needed money for he and his

11                   mother to move.

12        THE COURT:  Okay.

13        MR. LINDSEY:  And that on this occasion

14                   they came to his home.  "They"

15                   being the Defendants.

16        THE COURT:  Roberts Conrad and Smith?

17        MR. LINDSEY:  He and Smith.  And woke him

18                   up --  -- he has given a time

19                   that he thought that they came

20                   which was his best judgment at

21                   the time -- and enlisted him,

22                   Smith expressly told him they

23                   were going to the Toy Store, and

24                   he continued that they were --

25                   Yoeman was driving his mother's
```

1              car.  Conrad was driving --

2       THE COURT:  What kind of car was that?

3              Was that the Ford LTD?

4       THE WITNESS:  Yes, sir.  Chevy Corsica.

5       MRS. STOUT:  It was Silver?  Is that

6              right?

7       THE WITNESS:  Yes.

8       MRS. STOUT:  And that was your mom's car?

9       THE WITNESS:  Yes.

10      MR. LINDSEY:  He was -- he was driving

11             that and Smith was riding with

12             him.

13      THE COURT:  Conrad was driving what kind

14             of car?

15      THE WITNESS:  The blue LTD.

16      THE COURT:  What color was the LTD?  It's

17             like a sky blue.  Would that be

18             about right?

19      THE WITNESS:  Yes, sir.

20      THE COURT:  Did it have any damage to it?

21      THE WITNESS:  Yes.  I know there was a

22             dent on the driver's side.

23      THE COURT:  I'm sorry.  I should not have

24             asked your questions.

25      MR. LINDSEY:  Well, I haven't heard any

1          of the evidence in this case.

2     THE COURT:  We have.

3     MR. LINDSEY:  And in the course of

4          proceeding to the Toy Store,

5          Conrad, Brian Smith and Bryan

6          Yoeman -- Smith is in the car

7          with Yoeman.  Conrad is in the

8          car alone.  They separated, but

9          then they got back together near

10          -- they got back together near

11          the place where the Toy Store

12          was and stopped in the road and

13          had a conversation.

14               Smith got out of

15          the car, with Bryan Yoeman, and

16          went over and talked with

17          Conrad, and then came back and

18          got in the car.

19               They went to the

20          Toy Store and went in there.

21          And then in the course of the

22          transaction that they were

23          making -- I think he gave Smith

24          $4.00 -- is that right?

25     THE WITNESS:  Yes, sir.  Yes, sir.

1    MR. LINDSEY:  -- to make some sort of

2            purchase in --

3    THE WITNESS:  In comes Conrad --

4    MRS. STOUT:  How is Conrad dressed?

5    THE WITNESS:  He had a black mask on,

6            black long sleeve shirt, black

7            jeans and black shoes.

8    MRS. STOUT:  Do you know if he had on

9            anything under that black suit?

10            A t-shirt or anything?

11    THE WITNESS:  Yeah.  He had to because I

12            know the detective showed me

13            they found a shirt in the

14            dumpster.

15    MR. LINDSEY:  And he grabbed the old guy.

16            He didn't know the man's name,

17            and took money from him, took

18            money actually from Mr. Yoeman,

19            too.

20    THE COURT:  Who did that?

21    MR. LINDSEY:  Robert Conrad did that.

22            And then Conrad approached --

23    THE COURT:  Took money from this man?

24    THE WITNESS:  Yes, sir.

25    MR. LINDSEY:  He robbed him.

```
 1          THE COURT:  I read that in the
 2                 confessions.
 3      MR. LINDSEY:  And went there, and I think
 4                 maybe at that time -- you tell
 5                 the Judge then what happened.
 6
 7      THE WITNESS:  Well, when he robbed me,
 8                 and he had went over there to
 9                 the cash register where the
10                 woman was, and he grabbed her.
11                 So she pulled out a gun, and
12                 they started tussling.  And when
13                 she fell, she shot him and he --
14                 she -- I mean he shot her, and
15                 she shot him so he jumped up and
16                 run out the store.
17      MRS. STOUT:  Was the gun pressed against
18                 her?
19        Show me how it was pressed against --
20      THE WITNESS:  It's like she was laying
21                 like this on the ground, and the
22                 gun was like about like right
23                 here.
24      MRS. STOUT:  Was he standing over her?
25      THE WITNESS:  Well, he was like this
```

```
1              (indicating), going down like

2              this, and he shot her like that.

3    THE COURT:  Anything else?

4    MRS. STOUT:  What happened after y'all

5              left there?

6    THE WITNESS:  I asked the lady what could

7              I do to help her.  She said she

8              felt like she was fixing to die.

9              I went out.  The old guy there,

10             he was on his cell phone.  And

11             he was calling the police.  So I

12             asked him what can I do.

13                      He told me to

14             leave, go get help.  So I went

15             down to the house down the

16             street from the Toy Store, got

17             out there, knocked on the door.

18             Nobody answered the door, so I

19             went home.

20   MRS. STOUT:  Did Smith say anything to

21             you?

22   MR. JARRELL:  Smith was with you?

23   THE WITNESS: Yes.

24   MRS. STOUT:  You went home -- and that's

25             where you found --
```

```
 1              THE WITNESS:  Yes, ma'am.

 2          THE COURT:  Did you help get him to the

 3                  hospital?

 4          THE WITNESS:  Yes, sir.  Me and Smith got

 5                  back to my apartment.  Smith

 6                  told me that he would be back.

 7                  So, he left my apartment and he

 8                  went to his apartment.  When I

 9                  looked out the window, I seen

10                  Brian Smith mom's car going down

11                  to where Smith stayed at.  And,

12                  you know, they come back to my

13                  house I'd say in about five

14                  minutes.

15                          Robert Conrad had

16                  on different clothes.  And he

17                  said that he had been shot, he

18                  needed me to help take him to

19                  the hospital because I was the

20                  only one with license.

21          MRS. STOUT:  Did you know that he had

22                  been shot until then?

23          THE WITNESS:  I didn't know that he was

24                  shot until when I seen him shot

25                  for myself.
```

1   MRS. STOUT:  You said that she shot him?

2              You said that she shot him?

3   THE WITNESS:  Yes.  In the store I didn't

4              --

5   MR. JARRELL:  You --

6   MRS. STOUT:  You did not know in the

7              store --

8   THE WITNESS:  I just heard two gun shots.

9   MRS. STOUT:  But whether you were in the

10             store, you don't know whether or

11             not she fired first, or he fired

12             first or whatever?

13  THE WITNESS:  No, ma'am.  I just heard a

14             lot of gunshots.

15  MRS. STOUT:  But you saw him standing

16             over her pressing that gun

17             against her chest?

18  THE WITNESS:  Yes.

19  MR. LINDSEY:  One other thing that I

20             would like the record to show,

21             that he stated in here that

22             Brian Smith had communicated to

23             him that he had connections on

24             the street.  If he did talk, he

25             could have something -- make

1125

```
1                    something happen to his mother,
2                    so he has never told this to me
3                    before, until now, that he is
4                    telling this now, and he did not
5                    --
6        MRS. STOUT:  He did --
7        MR. LINDSEY:  And he did not relinquish
8                    that until he called me.  He
9                    trusts her for some reason.
10                            Let's go off
11                   record.
12                   Does your husband trust you like
13                   that?
14       THE COURT:  It's on the record.
15       MRS. STOUT:  There is only one other
16                   thing that I would like to get
17                   in the record.  We have talked
18                   to the victims representatives,
19                   April Gunnels and Lynn Bowman,
20                   but just for the sake of the
21                   record, could we have them come
22                   in here?
23       MR. LINDSEY:  And you made a good
24                   decision.
25       THE COURT:  Sure.
```

```
 1                    (Judge requested April Gunnels

 2                     and Lynn Bowman to approach).

 3         THE COURT:  Again, the record will

 4                     reflect that we are out of the

 5                     hearing and presence of the

 6                     jury.

 7         MRS. STOUT:  These are the brother of the

 8                     deceased and the daughter of the

 9                     deceased.

10         THE COURT:  And it's my understanding

11                     that y'all know what's going on

12                     here?  Is that correct?

13         MR. BOWMAN:  That's correct.

14         MRS. GUNNELS:  Could you go over it one

15                     more time.

16         THE COURT:  Let's go off the record for

17                     that purpose.

18                     (Off-record discussion).

19         THE COURT:  Back on the record.  What was

20                     your comment?

21         MR. BOWMAN:  I support it.

22         THE COURT:  And do you understand the

23                     terms of the settlement?

24         MR. BOWMAN:  Yes.

25         THE COURT:  Do you also understand?
```

```
 1              MS. GUNNELS:  Uh-huh.

 2         THE COURT:  What I'm going to do, just so

 3                    everybody knows, I'm going out

 4                    there before the jury. But I

 5                    will advise you of your rights.

 6                    Your lawyer is going to be

 7                    there.  And then you will need

 8                    to make a knowledgeable,

 9                    intelligent waiver if you elect

10                    to testify.  Okay?

11         THE WITNESS:  Okay.

12         THE COURT:  Let's get out there in the

13                    courtroom.

14         MRS. STOUT:  Your Honor, off the record.

15         MRS. STOUT:  How long are we going to go

16                    tonight?  I could use the time.

17         THE COURT:  I know you do.  But you are

18                    not going do get a whole heap

19                    because we are going to go on

20                    with this witness.  Now, as far

21                    as cross examination or

22                    whatever, they have the right to

23                    review the record, so we will

24                    break after your examination.

25                    Okay.  Let's go out in the
```

1           courtroom.

2     THE COURT:  And they are going to have a

3           right of transcript of this for

4           impeachment purposes.

5           (Parties enter the courtroom).

6     THE COURT:  If you will, please.

7                     I'm not going to swear

8           you in until I discuss with you

9           and your lawyer your

10          constitutional rights.  For the

11          record, and you have not been

12          sworn in, yet, you are Bryan

13          Yoeman?  Is that correct?

14    MR. YOEMAN:  Yes, sir.

15    THE COURT:  And is this the person that

16          you have called as a witness in

17          the trial of State of Alabama

18          versus Robert Thomas Conrad?

19    MRS. STOUT:  That's correct, Your Honor.

20    THE COURT:  Who is present.  Where are

21          his attorneys.  I need them out

22          here, Sheriff.

23          (Mr. Yoeman's attorneys

24          approached).

25    THE COURT:  I just need y'all out here

1    for my advisement of his

2    constitutional rights.

3    Again, for the record

4    since these attorneys have just

5    come into the courtroom, and

6    Robert Thomas Conrad is now in

7    the courtroom with his

8    attorneys.  The State Assistant

9    District Attorneys, both Mr.

10   Jarrell and Mrs. Stout are

11   present.

12   Gareth Lindsey is your

13   lawyer?  Is that correct, Mr.

14   Yoeman?

15   MR. YOEMAN:  Yes, sir.

16   THE COURT:  And your name is Bryan

17   Yoeman?

18   MR. YOEMAN:  Yes, sir.

19   THE COURT:  What is your middle name,

20   Bryan?

21   MR. YOEMAN:  Glenn.

22   THE COURT:  Glenn.  Bryan Glenn Yoeman?

23   Is that correct?

24   MR. YOEMAN:  Yes, sir.

25   THE COURT:  And you are you Co-defendant

```
 1                          in this case?  Is that correct?

 2          MR. YOEMAN:  Yes, sir.

 3          THE COURT:  You are charged with capital

 4                      murder?  Is that correct?

 5          MR. YOEMAN:  Yes, sir.

 6          THE COURT:  The intentional murder of

 7                      Jelaine Bowman Dennis, while

 8                      engaged in the commission of a

 9                      robbery in the first degree, I

10                      believe, the charge says.  And

11                      you are also charged with

12                      robbery in the first degree of a

13                      Mr. Grimes, who is not in the

14                      courtroom right now.

15                          That's okay, Sheriff.

16                      He doesn't have to be.

17          THE COURT:  You are charged with those

18                      two offenses?  Is that correct?

19          MR. YOEMAN:  Yes, sir.

20          THE COURT:  The State has just called you

21                      to the stand as a witness to

22                      serve in the trial of this

23                      Conrad case.  And you have made

24                      known on the record back in the

25                      room that you wish to testify?
```

1           Is that correct?

2      MR. YOEMAN:  Yes, sir.

3      THE COURT:  Do you understand that you

4           come into this courtroom cloaked

5           in a presumption of innocence,

6           and that the State cannot call

7           you to the stand to testify

8           because you have a

9           constitutional right to remain

10          silent.  The constitution of the

11          United States says that you have

12          a right to remain silent.  And

13          the State cannot compel you,

14          force you, to testify in the

15          trial of this case.  Do you

16          understand that?

17     MR. YOEMAN:  Yes, sir.

18     THE COURT:  However, if you give up that

19          constitutional right to remain

20          silent, then anything you say

21          can and will be used against you

22          in a court of law.  Do you

23          understand that?

24     MR. YOEMAN:  Yes, sir.

25     THE COURT:  Has anybody forced you,

```
 1                    threatened you, coerced you, in

 2                    an effort to get you to waive

 3                    your constitutional right to

 4                    remain silent?

 5          MR. YOEMAN:  No, sir.

 6          THE COURT:  Has anybody promised you any

 7                    leniency, favors, or anything in

 8                    order to cause you to waive your

 9                    right to remain silent?

10          MR. YOEMAN:  No, sir.

11          THE COURT:  Now, I know that the District

12                    Attorney, those two Assistant

13                    District Attorneys and your

14                    lawyer, Mr. Gareth Lindsey, who

15                    is here tonight, have reached

16                    some agreement with you, whereby

17                    certain charges against you

18                    would be reduced?

19          MR. YOEMAN:  Yes, sir.

20          THE COURT:  To what we call a lesser, but

21                    included offense embraced within

22                    the capital charge, and that the

23                    State and the Defendant and your

24                    attorneys will recommend that

25                    the Court sentence you to a
```

1           certain sentence?

2     MR. YOEMAN:  Yes, sir.

3     THE COURT:  In exchange for your

4           testimony?  Is that correct?

5     MR. YOEMAN:  Yes, sir.

6     THE COURT:  Do you understand that a

7           Judge, your Judge, can accept or

8           can reject that agreement and

9           sentence you anywhere within the

10          confines of law?

11    MR. YOEMAN:  Yes, sir.

12    THE COURT:  Knowing that, have you

13          voluntarily elected to testify

14          in the trial of this case?

15    MR. YOEMAN:  Yes, sir.

16    THE COURT:  Now, your conversations with

17          your attorney are confidential.

18          And I don't want to get into

19          your conversations with your

20          attorney.  But have you

21          discussed these things with your

22          lawyer?

23    MR. YOEMAN:  Yes, sir.

24    THE COURT:  And have you told him your

25          wishes in this regard?

1    MR. YOEMAN:  Yes, sir.

2    THE COURT:  And have you expressed the

3              same wishes to your attorney

4              that you've expressed to this

5              Court tonight?

6    MR. YOEMAN:  Yes, sir.

7    THE COURT:  Mr. Gareth Lindsey is known

8              to this Court to be a most

9              competent attorney. There are

10             not many around who are better,

11             an outstanding attorney.

12                  Mr. Lindsey, do you

13             know of any reason that this

14             Court should not find that this

15             young man has waived his

16             constitutional right to remain

17             silent?

18   MR. LINDSEY:  No, sir.  There are no

19             reasons why he should not.

20   THE COURT:  Do you feel that he is making

21             a knowledgeable, an intelligent,

22             and a voluntary decision to

23             waive his constitutional rights?

24   MR. LINDSEY:  I do.

25   THE COURT:  Okay.  This Court finds that

1135

```
 1                    Mr. Bryan Yoeman has made a

 2              knowledgeable, an intelligent,

 3              and voluntary decision to waive

 4              his constitutional right to

 5              remain silent and has elected to

 6              voluntarily take the witness

 7              stand in the trials of these two

 8              cases against Robert Thomas

 9              Conrad.  If y'all will bring the

10              jury back in.

11       MR. BRADSHAW:   Judge, before the jury

12              comes back, may we approach?

13       THE COURT:  Yes.

14       SHERIFF:  Do you want us to hold them

15              just a minute, Judge?

16       THE COURT:  Yes.

17                    The record will

18              reflect that we are out of the

19              hearing and presence of the

20              jury.

21       MR. BRADSHAW:   We have two motions

22              before the Court that concerns

23              this man testifying.  And this

24              Court, I believe, reserved

25              ruling to see if he was going to
```

1136

1    testify.

2    THE COURT:  Sure.  It was speculative up

3        until this time.

4    MR. BRADSHAW:  Yes, sir.

5    THE COURT:  The first one would be a

6        motion to exclude his testimony

7        or motion in limine to prevent

8        him from testifying.

9    MR. BRADSHAW:  Yes, sir.

10   THE COURT:  That motion is denied.  How

11       did y'all couch the other

12       motion?

13   MR. BRADSHAW:  The other motion was

14       coached that he be excluded from

15       testifying until we could be

16       assured that George Roberson,

17       who was a witness in the

18       exculpatory material, would be

19       available for the Defense.  And

20       until we see him, we have no

21       assurance that he will be

22       available.

23   THE COURT:  Yes, you do.  You have the

24       assurance of this Court if he

25       doesn't show up, then you have

1                      arguments for a mistrial and all

2                      other kinds of things.  After

3                      our in-camera hearing today, the

4                      Court ordered that Mr. Roberson

5                      be immediately returned from the

6                      State of Colorado.

7                        And it's my understanding

8                      that the office of the District

9                      Attorney has purchased an

10                    airline ticket.  And that he is

11                    in route here to Alabama.  If he

12                    doesn't get here, then we will

13                    have some very, very serious

14                    problems for the State of

15                    Alabama.

16      MR. BRADSHAW:  Judge, with all due

17                    respect, I understand that.  But

18                    waiting until he got here at

19                    7:00 o'clock -- we broke at 6:30

20                    last night.  I think a mistrial

21                    would be more prejudicial to our

22                    client than waiting until we

23                    have the assurance --

24      THE COURT:  I said that's bottom line.

25                    You've got other motions that

```
1                    you can file.

2         MR. BRADSHAW:  Yes, sir.

3         THE COURT:  Jeopardy is definitely

4              attached.

5         MR. BRADSHAW:  Yes, sir.

6         THE COURT:  Okay.  Anything further?

7         MR. BRADSHAW:  No, sir.

8         THE COURT:  Motion at this time is

9              denied.  The Court reserves the

10             authority to review that should

11             Mr. Roberson not show up as a

12             witness.

13                    Sheriff, y'all can

14             bring the jury in.

15        THE COURT:  This court will come to

16             order.  You may be seated.  If

17             you will please raise your right

18             hand and place your left hand

19    on the Bible.

20

21

22

23

24

25
```

1

2

3

4                          <u>BRYAN YOEMAN</u>

5          Whereupon, this witness, after first

6    being duly sworn to tell the truth, the whole

7    truth, and nothing but the truth, testified as

8    follows, to-wit:

9                      <u>DIRECT EXAMINATION</u>

10   <u>BY MRS. STOUT:</u>

11          THE COURT:  Bryan, if you will have a

12                      seat, please.  Bryan, if you

13                      will pull your chair up and

14                      speak into that microphone right

15                      there.  You can bend it down

16                      where those jurors can hear.

17                      You just make sure that you

18                      speak loudly enough so that they

19                      can hear you.  Okay?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  I know the ladies and

22                      gentlemen, y'all have wondered

23                      what in the world is that man

24                      doing to us.  But it will become

25                      more apparent.  I apologize for

1    the delay very much.

2    Q    Would you tell these ladies and

3    gentlemen of the jury who you are?

4    A    My name is Bryan Glenn Yoeman.

5    Q    And Mr. Yoeman, what is your

6    present address?  Where are you living right

7    now?

8    A    406 South Edgewood, Dothan,

9    Alabama.

10    Q    No.  Where are you presently

11    living?  Where do you go to bed every night.

12    A    Oh.  Covington County Jail,

13    Andalusia.

14    Q    And why are you in the Covington

15    County Jail?

16    A    Because I got separated from the

17    guys that's in the case with me.

18    Q    Go ahead.  Let's tell them why you

19    are in the Covington County Jail, Mr. Yoeman.

20    MR. SMITH:  Your Honor, I think he just

21    did, Your Honor.  That's an answer.

22    Q    You got separated?

23    THE COURT:  You can have him elaborate,

24    if you choose, but you need

25    another question.

1     Q      Please elaborate.

2          MR. SMITH:  Objection.

3          THE COURT:  Overruled.

4     A      Well, they just took me to the

5  jail, you know, to get me away from the people

6  that's in the case with me.

7     Q      And what are you charged with?

8     A      Capital murder, first degree

9  robbery.

10    Q      And is that the case, the capital

11  murder case, involving Jelaine Dennis?

12    A      Yes, ma'am.

13    Q      And Mr. Ray Grimes?

14    A      Yes, ma'am.

15    Q      Now, you are here testifying

16  against Robert Conrad?  Is that correct?

17    A      Yes, ma'am.

18    Q      Have you reached some kind of

19  agreement with the State of Alabama in return

20  for your testimony?

21    A      Yes, ma'am.

22    Q      What kind of agreement have you

23  reached with the State of Alabama for return

24  for your testimony?

25    A      That I get a lesser sentence.

1       Q      What is that lesser sentence?

2       A      Robbery in the first degree, twenty

3   years.

4       Q      And is that why you are here

5   testifying?

6       A      Yes, ma'am.

7       Q      Okay.  Let's talk about what you

8   know about what happened on May 23rd of 2001.

9   Do you know this person setting right over

10  here?

11      A      Yes, ma'am.

12      Q      Who is he?

13      A      Robert Conrad.

14      Q      And did you see him on May 23rd of

15  2001?

16      A      Yes, ma'am.

17      Q      When did you first see him on May

18  23rd of 2001?

19      A      When him and Brian Smith came to my

20  apartment.

21      Q      What were you doing when they came

22  to your apartment?

23      A      I was asleep.

24      Q      And when they came to your

25  apartment, what did you do with them?

```
 1          A      I took Brian Smith to the store,

 2    the Toy Store.

 3          Q      Was anyone with you when you took

 4    him to the Toy Store?

 5          A      Yes.

 6          Q      Who?

 7          A      Robert Conrad.

 8          Q      Did you go in the same car?

 9          A      No, ma'am.

10          Q      What car did you go in?

11          A      I drove my car.

12          Q      Who was with you in your car?

13          A      Brian Smith.

14          Q      Did this Defendant also go to the

15    Toy Store?

16          A      Yes, ma'am.

17          Q      What car did he go in?

18          A      He drove Brian Smith mom's car.

19          THE COURT:  Before you show him any

20                  picture, that would be leading.

21

22          MRS. STOUT:  Sir?

23          THE COURT:  Don't show him any picture.

24          Q      Describe the car for me?

25          A      It's a light blue LTD, with a dent
```

1    I believe, on the driver's side.

2         Q    Okay.  And who was driving that

3    car?

4         A    Robert.

5         Q    Robert who?

6         A    Robert Conrad.

7         Q    At some point when you were in

8    route to the Toy Store, did you meet?

9         A    Yes, ma'am.

10        Q    Where?

11        A    Down the street.

12        THE COURT:  Did you meet who?

13        Q    Did you and Brian Smith meet the

14   Defendant?

15        A    Yes, ma'am.

16        Q    What were you in when you met the

17   Defendant?

18        A    I was in my car.

19        Q    What was the Defendant in?

20        A    Brian Smith mom's car.

21        MR. BRADSHAW:  Your Honor, if she can

22             please, we have three

23             defendants.  Can she specify who

24             she's talking about that

25             Defendant that's testifying?

```
 1              THE COURT:  Could you be more specific.

 2         Q       Who was with you, Mr. Yoeman?

 3         A       Brian Smith.

 4         Q       Who was in the blue LTD, with a

 5    dent?

 6         A       Robert Conrad.

 7         Q       Where did you, Brian Smith and

 8    Robert Conrad meet?

 9         A       At the Toy Store.

10         Q       Did you meet somewhere else, first?

11         A       Yes, ma'am.  Down the street from

12    the store.

13         Q       What happened when you met down the

14    street?  When you, Brian Smith, and Robert

15    Conrad met down the street from the Toy Store?

16         A       Brian Smith jumped out of the car

17    and ran over there to the car where Robert

18    Conrad was, and had a couple of words and got

19    back in the car with me.

20         Q       Then what did you and Brian Smith

21    do?

22         A       Go to -- go to the store.

23         Q       Where was Robert Conrad?

24         A       He stayed right there where we met.

25         Q       What was he wearing?
```

1    A    He had a mask, a black shirt,

2    long-sleeve black shirt, long black pants and

3    black shoes.

4    Q    Did you know why you were going to

5    the Toy Store?

6    A    Yes, ma'am.  I was just taking

7    Brian Smith to the store to get something.

8    Q    You did not know why you were going

9    to the Toy Store?

10    MR. SMITH:  Object to leading.

11    THE COURT:  It's been asked and

12        answered.  And he said no.

13        Sustained.

14    Q    You were taking Brian Smith to the

15    Toy Store?

16    MR. SMITH:  Still leading.

17    THE COURT:  Sustained.

18    Q    When you got to the Toy Store, what

19    happened?

20    A    The store got robbed.

21    Q    What did you Brian Smith do?

22    THE COURT:  When?

23    Q    When you got to the Toy Store, what

24    did you and Brian Smith do?

25    A    He just showed me these bags that

1    he was going to buy at the store.

2         Q      What did you do when you went in

3    the store?

4         A      I walked to the back of the store

5    and looked around.

6         Q      Where was Brian Smith?

7         A      At the counter.

8         Q      While you were in the store, did

9    something draw your attention to the front of

10   the store.  "Yes," or "No."

11        A      Yes.

12        Q      What?

13        A      Someone came in and robbed the

14   store.

15        Q      Do you know who that was?

16        A      Yes, ma'am.

17        Q      Who?

18        A      Robert Conrad.

19        Q      How was he dressed?

20        A      With a mask, a long-sleeve black

21   sheet, long black pants and black shoes.

22        Q      How do you know it was Robert

23   Conrad if he had a mask on?

24        A      Because I found out later on that

25   day, when he came to my house, earlier, Brian

1   Smith asked me to help him take him to the

2   hospital because he was shot.

3        Q      While you were in the Toy Store,

4   and you saw this individual enter, what did you

5   observe?

6        A      There was going to be a robbery.

7        Q      What was the first thing that you

8   observed when that person came in dressed in

9   black and wearing an mask?

10       A      What did I observe?

11       Q      What did you observe?  What did you

12   see?

13       A      A gun.

14       Q      Okay.  And what did that person do

15   with that gun?

16       A      He had shot the lady that was in

17   the store.

18       Q      That's the first thing he did?

19       A      No, ma'am.

20       Q      He grabbed the old guy that was in

21   the store.  And he came over there where I was.

22   And then he went to where the lady was.

23       Q      What happened when he approached

24   the lady?  What did you see happen when he

25   approached the lady?

1       A     The lady, she had pulled a gun out.

2    And him and the lady started tussling.  And she

3    fell.  She shot him, and he shot her.

4       Q     How do you know she shot him?

5       A     Because her gun didn't sound too

6    loud, as his did.

7       Q     Okay.  Now, what did you observed

8    the person that was in the store, dressed in

9    black with a mask do, if anything?

10       A     Excuse me.  Can you repeat that

11   again.

12       Q     While this person was in the store,

13   that was dressed in black, did you see him do

14   something else to the lady?

15       A     Yes.  He had grabbed her from

16   behind the counter.  And they was tussling.  He

17   had -- she fell down.  She shot him and he shot

18   her.

19       Q     While she was on the floor?

20      MR. SMITH:  Objection.  Leading.

21      THE COURT:  Sustained.  Let the witness

22   testify.

23       A     He put the gun into her chest and

24   shot her.

25       Q     What happened next?

1    A    He jumped up and ran out the store.

2    Q    When did you do?

3    A    I asked the lady what can I do to

4 help her.  She told me that she felt like she

5 was going to die.  And the old guy, he was out

6 there at his truck, using his car phone.

7         And I ran outside and asked what

8 could I do to help.  He told me to go get help.

9    Q    Then what did you do?

10    A    I left to go get help.

11    Q    Did you get help?

12    A    No.  When I went down the store --

13 to the house next to the store and got out of

14 the car.  Nobody didn't come to the door when I

15 knocked on the door.  So I went home.

16    Q    You went home?

17    A    Yes, ma'am.

18    Q    Who was with you?

19    A    Brian Smith.

20    Q    Now, I want to back up to what

21 happened during this tussle that took place.

22    MRS. STOUT:  May I have him step down,

23         Your Honor.

24    THE COURT:  Sure.

25    Q    Now, I want you to demonstrate to

```
 1   the ladies and gentlemen of the jury, if I am
 2   the lady, and I am behind the counter, you show
 3   me what you observed took place that day.
 4   Okay?
 5        A    He came into the store.
 6        THE COURT:  Try to speak up loudly.  I
 7                know --
 8        MRS. STOUT:  Speak up.
 9        THE COURT:  -- you are soft spoken.
10                These two ladies right here,
11                they have to hear everything
12                that you say and take it down.
13        A    He came into the store.  And he
14   grabbed the old man.
15        Q    Speak up.  They can't hear you down
16   there.
17        A    He grabbed the old man.  He came to
18   me.  He had went back to the lady that was at
19   the counter, came to her.  And they started
20   tussling.  She pulled out a gun.  And they came
21   from behind the counter.  So she fell.  He was
22   on top of her.
23        Q    Where did she fall?  How did she
24   fall?
25        A    On her back.
```

```
 1          Q      Like this?  Like back down?

 2          A      Yes.

 3          Q      Okay.  Where is he?

 4          A      He be on top of her.  Just like

 5   this.

 6          Q      Where was the gun?

 7          A      The gun was in her hand.  She had

 8   the gun.

 9          Q      And where did he put the gun?

10          A      In her chest.

11          Q      Like that?

12          A      Yes, ma'am.

13          Q      And she is like this?

14          A      Yes, ma'am.

15          Q      When you left, you went back to

16   your apartment?

17          A      Yes, ma'am.

18          Q      When did you see, or did you see

19   Brian Smith and Robert Conrad, again?

20          A      When Bryan left my house, he went

21   to his apartment, I looked out the window.  And

22   seen Robert driving a car going to where Bryan

23   stay.

24          THE COURT:  Going where?  I couldn't

25                  understand you.
```

1       A       As soon as -- when Bryan left my

2   apartment, when me and him got back to my

3   apartment, he left and went to his apartment.

4               And when I was looking out the

5   window, I seen the car.  I seen Brian Smith

6   mom's car going back where he stayed.

7               And they come back to my house,

8   like five minutes afterwards.  And he told me

9   that Robert had been shot.

10          MR. SMITH:  Objection.  Hearsay.

11          THE COURT:  Sustained.

12                      Ladies and gentlemen of

13                  the jury, you took an oath to

14                  well and truly try this case and

15                  true verdicts render according

16                  to the legal and competent

17                  evidence so help you God.  The

18                  Court instructs you that the

19                  last response was improper, and

20                  is not to be considered by you

21                  in any decision or decisions

22                  that you may render in this

23                  case.

24                      Is there any juror that

25                  cannot abide by the Court's

1    instructions, raise your hand.

2

3    The record will reflect

4    that all have agreed to abide by

5    the Court's instruction.

6    Next question.

7    Q    Mr. Yoeman, did you see Robert

8    Conrad later that afternoon?

9    A    Yes, ma'am.

10    Q    And where did you see him?

11    A    When he came back to my house, him

12    and Brian Smith.

13    Q    And did you take Robert Conrad

14    somewhere?

15    A    Yes, ma'am.

16    Q    Where?

17    A    To the hospital.

18    Q    And in what vehicle did you take

19    him to the hospital?

20    A    Brian Smith mom's car.

21    Q    And who drove that vehicle?

22    A    I did.

23    Q    What happened when you and Brian

24    Smith drove Robert Conrad to the hospital?

25    A    There was a police officer there,

1  off duty.  But, really, Brian Smith wanted me

2  to drive to the hospital, because I was the

3  only one that had license.

4      Q      When you got to the hospital, what

5  did you do with Robert Conrad?

6      A      I helped push him in the hospital

7  in a wheelchair.

8      Q      And when you got him in the

9  hospital with a wheelchair, what did you do?

10     A      Come out on the outside.

11     Q      Then what did you do?  You and

12  Brian Smith?

13     A      Left the hospital.

14     Q      Where did you go after you left the

15  hospital?

16     A      On back to my apartment.

17     Q      Who was with you at your apartment?

18     A      Just me and Brian Smith.

19     Q      Did you ever see the weapon that

20  was used?

21     A      Just --

22     THE COURT:  Used where?

23     MRS. STOUT:  Used in the Toy Store

24          murder.

25     MR. SMITH:  Objection to the verbiage

1        used.

2        THE COURT:  Verbiage used?

3        MR. SMITH:  Verbiage used by the

4              prosecutor.

5        THE COURT:  If you will rephrase.

6              Sustained.

7        Q      Did you ever see the weapon that

8    was used in the incident that occurred at the

9    Toy Store on County Road 711?

10       A      Yes, ma'am.  The day I seen it,

11   when it -- the day when the robbery occurred.

12       Q      And where was that?

13       A      When Robert had it in his hand.

14       Q      Do you have any knowledge of what

15   happened to that weapon after the robbery

16   occurred?

17       A      Well, whenever him and Brian Smith

18   got back together, whatever they did with it, I

19   don't know.

20       Q      Did you have any knowledge, prior

21   knowledge, that they were planning that -- that

22   Brian Smith and Robert Conrad were planning a

23   robbery?

24       A      Yes, ma'am.  I heard them talk

25   about it a couple of times.

1       Q    And when you said I heard them talk

2    about it a couple of times, how many days prior

3    to May 23rd 2001, approximately did you hear

4    Brian Smith and Robert Conrad talking about the

5    robbery at the Toy Store?

6       A    I say it was like a month before it

7    happened.

8       MRS. STOUT:  Just a minute, Your Honor.

9       MRS. STOUT:  I tender the witness.

10       THE COURT:  Ladies and gentlemen, the

11               Defense has a right to have

12               certain matters that occurred

13               today transcribed by the court

14               reporter before cross

15               examination by them begin.

16                   Of course, these ladies

17               are going to be here tonight

18               typing that stuff up and making

19               that available to the Defense.

20                 So cross examination

21               cannot begin now.

22                 We will have to break

23               at this point.  We will start

24               back tomorrow morning at 9:00

25               o'clock.  Again, the Court

1   requires you and orders you not

2   to discuss this matter among

3   yourselves, nor to allow anyone

4   to discuss it with you.  There

5   is one other most important

6   thing that I need to say to you.

7           You've seen a

8   television person or two today

9   at the courthouse with cameras

10  and that kind of stuff.  And

11  there are news media here in the

12  courtroom.  They have been here

13  all day long.

14          And it is my

15  understanding that certain news

16  releases went out today to the

17  radio stations and the T.V.

18  people, and to the newspapers.

19  So there is going to be a lot

20  said on radio and television and

21  in the newspapers, I would

22  guess.  I always make it my

23  policy not to read anything,

24  until after a trial is over,

25  unless I'm forced to do it so.

```
1                      The Court earlier gave

2            you an instruction, but I

3            reemphasize it.  My gracious, do

4            I reemphasize it.  For heaven

5            sakes, please do not read any

6            newspaper, please do not listen

7            to any radio, and, certainly any

8            local stations, and no

9            television, as far as the Dothan

10           channels or whatnot, the local

11           stations are concerned.

12                      Have a good night.  We

13           will see you back here tomorrow

14           morning at 9:00 o'clock.  If

15           everyone will remain while the

16           jury exits the courtroom.

17           (Jurors exited the courtroom).

18      THE COURT:  Court is in recess until

19           9:00 tomorrow morning.

20

21

22

23

24

25
```

```
 1              September 27, 2002
 2         THE COURT:   This court will come to
 3              order.  You may be seated.
 4                       Again, I hope all of
 5              you had a good night.  I did.  I
 6              assure you last night was the
 7              first time in a while.  We are
 8              ready to go on.
 9         THE COURT:  Mr. Bradshaw?  Mr. Smith?
10         MR. BRADSHAW:   Thank you, Your Honor.
11              CROSS EXAMINATION
12    BY MR. BRADSHAW:
13         Q     Mr. Yoeman, my name is Gary
14    Bradshaw.  And I have a few questions for you.
15    I represent this man sitting over here.  Do you
16    know him?
17         A     Yes, sir.
18         Q     How well do you know him?
19         A     I haven't actually known him for a
20    long time, but I know him.
21         Q     I beg your pardon?
22         A     I said, I know him.  But I don't
23    rightly know him that well.
24         Q     Y'all are not that good of friends,
25    are you?
```

1       A       No, sir.

2       Q       No.  Matter of fact, you didn't

3   want to help take him to the hospital, did you?

4       A       Yes, sir.

5       THE COURT:   Did you tell him you did

6                   want to take him?  Or yes, sir,

7                   you did not?

8       THE WITNESS:  Yes, sir, I did.

9       Q       You did?

10      A       Yes, sir.

11      Q       Did you tell Brian Smith that you

12  didn't want to take him to the hospital because

13  you didn't like him?

14      A       No, sir.

15      Q       You didn't.  But y'all are not that

16  good of friends?

17      A       No, sir.

18      Q       Have you always been a chronic

19  liar?

20      A       No, sir.

21      Q       No?  You are not a liar?

22      MRS. STOUT:  Objection.

23      MR. JARRELL:  Objection, Your Honor.

24      THE COURT:   Overruled.

25      Q       You can answer that question, if

1    you can, truthfully.  Are you a liar?

2        A    No, sir.

3        Q    No.  Well, let's see, Mr. Yoeman,

4    about that.  Let me ask you some questions.

5    You got up here yesterday and told this jury

6    some things that happened on May 23rd.  That

7    was about your fifth different account of what

8    happened, wasn't it?

9        A    Yes, sir.

10        Q    Yes, it was.  Do you happen to

11    remember telling the first police officer that

12    on May 23rd, you didn't even wake up until

13    2:00 p.m. in the afternoon?

14        A    Yes, sir.

15        Q    You made that statement, didn't

16    you?

17        A    Uh-huh.

18        Q    I heard you say, "Uh-huh?"

19        A    Yes, sir.

20        Q    Okay.  You also said that the first

21    time you saw Brian Smith and Robert Conrad was

22    when they came to your house after something

23    happened at the Toy Store, didn't you?

24        A    Yes, sir.

25        Q    Now, you told Mrs. Stout yesterday

1    that, yeah, you had knowledge of it?  Is that

2    true?  Did you have knowledge of what was going

3    to happen before it happened?

4           A       No, sir.

5           Q       You didn't have any knowledge of

6    it?  So you lied to Mrs. Stout yesterday when

7    you said that you knew what was going to

8    happen?

9           A       I didn't -- I didn't know.  I

10   didn't know there was going to be a robbery at

11   the store.

12          Q       You didn't know there was going to

13   be a robbery at the store?

14          A       No, sir.

15          Q       Now, you are under oath.

16          MR. BRADSHAW:   Judge, did you tell him

17                  that he is still under oath.

18          THE COURT:   He is.  You are.

19          Q       You are still under oath.

20          A       Yes, sir.

21          Q       You didn't know there was going to

22   be a robbery on May 23rd?

23          A       No, sir.

24          Q       When did you tell the officer that

25   you had heard other people talking about a

1164

```
 1    robbery in the Toy Store?

 2         A      Excuse me.

 3         Q      When did you tell Officer Moore,

 4    with the Enterprise Police Department, in your

 5    May 23rd statement, less than ten hours after

 6    this lady had been shot, and she died, when did

 7    you tell him that you had heard about the

 8    robbery?

 9         A      About a month ago.

10         Q      About a what ago?

11         A      About a month ago.

12         Q      About a month ago?

13         A      Yes, sir.

14         Q      You say:  I woke up at 2:00 o'clock

15    on May 23rd?  And it was some time about this

16    month, around the 17th, that I heard --

17         MRS. STOUT:   Object to him reading.  I

18              would ask that he let the

19              witness look at that.

20         THE COURT:  Cross examination.

21              Overruled.

22         MR. BRADSHAW:   Thank you.

23         Q      Some time around the 17th, I

24    overheard Brian and a guy named Alex talking

25    about a robbery.
```

```
 1              And I don't mean this part to

 2   embarrass you, this question right here, but

 3   can you read and write?

 4        A     Yes, sir.

 5        THE COURT:   Judge, I object.  May we --

 6

 7        MR. JARRELL:   If he is going to read it,

 8              I want him to read it

 9              correctly.  He has left out

10              words, left out names.

11        MR. BRADSHAW:   The reason I asked him if

12              he could read and write, I was

13              going to put it in front of him,

14              Judge.

15        THE COURT:  Okay.  Objection overruled.

16        MR. BRADSHAW:  Thank you.

17        THE COURT:  Again, wide latitude is

18              allowed on cross examination.

19        Q     Do you know who Alex is?

20        A     Yes, sir.

21        Q     Who is Alex?

22        A     Brian Smith's cousin.

23        Q     Brian Smith's cousin?  What is

24   Alex's last name?

25        A     I don't know his last name.
```

1    Q    You don't know his last name?

2    A    No, sir.

3    Q    Do you know where he lives?

4    A    No, sir.

5    Q    Well, Mr. Yoeman, you knew back in

6    May of last year where he lived?  You told the

7    officer where he lived, didn't you?

8    A    Yes, sir.

9    Q    You are still not a liar, though,

10   are you?

11   A    No, sir.

12   Q    The 17th, is that when you heard

13   Brian, a guy named Alex, and a guy, Robert,

14   talking about a robbery?

15   A    Yes, sir.

16   Q    So it was a week before, wasn't it?

17   A    Yes.  But I heard them speaking

18   about it plenty of times.

19   Q    Oh.  Plenty of times, you heard

20   them speaking about it?

21   A    Yes, sir.

22   Q    And did you hear them speaking

23   about where it was going to be?

24   A    Yes, sir.

25   Q    Okay.  So you knew it was being

1  spoke about?  It was being planned, and you

2  knew where it was going to be?

3        A     Yes, sir.

4        Q     You knew where Alex lived?

5        A     Yes, sir.

6        Q     And you told the police officers,

7  didn't you, that he lived in the Villa

8  Apartments, by the Big Little Store, didn't

9  you?

10        A     Yes, sir.

11        Q     But you didn't know his last name?

12  Which one is true, Mr. Yoeman, before we go any

13  further?  Did you wake up at 2:00 o'clock that

14  day?  Or were you actually at the Toy Store at

15  1:30?

16        A     I had woke up about 12:00, I

17  believe, at 12:30, 1:00 p.m.  I can't really

18  remember because it was so long ago.

19        Q     Well, let me show you what has been

20  transcribed by the State of Alabama.  It's your

21  statement given to Captain William Moore.

22  Bryan Yoeman on May 23rd, that was 11:39 p.m.

23  that night?  What time did you tell him you

24  woke up?

25        A     2:00 o'clock.  2:00 p.m.

1    Q    2:00 p.m.  Is that what time you

2  woke up?

3    A    Yes.  That's the time.

4    Q    So you woke up at 2:00 p.m. on May

5  23rd?  That's your testimony?

6    A    Uh-huh.

7    Q    You can look at me.  You don't have

8  to look right there at her.  That's your

9  testimony?

10    THE COURT:  Let's go on.

11    Q    Do you know what time the incident

12  happened at the Toy Store?

13    A    I'd say about 1:25, 1:30 p.m.

14    Q    Do you realize that means you were

15  asleep when that happened?

16    A    Yes, sir.

17    Q    So you were not at the Toy Store?

18    A    I was trying to give them an exact

19  time of when it happened.

20    Q    Sir?

21    A    I was trying to give them the exact

22  time of when it happened.

23    Q    Were you at the Toy Store when it

24  happened, or were you not?

25    A    Yes, sir, I was.

```
 1          Q     Are you scared of Brian Smith?

 2          A     No, sir.

 3          Q     You are not scared of him?

 4          A     No, sir.

 5          Q     He didn't make threats to you?

 6          A     Yes, sir, he did.

 7          Q     What kind of threats did he make to

 8     you?

 9          A     Well, he said that if I didn't

10     stick to the statement that something would

11     happen to me and probably my mom.

12          Q     Stick to what?

13          A     That I was suppose to stick to the

14     statement.

15          Q     Stick to what statement?

16          A     To what we said first.

17          Q     What was said first?

18          A     That we was at my house playing

19     video games.

20          Q     Who?

21          A     Me and Brian Smith.

22          Q     Well, have you stuck to that

23     statement?

24          A     No, sir, I haven't, because I --

25          Q     Did you get some notes from Brian
```

1    Smith, while you were at Coffee County Jail,

2    threatening you?

3         A    Yes, sir.

4         Q    Do you know if this Robert Conrad

5    got any notes threatening him?

6         A    I don't know.

7         Q    You don't know about a note he got

8    and a note you got saying:  Niger, I wish you

9    were dead?

10        MR. JARRELL:   Objection.

11        MRS. STOUT:   Objection.

12        THE COURT:   Let's go on.  He said he

13   didn't know.  Let's go on.

14        A    No, sir.

15        Q    Do you know who his people are?

16   You told the police officers that if you told

17   the truth that his people, if they were still

18   out of jail, would get you or your mom?

19        A    No, sir, I don't know them.

20        Q    You don't know.  Okay.  Do you know

21   if any of his people are out of jail?

22        A    No, sir.

23        Q    Do you know why the robbery was

24   being planned, Mr. Yoeman?

25        A    I heard that Brian Smith needed

1    money to move.  Him and his mom needed money to

2    move.

3         Q    Brian Smith and his mom needed

4    money to move?

5         A    Yes, sir.

6         Q    Who did you hear that from?

7         A    Brian Smith.

8         Q    When was the first time that day

9    that you saw Mr. Conrad?

10        A    When we was driving over to the

11   store.

12        Q    Driving towards the store?

13        A    Yes, sir.

14        Q    So you saw him somewhere on the

15   road for the first time?

16        A    Yes, sir.  Down the street from the

17   store.

18        Q    Down the street from the store?

19        A    Uh-huh.

20        Q    Didn't you tell one of these other

21   officers  that Brian Smith wanted you to get

22   your mom's car so y'all could take Robert over

23   to his sister's house.

24        A    That was -- that was what was

25   planned to be said.

1    Q    That was what?

2    A    That was suppose to be the plan of

3  what to be said.

4    Q    Planned of what to be said?  It's

5  what you told this officer?  So what you told

6  the police officer was not true?

7    A    No, sir.

8    Q    So none of this in these statements

9  that you have given on May 25th and May 23rd,

10  none of that is true?

11    A    Yes, sir.

12    Q    Yes, it's true?  Or is anything you

13  told these police officers true in these

14  statements?

15    A    Yes, sir.

16    Q    Yes, it is?

17    A    Yes, sir.

18    Q    Where on the road was the first

19  place you saw Robert Conrad?

20    A    Down the street from the store.

21    Q    On County Road 711 or Highway 27?

22    A    I don't remember what road it was.

23    Q    Four lane or two lane?

24    A    It was a two-lane road.

25    Q    Two-lane road.  Was it the same

1   road that the store was on?

2           A       Yes, sir.

3           Q       Who were you in the car with?

4           A       Brian Smith.

5           Q       Whose car were you on?

6           A       My mom's car.

7           Q       What kind of car is that?

8           A       Chevy, Corsica.

9           Q       What color is it?

10          A       Silver.

11          Q       Is it five speed?

12          A       Yes, sir.

13          Q       What kind of car was Mr. Conrad on

14  when you saw him?

15          A       A light blue LTD.

16          Q       Do you know whose car it was?

17          A       Brian Smith's mom's car.

18          Q       And the first time you saw him was

19  on the road that the Toy Store was on?

20          A       Yes, sir.

21          Q       You were not at the Ramada Inn

22  before you left to go down to the Toy Store?

23          A       No, sir.

24          Q       Do you remember a white man coming

25  by you while you were stopped on the road

1    talking?

2          A    Yes, sir.

3          Q    How many times did he come by you?

4          A    I believe once.

5          Q    You believe once?

6          A    Yes, sir.

7          Q    What were you stopped in the road

8    talking about?

9          A    Brian Smith, he jumped out the car

10   and went to the car where Robert was and talked

11   to him.

12         Q    Where was your car and Brian

13   Smith's car when he stopped and got out and

14   talked to him?

15         A    My car was on the road.  Brian

16   Smith's mom's car was on the grass on the left

17   side.

18         Q    But y'all were at the same place?

19         A    Yes, sir.

20         Q    What did Brian Smith say to him?

21         A    I don't know.

22         Q    What did Brian Smith tell you he

23   was going to go say to him?

24         MRS. STOUT:  Objection.

25         THE COURT:  Sustained.

1        Q    Did Brian Smith carry him

2  anything?  Give him anything?

3        A    No, sir.

4        Q    Did you see a gun on Brian Smith?

5        A    No, sir.

6        Q    No gun.  How were you dressed that

7  day?

8        A    I had on some black shorts, a white

9  T-shirt, some black shoes.

10       Q    Say again?

11       A    I had on black shorts, a white

12  T-shirt and some black shoes.

13       Q    A white T-shirt, black shorts and

14  black shoes?

15       A    Yes, sir.

16       Q    Did your white T-shirt have Ronald

17  McKinnon football camp on it?

18       A    No, sir.

19       Q    How was Brian Smith dressed that

20  day, if you remember?

21       A    I don't remember.

22       Q    You don't remember what he had on?

23  Do you know what you were going to the Toy

24  Store for?

25       A    No, sir.  I was -- I was taking

1    Brian Smith to the store.

2        Q      You knew what you were going for,

3    didn't you?

4        A      Yes, sir.

5        Q      Why were you taking him to go to

6    the Toy Store?

7        A      To go get some bags.

8        Q      Some -- what kind of bags?

9        A      Marijuana bags.

10        Q      Marijuana bags?

11        A      Yes, sir.

12        Q      For you or for Brian Smith?

13        A      Brian Smith.

14        Q      Why did Brian Smith drive his mom's

15    car down there?

16        A      Because that's a car that he let

17    Robert use.

18        Q      Did he tell you that he wanted you

19    to drive because he didn't have a license?

20        MR. JARRELL:  Objection.

21        MRS. STOUT:  Objection.

22        THE COURT:  Sustained.

23        A      Yes, sir.

24        THE COURT:   When I sustain it, please

25              don't answer the question.

1        THE WITNESS:    Okay.

2        Q     After Brian Smith got out of your

3  car, went and got in with Mr. Conrad in the

4  other car and came back, what did you and Mr.

5  Smith do?

6        A     We went straight to the store.

7        Q     And?

8        A     We went inside the store.

9        Q     Who was inside the store then?

10       A     It was a lady and an old man.

11       Q     A lady and an old man?

12       A     Yes, sir.

13       Q     Was Brian Smith's cousin there on

14  the car that you so adequately described to the

15  police?

16       A     No, sir.

17       Q     Do you know where you saw this car?

18  Do you remember describing this car to the

19  police?

20       A     Yes, sir.

21       Q     What kind of car was it?

22       A     It was a Honda.

23       Q     Do you remember you told them the

24  year model and the color?

25       A     I don't remember the year model.

1    Q     In your statement you told them it

2    was a '92 Honda, and it was turquoise green?

3    A     Yes, sir.

4    Q     Did you see that car down there any

5    where?

6    A     No, sir.

7    Q     What did you and Brian do when you

8    got in the store?

9    A     I went in the store and Brian went

10   to the counter to the store.  I was just

11   walking around in the store looking at things

12   in the store.

13   Q     Looking around at things in the

14   store?

15   A     Yes, sir.

16   Q     Who all else was in the store, Mr.

17   Yoeman?

18   A     Just me, Brian Smith, the lady and

19   the old guy.

20   Q     Where were you at in the store

21   looking at things?

22   A     In the back of the store.

23   Q     In the back of the store.  Give me

24   just a minute.  You stayed in the back of the

25   store until somebody else came in?

1179

1      A      Yes, sir.

2           MR. BRADSHAW:    All right.  Mr. Yoeman,

3                step down here, if you would,

4                for a minute.

5      Q      I know you are soft spoken, so you

6   are going to have to speak up so that they can

7   hear you.

8           You said that you took Brian Smith

9   to this store to get some marijuana bags?

10     A      Yes, sir.

11     Q      I'm going to tell you that this is

12   what the State has introduced as an exhibit.

13   That's a diagram of that store.  Does that look

14   familiar to you?

15     A      Yes, sir.

16     Q      That wasn't the first day that you

17   had ever been in the that store, was it?

18     A      That was my first time going to it.

19     Q      That was your first time going

20   there?

21     A      Yes.

22     Q      This right here is the front door

23   and that's a cash register?  This is the front

24   of the store, I'm showing you right here.  If

25   you will walk up there and point to me where

```
 1      you were?

 2             A      Right here.

 3             Q      Back in the back around the

 4      magazine rack.   Right here?

 5             A      Uh-huh.

 6             Q      Where was Brian Smith?

 7             A      Right here.

 8             Q      Right here at the cash register?

 9      MR. JARRELL:    who?

10      MR. BRADSHAW:    Brian Smith.

11             Q      Where was Mr. Ray Grimes, the older

12      white gentlemen?

13             A      He was back here.

14             Q      Right here?

15             A      Uh-huh.

16             Q      You know there were two racks of

17      merchandise about five or six feet high right

18      here?  Do you remember those?

19             A      Can't remember.

20             Q      Can't remember.  Do you remember

21      this rack of shirts right here?

22             A      Yes, sir.

23             Q      You remember that?  You were back

24      here in the very back?  Brian Smith was at the

25      front getting his marijuana bags?  And you say
```

Mr. Ray Grimes was over here where the State

has a cigarette pack drawn?

    A    Uh-huh.

    Q    Then what happened?

    You are going to need to go to this

side so the ladies and gentlemen can see.  Come

to this side right here.

    What happened after Brian purchased

his marijuana bags, and you are in the back

looking around, what happened?

    A    Robert went into the store.  When

he came onto the store he --

    Q    Wait a minute.  Now, who came into

the store?

    A    Robert.

    Q    How do you know it was Robert that

came onto the store?

    A    Because he was down the street from

the store.

    Q    Uh-huh.

    A    Then when he came in the store --

    Q    He was down the street from the

store?  How did you -- did you see this

person's face?

    A    Because it was the clothes he had

1    on.

2        Q     What clothes was that?

3        A     The black clothes.  Black shirt,

4    black pants, the black shoes.

5        Q     And you and him both had on black

6    shoes?

7        A     Yes, sir.

8        Q     Okay.  And did you see the mask

9    before he got there?

10        A     No, sir.

11        Q     Okay.  So you don't know what the

12    mask looked like?

13        A     No, sir.

14        Q     When the person came in the store,

15    he had a mask on?

16        A     Yes, sir.

17        Q     All right.  Go ahead.

18        A     When he came into the store, the

19    old guy was standing right here.  He grabbed

20    him first.

21        Q     He walked past Brian Smith and past

22    -- where was Mrs. Dennis?  Was she back behind

23    the cash register?

24        A     Yes, sir.

25        Q     Taking care of Brian's purchase?

1183

```
 1          A       Yes, sir.

 2          Q       He walked past them two and walked

 3     straight to the man?

 4          A       Yes, sir.

 5          Q       Go ahead?

 6          A       And he grabbed the old guy, put the

 7     old guy on the ground.

 8          Q       Where did he put him on the ground

 9     at?

10          A       Right here.

11          Q       Right there in front of those

12     magazines?

13          A       Yes, sir.  And he made me get on

14     the ground.

15          Q       He made you get on the ground?

16          A       Yes, sir.

17          Q       How did he make you get on the

18     ground?

19          A       He had pointed the gun at me and

20     told me to get down.

21          Q       Did you get down?

22          A       Yes, sir.

23          Q       Where did you get down at now?

24          A       Right here.

25          Q       Right there.  You are all the way
```

1    to the back of the store?

2         A    Yes, sir.

3         Q    Okay.

4         A    And Brian Smith, he was on the

5    ground, too.

6         Q    How do you know he was on the

7    ground, Mr. Yoeman?

8         A    Because I looked.

9         Q    You looked through all this stuff

10   right here and you could see him?

11        A    It was --

12        Q    It was what?

13        A    I could see where they was.

14        Q    You could see where they were?

15        A    Because the store was not big.

16        Q    Uh-huh?

17        A    I could see.  I could see what was

18   all going on.

19        Q    Okay.  You were down on the ground

20   but you could see?  Go ahead?

21        A    And --

22        Q    Why did Brian Smith get down?

23        A    Because he pointed the gun at him,

24   too.

25        Q    Did you see him point the gun at

1   him?

2       A     Yes, sir.

3       Q     After you were down on the ground,

4   you saw him point the gun?

5       A     Yes, sir.

6       Q     Where did Brian Smith get down?

7       A     Right over there.

8       Q     He left from the cash register and

9   walked over here and got down?

10      A     Yes, sir.

11      Q     Somewhere over here in this area

12   that I'm pointing at with the red light?

13      A     Yes, sir.

14      Q     So, you and Mr. Grimes and Brian

15   Smith are all on the ground?

16      A     Yes, sir.

17      Q     The only people standing, you said,

18   is the man with the mask and Mrs. Dennis?

19      A     She wasn't standing.  She was

20   sitting in the chair.

21      Q     Sitting in the chair?

22      A     Yes, sir.

23      Q     Behind this counter?

24      A     Yes, sir.

25      Q     And you could see that from back

1    here?

2         A    Yes, sir.

3         Q    Will you come over here so the

4    ladies and gentlemen can see it?  Come over

5    about right here.  And the floor is not dirty.

6    I know you have on a white shirt.  I want you,

7    with your head facing them, I want you to show

8    them how you got down on the ground.  You put

9    your hands behind your head?

10        A    Yes, sir.

11        Q    Did you hold your head up or put

12   your head down on the floor?

13        A    I was like this, this way.

14        Q    Just like that.  That was the way

15   you were looking?  I know that's uncomfortable,

16   but for five more seconds -- that's the way you

17   were?

18        A    Yes, sir.

19        Q    Did you ever get up on your knees?

20        A    Until he left.  And I went to --

21        THE COURT:    Say that, again.  I couldn't

22             hear.  And I don't think the

23             court reporters or the jurors

24             could.

25        Q    You said what?  You didn't get up

1    before he left?

2         A       Yes, sir.

3         Q       Hop up for me.  Come back up here.

4    You were back here where I'm pointing with this

5    light?

6         A       Yes, sir.

7         Q       You had your head pointing towards

8    these racks or merchandise?

9         A       Yes, sir.

10        Q       And your feet pointing out here

11   towards this clothing rack?

12        A       Head going this way.

13        Q       Head going which way?

14        A       This way.

15        Q       You point and show me which way

16   your head was going and which way your feet was

17   going.  Where was your head pointing?

18        A       This way.

19        Q       Head was this way?  And your feet

20   were down here at this end?

21        A       No.  Feet was down at this end.  My

22   head was at this end.

23        Q       Okay.  They have an arrow on here

24   pointing north, which means this would be

25   east.  It means your head was pointing east.

1    And your feet were pointing to the west?  Is

2    that correct?

3          A     Yes, sir.

4          Q     All right.  You can have a seat

5    back up there for just a moment.

6                Do you know why you would tell

7    these police officers that the first thing the

8    man did was point a gun at you?

9          A     Yes, sir.

10         Q     Why did you tell them that?

11         A     Because that's what he did.

12         Q     That was what he did?  I thought

13   you just told the jurors that he walked past

14   Brian Smith, walked past Mrs. Dennis and went

15   over there and grabbed the old man and put him

16   on the ground?

17         A     Yes.  He grabbed the old man around

18   the neck and pointed the gun at me.

19         Q     Pointed the gun at you?

20         A     Yes, sir.

21         Q     But you had just seen him up the

22   road?

23         A     Yes, sir.  But I didn't know that

24   was him.

25         Q     What do you mean you didn't know it

1   was him?

2          A      I knew it was him.

3          Q      You didn't know that was him, did

4   you?

5          A      I knew it was him, because I could

6   see by the clothes that he had on.

7          Q      Had y'all already planned that you

8   would get down on the ground?

9          A      No, sir.  We ain't planned nothing

10  like that.

11         Q      Y'all ain't planned nothing like

12  that.  What had you planned?

13         A      Brian Smith just told me to take

14  him to the store.  That was it.

15         Q      So you were innocent in that?  You

16  didn't know what was fixing to happen?

17         A      No, sir.

18         Q      But you are willing to give up 20

19  years of your life for something that you

20  didn't know was going to happen, aren't you?

21         A      Right.

22         Q      Right.  Twenty years?  Yesterday

23  you got up there and testified they were going

24  to drop the capital murder charge.  Do you know

25  it said in your recorded statement that it's

1   nolle prosequi?  Do you know what nolle

2   prosequi means, Mr. Yoeman?

3         A     No, sir.

4         Q     Nolle prosequi means that the

5   State, if they want to, for good cause shown,

6   they can bring that capital murder charge back

7   against you.  Did they tell you that?

8         A     Yes, sir.

9         Q     They told you that?  That they

10  could bring the charge back up on good cause?

11  Do you know the charge has not gone away

12  completely?

13        A     Yes, sir.

14        Q     And it could come back?  Yet, you

15  want to testify to these people that you saw

16  this man shoot somebody and give up 20 years of

17  your life, and you never had a thing to do with

18  the planning of it?

19        A     I didn't.

20        Q     You didn't.  Okay.  I just wanted

21  to make sure of that point.

22              Let me ask you about somebody

23  else.  We are going to leave the Toy Store for

24  just a minute.  Do you know Mr. James Morgan?

25        A     No, sir.

```
 1            Q      Do you know Christa Dillard
 2   (phonetic)?
 3            A      No, sir.
 4            Q      Do you know where Shady Grove
 5   Apartments are?
 6            A      No, sir.
 7            Q      What about John or Johnny Farris?
 8            A      No, sir.
 9            Q      You know a lady named Vicky
10   Straughn, though, don't you?
11            A      Vicky Straughn?  No, sir.
12            Q      You never had a date with a Vicky
13   Straughn?
14            A      No.
15            Q      Do you know somebody referred to as
16   Forty?
17            A      Forty?
18            Q      Yeah.
19            THE COURT:    Like 4, O?
20            MR. BRADSHAW:    F-o-r-t-y.
21            Q      Nickname of Forty?
22            A      No, sir.
23            Q      You don't know anything about a 9
24   millimeter gun taken from James Morgan's
25   residence?
```

1    A  No, sir.

2    Q  How did you get an AKS rifle up in

3 the attic of your house?

4    MRS. STOUT: Objection.

5    A  It wasn't --

6    THE COURT: Overruled.

7    A  -- in the attic.

8    Q  It wasn't in the attic of your

9 house?

10    A  No, sir.

11    Q  Was it on the roof of your house or

12 in your bedroom?  Or above it?

13    A  No.  That was B. Smith's gun.  That

14 wasn't mine.

15    Q  That was B. Smith?  Now who is

16 "B. Smith"?

17    A  The guy, who I took to the store.

18    Q  Brian Smith?  Is that who you are

19 referring to?  The Co-defendant?

20    A  Yes, sir.

21    Q  That was his gun?

22    A  Yes, sir.

23    Q  How did it get in your house?

24    A  It wasn't in my house.

25    Q  Why did you tell these police

1    officers on May 23rd and May 25th that as soon

2    as Brian Smith came back, came to your

3    apartment, he said he needed to get that rifle?

4         A    Because that's what he told me to

5    say.

6         Q    That's what Brian Smith told you to

7    say?

8         A    Yes, sir.

9         Q    Well, when you were in here

10   testifying yesterday, is that what Brian Smith

11   told you to say?  Or is that the truth?

12        A    That's the truth.

13        Q    It's the truth that what Brian

14   Smith told you to say?

15        A    Yes, sir.  Not what he told me to

16   say, what I testified.  But you know he told me

17   the things to say when the police first called.

18        Q    And that gun was never at your

19   house?

20        A    No, sir.

21        Q    And none of that ammunition they

22   found on the roof over there, was on your roof,

23   or you knew anything about it?

24        A    I didn't know nothing about that.

25        Q    Any of the guns that were found out

1    there in the woods next to your apartment, none

2    of them were yours?  Or you knew nothing about

3    them?

4          A     No, sir.

5          Q     Do you know anything about a black

6    bag that Alex had?

7          A     No, sir.

8          Q     Was Alex anywhere around the Toy

9    Store?

10         A     No, sir.

11         Q     Was he anywhere around your

12   apartment when you got back from the Toy Store?

13         A     No, sir.

14         Q     So all this stuff about Alex

15   having a black bag and Alex having a gun that

16   was at the Toy Store, was there any truth to

17   that?

18         A     That's what B. Smith -- Brian

19   Smith, told me to say.

20         Q     You know him as B. Smith?  Right?

21         A     Yes, sir.

22         Q     Because you and B. Smith are real

23   good friends?  B. Smith and B. Yoeman?  Y'all

24   are good friends, aren't you?

25         A     Yeah.

```
 1          Q      I need to go back to the Toy Store
 2   just a minute, Mr. Yoeman.  I want to show you
 3   a picture that's already been introduced.  This
 4   one is Defendant's Exhibit A.  And let me ask
 5   you to look at it and see if you recognize it?
 6          A      Yes, sir.
 7          Q      Does that look like a picture of
 8   the outside of the Toy Store to you?
 9          A      Yes, sir.
10          Q      This Toy Store that we're talking
11   about in this diagram?
12          A      Yes, sir.
13          Q      Let me show you what was marked
14   Defendant's Exhibit I, and ask you if you
15   recognize the row of T-shirts, or the rack of
16   T-shirts you said you just recognized here, and
17   then the counter over here, the bottom of those
18   counters that you were over behind.  Do you
19   recognize that?
20          A      Yes, sir.
21          Q      And do you see that those counters
22   come all the way down to the floor?  Right?
23          A      Yes.  But you can see through them.
24          Q      You can see through?
25          A      They got slots right there you can
```

1    see through.

2         Q      Okay.  Slots you can see through?

3    Is that how you were able yesterday to see --

4    when you told this lady you were able to see

5    this lady go down?  And Mr. Conrad put the gun

6    to her chest, you were able to see through

7    those slots?

8         A      Yes, sir.

9         Q      Okay.  Come down for me just a

10   minute.  This thing right here had slots

11   through them?  And that's how you were able to

12   see through?

13        A      (Nodding head affirmatively).

14        Q      Okay.  So you were back here.  And

15   you could look and see through what was going

16   on up here?

17        A      Yes, sir.

18        Q      All right.  This is Defendant's

19   Exhibit B.  Does that look like the cash

20   register where your buddy B. Smith was up there

21   buying these marijuana bags?

22        A      He was on this side.

23        Q      On that side?  Okay.  Is that the

24   same door that you were talking about somebody

25   with a mask came through?

```
1        A      Yes, sir.

2        Q      Now stay right there for me just a

3   minute.  Now, back here, where you said that

4   the old man got down, back there, in the back

5   with you, did you ever see Mr. Conrad come and

6   put him on the ground and touch him in any way

7   or do anything?

8        A      He went in his pocket.

9        Q      He went in his pocket?

10        A      Here.

11        Q      Which pocket?

12        A      I believe it was his right pocket.

13        Q      That's what you told this police

14   officer?  Right?  When it was all fresh on your

15   mind on May 23rd, May 25th.

16               He went in his right pocket and you

17   said, quote, got nothing but change?

18        A      Change fell on the floor.

19        Q      Change fell on the floor:  He

20   pulled out nothing but change.  And then Robert

21   looked back up?

22        A      Yes, sir.

23        Q      Is that what happened?

24        A      Yes, sir.

25        Q      You didn't see him do anything
```

1    else?

2        A    No.

3        Q    How close were you and the old man

4    that was on the ground?  Like me and you?

5        A    Yes, sir.

6        Q    And you were watching him?

7        A    Yes, sir.

8        Q    You didn't see him go and get bills

9    out of his wallet, did you?

10       A    No, sir.

11       Q    Okay.  And did he come over there

12    and get anything from you?

13       A    Yes, sir.

14       Q    What did he get from you?

15       A    I believe it was about $26.00.

16       Q    Twenty-six dollars?  Where did you

17    have $26.00 on you at?

18       A    My right pocket.

19       Q    Your right pocket?  Were you

20    working at the time?

21       A    No, sir.

22       Q    You didn't have a job?

23       A    No, sir.

24       Q    Out of your right pocket?

25       A    Yes, sir.

1          Q      And this guy that you went down

2     there with, he's taking money from you?

3          A      Yes, sir.

4          Q      Did he get any money from B. Smith

5     or Brian Smith?

6          A      Not that I know of.

7          Q      Not that you know of?  Could you

8     see where Brian was when you were looking

9     through these racks right here?  These shelves?

10         A      Excuse me.

11         Q      I'm sorry.  Could you see where

12    Brian Smith got down?

13         A      Yes, sir.  He got down about right

14    here.

15         Q      Okay.  Could you look through here

16    and see him?

17         A      Yes, sir.  I could see him.

18         Q      Okay.  Did you see if this person

19    with the mask on took anything from Brian

20    Smith?

21         A      No.  I didn't see him take anything

22    from him.

23         Q      Now, after he came over, did he get

24    your $26.00 before he got some pocket change

25    from Mr. Grimes or after?

1        A        He didn't really get the change.

2    The change fell on the floor.

3        Q        So he didn't get that?  It fell on

4    the floor?

5        A        Yes, sir.

6        Q        But the thing with the change and

7    Mr. Grimes, was that before your $26.00 or

8    after your $26.00?

9        A        After.

10        Q        After your $26.00?  What did he do

11    next?  What did the man with the mask do next?

12        A        He got the money from me.

13        Q        Speak up, if you will?

14        A        He got the money from me.  He went

15    over there to where the lady was behind the

16    counter.

17        Q        Right here?  She was still behind

18    the counter?

19        A        Yes, sir.

20        Q        And he's walking all around here

21    with his back to her getting your $26.00 and

22    trying to see if he's got any pocket change?

23        A        Yes, sir.

24        Q        All right.  Go ahead.  And he

25    walked back over to the lady?

1     A     He had grabbed her and pulled her

2  from behind the counter.  And him and the lady

3  started tusseling, because she pulled a gun on

4  him.  Him and the lady started tusseling.  She

5  fell down behind on her back.  She fell.  She

6  fell and he was on top of her.  She shot him.

7  He shot her.

8     Q     You still are down back over here

9  like this?  Right?

10    A     Yes, sir.  I can see what's going

11 on.

12    Q     I understand why Mrs. Stout didn't

13 want you to grab her.  But come down and grab

14 me like you saw him grab her, like you saw him

15 grab.

16         Now, are you still back here?  Head

17 going east, feet going west?  And you are down

18 and you're looking through two racks?  And you

19 are seeing all of this going on and him

20 grabbing her?

21    A     Yes, sir.

22    Q     Come and grab me.

23    A     He came around where the cash

24 register was.

25    Q     By the cash register?

```
 1          A       He had grabbed her.

 2          Q       By the arm?

 3          A       Yes, sir.

 4          Q       Okay.

 5          A       And he pulled her and she grabbed

 6     the gun.

 7          Q       With her left hand?

 8          A       I believe so.

 9          Q       All right?

10          A       And him and the lady started

11     tusseling.  So she falls back.

12          Q       She falls back?

13          A       He shot her -- I mean she shot him

14     and he shot her.

15          Q       How do you know that?

16          A       Because that's what I saw.

17          Q       You saw it?

18          A       Yes, sir.

19          Q       You saw the lady shoot the man with

20     the mask?

21          A       I just heard the gunshots.

22          Q       You just heard gunshots?

23          A       Uh-huh.  And I was looking at the

24     same time.

25          Q       Look right here at me.  Did you see
```

```
1     it with your two eyes right there in your head?

2     Or did you just hear gunshots?

3          A      I seen it and I heard it.

4          Q      You seen it and you heard it?

5          A      Yes, sir.

6          Q      What kind of gunshots did you hear?

7     See if you can describe it to me like you did

8     back on May 25th?

9          A      The first gun shots was not that

10    loud.

11         Q      Was not that loud?  And how many

12    was that?

13         A      It was two of them.

14         Q      And --

15         A      And the other gunshots they was

16    louder than the first one.

17         Q      Okay.  When did he get the money

18    out of the cash register, Mr. Yoeman?

19         A      When he went over there, when she

20    was behind the cash register that was when he

21    grabbed the money and put it all in his pocket.

22         Q      At what point in time during this

23    scenario that you have just told us?

24         A      When she was sitting behind the

25    counter.  When he walked over there, he put his
```

1   hands in the cash register and grabbed the

2   money and pulled the lady from behind the

3   register.

4          Q      This was after he got your $26.00?

5          A      Yes, sir.

6          Q      So you are telling this jury that

7   this man comes in to rob the store, and he

8   wants a 79-year-old man's pocket change and

9   your $26.00 before he wants the money out of

10  the cash register?

11         A      That's what happened.

12         Q      That's all I'm asking, is what

13  happened.  Well, that's not quite what Mr. Ray

14  Grimes said happened.  Is Mr. Ray Grimes lying,

15  or are you lying?

16         A      I'm not lying.

17         Q      You're not lying?  So what Mr. Ray

18  Grimes said happened, it didn't happen, if it's

19  different from what you are saying?

20         A      Right.

21         Q      All right.  How did he get the

22  money out of the cash register?

23         A      He put the gun in his left hand and

24  stuck his right hand in the cash register and

25  pulled the money out and stuck it in his right

1    pocket.

2         Q      In his right pocket?  You saw him

3    do that?

4         A      Yes, sir.

5         Q      Did you see him drop the $5.00

6    bill?

7         A      No, sir.

8         Q      You didn't see him drop a $5.00

9    bill?

10        A      No, sir.

11        Q      Okay.  Did Mrs. Dennis ever take

12   any money out and put it on the counter or lay

13   it on the cash register for him?

14        A      No, sir.

15        Q      But you had a good view of this

16   cash register from back in the back laying on

17   the floor?

18        A      Yes, sir.  Because it was sitting

19   up there on the counter.

20        Q      Right.  This one right here?

21        A      Yes, sir.

22        Q      Okay.  How many shots did you

23   hear?  You said that you heard two soft shots

24   or not to loud shots?  And then you heard four

25   louder shots?

```
1        A       I didn't say "four."

2        Q       You didn't say "four"?  How many?

3        A       I don't remember it was -- it was

4   so many.

5        Q       Come around if you will, and stand

6   right here where the jury can see.  All this

7   happened -- did I understand all of this

8   happened behind the counter, is what you are

9   saying?  Or did they come from behind this

10  area?

11       A       He pulled her around the counter.

12       Q       Around the counter?  Out in this

13  area?  Have you ever seen this?

14       A       Yes, sir.

15       Q       Where did you see that at?

16       A       That's the gun that was on the

17  floor.  That was the gun that she shot him

18  with.

19       Q       That's the gun that she shot him

20  with?

21       A       Yes, sir.

22       Q       Was it on the floor right here?

23       A       Yes, sir.

24       Q       Right here?

25       A       Yes, sir.
```

```
 1          Q       Did you pick it up and fire it?

 2          A       No, sir.

 3          Q       Did your good friend, B. Smith,

 4    Brian Smith, did he pick it up and fire it?

 5          A       No, sir.

 6          Q       Your prints and Brian Smith's

 7    prints wouldn't be --

 8          THE COURT:    If you will point that down.

 9          MR. BRADSHAW:    I'm sorry.

10          Q       You didn't touch it, kick it, or

11    move it in any way?

12          A       No, sir.

13          Q       How do you know it was there?

14          A       Because that's where she shot him,

15    and where he shot her.  She let the gun go, and

16    she crawled back behind the cash register.

17          Q       Did y'all hear him --

18          THE COURT:    Will you say that over?  The

19                   jurors indicated that they

20                   couldn't hear that.  Why don't

21                   you turn and talk towards the

22                   jurors.

23          MR. BRADSHAW:    The question was, I

24                   asked, I said:  How do you know

25                   the gun was right there?
```

```
 1          Q        And tell the jurors what you just

 2    said?

 3          A        Well --

 4          Q        You said that's where she shot him?

 5          A        Yes, sir.

 6          Q        And when she got shot, what?

 7          A        She had the gun.  She dropped the

 8    gun right there, and she crawled behind,

 9    towards the cash register.  And she put the

10    phone cord back in the wall.

11          Q        She put the phone cord back in the

12    wall?

13          A        Yes, sir.

14          Q        Why would she put the phone cord

15    back in the wall?

16          A        Because when he came in the door,

17    he ripped the phone cord out of the wall.

18          Q        Well, Mr. Yoeman, when did he do

19    that?  We have already been through this

20    scenario twice now.  And here we go with

21    something else that happened.  The first time,

22    he didn't even get the money.  When did he get

23    the phone cord?

24          A        When he first came into the store.

25          Q        You told this officer the first
```

1    thing that he did when he came in the store was

2    was point the gun at you?

3         A    He did.  Pointed it for me to get

4    on the ground.  And then he grabbed the phone

5    cord.  And then he grabbed the old guy.

6         Q    Is there any place in your

7    scenario, your story, that you want to change

8    again?

9         A    No, sir.

10        Q    Do you know why that gun wound up

11   way back over here?  You and Brian Smith didn't

12   reach up and pick it up and throw it over

13   there?

14        A    No, sir.

15        Q    Y'all didn't ever fire it?

16        A    No, sir.

17        Q    Alex was not there?  And he didn't

18   pick it up?

19        A    No, sir.

20        MR. BRADSHAW:  Have a seat back on the

21             stand.  Just a minute please.

22        Q    Do you know what kind of gun that

23   is, Mr. Conrad (sic)?

24        A    Excuse me.

25        Q    Do you know what kind of gun this

1    is?

2         A    No, sir.

3         Q    Are you familiar with guns?

4         A    Not really.

5         Q    Not really?

6         A    No, sir.  That's kind of what you

7    told Officer Bill Moore back and May 23rd.  You

8    said:  I'm not good with guns.

9         A    I'm not.

10        Q    But you told him that Brian Smith

11   or B. Smith had a .22 or a .25

12        A    Yeah.  Because it was a small gun.

13        Q    That Brian Smith had?

14        A    Yes, sir.

15        Q    You had seen it?

16        A    Yes, sir.

17        Q    And you told him that you thought

18   Robert Conrad had a .45?

19        A    Yes, sir.

20        Q    Or a 380 or 9 millimeter, you said?

21        A    Yes, sir.

22        Q    And do you remember telling one of

23   your cell mates that it was a 357 Magnum?

24        A    One of my cell mates?

25        Q    Mr. Mark Hines over at Covington

1    County Jail.  Do you remember having a

2    conversation with him about this?

3           A      No, sir.

4           Q      You don't remember telling him it

5    was a 357 Magnum?

6           A      No, sir.

7           Q      You know a lot of different caliber

8    pistols not to be good with guns.  Do you own

9    any guns?

10          A      No, sir.

11          Q      Never owned -- let me ask it this

12   way:  Have you ever possessed a gun?

13          A      No, sir.

14          Q      And you don't need to come back to

15   the diagram, Mr. Yoeman.  But you said after

16   Mr. Conrad went out the door, that's when you

17   got up?

18          A      Yes, sir.

19          Q      Was Mr. Smith or Mr. Grimes, were

20   they already up or getting up at the same time?

21          A      Well, Mr. Grimes, he was the first

22   person to get up.  He ran outside to his truck.

23          Q      What did you and Brian Smith do?

24          A      Well, I got up, and I asked the

25   lady that got shot how could I help her.

1    Q    You stayed in there and talked to

2  her?

3    A    Yes, sir.

4    Q    And when you talked to her, had she

5  already gotten behind the counter?

6    A    She was crawling that way.

7    Q    Crawling.  What else did you do?

8    A    Well, she told me stuff like she

9  was going to die.  I went outside and asked the

10  old guy how could I help him.

11    THE COURT:  When you are referring to the

12         "old guy," would you look around

13         the courtroom and see if you see

14         the person that you keep talking

15         about as "the old guy."  Would

16         you recognize him again?  You

17         can get up and walk around and

18         see if you can find him, and

19         point him out if he's here.

20    THE WITNESS:  I believe that's him right

21         there.

22    THE COURT:  Go over in that direction

23         and point out a little bit

24         better who you are talking

25         about.

1          (Witness indicating).

2     THE COURT:  Okay.  Mr. Grimes, why don't

3             you come up and we will get you

4             a chair.  You have the right to

5             be sitting up here.

6     MR. SMITH:  Judge, might I ask the Court

7             at this point to note a little

8             later at side bar, I want to

9             interpose some remarks.

10    THE COURT:  Sure.

11    MR. SMITH:  Thank you, Your Honor.

12    THE COURT:  Go ahead.

13    Q     So, how long were you and Brian

14  Smith and Mrs. Jelaine Dennis the only ones

15  still in this store?

16    A     It wasn't that long.

17    Q     Give me your best guess in

18  minutes.  Two minutes?  Four minutes?  Ten

19  minutes?

20    A     I'd say about two minutes.

21    Q     About two minutes?

22    A     Yes, sir.

23    Q     Just the three of you in there?

24    A     Yes, sir.

25    Q     Did you ever look outside and see

1    where the man with the mask had gone?

2         A    When I went outside, after I asked

3    the lady what could I do to help, and she told

4    me she was going to die.  Well, I went

5    outside.  And I seen the guy.  He was running

6    up the street.

7         Q    He was running up the street?

8         A    Yes, sir.

9         Q    Which way?

10        A    Well, he come out the store, to the

11   right-hand side.

12        Q    He came out of the store, went to

13   County Road 711?  County Road 711 sits to the

14   right?

15        A    Yes, sir.

16        Q    Did he still have the mask on?

17        A    Yes, sir.

18        Q    Did he have a bag of money and gun?

19        A    I didn't see a bag.

20        Q    You didn't see a bag?

21        A    No, sir.

22        Q    Did you see a gun?

23        A    He had the gun in his hands while

24   he was running.

25        Q    He did?  Did you and B. Smith or

1   Brian Smith go and pick up that man?

2        A    No, sir.

3        Q    You don't remember giving a

4   statement saying where you said you went and

5   picked him up?

6        A    That's what Brian Smith told me to

7   say.

8        Q    And you said what Brian Smith told

9   you to say?

10       A    Yes, sir.

11       Q    Brian Smith was kind of calling all

12   of the shots here, wasn't he?

13       A    Yes, sir.

14       Q    He was pulling your string, wasn't

15   he?

16       A    Yes, sir.

17       Q    Were you working for him?

18       A    No, sir.

19       Q    Are you intimidated?  Do you know

20   what I mean by "intimidated?"

21       A    Yes, sir.

22       Q    Were you intimidated by him and

23   want to be like him and do whatever he said to

24   do?

25       A    No.  I don't want to be like him.

1    Just the threats that he gave.

2         Q    Did you see what color the gun was

3    that the masked person had on?  The masked

4    person had with him?  I'm sorry.

5         A    It was like a gray and black.

6         Q    Gray and black?

7         A    Yes, sir.

8         Q    What was gray?  And what was black?

9         A    It just, like, the handle part was

10   like black.  And like, underneath it, was like

11   gray.  On top of it, it was like back.

12        Q    And you could see all that with

13   this person's hand wrapped around it?  You

14   could tell all that?

15        A    Yes, sir.

16        Q    And you had seen it before, hadn't

17   you?

18        A    No, sir.

19        Q    You didn't see Brian Smith with

20   with that gun?

21        A    No, sir.

22        Q    Now, just a couple of more things

23   Mr. Smith.  Excuse me, Mr. Yoeman.  You said in

24   your statement back in that little side room

25   when you struck your deal yesterday, that you

1    had heard them planning this event?

2         A    Not this robbery.  But I heard them

3    plan some robbery.  But I didn't know this was

4    the one that was going to happen.

5         Q    Your attorney told this Court that

6    you knew and heard these people planning this?

7         A    I heard them saying the "Toy

8    Store."  But I didn't know that they was going

9    to rob the Toy Store.

10        Q    What did you think they were going

11   to do, Mr. Yoeman?  Go buy marijuana bags at

12   the Toy Store?

13        A    I guess so.  That's why B. Smith

14   told me to take them to the store.

15        Q    You didn't ask Mr. Smith what y'all

16   were doing stopping in the road and him going

17   and getting in the car and talking?  You didn't

18   ask any questions?

19        A    No, sir.  He just told me he needed

20   to talk to Robert.  That was all.

21        Q    How come you never told the police

22   that you had money taken from you?

23        A    I did tell them that money was

24   taken from me.

25        Q    You didn't tell them in your two

1       recorded statements, sir?

2              A      Well, if they'd asked, I told them.

3              Q      No, sir.

4              A      Yes, I did.

5              Q      Here's a statement of May 23rd.

6       And here's a statement of May 25th.  You can

7       look at it and find it for me if you want to.

8              Q      Is it in there?

9              A      No, sir.

10             Q      Is that something that B. Smith may

11      have just told you to say, too?

12             A      No, sir.

13             Q      But you didn't tell the officers

14      that you had been robbed?

15             A      Yes.  They knew I got robbed.

16             Q      You were in this side room

17      yesterday when this deal was struck for you to

18      get up here and testify, weren't you?

19             A      Yes, sir.

20             MR. BRADSHAW:  Judge, we want to offer

21                    this as Defendant's

22                    Exhibit A A.  And we offer it

23                    into evidence.  I will take the

24                    tabs out of it.

25             MR. JARRELL:   What is it?

1219

1    THE COURT:    He's offering the settlement

2                 agreement reached between the

3                 District Attorney, the Defendant

4                 and the Defendant's attorney

5                 yesterday.

6    MRS. STOUT:    He's questioned this person

7                 on the stand.  He's questioned

8                 him about this.  For what

9                 purpose is he offering this?

10                He's questioned him now.  He's

11                questioned him about his

12                residence.

13   THE COURT:  Is that an objection?

14   MRS. STOUT:  That's an objection.

15   THE COURT:  Objection is overruled.  It's

16               in evidence as Defendant's

17               Exhibit, what?

18   MR. BRADSHAW:   Defendant's Exhibit A A.

19      Q     Mr. Yoeman, you said yesterday

20   under oath when you were giving your little

21   illustration out here that the lady shot the

22   man, first?  You said today you saw it.  And

23   you heard the lower gunshots, and you saw that

24   with your eyes.  That was your testimony?

25                Back here yesterday in this room

1   you told Mrs. Stout that you were not sure.

2   Are are you sure?  Or are you not sure?

3          A    I'm sure.

4          Q    You're sure?

5          THE COURT:   For the record, when we are

6                       out of the hearing and presence

7                       of the jury, when we take our

8                       first break, the Court's

9                       rational in allowing that to go

10                      into evidence.  Has it been so

11                      marked by the court reporter?

12         MR. BRADSHAW:  It has been so marked.

13         THE COURT:  I want the court reporters to

14                     do what they need to do to make

15                     sure that things are marked

16                     properly.

17         MR. SMITH:   It's premarked.

18         THE COURT:   Okay.

19         Q    Brian, have you ever worked at

20   Kentucky Fried Chicken?

21         A    Yes, sir.

22         Q    When did you work there?

23         A    I really don't remember the months

24   that I worked there.

25         Q    Do you remember the years?

1       A       Yes, sir.

2       Q       When was the year?

3       A       2000.

4       Q       Did you work there in 2001?

5       A       No, sir.

6       Q       You didn't work any of the months

7   during 2001?

8       A       No, sir.

9       Q       Do you know a gentlemen by the

10  name of George Roberson?

11      A       Yeah.  He used to work with me.

12      Q       He used to work with you where?

13      A       At K.F.C.

14      Q       At K.F.C?

15      A       Yes, sir.

16      Q       You didn't work there with him in

17  February and March, April and the first of May

18  before this incident at the Toy Store?

19      A       No.  I wasn't working there in May.

20  I don't remember.

21      Q       You don't remember?

22      A.      No, sir.

23      Q       But you know Mr. Roberson?

24      A       Yes, sir.

25      Q       Is he a black or a white man?

1       A       Black man.

2       Q       Black man.  Do you remember you and

3   him talking about doing a robbery?

4       A       No, sir.  I never talked to him.

5       Q       You never talked to him?

6       A       Yes, I talked to him.  But I didn't

7   ever talk to him about the robbery or anything.

8       Q       You don't remember you and him

9   riding one day over your break or one evening

10  on your break down, down to the Inland Station

11  to get some Black and Milds?

12      A       That never happened.

13      Q       That never happened?

14      A       No, sir.

15      THE COURT:    Riding on what?

16      MR. BRADSHAW:  On his car down to the

17  Inland Station to get some black --

18      Q       Do you smoke Black and Mild cigars?

19      A       No, sir.

20      Q       Did Mr. Roberson?

21      A       Yes, sir.

22      Q       How long did you work there with

23  him?

24      A       I would say about two months.  Two

25  or three months at the most.

1    Q    You never told him anything about

2   you planning a robbery there?

3    A    No, sir.

4    Q    Do you know a gentlemen by the name

5   of Steve Brown?

6    A    No, sir.

7    Q    You are not familiar with him?  I

8   want to draw your attention back to May 13th of

9   last year.  May the 13th.  And that was on a

10  Sunday.  And I believe that would have been two

11  Sundays prior to this incident at the Toy

12  Store.

13         You don't recall telling Mr. George

14  Carlee Roberson that you and your buddies had

15  cased the place out at the Toy Store?

16      MR. JARRELL:   May we have a side bar?

17      THE COURT:    Sure.

18                    Ladies and gentlemen

19            of the jury, we have reached a

20            point where we can take a

21            break.  We will take at least 15

22            minutes.

23                    Again, the Court is

24            required to instruct you and

25            does instruct you not to discuss

1          this matter among yourselves,

2          nor allow anyone to discuss it

3          with you.

4                  If everyone will remain

5          while the jurors exit.

6          (Jurors exited the courtroom).

7     THE COURT:  The record will reflect we

8          are now out of the hearing and

9          presence of the jury.

10                 You may continue.

11    MR. JARRELL:   He's giving the

12         appearance, and obviously taken

13         information to ask question

14         from, a statement that he has

15         not laid proper predicate for.

16         This statement is between a Mr.

17         Roberson and an Investigator

18         Norris with the D.A.'s office.

19         He has no knowledge of --

20    THE COURT:   Where are you going with

21         this?

22    MR. BRADSHAW:  I'm just asking --

23    THE COURT:  First of all, you are not at

24         this time asking that that be

25         admitted into evidence?

```
 1          MR. BRADSHAW:  No, sir.

 2      THE COURT:   And you are just using that

 3              to ask him questions?

 4      MR. BRADSHAW:   I'm not reading directly

 5              from it, Judge, I've just got

 6              highlights, and I'm --

 7      THE COURT:   As long as you don't read

 8              directly from it.

 9      MR. BRADSHAW:   Right.  I'm just trying

10              to jog his memory with his

11              conversations with Mr. Roberson.

12      MRS. STOUT:   If he had conversations

13              with Mr. Roberson.

14      THE COURT:   Okay.

15      MR. SMITH:   Judge, the point that I put

16              in front of Your Honor, I just

17              have to respectfully ask the

18              Court to, and it would be an

19              objection to Your Honor's

20              questions during the course of

21              cross examination of Mr. Yoeman.

22              I would interpose an objection

23              to the questions that were

24              asked.

25      THE COURT:   Objection is overruled.
```

```
 1                        That was proper.  It clarified

 2                        something for the ladies and

 3                        gentlemen of the jury who the

 4                        person he was talking about

 5                        was.  It is very proper.

 6                        Objection overruled.  There is

 7                        no question about it.  And when

 8                        we get to a certain point when I

 9                        get a charge to the jury, and

10                        they go back to deliberate, I

11                        don't want the lawyers to leave

12                        here because I want to take up

13                        some matters with y'all.

14                            This court is in recess.

15                 THE COURT:  This court will come back to

16                        order.  You may proceed.

17                 MR. BRADSHAW:  Thank you, Your Honor.

18            Q    Mr. Yoeman, you said you knew Mr.

19      George Roberson?  Is that right?

20            A    I didn't say that.

21            Q    Sir?

22            A    I didn't say that.

23            Q    Did you know Mr. George Roberson?

24            A    No, sir.

25            Q    Did you ever work at Kentucky Fried
```

1      Chicken?

2              A      Yes, sir.

3              Q      When you worked there, was there a

4      George Roberson working there?

5              A      Yes, sir.  A black guy.

6              Q      A black guy?

7              A      Yes, sir.

8              Q      Do you know him?

9              A      Yes, I know him.  But not like, you

10     know, never been, like, around him that much.

11             Q      Well, let me ask you a couple of

12     questions about Mr. Roberson.  Did you ever

13     tell him after he told you they were going to

14     have a gun down there, and you said, "That's

15     all right.  My friend's got a gun"?

16             A      No, sir.

17             Q      You didn't tell him that?  Did you

18     ever tell him that you were going to use your

19     momma's car in the robbery and him to the tell

20     you, don't do that?

21             A      No, sir.

22             Q      Did you tell him that's all right.

23     We ain't going to involve my momma, we got

24     another car?

25             A      No, sir.

```
 1          Q      You didn't tell him that either?
 2    You didn't say:  No.  No, we not going to use
 3    that car.  We got another one?
 4          A      No, sir.
 5          Q      And did you ever tell him:  That's
 6    all right.  This place ain't for me?
 7                 Did you tell him:  This place ain't
 8    for me?  That after this happened, that you
 9    weren't going to work at K.F.C. anymore?  You
10    were going to go back to Florida?
11          A      No, sir.
12          Q      Are you from Miami or Orlando?
13          A      Orlando, Florida.
14          Q      Orlando.  You didn't ever tell him
15    that you were going to go back to Orlando after
16    this?
17          A      No, sir.
18          Q      Mr. Yoeman, did you get a call that
19    Mr. Conrad and his attorneys were going to try
20    to put all the blame on you?
21          A      Did I get a call?
22          Q      Did you get information that
23    Mr. Conrad and his attorneys were going to try
24    to put all this on you?
25          A      No, sir.
```

1        Q     When did you make this great

2   decision to try to come over here and testify

3   and cut a deal?

4        A     Because --

5        Q     When?

6        A     When?  Yesterday.

7        Q     Yesterday is when you decided?

8        A     Yes, sir.

9        Q     How long have you been in the

10  Covington County Jail?

11        A     A year and three months, now.

12        Q     You didn't stay any time at the

13  Coffee County Jail?

14        A     Yes, sir.  When I first -- when the

15  incident happened, I only stayed there for like

16  a month.

17        Q     For a month?

18        A     Yes, sir.

19        Q     And you didn't get a chance to talk

20  to Mr. Mark Hines over there?

21        A     No, sir.

22        Q     Well, in information from Mark

23  Hines and in two statements that you've given

24  to Mr. Moore and Mr. Norris, and information

25  that Mr. Roberson, did you tell all that -- not

1230

1    Mr. Roberson, but those others, that the lady

2    shot first?  Do you still stand by that

3    statement?

4         A    Yes, sir.

5         Q    That's the only consistent

6    statement all of your stuff is --

7         MRS. STOUT:  Objection.

8         THE COURT:  Sustained.

9         Q    After you said you were going to go

10   get some help, where did you go?

11        A    I went to the house that was down

12   the street from the store.

13        Q    Is it a house or a mobile home?  A

14   manufactured home?  I'm sorry?

15        A    It was like a house.

16        Q    Like a house?

17        A    Yes, sir.

18        Q    Could you still see the Toy Store

19   from there?

20        A    Yes, sir.

21        Q    And I believe you testified, and

22   it's in your transcript in Defendant's

23   Exhibit AA, that you heard a TV, but you

24   couldn't get anybody to come to the door?

25        A    Yes, sir.

1    Q    And you stayed there how long?

2    A    Not that long.

3    Q    You said in your statements to a

4    police officer, where you said that you

5    remember telling the truth, a minute-and-a-half

6    or two minutes you stood at the door?

7    A    Yes, sir.

8    Q    Now, is it my understanding that

9    the person with the mask left out of the

10   building before you did?

11   A    Yes, sir.

12   Q    Do you know if that person had a

13   car waiting anywhere or somebody to pick them

14   up?  Do you know?

15   A    Yes, sir.  The car, Brian Smith's

16   mom's car.

17   Q    How do you know that?

18   A    Because the car was parked down the

19   street.

20   Q    How do you know that?

21   A    Because that's where we met up,

22   down the street.

23   Q    I know you met up.  But you said

24   you drove off and went straight to the store.

25   How do you know where he parked?

1    A    Because when we seen him running,

2  that's where he was going, to the car.

3    Q    Did you see the car?

4    A    It was right around the corner.

5    Q    Did you see the car with your own

6  two eyes, Mr. Yoeman?    That's what I'm asking

7  you?

8    A    No, sir.

9    Q    So you don't know what was there,

10  do you?

11    A    No, sir.

12    Q    You don't know who picked up the

13  masked man, do you?

14    A    No, sir.

15    Q    After you went to this trailer,

16  this mobile house, and you couldn't get anybody

17  to come to the door, then what did you do?

18    A    I went home.

19    Q    You went straight home?

20    A    Yes, sir.

21    Q    Did Mr. B. Smith, Brian Smith, get

22  up there and knock on the door with you?  Or

23  did he stay in the car?

24    A    He sat in the car.

25    Q    You didn't go back to the Toy

1233

1    Store?

2         A       No, sir.

3         Q       You left the lady there who had

4    been shot and said she was dying?  You didn't

5    go back and offer any assistance.

6         A       No, sir.

7         Q       And this other person, as you said,

8    left and went and got in the car, left before

9    you?  And then you make a two-minute stop to

10   knock on somebody's door?  You still got back

11   to those apartments, where you and B. Smith

12   lived, before that person did?

13        A       Yes, sir.

14        Q       Did you drive 80 miles an hour?

15        A       No, sir.

16        Q       Well, the police officer testified

17   the other day that he saw that blue LTD going

18   up the Geneva Highway at a rapid rate of speed.

19        A       I was not the driver of the car.

20        Q       I didn't say you were, sir.  I'm

21   just saying that you got back to those

22   apartments before the blue car.

23             Now, is it your testimony that you

24   were sitting in your apartment when you saw

25   that blue LTD pull up?

1    A    Yes, sir.

2    Q    What happened after that?

3    A    Well, B. Smith, Brian Smith, told

4  me that he was going to go home.

5    Q    Was he in the apartment with you?

6    A    Yes, sir.

7    Q    So you and him -- I believe you

8  said that y'all were watching a movie?

9    A    Yes, sir.

10    Q    You just saw somebody get killed

11  and tell you that they were dying; and you go

12  home, sit down and watch a movie?

13    A    The movie was already on, sir.

14    Q    It didn't bother you one bit to see

15  that lady dying, did it?

16    A    It really did.  That's why I

17  couldn't go back to the store because it scared

18  me.

19    Q    You couldn't go back to what?

20    A    To the store.

21    Q    Because why?

22    A    Because it scared me, for real.

23    Q    Scared you, for real?

24    A    Yes, sir.

25    Q    Scared you so bad you told about

1   three or four lies to police officers, didn't

2   you.

3            Brian Smith scared you more than

4   that though, didn't he?

5        THE COURT:   I didn't hear his answer to

6            to first question.

7        MRS. STOUT:  He wasn't allowed to answer

8            it.

9        MR. BRADSHAW:   Can the court reporter

10           read it back, please.

11       THE COURT:   Sure.  I believe it was

12           something to the effect that it

13           scared him so bad that he lied

14           to the police three times, or

15           something along those line.

16       MR. BRADSHAW:   That's what it was.

17       THE COURT:  What was the answer to that

18           question?

19       THE WITNESS:   Which question do you want

20           me to answer?

21       Q     It scared you so bad that you lied

22   to at least three police officers about what

23   happened?

24       A     Yes, sir.  Because that's what I

25   was threatened about.

1    Q    You were threatened about?

2    A    Yes, sir.

3    Q    Who threatened you?

4    A    Brian Smith.

5    Q    Brian Smith.  Robert Conrad didn't

6 threaten you, did he?

7    A    No, sir.

8    Q    You ain't talked to Robert Conrad

9 since that day, have you?

10    A    No, sir.

11    Q    You didn't talk to him that day,

12 did you?

13    A    No, sir.

14    Q    Because you and him are not

15 friends?  When you said Brian Smith was going

16 to leave, where did he go?

17    A    He went to his apartment.

18    Q    How do you know that, Mr. Yoeman?

19    A    Because he ran straight down that

20 way.

21    Q    He ran straight -- did you get up

22 off of your couch from your movie and watch him

23 run down to his apartment?

24    A    No, sir.  Because he told me he was

25 going to run down there.

1237

```
 1          Q       He told you?

 2          A       Yes, sir.

 3          Q       And you believe everything that

 4   Brian Smith tells you?

 5          A       That's what he told me.

 6          Q       So you don't believe everything he

 7   tells you?  What did you do when he said that

 8   he was leaving to go down to stay at his

 9   apartment?

10          A       Stayed home.

11          Q       When was the next time anything

12   happened?

13          A       I would say about five or ten

14   minutes later, Brian Smith and Robert pulls up.

15          Q       "Pulls up"?

16          A       Yes, sir.

17          Q       Does that mean in a vehicle?

18          A       Yes, sir.

19          Q       What vehicle?

20          A       In Brian Smith's Mom's car.

21          Q       Both of them were in the car?

22          A       Yes, sir.

23          Q       How do you know they pulled up?

24          A       Because I looked out my window and

25   I seen them pull up.
```

1   Q    Where was Robert Conrad?

2   A    Inside the car.

3   Q    Just sitting there?

4   A    Yes, sir.

5   Q    And what did y'all do?

6   A    Brian Smith, he came upstairs and

7   told me to help him take him to the hospital,

8   because I was the only one that had license.

9   Q    Well, who drove the car up when it

10  pulled up?

11  A    Brian Smith.

12  Q    Why couldn't he drive on to the

13  hospital?  Can he drive?

14  A    Yes, sir, he can drive.

15  Q    And you voluntarily and happily

16  jumped downstairs and went out and drove them

17  to the hospital, didn't you?

18  A    Yes, sir.

19  Q    And then, what did you do?

20  A    Well, we took him to the hospital.

21  We had pushed him in by wheelchair.

22  Q    You pushed him in by a wheelchair?

23  Then tell these ladies and gentlemen of the

24  jury what you commenced to do after that,

25  Mr. Yoeman?

1       A       I went back home.

2       Q       And?

3       A       Me and my mom -- me, my mom, and

4    Brian Smith, we went to Dothan.

5       Q       To look at new houses?  Right?

6       A       Yes, sir.

7       Q       Went house shopping right after all

8    this?

9               THE COURT:  Is that a question?

10      Q       Did you go house shopping right

11   after all this?

12      A       Yes, sir.  Because --

13      Q       Thank you.  Let me go back and ask

14   you again, do you remember discussing with

15   anybody about the fact that the Toy Store,

16   being all out by itself and didn't have any

17   close neighbors or any threat of them?  Do you

18   remember you and Mr. Roberson discussing that?

19      A       No, sir.

20      Q       You don't remember him telling you,

21   and you responded, when he said:  They're gonna

22   have a gun.

23              And you said:  That's all right.

24   We got a gun?

25      A       No, sir.  Me and him never talked.

```
 1        Q      Y'all never talk at all?

 2        A      We talked.  But we didn't talk that

 3    much.

 4        Q      Do you remember Mr. Roberson

 5    telling you, Brian, that if it got hot, for you

 6    to go to Wal-Mart and be arrested there,

 7    because there would be a lot of people, and

 8    that way the police couldn't shoot you?  Do you

 9    remember him telling you that?

10        A      No, sir.

11        Q      Where did you get arrested, Mr.

12    Yoeman?

13        A      At Wal-Mart.

14        Q      Did you tell your mom all of what

15    happened while you were down there looking at

16    new houses?

17        A      Yes, sir.

18        Q      What did she tell you?

19        A      She asked me did I have anything to

20    do with it.

21        Q      What did you tell her?

22        A      I told her no.

23        Q      You told her that you didn't have

24    nothing to do with it?

25        A      Right.
```

1241

```
 1        Q      You told her that you would just
 2   give up 20 years of your life for something
 3   that you didn't have nothing to do with?
 4        A      Yes, sir.
 5        Q      You told her that?
 6        A      I didn't tell her that.
 7        Q      You didn't tell her that.  What did
 8   your mom tell you when you told her over there,
 9   when you were looking at those new houses over
10   in Dothan --
11        MR. JARRELL:  Objection.
12        THE COURT:  Sustained.
13        Q      Did you ever call the police?
14        A      No, sir.
15        Q      Did you ever tell one of these
16   officers that you did call the police for help?
17        A      No, sir.
18        Q      Did your mother ever tell you that
19   she was going to take you to the Enterprise
20   Police Department --
21        MR. JARRELL:  Objection.
22        THE COURT:  Sustained.
23        Q      And this decision that you made to
24   get up here and tell your story was made
25   yesterday?
```

```
1        A      Yes, sir.

2        Q      Not before?

3        A      No, sir.

4     MR. BRADSHAW:    If I can have just a

5                moment, Your Honor?   I don't

6                think we have anything else of

7                this man.

8     THE COURT:   Sure.

9     MR. BRADSHAW:    That's all we have at

10                this time, Judge.

11     THE COURT:    Mrs. Stout.

12     MRS. STOUT:   Yes, sir, Your Honor.

13                REDIRECT EXAMINATION

14  BY MRS. STOUT:

15        Q      Mr. Yoeman, was yesterday the

16  first time that your attorney had talked to you

17  about working something out with the District

18  Attorney's office?

19        A      Yes, ma'am.

20        Q      Yesterday was?

21        A      Yes, ma'am.

22        Q      Mr. Yoeman, let's talk about your

23  statement back on May the 25th of 2001.  That

24  was two days after the incident had occurred at

25  the Toy Store?  Is that correct?
```

1       A     Yes, ma'am.

2       Q     Now, have you seen any of these

3  statements or reread any of these statements?

4       A     Only one them!

5       Q     Which one?

6       A     The first one that my lawyer sent

7  me.

8       Q     Okay.  Have you read the one of May

9  25th of 2001?

10      A     No, ma'am.

11      Q     Are you testifying here from your

12  recollection of the events that took place on

13  that date?

14      A     Yes, ma'am.

15      Q     On May 25th of 2001, two days after

16  this event took place, strike that -- as you

17  have been cross examined about two statements

18  --

19      A     Excuse me.

20      Q     As you have been cross examined by

21  defense counsel about two statements --

22      A     Yes, ma'am.

23      Q     -- have you had any difficulty in

24  keeping straight the two dates that you gave

25  statements?

1244

```
 1        A      Yes, ma'am.

 2        Q      And you're telling the ladies and

 3   gentlemen of the jury --

 4      MR. SMITH:   Judge, I object.  It's already

 5                  leading.

 6      THE COURT:  You are. Sustained.  This is

 7                  your witness.

 8        Q      What have you told them about the

 9   statements that you made on these two dates?

10        A      Excuse me.

11        Q      What have you told them about those

12   dates?  About the truthfulness?

13        A      What all happened.

14        Q      Okay.  Now, on the 25th, do you

15   recall who you met with and gave a statement

16   to?

17        A      No, ma'am.

18      MRS. STOUT:  May I approached the

19                  witness?

20      THE COURT:  Sure.

21        Q      I'm going to ask you to look at

22   this and see if it looks familiar to you?  And

23   you may read it.  Do you recall the statement?

24        A      Yeah.

25        Q      You do?
```

1       A       Yes, ma'am.

2       Q       And do you recall what was said in

3   the statement?

4       A       Yes, ma'am

5       THE COURT:  Please speak up.

6       THE WITNESS:  Yes, sir.

7       Q       Now, I want to refer, and, again, I

8   want you to look at it to refresh your

9   recollection and then answer my question.

10  Page 2.  Have you reread Page 2, what you told

11  the police officers up to the top of Page 3.

12  Do you want to reread that to refresh your

13  recollection?

14      A       Yeah.

15      Q       Do you recall this?

16      A       Yes, ma'am.

17      Q       And do you recall on May the 25th

18  of 2001, during an interview that I have just

19  shown you, do you recall what you told

20  Investigator Patrick Norris took place at the

21  Toy Store?

22      A       Yes, ma'am.

23      Q       Were there some discrepancies in

24  what was in the statement with your testimony

25  today?

1    A    Yes, ma'am.

2    Q    Now, can you tell the ladies and

3    gentlemen of the jury why there are some

4    discrepancies?

5    A    Well, I don't really know.

6    Q    Okay.  When did you give this one?

7    A    That was the first statement that I

8    gave.

9    MR. BRADSHAW:    Judge, he's already

10                  answered that he doesn't know.

11                  And she is trying to get him to

12                  give an answer.  He's told her

13                  that he does not know.  And I

14                  object to further questioning on

15                  this.

16    THE COURT:  Overruled.

17    Q    Was this fresh, right after it

18    happened?

19    A    Yes, ma'am.  That was the first

20    statement that I gave.

21    Q    And in this statement, that you've

22    just read, that you've just referred to --

23    A    Yes, ma'am.

24    Q    Tell the ladies and gentlemen of

25    the jury what you told Patrick Norris that

1    day.  And I'm referring to the statement on May

2    25th, 2001, with Investigator Patrick Norris?

3        A    I had told them what Brian Smith

4    told me to tell them.

5        Q    Okay.  But you also told them what

6    you told the ladies and gentlemen of the jury,

7    didn't you?

8        A    Yes, ma'am.

9        Q    What discrepancies do you have in

10   your testimony today from what you told him on

11   the 25th and what you've read?

12       A    Could you restate the question,

13   please.

14       Q    Okay.  What's different?

15       A    About taking Robert to his

16   sister's house to get clothes.

17       Q    Okay.  What else that you have just

18   read?  Do you need this to refresh your

19   recollection?

20       A    Yes, ma'am.  When Brian Smith was

21   asking the lady questions at the store.

22       Q    Okay.  Is there anything else that

23   you've testified to here today that's

24   different?  The way things happened?

25       A    Yes, ma'am.

1       Q       Tell the ladies and gentlemen of

2   the jury what they are?

3       A       About Brian Smith walking around in

4   the store and about hitting Brian Smith in the

5   head with the gun.

6       Q       Okay.  Anything else?

7       A       And about Brian Smith asking

8   questions in the store.

9       Q       Any other discrepancies that you

10  see?

11      A       No, ma'am.

12      Q       And you've not had an opportunity

13  to read the whole statement, have you?

14      MR. SMITH:  Leading, Your Honor.

15      THE COURT:  Sustained.

16      MRS. STOUT:  May we approached?

17      THE COURT:  Let's go on.

18      Q       What did you tell the officers, as

19  you referred to Mr. Grimes, as the old man,

20  with that statement?

21      MR. SMITH:  When, may it please the

22          Court?

23      THE COURT:  When?

24      Q       On May 25th of 2001?

25      A       That he told me to leave to go get

1  help.

2      Q      Okay.  Let me rephrase that.  What

3  did you tell Mr. Norris on May 25th of 2001,

4  about Mr. Grimes, what did happened to

5  Mr. Grimes when Robert Conrad entered the

6  store?

7      A      That he grabbed him around his neck

8  and went into his pockets.

9      Q      Now, is that what you said today?

10     A      Yes, ma'am.

11     Q      What did you tell Investigator

12  Norris on May 25th of 2001, three days after

13  this incident occurred that Robert Conrad did

14  to Jelaine Dennis?

15     A      Shot her.

16     Q      And how did you describe that on

17  May the 25th of 2001?

18     A      That when he robbed the store, he

19  fell on top of her and shot her.

20     Q      But didn't you describe it --

21  MR. SMITH:  Objection.  Leading.

22     Q      -- in more detail?  "Yes," or "No"?

23  THE COURT:  You are are.  Sustained.

24     A      No, ma'am.

25     Q      Do you recall what time you were

1    arrested?

2        A        About 7:00, 7:30 p.m.

3        Q        Where?

4        A        At Wal-Mart.

5        Q        Why did you go to Wal-Mart?

6        A        Because that's the store my mom had

7    stopped at.

8        Q        Why was your mom?

9        A        She was in the store at that time.

10        Q        Who else was with you at Wal-Mart?

11        A        Brian Smith.

12        Q        Where were you taken once you were

13    arrested?

14        A        To the Enterprise Police Station.

15        Q        What, if any other, interviews did

16    you have prior to a tape recorder being turned

17    on?

18        A        Well, when the police first got me,

19    they asked me questions.  And I had a couple of

20    interviews with Mr. Captain Moore and

21    Mr. Norris.

22        Q        When they asked you those first

23    questions, were those taped?

24        A        No, ma'am.

25        Q        When did you tell them about being

1    robbed?

2         A    When Brian Smith had came to me and

3    he told me to go ahead and tell what happened.

4         Q    Was it during the taped session?

5         A    Yes, ma'am.  The tape was on,

6    again.

7         Q    But you didn't see it in here?

8         A    No, ma'am.

9    MRS. STOUT:  One moment, please.

10    THE COURT:  Sure.

11         Q    Mr. Yoeman, I would like for you to

12    review the remainder of this statement.  I

13    believe you were down to Page 5.

14              Have you had occasion to review

15    your statement that you gave on May 25th 2001,

16    at 10:13 with Patrick Norris and Bill Moore?

17         A    Yes, ma'am.

18         Q    And in reviewing this statement,

19    does it fairly and accurately depict what you

20    told those investigators on that date?

21         A    No, ma'am.

22         Q    It does not reflect what you told

23    them on that date?

24         A    No, ma'am.  There is things in

25    there that's in there right.  And there is

1  things in there that's not.

2      Q      Okay.  So the typing is wrong?  Is

3  that what you're saying?

4      A      It's wrong.

5      Q      Okay.  Now, Mr. Yoeman, I want you

6  to look around the courtroom.  And I want you

7  to tell me if you see the person in this

8  courtroom that shot Jelaine Dennis?

9      A      Yes, ma'am.

10     Q      Would you point to him please?

11     A      That guy right there.

12  MRS. STOUT:   May the record reflect that

13              he has pointed to the --

14  THE COURT:  I'm not clear where he

15              pointed.

16  THE WITNESS:  The guy right there.

17     Q      Can you identify him?

18     A      Yes, ma'am.  Robert Conrad.

19  THE COURT:  The record will so reflect.

20  MRS. STOUT:  Thank you, Your Honor.

21              Nothing further.

22  MR. BRADSHAW:  We have nothing further of

23              this witness.

24  THE COURT:  Is there any reason by the

25              State that this witness should

1    not be excused?  I asked that

2    question because I'm going to

3    direct him be taken to another

4    county.

5    MRS. STOUT:  I understand.  Your Honor,

6         we would like to keep him

7         subject to recall.

8    THE COURT:  Okay.  Sheriff, thank you.

9                        Call your next

10        witness.

11   MRS. STOUT:  The State rests.

12   THE COURT:  Okay.  Ladies and gentlemen,

13        we have reached that first point

14        in the trial where I'm required

15        to hear matters outside of your

16        hearing and presence.  I guess

17        you will have a longer lunch

18        today.  If you will be back here

19        at 1:00 o'clock, we will get

20        started.

21             I have a lot of things I

22        need to do with these attorneys

23        before we leave here, though.

24                The Court is required

25        to instruct you and does

1    instruct you not to discuss this

2    matter among yourselves, nor to

3    allow anyone to discuss it with

4    you.

5         Y'all have a good

6    lunch.

7         If everyone will remain

8    while the jurors exit the

9    courtroom.

10   (Jurors exited the courtroom).

11   THE COURT:  The record will reflect we

12   are now outside of the hearing

13   and presence of the jury.  The

14   State has rested it's case.  Are

15   there any motions by the

16   Defense?

17   MR. SMITH:  Yes, sir, Your Honor.  First,

18   we would move for a motion, a

19   Judgment of Acquittal, the State

20   having failed to prove this

21   Defendant guilty of intentional

22   murder committed during the

23   course of a robbery.  They have

24   failed to prove the defendant

25   guilty of a capital murder is my

1  motion.

2  THE COURT:  It's not necessary, but is

3  there a response by the State?

4  MRS. STOUT:  The State has certainly made

5  a prima facie showing.

6  THE COURT:  The Motion for Judgment of

7  Acquittal is denied.  The State

8  has presented evidence as to

9  each element of a murder with a

10  robbery in the first degree,

11  where the victim was

12  intentionally killed.  That is

13  certainly a question of fact to

14  be determined by a jury.  The

15  Motion for Judgment of Acquittal

16  as to any capital offense is

17  hereby denied.

18  MR. SMITH:  We further move for a Motion

19  of Judgment of Acquittal for the

20  robbery of Mr. Grimes, of two

21  counts:  One, the State has

22  failed to make a prima facie

23  case; plus, there is error in

24  the testimony in the indictment

25  in offense two.

1   THE COURT:  Again, it's a question of

2      fact to be determined by the

3      jury.  We have a statement by

4      Mr. Grimes that was heard by the

5      the jury.  And, certainly, we

6      have a statement by a person who

7      has just testified.  They are at

8      odds with each other, based on

9      what we've seen.  But, still, it

10      is a question of fact to be

11      determined by a jury.

12       The State has presented

13      some evidence as to each

14      required element of the crime of

15      robbery in the first degree as

16      charged in offense two in the

17      indictment.  Therefore, the

18      Motion for Judgment of Acquittal

19      as to Offense Two is hereby

20      denied.

21  MR. SMITH:  Is Your Honor ruling there is

22      not failure there in the

23      indictment and the testimony?

24  THE COURT:  No, there is not.  Motion is

25      denied.

1    MR. SMITH:  I just wanted the record to be

2            clear.

3    THE COURT:  Sure.

4    MR. SMITH:  And, Judge, we repuplish or

5            recite all of the previous

6            motions that we filed during the

7            course of this trial.

8    THE COURT:  Sure.  And the same rulings

9            of the Court are hereby order

10           entered.

11                   Anything further on any

12           motion?

13   MR. SMITH:  No, Your Honor

14   MRS. STOUT:  Nothing from the State.

15   THE COURT:  Nothing from the the State.

16                   Mr. Smith, if you

17           will raise your right hand.

18   MR. SMITH:  Judge, I know what you are

19           going to do.

20   THE COURT:  I've told you what I'm doing.

21           If you will raise your right

22           hand.

23

24

25

1    <u>AL SMITH</u>

2         Whereupon, this witness, after first

3    being duly sworn to tell the truth, the whole

4    truth, and nothing but the

5    Truth, testified as follows, to-wit:

6         THE COURT:  Okay.  You have provided

7                    this Court earlier with

8                    information from which this

9                    Court conclude that the State

10                   has not honored certain

11                   discovery questions, discovery

12                   orders, specifically.

13                        This Court earlier

14                   ordered that the State provide

15                   the Defense with exculpatory

16                   material, in other words,

17                   anything that's exculpatory to

18                   the Defendant.

19                        This Court also ordered

20                   the State to provide anything to

21                   the Defense that would be of an

22                   impeachable nature.  And I'm

23                   certainly not going to ask you

24                   to violate any attorney-client

25                   privilege at all.

1    But I have a duty to

2    make sure that the Orders of

3    this Court are carried out.  And

4    this is not directed in any way

5    negatively at you.  But I am

6    going to to find out more about

7    these things.  I'm going to find

8    out whether anybody has not

9    honored the Orders of this

10    Court.  And I will take

11    reasonable requirements, things

12    necessary to make sure that I

13    get to the bottom of this.

14        Yesterday, I found that

15    Mrs. Stout and Mr. Jarrell did

16    not know of these materials that

17    were brought to the attention of

18    this Court until just very

19    recently.

20        And, of course, it came

21    out at our hearing that their

22    boss man said that he would take

23    the credit for it not being

24    produced.  And he and Mr. DeVane

25    had the documents in some

1    separate area at the District

2    Attorney's Office and made known

3    to these two assistants just

4    before this trial began that the

5    documents even existed.

6         And it's clear to this

7    Court that as far back as the

8    year 2001, that the District

9    Attorney's Office had some

10   knowledge of these things,

11   because Investigator Norris

12   conducted some investigation and

13   interviews of some of the people

14   that were involved in these

15   allegations.

16        So, I'm going to go

17   further and get to the bottom of

18   things.  I've already found that

19   there was no prosecutorily

20   misconduct.  I said that things

21   sometimes might appear

22   non-exculpatory and not

23   impeachment items until a case

24   flows and as things develop as

25   far as a case is concerned.

```
 1                          And I have found that

 2              these people, these two

 3              Assistant District Attorneys

 4              have been, and always conduct

 5              themselves in a proper way.  But

 6              there are still folks that I'm

 7              concerned about that may not

 8              have.

 9                     So I direct you, I ask

10              you who was the person who

11              provided you with this

12              information at 10:00 o'clock

13              that night so I can have them

14              come down here and find out what

15              other information they may have

16              on this subject?

17   MR. SMITH:  Judge, I have a couple of

18              remarks, if I can in response.

19              I am very concerned about the

20              rules of responsibility,

21              professional responsibility, if

22              I become a witness in the case.

23   THE COURT:  You are not a witness in this

24              case.  You are are a witness as

25              to who has violated, if anybody,
```

1      this Court's Order in the State

2      of Alabama versus Robert Thomas

3      Conrad.

4    MR. SMITH:  And Your Honor, am I correct

5      that I am the Court's witness --

6    THE COURT:  You are the court's witness.

7    MR. SMITH:  -- at this hearing that is a

8      sub-part but separate from the

9      trial of Robert Conrad;

10      therefore, you are telling me,

11      as the Judge, I've no ethical

12      conflict?

13    THE COURT:  You have no ethical conflict.

14    MR. SMITH:  I certainly don't mind.  Mr.

15      Ronny Vaughan, one of my

16      neighbors, who I have known for

17      many years.  Your Honor knows

18      him.

19    THE COURT:  Where does he work?  Do you

20      know?  Because I'm going to have

21      the sheriff go get him.

22    MR. SMITH:  He's retired from the State.

23      He now works part time at the

24      Elba Stockyard now.

25    THE COURT:  If you will take this Order

1    to my secretary.  I want her to

2    type it up.  It's an Order for

3    the Sheriff to serve him with an

4    Order to appear before this

5    Court immediately for the

6    purpose of serving as the

7    Court's witness concerning a

8    violation of this Court's

9    Discovery Orders.

10    MR. SMITH:  Just for the record, Your

11    Honor, I understand from what I

12    said the other day, and Mr.

13    Vaughan told me that he had

14    received an unanimous and

15    caller-ID blocked telephone

16    call.

17    THE COURT:  I understand that.  This

18    court is adjourned until 1:00

19    o'clock.

20    (A lunch recess was taken).

21

22

23

24

25

```
 1          THE COURT:  This court will come back to
 2               order.  You may be seated.
 3          MR. BRADSHAW:  The Defense calls George
 4               Roberson.
 5          THE COURT:  Mr. Roberson, if you will
 6               come around please, sir.
 7          MR. BRADSHAW:  Judge, we have a motion
 8               for the Court prior to his
 9               testimony.
10          THE COURT:  Okay.  I will take that up.
11               Let me swear him in first.  Come
12               on up, if you will, please,
13               sir.  If you will please raise
14               your right hand and place your
15               left-hand on the Bible.
16          THE WITNESS:  I don't swear.  I'll
17               affirm.
18          THE COURT:  I understand.
19                    GEORGE ROBERSON
20          Whereupon, this witness, after first
21     being duly affirmed to tell the truth, the
22     whole truth, and nothing but the truth,
23     testified as follows, to-wit:
24          THE COURT:  Have a seat.  Let me talk to
25               these lawyers just a minute.  If
```

1           you will scoot your chair up

2              right there and speak into that

3              microphone.

4    MR. SMITH:  I put the motions there.

5    THE COURT:  Okay.  All don't have to

6              argue this.  The motion speaks

7              for itself.  I don't want you to

8              get into any details.  You can

9              cite some authority, if you wish

10             for me to look at something.  I

11             will be glad to look at

12             anything.

13   MR. JARRELL:  Judge, 609 --

14   THE COURT:  Now, you are talking about

15             the Alabama Rules of Evidence.

16   MR. JARRELL:  Yes, sir.

17   THE COURT:  Go ahead.

18   MR. JARRELL:  Alabama Rules of Evidence,

19             609.  And it would be

20             subparagraph (2)b, where it

21             talks about time limits.

22             Anything over ten was admissible

23             and to be used, with exception

24             that if they were given notice

25             and with opportunity to contest

```
 1              the use of that evidence, and
 2              whether the Court also has the
 3              authority, if it believes that
 4              probative value outweighs the
 5              prejudicial effect.  And we feel
 6              like under the circumstances of
 7              this that the probative value
 8              does not outweigh any
 9              prejudicial effect.
10        THE COURT:  Anything further?
11        MR. SMITH:  No, sir.
12        MR. BRADSHAW:  Judge --
13        MR. SMITH:  It speaks for itself.
14        MR. BRADSHAW:   -- we would argue that
15              just what he is saying due to
16              the rule and given the
17              circumstances of the way this
18              came about that we have not been
19              given notice that it was planned
20              to be used.  There is no way
21              that we could have.  We found
22              out about it yesterday at 2:00
23              o'clock.
24        THE COURT:  The truth is all this Court
25              wants.  As long as a jury is
```

1       apprised of the truth, whatever

2       that is so, so that they can

3       make a truthful and legal

4       decision.

5              This Court finds that

6       the probative value outweighs

7       any prejudicial effect.  The

8       Court also finds that the

9       probative outweighs any

10      prejudicial effect.  The Court

11      also finds that the proper,

12      adequate motion is denied.

13      <u>DIRECT EXAMINATION</u>

14  <u>BY MR. BRADSHAW:</u>

15      Q     Would you state your name for the

16  Court, please, sir?

17      A     George Carlee Roberson.

18      Q     George, how old are you?

19      A     Forty-four.

20      Q     Where do you presently live?

21      A     In Grand Junction, Colorado.

22      Q     In May of last year, May of 2001,

23  where did you live?

24      A     Enterprise, Alabama.

25      Q     Were you employed in Enterprise?

1        A     Yes, I was.

2        Q     Where were you employed?

3        A     At Kentucky Fried Chicken on Boll

4  Weevil Circle.

5        Q     Were you married at that time?

6        A     Yes, sir, I was.

7        Q     Where did your wife work?

8        A     Daleville Hospital.

9        Q     What did your wife do?

10       A     She is a nurse, a surgical squad

11  tech.

12       Q     What did you do at Kentucky Fried

13  Chicken?  What was your position, I should say?

14       A     I was a cashier.

15       Q     And how long did you work with that

16  franchise?

17       A     Three years.

18       Q     In May of last year, Mr. Roberson,

19  was a Brian Yoeman, a young black male, was he

20  a co-worker of yours at Kentucky Fried Chicken?

21       A     Yes, he was.

22       Q     Do you remember what time frame he

23  was a co-worker of yours?  In other words, was

24  he there the whole time you were there?

25       A     No, sir.  No more than a month, if

1     that.

2          Q     Do you remember what time frame

3     that was during 2001?

4          A     That was during May.  Sometime in

5     May 2001, June.  Sometime in there.

6          Q     Are you sure he was working there

7     in May of 2001?

8          A     Yes, sir.

9          MR. JARRELL:  Your Honor, he said May or

10              June.

11         THE COURT:  Sustained.

12         Q     During the month of May, do you

13    have knowledge of him being employed there with

14    you as a co-worker?

15         A     Yes, sir, Your Honor.

16         MR. JARRELL:  Objection, Your Honor.

17              He's already asked that

18              question.

19         THE COURT:  Overruled.  Let's go on.

20         Q     During that time, did you have

21    occasion to have conversation with Brian Yoeman

22    concerning a robbery he was planning?

23         A     Yes, sir.

24         Q     And would you tell the ladies and

25    gentlemen sitting up here about the

```
 1    conversation beginning with where you and

 2    Mr. Yoeman were when this conversation took

 3    place?

 4         A     We was on a break.  And we was

 5    going to the Inland store down the highway

 6    there.  And we was going to buy some Black and

 7    Milds.

 8         Q     What is Black and Milds?

 9         A     That's a cigar.  It's a cigar.

10         Q     Okay.

11         A     And he had mentioned something

12    going on.  When this Orkin man was there, he

13    had mentioned early on about how dangerous it

14    was for the bug man to have the door opened at

15    that time of night.

16         Q     The bug man?

17         A     Yes.

18         Q     You said earlier, did you say

19    "Orkin"?

20         A     Yes.

21         Q     Where was this at?

22         A     This was at K.F.C.

23         Q     Okay.

24         A     This was during the night shift,

25    the closing shift.
```

1    Q    Go ahead?

2    A    And he said anyone could run up in

3  there and rob him.  And at that time I kind of

4  gave him a look, and asked him, I said man I

5  hope you aren't thinking about, you know, doing

6  K.F.C.

7              And he said No.  No.  No, not

8  really.

9              And then that day when we was going

10  to Inland, I brought it up again, because I

11  just felt something was there.

12              And he said, no, he wasn't thinking

13  about doing K.F.C.  But he and some friends had

14  discovered another place.

15    Q    Did he say he and some friends?

16    A    Yes.

17    Q    Had discovered another place?

18    A    Yeah.  Had checked out another

19  place.  And it was out there around nowhere out

20  on Geneva highway.

21              And instantaneous, I said are you

22  talking about the -- I call it Toy Box, but

23  it's the Toy Store.  And he was like, yeah,

24  yeah, you know.

25              I had told him --

1    Q    He agreed that it was the Toy Store

2  that they had checked out?

3    A    Yes.  Yes.

4    Q    Did he say "they," talking about

5  him and his buddies?  His friends?

6    A    Yes.  Yes.

7    Q    Well, did you and him continue to

8  have a conversation about this plan?

9    A    Yes, we did.

10    Q    Did you give him any advice about

11  not doing it?

12    A    Yeah.  I tried to talk him out of

13  it.  I tried to really see where his mind set

14  was.  I asked him -- I had told him -- I said a

15  place like that, out in the open, usually one

16  of four things is happening there.  I said

17  there's surveillance, or there's security, or

18  there's a firearm, or all four.

19    And he said no, no, no camera's

20  there; they went and looked around, and they

21  already looked into it and been inside and

22  didn't see any cameras.

23    Q    Brian Yoeman told you that they had

24  already been inside?

25    A    Yes.

```
 1          Q       Him and his buddies?

 2          A       Yes.

 3          Q       Did you tell them they may have a

 4     gun?

 5          A       Yes.

 6          MR. JARRELL:   Object to leading, Your

 7               Honor.

 8          THE COURT:    You are.   Sustained.

 9          Q       So you gave him some warning?  What

10     happened next in your conversation?   What did

11     you and Mr. Yoeman discuss?

12          A       Well, I told him one of four

13     things.   I said one of four things could

14     happened.   And I mentioned if they have a

15     fireman in there, I mentioned about the gun.

16               He said well, we have a gun too.   I

17     said how many -- I said you got a gun?  He said

18     no, but we have one.   My friend has one.

19               And I said well, if you have a gun,

20     and you go up in a place like that, and they

21     probably have a gun, then more than likely,

22     they not going to just give the money just like

23     that.   So it's going to be a gun fight.   And I

24     said you are going to be more apt to shoot

25     first, since you in that mind set.
```

1     And I said if you shoot first and

2  you kill her, then that's premeditated.  You

3  know, because you going to harm to start with,

4  and then you actually carry out the act.

5  That's premeditated.

6     And he said I won't be going in.

7  I'll be driving the car.  And I said I hope

8  it's not your mother's car you're talking about

9  taking up in there, getting your mother

10 involved in something this.

11     Q     Did you know what kind of car his

12 mother had at that time?

13     A     Yes, sir.  We was riding in it.  It

14 was a Corsica.

15     Q     Do you know what color it was?

16     A     Blue.

17     Q     Blue?

18     A     Blue or gray.  One of the two.  I

19 believe it was blue.

20     Q     Do you remember if it was automatic

21 or five speed?

22     A     Five speed.  Just like the one I

23 had.  Previously, I had mentioned that I had a

24 Corsica, also, a five speed.  But, anyway --

25     Q     Did he tell you he was going to go

```
 1    on his mother's car?

 2         A      No.   No.   He said they had another

 3    car.

 4         Q      Another car?

 5         A      Yeah.   They had another car, yeah.

 6    And he told me --

 7         Q      Did he tell he was not going to go

 8    in the store?

 9         A      Yeah.   He told me he wasn't going

10    to go in the store.   He was going to be

11    driving.

12              And at that time there, I told him,

13    I said well, if your friend goes in the store,

14    and a murder happens, then you are just as

15    guilty as the individual that pulled the

16    trigger.   Because, you know, the consequences

17    now.   And it's premeditated if you still go

18    through with it.   You know, it's more -- just

19    as bad as you pulling the trigger.

20         Q      How long of a conversation on this

21    day did you and Mr. Yoeman have?

22         A      Approximately 20 to 30 minutes.

23    Somewhere in there.

24         Q      How do you know, sir, it was

25    between 20 and 30 minutes?
```

1    A    Because it was during our break

2  time.  And we only had 30 minutes.

3    Q    Okay.  Did you discuss with

4  Mr. Yeoman anything about being arrested or the

5  police chasing him?

6    A    Yes, I did.

7    Q    Would you tell the jury what you

8  and Mr. Yeoman talked about concerning police

9  chase and arrest?

10    A    Okay.  After we had talked for a

11  while, I saw that his mind was pretty much made

12  up.  And I asked him, I said well I see your

13  mind is pretty well made up.

14         So I'm going to tell you, if you go

15  through with it and 5-0, which is the police,

16  get in behind you, I said what you need to do

17  is go to a public place, like Wal-Mart, make a

18  commotion, draw attention to yourself, make

19  sure your hands, make sure they see your

20  hands.  I said, cause that way, at least they

21  won't take your life.  You know, they will be

22  more conscious about your actions and innocent

23  bystanders, than to get an innocent bystander

24  hurt.  I said at least that way, you will live

25  to see another day.

1    Q    Other than this time -- do you

2  remember about what time frame this was?  The

3  case we are here about today is for an incident

4  that occurred on May 23, 2001.  Do you remember

5  about what time frame this was that you and Mr.

6  Yoeman had this conversation?

7    A    Yes.  That was on a Sunday.  That

8  was on a Sunday, yeah.  Because that Monday I

9  told them.

10    Q    May 23rd was on a Wednesday?  Would

11 this have been the immediate Sunday prior or a

12 week-and-a-half?

13    A    The immediate Sunday prior.

14    Q    The immediate Sunday prior would

15 have been the -- around the 20th.  I know it's

16 been over a year.  I'm just asking you was the

17 conversation between you and Mr. Yoeman, was it

18 one or two days before or --

19    A    One or two days before.  One or two

20 days before.

21    Q    Did you ever have a conversation

22 with Mr. Bruce DeVane, with the District

23 Attorney's Office?

24    A    Yes, I did.

25    Q    What about a Mr. Patrick Norris?

1       A       Yes, I did.

2       Q       And did you tell them all this

3   information you are telling this Court here

4   today?

5       A       Yes, I did.

6       Q       Did you give a recorded statement

7   to all of them?

8       A       Yes, I did.

9       Q       Did Mr. Yoeman ever name any of his

10  buddies or friends that he said had a gun or

11  had a plan or had cased the joint out?  Did he

12  ever name any of those folks?

13      A       'No, sir, he didn't.  And I didn't

14  ask.

15      MR. BRADSHAW:  Just a moment.

16      Q       Did Mr. Yoeman come into work on

17  the Monday before this happened on that

18  Wednesday?  This would have been the 21st?

19      A       No, sir, he didn't.

20      Q       Why not?

21      A       I have no idea.

22      Q       Did he come in on the 22nd?

23      A       Yes, he did.

24      Q       He came in on the 22nd?  Did he

25  work that Tuesday?

```
 1        A      The 22nd.  I'm sorry.  I'm sorry.
 2   He didn't work that Tuesday.  I'm sorry.  No,
 3   sir.  He didn't work that Tuesday, no.  I'm
 4   thinking you were talking about Sunday.  I'm
 5   sorry.
 6        Q      Sunday?
 7        A      No, he didn't come in Monday nor
 8   Tuesday.
 9        Q      Did he get fired from
10   Kentucky Fried Chicken, if you have knowledge?
11        A      Yes, sir, he was relieved,
12   dismissed.
13        Q      And for what reason?
14        A      No show.  No call, no show.  He
15   came in that Sunday, when he wasn't suppose to
16   work, and didn't come in that Monday when he
17   was suppose to work.
18        Q      Did you have any knowledge of that
19   time, in May of 2001, about Brian Yoeman's
20   involvement in selling marijuana?
21        A      Yes, sir, I do.
22        Q      What knowledge did you have?
23        MR. JARRELL:  Your Honor, object.
24        MRS. STOUT:  Objection.
25        MR. JARRELL:  Irrelevant.
```

| | | |
|---|---|---|
| 1 | | THE COURT:  Sustained. |
| 2 | Q | Do you have any knowledge about |

Brian Yoeman's mother consenting to the

knowledge that you have about illegal drugs?

5    MRS. STOUT:  Objection.

6    THE COURT:  Sustained.

7    MR. BRADSHAW:  No other questions at this

8        time.

9    THE COURT:  Mr. Jarrell?

10    MR. JARRELL:  Thank you, Your Honor.

11                CROSS EXAMINATION

12  BY MR. JARRELL:

13    Q    Mr. Roberson?

14    A    Roberson.

15    Q    Roberson.  I'm sorry.  Very sorry.

16  Mr. Roberson.  Would it be all right if I just

17  call you George?

18    A    Fine.

19    Q    That would be a lot easier for me.

20    A    Fine.

21    Q    You seem to have quite a

22  familiarity with criminal activity?  Is that

23  correct?

24    A    Yes, it is.

25    Q    Isn't that because, sir, that you

1   have had numerous encounters with the law?

2       MR. SMITH:   Objection, Your Honor.

3       THE COURT:   Sustained.

4             Would you stop the

5           deputy.  He was going to do

6           something that I asked him to

7           do.

8             Sheriff, you can have

9           the other person come in and

10          have a seat in the courtroom.

11            Go ahead.  I'm sorry

12          for the interruption.

13      MR. JARRELL:   That's all right, Your

14          Honor.

15      Q    Are you Mr. George Carlee Roberson?

16      A    Yes, I am.

17      Q    Is your date of birth November 5,

18  1957?

19      A    Yes, it is.

20      THE COURT:  I'm just clarifying.  I'm not

21          prohibiting certain things --

22

23      MR. JARRELL:   I understand.

24      THE COURT:  By sustaining that.

25      MR. JARRELL:   Yes, sir.

1    Q    And did you ever live in North

2  Carolina?

3    A    Yes, I did.  Yes, I have.

4    THE COURT:  Sir?  "Yes, I did?"  I'm

5         sorry.  I didn't hear?

6    THE WITNESS:  Yes, I have.

7    Q    And on January 21, 1982, were you

8  convicted of uttering?

9    A    Yes, I was.

10    Q    What does that mean?

11    A    That means cashing.

12    Q    Cashing what?

13    A    Checks.

14    Q    Checks.  And did you accept a

15  sentence for that?

16    A    Yes, I did.

17    Q    And how many years?

18    A    I was convicted of several counts.

19  One account was five years; one was two --

20  three to five years; and two years:  A total

21  concurrent of seven years.  I did three years

22  -- two-and-a-half years total.  I maxed it

23  out.  Good behavior, I was released early.

24    Q    And, also, in that same court in

25  1981, August, 1981, or shortly thereafter, were

```
 1    you convicted of forgery?

 2           A      This is the same matter.

 3           Q      Same business?

 4           A      Yeah, yes, sir.

 5           Q      Also, Mr. Roberson, George, excuse

 6    me, were you -- did you ever suffer from a

 7    mental illness?

 8           A      Yes.  I was -- yes.

 9           Q      What was that mental illness?

10           A      Paranoia schizophrenia.

11           Q      Are you on medication for that

12    today?

13           A      No.  Never have been.

14           Q      Never have been?

15           A      No.

16           Q      You're diagnosed as having paranoia

17    schizophrenia?

18           A      Yes, sir.

19           Q      Anything else?

20           A      No -- hypertensin.

21           Q      Hypertensin?

22           A      Yes.

23           Q      Do you also suffer from personality

24    disorder?

25           A      That's what schizophrenia is.
```

1284

1       Q       Were you also told that you were

2    emotionally unstable?

3       A       At that time, yeah.

4       Q       Poor judgment?

5       A       Beg your pardon.

6       Q       And poor judgment?

7       A       At that time, yeah.

8       Q       Did you ever serve in the military?

9       A       Yes, I did.

10      Q       Were you discharged?

11      A       Yes, I was.

12      Q       What kind of discharge did you get?

13      A       A chapter 13.

14      Q       You got a dishonorable discharge,

15   did you not, sir?

16      A       Yes, I did, in lieu of court

17   martial.

18      Q       Why?

19      MR. SMITH:  Objection, Your Honor.

20      THE COURT:  As asked, sustained.

21      Q       What lead up to your dismissal from

22   the Army, sir?

23      MR. SMITH:  objection

24      THE COURT:  Sustained.

25      Q       Do you read the newspapers, sir?

1        A    Yes, occasionally.

2        Q    Did you read the newspaper back in

3  May, June, of 2001?

4        A    No, sir.

5        Q    You never read any newspapers

6  about that time about the accounts of the Toy

7  Store robbery, murder?

8        A    No, sir.

9        Q    Did you watch it on TV?

10       A    No, sir.

11       Q    You knew nothing about this all

12  during that period of time?

13       A    I knew plenty about it, but --

14       Q    Never came across it in a newspaper

15  or TV?

16      MR. SMITH:  Let him answer.

17       A    No, sir.  I was in school and

18  working at the time.  I didn't watch too much

19  television then.  I was attending George

20  Wallace College for AMT mechanic.

21       Q    You came and gave all this

22  information to Mr. Bruce DeVane, didn't you,

23  that you testified earlier?

24       A    Yes, I did.

25       Q    When did you do that?

1      A      Beg your pardon.

2      Q      When did you do that?

3      A      When?

4      Q      Yes?

5      A      After I talked it over with my

6  pastor.

7      Q      After you talked it over with your

8  pastor?

9      A      Yes, sir.

10      Q      When did you talk it over with your

11  pastor?

12      A      The day before -- a couple of days

13  before I spoke with Mr. DeVane.

14      Q      Do you have any idea what that date

15  was that you talked to Mr. DeVane?

16      A      Yes, sir.  The 8th of June.

17      Q      June?

18      A      Yeah.  8th of June.

19      Q      Are you sure it wasn't the 8th of

20  July?

21      A      No.  I'm not too sure about it.  I

22  think it was the 8th of June.  Somewhere in

23  there.

24      Q      How did you learn about

25  Mr. Conrad's involvement with any of this?

1      A      Mr. Conrad.  It was through a

2  neighbor that I found out about the whole

3  ordeal.

4      Q      Through a neighbor?

5      A      Yes, sir.

6      Q      What was that neighbor's name?

7      A      They were children.

8      Q      Children?

9      A      Yes.  Minors.

10      Q      How old were the children?

11      A      At the time between the ages of 8

12  and 11.

13      Q      Eight and eleven?

14      A      Yes.

15      Q      And they gave you Mr. Conrad's name

16  as being somebody that was involved in all

17  this?  And you learned all the details about it

18  from them?

19      A      And some --

20      THE COURT:  Did you hear that question?

21                  Did you learn all the details

22                  from them, meaning the

23                  children?

24      A      No, sir.  Had some barber shop --

25  you know, when you go get your hair cut at the

1    barber shop.

2         Q    So you were exposed to some folks

3    who had possibly read the papers?  Is that

4    correct or watched it on TV?

5         A    Or heard about it.

6         Q    Or heard about it.  So you didn't

7    talk about it with these people?

8         A    I listened.  I didn't talk about

9    it.  I just listened.

10        Q    You just listened?

11        A    Yeah.

12        THE WITNESS:  Could I add something

13                  there, Judge?

14        THE COURT:  Sure?

15        A    The reason why I didn't talk about

16   it, because I knew about it.  You know, and I

17   just didn't want to involve myself.  That's why

18   I talked to my pastor about it, my bishop,

19   about it.

20        THE COURT:  Next question.

21        Q    But you finally had to talk to your

22   pastor?  Your conscience made you go talk to

23   Mr. DeVane?  Is that right?

24        A    Well, yes.

25        Q    Did you expect any enumeration for

1    that?

2         A     No.

3         Q     But you do like to get information

4    for money, don't you, sir?

5         A     Yes.  I have in the past.

6         Q     In fact, you have asked for as much

7    as $21,000.00 for helping police officers,

8    haven't you?

9         A     Yes.

10        Q     I understand that you are employed

11   in Colorado?  Is that correct?

12        A     Yes, sir.

13        Q     And we flew you here from Colorado

14   last night?  Is that correct?

15        A     Yes, sir.

16        Q     And who do you work for in

17   Colorado?

18        A     Beg your pardon.

19        Q     Who do you work for in Colorado.

20        MR. BRADSHAW:   Judge, I object to letting

21             the jury think they flew him

22             here.  There was a bench warrant

23             from you for this man to come

24             here.

25        MR. SMITH:  Bench subpoena.

```
 1          MR. BRADSHAW:  Bench subpoena, from you,

 2                  not from the State.

 3          THE COURT:  Go ahead.  Is that an

 4                  objection?

 5          MR. BRADSHAW:  Yes.

 6          THE COURT:  Overruled.

 7          Q     Who do you work for out there?

 8          A     Wal-Mart.

 9          Q     Wal-Mart.

10          THE COURT:  If you need to stand, you're

11                  welcome to answer the questions

12                  standing.

13          THE WITNESS:  Yes, sir, I'm all right.

14                  I was in an accident and I have

15                  back problems.

16          THE COURT:  That's fine.  You can stand.

17          Q     You were in an accident?

18          A     Yes.

19          Q     What kind of accident were you in?

20          A     Roof fell on me while I was

21  working.

22          Q     A roof fell on you?

23          A     Yes.

24          Q     I've noticed, or have some

25  information, sir, that you signed a letter that
```

1    you wrote to the, I believe it was the Chief of

2    Police in Wade County, North Carolina?  Is that

3    where you asked for the $21,000.00?

4         A     Durham County?

5         Q     Durham County.  Excuse me.  And you

6    signed your name, and underneath your name you

7    put C.I.A. agent number 47 or something like

8    that?  Is that correct?

9         A     That's correct.

10        Q     Were you C.I.A. agent after your

11   dishonorable discharge or before?

12        A     Let me explain.  See, it's not

13   C.I.A. agent.  It's confidential information

14   agent.

15        Q     Oh.  Confidential information

16   agent?

17        A     Yes, sir.

18        Q     But you put C.I.A. agent, didn't

19   you?

20        A     I don't remember.  I don't recall.

21        Q     I'm still a little concerned, sir.

22   If you had this information that you gleamed

23   from the Barber Shop and from kids, 8 and 11

24   years old, about the details of this offense,

25   after it happened, that you took so long to go

1292

```
 1    to the police with it, the D.A.'s office.  Why?

 2         A    Well, let me explain something to

 3    you.  The day after he told me, I went to a

 4    police officer.

 5         Q    Wait a minute.

 6         MR. BRADSHAW:  Let him finish.

 7         MR. JARRELL:  That wasn't my question.

 8         THE COURT:    Ask your question, again.

 9         Q    My question was after the offense

10    occurred, why did it take you so long to get to

11    the D.A.'s office with this information?

12         A    Because I was waiting for the

13    officer, who I had told prior to the incident

14    happening, to get back to me.

15         Q    And you waited until some time the

16    first part of July to do that?

17         A    Well, that's when he came to me and

18    said that they were bringing a subpoena to talk

19    to me.  And he told me that he told them that

20    they didn't have to do that I would come down

21    and talk to them voluntarily, which I did.

22         Q    After you talked to your pastor?

23         A    Yes.  It was my neighbor.

24         Q    And you told them all about going

25    out to that -- well, you talked to Mr. Yoeman,
```

1    excuse me.  You told them they needed to go to

2    Wal-Mart to be arrested out there?  Right?

3         A     In a public place.

4         Q     A public place.  And you suggested

5    Wal-Mart?

6         A     Yeah.  I suggested Wal-Mart.

7    Because that's one of the busiest places here

8    in Enterprise.

9         Q     And you had not heard that in a

10    conversation when they were arrested?

11         A     No.  No.  No.

12         Q     These 11-year-old kids filled you

13    in on all of this information?

14         A     No.  No.  No.

15         Q     Explain to me, again, when it was

16    that Mr. Yoeman gave you this information that

17    he gave you?

18         A     It was on a Sunday.

19         Q     Sunday, prior to the actual

20    robbery?

21         A     One moment.  One moment.  I'm not

22    sure if it was a Saturday or Sunday.  It was a

23    few days prior to.

24         Q     And you say the robbery of the

25    attempted -- did you say something about the

1    attempted robbery of the --

2         A     K.F.C?

3         Q     K.F.C?

4         A     Yeah.

5         Q     When did that happen?

6         A     That happened on the date before

7    the actual robbery of the Toy Store.

8         Q     And if I understand you correctly,

9    possible three or four days, may be on a

10   Saturday or Sunday prior to the robbery is when

11   Mr. Yoeman told you about this?

12        A     That's when we talked.

13        Q     And y'all were talking about the

14   Orkin man and the robbery of the K.F.C?

15        A     No.  No.  No.  The Orkin man was

16   way before that.  The Orkin man was like, let's

17   see.  He came and they called him back, because

18   he didn't do a great job.  You know, he didn't

19   get all the bugs out.

20        Q     Now, when was the robbery of the

21   Orkin man?

22        A     The robbery of the Orkin man was

23   the day before the robbery of the Toy Store.

24        Q     Well, how can we talk about the

25   robbery of the Orkin man on Sunday, four days

1    before?

2         A    Sir, I haven't talked or spoked

3    about the robbery of the Orkin man.

4         Q    You told us just a few minutes ago,

5    while y'all were on your trip to get your Black

6    and Milds, you talked about the Orkin man and

7    the robbery?

8         A    I think you're getting confused in

9    what I said.

10        MR. BRADSHAW:  He misstated what the

11   witness is saying.

12        THE WITNESS:  Exactly.

13        THE COURT:  The jury can determine that.

14             Let's go on.

15        THE WITNESS:   Exactly.  You are

16             misconstruing it.

17        Q    It was just --

18        A    It was --

19        Q    -- coincidental that you talked to

20   --

21        A    -- several --

22        Q    -- that you talked about the Orkin

23   man and the robbery of K.F.C.

24        A    No, sir.  It was several

25   different occasions when I spoke to Mr. Yoeman.

1    Okay.  I ain't misconstruing nothing.

2         Q     They were all prior to the day

3    before the robbery, wasn't it?

4         A     Yeah.  Yeah.

5         Q     Because he didn't even show up to

6    work on the day before the robbery, according

7    to you?  Is that right?

8         A     No.  That was -- that was the day

9    when the Orkin man rushed back to the K.F.C.,

10   when someone tried to rush into the KFC, when

11   someone tried rush into KFC, the day before.

12        Q     Do you remember talking with an

13   investigator with the Alabama Bureau of

14   Investigations?  A Mr. Watson?

15        A     Mr. Watson, yes?  Corporal Watson,

16   yes.

17        Q     Do you remember telling him that

18   when you and Mr. Yoeman had this conversation,

19   it was a week before?

20        A     Okay.

21        Q     Do you remember?

22        A     Vaguely, sir.  I mean the dates --

23        Q     Why did you tell him it was a week

24   before, if it was just four days or three days,

25   whatever it was?

1      A     Well, I will put it like this, sir,

2  the answer to the question, as clear as I can.

3  All right.  When I was speaking with Mr. Yoeman

4  about these robberies, these plans of his, it

5  really wasn't that significant to me.

6        Therefore, I didn't, like, put a

7  date or a time in place with what was being

8  said at the time -- now listen to me -- to

9  recall later on.  Because I wasn't too sure.  I

10  wasn't actually sure that he was serious about

11  carrying them out at the time.

12      Q     George --

13      A     Okay.  May I finish, please?

14      THE COURT:  Do you have another question?

15      MR. JARRELL:  I have another question.

16      THE WITNESS:  Okay.

17      Q     George, you have indicated that

18  this bore on your mind.  And you just felt led

19  to talk to this young man about what he was

20  about to do.  And you are saying that this just

21  didn't amount to anything to you?  That's why

22  you weren't sure of the dates?

23      A     I've done that with several young

24  men.  Several young men here, in Coffee County.

25      Q     Here, in Coffee County?

*VOLUME 14*

COURT OF CRIMINAL APPEALS No. _CR-02-0333_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF _____ COFFEE _____ COUNTY, ALABAMA

CIRCUIT COURT NO. _CC-01-179, CC-01-180_

CIRCUIT JUDGE _Gary L. McAliley_

Type of Conviction / Order Appealed From: _Conviction, Capital Murder, Robbery 1st_

Sentence Imposed: _Life Without Parole, Life_

Defendant Indigent: [X] YES [ ] NO

Robert Thomas Conrad
_____
**NAME OF APPELLANT**

Gary Bradshaw
(Appellant's Attorney)                    (Telephone No.)
P. O. Box 311412
(Address)

Enterprise          AL          36331
(City)           (State)        (Zip Code)

Richard Waldrop
P. O. Box 310027
Enterprise, AL  36331

**V.**

STATE OF ALABAMA
_____
**NAME OF APPELLEE**

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____    _____
_____    _____

(For Court of Criminal Appeals Use Only)



```
 1        A      Yeah.   That's what I've been doing

 2   for the last ten years.   Trying to catch them

 3   before they do it.

 4        Q      And Mr. Yoeman was telling you that

 5   he was going to do this, but he didn't name

 6   anybody else?

 7        A      No.   He didn't give up any names.

 8   And that's kind of like a respect thing.   You

 9   know, you don't ask.   You don't volunteer.

10        Q      I'm sorry.   I don't follow you.

11        A      I don't ask and they don't

12   volunteer.

13        Q      Okay.   Did you know Mr. Conrad

14   before?

15        A      I met him briefly --

16        Q      Where was that?

17        A      -- in my home.

18        Q      How did Mr. Conrad get to your

19   home?

20        A      My wife and I had gone on a trip.

21   And we left my niece to babysit our children.

22   And we returned.   He was in the home, in the

23   house.

24        Q      Did you like that?

25        A      No.
```

1    Q    Do you remember why?

2    A    Because I don't like individuals in

3    my home when I'm not there, when an adult is

4    not there.

5    Q    Do you remember telling Mr. Watson

6    that you didn't want him there because you had

7    vibes that something wasn't right?

8    A    Right.

9    Q    What kind of vibes were you talking

10    about?

11    A    Well, one of the reasons, there was

12    three individuals in my home.  And one of the

13    individuals had his shirt off, which led me to

14    wonder what was going on in my home when we was

15    not there, with my children there.

16         He greeted.  And he greet me,

17    and though he greeted me, I still didn't feel

18    quite right about it.  He greeted me

19    respectfully, I'm saying.

20         Now, tell me again how long Brian

21    worked there?  Brian Yoeman.  Excuse me.  At

22    K.F.C?  I'll get the question out in a minute.

23    A    I'm not too sure.  I'm thinking

24    anywhere between one or two months.  It wasn't

25    that long.

1     Q     One to two months?

2     A     Yes, if that long.  He wasn't a

3   great skilled worker.

4     Q     I see.  Do you recall telling Mr.

5   Watson in your interview with him that Brian

6   worked there for quite a while?

7           This was back in July of 2001, up

8   closer to the time of his employment?

9     A     Well, that's a short period.  He

10  didn't hit the 90-day mark.  He didn't make

11  probation.

12    Q     "Quite a while," is a short period

13  of time?

14    A     Yes.

15    Q     I'm going to ask you again, sir, do

16  you take any medications for your mental

17  illness?

18    A     No.

19    Q     Do you consider yourself not to be

20  mentally ill?

21    A     Yes.

22    Q     You have been cured?

23    A     Yes.

24    Q     And you did that without taking

25  medication?

1    A    Yes.

2    MR. JARRELL:  Thank you.

3    THE COURT:  Mr. Bradshaw?

4    MR. BRADSHAW:    Yes, sir.

5                REDIRECT EXAMINATION

6  BY MR. BRADSHAW:

7    Q    George, Mr. Jarrell wants to make

8  something about the date.  I want to see if we

9  can help you.  We are here about something that

10  happened on the 23rd.  And that has been

11  undisputed, and that was on a Wednesday.

12         Now, I'm going to tell you, this is

13  May of 2001.  May 23rd, as we said, it's

14  undisputed, was on a Wednesday.

15         I want to show you what I'm telling

16  you is the first of a transcribed recorded

17  statement between you and a Mr. Patrick Norris

18  of the Twelfth Circuit D.A.'s office, and ask

19  you to look at that and see if you recognize

20  the dialogue in there, the conversations that

21  you had?

22    A    Yes, sir.

23    Q    And what is the date that it says

24  that that happened?  It should be up at the

25  very top, where it says today's date?

1     A     June 8, 2001.

2     Q     June 8, 2001.  Here is what I would

3  purport to you would be a second recorded

4  statement that you had given.  And, again, it's

5  with the Twelfth Circuit D.A.'s Office, Patrick

6  Norris, and ask you what date -- first of all

7  if you recognize it as being a transcript of

8  your recorded statement?

9     A     Yes, sir.

10     Q     And what date was that?

11     A     June 28.

12     Q     Of what year?

13     A     2001.

14     Q     And this a third, and even thicker

15  transcription of a recorded statement that I

16  would purport to you is between you and a Mr.

17  Watson, the same Mr. Watson that Mr. Jarrell

18  was asking you about with A.B.I, and ask you if

19  you recognize that as being a transcription

20  between you and him?

21     A     Yes.

22     Q     Now, what date is on it?

23     A     July 15, 2001.

24     Q     July 15, 2001.  So you had talked

25  with the District Attorney's Office on June 8,

1303

1    June 28 and on July the 16th.

2            Now, in here I want you to use this

3    to refresh your memory, and I purport to you,

4    you told this Mr. Watson that you were informed

5    on May 13 by Mr. Yoeman, which would have been

6    about a week and a half.  And you can use this

7    to refresh your memory, if you need, to see if

8    you may have been confused about whether or not

9    it was this Sunday, the 20th, or the 13th when

10   you were told -- by Mr. Yoeman when you were

11   told, if you remember?

12        A     Yes.  Yes, I remember.  In fact I

13   pretty much know exactly the date.  It was the

14   11th.

15        Q     The 11th?

16        A     It was that Friday?  That Friday.

17        Q     You think that was the 11th?  Was

18   that the first conversation with Mr. Yoeman?

19        A     It was the 11th.

20        Q     Did you have one on the 13th with

21   Mr. Yoeman?  On a Sunday?  If you remember?

22        A     Yes.  Yes.  The 13th on a Sunday,

23   and the Monday.

24        Q     After you had the conversation with

25   Mr. Yoeman, did you have a conversation in your

1304

```
 1    yard on a property line with somebody with the

 2    Enterprise Police Department?  I don't want to

 3    know a name.  And you told them about your

 4    conversation with Mr. Yoeman?

 5          A      Yes, I did.  Yes, I did.

 6          Q      And would that have been before the

 7    23rd of May?

 8          A      Yes, sir.

 9          Q      And is that what you told that man

10    from the A.B.I?

11          A      Yes, sir.

12          Q      Is that what you told Mr. Norris on

13    June 8th?

14          A      Yes, sir.

15          Q      Is that the same thing you told him

16    on June 28th?

17          A      Yes, sir.

18          Q      When was the first time that you

19    saw me and talked to me, sir?

20          A      Today.

21          Q      When was the first time you saw

22    that gray headed man over there, Mr. Al Smith,

23    and talked to him?

24          A      This morning.

25          Q      This morning.  Mr. Jarrell wants to
```

```
 1    make out that you've got mental problems.  And

 2    that you're a felon or some criminal.  This

 3    stuff that he's talking about happened how many

 4    years ago in your life?

 5          A    Over 22 years ago.

 6          Q    And you have held a job ever since

 7    then, haven't you, sir?

 8          A    Yes, sir.  Even obtained a degree.

 9          Q    You took the information that

10    Mr. Yoeman told you, and did you go and tell

11    somebody?

12          A    Yes, I did.

13          Q    And after that you had no control,

14    did you?

15          A    No, sir.

16          Q    These children you were talking

17    about, did you find out more details about what

18    had happened from those children?

19          A    Yes, sir.  They were classmates.

20    They go to the bus together.

21          Q    Did you talk to your wife about

22    this?

23          A    Yes, sir.

24          Q    Did you talk to your pastor?

25          A    Yes, sir.
```

1      MR. BRADSHAW:    Just a minute.    Judge,

2   that's all we have.    Thank you.

3          THE COURT:    Mr. Jarrell?

4                RECROSS EXAMINATION

5   BY MR. JARRELL:

6          Q      Mr. Roberson, I'm confused.

7          A      "Roberson," please.

8          Q      Mr. Roberson.    By the children and

9   classmates?

10         A      They rode the bus together, yes,

11  sir.

12         Q      They rode the bus together?

13         A      Yes, sir.    They rode the bus

14  together.    And they was telling their mother

15  about it.

16         Q      They were telling their mother

17  about it?

18         A      Yes.

19         Q      They learned about it on the bus?

20         A      Yes.

21         Q      And you took this information to

22  heart?

23         A      Yes.    Because it bothered me

24  deeply.

25         Q      Now, Mr. Roberson, again, I'm going

1    to ask the Judge to instruct you not to divulge

2    any names of any person with the police

3    department that you spoke the to.

4         MR. JARRELL:  Would you do that, please?

5         THE COURT:  Sure.

6         Q    Now, you have answered their

7    question in saying that you gave this

8    information to a police officer prior to this

9    happening?

10        A    Yes, sir.

11        Q    As a result of that, an

12   investigation by the Alabama Bureau of

13   Investigation took place?  And you were a part

14   of that investigation, were you not?  Weren't

15   you interviewed in that?

16        A    Yes.  Yes, sir.

17        Q    And in fact, you asked to take a

18   polygraph examination?

19        A    Yes.

20        Q    And they wouldn't do it, would

21   that?  You didn't take a polygraph examination,

22   did you?

23        A    No.

24        Q    Do you know why?

25        A    No.

1308

```
 1          Q       Did you inform them at that time
 2   about all of your mental illnesses and
 3   problems?
 4          A       Yes.  I was honest.
 5          Q       And are you aware that through the
 6   extensive investigation that was done by the
 7   Alabama Bureau of Investigation that all of
 8   that information was given to a Coffee County
 9   Enterprise Division Grand Jury?
10          A       No.
11          Q       Are you aware that that Grand Jury
12   returned a no bill, meaning, no problem as far
13   as anything the police officer did from
14   Enterprise?
15          A       No.
16          Q       You did all this and was involved
17   in the investigation, and you didn't bother to
18   find out what happened?
19          A       No.
20          Q       You were just looking for
21   attention, weren't you, sir?
22          A       No.
23          MR. JARRELL:  No further questions.
24          MR. BRADSHAW:  Can we have just a moment
25          THE COURT:  Sure.
```

```
 1          MR. BRADSHAW:  Just one other thing.

 2                  REDIRECT EXAMINATION

 3   BY MR. BRADSHAW:

 4       Q    Mr. Roberson, you have already

 5   identified this July 16 interview with

 6   Mr. Watson, Corporal David O. Watson.  And

 7   would you look here at what he comments on your

 8   ability to be a walking individual, breathing

 9   and truth-telling human being?

10       A    Yes, sir.

11       Q    Would you tell the ladies and

12   gentlemen of the jury what the man from the

13   A.B.I. said about you having to spend those

14   hours taking that statement from you?

15       A    He says because saying that you are

16   crazy -- because yesterday's conversation

17   overhearing, while I was waiting on the lady to

18   show up, and then talking with you today, you

19   don't appear to have any other problems that

20   are more outrageous than anyone else's

21   problems.

22       Q    He didn't think there was anything

23   wrong with you, did he.

24          MRS. STOUT:  Objection.

25          MR. JARRELL:  Objection
```

1    THE COURT:  Sustained.  Y'all should have

2  objected long ago.  Go ahead.

3    MR. BRADSHAW:  Nothing further.

4    RECROSS EXAMINATION

5  BY MR. JARRELL:

6    Q    George, I did not in any way, and I

7  apologize to you if I have indicated to you or

8  these ladies and gentlemen of the jury that I

9  thought that you were crazy.  Mental illness

10  does not mean crazy.

11    A    Apology accepted.

12    Q    Albert Einstein was a paranoid

13  schizophrenic.  Did you know that?

14    A    Yes.

15    MR. BRADSHAW:  Objection, Your Honor.

16    THE COURT:  Sustained.

17    MR. JARRELL:  Nothing further.

18    MR. BRADSHAW:  We don't have anything

19      further.  He can go.

20    THE COURT:  Does the State intend to

21      call him?

22    MR. JARRELL:  No, sir.

23    THE COURT:  You are excused.  Thank you,

24      sir.  Call your next witness.

25    MR. BRADSHAW:  Judge, may we have a short

1    break to discuss that witness.

2    THE COURT:   Certainly.  You do have

3    another witness?

4    MR. BRADSHAW:  Yes, possibly.

5    THE COURT:  I don't want y'all to take a

6    long time, but, yes, you may.

7    How much time do y'all need?

8    MR. BRADSHAW:  No more than 15 minutes.

9    THE COURT:  Okay.

10   MR. BRADSHAW:  If the Court will indulge,

11   we'll take longer.

12   THE COURT:  No, unless you have

13   justification.

14   MR. BRADSHAW:  No.

15   THE COURT:  Okay.  Ladies and gentlemen,

16   we will take a recess.  We will

17   be back in here, we will say at

18   2:25.  That will certainly allow

19   ample time for the Defense to

20   discuss their next witness.

21   The Court is required

22   to instruct you and does

23   instruct you not to discuss this

24   matter, nor allow anyone to

25   discuss this matter with you.

```
 1                    (Jurors exited the courtroom).

 2          THE COURT:  Ronnie Vaughan, if you will

 3                    come up and have a seat in this

 4                    witness chair here.

 5                    RONNIE VAUGHAN

 6          Whereupon, this witness, after first

 7   being duly sworn to tell the truth, the whole

 8   truth, and nothing but the truth, testified as

 9   follows, to-wit:

10                 DIRECT EXAMINATION

11   BY THE COURT:

12          Q     Mr. Vaughan, you are Ronnie

13   Vaughan?  Is that correct?

14          A     Yes, sir.

15          Q     And you have nothing to do with

16   this case.  I know that.

17          A     No, sir.

18          Q     You know nothing about it?

19          A     No, sir.

20          Q     You don't know why you are here?

21          A     No, sir.

22          Q     You were not expected to be here

23   today?  Is that right?

24          A     I'm mad at Al Smith, though.  I was

25   enjoying the afternoon off.
```

```
 1        Q       I understand.  Has anyone within

 2   this last 48 hours talked to you and told you

 3   that the Court is interested in talking to you?

 4        A       Repeat that, Judge.

 5        Q       Within the last 48 hours, has

 6   anyone talked to you and told you that the

 7   Court might be interested in talking to you

 8   about something that you might be aware of?

 9        A       No, sir.

10        Q       Nobody has?

11        A       No, sir.

12        Q       How do you know that Al Smith was

13   the one that told me certain information?

14        A       Because I called him after I

15   received the telephone call.

16        Q       And then you have talked to

17   somebody about why we are here today?

18        A       I'm sorry.  I thought you meant

19   from the police officer or something.

20        Q       Anyone?  Anyone.

21        A       Yes, sir.  Yes, sir.

22        Q       Al Smith?

23        A       Yes, sir.

24        Q       And what was the nature of your

25   conversation?
```

1  A   I was -- I don't know what night it

2  was.  I reckon it was Tuesday night or Monday

3  night, I can't remember.  I was fixing to go to

4  sleep.  Really, I was on the couch, waiting for

5  the news.

6  Q   I'm talking about the most recent

7  conversation with Mr. Smith about why we are

8  here today?

9  A   That's when I called him, when I

10  answered the phone call.  I received a

11  telephone call from someone.  I don't know.

12  Q   I'm not talking about that I'm

13  talking about he called you today or you called

14  him?

15  A   No, sir.  The sheriff called me on

16  my mobile phone.

17  Q   And then you called who?

18  A   Nobody.

19  Q   Nobody?

20  A   I came over here.

21  Q   How do you know that Al Smith was

22  the one that gave me this information?

23  A   Just assuming.

24  Q   Just assuming.  Okay.

25  A   Did I say something wrong.

1315

1       Q     No.  So during this week, during

2  this week, did you call Al Smith?

3       A     Yes, sir.  After I received a

4  telephone call.

5       Q     And do you consider yourself a

6  friend of Al Smith?

7       A     Yes, sir.

8       Q     Do you consider yourself a neighbor

9  of Al Smith?

10      A     Yes, sir.

11      Q     So it would be fair to say that you

12  are a friend and neighbor?

13      A     Yes, sir.

14      Q     You are my friend, also, is that

15  correct?

16      A     Yes, sir.

17      Q     We have been for many years.

18  Someone apparently called you?

19      A     Yes, sir.

20      Q     And they related some information

21  to you?

22      A     Yes, sir.

23      Q     And what did you do with that

24  information?

25      A     I turned around and called Al

1  Smith.

2       Q    Did you know that he was involved

3  in this case?

4       A    No, sir.

5       Q    This Robert Thomas Conrad case?

6       A    No, sir.  I didn't know anything

7  about the case.

8       Q    And I want you to tell me:  Was the

9  person who called you and gave you that

10 information a man or a woman?  Or could you

11 tell by their voice?

12      A    This day and time it's hard to

13 tell.  But I would say it was a female.

14      Q    Do you have caller I.D. on your

15 phone?

16      A    Yes, sir.

17      Q    Did you jot down that telephone

18 number?

19      A    It was a blocked call, sir.  That's

20 the first thing I looked at.

21      Q    Would it also be fair to say that

22 whoever it was that called you, was probably

23 aware where you lived; in other words, that you

24 might be a friend and neighbor of Al Smith?

25      A    Yes, sir, I would assume so.

1    Q    And did they ask you to relate a

2  message to Al Smith?

3    A    Yes, sir.

4    Q    And what message was that?

5    A    I don't remember verbatim.  But it

6  was like, get Al Smith to check the interim --

7  let's see.  What was the word.  I don't

8  remember.

9         What did I say, Al?

10   Q    If you remember, you remember.

11 It's your recollection?

12   A    It was something like the internal

13 investigation of the Enterprise P.D.

14 Department.  And that was -- like I said, I was

15 about half asleep.  It was 10 'til 10:00.  And

16 I usually go off about that time.  And it

17 shocked me, because I had no idea of why she

18 called me or anything at that time.

19   Q    Have you heard that voice before,

20 that female voice before?

21   A    Not that I recall, sir.  Could

22 have.  Like I said, I was dozing, you know.

23   Q    Would you recognize it again if you

24 heard it again?

25   A    Possibly.  She further sounded --

```
 1    my wife teaches school, and I thought she said

 2    Mrs. Vaughan.

 3               And I said she's asleep.

 4               And she said no, Mr. Vaughan.

 5               And I said yeah, speaking.

 6               And like I said, it was -- it

 7    shocked me because I had no idea why she called

 8    me, you know, unless I was a friend of Al's and

 9    a neighbor of Al's.  Because I don't know

10    anything about what's going on here today.  I

11    have no idea, you know.

12         Q    Did you have any other discussion

13    with this person, other than just check the

14    C.I.D. or whatever, the internal investigation

15    of the Enterprise Police Department?

16         A    No, sir.  I asked who it was.  And

17    I said, do you know who you called.

18               And she said yes.

19               And I says do you want to call Al?

20    Do you have his number?

21               And she called Al's number off.

22               And I said that's it.

23               And she said I just don't want to

24    be involved in the case.

25               And I reckon she put me involved in
```

```
 1   it, didn't she.

 2        Q      And your telephone number is what?

 3        A      334-897-6053.

 4        Q      And that's the telephone number

 5   that whoever called, called?  Is that correct?

 6        A      Yes, sir.

 7        Q      If they have such a thing as a pin

 8   register or anything like that, do you have any

 9   objection to us checking that out and

10   determining who made that phone call to you --

11        A      No, sir.

12        Q      -- or where it was made from?

13        A      No, sir.

14   THE COURT:  Thank you sir.

15   THE WITNESS:  Thank you

16   MR. SMITH:  Judge, could I just ask you

17            to advise him that you ordered

18            me to divulge his name.

19   THE COURT:  Sure.  I did.  I will talk to

20            him more later.

21   THE WITNESS:  Am I through.

22   THE COURT:  You can get out of here.

23   MR. SMITH:  I'm afraid to ask if he's

24            still my friend.

25   THE WITNESS:  I apologize for my attire.
```

1320

```
 1              I don't mean disrespect to the

 2              Court.

 3       THE COURT:  That's fine.  Have a good

 4              day.

 5                   Court is in recess.

 6                   (A break was taken).

 7

 8       THE COURT:  This court will come back to

 9              order.  You may be seated.

10                   Ladies and gentlemen of

11              the jury, I expect you having to

12              come back out here will turn out

13              to be just a formality.  We will

14              see.  Are there any motions by

15              the State or the Defense?

16       MR. SMITH:  The Defense rests, Your

17              Honor.

18       THE COURT:  The Defense rests.  The

19              State?  Rebuttal?

20       MR. JARRELL:  We rest.

21       THE COURT:  Okay.  I expected that was

22              going to happen.  But they have

23              to do that in your presence in

24              open court.

25                   We just brought you
```

1   out.  But, remember, I told you

2   there are two places in a trial

3   where the law requires that I

4   hear matters outside of your

5   hearing and presence.  And we

6   have reached that point, that

7   second point.

8         Also, to save your

9   time, what I'm going to do at

10   this time is I will hear their

11   motions, and I will rule on

12   their motions, outside of your

13   hearing and presence.

14         I will also have a

15   charge conference, a jury charge

16   conference.  That's where I give

17   them a rough outline of what I

18   intend to say to you.  They can

19   object and say Judge, you need

20   to add this that or the other,

21   if I don't tell them I'm going

22   to cover everything they think

23   I'm going to cover with you.

24   This is the first time they get

25   an opportunity to do that.  Then

1    they know what I'm going to say

2    to you in a nutshell before they

3    make their closing remarks to

4    you.

5              So, when we finish

6    that, you will come back into

7    the courtroom and they, the

8    attorneys for the State will go

9    first.  The Defense will go

10   second.  The Defense will split

11   their comments to you, which

12   means each of these two

13   attorneys will have the right to

14   say something to you.  And then

15   we will go back to the State for

16   the last remarks.

17             The State again has the

18   burden of proof so they can

19   split their comments to you.

20   They can go first and last.

21             Then, after that, I will

22   talk to you about the law,

23   explain the law to you.  It's

24   very voluminous, very

25   complicated, so I will do my best

1323

1    to explain it to you so that

2    hopefully you will understand it

3    when I finish.  Then you will

4    retire back to the jury room.

5    You will have all the verdict

6    form possibilities with you.  At

7    that time you will deliberate

8    and decide each of these two

9    cases by rendering a verdict as

10   to each of these two separate

11   offenses or any lesser but

12   included offenses embraced

13   therein.

14          Any questions?  The

15   Court is required to instruct

16   you and does instruct you not to

17   discuss this matter, yet, you

18   are getting close, among

19   yourselves, nor to allow anyone

20   to discuss it with you.

21          Sheriff, if you will

22   take the jurors back to the jury

23   room.

24   (Jurors exited the courtroom).

25   THE COURT:  You may be seated.  The

1    record will again reflect that

2    we are now out of the hearing

3    and presence of the jury.

4         Does the Defense have a

5    motion or motions that you would

6    like to make at this time?

7    MR. SMITH:  Offense One, may it please the

8    Court, we move for Judgment of

9    Acquittal.

10   THE COURT:  Same arguments as earlier?

11   MR. SMITH:  Absolutely, Your Honor.

12        And in Offense Two,

13   Motion for Judgment of

14   Acquittal, and we republish all

15   previous motions arguments

16   thereon.

17   THE COURT:  Does the State reassert all

18   of the arguments that it made as

19   far as the motions?

20   MRS. STOUT:  Yes, Your Honor, we do.

21   THE COURT:  The findings of the Court are

22   the same.  The Motion for

23   Judgment of Acquittal as to

24   Offense One, robbery in the

25   first degree, where the victim

1325

```
 1            is intentionally killed, is

 2            denied.

 3                    The same motion as to

 4            Offense Two, robbery in the

 5            first degree of Mr. Grimes?

 6    MR. SMITH:  Yes, sir, Your Honor.

 7    THE COURT:  Same arguments?

 8    MRS. STOUT:  Yes, Your Honor.

 9    THE COURT:  Same rulings of the court is

10            entered.  Motion for Judgment of

11            Acquittal as to Offense Two is

12            denied.

13                    Also, the Court finds

14            that all of these prior rulings

15            on any motions or objections,

16            all prior rulings are proper.

17            And the same rulings will remain

18            in full force and effect.

19                    Anything further?

20    MR. SMITH:  Judge, I need to withdraw two

21            of my requested charges.  But I

22            guess we will be there in a

23            minute.

24    THE COURT:  Okay.  Let me pull them out.

25            I think I have them all here.   I
```

```
1              do.  Which ones are you pulling
2              out?
3    MR. SMITH:  Your Honor, I would pull 13,
4              which is no longer relevant.
5    THE COURT:  Wait just a second.
6              Thirteen.  Good.  I have a big
7              'ole question mark on that
8              one.  So I'm going to write on
9              it withdrawn.
10   MR. SMITH:  And I withdraw number 24 or
11             rather withdraw and supplement
12             that charge.  I think it's
13             covered by --
14   THE COURT:  I'm sorry.  I didn't follow
15             you.  You are withdrawing it and
16             what?
17   MR. SMITH:  Judge, I had reserved that
18             right to file and supplement
19             that later, and I withdraw it.
20   THE COURT:  Certainly.  I had a notation
21             on there, no need for the Judge
22             to rule on that.  Okay.
23             Anything further
24   MR. SMITH:  Nothing.
25   THE COURT:  Okay.  Let's run through
```

them.

Of course, the Court at the guilt phase is going to give the pattern jury charges, general things, that a jury needs to know, the purpose of a Judge in the trial of a case. I'm going to remark a little bit more about the duties and the responsibilities of attorneys in the trial of such case.

I'll talk to them again about objections. I'll talk to them about testimony of witnesses. I will use the pattern jury charges there.

As to that law that deals with testimony of competence, because we have had a Co-defendant testify now, I didn't originally think that we would have that. But things, attributing terms of it, we now do have that testimony. The testimony of an accomplice, the

| | |
|---|---|
| 1 | testimony of one who provides |
| 2 | evidence against a Defendant as |
| 3 | an informant, for immunity, for |
| 4 | punishment or for personal |
| 5 | understanding vindication must |
| 6 | always be examined and weighed |
| 7 | by the jury with greater care |
| 8 | and greater caution than the |
| 9 | testimony of ordinary |
| 10 | witnesses. |
| 11 | That's the first part |
| 12 | of that pattern charge. And I |
| 13 | will go through that with the |
| 14 | jurors. And I feel that I am |
| 15 | obligated, required to do that. |
| 16 | The Defense has |
| 17 | submitted, and you have it in |
| 18 | charge number 9. You can mark |
| 19 | that given. And then in a |
| 20 | minute I will go back through |
| 21 | all of yours, 1, 2, 3, and give |
| 22 | you the ruling of the Court. |
| 23 | But at the point where I talk |
| 24 | about witnesses, I will give |
| 25 | that requested charge. |

```
 1                    Does the Defense mind
 2            me blending your requested
 3            charges in, when I'm talking
 4            about a certain subject?
 5     MR. SMITH:  I think it flows much better
 6            that way, Judge.
 7      THE COURT:  It does.  It's more
 8            understandable, probably, by the
 9            jury.
10                    There has been no
11            evidence that anyone during the
12            course of any acts alleged were
13            under the influence of addictive
14            drugs, so I'm not giving that,
15            if anyone insists that I do.  I
16            haven't heard anything.  Maybe
17            y'all have, but I haven't.  So
18            I'm not giving that.
19                    I will give requested
20            charge number 6, the Defense
21            requested charge number 6 on
22            credibility of witnesses.
23                    I will give requested
24            charge number 7, impeachment and
25            inconsistent statements.
```

```
 1                    I will give requested

 2              charge number 11 on the mere

 3              volume of number of witnesses.

 4                    I'll talk to the jury

 5              about sympathy or prejudice.  I

 6              will give them a charge or

 7              instruction on expert

 8              witnesses.

 9                    I'm not going to give

10              them an instruction on lay

11              witnesses.  I don't really think

12              we have had any lay witnesses

13              that have expressed any

14              opinions.  Can any of y'all

15              think of any to the contrary?

16        MR. SMITH:   I think that's correct, Your

17              Honor.

18        THE COURT:  I'm not giving them anything

19              on that.

20                    I'm not giving them a

21              circumstantial evidence charge.

22              I was going to do that.  But

23              since we've had one witness who

24              said that he was there, and that

25              he saw what happened and
```

1    described what happened, then it

2    would be inappropriate for the

3    Court to do that.

4          I will talk to the

5    jurors about intent and specific

6    intent.  Then I will get into

7    the crime, the crimes charged.

8    Of course, there are two

9    counts.

10         And I will give your

11   number 14, the Defense number

12   14.  You can mark that given.

13         Then I will give

14   requested number 15 and define

15   for the jurors capital murder as

16   it's charged here.

17         Then number 16 on

18   lesser included offenses.  Okay.

19   Now, we get down to some points

20   where either side may have some

21   things to express to the Court.

22         I will talk to them

23   about lesser included offenses.

24   And as to offense one, a lesser

25   included offense of capital

1    murder, certainly would be

2    intentional murder -- so murder

3    of the intentional type.  So I

4    will explain the law of Alabama

5    to them as it deals with murder

6    of the intentional type.

7         A lot of people are not

8    aware you don't always have to

9    have intent to kill to be guilty

10   of murder.  So, that brings up

11   the second kind of murder that I

12   will talk to the jury about.

13   And it will be a third

14   possibility.  And that is felony

15   murder.  We call that felony

16   murder doctrine when someone is

17   engaged in the commission of a

18   felony and then proximately

19   results from the felony

20   commissioned, then the person

21   who committed the felony would

22   be guilty of felony murder.

23   That's not going to be in my

24   instruction to the jury.  But I

25   will talk to them about felony

1    murder as a possibility.

2            Then we will move on,

3    and I will talk to the ladies

4    and gentlemen of the jury about,

5    I will move on to robbery in the

6    first degree.  That is a lesser

7    but included offense embraced

8    within the capital

9    charge, robbery in the first

10    degree of Jelaine Bowman

11    Dennis.

12            So I see those as being

13    the lesser but included offenses

14    embraced within the capital

15    charge.

16            I know that the Defense

17    -- let me just run through how

18    I'm going to rule on your

19    requested charges.  I have

20    already given request charge

21    number one to the jury, when I

22    started out, if you recall, if

23    you want to flip through with

24    me.

25    MR. SMITH:  Yes, Your Honor.

1    THE COURT:  Okay.  So, I've given number

2    one.  And I've marked it given.

3    Now, let's flip on over to Page

4    9.  All of these first ones are

5    just general instruction

6    charges, I will call them.  Do

7    y'all agree that they are?

8    MR. SMITH:  Yes, sir, your Honor.

9    THE COURT:  And I've marked them denied.

10   And the reasons I've marked them

11   denied is because I am going to

12   probably give all of these.  But

13   I'm going to give them in my own

14   words.  I try to keep things a

15   little more understandable for

16   the jurors, if I can do that, so

17   that they can understand them.

18   So I'm going to give

19   almost all of these.  Y'all can

20   object to anything that I've

21   left out at the conclusion.

22   MR. SMITH:  Which ones, Your Honor?

23   THE COURT:  I'm going to go through them

24   real quickly.  I think you are

25   going to find that I will give

1335

```
 1                              them all.
 2            MR. SMITH:  I've heard Your Honor's charge
 3                        so many times.  I would be
 4                        surprised if the language is not
 5                        there.
 6            THE COURT:  Well, I plan on giving them
 7                        all.  But the law requires that
 8                        if I grant these, then I have to
 9                        give them in the way that you
10                        have written them out with the
11                        punctuation of everything just
12                        like it, and I can't deviate
13                        from that.  So just to keep from
14                        having to do that, I've
15                        generally denied them.
16                             I feel at the
17                        conclusion of my instruction to
18                        the jury that you will see that
19                        I've given them.
20                             So, number 3, denied,
21                        number 4, denied, number 5,
22                        denied.
23            MR. SMITH:  We would respectfully object
24                        and ask the Court to give number
25                        5, because I think it varies
```

```
 1              wording from the pattern charge.
 2    THE COURT:  My charge that I'm going to
 3              give them, the very first few
 4              lines are included in what I
 5              will say to the jury.
 6    MR. SMITH:  That's fine, Judge.
 7    THE COURT:  Let me move on to the next
 8              paragraph.  Your last paragraph,
 9              I've already given an
10              instruction on this.  And I've
11              already said it to them.  And I
12              plan on saying to them remember
13              everything I've said to you in
14              the beginning of my instructions
15              to you.  And that would conclude
16              your second paragraph.  So in
17              effect I will have covered that
18              adequately in my general
19              charge.  So there is no need for
20              me to go over it.  It would be
21              redundant for me to go over it
22              again, especially, when I'm
23              going to say it substantially
24              the same.
25                   Okay.  Number 6, I've
```

1          marked refuse.  I've put on here

2          covered adequately in Judge's

3          general charge.  And I think you

4          will see it will be just about

5          exactly the same thing.  I might

6          have one extra blended in thing,

7          but I don't think you will be

8          dissatisfied with my

9          instructions on that.

10                  Okay.  Number 6, given.

11     MR.  SMITH:   Six?

12     THE  COURT:   It's 7, given; and 8 denied.

13          I might reexamine that since we

14          had our last witness.

15     MR.  SMITH:   Judge, I withdraw number 8.

16     THE  COURT:   I thought you might.  The

17          State might want me to give it.

18          So, withdrawn.

19                  I've asked each of you

20          if you had any requested jury

21          charges.  And I have given y'all

22          that opportunity at this point.

23     MR.  SMITH:   I think I gave you them Friday

24          a week ago.

25     MRS.  STOUT:   We have no problem with you

```
 1                         giving it.
 2          THE COURT:  I no you wouldn't.
 3          MRS. STOUT:  We ask that you give it.
 4          THE COURT:  That's too late.  I asked
 5                    y'all to submit earlier.  I've
 6                    got what I've got.
 7                         Okay.  I've marked
 8                    number 9, given.
 9                         I've marked number 10,
10                    denied.  The reason I did that
11                    in Federal Court a Judge can do
12                    these things, but in State
13                    Court, I cannot comment on the
14                    credibility of any category of
15                    witnesses.  And this is
16                    basically saying that I can tell
17                    the jury that just because
18                    somebody is a law enforcement
19                    officer doesn't mean that they
20                    are any more believable or less
21                    believable.  I don't comment on
22                    any category of witnesses at
23                    all.  I'm precluded from doing
24                    so.  I think that would be
25                    improper.  I've denied it.
```

1339

```
 1                          Number 11, I've marked

 2                  it given.  Federal Judges can

 3                  get away with a lot more than we

 4                  can.

 5                          Number 12, I've covered

 6                  adequately in my general charge

 7                  to the jury.  I think all will

 8                  see that it covers everything

 9                  you have there and more.

10                          Number 13?

11      MR. SMITH:  Withdraw.

12      THE COURT:  Have you withdrawn that?

13      MR. SMITH:  Withdrawn.

14      THE COURT:  Number 13 withdrawn for the

15                  record.

16                          Number 14, I've marked

17                  it given.  Number 15, given.

18                  Number 16, given.  These are

19                  pattern jury charges.  Number

20                  17, given.  Number 18, given.

21                          Number 19, denied.  Do

22                  y'all want to discuss that?

23                  It's very important.  Do you now

24                  contend that manslaughter is a

25                  lesser but included offense
```

```
 1              embraced within the charge based

 2              on the proof?

 3    MR. SMITH:  Yes, Your Honor.

 4    MR. JARRELL:  Your Honor, we would

 5              disagree with that.  There is no

 6              evidence of recklessness.

 7    THE COURT:  Well, it's not the

 8              recklessness necessarily that

 9              I'm looking at.  Manslaughter,

10              heat of passion, death caused by

11              sudden heat of passion because

12              of provocation recognized by

13              law.

14                   No.  There is no

15              provocation recognized by law

16              that has been touched on in this

17              particular case.  The issue of

18              self defense is not available,

19              when somebody goes into rob,

20              there hasn't been evidence that

21              would bring self defense or any

22              kind of provocation into play in

23              this case.  So I have denied

24              that.

25    MR. SMITH:  Judge, I agree with your
```

```
 1                    statement.  However, I would say

 2                    that the person, and there is

 3                    evidence here, that he was shot,

 4                    the pain and circumstances of

 5                    that could negate the intent of

 6                    intentional murder to reduce it

 7                    to manslaughter.

 8          THE COURT:  And I will give them adequate

 9                    instruction on intent and that

10                    kind of thing, and the

11                    requirement of intentional

12                    killing is one of the elements

13                    where the victim is

14                    intentionally killed, before

15                    they could return a verdict of

16                    guilty as to the capital

17                    offense.

18                       So that is going to be

19                    adequately covered in that.  But

20                    it would be improper for me to

21                    give a manslaughter charge when

22                    there is no provocation

23                    recognized by law -- recognized

24                    by law -- that would be

25                    appropriate to this case.
```

1               When somebody goes into

2      a place and robs them with a

3      pistol, that's the cost of doing

4      business.

5   MR. SMITH:  Of course, number 20 is a

6      different version of

7      manslaughter.

8   THE COURT:  Sure.  Number 20 is what the

9      State was probably talking about

10     a minute ago.  That's the

11     recklessness causing the death

12     of another.  There is no

13     evidence there was a reckless

14     death here.  Absolutely none.

15     Number 20 is denied.

16   THE COURT:  Any argument on that?

17   MR. SMITH:  Only my comments.

18   THE COURT:  Okay.  Number 21, I've marked

19     it given.  Number 22, given.

20     That's just a general

21     statement.  Number 23 talks

22     about Mr. Grimes, robbery in the

23     first degree, and I've marked it

24     given.

25   MR. SMITH:  Number 24 is withdrawn, may it

1       please the Court.

2       THE COURT:  Number 24 is withdrawn.  Let

3       me write that on here.

4       Number 25, I'm marking

5       that given.  Number 26, denied.

6       And that's just a general

7       thing.  And I'm going to give

8       them substantially that, as

9       Judges are encouraged to do.

10      But I'm not going to be bound by

11      those words.  It's just telling

12      the jury what they are to do

13      when they are to retire and

14      deliberate.  I will probably say

15      substantially the same thing.

16      But I just don't want to be

17      bound to say them in the words

18      that you have before me.

19      Anything else?

20      MR. SMITH:  No, Your Honor.

21      THE COURT:  Okay.  Now, let's go over,

22      does the State have anything

23      that it would like for me to say

24      on the jury charges?

25      MR. JARRELL:  Judge, the State is

```
 1                    satisfied with the charges.
 2          THE COURT:   Okay.   Y'all can hear the
 3                    charges.   And y'all can stand
 4                    up, both sides, and jump up and
 5                    down, complain, moan and groan
 6                    when we finish.
 7          MR. SMITH:   I don't think I have any jump
 8                    and down left.
 9          THE COURT:   Okay.   Let me see if I can
10                    find the jury verdicts.   These
11                    are the possibilities.   And you
12                    have a standing objection on
13                    manslaughter.   I don't have a
14                    manslaughter— reckless— or
15                    provocation-type manslaughter
16                    possibility.   And right now, you
17                    say that you object to it?
18          MR. SMITH:   Correct, Your Honor.
19          THE COURT:   So you don't have to go over
20                    that again.
21                         The first possibility
22                    is not guilty.   So I'm probably
23                    going to start with that.   Not
24                    guilty of the capital offense of
25                    an intentional murder and not
```

```
 1                    guilty of any lesser but

 2                    included offense embraced

 3                    therein.

 4                         And it reads as follows:

 5                    We, the jury, find the

 6                    Defendant, Robert Thomas Conrad,

 7                    not guilty of the capital

 8                    offense of the intentional

 9                    murder by the Defendant of

10                    Jelaine Bowman Dennis during a

11                    robbery in the first degree

12                    committed by the Defendant in

13                    violation of Section

14                    13A-5-40(a)(2), the Code of

15                    Alabama as amended, and not

16                    guilty of any lesser but

17                    included offense embraced

18                    therein.

19                         Does everybody agree

20                    that's a possibility?

21          MR. SMITH:  Yes, sir.

22          THE COURT:   The State?

23          MR. JARRELL:  Yes, sir.

24          THE COURT:  The opposite of that:  We,

25                    the jury, find the Defendant,
```

1    Robert Thomas Conrad, guilty of

2    the capital offense of

3    intentional murder by the

4    Defendant of Jelaine Bowman

5    Dennis, during a robbery in the

6    first degree committed by the

7    Defendant, in violation of

8    section 13A-5-40(a)(2), the Code

9    of Alabama, 1975, as amended.

10   Any problems with that by the

11   Defense?

12   MR. SMITH:  I will just state object.

13   THE COURT:  Okay.  By the State?

14   MRS. STOUT:  No, Your Honor.

15   THE COURT:  Okay.  Then we move on to

16   lesser but included offenses

17   embraced therein.  To find

18   someone guilty of a lesser

19   included offense, a jury would

20   have to find the Defendant not

21   guilty of the capital offense.

22   So we start off, I'm going to go

23   with murder first of the

24   intentional type.

25   We, the jury,

```
 1              find the Defendant, Robert

 2              Thomas Conrad, not guilty of the

 3              capital offense of intentional

 4              murder by the Defendant of

 5              Jelaine Bowman Dennis during a

 6              robbery in the first degree

 7              committed by the defendant in

 8              violation of Section

 9              13A-5-40(a)(2), the Code of

10              Alabama, 1975, as amended.

11              However, we, the jury, find the

12              Defendant, Robert Thomas Conrad,

13              guilty of the lesser but

14              included offense embraced

15              therein of murder of Jelaine

16              Bowman Dennis in violation of

17              Section 13A-6-2(a)(1), the Code

18              of Alabama, 1975, as amended.

19      MR. SMITH:  Judge, would you mind reading

20              the first two sentences again,

21              please?

22      THE COURT:  We, the jury, find the

23              Defendant, Robert Thomas Conrad,

24              not guilty of the capital

25              offense --
```

1348

```
 1          MR. SMITH:  That's good.  Thank you.

 2                    Your Honor, I wasn't sure I

 3                    heard something correctly.

 4          THE COURT:  Any problem with this?

 5          MR. SMITH:  No, Your Honor.

 6          THE COURT:  This is a lesser included of

 7                    intentional murder.  By the

 8                    State?

 9          MRS. STOUT:  No, Your Honor.

10          THE COURT:  We are going to move on now

11                    to felony murder.  Felony

12                    murder.  We, the jury, find the

13                    Defendant, Robert Thomas Conrad,

14                    not guilty of the capital

15                    offense of intentional murder by

16                    the Defendant of Jelaine Bowman

17                    Dennis, during a robbery in the

18                    first degree committed by the

19                    Defendant in violation of

20                    Section 13A-5-40(a)(2), the Code

21                    of Alabama, 1975, as amended.

22                    However, we, the jury, find the

23                    Defendant, Robert Thomas Conrad,

24                    guilty of the lesser but

25                    included offense embraced
```

```
 1              therein of felony murder of

 2              Jelaine Bowman Dennis in

 3              violation of Section

 4              13A-6-2(a)(1), the Code of

 5              Alabama, 1975, as amended.

 6                   Felony murder.

 7    MR. SMITH:  Satisfied.

 8    MRS. STOUT:  The State is satisfied.

 9    THE COURT:  Okay.  We move on to the

10              lesser offense of robbery in the

11              first degree of Jelaine Bowman

12              Dennis.

13                   We, the jury, find the

14              Defendant, Robert Thomas Conrad,

15              not guilty of the capital

16              offense of intentional murder by

17              the Defendant of Jelaine Bowman

18              Dennis during a robbery in the

19              first degree committed by the

20              Defendant in violation of

21              Section 13A-5-40(a)(2), the

22              Code of Alabama, 1975, as

23              amended.  However, we, the jury,

24              find the Defendant, Robert

25              Thomas Conrad, guilty of the
```

1                  lesser but included offense

2                  embraced therein of robbery in

3                  the first degree of Jelaine

4                  Bowman Dennis, in violation of

5                  Section 13A-8-41(a)(1), the Code

6                  of Alabama, 1975, as amended.

7                      Any objection by the

8                  Defense?

9    MR. SMITH:  None.

10   THE COURT:  By the State?

11   MRS. STOUT:  None.

12   THE COURT:  Now, we move on to the charge

13                  of robbery in the first degree

14                  of Mr. Grimes.

15                    Of course, the first

16                  possibility is not guilty, and

17                  it will read:

18                    We, the jury, find the

19                  Defendant, Robert Thomas Conrad,

20                  not guilty of robbery in the

21                  first degree of Robert Ray

22                  Grimes -- Did I get that right,

23                  Mr. Grimes?

24   MR. GRIMES: (Nodding head affirmatively).

25   THE COURT:  -- as charged in Offense Two

```
 1                    of the indictment in violation

 2                    of Section 13A-8-41(a)(1), the

 3                    Code of Alabama, 1975, as

 4                    amended.

 5                         Any objection by the

 6                    Defense?

 7        MR. SMITH:  No, Your Honor.

 8        THE COURT:  Objection by the State?

 9        MRS. STOUT:  None, Your Honor.

10        THE COURT:  And the other possibility is

11                    guilty.

12                         We, the jury,

13                    find the Defendant, Robert

14                    Thomas Conrad guilty of robbery

15                    in the first degree of Robert

16                    Ray Grimes, as charged in

17                    Offense Two of this indictment,

18                    in violation of Section

19                    13A-8-41(a)(1), the Code of

20                    Alabama, 1975, as amended.

21        MR. SMITH:  The only objection as

22                    consistent with my prior

23                    motions.

24        THE COURT:  Sure.  That concerns proof.

25                    I'm not talking about proof.
```

1    I'm talking about possible

2        verdicts.

3    MR. SMITH:  I understand, Judge.

4    THE COURT:  So with that, nothing else?

5    MR. SMITH:  Nothing else, other than

6        that.

7    THE COURT:  Sure.

8    MRS. STOUT:  No objection.

9    THE COURT:  Okay.  I know you have raised

10        manslaughter by provocation,

11        sufficient provocation.  You

12        have raised manslaughter,

13        reckless.  You have made

14        objection as to that.  And you

15        preserve that.  Anything else

16        from the Defense?

17    MR. SMITH:  Judge, we move for the Court

18        to instruct on any lesser

19        included charges that the Court

20        determines would be appropriate,

21        but not specifically stated.

22    THE COURT:  That's wide open, and I

23        appreciate that.  Anything else?

24    MRS. STOUT:  No, sir.

25    THE COURT:  Okay.  The State is going to

```
1              split it's arguments?  Is that

2         correct?

3    MR. JARRELL:  That's correct.

4    THE COURT:   And the Defense is going to

5         split its arguments?

6    MR. SMITH:  That's correct.

7    THE COURT:  And then we will go back to

8         the State.

9              Who is going to make

10        the first State's?  Who is going

11        to make second?

12   MRS. STOUT:  I will Your Honor.

13   THE COURT:  And who is going first for

14        the Defense?

15   MR. SMITH:  Your Honor, I'm going first.

16        It's not going to be very long.

17   THE COURT:  Are y'all ready to begin?

18        Defense?

19   MR. BRADSHAW:  Ready, Your Honor

20   THE COURT:  The State?

21   MRS. STOUT:  The State is ready Your

22        Honor.

23   THE COURT:  If y'all will call those

24        jurors back in.

25
```

1354

1    (Jurors entered the courtroom).

2    THE COURT:  This court will come back to

3         order.

4              Is the Defense ready?

5    MR. SMITH:  Yes, Your Honor?

6    THE COURT:  Is the State ready?

7    MRS. STOUT:  Yes, Your Honor?

8    THE COURT:  Ladies and gentlemen of the

9         jury, as you know, all of the

10        evidence has now been submitted

11        to you.  The only thing that

12        will remain will be for the

13        attorneys to talk to you, give

14        you their closing remarks to

15        you.

16              I can't tell you what

17        they are going to say, because I

18        don't know what they are going

19        to say.  But I would suggest

20        they are probably going to tell

21        you that they feel the evidence

22        should have satisfied you beyond

23        a reasonable doubt or they feel

24        the evidence should not have

25        satisfied you to beyond a

1    reasonable doubt.

2                Let me again caution

3    you that what attorneys tell you

4    is not evidence.  And you should

5    disregard any comment that you

6    find has not been supported by

7    the legal and competent

8    evidence presented in the trial

9    of this case.

10                You are the judges of

11    the facts, not the lawyers, not

12    me, you.  And it's up to you to

13    decide the facts.  What really

14    happened in this case.

15                Chris, you can come on

16    in.  I told y'all this is a

17    young man that has been working

18    with me now since the 11th grade

19    or whatever.  And he is in

20    college now.  And one of these

21    days, he is going to be a good

22    lawyer.

23                So it's your decision

24    that is important.  And you

25    should disregard any comment

```
 1                    that any attorney makes to you
 2                    that you find is not supported
 3                    by the evidence.  And I've told
 4                    you where the evidence is to
 5                    come from.  You have been a very
 6                    attentive, very patient jury,
 7                    and for that I express my
 8                    appreciation.  Here is what is
 9                    going to happen.  The State is
10                    going first.  I believe Mr.
11                    Jarrell?  Correct?
12          MR. JARRELL:  Correct.
13          THE COURT:  Mr. Jarrell is going first.
14                    And then we will hear from the
15                    Defense.
16                          Mr. Smith, you are
17                    going first?
18          MR. SMITH:  Yes, Your Honor.
19          THE COURT:  And then Mr. Bradshaw will go
20                    over that.  And then we will
21                    come back to the State and Mrs.
22                    Stout will go after that.
23                          I don't know how long
24                    that's going to take in a case
25                    of this nature.  I don't place
```

```
 1              limits on the attorneys.  In
 2              other cases I might, but not in
 3              this particular case.  That's
 4              the proper thing to do.
 5                   After that, I know that
 6              my instructions to you on the
 7              law are going to be an hour, to
 8              an hour-and-a-half, somewhere
 9              around there.  They are fairly
10              lengthy.  So, we are going to
11              take a break right after the
12              attorneys finish, so we won't
13              have to take a break during the
14              period that I talk to you.
15                   Is the State ready to
16              begin your closing remarks?
17     MR. JARRELL:  The State is ready, Your
18              Honor.
19     THE COURT:  You may.  And they may need
20              to cut off some of these lights
21              as we go.  And you may do that.
22     MR. JARRELL:  We won't do that
23              initially.
24
25
```

1        <u>CLOSING STATEMENTS</u>

2  <u>BY MR. JARRELL:</u>

3                Ladies and gentlemen,

4        the first thing I want to do is

5        thank you very much.  You have

6        been a very attentive audience.

7        I've seen trials that have

8        lasted a half day where jurors

9        would nod off and not seem to be

10       paying attention.  And y'all

11       have been down here since

12       Tuesday.  And that is to your

13       credit.  You have been very,

14       very attentive to both the

15       State and for the Defense.  And

16       I appreciate that and I'm sure

17       Mr. Smith and Mr. Bradshaw do,

18       as well.

19             I do want to apologize

20       for one thing in that it took a

21       while.  I know the State had to

22       recall several witnesses to get

23       some things straightened out.

24       But, please don't hold that

25       against the family of Jelaine

1    Dennis and Mr. Grimes.

2         If you see me outside

3    of the courthouse, you can tell

4    me what you think.  But as far

5    as this case is concerned,

6    please, please don't let that

7    enter into whatever decision

8    that you might make.

9         Another point that I

10   want to touch on is something

11   that Mr. Bradshaw said in his

12   opening statement that kind of

13   bothered me a little bit.  He

14   said this was going to be like a

15   long movie.

16        This was not a movie.

17   This was real.  Jelaine Dennis

18   is very dead.  She is not going

19   to get up off the floor and

20   continue with her life after the

21   movie is over and continue with

22   her life.  This is not a movie.

23   This is reality.

24        And there was another

25   thing that bothered me a little

1    bit that happened during the

2    course of the trial.  And that

3    was the attempted character

4    assassination of Mrs. Dennis by

5    pointing out to you that some of

6    the merchandise that she sold in

7    that store was used to smoke

8    dope.

9            Ladies and gentlemen,

10    it doesn't matter whether she

11    was selling dirty books or

12    whether or not she was selling

13    Bibles.  That has no bearing on

14    this case whatsoever.  None

15    whatsoever.

16            Her life is just as

17    precious to her family, her

18    daughter, her other children.

19    They have all been in this

20    courtroom.

21            She was a mother.  And

22    her life was precious to her and

23    precious to them.  That man

24    sitting right over there had no

25    right to take it.

```
 1                    On May 23rd of 2001,
 2          Jelaine went to her business,
 3          her store, where she was making
 4          a living.  It was her means of
 5          making an honest day's wage.
 6          Her business had a sign on it,
 7          on the inside, Chamber of
 8          Commerce.  It was a legitimate
 9          business.  You have heard about
10          that sign already during this
11          trial.
12                    On the other hand, the
13          Defendant was not interested
14          that day in making an honest
15          living.  He wanted somebody else
16          to make it for him, so he could
17          go steal it.  And he went out on
18          County Road 711 to the Toy
19          Store, the store located out in
20          the country, as far away there
21          wouldn't be very many witnesses,
22          isolated.  Hopefully, he
23          wouldn't be seen and he
24          committed a robbery.
25                    He goes into that
```

1    store, dressed in black, from

2    head to toe, with a 9 millimeter

3    semi-automatic pistol and

4    sticks it in the face of Ray

5    Grimes.  And then he grabs Mr.

6    Grimes around the neck and holds

7    that gun to his temple.  I hope

8    none of us have to experience

9    that.  But he did.  He reaches a

10   hold of Mr. Grimes, after asking

11   for the money out of the cash

12   register, took the money, put it

13   in his pocket, except for a

14   $5.00 he dropped.  And then he

15   took Mr. Grimes to the floor,

16   and took his $30.00 out of his

17   wallet.

18         I'm not exactly sure

19   what happened at that point,

20   exactly what the sequence of

21   events were.  You heard Mr.

22   Grimes' testimony some.  And you

23   heard Mr. Yoeman's testimony.

24   They were not that

25   inconsistent.

1  And if you had just
2  been scared to death, or you
3  were scared because you thought
4  you might be involved in this
5  and get caught, your memory
6  might not be real sharp as to
7  the exact sequence of events.
8  But one thing that was
9  indelible on Mr. Yoeman's mind,
10  and I think would be on yours,
11  if you witnessed it, was when he
12  saw the Defendant with a woman
13  on the ground with a gun in her
14  chest, pulling the trigger.  I
15  don't think that is something
16  that you can erase from your
17  mind, if you wanted to.
18  I'm not going to drag
19  out the photographs of Jelaine.
20  I'm not going to subject the
21  family to those things anymore,
22  or you.  But I'm sure that each
23  one of you have an indelible
24  imprint on your mind the size of
25  that bullet hole and the burned

1    scorched flesh around it that

2    was in her chest.

3            And not only did that

4    man do that, he shot her twice

5    more, once through the back of

6    the hip and once in the thigh.

7            The Defense wants to

8    make something out of, and I'm

9    sure they probably will, of the

10   fact that Mr. Yoeman says that

11   he heard two light sounds, soft

12   sounds, however he said it,

13   indicating that the .22 shot

14   first.  Maybe it was.  But it

15   didn't give him any right to

16   kill her.  He went there and

17   started this mess.

18            And who is to say --

19   Mr. Bradshaw made a comment in

20   voir dire, or Mr. Smith, about

21   property versus life.  What

22   about life versus life?  I don't

23   know that she was protecting her

24   property.  She might have been

25   protecting her life.  She didn't

1    know what this guy was going to

2    do.  He comes in there with a

3    gun, a semi-automatic pistol,

4    and puts it in her face.

5          After the shooting

6    occurs, she crawled from where

7    she was.  And if you remember,

8    the officer testified that the

9    crime scene, the crime scene

10    investigator, that secured the

11    scene, after the initial

12    officers, Sergent Hauser,

13    described a blood trail from

14    over to the counter.  And you

15    remember where the picture of

16    the gun was on the diagram.

17    There was a blood trail from

18    there all the way over to the

19    counter.  And there was blood

20    all over the counter and blood

21    behind it.

22          She crawled across

23    there with a gaping hole in her

24    chest, yeah there is going to be

25    a lot of blood -- and it's going

1   to spatter -- crying out that

2   she was shot, that she was

3   dying.

4           I think one of the most

5   revealing things of this crime,

6   other than the testimony of

7   seeing her shot point-blank in

8   the chest, is the fact that he

9   shot her twice more, and that he

10  expended six rounds before he

11  got her three times. I don't

12  think there is any question as

13  to what his intent was.

14          You heard the

15  pathologist. You heard her

16  description of those wounds.

17  You heard the DNA specialist

18  testify about the close

19  proximity. You saw the T-shirt

20  with the powder burns, not only

21  from the end of the barrel, but

22  coming out from around the

23  cylinder.

24          You heard one other

25  witness this week. Jelaine

1    Dennis spoke to you from the

2    grave.  She spoke through Joe

3    Saloom, the firearm's

4    specialist, who told you

5    unequivocally that her gun was

6    the gun that fired the bullet

7    that ended up in his arm.  That

8    was her testimony.

9         The Judge is going to

10   instruct you in a few minutes --

11   and I apologize for getting

12   emotional.  The Judge in a few

13   moments is going to talk to you

14   about the law.  He is going to

15   tell you in very precise and

16   correct legal terminology what

17   all the charges and offense that

18   he can be charged with,

19   possibly.  And we have charged

20   him initially with the offense

21   of capital murder.

22         He will tell you

23   that capital murder is where the

24   Defendant is charged with an

25   intentional murder committed

1    during a robbery in the first

2    degree.  And he will define the

3    terms.

4              As we have told you

5    before, and you heard since we

6    have been here that the State

7    has the burden of proof.  We

8    accept that burden.  We believe

9    in our system, and that's the

10   way it should be.  We should

11   have to prove that he is guilty.

12   And we feel like we have done

13   that.

14             Some of the things that

15   we have to prove, and, Bruce, I

16   might need your help.

17             To convict the

18   Defendant beyond a reasonable

19   doubt, we have to prove the

20   following elements.  One, that

21   Jelaine Bowman Dennis is dead.

22   I don't think there is any doubt

23   about that.  And I'm not going

24   to belabor that any further.

25             But number two, the

1   next element that we have to

2   prove is that the Defendant,

3   Robert Thomas Conrad, caused

4   that death to Jelaine Bowman

5   Dennis by shooting her with a

6   pistol.

7            All of the evidence

8   that you have heard from this

9   witness stand says that she was

10  shot with a 9 millimeter,

11  semi-automatic pistol.

12           You've heard testimony

13  about that SKS rifle and all

14  that.  All that is, is a red

15  herring.  It has nothing to do

16  with this case.

17           That in committing the

18  acts which caused the death of

19  Jelaine Bowman Dennis, the

20  Defendant intended to kill the

21  deceased or another person, and

22  a person acts intentionally,

23  when it is the purpose to cause

24  the death of another person and

25  that intent must be real and

1    specific.

2             This wasn't an

3    accident.  You don't place a 9

4    millimeter semi-automatic pistol

5    in somebody's center chest and

6    pull it, and not intend for them

7    to die.  That's as real and

8    specific as you can get.

9             This wasn't just firing

10   at someone and hoping to scare

11   them.  This was in close

12   proximity, almost a

13   belly-to-belly shooting to

14   kill.

15            Real and specific.  A

16   person acts intentionally with

17   respect to a result or conduct

18   when his or her person is to

19   cause that result and engage in

20   that conduct.

21            When you take a 9

22   millimeter pistol and place at

23   someone's chest and pull the

24   trigger, what do you expect is

25   going to happen?  The purpose is

1    to cause that result or to

2    engage in that conduct.  He

3    engaged in that conduct.  He did

4    an act that no fool could think

5    was not to kill.  And he is not

6    a fool.

7              That the Defendant

8    committed or attempted to commit

9    theft of United States currency

10   and/or coinage or checks.

11             Mr. Grimes said there

12   was a fairly large stack of

13   bills that he saw Jelaine put

14   out on that cash register.  And

15   he saw the Defendant reach over

16   and take a hold of it and do

17   something with it.  That money

18   was not there later, except a

19   $5.00 bill.

20             You also heard, as far

21   as Mr. Grimes is concerned, that

22   when he had him on the ground,

23   he said he took his wallet, and

24   took $30.00 out of it.  Bless

25   his heart.  He couldn't remember

1  the denominations he had.  I

2  can't remember the denomination

3  of the money I've got in my

4  pocket right now.

5      A person commits the

6  crime of theft, this is another

7  element that I've got to prove.

8  He commits the crime of theft of

9  property if he knowingly obtains

10  or  exerts unauthorized control

11  over the property of another

12  with the intent to deprive the

13  owner of the property.

14      The whole purpose of

15  this outing was these gentlemen,

16  when they went to the store, and

17  that was to steal.  To get money

18  to pay for Brian Smith's mother

19  to be able to move.

20      I don't think anyone's

21  common sense will allow you to

22  think that they didn't intend to

23  pay it back.  This was not a

24  loan.

25      The next element that I

```
 1              would have to prove:  In the
 2              course of committing or
 3              attempting to commit that theft,
 4              or in the immediate flight after
 5              the attempt or commission, the
 6              Defendant either used force, or
 7              threatened the imminent use of
 8              force against the person of
 9              Jelaine Bowman Dennis or another
10              person present, with the intent
11              to overcome her physical
12              resistance or physical power to
13              resist, to compel acquiescence
14              to the taking of or escaping
15              with the property.
16                      Don't be confused when
17              we are saying this is an
18              intentional act as far as the
19              killing was concerned, that it
20              had to be formulated prior to
21              going out there.  That's not the
22              test.  It could be -- that
23              intent could have occurred
24              anywhere along the lines.
25                      Once they use that
```

force to overcome somebody's physical resistance, it could be resistance of the taking or the resistance of trying to get a away, and somebody trying to stop them. The escaping with the property.

I have to prove this Defendant was armed with a deadly weapon. I'm not going to insult your intelligence anymore with that. The 9 millimeter pistol is a deadly weapon.

The murder took place during the robbery. This all happened in a matter of minutes, a very few minutes, maybe not even two or three. It happened quickly. It took place during the time they were there to rob that store.

Of course, "during" means in the course of the commission or in the connection with or in the flight from that

1   commission of that robbery.

2   It's kind of restating something

3   that I just stated earlier.

4           I made a statement a

5   while ago, ladies and gentlemen,

6   about a red herring.

7           You took an oath when

8   you started this case that the

9   Judge gave you, to render a true

10  verdict based on all the

11  competent and legal evidence of

12  the law.

13          The Judge has done his

14  duty in the course of this trial

15  in determining what was

16  competent and what was legal.

17  And he overruled both the

18  Defendant and the State, when we

19  were imposing objections, if he

20  didn't believe that the law

21  supported what we objected to.

22  And he allowed in what was

23  suppose to be in, and he denied

24  what was not suppose to be in.

25          So I think what all you

1  have heard here and what you've

2  seen here has been competent and

3  legal evidence.

4      But that evidence are

5  these documents.  That gun,

6  those bullets, those lists,

7  these pictures and the testimony

8  that was given from the stand.

9      Now, when you came into

10  this courthouse the first day,

11  you walked through a metal

12  detector.  If you had a gun, it

13  was taken away from you.  But

14  one thing they didn't take away

15  from you when you came through

16  there was your common sense.

17  And I feel fairly confident that

18  the Judge will instruct you that

19  is something that you can use in

20  deliberating when you are

21  deciding what to do.  Use your

22  common sense.  You know what's a

23  red herring and what's not.

24      Mr. Smith is probably

25  going to have a smile on his

face when I use this

terminology.  A long time ago he

and I worked together.  When

they started bringing bongs out,

stuff like the marijuana bags

and the things divert your

attention, it's kind of like the

'ole octopus.

You know an octopus

doesn't have any bones.  It

doesn't have any structure to

project itself.  So what does he

do?  He uses ink.  And he

squirts out the fluid in the

water and runs and hides.

And then he tries to

hide from you by bringing up

those irrelevant things to keep

you from seeing the truth.

The truth is, ladies

and gentlemen, that's the test.

He went to that store with a

gun, with the intent to rob it.

Did rob it.  And during the

course of the commission of that

1    offense or trying to get away,

2    he went to kill Jelaine Dennis.

3    And he did it intentionally.

4         Now, you also are going

5    to hear the Judge talk about

6    lesser included offenses.  There

7    will be one that I really want

8    touch on, because I don't think

9    the others you will have a

10   problem with.  That is the

11   offense of felony murder.

12        When you listen to the

13   instructions, there is really

14   just about one word difference

15   in it than the capital murder.

16   And that one word is "intent."

17   Intent to kill.  A felony

18   committed when somebody gets

19   killed during the commission of

20   that offense could be just

21   felony murder.

22        But if someone commits

23   a felony, and he intentionally

24   kills someone, it's not an

25   accident, it's not a mishap, but

1  intentionally kills someone,

2  then that is felony murder.

3  That's the main difference.

4  I appreciate you.

5  Thank you.

6  THE COURT:  Mr. Smith.

7  CLOSING STATEMENTS

8  BY MR. SMITH:

9  May it please the

10 Court.  Ladies and gentlemen,

11 you come up as an attorney in a

12 case like this, and when I heard

13 Mr. Jarrell say "thank you," and

14 I knew he was through, I got a

15 knot in my stomach.  And I

16 honestly don't know what I'm

17 going to say to you.

18 I do know that I want

19 to thank you for your

20 attentiveness.  It's not like

21 any one of you had a choice

22 about being here.  I know you

23 didn't.  I know, like all of us,

24 we had rather be somewhere else.

25 And it's Friday evening.  And

1  .it's 10 minutes to 4:00

2  o'clock.  There are things that

3  you would like to get on with

4  your beginning of your weekend

5  and I would, too.  But you are

6  here.  And we are going to do

7  our duty.  I'm tired.  I know

8  you are tired.  But all of us

9  are going to reach down and suck

10  up a little more energy and get

11  through this.

12          I want to apologize to

13  you.  And I was also taught when

14  you start to make a speech,

15  don't start out apologizing.

16  But I want to apologize to you,

17  if I have offended anyone of you

18  in this trial or tended to

19  offend you.  And I want to

20  apologize on behalf of Robert

21  Conrad, not myself.  Because I

22  ask you, if I offended anybody,

23  please do not hold it against

24  Robert Conrad.  You know, say

25  what you want to, think what you

1   want to about me, but don't hold

2   it against this young man right

3   here.

4            Jelaine Dennis, nor

5   anyone else deserves what

6   happened to Jelaine Dennis.

7   Life is precious.  And in the

8   perfect world, things like that

9   don't happen.  And I want to say

10  from my heart how sorry I am to

11  the family and the loss.  And we

12  have all had losses in our

13  family.  And I may get

14  emotional, too.

15           My father in-law is

16  suffering with cancer right now.

17  And life is just real precious

18  when you start thinking about

19  it.

20           The State, ladies and

21  gentlemen, has charged Robert

22  Conrad.  They have brought this

23  charge against him, and they

24  have prosecuted Robert Conrad

25  for capital murder, an offense

```
 1        for this 21-year-old young man.

 2        And he will be going down to

 3        Holman Prison and strapped in

 4        the electrical chair and

 5        killed.

 6               Now, that is the charge

 7        that the State has brought

 8        against him, and that the State

 9        has prosecuted this entire week.

10        And the State is asking you to

11        make the decision on this young

12        man this week and today and

13        tonight.

14               Again, I get my

15        feelings involved sometimes.

16        I've got a son who is the same

17        age as this young man.  And I've

18        sat there and watched through

19        the week and watched him read

20        the Testament over there.  And

21        you can't help but perhaps get

22        feelings about this.

23               I've seen this young

24        lady, and my heart goes out to

25        her.
```

1   But, you know, I'm not

2   going to tell you not to get

3   your feelings in it, because it

4   would just be stupid of me to do

5   that.  And I know you can't help

6   it, anymore than I can, any more

7   than Mr. Jarrell, or anybody

8   else in here.

9   But, ladies and

10  gentlemen, the State, in

11  prosecuting and bringing this

12  charge against Mr. Conrad, has

13  got to prove to you -- and each

14  one of the jurors make your

15  decision in this case.  They

16  have got to prove to you

17  unanimously from the evidence or

18  the lack of evidence goes to Mr.

19  Conrad's benefit.  They've got

20  to prove to you that he is

21  guilty of the offense, that they

22  can take him down to Holman

23  Prison and strap him in the

24  electric chair and kill him,

25  capital murder.

1      And, yet, there are

2   gaps in the evidence.  There are

3   holes in the evidence.  If there

4   are gaps and holes in the

5   evidence that don't satisfy each

6   of you in your mind and your

7   heart beyond a reasonable doubt.

8   that that doubt shifts, and Mr.

9   Conrad is to be given the

10  benefit of it.

11      Ask yourself a

12  question.  What happened.  And

13  if there is a question you can't

14  answer, that is a reasonable

15  doubt.  If there is a question,

16  when you start putting all of

17  these elements of capital murder

18  together, that the State has

19  prosecuted this case for, and

20  you say, I just don't know what

21  happened from the evidence, I

22  can speculate, I can -- if I was

23  a script writer I could write a

24  script and fill in the gap.  But

25  that's not what we are here

1    about.

2           You've got to base your

3    decision, ladies and gentlemen,

4    solely from the evidence, and

5    not from speculation, and not

6    from sympathy.  It's got to be

7    from the evidence.  And you ask

8    a question of yourself:  Could I

9    make a decision on the most

10   important thing that I do in my

11   family?

12           Could I make the

13   decision on what kind of

14   treatment my father-in-law

15   should have for his cancer?

16           If I've got to make a

17   decision, and I don't have all

18   of the answers, enough to

19   satisfy me beyond a reasonable

20   doubt, then that doubt has to go

21   by law to Mr. Conrad.

22           Now, you are going to

23   hear a lot of instructions to

24   you that I've heard many times.

25   And, you know, sometimes you

1  just say, gee, it's like a storm

2  drain going down and going in

3  circles, and I wonder what's

4  being said.

5     But the bottom line is,

6  to convict Mr. Conrad of capital

7  murder, the State has to prove

8  to you beyond a reasonable doubt

9  each one of those elements,

10  including that he intended to

11  kill Mrs. Dennis.

12     The Judge is going to

13  instruct you in several other

14  types of lesser included

15  offenses.  And you have heard

16  that since Monday.  And the

17  Judge is going to be very

18  thorough and adequately explain

19  that to you, the lesser included

20  offenses.

21     The evidence, if it is

22  against Mr. Conrad to a great

23  degree, came from Bryan Yoeman.

24  Bryan Yoeman is a bought and

25  paid for witness, ladies and

1  gentlemen. He is charged with

2  the same crime, the same

3  offense. He is being prosecuted

4  for the same offense by the

5  State of Alabama, as they have

6  Mr. Conrad charged with. That

7  same capital offense that he can

8  be taken to Holman and strapped

9  in the electric chair and

10  killed.

11      But they have bought

12  and paid for his testimony by

13  dismissing the capital murder

14  charge and recommending that he

15  get a sentence of only 20

16  years.

17      One thing we do know,

18  ladies and gentlemen, Bryan

19  Yoeman is a liar. He gave Mr.

20  Bradshaw five or six different

21  statements. And I submit to you

22  that Mr. Yoeman has changed his

23  story three or four different

24  times up there on the stand, and

25  would go just where ever anybody

```
 1        wanted to lead him around.

 2                    Now, one thing I do

 3        know is I'm not going to

 4        convince you of what you're

 5        going to do.  Just like the

 6        Judge told you that what the

 7        attorneys say is not evidence.

 8        I sometimes in cases where the

 9        tension is so thick, like in

10        this case, you could cut it with

11        a knife, that the Judge will

12        tell the jurors, don't listen to

13        what the lawyers say.  And I

14        haven't heard a lawyer shut up

15        from talking, yet.

16                    But I'm an advocate.

17        And I'm up here to talk to you

18        from my heart and my knowledge,

19        of what little I have, and  what

20        experience, and what ability and

21        means that I have.

22                    Ladies and gentlemen,

23        I'm just here to ask you, to not

24        on Friday evening, after a hard

25        tiring week of some of the most
```

1  difficult type of things that

2  you could be involved in, when

3  you go back to start

4  deliberating, it ain't going to

5  get any better, because then the

6  decision is going to be yours.

7       And you are not going

8  to have the Judge up here

9  telling you what to do.  And you

10  are not going to have Mr.

11  Jarrell and I back and forth

12  talking to you back and forth

13  about what is and what isn't.

14  You have heard that before.

15       It's going to be your

16  decision.  But you've got to

17  make your decision based on the

18  evidence.  Nobody has asked you

19  to leave your common sense at

20  home.  But you've got to make

21  your decision based on the

22  evidence.  Has the State proven

23  in your mind through the lawful

24  evidence?  Have they proven that

25  enough, to have this young man

1    taken to Holman Prison and

2    strapped to the electric chair.

3    That's the bottom line.

4         Now, I'm going to sit

5    down in a moment.  I'm leaving

6    Mr. Bradshaw with the burden of

7    finishing this decision to you

8    presentation to you.  And I know

9    he is going to do the excellent

10   job that he does.

11        Don't be rushed into

12   your decision.  I had a train of

13   thought there and it completely

14   left me.  I don't know what I

15   was going to say.

16        Again, I ask you don't

17   hold, if I've offended anybody,

18   don't hold it against Mr.

19   Conrad, please.  Base your

20   verdict on the evidence, just as

21   if the most important person in

22   your life, or you, yourself, was

23   on trial here today.  Hold your

24   decision and the State to prove

25   that.  If you were being judged

1    what would you want somebody to

2    do?  How would you want somebody

3    to judge the facts, that if you

4    were sitting in that chair right

5    there or the closest of your

6    family member?

7         Has the State proved

8    beyond a reasonable doubt to

9    take him to Holman Prison and

10   strap him in the chair and run

11   electricity through him and kill

12   him?  I submit to you, ladies

13   and gentlemen, they haven't.

14        Thank you very much.

15   THE COURT:  Mr. Bradshaw.

16        CLOSING STATEMENTS

17   BY MR. BRADSHAW:

18        Thank you, Your Honor.  Mrs. Stout,

19        Mr. Jarrell, ladies and

20        gentlemen of the jury, I want to

21        give you my thanks, too, for

22        sitting up here all week.  You

23        have been been up here since

24        Monday and Tuesday.  Without

25        you, our society as we know it

```
 1           would cease to exist.  We can't
 2           do it without you.
 3                 Without you, Mr. Conrad
 4           could not have any conclusion to
 5           this.  And I tell you I don't
 6           know if April or Lynn will ever
 7           have a conclusion to this.
 8                 I did tell you it's
 9           going to be kind of like
10           watching a movie.  I certainly
11           didn't mean that as insulting to
12           the family.  I just meant that
13           to tell you there was going to
14           be a lot of stuff you had to
15           watch for and you would had to
16           sift through to try to figure
17           out what the facts are.
18                 There is nothing that
19           we can do or say to bring
20           Jelaine Bowman Dennis back.
21           Lynn's sister is gone.  April's
22           mother is gone.  And there is a
23           grandchild that is not going to
24           have a grandmother.  And that's
25           the saddest of all things.
```

1    And I'm like my

2    co-counsel, Al, I can't leave

3    sympathy out of that.  You just

4    can't do it.

5    Dorothy Conrad has lost

6    a son ever since last May.  She

7    lost a son.  And what the State

8    wants to happen is for Dorothy

9    Conrad to lose that son

10   forever.

11   Al told you they want

12   to strap him in that chair and

13   run electricity through it.  You

14   have such a difficult job.  And

15   I have sympathy for you.  And I

16   empathize with you, the 12 of

17   you.  One of you are going to

18   get to go home.

19   Twelve of you have got

20   to go back there and do just

21   what Al said.  You've got to

22   decide did they prove their

23   case.  Did they stack those

24   boxes up and get over them.  Did

25   they run into them.  Did they

1    never get off the ground.

2              And I love the analogy

3    that Al said.  If that's your

4    son sitting over there, if

5    that's your wife sitting over

6    there where Robert is, how do I

7    judge what I've seen and heard

8    from up here.  How do I know who

9    to believe and who not to

10   believe.

11             I want to give you just

12   a couple, more than a couple,

13   and this is such a serious

14   matter, please, forgive me if I

15   go on and on.  But I want to run

16   back through a little bit of

17   what you have seen and show you

18   some of discrepancies in the

19   case that they've got to prove

20   to you.

21             Number one, starting

22   with this gun.  There has been

23   no testimony whose gun that is.

24   There has been testimony of

25   where it came from.

1                  I'm not throwing you a

2    red herring.  I not throwing you

3    a red apple.  I'm not throwing

4    you anything but the facts that

5    you have seen and heard.

6              Mr. Ray Grimes said

7    that he didn't know anything

8    about a gun, that  Jelaine never

9    had a gun.

10            The police want to get

11    up here and tell you we found

12    this gun way back here.

13            Mrs. Stout gets up and

14    questions the witness, and says

15    this back here is where this

16    happened.  This hole in the

17    ground, shot straight down.

18            Did y'all see any

19    pictures with holes in the

20    floor?  You have seen every

21    picture that has been

22    introduced.  What happens when

23    Chris Schwan comes up here.  Oh.

24    My goodness gracious.  Mr.

25    Schwan said the police officer

```
1            said watch out for that weapon.

2            It's laying right there.

3                       I said where, Mr.

4            swan?

5                       Right here by the

6            door.  Right by the door, Chris

7            said.  The bought for and paid

8            witness, that the State let go,

9            comes up here and testifies,

10           yeah, that's where it was.

11           Right there.  I saw it when I

12           got up.

13                      Al talked about filling

14           in the holes.  I could probably

15           fill in some holes right there,

16           myself.

17                      We know Brian Smith was

18           in there.  We know Brian Smith

19           was in there.  We know Jelaine

20           Dennis was in there.  We know

21           Mr. Grimes ran out.  Bryan

22           Yoeman said -- remember Brian?

23           Bryan Yoeman said him and Brian

24           Smith and Mrs. Dennis was there

25           for a good couple of minutes.
```

1        How in the world did

2    this gun get from right here to

3    right there, Detective Hauser?

4        Because that's where it

5    was.

6        And that's where he

7    took a picture of it.  And I

8    don't doubt that for a minute

9    when he got there that's where

10   it was.  But what we've got to

11   look at, ladies and gentlemen, a

12   man's life right here is on the

13   line.  We've got to look at

14   facts and what we know.

15        Let's take what we

16   know.  And then let's take what

17   we don't know, and see if we can

18   find a reasonable answer to it.

19        No fingerprints on this

20   gun.  No ownership claimed.  We

21   don't know where it came from.

22   We know it's a 22.

23        And then Mr. Joe

24   Saloom, and I don't have any

25   reason to doubt him.  He knows

1    more than I do.  The man could

2    probably fly the space shuttle,

3    he probably could.  But the

4    bullet that came out of the end

5    of this barrel went in his arm.

6    In his arm.   We don't know

7    about the bullet in his stomach

8    because he is still walking

9    around with it.

10              No fingerprints.  I

11    don't know if Bryan Yoeman shot

12    him or Brian Smith shot him.  We

13    know that Bryan Yoeman is scared

14    to death of Brian Smith, because

15    they sent him over to Covington

16    County.  They said that his

17    people would get him if he still

18    had people out of jail.

19              The State wants you to

20    think there is only one scenario

21    that went on in that store.

22              We don't know who's

23    gun.  We don't know who fired

24    it.  We don't know why it got

25    moved around.  What else do we

1   know?  We know there was

2   somebody else that came in there

3   with a mask.  We know he got

4   shot.  We don't know who was

5   behind the mask.  Mr. Grimes

6   said he couldn't tell if it was

7   a white or a black person.

8            We know that they get

9   down the road, and Bryan Yeoman,

10  the bought and paid for witness

11  says he was dressed in a black

12  shirt, black pants, black

13  shoes.  But he didn't have a

14  mask on then.  And he never saw

15  Brian or Robert Conrad, except

16  in the car from here up.  What

17  color shoes did Bryan Yeoman say

18  he had on?

19            Ladies and gentlemen,

20  I'm not trying to directly

21  suggest to you that Bryan Yeoman

22  is responsible for anything

23  other than lying, which you can

24  see that.

25            I'm just trying to fill

1    in some of the questions that

2    I'm having.  And I'm sure some

3    of the same questions that I'm

4    having, you are having.

5         A teacher one time told

6    me in Junior High at Elba, that

7    there is no such thing as a

8    stupid question.  I would raise

9    my hand, and say, Teacher, I

10   have a stupid question.  And she

11   would say, no, there is no such

12   thing as a stupid question.

13        But I want these

14   questions answered.  And if I

15   can't answer them, there is more

16   than a reasonable doubt.  There

17   is more than enough reason to

18   keep them from sitting him down

19   and putting the voltage through

20   him.

21        I know these people

22   want answers.  What else do we

23   know?  Who in God's name is

24   Alex?  Don't know his last

25   name.  I know it's Brian Smith's

1    cousin.  Where is Alex?  Were

2    there four people down there?

3    Were there five?  I don't know.

4    I wish I knew how it was.

5         I know contrary to what

6    the State wants you to think

7    about the man they brought down

8    here from Colorado, George

9    Roberson, he had no incentive to

10   go tell the police what he

11   heard -- Bryan Yoeman talking

12   about the planning of the murder

13   a week-and-a-half out.  He had

14   no incentive to do that, get

15   himself mixed up in this.  But

16   he did, and told you he went to

17   talk to his pastor because he

18   was troubled by it.

19         He had some stuff in

20   his past.  I would hate to know

21   that a past would prevent

22   anybody from speaking the truth,

23   because of a troubled past.

24   Because if they did, I can't

25   stand up here.  I would be

1    having to try to reach around

2    get a hold of my own britches

3    and pull them in.

4            You get to judge

5    whether or not you believe what

6    Mr. George Roberson said about

7    Bryan Yoeman.  And what did he

8    say?

9            Of course, Bryan Yoeman

10   said well, he said to start with

11   he knew him.  We take a break,

12   and we come back, and he said

13   that he didn't know him.  Of

14   course, you know all about

15   Brian's lies.  But we've got to

16   find out.  What Mr. Roberson

17   said was told him about it.

18   They had planned it.  Told him

19   they had had a gun.  Told him

20   there was no surveillance.  Told

21   him it was out in the country.

22   And told him my buddies -- my

23   buddies and my friends have a

24   gun.  We've already cased it

25   out.  He said this man right

```
 1                    here was not his buddy.  This
 2                    man right here was not his
 3                    friend.
 4                         He said B. Smith is my
 5                    friend.  B. Smith and his
 6                    cousin, Alex, are my friends.  I
 7                    bet they are.
 8                         And then, when it all
 9                    went array, B. Smith, the
10                    manipulator, apparently
11                    threatened him.  And they got to
12                    move him.
13                         So, you know, what it's
14                    going to come down to are a
15                    couple of things.  You are
16                    either going to believe that
17                    Robert Conrad was this quote,
18                    man behind the mask or he
19                    wasn't.
20                         Glenda told you, and
21                    the first thing out of her
22                    mouth, the first paragraph out
23                    of her mouth, she said -- the
24                    first statement out of her
25                    mouth, she said the Defendant
```

1       went into the store, robbed the

2       store, and got the money.  And

3       what did she say.  She said he

4       started to leave.  He started to

5       leave.

6               Let's put in a

7       Webster's definition of "intent"

8       right there.  Right there.

9       Because if I put all the

10      totality of the circumstances

11      together, whether it's Robert

12      Conrad, me, or whether it's one

13      of Bryan Yoeman's versions you

14      want to believe, he said he came

15      in and pointed the gun right at

16      him.

17      Mr. Ray Grimes said he comes in,

18      and he said he pointed the gun

19      right at him.

20              We are not going to

21      hear from the man behind the

22      mask.

23              But depending on which

24      version you want to hear, he

25      walked all around here, and

```
 1          turns his back on everything up

 2          here, and comes over here.  And

 3          he come over here, and he comes

 4          over here and says he robs Bryan

 5          Yoeman.

 6                  Now, why would -- this

 7          is one of those questions you

 8          wonder where they benefit.  But

 9          why would somebody in cahoots

10          with Bryan Yoeman and Brian

11          Smith bother to come over here,

12          and turn their back on the door

13          and everything else way over

14          here and get $26.00 out of

15          supposedly his partner's

16          pocket.  I don't know where

17          Brian Smith is.  But one said

18          he's here.  One says he's back

19          here.

20                  And then the part about

21          Mr. Grimes.  And I know he had

22          to have been terrified.  I would

23          have been.  I would have never

24          been able to wear the same pair

25          of pants.  I don't know if he
```

1    got his wallet and got his

2    money, if this person did or did

3    not.

4         I don't know if he

5    reached in the right pocket and

6    got change and left it laying on

7    the floor or not.  But the

8    bought for and paid witness that

9    the State bought and paid for,

10   and went into that room and you

11   heard what he rehearsed what he

12   was going to say, and put under

13   oath, said that the person with

14   the mask, reached in the pocket

15   and got nothing but change and

16   left it there.  Conflicting

17   stories.

18         Does that bring any

19   reasonable doubt into your

20   mind?  I would submit to you

21   that it certainly does.

22         You know, I told you

23   you weren't going to see or hear

24   from an eye witness that saw his

25   face in this store.  You

1          didn't.

2                    I told you were not

3          going to see a weapon with his

4          fingerprints or that came out of

5          his hand that caused this lady

6          to loose her life.  You haven't

7          seen a weapon.  Somebody had

8          one.  This lady lost her life.

9                    Reasonable doubt.  And

10          back to that thing about where

11          did this happen, this store.

12          You heard Officer Hauser telling

13          you about the dimension.  And

14          they want you to think it

15          happened back over here.  How do

16          you explain the bullet holes

17          through the shirts, as Officer

18          Hauser said was coming this

19          way?  How do you explain, ladies

20          and gentlemen, not a drop of his

21          blood in that store?  Where do

22          we find his blood?  Supposedly,

23          a drop came from a T-shirt out

24          of a dumpster.

25                    Whose property has

1    Mrs. Dennis' blood on it?  Think

2    for just a minute?  This guy

3    sitting back over here.

4    B. Smith.  It was on his tennis

5    shoes.  Blood on the bottom of

6    his tennis shoes, identified to

7    be that of Mrs. Jelaine Dennis.

8         You are going to have

9    all of this stuff back there to

10   look at.  These are the blood

11   spatters that are on this

12   counter that the cash register

13   was sitting on; that those

14   experts, good experts, told you

15   this is right here.  That's Mrs.

16   Dennis' blood.  It's not Robert

17   Conrad's.

18        The State, with their

19   bought and paid for witness,

20   Bryan Yoeman, wants you to

21   think, and Mr. Jarrell does,

22   too, that somebody standing over

23   her, putting a gun barrel in his

24   chest and pulls the trigger.

25   And all that blood is

1    everywhere.  But, yet, not a

2    drop is on this man's shoes.

3    Not a drop is on his shirt.  His

4    shirt, his shirt.  Please don't

5    give any reference to the name

6    of this NFL player on this

7    shirt.  Just look at this

8    writing on this shirt.

9              Somewhere they say

10   there is a bullet hole; that the

11   shirt must have been folded up,

12   Mr. Saloom said he believed.

13             Mr. Grimes told you the

14   man came in dressed all in

15   black.

16             Mr. Yoeman said the man

17   came in dressed all in black.

18   If that person was dressed in

19   black, and this shirt was on

20   Robert Conrad, then it's got to

21   be an undershirt.  That means

22   there has got to by an overshirt

23   on the outside.  Where is the

24   overshirt?

25             Well, the State may

1    want you to think that they

2    couldn't find it.  He threw it

3    away.

4            You are going to have

5    this back there.  Defendants

6    Exhibit B, not State's.

7    Defendant's Exhibit B.  It's

8    going to tell you -- if I can

9    find it.  Just a minute.  Item

10   number 16.

11           I know y'all have been

12   taking notes.  Look at this.

13   When you get back there in your

14   jury deliberations.  This is a

15   shirt.  It's identified to be

16   from Robert Thomas Conrad.

17           The DNA people got it.

18   But you didn't hear one word

19   about any blood or bullet holes

20   in that shirt.  And you won't

21   see it back there in that jury

22   room.  I'm trying to show you,

23   ladies and gentlemen, some

24   reasonable doubt.  Reasonable

25   doubt.  I think we are way

1    beyond reasonable doubt.

2         Bryan Yoeman is so

3    scared of Brian Smith that he

4    would tell these two police

5    officers, two or three of them,

6    all the lies they wanted to hear

7    because, because that's what

8    Brian Smith wants him to tell,

9    because he is that scared of

10   Brian Smith.  If he is that

11   scared of Brian Smith, Brian

12   Smith is locked up in jail, how

13   scared would he be of the State,

14   when they've got him charged

15   with capital murder?  And they

16   come and say, man we got

17   something for you.  He said

18   yesterday -- and I wonder why

19   they waited until yesterday to

20   call him?  Reasonable doubt.

21        They waited until

22   yesterday to call Brian Smith.

23   Do you think he would tell any

24   story that he thought somebody

25   wanted to hear?  I think you can

```
 1        figure that out for yourself.
 2                Again, ladies and
 3        gentlemen, this is complicated.
 4        It doesn't get any more serious
 5        than this.  People's lives lost,
 6        other people's lives on the
 7        line.  And you have got to make
 8        a decision.  You are going to
 9        have choices.
10                Mr. Jarrell put up
11        there on that very elegant, I
12        guess, expensive display on the
13        wall to you about intent and
14        elements.  And it is going to
15        sound like a lot of information
16        when you get it in there.
17                I think he is right.  I
18        really do.  Number one is Robert
19        Conrad, if Robert Conrad was in
20        there, he is the person behind
21        the mask.
22                Was there intent?
23        First, you've got to get past
24        all the questions and reasonable
25        doubt that he was in there.  Who
```

```
1          had a part in planning this?
2          Who knew about it ahead of
3          time?  Goodness gracious, that's
4          a question.
5                    I cannot tell you how
6          much I appreciate it.  You could
7          have gotten in one of those
8          lines and came up here to that
9          Judge the other day, Monday,
10         that you had a reason after
11         reason to want to go home and
12         get out of jury service.  And I
13         can understand that.  I would
14         love to be going to Prattville
15         tonight or going to Elba to
16         watch Luverne and Elba play.
17                   But there is nothing
18         right now any more important
19         than deciding this issue.  As
20         Mr. Smith expressed to you,
21         don't be rushed.  Don't be
22         rushed at all.  I would like for
23         you, especially, taking the oath
24         -- and listening to what I say
25         is not facts.  That's why I am
```

1                              asking you to look at what you

2                              have heard.  Go over it and over

3                              it again, the testimony that you

4                              heard.  If I was sitting over

5                              there would I want -- do they

6                              meet the burden?  Would they

7                              convict me based on that little

8                              bit of evidence?  There's still

9                              one person to be tried, I guess,

10                             B. Smith.

11         MR. BRADSHAW:    Thank you, ladies and

12                             gentlemen.  Thank you very much.

13         THE COURT:    And the last comment will be

14                             by Mrs. Stout.  Then we will

15                             take a break.

16                             CLOSING STATEMENTS

17   BY MRS. STOUT:

18                                 May it please the

19                             Court.  Defense counsel, ladies

20                             and gentlemen, of the jury, I,

21                             too, would like to say thank

22                             you.  Thank you for your time,

23                             your patience.  You have been so

24                             attentive.  And I know that it's

25                             difficult to leave your work for

1       the period of time that you have

2       been here. But it is your

3       responsibility as citizens of

4       the United States to do what you

5       are doing right now. And even

6       though it's your responsibility,

7       I know that it's a sacrifice.

8           And those of us with

9       the District Attorney's Office

10       and the Twelfth Circuit, which

11       is Coffee and Pike Counties

12       appreciate that.

13           Now, listening to

14       defense counsel, I don't know

15       how we ever got this thing out

16       of Grand Jury.

17           This is what we call

18       rebuttal closing or final

19       closing. And there are several

20       things I do want to comment on.

21       First of all, when I said

22       before, and I didn't do with all

23       of y'all. Mr. Jarrell helped me

24       in voir dire. But in voir dire,

25       we asked several questions

```
 1        about, did you have a fixed
 2        opinion about the death penalty.

 3

 4              And defense counsel
 5        would jump up and say there are
 6        options.  There are options.
 7        There are options.  And you are
 8         not going to have to make a
 9        decision.
10              And then, the first
11        thing out of the Mr. Smith's
12        mouth is please don't take that
13        21-year-old to Holman prison
14        strapped up in the electric
15        chair and kill him.  He did not
16        give Jelaine Dennis an option.
17        He did not.
18              On May 23rd of 2001, he
19        decided he would go to the Toy
20        Store.  Robert Conrad and Brian
21        Smith and, yes, Bryan Yoeman,
22        our bought and paid for
23        witness, however you want to
24        look at it.
25              Yes, he was a
```

1    Co-Defendant and, yes, he

2    testified.  And, yes, every one

3    of you, ladies and gentlemen,

4    sitting in this in this box

5    knows that it works that way

6    sometimes.  And, yes, to get the

7    trigger man, yes.  And I'm not

8    making any apologies.  To get

9    the trigger man.  The man that

10   stuck the barrel of that gun in

11   that woman's chest and left that

12   child, and Damon and Monica

13   without a mother, and Lynn

14   Bowman and Mike without a

15   sister.  Yes, we made a deal

16   with him.  We did it based on

17   his statements.  And I'm not

18   ashamed of that, and that does

19   not make the evidence that we

20   have presented before you,

21   ladies and gentlemen, any less

22   credible.

23          He stood before you,

24   counsel did, and said, put

25   yourself in the shoes.  That is

1       such an improper argument.  That

2       is so improper.  Because the one

3       thing that a juror is never

4       suppose to do is to put yourself

5       in the shoes of the victim or

6       the Defendant.

7               Why?  Because, ladies

8       and gentlemen, you are to look

9       at the facts.  You cannot

10      pretend that you are the

11      Defendant or that it's your

12      child.  You cannot pretend that

13      it's your mother or your

14      sister.  That is improper

15      argument.  And for him to ask

16      you to do that is improper.  And

17      I ask that you not even consider

18      that.

19              We know that Brian

20      Smith was there.  We do.  We

21      know Bryan Yoeman was there.

22      That's why we have brought

23      charges against them.

24              We also know that he

25      was there.  And we know he stuck

1    a gun in Jelaine Dennis' chest.

2    We know that he stuck that gun

3    to her chest, pulled the

4    trigger.  But he didn't stop one

5    time.  Six casings.

6         Now, there are

7    inconsistencies.  You are never

8    going to see in a trial, ladies

9    and gentlemen, when you don't

10   have inconsistencies.  And let

11   me tell you something.  If you

12   don't have inconsistencies, you

13   have been in a trial where

14   somebody has told everybody

15   exactly what to say.

16         This Toy Store is a

17   tiny place.  And I would imagine

18   that both Mr. Grimes and

19   probably Bryan Yoeman were

20   scared.  Whether Bryan Yoeman

21   knew they were going to do a

22   robbery or didn't know they were

23   going to do a robbery.  He was

24   probably pretty scared when that

25   gunfire was going on.

1    Now, I know you are
2    going to use your common sense.
3    I know you are going to.  You
4    have heard all of this.  But I
5    do want you to think about it.
6    If you do plan a robbery and you
7    hear gunfire going off, and you
8    weren't expecting that, you
9    might get scared, too, and go,
10   Oh.  My God.  What is
11   happening?
12        Look at how tiny this
13   building is.  Defense counsel
14   has throughout this trial tried
15   to make it appear that something
16   improper has been done; that
17   evidence has been moved; that it
18   has been changed; that something
19   improper has been done.
20        I remember when I was
21   in law school that professors
22   used to say, if you have the
23   facts on your side, you argue
24   the facts.  If you have the law
25   on your side, you argue the

```
 1          law.  When you have neither, you

 2          just argue.  And that's about

 3          all they've done.

 4                    They brought

 5          Mr. Roberson in to try to shoot

 6          down Bryan Yoeman's story.  But

 7          Mr. Roberson got up there and

 8          twitched and moved.  We weren't

 9          really sure what was going to

10          come out of Mr. Roberson's

11          testimony, other than he tried

12          to state that he told some

13          investigator about this.  And

14          this investigator didn't do

15          anything.

16                    And then I believe

17          Mr. Jarrell brought out there

18          was not a thing to that.  Also,

19          brought out that Mr. Roberson

20          had a very colorful past.  I

21          always like to, when I get

22          quoted, and I don't think my

23          quotes are quite right.  I don't

24          think I said he robbed them and

25          started to run.  But that's
```

1    okay.  You are to determine what

2    the evidence is in this case and

3    remember the evidence in this

4    case.

5         Ladies and gentlemen, I

6    don't think that you are going

7    to have a problem when you start

8    looking and thinking of time

9    span with the time that these

10    individuals were caught, and

11    then remembering that Brian

12    Smith, Bryan Yoeman -- and I'm

13    not standing up here and saying

14    that Bryan Yoeman is not guilty

15    of something.  He is.  I let you

16    know he is guilty of something

17    initially.

18         But I do know Jelaine

19    Dennis' life was taken, and I do

20    know Jelaine Dennis' bullet was

21    taken from his arm.  His gut

22    still carries one around.

23         And Bryan Yoeman in the

24    statements on May 25, 2001,

25    stated the same, that I saw them

1  tussling, and I saw him put that

2  gun in her chest, in her chest,

3  and pull the trigger.  And he

4  never wavered on that point.  He

5  may have wavered on whether or

6  not the old man was at the door,

7  or he was taken from stool or

8  whatever.

9        Now, did we get Bryan

10  Yoeman back there and rehearse

11  him today?  No, we did not.  If

12  if we did, I would have done a

13  much better job on direct

14  examination.

15        I know when I spoke to

16  you in voir dire I told you that

17  sympathy has no place in the

18  jury room.  And I understand

19  that that is very hard to ask of

20  you when you go back there and

21  when you start making a decision

22  and decide, without having

23  sympathy.  But that is true,

24  ladies and gentlemen.  Sympathy

25  has no place in the jury room.

1　　　　　　　　　　　　And those of you that I

2　　　　voir dired, I asked you to raise

3　　　　your hands, and I asked you

4　　　　could you do that. Could you

5　　　　put aside any sympathy that you

6　　　　would have for the Defendant or

7　　　　for the family members.

8　　　　Because, again, ladies and

9　　　　gentlemen, it works both ways.

10　　　　　　　　You must rely on the

11　　　　facts. You must rely on the

12　　　　law. The facts and the law.

13　　　　And it may be difficult, and you

14　　　　may have to muddle through

15　　　　because this is a trial where

16　　　　there was evidence put in.

17　　　　There was firearms. And there

18　　　　was DNA. And there were people

19　　　　seeing things on the side of the

20　　　　road that we had to talk about

21　　　　and weave it together and

22　　　　determine the credibility of the

23　　　　witnesses and the fact that we

24　　　　have this bought and paid for

25　　　　witness. And that's a decision

1      that you will make.

2              But the bullet doesn't

3      lie.  The gun doesn't lie.  The

4      six shell casing doesn't lie.

5      The results received from the

6      blood don't lie.

7              I have no idea what the

8      arguments by counsel about the

9      pictures and the blood and all

10     that was.  But the physical

11     evidence does not lie.  The

12     videotapes do not lie.  The

13     charts are not to scale but the

14     evidence is there, and it does

15     not lie.  And it does not tell

16     you that this man is guilty of a

17     lesser included.

18              It tells you that this

19     man walked into that store on

20     May 23rd.  He walked in there to

21     take that money, whether it was

22     a plan with Brian Smith or with

23     Bryan Yoeman or was one or the

24     other, whatever, that was he

25     did.

1      And when he walked out,

2   Jelaine Dennis would not live to

3   see the next day.  And it was

4   specific.  And it was

5   intentional.  And it is capital

6   murder.  And it is nothing

7   less.

8      I hope you do look at

9   the report on this again that

10   indicates that we must be hiding

11   something.  This is a blue

12   colored shirt.  We must be

13   hiding something -- item 16, a

14   blue colored shirt.  Everyone

15   has testified that this

16   perpetrator was wearing black.

17      Everybody testified, or

18   at least Yoeman testified, that

19   it appeared there was a

20   scuffle.  If there was a

21   scuffle, and there was a black

22   shirt on top, and a scuffle

23   issued, well, what can happen

24   during a scuffle?  Use your

25   common sense.  What can happen?

```
 1              Clothes can get moved around.
 2              What can happen?  Is it
 3              impossible the outer garment
 4              might not be damaged and the
 5              undergarment might?  This is a
 6              small caliber weapon.  This is a
 7              small caliber weapon.  Common
 8              sense.  Is there going to be a
 9              lot of blood with a small
10              caliber weapon?  Common sense.
11                   Now, you can talk about
12              baking a cake, and leaving the
13              eggs out, and all those little
14              things that you want to.  I
15              don't like to do that.  Defense
16              counsel used that in his
17              opening.
18                   I'm going to end by
19              saying we didn't bake one and
20              make it good.  We baked two, and
21              we didn't leave any eggs out.
22              And it tastes just like and adds
23              up to capital murder.
24                   And justice screams
25              that we tell our businesses,
```

1428

```
 1              whether you like the businesses
 2              or not, or the business owners,
 3              we will protect you.  This isn't
 4              going to happen to the people of
 5              Coffee County.
 6         THE COURT:  Please speak a little louder,
 7              if you will.
 8         MRS. STOUT:   The people of Coffee County
 9              and the State of Alabama will
10              not allow you to enter a
11              business, put a gun in
12              somebody's chest and kill them,
13              and think that you are going to
14              walk away and not pay the
15              ultimate price.
16                   Is a life more valuable
17              than property?  That's what
18              defense counsel asked you.
19              Absolutely.  He thought it was.
20              He thought property was more
21              valuable than life.  Please tell
22              him no.  You are not, we are not
23              going to tolerate this in our
24              county.
25                   We have met our
```

1    burden.  I asked you in voir

2    dire those of you that I voir

3    dired, can you hold us to the

4    standard that you hold us to if

5    we were trying a theft of

6    property, third degree, because

7    the standard never changes, even

8    though this is a capital case.

9    And those of you that I asked

10   all raised your hands.  The

11   standard does not change.  It's

12   a reasonable doubt.  A doubt for

13   which you can apply a reason.

14        We have proven capital

15   murder.  We have proven capital

16   murder.  And when you deliberate

17   the facts, the law, and if you

18   can match that up, should be

19   your own consideration, not his

20   argument, don't send this poor

21   21-year-old to Holman Prison to

22   strap him in a chair.  That is

23   not your consideration.  That is

24   sympathy deliberation.  That is

25   not proper.  Sympathy has no

1430

```
 1              place in the jury room.

 2                    The facts, the law, and

 3              and a just verdict.  We won't

 4              allow it.  Guilty beyond a

 5              reasonable doubt of capital

 6              murder, robbery.

 7                    Thank you.

 8         THE COURT:  Ladies and gentlemen, you are

 9              going to get to take a break.

10              Up to this point I said take 10

11              minutes or 15 minutes or

12              whatever.  But when we see you

13              back here in this jury box, we

14              will get started.  Take a few

15              minutes.  Refresh yourself.

16              Relax, stretch, walk around for

17              a moment or two.

18                    My daughter is home

19              from college.  I haven't seen

20              her in a while.  I'll give her a

21              big hug, and she is leaving to

22              go somewhere else.  So when you

23              get back we will get started.

24                    Again, the Court is

25              required to instruct you and
```

```
 1                    does instruct you not to discuss

 2                    this matter among yourselves,

 3                    yet, nor allow anyone to discuss

 4                    it with you.

 5                         If everyone will remain

 6                    while the jurors exit.

 7                    (Jurors exited the courtroom).

 8        THE COURT:  This court is in recess until

 9                    the jurors are back in the jury

10                    box.

11                    (A short break was taken).

12        THE COURT:  This case will come back to

13                    order.  You may be seated.

14            JUDGE'S CHARGE TO THE JURY

15        THE COURT:   Ladies and Gentlemen, all of

16                    the evidence that you are going

17                    to hear, as I said earlier, has

18                    now been presented to you and is

19                    now complete.

20                         The State and the

21                    Defendant have both rested their

22                    cases and made their closing

23                    remarks or their arguments to

24                    you.

25                         And at this time, or at
```

1    this point in the trial, it's my

2    duty, my job, my responsibility,

3    to talk to you about the law

4    that's applicable to this case.

5    I've already told you that, of

6    course, the Court's charge is

7    very lengthy.  And I apologize

8    to you for that.  But I assure

9    you that everything that I say

10   to you is necessary.  It's

11   required under the law.  And I

12   ask that you bear with me as I

13   go over the law with you.

14        You have been a very,

15   very patient jury.  One of the

16   best I've ever had.  Both of the

17   deputies have made that remark

18   throughout this week, how

19   attentive, how focused you are.

20   And I thoroughly, thoroughly

21   agree.

22        I have been a Judge for

23   27 years, and I've never seen a

24   more focused, patient jury

25   before.  And I appreciate that.

1       Because the Court's

2   instructions on the law are

3   rather lengthy, I'm going to

4   give you an outline of what I

5   intend to say to you, because if

6   you lose me along the way, you

7   can relate to the outline that

8   I'm going to give you.  And

9   everything should tie together,

10  and you should understand

11  everything when I finish.

12       My outline is

13  relatively easy to understand.

14  First of all, I'm going to talk

15  to you about the general law,

16  the general criminal, if you

17  will, that would apply to any

18  criminal case that comes before

19  any criminal jury in this state.

20       And then I'm going to

21  shift gears, and I'm going to

22  talk to you about the laws that

23  relate only to the crime charged

24  in these two separate offenses

25  and the lesser but included

1       offenses embraced therein.

2               The attorneys, as I've

3       told you, have the right to

4       submit what we call requested

5       jury charges.  And they have

6       done that.  And I look over the

7       requested charges.  And if the

8       Court decides they are complete

9       and proper statements of the

10      law, then I'm required to give

11      you those, also.  The attorneys

12      have been nice enough to let me

13      blend them in to what I intended

14      to say to you anyway.

15              So, when I'm talking

16      about one specific area, and

17      they have a charge that relates

18      to that area, I can add to what

19      I intended to say to what they

20      have submitted.  It makes it a

21      little more easy to understand.

22      So that's the best way to do

23      it.

24              Then I will end up

25      going over with you the verdict

1435

1    possibilities in this case.  And

2    that will be the last thing I

3    do.  So, when you see me reach

4    over and pick up these verdict

5    forms right here, you will know

6    that I'm just about finished,

7    and you can smile.  And I assure

8    you my voice will be glad when I

9    reach that point.

10         As I told you on

11   Monday, I'm a little hoarse.  I

12   gave a talk not too long ago,

13   and it was a long, drawn out

14   talk.  And it's just about wore

15   my voice cords out or

16   something.  I don't know.  But

17   we will get through this one way

18   or the other.

19         Please remember that

20   much of what I say to you is

21   couched in legal language.  I

22   wish that I could explain

23   everything to you in my own

24   words, but I'm not allowed to do

25   that.  I'm required to use the

1    very words, word for word, the

2    wordage used by our Appellant

3    Courts in this State in matters

4    of this nature.  We call that

5    precedent.  I know all of you

6    have heard that word before and

7    understand it.

8         So please bear with me

9    as I go over those things with

10   you in the manner that I'm

11   required to go over them with

12   you.  If I'm not required to do

13   that, I will explain things to

14   you in my own words.  Because

15   I'm a simple-minded fellow, and

16   I try to keep things simple.

17        First of all, some

18   general things that you should

19   know:  As you already know, it's

20   my duty, my responsibility, as

21   your Judge to talk to you about

22   the law that is applicable to

23   these two separate cases, so

24   that you can honor your sworn

25   oath as jurors that you took

```
 1              when we first got started to

 2              well and truly try these two

 3              separate offenses, cases,

 4              issues, that have been joined

 5              between these parties, and so

 6              that you can true verdict render

 7              according to the legal and

 8              competent evidence so help you

 9              God.

10                   That was the oath that

11              you took the very first day that

12              this trial started.

13                   Now, as I've said

14              earlier, you have considered the

15              evidence.  You have heard the

16              arguments of the attorneys.  And

17              you are about to hear the law.

18                   It's your duty as

19              jurors to follow the law as

20              stated to you by your Judge.

21              You understand earlier, I said

22              there are really going to be 13

23              judges in the trial of this

24              case.

25                   I'm the Judge of the
```

1    law.  It's my job to tell you

2    what the law is and to make sure

3    that this trial has been

4    conducted according to the laws

5    of this State and this Nation.

6         And you are judges,

7    also.  I like to think of you,

8    as I said earlier, as being

9    judges without robes.  You are

10   judges of the facts.  And you

11   will decide what are the true

12   facts in this case.  What really

13   happened in these two cases.

14   And you will apply the law as I

15   explain it to you, to the facts

16   that you find exist.  And in

17   doing so, reach two separate

18   verdicts consistent with the

19   laws of this State and Nation,

20   and the facts as you find them

21   to exist.

22         It would be a violation

23   of that oath that you took to

24   apply any other law, make up any

25   other rule, other than the laws

1            that I instruct you on.

2                  Justice by trial by

3            jury in our great country has

4            always depended on the

5            willingness of each individual

6            juror to find the truth,

7            whatever it is, based on the

8            evidence that was presented in

9            open court applying the law, as

10           explained to you by the Judge.

11           And to arrive at a verdict by

12           any other means would be a

13           violation of your oath.

14                 Now, when I pick up

15           those verdicts, I noticed at the

16           top of each page of the verdict

17           forms it has the word

18           "verdict." Verdict. That word

19           comes from a Latin word, two

20           separate Latin phrases. And I

21           don't have them before me but

22           "dict", d-i-c-t, means to

23           speak. And "veri", v-e-r-i,

24           would be the other the word

25           "verdict", means the truth. So

1    you are simply going to be

2    called on to speak the truth.

3         That's all we want.  No

4    matter what that is in these two

5    cases, to speak the truth.  In

6    the Bible, "verily, verily, I

7    say unto you" -- truth, truth I

8    say unto you.  That's where that

9    term comes from.

10        So I have talked to

11   you already about the purpose of

12   a Judge in the trial at the very

13   beginning.  Remember all of

14   those other things I talked to

15   you about at the very beginning

16   when I gave you instructions.  I

17   did that so that I could break

18   apart of what I intended to say

19   to you and simply say to you,

20   please remember everything that

21   I said to you at the very

22   beginning of this about our

23   duties and our responsibilities

24   here.  And that will separate

25   some of these things that I'm

1    required to go over here with

2    you tonight.

3              A note about the

4    attorneys.  And I've already

5    said this to some extent.  But,

6    again, attorneys are under a

7    duty to argue the evidence as

8    they remember the evidence.  And

9    they also are allowed or

10   authorized to draw reasonable

11   inferences from the evidence.

12             However, as I said to

13   you before, don't let what the

14   attorneys have said to you in

15   their arguments, or at any time

16   during this trial, in any way

17   influence you as to what the

18   evidence was in the trial of

19   these two separate cases, if

20   your recollection differs from

21   what any attorney has told you

22   the facts are.

23             Because, again, you are

24   the judges of the facts.  It

25   doesn't make any difference

1    what, I, the Judge of the law,

2    thinks the facts are.  That's

3    your decision and your decision

4    alone.

5           It doesn't make any

6    difference what these lawyers

7    tell you the facts are, if your

8    recollection differs from what

9    they have told you.

10          Because, again, it's

11   your decision that counts.  It's

12   not their's or mine.  Please

13   understand that.

14          Remember what I said

15   about objections.  I told you

16   that I've had a lot of cases,

17   and I've never had a jury trial

18   where the lawyers didn't object

19   to something.  And this trial

20   certainly has been no different.

21   And it's my job to rule on those

22   objections that are made.

23          And it's an attorney's

24   job, and both sides have done a

25   very fine job -- we are so

1   fortunate -- in representing

2   everything and objecting to

3   things that needed to be

4   objected to.  And it's their job

5   to do that.

6           And, again, it's my job

7   to rule on those objections.

8   And sometimes I think well, the

9   jurors think the Judge thinks,

10   and sometimes even the lawyers

11   think the Judge leans one way or

12   the other because of the way we

13   have ruled on these objections.

14           But I assure you that I

15   have no opinion as to what your

16   verdict should be.  Because I

17   know that is your

18   responsibility.  That is not

19   mine.  And just because one side

20   or the other may have received a

21   more favorable ruling, I assure

22   you that was not done because of

23   a feeling that I, your Judge,

24   may have.

25           The Court's rulings are

1    governed by Alabama Rules of

2    Evidence.  You have even seen

3    some of these attorneys run up

4    with a law book, and say,

5    Judge, Rule 16.1, and they would

6    cite it.  And we would gather

7    around up here.  And they would

8    say this, that, and the other.

9    And I would rule on those points

10   as they made them.  So I don't

11   have a lot of discretion in the

12   Court's rulings.  They are

13   governed by Rules of Evidence

14   that I'm bound by, that I've

15   already taken an oath to honor.

16   Please understand that.

17              Testimony of

18   witnesses.  Who should you

19   believe, and who should you not

20   believe?  What does the law say

21   about that?  It says that it's

22   your duty as jurors to attempt

23   to reconcile the testimony of

24   all of the witnesses who have

25   testified in this case so as to

1    make them all speak the truth,

2    if that can reasonably be done.

3        If you cannot

4    reasonably reconcile the

5    testimony of all of the

6    witnesses, the law goes onto to

7    say that it's then your duty to

8    consider the testimony with the

9    view of determining what the

10   truth, in fact, is.

11       So in considering the

12   testimony of the witnesses, I'm

13   required to charge you or tell

14   you that you are the sole judges

15   of the evidence.  And as jurors

16   you are also the sole judges of

17   the credibility of the

18   witnesses.  You may accept or

19   you may reject any portion of

20   any testimony, any witness's

21   testimony, that is.  And the law

22   goes on to say that you should

23   only accept those portions of a

24   witness's testimony that you

25   find to be worthy of belief.

1   Now, one of the

2   lawyers, and I said, at the very

3   beginning, and I don't know

4   whether they were just

5   "dittoing" a little bit of what

6   I said.  But I will say this to

7   you again:  You have all had

8   experiences in life in dealing

9   with people.  And there will be

10  12 of you who will be back in

11  that jury room.  And I instruct

12  you and remind you that having

13  had experiences in dealing with

14  people, you've had experiences

15  in determining with people you

16  have dealt with, who is telling

17  the truth, and in some cases,

18  people you have found that were

19  not telling the truth.

20      And you didn't leave

21  your common sense outside that

22  door when you became a juror.

23  You are to bring all that with

24  you and use that wisdom in

25  deciding the truth in these two

1    separate cases.

2         And I'm required to

3    state that the testimony of an

4    accomplice, a co-Defendant, if

5    you will, the testimony of one

6    who provides evidence against a

7    Defendant as an informer for pay

8    or for immunity from punishment

9    or for personal advantage or

10   vindication, must always be

11   examined and weighed by the jury

12   with greater care and greater

13   caution than the testimony of an

14   ordinary witness.

15        You, the jury, must

16   decide whether the witness's

17   testimony has been affected by

18   any of those circumstances or by

19   the witness's interest in the

20   outcome of this case or these

21   two cases or by prejudice

22   against the Defendant or by the

23   benefits that the witness has

24   received, either financially or

25   as a result of being forgiven,

1   or having their punishment

2   reduced or charges reduced as

3   far as the prosecution.

4           You should keep in mind

5   that such testimony is always to

6   be received with caution and

7   weighed with great care.  You

8   you should never convict any

9   Defendant, any Defendant, upon

10  the unsupported testimony of

11  such a witness, unless you

12  believe their testimony could be

13  fact and truthful beyond a

14  reasonable doubt.

15          Now, the testimony of

16  some witnesses must be

17  considered with more caution

18  than the testimony of other

19  witnesses.  The testimony of a

20  witness who provides evidence

21  against a Defendant for pay or

22  immunity from punishment or for

23  personal advantage or

24  vindication must be examined and

25  weighed by the jury with greater

1    care than the testimony of an

2    ordinary witness.

3         The jury must determine

4    whether this witness's testimony

5    has been affected by interest or

6    by prejudice against the

7    Defendant.

8         For example, a paid

9    informer or a witness who has

10   been promised that he or she

11   will not be charged or

12   prosecuted, or a witness who

13   hopes to gain more favorable

14   treatment in his or her case,

15   would have a reason to make a

16   false statement because he wants

17   to strike a good bargain with

18   the Government.

19         So while a witness at

20   that time may be entirely

21   truthful when testifying, you

22   should consider that testimony

23   with more caution than the

24   testimony of other witnesses.

25   Again, the testimony of some

1           witnesses must be considered

2           with more caution than the

3           testimony of other witnesses.

4                 For example, a witness

5           who has been promised that he or

6           she will not be charged or

7           prosecuted or a witness who

8           hopes to gain more favorable

9           treatment in his or her own case

10          may have some reasons to make a

11          false statement, because he or

12          she, again, wants to strike a

13          good bargain with the State.

14               Now, if all of you will

15          recall in talking further about

16          witnesses, who should you

17          believe or who should you not

18          believe? All of the witnesses

19          placed their hand on that Bible

20          in your presence. And I told

21          you they would, because the

22          Constitution of the United

23          States requires that.

24               A person charged with

25          the commission of a crime or

1  crimes has the right to confront

2  and cross examine all witnesses

3  against them.  So, they all have

4  appeared here in this courtroom.

5  And they all had to put their

6  hand on that Bible.  And they

7  all promised in your presence to

8  tell the truth, the whole truth,

9  nothing but the truth so help

10  them God.

11         One said, "I affirm."

12  That's the same thing.  That's

13  allowed.  Some people don't say

14  it.  And we understand that.  So

15  we merely ask them to promise or

16  affirm that they will tell the

17  truth, and all of them have done

18  that.

19         And because of that,

20  ladies and gentlemen, all of

21  them are presumed to have

22  testified truthfully.

23         However, in the event

24  that you determine that any

25  witness testified intentionally

1  and willfully falsely to a

2  material fact or facts while

3  under oath, then you may

4  presume and find that they might

5  testify falsely about other

6  material facts while under

7  oath.

8        But I emphasize that

9  rule only applies where you find

10  that under oath they appeared

11  before you, and they have

12  testified willfully falsely,

13  intentionally falsely.

14        That rule does not

15  apply because of a lapse of time

16  they have a vague memory or are

17  not sure or have forgotten.

18  There is a difference.

19        And, gee, during this

20  trial, I went to Wal-Mart to get

21  y'all some water one day or

22  something.  My mind was on other

23  things, and when I came out, I

24  forgot where my car was.  And I

25  went up and down.  This woman

```
 1              was watching me making an
 2              absolute whatever out of myself.
 3              And I went to somebody else's
 4              car, and was trying to get in
 5              it, and it wasn't even my car.
 6              It just looked like it.
 7                   So the human mind is
 8              frail in that way.  We are
 9              forgetful sometimes.  And we are
10              not sure sometimes.  And that
11              rule I gave you doesn't apply
12              where a person has forgotten or
13              is not clear.  Please understand
14              the difference.
15                   Again, on credibility
16              of witnesses.  In saying that
17              you must consider all of the
18              evidence, I do not mean that you
19              must accept all of the evidence
20              as true or accurate.  You should
21              decide whether you believe what
22              each witness had to say, and how
23              important that testimony was in
24              making that decision, you may
25              believe or disbelieve any
```

1    witness in whole or in part.

2    Also, the number of

3    witnesses that testified

4    concerning any particular

5    dispute is not controlling.  In

6    deciding whether you believe or

7    whether you don't believe a

8    witness, I suggest that you ask

9    yourself a few questions:  Did

10   the witness impress you as one

11   who is telling the truth?  Did

12   the witness have any particular

13   reason not to tell the truth?

14   Does the witness have a

15   personal interest in the outcome

16   of these two cases?  Did the

17   witness seem to have a good

18   memory?  Did the witness have

19   the opportunity and ability to

20   observe accurately the things

21   that he or she testified about?

22   Did the witness appear to

23   understand the questions clearly

24   and answer them directly?  Did

25   the witness's testimony differ

1    from other testimony or other

2    evidence.

3         Inconsistent

4    statements. You should also ask

5    yourself whether there is

6    evidence tending to prove that a

7    witness testified falsely

8    concerning some important facts,

9    or whether there was evidence

10   that at some other time the

11   witness said or did something

12   else or failed to say or do

13   something which was different

14   from the testimony that he or

15   she gave before you during the

16   trial.

17        You should keep in

18   mind, of course, that a simple

19   mistake by a witness does not

20   necessarily mean that the

21   witness was not telling the

22   truth as he or she remembers or

23   remembered the truth. Because

24   people naturally tend to forget

25   some things and remember other

1    things inaccurately.

2         So if a witness had

3    made a mistake, you need to

4    consider whether that

5    misstatement or mistake is

6    simply an innocent lapse of

7    memory or whether it was an

8    intentional falsehood.  And that

9    may depend on whether it has to

10   do with an important fact or was

11   only an unimportant detail.

12        If a person is shown to

13   have knowingly testified falsely

14   concerning any important or

15   material fact, you obviously

16   have a right to distrust the

17   testimony of such an individual

18   concerning other matters.  You

19   may reject all of the testimony

20   of that witness or give that

21   testimony such weight or

22   credibility as you may think it

23   deserves.

24        Again, on the number of

25   witnesses.  Your decision on the

1    facts of these two cases should

2    not be determined by the number

3    of witnesses testifying for or

4    against the parties.

5         You should consider all

6    the facts and all the

7    circumstances in evidence to

8    determine which of the witnesses

9    you choose to believe or which

10   witnesses you elect not to

11   believe.  You may find that the

12   testimony of a smaller number of

13   witnesses on one side is more

14   credible than the some of a

15   greater number of witnesses on

16   the other side.

17        At all times the burden

18   of proof remains on the State to

19   present proof to you beyond a

20   reasonable doubt of the guilt.

21        Sympathy or prejudice.

22   What does the law say about

23   that?  And I'm required to tell

24   you this:  Many cases, a lot of

25   cases, that appear before a

 1          Court, especially criminal

 2     cases, tend to invoke sympathy.

 3               However, I'm required

 4     to instruct you, the jury, that

 5     in arriving at any verdict you

 6     may arrive at, you must not

 7     permit sympathy or prejudice or

 8     emotion to influence you, nor

 9     may your verdict be based on

10     speculation, guess or

11     conjecture.

12               Expert witnesses.  I'm

13     required to say a little bit to

14     you about expert witnesses but

15     not much.  Experts are people

16     who have some special training

17     in some area of specialization.

18     Expertise, we call it.  And you

19     don't have to have that

20     expertise in this country to sit

21     on a jury.  In civil cases we

22     have neurosurgeons and all kinds

23     of folks come in and help the

24     jury shed light to the jury on

25     certain areas that they have

1    special training in.

2    And that's been done in

3    this case.  And sometimes jurors

4    say, Judge, am I bound by the

5    statements of the experts?  Am I

6    bound by that, if I don't

7    believe it?

8    Again, I'm required to

9    instruct you that you are the

10   judges of the facts.  And you

11   may accept or you may reject any

12   portion of any witness's

13   testimony that you find unworthy

14   of belief or that you don't

15   accept.  And the same rule

16   applies to experts.  You don't

17   have to accept an expert's

18   opinion just because they are an

19   expert.  They are here to help

20   you.  They are here to aid you.

21   They are here to help shed the

22   light for you on some areas that

23   they have spent a lot of time

24   and training on.  But you are

25   not bound to accept the

1    expressed opinions of an

2    expert.  And I'm required to

3    tell you that.

4              Intent.  You've heard

5    these lawyers talk about

6    intent.  Both sides talked about

7    intent.  What is intent?  I wish

8    I could say some of these things

9    to you in my own words.  But I'm

10   not allowed to do that.  Every

11   crime requires that there be a

12   joiner of acts, an intent.

13             In law school, before

14   somebody could be convicted of a

15   crime, they had to have a mens

16   rea.  That means a bad mind at

17   the time of an actus reus.  That

18   means a bad act.  If you didn't

19   have that occurring at the same

20   time, you're not guilty of a

21   crime.  Common law.

22             I inform you that the

23   burden is on the prosecution,

24   the State, Mr. Jarrell and Mrs.

25   Stout, to prove that the act

```
 1    occurred, the criminal act

 2    occurred.  The bad criminal act

 3    or acts occurred, and that the

 4    intent occurred beyond a

 5    reasonable doubt.

 6              Intent may be proved

 7    by circumstantial evidence.  And

 8    indeed it rarely can be

 9    established by any other

10    method.  While witnesses may

11    see, while witnesses may hear,

12    while witnesses may be able to

13    give direct evidence of what

14    particular thing they saw occur

15    or heard occur, or what a person

16    did, or what a person did or did

17    not do, there can be no eye

18    witness as to what goes on in a

19    person's mind or what state of

20    mind that person possessed when

21    an act was committed or

22    omitted.

23              The law says what a

24    Defendant does or what a

25    Defendant fails to do may
```

1    indicate that person's intent or

2    the lack of intent.

3         The law goes on to say

4    that as a general proposition of

5    law, it's reasonable for you,

6    the jury, to infer that a person

7    ordinarily intends -- that a

8    person ordinarily intends all of

9    the probable consequences of his

10   acts, which are knowingly done

11   and which are intentionally

12   done.

13        So unless the evidence

14   in this case leads you, the

15   jury, to a different conclusion,

16   you, the jury, may draw the

17   inference and find that the

18   Defendant, Mr. Robert Thomas

19   Conrad, intended all of the

20   natural consequences of any act

21   that you find that he knowingly

22   did, if you find that he

23   knowingly did anything.

24        If you will use that

25   definition when I talk to you

1    about intent.

2           I have talked to you

3    about some general things so

4    far.  And now I'm about to shift

5    gears a little bit.  And I'm

6    going to talk to you about the

7    crimes that are charged Mr.

8    Robert Thomas Conrad.

9           This is the file.  And

10    all I'm going to read to you

11    from this file is just an

12    indictment.  This young man has

13    it staked up on the top here.

14           The Constitution of the

15    United States says that before

16    anybody can be brought to trial,

17    they have to be given notice of

18    what they are charged with, with

19    specificity.  He has pointed

20    out the charge of this crime and

21    it's set out in the Code

22    Section, because they have a

23    right to notice of what they are

24    called on to defend against.

25           And the Constitution

1  says no one shall be tried for

2  an infamous crime without first

3  being indicted by a Grand Jury.

4          So a Grand Jury

5  returned this charge that sets

6  out with specificity what this

7  Defendant is before this Court

8  being tried for.

9          And it's a two-offense

10  indictment.  We call it an

11  indictment in this case.  And I

12  hold that indictment in my hand

13  at this time.  And it comes from

14  the Enterprise Division, Coffee

15  County, Alabama Grand Jury, from

16  the May term 2001, Grand Jury.

17          Offense one of this

18  indictment reads as follows:

19  The Grand Jury of said county

20  charges that before the finding

21  of this indictment, that Robert

22  Thomas Conrad, whose name is to

23  the Grand Jury otherwise

24  unknown, did intentionally --

25  intentionally -- cause the death

1   of another person, to wit

2   Jelaine Bowman Dennis, by

3   shooting her with a pistol; and

4   the said Robert Thomas Conrad

5   caused the death during the time

6   that he was in the course of

7   committing a theft of property,

8   to wit, United States currency

9   and/or United States coinage,

10  and/or a check, the property of,

11  to wit, Jelaine Bowman Dennis,

12  by the use of force or by

13  threatening the imminent use of

14  force against the person of the

15  said Jelaine Bowman Dennis or

16  another person present with the

17  intent to overcome her physical

18  resistance, her physical power

19  of resistance, or to compel

20  acquiescence to the taking of or

21  the escaping with the property,

22  while the said Robert Thomas

23  Conrad was armed with a deadly

24  weapon or dangerous instrument,

25  to wit, a pistol, in violation

1    of Section 13A-5-40 of the Code

2    of Alabama, against the peace

3    and dignity of the State of

4    Alabama.

5            This charges Mr. Conrad

6    with the capital offense of

7    robbery in the first degree,

8    that a victim is intentionally

9    killed, 13A-5-40(a)(2), Code of

10   Alabama.

11           To this charge Mr.

12   Conrad has entered a plea of not

13   guilty.  So this matter has been

14   at issue and has been tried

15   before you.

16           Offense Two of this

17   indictment reads as follows, and

18   this comes from this very same

19   Grand Jury.  It reads as

20   follows:

21           The Grand Jury of said

22   county charges that before the

23   finding of this indictment that

24   Robert Thomas Conrad, whose name

25   is otherwise unknown to the

1    Grand Jury, did in the course of

2    committing a theft of property,

3    to wit, $30.00 in United States

4    Currency, the denominations of

5    which are one $20.00 dollar

6    bill, and one $10.00 bill, the

7    property of, to wit, Robert Ray

8    Grimes, did use force or

9    threaten the imminent use of

10   force against the person of the

11   said Robert Ray Grimes, while

12   another person present, with the

13   intent to overcome his physical

14   resistance or physical power of

15   resistance or to compel

16   acquiescence to the taking of or

17   the escaping with the property,

18   while the said Robert Thomas

19   Conrad was armed with a deadly

20   weapon or a dangerous

21   instrument, to wit, a pistol, in

22   violation of Section 13A-8-41 of

23   the Code of Alabama, against the

24   peace and dignity of the State

25   of Alabama.

The second charge

charges Mr. Conrad with robbery

in the first degree.  To this

charge, Mr. Conrad has with

counsel, entered a plea of not

guilty.  So it's been tried

before you.

Since we've started

with the capital offense, I'm

going to talk to you about the

capital offense that's charged.

And I'm going to blend in some

of these requested charges so

they might just bump into each

other just a grunt.  But they

will flow together when I

finish, and you will understand

them.

The Defendant is

charged with capital murder.  To

convict, the State must prove

beyond a reasonable doubt each

of the elements of capital

murder charged beyond a

reasonable doubt.

1   If you find from the

2   evidence that the State has

3   proved beyond a reasonable doubt

4   each of the elements of the

5   offense of capital murder as

6   charged, then you shall find the

7   Defendant, Mr. Robert Thomas

8   Conrad, guilty of capital

9   murder.

10   If you find that the

11   State has failed to prove beyond

12   a reasonable doubt any one or

13   more of the elements of the

14   offense of capital murder, then

15   you cannot find the Defendant

16   guilty of capital murder.

17   I will read to you the

18   law of Alabama as it defines the

19   capital offense.  If my

20   instructions to you on the law

21   differs from what you have

22   already been told by the

23   lawyers, disregard what they

24   told you and go with what I tell

25   you.  Because I am the Judge of

1    the law, just like you are the

2    judges of the facts.  And it's

3    the Court's job to talk to you

4    about the law.  And some Judges

5    don't even allow the lawyers to

6    do so.

7            Capital murder, the

8    capital offense charged in this

9    case, offense one.  The

10   Defendant is charged with

11   capital murder.  The law states

12   that an intentional murder

13   committed during a robbery in

14   the first degree is capital

15   murder.

16           A person commits an

17   intentional murder if he causes

18   the death of another person and

19   in performing the act or acts

20   which cause the death of that

21   person, he intends to kill that

22   person.

23           A person commits a

24   robbery in the first degree if

25   in the course of committing or

```
1         attempting to commit a theft, he
2         uses force against the person of
3         the owner or any person present
4         with the intent to overcome his
5         or her physical resistance or
6         physical power of resistance or
7         threatens the imminent use of
8         force against the person of the
9         owner or any person present with
10        the intent to compel
11        acquiescence to the taking of or
12        the escaping with the property.
13        And in doing so, he is armed
14        with a deadly weapon.
15             To convict in this
16        case, of the capital offense,
17        the State must prove beyond a
18        reasonable doubt each of the
19        following elements of an
20        intentional murder during a
21        robbery in the first degree,
22        they are:
23             Number one, that
24        Jelaine Bowman Dennis is dead.
25             Number two, that the
```

1   Defendant, Robert Thomas Conrad,

2   caused the death of Jelaine

3   Bowman Dennis by shooting her

4   with a pistol.  That's the

5   second element.

6        Number three, that in

7   committing the act which caused

8   the death of Jelaine Bowman

9   Dennis the Defendant intended to

10  kill the deceased or another

11  person.  A person acts

12  intentionally when it's his

13  purpose to cause the death of

14  another person.  The intent to

15  kill must be real.  The intent

16  to kill must be specific.

17        Number four, that the

18  Defendant committed or attempted

19  to commit theft of United States

20  currency and/or United States

21  coinage and/or cash.

22        Number five, that in

23  the course of committing or

24  attempting to commit a theft or

25  in immediate flight or after the

1    attempt or the commission, the

2    Defendant either used force or

3    threatened the imminent use of

4    force against the person of

5    Jelaine Bowman Dennis or another

6    person present with the intent

7    to overcome her physical

8    resistance or physical power to

9    resist or to compel acquiescence

10    to the taking of or the escaping

11    with the property.

12    Number six, that the

13    Defendant was armed with a

14    deadly weapon.

15    Number seven, that the

16    murder took place during a

17    robbery.

18    Those are the seven

19    elements that the State must

20    have proven to be fact beyond a

21    reasonable doubt before this

22    jury could return a verdict of

23    guilty.

24    If the State has failed

25    to prove any one or more of

1    these elements as I have defined

2    them for you, then you must

3    return a verdict of not guilty

4    as to the capital offense.

5         I'm going to define

6    some of these elements a little

7    bit for you.  Theft.  We will

8    take theft up first.  Remember

9    that's one of the elements.

10        A person commits the

11   crime of theft of property if he

12   knowingly obtains or knowingly

13   exerts unauthorized control of

14   the property of another, the

15   property of someone else, with

16   the intent to deprive the owner

17   of his or her property.  Theft.

18        Knowingly.  I'm

19   required to give you that

20   definition.  We all know what

21   that is.  And it has its common

22   and ordinary meaning.  But I'm

23   still required to give it to

24   you.  A person acts knowingly

25   with respect to conduct or to

1    circumstances when he is aware

2    that his conduct is of that

3    nature or  that the

4    circumstances exist.

5         Intentionally.  A

6    person acts intentionally with

7    respect to a result or a conduct

8    when his or her purpose is to

9    cause that result or to engage

10   in that conduct.  And remember

11   that definition was a longer

12   definition that I gave you

13   earlier.

14         A deadly weapon.  I

15   know y'all know what a deadly

16   weapon is.  But I'm required to

17   tell you what it is, legally.  A

18   deadly weapon is defined as a

19   firearm or anything manifested,

20   designed, made or adapted for

21   the purposes of inflicting death

22   or serious physical injury.

23         During, d-u-r-i-n-g.

24   I'm a Southerner.  I may

25   mispronounce it.  During means

1   in the course of, commission of

2   or in connection with, or in

3   immediate flight from the

4   commission of a robbery.  During

5   the robbery.

6         If you find from the

7   evidence, again, that the State

8   has proven beyond a reasonable

9   doubt each of these seven

10  elements, as I've informed you,

11  of the offense of murder during

12  a robbery in the first degree,

13  as I've charged you, then you

14  shall find the Defendant guilty

15  of capital murder.

16        If you find that the

17  State has failed to prove beyond

18  a reasonable doubt any one or

19  more of the elements of the

20  offense of murder during a

21  robbery during a first degree,

22  then you cannot find the

23  Defendant guilty of capital

24  murder.

25        Now, that is the

1    definition of capital murder in

2    this state.

3        You've heard these

4    lawyers, both sides, talk about

5    lesser included offenses

6    embraced therein.

7        First of all, a person

8    charged with the commission of a

9    crime is presumed innocent --

10   You've heard both sides talk to

11   you about that, and the Court,

12   also -- until proven guilty

13   beyond a reasonable doubt.

14        So if you have

15   considered all of the evidence,

16   that for the State and that for

17   the Defense, and you have not

18   been convinced beyond a

19   reasonable doubt, that the

20   Defendant is guilty, you would

21   returned a verdict of not

22   guilty.  And that would be

23   that.

24        But, if you find that

25   he is guilty of something, then

1    you consider whether he is

2    guilty of a capital offense.

3    And if you find that he's not

4    guilty of the capital offense,

5    but he's guilty of something,

6    then you move on down to see if

7    he's guilty of, what we call, a

8    lesser but included offense

9    embraced within that capital

10    offense.  I'm going to tell you

11    what they all are in just a

12    minute.  I'm required to give

13    you these instructions, first.

14    I will say just what I just said

15    in another way.

16    Within the offense of

17    capital murder charged in the

18    indictment is the lesser

19    included offense of murder.  If

20    after your consideration of the

21    offense charged in the

22    indictment in accordance with

23    instructions that I've given

24    you, you are not convinced

25    beyond a reasonable doubt that

1    the Defendant is guilty of the

2    offense of capital murder, as

3    charged in the indictment, you

4    cannot find the Defendant guilty

5    of the offense.

6         Instead, you must next

7    consider the evidence as to the

8    lesser included offense of

9    murder and determine whether the

10   Defendant has been proven guilty

11   beyond a reasonable doubt of the

12   lesser included offense of

13   murder.

14        If you find from the

15   evidence that the State has

16   proven beyond a reasonable doubt

17   each of the elements of the

18   lesser included offense, then

19   you shall find the Defendant

20   guilty of murder.  If you find

21   that the State has failed to

22   prove beyond a reasonable doubt

23   any one or more of the elements

24   of murder, then you cannot find

25   the Defendant guilty of the

1    offense of murder.

2           For these purposes,

3    there are two types of murder,

4    that are possible, of lesser

5    included offenses.  And I will

6    talk to you about each one of

7    those, too.  And when I finish,

8    there will be a verdict as to

9    each of these possibilities.

10   Please understand that.

11          We will start with

12   murder of the intentional type,

13   first.  A person commits the

14   crime of murder if he causes the

15   death of another person, and in

16   performing the act or acts which

17   caused the death of that person,

18   he intends to kill that person.

19          To convict the State

20   must prove beyond a reasonable

21   doubt each of the following

22   elements of intentional murder:

23          Number one, that

24   Jelaine Bowman Dennis is dead.

25          Number two, that the

1    Defendant, Robert Thomas Conrad,

2    caused the death of Jelaine

3    Bowman Dennis by shooting her

4    with a pistol.

5         Number three, that in

6    committing the acts which caused

7    the death of Jelaine Bowman

8    Dennis, the Defendant acted with

9    intent.

10        Those are the three

11   elements.  If you have not been

12   satisfied beyond a reasonable

13   doubt, if you find that the

14   Defendant is not guilty, and

15   then after you've considered the

16   capital offense, you have not

17   been convinced beyond a

18   reasonable doubt that the

19   Defendant is guilty of the

20   capital offense, then you would

21   move on to see if he's guilty of

22   this lesser but included offense

23   of intentional murder.

24        And you would consider

25   those three elements.  If the

1    State has failed to prove beyond

2    a reasonable doubt any one of

3    those elements, you could not

4    find him guilty of the

5    intentional murder of the

6    intentional type, if it's a

7    murder.

8        A person acts

9    intentionally when it's his

10   purpose to cause the death of

11   another person.  If you find

12   from the evidence that the State

13   has proved beyond a reasonable

14   doubt each of the elements,

15   three elements, of the offense

16   of murder as charged, then you

17   shall find the Defendant guilty

18   of murder, meaning intentional

19   murder.

20       If you find that the

21   State has failed to prove beyond

22   a reasonable doubt any one or

23   more of the elements of the

24   offense of murder, intentional

25   murder, then you cannot find the

1           Defendant guilty of murder of

2           the intentional type.

3                    So, one lesser but

4           included offense embraced within

5           the capital charge is murder of

6           the intentional type.  So that's

7           going to be a possible verdict,

8           also.

9                    Now, we are going to

10          move on to another kind of

11          murder that's defined under our

12          Alabama law.  That's called

13          felony murder.  Now, I'm going

14          to say it to you real simply,

15          and then I will tell it to you

16          in the way that I'm required to

17          do.  If someone is engaged in

18          the commission of a felony,

19          involving a threat of harm to

20          others, and a person is killed

21          as a result of the commission of

22          a felony, then even if the

23          person involved, that was

24          committing the felony, a person

25          who killed that person, they are

```
 1              still guilty of murder. It's

 2              called felony murder, sort of a

 3              pin-the-tail-on-the-donkey type

 4              thing.  If the felony hadn't

 5              been committed, the death would

 6              not have been caused.

 7                   So, we hold people

 8              responsible in this country for

 9              that, in this State for that.

10                   Now, if what I've just

11              said to you disagrees with the

12              law, my simple way of saying it

13              disagrees with the law, and I'm

14              about to read the law to you,

15              disregard what I just said.  I

16              just said that to help you

17              understand it a little bit

18              better.

19                   A person commits the

20              crime of murder, this is felony

21              murder, if he commits or

22              attempts to commit robbery in

23              any degree.  And in the course

24              of the crime, in the furtherance

25              of the crime, in immediate
```

1   flight from the crime he is

2   committing or attempting to

3   commit, he causes the death of

4   another person.  That's felony

5   murder in this State.

6           So to convict, the

7   State must prove beyond a

8   reasonable doubt each of the

9   following elements of murder,

10  meaning felony murder:

11          Number one, that

12  Jelaine Bowman Dennis is dead.

13          Number two, that the

14  Defendant, Robert Thomas Conrad,

15  caused the death of Jelaine

16  Bowman Dennis by shooting her

17  with a pistol.

18          And number three, that

19  in committing the act that

20  caused the death of Jelaine

21  Bowman Dennis, the Defendant was

22  acting in the course of and in

23  the furtherance of the crime of

24  robbery in the first degree.

25  That's felony murder in this

1       State.

2                    And number four, that

3       in doing the acts which

4       constituted a commission or

5       attempted commission of the

6       felony of robbery in any degree,

7       during the course of which, in

8       the furtherance of which, or in

9       immediate flight from which, the

10      death of Jelaine Bowman Dennis

11      was caused by Robert Thomas

12      Conrad.  Those would be the four

13      elements of felony murder.

14                   Now, under that I'm

15      required to give you a

16      definition of robbery.  And I'm

17      required to go over again with

18      you a definition of theft.

19                   A person commits the

20      crime of robbery in the first

21      degree if, in the course of

22      committing a theft, he uses or

23      threatens the imminent use of

24      force against the person of the

25      owner of the property or any

1       person present with the intent

2       to overcome that person's

3       physical resistance or physical

4       power of resistance and in so

5       doing, he is armed with a deadly

6       weapon.  That the Defendant,

7       Robert Conrad, committed or

8       attempted to commit theft of

9       United States currency and/or

10      United States coinage and/or

11      checks, that in the course of

12      committing or attempting to

13      commit theft or immediate flight

14      after the attempt or commission,

15      the Defendant either used force,

16      or threatened the imminent use

17      of force against the person of

18      Jelaine Bowman Dennis or another

19      person present with intent to

20      overcome the physical resistance

21      or physical power to resist or

22      to compel acquiescence to the

23      taking of or escaping with the

24      property.

25              And number three, that

1      the Defendant was armed with a

2      deadly weapon.

3              A person commits the

4      crime of theft of property if he

5      knowingly obtains or exerts

6      unauthorized control of the

7      property of another with the

8      intent to deprive the owner of

9      his property.

10             The person, again, acts

11      knowingly with respect to

12      conduct or to a circumstance

13      when he is aware that his

14      conduct is of that nature or

15      that the circumstances exists.

16             A person acts

17      intentionally with respect to a

18      result or conduct when his or

19      her purpose is to cause that

20      result or to engage in that

21      conduct.

22             Again, a deadly weapon is

23      a firearm or anything

24      manifested, designed, made, or

25      adapted for the purpose of

1    inflicting death or serious

2    physical injury.

3         So, if you find from

4    the evidence that the State has

5    proven beyond a reasonable doubt

6    each of the above elements of

7    the offense of felony murder, as

8    a lesser included offense of

9    capital murder, then you shall

10   find the Defendant guilty of

11   felony murder.

12        If you find that the

13   State has failed to prove beyond

14   a reasonable doubt any one or

15   more of the elements of the

16   offense of felony murder, then

17   you cannot find the Defendant

18   guilty of felony murder.

19        The last possible

20   lesser included offense embraced

21   within the capital charge is

22   robbery in the first degree.  A

23   person commits the crime, under

24   Alabama law, of robbery in the

25   first degree, if in the course

1    of committing a theft he uses or

2    threatens the imminent use of

3    force against the person or the

4    owner of the property or any

5    person present with the intent

6    to overcome that person's

7    physical resistance or physical

8    power of resistance.  And in so

9    doing, he is armed with a deadly

10   weapon.  That is the definition

11   of robbery in the first degree

12   in this State.  That the

13   Defendant, Robert Conrad,

14   committed or attempted to commit

15   theft of United States currency

16   and/or United States coinage

17   and/or checks.

18            Number two, that in the

19   course of committing or

20   attempting to commit the theft

21   or in immediate flight after the

22   attempt or commission, the

23   Defendant either used forced or

24   threatened the imminent use of

25   force against the person of

1     Jelaine Bowman Dennis or another

2     person present with the intent

3     to overcome her physical

4     resistance or physical power to

5     resist or to compel acquiescence

6     to the taking of or the escaping

7     with the property.

8            And number three, that

9     the Defendant was armed with a

10    deadly weapon.

11           Those are the three

12    elements of robbery in the first

13    degree that must have been

14    proven to be fact beyond a

15    reasonable doubt before this

16    jury could find the Defendant

17    guilty of the lesser but

18    included offense of robbery in

19    the first degree.

20           Again, a person commits

21    the crime of theft of property

22    if he knowingly obtains or

23    exerts unauthorized control over

24    the property of another with

25    with intent to deprive the owner

```
1              of his or her property.

2                      A person acts knowingly

3              with respect to conduct,

4              circumstances, when he is aware

5              that his conduct is of that

6              nature or that the circumstances

7              exist.

8                      Again, a person acts

9              intentionally with respect to a

10             result or conduct when his or

11             her purpose is to cause that

12             result or to engage in that

13             conduct.

14                     Again, a deadly weapon

15             is a firearm or anything

16             manifested, designed, made, or

17             adapted for the purpose of

18             inflicting death or serious

19             physical injury.

20                     So if you find from the

21             evidence that the State has

22             proved beyond a reasonable doubt

23             each of the elements of robbery

24             in the first degree, as a

25             lesser but included offense
```

1    embraced within the capital

2    charge, then you shall find the

3    Defendant guilty of robbery in

4    the first degree.

5         If you find that the

6    State has failed to prove beyond

7    a reasonable doubt any one or

8    more of the elements of the

9    offense of robbery in the first

10   degree, then you cannot find the

11   Defendant guilty of the lesser

12   but included offense of robbery

13   in the first degree.

14        Now, so far I've talked

15   to you about the capital offense

16   charged.

17        Then I moved on down

18   and talked to you about the

19   lesser included offenses

20   embraced therein.  And I defined

21   for you murder of the

22   intentional type.

23        I have defined for you

24   a lesser but included offense of

25   felony murder.

1          And I have defined for

2     you a lesser but included

3     offense embraced therein of

4     robbery in the first degree.

5          So, those are all of

6     the possibilities, that with not

7     guilty.  And I will explain

8     those verdict possibilities to

9     you when I talk to you about the

10    verdicts.

11         Now, there is more than

12    one charge, charged this

13    Defendant, the capital offense,

14    in Offense One and robbery in

15    the first degree in Offense

16    Two.

17         Would y'all like to

18    stand and stretch just a second?

19    If you would, you can certainly

20    do that.  You just get my

21    attention, and we will stop.

22    And I will make a motion that

23    y'all can stand and stretch a

24    minute.

25         So we're talking now

1    about the second offense,

2    multiple counts, it's called.

3    In this case there are two

4    counts contained in the

5    indictment.  You are asked to

6    reach a verdict on each count of

7    the indictment.  You must

8    consider the evidence as to each

9    count separately and determine

10   whether the Defendant has been

11   proven guilty of the offense

12   charged in each of these

13   separate counts beyond a

14   reasonable doubt.

15            Now, the second count,

16   offense, charges, as you know,

17   the Defendant Mr. Robert Thomas

18   Conrad, with the robbery in the

19   first degree of Mr. Grimes.  So

20   I will have to define that,

21   again, for you.

22            Robbery in the first

23   degree.  The law of Alabama

24   defines it this way:  A person

25   commits the crime of robbery in

```
1        the first degree if in the

2        course of committing a theft, he

3        uses or threatens the imminent

4        use of force against the person

5        or the owner of the property or

6        another person present with the

7        intent to overcome that person's

8        physical resistance or physical

9        power of resistance, and in

10       doing so, is armed with a deadly

11       weapon.

12              So, the elements are,

13       number one, these are the things

14       that the State must have proven

15       to be fact beyond a reasonable

16       doubt, otherwise this jury could

17       not return a verdict of guilty

18       against Mr. Robert Thomas Conrad

19       of robbery in the first degree

20       as to the second offense.

21              Number one, that the

22       Defendant, Robert Thomas Conrad,

23       committed or attempted to commit

24       theft of $30.00 of United States

25       currency, the denominations of
```

1    which were one $20.00 bill and

2    one $10.00 bill.

3            Number two, that in the

4    course of committing or

5    attempting to commit theft, or

6    in immediate flight after the

7    attempt or its commission, the

8    Defendant either used force or

9    threatened the imminent use of

10   force against the person of

11   Robert Ray Grimes or another

12   person present with the intent

13   to overcome his physical

14   resistance or physical power to

15   resist or to compel acquiescence

16   to the taking of or escaping

17   with the property.

18           And number three, that

19   the Defendant was armed with a

20   deadly weapon.

21           Those are the three

22   elements that the State must

23   have proven to be fact beyond a

24   reasonable doubt before this

25   jury could return a verdict of

*VOLUME 15*

COURT OF CRIMINAL APPEALS NO. __CR-02-0333__

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

## CIRCUIT COURT OF _____COFFEE_____ COUNTY, ALABAMA

CIRCUIT COURT NO. __CC-01-179, CC-01-180__

CIRCUIT JUDGE __Gary L. McAliley__

Type of Conviction / Order Appealed From: __Conviction, Capital Murder, Robbery 1st__

Sentence Imposed: __Life Without Parole, Life__

Defendant Indigent: ☒ YES ☐ NO

Robert Thomas Conrad

Gary Bradshaw

(Appellant's Attorney)                    (Telephone No.)
P. O. Box 311412
(Address)
Enterprise         AL            36331
(City)         (State)         (Zip Code)

### NAME OF APPELLANT

Richard Waldrop
P. O. Box 310027
Enterprise, AL  36331

V.

## STATE OF ALABAMA

### NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)



Clerk fee
462-9372

1    guilty against Mr. Robert Thomas

2    Conrad of the offense charged of

3    robbery in the first degree.

4        Again, a person commits

5    the crime of theft of property

6    if he knowingly obtains or

7    exerts unauthorized control over

8    the property of another with the

9    intent to deprive the owner of

10   his property.

11       A person acts knowingly

12   with respect to conduct or

13   circumstances when he is aware

14   that his conduct is of that

15   nature or that the circumstances

16   exist.

17       A person acts

18   intentionally with respect to a

19   result or conduct when his or

20   her purpose is to cause that

21   result or to engage in that

22   conduct.

23       Again, a deadly weapon is

24   a firearm or anything

25   manifested, designed, made or

1  adapted for the purpose of

2  inflicting death or serious

3  physical injury.

4      So, if you find from the

5  evidence that the State has

6  proven beyond a reasonable doubt

7  each of the elements as I have

8  defined them for you of the

9  offense of robbery in the first

10  degree, then you shall find the

11  Defendant guilty of robbery in

12  the first degree.

13      If you find that the

14  State has failed to prove beyond

15  a reasonable doubt any one or

16  more of the elements of the

17  offense of robbery in the first

18  degree as charged in offense

19  two, then you cannot find the

20  Defendant guilty of robbery in

21  the first degree.  And you must

22  find him not guilty.

23      Now, that concludes my

24  talk to you on the specific

25  law.  I'm going to backtrack

1  just a grunt here.  And I'm

2  going to talk to you a little

3  more about general law.  And

4  then I'm going to reach over and

5  pick up these verdict forms and

6  go over them with you.  And then

7  you are going to retire back to

8  the jury room to deliberate and

9  decide these two cases.

10  Venue.  Venue.  That's

11  where the case has to be tried,

12  and where the offense has to

13  have been proven to have

14  occurred beyond a reasonable

15  doubt by the State before a

16  person can be found guilty.

17  And, generally, I'm

18  telling you if the State did not

19  prove that this crime, these two

20  crimes, as alleged or any lesser

21  but included offense embraced

22  therein, occurred in the

23  Enterprise Division of Coffee

24  County, then you have to return

25  a verdict of not guilty.

1    I will read you the law

2    now.  The State also has the

3    burden of proving beyond a

4    reasonable doubt that any crime

5    you find was committed by the

6    Defendant, Robert Thomas Conrad,

7    if any, was committed in the

8    Enterprise Division of Coffee

9    County, Alabama.  They have to

10   prove that beyond a reasonable

11   doubt.

12        Therefore, if any of

13   you find, or if you find that

14   the State has not proven beyond

15   a reasonable doubt that the

16   capital offense charged or any

17   lesser but included offense

18   embraced therein, as charged in

19   Offense One or the robbery in

20   the first degree as charged in

21   Offense Two, if they have not

22   been proven beyond a reasonable

23   doubt, that it was committed,

24   that they were committed in the

25   Enterprise Division of Coffee

1502

1        County, Alabama, then you must

2        find Robert Thomas Conrad not

3        guilty, as this proof of venue

4        is an essential element for any

5        conviction to be returned

6        against Robert Thomas Conrad.

7        Venue.

8             The right to remain

9        silent.  As you are aware, the

10      Defendant, Mr. Robert Thomas

11      Conrad, did not take the stand

12      in his own behalf.  I wish to

13      make it perfectly clear to you

14      that this is a constitutional

15      right that he has.  There

16      cannot, and there should not be

17      any presumption of guilt on your

18      part because the Defendant did

19      not take the stand and testify.

20      In this country this is an

21      absolute, this is an

22      unqualified, this is a

23      constitutional right that this

24      Defendant, and every other

25      Defendant in this country has,

1503

```
 1        not to take the stand in his own

 2        behalf.  And, again, you are to

 3        draw no inference from the fact

 4        that he did not testify.

 5              Because the burden of

 6        proof in a criminal case is

 7        solely on the State -- solely on

 8        the State -- to prove the

 9        Defendant's guilt beyond a

10        reasonable doubt.

11              Now, in talking about

12        burden of proof, and I'm getting

13        closer, I assure you, I'm

14        required to go over with you and

15        we have all heard burden of

16        proof is on the State to prove

17        his guilt beyond a reasonable

18        doubt, since grammar school.

19        But I'm still required to give

20        you what I'm about to give you.

21              The Prosecution has the

22        burden of proving the Defendant,

23        Robert Thomas Conrad, guilty

24        beyond a reasonable doubt.  The

25        law never imposes upon a
```

1    Defendant in a criminal case the

2    burden or the duty of calling

3    any witnesses or producing any

4    evidence.  And this burden of

5    proof remains on the State

6    throughout the case.

7         The Defendant is not

8    required to prove his

9    innocence.  Therefore, unless

10   the State so satisfies you, the

11   jury, of the Defendant, Robert

12   Thomas Conrad's guilt beyond a

13   reasonable doubt, then the

14   Defendant, Robert Thomas Conrad,

15   would be entitled to an

16   acquittal.

17         Stated another way, the

18   Defendant is entitled to an

19   acquittal unless you, the jury,

20   believe from the evidence that

21   the Defendant is guilty beyond a

22   reasonable doubt of all the

23   necessary elements of the crime

24   with which he is charged or

25   guilty of any lesser but

1  included offenses embraced

2  therein.

3        A finding of guilt

4  requires proof beyond a

5  reasonable doubt.  Or if the

6  jury has a reasonable doubt as

7  to any element of the crime of

8  which the Defendant is charged,

9  an acquittal must be returned.

10       Again, in this country

11  a Defendant charged with the

12  commission of a criminal offense

13  enters that criminal case

14  presumed to be innocent.  And

15  that presumption accompanies,

16  that presumption attends him,

17  and that presumption shields

18  him, and is evidence in his

19  behalf, and he is entitled to

20  this benefit or this presumption

21  until you, the jury, have been

22  satisfied, convinced, beyond a

23  reasonable doubt of the

24  Defendant's guilt.

25       Here, Mr. Robert Thomas

1    Conrad has entered this trial of

2    these two cases with this

3    presumption of innocence in his

4    favor.  And this presumption of

5    innocence in his favor is a fact

6    which is to be considered by

7    you, the jury, as evidence and

8    should not be disregarded.

9         You, the jury, are

10   again advised that this

11   presumption of innocence remains

12   with the Defendant, Robert

13   Thomas Conrad, during the trial

14   until overthrown by evidence

15   which convinces you, the jury,

16   of the Defendant's guilt beyond

17   a reasonable doubt.

18        As stated before, the

19   law never imposes upon a

20   Defendant in a criminal case the

21   burden or the duty of calling

22   any witnesses or producing any

23   evidence.

24        The Prosecution has the

25   burden at all times to produce

1    evidence of the alleged crime,

2    which convinces you of the guilt

3    beyond a reasonable doubt.  If

4    the Prosecution fails to

5    produce such evidence, such

6    proof beyond a reasonable doubt,

7    of any of these elements of any

8    of the crimes alleged and

9    charged, you must find the

10   Defendant not guilty of that

11   crime.  The Defendant is under

12   no obligation at any time to

13   produce any evidence.

14        I am just about

15   finished.  I have reasonable

16   doubt to go over with you, which

17   we've all learned since grammar

18   school.  But I'm still required

19   to give it to you, not in my

20   words but in the words that the

21   Appellant Courts have approved

22   and presumption of innocence.

23   My goodness.  I wish I could

24   give you that in my own words.

25        I used to sit and

1    listen to Judge Riley Green when

2    I was a young lawyer.  And I

3    would close my eyes and listen

4    to him give the same thing that

5    I'm about to give to you.  And I

6    would think, Oh. My goodness.

7    I've gone to law school, and I

8    couldn't even follow that.

9         But we will explain it

10   as best we can.  Reasonable

11   doubt.  We will take that up

12   first.  The law defines

13   reasonable doubt as being a fair

14   doubt based upon reason and

15   common sense and arising from

16   the state of the evidence.

17        It's rarely possible to

18   prove anything to an absolute

19   certainty.  A reasonable doubt

20   may arise not only from the

21   evidence produced but also from

22   a lack of evidence.  The burden

23   is upon the State to prove the

24   Defendant in this case, Robert

25   Thomas Conrad, guilty beyond a

```
1        reasonable doubt of every

2        essential element of the crime

3        or crimes charged.

4                A Defendant has the

5        right to rely upon failure of

6        the Prosecution to establish

7        such proof.  A Defendant may

8        also rely upon evidence brought

9        out on cross examination of

10       witnesses for the Prosecution.

11               The law never imposes

12       upon a Defendant in a criminal

13       case the burden or the duty of

14       producing any evidence.  A

15       reasonable doubt exits in any

16       criminal case when after careful

17       and impartial consideration of

18       all of the evidence in the case,

19       you, the jury, do not feel

20       convinced that a Defendant is

21       guilty of the crime or crimes

22       charged.

23               The phrase reasonable

24       doubt is self explanatory, and

25       efforts to define it do not
```

1    always clarify the term.  But it

2    would help you some to say that

3    the doubt which would justify an

4    acquittal must be an actual

5    doubt and a substantial doubt

6         So, if after

7    considering all the evidence in

8    these two separate cases, you

9    have an abiding conviction of

10   the truth of the charges or

11   charge, then you are convinced

12   beyond a reasonable doubt.  And

13   it would be your duty to convict

14   the Defendant of the crime or

15   crimes charged.

16         A reasonable doubt

17   which entitles an accused of an

18   acquittal is not a mere

19   fanciful, vague, conjectural or

20   speculative doubt; but a

21   reasonable substantial doubt

22   arising from the evidence and/or

23   remaining after careful

24   consideration of all of the

25   evidence such as reasonable,

1    fair-mined conscientious people

2    would entertain under all of the

3    circumstances.

4        Now, you will observe

5    that the State is not required

6    to convince you of the

7    Defendant's guilt beyond all

8    doubt, but beyond all reasonable

9    doubt.  There is a difference.

10        So if after comparing

11    and after considering all of the

12    evidence in the case, your minds

13    are left in such a condition

14    that you cannot say that you

15    have an abiding conviction of

16    the Defendant's guilt, then you

17    are not convinced beyond a

18    reasonable doubt and the

19    Defendant, Robert Thomas Conrad,

20    would be entitled to an

21    acquittal.

22        An indictment.

23    Remember I held it up?  I'm

24    required to tell you this:  As

25    you know, and I've said earlier,

1512

1    the Defendant is charged by way

2    of an indictment.  You've heard

3    the Court talk about an

4    indictment.  And you have heard

5    both sides, lawyers on both

6    sides, talk about an

7    indictment.  And I'm required to

8    instruct you that an indictment

9    is nothing more than a formal

10   method of accusing a person of a

11   crime or crimes.  It's just a

12   vehicle, if you will, that gets

13   a case before a petit jury.  You

14   are a petit jury.  It's a

15   vehicle just like each of you

16   have been back and forth to this

17   courthouse all week long,

18   probably all week long.  That's

19   all it is, nothing more.  It's

20   just a vehicle to get it down

21   here.  So it's absolutely no

22   evidence of guilt, none

23   whatsoever.

24            And the last thing I'm

25   going to talk to you about

1    before I get to those verdict

2    forms is what you have learned,

3    again, since grammar school,

4    presumption in this country of

5    innocence.

6            People in this country

7    are presumed innocent until

8    proven guilty.  And in this

9    case, as in every criminal case

10   in this country, there is a

11   legal principle in our law known

12   as a presumption of innocence.

13           When a Defendant is

14   placed on trial, charged with

15   the commission of a public

16   offense, a crime, the law says,

17   the constitution says, that the

18   Defendant is presumed to be

19   innocent of the offense or

20   offenses, criminal offenses,

21   charged.

22           The Defendant in this

23   case, Mr. Robert Thomas Conrad,

24   is presumed to be innocent.

25   This Defendant, Mr. Conrad, also

1   accused of two separate crimes,

2   began this trial with a clean

3   slate, with no evidence against

4   him, none whatsoever.  The law

5   permits nothing but legal

6   evidence to be submitted for

7   your consideration in support of

8   the criminal offense or criminal

9   offenses charged.  The Judge in

10  this country determines what is

11  legal evidence.

12          So the presumption of

13  innocence alone is sufficient to

14  acquit a Defendant, unless you

15  the judge are satisfied beyond a

16  reasonable doubt of the

17  Defendant's guilt from all of

18  the evidence in the case.

19          Again, this Defendant,

20  Mr. Robert Thomas Conrad, enters

21  this trial with this presumption

22  of innocence in his favor.  And

23  this presumption of innocence is

24  a fact which is to be considered

25  by you as evidence and should

1    not be disregarded.  You are

2    advised that this presumption of

3    innocence remains with this

4    Defendant, Robert Thomas Conrad,

5    during the trial, until

6    overthrown by evidence which

7    convinces you, the jury, of the

8    Defendant's guilt beyond a

9    reasonable doubt.

10            Now, we will move on to

11    the verdict forms.  I know y'all

12    are glad to hear that.  I assure

13    you my vocal cords are.  And

14    please don't infer or believe

15    that I think your verdict should

16    be one way or the other because

17    of the order that I give you

18    these verdicts.  Because, again,

19    that decision is for you.  I'm

20    just giving them to you in the

21    manner that I'm required to do

22    that by law.  If you have not

23    been convinced beyond a

24    reasonable doubt of the

25    Defendant's guilt -- we will

1516

```
 1              start with the capital offense

 2              first, then certainly the first

 3              form of verdict should be, if

 4              you have not been convinced

 5              beyond a reasonable doubt of the

 6              capital offense or any lesser

 7              but included offenses embraced

 8              therein, then you should utilize

 9              this first form of verdict,

10              which reads as follows:

11                   We, the jury, find the

12              Defendant, Robert Thomas Conrad,

13              not guilty of the capital

14              offense of intentional murder of

15              -- excuse me -- intentional

16              murder by the Defendant of

17              Jelaine Bowman Dennis during a

18              robbery in the first degree

19              committed by the Defendant in

20              violation of Section 13A-5-40

21              (a)(2), the Code of Alabama,

22              1975, as amended, and not guilty

23              of any lesser but included

24              offense embraced therein.

25                   So, that's the first
```

1    verdict possibility.  Not guilty

2    of the capital offense or any

3    lesser but included offense

4    embraced therein.

5         If, however, if after

6    considering all of the evidence

7    in this case, this capital case,

8    because we are looking at the

9    capital case right now, that for

10   the State and that for the

11   Defendant, and if you have been

12   convinced beyond a reasonable

13   doubt of the guilt of Mr. Robert

14   Thomas Conrad of the capital

15   offense charged, then you should

16   utilize this second form of

17   verdict which reads as follows:

18         We, the jury, find the

19   Defendant, Robert Thomas Conrad,

20   guilty of the capital offense of

21   intentional murder by the

22   Defendant of Jelaine Bowman

23   Dennis during a robbery in the

24   first degree committed by the

25   Defendant in violation of

1  Section 13A-5-40(a)(2), the Code

2  of Alabama as amended, 1975, as

3  amended.

4  If this is your

5  verdict, and if this is your

6  unanimous verdict, then one of

7  your number would sign this

8  verdict form in the space

9  provided at the bottom as

10  foreperson, that that would be

11  your verdict.

12  If on the other hand,

13  if after considering all of the

14  evidence, that for the State and

15  that for the Defendant, Robert

16  Thomas Conrad, and if you find

17  that he is guilty of something,

18  but that -- as far as this

19  Offense One, but if you find

20  that he is not guilty of the

21  lesser but included offense, if

22  you find that he is not guilty

23  of the capital offense, but if

24  you find that he is guilty of a

25  lesser included offense of

1  murder in the intentional type,

2  then you should utilize this

3  next form of verdict, which

4  reads as follows:

5  We, the jury, find the

6  Defendant, Robert Thomas Conrad,

7  not guilty of the capital

8  offense of intentional murder by

9  the Defendant of Jelaine Bowman

10  Dennis during a robbery in the

11  first degree committed by the

12  Defendant in violation of

13  Section 13A-5-40(a)(2), the Code

14  of Alabama, 1975, as amended.

15  However, we, the jury,

16  find the Defendant, Robert

17  Thomas Conrad, guilty of the

18  lesser but included offense

19  embraced therein of murder of

20  Jelaine Bowman Dennis in

21  violation of Section

22  13A-6-2(a)(1), the Code of

23  Alabama, 1975, as amended.  That

24  would be your verdict if you

25  find that he is not guilty of

1    the capital offense of guilty of

2    the lesser but included offense

3    embraced therein of murder of

4    the intentional type,

5    intentional murder.

6         The next possible

7    verdict will be a lesser but

8    included offense.  We are

9    talking about felony murder.

10   So, if after considering all of

11   the evidence in this case, that

12   for the State and that for the

13   Defendant, if you have not been

14   convinced beyond a reasonable

15   doubt of the guilt of Mr. Robert

16   Thomas Conrad of the capital

17   offense charged him, but if you

18   have been convinced beyond a

19   reasonable doubt of the lesser

20   but included offense embraced

21   therein of felony murder, then

22   you should utilize this next

23   form of verdict which reads as

24   follows:

25        We, the jury, find the

1      Defendant, Robert Thomas Conrad,

2      not guilty of the capital

3      offense of intentional murder by

4      the Defendant of Jelaine Bowman

5      Dennis during a robbery in the

6      first degree committed by the

7      Defendant, in violation of

8      Section 13A-5-40(a)(2) the Code

9      of Alabama, 1975, as amended.

10     However, we, the jury, find the

11     Defendant, Robert Thomas Conrad,

12     guilty of the lesser but

13     included offense embraced

14     therein of felony murder of

15     Jelaine Bowman Dennis in

16     violation of Section 13A-6-2

17     (a)(1), the Code of Alabama,

18     1975 as amended.  If this is

19     your verdict, and if this is

20     your unanimous verdict then one

21     of your number would sign this

22     verdict form in the space

23     provided at the bottom as

24     foreperson.

25         The last lesser

1    included offense embraced within

2    the capital charge is robbery in

3    the first degree.  If after

4    considering all of the evidence,

5    that for the State and that for

6    the Defendant, and if you have

7    not been convinced beyond a

8    reasonable doubt of the guilt of

9    Mr. Robert Thomas Conrad as to

10   the charge of capital offense

11   charged of him, but if you have

12   been convinced beyond a

13   reasonable doubt of the lesser

14   but included offense embraced

15   therein of robbery in the first

16   degree, then you should utilize

17   this next form of verdict which

18   reads as follows:

19        We, the jury, find the

20   Defendant, Robert Thomas Conrad,

21   not guilty of the capital

22   offense of intentional murder by

23   the Defendant of Jelaine Bowman

24   Dennis during a robbery in the

25   first degree committed by the

1523

```
 1                    Defendant in violation of
 2                    Section 13A-5-40(a)(2), the Code
 3                    of Alabama, 1975, as amended.
 4                    However, we, the jury, find the
 5                    Defendant, Robert Thomas Conrad,
 6                    guilty of the lesser but
 7                    included offense embraced
 8                    therein of robbery in the first
 9                    degree of Jelaine Bowman Dennis
10                    in violation of Section
11                    13A-8-41(a)(1), the Code of
12                    Alabama, 1975, as amended.  If
13                    this is your verdict, and if
14                    this is your unanimous verdict,
15                    then one of your number would
16                    sign this verdict form in the
17                    space provided at the bottom.
18                         Now, as to Offense One,
19                    these are all of the
20                    possibilities.  I've gone over
21                    with you all of the
22                    possibilities.  You don't have
23                    to be a lawyer.  You don't have
24                    to be a Judge.  You don't have
25                    to know how to put a verdict in
```

1    legal form.  We have done that

2    for you.  There will be one

3    verdict rendered, you might say,

4    per staple.  There are two

5    offenses and I've got two -- I

6    didn't mean staples,

7    paperclips.  So those are all of

8    the possibilities as to the

9    Offense One charge.

10          Any questions by this

11   jury on the possibilities?  One

12   verdict will be rendered by this

13   jury.

14          We move on now to the

15   Offense Two charge.  And I will

16   explain the possible verdicts as

17   to it.  And there will be one

18   verdict rendered as to the

19   Offense Two charge.

20          If, after considering

21   all of the evidence as to

22   Offense Two, that for the State

23   and that for the Defendant, that

24   charge again is robbery in the

25   first degree.  And if you have

1    not been convinced beyond a

2    reasonable doubt of the guilt of

3    Mr. Robert Thomas Conrad of the

4    charge of robbery in the first

5    degree that's alleged against

6    him by way of indictment, then

7    you should utilize this first

8    form of verdict which reads as

9    follows:

10          We, the jury, find the

11    Defendant, Robert Thomas Conrad,

12    not guilty of robbery in the

13    first degree of Robert Ray

14    Grimes as charged in Offense Two

15    of the indictment in violation

16    of Section 13A-8-41(a)(1), the

17    Code of Alabama, 1975, as

18    amended.  If this is your

19    verdict, and if this is your

20    unanimous verdict then one of

21    your number should sign this

22    verdict form in the space

23    provide at the bottom as

24    foreperson of this jury.

25          If, on the other hand,

1   ladies and gentlemen of the

2   jury, if after considering all

3   of the evidence as to the

4   Offense Two charge of robbery in

5   the first degree, that for the

6   State and that for the

7   Defendant, and if you have been

8   convinced beyond a reasonable

9   doubt of the guilt of Robert

10  Thomas Conrad of the offense two

11  charge of robbery in the first

12  degree, then you should utilize

13  this second form of verdict

14  which reads as follows:

15        We, the jury, find the

16  Defendant, Robert Thomas Conrad,

17  guilty of robbery in the first

18  degree of Robert Ray Grimes as

19  charged in Offense Two of this

20  indictment in violation of

21  Section 13A-8-41(a)(1) of the

22  Code of Alabama, 1975 as

23  amended.  If this is your

24  verdict, and if this is your

25  unanimous verdict then one of

1    your number would sign this

2    verdict form in the space

3    provided at the bottom as

4    foreperson of this jury.

5              There will be, again,

6    one verdict rendered as to this

7    Offense Two charge.  One verdict

8    rendered as to the Offense One

9    charge.  Whatever verdicts you

10   may render, they must be

11   unanimous verdicts; for under

12   Alabama's law, there are no

13   proper verdicts in criminal

14   cases, other than a unanimous

15   verdicts.  That's not so in

16   every state, but that is the law

17   of this state.

18              Now, the law requires

19   me to get with these lawyers

20   right down here in front.  Y'all

21   can stand and stretch just a

22   minute.  I'm almost done.

23   Probably, I am done.  But the

24   law gives them a chance to come

25   and say, "Hey, Judge, you forgot

1528

1    something," or, "Judge, you

2    didn't explain something just

3    right" or, "Judge, would you go

4    over with them one other thing

5    and clarify one other thing."

6         We will see.  But I'm

7    required to get that in the

8    record.

9         Let the record reflect

10   that we are in the presence of

11   this jury, but out of the jury's

12   hearing.  What says the State?

13   MRS. STOUT:   The State is satisfied.

14   THE COURT:   What says the Defense?

15   MR. SMITH:   Satisfied, except requested

16        charges that were not given.

17   THE COURT:   That were not given.  Okay.

18        the Court finds that the

19        instructions covered everything

20        that the Court was legally

21        required to cover for the ladies

22        and gentlemen of the jury.

23             You are about to go

24        back.  You will have with you,

25        ladies and gentlemen, the

```
 1        verdict forms as I've stated to
 2        you.  You can stand up.  That's
 3        Okay.  I feel better standing
 4        up.  You will have with you all
 5        of the verdict possibilities as
 6        I've gone over with you, that
 7        I've gone over with you.  You
 8        are going to have all of the
 9        evidence back with you while you
10        deliberate and decide this
11        case.  You are going to have a
12        television.  Everything that
13        went into evidence you are going
14        to have that with you.  And you
15        can review it.  You can look at
16        it.  You can do with it what you
17        want.  You don't have to look at
18        it.  Again, if you have already
19        seen it and considered it.  But
20        you are going to have it all
21        back there with you.  And it's
22        going to take these court
23        reporters, it's their job, they
24        are the keepers of the
25        evidence.  It's going to take
```

1530

1    them just a minute while you go

2    back.  They have to check off

3    with these lawyers.  These

4    lawyers are going to come in and

5    say this went into evidence and

6    this went into evidence.  And

7    this didn't and this didn't and

8    all that kind of stuff.  And

9    they have to check off and make

10   sure only the things that went

11   into evidence are back there

12   with you while you deliberate

13   and decide these two cases.

14   Nothing more.

15            Do any of you have any

16   questions?

17            Probably the first

18   thing that you should do when

19   you get back there after we

20   announce the alternate, and I

21   don't know how that person is

22   going to feel.  They may want to

23   come up to me and whop me.  I

24   don't know.  They may be very

25   very appreciative and relieved.

1   I don't know.  We will just have

2   to wait and see.  But I will

3   first want to announce the

4   alternate in just a minute.

5              And, again, I don't

6   even know which one of you that

7   is.  But we will know in just a

8   minute.

9              But probably the first

10  thing that you should do when

11  you get back there would be to

12  decide among yourselves who

13  should serve as foreperson.

14  That person would certainly sign

15  any verdict that's rendered by

16  this jury and serve as basically

17  the spokesperson should the need

18  for that occur.

19              Where is our Clerk to

20  announced the alternate.

21  (The Clerk announced the

22  alternate).

23  THE COURT:   You can stay or you can go.

24  It's your call.

25              I would like to see how

1532

1  you feel, Mr. Bedsole, before we

2  get out of here.  I appreciate

3  your service very, very much.

4        With that, remember up

5  until this point in time, every

6  time we would take a break, I

7  would say you are not allowed to

8  discuss this matter among

9  yourselves nor allow anyone to

10  discuss it with you.

11        I know y'all are tired

12  of hearing that.  But I'm

13  required to say that.  So, we've

14  reached a point in this trial

15  where you are going to begin

16  deliberations, and you are going

17  to be talking among yourselves

18  about the issues of these two

19  separate cases.  So you may

20  begin at this time your

21  deliberations.

22        Before now you have

23  been dependent on us setting

24  your breaks and all that kind of

25  stuff.  We are dependent on you

1    now.  Y'all can set your own

2    breaks.  You can stay as long as

3    you choose.  You can come back

4    whenever you choose.  All you

5    need to do is let me know and we

6    will be here for you for that

7    purpose, any time and all the

8    time that you are here.

9              I'm making sure that I

10   haven't forgotten something.

11             There is only one rule

12   that I need to go over with

13   you.  And that rule would be

14   remember, I said that you could

15   take breaks as often as you need

16   to whatever.  The only rule is

17   if any of you need to go to the

18   restroom or whatever, then all

19   deliberations must cease until

20   you are all back together.  That

21   way everyone will have the

22   common benefit of all of the

23   deliberations.  I think that's

24   about it.

25             Any questions?

1   JUROR:  Will we have a copy of each

2            breakdown of how you --

3   THE COURT:  Of the law?

4   JUROR:  Yes, sir, Your Honor.

5   THE COURT:  You know some states,

6            remember I talked to y'all about

7            taking notes, I said in Alabama

8            we would do that, but we haven't

9            always been allowed to do that.

10           In some states, and I'm for

11           this, the Judge is required at

12           the beginning of the trial to

13           give the jurors a handout of

14           everything we expect to say.

15                But in Alabama, we are

16           not allowed to give a jury the

17           law, the jurors are just allowed

18           to listen to the Judge.  And let

19           me just say to you if any of you

20           want me to go back over the law,

21           I will be glad to do that.

22           However, I warn you that I'm not

23           allowed just to pick out a

24           little segment and talk to you

25           about that little bit of

1535

1    segment.  I'm required to go

2    back over with you a whole

3    section.  That way I'm not

4    allowed to unduly emphasize any

5    area of the law.

6         So if you have a

7    question, we will bring you back

8    out in the courtroom.  You can

9    ask that question.  And if it's

10   a matter of law, I will instruct

11   you as to that.  All of the

12   evidence is complete so we can't

13   open things backup.  Sometimes

14   jurors come back out and say,

15   Hey, Judge, would you please --

16   would you please let us ask a

17   question or whatever.

18        So, with that

19   understanding, any other

20   questions before we retire back

21   and deliberate and decide this

22   case, these two cases?  Okay.

23   With that, if y'all will file

24   out and go back to the jury

25   room.

1                   Again, it's going to

2           take us just a minute to get all

3           this evidence back to you.  As

4           soon as as you've reached two

5           verdicts, if you will please get

6           our attention, we will bring you

7           back out in the courtroom and

8           receive your two verdicts.

9           (Jury began their

10          deliberations).

11     THE COURT:  This court will come back to

12          order.  You may be seated.

13            Has this jury

14          deliberated and reached a

15          verdict as to each of the two

16          separate offenses?

17     FOREPERSON:  We have.

18     THE COURT:  And are each of these

19          verdicts unanimous verdicts?

20     FOREPERSON:  They are, sir

21     THE COURT:  Sheriff, will you bring me

22          the verdicts?  No matter what

23          your verdict may be, I am sure

24          they are just and fair.  And if

25          anyone feels like they cannot

1    contain themselves, restrain

2    themselves or whatever, you need

3    to leave right now.

4         Sheriff, if there are

5    any outbursts or anything, I

6    want you to take whoever it is

7    immediately into custody.  And I

8    will have their contempt hearing

9    shortly after we finish with

10   this.  We will start with

11   Offense Two of this indictment

12   and come back to Offense One.

13         The jury has

14   deliberated and returned a

15   verdict that reads as follows:

16         We, the jury, find the

17   Defendant, Robert Thomas Conrad,

18   guilty of robbery in the first

19   degree of Robert Ray Grimes, as

20   charged in Offense Two, of the

21   indictment in violation of

22   Section 13A-8-41(a)(1), the Code

23   of Alabama, 1975, as amended.

24   And that's signed, Jeff D. Hill.

25         Did I get that right?

1538

1    FOREPERSON:  Yes, sir,

2    THE COURT:    If this is your verdict, and

3         if this is your unnanimous

4         verdict, would you signify by

5         raising your hands?

6              Let the record reflect

7         that all 12 jurors have

8         signified that this is their

9         unanimous verdict.  This Court

10         finds that the verdict of this

11         jury is supported by the legal

12         and competent evidence presented

13         in the trial of case.  This

14         court will hereby pronounce,

15         declare, Robert Thomas Conrad

16         guilty of robbery in the first

17         degree in violation of Section

18         13A-8-41(a)(1), the Code of

19         Alabama, as charged in Offense

20         Two of the indictment.

21              We will move on now to

22         the capital charge.  This jury

23         has deliberated and returned a

24         unanimous verdict.  And the

25         verdict of the jury reads as

1    follows:

2    We, the jury, find the

3    Defendant, Robert Thomas Conrad,

4    guilty of the capital offense of

5    intentional murder by the

6    Defendant of Jelaine Bowman

7    Dennis during a robbery in the

8    first degree by, committed by

9    this Defendant in violation of

10    Section 13A-5-40(a)(2), the Code

11    of Alabama, 1975, as amended.

12    If this is your verdict

13    raise your hands.  The record

14    will reflect that this is the

15    unanimous verdict of this jury

16    and signed by Jack D. Hill as

17    foreperson.

18    Okay.  Ladies and

19    gentlemen, I know you probably

20    think in your minds that it's

21    time to go home.  But that is

22    not it.  We have had the guilt

23    phase.

24    Now we are down to what

25    we call the sentence phase.  The

1    sentence phase normally does not

2    take as long as the guilt phase.

3    But it's required by the

4    statutes of this State and maybe

5    to some degree by the Supreme

6    Court of the United States.  So,

7    what we will do just so you will

8    know, and let me back up and say

9    that this Court finds that the

10   verdict, the capital verdict, of

11   this jury is supported by the

12   legal and competent evidence

13   presented in the trial of this

14   case.  And the Court does hereby

15   pronounce, declare that Robert

16   Thomas Conrad is guilty of the

17   capital offense of intentional

18   murder by the Defendant of

19   Jelaine Bowman Dennis during a

20   robbery in the first degree

21   committed by the Defendant in

22   violation of Section

23   13A-5-40(a)(2) of the Code of

24   Alabama, 1975, as charged in

25   Offense One of the indictment.

1     Okay.  The sentence

2     phase will consist of the

3     following:  It will consist of a

4     presentation to you by the State

5     of what we call or what is set

6     out in the Code of Alabama as

7     aggravating circumstances.  The

8     State can also offer any

9     mitigating circumstances if it

10    chooses.  The Defense can offer

11    any evidence of any mitigating

12    circumstances.

13         We will then, after we

14    hear that, then we are going to

15    have opening remarks by the

16    prosecutor.  Then we will have

17    opening remarks by the Defense

18    as we did earlier.  And then we

19    will have any evidence presented

20    to you for aggravating and

21    mitigating factors can be

22    considered for your

23    consideration.

24         And then you will

25    retire back to the jury room

1542

```
 1              after we have had instructions
 2              to you on the law and closing
 3              remarks by counsel for both
 4              sides.  I will talk to you about
 5              the law, and you will consider
 6              the aggravating and certain
 7              mitigating circumstances and
 8              have a recommendation to this
 9              court of life without parole or
10              death by electrocution.  This is
11              called the sentence phase.  And
12              you have resolved the guilt
13              phase.  We are now in the
14              sentence phase at this time.
15                  Of course, I have no way of
16              knowing what your verdict was
17              going to be.  So it's going to
18              take me and my staff just a
19              minute to type up the possible
20              verdicts for you for this phase.
21              But we will get that to you very
22              readily.  Is the State ready to
23              proceed?
24         MR. JARRELL:  We are, Your Honor.
25         THE COURT:  Is the Defense ready to
```

```
 1              proceed?
 2        MR. SMITH:   Your Honor, we would ask for
 3              a few minutes.
 4        THE COURT:   Sure.  Take a few minutes.
 5              It's going to take me a few
 6              minutes.  If y'all would like to
 7              stand and stretch just a few
 8              minutes, please feel free to do
 9              so.
10        THE COURT:  This court will come back to
11              order.  You may proceed with
12              your opening remarks to the
13              jury.
14        MR. JARRELL:  Thank you, Your Honor.
15              Ladies and gentlemen, as the
16              Judge has already informed you,
17              this is the phase in which we
18              make our plea to you as to what
19              we feel like Mr. Conrad should
20              receive.  There are two
21              possibilities.  One is life
22              without the possibility of
23              parole and the other is death.
24              This is not something that any
25              of us in this courtroom like.
```

```
1                    It is a very serious decision

2              that you have to make and a very

3              serious decision that the Judge

4              has to make.

5                    But a lady's life was

6              taken, totally without any

7              reason, without any

8              justification.  And we expect to

9              show you that, and we have

10             already shown you.

11       THE COURT:   Please speak louder.

12       MR. JARRELL:   And we have already shown

13             you that this was a robbery, a

14             robbery in the first degree.

15             And we've shown you, that to be

16             a robbery in the first degree,

17             there had to be a theft; and

18             with that theft -- during the

19             course of that theft, a man was

20             armed with a deadly weapon, and

21             that during that robbery or in

22             the flight therefrom, a person

23             was killed and a person was

24             killed intentionally.  It wasn't

25             an accident.  It was
```

1545

```
 1              intentional.  I'm not going to
 2              stand here and belabor this
 3              longer.  That's what we've got
 4              to show you for you to be able
 5              to recommend a sentence of
 6              death.
 7                      We will talk more at
 8              the end of this, but that's the
 9              thing that we have to prove.
10              Was there a robbery?  Was there
11              a death?  And was that death in
12              part of or during that robbery
13              in the first degree.
14   THE COURT:  Okay.  Mr. Smith.
15   MR. SMITH:  I'm sorry, Judge.  I can't see
16              you.
17   THE COURT:  Sure.  I will move around.
18   MR. SMITH:  Ladies and gentlemen, I'm
19              trying to organize my thoughts.
20              It may be a lost cause but you
21              have to make a decision.  One,
22              to find that there is at least
23              one aggravating circumstance.
24              And then you have to balance
25              whether the aggravating
```

1    circumstance is such that you

2    recommend a sentence of death.

3    And if you do not and cannot

4    find that, then the sentence

5    would be life, would be life

6    without parole.  The Judge will

7    instruct you on these again.

8    And you have a tough decision to

9    make.  Thank you.

10    THE COURT:  Call you first witness or

11    make your first proffer, one or

12    the other.

13    MR. JARRELL:  I call Mr. Ray Grimes

14    THE COURT:  Mr. Grimes, you are still

15    under oath.

16    RAY GRIMES

17    DIRECT EXAMINATION

18    BY MR. JARRELL:

19    Q    Again, for these ladies and

20    gentlemen of the jury, would you state your

21    name?

22    A    Robert Ray Grimes.

23    Q    Mr. Grimes, on May 23 of 2001, were

24    you in a store on Highway 711 called the Toy

25    Store?

1547

1    A    I was.

2    Q    And while there, on that date --

3    A    Do what?  Yes.

4    Q    -- did someone come into that store

5    with a gun?

6    A    That's right.

7    Q    And what did he do with that gun

8    when he came in?

9    A    He come in the door holding the gun

10   at me, said, "Don't move."

11        He come on around and put the gun

12   to my temple.  Told her to give him the money.

13   Q    Told her?  Meaning Jelaine?

14   A    Told her.

15   Q    Jelaine?

16   A    Yeah.

17   Q    Okay?

18   A    So she opened the drawer and give

19   him the money.

20   Q    Did he take the money at that time?

21   A    Yeah.

22   Q    What did he do to you, sir?

23   A    Taken me in the back of the

24   building and laid me down.

25   Q    At gun point?

```
 1          A       Uh-huh.

 2          Q       Did he still have his gun?

 3          A       Yeah.

 4          Q       And then, what did you do next?

 5   And then, what did you hear next?

 6          A       Well, in just a little bit, I heard

 7   fire, you know, gunfire.  And then she said,

 8   "Ray, I'm dying."

 9                  And I got up there to her.  And he

10   took my billfold when he laid me down.

11          Q       And when you heard her say, "Ray,

12   I'm dying," after hearing the gunshots, did you

13   go to her?

14          A       I went to her.

15          Q       Did you see that she was mortally

16   wounded?

17          A       I went to her.  She was shot then,

18   you know.

19          Q       So this occurrence that happened on

20   May 23, 2001, you were robbed, Jelaine Dennis

21   was robbed and she was killed?

22          A       That's right.

23          Q       And she was killed from a deadly

24   weapon, a 9-millimeter pistol to your

25   knowledge?
```

1549

1      A      I don't know what kind.   It looked

2  like a big gun to me.   It was in my eyeballs.

3      Q      You knew Jelaine for a long time,

4  didn't you, sir?

5      A      About 15 or 16 years.   She started

6  working with me in '85, January '85.

7      Q      What was she doing for you at that

8  time?

9      A      Nurse.

10     Q      For whom?

11     A      My wife.

12     Q      Did she work for you until your

13 wife passed away?

14     A      Five years.

15     Q      Did y'all work together in the

16 store after that?

17     A      Yeah.

18     Q      She meant a lot to you, didn't she

19 sir?

20     A      Sir?

21     Q      She meant a lot to you, didn't she?

22     A      She sure did.

23     MR. JARRELL:   Your witness.

24     MR. SMITH:   Thank you.   I don't have any

25            questions.

1550

```
 1        MR. JARRELL:  For the record, may I ask

 2              any other questions?

 3        THE COURT:  Any objection?

 4        MR. SMITH:  No, sir.

 5        Q      (By Mr. Jarrell) This store was in

 6  the Enterprise Division of

 7  Coffee County, was it not, sir?

 8        A      Sir?

 9        Q      It was in the Enterprise Division

10  of Coffee County?

11        A      Yeah.

12        MR. JARRELL:  You may step down, Mr.

13              Grimes.

14                   At this point, Judge,

15              the State would like to readmit

16              all of the previous testimony

17              that has been presented in this

18              case.

19        THE COURT:  In the guilt phase?

20        MR. JARRELL:  In the guilt phase.

21        MR. SMITH:  We make the same objections

22              that we did during the guilt

23              phase, Your Honor.

24        THE COURT:  And the same rulings are

25              entered by the Court.  And the
```

```
 1              offer to submit on the evidence

 2              presented in the guilt phase is

 3              approved which means, ladies and

 4              gentlemen of the jury, you are

 5              to consider everything, all of

 6              the evidence that you considered

 7              in the guilt phase in this

 8              sentence phase, for the purposes

 9              of any decision that you may

10              render in this case.

11    MR. JARRELL:   We have one other witness

12              we would like to call.

13    THE COURT:  Call your next witness.

14    MRS. STOUT:   April Gunnels.

15    THE COURT:   I need for you to make a

16              proffer before you do that.

17    MRS. STOUT:  Okay.

18    THE COURT:   If y'all will approach the

19              bench.  Counsel approached the

20              bench.

21    THE COURT:  I don't know where are you

22              going, but you have evidence in

23              the other -- you cannot -- the

24              State is limited.  I'm telling

25              you right now if there is an
```

```
 1                     objection, I'm going to sustain

 2                     it.  Nothing else can be offered

 3                     as far as those circumstances,

 4                     except specific things

 5                     enumerated in the trial.

 6                     Anything else?

 7         MRS. STOUT:  Okay.

 8         THE COURT:  Do you have any other

 9                     witnesses?

10         MRS. STOUT:   No, Your Honor.

11         THE COURT:  Okay.  Does the State rest?

12         MRS. STOUT:  Yes, Your Honor.

13         THE COURT:  Okay.  Does the Defense have

14                     any witnesses?  Do you need a

15                     minute?

16         MR. SMITH:  I don't.

17         THE COURT:  Okay.  If you will come

18                     around please, ma'am.  And I

19                     will swear you in.

20                     Will you raise your right hand,

21    please place your left hand on the Bible.

22                     DOROTHY CONRAD

23         Whereupon, this witness, after first

24    being duly sworn to tell the truth, the whole

25    truth, and nothing but the truth, testified as
```

1553

1    follows, to-wit:

2                        DIRECT EXAMINATION

3    BY MR. SMITH:

4        Q       Please tell this jury who you are?

5        A       Dorothy McKenzie Conrad.

6        Q       Ms. Conrad, tell the jury what this

7    young man is to you?

8        A       My son.

9        Q       How old is he, Mr. Conrad?

10       A       Twenty-one.

11       Q       Twenty-one years old?

12       A       Yes.

13       Q       Has he just recently turned 21?

14       A       He turned 21 in September.  He will

15   be 22 this coming September 30th.

16       Q       He will be 22 September 30th?

17       A       Uh-huh.

18       Q       The end of this month?

19       A       Yes, sir.

20       Q       You love your son?

21       A       Yes, I do.

22       Q       Ms. Conrad, do you have a request

23   of this jury?

24       A       Yes, I do.

25       Q       I want you to look them in the eye.

1554

1   And I want you to tell them what's on your

2   heart.

3      A   This is my son, Robert Conrad.

4   Please don't put my son to death.  My son did

5   not do that.  I raised my son.  I raised four

6   boys and one girl by myself, with the help of

7   the Lord.  And I never had no problems out of

8   my son.  And he never asked me for anything.

9   If he needed anything he would -- like, money,

10   he would come and ask me for it, or if he

11   needed some clothes, he would come ask me.  I

12   would buy it.  I always tried to provide

13   whatever my kids need.

14      Q   Ms. Conrad, this jury has said

15   Robert's guilty.  We have to live with that.

16      A   Okay.

17      Q   Do you ask this jury not to

18   recommend that he die?

19      A   Yes.  Please don't let my son die.

20   He's my oldest son.  I haven't never had any

21   problems out of him.  I always tried to make

22   him stay in school and do his work.  And he

23   always been smart around the house.  Please

24   don't send my son to die.

25      Q   Ms. Conrad, you have been sitting

1    over there in the courtroom right behind us

2    throughout this trials, haven't you?

3         A    Yes, sir.

4         Q    And Robert has been sitting over

5    there next to me most of the trial, reading a

6    book, has't he?

7         A    Yes, sir.

8         Q    Would you tell the jury what he has

9    been reading during this trial?

10        A    The Bible.  He always read the

11   Bible.  I raised my kids up in church.  And I

12   always taught them right from wrong.  And they

13   never taken no one else's life.  And they never

14   taken nothing from no one else.

15        Q    Let me backup, Ms. Conrad.  You've

16   got to live with this.  This jury said he did

17   it.

18        A    My son did not do that.

19        Q    Well, this jury said he did it.

20   And we are in the punishment stage.  And we are

21   all kind of in shock.  But I just want you to

22   listen to me and answer my questions.  I've got

23   one more question.  Tell the Judge what that

24   book is that he has been reading through this

25   trial?

1556

1        A      The Bible.  The New Testament.

2        Q      Read on the front what it says?

3        A      Bible New Testament.

4        Q      Do you know where he got this

5 particular book, if you do?

6        A      No, I don't.

7     MR. SMITH:  That's all.

8     MRS. STOUT:  We have no questions.

9     THE COURT:  You may step down.

10                  Call your next

11            witness.

12     MR. SMITH:  Nothing further, Your Honor.

13     THE COURT:  Nothing further?

14     MR. SMITH:  No, sir.

15     THE COURT:  The attorneys have the right

16            to come back before you and make

17            what we call closing remarks as

18            we stated earlier today.

19                The State may proceed

20            in your closing remarks

21     MRS. STOUT:  Ladies and gentlemen of the

22            jury, I know that you are

23            tired.  And again from the

24            District Attorney's Office and

25            for the Twelfth Circuit and for

1557

```
 1              the people of Coffee County, I

 2              thank you.  I know that this has

 3              been a tough decision for you.

 4                     Now, as you go back and

 5              you begin your deliberations on

 6              this, ten of you must decide,

 7              instead of the 12, ten of the 12

 8              must come back with a decision.

 9              And that is a recommendation for

10              the Judge.  I want you to

11              understand that.

12        MR. SMITH:  Judge, I object --

13         THE COURT:  Sustained.

14        MR. SMITH:   -- to her telling the

15              responsibilities of the jury.

16         THE COURT:   Ladies and gentlemen your

17              duty is a very, very serious

18              duty.

19        MRS. STOUT:   It is a serious duty and

20              just --

21         THE COURT:  Let me stop you.  And the

22              comments that counsel just made,

23              that is a recommendation, is

24              there any juror that cannot wipe

25              that out of your mind, raise
```

1558

1    your hand.  I order that you not

2    consider that statement in any

3    decision that you may render in

4    this case.  This is a most

5    serious phase of this matter.

6    And it cannot be minimized by

7    counsel.

8    MRS. STOUT:  And I did not intend to

9    minimize this because it is

10   serious.  Just as serious as the

11   one that you have just taken,

12   when you returned the verdict.

13   And I know that you have

14   listened to the evidence.

15         And as I stand before

16   you, I ask when you go back

17   there, that you remember what

18   you heard from the stand.  Look

19   at the evidence, and when you

20   come back before the Court and

21   render your verdict, I ask that

22   you think about the heinous

23   crime that was committed.  I ask

24   that you think about Ms. Dennis

25   as she lay on that floor,

1559

1     helpless, with the barrel of

2     that gun in her chest, after she

3     had already been robbed.

4          It is a very sad thing

5     for the family members of Robert

6     Conrad.  That cannot be taken

7     lightly.

8     THE COURT:  Please speak up, if you

9          will.

10    MS. STOUT:  But it is also a sad day for

11         the family members of Jelaine

12         Dennis.  And as I said in my

13         closing earlier, Jelaine Dennis

14         had no choice.  Robert Conrad

15         did.  I ask that you return your

16         verdict of death.  Thank you.

17    THE COURT:  Defense.

18    MR. SMITH:  Ladies and gentlemen, you

19         know you don't know what to do

20         when you are in a situation like

21         this.  I mean there is just

22         nothing that I can say that will

23         make this young lady's life any

24         better or bring her momma back.

25         There is nothing we can do.  And

1560

```
 1            I've prosecuted a lot of murder
 2       cases, and I've prosecuted a lot
 3       of dope cases, and I've defended
 4       cases.  Judge McAliley appointed
 5       me and Mr. Bradshaw to represent
 6       Mr. Conrad.  And it's kind of
 7       like he told y'all when we first
 8       came here as venire you wonder,
 9       why me and why me and why me.
10       But, I chose to be a lawyer and
11       I held up my hand and took an
12       oath that I would represent my
13       client and I've done that and I
14       cannot tell you that I've gotten
15       emotionally close to that young
16       man, but I've certainly gotten
17       feelings from him as I've sat
18       over there.  And I've accused
19       lawyers of putting onions in
20       their client's handkerchiefs and
21       putting it up in front of their
22       nose and crying, and, you know,
23       everything else in the world.
24       But, I know I didn't give him
25       that Bible.  He came into the
```

1    courtroom with it.  He's been

2    reading it and I don't know

3    what's in his heart or his

4    soul.  The Good Lord, only knows

5    that.  I do know you've got a

6    tough job.  And we have to go by

7    the law.  And y'all have made a

8    decision that he is guilty of

9    the crime he's charged.  And

10   what I think about that is

11   irrelevant.  It doesn't matter.

12   I have to put that aside and I

13   have to defend him in this

14   phase.  It's like a whole new

15   trial for me.  I've got to do

16   like that little lap-top

17   computer I've got over there and

18   wipe everything that's done

19   before in my mind, and reboot it

20   and we program it, whatever it

21   is these computer people talk

22   about.  But the law, the perfect

23   program we've got to talk about,

24   says that you've got to find at

25   least one aggravating

```
 1                    circumstance.  And the State has
 2                    said that the aggravating
 3                    circumstance is the death
 4                    committed during the course of
 5                    robbery.  I'm not going to
 6                    insult your intelligence by
 7                    trying to talk you out of that.
 8                    But, then it says that you have
 9                    to weigh the aggravating
10                    circumstance against the
11                    mitigating circumstances and the
12                    mitigating circumstances that
13                    the Code has in it.  Because it
14                    can't be limited to this.  But
15                    two of them.  The Defendant has
16                    no significant history of prior
17                    criminal activity.  And you
18                    heard his momma and it's
19                    uncontroverted that he has no
20                    significant prior criminal
21                    activity.  He's a young man.  I
22                    know when I was his age, I
23                    probably worried my mom to death
24                    thinking that I was grown.  I
25                    had a job and not too many years
```

1563

 1    down the road, started having

 2    children.

 3              But at 54, he is a

 4    young man.  I'm 54.  He's a

 5    young man.  Hiss age is a

 6    mitigating circumstance that you

 7    are allowed by the Code, by the

 8    law, that I just ask you to

 9    consider.

10              And then it boils down

11    to what are you going to do with

12    him.  You know the most merciful

13    thing would probably be to take

14    Jack Herbert's gun over there

15    and just walk over there and

16    shoot him.  And then some of you

17    may feel like that would be

18    justice, too.  I don't know.

19              But the choices are,

20    he's 21 years old.  He goes to

21    the penitentiary for the rest of

22    his life and stays in a death --

23    capital murder confinement cell

24    for the rest of his life.  And I

25    don't know what the folks that

1    know more than I do.  The

2    typical mortality tables, and

3    they tell us how long he's

4    suppose to live.  And I don't

5    know the average life

6    expectancy, how long they are

7    suppose to live.  Or they take

8    him down to Holman prison, and

9    they put him in a chair made out

10   of wood and painted yellow and

11   they shave his head.  And they

12   put leather straps on him and a

13   sponge soaked in salt water up

14   under a metal cap and latched

15   that down on his head.  Somebody

16   flips a switch, pushes a button

17   and electric flows through him.

18   And from what they have told us

19   sometimes, they catch on fire.

20   And that's still not going to

21   bring Jelaine Bowman Dennis

22   back.  I don't know.  It might

23   be more kind.

24        And Mrs. Conrad's still

25   back in that room because she's

1  hardly with us anymore.  I don't

2  know whether it might be more

3  merciful to her to take that gun

4  and shoot him.

5       But we only have two

6  choices.  I know we all have to

7  live with the decision.  I'm

8  glad I'm not over there.  I'm

9  glad I'm over here.

10       I told you my first

11  thought when Judge appointed me

12  was, why me.  And I'm still

13  thinking that.  But I'm glad I'm

14  not over there.  Y'all have the

15  to make a decision.

16       And Mr. Jarrell or Mrs.

17  Stout is going to have the last

18  say because they have the burden

19  of proof, and they get to go

20  first and last.  And this is the

21  only time that you are going to

22  hear from Robert Conrad's

23  Defense.  The last time.  You

24  will never hear another word

25  from us.

1566

```
 1                           I ask you to reach deep
 2              down in your soul, is it
 3              vengeance we are looking for?
 4              Is it putting him in the
 5              electric chair?  Or is it life
 6              without parole?  Which would be
 7              justice?  Will that be justice?
 8                      Ladies and gentlemen
 9              I'm just flat asking you.  I
10              don't know any other way.  I'm
11              just asking you to come back
12              with a recommendation of life
13              without parole and not the death
14              penalty.  Again, if I've
15              offended anybody, I'm sorry.
16              I'm an old country lawyer.  I
17              just do the best I can.  Don't
18              hold it against Robert Conrad
19              for my weakness.
20      THE COURT:  Mr. Jarrell.
21      MR. JARRELL:  Your Honor, Mr. Smith, I
22              commend Mr. Smith on his
23              eloquence.
24      THE COURT:  Please speak up.
25      MR. JARRELL:  Eloquence is not the
```

1567

```
 1                    test.  I know the good book
 2                    tells us that we render first
 3                    under --
 4        THE COURT:  Again, if you will please
 5                    speak up.
 6        MR. JARRELL:   We follow the law.  And
 7                    the law says there is a choice.
 8                    There are two sentences that can
 9                    be rendered.
10                        Mr. Conrad knew what
11                    those options were before he
12                    shot and robbed Jelaine Dennis.
13                    I don't think in this country by
14                    the time they get through high
15                    school are not aware of the
16                    wages of that sin.  I don't
17                    think it's hardly fair for you
18                    to be put in a position of
19                    almost a guilt trip for doing
20                    your duty.
21        THE COURT:  Please speak up.
22        MR. JARRELL:  You do not have to feel
23                    guilty for doing your duty.
24                    Heaven knows, I don't gain any
25                    pleasure standing here asking
```

1   you to come back with this death

2   penalty.  It's something that I

3   have to pray about.  I have to

4   live with.  But I have to do my

5   duty. I'm not telling you that

6   you have a duty to come back

7   with one or the other.

8          But I think that you've

9   got to weigh, as we've said, you

10  have to weigh the mitigating

11  factors against the aggravating

12  factors.  The aggravating

13  factors, you have already

14  basically agreed on.  You found

15  him guilty of capital murder and

16  a first degree robbery, and a

17  killing as a result of that. You

18  have already said there are

19  aggravating factors there.

20          Now, how does that

21  weigh against his age?  Well,

22  he's young.  We can't deny that.

23  But Ms. Jelaine wasn't old.  She

24  had a long life to live.  She

25  had children to raise and

```
1        grandchildren, even though she
2        wasn't a very old lady.
3               There are things that
4        you've got to take into
5        consideration when you're
6        weighing the mitigating factors
7        against the aggravating factors.
8               I don't know how to do
9        this, what I'm getting ready to
10       do.
11              Al, would you come up
12       to the bench?  I don't want to
13       do something wrong here.
14       (Counsel approached the bench,
15       and the following was heard in
16       the presence of, but out of the
17       jury's hearing).
18   MR. JARRELL:  Is the State allowed to go
19              into lethal injection?
20   THE COURT:  You can't get into that.
21   MR. JARRELL:  Okay.
22   THE COURT:  Let the record reflect that
23              was in the presence of the jury,
24              but out of the jury's hearing.
25   MR. JARRELL:  In a case like this, ladies
```

1570

1  and gentlemen, you have to be

2  very careful.  And I would

3  rather err on the part of

4  caution.

5          But this family here

6  today, this young lady, and the

7  family sitting out there, are

8  asking you for justice.  And

9  they don't believe that putting

10  him in prison for the rest of

11  his life equates to justice that

12  they believe they are entitled

13  to.  And we're asking for the

14  death penalty.  Thank you.

15  THE COURT:  Ladies and gentlemen, again,

16  I'm going to talk to you about

17  the law.  In talking to you

18  about the law, I also want to

19  remind you of the instructions

20  that I gave you earlier in the

21  guilt phase, so I don't have to

22  go back through all of that,

23  again.

24          However, if any of you

25  at any time want me to go back

1   through any of those

2   instructions, I will be more

3   than glad to do that.

4           I'm not going to charge

5   you, though, on the principles

6   of the law of the capital

7   offense that was charged Mr.

8   Conrad in the indictment in

9   Offense One.  Because that

10  question of fact has already

11  been discerned by you, the

12  ladies and gentlemen of this

13  jury.

14          Part of your function

15  has already been accomplished by

16  you, in many capital matters

17  that have, as in this specific

18  capital offense, you have

19  already made a finding of fact.

20          It has already been

21  proven, you've already found in

22  your finding of guilt that there

23  is one aggravating circumstance.

24  And that aggravating

25  circumstance that you have found

```
 1        to be fact beyond a reasonable
 2        doubt is that the capital
 3        offense was committed while the
 4        Defendant was engaged in, or was
 5        an accomplice in the commission
 6        of, or flight after committing a
 7        robbery in the first degree.
 8        You found that to be fact in two
 9        separate cases, two separate
10        offenses.
11             So there are two
12        aggravating circumstances of the
13        same name that you've already
14        found to be fact beyond a
15        reasonable doubt.  And that will
16        become important in just a few
17        minutes.  Because, normally,
18        when a Judge gives instructions
19        to you about aggravating
20        circumstances, it doesn't mean
21        that one has been proven.  But
22        one has already been proven to
23        be fact beyond a reasonable
24        doubt, already.  And that is,
25        again, that the capital offense
```

1    was committed while the

2    Defendant was engaged in and was

3    an accomplice in the commission

4    or a flight after committing,

5    not just one robbery, but two

6    separate robberies in the first

7    degree.  You've already made

8    that finding tonight in the

9    guilt phase.

10         Okay.  So I'm required

11    to go through the law with you,

12    but just please keep that in

13    your mind, that there has

14    already been a finding of two

15    aggravating circumstances when I

16    talk to you about aggravating

17    and mitigating circumstances,

18    you've already made that

19    finding.

20         The law of this State

21    provides that punishment for the

22    capital offense for which you've

23    convicted the Defendant, Robert

24    Thomas Conrad, is either death

25    by electrocution or life

1574

1    imprisonment without eligibility

2    of parole.  The law also

3    provides that which of these two

4    punishments should be invoked

5    upon the Defendant, depends on

6    whether any aggravating

7    circumstances exist, and I tell

8    you, you've already found two

9    aggravating circumstances exist.

10   And if so, whether the

11   aggravating circumstances, which

12   you find exist, and you've

13   already made that finding,

14   whether the aggravating that

15   you've already found exist,

16   outweigh, weigh more than the

17   mitigating circumstances that

18   have been offered here tonight.

19

20        Now, under Alabama law,

21   an aggravating circumstance is a

22   circumstance that's specified by

23   law.  The State is limited.

24   That's why I called them up here

25   and said, "Huh-uh," a few

1    minutes ago.  They are very,

2    very limited on what they can

3    establish as being an

4    aggravating circumstance for

5    you, very limited.  There are

6    only about four things or so

7    that they can even talk about

8    before you.  So an aggravating

9    circumstance is a circumstance

10   testified, by law, a very

11   limited category, which

12   indicates or tends to indicate

13   that the Defendant should be

14   sentenced to death.

15         On the other hand, a

16   mitigating circumstance is any,

17   in other words, the Defense can

18   show any mitigating

19   circumstance.  It doesn't have

20   to be set out in the Code of

21   Alabama.  It can be any

22   circumstance that would help you

23   decide that the sentence should

24   be life without parole, instead

25   of death.  Does everybody

```
 1            understand that?  Any

 2            circumstance.  Anything.

 3                    The evidence that was

 4            offered to you in the trial of

 5            the guilt phase has been

 6            reoffered and is to be

 7            considered by you at this phase

 8            so we don't need to go trough

 9            it, again.  You've heard it.

10            You are to take that with you

11            back there.  And you are to

12            consider everything that you've

13            heard.  For instance, his age

14            came out.  And you will hear me

15            read the section on the age of

16            the Defendant in a few minutes.

17            That is a mitigating

18            circumstance.  And you heard

19            what that was.  And you've seen

20            for your eyes what that was.  So

21            you are to consider whether

22            that's a mitigating

23            circumstance, for instance.  Any

24            factor that you find to be fact

25            is a mitigating circumstance.
```

```
 1                            I want to read to you

 2                    the law what a mitigating

 3                    circumstance is.  A mitigating

 4                    circumstance is any circumstance

 5                    that indicates or tends to

 6                    indicate that the Defendant

 7                    should be sentenced to life

 8                    imprisonment without parole

 9                    instead of death, any.

10                            The issue that this

11                    sentence hearing concerns

12                    circumstances of aggravation and

13                    circumstances of mitigation that

14                    you are to consider and weigh

15                    against each other in deciding

16                    what the proper punishment is in

17                    this case.  In making your

18                    recommendation concerning what

19                    the punishment should be, you

20                    must determine whether an

21                    aggravating circumstance exists.

22                    And you've already done that,

23                    when you found two.  They are

24                    one in the same.  That is that

25                    there are two separate -- that
```

1578

1    the capital offense was engaged

2    in or was an accomplice in the

3    commission of or flight after

4    committing a robbery in the

5    first degree, two times.  Two

6    robberies in the first degree.

7              Okay.  So you have

8    made that determination already.

9    You have to decide whether there

10   were any mitigating circumstance

11   or circumstances exist at this

12   point.  In making your

13   determination concerning the

14   existence of mitigating

15   circumstances, when considered

16   next to the aggravating

17   circumstance that you've already

18   found to exist, you should

19   consider the evidence presented

20   at this sentence hearing.  You

21   should also consider the

22   evidence that was considered

23   during the guilt phase of this

24   trial that is relevant to the

25   existence to any aggravating or

1579

1          mitigating circumstance.

2                 The law of this State

3          provides a list of aggravating

4          circumstances, which I've

5          already told you, and you've

6          already made that finding of

7          fact beyond a reasonable doubt.

8                 So I say to you the

9          aggravating circumstance, which

10         you may consider in this case,

11         and which you've already found

12         to be fact beyond a reasonable

13         doubt, is what I've already told

14         you.

15                 So we will move on now

16         to the mitigating circumstances.

17         I tell you that the burden of

18         proof has at all times been on

19         the State to prove beyond a

20         reasonable doubt.  And I ask you

21         to remember that definition of

22         reasonable doubt whenever I talk

23         to you about this.  Because the

24         State has had to prove to you

25         beyond a reasonable doubt that

1   there is an aggravating

2   circumstance.  And they've

3   already done that, beyond a

4   reasonable doubt, they've made

5   that finding.  So please

6   remember that definition.  Now

7   then, the law of this State

8   provides a list of mitigating

9   circumstances, also.  It

10  provides a list of aggravating

11  circumstances the State states

12  its sentence recommendation

13  argument on the one that you

14  have already found to be fact.

15  That's it.

16      So now we move on to

17  see if there are any mitigating

18  circumstances.  Now, the law of

19  this State provides a list of

20  some of the, some of the

21  mitigating circumstances which

22  you may consider.  But that list

23  is not a complete list of

24  mitigating circumstances that

25  you are to consider.

```
 1                    I'm going to read to

 2           you a list of the mitigating

 3           circumstances that are set out

 4           in the Code of Alabama.  That

 5           law book that Mr. Bradshaw has

 6           in his hand.  It's the Code of

 7           Alabama.  He's probably

 8           following along with me.  And

 9           I'm going to read every one of

10           them to you.  It's not going to

11           take too long.  But I'm telling

12           you, you are not bound by just

13           those.  Anything you find to be

14           fact, that you consider

15           mitigating, you can use in

16           deciding the sentence phase.

17                    Number one, the first

18           possibility is the Defendant has

19           no significant history of prior

20           criminal activity.  So just

21           because I read these to you

22           doesn't mean that I'm telling

23           you that this is a mitigating

24           circumstance.  It's just a

25           question for you to decide, hey,
```

1582

```
 1            is that a mitigating

 2            circumstance.  So the first one,

 3            has it been proven beyond a

 4            reasonable doubt, the

 5            aggravating circumstances.  And

 6            we are going to talk of the

 7            lesser requirement is proved for

 8            mitigating circumstances.

 9            Basically, I will go over that

10            with you in a minute.  But I

11            will read the list:  The

12            Defendant has no significant

13            history of prior criminal

14            activities is the first one

15            listed in the code.

16                 Some of these things,

17            you might find apply, and some

18            of these things, don't apply.

19                 Number two, the capital

20            felony was committed while the

21            Defendant was under extreme

22            mental or emotional disturbance.

23            In some cases we Judges have,

24            that's the situation.  You might

25            find it applies in this case.
```

```
 1              You might find that it doesn't.
 2                   Number three, that the
 3         victim was a participant in the
 4         Defendant's conduct or consented
 5         to the act.
 6                   Number four, the
 7         Defendant was an accomplice in
 8         the capital offense committed by
 9         another person, and his
10         participation was relatively
11         minor.
12                   Number five, the
13         Defendant acted under extreme
14         duress or under substantial
15         domination of another person.
16                   Number six, the
17         capacity of the Defendant to
18         appreciate the criminality of
19         his conduct or to conform his
20         conduct the the requirements of
21         law was substantially impaired.
22         A person's capacity to
23         appreciate the criminality of
24         this conduct or to conform his
25         conduct is a requirement of law
```

1584

1    is not the same as his ability

2    to know right from wrong,

3    generally, or to know what he's

4    doing at at given time, or to

5    know what he's doing is wrong.

6    A person may indeed know that

7    doing the act that constitutes a

8    capital offense is wrong and

9    still not appreciate his

10   wrongfulness because he does not

11   fully comprehend, or is not

12   fully sensible to what he's

13   doing or how wrong it is.

14   Further, for this mitigating

15   circumstance to exist, the

16   Defendant's capacity to

17   appreciate does not have to have

18   been totally liberated.  It's

19   enough that it was substantially

20   lessoned, or substantially

21   diminished.

22         Finally, this

23   mitigating circumstance will

24   exist even if the Defendant did

25   appreciate the criminality of

1    his conduct if his capacity to

2    conform to the law was

3    substantially impaired.  Since

4    the person may appreciate that

5    his actions are wrong, and still

6    lack the capacity to refrain

7    from doing that wrong.

8         And the last one listed

9    in the Code of Alabama, number

10   seven, the age of the Defendant

11   at the time of the crime.

12        A mitigating

13   circumstance does not have to be

14   included in the list I just gave

15   you in order for it to be

16   considered by you, the ladies

17   and gentlemen of this jury.

18        In addition to the

19   mitigating circumstances that

20   I've specified and read to you

21   from the Code of Alabama,

22   mitigating circumstances shall

23   also include any aspect of the

24   Defendant's character or record

25   or any of the circumstances of

1586

1   the offense of the Defendant

2   offers of the basis for a

3   sentence of life imprisonment

4   without parole instead of death.

5                A mitigating

6   circumstance considered by you

7   should be based on the evidence

8   you heard.  When the factual

9   existence of an offered

10  mitigating circumstance is in

11  dispute, the State shall have

12  the burden of disproving the

13  factual existence of that

14  circumstance by a preponderance

15  of the evidence.  That's

16  different from beyond a

17  reasonable doubt.  The State has

18  to prove an aggravating

19  circumstance exists beyond a

20  reasonable doubt.  And I

21  instruct you that that has

22  already been accomplished.

23                On the other hand,

24  the Defense has to prove to you

25  that there is a mitigating

```
 1          circumstance or mitigating
 2          circumstances based on a
 3          preponderance of the evidence
 4          and not beyond a reasonable
 5          doubt.
 6                      So what is a
 7          preponderance of the evidence?
 8          It means that you are to
 9          consider that the mitigating
10          circumstance does exist, unless
11          taking the elements as a whole,
12          it's more likely, than not, that
13          the mitigating circumstance does
14          not exist.
15                      Therefore, if there is
16          a factual dispute over the
17          existence of a mitigating
18          circumstance, then you should
19          find and consider that
20          mitigating circumstance, unless
21          you find the evidence is such
22          that it is more likely than not
23          that the mitigating circumstance
24          does not exist.  That's what we
25          mean by a preponderance of the
```

1588

1    evidence.

2            Only an aggravating

3    circumstance must be proven

4    beyond a reasonable doubt, which

5    you've already found.

6            And, again, I told you

7    that the burden is on the State

8    to prove, beyond a reasonable

9    doubt, an aggravating

10   circumstance, which is already

11   done by your findings earlier

12   tonight.

13           In reaching you

14   findings concerning an

15   aggravating and mitigating

16   circumstances in this case, and

17   I advise you, again, you've

18   already made a finding as to the

19   aggravating circumstances, and

20   in determining what to

21   recommend, what the punishment

22   in this case should be, you must

23   avoid any influence, or passion,

24   prejudice, or any other

25   arbitrary factors.

1589

1      Your deliberations and

2      verdicts should be based upon

3      the evidence that you have seen

4      and heard from those places that

5      I told you the evidence would

6      come from in this case.

7      While it's your duty to

8      follow instructions, which this

9      Court has given you, no

10     statement, no questions, no

11     rulings, no remarks, and no

12     other expressions that I may

13     have made at any time during

14     this trial, either the guilt

15     phase or during this sentence

16     phase is intended to indicate

17     any opinion of what the facts

18     are, or what the punishment

19     should be.  It is your

20     responsibility.  And that

21     responsibility should in no way

22     by any lawyer or any one be

23     diminished.  It's your

24     responsibility to determine the

25     facts and it's your

1      responsibility to recommend the

2      punishments.  And doing so, you

3      should not be influenced in any

4      way by what you may imagine to

5      be my views on such subjects.

6           The process of weighing

7      aggravating and mitigation

8      circumstances, one against the

9      other, in order to determine the

10     proper punishment is not a

11     mechanical process.

12           Your weighing of the

13     circumstances, one against the

14     other, should not consist of

15     merely adding up the number of

16     aggravating circumstances and

17     comparing that number to the

18     number of mitigating

19     circumstances.  The law of this

20     State recognizes that it's

21     possible in at least some

22     circumstances, situations that

23     one aggravating circumstance you

24     might find outweighs a large

25     number mitigating circumstances.

1       The law of this State

2   also recognizes that it's

3   possible in at least some

4   situations that more than one

5   aggravating circumstance might

6   be outweighed by just one

7   mitigating or a few mitigating

8   circumstances.

9       In other words, the law

10  contemplates that different

11  circumstances may be given

12  different weights by you or

13  different values by you in

14  determining the sentence in this

15  case.

16      And you, the jury, are

17  to decide what weight and what

18  value is to be given to a

19  particular circumstance in

20  determining the sentence in

21  light of all of the

22  circumstances in this case.  You

23  must do that in the process of

24  weighing the aggravating

25  circumstances against the

1592

1    mitigating circumstances.

2           In order to bring back

3    a verdict recommending the

4    punishment of death, at least

5    ten of your number must vote for

6    death.  In other words, a

7    verdict of death must be

8    unanimous, all 12 of you, or 11

9    for death and one for life

10    without parole or ten for death,

11    and two for life without parole.

12    Any number less than ten, cannot

13    recommend the death penalty.

14           Does everybody

15    understand?  All are nodding

16    their heads.

17           In order to bring back

18    a verdict recommending a

19    sentence of life imprisonment,

20    without parole, there must be a

21    concurrence of at least seven of

22    your number for that sentence.

23           In other words, in

24    order for a verdict to be

25    returned recommending

1    imprisonment or life without

2    parole, it must either be

3    unanimous, in other words, 12,

4    for life without parole; or 11

5    for life without parole, and one

6    for death; or ten for life

7    without parole, and two for

8    death; or nine for life without

9    parole, and three for death; or

10   eight for life without parole,

11   and four for death; or seven for

12   life without parole, and five

13   for death.

14        Any number less than

15   seven cannot recommend life

16   without parole.

17        Does everybody

18   understand?

19        The fact that the

20   determination of whether ten or

21   more of you can agree to

22   recommend the sentence of death,

23   or seven or more of you can

24   agree to recommend the sentence

25   of life without parole can be

1    reached by a single ballot.

2    That fact, if you agree to that,

3    should not influence you to act

4    hastily or without due regard to

5    the gravity of these

6    proceedings.

7              You should hear, you

8    should consider the views of

9    your fellow jurors.  Before you

10   vote you should carefully weigh,

11   you should carefully sift, you

12   should carefully consider the

13   evidence. And realizing that a

14   human life is at stake, and you

15   should bring to bear your best

16   judgment.  And I know you will.

17              The issue, again, is

18   whether the Defendant should be

19   sentenced to life imprisonment

20   without parole or death.

21              In addition to the

22   recommendation of either death

23   or life imprisonment without

24   parole, your verdict forms that

25   I'm going to give you, and I

1  have them right here, must

2  contain the numerical vote, not

3  who voted in what way, but the

4  actual count, the actual number.

5  Now, if after full and

6  fair consideration of all of the

7  evidence in this case you are

8  convinced beyond a reasonable

9  doubt that at least one

10  aggravating circumstance does

11  exist, and I am instructing you

12  that you have already found

13  beyond a reasonable doubt that

14  two aggravating circumstances in

15  fact exist.  They are called the

16  same thing.  That being that the

17  capital offense was committed

18  while the Defendant was engaged

19  in, or was an accomplice in, the

20  commission of or flight after

21  committing a robbery in the

22  first degree.  You have made

23  those two findings of fact,

24  already.

25  So I tell you, if you

1    find that those aggravating

2    circumstances that you've

3    already found to be fact

4    outweighs the mitigating

5    circumstances that you find to

6    be fact, your verdict would be

7    as follows.  And I have it in my

8    hand at this time.

9         We, the jury, recommend

10   that the Defendant, Robert

11   Thomas Conrad, be punished by

12   death.  The roll is as follows.

13        And my secretary

14   misspelled "is".  The vote is as

15   follows:  Death.  And you would

16   fill in the numerical number

17   that voted for death; life

18   without parole.  And you would

19   fill in the numerical number

20   that voted for life without

21   parole.

22        But if you return a

23   recommendation of death, this is

24   the verdict form that you would

25   return to the Court.  And,

1  again, your foreperson would

2  sign this verdict in the space

3  provided at the bottom, as

4  foreperson.

5      On the other hand, if

6  after full and careful

7  consideration of all of the

8  evidence in this case, that for

9  the State and that for the

10  Defendant, and if you find -- I

11  hope my secretary has gone to

12  correct that mistake.  If you

13  find that the mitigating

14  circumstances that you find to

15  be fact, outweigh the

16  aggravating circumstances that

17  you have already found to exist,

18  your verdict would be to

19  recommend punishment of life

20  imprisonment without parole.

21  And the form of verdict would

22  read:  We, the jury, recommend

23  that the Defendant, Robert

24  Thomas Conrad, be punished by

25  life imprisonment without

1598

1  parole.  The vote is as follows,

2  and would write down the

3  numerical number that voted for

4  death.  And you would write down

5  the numerical number who voted

6  for life without parole.  Then

7  you foreperson would sign that

8  verdict, and you would return to

9  the Court and render your

10  verdict.

11          Again, I'm required to

12  have these lawyers come up and

13  say, Judge, you've misstated

14  something, or clarify something.

15  I'm required to do that by law.

16  And then, you will retire back,

17  deliberate and decide this

18  issue.

19          (Counsel approached the bench).

20  THE COURT:  What says the State?

21  MR. JARRELL:  The State is satisfied.

22  MRS. STOUT:  Satisfied.

23  THE COURT:  What says the Defense?

24  MR. SMITH:  Just so that I don't loose

25          objections to preserve, we

1    object to the jury finding the

2    fact of doubt counting robberies

3    as two aggravating

4    circumstances, the finding of

5    fact that you have already said

6    has occurred rather than them

7    having to do that again.

8         Also, under Alabama

9    Constitution, as far as

10   challenge, and I object to the

11   non-innocent verdict.  I realize

12   its clearly Alabama Law, but I

13   preserve objections now that

14   it's after the capital sentence.

15   THE COURT:  I understand.  Anything else?

16   It is clearly the law and have

17   upteen pounds of precedent that

18   once you get robbery, this

19   situation is different than a

20   lot of capital situations,

21   because in some of the capital

22   situations, they have not made

23   that finding of fact and I will

24   be more than glad to show you

25   upteen pounds of precedent on

1  this, but the jury does not have

2  to make a finding of fact that

3  they half already made, but your

4  exceptions are well noted.  They

5  have already been argued.  You

6  never know how things are going

7  to go on --

8  MR. SMITH:  Just making that point.

9  THE COURT:  -- the appellant level.  You

10  had to make that, and I

11  certainly understand that.  But

12  the Court finds that the Court's

13  instructions to jury on the law

14  are according to the law and are

15  proper.  And I will not deviate

16  otherwise or change anything.

17  Anything further?

18  MS. STOUT:  Nothing from the State.

19  MR. SMITH:  Nothing.

20  (The following was heard in the

21  hearing of the jury.

22  THE COURT:  Okay.  They are correct, now.

23  Again, you will retire

24  back to the jury room.  As soon

25  as you've reached a verdict, if

1  you will return back to the

2  courtroom.  And we will receive

3  your verdict then.

4  (Jurors exited the courtroom).

5  THE COURT:  The court is in recess.

6  (After deliberation, the jury

7  entered the courtroom).

8  THE COURT:  You may be seated.

9  Has this jury reached a

10  verdict?

11  FOREPERSON:  Yes, sir, Your Honor.

12  THE COURT:  And is the verdict consistent

13  with the instructions that I

14  gave to the ladies and gentlemen

15  on the law?

16  FOREPERSON:  Yes, sir, Your Honor.

17  THE COURT:  Okay.  No matter what your

18  verdict is, your recommendation

19  is, I'm sure it is based on your

20  heart, so I appreciate your

21  input.  I appreciate you being

22  down here all week long.  We've

23  gone late at night.  You have

24  been a very attentive jury.  You

25  have been a very responsible,

1602

```
 1              serious-minded jury, and I

 2         appreciate you very much.

 3              Nobody is going to

 4         leave this courtroom for five

 5         minutes after you leave.  I want

 6         y'all out of here.

 7              Did y'all shred your

 8         notes?

 9         (Off-record discussion).

10   THE COURT:  Okay.  I'm going to read the

11         verdict of this jury.  And we

12         are going to wait in here for

13         some time before we leave.

14              And it may make some of

15         you feel better, we are not

16         allowed to say what this is,

17         because we are not allowed, no

18         lawyer or nobody is allowed to

19         diminish the importance of this

20         decision that you have already

21         made.  You have made it now.

22         And it may help some of you to

23         know that it's my decision, the

24         Court's decision that will be

25         carried out.
```

1603

```
 1                      The verdict of this

 2              jury is:  We, the jury,

 3              recommend that the Defendant,

 4              Robert Thomas Conrad, be

 5              punished by life imprisonment

 6              without parole.  The vote is as

 7              follows:  Four for death, and

 8              eight for life without parole.

 9                      And that, again, is

10              signed by Jack Hill.  Jack D.

11              Hill.  Correct?

12      FOREPERSON:  Yes, sir.

13      THE COURT:  Again, I appreciate your

14              service very much.  I've had one

15              case where I overrode a jury's

16              decision and sentenced a person

17              to death, even though they

18              recommended life without parole.

19              But, sometimes, unfortunately in

20              this country, jurors are the

21              least knowledgeable people in

22              the courtroom, because you

23              aren't allowed to know

24              everything.  We judges have more

25              information a lot of times than
```

1    jurors may have.

2           It's an unusual

3    situation for a Judge to

4    override a jury's decision.

5    But, again, your's is a

6    recommendation.  The Alabama law

7    says that the final authority in

8    imposing sentence is the Judge.

9    But this is a step that has to

10   be followed.

11          Again, I appreciate

12   your service.  No one will ever

13   thank you for your service.  But

14   this system that we live in

15   cannot work without people

16   sacrificing and to make sure

17   that it works.  Thank you.

18          The jurors are excused.

19   (Jurors exited the courtroom).

20   THE COURT:  Sheriff, when the last juror

21          leaves the parking lot, if y'all

22          will let us know.

23   SHERIFF:  Okay.

24   THE COURT:  Y'all may be seated.

25          Here is what's going to

1605

```
 1                    happen.  We are now outside of
 2                    the hearing and presence of the
 3                    jury.  The Alabama law provides
 4                    now that the Judge set a
 5                    sentence hearing.  The Alabama
 6                    statute provides that, and it's
 7                    required by law, and it cannot
 8                    be waived by a Defendant, that
 9                    the State Probation and Parole
10                    officer prepare a pre-sentence
11                    report of investigation.
12          MR. SMITH:  If I may.  There are some
13                    circumstances where the report
14                    has already been prepared.
15          THE COURT:  Sure.  Sure.  There is no
16                    questions that one has to be.
17          MR. SMITH:  That's true.
18          THE COURT:  Now, I'm not aware that one
19                    has been prepared, because I
20                    have been advised by the State
21                    Probation and Parole that they
22                    don't have one, yet, as far as
23                    this matter.  They may have one
24                    that needs to be updated, but
25                    they don't have one.
```

1606

1    MR. SMITH:  There has been a Y.O. report.

2    THE COURT:  I know there has been a Y.O.

3              report.  But it would still have

4              to be updated.

5                   So the Court will set a

6              hearing.  The State Probation

7              and Parole Officers have advised

8              me to give them at least 15 days

9              up to 30 days.

10   MR. SMITH:  Judge, I know you know my

11              situation.  I would ask Your

12              Honor to respectfully consider

13              that.

14   THE COURT:  Sure.  Now, are you saying if

15              I could get a PSI earlier, you

16              would want that earlier?

17   MR. SMITH:  No, sir.

18   THE COURT:  I just want to make sure.

19   MR. SMITH:  I know in the past, when

20              we've had agreements with the

21              Court, the Prosecution, and the

22              Defense, that the report be

23              accepted.

24   THE COURT:  As long as that was the case,

25              I would be glad to.  But out of

1607

1      abundance of precaution, I

2      wanted y'all to make sure in

3      this case the State Probation

4      and Parole Officer is going to

5      do a P.S.I, Presentence Report

6      of Investigation, Butch Taylor,

7      for many reasons.  He is going

8      to be particularly ordered be

9      the Court to be the person who

10     prepares the pre-sentence report

11     of investigation.

12              And if the attorneys

13     will come up, we are going to

14     pick out a time that is

15     convenient to every attorney.  I

16     know each of you have other

17     matters set.

18        (Counsel approached the bench).

19  THE COURT:  So we need to go to November.

20        That will allow them plenty of

21        time.

22  MR. SMITH:  Can we go off the record for

23        a minute.

24  THE COURT:  Okay.

25            (Off-record discussion).

1608

```
 1            THE COURT:   The United States Supreme
 2                    Court has recently rendered an
 3                    opinion in another case up from
 4                    another state.   And it's this
 5                    Court's belief that that
 6                    decision, Brady (sic), and
 7                    others has made Alabama Statute
 8                    totally unconstitutional,
 9                    because it has not.   But, in
10                    effect, when it's interpreted it
11                    stands for the proposition that
12                    the jury sets the ceiling.   So
13                    that ceiling in my opinion has
14                    been set.   The attorneys know
15                    that.   They feel that there is
16                    know need to drag things out
17                    further.   And they are talking
18                    to the Defendant at this time.
19                         And if the
20                    Defendant will agree that the
21                    Y.O.P.S.I., which is the
22                    Youthful Offender Pre-Sentence
23                    Report of Investigation would
24                    read exactly one in the same as
25                    the P.S.I., Pre-Sentence Report
```

1609

```
 1              of Investigation, then that will

 2              be submitted as a pre-sentence

 3              report of investigation.  And

 4              the Court could impose sentence

 5              tonight, which I will do if they

 6              come out and say that.

 7                   The law would require

 8              that I get the Defendant on the

 9              record to state that is his

10              wish.  We will give them a few

11              more minutes and see.

12     MR.  SMITH:  Judge, let me say this off

13              the record and then on the

14              record.

15     THE COURT:  Sure.  Mr. Conrad, if you

16              will come up, also.

17                   (Off-record discussion).

18     THE COURT:  Back on the record.  If you

19              will state that, again.

20     MR.  SMITH:  Judge, it's my understanding

21              that the Court, the Prosecution,

22              Mr. Bradshaw and myself, and Mr.

23              Conrad, who we have consulted,

24              are in agreement that Apprendi

25              and Ring has determined United
```

1610

```
 1              United State's Supreme Court's
 2         decision that the ceiling has
 3         been set for sentencing purposes
 4         by the jury's recommendation of
 5         life without parole.
 6              And in that vein and
 7         all in agreement, we move the
 8         Court to accept the Youthful
 9         Offender Report prepared August
10         30th of 2001, as the
11         Pre-Sentence Report.
12              There are no changes.
13         Mr. Conrad has been continuously
14         in custody since that was made.
15         We waive any delay of a
16         sentencing hearing and ask the
17         Court to impose sentence this
18         hearing, post-trial procedures
19         and whatever we need to do.
20    THE COURT:  Any objection by the State?
21    MRS. STOUT:  No, Your Honor.
22    THE COURT:  Does the State stipulate,
23         concur that the Y.O.P.S.I be
24         considered a P.S.I for the
25         purposes of sentencing?
```

1611

1    MRS. STOUT:  We do, Your Honor.

2    MR. SMITH:  Mr. Conrad?

3    THE COURT:  I'm not swearing him in.

4    MR. SMITH:  Please don't.

5    THE COURT:  I will not.

6    MR. SMITH:  I'm your attorney?  Is that

7         correct?

8    THE DEFENDANT:  Yes, sir.

9    MR. SMITH:  Mr. Bradshaw is your

10        attorney?

11   THE DEFENDANT:  Yes, sir.

12   MR. SMITH:  And we've explained to you

13        that the only sentence the Judge

14        can give you is life without

15        parole, based on the law as it

16        is right now?  We've told you

17        that?

18   THE DEFENDANT:  Yes, sir.

19   MR. SMITH:  And that you have a right to

20        have a sentencing hearing at a

21        later date and have a

22        pre-sentence report prepared

23        that's going to be the same

24        thing.

25                 We have

```
1              recommended to you that we go
2              ahead and ask the Judge to
3              sentence you tonight.  And we
4              will get started working on
5              whatever we have to get started
6              working on.
7                         And we got your
8              step-father in there, and he
9              talked to you also.  And do you
10             understand and are you satisfied
11             that we've given you good
12             advice,  and do you think we
13             are, and to go ahead and do
14             this?  Is that correct?
15  THE DEFENDANT:  Yes, sir.
16  MR. SMITH:  Is that what you want the
17             Judge to do?
18  THE DEFENDANT:  Yes, sir.
19  THE COURT:  Have you, Mr. Conrad, looked
20             at that report?
21  THE DEFENDANT:  Yes, sir.
22  THE COURT:  Have you read everything
23             contained therein?
24  THE DEFENDANT:  Yes, sir.
25  THE COURT:  Do you differ?  Do you state
```

1613

```
 1              that anything contained therein

 2              is not a statement of fact?

 3     MR.  SMITH:  Judge, only the offense

 4              details.

 5     THE  COURT:  I'm not going to talk about

 6              that.

 7     MR.  SMITH:  We ask the Court to adopt

 8              what was heard in evidence in

 9              that.

10     THE  COURT:  Okay.  Let's skip over that

11              part.  The State Probation and

12              Parole Officer is just required

13              to state what he or she contends

14              to be the allegations of a case.

15              And they have determined to be

16              fact by this jury, so I'm not

17              concerned about that.

18                   I'm talking about the

19              prior arrest records and prior

20              criminal history and everything

21              else in those categories that

22              are set out.

23     MR.  SMITH:  The other matters we take no

24              issue with.

25     THE  COURT:  Mr. Conrad, is that so?
```

1    THE DEFENDANT:  Yes, sir.

2    THE COURT:  Okay.  If you will give me

3         the Y.O.P.S.I?

4    MR. SMITH:  This is my copy, Judge.  I

5         know that the original is inside

6         the Manila folder stapled in one

7         of the files.

8    THE COURT:  I just need to refer to it a

9         minute.  The Alabama law,

10        Section 13A-5-39(1) reads as

11        follows:  It reads, and defines

12        a capital offense.  It says:  A

13        capital offense is an offense

14        for which a Defendant shall,

15        "shall," be punished by a

16        sentence of death or life

17        imprisonment without parole.

18             Do you have anything to

19        say, Mr. Conrad, as to why the

20        sentence of the law should not

21        at this time be imposed, as the

22        Court does hereby find, again,

23        that the verdict of the jury has

24        been supported by the legal and

25        competent evidence presented in

1    the trial of these two cases.

2    And the Court also finds that

3    the sentence recommendation of

4    this jury is in accordance with

5    law.

6    THE DEFENDANT:  No, sir.

7    THE COURT:  You may also offer anything

8    in mitigation of any sentence to

9    be imposed, other than what has

10    already been stated.

11    MR. SMITH:  Just what has been stated,

12    may it please the Court.

13    THE COURT:  Is that correct, Mr. Conrad?

14    THE DEFENDANT:  Yes, sir.

15    THE COURT:  According to the law of this

16    State, the Court does hereby

17    sentence you, Robert Thomas

18    Conrad, for the Offense One

19    conviction, capital conviction,

20    to a sentence of life

21    imprisonment without parole,

22    according to the provisions of

23    the Alabama Code.

24    Your sentence is this

25    day ordered executed.  You are

1616

```
 1            remanded to the custody of

 2            Coffee County for immediate

 3            delivery to the penitentiary,

 4            State of Alabama, for the

 5            purposes of serving this

 6            executed life without parole

 7            sentence.

 8                    As to Offense Two of

 9            the indictment, you have earlier

10            been declared by this jury to be

11            guilty of robbery in the first

12            degree of Mr. Grimes.  Do you

13            have anything that you would

14            like to state in mitigation of

15            any sentence to be imposed?

16     MR. SMITH:  What has been offered

17            previously, may it please the

18            Court.

19     THE COURT:  Does the State have anything

20            that it would like to state in

21            aggravation or mitigation of any

22            sentence to be imposed?

23     MRS. STOUT:  No, Your Honor.

24     THE COURT:  Mr. Conrad, do you have

25            anything you would like to state
```

1              in mitigation, reduction of any

2              sentence to be imposed?  You

3              don't have to say anything, if

4              you elect not to do so.

5     THE DEFENDANT:  No, sir.

6     THE COURT:  This Court does hereby

7              sentence you to a sentence of

8              life in the penitentiary.

9                You are ordered to pay

10             cost of court.  You are ordered

11             to reimburse the State for any

12             Attorneys' fees the State is

13             caused to pay out due to your

14             representation in this case.

15             You are ordered to pay

16             restitution in an amount

17             submitted by the State, which

18             the Alabama law requires you to

19             pay restitution.  I know you may

20             not be able to do so, because

21             you are going to be in the

22             penitentiary.  And you will not

23             be gainfully employed while you

24             are in the penitentiary for the

25             rest of your natural life.  But

1618

```
 1              Alabama law still requires that
 2              I order that that be done.  And
 3              I will simply say that that
 4              restitution is for the monetary
 5              amounts, burial expenses,
 6              hospital expenses, rescue squad
 7              expenses, other expenses that
 8              have been reasonably incurred as
 9              a result of a commission of the
10              crime, made the basis of this
11              suit and the other matter.  And
12              I know that restitution might
13              not be a great deal, a great
14              amount, as far as Mr. Grimes is
15              concerned.  But restitution will
16              not only be ordered in this
17              case, but in the prior case
18              where you were sentenced to life
19              without parole, as required by
20              law, whether it's just a
21              walk-through stage, or not, it's
22              required by law.
23       MR. SMITH:  If we could ask the State to
24              submit by pleadings to the Court
25              within 30 days?
```

1619

1    THE COURT:  Sure.

2    MR. SMITH:  And if we have an objection

3         to the amount, then we will file

4         our objection, and the Court can

5         take the appropriate --

6    THE COURT:  Let me say as far as Mr.

7         Grimes is concerned, it will not

8         be a great deal of money, but

9         it's still required by law.  And

10        if you contest that issue, then

11        you have 30 days after the State

12        has filed it with the Court to

13        contest that.  If you don't

14        contest it within that period of

15        time -- the State is going to

16        have 30 days to submit

17        something, and you are going to

18        have 30 days on top of that to

19        contest it.  If you don't

20        contest it, that will be the

21        amount of restitution that will

22        be ordered.

23             Do you understand that?

24   THE DEFENDANT:  Yes, sir.

25   THE COURT:  Both sentences are hereby

1620

```
 1              ordered executed.
 2                        You have the right to
 3              appeal.  You have 42 days to
 4              perfect an appeal.  The law of
 5              this country requires that if
 6              you are unable to hire an
 7              attorney, one will be appointed
 8              to represent you on appeal.
 9                        If you are unable to
10              pay for a transcript of a
11              record, one will be furnished at
12              no charge.  Do you understand
13              that, if the Court determines
14              that you are?
15         THE DEFENDANT:  Yes.
16         THE COURT:  Do you understand the period
17              of time that you will have to
18              appeal, otherwise you will waive
19              your right to appeal?
20         MR. SMITH:  Judge, I'm not going to make
21              an oral announcement tonight,
22              because there will still be
23              other pleadings that will be
24              filed.
25         THE COURT:  Sure.  Your sentences are
```

1621

1    hereby ordered executed. You

2    are remanded to the custody of

3    that gentleman, the Sheriff of

4    Coffee County, Alabama, for

5    delivery immediately to the

6    penitentiary, State of Alabama,

7    for the purposes of serving

8    these two sentences.

9            Thank you.  Court is

10   adjourned.

11           (End of trial).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COURT OF CRIMINAL APPEALS NO. __CR-02-0333__

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF ____COFFEE____ COUNTY, ALABAMA

CIRCUIT COURT NO. __CC-01-179, CC-01-180__

CIRCUIT JUDGE ____Gary L. McAliley____

Type of Conviction / Order Appealed From: __Conviction, Capital Murder, Robbery 1st__

Sentence Imposed: __Life Without Parole, Life__

Defendant Indigent: [X] YES  [ ] NO

__Robert Thomas Conrad__

NAME OF APPELLANT

__Gary Bradshaw__
(Appellant's Attorney)                    (Telephone No.)
__P. O. Box 311412__
(Address)
__Enterprise        AL        36331__
(City)            (State)        (Zip Code)

Richard Waldrop
P. O. Box 310027
Enterprise, AL  36331

V.

STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____
_____

(For Court of Criminal Appeals Use Only)



INDEX TO CLERK'S RECORD

                                                                Page No.

Motion To Correct The Record .......................................... 1 – 3

Letter To Court Of Criminal Appeals from Judge Blair .................... 4 – 5

Certificate Of Completion And Transmittal Of Record On Appeal By Trial
Clerk ................................................................. 6

| | | |
|---|---|---|
| **STATE OF ALABAMA** | * | **IN THE CIRCUIT COURT OF** |
| **PLAINTIFF,** | * | **COFFEE COUNTY, ALABAMA** |
| **VS.** | * | **ENTERPRISE DIVISION** |
| **ROBERT THOMAS CONRAD,** | * | **CASE NO: CC-2001-179 & 180** |
| **DEFENDANT.** | * | |

## MOTION TO CORRECT THE RECORD

Comes now Robert Thomas Conrad, by and through his undersigned attorneys, and being the Defendant in the above styled cause and Appellant in that cause styled Robert Thomas Conrad, Appellant vs. State of Alabama, now pending in the Court of Criminal Appeals, Docket Number CR-02-0333, and moves this Honorable Court to correct the record in said cause pursuant to Rule 10(g), Alabama Rules of Appellate Procedure and as grounds therefore states as follows:

(1) The Defendant, Robert Thomas Conrad, was indicted for Capital Murder and Robbery 1st Degree.

(2) That on September 27, 2002 said Defendant was convicted on said indictment.

(3) The record compiled by the Court Clerk as it now stands contains an inaccuracy or clerical error, to wit:

    (a) On page 315 of the Clerk's Record, the Trial Court ordered, "All pending unruled motions, including but not limited to the most recently filed motions to suppress, are scheduled for hearing on the 21st day of January, 2002 at 9:00 a.m." The date of this order was January 28, 2001.

    (b) On page 330 of the Clerk's Record, the Trial Court ordered, "Said motion and all other pending motions are

set for hearing on the date and hour earlier set, i.e. 1-21-2002 at 9:00. a.m."   The date of this order was January 20, 2002.

(c) The Clerk's Record and the Trial Record do not contain a transcript of, or reference to, the hearings, referred to in paragraphs (a) and (b) above, ever having been held.

(d) On page 648 of the Clerk's Record, the Case Action Summary Sheet indicates that three (3) "Orders" were issued on January 22, 2002, but does not specify what these Orders were for.

(e) The Case Action Summary Sheet begins on page 643 of the Clerk's Record and ends on  page 651.  There is no reference in these pages stating that the Court ruled on the Defendant's three (3) Motions to Suppress Evidence Seized after an Illegal Arrest and/or Search and to Suppress Statements.

(d) The Trial Attorneys time sheets indicate in excess of five (5) hours court time for suppression hearing on January 21, 2002 and testimony was taken, court reporter was present and Clerk's Record does not reflect same.

Wherefore, premises considered, the Defendant prays that the record be corrected so as to accurately recite the events as they occurred during the trial of this cause, and to extend the time of filing of the Appellant's brief until the error and Clerk's Record is corrected.

Respectfully submitted this the ___28th___ day of May, 2003.

Richard (Cracker) Waldrop
Attorney For Appellant
ASB-2398-L57R
P. O. Box 310027
Enterprise, Al  36331
(334) 393-2288

Gary D. Bradshaw
Attorney For Appellant
(BRA074)
P. O. Box 311412
Enterprise, Al  36331
(334) 393-6439

## CERTIFICATE OF SERVICE

We, Richard (Cracker) Waldrop and Gary D. Bradshaw, do hereby certify that we have served a copy of the above and foregoing Motion to Correct the Record, by placing a copy of same in the United States Mail, postage prepaid, and properly addressed to:

William Pryor, Jr.
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130

This is the 28TH day of May, 2003.

_____        _____
Richard (Cracker) Waldrop                Gary D. Bradshaw



### STEVEN E. BLAIR
*DISTRICT JUDGE*

## DISTRICT COURT OF COFFEE COUNTY, ALABAMA
*MAILING ADDRESS/ENTERPRISE*
*P.O. Box 311446*
*Enterprise, AL 36331*
*MAILING ADDRESS/ELBA*
*230 Court Square*
*Elba, AL 36323*

*JUDICIAL ASSISTANT*
*Terri McNees*

*TELEPHONE*
*334/393-2949  Enterprise*
*334/897-3355  Elba*

June 16, 2003

Hon. Lane Mann, Clerk
Court of Criminal Appeals
300 Dexter Avenue
Montgomery, AL 36104-3741

Fax: (334) 242-4689

RE: Robert Thomas Conrad v. State of Alabama
CR 02-0333
(Coffee County CC 2001-179 and CC 2001-180)

Dear Mr. Mann:

The Appellant was convicted of Capital Murder and Robbery, First Degree, on September 27, 2002. The trial judge, the Hon. Gary L. McAliley, retired from the bench in December, 2002, and I was appointed to fill the vacancy.

The Appellant files his motion to supplement / correct the record. Specifically, Conrad alleges that the transcript of a suppression hearing held January 21, 2002, was not included in the record on appeal.

I am advised that my court reporter, Sheila Hanson (and formerly Judge McAliley's court reporter) has located the record of this hearing and is in the process of transcribing same.

Please allow Mrs. Hanson an extension of time to complete the transcript and supplement the record on appeal.

Page Two
June 16, 2003
Hon. Lane Mann, Clerk

     I am advising all parties of the status of this matter by copy of this letter.  This letter is forwarded to the Clerk of Criminal Appeals by facsimile and the original mailed on date hereof.

Yours very truly,

Steven E. Blair

SEB/tlm

cc:

Hon. Richard Waldrop
Attorney for Appellant
P.O. Box 310027
Enterprise, Al 36331

Hon. Gary Bradshaw
Attorney for Appellant
P.O. Box
Enterprise, AL 36331

Hon. William Pryor, Jr.
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130

Mrs. Sheila Hanson
P.O. Box 311446
Enterprise, AL 36331

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP-14        Rev. 11/91 | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number<br><br>CR-02-0333 |
|---|---|---|

| TO: THE CLERK OF<br>    THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL:    10-7-02 |
|---|---|

**APPELLANT**

Robert Thomas Conrad

v.    STATE OF ALABAMA

---

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of ___1___ pages) (_____ volumes of 200 pages each and one volume of ___39___ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this ___10th___ day of ___July_____, ___2003___ .


_James M. Counts_____
Circuit Clerk

<div align="center">

IN THE CIRCUIT COURT OF

COFFEE COUNTY, ALABAMA

</div>

```
ROBERT THOMAS CONRAD,              )
                                   )
        APPELLANT,                 )
                                   )
VS.                                )  CC-2001-179; 180
                                   )
                                   )
STATE OF ALABAMA,                  )
                                   )
        APPELLEE.                  )
```

The above referenced testimony was heard before Honorable Gary L. McAliley on the 21st day of January, 2002, at the Coffee County Courthouse, Enterprise, Alabama.

<div align="center">

* * * * *

</div>

APPEARANCES:

FOR THE APPELLANT:                 FOR THE STATE:

MR. ALBERT SMITH                   MRS. GLENDA STOUT
Attorney at Law                    Assistant D.A.
Elba, Alabama                      Enterprise, Alabama

MR. GARY BRADSHAW
Attorney at Law
Enterprise, Alabama

COPY

## REPORTER'S INDEX

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Dr. Martin | 9 | | | |
| Jeff Spence | 37 | 48 | | |
| Dr. Sawyer | 62 | 83 | 98 | 103 |
| Buford Roberts | 108 | 113 | 104 | 120 |
| Dwight Holly | 141 | 157 | 171 | |
| Jeff Spence | | | 172 | 182 |
| | | | 186 | 187 |
| Bruce Mathews | 190 | 197 | 207 | |
| Michael Hines | 209 | 213 | | |

```
1

2      THE COURT:  The record will reflect this

3            case is styled State of Alabama

4            versus Robert Thomas Conrad.  These

5            are case numbers CC-2001-M-180 and

6            CC-2001-M-179.

7                  The Defendant is present and

8            is represented counsel.  Both

9            defense attorneys are present.  The

10           State is present and is represented

11           by the District Attorney and the

12           Assistant District Attorney, Mrs.

13           Stout.

14                 Are the parties ready for

15           argument on the various pending

16           motions?

17     MR. SMITH:  Judge, the defense is, but

18           there is one thing that I would like

19           to get into the record.

20     THE COURT:  Sure.

21     MR. SMITH:  And I would like to do it at

22           bar, if I could, sir.

23     THE COURT:  Certainly.

24     MR. SMITH:  Judge, for reasons that are

25           obvious, in a minute, I didn't want
```

4

1   to blurt this out, because it

2   involves a court employee.  Of

3   course, there are Motions to Suppress

4   three statements and items of

5   evidence that we are here on today,

6   among some other things.  I think,

7   there are three ex parte motions.

8   Our position is the statements and

9   items of evidence put -- the burden

10   is on the State to go forward, and to

11   show that those were obtained, since

12   he is in custody, by proper methods.

13       In planning for what we may

14   need to offer as evidence from the

15   defense, I caused a subpoena request

16   form to be made.  I made it myself on

17   the 11th of January for a number of

18   police officers and three doctors,

19   Dr. Sam Sawyer, Dr. Vincent Martin,

20   and Dr. Sherri Roach, who were

21   involved in the removal or treatment

22   of removal of the bullet.

23       I faxed that subpoena request

24   form to the Enterprise Clerk's

25   Office.  DeAnn, who normally handles

5

1    that, was out that day and we

2    followed up with it in the mail.   I

3    think the 11th was on a Friday.

4         On the 15th I received a

5    call.  And my secretary talked to

6    DeAnna.  And this is what my

7    secretary's note, who recognized a

8    problem, and, of course, that was

9    Dawn DeVane.

10        The Conrad subpoena, in the

11   future, please prepare subpoena and

12   send it, as faxing does no good.  She

13   got the subpoena request through the

14   mail.  We prepared them this time.

15   It takes too much of her time to

16   prepare the subpoenas.

17        The only reason I'm bringing

18   this up is because Friday evening,

19   it's my understanding that the

20   Sheriff's Department received the

21   subpoenas and called these doctors.

22        Now, Dr. Martin is here.  Dr.

23   Sawyer and Dr. Roach, I have not

24   personally heard from.  I think Mr.

25   Fuller has probably heard from Dr.

6

```
 1              Sawyer.  And I understand he is in
 2              surgery this morning.
 3         MR. FULLER:  I will respond.
 4         THE COURT:  If necessary.  We will make
 5              sure that you have time to get the
 6              physician's testimony.  But I would
 7              like for y'all, if you will, to
 8              briefly start with the physician who
 9              is here, so we can get him out of
10              here, to take him out of turn.  Is
11              that possible?
12         MR. FULLER:  The State doesn't intend to
13              call him.  And I think he has a
14              report.  I think it would be a waste
15              of everybody's time, unless there
16              were --
17         THE COURT:  That was made a
18              knowledgeable, intelligent, voluntary
19              --
20         MR. SMITH:  Judge, really, Dr. Martin,
21              that's not why we need him.
22         THE COURT:  That's not an issue?  Okay.
23         MR. SMITH:  It's not with Dr. Martin.
24              And I want to accommodate him as much
25              as I can.  I'm in a position with
```

7

```
 1              this being a capital case, I've got
 2              to do my job.
 3         THE COURT:  Sure.
 4         MR. SMITH:  I'm not asking for a
 5              continuance or anything this morning.
 6              I just wanted to put that on the
 7              record.
 8         THE COURT:  We will go ahead and get as
 9              far as we can, and then, we will make
10              sure you get the other physicians'
11              testimony while looking at pending
12              motions.
13         MR. SMITH:  The only reason I'm
14              mentioning this is for the record.
15         THE COURT:  Sure.  Certainly.  I would
16              like to go over with you maybe in
17              private, take better notes on what
18              happened and what was said by the
19              Clerk's Office?  Is that correct?
20         MR. SMITH:  Yes.  DeAnn in the Clerk's
21              Office.  And I'm not trying to get
22              her in trouble.
23         THE COURT:  I know.  That would not be
24              the intentions of the boss down
25              there.
```

8

```
 1        MR. SMITH:  I normally would not bring
 2            that up, except it may possibly make
 3            the witnesses more difficult to
 4            obtain.
 5        THE COURT:  To obtain.  Sure.  Again, is
 6            there some way that y'all can --
 7        MR. FULLER:  The State doesn't intend to
 8            call Dr. Martin.  We don't have
 9            anything to --
10        THE COURT:  Where are you going?
11        MR. SMITH:  Judge, it would relate to one
12            of the Ex Parte motions.  But I will
13            be glad to do that.
14        THE COURT:  Yes. I would like for you to
15            call him, so we can get him on his
16            way, if you can.
17        MR. SMITH:  Yes.
18        THE COURT:  And I know what the motions
19            are.  So you can present that, if you
20            would like you can go back in the
21            side room and take that down out of
22            the hearing of the State to make that
23            motion.
24        MR. SMITH:  Yes, sir, Judge.
25        THE COURT:  Okay.  We will go back to my
```

9

1    office.

2              Doctor, if you will come back

3         with us we will take your testimony.

4         Of course, I would like the Defendant

5         present.

6           (The following was heard in

7         chambers outside of the hearing and

8         presence of the District Attorney and

9         his staff).

10    THE COURT:  Would you raise your right

11         hand.

12

13              DR. VINCENT E. MARTIN

14      Whereupon, this witness, after first

15  being duly sworn to tell the truth, the whole

16  truth, and nothing but the truth, testified as

17  follows, to-wit:

18              DIRECT EXAMINATION

19  BY MR. SMITH:

20         Q    State your name for the record,

21  please, sir.

22         A    Dr. Vincent E. Martin.

23         Q    And you are a licensed medical

24  doctor in the State of Alabama?

25         A    That is correct.

```
 1        Q      Do you have a specialty, Doctor?

 2        A      Radiology.

 3        Q      And over and above your training as

 4   a medical doctor, would you very briefly relate

 5   to the Court for the record your training and

 6   experience as a Radiologist?

 7        A      I received training in the

 8   radiology subspecialty when I was in the Army

 9   Vincent Medical Center from 1983 to 1987.  I

10   have been practicing as a radiologist since

11   then.  That was an improved residency program.

12   And I stayed as a Army radiologist until I

13   retired from the Army in 1996, and then I

14   continued civilian radiology practice since

15   then.

16        Q      Doctor, what, again, briefly, does

17   a radiologist do?

18        A      Interprets images that are produced

19   in the radiology department.  And that may

20   range from plain x-rays that you are familiar

21   with, such as a chest film, looking for

22   phenomena; to CAT scans, computerized actual

23   tomography; specialized x-ray  equipment, that

24   gets a more comprehensive look; ultrasounds;

25   magnetic residence imaging.  That's a method of
```

1    imaging.   Those types of methodologies.

2         Q     You certainly have expertise and

3    knowledge in anatomy and physiology as part of

4    your medical training and your radiology

5    training, do you not?

6         A     Yes.

7         Q     And let me show you what I have

8    marked as Defendant's Exhibit A.  And I believe

9    you had an opportunity to look over a copy of

10   that just this morning, perhaps, and probably

11   very briefly, also?

12        A     I saw it this morning, but I have

13   not reviewed the films.

14        Q     Would you describe what Defendant's

15   Exhibit A is, please, sir?

16        A     It's a radiographic report dated

17   5-23-01.  I have several films.  The first is a

18   left humoris, which is the left upper arm,

19   describing the metallic foreign body in the

20   soft tissues and a comment there is no

21   fractures associated with that.

22        Q     With regard to that -- well, go

23   ahead to the second report of the x-ray.

24        A     The second, briefly, two views of

25   the abdomen, one on the upper right, and one

12

```
 1    lying down.  And I comment on the fact that
 2    there is a metallic foreign body compatible
 3    with a bullet projection near the acetabulum,
 4    which is near the left hip, on the left side,
 5    and comment there was no fracture associated
 6    with that.
 7         Q      Doctor, who is that report on?
 8    What patient?
 9         A      Robert Conrad.
10         Q      Is it in the regular course of
11    business when you x-ray a person that is a
12    patient before you, to make a written report of
13    that x-ray of your examination and your
14    findings?
15         A      I'm --
16         Q      Do you make a report after you take
17    the x-ray?
18         A      Yes.  The x-ray is presented to me.
19    It would normally be in film pile.  And I
20    dictate the report at the time that I'm reading
21    it.
22         Q      And that's something that you do in
23    the routine and in the regular course of your
24    business as yourself, an x-ray radiologist?
25         A      Yes.
```

1       Q    I started to say x-ray technician.

2  I apologize.  Did you do such a report on Mr.

3  Conrad?  That is Defendant's Exhibit A?

4       A    I would have to assume so, because

5  this is my report.

6       Q    All right.  Would it be correct

7  that you have no independent recollection of

8  this patient?  Or do you, sir?

9       A    No, I do not.

10      Q    To refresh your recollection, do

11  you recall on the occasion of this event that

12  this report discusses a murder having occurred

13  in Enterprise,  and a couple of patients, one

14  deceased, and one wounded coming into the

15  hospital?

16      A    I can't tell you clearly what I

17  knew at the time, except that there had been a

18  shooting.  I don't know if it's even on here,

19  5-23.  Sometimes these would be even read the

20  following morning, for example, and I might not

21  have even been there when the patient actually

22  arrived.  I was aware that there was a

23  shooting.  I don't know at what time I became

24  aware of that shooting.

25      Q    All right.  And who is the doctor

1    that was the treating physician that you were

2    reading the x-rays for?

3         A     Listed on here would be Dr. Drew,

4    who is an emergency room physician, and Dr. Sam

5    Sawyer, who is a surgeon.

6         Q     And did you become aware, or do you

7    know now that Dr. Sawyer actually did surgery

8    on the patient, Robert Conrad?

9         A     I have been told that he is the one

10   that did surgery.

11        Q     Do you know what, if anything, Dr.

12   Sawyer removed from the patient, Robert Conrad?

13        A     I have been told that he removed a

14   bullet.

15        Q     All right.  And do you -- a bullet?

16   One bullet?

17        A     I don't know those kinds of

18   details.

19        Q     With reference to your report on

20   the humoris bullet, your observation, according

21   to your report was that the bullet, or the

22   foreign body, I believe you've described it,

23   was located in the soft tissue?

24        A     Yes.

25        Q     Was there any indication that any

```
 1    vascular injury was associated with that

 2    foreign body from the x-ray that you read?

 3         A     I would not even attempt to try

 4    that from a plain film, because you do not see

 5    the vessels on a plain film.

 6         Q     But you see the bone, of course?

 7         A     You see the bone.  And that's

 8    primarily -- the utility of that would be the

 9    localization of the foreign body involved,

10    roughly where it is, but, also, is there an

11    associated fracture which would obviously

12    complicate the repair.  But in terms of

13    specific vessels, that would be pure guesswork.

14    And this is only one projection, also.

15         Q     The foreign body was not associated

16    with any fracture to the humoris?  Is that

17    correct?

18         A     As far as I could tell on that

19    single view, yes.

20         Q     All right.  As a medical doctor --

21    well, that's all of this witness.  And we would

22    offer Defendant's Exhibit A.

23         THE COURT:  Okay.  It's in evidence.

24                              You don't need to

25              take this down.
```

1              (Off-record discussion).

2       MR. SMITH:  Judge, I would ask, and

3           certainly I'm not relating that he

4           would do anything improper.  I don't

5           mean for that to even begin to come

6           out.  But I would ask that he not

7           discuss his testimony and the

8           questions asked of him with any other

9           person.

10      THE COURT:  Okay.  This is ex parte, that

11          means independent of the prosecution

12          for these limited purposes.  You

13          have the right to say whatever you

14          wish in this country.  So you have a

15          good day.

16      Dr. Martin:  Yes, sir.  I appreciate your

17          consideration.

18      THE COURT:  Sure.  Always.

19          (Dr. Martin exited Judge's

20          chambers).

21      MR. SMITH:  Judge, it's our position, and

22          we haven't fully developed it at this

23          point.  I think the evidence from the

24          State in the Motion to Suppress will

25          come out.  But from the evidence Your

```
 1            Honor has heard, and my review of the
 2       medical records, this bullet was in
 3       the fleshy part of his arm.  This
 4       bullet was removed by Dr. Sawyer, Sam
 5       Sawyer, in a surgery proceeding, and
 6       immediately handed to a police
 7       officer.  The reports are conflicting
 8       as to exactly what police officer it
 9       was given to.  But I know it wound up
10       with Jeff Spence, an Enterprise
11       Police Officer, and lead
12       investigator, who then immediately
13       took it to Joseph Saloom, the State's
14       forensic ballistic expert.  And the
15       bullet, according to Mr. Saloom's
16       report was matched to the deceased's
17       weapon.
18            So this is a critical piece of
19       evidence, from the testimony of Dr.
20       Martin and our review of the medical
21       records, and the fact that the bullet
22       was immediately handed to a police
23       officer.  That coupled with the
24       district attorney's subpoena that was
25       served almost contemptuously with
```

```
 1              the events for the medical records,

 2              leads us to believe that there is a

 3              great deal of probability that this

 4              bullet was taken out that not for

 5              medical necessity, but for evidence

 6              collection purposes.

 7                   And we would ask funds for a

 8              medical expert to review the medical

 9              records and review the testimony that

10              we anticipate is coming from Dr.

11              Sawyer if we ever get him here.

12         THE COURT:  Let me just say, I want to be

13              able to rule on this before I hear

14              the other medical experts testify,

15              and we will see where they go as far

16              as whether they corroborate what has

17              been proffered.

18         MR. SMITH:  And, certainly, even if Dr.

19              Sawyer says, we saved his life,

20              because that is such a critical piece

21              of evidence, we feel like we need a

22              defense medical person to review --

23         THE COURT:  Describe that person for me.

24              What kind of person are you talking

25              about?
```

1      MR. SMITH:  Judge, we would seek a

2          physician from probably a teaching

3          facility, UAB Birmingham is what I

4          have in mind, to review the records

5          and tell us if by our experts's

6          opinion it was medically necessary to

7          remove that bullet.  If it was not

8          medically necessary, then I think the

9          jury needs to know that, if it gets

10          to the jury.  Because certainly

11          removal of evidence from a person is

12          a mixed question of fact and law.

13      THE COURT:  In other words to show that

14          it was not medically necessary,

15          maybe, if that is a possibility, or

16          to eliminate that --

17      MR. SMITH:  Yes, sir.

18      THE COURT:  -- and to show that it was

19          more of a search and seizure with a

20          physician being an arm of the State?

21      MR. SMITH:  Exactly, Your Honor.  That's

22          much better articulated than I did.

23      THE COURT:  As a tool being used for that

24          purpose?

25      MR. SMITH:  Yes, sir.

```
 1          THE COURT:  Okay.  I see where you are
 2              headed.  Why so much money?  I know
 3              they charge a lot of money.  I don't
 4              have that motion in front of me.
 5      MR. SMITH:  $1,000.00.
 6          THE COURT:  $1,000.00?  Then there was
 7              another one that you wanted up to
 8              $3,000.00, I think?
 9      MR. SMITH:  Judge, I asked for a
10              ballistic expert.  I asked for
11              $1,000.00 for a ballistic expert.
12              And, certainly, because that is a
13              matter of opinion, an expert opinion,
14              as to whether the bullet recovered
15              from Mr. Conrad's arm matches the gun
16              of the deceased.  That is a critical
17              piece of evidence.  And we would
18              like, for two reasons, one to compare
19              the work of the state forensic
20              ballistic expert, Mr. Saloom, and,
21              also, to help us prepare for cross
22              examination of Mr. Saloom in
23              preparation of trial.
24          THE COURT:  I don't necessarily know,
25              just on that.  I understand where you
```

1    are going.  I have had Mr. Saloom

2    over many years.  And on a very few

3    occasions I have had him come down

4    and say they don't match up, and it's

5    not something to go with.  I just

6    don't -- I mean if he worked directly

7    for the prosecution that would be one

8    thing, but I don't necessarily see

9    y'all being entitled to a, let's say

10   second opinion on that.

11   MR. SMITH:  With all due respect, Judge,

12   I think that is exactly what we are

13   entitled to.

14   THE COURT:  I know you are asking for

15   that.  If we didn't have eye

16   witnesses, and I understand there are

17   some in this case, who are going to

18   talk about who was there and shots

19   being heard or seen.  I don't know

20   what they are going to say.  I've

21   read statements of the various

22   people.  I don't know what they are

23   going to end up testifying to.  If it

24   was a case where we didn't have that,

25   you know, if it was a question of

 1          how many shots, or who was doing the

 2          shooting.  If you can show me there

 3          is a question there, but, when we get

 4          down to it, I will certainly consider

 5          that a little more.  I just want you

 6          to know where I'm going to be coming

 7          from in ruling on this motion.

 8      MR. SMITH:  I understand, Judge.

 9      THE COURT:  But, I don't know how many

10          people we are going to have testify

11          that they were present at the scene,

12          that they saw or heard so many shots,

13          and who was shooting.  I don't know

14          whether the deceased actually shot at

15          him, your client.  I understand

16          that's a possibility.  And I don't

17          know whether they are going to say --

18          what they are going to say.  But that

19          is where I will be coming from in

20          ruling on this matter.  That will be

21          a factor.

22      MR. SMITH:  Certainly, Judge.  Our last

23          motion.  At one of our previous

24          meetings in court, the status call,

25          or docket call, I forget which.  The

1           State indicated that there was some

2           eye glasses taken from the Defendant,

3           and also some shoes, I believe, taken

4           from the Defendant.

5    THE COURT:  I haven't seen this motion

6           yet.

7    MR. SMITH:  It's DNA investigative

8           expenses for $3,000.00.

9    THE COURT:  Okay.

10   MR. SMITH:  And she said that they were

11          in the lab.  She mentioned the State

12          Forensic Expert, a female that I'm

13          familiar with.  And I can't recall

14          her name right now.  That was

15          preparing DNA Analysis in this case.

16          And my experience with DNA analysis

17          that I have done as a private

18          attorney, $3,000.00 would be a

19          reasonable sum to expend.  I have

20          used a lab in Pennsylvania previously

21          with good results.

22   THE COURT:  Run over with me, again, what

23          you anticipate accomplishing with

24          this expertise.

25   MR. SMITH:  Judge, at this point, the

1       State has not provided us with any

2       analysis.  They've simply told us and

3       the Court that the analysis is being

4       conducted.  And, of course, they will

5       be obligated to provide us with that

6       report when it's finished.  Because

7       DNA is a very exacting science, and a

8       very complicated science, we would

9       like our own expert to, number one, a

10      second opinion, analyze what the

11      State does.  And even more important

12      is to help us prepare for cross

13      examination, and to prepare the

14      defense's case in rebuttal of what

15      the State will offer, assuming that

16      they are going to offer it, with DNA

17      evidence.

18                      And as Mr.

19      Conrad's attorneys, we can only get

20      ready for what we anticipate is

21      coming from the State, since the

22      State has not provided us, at this

23      point, with what they have already

24      told the Court is being analyzed.

25      THE COURT:  In other words, a second

```
 1              opinion is "A."  And "B" would be to

 2              assist in the examination of the

 3              State's witness expert?

 4     MR. SMITH:  Correct.

 5              Mr. Bradshaw, I don't mean to

 6              monopolize.  If you'll --

 7     MR. BRADSHAW:  That's fine.

 8     THE COURT:  Just to give y'all an

 9              indication, I'm not ruling on either

10              of these last two, yet.  I'm inclined

11              to grant your first motion, Ex parte

12              motion, for medical expertise to see

13              whether or not the operation was

14              necessary and to make your argument

15              that you have earlier proffered, that

16              the procedure was not necessary, and

17              that it was more of a search and

18              seizure than medically necessary

19              procedure.  I'm inclined to grant

20              that.

21              I'm not inclined to grant the

22              last two motions, because, number

23              one, even those people, maybe Joe

24              Saloom and maybe the DNA expert, may

25              be called by the State, they would be
```

```
 1              under, number one, an oath to tell
 2              the truth.  Number two, they don't
 3              work directly for the district
 4              attorney.  Number three, the request
 5              would really be just a second
 6              opinion.  These people would have a
 7              duty to tell the truth.  I know there
 8              might be some inclinations, some
 9              argument, that they would have an
10              inclination to testify favorably to
11              the State.  But I don't really think
12              that the defense would be entitled to
13              the last two, they being the
14              ballistic, and then, the DNA.  But I
15              do think it would be entitled to the
16              first.
17     MR. BRADSHAW:  The Court mentioned that
18              if we could show the Court some
19              evidence of who did the shooting, or
20              who may not have done the shooting,
21              and I'm speaking in reference to the
22              ballistic investigative expense
23              application, we anticipate there to
24              be some questions.  There is one gun
25              missing.  And the State through talk
```

1          at docket calls and arraignment, and
2          they are aware that a Co-Defendant
3          owned a particular type of gun.
4     THE COURT:  If you can show me there is a
5          question, then I would be more
6          inclined to grant that.
7     MR. BRADSHAW:  We don't have that yet.
8          But we are moving in that direction.
9          It's something we can show you.
10    THE COURT:  Well, let's keep this issue
11         open, then.  Right now, tentatively,
12         I'm going to deny the last two,
13         subject to consideration as the
14         evidence develops.
15              If you can show me a conflict
16         that would justify the Court will
17         reconsider at any point.
18    MR. SMITH:  And it is in our motion just
19         to be thorough, I always put in the
20         record, of course, Mr. Conrad is
21         indigent.  Mr. Bradshaw and I are
22         both appointed attorneys for him.
23    THE COURT:  I want to make sure there is
24         a fair trial.  I want to make sure no
25         constitutional rights are violated.

1    I don't want there to be any

2    constitutional questions, so I'm

3    going to bend over backwards.  But

4    the defense still has to show me

5    there is a question that would

6    justify it.  And right now there

7    would not be a question, other than

8    we want a second opinion to prepare

9    for examination.

10         I can certainly make

11   arrangements for you to take the

12   depositions of these people who might

13   be called as a State's expert.  They

14   are going to be under oath.  You can

15   prepare in that way, also.  So that

16   would get rid of the "B" part.

17         The question is:  Is there a

18   question of guns used in this

19   instance that would justify the

20   examination of this issue in this

21   detail.  If y'all can show me there

22   is, the Court would certainly look at

23   that.

24         And, of course, I would like

25   for you to show me as soon as

```
 1              possible, because we are running out

 2              of time before our scheduled trial

 3              date.  And, again, I would like the

 4              record to reflect that these, so far,

 5              have been ex parte hearings today.

 6                   The only people present are

 7              Mr. Robert Conrad, Gary Bradshaw, Al

 8              Smith, the Court Reporter, Sheila

 9              Hanson, and the Judge, Gary McAliley,

10              and the witness, or witnesses that

11              have testified.

12       MR. SMITH:  Judge, we don't have anything

13              further to offer at this time.

14       THE COURT:  Okay.  If y'all will please

15              do that as soon as you possibly can,

16              if you will bring that to my

17              attention, again, we will stop at any

18              time that y'all can do that and have

19              another ex parte hearing.  And I will

20              be glad to reconsider.  I want to

21              make sure y'all get everything as

22              timely as possible.  So timeliness is

23              important.

24       MR. SMITH:  Judge, Mr. Bradshaw and I

25              just made a gut check decision that
```

1           we would not call Mr. Conrad at this
2           ex parte hearing.  And at this time
3           we don't have anything else that we
4           can offer the Court at the moment.
5           We certainly, the moment we discover
6           anything, we will bring it to the
7           Court's attention.  We are not trying
8           to be dilatory in any respect.
9       THE COURT:  Well, you have some
10          additional time because we have some
11          more doctors that we need to get down
12          here and testify.  Dr. Sawyer, I
13          believe you said.
14      MR. SMITH:  Yes, sir.  And Dr. Sherry
15          Roach.  And my understanding is they
16          were not actually properly served
17          with subpoenas.  They were notified
18          by phone by the Sheriff's office
19          Friday evening.
20      THE COURT:  All right.
21      MR. SMITH:  Thank you, Judge.
22      THE COURT:  Let's make sure we get all of
23          your testimony evidence before we
24          rule on them.
25          (The Court, Defendant, Defense

1       Counsel moved to the courtroom).

2   THE COURT:  Court will come back to

3       order.  Is the State ready on its

4       motion?

5   MR. FULLER:  Yes, sir.  Mrs. Stout has

6       gone to get copies at the office for

7       purposes of this hearing.  There are

8       two Motions to Suppress.  There is

9       one as to the statements.  And there

10      is one as to the medical records of

11      the bullet.

12  MR. SMITH:  There are three separate

13      statements.  And one bullet.  Judge,

14      we would ask for the rule when we

15      start proceeding.

16  THE COURT:  Who do you expect to call in

17      this matter?

18  MR. FULLER:  Your Honor, with respect to

19      the medical records and the bullet,

20      the State would intend to call

21      Sergeant Spence and Detective Buford

22      Roberts and Dwight Holley.

23          The suppression evidence,

24      Sergeant Spence can be called.

25      Dwight Holley from my office would be

1          called.

2     THE COURT:  What about Investigator

3          Roberts?

4     MR. FULLER:  No, sir.  He is not

5          involved.

6     THE COURT:  So Dwight and Jeff Spence.

7                Who do you expect to call

8          first?

9     MR. FULLER:  I would like to start off

10         with the suppression of the medical

11         records.  And if we can separate it

12         by motions.

13    THE COURT:  That will be fine.

14    MR. FULLER:  And maybe Buford, and get

15         through early.

16    THE COURT:  Who will be your first

17         witness?

18    MR. FULLER:  I will start with Sergeant

19         Spence.

20    THE COURT:  Okay.  Then, Buford, if you

21         and Jeff will step out, we will call

22         you back in shortly.

23    MR. FULLER:  I saw Bruce Mathews' name on

24         the subpoena list.

25    THE COURT:  Does the defense anticipate

```
 1                    calling him?

 2        MR. SMITH:  Judge, I have subpoenaed,

 3              and, of course, Your Honor has heard

 4              my argument.  I've supbeanoed Dwight

 5              Holley, Bruce Mathews, Kyle Hale of

 6              the Enterprise Police Department.

 7        THE COURT:  How do you spell that?

 8        MR. SMITH:  K-y-l-e.  Second word

 9              H-a-l-e.

10        THE COURT:  Does anyone know where he may

11              be?

12        MR. FULLER:  No, sir.

13        THE COURT: Bruce, would you mind giving

14              him a call and asking him to come

15              down here?

16        MR. SMITH:  Judge, there are two more.

17              Rick Hauser with Enterprise P.D., and

18              Michael Hines, who I thought was

19              still with the Sheriff's Department.

20              But I understand that he is now with

21              the Enterprise P.D. now, also.

22        THE COURT:  Go ahead.

23        MR. FULLER:  For the record, Your Honor,

24              if I could just state in response to

25              what Mr. Smith brought up initially
```

1     about the subpoenas themselves, I was

2     at home about 5:30 Friday afternoon,

3     the 18th.  And Dr. Sam Sawyer called

4     me and informed me that his office

5     had called, and a subpoena had been

6     dropped off by the Sheriff's

7     Department subpoenaing him for court

8     on today, this date.  And he informed

9     me that he had surgery already

10    scheduled, and he was disgusted with

11    having to be subpoenaed so late and

12    so forth.

13          And I told him, of course,

14    that I could not give him legal

15    advice.  I suggested if he would give

16    me a way to contact him today that I

17    would pass that knowledge on to the

18    Court so that the Court and defense

19    counsel could make a determination

20    whether to call him or not.  He gave

21    me pager numbers, and informed me

22    that he would be in surgery this

23    morning, and we could try to contact

24    him any way that we could.

25    THE COURT:  Maybe we can go ahead with

1           all of the testimony.  And as we get

2           closer to the end of it, we can give

3           him a call and see if we can get him

4           down here.

5     MR.  SMITH:  Judge, I don't want to jerk

6           him out of somebody being operated

7           on.

8     THE COURT:  We sure don't want to do

9           that.

10    MR.  FULLER:  And Dr. Martin called me

11          about 6:00 o'clock and stated the

12          same story.  And, basically, I gave

13          him the same story.  And, basically,

14          I gave him the same information, and

15          I've got his number.

16    THE COURT:  Sure.  We have already taken

17          his testimony.

18    MR.  FULLER:  I called Al and left a

19          message on his machine right after I

20          got this information.  And I tried to

21          call your house, and there was no

22          answer.

23    MR.  SMITH:  I listened to his message

24          this morning as a matter of fact.

25    THE COURT:  Who was the other physician?

36

```
 1        MR. SMITH:  Dr. Sherry Roach.  And,

 2            Judge, on both, Dr. Roach and Dr.

 3            Sawyer, I listed both their homes and

 4            office addresses on the subpoena

 5            request forms.  Now, I have not seen

 6            the subpoenas, so I don't know what

 7            was put on them.  But I don't guess

 8            anybody has heard from Dr. Roach.

 9        THE COURT:  Well, we will have someone

10            call.  Is that a female physician?

11        MR. SMITH:  Yes, sir.

12        THE COURT:  We will have someone call

13            her, also, today.  We will get that

14            done hopefully today.  She use to be

15            my doctor, too.

16        MR. FULLER:  We're ready to go on the

17            first Motion to Suppress.

18        THE COURT:  Okay.

19        MR. FULLER:  The State will call Sergeant

20            Spence.

21

22

23

24

25
```

<u>JEFF SPENCE</u>

1

2       Whereupon, this witness, after first

3   being duly sworn to tell the truth, the whole

4   truth, and nothing but the truth, testified as

5   follows, to-wit:

6                   <u>DIRECT EXAMINATION</u>

7   <u>BY MR. FULLER:</u>

8       THE COURT:  Do you exempt Dwight Holley

9               from the rule?

10      MR. SMITH:  Yes, sir.  That's okay.

11      Q     State your name and your occupation

12  for the record?

13      A     Jeffery D. Spence, Sergeant with

14  the Enterprise Police Department.

15      MR. FULLER:  And if it pleases the Court,

16              I will try and limit my questions as

17              to Sergeant Spence on the Motion to

18              Suppress the medical records and

19              bullet if that's what we're going to

20              take up first.

21      THE COURT:  Sure.

22      MR. FULLER:  That way we can hopefully

23              kind of expedite our time.

24      Q     You are an investigator or

25  detective with the Enterprise Police

1    Department?  Is that correct?

2        A      That's correct.

3        Q      And were you so employed, and did

4    you occupy the same position on or about May

5    23rd of 2001?

6        A      Yes.

7        Q      Let me ask if you had opportunity

8    to be contacted or notified about a shooting

9    that had occurred on County Road 711 in the

10   Enterprise police jurisdiction on May 23rd,

11   2001?

12       A      Yes.

13       Q      What time were you informed,

14   approximately?

15       A      Approximately, 1:30.

16       Q      Did you respond to the scene?

17       A      Yes, I did.

18       Q      Based upon the policy and

19   procedures of the Enterprise Police Department

20   were you assigned the primary investigative

21   duties of this case?

22       A      I was.

23       Q      Did your duties include either

24   collecting or supervising in the collection or

25   the instruction of others to collect evidence

1    material to this case?

2         A    Yes.

3         MR. FULLER:  Al, if my leading gets too

4              bad, tell me.  I will try to narrow

5              it down and not lead on the pertinent

6              things.

7         MR. SMITH:  I agree with you.  We are at

8              the preliminary stages.  Go right

9              ahead.

10        Q    You said that you were notified

11   approximately what time?

12        A    I believe it was 1:30 p.m.

13        Q    1:30.  While you were at the

14   scene, were you notified, or did you learn that

15   an individual had reported to Medical Center

16   Enterprise with some injuries which appeared to

17   be gunshot wounds?

18        A    Yes.

19        Q    What time were you notified of that

20   information?

21        A    I believe it was approximately 2:00

22   p.m.

23        Q    What, if anything, did you do in

24   response to information concerning the

25   individual who had been taken to Medical Center

1    Enterprise?

2        A    Detective Roberts was already at

3    Medical Center Enterprise, and I instructed him

4    to obtain what information he could at the

5    time.

6        Q    Had Detective Roberts been directed

7    to go to the Medical Center in response to the

8    injuries that the victim in this case, Mrs.

9    Dennis, suffered?

10        A    Yes.

11        Q    So he was already there when, as it

12    turns out when the Defendant in this case, Mr.

13    Conrad, was dropped off?

14        A    That's correct.

15        Q    Were you informed as to the

16    circumstances under which Mr. Conrad came about

17    getting to the Medical Center Enterprise?

18        A    Just someone had dropped him off in

19    a wheelchair at the Medical Center.

20        Q    When you notified Detective

21    Roberts, what  information did you give him, or

22    what directive did you give him on evidence

23    that you wanted to be collected from the

24    potential suspect, if any?

25        A    And he learned that Mr. Conrad was

1    suppose to go into surgery.  And I instructed

2    him to obtain the projectiles if they were

3    removed from Mr. Conrad.

4         Q    Had Mr. Conrad made statements to

5    you, or any other member of law enforcement,

6    that may have indicated that he was a suspect

7    in this crime?

8         A    Not at the time, no.

9         Q    And I'm talking about at the time

10   that he went into surgery.  What information

11   did you have to believe that he was involved in

12   the murder of Jelaine Dennis?

13        A    None.

14        Q    When Detective Roberts was at the

15   hospital, are you aware of a subpoena that was

16   issued by me, a District Attorney subpoena, for

17   the collection of medical records and test

18   results from Mr. Conrad?

19        A    Yes.

20        Q    Was it your instructions to Buford

21   in furtherance of what he was suppose to

22   collect from the hospital, did you expect him

23   to interview all of those who had treated Mr.

24   Conrad after he was dropped off at the

25   emergency room?

1         A    It would have been difficult for

2    him to do that due to the fact that they would

3    have had to stop their treatments of other

4    patients.

5         Q    Is that what you wanted him to do,

6    is to get information about the circumstance

7    upon this person turning up with gunshots in

8    his body within an hour of the crime being

9    committed?

10        A    Yes.

11        Q    You weren't there when Dwight

12   Holley served the D.A. subpoena on the

13   custodian of records were you?

14        A    No.

15        Q    So I will go back to the bullet

16   itself.  You instructed Buford to place

17   whatever evidence, and talk to the people that

18   had treated Mr. Conrad, regarding the

19   circumstance of his gunshot wounds?

20        A    Correct.

21        Q    What, if anything, did Buford do,

22   to the best of your knowledge, concerning the

23   collection of any evidence itself that was

24   later determined to be evidence for the

25   prosecution of Mr. Conrad in this case?

43

1        A       He stood by and received the

2   projectile that was taken from Mr. Conrad

3   during surgery.

4        Q       To your knowledge was he in the

5   operating room when the projectile was

6   recovered?

7        A       I believe he was.

8        Q       And did he recover it directly from

9   the surgeon who removed it from Mr. Conrad?

10       A       Yes.

11       Q       Was the evidence secured by him and

12   either kept by him or other members of the

13   Enterprise Police Department until it could be

14   turned over to the Department of Forensic

15   Sciences?

16       A       Yes.

17       Q       Was it subsequently turned over to

18   the Department of Forensic Sciences?

19       A       Yes.

20       Q       And did you receive either or both

21   a verbal and written report from Joe Saloom

22   with the Department of Forensic Sciences?

23       A       I received a notification verbally

24   from Dr. Joe Saloom.

25       MR. FULLER:  Judge, I don't really know

```
 1              how far to go as far as the evidence
 2              itself, if you wish to get the
 3              evidence, i.e., the bullet in this
 4              case.
 5      THE COURT:  I don't think that's
 6              necessary for this hearing.
 7      MR. FULLER:  I've got copies of the
 8              report.
 9      THE COURT:  No.  This is a motions
10              hearing.  We don't need any of that.
11
12      MR. FULLER:  I was just -- and we may can
13              do this without argument.  This is a
14              copy of that report.
15      MR. SMITH:  For purposes of this hearing,
16              we have no objection to this.
17      MR. FULLER:  And I understand for
18              purposes of this hearing, this is the
19              report from the Department of
20              Forensic Sciences, Joe Saloom.  It is
21              four pages in length.  And it covers
22              a number of items of evidence that
23              were collected and submitted to him
24              for examination.
25      Q    Mr. Saloom gave you a verbal report
```

1   concerning the bullet that came out of Mr.

2   Conrad's arm on May the 24th, did he not?

3        A     Correct.

4        Q     And you used that information in

5   further developing Mr. Conrad as a suspect and

6   ultimately arresting him in this case?

7        A     Correct.

8        Q     But after you received that

9   information from Mr. Saloom, you received a

10  full report from him and the date of his report

11  is July 31st, 2001?

12       A     I have not received a report as of

13  yet.

14            MR. FULLER:  We have gotten a copy.  And

15                 I ask for purposes of this

16                 hearing, and I don't think we

17                 are going to have any argument.

18                 This is a copy of this report

19                 from Joe Saloom concerning this

20                 evidence.        .cq 0 10 0

21            MR. SMITH:  We stipulate this is the

22                 report for this hearing.

23            THE COURT:  Certainly.  And we will have

24                 another for other purposes.

25            MR. FULLER:  I think Al indicated in his

1              Motion to Suppress the bullet

2              and all that he had never gotten

3              any report back.  But we filed

4              this in November in our

5              discovery response.

6    THE COURT:  I have not seen that.

7    MR. SMITH:  I've got a forensic report.

8              I may have seen that after that

9              motion was drafted, but I've

10              definitely gotten a report.

11   MR. FULLER:  Okay.  I just want to make

12              sure there's no argument.  You

13              do have the report, so we can

14              get our discovery straight.

15   MR. SMITH:  Right.

16   THE COURT:  I just want the record to

17              reflect that you mentioned Joe

18              Saloom.  Joe Saloom is the

19              ballistic person who is going to

20              be alleged to be a ballistic

21              expert?

22   MR. FULLER:  Yes, sir.

23   THE COURT:  Did you mark that as State's

24              Exhibit A, Mark?

25   MR. FULLER:  Yes, sir.  And move to

1              introduce State's Exhibit 1.

2         THE COURT:  Which is a ballistic report.

3         MR. FULLER:  Yes, sir.

4         THE COURT:  It's in evidence for this

5              limited hearing.

6                   Mr. Bradshaw, during some

7              break, if you would call your

8              witnesses, Dr. Sawyer and Sherry

9              Roach, and tell them that we

10             will get to them some time

11             today, when we see them come

12             down here, we will stop and take

13             them out of turn.

14        MR. BRADSHAW:  Yes, sir.

15        Q     You never saw the medical records

16   on the date they were subpoenaed?  May 23rd --

17        A     No.

18        Q     -- 2001, did you?

19        A     No.

20        Q     Was Investigator Dwight Holley

21   assisting you in the investigation of this

22   case?

23        A     Yes, he was.

24        Q     To your knowledge, did he in fact

25   recover these medical records from Medical

1    Center Enterprise?

2         A    Yes.

3         Q    You had that knowledge and benefit

4    of these medical records in subsequent

5    interviews that you had with Mr. Conrad which

6    we will take up in separate hearings on the

7    suppression of the interviews?

8         A    Yes.

9         MR. FULLER:  I think that's all I have of

10            this witness for this particular

11            motion.

12       THE COURT:  Mr. Smith?  Mr. Bradshaw?

13       MR. SMITH:  Thank you, Your Honor.  I

14            will cross examine.

15                    CROSS EXAMINATION

16   BY MR. SMITH:

17        Q    Mr. Spence, you were notified of

18   the shooting on May 23rd 2001, on County Road

19   711, at the Toy Store?  Is that correct?

20        A    Correct.

21        Q    Were you on duty or off duty at

22   that time?

23        A    I was on my lunch break.

24        Q    And you were notified by radio and

25   responded in your patrol car, I assume?

1      A      Actually, I was notified by pager,

2   and then, I responded.

3      Q      Jeff, can you pull the microphone

4   around a little bit.  I'm getting hard of

5   hearing.  Yell at me, if you will.  I won't be

6   offended.

7              What representatives from the

8   D.A.'s office were present?  Let me break it up

9   into segments, when you arrived at the Toy

10  Store?

11     A      None were at the scene at that

12  time.

13     Q      All right.  And during this period

14  you've testified about, that you communicated

15  with Mr. Roberts at the hospital, were you in

16  communication with District Attorney's

17  personnel at that time?

18     A      I believe I was.

19     Q      All right.  And there were other

20  police officers from the Enterprise Police

21  Department present at the Toy Store?  Is that

22  correct?

23     A      That's correct.

24     Q      And there were members of the

25  Coffee County Sheriff's Department?  Or were

```
 1    there, I guess?

 2         A      I don't recall seeing any of them

 3    present.

 4         Q      And were persons from the

 5    Department of Forensic Sciences there at the

 6    Toy Store?

 7         A      Not at that time.  They were not.

 8         Q      Now, the victim in this case was

 9    carried to the hospital?  Medical Center

10    Enterprise?  Is that correct?

11         A      That's correct.

12         Q      And you've testified that Officer

13    Roberts was instructed to follow the ambulance

14    to the hospital, or go to the hospital?  I

15    didn't quite understand you?

16         A      He was already at the hospital,

17    when I arrived at the scene, with the victim in

18    this case.

19         Q      All right.  Now, did you

20    communicate to him as soon as you arrived at

21    the scene with Officer Roberts?

22         A      Yes.

23         Q      By telephone?  Or radio?  Or how?

24         A      Cellular phone.

25         Q      And your conversation with him at
```

1    that time was what, sir?

2          A     At first -- the first conversation

3    we had was he told me that the victim had died

4    in this case.  And then he called me back and

5    informed me that a person was brought into the

6    hospital with a gunshot wound.

7          Q     How much time elapsed between your

8    conversation, in your best judgment, if you

9    don't know exactly, from the time that he told

10   you on the cell phone that she had died, until

11   someone came in with a gunshot wound?

12         A     To be real conservative, it would

13   be within an hour.

14         Q     All right.  And why was he

15   remaining there at the hospital, if you know?

16         A     For the victim.

17         Q     Chain of custody of the body?

18         A     Chain of custody with the body.

19   Correct.

20         Q     What did he tell you when he called

21   you and told you that someone had come in with

22   gunshot wounds?

23         A     He stated that an individual came,

24   pushed in a wheelchair, with a subject that had

25   suffered gunshot wounds, that had been from

1    what he could understand shot on Methodist

2    Side.

3         Q      Do you know how he learned what he

4    told you?

5         A      That I don't know.  Maybe in

6    talking to a nurse.

7         Q      Did he identify the person that had

8    been shot to you at that time?

9         A      Not at that time, no.

10        Q      What were your instructions to him

11   when he he told you that someone had come in

12   that had been shot?

13        A      Find out his condition.  Also, if

14   at all possible, to obtain the evidence from

15   his injuries, such as, if he was going to be

16   operated on, to recover any of the projectiles

17   as evidence.

18        Q      Have you ever done that before?

19        A      Yes.

20        Q      Recovered projectiles from the

21   operating emergency room or surgery?

22        A      Personally, I have not.

23        Q      Have you ever directed other

24   persons to do so?

25        A      We have not had anything like this

1    happen since I have been in a supervisory

2    position.

3         Q    The answer would be, no, then --

4         A    Correct.

5         Q    -- since you have been in a

6    supervisory position?

7         A    Correct.

8         Q    When Detective Roberts called you

9    and told you that the person that had been

10   brought into the hospital and shot, and you

11   advised him to get the evidence, who if anyone

12   else did you notify of that conversation?

13        A    Captain William Moore, also, Dwight

14   Holley with the D.A.'s Office.

15        Q    Where was Mr. Holley when you

16   notified him?

17        A    I don't recall if he was out at the

18   scene, or if he was at Medical Center at the

19   time.  He might have been in route to the

20   Medical Center.

21        Q    Did you have any discussion with

22   Mr. Holley about the collection of the

23   evidence?

24        A    I believe I told him what I had

25   directed Detective Roberts to do.

1          Q       Was there any discussion with the

2     District Attorney's officer at that time?

3          A       No, not that I recall.

4          Q       Did you and Detective Roberts

5     discuss the means by which he was to recover

6     any items of evidence from the person who had

7     come there being shot, that we know now was Mr.

8     Conrad?

9          A       I just advised him to get with the

10    surgeon and see what means were available to

11    obtain the evidence.

12         Q       Did you know who the surgeon would

13    be at that time?

14         A       No, I did not.

15         Q       Did you know where, we will

16    identify him as Conrad, where on his body he

17    had wounds?

18         A       What Detective Roberts advised me

19    was to his arm and to his stomach area, abdomen

20    area.

21         Q       Did you have any discussions about

22    the condition of Mr. Conrad, other than the

23    fact that he was shot?

24         A       Other than he was shot, and they

25    were going to take him to surgery.

1          Q       Any further discussions regarding

2     whether he was on death's door, or

3     superficially hurt, or anything in between?

4          A       They just advised that they had to

5     take him into surgery.  That's all I knew.

6          Q       Now, when did you first have any

7     discussions regarding the D.A. subpoena for

8     medical records?

9          A       It was shortly after he was taken

10    into surgery.

11         Q       Who was that conversation with?

12         A       Dwight Holley

13         Q       All right.  Would you relate the

14    substance of that conversation to us, please?

15         A       I advised him that he were going to

16    need some information about the records since

17    it was going to be very difficult to interview

18    all of the nurses and doctors that were at the

19    E.R., working with the victim and Mr. Conrad in

20    this case, and prevent them from assisting

21    other patients.

22         Q       And did you, based on that theory

23    or philosophy, make any requests of Mr. Holley?

24         A       I asked him if we could get a D.A.

25    subpoena for these records.

1       Q       And what was his response to you?

2       A       He would confer and possibly get

3    one.

4       Q       Did you learn that a D.A. subpoena

5    was then issued?

6       A       Yes.

7       Q       How did you learn that, and

8    approximately when did you learn that?

9       A       It was later on in the day when I

10   learned that.

11      Q       Do you have a judgment or opinion

12   as to approximately when?

13      A       Approximately three hours later.

14      Q       All right.  And where were you when

15   you learned that a D.A. subpoena had been

16   issued?

17      A       I had went to the District

18   Attorney's Office.

19      Q       Had the records been obtained by

20   that time?

21      A       I don't believe they were prepared

22   at that time.

23      Q       An item subsequently became

24   evidence and taken from Mr. Conrad?

25      A       You're talking about the

1    projectile?

2         Q    Yes, sir.

3         A    Detective Roberts notified me that

4    afternoon that he had recovered that projectile

5    from the surgeon.

6         Q    And do you know, or have a judgment

7    or opinion about, how much time passed between

8    the conversation with Mr. Holley about getting

9    the records, until Detective Roberts told you

10   the bullet had been recovered?

11        A    Not right off hand.  You have to

12   understand that was a real busy time for us,

13   trying to get some interviews conducted and

14   whatnot.

15        Q    I understand.  And that's why I say

16   generally, any idea?

17        A    Generally, I would say

18   two-and-a-half hours.

19        Q    You learned that you had the bullet

20   before the D.A. subpoena?

21        A    No.

22        Q    After the D.A. subpoena?

23        A    After.

24        Q    How many bullets were recovered?

25        A    I believe only one.

1      Q      And did you subsequently take

2  custody or control of that item of evidence?

3      A      No.  It went from Detective Buford

4  Roberts to Detective Rick Hauser.

5      Q      All right.  And do you know when

6  the custody was changed from Roberts to Hauser?

7      A      That night.

8      Q      Late?  Early?

9      A      It was before midnight.

10     Q      Okay.  Before midnight.  We are

11  still on the 23rd?

12     A      Correct.

13     Q      And do you know what Rick Hauser

14  did with the item of evidence?

15     A      The following day he took it to

16  forensic sciences in Montgomery.

17     Q      To Joe Saloom?

18     A      Yes.

19     Q      And were you listed as the case

20  agent on the paperwork that went to Mr. Saloom?

21  Or do you know?

22     A      I believe I was.

23     Q      So you never actually handled the

24  projectile item of evidence itself?  Is that

25  correct?

1     A     That's correct.

2     Q     Did you receive a verbal report

3  from Mr. Saloom?

4     A     Yes.

5     Q     You, personally?

6     A     I was at the D.A.'s office when

7  they received it.

8     Q     Was that by telephone call?

9     A     Yes.

10     Q     When did that occur?

11     A     Between 12:00 and 1:00 p.m. on the

12  24th.

13     Q     So it would have been after lunch

14  on the 24th?

15     A     Yes.

16     Q     And Mr. Saloom called the District

17  Attorney's Office.  Do you know who he spoke

18  with?

19     A     That I do not know.

20     Q     The general knowledge that came,

21  that he made an analysis and made a finding?

22  Is that correct?

23     A     That's correct.

24     Q     Did you have any conversation with

25  any of the medical personnel, yourself, at

1    Medical Center Enterprise that treated Mr.

2    Conrad?

3        A    I did not.

4        Q    Was there any conversation with any

5    law enforcement officer or any medical

6    personnel relating to Mr. Conrad?

7        A    When are you talking about?

8        Q    From the time that he was taken to

9    the hospital, until he was taken to the county

10    jail?

11        A    I believe there was.

12        Q    Do you recall who would have been

13    the medical person that the conversations with

14    law enforcement was reported to?

15        A    I don't know the person's name.

16        MR. FULLER: Your Honor, I don't mean to

17    be objectionable, but I think he is a little

18    confused. Because there were a lot of

19    discussions with medical people. Are you

20    wanting him to tell you every time they checked

21    on somebody and --

22        MR. SMITH: No. I have gone as far as I

23        need to.

24        MR. FULLER: I don't want to cut you off.

25        I just think he's probably confused.

1          There were a lot of folks that he

2          talked to about a lot of things.

3     MR. SMITH:  I have gone as far as I

4          wanted to with this witness.

5     THE COURT:  Okay.

6     MR. SMITH:  One moment, please, Your

7          Honor.

8     THE COURT:  Sure.

9     Q     (By Mr. Smith) Jeff, did anybody

10   make a comparison of the bullet taken out of

11   Mr. Conrad with any other item of evidence,

12   other than Mr. Saloom, as far as you know?

13    A     As far as I know, only Mr. Saloom.

14    Q     And you were not made aware of any

15   comparison until the afternoon of the 24th?  Is

16   that correct?

17    A     Correct.

18   MR. SMITH:  That's all, Your Honor.

19   THE COURT:  Mr. Fuller.

20   MR. FULLER:  I call Dwight Holley.

21   THE COURT:  So we are finished with this

22        witness.

23             Mr. Bradshaw, I would

24        like for you to take a few minutes

25        and call those folks, and let us know

62

1          when you are finished.  And we will

2          start back.  We will take a few

3          minutes for that purpose.  Let me

4          know.

5              (A short break was taken).

6     THE COURT:  So you anticipate recalling

7          Officer Spence?

8     MR. SMITH:  Possibly, yes, sir.  Judge,

9          we have some ex parte motions.

10    THE COURT:  Ex parte.  Okay.  We will

11         move on back to my office.

12                DR. SAM SAWYER

13        Whereupon, this witness, after first

14   being duly sworn to tell the truth, the whole

15   truth, and nothing but the truth, testified as

16   follows, to-wit:

17    THE COURT:  First of all, we apologize

18         to you for you getting you subpoenaed

19         late.  I don't have any control over

20         when lawyers subpoena people.  But I

21         just want you to know that I set this

22         hearing on today's date.  One of the

23         reasons was I felt it would be easier

24         for physicians to come down.  We have

25         a lot of physicians that are going to

```
 1              end up testifying.  And I heard that

 2              you just got a faxed subpoena or

 3              something Friday?

 4        DR. SAWYER:  Yes.

 5        THE COURT:  And it wasn't timely.  So we

 6              apologize for that.

 7        DR. SAWYER:  I just called Mark, and

 8              asked if I didn't have to be there

 9              right at 9:00, it would be okay.  I

10              had one case, but it wasn't going to

11              take that long.

12        THE COURT:  This is what's called an ex

13              parte motion's hearings, this first

14              part of it.  And it's rather unusual,

15              because one side has filed a motion,

16              and that is the defense gets to ask

17              you some questions outside of the

18              hearing of the prosecution for

19              purposes of me ruling on their

20              motions that they have filed that the

21              district attorney is not allowed to

22              know their strategy in this matter in

23              certain areas.  So we will hear that

24              first.  These lawyers can ask you

25              whatever they wish to ask you about
```

```
 1              these matters.

 2                   And then we will call the

 3              District Attorney in, and he will

 4              find out what happened when you

 5              operated.

 6         DR. SAWYER:  Okay.

 7         THE COURT:  He has been sworn.

 8                DIRECT EXAMINATION

 9  BY MR. SMITH:

10      Q      Dr. Sawyer, I'm Al Smith.  I'm one

11  of the attorneys appointed to represent Mr.

12  Conrad.  And your name for the record, please,

13  sir?

14      A      Samuel F. Sawyer.

15      Q      And your profession?

16      A      General surgeon.

17      Q      You are affiliated with Medical

18  Center Enterprise?  Is that correct?

19      A      Well, I'm on active medical staff

20  at Medical Center Enterprise.

21      Q      What does that mean?

22      A      Well, I'm an independent

23  practitioner. I have my own office, Sawyer

24  Surgery Clinic.  But I'm on medical staff,

25  which means that I respond to emergencies, to
```

1    the emergency room, or whatever when I'm on

2    call.

3          Q      And directing your attention to May

4    23rd of 2001, did you have occasion to be

5    called regarding Mr. Robert Conrad and gunshots

6    wounds to him?

7          A      Yes.

8          Q      And would you tell me, where you

9    were when you got called, and how you received

10   the call, that there was someone needing your

11   attention?

12         A      I was actually already in the

13   emergency room taking care of another trauma.

14   And then he came in.  And so when I finished

15   with the other one, I went to take care of him.

16         Q      Would you describe what you

17   observed when he first was presented to you?

18         A      He was stable.  He had a bullet

19   wound in his abdomen and another one in his

20   arm.  Physical exam of the abdomen showed that

21   he in fact had blood or gut content or

22   something in the abdomen which required

23   surgery.

24         Q      That's a life-threatening matter,

25   is it not, sir?

1          A      Yes.

2          Q      And surgery would be required for

3    that wound?

4          A      Yes.

5          Q      And did you -- who else, in

6    particularly law enforcement personnel, were

7    present at the time that you were examining?

8          A      I'm sorry.  I know that Buford

9    Roberts was there.

10         Q      Did Mr. Roberts -- do you recall

11   seeing him at the time that you were actually

12   treating the other person?  Is that not

13   correct?

14         A      I can't say.  I mean there was a

15   lot going on.

16         Q      I understand and your focus was

17   taken.

18         A      Yes.

19         Q      But do you recall seeing Mr.

20   Roberts there as you were treating Mr. Conrad?

21         A      Yes.

22         Q      Did you and Mr. Roberts have any

23   conversations, particularly regarding Mr.

24   Conrad?

25         A      No.  I did talk with Mark Fuller at

67

```
 1    pre-op.

 2          Q       Pre-op?  Is that correct?

 3          A       Yes.

 4          Q       Would you relate the substance and

 5    the details of that conversation, please, sir?

 6          A       Basically, Mark asked me if the

 7    bullet was going to be removed.

 8          Q       And did you discuss one or two

 9    wounds at that time?

10          A       Both.

11          Q       Both wounds?

12          A       Uh-huh.

13          Q       And he asked if the bullets were

14    going to to be removed?

15          A       Yes.

16          Q       What else was discussed?

17          A       Well, at that point I told him that

18    most likely the one in the abdomen would not be

19    removed, because it would not be indicative

20    because it was probably further in the muscle

21    of the back or whatever.

22                  But the one from the arm would be

23    removed, because it was right under the skin.

24    And it would cause infection.  So it required

25    removal from a medical standpoint.
```

1      Q      Why would the one from the arm

2   cause infection when one from the abdomen

3   wouldn't? And perhaps that's a poorly raised

4   question. But why would you be concerned about

5   one and not the other one?

6      A      Because of the location. If you

7   have a  bullet that's right under the skin,

8   it's going to irritate the skin and wind up

9   causing infection. The other one would

10  probably be in the muscles of the back and

11  would not.

12     Q      Let me ask you to look at this

13  document. And a copy of that is already in

14  evidence as Defendant's Exhibit A.  The second

15  report there in the document discusses the

16  wound in the abdomen?

17     A      Uh-huh.

18     Q      And uses some terms in locating the

19  wound that I certainly don't understand.  Would

20  you tell me where, in terms so that a lay

21  person could understand, where it is?

22     A      It says here metallic foreign body,

23  compatible with a bullet, projecting near the

24  acetabulum, superolateral to it, on the left

25  side.

1    That basically means that it's deep within the

2    muscular tissues.

3            The acetabulum is the socket or the

4    hip joint.  So superolateral means above and to

5    the side.  In other words, the bullet went

6    through the abdomen and was in the big muscles

7    of the upper thigh, down near the hip joint.

8    Not in the joint, but near it.

9        Q    All right.  The abdomen wound, you

10   said, indicated that the peridium was

11   punctured?

12       A    Uh-huh.

13       Q    And that required that you go in

14   and do surgery?

15       A    Correct.

16       Q    Now, and I know you are not a

17   ballistic expert.  But I unfortunately would

18   assume that you have practiced here in

19   Enterprise for some length of time, and are

20   familiar with gunshot wounds.  When a bullet is

21   fired, is it not somewhat sterilized by the

22   blast of the powder that's ejected from the

23   gun?

24       A    Yes.  To the point that you don't

25   have to go get out every bullet that's in

1    somebody.  Right.

2         Q     So, secondary infection from

3    contaminants on the bullet itself is really not

4    a great concern, is it?

5         A     That's correct.

6         Q     And the protocol or the criteria

7    for removing the bullet when it's not

8    threatening an organ or a vessel or something

9    of that nature, you balance the damage you are

10    going to do taking it out with the risk of it

11    being left in?  Would that be a --

12         A     Yes.

13         Q     -- a correct elementary way to

14    describe it?

15         A     Yes.

16         Q     And at what point of the

17    examination did you make a determination to

18    remove the bullet from the arm?

19         A     When we were in the emergency room,

20    we obviously mobilized the team for the

21    peritonitis, you know, the abdominal

22    exploration with the decision to be made to do

23    the lesser and less important procedure if

24    everything had gone well with the abdominal

25    surgery.  It remained stable.

1              In other words, we took care of the

2     life-treating injury first, realizing that, you

3     know, because it was going to be symptomatic as

4     far as painful, as far as causing infection in

5     the skin, he was still, so we went ahead and

6     removed the bullet to do that.

7          Q      And you had already spoken with

8     Detective Buford Roberts at the emergency room?

9          A      I'm sure I talked with Fuller.

10         Q      And you did talk with Mr Fuller

11    pre-op?

12         A      Yes.

13         Q      Did Detective Roberts make any

14    request of you with regard to anything dealing

15    with Mr. Conrad or the projectiles?  Did he ask

16    you to give him anything that you took out?

17         A      Oh, yeah.  It was pretty obvious

18    that, you know, with a potential crime here,

19    that the bullet should be given to police.  We

20    do that all the time.

21         Q      And other than the fact that Mr.

22    Conrad himself had bullet wounds, what else was

23    obvious that the crime had occurred?

24         A      We were obviously making the

25    assumption that he was involved in the

1   shooting.

2          Q      Ms. Dennis?

3          A      The blond headed lady at the Toy

4   Box.  I don't know her name.  I never knew her

5   name.

6          Q      Is that the trauma patient that you

7   were --

8          A      Yes.

9          Q      She had died?

10         A      She died.  That's right.

11         Q      And, therefore, it was obvious that

12  Mr. Conrad, having been shot, and the lady just

13  died of gunshots wounds, some criminal activity

14  was a foot?

15         A      Well, I mean it could be.  It could

16  be.  The potential was there.

17         Q      And you knew that Mr. Roberts was

18  there because of Ms. Dennis having been killed?

19         A      Correct.

20         Q      Would it be correct to say that he

21  then, Detective Roberts, then kind of shifted'

22  his focus from Ms. Dennis over to Mr. Conrad

23  when he came in?

24         A      I can't tell you right off.

25         Q      I realize I was asking for what he

1   was thinking. And I meant what you observed.

2       A    I really -- I can't tell you. I

3   know that initially it was trying to save her

4   life. And we were not able to. And there was

5   some suspicion that Mr. Conrad was involved.

6   But, yes, he was keeping an eye on him. I

7   don't remember the details.

8       Q    Mr. Roberts is who you refer to

9   when you say "he"?

10      A    Yes.

11      Q    Keeping an eye on Mr. Conrad?

12      A    Uh-huh.

13      Q    And then Detective Roberts asked

14  you for everything that you recovered? Is that

15  correct?

16      A    Yes.

17      Q    Did Detective Roberts actually go

18  into the operating room with you?

19      A    Yes.

20      Q    And he had -- this would have been

21  the conversation with Mr. Fuller, regarding the

22  bullets -- had already occurred?

23      A    Yes.

24      Q    Mr. Fuller being the District

25  Attorney?              A    Right.

1          Q      Ms. Dennis had already expired?

2          MR. FULLER:  "Dennis"

3          THE COURT:  "Mrs. Dennis."

4          Q      Mrs. Dennis.  I apologize.  Mrs.

5     Dennis had already expired?

6          A      Yes.

7          Q      And the focus of suspicion, if you

8     will, was on Mr. Conrad, who had a couple of

9     bullet wounds in him?  Would that be a correct

10    sequence of events?

11         A      Yes.

12         Q      Now, Detective Roberts went into

13    the operating room with you?

14         A      Yes.

15         Q      Y'all put all the gowns and masks

16    on?

17         A      He did not come in until we got

18    ready to do the arm.  He was not in while the

19    abdomen was open, during any of the critical

20    part of the operation.

21         Q      And what did he do while he was in

22    the operating room?  And I'm not talking about

23    just standing around waiting, what he actually

24    did.

25         A      He watched me remove the bullet

1  from the arm, actually remove it from the

2  tissue.  And I took it and handed it directly

3  to him.

4      Q      Substratum tissue is right below

5  the surface of the skin?

6      A      Right.

7      Q      And, again, I'm using very simple

8  lay terms.  You basically made the decision,

9  took the bullet out, and then sewed it back up?

10  Would that be correct?

11      A      That's right.

12      Q      Do you recall how many stitches it

13  took?

14      A      One.

15      Q      Just one stitch?

16      A      Yes.

17      Q      Was the bullet in any blood

18  vessels?

19      A      No.

20      Q      And certainly there were no organs

21  that the bullet was next to?

22      A      No.

23      Q      I don't suppose you call an arm an

24  organ, would you?

25      A      No.  Well, I'm sure it went near

1    vessels and nerves, as it went through. But he

2    didn't have any problems with his hands, any

3    vascular or neurological problems with his

4    hands.

5        Q    There wasn't any arterial bleeding,

6    or swelling up of tissue, or anything of that

7    nature?

8        A    No.

9        Q    Did you actually hand the bullet to

10   Detective Roberts?

11       A    Yes.

12       Q    And when I say hand it to him, I

13   assume that you have it on forceps or

14   something? Or do you actually have it in your

15   hand?

16       A    I have it in my hand. You don't

17   want to touch the outside of a bullet with

18   anything metal.

19       Q    Why is that?

20       A    Well, it could mess up the rifling,

21   make it tougher for forensics.

22       Q    Okay. It would make it tougher

23   evidential wise for the police or state to

24   analyze?

25       A    Correct. So you make an incision,

1   and you can touch the butt end of the bullet

2   with something metal to get it out.  But then

3   nothing metal to pass it on.

4        Q    And you are concerned with

5   preserving any items of evidence that police

6   need in the course of you taking it out?  Is

7   that correct?

8        A    I saw the O.J. trial.

9        THE COURT:  Unfortunately, a lot of us

10            did.

11   MR. SMITH:  We are all living with that.

12        A    But that was the reason, you know,

13   so that the evidence, if he were ultimately

14   charged with a crime, the evidence would go

15   directly from the patient's body, to me, to the

16   policeman.

17        Q    You actually put it into Mr.

18   Robert's hands?

19        A    Yes.

20        Q    Did you see it after that?

21        A    No.

22        Q    When you spoke with Mr. Fuller, did

23   he discuss, or anyone else for that matter, but

24   was anything discussed about a subpoena for

25   anything involving Mr. Conrad?

1          A      Uh-huh.

2          Q      One-half second, Judge.

3          THE COURT:    Would you tell the D.A.'s we

4                  are getting ready for them to come

5                  in.  If they will come stand at this

6                  door.  We might have to go through

7                  this, again.  When we get to that

8                  point.  We'll see.

9          Q      Dr. Sawyer, again, I'm asking you

10    to put in terms the things so that I, a lay

11    person, could understand.  You said that Mr.

12    Conrad was stable?

13         A      Yes.

14         Q      Would you explain what that means

15    in terms of -- if I've got two bullet holes in

16    me, I'm going to be excited at the minimum.

17         A      Okay.  When I say "stable," his

18    vital signs, his heart rate and blood pressure

19    were normal.

20         Q      His heart rate and blood pressure

21    were normal?

22         A      Yes.

23         Q      He had two holes in his colon.

24    Obviously, if you did not operate on him, he

25    would ultimately become unstable.  He would

1    have a leaking stool into his abdomen, get

2    blood poisoning, and die.  He had only hit one

3    small artery.  And it had quit bleeding.  So

4    he was not in shock or anything.  But the fact

5    that he had the peritonitis meant take him to

6    surgery.

7        Q    He was hurt, but he wasn't in

8    imminent danger of dying right there in front

9    of you as far as you could tell?

10       A    Correct.

11       Q    Would that be correct?

12       A    Correct.

13       Q    Was he in pain?

14       A    Yes.

15       Q    A lot of pain?

16       A    A lot of pain.

17       Q    Was he given anything there in the

18   emergency room for that pain?

19       A    I don't know.  I would have to look

20   at the chart.

21       Q    You don't have that with you?

22       A    No.  I just have my office chart.

23       Q    Would it be normal for a person

24   who's shot in the abdomen and in a lot of pain

25   to be given medication?

1      A      Yes.

2      Q      Who would order that medication?

3   You?

4      A      I would.

5      Q      What typically would you order as

6   medication for that time of injury?

7      A      Demerol.

8      Q      All right.  Now, Demerol, if you

9   will tell the Court what that substance is?

10     A      It's a narcotic.

11     Q      A very strong narcotic, is it not?

12     A      Uh-huh.

13     Q      Does it suppress the central

14   nervous system?

15     A      Yeah, to a degree, yes.

16     Q      And has a narcotic affect on the

17   human being to try to deal with the pain?  Is

18   that correct?

19     A      Yes.

20     Q      Do you know if any other

21   medications there in the emergency room were

22   given to him?

23     A      I'm sure he got antibiotics.

24     Q      All right.  In the operating room,

25   what kinds of medications would he have been

1  administered there?

2      A    Both inhaled and intravenous

3  anesthetic agents.

4      Q    And that renders him unconscious?

5      A    Yes.

6      Q    Is there any residual effect to

7  those general anesthesia medications?

8      A    Not more than a couple of hours.

9      Q    For a couple of hours a person

10  would be whoozy?

11      A    Yes.

12      Q    Maybe not quite alert and knowing

13  what was going on?

14      A    Correct.  Post-opt he would be

15  getting more pain medicine for the surgical

16  wound.

17      Q    More Demerol or morphine or both?

18      A    Right.

19      Q    And the medical records themselves

20  would show what medication he would have

21  received, would they not?

22      A    Yes.

23      Q    How long would he have continued to

24  receive narcotic-type pain medication?

25      A    He probably was discharged with a

1    prescription for narcotics.

2        Q      So throughout his hospitalization,

3    you would expect that he would continue to be

4    given narcotic drugs?

5        A      Yes.  Not in the dose, you know, to

6    keep him knocked out.  At that point every day

7    post-op his pain was less, therefore, his

8    dosages and dosage intervals were changed.

9        Q      Doctor, again, to put things in

10   terms that I can understand, other than medical

11   terms, I have had kidney stones before, and

12   given Demerol for that.  I assume everyone's

13   medicine affects them somewhat different would

14   that be correct?

15       A      Correct.

16       Q      But when I was administered

17   Demerol, I didn't care whether it was kidney

18   stones, you could have taken my head off, and I

19   would have been perfectly happy.  Is that kind

20   of a general way that it affects a person?

21       A      You hope so when hurting that much.

22       Q      Did Mr. Conrad appear to get relief

23   or some relief from the pain medication that he

24   was given?

25       A      I don't remember.

83

```
 1          MR. SMITH:  Thank you very much.
 2          THE COURT:  If you will ask the
 3   prosecutor to come in, I appreciate it.
 4                    (Off-record discussion).
 5          MR. SMITH:  Judge, I don't see any need
 6              to require Dr. Roach to come.
 7          THE COURT:  I think we have already
 8              gotten her word, but we can see if we
 9              can stop that.
10                    (A short break was taken).
11          THE COURT:  The record will reflect that
12              this witness is under oath.
13                              Mr. Fuller.
14                    CROSS EXAMINATION
15   BY MR. FULLER:
16          Q     Dr. Sawyer, if you will tell the
17   Judge your name and your occupation, please?
18          A     Samuel F. Sawyer.  I'm a general
19   surgeon.
20          MR. FULLER:  For purposes of this
21              hearing, can we stipulate that he is
22              an expert?
23          MR. SMITH:  Absolutely.
24          THE COURT:  Sure.  And the Court is
25              aware of Dr. Sawyer and declares this
```

84

```
 1              witness to be an expert and will

 2              allow this witness to express his

 3              opinions based on his fields of

 4              expertise.

 5         MR. FULLER:  Thank you, Your Honor.

 6         Q     Dr. Sawyer, did you have an

 7  opportunity on May 23rd of last year to see a

 8  young man seated in the orange suit over there

 9  by the name of Robert Conrad?

10         A     Yes.

11         Q     Under what circumstances did he

12  present himself to you as a physician?

13         A     He presented to the emergency room

14  with two gunshots.  One in the abdomen and one

15  on the left arm.

16         Q     Were you notified after he arrived

17  at the emergency room to treat him and possibly

18  the need for surgery?

19         A     Yes.

20         Q     Did in fact you go and see Mr.

21  Conrad?

22         A     Yes.

23         Q     And is that the person that you

24  subsequently performed surgery on?

25         A     Yes.
```

85

| | | |
|---|---|---|
| 1 | Q | The person seated in the courtroom |

1    Q    The person seated in the courtroom

2  today?

3    A    Yes.

4    Q    What diagnoses did you make of the

5  injuries that Mr. Conrad had upon his

6  presentment to the emergency room, and after

7  you had time to evaluate him?

8    A    The damage from the two gunshot

9  wounds, the abdominal wound, did penetrate the

10  pertained cavity.  It was obvious that he had

11  paradenitis, which would have come from

12  bleeding and/or spilling the guts content.  And

13  the left arm wound did not damage any major

14  structures, but was embedded up under and in

15  the deep layer skin of the arm.

16    Q    Was any decision to do any kind of

17  surgery on Mr. Conrad formulated by you at that

18  time?

19    A    Yes.

20    Q    What decision did you make

21  concerning the medical treatment for Robert

22  Conrad?

23    A    He needed to go to surgery for

24  diagnostic laparoscopy to confirm our findings.

25  That means to put a scope in the belly button.

86

1    And then if in fact we proved our diagnosis,

2    blood, and/or stool in the abdomen, he would

3    need an open operation to repair the damage.

4    And a secondary importance was the bullet right

5    up under the skin of his arm.

6        Q    Was the decision to remove the

7    bullet from Mr. Conrad's arm a decision made by

8    you after confrontation, or after conferring

9    with Mr. Conrad, himself?

10       A    Well, I discussed with him what we

11   were going to go, he needed surgery.  And while

12   we were there, the bullet was going to need to

13   be removed from his arm at some point.

14       Q    Did he seem to understand what you

15   were talking to him about?

16       A    Yes.

17       Q    When he was presented to you, was

18   he impaired in any fashion in your judgment and

19   opinion?

20       A    Not -- I mean, he was in a lot of

21   pain.  As far as drugs or drunk or anything,

22   no.  He was clearheaded, just in a lot of pain.

23       Q    Was he clearheaded enough that you

24   could discuss the importance of having surgery

25   and the consequences that go along with that,

87

```
 1    which necessitate a consent form prepared by
 2    the hospital?
 3         A     Yes.
 4         MR. FULLER:  Al, if it's okay with you, I
 5              will just mark this, and let him look
 6              at the records.  These are the
 7              records themselves.  I was not going
 8              to introduce them at this point.  Or,
 9              how do you want to handle it?
10         MR. SMITH:  I think for purposes of this
11              hearing, we probably need the medical
12              records introduced.  We can stipulate
13              for this hearing that the whole
14              record goes in.
15         MR. FULLER:  Do you want to do that to
16              cut it short?  The only thing after
17              that would be the one that went with
18              the subpoena to get the records and
19              here they are.  And then item one
20              here --
21         MR. SMITH:  I think there is even a copy
22              of the D.A. subpoena in the records.
23              So let's just stipulate for this
24              hearing to put it in.
25         MR. FULLER:  Okay.  That will be No. 2,
```

1        Your Honor.

2        THE COURT:  It's in.

3        Q    Dr. Sawyer, I'm going to show you

4   what I have been provided, and what has been

5   represented to me as being a copy of the

6   medical records on Robert Conrad, up and

7   through the initial report that was performed

8   after surgery on him, on May 23rd, 2001.

9        A    Okay.

10       Q    Have you had a chance at any point

11  in time before you were sitting here right now

12  to review those records?

13       A    No.

14       Q    Would you just look through them

15  and see, and I know you would not have all of

16  those records in any file that you keep?  Would

17  that be a true statement?

18       A    That's correct.

19       Q    But they would all be kept together

20  in

21  Mr. Conrad's hospital records after he was

22  presented to the emergency room on May 23rd?

23       A    That's correct.

24       Q    Would you agree with me by looking

25  at those records that you could pretty much

1    tell the Court when he arrived at the Medical

2    Center, what tests were performed on him, and

3    what the outcome of those tests were?  And then

4    I think it even has records in there on the

5    time that he was prepared for surgery and the

6    time that he went into surgery?

7         A     Yes.

8         Q     If you would, just briefly look at

9    those.  And this is a blank page.  I'm taking

10   it out.

11        A     Okay.

12        Q     Okay.  Dr. Sawyer, after you have

13   had an opportunity to review those records, can

14   you tell the Court when it was that Mr. Conrad

15   first reported to the hospital with the

16   injuries that you have described?

17        A     It was about one hour before

18   surgery.  Let me get this correct.  It was

19   13:55, triage time.

20        Q     And you were notified, and am I

21   correct in assuming that you reported to the

22   emergency room and saw Mr. Conrad?

23        A     Like I say, I was already there.

24        Q     After you saw Mr. Conrad, did you

25   discuss with him the need for surgery to his

96

1    abdomen to repair any damage that was done to

2    his peritoneum or other organs from his body --

3         A    Yes.

4         Q    And to remove the bullet out of his

5    arm?

6         A    Right.

7         Q    For purposes of this hearing, the

8    bullet wound was to his left arm?

9         A    That's correct.

10        Q    Did you discuss with Mr. Conrad, or

11   were you present when Mr. Conrad was provided

12   certain consent forms?  I believe, is the title

13   of the form from the hospital, to describe the

14   surgery that is to be performed on him that

15   day?

16        A    No.

17        Q    Are they in the records that you

18   have indicated that you've reviewed, State's

19   Exhibit 2?

20        A    Yes, they are.

21        Q    And would it be part of the

22   practice, it's conduct of the staff at the

23   Medical Center prior to surgery to go over

24   consent forms such as the ones contained in

25   State's Exhibit 2 --

```
1         A      Yes.

2         Q      -- with a --

3         A      With a patient.

4         Q      And did the patient execute those

5    forms?

6         A      Yes.

7         Q      When you saw Mr. Conrad, did you

8    ever discuss with him the need to remove the

9    bullet?

10        A      Yes.

11        Q      From his arm?

12        A      Yes.

13        Q      Did he object to that?

14        A      No.

15        Q      At the time that you were

16   discussing that with him was he impaired in any

17   fashion, other than just pain from being shot?

18        A      No.   He was not impaired.

19        Q      Could he provide you with other

20   general information that was known specifically

21   to him and not to you, such as his social

22   security number, or any other personal

23   information that you may have asked him without

24   being confused in any way?

25        A      He answered all of the questions.
```

92

1    I took his medical history lucid.

2         Q      And you made the decision to

3    operate on him?

4         A      Yes.

5         Q      I believe the notes indicate that

6    he was taken into the operating room some time

7    around 3:00 p.m. or 15:00?

8         A      That's when the anesthesia started.

9         Q      And you operated on him some 20 or

10   40 minutes later.

11        A      Anesthesia started at 15:00 and the

12   procedure started 15:40.

13        Q      To the best of your knowledge and

14   belief, Dr. Sawyer, had Mr. Conrad executed

15   these consent forms prior to anesthesia being

16   administered at 15:00?

17        A      Yes.

18        Q      Now, after he presented himself to

19   the emergency room, shortly before 2:00 p.m. --

20   would that be correct?  He presented himself at

21   2:00?

22        THE COURT:  If you need to go through

23             your report, go ahead.

24        THE WITNESS:  Yeah.  I'm about three

25             pages behind.

93

1        MR. FULLER: Go ahead. Do that. Take a

2        minute out.

3      Q  . I guess the point I was trying to

4 make, and, certainly, Al, interrupt me if you

5 feel it's improper. He appeared in the

6 emergency room, Mr. Conrad did, shortly before

7 2:00 o'clock in the afternoon. And the

8 anesthesia was administered at 3:00 o'clock

9 p.m. in the afternoon?

10     A   Yes.

11     Q   You talked with him in the

12 intervening period of time, which was just over

13 an hour?

14     A   Yes.

15     Q   And you indicated that he was

16 lucid, and understood what was going to happen?

17     A   Right.

18     Q   He didn't object to the surgery

19 that you were going to perform on him?

20     A   No.

21     Q   And the decision to perform the

22 surgery was made by whom?

23     A   Me.

24     Q   The recommendation, I guess, or the

25 person who's body you are going to cut on

94

1     always has the ability to say, "Don't cut me"?

2

3          A     Correct.

4          Q     You felt that it was necessary to

5     remove the bullet from his arm, and to perform

6     the surgery on his abdomen, did you not?

7          A     The operation that obviously was

8     necessary to save his life was the abdominal

9     operation, and, certainly, that was addressed,

10    first.  We had consent to take the bullet out

11    there should be no contradiction.  In other

12    words, once we finish the abdominal surgery, if

13    he had been unstable in any way, the arm could

14    have been taken care of later.  But he had done

15    fine with the surgery.  This would give me the

16    opportunity to take the bullet out under

17    anesthesia, rather than local anesthesia at a

18    later time.  That is why it was done at that

19    time in the operating room.

20         Q     Would that have been a preferred

21    method to use as far as removal of the bullet

22    from an arm?

23         A     I could do it either way.

24         Q     If you had an option?

25         A     Well, yeah, I mean if he had an

1    option, he had rather have it removed while

2    he's asleep rather than have a shot to numb it

3    up to remove it.

4         Q     Okay.  After you had this

5    discussion with Mr. Conrad, did you have

6    occasion to see either myself or any member of

7    law enforcement?

8         A     Yes.

9         Q     Was there any conversation had

10   between you and either me, or any other member

11   of law enforcement, requesting that you remove

12   the bullet which would have impaired or changed

13   your opinion that the bullet did not need to be

14   removed from his arm?

15        A     No.  Your question was, are either

16   one of the bullets going to be removed,

17   basically for medical reasons.

18              And I said the one in the abdomen

19   is probably not because it's going to be

20   impossible to find.  The one in the arm needs

21   to be removed.

22        MR. FULLER:  Judge, I'm kind of in a

23             position.  I feel a little bit

24             uncomfortable because I may be a

25             witness at some point in time.  But

```
 1              for the record, I did see Dr. Sawyer.

 2

 3         THE COURT:  We are aware of that.

 4         MR. FULLER:  Okay.  I didn't want to

 5              cross any line.  And I can leap ahead

 6              now.

 7         THE COURT:  Sure.

 8         Q     Okay.  Dr. Sawyer, pursuant to the

 9    conversation that you and I had regarding the

10    surgery that you were going to do on Mr.

11    Conrad, obviously it took place before you did

12    the surgery, did it not?

13         A     Yes.

14         Q     At my request, an officer was

15    either present directly inside or outside of

16    the operating room to take custody of the

17    bullet?  Is that correct?

18         A     Well, it was your request and my

19    request.

20         Q     Okay.  And did in fact Officer

21    Buford Roberts or Detective Buford Roberts go

22    into the operating room during the course of

23    surgery?  And was he present at all times prior

24    to the incision to remove the bullet in Mr.

25    Conrad's arm, up until the point in time the
```

1    bullet was delivered to Buford Roberts?

2        A    He remained in the surgeons' lounge

3    throughout the abdominal part of the operation.

4    When we were ready to operate on the arm, we

5    called him.  He came in.  He observed the

6    incision.  He observed the removal of it.  And

7    I handed it directly to him.

8        Q    Okay.  You didn't alter the bullet

9    in any fashion while the bullet was in Mr.

10   Conrad's arm or during the time that you

11   touched it with whatever forceps that you may

12   have used to deliver it to Mr. Roberts, did

13   you?

14       A    No.  From a forensic standpoint,

15   from having done this before, you try not to

16   touch the outside of the bullet, nothing but

17   the very backside of it with anything metal.

18       Q    And is that the procedure that you

19   --

20       A    Yes.

21       Q    -- used in this case?

22       A    Yes.

23       MR. FULLER:  The records themselves are

24           in for the purposes of this hearing.

25           I think I'm through, Al.

1          THE COURT:  Mr. Smith?

2

3

4                    REDIRECT EXAMINATION

5    BY MR. SMITH:

6          Q       Dr. Sawyer, you've testified that

7    the bullet in the arm, that could have been

8    done later?

9          A       Yes.

10         Q       You had testified earlier that the

11   concern of the bullet in the arm was infection,

12   because of irritation under the skin?

13         A       Correct.

14         Q       That wouldn't be something that

15   would occur in the next few minutes?  Or

16   overnight?                        A       No.

17         Q       Days could have waited without any

18   significant risk to Mr. Conrad?

19         A       A couple of days.

20         Q       A couple of days?

21         A       A couple of days.

22         Q       Now, did you tell Mr. Conrad that

23   you had had a conversation with the authorities

24   concerning bullets being take from him?

25         A       No.

1          Q      And did you tell Mr. Conrad or

2    direct anyone else to tell Mr. Conrad that if

3    the bullet was taken from the him, it would be

4    turned over to the police?

5          A      No, I didn't.

6          Q      And the consent form that I believe

7    counsel has placed into evidence, and I'm going

8    to show you this.  This was a laparoscopy?

9          A      Laparoscopy, possible laparotomy.

10         Q      It was signed or has a time in here

11   of 14:25?

12         A      Right.

13         Q      Or 26?

14         A      Right.

15         Q      Somewhere around there.  And would

16   this be the form you were talking about, the

17   triage form, the Emergency Department Triage

18   and Assessment and Flow sheet?

19         A      Yes.

20         Q      And he was triaged at 13:55?

21         A      Right.

22         Q      Now, these notes show nursing

23   diagnosis analysis, conform, pain alteration?

24         A      Uh-huh.

25         Q      Would you tell me what that means,

1    please?

2         A    It's basically what all of our

3    accreditation agencies require on a form.  It

4    doesn't help anyone at all.  I mean all of this

5    up here obviously says he has an alteration

6    comfort, and he has pain.  This is a

7    requirement.

8         Q    And here, thought process

9    alterations.

10   That's checked in the same block area as

11   comfort/pain alteration?  Correct?

12        A    Uh-huh.

13        Q    Does that indicate as if -- never

14   mind.  It's speaks for itself.  What is the

15   issue perfusion alteration?

16        A    "Tissue."

17        Q    "Tissue."  I'm sorry.

18        A    That means if you have blood, and

19   your blood pressure is down.

20        Q    Now, he would have been

21   administered pain medication in the emergency

22   room, would he not?

23        A    I can't find it on there.  After

24   you had asked me that earlier -- the nurse

25   would indicate if she had given him something.

1       Q    It would be in the regular course

2    of events in a case like this for you to have

3    ordered something like Demerol, would it not?

4       A    Correct.

5       Q    Apparently, that did not happen,

6    though, because if drugs were given, they would

7    be documented here.  When the nurse would have

8    given the meds -- that would have given the

9    meds, would have been documented on here, or on

10    her sheet which is here.

11       THE COURT:  So it doesn't reflect that

12               he was given --

13       THE WITNESS:  It doesn't reflect that we

14               gave him any medicine in the

15               E.R.

16       Q    If these records were produced on

17    the 23rd or the 24th.

18       MR. FULLER:  Al, I think it was late

19               afternoon on the 23rd.

20       Q    As the certificate, cover

21    certificate indicates?

22       A    Yes.

23       Q    Would it be possible that the

24    medication records had not caught up with the

25    medical records, yet?

102

```
 1          A       That should not be the case.

 2          Q       Should not be?

 3          A       Should not be.   That's right.

 4          Q       If, in the normal course of events,

 5    you would have seen or ordered something like

 6    Demerol administered to him in the emergency

 7    room, which you've testified would that be

 8    correct?

 9          A       Right.

10          Q       And these records indicate that he

11    was in a great deal -- in pain, with thought

12    process alteration, do you have any idea why

13    pain medication would not have been

14    administered to him pre-op?

15          A       No.   Other than his time from the

16    door to general anesthesia was on hour-and-five

17    minutes.   And, you know, that may have been the

18    reason.   Diagnosing and, going to surgery.   And

19    he may not have not gotten something within

20    that hour.

21          Q       At the time that he went to

22    surgery, you had had a conversation with Mr.

23    Fuller regarding questioning whether the bullet

24    or bullets were going to be taken from him?   Is

25    that correct?
```

1      A     Yes.

2      Q     And you had had a conversation with

3  Mr. Roberts that he was going to be present to

4  receive whatever you took out?

5      A     My conversation, I believe, with

6  Mr. Roberts was, while Mr. Conrad was going to

7  sleep in the surgeon's lounge.

8      Q     So the District Attorney made the

9  arrangements for Mr. Roberts to be present?

10      A     Yes, I assume.

11      Q     Well, if you know, and I'm not

12  trying to get you to speculate.

13      A     I would assume that, yes.

14      Q     And you did not discuss or direct

15  anyone to discuss with Mr. Roberts -- with Mr.

16  Conrad that anything recovered was going to be

17  turned over to the police?

18      A     No, I did not.

19             RECROSS EXAMINATION

20  BY MR. FULLER:

21      Q     Regardless of the circumstances,

22  Dr. Sawyer, the records indicate that he was

23  not administered any mind-altering drugs of any

24  fashion after he arrived at 1:55, and before he

25  went into the operating room at 3:00 p.m. on

```
 1      May 23rd, 2001?  Is that correct?

 2           A      That's correct.

 3           MR. FULLER:  That's all I have.

 4           THE COURT:  Mr. Smith?

 5                   REDIRECT EXAMINATION

 6      BY MR. SMITH:

 7           Q      Dr. Sawyer, have you ever operated

 8      on anyone for such a wound before they were

 9      given pain medication?

10           A      Oh, yeah.  I mean he was not

11      critical as far as instability.  But,

12      certainly, when someone is bleeding, you are

13      not going to give them large dozes of narcotics

14      to drop their blood pressure further.

15                   A lot of times it winds up the

16      nurses are doing a lot more important things,

17      getting I.V.'s, and catheter in, and

18      everything, and preparing the operating room.

19      And it's true that some people do not get their

20      pain relieved in that first hour.

21           MR. SMITH:  That's all.

22           THE COURT:  Mr. Fuller?

23           MR. FULLER:  No questions.

24           THE COURT:  Doctor, I doubt they are

25                   going to need you to testify further
```

1        between now and the trial. It's

2        possible they may call you for the

3        trial. If I'm the Judge, and most of

4        the Judges do this, we have a

5        position, if we are notified that we

6        might need your testimony on a

7        certain date, then I always have the

8        lawyers give me an idea of when they

9        are going to need a physician's

10       testimony. If you will have somebody

11       from your staff to let us know when

12       it would be most convenient and least

13       convenient on that date, we will try

14       to work around that.

15   DR. SAWYER:  Okay.

16   THE COURT:  We always will put you on

17       call. Thank you for coming down.

18   DR. SAWYER:  Certainly.

19   THE COURT:  Have a good day.

20                If you will call your

21       next witness. Who is next?

22   MR. FULLER:  I proffer that Dwight Holley

23       would testify in this matter

24       regarding the medical records that he

25       had a request by me signed from the

```
 1              D.A.'s office to go retrieve the

 2              records.  He went to the hospital.

 3              He, at some point on the afternoon of

 4              May 23rd, served the subpoena and

 5              retrieved a copy of medical records

 6              which is in State's Exhibit No. 2.

 7        THE COURT:  Okay.

 8        MR. FULLER:  Now, he is going to be,

 9              obviously, more needed in the

10              statement part of our hearing than

11              this D.A. subpoena.  But as far as

12              the D.A. subpoena itself, it was just

13              for these medical records.

14        THE COURT:  That's how you got the

15              medical records?

16        MR. FULLER:  Yes, sir.  That's how the

17              State got the medical records.

18        THE COURT:  And, of course, the Defense

19              is going to say the D.A. subpoena has

20              no significant power --

21        MR. FULLER:  We've got the --

22        THE COURT:  Y'all can submit that to me

23              either in writing, or orally, either

24              one.

25        MR FULLER:  And then Buford -- and I
```

1         would like for the purposes of this

2         hearing, mark the D.A. subpoena as

3         No. 3.

4    THE COURT:  Any objection?

5    MR. SMITH:  No.  For purposes of this

6         hearing only.

7    THE COURT:  Everything that we do is for

8         the purposes of this hearing.

9    MR. FULLER:  And I've tried to substitute

10        copies, so we don't get confused with

11        exhibits.  But as far as State's

12        Exhibit No. 3, the D.A. subpoena,

13        itself, on May 23rd, 2001, that is

14        the only thing that we have.  And it

15        involves the medical records, which

16        are in under State's Exhibit No. 2,

17        the bullet itself was retrieved by

18        Buford.  And I will put him on just

19        to reiterate what Dr. Sawyer says,

20        unless you are confident that

21        evidence is what's going to be --

22   MR. SMITH:  I think we probably need to

23        hear from Buford.

24   MR. FULLER:  Okay.

25   MR. SMITH:  I'm not trying to prolong

1              this.

2         THE COURT:  Of course, at trial if this

3              is not suppressed, we will need to go

4              through everything a fresh.

5         MR. FULLER:  Right.  I think we can

6              avoid, at this point, calling Dwight.

7              But I will call Buford.

8              (Off-record discussion).

9

10                   BUFORD ROBERTS

11         Whereupon, this witness, after first

12   being duly sworn to tell the truth, the whole

13   truth, and nothing but the truth, testified as

14   follows, to-wit:

15                 DIRECT EXAMINATION

16   BY MR. FULLER:

17         Q    Buford, if you will tell the Judge

18   your name and your occupation, please?

19         A    Buford Roberts.  I'm an

20   investigator with the City of Enterprise.

21         Q    And were you working with the City

22   of Enterprise on May 23rd 2001?

23         A    I was.

24         Q    And shortly after 1:30, there

25   about, did you receive information that there

1    had been a shooting at a business known as the

2    Toy Box on County Road 711, in which a lady had

3    been shot, and was either on her way to the

4    emergency room here in Enterprise or was

5    already at the emergency room?

6           A       Yes, sir, I did.

7           Q       What, if anything, did do you in

8    response to the call that went out regarding

9    this crime?

10          A       First of all, I went to the scene.

11   I basically sat around the scene for a while

12   for instructions.  Then I was instructed to go

13   to the hospital around, somewhere around 3:00

14   o'clock, that there was an individual there

15   that was about to go into surgery.

16                  I was told that a projectile was

17   going to be removed from that individual, that

18   Dr. Sam Sawyer was going to do surgery.  And if

19   there was a projectile removed from this

20   person, for me to collect it as evidence.

21          Q       Did you in fact go to the hospital?

22          A       I did.

23          Q       This hospital that we are referring

24   to on this occasion for purposes of this record

25   is Medical Center Enterprise?

1          A      It is.

2          Q      When you got to the hospital, did

3  you in fact have an occasion to see Dr. Sam

4  Sawyer?

5          A      I did.

6          Q      Did you ever see Robert Conrad, the

7  young man seated at the counsel table?

8          A      Yes, sir, I did.

9          Q      When did you see Mr. Conrad?

10         A      I saw Mr. Conrad in the operating

11 room at the Medical Center Enterprise.

12         Q      Did you see Mr. Conrad on May 23rd,

13 2001, prior to seeing him in the operating

14 room, when he was conscious in any fashion?

15         A      Yes, sir.  I saw him in the

16 emergency room.

17         Q      Did you have a conversation with

18 Mr. Conrad then?

19         A      No, sir.

20         Q      When you saw Mr. Conrad in the

21 emergency room, obviously that was before his

22 surgery?

23         A      It was before.

24         Q      It was before his surgery, right

25 after he was brought into the emergency room.

1    You said that he got a call to go from the

2    scene to the hospital around 3:00 o'clock.  How

3    did you see him in the emergency room?

4        A    I had been over there, I guess it

5    was prior to 3:00 o'clock, that I had walked

6    into the emergency room.  And he was in the

7    emergency room.

8        Q    So you were already at the

9    hospital, or had been told to go to the

10   hospital?

11       A    Right.

12       Q    You knew the victim had been taken

13   to the hospital?

14       A    Right.

15       Q    Were you later notified about this

16   individual who was going to have surgery?

17       A    Yes, sir.

18       Q    And have the bullet removed?

19       A    Yes.

20       Q    And that individual was Robert

21   Conrad?

22       A    Right.

23       Q    Instructions that you were given,

24   if there is going to be evidence recovered from

25   the body of Mr. Conrad, we want to get it?

1        A        Right.

2        Q        Did you talk to Dr. Sam Sawyer

3    about the possibility of getting any bullets,

4    if they were removed from Robert Conrad's body?

5        A        No, sir.   The only conversation

6    that I had with Dr. Sawyer was he told me to

7    wait until he notified me to come in.   And I'd

8    have to dress up in a gown, and overshoes, and

9    a mask.   And when he informed me to come into

10   the operating room, once I was in the operating

11   room, he showed me where to stand, and gave me

12   a little vial to hold.   And he said when I

13   remove the projectile, I will drop it in the

14   vial.

15       Q        Did you observe Dr. Sawyer perform

16   the incisions on Mr. Conrad's arm?

17       A        Yes, sir, I did.

18       Q        Were you present, and did you

19   observe the removal of the projectile, which is

20   a part of the forensic report from Joe Saloom,

21   with the Department of Forensic Sciences in

22   State's Exhibit No. 1?

23       A        Yes, sir, I did.

24       Q        Was the, I will refer to as a

25   bullet --

1          A       Yes.

2          Q       Was the bullet altered in any

3    fashion while in your presence when Dr. Sawyer

4    removed it from Mr. Conrad's arm, and prior to

5    him depositing it into the container that he

6    had given to you?

7          A       No, sir.

8          MR. SMITH:  I don't make issue with the

9    chain of custody.

10         MR. FULLER:  Okay.

11         Q       Since there is no issue of chain of

12   custody, you secured the evidence?  And it was

13   subsequently tested?  Is that right?

14         A       That's correct.

15         MR. FULLER:  Is that okay as far as

16   chain?

17         MR. SMITH:  I'm satisfied, yes.

18         MR. FULLER:  If you will answer Al's

19                 questions.

20         THE COURT:  Mr. Smith or Bradshaw?

21                 CROSS EXAMINATION

22   BY MR. SMITH:

23         Q       Buford, do you know what time you

24   arrived at Medical Center Enterprise?

25         A       The first time, I don't.  I went to

1    the Medical Center Enterprise I guess on two

2    occasions, now that I recall.

3                Right after this, I went out for

4    about three months sick leave, myself.  But now

5    recalling, I was at the Medical Center

6    Enterprise, twice.  I was told that the victim

7    was down there.  I went to the hospital, and

8    then left.

9         Q      All right.  Do you know what time

10   that would have been?

11        A      The first time, I don't.  But it

12   was around 3:00 o'clock when I was told to go

13   back, that there was going to be surgery

14   performed on this gentleman.

15        Q      Were there -- are there any records

16   of when you would have arrived and departed the

17   first time?

18        A      There should be.

19        Q      Where would those records be?

20        A      They should be on a dispatch --

21   dispatch should have those records.

22        Q      Is that how you maintain knowledge,

23   i.e., record, of where you would go and what

24   you do?

25        A      Yes, sir.  Most of the time, yes,

1    sir.

2         Q      Now you accompanied, or went to the

3    hospital the first time with Ms. Dennis?   Is

4    that correct?

5         A      No.

6         Q      Shortly after she was carried

7    there?

8         A      It was shortly after she was taken

9    there, yes, sir.

10        Q      And it's your testimony that while

11   you were there, and, of course, we know that

12   she died.  While you were there the first time

13   you had no contact with Mr. Conrad or --

14        A      No.  I walked by the room where he

15   was -- just glimpsed at him when I walked down

16   through the emergency room.

17        Q      How did you know who he was or why?

18        A      I was told.

19        Q      Do you recall by whom?

20        A      Corey Mason, I believe told me that

21   it was Robert Conrad.  I believe it was Cory.

22        Q      And what was your understanding of

23   why he was there?  Why "he," being Mr. Conrad,

24   was there?

25        A      I don't think I was ever told, at

```
 1    that time.

 2          Q      What was going on with him at the

 3    time that you saw him in the E.R?  Mr. Conrad

 4    in the E.R?

 5          A      I don't think anything was going

 6    on.  He was laying on a bed in the emergency

 7    room.

 8          Q      Was he being treated by anyone at

 9    that time?

10          A      Not at that time, no.

11          Q      Did you see Dr. Sawyer?

12          A      At that time?

13          Q      On the occasion of your first trip

14    to Medical Center Enterprise?

15          A      No, sir.

16          Q      Not at all?

17          A      No, sir.

18          Q      Are you clear in your recollection

19    of that?

20          A      Yes, sir.  Fairly clear, sure.

21          Q      The second time that you went to

22    the hospital would have been what time?

23          A      Probably around 3:00 o'clock in the

24    afternoon.

25          Q      Would there be a record at the
```

1   Police Department of you being dispatched and

2   arriving there?          A      There should be.

3          Q      And would that be in the dispatch

4   logs?

5          A      Yes, sir.

6          Q      Who instructed you to go back to

7   the hospital?

8          A      I believe it was Sergeant Spence.

9          Q      And for what purpose were you told

10  to go back there?

11         A      I was told they were about to

12  perform surgery on Mr. Conrad, and if there was

13  a projectile or bullet removed for me to

14  collect it.

15         Q      Were you told why?

16         A      As evidence, that he was a probable

17  suspect in the shooting at the Toy Store.

18         Q      And that was the Toy Store?  Is

19  that correct?

20         A      Yes, sir.

21         Q      When you were there the first time,

22  you said that Mr. Mason, Cory Mason, told you

23  that Mr. Conrad was there, and who he was?

24         A      Right.  Right.

25         Q      Did he tell you how he presented?

1    What was wrong with him?

2        A    No, sir.

3        Q    Now, your conversation with Dr.

4    Sawyer, the first conversation with Dr. Sawyer

5    that day was when and where?

6        A    The one and only conversation that

7    I had with him was prior to going into surgery

8    and into the operating room.  Just prior to

9    going into the operating room, he told me to

10   wait in the hallway until he called me, and

11   once he called me to suit up and come in there.

12       Q    Did Dr. Sawyer indicate to you that

13   he had received request or instructions from

14   anyone concerning the bullet?

15       A    No, sir.

16       Q    If Dr. Sawyer had indicated that he

17   became aware in the emergency room that Mr.

18   Conrad was a suspect in the shooting at the Toy

19   Store, would that refresh your recollection?

20   Or do you have any recollection of a

21   conversation of such occurring?

22       A    Between myself and Dr. Sawyer?

23       Q    Yes, sir.

24       A    No, sir.  There was no such

25   conversation.

1    Q    Did you see or talk to Dr. Sawyer

2    there when Mrs. Dennis was being treated?

3    A    Not that I recall, no, sir.

4    Q    Could there have been conversations

5    there between you and he?

6    A    I think I would have recalled it,

7    and I don't recall it.

8    Q    One moment.  Buford at the time

9    that you walked by Mr. Conrad there in the

10   E.R., and you said Cory Mason told you who he

11   was, where was Cory Mason in relation to where

12   Mr. Conrad was?

13   A    Right outside the room.  I guess it

14   would be a room.

15   Q    Were there any other law

16   enforcement officers present there around Mr.

17   Conrad at that time?

18   A    There were other offices at the

19   hospital.

20   Q    Around Mr. Conrad?

21   A    No.  No.

22   Q    Is this like a room with a door, or

23   a curtain?

24   A    Curtain.

25   Q    Okay.  And were there any other

1    officers, other than yourself and Cory Mason

2    right there around the curtain where Mr. Conrad

3    was?

4         A    No, sir.   Cory and I were passing.

5    I think I may have asked him, "Who is this," or

6    whatever.   But, anyway, I was told at that time

7    that it was Mr. Conrad.

8         Q    And did Mr. Mason tell you why Mr.

9    Conrad was there?

10        A    No, sir.   I never asked.

11        Q    Did you see Mr. Mason interacting

12   in any manner with Mr. Conrad?

13        A    No, sir.

14        MR. SMITH:   That's all.

15        THE COURT:   Mr. Fuller?

16        MR. FULLER:   I have no other questions --

17   well,                just briefly to clear up one

18   point.

19                REDIRECT EXAMINATION

20   BY MR. FULLER:

21        Q    Talking about the dispatch records,

22   just to clear this point up, because I haven't

23   seen them.   And I'm sure we will all get a

24   chance to review them in detail before this

25   trial.

1              You were at the scene on County

2   Road 711, and were instructed in person to go

3   back to the hospital?

4         A      (Nodding in the affirmative).

5         Q      And this person was down there

6   about to have surgery, and to collect any

7   evidence recovered from him?  Would that

8   necessarily require any type of dispatch

9   records generated?

10        A      Normally, Mr. Fuller, we would call

11  out wherever we are at, you know, if I'm

12  leaving the scene, I would call 108 from the

13  scene and 1023 from the Medical Center

14  Enterprise, but not necessarily what I'm there

15  for.

16        Q      There was a lot things going on

17  that day?

18        A      Yes, sir.

19        Q      At that particular time?

20        A      Yes, sir.

21        MR. FULLER:  I'm just trying to clarify

22              in case there is a discrepancy in

23              your log what may be.  Other than

24              that, I don't have anything else.

25        MR. SMITH:  I don't have any questions.

1          Judge, but because who did what when

2          is an issue in this matter, could we

3          have the logs produced to us?

4     THE COURT:  Sure.

5     MR. FULLER:  Sure.

6     THE COURT:  Any other question of this

7          witness, though?

8     MR. SMITH:  No, sir.

9     MR. FULLER:  No, Judge.  Can he be

10         excused as far as this is concerned?

11

12    THE COURT:  Yes.

13              Have a good day.  Good to see

14         you, again.  I'm glad you're looking

15         so well.

16    MR. FULLER:  I believe as far as the

17         State is concerned, this is generally

18         a two-part motion, Motion to Suppress

19         the Medical Records and Motion to

20         Suppress the Bullet.  And I have

21         tried to represent the facts from the

22         State's point of view that it was

23         obtained separately.  We can present

24         all the law that the Court wants us

25         to present, or that you would be

1          interested in listening to, Your

2          Honor, as far as who did what when,

3          that is all of the evidence that we

4          have as far as suppression of either

5          of those items.

6     THE COURT:  Let me make sure that I

7          understand.  The projectile that was

8          taken and is subject to the motion

9          was the one taken out of the left

10         arm?

11    MR. SMITH:  Yes, sir.  Correct.

12    MR. FULLER:  Yes, sir.

13    THE COURT:  Any further argument?  Any

14         further evidence on that issue?

15    MR. SMITH:  Judge, no further evidence at

16         this time.  Of course, our Ex Parte

17         motion, I think it would be two --

18    THE COURT:  I will rule on the Ex

19         Parte part of everything in writing,

20         separately and in my Order I will say

21         that it is not to be produced to the

22         State by my office.

23    MR. SMITH:  Thank you, Judge.  We can't

24         make a final argument on the issue of

25         suppression of the bullet without

1          knowing the results of that motion.

2      THE COURT:  Okay.  What I will do is

3          tentatively rule, with reservations

4          that I said earlier.

5      MR. SMITH:  That certainly works, Judge.

6      THE COURT:  With right to examine the

7          issues and renew the pending

8          additional testimony that could

9          possibly come as a result of a

10          favorable ruling on that motion.

11      MR. SMITH:  That's acceptable.

12      THE COURT:  Okay.  Now let's go to the

13          D.A. subpoena issue.  And I will come

14          back to both of those.

15      MR. SMITH:  Sure.

16      MR. FULLER:  Your Honor, as far as the

17          D.A. subpoena is concerned, the State

18          would argue that --

19      THE COURT:  And if y'all will, both

20          sides, if you will submit me your

21          precedent so I can read that before I

22          rule on that.

23      MR. SMITH:  As far as the Defense --

24      THE COURT:  You have put your's in

25          writing.

1          MR. SMITH:  Right.

2          THE COURT:  I've read that.

3          MR. FULLER:  I would just argue that I

4              think the same -- we are arguing

5              about the same statute, 12-17-184,

6              subsection 18.  And then rules 17.1

7              and 17.3 of the Alabama Rules of

8              Criminal Procedure.  I believe that's

9              in total all the law that I'm aware,

10             outside the case law concerning D.A.

11             subpoenas and whether or not you can

12             issue them, and what they are are

13             for, and so forth.

14                        I would argue,

15             Your Honor, that the Rules of

16             Criminal Procedure give the District

17             Attorney the right to subpoena, to

18             issue subpoenas, for matters that are

19             under investigation while the Grand

20             Jury is out of session and for

21             matters that are not before that

22             Grand Jury while the Grand Jury is in

23             session.

24                   The rules define a subpoena

25             in 17.3, as a subpoena may command a

1    person to who it is directed to, to

2    produce books, papers, documents, or

3    other objects which may be designated

4    therein.

5         I would simply proffer to the

6    Court, Your Honor, that on May 23rd,

7    2001, shortly after 1:30 in the

8    afternoon, law enforcement received

9    information about a robbery and a

10    shooting that had occurred to Mrs.

11    Jelaine Dennis at her place of

12    business on County Road 711, here in

13    police jurisdiction of Enterprise, in

14    the Enterprise Division of Coffee

15    County.

16         Shortly before 2:00 p.m. or

17    shortly after 2:00 p.m., law

18    enforcement was notified that the

19    Defendant, Mr. Robert Conrad, was at

20    the emergency room and had suffered

21    two gunshot wounds.  At that

22    particular point in time, the State

23    was obviously involved in

24    investigating what had turned out to

25    be a capital murder and robbery

1              charge, as well as the circumstances

2         under which Mr. Conrad came to the

3         emergency room, after being shot,

4         both of which required notification

5         to law enforcement, in this

6         particular case, Enterprise Police

7         Department.

8              The request for medical

9         records was just that.  It was a

10        request to get the medical records on

11        Mr. Conrad as a further investigation

12        concerning the circumstances under

13        which he presented himself on May

14        23rd, in the afternoon of May 23rd.

15             I have read case law, I've

16        read the statutes and comments and

17        the rules, and the comments to the

18        rules, Your Honor.  And I would have

19        to say that under -- I would even

20        concede that under certain

21        circumstances the D.A. subpoenas can

22        be abused.  But in this particular

23        case, I believe the facts

24        distinguished themselves from those

25        cases in which there has been a focus

128

1 on a specific person, as opposed to

2 gathering information, and, in

3 general the scope of investigating

4 the commission of a crime.

5  The information from Mr.

6 Conrad was just as much for his

7 benefit as to his detriment.  Law

8 enforcement was trying to collect

9 evidence to either include him or

10 exclude him as a suspect in this

11 crime.

12  The bullet itself, I would

13 argue to the court, that the bullet

14 itself was taken out pursuant to the

15 medical requirements that Dr. Sawyer

16 has testified to was taken out

17 without any influence, or

18 suggestion, or demands made from law

19 enforcement or members from the

20 District Attorney's Office.

21  I did in fact confer with Dr.

22 Sawyer prior to the surgery, after

23 the decision had been made, to see,

24 if in fact the evidence was going to

25 be removed from an individual who

1          could possibly be a suspect in a

2          crime.  All I was interested in was

3          preserving that evidence.

4                 I believe Dr. Sawyer, as far

5          as my mind is concerned, and I hope

6          has expressed to you, that that is in

7          fact what happened.  And that was the

8          reason that Buford Roberts was

9          notified and put in place to

10          retrieve the evidence and submit it

11          to the crime lab.

12                 And I would certainly argue,

13          Your Honor, as a means of concluding

14          my argument here, that the medical

15          records themselves are certainly not

16          going to change, and haven't changed,

17          I hope, from May of 2001 to today's

18          date.  In 1987 the United States

19          Supreme Court in U.S. versus

20          Martinez talked about inevitable

21          discovery.  And I certainly think

22          this is where this would fall, an

23          inevitable discovery situation.  We

24          needed the information, on May 23rd

25          we needed to know about individuals

1           who may not even have been a suspect

2           under circumstances that Mr. Conrad

3           presented himself, the State would

4           argue that if you had gone to the

5           hospital and received a gunshot

6           wound.

7       THE COURT:  You were investigating it?

8       MR. FULLER:  We were investigating

9           nonetheless. And it just happened to

10          be that the focus of the

11          investigation centered on Mr. Conrad,

12          after the fact.  But these records

13          are going to be, whatever they are

14          going to be, and they haven't changed

15          from then until now, and I would

16          argue to the Court that it would be

17          inevitable discovery, and used in the

18          furtherance of our investigation,

19          general investigation.  He was not a

20          suspect at the time.

21      THE COURT:  Okay.  Anything further?

22      MR. FULLER:  No, sir.

23      MR. SMITH:  Judge, the subpoena itself is

24          in evidence, as I believe it's

25          State's Exhibit No. 3.  I think we

```
 1        stipulated.  And it says you are
 2        commanded, summoned keeper of
 3        records, Enterprise Medical Center,
 4        Enterprise, Alabama, any and all
 5        medical records, lab reports, blood,
 6        hair, saliva, and bodily fluids of
 7        Roberts Conrad, who was treated at
 8        Enterprise Medical Center on May
 9        23rd, 2001.  It's returnable instanta
10        and special instructions in lieu of
11        personal appearance, certified copies
12        maybe released to serving officers.
13             Judge, you have heard the
14        testimony that at the time that
15        subpoena was issued, that Mr. Conrad
16        was already the focus of suspicion of
17        the death of Jelaine Dennis.  And you
18        have also heard that the bullet was
19        not medically necessary to remove
20        that bullet right then.
21             The very wording of the
22        subpoena, Judge, it's obvious that it
23        is an attempt to circumvent a search
24        warrant.  It goes beyond medical
25        records.  But it includes certainly
```

1          medical records.

2               And the law is absolutely

3          critically clear in Alabama.  A D.A.

4          subpoena cannot be used as a

5          substitute for subpoena duces tecum.

6     THE COURT:  Okay anything further?

7     MR. FULLER:  All I want to point out to

8          the Court is, we are talking about

9          two separate pieces of evidence that

10         are in this hearing today.  Medical

11         records, under the D.A. subpoena, and

12         a bullet which was recovered totally

13         outside of the scope of that D.A.

14         subpoena.  The bullet was recovered

15         as a part of the evidence and an

16         on-going investigation of a crime.

17         It was not recovered under the

18         possession of that D.A. subpoena.

19    THE COURT:  Anything further?

20    MR. SMITH:  No, Your Honor.

21    MR. FULLER:  No, Judge.

22    THE COURT:  I've heard everything.  We

23         know where we are on this.  And,

24         again, one of my rulings is

25         potentially subject to change based

1    on ex parte matters that the court

2    has considered at this time.  But I

3    think I need to rule on these things

4    as we have the evidence now.  And,

5    again, the motion to suppress the

6    projectile would be potentially

7    subject to a later modification in

8    the Court's ruling the Defendants

9    with some things.  But I have heard

10   everything that has been presented in

11   this matter.  And it's very clear to

12   the Court that under what has been

13   presented to the Court that the

14   Defendant reported to the emergency

15   room.  It's very important to note

16   that he was stable at the time that

17   he was initially reported, but that

18   he had two gunshot wounds, or what

19   appeared to be gunshot wounds to his

20   body.  One of the projectiles, of

21   course everybody has talked about

22   bullets, but really projectiles was

23   in the left arm, slightly under the

24   skin.  It's important to further note

25   that the Defendant had not been given

1      any mind altering agents or substance

2      prior to the operation, prior to

3      being placed under anesthesia, and

4      being unconscious.  And the

5      physician, the treating physician,

6      the physician who performed the

7      operation, Dr. Sawyer testified that

8      there was no indication that he had

9      been given any mind altering

10     substances, until he underwent

11     surgery.  It's important to note that

12     Dr. Sawyer was very clear in stating

13     that the Defendant made what the

14     Court finds to be knowledgeable, and

15     intelligent, and voluntary, under the

16     circumstances, decision to undergo

17     this treatment, and to have the

18     operation, and to sign the medical

19     authorization for the physician to do

20     so.

21          It was in always proper for

22     the doctor to operate as the doctor

23     did.  The doctor testified that it

24     was the doctor's decision to operate,

25     based upon his medical opinions,

1  expertise, that the -- of course,

2  we are not really concerned about the

3  projectile in the abdomen area, or in

4  the hip area, because that is not

5  before us. But it was essential for

6  the doctor to operate as he did in

7  that particular area. I believe the

8  doctor described the condition as

9  partenitis, with two holes through, I

10  believe the colon. So that would

11  have been a life-threatening

12  situation had the doctor not done

13  what he did. He would have

14  ultimately probably have died had

15  that part of the operation not taken

16  place.

17        But, again, that is not

18  really the focus. The focus is on

19  the left arm. It's important to note

20  that the doctor decided that it was

21  important to operate on the arm and

22  to remove the projectile because the

23  doctor testified that the arm would

24  have later developed infection

25  because of the location of the

1    projectile, and that he also felt it

2    better for his patient to go ahead

3    and take the projectile out at the

4    same time while the patient was

5    unconscious, so that he didn't have

6    to go back at a later point in time

7    and take it out a day or two later by

8    localizing the deadening effect.

9    So what was done was done in

10    a medically recognized fashion, was

11    medically necessary for the health

12    and safety of the Defendant.  The

13    Court finds that based on what the

14    Court has before it now that the

15    taking of the projectile out of the

16    arm was not done in effect as an

17    agent of the State for the purposes

18    of searching and seizing the

19    projectile, but for other medical

20    reasons that have proved to the

21    benefit of this Defendant.

22    So at this time the

23    Defendant's Motion to Suppress the

24    projectile is denied.  Again, that is

25    subject to consideration as far as ex

```
 1        parte considerations that were made
 2        known to this court.  We will  have
 3        to look at that a little later.
 4             I am going to review all of
 5        those things, again, after having
 6        considered the testimony in evidence
 7        that has been offered here today.
 8        And I will issue a written decision
 9        on these ex parte matters.
10             Let's move on now to the
11        Motion to Suppress the medical
12        records as a result of the District
13        Attorney's subpoena.  First of all, I
14        don't necessarily, personally, like
15        D.A. subpoenas.   I remember when
16        they came into being.  And I remember
17        which D.A. in the State of Alabama
18        got that through the legislature and
19        pushed that, the rules.
20             Do y'all remember that?
21        I remember that very well.  Mr.
22        Smith was an assistant D.A. at that
23        time.
24   MR. SMITH:  That was right before my
25        tenure, Judge.
```

1          THE COURT:  You working with the group?

2                 I remember that case.  And I've

3                 scratched my head over the possible

4                 misuse of D.A. subpoenas.  So I have

5                 to say that there are some situations

6                 where the use would be feasible.  And

7                 Mr. Fuller has gone through some of

8                 those things.  I have to also say

9                 that I had in my notes inevitable

10                discovery rule.  And it's refreshing

11                a little bit to see somebody make

12                that argument.  And I've had it made

13                before my Court only two times in my

14                26 years as a Judge, State versus

15                Albert Baker, Jr., made by Mr. Smith

16                back in those days Pike County,

17                Alabama, and today it was made again.

18                      Of course, there are certain

19                things that have to be established

20                before the inevitable discovery rule

21                comes into effect.  One was that law

22                enforcement was on that same line of

23                investigation, and that they would

24                have inevitably have discovered it

25                had they continued on that line

```
 1            before doing whatever it was they
 2            did.  And, certainly, that is clear
 3            to the Court.  These medical records
 4            would not have changed from what they
 5            were on the date they were initially
 6            written, maintained, it's important
 7            to note that in the possession of the
 8            medical people for their own records,
 9            not for the purposes of litigation,
10            so they would not have changed.  They
11            could be secured by other proper
12            means that have been stated to the
13            Court here today.
14                 The Motion to Suppress the
15            medical records is denied.  The Court
16            finds that under the facts of this
17            case, and I emphasize those words.
18            Under the facts of this case, the
19            suppression should not be granted.
20                 Anything further on those two
21            issues?
22      MR.  FULLER:  No, Your Honor.
23      MR.  SMITH:  I just thought I was right on
24            that point.
25      THE COURT:  You certainly were.  And the
```

```
 1                    Alabama Supreme Court affirmed you,
 2              and it was the very first case in the
 3              State of Alabama on inevitable
 4              discovery. So you and I have that --
 5        MR. SMITH:  Dubious distinction?
 6        THE COURT:  Right.  Why don't y'all get
 7              together and decide.  Do y'll want to
 8              go through lunch or take a lunch
 9              break?   Get together and decide.
10                    (A lunch recess was taken).
11        THE COURT: The record will reflect that
12                  this case is styled Robert
13                  Conrad.  These are case numbers
14                  CC-2001-M-180 and CC-2001-M-179.
15                    The Defendant is
16              present and is represented by
17              counsel.  Both defense attorneys
18              are present.  The State is
19              present and is represented by
20              the Assistant District Attorney,
21              Mrs. Stout.
22                      Are the parties ready
23              for the various pending motions?
24        MR. FULLER:  Judge, There is one thing I
25              would like to get in the record,
```

1        and I would like to ask Dwight

2           some questions.

3

4              DWIGHT HOLLEY

5      Whereupon, this witness, after first

6  being duly sworn to tell the truth, the whole

7  truth, and nothing but the truth, testified as

8  follows, to-wit:

9            DIRECT EXAMINATION

10  BY MR. FULLER:

11      Q      For purposes of this hearing, you

12  are Dwight Holley?  And you are a part of the

13  District Attorney's office?  Is that right?

14      A      That's correct.

15      Q      Dwight, to get to the point of what

16  we are here about today:  Did you have occasion

17  to participate in an investigation of the

18  shooting and subsequent death of Jelaine

19  Dennis, on County Road 711, on the afternoon of

20  May 23rd, 2001?

21      A      I did.

22      Q      And as a part of the investigation

23  that you participated in, did you have occasion

24  to be present or actually participate in the

25  interview of the Defendant, Robert Conrad?

1          A      I did.

2          Q      Do you recognize the Defendant

3    seated as the third person on the left at the

4    right counsel table as Robert Conrad, the

5    person that you interviewed May 23rd and May

6    25th, 2001?

7          A      Yes, sir, that's him.

8          Q      Where was Mr. Conrad when you first

9    saw him?

10         A      He was in the Medical Center

11   Enterprise in a private room.

12         Q      And when you went to see him, do

13   you recall the day that you first saw Mr.

14   Conrad?  The date?

15         A      The first time I saw Mr. Conrad was

16   on May 24th at approximately 1413 hours.

17         THE COURT:  What time of day is that?

18         THE WITNESS:  1413 hours, on May the

19                  24th, which would have been

20                  2:13.

21         Q      When you first saw Mr. Conrad, on

22   the afternoon of May 24th, was anyone else with

23   you?

24         A      Investigator Jeff Spence with the

25   Enterprise Police Department.

1    Q    When you went to the hospital, you
2    said that he was in a private room?  Was
3    Mr. Conrad under arrest for any offense at that
4    time?
5        A    Not at that time.
6        Q    Did you have occasion to speak with
7    Mr. Conrad after you arrived at Medical Center
8    Enterprise?
9        A    I did.
10       Q    Prior to speaking with Mr. Conrad,
11   did you inquire into the medical condition of
12   Mr. Conrad as to any drugs that had been
13   administered and his ability to participate in
14   any investigation or questioning that you were
15   going to conduct upon him?
16       A    I talked to a nurse at the nurse's
17   desk and inquired about as to whether or not
18   Mr. Conrad would be coherent or able to give us
19   a statement at that time.
20       Q    Do you recall the name of the
21   nurse?
22       A    I do not.
23       Q    But you did, in fact, inquire prior
24   to seeing Mr. Conrad, as to his mental state?
25       A    I did.

1   Q  At the first time that you saw Mr.

2 Conrad in the private room, was there anyone

3 else in the room with him?

4   A  At that time I believe Officer

5 Lewis Kent from the Enterprise Police

6 Department was there.

7   Q  When you saw Mr. Conrad, can you

8 described his demeanor and appearance?

9   A  At that time, Mr. Conrad seemed to

10 be alert ,coherent.  His voice and his speak

11 was not slurred.  His eyes seem to be clear and

12 not glassy-over as a person under any type of

13 narcotic drugs.

14   Q  Did you ask medical personnel if

15 Mr. Conrad had received any type of pain

16 medication or muscle relaxers or anything that

17 would have impaired his ability to participate

18 in questioning with you?

19   A  Initially in talking with the nurse

20 at the nursing station, I just asked if  it

21 would be okay to interview him, and if he would

22 be in a state of mind to interview him.  And

23 they said, yes.

24   Q  Did, in fact, you go into his room

25 and verify that on your own?

1        A       I did.

2        Q       Was Mr. Conrad cooperative with you

3    on the afternoon of May 24th, 2001?

4        A       He was.

5        Q       Did he agree to talk with you about

6    the circumstances under which he was in the

7    hospital after having being shot the two

8    separate times?

9        A       He did.

10       Q       Prior to questioning Mr. Conrad,

11   did you advise him of his constitutional

12   Miranda Warnings?

13       A       We did.

14       Q       Were you present when they were

15   administered to him?

16       A       I was.

17       Q       Did Mr. Conrad seem to understand

18   the rights that were read to him?

19       A       Yes, he did.

20       Q       Did he, in your opinion, make a

21   knowledgeable, voluntary, intelligent waiver of

22   his rights and agree to talk with you and any

23   other officer that was with you?

24       A       He did.

25       Q       Was Officer Spence with you?  Jeff

1    Spence?

2        A    He was.

3        Q    Was it just the two of y'all?

4        A    Just the two of us.

5        THE COURT:  Dwight, just so I understand,

6                    did you advise the Defendant of

7                    his Miranda?  Or did someone in

8                    your presence?

9        THE WITNESS:  Someone in my presence.

10                    Jeff Spence did.

11       THE COURT:  I just wanted to make sure I

12                    understood.

13       Q    I am going to show you State's

14   Exhibit No. 4 and 4-A, and just ask if you were

15   present, and did you observe State's Exhibit

16   No. 4 being filled out on the afternoon of May

17   24th, 2001?

18       A    I did.  I was present.  And I

19   observed it being filled out.

20       Q    Did you hear Mr. Conrad respond to

21   the questions and to the rights that were read

22   to him before being questioned?

23       A    I did.

24       Q    And I believe it has a place there

25   where he is to sign, unable to sign?

1      A      Mr. Conrad was unable to sign

2  because he had a needle in his hand and an I.V.

3  in his hand.

4      Q      Did he indicate that he was right

5  handed, and that was the hand that the I.V. was

6  was in; or left-handed, and that was the hand

7  the I.V. was in?

8      A      I don't recall.  I just recall that

9  he was unable to sign because of the I.V.

10      Q      He wasn't unable to sign because of

11  his state of mind in your opinion, was he?

12      A      No, he was not.

13      THE COURT:  He had an I.V. in his right

14          hand?

15      THE WITNESS:  I don't remember exactly

16          which hand it was in.  He had an

17          I.V. in.  And I remember Jeff

18          Spence mentioning to him about

19          signing.  And he couldn't sign

20          because of the I.V. in his hand.

21      Q      The transcript of the interview

22  that was conducted with Mr. Conrad, in State's

23  Exhibit No. 4-A -- let me back up and lay a

24  proper predicate.  I apologize.

25          Did you or Jeff Spence in your

1    presence inform Mr. Conrad of his

2    constitutional Miranda Warnings before taking

3    any formal statement from him?

4            A       We did.

5            Q       And after Mr. Conrad agreed to

6    cooperate and talk with you and Sergeant

7    Spence, was there an effort made to record the

8    context of that conversation electronically?

9            A       After he waived his rights.

10           Q       After that form was read to him,

11   and the rights were read to him that were on

12   that form, and after he waived his rights, he

13   then agreed to conduct an interview with you

14   and Sergeant Spence?

15           A       He did.

16           Q       And is State's Exhibit No. 4-A, is

17   that an accurate reproduction in written form

18   of what is contained on the audio cassette tape

19   of the interview with Mr. Conrad on the

20   afternoon of May 24, 2001?

21           A       Yes, sir.

22           MR. FULLER:  Your Honor, I don't know how

23                   specific you want to be with all

24                   of this.  Do you want to go into

25                   the evidence of the tape,

1             itself, or for purposes of this

2             hearing --

3        THE COURT:  You are probably shooting for

4             the admissibility of whether or

5             not --

6        MR. FULLER:  We are not going as far as

7             offering the evidence itself.

8        MR. SMITH:  Whether or not the statement

9             is voluntary, is our request.

10       MR. FULLER:  I understand.

11       Q    I'm not going to go into the

12  contents of the statement itself.  But did the

13  interview that you and Sergeant Spence had with

14  Mr. Conrad on the afternoon of May 24th require

15  a follow-up interview with him at a later time?

16       A    We did a follow-up with him on the

17  25th.  Investigator Spence was not present.  It

18  was investigator Bruce Matthews of the District

19  Attorney's Office and myself.

20       Q    And can you tell the Court what

21  time it was on Friday May 25th of 2001, that

22  you went to talk to Mr. Conrad?

23       A    We arrived at the room at

24  approximately 10:20 that morning.

25       Q    Was Mr. Conrad in the same room

1    that he was in when you had left him the

2    afternoon before?

3         A      He was.

4         Q      Prior to going into Mr. Conrad's

5    room, did you inquire into his medical

6    condition?

7         A      Yeah.  I checked with one of the

8    RN's, a Betty Coland (sic), about the

9    medication that they were giving him, and asked

10   Ms. Coland when was the last time that he had

11   any medication.

12              And she said a little after 2:00

13   a.m., that morning, which would have been about

14   ten hours since he had any medication.

15        Q      To the best of your knowledge and

16   recollection, do you recall her saying if he

17   had been given any other medication that would

18   have impaired his ability to sit for the

19   interview?

20        A      Her words were that was the only

21   medication that he had received in the last

22   ten hours.

23        Q      Okay.  Did you ask Ms. Coland if

24   she thought it was okay to interview him?

25        A      I didn't ask her if it was okay.  I

1  just asked her when he had received his last

2  medication.

3        Q      Okay.  Did you make a note of that?

4        A      I made a note in my written notes

5  about asking her, and who she was.

6        Q      Okay.  Were you present when the

7  Miranda Warnings were, again, read to Mr.

8  Conrad, or if, in fact, they were read to him

9  on the morning of May 25th?

10       A      I was.

11       Q      Dwight, let me show you State's

12  Exhibit No. 5 and 5-A.  If you wouldn't mind,

13  take a look at that.  Do you recall State's

14  Exhibit 5, the Waiver of Rights form,

15  corresponding with the interview that was

16  conducted on the morning of May 25th?  Do you

17  recall seeing that before today's date?

18       A      Yes.  I've seen it before today's

19  date.

20       Q      Were you present either when that

21  was filled out, or did you, in fact, fill it

22  out?  State's Exhibit 5?

23       A      I was present when it was filled

24  out by Investigator Bruce Matthews.  And I

25  witnessed it.  My name is a witness on it.

1      Q      Okay.  The interview that you had

2   with Mr. Conrad, after you inquired with

3   medical personnel, did you, again, for your own

4   benefit, make an independent inquiry

5   as to the condition of Mr. Conrad before asking

6   him any questions?

7      A      That's what I talked to Mrs.

8   Coland, the RN, and asked when was the last

9   time that he had received any medication.

10     Q      And after you got this information,

11  did you follow up and then talk with Mr. Conrad

12  before a statement was taken?

13     A      We did.

14     Q      You were present when his rights

15  were read to him that are listed on State's

16  Exhibit 5?

17     A      I was.

18     Q      Did Mr. Conrad on this particular

19  occasion seem to understand the rights that

20  were again read to him?

21     A      He did.

22     Q      Did he continue to agree and did

23  participate in the interview that you and

24  investigator Matthews conducted with him

25  shortly after that form was filled out?

1          A      He did.

2          Q      Did he seem to knowingly,

3    voluntarily, intelligently waive his right and

4    agree to talk with you?

5          A      He did.

6          Q      Was he hostile on either occasion?

7    Either the afternoon of May 24 or the morning

8    of May 25?

9          A      He was not.

10          Q      Did you or any other officer in

11    your presence offer him anything, promise him

12    anything, or threaten him in any manner before

13    he gave his statement to you?

14          A      Not in my presence.

15          Q      Were you in his presence the entire

16    time from the point in which you arrived in the

17    room, on each of these two occasions, until the

18    time that the interview was completed?

19          A      I was.

20          Q      At any time did Mr. Conrad ever

21    stop or request that the interview cease, or in

22    anyway or otherwise refuse to cooperate and

23    give information to law enforcement as is

24    contained in State's Exhibit No. 4 through 5-A

25    collectively?

1    A    No, he did not.

2    Q    Did you have occasion, after this

3    statement on the morning of May the 25th, 2001,

4    to take another statement from Mr. Conrad?  And

5    I believe there was a brief statement

6    concerning the identification of a shirt?

7    A    I was present, yes, sir, at that

8    time.  Yes, I was.

9    Q    Was Mr. Conrad again read his

10   constitutional Miranda Warnings?

11   A    He was.

12   Q    Were the warnings on a form for Mr.

13   Conrad to sign and fill out?  Or do you recall?

14   A    I don't recall that.  I was present

15   when he received them.  But I wasn't privied to

16   him actually signing or filling it out.

17   Q    After initial contact with Mr.

18   Conrad on each of these three occasions, when

19   the right form was shown to him, and after the

20   right's form was executed, as you've described

21   in your previous testimony, was that fact again

22   reiterated on the beginning portion of the

23   tape, prior to any statement being taken from

24   Mr. Conrad?

25   A    In reference to his Miranda

1    Warnings?

2         Q      Yes?

3         A      Yes, it was.

4         Q      That's what I indicated, not the

5    substance of what he said, but the

6    voluntariness of how he said it, I guess, is

7    what I'm trying to get to.

8              Mr. Conrad, in your testimony, was

9    again notified of his rights some six hours or

10   more later on the afternoon of May 25th, from

11   the time that you and Investigator Matthews had

12   been there at 10:00 that morning?

13        A      Yes.  The third interview and the

14   second one on May 25th, conducted somewhere

15   around 4:45 p.m. that afternoon.

16        Q      Were you present when that

17   interview took place?

18        A      I was.

19        Q      Was Mr. Conrad advised of his

20   constitutional Miranda Warnings?

21        A      He was.

22        Q      And, again, did he make a knowing,

23   voluntary and intelligent waiver of his rights

24   and agree to talk with you and the other

25   officers present?

1          A       He did.

2          Q       Did you inquire then to his medical

3   condition to see if he was impaired in any

4   fashion?

5          A       I did not.

6          Q       Did you in your observation of Mr.

7   Conrad believed that he was impaired to any

8   degree that it would affect his statements that

9   he gave you and other members of law

10  enforcement?

11         A       To me he still appeared to be

12  coherent, able to understand what we were

13  asking him, the purpose of us being there.  And

14  he appeared to understand questions that were

15  posed to him.

16         Q       Did you review the contents of any

17  of the tape recorded statements between

18  yourself or any other members of law

19  enforcement with any other department on Robert

20  Conrad?

21         A       Did I listen to the tape and --

22         Q       Compared to the transcript?

23         A       No, I have not.

24         MR. FULLER:  That's fair enough.  That's

25                 all.

1                              Answer Mr. Bradshaw's

2                    questions.

3

4                    CROSS   EXAMINATION

5   BY MR. BRADSHAW:

6           Q       Mr. Holley, the first time that you

7   took a recorded statement was May 24th?  Is

8   that your testimony?

9           A       That's correct.

10          Q       Had you talked with the Defendant,

11  Mr. Conrad, prior to taking that statement?

12          A       On May 24th, we talked briefly

13  prior to taking the statement.

14          Q       Did you talk to him on May 23rd

15          A       May 23rd?

16          Q       Yes?

17          A       No.

18          Q       Do you know why your recorded

19  transcript says the statement was taken on May

20  23rd?

21          A       I can tell you what Jeff Spence

22  told you me.  He told me that it was a

23  misprint, and it would be corrected when he

24  went back to correct the statement from the

25  23rd.  It should have been the 24th.

1          Q      Corrected when he what?

2          A      When he went back and listened to

3     the tape, he corrected the statement.

4          Q      Is that a copy of the transcript

5     that was taken that day?

6          A      It is.

7          MR. FULLER:  We stipulate that the

8                     transcript said May the 23rd.

9                     And Jeff Spence is the only one

10                    that can testify about the

11                    difference.

12         Q      Had you spoken with the Defendant,

13    Robert Conrad, prior to taking, and I'm not

14    talking a few minutes right before, but prior

15    to that time, had you talk with him?

16         A      I had not.

17         Q      How long had you talked with him on

18    that occasion?  Whether it was the 23rd or

19    24th, how long did you talk to him before the

20    recorder was turned on?

21         A      Very briefly.  Probably 10 minutes

22    at the most.

23         Q      What was the subject of that

24    conversations.

25         A      Just basically what we were there

1    for and the reasons of us being there.

2         Q      And what did you tell him you were

3    there for?

4         A      That we needed to take a statement

5    from him, that we had received information from

6    two other people who were suspects in the Toy

7    Store murder, we had taken their statements and

8    that they had told us that he was a part of

9    that.  And we needed to talk to him.

10        Q      You told him he was a suspect in a

11   capital murder?

12        A      I did.

13        Q      You don't remember the nurse's name

14   that you talked to before going into his room?

15        A      No, I don't.  There were two or

16   three nurses standing at the nurse's station

17   when I went up there.  And I didn't put their

18   name down.

19        Q      Do you know why it's stated, what's

20   listed May 23rd, maybe May 24th, just says that

21   the interview took place at the Medical Center

22   Enterprise, but on the next, second statement,

23   I believe, State's Exhibit No. 5 says -- it

24   names the particular room that you were in?

25        A      I did not do the pre-interview

1    introduction.  Investigator Jeff Spence did,

2    and that's just the way he did it.  I don't

3    know why.

4        Q    Well, can you tell us if the first

5    and second interviews were done in the same

6    place or not?

7        A    They were.

8        Q    They were.  Was anybody in the room

9    during the first interview, besides you and Mr.

10   Spence and Mr. Conrad?

11       A    I believe when we arrived, there

12   was a police officer in the room acting as

13   security.  And I believe there was some of his

14   kin folks there in the room when we first

15   arrived.

16       Q    Why were people there for security?

17       A    I have no idea.  That was a

18   decision made by the sheriff's department and

19   by the police department.

20       Q    Was he under arrest?

21       A    Not at that time.

22       Q    Where was the I.V. at in his arm?

23       A    In his hand.

24       Q    By "hand," do you mean from the

25   wrist and the fingers?  Or sometimes, they will

1    put an I.V. in the forearm?

2         A    The best I recall, it was in his

3    hand, the top of his hand.

4         Q    But you testified that you don't

5    remember right or left?

6         A    I don't remember right or left, no.

7         Q    Did you ask him to sign it?

8         A    I didn't.  I was not the one that

9    advised him of his rights.  Jeff was the one

10   that advised him of his rights.

11        Q    Was he asked to sign it?

12        A    He was.

13        Q    Was he asked to make a mark?

14        A    I don't remember whether Jeff asked

15   him to make a mark or not.

16        Q    Do you know whether or not he had

17   already done writing before he was asked to

18   sign that?

19        A    No, I don't.

20        Q    Do you know the medication that he

21   was on?

22        A    No, I don't.

23        Q    Why was the statement made:  We

24   know your voice is kind of low because of

25   everything that's happened.

1        Where was the tape -- if you know

2    that, why was his voice kind of low?

3        A    I don't remember saying about the

4    tape recorder.  But it was a situation where he

5    was in the bed.  And there's no where to really

6    set the tape recorder, except lay it up on the

7    bed.

8        Q    Wasn't the tape recorder originally

9    put on the night stand by the bed?

10       A    I don't remember the tape recorder

11   laying on the bed.  It could have been the bed.

12   No, I don't remember it being on the night

13   stand.

14       Q    Didn't you have to actually put the

15   tape recorder on his chest, right up under his

16   chin?

17       A    I believe it was laying on his

18   abdomen area or on his chest, yes.

19       Q    Why was that?

20       A    So to make sure that we picked up

21   everything that he said.

22       Q    Was he not strong enough to talk

23   like you and I are talking right now?

24       A    He was talking basically the way we

25   are talking now.  Might have been a little

1    weak.  Nothing real noticeable.  We just --

2    with those tape recorders, we always try to

3    make sure they are laying in a place that they

4    will pick up everything that's said by a person

5    we are interviewing.

6        Q    Did he ever ask you to stop or take

7    a break during that first interview?

8        A    No, he did not.

9        Q    Did he ever give you a response,

10   Mr. Holley, that you thought may indicate that

11   he was not being very coherent and not

12   understanding what you were saying?

13       A    Not during the first statement, no

14   he did not.

15       MR. BRADSHAW:  Judge, without getting

16                    into -- I don't want to present

17                    the evidence of content of the

18                    recorded statement.

19       Q    But for going towards the

20   admissibility of it, and the intelligent and

21   knowledgeable giving of it, and I ask you to

22   look at page 2 of this first one, which is

23   State's Exhibit No.  4-A.

24       THE COURT:  Page 2.

25       MR. BRADSHAW:  Yes, sir.  Page 2.  Let me

1              make sure we have the same

2                    thing.  Yes.

3          Q      Where Officer Spence tells him that

4    they have taken a bullet or projectile.  And it

5    matched up 100 percent.  And his response is:

6    It's going to take just a minute.

7          A      That was his response.

8          Q      Did that seem like a coherent

9    response to what he was being asked?

10         A      It did to me, yes.  He was going to

11   tell us about what happened the day before.

12   And it may take a little while.  It would take

13   a few minutes, would take a minute.

14         Q      On the second day you went in.  How

15   long did you talk to him then, before the

16   recorder was turned off?

17         A      We went in at approximately 10:20.

18   And the recorder was turned off at 12:16.

19         Q  .   So you talked to him nearly two

20   hours?

21         A      Yes.  Almost two hours, yes.

22         Q      What was talked about in two-hours

23   time?

24         A      When we got back to the hospital

25   room for the second interview, we had

1    interviewed the other two suspects in the case.

2    And they had given us information that he was

3    in fact a part of it.

4              And we wanted to go over with him

5    and let him understand what we had found out.

6    And if he wanted to change his story and talk

7    to us about what really happened that day, we

8    wanted to listen.  And he said that he was

9    willing to talk to us about the information

10   that we had received from the other two.  And

11   we were going over basically his previous

12   statement, which actually turned out later --

13   he admitted in the later statement that he had

14   lied in the first statement, that the first

15   statement was completely a lie.  And we were

16   trying to make sure that we had gotten all the

17   information in the second statement that would

18   let us know what happened.

19        Q     Did you ever -- you spent nearly

20   two hours telling him what you had talked about

21   with someone else?

22        A     We talked to him about that and

23   about what really happened.  And he went over

24   with us the different things.

25        Q     When was it that you gave him his

1 Miranda Warnings that you testified to?  10:20

2 or 12:16.

3   A  The Miranda Warnings were given to

4 him that morning at 10:20.

5   Q  And the tape recorder wasn't turned

6 off until 12:16?

7   A  That's correct.

8   Q  Is that the time that you said you

9 talked to Betty Coland?

10   A  Prior to talking to him, we talked

11 to Betty Coland.

12   Q  Did she tell you what was given to

13 him?

14   A  No, she did not.  She just told me

15 that he hadn't had anything since approximately

16 2:00 o'clock that morning.

17   Q  And he was able to sign his own

18 waiver on that day?

19   A  He did.

20   Q  Who requested, or did anybody

21 request that the first interview be stopped?

22   A  The first interview?  Are you

23 talking about on the 24th?

24   Q  Yes, sir.

25   A  Investigator Spence was the one

1  that entered that interview.

2      Q    Did you ask Nurse Betty Coland if

3  the I.V. that he had was for fluid or for

4  medicine or for both?

5      A    I didn't ask her that.  I just

6  asked when was the last time he received

7  medication.

8      Q    Do you know if he had a slow drip

9  medication?

10     A    All I know is there was an I.V.

11 there during the first interview.

12     Q    So you don't know?

13     A    I don't know.

14     Q    At any time during the second

15 interview, did he ever ask you to stop or ask

16 to speak to an attorney?

17     A    No, he did not.

18     Q    Was there anyone present in the

19 room, besides you and Officer Spence -- excuse

20 me, Officer Matthews?  Was there anybody in the

21 room besides the three of you?  Mr. Conrad?

22 Yourself?  And Matthews?

23     A    A guy who was at the door, Matt

24 Key, police officer with the Enterprise Police

25 Department, was there when we first arrived,

1    and Deputy Michael Hines came in a short time

2    later and took over his position.

3        Q    So the four authorities in there

4    and Mr. Conrad?

5        A    There were three initially.

6    Myself.  Investigator Mathews and Matt Key.

7    When Matt Key left, Michael Hines took his

8    place.  They just swapped out.

9        Q    Why was Kyle Hale listed on here as

10   being in that room?

11       A    I believe Kyle Hale was on the

12   first interview.

13       Q    May 25th at 12:16 p.m., it says

14   Kyle Hale, Enterprise Police Officer, present.

15   Would you refer to State's Exhibit 5 or 5-A and

16   see if that's correct?

17       A    I'm sorry.  I was looking at the

18   wrong -- Michael Hines was the one for the

19   third interview.  I'm sorry.  This is the

20   second interview.  It was Kyle Hale.

21       Q    So do you remember by looking at

22   that how many people were in the room besides

23   Mr. Conrad?

24       A    Mr. Hale.  Myself.  And

25   Investigator Matthews.

1          Q      Was any of Mr. Conrad's family

2    there?

3          A      I don't recall on that date.

4          Q      On the first date, was his family

5    allowed to stay in the room while you talked to

6    him?

7          A      No, they were not.

8          Q      Why not?

9          A      Because we wanted to interview him,

10   and we wanted to interview him outside the

11   presence of any of his kin folks or anyone

12   else.

13         Q      He was not under arrest, was he?

14         A      No, he wasn't.

15         Q      On that third and final interview,

16   Mr. Holley, that was taking place, who all was

17   in the room on that day?

18         A      Bruce Matthews.  Myself.  Michael

19   Hines.  And Investigator Rick Hauser with the

20   Enterprise Police Department.

21         Q      Was any of Mr. Conrad's family

22   there that day?

23         A      They may have been present, but I

24   don't remember.

25         Q      Would you have asked them to leave

1    then also?

2        A    Yes, we would have.

3        Q    Were any promises made to Mr.

4    Conrad while you were taking the statement from

5    him?

6        A    No, there wasn't.

7        Q    Were there any threats or

8    punishment by death or imprisonmnet told to

9    him?

10        A    Not by me.

11        Q    By whoever was asking him

12    questions?  Whoever was speaking?

13        A    I believe the first statement of

14    May 24th, our Investigator Jeff Spence says

15    they compared it with the weapon found if the

16    robbery yesterday, that matched the bullet 100

17    percent.  And then he talked to him about the

18    fact that that was capital murder.

19        Q    He was told on another occasion

20    that he was facing capital murder and

21    punishment by death, wasn't he?

22        A    I don't recall that.

23        Q    You don't recall?

24        A    No.

25        Q    Was he in fact under arrest at that

1   time?

2          A      No, he wasn't.

3          Q      So that wasn't really the truth,

4   was it?

5          A      It was a possibility.

6          Q      He wasn't facing death.  If he

7   wasn't under arrest, he wasn't facing that, was

8   he?

9          A      He wasn't facing that if he was not

10  convicted of it.  But if he was arrested and

11  convicted, he was facing capital murder.

12         Q      When he was told there was a 100

13  percent match of the bullet, that wasn't true

14  either, was it, on May 24th?

15         A      All I know is we received

16  information from Joe Saloom, Department of

17  Forensic Sciences, before we took that second

18  statement from him and stated that the bullet

19  matched, the one taken from his arm was fired

20  from the victim's gun.

21         MR. BRADSHAW:  Just a minute, Your Honor.

22                        That's all.

23               REDIRECT EXAMINATION

24  BY MR. FULLER:

25         Q      Mr. Holley, I over looked the last

1    waiver form.  For the record, I have shown Mr.

2    Smith State's Exhibit No. 6.  You had testified

3    about State's Exhibit No. 6, which is the

4    Waiver of Rights form?  Is that correct?

5         A    That's correct.

6         Q    And your testimony earlier about

7    the circumstances under which you got it, is

8    still the testimony that you are giving right

9    now?

10        A    That's correct.

11        MR. FULLER:  I apologize, Your Honor.  I

12              just don't have a copy of it.

13              State's Exhibit No. 6-A is the

14              transcript.

15                    No further questions.

16        THE COURT:  Mr. Bradshaw?  Nothing

17              further.

18        MR. BRADSHAW:  No, sir.

19        THE COURT:  Call your next witness.  For

20              the record, this witness is

21              still under oath.

22                    JEFF SPENCE

23              REDIRECT EXAMINATION

24    BY MR. FULLER:

25        Q    You are still under oath.  With

1    respect to the earlier questions, Sergeant

2    Spence, did you have occasion on, and I back up

3    and try to -- did you have occasion to

4    interview or attempt to interview the

5    Defendant, Robert Conrad, at any point after

6    you had been notified of the death and the

7    robbery of Mrs. Dennis on the afternoon of May

8    23rd, 2001?

9         A    Yes.

10        Q    When was the first time that you

11   either talked to Mr. Conrad or attempted to

12   talk to Mr. Conrad?

13        A    The evening of May 23rd.

14        Q    Was the person that you -- where

15   was this person?

16        A    Medical Center.

17        Q    Did you go to the Medical Center to

18   talk with this person?

19        A    Yes.

20        Q    Was the person that you went there

21   to talk to there?

22        A    Yes.

23        Q    Did you have occasion to see that

24   person?

25        A    Yes.

1          Q      Is the person that you saw on the
2     night of May 23rd the same person that is
3     seated next to Mr. Bradshaw in the courtroom
4     today?
5          A      Yes.
6          Q      Mr. Robert Conrad for the record?
7          A      Correct.
8          Q      When you went to the hospital, on
9     May 23rd, do you recall the time that you were
10    there?
11         A      Approximately 8:05 p.m.
12         Q      What was the purpose of you going
13    to the hospital that day?
14         A      To converse with him about what had
15    transpired.
16         Q      Was anyone else with you?
17         A      Bruce Matthews.
18         Q      With the District Attorney's
19    Office?
20         A      Correct.
21         Q      When you saw Mr. Conrad, would you
22    describe his condition or demeanor, or describe
23    his circumstances in any way that you feel
24    would better describe the condition he was in?
25         A      He as sedated, slurred speech.   And

1    would fade in and out.

2         Q      Did you attempt to read Mr.

3    Conrad's his constitutional Miranda Warnings

4    before going further and talking to him?

5         A      Yes.

6         Q      Was Mr. Conrad in a position -- in

7    your opinion did he understand the rights that

8    were being read to him?

9         A      At that time, no.

10        THE COURT:  At that time, no?  He was not

11             in a position to understand?

12        THE WITNESS:  No.

13        Q      Because you got started -- did you

14   go ahead and fill out a Miranda form and make

15   an interview sheet?

16        A      Correct.

17        Q      Because you attempted to conduct

18   the interview?

19        A      Correct.

20        MR. FULLER:  And, again, Judge, I

21             apologize for jumping ahead

22             here.  I'm just going to try

23             save some time.

24        Q      Did you ever take any statements

25   from Mr. Conrad, or did he ever -- first of

1  all, did you ever take any statement from Mr.

2  Conrad on the night of May 23rd?

3      A    No.

4      Q    Did Mr. Conrad ever say anything to

5  you about, I don't want to talk to you.  Don't

6  ever come back, or any statement to that

7  degree?

8      A    No.

9      Q    You said that he was sedated.   I

10  imagine in my mind being in the hospital after

11  surgery, that means he had medication that

12  affected pain, speech?

13      A    Yes.

14      Q    And those kinds of things?

15      A    Yes.

16      Q    Did he appear to be impaired?

17      A    Yes, he did.

18      Q    And for the record in this hearing,

19  State's Exhibit No. 7 and 8, I have shown those

20  to Mr. Bradshaw and Mr. Smith.  Can you

21  identify those, please?

22      A    This is the form that I used to

23  advise him of his rights and the interview

24  sheets that I filled out.

25      Q    Mr. Conrad did not understand his

1    rights in your opinion?  Is that your opinion?

2         A    No.

3         Q    And did not sign it either?

4         A    No.

5         THE COURT:  That was on May 23rd?

6         THE WITNESS:  Correct.

7         Q    When was the next time that you had

8    occasion to go back to Medical Center or any

9    other place that Mr. Conrad was and talk to

10   him?

11        A    Approximately 2:00 p.m., the

12   following day, May 24th.

13        Q    On May 24th?

14        A    Correct.

15        Q    That was on a Thursday?

16        A    Yes.

17        Q    The crime took place shortly after

18   1:00 o'clock, between 1:00 and 2:00, on a

19   Wednesday?

20        A    Yes.

21        Q    So, Thursday afternoon?  What time

22   did you say it was?

23        A    2:00.

24        Q    2:00 o'clock?  You went back and

25   saw Mr. Conrad?

1       A       Yes.

2       Q       Was anybody else with you?

3       A       Yes.

4       Q       Who was with you?

5       A       Dwight Holley with the District

6    Attorney's Office.

7       Q       When you saw Mr. Conrad, can you

8    describe his demeanor or condition or state of

9    mind?

10      A       He was alert.

11      Q       Prior to going in and talking with

12   Mr. Conrad, did you make an inquiry of any

13   medical staff present or that were attending to

14   him as to any medication that he was taking?

15      A       I personally did not.  Dwight

16   Holley did.

17      Q       Were you informed by anyone that

18   Mr. Conrad was impaired or was not able to

19   communicate with you?

20      A       No.

21      Q       Or anyone else?

22      A       No.

23      Q       You have taken statements from many

24   individuals in the years that you have been an

25   investigator with the police department, have

1    you not?

2         A    Correct.

3         Q    And when I asked you if Mr. Conrad

4    appeared to be alert and understand the rights

5    that were read to him, do you understand what I

6    mean by that?

7         A    Yes.

8         Q    Did he, in fact, appear to be

9    alert, and did he understand the rights that

10   were being read to him?

11        A    Yes.

12        Q    Did he knowingly and voluntarily

13   agree to talk with you?

14        A    Yes.

15        Q    And did he waive any constitutional

16   Miranda Warnings that he had and agree to talk

17   with you, and you make a cassette tape

18   recording of that conversation?

19        A    Yes.

20        Q    Was in fact a cassette tape

21   recording made of that conversation?

22        A    Yes.

23        Q    Was it subsequently reduced into

24   written form, which is shown, I believe, as

25   State's Exhibit No. 4-A?

1          A       Yes.

2          Q       And have you had occasion to review

3    State's Exhibit No. 4-A?

4          A       I have.

5          Q       Is there anything about State's

6    Exhibit No. 4-A that is inaccurate?

7          A       Yes.

8          Q       What is it?

9          A       When I began the tape, I stated it

10   was May 23rd, but the tape is incorrect.  I did

11   state May 23.

12         Q       Was it Wednesday, May 23rd or

13   Thursday, May 24th, when you were talking?

14         A       It was Thursday, May 24th.

15         Q       Did you in fact make that

16   correction on the Waiver of Rights form showing

17   in Exhibit 4?

18         A       Yes.

19         Q       Okay.  Did you promise Mr. Conrad

20   anything?

21         A       I did not.

22         Q       Did you threaten him in any manner?

23         A       No.

24         Q       Did he at any time say that he

25   wanted to stop, that he was too uncomfortable

1    to continue?  Or did he at any time ever ask

2    for an attorney to represent him or be present

3    while he was being questioned?

4        A       No, he did not.

5        Q       And I will ask you specifically for

6    each interview that you were present at.  I

7    believe you had an occasion next to be with Mr.

8    Conrad the following day, which was Friday

9    morning, May 25th.  Were you present then?

10       A       No, I was not.

11       Q       That was Mr. Matthews and Mr.

12   Holley?

13       A       Correct.

14       Q       And you are aware that they went

15   and interviewed Mr. Conrad on that morning,

16   Friday May 24th?

17       A       Friday morning, May 25th.

18       Q       Friday, May 25th?  You are aware

19   that they had gone back and seen him that day?

20       A       Yes.

21       Q       Did you again go back later on the

22   afternoon of May 25th, and were you present

23   when he was interviewed the third formal time?

24       A       No.

25       Q       You were not present on either the

1    second or third interview of Mr. Conrad?

2        A    No, I was not.

3        Q    So the only interview that you were

4    present at and participated in was the first

5    recorded interview, that being on the afternoon

6    of May 24th?

7        A    Correct.

8        Q    Was there anything about Mr.

9    Conrad's demeanor, condition or circumstances

10   upon which he was being interviewed, that you

11   feel would not have made his responses

12   voluntary or knowingly?

13       A    No.

14       MR. FULLER:    That's all I have.    If you

15                   will answer Mr. Bradshaw's

16                   questions.

17             RECROSS EXAMINATION

18   BY MR. BRADSHAW:

19       Q    Officer Spence, do you know why he

20   didn't sign your form on the 24th?

21       A    Yes, I do.

22       Q    Why?

23       A    Because he had an I.V. in his hand,

24   and he couldn't hold a pen.

25       Q    Do you know why he could sign one

1   on the 25th when he still had the same I.V. in

2   his hand?

3        A      That, I don't know.

4        Q      Did you ask him to sign it on the

5   24th?

6        A      Yes, sir.  And he held up his hand,

7   and said that he had an I.V. in his hand.  I

8   said, okay, that's fine.

9        Q      Was there anybody else that saw you

10  ask him to sign it?

11       A      Dwight Holley.

12       Q      But he could sign one on the 25th?

13       A      Apparently, he could.

14       Q      Had you received that phone call

15  from Mr. Saloom before you went back to take

16  this recorded statement?

17       A      Yes.

18       Q      Did Mr. Saloom call you personally?

19       A      No.

20       Q      Did you ever tell Mr. Conrad that

21  he was hanging himself?  That he was going to

22  the electric chair?

23       A      I don't recall.  What was in the

24  statement, that's all I can tell you.

25       Q      Did you use any language like that

1    to threaten him or to coerce him?

2         A    I don't recall.  I would have to

3    review the transcript.

4         THE COURT:  You can certainly use

5                  anything to refresh your

6                  recollection.

7         Q    Would you look at the back page,

8    page 25, the last paragraph, next to the last

9    paragraph?

10        A    Yes.

11        Q    Did you use language to try to

12   coerce him or threaten him or to put fear into

13   him?

14        A    I said:  Let him hang himself.

15        Q    You said that's what's going to

16   happen?  You were telling him that he was going

17   to be hung?

18        MR. FULLER:  I think he may be taking

19                 that out of context.  Do you

20                 have a copy?

21        THE COURT:  I have read it.

22        MR. FULLER:  I wanted to make sure that

23                 you understood the

24                 circumstances.

25        THE COURT:  I have read it.

1      Q      And you used that language?  Were

2   you telling him those things, Mr. Spence, in

3   order to try to coerce him into saying

4   something that you wanted to hear?

5      A      No.  Just the truth.

6      Q      You knew that?  You knew that was

7   the truth?

8      A      What?

9      Q      You just said it's the truth?

10      A      No.  I wanted to obtain the truth.

11      Q      Oh.  Okay.  Do you know which arm

12   the I.V. was in?

13      A      I can't recall.

14      Q      Do you know where in the arm it

15   was?  If it was on the hand, or if it was in

16   the forearm?

17      A      I believe there was one right

18   above, or right below the knuckles.

19      Q      Right above the knuckles in his

20   hand?

21      A      Yes.

22      Q      Did you inquire of any medical

23   personnel as to what his mental condition was?

24      A      I did not.  Dwight Holley did.

25      Q      Did you ask his parents and family

1    to leave the room?

2         A    They were not present, I don't

3    believe, when I spoke with him.

4         Q    Did you ask them to leave the room?

5         A    I don't believe they were there

6    when I talked to them.

7         Q    They were not there when you

8    arrived?

9         A    I don't believe they were.

10   They may have been.  I don't recall.

11        Q    Would you have allowed them to stay

12   in the room if they had been there in the room?

13        A    No.

14        Q    You would not?

15        A    No.

16        MR. BRADSHAW:  That's all.  Thank you.

17        THE COURT:  Any other questions?

18                  REDIRECT EXAMINATION

19   BY MR. FULLER:

20        Q    I would like to clear up this issue

21   about him hanging himself.  On State's Exhibit

22   No. 4, did you direct that comment at Mr.

23   Conrad?

24        A    No.

25        Q    Who were you talking to?

1       A       Dwight Holley.

2       Q       At any time during any of the

3 interviews that you conducted or participated

4 in, was Mr. Conrad threatened?

5       A       No.

6       Q       Abused?

7       A       No.

8       Q       Beaten?

9       A       No.

10      Q       Promised anything?

11      A       No.

12      Q       Given any assurance, leniency or

13 promises?

14      A       No.

15              RECROSS EXAMINATION

16 BY MR. BRADHSHAW:

17      Q       Officer Spence, who operated the

18 tape recorder?

19      A       I had turned it on and placed it

20 next to him where it would pick him up.

21      Q       Did you place it on his chest or

22 abdomen area?

23      A       No.  It was off to the side, next

24 to his arm, propped up against his arm, I

25 believe.  I'm not sure exactly where it was.

1    It might have been on the bed.

2           Q      Was he in the bed or sitting up in

3    a chair in the room?

4           A      He was in the bed.

5           Q      Did he have a cast or anything on

6    his left arm?

7           A      I don't recall.

8           Q      Why would you put it on his arm?

9    Is that what you normally do when you take a

10   statement from somebody?  Lay it up on their

11   body or next to their body?

12          A      I put it next to him where it would

13   pick him up talking.

14          Q      Was he talking low?

15          A      He wasn't real loud.  And I wanted

16   to make sure that we got him on tape.  I didn't

17   want to stick it in his face, either.

18          Q      Why did you think that he wasn't

19   talking real loud?

20          A      He was not carrying on a

21   conversation like us.  This was the first time

22   that I had a conversation with him.  I did not

23   know how he spoke.

24          Q      You stated that:  Your voice is

25   kind of low because of everything that

1    happened?

2              Was that all of the medical

3    procedure and medicine and surgery?  Didn't

4    that make you think that his voice might be

5    low?

6         A    Could have been from tubes being

7    placed in his mouth during surgery.  I don't

8    know.  He was talking low.  That might have

9    been his normal tone.  I don't know that.

10        Q    That didn't give you any indication

11   that he might not be giving a knowingly,

12   intelligent statement to you?

13        A    Not for a person talking low.

14        Q    For a person coming out from under

15   surgery?

16        A    That's been 24 hours.

17        MR. BRADSHAW:  No other questions.

18        THE COURT:  Mr. Fuller?

19        MR. FULLER:  I don't have any questions.

20        THE COURT:  None.  Do y'all expect to

21             recall Officer Spence?  Either

22             side?  We have had him twice

23             today.

24        MR. BRADSHAW:  I don't intend to call

25             him.

1          MR. FULLER:  I don't.

2          THE COURT:  Okay.  You are excused.

3          MR. FULLER:  I have Mr. Matthews I will

4               call briefly?

5                    BRUCE MATTHEWS

6          Whereupon, this witness, after first

7     being duly sworn to tell the truth, the whole

8     truth, and nothing but the truth, testified as

9     follows, to-wit:

10                    DIRECT EXAMINATION

11    BY MR. FULLER:

12         Q       Bruce, would mind, please, telling

13    the Judge who you are and where you work?

14         A       Bruce Matthews, Investigator with

15    the District Attorney's Officer, Twelfth

16    Judicial Circuit.

17         Q       Part of your duties and

18    responsibilities as being an investigator with

19    our office includes taking statements from

20    suspects or individuals involved in knowing

21    anything about a crime?

22         A       Yes, sir.  That's correct.

23         Q       Were you employed with the District

24    Attorney's Office as an investigator on May

25    25th, 2001?

1      A     Yes, sir, I was.

2      Q     Did you have occasion to

3 participate in or either conduct yourself with

4 the aid of someone else an interview of an

5 individual by the name of Robert Conrad on May

6 25th, 2001?

7      A     Yes, sir.

8      Q     Do you recognize the individual

9 seated next to Mr. Bradshaw as being the same

10 Robert Conrad that you interviewed on May 25th

11 of 2001?

12      A     Yes, sir.

13      Q     Were you present when Mr. Conrad

14 had his constitutional Miranda Warnings read to

15 him or Waiver of Rights form presented to him

16 for his review and signature on either of those

17 interviews on May 25th, 2001?

18      A     I was present in both of those

19 interviews on May 25th, '01, at the time of the

20 Miranda.

21      Q     State's Exhibit No. 5 and 6 are the

22 two Waiver of Rights form on May 25th of 2001.

23 State's Exhibit No. 5 occurred at approximately

24 10:20 a.m. And State's Exhibit No. 6 occurred

25 at approximately 4:45 p.m. Did you fill out or

1    assist in filling out either of those forms?

2        A    Yes, sir.  They appear to be my

3    handwriting.  I believe I filled them out.

4        Q    Both of them?

5        A    Yes, sir.  I'm not 100 percent sure

6    on this one.  It looks like my handwriting as

7    well.  But my handwriting is sloppy.  This

8    could possibly be Dwight's.  But I was on both

9    of them.

10        Q    Were you the one on either or both

11    of those occasions the one who informed Mr.

12    Conrad of his constitutional Miranda Warnings?

13        A    I'm not certain on that.  I was the

14    backup investigator.  And I believe it was

15    Investigator Holley that actually informed him

16    of his rights.

17        Q    So you were present when his rights

18    were read to him?

19        A    Yes, sir.

20        Q    Did Mr. Conrad appear to understand

21    his rights that were read to to him?

22        A    Yes, sir.

23        Q    Was he promised anything if he

24    would agree to talk with y'all?

25        A    No, sir.

1        Q        Did y'all threaten him in any

2   fashion, if he didn't talk with you?

3        A        No, sir.

4        Q        He give you information that would

5   be known only to him, I presume?  You didn't

6   know Mr. Conrad before May 25th of 2001, did

7   you?

8        A        I had never had occasion that I

9   know of to meet him or know him.

10        Q        You didn't know what grade he last

11  attended or any of his personal information

12  that he took down, did you?

13        A        Correct.

14        Q        And he provided that to you?

15        A        Let me make a correction.  I did go

16  to the hospital on the 23rd.  But that was my

17  first contact with him.  And it was in

18  reference to the same case.

19        Q        Did you speak to Mr. Conrad?

20        A        I was in the room when Investigator

21  Spence attempted to talk to him that night.

22        Q        That night?

23        A        That night.  Right.  And there was

24  no statement taken.

25        Q        Not at that time taken?

1        A       Right.

2        Q       But as far as any personal

3   information about Mr. Conrad, you didn't know

4   him before?

5        A       No, sir.

6        Q       So any information that he gave

7   you, did it appear to be lucid?

8        A       Yes, sir.

9        Q       Did he appear to understand what

10  y'all were there to do and what he was asked to

11  do in an effort to ask questions that y'all had

12  been asking?

13       A       Yes, sir, he did.

14       Q       Now, I think you've indicated he

15  wasn't promised anything, and he wasn't

16  threatened or beaten in any fashion, was he?

17       A       No, sir.

18       Q       Did the waiver forms that he

19  executed -- I believe he executed one of them,

20  did he not?

21       A       Both of them.

22       Q       He executed both of them.  They

23  were executed in your presence?

24       A       Yes, sir.

25       Q       Was that after the contents of

COURT OF CRIMINAL APPEALS NO. CR-02-0333

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF _____ COFFEE _____ COUNTY, ALABAMA

CIRCUIT COURT NO. CC-01-179, CC-01-180

CIRCUIT JUDGE _____ Gary L. McAliley _____

Type of Conviction / Order Appealed From: Conviction, Capital Murder, Robbery 1st

Sentence Imposed: Life Without Parole, Life

Defendant Indigent: [X] YES  [ ] NO

Robert Thomas Conrad
_____
                                    NAME OF APPELLANT

Gary Bradshaw
(Appellant's Attorney)                    (Telephone No.)    Richard Waldrop
P. O. Box 311412                                            P. O. Box 310027
(Address)                                                   Enterprise, AL  36331
Enterprise        AL        36331
(City)           (State)        (Zip Code)

V.

STATE OF ALABAMA
_____
                                    NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____
_____

(For Court of Criminal Appeals Use Only)



1    those two forms were read to him?

2         A    Yes, sir.

3         Q    And after he executed those forms,

4    were each of those two statements recorded with

5    an audio cassette tape?

6         A    Yes, sir, they were.

7         Q    Were transcripts made, Exhibits 5-A

8    and 6-A, respectively?

9         A    Yes, sir.

10        Q    Have you had occasion to review

11   those?

12        A    I have reviewed these transcripts.

13        Q    With the tape?

14        A    No, sir.

15        Q    In your review of those two

16   statements, did it appear to fairly and

17   accurately contain the questions and responses

18   that were asked of Mr. Conrad on the two

19   occasions of May 25, 2001?

20        A    Yes, sir.

21        Q    Did Mr. Conrad at any time ever

22   say, on or off the tape, I don't want to talk

23   to you?  I would rather not talk to?  I want a

24   lawyer?  Or I want to stop?  Or any words to

25   that effect?

1       A      No, sir.

2       Q      Was there any reference by Mr.

3  Conrad -- or were there any statements that you

4  were present that were made?

5       A      Yes, sir.

6       Q      Which one?

7       A      I believe it was the second one.

8       THE COURT:  On the 25th?

9       THE WITNESS:  On the 25th, yes, sir.  At

10             4:45 p.m.

11      Q      What is your recollection?

12      A      Right at the end of the interview

13  he asked about a form that he had, a form to

14  obtain an attorney.  And I explained to him how

15  he could get his mother to sign it.  And I

16  explained that he would have to talk to a

17  deputy, that they were in charge of his

18  custody, and that I had nothing to do with

19  that; that I didn't have anything to do with

20  that and didn't know how that would work.

21      Q      Did you understand that he was

22  under arrest at that time?  He had been

23  arrested at that point in time?

24      A      Yes, sir.

25      Q      His initial appearance had taken

1    place, I believe?

2        A    Yes, sir.

3        MR. FULLER:  That's all.

4        THE COURT:  Would you go over that,

5             again, please?

6        MR. FULLER:  He was arrested on that

7             date.  And Judge Blair had gone

8             to the hospital and done his

9             initial appearance when that

10            statement was taken.

11       THE COURT:  Do you have a record of what

12            time?

13       MR. FULLER:  No, sir.  We are trying to

14            find that out.

15       THE COURT:  I need that for purposes of

16            this hearing.

17       MR. FULLER:  If you will answer Mr.

18            Bradshaw's questions.

19            <u>CROSS EXAMINATION</u>

20   <u>BY MR. SMITH</u>:

21       Q    Bruce, you first went to the

22   hospital on the 23rd?

23       A    Yes.

24       Q    What time on the 23rd?

25       A    I don't recall exactly, but that

1    that evening.

2        Q    Past dark?

3        A    As my recall, I believe so.

4        Q    And Mr. Conrad had -- was that

5    before or after he had surgery?

6        A    It was after he had surgery.

7        Q    After he had surgery?

8        A    Yes, sir.

9        Q    Was he in his room?

10        A    Yes, sir.

11        Q    And you and Jeff Spence were there

12    on that first occasion?

13        A    Yes, sir.

14        Q    On the 23rd?

15        A    That's correct.

16        Q    And basically didn't conduct any

17    interview with him?

18        A    No, sir.

19        Q    Didn't receive any statements or

20    what have you, that were recorded?

21        A    No, sir.

22        Q    Did you have contact on the 24th

23    with Investigator Spence?

24        A    I'm sure I did, sir. I don't

25    recall a specific contact. We had meetings.

1    We had a lot going on.

2        Q    You were aware that a warrant was

3    signed by Mr. Spence and warrant was issued,

4    complaint and warrant was issued on the 24th?

5        A    Specifically aware that he actually

6    signed it, no.  But I was aware that one had

7    been signed and so on.

8        Q    And you and Mr. Holley went back on

9    the 24th to the hospital?

10       A    No, sir.  That was the 25th.

11       Q    You didn't go to the hospital at

12   all on the 24th?  Is that correct?

13       A    Not that I recall.  I didn't

14   participate in any interviews with him on the

15   24th.

16       Q    All right.  On the 25th, your visit

17   as I understand to the hospital, was what time?

18       A    Around 10:20 that morning.

19       Q    Now, I'm confused, Bruce.  And I

20   apologize.  But on the occasion where you went

21   with Jeff and no statement was taken, again,

22   that was on the 23rd?

23       A    To the best of my recollection.

24       Q    Post surgery?

25       A    Yes, sir.  In the evening time.

200

1       Q     You didn't see him?  See Mr. Conrad

2  at all on the 24th?

3       A     No, sir, not that I recall.

4       Q     And then about 10:00 a.m, on the

5  25th?

6       A     That's correct.

7       Q     How long did you stay at that

8  hospital on the 25th?

9       A     I think the interview concluded

10  around 1:00 o'clock.  So it would have been

11  between basically 10:00 and 1:00.

12       Q     And you started recording some time

13  after noon?  Is that correct?

14       A     That's correct.

15       Q     Was there a lot of activity with

16  Mr. Conrad between when you first arrived there

17  and you began taping the statement?

18       A     There was activity.

19       Q     Nurses coming in to treat him?

20       A     Yes.

21       Q     Did they do anything to the I.V.,

22  or provide any medication that you observed?

23       A     We were told they had not medicated

24  him as far as pain medicine or any kind of

25  sedative or anything like that.  If they gave

1    him any antibiotics or anything like that, I'm

2    not sure.

3         Q    You don't recall that occurring?

4         A    We left room.  If a nurse came in

5    to treat him, we would step outside.

6         Q    You did not remain in when he was

7    treating him?

8         A    Not that I recall.

9         Q    Your first inquiry about this

10   medication, did you read, or inquire, as the

11   day progressed of medical providers?

12        A    A couple of nurses, as they went

13   in, I would ask them if they had given him any

14   kind of sedative or anything like that, and

15   they would tell me, no.

16        Q    You did that on each occasion that

17   they left?

18        A    I can't specifically recall.  One

19   occasion she lowered the bed, is -- she said

20   she did was lower the bed for him.  Sat him up

21   or lay him down.  Whichever.

22        Q    Did he appear to be in pain?

23        A    He complained of having some pain

24   occasionally.

25        Q    You started the tape recorder at 12

1    -- shortly after noon, 12:16, according to the

2    transcript?

3         A    Yes, sir.

4         Q    And that is correct as far as you

5    know?

6         A    Yes, sir.

7         Q    And you interviewed him for some 35

8    or 36 pages of transcript, about 1:00, when you

9    ended?  About 45 minutes of interview?

10        A    That's correct.

11        Q    What did you then do?

12        A    The best I recall, we left.

13        Q    Did you not remain at the hospital?

14        A    To be honest with you, Mr. Smith, I

15   can't remember exactly what I did after the

16   interview.  I want to say I left.  But that

17   would just be in the course of what I would

18   have normally done.  We terminated the

19   interview.  We didn't stay around and visit and

20   talk.  I don't recall anything else to do at

21   the hospital.  So to the best of my

22   recollection is that we left.

23        Q    Were you present at any time when

24   an initial appearance for him by Judge Blair --

25        A    No, sir.

1      Q      -- was talked about?

2      A      No, sir.  When are you talking

3  about?  When it was done?

4      Q      Were you aware of Judge Blair going

5  to the hospital to do an initial appearance?

6      A      I think so.

7      Q      And how did you become aware of

8  that?

9      A      Through investigator meetings, or

10  someone in the office told me that it had

11  occurred or something of that nature.  I

12  honestly don't recall the exact method that I

13  became aware of it.

14      Q      It would have been through law

15  enforcement sources?

16      A      Yes, sir.  Or office personnel at

17  our office.

18      Q      Do you know whether or not there

19  was any suggestion on the part of law

20  enforcement that Judge Blair had conducted that

21  interview at the hospital?

22      A      I have no idea of that, sir.

23      Q      When you went back to the hospital

24  on the afternoon of the 25th, what time did you

25  get back to the hospital?

1          A        We started the interview on that

2    occasion almost immediately when we got there,

3    so it would have been around 4:00 -- 4:30.

4          Q        And Police Officer Mike Hines was

5    there at the hospital on that occasion?  Is

6    that correct?

7          A        Yes, sir.

8          Q        Why was he there?

9          A        My understanding, was that he was

10   posted there as a security or deputy, law

11   enforcement, in custody of the Defendant.

12         Q        Were you aware that the initial

13   appearance by Judge Blair had already occurred?

14         A        I believe so.

15         Q        Bruce, I show you what is marked as

16   Defendant's Exhibit B, and ask if you would

17   notice the date and time that that document --

18   and we represent to the Court, that is a court

19   document, the original of which is in the court

20   file.

21         A        Okay.  Yes, sir, I have it.

22         Q        What time, date and time, does that

23   reflect Judge Blair conducted an initial

24   appearance?

25         A        May 25th, 2001, 2:00 o'clock, p.m.

1    And you said that you, when you went back to

2    the hospital the second time, were aware that

3    that initial appearance had taken place?

4         A    I believe I was, sir.

5         Q    And, in fact, Bruce, would it not

6    be correct that looking at your second

7    transcription, statement, the last page, five

8    lines down, there is a discussion with Mr.

9    Conrad about a paper for a lawyer?  Is that

10   correct?

11        A    Yes, sir.

12        Q    And you understood that to be an

13   affidavit of substantial hardship and request

14   for counsel?

15        A    I didn't look at the paper, sir.  I

16   mean, he asked me that question.  And what was

17   discussed and transpired around that, that

18   question is right there on the tape.  So I

19   assumed it was an application for attorney.

20        Q    All right.  And you knew -- how

21   long have you been associated with the District

22   Attorney's Office?

23        A    In this circuit?

24        Q    In this circuit.

25        A    Almost seven years.

```
 1          Q      And that's Pike and Coffee County?

 2   Correct?

 3          A      Yes.  Uh-huh.

 4          Q      Is it not routine when a prisoner

 5   is taken, or in this case, the Court comes to

 6   the prisoner, for them to be advised they have

 7   a right to an attorney, and they ask the Court

 8   to appoint them one if they want to?

 9          A      That's my understanding of the way

10   it works.

11          Q      You are familiar with the form

12   affidavit of substantial hardship, that they

13   say:  I don't have any money.  I want you to

14   appoint me a lawyer?

15          A      Yes.

16          Q      And you understood that's what he

17   was talking about?

18          A      I assumed that was what he was

19   talking about, yes, sir.

20          MR. SMITH:  Your Honor, we offer for

21                 convenience of the Court,

22                 primarily, since it's a court

23                 document.

24          THE COURT:  I just need to know

25                 something.  On your 5-25
```

1            interview, what time did that

2            begin?

3       THE WITNESS:  Which one, Your Honor, we

4            had two on that date.

5       THE COURT:  Number one.

6       THE WITNESS:  The first one, the

7            interview started around 10:20

8            in the morning.

9       THE COURT:  And number two?

10      THE WITNESS:  At 4:45, maybe 4:40, when

11           we walked into the room.

12           Something like that.

13      THE COURT:  In other words, number two

14           was after, supposedly after, I

15           assume, after Judge Blair had

16           conducted the initial

17           appearance?

18      MR. SMITH:  That's correct.  I have no

19           further questions of Mr.

20           Matthews.

21           REDIRECT EXAMINATION

22  BY MR. FULLER:

23       Q    The very last conversation that you

24  and Mr. Conrad had on the last interview that

25  you conducted with him, is State's Exhibit No.

1    6-A?

2            A       Yes, sir.

3            Q       And is contained in State's Exhibit

4    No. 6-A -- involve a conversation about a

5    signature on a form?

6            A       Yes, sir.

7            Q       And you have testified, if you had

8    to guess, it was an affidavit of substantial

9    hardship?  Would that be true?

10           A       Because he said for a lawyer, yes.

11           Q       Have you ever questioned Mr. Conrad

12   since that time?

13           A       No, sir.

14           Q       Do you know of any law enforcement

15   that has tried to question Mr. Conrad since

16   that time?

17           A       Not to my knowledge.

18           MR. FULLER:  Nothing further, Judge.

19           THE COURT:  And, again, I need to to know

20                    what time did Judge Blair

21                    conduct the initial appearance?

22           THE WITNESS:  2:00 p.m., Your Honor.

23           THE COURT:  Next question?

24           MR. FULLER:  That's all from the State.

25           MR. SMITH:  That's all.

1          THE COURT:  Call your next witness.

2

3                    MICHAEL HINES

4          Whereupon, this witness, after first

5    being duly sworn to tell the truth, the whole

6    truth, and nothing but the truth, testified as

7    follows, to-wit:

8                    DIRECT EXAMINATION

9    BY MR. SMITH:

10         Q      State your name for the Court,

11   please?

12         A      Michael Hines.

13         Q      How are you employed?

14         A      Currently employed?

15         Q      Yes?

16         A      I'm employed with the Enterprise

17   Police Department.

18         Q      And on May 23rd, where were you

19   employed?

20         A      Coffee County Sheriff's Department.

21         Q      You had occasion to be at Medical

22   Center Enterprise on the time frame from May

23   23rd to May 25th, at one point in time when

24   Robert Conrad was a patient there?

25         A      Yes, sir.

1        Q        Why were you there at the hospital?

2        A        I was sent to watch over Mr.

3    Conrad.  I believe it was for three hours that

4    day, because he was placed under arrest.

5        Q        What date would that have been?

6        A        I believe that was May 25th.

7        Q        May 25th?

8        A        Right.

9        Q        Whichever day it was, the 24th or

10   the 25th, you were assigned as a guard to

11   secure him?

12       A        Yes, sir.

13       Q        And you said it was for a period of

14   three hours?

15       A        Yes, sir.  I believe that's

16   correct.

17       Q        What part of the day or evening was

18   that to your best recollection?

19       A        I'm not sure the part of the

20   evening.  It was in the evening time.

21       Q        Evening time?

22       A        Yes, sir.

23       Q        And how did you position yourself

24   in the room or at the room?

25       A        It was a double room, a double

1    patient room.  As you come in the door, I was

2    sitting at the first bed.

3         Q       Was there another person in the

4    other bed?

5         A       No, sir.

6         Q       Was any family or visitors present

7    --

8         A       No, sir.

9         Q       -- during that three hours that you

10   were there?

11        A       No, sir.

12        Q       Were any visitors allowed?

13        A       No other visitors were allowed into

14   the room.

15        Q       Who was allowed in the room

16   pursuant to your duties there?

17        A       Law enforcement, as far as the

18   District Attorney's Office.  And I believe

19   investigators pertaining to the case.

20        Q       And, of course, medical personnel?

21        A       Yes, sir.

22        Q       And during that three-hour period,

23   were you there while medical personnel attended

24   to him?

25        A       I believe one male nurse went into

1   the room just to check on him for 30 to 45

2   seconds.

3        Q     That was during the entire

4   three-hour period that you were there?

5        A     To the best of my recollection,

6   yes, sir.

7        Q     All right.  Did law enforcement

8   personnel come in while you were present?

9        A     Yes, sir.

10        Q     Who were those personnel?

11        A     D.A.'s, Investigator Dwight Holley,

12   Bruce Matthews.  And Enterprise Police

13   Department Investigator Rick Hauser.

14        Q     All of those at the same time?

15        A     Yes, sir.

16        Q     And what, if anything, occurred

17   while those three persons were there in Mr.

18   Conrad's room?

19        A     As far as -- they just interviewed

20   Mr. Conrad.

21        Q     Would you describe how that

22   interview took place, please?

23        A     They simply came in and went

24   through the normal process of asking a few

25   questions.  I didn't really relate to any of

1   their questions.  I wasn't paying attention as

2   far as listening to their work.

3          Q     Were you present when Judge Blair

4   came to the hospital?

5          A     No, sir.

6          MR. SMITH:  That's all.

7          THE COURT:  Mr. Fuller.

8                     CROSS EXAMINATION

9   BY MR. FULLER:

10          Q     If you will, look at State's

11   Exhibit No. 6 and 6-A.  You didn't either fill

12   out or participate in, or either way witness

13   any of these forms, did you?  The form is 6 and

14   the interview itself is 6-A?

15          A     I didn't witness, no, sir.

16          Q     You were present in the room?  Or

17   you may have been in your position?

18          A     I was present in the room in a

19   different position, yes, sir.

20          Q     And you said that during the

21   three-hour period of time that you were there

22   on the 25th of May 2001, that one nurse came

23   in, a male nurse, for 30 or 45 seconds, just to

24   check up?

25          A     Yes, sir.

1       Q    In your three hours there, was

2  there any medication that had to be brought

3  into the room that had to be administered?

4       A    No, sir.  Other than the time that

5  the other three people were present, Mr. Conrad

6  had nothing.  He was asleep basically the whole

7  time.  He didn't say anything.

8       Q    He was asleep or didn't say

9  anything?

10      A    Yes, sir.

11      Q    Now, you weren't present at 10:20

12  that morning, when there was an interview

13  taken, were you?

14      A    No, sir.

15      Q    Or at 2:00 o'clock, the afternoon

16  of May 24th?

17      A    No, sir.

18      Q    Were you present when -- were you

19  alone when Mr. Conrad after the three officers

20  left?  Investigator Holley, Matthews of the

21  D.A.'s office, and Rick Hauser from the police

22  department on May 25th?

23      A    I was present, yes, sir.

24      Q    Did you observe Mr. Conrad after

25  they had left?

1      A     Yes, sir.

2      Q     Did he appear to be abused or

3  beaten in any fashion?

4      A     No, sir.

5      Q     You didn't see the officers force a

6  towel down his throat and make him testify or

7  give a statement, did you?

8      A     No, sir.

9      Q     Did you hear them promise him

10  anything or threaten him with any kind of

11  punishment if he didn't agree to talk to them?

12      A     No, sir.

13      Q     Did he act respectively the same

14  after they had left as before they arrived?

15      A     Yes, sir.

16      Q     Did he ever talk to you while you

17  were there?

18      A     No, sir.  He slept most of the

19  time.

20      Q     Did they wake him up when you got

21  there?  Or do you recall?

22      A     I don't recall.

23      MR. SMITH:  No further questions.

24      THE COURT:  You are excused.  Thank you.

25                     Call your next witness.

1          MR. SMITH:  Judge, I don't think I have

2               anything else.

3     THE COURT:  Does the State have any

4               rebuttal?

5     MR. FULLER:  No, sir.

6     THE COURT:  There's no need for any

7               argument, unless y'all just

8               choose to make it.

9                    Before the Court

10              there is a Motion to Suppress

11              the evidence, seized after an

12              illegal arrest and/or search.

13              That is the way it's styled.

14                   And then, you have a

15              subsequent one, but it all boils

16              down to that.  It's not always

17              when a law enforcement officer

18              says you are in custody that's

19              controlling.  A person can be in

20              custody when a law enforcement

21              officer doesn't say something

22              like that.

23                   For instance, the case

24              with a fellow that's lying in a

25              hospital bed and paralyzed.  And

1          law enforcement officers go in

2          and have a seat and conduct an

3          examination.  His freedom to go,

4          had he been able to pick up and

5          walk out has been curtailed.  So

6          we don't always look at the

7          magic words.  And sometimes

8          there is a gray area between

9          when law enforcement officers

10         are in what we call an

11         investigatory stage, versus

12         whether or not it's shifted to

13         the spotlight, focusing on the

14         Defendant as being the person

15         who did it.

16               And we have heard some

17         evidence as to all of this

18         today.  And at some point it's

19         obvious that the Defendant was

20         in custody.

21               First of all, this

22         Court finds that -- well, let me

23         back up and say one thing.  What

24         I say today will be subject

25         to the ex parte consideration

```
 1                    earlier mentioned.  If you have

 2                    some additional evidence that

 3                    can shed light on these issues,

 4                    the Court reserves, even though

 5                    I'm going to rule on this

 6                    tentatively today, the Court

 7                    reserves authority to conduct

 8                    additional hearings and have

 9                    additional information presented

10                    as to the now pending issues.

11                    So what I say today will be

12                    subject to the ex parte

13                    consideration.

14          MR.  SMITH:   Certainly, Judge.

15          THE  COURT:   This Court finds based on

16                    what it's heard today, and let

17                    me say that it's clearly the law

18                    of this nation that the burden

19                    is on the State to prove that a

20                    Defendant made a knowledgeable,

21                    an intelligent, and a voluntary

22                    waiver of his or her

23                    constitutional rights and gave a

24                    statement.  The burden is on the

25                    government to do that.
```

1          I had a District

2    Attorney argue, not this one,

3    but one long ago, that that

4    wasn't the case.  Of course, I

5    had to overrule him.

6          It is clearly the case.

7    The burden of proof is on the

8    State to show every statement

9    that's knowledgeably,

10   intelligently, and voluntarily

11   made.

12         And it is clear to this

13   Court so far, that at the time

14   all of the statements were made,

15   that the Defendants made a

16   knowledgeable, intelligent and a

17   voluntary waiver.

18         I have heard testimony

19   as to the appearances of the

20   Defendant on the various

21   occasions.  There has been no

22   evidence of any promise, threat,

23   offers of hope or reward.

24         As a matter of fact,

25   the witnesses have testified

1       there were no promises. There

2       were no threats. There were no

3       offers of hope or reward made to

4       this Defendant in exchange for

5       his statements.

6              I'm going to say that

7       the Motion to Suppress is denied

8       all the way down to 2:00 o'clock

9       p.m., on May the 25th; however,

10       I say that a person can demand a

11       right to an attorney in many,

12       many different ways. He can

13       say, for instance, I don't want

14       to say anything else to y'all,

15       until I have my attorney here.

16       That's one way of doing it. And

17       I leave this open for

18       reconsideration. Maybe after I

19       hear Judge Blair's testimony or

20       whatever, that certainly appears

21       to be very, very important. I

22       don't know how this young man

23       ended up with a hardship

24       application. But I do know when

25       a Judge conducts an initial

1    appearance, we normally, number

2    one, advise them of what they

3    are charged with. Number two,

4    we explain what the possible

5    punishments are. Number three,

6    we explain to them their right

7    to an attorney. And I feel

8    certain that Judge Blair went

9    through this with the Defendant

10    and even probably gave him the

11    paperwork to fill out.

12    Was this young man in

13    the process of saying by his

14    act, I want an attorney; how do

15    I get one, with this document.

16    So at this time I say

17    that the 6-A, I guess you called

18    it, the statement which began at

19    4:45 is suppressed at this time

20    with the right for the Court to

21    reconsider.

22    I think it would be

23    most appropriate to say at this

24    time it appears, it appears,

25    that the Defendant was saying I

1     want an attorney.  And that

2     document, being in his presence

3     and possession, was trying to

4     ascertain how to fill it out,

5     and what he needed to do to get

6     an attorney, after Judge Blair

7     began discussing that with him

8     at 2:00 o'clock.

9            But that was not made

10    known to any law enforcement

11    officer until the end of the

12    4:45 statement.

13           So it's still possible

14    that some day that could go into

15    evidence.  But right now the

16    motion is granted, the Motion to

17    Suppress as to that 6-A is

18    granted.

19    THE COURT:  Anything further?

20    MR. SMITH:  Nothing further.

21    THE COURT:  Any other motion before the

22        Court?

23    MR. SMITH:  Not that has not been talked

24        about.

25    MR. FULLER:  No, sir, Your Honor.   I

1            reviewed the motion this

2            weekend.  And I saw that there

3            was an Order by this Court

4            sitting it on the March 18th

5            docket.

6      THE COURT:  Correct.  I asked y'all, and

7            I think you walked out, left a

8            little early, had some meeting

9            or something.  But I asked can

10           y'all get the forensics in.

11     MRS. STOUT:  Judge, may I respond?

12     THE COURT:  Yes, please.  I want to know

13           where we are.

14     MRS. STOUT:  I spoke with forensics last

15           week.  The DNA still has not

16           been worked. I have advised them

17           that we have a court date on

18           March the 18th.  And I spoke

19           specifically with Phyllis Roland

20           Thursday of last week.  She says

21           that she will try her very best

22           to have that worked by the end

23           of February.  I'm sure that

24           defense counsel probably is

25           going to object to getting the

```
1                    reports that late.  But she is

2                    going to try her best to get it

3                    worked so that it will be ready

4                    for trial this time.  That's

5                    where we stand.

6          MR. SMITH:  Judge, my only reservation

7                    is, of course, the ex parte

8                    motion.

9          THE COURT:  I've got that consideration,

10                   and that could possibly result

11                   in a delay, but we will see.

12         MR. SMITH:  We are anxious to get the

13                   case litigated, also.  And in

14                   that context, I remind Your

15                   Honor there was a motion

16                   granted, I believe, for a jury

17                   questionnaire.

18         THE COURT:  Correct.

19         MR. SMITH:  And I only bring that up

20                   because we started --

21         THE COURT:  I want y'all to get that to

22                   me in a timely fashion so I can

23                   get -- I've had jury

24                   questionnaires submitted in

25                   other capital cases where I've
```

1            struck part of the questions.

2            It would be improper --

3     MR. SMITH:  That questionnaire was

4            provided several months ago.

5            It's a simple questionnaire.

6            It's similar to the AOC

7            suggested questionnaire.

8     MR. BRADSHAW:  I thought the Court had

9            already ruled on the

10            questionnaire, just changed the

11            letter that was going with it.

12     THE COURT:  I think I did something.  I

13            don't recall exactly what I did.

14     MR. BRADSHAW:  You denied the cover

15            letter.  And you wrote your own

16            letter to go with the

17            questionnaire.  And I think your

18            Order granted the questionnaire.

19     THE COURT:  There is a pattern

20            questionnaire, and that is the

21            one that I will use whatever --

22     MR. SMITH:  The only reason I raised that

23            is if we do, so the Clerk can

24            get that sent out with the

25            venire.

```
 1          THE COURT:  Sure.  Here will be the
 2                  procedure.  It will either go
 3                  out, my objective will be when
 4                  we do ascertain definitely, and
 5                  see whether we are going to have
 6                  this trial at a certain term, I
 7                  would want the Administrative
 8                  Office of Courts preferably.
 9                  And, if not, then the Clerk --
10                  we had to do it through the
11                  clerk one time.  But one time
12                  this Administrative Office of
13                  Courts would send the
14                  questionnaire out with their
15                  juror notifications.  But they
16                  have changed that practice.  And
17                  they are now saying, we are not
18                  doing that.  The Clerk is going
19                  to have to it.  So, preferably,
20                  I would want it to come from
21                  Montgomery.  The second option
22                  would be for it to come from the
23                  Clerk.  It's just double money,
24                  double postage, double
25                  everything.
```

1               So, when we get down to

2       it, when we know for sure we are

3       going to go during that term, we

4       will address that issue.  We

5       will make sure the right entity

6       sends it out in advance and in a

7       timely fashion so that hopefully

8       every party, attorney, can sit

9       down and review the answers.

10      Hopefully, we will have them

11      back prior to conducting the

12      voir dire.

13  MR. SMITH:  Of course, some will come not

14      filled out.

15  THE COURT:  That always occurs, but we

16      will shoot for that.  Even if by

17      chance for some reason, and I

18      hope it doesn't happen, but if

19      by chance we can't send them out

20      ahead of time, then I will allow

21      the venire an opportunity to

22      fill them out.  And I will allow

23      some time before I bring them

24      back for counsel to see

25      responses they think duly stand

```
 1              out.  And I will afford some

 2              time for that to be

 3              accomplished.  But we will try

 4              to have time.

 5    MR. SMITH:  Judge, can we ask about

 6              responses during voir dire?

 7    THE COURT:  Yes.  And that's on the

 8              record.  And this can be on the

 9              record or off the record.  I

10              don't really care.  I want to

11              get this thing to trial.  The

12              attorneys have made known to the

13              Court they want to get it to

14              trial.

15                   I, initially, was

16              hoping we could get it to March.

17              I can see right now some things

18              that will keep it from actually

19              going in March.  I just want to

20              level with y'all.

21                   The State is saying we

22              are going to try to get the

23              forensics the end of February.

24              Well, then I normally hear the

25              Defense say, I would anticipate
```

```
 1            the Defense saying, Judge, we

 2            need time to review this.

 3            That's number one.  Number two,

 4            Judge, we need some time to get

 5            somebody else to review this for

 6            us.  I see that would be a

 7            reasonable request.  And

 8            realistically I want to shoot

 9            for March.  But realistically, I

10            think I'm going to have to set

11            this during a special term.  I

12            can see that happening right

13            now.  That might be better any

14            way.

15     MRS. STOUT:  Realistically, Your Honor,

16            we don't have the official

17            autopsy report.  So I have to be

18            realistic there, too.

19     THE COURT:  There are problems, money

20            problems in the State.  And we

21            have to consider all those

22            things.  And we are going to

23            make sure that everybody has an

24            opportunity to review everything

25            that comes through before I put
```

```
 1              anybody to a trial in a case
 2              where somebody is looking at the
 3              death penalty.
 4       MR. STOUT:  I have called forensics and
 5              asked them to put this on the
 6              front burner.  And I've talked
 7              to Phyllis Roland.  And she
 8              promised me that they will
 9              accommodate us and the Court.
10              But, again, we do not have the
11              official autopsy report back on
12              this case.
13       MR. BRADSHAW:  In light of that will
14              there be make-a-call date, or
15              will we have to wait until the
16              first week of March?  And I have
17              other matters, none as important
18              as that, but for future
19              planning, will there we a time
20              that we will get to in February
21              and make a call, and say --
22       THE COURT:  I think we might as well do
23              that right know.  I do not see
24              us going in March.  And I'm
25              thinking about getting with the
```

```
 1              other Judges and see if they

 2              have objection to me setting a

 3              special term, if there is no

 4              objection.  And I don't expect

 5              there will be.  Judge Head

 6              always says do want you want,

 7              and Judge Barr does what he

 8              wants.  I hope the court

 9              reporter took that down.  And

10              after I show courtesy to the

11              other Judges in doing that, I

12              will get with both sides and

13              jointly we will discuss a time

14              frame.  So I think March is off

15              realistically.  Now, if there is

16              an objection to that, y'all

17              please, please, let me know.

18         MRS. STOUT:  There's no objection from

19              the State.

20         THE COURT:  I have some ex-parte motions

21              that would cause the Court to

22              capitalize what it says,

23              already.

24         MR. SMITH:  I don't think the Defense is

25              in a position, having asked for
```

1          what we have asked for, to

2          object to March 18th not being

3          realistic.

4      THE COURT:   Okay.   Thank you.

5              (End of hearing).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

State of Alabama
Unified Judicial System

Form ARAP 13

# CERTIFICATE OF COMPLETION
## REPORTER'S TRANSCRIPT

Page Number

_233_

TO:    The Clerk of the Court of Criminal Appeals    Fax: (334) 242-4689
       P. O. Box 301555
       Montgomery, Alabama 36130-1555

Criminal Appeals Case Number      CR _02_ - _0333_

_Robert Thomas Conrad_ _____ v. _State of Alabama_
**Appellant's Name**                     **Appellee**

On appeal from the:  [✓] Circuit Court of
                     [ ] District Court of   _Coffee_ County
                     [ ] Juvenile Court of

Trial Court Case Number _CC-01-179 & 180_

Notice of Appeal Date _____

I, _Sheila Hanson_ _____, certify that I have this date completed and filed with the clerk of the trial court an original and three copies of a true and correct transcript of all proceedings in the above referenced case that were reported by me and were specifically designated by the appellant for inclusion on the Reporter's Transcript Order.  The transcript, which is numbered serially in the upper right-hand corner of each page, begins with a copy of the Reporter's Transcript Order and an index of both the exhibits and the testimony of the witnesses.  The original transcript concludes with the original of this notice and the copies of the transcript conclude with copies of this notice.  The page number appearing in the upper right-hand corner of this certificate is the last page of my portion of the transcript in this case.

Done this the _27th_ day of _June 2003_ _____.

_Sheila Hanson_
Court Reporter

**FILING AND SERVICE OF THIS FORM:**    Pursuant to Rule 11(b), A.R.App.P., the court reporter should file a copy of this certificate with the Clerk of the Court of Criminal Appeals and should serve copies of the certificate on counsel for the appellant or the appellant if he or she is not represented by appellate counsel, the attorney general and the district attorney, unless the appeal is from a municipal appeal, in which event a copy of the form should be served on the municipal prosecutor rather than the attorney general and district attorney.

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF ALABAMA

ROBERT THOMAS CONRAD,          *

   APPELLANT,   *   CASE NO: CR 02-0333

VS.          *

STATE OF ALABAMA,    *

    APPELLEE.   *

APPEALED FROM AN ADVERSE DECISION IN
THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION
CASE NO:  CC-2001-179 & 180

---

### BRIEF AND ARGUMENT OF APPELLANT

---

RESPECTFULLY SUBMITTED BY:

GARY D. BRADSHAW
ATTORNEY FOR APPELLANT
(BRA074)
P. O. BOX 311412
ENTERPRISE, AL   36331
(334) 393-6439

RICHARD (CRACKER) WALDROP
ATTORNEY FOR APPELLANT
ASB-2398-L57R
P.O. BOX 310027
ENTERPRISE, AL   36331
(334) 393-2288

STATE'S
EXHIBIT
B

PENGAD 800-631-6989

## TABLE OF CASES AND AUTHORITIES

Page

Alabama Code of Judicial Ethics, Canons 2 & 3 ........................ 12,20

Acromaq Viking v. Blalock, 420 So.2d 60 (Ala. Civ.
    App. 1982); affirmed on other grounds, 474
    So.2d 91 (Ala. 1985) .......................................................... 13, 24

Brady v. Maryland, 373 U.S. 83; 83 S.Ct.1194; 10 L.Ed.
    215 (1963) ........................................................................... 33

Canons of Ju. Ethics, Canon 3, subds. C, C(1) ........................ 12,17,16

Crowell v. May, 676 So.2d 941, (Ala. Civ. App. 1996) ........ 16

Daniels v. State, 762 So.2d 864, 866 (Ala. Crim. App.
    1999) .................................................................................... 28

Ex Parte Duncan, 638 So.2d. 1332, (Ala. 1994) ........................ 17

Ex Parte Monk, 557, So.2d 832 (Ala. 1989) ........................ 28

Ex Parte Wilson, 697 So.2d 477 (Ala.1997) ........................ 33

Ex Parte Yarber, 375 So.2d 1231, 1324, (Ala. 1979) ........... 27

Grice v. State, 481 So. 2d 449 at 451
    (Ala. Cr. App. 1985) .......................................................... 25

In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625,
    99 L.Ed 942 (1955) (citations omitted) ........................ 17

Jefferson v. State, 645 So.2d 313, (Ala. Crim. App.
    1994) .................................................................................... 28

Kyles v. Whitley, 514 U.S. 419, 115 S.Ct.1555, 131 L.Ed.
    2d 490 (1995) ...................................................................... 32

United States vs. Aqurs, 427 S.S. 97, 96 S.Ct. 2392,
    49 L.Ed.2d 342 (1976) ...................................................... 33

United States vs. Bagley, 473 U.S. 667, 105 S.Ct.3375,
    87 L.Ed.2d 481 (1985) ...................................................... 15

United States vs. Phillips, 664 F. 2d 971,

1002-03 (5th Cir. Unit B 1981) ............................................... 23

Wallace, supra ............................................................................ 24

Whetstone v. State, 407 So. 2d 854 at 859 ................................. 25
    (Ala. Cr. App. 1981)

Id. At 859 ................................................................................. 25

Wright v. State, 628 So. 2d 1071, (Ala. Crim.......................... 16
    App. 1993)

## OTHER AUTHORITIES

Fourteenth Amendment

# TABLE OF CONTENTS

<u>Page</u>

Table of Cases and Authorities ..................................................... i

Table of Contents.......................................................................... iii

Statement of the Case ................................................................. 1

Statement of the Issues Presented for Review........................... 5

Statement of the Facts................................................................. 6

Statement of the Standard of Review ........................................ 11

Summary of the Arguments......................................................... 12

Summary of the Argument of Issue III....................................... 14

Arguments..................................................................................... 16

Summary of Rulings and Actions Adverse to Appellant........ 36

Conclusion..................................................................................... 43

Certificate of Service ................................................................... 44

Certificate Re: Font ..................................................................... 45

Exhibit "A" ................................................................................... 46

## STATEMENT OF THE CASE

The Appellant, Robert Thomas Conrad, was bound over to the Grand Jury of Coffee County on May 25, 2001 by order of the Coffee County District Court unless a demand for preliminary hearing was made within thirty (30) days from the date of Defendant's arrest. On May 31, 2001 an indictment was returned by the Grand Jury charging the Appellant with capital murder and robbery in the first degree. (CR-6)

The Appellant was arrested the same date the indictment was returned and held without bond pending trial. (CR-8)

Appellant being age 20 at the time of his indictment, filed Application for Youthful Offender Status, through his attorneys of record, (CR-27), which was denied by the Court. (CR-31)

Counsel of record, Bradshaw and Smith, were appointed to represent Appellant and had been actively engaged in the preparation of the case for trial prior to that time.

Trial counsel filed many timely and appropriate discovery motions, (CR-28 thru 119), and the Court issued its standing discovery order, (CR-43,) to the District

1

Attorney's Office to fully comply with the Motion for Discovery heretofore filed by the Appellant's Counsel.

On June 25, 2001, (CR-80), Appellant filed a Motion to Suppress Evidence Seized After an Illegal Arrest and/or Search. On November 19, 2001, Appellant filed his second Motion to Suppress Evidence Seized After and Illegal Arrest and/or Search, (CR-292), and on December 26, 2001, Appellant filed his third Motion to Suppress Evidence Seized After and Illegal Arrest and/or Search. (CR-312)

On December 28, 2001 the Trial Court finally entered its order setting a date, January 21, 2002, as the time to consider all pending unruled motions. (CR-315)

Although ordered to comply with the Appellant's Discovery Motion, the District Attorney's Officer failed to do so and a Motion to Compel was filed by counsel for Appellant on September 4, 2001. (CR-145)  As a result of said Motion, the State of Alabama finally complied with a discovery order on November 2, 2001. (CR-154-270)

In anticipation for trial, counsel for Appellant filed several motions, namely:

> (1)  Motion to Declare the Alabama Capital Sentencing Process Unconstitutional and To Bar Imposition of the Death Penalty

2

   (2)   Motion to Dismiss the Indictment on the
         Grounds that the Failure to Specify the
         Aggravating Circumstances on Which a Death
         Sentence May be Imposed Violates the Fifth,
         Sixth, Eighth, and Fourteenth Amendments and
         State Law

   (3)   Motion to Bar Imposition of the Death
         Penalty Where the Jury's Role and Factual
         Determinations are Deemed Advisory

   (4)   Defendant's Fourth Motion to Suppress or, in
         the Alternative, Motion in Limine to
         Prohibit the Prosecutor From Displaying to
         the Jury Certain Inflammatory Evidence

   (5)   Motion for Funds for Court Reporter
         Transcripts (CR-403 thru 428)

All of which were denied by the Trial Court. (CR-650)

        Trial on the issues were joined between the
parties on September 23, 2003 and in the late evening hours
of September 27, 2002, the jury returned a verdict finding
the Appellant guilty of capital murder and robbery in the
first degree. (R-1537 and 1539)   On that same day, a
sentencing hearing was held before the same jury panel.  As
a result of the sentence hearing, the jury returned a

                                                              3

verdict of 8 to 4 recommending punishment at life without parole. (R-1603)

After the jury returned its recommended sentence, the Court sentenced the Appellant to life without parole on the capital murder conviction (R-1615) and to life in the penitentiary for the robbery 1$^{st}$ degree conviction. (R-1617)

Trial counsel having been re-appointed for purposes of Appellant filed a Motion for New Trial on October 22, 2002 (CR-619), which was denied on December 9, 2002. (CR-651)

On December 13, 2002, trial counsel AL Smith was allowed to withdraw and Attorney Richard (Cracker) Waldrop was appointed to assist trial counsel Gary D. Bradshaw on appeal. (CR-1303)

The record on appeal was certified to trial counsel on May 13, 2002.

This cause is currently before the Court of Criminal Appeals on the basis of the foregoing record.

4

## ISSUES PRESENTED

I.  WHETHER THE TRIAL COURT'S IMPERMISSIBLY CONSIDERING MATTERS OUTSIDE OF THE RECORD IN CONDUCTING THE TRIAL OF APPELLANT CONSTITUTED PLAIN ERROR.

II.  DID THE TRIAL COURT COMMIT REVERSIBLE ERROR WHEN EVIDENCE PRESENTED AT TRIAL ESTABLISHED A MISSING LINK IN THE CHAIN OF CUSTODY OF ESSENTIAL EVIDENCE AND THE TRIAL JUDGE ALLOWED SUCH EVIDENCE TO BE ADMITTED OVER OBJECTION OF DEFENDANT TO EXCLUDE SAME.

III.  WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY (A) DENYING DEFENDANT'S MOTION TO DISMISS THE CASE AFTER THE COURT'S OWN RULING THAT THE STATE HAD WITHHELD EXCULPATORY AND IMPEACHABLE EVIDENCE AND (B) WHETHER THE TRIAL COURT DENIED ROBERT CONRAD'S CONSTITUTIONAL RIGHT TO A FAIR AND IMPARTIAL TRIAL BY FORCING HIM TO PROCEED AND ALLOWING TESTIMONY OF THE CO-DEFENDANT, BRIAN YEOMAN, WHEN HIS DEFENSE COUNSEL WAS NOT GIVEN EXCULPATORY AND IMPEACHABLE EVIDENCE UNTIL MIDWAY OF THE TRIAL.

5

## STATEMENT OF FACTS

On May 23, 2001, Jelaine Dennis was operating The Toy Store (an adult sex and novelty shop that she owned) on County Road 711, Coffee County, Alabama.  Present with Mrs. Dennis in the store that day was a friend of many years, Mr. Robert Ray Grimes.  Between 1:00 and 1:30 p.m., Enterprise Police Officer, Lennis Darby, was dispatched to the Toy Store for an apparent robbery and homicide.  (R-521)

Apparently two black males had entered the Toy Store posing as customers when a third person entered the building dressed in all black and carrying a hand gun.  The unidentified suspect made everyone get on the floor, jerked the phone out of the wall and demanded the store's money.  (R-570 thru R-575, R-581) Shortly after obtaining the money, shots were fired inside the building and the suspect dressed in all black exited on foot.  Mr. Grimes stated that Jelaine Dennis had been shot and he began to call for help, while witnessing the suspect dressed in all black running up County Road 711.  (R-578, R-597)  The two black males that were in the building got into their car and left the scene.  (R-577)  Mr. Grimes was unable to identify whether the suspect dressed in all black was a white or

6

black individual, male or female, even though he claims that the suspect forced him to the ground and robbed him of thirty dollars. (R-570 thru R-575, R-833) Although testimony and evidence reveal that several shots fired in the building, Mr. Grimes, a long time friend of Dennis and a frequent visitor to The Toy Store, was not aware of any gun that Mrs. Dennis had in the store. (R-581, R-588) Upon arriving at the scene, Officer Lennis Darby, found that the cash register drawer was open and bullet marks were in the floor and a lot of blood was on the floor, in addition to a revolver laying on the floor. (R-527, R-532) Officer Darby initially thought the victim, Jelaine Dennis, was dead, but discovered she was still alive and crying for help and that she had been shot in the chest. (R-525 thru R-527) Officer Lennis Darby did not find any suspects in the building or on the grounds. (R-523 and R-524)

Another Enterprise Officer, Michael Petty, was dispatched to the scene and while in route on Alabama Highway 27, he met a known vehicle traveling at an "un-normal" rate of speed on Northbound 27. (R-629 and R-630) Officer Petty recognized the vehicle due to prior police involvement and the vehicle later was identified to be that of Brian Smith.

7

Officer Jeff Spence was dispatched to the Medical Center Enterprise to follow up on the victim's condition and discovered that a second individual (Robert Conrad) was recently brought in suffering from a gun shot wound. (R-741) Officer Spence also stated that the same vehicle witnessed by Officer Petty and belonging to Brian Smith had been seen on County Road 711 that day prior to the shooting. (R-743) The same vehicle was also seen at Medical Center Enterprise at 2:00 p.m. May 23rd. (R-743)

Upon conducting an investigation, Officer Richard Hauser determined that a **gun battle** had taken place inside The Toy Store as he had recovered several shell casings of a 9mm and .22 caliber weapon. (R-647 and R-655) The pistol that was recovered from the scene was determined to be a .22 caliber pistol, but never had any owner established or fingerprints lifted. (R-733) This same pistol was linked to a .22 caliber bullet that was removed from the arm of Robert Conrad. (R-733)

Officer Jeff Spence, acting on a search warrant for Brian Yeoman, (co-defendant's apartment) found a 30 round magazine for an assault weapon, 7.62 ammunition, and a 10 round magazine for an assault weapon. The search warrant also uncovered several other weapons and the wooded area near the home of Brian Smith, but the "murder weapon" was

8

never discovered. (R-748 thru R-751, R-753) Testimony was given by Officer Rick Hauser as to the location of the .22 caliber pistol found at the scene. The State also introduced a diagram showing where this .22 caliber pistol was discovered. However, the Rescue Squad worker, Chris Schwan, testified that when he had entered the scene, the .22 caliber pistol laying in a different area indicating that it had been moved and/or used after the apparent shooting. (R-656, R-766 thru R-767) While in the emergency room of Medical Center Enterprise, surgery was performed on Defendant Robert Conrad and blood was removed from his body as well as several statements taken from him. Detective Buford Roberts recovered a projectile was removed from the surgery room. (R-814)

The victim, Jelaine Dennis, was pronounced dead moments after arriving at Medical Center Enterprise emergency room and co-defendants, Brian Smith and Brian Yeoman, were later found, detained and questioned at 8:00 p.m. that night at the Enterprise Wal-Mart store. Defendant, Robert Conrad, was arrested after ballistic reports matched the bullet in his arm to the gun fount at the scene.

While the District Attorney's Office conducted the investigation into this crime, they received information

that the crime had been planned for some time by Defendant Brian Yeoman. An internal affairs investigation into the Enterprise Police Department was conducted by the Alabama Bureau of Investigation and the Attorney General's Office. (R-907 thru R-910) This investigation centered around whether or not a police officer with the Enterprise Police Department held received information from a witness, prior to the robbery and homicide of Jelaine Dennis, that the crime was actually going to take place.

## STANDARD OF REVIEW

(1)  The Standard of Review for reviewing claim under the plain error doctrine is whether the error is particularly egregious and if it seriously affects the fairness, integrity or public reputation of judicial proceedings.

(2)  The Standard of Review for chain of custody of evidence is, where a break in the chain of custody, or a missing link in the chain of custody is shown, the admissibility of the evidence is questioned.

(3)  The Standard of Review in this issue is not whether the evidence was exculpatory and impeachable as the trial court had already ruled on that issue, but whether the corrective measures attempted by the trial court offset the damage done to the Defendant's right to a fair trial.

11

## SUMMARY OF THE ARGUMENT OF THE ISSUES

I.    "Implanted in foundation of public policy is general rule that no judge shall preside in case in which he is not wholly free, disinterested, and independent.

Under Alabama Canons of Judicial Ethics, recusal is required when facts are shown which make it reasonable for members of public or party, or counsel opposed to question impartiality of judge.  Canons of Ju. Ethics, Canon 3, subds. C, C(1).

Question with regard to recusal is not whether judge was impartial in fact, but whether another person knowing all of circumstances, might reasonably question judge's impartiality, whether there is an appearance of impropriety.  Canons of Jud. Ethics, Canon 3, subds. C, C(1)."

Appellant contends the trial judge's pretrial remarks (See Attached Exhibit A) that all defendants who appeared before him in court would receive active penitentiary time, if they were found guilty or plead guilty, showed appearance of impartiality, impropriety, and personal bias warranting the judge's voluntary recusal, pursuant to judicial ethics rule which requires a judge to recuse himself in any proceeding in which his impartiality could reasonably be questioned, was plain error.  See Canons of Judicial Ethics, Canon 3.C(1)

The <u>Alabama Code of Judicial Ethics</u>, Canons 2 & 3, indicate that a judge should "adopt the usual and

12

expected method of doing justice, **rather than being extreme or peculiar in his judgment.**"

The following case is directly on point with the Appellant's contention of the trial court's impartiality,

> "Given the concept of promoting public confidence in the system, Canon 3(C)(1) states that '[a] judge should disqualify himself in a proceeding in which . . . his impartiality might reasonably be questioned' by members of the public, a party, or counsel. See <u>Wallace</u>, supra; <u>Acromaq Viking v. Blalock</u>, 420 So.2d 60 (Ala. Civ. App. 1982); affirmed on other grounds, 474 So.2d 91 (Ala. 1985)."

The trial judge's remarks show pervasive bias, and prejudice and a vindictive attitude, against all individuals who are charged with a violent crime, that are assigned to him.

II.   The state did not prove that its Exhibit 28(a), a blood specimen, was that of the Appellant. A lab tech testified that she drew a blood specimen from Appellant but was "assuming this is the sample." (R-901)

The prosecutor did not ask the lab tech if Exhibit 28(a) was the specimen taken from Appellant, only asking, "Is this a specimen that you went to the refrigerator and retrieved pursuant to a search warrant?" (R-901)

13

## SUMMARY OF THE ARGUMENT OF ISSUE III

The State's failure to disclose exculpatory and impeachable evidence denied the Defendant his constitutional right to a fair trial. The State in this matter failed to disclose exculpatory and impeachable evidence to Defendant prior to trial. It is obvious from the records that the State had no intention of ever producing this evidence had they not been caught red handed. There actions constitute a *Brady* violation and the trial court attempted corrective measures to insure the Defendant would have a completely fair trial; however, ordering that the State produce a voluminous file of statements and documents and track down a witness overnight and giving the defense counsels less than an hour to interview and prepare with this witness does not negate the irreparable harm and potential harm of failing to disclose the evidence as was specifically requested. A reasonable probability of a different result is accordingly shown when the Government's evidentiary suppression undermines the evidence as was specifically requested. A reasonable probability of a different result is accordingly shown when the Government's evidentiary suppression undermines confidence in the outcome of the trial. The question is

14

not whether the Defendant would more likely than not have received a different verdict with the evidence, but whether in its absence [the Defendant] received a fair trial. <u>Bagley</u>, <u>Kyles</u>  The Defendant was not allowed the opportunity to prepare a complete defense due to the State's failure to disclose evidence.

## ARGUMENT AS TO ISSUE I

The case of <u>Wright v. State,</u> 628 So. 2d 1071, (Ala. Crim. App. 1993) held that "every accused is entitled to detached neutrality from a judge. Trial judges should refrain from volunteering remarks regarding to sentencing before a finding of guilt has been made and before pre-sentencing considerations are examined. In situations where premature remarks are made, a red flag is raised in regard to potential bias on the part of the judge. In such a case, this Court **must closely review the remarks and conduct of the trial judge to ensure that the accused was, in fact, accorded fairness in all stages of his trial."**

The Appellant further contends that there is no reasonable basis, under the facts and the standing pre-sentence order, made by the trial judge, from which a reasonable person could not but question the trial judge's impartiality.

The following is found in <u>Crowell v. May</u>, 676 So.2d 941, (Ala. Civ. App. 1996).

> "Canon 3(C)(1) of the <u>Alabama Canons of Judicial Ethics</u> clearly states that "[a]judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned."
> (Emphasis added.) "Therefore, it appears that actual bias is not necessary for a judge to recuse—only a reasonable appearance

16

of bias or impropriety. The strictest application of this rule may "sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scale of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.'" <u>In re Murchison</u>, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed 942 (1955) (citations omitted). Furthermore, our Supreme Court has written:

"Recusal is required when 'facts are shown which make it reasonable for members of the public or a party, or counsel opposed to question the impartiality of the judge.' … The question is not whether the judge was impartial in facts, but whether another person, knowing all of the circumstances, might reasonably question the judge's impartiality – whether there is an appearance of impropriety."

The case of <u>Ex Parte Duncan</u>, 638 So.2d. 1332,

(Ala. 1994) held the following:

"Implanted in foundation of public policy is general rule that no judge shall preside in case in which he is not wholly free, disinterested, and independent.

Under Alabama Canons of Judicial Ethics, recusal is required when facts are shown which make it reasonable for members of public or party, or counsel opposed to question impartiality of judge. Canons of Ju. Ethics, Canon 3, subds. C, C(1).

Question with regard to recusal is not whether judge was impartial in fact, but whether another person knowing all of circumstances, might reasonably question judge's impartiality, whether there is an appearance of impropriety. Canons of Jud. Ethics, Canon 3, subds. C, C(1)."

17

The Appellant contends that extra judicial matters were introduced during the hearing of this case.

At the sentence hearing of Defendant, the following exchange took place. (R-1571-1597)

The trial court begins its charge to the jury, during the sentence phase.

During the Court's charge the trial judge explains the requirement that the jury has to find aggravating circumstances to recommend the death penalty.

The Judge's personal bias is clearly evident by the court's repeating twenty one times to the jury that they had already found two aggravating circumstances beyond a reasonable doubt, **or words to that effect**, when explaining how the jury could recommend the death penalty.

The trial judge was doing all he could to get the jury to return a death penalty verdict, which follows his pre-trial attitude and statement about persons convicted of violent crimes. The statements of the Judge were in such a manner as to indicate that the Judge was biased and indicated the Judge's opinion.

During the course of the trial, the Judge's bias was made evident in the way he aided the prosecution in questioning witnesses. The following occurred at R-876 and again at R-1212 thru R-1213:

18

"MR. SMITH:    I really hesitate to do this.    Your

    Honor, I've known you for many, many years.    I

    have the utmost respect for you.    But I have

    got to represent my client and interpose an

    objection to Your Honor asking questions that

    tend to cross over to making the Prosecution's

    case.    And the last thing in the world I ant to

    do is insult the Court or cause anything that

    sounds like I don't have absolutely the utmost

    respect.    Because I have much respect.    But I

    have to put in an objection at this time.    And

    e have to object at this time." (R-876)

    Then at R1212 thru 1213:

"THE  COURT:  When  you  are  referring  to  the  "old

    guy," would you look around the courtroom and

    see if you see the person that you keep talking

    about as "the old guy."    Would you recognize

    him again?    You can get up and walk around and

    see if you can find him, and point him out if

    he's here.

THE WITNESS:    I believe that's him right there.

THE COURT:    Go over in that direction and point out

    a little bit better who you are talking about.

    (Witness indicating).

19

THE COURT: Okay, Mr. Grimes, why don't you come up and we will get you a chair. You have the right to be sitting up here.

MR. SMITH: Judge, might I ask the Court at this point to note a little later at side bar, I want to impose some remarks."

Then later at R-1225 trial counsel made the following statement outside the hearing and presence of the jury, requesting that the judge not act as prosecutor.

"MR. SMITH: Judge, the point that I put in front of Your Honor, I just have to respectfully ask the Court to, and it would be an objection to Your Honor's questions during the course of cross examination of Mr. Yoeman. I would interpose an objection to the questions that were asked.

THE COURT: Objection is overruled."

The Alabama Code of Judicial Ethics, Canons 2 & 3, indicate that a judge should "adopt the usual and expected method of doing justice, **rather than being extreme or peculiar in his judgment.**"

As the conduct of the sentence hearing has the appearance of impropriety, in what manner was Robert Thomas

Conrad prejudiced. That is obvious upon examination of the record.

Review of the record clearly indicates the degree of influence and consideration given to the extra judicial statements made by the trial judge.

The procedural safeguards entitled to the defendant were not followed in the present case, and as they were not followed, this case is due to be remanded.

The Appellant contends that the trial judge's pre-sentence standing order that, "Criminal defendants who enter a guilty plea or who are convicted of any act of violence, some active time in custody will be ordered served," showed appearance of impartiality or impropriety, warranting judge's recusal, pursuant to Judicial Ethics Rule requiring a judge to recuse himself in any proceeding in which his impartiality **could** reasonably be questioned. Canons of Judicial Ethics, Canon 3, C.(1)

The Appellant contends that it is a flagrant violation of the Fourteenth Amendment for a state trial judge to announce and follow a pretrial practice of imposing "active time in custody" for all defendant's who plea or are convicted of "any act of violence," regardless of any possible mitigating circumstances involved in the crime committed.

21

The Appellant submits that the facts before this court and in connection with those presented in this brief demonstrate personal bias on the part of the trial judge. These facts and presentments suggest a form of judicial bias in that the trial judge's pre-sentence remarks could be construed as evidencing a bias against a class of persons, of which the Appellant is a member.

Appellant contends the trial judge's pretrial remarks (See Attached Exhibit A) that all defendants who appeared before him in court would receive active penitentiary time, if they were found guilty or plead guilty, showed appearance of impartiality, impropriety, and personal bias warranting the judge's voluntary recusal, pursuant to judicial ethics rule which requires a judge to recuse himself in any proceeding in which his impartiality could reasonably be questioned, was plain error. See Canons of Judicial Ethics, Canon 3.C(1)

The Appellant further contends that the extra judicial, pre-trial remarks of the trial judge indicated personal bias against all defendants charged with "violent crimes" and it is obvious that it was derived from something other than that which the trial judge learned by participating in the Appellant's case. The trial judge's pre-trial statement (Exhibit A) and his reference to it

22

clearly indicates that such predetermination to a sentencing posture, i.e. active time in the penitentiary, is prevalent and spread throughout the trial judge's reasoning and thought process involving sentencing, indicates "pervasive bias and prejudice," which is a ground for reversal under the ruling of <u>United States vs. Phillips</u>, 664 F. 2d 971, 1002-03 (5<sup>th</sup> Cir. Unit B 1981).

The Appellant contends that a reasonable person would conclude from the trial judge's pre-trial statement (Exhibit A) and his sentence hearing statement that the trial judge was personally biased against any defendant who appeared before him being tried for a violent crime, and therefore had a legal obligation to voluntarily recuse himself from presiding over the Appellant's sentencing hearing.

The question is not whether the trial judge was impartial in fact, but whether another person knowing all of the circumstance, might reasonably question the judge's impartiality - - - whether there is an appearance of impropriety.

The Appellant is submitting that this is a case of personal bias and is definitely a case where the trial court's impartiality should reasonably be questioned.

The following case is directly on point with the Appellant's contention of the trial court's impartiality,

> "Given the concept of promoting public confidence in the system, Canon 3(C)(1) states that '[a] judge should disqualify himself in a proceeding in which . . . his impartiality might reasonably be questioned' by members of the public, a party, or counsel. See <u>Wallace</u>, supra; <u>Acromaq Viking v. Blalock</u>, 420 So.2d 60 (Ala. Civ. App. 1982); affirmed on other grounds, 474 So. 2d 91 (Ala. 1985)."

The trial judge's remarks show pervasive bias, and prejudice and a vindictive attitude, and state that all individuals who are charged with violent crimes, and are assigned to him, face either acquittal or active jail time, sentenced at the hands of said judge.

24

## ARGUMENT AS TO ISSUE II

This Court has stated that:

> The establishment of a chain of custody is
> needed to show a reasonable possibility that
> evidence has been tampered with or altered.

Grice v. State, 481 So. 2d 449 at 451 (Ala. Cr. App.

1985).

Also, in Whetstone v. State, 407 So. 2d 854

at 859 (Ala. Cr. App. 1981), this Court stated that:

> To establish a sufficient predicate for
> admission into evidence it must be shown
> that there was no break in the chain of
> custody. Identification and continuity must
> be sufficiently established to afford ample
> assurance of the authenticity of the item.

Id. At 859.

The trial court admitted state's Exhibit 28(a)

into evidence over Defendant's objection (R-901), following

the testimony of Glenda Allums, Lab Tech at Medical Center

Enterprise, who testified that she drew blood from

Appellant, based on a search warrant, on May 23, 2001. (R-

899)

Ms. Allums further testified that, "We draw

samples and then they are stored in a refrigerator, usually

three days. Actually, part of them were stored seven days.

And part of them are thrown out after three days." (R-900)

At R-901, when the prosecutor asked the following question of Ms. Allums:

> "Is this **a** specimen that you went to the refrigerator and retrieved pursuant to a search warrant?"
>
> Ms. Allums stated, "I'm assuming this is the sample."

Not only does Ms. Allums not specifically identify state's Exhibit 28(a), she was not asked by the prosecutor if 28(a) was **the** same identical specimen Ms. Allums took from the Appellant on May 23, 2001.

On cross examination, Ms. Allums testified that she did not put any markings on the Exhibit herself, didn't put any thing to uniquely identify it for her possession. (R-902)

In clear language all Ms. Allums testified to was that she took a blood sample from Appellant, based on a search warrant, and that she gave that specimen to a police officer, but she testified that she could only assume that Exhibit 28(a) was that same specimen.

To establish a sufficient predicate for admission into evidence it must be shown that there was no break in the chain of custody, identification and continuity of possession to afford ample assurance of the authenticity of

the item. <u>Ex parte Yarber</u>, 375 So.2d 1231, 1324, (Ala. 1979)

The Appellant submits that the physical evidence, Exhibit 28(a), was erroneously admitted by the Trial Court, that its admission aided a conviction in this case and because the prosecution did not fulfill the requirement that the integrity of the evidence be proved by an accounting of all the successive steps in the handling of state's Exhibit 28(a), blood specimen, from the time of its seizure until the time of trial, the Exhibit was improperly admitted. For this reason, the judgment of the Circuit Court must be reversed and the cause rendered.

### ARGUMENT AS TO ISSUE III

This court stated in <u>Jefferson v. State</u>, 645 So.2d 313 (Ala. Crim. App. 1994) that "the existance of any small piece of evidence favorable to the defense may, in a particular case, create just the doubt that prevents the jury from returning a verdict of guilty." The creditability of witnesses and the weight of probative force of testimony are for the jury to judge and determine. Whether or not the defendant will be acquitted if undisclosed evidence had been provided is not for the court to decide. <u>Daniels v.State</u>, 762 So.2d 864, 866 (Ala. Crim. App. 1999).

During the month preceding the trial of Robert Conrad, his attorneys made specific motions for discovery. (C-33 thru 42) This motion specifically relied on <u>Ex Parte Monk</u> 557, So.2d 832 (Ala. 1989) which states that the possibility of the death penalty creates special circumstances justifying broader discovery in capital cases. This motion for discovery of prosecution files, records and information necessary to a fair trial was filed on June 22, 2001, less than one month after the alleged crime. The motion itself referred to specific documents and materials in the D.A.'s possession especially if they

28

were exculpatory or favorable and went on to request the
entire case file.  (C-34, 36, 37, 40)  the court issued a
discovery order that the state should disclose any and all
evidence tending to exculpate the defendant.  (C-43)  The
state proceeded to file its first response to defendant's
discovery motion in November 2001, (C-154 thru 270) and
thereafter filed ten supplementary responses to discovery.
However, none of the responses or supplementary responses
contained information and evidence from a certain file
being kept by the district attorney.  The court entered an
order on May 31, 2002, stating a cut off date for discovery
of August 20, 2002, at 9:00 a.m. trial in this case was set
for September 23, 2002.

During the course of the trial and on cross
examination of Officer Jeff Spence, it was learned that an
internal affairs investigation had been conducted regarding
possible misconduct of one of its investigators into this
crime.  (R-907 thru R-910) The potential misconduct of the
officer is not at issue here, but the undisclosed file and
investigation into potential witnesses and evidence that
was accumulated and kept in a separate file is the central
issue.  These separate file(s) contained material evidence
that was both exculpatory and impeachable, but yet was
never given to the defense's counsel.  After Officer Spence

gave his testimony and the court summoned Chief

Investigator, Bruce Devane, to testify and to produce the

internal file of the D.A.'s, the court held an in camera

hearing with both the prosecutor and the defense attorneys

to review the file.   It took Circuit Judge Gary McAliley

less than five minutes to determine that it contained both

exculpatory and impeachable evidence that should have been

turned over to the defense counsel.   (R-966, R-1000)

Circuit Judge, Gary McAliley, went on to rule **absolutely**

**that it was essential** for this file to be provided to the

defense.   (R-956)

It became apparent, after the jurors were dismissed

and further testimony was taken, that District Attorney

Mark Fuller made the decision to not disclose the evidence.

(R-937, R-943)   However, District Attorney Mark Fuller,

Chief Investigator Bruce Devane, and Prosecutor Glenda

Stout, made a joint decision after a several hour meeting

on the Tuesday prior to the trial beginning on a Monday

that this information would not be disclosed to defense

counsels.   (R-934, R-935)   Instead of choosing to file the

material in camera and get a ruling from the court, this

separate file was maintained in a locked filing cabinet

marked "sensitive matters" with the only key belonging to

District Attorney Mark Fuller, Chief Investigator Bruce

30

Devane, and his personal secretary. (R-935, R-939) The District Attorney was not even sure if discussion was had concerning filing the material in camera for a decision from the court on the possibility of it being exculpatory.

The information contained in the file revealed that a George Roberson had informed Officer Rick Hauser of the Enterprise Police Department over a week before the crime that certain individuals were planning to rob The Toy Store. Although Officer Hauser confirmed that Roberson gave him this information, he contends that Roberson gave it to him two to three days after the crime. (R-947 thru R-950) The information contained in the non-disclosed file shows that co-defendant Brian Yeoman worked for Roberson at Kentucky Fried Chicken and told him that he had been planning to do a job like robbing The Toy Store for a while. (R-952) Roberson had also given information to the police about the attempted robbery of the Kentucky Fried Chicken store where he worked that may have involved the co-defendant in this case. Many interviews were conducted with Roberson and several recorded statements were contained in the file. (R-933) In addition, other names were given to the District Attorney's Office of potential suspects, namely a Steve Brown. (R-960) Roberson alleged that Steve Brown was a co-conspirator along with co-

31

defendant, Brian Yeoman.   The District Attorney's Office
considered George Roberson as a witness in the case against
Robert Conrad as indicated by their notes of June 15, 2001,
and July 10, 2001.   (R-991)

The District Attorney's Office recused themselves and
sought the aid of the Alabama Bureau of Investigation and
the Attorney General's Office, but still failed to disclose
any of this information to defense counsels.   Their failure
to disclose prevented defense counsels from acquiring
potential favorable evidence from the Alabama Bureau of
Investigation and/or the Attorney General's Office.   The
Prosecutor's, Stout and Jarrell, claimed they had no
knowledge of the exculpatory and impeachable evidence or
the "sensitive" file until the Tuesday prior to the trial
beginning on Monday.   They cannot escape the fact that they
are the State and they are under the umbrella of the
court's order to disclose all information.   In <u>Kyles v.
Whitley</u>, 514 U.S. 419, 115 S.Ct.1555, 131 L.Ed.2d 490
(1995), the Supreme Court stated the prosecution may be
deemed to have suppressed evidence even though no
prosecutor actually knew the existence of evidence until
after trial.   In other words, "the prosecutor anxious about
tacking to close to the wind will disclose a favorable
piece of evidence."   A prosecutor's lack of knowledge of

32

exculpatory evidence does not necessarily eliminate the prosecution's responsibility to disclose the evidence, because the *Brady rule* is framed in a matter that permits its application to evidence of which the prosecution might be ignorant. The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83; 83 S.Ct.1194; 10 L.Ed.2d 215 (1963).

The United States Supreme Court has stated that when the prosecutor receives a specific and relevant request that failure to make any response is seldom, if ever, excusable. U.S. v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) The rationale behind this rule rest on the principal that a specific request puts the prosecution on notice of what evidence that the Defendant desires, thus alleviating the prosecution the burden of determining what might be and what might not be relevant to the defense. On the other hand, the failure of the prosecution to turn over specifically requested evidence, to which no objection is filed, could mislead the Defendant into believing the evidence does not exist. Ex Parte Wilson, 697 So.2d 477 (Ala.1997)

As stated earlier, the argument is not whether the
evidence withheld by the state was exculpatory or
impeachable in nature as the court ruled that very
specifically. However, you must look to the corrective
action taken by the court to remedy the wrong of the State.
Ss set out earlier, this discovery request was specific and
noted that the death penalty was possible punishment for
the Defendant. After a determination that the State had
withheld exculpatory and physical evidence, the court
ordered the material copied and given to the defense
counsels and issued a bench subpoena for witness George
Roberson. It was determined that Mr. Roberson was in
Colorado, but the state secured his presence at the
following day's testimony. The defense counsels were
allowed less than one hour to interview Mr. George Roberson
and glean whatever information they could from this
witness; however, defense counsels were unable to leave the
courtroom in an attempt to interview witness Steve Brown,
and the mysterious Alex that Mr. Roberson testified about.
This defendant does not find that the trial court corrected
the potential fatal error of the prosecution by producing
Mr. Roberson to testify. There was not enough time in the
midst of the trial (in a trial that went to 7:00 and 9:00
p.m. every night) to follow up on all of the evidence

34

brought out in the exculpatory material.  To simply ask the shoplifter to go back in the store and replace the item that he had stolen does not produce justice and in this case, forcing the District Attorney to produce the evidence they so strongly attempted to conceal did not in any way provide a fair trial for the Defendant.  Conrad was prejudiced by not being able to investigate and prepare evidence to rebut co-defendant's, Brian Yeoman, testimony and the corrective action attempted by the court.  Although well intentioned, was inadequate in correcting the prosecutor's failure to produce exculpatory evidence.  The Defendant's motion to dismiss should have been granted and/or their motion requesting that Brian Yeoman not be allowed to testify should have been granted.  (R-1002, R-1004)  This court stated in its ruling of exculpatory evidence that it had found forty something pieces of exculpatory evidence in another file of a separate capital murder case by this same 12$^{th}$ Circuit District Attorney's Office.  (R-1001 thru R-1002)  What incentive is there to abide by the rules of court when there are no repercussions for their violations?

35

## SUMMARY OF RULINGS AND
## ACTIONS ADVERSE TO APPELLANT

| Transcript Page Number | Summary |
|---|---|
| CR-31 & 32 | Motion for Defendant to Physically go to the Crime Scene with Defendant's Attorney, denied by Trial Court |
| CR-120 | Motion for Order Permitting Discovery of Transcript, Exhibits, Other Memorialization of the Grand Jury Proceedings, and List of Grand Jury members, denied in part by Trial Court |
| CR-121 | Defendant's Motion to Depose the State's Expert Witness, denied by the Trial Court |
| CR-123 | Defendant's Motion to Dismiss the Indictment on Grounds that the Grand Jury was Improperly Impaneled, denied by the Trial Court |
| CR-126 | Defendant's Motion that Venire Members Be Sent Questionnaire Attached to His "Motion for Jury Questionnaire," denied by the Trial Court |
| CR-127 | Defendant's Motion to Suppress Evidence Seized After An Illegal Arrest/or Search, denied by the Trial Court |
| CR-128 | Defendant's Motion to Reveal the Identity of Informants, denied by Trial Court |
| CR-310 | Defendant's Motion for Treatment as Youthful Offender, denied by Trial Court |

36

| | |
|---|---|
| CR-547–548 | Defendant's Motion for Funds for Court Reporter Transcripts, denied by Trial Court |
| CR-628 | Defendant's Motion for New Trial/Supplemental Motion for New Trial, denied by Trial Court |
| CR-649 | Defendant's Motion for Mental Evaluation, denied by Trial Court |
| CR-650 | Defendant's Motion to Dismiss the Indictment on the Grounds – The Failure to Specify the Aggravating Circumstances on Which the Death Penalty May Be Imposed, denied by Trial Court |
| CR-650 | Defendant's Motion to Declare the Alabama Capital Sentencing Process Unconstitutional, denied by Trial Court |
| CR-650 | Defendant's Motion to Bar Imposition of Death Penalty, denied by Trial Court |
| CR-650 | Defendant's Motion in Limine to Exclude Photographs, denied by Trial Court |
| CR-983 | Trial Court Denied Defendant's Requested Jury Charge #2 |
| CR-984 | Trial Court Denied Defendant's Requested Jury Charge #3 |
| CR-985 | Trial Court Denied Defendant's Requested Jury Charge #4 |
| CR-986 | Trial Court Denied Defendant's Requested Jury Charge #5 |
| CR-987 | Trial Court Denied Defendant's Requested Jury Charge #6 |

37

| | |
|---|---|
| CR-993 | Trial Court Denied Defendant's Requested Jury Charge #10 |
| CR-998 | Trial Court Denied Defendant's Requested Jury Charge #12 |
| CR-1006 | Trial Court Denied Defendant's Requested Jury Charge #19 |
| CR-1008 | Trial Court Denied Defendant's Requested Jury Charge #20 |
| CR-1016 | Trial Court Denied Defendant's Requested Jury Charge #26 |
| R-117 | Defendant's exception to Potential Juror #37, denied by the Trial Court |
| R-119 | Defendant's objection to Potential Juror #13, overruled by the Trial Court |
| R-181-183 | Defendant's objection to Potential Juror #67, overruled by the Trial Court |
| R-375 | Defendant's challenge to Potential Juror #167, denied by the Trial Court |
| R-453 | Defendant's objection to State's challenge to Potential Juror 111, overruled the Trial Court |
| R-455 | Defendant's challenge to Potential Juror #179, denied by the Trial Court |
| R-513 | State's objection sustained alleging counsel for Defendant was giving an incorrect statement of the law |
| R-642 | Trial Court overruled Defendant's objection Re: Hearsay |

| | |
|---|---|
| R-649 | Trial Court overruled Defendant's objection Re: testimony's prejudicial effect out weighs the probative value |
| R-663 | Trial Court overruled Defendant's objection to the witness's feelings |
| R-732 | Trial Court overruled Defendant's objection to leading questions |
| R-733 | Trial Court overruled Defendant's objection to leading questions |
| R-744 | Trial Court overruled Defendant's objection to the arrival of a vehicle at the hospital |
| R-794 | Trial Court overruled Defendant's objection to the admissibility of State's Exhibit #7 |
| R-845 | Trial Court overruled Defendant's objection to the admissibility of State's Exhibit #8 |
| R-845-846 | Trial Court overruled Defendant's objection to the admissibility of State's Exhibit #31 |
| R-890 | Trial Court overruled Defendant's objection to witness's lack of personal knowledge |
| R-918 & 1002 | Trial Court denied Defendant's Motion for Dismissal based on the imputed knowledge of the District Attorney's Office Re: |

|  | exculpatory and impeachable information not produced to the defense in discovery as ordered by the Court |
|---|---|
| R-1004 | Trial Court overruled Defendant's Motion to Prohibit from Calling Co-Defendant, Bryan Yoeman, to Testify for Failure of State to Produce Exculpatory and Impeachable Material |
| R-1009 & 1011 | Trial Court overruled Defendant's objection to missing link in chain of custody Re: State's Exhibit #26(a) and gave Defendant a standing objection to said matter |
| R-1041 | Trial Court overruled Defendant's standing objection |
| R-1046, 1059, 1061 | Trial Court denied Defendant's Motion to Exclude State's Exhibit #25 |
| R-1066 | Trial Court overruled Defendant's standing objection |
| R-1084 | Trial Court overruled Defendant's objection to admitting State's Exhibit #11(a-e) |
| R-1088 | Trial Court overruled Defendant's objection to State's Exhibit #25 |
| R-1107 | Trial Court overruled Defendant's standing objection to Exhibit #26 being entered into evidence |
| R-1136 | Trial Court overruled Defendant's Motion to Exclude Testimony of Witness Yoeman |

| | |
|---|---|
| R-1141 | Trial Court overruled Defendant's objection over Court allowing witness to elaborate his answer |
| R-1174 | Trial Court sustained State's objection Re: Hearsay |
| R-1176 | Trial Court sustained State's objection Re: Hearsay |
| R-1225 | Trial Court overruled Defendant's objection to Court asking questions of witness, co-defendant, during course of defense's cross examination |
| R-1230 | Trial Court sustained State's objection Re: question being argumentative |
| R-1241 | Trial Court sustained State's objection Re: Hearsay |
| R-1246 | Trial Court overruled Defendant's objection Re: question being asked and answered |
| R-1254 & 1255 | Trial Court denied Defendant's Motion for Judgment of Acquittal after State rested its case |
| R-1265 | Trial Court overruled Defendant's objection Re: probative value out weighs prejudicial effect |
| R-1273 | Trial Court sustained State's objection Re: leading witness |
| R-1279 | Trial Court sustained State's objection Re: relevancy |
| R-1280 | Trial Court sustained State's objection Re: argumentative question |

| | |
|---|---|
| R-1290 | Trial Court overruled Defendant's objection Re: type of subpoena issued |
| R-1324 & 1325 | Trial Court denied Defendant's Motion for Acquittal at the close of all the evidence |
| R-1528 | Defendant's objection to Trial Court not giving his requested jury charges, denied by the Trial Court |
| R-1550 | Trial Court overruled Defendant's standing objection that were made in the guilt phase of trial |
| R-1598 | Trial Court overruled Defendant's objection to the jury finding two aggravating circumstances and objection to the non-innocent verdict |

## CONCLUSION

For reasons stated herein, the verdict of the trial court is due to be reversed and remanded for a new trial. To not grant this Defendant a new trial will send a crippling message throughout all of the justice system that there is no repercussions for blatantly disregarding a Defendant's right to a fair trial.

Respectfully submitted this ___1st___ day of ___August___, 2003.


_____
Gary D. Bradshaw
Attorney For Appellant
(BRA074)
P. O. Box 311412
Enterprise, Al  36331
(334) 393-6439


_____
Richard (Cracker) Waldrop
Attorney For Appellant
ASB-2398-L57R
P. O. Box 310027
Enterprise, Al  36331
(334) 393-6439


43

## CERTIFICATE OF SERVICE

We, Richard (Cracker) Waldrop and Gary D. Bradshaw, do hereby certify that we have served a copy of the above and foregoing by placing a copy of same in the United States Mail, postage prepaid, and properly addressed to:

William Pryor, Jr.
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130

This is the ___1st___ day of _August_, 2003.


_____          _____
Gary D. Bradshaw                          Richard (Cracker) Waldrop
Attorney For Appellant                    Attorney For Appellant

## CERTIFICATION

We, Gary D. Bradshaw and Richard (Cracker) Waldrop, do hereby certify that access to equipment capable of producing Courier New 13 font is not reasonably available and that the font style used constitutes the closest approximation of Courier New 13 under the circumstances.

This is the _1st_ day of _August_, 2003.

_Gary D. Bradshaw_
Gary D. Bradshaw
Attorney for Appellant

_Richard (Cracker) Waldrop_
Richard (Cracker) Waldrop
Attorney for Appellant

**GARY McALILEY**
CIRCUIT JUDGE

KIMBERLY JOHNSON
Judicial Assistant

TWELFTH JUDICIAL CIRCUIT OF ALABAMA
P.O. BOX 310306
ENTERPRISE, ALABAMA 36331-0306
(334) 347-4785
FAX (334) 347-3761

SHEILA HANSON
Official Court Reporter

September 12, 2001

## TO: ALL ATTORNEYS WHO PRACTICE CRIMINAL LAW IN THE 12TH CIRCUIT, STATE OF ALABAMA

*RE:   Crimes involving ACTS OF VIOLENCE*

*Each of you are hereby advised that when representing criminal defendants who enter a guilty plea to or who are convicted of ANY ACT OF VIOLENCE, some active time in custody WILL BE ORDERED SERVED. The undersigned makes known that in the future WHEN SENTENCING CRIMINAL DEFENDANTS WHO ARE PROVEN TO HAVE ENGAGED IN ANY UNLAWFUL ACT OF VIOLENCE, this Judge WILL NOT BE BOUND by any sentence "settlement agreement" reached between the Office of the District Attorney, the Defendant and Defendant's attorney. In cases involving acts of violence, the appropriate sentence will be determined by this Judge. (I realize this policy will cause fewer guilty pleas and more jury trials. However, I strongly feel, this added work is a small price to pay for the improved safety of our citizens.)*

*The undersigned will continue to consider sentence recommendations/agreements reached between the Office of the District Attorney, Defendant and Defendant's counsel in cases that are NON VIOLENT OFFENSES.*

*I feel certain each of you would agree, it is time we take all actions necessary to deter any unlawful act of violence.*

Yours very truly,

Gary L. McAliley
Circuit Judge

EXHIBIT "A"

46

No. CR-02-0333

## In the COURT of CRIMINAL APPEALS of ALABAMA

———————————— ◆ ————————————

ROBERT THOMAS CONRAD,

Appellant,

v.

STATE OF ALABAMA,

Appellee.

———————————— ◆ ————————————

On Appeal From the Circuit Court
of Coffee County (CC-01-179; 01-180)
Enterprise Division

## BRIEF OF APPELLEE

William H. Pryor Jr.
*Attorney General*

P. David Bjurberg
*Assistant Attorney General*

Beth Slate Poe
*Assistant Attorney General*
Counsel of Record*

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, Alabama  36130-0152
(334) 242-7401, 242-7300*

August 29, 2003


STATE'S
EXHIBIT

## STATEMENT REGARDING ORAL ARGUMENT

The brief and record are adequate for the resolution of this case on appeal.  Therefore, the State does not request oral argument.

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT......................... i

TABLE OF CONTENTS........................................ ii

TABLE OF AUTHORITIES..................................... iv

STATEMENT OF THE CASE..................................... 1

ISSUES PRESENTED FOR REVIEW.............................. 2

STATEMENT OF THE FACTS................................... 3

STANDARD OF REVIEW...................................... 11

SUMMARY OF THE ARGUMENT................................. 12

ARGUMENT............................................... 14

I.  CONRAD'S CLAIM THAT THE TRIAL JUDGE'S REMARKS AND
CONDUCT RAISED QUESTIONS CONCERNING THE JUDGE'S
IMPARTIALITY IS NOT REVIEWED UNDER THE PLAIN ERROR
STANDARD BECAUSE THE DEATH PENALTY WAS NOT IMPOSED;
AND THAT FURTHERMORE, THE CLAIM IS WITHOUT MERIT. ...... 14

1.  Judge's comments during the sentencing phase...... 15

2.  Judge "aided the prosecution in questioning
witnesses" indicated bias............................ 15

3.  Court's reference to "the old guy"............... 20

4.  Judge's "pretrial remarks"...................... 21

II. Conrad Has Failed To Show That There Was A
Missing Link In The Chain Of Custody Of State's
Exhibit 28(a). ...................................... 23

III. The State's Failure To Disclose Evidence Is Not
Reversible Error When No Residual Undue Prejudice Is
Shown By Conrad. .................................... 29

CONCLUSION.......................................37

CERTIFICATE OF SERVICE............................. 38

## TABLE OF AUTHORITIES

### Cases

Burks v. State, 353 So. 2d 539 (Ala. Crim.
  App. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Dunaway v. State, 746 So. 2d 1021 (Ala. Crim.
  App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Ex parte Slaton, 680 So. 2d 909 (Ala. 1996) . . . . . . . . . . . . . 24

Hardy v. State, 804 So. 2d 247 (Ala. Crim. App. 1999) . . . . 33

Martin v. State, 449 So. 2d 801 (Ala. Crim. App. 1984) . . . 22

McLemore v. State, 562 So. 2d 639 (Ala. Crim.
  App. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Montgomery v. State, 504 So. 2d 370 (Ala. Crim.
  App. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Williams v. State, 410 So. 2d 911 (Ala. Crim.
  App. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Wilson v. State, CR-01-1003, 2003 WL 21362973,
  (Ala. June 13, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Wynn v. State, 804 So. 2d 1122 (Ala. Crim. App. 2000) . . . . 32

## STATEMENT OF THE CASE

This is an appeal from a conviction of capital murder and first degree robbery in the Circuit Court of Coffee County, Alabama (CC-01-179, CC-01-180). Judge Gary L. McAliley presided.

Robert Thomas Conrad, the appellant in this case, was indicted by a Coffee County Grand jury on May 31, 2001, and charged with capital murder and robbery in the first degree. (C. 6, 7)

In the "order on initial appearance", issued May 31, 2001, the circuit judge appointed Mr. Don Puttman to represent Conrad in this case and appointed Mr. Gary Bradshaw as co-counsel. (C. 13, 16) On June 1, 2001, Mr. Bradshaw filed a motion to withdraw as did Mr. Puttman on June 1, 2001. (C. 20, 22) The trial court issued a written order on June 6, 2001 allowing Mr. Pittman to withdraw and ordering Mr. Al Smith to represent Conrad. (C. 24) Mr. Bradshaw's motion to withdraw was denied in that same order. (C. 24, 25)

Conrad's application for youthful offender status (C. 27) was denied. Trial commenced on September 27, 2002, at which time, Conrad was represented by appointed counsel,

Mr. Albert Smith and Mr. Garry D. Bradshaw. (R. 1) The jury found Conrad guilty of capital murder and robbery in the first degree. (R. 1338, 1539) The jury returned a sentence recommendation of life without the possibility of parole. (R. 1615) At the request and upon the agreement of the State, the trial court imposed sentence at the conclusion of the sentencing phase of the trial instead of setting a separate sentencing date and waiting for a presentence report. (R. 1617) The trial court sentenced Conrad to life without the possibility of parole.

Conrad filed a motion for new trial, which was denied by the trial court. Mr. Bradshaw was reappointed to represented Conrad on appeal and Mr. Al Smith was allowed to withdraw as counsel on December 13, 2002. (C. 1303) On that same date, Mr. Richard Waldrop was appointed to assist Mr. Bradshaw in representing Conrad on appeal.

## ISSUES PRESENTED FOR REVIEW

1. Is Conrad's claim that the trial judge's remarks and conduct raised questions concerning the judge's impartiality reviewable under the plain error standard? Is this claim due any relief on appeal when it is without merit?

2

2. Did Conrad fail to show that there was a missing link in the chain of custody of State's Exhibit 28(a)?

3. Is Conrad entitled to a new trial based on a discovery violation when he failed to show any residual undue prejudice?

## STATEMENT OF THE FACTS

This case involves a robbery that occurred on May 23, 2001, at a store called the Toy Store in Enterprise, Alabama, during which, Robert Thomas Conrad robbed Mr. Robert Grimes at gunpoint robbed and fatally shot Ms. Jelaine Dennis.

On May 23, 2001, codefendant Brian Smith and the appellant in this case, Robert Conrad asked codefendant Brian Yeoman to drive Smith in Smith's mother's car, a light blue LTD with a dent of the driver's side, to the Toy Store to buy some "marijuana bags". (R. 1142) Conrad went in his own car and met Smith and Yeoman in the street near the store. (R. 1144, 1145) Smith got out of the car, ran over to Conrad's car, "had a couple of words", and then got back in the car with Yeoman. (R. 1145) At that time, Conrad had a mask and was "wearing a long-sleeved black shirt, long black pants and black shoes." (R. 1146)

Around Lunch time on that date, Mr. Donald Smith Jr.,
who had a "farming operation" on Highway 711 near the Toy
Store, was on his way to his chicken houses, which were
located almost directly across the road from the Toy Store,
when he saw two cars "like they had sort of met and passed
each other a little bit". (R. 599-602) One of the cars was
a big, light blue car and the other was a small, silver
car. (R. 602) He saw one person in the blue car and two
black persons in the silver car. (R. 602, 604) He saw the
persons in the cars talking to each other but did not see
anyone get out of the cars. (R. 604) Donald Smith then
saw the little silver car drive into the parking lot of the
Toy Store. (R. 604) At trial, Mr. Smith identified a
photograph (Exhibit 17) as the bigger car having a dent in
the front of it. (R. 613, 614) Before May 23, 2001, Yeoman
and a coworker of codefendant, Brian Smith, heard Smith
talk about robbing the Toy Store and/or another place. (R.
1156, 1219, 1270-1277)

On May 23, 2001, at approximately 1:00 p.m., Jelaine
Dennis was operating the Toy Store, where she sold adult
sex and novelty items. (R. 521) Robert Grimes, her long-
time friend was also present in the store at that time.

4

(R. 568, 569)  Sometime between 1:00 and 1:30 that

afternoon, while Ms. Dennis was seated behind the cash

register and Grimes was located near the end of the

counter, two young black men, Brian Smith and Bryan Yeoman[1]

came in the store looking around.  (R. 570, 581-582)  Then,

suddenly, the door "popped open" and a man, the appellant

in this case, Robert Conrad, burst into the store dressed

in black clothing and armed with a gun.  (R. 570, 571,

1252) Conrad jerked the telephone cord out of the wall and

ordered that everyone get down on the floor and not move.

(R. 574) Conrad "got" Grimes around the neck and held a gun

to his head demanding that Grimes give him money.  (R. 572)

Conrad took Grimes's billfold, took the money out and then

threw the wallet on the floor.  (R. 575)

Ms. Dennis opened the cash register drawer and Conrad

took the money totaling approximately $300-400.  (R. 573)

Then as Conrad approached Ms. Dennis, she pulled out a gun

and started "tussling" with Conrad.  (R. 1148-1149) Ms.

Dennis fell to the floor and shot Conrad.  (R. 1148)

---

[1] The record refers to this person as "Yoeman" but Conrad
calls him "Yeoman" in brief.  The appellee will refer to
this person as "Yeoman".

Conrad then put a gun to Ms. Dennis's chest and shot her."
(R. 1149, 1152)  Mr. Grimes heard the gunfire.  (R. 575)

Though wounded, Conrad got up and ran out of the store
(R. 1150) and Grimes saw him going towards the Geneva
Highway.  (R. 597)  Mr. Eric Kormlyo, who owns a shop near
the Toy Store, heard "pooping sounds" that afternoon, and
"seconds later", saw a black male running towards Highway
27".  (R. 616-617)  Mr. Kormlyo followed the black male he
saw running but was unable to catch him.  (R. 617-619)  He
then left and went to the Toy Store to see if he could help
He found Mr. Grimes on the telephone outside calling for
help and Ms. Dennis inside "curled up in a ball behind the
counter" crying.  (R. 620)  Ms. Dennis repeatedly told him
she was dying.  (R. 575)  Mr. Grimes tried to comfort her
and attempted to contact her daughter and a friend.  (R.
577)

Ms. Dennis was taken to the hospital in an ambulance.
(R. 761-762)  She was semi-conscious enroute to the
hospital.  (R. 762)  She had "labored" breathing, was very
pale and sweaty, all of which were indicative of "massive
blood loss".  (R. 763)  The paramedic could not get a blood
pressure from her at one time.  (R. 763)  Ms. Dennis told

6

the medic that the was going to die and that she did not
want to die "and other things of that nature."   (R. 763)

When Ms. Dennis arrived in the emergency room, she had
a "panicked look on her face" and was begging them to help
her because she thought she was going to die.   (R. 772)
Ms. Dennis had a gunshot wound in her chest, a gunshot
wound on her left hip and on her right "chest, pelvis."
(R. 773)   She arrived at the emergency room at 1:40 p.m.
and was pronounced dead at 2:10 p.m.   (R. 774)

An autopsy was performed on Ms. Dennis the following
day, May 24, 2001 in Montgomery.   (R. 823, 827)   The
medical examiner found she had three gunshot wounds: one on
the front chest; one on the left side of her buttocks; and,
one on her lower left leg.   (R. 828-830)   Dr. Ward
determined that the cause of death was from "multiple
gunshot wounds."   (R. 831)   Dr. Ward removed a projectile
from Ms. Dennis's body and it was given to the Department
of Forensic Sciences for testing.   (R. 833)   Dr. Ward
concluded from the autopsy that the wound to Ms. Dennis's
chest was a contact wound, meaning that "the gun was firmly
pressed against her when the trigger was pulled."   (R. 842-
43)

7

Meanwhile, after fleeing the scene of the crime, Conrad went to Smith's apartment and then a short time later both Conrad and Smith went to Yeoman's apartment to get Yeoman to drive Conrad to the hospital for treatment of a gunshot wound he had sustained. (R. 1150-1154) Yeoman took Conrad to the hospital in Smith's mother's car and left Conrad at the hospital and returned to his (Yeoman's) apartment. (R. 1155) Conrad was treated at the hospital for a gunshot wound to his lower abdomen and upper left arm. (R. 787-789) A projectile in Conrad's stomach was not removed from where it had lodged in the muscles of his back, but another projectile was removed from underneath the skin of Conrad's arm. (R. 790) Dr. Sawyer said Conrad's wounds did not look like "contact" wounds. (R. 794) The bullet removed from Conrad's arm later was tested and found to match the gun found at the scene of the crime. (R. 814, 1098, 1099, 1100)

Officer Lennis Darby was the first police officer to go to the Toy Store after the incident had been reported. (R. 520) Inside the store, he saw Mr. Grimes standing directly in front of the front door and blood on the floor in various places. (R. 232) He saw the cash register was

8

open.   (R. 532)   He then saw Ms. Dennis laying on the floor

behind the counter.   (R. 524)  After calling emergency

personnel and securing the scene, he videotaped the crime

scene.   (R. 525)   He found shell casings and a revolver on

the floor.   (R. 527)   Officer Darby remained at the scene

until Sergeant Hauser arrived.   (R. 564-565)

Sergeant Hauser arrived at the scene around 2:00 p.m.

and collected shell casings at the scene that were later

taken to the Department of Forensic Sciences laboratory for

testing by Joseph Saloom.   (R. 650-651)   Mr. Saloom was

unable to identify the bullet removed from Ms. Dennis's

body as having been fired from the same gun as the other

bullets, the .9 and .38, bullets that had been given to

him.   (R. 1100)

Sergeant Jeff Spence of the Enterprise Police

Department received information that enabled him to

identify Brian Smith and Brian Yeoman as suspects in this

case.   (R. 743)   An officer had seen them at the hospital

with the vehicle that Michael Petty had previously seen

them in coming north on the Geneva Highway.   (R. 743)

Smith and Yeomann were brought in for questioning and

afterwards, the police obtained search warrants for the

9

residences of both Smith and Yeoman. (R. 745, 747, 748)

The search of Smith's apartment revealed nothing of value.

(R. 748) A search of Yeoman's apartment revealed "one 30

round magazine for an assault-type weapon, containing 7.62

ammunition. One 10-round magazine for an assault-type

weapon. One flash suppressor an (sic) assault-type

weapon." (R. 748) The police did not find a weapon in

Yeoman's apartment. (r. 748) The did however, find

weapons "along the wood line of the apartment complex" near

Smith's apartment. (R. 750) No connection was established

between those weapons found at the "wood line" and this

crime. (R. 753) A tee-shirt was retrieved from the

dumpster near apartment 228 that appeared to have blood on

it. (R. 816-818) That shirt was tested at the Department

of Forensic Sciences and the blood stain on it was analyzed

for DNA. it was determined that the DNA on blood stain was

consistent with that of Conrad. (R. 818, 864, 967, 1038,

1040)

Codefendant Brian Yeoman entered a plea agreement with

the State whereby he would plead guilty to first degree

robbery and receive a twenty year sentence in exchange for

the capital charge being nolle prossed and his testifying

at Conrad's trial.  (R.  1141) Yeoman testified at trial

that he had previously given different details of what

happened than those given at trial because David Smith, had

threatened to harm him and Yeoman's mother.  (R. 1169)

## STANDARD OF REVIEW

1.  The standard review of errors in cases where in the

death penalty is imposed is plain error.  In all other

cases that standard of review does not apply.  The standard

of review of the issue of whether a judge has exhibited

conduct indicative of judicial bias is

2.  The trial court's ruling on Conrad's objection to

the admission of State's Exhibit 28(a) is not due to be

reversed absent a clear abuse of discretion.  Jackson v.

State, 589 So. 2d 781, 784 (Ala. Crim. App. 1991).

3.  The standard of review of whether a court's ruling

is correct in the event of a discovery violation is abuse

of discretion.  McLemore v. State, 562 So. 2d 639, 645

(Ala. Crim. App. 1989).

11

## SUMMARY OF THE ARGUMENT

Conrad argues on appeal that "there is no reasonable basis under the facts and the standing presentence order, made by the trial judge, from which a reasonable person could not but question the trial judge's impartiality." (Conrad's brief, pg. 16)  Conrad discusses various examples which he believes indicates a lack of judicial impartiality.  He argues that this claim should be reviewed under the plain error standard.  He is wrong.

The instances of which he complains are either not preserved for review on appeal, and are not reviewable under plain error, or are without merit.  It is not error for a trial judge to make suggestions to counsel or to interpose questions as long as no bias is shown.  None is shown here.  Therefore, no reversal is due on the ground.

Conrad also contends on appeal that the trial court erred in admitting State's Exhibit 28(a), a blood specimen of Conrad's, when there was a missing link in the chain of custody.  (Conrad's brief, pg. 27)  The alleged missing 'link' was actually a weak 'link' because the State's evidence either directly or circumstantially accounted for each 'link' in the chain of custody and showed the

reliability of the care and control of the evidence. Therefore, the "weak link" did not prohibit admissibility – it only raised of question of credibility for the jury to weigh and resolve. As the jury did this, its opinion is entitled to stand on appeal.

Conrad finally asserts on appeal that the State violated his right to a fair trial when certain information was not disclosed until the trial court reviewed it *in camera* at trial and allowed defense counsel to review it. His specific complaint is that the corrective action taken by the trial court was insufficient and that his motion to dismiss (R. 1002, 1004) should have been granted. The specific facts and circumstances surrounding this matter and the trial court's corrective actions are set forth below.

The burden of proof on appeal is Conrad's. Before a jury's verdict is set aside Conrad must prove resulting prejudice. He has not done so. It is his burden to show that the trial court abused its discretion in applying the remedy it did in response to the discovery violation. No such abuse has been demonstrated. Therefore, the decision of the trial court is due to stand on appeal.

13

ARGUMENT

I.   CONRAD'S CLAIM THAT THE TRIAL JUDGE'S REMARKS AND
     CONDUCT RAISED QUESTIONS CONCERNING THE JUDGE'S
     IMPARTIALITY IS NOT REVIEWED UNDER THE PLAIN ERROR
     STANDARD BECAUSE THE DEATH PENALTY WAS NOT IMPOSED; AND
     THAT FURTHERMORE, THE CLAIM IS WITHOUT MERIT.

Conrad argues on appeal that "there is no reasonable
basis under the facts and the standing presentence order,
made by the trial judge, from which a reasonable person
could not but question the trial judge's impartiality."
(Conrad's brief, pg. 16)  Conrad discusses various examples
which he believes indicates a lack of judicial
impartiality.  He argues that this claim should be reviewed
under the plain error standard.  He is wrong.

First the appropriate standard of review is not plain
error.  Plain error review only applies in those cases in
which the death penalty has been imposed.  Dunaway v.
State, 746 So. 2d 1021, 1027 (Ala. Crim. App. 1998).
Furthermore, in none of the examples cited by Conrad in
brief does the record support a finding of a lack of
impartiality on the part of the presiding judge in this
case.

14

### 1.  Judge's comments during the sentencing phase

The first instance cited by Conrad as indicative of a lack of impartiality is when "extra judicial matters were introduced during the hearing of the case". (Conrad's brief, pg. 18)  Specifically, he points to that portion of the sentencing hearing reflected on pages 1571 through 1597 of the record.  Conrad notes that during the judge's explanation to the jury they had to find an aggravating circumstance in order to recommend the death penalty, the "Judge's personal bias is clearly evident by the court's repeating twenty-one times to the jury that they had already found two aggravating circumstances beyond a reasonable doubt, or words to that effect."  (Conrad's brief, pg. 18)  The record does not indicate that any objection was raised in the trial court on this basis, therefore, this particular claim is not subject to review on appeal.  See, e.g. <u>Williams v. State</u>, 410 So. 2d 911, 912 (Ala. Crim. App. 1982).

### 2.  Judge "aided the prosecution in questioning witnesses" indicated bias

Conrad also alleges that the "judge's bias was made evident in the way he aided the prosecution in questioning witnesses" (Conrad's brief, pg. 18) and specifically refers

15

to pages 876 and 1212 through 1213 of the record in support

of his claim.  The first excerpt to which he refers in

brief is as follows.

> Mr. Smith:  I really hesitate to do this.  Your
> Honor, I've known you for many, many years.  I
> have the utmost respect for you.  But I have got
> to represent my client and interpose an objection
> to Your Honor asking questions that tend to cross
> over to making the prosecution's case.  And the
> last thing in the world I want to do is insult the
> court or cause anything that sounds like I don't
> have absolutely the utmost respect.  Because I
> have much respect.  But I have to put in an
> objection at this time.  And I have to object at
> this time. (R. 876)

(Conrad's brief, pg. 19)

First, the State does not concede that the above

objection sufficiently preserved the claim because it fails

to identify which questions were objectionable and no basis

for the general objection were stated which would put the

court on notice as to the specific legal basis for the

objection.  Even assuming, however, that the objection was

sufficient to preserve the matter for appellate review, no

legal basis other than Canon three of The Alabama Code of

Judicial Ethics is cited to show that it constituted error

and even then, he only refers to a general proposition that

judges should not be "extreme or peculiar in [their]

judgment."  (Conrad's brief, pg. 20)  Though no specific

16

questions are identified by Conrad as the basis for his
general allegation here, none of the trial judge's
questions in the pages preceding this general objection
could fairly characterized as "extreme" or "peculiar".

Out of the presence of the jury, the trial court asked
the prosecutor if she was "going to expect to have somebody
give an opinion with respect to the blood", to which the
prosecutor replied "yes, sir." (R. 869) The judge then
stated that "you are not going to be able to get it in. [I]
don't want anyone to be shocked here. Are you going to
give any evidence with respect to –". (R. 869) The trial
court did not try the state's case. The trial court did
not complete his sentence to state what he would expect the
state to prove—the court merely cautioned the attorney that
the evidence as it was would not be admissible. This is
not "crossing the line". See, e.g., Burks v. State, 353 So.
2d 539, 541 (Ala. Crim. App. 1977).

The next time the court interposed a question to a
witness was when the following occurred.

Q: [by the prosecutor] And what do you
   recognize what I have marked as State's
   Exhibit No. 28(a) to be?

A: One purple stopper tube of blood from
   Robert Conrad.

17

Q:  And where did you receive that tube of
      blood marked State's Exhibit No. 28(a)?

A:  Medical Center Enterprise.

Q:  Now, there are some other --

THE COURT:  Do you recall who at Medical
      Center Enterprise handed you that?

THE WITNESS:  I want to say it was Ms. Allen,
      the lab technician, I believe.

Q:  Ms. Allen, at Medical Center Enterprise?

A:  Correct.

(R. 872)  Again, the court's question above was not

"extreme" or "peculiar".  In fact, the court was helping

defense counsel, because that was an objection defense

counsel should have made, and if defense counsel had made

the objection, he would have had to state the basis of his

objection, which would have been that the person receiving

the evidence was not identified.

The final interjection the court had was as follows.

Q:  [by the prosecutor]  Did Rick, Hauser
      place what was just marked as State's
      exhibit No. 28(a) in the -- how did he
      place it for safe keeping, until it was
      transferred to the Department of Forensic
      Sciences?"

A.  MR. SMITH [defense counsel]:  If he has
      personal knowledge, may it please the
      Court.

18

THE COURT:  Only.  First, of all, do you have
    personal knowledge?

THE WITNESS:  It was kept in the evidence
    locker in the refrigerator until it was
    removed and given to Detective  Hauser on
    the day that he took it to Forensic
    Sciences.

THE COURT:  Was that your question?

Mrs. Stout [the prosecutor]:  Yes.

THE COURT:  I thought your question was how
    did Detective Hauser, what did he do with
    it.  How did he package it?  Did he
    package it in the red container?

Q:  Did you package it for safety, until it
    was transported to the Department of
    Forensic Sciences?

A:  No.

Q:  Who packaged it?

THE COURT:  If you know?

THE WITNESS:  In this red container?

THE COURT:  Yes.

THE WITNESS:  I do not know.

Q:  You don't know who put it in that red
    container?

A:  No, I do not.

(R. 874-875)  Again, this excerpt does not demonstrate any

behavior on the part of the judge that could fairly and

19

reasonably be characterized as "extreme" or "peculiar".
The judge was trying to clarify certain details that would
be necessary for laying a proper predicate for the
admission of the evidence, but these were only questions
that defense counsel would have or should have raised
except for the fact that the trial court did so for them.
This was not tantamount to the trial judge trying the
state's case, if anything, the trial court helped defense
counsel by supplying the grounds they would have been
required to state had an objection been raised by
defense counsel.

### 3.  Court's reference to "the old guy"

Conrad cites as another example of evidence of judicial
partiality the following excerpt.

> Q: [by the prosecutor] And when you talked to
> her, had she already gotten behind the
> counter?
>
> A:  She was crawling that way.
>
> Q:  Crawling.  What else did you do?
>
> A:  Well, she told me stuff like she was going
> to die.  I went outside and asked the old
> guy how could I help him.
>
> THE COURT:  When you are referring to the "old
> guy", would you look around the courtroom
> and see if you see the person that you
> keep talking about as "the old guy."

20

> Would you recognize him again?  You can
> get up and walk around and see if you can
> find him, and point him out if he's here.

THE WITNESS:  I believe that is him right
     there.

THE COURT: Go over in that direction and point
     out a little bit better who you are
     talking about.

(Witness indicating).

THE COURT:  Okay.  Mr. Grimes, why don't you
     come up and we will get you a chair.  You
     have the right to be sitting up here.

MR. SMITH: [defense counsel]  Thank you, Your
     Honor.

THE COURT:  Go ahead.

(R. 1212-1213)  It should be initially noted that no timely

objection was interposed by defense counsel at this time,

therefore, this specific claim is not properly preserved

for review on appeal.  If, however, this claim had been

preserved, no reversal would be warranted because, as the

judge aptly stated, "[T]hat was proper.  It clarified

something for the ladies and gentlemen of the jury who the

person he was talking about was."  (R. 1226)

### 4.  Judge's "pretrial remarks"

Conrad further alleges that the trial judge's "pretrial

remarks"

21

"that all defendants who appeared before him in court would receive active penitentiary time, if they were found guilty or plead guilty, showed an appearance of impartiality, impropriety, and personal bias warranting the judge's voluntary recusal, pursuant to judicial ethics rule which requires a judge to recuse himself in any proceeding in which his impartiality could reasonably be questioned."

(Conrad's brief, pg. 22)    Conrad argues that the trial court's stance was plain error.

This instance does not warrant relief on appeal. First, the matter was not preserved by a timely and proper objection below on this basis.    Plain error review is not applicable here as the death penalty was not imposed. Moreover, even if preserved no relief is due because there is no basis in the record for this claim.    The document purporting to support this particular allegation is not included in the record therefore, there is no basis for assessing the claim or ruling on it. See, Martin v. State, 449 So. 2d 801, 801 (Ala. Crim. App. 1984) (indicating that where the record does not contain a copy of a report relied upon by a defendant, there is not a basis in the record to review the claim because "exhibits attached to the briefs of the parties are not part of the record and cannot be considered by appellate courts.")    Though Conrad does

22

include a copy of a document purporting to be an order or

the trial court at the end of his brief, which may not be

considered by this Court on appeal. Id. Therefore, no

relief is due on this claim even if it had been properly

preserved for review on appeal.

## II. Conrad Has Failed To Show That There Was A Missing Link In The Chain Of Custody Of State's Exhibit 28(a).

Conrad contends on appeal that the trial court erred in

admitting State's Exhibit 28(a), a blood specimen of

Conrad's when there was a missing link in the chain of

custody. (Conrad's brief, pg. 27) The basis for his claim

is that Glenda Allums, a laboratory technician who drew

blood from Conrad pursuant to a search warrant, testified

that she was "assuming" that State's Exhibit 28(a) was the

sample she took and that she did not put any markings on

the exhibit herself to uniquely identify it for her

possession. Conrad concludes that "all Ms. Allums

testified to was that she took a blood sample from

Appellant, based on a search warrant and that she gave that

specimen to a police officer, but she testified that she

could only assume that Exhibit 28(a) was that same

23

specimen." (Conrad's brief, pg. 26). This claim warrants
no reversal on appeal.

"The chain of custody is composed of 'links'. A 'link'
is anyone who handled the item. The State must identify
each link from the time the item was seized." Ex parte
Slaton, 680 So. 2d 909, 918 (Ala. 1996), citing Ex parte
Holton, 590 So. 2d 918, 920 (Ala. 1991). In establishing a
proper chain of custody, the record must show each link and
"the following with regard to each link's possession of the
item: '(1) [the] receipt of the item; (2) [the] ultimate
disposition of the item, i.e. transfer, destruction, or
retention; and (3) [the] safeguarding and handling of the
item between receipt and disposition.' " Id.

If there is a missing 'link' the evidence is
inadmissible. A missing 'link' occurs when the proponent
of the evidence fails to identify a 'link' and fails to
show any one of the three criteria for that 'link'. Id.
On the other hand, a weak 'link' occurs when the State has
identified each link and "has shown all three criteria as
to each link, but has done so with circumstantial evidence,
as opposed to the direct testimony of the 'link', as to one
or more criteria or as to one or more links." Id. When

the 'link' is weak, 'a question of credibility and weight'
is presented, not one of admissibility." Id.

In brief Conrad does not assert that there was a
missing 'link' in the chain of custody. The only challenge
he makes concerns Ms. Allums, the laboratory technician who
drew Conrad's blood for testing pursuant to a warrant. To
that extent he is in agreement with the trial court who
declared that there was no a missing 'link', but a weak
"link".

Conrad suggests that the portion of the predicate
required for the admission of the vial of blood relative to
Ms. Allums, is unreliable because she did "not specifically
identify State's Exhibit 28(a), she was not asked by the
prosecutor if 28(a) was the same identical specimen "she
took from Conrad, and she testified on cross-examination
that she "did not put any markings on the exhibit herself,
didn't put anything to uniquely identify it for her
possession. (R. 902)" (Conrad's brief, pg. 26)

Notwithstanding the above, there was sufficient
evidence to meet the requirements set forth in Ex parte
Holton to allow the evidence to be properly admitted with
issues of credibility to be left to the jury to resolve.

25

The evidence showed that Ms. Brooke Reen drew the blood sample from Conrad pursuant to the warrant.  (R. 885, 893) Ms. Reen put her initials, the date and the time the blood was drawn on the label of the vial.  (R. 888)  She was able to identify Exhibit 28(a) at trial by those markings.  (R. 885, 886)  Ms. Reen then took the vial of blood to the laboratory where entry was restricted.  (R. 809, 894)  She testified that unauthorized persons were not allowed inside that area and that there were always "techs in the lab to note unauthorized people" in there.  (R. 890)

Ms. Allums, the technician who analyzed the blood sample retrieved the sample from the storage refrigerator laboratory and gave it to two officers who were there.  (R. 899)  Though Ms. Allums testified at trial that she was "assuming" State's Exhibit 28(a) was the same vial of blood she gave to the police officers, she clarified that her assumption was based on the identification on the vial. (R. 901, 902)  In fact she specifically said of Exhibit 28(a) that:  "It's identified with our identification procedure that we use at the hospital.  And it has a tech that was working in the lab at the time.  And that's how we identify our tubes of blood."  (R. 901)  Thus, while Ms.

Allums did not directly testify that 28(a) was the vial she retrieved and gave to the police officers there was strong circumstantial evidence that Exhibit 28(a) was indeed the vial of Conrad's blood.

As further evidence that 28(a) was the vial of Conrad's blood, the State's evidence showed from Officer Jeff Spence's testimony that he and Detective Hauser went to the hospital with a search warrant and picked up the vial of blood from Ms. Allums. (R. 905) At trial Spence held up the tube of blood with a purple stopper (Exhibit 28(a)) and said when he received it from Ms. Allums it was just like it was at trial. (R. 905, 906) He had previously stated under oath that he recognized Exhibit 28(a). (R. 872) In other words, Officer Spence identified State's Exhibit 28(a) at trial as the same vial of blood he received from Ms. Allums at the hospital. Additionally, Spence testified that when he collected the vial he placed it in the refrigerator "in evidence" where it remained until it was turned over to Detective Hauser to transport to the Department of Forensic Sciences in Montgomery for testing. (R. 874) All of the above evidence suggests that the integrity of the evidence remained intact.

27

Detective Rick Hauser, the next 'link' in the chain testified that he received a vial of blood from Lieutenant Spence and took it to the Department of Forensic Sciences where he followed the "usual procedure" of giving it to the receptionist who then gave him a receipt. (R. 864, 865) At trial he testified that Exhibit 28(a) appeared to be in the same condition as when he received it and took it to the Department of Forensic Sciences (except that it was sealed with a pink tab stating "bodily fluids"). (R. 866) Ms. Phyllis Rollan, the DNA expert from the Department of Forensic Sciences who analyzed the blood sample, testified at trial that she received State's Exhibit 28(a) from the receptionist at the Department of Forensic Sciences laboratory and that it was kept in a locked facility until time for testing. (R. 1016) During her testimony, Ms. Pollan identified State's Exhibit 28(a) because "it bears our case number, the item number and also on [her] initials on the outer package, as well as the inner packaging." (R. 1017) Her testimony was further evidence of the continuity of the integrity of the evidence.

28

In sum, the State's evidence either directly or circumstantially accounted for each 'link' in the chain of custody and showed the reliability of the care and control of the evidence. Therefore, the "weak link" did not prohibit admissibility — it only raised of question of credibility for the jury to weigh and resolve. As the jury did this, its opinion is entitled to stand on appeal.

III. **The State's Failure To Disclose Evidence Is Not Reversible Error When No Residual Undue Prejudice Is Shown By Conrad.**

Conrad asserts on appeal that the State violated his right to a fair trial when certain information was not disclosed until the trial court reviewed it *in camera* at trial and allowed defense counsel to review it. His specific complaint is that the corrective action taken by the trial court was insufficient and that his motion to dismiss (R. 1002, 1004) should have been granted. The specific facts and circumstances surrounding this matter and the trial court's corrective actions are set forth below.

The night before trial commenced at about 10:00 p.m., "a good friend and neighbor" of defense counsel (Mr.

29

Smith), called Mr. Smith telling him he had received an

anonymous telephone call informing him that Smith needed

to get "the internal investigative report of the Enterprise

Police Department concerning Conrad." (R. 918-919) The

next day at trial, Mr. Smith asked Lieutenant Spence on

cross examination if he was "aware of" "an Enterprise

Police Department internal investigation report concerning

this case?" (R. 907) That question prompted the court to

stop the trial to inquire about the allegation. The

inquiry disclosed that Detective Hauser was the subject of

a police internal investigation concerning his receipt of

information before the incident that co-defendant Brian

Yeoman planned to rob the Toy Store. (R. 922-923, 964)

Because of a conflict of interest, the internal

investigation was turned over to the Alabama Bureau of

Investigation and the Alabama Attorney General's Office.

(R. 922, 923) When the investigation was complete the

information was presented to a Coffee County grand jury,

which, "found no wrongdoing and issued a no bill." (R.

923) The prosecutors told the court that they did not find

out about the file resulting from the ABI investigation

30

until the "Thursday or Friday" preceding the commencement
of trial on Monday. (R. 916)

A few days before trial the district attorney and the
two prosecutors in this case discussed the possibility of
disclosing the information gleaned from the investigation
to defense counsel. (R. 935) They decided that the file
contained no exculpatory evidence that was required to be
disclosed. (R. 936-938) Although this information was not
kept with the file in Conrad's case, the special
investigation file on the internal investigation was
maintained in the district attorney's office through the
time of the investigation and after the district attorney
had recused his office. (R. 935)

Upon an *in camera* review at trial, the trial judge
determined that the information in the file regarding
codefendant Yeoman's involvement in planning the robbery of
the Toy Store was exculpatory. (R. 956-957) The judge,
however, specifically found that there had been no
prosecutorial misconduct. (R. 1002) The trial judge
stated that he would make Roberson, the person who told the
police officer that Yeoman had talked about robbing the Toy
Store, available for the defense to interview.

31

Additionally, the court explained that "[i]f y'all need additional time to interview him, that's wonderful.  I'm going to make him available to the defense for that purpose." (R. 970, 1000, 1001) Roberson testified at trial and was subject to cross examination by defense counsel.

In order to set aside a jury verdict based on a discovery violation, a court must find prejudice. Wynn v. State, 804 So. 2d 1122, 1130 (Ala. Crim. App. 2000). ("A delay in disclosing Brady material requires reversal if 'the lateness of the disclosure so prejudiced appellant's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial'. . . . . . [I]n the Brady context, 'evidence is material only if there is a reasonable probability that had the evidence been discovered to the defense [or disclosed sooner], the result of the proceeding would have been different.'"); Wilson v. State, CR-01-1003, 2003 WL 21362973, at *3 (Ala. June 13, 2003) (noting prejudice must be shown to support the three components of a Brady violation). Furthermore, when addressing an alleged discovery violation, this Court has admonished that a

32

"trial court should not impose a sanction which is harsher
that necessary" to ensure compliance with the discovery
order at issue. Hardy v. State, 804 So. 2d 247, 284 (Ala.
Crim. App. 1999), citing McCroy, 505 So. 2d at 1279;
Pilley, 789 So. 2d at 881. The trial court correctly did
not choose this option, but instead, imposed an appropriate
resolution to the matter by allowing defense counsel an
opportunity to review the information previously not
disclosed. The trial court also ordered that Roberson, be
subpoenaed to testify, allowing defense counsel the
opportunity to examine him. This was sufficient, and
apparently defense counsel agreed because the record does
not indicate that counsel requested additional time to
review the information or indicated to the court that it
lacked sufficient opportunity to question Mr. Roberson.
Likewise, the record does not provide that defense counsel
moved for a longer recess, a continuance, to have other
witnesses called, or for any other remedy in the case to
allow further inquiry into the matter. Therefore, the trial
court applied no harsher remedy than necessary under the
circumstances and thereby, did not abuse its discretion in
denying Conrad's motions to dismiss the case based on this

33

matter. <u>McLemore v. State</u>, 562 So. 2d 639, 645 (Ala. Crim. App. 1989) (rejecting a claim for a more drastic remedy following a discovery violation on the basis that "under the circumstances . . . either a recess or a continuance would have been sufficient. . . .").

Furthermore, though Conrad alleges in brief that he was prejudiced as a result of the discovery violation, he has failed to demonstrate this allegation. Conrad alleges that (other than a general allegation of not having a fair trial) he "was prejudiced by not being able to investigate and prepare evidence to rebut co-defendant's, Brian Yeoman, testimony and the corrective action attempted by the court." (Conrad's brief, pg. 35) He fails to offer anything specific about what he wanted to investigate nor what he expected to find had he had the information earlier. A review of the record indicates that defense counsel's cross examination of Yeoman was vigorous, thoughtful, forceful, and effective. There is absolutely no showing that it would have been improved by a more drastic corrective action on the part of the trial judge. Moreover, Conrad should not now be permitted to complain about the adequacy of the time given to review the material

34

when the record does not indicate that he raised this
concern to the court by requesting additional time.

Similarly, Conrad notes briefly on page thirty-four of
his brief that defense counsel was not able to leave the
courtroom in an attempt to interview Steve Brown, "and the
mysterious Alex that Mr. Roberson testified about." Conrad
asserts that "[t]here was not enough time in the midst of
the trial (in a trial that went to 7:00 and 9:00 p.m every
night) to follow upon all of the evidence brought out in
the exculpatory material." (Conrad's brief, pg. 35)
Again, as noted above, there is no proof of this in the
record and no indication that this was brought to the
attention of the court in the form of a motion to recess or
continue the case to pursue these topics. Therefore,
Conrad should not now be allowed to assert that the trial
court's choice of a remedy was an abuse of discretion.

Moreover, Conrad was not unduly prejudiced by learning
of the existence of Roberson at the trial because Roberson
was not a persuasive or credible source and any information
that he may have given was dubious at best and useless at
worst. He had a lengthy criminal history with numerous
convictions and was mentally ill suffering from paranoia

35

schizophrenia.   Therefore, it is highly improbable that
knowledge of this witness before trial would have made a
significant improvement in Conrad's defense.

Finally, even if the State violated the trial court's
discovery order, the error was harmless due to the
overwhelming evidence against Conrad.   Montgomery v. State,
504 So. 2d 370, 373 (Ala. Crim. App. 1987) (finding that,
even if the trial court's ruling regarding discovery
production was in error, any error was harmless due to the
overwhelming evidence presented against the defendant).   In
fact, it is very significant that Conrad does not raise a
sufficiency of the evidence claim in his brief though the
issue was preserved at trial through a motion for judgment
of acquittal made at the end of the state's case as well as
the end of all the evidence.   This is highly indicative of
Conrad's recognition of the overwhelming evidence against
him.

In sum, the burden of proof on appeal is Conrad's.   It
is his burden to show that the trial court abused its
discretion in applying the remedy it did in response to the
discovery violation.   No such abuse has been demonstrated.

36

Therefore, the decision of the trial court is due to stand on appeal.

## CONCLUSION

Based on the foregoing, the applicable law and the record in this case, the trial court's ruling is due to be affirmed on appeal.

Respectfully submitted,

William H. Pryor Jr.
Attorney General

P. David Bjurberg
Assistant Attorney General

By-

Beth Slate Poe
Assistant Attorney General
Counsel of Record

37

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of August, 2003, I served a copy of the foregoing on the attorneys for Appellant, by placing the same in the United States Mail, first class, postage prepaid and addressed as follows:

Hon. Gary D. Bradshaw
P. O. Box 311412
Enterprise, AL  36331

Hon. Richard Waldrop
P. O. Box 310027
Enterprise, AL  36331

BETH SLATE POE
ASSISTANT ATTORNEY GENERAL

ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama 36130-0152
(334) 242-7300

116799/47531-001

38



Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d),
states, in part, that this unpublished memorandum "shall have no precedential value and shall not be cited in arguments or
briefs and shall not be used by any court within this state, except for the purpose of establishing the application
of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals

State of Alabama
Judicial Building, 300 Dexter Avenue
**P. O. Box 301555**
Montgomery, AL 36130-1555



RELEASED

OCT 2 4 2003

CLERK
ALA COURT CRIMINAL APPEALS

H.W."BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

### MEMORANDUM

CR-02-0333   Coffee (Enterprise) Circuit Court CC-01-179 and
CC-01-180

## Robert Thomas Conrad v. State of Alabama

Baschab, Judge.

The appellant was convicted of the capital offense of
robbery-murder, a violation of §13A-5-40(a)(2), Ala. Code
1975, and first-degree robbery, a violation of §13A-8-
41(a)(1), Ala. Code 1975. By a vote of 8-4, the jury
recommended that he be sentenced to imprisonment for life
without the possibility of parole on the robbery-murder
conviction. The trial court accepted the jury's
recommendation and sentenced the appellant to imprisonment for
life without the possibility of parole on the robbery-murder
conviction. It also sentenced him to serve a term of life in
prison on the first-degree robbery conviction. The appellant
filed a motion for a new trial and a supplemental motion for
a new trial, which were denied by operation of law. See Rule



STATE'S
EXHIBIT
D

24.4, Ala. R. Crim. P.   This appeal followed.

The State presented evidence that, on May 23, 2001, Jelaine Dennis was working at the Toy Store; Robert Grimes was there talking with her; and two black men were also in the store.  At some point, a man who was dressed in black and who was wearing a mask came into the store with a gun.   The man grabbed Grimes, pointed the gun at him, took money from the store cash register, pulled the telephone out of the wall, took Grimes to the back of the store, made Grimes lie down, and took Grimes' wallet.  Grimes subsequently heard gunfire. Dennis then said, "'Ray[,] I'm dying.'"   (R. 575.)   Dennis subsequently died from multiple gunshot wounds.

Bryan Yoeman, a codefendant, testified that Brian Smith, another codefendant, came to his apartment on May 23, 2001; that he took Smith to the Toy Store in his vehicle; that Conrad also went to the Toy Store in Smith's mother's vehicle; that he and Smith met the appellant down the street from the Toy Store; that Smith got out of his vehicle, spoke to the appellant, and then got back into his vehicle; that he and Smith went on to the Toy Store; that the appellant stayed where he was; that, while he and Smith were in the Toy Store, the appellant came into the store wearing a mask; that the appellant was dressed in black and had a gun; that Dennis pulled a gun; that Dennis and the appellant started "tussling"; that Dennis fell and shot the appellant; and that the appellant shot Dennis.  (R. 1149.)  He also testified that he had previously known that the appellant and Smith had been planning a robbery and that he had heard them talk about it a couple of times about one month before the events of May 23, 2001.   However, he testified that he did not know that there was going to be a robbery at the Toy Store; that Smith had only told him to take him to the store; and that he did not have anything to do with planning the robbery.

I.

The appellant argues that the trial judge erroneously considered matters outside of the record during the proceedings against him.  Specifically, he contends that the trial judge's "pre-sentence standing order that, 'Criminal defendants who enter a guilty plea or who are convicted of any act of violence, some active time in custody will be ordered

2

served,' showed [the] appearance of impartiality or impropriety, warranting judge's recusal." (Appellant's brief at p. 21.) He further contends that the trial judge's questioning of witnesses during the guilt phase of his trial and his oral charge to the jury during the penalty phase of his trial further evidenced his bias. However, the record does not indicate that the appellant objected to the trial court's actions on the ground that the trial judge was biased against him or that he requested that the trial judge recuse himself. Therefore, this issue is not properly before this court. See Ex parte Crawford, 686 So. 2d 196 (Ala. 1996); Acoff v. State, 435 So. 2d 224 (Ala. Crim. App. 1983).

II.

The appellant also argues that the State did not present an adequate chain of custody regarding the blood sample that was taken from him. Specifically, he contends that the State "did not fulfill the requirement that the integrity of the evidence be proved by an accounting of all the successive steps in the handling of State's Exhibit 28(a), blood specimen, from the time of its seizure until the time of trial." (Appellant's brief at p. 27.) To prove a chain of custody, the State must sufficiently establish (1) the receipt of the evidence; (2) the ultimate disposition of the evidence; and (3) the safeguarding and handling of the evidence between receipt and disposition. See Ex parte Holton, 590 So. 2d 918 (Ala. 1991). "'The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence.'" Jones v. State, 616 So. 2d 949, 951 (Ala. Crim. App. 1993) (quoting Williams v. State, 505 So. 2d 1252, 1253 (Ala. Crim. App. 1986), aff'd, 505 So. 2d 1254 (Ala. 1987)).

Brooke Reene testified that she was a laboratory technician at Medical Center Enterprise on May 23, 2001; that she went to the emergency room and drew blood from the appellant on that date; that the tube had a label on it that had been printed by the hospital computer system; that the label had the appellant's name and patient number; that she put her initials and the time and date of the draw on the label; that it was a purple-topped tube; that she took the blood to the laboratory; that the blood was taken to the hematology department and tested for a complete blood count;

3

and that it was requested that the blood be held out in case it was needed for other testing. She also testified that the storage unit was in the main restricted laboratory; that there were not locks on the laboratory door, but there were signs that said "'Biohazard. Restricted. Authorized Personnel only'"; that unauthorized personnel were not allowed into the laboratory; that laboratory personnel, nurses, doctors, and janitorial staff were allowed in the laboratory; and that there were always technicians in the laboratory to note any unauthorized people who came into the laboratory. (R. 889.) Finally, she testified that she recognized State's Exhibit #28(a) as the tube of blood she had drawn from the appellant.

Glenda Allums testified that she was a laboratory technician at the Medical Center Enterprise; that she recalled being served with a search warrant for a blood specimen for a patient on May 25, 2001; that she believed that there were two officers; that she went to the storage refrigerator to retrieve the blood; and that she turned the blood sample over to the officers. She also testified that the blood was stored in a restricted area; that the blood bank refrigerator was located in the blood bank department; that there was a technician in the laboratory at all times; and that the janitorial staff had access to the laboratory. She further testified that, based on the identification on State's Exhibit #28(a), she assumed it was the blood specimen she retrieved pursuant to the search warrant. However, she stated that she did not put any uniquely identifying markings on the tube.

Lieutenant Jeff Spence of the Enterprise Police Department testified that, on May 25, 2001, he executed a search warrant at the Medical Center Enterprise to obtain blood that had been drawn from the appellant; that he and Detective Rick Hauser went to Medical Center Enterprise; that he presented the search warrant to Glenda Allums; that Allums gave him a purple-topped tube of blood; that he placed the tube of blood in an evidence bag; that the tube was placed in the refrigeration unit in the evidence room; and that he subsequently removed the tube of blood from the refrigeration unit in the evidence room and gave it to Rick Hauser, who then took it to the Alabama Department of Forensic Sciences. He identified State's Exhibit #28(a) as the tube of blood he had received from Medical Center Enterprise.

4

Detective Rick Hauser of the Enterprise Police Department testified that Spence had served a search warrant; that he subsequently received a tube of blood from Spence; and that he placed the tube of blood in the cooler in the evidence vault. He also testified that State's Exhibit #28(a) was inside of another tube and that he had placed the tube of blood into that container. He further testified that he took the tube of blood to the Alabama Department of Forensic Sciences on May 29, 2001; that he turned the tube of blood over to the receptionist at the Alabama Department of Forensic Sciences, who inventories the evidence, goes over it with the officer, signs for the evidence, and gives a receipt for the evidence; that he subsequently received the tube of blood back from the Alabama Department of Forensic Sciences and placed it back into evidence; and that it had been under his care, custody, and control since he had received it back from the Alabama Department of Forensic Sciences except for when he took it out for discovery purposes.

Phyllis Rollan of the Alabama Department of Forensic Sciences testified that she received blood evidence from Hauser on May 29, 2001; that, when evidence is brought into the laboratory, it is given a unique case number; that a record is created showing who brought the evidence, the date, who signed for the evidence at the laboratory, and a brief description of the evidence; and that the item was taken to the laboratory and placed into a locked facility until someone could work on it. She also testified that State's Exhibit #28(a) was a red carton that contained a purple-topped tube; that the tube had the Alabama Department of Forensic Sciences' case number and item number on it; that there was also a label on the tube that had the appellant's name printed on it; and that her initials were on the outer and inner packaging.

Based on this testimony, the State presented sufficient evidence to establish a proper chain of custody for the evidence and to establish a reasonable probability that the tube of blood had not been tampered with. "'"'So long as the court is persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded, the jury should be permitted to consider and assess it in the light of surrounding circumstances.'"'" Blankenship v. State, 589 So. 2d 1321, 1324-25 (Ala. Crim. App. 1991) (quoting Moorman v. State, 574 So. 2d 953, 956-57 (Ala. Crim. App. 1990)).

5

Furthermore, Reene identified State's Exhibit #28(a) as the tube of blood she had drawn from the appellant. Section 12-21-13, Ala. Code 1975, provides:

> "Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence.  Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper.  The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."

Therefore, any question as to the adequacy of the safeguarding and handling of the tube of blood did not go to its admissibility.  Rather, it went to the weight the jury would assign to the evidence.

## III.

Finally, the appellant argues that the trial court erroneously denied his motion to dismiss his case and his motion to prevent Yoeman from testifying after the State violated <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by withholding a report regarding an internal investigation by the Enterprise Police Department until the middle of trial.  Specifically, he contends that "[t]here was not enough time in the midst of the trial (in a trial that went to 7:00 and 9:00 p.m. every night) to follow up on all of the evidence brought out in the exculpatory material" and that he "was prejudiced by not being able to investigate and prepare evidence to rebut co-defendant's, Bryan Yoeman, testimony." (Appellant's brief at pp. 34-35.) During the course of the trial, one of the appellant's attorneys informed the trial court that a friend told him he had received an anonymous telephone call and that the caller had told his friend to tell him he needed to obtain a copy of a report about the Enterprise Police Department's internal investigation regarding the investigation of Dennis' death.

6

Evidence was presented that, after Dennis' death, George Roberson had telephoned the Enterprise Police Department. Roberson told law enforcement authorities that, before the robbery of the Toy Store occurred, he had told an Enterprise Police Department detective that Yoeman had told him that he and some friends were planning to rob the Toy Store. Subsequently, the Enterprise Police Department asked the Alabama Bureau of Investigation ("ABI") to conduct an investigation regarding this matter, and the District Attorney's Office asked the Attorney General's Office to handle the matter. Subsequently, the case was presented to a grand jury, which returned a no-bill in the matter. Bruce Devane, an investigator with the District Attorney's Office, testified that the file regarding the internal investigation was kept in a locked cabinet in the District Attorney's office under sensitive matters and that it was not a part of the file regarding Dennis' death. The assistant district attorneys who prosecuted the case stated that they had only learned about the investigation shortly before the trial began; that they had had a meeting with the District Attorney and Devane about whether to disclose the file regarding the investigation to the defense; and that the District Attorney had decided that the file did not contain any exculpatory evidence. Therefore, the file was not disclosed to the defense.

The trial court ordered the State to produce the file regarding the internal investigation for an in camera inspection. After reviewing the documents with the prosecutors and the defense attorneys, the trial court decided that the file contained exculpatory evidence and evidence that could be used for impeachment; decided that there was not any prosecutorial misconduct; ordered the State to produce documents regarding the investigation to the defense; and issued a bench warrant for Roberson, who was in Colorado. The defense made a motion to dismiss the case based on prosecutorial misconduct and moved to prevent Yoeman from testifying in this case. The trial court denied the motions. Subsequently, Roberson appeared for trial, and the appellant called him as a witness.

At trial, the appellant did not argue that he did not have an adequate opportunity to follow up on the evidence contained in the file regarding the internal investigation or that he was not able to investigate and prepare evidence to

7

rebut Yoeman's testimony.  Further, he did not move for a continuance.  Rather, he raised this argument for the first time in his supplemental motion for a new trial.  Therefore, it is not properly before this court.  See Saffold v. State, 627 So. 2d 1107 (Ala. Crim. App. 1993).

Moreover,

> "'[t]ardy disclosure of Brady material is generally not reversible error unless the defendant can show that he was denied a fair trial.  United States v. Gordon, 844 F.2d 1397 (9th Cir. 1988); United States v. Shelton, 588 F.2d 1242 (9th Cir. 1978), cert. denied, 442 U.S. 909, 99 S. Ct. 2822, 61 L. Ed. 2d 275 (1979); Ex parte Raines, 429 So. 2d 1111 (Ala. 1982), cert. denied, 460 U.S. 1103, 103 S. Ct. 1804, 76 L. Ed. 2d 368 (1983); McClain v. State, 473 So. 2d 612 (Ala. Cr. App. 1985).  A delay in disclosing Brady material requires reversal only if "the lateness of the disclosure so prejudiced appellant's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial."  United States v. Shelton, 588 F.2d at 1247 (quoting United States v. Miller, 529 F.2d 1125, 1128 (9th Cir.), cert. denied, 426 U.S. 924, 96 S. Ct. 2634, 49 L. Ed. 2d 379 (1976)).'

> "[Coral v. State,] 628 So. 2d [954,] 980 [Ala. Cr. App. 1992), aff'd, 628 So. 2d 1004 (Ala. 1993)]."

Ward v. State, 814 So. 2d 899, 919 (Ala. Crim. App. 2000). The appellant did not show that he was prejudiced by the State's late disclosure of the report about the internal investigation or that he did not receive a fair trial as a result of the late disclosure.  Therefore, his argument is also without merit.

For the above-stated reasons, we affirm the trial court's judgment.

**AFFIRMED.**

McMillan, P.J., and Cobb, Shaw, and Wise, JJ., concur.

IN THE COURT OF CRIMINAL APPEALS

STATE OF ALABAMA

ROBERT THOMAS CONRAD,          *

     APPELLANT,          *          CASE NO: CR-02-0333

VS.          *

STATE OF ALABAMA          *

     APPELLEE.          *

---

## APPLICATION FOR REHEARING AND

## BRIEF IN SUPPORT THEREOF

---

ON APPEAL FROM THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION
CASE NOS: CC-2001-179 & 180

---

GARY D. BRADSHAW
ATTORNEY FOR APPELLANT
(BRA074)
P. O. BOX 311412
ENTERPRISE, AL  36331
(334) 393-6439

RICHARD (CRACKER) WALDROP
ATTORNEY FOR APPELLANT
ASB-2398-L57R
P.O. BOX 310027
ENTERPRISE, AL  36331
(334) 393-2288

STATE'S
EXHIBIT
E
PENGAD 800-631-6989

## TABLE OF CASES

**Page**

Alabama Rules of Criminal Procedure 24.1 (c) ............................................ 11, 12

Bartone v. United States, 375 U.S. 52, 84 S. Ct. 21, ............  14
  11 L. Ed 2d 11 (1963)

Capps v. State, 747 So.2d 358 (Ala. Crim. App. 1999) ............  14

Ex Parte Haden, 531 So. 2d 940 (Ala. Crim. App. 1988) .........  11

Leverett v. State, 462, So. 2d 972, (Ala. Crim. App.) .........  14

Zumbado v. State, 615 So. 2d 1223 (Ala. Crim. App.) ................  12

## APPLICATION FOR REHEARING

Comes now your Petitioner, Robert Thomas Conrad, and files this his Application for Rehearing in the above styled cause under Rule 40, Alabama Rules of Appellate Procedure, and shows as follows:

1. Petitioner was found guilty of capital murder and robbery 1st degree and was sentenced to life in prison without parole on the 27th day of September 2002, in the Circuit Court of Coffee County, Alabama, Enterprise Division. This Honorable Court affirmed the judgment on October 24, 2003.

2. Material questions of fact and law were presented by the Appellant for review by this court in his briefs, and he submits that this Court was incorrect in its decision.

3. Further this decision is in conflict with a prior decision in Capps v. State, 747 So. 2d 358 (Ala. Crim. App. 1999) when it stated, "an allegedly illegal sentence may be challenged at anytime because, if sentence is illegal, sentence exceeds jurisdiction of the Trial Court and is void."

   This statement of law and the substance of the opinion, issued October 24, 2003 in this matter, are in conflict and the Appellate Court erred in failing to follow the decision.

Petitioner respectfully requests that his Application for Rehearing be granted and this Court proceed

iii

to review the judgment and reverse, and for such other relief as Petitioner may be entitled.

_____
GARY D. BRADSHAW
ATTORNEY FOR APPELLANT
(BRA074)
P. O. BOX 311412
ENTERPRISE, AL  36331
(334) 393-6439

RICHARD (CRACKER) WALDROP
ATTORNEY FOR APPELLANT
ASB-2398-L57R
P.O. BOX 310027
ENTERPRISE, AL  36331
(334) 393-2288

## CERTIFICATE OF SERVICE

We, Gary D. Bradshaw and Richard (Cracker) Waldrop, do hereby certify that we have served a copy of the above and foregoing Application for Rehearing, by placing a copy of same in the United States Mail, postage prepaid, and properly addressed to:

William Pryor, Jr.
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130

This is the _5th_ day of _November_ , 2003.

_____
Gary D. Bradshaw

_____
Richard (Cracker) Waldrop

iv

## STATEMENT OF THE CASE AND FACTS

This is an appeal by Robert Thomas Conrad from his conviction in Coffee County Circuit Court on charges of capital murder and robbery 1$^{st}$ degree. Coffee County Circuit Court Judge Gary L. McAliley presided over Conrad's trial.

On May 31, 2001, the Coffee County Grand Jury indicted Conrad on a charge of capital murder and robbery 1$^{st}$ degree, Ala. Code, Section 13A-5-40(a)(2) and 13A-8-41 (a) (1), (1975). On June 18, 2001, Conrad waived formal arraignment and entered a plea of not guilty.

Trial on the issues were joined between the parties on September 23, 2002 and in the late evening hours of September 27, 2002, the jury returned a verdict finding the Appellant guilty of capital murder and robbery 1$^{st}$ degree. On that same day, a sentencing hearing was held before the same jury panel. As a result of the sentence hearing, the jury returned a verdict of 8 to 4 recommending punishment of life without parole.

Conrad filed a Motion for New Trial on October 22, 2002. Conrad's Motion for New Trial was denied on December 9, 2002, by operation of law.

Conrad filed notice of appeal on January 9, 2003. This appeal ensured.

1

On October 24, 2003, this Court filed its opinion affirming Appellant's conviction.

This Application for Rehearing followed.

## **APPENDIX I**

## **ADVERSE RULINGS**

| Transcript Page Number | Summary |
| --- | --- |
| CR-31 & 32 | Motion for Defendant to Physically go to the Crime Scene with Defendant's Attorney, denied by Trial Court |
| CR-120 | Motion for Order Permitting Discovery of Transcript, Exhibits, Other Memorialization of the Grand Jury Proceedings, and List of Grand Jury members, denied in part by Trial Court |
| CR-121 | Defendant's Motion to Depose the State's Expert Witness, denied by the Trial Court |
| CR-123 | Defendant's Motion to Dismiss the Indictment on Grounds that the Grand Jury was Improperly Impaneled, denied by the Trial Court |
| CR-126 | Defendant's Motion that Venire Members Be Sent Questionnaire Attached to His "Motion for Jury Questionnaire," denied by the Trial Court |
| CR-127 | Defendant's Motion to Suppress Evidence Seized After An Illegal Arrest/or Search, denied by the Trial Court |
| CR-128 | Defendant's Motion to Reveal the Identity of Informants, denied by Trial Court |
| CR-310 | Defendant's Motion for Treatment as Youthful Offender, denied by Trial Court |

| | |
|---|---|
| CR-547-548 | Defendant's Motion for Funds for Court Reporter Transcripts, denied by Trial Court |
| CR-628 | Defendant's Motion for New Trial/Supplemental Motion for New Trial, denied by Trial Court |
| CR-649 | Defendant's Motion for Mental Evaluation, denied by Trial Court |
| CR-650 | Defendant's Motion to Dismiss the Indictment on the Grounds – The Failure to Specify the Aggravating Circumstances on Which the Death Penalty May Be Imposed, denied by Trial Court |
| CR-650 | Defendant's Motion to Declare the Alabama Capital Sentencing Process Unconstitutional, denied by Trial Court |
| CR-650 | Defendant's Motion to Bar Imposition of Death Penalty, denied by Trial Court |
| CR-650 | Defendant's Motion in Limine to Exclude Photographs, denied by Trial Court |
| CR-983 | Trial Court Denied Defendant's Requested Jury Charge #2 |
| CR-984 | Trial Court Denied Defendant's Requested Jury Charge #3 |
| CR-985 | Trial Court Denied Defendant's Requested Jury Charge #4 |
| CR-986 | Trial Court Denied Defendant's Requested Jury Charge #5 |
| CR-987 | Trial Court Denied Defendant's Requested Jury Charge #6 |

| | |
|---|---|
| CR-993 | Trial Court Denied Defendant's Requested Jury Charge #10 |
| CR-998 | Trial Court Denied Defendant's Requested Jury Charge #12 |
| CR-1006 | Trial Court Denied Defendant's Requested Jury Charge #19 |
| CR-1008 | Trial Court Denied Defendant's Requested Jury Charge #20 |
| CR-1016 | Trial Court Denied Defendant's Requested Jury Charge #26 |
| R-117 | Defendant's exception to Potential Juror #37, denied by the Trial Court |
| R-119 | Defendant's objection to Potential Juror #13, overruled by the Trial Court |
| R-181-183 | Defendant's objection to Potential Juror #67, overruled by the Trial Court |
| R-375 | Defendant's challenge to Potential Juror #167, denied by the Trial Court |
| R-453 | Defendant's objection to State's challenge to Potential Juror 111, overruled the Trial Court |
| R-455 | Defendant's challenge to Potential Juror #179, denied by the Trial Court |
| R-513 | State's objection sustained alleging counsel for Defendant was giving an incorrect statement of the law |
| R-642 | Trial Court overruled Defendant's objection Re: Hearsay |

| | |
|---|---|
| R-649 | Trial Court overruled Defendant's objection Re: testimony's prejudicial effect out weighs the probative value |
| R-663 | Trial Court overruled Defendant's objection to the witness's feelings |
| R-732 | Trial Court overruled Defendant's objection to leading questions |
| R-733 | Trial Court overruled Defendant's objection to leading questions |
| R-744 | Trial Court overruled Defendant's objection to the arrival of a vehicle at the hospital |
| R-794 | Trial Court overruled Defendant's objection to the admissibility of State's Exhibit #7 |
| R-845 | Trial Court overruled Defendant's objection to the admissibility of State's Exhibit #8 |
| R-845-846 | Trial Court overruled Defendant's objection to the admissibility of State's Exhibit #31 |
| R-890 | Trial Court overruled Defendant's objection to witness's lack of personal knowledge |
| R-918 & 1002 | Trial Court denied Defendant's Motion for Dismissal based on the imputed knowledge of the District Attorney's Office Re: |

|  | exculpatory and impeachable information not produced to the defense in discovery as ordered by the Court |
|---|---|
| R-1004 | Trial Court overruled Defendant's Motion to Prohibit from Calling Co-Defendant, Bryan Yoeman, to Testify for Failure of State to Produce Exculpatory and Impeachable Material |
| R-1009 & 1011 | Trial Court overruled Defendant's objection to missing link in chain of custody Re: State's Exhibit #26(a) and gave Defendant a standing objection to said matter |
| R-1041 | Trial Court overruled Defendant's standing objection |
| R-1046, 1059, 1061 | Trial Court denied Defendant's Motion to Exclude State's Exhibit #25 |
| R-1066 | Trial Court overruled Defendant's standing objection |
| R-1084 | Trial Court overruled Defendant's objection to admitting State's Exhibit #11(a-e) |
| R-1088 | Trial Court overruled Defendant's objection to State's Exhibit #25 |
| R-1107 | Trial Court overruled Defendant's standing objection to Exhibit #26 being entered into evidence |
| R-1136 | Trial Court overruled Defendant's Motion to Exclude Testimony of Witness Yoeman |

7

| | |
|---|---|
| R-1141 | Trial Court overruled Defendant's objection over Court allowing witness to elaborate his answer |
| R-1174 | Trial Court sustained State's objection Re: Hearsay |
| R-1176 | Trial Court sustained State's objection Re: Hearsay |
| R-1225 | Trial Court overruled Defendant's objection to Court asking questions of witness, co-defendant, during course of defense's cross examination |
| R-1230 | Trial Court sustained State's objection Re: question being argumentative |
| R-1241 | Trial Court sustained State's objection Re: Hearsay |
| R-1246 | Trial Court overruled Defendant's objection Re: question being asked and answered |
| R-1254 & 1255 | Trial Court denied Defendant's Motion for Judgment of Acquittal after State rested its case |
| R-1265 | Trial Court overruled Defendant's objection Re: probative value out weighs prejudicial effect |
| R-1273 | Trial Court sustained State's objection Re: leading witness |
| R-1279 | Trial Court sustained State's objection Re: relevancy |
| R-1280 | Trial Court sustained State's objection Re: argumentative question |

| | |
|---|---|
| R-1290 | Trial Court overruled Defendant's objection Re: type of subpoena issued |
| R-1324 & 1325 | Trial Court denied Defendant's Motion for Acquittal at the close of all the evidence |
| R-1528 | Defendant's objection to Trial Court not giving his requested jury charges, denied by the Trial Court |
| R-1550 | Trial Court overruled Defendant's standing objection that were made in the guilt phase of trial |
| R-1598 | Trial Court overruled Defendant's objection to the jury finding two aggravating circumstances and objection to the non-innocent verdict |
| | Appellant Court's affirming of Trial Court's judgment |

9

## ISSUES

I.  Whether the trial court was given the first opportunity to correct any errors that may have occurred during sentencing.

II. Whether Appellant must object at the trial level in order to preserve issues on appeal.

## ARGUMENT I

The Appellant submits that the trial court was given the first opportunity to correct any errors that may have occurred during sentencing.

The first opportunity to correct the error committed against the Appellant came at the sentence hearing and later when counsel for Appellant filed motions for new trial.

Rule 24.1 Alabama Rules of Criminal Procedure requires that a Motion for New Trial must be filed within thirty (30) days after pronouncement of sentence, and this requirement of the rule that a Motion for New Trial be filed within thirty (30) days after pronouncement of sentence is jurisdictional. See Ex Parte Haden, 531 So.2d 940 (Ala. Crim. App. 1988)

The Appellant filed his timely Motion for New Trial, in writing, and filed it within thirty (30) days after pronouncement of sentence and was based on the reasons and issues that the Appellant alleges deprived him of a fair and impartial hearing.

Rule 24.1 of the Alabama Rules of Criminal Procedure provides that the court, on motion of the defendant, filed within thirty (30) days after

11

pronouncement of sentence, may grant a new trial for the reason that the verdict is contrary to law or to the weight of the evidence or for any other reason the defendant has not received a fair and impartial trial. Issue of weight of evidence is preserved by Motion for New Trial, stating the verdict is contrary to law or weight of evidence. See Zumbado v. State, 615 So.2d 1223 (Ala. Crim. App.) The Appellant submits that he complied with Rule 24.1(c), Alabama Rules of Criminal Procedure by filing his timely Motion for New Trial and listing his reasons for same as the verdict is contrary to law and the verdict is contrary to the evidence, and is strongly against the weight of the evidence.

The Appellant submits that no proposition of the law is more fundamental than the one requiring that the proof at trial must correspond with the material allegations against the Defendant to so find would be extremely contrary to the law.

The Court of Criminal Appeals held that this Appellant had failed to preserve error in the trial court and therefore, his claim of error is procedurally barred.

Appellant does not concede that his issues were not raised by exception or objection at the trial level, but submits the Rules of Criminal Procedure do not require

12

the objection or exception to an adverse final judgment.
Appellant further submits that it would be impossible for a
defendant to object to the inadequacy of a written order,
prior to its being written.

13

## **ARGUMENT II**

The case of <u>Leverett v. State</u>, 462, So.2d 972, (Ala. Crim. App.) held that there are two exceptions to the general rule that a new trial will not be granted absent timely sufficient objections.   These two exceptions arise (1) in instances of newly discovered evidence, or (2) in instances of fundamental errors, which invalidate the trial.

The Appellant submits that the trial court's remarks and actions are fundamental errors, which invalidated the Appellant's sentence hearing.

"When a sentence is clearly illegal or is clearly not authorized by statute, the Defendant does not need to object at the trial level in order to preserve that issue for appellate review.   See <u>Bartone v. United States</u>,375 U.S. 52, 84 S.Ct. 21, 11 L. Ed 2d 11 (1963), and <u>Capps v. State</u>, 747 So.2d 308 (Ala. Crim. App. 1999)when it stated, "an allegedly illegal sentence **may be challenged at any time**, because, if sentence is illegal, sentence exceeds jurisdiction of the trial court and is void," thus making it contrary to the law.

## CONCLUSION

Conrad submits that these are important issues and that the Court needs to address them. Conrad submits that he should, under the circumstances of this case, at a minimum be entitled to a new trial, one in which he will not be discriminated against. Conrad submits a different result will be reached if the Court will grant him a new trial and consider again the legitimate issues he has presented.

## CERTIFICATE OF SERVICE

We, Gary D. Bradshaw and Richard (Cracker) Waldrop, do hereby certify that we have served a copy of the above and foregoing Application for Rehearing and Brief in Support of Application for Rehearing of Appellant, by placing a copy of same in the United States Mail, postage prepaid, and properly addressed to:

William Pryor, Jr.
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130

This is the _5th_ day of _November_, 2003.

_____              _____
Gary D. Bradshaw                       Richard (Cracker) Waldrop

16

## CERTIFICATION

We, Gary D. Bradshaw and Richard (Cracker) Waldrop, do hereby certify that access to equipment capable of producing Courier New 13 font is not reasonably available and that the font style used constitutes the closest approximation of Courier New 13 under the circumstances.

This is the _5th_ day of _November_, 2003.

_Gary D. Bradshaw_
Gary D. Bradshaw
Attorney for Appellant

_Richard (Cracker) Waldrop_
Richard (Cracker) Waldrop
Attorney for Appellant

17

To C

47531

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA
### JUDICIAL BUILDING. 300 DEXTER AVENUE
### P.O. BOX 301555
### MONTGOMERY, AL 36130-1555

H. W. "Bucky" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
FAX (334) 242-4689

Hon. James M. "Mickey" Counts, Circuit
Clerk
Hon. Beth Slate Poe, Asst. Atty. Gen.
Hon. Gary D. Bradshaw, Attorney
Hon. Richard (Cracker) Waldrop, Attorney

RE:  CR-02-0333
Robert Thomas Conrad v. State of Alabama (Appeal from
Enterprise Division, Coffee Circuit Court: CC01-179;
CC01-180).

Dear Sir or Madam:

You are hereby notified that on November 14th, 2003 the following action was taken in the above referenced
cause by the Court of Criminal Appeals:

Application for rehearing overruled.

Lane W. Mann
Clerk
Court of Criminal Appeals

LWM/ lk

NOTE: If you are filing a petition for certiorari with the Alabama Supreme Court, Rule 39(e), Alabama Rules of
Appellate Procedure, states that a copy of the petition shall be filed with this Court.  Please be advised that your
failure to comply with this requirement could result in the issuance of a premature Certificate of Judgment.



STATE'S
EXHIBIT
F

ROBERT THOMAS CONRAD

Appellant

v.

STATE OF ALABAMA

Appellee

Circuit Court of Coffee County

SC No. _____

**Petition for Writ of Certiorari**

**TO THE SUPREME COURT OF ALABAMA:**

Comes your Petitioner Robert Thomas Conrad and petitions this Court for a Writ of Certiorari to issue to the Court of Criminal Appeals in the above-styled cause under Rule 39, ARAP, and shows the following:

1.   Petitioner was convicted of the charge of Robbery $1^{st}$ Degree and Capital Murder, in the Circuit Court of Coffee County, Alabama, on September 27, 2002.

The Court of Criminal Appeals affirmed the judgment on October 24, 2003.     An Application for



STATE'S EXHIBIT
6
PENGAD 800-631-6989

Rehearing was filed on November 5, 2003 and overruled on November 14, 2003.

2. A copy of the opinion of the Appellate Court is attached to this petition, which shows the Court of Criminal Appeals case to be No. CR-02-0333.

3. Petitioner alleges as grounds for the issuance of the writ the following:

(1) The basis of this petition for the writ is that the decision of the Appellate Court is in conflict with its prior decision(s) on the same point of law. In its present decision the Appellate Court held:

(A) The record does not indicate that the Appellant objected to the Trial Court's actions on the ground that the Trial Judge was biased against him or that he requested that the Trial Judge recuse himself. Therefore, this issue is not properly before this Court.

In the case of Capps. Vs. State, 747 So. 2d 358 (Ala. Crim. App. 1999), the

Appellate Court held: "An allegedly illegal sentence may be challenged at any time because, if sentence is illegal, sentence exceeds jurisdiction of the Trial Court and is void."

(B)  That the Appellant did not show that he was prejudiced by the State's late disclosure of the report about the internal investigation (in reference to this case), or that he did not receive a fair trial as a result of the late disclosure.  Therefore, his argument is also without merit.

The court stated in <u>Jefferson v. State</u>, 645 So. 2d 313 (Ala. Crim. App. 1994) that "the existence of any small piece of evidence favorable to the defense may, in a particular case, create just the doubt that prevents the jury from returning a verdict of guilty."  The credibility of witnesses and the weight of probative force of testimony are for the jury to

judge and determine. Whether or not the defendant will be acquitted if undisclosed evidence had been provided is not for the court to decide. Daniels v. State, 762 So. 2d 864, 866 (Ala. Crim. App. 1999).

Ex Parte Monk, 557, So. 2d 832 (Ala. 1989) which states that the possibility of the death penalty creates special circumstances justifying broader discovery in capital cases.

In Kyles v. Whitley, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995), the Supreme Court stated the prosecution may be deemed to have suppressed evidence even though no prosecutor actually knew the existence of evidence until after trial.

The United States Supreme Court has stated that when the prosecutor receives a specific and relevant request that

failure to make any response is seldom, if ever, excusable. <u>U.S. v. Aqurs</u>, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976).

The failure of the prosecution to turn over specifically requested evidence, to which no objection is filed, could mislead the Defendant into believing the evidence does not exist. <u>Ex Parte Wilson</u>, 697 So. 2d 477 (Ala. 1997).

These statements of the law are in conflict and the issue is which holding should be followed on this principle of law.

Petitioner respectfully requests that after preliminary examination, the Writ of Certiorari be granted and that this Court proceed under its rules to review the matters complained of, and to reverse the judgment of the Court of Criminal Appeals, and for such other relief as Petitioner may be entitled.

I certify that I have this day served copies of this petition and the brief on all other parties to the appeal in the Court of Appeals and the Court of Criminal Appeals.

Respectfully   submitted   this   _21$^{s}$_   day   of

November, 2003.


_____
GARY D. BRADSHAW
ATTORNEY FOR APPELLANT
(BRA074)
P. O. BOX 311412
ENTERPRISE, AL  36331
(334) 393-6439

_____
RICHARD (CRACKER) WALDROP
ATTORNEY FOR APPELLANT
ASB-2398-L57R
P.O. BOX 310027
ENTERPRISE, AL  36331
(334) 393-2288

## STATE OF ALABAMA

### SUPREME COURT

### PETITION FOR WRIT OF CERTIORARI AND

### BRIEF OF APPELLANT

| | | |
|---|---|---|
| ROBERT THOMAS CONRAD, | * | CIRCUIT COURT OF COFFEE COUNTY, ALABAMA |
| APPELLANT, | * | |
| | | COURT OF CRIMINAL APPEALS |
| V. | * | CASE NO. CR-02-0333 |
| STATE OF ALABAMA, | * | ALABAMA SUPREME COURT CASE NO. _____ |
| APPELLEE. | * | |

GARY D. BRADSHAW
ATTORNEY FOR APPELLANT
(BRA074)
P. O. BOX 311412
ENTERPRISE, AL  36331
(334) 393-6439

RICHARD (CRACKER) WALDROP
ATTORNEY FOR APPELLANT
ASB-2398-L57R
P.O. BOX 310027
ENTERPRISE, AL  36331
(334) 393-2288

# TABLE OF CONTENTS

Page

Table of Cases and Authorities...........................................................

Statement of the Case and Facts ....................................................

Statement of the Issues Presented for Review .....................

Statement of the Standard of Review .........................................

Summary of the Arguments .............................................................

Arguments ..................................................................................................

Rulings Adverse to the Appellant...............................................

Conclusion ................................................................................................

Certificate of Service ....................................................................

Certification ...........................................................................................

Exhibits ......................................................................................................

## TABLE OF CASES AND AUTHORITIES

Page

Alabama Code of Judicial Ethics, Canons 2 & 3 ........................

Acromag Viking v. Blalock, 420 So.2d 60 (Ala. Civ..............
        App. 1982); affirmed on other grounds, 474
        So.2d 91 (Ala. 1985)

Brady v. Maryland, 373 U.S. 83; 83 S.Ct.1194;................................
        10 L.Ed.2d 215 (1963)

Crowell v. May, 676 So.2d 941, (Ala. Civ. App. 1996)......

Daniels v.State, 762 So.2d 864, 866 ........................................................
        (Ala. Crim. App. 1999)

Ex Parte Duncan, 638 So.2d. 1332, (Ala. 1994)...............................

Ex Parte Monk 557, So.2d 832 (Ala. 1989)..........................................

Ex Parte Wilson, 697 So.2d 477 (Ala. 1997)..............................

Ex Parte Yarber, 375 So.2d 1231, 1324, (Ala. 1979)...........

Grice v. State, 481 So. 2d 449 at 451 .........................................
        (Ala. Cr. App. 1985)

In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625,...
        99 L.Ed 942 (1955) (citations omitted)

Jefferson v. State, 645 So.2d 313 ................................................................
        (Ala. Crim. App. 1994)

Kyles v. Whitley, 514 U.S. 419, 115 S.Ct.1555,..........................
        131 L.Ed.2d 490 (1995)

U.S. v. Agurs, 427 U.S. 97, 96 S.Ct. 2392,.....................................
        49 L.Ed.2d 342 (1976)

United States vs. Phillips, 664 F. 2d 971,..............................
        1002-03 (5th Cir. Unit B 1981).

Wallace, supra ...............................................................................................................

Whetstone v. State, 407 So. 2d 854 at 859 ...............................

(Ala. Cr. App. 1981)

Id. At 859 ................................................................................................................................ .

Wright v. State, 628 So. 2d 1071, (Ala. Crim...................................
        App. 1993)

## **OTHER AUTHORITIES**

Canons of Judicial Ethics, Canon 3, subds. C, C(1).............

Fourteenth Amendment.......................................................................................................

## **EXHIBITS**

Exhibit A – Standing Order issued September 12, 2001

### STATEMENT OF THE CASE AND FACTS

The Appellant, Robert Thomas Conrad, was bound over to the Grand Jury of Coffee County on May 25, 2001 by order of the Coffee County District Court unless a demand for preliminary hearing was made within thirty (30) days from the date of Defendant's arrest. On May 31, 2001 an indictment was returned by the Grand Jury charging the Appellant with Capital Murder and Robbery in the first degree. (CR-6)

The Appellant was arrested the same date the indictment was returned and held without bond pending trial. (CR-8)

Appellant being age 20 at the time of his indictment, filed Application for Youthful Offender Status, through his attorneys of record, (CR-27), which was denied by the Court. (CR-31)

Counsel of record, Bradshaw and Smith, were appointed to represent Appellant and had been actively engaged in the preparation of the case for trial prior to that time.

Trial counsel filed many timely and appropriate discovery motions, (CR-28 thru 119), and the Court issued its standing discovery order, (CR-43,) to the District

The Appellant, Robert Thomas Conrad, was bound over to the Grand Jury of Coffee County on May 25, 2001 by order of the Coffee County District Court unless a demand for preliminary hearing was made within thirty (30) days from the date of Defendant's arrest. On May 31, 2001 an indictment was returned by the Grand Jury charging the Appellant with Capital Murder and Robbery in the first degree. (CR-6)

The Appellant was arrested the same date the indictment was returned and held without bond pending trial. (CR-8)

Appellant being age 20 at the time of his indictment, filed Application for Youthful Offender Status, through his attorneys of record, (CR-27), which was denied by the Court. (CR-31)

Counsel of record, Bradshaw and Smith, were appointed to represent Appellant and had been actively engaged in the preparation of the case for trial prior to that time.

Trial counsel filed many timely and appropriate discovery motions, (CR-28 thru 119), and the Court issued its standing discovery order, (CR-43,) to the District

Attorney's Office to fully comply with the Motion for Discovery heretofore filed by the Appellant's Counsel.

On June 25, 2001, (CR-80), Appellant filed a Motion to Suppress Evidence Seized After an Illegal Arrest and/or Search. On November 19, 2001, Appellant filed his second Motion to Suppress Evidence Seized After and Illegal Arrest and/or Search, (CR-292), and on December 26, 2001, Appellant filed his third Motion to Suppress Evidence Seized After and Illegal Arrest and/or Search. (CR-312)

On December 28, 2001 the Trial Court finally entered its order setting a date, January 21, 2002, as the time to consider all pending un-ruled on motions. (CR-315)

Although ordered to comply with the Appellant's Discovery Motion, the District Attorney's Officer failed to do so and a Motion to Compel was filed by counsel for Appellant on September 4, 2001. (CR-145)  As a result of said Motion, the State of Alabama finally complied with a discovery order on November 2, 2001. (CR-154-270)

In anticipation for trial, counsel for Appellant filed several motions, namely:

> (1)   Motion to Declare the Alabama Capital Sentencing Process Unconstitutional and To Bar Imposition of the Death Penalty

    (2)    Motion to Dismiss the Indictment on the Grounds that the Failure to Specify the Aggravating Circumstances on Which a Death Sentence May be Imposed Violates the Fifth, Sixth, Eighth, and Fourteenth Amendments and State Law

    (3)    Motion to Bar Imposition of the Death Penalty Where the Jury's Role and Factual Determinations are Deemed Advisory

    (4)    Defendant's Fourth Motion to Suppress or, in the Alternative, Motion in Limine to Prohibit the Prosecutor From Displaying to the Jury Certain Inflammatory Evidence

    (5)    Motion for Funds for Court Reporter Transcripts (CR-403 thru 428)

All of which were denied by the Trial Court. (CR-650)

Trial on the issues were joined between the parties on September 23, 2002 and in the late evening hours of September 27, 2002, the jury returned a verdict finding the Appellant guilty of Capital Murder and Robbery in the first degree. (R-1537 and 1539) On that same day, a sentencing hearing was held before the same jury panel. As a result of the sentence hearing, the jury returned a

verdict of 8 to 4 recommending punishment at life without parole. (R-1603)

After the jury returned its recommended sentence, the Court sentenced the Appellant to life without parole on the Capital Murder conviction (R-1615) and to life in the penitentiary for the Robbery 1$^{st}$ degree conviction. (R-1617)

Trial counsel having been re-appointed for purposes of Appellant filed a Motion for New Trial on October 22, 2002 (CR-619), which was denied on December 9, 2002. (CR-651)

On December 13, 2002, trial counsel AL Smith was allowed to withdraw and Attorney Richard (Cracker) Waldrop was appointed to assist trial counsel Gary D. Bradshaw on appeal. (CR-1303)

The record on appeal was certified to trial counsel on May 13, 2002.

This cause is currently before this Court on the basis of the foregoing record.

THE FACTS ELICITED AT TRIAL ARE AS FOLLOWS:

On May 23, 2001, Jelaine Dennis was operating The Toy Store (an adult sex and novelty shop that she owned) on County Road 711, Coffee County, Alabama. Present with Mrs. Dennis in the store that day was a friend of many years, Mr. Robert Ray Grimes.   Between 1:00 and 1:30 p.m., Enterprise Police Officer, Lennis Darby, was dispatched to The Toy Store for an apparent robbery and homicide. (R-521)

Apparently two black males had entered the Toy Store posing as customers when a third person entered the building dressed in all black and carrying a hand gun.  The unidentified suspect made everyone get on the floor, jerked the phone out of the wall and demanded the store's money. (R-570 thru R-575, 581)  Shortly after obtaining the money, shots were fired inside the building and the suspect dressed in all black exited on foot.  Mr. Grimes stated that Jelaine Dennis had been shot and he began to call for help, while witnessing the suspect dressed in all black running up County Road 711. (R-578, R-597)  The two black males that were in the building got into their car and left the scene.  (R-577)  Mr. Grimes was unable to identify whether the suspect dressed in all black was a white or black individual, male or female, even though he claims that the suspect forced him to the ground and robbed him of

thirty dollars. (R-570 thru R-575, R-833) Although testimony and evidence reveal that several shots fired in the building, Mr. Grimes, a long time friend of Dennis and a frequent visitor to The Toy Store, was not aware of any gun that Mrs. Dennis had in the store. (R-581, R-588) Upon arriving at the scene, Officer Lennis Darby, found that the cash register drawer was open and bullet marks were in the floor and a lot of blood was on the floor, in addition to a revolver lying on the floor. (R-527, R-532) Officer Darby initially thought the victim, Jelaine Dennis, was dead, but discovered she was still alive and crying for help and that she had been shot in the chest. (R-525 thru R-527) Officer Lennis Darby did not find any suspects in the building or on the grounds. (R-523 and R-524)

Another Enterprise Police Officer, Michael Petty, was dispatched to the scene and while in route on Alabama Highway 27, he met a known vehicle traveling at an "unnormal" rate of speed on Northbound 27. (R-629 and R-630) Officer Petty recognized the vehicle due to prior police involvement and the vehicle later was identified to be that of Brian Smith.

Officer Jeff Spence was dispatched to the Medical Center Enterprise to follow up on the victim's condition and discovered that second individual (Robert Conrad) was

recently brought in suffering from a gun shot wound. (R-741) Officer Spence also states that the same vehicle witnessed by Officer Petty and belonging to Brian Smith had been seen on County Road 711 that day prior to the shooting. (R-743) The same vehicle was also seen at Medical Center Enterprise at 2:00 p.m. May 23, 2001. (R-743)

Upon conducting an investigation, Officer Richard Hauser determined that a **gun battle** had taken place inside The Toy Store as he had recovered several shell casings of a 9mm and .22 caliber weapon. (R-647 and R-655) The pistol that was recovered from the scene was determined to be a .22 caliber pistol, but never had any owner established or fingerprints lifted. (R-733) This same pistol was linked to a .22 caliber bullet that was removed from the arm of Robert Conrad. (R-733)

Officer Jeff Spence, acting on a search warrant for Brian Yeoman, (co-defendant's apartment) found a 30 round magazine for an assault weapon, 7.62 ammunition, and a 10 round magazine for an assault weapon. The search warrant also uncovered several other weapons in the wooded area near the home of Brian Smith, but the "murder weapon" was never recovered. (R-748 thru R-751, R-753) Testimony was given by Officer Rick Hauser as to the location of the

.22 caliber pistol found at the scene. The State also introduced a diagram showing where this .22 caliber pistol was discovered. However, the Rescue Squad worker, Chris Schwan, testified that when he had entered the scene, the .22 caliber pistol was lying in a different area indicating that it had been moved and/or used after the apparent shooting. (R-656, R-766 thru R-767) While in the emergency room of Medical Center Enterprise, surgery was performed on Defendant Robert Conrad and blood was removed from his body as well as several statements taken from him. Detective Buford Roberts recovered a projectile which was removed from the surgery room. (R-814)

The victim, Jelaine Dennis, was pronounced dead moments after arriving at Medical Center Enterprise emergency room and co-defendants, Brian Smith and Brian yeoman, were later found, detained and questioned at 8:00 p.m. that night at the Enterprise Wal Mart store. Defendant, Robert Conrad, was arrested after ballistic reports matched the bullet in his arm to the gun found at the scene.

While the District Attorney's Office conducted the investigation in to this crime, they received information that the crime had been planned for some time by Defendant Brian Yeoman. An internal affairs

investigation into the Enterprise Police Department was conducted by the Alabama Bureau of Investigation and the Attorney General's Office. (R-907 thru R-910) This investigation centered around whether or not a police officer, with the Enterprise Police Department, held received information from a witness, prior to the robbery and homicide of Jelaine Dennis, that the crime was actually going to take place.

## ISSUES PRESENTED

I.  WHETHER THE TRIAL COURT'S IMPERMISSIBLY CONSIDERING MATTERS OUTSIDE OF THE RECORD IN CONDUCTING THE TRIAL OF APPELLANT CONSTITUTED PLAIN ERROR.

II. WHETHER THE TRIAL COURT COMMITTED RE REVERSIBLE ERROR BY (A) DENYING DEFENDANT'S MOTION TO DISMISS THE CASE AFTER THE COURT'S OWN RULING THAT THE STATE HAD WITHHELD EXCULPATORY AND IMPEACHABLE EVIDENCE AND (B) WHETHER THE TRIAL COURT DENIED ROBERT CONRAD'S CONSTITUTIONAL RIGHT TO A FAIR AND IMPARTIAL TRIAL BY FORCING HIM TO PROCEED AND ALLOWING TESTIMONY OF THE CO-DEFENDANT, BRIAN YEOMAN, WHEN HIS DEFENSE COUNSEL WAS NOT GIVEN EXCULPATORY AND IMPEACHABLE EVIDENCE UNTIL MIDWAY OF THE TRIAL.

## STANDARD OF REVIEW

(1)  The Standard of Review for reviewing claim under the plain error doctrine is whether the error is particularly egregious and if it seriously affects the fairness, integrity or public reputation of judicial proceedings.

(2)  The Standard of Review in this issue is not whether the evidence was exculpatory and impeachable as the trial court had already ruled on that issue, but whether the corrective measures attempted by the trial court offset the damage done to the Defendant's right to a fair trial.

**SUMMARY OF THE ARGUMENT OF ISSUE I**

I.  "Implanted in foundation of public policy is
    general rule that no judge shall preside in
    case in which he is not wholly free,
    disinterested, and independent.

    Under Alabama Canons of Judicial Ethics,
    recusal is required when facts are shown
    which make it reasonable for members of
    public or party, or counsel opposed to
    question impartiality of judge.  Canons of
    Ju. Ethics, Canon 3, subds. C, C(1).

    Question with regard to recusal is not
    whether judge was impartial in fact, but
    whether another person knowing all of
    circumstances, might reasonably question
    judge's impartiality, whether there is an
    appearance of impropriety.  Canons of Jud.
    Ethics, Canon 3, subds. C, C(1)."

    Appellant contends the trial judge's pretrial

remarks (See Attached Exhibit A) that all defendants who

appeared before him in court would receive active

penitentiary time, if they were found guilty or plead

guilty, showed appearance of impartiality, impropriety, and

personal bias warranting the judge's voluntary recusal,

pursuant to judicial ethics rule which requires a judge to

recuse himself in any proceeding in which his impartiality

could reasonably be questioned, was plain error.  See

Canons of Judicial Ethics, Canon 3.C(1)

    The <u>Alabama Code of Judicial Ethics</u>, Canons 2 &

3, indicate that a judge should "adopt the usual and

expected method of doing justice, **rather than being extreme or peculiar in his judgment.**"

The following case is directly on point with the Appellant's contention of the trial court's impartiality,

> "Given the concept of promoting public confidence in the system, Canon 3(C)(1) states that '[a] judge should disqualify himself in a proceeding in which . . . his impartiality might reasonably be questioned' by members of the public, a party, or counsel. See Wallace, supra; Acromag Viking v. Blalock, 420 So.2d 60 (Ala.. Civ. App. 1982); affirmed on other grounds, 474 So.2d 91 (Ala. 1985)."

The trial judge's remarks show pervasive bias, and prejudice and a vindictive attitude, against all individuals who are charged with a violent crime, that are assigned to him.

## SUMMARY OF THE ARGUMENT OF ISSUE II

The State's failure to disclose exculpatory and impeachable evidence denied the Defendant his constitutional right to a fair trial. The State in this matter failed to disclose exculpatory and impeachable evidence to Defendant prior to trial. It is obvious from the records that the State had no intention of ever producing this evidence had they not been caught red handed. These actions constitute a *Brady* violation and the trial court attempted corrective measures to insure the Defendant would have a completely fair trial; however, ordering that the State produce a voluminous file of statements and documents and track down a witness overnight and giving the defense counsels less than an hour to interview and prepare with this witness does not negate the irreparable harm and potential harm of failing to disclose the evidence as was specifically requested. A reasonable probability of a different result is accordingly shown when the Government's evidentiary suppression undermines the evidence as was specifically requested. A reasonable probability of a different result is accordingly shown when the Government's evidentiary suppression undermines confidence in the outcome of the trial. The question is not

whether the Defendant would more likely than not have received a different verdict with the evidence, but whether in its absence [the Defendant] received a fair trial. Bagley, Kyles The Defendant was not allowed the opportunity to prepare a complete defense due to the State's failure to disclose evidence.

## ARGUMENT AS TO ISSUE I

The case of Wright v. State, 628 So. 2d 1071, (Ala. Crim. App. 1993) held that "every accused is entitled to detached neutrality from a judge. Trial judges should refrain from volunteering remarks regarding to sentencing before a finding of guilt has been made and before pre-sentencing considerations are examined. In situations where premature remarks are made, a red flag is raised in regard to potential bias on the part of the judge. In such a case, this Court **must closely review the remarks and conduct of the trial judge to ensure that the accused was, in fact, accorded fairness in all stages of his trial.**"

The Appellant further contends that there is no reasonable basis, under the facts and the standing pre-sentence order, made by the trial judge, from which a reasonable person could not but question the trial judge's impartiality.

The following is found in Crowell v. May, 676 So.2d 941, (Ala. Civ. App. 1996).

> "Canon 3(C)(1) of the Alabama Canons of Judicial Ethics clearly states that "[a]judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned."
> (Emphasis added.) "Therefore, it appears that actual bias is not necessary for a judge to recuse—only a reasonable appearance

of bias or impropriety. The strictest application of this rule may "sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scale of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.'" In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed 942 (1955) (citations omitted). Furthermore, our Supreme Court has written:

"Recusal is required when 'facts are shown which make it reasonable for members of the public or a party, or counsel opposed to question the impartiality of the judge.' … The question is not whether the judge was impartial in facts, but whether another person, knowing all of the circumstances, might reasonably question the judge's impartiality – whether there is an appearance of impropriety."

The case of Ex Parte Duncan, 638 So.2d. 1332,

(Ala. 1994) held the following:

"Implanted in foundation of public policy is general rule that no judge shall preside in case in which he is not wholly free, disinterested, and independent.

Under Alabama Canons of Judicial Ethics, recusal is required when facts are shown which make it reasonable for members of public or party, or counsel opposed to question impartiality of judge. Canons of Ju. Ethics, Canon 3, subds. C, C(1).

Question with regard to recusal is not whether judge was impartial in fact, but whether another person knowing all of circumstances, might reasonably question judge's impartiality, whether there is an appearance of impropriety. Canons of Jud. Ethics, Canon 3, subds. C, C(1)."

The Appellant contends that extra judicial matters were introduced during the hearing of this case.

At the sentence hearing of Defendant, the following exchange took place. (R-1571-1597)

The trial court begins its charge to the jury, during the sentence phase.

During the Court's charge the trial judge explains the requirement that the jury has to find aggravating circumstances to recommend the death penalty.

The Judge's personal bias is clearly evident by the court's repeating twenty one times to the jury that they had already found two aggravating circumstances beyond a reasonable doubt, **or words to that effect,** when explaining how the jury could recommend the death penalty.

The trial judge was doing all he could to get the jury to return a death penalty verdict, which follows his pre-trial attitude and statement about persons convicted of violent crimes.  The statements of the Judge were in such a manner as to indicate that the Judge was biased and indicated the Judge's opinion.

During the course of the trial, the Judge's bias was made evident in the way he aided the prosecution in questioning witnesses. The following occurred at R-876 and again at R-1212 thru R-1213:

"MR. SMITH:    I really hesitate to do this.    Your

Honor, I've known you for many, many years.    I

have the utmost respect for you.    But I have

got to represent my client and interpose an

objection to Your Honor asking questions that

tend to cross over to making the Prosecution's

case.    And the last thing in the world I want

to do is insult the Court or cause anything

that sounds like I don't have absolutely the

utmost respect.    Because I have much respect.

But I have to put in an objection at this time.

And we have to object at this time." (R-876)

Then at R1212 thru 1213:

"THE COURT: When you are referring to the "old

guy," would you look around the courtroom and

see if you see the person that you keep talking

about as "the old guy."    Would you recognize

him again?    You can get up and walk around and

see if you can find him, and point him out if

he's here.

THE WITNESS:    I believe that's him right there.

THE COURT:    Go over in that direction and point out

a little bit better who you are talking about.

(Witness indicating).

> THE COURT:  Okay, Mr. Grimes, why don't you come up
> and we will get you a chair.  You have the
> right to be sitting up here.

> MR. SMITH: Judge, might I ask the Court at this
> point to note a little later at side bar, I
> want to impose some remarks."

Then later at R-1225 trial counsel made the following statement outside the hearing and presence of the jury, requesting that the judge not act as prosecutor.

> "MR. SMITH:  Judge, the point that I put in front
> of Your Honor, I just have to respectfully ask
> the Court to, and it would be an objection to
> Your Honor's questions during the course of
> cross examination of Mr. Yoeman.  I would
> interpose an objection to the questions that
> were asked.

> THE COURT:  Objection is overruled."

The <u>Alabama Code of Judicial Ethics</u>, Canons 2 & 3, indicate that a judge should "adopt the usual and expected method of doing justice, **rather than being extreme or peculiar in his judgment.**"

As the conduct of the sentence hearing has the appearance of impropriety, in what manner was Robert Thomas

Conrad prejudiced.  That is obvious upon examination of the record.

Review of the record clearly indicates the degree of influence and consideration given to the extra judicial statements made by the trial judge.

The procedural safeguards entitled to the defendant were not followed in the present case, and as they were not followed, this case is due to be remanded.

The Appellant contends that the trial judge's pre-sentence standing order that, "Criminal defendants who enter a guilty plea or who are convicted of any act of violence, some active time in custody will be ordered served," showed appearance of impartiality or impropriety, warranting judge's recusal, pursuant to Judicial Ethics Rule requiring a judge to recuse himself in any proceeding in which his impartiality **could** reasonably be questioned. Canons of Judicial Ethics, Canon 3, C.(1)

The Appellant contends that it is a flagrant violation of the Fourteenth Amendment for a state trial judge to announce and follow a pretrial practice of imposing "active time in custody" for all defendant's who plea or are convicted of "any act of violence," regardless of any possible mitigating circumstances involved in the crime committed.

The Appellant submits that the facts before this court and in connection with those presented in this brief demonstrate personal bias on the part of the trial judge. These facts and presentments suggest a form of judicial bias in that the trial judge's pre-sentence remarks could be construed as evidencing a bias against a class of persons, of which the Appellant is a member.

Appellant contends the trial judge's pretrial remarks (See Attached Exhibit A) that all defendants who appeared before him in court would receive active penitentiary time, if they were found guilty or plead guilty, showed appearance of impartiality, impropriety, and personal bias warranting the judge's voluntary recusal, pursuant to judicial ethics rule which requires a judge to recuse himself in any proceeding in which his impartiality could reasonably be questioned, was plain error. See Canons of Judicial Ethics, Canon 3.C(1)

The Appellant further contends that the extra judicial, pre-trial remarks of the trial judge indicated personal bias against all defendants charged with "violent crimes" and it is obvious that it was derived from something other than that which the trial judge learned by participating in the Appellant's case. The trial judge's pre-trial statement (Exhibit A) and his reference to it

clearly indicates that such predetermination to a sentencing posture, i.e. active time in the penitentiary, is prevalent and spread throughout the trial judge's reasoning and thought process involving sentencing, indicates "pervasive bias and prejudice," which is a ground for reversal under the ruling of United States vs. Phillips, 664 F. 2d 971, 1002-03 (5th Cir. Unit B 1981).

The Appellant contends that a reasonable person would conclude from the trial judge's pre-trial statement (Exhibit A) and his sentence hearing statement that the trial judge was personally biased against any defendant who appeared before him being tried for a violent crime, and therefore had a legal obligation to voluntarily recuse himself from presiding over the Appellant's sentencing hearing.

The question is not whether the trial judge was impartial in fact, but whether another person knowing all of the circumstance, might reasonably question the judge's impartiality - - - whether there is an appearance of impropriety.

The Appellant is submitting that this is a case of personal bias and is definitely a case where the trial court's impartiality should reasonably be questioned.

The following case is directly on point with the Appellant's contention of the trial court's impartiality,

> "Given the concept of promoting public confidence in the system, Canon 3(C)(1) states that '[a] judge should disqualify himself in a proceeding in which . . . his impartiality might reasonably be questioned' by members of the public, a party, or counsel. See <u>Wallace</u>, supra; <u>Acromag Viking v. Blalock</u>, 420 So.2d 60 (Ala. Civ. App. 1982); affirmed on other grounds, 474 So. 2d 91 (Ala. 1985)."

The trial judge's remarks show pervasive bias, and prejudice and a vindictive attitude, and state that all individuals who are charged with violent crimes, and are assigned to him, face either acquittal or active jail time, sentenced at the hands of said judge.

## ARGUMENT AS TO ISSUE II

This court stated in Jefferson v. State, 645 So.2d 313 (Ala. Crim. App. 1994) that "the existence of any small piece of evidence favorable to the defense may, in a particular case, create just the doubt that prevents the jury from returning a verdict of guilty." The creditability of witnesses and the weight of probative force of testimony are for the jury to judge and determine. Whether or not the defendant will be acquitted if undisclosed evidence had been provided is not for the court to decide. Daniels v.State, 762 So.2d 864, 866 (Ala. Crim. App. 1999).

During the month preceding the trial of Robert Conrad, his attorneys made specific motions for discovery. (C-33 thru 42) This motion specifically relied on Ex Parte Monk 557, So.2d 832 (Ala. 1989) which states that the possibility of the death penalty creates special circumstances justifying broader discovery in capital cases. This motion for discovery of prosecution files, records and information necessary to a fair trial was filed on June 22, 2001, less than one month after the alleged crime. The motion itself referred to specific documents and materials in the District Attorney's possession especially if they were exculpatory or favorable and went

on to request the entire case file. (C-34, 36, 37, 40) The court issued a discovery order that the state should disclose any and all evidence tending to exculpate the defendant. (C-43) The state proceeded to file its first response to defendant's discovery motion in November 2001, (C-154 thru 270) and thereafter filed ten supplementary responses to discovery. However, none of the responses or supplementary responses contained information and evidence from a certain file being kept by the District Attorney. The court entered an order on May 31, 2002, stating a cut off date for discovery of August 20, 2002, at 9:00 a.m. trial in this case was set for September 23, 2002.

During the course of the trial and on cross examination of Officer Jeff Spence, it was learned that an internal affairs investigation had been conducted regarding possible misconduct of one of its investigators into this crime. (R-907 thru R-910) The potential misconduct of the officer is not at issue here, but the undisclosed file and investigation into potential witnesses and evidence that was accumulated and kept in a separate file is the central issue. These separate file(s) contained material evidence that was both exculpatory and impeachable, but yet was never given to the defense's counsel. After Officer Spence gave his testimony and the court summoned Chief

Investigator, Bruce Devane, to testify and to produce the internal file of the District Attorney's, the court held an in camera hearing with both the prosecutor and the defense attorneys to review the file. It took Circuit Judge Gary McAliley less than five minutes to determine that it contained both exculpatory and impeachable evidence that should have been turned over to the defense counsel. (R-966, R-1000) Circuit Judge, Gary McAliley, went on to rule **absolutely that it was essential** for this file to be provided to the defense. (R-956)

It became apparent, after the jurors were dismissed and further testimony was taken, that District Attorney Mark Fuller made the decision to not disclose the evidence. (R-937, R-943) However, District Attorney Mark Fuller, Chief Investigator Bruce Devane, and Prosecutor Glenda Stout, made a joint decision after a several hour meeting on the Tuesday, prior to the trial beginning on a Monday, that this information would not be disclosed to defense counsels. (R-934, R-935) Instead of choosing to file the material in camera and get a ruling from the court, this separate file was maintained in a locked filing cabinet marked "sensitive matters" with the only key belonging to District Attorney Mark Fuller, Chief Investigator Bruce Devane, and his personal secretary. (R-

935, R-939)    The District Attorney was not even sure if discussion was had concerning filing the material in camera for a decision from the court on the possibility of it being exculpatory.

The information contained in the file revealed that a George Roberson had informed Officer Rick Hauser of the Enterprise Police Department over a week before the crime that certain individuals were planning to rob The Toy Store.    Although Officer Hauser confirmed that Roberson gave him this information, he contends that Roberson gave it to him two to three days after the crime.    (R-947 thru R-950)    The information contained in the non-disclosed file shows that co-defendant Brian Yeoman worked for Roberson at Kentucky Fried Chicken and told him that he had been planning to do a job like robbing The Toy Store for a while.    (R-952)    Roberson had also given information to the police about the attempted robbery of the Kentucky Fried Chicken store where he worked that may have involved the co-defendant in this case.    Many interviews were conducted with Roberson and several recorded statements were contained in the file.    (R-933)    In addition, other names were given to the District Attorney's Office of potential suspects, namely a Steve Brown.    (R-960)    Roberson alleged that Steve Brown was a co-conspirator along with co-

defendant, Brian Yeoman. The District Attorney's Office considered George Roberson as a witness in the case against Robert Conrad as indicated by their notes of June 15, 2001, and July 10, 2001. (R-991)

The District Attorney's Office recused themselves and sought the aid of the Alabama Bureau of Investigation and the Attorney General's Office, but still failed to disclose any of this information to defense counsels. Their failure to disclose prevented defense counsels from acquiring potential favorable evidence from the Alabama Bureau of Investigation and/or the Attorney General's Office. The Prosecutors, Stout and Jarrell, claimed they had no knowledge of the exculpatory and impeachable evidence or the "sensitive" file until the Tuesday prior to the trial beginning on Monday. They cannot escape the fact that they are the State and they are under the umbrella of the court's order to disclose all information. In <u>Kyles v. Whitley</u>, 514 U.S. 419, 115 S.Ct.1555, 131 L.Ed.2d 490 (1995), the Supreme Court stated the prosecution may be deemed to have suppressed evidence even though no prosecutor actually knew the existence of evidence until after trial. In other words, "the prosecutor anxious about tacking to close to the wind will disclose a favorable piece of evidence." A prosecutor's lack of knowledge of

exculpatory evidence does not necessarily eliminate the prosecution's responsibility to disclose the evidence, because the *Brady rule* is framed in a matter that permits its application to evidence of which the prosecution might be ignorant. The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83; 83 S.Ct.1194; 10 L.Ed.2d 215 (1963).

The United States Supreme Court has stated that when the prosecutor receives a specific and relevant request that failure to make any response is seldom, if ever, excusable. U.S. v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) The rationale behind this rule rests on the principal that a specific request puts the prosecution on notice of what evidence that the Defendant desires, thus alleviating the prosecution the burden of determining what might be and what might not be relevant to the defense. On the other hand, the failure of the prosecution to turn over specifically requested evidence, to which no objection is filed, could mislead the Defendant into believing the evidence does not exist. Ex Parte Wilson, 697 So.2d 477 (Ala. 1997)

As stated earlier, the argument is not whether the evidence withheld by the state was exculpatory or impeachable in nature as the court ruled that very specifically. However, you must look to the corrective action taken by the court to remedy the wrong of the State. As set out earlier, this discovery request was specific and noted that the death penalty was possible punishment for the Defendant. After a determination that the State had withheld exculpatory and physical evidence, the court ordered the material copied and given to the defense counsels and issued a bench subpoena for witness George Roberson. It was determined that Mr. Roberson was in Colorado, but the state secured his presence at the following day's testimony. The defense counsels were allowed less than one hour to interview Mr. George Roberson and glean whatever information they could from this witness; however, defense counsels were unable to leave the courtroom in an attempt to interview witness Steve Brown, and the mysterious Alex that Mr. Roberson testified about. This defendant does not find that the trial court corrected the potential fatal error of the prosecution by producing Mr. Roberson to testify. There was not enough time in the midst of the trial (in a trial that went to 7:00 and 9:00 p.m. every night) to follow up on all of the evidence

brought out in the exculpatory material. To simply ask the shoplifter to go back in the store and replace the item that he had stolen does not produce justice and in this case, forcing the District Attorney to produce the evidence they so strongly attempted to conceal did not in any way provide a fair trial for the Defendant. Conrad was prejudiced by not being able to investigate and prepare evidence to rebut co-defendant's, Brian Yeoman, testimony and the corrective action attempted by the court. Although well intentioned, was inadequate in correcting the prosecutor's failure to produce exculpatory evidence. The Defendant's Motion to Dismiss should have been granted and/or their motion requesting that Brian Yeoman not be allowed to testify should have been granted. (R-1002, R-1004) This court stated in its ruling of exculpatory evidence that it had found forty something pieces of exculpatory evidence in another file of a separate capital murder case by this same 12th Circuit District Attorney's Office. (R-1001 thru R-1002) What incentive is there to abide by the rules of court when there are no repercussions for their violations?

## SUMMARY OF RULINGS AND
## ACTIONS ADVERSE TO APPELLANT

| Transcript Page Number | Summary |
|---|---|
| CR-31 & 32 | Motion for Defendant to Physically go to the Crime Scene with Defendant's Attorney, denied by Trial Court |
| CR-120 | Motion for Order Permitting Discovery of Transcript, Exhibits, Other Memorialization of the Grand Jury Proceedings, and List of Grand Jury members, denied in part by Trial Court |
| CR-121 | Defendant's Motion to Depose the State's Expert Witness, denied by the Trial Court |
| CR-123 | Defendant's Motion to Dismiss the Indictment on Grounds that the Grand Jury was Improperly Impaneled, denied by the Trial Court |
| CR-126 | Defendant's Motion that Venire Members Be Sent Questionnaire Attached to His "Motion for Jury Questionnaire," denied by the Trial Court |
| CR-127 | Defendant's Motion to Suppress Evidence Seized After An Illegal Arrest/or Search, denied by the Trial Court |
| CR-128 | Defendant's Motion to Reveal the Identity of Informants, denied by Trial Court |
| CR-310 | Defendant's Motion for Treatment as Youthful Offender, denied by Trial Court |

| | |
|---|---|
| CR-547-548 | Defendant's Motion for Funds for Court Reporter Transcripts, denied by Trial Court |
| CR-628 | Defendant's Motion for New Trial/Supplemental Motion for New Trial, denied by Trial Court |
| CR-649 | Defendant's Motion for Mental Evaluation, denied by Trial Court |
| CR-650 | Defendant's Motion to Dismiss the Indictment on the Grounds – The Failure to Specify the Aggravating Circumstances on Which the Death Penalty May Be Imposed, denied by Trial Court |
| CR-650 | Defendant's Motion to Declare the Alabama Capital Sentencing Process Unconstitutional, denied by Trial Court |
| CR-650 | Defendant's Motion to Bar Imposition of Death Penalty, denied by Trial Court |
| CR-650 | Defendant's Motion in Limine to Exclude Photographs, denied by Trial Court |
| CR-983 | Trial Court Denied Defendant's Requested Jury Charge #2 |
| CR-984 | Trial Court Denied Defendant's Requested Jury Charge #3 |
| CR-985 | Trial Court Denied Defendant's Requested Jury Charge #4 |
| CR-986 | Trial Court Denied Defendant's Requested Jury Charge #5 |
| CR-987 | Trial Court Denied Defendant's Requested Jury Charge #6 |

| | |
|---|---|
| CR-993 | Trial Court Denied Defendant's Requested Jury Charge #10 |
| CR-998 | Trial Court Denied Defendant's Requested Jury Charge #12 |
| CR-1006 | Trial Court Denied Defendant's Requested Jury Charge #19 |
| CR-1008 | Trial Court Denied Defendant's Requested Jury Charge #20 |
| CR-1016 | Trial Court Denied Defendant's Requested Jury Charge #26 |
| R-117 | Defendant's exception to Potential Juror #37, denied by the Trial Court |
| R-119 | Defendant's objection to Potential Juror #13, overruled by the Trial Court |
| R-181-183 | Defendant's objection to Potential Juror #67, overruled by the Trial Court |
| R-375 | Defendant's challenge to Potential Juror #167, denied by the Trial Court |
| R-453 | Defendant's objection to State's challenge to Potential Juror 111, overruled the Trial Court |
| R-455 | Defendant's challenge to Potential Juror #179, denied by the Trial Court |
| R-513 | State's objection sustained alleging counsel for Defendant was giving an incorrect statement of the law |
| R-642 | Trial Court overruled Defendant's objection Re: Hearsay |

R-649                          Trial        Court        overruled
                               Defendant's    objection    Re:
                               testimony's   prejudicial   effect
                               out weighs the probative value

R-663                          Trial        Court        overruled
                               Defendant's  objection  to   the
                               witness's feelings

R-732                          Trial        Court        overruled
                               Defendant's objection to leading
                               questions

R-733                          Trial        Court        overruled
                               Defendant's objection to leading
                               questions

R-744                          Trial        Court        overruled
                               Defendant's   objection   to   the
                               arrival  of  a  vehicle  at  the
                               hospital

R-794                          Trial        Court        overruled
                               Defendant's   objection   to   the
                               admissibility of State's Exhibit
                               #7

R-845                          Trial        Court        overruled
                               Defendant's   objection   to   the
                               admissibility of State's Exhibit
                               #8

R-845-846                      Trial        Court        overruled
                               Defendant's   objection   to   the
                               admissibility of State's Exhibit
                               #31

R-890                          Trial        Court        overruled
                               Defendant's    objection      to
                               witness's   lack   of   personal
                               knowledge

R-918 & 1002                   Trial  Court  denied  Defendant's
                               Motion  for  Dismissal  based  on
                               the   imputed   knowledge   of   the
                               District  Attorney's  Office  Re:

|              | exculpatory and impeachable information not produced to the defense in discovery as ordered by the Court |
|--------------|--------------------------------------------------------------------------------------------------------------|
| R-1004       | Trial Court overruled Defendant's Motion to Prohibit from Calling Co-Defendant, Bryan Yoeman, to Testify for Failure of State to Produce Exculpatory and Impeachable Material |
| R-1009 & 1011 | Trial Court overruled Defendant's objection to missing link in chain of custody Re: State's Exhibit #26(a) and gave Defendant a standing objection to said matter |
| R-1041       | Trial Court overruled Defendant's standing objection |
| R-1046, 1059, 1061 | Trial Court denied Defendant's Motion to Exclude State's Exhibit #25 |
| R-1066       | Trial Court overruled Defendant's standing objection |
| R-1084       | Trial Court overruled Defendant's objection to admitting State's Exhibit #11(a-e) |
| R-1088       | Trial Court overruled Defendant's objection to State's Exhibit #25 |
| R-1107       | Trial Court overruled Defendant's standing objection to Exhibit #26 being entered into evidence |
| R-1136       | Trial Court overruled Defendant's Motion to Exclude Testimony of Witness Yoeman |

| R-1141 | Trial Court overruled Defendant's objection over Court allowing witness to elaborate his answer |
| --- | --- |
| R-1174 | Trial Court sustained State's objection Re: Hearsay |
| R-1176 | Trial Court sustained State's objection Re: Hearsay |
| R-1225 | Trial Court overruled Defendant's objection to Court asking questions of witness, co-defendant, during course of defense's cross examination |
| R-1230 | Trial Court sustained State's objection Re: question being argumentative |
| R-1241 | Trial Court sustained State's objection Re: Hearsay |
| R-1246 | Trial Court overruled Defendant's objection Re: question being asked and answered |
| R-1254 & 1255 | Trial Court denied Defendant's Motion for Judgment of Acquittal after State rested its case |
| R-1265 | Trial Court overruled Defendant's objection Re: probative value out weighs prejudicial effect |
| R-1273 | Trial Court sustained State's objection Re: leading witness |
| R-1279 | Trial Court sustained State's objection Re: relevancy |
| R-1280 | Trial Court sustained State's objection Re: argumentative question |

R-1290

Trial Court overruled Defendant's objection Re: type of subpoena issued

R-1324 & 1325

Trial Court denied Defendant's Motion for Acquittal at the close of all the evidence

R-1528

Defendant's objection to Trial Court not giving his requested jury charges, denied by the Trial Court

R-1550

Trial Court overruled Defendant's standing objection that were made in the guilt phase of trial

R-1598

Trial Court overruled Defendant's objection to the jury finding two aggravating circumstances and objection to the non-innocent verdict

## CONCLUSION

For reasons stated herein, the judgment of the trial court is due to be reversed and reversed and remanded for a new trial.

Respectfully submitted this 21ˢᵗ day of November, 2003.

Gary D. Bradshaw
Attorney For Appellant
(BRA074)
P. O. Box 311412
Enterprise, Al  36331
(334) 393-6439

Richard (Cracker) Waldrop
Attorney For Appellant
ASB-2398-L57R
P. O. Box 310027
Enterprise, Al  36331
(334) 393-6439

## CERTIFICATE OF SERVICE

We, Richard (Cracker) Waldrop and Gary D. Bradshaw, do hereby certify that we have served a copy of the above and foregoing by placing a copy of same in the United States Mail, postage prepaid, and properly addressed to:

William Pryor, Jr.
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130

This is the _21st_ day of _November_ , 2003.


Gary D. Bradshaw
Attorney For Appellant

Richard (Cracker) Waldrop
Attorney For Appellant

## CERTIFICATION

We, Gary D. Bradshaw and Richard (Cracker) Waldrop, do hereby certify that access to equipment capable of producing Courier New 13 font is not reasonably available and that the font style used constitutes the closest approximation of Courier New 13 under the circumstances.

This is the 21ˢᵗ day of November, 2003.

_____          _____
Gary D. Bradshaw                  Richard (Cracker) Waldrop
Attorney for Appellant            Attorney for Appellant

**GARY McALILEY**
CIRCUIT JUDGE

LY JOHNSON
al Assistant

TWELFTH JUDICIAL CIRCUIT OF ALABAMA
P.O. BOX 310306
ENTERPRISE, ALABAMA 36331-0306
(334) 347-4785
FAX (334) 347-3761

SHEILA HANSON
Official Court Reporter

September 12, 2001

## TO: ALL ATTORNEYS WHO PRACTICE CRIMINAL LAW IN THE 12$^{TH}$ CIRCUIT, STATE OF ALABAMA

*RE:   Crimes involving ACTS OF VIOLENCE*

    *Each of you are hereby advised that when representing criminal defendants who enter a guilty plea to or who are convicted of ANY ACT OF VIOLENCE, some active time in custody WILL BE ORDERED SERVED. The undersigned makes known that in the future WHEN SENTENCING CRIMINAL DEFENDANTS WHO ARE PROVEN TO HAVE ENGAGED IN ANY UNLAWFUL ACT OF VIOLENCE, this Judge WILL NOT BE BOUND by any sentence "settlement agreement" reached between the Office of the District Attorney, the Defendant and Defendant's attorney. In cases involving acts of violence, the appropriate sentence will be determined by this Judge. (I realize this policy will cause fewer guilty pleas and more jury trials. However, I strongly feel, this added work is a small price to pay for the improved safety of our citizens.)*

    *The undersigned will continue to consider sentence recommendations/agreements reached between the Office of the District Attorney, Defendant and Defendant's counsel in cases that are NON VIOLENT OFFENSES.*

    *I feel certain each of you would agree, it is time we take all actions necessary to deter any unlawful act of violence.*

                       *Yours very truly,*

                       Gary L. McAliley
                       Circuit Judge

EXHIBIT "A"

46

# IN THE SUPREME COURT OF ALABAMA

PAGE 47531



January 16, 2004

## 1030311

Ex parte Robert Thomas Conrad.  PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS  (In re: Robert Thomas Conrad v. State of Alabama)   (Enterprise Division of Coffee Circuit Court: CC01-179; CC01-180; Criminal Appeals : 020333).

## <u>CERTIFICATE OF JUDGMENT</u>

### <u>Writ Denied</u>

The above cause having been duly submitted, IT IS CONSIDERED AND ORDERED that the petition for writ of certiorari is denied.

**Writ Denied - No Opinion**

HOUSTON, J. - Lyons, Johnstone, Woodall, and Stuart, JJ., concur.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court of Alabama, do hereby certify that the foregoing is a full, true and correct copy of the instrument(s) herewith set out as same appear(s) of record in said Court.

Witness my hand this _16th_ day of _January,   2004_

*Robert D Esdale Sr*

**Clerk, Supreme Court of Alabama**



STATE'S EXHIBIT
H
PENGAD 800-631-6989

/tr

# COPY

COURT OF CRIMINAL APPEALS NO. _05 – 1913_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM   ENTERPRISE DIVISION

## CIRCUIT COURT OF ___COFFEE___ COUNTY, ALABAMA

CIRCUIT COURT NO.   CC-2001-179.60 & CC-2001-180.60

CIRCUIT JUDGE   JEFF W. KELLEY

**FILED**

AUG – 3 2006

_____ 8/9/06

CLERK
ALA COURT CRIMINAL APPEALS

Type of Conviction / Order Appealed From: __DENIAL OF RULE 32__

Sentence Imposed: _____N/A_____

Defendant Indigent:  ☒ YES  ☐ NO

ROBERT T CONRAD  AIS # 226791

**NAME OF APPELLANT**

(Appellant's Attorney)
3700 HOLMAN UNIT (5-156)                    (Telephone No.)
(Address)
ATMORE, ALABAMA 36503
(City)              (State)              (Zip Code)

## STATE OF ALABAMA

V.

(State represented by Attorney General)
**NOTE:** If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

**NAME OF APPELLEE**

_____

_____

(For Court of Criminal Appeals Use Only)



PBII&AD 800-631-6989

**STATE'S
EXHIBIT**

_I_

# INDEX TO CLERK'S RECORD

PAGE NO.

IN FORMA PAUPERIS DECLARATION...........................................1 - 3

PETITION FOR RELIEF FROM CONVICTION OR SENTENCE...............4 - 35

MOTION FOR PRE-ACTION DISCOVERY.......................................36 – 38

MOTION FOR AN EVIDENTIARY SUBMISSION..............................39 – 43

STATE'S RESPONSE TO PETITIONER'S MOT FOR PRE-ACTION DISC..44 - 45

PETITIONER'S RESPONSE TO STATE'S RESPONSE TO PETITION'S

MOTION FOR PRE-ACTION DISCOVERY.......................................46 - 52

MOTION FOR DISCLOSURE AN INCAMERA INSPECTION OF GRAND

JURY TESTIMONY................................................................53 - 56

MOTION FOR APPOINTMENT OF COUNSEL.....................................57 - 58

STATE'S RESPONSE TO PETITIONER'S MOTION FOR DISCLOSURE

AND IN CAMERS INSPECTION OF GRAND JURY TESTIMONY...........59 - 60

WESTLAW (PAGE 2 THRU 25).....................................................61 - 84

STATE'S ANSWER/RESPONSE TO RULE 32 PETITION FOR RELIEF

FROM CONVICTION OR SENTENCE.............................................85 - 109

ORDER..............................................................................110

ORDER..............................................................................111

MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DISTRICT

ATTORNEY'S ANSWER AND TO ALLOW TIME TO AMEND...............112 - 114

MOTION TO AMEND PETITION FOR POSTCONVICTION RELIEF

PURSUANT TO RULE 32 AL RULES CRIMINAL PROCEDURE.............115 – 122

MOTION TO STRIKE STATE'S PLEADING.....................................123 – 124

MOTION FOR APPOINTMENT OF COUNSEL...................................125 – 126

MOTION FOR IINQUIRY PURSUANT TO RULE 77(b) a.r.civ.p.............127 – 128

STATE'S ANSWER/RESPONSE TO PETITION'S AMENDED RULE 32

PETITION FOR RELIEF FROM CONVICTION OR SENTENCE...............129 – 136

ORDER..............................................................................136

ORDER..............................................................................137

MOTION FOR POSTCONVICTION DISCOVERY...............................138 – 140

ORDER.................................................................................141

NOTICE OF INTENT TO SERVE SUBPOENA ON NON-PARTY..............142 – 145

ORDER.................................................................................145

SUBPOENA REQUEST FORM...................................................146

CIVIL SUBPOENA FOR PRODUCTION OF DOCUMENTS, UNDER

RULE 34(b) (2).......................................................................147 – 149

AMENDMENT OF RULE 32 PETITION..........................................150 – 154

STATE'S RESPONSE TO PETITIONER'S SECOND AMENDED RULE 32

PETITION..............................................................................155 – 156

WESTLAW (PAGE 2 THRU 9)....................................................157 – 164

WESTLAW (PAGE 2 THRU 10)...................................................165 – 173

ORDER.................................................................................174 – 175

MOTION TO TRANSFER PRISONER............................................176 – 177

COPY OF CORRESPONDENCE TO MR. HOLLINGSWORTH.................178 – 180

ORDER TO TRANSPORT DEF.....................................................181

ORDER DENYING RULE 32 PETITION.........................................182 – 192

ATTORNEY'S FEE DECLARATION...............................................193 – 208

MOTION TO ALTER, AMEND OR VACATE JUDGEMENT....................209 – 212

ORDER.................................................................................213

CASE ACTION SUMMARY.........................................................214 – 215

NOTICE OF APPEAL................................................................216

DOCKETING STATEMENT.........................................................217

REPORTER'S TRANSCRIPT ORDER............................................218

NOTICE OF APPEAL BY TRIAL COURT CLERK...............................219

CORRESPONDENCE FROM DEFENDANT.......................................220

CORRESPONDENCE TO COURT OF CRIMINAL APPEALS..................221

COUNSEL'S MOTION TO WITHDRAW...........................................222 – 224

ORDER GRANTING COUNSEL'S MOTION TO WITHDRAW..................225

CERTIFICATE OF COMPLETION AND TRANSMITTAL OF RECORD

ON APPEAL BY TRIAL CLERK...................................................226

Case Number

CC - 01 - 179
CC - 01 - 180

ID   YR   NUMBER
(To be completed
by Court Clerk)

# IN FORMA PAUPERIS DECLARATION

In the Circuit Court of Coffee County Alabama
[Insert appropriate court]

Robert T. Cowean
(Petitioner)

vs.

State of Alabama
(Respondent(s)

## DECLARATION IN SUPPORT OF REQUEST TO PROCEED
## IN FORMA PAUPERIS

I, Robert T. Cowead _____ declare that I am the petitioner in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs, or give security therefor, I state that because of my poverty I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.

1.  Are you presently employed?    Yes _____    No ✓

    a.  If the answer is "yes", state the amount of your salary or wages per month, and give the name and address of your employer.

    _____N/A_____

    _____

    b.  If the answer is "no", state the date of last employment and the amount of the salary and wages per month which you received.

    _____10/2002 - 27.00 hr_____

    _____

2.  Have you received within the past twelve months any money from any of the following sources?

    a.  Business, profession, or other form of self-employment?

        Yes _____        No ✓

    b.  Rent payments, interest, or dividends?

        Yes _____        No ✓

    c.  Pensions, annuities, or life insurance payments?

        Yes _____        No ✓

    d.  Gifts or inheritances?

        Yes _____        No ✓

    e.  Any other sources?

        Yes ✓        No _____

2

If the answer to any of the above is "yes", describe each source of money and state the amount received from each during the past twelve months.

Money order from family. See Attached Receipt.

3. Do you own cash, or do you have money in a checking or savings account?

Yes ✔          No _____

(Include any funds in prison accounts.)

If the answer is "yes", state the total value of the items owned.

See Attached Receipt.

4. Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing)?

Yes _____          No ✔

If the answer is "yes", describe the property and state its approximate value.

N/A

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support.

N/A

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on _____

(Date)

Robert T. Cowen
Signature of Petitioner

CERTIFICATE

I hereby certify that the petitioner herein has the sum of $ 0.48 on account to his credit at the institution where he is confined. I further certify that petitioner likewise has the foregoing securities to his credit according to the records of said _____ Holman _____ institution:

12-16-04
DATE

C. Gray
AUTHORIZED OFFICER OF INSTITUTION

Rule 32

3

## STATE OF ALABAMA
## DEPARTMENT OF CORRECTIONS
## HOLMAN CORRECTIONAL FACILITY

AIS #: 226791    NAME: CONRAD, ROBERT THOMAS    AS OF: 12/16/2004

| MONTH | # OF DAYS | AVG DAILY BALANCE | MONTHLY DEPOSITS |
|-------|-----------|-------------------|------------------|
| DEC | 15 | $20.52 | $40.00 |
| JAN | 31 | $10.41 | $50.00 |
| FEB | 28 | $100.78 | $255.00 |
| MAR | 31 | $68.14 | $0.00 |
| APR | 30 | $25.29 | $70.00 |
| MAY | 31 | $9.47 | $40.00 |
| JUN | 30 | $15.50 | $50.00 |
| JUL | 31 | $9.42 | $80.00 |
| AUG | 31 | $5.28 | $40.00 |
| SEP | 30 | $11.03 | $40.00 |
| OCT | 31 | $20.56 | $90.00 |
| NOV | 30 | $42.22 | $80.00 |
| DEC | 16 | $13.81 | $0.00 |

# PETITION FOR RELIEF FROM
# CONVICTION OR SENTENCE

### (Pursuant to Rule 32,
### Alabama Rules of Criminal Procedure)

4

**Case Number**

| CC | 01 | 179 |
| CC | 01 | 180 |
| ID | YR | NUMBER |

IN THE _____ Circuit _____ COURT OF _Coffee County_, ALABAMA

_Robert Thomas Conrad_ vs. _State of Alabama_
Petitioner (Full Name)                    Respondent

[Indicate either the "State" or,
if filed in municipal court, the
name of the "Municipality"]

Prison Number _226791X_          Place of Confinement _Holman Corr. Fac_

County of conviction _____Coffee_____

**NOTICE: BEFORE COMPLETING THIS FORM, READ CAREFULLY
THE ACCOMPANYING INSTRUCTIONS.**

1. Name and location (city and county) of court which entered the judgment of conviction
   or sentence under attack _Circuit Court of Coffee County Enterprise_
   _Alabama_

2. Date of judgment of conviction _9/27/02_

3. Length of sentence _Life without Parole and Life cc_

4. Nature of offense involved (all counts) _Capital Murder (committed during a_
   _Robbery or an Attempt thereof) and Robbery in the first_
   _degree_

5. What was your plea? (Check one)
   (a) Guilty _____
   (b) Not guilty _✓_
   (c) Not guilty by reason of mental disease or defect _____
   (d) Not guilty and not guilty by reason of mental disease or defect _____

5

6.  Kind of trial: (Check one)

    (a)   Jury _____✓_____          (b)   Judge only _____

7.  Did you testify at the trial?

    Yes _____          No ___✓___

8.  Did you appeal from the judgment of conviction?

    Yes __✓____          No _____

9.  If you did appeal, answer the following:

    (a)   As to the state court to which you first appealed, give the following information:

        (1)   Name of court   _Court of Criminal Appeals State of Alabama_

        (2)   Result   _Affirmed_

        (3)   Date of result _____

    (b)   If you appealed to any other court, then as to the second court to which you appealed, give the following information:

        (1)   Name of court   _Court of Criminal Appeals_

        (2)   Result   _Overruled_

        (3)   Date of result _____

    (c)   If you appealed to any other court, then as to the third court to which you appealed, give the following information:

        (1)   Name of court   _Alabama Supreme Court_

        (2)   Result   _Denied_

        (3)   Date of result _____

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?

Yes _____          No ✓

11. If your answer to Question 10 was "yes", then give the following information in regard to the first such petition, application, or motion you filed:

(a) (1) Name of court _____

(2) Nature of proceeding _____ N/A _____

(3) Grounds raised _____

_____

_____

_____

_____

(attach additional sheets if necessary)

(4) Did you receive an evidentiary hearing on your petition, application, or motion?

Yes _____          No _____

(5) Result _____ N/A _____

(6) Date of result _____

(b) As to any second petition, application, or motion, give the same information:

(1) Name of court _____

(2) Nature of proceeding _____

(3) Grounds raised _____ N/A _____

_____

_____

_____

(attach additional sheets if necessary)

(4) Did you receive an evidentiary hearing on your petition, application, or motion?

Yes _____          No _____

(5) Result _____ N/A _____

(6) Date of result _____ N/A _____

(c) As to any third petition, application, or motion, give the same information (attach additional sheets giving the same information for any subsequent petitions, applications, or motions):

(1) Name of court _____ N/A _____

3

(2)   Nature of proceeding _____

(3)   Grounds raised _____

_____

_____ *N/A* _____

_____

(attach additional sheets if necessary)

(4)   Did you receive an evidentiary hearing on your petition, application, or motion?

Yes _____                    No _____

(5)   Result _____

(6)   Date of result _____ *N/A* _____

(d)   Did you appeal to any appellate court the result of the action taken on any petition, application, or motion?

(1)   First petition, etc.            Yes _____                    No _____

(2)   Second petition, etc.        Yes _____                    No _____

(2)   Third petition, etc.          Yes _____                    No _____

**ATTACH ADDITIONAL SHEETS GIVING THE SAME INFORMATION
FOR ANY SUBSEQUENT PETITIONS, APPLICATIONS, OR MOTIONS.**

(e)   If you did not appeal when you lost on any petition, application, or motion, explain briefly why you did not:

_____

_____ *N/A* _____

_____

12.   Specify every ground on which you claim that you are being held unlawfully, by placing a check mark on the appropriate line(s) below and providing the required information. Include <u>all</u> facts. If necessary, you may attach pages stating additional grounds and the facts supporting them.

# GROUNDS OF PETITION

**Listed below are the possible grounds for relief under Rule 32. Check the ground(s) that apply in your case, and follow the instruction under the ground(s):**

✓   A.   <u>The Constitution of the United States or of the State of Alabama requires a new trial, a new sentence proceeding, or other relief.</u>

For your information, the following is a list of the most frequently raised claims of constitutional violation:.

4

(1) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(2) Conviction obtained by use of coerced confession.

(3) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(4) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(5) Conviction obtained by a violation of the privilege against self-incrimination.

(6) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(7) Conviction obtained by a violation of the protection against double jeopardy.

(8) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

X (9) Denial of effective assistance of counsel.

+(10) Denial of effective assistance of Appellate counsel.

This list is not a complete listing of all possible constitutional violations.

If you checked this ground of relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each constitutional violation that you claim, whether or not it is one of the nine listed above, and include under it each and every fact you feel supports this claim. Be specific and give details.

B. **The court was without jurisdiction to render the judgment or to impose the sentence.**

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

C. **The sentence imposed exceeds the maximum authorized by law, or is otherwise not authorized by law.**

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

D. **Petitioner is being held in custody after his sentence has expired.**

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

E. **Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:**

**The facts relied upon were not known by petitioner or petitioner's counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to rule 24, or in time to be included in any previous collateral proceeding, and could not have been discovered by any of those times through the exercise of reasonable diligence; and**

**The facts are not merely cumulative to other facts that were known; and**

9

The facts do not merely amount to impeachment evidence; and

If the facts had been known at the time of trial or sentencing, the result would probably have been different; and

The facts establish that petitioner is innocent of the crime for which he was convicted or should not have received the sentence that he did.

      If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____ F.  **The petitioner failed to appeal within the prescribed time and that failure was without fault on petitioner's part.**

      If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

13.  **IMPORTANT NOTICE REGARDING ADDITIONAL PETITIONS RULE 32.2(b) LIMITS YOU TO ONLY ONE PETITION IN MOST CIRCUMSTANCES. IT PROVIDES:**

> "**Successive Petitions**. The court shall not grant relief on a second or successive petition on the same or similar grounds on behalf of the same petitioner. A second or successive petition on different grounds shall be denied unless the petitioner shows both that good cause exist why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice."

A.  Other than an appeal to the Alabama Court of Criminal Appeals or the Alabama Supreme Court, have you filed in state court any petition attacking this conviction or sentence?

      Yes _____           No  ✔

B.  If you checked "Yes," give the following information as to earlier petition attacking this conviction or sentence:

     (a)  Name of court _____ *N/A* _____

     (b)  Result _____

     (c)  Date of result _____
           (attach additional sheets if necessary)

C.  If you checked the "Yes" line in 13A, above, and this petition contains a different ground or grounds of relief from an earlier petition or petitions you filed, attach a separate sheet or sheets labeled: "EXPLANATION FOR NEW GROUND(S) OF RELIEF."

      On the separate sheet(s) explain why "good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and [why the] failure to entertain [this] petition will result in a miscarriage of justice."

14.  Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

      Yes _____           No _____ ✔

6

15. Give the name and address, if known, of each attorney who represented you at the following stages of the case that resulted in the judgment under attack:

(a) At preliminary hearing __AL SMITH P.O. Drawer 389 ENTERPRISE. ALABAMA 36331__
__GARY BRADSHAW P.O. Box 311412 ENTERPRISE. ALABAMA 36331__

(b) At arraignment and plea __SAME AS ABOVE__

(c) At trial __SAME AS ABOVE__

(d) At sentencing __SAME AS ABOVE__

(e) On appeal __GARY BRADSHAW P.O. Box 311412 ENTERPRISE. ALABAMA 36331__
__Richard Waldrop P.O. Box 310027 ENTERPRISE. ALABAMA 36331__

(f) In any post-conviction proceeding __PRO-SE__

(g) On appeal from adverse ruling in a post-conviction proceeding _____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?

Yes __✓__          No _____

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes _____          No __✓__

(a) If so, give name and location of court which imposed sentence to be served in the future: _____
__N/A__

(b) And give date and length of sentence to be served in the future: _____
__N/A__

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes _____          No __✓__

18. What date is this petition being mailed?          __1/7/95__

Wherefore, petitioner prays that the court grant petitioner relief to which he may be entitled in this proceeding.

7

# PETITIONER'S VERIFICATION UNDER OATH SUBJECT TO PENALTY FOR PERJURY

I swear (or affirm) under penalty of perjury that the foregoing is true and correct.

Executed on _____12-27-04_____
                    (Date)

_____
Signature of Petitioner

SWORN TO AND SUBSCRIBED before me this the _27_ day of __December__, _2004_.

_____
Notary Public
My Commission Expires July 17, 2008

## OR *

## ATTORNEY'S VERIFICATION UNDER OATH SUBJECT TO PENALTY FOR PERJURY

I Swear (or affirm) under penalty of perjury that, upon information and belief, the foregoing is true and correct. Executed on _____,
                                              (Date)

_____
Signature of Petitioner's Attorney

SWORN TO AND SUBSCRIBED before me this the _____ day of _____, _____.

_____
Notary Public

Name and address of attorney representing petitioner
in this proceeding (if any)

_____

_____

_____

_____

_____

* If petitioner is represented by counsel, Rule 32.6(a) permits either petitioner or counsel to verify the petition.

12

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA

ROBERT THOMAS CONRAD,
    Petitioner,

    VS                    CASE NO.'s CC-01-179

                                CC-01-180

STATE OF ALABAMA,
    Respondent,

### ATTACHMENT TO PETITION FOR POSTCONVICTION RELIEF PURSUANT TO RULE 32 ALA.R.CRIM.P. FOR RELIEF FROM JUDGMENT.

COMES NOW the Petitioner, Robert Thomas Conrad, Now incarcerated at Holman Prison in Atmore, Alabama, and Petitions this Honorable Court pursuant to Rule 32 Alabama Rules of Criminal Procedure for relief from his unconstitutionally obtained convictions and sentences, in the above styled cause, and as grounds therefore submits the following:

### I. PROCEDURAL HISTORY

1. Petitioner Robert Thomas Conrad was convicted of Capital Murder pursuant to §13A-5-40 (A)(2) and Robbery First Degree pursuant to §13A-8-41 Code of Alabama 1975, In The Circuit Court of Coffee County, Alabama, on September 27, 2002, and was subsequently sentenced to Life without parole and Life respectively.

2. On October 24, 2003, The Alabama Court of Criminal Appeals affirmed the convictions and sentences by a memorandum opinion. A timely filed Application for Rehearing was overruled on November 14, 2003.

3. The Alabama Supreme Court denied Petitioner's Petition for Certiorari Review, and a certificate of judgment issued on January 16, 2004.

4. There being no other Petition, Application or Motion pending with regards to the above cause,         The Instant Petition pursuant to Rule 32 A.R.Crim.P. follows:

13

## II. FACTS SUPPORTING GROUNDS FOR RELIEF

### GROUND A

1. The right of the accused to adequate, effective counsel is central to the adversary system of criminal justice. <u>Strickland V. Washington</u>, 466 U.S. 668 (1984); <u>Ex Parte Womack</u>, 541 So.2d 47 (Ala.1988).

2. Petitioner Robert Thomas Conrad's Trial and Appellate counsels, Albert Smith , Gary Bradshaw and Richard Waldrop, did not render reasonably effective assistance before, during or after Petitioner's trial. But for counsels ineffectiveness at trial and on direct appeal, Petitioner submits there exist a reasonable probability that the result of those proceedings would have been different.

3. Trial counsels ineffectiveness includes, but is not limited to the following:

A. Counsel was ineffective and Petitioner was prejudiced thereby when counsel failed to object to the Oath not being administered to the venire prior to Voir Dire examination by the Court and Counsels.

Rule 12.1(c) Ala.R.Crim.P., provides in pertinent parts:

> "(c) Qualifying the venire on the opening day of the term, or on such other day as the venire shall have been summoned to appear, the Judge presiding shall proceed to organize the Court, by: ....
> (2) Administering or causing to be administered to the Jurors the following Oath required by law:
>
> "Do you and each of you solemnly swear or affirm that you will well and truly answer all questions propounded to you touching your general qualifications as a Juror, or qualifications as a Grand Juror or Petit Juror, and that you will well and truly try all issues and execute all writs of inquiry submitted to you and true verdicts rendered according to the law and evidence, so help you God?

H

In Ex Parte Hamlett, 815 So.2d 499 (Ala.2000), The Alabama Supreme Court faced with an identical issue, noted that when the record is silent as to whether the Oath was administered to the Venire, Remand is required to determine whether the Venire had been properly sworn.

In this case, The REcord is silent and does not contain the required Oath. Therefore counsel's failure to object to this action was prejudical to the substantial Rights of the Petitioner as Petitioner was entitled to have the prospective Jurors sworn to truthfully answer the questions propounded to them during Voir Dire examination.

15

## III.

TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT FOR HIS FAILURE TO OBJECT TO THE FACT THE PETITIONER'S SENTENCE IS ILLEGAL DUE TO HIS INDICTMENT ONLY SETTING FORTH THE MATERIAL ELEMENTS OF ROBBERY THIRD DEGREE, WHICH RESULTED IN THE PETITIONER BEING CONVICTED AND SENTENCED BEYOND THE MAXIMUM AUTHORIZED BY LAW, IN VIOLATION OF THE 8TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

The Petitioner was indicted for Robbery in the first degree (see Indictment as Petitioner's Exhibit __ ) and was enhanced to First degree by subsection of 13A-8-41(a)(1), which states:

(1) is armed with a deadly weapon or dangerous instrument: A person commits the crime of Robbery in the first degree if he violates section 13A-8-43, Code of Alabama 1975 which states as follows:

13A-8-43, Robbery in the third degree.
(a) A person commits the crime of Robbery in the third degree if in the course of committing a theft, he:
(1) Uses force against the person of the owner or any person present with intent to over come his physical resistance or physical power of resistance, or
(2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquie- scence to the taking of or escaping with the property.

The facts of this case the victim alleges that petitioner was armed with a weapon, in this case, a pistol.

True a pistol is a deadly weapon and an essential element of the statute 13A-8-41, first degree Robbery but it also has been legally determined by the Alabama Court of Criminal Appeals in the decision of Dick V. State, 677 So.2d 1267 (Ala.Crim.App. 1996) ... is an element of 13A-8-43, third degree robbery the Dick Court set out the proposition of law as follows:

As a matter of law, wielding a gun constitutes both, use of force and threat of force required for third degree robbery.

16

PETITIONER IN possession of a gun during a robbery is an element of both 1st degree and 3rd degree robbery but 3rd degree robbery is the essential element that must occur first before you can charge an individual with 1st degree robbery.

Therefore, in order to charge your Petitioner with 1st degree robbery on the remaining subsection of 13A-8-41 (a)(2) or (b), must occur to charge Petitioner with robbery in the 1st degree.

(2) Causes serious physical injury to another.

(b) possession then and there of an article used or fashioned in a manner to lead any person who is present reasonably to believe it to be a deadly weapon or dangerous instrument, or any verbal or other representation by the defendant that he is then and there armed is prima facie evidence under subsection (a) of this section that he was so armed.

Petitioner did not cause serious physical injury to another therefore, the evidence of a 1st degree robbery did not exist or occur in this case, that warranted a sentence for first degree robbery. As his indictment charges the lesser charge or completed charge of 3rd degree robbery, a class C felony is 1 year 1 day to 10 years, (13A-5-6), Code of Alabama 1975.

Trial counsel's failure to object to this error rendered his performance deficient, and his deficient performance prejudiced the Petitioner because if caused the Petitioner to be convicted of a class A felony and sentenced to Life for an offense which is a class C felony and only carries a maximum sentence of 10 years.

Petitioner avers that his illegal sentence can be challenged at any time, J.N.J. Jr. v. State, 690 So.2d 519 (Ala.Cr.App. 1996); and Moore v. State, 733 So.2d 912 (1998).

In the case of Barne v. State, 703 So.2d 217 (Ala.Cr.App. 1997), The Court of Criminal Appeals held that an appellant was entitled to a hearing on Petition for Post-Conviction Relief, where he alleged that he was sentenced to 15 years in prison for second degree theft of property, a class C felony carrying a maximum sentence of 10 years and that he was not sentenced pursuant to the Habitual Offender Act.

-13-

7                                                                    17

Petitioner has specifically plead this claim of ineffective assistance of counsel and has supported this claim with sufficiently plead facts which, if proven at an Evidentiary hearing would entitle him to relief. Johnson V. State, 835 So.2d 1077 (Ala.Crim.App. 2002).

18

## IV.

TRIAL COUNSEL WAS INEFFECTIVE IN VIOLATION OF THE PETITIONERS
SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, FOR
HIS FAILURE TO FILE A MOTION TO DISMISS THE PETITIONERS INDICT-
MENT WHERE THE GRAND JURY, FOREMAN FAILED TO ENDORSE UPON THE
PETITIONERS INDICTMENT WHETHER A PROSECUTOR APPEARED OR NOT BEFORE
THE GRAND JURY AS REQUIRED BY SECTION 12-16-205 of the code
OF ALABAMA 1975.

In Section 12-16-205, Code of Alabama 1975, the Legislature
set forth in mandatory language the requirements that must be
meet before a valid indictment can be considered to be made
in the manner as prescribed by law:

"If a prosecutor appears, his name must be endorsed on the
indictment and if no prosecutor, appears, the words no
prosecutor must be endorsed thereon."

The petitioner's indictment in this case, submitted as peti-
tioner's exhibit Y , was not made in this manner, as prescribed
by law, because it does not reflect, and is not endorsed, as
to whether a prosecutor or his agent appeared before the grand
jury, as required by 12-16-205.

In Ex Parte Looney, 796 So.2d 427 (Ala. 2001) the Supreme
Court held that to prove this ineffective assistance of counsel
claim that the counsel's performance must be shown to be (1)
deficient and that counsel's deficient performance (2) prejudiced
the petitioner.

Petitioner contends that trial counsel's failure to object
to the fact that his indictment was void because it was made
in the manner as prescribed by law 12-16-205, Code 1975 was
deficient, and that the petitioner was prejudiced by counsel's
deficient performance because, had the non-conformity of the
petition's indictment with §12-16-205, deprived the trial court
of jurisdiction. EX parte Looney, supra.

Petitioner's indictment is not made in the manner by law
imperatively and mandatory, therefore, depriving the sentencing
court of jurisdiction. This isn't merely discretionary as held
in prior decisions such as HUBBARD V. STATE, 72 Ala. 164 (1882).
This judicial right was misinterpreted and counsels failure

19

to file motion to dismiss petitioner's indictment due to the trial court's refusal to comply with the legislature mandatory language provisions of section 12-15-205, Code of Alabama, 1975, render's counsel's performance ineffective.

Petitioner has met his burden of pleading avd submitted his indictment in support as evidence to prove this violation. Petitioner is entitled to an evidentiary hearing and appointment of counsel to assist in substantiating the credibility question of law. This is judicially answered in the petitioner's behalf unambiguosly. JOHNSON V. STATE, 835 so.2d 1077 (Ala.Cr.App.2001).

20

## ISSUE V

TRIAL COUNSEL WAS INEFFECTIVE, FOR FAILURE TO KNOW THE APPLIC-
ABLE, LAW TO MAKE A TIMELY OBJECTION WHERE THE CLERK FAILED TO
COMPLY WITH SECTION 12-16-170, ALABAMA CODE 1975, IN ADMINI-
STER, THE OATH TO THE PETIT JURORS, THUS VIOLATING PETITIONERS
6th AND 14th AMENDMENT RIGHT UNDER THE UNITED STATES CONSTITU-
TION.

(1.) Petitioner avers that his trial counsel was ineffective for
failing to know the applicable law to make a timely objection
where the Clerk failed to comply with Section 12-16-170, Ala.
Code (1975), to the petit jurors.

Section 12-16-170, Petit Jurors States:

"The following oath "shall" be administered by the Clerk,
in the presence of the Court, to each of the Petit Jurors:

"You do solemnly swear (or affirm as the case maybe) that
you will well and truly try all issues which may be sub-
mitted, to you during the present session (or week, as the
case may be), and true verdicts render according to the
evidence "so help you God" and the same oath must be ad-
ministered to the talesman, substituting the word "day"
for "session."

(2.) In the instant case therein, petitioner avers that the Clerk
failed to comply with the mandatory requirements as set out in the
statute and administer the oath to the petit jury.

(3.) In Ex Parte Looney, 797 So. 2d. 427, 429 (Ala.2001), the
Alabama Supreme Court held that the words used in a statute must
be given their natural, plain, ordinary and commonly understood
meaning, and where plain language is used, a court is bound to

21

interpret that language to mean exactly what it says. See also,
Dept. of Mental Health & Mental Retardation Vs. Randolph, 808 So.
2d, 54 [Ala.Civ.App.2001]; Shiever Vs. Butler County Bd. of Edu-
cation, 797 So. 2d. 1086 Cert. Denied [Ala.Civ.App.1997].

(4.) Petitioner's exhibit __II__, page 460 of the record reflects
that after the jury selection process had concluded, that the
trial court - not the Clerk - then swore in the petit jury;

> "The Court; This Court will come to order. You
> may be seated.
> Ladies and gentlemen, first of all
> I will swear you in .....,"

At this stage, trial counsel did not render effective assis-
tance, of counsel because he failed to object to both the Judge
and Clerk's failed to comply with Section 12-16-170, Code of
Ala. [1975].

Petitioner also submits to this Honorable Court the affidavit
of Robert Conrad , as petitioner's exhibit __IV__, wherein he
states, in pertinent parts that;

> " ... I attest that my trial Judge, Judge Gary L. McAliley,
> did swear in my petit jury ..."

By trial counsel failing to object to this error, his perfor-
mance, was deficient and his actions fell below an objective
standard of reasonableness. Strickland Vs. State, 771 So. 2d.

22

¶123 [Ala.App.1999], because the failure to swear in a petit jury renders it's verdict void!

This prejudice concerning counsel's duties, violated petitioners 6th Amendment Right to the United States Constitution, the right to a fair trial by an impartial jury and effective assistance of counsel; and the 14th Amendment Right to the United States Constitution, to due process of the law.

Petitioner has met his burden of specifically pleading this claim of ineffective assistance of counsel and has supported this claim with sufficient facts/exhibits, in the form of the relevant portions of the Court Reporter's Transcript and the petitioner's own affidavit to show that he is entitled to an evidentiary hearing, and appointed of counsel to prove his claim. Johnson Vs. State, 835 So. 2d. 1077 [Ala.Crim.App.2001].

23

ISSUE II

PETITIONER AVERS THAT THE TRIAL COUNSEL WAS IN-
EFFECTIVE FOR FAILING TO KNOW THE    APPLICABLE
POINT OF LAW TO FILE A MOTION TO DISMISS    THE
INDICTMENT, PURSUANT TO RULE 15,3 ALA.R.CRIM.P.
ON THE GROUNDS THAT; HIS INDICTMENT IS VOID    AS
IT FAILS TO ALLEGE THE ESSENTIAL ELEMENTS    OF
THE CAPITAL MURDER STATUTES IN ITS ENTIRETY    AS
REQUIRED BY SECTION 13A-5-40 SUBSECTION 2,10,16
17 AND 18; 13A-5-50, OF THE CODE OF.....ALABAMA
1975.

Petitioner was denied his 5th, 6th and 14th Amendment Right's of
the United States Constitution, when counsel failed to know the
applicable point of law to file a motion to dismiss the indict-
ment, pursuant to Rule 15.3, Ala.R.Crim.P.,

The death penalty appeals in chapter 5 Article 2 of the Code
of Alabama [1975], and enumerates Title/Sections 13A-5-39 to
13A-5-59, Code of Alabama [1975].

Petitioner's indictment is void as it is devoid of material
elements of the statute as required by law and violates his 6th
Amendment Right to the United States Constitution, that gives
petitioner notice of the charge of Capital Murder in the indict-
ment, of what petitioner must defend himself against.

Petitioner avers that his indictment tracks only part of the
element of the charge of Capital Murder and that part is Section
13A-5-40(a)(2) Code of Alabama [1975]. But, is devoid of the
material element of the complete Capital Murder Statute of what
the petitioner must defend himself against. Section 13A-5-40(a)

24

(2) and 13A-5-50 of the Code of Alabama (1975), are enumerated as both elements of Capital Murder, during the guilty phase of the trial and as a aggravating circumstance during the penalty phase of the trial. See: Burton Vs. State, 651 So. 2d. 641 (Ala.Crim. App.1993) aff'd sub nom. Ex Parte Burton, 651 So. 2d. 659 (Ala. 1994).

Section 13A-5-50, verify's and on it's face substantiates it in corporation and necessary existance with 13A-5-40(a) as follow:

Aggravating circumstances Capital Offenses including aggravating, circumstance.

(A) The fact that a particular Capital Offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49, shall not be construed to preclude, the finding and construed to preclude the finding and consideration of the relevant circumstance, or circumstances in determining sentence. By way of illustrates and not limitation, the aggravating circumstance specified in determining sentence in every case in which a defendant is convicted of the Capital Offenses defined in Subsection (1) through (4) of Subsection (A) of Section, 13A-5-49.

Petitioner's indictment is devoid of the notice imperative and mandatory word "shall"; In essence, petitioner's indictment is devoid of the fact that he must also defend himself in the guilt

25

and sentencing phase of the charge against him, of aggravating circumstances not charged in the indictment; [emphasis mine] [See Ex. I ] petitioner's indictment.

In Ex Parte Looney, 797 So. 2d. at page 426 [Ala.Crim.App.2001], the word "shall" is defined as stated below:

> "As used in statutes, contracts or the like this word is generally imperative or mandatory. In common or ordinary parlance, and in it's ordinary signification, the term "shall" is a word of command, and one which has always [been given] or which must be given a compulsory meaning; as denoting obligation. The word in ordinary usage mean "must" and is inconsistent with a concept of discretion."

It has consistently been the law within the State of Alabama that the aggravating circumstances must be alleged in the indictment, in order to afford the defendant due process. See: Ex Parte Arthur, 472 So. 2d. 665 [Ala.1985].

But, this requirement is mandatory pursuant to the entire Capital, Murder Statute of notice in an indictment, and by law pursuant to 13A-5-50 Code of Alabama [1975].

Also, circumstances during the guilt phase as can be developed, proved alleged for guilt and sentence to punish a defendant. Therefore, this element become's necessary to state an offense and incumbent that notice be given to a defendant in the indictment. Without such guilt and sentence is and can be obtained on elements of the crimes without notice to the defendants.

26

Trial counsel failed to provide the petitioner with effective assistance of counsel that's guaranteed by the 8th Amendment of the United States Constitution. Trial counsel was also ineffective, for failing to file a Motion To Dismiss the indictment at the pre-stage before proceeding to trial. Counsel can deprive a defendant of the right to effective assistance of counsel simply by failing to render adequate legal assistance. See: Strickland Vs. Washington, 466 U.S. 668, 80 L. Ed. 2d, 674 ____ S.ct _____.

The obligation to petitioner was clear that the trial court can only make a determination upon this claim from counsel's explanation, of whether he didn't know the applicable law or whether his failure to exercise petitioner's right was trial strategy, as credibility question can't be assumed nor answered from a trial record or affidavit. An evidentiary hearing must be conducted in order to test and substantiate this claim from the witness stand.

Petitioner has met his burden of pleading so as to avoid summary, disposition and a evidentiary hearing must be conducted on the merits of this claim for petitioner, to meet his burden of proof.

Johnson Vs. State, 835 So. 2d. 1077 [Ala.Cr.App.2001].

27

## VII.

PETITIONER ALLEGES THAT HIS INDICTMENT IS VOID BECAUSE
IT VIOLATES THE CONSTITUTIONAL DOCTRINE OF "SEPARATION
OF POWERS"

Petitioner alleges that his indictment is void because
it violated the Constitutional Doctrine of "Separation of
Powers."

This Court has consistently affirmed claims that attack
unconstitutional statute by adopting the State of Alabama's
reasoning, that the issue isn't reviewable because it wasn't
raised during direct appeal or a criminal defendant's direct
appeal. This legal reasoning is without merit as the United
States Supreme Court explains in EX PARTE SEIBOLD, 100 U.S.
371, 25 L.Ed.2d 717, 1879 U.S. Lexis 1833; 10 otto 371;

> "An unconstitutional law is void and is as no law.
> An offense created by it is not a crime. A conviction
> under it is not merely erroneous, but is illegal and
> void and cannot be a legal cause of imprisonment.
> It is true is no Writ of Error lies, the judgment
> may be final, in the that there may be no means of
> reversing it. But personal liberty is of so great
> moment in the eye of the law that the judgment of
> an inferior court affecting it is not deemed so
> conclusive but that the question of the trial court's
> authority to try and imprison the party may be reviewed
> on Habeas Corpus by a Superior Court or Judge having
> authority to award the writ."

In Alabama Constitution provides that the powers of
government shall be divided into three separate departments,
Legislative, Executive and Judicial and that the powers of one
department shall never be exercised by another, therefore, if
this is an element of a republican form of government which
the U.S. Constitution guarantees to the states, it is met in
Alabama HUNT V. ANDERSON, 794 F.Supp. 1157 (M.D. Ala.), Aff'd
979 F.2d 744 (11th Cir. 1992)

28

But in the Petitioner's claim that section 13A-5-40 Alabama Capital Murder Statute is unconstitutional, Alabama specifically violates the provision of Article III Section 42 of the Constitution of Alabama of 1901 (Legislative, Executive and Judicial Departments established) and Art.IV, Section 4 of the United States Constitution. (Separation of Powers).

Petitioner raises the claim that 13A-5-40 was enacted by the Alabama Law Institute which was composed of individuals from each of the three (3) branches of government.

The Alabama Legislature devised the Alabama Law Institute because of it's long history of failing to establish a sound and applicable death penalty statute, which this institute was comprised of individuals from each of the branches of government which they did create the present day death penalty statute.

In the Supreme Court of Alabama's decision, in BROOKS V. HOBBIE, 631 So.2d 883, 890 (Ala.1993), Justice Houston's special concurrence states the confusion the court encounter's in its responsibility under State Law, where our jurisdiction is restricted by the department of powers provision in the Alabama Constitution." 835 So.2d 186 n. 4. It then concludes that "it is for the legislature, not the judiciary districts are as nearly equal to each other in the number of inhabitants as may be." citing Art. III § 43, Ala. Constitution 1901 (the separation of powers clause). Id. Such abduction of judicial responsibility is inconsistent with the settled principle that the people have

forbidden the Legislature from conducting itself in a manner inconsistent with their Constitution and when it does, it is incumbent upon the judicial to nullify a Legislative enactment contrary to the Constitution. See EX PARTE SELMA & GULF R.R., 45 Ala. 695 (1871).

It has been established through case law that the State's highest Court can act in an advisory role directly to the Legislature when the Legislature poses specific questions. But, its not the ability of the Alabama Supreme Court to act in an advisory role to the Legislature is not what is in question by your petitioner.

It's abduction by the State of Alabama to the Supreme Court Justice of Alabama, the Attorney General, Legal Advisors to the Governor, State Representatives, State Senators and a Federal Level Justice all joined together, not in advisory capacity but as creators of what has become the present death penalty statute.

There is no provisions in Alabama which allow members of the Executive Brance to act with the Judicial Branch. As advisors to the State Legislature. Because these violations of State and Federal Constitutional provisions that created Alabama's death penalty statstatute as a result of their consorted efforts of the Legislative, Executive and Judicial Branched of Government.

Wherefore, this claim is due to be set for an evidentiary hearing.

30

## VIII

THE PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF
TRIAL COUNSEL; DUE TO HIS FAILURE TO FILE A   PRE-
TRIAL MOTION TO DISMISS THE SECOND COUNT IN   HIS
INDICTMENT FOR ROBBERY AND HIS FAILURE TO  OBJECT
TO THE TRIAL COURT ADJUDICATION OF THE JURY  VER-
DICT, OF ROBBERY.

Conrad argues that double jeopardy prevents his conviction for
robbery by the jury and the adjudication of the verdict by the
trial court. Therefore, his attorney was ineffective for failing
to object to the verdict II, and failing to object to the verdict
and sentencing by the trial court on the charge of robbery in the
first degree.

Conrad was charged in Count II of his indictment for Murder
Robbery in violation 13A-5-4(a)(2) of the Code of Alabama §1975§,
and was charged separatly in Count II. for robbery in the first
degree. (Ex. I)

In order to find Conrad guilty the robbery charge had to be
proved as it's the underlying charge that is used to enhance the
murder to Capital Murder.

The identical elements to prove Capital Murder are the same ele-
ments, used to prove Robbery 1st Degree.

As the Alabama Criminal Court of Appeals stated in Weaver Vs
State, 763 So. 2d. at 981 N. 15 [1998]:

> "However, when appling the Block Burger Test to the lesser
> include offenses of First – Degree Robbery, Second – Degree
> Burglary, and Second – Degree Theft, we can discern no ele-
> ment, that was required to be proven that was not also a
> part of the Felony Murder Charts."

-19-

31

As in Conrad set of circumstance the State of Alabama proved the exact same elements to convict him of Robbery in the Capital Murder count of his indictment and the exact same elements of Count II the charge of Robbery 1st Degree.

As defined in 13A-1-9, Code of Alabama [1975], an offense as an include one or an less included charge if it is established by proof of the same or fewer than all the facts required to establish the commission of the offense charged.

> "For purposes of former jeopardy, the felony which provides the component necessary to elevate an intentional, killing to Capital Murder is a lesser include offense of the capital crime. Section 13A-5-41; J. Colquitt, The Death Penalty Laws of Alabama, 33 Ala. L. Rev. 213, 254 [1982] ["In the ordinary case, lesser included offenses will include some or lesser degrees of crimes within the definition of the aggravating component. Additionally, lesser included offenses may themselves include lesser offenses supported by the evidence."] E. Carnes, Alabama 1981 Capital Punishment Statute, 42 Alabama Lawyer 456, 472 [1981]. See also Sekou Vs. Blackburn, 796 F. 2d. 108, 110 [5th Circuit 1986] ["The Double Jeopardy Clause prohibits prosecution and conviction for both Felony Murder and the enumerated felony .... The underlying felony is considered a lesser included offense of felony and thus the "same offense" for double jeopardy purposes.].
>
> Therefore, Robbery is a lesser included offense of the Capital Offense involving Murder-Robbery.

Heaver Vs. State, 763 So.2d. 972 [Ala.Crim.App.1998].

IX.

THE CONSTITUTION OF THE UNITED STATES AND OF THE STATE
OF ALABAMA REQUIRE A NEW TRIAL WHEN TRIAL COUNSEL RENDERS
INEFFECTIVE ASSISTANCE IN VIOLATION OF THE 6th and 14th
AMENDMENT FOR HIS FAILURE TO OBJECT TO THE PETITIONER'S INDICTMENT
BEING VOID IN THAT IT WAS RETURNED PURSUANT TO THE AUTHORITY
OF THE ALABAMA CONSTITUTION OF 1901, WHICH WAS ESTABLISHED
TO PROMOTE WHITE SUPREMACY AND TO DISENFRANCHISE AFRICAN-
AMERICANS.

The Petitioner has been convicted for the offense of murder with aggravating
circumstances that elevated this offense to capital murder. Petitioner contends
that because this offense was secured through the indictment clauses of the
Alabama Constitution of 1901 that his indictment is void because the Alabama
Constitution of 1901 was enacted to establish white supremacy in the State
of Alabama and to disenfranchise African Americans.

The establishment of white supremacy and the disenfranchisement of African
Americans denies this Petitioner of Equal Protection of the law, in violation
of the 14th Amendment, and the laws enacted to promote same are unconstitutional.

In Ex parte Seibold, 25 L.Ed 171 (1879), the Supreme Court explained that,
where an underlying criminal law is unconstitutional, the conviction does
not redress any legal wrong because an unconstitutional law is void and is
no law. The Court also went on to state that any offense created by it is
no crime and that any conviction under it is illegal and void and cannot
be a legal cause of imprisonment.

In Hunter v. Underwood, 471 U.S. 222, 85 L.Ed.2d 222, 105 S Ct 1916 (1985),
the Court quoted from the minutes of the Alabama Constitutional Convention
of 1901, where the President of the Convention, John B. Knox, stated in his
opening address:

> "And what it is that we want to do?  Why it is within the limits imposed
> by the Federal Constitution to establish white supremacy. Official
> Proceedings of the Constitutional Convention of the State of Alabama,
> May 21st, 1901 to September 3rd, 1901, p. 8 (1940)."

Hunter v. Underwood, 471 U.S. at 232.

33

The other noted objective of the Convention, also noted by the Court in Underwood, was to disenfranchise African-Americans. The Court found that the Convention has devised a long list of offense which it considered were most likely to be committed by African-Americans, and the Convention then laid a trap to ensnare African-Americans by enacting § 182 of the Alabama Constitution of 1901 to disenfranchise. . At 233 of Hunter, the Court stated that:

> "Without deciding whether § 182 would be valid if enacted today without any impermissible motivation, we simply observe that its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect. As such, it violates equal protection under Arlington Heights."

The Appellee/Respondent in this matter, as cited in Hunter, has already admitted "that the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks."

In Ex parte McWilliams, 812 So.2d 318 (Ala. 2001), the Alabama Supreme Court held that this claim is cognizable in a Rule 32 petition. Trial counsel denied the Petitioner of effective assistance of counsel by failing to object to him being tried upon an indictment which was passed pursuant to constitutional authority that was designed to disenfranchise the Petitioner and to establish white supremacy. The Petitioner was prejudiced by counsel's deficient performance because he has now been disenfranchised through a conviction which was obtain and denied life, liberty and property without due process of law, all in violation of the 14th Amendment.

The Petitioner moves the Court to appoint counsel and to schedule this cause for an evidentiary hearing where he has stated a claim which, if proven to be true, would entitle him to relief. Johnson v. State, 835 So. 2d 1077 (Ala.Crim.App. 2002)

34

## ISSUE X

PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUN-
SEL, DUE TO TRIAL COUNSEL'S FAILURE TO PROPERLY OB-
JECT, TO TRIAL COURT'S ERRONEOUS INSTRUCTION TO THE
JURY ON CORROBORATED TESTIMONY OF CODEFENDANT.

Petitioner alleges that he was denied his right to a fair trial
due to trial attorney's at [CR-1448] of trial transcript, for
failing to object to the trial court judge giving a erroneous
instruction to the jury.

The Trial Transcript At [CR-1448]:

> "You should keep in mind that such testi-
> mony, is always to be received with cau-
> tion, and weighted with great care, you
> should never convict any defendant, any
> defendant, upon the unsupported testimony
> of such a witness, unless you believe
> their testimony could be truthful beyond
> reasonable doubt." Etc. Etc.

This particular instruction to the jury wenton from [Cr.1448 to
Cr. _____].

As stated in Section 12-21-222, Code of Alabama [1975] "a
conviction of felony cannot be had on the testimony of an accom-
plice, unless corroborated by other evidence tending to connect
the defendant with the commission of the offense, and such corro-
borative evidence, if it merely shows the commission of the
offense or the circumstances thereof, is not sufficient."

35

Petitioner avers that trial counsel failure to object to trial court's erroneous instruction, denied him a Right to Effective Assistance Of Counsel.

Petitioner is entitled to a correct proposition to the law, petitioner moves this court to appoint counsel and set this cause for an evidentiary hearing.

36

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA

*

Robert T. Conrad,
Petitioner,

*

Vs.

*

Case No: CC-01-179
CC-01-180

State of Alabama,
Respondent.

*

### MOTION FOR PRE-ACTION DISCOVERY

Comes now the petitioner, Robert T. Conrad [hereinafter Conrad], in the above styled cause of action, moves this Honorable Court with this "Motion For Pre-Action Discovery," pursuant to Rule 27 Ala.R.Civ.P., and states the following grounds of why this petition, should be granted:

(1.) Petitioner Conrad contemplates the filing of a Rule 32 petition for post-conviction relief and ask this Honorable Court to afford him with this discovery of the minutes of the Alabama's Sentencing Commission, pursuant to Section 12-25-2, Code of Alabama, [1975].

(2.) Petitioner states that as contemplating of filing a Rule 32 petition, he will allegly raise the claim of how his trial counsel was ineffective.

(3.) Petitioner submits that the facts that would be established, in this cause and the reason for the Alabama Sentencing Commission minutes pursuant to Section 12-25-2, Code of Alabama [1975], is to substantiate the fact of how the Alabama Attorney General, Alabama Supreme Court and Legislature cannot come together as one to come up with what has been established as to-day's, Alabama Capital Murder Statute. Discovery will support this claim within his Rule 32 petition.

(4.) Petitioner also submits that in Ex Parte Land, 775 So.2d. 840 [Ala.2000], the Alabama Supreme Court sets out that, "Discovery, in post-conviction proceeding should be allowed only when "good cause" has been shown." [Page 847 N. 9].

(5.) Petitioner has shown that the "good cause" standard has been established and met in this cause and discovery should be afforded to him in this instant for him to substantiate this claim.

This is not a Petition For Pre-Action Discovery to just "fish" through to search for possible claims, for the above stated reasons, makes specific of the facts and how this discovery will be properly utilized.

(3)

38

Wherefore, premises considered, petitioner prays that this Honorable Court grant him discovery for petitioner has made specific of the facts and the showing of the reason why this discovery should be granted.

Done on this the 10ᵗʰ day of JANUARY, 2005:

Respectfully Submitted,

/s./ Robert T. Conrad

Mr. Robert T. Conrad
AIS# 226791    Bed# 5-156
Holman Unit 3700
Atmore, Al 36503-3700

## CERTIFICATE OF SERVICE

I, hereby certify that I have on this the 10ᵗʰ day of JANUARY, 2005, served a copy of the foregoing on the following parties stated below, VIA, by placing the same in the institutional mail box, postage prepaid and properly addressed as follows:

Mark E. Fuller
Post Office Box 1102
Coffee, Al 36331-1102

/s./ Robert T. Conrad
Robert T. Conrad

39

IN THE CIRCUIT COURT OF _Coffee_ _____ COUNTY, ALABAMA

_Robert Thomas Conrad_,
**PETITIONER,**

V.

CASE NO: _CC-01-179_
_CC-01-180_

STATE OF ALABAMA
RESPONDENT.

JAN 2005
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

## MOTION FOR AN EVIDENTIARY SUBMISSION

Comes now the Petitioner _Robert I. Conrad_ (hereinafter
_Conrad_ ), and moves this Honorable Court with his Motion
for an Evidentiary Submission and states the following grounds:

1. On the _10_ day of _January_, 200_5_, Petitioner
filed a Rule 32 petition.

2. Petitioner submits exhibit(s) _I + II_. Petitioner prays
this Honorable Court make this submission a permanent part of
the record.

The evidence further establishes that there is a genuine
issue of material fact in dispute. CELOTEX CORP. V. CATRETT,
477 US 317, 91 L.Ed.2d 265, 106 S.Ct 2548 (1986). In addition
Petitioner alleges that he has met his initial burden of pleading.
JOHNSON V. STATE, 835 So.2d 1077 (Ala.Cr.App. 2001).

Paddtitioner prays that this Honrable Court take judicial
notice of the entire record in this cause pursuant to Rule 201
(d) Alabama Rules of Evidence.

Wherefore, for the above said reasons, Petitioner prays this Honorable Court grant his Motion for an Evidentiary Submission.

DATED: _January 12, 2005_

Respectfully Submitted,

_Robert J. Conrad_

A.I.S.#
HOLMAN UNIT 3700
ATMORE, ALABAMA 36503

### CERTIFICATE OF SERVICE

I hereby certify that on this the __12__ day of _January_, _200 5_, I have placed a copy of the above mentioned in the Institutional Mailbox, postage prepaid and properly addressed to the _Coffee County_ County District Attorney at: _P.O. Box 1102  Enterprise, Alabama  36331-1102_.

_Robert J. Conrad_

41

**INDICTMENT**

### THE STATE OF ALABAMA
#### COFFEE COUNTY
### ENTERPRISE JURISDICTION

IN CIRCUIT COURT
MAY TERM 2001

The Grand Jury of said County charges that before the finding of this indictment that

ROBERT THOMAS CONRAD whose name is to the Grand Jury otherwise unknown, did intentionally cause the death of another person, to-wit: Jelane Bowman Dennis, by shooting her with a pistol, and the said ROBERT THOMAS CONRAD, caused the death during the time that he was in the course of committing a theft of property, to-wit: United States currency and/or United States coinage and/or check, the property of, to-wit: Jelane Bowman Dennis, by the use of force or in threatening the imminent use of force against the person of the said Jelane Bowman Dennis, or another person present, with the intent to overcome her physical resistance or physical power of resistance or the compel acquiescence in the taking of or escaping with the property, while the said ROBERT THOMAS CONRAD, was armed with a deadly weapon or dangerous instrument, to-wit: a pistol, in violation of Section 13-A-5-40 of the Code of Alabama, against the Peace and Dignity of the State of Alabama, etc.

#### OFFENSE

The Grand Jury of said county charges that before the finding of this indictment that ROBERT THOMAS CONRAD, whose name is to the Grand Jury otherwise unknown, did in the course of committing a theft of property, to-wit: Thirty Dollars in United States currency, the denominations of which were one (1) twenty dollar bill and one (1) ten dollar bill, the property of, to-wit: Robert Ray Grimes, use force or threaten the imminent use of force against the person of the said Robert Ray Grimes, or another person present with the intent to overcome his physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property, while the said ROBERT THOMAS CONRAD was armed with a deadly weapon or dangerous instrument to-wit: a pistol, in violation of Section 13A-8-41 of the Code of Alabama.

Against the Peace and Dignity of the State of Alabama.

Mark E. Fuller, District Attorney for the
Twelfth Judicial Circuit

42

GRAND JURY NO. 01-137 & 142

A TRUE BILL

_____
GRAND JURY FOREPERSON

Presented in open Court by the
Foreperson of the Grand Jury in the
presence of at least twelve other
members of the Grand Jury.

James W. Counts, Clerk of the Circuit
Court of Coffee County, Twelfth Judicial
Circuit of Alabama.
Filed this the _____3rd_____ day of
_____ 2001.

Bail in each offense in this indictment is
fixed at $ _____ for a total bail
for this indictment $ _____

_____ Continued bond _____

_____

_____
Judge presiding

THE STATE OF ALABAMA
COFFEE COUNTY
CIRCUIT COURT
MAY    TERM 2001
THE STATE
vs.

ROBERT THOMAS CONRAD

_____

OFFENSE(S)
MURDER DURING ROBBERY 1ST
DEGREE

OFFENSE 2
ROBBERY FIRST DEGREE

INDICTMENT

43

460

1    to be attentive or what not,

2    thinking their decision is not

3    going to be important.

4    (Jury selection began and the

5    jurors were called).

6    THE COURT:  This Court will come to

7        Order.  You may be seated.

8        Ladies and gentlemen, first

9    of all I will swear you in.

10   Would all of you please raise

11   your right hand and be sworn.

12       Do you swear or affirm that

13   you will well and truly trial

14   this case, or these two cases,

15   and true verdict or verdicts

16   render according to the legal

17   and competent evidence so help

18   you God?

19       All have signified that

20   they will.

21       I don't know about you, but

22   I have never been on a jury

23   before.  I have had hundreds and

24   hundreds of juries, but I have

25   never been a juror before.

44

| | | |
|---|---|---|
| ROBERT THOMAS CONRAD, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PETITIONER, | ) | COFFEE COUNTY, AL |
| | ) | |
| VS. | ) | ENTERPRISE DIVISION |
| | ) | |
| STATE OF ALABAMA, | ) | |
| | ) | |
| RESPONDENT. | ) | CASE#: CC-2001-M-178 & |
| | ) | CC-2001-M-179 |

## STATE'S RESPONSE TO PETITIONER'S
## MOTION FOR PRE-ACTION DISCOVERY

*COMES NOW* the State of Alabama by and through Tom Anderson, Assistant District Attorney, and in response to the Petitioner's Motion for Pre-action Discovery replies on grounds which are as follows:

1. The Petitioner is requesting the minutes of the Alabama Sentencing Commission so that he may seek post-conviction relief based on issues that could have been raised at trial and on appeal, but were not.

2. Further, Petitioner intends to argue Alabama's Capital Murder Statute was created through the cooperation of representatives from the three (3) branches of government and is therefore in violation of the United States Constitution and the Alabama State Constitution. This contention is entirely without merit. The mere assertion that a statute was drafted with the cooperation of the Alabama Attorney General, Alabama Supreme Court and Legislature is in no way a showing that said branches of government were not distinct and separate from each other and therefore unconstitutional. The minutes of the Alabama Sentencing Commission, if provided the Petitioner, would in no way serve to substantiate such a baseless claim.

45

WHEREFORE, premises considered, the Petitioner's motion is due to be **DENIED.**

*Done this the 3rd day of February, 2004.*

Thomas T. Anderson (AND086)
Assistant District Attorney
Twelfth Judicial Circuit

**CERTIFICATE OF SERVICE**

I, Tom Anderson, Assistant District Attorney, hereby certify that the foregoing has been served upon the Defendant by placing a copy of same in the United States Mail, first class postage prepaid on this the 3rd day of February, 2004.

Thomas T. Anderson

46

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA

ROBERT T. CONRAD,
          PETITIONER,

                                          FEB 2005
                                           FILED
                                         J.M. Counts
                                         Court Clerk
                                         Coffee Co. AL

VS.                                 CASE NO: CC 01-M-479
                                             CC 01-M-179

STATE OF ALABAMA,
          RESPONDENT.

PETITIONER'S RESPONSE TO STATE'S RESPONSE TO
PETITIONER'S MOTION FOR PRE-ACTION DISCOVERY

Comes now the Petitioner, Robert T. Conrad, [Herein after

Conrad], in the above styled cause of action and submits the

following reply why his request for discovery should be granted

on the following grounds to-wit:

1. The petitioner submitted a request to this Court

requesting the release of tha minutes of the Alabama Sentencing

Commission, Because he can prove that the Alabama Death Penalty

Statute is unconstitutional due to the fact it violates the

Federal and Satte Separation of Power's provisions.

2. The State of Alabama response as of February 3rd, 2005,

pre-textually asserts that Conrad's Motion for Pre-Action

Discovery should be denied because:

          Further, Petitioner intends to argue Alabama's Capital
          Murder Statute was created through the cooperation
          of representatives from the (3) branches of government
          and is therefore in violation of the United States
          Constitution and the Alabama State Constitution. this
          contention is entirely without merit. The mere
          assertion that a statute was drafted with the
          cooperation of the Alabama Attorney General, Alabama

47

Supreme Court and Legislature is in no way a showing
that said branches of government were not distinct
and separate from each other and therefore
unconstitutional. The minutes of the Alabama Sentencing
Commission, if provided the Petitioner, would in no
way serve to substantiate such a baseless claim.

3. The standard to be used whether this motion should be
granted is "good cause" in Post-Conviction proceedings. EX PARTE
LAND, 775 So.2d 840 (Ala.Crim.App. 1998).

4. The issue Conrad raises, that the Alabama Death penalty
Statute is unconstitutional is reviewable to determine whether
Conrad's rights to a fair trial was violated. As the Alabama
Supreme Court determined in EX PARTE JAMES, 713 So.2d 869 (Ala.
1997) a issue involving the merits of a dispute by the trial
court could be considered by them because the court ruling may
have violated the Separation of Powers Doctrine of our
Constitution;

"We may address this issue because "the lack of subject
matter jurisdiction is not waivable and may be raised
at any time by the suggestion of a party or by a court
ex mero motu." Id. at 1146. See also STAMPS V.
JEFFERSON COUNTY BD. OF EDUCATION, 642 So.2d 941,
945 n. 2 (Ala. 1994). Judgments entered without sub-
ject matter jurisdiction can "be set aside at any
time as void, either on direct or on collateral
attack." INTERNATIONAL LONGSHOREMEN'S ASS'N V. DAVIS,
470 So.2d 1215, 1217 (Ala.1985), aff'd 476 U.S. 380,
106 S.Ct. 1904, 90 L.Ed.2d 389 (1986).

5. Conrad submits his Exhibit A, as prima facie evidence
that this aver . . . that the Alabama Death Penalty Statute is
unconstitutional because it violates the State and Federal
Separation of Power provision's.

The attached exhibit A, is a Journal prepared by the Honorable Herbert Willis Brewer, Jr., publish periodically, Examines the chronlogy of Alabama's Capital Punishment and the Alabama Sentencing Commission's violation of the Separation of Powers Act.

6. Conrad has met his burden of proving 'Good Cause', why the Pre-Action Discovery Motion should be granted.

Wherefore for the above said reason Conrad prays this motion be granted in full.

RESPECTFULLY SUBMITTED,

ROBERT T. CONRAD
AIS # 226791
HOLMAN UNIT 3700
ATMORE, ALABAMA 36503

## CERTIFICATE OF SERVICE

I hereby certify that I have this 14th day of February, 2005, served a copy of the foregoing "Response" upon Thomas T. Anderson Assistant District Attorney at P.O. BOX 1102, Enterprise, Alabama 36331-1102, by placing a copy of the same in the institutional mailbox, via U.S. mail, postage prepaid and properly addressed.

ROBERT T. CONRAD

Chronology of Alabama's Capital Punishment

In order to allow you, the reader, the opportunity to fully understand the statutes on which Alabama's death penalty is based, we must first digress and revisit the precedent setting case of Furman v Georgia (FN 1) in order to review its implications and the effects it had on the Alabama statutes.

Furman, a Georgia Negro under the sentence of death along with two (2) other Negro petitioners questioned the application of Georgia's death penalty statutes that allowed for arbitrary and capricious applications of the death penalty based on the race of the defendants and the victims' race in the crimes in question.

Georgia's system allowed for this discrimination which was well established by statistical information presented to the United States Supreme Court by Furman.

The United States Supreme Court frowned on the ability of judges and juries to impose the death penalty upon such an unpopular group without specific guidelines or standards.

In the aftermath of Furman, the Alabama State Legislature, in the attempt to comply with the United States Supreme Court's decision, enacted the 1975 death penalty statute.

The Alabama Legislature's inability to completely understand the U.S. Supreme Court's decision eventually led to the demise of the death penalty provisions as is evident in the U.S. Supreme Court BECK (FN 2) decision.

In excess of forty (40) men and one (1) woman were sentenced to death under Alabama's unconstitutional 1975 death penalty statutes.

## THE BECK DECISION

Beck was the first Alabama death row inmate to succeed in receiving review of the new standards set out in the 1975 capital statute.

BECK argued one issue <u>only</u>, that Alabama's 1975 death penalty statutes were unconstitutional because they did not allow judges to instruct juries on the lesser included offenses of capital murder.

This **"Preclusionary Rule"** mandated that trial judges not instruct juries on lesser included offenses in capital cases. Capital defendants were the only defendants that were precluded from the instructions of lesser included offense charges. The U.S. Supreme Court here ruled that if the evidence supported the instruction of the charge of a lesser included offense, it was mandatory for it to be given and for trial juries to be allowed to consider it.

Here again, the Court was very adamant in its language determining that post-Furman cases which did not allow juries to consider lesser included offenses were unconstitutional. This Court recognized that this type of preclusionary rule would in some way effect the jury's decision-making process: In a case where the evidence may have suggested a lesser degree of participation in the criminal act, the jury was left with one of two choices:

(1) allow the defendant they believed to be guilty of a criminal act to go without any type of punishment, or

(2) sentence a defendant guilty of a non-capital offense to their death.

The Alabama statutes additionally required all capital juries that found a defendant guilty of the capital offense with a single aggravating factor to fix the punishment at death (FN 3).

The use of the Preclusionary Rule went even further into the judicial process because defense attorneys were aware that trial judges would be precluded from instructing juries about lesser included offenses.

Defense attorneys had to make conscious choices to exclude all evidence that would have supported a lesser included offense charge, thereby limiting the attorney's ability to select the best course of action in defending capital defendants (FN 4).

" Exhibit A "

50

If there was any evidence that would have supported a lesser charge and reduced the culpability of the defendant during the criminal act, the defense by presenting this evidence would have sealed the fate of the defendant to death.

Defense counsels' hands were bound by the unconstitutional caption and application of the preclusionary rule. It is nonsense to think that the prosecution would have presented evidence supporting a lesser offense charge. The prosecution in considering evidence of lesser culpability of the capital defendant could have sought an indictment for a non-capital offense.

### Relief via BECK

All state level appellant courts in Alabama in reviewing BECK, created exemptions to the U. S. Supreme Court opinion. Alabama death row inmates that were deemed to have presented alibi defenses were excluded from relief under the Beck decision. Nowhere in the language of the U. S. Supreme Court opinion does the Court refer to this exclusion.

More questionable is the method used in excluding these select few death row inmates. If the defense chose to present evidence of an alibi, they were excluded from the relief afforded in BECK (as if to say that all defendants using an alibi defense were exempt from a lesser included offense charge).

In no other criminal judicial process is the defendant precluded from a lesser included offense charge except here! In all other criminal prosecutions, it is required that only the evidence supports such a charge. The methods of the defense has never been a consideration in support or denial of a lesser included charge as is mandated by case law.

Alibi defendants were not afforded an opportunity to present evidence that the preclusionary rule prevented them from presenting, evidence that would have supported a lesser offense charge and consideration upon the finding in BECK. Again the Alabama Legislature was forced to revise the death penalty statutes (FN 9).

### Severability Clause

Was the application of the severability clause appropriately applied to the 1975 death penalty statutes?

To understand the application of the severability clause, you must review the statutes relating to severability (FN 5: Code of Alabama 1975 1-1-16: "Under prior versions of the death penalty statute where legislature included jury participation in the sentencing schemes supreme court could not judicially sever it."). The 1975 death penalty statutes are specific in their language that, "If the jury finds the defendant guilty, it (jury) shall fix the punishment at death."

The legislature's intent was to involve the jury in the sentencing of capital defendants. By their own standards, they should not have been allowed to sever any aspect of the 1975 death penalty statutes that called for jury participation in the sentencing scheme. Additionally, in BECK, the State Attorney General's office requested that the Alabama Supreme Court sever the language which required the jury to fix the punishment at death.

Again the jury was notedly involved in the sentencing scheme. The severability clause should not have been applied as it was in any case.

There are several standards applied to determine the constitutional soundness of any law that is deemed to be unconstitutional in which the severability clause can be applied. The first of these standards deals with the ability of the law to stand, separate from the unconstitutional provisions of the statutes.

In this case, the answer lies within the actions of the Alabama State Legislature. Since the Beck decision, the Legislature has enacted legislation that specifically outlined the (FN 6) minimal levels of review for capital defendants during sentencing hearings. These actions allow for the limiting of the prosecution to eight (8) specific aggravating factors and allowed great latitude (FN 7) (FN 8) to the defendant in presenting mitigating evidence.

54

The 1975 death penalty statutes minus the severed unconstitutional preclusionary rule is no more. A new, more diverse, detailed statute has replaced the 1975 and 1980 statutes which the Legislature realized could not meet the test of the judiciary.

The mere creation of the 1981 death penalty statute within one (1) year of the Beck decision is a clear indication that the state legislature was aware that the 1975 death penalty statute separate from the unconstitutional preclusionary rule could not stand on its own. Without the preclusionary rule, the statute was vague and unclear, making it unlikely that the 1975 statute could have mustered the needed soundness required to satisfy the concern(s) of the United States Supreme Court.

The second of these standards relates to case law established prior to the questionable enactment of Alabama's severability clause.

As is noted by Justice Cooley in Leisy v. Hardin (FN 13), "When a statute is adjudged to be unconstitutional it is as if it had never been. Rights cannot be built upon it." Based on practices and provisions of noted case law, this requires that all death row inmates prosecuted and subsequently sentenced under the repealed 1975 death penalty statutes which had not reached final judgement of the highest court with jurisdiction should have received relief (FN 10).

### The Separation of Powers

In conclusion, the most complex of topics discussed herein deals with the Separation of Powers Act (FN 11). It has been well established in both the United States and Alabama State constitutions that each state shall have in place three (3) separate and distinctive branches of government whose duties are clear and well defined.

Alabama's long history of failure in establishing a sound and applicable death penalty statute subsequently led to the unconstitutional consolidated efforts of the Alabama Law Institute, comprised of individuals from each of the three (3) branches of government, their purpose being to create a death penalty statute (FN 12).

It has been established through case law that the state's highest court can act in an advisory role directly to the Legislature when the Legislature poses specifics questions.

The ability of Alabama's Supreme Court to act in an advisory role to the Legislature is not what is in question.

However, in this instance, a Supreme Court Justice for Alabama, the Attorney General, Legal Advisors to the Governor, State Representatives, State Senators, and a Federal level Justice all joined together not in an advisory capacity but as creators of what has become the present death penalty statute.

To date, there are NO provisions which allow members of the executive branch to act with the judiciary branch as advisors to the State Legislature. Because of this the use and application of any statute created as a result of their consorted efforts is unconstitutional.

### Footnotes

FN 1. Furman v GA 33 L.Ed. 2d., 346 (1972)

FN 2. Beck v State, 396 So. 2d., 645 (1980)

FN 3. Code of Alabama 1975 Title 13-11-2 (A)

FN 4. Dunn v State 628 So. 2d. 519 (1993) Legislature is without authority to enact laws which impair attorney's ability to fulfill his ethical duties as officer.

FN 5. Code of Alabama 1975 Title 1-1-16 "under prior versions of the Death Penalty Statute where legislature included jury participation in the sentencing schemes supreme court could not judicially sever it."

FN 6. Code of Alabama, 1975 Title 13A-5-47

3

52

FN 7. Code of Alabama, 1975 Title 13A-5-49

FN 8. Code of Alabama, 1975 Title 13A-5-51

FN 9. Code of Alabama, 1975 Title 13A-5-37 through 5-59

FN 10. <u>Bradley v. United States</u>: 410 U.S. 605 "...The repeal of a criminal statute abates all prosecution which have not reached final disposition...." See also

    A) <u>Bell v. Maryland</u>, 120 L. Ed. 2d., 822

    B) <u>Warden v. Lewisburg Pen v. Marrard</u>, 41 L. Ed. 2d., 383

    C) <u>Reinsinger v. U.S.</u> 32 L. Ed. 2d., 480

FN 11. <u>Hendrix v. Creel</u> 297 So. 2d., 364 "Court above all others are charged with sacred duty not to encroach upon the domain of other departments of government.

FN 12. Code of Alabama, 1975 Title 29-8-1, The Law Institute:

    A) Executive Board

      1) The Attorney General

      2) Legal Advisor to State Governor

      3) Six (6) Attorneys appointed by Governor

    B) Judicial Branch

      1) One Alabama Supreme Court Justice

      2) One Civil Appeals Court Justice

      3) One Court of Criminal Appeals Justice

      4) One Circuit Court Justice

      5) One Residing Federal Justice

    C) Legislature:

      1) President of State Senate

      2) President Pro Tempore to the Senate

      3) Four (4) members of the Senate

      4) The Speaker of the Senate

      5) The Speaker Pro Tempore to the House

      6) Six (6) members of the House

      7) Chairman of Senate Finance and Taxation Committee

      8) Chairman of Senate Judiciary Committee

      9) Chairman of Senate Ways and Means Committee

      10) Chairman of House Judiciary Committee

      11) Chairman of Senate Rules Committee

      12) Chairman of House Rules Committee

FN 13. <u>Leisy v. Hardin</u> 10 S. Ct., 681, "And what is true of an act void in toto is true as to any part of an act which is found to be unconstitutional and which subsequently is to be regarded as having never at any time been passed and in legal force."

56

53

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA

Robert T. Conrad,
Defendant/Petitioner,

*

Vs.

Case No: CC-01-179-180

State of Alabama
Plaintiff/Respondents.

*

MOTION FOR DISCLOSURE AN INCAMERA
INSPECTION OF GRAND JURY TESTIMONY

Comes now the petitioner, Robert T. Conrad, [hereinafter Conrad ]
and moves this Court to garnt the above styled Motion on the following grounds
to wit:

1. Petitioner is about to raised the following claim in the Rule 32 peti-
tion, he is preparing to file with this Court, and is requesting disclosure of
material information concerning the grand jury. Pursuant to Rule 27 of the
[A.R.Civ.P.], as he cannot complete his claim without the disclosure of the
grand jury minutes: See Ex Parte Land, 775 So.2d 840 [Ala.Crim.App.1988];

> "PETITIONER'S INDICTMENT IS VOID DUE TO PROSECUTOR'S MISCON-
> DUCT; AS THE PROSECUTOR AND THE ALABAMA DEPARTMENT..........OF
> FORENSIC EXPERT WITNESS, PERJURED THEMSELVES TO ESTABLISH THE
> CORPUS DELICTI BEFORE THE GRAND JURY; A LEGALREQUIREMENT    TO
> ESTABLISH THE BODY OF THE ALLEGED CRIME ESSENTIAL TO THE  RE-
> TURN, OF PETITIONER'S INDICTMENT; IN VIOLATION OF HIS 5TH, 6TH
> AND 14TH AMENDMENT RIGHTS PROVIDED BY THE UNITED STATES   CON-
> STITUTION."

2. As for back as 1920 Alabama has quashed indictments on the grounds "that
the Grand Jury had before it no legal evidence on which it could find the in-

dictment. See: <u>Walker Vs. State</u>, 86 So. 257, 17 Ala. App. 555.

3. If the allegations are true as petitioner states, then he is entitled to an incamera inspection of the Grand Jury testimony thereafter an evidentiary hearing.

4. The proper standard to review this claim was established in the decision, <u>McConico Vs. State</u>, 458 So.2d 743 [Ala.Cr.App.1984] [The appellant must show a justifiable need to have the Grand Jury minutes revealed to him.]; and <u>Miller Vs. Wainright</u>, 798 F.2d 426 [11th.Cir. 1986], [To obtain Grand Jury testimony, defendant must show particularized need sufficient to justify revelation of generally secret Grand Jury proceedings.]

5. Defendant/Petitioner claim states the materiality of perjury that the Alabama Department of Forensic Science [ADFS] admits and the prosecutor for that State of Alabama knew all the time, that the ADFS wasn't accredited.

6. The prosecutor knows that a Grand Jury cannot return an indictment by the presentment of a certified copy of a death certificate. See: <u>Lowery Vs. State</u>, 317 So.2d 365, 55 Ala. App. 514 cert. denied 317 So.2d 372, 294 Ala. 763; Appeal after remand, 342 So.2d 797, writ denied <u>Ex Parte Lowery</u>, 342 So.2d 802.

7. No witness testified before the GRand Jury that they witness petitioner's, caused the death of the deceased by unlawful means. Therefore, the only lawful manner to establish the death was a homicide in violation of §§ 13A-6-2 Or 13A-5-40(2) of the Code of Alabama [1975], was to bring forth an employee from the unaccredited ADFS.

55

(3)

With the ADFS not able to provide the public function accredited, it was established, to preform. The autospy report in defendant/petitioner case was nothing more than a certified copy of a death certificate. It self unreliable, the results of the autospy report deficient and the ADFS employee testimony before Grand Jury, because the testimony of accreditation was perjured testimony to the Grand Jury.

8. The only question now is the particular's of this false reliance by the Grand Jury. It is an extraordinary disclosure by a public agency to admit it's not certified to preform the public function entrusted in it to preform. Therefore, secrecy of petitioner's Grand Jury testimony cannot be allowed to be preserved, when the ADFS admits that it role has been compromise by leading a Grand Jury with improper influences that it was compentent to determine the cause of death during jury proceedings.

9. Material information that would contradict the employee's of the ADFS testimony they gave before the Garnd Jury. Is made apparent that their testimony, could not agree with their now admission that they weren't accredited in the year of our Lord 2004.

Wherefore, the above said reason Defendant/Petitioner prays that this motion be granted in full, appointed of counsel, leave to proceed indigent and all other this Court deem just and proper.

02-25-06
Dated:

Respectfully Submitted,

/s./ Robert T. Conrad
ATIS 226701
Holman Unit 3700

Almore AL. 36503

(4)                                                      56

## CERTIFICATE OF SERVICE

I hereby certify that on this the _25_ day of _February_ , 2005, I have

placed a copy of the above mentioned in the institutional mail box, postage pre-

paid, and properly addressed to the _COFFEE_ County District Attorney

at: _Mark E. Fuller, District Attorney; P.O. Box 1102 Enterprise, AL. 36331-110_

_And James M. Count, Clerk; 230 N. Court St. Ave   Enterprise, AL. 36323_


_Mark E. Fuller, District Attorney_          /s./ _Robert L. Cread_
_P.O. Box 1102_                                    Defendant/Petitioner, Pro-se:
_Enterprise, AL. 36331-1102_


_James M. Count, Clerk_
_230-N. Court Ave_
_Enterprise, AL. 36323_

57

IN THE CIRCUIT COURT OF COFFEE    COUNTY, ALABAMA

*

Robert Conrad ,
Petitioner,

*

Vs.

Case No: CC-04-019 etc

State of Alabama,
respondents.

*

## MOTION FOR APPOINTMENT OF COUNSEL

Comes now the petitioner Robert Conrad , [hereinafter Conrad ]
and moves this Honorable Court with his motion for appointment of
counsel and states the following grounds:

1. On the 10 day of JANUARY , 2005, the petitioner filed
petition for POST CONVICTION RELIEF PURSUANT TO Rule 32 A.R.Crim.P.

2. Pursuant to Section 15-12-23, Code of Alabama 1975, this Court
has authority to appoint counsel to represent and assist persons so
charged or convicted if it appears to the Court that the person
charged or convicted is unable financially or otherwise to obtain
the assistance of counsel and desires the assistance of counsel.

3. Petitioner prays this Honorable Court take judicial notice
of the entire record in this cause pursuant to Rule 201(d), Alabama
Rules of Evidence.

4. The claims presented are complex and petitioner is not a person
trained in the law.

5. Respondent will not be prejudiced by the Court granting this
motion.

Wherefore, for the above styled cause the petitioner prays that
this Honorable Court grant his Motion For Appointment of counsel.

(2)

Dated: 2/28/05 .

Respectfully Submitted,

/s./ Robert Conrad

Robert Conrad
3700 Holman Unit
# 226791  Bed# 5-156
Atmore, Al 36503

## CERTIFICATE OF SERVICE

I hereby certify that on this the 28th day of February , 2005, I have served a copy of the foregoing upon the parties below, via, postage prepaid and properly addressed as follows:

James M. Counts, clerk

230-M Court Ave

Enterprise, Al

36323

Mark Fuller District Attorney

P.O. Box 1102

Enterprise, Al.

36331

/s./ Robert Conrad

59

| | |
|---|---|
| ROBERT THOMAS CONRAD, ) | IN THE CIRCUIT COURT OF |
| ) | |
| PETITIONER, ) | COFFEE COUNTY, AL |
| ) | |
| VS. ) | ENTERPRISE DIVISION |
| ) | |
| STATE OF ALABAMA, ) | |
| ) | |
| RESPONDENT. ) | CASE #s: CC-2001-M-179 |

CASE #s: CC-2001-M-179
and
CC-2001-M-180

## STATE'S RESPONSE TO PETITIONER'S MOTION FOR DISCLOSURE AND IN CAMERA INSPECTION OF GRAND JURY TESTIMONY

*COMES NOW, the State of Alabama, by and through Thomas T. Anderson, Assistant District Attorney, and files this response to Petitioner's Motion for Disclosure and In Camera Inspection of Grand Jury Testimony and as grounds therefore states as follows:*

1. Petitioner requests an *in camera* inspection of the minutes and records of testimony from the meeting of the Grand Jury on May 31, 2001. It is not the practice or protocol of the State to make record of any Grand Jury testimony or proceedings and the undersigned is not aware of any concerning the above styled matter.

2. Furthermore, the State contends that Petitioner's argument in favor of such relief is groundless. The Petitioner's allegation that the Alabama Department of Forensic Science autopsy procedures were performed deficiently is wholly without merit. Petitioner has failed to show, in any way, that the scientific evidence admitted during Grand Jury proceedings and later at his trial, was deficient. Petitioner contends that the Alabama Department of Forensic Sciences was not accredited and that its testimony

60.

before the Grand Jury was unreliable as a result. There was
no requirement of accreditation by any certifying authority
at the time Petitioner's case was presented to the Grand
Jury. The Alabama Department of Forensic Sciences was
not required to testify as to such accreditation and in no
way offered any perjured testimony to the grand jurors.

*WHEREFORE, premises considered, Petitioner's Motion is*
*due to be DENIED.*

*Done and ordered this the 28th day of March, 2005.*

THOMAS T. ANDERSON, ASST. DIST. ATTY.
TWELFTH JUDICIAL CIRCUIT
STATE OF ALABAMA

CERTIFICATE OF SERVICE
I do hereby certify that I have this day mailed a copy of the above pleading to the Petitioner,
Robert T. Conrad, at the penitentiary address he has listed in his pleading, postage prepaid.

Thomas T. Anderson, Asst. District Attorney

Westlaw.

--- So.2d ----

--- So.2d ----, 2004 WL 1418105
(Cite as: --- So.2d ----)

**c**
Only the Westlaw citation is currently available.
NOT YET RELEASED FOR PUBLICATION.
Court of Criminal Appeals of Alabama.
Donald DEARDORFF
v.
STATE of Alabama.
CR-01-0794.
June 25, 2004.

**Background:** Defendant was convicted in the Baldwin Circuit Court, No. CC-2000-151, J. Langford Floyd, J., of three counts of **capital murder**, seven counts of theft, and one count of receiving stolen property. Defendant appealed.

**Holdings:** The Court of Criminal Appeals, Cobb, J., held that:
(1) conviction of defendant for robbery-murder and also for the underlying thefts that constituted an element of the capital-murder charges violated **double jeopardy**;
(2) testimony by witnesses concerning addendum to victim's will, which stated victim was reaffirming his will in case defendant was crazy, did not constitute hearsay;
(3) note from defendant's co-conspirator to co-conspirator's girlfriend was within the res gestae of the crime and did not constitute hearsay;
(4) statement by prosecutor in rebuttal closing argument during guilt phase of trial that allegedly referred to defendant's failure to testify did not constitute plain error;
(5) opinion of law enforcement agent regarding defendant's credibility during investigation was relevant and admissible;
(6) acts surrounding victim's death sufficiently supported the aggravating circumstance that victim's murder was especially heinous, atrocious, or cruel; and
(7) sentence of death was not disproportionate or excessive when compared to the penalty imposed in similar cases.

Affirmed and remanded with directions.

West Headnotes

[1] Double Jeopardy 135H ☞150(2)
135Hk150(2) Most Cited Cases
Conviction of defendant for **robbery-murder** and also for the underlying thefts that constituted an element of the **capital-murder** charges violated defendant's right to be free of **double jeopardy**; crimes of theft were included in the greater offense of murder during a robbery. U.S.C.A. Const.Amend. 5.

[2] Criminal Law 110 ☞419(1.10)
110k419(1.10) Most Cited Cases
A statement offered for a reason other than to establish the truth of the matter asserted therein is not hearsay. Rules of Evid., Rule 801(c).

[3] Criminal Law 110 ☞419(3)
110k419(3) Most Cited Cases
Testimony by murder victim's girlfriend, that she had witnessed victim's original will and recognized victim's handwriting on addendum that stated victim was reaffirming his will in case defendant was crazy, did not constitute hearsay and, thus was properly admitted in trial of defendant for capital murder and theft, as it was not offered to prove the truth of the matter asserted, that defendant killed victim, but rather was given in the context of the investigation of the case and the reasons for the actions the police took. Rules of Evid., Rule 801(c).

[4] Criminal Law 110 ☞419(2)
110k419(2) Most Cited Cases
Criminal Law 110 ☞419(3)
110k419(3) Most Cited Cases
Testimony by murder victim's daughter, in which she stated she found victim's will and that addendum was in victim's handwriting, and read addendum which stated victim was reaffirming his will in case defendant was crazy, did not constitute hearsay and, thus was properly admitted in trial of defendant for capital murder and theft, as it was not offered to prove the truth of the matter asserted, that defendant killed victim, but for the purpose of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1418105
(Cite as: --- So.2d ----)

Page 2

establishing that the signature on the original will and the text of the addendum were in victim's handwriting, and why police suspected defendant as they investigated victim's disappearance. Rules of Evid., Rule 801(c).

**[5] Criminal Law 110 ☞419(3)**
110k419(3) Most Cited Cases
Testimony by murder victim's son-in-law, who had examined victim's computer and found that automobile parts had been ordered following defendant's disappearance that matched automobiles defendant left in victim's warehouse after victim had been evicted, that he had seen addendum to victim's will, in which victim stated he was reaffirming his will in case defendant was crazy, did not constitute hearsay and, thus was properly admitted in trial of defendant for capital murder and theft, as it was not offered to prove the truth of the matter asserted, that defendant killed victim, but rather was given in the context of the investigation of the case, and why son-in-law and police suspected defendant. Rules of Evid., Rule 801(c).

**[6] Criminal Law 110 ☞419(3)**
110k419(3) Most Cited Cases
Testimony by police officer investigating victim's disappearance, that he was told by victim's girlfriend that victim had evicted defendant from warehouse and that he had been told that victim had executed addendum to his will stating he was reaffirming his will in case defendant was crazy, did not constitute hearsay and, thus was properly admitted in trial of defendant for capital murder and theft, as it was not offered to prove the truth of the matter asserted, that defendant killed victim, but rather was given in the context of the investigation of the case, and why police suspected defendant. Rules of Evid., Rule 801(c).

**[7] Criminal Law 110 ☞368(1)**
110k368(1) Most Cited Cases
(Formerly 110k364(1))
A coconspirator's out-of-court statement is admissible when it is part of the res gestae. Rules of Evid., Rule 801(d)(2).

**[8] Criminal Law 110 ☞368(1)**
110k368(1) Most Cited Cases
(Formerly 110k364(1))
Statements made by a co-conspirator within the res gestae of the crime are admissible against the defendant. Rules of Evid., Rule 801(d)(2).

**[9] Criminal Law 110 ☞368(2)**
110k368(2) Most Cited Cases
(Formerly 110k364(2))
Note from defendant's co-conspirator to co-conspirator's girlfriend the week before murder victim was kidnapped, stating that co-conspirator and defendant were traveling to Atlanta to work on a car, was within the res gestae of the crime, and, thus did not constitute hearsay and was properly admitted in trial of defendant for capital murder and theft, as note tended to establish that defendant and co-conspirator had formulated a plan to make it appear that they were not in Alabama at the time the crimes against victim were to be perpetrated and to provide an alibi for them. Rules of Evid., Rule 801(d)(2).

**[10] Constitutional Law 92 ☞268(8)**
92k268(8) Most Cited Cases
In judging a prosecutor's closing argument, the standard is whether the argument so infected the trial with unfairness as to make the resulting conviction a denial of due process. U.S.C.A. Const.Amend. 14.

**[11] Criminal Law 110 ☞709**
110k709 Most Cited Cases
A prosecutor's statement that is claimed to be improper must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.

**[12] Criminal Law 110 ☞713**
110k713 Most Cited Cases
Statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.

**[13] Criminal Law 110 ☞709**
110k709 Most Cited Cases
When an accused contends that a prosecutor has made improper comments during a closing argument, the statements at issue must be viewed in the context of the evidence presented in the case and the entire closing argument made to the jury, both defense counsel's and the prosecutor's.

**[14] Criminal Law 110 ☞1037.1(2)**
110k1037.1(2) Most Cited Cases
Statement by prosecutor in rebuttal closing argument during guilt phase of trial of defendant for capital murder and theft that allegedly referred to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ---, 2004 WL 1418105
(Cite as: --- So.2d ---)

Page 3

defendant's failure to testify, "he didn't make testimony," did not constitute plain error; it was not clear whether statement referenced defendant's failure to present testimony by other witnesses that supported his defense or defendant's failure to testify, and was not of such a character that a jury would naturally and necessarily take it to be a comment on defendant's choice not to testify.

**[15] Criminal Law 110** ☞449.1

110k449.1 Most Cited Cases

Opinion of law enforcement agent investigating disappearance of murder victim, that he did not find defendant's explanation of how defendant came into possession of money and gun credible, was relevant and admissible, in trial of defendant for capital murder and theft, as testimony provided explanation as to why defendant was considered a suspect and officers continued to investigate defendant's possible involvement in disappearance of victim. Rules of Evid., Rule 701.

**[16] Criminal Law 110** ☞1169.9

110k1169.9 Most Cited Cases

Even if trial court erred in admitting opinion of law enforcement agent investigating disappearance of murder victim, that he did not find defendant's initial explanation of how defendant came into possession of money and gun credible, admission of opinion was harmless, in trial of defendant for capital murder and theft, where audiotape of defendant's second interview with police was admitted in evidence, and in such tape defendant admitted he initially lied to police.

**[17] Criminal Law 110** ☞661

110k661 Most Cited Cases

**Criminal Law 110** ☞1153(1)

110k1153(1) Most Cited Cases

A determination of the admissibility of evidence rests in the trial court's sound discretion, and the trial court's ruling will not be reversed absent an abuse of that discretion.

**[18] Criminal Law 110** ☞478(1)

110k478(1) Most Cited Cases

Trial court did not abuse its discretion, in trial of defendant for capital murder and theft, by determining that State had established forensic expert's qualifications to render opinion that duct tape recovered from victim's body matched the roll of duct tape recovered from warehouse unit defendant had rented from victim, where expert had

received on-the-job training with the forensic sciences departmental director when he began his career, he had been working as a forensic scientist for more than 30 years, and he had completed numerous post-graduate training seminars. Rules of Evid., Rule 702.

**[19] Searches and Seizures 349** ☞165

349k165 Most Cited Cases

Defendant had no standing to object to stop and search of vehicle or seizure of gun and money found in such search, where license tags for vehicle established that defendant's girlfriend owned the vehicle at the time of the stop and search, and defendant claimed at the time of the stop that he did not own box in which gun and money were found. U.S.C.A. Const.Amend. 4.

**[20] Sentencing and Punishment 350H** ☞1684

350Hk1684 Most Cited Cases

Facts surrounding victim's death sufficiently supported the aggravating circumstance that victim's murder was especially heinous, atrocious, or cruel when compared to other capital offenses, in penalty phase of trial of defendant for capital murder; victim was held captive in a closet in his own home for more than 24 hours, victim pleaded for his life, victim recently had knee surgery, when defendant took him from his house defendant bound victim's hands and mouth with duct tape, defendant forced victim to walk a long way down a logging road, and at end of road defendant forced victim to kneel on the ground and shot victim repeatedly in the back of his head. Code 1975, § 13A-5-49(8).

**[21] Sentencing and Punishment 350H** ☞1789(3)

350Hk1789(3) Most Cited Cases

No plain error occurred in the prosecutor's questions, during penalty phase of trial of defendant for capital murder, regarding defendant's desertion from the military, where defendant's mother as a mitigation witness had testified that defendant's service in the Navy had changed his personality; once such evidence was admitted, prosecutor was entitled to challenge it, and defendant's own explanation as to his discharge far exceeded the scope of questions the prosecutor asked his mother. Code 1975, § 13A-5-45 (c, d, g); Code 1975, § 13A-5-52.

**[22] Sentencing and Punishment 350H** ☞1612

350Hk1612 Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ---

--- So.2d ---, 2004 WL 1418105
(Cite as: --- So.2d ----)

The death penalty does not constitute cruel and unusual punishment. U.S.C.A. Const.Amend. 8.

**[23] Sentencing and Punishment 350H⟜1788(3)**
350Hk1788(3) Most Cited Cases
(Formerly 350Hk1789(3))
Defendant's failure to include any specific claims of equal-protection or due-process violations supporting his claim that his death sentence for capital murder violated equal protection and due process precluded a finding of plain error in his appeal of his sentence.

**[24] Constitutional Law 92 ⟜48(6)**
92k48(6) Most Cited Cases
An analysis of whether a sentence violated equal protection or due process begins with the basic principle that a defendant who alleges an equal protection or due process violation has the burden of proving the existence of purposeful discrimination or an adverse impact on his own rights, and that the purposeful discrimination had a discriminatory effect on him. U.S.C.A. Const.Amend. 14.

**[25] Sentencing and Punishment 350H⟜1788(3)**
350Hk1788(3) Most Cited Cases
(Formerly 350Hk1789(3))
No plain error occurred as a result of the trial court's double counting of burglary, robbery, and kidnapping as both elements of the capital offenses and as aggravating circumstances, in penalty phase of trial of defendant on three counts of capital murder; "double counting" of burglary, robbery, and kidnapping as aggravating circumstances was provided for in Alabama's death-penalty statutory scheme, and *Apprendi* was not violate. Code 1975, § 13A-5-45(e).

**[26] Jury 230 ⟜31.1**
230k31.1 Most Cited Cases
**Sentencing and Punishment 350H ⟜1626**
350Hk1626 Most Cited Cases
Alabama's capital-sentencing scheme is not unconstitutional and does not violate the principles established in *Ring* because the trial judge, and not the jury, makes the findings regarding the aggravating and mitigating circumstances and determines the sentence, and because it permits imposition of a death sentence without unanimous jury findings as to the aggravating circumstances.

**[27] Criminal Law 110 ⟜1035(6)**
110k1035(6) Most Cited Cases
No plain error occurred as a result of prosecutor's statement during voir dire in trial of defendant for capital murder and theft, that verdict during the penalty phase of the trial would be advisory only and that the trial court would determine the actual sentence, because such was an accurate statement of the law. Code 1975, § 13A-5-46.

**[28] Sentencing and Punishment 350H ⟜1657**
350Hk1657 Most Cited Cases
**Sentencing and Punishment 350H ⟜1681**
350Hk1681 Most Cited Cases
Sentence of death for defendant convicted of three counts of capital murder was not disproportionate or excessive when compared to the penalty imposed in similar cases; defendant committed a murder during the course of a robbery, a burglary, and a kidnapping, and similar crimes have been punished by death throughout Alabama. Code 1975, § 13A-5-53(b).

Jeffery C. Duffey, Montgomery, for appellant.
William H. Pryor, Jr. , atty. gen., and Anne C. Adams, asst. atty. gen., for appellee.

COBB, Judge.
*1 Donald Deardorff was charged in a 23-count indictment with capital murder and related offenses surrounding the death of Ted Turner. A jury convicted Deardorff of three counts of capital murder, seven counts of theft, and one count of receiving stolen property. Following a penalty-phase hearing on the capital-murder convictions, the jury recommended, by a 10-2 vote, the imposition of the death penalty. The trial court conducted a separate hearing and considered additional evidence, then ordered that the death penalty be imposed for the capital-murder convictions. The trial court imposed sentences of imprisonment for each of the remaining convictions. Deardorff appeals from the convictions and sentences for capital murder. We affirm in part and remand for further proceedings.
Deardorff was initially indicted for four counts of capital murder: murder committed during the course of a burglary, § 13A-5-40(a)(4), Ala.Code 1975 ; murder committed during the course of a robbery, § 13A-5-40(a)(2), Ala.Code 1975 ; murder committed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1418105
(Cite as: --- So.2d ----)

Page 5

during the course of a kidnapping, § 13A-5-40(a)(1), Ala.Code 1975 ; and murder committed for pecuniary gain or for hire, § 13A-5-40(a)(7), Ala.Code 1975. He was also charged with five counts of theft of funds from Turner's bank and credit-card accounts, and with two counts of theft for stealing Turner's car and truck, § 13A-8-3(a), Ala.Code 1975. Deardorff was also charged with one count of receiving stolen property, § 13A-8-17, Ala.Code 1975, for obtaining possession of a gun that had belonged to a relative of Deardorff's but was stolen in a burglary. In addition to each of the substantive charges of theft and capital murder, Deardorff was charged with 11 separate counts of conspiracy for conspiring with co-defendant Millard Peacock to commit each of the eleven underlying capital-murder and theft offenses. § 13A-4-3, Ala.Code 1975. The two counts related to the charge of murder for pecuniary gain-the capital-murder charge and the conspiracy charge-were dismissed on motion of the State before trial. The State withdrew the remaining counts charging conspiracy at the conclusion of the State's presentation of the evidence at the guilt phase.

The jury found Deardorff guilty of the eleven counts submitted for its consideration-three counts of capital murder, seven counts of theft, and one count of receiving stolen property-and the trial court entered judgment and sentence on all counts. As to the non-capital convictions, the trial court imposed sentences of imprisonment totaling 140 years. In a very thorough sentencing order, the circuit judge found the following aggravating circumstances to exist: § 13A-5-49(4), Ala.Code 1975 , that the capital offense was committed during the course of a robbery, a burglary, and a kidnapping; and § 13A-5-49(8), Ala.Code 1975, that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses. The court found no statutory mitigating circumstances. § 13A-5-51, Ala.Code 1975. With regard to nonstatutory mitigating circumstances, § 13A-5-52, Ala.Code 1975, the trial court stated that it considered Deardorff's family life, "his past life experiences and his past service in the military," and Deardorff's continuing assertions of innocence. (C. 29.) The court determined that the aggravating circumstances outweighed the mitigating circumstances and

imposed the death sentence for each of the remaining counts of capital murder.

*Facts*

*2 Ted Turner was a minister of Unity Church, the father of two children, and a businessman who owned a warehouse and rental properties. He disappeared in September 1999. His decomposed remains were discovered in a remote area of Baldwin County in July 2001, after Deardorff's codefendant, Millard Peacock, cooperated with members of law enforcement investigating Turner's disappearance and led them to the body.

The trial of this case spanned two weeks and involved many witnesses and exhibits. The evidence occasionally conflicted, but the evidence presented at trial tended to establish the following. Turner was 56 years old and had undergone knee surgery shortly before he disappeared in September 1999. He was still required to wear a knee brace and his mobility was restricted, but he could walk and drive a vehicle.

Beginning in 1998, Turner had leased a storage warehouse to Deardorff and his girlfriend, Christy Andrews. Deardorff had, at some point, stopped making the rental payments for the warehouse and Turner pursued legal action against Deardorff and Andrews in the district court. Deardorff and Andrews were evicted from the warehouse and, on July 27, 1999, a default judgment was entered against them in the amount of $3,087.50. Numerous dismantled vehicles, vehicle parts, and tools were left in the warehouse when Deardorff and Andrews abandoned it, and Turner was attempting to seize those items through the court proceedings.

Turner had executed a will on January 22, 1999, in preparation for a trip to Paris, France. A copy of the will was found on his kitchen table after he disappeared. The will had an addendum in Turner's handwriting that stated: "Reaffirmed 7/27/99 just in case Don Deardorff is really crazy." Turner's signature followed the reaffirmation. (C. 845.)

Deardorff became acquainted with his codefendant, Millard Peacock, several years before the murder, and they became friends and worked on cars together. Peacock entered into a plea bargain with the State of Alabama in which he received a sentence of 15 years' imprisonment; part of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1418105
(Cite as: --- So.2d ----)

Page 6

agreement involved Peacock's promise to cooperate with the prosecution and to testify truthfully at Deardorff's trial. Peacock testified that Deardorff was very angry at Turner for filing the legal actions against him and attempting to seize his property. In August 1999, Deardorff told Peacock that he planned to rob Turner to "get even" with him. Deardorff also said that he would like to kill Turner. On September 20, 1999, Deardorff drove to Lucedale, Mississippi, where Peacock was staying with his girlfriend, Dawn Dunaway. Dunaway later testified that she left Peacock a note with a picture of a handgun because her .38 Special handgun was missing from her house. During the evening of September 21, 1999, Deardorff and Peacock went to an area near Turner's house. The climbed the hillside behind Turner's house and planned how they would later break into the house. Deardorff had carried a .38 caliber handgun with him, and he hid the gun behind Turner's house before they left. Deardorff had previously told Peacock that that handgun had been stolen from his grandmother's house during a burglary and that he later found the gun and kept it without reporting that it had been recovered. On the evening of September 22, 1999, Deardorff and Peacock again climbed the hillside behind Turner's house, this time with the intent to rob Turner, Peacock said. Deardorff retrieved the handgun that he had hidden earlier, and they entered the house through an unlocked back door. Turner was not home. Deardorff looked in Turner's file cabinets, and then the men waited for Turner to come home.

*3 When Turner entered through the front door of his house, Deardorff pointed the gun at him and told him to be quiet or "he would blow his brains out." (R.2098.) Deardorff and Peacock then used duct tape they had found in the house to bind Turner's hands, and they placed him in a closet. Deardorff left for the evening and Peacock slept on the floor. He let Turner out of the closet to use the bathroom; he removed the tape from Turner's hands and did not reapply it when he put Turner back into the closet. Deardorff returned to the house the following morning. Peacock testified that Deardorff forced Turner to write a personal check for $4,000. Peacock said that Deardorff told Turner that "he figured this was the best way to get even with him, to leave him financially broke." (R. 2101.) Turner

told Deardorff he would give him whatever he wanted, and pleaded to be left alive. Deardorff then told Turner that he was not going to kill him. He also told Peacock that the two of them would leave the country after they had finished with Turner.

Peacock drove Turner's car to AmSouth Bank, taking the $4,000 check with him. Peacock said that he took the check to be cashed because Deardorff did not have any identification. Peacock cashed the check, returned to Turner's house, and gave Deardorff the money. Peacock said that Deardorff then made Turner write out four "credit card checks. " The four checks totaled $17,750. Peacock again drove Turner's car, this time to United Bank, where Peacock had an account. The bank would not cash the checks; the teller told Peacock he would have to deposit them into his savings account and that the money would be available in five business days. Peacock deposited the checks in his account. When he returned to Turner's residence and told Deardorff that he could not access the money for five days, Deardorff said that they would have to change their plans.

Deardorff and Peacock spent that remainder of the day and night in Turner's house. They watched television and ate pizza purchased with Turner's money. Deardorff used Turner's computer; he ordered numerous automobile parts using Turner's credit cards, and he visited several pornographic Web sites. Turner remained in the closet the entire time.

Early the following morning, before dawn, Deardorff woke Peacock and told him they had to leave. Deardorff told Turner that they were going to take him to a park and leave him on a park bench, then call the police so they could pick him up. Turner requested a blanket because it was cool outside, so one of the men put a blanket in the car. Turner's hands and mouth were taped using the duct tape and he was placed in the passenger seat of his own car. Deardorff took some items from Turner's garage and some files from the file cabinet. Deardorff had the handgun and the proceeds from the check they had been able to cash. Deardorff drove the car with Turner in the front seat and Peacock followed, driving Turner's truck.

*4 Deardorff stopped at a small gasoline service station and told Peacock to lock Turner's truck and leave it there. Peacock then got in the backseat of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ---, 2004 WL 1418105
(Cite as: --- So.2d ---)

Page 7

Turner's car. Deardorff told Turner that he did not want him to see where they were taking him, so he put a pillowcase over his head and taped it so it would not come off. Deardorff then placed the passenger seat in a reclining position and drove to a logging road blocked by a gate. The road was approximately one mile away from a house Deardorff and his girlfriend, Christy Andrews, had lived in until August 1999. Peacock said that he and Deardorff got Turner out of the car and walked him to the end of the logging road. Peacock did not believe at that time that Turner would be killed, and he did not know whether Deardorff had a weapon with him. When they reached the end of the road, Peacock said, Deardorff told him to wait there and that he was going to walk Turner a few more feet. Deardorff walked a bit further with Turner, forced him to kneel on the ground, and then shot him in the head four times, killing him.

Peacock and Deardorff drove Turner's car to the service station where they had parked Turner's truck. Deardorff suggested that he and Peacock drive the vehicles to Dawn Dunaway's house in Mississippi and leave one of the vehicles there. Deardorff drove the car and Peacock drove the truck, and they left the truck in Mississippi. They spent two nights at a hotel in Mobile. Deardorff then instructed Peacock to drop him off at a Conoco brand gasoline service station and to pick him up there two days later, which Peacock did. The men then returned to Dunaway's house and stayed there overnight. Deardorff used the computer at Dunaway's residence to order additional car parts using Turner's credit cards.

On September 30, 1999, Deardorff drove Turner's car to a sandbar along a river in Mississippi and burned it. Deardorff and Peacock then drove to Atmore, where Peacock entered the United Bank and withdrew from his account $17,700 from the deposit of Turner's credit-card checks. Deardorff told Peacock to drop him off at the Conoco station. He gave Peacock several hundred dollars but told him that he would keep the rest of the money. He told Peacock that he would contact him later and that they would split the rest of the money then.

Deardorff went to stay with his girlfriend at her parents's residence. Deardorff told Andrews that he had gotten the money in a drug deal. He also showed her a handgun and he told her he had it for

protection. On the following day, October 1, 1999, Andrews and Deardorff went to a Wal-Mart discount store in Andrews's car. As they were leaving the store parking lot, several law-enforcement officers, with guns drawn, stopped the car. Andrews was driving. The officers asked Andrews to follow them to the sheriff's office and she agreed to do so. While en route, Andrews told Deardorff that the officers must have found out about his drug deal. Deardorff disagreed and told Andrews that they wanted to question him about Turner. Andrews said that, earlier that day, she and her father had heard a news report of Turner's disappearance. Deardorff had asked them what information had been reported, and Andrews testified that Deardorff seemed surprised to hear that Turner was missing.

*5 Upon their arrival at the sheriff's office, Andrews consented to the search of her vehicle. On the backseat of her car officers discovered a box that belonged to Deardorff. Inside the box the police found $18,900 in cash and a .38 caliber handgun with five unspent rounds in the chamber. FN1 The box also contained a catalog of pornographic videotapes and paperwork relating to Internet orders for automobile parts placed in Turner's name and using his credit cards. The parts ordered were for cars of the same make and model as Deardorff owned and the documents were printed on the evening of September 28, 1999. When Deardorff heard the officers talking about the money and the weapon being found in the car, he stated, "The gig is up." (R. 1514, 1595.) FN2 When one of the deputy sheriffs asked Deardorff what he meant by that remark, the officer testified that he replied, " [T]ake the death penalty off the table and I'll tell you." (R. 1595.)

Deardorff then told the officers that, a few days earlier, Peacock had given him the box to hold for safekeeping. He said that Peacock asked him to hold the box for two days and that Peacock would then retrieve it. Deardorff said that he became curious about the contents of the box and opened it; he said that he was surprised to see the gun and the money, and he became scared and nervous. Deardorff told the officers that when he heard that Turner was missing, he "put two and two together;" the money, Millard Peacock, the gun, Ted Turner missing," and put the box and its contents into

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ---

--- So.2d ----, 2004 WL 1418105
(Cite as: --- So.2d ----)

Andrews's car. (R. 1561.) He said that he and Andrews rode around looking for Peacock so they could return the box to him. They stopped at a Wal-Mart, he said, and were then stopped by the police. The officers noted that the box was from a Dollar General Store, and that Andrews worked in a Dollar General Store. Deardorff was arrested on a charge of possessing a firearm without a permit.

Andrews consented to the search of the storage facility she and Deardorff had rented. Inside the facility the police found numerous items that came from Turner's house, including a roll of duct tape, the ends of which matched the tape used to bind Turner's hands and feet and to secure the pillowcase over his head, a pair of binoculars Turner frequently used at his house, and two cameras that a neighbor had recently loaned to Turner.

Peacock was arrested at Dunaway's house in Mississippi on October 5, 1999. He gave numerous conflicting statements to the police, and in July 2001, he agreed to cooperate fully and he led the police to Turner's remains.

### I.

Because the death penalty has been imposed in this case, this Court conducts a review of the record for plain error pursuant to Rule 45A, Ala. R.App. P. We have explained our plain-error review as follows:

"Rule 45A, Ala. R.App. P., provides:

" 'In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.'

*6 "Plain error has been defined as error so obvious that the failure to notice it would seriously affect the fairness or the integrity of judicial proceedings. Plain-error review of an alleged error must be conducted within the context of the entire proceeding. E.g., Turner v. State, [Ms. CR-99-1568, Nov. 22, 2002] --- So.2d ----, ---- (Ala.Crim.App.2002). Alabama courts have often stated that a defendant's failure to

object to an alleged error at trial weighs against any claim of prejudice raised on appeal. E.g., Ziegler v. State, [Ms. CR-00-1987, Feb. 28, 2003] --- So.2d ---- (Ala.Crim.App.2003) , Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala.1985) . Lastly, the United States Supreme Court has often stated that a criminal defendant is constitutionally entitled to a fair trial, not to a perfect one. E.g., United States v. Hasting, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) ; Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)."

Yeomans v. State, [Ms. CR-01-0701, Feb. 27, 2004] --- So.2d ---, ---- (Ala.Crim.App.2004).

The attorney initially appointed to represent Deardorff on appeal filed a brief addressing only penalty-phase issues. After oral argument was heard in this case, new counsel was appointed for Deardorff, and the newly appointed attorney filed a supplemental brief addressing guilt-phase issues. We will address the guilt-phase issues and then the penalty-phase issues presented in the briefs.

*Guilt-phase Issues*

### II.

[1] Deardorff argues that his right to be free of **double jeopardy** was violated when he was convicted and sentenced for **robbery**-murder and also for the underlying thefts that constituted an element of the **capital-murder** charges. The State agrees that Deardorff was erroneously convicted of the lesser-included offenses of theft in Counts 9, 11, 13, 15, 17, 19, and 21. We agree that Deardorff's **double-jeopardy** rights have been violated in this respect and that the case must be remanded.

The Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." United States Const., Amend. V. We recently addressed this issue in another case:

"The crimes of robbery and theft are included in the greater offense of murder during a robbery. Rape is included in the greater offense of murder during a rape. A defendant cannot be convicted of both a greater offense and a lesser-included offense based on the same set of facts. *Simmons*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1418105
**(Cite as: --- So.2d ----)**

*v. State*, 797 So.2d 1134 (Ala.Crim.App.2000), cert. denied, 797 So.2d 1186 (Ala.), cert. denied, 534 U.S. 932, 122 S.Ct. 298, 151 L.Ed.2d 221 (2001)."

*Turner v. State*, [Ms. CR-99-1568, Nov. 22, 2002] --- So.2d ----, ---- (Ala.Crim.App.2002), *opinion on first return to remand* [April 25, 2003], ---So.2d at ---- (Ala.Crim.App.2003), *aff'd on second return to remand* [Aug. 29, 2003], --- So.2d at ---- (Ala.Crim.App.2003).

Therefore, this case is due to be remanded for the trial court to vacate Deardorff's convictions and sentences for theft in Counts 9, 11, 13, 15, 17, 19, and 21. FN3

**III.**

*7 Deardorff next argues that hearsay evidence was erroneously admitted during the prosecution's case-in-chief. Specifically, he claims that State's Exhibit 2, Turner's will with the handwritten reaffirmation referring to Deardorff, and the testimony about the will should not have been admitted. He also argues that State's Exhibit 52, a note Peacock wrote to Dawn Dunaway regarding his going out of town to work with Deardorff, was improperly admitted as a statement made in furtherance of a conspiracy. We disagree.

*A. Turner's Will*

Gail Goodwin, Turner's girlfriend, identified State's Exhibit 2 as Turner's handwritten will, which she signed as a witness on January 22, 1999. Goodwin identified the additional writing at the bottom of the will as also being in Turner's handwriting. She testified about the contents of the original will, but did not testify as to the substance of the addendum. Karen Hodge, Turner's daughter, testified that she found the will after her father disappeared. She testified that, at the bottom of the will, her father had written "that he reaffirmed the will just in case Don Deardorff was crazy." (R. 1237.) Greg Hodge, Turner's son-in-law, testified that he saw the addendum to Turner's will. He said that the addendum, in addition to other circumstances, caused him to suspect that Deardorff was involved in Turner's disappearance. Tom Montgomery, a special agent with the Federal Bureau of

Investigation ("the FBI"), testified that Turner's daughter told him that she had found her father's will and that the addendum to the will referred to Deardorff. Deardorff argues that this evidence was referred to throughout the trial, and was prejudicial. He also notes that part of the prosecution's theory was that Deardorff killed Turner, in part, because of the civil case Turner had filed against him. Deardorff objected to none of the foregoing testimony about Turner's will. Therefore, we review his claim for plain error.

[2] Alabama courts have often stated that a determination of the admissibility of evidence rests in the trial court's sound discretion and that the trial court's ruling will not be reversed absent an abuse of that discretion. *E.g., Baird v. State*, 849 So.2d 223, 237 (Ala.Crim.App.2002). Rule 801(c), Ala. R. Evid., defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A statement offered for a reason other than to establish the truth of the matter asserted therein is not hearsay. *E.g., Smith v. State*, 795 So.2d 788, 814 (Ala.Crim.App.2000).

[3] Gail Goodwin testified that she had witnessed the original will, and she identified Turner's handwriting on the original portion and on the addendum. Goodwin did not testify as to the contents of the will or to the reference to Deardorff. Clearly, Goodwin's testimony was offered for the purpose of establishing that the will was Turner's and that the addendum had been written by Turner. Thus, Goodwin's testimony did not constitute hearsay because it was not offered to prove the truth of that matter asserted-that Deardorff killed Turner. No plain error occurred as a result of Goodwin's testimony.

*8 [4] Karen Hodge testified that she found the will at her father's house. She, too, testified that the addendum to the will was in Turner's handwriting and she read for the record the text of the addendum. She stated that she took the will to the police department. Karen's testimony was offered, not for the truth of the matter asserted-that Deardorff killed Turner-but for the purpose of establishing that the signature on the original will and the text of the addendum were in Turner's handwriting and that the addendum verified some concerns Turner had had as a result of his legal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1418105 ·
(Cite as: --- So.2d ----)

problems with Deardorff. Her testimony was not hearsay, and it was properly admitted.

Greg Hodge, Turner's son-in-law, testified that he built Turner's computer. After Turner disappeared, Hodge examined the computer to review recent activity on the Internet. Hodge discovered e-mail confirmations that several automobile parts had been ordered, and he determined that the types of parts ordered matched the automobiles that Deardorff had left in the warehouse he had rented from Turner. Hodge testified that the companies were contacted to confirm that the parts were ordered after Turner had disappeared. Hodge testified that he began to suspect Deardorff's involvement in Turner's disappearance because the automobile parts ordered matched the automobiles Deardorff had in the warehouse. The prosecutor then asked Hodge whether he had seen the addendum to Turner's will, and Hodge said he had seen it. The prosecutor asked if that, too, caused him to suspect Deardorff, and Hodge said that it did. (R. 1292.) Hodge said that he and Karen turned the information over to law-enforcement officers.

Agent Montgomery testified that in a missing-person case, a series of steps is generally followed to determine whether the person left voluntarily or as a result of foul play. He said the victim of a crime often knows the perpetrator, and he asked Turner's daughter, Karen Hodge, whether anyone was mad at her father or had had a dispute with him. Karen advised the agent that her father had had difficulties with two tenants at his rental property; one tenant had been evicted from a mobile home, and the other tenant had been evicted from a warehouse facility from which he had run an automotive business. Further investigation revealed that Deardorff was the tenant who had been evicted from the warehouse. Agent Montgomery testified that a few days after Turner disappeared, Karen informed him that she had found her father's will and that Deardorff was mentioned in the addendum to the will. He said that Deardorff and his girlfriend, along with the other tenant Turner had evicted from a rental property, were the initial suspects in Turner's disappearance. Montgomery also testified that law enforcement became aware of Peacock's name when AmSouth Bank personnel notified the Turner family that he had cashed a $4,000 check on the victim's account. Agent Montgomery testified

that he had no evidence of malice between Peacock and Turner at that time. He further testified that he learned of Peacock's association with Deardorff on October 1, 1999, in his interview with Deardorff's girlfriend, Christy Andrews.

\*9 [5] [6] A review of the record demonstrates that Agent Montgomery's testimony and Karen and Greg's testimony about Turner's will, and particularly the addendum to the will, was given in context of the investigation of the case and the reasons for the actions the police took. It was by definition not hearsay and it was properly admitted into evidence. We have considered cases presenting similar circumstances and have found no error in the admission of the testimony. For example, in *Smith v. State*, 795 So.2d 788 (Ala.Crim.App.2000) , a police officer testified that, during a search of the house belonging to the defendant's mother, she told him that the defendant had put some clothes in the washing machine; Smith argued that the testimony was prejudicial hearsay. We held:

"[T]his statement was elicited to establish the reasons for the officer's action and the reasons the officers searched certain areas of the trailer. It was not offered for the truth of the matter asserted and was not hearsay. 'The fact of the conversations in this case was offered to explain the officer's actions and presence at the scene-not for the truth of the matter asserted. Accordingly, it was not hearsay. *Clark v. City of Montgomery*, 497 So.2d 1140, 1142 (Ala.Cr.App.1986).' *Thomas v. State*, 520 So.2d 223 (Ala.Cr.App.1987)."

795 So.2d at 814.

In *D.R.H. v. State*, 615 So.2d 1327 (Ala.Crim.App.1993), the appellant argued that hearsay had erroneously been admitted when the officers were permitted to testify about what the confidential informant had told them. We disagreed, found that the evidence was not hearsay, and stated, "[The officers'] testimony was received to show the reasons for the officers' actions and how their investigation focused on a suspect. *Sawyer v. State*, 598 So.2d 1035 (Ala.Cr.App.1992)." 615 So.2d at 1330. *In accord, Miller v. State*, 687 So.2d 1281, 1285 (Ala.Crim.App.1996).

The testimony about Turner's will that was elicited from Goodwin, the Hodges, and Agent Montgomery was not hearsay and it was properly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

admitted at trial. No error or plain error occurred as a result of the admission of their testimony.

### B. *Note from Peacock*

Deardorff also argues that State's Exhibit 52, a note Peacock wrote to his girlfriend, Dawn Dunaway, regarding his going out of town to work on a car with Deardorff, was improperly admitted as a statement made in furtherance of a conspiracy. He contends that because the State failed to prove that the statement was made in furtherance of the conspiracy, it constituted hearsay and therefore should not have been admitted. Deardorff objected on this basis at trial and the trial court overruled the objection; thus the alleged error was preserved for our review.

Dunaway identified State's Exhibit 52 as a note Peacock wrote to her the week before Turner was kidnapped. The note informed Dunaway that Peacock was going to Atlanta with Deardorff to work on a car. When Deardorff objected at trial on the ground that the note did not demonstrate a furtherance of the conspiracy and was, instead, offered for the truth of the matter asserted (R. 1613), the State argued that the note was not offered to establish the truth of the matter asserted-that Peacock and Deardorff went to Atlanta to work on a car. Instead, the State argued that it was offered to show that Deardorff and Peacock were traveling together and making a plan during the days before Turner was kidnapped. The State also argued that the statements of a coconspirator in furtherance of the conspiracy are admissible.

*10 [7] [8] [9] Rule 801(d)(2), Ala. R. Evid., states, in pertinent part, that a statement is not hearsay if it "is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Deardorff does not dispute that there was a the conspiracy. "A coconspirator's out-of-court statement is admissible when it is part of the res gestae. 'Statements made by a co-conspirator within the res gestae of the crime are admissible against the defendant.' *Moore v. State,* 539 So.2d [416,] 420 [(Ala.Crim.App.1988)]." *Acklin v. State,* 790 So.2d 975, 999 (Ala.Crim.App.2000). The note from Peacock tended to establish that Deardorff and Peacock had formulated a plan to make it appear

that they were not in Alabama at the time the crimes against Turner were to be perpetrated and to provide an alibi for them. Thus, Peacock's statement in the note was within the res gestae of the crime, and the trial court correctly admitted the note into evidence. No error occurred with regard to this issue, and Deardorff is not entitled to any relief.

### IV.

[10] [11] [12] Deardorff next argues that the prosecutor improperly commented during closing argument at the guilt phase on Deardorff's failure to testify. Specifically, he objects to the statement, " He didn't make testimony." (R. 2790.) Deardorff did not object to this statement when the prosecutor made it, so our review is limited to a review for plain error. We find no plain error.

" ' "This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful." ' " *Kuenzel v. State,* 577 So.2d 474, 489 (Ala.Crim.App.1990) , aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991) , quoting *Johnson v. Wainwright,* 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). Moreover,

" '[t]his court has stated that "[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract." *Bankhead v. State,* 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991) , aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). See also *Henderson v. State,* 583 So.2d 276, 304 (Ala.Crim.App.1990) , aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). "In judging a prosecutor's closing argument, the standard is whether the argument ' so infected the trial with unfairness as to make the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1418105
(Cite as: --- So.2d ----)

Page 12

resulting conviction a denial of due process.' " *Bankhead*, 585 So.2d at 107, quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury." *Roberts v. State*, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.) , cert. denied, 538[528] U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, " statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict." *Bankhead*, 585 So.2d at 106.' "

*11 *Johnson v. State*, 823 So.2d 1, 45-46 (Ala.Crim.App.2001) (quoting *Ferguson v. State*, 814 So.2d 925, 946 (Ala.Crim.App.2000)).

[13] The comment now objected to was made in the prosecution's rebuttal closing argument during the guilt phase of the trial. During that rebuttal argument, the prosecutor addressed some of the arguments defense counsel had made in their closing arguments, and he restated his theory of the case against Deardorff. The comment was made near the middle of the prosecutor's rebuttal argument:

"What do we have on Donald Deardorff that points to him? You had the default judgment and you had the motive. What else do we have? Deardorff has no place to live and he's having trouble. What else do we have? You have Ted Turner's will naming (sic). What else do you have? I'm having a hard time reading that. Let me get my list. Here we go. Trifocals are better. You've got Deardorff's car at the catfish house just like they said. You've got Deardorff's use of Ted Turner's computer.

"Now, let me tell you, y'all remember the evidence on this. This is critical, because [defense counsel] suggested to you it was 1:36. You remember the evidence that the check was 12:28 at Fairhope Bank. It's in evidence. And when they said that computer was turned on that porno site was 12:28, the exact time. And you heard from

the witness stand that Tom Montgomery found a problem on that time clock, and it wasn't 1:36, it was 1:03. That's the evidence before this jury. It's not 1:36 as [defense counsel] suggested. It's 1:03.

"And at Dawn's house. Now, why do we think the same? It's the same porn site. Now, is [defense counsel] suggesting that Mr. Peacock has killed Mr. Turner and there is somebody else in that house while he's cashing the check, visiting a porn site that just so happened to be visited at Dawn Dunaway's house? No. It's not common sense and it's not reasonable.

"What other areas do you have? Connection. Again, you have the money, pistol, car part, receipt books. And I made a mistake earlier. I forgot that the computer orders, I thought it came out of the shed. It came out of the car. What came out of the shed, I think, was the tape, the masking tape, the same masking tape that was used around Ted Turner's hands, I submit to you. The same shed that is not connected to Peacock, it's connected to Deardorff. Mr. Peacock doesn't have a key to it. Could not get into it.

"And the gig is up. Take capital murder off the table. You heard the phone calls from the jail and to his mother. *He didn't make testimony.* There ain't no doubt about it. They've got the power to subpoena. They could bring anybody up here they wanted to.

"We put inmates up here. You've got to determine whether they're telling you the truth. But I'm going to tell you something. It's hard for me to believe that Mr. Fambro can make up something that nobody knows. Didn't nobody know he was killed up there around Stockton at this time. Mr. Fambro nails it. And he had him shot."

*12 (R. 2788-91.)(Emphasis added.)

"When an accused contends that a prosecutor has made improper comments during a closing argument, the statements at issue must be viewed in the context of the evidence presented in the case and the entire closing argument made to the jury-both defense counsel's and the prosecutor's. *Washington v. State*, 259 Ala. 104, 65 So.2d 704 (1953) ; *Stephens v. State*, 580 So.2d 11 (Ala.Crim.App.1990), aff'd, 580 So.2d 26 (Ala.1991)."

*Ex parte Musgrove*, 638 So.2d 1360, 1368

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works..

— So.2d ----

--- So.2d ----, 2004 WL 1418105
(Cite as: — So.2d ----)

Page 13

(Ala.1993).

[14] Viewing the objected-to comment in context of all of the evidence and in context of the entire closing argument, as our caselaw directs us to do, we first note that we are unable to discern exactly what the prosecutor's comment intended to convey. The above-quoted portion of the rebuttal argument was not cohesive. Rather, it appears that the prosecutor was responding, point-by-point and from a list, to defense counsel's closing arguments. It further appears that the comment to which Deardorff now objects was directed to the various types of evidence the State presented regarding the statements Deardorff made while he was in jail, including the statements he made to his mother, to the police, and to other inmates. It also appears that the prosecutor was responding to defense counsel's assertions that the inmates called by the State were not telling the truth and was making the point that, if other witnesses could have testified to different facts, Deardorff could have called them to testify. Viewing the evidence presented and the entire argument in context, we are unable to conclude with any degree of certainty that the isolated comment was, in fact, a comment on the defendant's failure to testify. It appears more likely that the comment was directed at Deardorff's failure to present other testimony that would have supported his defense, if those witnesses existed. Therefore, no plain error occurred. *See also Ex parte Musgrove,* 638 So.2d 1360 (Ala.1993) ; *Payne v. State,* 683 So.2d 440, 449-51 (Ala.Crim.App.1995), *aff'd,* 683 So.2d 458 (1996).

Even if the comment could be interpreted as an indirect comment on Deardorff's failure to testify, we would find no plain error. We have previously held:

  " 'Thus, in a case in which there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error, there must have been a virtual identification of the defendant as the person who did not become a witness. *Ex parte Yarber,* 375 So.2d [1231,] 1234 [ (Ala.1979) ] ; *Ex parte Williams,* [461 So.2d 852, 853 (Ala.1984) ]; *Ex parte Wilson,* [571 So.2d 1251 (Ala.1990) ]; *Ex parte Purser,* [607 So.2d 301 (Ala.1992) ]. A virtual identification will not exist where the prosecutor's comments were directed toward the

fact that the State's evidence was uncontradicted, or had not been denied. See *Beecher v. State,* 294 Ala. 674, 682, 320 So.2d 727, 734 (1975) ; *Ex parte Williams,* supra; *Ex parte Purser,* supra. Yet, in such circumstances, it becomes important to know whether the defendant alone could have provided the missing evidence.'

*13 "*Ex parte Brooks,* 695 So.2d 184, 188-89 (Ala.1997)(footnotes omitted)."

*Gavin v. State,* [Ms. CR-99-1127, Sept. 26, 2003] — So.2d ----, ---- (Ala.Crim.App.2003).

The prosecutor's comment seems to suggest, at most, that the defense failed to present testimony to contradict any of the testimony the prosecution presented that tended to establish that Deardorff was the manipulator, the one who directed Peacock's actions, and the one who had made statements admitting his involvement in the capital murder. As the prosecutor noted in the same portion of the rebuttal argument to which Deardorff now objects, the defense could have called any witnesses it had who would contradict the prosecution's theory of the case. The prosecutor also noted that the jury would have to determine whether the prosecution witnesses had been truthful.

Remarks that refer to the failure of the defense and to the fact that the State's evidence is uncontradicted are permitted and have been found not to violate a defendant's constitutional right to refuse to testify. The comment was "not manifestly intended or of such a character that a jury would naturally and necessarily" take it to be a comment on Deardorff's choice not to testify. *Gavin,* --- So.2d at ----. Therefore, even if the comment could have been construed as an indirect comment on Deardorff's failure to testify, we would find that Deardorff was not entitled to relief on his claim, because no plain error would have occurred.

V.

Deardorff next argues that improper character evidence was admitted. Agent Charles Huggins of the Alabama Bureau of Investigations testified that he interviewed Deardorff four times during the course of the investigation of Turner's disappearance and murder. During the first interview, after Andrews's car was searched and the police found the money and the handgun, Deardorff

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1418105
(Cite as: --- So.2d ----)

Page 14

explained to Agent Huggins how he came into possession of those items. Agent Huggins testified that Deardorff told him that Peacock had told him the box had some personal items in it and had asked Deardorff to keep it for two days. Deardorff told Agent Huggins that, while he was walking to Andrews's parent's house with the box, he heard a clumping sound and became curious, so he looked inside the box. He said he became scared and nervous when he saw the money and the gun, and he hid the items when he got to the house. He showed Andrews the gun and the money, but he told her that the money came from a drug transaction and that the gun belonged to a drug dealer. Deardorff told Agent Huggins that he had not told Andrews that the money and the gun had come from Peacock because Andrews did not like him to spend time with Peacock, and she would have been angry if he had told her that they were Peacock's. On the following day, Deardorff told Agent Huggins, he saw a news report about Turner's disappearance and he "started putting two and two together; the money, Millard Peacock, the gun, Ted Turner missing." (R. 1561.) Deardorff said that he put everything back into the box, which was a box from a Dollar General Store; Andrews was employed at a Dollar General Store. Deardorff told Agent Huggins that he put the box in the car and that he and Andrews drove to Bay Minette to search for Peacock so he could return the box to him. Deardorff told Agent Huggins that they were looking for Peacock when they were stopped in the Wal-Mart parking lot. The prosecutor asked Agent Huggins, without objection from the defense, if he found Deardorff's explanations credible. Agent Huggins answered, "No, sir." (R. 1566.) Trial was then recessed for a lunch break. When the direct examination of Agent Huggins resumed, the prosecutor noted that, before the break, he had asked Agent Huggins whether he found Deardorff's statements to be credible; he asked whether Agent Huggins remembered his response to the question. Again, without an objection from the defense, Agent Huggins testified that his answer had been "no." Agent Huggins then testified that he found Deardorff's version of events not to be credible because they conflicted with Andrews's statements and because Deardorff had told him that he was riding around hoping to locate Peacock so he could

return the money.

*14 Deardorff now argues that Agent Huggins should not have been permitted to testify that he did not find Deardorff's statements credible. He claims that the evidence could not have been admitted to impeach his credibility as a witness because he did not testify. He further argues that it could not have been admitted pursuant to Rule 404(a)(1), Ala. R. Evid., because he did not put forth character evidence. The State argues that the trial court did not abuse its discretion when it permitted this testimony because Agent Huggins simply gave his opinion based on facts already in evidence.

[15] We note, initially, that Deardorff did not object either time that the prosecution asked Agent Huggins for his opinion as to the credibility of Deardorff's statements. Therefore, we review this claim for plain error only, and we find no plain error. "Alabama courts have repeatedly held that the trial court has broad discretion in determining the admissibility of evidence, and that the trial court's determination will not be reversed unless the court has abused its discretion." Yeomans v. State, [Ms. CR-01-0701, Feb. 27, 2004] --- So.2d ----, ---- (Ala.Crim.App.2004).

Agent Huggins was one of the law-enforcement officers initially involved in investigating Turner's disappearance. During the early stages of the investigation, Deardorff was identified as a possible suspect; his name was on the addendum to Turner's will, and Turner's daughter identified him as a person with whom Turner had had a legal dispute. When law-enforcement officers found Deardorff and he had in his possession a large sum of money and a gun, they questioned him about the items; Deardorff gave the statement to Agent Huggins. Agent Huggins's opinion of whether Deardorff's initial statements were credible was relevant to whether the officers continued to consider Deardorff as a suspect and continued to investigate his possible involvement, or whether they believed Deardorff was telling the truth and that he was not involved in Turner's disappearance.

Rule 701, Ala. R. Evid., provides:

"If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1418105
(Cite as: --- So.2d ----)

Page 15

clear understanding of the witness's testimony or the determination of a fact in issue."

As a witness who was testifying not as an expert but rather as to the initial stages of the investigation and the reasons the investigation focused on Deardorff as a suspect, Agent Huggins's opinion was permissible.

[16] Moreover, the audiotape of Deardorff's second interview with the police, which took place three days after the initial interview, was played for the jury. Agent Huggins testified that, during that interview, Deardorff told officers that he had lied during the first interview and that he wanted "to come clean." (R. 1722.) Agent Huggins then identified the discrepancies between Deardorff's first statement and his second statement. Even if Huggins's statement regarding the credibility of Deardorff's initial explanation had been error because it encroached on the jury's right to determine the credibility of Deardorff's statement, it would have been rendered harmless by the subsequent admission of the audiotapes of the interviews. The jury heard Deardorff admit that he had lied during his first interview with the police. *Ex parte Harris*, [Ms. 1020899, March 5, 2004] --- So.2d ----, ---- (Ala.2004).

*15 No plain error occurred as a result of Agent Huggins's testimony.

VI.

Deardorff next argues that Richard Dale Carter, the State's forensic expert, was erroneously permitted to testify that the duct tape recovered from the victim's body matched the roll of duct tape recovered from the warehouse unit Deardorff had rented from Turner. He acknowledges that defense counsel made no objection at trial to Carter's testimony. We review the claim for plain error, and we find none.

Carter testified as to his academic credentials and the course work he had completed at the FBI academy schools. He stated that his area of specialty is firearm and toolmark examination. After he testified about the results of his comparison of the bullets and the revolver he received in this case, he testified that he compared the duct tape found on the victim's jacket and the pillowcase to the roll of duct tape that was recovered from Deardorff's warehouse unit. Carter explained the manufacturing

process involved in making rolls of duct tape and he testified in detail about the manufacturing marks that remain on the tape. Carter stated that, in his opinion, the tape recovered from the crime scene and the roll of duct tape recovered from Deardorff's warehouse unit were all made on the same machine during the same four- to six-month period.

[17] A determination of the admissibility of evidence rests in the trial court's sound discretion, and the trial court's ruling will not be reversed absent an abuse of that discretion. *E.g., Baird v. State*, 849 So.2d 223, 237 (Ala.Crim.App.2002). Rule 702, Ala. R. Evid., provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

In his brief to this Court, Deardorff acknowledges that the duct-tape comparison was an area beyond the understanding of an average juror. There is no dispute that Carter examined the tape from the crime scene and the roll of tape from the warehouse facility. Deardorff appears to argue that the State did not establish Carter's qualification to render an expert opinion about the duct tape comparison. However, the Advisory Committee's Notes to Rule 702, Ala. R. Evid., provide:

"[U]nder Rule 702 'qualification' should continue to be defined broadly, so that one may gain an expertise through practical experience as well as through formal training or education. See, e.g., *International Telecommunications Sys. v. State*, 359 So.2d 364 (Ala.1978) (recognizing that experience and practical knowledge, as fully as formal education, qualify one to make technical judgments)."

[18] Carter's testimony established that he had received on-the-job training with the forensic sciences departmental director when he began his career, that he had been working as a forensic scientist for more than 30 years, and that he had completed numerous post-graduate training seminars. The proper predicate for Carter's expert testimony regarding the duct-tape comparison was laid, and the trial court did not abuse its broad discretion when it permitted Carter to testify. No

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ---

--- So.2d ----, 2004 WL 1418105
(Cite as: --- So.2d ---)

·plain error occurred as a result of Carter's testimony, and Deardorff is not entitled to any relief on this claim.

## VII.

*16 [19] Deardorff next argues that the stop and search of Christy Andrews's vehicle were illegal, as was the subsequent seizure of evidence from the vehicle. He appears to argue that he was unlawfully detained while Andrews's consent to search was ·obtained. Finally, Deardorff also appears to argue that Andrews's consent was not given voluntarily. Defense counsel filed a pretrial motion to suppress the evidence seized from the vehicle, making many of the same arguments. After a hearing, the trial court denied the motion to suppress. We need not address the trial court's ruling on the merits of Deardorff's motion to suppress, however, because Deardorff had no standing to the stop and search of another person's vehicle or to the seizure of evidence from that vehicle.

Deardorff filed a pretrial motion to suppress; in that motion he alleged that he was detained and "his vehicle was searched" without probable cause. (C. 150.) He also alleged in that motion that Christy Andrews did not voluntarily consent to the search of the car, which he acknowledges she was driving when the officers stopped the vehicle. He alleged, last, that even if Andrews had voluntarily consented to the search of the vehicle, the evidence seized in the search was due to be suppressed because, he says, there was no reasonable basis for the search.

During the hearing on the motion to suppress, the prosecutor· argued that Deardorff . did not have standing to object to the search and seizure. (R. 360-61.) Defense counsel argued that he could establish that Deardorff owned the car, and the hearing proceeded. The State presented evidence indicating that Andrews owned the car and that she had consented to the search of the car. The State also presented evidence indicating that Andrews and Deardorff were stopped because they were wanted for questioning with regard to Turner's disappearance. During the hearing, the trial court interjected, "Wait a minute now. I was told at the start of this hearing that Mr. Deardorff owned the vehicle. That's what [defense counsel] said. Now you're telling me that according to whatever

[records check] you ran it through, that Ms. Andrews owned the vehicle?" (R. 434.) The court further stated, "At this point in time ..., there is no standing for Mr. Deardorff to raise the motion to suppress until he presents something to indicate he is an owner of the vehicle." (R. 435.) Defense counsel claimed that his presence in the vehicle gave him standing to object to the stop and the search, and the hearing proceeded. (R. 439.) Further testimony from the employees in the probate office that had provided license tags for the vehicle also indicated that Andrews was the owner of the vehicle at the time of the stop and search.

At the conclusion of the hearing on the motion to suppress, the trial court stated, "I'm not sure that Mr. Deardorff has standing to raise the issue about the suppression, but assuming that he does have standing, I still find that the State has presented sufficient evidence that the search was voluntary...." (R. 565-66.) As the trial court suggested in its ruling, we conclude that Deardorff did not establish that he had standing to object to the stop and search of the vehicle. Therefore, we affirm the trial court's denial of the motion to suppress.

*17 The United States Supreme Court, in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), addressed the issue whether a mere passenger in vehicle that was stopped and searched could object, on Fourth Amendment grounds, to the legality of the search. The Supreme Court held that the passenger-defendant did not have standing to object. The Court stated:

"As we stated in *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), 'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.' See *Brown v. United States,* 411 U.S. 223, 230, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) ; *Simmons v. United States,* 390 U.S. 377, 389, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) ; *Wong Sun v. United States,* 371 U.S. 471, 492, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); cf. *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961) ; *Gouled v. United States,* 255 U.S. 298, 304, 41 S.Ct. 261, 65 L.Ed. 647 (1921). A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ---

--- So.2d ---, 2004 WL 1418105
(Cite as: --- So.2d ----)

Page 17

or property has not had any of his Fourth Amendment rights infringed. *Alderman, supra,* 394 U.S., at 174, 89 S.Ct. 961. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, *United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections."

439 U.S. at 133-34, 99 S.Ct. 421 (footnote omitted). The Court further explained:

"[T]he question is whether the challenged search and seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect."

439 U.S. at 140, 99 S.Ct. 421.

"[The] petitioners' claims must fail. They asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized. And as we have previously indicated, the fact that they were 'legitimately on [the] premises' in the sense that they were in the car with the permission of its owner is not determinative of whether they had a legitimate expectation of privacy in the particular areas of the automobile searched.... But here petitioners' claim is one which would fail even in an analogous situation in a dwelling place, since they made no showing that they had any legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers. Like the trunk of an automobile, these are areas in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy."

439 U.S. at 148-49, 99 S.Ct. 421.

Like the passengers in *Rakas,* Deardorff did not own the vehicle in which he was riding. The box containing the money and the gun was on the back seat of the car, and, according to *Rakas,* Deardorff did not have a legitimate expectation of privacy in that area. Moreover, Deardorff claimed that he did not own the box containing the money and the gun. Therefore, Deardorff did not have standing to raise

any Fourth Amendment objections to the stop and search of Andrews's vehicle or to the seizure of the box and its contents from the backseat of that vehicle.

*18 Because Deardorff did not have standing to object to the search of the vehicle and the seizure of the evidence from the vehicle, the trial court's denial of his motion to suppress is due to be affirmed.

*Penalty-phase Issues*

VIII.

[20] Deardorff next argues that the trial court erred when it found the aggravating circumstance in § 13A-5-49(8), Ala.Code 1975, to exist. Specifically, he argues that the facts surrounding Turner's death did not support the aggravating circumstance that the murder was especially heinous, atrocious, or cruel when compared to other capital offenses because Turner was killed by rapid gunshots to the head. Although Deardorff acknowledges that Turner was held against his will for two days, he asserts that this did not support the aggravating circumstance because "he was untied shortly after his capture, allowed to use the restroom, and supplied with blankets and jackets when he complained he was cold." (Appellant's initial brief at pp. 12-13.) Deardorff also states that the trial court's mention of the fact that Turner was forced to walk an extended distance, even though he had recently had knee surgery, indicates that the trial court considered an improper factor in reaching its finding that this circumstance applied. The State notes that Deardorff did not raise this objection in the trial court so our review is limited to review for plain error. The State also argues that the facts presented at trial amply support the trial court's finding that this crime was especially heinous, atrocious, or cruel. We agree with the State.

In its sentencing order, the trial court made the following findings regarding this aggravating circumstance:

"The capital offense was especially heinous, atrocious and cruel compared to other capital offenses in that the victim, Ted Turner, lived alone, was unsuspecting and unarmed when overpowered by two assailants; was held in a hall

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1418105
(Cite as: — So.2d ----)

Page 18

closet for over twenty-four (24) hours; was removed from his home and driven in his own vehicle to a wooded area while being bound and having a pillow case taped over his head; was forced to walk an extended distance into the woods after only recently having knee surgery which limited the use of his leg, and was shot in the back of the head at least three times after complying with all of the wishes of his assailants, therefore [the § ] 13A-5-49(8) [Ala.Code 1975] aggravating circumstance is present. The aggravating circumstance that has been found above is found to be present beyond a reasonable doubt, and an aggravating circumstance to be considered."
(C. 27-28.)

Deardorff filed a motion to reconsider the sentence, but he did not raise this ground of objection. Therefore, we review this argument for plain error. We find no plain error in the trial court's determination that this crime was especially heinous, atrocious, or cruel, as that aggravating circumstance has been defined in Alabama law.

This Court has often stated:

*19 " 'When considering whether a particular capital offense was "especially heinous, atrocious or cruel," this Court adheres to the standard set out in *Ex parte Kyzer*, 399 So.2d 330, 334 (Ala.1981), namely, that the particular offense must be one of those "conscienceless or pitiless homicides which are unnecessarily torturous to the victim." ' *Duke v. State*, [[Ms. CR-98-1218, May 31, 2002] --- So.2d ----, ---- (Ala.Crim.App.2002)]."

*Yeomans v. State*, [Ms. CR-01-0701, Feb. 27, 2004] --- So.2d ----, ---- (Ala.Crim.App.2004).

"One factor this Court has considered particularly indicative that a murder is 'especially heinous, atrocious or cruel' is the infliction of psychological torture. Psychological torture can be inflicted where the victim is in intense fear and is aware of, but helpless to prevent, impending death. Such torture 'must have been present for an appreciable lapse of time, sufficient enough to cause prolonged or appreciable suffering.' *Norris v. State*, 793 So.2d 847, 861 (Ala.Crim.App.1999)

"In *Ex parte Rieber*, 663 So.2d 999 (Ala.1995), the defendant stalked a convenience-store clerk

for several days before he walked into the store and shot her during a robbery. There was evidence that the clerk had been aware of his presence and that she was afraid of him. This Court held that the murder was 'especially heinous, atrocious or cruel' given, among other things, that the murder was perpetrated under circumstances that caused fear and pain to the victim before death. The Court specifically stated that 'evidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was heinous, atrocious, or cruel. *Ex parte Whisenhant*, 555 So.2d 235, 243-44 (Ala.1989)....' 663 So.2d at 1003."

*Ex parte Key*, [Ms. 1020677 , March 5, 2004] --- So.2d ----, ---- (Ala.2004).

As the trial court stated in the sentencing order, the victim was held captive in a closet in his own home for more than 24 hours. He complied with each demand his captors made, and he never attempted to fight them or to escape. The evidence presented at trial indicated that Turner pleaded for his life while he was being held captive, agreeing to do whatever was asked of him so that he would not be killed. Turner knew that Deardorff was armed with a pistol because Deardorff had threatened to kill Turner with it when Turner arrived home and found Deardorff and Peacock inside his house waiting for him. The addendum to Turner's will, which was written on the day Turner obtained a default judgment in his case against Deardorff, indicated that Turner was afraid of what Deardorff might do to him. The trial court correctly noted that Turner had recently had knee surgery and that his mobility was limited. This condition would have added to the physical discomfort of being bound and confined in a closet. When the assailants took Turner from his house, they bound his hands and placed duct tape over his mouth. During the trip, they placed a pillowcase over his head and secured it with duct tape. They then forced Turner to walk a long way down a logging road; the trial court correctly noted that the extended walk would have been difficult for Turner, given his medical condition. Once they reached the end of the logging road, Deardorff forced Turner to kneel on the ground. He shot Turner repeatedly in the back of the head.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1418105
(Cite as: --- So.2d ----)

Page 19

**\*20** Deardorff argues that there is a "complete lack of evidence of physical or psychological torture" in this case. (Appellant's reply brief at p. 2.) We disagree. The evidence fully supports the trial court's finding that the § 13A-5-49(8) aggravating circumstance applies to this case. From the moment Deardorff threatened Turner with the "blowing his brains out" to the moment he was forced to kneel, bound and with his head covered with a pillowcase secured with duct tape, Turner's fear for his life was undoubtedly great. Turner knew that Deardorff was angry and vengeful, and he knew that he was armed. The terror he experienced must have escalated tremendously when his mouth was taped and his hands were bound as he was taken away from his home, driven away in his own car. When the pillowcase was taped over his head and he could no longer see where he was being taken, he had to know that his death was imminent. This type of prolonged psychological torture has been held to support the finding of the § 13A-5-49(8) aggravating circumstance. See, e.g., Ziegler v. State, [Ms. CR-00-1987, Feb. 28, 2003] --- So.2d ---- (Ala.Crim.App.2003), sentence aff'd on return to remand, [June 27, 2003] 886 So.2d at ---- (Ala.Crim.App.2003) (upholding finding of § 13A-5-49(8) aggravating circumstance after defendant participated in "prolonged brutal beating of the slightly built victim, and then led him down a dark road and into the wooded area where, without a doubt, [the victim] was filled with terror and the knowledge that his death was imminent"); Ex parte Whisenhant, 555 So.2d 235, 243-44 (Ala.1989) (recognizing that the fear experienced by the victim before death is a significant factor in determining the existence of this aggravating circumstance).

The trial court's determination that the evidence established the § 13A-5-49(8) aggravating circumstance, that the murder was especially heinous, atrocious, or cruel, is fully supported by the record. No plain error occurred; Deardorff is not entitled to any relief on this claim.

### IX.

Deardorff next argues that the trial court erred when it permitted the State to elicit prejudicial character evidence during the sentencing hearing before the jury. Specifically, Deardorff argues that the State

should not have been permitted to introduce evidence indicating that he received a dishonorable discharge from the United States Navy following his desertion. Deardorff did not object to the prosecutor's questions at trial, so the claim is reviewed only for plain error.

Deardorff presented his mother, Laura Byrd, as a witness at the sentencing hearing before the jury. Byrd testified that when Deardorff was in the Navy he was "involved in things" that "changed his personality a lot, even in his adult time." (R. 2895.) She stated that, as a result of the assignments Deardorff received in the Navy, he became "a little bit harder, not showing his emotions as much as he normally did." (R. 2896.) On cross-examination, Byrd acknowledged that her son did not receive an honorable discharge from the military. She testified that she disapproved of his actions, and when the prosecutor asked her which actions she disapproved of, she replied, "He felt since the Navy did not fulfill their part of the agreement, he did not fill his. He did not report for duty." (R. 2901.) She explained that, when Deardorff reenlisted after his first tour of duty, he was promised shore duty; after six months of shore duty, he was ordered to return to sea, she said, so Deardorff failed to report for duty. Defense counsel did not object to any of the prosecutor's questions.

**\*21** Deardorff then testified on his own behalf. Defense counsel asked Deardorff whether he had anything to say to the jury, and he offered a fairly lengthy monologue addressing, among other issues, his claim that he was innocent of the crime, his desertion from the Navy, and some perceived conflicts in the evidence presented at the guilt phase. Deardorff explained that he worked very hard after he had reenlisted and he told his commanding officer that he was "burned out" and needed to go on leave. He said that he was denied leave and further stated, "I took what's referred to in military terms as whether leave. I'm taking it whether you give it to me or not. So I took it. I called them. I said I'm not coming in. I'll be at home when you get ready for me." (R. 2910.) He also claimed that he was disciplined but remained in the Navy for two additional years because, he said, "I was so good, they kept me around for two more years." (R. 2911.)

Deardorff's discharge form was admitted into

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1418105
(Cite as: --- So.2d ----)

evidence. The form indicates that he was discharged in absentia following a conviction by court martial. (C. 1363.)

Section 13A-5-45(c), Ala.Code 1975, provides, in pertinent part, "At the sentence hearing evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to aggravating and mitigating circumstances...." Section 13A-5-45(d), Ala.Code 1975, provides, "Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements."

[21] Deardorff argues that the prosecutor's questions about his desertion from the Navy were improper because, he argues, they were intended solely to "tarnish Donald Deardorff's character in the eyes of the jury" (Appellant's brief at p. 18) and to prejudice him by implying that he was disloyal. The State argues that no plain error occurred as a result of the testimony about Deardorff's desertion because the prosecutor's questions were intended to rebut Byrd's testimony about her son's military experience, which was offered as mitigation evidence. We find no plain error in the prosecutor's questions regarding Deardorff's desertion from the military because the State was entitled to rebut Deardorff's proffered mitigation evidence.

In accordance with § 13A-5-52, Ala.Code 1975, Deardorff was entitled to present evidence of "any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole...." As a mitigation witness, Deardorff's mother testified as a character witness that his military experience "changed his personality," thus suggesting that he was somehow more deserving of a sentence of life imprisonment without parole. Deardorff's military experience was relevant and admissible as a nonstatutory mitigating circumstance. Once Deardorff offered this evidence in mitigation, however, the prosecutor was entitled to challenge it. Section 13A-5-45(g), Ala.Code 1975, provides that, once the defendant offers as mitigation evidence a fact that the State disputes, the State "shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence."

*22 In Jackson v. State, 791 So.2d 979 (Ala.Crim.App.2000), the appellant objected to the prosecutor's cross-examination of Jackson's character witnesses, claiming that the evidence was improper because it introduced evidence of his prior bad conduct. We rejected that argument, stating:

"To rebut Jackson's claim of good character, the State cross-examined one of Jackson's character witnesses regarding Jackson's prior misdemeanor assault conviction and his suspension from school for carrying a gun. This cross-examination was proper both to test the witness's credibility as to his knowledge of Jackson's character and to rebut the mitigating evidence offered by Jackson."

791 So.2d at 1026.

We have also held that an appellant's disciplinary problems in jail were admissible to rebut mitigation evidence he offered regarding his good behavior in jail. In Clark v. State, [Ms. CR-99-1062, June 27, 2003] ---So.2d ----, ---- (Ala.Crim.App.2000) (on return to remand and on application for rehearing), we stated:

"Evidence of Clark's prison disciplinary problems was clearly offered to rebut the evidence he had offered in mitigation that he was a 'model inmate.' (R. 1547.) The evidence was relevant and probative to sentencing and was, thus, properly admitted. See, e.g., Jackson v. State, 791 So.2d 979 (Ala.Crim.App.), cert. denied, 791 So.2d 1043 (Ala.2000), cert. denied, 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311 (2001) (evidence of the defendant's prior misdemeanor conviction and his suspension from high school was properly admitted to rebut the defendant's mitigation evidence); and Halford v. State, 548 So.2d 526 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989)(evidence that the defendant was having an incestuous relationship with his daughter was properly admitted to rebut the defendant's mitigation evidence regarding his good character)."

Based on the relevant statutes and on previous cases presenting similar circumstances, we find no plain error as a result of the prosecutor's questioning of Deardorff's mother regarding the manner in which Deardorff ended his military service. The evidence was relevant to her credibility as a witness and to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1418105
(Cite as: --- So.2d ----)

Page 21

rebut the implication that Deardorff's experience in the military supported a sentence of life imprisonment without the possibility of parole. We note, additionally, that Deardorff testified extensively about his military service and about the circumstances surrounding his desertion. He offered his complete explanation for his desertion and his subsequent discharge from the military and the explanation he presented far exceeded the scope of the questions the prosecutor asked Byrd. Finally, we note that the trial court found Deardorff's military experience to be a nonstatutory mitigating circumstance. For all of the foregoing reasons, we find that no plain error occurred and that Deardorff is not entitled to any relief on this claim.

## X.

Deardorff argues in Issue III of his initial brief that statutes that impose the death penalty in the United States "and in this country" are unconstitutional because, he says, they are arbitrary; they create a substantial risk that an innocent person will be executed; and they result in geographic disparities in the imposition of capital punishment. Deardorff also argues that "[a]ll branches of the state and federal government have imposed numerous procedural barriers to review by appellate courts." (Appellant's brief at p. 28.) In Issue X of his initial brief, Deardorff argues that the death penalty in general and, in particular, Alabama's death penalty scheme, violate the Eighth Amendment to the United States Constitution because the death penalty constitutes cruel and unusual punishment. Deardorff raises these claims for the first time in this Court. FN4 Therefore, the claims are reviewed only for plain error. We find no plain error.

*23 [22] As for his claim that the death penalty constitutes cruel and unusual punishment, Alabama courts have often held otherwise. E.g., Martin v. State, [Ms. CR-99-2249, May 30, 2003] --- So.2d ---- (Ala.Crim.App.2003), and cases cited therein. The portions of the equal-protection and due-process claims that relate to state statutes other than Alabama's and to appellate review in federal courts and in state courts other than Alabama's are not matters within our jurisdiction to consider. Therefore, we do not address them.

[23] [24] The equal-protection and due-process

claims that relate to Alabama's statute and to Alabama's appellate court review are very general and contain no references to any particular portion of Alabama's statute or to the proceedings now under review. Deardorff's failure to include any specific claims of equal-protection or due-process violations precludes a finding of plain error.

"Our analysis begins with the basic principle that a defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination.' Whitus v. Georgia, 385 U.S. 545, 550, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). A corollary to this principle is that a criminal defendant must prove that the purposeful discrimination 'had a discriminatory effect' on him. Wayte v. United States, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)."
McCleskey v. Kemp, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)(footnote omitted).
The same principle applies with regard to the examination of due-process claims. The United States Supreme Court stated what has become an oft-cited principle, "A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights." County Court of Ulster County, N.Y. v. Allen, 442 U.S. 140, 154-55, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
The State correctly argues that Deardorff has made no attempt to allege or prove a discriminatory intent or a specific due-process violation. His "boilerplate" allegations regarding alleged inequities, such as his conclusory statement that "the entire death penalty structure in this state and in this country is unconstitutional on its face and should be abolished as such" (Appellant's initial brief at p. 21), do not establish that any of his rights to due process and equal protection were infringed. Thus, we find no plain error and hold that Deardorff is not entitled to relief on these claims.

## XI.

Deardorff next argues that the trial court erred in "double counting" burglary, robbery, and kidnapping as both elements of the capital offenses and as aggravating circumstances. He cites Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), in support of his claim.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ---

--- So.2d ----, 2004 WL 1418105
(Cite as: --- So.2d ----)

Page 22

Deardorff did not raise this objection in the trial court, so we review it only for plain error. No plain error occurred here.

The "double counting" of burglary, robbery, and kidnapping as aggravating circumstances is provided for in Alabama's death-penalty statutory scheme. § 13A-5-45(e), Ala.Code 1975. "Double counting" has been upheld in the United States Supreme Court, *Lowenfield v. Phelps*, 484 U.S. 231, 244-45, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), and in our appellate courts, *e.g., Ferguson v. State*, 814 So.2d 925, 956-57 (Ala.Crim.App.2000), *aff'd*, 814 .So.2d 970 (Ala.2001), and cases cited therein. Finally, the Alabama Supreme Court has held that " double counting" does not violate *Apprendi. Ex parte Waldrop* 859 So.2d 1181, 1186-88 (Ala.2002)

*24 [25] For the foregoing reasons, we hold that no plain error occurred as a result of the trial court's " double counting" of burglary, robbery, and kidnapping, and that Deardorff is not entitled to any relief on his claim.

### XII.

[26] Deardorff next argues that Alabama's capital-sentencing scheme violates the principles established in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Specifically, he argues that the statutory scheme is unconstitutional because the trial judge, and not the jury, makes the findings regarding the aggravating and mitigating circumstances and determines the sentence, and because it permits imposition of a death sentence without unanimous jury findings as to the aggravating circumstances. Deardorff failed to raise these claims in the trial court, so we review them now for plain error.

Each of the claims raised here has been considered and rejected by Alabama courts. *Ex parte Waldrop*, 859 So.2d 1181 (Ala.2002) ; *Turner v. State*. [Ms. CR-99-1568, Nov. 22, 2002]  --- So.2d ---, --- (Ala.Crim.App.2002), *opinion on return to remand* [April 25, 2003] --- So.2d at ---- (Ala.Crim.App.2003), *aff'd on return to second remand* [Aug. 29, 2003] ---So.2d at ---- (Ala.Crim.App.2003). Deardorff is not entitled to any relief on these newly raised claims.

### XIII.

Deardorff argues that reversible error occurred when, during voir dire, the jury was told that its verdict during the penalty phase of the trial would be advisory only and that the trial court would determine the actual sentence. He claims that the statement violated *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) , because the United States Supreme Court held in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), that a jury must determine the sentence. Deardorff does not cite to the portion of the record where this allegedly objectionable comment was made, nor does he identify who made the comment. He did not raise this objection at trial. Therefore, we review the claim for plain error. We find no plain error.

[27] Our review of the record reveals that, on at least one occasion, the prosecutor stated to a venire panel that the jury recommends the punishment during the penalty phase. No error occurred as a result of this statement because it is an accurate statement of the law. Under Alabama law, a jury's verdict as to the sentence in a capital case is an advisory one. *See* § 13A-5-46, Ala.Code 1975. Thus, Alabama courts have repeatedly held that a prosecutor's comments and a trial court's instructions accurately informing a jury that its sentencing verdict is advisory or is a recommendation do not violate *Caldwell. E.g. Ray v. State*, 809 So.2d 875, 883 (Ala.Crim.App.2001), and cases cited therein. To the extent Deardorff argues that the United States Supreme Court's decision in *Ring* invalidates the foregoing line of cases, this Court has held otherwise.

"In several recent decisions, both this Court and the Alabama Supreme Court have agreed with the State's rationale that *Ring* did not invalidate Alabama's law, which vests the ultimate sentence determination in the hands of the trial judge and not a jury. See, e.g., *Ex parte Hodges*, [Ms. 1010619, March 14, 2003] --- So.2d --- (Ala.2003) ; *Ex parte Waldrop*, 859 So.2d 1181 (Ala.2002) ; *Turner v. State*, [Ms. CR-99-1568, November 22, 2002] ---So.2d --- (Ala.Crim.App.2002) ; *Stallworth v. State*, 868 So.2d 1128 (Ala.Crim.App.2001) , opinion on return to second remand, 868 So.2d at 1198.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ---

--- So.2d ----, 2004 WL 1418105
(Cite as: --- So.2d ----)

Page 23

**\*25** *Duke v. State,* [Ms. CR-98-1218, March 21, 2003] ---So.2d ----, ---- (Ala.Crim.App.2003).
There is no merit to Deardorff's claim that a *Caldwell* violation occurred during voir dire proceedings. No plain error occurred and Deardorff is not entitled to any relief on this claim.

### XIV.

Deardorff argues that, upon its review of the proportionality of the sentence in this case pursuant to its duty under § 13A-5-53(b)(2), Ala.Code 1975, this Court should remand the case for the imposition of a sentence of life imprisonment without the possibility of parole. Deardorff argues that there is no evidence indicating that he is beyond rehabilitation and that this case does not fit into the category of serious cases deserving of the death penalty. Deardorff did not raise this claim at trial. Nonetheless, we will address the propriety of the sentence pursuant to our mandatory review.
Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this Court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Deardorff of the capital offenses charged in the indictment, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala.Code 1975. The jury heard the evidence concerning the aggravating circumstances and the mitigating circumstances and it was properly instructed by the trial court as to the applicable law. The jury was correctly advised as to its function regarding the finding of any aggravating circumstance or circumstances and any mitigating circumstance or circumstances, the weighing of the aggravating circumstances it found to exist, and the return of an advisory verdict. The jury recommended a sentence of death by a vote of 10-2.
Thereafter, in accordance with § 13A-5-47, Ala.Code 1975, the trial court held another hearing

to aid it in determining whether it would sentence Deardorff to life imprisonment without parole or whether it would follow the jury's recommendation and sentence him to death. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). The trial court entered a thorough sentencing order. That order included written findings of fact summarizing the offense. It also included specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975 , each statutory mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975 , and the nonstatutory mitigating circumstances found to exist under § 13A-5-52, Ala.Code 1975.
In its findings, the trial court found the existence of two statutory aggravating circumstances: that the capital offense was committed while Deardorff was engaged in, or was an accomplice in the commission of, a robbery, burglary, and kidnapping, § 13A-5-49(4), Ala.Code 1975 ; and that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, § 13A-5-48(8), Ala.Code 1975. The trial court included specific fact findings to support the § 13A-5-48(8) aggravating circumstance. The trial court found that no statutory mitigating circumstances existed. The court found as nonstatutory mitigating circumstances Deardorff's troubled family life as a child, his past life experiences, and his military service. The court also considered Deardorff's continuing assertion of his innocence.
**\*26** [28] The trial court found that aggravating circumstances outweighed the mitigating circumstances and that death was the appropriate sentence. The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. *See* § 13A-5-53(b)(1), Ala.Code 1975. As required by § 13A-5-53(b)(3), Ala.Code 1975, we must determine whether the appellant's sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. We find that it is not disproportionate or excessive. Deardorff committed a murder during the course of a robbery, a burglary, and a kidnapping. Similar crimes have been punished by death throughout this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ---

--- So.2d ---, 2004 WL 1418105
(Cite as: --- So.2d ---)

State. *E.g., Harrison v. State,* 869 So.2d 509 (Ala.Crim.App.2002) , and cases cited therein (robbery-murder); *Harris v. State,* 854 So.2d 145 (Ala.Crim.App.2002) , and cases cited therein (burglary-murder and robbery-murder); *Lewis v. State,* [Ms. CR-99-1155, May 30, 2003] --- So.2d ---- (Ala.Crim.App.2003), and cases cited therein (kidnapping-murder and robbery-murder).

The trial court's findings are fully supported by the evidence presented. We have independently weighed the aggravating circumstances against the statutory and nonstatutory mitigating circumstances, and we believe that the trial court correctly determined that the aggravating circumstances outweigh the mitigating circumstances, and we agree that death is the appropriate sentence in this case.

### Conclusion

We have performed our statutorily mandated review of the proceedings below, including our review for plain error, Rule 45A, Ala. R.App. P., and we have reviewed the propriety of the death sentence. We conclude that Deardorff's convictions for capital murder and his sentence of death are due to be, and are now, affirmed. As discussed in Part II of this opinion, however, the convictions and sentences for theft in Counts 9, 11, 13, 15, 17, 19, and 21 are due to be vacated because those convictions violated Deardorff's double-jeopardy rights. Therefore, we remand this cause to the trial court for that limited purpose-to vacate those convictions and sentences. Due return is to be made to this Court within 28 days of the date of this opinion.

AFFIRMED IN PART AND REMANDED WITH DIRECTIONS.

McMILLAN , P.J., and BASCHAB , SHAW , and WISE, JJ., concur.

> FN1. The handgun recovered from the car was the handgun Dawn Dunaway, Peacock's girlfriend, has told Peacock was missing from her house.

> FN2. It is unclear from the record whether Deardorff used the term "gig" or "jig."

FN3. Although the State contends in footnote 1 of its supplemental brief to this Court that Deardorff argues that Count 23, receiving stolen property, should also be vacated, we disagree with the State's interpretation of Deardorff's argument on this issue. In the initial portion of his discussion of this issue, Deardorff lists all of the charges of which he was convicted, including the receiving stolen property charge. Deardorff then argues only that the theft convictions should be vacated because they were encompassed in the greater offenses. Because Deardorff does not seek to have the receiving conviction vacated, we do not address the merits of the State's argument. We note, however, that Count 23 charged an offense unrelated to the thefts of Turner's property.

FN4. Deardorff filed a post-trial motion, but that motion challenged the constitutionality of electrocution as a means of punishment and did not challenge the constitutionality of capital punishment per se.

Ala.Crim.App.,2004.
Deardorff v. State
--- So.2d ----, 2004 WL 1418105
END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

85

| ROBERT THOMAS CONRAD, | ) | IN THE CIRCUIT COURT OF |
|---|---|---|
| | ) | |
| PETITIONER, | ) | COFFEE COUNTY, AL |
| | ) | |
| VS. | ) | ENTERPRISE DIVISION |
| | ) | |
| STATE OF ALABAMA, | ) | |
| | ) | |
| RESPONDENT. | ) | CASE #s: CC-2001-M-179 |

and
CC-2001-M-180

## STATE'S ANSWER/RESPONSE TO RULE 32 PETITION FOR RELIEF FROM CONVICTION OR SENTENCE

The State requests the Court to take judicial notice of its own records, its orders, the pleadings filed with the court and the testimony along with the evidence presented at Mr. Conrad's trial whereby the petitioner was found guilty by a jury of his peers.

Rule 32.3 of the Alabama Rules of Criminal Procedure provides **the petitioner shall have the burden of pleading and proving** by a preponderance of the evidence **the facts necessary to entitle the petitioner to relief.** The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence.

The State contends Mr. Conrad's "PETITION..." should be summarily denied for the following reasons:

1. The "PETITION..." is precluded by Rule 32.2(a)(3) of the Alabama Rules of Criminal Procedure as Petitioner raises matters which could have been but were not raised at trial.

2. The "PETITION..." is precluded by Rule 32.2(5) of the Alabama Rules of Criminal Procedure as Petitioner raises matters which could have been raised on appeal but were not.

86

3.      The "PETITION…" is precluded by Rule 32.2(c) as being filed beyond the limitations period. In this "PETITION…," Mr. Conrad admits that he filed an appeal with the Court of Criminal Appeals and that his convictions and sentences were affirmed on October 24, 2003. This Rule 32 Petition was filed on January 18, 2005, more than one (1) year after the issuance of the certificate of judgment by the Court of Criminal Appeals. The Petition is precluded as having been untimely filed. The Petition does not allege any newly discovered evidence that could not have been ascertained through reasonable diligence at trial, at sentencing, or on appeal.

4.      Petitioner argues that "Albert Smith, Gary Bradshaw, and Richard Waldrop, did not render reasonably effective assistance before, during or after Petitioner's trial" and but for that ineffectiveness…there exists a reasonable probability that the result…would have been different." The State disagrees and responds more specifically hereafter.

5.      Petitioner asserts that counsel was ineffective due to a failure to object to the Oath not being administered prior to Voir Dire examination. Hon. Robert W. Barr presiding, administered the oath as required by statute to the jury venire prior to qualification. The court record and the Judgment of conviction and sentence of this Honorable Court *(See State's Exhibits A & B)* reflect, through the statements of the trial judge, that the oath was properly administered by the presiding judge to the venire before qualification.

6.      Petitioner's contention that "trial counsel rendered ineffective assistance…for his failure to object" to the illegal sentence that resulted from the "indictment only setting forth the elements of robbery third degree" is in no way supported by the facts and is, in fact, proven to be false by Petitioner's Exhibit I. The indictment returned against Robert Thomas Conrad for the offense of Robbery, First Degree reads as follows:

> "**ROBERT THOMAS CONRAD**…did, in the course of committing a theft of property,…**use force** or threaten the imminent use of force **against** the person of the said **Robert Ray Grimes**…with the intent to overcome his physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property,

while the said **Robert Thomas Conrad was armed with a deadly weapon** or dangerous instrument, to wit: **a pistol.**"

Petitioner's indictment clearly sets out the elements of Robbery, Third Degree [§13A-8-43] as required by Section 31A-8-41(a) of the Code of Alabama, 1975 and the use of a deadly weapon during the offense, thereby enhancing the crime to Robbery, First Degree as required by Section 31A-8-41(a)(2). In addition, Mr. Conrad's claim that "the possession of a gun during a robbery is an element of 1st degree and 3rd degree robbery," therefore "the remaining subsection of 13A-8-41(a)(2) or (b), must occur to charge Petitioner with robbery in the first degree" is a misstatement of the law and without any legal support or merit. Mr. Conrad was sentenced to Life for his conviction of Robbery, First Degree, a Class "A" Felony with punishment ranging from ten (10) to (99) years or life in the state penitentiary, as such, his sentence is within the limits prescribed by law.

7. Petitioner again puts at issue the performance of his trial counsel by stating that counsel was ineffective in his "failure to file a Motion to Dismiss the... Indictment where the Grand Jury Foreman failed to endorse...whether a prosecutor appeared...before the Grand Jury." Here too, Petitioner's argument is shown to be false by his own Exhibit I. The Indictment returned by the Grand Jury on May 31, 2001, against Mr. Conrad is endorsed by the Grand Jury Foreperson and by the prosecuting authority, Mark E. Fuller.

8. Petitioner's allegation that his trial counsel was ineffective for failing to make a timely objection where the Clerk "failed to comply with Section 12-16-170, Code of Alabama, 1975," by administering the oath [pursuant to 12-16-170] to petit jurors is without merit as the jury was properly sworn. The Petitioner's own Exhibit II is proof that the oath administered to the petit jury was clearly sufficient and the court record reflects the same. If there is any error deemed to have taken place due to the record's reflection of the oath being administered by the trial judge, it is the State's position that such error is harmless and that Petitioner's claim serves as no basis for relief.

88

9.    Petitioner avers that trial counsel was ineffective for his failure to file a Motion to Dismiss the Indictment on the grounds that "his indictment is void as it fails to allege the essential elements of the capital murder statute in its entirety." The indictment under which the petitioner was tried is clearly sufficient and meets the statutory requirements under the law and Constitution of Alabama. The Petitioner argues that he was not given notice, in the indictment, of the aggravating circumstance that he was to defend himself against in the guilty **and** sentencing phases. Petitioner has attached his own Exhibit I, which clearly states:

> "ROBERT THOMAS CONRAD...did intentionally cause the death of another person, to wit: Jelaine Bowman Dennis, by shooting her with a pistol, and the said ROBERT THOMAS CONRAD, caused the death during the time that he was in the course of committing a theft of property... of Jelaine Bowman Dennis, by the use of force or by threatening the imminent use of force against the person of the said Jelaine Bowman Dennis, with the intent to overcome her physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property, while the said ROBERT THOMAS CONRAD, was armed with a deadly weapon or dangerous instrument, to wit: a pistol, in violation of Section 13A-5-40 of the Code of Alabama."

The indictment is clear in its language charging Petitioner with the capital murder of Jelaine Bowman Dennis by setting forth the aggravating circumstance that the murder was intentionally committed during the course of a robbery in the first degree of the victim.

Further, Petitioner argues that Section 13A-5-50 requires that the indictment give notice to a defendant that he must defend himself in the guilt **and** sentencing phases of trial against the aggravating circumstances. The aforementioned section requires that, even though a capital offense necessarily includes one or more aggravating circumstances, the/those aggravating circumstance(s) must still be found and considered in determining sentence. This section sets out no notice requirement, even so, the indictment does set out the sole aggravating circumstance that Defendant was to defend himself against and is in conformity with the law.

10.    The Petitioner contends that his trial counsel was ineffective for failing to file a Motion to Dismiss the Indictment on the grounds that said indictment is void as it "violated the constitutional doctrine of Separation of Powers, " in that the death penalty statute was created through the cooperation of representatives from the three (3) branches of government and is therefore in violation of the United States Constitution and the Alabama State Constitution. This allegation is entirely without merit. The mere contention that a statute was drafted with the cooperation of representatives from the three branches of government is in no way a showing that said branches were not distinct and separate from each other and therefore unconstitutional. There has been no evidence offered by this Petitioner to show that the "powers of one department" were "exercised by another" during the drafting of the Capital Murder Statute.

11.    Petitioner alleges that his trial counsel was ineffective due to the failure to file a pre-trial Motion to Dismiss the Indictment for Robbery and his failure to object to the adjudication of the jury verdict of Robbery. "Petitioner argues that double jeopardy prevents his conviction for robbery by the jury and the adjudication by the trial court" in that "the underlying felony is considered a lesser included offense of felony murder and thus the same offense for double jeopardy purposes." Petitioner's trial counsel had no grounds to dismiss the indictment or to object to the jury verdict of robbery. The offenses with which Petitioner was charged were separate and distinct crimes with two different victims. The record reflects the State proved beyond a reasonable doubt the intentional murder of Jelaine Bowman Dennis during a robbery in the first degree and a separate robbery in the first degree of Robert Grimes.

The Capital Sentence Order of this Honorable Court sets out that: *(See State's Exhibit "C")*

"...an older Caucasian male *[later found to be Robert Grimes]* ...stated to Officer Darby that he had been robbed and that "she" *[an individual later identified as being Jelaine Bowman Dennis]* has been shot. Robert Grimes gave statements and testimony that **"the person dressed totally in black was brandishing a pistol and with it forced Robert Grimes to the floor and took Robert Grimes wallet which contained thirty ($30.00) dollars.** Robert Grimes further stated that moneys were taken by the person dressed in black from the *"The Toy Store"* cash register.

90

> As the person dressed in black was taking moneys from the cash
> register, Mr. Grimes further stated that he heard gun fire and that
> numerous shots were fired. Thereafter, the person dressed in
> black quickly exited *"The Toy Store"* as **Jelaine Bowman**
> **Dennis told Mr. Grimes that she had been shot and that she**
> **had also shot the person who robbed her.**

Due to the fact that the charges of Capital Murder and Robbery,
First Degree were separate and distinct from each other, the principles
of double jeopardy are not at issue in this case. Petitioner's averment
of counsel's ineffectiveness on this ground is unfounded.

12.    Petitioner argues that trial counsel was ineffective in his failure
to object to the "indictment being void in that it was returned
pursuant to the...Alabama Constitution of 1901, which was
established to promote white supremacy and to disenfranchise
African-Americans." This allegation is outlandish, unsubstantiated
and wholly without merit. Petitioner's counsel was in no way
ineffective in withholding any objection to such a frivolous claim.

13.    Petitioner asserts that he was denied effective assistance of trial
counsel due to a failure to object "to trial court's erroneous instruction
to the jury on corroborated testimony of a codefendant." The
instruction given the petit jury by the trial judge was not erroneous
and was a correct statement of the law as to codefendant testimony.
This instruction was clearly in line with Section 12-21-222, Code of
Alabama, 1975. Furthermore, the court record reflects that the
testimony of the accomplice was also corroborated by extensive
evidence other than his testimony. Petitioner has done nothing more
than quote the court record and the relative statutory authority without
setting out how he believes said instruction is erroneous.

14.    Petitioner alleges, throughout his "PETITION..." that both his
trial and appellate counsel were ineffective. Mr. Conrad has failed to
establish defense and appellate counsels' performance were in any
way deficient or below the level of competence expected of attorneys
in criminal cases. The petitioner also failed to substantiate the
allegation that his attorneys' "...performance prejudiced
[PETITIONER], thereby affecting the verdict, sentence or on appeal."

Attorneys cannot be expected to invent facts or pursue a course

9\

not supported by the facts or by the law. The standard for judging effectiveness is an objective one, in that the defendant must show that the advice given by counsel was not within the range of competence demanded of attorneys in criminal cases. It would not be enough that some or even most defense lawyers would have handled the matter differently, since there are "countless ways to provide effective assistance in any given case." *Strickland v. Washington, 466 U.S. 668, (1984).* Furthermore, the court should apply a "strong presumption that the lawyer's conduct fell within this wide range". *Strickland, 466 U.S. 668, (1984).*

The state contends Defense counsel's performance at arraignment and at sentencing was within the range of competence demanded of attorneys in criminal cases. Petitioner's appellate counsel were also within this range of competence. The State contends Petitioner has set forth only baseless allegations which (considering what did occur in open court before this honorable court) are untrue and without factual or legal merit. Petitioner has failed to set forth sufficient allegations of ineffective assistance of counsel as provided in *Strickland.* The requirements of *Strickland v. Washington* have not been set forth such as to afford Petitioner the relief sought.

15.    If this Honorable Court determines that a hearing is necessary, the State in its response would respectfully request that this Honorable Court order the Defendant's trial and appellate attorneys, Hon. Albert Smith, Hon. Gary Bradshaw, and Hon. Richard Waldrop to appear and testify at any future proceedings with the understanding that the attorney-client privilege is hereby waived as pursuant to *David Vest v. State, 420 So. 2d 803 (Ala. Crim. App. 1982),* in which the court remanded the case with *directions that defense counsel be allowed to testify without fear that he will breach any attorney-client privilege.*

**WHEREFORE,** the State does request that Mr. Conrad's Rule 32 "PETITION FOR RELIEF FROM CONVICTION OR SENTENCE" pursuant to Rule 32.7(d), Alabama Rules of Criminal Procedure should be summarily denied .

92

Done this the 31st day of March, 2005.

Tom Anderson, Assistant District Attorney
Twelfth Circuit, State of Alabama

### CERTIFICATE OF SERVICE

I do hereby certify that I have this day mailed a copy of the above pleading to the Petitioner, Robert T. Conrad at the penitentiary address he has listed in his pleading postage prepaid.

Tom Anderson, Asst. District Attorney

93

1

State's
Exhibit
"A"

1

2             COFFEE COUNTY, ALABAMA

3             ENTERPRISE DIVISION

4

5

6 ROBERT THOMAS CONRAD,     )
       APPELLANT,         )

7                      )
VS.                  )     CC-2001-M-179

8                      )     CC-2001-M-180
STATE OF ALABAMA,       )

9                      )
       APPELLEE.         )

10

11

12      The above referenced testimony was heard

13 before Honorable Gary L. McAliley on the 23rd

14 day through the 27th day of September, 2002, at

15 the Coffee County Courthouse, Enterprise,

16 Alabama.

17             * * * * *

18

19

20 APPEARANCES:

21 FOR THE APPELLANT:          FOR THE STATE:

22 MR. ALBERT SMITH          MRS. GLENDA STOUT
Attorney at Law           Assistant D.A.

23 Elba, Al.                Enterprise, Al.

24 MR. GARY D. BRADSHAW      MR. LARRY JARRELL
Attorney at Law           Assistant D.A.

25 Enterprise, Al.          Enterprise, Al.

94

4

September 23, 2002

THE COURT:  This court will come to order.

Ladies and gentlemen of the jury, this is the next case that will be tried.  As you see it's voluminous.  I'm not going to go through everything with you.  But I will tell you who the people that are going to be involved in the trial of this case are, so you will have knowledge of who is going to be involved in the trial of this case, and who is on trial in this particular case, so you will know a little bit about the allegations of this case.  And, likewise, these attorneys are going to have a right to know a little bit about you before they select a jury.

Now, Judge Barr has already selected a jury in one matter.  You saw how that was

1    brief recess).

2    THE COURT:  This court will come

3    back to order.

4         Ladies and gentlemen,

5    all of you are still under oath.

6    And I'm going to ask you some

7    questions.  And then, I will

8    certainly allow the attorneys to

9    do likewise.  And let me move

10   this so I can see these lawyers

11   sitting over here.

12        First of all, if you

13   will, we are going to start on

14   the bottom row, on my left-hand

15   side.  If you will, please state

16   your name for the record.  And I

17   hate to ask you woman to do

18   this, but if you will give me

19   your rough age, you can say 40

20   or 30 or 35.  You don't have to

21   give me your exact age.  You can

22   round it, if you will.  I just

23   need to know for the record.  We

24   have older folks, younger

25   people, so when we start



✓ bs ¹¹/⁶/⁰³ qlo

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| PLAINTIFF, | ) | COFFEE COUNTY, AL |
| VS. | ) | ENTERPRISE DIVISION |
| ROBERT THOMAS CONRAD, | ) | |
| DEFENDANT. | ) | CASE #s: CC-2001-M-180. |

## JUDGMENT

This case came before the Court for trial by jury with the Defendant being present and represented by Albert Smith and Gary Bradshaw, attorneys at law.   The State was represented by Glenda Stout and Larry Jarrell, assistant District Attorneys, Twelfth Judicial Circuit, State of Alabama.

A properly qualified and duly struck jury was empanelled.  Trial was had and the jury returned a unanimous verdict, i.e., a verdict of "Guilty" of "ROBBERY IN THE FIRST DEGREE" in violation of Section 13A-8-41, the Code of Alabama as charged in offense TWO of the indictment.

The Court finds that the verdict of the jury is supported by the legal and competent evidence presented in the trial of this case.

IT IS THEREFORE ORDERED that ROBERT THOMAS CONRAD is declared "GUILTY" of "*ROBBERY IN THE FIRST DEGREE*" in violation of Section 13A-8-41 of the *Code of Alabama* and as charged in the indictment.

Defendant was:

1.  Afforded an opportunity to make a statement in Defendant's own behalf before sentencing and was further asked if the Defendant had anything to say as to why the sentence of the law should not be imposed.

2.  Given an opportunity to present evidence as to any matter probative to the issue of sentence and/or facts in mitigation of any penalty to be imposed.

The State was then afforded an opportunity to present evidence as to any matter

97

probative to the issue of sentence and/or facts in aggravation or mitigation of any penalty to be imposed.

IT IS ORDERED that for the Defendant's conviction of *ROBBERY IN THE FIRST DEGREE*, **ROBERT THOMAS CONRAD** is sentenced to **LIFE IN THE PENITENTIARY**, STATE OF ALABAMA.

No application for split sentence, probation, suspended sentence or early release was made. However, had such a motion been made, it would have been denied AND THE RECORD SHALL SO REFLECT.

As an additional part of the Defendant's sentence, the Defendant is ordered:

1.)    To pay costs of Court;

2.)    To pay restitution in an amount to be TIMELY submitted by the District Attorney. (*Note: .Defendant shall be sent a copy of the restitution demanded and shall have 30 days from the date of receipt in which to object. If an objection is made, a hearing WILL be set by the Court for the purposes of determining restitution due and owing AND for the purposes of providing "due process" of law. If no objection is filed with the Clerk of Court by the Defendant or his attorney within 30 days from the date the Defendant receives notice of restitution, a judgment will be considered issued,for restitution in the sum stated to the Court by written document filed by the District Attorney/victim and without the necessity of any further orders of court.*)

3.)    To reimburse the State of Alabama for any attorney fees the state is caused to pay out due to the Defendant's representation herein; and,

4.)    To pay $50 to the Clerk of Court for distribution to the Alabama Crime Victims Compensation Commission.

The Defendant is given credit toward Defendant's sentence for the time the Defendant has already served while awaiting trial and/or disposition in this case.

Defendant's sentence was in open court ordered EXECUTED and to be served. Defendant was remanded to the custody of the Sheriff of the County for delivery to the penitentiary, State of Alabama for the purpose of serving Defendant's executed sentence.

Defendant was in open court advised of the Defendant's **right to appeal,** as long as Defendant perfects Defendant's appeal within a specified time; of the Defendant's rights, if indigent, to a free transcript for the purposes of pursuing appeal and of the Defendant's right to Court appointed legal representation, at no

98

charge to the Defendant, along with the Defendant's other appeal rights incident thereto.

Done and ordered this the 27th day of September, 2,002.
(*Note: This "sentence order" was rendered orally in the presence of all attorneys and the Defendant on the date of Defendant's conviction.*)

Gary L. McAliley, Circuit Judge, 12th Cir. AL



DEC 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

States'
Exhibit "C"

✓ 65 11/6/03
½
99

STATE OF ALABAMA,                )          IN THE CIRCUIT COURT OF
                                 )
        PLAINTIFF,               )          COFFEE COUNTY, AL
                                 )
VS.                              )          ENTERPRISE DIVISION
                                 )
ROBERT THOMAS CONRAD,            )
                                 )
        DEFENDANT.               )          CASE #s: CC-2001-M-179.

## *CAPITAL SENTENCE ORDER*

The Defendant, Robert Thomas Conrad appeared before this Circuit Court for trial by a properly struck (selected) and duly sworn jury of twelve (12) with two (2) alternates. Robert Thomas Conrad was represented by two (2) attorneys, Gary Bradshaw and Al Smith, both having the qualifications as required by law for the representation of capital defendants.

One juror was properly excused due to illness. Trial was completed with thirteen (13) jurors who were instructed as to the applicable law by the Court. Thereafter, the alternate juror was excused. The remaining twelve (12) jurors deliberated and returned a unanimous verdict which reads as follows: "We, the jury, find the Defendant, Robert Thomas Conrad "GUILTY" of the CAPITAL OFFENSE OF INTENTIONAL MURDER by the Defendant of Jelaine Bowman Dennis during a robbery in the first degree committed by the Defendant in violation of Section 13A-5-40(a)(2), the *Code of Alabama, 1975, as amended.*"

**The State proved the Defendant's guilt** of the capital offense of "MURDER BY THE DEFENDANT DURING A ROBBERY IN THE FIRST DEGREE….COMMITTED BY THE DEFENDANT in violation of Section 13A-5-40(a)(2), the Code of Alabama, **to be fact, beyond a** reasonable doubt.

This Court finds said verdict to be supported by the legal and competent evidence presented in the trial of this case.



DEC 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

100

## *FACTS CONCERNING THE CRIME AND THE*
## *DEFENDANT'S PARTICIPATION IN IT.*

The Court finds, <u>beyond a reasonable doubt</u> that:

1).     At about 1:25 p.m. on the 23$^{rd}$ day of May, 2001, Enterprise police officers were dispatched to a report of a robbery and shooting at a place of business in the Enterprise Division of Coffee County, Alabama called *"The Toy Store."* This place of business was more specifically located at 643 County Road 711, Enterprise, Alabama. The business was that of an "adult novelty" store. While enroute, officers were told the suspect was last seen running west on Coffee County, Alabama Road 711 and was described as being a black male wearing all black clothing. Upon arrival at *"The Toy Store"*, Enterprise, Alabama Police Officer Lennis Darby was met by an older caucasian male [*later found to be Robert Grimes*] who stated to officer Darby he had been robbed and that "she" [*an individual later identified as being Jelaine Bowman Dennis*] has been shot." Officer Darby entered *"The Toy Store"* and found Jelaine Bowman Dennis to be alive but lying behind the counter bleeding profusely from her chest and other areas of her body. Jelaine Bowman Dennis told Officer Darby she had also shot the suspect. Blood could be readily seen in various locations inside *"The Toy Store."* However, it was mainly found in the area of the cash register; the counter area on which the cash register set; and the floor area around where Jelaine Bowman Dennis was found by Officer Darby. Officer Darby then requested rapid response from rescue personnel. Officer Darby observed the cash register inside "The Toy Store" to be slightly open, and that there was no money inside the drawer. Officer Darby preserved the scene. Shortly thereafter, Enterprise Rescue Squad personnel arrived. Jelaine Bowman Dennis was still alive and remained alive until she was transported out of *"The Toy Store"* to Medical Center Enterprise, a hospital in Enterprise, Alabama where she later died. A video was played for the members of the jury who could see Jelaine Bowman Dennis alive at the time she was taken from the scene by rescue personnel.

Officer Darby obtained a statement made by Robert Grimes that during the robbery and shooting, he, Jelaine Bowman Dennis and two (2) black males were present in the business when a person dressed

totally in black came into *"The Toy Store"* and forced him and the other two black males onto the floor toward the back of the very small building. He further stated the person dressed totally in black was brandishing a pistol and with it forced Robert Grimes to the floor and took Robert Grimes wallet which contained thirty ($30.00) dollars. Also, moneys and a wallet was taken from one of the black individuals *[later identified as being Bryan Glenn Yeomans, a co-defendant]*. Mr. Robert Grimes further stated that moneys were taken by the person dressed in black from *"The Toy Store"* cash register. As the person dressed in black was taking moneys from the cash register, Mr. Grimes further stated he heard gun fire and that numerous shots were fired. Thereafter, the person dressed in black quickly exited *"The Toy Store"* as Jelaine Bowman Dennis told Mr. Grimes she had been shot and that she had also shot the person who had robbed her. Robert Grimes further stated he then went to his vehicle where he placed a "911 call" on his cell phone and that the two black males had also exited the business, stopping to ask what they could do. Robert Grimes told the two black males to go get help and the two black males quickly departed.

While Enterprise Police Officer Michael Petty was enroute to *"The Toy Store"*, he observed a light blue Ford LTD automobile pass him that he recognized belonged to Brian Smith who he had had dealings with in the past. The vehicle of Brian Smith was traveling North on the Geneva Highway at a high rate of speed. *(Note: A video taken from a police officer's patrol car recorded on the way to "The Toy Store" substantiates that to get to 643 County Road 711, one must turn off of what is commonly known as "The Geneva Highway---leaving out of Enterprise, Alabama.)* Officer Petty did not recognize the driver of co-Defendant, Brian Smith's light blue Ford LTD automobile.

At approximately 1:50 p.m. on the same date, Robert Thomas Conrad was dropped off by two black males at Medical Center Enterprise, Enterprise, Alabama for treatment of gun shot wounds. As the two black males pushed Robert Thomas Conrad into the emergency room of the hospital in a wheel chair, they quickly ran from the emergency room area back to their car and sped away. Off duty Enterprise, Alabama police officer, Matt Key was in the parking lot of the hospital and observed Brian Smith and another black male Officer Key later identified as co-defendant, Bryan Yeoman, in the parking lot

in Brian Smith's vehicle. Officer Key was unaware of the robbery and Jelaine Bowman Dennis' being shot at that time.

At approximately 3:00 p.m., Brian Smith's vehicle was at his residence at Green Tree Apartments in Enterprise, Coffee County, Alabama. Investigator Jeff Spence of the Enterprise, Alabama Police Department spoke with Brian Smith's mother who stated Robert Thomas Conrad had spent the night with them on May 22, 2001 and that when she had returned home from work, Robert Thomas Conrad was not at home. She stated Brian Smith and Bryan Yeoman came in at approximately 2:15 p.m. and walked to Bryan Yeoman's residence. Investigator Spence and Lt. Mike Lolley attempted to contact Bryan Yeoman and Brian Smith at the apartment of Bryan Yeoman. However, neither of the two were found there.

During the evening hours of May 23, 2001, Investigator Spence and Twelfth Judicial Circuit District Attorney Investigator, Bruce Matthews interviewed Robert Thomas Conrad concerning his gun shot wounds at Medical Center Enterprise. Robert Thomas Conrad stated he was walking near the cemetery on Bell Street in Enterprise, Alabama when an unknown person jumped from the bushes and robbed him of his pager; and, his cell phone. Robert Thomas Conrad further stated that when he attempted to flee, the unknown person shot him. Robert Thomas Conrad further told Investigator Matthews he could only recall being loaded into a vehicle and taken to Medical Center Enterprise but could not remember who took him to the hospital emergency room.

Captain William Moore of the Enterprise, Alabama Police Department and Officer Key interviewed Bryan Yeoman. Bryan Yeoman stated to Captain William Moore that he overheard Brian Smith and Robert Thomas Conrad talking about doing a robbery. Bryan Yeoman stated he then went with Brian Smith to *The Toy Store*. However, he was unaware they were going to commit a robbery. Yeoman stated while inside *The Toy Store*, he observed Robert Thomas Conrad rob and shoot Jelaine Bowman Dennis. Bryan Yeoman then said he and Brian Smith then left *The Toy Store* and went to the residence next door to get assistance. When no one would answer the door, he stated they returned home and later discovered that Robert Thomas Conrad had been shot. Bryan Yeoman stated he and Brian Smith took Robert Thomas Conrad to Medical Center Enterprise

and returned home where he and Brian Smith went with his mother to Dothan, Alabama.

An autopsy conducted by the Alabama Department of Forensic Science experts substantiated that Jelaine Bowman Dennis died from receiving multiple gun shot wounds and specifically, the cause of death was a gun shot wound to her chest. It was also determined Jelaine Bowman Dennis had shot her assailant with a small caliber 22 pistol.

The murder weapon, i.e., the weapon that was used to kill Jelaine Bowman Dennis was never recovered. However, ballistics expert, Joe Saloom of the Alabama Department of Forensic Science testified one of the projectiles taken from the body of the Defendant, Robert Thomas Conrad could be in his expert opinion declared to have come from/been shot from the small caliber .22 pistol of Jelaine Bowman Dennis that had been used to shoot Jelaine Bowman Dennis' assailant.

Another witness put three black males in two separate vehicles just down the road from "*The Toy Store*" talking to each other parked in the highway parallel to each other only moments before the shooting. The witness was inconvenienced in driving to his farm work as a result of their blocking the highway. As the farmer returned back down the road to get some more tools, he found the three black males still there talking with each. One of the vehicles was a light blue Ford LTD with specifically described damages to the vehicle.

At trial, Bryan Yeoman advised the Court he was desirous of testifying against Robert Thomas Conrad. He further advised he wanted to tell the jury the truth about what happened. The Court, with Bryan Yeoman's attorney, G. A. Lindsey present advised Bryan Yeoman of his constitutional rights. The Court determined Bryan Yeoman knew/was aware of his constitutional rights. The Court further finds Bryan Yeoman made a knowledgeable, intelligent and voluntary waiver of his constitutional rights (specifically, his constitutional right to remain silent; that anything he stated could and would be used against him in a court of law) and that he elected to testify freely and voluntarily.

Bryan Yeoman took the stand as a witness and after being sworn testified he, Brian Smith and Robert Thomas Conrad planned to rob

"*The Toy Store*"; that they met in two separate vehicles just down the road from "*The Toy Store*" and made last minute plans; that Robert Thomas Conrad had a pistol and made statements about using it. Bryan Yeoman testified he and Brian Smith went into "*The Toy Store*" and shortly thereafter, Robert Thomas Conrad came into "*The Toy Store*" brandishing a pistol....made the old white man; Brian Smith and Bryan Yeoman lie down on the floor. That Robert Thomas Conrad was dressed totally in black with a black hood over his face and that Robert Thomas Conrad took the billfold from the old white man and that Robert Thomas Conrad took his [*Bryan Yeoman's billfold and a designated amount of cash, i.e., United States Currency that was the property of Bryan Yeoman and that Bryan Yeoman had in his billfold*] during the robbery. Bryan Yeoman further testified he heard multiple gunshots. He further testified he saw Robert Thomas Conrad place the pistol close to the chest of Jelaine Bowman Dennis and he saw Robert Thomas Conrad pull the trigger and shoot Jelaine Bowman Dennis in the chest area. Thereafter, Bryan Yeoman testified he saw Robert Thomas Conrad run from the building. He further testified he and Brian Smith ask the old white man what they could do. They were told by the old white man to go get help. Bryan Yeoman further testified, he went to a neighbor's house but could get no one to come to the door. He and Brian Smith left the area and later determined Robert Thomas Conrad had been shot. They took Robert Thomas Conrad to the hospital emergency room in Enterprise, Alabama; rolled Robert Thomas Conrad into the emergency room in a wheel chair and quickly left the hospital premises.

The Court does find beyond a reasonable doubt that Robert Thomas Conrad did in Coffee County, Enterprise Division, Alabama on the day and date above mentioned use a pistol and did deliberately and intentionally kill and cause the death of Jelaine Bowman Dennis by shooting her with a pistol and that Robert Thomas Conrad caused the death of Jelaine Bowman Dennis during the time that he was in the course of committing a theft of property, to-wit: United States currency and/or United States coinage and/or checks, the property of Jelaine Bowman Dennis accomplished by the use of force or by threatening the imminent use of force against the person of Jelaine Bowman Dennis or another person present, with the intent to overcome her physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property, while the said ROBERT

THOMAS CONRAD was armed with a deadly weapon or a dangerous instrument, to-wit: a pistol, in violation of Section 13A-5-40 of the Code of Alabama, against the peace and dignity of the State of Alabama.

This Court does further declare the unanimous verdict of the jury finding Robert Thomas Conrad *"guilty"* of the CAPITAL OFFENSE of INTENTIONAL MURDER by the Defendant of Jelaine Bowman Dennis during a robbery in the first degree committed by the Defendant in violation of Section 13A-5-40(a)(2), *the Code of Alabama, 1975, as amended,* is supported by the legal and competent evidence presented in the trial of this case.

Therefore, ROBERT THOMAS CONRAD is declared "GUILTY" of the CAPITAL OFFENSE of the INTENTIONAL MURDER by the Defendant of Jelaine Bowman Dennis during a robbery in the first degree committed by the Defendant in violation of Section 13A-5-40(a)(2), the *Code of Alabama*, 1975, as amended.

## *AGGRAVATING CIRCUMSTANCES*

The only aggravating circumstances which may be considered in sentencing are those set out in Section 13A-5-49, the *Code of Alabama, 1975.* Also, pursuant to Section 13A-5-45(e), the *Code of Alabama, 1975, as amended,* "...the state shall have the burden of proving **beyond a reasonable doubt** the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for the purposes of the sentence hearing. (f). Unless at least one aggravating circumstance....exists, the sentence shall be life imprisonment, without parole."

Therefore, *this Court finds* that the below listed Section 13A-5-49(4) *AGGRAVATING CIRCUMSTANCE has been proven to be fact "beyond a reasonable doubt" and will be considered by this Court in sentencing.*

*"The capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit...robbery..."*

## *MITIGATING CIRCUMSTANCES*

In regard to the statutory mitigating circumstances set out in Section 13A-5-51, the *Code of Alabama, 1975, as amended, based upon a* "*PREPONDERANCE OF THE EVIDENCE*" the Court finds the following:

(The mitigating circumstances set forth in Section 13A-5-51 have been considered.)

(1).    The Defendant does have a significant history of traffic type minor offenses.  He has one Assault in the Second Degree conviction on the 19th day of February, 2000 in the Enterprise Municipal Court, Enterprise, Alabama in case number MC 2000-238 and a "Giving False Information to Law Enforcement" conviction on the 19th day of July, 2000 in the Enterprise, Alabama Municipal Court.  Even though he has pending a drug matter in the Coffee County, Alabama District Court, this Court has not considered those pending charges as Defendant has not been convicted of these charges.  Therefore, the Defendant does not have a significant history of prior criminal activity.  Therefore, this Court *does find* the Section 13A-5-51(1) Mitigating Circumstance does exist.

(2).    The evidence does not justify that Robert Thomas Conrad was under the influence of any extreme mental or emotional disturbance.  To the contrary, the evidence presented at trial proved beyond a reasonable doubt that the Defendant, Robert Thomas Conrad acted with deliberation and with the intent to commit this capital offense.  There was no evidence presented and this Court has no basis to find that the defendant was under the influence of extreme mental or emotional disturbance.  The evidence does not establish based on a preponderance of the evidence this mitigating circumstance.  Therefore, **the Court finds that** **this Section 13A-5-51 (2)** **mitigating circumstance DOES NOT exist.**

(3).    The victim, Jelaine Bowman Dennis was not a participant in the Defendant's conduct.  Nor, did the victim, Jelaine Bowman Dennis consent to it.  Therefore, **this Section 13A-5-51(3) mitigating circumstance DOES** **NOT exist.**

(4).    Likewise, **the Section 13A-5-54(4) mitigating circumstance** **DOES NOT exist** as this Defendant, not another, committed the capital offense for which this defendant was convicted.  It was Robert Thomas

Conrad who was proven beyond a reasonable doubt to have intentionally caused the death of Jelaine Bowman Dennis and it was Robert Thomas Conrad who beyond a reasonable doubt committed intentionally all of the other elements of this capital offense as defined, even though he was aided by others present in the commission of the robbery of the victim, Jelaine Bowman Dennis. This capital offense, beyond a reasonable doubt, was committed by Robert Thomas Conrad. This capital offense was not committed by another person. This defendant's participation was in no way "...relatively minor."

(5). There is no evidence that the defendant acted under extreme duress or under the substantial domination of another person. Therefore, **this Circuit Court finds that the Section 13A-5-51(5) mitigating circumstance DOES NOT exist.**

(6). There is no evidence that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. Therefore, **this Circuit Court finds that the Section 13A-5-51(6) mitigating circumstance DOES NOT exist.**

(7) The defendant, at the time of the commission of this capital offense was a young man of approximately twenty (20) years of age, being born on the 30th day of October, 1980. Therefore, **this Circuit Court finds the Section 13A-5-51(7) mitigating circumstance DOES EXIST.**

The **NON-STATUTORY mitigating circumstances** as required by Section 13A-5-52, the Code of Alabama, 1975 as amended, have also been considered by this Circuit Court. The Defendant comes from a well thought of family who has made considerable efforts to teach the defendant right from wrong. Members of the community and defendant's family members appeared and requested the Defendant not be sentenced to death as he was a "good boy" and that he was "always respectful."

*All of the statutory and non-statutory mitigating circumstances possibilities have been carefully considered. The Court has applied the standards of proof set out in Section 13A-5-45(g) to issues involving the factual existence of the mitigating circumstance.*

## THE JURY'S RECOMMENDATION

**THE JURY VOTED EIGHT (8) TO FOUR (4) TO RECOMMEND A SENTENCE OF *"LIFE IN THE PENITENTIARY (PRISON) WITHOUT PAROLE."* THE COURT GIVES VERY SERIOUS CONSIDERATION AND WEIGHT TO THAT RECOMMENDATION.**

### THE SENTENCE

*Having found beyond a reasonable doubt the existence of the above AGGRAVATING CIRCUMSTANCE and further, based upon a preponderance of the evidence, having determined and weighed those statutory and non-statutory mitigating circumstances, and having given careful consideration and substantial weight to the jury's advisory recommendation, the Court finds that the punishment should be "LIFE IMPRISONMENT WITHOUT PAROLE."*

*It is therefore ORDERED, ADJUDGED AND DECREED that the Defendant, Robert Thomas Conrad is guilty of the Code of Alabama, 1975, as amended, Section 13A-5-40(a)(2) capital offense as charged in Offense One of the CC-2001-M-179 indictment, which indictment is referred to and incorporated herein by reference; and,*

*Nothing being stated by the Defendant as to why the sentence of the law should not be imposed;*

*IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that for his capital conviction, ROBERT THOMAS CONRAD is sentenced to "LIFE IMPRISONMENT WITHOUT PAROLE" in the penitentiary (custody of the director of corrections), State of Alabama.*

*Defendant is given credit for any time he has already served while awaiting trial and/or disposition in this case.*

*Defendant was in open court advised of his right to appeal, as long as he perfects his appeal within a specified time; of his right, if declared indigent, to a free transcript for the purposes of pursuing any appeal and of his right to court appointed legal representation, along with the Defendant's other appeal rights incident thereto.*

*The Defendant, upon demand, is also ordered to submit to DNA testing as is required by Section 36-18-20, et seq., the Code of Alabama, 1975, as amended.*

*The Defendant, Robert Thomas Conrad is remanded to the custody of the Sheriff of Coffee County, Alabama who is ORDERED to deliver ROBERT THOMAS CONRAD to the custody of the Alabama Department of Corrections as his sentence is hereby ordered "executed" and to be served.*

*Costs of Court are remitted as the Defendant, Robert Thomas Conrad is indigent. It is further ordered that Defendant, Robert Thomas Conrad pay restitution in the amount of FIFTEEN THOUSAND ($15,000.00) DOLLARS to the Clerk of Court for distribution to the Alabama Crime Victim's Compensation Commission.*

Done and ordered this the 27th day of September, 2,002. (*Note: This "sentence order" was rendered orally in the presence of all attorneys and the Defendant on the date of Defendant's conviction.*)

Gary L. McAliley, Circuit Judge, 12th Cir. AL



DEC 2002
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

**IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION**

ROBERT THOMAS CONRAD,                 *
                                      *
    PETITIONER,                       *
                                      *
VS.                                   *          CASE NO: CC-2001-180.60
                                      *          CC-2001-179.60
STATE OF ALABAMA,                     *
                                      *
    RESPONDENT.                       *

## ORDER

The court finds that the Defendant has failed to show "good cause" to allow such pre-action discovery. Furthermore, the allegations that the Alabama Capital Murder Statue is unconstitutional because it was created with the cooperation of three (3) branches of government is without merit.

Done this the ___5th___ day of __April_____, 2005.



_____
JEFF W. KELLEY
CIRCUIT JUDGE

APR 2005
FILED
J.M. Counts
Court Clerk
Coffee Co. Al.

# IN THE CIRCUIT COURT OF
## COFFEE COUNTY, ALABAMA
### ENTERPRISE DIVISION

ROBERT THOMAS CONRAD,　　　　*

　　　PETITIONER,　　　　　　*
　　　　　　　　　　　　　　　*
VS.　　　　　　　　　　　　　*　　　CASE NO: CC-2001-180.60
　　　　　　　　　　　　　　　*　　　　　　　　CC-2001-179.60
STATE OF ALABAMA,　　　　　　*
　　　　　　　　　　　　　　　*
　　　RESPONDENT.　　　　　　*

## ORDER

The Petitioner's Application for Leave to Proceed in Forma Pauperis is ***GRANTED***. The Clerk of the Court shall forward a copy of the Rule 32 Petition, Motion for an Evidentiary Submission, Motion for Appointment of Counsel, and Motion for Disclosure an Incamera Inspection of Grand Jury Testimony to the Office of District of Attorney and the State shall file a response to pleadings and motions within thirty (30) days of receipt of service.

Done this the ___5___ day of ___April_____, 2005.



JEFF W. KELLEY
CIRCUIT JUDGE

APR 2005
FILED
J.M. Counts
Court Clerk
Coffee Co. AL



112

# IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA

Robert T. Conrad
   Petitioner,

     vs.

State of Alabama
   Respondent.

\*
\*
\*
\*

Case No(s): CC 01 - M - 179
         CC 02 - M - 180

APR 2005
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

# MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO DISTRICT ATTORNEY'S ANSWER AND TO ALLOW TIME TO AMEND

Comes now the Petitioner Robert T. Conrad [ herein after Conrad ] pro-se, pursuant to Rule 1.3(b) Ala. R. Crim.P., in the above style cause of action and is seeking a 21 day extension of time on the following grounds to wit:

1. The Law Library has been closed frequently due to "shakedowns" and "lock-downs" by the Administration.

2. The Administration only allows Conrad to utilize the law library 13 hours per (7) seven day period.

# CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of April 2005, I have served a copy of the above and foregoing MOTION upon District Attorney ___Thomas T. Anderson___ at ___P.O. Box 1102___ via U.S. Mail by placing same in the Institutional Mailbox, postage pre-paid and properly addressed.

15.1 Robert T. Conrad
Robert T. Conrad

3. The law library only has the capacity to seat 10 prisoners at one time.

4. There are over 950 prisoners at Holman Prison which has to share the law library on a first come, first serve basis.

5. Conrad needs adequate time to respond to District Attorney's answer in Rule 32 Petition.

6. Conrad needs additional time to Amend Rule 32 Petition.

7. Conrad is indigent and unable to purchase legal supplies.

8. The Administration only issues Conrad (8) eight sheets of paper and two (2) envelopes per week.

WHEREFORE, for the above said reasons Conrad prays that this Honorable Court grant this petition in full.

Respectfully Submitted,

/S./ Robert T. Conrad
Robert T. Conrad

cc: file

115

## IN THE CIRCUIT COURT OF COFFEE COUNTY ALABAMA

ROBERT THOMAS CONRAD
    Petitioner,

VS.

                        CASE NO: CC01-179-M
                                        CC01-180-M

STATE OF ALABAMA
    Respondent.

### MOTION TO AMEND PETITION FOR POSTCONVICTION RELIEF PURSUANT TO RULE 32 ALABAMA RULES CRIMINAL PROCEDURE.

Comes now the petitioner ROBERT THOMAS CONRAD, PRO SE, AND HEREBY PURSUANT TO RULE 32.7(b) A.R.Crim.P; and moves this court to amend his petition pursuant to rule 32 A.R.Crim.P; as follows:

### I.

PETITIONER WAS DENIED HIS SIXTH AND FOURTEETH AMENDMENT RIGHT TO EFFECTIVE ASSITANCE OF COUNSEL; WHEN COUNSEL FAIL TO MOVE FOR A CONTINUANCE OR MISTRIAL BASED ON THE PROSECUTION FAILURE TO TURN OVER EXCULPATORY AND IMPEACHMENT EVIDENCE TO THE DEFENSE.

During petitioner trial it was discoovered that the prose-cution, had withheld a report regarding an internal investigation by the Enterprise Police Department;

The report demonstrated that the District Attorney Office knew of the plan to commit the Robbery of the Toy Store prior to the incident inwhich petitioner stands convicted.

After an in camera review of the report, the trial court agreed that the report contained exculpatory and impeachment evidence (R.969, 999,1000). Petitioner argues that trial counsel failure to request a continuance or mistrial was prejudical to the substantive rights of the petitioner as the prosecutor misconduct deprived the petitioner of evidence to rebut co-

1

defendant, Yeoman's testimony, which was crucial to the states
case.

Petitioner argues had counsel properly moved for mistrial
or continuance, and the trial denied such there's a reasonable
probability the trial courts ruling would have been reversed
on appeal as the states action was in clear violation of Brady
v. Maryland, 373 U.S. 83 (1963).


## II.

PETITIONER WAS DENIED HIS SIXTH AND FOURTEENTH AMEND-
MENT, RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN
COUNSEL FAIL TO OBJECT AND SEEK RECUSAL OF THE TRIAL
JUDGE ON THE GROUND THAT THE JUDGE WAS BIAS AND
IMPARTIAL PRIOR TO AND DURING PETITIONER'S TRIAL
AND SENTENCING PROCEEDING.


Petitioner avers that he was prejudice from the outset
of his trial by Judge McAliley pre-trial statements that " Crimi-
nal defendants who enter a guilty plea or who are convicted
of any act of violence, some active time in custody will be
ordered served." Further during trial Judge McAliley questioned
witnesses for the prosecution and made comments that demonstrated
the appearance of impartiality. Specifically, the record shows
that several times the Judge questioned witnesses. (R. 1140,
1143, 1144, 1146, 1155, 1161, 1212, 1213, 1225) and referred
to defense counsel to Tom, Dick and Harry, (R. 876-77, 942,
945). the Court further showed  appearances of impartiality
during his rulings on defense counsel motions and objections
during the course of the trial, where the Court demonstrated
favorable treatment to the prosecution. Petitioner avers that
at one point counsel did object to the Court improper questioning

2.

of witness. (R.1225). Petitioner contends that counsel error and omissions deprived petitioner of his constitutional rights to a fair trial.

### III.
PETITIONER WAS DENIED HIS SIXTH AND FOURTEENTH AMEND-MENT, RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN PETITIONER WAS PROCEED WITH COUNSEL WHO LABORED UNDER A CONFLICT OF INTEREST.

Prior to trial defense counsel Gary D. Bradshaw, filed a motion to withdraw as appointed counsel for the petitioner avering as grounds therefore;

1. The victim, Jelaine Dennis, was a member of the same church;

2. The victim three children, April, Monica and Damen, were all members of the Sunday, School Class in which counsel was youth director and teacher. (C.R.20).

The record does not reflect whether or not the court ruled on said motion, but the record does whow that petitioner proceed to trial and on direct appeal with Attorney Gary D. Bradshaw without objection.

Petitioner aver's that he has Constitutional Right to be represented by conflict free counsel.

In the instant case, counsel made known to the court that he had a personal relationship with the victim and the victims children under such circumstances, counsel could not represent the petitioner to the best of his abilities which adversly affected counsel's performance during trial to the prejudice of the petitioner as counsel had to choose between respect and loyalty to the victims family and diligently representing his client.

Petitioner avers that counsel's failure to object to his continuing participation in light of the circumstance was pre-judicial, to the substantial rights of the petitioner, as counsel could not be expected to represent petitioner to the best of his abilities in light of his relationship with the victim and the victims children.

To the extent that the court finds that this issue was preserved, Petitioner argues that counsel's failure to raise this issue on direct appeal constitutites ineffective assistance of counsel.

#### IV.

PETITIONER WAS DENIED HIS 6TH AND 14TH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO OBJECT TO THE ADMISSION OF THE BULLET TAKEN FROM PETITIONER'S BODY ON THE GROUNDS THAT IT WAS THE PRODUCT OF AN ILLEGAL SEARCH AND SEIZURE.

Petitioner avers that on May 23, 2001, the District Attonrey, issues a subpoena to the keeper of records of the Enterprise Medical Center, requesting any and all medical records, lab reports, blood, hair, salgva and bodily fluids of the petitioner (C.R.296).

In Response to the subpoena, the District Attonrey obtained evidence to include bullets that was remanded from the petitioner body, which was later admitted into evidence during petitioner's trial.

Petitioner avers that this evidence was illegally seized in violation of Petitioner's fourth, fifth, sixth, eighth and forteenth amendments rights to the United States Constitutional as the District Attorney was without authority to subpoena the evidence.

The record reflects that counsel filed at least two pretrial motions to suppress, but counsel did not object to the intro- duction, the evidence during trial.

Petitioner avers that he was prejudiced by the introduction of the evidence, as the evidence was admitted and used by the jury to convict the petitioner.

To the extent that this court considered this issue was preserved counsel failure to raise this issue on appeal was prejudical to the petitioner and deprived the petitioner of a fair Appellate review of his conviction and sentence.

119

## V.
### PETITIONER WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAIL TO ADVISE THE PETITIONER OF HIS RIGHT TO TAKE THE STAND AND TESTIFY, IN HIS OWN DEFENSE

Petitioner avers that his trial counsel was ineffective and he was prejudiced thereby when counsel fail to inform petitioner of his right to testify and that the final decision to testify belonged to the petitioner alone.

Petitioner avers that neither of his counsels prior to, during nor when the state rested its case informed the petitioner that he had a constitutional right to testify in his own defense.

Petitioner submits had he been informed of his rights he would have taken the stand and testified in is own defense, which would have allowed the jury to hear his version of the case. Specifically, petitioner would have testified as to his whereabouts at the time of the crime, and that the bullets that was taken from his body was caused by another indivial during a robbery of the petitioner and not from the victim. Further petitioner would have testified about an argument he had with Yeoman, that resulted in petitioner beating Yeoman up, and that is what caused Yeoman, to lie on the petitioner.

Petitioner submits had the jury heard him testify in his own defense, there's a reasonable probability that the jury would have had a reasonable doubt as to petitioner's guilt of the crime he stands convicted of. Petitioner contends that counsel error was prejudicial to the substantial rights of the petitioner.

## vi.
### PETITIONER WAS DENIED HIS SIXTH AND FOURTEETH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, WHEN THE TRIAL COURT FORCED COUNSEL TO BECOME A WITNESS IN THE CASE CREATING AN ACTUAL CONFLICT.

Petitioner avers that 12-21-161 Code of Alabama 1975 Provides:

"No attorney of his clerk shall be competent or compelled to testify in any court in this state against the client as to any matter or thing, knowledge, of which may have been acquired from the client, or as to advice or counsel to the client given by virtue of the relation as attorney or

5

given by reason of anticipated employment
as attorney unless called to testify by the client
but shall be competent to testify for or against the
client as to any matter or thing the knowledge, of
which may have been acquired in any other manner.

AN actual conflict exist when defense counsel is compelled
to compromise his or her duty of loyalty or zealous advocacy
to the accused by choosing between or blanding the divergent
or competiting interest of a former or current client. See:
Cuyler v. Sullivan, 446 U.S. 335 (1980).

In the instant case, during petitioner trial, the trial
court forced defense counsel Al Smith, to become a witness in
the case. (R.1258-1264), specifically counsel was forced to
reveal the identity of the source that gave him information
regarding the District Attorney withholding of exculpatory and
impeachment evidence.

Petitioner avers that this action by the trial court com-
pelled, counsel to compromise his duty of loyalty to his client
as theaction prohibited counsel from vigorously seeking a mis-
trial, and /or dismissal of the charges based on the prosecution
withholding of exculpated and impeachment evidence, counsel
had discused this information with his client, therefore, the
information became part of trial strategy, As the source could
have became a potential witness for the defense.

Petitioner avers the that he was prejudiced by the trail
court actions in this instance, and was deprived of his rights
to a fundamental fair trial.

VII.

PETITIONER AVERS THAT NEWLY DISCOVERED EVIDENCE EXIST
REQUIREING A NEW TRIAL OR OTHER RELIEF BASED ON THE
FALSE AND MISLEADING EVIDENCE PRESENTED AT HIS TRIAL
BY EMPLOYERS OF THE ALABAMA DEPARTMENT OF FORENSIC
SCIENCES.

Petitioner submits that the Alabama Departmentof Forensic
Sciences has falsely misleadcourts jurors and the public to
believe that the method and priniciples used in examing and
analyzing forensic and physical evidence is performed under
reliable techniques.

The Alabama Department of Forensic Sciences has recently openly admitted that its laboratories has just gained accreditation by the American Society of Crime Laboratores Director which demonstrates was deficent at the time of petitioner's trial. This court can take judicial notice that the Department and prosecutors for years in this court and the courts throughout the State of Alabama through the testimony of employees purported to be experts, has mislead the court, juries and the public to believe that the scientific and technics evidence was valid. when in fact based on the Department's recent proclamation, the entire Department of Forensic Science was fatally deficient, rendering any testimony or evidence from the Department Inadmissible under the test laid down by the United States Supreme Court in <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.,</u> <u>509 U.S. 579(1993).</u>

In the petitioner case, several employees of the Alabama Department of Forensic Sciences testified as to certain findings performed in its laboratories regarding blood and ballistic

evidence and such was crucial and material to the State's case against the petitioner. However, due to the  Department not being accredited at the time of the testing, such evidence was inadmissible under the Daubert standard.

Petitioner avers that he discovered this evidence on January 2005, and submits that this new evidence requires that his conviction and sentence be vacated and a new trial ordered, because petitioner convictions rest upon the testimony and evidence submitted by the Alabama Department of Forensic Sciences, and absent such evidence, petitioner would not have been convicted.

7.

122

Wherefore, Premises considered, Petitioner prays for the relief heretofore prayed for.

Respectfully Submitted,

ROBERT THOMAS CONRAD
AIS # 226791
Holman Unit 3700
Atmore, Al. 36503-3700

## CERTIFICATE OF SERVICE

I hereby certify that I have this 9th day of April 2005, served a copy of the foregoing on the District Attorney by placing a copy of the same in the United States Mail, postage prepaid and properly addressed as follows:

Mark Fuller
District Attorney
P.O. Box 1102
Enterprise, Al. 36831

ROBERT THOMAS CONRAD

8.

123

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA

Robert Conrad,
Petitioner,

Vs.

Case No(s):CC-01-179.60
CC-01-180.60

State of Alabama,
Respondent.

## MOTION TO STRIKE STATE'S PLEADING

Comes now the petitioner, Robert T. Conrad, [hereinafter Conrad],
Pro-se, pursuant to Rule 12(f), Ala.R.Civ.P., in the above style cause
of action, requesting that this Honorable Court strike District Attor-
ney's, response to petitioner's Rule 32 petition and is seeking relief
on the following grounds to wit:

[1] On April 5, 2005, Conrad received an "Order" from this Honorable
Court inter alia granting in forma pauperis status.

[2] On March 31, 2005, the State of Alabama filed its pleading
requesting summary dissmissal prematurely.

[3] Conrad avers that this Honorable Court "did not" obtain juris-
diction until April 5, 2005, and request that the District Attorney
response of March 31, 2005, in its entirety, be stricken from the
record.

Wherefore, for the above said reasons, Conrad prays that this Honorable Court
grant the relief prayer for herein.

/s. Robert T. Conrad, #226791
3700 Holman Unit
Atmore, Alabama 36503

124

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of April, 2005, I have served a copy of the above and foregoing Motion upon District Attorney Tom Anderson at Post Office Box 1102 Enterprise, Alabama 36331, via U.S. mail, postage prepaid and properly addressed.

/s/ _____

Robert Conrad

125

IN THE CIRCUT COURT OF COFFEE COUNTY, ALABAMA

Robert Thomas Conrad
    Petitioner,

Vs.

                               Case No: CC01-179-M
                                        CC01-180-M

State of Alabama,
        Respondent.

### Motion For Appointment Of Counsel

        Comes now the petitioner Robert Thomas Conrad, Prose, in the above stated cause, and hereby request that this Honorable Court pursuant to Rule 32.9(a) Alabama Rules of Criminal Procedure to appoint Counsel to represent petitioner in the above cause, and submits the following in support thereof:

        1. Petitioner was convicted of Capital Murder and First Degree Robbery and was sentenced to Life Without Parole.

        2. Petitioner was declared Indigend by this Court during his trial and Appellate procedures and submits that due to his Incarceration his Financial Status has not Substantially changed.

        3. Petitioner currently has pending before this Honorable Court a Petition for Postconviction Relief pursuant to Rule 32 Alabama Rules Of Criminal Procedure that was prepared through the assistance of a fellow inmate, because Petitioner is unskilled in the Law and Legal procedure.

        4. Petitioner believes that his Petition has merits and that the Assistance of a Professional Attorney is necessary to Assert and Protect the Substantial Rights of the Prtitioner in this proceeding.

5. Petitioner is unable to retain Counsel due to his poverty, and desires the Assistance of Counsel.

Wherefore, premises considered Petitioner prays that this Honorable Court will appoint Counsel to represent Petitioner in this cause. So it is forever prayed.

Respectfully Submitted,

Robert Thomas Conrad
AIS # 226787
Holman Unit 3700
Atmore, Al. 36130-3700

## Certificate of Service

I hereby certify that I have this 10 day of May 2005, served a copy of the foregoing to the District Attorney by placing a copy of the same in the United States Mail, postage prepaid and properly addressed as follows:

Mark Fuller
District Attorney
P.O.Box 1102
Enterprise, Ala. 36331

Robert Thomas Conrad

cc/File

127

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA

ROBERT CONRAD
          PETITIONER,

                                        CC-2001-M-178
VS.                          CASE NO: CC-2001-M-179

STATE OF ALABAMA,
          RESPONDENTS.

MOTION FOR INQUIRY PURSUANT TO RULE 77(d) A.R.Civ.P.

Comes now the petitioner Robert Conrad (Herein after

Conrad ), and moves this Honorable Court with his Motion

for Inquiry pursuant to rule 77(d) A.R.Civ.P., and states the

following grounds:

     1. On the 25th day of February , 2005, Petitioner filed

Motion for Disclosure an Incamera Inspection of Grand Jury

Testimony.

     2. Petitioner is requesting the disposition of the case.

     3. Respondent will not be prejudiced by the granting of

this Motion.

     WHEREFORE, the above styled cause petitioner PRAYS that

this Honorable Court grant this Motion.

DATED: June 8, 2005

                                   Respectfully Submitted,

                                   /s./ Robert Conrad
                                   ROBERT CONRAD
                                   AIS # 226791
                                   HOLMAN UNIT 3700
                                   ATMORE, ALABAMA 36503

128

## CERTIFICATE OF SERVICE

I hereby certify that on this the _8th_ day of _JUNE_,
2005, I have placed a copy of the above Motion in the
institutional mailbox, postage prepaid addressed to the
_Coffee_ County District Attorney at: _Mark E. Fuller, P.O. Box 1102_
_Enterprise, Alabama 36331-1102_.

/s/ _Robert Conrad_

129

| | |
|---|---|
| ROBERT THOMAS CONRAD, | ) | IN THE CIRCUIT COURT OF |
| PETITIONER, | ) | COFFEE COUNTY, AL |
| VS. | ) | ENTERPRISE DIVISION |
| STATE OF ALABAMA, | ) | |
| RESPONDENT. | ) | CASE #s: CC-2001-M-179 |
| | | and |
| | | CC-2001-M-180 |

## STATE'S ANSWER/RESPONSE TO PETITIONER'S AMENDED RULE 32 PETITION FOR RELIEF FROM CONVICTION OR SENTENCE

The State requests the Court to take judicial notice of its own records, its orders, the pleadings filed with the court and the testimony along with the evidence presented at Mr. Conrad's trial whereby the petitioner was found guilty by a jury of his peers.

Rule 32.3 of the Alabama Rules of Criminal Procedure provides **the petitioner shall have the burden of pleading and proving by a** preponderance of the evidence **the facts necessary to entitle the petitioner to relief.** The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence.

The State contends Mr. Conrad's "PETITION..." should be summarily denied for the following reasons:

1.    The "PETITION..." is precluded by Rule 32.2(a)(3) of the Alabama Rules of Criminal Procedure as Petitioner raises matters which could have been but were not raised at trial.

2.    The "PETITION..." is precluded by Rule 32.2(5) of the Alabama Rules of Criminal Procedure as Petitioner raises matters which could have been raised on appeal but were not.

3.    The "PETITION…" is precluded by Rule 32.2(c) as being filed beyond the limitations period. In this "PETITION…," Mr. Conrad admits that he filed an appeal with the Court of Criminal Appeals and that his convictions and sentences were affirmed on October 24, 2003. This Rule 32 Petition was filed on January 18, 2005, more than one (1) year after the issuance of the certificate of judgment by the Court of Criminal Appeals. The Petition is precluded as having been untimely filed. The Petition does not allege any newly discovered evidence that could not have been ascertained through reasonable diligence at trial, at sentencing, or on appeal.

4.    Petitioner has moved this Court to allow him to amend his original Petition and continues to argue that Albert Smith, Gary Bradshaw, and Richard Waldrop, did not render reasonably effective assistance before, during or after Petitioner's trial and but for that ineffectiveness…there exists a reasonable probability that the result…would have been different. The State again disagrees and responds more specifically hereafter.

5.    Petitioner asserts that he was denied his Sixth and Fourteenth Amendment rights to effective assistance of counsel due his attorneys' failure "to move for a continuance or mistrial based on the prosecution [sic] failure to turn over exculpatory and impeachment evidence to the Defense." Counsel was in no way ineffective as they properly raised this issue at trial. The Court did declare certain matters to be exculpatory in nature, however, great lengths were taken by the State and Counsel for the Defendant to make sure that Mr. Conrad had the benefit of the alleged exculpatory information. The trial judge ordered that a witness be flown back to the state of Alabama, at the expense of the District Attorney's Office, so that any material exculpatory in nature could be developed by the Defendant. Counsel was able to fully develop these issues at trial and as result there were no grounds for a continuance or motion for a mistrial. The Defendant has not, in any way, been denied his Sixth and Fourteenth Amendment rights as this allegation is without merit.

6.    Petitioner argues that counsel was ineffective in their failure to "object and seek recusal of the trial judge on the ground that the judge was biased and impartial prior to and during Petitioner's trial and sentencing." Petitioner avers that pretrial statements that "Criminal

defendants who enter a guilty plea or who are convicted of any act of violence, some active time in custody will be ordered served" caused him prejudice. A judge's position on the sentencing of convicted violent offenders to "some active time" would in no way evidence any impartiality or bias. In fact, Mr. Conrad was charged with the offenses of Capital Murder and Robbery, First Degree, which if found guilty, leaves the trial judge with only two choices; life without the possibility of parole or the death penalty. All rulings by Judge McAliley on motions and objections were based on and entirely in line with the laws of this state and those of the United States. Furthermore, at no time did the trial judge ever refer to defense counsel as Tom, Dick, and Harry. Even had the Judge done so, that is no showing of bias or impartiality. Petitioner's argument is again unsubstantiated.

7.    Petitioner avers that he was denied his Sixth and Fourteenth Amendment rights to effective assistance of counsel when he proceeded to trial and on appeal by counsel who labored under conflict of interest. This is not the case and the State refutes such an assertion with the attached affidavit of this attorney, Hon. Gary D. Bradshaw. [See State's Exhibit "A"]

8.    Petitioner's allegation that his counsel were ineffective for failing "to object to the admission of the bullet taken from Petitioner's body on the grounds that is was the product of an illegal search and seizure" is wholly without merit. Petitioner admits that *counsel filed at least two pretrial motions to suppress* but argues ineffectiveness for their decision not to raise the objection again at trial. This issue was fully developed by the defense and argued before the Court with the trial judge ruling not to suppress the evidence. The issue was properly preserved for appeal had counsel elected to argue it. However, the exercise of discretion not to raise this issue on appeal (if Petitioner's assertion that it was not is taken at face value) did not in any way cause prejudice to the Defendant.

9.    Petitioner avers that trial counsel were ineffective for their failure "to advise the petitioner of his right to take the stand and testify in his own defense." This is a mere unsubstantiated allegation for which Petitioner can offer no proof. Mr. Conrad also failed to substantiate the allegation that his attorneys' "…performance

prejudiced [PETITIONER], thereby affecting the verdict, sentence or on appeal."

The state contends Defense counsel's performance at trial and at sentencing was within the range of competence demanded of attorneys in criminal cases. Petitioner's appellate counsel were also within this range of competence. The State contends Petitioner has set forth only baseless allegations which (considering what did occur in open court before this honorable court) are untrue and without factual or legal merit. Petitioner has failed to set forth sufficient allegations of ineffective assistance of counsel as provided in _Strickland._ The requirements of _Strickland v. Washington_ have not been set forth such as to afford Petitioner the relief sought.

10.    The Petitioner contends that his Sixth and Fourteenth Amendment rights to effective assistance were again denied when "the trial court forced counsel to become a witness in the case creating an actual conflict." During the course of the trial, Attorney Smith made known to the Court that he, through a neighbor, had received anonymous information that the State had withheld exculpatory material. The trial judge conducted an **in camera** hearing to determine whether any exculpatory material existed. Attorney Smith was called as a witness for those purposes, as the Court had a duty to ascertain if such material did exist. Petitioner was in no way prejudiced as the hearing and all conversations pertaining thereto took place out of the presence of the jury. Furthermore, Attorney Smith was not asked of or forced to divulge any confidential information that he may have obtained from his client.

11.    Finally, Petitioner raises the issue that "false and misleading evidence" was "presented at his trial by employees of the Alabama Department of Forensic Sciences." Petitioner contends that the Alabama Department of Forensic Sciences falsely mislead courts and jurors to believe that the methods and principles used in examining and analyzing forensic evidence was performed under reliable techniques when the Department was not accredited at the time of his trial and as a result all evidence was inadmissible due its inability to meet the standard set forth in _Daubert vs. Merrell Dow Pharmaceuticals, Inc.,_ 509 U.S. 579 (1993). The Court holding in _Daubert_ encompasses no requirement of accreditation for any entity

133

by a certifying authority so that its standard of assessing scientific reliability can be met. In addition, the State laid an extensive and proper predicate at trial for each witness and upon its motion had the trial judge declare the witnesses from the Alabama Department of Forensic Sciences as experts before they testified as to "blood and ballistic evidence." This claim of the Petitioner is entirely baseless and in no way supported by the facts.

**WHEREFORE,** the State does request that Mr. Conrad's Amended Rule 32 "PETITION FOR RELIEF FROM CONVICTION OR SENTENCE" pursuant to Rule 32.7(d), Alabama Rules of Criminal Procedure should be summarily denied.

Done this the _Kth_ day of June, 2005.

_____
Tom Anderson, Assistant District Attorney
Twelfth Circuit, State of Alabama

**CERTIFICATE OF SERVICE**

I do hereby certify that I have this day mailed a copy of the above pleading to the Petitioner, Robert T. Conrad at the penitentiary address he has listed in his pleading postage prepaid.

_____
Tom Anderson, Asst. District Attorney

134

State Exhibit "A"

## IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
### ENTERPRISE DIVISION

| | | |
|---|---|---|
| STATE OF ALABAMA, | * | |
| Plaintiff, | * | |
| VS. | * | **CASE NOS. CC 2001-179 and** |
| | | **CC 2001-180** |
| ROBERT THOMAS CONRAD, | * | |
| Defendant. | * | |

### AFFIDAVIT

STATE OF ALABAMA
COUNTY OF COFFEE

Before me, the undersigned, an officer commissioned by the State of Alabama, on June 17, 2005, personally appeared **GARY D. BRADSHAW**, who having been first duly sworn does depose and say as follows:

I, **GARY D. BRADSHAW**, did serve as appointed co-counsel for Robert Thomas Conrad. That shortly after being appointed to represent said Defendant, I filed a "Motion to Withdraw" based upon the fact that the children of the victim were listed as Sunday school members at the same church that I attended. April, Monica and Danon Dennis were on the Sunday school roll in the youth department where I taught. At that time I was teaching 12th grade and I believe one of the children was currently in the 12th grade; however, I can testify that none of the children ever attended Sunday School and I would not have recognized any of the children had they appeared in the courtroom because none of them ever attended church.

Your affiant filed a motion with the court to make the court aware of the fact that the victim and the children were listed on a church and Sunday school roll where a counsel was an active member. The court ruled, via then Circuit Judge, Gary L. McAliley, that this did not create a conflict and denied my Motion to Withdraw. This ruling came only after I was questioned by Circuit Judge McAliley concerning any conflict.

_____
Affiant
**GARY D. BRADSHAW**

Sworn to and subscribed before me this _17ᵗʰ_ day of June, 2005.

_____
Notary Public
My Commission Expires: 1/29/07

136

# IN THE CIRCUIT COURT OF
## COFFEE COUNTY, ALABAMA
### ENTERPRISE DIVISION

ROBERT CONRAD,                    *

    PETITIONER,                  *
                  *
VS.                               *    CASE NO: CC-01-179.60
                  *    CC-01-180.60
STATE OF ALABAMA,                 *

    RESPONDENT.                  *

## ORDER

The Defendant's Motion to Strike State's Pleadings is hereby **DENIED**.

Done this the ___4th___ day of ___May___, 2005.



JEFF W. KELLEY
CIRCUIT JUDGE

137

# IN THE CIRCUIT COURT OF
## COFFEE COUNTY, ALABAMA
### ENTERPRISE DIVISION

ROBERT THOMAS CONRAD,     *

     PETITIONER,     *

VS.     *    CASE NO: CC-2001-179 & 180

STATE OF ALABAMA,     *

     RESPONDENT.     *

## ORDER

Upon consideration of the Defendant's Rule 32 Petition and the States's Response. It is **ORDERED** as follows:

A.    That the Petitioner is indigent and Attorney Rick Hollingsworth, Sr. is appointed to represent the Petitioner on the issues raised on the Rule 32 Petition.

B.    That an evidentiary hearing is scheduled for the **2ⁿᵈ day of December 2005** at **9:00 a.m.** at the Coffee County Courthouse, Courtroom D, Enterprise, Alabama.

C.    That Hon. Gary Bradshaw and Hon. Richard Waldrop are ordered to appear and testify if requested at any future proceedings as the Attorney-client privilege has been waived by the allegations of the Petition.

Notice to Hon. Rick Hollingsworth, Sr., Hon. Gary Bradshaw, Hon. Richard Waldrop and the District Attorney.

Done this the _17th_ day of _June_, 2005.

JUL 2005
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

JEFF W. KELLEY
CIRCUIT JUDGE

x: DA
Hollingsworth,
Bradshaw
Waldrop

IN THE CIRCUIT COURT OF COFFEE COUNTY ALABAMA
ENTERPRISE DIVISION

138

ROBERT THOMAS CONRAD
PETITIONER,

Vs.

CASE NO. CC 01-179-M
CC 01-180-M

STATE OF ALABAMA
RESPONDENT.

## MOTION FOR POSTCONVICTION DISCOVERY

Comes now the Petitioner Robert Thomas Conrad, Pro se in the above styled cause, and hereby moves this court for Postconviction Discovery pursuant to Ex Parte Land, 775 So.2d 847 (ALA. 2000), and to meet his burden of proof in his pending Petition for Postconviction relief, pursuant to Rule 32. ALA. Rules of Criminal Procedure, and summits the following in support hereof:

1. Petitioner Robert Thomas Conrad, was convicted of Capital Murder, and First Degree Robbery, and was subsequently sentenced to Life without Parole and Life Imprisonment. Petitioner's conviction and sentence was affirmed by the Alabama Court of Criminal Appeals in an unpublished Memorandum, a petition for Writ of Certiorari was subsequently denied.

2. On December 27, 2004, Petitioner filed a petition for Postconviction Relief and a subsequently Amendment, averring that he is entitled for relief on several Constitutional violations committed during his Trial and on Direct Appeal of his conviction. That petition is currently pending before this Court.

3. Petitioner is indigent and unable to afford an Attorney to represent him or to perform an investigation in this case, as his financial status has not substantially changed since his conviction and sentence in this case.

4. Petitioner has pleaded facts in his petition that entitle him to relief, and request that this Court grant Discovery of evidence to prove those facts and to enable Petitioner to meet his burden proof as required by Rule 32.3 Alabama Rules of Criminal Procedure.

5. Petitioner request Discovery of the following:

(a.) Issue a subpoena to the Secretary of State, Nancy Morley, to produce the minutes of the convention of the adoption of the Alabama Constitution of 1901. This will support Petitioner's claim that the statutes upon which he was convicted is invalid, because they were enacted pursuant to a State Constitution that violated the United States Constitution.

(b.) To produce for Inspection a copy of the Internal Investigation Report by the Enterprise Police Department reflecting that the District Attorney, the Enterprise Police Department and other Law Enforcement Officials, knew of the plan to Rob the Toy Store, prior to it being Robbed. This will support Petitioner's claim that he was denied a Fundamental Fair Trial, based on the State's withholding Evidence favorable to the Defense.

(c.) To produce for Inspection a copy of the Pre-trial statements of Judge McAliley regarding violent offenders convicted in his Courtroom. This will support Petitioner's claim that Judge McAliley was biased towards him, and deprived Petitioner of a Fair Trial.

(d.) to produce for Inspection a copy of the District Attorney's Subpoena and supporting documents issued to the keepers of records of the Enterprise Medical Center, requesting all Medical Records, Lab Records, Blood, Hair, Saliva and Bodily fluids of Petitioner. This will support Petitioner's claim that the District attorney was without Authority to issue the subpoena, and that any and all Evidence submitted during trial as a result of the Subpoena, should have been suppressed.

(e.) Issue a subpoena to the Alabama Department of Forensic Sciences to produce for Inspection, copying and to present as Evidence, it's most recent Audit Report of the Laboratory that tested and analyzed the Evidence in this case, and to produce the Certificate of Accreditation it received from the American Society of Crime Laboratories Directors. This will support Petitioner's claim that the Forensic Evidence pre- at his trial was Inadmissible under the Daubert test.

(f.) To produce a copy of the Transcripts, Court Records, reflecting, that the Oath was administered as required by Sec.12-16-170 Alabama Code 1975. The Record is silent on this matter, and the Exhibits submitted by the District Attorney refers to a previous Oath, rather than the actual swearing of the Venire and Petit Jury as required by Law.

(g.) A copy of the original Indictments returned by the Grand Jury as required by Law.

(h.) Subpoena issued to the Alabama Law Institute requiring the custodian of Records to produce for Inspection, the Draft of the current Death Penalty Statute, and the names and position of those who participated in the Draft of the Statute. This will

\140

support Petitioner's claim that the Statute upon which he was convicted is Unconstitutional in violation of The Separation of Power Doctrine.

(6.) Petitioner avers that he is incarcerated in the Alabama penal System, indigent and has no other means to obtain the requested Discovery without Substantial Hardship. Further, Petitioner submits that the materials, Documents and Evidence requested herein are germane to Petitioner presenting Evidence in support of the Rule 32. Petition and to meet his burden of proof.

Wherefore, premises considered petitioner prays that this Honorable Court will order the requested Discovery. See Ex Parte Land, Supra.

Respectfully Submitted,

Robert Thomas Conrad
AIS# 226791   D-5
Holman Unit 3700
Atmore Ala. 36503-3700

## CERTIFICATE OF SERVICE

I hereby certify that I have this 16 day of July 2005, served a copy of the foregoing to the District Attorney by placing a copy of the same in the U.S. mail, postage prepaid and properly addressed as follows:

Tom Anderson
Assistance District Attorney
P.O. Box 1102
Enterprise, AL.
36331

ROBERT THOMAS CONRAD

cc/file

141

# IN THE CIRCUIT COURT OF
## COFFEE COUNTY, ALABAMA
### ENTERPRISE DIVISION

ROBERT CONRAD,                 \*

     PETITIONER,           \*

                          \*

VS.                      \*   CASE NO: CC-01-179.60

                          \*           CC-01-180.60

STATE OF ALABAMA,       \*

     RESPONDENT.       \*

## ORDER

The Defendant's Motion to Amend Petition for Post Conviction Relief pursuant to Rule 32 Alabama Rules of Criminal Procedure is **GRANTED.**

The State shall respond to the Amended Petition within forty five (45) days of this order. The Clerk shall forward a copy of the amended pleadings to the District Attorney.

Done this the ___21st___ day of ___July___, 2005.



JEFF W. KELLEY
CIRCUIT JUDGE

142

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA

ROBERT THOMAS CONRAD,
        PETITIONER,

VS.

CASE NO: 179-180

DEPUTY MEDICAL EXAMINER
EMILY WOFFORD WARD
THE MONTGOMERY COUNTY MEDICAL
EXAMINER'S OFFICE,
        RESPONDENTS.

## NOTICE OF INTENT TO SERVE SUBPOENA ON NON-PARTY

Take notice that upon the expiration of Fifteen (15) days (or such time as the Court has allowed) from the date of service of the notice, Robert Thomas Conrad, will apply to the Clerk of the Court for Issuance of the attached Subpoena directed to The Custodian of the Records, Deputy Medical Examiner, at P.O. Box 240591, Montgomery, Alabama 36124-0591, to produce the Documents, Reports, Memorandums, Evaluations, etc., as specified at the time and place specified in the Subpoena,

/s. _____
ROBERT THOMAS CONRAD

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th of July, 2005, I have a copy of this "Notice of Intent" upon the listed parties below, via, U.S. Mail, prepaid and properly, addressed as follows:

MARK E. FULLER, D.A.
P.O. BOX 1102
ENTERPRISE, ALABAMA 36331-1102

JAMES M. COUNTS, CLERK
230-M COURT AVENUE
ENTERPRISE, ALABAMA 36323

MS. EMILY WOFFORD WARD
DEPUTY MEDICAL EXAMINER
THE CUSTODIAN OF THE RECORDS OF
THE MONTGOEMRY COUNTY MEDICAL
EXAMINER'S OFFICE
P.O. BOX 240591
MONTGOMERY, ALABAMA 36124-0591

/s. _____
ROBERT THOMAS CONRAD #226791
3700 HOLMAN UNIT (5-156)
ATMORE, ALABAMA 36503

143

## COVER LETTER

JAMES M. COUNTS, CLERK
230-M COURT AVENUE
ENTERPRISE, ALABAMA 36323


ROBERT THOMAS CONRAD 226791
3700 HOLMAN UNIT (5-156)
ATMOTE, ALABAMA 36503

RE: NOTICE OF INTENT ROBERT THOMAS CONRAD V. EMILY WOFFORD WARD
    DEPUTY MEDICAL EXAMINER

Dear Mr. Counts,

This is in reference to the service of the Non-Party Subpoena

in the above said case. I previously mailed the Non-Party

Subpoena minus the Notice of Intent. I am now mailing the notice

of Intent to comply with the Rule of the Court.

Your cooperation in this matter will be greatly appreciated.

Thank You in advance.

WITH KINDEST REGARDS I AM


Sincerely,

ROBERT THOMAS CONRAD



144

COVER SHEET

Robert Thomas Conrad
#226791 5-156
Holman Unit 3700
Atmore, Al. 36503

July 25, 2005

To: James M. Counts, Clerk
Circuit Court of Coffee County
230-M Court Ave
Enterprise, Al. 36323

Re: State of Alabama Vs. Robert Thomas Conrad
Case No. 179-180
Notice of Intent to Serve Non-Party
Subpoena.

Dear Mr. Counts,

The non-party has been served, and I mailed your Office
a copy for verification purposes. If after 15 days they've
served no objections, I will forward payment in the amount of
$8.00 dollars for issuance of the subpoena.

With kindest regards I am,

/s/ Robert T. Conrad

145

## IN THE CIRCUIT COURT OF
### COFFEE COUNTY, ALABAMA
### ENTERPRISE DIVISION

ROBERT THOMAS CONRAD,                    *
                                         *
    PETITIONER,                          *
                                         *
VS.                                      *     CASE NO: CC-2001-179 & 180
                                         *
STATE OF ALABAMA,                        *
                                         *
    RESPONDENT.                          *

### ORDER

This court appointed Attorney Rick Hollingsworth, Sr. to represent the Defendant on his Rule 32 Petition. The Clerk of Court shall provide Rick Hollingsworth, Sr. with a copy of the Motion for Post Conviction Discovery.

This court will hold a hearing on the *29th* day of *September, 2005* at *9:00 a.m.* at the Coffee county Courthouse, Courtroom D, Enterprise, Alabama for the court to hear arguments from counsel on the Motion for Discovery.

Done this the ___ day of _August_, 2005.

JEFF W. KELLEY
CIRCUIT JUDGE

AUG 2005
FILED
J.M. County
Court Clerk
Coffee Co. AL

X:Dir,
R Hollingsworth

146

State of Alabama
Unified Judicial System

**SUBPOENA REQUEST FORM**

CASE NUMBER
CC# CC-01-M-179,

Form C-12. Rev 10/86

IN THE _____**CIRCUIT**_____ COURT OF _____**COFFEE**_____ COUNTY, ALABAMA

PLANTIFF:         **STATE**                V. DEFENDANT:  **ROBERT THOMAS CONRAD**

In the matter of _____**CAPITAL MURDER DURING ROBBERY 1**_____

Evidentiary Hearing
Court Date   12/02/2005         Court Time   9:00         Date Requested   08/02/2005

The Clerk/Register is requested to issue an Order to Appear (Subpoena) for each of the following witnesses for:

☒ Plaintiff / State    ☐ Defendant    ☐ Grand Jury    ☐ Other _____

|  |  | Date Issued | Date Executed | Remarks |
|---|---|---|---|---|
| Name:  **AL SMITH** | ( ) - | 8-2-05 | _____ | _____ |
| Address: **122 NORTH CORDELIA AVENUE, ELBA, AL  36323** |  |  |  |  |



METHOD OF SERVICE REQUESTED            Party Requesting Subpoena__**DA OFFICE**__
☒ Personal  ☐ Mail                                                  08/02/2005

147

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA

ROBERT THOMAS CONRAD,
    PETITIONER,

    VS.

DEPUTY MEDICAL EXAMINER
EMILY WOFFORD WARD
THE MONTGOMERY COUNTY MEDICAL
EXAMINER'S OFFICE,
    RESPONDENTS.

CASE NO: CC-2001-M-179
            CC-2001-M-180



CIVIL SUBPOENA FOR PRODUCTION OF
DOCUMENTS,   UNDER   RULE 34 (b) (2)

TO: THE CUSTODIANS OF THE RECORDS
    OF THE MONTGOMERY COUNTY
    MEDICAL EXAMINER'S OFFICE
    P.O. BOX 240591
    MONTGOMERY, ALABAMA 36124-0591

    You are hereby commanded to do each of the following acts
in the instance of the Petitioner/Plaintiff within 15 days after
service of this subpoena:

    (1) That the Custodian of the Records of the Montgomery
County Medical Examiner's Office and permit the Petitioner to
inspect and to copy each of the following documents:

    (i) The Accreditation certificate of the Medical Examiner
        Office and it's Laboratory.
    (ii) The Accreditation certificate of the Medical Examiner's
        Office governing it's autopsy protocol involving
        autopsies performed by the Montgomery Examiner's Office.
    (iii) Copies of all standard operational procedures, protocols,
        regulations and audit reports that govern the daily
        operation of the Montgomery Medical Examiner's Office.

-1-

148

(iv) Copies of the Internal Records and Report's that show the calidration records of all the equipment used in the performance of autopsies during the January 2001 month to the January 2002 month. Whether they are performed in Montgomery County Medical Examiner's Laboratory or the Alabama Department of Forensic Sciences Laboratory.

(v) A copy of the last Audit Report(s) performed to determine whether the Montgomery County Medical Examiner's Office complied with the Accreditation standards of it's accreditating agency.

You are further advised that other parties to have the right to be present at the time of such production or inspection.

You have the option to deliver or mail legible copies of documents or things to the party causing the issuance of this subpoena but may condition such activity on your part upon the payment in advance by the party causing the issuance of this subpoena of the reasonable costs of the making of such copies.

You have the right to object at anytime prior to the date set fourth in this subpoena for compliance. Should you choose to object, you should communicate such objection in writing to the party causing the issuance of this subpoena and stating with respect to any item or category to which objection is made, your reasons for such objection.

Date: July 25, 2005

_____
Pro Se

Clerk

By:_____
         Deputy Clerk

149

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of July, 2005, I have served a copy of this Civil Subpoena for Production of Documents, upon the Respondents below, via, U.S. Mail, prepaid and properly addressed.

MR. MARK E. FULLER,
DISTRICT ATTORNEY
P.O. BOX 1102
ENTERPRISE, ALABAMA 36331-1102

ROBERT THOMAS CONRAD

IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA

Robert T. Conrad
   Petitioner,

     vs.

State of Alabama
   Respondents.

        *
        *
        *   Case No(s): CC 01-179
        *             CC 01-180
        *

## AMENDMENT OF RULE 32 PETITION

Comes now the Petitioner Robert T. Conrad [hereinafter Conrad], pursuant to Rule 32.7(b) of the Alabama Rules of Criminal Procedures (A.R.Crim.P.) and submit the following amendments to his pending Rule 32 Petition:

### ISSUE I.

PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF TRIAL COUNSEL FOR FAILING TO FILE A MO- TION TO DISMISS THE INDICTMENT, PURSUANT TO RULE 15.3, Ala.R.Crim.P., ON THE GROUNDS THAT; PETITIONER'S INDICTMENT IS VOID BE- CAUSE IT VIOLATES CONSTITUTIONAL DOCTRINE OF SEPARATION OF POWERS.

Petitioner was denied his 5th, 6th and 14th Amendment Rights' of the United States Constitution, when counsel failed to know the applicable point of law to file a motion to dismiss his indictment on the grounds it violated the Doctrine of Separation of Powers, pursuant to Rule 15.3, Ala.R.Crim.P.

The law under attack in this petition for post-conviction relief is the Alabama Death Penalty Act.  The principle contention being pressed by the petitioner is that, the statute is unconstitutional rendering his indictment returned upon said statute void, because

-1-

it was drafted by a committee called three branches of government, while elected, in violation of the principles of separation of powers expressed in Article III, Section 42 and 43 Article I, II and III of the United States Constitution.

The question of whether the first Alabama Law Institute drafted the current Death Penalty Statute, while composed of all three branches of government has been admitted by the Court of Criminal Appeals in its memorandum opinion of <u>Dwight Marshall v. State of Alabama,</u> (CR-04-0663) stating:

> "Although the Alabama Law Institute may have drafted out Death Penalty Statute, the statute was enacted by the Alabama Legislature, the fact that individuals from all three branches of government may have served on a body that drafted this legislation does not constitute a violation of the separation of powers doctrines."

However, to confer power to other branches of government to draft, write and decide what the death penalty is in Alabama isn't a ministerial task by the Alabama Law Task by the Alabama Law Institute. It decided what the law is in Alabama concerning capital offenses; who will be charged and why for certain criminal offenses with the Alabama, Legislature simply rubber-stamping the state-wide policy law and discretionary judgments to charge Alabama citizens.

The authority of legislative powers of this State of Alabama is exclusively vested in the State Legislature, Article IV, Section 44 of the Constitution of Alabama 1901.

Section 13A-5-40(a) (1-18), Code of Alabama (1975), is unconstitutional because the co-equal sharing of power to write or decide the law of the State of Alabama is prohibited.

-2-

The first Alabama Law Institute in 1978-1979 that consisted of all three branches of State Government, plus a Federal Representative wrote Alabama's present day death penalty statute and if they violated separation of power doctrine of the law, Alabama Constitution and U.S. Constitution by doing so. Then, the Alabama Law Institute's actions were illegal, rendering Section 13A-5-40, Code (1975) and its subsections null and void. Thereby, rendering the petitioner's sentence and conviction by the trial court without subject-matter jurisdiction, as his indictment upon said statute null and void.

Drafting legislation is a power reserved to the sole and exclusive authority of the legislature. See e.g., Newberry v. City of Andalusia, 257 Ala. 49, 60, 57 So.2d 629, 637-38 (1952). The judiciary is responsible to interpret and apply the law; the executive carries the law into effect and executes them.

In the case Folsom v. Wynn, 631 So.2d 890 (Ala.Crim.App. 1992), the court addressed a claim that Section 41-4-90, Code 1975, was unconstitutional because the statute had granted co-equal power over the State purse to the governor in the event of financial shortfalls. The court found this statute is unconstitutional to the extent that "it may apply to co-equal branches of government, the legislature and the judiciary," because that function was served by constitutional decree to the legislature.

When embarking on its mission as members of the Alabama Law Institute, the elected judicial and executive members knew that they were going to draft and make law. This is purely legislative function.

153

Under the test articulated by the Supreme Court in <u>Monroe v. Harco Inc.</u>, 762 So.2d at 831 (Ala. 2000), the Alabama Death Penalty Act must fail:

> "The true test and distinction whether a power is strictly legislature, or whether it is administrative, and merely relates to the execution of the statutory law, is between the delegation of power to make the law, which, necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution to be exercised under and pursuance of the law. The first cannot be done, to the latter, no valid objection can be done."

If trial counsel had filed a motion to dismiss petitioner's indictment was unconstitutional because the Alabama Law Institute decided what the Alabama Death Penalty was. Based upon the doctrine of separation and power, petitioner was entitled to dismissal of the indictment, as the statute would had to have been determined to be unconstitutional. Based upon the evidence and the Criminal Court of Appeals own judicial admission that the Alabama Law Institute <u>drafted</u> the State of Alabama's present death statute. A legislative function it couldn't lawfully perform. <u>Dwight Marshall v. State of Alabama</u>, CR-04-0633 supra.

Petitioner moves the court to grant him an evidentiary hearing to resolve the disputed facts and appointment of counsel.

154

Done on this the 15 day of August,
2005:

/s. Robert T. Cowan

Robert - T. Cowan
3700 Holman Unit
# 226791    Bed# 5-156
Atmore, Al 36503


CERTIFICATE OF SERVICE


I hereby certify that I have on this the 15 day of August,
2005, served a copy of the foregoing on all parties, by placing same
in the institutional-mail box, postage prepaid and properly addressed
to: Office of the Attorney General, 11 South Union Street, Montomery,
Alabama 36130, and the presiding Judge of CofSeo County
at: Thomas E. Head III, 1501 Forest Lake Dr.
36323.


/s. Robert T. Cowan


Mark E. Foller, DA
P.O. Box 1102
Enterprise, AL 36331


James M. County Clerk
230-M Covet Ave.
Enterpise AC 36323

ROBERT THOMAS CONRAD,    )    IN THE CIRCUIT COURT OF

            PETITIONER,    )    COFFEE COUNTY, ALA.

VS.    )    ENTERPRISE DIVISION

STATE OF ALABAMA,    )

            RESPONDENT.    )    CASE #s: CC-2001-M-179

                                        and

                                    CC-2001-M-180

## STATE'S RESPONSE TO PETITIONER'S SECOND AMENDED RULE 32 PETITION

**COMES NOW the State of Alabama by and through Tom Anderson, Assistant District Attorney for the Twelfth Judicial Circuit and does respond to Petitioner's second "Amendment to Rule 32 Petition" as follows:**

1.    Petitioner again raises an issue that was put forth by him in his original petition. The Petitioner contends that his trial counsel was ineffective for failing to file a Motion to Dismiss the Indictment on the grounds that said indictment is void as it "violated the constitutional doctrine of Separation of Powers, " in that the death penalty statute was created through the cooperation of representatives from the three (3) branches of government and is therefore in violation of the United States Constitution and the Alabama State Constitution. This allegation is entirely without merit. The mere contention that a statute was drafted with the cooperation of representatives from the three branches of government is in no way a showing that said branches were not distinct and separate from each other and therefore unconstitutional. There has been no evidence offered by this Petitioner to show that the "powers of one department" were "exercised by another" during the drafting of the Capital Murder Statute.

**WHEREFORE**, the State does request that Mr. Conrad's Rule 32 "PETITION FOR RELIEF FROM CONVICTION OR SENTENCE" pursuant to Rule 32.7(d), Alabama Rules of Criminal Procedure should be summarily denied .

156

Done this the 25th day of August, 2005.


Tom Anderson, Assistant District Attorney
Twelfth Judicial Circuit, State of Alabama


### CERTIFICATE OF SERVICE

I do hereby certify that I have this day mailed a copy of the above pleading to the Petitioner, Robert T. Conrad at the penitentiary address he has listed in his pleading postage prepaid.

Tom Anderson, Asst. District Attorney



2005 WL 1792032

--- So.2d ---, 2005 WL 1792032 (Ala.Crim.App.)

**(Cite as: 2005 WL 1792032 (Ala.Crim.App.))**

Page 1

**H**
Only the Westlaw citation is currently available.

NOT YET RELEASED FOR PUBLICATION.

Court of Criminal Appeals of Alabama.
Ex parte Roy Edward PERKINS.
(In re State of Alabama
v.
Roy Edward Perkins).
**CR-04-1713.**

July 29, 2005.

**Background:** After inmate was convicted of murder and sentenced to death, he filed a petition for postconviction relief. The Circuit Court, Tuscaloosa County, No. CC-92-478.60, scheduled and evidentiary hearing and denied inmate's motion for discovery. Inmate filed a petition for a writ of mandamus directing trial court judge to grant his request for discovery.

**Holdings:** The Court of Criminal Appeals held that:
(1) inmate was entitled to a writ of mandamus compelling postconviction discovery of correctional and mental health documents related to inmate that supported his claim that trial and appellate counsel were ineffective due to their failure to present mitigating evidence;
(2) inmate was not entitled to a writ of mandamus compelling postconviction discovery of Department of Youth Services (DYS) and Department of Human Resources (DHR) records pertaining to inmate's mother, stepfather, and sister;
(3) inmate was not entitled to a writ of mandamus compelling postconviction discovery of his records maintained by the Alabama Board of Pardons and Paroles;
(4) inmate was not entitled to a writ of mandamus compelling postconviction discovery of records

maintained by various police and sheriff departments related to inmate's stepfather, mother, half-brother and others;
(5) inmate was entitled to a writ of mandamus compelling postconviction discovery of records pertaining to his crimes in the State's possession; and
(6) inmate was not entitled to a writ of mandamus compelling postconviction discovery of the prosecutor's notes compiled during jury selection.
Granted in part; denied in part; writ issued.

**[1] Mandamus ☜1**

250k1 Most Cited Cases
For a writ of mandamus to issue the petitioner must show: (1) a clear legal right to the relief sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the reviewing court.

**[2] Mandamus ☜61**
250k61 Most Cited Cases
Inmate was entitled to a writ of mandamus compelling postconviction discovery of correctional and mental health documents related to inmate that supported his claim that trial and appellate counsel were ineffective due to their failure to present mitigating evidence; inmate alleged that counsel failed to investigate evidence concerning inmate's mental health, physical health, and childhood, and it would be practically impossible for inmate to prove that he was prejudiced by counsels' failure to investigate unless he could show the trial court the mitigating evidence. U.S.C.A. Const.Amend. 6.

**[3] Criminal Law ☜641.13(1)**
110k641.13(1) Most Cited Cases
To prevail on a claim of ineffective assistance of counsel the petitioner must show (1) that counsel's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1792032

--- So.2d ----, 2005 WL 1792032 (Ala.Crim.App.)

(Cite as: 2005 WL 1792032 (Ala.Crim.App.))

Page 2

performance was deficient and (2) that he was prejudiced by the deficient performance. U.S.C.A. Const.Amend. 6.

**[4] Mandamus** ☞61
250k61 Most Cited Cases
Inmate was not entitled to a writ of mandamus compelling **postconviction discovery** of Department of Youth Services (DYS) and Department of Human Resources (DHR) records pertaining to inmate's mother, stepfather, and sister, for the purpose of motion for **postconviction discovery**; state law protected the confidentiality of DYS and DHR records, and, thus, inmate failed to establish a clear legal right to access the records. Code 1975, §§ 12-15-100, 12-15-101, 38-2-1.

**[5] Records** ☞33
326k33 Most Cited Cases
A party is not entitled to unfettered access to records that are not related to him and that are maintained by state agencies specifically charged with guarding the confidentiality of those records.

**[6] Mandamus** ☞61
250k61 Most Cited Cases
Inmate was not entitled to a writ of mandamus compelling **postconviction discovery** of his records maintained by the Alabama Board of Pardons and Paroles; statute provided that records maintained by the Board were confidential and were not subject to inspection. Code 1975, § 15-22-36(b).

**[7] Mandamus** ☞61
250k61 Most Cited Cases
Inmate was not entitled to a writ of mandamus compelling **postconviction discovery** of records maintained by various police and sheriff departments related to inmate's stepfather, mother, half-brother and others, even though inmate alleged that the records were relevant to his postconviction claims of ineffective assistance of counsel; the criminal records of the named individuals were a matter of public record.

**[8] Records** ☞32
326k32 Most Cited Cases
Convictions are matters of public record.

**[9] Criminal Law** ☞1590
110k1590 Most Cited Cases
A postconviction relief petitioner fails to show good cause for discovery when requested evidence is available through counsel's own efforts.

**[10] Mandamus** ☞61
250k61 Most Cited Cases
Inmate was not entitled to a writ of mandamus compelling **postconviction discovery** of records maintained by the United States Department of Health and Human Services and the Social Security Administration that related to him, his mother, and his sister, even though inmate argued the records were necessary to show that inmate was raised in poverty, for the purpose of postconviction claim of ineffective assistance of counsel; information showing that inmate was raised in a poverty-stricken household was available from other sources.

**[11] Criminal Law** ☞627.5(1)
110k627.5(1) Most Cited Cases
When evidence is available through less intrusive means, a petitioner fails to establish good cause for requested discovery.

**[12] Mandamus** ☞61
250k61 Most Cited Cases
Inmate was entitled to a writ of mandamus compelling **postconviction discovery** of records pertaining to his crimes in the State's possession, for the purpose of postconviction relief petition; inmate was entitled to view the State's file, absent any work-product materials.

**[13] Mandamus** ☞61
250k61 Most Cited Cases
Inmate was not entitled to a writ of mandamus compelling **postconviction discovery** of the prosecutor's notes compiled during jury selection, for the purpose of postconviction relief petition; the prosecutor's notes were privileged and were not subject to discovery.

PER CURIAM.

*1 The petitioner, Roy Edward Perkins, filed this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1792032

--- So.2d ----, 2005 WL 1792032 (Ala.Crim.App.)

(Cite as: 2005 WL 1792032 (Ala.Crim.App.))

petition for a writ of mandamus directing Judge William Scott Donaldson to grant his request for discovery relating to Perkins's postconviction petition attacking his capital-murder conviction and sentence of death.

In 1994 Perkins was convicted of murdering Cathy Gilliam during the course of a kidnapping--an offense defined as capital by § 13A-5-40(a)(1), Ala.Code 1975. The jury, by a vote of 10 to 2, recommended that Perkins be sentenced to death. The circuit court followed the jury's recommendation and sentenced Perkins to death. We affirmed his conviction on direct appeal. See *Perkins v. State*, 808 So.2d 1041 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001). However, the United States Supreme remanded the case to the Alabama Supreme Court in light of its holding in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which held that a mentally retarded defendant cannot be sentenced to death. See *Perkins v. Alabama*, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). On remand, the Alabama Supreme Court held that, under the most liberal definition of that term as employed by states that have legislation defining mental retardation, Perkins was not mentally retarded. [FN1] See *Ex parte Perkins*, 851 So.2d 453 (Ala.2002). The United States Supreme Court denied certiorari review in *Perkins v. Alabama*, 540 U.S. 830, 124 S.Ct. 69, 157 L.Ed.2d 55 (2003). Perkins's direct appeal was final when this Court issued the certificate of judgment on February 20, 2003. See Rule 41, Ala.R.App.P.

On January 29, 2004, Perkins filed a Rule 32, Ala.R.Crim.P., petition for postconviction relief in the Tuscaloosa Circuit Court attacking his conviction and death sentence. On April 18, 2005, the circuit court scheduled an evidentiary hearing for August 10, 2005, and indicated that it would hear evidence on Perkins's claims of ineffective assistance of trial and appellate counsel and juror misconduct. [FN2] On May 16, 2005, Perkins filed an "Expedited Motion for Discovery." In a one-sentence order the circuit court denied the discovery motion on the same day that it was filed.

Perkins then filed this extraordinary petition for a writ of mandamus.

[1] For a writ of mandamus to issue the petitioner must show: (1) a clear legal right to the relief sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the reviewing court. See *Ex parte Horton*, 711 So.2d 979 (Ala.1998).

The State initially argues that Perkins's has another remedy--an appeal. Therefore, it argues, he cannot satisfy the requirements for the issuance of this extraordinary writ. However, the Supreme Court in *Ex parte Land*, 775 So.2d 847 (Ala.2000), specifically held otherwise. "This Court has held that a petition for the writ of mandamus is the proper means for seeking appellate review of a trial court's discovery order." *Land*, 775 So.2d at 850. See also *Jackson v. State*, [Ms. CR-04-0096, March 18, 2005] --- So.2d ---- (Ala.Crim.App.2005); *Ex parte Mack*, 894 So.2d 764 (Ala.Crim.App.2003). Therefore, we will review Perkins's discovery claims in this extraordinary petition.

I.

*2 [2] Perkins argues in this mandamus petition that the circuit court erred in denying his discovery motion as a whole without allowing him any access to records that are necessary to support the ineffective-assistance-of-counsel claims he asserts in his postconviction petition.

The Alabama Supreme Court in *Land* held that in order for a petitioner to be entitled to discovery in a postconviction proceeding the petitioner must show "good cause" for the requested evidence. The Supreme Court stated: "[I]n order to obtain discovery, a petitioner must allege facts that, if proved, would entitle him to relief." 775 So.2d at 852.

In *Ex parte Mack*, we cited several cases that the Supreme Court relied on in *Land* and stated the following concerning the "good cause" standard:

" 'A trial court has inherent discretionary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1792032

Page 4

--- So.2d ---, 2005 WL 1792032 (Ala.Crim.App.)

(Cite as: 2005 WL 1792032 (Ala.Crim.App.))

authority to order discovery in post-conviction proceedings. See *People ex rel. Daley v. Fitzgerald,* 123 Ill.2d 175, 183, 121 Ill.Dec. 937, 526 N.E.2d 131 (1988); *People v. Rose,* 48 Ill.2d 300, 302, 268 N.E.2d 700 (1971). A court must exercise this authority with caution, however, because a defendant may attempt to divert attention away from constitutional issues which escaped earlier review by requesting discovery.... *Accordingly, the trial court should allow discovery only if the defendant has shown 'good cause,' considering the issues presented in the petition, the scope of the requested discovery, the length of time between the conviction and the post-conviction proceeding, the burden of discovery on the State and on any witnesses, and the availability of the evidence through other sources. Daley,* 123 Ill.2d at 183-84, 121 Ill.Dec. 937, 526 N.E.2d 131; see *People v. Fair,* 193 Ill.2d 256, 264-65, 250 Ill.Dec. 284, 738 N.E.2d 500 (2000). We will reverse a trial court's denial of a post-conviction discovery request only for an abuse of discretion. *Fair,* 193 Ill.2d at 265, 250 Ill.Dec. 284, 738 N.E.2d 500. A trial court does not abuse its discretion in denying a discovery request which ranges beyond the limited scope of a post-conviction proceeding and amounts to a "fishing expedition." ' "

894 So.2d at 768 (quoting *People v. Johnson,* 205 Ill.2d 381, 408, 275 Ill.Dec. 820, 836-37, 793 N.E.2d 591, 607-08 (2002)).

In *Jackson v. State,* [Ms. CR-04-0096, March 18, 2005] --- So.2d ---- (Ala.Crim.App.2005), we stated:

"The New Jersey Supreme Court in *State v. Marshall,* 148 N.J. 89, 690 A.2d 1 (1997), a case also cited with approval by the Alabama Supreme Court in *Land,* stated:

" 'We anticipate that only in the unusual case will a PCR [postconviction relief] court invoke its inherent right to compel discovery. In most cases, a post-conviction petitioner will be fully informed of the documentary source of the errors that he brings to the PCR court's attention. Moreover, we note that PCR "is not a device for investigating possible claims, but a means for vindicating actual claims." *People v. Gonzalez,* 51 Cal.3d

1179, 275 Cal.Rptr. 729, 776, 800 P.2d 1159, 1206 (1990), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 85 (1991). The filing of a petition for PCR is not a license to obtain unlimited information from the State, but a means through which a defendant may demonstrate to a reviewing court that he was convicted or sentenced in violation of his rights....

*3 " 'Moreover, consistent with our prior discovery jurisprudence, any PCR discovery order should be appropriately narrow and limited. "[T]here is no postconviction right to 'fish' through official files for belated grounds of attack on the judgment, or to confirm mere speculation or hope that a basis for collateral relief may exist." *Gonzalez, supra,* 275 Cal.Rptr. at 775, 800 P.2d at 1205; *see Deputy v. Taylor,* 19 F.3d 1485, 1493 (3d Cir.), *cert. denied,* 512 U.S. 1230, 114 S.Ct. 2730, 129 L.Ed.2d 853 (1994); *State v. Thomas,* 236 Neb. 553, 462 N.W.2d 862, 867-68 (1990). However where a defendant presents the PCR court with good cause for ordering the State to supply the defendant with discovery that is relevant to the defendant's case and not privileged, the court has discretionary authority to grant relief. *See Rules Governing Section 2254 Cases in the United States District Courts,* 28 U.S.C.A. § 2254 Rule 6(a); *[State v.] Lewis,* ... 656 So.2d [1248,] 1250 [(Fla.1994)]; *[People ex rel. Daley v.] Fitzgerald,* [123 Ill.2d 175, 183,] 121 Ill.Dec. [937,] 941, 526 N.E.2d [131,] 135 [(1998)] (noting that 'good cause' standard guards against potential abuse of PCR discovery process).'

"*Marshall,* 148 N.J. at 270-71, 690 A.2d at 91-92. "

See also *State v. O'Brien,* 214 Wis.2d 328, 341, 572 N.W.2d 870, 877 (Ct.App.1997).

[2] To determine whether a petitioner has established good cause we must examine the elements of the claim for which the discovery is requested. See *Land,* supra. Here, all of the discovery related to Perkins's claims of ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel the petitioner must satisfy the test articulated by the United States Supreme Court in *Strickland v. Washington,* 466

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1792032

--- So.2d ----, 2005 WL 1792032 (Ala.Crim.App.)

(Cite as: 2005 WL 1792032 (Ala.Crim.App.))

Page 5

U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The petitioner must show (1) that counsel's performance was deficient and (2) that he was prejudiced by the deficient performance. Perkins argued that counsel was ineffective for failing to investigate and to present any mitigating evidence at the penalty phase and that appellate counsel was also ineffective for failing to raise this issue on appeal. [FN3] In order to prevail on this claim, Perkins was required to show that mitigating evidence did in fact exist but was not presented.

Perkins's 64-page discovery motion was very detailed. In the motion Perkins requested production of his records that were maintained by "the Alabama Department of Corrections ("DOC"), the Vacca Campus of the Alabama Department of Youth Services (formerly the Alabama Boys' Industrial School), Draper Correctional Facility, Kilby Correctional Facility, William Donaldson Correctional Facility, (Formerly West Jefferson), Holman Correctional Facility, and any /or psychiatric services or contractors for medical and/or psychiatric services to the Alabama Department of Corrections, including, but not limited to Correctional Medical Services."
Perkins also requested production of his records from the following agencies and courts: the Alabama Department of Youth Services ("DYS"), the Alabama Department of Human Resources ("DHR"), the Alabama Department of Mental Health and Mental Retardation, Taylor Hardin Secure Medical Facility, Bryce Medical Facility, the police departments of Tuscaloosa and Fayette Counties, the sheriff departments of Tuscaloosa and Fayette Counties, Berry Police Department, and the juvenile court files from Fayette and Tuscaloosa Counties. [FN4]

*4 Perkins contended in his discovery motion that he had been incarcerated, had had contact with, or had been evaluated by, each of the named facilities or agencies and that he needed the records to substantiate his claim that counsel failed to investigate and present any mitigation evidence at the penalty phase. He contended that the records would show that Perkins had a history of mental illness related to brain dysfunction and cognitive deficits, that he adapted well to a structured environment while incarcerated, that he was not violent, that he is epileptic and suffers from occasional seizures, that counsel did not meet with him before trial, and that he was raised in an horrific home environment with little money and no supervision. [FN5]

In *Land*, the petitioner requested almost the identical information to support his claim of ineffective assistance of counsel for failing to investigate and present mitigating evidence at his capital trial. In issuing the writ of mandamus the Alabama Supreme Court stated:
"Land presented the trial court with claims of ineffective assistance of counsel that are facially meritorious. In fact, these claims suggest several potential serious deficiencies in the performance of his trial counsel that, if proved, may entitle him to relief. Furthermore, we agree with Land that it would be practically impossible for him to show that he suffered prejudice from the deficient performance of his counsel unless he could show the trial court that mitigating evidence (which he has a reasonable basis to believe in fact exists) existed at the time of his trial and then argue, on the basis of that evidence, that a 'reasonable probability' exists that a jury hearing the evidence would have recommended life imprisonment without parole. Cf. *Jackson v. Herring,* supra, 42 F.3d [1350] at 1364, 1369 [ (11th Cir.1995) ] (federal habeas evidentiary hearing 'unearthed a great wealth of [mitigating evidence]' from which the defendant was able to show 'that a reasonable probability exists that a jury hearing this evidence would have recommended life'). Therefore, we conclude that Land demonstrated to the trial court that he was entitled to the requested discovery (listed above), which is relevant to his claim that his trial counsel was ineffective at the penalty phase of his trial."
775 So.2d at 855. Based on the Supreme Court's holding in *Land,* Perkins is entitled to discovery from the above-referenced agencies and courts as those files relate to the petitioner--Roy Perkins.

II.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1792032

--- So.2d ---, 2005 WL 1792032 (Ala.Crim.App.)

Page 6

(Cite as: 2005 WL 1792032 (Ala.Crim.App.))

[4] Perkins also requested production of any and all DYS and DHR records related to Dovie Mae Perkins, his mother; Pat Traweek, his stepfather; and Kathy Hocutt, his sister.

[5] The Alabama Supreme Court in *Land* did not address discovery as it relates to confidential files on individuals other than the petitioner. However, this Court has noted that Alabama law protects the confidentiality of DYS and DHR records. See § 12-15-100 and 12-15-101, and § 38-2-1, Ala.Code 1975. Because these records are confidential, the most a party is entitled to, upon a showing of good cause, is an in camera inspection of the documents by a circuit court. See *Gibson v. State*, 677 So.2d 233 (Ala.Crim.App.1994). A party is not entitled to unfettered access to records that are not related to him and that are maintained by state agencies specifically charged with guarding the confidentiality of those records. [FN6] See *Jackson*, supra.

*5 For these reasons, we cannot say that Perkins has a clear legal right to complete access to these records; therefore, he has failed to establish the requirements for the issuance of a writ of mandamus as it relates to this claim.

### III.

[6] Perkins argues that the circuit court erred in denying his request for production of his records maintained by the Alabama Board of Pardons and Paroles ("the Board"). The Alabama Supreme Court in *Ex parte Alabama Board of Pardons & Paroles*, 814 So.2d 870 (Ala.2001), held that according to § 15-22-36(b), Ala.Code 1975, records maintained by the Board are confidential and are not subject to inspection. As the Supreme Court construing § 15-22-36(b), stated:

"Principles of statutory construction bind this Court to interpret plain language of a statute 'to mean exactly what it says' and to engage in judicial construction only if the language in the statute is ambiguous. *Ex parte Alabama Great Southern R.R.*, 788 So.2d 886, 889 (Ala.2000), quoting *Blue Cross & Blue Shield v. Nielsen*, 714 So.2d 293, 296 (Ala.1998). The Legislature stated in § 15-22-36(b), Ala.Code 1975, with

specificity and particularity, that 'all other portions of the file shall be privileged.' A plain reading of the statute indicates that the Legislature created an absolute privilege to provide individuals and entities an unfettered opportunity to provide information to the Board, without exposing the individuals and entities to *public scrutiny* and potential retaliation. To hold otherwise, this Court would have to engage in improper judicial construction.

"....

"Section 15-22-36(b), Ala.Code 1975, clearly and unambiguously establishes an absolute privilege that the Board is legally bound to obey and the circuit court is under a duty to uphold."

814 So.2d at 872-73. Therefore, Perkins cannot satisfy the requirements for the issuance of a writ of mandamus as to this claim.

### IV.

[7][8][9] Perkins also argues that the circuit court erred in denying his request for discovery of records maintained by various police and sheriff departments related to Pat Traweek, Perkins's stepfather; Dovie Mae Perkins, Perkins's mother; Raymond Watkins; Annie Watkins; Richard Watkins; Jerry Traweek, Perkins's half-brother; and Faye Edgeworth. [FN7] He asserts that the criminal records of these individuals are relevant to his claim of ineffective assistance of counsel. Convictions are matters of public record. A petitioner fails to show good cause for discovery when requested evidence is available through counsel's own efforts. See *Mack v. State*, 894 So.2d 764 (Ala.Crim.App.2003) (upheld circuit court's failure to grant discovery of criminal records in postconviction proceeding, noting that convictions are matters of public record).

### V.

[10] Perkins also argues that he is entitled to production of records maintained by the United States Department of Health and Human Services and the Social Security Administration as they relate to him, his mother, and his sister. Specifically, he contends that during Perkins's childhood his mother was receiving Social Security benefits and supplemental security income ("SSI") and his mother cannot remember the exact amount

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1792032

--- So.2d ----, 2005 WL 1792032 (Ala.Crim.App.)

**(Cite as: 2005 WL 1792032 (Ala.Crim.App.))**

Page 7

that she received from the government. He contends that the amount was relevant to show that Perkins grew up in poverty.

*6 [11] Certainly, it was not necessary to show the exact amount that Perkins's mother received from the government every month in order to show that Perkins was raised in a poverty-stricken household. This information was available from other sources, without resort to subpoenaing the federal government files. As Perkins states in his mandamus petition, the one record he was able to obtain from DYS shows that at the time DYS was involved Perkins was living in a "shack" in Berry, Alabama. When evidence is available through less intrusive means, a petitioner fails to establish good cause for requested discovery. See *Jackson,* supra. Therefore, we cannot say that Perkins has a clear legal right to relief on this claim.

VI.

[12] Perkins argues that the circuit court abused its discretion in denying him access to records in the State's possession. Perkins contends that he is entitled to the production of various items that are in the State's possession including: all reports and test results pertaining to State's Exhibit 51 and 52--two halves of a bloody shirt the victim was wearing; Perkins's fingerprints and latent prints lifted in the case and all test results pertaining to the fingerprints; all "tests performed or relied on by Dr. [Kenneth] Warner in this case, the results of those tests, the methodologies used, and any and all reports and analyses made or relied on by Dr. Warner"; [FN8] photographs of the victim before her death; custody logs for exhibits that were introduced at trial; and tests conducted on the semen recovered from the rape kit.

Essentially, Perkins requests access to the State's file on this case. Perkins is entitled to this information. See *Ex parte Monk,* 557 So.2d 832 (Ala.1989); *Hooks v. State,* 822 So.2d 476 (Ala.Crim.App.2000). However, Perkins is not entitled to the State's work-product because work-product materials contained in the district attorney's file are privileged and thus not discoverable. *Monk.*

[13] As part of this claim Perkins requests access to notes made by the district attorney made during voir dire examination. The State asserts that these notes are work-product and are privileged. It cites this Court's opinion in *Rogers v. State,* 417 So.2d 241 (Ala.Crim.App.1982), to support its assertion.

In *Rogers,* this Court held that the original notes made by a detective while investigating a case were work-product and were privileged. However, Alabama has never specifically addressed whether a prosecutor's notes made during voir dire examination are likewise privileged. Our neighboring states of Florida, Georgia, and Mississippi have addressed this issue and have held that a prosecutor's personal notes compiled during voir dire examination are work-product and are not discoverable by the defense. See *Patton v. State,* 784 So.2d 380 (Fla.2000); *Thorson v. State,* 721 So.2d 590 (Miss.1998); *Foster v. State,* 258 Ga. 736, 374 S.E.2d 188 (1988). See also *State v. Carter,* 641 S.W.2d 54 (Mo. banc 1982). We join those jurisdictions that hold that a prosecutor's notes compiled during jury selection are privileged and are not subject to discovery.

*7 For the foregoing reasons, this petition is due to be granted in part and denied in part. Judge Donaldson is directed to comply with our instructions and grant Perkins discovery as discussed in Parts I and VI of this opinion. All other relief requested in this petition is denied.

PETITION GRANTED IN PART; DENIED IN PART; WRIT ISSUED.

McMILLAN, P.J., and COBB, BASCHAB, SHAW, and WISE, JJ., concur.

> FN1. Alabama has yet to adopt legislation addressing the *Atkins* decision.

> FN2. Perkins raises no issues in this mandamus petition related to the juror misconduct claim.

> FN3. We note that when Perkins was tried the *Ex parte Jackson,* 598 So.2d 895

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1792032

--- So.2d ----, 2005 WL 1792032 (Ala.Crim.App.)

**(Cite as: 2005 WL 1792032 (Ala.Crim.App.))**

(Ala.1992), overruled by *Ex parte Ingram,* 675 So.2d 863 (Ala.1996), procedure was in place which allowed for appellate counsel to raise claims of ineffective assistance of trial counsel in a motion for a new trial. Therefore, we question whether the claims that relate to ineffective assistance of trial counsel are properly before the circuit court. See *Clemons v. State,* [Ms. 01-1355, June 24, 1005] --- So.2d ---- (Ala.Crim.App.2005); *Brooks v. State,* [Ms. CR-01-0607, April 29, 2005] --- So.2d --- (Ala.Crim.App.2005).

FN4. Perkins's motion requested discovery from other agencies; however, he does not pursue all of the requested discovery in this mandamus petition.

FN5. This type of evidence has been viewed as mitigating evidence. See *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986).

FN6. This is in keeping with law that holds that a defendant in a death-penalty case is entitled to an "individualized sentencing determination." See *Hall v. State,* 820 So.2d 113, 149 (Ala.Crim.App.1999).

FN7. Some of these individuals were not identified in Perkins's mandamus petition.

FN8. Dr. Warner performed the autopsy on the victim.

--- So.2d ----, 2005 WL 1792032 (Ala.Crim.App.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

775 So.2d 847

Page 1

775 So.2d 847
(Cite as: 775 So.2d 847)

**H**
775 So.2d 847

Supreme Court of Alabama.
Ex parte Michael Jeffrey LAND.
(In re Michael Jeffrey Land
v.
State).
**1971816.**

June 2, 2000.
Rehearing Denied July 28, 2000.

Following affirmance, 678 So.2d 201, of conviction of murder and sentence of death, petitioner sought postconviction relief. The Jefferson Circuit Court, No. CC-92-4671.60, James H. Hard IV, J., denied petitioner's motion for discovery. Petitioner sought writ of mandamus. The Court of Criminal Appeals, 775 So.2d 840, denied petition. Petitioner sought review. On grant of rehearing, the Supreme Court, Lyons, J., held that: (1) petitioner was entitled to postconviction discovery to support his claim of ineffective assistance of counsel in penalty phase of trial, but (2) petitioner was not entitled to other requested postconviction discovery.

Petition granted in part and denied in part.

West Headnotes

**[1] Mandamus 250 ☞1**
250k1 Most Cited Cases
Mandamus is a drastic and extraordinary writ that will be issued only when there is: (1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court.

**[2] Criminal Law 110 ☞1590**
110k1590 Most Cited Cases
"Good cause" is the appropriate standard by which

to judge postconviction discovery motions. Rules Crim.Proc., Rule 32.1 et seq.

**[3] Criminal Law 110 ☞1652**
110k1652 Most Cited Cases
Evidentiary hearing must be held on a petition for postconviction relief which is meritorious on its face, i.e., one which contains matters and allegations which, if true, entitle the petitioner to relief. Rules Crim.Proc., Rule 32.1 et seq.

**[4] Criminal Law 110 ☞1590**
110k1590 Most Cited Cases
In order to obtain postconviction discovery, a petitioner must allege facts that, if proved, would entitle him to relief. Rules Crim.Proc., Rule 32.1 et seq.

**[5] Criminal Law 110 ☞1590**
110k1590 Most Cited Cases
Petitioner was entitled to postconviction discovery of documents to support his claim that counsel's performance during penalty phase of trial was deficient; petitioner alleged that counsel failed to investigate possibility of mitigating evidence, it was impossible without discovery to determine whether requested documents contained evidence of mitigating circumstances, and determining whether requested documents existed would not unduly burden State. U.S.C.A. Const.Amend. 6 ; Rules Crim.Proc., Rule 32.1 et seq.

**[6] Criminal Law 110 ☞641.13(6)**
110k641.13(6) Most Cited Cases
Trial counsel may be found ineffective for failing to present mitigating evidence of adjustment to incarceration, evidence of mental-health problems, and evidence regarding the defendant's contact with a juvenile system. U.S.C.A. Const.Amend. 6.

**[7] Mandamus 250 ☞3(11)**
250k3(11) Most Cited Cases
On mandamus petition, petitioner was not entitled to postconviction discovery to support his claim that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

775 So.2d 847

775 So.2d 847
(Cite as: 775 So.2d 847)

defense counsel was ineffective for failing to adequately challenge petitioner's waiver of *Miranda* rights, where petitioner did not present that claim to trial court in his petition for postconviction relief. U.S.C.A. Const.Amend. 6 ; Rules Crim.Proc., Rule 32.1 et seq.

**[8] Mandamus 250 ☞61**
250k61 Most Cited Cases
On mandamus petition, petitioner was not entitled to postconviction discovery of evidence to support his *Brady* claim, where trial court had dismissed *Brady* claim in petition for postconviction relief. Rules Crim.Proc., Rule 32.1 et seq.

**\*848** J. Drew Colfax, Equal Justice Initiative of Alabama, Montgomery, for petitioner.
Bill Pryor , atty. gen., and Michael B. Billingsley, asst. atty. gen., for respondent.

*On Application for Rehearing*

LYONS, Justice.
The opinion of August 6, 1999, is withdrawn and the following is substituted therefor.

Michael Jeffrey Land petitions this Court for a writ of mandamus directing Judge James H. Hard IV, of the Jefferson Circuit Court, to grant a portion of his motion for discovery filed in regard to his petition for postconviction relief. We grant the petition in part and deny it in part, and issue the writ.

Land first petitioned the Court of Criminal Appeals for this relief, that court, on July 2, 1998, denied his petition, with an opinion. See *Ex parte Land,* 775 So.2d 840 (Ala.Crim.App.1998). Land then filed an application for rehearing with the Court of Criminal Appeals, but later withdrew **\*849** that application and filed a petition in this Court. His petition is before this Court pursuant to Rule 21(e), Ala. R.App. P., which provides that a decision by a court of appeals on an original petition for the writ of mandamus may be reviewed de novo by this Court, and that an application for rehearing below is not a prerequisite for such review. FN1

FN1. Land also asks this Court for a writ of mandamus directing the Court of Criminal Appeals to order the discovery he seeks. Rule 21(e) states that when an original petition for the writ of mandamus has been denied by a Court of Appeals, the petitioner may file a similar petition in this Court, seeking a writ directed to the trial court. Therefore, we do not address Land's request for a writ of mandamus directed to the Court of Criminal Appeals.

In December 1993, Land was convicted of two counts of capital murder for the murder of Candace Brown, on the basis that that murder was committed during a burglary and during a kidnapping. See Ala.Code 1975, §§ 13A-5-40(a)(1) and (a)(4). The circuit court sentenced Land to death by electrocution. His conviction and sentence were affirmed on appeal. See *Land v. State,* 678 So.2d 201 (Ala.Crim.App.1995), *aff'd,* 678 So.2d 224 (Ala.), *cert. denied,* 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996).

In October 1997, Land petitioned the Circuit Court of Jefferson County (the trial court in which he had been convicted) for postconviction relief, pursuant to Rule 32, Ala. R.Crim. P., requesting that his conviction and sentence be set aside. Land based his Rule 32 petition on several claims, only a few of which are relevant to this petition for the writ of mandamus. The State filed motions asking the circuit court to dismiss many of the claims in Land's petition. On April 20, 1998, the circuit court dismissed most of Land's claims because they either had been raised on the direct appeal or could have been raised on the direct appeal, and it dismissed the other claims for failure to meet the specificity requirement of Rule 32.6(b), Ala. R.Crim. P. However, the circuit court did allow Land to amend his petition as it related to the claims lacking specificity. In his petition, Land contends that his principal Rule 32 claim is that his trial counsel was ineffective at the guilt and penalty stages of his trial. For the most part, the various subparts of Land's Rule 32 claim of ineffective assistance of counsel remain pending before the circuit court, and the majority of the discovery he seeks relates to his ineffective-assistance claim. Land also seeks

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

775 So.2d 847                                                                                                      Page 3

775 So.2d 847
(Cite as: 775 So.2d 847)

discovery relative to claims pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) , and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); the State contends those claims have been dismissed.

Soon after filing his Rule 32 petition, Land filed two discovery motions in the circuit court. In his first motion, Land sought access to the complete files of the Jefferson County district attorney's office related to the case, and the complete files of all other agencies involved in the investigation of the charges against him, including the Jefferson County Sheriff's Department, the Birmingham Police Department, the Jefferson County coroner's office, the Alabama Bureau of Investigation, the Alabama Department of Forensic Sciences, and the Alabama Department of Youth Services. In his second discovery motion, Land sought access to his institutional records, as generated by several state agencies. The State wrote a letter to the trial court stating its opposition to Land's motions, and it orally opposed the motions at a status conference.

The trial court entered an "Order Regarding Discovery of Prosecution Files," which stated:
"This cause having come before the Court on the petitioner's motion for discovery of the prosecution files relating to Michael Jeffrey Land in the possession of the Jefferson County District Attorney's Office, and the same having *850 been duly considered by this Court, it is hereby ORDERED:
"The Jefferson County District Attorney's Office shall make available to petitioner for inspection and copying, at his expense, any and all records which are discoverable pursuant to Rule 16.1 of the Alabama Rules of Criminal Procedure relating to the May 1992 death of Candace Brown, the investigation of Ms. Brown's death, and the arrest and prosecution of Michael Land as a result of Ms. Brown's death. With regard to any documents for which the State claims a privilege, those documents shall be produced to the Court for an in camera inspection."
Although in its order the trial court did not mention Land's other discovery requests, it did, in a letter to the parties, state that the rest of what Land "is seeking by way of discovery is irrelevant to the

issues framed by the Petition for Relief." Land moved for a "reconsideration," but the trial court denied the motion.

In his mandamus petition, Land alleges that the trial court erred in denying him access to his penal-institution records, his mental-health records, and his juvenile records, and in denying him access to records of the Birmingham Police Department's investigation regarding other suspects in Candace Brown's murder. Land argues that these materials support his claims alleging ineffective assistance of counsel and his claim alleging that the State committed a *Brady* violation.

[1] We begin with the rule that "mandamus is a drastic and extraordinary writ that will be issued only when there is: (1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court." *Ex parte Horton,* 711 So.2d 979 (Ala.1998) (citations omitted). This Court has held that a petition for the writ of mandamus is the proper means for seeking appellate review of a trial court's discovery order. *Ex parte Monk,* 557 So.2d 832 (Ala.1989). As noted above, Land has complied with Rule 21, Ala. R.App. P., and the State has refused to produce the materials he sought. Therefore, the only issues to be resolved are (1) whether the State has an imperative duty to give Land access to the materials requested and (2) whether Land has shown a clear legal right to the discovery order he seeks. In determining whether Land has shown a clear legal right, we limit our review to determining whether the trial court abused its discretion in denying Land's discovery motion. *Horton,* 711 So.2d at 983.

Land maintains that the State has an imperative duty to give him access to the materials and that he has shown a clear legal right to the relief requested because, he says, he presented the trial court with claims of ineffective assistance of counsel that were meritorious on the face of the petition. He says he alleged facts that, if proven, would entitle him to relief. Land points us to *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

775 So.2d 847

Page 4

775 So.2d 847
(Cite as: 775 So.2d 847)

(1984), in which the United States Supreme Court held that to establish a claim of ineffective assistance of counsel, a petitioner must prove (1) that counsel did not provide reasonably effective assistance and (2) that counsel's deficient performance prejudiced the petitioner. Land also points us to the standard for showing prejudice as stated in *Strickland*, in which the Supreme Court held: "[To show prejudice, the] defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. 2052.

Land argues that it would be difficult, if not impossible, for him to satisfy the prejudice prong of *Strickland* without the requested discovery. He maintains that in order to show the trial court a reasonable probability that the outcome would have *851 been different, he must obtain actual proof in the form of records to show that evidence was available to his trial counsel at the time of the trial and that there was a reasonable probability that that evidence would have affected the outcome. Land says:

"[Without the materials, the trial court's] review is no review at all, and will require that Federal Courts compel discovery of now sought-after evidence and will heighten federal involvement in Alabama capital cases. See *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992) (postconviction petitioner is entitled to federal evidentiary hearing on merits of claim when applicant was deprived of full and fair opportunity to present evidence in state courts; 28 U.S.C. § 2254 ; Rule 6(a), Habeas Rules [Governing § 2254 Cases in the United States District Courts], Advisory Committee Notes ('Where specific allegations before the court show reason to believe that the petitioner may, if the facts are more fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.')."
(*Petition for Mandamus*, p. 6.)

As for the documents relating to his claim that the

State committed a *Brady* violation, Land maintains that the trial court abused its discretion in restricting discovery to the prosecutor's files because, he says, he provided the trial court with specific facts and allegations showing that the police department has information regarding its investigation of other suspects in the murder of Candace Brown.

The State contends that Land has not shown that the State has a duty to give him access to the materials he seeks or that he has a clear legal right to the order sought. The State says that nothing in the Alabama Rules of Criminal Procedure provides a vehicle for postconviction discovery of documents and/or other things. FN2 The State concedes that a trial court has an inherent right to compel discovery. However, it maintains that this right to compel discovery should be limited to those circumstances in which the defendant presents the trial court with " good cause" to order the State to disclose the requested items. The State says Land did not present the trial court with good cause and that he is merely on a "fishing expedition" to find information to support his petition, which, the State says, should be meritorious on its face.

> FN2. The State does concede that Rule 32.4, Ala. R.Crim. P., allows the trial court, in its discretion, to allow "the taking of depositions for discovery or for use at trial." The State says, however, that this provision does not allow for discovery of documents and other things in the possession of the State.

We note that in making its arguments, the State relies on the July 2, 1998, opinion of the Court of Criminal Appeals, in which that court denied a petition similar to the one now before us. In that opinion, the Court of Criminal Appeals correctly recognized that the Alabama Rules of Criminal Procedure do not specifically provide for postconviction discovery of documents and/or other things. See *Land*, supra, 775 So.2d at 843. The Court of Criminal Appeals also correctly noted that "there is little Alabama law on this issue." *Id.* at 845. That court then, 775 So.2d at 845, quoted with approval *State v. Marshall*, 148 N.J. 89, 690

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

775 So.2d 847

775 So.2d 847
(Cite as: 775 So.2d 847)

Page 5

A.2d I, *cert. denied,* 522 U.S. 850, 118 S.Ct. 140, 139 L.Ed.2d 88 (1997), in which the New Jersey Supreme Court, when faced with a question of discovery in a postconviction-relief proceeding commenced by a defendant who had been convicted of capital murder, held that "where a defendant presents the [postconviction-relief] court with good cause to order the State to supply the defendant with discovery that is relevant to the defendant's case and not privileged, the court *852 has the discretionary authority to grant relief." 148 N.J. at 270, 690 A.2d at 92.

In rejecting Land's petition for a writ of mandamus, the Court of Criminal Appeals held that Land had " established no 'clear legal right' to the discovery [sought]," 775 So.2d at 847. Although that court did not specifically say that Land did not show good cause for the discovery sought, it held that "Judge Hard's discovery order gives Land more than he is lawfully entitled to obtain in a post-conviction proceeding." *Id.* at 846. The Court of Criminal Appeals also distinguished this Court's decision in *Ex parte Monk,* supra, 557 So.2d at 836-37, in which this Court stated that "broader discovery" is justified in capital cases, by stating that the present case involves a petition for postconviction relief and not a motion for pretrial discovery. See the July 2, 1998, opinion, 775 So.2d at 843.

[2] [3] We agree with the Court of Criminal Appeals that "good cause" is the appropriate standard by which to judge postconviction discovery motions. In fact, other courts have adopted a similar "good-cause" or "good-reason" standard for the postconviction discovery process. See *Marshall,* supra; *State v. Lewis,* 656 So.2d 1248 (Fla.1994) ; *People ex rel. Daley v. Fitzgerald,* 123 Ill.2d 175, 121 Ill.Dec. 937, 526 N.E.2d 131 (1988). As noted by the Illinois Supreme Court, the good-cause standard guards against potential abuse of the postconviction discovery process. See *Fitzgerald,* supra, 123 Ill.2d at 183, 121 Ill.Dec. 937, 526 N.E.2d at 135. We also agree that New Jersey's *Marshall* case provides a good working framework for reviewing discovery motions and orders in capital cases. In addition, we are bound by our own rule that "an evidentiary hearing must be held on a [petition for

postconviction relief] which is meritorious on its face, *i.e.,* one which contains matters and allegations (such as ineffective assistance of counsel) which, if true, entitle the petitioner to relief. " *Ex parte Boatwright,* 471 So.2d 1257, 1258 (Ala.1985). FN3

> FN3. *Ex parte Boatwright* was decided before this Court adopted Rule 32, Ala. R.Crim. P., when a petition for postconviction relief was usually styled as a "petition for writ of error coram nobis." However, as Justice Maddox has noted: " The common law writ of coram nobis in criminal cases has been incorporated into Rule 32." 2 Hugh Maddox, *Alabama Rules of Criminal Procedure* § 32.0, p. 971 (2d ed. 1994).

[4] We emphasize that this holding-that postconviction discovery motions are to be judged by a good-cause standard-does not automatically allow discovery under Rule 32, Ala. R.Crim. P ., and that it does not expand the discovery procedures within Rule 32.4. Accord *Lewis,* supra, 656 So.2d at 1250, wherein the Florida Supreme Court stated that the good-cause standard did not affect Florida's rules relating to postconviction procedure, which are similar to ours. By adopting this standard, we are only recognizing that a trial court, upon a petitioner's showing of good cause, may exercise its inherent authority to order discovery in a proceeding for postconviction relief. In addition, we caution that postconviction discovery does not provide a petitioner with a right to "fish" through official files and that it "is not a device for investigating possible claims, but a means of vindicating actual claims." *People v. Gonzalez,* 51 Cal.3d 1179, 1260, 800 P.2d 1159, 1206, 275 Cal.Rptr. 729, 776 (1990), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 85 (1991) . Instead, in order to obtain discovery, a petitioner must allege facts that, if proved, would entitle him to relief. Cf. *Porter v. Wainwright,* 805 F.2d 930, 933 (11th Cir.1986) ("a hearing [on a habeas corpus petition] is not required unless the petitioner alleges facts which, if proved, would entitle him to federal habeas relief"), *cert. denied,* 482 U.S. 918, 919,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 S.Ct. 3195, 96 L.Ed.2d 682 (1987). Furthermore, a petitioner seeking postconviction discovery also must meet the requirements of Rule 32.6(b), Ala. R.Crim. P., which states:

"The petition must contain a clear and specific statement of the grounds upon *853 which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings."

That having been said, we must determine whether Land presented the trial court with good cause for ordering the requested discovery. To do that, we must examine Land's basis for the relief requested in his postconviction petition and determine whether his claims are facially meritorious. Only after making that examination and determination can we determine whether Land has shown good cause.

### I. The Ineffective-Assistance-of-Counsel Claims

#### A. The Penalty Phase of Land's Trial

[5] We begin with Land's claims that relate to his counsel's performance during the penalty (or sentencing) phase of his trial because most of his discovery requests arise from these claims. Land alleges that his trial counsel was ineffective at the penalty phase of his trial because, he says, his counsel did not investigate the possibility of the existence of mitigating evidence and did not present *any* evidence of mitigating circumstances. Land says that evidence of mitigating circumstances existed at the time of his trial and that that evidence consists of the following: (1) evidence that he adjusts well to incarceration; this evidence, he says, is contained in records of his incarceration in the Jefferson County jail, the State Cattle Ranch Facility, the Mobile County jail, the Mt. Meigs Youth Services Facility, and records held by the Alabama Board of Pardons and Paroles and the Alabama Department of Corrections; (2) evidence of mental-health problems; this evidence, he says, is contained in records maintained by Bryce

Hospital, Taylor Hardin Secure Medical Facility, the Alabama Department of Mental Health and Mental Retardation, the Alabama Department of Youth Services, Mt. Meigs Youth Services Facility, and the Department of Human Resources; (3) evidence of mental and emotional problems stemming from family problems and relationships he experienced as a juvenile; this evidence, he says, is held by the Alabama Department of Youth Services and the Mt. Meigs Youth Services Facility. Land maintains that all of this evidence was available at the time of his trial and that his trial counsel should have attempted to discover it and present it at the penalty phase of his trial.

The State contends that Land is merely attempting to use the discovery process as a "fishing expedition " and to "drum up" a claim of ineffective assistance of counsel because, the State says, none of his claims is meritorious on its face. The State also argues that Land has not shown that the documents he requests relate to his claims of ineffective assistance of counsel or that the documents he seeks contain any mitigating evidence. The State also maintains that Land has waived his right to request discovery of his correctional and juvenile records because he did not make such a request before the trial court. Last, the State contends that Land is not entitled to the requested information because, it says, he has not presented evidence indicating that he has ever had any interaction with Bryce Hospital, Taylor Hardin Secure Medical Facility, or the Alabama Department of Human Resources.

[6] First, we disagree with the State's argument that Land's claims are not facially meritorious. In fact, Land's claims, if proved to be true, would entitle him to relief. The United States Court of Appeals for the Eleventh Circuit has held that trial counsel's failure to investigate the possibility of mitigating evidence is, per se, deficient performance. See *Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir.1991) ("our case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them"), *cert. denied,* *854503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992) ; see, also, *Jackson v. Herring,* 42 F.3d 1350, 1366-68 (11th Cir.) ("Although

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

775 So.2d 847

Page 7

775 So.2d 847
(Cite as: 775 So.2d 847)

counsel need not 'investigate every evidentiary lead, ' he *must* gather enough knowledge of the potential mitigation evidence to arrive at an 'informed judgment' in making [the decision not to present such evidence].... [A] legal decision to forgo a mitigation presentation cannot be reasonable if it is unsupported by sufficient investigation.") (emphasis added; citations omitted), *cert. dismissed,* 515 U.S. 1189, 116 S.Ct. 38, 132 L.Ed.2d 919 (1995). Furthermore, trial counsel may be found ineffective for failing to present evidence of adjustment to incarceration, evidence of mental-health problems, and evidence regarding the defendant's contact with a juvenile system. See *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (holding that a capital defendant *must* be permitted at the penalty phase of his trial to introduce evidence of adjustment and good behavior while incarcerated); *Horton v. Zant,* supra (counsel found ineffective for not presenting evidence of adjustment to incarceration); *Blanco v. Singletary,* 943 F.2d 1477 (11th Cir.1991), *cert. denied,* 504 U.S. 943, 112 S.Ct. 2282, 119 L.Ed.2d 207 (1992) (counsel found ineffective for failing to introduce evidence that defendant had mental-health problems and a very low IQ and had suffered from various bouts of paranoia and depression); *Porter v. Wainwright,* supra (holding that juvenile records may be evidence of mitigating circumstances and that trial counsel's failure to present such records may constitute ineffective assistance of counsel); see, also, *Williams v. Turpin,* 87 F.3d 1204 (11th Cir.1996) (failure to investigate and present juvenile records may constitute ineffective assistance of counsel, depending on the content of such records and a showing of prejudice).

Second, the State's argument that Land has not shown that the requested documents contain evidence of mitigating circumstances and that he therefore is not entitled to the requested discovery is equally unavailing. Until the documents are actually produced, it is impossible to determine whether they contain evidence of mitigating circumstances. Cf. *United States v. Streit,* 962 F.2d 894, 900 (9th Cir.) (rejecting the Government's position that the defendant could not discover sealed documents because he could not show that the documents contained exculpatory evidence and

stating that "[i]f defendants were required to make a positive showing that sealed documents in fact contained exculpatory material, *Brady* violations would come to the attention of appellate courts only by the merest happenstance of confidential material falling into a defendant's hands"), *cert. denied,* 506 U.S. 962, 113 S.Ct. 431, 121 L.Ed.2d 352 (1992). Thus, this argument is without merit.

Third, we disagree with the State's contention that Land waived his right to request discovery of his correctional and juvenile records by not requesting those records in his motions made in the trial court. A close review of those motions shows that Land did request those records. In his Rule 32 petition, at p. 856, Land alleged that his trial counsel was ineffective because he failed to investigate and offer mitigating evidence, which would have included his correctional and juvenile records. In his first motion for discovery, Land requested discovery of his correctional and juvenile records. See *Motion for Discovery of Prosecution Files, Records, and Information Necessary to a Fair Rule 32 Evidentiary Hearing,* p. 12. In his motion for " reconsideration," Land argued that he was "clearly constitutionally entitled to those records which predate his arrest for the current [offense]," and that "Such records are necessary to claims ... [that counsel was ineffective during the penalty phase of his trial], for they may establish that a) Mr. Land was a model prisoner...." *Motion for Reconsideration of the Denial of Court-Ordered Discovery of Records Necessary to a Fair *855 Rule 32 Evidentiary Hearing,* p. 16. Thus, this argument is also without merit.

Fourth, we reject the State's argument that Land should not be allowed to discover the requested materials because, the State argues, he has not shown any connection with Taylor Hardin Secure Medical Facility, Bryce Hospital, or the Alabama Department of Human Resources. Land has alleged that persons from both Taylor Hardin and Bryce evaluated him. He also claims that he and his family had interaction with the Alabama Department of Human Resources. Furthermore, if these facilities have no documents that relate to Land's claims, they can simply say so. Merely determining whether such documents exist would

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

775 So.2d 847

Page 8

775 So.2d 847
**(Cite as: 775 So.2d 847)**

not unduly burden the State.

Thus, Land presented the trial court with claims of ineffective assistance of counsel that are facially meritorious. In fact, these claims suggest several potential serious deficiencies in the performance of his trial counsel that, if proved, may entitle him to relief. Furthermore, we agree with Land that it would be practically impossible for him to show that he suffered prejudice from the deficient performance of his counsel unless he could show the trial court that mitigating evidence (which he has a reasonable basis to believe in fact exists) existed at the time of his trial and then argue, on the basis of that evidence, that a "reasonable probability" exists that a jury hearing the evidence would have recommended life imprisonment without parole. Cf. *Jackson v. Herring,* supra, 42 F.3d at 1364, 1369 (federal habeas evidentiary hearing "unearthed a great wealth of [mitigating evidence]" from which the defendant was able to show "that a reasonable probability exists that a jury hearing this evidence would have recommended life"). Therefore, we conclude that Land demonstrated to the trial court that he was entitled to the requested discovery (listed above), which is relevant to his claim that his trial counsel was ineffective at the penalty phase of his trial.

### B. The Guilt Phase of Land's Trial

[7] Land contends in his mandamus petition that his trial counsel was ineffective at the guilt stage of his trial because, he says, his counsel did not adequately challenge his alleged waiver of rights made pursuant to *Miranda v. Arizona,* supra, on the basis that he lacked the mental capacity to make such a waiver. Land says that the documents pertinent to this claim that his trial counsel did not adequately challenge his *Miranda* waiver are his mental-health and correctional records; he says his mental-health history and his prior experiences with law-enforcement authorities are directly relevant to the question of the voluntariness of his *Miranda* waiver. The State maintains that Land did not make this claim in his petition for postconviction relief.

The State is correct in arguing that Land did not present this claim in his Rule 32 petition as he has presented it in his mandamus petition. In his Rule 32 petition, Land alleged numerous ways in which he said his trial counsel was ineffective at the guilt stage of his trial. A failure to adequately challenge his waiver of his *Miranda* rights was not, however, among the shortcomings ascribed to Land's trial counsel. Land made a separate claim in his Rule 32 petition in which he challenged the admission during his trial of the statements he had made while in custody, arguing that the statements were inadmissible because, he said, police officers had continued to interrogate him after he had invoked his right to counsel and because, he further says, the statements were obtained through coercion and intimidation. Nowhere in this claim does Land mention the alleged ineffectiveness of his trial counsel. Moreover, the *Miranda* claim was dismissed by the trial court. Land has not shown that he is entitled to the discovery he seeks in connection with this dismissed claim.

### II. The Brady Claim

[8] Land next argues that the trial court erred when it granted his initial request*856 but restricted discovery to the district attorney's files and refused to order discovery of other documents held by certain state agencies. He maintains that the state agencies involved in his case are required to provide him with requested *Brady* material. He says that, in support of his request to the trial court, he attached a number of records obtained in response to his initial request, records indicating that officers from the Birmingham Police Department investigated and interviewed other suspects about the disappearance and murder of Candace Brown. He claims that the records of these investigations and interviews were never provided to him. Thus, he says, the trial court was required to order the production of these documents so that he could prove that the State committed a *Brady* violation.

The State contends that Land is not entitled to the requested discovery, for the following reasons: (1) because the trial court dismissed his *Brady* claims;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

775 So.2d 847

775 So.2d 847
(Cite as: 775 So.2d 847)

Page 9

(2) because Land has offered no evidence indicating that the records in question would lead to exculpatory information; (3) because the district attorney is not required to go on a "fishing expedition" to other state agencies; and (4) because Land is seeking to "fish through" the State's files in order to uncover a *Brady* claim.

The State correctly points out that Land is not entitled to the discovery requested relative to his *Brady* claim, because that claim has been dismissed. Land's *Brady* claim states:

"Despite the heightened obligation upon the state in this capital proceeding, the state in this instance failed to provide a wealth of exculpatory evidence to Mr. Land. For example, the police failed to provide Mr. Land with fingerprint evidence collected from Brown's house which indicated that someone else had handled the glass that was broken. In addition, the state failed to provide evidence about police officers and other state agents that would have impeached or otherwise impugned upon their testimony. Further, the court blocked *Brady* discovery on at least one instance, by not granting Mr. Land access to grand jury transcripts or notes of the grand jury proceedings. Though the trial court offered to compare the testimony proffered at trial with that given at the grand jury proceedings, this apparently did not occur. Mr. Land was entitled to the grand jury transcripts in the same manner as he was entitled to all other *Brady* materials."

The trial court dismissed the claims relative to the fingerprints and the grand-jury proceedings because those claims were procedurally barred, pursuant to Rule 32.2(a). It dismissed the remainder of Land's *Brady* claim for a failure to comply with the specificity requirement of Rule 32.6(b). Because Land has no *Brady* claim pending in his Rule 32 petition, he has not shown that he is entitled to the discovery he seeks in connection with such a claim. FN4

FN4. The State informs us in its brief in support of its application for rehearing that Land filed an amended Rule 32 petition in the circuit court on November 6, 1998,

some four months after he had filed his mandamus petition with this Court. The claims in that amended petition, of course, are not before us.

Because Land's *Brady* claim has been dismissed, we do not address the remainder of the parties' arguments relative to that claim.

*Conclusion*

Land has shown a clear legal right to the relief sought as to his ineffective-assistance-of-counsel claims that were not dismissed by the trial court. The trial court is directed to order production of the documents held by the agencies named in part I.A. of this opinion; to that extent, the mandamus petition is granted, but it is otherwise denied.

OPINION OF AUGUST 6, 1999, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION FOR REHEARING GRANTED; PETITION GRANTED IN *857 PART AND DENIED IN PART; WRIT ISSUED.

HOOPER , C.J., and MADDOX , HOUSTON , COOK , SEE , JOHNSTONE , and ENGLAND, JJ., concur.
BROWN, J., recuses herself. FN*

FN* Justice Brown was a member of the Court of Criminal Appeals when that court considered this case.

Ala.,2000.
Ex parte Land
775 So.2d 847

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

174

# IN THE CIRCUIT COURT OF
## COFFEE COUNTY, ALABAMA
### ENTERPRISE DIVISION

STATE OF ALABAMA,       *

    PLAINTIFF,       *

     *

VS.       *

     *      CASE NO: CC-2001-179.60

ROBERT THOMAS CONRAD,       *

    DEFENDANT.       *

     *

## ORDER

A hearing was held on the 28th day of September 2005 on the Petitioner's Motion for Post Conviction Discovery. The State was represented by Assistant District Attorney Larry Jarrell and the Petitioner was represented by Attorney Rick Hollingsworth, Jr.

In order for the Petitioner to be entitled to discovery in a post conviction proceeding he must show "good cause" for the requested evidence. The courts have held that in order to obtain discovery, a Petitioner must allege facts that, if proved, would entitle him to relief. Exparte Land 775 So2d 847 (Ala.2000).

Counsel for Petitioner and the District Attorney addressed each discovery request for the court.

Request 5(a) the requested minutes of the convention of the adoption of the Alabama Constitution 1901 is available through counsel efforts.

Defendant has failed to show good cause for discovery.

5(b).      The District Attorney informed the court that no Internal Investigation Report not already revealed. The Petitioner makes reference to a report which was reviewed in camera by the trial judge and the report was made available to the Petitioner and trial counsel.

5(c).      The District Attorney informed the court that no Pre trial Statement exist in their control.

5(d).      The District Attorney advised that all medical of the Enterprise Medical Center had been produced.

175

5(e).   The Audit requested regarding the Alabama Department of Forensic Sciences is not relevant to this matter. The trial court determined the forensic evidence was admissible. The Defendant has failed to show "good cause".

5(f).   Petitioner counsel acknowledged receipt.

5(g).   Petitioner counsel acknowledged receipt.

5(h).   The Petitioner has failed to show "good cause" as the information is available to counsel. This court held on April 5, 2005 that the Petitioner's claim that the Alabama Capital Murder Statute is unconstitutional is without merit.

Based upon the above the Petitioner's Request for Discovery the court finds th at the information has been provided or the Defendant has failed to show "good cause".

Done this the ___30th___ day of ___September___, 2005.



JEFF W. KELLEY
CIRCUIT JUDGE

IN THE CIRCUIT COURT OF COFFEE
COUNTY, ALABAMA
ENTERPRISE DIVISION

ROBERT T. CONRAD
PETITIONER,

Vs.

State OF ALABAMA
RESPONDENT.

CC: 01-M-179
01-M-180

[stamp: NOV 2005 FILED J.M. Counts Court Clerk Coffee Co. Al.]

## Motion To Transfer Prisoner

COMES NOW Petitioner, Robert Thomas Conrad
IN THE ABOVE STYLED CAUSE BY AND THROUGH HIMSELF
PRO SE, AND MOVES THIS Honorable COURT FOR AN ORDER TO
TRANSFER Petitioner FROM THE ALABAMA DEPARTMENT OF
CORRECTIONS, L Holman UNIT, TO THE CUSTODY OF THE
COFFEE COUNTY SHERIFF'S DEPARTMENT, JAIL, AT LEAST
TEN (10) TO FIFTEEN (15) WORKING DAYS PRIOR TO THE HEARING
DATE (DECEMBER 02, 2005) ORDERED BY THIS COURT.
AS REASONS PETITIONER WOULD OFFER THE FOLLOWING:

1) THIS Honorable COURT APPOINTED ATTORNEY
RICHARD HOLLINGSWORTH TO REPRESENT PETITIONER AT
THE HEARING SET FOR DECEMBER 02, 2005.

2) PETITIONER HAS HAD NO CONTACT WHAT-SO-
EVER WITH HIS APPOINTED ATTORNEY, DUE TO
PRISON POLICY, WHICH WILL NOT ALLOW PHONE NUMBER
CHANGES, ADD ONS, ECT, EXCEPT EVERY SIX (6) MONTHS,
THIS INCLUDES ATTORNEYS AS WELL AS EVERY ONE ELSE.

3) PETITIONER NEEDS PERSONAL CONTACT WITH
SAID ATTORNEY IN ORDER TO PREPARE HIS CASE.
THIS IS TO INCLUDE BUT NOT LIMITED TO, GATHERING
EVIDENCE, CONTACTING WITNESSES, AND DISCUSSING
THE CASE AS A WHOLE AND FAMILIARIZE COUNSEL WITH

177

HIS INTEREST IN PRESENTING HIS CASE, AND HERE IS NOT
COUNSELS INTEREST IS MAKES THAT NO CONFLICT EXISTS.

4) PETITIONER SEEKS HIS TRANSFER AT
TEN (10) to FIFTEEN (15) WORKING DAYS PRIOR TO THE HEARING
IS ORDER THAT COUNSEL MAY SEEK OUT SOMETHING IN
HIS BUSY SCHEDULE TO MAKE ARRANGEMENT TO VISIT
PETITIONER AT THE COUNTY JAIL, AND HAVE TIME TO
INTERVIEW EVIDENCE, WITNESSES, PRIOR TO THE HEARING.

WHEREFORE, PREMISES CONSIDERED, PETITIONER
PRAYS THIS HONORABLE COURT WILL GRANT THIS MOTION AND
ORDER THAT PETITIONER BE TRANSFERED AT LEAST
TEN (10) to FIFTEEN (15) WORKING DAYS PRIOR TO HIS
HEARING DATE.

RESPECTFULLY SUBMITTED,

Robert Conrad

ROBERT THOMAS CONRAD
226791   5-156 HONOR DORM
3700 HOLMAN UNIT
ATMORE, AL 36503

DATE: 11-08-05

CC/FILE
  Mother / Dorothy Conrad
  Attorney / Richard Hollingsworth

178

Dear Mr. Hollingsworth,                    11/08/05

How are you sir? I pray that this letter finds you in good health and spirit. I look to consideration to file a motion to the court for "Transfer of Prisoner" from the DOC. to the county jail on good terms. See the attached motion.

I pray to see you soon and thank you sir for your attentive help. "God bless"!

Sincerely,



IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION

ROBERT T. CONRAD
    PETITIONER,

Vs.                                         CASE No. 04-N-179
                                                     01-N-180

STATE OF ALABAMA

## MOTION TO TRANSFER PRISONER

      COMES NOW Petitioner, Robert Thomas Conrad, in the above styled cause, by and through himself Pro Se, and moves this honorable court for an order to transfer petitioner from the Alabama Department of Corrections, (Hamman Unit), to the custody of the Coffee County Sheriff's Department, Jail, at least (10) to (15) days prior to the hearing date (December 02, 2005) ordered by this court, as reasons petitioner would offer the following:

      1) This honorable court appointed attorney Richard Hollingsworth to represent petitioner at the hearing set for December 02, 2005.

      2) Petitioner has not had any contact what-so-ever with his appointed attorney, due to prison policy, which will not allow phone number changes, adding, ect, except every six (6) months, this includes attorneys as well as every one else.

      3) Petitioner needs personal contact with said attorney in order to prepare his case. This is to include, but not limited to, gathering evidence, contacting witnesses, and discussing the case as a whole and familiarize counsel with his interest

180

IN PRESENTING PETITIONER'S CASE, AND ABOR OF COUNSEL'S INTEREST IN ORDER THAT NO CONFLICT EXIST.

4) PETITIONER SEEKS HIS TRANSFER AT LEAST (10) TO (15) WORKING DAYS PRIOR TO THE HEARING IN ORDER THAT COUNSEL MAY WORK OUT SOMETHING IN HIS BUSY SCHEDULE TO MAKE ARRANGEMENTS TO VISIT PETITIONER AT THE COUNTY JAIL, AND HAVE TIME TO INTERVIEW EVIDENCE, WITNESSES, PRIOR TO THE HEARING.

WHEREFORE, PREMISSES CONSIDERED, PETITIONER PRAYS THIS HONORABLE COURT WILL GRANT THIS MOTION AND ORDER THAT PETITIONER BE TRANSFERED AT LEAST (10) TEN TO (15) FIFTEEN WORKING DAYS PRIOR TO HIS HEARING DATE.

RESPECTFULLY SUBMITTED,

ROBERT THOMAS COBRAS
226741    5-156   40.506 DORM
3700 HOLMAN UNIT
ATMORE, AL 36503

DATE: 11-08-05

CC/ MOTHER,
CLERK,

## IN THE CIRCUIT COURT OF
## COFFEE COUNTY, ALABAMA
## ENTERPRISE DIVISION

STATE OF ALABAMA,            *

    PLAINTIFF,                *

                              *

VS                           *

                              *    CASE NO.  CC-2001-179 & 180 .60

ROBERT THOMAS CONRAD,        *

    DEFENDANT.                *

### ORDER

The Defendant being incarcerated at a state penitentiary, the Sheriff of Coffee County, Alabama, is hereby directed to transport the Defendant from said penitentiary for a hearing on the **2nd** day of **December, 2005**, at **9:00** a.m., in Courtroom D, in the Coffee County Courthouse, Enterprise, Alabama.  Notice shall issue to State, Sheriff of Coffee County and Hon. Rick Hollingsworth, Sr..

Done this the 11th day of _____, 2005.

_____
JEFF W. KELLEY
CIRCUIT JUDGE

182

## IN THE CIRCUIT COURT OF
## COFFEE COUNTY, ALABAMA
## ENTERPRISE DIVISION

STATE OF ALABAMA,             *

    PLAINTIFF,              *
                       *

VS.                           *         CASE NO:  CC-2001-179.60 & 180.60
                       *

ROBERT THOMAS CONRAD,         *

    DEFENDANT.               *

## ORDER

This matter comes before this court by, Robert Thomas Conrad's Petition for Relief from Conclusion or Sentence pursuant to Rule 32, <u>Alabama Rules of Criminal Procedure</u>, and two amendments, and the responses of the State.

The court appointed Attorney Rick Hollingsworth, Sr. to represent the Petitioner. A hearing was held on the 2nd day of December 2006. The Petitioner was present and represented by Attorney Rick Hollingsworth, Sr. The State was represented by Assistant District Attorney Tom Anderson.

## HISTORY

The Petitioner was indicted by a Coffee County Grand Jury for the Capital offense of Intentional Murder of Jelaine Bowman Dennis during a Robbery in the First Degree and of the offense of Robbery First Degree by the use of force or threat of imminent use of force against Robert Ray Grimes.

A trial was held, the Petitioner was represented at trial by attorneys Al Smith and Gary Bradshaw. A properly struck and duly sworn jury of twelve returned the unanimous verdict of guilty to both offenses. (See Sentencing Order and record).

The Petitioner was sentenced to life without parole on the Capital Murder conviction and life on the Robbery First conviction.

1

183

An appeal was taken to the Alabama Court of Criminal Appeals and the convictions were affirmed. A Petition for Writ of Certori was filed with the Alabama Supreme Court and the Petition was denied.

Attorney Al Smith was allowed to withdraw as appellate counsel and Attorneys Gary Bradshaw and Richard Waldrop served as counsel on appeal.

This is the Petitioner's first Petition pursuant to Rule 32 Alabama Rules of Criminal Procedure. The Petition has raised several grounds in his Petitioner and amendments.

The first ground listed was ineffective assistance at trial and appellate counsel. The Petitioner has raised several matters regarding the ineffective assistance of counsel.

## ISSUE ONE

**That counsel was ineffective by failing to object to the oath not being administered to the venire prior to voire dire examinations.**

Circuit Judge Robert W. Barr presided over the term of court in which the Petitioner was tried. As Presiding Judge over the term, Judge Barr administered the general qualifying. When the Petitioner's cases were called the trial Judge, Gary L. McAliley stated "Ladies and Gentlemen all of you are still under oath, and I am going to ask you some questions. And then, I will certainly allow the attorneys to do like wise". (see the record). Furthermore, the sentencing orders indicate that the jury was properly, qualified, duly sworn and properly struck.

Based upon the pleadings, evidence presented, and arguments the court finds that the Petitioner's allegations are not supported by fact or law. The matters raised in Issue One are without merit and the requested relief in denied.

## ISSUE TWO

The Petitioner alleges that trial counsel was ineffective in failing to object to the Petitioner's sentence to the conviction of Robbery 1st Degree due to the indictment only setting forth the material elements of Robbery 3rd Degree.

2

Based upon the pleadings, evidence presented and arguments the court finds the allegations involving matters raised in Issue Two are without merit and are not supported by facts or law. The indictment clearly alleges that the Petitioner was armed with a deadly weapon or dangerous instrument, to wit; Pistol.

Furthermore, the Petitioner's testimony at the hearing reveals he contends that no violence was used and the victim was not caused serious physical injury.

The court finds that based upon the pleadings and evidence presented that the Petitioner's allegations regarding this matter is without merit and is not supported by the facts or law. Upon a review of the indictment the court finds that the indictment contained the necessary statutory language.

## ISSUE THREE

That counsel was ineffective for failing to file a Motion to Dismiss the Indictment because the Foreperson failed to endorse upon the indictment whether a prosecutor appeared before the Grand Jury as requested by Section 12-16-205, Code of Alabama.

The court that based upon the evidence presented and a review of the record finds that the indictment was clearly signed by Mark A. Fuller, District Attorney for the 12th Judicial Court. The Grand Jury Foreperson's signature was also affixed to the indictment.

Based upon the pleadings and evidence presented the allegations of the Petitioner regarding this matter is without merit and is not suggested by facts or law. The relief sought is denied.

## ISSUE FOUR

That trial counsel was ineffective for failure to make a timely objection where Clerk did not give the oath to the Petit Jury, Section 12-16-170, Code of Alabama.

Based upon the evidence presented the Trial Judge administered the proper oath to the Petit Jury. The record reflects the oath was administered.

3

185

The Petitioner testified that the Trial Judge administered the oath. The Sentencing Order indicates the jury was properly sworn. Rule 18.5 <u>Alabama Rules of Criminal Procedure</u> states that the court shall either remind the jurors they are still under oath or give them the oath. The Judge is clearly allowed to administer the oath.

Based upon the pleadings and evidence the court finds that the Petitioner's allegations regarding this matter raised in this issue is without merit and it is not supported by facts or law. The relief sought is denied.

## ISSUE FIVE

The Petitioner avers that the trial counsel was ineffective for failing to know the applicable point of law to file a Motion to Dismiss the Indictment, pursuant to Rule 15.3, <u>Alabama Rules of Criminal Procedure</u> on the grounds that: His indictment is void as it fails to allege the essential elements of the Capital Murder statute in its entirety as required by Section 12A-5-40 subsection 2,10,16,17 and 18; and 13A-5-50, <u>Code of Alabama</u>.

The Petitioner alleges trial counsel was ineffective for failing to file a Motion to Dismiss the indictment at the pre-stage before proceeding to trial. At the hearing the Petitioner appears to allege that the indictment was devoid of a material element of capital murder, in that it did not include aggravating circumstances. The court finds that the indictment clearly stated that the death of Ms. Dennis was during a robbery in the first degree.

At the hearing the Petitioner could not tell the court what element was missing from the indictment.

Based upon the pleadings and evidence presented the court finds that the Petitioner was not deprived of the right to counsel by counsels failure to render adequate legal assistance. Any decision to file a Motion to Dismiss would be a trial strategy. The allegations of the Petitioner are without merit and are not supported by facts or law. The relief sought is denied.

4

## ISSUE SIX

The Petitioner alleges that the indictment is void because it violates the constitutional doctrine of "Separation of Powers".

The Petitioner alleges that Section 13A-15-40, Code of Alabama (Capital Murder Statute) is unconstitutional and void because the Alabama Law Institute was involved in drafting the legislature. The Petitioner argues there is a violation of the Separation of Powers.

Based upon the evidence presented the court finds that the Petitioner's allegations are without merit and are not supported by laws or fact. Furthermore, the Petitioner has not served a copy of the pleadings on the Attorney General of the State of Alabama wherein be challenges the constitutionality of the statute.

The issue could have been raised at trial or on appeal. The relief sought is denied.

## ISSUE SEVEN

The Petitioner alleges that he was denied effective assistance of trial counsel, as trial counsel failed to file a Motion to Dismiss the second count of the indictment for Robbery 1st Degree as double jeopardy would prevent a conviction.

The Petitioner contends that since Robbery 1st Degree was an element or basis for his capital conviction, that it would be double jeopardy if he was also convicted of Robbery 1st Degree.

Based upon the record and evidence presented the court finds that the basis of the Capital Murder conviction was the alleged Robbery of Jelanie Dennis. The Robbery 1st Degree conviction involved a separate victim, namely Robert Ray Grimes.

The court finds that the facts do not support the allegations that double jeopardy applies. There were two separate sets of facts and the law is clear that the Petitioner could be tried for both offenses.

5

The court finds that the Petitioner's allegations are without merit and are not supported by facts or law. The Petitioner was not denied effective assistance of counsel.

## OFFENSE EIGHT

**The Constitution of the U.S. and Alabama requires a new trial when trial counsel renders ineffective assistance in violation of the 6th and 14th amendment for his failure to object to Petitioner's Indictment being void in that it was returned pursuant to the authority of the Alabama Constitution of 1901, which was established to promote white supremacy and to disenfranchise African-Americans.**

At the hearing the Petitioner presented no evidence to support this allegation. The Petitioner stated "I have no comment on that one".

The court finds that the Petitioner allegations are without merit as it is not supported by any facts or law.

The relief sought by the Petitioner is denied.

## OFFENSE NINE

**That the Petitioner was denied effective assistance of counsel, due to trial counsel's failure to properly object, to trial court's erroneous instructions to the jury on corroborated testimony of co-defendant.**

The court finds that the courts instruction to the jury was not an erroneous instruction. The instruction was in compliance with Section 12-21-222, Code of Alabama, 1975. The record further reveals that the testimony of the accomplice was corroborated by other evidence. The Petitioner was not prejudiced by the jury instructions. Trial counsel was not ineffective by failing to object to the jury instructions.

The Petitioner's allegations are not supported by evidence of law and are without merit. The relief sought is denied.

6

## ISSUES RAISED IN THE 1ST AMENDMENT
## FILED APRIL 18, 2005
### ISSUE TEN

Petitioner was denied his 6th and 14th amendment right to effective assistance of counsel when counsel failed to move for a continuance or mistrial based upon the prosecution's failure to turn over exculpatory and impeachment evidence to the defense.

During the trial defense counsel discovered that the prosecution, had withheld a report regarding an internal investigation by the Police Department, which involved a witness with information favorable to the Petitioner. The trial Judge held a hearing out of the presence of the jury. The trial Judge ordered the District Attorney to fly the witness from Arizona to Alabama for the trial. Trial counsel met with the witness. The court appears to have made reasonable efforts to allow the defense an opportunity to talk to the witness. The witness testified at trial.

The court finds that the Petitioner was not prejudiced. The witness was disclosed and the witness was allowed to testify. The court finds that the Petitioner was not deprived of the right of counsel based upon the trial strategy of counsel. This issue could have been raised on appeal.

### ISSUE ELEVEN

Petitioner was denied his 6th and 14th amendment rights to effective assistance of counsel when counsel failed to object and seek recusal of the trial Judge on the grounds that the Judge was bias and impartial prior to and during the trial and at sentencing.

The Petitioner alleges that the Judge questioned witnesses and made comments that demonstrated the appearance of impartiality. The Petitioner has stated that at one point counsel did object.

At the hearing the Petitioner stated that comments by the trial Judge seemed to indicate a friendship between the Judge and attorneys.

7

The court finds that the Petitioner has failed to provide sufficient evidence to support this allegation. The Petitioner has failed to show any prejudice. Trial counsel's strategy cannot be said to be deficient so as to amount to ineffective assistance of counsel. The allegations are not supported by facts or law. The relief sought is denied.

## ISSUE TWELVE

### That trial counsel was ineffective due to a conflict of interest.

The Petitioner has made broad allegations that defense counsel, Gary Bradshaw had a conflict of interest.

The Petitioner has made broad allegations that defense counsel, Gary Bradshaw had a conflict as he attended the same church as the victim Jelanie Dennis and that the victim's three children were members of the Sunday School class in which counsel was a youth director and teacher.

Attorney Gary Bradshaw filed a Motion to Withdraw as counsel which was not granted by the court. In an Affidavit submitted by Gary Bradshaw he stated none of the children ever attended Sunday School and he would not recognize them if they appeared in court.

The court finds that the Petitioner was aware of counsels association as a Sunday School teacher and church member and he did not raise that issue at trial. Furthermore, this issue could have been raised at trial or on appeal as Al Smith was additional trial counsel and Richard Waldrop was appointed as additional appellate counsel.

The allegations that Attorney Gary Bradshaw had a conflict of interest which amounted to ineffective assistance of counsel are not supported by the record or evidence. The relief sought is denied.

## ISSUE THIRTEEN

That counsel was ineffective when they failed to object to the admission of the bullet taken from the Petitioner's body on the ground that it was the product of an illegal search and seizure.

190

The District Attorney received the bullet pursuant to a District Attorney subpoena. The evidence supports that counsel filed a Motion to Suppress. The court held that the bullet would have been available and obtained anyway so the Motion to Suppress was denied. Counsel had a standing objection regarding the introduction of the bullet into evidence. The issue was raised at trial and appeal. Trial counsel was not deficient so as to the amount to ineffective assistant of counsel. The Petitioners allegations are not supported by the evidence. The relief sought is denied.

## ISSUE FOURTEEN

That the Petitioner was denied his 6th and 14th amendment rights to effective assistance of counsel when counsel failed to advise the Petitioner of his right to take the stand and testify.

At the hearing Attorney Al Smith testified that the Petitioner did not testify on his recommendation. Counsel was concerned that if the Petitioner testified it would do more damage than good. Counsel testified that this matter was discussed several times. Counsel testified he advised the Petitioner of his right to testify and the Petitioner made the decision not to testify.

Based upon the evidence presented the court finds that the Petitioner made the decision not to testify. The Petitioner's allegations are not supported by the evidence. The court finds that the Petitioner was not denied effective assistance of counsel. The relief sought is denied.

## ISSUE FIFTEEN

That the Petitioner was denied his 6th and 14th amendment right to effective assistance of counsel, when the trial court forced counsel to become a witness in the case breaking an actual conflict.

Based the evidence presented the court finds that Attorney Al Smith was required by the trial Judge to testify regarding the witness that was not disclosed by the District Attorney. Attorney Smith testified outside the presence of the jury and was not required to disclose any confidential client information.

The court finds that the Petitioners allegations are without merit and are not supported by the facts. The relief sought is denied.

## ISSUE SIXTEEN

That newly discovered evidence exist requiring a new trial as other relief based on the false and misleading evidence presented at trial by employees of the Alabama Department of Forensic Sciences.

The Petitioner is alleging that the Alabama Department of Forensic Sciences was not accredited at the time of trial. The court finds that there is no requirement that the Department of Forensic Sciences be accredited by any organization.

This matter could have been raised at trial or on appeal.

Based upon the pleadings and evidence the court finds that the Petitioners allegations are without merit and is not supported by facts or law. The relief sought is denied.

## ISSUE RAISED IN SECOND AMENDED PETITION

That the Petitioner was denied effective assistance of trial counsel for failing to file a Motion to Dismiss the indictment, pursuant to Rule 15.3, Alabama Rules of Criminal Procedure on the grounds that the Petitioner's indictment is void because it violates constitutional directive of separation of powers.

The court adopts the response of issue six above. Furthermore based upon the findings of the court the Petitioner was not deprived of effective assistance of counsel.

Upon consideration of all of the issues raised, the pleadings and evidence presented, the court specifically finds that the Petitioner was not deprived of effective assistance of counsel at trial or appellate counsel. Based upon the findings of the court, all relief sought by the Petitioner is denied.

10

192

Done this the ___17th___ day of ___March___, 2006.

JEFF W. KELLEY
CIRCUIT JUDGE



MAR 2006
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

c: OA
+ Hollingsworth

| State of Alabama Unified Judicial System | ATTORNEY'S FEE DECLARATION (Adult) [For Work Performed On or After 10/1/2000] | County Code | Case Number |
|---|---|---|---|
| Form C-62A  Rev 7/2000 | | 16 | CC 2001-179.60 CC 2001-180.60 |

Mark Appropriate Court:
x Circuit Court of Coffee _____ County
☐ District Court of _____ County
☐ Municipal Court of _____
☐ Alabama Court of Criminal Appeals
☐ Alabama Court of Civil Appeals
☐ Supreme Court of Alabama

Indicate if Original Charge is:    Limits:
Capital Case (or charge
    carrying sentence of
    life without parole)    ☐ (No Limit) CC
Class A Felony    ☐ ($3,500) FA
Class B Felony    ☐ ($2,500) FB
Class C Felony    ☐ ($1,500) FC
Other    ☐ ($1,000) OT
Appeal    ☐ $2,000) AP
Petition for Writ of Certiorari    ☐ ($2,000) WC
Post-Conviction/Habeas Corpus ☐ ($1,000) PC

Attorney Name (Please type or print)

J. Rick Hollingsworth

42064538800
Social Security Number or FEIN

STYLE OF CASE:    X STATE OF ALABAMA
    ☐ MUNICIPALITY OF _____    vs.    Robert Thomas Conrad
                                    Defendant

CHARGE: Rule 32 Petition
Companion case numbers and charges or convictions: _____

The undersigned attorney declares that on (date) 07/15/05    the Honorable Jeff Kelley    Judge, appointed the
undersigned to represent the above-named defendant or appellant, and on (date) 12/02/05    the case was heard by the Honorable Jeff Kelley
_____ Judge. The case was disposed of by _____

*(Plea of Guilty, conviction, acquittal, affirmance, reversal, cert. denied)*

| | | | | |
|---|---|---|---|---|
| (1) In-Court Appearance (Trial Level or Post-Conviction Proceeding) | Total Hours | 5.75 | x $60.00 per hour = | 345.00 |
| (2) Out-of-Court Preparation (Trial Level or Post-Conviction Proceeding) | Total Hours | 42.50 | x $40.00 per hour = | 1,700.00 |
| (3) Preparation (Appellate Level) | Total Hours | | x $60.00 per hour = | |
| (4) Extraordinary Expenses (If approved in advance by court) | | | | |
| (5) Overhead Expenses (If approved in advance by court) | Total Hours | 48.25 | x $25.00 per hour = | 1,206.25 |
| | | | TOTAL CLAIM OF ATTORNEY | 3,251.25 |

NOTICE OF ATTORNEY: Complete this form. Attach a copy of a complete itemization of (1) in-court appearance; (2) out-of-court preparation; (3) preparation for appeals; (4) extraordinary expenses; and/or (5) overhead expenses reflecting the date of actions and amount of time involved in each activity Make a copy of same for the court's record and a copy for your records.

The undersigned attorney further declares that the above claim is true and correct and represents the services actually rendered by him/her as an attorney and the amount is due and payable. If further declare that the above claim is not a duplication of charges and expenses in any case (companion or otherwise).

_____
Signature of Attorney

Attorney Code  HOL070

Sworn to and subscribed before me this 27th
day of March , 20__
CLEO A. LARKIN
Notary Public - AL State at Large
My Comm. Expires Oct. 10, 2007
_____
Notary Public

Mailing Address of Attorney
*(Please type or print)(including city, state, and zip code)*
HOLLINGSWORTH & HOLLINGSWORTH
POST OFFICE BOX 311662
ENTERPRISE, ALABAMA 36331
Telephone Number  334-347-3249 · Fax Number  SAME

I, the undersigned judge, hereby certify that the foregoing has been presented to me, and I have reviewed the same and believe the same to be true and correct. I am further of the opinion that said attorney is not duplicating said charges and expenses in any case (companion or otherwise).

Based on the above, I hereby approve the declaration and claim in the amount of $ 3,251 25

Done this 3rd day of March 20__
_____
Judge's Signature

NOTICE TO ATTORNEY AND JUDGE: Sections 15-12-21 through 15-12-23, Code of Alabama 1975, provide that fees and expenses of court appointed attorneys shall be paid by the State of Alabama.

THIS FORM MUST CONTAIN ORIGINAL SIGNATURES OF THE ATTORNEY AND THE JUDGE. THIS FORM WITH ATTACHED ITEMIZATION MUST BE SUBMITTED TO THE TRIAL COURT JUDGE OR PRESIDING JUDGE OF CHIEF JUSTICE OF THE APPELLATE COURT FOR APPROVAL. AFTER APPROVAL, FILE WITH THE CLERK, WHO SHALL SUBMIT THE ORIGINAL DECLARATION TO THE STATE COMPTROLLER FOR AUDIT.
Mail to: State Comptroller, Indigent Defense Section, P.O. Box 302602, Montgomery, Alabama 36130-2602.
Filed in the Clerk's Office at _____ Alabama, on _____
                                                        date

194

CASE NUMBER:    CC 2001-179.60
                CC 2001-180.60

## IN COURT

| | | |
|---|---|---|
| 09/28/05 | Hearing | 1.00 |
| 12/02/05 | Hearing | 4.75 |
| | **Total In Court:** | **5.75** |

## OUT OF COURT

| | | |
|---|---|---|
| 07/15/05 | Received and Reviewed Paperwork | .50 |
| 07/18/05 | Conference with Appellant Counsel | .50 |
| 07/19/05 | Received and Reviewed Transcript | 1.00 |
| 07/20/05 | Reviewed Transcript | 1.00 |
| 07/21/05 | Reviewed Transcript | 1.00 |
| 07/22/05 | Reviewed Transcript | 1.00 |
| 07/25/05 | Reviewed Transcript | 1.00 |
| 07/27/05 | Received and Reviewed Order | .25 |
| 07/27/05 | Reviewed Transcript | 1.00 |
| 07/28/05 | Reviewed Transcript | 1.00 |
| 08/01/05 | Received and Reviewed Letter from client | .50 |
| 08/01/05 | Letter to client | .25 |
| 08/03/05 | Received and Reviewed Order | .25 |
| 08/03/05 | Reviewed Transcript | 1.00 |
| 08/09/05 | Reviewed Transcript | 2.00 |
| 08/12/05 | Reviewed Transcript | 2.00 |
| 08/15/05 | Reviewed Transcript | 1.00 |
| 08/19/05 | Reviewed Transcript | 2.00 |
| 08/22/05 | Received and Reviewed Letter | .25 |
| 08/22/05 | Reviewed Transcript | 1.00 |
| 08/24/05 | Reviewed Transcript | 1.00 |
| 09/05/05 | Reviewed Transcript | 1.00 |
| 09/06/05 | Reviewed Transcript | 1.00 |
| 09/08/05 | Reviewed Transcript | 1.00 |
| 09/14/05 | Reviewed Transcript | 1.00 |
| 09/19/05 | Reviewed Transcript | 1.50 |
| 09/20/05 | Reviewed Transcript | 1.00 |
| 09/21/05 | Reviewed Transcript | 1.00 |
| 09/27/05 | Reviewed Transcript | 1.00 |
| 09/28/05 | Conference with District Attorney | .50 |
| 09/30/05 | Received and Reviewed Order | .50 |
| 10/10/05 | Reviewed Transcript | 2.00 |
| 10/13/05 | Reviewed Transcript | 1.00 |

| Date | Description | Hours |
|------|-------------|-------|
| 10/14/05 | Received and Reviewed Letter | .50 |
| 10/14/05 | Letter to Client | .75 |
| 10/14/05 | Reviewed Transcript | 1.00 |
| 10/18/05 | Reviewed Transcript | 1.00 |
| 10/21/05 | Reviewed Transcript | 2.00 |
| 10/21/05 | Received and Reviewed Letter | .75 |
| 10/21/05 | Received and Reviewed Motions | 1.00 |
| 10/24/05 | Reviewed Transcript | 1.00 |
| 11/08/05 | Received and Reviewed Motion | .75 |
| 11/14/05 | Received and Reviewed Order | .50 |
| 03/21/06 | Teleconference with Client's Mother | .50 |
| 03/24/06 | Received and Reviewed Order | .75 |

Total In Court:     **42.50**

/cal

***NOTE:     Transcript and Exhibits consisted of more than 3,300 pages.

**IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ENTERPRISE DIVISION**

STATE OF ALABAMA,                              *

    PLAINTIFF,                              *

                       *

VS.                                            *     CASE NO: CC-2001-179 & 180.60

                       *

ROBERT THOMAS CONRAD,                          *

    DEFENDANT.                              *

## ORDER

This matter comes before this court by, Robert Thomas Conrad's Petition for Relief from Conclusion or Sentence pursuant to Rule 32, <u>Alabama Rules of Criminal Procedure</u>, and two amendments, and the responses of the State.

The court appointed Attorney Rick Hollingsworth, Sr. to represent the Petitioner. A hearing was held on the 2<sup>nd</sup> day of December 2006. The Petitioner was present and represented by Attorney Rick Hollingsworth, Sr. The State was represented by Assistant District Attorney Tom Anderson.

## HISTORY

The Petitioner was indicted by a Coffee County Grand Jury for the Capital offense of Intentional Murder of Jelaine Bowman Dennis during a Robbery in the First Degree and of the offense of Robbery First Degree by the use of force or threat of imminent use of force against Robert Ray Grimes.

A trial was held, the Petitioner was represented at trial by attorneys Al Smith and Gary Bradshaw. A properly struck and duly sworn jury of twelve returned the unanimous verdict of guilty to both offenses. (See Sentencing Order and record).

The Petitioner was sentenced to life without parole on the Capital Murder conviction and life on the Robbery First conviction.

1

An appeal was taken to the Alabama Court of Criminal Appeals and the convictions were affirmed. A Petition for Writ of Certori was filed with the Alabama Supreme Court and the Petition was denied.

Attorney Al Smith was allowed to withdraw as appellate counsel and Attorneys Gary Bradshaw and Richard Waldrop served as counsel on appeal.

This is the Petitioner's first Petition pursuant to Rule 32 Alabama Rules of Criminal Procedure. The Petition has raised several grounds in his Petitioner and amendments.

The first ground listed was ineffective assistance at trial and appellate counsel. The Petitioner has raised several matters regarding the ineffective assistance of counsel.

## ISSUE ONE

**That counsel was ineffective by failing to object to the oath not being administered to the venire prior to voire dire examinations.**

Circuit Judge Robert W. Barr presided over the term of court in which the Petitioner was tried. As Presiding Judge over the term, Judge Barr administered the general qualifying. When the Petitioner's cases were called the trial Judge, Gary L. McAliley stated "Ladies and Gentlemen all of you are still under oath, and I am going to ask you some questions. And then, I will certainly allow the attorneys to do like wise". (see the record). Furthermore, the sentencing orders indicate that the jury was properly, qualified, duly sworn and properly struck.

Based upon the pleadings, evidence presented, and arguments the court finds that the Petitioner's allegations are not supported by fact or law. The matters raised in Issue One are without merit and the requested relief in denied.

## ISSUE TWO

**The Petitioner alleges that trial counsel was ineffective in failing to object to the Petitioner's sentence to the conviction of Robbery 1st Degree due to the indictment only setting forth the material elements of Robbery 3rd Degree.**

2

Based upon the pleadings, evidence presented and arguments the court finds the allegations involving matters raised in Issue Two are without merit and are not supported by facts or law. The indictment clearly alleges that the Petitioner was armed with a deadly weapon or dangerous instrument, to wit; Pistol.

Furthermore, the Petitioner's testimony at the hearing reveals he contends that no violence was used and the victim was not caused serious physical injury.

The court finds that based upon the pleadings and evidence presented that the Petitioner's allegations regarding this matter is without merit and is not supported by the facts or law. Upon a review of the indictment the court finds that the indictment contained the necessary statutory language.

## ISSUE THREE

**That counsel was ineffective for failing to file a Motion to Dismiss the Indictment because the Foreperson failed to endorse upon the indictment whether a prosecutor appeared before the Grand Jury as requested by Section 12-16-205, Code of Alabama.**

The court that based upon the evidence presented and a review of the record finds that the indictment was clearly signed by Mark A. Fuller, District Attorney for the 12th Judicial Court. The Grand Jury Foreperson's signature was also affixed to the indictment.

Based upon the pleadings and evidence presented the allegations of the Petitioner regarding this matter is without merit and is not suggested by facts or law. The relief sought is denied.

## ISSUE FOUR

**That trial counsel was ineffective for failure to make a timely objection where Clerk did not give the oath to the Petit Jury, Section 12-16-170, Code of Alabama.**

Based upon the evidence presented the Trial Judge administered the proper oath to the Petit Jury. The record reflects the oath was administered.

3

The Petitioner testified that the Trial Judge administered the oath. The Sentencing Order indicates the jury was properly sworn. Rule 18.5 <u>Alabama Rules of Criminal Procedure</u> states that the court shall either remind the jurors they are still under oath or give them the oath. The Judge is clearly allowed to administer the oath.

Based upon the pleadings and evidence the court finds that the Petitioner's allegations regarding this matter raised in this issue is without merit and it is not supported by facts or law. The relief sought is denied.

## ISSUE FIVE

The Petitioner avers that the trial counsel was ineffective for failing to know the applicable point of law to file a Motion to Dismiss the Indictment, pursuant to Rule 15.3, <u>Alabama Rules of Criminal Procedure</u> on the grounds that: His indictment is void as it fails to allege the essential elements of the Capital Murder statute in its entirety as required by Section 12A-5-40 subsection 2,10,16,17 and 18; and 13A-5-50, <u>Code of Alabama.</u>

The Petitioner alleges trial counsel was ineffective for failing to file a Motion to Dismiss the indictment at the pre-stage before proceeding to trial. At the hearing the Petitioner appears to allege that the indictment was devoid of a material element of capital murder, in that it did not include aggravating circumstances. The court finds that the indictment clearly stated that the death of Ms. Dennis was during a robbery in the first degree.

At the hearing the Petitioner could not tell the court what element was missing from the indictment.

Based upon the pleadings and evidence presented the court finds that the Petitioner was not deprived of the right to counsel by counsels failure to render adequate legal assistance. Any decision to file a Motion to Dismiss would be a trial strategy. The allegations of the Petitioner are without merit and are not supported by facts or law. The relief sought is denied.

4

### ISSUE SIX

The Petitioner alleges that the indictment is void because it violates the constitutional doctrine of "Separation of Powers".

The Petitioner alleges that Section 13A-15-40, Code of Alabama (Capital Murder Statute) is unconstitutional and void because the Alabama Law Institute was involved in drafting the legislature. The Petitioner argues there is a violation of the Separation of Powers.

Based upon the evidence presented the court finds that the Petitioner's allegations are without merit and are not supported by laws or fact. Furthermore, the Petitioner has not served a copy of the pleadings on the Attorney General of the State of Alabama wherein be challenges the constitutionality of the statute.

The issue could have been raised at trial or on appeal. The relief sought is denied.

### ISSUE SEVEN

The Petitioner alleges that he was denied effective assistance of trial counsel, as trial counsel failed to file a Motion to Dismiss the second count of the indictment for Robbery 1st Degree as double jeopardy would prevent a conviction.

The Petitioner contends that since Robbery 1st Degree was an element or basis for his capital conviction, that it would be double jeopardy if he was also convicted of Robbery 1st Degree.

Based upon the record and evidence presented the court finds that the basis of the Capital Murder conviction was the alleged Robbery of Jelanie Dennis. The Robbery 1st Degree conviction involved a separate victim, namely Robert Ray Grimes.

The court finds that the facts do not support the allegations that double jeopardy applies. There were two separate sets of facts and the law is clear that the Petitioner could be tried for both offenses.



COURT OF CRIMINAL APPEALS NO. 05-1913

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM   ENTERPRISE DIVISION

CIRCUIT COURT OF ___COFFEE___ COUNTY, ALABAMA

CIRCUIT COURT NO. __CC-2001-179.60 & CC-2001-180.60__

CIRCUIT JUDGE __JEFF W. KELLEY__

**FILED**

**AUG - 3 2006**

CLERK
ALA COURT CRIMINAL APPEALS

Type of Conviction/Order Appealed From: __DENIAL OF RULE 32__

Sentence Imposed: __N/A__

Defendant Indigent:   [X] YES   [ ] NO

__ROBERT T CONRAD   AIS # 226791__

**NAME OF APPELLANT**

(Appellant's Attorney)
__3700 HOLMAN UNIT (5-156)__   (Telephone No.)
(Address)
__ATMORE, ALABAMA 36503__
(City)            (State)            (Zip Code)

V.

__STATE OF ALABAMA__

**NAME OF APPELLEE**

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

(For Court of Criminal Appeals Use Only)

The court finds that the Petitioner's allegations are without merit and are not supported by facts or law. The Petitioner was not denied effective assistance of counsel.

## OFFENSE EIGHT

The Constitution of the U.S. and Alabama requires a new trial when trial counsel renders ineffective assistance in violation of the 6th and 14th amendment for his failure to object to Petitioner's Indictment being void in that it was returned pursuant to the authority of the Alabama Constitution of 1901, which was established to promote white supremacy and to disenfranchise African-Americans.

At the hearing the Petitioner presented no evidence to support this allegation. The Petitioner stated "I have no comment on that one".

The court finds that the Petitioner allegations are without merit as it is not supported by any facts or law.

The relief sought by the Petitioner is denied.

## OFFENSE NINE

That the Petitioner was denied effective assistance of counsel, due to trial counsel's failure to properly object, to trial court's erroneous instructions to the jury on corroborated testimony of co-defendant.

The court finds that the courts instruction to the jury was not an erroneous instruction. The instruction was in compliance with Section 12-21-222, Code of Alabama, 1975. The record further reveals that the testimony of the accomplice was corroborated by other evidence. The Petitioner was not prejudiced by the jury instructions. Trial counsel was not ineffective by failing to object to the jury instructions.

The Petitioner's allegations are not supported by evidence of law and are without merit. The relief sought is denied.

6

## ISSUES RAISED IN THE 1<sup>ST</sup> AMENDMENT
## FILED APRIL 18, 2005
### ISSUE TEN

Petitioner was denied his 6<sup>th</sup> and 14<sup>th</sup> amendment right to effective assistance of counsel when counsel failed to move for a continuance or mistrial based upon the prosecution's failure to turn over exculpatory and impeachment evidence to the defense.

During the trial defense counsel discovered that the prosecution, had withheld a report regarding an internal investigation by the Police Department, which involved a witness with information favorable to the Petitioner. The trial Judge held a hearing out of the presence of the jury. The trial Judge ordered the District Attorney to fly the witness from Arizona to Alabama for the trial. Trial counsel met with the witness. The court appears to have made reasonable efforts to allow the defense an opportunity to talk to the witness. The witness testified at trial.

The court finds that the Petitioner was not prejudiced. The witness was disclosed and the witness was allowed to testify. The court finds that the Petitioner was not deprived of the right of counsel based upon the trial strategy of counsel. This issue could have been raised on appeal.

### ISSUE ELEVEN

Petitioner was denied his 6<sup>th</sup> and 14<sup>th</sup> amendment rights to effective assistance of counsel when counsel failed to object and seek recusal of the trial Judge on the grounds that the Judge was bias and impartial prior to and during the trial and at sentencing.

The Petitioner alleges that the Judge questioned witnesses and made comments that demonstrated the appearance of impartiality. The Petitioner has stated that at one point counsel did object.

At the hearing the Petitioner stated that comments by the trial Judge seemed to indicate a friendship between the Judge and attorneys.

The court finds that the Petitioner has failed to provide sufficient evidence to support this allegation. The Petitioner has failed to show any prejudice. Trial counsel's strategy cannot be said to be deficient so as to amount to ineffective assistance of counsel. The allegations are not supported by facts or law. The relief sought is denied.

## ISSUE TWELVE

### That trial counsel was ineffective due to a conflict of interest.

The Petitioner has made broad allegations that defense counsel, Gary Bradshaw had a conflict of interest.

The Petitioner has made broad allegations that defense counsel, Gary Bradshaw had a conflict as he attended the same church as the victim Jelanie Dennis and that the victim's three children were members of the Sunday School class in which counsel was a youth director and teacher.

Attorney Gary Bradshaw filed a Motion to Withdraw as counsel which was not granted by the court. In an Affidavit submitted by Gary Bradshaw he stated none of the children ever attended Sunday School and he would not recognize them if they appeared in court.

The court finds that the Petitioner was aware of counsels association as a Sunday School teacher and church member and he did not raise that issue at trial. Furthermore, this issue could have been raised at trial or on appeal as Al Smith was additional trial counsel and Richard Waldrop was appointed as additional appellate counsel.

The allegations that Attorney Gary Bradshaw had a conflict of interest which amounted to ineffective assistance of counsel are not supported by the record or evidence. The relief sought is denied.

## ISSUE THIRTEEN

### That counsel was ineffective when they failed to object to the admission of the bullet taken from the Petitioner's body on the ground that it was the product of an illegal search and seizure.

204

The District Attorney received the bullet pursuant to a District Attorney subpoena. The evidence supports that counsel filed a Motion to Suppress. The court held that the bullet would have been available and obtained anyway so the Motion to Suppress was denied. Counsel had a standing objection regarding the introduction of the bullet into evidence. The issue was raised at trial and appeal. Trial counsel was not deficient so as to the amount to ineffective assistant of counsel. The Petitioners allegations are not supported by the evidence. The relief sought is denied.

## ISSUE FOURTEEN

That the Petitioner was denied his 6th and 14th amendment rights to effective assistance of counsel when counsel failed to advise the Petitioner of his right to take the stand and testify.

At the hearing Attorney Al Smith testified that the Petitioner did not testify on his recommendation. Counsel was concerned that if the Petitioner testified it would do more damage than good. Counsel testified that this matter was discussed several times. Counsel testified he advised the Petitioner of his right to testify and the Petitioner made the decision not to testify.

Based upon the evidence presented the court finds that the Petitioner made the decision not to testify. The Petitioner's allegations are not supported by the evidence. The court finds that the Petitioner was not denied effective assistance of counsel. The relief sought is denied.

## ISSUE FIFTEEN

That the Petitioner was denied his 6th and 14th amendment right to effective assistance of counsel, when the trial court forced counsel to become a witness in the case breaking an actual conflict.

Based the evidence presented the court finds that Attorney Al Smith was required by the trial Judge to testify regarding the witness that was not disclosed by the District Attorney. Attorney Smith testified outside the presence of the jury and was not required to disclose any confidential client information.

9

The court finds that the Petitioners allegations are without merit and are not supported by the facts. The relief sought is denied.

## ISSUE SIXTEEN

That newly discovered evidence exist requiring a new trial as other relief based on the false and misleading evidence presented at trial by employees of the Alabama Department of Forensic Sciences.

The Petitioner is alleging that the Alabama Department of Forensic Sciences was not accredited at the time of trial. The court finds that there is no requirement that the Department of Forensic Sciences be accredited by any organization.

This matter could have been raised at trial or on appeal.

Based upon the pleadings and evidence the court finds that the Petitioners allegations are without merit and is not supported by facts or law. The relief sought is denied.

## ISSUE RAISED IN SECOND AMENDED PETITION

That the Petitioner was denied effective assistance of trial counsel for failing to file a Motion to Dismiss the indictment, pursuant to Rule 15.3, Alabama Rules of Criminal Procedure on the grounds that the Petitioner's indictment is void because it violates constitutional directive of separation of powers.

The court adopts the response of issue six above. Furthermore based upon the findings of the court the Petitioner was not deprived of effective assistance of counsel.

Upon consideration of all of the issues raised, the pleadings and evidence presented, the court specifically finds that the Petitioner was not deprived of effective assistance of counsel at trial or appellate counsel. Based upon the findings of the court, all relief sought by the Petitioner is denied.

10

206

Done this the 17th day of March, 2006.



JEFF W. KELLEY
CIRCUIT JUDGE

X: CA
+ Hollingsworth

11

## IN THE CIRCUIT COURT FOR COFFEE COUNTY, ALABAMA
### ADMINISTRATIVE ORDER

In Ex parte May, the Court of Criminal Appeals held that the office overhead of a lawyer appointed to defend an indigent in a criminal case should be allowed as extraordinary expense upon the filing of an appropriate motion. In the light of the many criminal cases and juvenile cases pending in the Twelfth Judicial Circuit, I find that the filing of individual motions and the signing of corresponding orders will involve an excessive administrative burden on court personnel as well as increasing the cost of indigent defense. I have, with the co-operation of the practicing criminal defense bar in this circuit, determined that $25.00 per hour represents a presumptively reasonable charge for office overhead based on actual cost figures submitted to me and based on presumptive amounts allowed in other circuits in this part of Alabama. I have, therefore, entered the following order, applicable in the circuit and district courts of Coffee County, Alabama, in all cases where the court appoints indigent defense counsel.

1. Effective with the time accrued on or after September 1, 2000, without the need for the filing of an individual motion, court appointed counsel in indigent criminal and juvenile cases at the trial and appeal de novo levels are authorized to charge $25.00 per hour, whether in or out of court, as the cost of office overhead.

2. The presumptive office overhead amount for time accrued on or before September 1, 2000, and the requirement of filing motions in individual cases shall remain unchanged and all office overhead accrued before the effective date of this Order shall be calculated and submitted for approval as was done prior to the issuance of this Order.

3. The statutory cap on compensation for indigent counsel does not apply to the amount set in the preceding paragraphs.

4. If appointed counsel seeks to claim an office overhead expense in excess of the amount authorized in this Order, counsel will submit a motion and affidavit tot he judge to whom the case is assigned. The affidavit will be detailed and it will set out a category by category itemization of overhead expenses claimed, reduced to an hourly amount by dividing the monthly expenses by 175.

5. The Circuit Clerk will prepare an appropriate number of copies of this Order for the use of appointed counsel. In filing fee declarations, appointed counsel will attach copies of this Order to their submission. A photostatic copy shall be treated for all purposes the same as the original Order.

Done and Ordered this the ___15___ day of August, 2000.

Robert W. Barr, Presiding Judge
Twelfth Judicial Circuit

**AFFIDAVIT**

I, Rick Hollingsworth, Sr. submit this Affidavit in support of the Attorney Fee Declaration submitted in Case No: CC-2001-179.60 and CC-2001-180.60, In the Circuit Court of Coffee County, Enterprise Division. The cases include a Capital Murder conviction and Robbery 1st Degree conviction wherein the Defendant was sentenced to life without parole.

I hereby submit good cause exists for the court to approve the attorney fees due to the following:

1.    The Defendant raised approximately eighteen (18) grounds for review in his Rule 32 Petition.

2.    I was not trial or appellant counsel and was required to spend extensive time reviewing the Petition and volumes of transcript. The transcript and exhibits exceeded 3,300 pages.

3.    A lengthy hearing was required by the court.

I hereby swear the above is true and correct.

_3/30/06_
Date

_Rick Hollingsworth, Sr_

STATE OF ALABAMA    }
COUNTY OF COFFEE    }

Sworn to and subscribed before me this _30th_ day of _March_, 2006.

_Notary Public_
My Commission Expires: _2/22/07_

THE CIRCUIT COURT OF COF——
COUNTY, ALABAMA

                    *

Robert Thomas Conrad
        Petitioner,
                              *

Vs.                                    Case No. CC-01-179-M
                                                CC-01-180-M
                              *

State of Alabama
        Respondent.
                              *



MOTION TO ALTER, AMEND OR VACATE JUDGEMENT

        Comes now the Petitioner Robert Thomas Conrad, pro se,
in the above styled cause, and respectfully moves this court
to Alter, Amend or Vacate it's Judgement of March 17, 2006 and
it's grounds therefore says as follows:

        1. That the hearing conducted in this matter was not full
and fair in violation of Petitioner's Due Process rights, in
that this court fail to order discovery of documents and evidence
material to the Petitioner meeting his burden of proof as
required by Rule 32.3 Ala. R. Crim. P. Petitioner submits that
he filed with his Rule 32. Petition a motion for Discovery,
requesting that an order be issued to produce:

        (a). The minutes of the convention of the adoption of
the Alabama constitution to support the claim that the Alabama
Constitution of 1901 is invalid;
        (b). to produce for inspection acopy of the Internal
Investigation report by the Enterprise Police Department to
support the claim that the prosecution withheld Exculpatory
and Favorable Evidence;
        (c). To produce for inspection a copy of the Pre-Trial
statements of Judge McAliley regarding violent offenders convicted
in his courtroom. This will support Petitioner's claim that
the Judge McAliley was biased towards him, and deprived
Petitioner of a fair trial;
        (e). Issue a subpoena to the Alabama Department of
Forensic Sciences to produce for inspection, copying and to
present as evidence, it's most recent Audit Report of the labora-
tory that tested and analyzed the evidence in this case, and
to produce the Certificate of Accreditation it received from
the American Society of Crime Laboratories Directors. This will
support Petitioner's claim that the Forensic Evidence at his
trial was inadmissable under the Daubert test.

210

(f). to procure a copy of the transcript court records, reflecting that the oath was administered as required by Art. 12-16-170 Alabama Code 1975. The record is silent on this matter, and the exhibits submitted by the District Attorney refers to a previous oath, rather than the actual swearing of the Venire and petit jury as required by law.

(g). A copy of the original Indictments returned by the Grand Jury as required by law.

(h). Subpoena issued to the Alabama Law Institute requiring the custodian of records to produce for inspection, the draft of the current Death Penalty Statute, and the names and position of those who participated in the draft of the statute. This will support Petitioner's claim that the statute upon which he was convicted is unconstitutional in violation of the Separation of Power doctrine.

Petitioner avers that he met the good cause standard for Discovery. See Ex Parte Land, 575 So. 2d 840 (Ala.1998), and was entitled to the evidence to prove his claim.

Accordingly, this Court should vacate its order, conduct a new evidentiary hearing with adequate discovery, so as to provide the petitioner the opportunity to present evidence proving his entitlement to relief.

2. That this Court's findings in its order of March 17, 2006, was erroneous and in direct conflict with prior precedent of the United States Supreme Court; The Alabama Supreme Court and the Alabama Court of Criminal Appeals, on the same or similar points of law.

3. This Court erred in finding that petitioner was not denied his sixth and fourteenth amendment rights to effective assistance of both trial and direct appeal counsel, where the facts and evidence presented demonstrated that counsels deficient performance prejudiced petitioner, and deprived the petitioner of a fair trial and/or appellate review of his conviction and sentence. See Strickland v. Washington, 466 U.S. 668 (1984)

4. Petitioner submits that this Court erred in denying relief on the claims raised in the petition, as petitioner met his

burden of proof by demonstrating his entitlement to relief by a preponderance of the evidence.

5. The Finding by this Court was against the weight of authority and evidence presented, and contrary to the record in this case.

6. That this Court failed to make specific findings of fact as to each issue of fact presented in the petition and at the hearing.

Wherefore, premises considered, petitioner prays that this Honorable Court Alter, Amend or Vacate it March 17, 2006 Judgement denying petitioner's Rule 32 Petition, and issue a New Order granting the Petition and/or conduct further proceedings in this matter correcting the errors complained of herein.

Respectfully Submitted,

ROBERT THOMAS CONRAD
AIS# 226791
Holman Unit 3700
Atmore, Al. 36503-3700

## CERTIFICATE OF SERVICE

I hereby certify that I have this 31 day of March 2006, served a copy of the foregoing on the District Attorney, by placing a copy of the same in the Prison Internal Mailing system, first class postage prepaid and properly addressed.

ROBERT THOMAS CONRAD

## IN THE CIRCUIT COURT OF
## COFFEE COUNTY, ALABAMA
## ENTERPRISE DIVISION

ROBERT THOMAS CONRAD,     *

      PETITIONER,     *

                       *

VS.                *     CASE NO: CC-2001-179 & 180.60

                       *

STATE OF ALABAMA,     *

      RESPONDENT.     *

### ORDER

The Defendant's Motion to Alter, Amend or Vacate Judgment is **denied.**

Done this the **28**th day of **April, 2006.**



JEFF W. KELLEY
CIRCUIT JUDGE

APR 2006
FILED
J.M. Counts
Court Clerk
Coffee Co. AL



214

```
                ALABAMA JUDICIAL INFORMATION SYSTEM      CASE: CC 2001 000179,60
                         CASE ACTION SUMMARY
                         CIRCUIT  CRIMINAL                RUN DATE: 03/14/2007
    .E CIRCUIT COURT OF COFFEE                                      JUDGE: JWH

.TE  OF  ALABAMA                    VS     CONRAD ROBERT THOMAS
                                           3700 HOLMAN UNIT
CASE: CC 2001 000179,60                    (5-106)
                                           ATMORE, AL  36503 0000

DOB: 09/30/1980        SEX: M  RACE: D  HT: 6 00  WT: 155   HR: BLK EYES: BRO
SSN: 419175095  ALIAS NAMES:

CHARGE01: RULE 32-FELONY       CODE01: RULE  LIT: RULE 32-FELONY TYP: F #: 001
CHARGE02: MURDER CAPITAL       CODE02: CMUR                     TYP: F #: 001
OFFENSE DATE:                          AGENCY/OFFICER:

DATE WAR/CAP ISS:                       DATE ARRESTED:
DATE    INDICTED:                       DATE   FILED: 01/18/2005
DATE   RELEASED:                        DATE HEARING:
BOND    AMOUNT:          $.00           SURETIES:

DATE 1:          DESC:                  TIME: 0000
DATE 2:          DESC:                  TIME: 0000

TRACKING NOS: GJ 2001 000137 00  /  DC 2001 000505 00  /

   DEF/ATY                                                          TYPE:

                         00000                              00000

PROSECUTOR: MCALILEY GARY L

OTH CSE: GJ200100013700 CHK/TICKET NO:               GRAND JURY:
COURT REPORTER:              SID NO:    000226791
DEF STATUS: PRISON           DEMAND:                          OPER: DEC

DATE        ACTIONS, JUDGEMENTS, AND NOTES
```

| DATE | ACTIONS, JUDGEMENTS, AND NOTES |
|------|-------------------------------|
| 1-18-05 | In Forma Pauperis Declaration |
| 1-18-05 | Petition For Relief From Conviction a Sentence |
| 1-14-05 | Motion For Pre-Action Discovery |
| 1-18-05 | Motion For An Evidentiary Submission |
| 2-9-05 | State's Response to Petitioner's Motion For Pre-Action Discovery |
| 2-16-05 | Petitioner's Response to State's Response to Petitioner's Motion For Pre-Action Discovery |
| 3-1-05 | Motion For Disclosure An In camera Inspection of Grand Jury Testimony |
| 3-3-05 | Motion For Appointment of Counsel |
| 4-6-05 | Order. The Court finds that the D has failed to show "Good Cause" to allow such pre-action discovery. CC/DHD |
| 4-6-05 | Order. Application For Leave to Proceed In Forma Pauperis is granted. Deft to file response to all motion pleadings w/ 30 days. CC/DHD |
| 7-1-05 | State's Response to Petitioner's Motion for Disclosure and In camera Inspection of Grand Jury Testimony |
| 9-1-05 | State's Answer/Response to Rule 32 Petition For Relief In Conviction a Sentence |

215

CR0369  A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2001 000171
JUDGE ID: JWR

STATE  OF  ALABAMA                VS      CONRAD ROBERT THOMAS

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 4-20-05 | Motion to Strike State Pleading |
| 5-16-05 | Motion for Appointment of Counsel |
| 7-1-05 | Order- Motion to strike pleadings is denied. CC: DA + D |
| 7-1-05 | Order- Hollingsworth appointed. Hearing set for December 2, 2005, @ 9:00 a.m. Bradshaw + Waldrop advised to appear @ hearings. CC: DA, D, Hollingsworth, Bradshaw + Waldrop |
| 7-18-05 | Motion to Amend Petition for Post conviction Relief Pursuant to Rule 32 Alabama Rules Criminal Procedure |
| 7-26-05 | Order- Ds Motion to Amend Petition for Post Conviction Relief is granted. State shall respond to the Amended petition w/i 45 days. cc: DA, D + Attys |
| 7-20-05 | Motion for Postconviction Discovery |
| 8-2-05 | Order- Motion for Discovery set for H. on September 29, 2005, @ 9:00 a.m. CC: DA, D + Attys |
| 8-2-05 | Subpoena Request Form |
| 6-30-05 | States Answer & Response to Petitioners Amended Rule 32 Petition for Relief from Conviction or Sentence |
| 7-29-05 | Notice of Intent to Serve Subpoena on Non-Party |
| 8-2-05 | Civil Subpoena for Production of Documents, Inclu Rule 34(b)(2) |
| 8-19-05 | Amendment of Rule 32 Petition |
| 8-25-05 | States Response to Petitioners Second Amended Rule 32 Petition |
| 9-30-05 | Order- Based upon the petitioners request for discovery, the D has failed to show "good cause". cc: DA, D + Atts |
| 11-14-05 | Motion to Transfer Prisoner |
| 11-14-05 | Order to Transport D. cc: DA, Sheriff, Zach, Davis + Hollingsworth |
| 3-21-06 | Order- Rule 32 petition is denied. cc: DA + Atts |
| 3-28-06 | Attorney Fee Declaration |
| 3-30-06 | Order- Attorney Fee Declaration is approved. |
| 4-7-06 | Motion to Alter, Amend or Vacate Judgement |
| 4-25-06 | Order- Motion to Alter, Amend or Vacate Judgment is denied. cc: DA + D |
| 7-18-06 | Counsels Motion to Withdraw |
| 8-21-06 | Order- Motion to Withdraw By Hollingsworth is granted |

214

In the Circuit Court of Coffee
County, Alabama



Robert T. Conrad
Petitioner, Pro Se,

Vs.

Case No. CC-01-179.60
CC-01-180.60

State of Alabama,
Respondent.

## NOTICE OF APPEAL

Comes now the Petitioner, Robert Thomas Conrad, Pro Se,
in the above cause and hereby gives Notice of Appeal to the
Alabama Court of Criminal Appeals from the final Judgement
entered in the above cause on March 17, 2006.

Respectfully Submitted,
Robert Thomas Conrad
A.I.S.# 226791
Holman Unit 3700
Atmore Al. 36503

## CERTIFICATE OF SERVICE

I hereby certify that I have on this  17  day of April,
2006, placing a copy of the foregoing on all parties by placing
same in the institutional mail box, postage prepaid and properly
addressed, to: Court of Criminal Appeals, 300 Dexter Ave, P.O. Box 301 555
Montgomery, AL 36130-1555; James M. Counts, Circuit Clerk, P.O. Box 311284
Enterprise AL 36331-1284

Robert T. Conrad

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 26 (front)   8/91 | COURT OF CRIMINAL APPEALS<br>DOCKETING STATEMENT | Criminal Appeal Number |
|---|---|---|

**A. GENERAL INFORMATION:**

☒ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF _____ Coffee _____ COUNTY

_____ Robert Thomas Conrad _____, Appellant

V.  ☒ STATE OF ALABAMA  ☐ MUNICIPALITY OF _____

| Case Number CC-01-179<br>CC-01-180 | Date of Complaint or Indictment | Date of Judgment/Sentence/Order<br>March 17, 2006 |
|---|---|---|
| Number of Days of Trial/Hearing<br>01 Days | Date of Notice of Appeal<br>Oral: | Written: April 17, 2006 |

Indigent Status Requested:  ☒ Yes  ☐ No          Indigent Status Granted:  ☒ Yes  ☐ No

**B. REPRESENTATION:**

Is Attorney Appointed or Retained?  ☐ Appointed  ☐ Retained.     If no attorney, will appellant represent self?  ☒ Yes  ☐ No

| Appellant's Attorney (Appellant if pro se) (Attach additional pages if necessary)<br>Robert Thomas Conrad | Telephone Number |
|---|---|
| Address<br>Holman Unit 3700 | City<br>Atmore | State<br>Al. | Zip Code<br>36503. |

**C. CODEFENDANTS:** List each CODEFENDANT and the codefendant's case number.

| Codefendant | Case Number |
|---|---|
| Codefendant | Case Number |
| Codefendant N/A | Case Number N/A |

**D. TYPE OF APPEAL:** Please check the applicable block.

1 ☐ State Conviction
2 ☒ Post-Conviction Remedy
3 ☐ Probation Revocation
4 ☐ Pretrial Order
5 ☐ Contempt Adjudication
6 ☐ Municipal Conviction
7 ☐ Juvenile Transfer Order
8 ☐ Juvenile Delinquency
9 ☐ Habeas Corpus Petition
10 ☐ Other (Specify) _____

**E. UNDERLYING CONVICTION/CHARGE:** Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☒ Capital Offense - § 13A-5-40
2 ☐ Homicide - § _____
3 ☐ Assault - § _____
4 ☐ Kidnapping/Unlawful Imprisonment - § _____
5 ☐ Drug Possession - § _____
6 ☐ Trafficking in Drugs - § _____
7 ☒ Theft - § 13A-8-41
8 ☐ Damage or Intrusion to Property - § _____
9 ☐ Escape - § _____
10 ☐ Weapons/Firearms - § _____
11 ☐ Fraudulent Practices - § _____
12 ☐ Offense Against Family - § _____
13 ☐ Traffic - DUI - § _____
14 ☐ Traffic - Other - § _____
15 ☐ Miscellaneous (Specify): _____ - § _____

**F. DEATH PENALTY:**

Does this appeal involve a case where the death penalty has been imposed?  ☐ Yes  ☒ No

**G. TRANSCRIPT:**

1. Will the record on appeal have a reporter's transcript?  ☒ Yes  ☐ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed. _____ 4-17-06 _____ (Date)
   If the answer to question "1" is "No.":
   (a) Will a stipulation of facts be filed with the circuit clerk?  ☐ Yes  ☒ No
   (b) Will the parties stipulate that only questions of law are involved and will the trial court certify the questions?  ☐ Yes  ☒ No
   NOTE: If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive response is required for question 2(a) or 2(b).

218

| State of Alabama Unified Judicial System Form ARAP-1C    8/91 | REPORTER'S TRANSCRIPT ORDER -- CRIMINAL See Rules 10(c) and 11(b) of the Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number |
|---|---|---|

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☒ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF    **Coffee** _____ COUNTY

**Robert Thomas Conrad** _____, Appellant

V.  ☒ STATE OF ALABAMA    ☐ MUNICIPALITY OF _____

| Case Number CC-01-179 CC-01-180 | |
|---|---|
| Date of Notice of Appeal Oral:    Written: 4-17-06 | Date of Judgment/Sentence/Order **March 17, 2006** |
| | Indigent Status Granted: ☒ Yes  ☐ No |

PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:

I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, CODE OF ALABAMA 1975).

| Signature | Date | Print or Type Name |
|---|---|---|

PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED. Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R App.P.)):

CLERK PROCEEDINGS REQUESTED:

COURT REPORTER(S)

A. ☐ TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately    _____

B. ☐ ORGANIZATION OF THE JURY - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP)    _____

C. ☐ ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP)    _____

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
|---|---|---|
| D. Rule 32 Evidentiary Hearing and | 12-02-06 | Unknown |
| E. Exhibits submitted into evidence at Hearing | | |
| F. Arguments of Counsels at Hearing before Judge Jeff W. Kelley | 12-02-06 | Unknown |
| G. | | |

IMPORTANT NOTICE: The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT.

I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

| Signature *Robert T Conrad* | Date 04/17/06 | Print or Type Name Robert Thomas Conrad |
|---|---|---|

DISTRIBUTION: Original filed with Clerk of Trial Court

REV. 4/1/97

219

## NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
## BY THE TRIAL COURT CLERK

Robert T. Conrad                                    v.    [X]  STATE OF ALABAMA
_____                                [ ]  CITY OF _____
**APPELLANT'S NAME**                                                          **APPELLEE**
(as it appears on the indictment)

[X] CIRCUIT    [ ] DISTRICT    [ ] JUVENILE COURT OF Enterprise Div — Coffee COUNTY

CIRCUIT/DISTRICT/JUVENILE JUDGE:    Jeff W. Kelley

---

**DATE OF NOTICE OF APPEAL:**  April 19, 2006
(NOTE: If the appellant is incarcerated and files notice of appeal, this date should be the date on the certificate of service, or if there was no certificate of service, use the postmark date on the envelope.)

---

**INDIGENCY STATUS:**
   Granted Indigency Status at Trial Court:                   [X] Yes [ ] No
   Appointed Trial Counsel Permitted to Withdraw on Appeal:   [ ] Yes [X] No
   Indigent Status Revoked on Appeal:                         [ ] Yes [X] No

**DEATH PENALTY:**
   Does this appeal involve a case where the death penalty has been imposed?   [ ] Yes [X] No

**TYPE OF APPEAL: (Please check the appropriate block.)**

| | | |
|---|---|---|
| [ ] State Conviction | [ ] Pretrial Appeal by State | [ ] Juvenile Transfer Order |
| [X] Rule 32 Petition | [ ] Contempt Adjudication | [ ] Juvenile Delinquency |
| [ ] Probation Revocation | [ ] Municipal Conviction | [ ] Habeas Corpus Petition |
| [ ] Mandamus Petition | [ ] Writ of Certiorari | [ ] Other(specify) _____ |

---

**IF THIS APPEAL IS FROM AN ORDER DENYING A PETITION (I.E.,RULE 32 PETITION, WRIT OF HABEAS CORPUS, ETC.) OR FROM ANY OTHER ORDER ISSUED BY THE TRIAL JUDGE, COMPLETE THE FOLLOWING:**

**TRIAL COURT CASE NO.:**  CC-01-179.60 thru 180.60

**DATE ORDER WAS ENTERED:**  3-17-06              **PETITION:** [ ] Dismissed  [XX] Denied  [ ] Granted

---

**IF THIS IS AN APPEAL FROM A CONVICTION, COMPLETE THE FOLLOWING:**

**DATE OF CONVICTION:** _____    **DATE OF SENTENCE:** _____

**YOUTHFUL OFFENDER STATUS:**
   Requested:   [ ] Yes [ ] No    Granted:   [ ] Yes [ ] No

**LIST EACH CONVICTION BELOW:** *(attach additional page if necessary)*

1.   Trial Court Case No. _____    CONVICTION: _____
     Sentence: _____
2.   Trial Court Case No. _____    CONVICTION: _____
     Sentence: _____
3.   Trial Court Case No. _____    CONVICTION: _____
     Sentence: _____

---

**POST-JUDGMENT MOTIONS FILED:** (complete as appropriate)

| | Date Filed | Date Denied | Continued by Agreement To (Date) |
|---|---|---|---|
| [ ] Motion for New Trial . . . . . . . . . . . . . . . . . . . . . . . | | | |
| [ ] Motion for Judgment of Acquittal . . . . . . . . . . . . . . . | | | |
| [ ] Motion to Withdraw Guilty Plea . . . . . . . . . . . . . . . . | | | |
| [ ] Motion in Arrest of Judgment . . . . . . . . . . . . . . . . . | | | |
| [XX] Other  Motion To Vacate Judgment . . . . . . . . . . . . | 4-7-06 | 4-28-06 | |

---

**COURT REPORTER(S):** . . . . . . . . . Misty Whitworth
**ADDRESS:** . . . . . . . . . . . . . . . . . . . . . 991 Brookdale Ave.
      Elba, AL  36323
**APPELLATE COUNSEL:** . . . . . . . . Rick Hollingsworth
**ADDRESS:** . . . . . . . . . . . . . . . . . . . . . P. O. Box 311662
      Enterprise, AL  36331
**APPELLANT: (IF PRO SE)** . . . . . . AIS# 226791
**ADDRESS:** . . . . . . . . . . . . . . . . . . . . . Robert T. Conrad
      3700 Holman Unit
      Atmore, AL  36503
**APPELLEE (IF CITY APPEAL):** . .
**ADDRESS:** . . . . . . . . . . . . . . . . . . . . .

---

I certify that the information provided above is accurate
to the best of my knowledge and I have served a copy of this
Notice of Appeal on all parties to this action on
this  12th  day of  July  , 2006 .

*James M Counts* Jnda
**CIRCUIT COURT CLERK**

220

Robert Conrad
#226791 5/163
3700 Holman Unit
Atmore, Al. 36503

July 10, 2006

JAmes M. Counts, Clerk
P.O., box 311284
Enterprise, Al, 36331-1284

Re: Robert Conrad V. State
CC-01-179.60 and 180.60
Record on Appeal
Criminal Appeal No. CR-02-0533



Dear Mr. Counts,

        Would you please inform me of the status of the record
on the appeal.

        I filed a Notice of Appeal along with a Reporter's
Transcript Order on April 17     , 2006 and as if the above
date I have not received a copy of the record.

        As you know the record is germane to perfect my Appeal.
Therefore, would you please check this matter and inform me
of the status of the record in this case.


                Your immediate attention to this matter will
be appreciated.


                              Respectfully Submitted,

                              Robert Conrad
                              Robert Conrad
                              #226791 5/163
                              3700 Holman Unit
                              Atmore, Al. 36503

CC:File
    Lane Mann, Clerk
    Court of Criminal Of Appeals

221



## JAMES M. *"MICKEY"* COUNTS
### CIRCUIT CLERK
### COFFEE COUNTY, ALABAMA

ELBA: (334) 897-2954
230M Court Square
Elba, Alabama 36323

ENTERPRISE: (334) 347-2519
P.O. Box 311284
Enterprise, Alabama 36331

JULY 14, 2006

STATE OF ALABAMA

  VS.

ROBERT CONRAD

CR - 05 -1913

TO THE COURT OF CRIMINAL APPEALS:

  COULD YOU ALLOW THE COURT REPORTER ADDITIONAL TIME TO FILE HER TRANSCRIPT DUE TO THE DELAY IN FORWARDING NOTE OF APPEAL TO YOUR COURT AND THE COURT REPORTER.  THIS OFFICE IS EXPERIENCING CHANGES IN STAFFING AND APOLOGIZES FOR ANY INCONVENIENCE.

THANK YOU.

CC: ATTY GENERAL
   DEFENDANT
   DISTRICT ATTORNEY
   ATTORNEY
   COURT REPORTER



JUL 2006
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

222

# IN THE COURT OF
# CRIMINAL APPEALS OF ALABAMA

CRIMINAL APPEAL NUMBER CR 05-1913

### ROBERT CONRAD,

APPELLANT,

V.

### STATE OF ALABAMA

APPELLEE.

ON APPEAL FROM THE

CIRCUIT COURT OF COFFEE COUNTY, ALABAMA

CIRCUIT COURT NUMBER CC 2001-179.60 THRU 180.60

## COUNSEL'S MOTION TO WITHDRAW

**J. Rick Hollingsworth (HOL070)**
Attorney for Appellant
P.O. Box 311662
Enterprise, Alabama 36331
(334) 347-3249

223

# IN THE COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

ROBERT CONRAD,  
    APPELLANT

VS.

STATE OF ALABAMA,  
    APPELLEE.

\*  
\*  
\*  
\*  
\*  
\*  
\*

APPEAL'S COURT  
CASE NO.: CR 05-1913

CIRCUIT CASE NO.: CC 2001-179.60  
                CC 2001-180.60

## MOTION TO WITHDRAW

COMES NOW J. Rick Hollingsworth, and hereby moves this Honorable Court to allow him to withdraw as counsel for Appellant and would further show as follows:

1. That Counsel has a conflict with the Appellant and cannot continue to represent the Appellant in this matter.

2. That Counsel for Appellant submitted an Attorney Fee Declaration that was not adequately compensated by the State.

WHEREFORE the premises considered, Counsel prays this Honorable Court to allow him to withdraw as Counsel for Appellant and any other relief this Court deems just and proper.

Respectfully submitted this the 17th day of July, 2006.

J. Rick Hollingsworth (HOL070)  
Attorney for Appellant  
Post Office Box 311662  
Enterprise, Alabama 36331  
(334) 347-3249

224

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing Motion upon the parties listed below by placing same in the U.S. Mail, postage prepaid, this the 17th day of July, 2006.

Hon. Troy King
Attorney General
11 S. Union Street
Montgomery, Al

Hon. Gary McAliley
District Attorney
P.O. Box 311102
Enterprise, Al 36331

Misty Whitworth
Court Reporter
991 Brookdale Ave.
Elba, Al 36323

Hon. James M. Counts
Circuit Clerk
P.O. Box 311284
Enterprise, Al 36331

Robert T. Conrad
AIS # 226791
3700 Holman Unit
Atmore, Al 36503

J. Rick Hollingsworth (HOL070)

225

# IN THE CIRCUIT COURT OF
## COFFEE COUNTY, ALABAMA
## ENTERPRISE DIVISION

ROBERT CONRAD,                    *
                                  *
    APPELLANT,                    *
                                  *
VS.                               *       CASE NO: CC-01-179.60 thru
                                  *                CC-01-180.60
STATE OF ALABAMA,                 *
                                  *
    APPELLEE,                     *

## ORDER

The Motion to Withdraw as Counsel filed by Hon. J. Rick Hollingsworth is granted due to a conflict between counsel and Petitioner.

The appeal involves a Rule 32 Petition for which the Petitioner does not have a constitutional right to counsel.

The Petitioner has filed his notice of appeal, Pro se and the court assumes the Petitioner does not desire court appointed counsel.

Done this the **21st** day of **July, 2006.**

JEFF W. KELLEY
CIRCUIT JUDGE

CC: DA,
Hollingsworth

226

| State of Alabama<br>Unified Judicial System<br><br>m ARAP-14    Rev. 11/91 | **CERTIFICATE OF COMPLETION AND TRANSMITTAL OF RECORD ON APPEAL BY TRIAL CLERK** | Appellate Case Number |
|---|---|---|

| TO: THE CLERK OF<br>THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL: APRIL 19, 2006 |
|---|---|

**APPELLANT**

ROBERT T CONRAD

**v.  STATE OF ALABAMA**

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of _____ pages) (___1___ volumes of 200 pages each and one volume of __117__ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this ___3rd___ day of ___AUGUST___, 2006

_James M Christs/mda_
Circuit Clerk

1

1        IN THE STATE OF ALABAMA

2        FOR THE COUNTY OF COFFEE

3        ENTERPRISE DIVISION

4        TWELFTH JUDICIAL CIRCUIT

5

6

7   STATE OF ALABAMA,                    COPY

8              Plaintiff,
                                    CASE NUMBERS
9   vs.                             CC-2001-179.6;180.6

10  ROBERT THOMAS CONRAD,

11             Defendant.

12  _____/

13

14        REPORTER'S OFFICIAL TRANSCRIPT
               DECEMBER 2, 2005
15

16

17

18            Before the Honorable
                 Jeff W. Kelley
19          Coffee County Courthouse
              Enterprise, Alabama
20

21

22

23

24

25  Taken by:  Misty P. Whitworth, CSR
               Official Court Reporter

2

INDEX

DEFENDANT'S WITNESSES:

ROBERT THOMAS CONRAD
          DIRECT BY MR. HOLLINGSWORTH . . . . . . 7
          CROSS BY MR. ANDERSON . . . . . . . . .38
          REDIRECT BY MR. HOLLINGSWORTH . . . . .67

STATE'S WITNESSES:

SYDNEY ALBERT SMITH
          DIRECT BY MR. ANDERSON. . . . . . . . .72
          CROSS BY MR. HOLLINGSWORTH. . . . . . .79
          REDIRECT BY MR. ANDERSON. . . . . . . .81
          RECROSS BY MR. HOLLINGSWORTH. . . . . .83

CERTIFICATE OF REPORTER. . . . . . . . . . .90

CERTIFICATE OF COMPLETION. . . . . . . . . .91

3

```
 1                        A P P E A R A N C E S

 2

 3     ON BEHALF OF THE STATE:

 4     TOM ANDERSON, ESQUIRE
       ASSISTANT DISTRICT ATTORNEY
       POST OFFICE BOX 311102
 5     ENTERPRISE, ALABAMA   36331

 6

 7     ON BEHALF OF THE DEFENDANT:

 8     RICK HOLLINGSWORTH, ESQUIRE
       ATTORNEY AT LAW
       POST OFFICE BOX 311662
 9     ENTERPRISE, ALABAMA   36331

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                    PROCEEDINGS
 2          THE COURT:  These are the cases of the
 3              State of Alabama versus Robert
 4              Thomas Conrad, Jr., Case Numbers
 5              CC-01-179.6 and 180.6.  The State
 6              is here and is represented by
 7              Assistant District Attorney Tom
 8              Anderson.  The Defendant is
 9              represented by Attorney Rick
10              Hollingsworth, Sr.  These cases are
11              before the Court on a petition for
12              relief from sentence or conviction
13              pursuant to Rule 32 of the Alabama
14              Rules of Criminal Procedure.  And I
15              believe there's at least two
16              amended petitions which have been
17              allowed by the Court and a response
18              from the State in this case.  The
19              petition and amendments raise
20              several issues, which they speak
21              for themselves.  That's what we're
22              going to limit this hearing to.
23                  Mr. Conrad?
24          MR. CONRAD:  Yes, sir.
25          THE COURT:  One thing I want to make
```

5

```
 1              sure you are aware of prior to this
 2              Court going forward is one of these
 3              convictions, I believe, was for a
 4              felony murder.  And the other one
 5              was for what?
 6      MR. ANDERSON:  There was robbery first
 7              degree and capital murder, Your
 8              Honor.
 9      THE COURT:  Okay.  Robbery first
10              degree.  Understand that on this
11              felony murder or capital murder
12              that, you know, if you sentence --
13              if the Court is convinced that you
14              prove your case and your conviction
15              is set aside that there would be
16              another trial of the case, and the
17              disposition of that case could be
18              different from what this one was.
19              You could possibly be looking at
20              the death penalty.  Are you aware
21              of that?
22      MR. CONRAD:  Yes, sir.
23      THE COURT:  Okay.  I just want to make
24              sure that you know what you're
25              asking for, that if your relief is
```

6

1          granted and you're retried that the

2          death penalty would be back on the

3          table.  You understand that?

4     MR. CONRAD:  Yes, sir.

5     THE COURT:  All right.  This is your

6          petition.  I'm going to allow you

7          to go forward, Mr. Hollingsworth.

8     MR. HOLLINGSWORTH:  Your Honor, we

9          would move the Court for an in

10         limine order confining Mr. Conrad's

11         testimony to only those issues

12         raised in this petition and not

13         specifically issues of innocence or

14         guilt.

15    MR. ANDERSON:  The State concurs with

16         that, Your Honor, and I also move

17         the Court to limit the argument and

18         testimony and to bar those issues

19         that are precluded under the Rules

20         of Criminal Procedure.

21    THE COURT:  And the Court will grant

22         that.  And, as a matter of fact,

23         the Court intends on limiting all

24         the testimony to the issues that

25         have been presented in the petition

1              and responses.

2              MR. HOLLINGSWORTH:  I would call Mr.

3              Robert Thomas Conrad to the stand,

4              please, Your Honor.

5          THE COURT:  All right.  Mr. Conrad?

6

7              ROBERT THOMAS CONRAD,

8   was sworn (affirmed) and testified as follows:

9

10              DIRECT EXAMINATION

11   BY MR. HOLLINGSWORTH:

12   Q.   Mr. Conrad, tell the Court your full name,

13   please, sir.

14   A.   Robert Thomas Conrad.

15   Q.   And, Mr. Conrad, you were tried back in --

16   I guess it was 2002, wasn't it?

17   A.   2001.

18   Q.   The trial?

19   A.   Yeah, 2002.

20   Q.   Okay.  And you were found guilty of the

21   offenses charged in the indictment and sentenced

22   to life in prison without parole; is that

23   correct?

24   A.   Yes, sir.

25   Q.   In that case, you were represented by these

1  two gentlemen over here, Mr. Al Smith and

2  Mr. Bradshaw, Gary Bradshaw (indicating)?

3  A.    Yes, sir.

4  Q.    And we're here today on your petition that

5  alleges essentially that there were some errors

6  made in your trial and that the effective

7  assistance of counsel was denied you in that

8  trial; is that your understanding of what we're

9  doing?

10  A.    Yes, sir.

11  Q.    All right.  Now, I'm just going to ask you

12  as we go through these things to comment and

13  testify however you will on the issues that you

14  have raised.  There's, as the Court mentioned,

15  three separate -- three separate parts of the

16  petition that were initiated and then amended a

17  time or two.  And I'm going to start out with

18  the handwritten part that's the Rule 32

19  Petition.

20       In that petition, getting down to the  part

21  on page five where you have checked "denial of

22  effective assistance of counsel," "denial of

23  effective assistance of appellate counsel," and

24  then just below that, you've checked "the Court

25  was without jurisdiction to render judgment or

1       impose sentence," and "the sentence imposed

2       exceeds the maximum authority authorized by law,

3       or is otherwise not authorized by law."

4           Let's go with those first and let you

5       comment to the Court on, first of all, number

6       nine, denial of effective assistance of counsel.

7       Do you have something to offer the Court in that

8       regard?

9       A.    Yes, sir.  On the first issue is -- was

10      that the trial counsel rendered ineffective

11      assistance of counsel in violation of my 6th

12      Amendment right for his failure to object to the

13      fact that the Petitioner's sentence is illegal

14      due to his indictment only setting forth the

15      material elements of robbery third degree, which

16      resulted in the Petitioner being convicted and

17      sentenced beyond the maximum authorized by law,

18      in violation of the 8th and 14th Amendments to

19      the United States Constitution.

20      Q.    Okay.  As I understand what you just said,

21      your complaint is that you were charged with

22      robbery first degree, and the elements of

23      robbery in the first degree were not met?

24      A.    Yes, sir.  This is required to have the

25      second offense, robbery first degree.

1   Q.   And that applies to robbery in the first

2   degree against Mr. Grimes, I suppose?

3   A.   Yes, sir.

4   Q.   Is there any particular thing there that

5   you -- we've discussed this, and I've indicated

6   to you that I'm a little confused.  But go ahead

7   and tell the Court what you think happened in

8   that situation where you were illegally

9   sentenced.

10  A.   The offense two, which is on the

11  indictment, states that the kind of charges --

12  I'm reading off of the indictment.

13  Q.   That's all right.

14  A.   "The grand jury of said county charges that

15  before the finding of this indictment that

16  Robert Thomas Conrad, whose name is to the grand

17  jury otherwise unknown, did in the course of

18  committing a theft of property, to-wit:  Thirty

19  dollars in United States currency, the

20  denominations of which were one twenty-dollar

21  bill and one ten-dollar bill, the property of,

22  to-wit, Robert Ray Grimes, use force or threaten

23  the imminent use of force against the person of

24  the said Robert Ray Grimes or another person

25  present, with the intent to overcome his

11

1   physical resistance or physical power of

2   resistance or to compel acquiescence to the

3   taking of or escaping with the property while

4   the said Robert Thomas Conrad was armed with a

5   deadly weapon or dangerous instrument, to-wit:

6   a pistol, in violation of Section 13A-8-41 of

7   the Code of Alabama."

8   Q.   And do I understand your complaint to be

9   that against Mr. Grimes, you didn't use -- that

10  you didn't -- that no violence was used against

11  him?

12  A.   Yes, sir.

13  Q.   And that because no violence was used, that

14  should have been robbery in the third degree, as

15  opposed to robbery in the first degree?

16  A.   Yes, sir.  And the fact also of the element

17  of "cause serious physical injury to another

18  person."

19  Q.   Mr. Grimes was not injured, so you contend

20  that that should have been third degree instead

21  of first degree?

22  A.   Yes, sir.

23  Q.   Do you have any other argument as far as

24  that particular issue is concerned?

25  A.   No, sir.

12

1    Q.    All right.   Let's go back to the beginning

2    of the --

3              THE COURT:   So you're saying that

4                   counsel was ineffective by not

5                   filing that objection prior to

6                   trial?   Is that what you're saying?

7              MR. CONRAD:   Yes, sir.

8    Q.    Okay.   In that -- and I'm referring to --

9    for the benefit of the Court and others that may

10   be interested, an attachment that was filed

11   along with the handwritten Rule 32 Petition, I'm

12   referring to it when I ask these questions.

13        Was there a question, Mr. Conrad, about

14   qualifying the jury venire?   And that was raised

15   first on the --

16   A.    Yes, sir, there was.

17   Q.    And what was that issue, if you will,

18   please?

19   A.    I --

20   Q.    It had to do with the oath that was given

21   to the jurors prior to voir dire.   Maybe if I

22   showed where I'm looking at, it would be easier

23   for you to follow along here.   I'm looking at

24   what amounts to page ten, which is right at the

25   very beginning of the petition, right here

1    (indicating).

2    A.    Okay.

3    Q.    Could you address that issue, please?

4    A.    This deals with -- do you want me to state

5    out the actual elements?

6    Q.    Well, tell the Court what your complaint

7    with their behavior is.  That's really why we're

8    here, so that you can tell the Court why you

9    think that's prejudiced you and --

10              THE COURT:  Just a second.

11                    (Brief interruption.)

12              THE COURT:  All right.  You can answer

13                    it.

14    A.    Counsel was ineffective and Petitioner was

15    prejudiced thereby when he failed to object to

16    the oath not being administered to the venire

17    prior to the voir dire examination by the Court

18    and counsel.

19    Q.    So you're saying that the oath to the

20    jurors that says they will truly answer any

21    questions propounded to them in the course of

22    being qualified as jurors was not administered;

23    is that your complaint?

24    A.    Yes, sir.

25    Q.    All right, sir.  And is that the extent of

14

1    your complaint as far as that particular

2    situation exists?

3    A.    Yes, that's all to that one.

4    Q.    Let's skip over, then, to complaint number

5    four, which is -- that's going to be the

6    violation of your 6th Amendment right to

7    effective assistance of counsel for failure to

8    file a motion to dismiss the indictment where

9    the grand jury foreman failed to endorse upon

10   the Petitioner's indictment whether a prosecutor

11   appeared or not before the grand jury, as

12   required by Section 12-16-205 of the Code.

13         Can you tell the Court what the basis of

14   your complaint for that is?

15   A.    On the indictment, the prosecutor's name

16   was not endorsed, and that counsel's failure to

17   object to the fact that the indictment was void

18   because it wasn't made in the manner as

19   prescribed by law 12-16-205, Code 1975, was

20   deficient, and that the Petitioner was

21   prejudiced by counsel's deficiency, had the

22   non-conformity of the Petitioner's indictment

23   with the 12-16-205 deprived the trial court of

24   jurisdiction.

25         MR. HOLLINGSWORTH:    Okay.    And we would

1            ask the Court to take judicial

2            notice of the copy of the

3            indictment that's in the file in

4            that regard, Your Honor.

5       THE COURT:  Okay.

6 Q.  All right.  Let's go to the -- was there

7 anything else you would like to add to that, Mr.

8 Conrad?  I want to give you ample opportunity to

9 tell the Court anything you want to tell him in

10 regard to these issues, so now is that time to

11 do that.  If you have anything else you would

12 like to add, go ahead and do it now.

13 A.  No.  I have nothing else to say concerning

14 that issue.

15 Q.  Let's go to issue number five, then, that

16 says essentially that trial counsel was

17 ineffective for failing to know the applicable

18 law to make a timely objection where the clerk

19 failed to comply with 12-16-170, Code of

20 Alabama, to administer the oath to the petit

21 jurors, this violating Petitioner's 6th and 14th

22 Amendment rights under the Constitution of the

23 United States.  And in your discussion, you cite

24 that the statute requires that the oath shall be

25 administered by the clerk in the presence of the

16

1   Court to the petit jurors. And what's your

2   argument in that regard?

3   A.    That the clerk did not require that the

4   Judge solemnly swear the jury.

5   Q.    Okay. The Judge actually conducted the

6   oath himself?

7   A.    Yes, sir.

8   Q.    And the clerk didn't appear to do that?

9   A.    (Witness shakes head negatively.)

10  Q.    All right. Is there anything else in that

11  regard you'd like to make known to the Court?

12  Your pleadings are in the record. The Court has

13  access to those.

14      All right. Let's look on to the next --

15  A.    To that issue, I'd like to state concerning

16  the ineffective assistance of counsel matter

17  that they failed to object to both the Judge and

18  the clerk's compliance with Section 12-16-170,

19  Code of Alabama, which reflects that the trial

20  court and not the clerk swore the petit jury.

21  Q.    Okay. Let's go to the next issue then,

22  issue number six. And it avers that the trial

23  counsel was ineffective for failing to know the

24  applicable law to file a motion to dismiss the

25  indictment pursuant to Rule 15.3, Alabama Rules

1    of Criminal Procedure, on the grounds that the

2    indictment is void as it fails to allege the

3    essential elements of the Capital Murder Statute

4    in its entirety, as required by 13-A-540,

5    subsections 2, 10, 16, 17, and 18; and 13A-5-50

6    of the Code of Alabama 1975.

7        That really deals with the fact that the

8    aggravating circumstances were not listed in the

9    indictment; is that correct?

10   A.   Yes, sir.

11   Q.   Tell the Court what your complaint about

12   that is.

13   A.   The indictment tracks only part of the

14   element of the charge of capital murder, and

15   that part is Section 13A-5-40(a)(2), Code of

16   Alabama 1975, but is devoid of the material

17   elements of the complete Capital Murder Statute

18   of what I, myself, must defend against.

19   Q.   And that would, in your judgment, include

20   those aggravating circumstances that were

21   presented by the sentencing?

22   A.   Yes, sir.

23   Q.   Do you have any other comments about that

24   particular section?

25   A.   No, sir.

1    Q.    Let's go on, then, to section seven, which
2    says that you allege that the indictment is void
3    because it violates the Constitutional Doctrine
4    of Separation of Powers.  Tell the Court what
5    your complaint in that regard is, Mr. Conrad.
6    A.    (No response.)
7    Q.    Maybe I can help you a little by asking it
8    this way:  Since the record reveals that the
9    legislature passed this law, but it was written
10   in part by another agency of the State -- and I
11   don't know what that agency is at this
12   particular time.  I think that's also addressed
13   in the first amendment to the petition.  And
14   I'll tell the Court --
15              THE COURT:  I think the pleadings
16                   allege something about the Alabama
17                   Law Institute was --
18              MR. HOLLINGSWORTH:  They do.  Alabama
19                   Law Institute.  I was having a
20                   senior moment there.  I couldn't
21                   remember what that was for a
22                   second.
23   Q.    Is that the nature of the complaint, that
24   the Alabama Law Institute was instrumental in
25   drafting the Death Penalty Statute, as opposed

1  to the legislature itself?

2  A.    Yes, sir.

3  Q.    Is there anything you want to add to what

4  I've just said to the Court?

5  A.    I want to state that in this -- concerning

6  these claims that Section 13A-5-40, Alabama

7  Capital Murder Statute, is unconstitutional.

8  Alabama specifically violates the provision of

9  Article III, Section 42, of the Constitution of

10  Alabama of 1901, Legislative, Executive, and

11  Judicial Departments established, and Article

12  IV, Section 4, of the United States

13  Constitution, Separation of Powers.

14      Petitioner raises the claim that 13A-5-40

15  was enacted by the Alabama Law Institute which

16  was composed of individuals from each of the

17  three branches of government.

18      The Alabama Legislature devised the Alabama

19  Law Institute because of its long history of

20  failing to establish a sound and applicable

21  Death Penalty Statute, which this institute was

22  comprised of individuals from each of the

23  branches of government, which they did create

24  the present-day Death Penalty Statute.

25      But it was concluded that it is for the

1    legislature, not the judicial districts, that

2    each part plays a certain part.  One part plays

3    to interpret the law.  One part plays to enforce

4    the law.  One part plays to inform the law.  But

5    it was a misconstruing of one branch playing a

6    part as another branch.

7    Q.    And that's your argument, that because of

8    that, it's a violation of the Separation of

9    Powers Doctrine?

10    A.    Yes, sir.

11    Q.    Anything further on that particular point?

12    A.    No.

13    Q.    Let's go to number eight.  And it alleges

14    that you were denied effective assistance of

15    counsel due to your failure to file a pretrial

16    motion to dismiss the second count in the

17    indictment for robbery and failure to object to

18    the trial court's adjudication of the jury

19    verdict of robbery.

20        And I believe that in that particular

21    issue, you allege that that constituted double

22    jeopardy?

23    A.    Yes, sir.

24    Q.    Tell the Court the reason you complain

25    there and what you believe to be the case.

1   A.   Because I was charged on count two of the
2   indictment for murder robbery, in violation of
3   13A-5-40(a)(2) of the Code of Alabama 1975.  I
4   was charged separately in count two for robbery
5   in the first degree.  But in order for me to be
6   found guilty, the robbery charge had to be
7   proved, as it's the underlying charge that is
8   used to enhance the murder to capital murder.
9        And in the indictment, the identical
10   elements that prove capital murder are the same
11   elements used to prove robbery first degree.
12   Q.   So your testimony is that both of these
13   cases were tried at the same time, and the same
14   evidence was used for convictions in both cases?
15   A.   Right.
16   Q.   So you believe that violates the double
17   jeopardy provisions of the --
18   A.   The clause, yes, sir.
19   Q.   Do you need to add anything to that?  I'm
20   not trying to suggest that you need to.  I'm
21   just asking if you want to say anything further
22   there.
23   A.   Yeah.  I'd like to say that -- as stated on
24   the document here, "For purposes of former
25   jeopardy, the felony which provides the

22

1   component necessary to elevate an intentional

2   killing to capital murder is a lesser-included

3   offense of the capital crime.  Section 13A-5-41;

4   The Death Penalty Law of Alabama; in the

5   ordinary case, lesser-included offenses will

6   include some or lesser degrees of crimes within

7   the definition of the aggravating component.

8   Additionally, lesser-included offenses may

9   themselves include lesser offenses supported by

10  the evidence.  The Double Jeopardy Clause

11  prohibits prosecution and conviction for both

12  felony murder and the enumerated felony.  The

13  underlying felony is considered a

14  lesser-included offense of felony, and thus the

15  same offense for double jeopardy purposes.  So

16  it is -- robbery is a lesser included offense of

17  the capital offense involving murder robbery.

18  But the matter of both cases being presented all

19  at one time, the same elements and evidence was

20  used to -- for both offenses."

21  Q.    All right.  Anything else?

22  A.    No, sir.

23  Q.    All right.  Let's go to issue number ten.

24  Petitioner was denied effective assistance of

25  counsel due to trial counsel's failure to

1    properly object to the trial court's erroneous

2    instruction to the jury on corroborated

3    testimony of codefendant.  And I'd suggest to

4    the Court maybe that the drafter of this

5    document meant uncorroborated testimony.  But

6    let me get you to comment on that, Mr. Conrad,

7    and tell the Court what your complaint really is

8    about -- I'm assuming this involves the

9    testimony of Mr. Yeomans, who was a State's

10   witness against you in this case?

11   A.    Yes, sir.

12   Q.    Tell the Court what your complaint is in

13   that regard.

14   A.    I stated I was denied a fair trial due to

15   trial attorney's at -- the transcript record of

16   page 1448 of the trial transcript for failing to

17   object to the trial court judge giving an

18   erroneous instruction to the jury.

19   Q.    And you've included a -- you've included an

20   excerpt from that transcript in your pleadings

21   that sets out what you intend for the Court to

22   consider, have you not?

23   A.    Yes, sir.

24   Q.    All right.  And I believe that was the end

25   of the -- the end of the first attachment.

24

1    THE COURT:  I think I had a nine.  Did
2        he touch on it?
3    MR. ANDERSON:  There is a nine, Judge.
4    MR. HOLLINGSWORTH:  Did I miss it?
5    THE COURT:  Yeah.
6    MR. ANDERSON:  It would be page number
7        twenty-nine as numbered by Mr.
8        Conrad.
9    MR. HOLLINGSWORTH:  Mine is cut off, so
10        I don't know what -- did that have
11        to do with failure to object to the
12        Petitioner's indictment being void,
13        in that it was returned pursuant to
14        the authority of the Alabama
15        Constitution of 1901, which was
16        established to promote white
17        supremacy and to disenfranchise
18        African-Americans?
19    THE COURT:  Right.
20 Q.  Tell the Court --
21 A.  I have no comment on that one.
22 Q.  Okay.  Do you want to stand on the --
23 A.  Yes, sir.
24 Q.  -- cases cited in your attached brief or
25 your attached complaint?

25

1    A.    Yes, sir.

2    Q.    All right.  Do you have anything else you

3    would like to say to the Court in connection

4    with the ineffective assistance of counsel or,

5    for that matter, any other aspect of the trial

6    that you wish to raise at this point in time?

7    A.    Including the amendments that was attached

8    and just the issues that I just stated.

9    Q.    Are you asking the Court to take into

10   consideration before he makes a ruling all the

11   argument that's contained in your petition?

12   A.    Yes, sir.

13          MR. HOLLINGSWORTH:  All right.  Answer

14             questions for the DA, please sir.

15          THE COURT:  Do you want to go over the

16             amendments?

17          MR. HOLLINGSWORTH:  I think we covered

18             those, Judge, in the initial --

19             the first amendment to the Rule 32

20             Petition was also covered in the

21             body of the other one, in the

22             attachment.  It had to do with the

23             Separation of Powers Doctrine.  And

24             I don't have a third amendment.

25          THE COURT:  I've got two.

26

```
 1              MR. ANDERSON:  There is another
 2          amendment.  Let me see if I can't
 3          find it.
 4          THE COURT:  I've got one here that was
 5          filed April 18th.  It deals with
 6          denial of the 14th Amendment right
 7          to effective counsel or counsel
 8          failing to move for a continuance
 9          or a mistrial based on the
10          prosecution's failure to turn over
11          exculpatory evidence to the
12          defense.
13              MR. HOLLINGSWORTH:  All right.  I
14          haven't received this from the
15          clerk, Judge.  Let me cover it
16          quickly with Mr. Conrad.
17  Q.  Mr. Conrad, in the second amended part of
18  the petition, you have alleged that you were
19  denied effective assistance of counsel when they
20  failed to move for a continuance or a mistrial
21  based on the prosecution's failure to turn over
22  exculpatory evidence to the defense.  And I'm
23  assuming that that involves the testimony of Mr.
24  Robinson?
25  A.  Yes, sir.
```

1    Q.    Tell the Court what your complaint in that

2    regard is, if you would.

3    A.    Stating from what's on the petition, during

4    my trial, it was discovered the prosecution had

5    withheld a report regarding an internal

6    investigation by the Enterprise Police

7    Department.  The report demonstrated that the

8    District Attorney's office knew of the plan to

9    commit the robbery of the Toy Store prior to the

10   incident in which Petitioner stands convicted.

11   After an in camera review of the report, the

12   trial court agreed that the report contained

13   exculpatory and impeachment evidence.

14        Petitioner argues that trial counsel's

15   failure to request a continuance or mistrial was

16   prejudicial to the substantive rights of the

17   Petitioner, as the prosecutor's misconduct

18   deprived the Petitioner of evidence to rebut

19   codefendant, Yeoman's testimony, which was

20   crucial to the State's case.  Petitioner argues

21   that had counsel properly moved for a mistrial

22   or continuance and the trial denied such, there

23   is a reasonable probability the trial court's

24   ruling would have been reversed on appeal as the

25   state's action was in clear violation of Brady

1   versus Maryland, 373 U.S. 83.

2   Q.    All right.   You're saying essentially,

3   then, that when the District Attorney's office

4   attempted to conceal Mr. Robinson's identity and

5   potential testimony that that violated your

6   rights?

7   A.    Yes, sir.

8   Q.    And to force you to go to trial after

9   discovering the existence of that witness during

10  the course of the trial prejudiced you in this

11  case?

12  A.    Yes, sir.

13  Q.    Let's go on through.   There are a couple

14  of --

15              THE COURT:   While we're there, I want

16                   you to tell me how that prejudiced

17                   you.

18              MR. CONRAD:   There was documents that I

19                   found out afterwards, after the

20                   trial that -- the Enterprise Police

21                   Department had documents that this

22                   was about to occur before it did

23                   occur.   And he also had a list of

24                   names of individuals that knew

25                   something about this incident going

29

1             to happen.

2        THE COURT:  And I think that's what it

3             contains.  But how did that

4             prejudice you?

5        MR. CONRAD:  It was withheld from the

6             attorneys.

7        THE COURT:  I understand that.  But I'm

8             asking:  How did it prejudice you?

9        MR. CONRAD:  By misconstruing the jury

10            of how -- the jury -- it

11            misconstrued, misled the jury,

12            which led them to come back with a

13            different verdict.

14       THE COURT:  You're assuming that?

15       MR. CONRAD:  No, sir.

16       THE COURT:  Have you got any proof of

17            it?

18       MR. CONRAD:  Yes, sir.  I don't have it

19            with me.

20  Q.   Anything further on that point?

21  A.   No, sir.

22  Q.   Let's go to number two in the second

23  amendment, and it basically says that the trial

24  counsel failed to object or to seek recusal of

25  the trial judge on the grounds that the judge

1  was bias and not impartial prior to and during

2  the Petitioner's trial and sentencing

3  proceedings.  And would you like to address

4  that?

5  A.    Yes.  I aver that I was prejudiced from the

6  outset of the trial by Judge McAliley's pretrial

7  statements that "Criminal defendants who enter a

8  guilty plea or who are convicted of any act of

9  violence, some active time in custody will be

10  ordered served."

11  Q.    And, in addition to that, you mentioned in

12  your description of that complaint that he asked

13  questions of the prosecution's witnesses?

14  A.    Yes, sir.

15  Q.    And that he demonstrated an appearance of

16  impartiality?

17  A.    Yes, sir.

18  Q.    And you conclude that from the transcript

19  itself?

20  A.    Yes, sir.

21  Q.    Anything further on that point?

22  A.    No.

23  Q.    On number three of that particular -- of

24  this particular edition, you say that you were

25  denied effective assistance of counsel when

31

1   Petitioner proceeded as counsel with a conflict

2   of interest.  And that would apply to Mr.

3   Bradshaw's being a member of the same church as

4   Ms. Dennis; is that essentially the complaint?

5   A.    Yes, sir.

6   Q.    And that he may have been a Sunday school

7   teacher or director of the children involved?

8   A.    Yes, sir.

9   Q.    Is that essentially the essence of your

10  complaint?

11  A.    Yes, that counsel could not represent me to

12  the best of his ability.

13  Q.    Do you want to add anything further in that

14  regard?  Again, I'm not suggesting that you need

15  to.  I'm just trying to give you the opportunity

16  to.

17  A.    Yes.  Which also adversely affected

18  counsel's performance during trial to the

19  prejudice of the Petitioner, as counsel had to

20  choose between respect and loyalty to the

21  victims' family and diligently representing me

22  as his client.

23  Q.    Anything further on that point?

24  A.    No, sir.

25  Q.    Let's go to number four.  You were denied

32

1    6th and 14th Amendment rights protection when

2    counsel failed to object to the admission of the

3    bullet taken from your arm on the grounds that

4    it was the product of an illegal search and

5    seizure.  Were you ever presented a search

6    warrant as far as the bullet was concerned?

7    A.    No, sir.

8    Q.    Did you give consent for that search?

9    A.    I had no knowledge of the --

10   Q.    You were sedated when it took place?  You

11   were under anesthesia when it took place?

12   A.    Yes, sir.

13   Q.    Did you ever see a search warrant after

14   that?

15   A.    No, sir.

16   Q.    Do you know whether a search warrant

17   existed or not?

18   A.    No, sir.

19   Q.    But were you ever presented with one?

20   A.    No, sir.

21   Q.    Okay.  The next -- did you have anything

22   further you wanted to add to that about the

23   search and seizure?

24   A.    Yeah.  I would like to state that I aver

25   this evidence was -- the bullet was illegally

33

 1    seized, in violation of my 4th, 5th, 6th, 8th,

 2    and 14th Amendment rights to the United States

 3    Constitution, as the District Attorney was

 4    without authority to subpoena the evidence.  The

 5    record reflects that counsel filed at least two

 6    pretrial motions to suppress, but counsel did

 7    not object to the introduction of the evidence

 8    during trial.  So I aver that I was prejudiced

 9    by the introduction of the evidence, as the

10    evidence was admitted and used by the jury to

11    convict me of the offenses.

12    Q.    All right.  Number five is the allegation

13    that counsel failed to advise you that you had

14    the right to take the stand and testify in your

15    own behalf?

16    A.    Yes, sir.

17    Q.    You were never discussed that with your

18    attorneys?

19    A.    It was discussed, and it was stated that I

20    would if the codefendant was to get up on the

21    stand and testify.  And that did occur.  The

22    codefendant got on and testified, and there was

23    no more talking of me getting on the stand.

24    Q.    Did you wish to testify?

25    A.    Yes, sir.

1  Q.   Okay.  Number six is similar in nature,

2  when it says essentially that the trial counsel

3  was forced to become a witness in the case

4  without objection, I suppose, and the Court

5  forced counsel to become a witness in the case,

6  creating a conflict.  Tell the Court what your

7  complaint there is.  And be specific as to what

8  was said or what was the testimony offered or

9  what gives rise to that particular complaint.

10  A.   An actual conflict exists when defense

11  counsel is compelled to compromise his or her

12  duty of loyalty or zealous advocacy to the

13  accused by choosing between or blending the

14  divergent or competing (sic) interest of a

15  former or current client.  In the instant case,

16  during the trial, the trial court forced defense

17  counsel, Al Smith, to become a witness in the

18  case.  Specifically, counsel was forced to

19  reveal the identity of the source that gave him

20  information regarding the District Attorney's

21  office's withholding of exculpatory and

22  impeachment evidence.

23  Q.   You're suggesting that that's an error for

24  the Court to force him to do that; and as such,

25  he testified or offered testimony?

35

1    A.   Yes, sir.

2    Q.   And that that made him have a conflict of

3    interest, if I understand what you're saying?

4    A.   It's that -- I aver that the action by the

5    trial court compelled counsel to compromise his

6    duty of loyalty to his client, as that action

7    prohibited counsel from vigorously seeking a

8    mistrial or a dismissal of the charges based on

9    the prosecution withholding exculpatory and

10   impeachment evidence.  Counsel had discussed

11   this information with me; therefore, the

12   information became part of trial strategy, as

13   the source could have became a potential witness

14   for the defense.  The source that he had to give

15   up within the trial that the Court forced him to

16   testify about could have been a source of a

17   witness for my defense.  So I aver that he was

18   prejudiced by the trial court's action in this

19   instance, and I was deprived of my right to a

20   fundamental fair trial.

21   Q.   Okay.  Now, the final averment in your

22   petition is that there is newly-discovered

23   evidence that the Department of Forensic

24   Sciences either withheld or recorded erroneously

25   to the Court?

1    A.    Yes, sir.

2    Q.    And tell the Court what that involves.

3    A.    That the Department and prosecutors for

4    years in this court and the courts throughout

5    the State of Alabama through the testimony of

6    employees purported to be experts has mislead

7    the Court, juries, and the public that the

8    scientific and technical evidence was valid,

9    which, in fact, based on the Department's recent

10   proclamation, the entire Department of Forensic

11   Sciences was fatally deficient, rendering any

12   testimony or evidence from the Department

13   inadmissable under the test laid down by the

14   United States Supreme Court in Daubert versus

15   Merrill Dow Pharmaceuticals, Incorporated; and

16   that several employees of the Department of

17   Forensic Sciences testified as to certain

18   findings performed in its laboratories regarding

19   blood and ballistic evidence, and such was

20   crucial and material to the State's case against

21   the Petitioner.  However, due to the Department

22   not being accredited at the time of the testing,

23   such evidence was inadmissible under the Daubert

24   standard.

25   Q.    Okay.  So you're saying that because the --

1    that the Department of Forensic Sciences in

2    Alabama was not certified or was not accredited,

3    and because of that, their testimony was

4    invalid?

5    A.    Yes, sir.

6    Q.    All right.  Any other issue that you need

7    to raise at this time that hasn't been included

8    in any of the amendments?

9    A.    No, sir.

10             MR. HOLLINGSWORTH:  All right.  Answer

11                 the questions of --

12             THE COURT:  I'm going to have to take a

13                 break.

14                 (A break was taken.)

15             MR. ANDERSON:  As to each and every

16                 allegation that was raised in his

17                 petition and Mr. Conrad's two

18                 amendments, also, again, that were

19                 reasserted throughout his

20                 testimony, I would respond first

21                 and foremost with what's already in

22                 the court file.  My State's

23                 response is to the Rule 32 Petition

24                 and to the 1st and 2nd Amendments.

25                 But I do have a few brief questions

38

1          for Mr. Conrad.

2

3          CROSS-EXAMINATION

4   BY MR. ANDERSON:

5   Q.    Mr. Conrad, did you draft your Rule 32

6   Petition and its two amendments yourself, or did

7   you have some assistance?

8   A.    I had some assistance.

9   Q.    What some of us refer to as a jailhouse

10  lawyer, maybe?

11  A.    Yes, sir.  It was basically more than one

12  individual.

13  Q.    How many people assisted you?

14  A.    It was about me and three others.

15  Q.    Did these people develop these allegations

16  which you've raised in this Rule 32 Petition?

17  A.    Would you reiterate that?

18  Q.    Did you develop these allegations,

19  everything that you've testified to and

20  everything that you've offered to the Court?

21  Did you develop those issues yourself?

22  A.    In some form or fashion.  I researched the

23  transcript and looked things up and collaborated

24  with the law.

25  Q.    One of the first allegations you raised and

1    that was testified to today has to do with the

2    Robbery Statute.  And you argued that possession

3    of a firearm is both an element of robbery third

4    degree, which has to be satisfied before you can

5    get a higher degree robbery, and also an element

6    of robbery first degree; is that correct?

7    A.    Yes, sir.

8    Q.    Do you understand that the logic of that

9    argument would render it impossible to have any

10   armed robbery conviction for robbery first

11   degree?

12   A.    I don't quite understand what you're

13   saying.  I don't understand.

14   Q.    You say that the indictment should have

15   been dismissed and that these counsel were

16   ineffective because they failed to do so because

17   of the fact that robbery third degree must first

18   be satisfied before you can meet robbery first

19   degree and that a pistol is the element of both?

20   A.    Right.

21   Q.    You said, therefore, the indictment was

22   defective?

23   A.    Yes.

24   Q.    That logic right there would stand to

25   represent the argument that it is not possible

1   to commit the offense of robbery in the first

2   degree with a pistol; do you agree with that?

3   A.    No.

4   Q.    Force must be established in robbery.

5   Okay?

6   A.    Yes, sir.

7   Q.    That may be done with a pistol?

8   A.    Uh-huh.

9   Q.    We've got force.  We've also got -- it just

10  happens to be that a pistol was involved and a

11  pistol was used on two different victims.

12  A.    Uh-huh.

13  Q.    One of them was shot and killed, and the

14  other one, Mr. Grimes, was not.  So would you

15  agree or is it your contention that it is not

16  possible for an armed robbery to be robbery

17  first degree?

18  A.    The elements of robbery first degree is

19  causing physical harm.  There was no physical

20  harm caused on Mr. Grimes.

21  Q.    Have you looked at your petition?

22  A.    Yes.

23  Q.    Where does it say that physical harm is

24  necessary in robbery first degree when a pistol

25  or deadly weapon is present?

41

1   A.    It relates to the fact that the indictment

2   states on the offense --

3   Q.    I'll assert to you that it does not say

4   serious physical injury is necessary when a

5   pistol is present.

6         You testified and you also set out in your

7   Rule 32 Petition that the jury venire who would

8   sit out here probably in this very courtroom was

9   not properly qualified by the presiding judge at

10  that time before your trial; is that correct?

11  A.    Yes, sir.

12  Q.    You see we have a court reporter here

13  today, do we not?

14  A.    Yes, sir, we do.

15  Q.    So there would be a record of whether or

16  not that took place, wouldn't there?

17  A.    Yes, sir.

18  Q.    And I would assert that that's something

19  that could be determined by the record.  Judge

20  Barr presided at that time, and I'd have a hard

21  time believing that he failed to do something

22  that he so often does.

23            THE COURT:  Was that issue raised on

24            appeal?

25            MR. ANDERSON:  I'm sure that if it was

```
 1                        not raised on appeal, it was deemed

 2                        an issue that was without merit,

 3                        Your Honor.  However, I'd also say

 4                        that that very argument would be

 5                        precluded because it could have

 6                        been raised on appeal, and it was

 7                        not; or at trial, and it was not.

 8                        And in here, he sees it fit to

 9                        raise it during his Rule 32

10                        Petition.

11   Q.   You also allege --

12             THE COURT:  Yes, sir?

13             MR. ANDERSON:  I was just going to add

14                        that I don't have any knowledge of

15                        what happened on the appeal.  We

16                        didn't get the benefit of those

17                        briefs and arguments.

18             THE COURT:  Okay.

19             MR. ANDERSON:  I will -- later, I'll

20                        call one witness, and we'll delve

21                        briefly into what issues were and

22                        were not raised on appeal.

23   Q.   You allege that counsel again was

24   ineffective because they didn't move to dismiss

25   the indictment because it lacked -- failed to
```

43

1  have a prosecutor appear or affix his signature

2  to that indictment, and the same thing with the

3  grand jury foreperson.  Is that a copy of the --

4  do you have it before you?

5  A.    Yes, sir.

6  Q.    Would you look at the bottom, right-hand

7  corner and tell me what that says?

8  A.    In print or type?

9  Q.    In print.  Can you read that?  What does

10 that appear to be?

11 A.    It's initials.

12 Q.    It's initials.  Does that appear to be the

13 signature of the name below it?

14 A.    I can't tell.

15 Q.    Will you read what is purported to be

16 written on that line?  What does that say in

17 type?

18 A.    Mark E. Fuller, District Attorney for the

19 Twelfth Judicial Circuit.

20 Q.    Mark E. Fuller, District Attorney for the

21 Twelfth Judicial Circuit.  And, Judge, the

22 indictment speaks for itself.  It's in the court

23 record.  You can look at it and see that the

24 signature is affixed thereto.

25        THE COURT:  I'll just ask this question

44

1            right here:  Mr. Conrad, have you

2            got anything to indicate that that

3            is not Mark E. Fuller's signature

4            on that indictment?

5        MR. CONRAD:  No, I do not.

6   Q.   Would you look at your own photostatic copy

7   that you have in front of you and what is

8   purported to be the rear side of that document,

9   the back side of it?

10  A.   Yes, sir.

11  Q.   What is that in the top left?  What does

12  that say?

13  A.   Grand jury number.

14  Q.   Okay.  And then under what looks like a

15  signature, what does that say?  Can you read

16  that word right there?

17  A.   Yes, sir.  Grand jury foreperson.

18  Q.   Grand jury foreperson.  Is there a

19  signature affixed to that line?

20  A.   Yes, it is.

21           MR. ANDERSON:  Your Honor, it would

22           appear also from the rear of that

23           indictment that the grand jury

24           foreperson was present and did

25           affix his signature or her

45

1          signature, whatever the case may

2          be, to that.  And, again, the

3          record would speak for itself.

4          That is part of the court record,

5          and I will no longer take up the

6          Court's time with that issue.

7  Q.    You again raised ineffective assistance of

8  counsel.  You said trial counsel did not object

9  to the judge's -- this is the trial judge, which

10 is Judge McAliley -- his failure to properly

11 administer the oath to the petit jury.  You were

12 present at the trial, correct?

13 A.    Yes, sir.

14 Q.    Did you hear Judge McAliley administer the

15 oath?

16 A.    Yes, sir.

17 Q.    So Judge McAliley administered the oath?

18 A.    Yes, he did.

19 Q.    I think you assert that it was done

20 improperly because the clerk of court is to

21 administer the oath; is that correct?

22 A.    That's correct.

23          MR. ANDERSON:  Your Honor, I have not

24          read that portion of the court

25          file.  But it's the State's

46

1            position that any trial judge can

2            administer the oath to the petit

3            jury and that they often do and

4            that if there's any sort of skewing

5            away from what the statute says

6            that there's no harm or prejudice

7            caused to the Defendant and that

8            kind of error would be harmless,

9            and there's no merit to that

10           argument.

11      THE COURT:  I think that's been said

12           pretty well by case law too, as

13           well as the Rules of Criminal

14           Procedure.

15  Q.    There was another allegation that was

16  raised and testified to by you.  You said that

17  the indictment -- well, actually, counsel was

18  ineffective another time for failing to move to

19  dismiss the indictment.  But you said they

20  didn't sufficiently set out what is required

21  under the Capital Murder Statute.  I believe you

22  stated that you were not given notice in the

23  indictment as to the aggravating factors that

24  you were to defend yourself against; is that

25  right?

47

1   A.    Yes, sir.

2   Q.    Would you look at your indictment?

3   A.    (Witness complies.)

4   Q.    Will you read after it says your name?

5   A.    Robert Thomas Conrad caused the death

6   during the time --

7   Q.    Here.  I'll read it.  This indictment does

8   say, "Robert Thomas Conrad caused the death

9   during the time that he was in the course of

10  committing a theft of property, to-wit:  United

11  States currency or United States coins or

12  checks, the property of Jelaine Bowman Dennis,

13  by the use of force or trying to threaten the

14  imminent use of force against the person of the

15  said Jelaine Bowman Dennis or another person

16  present with the intent to overcome her physical

17  resistance or physical power of resistance or to

18  compel acquiescence to the taking or escaping

19  with that property, and that you were armed with

20  a deadly weapon or a dangerous instrument, a

21  pistol.  Okay?  Everything I just said there

22  says that there was a taking of property with a

23  threat of force, that you used a pistol, and a

24  death occurred.  That would be the murder of

25  somebody during the commission of a robbery in

48

1    the first degree.  Okay?

2    A.    Uh-huh.

3    Q.    Do you know what the aggravating factors

4    to substantiate a capital offense was in your

5    case?

6    A.    I do.

7    Q.    What was it?

8    A.    It was stated in the indictment,

9    13A-5-40(a), that --

10    Q.    Let me ask you this:  That portion of the

11    indictment that I just read --

12    A.    Uh-huh.

13    Q.    -- did it not say that you caused the death

14    of Jelaine Dennis during a robbery in the first

15    degree?

16    A.    Would you restate that?

17    Q.    Does it basically say that you caused the

18    death of one Jelaine Dennis during the

19    commission of a robbery in the first degree?

20    A.    In the course of committing theft of

21    property.

22    Q.    Right.  And you used a pistol.

23          MR. ANDERSON:  Your Honor, I would

24              purport to the Court that this

25              death -- this murder was committed

49

```
 1              during the commission of a robbery
 2              in the first degree.  That is the
 3              aggravating factor, the aggravating
 4              circumstance.  It is set out in the
 5              indictment, and that argument too
 6              is grounds --
 7     THE COURT:  Well, Mr. Conrad, do you
 8              want to tell me what the deficiency
 9              is in this indictment, then?
10     MR. CONRAD:  Yes, sir.  The indictment
11              tracks only part of the element of
12              the charge of capital murder, and
13              that part is Section 13A-5-40(a)(2)
14              of the Code of Alabama 1975.  But
15              it is devoid of the material
16              element of the complete Capital
17              Murder Statute of what the
18              Petitioner must defend himself
19              against, which is Section
20              13A-5-40(a)(2) and 13A-5-50 of the
21              Code of Alabama 1975, which is
22              enumerated as both elements of
23              capital murder.
24     THE COURT:  Tell me what elements are
25              deficient.
```

1         MR. CONRAD:  The aggravating

2         circumstance -- 13A-5-40 verifies

3         and on its face substantiates it in

4         corporation and necessary existence

5         with 13A-5-40(a) as follows:  The

6         fact that a particular capital

7         offense as defined in 13A-5-40(a)

8         necessarily includes one or more

9         aggravating circumstances as

10        specified in Section 13A-5-49,

11        shall not be construed to preclude

12        the finding and consideration of

13        the relevant circumstance or

14        circumstances in determining

15        sentence.  By way of illustration

16        and not limitation, the aggravating

17        circumstance specified in

18        determining sentence in every case

19        in which a defendant is convicted

20        of the capital offenses defined in

21        Subsection (1) through (4) of

22        Subsection (A) of Section 13A-5-40.

23           The indictment is void of the

24        notice imperative and mandatory

25        "shall".  In essence, the

51

```
 1                    indictment is devoid of the fact
 2                    that I must defend myself in the
 3                    guilt and sentencing phase of the
 4                    charge against me.  The word
 5                    "shall" is defined as stated below
 6                    in Ex Parte Looney:  As used in
 7                    statutes, constructs, or the like,
 8                    this word is generally imperative
 9                    or mandatory.  In common or
10                    ordinary parlance and its ordinary
11                    signification, the term "shall" is
12                    a word of common, and one which has
13                    been given or which must be given
14                    a --
15          MR. ANDERSON:  Judge, I would object to
16                    this being nonresponsive and also
17                    reading from something that's
18                    already part of the court record.
19          THE COURT:  I'm still waiting for you
20                    to give me that element that I
21                    believe you said is deficient.
22          MR. CONRAD:  Could you restate what the
23                    question was?
24          THE COURT:  I understand you're telling
25                    me -- what you said was that the
```

52

1              indictment was deficient of certain

2              language.

3        MR. CONRAD:  Yes, sir.

4        THE COURT:  Tell me what language it

5              was deficient of.

6        MR. CONRAD:  I don't know.

7        MR. ANDERSON:  Okay.  I believe what

8              his petition sets out is that the

9              indictment didn't set forth that

10             aggravating circumstance which he

11             was to defend himself against.  And

12             my response was that it, of course,

13             did, and there's a copy of the

14             indictment that is part of the

15             court record.

16  Q.    You also raised a double jeopardy issue.

17  You said that because robbery first degree --

18  well, you said, first of all, that robbery first

19  degree served as a basis for your indictment and

20  your conviction of capital murder, that that was

21  the aggravating circumstances, and that you were

22  also charged with robbery first degree.  And you

23  said that double jeopardy came into the picture

24  because if robbery first degree serves as a

25  basis for a capital charge, then how too can you

53

1    also be convicted of robbery first degree.

2    There were two individuals in the Toy Store that

3    day, were there not, a Mr. Grimes and a Ms.

4    Dennis; is that right?

5    A.    To my knowledge.

6              MR. ANDERSON:   Your Honor, the

7                   indictment sets out that that

8                   robbery first degree was of the

9                   person of Mr. Grimes, that he used

10                  a pistol to take a wallet from that

11                  individual.  It's a separate

12                  individual, separate property, same

13                  firearm, of course, but these are

14                  two different robberies.  And that

15                  double jeopardy is not at issue.

16                  These are completely separate

17                  individuals, victims, not entire

18                  circumstances, but that is also

19                  grounds for --

20             MR. CONRAD:  May I speak?

21             THE COURT:  Wait just a minute.

22   Q.   You raised an issue as to the Alabama

23   Constitution.  I think that that -- you actually

24   decided not to offer anymore testimony other

25   than what was set out in your petition; is that

54

1    correct?  Something along the lines that the

2    Alabama Constitution was drafted to promote

3    white supremacy or something of that nature?

4    A.    That's not relating to that issue.

5    Q.    On page twenty-nine, did you not assert

6    that the Alabama Constitution -- you were

7    convicted under the Alabama Constitution --

8    A.    That's right.

9    Q.    -- and that this Alabama Constitution was

10   established to promote white supremacy or to

11   disenfranchise African-Americans?

12   A.    .Uh-huh.

13   Q.    It does say that.  And you opted not to

14   offer anymore testimony for Judge Kelley to

15   consider?

16   A.    Oh, yes, yes.

17   Q.    And I will again submit what's contained in

18   the State's response.

19        You also set forth an allegation that there

20   was some exculpatory information that was

21   withheld from the State; is that right?

22   A.    Yes, sir.

23   Q.    To your knowledge, was that issue raised

24   with the trial judge, Gary McAliley?

25   A.    No, sir.

1  Q.   It was not?

2  A.   Not to my knowledge.

3  Q.   If it was not raised, then how can you also

4  raise the issue that your counsel was called as

5  a witness to appear and testify during an in

6  camera hearing in relation to exculpatory

7  evidence?

8  A.   It was at the trial.  It was during the

9  trial.

10  Q.   So it was raised?

11  A.   Yes, sir.

12  Q.   Was it determined that there may have been,

13  in fact, some exculpatory evidence?

14  A.   Yes, sir.

15  Q.   And did the trial judge, Gary L. McAliley,

16  order the State on its own dime, to fly -- was

17  it Mr. Robinson -- from Arizona back to Alabama?

18  A.   I guess.

19  Q.   And didn't your counsel meet with Mr.

20  Robinson?  Didn't they speak with Mr. Robinson?

21  A.   I'm not aware of that.

22        MR. ANDERSON:  Your Honor, I would

23           submit that the record reflects

24           that this issue was taken up by the

25           trial court.  I think it was

56

```
 1            determined that there may have been
 2            some exculpatory material that was
 3            withheld by the State.  But the
 4            State, after the Judge ordered so,
 5            took every effort to make sure that
 6            the defense had the time and
 7            opportunity to fully develop
 8            whatever issues those may be.  And
 9            I think this individual testified
10            at trial, didn't he?
11   Q.   Did he testify at trial, Mr. Robinson?
12   A.   Yes, he did.
13            MR. ANDERSON:  Okay.  Your Honor, I
14            think there's sufficient
15            information in the court records
16            for you to determine whether or not
17            that substantiates any kind of
18            claim --
19            THE COURT:  Mr. Conrad, are you saying
20            that the person -- Mr. Robinson,
21            the person that had this
22            exculpatory evidence, testified at
23            trial?
24            MR. CONRAD:  Yes, sir.  But may I
25            speak?
```

57

1          MR. ANDERSON:  Your Honor, I just still
2              have one or two questions for him.
3          THE COURT:  Go ahead.
4   Q.   Mr. Conrad, I believe you set forth in your
5   petition that the trial judge was impartial and
6   biased, and you say he called counsel, which
7   would be Gary Bradshaw, Al Smith, and Cracker
8   Waldrop, Tom, Dick, and Harry?
9   A.   Yes, sir.
10  Q.   Did he refer to them as Tom, Dick, and
11  Harry?
12  A.   Yes, sir.
13          MR. ANDERSON:  Your Honor, I have no
14              personal knowledge of him actually
15              referring to them as that.
16  Q.   But, Mr. Conrad, I would like to know:  How
17  does that show -- the possibility that the trial
18  judge referred to the defense counsel as such
19  show any impartiality or bias?
20  A.   It can show that in some form or fashion
21  within their trial strategy, there was some
22  friendship to show favor was between the Judge
23  and the attorneys.
24  Q.   If I were to take what you just said, that
25  Tom, Dick, and Harry showed friendship with your

58

1   trial counsel, that certainly would have worked

2   in your favor and not prejudiced you.  How were

3   you prejudiced?

4   A.    I don't have a comment.

5          MR. ANDERSON:  Judge, there's also an

6               issue of which he testified to as a

7               possible conflict with the

8               representation by Gary Bradshaw and

9               some involvement or relationship he

10              may have had with the victim's

11              children.  I'm not going to ask any

12              questions as to that because we

13              have submitted an affidavit from

14              Mr. Bradshaw, and I think that

15              that's clearly sufficient to rebut

16              any such claims.  Mr. Bradshaw

17              asserts that he didn't know the

18              children by face and that they were

19              on a Sunday school roster of his,

20              and he felt it necessary to raise

21              that issue with the Court, who

22              determined there was no conflict

23              and left him in the case.

24   Q.    You raised an issue as to the failure of

25   your counsel to object at trial to the admission

1    of evidence, more specifically, a bullet that
2    you said was taken from you pursuant to an
3    illegal search; isn't that right?
4    A.    Yes, sir.
5    Q.    Isn't it true that there was a warrant
6    handed down from the Court authorizing that
7    bullet --
8    A.    I am not aware of it.
9    Q.    -- to be taken from your person?
10   A.    I have no notice of it.
11              MR. ANDERSON:  Judge, I believe the
12                   court record and the transcript
13                   refers to one.  I do not have one
14                   in my file, but it does refer to a
15                   search warrant.
16              THE COURT:  Hold on just a second,
17                   then.
18              MR. ANDERSON:  That is going to be in
19                   his amended petition.
20              THE COURT:  Okay.  So the contention is
21                   not that there was any kind of
22                   search warrant telling them to take
23                   it out of his body but that the
24                   District Attorney issued a subpoena
25                   and got that as part of his records

60

1      and as a result of a subpoena,

2      right?

3  MR. ANDERSON:  He testified as to that.

4      He also raises the issue -- he says

5      that trial counsel was ineffective

6      because they failed to object to

7      that admission during trial.  And

8      the State's position is that there

9      were two motions to suppress filed

10     by his defense counsel before that,

11     and there was no reason for them to

12     again object to something that has

13     already been decided by the Court.

14     And I also think that the record

15     will reflect that they asserted

16     every objection at every

17     opportunity that had either been

18     decided on whenever they were given

19     a chance by the circuit judge.

20  THE COURT:  The District Attorney

21     issued a subpoena on May 23rd,

22     2001, to the keeper of records at

23     Medical Center Enterprise

24     requesting all medical records, lab

25     reports, blood, hair, saliva, and

61

1   bodily fluids of Petitioner.  And

2   you're saying that your

3   Constitutional rights of the 4th,

4   5th, 6th, 8th, and 14th Amendment

5   rights were violated because the

6   District Attorney was without

7   authority to subpoena that evidence

8   based on -- why are you saying that

9   the District Attorney had no

10  authority to subpoena that

11  evidence?

12  MR. CONRAD:  There was no issue from

13  the Judge concurring with him to

14  have authority to try to

15  subpoena -- there's no paperwork

16  showing --

17  THE COURT:  It's your position that the

18  DA cannot issue a subpoena and get

19  that information?

20  MR. CONRAD:  Sir?

21  THE COURT:  You're saying that the DA

22  cannot issue a subpoena and get

23  that information?

24  MR. CONRAD:  To my knowledge, from what

25  I've read in books and in case law,

62

1          it has to be ordered out from the

2          magistrate or the judge.

3      THE COURT:  Okay.

4  Q.   Did your counsel not file two separate

5  motions to suppress raising that very argument

6  with Judge McAliley?

7  A.   Not to my knowledge.

8          MR. ANDERSON:  Your Honor, the record

9          will reflect that the issue of

10         suppression as to that very

11         evidence was raised, preserved for

12         appeal.  As a matter of fact, there

13         was a standing objection in

14         reference to numerous motions for

15         suppression that had been made that

16         was renewed throughout the trial

17         process, and this was part of it.

18         And, again, I would say that his

19         argument is without merit.

20      THE COURT:  All right.

21  Q.   You also said you wished to testify, and

22  the trial counsel would not allow you to?

23  A.   Yes, sir.

24  Q.   You told them you wished to testify, and

25  they said no?

63

1    A.    Yes, sir.

2    Q.    Is it not true that you didn't testify

3    because after being informed of all the

4    possibilities and all of the ramifications of

5    you taking the stand, your trial counsel along

6    with yourself thought it best that you not

7    testify?

8    A.    No, sir, it was not.

9    Q.    That's not true?

10    A.    No.

11    Q.    Okay.  You also say that there was a

12    conflict created in reference to your

13    representation where Judge McAliley required

14    that Mr. Al Smith become a witness in your case.

15    Now, isn't it true that Al Smith was called as a

16    witness in an in camera hearing?  That means a

17    hearing that is out of the visibility of any

18    juror; isn't that right?

19    A.    Yes, sir.

20    Q.    And isn't it true that that hearing had to

21    do with how did Al Smith obtain information as

22    to possible exculpatory evidence?

23    A.    I have no record of that.  I was not

24    informed of --

25            MR. ANDERSON:  Your Honor, the record

64

1        would reflect that that is what the

2        subject matter was.

3    A.    I wasn't informed of that.

4    Q.    Mr. Smith being asked to testify or ordered

5    to testify away from any juror as to how he got

6    some information, how would that prejudice you?

7    A.    It could have been a bad investigation

8    concerning where the evidence came from and how

9    it would have been in favor to my behalf.

10   Q.    How does that create a conflict which

11   hindered his ability to represent you?

12   A.    It could have caused him to become in the

13   state of not being able to present himself in a

14   professional standing.

15        MR. ANDERSON:    Your Honor, we argue

16             that there was no conflict that

17             came about and that everything was

18             done out of the view of the jury.

19             Mr. Smith's representation of Mr.

20             Conrad was in no way hindered.

21        THE COURT:    Okay.    Now, you have cited

22             under Section 12-21-161, Code of

23             Alabama, Mr. Conrad, that "No

24             attorney or his clerk shall be

25             competent or compelled to testify

65

1          in any court in this state against

2          the client as to any matter or

3          thing or knowledge, of which may

4          have been acquired from the

5          client."

6     MR. CONRAD:  Yes, sir.

7     THE COURT:  Do you have any information

8          or any evidence to indicate that

9          that hearing had anything to do

10          with information that Mr. Smith

11          obtained from you?

12     MR. CONRAD:  Could you state that

13          again?

14     THE COURT:  Do you know what that in

15          camera hearing was about?

16     MR. CONRAD:  Oh, no, sir.

17     THE COURT:  Do you know whether or not

18          that hearing involved anything that

19          had to do with information that Mr.

20          Smith obtained from you as his

21          client?

22     MR. CONRAD:  No, sir.

23     THE COURT:  So if it was about

24          something else that had to do with

25          knowledge and information that you

66

1          gave Mr. Smith, that statute would

2          not apply; do you agree?

3     MR. CONRAD:  Yes, sir.

4     THE COURT:  Okay.

5     MR. ANDERSON:  Your Honor, I also raise

6          that in the State's response.  I

7          say that Attorney Smith was not

8          asked or forced to divulge any

9          confidential information that he

10         obtained from his client, and his

11         client just affirmed that.

12    Q.   You raise another issue.  You say that

13    testimony by the Department of Forensic

14    Sciences' witnesses was misleading because they

15    were not accredited at the time; is that right?

16    A.   Yes, sir.

17    Q.   How was that misleading if they testified

18    as to their training and expertise as to the

19    things that they testified to?  Did they tell

20    the jurors that they were accredited when they

21    were not?

22    A.   Yes, they did.

23    Q.   They said that they were accredited?

24    A.   Yes, sir, they did.

25         MR. ANDERSON:  Your Honor, I think the

67

1  record would refute that.  And I

2  would also like to say that the

3  trial judge declared those

4  individuals experts, that their

5  methods met the Daubert standard,

6  and that there is no requirement

7  under Alabama Statute or any other

8  law that I'm aware of that a DFS

9  expert is required that they be

10  certified by some certifying

11  authority as having being

12  accredited.  That issue is also

13  without merit, Judge.

14        And I believe that that's the

15  last issue that Mr. Conrad raised,

16  and I have no more questions of

17  him.

18  MR. HOLLINGSWORTH:  Judge, I have one

19        follow-up question or two.

20  THE COURT:  Take your time.  This is

21        Mr. Conrad's opportunity, and I

22        want to make sure --

23

24        <u>REDIRECT EXAMINATION</u>

25  BY MR. HOLLINGSWORTH:

68

1    Q.    Mr. Conrad, you wanted to offer some

2    explanation a few minutes ago to the question

3    that the prosecutor asked you about, I believe,

4    the search warrant?

5    A.    Yes, sir.

6    Q.    Go ahead and tell the Court what you wanted

7    to --

8    A.    It was dealing with -- I stated on that

9    that the subpoena that they -- the subpoena to

10   the medicals, that it wasn't ordered out from

11   the magistrate or the judge.

12   Q.    I think it's probably clear from the record

13   that there was not a search warrant for that

14   particular --

15   A.    Oh, yes, sir.  Within the trial transcript,

16   I believe it stated that the search warrant that

17   was supposed to have been notified was lost.

18   There was no such thing as the search warrant.

19   Q.    Were you, during the course of that time,

20   being medicated with pain medication and

21   anesthesia during part of that time?

22   A.    Yes, sir.

23   Q.    Did you know what was going on around you?

24   A.    No, sir.

25            THE COURT:  Were you seeking medical

69

1      treatment for a gunshot wound?

2  MR. CONRAD:  I was in the hospital bed,

3      yes, sir.

4  THE COURT:  For treatment of a gunshot

5      wound?

6  MR. CONRAD:  Yes, sir.

7  MR. HOLLINGSWORTH:  I believe that's

8      everything I wanted to cover.

9  THE COURT:  Anything else from the

10      State?

11  MR. ANDERSON:  No, sir, not for Mr.

12      Conrad?

13  THE COURT:  Any arguments?

14  MR. ANDERSON:  Your Honor, I would like

15      to call --

16  THE COURT:  Oh, you want to call some

17      witnesses?

18  MR. ANDERSON:  Yes.  Your Honor, I

19      would like to call Attorney Al

20      Smith just for some brief

21      questions.

22  THE COURT:  Mr. Conrad, you can step

23      down.

24          (Witness excused.)

25  MR. HOLLINGSWORTH:  Let me confer with

1         my client just a minute, Judge, and

2         then we'll either rest or --

3    THE COURT:  Okay.

4         (A break was taken.)

5    MR. HOLLINGSWORTH:  We rest at this

6         time, Judge.

7    MR. ANDERSON:  Your Honor, the State

8         will call the Honorable Albert

9         Smith, who was trial counsel for

10        the Defendant at trial.

11   MR. HOLLINGSWORTH:  Judge, I'm going to

12        object to his testimony on the

13        grounds that it's a conflict of

14        interest for him to now testify.

15   MR. ANDERSON:  Your Honor, his

16        testimony is necessary due to the

17        issues that were raised by the

18        Petitioner in his Rule 32 Petition.

19   THE COURT:  And I think I've already

20        addressed that this morning, if I'm

21        not mistaken.

22   MR. SMITH:  Judge, I have requested Mr.

23        Hollingsworth to make that

24        objection and would ask the Court

25        that if it wishes for me to testify

71

1                to please order me to do so.

2        THE COURT:  I think I've already done

3                that, but I'm going to do it on the

4                record here.

5        MR. SMITH:  There is an order in there

6                that he's waived attorney-client

7                privilege.  But, specifically, this

8                morning as to me, I would

9                appreciate a ruling from the Court.

10       THE COURT:  And would the State tell me

11               what they expect to use this

12               witness for?

13       MR. ANDERSON:  Your Honor, there were

14               issues raised as to exculpatory

15               information being withheld by the

16               State.  And Mr. Smith was a witness

17               at an in camera hearing.  And I

18               would just like him to testify as

19               to what that information was, what

20               his role was as a witness, and if

21               any conflict arose.

22       THE COURT:  By filing this Rule 32 and

23               claiming ineffective counsel, the

24               Defendant did waive any

25               attorney-client privileges, and I'm

72

1    going to order you to testify.

2

3    SYDNEY ALBERT SMITH,

4    was sworn (affirmed) and testified as follows:

5

6    DIRECT EXAMINATION

7    BY MR. ANDERSON:

8    Q.    Mr. Smith, you've been alluded to

9    throughout the proceedings today.  But could you

10   please state for the court record your name and

11   occupation?

12   A.    Sydney Albert Smith.  I go by Al.  I'm an

13   attorney at law in the state of Alabama.

14   Q.    Are you familiar with Robert Thomas Conrad?

15   A.    Yes.  I was appointed to represent him in a

16   capital offense here in Coffee County,

17   Enterprise Division.

18   Q.    And you've been present throughout the

19   proceedings here this morning, have you not?

20   A.    I have.

21   Q.    You understand the allegations that have

22   been raised against you and other trial counsel

23   and appellate counsel; is that correct?

24   A.    Somewhat.  I have received a copy of the

25   original petition.  I was not aware that there

73

1    were amended petitions, and I followed as best I

2    could as the allegations were addressed in the

3    amended petition as so testified to.

4    Q.    During your representation of Mr. Conrad,

5    did you come about some information that may

6    have been exculpatory in nature that was not

7    disclosed by the District Attorney's office?

8    A.    Absolutely.

9    Q.    What was that information?

10   A.    I received -- well, the information was

11   that there had been a cover-up by the Enterprise

12   Police Department and the District Attorney's

13   office.  How I got that information, are you

14   asking me that?

15   Q.    I would like know what the information was,

16   first.

17   A.    That there had been a secret investigation

18   by the Enterprise Police Department and the

19   District Attorney's office of a witness that had

20   information favorable to Mr. Conrad.

21   Q.    Did you raise that possibility with the

22   trial judge, Gary McAliley?

23   A.    I first did so by asking a witness -- I

24   believe it was Jeff Spence, a police officer who

25   was testifying -- I received this information in

74

1    my home at night during the trial. We had not

2    finished with the witness. Yeah, I think it was

3    Jeff Spence. I'm not sure. And I asked him in

4    one of my final questions to him was he aware of

5    an investigation of a police officer involving

6    the investigation of this offense, words to that

7    effect. And he answered yes, that he was aware

8    of it. And my next question -- I don't remember

9    exactly what it was, but it was something to

10   what was that investigation about. And about

11   that time, the District Attorney prosecuting

12   this case -- and, of course, you weren't

13   involved at that point -- objected. And we went

14   in camera for I think the rest of the day

15   probably. We had an in camera hearing on what

16   that was.

17   Q.    During that in camera hearing, were you

18   required by Judge McAliley to testify as a

19   witness?

20   A.    I was.

21   Q.    During that testimony, was there any

22   conflict created in reference to your

23   representation of Robert Thomas Conrad through

24   that testimony?

25   A.    I felt that there was a conflict simply

1   because I was trial counsel and was called as a

2   witness.  Now, this was during an in camera

3   hearing.  And nothing I testified to was

4   received from Mr. Conrad himself.  I think that

5   issue was dealt with by the appellate courts.

6   And, obviously, my concern was not upheld by the

7   Alabama courts.  But there was nothing testified

8   to that was received from Mr. Conrad.

9   Q.    So this took place in an in camera hearing

10  out of the presence of the jurors, correct?

11  A.    The in camera hearing did.  The first

12  couple of questions were in the courtroom

13  regarding -- to Mr. Spence regarding was there

14  an investigation, and that was before the jury.

15  But nothing of my testimony was before the jury.

16  Q.    During your testimony which was not in the

17  presence of the jury, did you ever -- were you

18  ever forced to divulge any confidential

19  information that you received from Mr. Conrad?

20  A.    No.

21  Q.    And this issue was raised on appeal, was it

22  not?

23  A.    I did not handle the appeal.  I had a

24  family member dying of cancer, and the Court

25  allowed me to come out of the case after the

1   trial.  So I didn't handle the appeal.  But my

2   understanding is that it was actively addressed,

3   yes.

4   Q.   And do you know what the decision was by

5   the Criminal Court of Appeals in reference to

6   this case?

7   A.   All of the issues were ruled in favor of

8   the State by both the Court of Criminal Appeals

9   and the Alabama Supreme Court.

10  Q.   And Mr. Conrad just before you took the

11  stand testified and also raised it in his

12  petition that you and Mr. Bradshaw were

13  ineffective because you failed to object during

14  the trial to the admission of a bullet.  Did you

15  hear that argument?

16  A.   I heard it, yes, sir.

17  Q.   Did you not, along with Mr. Bradshaw, file

18  a motion to suppress that very evidence?

19  A.   Oh, we did.  We vigorously opposed and

20  requested the removal and the admissibility of

21  that bullet on numerous grounds.

22  Q.   What was the decision by the trial court?

23  A.   The Court held that the law is clear that a

24  District Attorney's subpoena cannot be used to

25  obtain records.  And that is clearly the law.

1    But the Court ruled that under the

2    Nix (phonetic) v. Williams discovery doctrine

3    that the records would have been available and

4    obtained anyway.  And I think the Court's ruling

5    is correct.  There's no error there.  There was

6    a consent to the surgical procedure signed by

7    the Defendant.  And my recollection is we raised

8    at length his ability to give an intelligent and

9    knowing waiver.  Since it was for medical

10   treatment, my recollection is that the Court

11   again ruled that that was admissable.

12        We also raised the issue of Dr. Sawyer and

13   District Attorney Mark Fuller being friends,

14   whether there was any collusion, not that we had

15   any evidence that there was.  But we raised

16   that.  We raised vigorously with a couple of the

17   doctors' testimonies whether the medical

18   treatment was reasonable and necessary from a

19   medical standpoint to remove the bullet, or was

20   it just going fishing for evidence.  And there

21   was no testimony other than it was medically

22   necessary.

23             MR. ANDERSON:  Your Honor, I would like

24                  to correct some of my statements

25                  during cross-examination of Robert

78

```
 1              Thomas Conrad, whereby I referred

 2              to it as a search warrant.  In

 3              fact, it was a District Attorney

 4              subpoena.

 5   Q.   Did you object when the State began to

 6   admit this evidence at trial?

 7   A.   Oh, yeah.  We had a standing objection --

 8   our objection was preserved simply by the motion

 9   to suppress.  I think we did a couple of days

10   testimony on that.  And part of it was done in

11   camera.  The Court allowed us to do it in

12   camera.  We raised that objection and preserved

13   our standing, and we asked for a standing

14   objection at the time the evidence was

15   presented.

16   Q.   Not only was that issue already raised and

17   preserved, you had a standing objection whereby

18   each opportunity given, that was again raised?

19   A.   That's correct.  The first opportunity --

20   the first mention of it was to be introduced by

21   the State, and we raised an objection.  And to

22   keep from disrupting court, we asked for and

23   were granted a standing and continuing objection

24   to that evidence.

25   Q.   So it wasn't necessary for you to object at
```

79

1    trial when this was introduced, was it?

2    A.    Not at the time, no.

3    Q.    But you did with that standing objection,

4    did you not?

5    A.    Absolutely.

6         MR. ANDERSON:   Your witness.   Thank

7              you.

8

9              CROSS-EXAMINATION

10   BY MR. HOLLINGSWORTH:

11   Q.    You didn't really learn about a bullet

12   existing for several months after it was taken

13   out, did you, Al?  You weren't appointed

14   immediately?

15   A.    I'm sure I wasn't.  My file is in storage,

16   and I didn't pull it.  And I haven't looked at

17   the court file, but I'm sure I didn't get in the

18   case immediately.  I think that there were a

19   couple of other attorneys that were in and out

20   before I got into the case, I think, if my

21   recollection is correct.

22   Q.    Okay.  And you say that not only the

23   subpoena was raised as a defense matter but also

24   search and seizure issues and consent issues?

25   A.    Oh, absolutely.  We raised everything we

1  could think of, including the kitchen sink.

2  Q.   Were you provided any defense materials

3  from one of the earlier attorneys, Mr. Pitman,

4  before he got out?  His withdrawal was based on

5  the fact that he never handled criminal cases

6  and was unqualified to do so.  Did he gather any

7  discovery or anything that he passed on?

8  A.   Rick, I really do not remember.

9  Q.   Okay.

10  A.   I'm sorry.  I just don't recall.

11          MR. HOLLINGSWORTH:  That's fine.  I

12              believe that's all the questions I

13              have of this witness.

14          MR. ANDERSON:  Your Honor, the State

15              would rest as to calling anymore

16              witnesses.

17          MR. HOLLINGSWORTH:  I don't have any

18              further questions of Mr. Smith, but

19              let me take a minute.

20              (A break was taken.)

21          MR. ANDERSON:  Your Honor, there is one

22              issue that I cross-examined Mr.

23              Conrad on and intended to raise

24              this in Mr. Smith's testimony and

25              neglected to do so.  I apologize.

1          That was inadvertent.

2

3          REDIRECT EXAMINATION

4    BY MR. ANDERSON:

5    Q.    Mr. Conrad testified that he was denied by

6    you the option -- you and Mr. Bradshaw the

7    option to testify at trial.  Is that correct?

8    A.    That is not correct.  We -- he did not

9    testify at trial, and he did not testify based

10   on my recommendation to him and Mr. Bradshaw's.

11   We discussed at length whether he would testify

12   or not.  The evidence that was before the jury

13   at the time that he would have testified -- we

14   left the discussion open all through the trial

15   until the very end -- was would anything be

16   served by his testimony.  It was a strategic

17   decision for him not to testify, not to put him

18   on the record to have anything that could come

19   back in a future proceeding.

20         For one reason, I was convinced that the

21   exculpatory evidence would result in a reversal

22   of the case.  I felt very strongly about that.

23   And, obviously, I was wrong, at least at this

24   point.  And I didn't feel that there was

25   anything to be gained by putting him on the

82

1    stand at that trial.  Mr. Conrad is certainly

2    not -- he's an intelligent young man.  He is not

3    the most articulate young man, and I was

4    concerned that he would do more damage for his

5    case than we would get benefit out of it.  And

6    we discussed it with him several times and --  I

7    mean, several minutes of involved conversations

8    about whether he should testify or not.  And I

9    strongly recommended that he not testify.  And I

10   remember right before I rested in this very

11   courtroom at that table where he's still

12   sitting, I reaffirmed that he had the right to

13   testify, and he said that he was going to follow

14   my advice and not testify.  Right before I stood

15   up to rest the Defendant's case, I reaffirmed

16   that with him.

17   Q.    So you had numerous discussions with him in

18   detail, long discussions as to his testimony

19   during trial?

20   A.    That's correct.  It was my advice that he

21   did not, but it was his decision.

22   Q.    That's right.  Did he ever tell you:   I

23   don't care what your advice is; it's my right,

24   and I want to testify?

25   A.    No.  He indicated he trusted my judgment

83

1    and would go along with it.

2            MR. ANDERSON:  Okay.  Thank you very

3                much.

4            MR. HOLLINGSWORTH:  Mr. Smith, just a

5                couple of other questions.

6

7                RECROSS-EXAMINATION

8    BY MR. HOLLINGSWORTH:

9    Q.    Do you recall a conversation with the

10   Defendant to the effect that if Brian Yeomans

11   testifies, we'll let you testify in rebuttal?

12   A.    I'm sure that occurred because we kept it

13   very flexible, depending on what came before the

14   jury during the trial.  And a decision was not

15   made final until right before I rested the case.

16   Q.    And is it your testimony that that having

17   taken place, Mr. Conrad was later given the

18   opportunity to testify if he wanted to but did

19   not?

20   A.    That's correct.

21   Q.    Okay.  I've got one other question.  When

22   the in camera incident took place where you were

23   asked to testify, was the information that the

24   source provided to you the same information or

25   similar information that was obtained from your

84

1    client, or did the client provide any

2    information?

3    A.    I don't recall Mr. Conrad having anything

4    to provide us about Mr. Jackson.

5    Q.    Robinson?

6    A.    I mean, Mr. Robinson.  I'm sorry.  If he

7    did, I do not recall it.

8    Q.    So you didn't reveal any information to the

9    Court that Mr. Conrad had provided to you?

10   A.    No, absolutely not.

11            MR. HOLLINGSWORTH:  All right.  That's

12            all.

13            MR. ANDERSON:  I have no more questions

14            for Mr. Smith.

15         THE COURT:  You can step down.  Thank

16            you, Mr. Smith.

17                (Witness excused.)

18         THE COURT:  Let's take a break.

19                (A break was taken.)

20         THE COURT:  Mr. Hollingsworth, you've

21            had an opportunity to talk with Mr.

22            Conrad during the hour break?

23            MR. HOLLINGSWORTH:  Yes, Your Honor, we

24            have.  And we have elected to rest

25            at this point in time; however, Mr.

85

1          Conrad has asked that he be allowed

2          to make a statement to the Court.

3    THE COURT:  The Court has no objection

4          if there's no objection from

5          counsel.

6    MR. ANDERSON:  No objection.

7    THE COURT:  Mr. Conrad, I would ask

8          that if you would, come on up here

9          so we can hear you on the

10          microphone because you're kind of

11          soft-spoken.  And, Mr. Conrad, I'm

12          just reminding you that you're

13          still under oath for what you're

14          telling the Court.  Okay?

15    MR. CONRAD:  Yes, sir.

16    THE COURT:  All right.  Speak into the

17          microphone and tell me whatever you

18          want to tell me within reason.  If

19          the lawyers object, stop and let me

20          address that.  Okay?

21    MR. CONRAD:  Yes, sir.

22    THE COURT:  All right.

23    MR. CONRAD:  I just wanted to state

24          that if I caused any happenings of

25          dismay or loss of time from court

86

1      on Mr. Hollingsworth, Mr. Bradshaw,

2      and Mr. Smith, I apologize.  And I

3      want to thank you for this

4      opportunity and for you all

5      defending me.  Thank you.

6      THE COURT:  Well, let me say this on

7          behalf of the Court:  That's what

8          we're here for.  This is your first

9          petition that you may have filed in

10         this court.  And the Court wanted

11         to make sure you had every

12         opportunity to present your

13         evidence because if something is

14         wrong, this Court wants to address

15         it.  I want to assure you of that.

16             But go ahead if there's

17         anything else.

18     MR. CONRAD:  No, sir.

19     THE COURT:  Is that all?

20     MR. CONRAD:  Yes, sir.

21     THE COURT:  Anything else from counsel?

22     MR. HOLLINGSWORTH:  Nothing from us,

23         Your Honor.

24     MR. ANDERSON:  Briefly, Your Honor, I

25         would --

87

1    THE COURT:  Do y'all want to make any
2       arguments?
3    MR. ANDERSON:  As a response from the
4       State to everything that was
5       alleged and argued today, I would
6       like to again resubmit what's filed
7       with the Court already, the State's
8       responses, and also the testimony
9       that was given by Mr. Conrad and
10      also by Mr. Smith in support of the
11      State's motion, response.  We're
12      asking for these matters to be
13      denied.
14   MR. HOLLINGSWORTH:  Well, obviously, we
15      want it to be granted, Judge, so
16      I'm not going to belabor that
17      point.  Mr. Smith and Mr. Bradshaw
18      came in after -- I think after Mr.
19      Conrad told the Court that he
20      appreciated the efforts of both you
21      in defending him.
22   THE COURT:  I'll take this under
23      advisement and get an order out.
24      Mr. Conrad, I just want you to know
25      that it's going to take me a while

88

1    to go through this because there's

2    a lot of issues raised.  And I want

3    to go through it and go through all

4    of the evidence before I get a

5    ruling out.  It's going to take me

6    a little while.  Since we have

7    completed this evidentiary hearing,

8    I want everybody to know that as

9    far as any amendments to this

10    petition, the Court will deny or

11    cut off any amendments with regards

12    to this petition with regards to

13    the close of the evidence.

14        All right.  That's it.  I'll

15    get an order out.  Like I said, Mr.

16    Conrad, it may be a little while

17    because, first of all, I've got

18    several other things to rule on

19    that are ahead of this one.  And

20    then I want to make sure that I

21    spend the time and be able to go

22    over the evidence to make a proper

23    ruling.  Okay?

24    MR. CONRAD:  Okay.

25    THE COURT:  All right.  Good luck.

89

1          MR. ANDERSON:  Thank you, Judge.

2          MR. HOLLINGSWORTH:  Thank you, Judge.

3                  (PROCEEDINGS CONCLUDED.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

90

```
 1                    REPORTER'S CERTIFICATE
      STATE OF ALABAMA
 2    COFFEE COUNTY

 3

 4        I, Misty P. Whitworth, CSR, Official Court

 5    Reporter in and for the Twelfth Judicial Circuit

 6    of Alabama, do hereby certify that the foregoing

 7    transcript, pages 1 through 91, is a true and

 8    correct transcript of the testimony, to the best

 9    of my ability and understanding; and that the

10    same was taken down by me in stenographic

11    shorthand, recorded electronically, and

12    transcribed by me personally or under my direct

13    supervision.

14        I further certify that I have no interest

15    in this matter, financial or otherwise, or how

16    it may develop or what its outcome may be.  I

17    further certify that I am not of counsel for any

18    parties, nor am I related to counsel or

19    litigants or associated with anyone connected

20    with this cause to my knowledge.

21        WITNESS my hand this the 27th day of July,

22    2006.

23                    Misty Whitworth

24                    Misty Perry Whitworth, CSR
                      Official Court Reporter
25                    Notary Public, Alabama-at-Large
                      My Commission Expires:  11-01-2007
```

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP 13 | CERTIFICATE OF COMPLETION<br>REPORTER'S TRANSCRIPT | Page Number<br><br>**91** |
| --- | --- | --- |

**TO: The Clerk of the Court of Criminal Appeals**   Fax: (334) 242-4689
   **P. O. Box 301555**
   **Montgomery, Alabama  36130-1555**

**Criminal Appeals Case Number   CR-05-1913**

**STATE OF ALABAMA  vs.  ROBERT THOMAS CONRAD**
**Appellant's Name        Appellee**

On appeal from the:   [ X ] Circuit Court of   ]
                      [   ] District Court of   ]   Coffee County
                      [   ] Juvenile Court of  ]

Trial Court Case Numbers   <u>CC-2001-179.60; CC-2001-180.60</u>

Notice of Appeal Date  7-13-2006

I, Misty P. Whitworth, certify that I have this date completed and filed with the clerk of the trial court an original and three copies of a true and correct transcript of all proceedings in the above referenced case that were reported by me and were specifically designated by the appellant for inclusion on the Reporter's Transcript Order.  The transcript, which is numbered serially in the upper right-hand corner of each page, begins with a copy of the Reporter's Transcript Order and an index of both the exhibits and testimony of the witnesses.  The original transcript concludes with the original of this notice and the copies of the transcript conclude with copies of this notice.  The page number appearing in the upper right-hand corner of this certificate is the last page of my portion of the transcript in this case.

Done this the 27th day of July, 2006.

_Misty Whitworth_
Court Reporter

---

**FILING AND SERVICE OF THIS FORM: Pursuant to Rule 11(b), A.R.App.P., the court reporter should file a copy of this certificate with the Clerk of the Court of Criminal Appeals and should serve copies of the certificate on counsel for the appellant or the appellant if he or she is not represented by appellate counsel, the attorney general and the district attorney, unless the appeal is from a municipal appeal, in which event a copy of the form should be served on the municipal prosecutor rather than the attorney general and district attorney.**



IN THE ALABAMA COURT OF CRIMINAL APPEAL

CR-05-1913

ROBERT T. CONRAD
APPELLANT,

Vs.

STATE OF ALABAMA
APPELLEE.

---

ON APPEAL FROM THE CIRCUIT COURT
OF COFFEE COUNTY ALABAMA
CASE NO. CC-01-179.60 & CC-01-180.60

---

BRIEF AND ARGUMENTS OF APPELLANT

ROBERT T. CONRAD
AIS# 226791
HOLMAN UNIT 3700
ATMORE, AL.
36503-3700

STATE'S
EXHIBIT
J

## STATEMENT REGARDING ORAL ARGUMENTS

APPELLANT DOES NOT REQUEST ORAL ARGUMENT AT THIS TIME, BECAUSE OF HIS PRO SE STATUS, HOWEVER, IN THE EVENT OF A REMAND FOR FURTHER PROCEEDINGS AND COUNSEL IS APPOINTED, APPELLANT WILL AT THE TIME REQUEST ORAL ARGUMENTS.

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENTS.........................i

TABLE OF CONTENTS.........................................ii

TABLE OF CASES AND AUTHORITIES...........................iii

STATEMENT OF THE CASE......................................1

ISSUES PRESENTED FOR REVIEW...............................2

STATEMENT OF THE FACTS....................................3

STANDARD OF REVIEW........................................4

SUMMARY OF ARGUMENTS......................................5

ARGUMENTS.............................................6-30

CONCLUSION...............................................30

CERTIFICATE OF SERVICE...................................31

## TABLE OF CASES AND AUTHORITIES

Pg.

BRADY V MARYLAND, 373 US 83 (1963).....................14

BROOKS V KEMPER, #41 So.2d 483, 990 (Ala.1993)....28

BROWN V STATE, 686 So.2d 385, 405-406 (Ala. Crim. App. 1993..18

BURTON V STATE 651 So.2d 659.......................9

CUYLER V SULLIVAN, 466 U.S. 335 (1980).............17,21

EX PARTE ARTHUR, 472 So.2d 665 (Ala. 1985).........19

EX PARTE BURTON, 652 So.2d 659.....................9

EX PARTE CLARK, 639 So.2d 493, 499-500(Ala. Crim.App.2005).17

EX PARTE CITY OF DOTHAN PERSONNEL BOARD,831 So.2d 1 (2002).15

EX PARTE HAMLETT, 815 So.2d 499 (Ala. 200)........8

EX PARTE LOONEY, 797 So.2d (Ala. Crim.App.2001)....9

EX PARTE SEIBOLD, 25 LED.2d 171 (1979).............11,27

EX PARTE SELMA & Gulf R.R., Ala. 699 (1871).......28,32

EX PARTE McMILLIANS, 612 So.2d 318 (Ala.2001).....12

EPHRAIM V STATE, 627 So.2d 1102 (Ala. Crim. App...20

DWIGHT MARSHALL V STATE OF ALABAMA (CR-04-0663)....23,25

FOLSOM V WYNN, 631 So.2d 890 (Ala. Crim.App. 1992).24

HAMLETT, Supra.......................................8

HUNT V ANDERSON, 794 F. Supp. 1157 (M.D.Ala) Aff'd 979 F.2d
744 (11th Cir.1992)................................27

HUNTER V UNDERWOOD, 471 U.S. 22,85 Led.2d 222,105 S.Ct. 1916
(1985)............................................11,12

JONES V STATE, 2005 Ala. Crim. App. Lexis 89(Ala.Crim.App.2005)17

MONROE V HARCO INC. 762 So.2d at 31 (Ala. 2000)...25

NEWBERRY V CITY OF ANDALUSIA, 257 Ala. 49, 60, 57 So.2d 629,
637-38 (1952).....................................24

ROCK V ARKANSAS, 483 U.S. 44 (1987)................20

STATE V JUDE, 656 So.2d 528 (Ala. Crim.App.1993...8

STRICKLAND V WASHINGTON, 466U.S. 668, 104 S Ct. 2052, 80 Led.2d
674(1984).........................................7,10,11,14,26

TUMY V OHIO 273 U.S. 510,71 Led.2d 249 (1927)......16

WILLIAMS V WASHINGTON 895 So.2d 1012, 1016 (Ala. Crim.App. 2004).6

STRICKLAND V STATE, 771 So.2d 1123, 1125 (Ala.Crim.App.199_).7,13

## OTHER AUTHORITIES

Alabama Constitution of 1901------------------------------------11,22
Rule 12.1 (c) Ala.R.Crim.P.------------------------------------------7
Rule 15.3 Ala.R.Crim.P.---------------------------------------------8
Article 2 Chpt. 3 Code of Ala. 1975--------------------------------8

Rule 17.1(c)(2) A.R.Crim.P.-----------------------------------------16
Alabama Constitution of 1901 § 6-----------------------------------20
Article III § 42 and 43 Ala. Const.1901-------------------------23,28
Article II and III U.S. Constitution----------------------------23,28
Fifth, Sixth and Fourteenth Amend. U.S. Const.----------8,11,22,2
Article IV §44 of Ala. Const. 1901---------------------------------24
Ala. Code 1975 § 36-18-30------------------------------------------31
Canon 3(c)(1) of Canons of judicial ethics-------------------------14
§ 12-17-184 (19) Code of Ala. 1375---------------------------------19
§ 12-21-151 Ala. Code 1975-----------------------------------------20
§ 12-21-221 Code of Ala. 1975--------------------------------------13
§ 13A-5-39 thru 13A-5-69 Ala. Code 1975-----------------------------8
§ 13A-5-40 (a)(1-18) Ala. Code 1975--------------------------------24
§ 13A-5-40 (a)(2) Code of Ala. 1975---------------------------------9
§ 13A-5-49 Ala. Code 1975-------------------------------------------9
§ 13A-5-50 Ala. Code 1975---------------------------------------9,10
§ 41-4-90 Ala. Code 1975-------------------------------------------24

STATEMENT OF THE CASE

THIS APPEAL IS FROM THE CIRCUIT COURT OF COFFEE COUNTY ALABAMA, JEFF W. KELLEY, JUDGE, DENIAL OF A RULE 32 PETITION.

ON SEPTEMBER 27, 2002, CONRAD WAS CONVICTED OF CAPITAL MURDER PURSUANT TO §13A-5-40 (a) (2) ALA. CODE 1975 AND ROBBERY FIRST DEGREE PURSUANT TO Z13A-8-41 ALA. CODE 1975. (C.4) CONRAD WAS SENTENCED TO SERVE A TERM OF LIFE WITHOUT PAROLE ON THE CAPITAL CONVICTION AND LIFE ON THE ROBBERY CONVICTION. (C.4)

ON OCTOBER 24, 2003, THE ALABAMA COURT OF CRIMINAL APPEALS AFFIRMED THE CONVICTIONS AND SENTENCES BY A MEMORANDUM OPINION[1] SEE CONRAD V. STATE, 897 So.2d 124 (ALA. CRIM. APP. 2003). A CERTIFICATE OF JUDGEMENT WAS ISSUED ON JANUARY 16, 2004. (C.12)

ON JANUARY 7, 2005, CONRAD FILED A PETITION FOR POSTCONVICTION RELIEF IN THE CIRCUIT COURT OF COFFEE COUNTY ALABAMA PURSUANT TO RULE 32 A.R.CR.P. (C.1-84) CONRAD AMENDED HIS PETITION AT LEAST TWO TIMES. (C.214-215) in his PETITION AND AMENDMENTS, CONRAD ASSERTED AS GROUNDS FOR RELIEF:

1. DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL.

2. DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL.

3. THE COURT WAS WITHOUT JURISDICTION TO RENDER JUDGEMENT OR TO IMPOSE SENTENCE.

4. THE SENTENCE IMPOSED EXCEEDS THE MAXIMUM AUTHORIZED BY LAW, OR IS OTHERWISE NOT AUTHORIZED BY LAW. (C.8, 1-84, 150-154)

AFTER RECEIVING RESPONSES FROM THE DISTRICT ATTORNEY, AND APPOINTING COUNSEL TO REPRESENT CONRAD, ON DECEMBER 2, 2005, THE COURT CONDUCTED A EVIDENTIARY HEARING. (C.182) [2]

ON MARCH 17, 2006, THE TRIAL ISSUED IT'S ORDER DENYING THE PETITION. (C.182-206)

ON MARCH 31, 2006, CONRAD FILED A MOTION TO ALTER, AMEND OR VACATE THE JUDGEMENT. (C.209-212)

ON APRIL 28. 2006, THE COURT DENIED THE MOTION. (C.213)

THUS, THIS APPEAL ENSUES.

---

1. CONRAD REQUEST THAT THIS COURT TAKE JUDICIAL NOTICE OF THE RECORD ON DIRECT APPEAL.

---

2. THE EVIDENTIARY HEARING TRANSCRIPT IS INCLUDED IN THE RECORD ON APPEAL, REFERENCE TO THAT RECORD WILL BE DESIGNATED "R."

## STATEMENT OF THE ISSUES

### I.

WHETHER THE TRIAL COURT ABUSED ITS
DISCRETION IN DENYING THE PETITIION?

### II.

WHETHER APPELLANT WAS DENIED EFFE-
CTIVE ASSISTANCE OF TRIAL COUNSEL?

### III.

WHETHER APPELLANT WAS DENIED EFFE-
CTIVE ASSISTANCE OF COUNSEL ON
DIRECT APPEAL?

### IV.

WHETHER THE TRIAL COURT HAD JURIS-
DICTION TO RENDER JUDGEMENT OR TO
IMPOSE SENTENCE?

### V.

Newly Discovered evidence exist
requiring a new trial or other
relief based on the false and mis-
leading evidence presented at App-
ellant's Trial by employees of the
Alabama Department of Forensic
Sciences?

## STATEMENT OF THE FACTS

ROBERT THOMAS CONRAD WAS CONVICTED BY A JURY OF CAPITAL MURDER AND ROBBERY FIRST DEGREE, AND WAS SENTENCED TO LIFE WITHOUT PAROLE AND LIFE, RESPECTIVELY.

CONRAD CONVICTIONS AND SENTENCES WERE AFFIRMED ON DIRECT APPEAL, A CERTIFICATE OF JUDGEMENT WAS ISSUED ON JANUARY 16, 2004. Ex Parte Conrad, 899 So.2d 318 (Ala.2004)[3]

On january 7, 2005 Conrad filed a Rule 32 Ala.R.Crim.P. Petition, the denial of which is the basis of this Appeal.

As grounds in support of his Petition, Conrad essentially raised three grounds , with several sub-claims. ( C. 7-8; 12-58; 115-122; 150-154),Specifically, the three grounds of Conrad's Petition were:

1. Denial of Effective Assistance of Counsel at Trial;

2. Denial of Effective assistance of counsel on Direct Appeal, and

3. The Trial Court was without jurisdiction to render Judgement or to impose sentence. (Id.)

In support of the grounds and subclaims, Conrad submitted documentary evidence; excerpts from the trial records; Affidavits and other evidence .(Id.)

On December 2, 2006, a Evidentiary hearing was conducted on the claims before Judge Jeff W. Kelley. (R. 1)

At the hearing Conrad presented testimony and evidence to support his claims. (R. 7-67)

The State presented the testimony of Conrad's Trial Attorney Sydney Albert Smith. (R. 72-83)

At the conclusion of the hearing the trial Court took the case under advisement. (R. 87-89)

On March 17, 2006, the Trial Court issued its Order denying the Petition. (C. 182-206)

---

3. For Facts surrounding Conrad's original conviction this Court make take judicial notice of the record on Direct Appeal of

Conrad's convictions. The instant facts concerns the Rule 32 proceedings.

## STANDARD OF REVIEW

The standard of review an Appellate Court applies to a Circuit Court's denial of a petition for Post-conviction relief where the facts are disputed, is whether the trial judge abused his discretion when he denied the petition. Tolbert V. State, 2005 Ala. Crim. App. Lexis 143.

When the facts are not in dispute and pure questions of the law are involved, the review is denovo. Ex Parte White, 792 So.2d 1097 (Ala. 2001)

A court abuses it's discretion only when it bases it's decision on an erroneous conclusion of law or if there is no evidence in the record to rationally support the decision. State V. Jude, 686 So.2d 528, 530 (Ala. Crim. App. 1986)

SUMMARY OF ARGUMENTS

I.

With respect to issue one, Conrad argues that the trial court abused it's discretion in not granting Conrad relief on his claim raised in his petition, Conrad met his burden of proof by a preponderance of the evidence as to his claims raised.

The trial erred in not granting Conrad a new trial.

II.

With respect to issue two, Conrad argues that his trial errors and omissions deprived him of a fair trial, during the evidentiary hearing Conrad identified the acts of his trial counsel that were deficient and submitted facts showing that his counsel deficient performance prejudiced his defense to the extent that he was denied a fundamental fair trial, a trial whoseresults are unreliable due to counsel grave errors and omissions.

Conrad met the Strickland V. Washington, 466 U.S. 668 (1984) standard, and should have been granted a new trial.

III.

With respect to issue three, Conrad argues that he was deprived of a reversal of his conviction on Direct Appeal, due to his Appellate Counsel failure to raise meritorious issues that was preserved at trial.

Conrad met his burden of demonstrating that had counsel raised the issues on Direct Appeal, the outcome of his appeal would have been different.

The trial court abused it's discretion in not granting Conrad a new trial on this claim.

IV.

With respect to claim four, Conrad argues that the trial court was deprived of jurisdiction to render judgement or to impose sentence because the Alabama Constitution of 1901 and the statutes upon which he was indicted are void.

Conrad met his burden of proof with respect to his claim and trial court abused his it's discretion in not granting Conrad a new trial.

ARGUMENTS

I.

Whether the trial Court abused
it's discretion in denying the
petition?

YES

Conrad in his Rule 32 petition; various Amendments and
at the Evidentiary Hearing, essentially presented three (3)
grounds for relief: (1) Denial of effective Assistance of counsel
at trial, (2) Denial of Effective Assistance of counsel on Direct
Appeal and (3) The trial court was without jurisdiction to render
judgement or to impose sentence.

Within these grounds for relief, Conrad raised several
underlying claims and submitted facts and evidence entitling
him to relief.

With respect to each claim presented, Conrad contends
that the trial court abused it's discretion when the court failed
to grant him a new trial  after receiving evidence on the claims.

This court in State V. Jude, 686 So.2d 528 (ALA. Crim.
App. 1993) held :

> " A judge abuses his discretion
> only when his discretion is
> based on an erroneous conclusion
> of laws or where the record
> contains no evidence on which he
> ratinally could have based
> his decision. "

Id. At 530; see also Williams V. State, 895 So.2d 1012,
1016 (ALA. Crim. App. 2004)

In the instant case, Sub JUdice, Conrad submits, as
demonstrated hereinafter, a abuse of discretion occurred requir-
ing reversal of the trial court's denial of Conrad's petition.

II.

Whether Appellant was denied Effective
Assistance of trial counsel?

Appellant contends that his trial counsels Mr. Albert
Smith and Mr. Gary Bradshaw did not render reasonable effective
assistance of counsel prior to, during, or after Conrad's trial

-5-

counsel's acts and omissions identified below were not the result of reasonable professional judgement and fell outside the wide range of professional competent Assistance.

Conrad contends that counsel's deficient performance prejudiced his defense and deprived Appellant of fundamental fair trial within the meaning of Strickland V. Washington, 466 U.S. 668, 104 S.ct. 2052, 80 L.ed 2d 674 (1984).

In Strickland, the court stated:

> " in order to prevail on a claim of Ineffective Assistance of counsel, a defendant must show (1) that his counsel's performance was defi-cient, and (2) that he was prejudiced by the deficient performance..."

Id. 466 U.S. at 687; Strickland V. State, 771 So.2d 1123, 1125 (aLA. Crim. App. 199)

A. Counsel was ineffective and Appellant was prejudiced thereby when counsel failed to object to the oath not being administered to the venire prior to Vior Dire examination by the Court and Counsels.

> Rule 12.1(c) Ala.R.Crim.P., provides in pertinent parts:
> " (c) Qualifying the venire on the opening day of the term, or on such other day as the venire shaLL have been summoned to appear, the Judge presiding shall proceed to organize the Court, by: ....
> (2) Administering or causing to be administered to the Jurors the following oath required by law;
>
> " Do you and each of you solemnly swear or affirm that you will well and truly answer all questions propounded to you touching your general qualifications as a Juror, or qualifications as a Grand Juror or Petit Juror, and that you will well and truly try all issues and execute all writs of inquiry submitted to you and true verdicts rendered according to the law and evidence, so help you God?

In Ex Parte Hamlett, 815 So.2d 499 (Ala.2000), The Alabama
Supreme Court faced with an identical issue, noted that when
the record is silent as to whether the Oath was administered
to the Venire, Remand is required to determine whether the Venire
had been properly sworn.

In this case, the record is silent and does not contain
the required Oath. Therefore, counsel's failure to object to
this action was prejudicial to the substantial rights of the
Appellant as Conrad was entitled to have the prospective Jurors
sworn to truthfully answer the questions propounded to them
during Voir Dire examination.

In addressing this issue, the Trial Court found that
Circuit Judge Robert W. Barr presided over the term of the Court,
and Administered the general qualifying. The Court further held
that when Conrad's cases were called the Trial Judge, Gary L.
McAliley stated ' Ladies and Gentlemen all of you are still
under Oath, and I am going to ask you some questions ...."

Conrad argues, that Judge McAliley statements refers
to what Judge Barr allegedly did, and cannot impeach the record.
When the record is silent it is assumed that the Jury was not
sworn, Hamlett, Supra.

Accordingly, the Trial Court abused it's discretion in
not granting relief on this claim.

B. Counsel was ineffective and Conrad was prejudiced
thereby when counsel fail to move to dimiss the Indictment based
on the Indictment failure to allege essential elements of the
Offense.

Appellant was denied his 5th, 6th and 14th Amendment
Right's of the United States Constitution, when counsel failed
to know the applicable point of law to file a motion to dismiss
the Indictment, pursuant to Rule 15.3, Ala.R.Crim.P..

The death penalty appeals in Chapter 5 Article 2 of the
Code of Alabama [1975], and enumerates Title/Sections 13A-5-
39 to 13A-5-59, Code of Alabama [1975].

Appellant's Indictment is void as it is devoid of material elements of the statute as required by the law and violates his 6th Amandment Right to the United States Constitution, that gives Appellant notice of the charge of Cpital Murder in the Indictment, of what Appellant must defend himself against.

Conrad avers that his Indictment tracks only part of the element of the charge of Capital Murder and that part is Section 13A-5-40(a)(2) Code of Alabama [1975]. But, is devoid of the material element of the complete Capital Murder Statute of what the Appellant must defend himself against. Section 13A-5-40(a)(2) and 13A-5-50 of the Code of Alabama [1975], are enumerated as both elements of Capital Murder, during the guilty phase of the trial and as a aggravating circumstance during the penalty phase of the trial. See: Burton Vs. State, 651 So.2d 641 [Ala.Crim.App.1993] aff'd Sub nom. Ex Parte Burton, 652 So.2d 659 [Ala.1994].

Section 13A-5-50, verify's and on it's face substantiates it in corporation and necessary existance with 13A-5-40(a) as follows:

Aggravating circumstances Capital Offenses including aggravating circumstances.

> (A) The fact that a particular Capital Offense as defined in SEction 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49, shall not be construed to preclude, the finding and construed to preclude the finding and construed to preclude the finding and consideration of the relevant circumstance, or circumstances in determining sentence. By way of illustrate and not limitation, the aggravating circumstance specified in determining sentence in every case in which a defendant is convicted of the Capital Offenses defined in subsection (1) through (4) Subsection (h) of Subsection, 13A-5-40.

Conrad's Indictment is devoid of the notice imperative and mandatory word "shall". In essence, Appellant's Indictment is devoid of the fact that he must also defend himself in the guilt and sentencing phase of the charge against him, of aggravating circumstances not charged in the Indictment, (emphasis mine) [C.41].

In Ex Parte Lonney, 797 So.2d at page 428 [Ala.Crim.App. 2001], the word "shall" is defined as stated following:

-9-

" As used in statutes, constructs or the like this
word is generally imperative or mandatory. in
In common or ordinary parlance, and in it's ordin-
ary signification, the term " shall " is a word of
command , and one which has always [been given] or
which must be given a compulsory meaning; as dire-
cting obligation. The word in ordinary usage mean
" must " and is inconsistent with a concept of
discretion."

It has consistently been the law within the state of
Alabama that the aggravating circumstances must be alleged in
the Indictment, in order to afford the defendant due process.
See: Ex Parte Arthur, 472 So.2d. 665 [Ala. 1985].

But, this requirement is mandatory pursuant to the entire
Capital Murder Statute of notice in an Indictment, and by law
pursuant to 13A-5-50 Code of Alabama [1975].

Also, circumstances during the guilt phase as can be
developed, proved alleged  for guilt and sentence to punish
a defendant. Therefore, this element become's necessary to state
an offense and incumbent that notice be given to a defendant
in the Indictment. Withoyt such guilt and sentence is and can
be obtainerd on elements of the crimes without notice to the
defendant.

Trial counsel failed to provide Conrad with effective
assistance of counsel that's guaranteed by the 6th Amendment
of the United States Constitution . Trial counsel was also
ineffective, for failing to file a motion to dismiss the Indict-
ment at the pre-stage before proceeding to trial. Counsel can
deprive a defendant of the right to effective assistance of
counsel simply by failing to render adequate legal assistance.
See: Strickland Vs. Washington, 466 U.S. 668, 80. L. Ed. 2d
674 (1984).

The obligationto Appellant was clear that the Trial Court
can only make a determination upon this claim from counsel's
explanation, of whether he didn't know the applicable law or
whether his failure to excercise Conrad's right was trial
strategy, as credibility question can't be assured nor answered
from a trial record or affidavit.

The Trial Court after receiving evidence an argument
on this issue at the Evidentiary Hearing, held that counsel's
decision was trial strategy.

Conrad argues that the finding by the court is indirect conflict
with the comments of Strickland, supra, where the United States
Supreme Court held that strategy choices only can be made after
investigations, and demands more than the mere decision of a
strategy choice by counsel. It requires "Informed Strategy Choice"

Therefore, the trial court abused it's discretion in denying
Mr. Conrad relief on this claim.

### C. COUNSEL WAS INEFFECTIVE AND APPELLANT WAS PREJUDICED THEREBY WHEN COUNSEL FAIL TO CHALLENGE THE INDICTMENT ON THE GROUNDS THAT IT WAS RETURNED PURSUANT TO THE AUTHORITY OF ALABAMA CONSTITUTION OF 1901 WHICH WAS UNCONSTITUTIONALLY ESTABLISHED.

The Appellant has been convicted for the offense of murder with
aggravating circumstances that elevated this offense to Capital
Murder. Conrad contends that because this offense was secured
through the indictment clauses of the Alabama Constitution of
1901 that his indictment is void because the Alabama Constitution
of 1901 was enacted to establish white supremacy in the state
of Alabama and to disenfranchise African Americans
The establishment of white supremacy and the franchisement of
African Americans denies Mr. Conrad of equal protection of the
law, in violation of the 14th amendment, and the laws enacted
to promote the same are unconstitutional.
In Ex parte Seibold, 25 l.ed 171 (1879), the supreme court explain-
ed that ,where an underlying criminal law is unconstitutional,
the conviction does not redress any legal wrong because an uncons-
titutional law is void and is no law. the courts also went on
to state that any offense created by it is no crime and that
any conviction under it is illegal and void and cannot be legal
cause of imprisonment.
In Hunter V. Underwood, 471 U.S 22,85 l.ed.2d 222,105 S.ct 1916
(1985), the courts quoted from the minutes of the

-11-

Alabama Constitutional Convention of 1901, where the President *Redoing*
of the Convention, John B. Knox, stated in his opening address:

> " And what it is that we want to do? Why it is within
> the limits imposed by the Federal Constitution to
> establish white supremacy. Official Proceedings of
> the Constitutional Convention ofthe State of Alabama,
> May 21st, 1901 to September 3rd, 1901, p.8 (1940)."

Hunter V. Underwood, 471 U.S. at 232.

The other noted objective of the Convention, also noted
by the Court in Underwood, was to disfranchise African Americans.
The court found that the Convention was devised a long list
of offenses which it considered were most likely to be commited
by African Americans by enacting §182 of the Alabama Constitution
of 1901 to disfranchise. At 233 of Hunter, the Court stated
that:

> " Without deciding whether §182 would be valid if
> enacted today without any impermissible motivation,
> we simply observe that it's original enactment was
> motivated by a desire to discriminate against blacks
> on account of race and the section continues to this
> day to have that effect. As such, it violates Equal
> Protection under Arlington Heights."

The Appelle/Respondent in this matter, as cited in Hunter, has
already admitted " that the Alabama Constitutional Convention
of 1901 was part of a movement that swept the post-reconstruction
South to disfranchise blacks."

In Ex Parte McWilliams, 812 So.2d 318 (Ala. 2001), the
Alabma Supreme Courth held that this claim is cognizable in
a Rule 32 Petition. Trial counsel denied the appellant of Effec-
tive Assistance of counsel by failing to object to him being
tried upon an Indictment which was passed pursuant to constitut-
ional authority that was designed to disfranchise the Appellant
and to establish white supremacy. Conrad was prejudiced by
counsel deficient performance, because he has now been disenfran-
chised through a conviction which was obtain and denied life,
liberty and property without due process of law, all in violation
of the 14th Amendment.

Accordingly, the TRial Court abused it's discretion in
denying relief on this claim.

D. Counsel was Ineffective And Appellant was
   prejudiced thereby due to counsel
   failure to object to the erroneous in-
   structions to the jury on the uncorro-
   botated Testimony of the Co-defendant.

Appellant alleges that he was denied his right to a fair
trial due to trial attorney's at [Cr-1448] of trial transcript,
for failing to object to the trial court judge giving a erroneous
instruction to the jury.

The Trial Transcript at ]CR-1448]:

> " You should keep in mind that such testimony,
> is always to be received with caution, and
> weighted with great care, you shouldnever
> convict any defendant, any defendant, upon the
> unsupported testimony of such a witness, unless
> you believe their testimony could be truthful
> beyond reasonable doubt." Etc. Etc.

This particular instruction to the jury wenton from [Cr.1448
to Cr. _____].

As stated in Section 12-21-222, Code of Alabama [1975]
" A conviction of felony cannot be had on the testimony of a
accomplice, unless corroborated  by other avidence tending to
connect the defendant with the commission of the offense, and
such corroborative evidence, if it merely shows the commission
of the offense or the circumstances thereof, is not sufficient."

Appellant avers that trial counsel failure to object to
trial court's erroneous instruction, denied him a right to
Effective Assistance of Counsel.

The court after receiving evidence concluded that the instr-
uction was in compliance with §12-21-222 Code of Alabama 1975.
Conrad diagree, and submits when the court instructed the jury
" unless you believe their testimony could be truthful beyond
a reasonable doubt." allow the jury to infer that a conviction
could be obtained based on the co-defendant's testimony without
a finding of corroboration.

Conrad contends that counsel error in this regard, deprived
Conrad of a Fair Trial. See Strickland V. State, 771 So.2d 1123
{Ala.Crim.Appp.2002}

-13-

E. Counsel was Ineffective and Conrad was
prejudiced thereby when counsel
fail to move for a mistrial or con-
tinuance based on the prosecution
failure to turn over Exculpatory
and Impeachment Evidence.

During Conrad's trial it was discovered that the prosecut-
ion, had withheld a report regarding an internal investigation
by the Enterprise Police Department.

The report demonstrated that the District Attorney Office
knew of the plan to commit the robbery of the Toy Store prior
to the incident in which Appellent stands convicted.

After an in camera review of the report, the trial court
agreed that the treport contained exculpatory and impeachment
evidence (R.969, 999,1000). Conrad argues that trial counsel
failure to request a continuance or mistrial was prejudicial
to the substantive rights of the Appellant as the prosecutor
misconduct deprived the Appellant of evidence to rebut co-defen-
dant, Yeoman's testimony, which was crucial to the states case.

Conrad argues that had counsel properly moved for mistrial
or continuance, and the trial court denied such, there's a
reasonable probability the trial courts ruling would have been
reversed on appeal, as the states action was in clear violation
of Brady V. Maryland, 373 U.S. 83 (1963).

The trial court in it's order denying the petition, held
that Appellant was not prejudiced, by counsel deficient performan-
ce.

Appellant disagree, and submits taht the remedy afforded
the Appellant was insufficient to afford him a fundamental fair
trial as required by the Due Process clause of the Fourteenth
Amendment, to hold that counsel, could investigate, prepare
and adequately defend his client regarding a crucial defense
on the day of trial, would effectively erode the commands of
Strickland, that counsel's role is to ensure that the
adversarial testing process work to produce a just results.

Conrad submits that the trial court errerd in denying relief
on this claim.

F. COUNSEL WAS INEFFECTIVE AND APPELLANT WAS
PREJUDICED THEREBY WHEN COUNSEL FAIL TO OBJECT
AND SEEK RECUSAL OF THE TRIAL JUDGE, GARY L. MC-
ALILEY, ON THE GROUND THAT JUDGE MC ALILEY WAS
BIAS AND IMPARTIAL PRIOR TO AND DURING APPELLANTS
TRIAL AND SENTENCING.

Conrad avers that he was prejudice from the outest of his trial
by Judge Mc Aliley pre-trial statements that "Criminal
defendants who enter a guilty plea or who are convicted of
any act of violence, some active time in custody will be ordered
served." Further during trial Judge Mc Aliley questioned
witnesses for the prosecution and made comments that
demonstrated the appearance of impartiality. Specically, the
records shows that several times the Judge questioned witnesses.
(R. 1140, 1143, 1144, 1155, 1151, 1212, 1213, 1225) and referred
to defense counsel to Tom, Dick and Harry. (R. 376-77, 942,
945). The court further showed appearances of impartiality
during his ruling on defense counsel motions and objections
during the course of the trial, where the court demonstrated
favorable treatment to the prosecution. Conrad avers that at
one point counsel did object to the court improper questioning
of witness. (R. 1225). Conrad contends that counsel error and
omissions deprived him of his constitutional rights to a fair
trial.

Conrad argues that Canon 3 (C)(1) at the canons of Judicial
Ethics, requires that Judge Mc Aliley recuse himself from the
case. Canon 3(C)(1) Provides in pertinent part that " A Judge
should disqualify himself in a proceeding in which his
disqualification is required by law or his impartiality might
reasonably be questioned.

In Ex Parte City of Dothan Personnel Board, 831 So, 2d 1 (2002),
The court noted.
" Under canon 3 (C)(1), Alabama canons of Judicial Ethics,
recusal is required when facts are shown which make it
reasonable for members of the public or A party, or counsel
opposed to question the impartiality of the judge,

The court in its order addressing this issue, found that conrad
had fail to show any prejudice. Conrad argues that the lack
of a impartial trial judge is a structural error where presumed.
Tumey V. Ohio, 273 U.S. 510, 71 L.ed 249 (1927),
Brady V. Gramley, 520 U.S. 899, 904 (1997).
Conrad has a right to an impartial judge regardless of the
evidence against him, and counsel failure to halt the proceeding
in light of the clear evidence of impartiality by judge Mc-
Aliley, was constitutionally infirm.

### G. CONRAD WAS PREJUDICE BY COUNSEL PROCEEDING TO REPRESENT APPELLANT WHILE LABORING UNDER A CONFLICT OF INTEREST.

Prior to trial defense counsel Gary D , Bradshaw, filed a motion
to withdraw as appointed counsel for the appellant avering
as grounds therefore;
1. The victim, Jalaine Dennis, was a member of the same church;
2. The victims three children, April, Monica and Damon, were
all members of the Sunday, School Class in which counsel was
youth director and teacher. (C.R.20).

The record does not reflect whether or not the court ruled
on said motion, but the record does show that petitioner proceed
to trial and on direct appeal with attorney Gary D, Bradshaw
without objection.
Conrad aver's that he has a Constitutional right to be represent-
ed by conflict free counsel.
In the instant case, counsel made known to the court that he
had a personal relationship with the victim and victims children
under such circumstances, counsel could not represent the
appellant to the best of his abilities which adversely affected
counsel's performance during trial to the prejudice of the
appellant, as counsel had to choose between respect and loyalty
to the victims family and diligently representing his client.

-16-

Conrad avers that counsel's failure to object to his continuing participation in light of the circumstances was prejudicial to the substantial rights of the appellant, as counsel could not be expected to represent appellant to the best of his abilities in light of his relationship with the victim and victims children.

the trial court in his order denying the petition suggest that this issue could have been raised at trial or on direct appeal. However, the record clearly shows that Conrad was represented at trial by the counsel who labored under the conflict, and that appellate counsel was not prepared to raise the issue, because the record was not prepared in time to raise the issue. In CULLER V. SULLIVAN, 446 U.S 335 (1980), the supreme court held that a defendant is deprived of his right to effective assistance of counsel, when counsel labor under a conflict of interest.

In this case, contrary to the trial court's finding that the record does not support this claim, counsel himself filed a motion to withdraw based on his potential conflict, that actually materialize and adversely affected his performance in representing appellant. see JONES V. STATE, 2005. Ala. Crim. App. Lexus 89 (ala. crim. app. 2005).

Therefore, the trial court abused his discretion in denying relief on this claim.

                    II. COUNSEL WAS INEFFECTIVE AND APPELLANT
WAS PREJUDICED THEREBY WHEN COUNSEL FAIL TO OBJECT TO THE
ADMISSION OF THE BULLET TAKEN FROM BODY ON THE GROUNDS THAT
IT WAS THE PRODUCT OF AN ILLEGAL SEARCH AND SEIZURE.

Appellant avers that on May 23, 2001, the District Attorney, issues a subpoena to the keeper of the records of the Enterprise

-17-

Medical Center, requesting any all medical records, lab reports, blood, hair, slava, and bodily fluids of the appellant (C.R.296) In response to the subpoena, the District Attorney obtained evidence to include bullet that was removed from the appellant's body, which was later admitted into evidence during Conrad's trial.

Conrad contends that the authority of a District Attorney to issue subpoenas is found in §12-17-184 (18) code of alabama 1975, which provides:

" it is the duty of every District Attorney and assistant District Attorney within the circuit, county or other territory for which he is elected or appointed":

" At any time the grand jury is not in session, issue subpoenas to persons to come before them, and they shall have power to administer oaths to said persons and examine them as to any violation of the criminal laws of the state."
Also, Rule 17.1 (c)(2),A.R.Crim.P. Provides:

At any time the grand jury is not in session, the district attorney shall issue subpoenas for any witnesses the district attorney may require to come before the district attorney for examination under oath administered by the district attorney as to any violations of the laws of the state of alabama; if the matter being invesigated is not before the grand jury, the district attorney shall have authority to issue such subpoenas when the grand jury is in session."

See BROWN V. STATE, 686 So.2d 385, 405-406 (ala.crim.app.1995); EX PARTE CLARK, 630 So.2d 493, 499-500 (ala.crim.app. 1993)

In this case, the trial court in it's order denying the petition, recognized that the district attorney lacked the authority to issue the subpoena, but held that the evidence would have been

-18-

available and obtained anyway. Therefore, the trial court
acknowledge that the evidence should have been suppressed.
Appellant contends that counsels error in this regards was
prejudical to the fundamental constitutional rights of the
appellant.

### I. COUNSEL WAS INEFFECTIVE AND APPELLANT WAS PREJUDICED THEREBY WHEN COUNSEL FAIL TO ADVISE APPELLANT OF HIS RIGHT TO TAKE THE STAND AND TESTIFY IN HIS OWN DEFENCE.

Appellant avers that his trial counsel was ineffective and he
was prejudiced thereby when counsel fail to inform Conrad of
his right to testify and that the final decision to testify
belonged to him alone.
Conrad avers that neither of his counsels prior to , during nor
when the state rested its case informed him that he had a
constitutional right to testify in his own defense.
Appellant submits had he been informed of his rights he would
have taken the stand and testified in his own defense, which
would have allowed the jury to hear his version of the case.
Specifically, appellant would have testified as to his
whereabouts at the time of the crime, and that the bullets that
was taken from his body was caused by another individual during
a robbery of the appellant and not from the victim. Further
appellant would have testified about an argument he had with
Yeoman, that resulted in appellant beating Yeoman up, and that
is what caused Yeoman, to lie on the Appellant.

Conrad submits had the jury heard him testify in his own defense,
there's a reasonable probability that the jury would have had
a reasonable doubt as to his guilt of the crime he stands
convicted of. Conrad contends that counsel error was prejudicial
to the substantial rights of the appellant.

In EPHRAIM V. STATE, 627 So.2d 1102 (ala.crim.app.1993), This
court held:

" the right of an accused to testify in his own behalf is firmly
rooted in our legal system. The Alabama Constitution of 1901
ART1,§6, grants to an accuses the following rights, among others;
" That in all criminal prosecution, the accused has a right
to be heard by himself and counsel, or either; to testify in
all cases in his own behalf, if he elects to do so. "

The right to testify is derived from Amendment V and VI of the
United States Constitution, and grants to the accused personally
the right to make his defense. ROCK V. ARKANSAS, 483 U.S. 44
(1987),

In its order, denying the petition the trial court found, based
on counsel testimony at the hearing, that counsel advised the
appellant of his rights and that appellant made the decision
not to testify.
Conrad argues that the record does not support the conclusions
of the trial court, as there is nothing to support the court's
credibility determination. Moreover counsel never testified
as to why he believe it would do more damage than good, and
would information was forming appellant of his fundamental rights.

Conrad maintains that counsel deficient performance in this
regard prejudiced his defense, and deprived conrad of a fair
trial. GALLEGO V. UNITED STATES, 174 F.3d 1196 (11th.cir 1999)

J. COUNSEL WAS INEFFECTIVE AND APPELLANT WAS
PREJUDICED THEREBY WHEN COUNSEL WAS FORCED TO
BECOME A WITNESS IN THE CASE AGAINST HIS CLIENT.

Appellant avers that 12-21-161 code of alabama 1975 provides:

" No attorney of his clerk shall be competent or compelled to
testify in any court in this state against the client as to
any matter or thing, knowledge, of which may have been acquired
from the client, or as to advise or counsel to the client given
by virtue of the relation as attorney or given by reason of
anticipated employment as attorney unless called to testify
by the client but shall be competeny to testify for or against
the client as to any matter or thing the knowledge, of which
may have been acquired in any other manner.

An actual conflict exist when defense counsel is compelled to
compromise his or her duty of loyalty or zealous advocacy to
the accused by choosing between or blending the divergent or
competiting interest of a former or current client, see CUYLER
V. SULLIVANS.446 U.S. 335 (1980).

In the instant case, during appellant's trial, the trial court
forced defense counsl Al Smith, to become a witness in the case.
(R.1258-1264), Speifically counsel was forced to reveal the
identity of the source that gave him information regarding the
district attorney withholding of exculpatory and impeachment
evidence.

Conrad avers that this action by the trial court compelled,
counsel to compromise his duty of loyalty to his client as the
action prohibited counsel from vigorously seeking a mis-trial
and or dismissal if the charges based on the prosecution
withholding of exculpatory and impeachment evidence, counsel
had discused this information with his client, therefore, the
information became part of trial strategy, as the source could
have became potential witness for the defense.

Appellant avers that he was prejudiced by the trial courts
actions in this instance, and was deprived of his rights to
a fundamental fair trial.

-21-

The Trial Court in its order addressing this issue found that because counsel testified outside the presence of the jury, and was not required to disclose any confidential client information, this claim is without merits.

Appellant avers that when the trial court forced counsel to testify, it intimidated counsel and cause counsel to reveal attorney/client information that was discussed with the appellant.

Such action caused counsel to compromise his duty of loyalty to his client, as the action prohibited counsel from vigourously seeking a mistrial or dismissal of the charges, and further caused counsel to not vigourously represent the appellant.

All to the detriment and prejudice of the appellant, in violation of his Sixth and Fourteenth Amendment Rights to the United States Constitution, and the Applicable sections and Statutes of the Alabama Constitution of 1901.

The trial Court abused its discretion in not granting Conrad relief on this claim.

K. COUNSEL WAS INEFFECTIVE AND APPELLANT WAS
PREJUDICED THEREBY WHEN COUNSEL FAIL TO MOVE
TO DISMISS THE INDICTMENT ON THE GROUNDS IT
VIOLATES THE SEPERATION OF POWERS DOCTRINE OF
THE UNITED STATES AND ALABAMA CONSTITUTION.

Appellant was denied his 5th, 6th, and 14th amendments rights
of the United States Constitution, when counsel failed to know
the applicable point of law to file a motion to dismiss his
indictment on the grounds it violated the doctrine of seperation
of powers.

The law under attack in this petition for post-conviction relief
is the Alabama Death Penalty Act. The principle contention being
pressed by the appellant is that, the statute is unconstitutional
rendering his indictment returned upon said statute void, because
it was drafted by a committee called three branches of government
while elected, in violation of the principle of separation of
powers expressed in Article III, section 42 and 43 Article I,
II and III of the United States Constitution.

The question of whether the first alabama law institute drafted
the current death penalty statute, while composed of all three
branches of government has been admitted by the court of criminal
appeals in its memorandum opinion of DWIGHT MARSHALL V. STATE
OF ALABAMA, (C.R.-04-0663) stating:

" Although the alabama law institute may have drafted out Death
Penalty Statute, the statute was enacted by the alabama
legislature, the fact that individuals from all three branches
of government may have served on a body that drafted this
legislation does not constitute a violation of the separation
of powers doctrine,"

-23-

However, to confer power to other branches of the government
to draft, write and decide what the death penalty is in alabama
isn't a ministerial task by the alabama law task by the alabama
law institute. It decided what the law is in alabama concerning
capital offenses; who will be charged and why for certain
criminal offenses with the alabama, legislature simply rubber-
stamping the state-wide policy law and discretionary judgements
to charge alabama citizens.
The authority of legislative powers of this state of alabama
is exclusively vested in the state legislature, Article IV,
Section 44 of the constitution of alabama 1901.
Section 13A-5-40 (a) (1-18), code of alabama (1975), is
unconstitutional because the co-equal sharing of power to write
or decide the law of the state of alabama is prohibited.

The first alabama law institute in 1978-1979 that consisted
of all three branches of state government, plus a federal
representative wrote alabama's present day death penalty statute
and if they violated separation of powers doctrine of the law,
alabama constitution and U.S constitution by doing so. Then
the alabama law institute's actions were illegal, rendering
section 13A-5-40, code (1975) and its subsections null and void.
Thereby, rending the petitioner's sentence and conviction by
trial court without subject-matter jurisdiction, as his
indictment upon said statute null and void.

Drafting legislation is a power reserved to the sole and
exclusive authority of the legislature. see e.g, NEWBERRY V.
CITY OF ANDALUSIA, 267 Ala. 49, 60, 57 So.2d 629, 637-38 (1952).
The judiciary is responsible to interpret and apply the law;
the executive carries the law into effect and executes them.
In the case FOLSOM V. WYNN, 631 So.2d 890 (Ala.Crim. App. 1992),
the court addressed a claim that section 41-4-90, code 1975,

-24-

was unconstitutional because the statute had granted co-equal
power over the state purse to the governor in the event of
financial short-falls. the court found this statute is
unconstitutional to the extent that "it may apply to co-equal
branches of government, the legislature and the judiciary,"
because that function was served by constitutional decree to
the legislature.

When embarking on its mission as members of the alabama law
institute, the elected judicial and executive members of the
draft and make law. This is purely legislative function.

Under the test articulated by the suprema court in MONROE V.
HARCO INC. , 762 So.2d at 831 (ala. 2000), the alabama death
penalty act must fail:

"the true test and distinction whether a power is strickly
legislature, or whether it is administrative, and merely relates
to the execution of the statutory law, is the law, which ,
necessarily involes a discretion as to what it shall be, and
conferring authority or discretion as to pursuance of the law.
The first cannot be done, to the latter, no valid objection
can be done."

If trial counsel had filed a motion to dismiss petitioner's
indictment was unconstitutional because the Alabama law institute
decided what the Alabama death penalty was. Based upon the
doctrine of the separation and power, petitioner was entitled
to dissmissal of the indictment, as the statute would had to
have been determined to be unconstitutional. Based upon the
evidence and the criminal court of appeals own judicial admission
that the alabama law institute Drafted the state of alabama's
present death statute. A legislative function it couldn't
lawfully perform. DWIGHT MARSHALL V. STATE, CR-04-0633 supra.

III.

Whether Appellant was denied
Effective Assistance of Coun-
sel on Direct Appeal?

L. Appellant avers that his Appellate Counsel was In
effective and he was prejudice thereby when counsel fail to
raise on Direct Appeal, Conrad's objection to the Admission
of the bullet taken from Conrad's body.

During trial counsel challenged the admissibility of
the bullet taken from Conrad body while he was in the Hospital
on the ground that the bullet was the product of an illegal
search and seizure, specifically Conrad argues that the bullet
was seized from his body pursuant to a subpoena issued by the
District Attorney.

Conrad adopts the facts and arguments of claim H. supra,
and contends that the Trial Court erred in allowing the evidence
to be admitted.

Appellant contends had counsel raised this Issue on Direct
Appeal, there's a reasonable probability the result of Conrad's
Direct Appeal would have been different. Strickland, Supra.

M. Appellate Counsel was Ineffective and Appellant was
prejudiced thereby when counsel fail to raise on Direct Appeal
Trial Counsel's conflict of Interest. Prior to trial, Conrad's
attorney , Gary Bradshaw filed a motion to withdraw, citing
grounds that he had a close relationship with the victim's family

The record does not show whether the Trial Court Ruled
on the motion, but it's apparent that the Motion was denied
because Appellant was forced to proceed to trial and on Appeal
with this same Attorney.

Conrad adopts the facts and arguments of claim G. supra,
and contends that he was prejudiced by counsel failure to raise
this claim in the face of clear evidence that counsel labored
under a Conflict of Interest.

Conrad contends had Counsel raised this Issue, there's
a reasonable probability the result would have been different.
Strickland, Supra.

IV.

## Whether the Trial Court had Jurisdiction to render Judgement or to Impose Sentence?

N. Appellant contends that the Trial Court was without Jurisdiction to render Judgement or to Impose Sentence because Appellant was Indicted under a statute that violates the Separation of Power Doctrine of the Federal and State Constitution.

Appellant argues that his Indictment is void because it violated the Constitutional doctrine of " Separation of Power."

This Court has consistently affirmed claims that attack unconstitutional statute by adopting the State of Alabama's reasoning, that the issue isn't reviewable because it wasn't raised during Direct Appeal or a criminal defendant's Direct Appeal. This legal reasoning is without merit as the United States Supreme Court explains in Ex Parte Seibold, 100 U.S. 371, 25 L.Ed. 2d 717, 1879 U.S. Lexis 1833; 10 otto 371;

> " An unconstitutional law is void and is as no law. An offense created by it is not a crime. A conviction under it is not merely erroneous, but is illegal and void and cannot be a legal cause of imprisonment. It is true where no Writ of error lies, the judgment may be final, in that there may be no means of reversing it. But personal liberty is of so great moment in the eyes of the law that the judgment an inferior court affecting it is not deemed so conclusive but that the question of the trial's court's authority to try and imprison the party may be reviewed on Habeas Corpus by a Superior Court or Judge having authority to award the Writ."

In Alabama, Constitution provides that the power of Government shall be divided into three separate departments, Legislative, Executive, Judicial and that the powers of one department shall never be excercised by another, therefore, if this is an element of a republican form of Government wich the U.S. Constitution gurantees to the States, it is met in Alabama Hunt V. Anderson, 794 F.Supp. 1157 (M.D. Ala.) Aff'd 979 F.2d 744 (11 th Cir. 1992)

But the Appellant's claim that section 13A-5-40 Alabama Capital Murder statute is unconstitutional, ALabama specifically violates the provision of Article III. Section 42 of the Constitution of Alabama of 1901 ( Legislative, Executive, Judicial Department established ) and Art.IV, Section 4 of the United States Constitution. (Separation of Poewers).

Conrad raises the claim that 13A-5-40 was enacted by the Alabama LAw Institute which was composed of individuals from each of the three (3) branches of Government.

The Alabama Legislature devised the Alabama Law Institute because of it's long history of failing to establish a sound applicable death penalty statute, which this Institute was comprised of individuals from each of the branches of Government which they did create the present day death penalty statute.

In the Supreme Court of Alabama's decision, in Brooks V. Hobbie, 631 So.2d 883, 890 (Ala. 1993), Justice Houston's special concurrence states the confusion the court encounter's in the responsibility under State Law, where our jurisdiction is restricted by the department of powers provision in the Alabma Constitution, " 835 So.2d 186 n, 4. It then concludes that "it is for the legislature, not the Judiciary Districts are as nearly equal to each other in the number of inhabitants as may be." Citing Art. III § 43, ALa. Constitution 1901 ( the Separation of Powers clause). Id. Such abduction of Judicial responsibility is inconsistent with the settled principle that the people have forbidden the Legislature from conducting itself in a manner inconsistent with their Constitution and when it does, it is incumbent upon the Judicial to nullify a Legislative enactment contrary to the Constitution. See: Ex PArte Selma & Gulf R.R., Ala. 695 (1871).

It has been established through case law that the State's highest Court can act in an advisory role directly to the Legislature when the Legislature poses specific questions. But, it's not the ability of the Alabama Supreme Court to act in an advisory role to the Legislature is not what is in question by your Appellant.

It's abduction by the State of Alabama to the Supreme Court Justice of Alabama, the Attorney General, Legal Advisors to the Governor, State Representatives, State Senators and a Federal Level Justice all joined together, not in advisory

28.

capacity, but as creators of what has become the present
death penalty statute. There is no provisions in Alabama
which allows members of Executive Branch to act with the
Judicial Branch as advisors to the State Legislature, becau-
se this is a violation of the State and Federal Constit-
ional provisions that created Alabama's death penalty stat-
ute as a result of their  consorted efforts of the legislat-
ive, Executive and Judicial Branches of Government.

Conrad argues that the TRial Court abused his dis-
cretion in not granting relief on this claim.

V.

NEWLY DISCOVERED EVIDENCE EXIST REQUIRING A NEW
TRIAL OR OTHER RELIEF BASED ON THE FALSE AND MIS-
leading evidence presented at Appellant's Trial
by employees of the Alabama Department of
Forensic Sciences.

Appellant argues that the Alabama Department of Foren-
sic Sciences has falsely mislead courts jurors and the
public to believe that the method and principles used
in examining and analyzing forensic and physical evidence
is performed under reliable techniques.

The Alabama Department of Forensic Sciences has recent-
ly openly admitted that its laboratories has just gained
accreditation by the American Society of crime Laboratories
Directors, which demonstrates that the Laboratories was
deficient at the time of appellant's trial. This Court
can take judicial notice that the department and prosecutor
for years in this Court and the Courts throughout the

29.

State of Alabama through the testimony of employees purported to be experts, has mislead the Court, Juries and the Public to believe that the scientific and technical evidence was valid, when in fact based on the department's recent proclamation, the entire department of forensic science was fatally deficient rendering any testimony or evidence from the department inadmissible under the test laid down by the United States Supreme Court in Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

In Conrad's case, several employees of the Alabama Department of Forensic Sciences testified as to certain findings performed in its laboratories regarding blood and ballistic evidence, and such was crucial and material to the State's case against the appellant. However, due to the Department not being accredited at the time of the testing, such evidence was inadmissible under the Daubert standard.

Conrad contends that he discovered this evidence in January 2005, and submits that this new evidence requires that his convictions and sentences be vacated, and a new trial ordered, because Conrad's convictions rested upon the testimony and evidence submitted by the Aabama Department of Forensic Sciences, and absent such evidence, Appellant would not have been convicted.

Conrad argues that contrary to the Trial Court's findings that this claim is without merits, the false and

misleading evidence of the department and the prosecution, coupled with the lack of accreditation, deprived Conrad of the opportunity to challenge the admissibility of the evidence under Ala. Code 1975 § 36-18-30, and the United States Supreme Court decision in Daubert, Supra.

Conrad contends that the Trial Court abused its discretion in denying relief on this claim.

## CONCLUSION

For all of the above reasons, Appellant, Robert Thomas Conrad, respectfully request that this Court Reverse the judgement below and Remand with direction that Conrad be afforded a New Tria or other reief, as justice requires under the circumstances. So it is forever Prayed.

Respectfully Submitted,

ROBERT THOMAS CONRAD
AIS# 226791
Holman Unit 3700
Atmore, Al. 36503-3700

31.

## CERTIFICATE OF SERVICE

I hereby certify that I have this 29th day of

September 2006, served a copy of the foregoing on the Appelee

by pacing a copy of the same in the Prison Internal Mailing

system for mailing to the Court and the Appellee, Postage

prepaid and properly addressed as follows:

Troy King
A;labama  Attorney General
11 South Union Street
Montgomery, Al. 36130

ROBERT THOMAS CONRAD

32.

CR-05-1913

In the COURT of CRIMINAL APPEALS
of ALABAMA

ROBERT T. CONRAD,

Appellant,

v.

STATE OF ALABAMA,

Appellee.

On Appeal From the Circuit Court
of Coffee County
(CC-01-179.60, CC-01-180.60)

**BRIEF OF APPELLEE**

Troy King
Attorney General

Beth Slate Poe
Assistant Attorney General
Counsel of Record

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, Alabama 36130-0152
(334) 242-7300

October 27, 2006



STATE'S
EXHIBIT
K

PENGAD 800-631-6989

## STATEMENT REGARDING ORAL ARGUMENT

The State does not request oral argument in this case.

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT......................... i

TABLE OF CONTENTS........................................ ii

TABLE OF AUTHORITIES.................................... iv

STATEMENT OF THE CASE.................................... 1

ISSUE PRESENTED FOR REVIEW.............................. 5

STATEMENT OF THE FACTS.................................. 5

STANDARD OF REVIEW..................................... 18

SUMMARY OF ARGUMENT.................................... 19

ARGUMENT.............................................. 20

  I.   The Trial Court's Denial Of Conrad's Petition Was
Proper Because The Claims Were Precluded Pursuant To Rules
32.2(a), (c), And/Or Were Without Merit ................ 20

    a.   Failure to object to oath not being administered
before voir dire.................................... 23

    b.   Failure to move to dismiss indictment for failure
to allege essential element of aggravating
circumstance(s)..................................... 24

    c.   Counsel failed to challenge the indictment based on
the alleged racist Alabama Constitution of 1901....... 25

    d.   Counsel failed to object to the alleged erroneous
jury instruction on uncorroborated  testimony of the
codefendant......................................... 26

    e.   Failure of counsel to move for a mistrial or
continuance based on exculpatory evidence............ 28

    f.   Counsel failed to move for recusal of the trial
court............................................... 29

g.   Counsel's alleged conflict of interest .......... 32

h.   Failure to object to the admission of the
bulletremoved from Conrad's body pursuant to medical
treatment......................................... 33

i.   Failure to advise Conrad of his right to testify . 34

j.   Conrad was prejudiced when counsel, Mr. Smith was
forced to become a witness against Conrad............ 35

k.   Failure to move to dismiss indictment of grounds
that it violates the Separation of Powers Doctrine.... 36

l and m.  Ineffective assistance of appellate counsel . 37

II.  Conrad's Claim Of Newly Discovered Evidence That The
Department Of Forensic Sciences Laboratory Was
Unaccredited In The Past Warrants No Relief Because It
Fails To Meet The Test For Newly Discovered Evidence ... 38

CONCLUSION............................................ 40

CERTIFICATE OF SERVICE............................... 41

## TABLE OF AUTHORITIES

**Cases**

Bryant v. State, CR-98-0023, 2003 WL 1424026 (Ala. Crim. App., Mar. 2003) ...................................... 24

Daniels v. State, 650 So. 2d 544 (Ala. Crim. App. 1994) ........................................... 21

Ex parte Baldwin, 456 So. 2d 129 (Ala. 1994) ............. 21

Hallford v. State, 629 So. 2d 6 (Ala. Crim. App. 1992) ... 22

Hoobler v. State, 668 So. 2d 905 (Ala. 1995) ............. 39

Luke v. State, 484 So. 2d 531 (Ala. Crim. App. 1985) ..... 22

Saffold v. State, 570 So. 2d 727 (Ala. Crim. App. 1990) ............................................. 25

Strickland v. Washington, 466 U.S. 668 (1984) ........... 20

Ward v. State, 814 So. 2d 899 (Ala. Crim. App. 2000) ..... 31

**Other Authorities**

Code of Alabama (1975),

§ 12-21-222 ........................................ 27

**Rules**

Alabama Rules of Criminal Procedure,

Rule 32.2(a) (3) and (5) .............................. 32

Rule 32.2(c) ........................................ 38

Rule 32.3 ........................................... 20

## STATEMENT OF THE CASE

This is an appeal from the denial of a Rule 32 petition in the Circuit Court of Coffee County, Alabama (CC-01-179.60 and CC-01-180.60) Judge Jeff W. Kelley presided.

Robert T. Conrad, the appellant in this case, filed a Rule 32 petition in the Coffee County Circuit Court on December 22, 2005 (C. 11), challenging his September 22, 2002, convictions of capital murder and of robbery in the first degree and resulting sentences of life without parole and life, respectively. (C. 4) Conrad raised the following claims in his Rule 32 petition:

> 1. that trial counsel failed to object to the oath not being administered before voir dire examination by the court and attorneys in violation of Rule 12.1(c), A.R.Cr.P. (C. 13-14);
>
> 2. that trial counsel failed to object on the basis that the sentence was illegal "due to the fact that the petitioner's sentence was illegal due to his indictment only setting forth the material elements of robbery third degree, which resulted in petitioner being convicted and sentenced beyond the maximum authorized by law" (C. 15);
>
> 3. that counsel failed to move to dismiss the indictment "where the grand jury foreman failed to endorse upon the indictment whether a prosecutor appeared or not before the grand jury as required by §12-16-205" (C. 18);
>
> 4. that counsel failed to object to the trial judge swearing in the petit jury instead of the

circuit clerk as required by Section 12-16-170 of
the Code of Alabama (1975) (C. 20-21);

5. that counsel failed to move to dismiss the
indictment on the basis that it failed to allege
an essential element to wit: the aggravating
circumstance(s) (C. 23-24);

6. that counsel failed to move to dismiss the
second count in the indictment because the
elements in the second count charging first degree
robbery were the same facts encompassed in the
capital murder charge alleging murder plus first
degree robbery (C. 30); and,

7. that the indictment was void because it was
based upon a capital murder statute that violated
the Separation of Powers Doctrine because it was
drafted by a commission comprised of individuals
from all three branches of government (C. 27-29).

On April 1, 2005, the district attorney filed a response

asserting that the petition was due to be dismissed on the

basis that the grounds were precluded pursuant to Rule 32.2

(a)(3) and (5) as well as Rule 32.2(c) of the Alabama Rules

of Criminal Procedure.  (C. 85-92) The district attorney

also alleged the petition was due to be denied for lack of

merit.  (C. 85-92) Conrad filed a motion to amend his

petition on April 9, 2005, raising the following additional

claims.

1. that trial counsel was ineffective for failing
to move for a continuance when it was discovered
during the trial that "the prosecutor had withheld

2

a report regarding an internal investigation by the Enterprise Police Department" indicating that the district attorney's office knew about the plan to rob the toy store before the incident for which Conrad was convicted occurred (C. 115);

2. that trial counsel failed to move to have the trial judge recused on the basis of bias toward Conrad based on a pretrial comment and calling defense counsel "Tom, Dick, and Harry" during the trial (C. 116);

3. that trial counsel, Mr. Bradshaw, had a conflict of interest because he allegedly went to church with the victims and the victim's children were allegedly in the Sunday School class taught by Mr. Bradshaw (C. 117);

4. that trial counsel filed two pretrial motions to suppress the bullet removed from Conrad's body but failed to object when the bullet was admitted into evidence (C. 118);

5. that trial counsel failed to advise Conrad that he could testify at trial in his own behalf (C. 119);

6. that trial counsel was forced to testify in a hearing during the trial and thereby creating a conflict of interest (C. 119); and,

7. that newly discovered evidence required a new trial to wit: that the Department of Forensic Sciences was not accredited.

(C. 115-122) The State filed a response to the amended claims on June 30, 2005, alleging that those amended claims were precluded pursuant to Rules 32.2(a)(5) and 32.2(c) of the Alabama Rules of Criminal Procedure and further, were without merit. (C. 129-133)

3

On June 17, 2005, Judge Kelley issued a written order setting a hearing on the petition for December 2, 2005, and appointing the Honorable Rick Hollingsworth, Sr. to represent Conrad. (C. 137) On August 15, 2005, Conrad again moved to amend his Rule 32 petition to raise the following claim:

> 1. that the capital murder statute violated the Separation of Powers Doctrine (basically a reprise of the same claim made earlier).

(C. 150-154) On August 25, 2005, the district attorney filed a response to the second amended petition alleging that his second amended petition was due to be summarily denied. (C. 155-156)

A hearing was held on December 2, 2006, following which Judge Kelley issued a detailed written order on March 17, 2006, denying the petition. (C. 182-192)

Conrad filed a pro se written notice of appeal on April 17, 2006. (C. 216)

4

## ISSUE PRESENTED FOR REVIEW

Was the trial court's denial of Conrad's petition proper because the claims were precluded pursuant to Rules 32.2(a), (c), and/or without merit?

## STATEMENT OF THE FACTS

The following facts were adduced at the evidentiary hearing on the Rule 32 petition.  With the agreement of the trial court and counsel, the testimony at the hearing was limited to "the issues that have been presented in the petition and responses".  (R. 6-7)

Conrad testified in his own behalf that he was represented at trial by Mr. Al Smith and Mr. Gary Bradshaw. (R. 8)  Conrad testified that he should have been charged with robbery in the third degree instead of first degree robbery because there was no violence involved in the offense.  (R. 9-11)  Conrad opined that his counsel should have filed an objection on that basis before the trial began.  (R. 12)

Conrad testified that his counsel should have objected to the "oath not being administered to the venire prior to the voir dire examination by the court and counsel".  (R.

13)    Conrad further complained that counsel failed to object on the basis that the prosecutor's name was not endorsed on the indictment as required by Section 12-16-205 of the Code of Alabama (1975).  (R. 14)  On cross examination, Conrad conceded that the grand jury foreperson's name was on the back side of the indictment and that the district attorney's name, "Mark Fuller", was typed on the front of the indictment form and his initials were written above his typed name.  (R. 43-44)  He further conceded that he did not have any evidence to prove that was not Mr. Fuller's name.  (R. 43-44)

Conrad also complained that trial counsel was ineffective for failing to object on the basis that the judge swore in the jury instead of the circuit clerk.  (R. 15) On cross examination, Conrad admitted that the judge did administer the oath to the jurors, but maintained that the clerk should have administered the oath.  (R. 45)

Conrad alleged that counsel was ineffective for failing "to know the applicable law to file a motion to dismiss the indictment pursuant to Rule 15.3 A.R.Cr.P. on grounds that the indictment was void [because] it failed to allege" the aggravating circumstances.  (R. 16)  On cross examination,

6

when the court asked Conrad to "tell me what language it [the indictment] was deficient of", Conrad replied, "I don't know". (R. 51-52) The assistant district attorney read the indictment at the hearing and pointed out that the indictment alleged the crime of capital murder, which was also the aggravating circumstance alleged at the sentencing stage of the trial. (R. 52-53)

Conrad alleged that his indictment was void because the capital murder statute was drafted by the Alabama Law Institute, which was comprised of individuals from all three branches of government. He contends that the drafting of the law in that manner violated the Separation of Powers Doctrine. (R. 18-19)

Conrad testified that counsel was ineffective for failing to file a pretrial motion to dismiss the second count of the indictment, which charged first degree robbery based on double jeopardy. He stated that the robbery upon which the second count was based was also part of the capital murder charge alleging murder and a robbery. (R. 10-21) He asserted on cross examination that, "the elements of robbery first degree is (sic) causing physical harm. There was no physical harm caused on Mr. Grimes".

(R. 40)  During cross examination of Conrad, the district attorney explained that there were two victims and that the robbery underlying the capital murder count was a separate robbery from the one alleged in count two, and thus, there was no double jeopardy issue.  (R. 53)

> Your Honor, the indictment sets out that that robbery first degree was of the person of Mr. Grimes, that he used a pistol to take a wallet from that individual.  It's a separate individual, separate property, same firearm, of course, but these are two different robberies.  And that double jeopardy is not at issue.  These are completely separate individuals, victims, not entire circumstances,....

(R. 53)

Conrad alleged that counsel was ineffective for failing to object to the erroneous jury instruction on corroborated testimony of a codefendant found at page 1448 of the trial transcript.  (R. 22) He also alleged counsel was ineffective for failing to object to the indictment based on it being returned pursuant to the Alabama Constitution (1901), "which was established to promote white supremacy and disenfranchise African-Americans".  (R. 24) On cross examination, Conrad agreed that he opted not to give any testimony on this claim for the trial court to consider. (R. 54)

8

In reference to one of his two amended petitions, Conrad alleged that counsel failed to move for a mistrial or continuance based on the prosecutor's failure to turn over exculpatory evidence to defense counsel. (R. 28)  He testified that he found out after the trial "that the Enterprise Police Department had documents that this [robbery of a toy store] was about to occur before it did occur.  And he also had a list of names of individuals that they knew about this incident going to happen". (R. 28-29)  When the trial court asked Conrad how he was prejudiced by this, Conrad replied, "it misled the jury, which led them to come back with a different verdict". (R. 29)

In reference to his second amended claim, Conrad testified that trial counsel failed to seek recusal of the trial judge on the basis that the trial court commented before trial that "criminal defendants who enter a guilty plea or who are convicted of any act of violence, some active time in custody will be ordered served". (R. 29-30)  He also alleged the trial court demonstrated the appearance of impartiality by the questions he asked of the prosecution's witnesses. (R. 30)  Conrad did not specify at the hearing what questions of the court's he considered

9

to indicate "impartiality" (presumably Conrad meant
"partiality") or how he was prejudiced.  (R. 30) On cross
examination, Conrad said that the judge was "impartial"
when he called defense counsel, Mr. Bradshaw and Mr. Al
Smith and Mr. "Cracker Waldrop" "Tom, Dick, and Harry."
(R. 57)  The assistant district attorney said in response
to that, "Your Honor, I have no personal knowledge of him
actually referring to them as that."  (R. 57) When the
assistant district attorney asked Conrad how that would
indicate bias even if it were true, Conrad replied, "It can
show in some form or fashion within their trial strategy,
there was some friendship to show favor was between the
Judge and the attorneys."  (R. 57)  When the district
attorney then asked Conrad how he would be prejudiced if
the trial court showed favoritism to defense counsel,
Conrad responded, "I don't have a comment."  (R. 58)

Conrad testified that counsel had a conflict of
interest based on Mr. Bradshaw's being a member of the same
church as the victim, Ms. Dennis.  (R. 31)  Conrad alleged
that counsel may have been a Sunday School teacher or
director of the children involved and that his defense was
adversely affected during the trial to the prejudice of

10

Conrad, "as counsel had to choose between respect and loyalty to the victims' family and diligently representing [Conrad] as his client". (R. 31) At the hearing, the assistant district attorney stated in response to this allegation that:

> Judge, there is also an issue of which he
> testified to as a possible conflict with the
> representation by Gary Bradshaw and some
> involvement or relationship he may have had with
> the victim's children. I'm not going to ask any
> questions as to that because we have submitted an
> affidavit from Mr. Bradshaw, and I think that's
> clearly sufficient to rebut any such claims. Mr.
> Bradshaw asserts that he didn't know the children
> by face and that they were on a Sunday School
> roster of his and he felt it necessary to raise
> that issue with the court, who determined there
> was no conflict and left him in the case.

(R. 58)

Conrad alleged at the hearing that counsel was ineffective for failing to object at trial to the admission of the bullet taken from his arm on the grounds that it was the product of an illegal search and seizure. (R. 32) Conrad said he was never presented with a search warrant for the bullet and that it was taken from his arm without his consent while he was sedated and/or under anesthesia. (R. 32) He stated that though counsel filed two pretrial motions to suppress, counsel should have objected to

11

admission of the bullet at trial. (R. 31-33) The trial court attempted to clarify Conrad's allegation by stating that, "So the contention is not that there was any kind of search warrant telling them to take it out of his body but that the district attorney issued a subpoena and got that as part of his records and as a result of a subpoena?" (R. 59-60) The trial court noted that the "district attorney issued a subpoena on May 23, 2001, to the keeper of records at Medical Center Enterprise requesting all medical records, lab reports, blood, hair, saliva, and bodily fluids of petitioner." (R. 61) Conrad said that it was his position that the district attorney could not subpoena and get the evidence of the bullet without "some paperwork" from the trial court. (R. 61) The assistant district attorney responded:

> The record will reflect that the issue of suppression as to that very evidence was raised, preserved for appeal. As a matter of fact, there was a standing objection in reference to numerous motions for suppression that have been made that was renewed throughout the trial process, and this was part of it.

(R. 62)

Conrad testified that counsel was ineffective because he failed to advise him that he could testify in his own

12

behalf at trial.  (R. 33)  Then Conrad admitted that he
discussed with his attorneys the possibility of his
testifying at trial.  (R. 33)  Conrad stated that "it was
discussed, and it was stated that I would [testify] if the
codefendant was to get up on the stand and testify.  And
that did occur.  The codefendant got on the stand and
testified, and there was no more talking of me getting on
the stand".  (R. 33)  Conrad alleged that he wanted to
testify.  (R. 33)  On cross examination, Conrad again
denied that he did not testify because he himself thought
it best not to testify after discussing with counsel the
ramifications of his testifying.  (R. 63)

Conrad also alleged that there was an a actual conflict
of interest because, "during the trial, the trial court
forced defense counsel, Al Smith, to become a witness in
the case" when "counsel was forced to reveal the identity
of the source that gave him information regarding the
district attorney's office's withholding of exculpatory and
impeachment evidence".  (R. 34)  Conrad alleged that the
court's action "compelled counsel to compromise his duty of
loyalty to his client, as that action prohibited counsel
from vigorously seeking a mistrial or a dismissal of the

13

charges based on the prosecution withholding exculpatory and impeachment evidence". (R. 35) On cross examination, Conrad admitted that the person, Mr. Robinson, who had had the exculpatory evidence testified at trial. (R. 55) The assistant district attorney explained at the hearing that:

> I think it was determined that there may have been some exculpatory material that was withheld by the State. But the State, after the Judge ordered so, took every effort to make sure that the defense had the time and opportunity to fully develop whatever issues those may be. And I think that individual testified at trial, didn't he?

(R. 56) Conrad also conceded that if the in camera hearing in which counsel testified had nothing to do with any information from Conrad, the statute upon which Conrad sought relief (§12-21-161) would not apply. (R. 65-66) The assistant district attorney informed the court that "Attorney Smith was not asked or forced to divulge any confidential information that he obtained from his client, and his client just affirmed that." (R. 66)

Conrad's final claim he that he offered testimony on at the hearing was that the testimony at trial from the employees at the Department of Forensic Sciences was inadmissible because the Department had not been accredited at the time of the testing. (R. 36) Conrad claimed upon

14

cross examination that the experts from the Department of Forensic Sciences testified that they were accredited. (R. 66) In response, the assistant district attorney stated to the court that:

> Your Honor, I think the record would refute that. And I would also like to say that the trial judge declared those individuals experts, that their methods met the Daubert standard and that there is no requirement under Alabama Statute or any other law that I'm aware of that a FDS expert is required that they be certified by some certifying authority as having been accredited.

(R. 67)

Mr. Sydney Albert Smith, Conrad's trial counsel, testified at the hearing. (R. 72) He said he testified at the in camera hearing during trial but that "nothing [he] testified to was received from Mr. Conrad himself." (R. 75) Mr. Smith was never forced to divulge any confidential information that he had received from Conrad. (R. 75) Mr. Smith did not handle the appeal but thought this issue had been "actively addressed". (R. 76)

Mr. Smith said he and Mr. Bradshaw "vigorously opposed and requested the removal and the admissibility of the bullet on numerous grounds. (R. 76) The trial court ruled that the district attorney's subpoena could not be used to obtain records, but the court admitted the evidence of the

bullet "under the <u>Nix v. Williams</u> discovery doctrine that the records would have been available and obtained anyway. (R. 76, 77) Mr. Smith thought the court's ruling was correct. (R. 77) Mr. Smith testified that there was a consent to the surgical procedure signed by Conrad and he recollected that, "we raised at length his ability to give an intelligent and knowing waiver" but that "since it was for medical treatment, my recollection is that the court again ruled that that was admissible". (R. 77)

Mr. Smith said "we also raised the issue of Dr. Sawyer and District Attorney Mark Fuller being friends, whether there was any collusion, not that we had any evidence that there was. But we raised that." (R. 77) Defense counsel "raised vigorously with a couple of the doctors' testimonies whether the medical treatment was reasonable and necessary from a medical standpoint to remove the bullet, or was it just going fishing for evidence. And there was no testimony other than it was medically necessary." (R. 77)

The assistant district attorney noted that earlier when he had referred to a "search warrant" that he had meant a district attorney subpoena. (R. 77-78)

Mr. Smith said that when the State began to admit this evidence (the bullet), "we had a standing objection – our objection was preserved simply by the motion to suppress." (R. 78)  The first time the evidence was mentioned, defense counsel objected and was granted "a standing and continuing objection", so it was not necessary to object at the time the evidence was introduced. (R. 78-79)

With respect to a defendant's right to testify, Mr. Smith and Mr. Bradshaw had several detailed discussions during trial with Conrad about his testifying. (R. 81-82) Defense counsel "strongly recommended" that Conrad not testify, "but it was his [Conrad's] decision." (R. 82)  In fact, Mr. Smith "remember[ed] that right before [he] rested... [he] reaffirmed that [Conrad] had the right to testify, and [Conrad] said that he was going to follow [counsel's] advice and not testify." (R. 82)  "Right before [Smith] stood up to rest the defendant's case, [Smith] reaffirmed that with him." (R. 82)  Conrad never told Smith he did not care what Smith's advice was, that it was his right at that he wanted to testify. (R. 82)  Conrad "indicated he trusted [Smith's] judgment and would go along with it." (R. 82-83)

17

Mr. Smith "felt very strongly" that Conrad should not testify. (R. 81)  He said Conrad was "an intelligent young man", but "was not the most articulate young man" and [Smith] "was concerned that he would do more damage for his case that we would get benefit out of it." (R. 82)  "It was a strategic decision for him not to testify, not to put him on the record to have anything that could come back in a future proceeding." (R. 81)

At the end of the hearing Conrad asked to make a statement. (R. 86)  In his statement he told the court that he appreciated the efforts of both Mr. Smith and Mr. Bradshaw in defending him. (R. 86, 87)

## STANDARD OF REVIEW

The standard of review in evaluating the denial of a postconviction petition is whether the trial court abused its discretion.  Elliot v. State, 601 So. 2d 1118, 1119 (Ala. Crim. App. 1992).  This Court will affirm the trial court's decision to deny a postconviction petition if the trial court was correct for any reason.  Hoobler v. State, 668 So. 2d 905, 906 (Ala. 1995).

## SUMMARY OF ARGUMENT

The denial of the Rule 32 postconviction petition was proper because: (1) it contained claims that could have been raised on direct appeal but were not; (2) the claims were barred by the statute of limitation; and/or (3) the claims were without merit. Therefore, the trial court's denial of the petition was not an abuse of discretion warranting reversal on appeal.

**ARGUMENT**

I.  **The Trial Court's Denial Of Conrad's Petition Was Proper Because The Claims Were Precluded Pursuant To Rules 32.2(a), (c), And/Or Were Without Merit.**

Conrad contends that trial court erroneously denied his Rule 32 postconviction petition following the evidentiary hearing.  This petition was properly dismissed because Conrad failed to carry his burden of proof to prove this claims as required by Rule 32.3 of the Alabama Rules of Criminal Procedure.  Because almost all of his claims involve allegations of ineffective assistance of trial counsel, the following discussion of caselaw pertaining to ineffective counsel claims is provided as a precursor to addressing the specific allegations individually below.

To prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-pronged test articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984):

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant

20

makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.

The standard established in Strickland is an objective one and the claimant has the burden of showing counsel's performance was ineffective. Ex parte Baldwin, 456 So. 2d 129, 134-135 (Ala. 1994). Furthermore, counsel's assistance must be judged under the prevailing professional norms and the circumstances of the case. Daniels v. State, 650 So. 2d 544, 552 (Ala. Crim. App. 1994). "A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690. "Once a petitioner has identified the specific acts or omissions that he alleges were not the result of reasonable professional judgment on counsel's part, the court must determine whether those acts or omissions fall 'outside the wide range of professionally competent assistance.'" Id.; Daniels, 650 So. 2d at 552.

When reviewing a claim of ineffective assistance of counsel, the appellate courts of this state indulge a

21

strong presumption that counsel's conduct was appropriate and reasonable, and must avoid using "hindsight" to evaluate the performance of counsel. <u>Hallford v. State</u>, 629 So. 2d 6, 9 (Ala. Crim. App. 1992); <u>Luke v. State</u>, 484 So. 2d 531 (Ala. Crim. App. 1985).

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that , under the circumstances, the challenged action 'might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. <u>Strickland</u>, 466 U.S. at 689. <i>See</i> <u>Ex parte Lawley</u>, 512 So. 2d 1370, 1372 (Ala. 1987).

Even where an attorney's performance is determined to be deficient, a petitioner is not entitled to relief unless he shows a "reasonable probability that, but for counsel's unprofessional errors, the result or the proceeding would

22

have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Daniels, 650 So. 2d at 552, *quoting* Strickland, 466 U.S. at 694.  The record shows that Harris failed to reasonably satisfy the trial court that there was substance to any of the claims of ineffective assistance of counsel that he raised in his Rule 32 petition.

### a.    Failure to object to oath not being administered before voir dire

Conrad contends in brief that trial counsel was ineffective for failing to object to the oath not being administered to the venire prior to voir dire examination. (Conrad's brief, pgs. 7-8)  The trial court denied this claim finding that it was not supported by fact or law. The trial court found as fact that the record indicated otherwise.  Judge Kelley found in his order that:

> Circuit Judge Robert W. Barr presided over the
> term of court in which the Petitioner was tried.
> As Presiding Judge over the term, Judge Barr
> administered the general qualifying.  When the
> Petitioner's cases were called the trial Judge,
> Gary L. McAliley stated "Ladies and Gentlemen all
> of you are still under oath, and I am going to ask
> you some questions and then, I will certainly
> allow the attorneys to do likewise".  (See the
> record).  Furthermore, the sentencing orders
> indicate that the jury was properly qualified,
> duly sworn and properly struck.

23

> Based upon the pleadings, evidence presented, and arguments the court finds that the Petitioner's allegations are not supported by fact or law.  The matters raised in Issue One are without merit and the requested relief is denied.

(C. 183) Conrad has not refuted this finding by any credible evidence.  Therefore, he has failed to establish an abuse of discretion entitling him to relief.

### b.   Failure to move to dismiss indictment for failure to allege essential element of aggravating circumstance(s)

Conrad contends that trial counsel was ineffective for failing to move to dismiss the indictment on the basis that it failed to charge the aggravating circumstance which is an essential element of the charge.  (Conrad's brief, pgs. 8-10)  The trial court properly found this claim to be without merit.

The trial court noted in its order that, "the indictment clearly stated that the death of Ms. Dennis was during a robbery in the first degree."  (C. 187) Furthermore, a capital indictment is not required to recite the aggravating circumstances used at sentencing.  See Bryant v. State, CR-98-0023, 2003 WL 1424026, at 1 (Ala. Crim. App., Mar. 2003).  Moreover, counsel is never

24

required to raise baseless objections to avoid being ineffective. Saffold v. State, 570 So. 2d 727, 730 (Ala. Crim. App. 1990).

Significantly, "at the hearing the Petitioner could not tell the court what element was missing from the indictment". (C. 185) Clearly, Conrad failed to prove ineffective assistance based on this allegation. Accordingly, he has failed to establish an abuse of discretion.

**c.    Counsel failed to challenge the indictment based on the alleged racist Alabama Constitution of 1901**

Conrad alleges on appeal that counsel was ineffective for failing to challenge the indictment because it was returned pursuant to "the authority of Alabama Constitution of 1901", which he alleges, "was enacted to establish white supremacy in the State of Alabama and to disenfranchise African-Americans". (*Conrad's brief, pg. 11)

The trial court properly found this claim to be without merit as Conrad presented no evidence of this claim at the hearing. When the trial court asked about this claim, Conrad stated, "I have no comment on that one". (C. 187)

25

By failing to present evidence on this claim, Conrad, in effect, abandoned this claim in the trial court and this Court should so find on appeal.

Moreover, even if not abandoned, this claim would warrant no relief because he has failed to prove the truth of the general assertion regarding the Constitution of Alabama and further, has failed to make any specific application of how that affected his charge and the outcome of his case even if counsel had made such an objection.

No abuse of discretion occurred on the basis of the trial court's ruling on this claim.

      d.    **Counsel failed to object to the alleged erroneous jury instruction on uncorroborated testimony of the codefendant**

Conrad contends that trial counsel was ineffective for failing to object to an alleged erroneous jury instruction on uncorroborated testimony of a codefendant. (Conrad's brief, pg. 13) Specifically, he alleges in brief that the following instruction from page 1448 of the trial transcript "allowed the jury to infer that a conviction could be obtained based on the codefendant's testimony

without a finding or corroboration". (Conrad's brief, pg. 13)

> You should keep in mind that such testimony is always to be received with caution, and weighted with great care, you should never convict any defendant, upon the unsupported testimony of such a witness, unless you believe their testimony could be truthful beyond a reasonable doubt.

(Conrad's brief, pg. 13)

The trial court correctly found that the instruction was not erroneous and was in compliance with Section 12-21-222 of the Code of Alabama (1975). The only argument Conrad presents on appeal to discredit the trial court's finding is that "Conrad disagree (sic)". Conrad's self-serving conclusion does not overcome an experienced trial judge trained in the law.

Furthermore, the trial court correctly found that, "the testimony of the accomplice was corroborated by other evidence". (C. 187) Thus, trial counsel was not ineffective for failing to object to a correct jury charge and when the evidence was corroborated. This claim warrants no relief on appeal.

e.    Failure of counsel to move for a mistrial or
continuance based on exculpatory evidence

Conrad maintains that trial counsel failed to move for a mistrial or a continuance based on the prosecution's failure to disclose exculpatory evidence. (Conrad's brief, pg. 14) He states, "that during the trial it was discovered that the prosecution had withheld a report regarding an internal investigation by the Enterprise Police Department", that "demonstrated that the district attorney's office knew of the plan to commit the robbery of the toy store prior to the incident in (sic) which Appellant stand convicted". (Conrad's brief, pg. 14) He claims he was prejudiced by counsel's failure to move for a mistrial or continuous.

At the hearing, the only prejudice Conrad managed to articulate was that when the trial court asked how Conrad was prejudiced by this. Conrad said that "it misled the jury, which led them to come back with a different verdict". (R. 29) He failed to state how this misled the jury or how it would have resulted in a different verdict. In fact, Conrad's answer failed to prove prejudice at the hearing and therefore, he failed to carry his burden of

28

proof pursuant to Rule 32.3 of the Alabama Rules of Criminal Procedure.

Furthermore, the trial court's order correctly points out that Conrad's case was not prejudiced because the witness was disclosed and testified at trial. (C. 188) Specifically, the trial court found that:

> During the trial defense counsel discovered that the prosecution, had withheld a report regarding an internal investigation by the Police Department which involved a witness with information favorable to the Petitioner. The trial judge held a hearing out of the presence of the jury. The trial judge ordered the district attorney to fly the witness from Arizona to Alabama for trial. Trial counsel met with the witness. The court appears to have made reasonable efforts to allow the defense an opportunity to talk to the witness. The witness testified at trial. The court finds that the Petitioner was not prejudiced. The witness was disclosed and the witness was allowed to testify. The court finds that the Petitioner was not deprived of the right of counsel based upon the trial strategy of counsel. This issue could have been raised on appeal.

(C. 188) Conrad has not successfully refuted the trial court's decision, and thus, is due no relief on this claim.

### f. Counsel failed to move for recusal of the trial court

Conrad claims that trial counsel was ineffective for failing to "object and seek recusal of the trial judge" on

29

the ground that Judge McAliley was "bias (sic) and impartial (sic) prior to and during Appellant's trial and sentencing". (Conrad's brief, pg. 15) Specifically, he contends that he was prejudiced from the outset of his trial by Judge McAliley's pretrial statements that "criminal defendants who enter a guilty plea or who are convicted of any act of violence, some active time in custody will be ordered served". (Conrad's brief, pg. 15) He also states that the trial court questioned witnesses (R. 1140, 1143, 1144, 1155, 1151, 1212, 1213, 1225)" and also referred to defense counsel as "Tom, Dick, and Harry (R. 876-77, 942, 945)". (Conrad's brief, pg. 15) Conrad additionally states in brief that the "court further showed appearances of impartiality (sic) during his ruling on defense counsel's motions and objections during the course of the trial, where the court demonstrated favorable treatment to the prosecutor". (Conrad's brief, pg. 15) Conrad states that defense counsel did object at one point to the court's improper questioning of a witness (R. 1225). (Conrad's brief, pg. 15) He argues that under Canon 3(C) (1) of the Canon of Judicial Ethics, the trial court ought to have recused himself. (Conrad's brief, pg. 15)

30

This claim warrants no relief because the trial court correctly found that "Conrad failed to provide sufficient evidence to support this allegation. Petitioner has failed to show any prejudice." (C. 189)

Simply because a judge questions a witness does not amount to prejudice. A judge may question a witness. Ward v. State, 814 So. 2d 899, 917 (Ala. Crim. App. 2000). Moreover, no prejudice is presumed or proved based on the trial court's reference (if true) to defense counsel as "Tom, Dick, and Harry". Conrad's own testimony refutes preclude any claim of prejudice from him. When the assistant district attorney asked Conrad how that would indicate bias even if it were true, Conrad replied, "It can show in some form or fashion within their trial strategy, there was some friendship to show favor was between the Judge and the attorneys." (R. 57) When the district attorney then asked Conrad how he would be prejudiced if the trial court showed favoritism to defense counsel, Conrad responded, "I don't have a comment." (R. 58)

Finally, the trial court's pretrial remark that a defendant convicted of a crime of violence would save time did not prejudice Conrad. He was convicted of capital

31

murder. By law the court had to sentence him to life without parole. By law his sentence was not eligible for probation. Because there is no showing of prejudice this claim must fail.

### g. Counsel's alleged conflict of interest

Conrad contends that that he was prejudiced when his counsel had a conflict of interest. Specifically, Conrad alleges that Mr. Gary Bradshaw filed a motion to withdraw because he had a conflict of interest based on his being a member of the same church as the victim and based on the victims' three children being members of the Sunday School class for which Mr. Bradshaw was the youth director and/or teacher. (Conrad's brief, pg. 16) The trial court correctly ruled that this issue could have been raised at trial or on direct appeal "as Al Smith was additional trial counsel and Richard Waldrop was appointed as additional appellate counsel". (C. 189) Thus, this issue was properly denied on the basis that it was precluded pursuant to Rule 32.2(a)(3) and (5) of the Alabama Rules of Criminal Procedure. This Court should affirm on this basis.

32

However, even if this claim was properly reviewable on appeal, it would warrant no relief because of lack of merit. As the trial court correctly noted in its order denying the petition, "Attorney Gary Bradshaw filed a Motion to Withdraw as counsel which was not granted by the court.  In an affidavit submitted by Gary Bradshaw he stated that none of the children even attended Sunday School and [that] he would not recognize them if they appeared in court."  (C. 189)  Clearly, there was no basis for a conflict of interest based on this allegation.  Thus, this claim fails for want of proof.

      h.   **Failure to object to the admission of the bullet removed from Conrad's body pursuant to medical treatment**

Conrad contends that trial counsel was ineffective for failing to object to the admission of the bullet taken from his body on the grounds that if was the product of an illegal search and seizure.  (Conrad's brief, pg. 17) This claim is without merit and warrants no relief.

The apparent basis of this complaint is that the district attorney received a bullet removed from Conrad's body pursuant to a district attorney subpoena.  At trial,

the court found that the subpoena was not a valid basis for having obtained the bullet, but nonetheless, admitted the bullet on the basis that "the bullet would have been available and obtained anyway". (C. 190)  Judge Kelley found that this issue had been raised at trial and on appeal. (C. 190)  As the case was affirmed on appeal, the issue of the admissibility of the bullet was decided adversely to Conrad.  In other words, it had no merit. Counsel was not required to raise a claim having no merit.

Furthermore, the record in this case indicates that counsel did in fact object to the admission of the evidence and had a standing objection to the admission of the evidence. (C. 190) Thus, Conrad's claim fails.


i.    **Failure to advise Conrad of his right to testify**

Conrad claims that counsel was ineffective because he failed to advise him of his right to testify on appeal. Conflicting evidence at the hearing by defense counsel flatly refuted this claim.  Mr. Smith testified at the hearing that:

> With respect to defendant's right to testify, Ms. Smith and Mr. Bradshaw had several detailed discussions during trial with defendant about defendant's testifying. (R. 81-82)  Defense

34

counsel "strongly recommended" that defendant
testify, "but it was his [defendant's] decision."
(R. 82)  In fact, Mr. Smith "remember[ed] that
right before [he] rested... [he] reaffirmed that
[defendant] had the right to testify, and
[defendant] said that he was going to follow
[counsel's] advice and not testify." (R. 82)
"Right before [Smith] stood up to rest the
defendant's case, [Smith] reaffirmed that with
him." (R. 82)  Defendant never told Smith he did
not care what Smith's advice was, that it was his
right at that he wanted to testify. (R. 82)
Defendant "indicated he trusted [Smith's] judgment
and would go along with it." (R. 82-83)

Mr. Smith "felt very strongly" that defendant
should not testify. (R. 81)  He said defendant was
"an intelligent young man", but "was not the most
articulate young man" and [Smith] "was concerned
that he would do more damage for his case that we
would get benefit out of it." (R. 82)  "It was a
strategic decision for him not to testify, not to
put him on the record to have anything that could
come back in a future proceeding." (R. 81)

The trial court made a credibility choice between witnesses

and believed counsel's testimony.  The credibility choice

was the Judge Kelley's to make.  Conrad has not shown an

abuse of discretion, therefore, he is due no relief.

j.  Conrad was prejudiced when counsel, Mr. Smith was
forced to become a witness against Conrad

Conrad contends that he was prejudiced when Mr. Smith,

his trial counsel, was forced to testify against him during

the trial.  (Conrad's brief, pgs. 20-22)  The basis for

35

this claim is that during the trial Mr. Smith was required
to testify in a hearing outside the presence of the jury
regarding a witness that had not been disclosed by the
prosecution.  (C. 190) The trial court correctly found that
no prejudice resulted from this because it was outside the
presence of the jury and because Mr. Smith was not required
to disclose any confidential client information.  (C. 190;
R. 66) Moreover, Conrad conceded at the hearing that if the
in camera hearing in which counsel testified had nothing to
do with any information from Conrad, the statute upon which
Conrad claimed relief (§12-21-161) would not apply.  (R.
65-66)

Because the record does not support Conrad's claim and
does support the decision of the trial court, this Court
should affirm on appeal.


**k.  Failure to move to dismiss indictment of grounds
that it violates the Separation of Powers Doctrine**

Conrad contends that counsel was ineffective for
failing to move to dismiss the indictment on the basis that
violated the Separation of Powers Doctrine because the
capital murder statute was drafted by a commission
consisting of individuals from all three branches of

government.  (Conrad's brief, pgs. 23-25)  The trial court's denial of this claim was correct and not an abuse of discretion.

Conrad failed to prove that the capital murder statute was in fact a violation of the Separation of Powers Doctrine,[1] and further, how he was actually prejudiced.  The statute does not violate the Separation of Powers Doctrine.  Therefore, there was no legitimate basis for such an objection.  This claim is patently without merit.

### l and m.  Ineffective assistance of appellate counsel

Conrad contends that appellate counsel was ineffective for failing to raise the following issues on appeal:  (1) "Conrad's objection to the admission of the bullet taken from Conrad's body"; and, (2) "counsel's [Gary Bradshaw] conflict of interest".  (Conrad's brief, pg. 26)  Conrad raises the issue of ineffective assistance of appellate counsel for the first time on appeal, which is improper for

---

[1] To the extent that Conrad also tries to raise this as an independent claim designated as claim "N" (Conrad's brief, pgs. 27-29), this allegation raised as an independent claim is precluded because it was not raised on direct appeal, and is not before this Court properly either, because it was not alleged and argued at the hearing as an independent claim.

appellate review.  Because he has not preserved a claim of ineffective assistance of appellate counsel, it is due no review or relief by this Court.


**II.  Conrad's Claim Of Newly Discovered Evidence That The Department Of Forensic Sciences Laboratory Was Unaccredited In The Past Warrants No Relief Because It Fails To Meet The Test For Newly Discovered Evidence.**

Conrad contends on appeal that he has newly discovered evidence requiring a new trial or other relief.  The "new evidence" is that "the Alabama Department of Forensic Sciences has recently openly admitted that its laboratories has (sic) just gained accreditation by the American Society of Crime Laboratories Directors, which demonstrates that the Laboratories was (sic) deficient at the time of appellant's trial."  (Conrad's brief, pg. 29)

The trial court found the issue precluded for failing to raise it at trial or on appeal.  That ruling should be affirmed.  But even assuming that the "evidence" was not available at the time of trial or appeal, it is barred by the statute of limitation provided in Rule 32.2(c) of the Alabama Rules of Criminal Procedure, which provides that claims of newly discovered evidence must be presented to the court within six months of discovery.  Conrad admits in

brief, (pg. 30) that "he discovered this evidence in January 2005". He filed this Rule 32 petition on September 22, 2005, more than six months after the alleged discovery of this "new evidence". Therefore, this claim is precluded from review here. The trial court's denial was correct.[2]

Because this petition was properly denied on all of the above grounds, this Court should affirm the trial court's decision. Hoobler v. State, 668 So. 2d 905, 906 (Ala. 1995). Conrad has failed to show an abuse of discretion warranting a reversal on appeal.

---

[2] The trial court also correctly determined that there was no merit to the claim either. The trial court wrote that it "finds that there is no requirement that the Department of Forensic Sciences be accredited by any organization." (C. 191)

## CERTIFICATE OF SERVICE

I hereby certify that on this 27 day of October, 2006, I served a copy of the foregoing on Conrad, by placing the same in the United States Mail, first class, postage prepaid and addressed as follows:

Robert T. Conrad
AIS# 226791
Holman Unit 3700
Atmore, AL  36503-3700


*Beth Slate Poe*
Beth Slate Poe
Assistant Attorney General


ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama 36130-0152
(334) 242-7300

195357/97374-001

## CONCLUSION

Based on the foregoing, this case is due to be affirmed on appeal.

Respectfully submitted,

Troy King
Attorney General

By-

Beth Slate Poe
Assistant Attorney General
Counsel of Record

Rel 08/24/2007 Conrad
Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d), states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or briefs and shall not be used by any court within this state, except for the purpose of establishing the application of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals
### State of Alabama
### Judicial Building, 300 Dexter Avenue
### P. O. Box 301555
### Montgomery, AL 36130-1555

PAMELA W. BASCHAB
Presiding Judge
H.W."BUCKY" McMILLAN
GREG SHAW
A. KELLI WISE
SAMUEL HENRY WELCH
Judges

Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

## MEMORANDUM

CR-05-1913          Coffee Circuit Court(Enterprise Division)
                    CC-01-179.60; CC-01-180.60

Robert Thomas Conrad v. State of Alabama

WELCH, Judge.

Robert Thomas Conrad appeals from the circuit court's denial of his Rule 32, Ala. R. Crim. P., petition for postconviction relief. The petition challenged Conrad's September 27, 2002, convictions for capital murder, a violation of § 13A-4-40(a)(2), Ala. Code 1975, and first-degree robbery, a violation of § 13A-8-41, Ala. Code 1975, and his sentence to imprisonment for life without the possibility of parole. This Court affirmed Conrad's convictions and sentence in an unpublished memorandum issued on October 24, 2003. See Conrad v. State, 897 So. 2d 1246 (Ala. Crim. App. 2003) (table). The Alabama Supreme Court denied certiorari

1


STATE'S
EXHIBIT
L

review and this Court issued a certificate of judgment on January 16, 2004.

Conrad filed the instant petition on January 7, 2005. In the petition, Conrad alleged: (1) that his trial counsel was ineffective for a number of reasons; and (2) that the circuit court lacked jurisdiction to render the judgment or to impose the sentence because his indictment was based on an unconstitutional statute and therefore void on its face. On April 9, 2005, Conrad filed an amendment to the petition wherein he alleged additional facts in support of his assertions that he was denied the effective assistance of counsel at trial as well as a claim that newly discovered evidence required a new trial or other relief. On August 15, 2005, Conrad filed a second amendment to the petition wherein he essentially reiterated his claim that his indictment was defective because Alabama's capital murder statute violated the constitutional separation of powers doctrine. The State filed a motion to dismiss, asserting that Conrad's claims were without merit and precluded by Rules 32.2(a)(3) and (5), because they could have been, but were not, raised and addressed at trial or on appeal, and time-barred by Rule 32.2(c). After conducting an evidentiary hearing on December 2, 2006, the circuit court issued a written order denying Conrad's petition by ruling that the various claims set forth therein were all without merit.

I.

Conrad argues on appeal that the circuit court abused its discretion when it denied his petition by finding that he failed to meet his burden of showing that his trial counsel was unconstitutionally ineffective.

In order to prevail on a claim of ineffective assistance of counsel, a petitioner must adequately plead facts indicating that (1) counsel's performance was deficient and (2) that the deficient performance actually prejudiced the defense. Strickland v. Washington, 466 U.S. 668 (1984). See Rules 32.3 and 32.6(b), Ala. R. Crim. P. If assuming that every factual allegation in Conrad's Rule 32 petition is true, Conrad has failed to plead facts suggesting that counsel's performance was deficient. Because his ineffective assistance of counsel claims are nothing more than bare allegations, the

2

circuit court correctly concluded that Conrad failed to sufficiently plead facts, as required in Rules 32.3 and 32.6(b), Ala. Code 1975, entitling him to relief.

Conrad further contends that he was denied the effective assistance of appellate counsel. However, because this claim was not included in Conrad's petition, it is not properly before this Court for review. See <u>Arrington v. State</u>, 716 So. 2d 237, 239 (Ala. Crim. App. 1997) ("An appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.").

## II.

Conrad claims that newly discovered evidence exists that requires that he be granted a new trial or other relief. Specifically, Conrad argues expert evidence was erroneously admitted at trial because the Alabama Department of Forensic Sciences was not properly accredited at the time. Conrad's claim is nothing more than an attack on the admissibility of forensic evidence. Therefore, Conrad's claim does not constitute newly discovered evidence, nor does it satisfy the requirements of Rule 32.1(e).[1] Because Conrad offers no

---

[1]Rule 32.1(e), Ala. R. Crim. P., defines newly discovered evidence as follows:

> "(1) The facts relied upon were not known by petitioner or petitioner's counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence;

> "(2) The facts are not merely cumulative to other facts that were known;

> "(3) The facts do not merely amount to impeachment evidence;

> "(4) If the facts had been known at the time of trial or of sentencing, the result probably would

3

evidence to support his claim other than his bare allegations, he has thus failed to meet his burden of pleading and proof as required by Rules 32.3 and 32.6(b). <u>Duncan v. State</u>, 925 So. 2d 245, 257 (Ala. Crim. App. 2005).

### III.

Finally, Conrad contends that his indictment was void because, he says, it violated the constitutional separation of powers doctrine. Specifically, he argues that the Alabama capital murder statute is unconstitutional because it was drafted by the Alabama Law Institute, a committee comprised of members of the executive and judicial branches of government, rather than by the legislature alone.

Although the Alabama Law Institute may have drafted the state's capital murder statute, the statute was enacted by the Alabama Legislature. The fact that individuals from all three branches of government may have served on a body that drafted this legislation does not constitute a violation of the separation of powers doctrine. Likewise, such action does not render Conrad's indictment void. Thus, the circuit court correctly concluded that this claim was without merit.

For the foregoing reasons, the judgment of the circuit court is due to be affirmed.

AFFIRMED.

McMillan, Shaw, and Wise, JJ., concur. Baschab, P.J. concurs in the result.

---

have been different; and

"(5)   The facts establish that petitioner is innocent of the crime for which petitioner was convicted or should not have received the sentence that petitioner received." ]2    For the reasons we have set out above, the judgment of the circuit court is hereby affirmed.

4

In The Alabama Court Of Criminal Appeals
Cr-05-1913


Robert T. Conrad
Appellant,


Vs.


State of Alabama
Appellee.

----

---

On Appeal From The Circuit Court
Of Coffee County Alabama
(Enterprise Division)
CC 01-179,60; CC 01-180,60

---


Application for Rehearing
And
Supporting Brief


Robert Thomas Conrad
AIS# 226791
Holman Unit 3700
E-12A
Atmore, Al. 36503-3700

STATE'S
EXHIBIT
m
PENGAD 800-631-6989

In The Alabama Court of Criminal Appeals

CR-05-1913

Robert thomas Conrad
Appellant,

Vs.

State of Alabama
Appellee.

## Application for Rehearing

Comes now the Appellant, Robert Thomas Conrad, pro se, in the above styled cause, and hereby pursuant to Rule 39 and 40 (A.R.A.P.) for Rehearing, praying that the judgment entered in this cause on August 24, 2007, be set aside, and as grounds therefore, says as follows:

1. That this court in it's memorandum opinion of August 24, 2007, overlooked the facts and misapplied the law in Appellant's case, in holding that Appellant failed to sufficiently plead facts as required by Rule 32.3 and 32.6(b) A.R.Crim.P., entitling him to relief on his claim of Ineffective Assistance of Counsel.

The record reflects that the Appellant pleaded sufficient facts and presented evidence at the Evidentiary Hearing meeting his burden of proof as required by Rule 32.3 A.R.Crim.P. and Strickland V. Washington, 466 U.S. 668 (1984).

2. That this Court in it's memorandum opinion of August 24, 2007 overlokked the facts of record and misapprehended appellant's claims, in holding that Appellant did not include in his Petition a claim of Ineffective Assistance of Appellate Counsel.

Contrary to the Court's holding, the record reflects that the claim was included in the Petition, and presented at the Evidentiary Hearing.

Therefore this Court erred in holding that Appellant's Ineffective Assistance of Appellate Counsel claim, is not properly before the Court.

3. That this Court overlooked the facts and misapplied the law in holding that Appellant fail to offer evidence in support of his Newly Discovered Evidence claim.

4. That this Court overlooked the facts and misapplied the law to Appellant's void Indictment claim based on the capital murder statute being unconstitutional in violation of the Separation of Powers doctrine.

The claim was sufficiently plead and evidence was presented at the hearing, the question of the law is clear that three (3) Branches of Government can not participate in drafting and enacting statutes.

Therefore, this court erred in holding the claim to be without merits.

5. Submitted herewith, is a Rule 39(d)(5) and 40(e) A.R.A.P. Motion and Brief in support of Appellant's Application for Rehearing.

Wherefore, premises considered, Appellant prays that this Court will set aside it's judgment of August 24, 2007, and enter a new opinion reversing the judgment of the Circuit Court and such other relief as Justice requires.

Respectfully Submitted,

Robert Conrad

Robert Thomas Conrad
AIS# 226791
Holman Unit 3700
E-12A
Atmore, Al. 36503-3700

In The Alabama Court of Criminal Appeals
CR-05-1913


Robert Thomas Conrad
Appellant,


Vs.


State of Alabama
Appellee.


## MOTION TO ADD OR CORRECT FACTS

Pursuant to Rule 39(d)(5) and 40(e) A.R.A.P., Appellant request that this Court Correct and/or Add the following Facts to it's opinion on Rehearing:

This Appeal is from the Circuit Court of Coffee County Alabama, Jeff W. Kelley, Judge, denial of a Rule 32 Petition.

On September 27, 2002, Conrad was convicted of capital murder pursuant to 13A-5-40(a)(2) Ala. Code 1975 2nd Robbery first degree pursuant to 13A-5-41 Ala. Code 1975 (C.4) Conrad was sentenced to serve a term of life without parole on the capital conviction and life on the robbery conviction. (C.4)

On October 24, 2003, the Alabama Court of Criminal Appeals affirmed the convictions and sentences by a memorandum opinion (footnote 1.) See Conrad V. State, 897 So.2d 124 (Ala.Crim.App. 2003). A Certificate of Judgment was issued on January 16, 2004. (C.12)

---

1. Conrad request that this Court take Judicial Notice of the record on Direct Appeal.

On January 7, 2005, Conrad filed a Petition for Post-Conviction relief in the Circuit Court of Coffee County Alabama pursuant to Rule 32 A.R.CR.P. (C.1-84) Conrad amended his Petition at least two times. (C.214-215) In his Petition and Amendments, Conrad asserted as grounds for relief:

1. Denial of Effective Assistance of Counsel at trial.
2. Denial of Effective Assistance of Counsel on Direct Appeal.
3. The Court was without Jurisdiction to render Judgment or to impose sentence.
4. The sentence imposed exceeds the maximum authorized by law, or is otherwise not authorized by law. (C.8, 1-84, 150-154)

After receiving responses from the District Attorney and appointing counsel to represent Conrad, on December 2, 2005, the Court conducted a Evidentiary Hearing. (C.182) (footnote 2.)

On March 17, 2006, the trial issued it's order denying the Petition. (C.182-206)

On March 31, 2006, Conrad filed a Motion to Alter, Amend or Vacate the Judgment. (C.209-212)

On April 28, 2006, the court denied the motion. (C.213)

Thus, this Appeal ensues.

The following facts were adduced at the evidentiary Hearing on the Rule 32 Petition. With the agreement of the trial court and counsel, the testimony at the hearing was limited to "the issues that have been presented in the Petition and responses." (R. 6-7)

Conrad testified in his own behalf that he was represented at trial by Mr. Al Smith and Mr. Gary Bradshaw. (R. 8) Conrad testified that he should have been charged with robbery in the third degree instead of first degree robbery because there was no violence involved in the offense. (R. 9-11) Conrad opined that his counsel should have filed an objection on that basis before the trial began. (R. 12)

Conrad testified that his counsel should have objected to the "oath not being administered to the venire prior to the vior dire examination by the court and counsel". (R. 13)

_____

2. The Evidentiary Hearing transcript is included in the record on Appeal, reference to that record will be designated "R."

Conrad further complained that counsel failed to object on the basis that the prosecutor's name was not endorsed on the Indictment as required by Section 12-16-205 of the Code of Alabama (1975). (R.14)

Conrad also complained that trial counsel was Ineffective for failing to object to the basis that the judge swore in the jury instead of the Circuit clerk. (R.15)

Conrad alleged that counsel was Ineffective for failing "to know the applicable law to file a motion to dismiss the Indictment pursuant to Rule 15.3 A.R.CR.P. on grounds that the Indictment was void [because] it failed to allege" the aggravating circumstances. (R.16)

Conrad alleged that his Indictment was void because the capital murder status was drafted by the Alabama Law Institute, which was comprised of individuals from all three (3) Branches of Government. He contends that the drafting of the law in that manner violated the Separation of Powers doctrine. (R.18-19)

Conrad testified that counsel was Ineffective for failing to file a pretrial motion to dismiss the second count of the Indictment, which charged first degree robbery based on double jeopardy. He stated that the robbery upon which the second count was based was also part of the capital murder charge alleging murder and a robbery. (R.10-21) He asserted on cross examination that, "the elements of robbery first degree is (sic) causing physical harm. There was no physical harm caused on Mr. Grimes." (R.40) During cross examination of Conrad, the District Attorney explained that there were two victims and that the robbery underlying the capital murder count was a separate robbery from the one alleged in count two, and thus, there was no double jeopardy issue. (R.53)

Conrad alleged that counsel was Ineffective for failing to object to the erroneous jury instruction on corroborated testimony of a co-defendant found at page 1443 of the trial transcript. (R.22) He also alleged counsel was Ineffective for failing to object to the Indictment based on it being returned pursuant to the Alabama Constitution (1901), "which was established to promote white supremecy abd disenfranchise African Americans." (R.24) On cross examination, Conrad agreed that

he opted not to give any testimony on this claim for the trial court to consider. (R.54)

In reference to one of his two amended Petitions, Conrad alleged that counsel failed to move for a mistrial or continuance based on the prosecutor's failure to turn over exculpatory evidence to defense counsel. (R.28) He testified that he found out after the trial "that the Enterprise Police Department had documents that this robbery of a toy store was about to occur before it did occur. And he also had a list of names of individuals that they new about this incident going to happen." (R.28-29) When trial court asked Conrad how he was prejudiced by this, Conrad replied, "it mislead the jury, which led them to come beack with a different verdict." (R.29)

In reference to his second amended claim, Conrad testified that trial counsel failed to seek recusal of the trial judge on the basis that the trial court commented before trial that "criminal defendant's who enter a guilty plea or who are convicted of any act of violence, some active time in custody will be orderd served." (R.29-30) He also alleged that the trial court demonstrated the appearance of impartiality by the questions asked of the prosecution's witness. (R.30)

On cross examination, Conrad said that the judge was "impartial" when he called defense counsel, Mr. Bradshaw and Mr. Al Smith and Mr. "Cracker Waldrop" "Tom, Dick, and Harry." (R.57) The assistance District Attorney said in response to that, "Your Honor, I have no personal knowledge of him actually referring to them as that." (R.57) When the assistance District Attorney asked Conrad how that would indicate bias even if it were true, Conrad replied, "It can show in some form or fashion within their trial strategy, there was some friendship to show favor was between the judge and the attorney's." (R.57)

Conrad testified that counsel had a conflict of interest based on Mr. Bradshaw's being a member of the same church as the victim, Ms. Dennis. (T.31) Conrad alleged that counsel may have been a Sunday School teacher or director of the children involved and that his defense was adversely affected during the trial to the prejudice of Conrad, "as counsel had to choose between respect and loyalty to the victims' family and diligently representing [Conrad] as his client". (R.31)

Conrad alleged at the Hearing that counsel was Ineffective fo failing to object to the admission of the bullet taken from his arm on the grounds that it was the product of an illegal search and seizure. (R.32) Conrad said he was never presented with a search warrant for the bullet and that it was taken from his arm without his consent while he was sedated and/or under anesthesia. (R.32) He stated that though counsel filed two pretrial motions to suppress, counsel should have objected to admission of the bullet at trial. (R.31-33) The trial court attempted to clarify Conrad's allegation by stating that, "So the contention is not that there was any kind of search warrant telling them to take it out of his body but that the District Attorney issued a subpoena and got that as part of his records and as a result of a subpoena?" (R.59-60) The trial court noted that the "District Attorney issued a subpoena on May 23, 2001, to the keeper of records at Medical Center Enterprise requesting all medical records, lab reports, blood, hair, saliva, and bodily fluids of Petitioner." (R.61) Conrad said that it was his position that the District Attorney could not subpoena and get the evidence of the bullet without "some paperwork" from the trial court. (R.61) The assistance District Attorney responded:

> The record reflect that the issue of suppression
> as to that very evidence was raised, preserved for
> Appeal. As a matter of fact, there was a standing
> objection in reference to numerous motions for supp-
> ression that have been made that was renewed
> throughout the trial process, and this was part of
> it.

(R.62)

Conrad testified that counsel was Ineffective because he failed to advise him that he could testify in his own behalf at trial. (R.33) Then Conrad admitted that he discussed with his attorneys the possibilty of his testifying at trial. (R.33) Conrad stated that "it was discussed, and it was stated that I would [testify] if the co-defendant was to get up on the stand and testify. And that did occur. The Co-defendant got on the stand and testified, and there was no more talking of me getting on the stand". (R.33) Conrad alleged that he wanted to testify. (R.33) On cross examination, Conrad again denied that he did not testify because he himself thought it best not to testify after discussing with counsel the ramifications of his testifying. (R.53)

Conrad also alleged that there was an actual conflict of interest becasue, "during the trial, the trial court forced defense counsel, Al. Smith, to become a witness in the case" when "counsel was forced to reveal the identity of the source that gave him information regarding the District Attorney's office withholding of exculpatory and impeachment evidence". (R. 34) Conrad alleged that the court's action "compelled counsel to compromise his duty of loyalty to his client, as that action prohibited counsel from vigorously seeking a mistrial or a dismissal of the charges based on the prosecution withholding exculpatory and impeachment evidence." (R. 35)

Conrad's final claim is that he offered testimony on at the hearing that the testimony at the trial from the employee at the Department of Forensic Sciences was inadmissable because the Department had not been accredited at the time of the testing. (R. 36) Conrad claimed upon cross examination that the experts from the Department of Forensic Sciences testified that they were accredited. (R. 66)

## IN THE ALABAMA COURT OF CRIMINAL APPEALS

CR-05-1913

### ROBERT THOMAS CONRAD

Appellant,

V.S.

### STATE OF ALABAMA,

Appellee.

---

ON APPEAL FROM THE CIRCUIT COURT OF COFFEE

COUNTY, ALABAMA ( ENTERPRISE DIVISION).

CC-01-179.60; CC01-180.60

---

BRIEF IN SUPPORT OF APPLICATION FOR REHEARING

Robert Thomas Conrad
AIS# 226791
Holman Unit 3700
Atmore, Al. 36503-3700

# TABLE OF CONTENTS

TABLE OF CONTENTS------------------------------------------i

TABLE OF CASES AND AUTHORITIES ---------------------ii

STATEMENT OF CASE AND FACTS-------------------------1

ISSUES PRESENTED FOR REVIEW-----------------------1

SUMMARY OF ARGUMENTS------------------------------2-3

ARGUMENTS-------------------------------------------- 4-8

CONCLUSION----------------------------------------- 8

CERTIFICATE OF SERVICE---------------------------- 9

## TABLE OF CASES AND AUTHORITIES

### CASES                                                    PAGES

Exparte Clemons, 2007 Ala.Lexis 78...............    6

Farris v. State, 890 So.2d 188 (Ala.Crim.App.2003)    6

Marbury v. Madison, 5 U.S. 137 (1803)............    7

Poole v. State, 2007 Ala.Crim.App.Lexis 87........    4

Ray v. State, 880 So.2d 477, 479 (Ala.Crim.App.2002)    6

Strickland v. Washington, 406 U.S.668 (1984)......    1,2,4,5


### AUTHORITIES                                              PAGES

Alabama Constitution 1901.......................    7

Article III § 42 & 43...........................    7,8

Rule 32.1 (e) Ala.R.Crim.P......................    6

Rule 32.3 and 32.6 (b) Ala.R.Crim.P.............    1,2,3,4

Rule 39(d)(5) and (e) A.R.A.P...................    1

## STATEMENT OF CASE AND FACTS

Appellant adopts The Statement of Case and Facts as set out
in the preceding Rule 39 (d)(5) and (e) A.R.A.P. Motion, attached
to his Application for Rehearing.

## ISSUES PRESENTED FOR REVIEW

I. WHETHER THIS COURT ERRED IN HOLDING THAT APPELLANT
FAILED TO SUFFICIENTLY PLEAD FACTS, AS REQUIRED IN
RULES 32.3 AND 32.6 (b) ALA.R.CRIM.P. TO ENTITLE HIM
TO RELIEF ON HIS CLAIM OF INEFFECTIVE ASSISTANCE OF
TRIAL COUNSEL.

II. WHETHER THIS COURT ERRED IN HOLDING THAT APPELLANT
CLAIM OF INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL
WAS NOT RAISED IN THE RULE 32 PETITION, AND THUS
PRECLUDED FROM REVIEW BY THIS COURT.

III. WHETHER THIS COURT ERRED IN HOLDING THAT APPELLANT
FAILED TO OFFER EVIDENCE IN SUPPORT OF HIS CLAIM OF
NEWLY DISCOVERED EVIDENCE.

IV. WHETHER THIS COURT ERRED IN HOLDING THAT APPELLANT
CLAIM THAT HIS INDICTMENT IS VOID BECAUSE IT WAS
OBTAINED PURSUANT TO AN UNCONSTITUTIONAL STATUTE,
IS WITHOUT MERITS.

## SUMMARY OF ARGUMENTS

I. That this court in its memorandum opinion of August 24, 2007, over-looked the facts and Misapplied The Law in Appellant's case, In holding that Appellant failed to sufficiently Plead Facts as required by Rule 32.3 and 32.6 (b) A.R.Crim.P. entitling him to relief on his claim of Ineffective Assistance of Counsel.

The record reflects that The Appellant Pleaded Sufficient facts and presented evidence at the Evidentiary Hearing meeting his burden of proof as required by Rule 32.3 A.R.Crim.P. and STRICKLAND V. WASHINGTON, 466 U.S. 668 (1984)

II. That this Court in it's memorandum opinion of August 24, 2007. Over-looked the facts of record and misapprehended Appellant's claims, In holding that Appellant did not include in his petition a claim of ineffective Assistance of Appellate Counsel.

Contrary to the Court's holding, The record reflects that the claim was included in the petition, and presented at the Evidentiary Hearing.

Therefore, this Court erred in holding that Appellant's Ineffective Assistance of Appellate Counsel claim, is not properly before the court.

III. That this court over-looked the facts and Misapplied the Law, In holding that Appellant fail to offer evidence in support of his Newly Discovered Evidence Claim.

IV. That this court over-looked the facts and misapplied the Law to Appellant's void indictment claim based on the Capital Murder Statute being Unconstitutional in violation of the seperation of Powers Doctrine.

The claim was sufficiently Plead and Evidence was presented at the hearing, The Question of Law is clear That three (3) branches of Government cannot participate in drafting and enacting statutes.

Therefore, this court erred in holding the claim to be without merits.

## ARGUMENTS
### I.

> Whether the Court of Criminal
> Appeals erred in holding that
> Appellant failed to suffici-
> ently plead facts as required
> in Rule 32.3 and 32.6(b) Ala.
> R.Crim.P. to entitle him to
> relief on his claim of Ineffec-
> tive Assistance of counsel?

The Court of Criminal Appeals in it's memorandum opinion
of August 24, 2007, after quoting the standard governing claims
of Ineffective Assitance of counsel, as set out in <u>Strickland</u>
<u>V. Washington,</u> 466 U.S. 668 (1984), held:

> " If assuming that every factual alle-
> gation in Conrad's Rule 32 Petition
> is true, Conrad has failed to plead
> facts suggesting that counsel's per-
> formance was deficient. Because his
> Ineffective Assistance of counsel
> claims are nothing more than bare
> allegations, the Circuit Court
> correctly concluded that Conrad
> failed to sufficiently plead facts,
> as required in Rule 32.3 and 32.6(b)
> Ala. Code 1975 (sic), entitling
> him to relief. "

(See Mem.op. pg.23)

Appellant contends that the court has overlooked the
facts of record and misapplied the law governing review of the
trial court's order denying relief on this claim.

Initially, it should be noted that the trial court conduc-
ted and Evidentiary Hearing on the merits of Appellant's claims
of Ineffective Assistance of counsel. Therefore, the trial court
conceded that Appellant met his burden of pleading as required
by Rule 32.3 and 32.6(b) Ala.R.Crim.P. See <u>Poole V. State,</u> 2007
Ala.Crim.App. Lexis 87

The Court of Criminal Appeals was required to determine
whether the Circuit Court correctly applied <u>Strickland V.</u>
<u>Washington,</u> to the merits of Conrad's Ineffective Assistance
of counsel claim, as the Circuit Court's order denying Conrad's
Petition addresses the merits of Conrad's Ineffective Assistance

of counsel claims. (See C.R. 196-206)

Appellant adopts his arguments in his original brief regarding his claim of Ineffective Assistance of counsel. (See original brief pg. 6-25) and maintains that the Circuit court abused it's discretion in denying relief on Appellanst's Ineffective Assistance of counsel claims, where Appellant presented evidence that his counsel deficient performance prejudice his defense within the meaning of Strickland V. Washington, supra.

Accordingly, this court should withdraw it's original opinion and issue a new opinion addressing the merits of Conrad's claims and upon review reverse the judgment of Circuit Court denying relief on Appellant's  Ineffective Assistance of counsel claims.


                              II.
              Whether the court of Criminal Appeals
              erred in holding that Appellant's
              claims of Ineffective Assistance of
              Appellate counsel was not raised in the
              Rule 32 Petition and thus precluded
              from review?

Appellant argues that the Court of Criminal Appeals overlooked the facts of record and apparently misapprehended Conrad's claims in holding:

              " Conrad further contends that he was
              denied the Effective Assistance of
              Appellate counsel. However, because
              this claim was not included in Con-
              rad's petition, it's not properly
              before this court for review. "

(See Mem.op. pg.2-3)


The record before the court clearly shows that Conrad raised the claims of Ineffective Assistance of Appellate Counsel in his Rule 32 Petition. (C.R. 8)

Pleaded in his amended claims in the Circuit Court. (C.R. 118); presented at the evidentiary Hearing. (R. 8) and further was ruled upon by the trial court in it's order denying the Petition. (C.R. 205)

Therefore, this claim is properly before the court for review and not precluded. See Ray V. State, 830 So.2d 477,479 (Ala.Crim.App. 2002)

Appellant adopts his arguments presented in his original brief with respect to this claim.

(See original brief pg.26)

Appellant maintains that had Appellate counsel raised the issues on Direct Appeal there's a reasonable probability the results would have been different. Strickland, supra.

### III.

Whether the Court of Criminal Appeals
erred in holding that Appellant fail to
offer evidence in support of his claim
of     Newly Discovered Evidence?

With respect to this claim, the Court of Criminal Appeals held:

> " Conrad's claim is nothing more than an
> attack on the admissibilty of Forensic
> evidence. Therefore, Conrad's claim does
> not constitute Newly Discovered Evid-
> ence, nor does it satisfy the require-
> ments of Rule 32.1(e) Ala.R.Crim.P. "

Initially, Appellant argues that the Circuit Court in it's order denying relief on this claim, did not hold that Conrad fail to meet the Rule 32.1(e), but rather held that the claimwas without merits. (C.R. 205) Therefore the Court of Criminal Appeals erred in raising the defense Sua Sponte. see Exparte Clemons, 2007 Ala. Lexis 78

Appellant adopts his claim as set out in his Petition, (C.R. 120-121), and as presented at the Evidentiary Hearing (R. 35-40), and maintains that the trial court abused his discration in denying Relief on his Newly Discovered evidence claim. see Farris V. State, 890 So.2d 188 (Ala.Crim.App. 2003)

### IV.

Whether the Court of Criminal Appeals
erred in holding, that Appellant's claim
that his Indictment is void because it
was obtained pursuant to an unconstit-
utional statute, is without merits?

The Court of Criminal Appeals in it's memorandum opinion
of August 24,2007, held:

> " Although the Alabama Law Institute may have draf-
> ted the state's capital murder statute the statute
> was enacted by the Alabama Legislature. The fact that
> individuals from all three branches of govern-
> ment may have served on a body that drafted this
> legislation does not constitute a violation of the
> Separation of Powers doctrine. Likewise, such
> action does not render Conrad's Indictment void."

(Mem.op. pg.4)

Appellant contends that the Court of Criminal Appeals
concedes that the praent Alabama Death Penalty Statute was draft-
ed by Alabama LAw Institute, but asserts since the statute was
enacted by the Alabama Legislature, it does not violate the
Separation of Powers doctrine.

Appellant adopt his arguments on this claim as set out
in his original brief. (See Appellant's brief pg.27-29)

The Separation of Powers doctrine, which the United States
Supreme Court first set out in the landmark case of <u>Marbury</u>
<u>V. Madison</u>, 1 Cranch 137, 5 U.S. 137, 2 L.ed 60 (1803), is incor-
porated in Ala. Const. 1901, see Art III.§42 and 43, which
provides:

> Section 42 reads:
> " The power of the government of the State
> of Alabama shall be divided into three
> distinct departments, each of which shall
> be confided to a separate body of magis-
> try, to wit: those which are ligislative,
> to one; those which are executive, to
> another, and those which are judicial, to
> another."

> Section 43 reads:
> " In the government of this State, except in
> the instances in this constitution herein-
> after expressly directed or permitted,

> the legislative department shall never exercise the
> executive and judicial powers, or either of them;
> the executives shall never exercise the legislative
> and judicial powers, or either of them; the Judicial
> shall never exercise the legislative and executive
> powers, or either of them; to the end that it may
> be a government of laws and not of men. "

In the instant case, because each branch of the Government participated in writing the current Alabama Death Penalty statute the statute is void in violation of the separation of powers doctrine and Conrad's indictments thereunder cannot be a legal cause of conviction.

### CONCLUSION

Based on the foregoing, Appellant request that this court grant rehearing, and after further review, reverse the judgment of the circuit court and/or such other relief, as justice requires in this case.

Respectfully Submitted,

Robert Thomas Conrad
226791 E1-12A
Holman Unit 3700
Atmore, Al.
      36503-3700

## CERTIFICATE OF SERVICE

I hereby certify that I have this _18_ day of September 2007, served a copy of the foregoing on the Appellee, by placing a copy of the same in the U.S. mail, postage prepaid and properly addressed as follows:

Beth Slate Poe
Assistant Attorney General
11 South Union St.
Montgomery, Al.
            36130-0152

Robert Thomas Conrad

9.

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

Lane W. Mann
 Clerk
Gerri Robinson
 Assistant Clerk



P. O. Box 301555
Montgomery, AL 36130-1555
(334) 229-0751
Fax (334) 229-0521

September 28, 2007

**CR-05-1913**

Robert Thomas Conrad v. State of Alabama   (Appeal from Enterprise Division, Coffee
Circuit Court: CC01-179.60; CC01-180.60)

## NOTICE

You are hereby notified that on September 28, 2007 the following action was taken in the
above referenced cause by the Court of Criminal Appeals:

Application for Rehearing Overruled.

**Lane W. Mann, Clerk**
**Court of Criminal Appeals**

cc: Hon. James M. "Mickey" Counts, Circuit Clerk
 Robert T. Conrad, Pro Se
 Beth Slate Poe, Asst. Atty. Gen.



STATE'S
EXHIBIT
N
PENGAD 800-631-6989

Poe
97374

In The Alabama Supreme Court

S.Ct. No._____

Ex parte Robert T. Conrad
( In Re Robert T. Conrad
        Petitioner-Appellant,

Vs.

State of Alabama
        Respondent-Appellee. )

---

On Appeal from the Circuit Court
of Coffee County, Alabama
Case No. CC 01-179.60 & CC-01-180.60

---

Petition For Writ of Certiorari
To The Alabama Court of Criminal Appeals
CR-05-1913



STATE'S
EXHIBIT
O
PENGAD 800-631-6989

Robert T. Conrad
AIS# 226791 E1-12A
Holman Unit 3700
Atmore, Al.
            36503-3700

In The Alabama Supreme Court

Ex parte Robert T. Conrad
               Petitioner,

                                   S.ct. No._____

                                   Crim.App. No. <u>CR-05-1913</u>

               Vs.

State of Alabama
               Respondent.

## Petition for Writ of Certiorari

    To the Honorable Chief Justice and Associate Justices of
the Alabama Supreme Court:

        Comes now your Petitioner, Robert T. Conrad, pro se,
in the above styled cause, and hereby pursuant to Rule 39 of
the Alabama Rules of Appellate Procedure, moves this honorable
court to issue a Writ of Certiorari to the Alabama Court of
Criminal Appeals, and as grounds therefore, submits the
following:

        1. Petitioner, Robert T. Conrad was indicted by a Coffee
County grand jury on May 31, 2001 on charges of capital murder
and robbery first degree pursuant to §13A-5-40-(a)(2) and §13A-
8-41(a)(1) Ala. Code 1975.

        On September 27, 2002, a jury returned a verdict find-
ing Petitioner guilty as charged, and on the same day, Petitioner
was sentenced to life without parole and life, respectively.

        2. Petitioner's conviction and sentences was affirmed
on Direct Appeal, a Certificate of Judgment was issued on January
16, 2004. See <u>Ex parte Conrad,</u> 899 So.2d 318 (Ala. 2004)

        3. On January 7, 2005, Conrad filed a Petition for Postco-
nviction relief pursuant to Rule 32 Ala.R.Crim.P., after an
Evidentiary Hearing, the trial court denied the Petition on
March 17, 2006.

        4. On August 24 , 2007 the Alabama Court of Criminal
Appeals affirmed the judgment of the trial court. An Application
for Rehearing was overruled on September 28, 2007.

        5. A copy of opinions of the Alabama Court of Criminal
Appeals is attached herto as exhibit I and II.

6. Pursuant to Rule 39(d)(5)(A) (ii) A.R.A.P., I, Robert T. Conrad verify the following is a verbatim copy of the Statement of Facts presented to the Court of Appeals in his Application for Rehearing:

   This Appeal is from the Circuit Court of Coffee County Alabama, Jeff W. Kelley, Judge, denial of a Rule 32 Petition.
   On September 27, 2002, Conrad was convicted of capital murder pursuant to 13A-5-40-(a)(2) Ala. Code 1975 and robbery first degree pursuant to 13A-8-41(a)(1) Ala. Code 1975 (C. 4). Conrad was sentenced to serve a term of life without parole on the capital conviction and life on the robbery conviction. (C. 4)
   On October 24, 2003, the Alabama Court of Criminal Appeals affirmed the convictions and sentences by a memorandum opinion (footnote 1.) see Conrad V. State, 897 So.2d 124 (Ala.Crim.App. 2003) A Certificate of Judgment was issued on January 16, 2004. (C.12)
   On January 7, 2005, Conrad filed a Petition for Post-conviction relief in the Circuit Court of Coffee County Alabama pursuant to rule 32 A.R.Cr.P. (C. 1-84) Conrad amended his Petition at least two times. (C. 214-125) In his Petition and Amendments, Conrad asserted as grounds for relief:

   1. **Denial of Effective Assistance of Counsel at trial.**
   2. **Denial of Effective Assistance of Counsel on Direct Appeal.**
   3. **The court was without Jurisdiction to render judgment or to impose sentence.**
   4. **The sentence imposed exceeds the maximum authorized by law, or is otherwise not authorized by law. (C. 8, 1-84, 150-154)**

   After receiving responses from the District Attorney and appointing counsel to represent Conrad, on December 2, 2005, the Court conducted an Evidentiary Hearing. (C. 182) (footnote 2.)
   On March 17, 2006, the trial issued its order denying the Petition. (C. 182-206)

---

1. Conrad requests that this court take judicial notice of the record on Direct Appeal.

---

2. The Evidentiary Hearing transcript is included in the record on Appeal, reference to that record will be designated "R".

On March 31, 2006, Conrad filed a Motion to Alter, Amend or Vacate the Judgment. (C. 209-212)

On April 28, 2006, the court denied the Motion. (C 213)

Thus this Appeal ensues.

The following facts were adduced at the Evidentiary Hearing on the Rule 32 Petition. With the agreement of the trial court and counsel, the testimony at the Hearing was limited to "the issues that have been presented in the Petition and responses." (R. 6-7)

Conrad testified in his own behalf that he was represented at trial by Mr. Al Smith and Mr. Gary Bradshaw. (R. 8) Conrad testified that he should have been charged with robbery in the third degree instead of first degree because there was no violence involved in the offense. (R. 9-11) Conrad opined that his counsel should have filed an objection on that basis before the trial began. (R. 12)

Conrad testified that his counsel should have objected to the "oath not being administered to the venire prior to the vior dire examination by the court and counsel." (R 13)

Conrad further complained that counsel failed to object on the basis that the prosecutor's name was not endorsed on the Indictment as required by section 12-16-205 of the Code of Alabama (1975). (R. 14)

Conrad also complained that trial counsel was ineffective for failing to object to the basis that the judge swore in the jury instead of the Circuit Court claerk. (R. 15)

Conrad alleged that counsel was ineffective for failing "to know the applicable law to file a motion to dismiss the Indictment pursuant to Rule 15.3 A.R.CR.P. on grounds that he Indictment was void [because] it failed to allege" the aggravating circumstances. (R. 16)

Conrad alleged that his Indictment was void because the capital murder statue was drafted by the Alabama Law Institute, which was comprised of individuals from all three (3) branches of Government. He contends that the drafting of the law in that manner violated the Separation of Powers doctrine. (R. 18-19)

Conrad testified that counsel was ineffective for failing to file a Pretrial Motion to dismiss the second count of the Indictment, which charged first degree robbery based on double jeopardy. He stated that the robbery upon which the second count

was based was also part of the capital murder charge alleging murder and robbery. (R. 10-21) He asserted on cross examination that, **"the elements of robbery first degree is (sic) causing physical harm. There was no physical harm caused on Mr. Grimes."** (R. 40) During cross examination of Conrad, the District Attorney explained that there were two victims and that the robbery underlying the capital murder count was a separate robbery from the one alleged in count two, and thus, there was no double jeopardy issue. (R. 53)

Conrad alleged that counsel was ineffective for failing to object to erroneous jury instruction on corroborated testimony of a co-defendant found at page 1448 of the trial transcript. (R. 22) He also alleged counsel was ineffective for failing to object to the Indictment based on it being returned pursuant to the Alabama Constitution (1901). **"Which was established to promote white supremacy and disenfranchise African Americans ."** (R. 24) On cross examination, Conrad agreed that he opted to give any testimony on this claim for the trial court to consider. (R. 54)

In reference to one of his two amended Petitions, Conrad alleged that counsel failed to move for a mistrial or continuance based on prosecutor's failure to turn over exculpatory evidence to defense counsel. (R. 28) He testified that he found out after trial **"that the Enterprise Police Department had documents that this robbery of a toy store was about to occur before it did occur. And he also had a list of names of individuals that knew about this incident going to happen."** (R. 28-29) When trial court asked Conrad how he was prejudiced by this, Conrad replied "it mislead the jury, which led them to come back with a different verdict." (R. 29)

In reference to his second amended claim, Conrad testified that the trial counsel failed to seek recusal of trial judge on the basis that the trial court commented before trial that **"criminal defendant's who enter a guilty plea or who are convicted of an act of violence, some active time in custody will be ordered served."** (R. 29-30) He also alleged that the trial court demonstrated the appearance of impartiality by the questions asked of the prosecution's witness. (R. 30)

On cross examination, Conrad said that the judge was "impartial" when he called defense counsel, Mr. Bradshaw and Mr. Al Smith and Mr. **"Cracker Waldrop"** " **Tom, Dick and Harry."** (R. 57) The assistance District Attorney said in response to that, **"Your Honor, I have no personal knowledge of him actually referring to them as that."** (R. 57) When the assistance District Attorney asked Conrad how that would indicate bias even if it were true, Conrad replied, **"It can show in some form or fashion within there trial strategy, there was some friendship to show favor was between the judge and the attorney's."** (R. 57) Conrad testified that counsel had a conflict of interest based on Mr. Bradshaw being a member of the same church as the victim, Ms. Dennis. (R. 31) Conrad alleged that counsel may have been a Sunday School teacher or director of the children involved and that his defense was adversely affected during the trial to the prejudice of Conrad, **"as counsel had to choose between respect and loyalty to the victim's family and diligently representing [Conrad] as his client."** (R. 31)

Conrad alleged at the Hearing tat counsel was ineffective for failing to object to the admission of the bullet taken from his arm on the grounds that it was the product of an illegal search and seizure. (R. 32) Conrad said he was never presented with a search warrant for the bullet and that it was taken from his arm without his consent while he was

sedated and/or under anesthesia. (R. 32) He stated that though counsel filed two pretrial
motions to suppress, counsel should have objected to admission of the bullet at trial. (R.
31-33) The trial court attempted to clarify Conrad's allegation by stating that, "So the
contention is not that there was any kind of search warrant telling them to take it
out of his body but that the District Attorney issued a subpoena and got that as part
of his records and as a result of a subpoena?" (R. 59-60) The trial court noted that the
"District Attorney issued a subpoena on My 23, 2001, to the keeper of records at
Medical Center Enterprise requesting all medical records, lab reports, blood, hair,
saliva and bodily fluids of Petitioner." (R. 61) Conrad said that it was his position that
the District Attorney could not subpoena and get the evidence of the bullet without
"some paperwork" from the trial court.
(R. 61)

    The assistance District Attorney responded:

> The record reflect that the issue of suppression as to
> That very evidence was raised, preserved for Appeal.
> As a matter of fact, there was a standing objection in
> Reference to numerous motions for suppression that
> Have been made that was renewed throughout the trial
> Process, and this was part of it.

(R.62)

    Conrad testified that counsel was ineffective because he fail to advise him that
he could testify in his own behalf at trial. (R. 33) Then Conrad admitted that he discussed
with his attorneys the possibility of his testifying at trial. (R. 33) Conrad stated that "it
was discussed, and it was stated that I would [testify] if the co-defendant was to get
up on the stand and testify. And that did occur . The co-defendant got on the stand
and testified, and there was no more talking of me getting on the stand." (R. 33)
Conrad alleged that he wanted to testify. (R. 33) On cross examination, Conrad again
denied that he did not testify because he himself thought it best not to testify after
discussing with counsel the ramifications of his testifying. (R. 63)

    Conrad also alleged there was an actual conflict of interest because, "during the
trial, the trial court forced defense counsel, Al. Smith, to become a witness in the
case" when "counsel was forced to reveal the identity of the source that gave him
information regarding the District Attorney's office withholding of exculpatory and
impeachment evidence." (R. 35)

    Conrad's final claim is that he offered testimony at the Hearing that the testimony at
the trial from the employee at the Department of Forensic Science was inadmissible
because the Department had not been accredited as the time of the trial. (R. 36) Conrad
claimed upon cross examination that the experts from the Department of Forensic
Science testified that they were accredited. (R. 66)

Robert T. Conrad

7. Petitioner alleges as grounds for the issuance of the Writ of the following:

(1.) The first basis for the issuance of this Petition for Writ of Certiorari, is encompassed in Rule 39(a)(1) (D.) A.R.A.P., In that the decision of the Alabama Court of Criminal Appeals, Is in direct conflict with prior decisions of the United States Supreme Court, the Alabama Supreme Court and the Court of Appeals very own prior decisions on the same or similar points of law.

The Court of Criminal Appeals in it's Memorandum Opinion of August 24, 2007, after quoting the standard governing claims of Ineffective Assistance of Counsel, as set out in Strickland V. Washington, 466 U.S. 668 (1984), held:

"If assuming that every factual allegation in Conrad's Rule 32 Petition is true, Conrad has failed to plead facts suggesting that counsel's performance was deficient. Because his Ineffective Assistance claims are nothing more than bare allegations, the Circuit Court correctly concluded that Conrad failed to sufficiently plead facts as required in Rule 32.3 and 32.6(b) Ala.Code 1975 (sic), entitling him to relief,"

(See exhibit I, attached hereto pg. 2-3)

Petitioner contends that the Court of Criminal Appeals overlooked the facts of record which resulted in that court misapplying of review of Petitioner's Ineffective Assistance of Counsel claims.

Initially, it should be noted that the trial court conducted an Evidentiary Hearing on the merits of Petitioner's Ineffective Assistance of Counsel claims, thus, conceding that Petitioner met his burden of pleading as required by Rule 32.3 and Rule 32.6(b) Ala.R.Crim.P. See Poole V. State, 2007 Ala.Crim.App. Lexis 87

In this case, Conrad raised a litany of claims of Ineffective Assistance of Trial and Appellate Counsel and at the Evidentiary Hearing presented evidence in support of the claims. At the conclusion of the hearing the trial court issued a lengthy detailed order making findings of facts as to each claim presented. (C.R. 196-206)

Therefore, the Court of Criminal Appeals was required to determine whether the Circuit Court abused it's discretion in denying relief on the merits of Petitioner's Ineffective Assistance of Counsel claims and whether the Circuit Court correctly found that Petitioner failed to meet his burden under Strickland V. Washington, 466 U.S. 668 (1984)

The Court of Criminal Appeals erroneously held that "Assuming that every factual allegation in Conrad Rule 32 Petition is true, Conrad has failed to plead facts suggesting that counsel's performance was deficient."

Petitioner avers that the record directly contradicts this holding.

In Strickland, Supra the Supreme Court held that a convicted defendant is required to show that counsel performance was deficient and the deficient performance prejudiced his defense.

In this case Conrad presented several claims that meets this standard. (See the record at C.R. 7-8, 12-58, 115-122, 150-154, which he adopts and makes a part hereof) further Conrad in his brief to the Court of Criminal Appeals specifically set out his claims and argued that he was entitled to relief under Strickland. (see original brief pg. 6-25) For example, without waiving any claims, Conrad presented evidence that the record was silent as to the oath being administered to the venire.

In Ex parte Hamlett, 815 So.2d 499 (Ala. 2000), this court faced with an identical issue, noted when the record silent remand is required to determine whether the venire had been properly sworn.

Conrad also presented evidence that the trial court erroneously instructed the jury as to uncorroborated testimony, when the court told the jury that:

> "you should never convict any defendant upon the
> supported testimony of such witness, unless you
> believe their testimony could be truthful beyond
> a reasonable doubt."

(R. 1448)

Petitioner avers that, it does not matter whether the jury believes the witness, the disposition question is whether the witness testimony was corroborated as required by Section 12-21-222 Code of Ala. 1975.

Conrad also presented evidence that during his trial it was discovered that the prosecution had withheld a report regarding an internal investigation by the Enterprise Police Department. After an In Camera review of the report, the trial court found that the report was with-held; that it contained exculpatory and impeachment evidence, but held that since the witness was now present and allowed to testify, Petitioner was not prejudiced.

Counsel did not move for a continuance or a mistrial based on the prosecution Brady violation.

Conrad further presented evidence, that the District Attorney has issued an unauthorized subpoena to have evidence removed from Petitioner's person while Petitioner was in the hospital having surgery; that the trial judge throughout his trial, as well as prior to trial displayed bias and partiality, by commenting on the evidence and placing himself in prosecution's role.

Petitioner argues that the Court of Criminal Appeals holding is in direct conflict with Strickland V. Washington, and it progenies.

> (2.) The second basis for this Petition for writ of Certiorari is that the
> holding of the Court of Criminal Appeals is direct contradictions of
> the record and is in conflict with prior decisions of the U.S. Supreme
> Court, this court and the Court of Appeals very own prior decisions.

The Court of Criminal Appeals in it's Memorandum Opinion held:
> " Conrad further contends that he was denied Effective
> Assistance of Appellate Counsel. However, because
> this claim was not included in Conrad's Petition, it's
> not properly before this court for review."

(See exhibit I, pg. 2-3)

Conrad argues that the record clearly contradicts, the Court of Appeals holding, as it claim that Conrad raised the claim in his Petition. (C.R. 8); pleaded the claim in his amended claims in the Circuit Court. (C.R. 118); presented the claims at the Evidentiary Hearing . (R. 8) and the claim was ruled upon by the trial court in its order denying the Petition. (C.R. 205)

Therefore, the Court of Criminal Appeals erred in holding that Conrad's claim of Ineffective Appellate Counsel **"Is not properly before the court for review."** See Ray V. State, 880 So.2d 477, 479 (Ala.Crim.App. 2002)

Conrad maintains that his Direct Appeal counsel failure to raise meritorious issues that was preserved at trial on Appeal was deficient performance that prejudiced the fairness of Conrad's Appeal, and had counsel raised the issues as cited above, there's a reasonable probability the outcome of Conrad's Appeal would have been different. See Strickland, supra.

> **(3.)As a third basis for this Petition for Writ of Certiorari, the Court of Criminal Appeals holding that Conrad failed to offer evidence in support of his claim of Newly Discovered Evidence, is in direct contradiction of the record and further conflicts with prior holdings of this court and the Court of Appeals.**

With respect to Conrad's claim that Newly Discovered Evidence exist that the Alabama Department of Forensic Science was not accredited at the time it's employees presented testimony and scientific evidence during Conrad's trial, Conrad presented evidence that he had just recently discovered the lack of accreditation; that the evidence presented by Department was material and crucial in his case and that the lack of accreditation rendered the evidence inadmissible under the Draubert V. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) (See original brief pg. 29-31)

Conrad argues that the Circuit Court in its order denying relief on this claim, did not hold that Conrad fail to meet the Rule 32.1(e) Ala.R.Crim.P. standard, but ruled that the claim was without merits.

Therefore, the Court of Criminal Appeals erred in Sua sponte asserting a defense. See Ex parte Clemons, 2007 Ala. Lexis 78.

Conrad maintains that the trial court abused its discretion in denying relief on this claim. See Farris V. State, 890 So.2d 188 (Ala.Crim.App. 2003)

> **( 4.) As a fourth basis for this Petition for Writ of Certiorari is that the Court of Criminal Appeals holding on Conrad's Separation of Powers claim is in direct conflict with prior holdings of the U.S. Supreme Court; this court and the Court of Appeals very own prior holdings on the same or similar points of Law.**

The Court of Criminal Appeals in it's Memorandum Opinion of August 24, 2007, held:

> **"Although the Alabama Law Institute may have drafted the state's capital murder statute the statute was enacted by the Alabama**

> Legislature. The fact that individuals from all three branches of
> government may have served on a body that drafted this Legisl-
> ation doe's not constitute a violation of the Separation of Powers
> doctrine. Likewise, such action doe's not render Conrad's Indictment
> void."

(See exhibit I pg. 4)

Conrad contends that the Court of Criminal Appeals concedes that the present
Alabama Death Penalty Statute was drafted by Alabama Law Institute, but asserts since
the statute was enacted by the Alabama Legislature, it doe's not violate the Separation of
Powers doctrine.

Conrad adopts his arguments on this claim as set out in his original brief. (See
Appellant's Brief pg. 27-29)

The Separation of Powers doctrine, which the United States Supreme Court first
set out in the landmark case of Marbury V. Madison, 1 Cranch 137, 5 U.S. 137, 2 L.ed 60
(1803), is incorporated in Ala. Const. 1901 see Art III. Sec.42 and 43, which provides:

**Section 42 reads:**
> " The power of the government of the State of Alabama
> shall be divided into three distinct departments, each
> of which shall be confided to a separate body of
> magistracy, to wit: those which are legislative, to one;
> those which are executive, to another, and those which
> are judicial, too another."

**Section 43 reads:**
> " In the government of this State, except in the instances
> in this constitution hereinafter expressly directed or
> permitted, the legislative department shall never
> exercise the executive and judicial powers, or either of
> them; the executive shall never exercise the legislative
> and judicial powers or either of them; the judicial shall
> never exercise the legislative and executive powers, or
> either of them; to the end that it may be a government
> of laws and not of men."

In the instant case, because each branch of the government participated in writing
the current Alabama Death Penalty statute the statute is void in violation of the
Separation of Powers doctrine and Conrad's indictments thereunder cannot be a legal
cause of conviction.

Therefore, the Court of Criminal Appeals holding conflicts with the above cited
authorities.

Wherefore, premises considered Petitioner, respectfully request that after a
preliminary examination, the Writ of Certiorari be granted and that this Honorable Court
proceed under it's rules to review the matters complained of, and to reverse the judgment

of the Court of Criminal Appeals, and for such other relief as to which Petitioner maybe entitled to in this proceeding.

Respectfully Submitted,

Robert Thomas Conrad
AIS# 226791 E1-12A
Holman Unit 3700
Atmore, Al. 36503-3700

## Certificate of Service

I hereby certify that I have this 9th day of October 2007, served a copy of the foregoing on all parties, by placing a copy of the same in the U.S. mail postage prepaid and properly addressed as follows:

Lane W. Mann, Clerk
Alabama Court of Criminal Appeals
P.O. Box 301555
Montgomery, Al. 36130-1555

Beth Slate Poe
Assistance Attorney General
11 South Union St.
Montgomery, Al. 36130

Robert Thomas Conrad

CONRAD J. STATE CR-05-1913

## Exhibits

Exhibit I - Court of Criminal Appeals Memorandum Opinion of August 24, 2007

Exhibit II - Opinion Overruling Application for Rehearing

Robert Thomas Conrad
AHS# 226791 - E1-12-A
Holman Unit 3700
Atmore, Al.
36503-3700

LEGAL MAIL ONLY

Robert Slate top.
Assistant Atty. General
11 South Union St.
Montgomery, Al.
36130

# IN THE SUPREME COURT OF ALABAMA

97374
Poe



November 9, 2007

**1070087**

Ex parte Robert Thomas Conrad.  PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS  (In re: Robert Thomas Conrad v. State of Alabama)  (Enterprise Division of Coffee Circuit Court: CC01-179.60; CC01-180.60; Criminal Appeals : CR-05-1913).

## CERTIFICATE OF JUDGMENT

## Writ Denied

The above cause having been duly submitted, IT IS CONSIDERED AND ORDERED that the petition for writ of certiorari is denied.

LYONS, J. -  See, Stuart, Bolin, and Murdock, JJ., concur.  Cobb, C.J., recuses herself.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court of Alabama, do hereby certify that the foregoing is a full, true and correct copy of the instrument(s) herewith set out as same appear(s) of record in said Court.

Witness my hand this _9th_ day of _November, 2007_

*Robert G. Esdale, Sr.*
**Clerk, Supreme Court of Alabama**



STATE'S
EXHIBIT
P

/bb

Westlaw.

210 Fed.Appx. 895, 2006 WL 3635410 (C.A.11 (Ala.))
**(Cite as: 210 Fed.Appx. 895)**

**H**
Jenkins v. Bullard
C.A.11 (Ala.),2006.
This case was not selected for publication in the
Federal Reporter.Please use FIND to look at the ap-
plicable circuit court rule before citing this opinion.
Eleventh Circuit Rule 36-2. (FIND CTA11 Rule
36-2.)
United States Court of Appeals,
Eleventh Circuit.
Louis JENKINS, Petitioner-Appellant,
v.
Stephen BULLARD, Respondent-Appellee.
**No. 06-10646**
**Non-Argument Calendar.**

Dec. 13, 2006.

**Background:** Following appellate affirmance of
his state court conviction of manslaughter and his
habitual offender sentence of life imprisonment,
and rejection of his petition for writ of certiorari to
state supreme court, petitioner sought federal writ
of habeas corpus. The District Court for the South-
ern District of Alabama denied petition, and peti-
tioner, acting pro se, sought certificate of appealab-
ility (COA).

**Holdings:** The Court of Appeals granted COA in
part, and held that:
(1) petitioner exhausted available state court remed-
ies with respect to his claims involving state trial
court actions, and
(2) petitioner's claim of ineffective assistance of
state court appellate counsel was procedurally barred.

Vacated and remanded in part, affirmed in part.

West Headnotes

**[1] Habeas Corpus 197 🗝🗝366**

197 Habeas Corpus
   197I In General

      197I(D) Federal Court Review of Petitions
by State Prisoners
        197I(D)4 Sufficiency of Presentation of
Issue or Utilization of State Remedy
           197k362 Particular Remedies or Pro-
ceedings
             197k366 k. Direct Review; Appeal
or Error. Most Cited Cases
Habeas petitioner exhausted available state court
remedies with respect to his claims involving state
trial court actions in his manslaughter prosecution,
where state appellate court affirmed petitioner's
conviction after reviewing record and issues raised
in brief submitted by appellate counsel in support
of her motion to withdraw, and state supreme court
rejected petitioner's petition for writ of certiorari.
28 U.S.C.A. § 2254.

**[2] Habeas Corpus 197 🗝🗝774**

197 Habeas Corpus
   197III Jurisdiction, Proceedings, and Relief
      197III(C) Proceedings
        197III(C)4 Conclusiveness of Prior De-
terminations
           197k765 State Determinations in Fed-
eral Court
             197k774 k. Waiver of Rights; Ex-
haustion, Bypass, or Default. Most Cited Cases
For purposes of determining whether habeas peti-
tioner's claims relating to state trial court actions in
his manslaughter prosecution were barred on basis
of failure to exhaust available state court remedies,
state appellate court judgment affirming conviction
amounted to binding determination that issues
raised by appellate counsel in her brief in support
of her motion to withdraw were meritless, and that
there was no error of any kind in the record. 28
U.S.C.A. § 2254.

**[3] Habeas Corpus 197 🗝🗝422**

197 Habeas Corpus
   197I In General



STATE'S
EXHIBIT
PENGAD 800-631-6989

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

210 Fed.Appx. 895
210 Fed.Appx. 895, 2006 WL 3635410 (C.A.11 (Ala.))
(Cite as: 210 Fed.Appx. 895)

1971(D) Federal Court Review of Petitions by State Prisoners
    1971(D)6 State's Reliance on or Waiver of Procedural Bar or Want of Exhaustion
        197k422 k. State Court Decision on Procedural Grounds, and Adequacy of Such Independent State Grounds. Most Cited Cases
Habeas petitioner's claim of ineffective assistance of appellate counsel in his state court manslaughter prosecution was procedurally barred, where petitioner's state court post-conviction petition alleging appellate counsel's ineffectiveness was summarily dismissed on state procedural grounds for lack of specificity, state appellate court affirmed dismissal of state post-conviction petition on grounds of state law procedural bar, state court's specificity rules were firmly established and regularly followed by state courts, and petitioner failed to demonstrate cause for default, resulting prejudice, or miscarriage of justice resulting from application of procedural bar. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2254; Rules Crim.Proc., Rules 32.3, 32.6(b), 32.7(d).

**[4] Habeas Corpus 197 ⬅401**

197 Habeas Corpus
    1971 In General
        1971(D) Federal Court Review of Petitions by State Prisoners
            1971(D)5 Availability of Remedy Despite Procedural Default or Want of Exhaustion
                197k401 k. In General. Most Cited Cases

**Habeas Corpus 197 ⬅405.1**

197 Habeas Corpus
    1971 In General
        1971(D) Federal Court Review of Petitions by State Prisoners
            1971(D)5 Availability of Remedy Despite Procedural Default or Want of Exhaustion
                197k405 Cause or Excuse
                    197k405.1 k. In General. Most Cited Cases

Habeas petitioner failed to demonstrate cause for his procedural default of his ineffective assistance of appellate counsel claim in state court, resulting prejudice, or miscarriage of justice resulting from application of procedural bar, where petitioner did not reference in his petition any objective factors indicating that he was impeded from complying with state procedural rules or suggest that he was actually innocent or that outcome of his habeas claims would be different but for procedural bar. 28 U.S.C.A. § 2254.

**[5] Habeas Corpus 197 ⬅406**

197 Habeas Corpus
    1971 In General
        1971(D) Federal Court Review of Petitions by State Prisoners
            1971(D)5 Availability of Remedy Despite Procedural Default or Want of Exhaustion
                197k405 Cause or Excuse
                    197k406 k. Ineffectiveness or Want of Counsel. Most Cited Cases
Fact that federal habeas petitioner was proceeding pro se, without more, was insufficient to establish cause for his procedural default of particular claims in state court. 28 U.S.C.A. § 2254.

*896 Louis Jenkins, Bessemer, AL, pro se.
*897 Marc Alan Starrett, Office of the Attorney General, Montgomery, AL, for Appellee.

Appeal from the United States District Court for the Southern District of Alabama. D.C. Docket No. 04-00644-CV-BH-B.

Before BLACK, CARNES and BARKETT, Circuit Judges.

**1 PER CURIAM:

Louis Jenkins, an Alabama prisoner proceeding *pro se,* appeals the district court's denial of his federal habeas petition, which he filed pursuant to 28 U.S.C. § 2254. In his petition, Jenkins raised the following claims: (1) the trial court erred by over-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

210 Fed.Appx. 895
210 Fed.Appx. 895, 2006 WL 3635410 (C.A.11 (Ala.))
**(Cite as: 210 Fed.Appx. 895)**

ruling his objection to the autopsy photographs; (2) the trial court erred by denying his motion for directed verdict of acquittal based on an improper jury instruction regarding intent; (3) the trial court erred by denying his motion for judgment of acquittal based on insufficiency of the evidence; and (4) his appellate counsel was ineffective because she failed to raise claims that Jenkins's trial counsel was ineffective and failed to raise various trial level claims. The district court found that Jenkins's claims were procedurally defaulted.

We granted a certificate of appealability on the following issues:
> (1) Whether the district court erred by finding that appellant's claims relating to the alleged errors committed by the state trial court were procedurally barred?
>
> (2) Whether the district court erred by finding that appellant's claims of ineffective assistance of appellate counsel were procedurally barred?

Before filing a federal habeas action, a state prisoner must exhaust state court remedies, either on direct appeal or in a state post-conviction motion. 28 U.S.C. § 2254(b), (c). Exhaustion presents a mixed question of law and fact, subject to *de novo* review. *Fox v. Kelso,* 911 F.2d 563, 568 (11th Cir.1990). To exhaust state remedies, the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. *Castille v. Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 1060, 103 L.Ed.2d 380 (1989). The Supreme Court has held that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese,* 541 U.S. 27, 32, 124 S.Ct. 1347, 1351, 158 L.Ed.2d 64 (2004).

Generally, when a petitioner has failed to exhaust state remedies, the district court should dismiss the petition without prejudice to allow exhaustion. *Rose v. Lundy,* 455 U.S. 509, 519-20, 102 S.Ct. 1198, 1203-04, 71 L.Ed.2d 379 (1982). Where, however, the claim presented is procedurally defaulted, the court need not dismiss to permit exhaustion but should dismiss on procedural default grounds. *Snowden v. Singletary,* 135 F.3d 732, 736 (11th Cir.1998). The issue of whether a habeas petitioner's claims are subject to the doctrine of procedural default is a mixed question of law and fact that we review *de novo. Judd v. Haley,* 250 F.3d 1308, 1313 (11th Cir.2001).

Generally, procedural default can arise in two ways: (1) when the state court applies a state procedural rule to bar consideration of the federal claim; or (2) when the petitioner never raised the claim in state court, but it is obvious that the state courts would hold it to be procedurally barred if it were raised now. *Bailey v. Nagle,* 172 F.3d 1299, 1302-03 (11th Cir.1999). Federal habeas courts are precluded**898 from deciding the merits of a claim that is procedurally barred, except in two circumstances. One is where the petitioner makes a showing of adequate cause and actual prejudice, and the other is where the failure to consider the claim would result in a fundamental miscarriage of justice. *Coleman v. Thompson,* 501 U.S. 722, 749-50, 111 S.Ct. 2546, 2564-65, 115 L.Ed.2d 640 (1991); *Marek v. Singletary,* 62 F.3d 1295, 1301-02 (11th Cir.1995).

### A. Claims Involving State Trial Court Actions

**\*\*2 [1]** The State argues, and the district court concluded, that Jenkins' trial level claims were procedurally barred because he failed adequately to raise those claims during his direct appeal to the Alabama Court of Criminal Appeals or, after that court affirmed his conviction, in his certiorari petition to the Alabama Supreme Court.

After Jenkins was convicted of manslaughter and sentenced as a habitual offender to life imprisonment, the trial court appointed counsel to represent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

210 Fed.Appx. 895                                                                           Page 4
210 Fed.Appx. 895, 2006 WL 3635410 (C.A.11 (Ala.))
**(Cite as: 210 Fed.Appx. 895)**

him on appeal. Counsel filed a brief with the Alabama Court of Criminal Appeals pursuant to *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), asserting that there were no meritorious issues to raise on appeal and requesting that the court allow her to withdraw as counsel. As the *Anders* procedure requires, counsel did note in her brief that there were several possible issues that might be raised, including: (1) the trial court's denial of Jenkins' motion for directed verdict based on the jury instruction regarding intent; (2) the trial court's overruling of Jenkins' objection to the introduction of autopsy photos; and (3) the trial court's denial of Jenkins' motion for judgment of acquittal based on the sufficiency of the evidence. Nevertheless, the brief stated that those issues did not have arguable merit. Under the *Anders* procedure if the reviewing court agrees with counsel, and after conducting an independent review of the record, concludes that there are no issues of arguable merit, it may grant counsel's motion to withdraw and either dismiss the appeal or affirm the judgment. *Id.* at 744, 87 S.Ct. at 1400. That is what the Court of Criminal Appeals did.

[2] The Court of Criminal Appeals judgment affirming Jenkins' conviction and sentence reflects a decision by it that the issues flagged by Jenkins' counsel in her *Anders* brief were meritless, and that there was no error of any kind in the record. What the Seventh Circuit said in a different but related context makes sense here as well:

It makes no difference that his claim had been presented in his direct appeal in an *Anders* brief on the basis of which we dismissed the appeal as frivolous. Presented is presented, whether in an *Anders* brief or in any other format; and if an appeal is dismissed as frivolous, that is a binding adjudication that the claims presented in it had no merit at all, rather than an invitation to refile.

*White v. United States,* 371 F.3d 900, 902-03 (7th Cir.2004). There was no failure to exhaust in the Court of Criminal Appeals, and when Jenkins unsuccessfully sought certiorari review in the

Alabama Supreme Court on the ground that the Court of Criminal Appeals decision was error, he completed the exhaustion of his state court remedies insofar as his trial level claims are concerned.

### B. Claims of Ineffective Assistance of Appellate Counsel

[3] Jenkins' claims that his appellate counsel rendered ineffective assistance is a different story. Those claims were not, and of course could not have been, raised during the direct appeal. However, they *899 could be raised in Jenkins' state collateral proceedings.

**3 Alabama Rule of Criminal Procedure 32.1 permits defendants who have been convicted of a criminal offense to petition for relief from their convictions on the basis of one of six specified grounds. Ala. R.Crim. P. 32.1. Rule 32.3 provides that "[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petition to relief." *Id.* R. 32.3. Likewise, Rule 32.6(b) provides that

[t]he petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.

*Id.* R. 32.6(b). To underscore this final point, Rule 32.7(d) allows the state collateral court to dismiss the petition "[i]f the court determines that the petition is not sufficiently specific." *Id.* R. 32.7(d).

Jenkins filed a Rule 32 petition in Alabama state court claiming that his appellate counsel was ineffective for not arguing at the direct appeal Jenkins' ineffective assistance of trial counsel claims, but the state collateral court dismissed the petition under Rule 32.7(d) because it did not meet the specificity requirements of Rules 32.3 and 32.6(b). The Court of Criminal Appeals affirmed the dismissal

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

210 Fed.Appx. 895                                                                      Page 5
210 Fed.Appx. 895, 2006 WL 3635410 (C.A.11 (Ala.))
(Cite as: 210 Fed.Appx. 895)

of Jenkins' Rule 32 petition, concluding that the collateral court did not err in summarily dismissing the petition under Rule 32.7(d) because Jenkins' petition was procedurally barred for not including specific facts which entitled him to relief, and in any case the petition lacked merit.

Federal courts do not review a procedurally defaulted state collateral claim in a § 2254 petition if the petitioner failed to substantially comply with a state procedural rule, *Lee v. Kemna,* 534 U.S. 362, 375-76, 382, 122 S.Ct. 877, 885, 889, 151 L.Ed.2d 820 (2002), the last state court to review the claim clearly and expressly stated that its judgment rested on the petitioner's failure to substantially comply with the state procedural rule, and the rule was firmly established and regularly followed when applied by the state court. *Judd,* 250 F.3d at 1313; *Hill v. Jones,* 81 F.3d 1015, 1022 (11th Cir.1996). Under this criteria, the district court was correct to dismiss Jenkins' claim as procedurally defaulted.

First, Jenkins' Rule 32 petition, on its face, did not comply with the specificity requirements of Rules 32.3 and 32.6(b). For an ineffective-assistance-of-appellate-counsel claim, Jenkins was required to allege specific facts that his appellate counsel's performance was deficient-that counsel's decisions were so unreasonable that they could not be considered part of the appellate strategy-and that the deficiency made a difference to the outcome of the proceeding. See *Strickland v. Washington,* 466 U.S. 668, 687, 689, 694, 104 S.Ct. 2052, 2064-65, 2068, 80 L.Ed.2d 674 (1984).

**4 Jenkins' only allegations in this Rule 32 petition were that his appellate counsel was ineffective for not raising the following errors or omission of his trial counsel during the direct appeal:
[That] (1) [t]rial counsel improperly argued her motion for judgment of acquittal in that, she did not argue that the petitioner was either guilty of murder or not guilty of murder; (2) [t]rial counsel argued in her motion for judgment of acquittal, insufficiency of the evidence regarding the petitioner's intent, but did not argue any other

grounds; (3) [t]rial counsel failed to argue ... that there was a fatal variance, between evidence *900 presented at trial, and the charge as embra[c]ed in the indictment, because all evidence presented at trial pointed to Assault in the First Degree, where the victim's death was due to a delay in medical attention; (4) [t]rial counsel failed to argue ... that the State had failed to prove the [e]lement of [i]ntent, which is a[s]tatutory [e]lement of the offense of [m]urder ...; (5) [t]rial counsel failed to object to all of the State[']s requested jury charges where the requested jury charges were a misstatement of the law; (6) [t]rial counsel should not have asked for certain jury charges, where the requested jury charges were aimed at a defense for murder as opposed to a[n] acquittal of the murder charge due to a failure of the state to prove the intentional murder statue; [and] (7) [t]rial counsel was ineffective for [failing] to move for a judgment in favor of the petition on the grounds that the State had failed to meet its burden of proof to the petitioner's guilt on murder.

However, all of these claims were made, or are otherwise derivative of claims already made, by Jenkins in the direct appeal brief he filed, in addition to the *Anders* brief, with the Alabama Court of Criminal Appeals. The Court of Criminal Appeals, in turn, denied as meritless each of same claims Jenkins asserted that his trial counsel was ineffective. Thus, as a factual matter, Jenkins' appellate counsel could not have been ineffective since each of his trial level claims was preserved, and disposed of, on direct appeal.

To the extent, however, that Jenkins' Rule 32 petition did in fact allege that his counsel on direct appeal was ineffective, his claims amount to no more than a "bare allegation that a constitutional right has been violated and mere conclusions of law." Ala. R.Crim. P. 32.6(b). That is, Jenkins has done no more than claim that his trial counsel committed error X, and because of error X, counsel was ineffective. These are exactly the kinds of nonspecific

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

210 Fed.Appx. 895                                                                                    Page 6
210 Fed.Appx. 895, 2006 WL 3635410 (C.A.11 (Ala.))
**(Cite as: 210 Fed.Appx. 895)**

allegations that the Alabama procedural rules prohibit. Jenkins' petition lacks a "clear and specific statement" of the essential facts, as it does not disclose, among other deficiencies, what other grounds his trial counsel should have included in the motion for judgment of acquittal; what jury charges his trial counsel should have objected to as misstatements of the law; what jury charges his trial counsel should not have asked for; and what prejudice he suffered by these alleged errors given that he was acquitted of the murder charge.

**\*\*5** As to the second part of the procedural default rule, the Court of Criminal Appeals clearly and expressly stated that its judgment affirming the dismissal of Jenkins' Rule 32 petition rested on his failure to comply with Rules 32.3 and 32.6(b). Quoting for the lower court's order dismissing the petition, the Court of Criminal Appeals wrote that Jenkins' "claims fail to meet the requirements of specificity in pleadings as required by Rule 32.3 and further stressed by Rule 32.6(b)." "Because ... Jenkins's claims were ... procedurally barred," the Court of Criminal Appeals concluded, "the [lower] court did not err in summarily denying the petition pursuant to Rule 32.7(d)."

As to the third part of the procedural default rule, Rules 32.3 and 32.6(b) have been firmly established and regularly followed by the Alabama courts. The Court of Criminal Appeals has consistently affirmed, as it did with Jenkins, lower court decisions that have summarily dismissed Rule 32 petitions that do not include specific facts which would entitle the petitioner to collateral relief. *See, e.g., Shaw v. State,* 949 So.2d 184, ---- (Ala.Crim.App.2006); *Tubbs v. State,* 931 So.2d 66, 68 (Ala.Crim.App.2005); **\*901**Boyd *v. State,* 913 So.2d 1113, 1126-32 (Ala.Crim.App.2003); *Chambers v. State,* 884 So.2d 15, 18-19 (Ala.Crim.App.2003).

[4][5] Finally, Jenkins has not demonstrated that there was cause for, and that he was prejudiced by, his procedural default, or that the procedural bar, if applied here, would work a fundamental miscar-

riage of justice. Jenkins did not include in his § 2254 petition any objective factors that would indicate that he was impeded from complying with Rules 32.3 and 32.6(b). *See Henderson v. Campbell,* 353 F.3d 880, 892 (11th Cir.2003) ("[t]o establish 'cause' for procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court"). The fact that he is proceeding *pro se* with his § 2254 petition is insufficient to establish cause.

Nor did Jenkins suggest in his § 2254 petition that he is actually innocent of the crime for which he has been convicted or that, but for the procedural bar, the outcome of his habeas claims would be different, which are threshold requirements of the fundamental-miscarriage-of-justice and cause-and-prejudice exceptions to the procedural default rule, respectively. *See Henderson,* 353 F.3d at 892 ("[a] fundamental miscarriage of justice occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent"; "[t]o establish 'prejudice,' a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different"). Accordingly, with all the exceptions inapplicable here, the district court did not err in dismissing Jenkins' ineffective-assistance-of-appellate-counsel claims as procedurally defaulted.

**\*\*6 VACATED AND REMANDED IN PART, AFFIRMED IN PART.**

C.A.11 (Ala.),2006.
Jenkins v. Bullard
210 Fed.Appx. 895, 2006 WL 3635410 (C.A.11 (Ala.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.